# PARTICIPATION AGREEMENT

### Oakhay Creek Prospect
### Smith County, Mississippi

**THIS PARTICIPATION AGREEMENT** (the "**Agreement**"), dated effective as of the 1st day of March, 2013 (the "**Effective Date**"), is entered into by and between the following (sometimes herein referred to singularly as a "**Party**" or collectively as the "**Parties**"):

**SKLAR EXPLORATION COMPANY L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("**SEC**" or "**Operator**");

**SKLARCO L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President & Chief Operating Officer, David A. Barlow ("**Sklarco**");

**JJS WORKING INTERESTS LLC,** a Texas limited liability company, whose address is 4295 San Felipe, Suite 207, Houston, Texas 77027, represented herein by Houston Bulldog Capital Management, LLC, its duly authorized Manager, represented here by Justin Simons, in his capacity as the duly authorized Manager of Houston Bulldog Capital Management, LLC ("**JJS**");

**RESOURCE VENTURES, LLC,** a Colorado limited liability company, whose address is 8369 SouthPark Lane, Suite B, Littleton, Colorado 80120, represented herein by its General Manager, Mark A. Arnold ("**Resource**");

**KUDZU OIL PROPERTIES, LLC,** a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("**Kudzu**");

**PICKENS FINANCIAL GROUP, LLC,** a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, Texas 75231-2417, represented herein by its Vice President, Michael K. Pickens ("**Pickens**");

**TAUBER EXPLORATION & PRODUCTION CO.,** a Texas corporation, whose address is 55 Waugh Drive, Suite 601, Houston, Texas 77007-5837, represented herein by its President, Richard E. Tauber ("**Tauber**");

**GARDNER ENERGY CORPORATION,** a Texas corporation, whose address is 952 Echo Lane, Suite 380, Houston, Texas 77024, represented herein by its President, David Gardner ("**Gardner**");

**LANE OIL & GAS CORPORATION,** a Texas corporation, whose address is 952 Echo Lane, Suite 380, Houston, Texas 77024, represented herein by its President, David Gardner ("**Lane**")

**STATESIDE OIL, INC. ,** a Texas corporation, whose address is 952 Echo Lane, Suite 380, Houston, Texas 77024, represented herein by its Vice President, David Gardner ("**Stateside**")

**GOOLSBY INTERESTS, LLC,** a Texas limited liability company, whose address is 110 Sibelius Lane, Houston, Texas 77079, represented herein by its Sole Member, James W. Goolsby ("**Goolsby**")

**NORTHSTAR PRODUCING I, LP**, a Texas partnership, whose address is 204 Cross Creek Drive, Bossier City, Louisiana 71101, represented herein by its Partner, Kurt Ley ("**Northstar**")

**WIMBERLEY PARK LTD.**, a Texas limited partnership, whose address is 5308 Ashbrook, Houston, Texas 77081, represented herein by Wimberley Park Inc., its Managing General Partner, represented herein by Peter M. Way, in his capacity as the President of Wimberley Park Inc. ("**Wimberly**")

**CTM 2005, LTD.**, a Texas limited partnership, whose address is 55 Waugh Drive, Houston, Texas 77007, represented herein by McCord Investments, Inc., its General Partner, represented herein by Charles T. McCord III, in his capacity as the President of McCord Investments, Inc. ("**CTM**");

(hereinafter Kudzu, Pickens, Tauber, Gardner, Lane, Stateside, Goolsby, Northstar, Wimberley and CTM are sometimes referred to collectively as the "**Participants**" or individually as a "**Participant**");

## W I T N E S S E T H:

**WHEREAS**, Sklarco acquired from Maple Leaf Exploration LP ("**Maple Leaf**") a twenty-five percent (25%) undivided interest (the "**Maple Leaf Interest**") in and to the oil, gas and other mineral leases (hereinafter sometimes referred to singularly as a "**Lease**" or collectively as the "**Leases**") through that certain Assignment of Oil, Gas and Other Mineral Leases dated effective January 1, 2013 by and between Maple Leaf, as Assignor and Sklarco, as Assignee, and recorded in the Chancery Clerk's office of Smith County, Mississippi in Book 517, Page 142, (the "**Maple Leaf Assignment**") a copy of which is attached hereto as Exhibit "A" and made a part hereof, covering lands located in Smith County, Mississippi, lying within a contract area (the "**Contract Area**"), which itself is lying within an area of mutual interest (the "**AMI**"), as described on Exhibit "C-1" attached hereto that replaces Exhibit A to the Joint Operating Agreement in its entirety, generally known as the Oakhay Creek Prospect (the "**Prospect**"); and

**WHEREAS**, subject to a Reversionary Back-In Working Interest described in Section 1.2 below, Sklarco desires to sell to the Participants, all of Sklarco's right, title and interest in and to the Maple Leaf Interest;

**WHEREAS**, Participants desire to acquire all of Sklarco's right, title and interest in and to the Maple Leaf Interest; and

**WHEREAS**, the Parties desire to enter into this Agreement to set forth the terms and conditions under which they sell or acquire, as the case may be, the Maple Leaf Interest in the Leases.

**NOW, THEREFORE**, the Parties agree as follows:

## Article I. Purchase And Sale And Development Commitments

### Section 1.1. Leases

Concurrent with the execution of this Agreement, Participants shall tender to SEC in the following proportions an amount equal to twenty-five percent (25%) of Five Hundred Fifty-Two Thousand Nine Hundred Thirty-Five and 25/100 Dollars ($552,935.25), (48.571429% of which shall be distributed to Sklarco, 3.809524% distributed to JJS, and 47.619048% distributed to Resource), representing the total lease bonus, brokerage, geological, geophysical and other costs associated with the Prospect incurred through January 15, 2013 (collectively, the "**Prospect Fee**"):

| Participant | Proportion | Amount |
|---|---|---|
| Kudzu | 2.0000% | $ 11,058.71 |
| Pickens | 6.5000% | $ 35,940.78 |
| Tauber | 6.5000% | $ 35,940.79 |
| Gardner | 1.5000% | $ 8,294.03 |
| Lane | 1.0000% | $ 5,529.35 |
| Stateside | 1.5000% | $ 8,294.03 |
| Goolsby | 1.0000% | $ 5,529.35 |
| Northstar | 1.0000% | $ 5,529.35 |
| Wimberly | 2.0000% | $ 11,058.71 |
| CTM | <u>2.0000%</u> | <u>$ 11,058.71</u> |
| | 25.0000% | $ 138,233.81 |

Participants acknowledge and agree that they shall each be responsible for their proportionate share of actual costs incurred after January 15, 2013.

For and in consideration of the Prospect Fee, and the reservation of the Reversionary Back-In Working Interest described below, the receipt and sufficiency of which are hereby acknowledged, Sklarco hereby sells and agrees to assign unto the other Participants, in the same proportions shown above, all of its right, title and interest in and to the Maple Leaf Interest by means of the form of assignment attached hereto as Exhibit "B." Each assignment of interest shall be (i) made without warranty of title, express or implied, not even for return of the Prospect Fee, except Sklarco agrees to warrant title against all defects arising out of claims by Sklarco or of persons claiming by, through or under Sklarco, (ii) subject to the terms of the Leases including Lessors' Burdens, (iii) subject to Maple Leaf's reserved Overriding Royalty Interest, and (iv) subject to this Agreement and the JOA described in Section 2.1 of this Agreement.

### Subsection 1.1(a).  Overriding Royalty Interests

Each Participant expressly acknowledges and agrees that Maple Leaf has excluded and excepted from the Maple Leaf Assignment, and retained unto itself, an overriding royalty interest in each of the Leases (also as provided in the Joint Operating Agreement) including extension and renewals of such Leases, equal to the amount by which 25% of the oil and gas in, under or produced from lands covered by such Lease exceeds the royalty, overriding royalties and other payments burdening such production, subject to being proportionately reduced if the Lease covers less than the entire mineral fee estate in such lands or the Maple Leaf Assignment covers only an undivided interest in such Lease.  The Maple Leaf Interest in each of the Leases is delivered subject to a 25% total burden, delivering to the Participants collectively a 75% net revenue interest in the Maple Leaf Interest in each Lease, proportionately reduced as herein set forth and subject to the RBWI in Section 1.2.  It is expressly understood and agreed that the Maple Leaf Assignment is intended to assign only Maple Leaf's after payout working interest and the Maple Leaf Assignment shall not cover or affect and there is expressly excluded herefrom all of overriding royalty interests of Maple Leaf excepted from and reserved in any and all prior assignments of interests in the Leases as the same may appear in the Records of the Office of the Chancery Clerk of Smith County, Mississippi.

### Section 1.2.  Reversionary Back-In Working Interest

As further consideration for the sale described in Section 1.1 above, upon reaching Prospect Payout (as defined below), an undivided twenty-five percent (25%) of the interest of each of the Participants in the Leases shall automatically and permanently vest in Sklarco, JJS, and Resource proportionately as shown on the revised and restated Exhibit "A" to the JOA attached hereto as Exhibit "C-1," thereby proportionately reducing each Participant's interest (the "**Revisionary Back-In Working Interest**" or "**RBWI**").  At Sklarco's written request, the Participants will assign said interest unto Sklarco, JJS, and Resource after Prospect Payout, including, without limitation, a like interest from and after the effective date of Prospect Payout in the Leases, the Initial Well and any subsequent wells, the proceeds from the sale of oil, gas, and all other products produced or derived from any and all such wells, and in any easements, rights of way, personal property, equipment, facilities, and pipelines associated with such wells.

"**Prospect Payout**" is defined on a Prospect (not well-by-well) basis as the first day of the calendar month following the month in which a Participant's share of the total and cumulative revenue received from the sale of oil, gas and other hydrocarbons and minerals produced, saved and sold from the AMI, equals that Participant's share of the total and cumulative costs and expenses incurred by that Participant relating to the AMI. For purposes of Prospect Payout, (i) the total and cumulative revenue shall consist of the Participant's share of all sales proceeds received for all oil, gas and other hydrocarbons and minerals produced, saved and sold from the AMI, and (ii) the total and cumulative cost incurred shall include the Participant's share of all royalty and overriding royalty payments, severance, ad valorem, production and other taxes applicable to production and not measured by the Participant's other income, the Prospect Fee, all lease acquisition and maintenance costs, all seismic survey and data costs, geological and geophysical evaluation costs, all costs for site preparation, drilling, reworking, deepening, sidetracking, logging, stimulation, testing, equipping, operating, plugging and abandoning the Initial Well and all other wells within the AMI, and the cost of all surface damages, pipelines, gathering and other production handling facilities related thereto.  Before Prospect Payout has occurred, the status of the Prospect is sometimes hereinafter referred to as **Before Prospect Payout ("BPPO")**.  Once Prospect Payout has occurred, the status of the Prospect is sometimes hereinafter referred to as **After Prospect Payout ("APPO")**.

## Article II.  Operations

### Section 2.1.  JOA

SEC is hereby designated Operator of all wells drilled within the Prospect or land outlined therewith.  Except as otherwise provided in this Agreement, all operations within the Contract Area shall be governed by the joint operating agreement (the "**JOA**"), covering the Contract Area attached hereto as

Exhibit "C." The Parties hereby adopt and ratify the JOA with their execution of this Agreement. In the event of a conflict between this Agreement and the JOA, this Agreement shall govern and control. The Participant's expressly acknowledge and agree that the **Initial Well** (the "**Johnson 20-2 #1**" or "**Johnson Well**"), as defined in Article VI.A. of the JOA, has already been drilled and resulted in a dry hole. As a result of drilling the Johnson Well, Articles XVI.A. and J. are hereby deleted from the JOA, all references to "**OCS First Well**" in Article XVI.C, D. and F. shall be changed to "**Initial Well**", and in Article XVI.F. "Sklar Exploration Company L.L.C." shall be substituted for "Maple Leaf LP". Under the terms of this Agreement, the Initial Well shall be the Sklar Exploration Company L.L.C.: Jamie Dixon Kilgore et al 21-7 #1 well with a bottom hole location being approximately 2,399 feet from the North Line and 2,133 feet from the East Line of Section 21, Township 10 North, Range 15 West, Smith County, Mississippi. The proposed total depth of this well is 14,000 feet or a depth sufficient to test the Hosston Formation. The AFE for this well is attached as Exhibit "D." The Parties agree to execute the AFE concurrent with their execution of this Agreement. The Revised and Restated Exhibit "A" to the JOA is attached hereto as Exhibit "C-1."

## Article III.  Miscellaneous

### Section 3.1.  AMI

The Parties have formed an AMI under the terms contained in Article XV.S of the JOA covering the lands within the red outline on the plat attached hereto as Exhibit "A" which shall govern the acquisition by any of the Parties of any oil and gas lease or oil and gas interest (as defined in the JOA) covering lands located within the Contract Area and AMI created under this Agreement. If a lease is acquired from a lessee, the term "**Lessor's Burden**" as used in paragraph 1.1, above, shall include any overriding royalty interest, production payment or other burden created by any lessee of the lease prior to its acquisition or reserved in the assignment of the lease to the Party which acquires the lease. The Reversionary Back-In Working Interest described in Section 1.2 of this Agreement shall also burden new leases acquired under the AMI.

### Section 3.2.  Information

Upon execution of this Agreement by all of the Parties, any Participant may request and shall be entitled to a copy of all of the Leases and any other title information such as any abstracts of title or drill-site title opinions for the drill-site tract of and drilling unit for the initial well, along with drilling and completion and log reports for the initial well and any subsequent wells.

### Section 3.3.  Confidentiality

The Parties agree to keep confidential and not disclose any information about this Prospect, not already disclosed or of public record, to third parties except as required by statutes, regulations, or court order for so long as this Agreement is in effect, but not to exceed five (5) years from the date of this Agreement.

### Section 3.4.  Closing

Closing shall occur by mail or by such other means and at such time and place to which the Parties mutually agree.

### Section 3.5.  Binding On Successors And Assigns

This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

### Section 3.6.  Entire Agreement

This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties, or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement. Except as otherwise expressly provided herein, no amendment or modification of this Agreement shall be effective unless set forth in writing and signed by a duly authorized officer of each and all of the Parties.

### Section 3.7.  Severability

The invalidity of any one or more of the provisions of this Agreement does not affect the remaining portions of this Agreement, and in case of any such invalidity, this Agreement should be construed as if the invalid provision(s) had not been inserted.

**Section 3.8. Notices**

All notices between the Parties authorized or required by any of the provisions of this Agreement, unless otherwise expressly provided, shall be given in writing by email or facsimile or regular or express mail, addressed to those of the Parties to whom the notice is given at the email addresses or fax telephone numbers and addresses set forth in the Revised and Restated Exhibit "A" to the JOA. Any of the Parties may change its designated email address, fax telephone number and address at any time, and from time to time, by giving written notice thereof to the other Parties.

**Section 3.9. Headings for Convenience**

The article, section, and subsection headings used in this Agreement are inserted for convenience only and shall not be regarded in construing this Agreement.

**Section 3.10. Time**

Time is of the essence hereunder.

**Section 3.11. Governing Law**

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Mississippi.

**Section 3.12. Relationship Of The Parties**

Liability of the Parties hereto shall be several and not joint or collective. Each Party shall make its own elections under this Agreement and shall be responsible only for its obligations as herein set out. It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a mining or other partnership, joint venture or association between the Parties.

**Section 3.13. Assignability**

The Parties to this Agreement may assign all or part of their rights and obligations hereunder, provided, however, that any such assignment must be made subject to the terms and conditions of this Agreement and the JOA.

**Section 3.14. Term**

This Agreement shall remain in full force and effect as between the Parties until expiration of the last lease jointly owned by them, or any combination of the Parties, covering any part of the AMI.

**Section 3.15. Counterparts**

This Participation Agreement may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

**Section 3.16. Sophisticated Investors**

By execution of this Agreement, the Participants confirm that they have a working knowledge of the oil and gas industry and that each has thoroughly investigated its participation in the Prospect. Each Participant acknowledges that it is a sophisticated investor and it (or its owner) has a financial net worth in excess of one million dollars. Each Participant represents it can afford to take the financial risk associated with participation in an oil and gas drilling venture, including without limitation, loss of not just its share of the Prospect Fee and drilling advance, but also its share of all other costs incurred in operations on the Prospect. EACH PARTICIPANT ACKNOWLEDGES THERE CAN BE NO ASSURANCE THAT OIL AND/OR GAS WILL BE FOUND, OR IF FOUND, THAT IT CAN BE PRODUCED IN PROFITABLE QUANTITIES. Each Participant further confirms and accepts that the offering of the interest herein purchased has not been registered pursuant to the Federal Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission promulgated or issued thereunder or the securities laws of the States of Louisiana or Texas, or any other state. Each Participant has hereby agreed to participate in the Prospect for investment purposes only, and not with a view to or for sale in connection with any distribution of interests in the Prospect within the meaning of said laws.

THUS DONE AND SIGNED This *7th* day of *June* , 2013, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By _____

David A. Barlow
President - Chief Operating Officer

SKLARCO L.L.C.

By _____

David A. Barlow
President - Chief Operating Officer

JJS WORKING INTERESTS, LLC
    By Houston Bulldog Capital Management, LLC, its
    Manager

By _____

    Justin Simons, Manager of Houston
    Bulldog Capital Management, LLC

RESOURCE VENTURES, LLC

By _____

    Mark A. Arnold
    General Manager

KUDZU OIL PROPERTIES, L.L.C.

By _____

    R. Nash Neyland
    Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By _____

    Michael K. Pickens
    Vice President

TAUBER EXPLORATION & PRODUCTIN CO.

By _____

    Richard E. Tauber
    President

GARDNER ENERGY CORPORATION

By _____

    David Gardner
    President

THUS DONE AND SIGNED This 7ᵗʰ day of June, 2013, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By_____
David A. Barlow
President - Chief Operating Officer

SKLARCO L.L.C.

By_____
David A. Barlow
President - Chief Operating Officer

JJS WORKING INTERESTS, LLC
By Houston Bulldog Capital Management, LLC, its
Manager

By_____
Justin Simons, Manager of Houston
Bulldog Capital Management, LLC

RESOURCE VENTURES, LLC

By_____
Mark A. Arnold
General Manager

KUDZU OIL PROPERTIES, L.L.C.

By_____
R. Nash Neyland
Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By_____
Michael K. Pickens
Vice President

TAUBER EXPLORATION & PRODUCTIN CO.

By_____
Richard E. Tauber
President

GARDNER ENERGY CORPORATION

By_____
David Gardner
President

THUS DONE AND SIGNED This 7th day of June_____, 2013, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By_____

David A. Barlow
President - Chief Operating Officer

SKLARCO L.L.C.

By_____

David A. Barlow
President - Chief Operating Officer

JJS WORKING INTERESTS, LLC
    By Houston Bulldog Capital Management, LLC, its
    Manager

By_____

Justin Simons, Manager of Houston
Bulldog Capital Management, LLC

RESOURCE VENTURES, LLC

By_____

Mark A. Arnold
General Manager

KUDZU OIL PROPERTIES, L.L.C.

By_____

~~R. Nash Neyland~~   Wirt A Yerger III
~~Executive Vice President~~   manager

PICKENS FINANCIAL GROUP, LLC

By_____

Michael K. Pickens
Vice President

TAUBER EXPLORATION & PRODUCTIN CO.

By_____

Richard E. Tauber
President

GARDNER ENERGY CORPORATION

By_____

David Gardner
President

DC

THUS DONE AND SIGNED This 7ᵗʰ day of June____, 2013, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By_____
    David A. Barlow
    President - Chief Operating Officer

SKLARCO L.L.C.

By_____
    David A. Barlow
    President - Chief Operating Officer

JJS WORKING INTERESTS, LLC
    By Houston Bulldog Capital Management, LLC, its
    Manager

By_____
    Justin Simons, Manager of Houston
    Bulldog Capital Management, LLC

RESOURCE VENTURES, LLC

By_____
    Mark A. Arnold
    General Manager

KUDZU OIL PROPERTIES, L.L.C.

By_____
    R. Nash Neyland
    Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By_____
    Michael K. Pickens
    ~~Vice~~ President

TAUBER EXPLORATION & PRODUCTIN CO.

By_____
    Richard E. Tauber
    President

GARDNER ENERGY CORPORATION

By_____
    David Gardner
    President

DC

THUS DONE AND SIGNED This 7th day of June , 2013, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By_____
        David A. Barlow
        President - Chief Operating Officer

SKLARCO L.L.C.

By_____
        David A. Barlow
        President - Chief Operating Officer

JJS WORKING INTERESTS, LLC
        By Houston Bulldog Capital Management, LLC, its
        Manager

By_____
        Justin Simons, Manager of Houston
        Bulldog Capital Management, LLC

RESOURCE VENTURES, LLC

By_____
        Mark A. Arnold
        General Manager

KUDZU OIL PROPERTIES, L.L.C.

By_____
        R. Nash Neyland
        Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By_____
        Michael K. Pickens
        Vice President

Signature / Acknowledgement Pages to that certain
Participation Agreement dated effective as of the 1st day
of March, 2013, by and between Sklar Exploration
Company, LLC, et al; pertaining to the Oakhay Creek
Prospect, Smith County, Mississippi.

TAUBER EXPLORATION & PRODUCTIN CO.

By_____
        Richard E. Tauber
        President

GARDNER ENERGY CORPORATION

By_____
        David Gardner
        President

THUS DONE AND SIGNED This 7th day of June, 2013, but effective as of the Effective Date.

SKLAR EXPLORATION COMPANY L.L.C.

By_____
David A. Barlow
President - Chief Operating Officer

SKLARCO L.L.C.

By_____
David A. Barlow
President - Chief Operating Officer

JJS WORKING INTERESTS, LLC
By Houston Bulldog Capital Management, LLC, its Manager

By_____
Justin Simons, Manager of Houston
Bulldog Capital Management, LLC

RESOURCE VENTURES, LLC

By_____
Mark A. Arnold
General Manager

KUDZU OIL PROPERTIES, L.L.C.

By_____
R. Nash Neyland
Executive Vice President

PICKENS FINANCIAL GROUP, LLC

By_____
Michael K. Pickens
Vice President

TAUBER EXPLORATION & PRODUCTIN CO.

By_____
Richard E. Tauber
President

GARDNER ENERGY CORPORATION

By_____
David Gardner
President

LANE OIL AND GAS CORPORATION

By_____
     David Gardner
     President


STATESIDE OIL, INC.

By_____
     David Gardner
     Vice President


GOOLSBY INTERESTS, LLC


By_____
     Jim Goolsby
     Sole Member


NORTHSTAR PRODUCING


By_____
     Kurt Ley
     Member


WIMBERLY PARK LTD.
By:  Wimberley Park Inc.

By_____
     Peter Way
     President


CTM 2005, LTD.
By:  McCord Investments, Inc.


By_____
     Charles T. McCord, III
     President


Attachments

| Exhibit "A": | Maple Leaf Assignment |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | JOA |
| Exhibit "C-1": | Revised and Restated Exhibit A to JOA |
| Exhibit "D": | AFE |

LANE OIL AND GAS CORPORATION

By_____
           David Gardner
           President


STATESIDE OIL, INC.

By_____
           David Gardner
           Vice President


GOOLSBY INTERESTS, LLC


By_____
           Jim Goolsby
           Sole Member


NORTHSTAR PRODUCING


By_____
           Kurt Ley
           Member


WIMBERLY PARK LTD.
By:  Wimberley Park Inc.

By_____
           Peter Way
           President


CTM 2005, LTD.
By:  McCord Investments, Inc.


By_____
           Charles T. McCord, III
           President


Attachments

| | |
|---|---|
| Exhibit "A": | Maple Leaf Assignment |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | JOA |
| Exhibit "C-1": | Revised and Restated Exhibit A to JOA |
| Exhibit "D": | AFE |

DC

LANE OIL AND GAS CORPORATION

By_____
          David Gardner
          President


STATESIDE OIL, INC.

By_____
          David Gardner
          Vice President

GOOLSBY INTERESTS, LLC

By_____
          Jim Goolsby
          Sole Member


NORTHSTAR PRODUCING

By_____
          Kurt Ley
          Member


WIMBERLY PARK LTD.
By: Wimberley Park Inc.

By_____
          Peter Way
          President


CTM 2005, LTD.
By: McCord Investments, Inc.

By_____
          Charles T. McCord, III
          President


Attachments

| | |
|---|---|
| Exhibit "A": | Maple Leaf Assignment |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | JOA |
| Exhibit "C-1": | Revised and Restated Exhibit A to JOA |
| Exhibit "D": | AFE |

DC

LANE OIL AND GAS CORPORATION


By_____
　　　　David Gardner
　　　　President


STATESIDE OIL, INC.


By_____
　　　　David Gardner
　　　　Vice President

GOOLSBY INTERESTS, LLC


By_____
　　　　Jim Goolsby
　　　　Sole Member


NORTHSTAR PRODUCING


By____*Kurt Ley*_____
　　　　Kurt Ley
　　　　Member


WIMBERLY PARK LTD.
By: Wimberley Park Inc.


By_____
　　　　Peter Way
　　　　President


CTM 2005, LTD.
By: McCord Investments, Inc.


By_____
　　　　Charles T. McCord, III
　　　　President


Attachments

Exhibit "A":    Maple Leaf Assignment
Exhibit "B":    Form of Assignment
Exhibit "C":    JOA
Exhibit "C-1":  Revised and Restated Exhibit A to JOA
Exhibit "D":    AFE

LANE OIL AND GAS CORPORATION


By_____
      David Gardner
      President


STATESIDE OIL, INC.


By_____
      David Gardner
      Vice President

GOOLSBY INTERESTS, LLC


By_____
      Jim Goolsby
      Sole Member


NORTHSTAR PRODUCING


By_____
      Kurt Ley
      Member


WIMBERLY PARK LTD.
By: Wimberley Park Inc.

By_____
      Peter Way
      President


CTM 2005, LTD.
By: McCord Investments, Inc.


By_____
      Charles T. McCord, III
      President


Attachments

| | |
|---|---|
| Exhibit "A": | Maple Leaf Assignment |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | JOA |
| Exhibit "C-1": | Revised and Restated Exhibit A to JOA |
| Exhibit "D": | AFE |

LANE OIL AND GAS CORPORATION


By_____
       David Gardner
       President


STATESIDE OIL, INC.


By_____
       David Gardner
       Vice President

GOOLSBY INTERESTS, LLC


By_____
       Jim Goolsby
       Sole Member


NORTHSTAR PRODUCING


By_____
       Kurt Ley
       Member


WIMBERLY PARK LTD.
By: Wimberley Park Inc.


By_____
       Peter Way
       President


CTM 2005, LTD.
By: McCord Investments, Inc.


By_____
       Charles T. McCord, III
       President

*CTM 2005, LTD*
*Charles T. McCord III,*
*President McCord Investments, Inc.*
*General Partner*

Attachments

| | |
|---|---|
| Exhibit "A": | Maple Leaf Assignment |
| Exhibit "B": | Form of Assignment |
| Exhibit "C": | JOA |
| Exhibit "C-1": | Revised and Restated Exhibit A to JOA |
| Exhibit "D": | AFE |

OHC

## ACKNOWLEDGMENTS

STATE OF LOUISIANNA

PARISH OF CADDO

I, *SHERRI H. THIBODEAUX* notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___7th___ day of ___June___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

Sherri H. Thibodeaux, Notary Public # 060494
Bossier Parish, Louisiana
My Commission Expires: _____ My Commission is for Life


STATE OF LOUISIANNA

PARISH OF CADDO

I, *SHERRI H. THIBODEAUX*, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___7th___ day of ___June___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

Sherri H. Thibodeaux, Notary Public # 060494
Bossier Parish, Louisiana
My Commission Expires: _____ My Commission is for Life


STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: _____

## ACKNOWLEDGMENTS

STATE OF LOUISIANNA

PARISH OF CADDO

I, *SHERRI H. THIBODEAUX* notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLAR EXPLORATION COMPANY L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___7th___ day of ___June___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Sherri H. Thibodeaux, Notary Public # 060494
Bossier Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANNA

PARISH OF CADDO

I, *SHERRI H. THIBODEAUX*, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___7th___ day of ___June___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Sherri H. Thibodeaux, Notary Public # 060494
Bossier Parish, Louisiana
My Commission is for Life

STATE OF TEXAS

COUNTY OF HARRIS

I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of JJS WORKING INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the ___24th___ day of ___June___, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My commission expires: ___8-11-13___

MARCIA A. DE LUNA
Notary Public, State of Texas
My Commission Expires
August 11, 2015

STATE OF COLORADO

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as General Manager of RESOURCE VENTURES, LLC, a Colorado limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF MISSISSIPPI

COUNTY OF Madison

I, Pamela F. Sebren, a notary public in and for said County and State, hereby certify that ~~R. Nash Neyland, whose~~ name as ~~Executive Vice President~~ of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

*Wirt A. Yerger III*
*manager*

Given under my hand and notarial seal this the 14 day of June, 2013.

*Pamela F Sebren*
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF COLORADO

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Mark A. Arnold, whose name as General Manager of RESOURCE VENTURES, LLC, a Colorado limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF MISSISSIPPI

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, whose name as Executive Vice President of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _Dallas_

I, _Marilyn L. Fulton_, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as ~~Vice~~ President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 13ᵗʰ day of _June_, 2013.

Marilyn L Fulton
My Commission Expires
06/23/2016

_Marilyn L. Fulton_
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _6-23-16_

**Signature / Acknowledgement Pages to that certain Participation Agreement dated effective as of the 1st day of March, 2013, by and between Sklar Exploration Company, LLC, et al; pertaining to the Oakhay Creek Prospect, Smith County, Mississippi.**

STATE OF TEXAS

COUNTY OF HARRIS

I, MYLA WUNDERLICH, a notary public in and for said County and State, hereby certify Richard E. Tauber, whose name as President of TAUBER EXPLORATION & PRODUCTION COMPANY, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 17th day of JUNE, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

```
MYLA WUNDERLICH
Notary Public, State of Texas
Commission Expires 02-11-2016
```

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that David Gardner, whose name as President of GARDNER ENERGY CORPORATION, a Texas corporation, is signed to the foregoing instrument and who is known to me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that David Gardner, whose name as President of LANE OIL & GAS CORPORATION, a Texas Corporation, is signed to the foregoing instrument and who is known to me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify Richard E. Tauber, whose name as President of TAUBER EXPLORATION & PRODUCTION COMPANY, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the ___ day of _____, 2013.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____



STATE OF TEXAS

COUNTY OF Harris

     I, Jennifer Mrozek, a notary public in and for said County and State, hereby certify that David Gardner, whose name as President of GARDNER ENERGY CORPORATION, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the 26 day of June, 2013.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: March 29, 2014

```
JENNIFER MROZEK
Notary Public, State of Texas
My Commission Expires
March 29, 2014
```

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify David Gardner, whose name as President of LANE OIL & GAS CORPORATION, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the ___ day of _____, 2013.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

        I, _____, a notary public in and for said County and State, hereby certify Richard E. Tauber, whose name as President of TAUBER EXPLORATION & PRODUCTION COMPANY, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the ___ day of _____, 2013.

                                      _____

                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

        I, _____, a notary public in and for said County and State, hereby certify that David Gardner, whose name as President of GARDNER ENERGY CORPORATION, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the ___ day of _____, 2013.

                                        _____

                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF Harris _____

        I, Jennifer Mrozek _____, a notary public in and for said County and State, hereby certify David Gardner, whose name as President of LANE OIL & GAS CORPORATION, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

        Given under my hand and notarial seal this the 2ⱡ day of June _____, 2013.

                                        _____

                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: March 29, 2014



JENNIFER MROZEK
Notary Public, State of Texas
My Commission Expires
March 29, 2014

OC

STATE OF TEXAS

COUNTY OF _Harris_

I, _Jennifer Mrozek_, a notary public in and for said County and State, hereby certify that David Gardner, whose name as Vice President of STATESIDE OIL, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the _2L_ day of _June_, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _Mcd 29, 204_

JENNIFER MROZEK
Notary Public, State of Texas
My Commission Expires
March 29, 2014


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify James W. Goolsby, whose name as Sole Member of GOOLSBY INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Kurt Ley, whose name as Partner, of NORTHSTAR PRODUCING I, LP, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that David Gardner, whose name as Vice President of STATESIDE OIL, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify James W. Goolsby, whose name as Sole Member of GOOLSBY INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF ~~TEXAS~~ LOUISIANA

COUNTY OF BOSSIER PARISH

    I, _____Deborah S. McGrath_____, a notary public in and for said County and State, hereby certify that Kurt Ley, whose name as Partner, of NORTHSTAR PRODUCING I, LP, a ~~MISSISSIPPI~~ limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 19 day of _____June_____, 2013.

_____
NOTARY PUBLIC

DEBORAH S. McGRATH ID# 068259
NOTARY PUBLIC
MY COMMISSION IS FOR LIFE

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

DC

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that David Gardner, whose name as Vice President of STATESIDE OIL, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF Harris

     I, Pamela Bullard, a notary public in and for said County and State, hereby certify James W. Goolsby, whose name as Sole Member of GOOLSBY INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 1 day of July, 2013.

```
PAMELA BULLARD
Notary Public, State of Texas
Commission Expires 04-03-2017
```

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 4-3-17


STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify that Kurt Ley, whose name as Partner, of NORTHSTAR PRODUCING I, LP, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

DC

STATE OF TEXAS

COUNTY OF _Harris_

    I, _Cynthia Maciejewski_ , a notary public in and for said County and State, hereby certify Peter M. Way, whose name as President of Wimberley Park Inc., the Managing General Partner of WIMBERLEY PARK LTD, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 13 day of ___June_____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _3.14.15_

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that Charles T. McCord III, whose name as President of McCord Investments, Inc., the General Partner of CTM 2005, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

DHC

STATE OF TEXAS

COUNTY OF _____

     I, _____, a notary public in and for said County and State, hereby certify Peter M. Way, whose name as President of Wimberley Park Inc., the Managing General Partner of WIMBERLEY PARK LTD, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF Harris

     I, Kim Tonks _____, a notary public in and for said County and State, hereby certify that Charles T. McCord III, whose name as President of McCord Investments, Inc., the General Partner of CTM 2005, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

     Given under my hand and notarial seal this the 19 day of June _____, 2013.

```
KIM E. TONKS
Notary Public, State of Texas
My Commission Expires
April 02, 2017
```

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 4/2/17

## ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES

STATE OF MISSISSIPPI,

COUNTY OF SMITH,

Book 0517 Page 143

    KNOW ALL MEN BY THESE PRESENTS that the following (hereinafter sometimes referred to as "Assignor"):

> MAPLE LEAF EXPLORATION LP, a Texas limited partnership whose address is 200 Crescent Court, Suite 877, Dallas, Texas 75201, represented herein by its duly authorized general partner, MLEGP LC by R. Stewart Campbell, Jr. it's manager ("Maple Leaf");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does, subject to the terms, provisions and exceptions as hereinafter set forth, hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER and DELIVER unto the following (hereinafter sometimes referred to as the "Assignee"):

> SKLARCO L.L.C., a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President-Chief Operating Officer, David A. Barlow ("Sklarco");

all of its undivided 25.0000% after casing point working interest* in all of the oil, gas and mineral leases (the "Leases") described on Exhibit "A" attached hereto and by reference made a part hereof, said Leases covering lands located in Smith County, Mississippi (hereinafter the undivided interest in the Leases is collectively referred to as the "Assigned Interest").

\* As set out and retained in the Joint Operating Agreement ("JOA") referenced below.

TO HAVE AND TO HOLD the Assigned Interest unto Assignee, its successors and assigns, forever, together with all rights, privileges, easements, tenements, hereditaments, improvements, equipment, appurtenances, and the like belonging or appertaining thereto, in accordance with and subject to, and in accordance with, the terms and provisions of this Assignment:

2

1.   This Assignment is made effective as of January 1, 2013 (the **"Effective Date"**).

2.   Assignor excludes and excepts from this Assignment, and retains unto itself, its overriding royalty interest in each of the Leases (also as provided in the Joint Operating Agreement (**"JOA"**)) including extension and renewals of such Leases, equal to the amount by which 25% of the oil and gas in, under or produced from lands covered by such Lease exceeds the royalty, overriding royalties and other payments burdening such production, subject to being proportionately reduced if the Lease covers less than the entire mineral fee estate in such lands or this Assignment covers only an undivided interest in such Lease.  The Assigned Interests in each of the Leases are delivered subject to a 25% total burden, delivering to Assignee a 75% net revenue interest in the Assigned Interests in each Lease, proportionately reduced as herein set forth.  It is expressly understood and agreed that this Assignment is intended to assign only the Assignor's after payout working interest and this Assignment, shall not cover or affect and there is expressly excluded herefrom, all of overriding royalty interests of Maple Leaf excepted from and reserved in any and all prior assignments of interests in the Leases as the same may appear in the Records of the Office of the Chancery Clerk of Smith County, Mississippi.                              Book 0S17 Page 144

3.   The Assigned Interest is assigned herein without limitation as to depth or formation, except as may be provided in any of the Leases and all other instruments of record affecting the Leases (the **"Recorded Instruments"**) or unrecorded instruments expressly described in this Assignment.

4.   This Assignment is made without warranty of title, express or implied, not even for return of the purchase price, except Assignor agrees to warrant title against all defects arising out of claims by Assignor or of persons claiming by, through or under Assignor.  To the extent transferable, Assignor does hereby transfer and convey to Assignee the benefits of and the right to enforce all covenants and warranties which Assignor is entitled to enforce with respect to the Assigned Interest, including without limitation, full substitution and subrogation of all prior rights and warranty, and the benefit of and the right to enforce all rights accruing under applicable statutes of limitation or prescription.

5.   The Assigned Interest is assigned subject to the terms and conditions of the Leases, including the lessor's royalties provided for in each of the Leases.

6.   This Assignment is made subject to the terms and provisions of that certain Joint Operating Agreement (**"JOA"**) dated effective as of June 1, 2011, by and between Sklarco L.L.C, McCombs Energy, Ltd., JJS Working Interests, LLC,  Resource Ventures, LLC, Maple Leaf Exploration LP and Sklar Exploration Company L.L.C., covering the Oakhay Creek Prospect, Smith County, Mississippi, including the rights in extension and renewal leases and includes all of the Oil, Gas and Mineral Leases owned or claimed by Assignor in the prospect lands being Sections 15, 16, 17, 20, 21, 22 and 23 in Township 10 North, Range 15 West, Smith County, Mississippi, whether correctly described herein

3

or in Exhibit "A" or not.

7.  Assignee hereby assumes its proportionate share of all costs, obligations and liabilities attributable to the Assigned Interest that arises after the Effective Date as provided in said Joint Operating Agreement.

8.  This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

9.  This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.  The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

Book 0517 Page 145

This Assignment is executed by the parties on the date set forth in each party=s acknowledgment, but effective as of the Effective Date.

MAPLE LEAF EXPLORATION LP

By _____
R. Stewart Campbell, Jr., Manager
of MLEGP LC, general partner

‑‑ ASSIGNOR

SKLARCO L.L.C.

By _____
David A. Barlow
President-Chief Operating Officer

‑‑ ASSIGNEE

4

## ACKNOWLEDGMENTS

STATE OF TEXAS
COUNTY OF DALLAS

I, the undersigned notary public in and for said County in said State, hereby certify that R. Stewart Campbell, Jr. as Manager of MLEGP LC which is the general partner of **MAPLE LEAF EXPLORATION LP**, a Texas limited partnership is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the ____13th____ day of ____February____ _____, 2013.

PHILIP N. DISSPAIN
MY COMMISSION EXPIRES
February 2, 2014

(AFFIX NOTARIAL SEAL)

_____
Notary Public

Book 0517 Page 146

My commission expires: ___2-2-2014___

STATE OF LOUISIANA
PARISH OF CADDO

I, the undersigned notary public in and for said Parish in said State, hereby certify that David A. Barlow whose name as President-Chief Operating Officer of **SKLARCO L.L.C.**, a Louisiana limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the __19th__ day of __February__ _____, 2013.

_____
Notary Public

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

(AFFIX NOTARIAL SEAL)

My commission expires: __at death__

S&rc/my docs/SK8241-017 Maple Leaf-Sklar 2013 Oakhay Creek Prospect Assignment

5

EXHIBIT "A"

Attached to and made a part of that certain Assignment of Oil, Gas and Mineral Leases dated February 13, 2013 from Maple Leaf Exploration LP as Assignor to Sklarco L.L.C. as Assignee

Book 0517 Page 147

| Lessor | Lessee | Date | Recorded Book | Page |
|--------|--------|------|------|------|
| Adcox, Brenda Jo S. | Maple Leaf Exploration LP | | 494 | 437 |
| Alewine, Thomas M. Jr. | Miller Land Professionals, LLC | 4/12/2010 | 494 | 230 |
| Anadarko E & P Co., LP | Maple Leaf Exploration LP | | 501 | 27 |
| Atchley, Bobby | Miller Land Professionals, LLC | 6/22/2010 | 495 | 519 |
| Austin, Darrell W. et ux | Maple Leaf Exploration LP | | 494 | 538 |
| Barnes, Ronald L. | Maple Leaf Exploration LP | | 494 | 417 |
| Blackstone Minerals I, LP | Assigned by Ventex | | 480 | 158 |
| Blackwell, J. Ruth | Maple Leaf Exploration LP | | 494 | 465 |
| Blakeney, Donald | Miller Land Professionals, LLC | 5/18/2010 | 494 | 632 |
| Blakney, Larry Joe | Maple Leaf Exploration LP | | 494 | 442 |
| Blakney, Larry Joe | Maple Leaf Exploration LP | | 494 | 518 |
| Bradford, Melanie V. | Maple Leaf Exploration LP | | 494 | 526 |
| Brooks, Ramona T. Talbert | Maple Leaf Exploration LP | | 494 | 492 |
| Bryant, Edith R. | Maple Leaf Exploration LP | | 494 | 457 |
| Bynum, Hilda Grace | Maple Leaf Exploration LP | | 494 | 423 |
| Cargill, Virginia T. | Maple Leaf Exploration LP | | 494 | 467 |
| Clark, Eric C. | Miller Land Professionals, LLC | 4/14/2010 | 494 | 247 |
| Clark, John B. | Miller Land Professionals, LLC | 4/14/2010 | 494 | 243 |
| Clark, Larry E. | Miller Land Professionals, LLC | 4/14/2010 | 494 | 239 |

Recorded

6

| Lessor | Lessee | Date | Book | Page |
|---|---|---|---|---|
| Clements-Balas, Mary Jo | Maple Leaf Exploration LP | | 494 | 463 |
| Cole, Charles D. | Maple Leaf Exploration LP | | Book 0517 Page 148 494 | 512 |
| Cole, Jeanette S. | Maple Leaf Exploration LP | | 494 | 447 |
| Craft, Cynthia C. | Maple Leaf Exploration LP | | 494 | 421 |
| Craft, David | Maple Leaf Exploration LP | | 494 | 413 |
| Craft, Diane | Miller Land Professionals, LLC | 5/14/2010 | 495 | 415 |
| Craft, Donald S. | Miller Land Professionals, LLC | 5/12/2010 | 495 | 511 |
| Craft, Jack R. | Maple Leaf Exploration LP | | 494 | 469 |
| Craft, J.E. | Miller Land Professionals, LLC | 4/21/2010 | 494 | 226 |
| Craft, Margaret A. | Miller Land Professionals, LLC | 4/30/2010 | 494 | 268 |
| Craft, Thomas Rodney | Maple Leaf Exploration LP | | 494 | 431 |
| Davis, Brenda T. | Maple Leaf Exploration LP | | 494 | 506 |
| Davis, Mary V. | Maple Leaf Exploration LP | | 494 | 473 |
| Eaton, Kendall et al | Maple Leaf Exploration LP | | 494 | 415 |
| Eaton, Kendall et al | Maple Leaf Exploration LP | | 494 | 522 |
| Ford, Cecil Atha | Maple Leaf Exploration LP | | 494 | 502 |
| Ford, Jocaster Bynam | Miller Land Professionals, LLC | 6/8/2010 | 495 | 419 |
| Foster, Sally K. | Maple Leaf Exploration LP | | 494 | 435 |
| Frierson, Peggy Petty | Miller Land Professionals, LLC | 5/1/2010 | 494 | 264 |
| Garraway, Jo Ann Craft | Miller Land Professionals, LLC | 4/29/2010 | 494 | 256 |
| Gibson, Betty Bell | Maple Leaf Exploration LP | | 494 | 504 |
| Gibson, Gayril | Maple Leaf Exploration LP | | 494 | 455 |
| Givens, Lisa | Maple Leaf Exploration LP | | 494 | 494 Recorded |

7

| Lessor | Lessee | Date | Book | Page |
|--------|--------|------|------|------|
| Hall, Phil D. et ux | Maple Leaf Exploration LP | | Book 0517 Page 149 494 | 496 |
| Harding, Kathy Jo Craft | Miller Land Professionals, LLC | 4/30/2010 | 494 | 296 |
| Harris, Tommie Lee | Maple Leaf Exploration LP | | 494 | 471 |
| Highmount Minerals, LLC | Maple Leaf Exploration LP | | 501 | 25 |
| Hill, Robert Kenneth | Maple Leaf Exploration LP | | 494 | 446 |
| Johnson, Barbara | Maple Leaf Exploration LP | | 494 | 500 |
| Johnson, Emma Jean Jones | Miller Land Professionals, LLC | 6/3/2010 | 495 | 411 |
| Johnson, Mary L. | Maple Leaf Exploration LP | | 494 | 449 |
| Johnson, Peggy R. Rev. Trust | Maple Leaf Exploration LP | | 480 | 257 |
| Jones, Johnny et us | Maple Leaf Exploration LP | | 494 | 443 |
| Keyes, John A. Trust | Miller Land Professionals, LLC | 5/14/2010 | 494 | 627 |
| Keyes, John K. | Miller Land Professionals, LLC | 5/6/2010 | 494 | 300 |
| Kilgore, Jamie Dixon | Maple Leaf Exploration LP | | 494 | 397 |
| Lindsey, Robert Jr., Dec., By Jean Lewis Lindsey, Widow and Sandra Bateman, sole heirs | Maple Leaf Exploration LP | | 494 | 393 |
| Lowery, Buddy L. | Maple Leaf Exploration LP | | 494 | 433 |
| McCormick, Dan | Miller Land Professionals, LLC | 5/11/2010 | 494 | 623 |
| McDaniel, Donald Martin | Maple Leaf Exploration LP | | 494 | 399 |
| McDaniel, Kenneth Ray | Miller Land Professionals, LLC | 4/27/2010 | 494 | 260 |
| McKay, Cleone L. | Maple Leaf Exploration LP | | 494 | 461 |
| McLaughlin, Janis Craft | Miller Land Professionals, LLC | 5/4/2010 | 495 | 392 |
| Mallia, Barbara V. | Maple Leaf Exploration LP | | 494 Recorded | 530 |

8

| Lessor | Lessee | Date | Book | Page |
|--------|--------|------|------|------|
| Mayfield, Pamela | Maple Leaf Exploration LP | | Book 917 495 | Page 150 |
| Mayfield, Thomas | Maple Leaf Exploration LP | | 494 | 516 |
| Mayfield, William Cato Jr. | Miller Land Professionals, LLC | 5/17/2010 | 494 | 644 |
| Metts, Floyd H. | Miller Land Professionals, LLC | 5/17/2010 | 494 | 640 |
| Neal, Martha Jones | Miller Land Professionals, LLC | 6/3/2010 | 495 | 403 |
| Noblin, Elizabeth | Maple Leaf Exploration LP | | 494 | 508 |
| Noblin, John Thomas Jr. | Maple Leaf Exploration LP | | 494 | 488 |
| Noblin, Larry Evon Ford | Maple Leaf Exploration LP | | 494 | 486 |
| Petty, Muriel L. | Maple Leaf Exploration LP | | 494 | 425 |
| Pittman, Theresa | Miller Land Professionals, LLC | 6/22/2010 | 495 | 515 |
| Rahaim, Peggy Ann Reid | Maple Leaf Exploration LP | | 494 | 475 |
| Roberts, Virginia V. | Maple Leaf Exploration LP | | 494 | 528 |
| Samson Contour Energy E & P, LLC | Maple Leaf Exploration LP | | 494 | 602 |
| Skipper, Walter S. | Maple Leaf Exploration LP | | 494 | 534 |
| Slack, Carol Blackwell | Maple Leaf Exploration LP | | 494 | 459 |
| The Smith County Board Of Education | Maple Leaf Exploration LP | | 494 | 477 |
| Sullivan, Brad | Miller Land Professionals, LLC | 4/22/2010 | 494 | 234 |
| Sullivan, Hazel | Miller Land Professionals, LLC | 5/3/2010 | 494 | 251 |
| Sullivan, Michael | Maple Leaf Exploration LP | | 494 | 440 |
| Sullivan, Taylor | Miller Land Professionals, LLC | 4/21/2010 | 494 | 221 |
| Talbert, Gary D. | Maple Leaf Exploration LP | | 494 | 490 |
| Tarantino, Valerie V. | Maple Leaf Exploration LP | | 494 | 536 |

| Lessor | Lessee | Date | Recorded Book | Page |
|--------|--------|------|------|------|
| Tootle, Terry | Maple Leaf Exploration LP | | 494 | 498 |
| Tubbs, Mary C. et vir | Miller Land Professionals, LLC | 6/2/2010 | 495 | 387 |
| Van Zant, Angela | Maple Leaf Exploration LP | | 494 | 520 |
| Van Zant, R. P. Jr. | Maple Leaf Exploration LP | | 494 | 532 |
| Vickery, Patty | Miller Land Professionals, LLC | 6/3/2010 | 495 | 407 |
| Waites, Kathryn J. et al | Maple Leaf Exploration LP | | 494 | 524 |
| Wallace, Rebecca Ann S. | Maple Leaf Exploration LP | | 494 | 514 |
| Whitworth, Ann M. | Miller Land Professionals, LLC | 5/17/2010 | 494 | 636 |

All of said leases are recorded in the office of the Chancery Clerk of Smith County, Mississippi, reference made herein for all purposes.

Book 0517 Page 151

S&rc/my documents/SK8241-017 Maple Leaf-Sklar 2013 Oakhay Creek Prospect Assignment

10

EXHIBIT "B"

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective March 1, 2013 from Sklarco L.L.C. as Assignor to Pickens Financial Group, LLC, Kudzu Oil Properties, LLC, Tauber Exploration & Production Co., Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., CTM 2005, Ltd., as Assignees.

**Document Title:**     Assignment of Oil, Gas and Other Mineral Leases

**Date:**     _____, 2013

**THIS INSTRUMENT PREPARED BY AND TO BE RETURNED TO:**
Sklar Exploration Company L.L.C.
Louisiana Tower, Suite 1601
401 Edwards Street
Shreveport, LA  71101
Telephone:  318-227-8668

**ASSIGNOR:**
Sklarco L.L.C.
Louisiana Tower, Suite 1601
401 Edwards Street
Shreveport, LA  71101
Telephone:  318-227-8668

**ASSIGNEES:**
Pickens Financial Group, LLC
Attn:  Michael K. Pickens
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417
Telephone: (214) 503-1271

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157
Telephone: (601) 987-6576

Tauber Exploration & Production Co.
Attn:  John Robinson
55 Waugh, #601
Houston, Texas 77007
Telephone: (713) 869-5656

1

Gardner Energy Corporation
Attn:  David Gardner
952 Echo Lane, Suite 380
Houston, Texas 77024
Telephone: (713) 463-6930

Lane Oil & Gas Corporation
Attn:  David Gardner
952 Echo Lane, Suite 380
Houston, Texas 77024
Telephone: (713) 463-6930

Stateside Oil, Inc.
Attn:  David Gardner
952 Echo Lane, Suite 380
Houston, Texas 77024
Telephone: (713) 463-6930

Goolsby Interests, LLC
Attn:  James W. Goolsby, Jr.
110 Sibelius Lane
Houston, Texas 77079
Telephone: (832) 325-1867

Northstar Producing I, LP
Attn:  Kurt Ley
204 Cross Creek Drive
Bossier City, Louisiana 71111
Telephone: (318) 795-9555

Wimberley Park Ltd.
Attn:  Peter M.Way
5308 Ashbrook
Houston, Texas 77081
Telephone: (713) 512-9845

CTM 2005, Ltd.
Attn:  Charles T. McCord, III
55 Waugh Drive, Suite 515
Houston, Texas 77007
Telephone:  (713)

**INDEXING INSTRUCTIONS:**            **No section indexing – Marginal Notations only**

2

## ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES

**STATE OF MISSISSIPPI,**

**COUNTY OF SMITH,**

      **KNOW ALL MEN BY THESE PRESENTS** that the following (hereinafter sometimes referred to as **"Assignor"**):

      **SKLARCO L.L.C.,** a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its President-Chief Operating Officer, David A. Barlow ("**Sklarco**");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does, subject to the terms, provisions and exceptions as hereinafter set forth, hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER and DELIVER unto the following (hereinafter sometimes referred to as **"Assignee(s)"**):

      **KUDZU OIL PROPERTIES, LLC**, a Mississippi limited liability company, whose address is 300 Concourse Blvd., Suite 101, Ridgeland, Mississippi 39157, represented herein by its Executive Vice President, R. Nash Neyland ("**Kudzu**");

      **PICKENS FINANCIAL GROUP, LLC**, a Texas limited liability company, whose address is 8499 Greenville Avenue, Suite 105, Dallas, Texas 75231-2417, represented herein by its Vice President, Michael K. Pickens ("**Pickens**");

      **TAUBER EXPLORATION & PRODUCTION CO.,** a Texas corporation, whose address is 55 Waugh Drive, Suite 601, Houston, Texas 77007-5837, represented herein by its President, Richard E. Tauber ("**Tauber**");

      **GARDNER ENERGY CORPORATION**, a Texas corporation, whose address is 952 Echo Lane, Suite 380, Houston, Texas 77024, represented herein by its President, David Gardner ("**Gardner**");

      **LANE OIL & GAS CORPORATION**, a Texas corporation, whose address is 952 Echo Lane, Suite 380, Houston, Texas 77024, represented herein by its President, David Gardner ("**Lane**")

      **STATESIDE OIL, INC.** , a Texas corporation, whose address is 952 Echo Lane, Suite 380, Houston, Texas 77024, represented herein by its Vice President, David Gardner ("**Stateside**")

3

**GOOLSBY INTERESTS, LLC**, a Texas limited liability company, whose address is 110 Sibelius Lane, Houston, Texas 77079, represented herein by its Sole Member, James W. Goolsby ("**Goolsby**")

**NORTHSTAR PRODUCING I, LP**, a Texas partnership, whose address is 204 Cross Creek Drive, Bossier City, Louisiana 71101, represented herein by its Partner, Kurt Ley ("**Northstar**")

**WIMBERLEY PARK LTD.**, a Texas limited partnership, whose address is 5308 Ashbrook, Houston, Texas 77081, represented herein by Wimberley Park Inc., its Managing General Partner, represented herein by Peter M. Way, in his capacity as the President of Wimberley Park Inc. ("**Wimberly**")

**CTM 2005, LTD.**, a Texas limited partnership, whose address is 55 Waugh Drive, Houston, Texas 77007, represented herein by McCord Investments, Inc., its General Partner, represented herein by Charles T. McCord III, in his capacity as the President of McCord Investments, Inc. ("**CTM**");

(hereinafter Kudzu, Pickens, Tauber, Gardner, Lane, Stateside, Goolsby, Northstar, Wimberley and CTM are sometimes referred to collectively as "**Assignees**" or individually as an "**Assignee**")

an undivided 25.0000% after casing point working interest* in all of the oil, gas and mineral leases (the "**Leases**") described on Exhibit "A" attached hereto and by reference made a part hereof, said Leases covering lands located in Smith County, Mississippi (hereinafter the undivided interest in the Leases is collectively referred to as the "**Assigned Interest**"), and is the same Assigned Interest previously acquired by Sklarco from Maple Leaf Exploration LP through that certain "Assignment of Oil, Gas and Other Mineral Leases" dated effective January 1, 2013, and recorded on March 1, 2013, in the office of the Chancery Clerk of Smith County, Mississippi as Instrument No. 201300776 at Book 517, Page 142.

| Assignees | Interest |
|---|---|
| Kudzu | 2.0000% |
| Pickens | 6.5000% |
| Tauber | 6.5000% |
| Gardner | 1.5000% |
| Lane | 1.0000% |
| Stateside | 1.5000% |
| Goolsby | 1.0000% |
| Northstar | 1.0000% |
| Wimberly | 2.0000% |
| CTM | 2.0000% |
| | 25.0000% |

* As set out and retained in the Joint Operating Agreement referenced below.

4

**TO HAVE AND TO HOLD** the Assigned Interest unto Assignee, its successors and assigns, forever, together with all rights, privileges, easements, tenements, hereditaments, improvements, equipment, appurtenances, and the like belonging or appertaining thereto, in accordance with and subject to, and in accordance with, the terms and provisions of this Assignment:

1.  This Assignment is made effective as of January 15, 2013 (the **"Effective Date"**).

2.  Assignor excludes and excepts from this Assignment, and retains unto itself, its overriding royalty interest in each of the Leases (also as provided in the Joint Operating Agreement referenced below) including extension and renewals of such Leases, equal to the amount by which 25% of the oil and gas in, under or produced from lands covered by such Lease exceeds the royalty, overriding royalties and other payments burdening such production, subject to being proportionately reduced if the Lease covers less than the entire mineral fee estate in such lands or this Assignment covers only an undivided interest in such Lease. The Assigned Interests in each of the Leases are delivered subject to a 25% total burden, delivering to Assignee a 75% net revenue interest in the Assigned Interests in each Lease, proportionately reduced as herein set forth. It is expressly understood and agreed that this Assignment is intended to assign only the Assignor's after payout working interest and this Assignment shall not cover or affect and there is expressly excluded herefrom all of overriding royalty interests of Maple Leaf excepted from and reserved in any and all prior assignments of interests in the Leases as the same may appear in the Records of the Office of the Chancery Clerk of Smith County, Mississippi.

3.  The Assigned Interest is assigned herein without limitation as to depth or formation, except as may be provided in any of the Leases and all other instruments of record affecting the Leases (the **"Recorded Instruments"**) or unrecorded instruments expressly described in this Assignment.

4.  This Assignment is made without warranty of title, express or implied, not even for return of the purchase price, except Assignor agrees to warrant title against all defects arising out of claims by Assignor or of persons claiming by, through or under Assignor. To the extent transferable, Assignor does hereby transfer and convey to Assignee the benefits of and the right to enforce all covenants and warranties which Assignor is entitled to enforce with respect to the Assigned Interest, including without limitation, full substitution and subrogation of all prior rights and warranty, and the benefit of and the right to enforce all rights accruing under applicable statutes of limitation or prescription.

5.  The Assigned Interest is assigned subject to the terms and conditions of the Leases, including the lessor's royalties provided for in each of the Leases.

6.  This Assignment is made subject to the terms and provisions of that certain Joint Operating Agreement (**"JOA"**) dated effective as of June 1, 2011, by and between Sklarco L.L.C, McCombs Energy, Ltd., JJS Working Interests, LLC, Resource Ventures, LLC, Maple Leaf Exploration LP, Sklar Exploration Company L.L.C., and Assignees covering the Oakhay Creek Prospect, Smith County, Mississippi, including the rights in extension and renewal leases and includes all of the Oil, Gas and Mineral Leases owned or claimed by Assignor in the prospect lands being Sections 15, 16, 17, 20, 21, 22 and 23 in Township 10 North, Range 15 West, Smith County, Mississippi, whether correctly described herein or in Exhibit "A" or not.

7.  Assignees hereby assume their proportionate share of all costs, obligations and liabilities

5

attributable to the Assigned Interest that arises after the Effective Date as provided in said Joint Operating Agreement.

8.      This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

9.      This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.   The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party=s acknowledgment, but effective as of the Effective Date.

**SKLARCO L.L.C.**

By _____
        David A. Barlow
        President-Chief Operating Officer

- - **ASSIGNOR**

**KUDZU OIL PROPERTIES, L.L.C.**

By_____
        R. Nash Neyland
        Executive Vice President

- - **ASSIGNEE**

**PICKENS FINANCIAL GROUP, LLC**

By_____
        Michael K. Pickens
        Vice President

- - **ASSIGNEE**

**TAUBER EXPLORATION & PRODUCTIN CO.**

By_____
        Richard E. Tauber
        President

- - **ASSIGNEE**

6

attributable to the Assigned Interest that arises after the Effective Date as provided in said Joint Operating Agreement.

8.     This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

9.     This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.  The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party=s acknowledgment, but effective as of the Effective Date.

**SKLARCO L.L.C.**

By _____
      David A. Barlow
      President-Chief Operating Officer

                          - - **ASSIGNOR**

**KUDZU OIL PROPERTIES, L.L.C.**

By _____
    ~~R. Nash Neyland~~ Wirt A Yerger III
    ~~Executive Vice President~~
    Manager         - - **ASSIGNEE**

**PICKENS FINANCIAL GROUP, LLC**

By_____
      Michael K. Pickens
      Vice President

                          - - **ASSIGNEE**

**TAUBER EXPLORATION & PRODUCTIN CO.**

By_____
      Richard E. Tauber
      President

                          - - **ASSIGNEE**

6

attributable to the Assigned Interest that arises after the Effective Date as provided in said Joint Operating Agreement.

8. This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

9. This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.   The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party=s acknowledgment, but effective as of the Effective Date.

**SKLARCO L.L.C.**

By _____
       David A. Barlow
       President-Chief Operating Officer

                 - - **ASSIGNOR**

**KUDZU OIL PROPERTIES, L.L.C.**

By_____
       R. Nash Neyland
       Executive Vice President

                 - - **ASSIGNEE**

**PICKENS FINANCIAL GROUP, LLC**

By _____
       Michael K. Pickens
       ~~Vice~~ President

                 - - **ASSIGNEE**

**TAUBER EXPLORATION & PRODUCTIN CO.**

By_____
       Richard E. Tauber
       President

                 - - **ASSIGNEE**

6

attributable to the Assigned Interest that arises after the Effective Date as provided in said Joint Operating Agreement.

8.      This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

9.      This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.  The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party=s acknowledgment, but effective as of the Effective Date.

SKLARCO L.L.C.


By _____
       David A. Barlow
       President-Chief Operating Officer

- - ASSIGNOR

KUDZU OIL PROPERTIES, L.L.C.


By_____
       R. Nash Neyland
       Executive Vice President

- - ASSIGNEE


PICKENS FINANCIAL GROUP, LLC


By_____
       Michael K. Pickens
       Vice President

- - ASSIGNEE

Signature / Acknowledgement Pages to that certain Assignment of Oil, Gas and Mineral Leases from Sklarco, LLC (Assignor) to Kudzu Oil Properties, LLC, et al (Assignees); pertaining to the Oakhay Creek Prospect, Smith County, Mississippi.

TAUBER EXPLORATION & PRODUCTIN CO.


By_____
       Richard E. Tauber
       President

- - ASSIGNEE

6

DC

**GARDNER ENERGY CORPORATION**

By_____
      David Gardner
      President

                        - - ASSIGNEE

**LANE OIL AND GAS CORPORATION**

By_____
      David Gardner
      President

                        - - ASSIGNEE

**STATESIDE OIL, INC.**

By_____
      David Gardner
      Vice President

                        - - ASSIGNEE

**GOOLSBY INTERESTS, LLC**

By_____
      Jim Goolsby
      Sole Member

                        - - ASSIGNEE

**NORTHSTAR PRODUCING**

By_____
      Kurt Ley
      Member

                        - - ASSIGNEE

**WIMBERLY PARK LTD.**
By:  Wimberley Park Inc.

By_____
      Peter Way
      President

                        - - ASSIGNEE

7

**GARDNER ENERGY CORPORATION**


By_____
      David Gardner
      President

                           - - ASSIGNEE

**LANE OIL AND GAS CORPORATION**

By_____
      David Gardner
      President

                           - - ASSIGNEE

**STATESIDE OIL, INC.**


By_____
      David Gardner
      Vice President

                           - - ASSIGNEE

**GOOLSBY INTERESTS, LLC**


By_____
      Jim Goolsby
      Sole Member

                           - - ASSIGNEE


**NORTHSTAR PRODUCING**


By_____
      Kurt Ley
      Member

                           - - ASSIGNEE


**WIMBERLY PARK LTD.**
By:  Wimberley Park Inc.


By_____
      Peter Way
      President

                           - - ASSIGNEE

**GARDNER ENERGY CORPORATION**

By_____
      David Gardner
      President

                           **- - ASSIGNEE**

**LANE OIL AND GAS CORPORATION**

By_____
      David Gardner
      President

                           **- - ASSIGNEE**

**STATESIDE OIL, INC.**

By_____
      David Gardner
      Vice President

                           **- - ASSIGNEE**

**GOOLSBY INTERESTS, LLC**

By_____
      Jim Goolsby
      Sole Member

                           **- - ASSIGNEE**

**NORTHSTAR PRODUCING**

By_____
      Kurt Ley
      Member

                           **- - ASSIGNEE**

**WIMBERLY PARK LTD.**
By:  Wimberley Park Inc.

By_____
      Peter Way
      President

                           **- - ASSIGNEE**

7

**GARDNER ENERGY CORPORATION**

By_____
      David Gardner
      President

          - - ASSIGNEE

**LANE OIL AND GAS CORPORATION**

By_____
      David Gardner
      President

          - - ASSIGNEE

**STATESIDE OIL, INC.**

By_____
      David Gardner
      Vice President

          - - ASSIGNEE

**GOOLSBY INTERESTS, LLC**

By_____
      Jim Goolsby
      Sole Member

          - - ASSIGNEE

**NORTHSTAR PRODUCING**

By_____
      Kurt Ley
      Member

          - - ASSIGNEE

**WIMBERLY PARK LTD.**
By: Wimberley Park Inc.

By_____
      Peter Way
      President

          - - ASSIGNEE

7

**GARDNER ENERGY CORPORATION**

By_____
     David Gardner
     President

- - **ASSIGNEE**

**LANE OIL AND GAS CORPORATION**

By_____
     David Gardner
     President

- - **ASSIGNEE**

**STATESIDE OIL, INC.**

By_____
     David Gardner
     Vice President

- - **ASSIGNEE**

**GOOLSBY INTERESTS, LLC**

By_____
     Jim Goolsby
     Sole Member

- - **ASSIGNEE**

**NORTHSTAR PRODUCING**

By_____ *Kurt Ley* _____
     Kurt Ley
     Member

- - **ASSIGNEE**

**WIMBERLY PARK LTD.**
By:  Wimberley Park Inc.

By_____
     Peter Way
     President

- - **ASSIGNEE**

7

**GARDNER ENERGY CORPORATION**

By_____
      David Gardner
      President

                - - ASSIGNEE

**LANE OIL AND GAS CORPORATION**

By_____
      David Gardner
      President

                - - ASSIGNEE

**STATESIDE OIL, INC.**

By_____
      David Gardner
      Vice President

                - - ASSIGNEE

**GOOLSBY INTERESTS, LLC**

By_____
      Jim Goolsby
      Sole Member

                - - ASSIGNEE

**NORTHSTAR PRODUCING**

By_____
      Kurt Ley
      Member

                - - ASSIGNEE

**WIMBERLY PARK LTD.**
By:  Wimberley Park Inc.

By_____
      Peter Way
      President

                - - ASSIGNEE

7

**CTM 2005, LTD.**
By:  McCord Investments, Inc.

By_____
       Charles T. McCord, III
       President

– – ASSIGNEE

**CTM 2005, LTD**
**Charles T. McCord III,**
**President McCord Investments, Inc.**
**General Partner**

8

DHC

## ACKNOWLEDGMENTS

STATE OF LOUISIANNA

PARISH OF CADDO

      I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the ___ day of _____, 2013.

                                    _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as Vice President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the ___ day of _____, 2013.

                                      _____
                                      NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

## ACKNOWLEDGMENTS

STATE OF LOUISIANNA

PARISH OF CADDO

I, _____, a notary public in and for said Parish and State, hereby certify that David A. Barlow, whose name as President – Chief Operating Officer of SKLARCO L.L.C., a Louisiana limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF Dallas

I, Marilyn L. Fulton, a notary public in and for said County and State, hereby certify that Michael K. Pickens, whose name as ~~Vice~~ President for PICKENS FINANCIAL GROUP, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 13th day of June, 2013.

Marilyn L. Fulton
My Commission Expires
06/23/2016

Marilyn L. Fulton
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 6-23-16

STATE OF MISSISSIPPI

COUNTY OF Madison

Wirt A. Yerger III
manager

I, Pamela F. Sebren, a notary public in and for said County and State, hereby certify that R. Nash Neyland, whose name as Executive Vice President of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 14 day of June, 2013.

Pamela F Sebren
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify Richard E. Tauber, whose name as President of TAUBER EXPLORATION & PRODUCTION COMPANY, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.


_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

10

STATE OF MISSISSIPPI

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that R. Nash Neyland, whose name as Executive Vice President of KUDZU OIL PROPERTIES, LLC, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

Signature / Acknowledgement Pages to that certain Assignment of Oil, Gas and Mineral Leases from Sklarco, LLC (Assignor) to Kudzu Oil Properties, LLC, et al (Assignees); pertaining to the Oakhay Creek Prospect, Smith County, Mississippi.

STATE OF TEXAS

COUNTY OF _HARRIS_

    I, _MYLA WUNDERLICH_, a notary public in and for said County and State, hereby certify Richard E. Tauber, whose name as President of TAUBER EXPLORATION & PRODUCTION COMPANY, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the _7th_ day of _JUNE_, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

MYLA WUNDERLICH
Notary Public, State of Texas
Commission Expires 02-11-2016

10

STATE OF TEXAS

COUNTY OF _Harris_

    I, _Jennifer Mrozek_____, a notary public in and for said County and State, hereby certify that David Gardner, whose name as President of GARDNER ENERGY CORPORATION, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 2⁶ day of _June_____, 2013.

                                        NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _March 29, 2014_

                                JENNIFER MROZEK
                          Notary Public, State of Texas
                          My Commission Expires
                          March 29, 2014

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify David Gardner, whose name as President of LANE OIL & GAS CORPORATION, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___ day of _____, 2013.

                                    NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

11

STATE OF TEXAS

COUNTY OF _____

      I, _____, a notary public in and for said County and State, hereby certify that David Gardner, whose name as President of GARDNER ENERGY CORPORATION, a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the ___ day of _____, 2013.


                              _____
                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF Harris

      I, Jennifer Mrozek, a notary public in and for said County and State, hereby certify David Gardner, whose name as President of LANE OIL & GAS CORPORATION, a Texas Corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

      Given under my hand and notarial seal this the 2u day of June, 2013.


                                _____
                              NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: March 29, 2014

JENNIFER MROZEK
Notary Public, State of Texas
My Commission Expires
March 29, 2014

11

STATE OF TEXAS

COUNTY OF Harris

I, Jennifer Mrozek , a notary public in and for said County and State, hereby certify that David Gardner, whose name as Vice President of STATESIDE OIL, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 20 day of June , 2013.

NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: March 29, 2014

JENNIFER MROZEK
Notary Public, State of Texas
My Commission Expires
March 29, 2014

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify James W. Goolsby, whose name as Sole Member of GOOLSBY INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

12

STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify that David Gardner, whose name as Vice President of STATESIDE OIL, INC., a Texas corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

STATE OF TEXAS

COUNTY OF Harris

    I, Pamela Bullard, a notary public in and for said County and State, hereby certify James W. Goolsby, whose name as Sole Member of GOOLSBY INTERESTS, LLC, a Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 1 day of July, 2013.

PAMELA BULLARD
Notary Public, State of Texas
Commission Expires 04-03-2017

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 4-3-17

12

STATE OF ~~TEXAS~~ LOUISIANA

COUNTY OF _____ BOSSIER _____

    I, _____ Deborah S. McGrath _____, a notary public in and for said County and State, hereby certify that Kurt Ley, whose name as Partner, of NORTHSTAR PRODUCING I, LP, a ~~Mississippi~~ Texas limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the 19 day of _____ June _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

DEBORAH S. McGRATH ID# 068259
NOTARY PUBLIC
My Commission Expires: _____ MY COMMISSION IS FOR LIFE


STATE OF TEXAS

COUNTY OF _____

    I, _____, a notary public in and for said County and State, hereby certify Peter M. Way, whose name as President of Wimberley Park Inc., the Managing General Partner of WIMBERLEY PARK LTD, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

    Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____

13

STATE OF TEXAS

COUNTY OF _____

I, _____, a notary public in and for said County and State, hereby certify that Kurt Ley, whose name as Partner, of NORTHSTAR PRODUCING I, LP, a Mississippi limited liability company, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the ___ day of _____, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: _____


STATE OF TEXAS

COUNTY OF ~~Harris~~

I, Cynthia Maciejewski, a notary public in and for said County and State, hereby certify Peter M. Way, whose name as President of Wimberley Park Inc., the Managing General Partner of WIMBERLEY PARK LTD, a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 3rd day of June, 2013.

_____
NOTARY PUBLIC

[AFFIX NOTARIAL SEAL]

My Commission Expires: 3/14/15

13

DHC

STATE OF TEXAS

COUNTY OF Harris

I, Kim Tonks, a notary public in and for said County and State, hereby certify that Charles T. McCord III, whose name as President of McCord Investments, Inc., the General Partner of CTM 2005, LTD., a Texas limited partnership, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same for and as the act of said company.

Given under my hand and notarial seal this the 19 day of June , 2013.

```
KIM E. TONKS
Notary Public, State of Texas
My Commission Expires
April 02, 2017
```

[AFFIX NOTARIAL SEAL]

NOTARY PUBLIC

My Commission Expires: 4/2/17

14

OHc

EXHIBIT "C-1"

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective March 1, 2013, by and between Sklar Exploration Company, LLC, Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures LLC, Pickens Financial Group, LLC, Kudzu Oil Properties, LLC, Tauber Exploration & Production Co., Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, Ltd.

# REVISED AND RESTATED EXHIBIT "A"

Attached to and made part of the Operating Agreement dated June 1, 2011 by and between
Sklar Exploration Company LLC. as Operator and Maple Leaf Exploration LP, et al as Non-Operators.

I. **Contract Area and AMI – Lands Subject to this Agreement**

All of the following described lands located in Smith County, Mississippi.
Township - Range
10N – 15W    All of Sections 15,16, 17, 20, 21, 22, 23

II. **Restrictions as to Depth, Formation or Substance**

None – except as may be provided in any lease subject to this Agreement.

III. **Addresses and Contact Information for the Parties to this Agreement**

See attached Schedule of Addresses and Contact Information.

IV. **Interests of the Parties to this Agreement**

| | BPPO | APPO |
|---|---|---|
| Sklarco LLC | 25.50000000% | 28.53571429% |
| McCombs Energy, Ltd. | 22.50000000% | 22.50000000% |
| JJS Working Interests, LLC | 2.00000000% | 2.23809524% |
| Resource Ventures, LLC | 25.00000000% | 27.97619047% |
| Pickens Financial Group, LLC | 6.50000000% | 4.87500000% |
| Kudzu Oil Properties, LLC | 2.00000000% | 1.50000000% |
| Tauber Exploration & Production Co. | 6.50000000% | 4.87500000% |
| Gardner Energy Corporation | 1.50000000% | 1.12500000% |
| Lane Oil & Gas Corporation | 1.00000000% | 0.75000000% |
| Stateside Oil, Inc. | 1.50000000% | 1.12500000% |
| Goolsby Interests, LLC | 1.00000000% | 0.75000000% |
| Northstar Producing I, LP | 1.00000000% | 0.75000000% |
| Wimberley Park Ltd. | 2.00000000% | 1.50000000% |
| CTM 2005, Ltd. | 2.00000000% | 1.50000000% |
| | 100.000000% | 100.0000000% |

V. **Oil and Gas Leases Subject to this Agreement**

See attached Lease Summary Report.

VI **Addresses of parties for notice purposes:**

Sklar Exploration Company L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
grembert@sklarexploration.com

Sklarco L.L.C.
Attn: Land Department
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Phone: (318) 227-8668
Fax: (318) 227-9012
grembert@sklarexploration.com

McCombs Energy, Ltd.
Attn: Ricky Haikin, Vice President
5599 San Felipe St., Suite 1200
Houston, TX 77056-2721
Phone: (713) 621-0033
Fax: (713) 621-1670
rhaikin@mccombsenergy.com

JJS Working Interests LLC
Attn: Mr. Justin Simons
4295 San Felipe, Suite 207
Houston, Texas 77027
Phone: (713) 888-0875
Fax: (866) 406-9550
Justin@hbcapllc.com

Resource Ventures, LLC
Attn: Mark A. Arnold
8369 SouthPark Lane, Suite B
Littleton, Colorado 80120
Phone: (303) 217-5151
arnold@royaltyexploration.com

Pickens Financial Group, LLC
Attn: Michael K. Pickens
8499 Greenville Avenue, Suite 105
Dallas, Texas 75231-2417
Phone: (214) 503-1271
Fax: (214) 503-7247
mike@pickensenergy.com

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157
Phone: (601) 987-6576
Fax: (601) 366-1922
kudzu@cavaliergrp.com

Tauber Exploration & Production Co.
Attn: John Robinson
55 Waugh, #601
Houston, Texas 77007
Phone: (713) 869-5656
Fax: (713) 869-1997
john.robinson@tauberoil.com

Gardner Energy Corporation
Attn: David Gardner
952 Echo Lane, Suite 380
Houston, Texas 77024
Phone: (713) 463-6930
Fax: (712) 463-6929
gecop@att.net

Lane Oil & Gas Corporation
Attn:  David Gardner
952 Echo Lane, Suite 380
Houston, Texas 77024
Phone: (713) 463-6930
Fax:  (712) 463-6929
gecop@att.net

Stateside Oil, Inc.
Attn:  David Gardner
952 Echo Lane, Suite 380
Houston, Texas 77024
Phone: (713) 463-6930
Fax:  (712) 463-6929
gecop@att.net

Goolsby Interests , LLC
Attn:  James W. Goolsby, Jr.
110 Sibelius Lane
Houston, Texas 77079
Phone: (832) 325-1867
Fax: (713) 869-8069
jimg@tauberoil.com

Northstar Producing I, LP
Attn:  Kurt Ley
204 Cross Creek Drive
Bossier City, Louisiana 71111
Phone: (318) 795-9555
Fax: (318) 572-2790
kurt.ley@kingwoodexploration.com

Wimberley Park Ltd.
Attn:  Peter M.Way
5308 Ashbrook
Houston, Texas 77081
Phone: (713) 512-9845
Fax:  (713) 512-9845
pway@wayholding.com

CTM 2005, Ltd.
Attn:  Charles T. McCord, III
55 Waugh Drive, Suite 515
Houston, Texas 77007
Phone:  (713)
Fax:  (713)
cmccord@mccordprod.com

VII.    **Burdens on Production**

In addition to the royalties provided in each oil and gas lease, Maple Leaf Exploration LP is or shall be vested with an overriding royalty in each lease equal to the amount by which 25% of the oil and gas in, under or produced from lands covered by such lease exceeds the royalty, overriding royalties and other payments burdening such production, subject to being proportionately reduced if the lease covers less than the entire mineral fee estate in such lands or only an undivided interest in such lease is subject to this Agreement.

Attached to and made a part of that certain Participation Agreement dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside oil, Inc., Goolsby Interest LLC, Northstar Producing 1, LP, Wimberley Park Ltd., and CTM 2005, LTD.

### A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

_____ JUNE 1 _____ , __ 2011 __ ,
                                   year

OPERATOR   __ SKLAR EXPLORATON COMPANY LLC _____

CONTRACT AREA   ____ 10N 15W   All of Sections 15, 16, 17, 20, 21, 22, 23 ____

_____

_____

_____

_____

COUNTY OR PARISH OF   __ SMITH _____ , STATE OF   __ MISSISSIPPI __

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN. 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS. 76137. APPROVED FORM.

A.A.P.L. NO. 610 – 1989

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 1 |
| III. | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | **TITLES** | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

|      | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: | 15 |
|------|---|---|
|      | E. WAIVER OF RIGHTS TO PARTITION: | 15 |
|      | F. PREFERENTIAL RIGHT TO PURCHASE: | 15 |
| IX.  | INTERNAL REVENUE CODE ELECTION | 15 |
| X.   | CLAIMS AND LAWSUITS | 15 |
| XI.  | FORCE MAJEURE | 16 |
| XII. | NOTICES | 16 |
| XIII.| TERM OF AGREEMENT | 16 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 16 |
|      | A. LAWS, REGULATIONS AND ORDERS: | 16 |
|      | B. GOVERNING LAW: | 16 |
|      | C. REGULATORY AGENCIES: | 16 |
| XV.  | MISCELLANEOUS | 17 |
|      | A. EXECUTION: | 17 |
|      | B. SUCCESSORS AND ASSIGNS: | 17 |
|      | C. COUNTERPARTS: | 17 |
|      | D. SEVERABILITY | 17 |
| XVI. | OTHER PROVISIONS | 17 |

ii

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1989

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Sklar Exploration Company LLC_____,
hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes
hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil
and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of
estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil
and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation
and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be
developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas
Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest
Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the
lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the
cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal
body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as
established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be
located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as
provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a
proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous
hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is
specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts
of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein
covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a
Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned
in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure,
restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but
are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking,
Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to
change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other
mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and
Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes
natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.
The term "Affiliate" is defined in Article XVI – Other Provisions.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

_____ A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement.

(2) Restrictions, if any, as to depths, formations, or substances.

(3) Parties to agreement with addresses and telephone numbers for notice purposes.

(4) Percentages or fractional interests of parties to this agreement.

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement.

(6) Burdens on production.

~~_____ B. Exhibit "B," Form of Lease.~~

_____ C. Exhibit "C," Accounting Procedure.

_____ D. Exhibit "D," Insurance.

~~_____ E. Exhibit "E," Gas Balancing Agreement.~~

~~_____ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.~~

~~_____ G. Exhibit "G," Tax Partnership.~~

_____ H. Other: _____

- 1 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

1    If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in
2  the body of this agreement, the provisions in the body of this agreement shall prevail.

**ARTICLE III.**
**INTERESTS OF PARTIES**

5  A. Oil and Gas Interests: N/A

6    ~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this~~
7  ~~agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B,"~~
8  ~~and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

9  B. Interests of Parties in Costs and Production:

10    Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne
11  and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their
12  interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the
13  Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

14    Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other
15  burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or
16  cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,
17  Twenty-five (25%) percent_____ and shall indemnify, defend and hold the other parties free from any liability therefor.
18  Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is
19  burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts
20  stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend
21  and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as
22  the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to
23  be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)
24  which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any
25  liability therefor.

26    No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's
27  lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher
28  price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

29    Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,
30  and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in
31  said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

32  C. Subsequently Created Interests:

33    If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security
34  for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production
35  payment, net profits interest, assignment of production or other burden payable out of production attributable to its working
36  interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed
37  hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden
38  payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such
39  burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's
40  Lease or Interest to exceed the amount stipulated in Article III.B. above.

41    The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and
42  alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other
43  parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses
44  chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the
45  same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required
46  under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the
47  production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of
48  said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or
49  parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

**ARTICLE IV.**
**TITLES**

52  A. Title Examination:

53    Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,
54  if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire
55  Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working
56  interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing
57  Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator
58  all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of
59  charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the
60  examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or
61  by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in
62  procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty
63  opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling
64  Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such
65  interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel
66  in the performance of the above functions.

67    Each party /__Operator__/ shall be responsible for securing curative matter and pooling amendments or agreements required in
68  connection with Leases or Oil and Gas Interests contributed by / __each__ such party. Operator shall be responsible for the preparation
69  and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings
70  before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to
71  the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.
72  Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental
73  agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct
74  charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
2 functions.
3   No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has
4 been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by
5 all of the Drilling Parties in such well.
6 B. Loss or Failure of Title:
7   ~~1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a~~
8 ~~reduction of interest from that shown on Exhibit "A", the party credited with contributing the affected Lease or Interest~~
9 ~~(including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title~~
10 ~~failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject~~
11 ~~to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas~~
12 ~~Leases and Interests; and:~~
13 ~~  (a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if~~
14 ~~applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from~~
15 ~~Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there~~
16 ~~shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
17 ~~  (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the~~
18 ~~Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage~~
19 ~~basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or~~
20 ~~Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~
21 ~~  (c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract~~
22 ~~Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable~~
23 ~~to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and~~
24 ~~burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well~~
25 ~~attributable to such failed Lease or Interest;~~
26 ~~  (d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest~~
27 ~~which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid~~
28 ~~to the party or parties who bore the costs which are so refunded;~~
29 ~~  (e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises~~
30 ~~by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received~~
31 ~~production for which such accounting is required based on the amount of such production received, and each such party shall~~
32 ~~severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~
33 ~~  (f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of~~
34 ~~the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title~~
35 ~~it shall bear all expenses in connection therewith; and~~
36 ~~  (g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an~~
37 ~~interest in the wellbore or any well or wells and the production therefrom, such party's absence of interest in the remainder~~
38 ~~of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest~~
39 ~~is reflected on Exhibit "A."~~
40 ~~  2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well~~
41 ~~payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas~~
42 ~~Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary~~
43 ~~liability against the party who failed to make such payment. Unless the party who failed to make the required payment~~
44 ~~secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make~~
45 ~~proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A"~~
46 ~~shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party~~
47 ~~who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership~~
48 ~~of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully~~
49 ~~reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest,~~
50 ~~calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest,~~
51 ~~it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole~~
52 ~~previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~
53 ~~  (a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease~~
54 ~~burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or~~
55 ~~Interest, on an acreage basis, up to the amount of unrecovered costs;~~
56 ~~  (b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed~~
57 ~~to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and~~
58 ~~marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination,~~
59 ~~would be attributable to the lost Lease or Interest on an acreage basis and which, as a result of such Lease or interest~~
60 ~~termination, is credited to the other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties~~
61 ~~in proportion to their respective interests reflected on Exhibit "A"; and,~~
62 ~~  (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner~~
63 ~~of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
64   3. Other Losses: All losses of Leases or Interests committed to this agreement, ~~other than those set forth in Articles~~
65 ~~IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests shown on
66 Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because
67 express or implied covenants have not been performed (other than performance which requires only the payment of money),
68 and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no
69 readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.
70   ~~4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any~~
71 ~~Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety~~
72 ~~(90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed~~
73 ~~or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B.~~
74 ~~shall not apply to such acquisition.~~

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

   Sklar Exploration Company LLC   shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

   1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, ~~/~~ no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed ~~/ only for good cause~~ /at any time and without the working interest owners by the affirmative vote of ~~/ Non-Operators~~ owning a majority interest based on ownership as shown on Exhibit "A" ~~remaining after excluding the voting interest of Operator~~; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator. ~~detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.~~

   Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ~~/ ninety (90)~~ /fifteen (15) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

   2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

   3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

   The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

   1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

   2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

   3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

A. Initial Well:

On or before the _first_ day of _November_, _2011_, Operator shall commence the drilling of the Initial Well at the following location:

As close as reasonably possible to:
Latitude (Deg/Min/Sec)    31 49 37.808
Longitude (Deg/Min/Sec)   89 31 27.341

(Approximate Calls: 1" FSL & 1309' FEL)
of Section 17, T10N R15W, Smith County, Mississippi

and shall thereafter continue the drilling of the well with due diligence to a vertical subsurface depth of 14,500' feet or to the base of the Yelverton Sand plus an additional 100 feet, whichever is the lesser depth.

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

B. Subsequent Operations:

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2   performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a
3   notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4   whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to
5   Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
6   eight (48) hours, *inclusive*/ exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply
7   within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8   Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9   within the time and in the manner provided in Article VI.B.6.

10       If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11   contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12   forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13   promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
14   may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15   the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16   by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17   additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18   way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19   acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as
20   specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21   said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22   proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
23   Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
24   reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance
25   with Article VI.B.5. in the event of a Sidetracking operation.

26       2. Operations by Less Than All Parties:

27       (a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or
28   VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29   Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
30   later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31   expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
32   proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting
33   Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
34   the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35   account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The
36   rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37   designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when
38   conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39   agreement.

40       If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41   applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42   recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party,
43   within forty-eight (48) hours (e/ *inclusive*/ exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the
44   proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45   proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46   the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47   Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48   interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a
49   Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50   proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a
51   drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52   total of forty-eight (48) hours (/ *inclusive*/ exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may
53   withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54   days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55   If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56   of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57   period provided in Article VI.B.1., subject to the same extension right as provided therein.

58       (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
59   borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60   paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61   encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results
62   in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63   the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64   participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65   shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66   increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,
67   Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68   paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69   well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70   expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking,
71   Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72   provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73   Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74   Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) _____500_____ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) _____500_____ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____500_____ % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required
2  under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening
3  operation just completed.   Stand-by costs subsequent to all parties responding, or expiration of the response time permitted,
4  whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
5  of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation,
6  but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated
7  between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8  interest as shown on Exhibit "A" of all Consenting Parties.
9       In the event that notice for a Sidetracking operation is given while the drilling rig is to be utilized is on location, any party
10  may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in
11  Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended
12  response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending
13  the response period.  If more than one party elects to take such additional time to respond to the notice, standby costs shall be
14  allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's
15  interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.
16       4. Deepening:  If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17  pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article
18  VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone
19  of which the parties were given notice under Article VI.B.1. ("Initial Objective").  Such well shall not be Deepened beyond the
20  Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate
21  in the Deepening operation.
22       In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective,
23  such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-
24  Consenting Parties).  Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to
25  participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2.  If a Deepening operation
26  is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation,
27  such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.
28       (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29  quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs
30  and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-
31  Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting
32  Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other
33  provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well
34  incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the
35  sole account of Consenting Parties.
36       (b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing
37  in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or
38  reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and
39  equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less
40  those costs recouped by the Consenting Parties from the sale of production from the well.  The Non-Consenting Party shall
41  also pay its proportionate share of all costs of re-entering said well.  The Non-Consenting Parties' proportionate part (based
42  on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent
43  Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in
44  connection with such well shall be determined in accordance with Exhibit "C."  If the Consenting Parties have recouped the
45  cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-
46  Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the
47  well for Deepening.
48       The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
49  to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article
50  VI.F.
51       5. Sidetracking:  Any party having the right to participate in a proposed Sidetracking operation that does not own an
52  interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its
53  proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore
54  to be utilized as follows:
55       (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
56  incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.
57       (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
58  such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth
59  at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above.  Such party's
60  proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking
61  operation is initiated shall be determined in accordance with the provisions of Exhibit "C."
62       6. Order of Preference of Operations.  Except as otherwise specifically provided in this agreement, if any party desires to
63  propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such
64  party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform
65  an operation on a well where no drilling rig is on location, or twenty-four (24) hours, inclusive / exclusive of Saturday, Sunday and legal
66  holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be
67  conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such
68  alternate proposal to contain the same information required to be included in the initial proposal.  Each party receiving such
69  proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within
70  twenty-four (24) hours ( / inclusive / exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the
71  subject of the proposals, to participate in one of the competing proposals.  Any party not electing within the time required
72  shall be deemed not to have voted.  The proposal receiving the vote of parties owning the largest aggregate percentage
73  interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the
74

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation
2  within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3  and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4  is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5  relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within
6  such period shall be deemed an election not to participate in the prevailing proposal.

7        7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be
8  proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9  Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

10       8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
11  Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except
12  with the consent of all parties that have not relinquished interests in the well at the time of such operation.

13  C. Completion of Wells: Reworking and Plugging Back:
14       1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
15  drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the drilling,
16  Deepening or Sidetracking shall include:
17  ☐   Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and
18      equipping of the well, including necessary tankage and/or surface facilities.
19  ☑   Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When
20      such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results
21      thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to
22      participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,
23      together with Operator's AFE for Completion costs if not previously provided.  The parties receiving such notice
24      shall have forty-eight (48) hours ( / exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of
          inclusive
25      notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an
26      accompanying AFE.  Operator shall deliver any such Completion proposal, or any Completion proposal conflicting
27      with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the
28      procedures specified in Article VI.B.6.  Election to participate in a Completion attempt shall include consent to all
29      necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface
30      facilities but excluding any stimulation operation not contained on the Completion AFE.  Failure of any party
31      receiving such notice to reply within the period above fixed shall constitute an election by that party not to
32      participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of
33      conflicting Completion proposals.  If one or more, but less than all of the parties, elect to attempt a Completion, the
34      provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging
35      Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations
36      thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each
37      separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting
38      Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party
39      in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier
40      Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any
41      recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in
42      which the Completion attempt is made.  Election by a previous Non-Consenting party to participate in a subsequent
43      Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable
44      materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,
45      insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a
46      Completion attempt.
47       2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
48  Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the Reworking,
49  Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
50  Completing and equipping of said well, including necessary tankage and/or surface facilities.

51  D. Other Operations:                    Including the installation of gathering and transportation facilities
52       Operator shall not undertake any single project reasonably estimated to require an expenditure / in excess of
53  ___Fifty Thousand___ Dollars ($__50,000___) except in connection with the
54  drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously
55  authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
56  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion
57  are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the
58  emergency to the other parties.  If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so
59  requesting an information copy thereof for any single project costing in excess of ___Fifty Thousand___ Dollars
60  ($__50,000___).  Any party who has not relinquished its interest in a well shall have the right to propose that
61  Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as
62  salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but
63  not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall
64  be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the
65  amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under
66  Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by those Articles).  Operator shall deliver such
67  proposal to all parties entitled to participate therein.  If within thirty (30) days thereof Operator secures the written consent
68  of any party or parties owning at least ___51___% of the interests of the parties entitled to participate in such operation,
69  each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated
70  to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms
71  of the proposal.

72  E. Abandonment of Wells:
73       1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has
74  been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

- 9 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

1  plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2  party, or should any party fail to reply within forty-eight (48) hours (~~/ / exclusive~~ of Saturday, Sunday and legal holidays) after
    inclusive
3  delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4  proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
5  cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to
6  plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (~~/ exclusive~~ of Saturday,
    inclusive
7  Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8  forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9  Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10  such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11  abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12  taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13  liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14  restoring the surface, for which the abandoning parties shall remain proportionately liable.

15    2. Abandonment of Wells That Have Produced: ~~Except—for—any—well—in—which—a—Non-Consent—operation—has—been~~
16  ~~conducted—hereunder—for—which—the—Consenting—Parties—have—not—been—fully—reimbursed—as—herein—provided,—a~~Any well which has
    with an interest in such well
17  been completed as a producer shall not be plugged and abandoned without the consent of all parties./ If all such parties consent to
18  such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19  and expense of all of such ~~the—parties.—hereto.~~ Failure of a party to reply within sixty (60) days of delivery of notice of proposed
20  abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the
21  proposed abandonment of any well, all such parties do not agree to the abandonment of such well, those wishing to continue its
22  operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23  applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24  against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25  proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26  within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession
27  of such well and plug and abandon the well.

28    Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29  the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30  of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31  the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
32  value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33  operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34  parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35  of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36  insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37  interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-
38  abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39  one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
40  attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
41  The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42  respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43  Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

44    Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45  from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46  request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47  charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48  ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49  shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50  further operations therein subject to the provisions hereof.

51    3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
52  between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53  however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54  operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55  in accordance with the provisions of this Article VI.E. ; and provided further, that Non-Consenting Parties who own an interest
56  in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as
57  provided in Article VI.B.2.(b).

58  F. Termination of Operations:
59    Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60  Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without
61  consent of parties bearing <u>51</u>% of the costs of such operation; provided, however, that in the event granite or other
62  practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63  Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1. and the
64  provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

65  G. Taking Production in Kind:
66  ~~☐—Option—No.—1:—Gas—Balancing—Agreement—Attached~~
67  ~~—Each—party—shall—take—in—kind—or—separately—dispose—of—its—proportionate—share—of—all—Oil—and—Gas—produced—from—the~~
68  ~~Contract—Area,—exclusive—of—production—which—may—be—used—in—development—and—producing—operations—and—in—preparing—and~~
69  ~~treating—Oil—and—Gas—for—marketing—purposes—and—production—unavoidably—lost.—Any—extra—expenditure—incurred—in—the—taking~~
70  ~~in—kind—or—separate—disposition—by—any—party—of—its—proportionate—share—of—the—production—shall—be—borne—by—such—party.—Any~~
71  ~~party—taking—its—share—of—production—in—kind—shall—be—required—to—pay—for—only—its—proportionate—share—of—such—part—of~~
72  ~~Operator's—surface—facilities—which—it—uses:~~
73  ~~—Each—party—shall—execute—such—division—orders—and—contracts—as—may—be—necessary—for—the—sale—of—its—interest—in~~
74  ~~production—from—the—Contract—Area,—and,—except—as—provided—in—Article—VII.B.,—shall—be—entitled—to—receive—payment~~

– 10 –

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

~~directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

~~In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas-balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.~~

☑ Option No. 2: No Gas Balancing Agreement:

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to / market purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

ARTICLE VII.

EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

- 11 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

B. **Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. **Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. **Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator,
2    and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator.
3    Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified
4    below or otherwise available to a non-defaulting party.

5        1. Suspension of Rights:  Any party may deliver to the party in default a Notice of Default, which shall specify the default,
6    specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one
7    or more of the remedies provided in this Article.  If the default is not cured within thirty (30) days of the delivery of such
8    Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the
9    default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of
10   the defaulting party previously accrued or thereafter accruing under this agreement.  If Operator is the party in default, the
11   Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area
12   after excluding the voting interest of Operator, to appoint a new Operator effective immediately.  The rights of a defaulting
13   party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right
14   to receive information as to any operation conducted hereunder during the period of such default, the right to elect to
15   participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being
16   conducted under this agreement even if the party has previously elected to participate in such operation, and the right to
17   receive proceeds of production from any well subject to this agreement.

18       2. Suit for Damages:  Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint
19   account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default
20   until the date of collection at the rate specified in Exhibit "C" attached hereto.  Nothing herein shall prevent any party from
21   suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

22       3. Deemed Non-Consent:  The non-defaulting party may deliver a written Notice of Non-Consent Election to the
23   defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in
24   which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a
25   well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting
26   party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with
27   respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party,
28   notwithstanding any election to participate theretofore made.  If election is made to proceed under this provision, then the
29   non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

30       Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure
31   its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such
32   payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-
33   defaulting parties as a result of the default.  Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the
34   non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership
35   of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

36       4. Advance Payment:  If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or
37   Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting
38   party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may
39   be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of
40   the previous default.  Such right includes, but is not limited to, the right to require advance payment for the estimated costs of
41   drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made.  If the
42   defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided
43   in the Article VII.D. or any other default remedy provided elsewhere in this agreement.  Any excess of funds advanced remaining
44   when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

45       5. Costs and Attorneys' Fees:  In the event any party is required to bring legal proceedings to enforce any financial
46   obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of
47   collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

48   E.  Rentals, Shut-in Well Payments and Minimum Royalties:
49       Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid
          Operator for the joint account of the parties.
50   by ~~the party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties~~
51   ~~own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to~~
52   ~~make said payments for and on behalf of all such parties.~~  Any party may request, and shall be entitled to receive, proper
53   evidence of all such payments.  In the event of failure to make proper payment of any rental, shut-in well payment or
54   minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which
55   results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

56       Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to
57   production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such
58   action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so.  In the event of
59   failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make
60   timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article
61   IV.B.3.

62   F.  Taxes:
63       Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all
64   property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed
65   thereon before they become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as
66   to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and
67   Gas Interests contributed by such Non-Operator.  If the assessed valuation of any Lease is reduced by reason of its being
68   subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes
69   resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to
70   such owner or owners so as to reflect the benefit of such reduction.  If the ad valorem taxes are based in whole or in part
71   upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to
72   the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's
73   working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in the manner
74   provided in Exhibit "C."

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3 determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4 and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5 the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6 paid by them, as provided in Exhibit "C."
7   Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8 to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.
9                    ARTICLE VIII.
10          ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
11 A. Surrender of Leases:
12   The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13 or in part unless all parties consent thereto.
14   However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15 notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16 delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a
17 party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18 described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19 implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20 located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the
21 assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22 consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
23 thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B."
24 Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25 accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26 shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27 in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the
28 reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29 acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30 the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less
31 than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the
32 assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33 interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made
34 varies according to depth, then the interest assigned shall similarly reflect such variances.
35   Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36 party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37 assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38 agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.
39 B. Renewal or Extension of Leases:
40   If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41 shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42 promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following
43 delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44 affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45 allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the
46 parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47 assignment of its proportionate interest therein by the acquiring party.
48   If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49 by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50 the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51 purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52 shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53 less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54 Agreement in the form of this agreement.
55   If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56 renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.
57   The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58 the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the
59 expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60 existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61 the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62 expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63 agreement.
64   The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.
65 C. Acreage or Cash Contributions:
66   While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67 operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68 be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom
69 the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70 proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the
71 extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any
72 acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above
73 provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74 inside Contract Area.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

D. Assignment; ~~Maintenance of Uniform Interest:~~

~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:~~

~~1.    the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~

~~2.    an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area .~~

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee.  No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by ~~four~~ two or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

E. Waiver of Rights to Partition:

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~F.  Preferential Right to Purchase:~~

~~☐ (Optional; Check if applicable.)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer.  The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties.  However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

### ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder.  Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761.  Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election.  No such party shall give any notices or take any other action inconsistent with the election made hereby.  If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws.  In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

### ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed     Fifty Thousand                              Dollars ($   50,000            ) and if the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator.  All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises.  If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. ~~If the Contract Area is in two or more states, the law of the state of _____ shall govern.~~

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

### ARTICLE XV.
### MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

### ARTICLE XVI.
### OTHER PROVISIONS

NOTWITHSTANDING ANY PROVISION IN THIS OPERATING AGREEMENT TO THE CONTRARY, IN THE EVENT OF A CONFLICT BETWEEN ANY PROVISION IN THIS AGREEMENT AND THE "OTHER PROVISONS" SET FORTH IN THIS ARTICLE XVI, SUCH OTHER PROVISION SHALL PREVAIL AND CONTROL.

**A.** _ACCEPTANCE OF PARTICIPATION OFFER_

Upon a Non-Operator named in Section IV of Exhibit A to this Operating Agreement ("WI Owner") delivery:

(i) to Maple Leaf Exploration LP ("Maple Leaf") on or before the time hereinafter set forth ("Deadline") check payable to the order of Maple Leaf in an amount equal to such WI Owner's "Share" (as set forth in Section IV of Exhibit A of the Operating Agreement under the heading "Before CP") of the sum of $817,000 G/G Costs as payment of such WI Owner's share of such costs; and

(ii) to Sklar Exploration Company LLC ("Sklar") on or before the Deadline of (a) a properly executed counterpart of the AFE; (b) a properly executed counterpart of this Operating Agreement and (c) a check payable to the order of Sklar in an amount equal to such WI Owner's "Share" (as set forth in Section IV of Exhibit A of the Operating Agreement under the heading "Before CP") of the sum of $1,556,000 being the total estimated costs of drilling the Initial Well as set forth in the AFE, as the advance payment such WI Owner's Share of such estimated costs;

then such WI Owner, Sklar and Maple Leaf shall have entered into this Operating Agreement and such WI Owner will be entitled to an assignment of that undivided interest set forth on said Exhibit A under the heading "After CP" in connection with such WI Owner in the oil and gas leases described in Section V of said Exhibit A, less and except Maple Leaf's overriding royalty interest in such leases as described in Section VI of said Exhibit A.

The check due Maple Leaf and the executed AFE, executed Operating Agreement and check due Sklar must be received in Maple Leaf's offices and Sklar's offices at the addresses set forth below, respectively, on or before 5:00 p.m. on August 19, 2011 ("Deadline"), at which time this offer to enter into the Operating Agreement and acquire said interests in said leases for said amounts shall terminate and be of no further force and effect.

Maple Leaf's offices:   200 Crescent Court #877   Dallas, TX 75201   – (G/G Check)

Sklar's offices:   401 Edwards St #1601   Shreveport, Louisiana  71101 – (AFE Check, JOA & AFE)

An assignment of your interests in the leases in the form attached hereto as Exhibit "A-1" will be executed and delivered to you when all of the other Non-Operators listed in Section IV of said Exhibit A have properly accepted this offer, or the Deadline with respect their offers has past, or within thirty (30) days of your request for the same, whichever is the later date. Maple Leaf will warrant title to such interests by, through or under it but not otherwise.

This offer may be accepted by any of the WI Owners listed in Section IV of said Exhibit A and the Operating Agreement shall be binding upon each and every such owner which properly and timely accepts the same regardless of whether any other such owner accepts this offer.

- 17a –

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

B.    OAKHAY CREEK NORTH PROSPECT  AND  OAKHAY CREEK SOUTH PROSPECT

For the purposes of this Agreement, the Contract Area has been divided into two parts, the Oakhay Creek North Prospect and the Oakhay Creek South Prospect ("North Prospect" and "South Prospect" respectively) each of which shall encompass those lands so designated and described on Exhibit A.

C.    ELECTION AND PARTICIPATION

1.    Notwithstanding the provisions of Article VI.B to the contrary, but subject and subordinate to the provisions of Section F below pertaining to the OCS First Well drilled on the South Prospect, if any party hereto elects to not participate in the drilling of any well which is proposed or drilled under the provisions of Article VI.B, then in lieu of relinquishing interest subject to risk compensation under the terms of Article VI.B.2, each such Non-Consenting Party shall forfeit all of its right, title and interest in all leases covering lands located within the producing unit for such well. If, at the time of its election such Non-Consenting Party(s) holds record title to the portions of the leases so forfeited, then such Non-Consenting Party shall promptly furnish the Consenting Parties who have elected to take their proportionate share of the interest forfeited, with a recordable assignment of such leases.  Such assignment shall be due upon the commencement of operation for such well and shall be free and clear of any overriding royalties, production payments, mortgages, liens or other encumbrances placed thereon by or resulting from the Assignor's ownership and operations subsequent to the date of this Agreement but otherwise without warranty of title, either express or implied.  Nothing contained herein shall be construed as requiring a relinquishment of any Non-Consenting Parties' interest in any producing well then in existence.

2.    The interests so forfeited by such Non-Consenting Party in the Contract Area shall automatically vest in the remaining Consenting Parties in the proportions that the respective interests of the Consenting Parties hereunder bear to the aggregate interests of all of the Consenting Parties.  Notwithstanding the foregoing, however, any one or more of the Consenting Parties may expressly decline (which shall be stated in its or their election to participate in the required operation) to be vested with its or their proportionate share of the interest forfeited by the Non-Consenting Party(s).

D.    ADVANCES

1.    Notwithstanding anything to the contrary contained in the provisions of this Agreement, in the event of any well to be drilled under Article VI, hereof, Operator shall have the right to notify each party who elects to participate in such well of the estimated spud date of such well and request, not more than sixty (60) days prior to such spud date, the advance payment of each such party's share of the estimated costs of drilling said well to total depth.  Such notice may be made by certified mail, Federal Express, email, facsimile or hand delivery and shall be deemed to be given when deposited with the U.S. Postal Service (in the case of certified mail) tendered to Federal Express (in the case of Federal Express) or tendered to the Party (in all other cases).  Each such party shall make payment to Operator of its share of such estimated costs of drilling to total depth within fifteen (15) days from the date of receipt of said notification.  Should any party fail or refuse to timely advance to Operator its share of the estimated costs of drilling the well to casing point, then Operator shall notify such party, by certified mail, Federal Express, or hand delivery, that such Party is delinquent in making such payment.  Should such delinquent party then fail to pay Operator such Party's share of the estimated cost of drilling said Well to Casing Point within ten (10) days from the date the notice is deposited with the U.S. Postal Service (in the case of certified mail) tendered to Federal Express (in the case of Federal Express) or tendered to the Party (in the case of hand delivery), such party shall be conclusively deemed -as follows:

a.    If the well is the OCS First Well (as defined below), then such party shall be conclusively deemed to have relinquished the interests specified in -Article XVI.F of this Agreement; or

b.    If the well is any other well, then such party shall be conclusively deemed to have relinquished the interests specified in Article XVI.C of this Agreement.

2.    Upon election by any party hereto to participate in the completion attempt of any well drilled under this Agreement, Operator may, at its election, require any such parties to pay in advance their proportionate share of the estimated completion costs for that well prior to beginning operation on the said completion attempt.  Such advance payment shall be made on or before ten (10) days after receipt of notice of such request for prepayment.  Should any party fail or refuse to timely advance to Operator its share of the estimated completion costs-, then Operator shall notify such party, by certified mail, Federal Express, or hand delivery, that such Party is delinquent in making such payment.  Should such delinquent party then fail to pay Operator such Party's share of the estimated cost of completing said well within ten (10) days from the date the notice is deposited with the U.S. Postal Service (in the case of certified mail) tendered to Federal Express (in the case of Federal Express) or tendered to the Party (in the case of hand delivery), such party shall be conclusively deemed  to be a Non-Consenting Party and shall relinquish its interest in accordance with the terms of this Agreement.

E.    INTENTIONALLY OMITTED

F.    ELECTION & PARTICIPATION - DRILLING OF FIRST WELL ON OAKHAY CREEK SOUTH PROSPECT

Notwithstanding the provisions of Section C above, if any party fails to elect to participate or is deemed to have elected not to participate in the drilling of the first well drilled on lands lying within the South Prospect ("OCS First Well"), then the interests relinquished by such party shall be all of such Non-Consenting Party's interests in the lands lying within the boundaries of the South Prospect, including without limitation all interests in the oil and gas in and under such lands and in all oil and gas leases and other rights and interests of such party hereunder, only insofar as the same cover the lands lying within the boundaries of such prospect. Notwithstanding the provision of Article VI.B.2 (a) found on lines 48-50, with respect to any portion of a Non-Consenting Party's interests in the South Prospect relinquished under the provisions of this section which is not acquired by a Consenting Party, then Maple Leaf Exploration LP shall have the option for a period of sixty (60) days after the time periods for the Consenting Parties to make their elections with respect to such relinquished interests, within which to elect to acquire all of the remainder of such relinquished interests subject to the provisions of the applicable Operating Agreement.  If any party relinquishes such party's interests in the South Prospect under the terms of this section, then the lands lying within such prospect and all of the interests of Maple Leaf Exploration LP and the Consenting Parties in such lands, including the oil and gas in and under such lands and in the oil and gas leases covering such lands only insofar as they cover the same, shall be released from this Operating Agreement and shall be covered by and subject to an Operating Agreement identical to this Agreement, provided that if the Operator or its affiliate is a Non-Consenting Party, then it shall continue to function as the Operator under the new Operating Agreement until a successor operator is selected by the majority in interest vote of Maple Leaf Exploration LP and the Consenting Parties.

G.    NON-CONSENTING PARTY'S RELINQUISHED INTERESTS

The interests relinquished by a Non-Consenting Party under the provisions of this Agreement shall be free and clear of any and all Subsequently Created Interests and liens and encumbrances of any kind or character, except as may arise under the provisions of this Agreement.  The Non-Consenting Party shall within five (5) business days after the time when such relinquishment becomes effective, execute, acknowledge and deliver to the Consenting Parties entitled to such relinquished

- 17b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

interests an assignment in recordable form of such relinquished interests and shall warrant title to the same, by, through and under such Non-Consenting Party, but not otherwise.

### H. AREA OF MUTUAL INTEREST

Any interests or rights to acquire any interests in the oil and gas in and under the Contract Area ("AMI"), including without limitation, oil and gas leases, farmout and farmin agreements, mineral interests, royalty interests, or any other interest in the minerals in and under such lands, including any contractual rights to acquire such interests are hereinafter referred to as an "Acquired Interest."

In the event an Acquired Interest is acquired within the AMI by any party hereto (whether directly, indirectly or by the way of farmin or other contractual arrangement), the Acquiring Party shall assign Maple Leaf Exploration, LP its overriding royalty interest therein as set forth below. The Acquiring Party shall then promptly give written notice of such acquisition to the other parties hereto (Non-Acquiring Parties) identifying the interest acquired, specifying the cost of such acquisition and evidence of payment of the actual direct costs of such acquisition (including bonus, broker's fees, recording charges and the like, hereinafter "Acquisition Costs") and any other pertinent and available data. Each Non-Acquiring Party shall have the right, by giving written notice to the Acquiring Party within fifteen (15) days (or forty-eight (48) hours in the event a drilling rig is on location within the AMI) after receipt of notice of such acquisition, to purchase and acquire its share of the Acquired Interest in the proportion to which its interest in the AMI bears to the aggregate interest in the AMI of the all the other Acquiring Party(s). Failure of a Non-Acquiring Party to notify the Acquiring Party shall be deemed an election by the Non-Acquiring Party to not acquire its proportionate share of the Acquired Interest. The election to participate in the acquisition of the Acquired Interest must be followed by payment of such party's proportionate share of the Acquisition Costs within fifteen (15) days after receipt of an Acquiring Party's invoice therefor. Failure to pay such invoice within the time provided shall be deemed an election not to participate in the Acquired Interest. The Acquiring Party shall assign the participating parties their proportionate shares of the Acquired Interest within ten (10) days after receipt of payment from such parties. Any assignment of interest made hereunder shall be free and clear of any burdens placed thereon by the Acquiring party, except as to the burdens specified herein below, but otherwise without warranty of title, either express or implied, even to the return of the purchase price. When less than all parties elect to acquire any Acquired Interest, such interest shall thereafter be subject to the provisions of an agreement identical to this Agreement with the exception of appropriate modification of the interests of the parties. If any Acquired Interest covers land both within and outside the AMI, the Acquiring Party may, at its option, offer either the entire Acquired Interest, or only the portion of such Interest covering lands within the AMI. If less than the entirety is offered, the Acquiring Party's costs applicable to the offered interest shall be prorated on a surface acreage basis. Provided, however, that if the Acquired Interests is a farm-in or other contractual arrangement which requires the drilling of a well to earn the Acquired Interest, the Non-Acquiring Parties shall be entitled to participate in all lands to be earned by drilling the earning well, whether such lands are situated within or outside the AMI.

In the event a part of the consideration concerning the cost of acquisition of an Acquired Interest requires the drilling of a well, the acquisition of seismic or other operation prior to earning an assignment of such interest, for the purpose of this paragraph it shall be considered that such Acquired Interest has been acquired and the offer shall be made promptly after the agreement to acquire such interest has been executed. An election to participate in the Acquired Interest shall be deemed an election to participate in the agreement governing such operations, together with all of the obligations required there under. A party shall be required to make its election to participate in such Acquired Interest, and the attendant operation, within fifteen (15) days (or forty-eight (48) hours in the event a drilling rig is on location within the AMI). Operations necessary to acquire the interest shall be governed by this Agreement. To receive an assignment of its proportionate share of such Acquired Interest, a Non-Acquiring Party must have: (a) participated in all operations necessary for the acquisition of the Acquired Interest, including, but not limited to, completion operations and also must have paid all costs and expenses incurred in connection therewith; (b) participated in any previous Drilling, seismic, or other operations that were necessary or were a condition precedent to the operations resulting in the acquisition of such Acquired Interest; and (c) participated in accordance with the terms, provisions, covenants, and conditions of the agreements governing the acquisition of such Acquired Interest.

If two (2) or more separate Acquired Interests are included in the same notice, each Offeree shall have the right of separate election as to each Acquired Interests.

The Acquiring Party shall immediately assign Maple Leaf an overriding royalty interest equal to the amount by which 25% of the oil and gas in, under and/or produced from the lands covered by the AMI Interest exceeds the royalty, overriding royalty and other payments burdening such production, but excluding any such burdens imposed thereon by the Acquiring Party. Such overriding royalty shall be subject to being proportionately reduced if the AMI Interest covers less than the entire mineral fee estate in the lands covered thereby. Such overriding royalty interest shall not be merged into or with any other interests of Maple Leaf Exploration LP in the AMI.

### I. BURDENS ON PRODUCTION

In addition to the royalties provided in each oil and gas lease, Maple Leaf Exploration LP is or shall be vested with an overriding royalty in each lease equal to the amount by which 25% of the oil and gas in, under or produced from lands covered by such lease exceeds the royalty, overriding royalties and other payments burdening such production, subject to being proportionately reduced if the lease covers less than the entire mineral fee estate in such lands or only an undivided interest in such lease is subject to this Agreement.

### J. MAPLE LEAF EXPLORATION LP'S CARRIED TO CASING POINT INTERESTS IN THE INITIAL WELL

For the benefit of Maple Leaf all of the other parties to this Operating Agreement shall bear and pay in proportion to their interest Maple Leaf's "Share" (as set forth in Section IV of Exhibit A of the Operating Agreement under the heading "Before CP") an undivided 25% of all the costs and expenses incurred hereunder which are attributable to or incurred in connection with the drilling of the Initial Well prior to reaching the Casing Point in such well and in connection with the plugging and abandoning the same if no attempt is made to complete the same. For purposes of this Operating Agreement the "Casing Point" shall have been reached in each of such wells when the Operator properly gives the notice provided in Option No. 2 of Article VI.C.1 entitled "Completion" to the parties entitled to receive such notice.

### K. INFORMATION

Notwithstanding any other provisions of this Operating Agreement and specifically Article V.D. 7 Non-Consenting Parties shall not be entitled to data or information obtained from a well or operation in which such Non-Consenting Party did not participate and no party shall be entitled to data or information from or with respect to any well in which such party has no interest.

### L. SUBSEQUENTLY CREATED INTERESTS

Notwithstanding the provisions of this Agreement to the contrary, if any party hereto shall create an overriding royalty, production payment, net proceeds interest, or other similar interest, subsequent to the effective date of this Agreement, or if such an interest was created prior to the effective date hereof but was neither recorded in the county/parish in which the Contract Area is located nor disclosed to all parties hereto at the time of execution hereof (any such interest created under the

- 17c -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

circumstances herein mentioned shall hereafter be referred to as a "Subsequently Created Interest"), such Subsequently Created Interest shall be specifically subject to all of the terms and provisions of this Agreement, as follows:

    (1)   If non-consent operations are conducted pursuant to any provision of this agreement, and the Party or Parties conducting such operations become entitled to receive the production attributable to the interest out of which the Subsequently Created Interest is derived, such Party or Parties shall receive same free and clear of such Subsequently Created Interest. The Party creating same shall bear and pay all such Subsequently Created Interests and shall indemnify and hold the other Parties hereto free and harmless from any and all liability resulting there from.

    (2)   If the owner of the interest from which a Subsequently Created Interest is derived fails to pay, when due, its share of expenses chargeable hereunder, the lien granted the other Parties hereto under the provisions of Article VII.B. or under the appropriate state statutes shall cover and affect the Subsequently Created Interest and the rights of the Parties shall be the same as if the Subsequently Created Interest has not been created. The owner of the interest from which such Subsequently Created Interest was derived shall be responsible to the owner of such Subsequently Created Interest for any amounts to which the latter may be entitled.

    (3)   If the owner of the interest from which a Subsequently Created Interest is derived (i) elects to abandon a well under the provision of Article VI.E. hereof, (ii) elects to surrender a lease (or portion thereof) under the provisions of Article VIII.A. hereof, or (iii) elects not to pay rentals attributable to its interest in any lease and thereby is required to assign the lease or that portion or interest therein for which it elects not to pay rentals to those Parties paying such rental, any assignment resulting from such election shall be free and clear of the Subsequently Created Interest.

    (4)   The owner creating such interest shall indemnify and hold the other Parties hereto harmless from any claim or cause of action by the owner of the Subsequently Created Interest.

    (5)   The overriding royalty interests to be assigned to or reserved by Maple Leaf Exploration LP, or its successors or assigns, shall never be considered a Subsequently Created Interest.

M.    MARKETING OF GAS

    Operator agrees to use its best efforts to market any Non-Operator's share of any production from the Contract Area which is not being separately marketed by Non-Operator under the same terms that Operator is marketing its or its affiliate's share of said production. Any Non-Operator choosing to separately market its proportionate share of said production must give a minimum of forty-five (45) days advance written notice to Operator prior to the month in which said Non-Operator intends to separately market its production. Conversely, if said Non-Operator desires to cease separately marketing its share of production again requests that the Operator market its production, Non-Operator must provide a minimum forty-five (45) day advance request of the same prior to the month in which Operator is again to market said Non-Operator's production.

N.    METERING OF PRODUCTION

    In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

O.    DEFINITION OF "AFFILIATE"

    The term Affiliate shall mean a company, partnership or other legal entity which controls, or is controlled by or which is controlled by an entity which controls a party to this agreement. Control means the ownership directly or indirectly of more than fifty percent (50%) of the shares of voting rights in a company, partnership or legal entity.

P.    OPERATOR / NON-OPERATORS EMPLOYMENT RELATIONSHIP

    In the performance of its duties, Operator shall be an independent contractor and no relationship of employer and employee, principal and agent, partnership or joint venture shall exist or arise between Operator and Non-Operators.

Q.    CASH CALL

    Regardless of anything contained herein to the contrary, Operator is not required to begin any operation unless and until Operator's invoice(s) therefore, have been paid in full and the funds have been received by Operator at least five (5) days before any drilling or pre-drilling operation begins and three (3) days before any completion or subsequent operations begin. If the Non-Operators approve the commencement of operation, Operator may elect to proceed prior to receipt of funds, provided, however, the Non-Operators shall remain fully liable to provide such funding.

- 17d -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1989

IN WITNESS WHEREOF, this agreement shall be effective as of the ___1___ day of __June_____,
2011___.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.~~

ATTEST OR WITNESS:                              OPERATOR

                                               ___SKLAR EXPLORATION COMPANY LLC___


                                               By _____

_____                   ___David A. Barlow_____
                                               Type or print name

                                               Title __President, Chief Operating Officer____

                                               Date _____7 - 26 - 11_____

                                               Tax ID or S.S. No. _____


                              NON-OPERATORS


                                               SKLARCO  LLC_____


                                               By _____

_____                   ___David A. Barlow_____
                                               Type or print name

                                               Title __President, Chief Operating Officer____

                                               Date _____7 - 26 - 11_____

                                               Tax ID or S.S. No. _____



                                               ___MCCOMBS ENERGY, LTD._____



_____                       By _____

_____                       ___Ricky Haikin_____
                                               Type or print name

                                               Title __Vice President_____

                                               Date _____

                                               Tax ID or S.S. No _____

- 18a -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

IN WITNESS WHEREOF, this agreement shall be effective as of the __1__ day of __June_____,

2011____. ~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles_____, have been made to the form.~~

ATTEST OR WITNESS:                         OPERATOR

                                          __SKLAR EXPLORATION COMPANY LLC_____

_____            By  _____

_____                __David A. Barlow_____
                                        Type or print name

                                        Title __President, Chief Operating Officer__

                                        Date ____7 – 26 – 11_____

                                        Tax ID or S.S. No. _____


                               NON-OPERATORS


                                          __SKLARCO  LLC_____

_____            By  _____

_____                __David A. Barlow_____
                                        Type or print name

                                        Title __President, Chief Operating Officer__

                                        Date _____7 – 26 – 11_____

                                        Tax ID or S.S. No. _____


                                          __MCCOMBS ENERGY, LTD._____

_____            By  _____

_____                __Ricky Hamon_____
                                        Type or print name

                                        Title __Vice President_____

                                        Date __7/27/11_____

                                        Tax ID or S.S. No __74-Y86/757_____

- 18a -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

JJS WORKING INTERESTS, LLC
Houston Bulldog Capital Managemenet, LLC.
It's Manager

By _____

Justin Simons
Type or print name

Title _ Manager of Bulldog Capital Management, LLC

Date _08/03/2011_____

Tax ID or S.S. No. _27-0871744_____


RESOURCE VENTURES, LLC.

By _____

Mark A. Arnold
Type or print name

Title _ General Manager_____

Date _____

Tax ID or S.S. No. _____


MAPLE LEAF EXPLORATION LP

By _____

R. Stewart Campbell, Jr.
Type or print name

Title _ President_____

Date _____

Tax ID or S.S. No. _____

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

JJS WORKING INTERESTS. LLC
Houston Bulldog Capital Managemenet, LLC,
It's Manager

By _____

_____ Justin Simons _____
Type or print name

Title __ Manager of Bulldog Capital Management, LLC __

Date _____

Tax ID or S.S. No. _____


RESOURCE VENTURES, LLC.

By _____

_____ Mark A. Arnold _____
Type or print name

Title __ General Manager _____

Date __ 8/15/2011 _____

Tax ID or S.S. No. 26-2560548


MAPLE LEAF EXPLORATION LP

By _____

_____ R. Stewart Campbell, Jr. _____
Type or print name

Title __ President _____

Date _____

Tax ID or S.S. No. _____

- 18b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

JJS WORKING INTERESTS, LLC
Houston Bulldog Capital Managemenet, LLC,
It's Manager

By _____

_____
Justin Simons
Type or print name

Title _ Manager of Bulldog Capital Management, LLC

Date _____

Tax ID or S.S. No. _____


RESOURCE VENTURES, LLC.


By _____

_____
Mark A. Arnold
Type or print name

Title _ General Manager

Date _____

Tax ID or S.S. No. _____


MAPLE LEAF EXPLORATION LP


By _____

_____
R. Stewart Campbell, Jr.
Type or print name

Title _ President

Date _____

Tax ID or S.S. No. _____

- 18b -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ACKNOWLEDGMENTS

1

2

3    State of ___Louisiana___ )

4                                          ) ss.

5    Parish of ___Caddo___ )

6        This instrument was acknowledged before me on

7    _July 26, 2011_____ by _____David A. Barlow_____ as

8    President, Chief Operating Officer of    SKLAR EXPLORATION COMPANY LLC_____.

9    (Seal, if any)                          _Marie Gardner_____

10                                           Title (and Rank) _____

11                                           My commission expires: _With Life_____

12

13   State of ___Louisiana___ )           Marie Gardner, Notary Public # 56265
                                              Bossier Parish, Louisiana
14                                      ) ss.    My Commission is for Life

15   Parish of ___Caddo___ )

16        This instrument was acknowledged before me on

17   _July 26, 2011_____ by _____David A. Barlow_____ as

18   President, Chief Operating Officer  of  SKLARCO LLC_____.

19   (Seal, if any)                          _Marie Gardner_____

20                                           Title (and Rank) _____

21                                           My commission expires: _With Life_____

22

23                                      Marie Gardner, Notary Public # 56265
                                              Bossier Parish, Louisiana
24                                          My Commission is for Life

25   State of ___Texas___ )

26                                      ) ss.

27   County of ___Harris___ )

28        This instrument was acknowledged before me on

29   _____ by _____Ricky Haikin_____as

30   Vice President___ of ___MCCOMBS ENERGY, LTD._____.

31   (Seal, if any)                          _____

32                                           Title (and Rank) _____

33                                           My commission expires: _____

34

35

36

37

- 19a -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

**ACKNOWLEDGMENTS**

1

2

3   State of ___Louisiana___ )

4                           ) ss.

5   Parish of ___Caddo___ )

6       This instrument was acknowledged before me on

7   _July 26, 2011_____ by _____David A. Barlow_____ as

8   President, Chief Operating Officer of ___SKLAR EXPLORATION COMPANY LLC_____ .

9   (Seal, if any)

10                                      Title (and Rank) _____

11                                      My commission expires: _With Life_____

12

13                                      Marie Gardner, Notary Public # 56265
                                        Bossier Parish, Louisiana
14   State of ___Louisiana___ )        My Commission is for Life

15                           ) ss.

16   Parish of ___Caddo___ )

        This instrument was acknowledged before me on

17   _July 26, 2011_____ by _____David A. Barlow_____ as

18   President, Chief Operating Officer  of ___SKLARCO LLC_____ .

19   (Seal, if any)

20                                      Title (and Rank) _____

21                                      My commission expires: _With Life_____

22

23                                      Marie Gardner, Notary Public # 56265
                                        Bossier Parish, Louisiana
24                                      My Commission is for Life

25   State of ___Texas___ )

26                           ) ss.

27   County of ___Harris___ )

28       This instrument was acknowledged before me on

29   _July 27th, 2011_____ by _____Ricky Haikin_____ as

30   Vice President  of ___MCCOMBS ENERGY, LTD._____ .

31   (Seal, if any)

32   [Notary Seal: DAWN M. KEMPTHORNE, Notary Public, State of Texas, Commission Expires 05-25-2015]

                                        Title (and Rank) _____

33                                      My commission expires: _5/25/2015_____

34

35

36

37

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1989

State of _____ Texas _____ )

) ss.

County of _____ Harris _____ )

This instrument was acknowledged before me on
_August 5, 2011_____ by _____ Justin Simons _____ as

Manager  of ___ HOUSTON BULLDOG CPAITAL MANAGEMENT, LLC. THE MANAGER OF JJS WORKING INTERESTS LLC ___.

(Seal, if any)

Title (and Rank) _Glenda Smith_
_Banking Officer_

My commission expires: _____ 10/11/2013

GLENDA SMITH
Notary Public, State of Texas
My Commission Expires 10/11/2013

State of _____ Colorado _____ )

) ss.

County of _____ Arapaho _____ )

This instrument was acknowledged before me on
_____ by _____ Mark A. Arnold _____ as

General Manager  of _____ RESOURCE VENTURES, LLC. _____.

(Seal, if any)

Title (and Rank) _____

My commission expires: _____

State of _____ Texas _____ )

) ss.

County of _____ Dallas _____ )

This instrument was acknowledged before me on
_____ by _____ R. Stewart Campbell, Jr. _____ as

President _____ of _____ MAPLE LEAF EXPLORATION LP _____.

(Seal, if any)

Title (and Rank) _____

My commission expires: _____

- 19b -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1989

State of _____Texas_____ )

                ) ss.

County of ____Harris____ )

This instrument was acknowledged before me on

_____ by _____Justin Simons_____ as

Manager of _____HOUSTON BULLDOG CPAITAL MANAGEMENT, LLC, THE MANAGER OF JJS WORKING INTERESTS LLC_____.

(Seal, if any)                        _____

                                    Title (and Rank) _____

                                      My commission expires: _____

State of ____Colorado____ )

                ) ss.

County of ____Arapaho____ )

This instrument was acknowledged before me on

_____8 / 15 / 11_____ by _____Mark A. Arnold_____ as

General Manager of ____RESOURCE VENTURES, LLC._____.

(Seal, if any)                        *Jo Anne Scherfel*

                                      Title (and Rank) Notary / Acctg. mgr.

                                      My commission expires: 3 / 15 / 2013

State of _____Texas_____ )

                ) ss.

County of ____Dallas____ )

This instrument was acknowledged before me on

_____ by _____R. Stewart Campbell, Jr._____ as

President_____ of ____MAPLE LEAF EXPLORATION LP_____.

(Seal, if any)                        _____

                                      Title (and Rank) _____

                                      My commission expires: _____

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1989

State of _____ Texas _____ )

                ) ss.

County of ___ Harris ___ )

    This instrument was acknowledged before me on

_____ by _____ Justin Simons _____ as

Manager of ___ HOUSTON BULLDOG CPAITAL MANAGEMENT, LLC, THE MANAGER OF JJS WORKING INTERESTS LLC _____ .

(Seal, if any)                  _____

                        Title (and Rank) _____

                        My commission expires: _____

State of _____ Colorado _____ )

                ) ss.

County of ___ Arapaho ___ )

    This instrument was acknowledged before me on

_____ by _____ Mark A. Arnold _____ as

General Manager of ___ RESOURCE VENTURES, LLC. _____ .

(Seal, if any)                  _____

                        Title (and Rank) _____

                        My commission expires: _____

State of _____ Texas _____ )

                ) ss.

County of ___ Dallas ___ )

    This instrument was acknowledged before me on

_27th_ _July 2011_ _____ by _____ R. Stewart Campbell, Jr. _____ as

President _____ of ___ MAPLE LEAF EXPLORATION LP _____ .

(Seal, if any)                _____

    [SEAL: PHILIP N. DISSPAIN / MY COMMISSION EXPIRES / February 2, 2014]

                        Title (and Rank) _____

                        My commission expires: _2-2-2014_

- 19b -

# EXHIBIT "A"

Attached to and made part of the Operating Agreement dated June 1, 2011 by and between
Sklar Exploration Company LLC. as Operator and Maple Leaf Exploration LP, et al as Non-Operators.

I.    **Contract Area and AMI – Lands Subject to this Agreement**

    All of the following described lands located in Smith County, Mississippi.

        Township - Range
        10N – 15W   All of Sections 15,16, 17, 20, 21, 22, 23

        **Oakhay Creek North Prospect** - All of the following described lands.

        Township – Range
        10N - 15W   Section 16:  S/2 SW/4
        10N - 15W   Section 17:  All
        10N - 15W   Section 20:  N/2
        10N - 15W   Section 21:  N/2 NW/4

        **Oakhay Creek South Prospect** - All of the Contract Area except the lands described
        above as the Oakhay Creek North Prospect.

II.   **Restrictions as to Depth, Formation or Substance**

    None – except as may be provided in any lease subject to this Agreement.

III.  **Addresses and Contact Information for the Parties to this Agreement**

    See attached Schedule of Addresses and Contact Information.

IV.   **Interests of the Parties to this Agreement**

| | Before CP* | After CP** |
|---|---|---|
| Sklarco LLC | 34.00000% | 25.50000% |
| McCombs Energy, Ltd. | 30.00000% | 22.50000%*** |
| JJS Working Interests, LLC | 2.66667% | 2.00000% |
| Resource Ventures, LLC | 33.33333% | 25.00000% |
| Maple Leaf Exploration LP | 0.00000% | 25.00000% |
| | 100.00000% | 100.00000% |

    \*     Before CP – The interest of the party in the Initial Well prior to the Casing Point and
        in plugging and abandoning the same if no completion attempt is made, all as set
        forth in Article XVI.J.

    \*\*   After CP – The interest of the party in the Initial Well after the Casing Point and in
        plugging and abandoning the same if a completion attempt is made and in the
        remainder of the Contract Area.

    \*\*\*  After Prospect Payout – The interest of McCombs Energy, Ltd. is subject to a 1/16[th]
        back-in, proportionately reduced, after Prospect Payout in favor of Sklarco LLC.

V.    **Oil and Gas Leases Subject to this Agreement**

    See attached Lease Summary Report.

VI.   **Burdens on Production**

    In addition to the royalties provided in each oil and gas lease, Maple Leaf Exploration LP is
    or shall be vested with an overriding royalty in each lease equal to the amount by which 25%
    of the oil and gas in, under or produced from lands covered by such lease exceeds the royalty,
    overriding royalties and other payments burdening such production, subject to being
    proportionately reduced if the lease covers less than the entire mineral fee estate in such lands
    or only an undivided interest in such lease is subject to this Agreement.

**Schedule of Addresses and Contact Information.**

| OPERATOR/NON-OPERATORS | PHONE | ADDRESS |
|---|---|---|
| **SKLAR EXPLORATION COMPANY  LLC** | 318 227 8668 | Sklar Exploration Company LLC |
| | | ATTN:  David A. Barlow |
| DBarlow@sklarexploration.com | | 401 Edwards St    Suite# 1601 |
| | | Shreveport, LA 71101 |
| | | |
| **SKLARCO  LLC** | 318 227 8668 | Sklarco LLC |
| | | ATTN:  David A. Barlow |
| DBarlow@sklarexploration.com | | 401 Edwards St   Suite# 1601 |
| | | Shreveport, LA 71101 |
| | | |
| **MCCOMBS ENERGY. LTD.** | 713 621 0033 | McCombs Energy, Ltd. |
| | | ATTN:  Larry Wyont |
| RHaikin@mccombsenergy.com | | 5599 San Felipe   Suite# 1200 |
| LWyont@mccombsenergy.com | | Houston, TX 77056 |
| SMcDonald@mccombsenergy.com | | |
| DDR@mccombsenergy.com | | |
| | | |
| **JJS WORKING INTERESTS, LLC** | 713 888 0875 | JJS Working Interests LLC |
| | | ATTN:  Justin Simons |
| Justin@hbcapllc.com | | 4295 San Felipe  Suite #207 |
| Suzanne@hbcapllc.com | | Houston, TX   77027 |
| | | |
| **RESOURCE VENTURES, LLC.** | 303 217 5151 | Resource Ventures, LLC. |
| | | ATTN:  Mark A. Arnold |
| Arnold@royaltyexploration.com | | 8369 SouthPark Lane   Suite B |
| | | Littleton, CO  80120 |
| | | |
| **MAPLE LEAF EXPLORATION LP** | 214 740 0490 | Maple Leaf Exploration LP |
| | | ATTN:  R. Stewart Campbell, Jr. |
| RStewartCampbellJr@yahoo.com | | 200 Crescent Court   Suite# 877 |
| | | Dallas, TX  75201 |

<u>**EXHIBIT "A" - V**</u>

Attached to and made a part of that certain Operating Agreement dated effective June 1, 2011 by and between Sklar Exploration Company L.L.C., as Operator, and Maple Leaf Exploration LP, et al, as Non-Operators.

1. Oil, Gas and Mineral Lease dated May 8, 2008, by and between Jean Lewis Lindsay, et al, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 393 of the Official Public Records of Smith County, Mississippi.

2. Oil, Gas and Mineral Lease dated April 12, 2010, by and Thomas M. Alewine, Jr., as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 230 of the Official Public Records of Smith County, Mississippi.

3. Oil, Gas and Mineral Lease dated May 19, 2008, by and between Jamie Dixon Kilgore, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 397 of the Official Public Records of Smith County, Mississippi.

4. Oil, Gas and Mineral Lease dated May 8, 2008, by and between Donald Martin McDaniel, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 399 of the Official Public Records of Smith County, Mississippi.

5. Oil, Gas and Mineral Lease dated April 27, 2010, by and between and Kenneth Ray McDaniel, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 260 of the Official Public Records of Smith County, Mississippi.

6. Oil, Gas and Mineral Lease dated April 30, 2010, by and between and Margaret A. Craft, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 268 of the Official Public Records of Smith County, Mississippi.

7. Oil, Gas and Mineral Lease dated April 14, 2010, by and between and Eric C. Clark, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 247 of the Official Public Records of Smith County, Mississippi.

8. Oil, Gas and Mineral Lease dated April 14, 2010, by and between and John B. Clark, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 243 of the Official Public Records of Smith County, Mississippi.

9. Oil, Gas and Mineral Lease dated March 29, 2011, by and between Carolyn "Polly" Clark, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 503, Page 781 of the Official Public Records of Smith County, Mississippi.

10. Oil, Gas and Mineral Lease dated June 6, 2008, by and between David Craft, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 413 of the Official Public Records of Smith County, Mississippi.

11. Oil, Gas and Mineral Lease dated August 26, 2008, by and between Kendall Eaton, et al, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 415 of the Official Public Records of Smith County, Mississippi.

12. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Ronald L. Barnes, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 417 of the Official Public Records of Smith County, Mississippi.

13. Oil, Gas and Mineral Lease dated May 1, 2010, by and between and Peggy Petty Frierson, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 264 of the Official Public Records of Smith County, Mississippi.

14. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Cynthia C. Craft, et al, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 421 of the Official Public Records of Smith County, Mississippi.

15. Oil, Gas and Mineral Lease dated April 21, 2010, by and between J. E. Craft, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 226 of the Official Public Records of Smith County, Mississippi.

16. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Thomas Rodney Craft, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 431 of the Official Public Records of Smith County, Mississippi.

17. Oil, Gas and Mineral Lease dated September 22, 2008, by and between Buddy L. Lowery, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 433 of the Official Public Records of Smith County, Mississippi.

18. Oil, Gas and Mineral Lease dated September 22, 2008, by and between Sally K. Foster, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 435 of the Official Public Records of Smith County, Mississippi.

19. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Brenda Jo Sullivan Adcox, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 437 of the Official Public Records of Smith County, Mississippi.

20. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Michael C. Sullivan, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 440 of the Official Public Records of Smith County, Mississippi.

21. Oil, Gas and Mineral Lease dated September 25, 2008, by and between Larry Joe Blakeney, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 442 of the Official Public Records of Smith County, Mississippi.

22. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Robert Kenneth Hill, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 446 of the Official Public Records of Smith County, Mississippi.

23. Oil, Gas and Mineral Lease dated September 19, 2008, by and Jeanette S. Cole, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 447 of the Official Public Records of Smith County, Mississippi.

24. Oil, Gas and Mineral Lease dated September 22, 2008, by and between Mary L. Johnson, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 449 of the Official Public Records of Smith County, Mississippi.

25. Oil, Gas and Mineral Lease dated April 21, 2010, by and between Taylor Sullivan, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 221 of the Official Public Records of Smith County, Mississippi.

26. Oil, Gas and Mineral Lease dated May 3, 2010, by and between Hazel D. Sullivan, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 251 of the Official Public Records of Smith County, Mississippi.

27. Oil, Gas and Mineral Lease dated September 22, 2008, by and between Gayril Gibson, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 455 of the Official Public Records of Smith County, Mississippi.

28. Oil, Gas and Mineral Lease dated November 20, 2008, by and between Edith R. Bryant, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 457 of the Official Public Records of Smith County, Mississippi.

29. Oil, Gas and Mineral Lease dated November 1, 2008, by and between Carol Blackwell Slack, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 459 of the Official Public Records of Smith County, Mississippi.

30. Oil, Gas and Mineral Lease dated November 1, 2008, by and between J. Ruth Blackwell, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 465 of the Official Public Records of Smith County, Mississippi.

31. Oil, Gas and Mineral Lease dated November 1, 2008, by and between Mary Jo Clements-Balas, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 463 of the Official Public Records of Smith County, Mississippi.

32. Oil, Gas and Mineral Lease dated November 7, 2008, by and between Tommy Lee Harris, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 471 of the Official Public Records of Smith County, Mississippi.

33. Oil, Gas and Mineral Lease dated November 1, 2008, by and between Mary V. Davis, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 473 of the Official Public Records of Smith County, Mississippi.

34. Oil, Gas and Mineral Lease dated December 4, 2008, by and between Peggy Ann Reid Rahaim, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 475 of the Official Public Records of Smith County, Mississippi.

35. Oil, Gas and Mineral Lease dated December 8, 2008, by and between The Smith County Board of Education, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 479 of the Official Public Records of Smith County, Mississippi.

36. Oil, Gas and Mineral Lease dated April 22, 2010, by and between Brad Sullivan, et ux, as Lessors, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 234 of the Official Public Records of Smith County, Mississippi.

37. Oil, Gas and Mineral Lease dated January 26, 2009, by and between Larry Evan Ford Noblin, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 486 of the Official Public Records of Smith County, Mississippi.

38. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Gary D. Talbert as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 490 of the Official Public Records of Smith County, Mississippi.

39. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Ramona T. Talbert Brooks, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 492 of the Official Public Records of Smith County, Mississippi.

40. Oil, Gas and Mineral Lease dated January 8, 2009, by and between Lisa Givens, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 494 of the Official Public Records of Smith County, Mississippi.

41. Oil, Gas and Mineral Lease dated January 8, 2009, by and between Phil D. Hall, et ux, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 496 of the Official Public Records of Smith County, Mississippi.

42. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Terry Tootle, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 498 of the Official Public Records of Smith County, Mississippi.

43. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Barbara Johnson, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 500 of the Official Public Records of Smith County, Mississippi.

44. Oil, Gas and Mineral Lease dated January 26, 2009, by and between Cecil Atha Ford, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 502 of the Official Public Records of Smith County, Mississippi.

45. Oil, Gas and Mineral Lease dated January 26, 2009, by and between Betty Bell Gibson, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 504 of the Official Public Records of Smith County, Mississippi.

46. Oil, Gas and Mineral Lease dated April 14, 2010, by and between Larry E. Clark, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 239 of the Official Public Records of Smith County, Mississippi.

47. Oil, Gas and Mineral Lease dated September 25, 2008, by and between Larry Joe Blakeney, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 518 of the Official Public Records of Smith County, Mississippi.

48. Oil, Gas and Mineral Lease dated November 1, 2008, by and between Angela Van Zandt as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 520 of the Official Public Records of Smith County, Mississippi.

49. Oil, Gas and Mineral Lease dated September 30, 2009, by and between Melanie V. Bradford, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 526 of the Official Public Records of Smith County, Mississippi.

50. Oil, Gas and Mineral Lease dated October 27, 2009, by and between Virginia V. Roberts, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 528 of the Official Public Records of Smith County, Mississippi.

51. Oil, Gas and Mineral Lease dated October 21, 2009, by and between Barbara V. Mallia, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 530 of the Official Public Records of Smith County, Mississippi.

52. Oil, Gas and Mineral Lease dated October 21, 2009, by and between R. P. Van Zandt, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 532 of the Official Public Records of Smith County, Mississippi.

53. Oil, Gas and Mineral Lease dated September 30, 2009, by and between Valeria Van Zandt Tarantino, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 536 of the Official Public Records of Smith County, Mississippi.

54. Oil, Gas and Mineral Lease dated January 4, 2010, by and between Carrell Wayne Austin, et ux, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 538 of the Official Public Records of Smith County, Mississippi.

55. Oil, Gas and Mineral Lease dated May 12, 2011, by and between Peggy R. Johnson Revocable Trust, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 503, Page 779 of the Official Public Records of Smith County, Mississippi.

56. Oil, Gas and Mineral Lease dated August 18, 2008, by and between Black Stone Natural Resources I, L.P., as Lessor, and N & M Resources, LLC, as Lessee, filed in Book 480, Page 158 of the Official Public Records of Smith County, Mississippi.

57. Oil, Gas and Mineral Lease dated April 13, 2010, by and between Samson Contour Energy E&P, LLC, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 602 of the Official Public Records of Smith County, Mississippi.

58. Oil, Gas and Mineral Lease dated May 18, 2010, by and between Donald Blakeney, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 632 of the Official Public Records of Smith County, Mississippi.

59. Oil, Gas and Mineral Lease dated June 22, 2010, by and between Therese Pittman, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 515 of the Official Public Records of Smith County, Mississippi.

60. Oil, Gas and Mineral Lease dated June 22, 2010, by and between Bobby Atchley, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 519 of the Official Public Records of Smith County, Mississippi.

61. Oil, Gas and Mineral Lease dated May 12, 2010, by and between Donald S. Craft, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 511 of the Official Public Records of Smith County, Mississippi.

62. Oil, Gas and Mineral Lease dated June 8, 2010, by and between Jocaster Bynam Ford, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 419 of the Official Public Records of Smith County, Mississippi.

63. Oil, Gas and Mineral Lease dated June 3, 2010, by and between Emma Jean Jones Johnson, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 411 of the Official Public Records of Smith County, Mississippi.

64. Oil, Gas and Mineral Lease dated June 3, 2010, by and between Patty J. Vickery, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 407 of the Official Public Records of Smith County, Mississippi.

65. Oil, Gas and Mineral Lease dated June 3, 2010, by and between Martha Jones Neal, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 403 of the Official Public Records of Smith County, Mississippi.

66. Oil, Gas and Mineral Lease dated May 4, 2010, by and between Janis Craft McLauglin, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 392 of the Official Public Records of Smith County, Mississippi.

67. Oil, Gas and Mineral Lease dated June 2, 2010, by and between Mary C. Tubbs, et vir, as Lessors, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 387 of the Official Public Records of Smith County, Mississippi.

68. Oil, Gas and Mineral Lease dated May 11, 2010, by and between Dan McCormick, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 623 of the Official Public Records of Smith County, Mississippi.

69. Oil, Gas and Mineral Lease dated April 30, 2010, by and between Kathy Jo Craft Harding, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 296 of the Official Public Records of Smith County, Mississippi.

70. Oil, Gas and Mineral Lease dated May 14, 2010, by and between Diane Craft, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 415 of the Official Public Records of Smith County, Mississippi.

71. Oil, Gas and Mineral Lease dated April 29, 2010, by and between Jo Ann Craft Garraway, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 256 of the Official Public Records of Smith County, Mississippi.

72. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Jeanette Sullivan Cole, et vir, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 512 of the Official Public Records of Smith County, Mississippi.

73. Oil, Gas and Mineral Lease dated November 9, 2009, by and between Walter Skipper, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 534 of the Official Public Records of Smith County, Mississippi.

74. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Rebecca Ann Sullivan Wallace, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 514 of the Official Public Records of Smith County, Mississippi.

75. Oil, Gas and Mineral Lease dated July 1, 2010, by and between Anadarko E&P Company LP, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 501, Page 27 of the Official Public Records of Smith County, Mississippi.

76. Oil, Gas and Mineral Lease dated June 1, 2010, by and between Highmount Minerals LLC, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 501, Page 25 of the Official Public Records of Smith County, Mississippi.

77. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Kendall Eaton, et al, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 522 of the Official Public Records of Smith County, Mississippi.

78. Oil, Gas and Mineral Lease dated February 4, 2009, by and between Elizabeth Noblin, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 508 of the Official Public Records of Smith County, Mississippi.

79. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Brenda T. Davis, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 506 of the Official Public Records of Smith County, Mississippi.

80. Oil, Gas and Mineral Lease dated November 3, 2008, by and between Virginia T. Cargill, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 467 of the Official Public Records of Smith County, Mississippi.

81. Oil, Gas and Mineral Lease dated November 24, 2008, by and between Jack R. Craft, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 469 of the Official Public Records of Smith County, Mississippi.

82. Oil, Gas and Mineral Lease dated September 30, 2008, by and between Johnny Jones, et ux, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 443 of the Official Public Records of Smith County, Mississippi.

83. Oil, Gas and Mineral Lease dated January 26, 2009, by and between John Thomas Noblin, Jr., as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 488 of the Official Public Records of Smith County, Mississippi.

84. Oil, Gas and Mineral Lease dated March 3, 2009, by and between Kathryn J. Waites, et al, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 524 of the Official Public Records of Smith County, Mississippi.

85. Oil, Gas and Mineral Lease dated July 28, 2008, by and between Pamela Mayfield, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 405 of the Official Public Records of Smith County, Mississippi.

86. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Muriel L. Petty, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 425 of the Official Public Records of Smith County, Mississippi.

87. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Hilda Grace Bynum, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 423 of the Official Public Records of Smith County, Mississippi.

88. Oil, Gas and Mineral Lease dated November 17, 2008, by and between Cleone L. McKay, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 461 of the Official Public Records of Smith County, Mississippi.

89. Oil, Gas and Mineral Lease dated June 23, 2008, by and between Thomas Mayfield, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 516 of the Official Public Records of Smith County, Mississippi.

90. Oil, Gas and Mineral Lease dated May 6, 2010, by and between John K. Keyes, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 300 of the Official Public Records of Smith County, Mississippi.

91. Oil, Gas and Mineral Lease dated May 14, 2010, by and between John K. Keyes Trust, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 627 of the Official Public Records of Smith County, Mississippi.

92. Oil, Gas and Mineral Lease dated May 17, 2010, by and between Floyd H. Metts, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 640 of the Official Public Records of Smith County, Mississippi.

93. Oil, Gas and Mineral Lease dated May 17, 2010, by and between Ann M. Whitworth, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 637 of the Official Public Records of Smith County, Mississippi.

94. Oil, Gas and Mineral Lease dated May 17, 2010, by and between William Cato Mayfield, Jr., as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 644 of the Official Public Records of Smith County, Mississippi.

**EXHIBIT "A-1"**

Attached to and made a part of that certain Operating Agreement dated June 1,
2011, by and between **SKLAR EXPLORATION COMPANY LLC,** as
**OPERATOR,** and Maple Leaf Exploration LP et al, as **NON-OPERATORS.**

## ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES

STATE OF MISSISSIPPI,

COUNTY OF SMITH,

      **KNOW ALL MEN BY THESE PRESENTS** that the following (hereinafter
sometimes referred to as **"Assignor"**):

      **MAPLE LEAF EXPLORATION LP,** a Texas limited
partnership whose address is 200 Crescent Court, Suite 877,
Dallas, Texas 75201, represented herein by its duly authorized
general partner, MLEGP LC by R. Stewart Campbell, Jr. it=s
manager ("Maple Leaf");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and
valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does
hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER and
DELIVER unto the following (hereinafter sometimes collectively referred to as the
"Assignees"):

      **SKLARCO L.L.C.,** a Louisiana limited liability company, whose
address is Louisiana Tower, Suite 1601, 401 Edwards Street,
Shreveport, Louisiana 71101, represented herein by its Vice
President-Chief Operating Officer, David A. Barlow ("Sklarco");

      **MCCOMBS ENERGY, LTD.,** a Texas limited partnership,
whose address is 5599 San Felipe, Suite 1200, Houston, Texas
77056-2794, represented herein by its Vice President, Ricky
Haikin ("McCombs");

      **JJS WORKING INTERESTS LLC,** a Texas limited liability
company, whose address is 4295 San Felipe, Suite 207, Houston,
Texas 77027, represented herein by Houston Bulldog Capital
Management, LLC, its duly authorized Manager, represented
herein by Justin Simons, in his capacity as the duly authorized
Manager of Houston Bulldog Capital Management, LLC ("JJS");

      **RESOURCE VENTURES, LLC,** a Colorado limited liability
company, whose address is 8369 SouthPark Lane, Suite B,
Littleton, Colorado 80120, represented herein by its General
Manager, Mark A. Arnold ("Resource Ventures");

      and

**MAPLE LEAF EXPLORATION LP,** a Texas limited partnership whose address is 200 Crescent Court, Suite 877, Dallas, Texas 75201, represented herein by its duly authorized general partner, MLEGP LC by R. Stewart Campbell, Jr. it=s manager ("Maple Leaf");

The undivided interests set out below in all of the oil, gas and mineral leases (the "**Leases**") described on Exhibit "A" attached hereto and by reference made a part hereof, said Leases covering lands located in Smith County, Mississippi (hereinafter the undivided interests in the Leases are collectively referred to as the "**Assigned Interests**"). The Assigned Interests are granted by Assignor and assigned to Assignees in the following shares (hereinafter sometimes referred to as the "Assignees' Shares"):

| Assignees | Assignees – Shares Before Casing Point* | Assignees – Shares After Casing Point** |
|---|---|---|
| Sklarco LLC | 34.00000% | 25.50000% |
| McCombs Energy, Ltd. | 30.00000% | 22.50000%*** |
| JJS Working Interests, LLC | 2.66667% | 2.00000% |
| Resource Ventures, LLC | 33.33333% | 25.00000% |
| Maple Leaf Exploration LP | 0.00000% | 25.00000% |
| | 100.00000% | 100.00000% |

\*       Before CP – The interest of the party in the Initial Well prior to the Casing Point and in plugging and abandoning the same if no completion attempt is made, as set forth in Article XVI.J in the Joint Operating Agreement referenced below.

\*\*      After CP – The interest of the party in the Initial Well after the Casing Point and in plugging and abandoning the same if a completion attempt is made and in the remainder of the Contract Area as set forth in Article XVI.J in the Joint Operating Agreement referenced below.

\*\*\*     After Prospect Payout – The interest of McCombs Energy, Ltd. is subject to a 1/16th back-in, proportionately reduced, after Prospect Payout in favor of Sklarco LLC as set forth in Exhibit "A" in the Joint Operating Agreement referenced below.

**TO HAVE AND TO HOLD** the Assigned Interests unto Assignees in the Assignees, their successors and assigns, forever, together with all rights, privileges, easements, tenements, hereditaments, improvements, equipment, appurtenances, and the like belonging or appertaining thereto, in accordance with and subject to, and in accordance with, the terms and provisions of this Assignment:

1.      This Assignment is made effective as of June 1, 2011 (the "**Effective Date**").

2.      Assignor excludes from this Assignment, and retains and reserves unto itself, an overriding royalty in each lease equal to the amount by which 25% of the oil and gas in, under or produced from lands covered by such lease exceeds the royalty, overriding royalties and other payments burdening such production, subject to being proportionately reduced if the lease covers less than the entire mineral fee estate in such lands or only an undivided interest in such lease. All leases assigned herein are delivered with a 25% total burden, delivering to Assignees a 75% net revenue interest. Assignors and Assignees, by their execution of this instrument, stipulate and declare that the undivided interests in the Leases hereby retained or assigned are owned by them in the proportions set forth above.

3.      The Assigned Interests are assigned herein without limitation as to depth or formation, except as may be provided in any of the Leases and all other instruments of record

2

affecting the Leases (the **"Recorded Instruments"**) or unrecorded instruments expressly described in this Assignment.

4.  This Assignment is made without warranty of title, express or implied, not even for return of the purchase price, except Assignor agrees to warrant title against all defects arising out of claims by Assignor or of persons claiming by, through or under Assignor. To the extent transferable, Assignor does hereby transfer and convey to Assignees the benefits of and the right to enforce all covenants and warranties which Assignor is entitled to enforce with respect to the Assigned Interests, including without limitation, full substitution and subrogation of all prior rights and warranty, and the benefit of and the right to enforce all rights accruing under applicable statutes of limitation or prescription.

5.  The Assigned Interests are assigned subject to the terms and conditions of the Leases, including the lessor's royalties provided for in each of the Leases.

6.  This Assignment is made subject to the terms and provisions of that certain Joint Operating Agreement (**"JOA"**) dated effective as of June 1, 2011, by and between Sklarco L.L.C, McCombs Energy, Ltd., JJS Working Interests, LLC, Resource Ventures, LLC, Maple Leaf Exploration LP and Sklar Exploration Company L.L.C., covering the Oakhay Creek Prospect, Smith County, Mississippi and include all of the Oil, Gas and Mineral Leases owned or claimed by Assignor in the prospect lands being Sections 15, 16, 17, 20, 21, 22 and 23 in Township 10 North, Range 15 West, Smith County, Mississippi, whether correctly described herein or in Exhibit "A" or not.

7.  Each of the Assignees hereby assumes its proportionate share of all costs, obligations and liabilities attributable to the Assigned Interests that arise after the Effective Date as provided in said Joint Operating Agreement. Without limitation upon the foregoing, each of the Assignees assumes its disproportionate share of the costs to drill the Test Well (as defined in said Joint Operating Agreement) to Casing Point (as defined in said Joint Operating Agreement).

8.  This Assignment is binding upon the parties hereto and shall inure to the benefit of the parties hereto, their respective successors and assigns, and the terms, covenants and conditions set forth herein shall be deemed as covenants running with the lands covered by the Leases.

9.  This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. The parties further agree that for recordation purposes, the signature pages from each such counterpart may be detached and compiled into one composite original.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**MAPLE LEAF EXPLORATION LP**

By _____
R. Stewart Campbell, Jr., Manager
of MLEGP LC, general partner

**- - ASSIGNOR**

3

**SKLARCO L.L.C.**


By _____
      David A. Barlow
      Vice President-Chief Operating Officer


**MCCOMBS ENERGY, LTD.**


By _____
      Ricky Haikin
      Vice President


**JJS WORKING INTERESTS, LLC**
By Houston Bulldog Capital Management, LLC, its
Manager


By _____
      Justin Simons, Manager of Houston
      Bulldog Capital Management, LLC


**RESOURCE VENTURES, LLC**


By _____
      Mark A. Arnold
      General Manager


**MAPLE LEAF EXPLORATION LP**


By _____
      R. Stewart Campbell, Jr., Manager
      of MLEGP LC, general partner

               **-- ASSIGNEES**

## ACKNOWLEDGMENTS

STATE OF TEXAS

COUNTY OF DALLAS

I, the undersigned notary public in and for said County in said State, hereby certify that R. Stewart Campbell, Jr. as Manager of MLEGP LC which is the general partner of **MAPLE LEAF EXPLORATION LP**, a Texas limited partnership is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____ _____, 2011.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF LOUISIANA

PARISH OF CADDO

I, the undersigned notary public in and for said Parish in said State, hereby certify that David A. Barlow whose name as Vice President of **SKLARCO L.L.C.**, a Louisiana limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand and notarial seal this the _____ day of _____ _____, 2011.

_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

STATE OF TEXAS

HARRIS COUNTY

     I, the undersigned notary public in and for said County in said State, hereby certify that Ricky Haikin whose name as Vice President of **MCCOMBS ENERGY, LTD.**, a Texas limited partnership, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said limited partnership.

     Given under my hand and notarial seal this the _____ day of _____ _____, 2011.


                                      _____
                                        Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____



STATE OF TEXAS

COUNTY OF HARRIS

     I, the undersigned notary public in and for said County in said State, hereby certify that Justin Simons whose name as Manager of Houston Bulldog Capital Management, LLC, the Manager of **JJS WORKING INTERESTS, LLC**, a Texas limited liability company, is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, in such capacity and with full authority, executed the same voluntarily for and as the act of said company.

     Given under my hand and notarial seal this the _____ day of _____ _____, 2011.


                                        _____
                                        Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

6

STATE OF COLORADO

COUNTY OF ARAPAHO

I, the undersigned notary public in and for said County in said State, hereby certify that
Mark A. Arnold whose name as General Manager of **RESOURCE VENTURES, LLC,** a
Colorado limited liability company, is signed to the foregoing conveyance and who is known to
me, acknowledged before me on this day that, being informed of the contents of the conveyance,
he, in such capacity and with full authority, executed the same voluntarily for and as the act of
said company.

Given under my hand and notarial seal this the _____ day of _____
_____, 2011.


_____
Notary Public

(AFFIX NOTARIAL SEAL)

My commission expires: _____

7

## EXHIBIT "A"

Attached to and made a part of that certain Assignment of Oil, Gas and Other Minerals Leases dated effective June 1, 2011 by and between Sklar Exploration Company L.L.C., as Operator, and Maple Leaf Exploration LP, et al, as Non-Operators.

1. Oil, Gas and Mineral Lease dated May 8, 2008, by and between Jean Lewis Lindsay, et al, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 393 of the Official Public Records of Smith County, Mississippi.

2. Oil, Gas and Mineral Lease dated April 12, 2010, by and Thomas M. Alewine, Jr., as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 230 of the Official Public Records of Smith County, Mississippi.

3. Oil, Gas and Mineral Lease dated May 19, 2008, by and between Jamie Dixon Kilgore, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 397 of the Official Public Records of Smith County, Mississippi.

4. Oil, Gas and Mineral Lease dated May 8, 2008, by and between Donald Martin McDaniel, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 399 of the Official Public Records of Smith County, Mississippi.

5. Oil, Gas and Mineral Lease dated April 27, 2010, by and between and Kenneth Ray McDaniel, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 260 of the Official Public Records of Smith County, Mississippi.

6. Oil, Gas and Mineral Lease dated April 30, 2010, by and between and Margaret A. Craft, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 268 of the Official Public Records of Smith County, Mississippi.

7. Oil, Gas and Mineral Lease dated April 14, 2010, by and between and Eric C. Clark, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 247 of the Official Public Records of Smith County, Mississippi.

8. Oil, Gas and Mineral Lease dated April 14, 2010, by and between and John B. Clark, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 243 of the Official Public Records of Smith County, Mississippi.

9. Oil, Gas and Mineral Lease dated March 29, 2011, by and between Carolyn "Polly" Clark, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 503, Page 781 of the Official Public Records of Smith County, Mississippi.

10. Oil, Gas and Mineral Lease dated June 6, 2008, by and between David Craft, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 413 of the Official Public Records of Smith County, Mississippi.

11. Oil, Gas and Mineral Lease dated August 26, 2008, by and between Kendall Eaton, et al, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 415 of the Official Public Records of Smith County, Mississippi.

12. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Ronald L. Barnes, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 417 of the Official Public Records of Smith County, Mississippi.

13. Oil, Gas and Mineral Lease dated May 1, 2010, by and between and Peggy Petty Frierson, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 264 of the Official Public Records of Smith County, Mississippi.

14. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Cynthia C. Craft, et al, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 421 of the Official Public Records of Smith County, Mississippi.

15. Oil, Gas and Mineral Lease dated April 21, 2010, by and between J. E. Craft, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 226 of the Official Public Records of Smith County, Mississippi.

16. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Thomas Rodney Craft, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 431 of the Official Public Records of Smith County, Mississippi.

17. Oil, Gas and Mineral Lease dated September 22, 2008, by and between Buddy L. Lowery, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 433 of the Official Public Records of Smith County, Mississippi.

18. Oil, Gas and Mineral Lease dated September 22, 2008, by and between Sally K. Foster, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 435 of the Official Public Records of Smith County, Mississippi.

19. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Brenda Jo Sullivan Adcox, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 437 of the Official Public Records of Smith County, Mississippi.

20. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Michael C. Sullivan, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 440 of the Official Public Records of Smith County, Mississippi.

21. Oil, Gas and Mineral Lease dated September 25, 2008, by and between Larry Joe Blakeney, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 442 of the Official Public Records of Smith County, Mississippi.

22. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Robert Kenneth Hill, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 446 of the Official Public Records of Smith County, Mississippi.

23. Oil, Gas and Mineral Lease dated September 19, 2008, by and Jeanette S. Cole, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 447 of the Official Public Records of Smith County, Mississippi.

24. Oil, Gas and Mineral Lease dated September 22, 2008, by and between Mary L. Johnson, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 449 of the Official Public Records of Smith County, Mississippi.

25. Oil, Gas and Mineral Lease dated April 21, 2010, by and between Taylor Sullivan, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 221 of the Official Public Records of Smith County, Mississippi.

26. Oil, Gas and Mineral Lease dated May 3, 2010, by and between Hazel D. Sullivan, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 251 of the Official Public Records of Smith County, Mississippi.

27. Oil, Gas and Mineral Lease dated September 22, 2008, by and between Gayril Gibson, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 455 of the Official Public Records of Smith County, Mississippi.

28. Oil, Gas and Mineral Lease dated November 20, 2008, by and between Edith R. Bryant, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 457 of the Official Public Records of Smith County, Mississippi.

29. Oil, Gas and Mineral Lease dated November 1, 2008, by and between Carol Blackwell Slack, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 459 of the Official Public Records of Smith County, Mississippi.

30. Oil, Gas and Mineral Lease dated November 1, 2008, by and between J. Ruth Blackwell, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 465 of the Official Public Records of Smith County, Mississippi.

31. Oil, Gas and Mineral Lease dated November 1, 2008, by and between Mary Jo Clements-Balas, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 463 of the Official Public Records of Smith County, Mississippi.

32. Oil, Gas and Mineral Lease dated November 7, 2008, by and between Tommy Lee Harris, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 471 of the Official Public Records of Smith County, Mississippi.

33. Oil, Gas and Mineral Lease dated November 1, 2008, by and between Mary V. Davis, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 473 of the Official Public Records of Smith County, Mississippi.

34. Oil, Gas and Mineral Lease dated December 4, 2008, by and between Peggy Ann Reid Rahaim, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 475 of the Official Public Records of Smith County, Mississippi.

35. Oil, Gas and Mineral Lease dated December 8, 2008, by and between The Smith County Board of Education, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 479 of the Official Public Records of Smith County, Mississippi.

36. Oil, Gas and Mineral Lease dated April 22, 2010, by and between Brad Sullivan, et ux, as Lessors, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 234 of the Official Public Records of Smith County, Mississippi.

37. Oil, Gas and Mineral Lease dated January 26, 2009, by and between Larry Evan Ford Noblin, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 486 of the Official Public Records of Smith County, Mississippi.

38. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Gary D. Talbert as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 490 of the Official Public Records of Smith County, Mississippi.

39. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Ramona T. Talbert Brooks, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 492 of the Official Public Records of Smith County, Mississippi.

40. Oil, Gas and Mineral Lease dated January 8, 2009, by and between Lisa Givens, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 494 of the Official Public Records of Smith County, Mississippi.

41. Oil, Gas and Mineral Lease dated January 8, 2009, by and between Phil D. Hall, et ux, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 496 of the Official Public Records of Smith County, Mississippi.

42. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Terry Tootle, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 498 of the Official Public Records of Smith County, Mississippi.

43. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Barbara Johnson, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 500 of the Official Public Records of Smith County, Mississippi.

44. Oil, Gas and Mineral Lease dated January 26, 2009, by and between Cecil Atha Ford, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 502 of the Official Public Records of Smith County, Mississippi.

45. Oil, Gas and Mineral Lease dated January 26, 2009, by and between Betty Bell Gibson, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 504 of the Official Public Records of Smith County, Mississippi.

46. Oil, Gas and Mineral Lease dated April 14, 2010, by and between Larry E. Clark, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 239 of the Official Public Records of Smith County, Mississippi.

47. Oil, Gas and Mineral Lease dated September 25, 2008, by and between Larry Joe Blakeney, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 518 of the Official Public Records of Smith County, Mississippi.

48. Oil, Gas and Mineral Lease dated November 1, 2008, by and between Angela Van Zandt as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 520 of the Official Public Records of Smith County, Mississippi.

49. Oil, Gas and Mineral Lease dated September 30, 2009, by and between Melanie V. Bradford, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 526 of the Official Public Records of Smith County, Mississippi.

50. Oil, Gas and Mineral Lease dated October 27, 2009, by and between Virginia V. Roberts, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 528 of the Official Public Records of Smith County, Mississippi.

51. Oil, Gas and Mineral Lease dated October 21, 2009, by and between Barbara V. Mallia, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 530 of the Official Public Records of Smith County, Mississippi.

52. Oil, Gas and Mineral Lease dated October 21, 2009, by and between R. P. Van Zandt, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 532 of the Official Public Records of Smith County, Mississippi.

53. Oil, Gas and Mineral Lease dated September 30, 2009, by and between Valeria Van Zandt Tarantino, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 536 of the Official Public Records of Smith County, Mississippi.

54. Oil, Gas and Mineral Lease dated January 4, 2010, by and between Carrell Wayne Austin, et ux, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 538 of the Official Public Records of Smith County, Mississippi.

55. Oil, Gas and Mineral Lease dated May 12, 2011, by and between Peggy R. Johnson Revocable Trust, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 503, Page 779 of the Official Public Records of Smith County, Mississippi.

56. Oil, Gas and Mineral Lease dated August 18, 2008, by and between Black Stone Natural Resources I, L.P., as Lessor, and N & M Resources, LLC, as Lessee, filed in Book 480, Page 158 of the Official Public Records of Smith County, Mississippi.

57. Oil, Gas and Mineral Lease dated April 13, 2010, by and between Samson Contour Energy E&P, LLC, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 602 of the Official Public Records of Smith County, Mississippi.

58. Oil, Gas and Mineral Lease dated May 18, 2010, by and between Donald Blakeney, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 632 of the Official Public Records of Smith County, Mississippi.

59. Oil, Gas and Mineral Lease dated June 22, 2010, by and between Therese Pittman, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 515 of the Official Public Records of Smith County, Mississippi.

60. Oil, Gas and Mineral Lease dated June 22, 2010, by and between Bobby Atchley, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 519 of the Official Public Records of Smith County, Mississippi.

61. Oil, Gas and Mineral Lease dated May 12, 2010, by and between Donald S. Craft, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 511 of the Official Public Records of Smith County, Mississippi.

62. Oil, Gas and Mineral Lease dated June 8, 2010, by and between Jocaster Bynam Ford, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 419 of the Official Public Records of Smith County, Mississippi.

63. Oil, Gas and Mineral Lease dated June 3, 2010, by and between Emma Jean Jones Johnson, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 411 of the Official Public Records of Smith County, Mississippi.

64. Oil, Gas and Mineral Lease dated June 3, 2010, by and between Patty J. Vickery, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 407 of the Official Public Records of Smith County, Mississippi.

65. Oil, Gas and Mineral Lease dated June 3, 2010, by and between Martha Jones Neal, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 403 of the Official Public Records of Smith County, Mississippi.

66. Oil, Gas and Mineral Lease dated May 4, 2010, by and between Janis Craft McLauglin, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 392 of the Official Public Records of Smith County, Mississippi.

67. Oil, Gas and Mineral Lease dated June 2, 2010, by and between Mary C. Tubbs, et vir, as Lessors, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 387 of the Official Public Records of Smith County, Mississippi.

68. Oil, Gas and Mineral Lease dated May 11, 2010, by and between Dan McCormick, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 623 of the Official Public Records of Smith County, Mississippi.

69. Oil, Gas and Mineral Lease dated April 30, 2010, by and between Kathy Jo Craft Harding, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 296 of the Official Public Records of Smith County, Mississippi.

70. Oil, Gas and Mineral Lease dated May 14, 2010, by and between Diane Craft, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 495, Page 415 of the Official Public Records of Smith County, Mississippi.

71. Oil, Gas and Mineral Lease dated April 29, 2010, by and between Jo Ann Craft Garraway, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 256 of the Official Public Records of Smith County, Mississippi.

72. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Jeanette Sullivan Cole, et vir, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 512 of the Official Public Records of Smith County, Mississippi.

73. Oil, Gas and Mineral Lease dated November 9, 2009, by and between Walter Skipper, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 534 of the Official Public Records of Smith County, Mississippi.

74. Oil, Gas and Mineral Lease dated September 19, 2008, by and between Rebecca Ann Sullivan Wallace, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 514 of the Official Public Records of Smith County, Mississippi.

75. Oil, Gas and Mineral Lease dated July 1, 2010, by and between Anadarko E&P Company LP, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 501, Page 27 of the Official Public Records of Smith County, Mississippi.

76. Oil, Gas and Mineral Lease dated June 1, 2010, by and between Highmount Minerals LLC, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 501, Page 25 of the Official Public Records of Smith County, Mississippi.

77. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Kendall Eaton, et al, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 522 of the Official Public Records of Smith County, Mississippi.

78. Oil, Gas and Mineral Lease dated February 4, 2009, by and between Elizabeth Noblin, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 508 of the Official Public Records of Smith County, Mississippi.

79. Oil, Gas and Mineral Lease dated January 15, 2009, by and between Brenda T. Davis, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 506 of the Official Public Records of Smith County, Mississippi.

80. Oil, Gas and Mineral Lease dated November 3, 2008, by and between Virginia T. Cargill, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 467 of the Official Public Records of Smith County, Mississippi.

81. Oil, Gas and Mineral Lease dated November 24, 2008, by and between Jack R. Craft, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 469 of the Official Public Records of Smith County, Mississippi.

82. Oil, Gas and Mineral Lease dated September 30, 2008, by and between Johnny Jones, et ux, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 443 of the Official Public Records of Smith County, Mississippi.

83. Oil, Gas and Mineral Lease dated January 26, 2009, by and between John Thomas Noblin, Jr., as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 488 of the Official Public Records of Smith County, Mississippi.

84. Oil, Gas and Mineral Lease dated March 3, 2009, by and between Kathryn J. Waites, et al, as Lessors, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 524 of the Official Public Records of Smith County, Mississippi.

85. Oil, Gas and Mineral Lease dated July 28, 2008, by and between Pamela Mayfield, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 405 of the Official Public Records of Smith County, Mississippi.

86. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Muriel L. Petty, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 425 of the Official Public Records of Smith County, Mississippi.

87. Oil, Gas and Mineral Lease dated June 6, 2008, by and between Hilda Grace Bynum, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 423 of the Official Public Records of Smith County, Mississippi.

88. Oil, Gas and Mineral Lease dated November 17, 2008, by and between Cleone L. McKay, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 461 of the Official Public Records of Smith County, Mississippi.

89. Oil, Gas and Mineral Lease dated June 23, 2008, by and between Thomas Mayfield, as Lessor, and Maple Leaf Exploration LP, as Lessee, filed in Book 494, Page 516 of the Official Public Records of Smith County, Mississippi.

90. Oil, Gas and Mineral Lease dated May 6, 2010, by and between John K. Keyes, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 300 of the Official Public Records of Smith County, Mississippi.

91. Oil, Gas and Mineral Lease dated May 14, 2010, by and between John K. Keyes Trust, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 627 of the Official Public Records of Smith County, Mississippi.

92. Oil, Gas and Mineral Lease dated May 17, 2010, by and between Floyd H. Metts, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 640 of the Official Public Records of Smith County, Mississippi.

93. Oil, Gas and Mineral Lease dated May 17, 2010, by and between Ann M. Whitworth, as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 637 of the Official Public Records of Smith County, Mississippi.

94. Oil, Gas and Mineral Lease dated May 17, 2010, by and between William Cato Mayfield, Jr., as Lessor, and Miller Land Professionals, LLC, as Lessee, filed in Book 494, Page 644 of the Official Public Records of Smith County, Mississippi.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT "C"

## OAKHAY CREEK NORTH PROSPECT & OAKHAY CREEK SOUTH PROSPECT
### SMITH COUNTY, MISSISSIPPI

Attached to and made a part of ___ the Operating Agreement dated June 1, 2011, between Sklar Exploration Company LLC, as Operator, and Maple Leaf Exploration LP, et al, as Non-Operators.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

### I. GENERAL PROVISIONS

1. **Definitions**

   "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

   "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

   "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

   "Operator" shall mean the party designated to conduct the Joint Operations.

   "Non-Operators" shall mean the Parties to this agreement other than the Operator.

   "Parties" shall mean Operator and Non-Operators.

   "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

   "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

   "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

   "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

   "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

2. **Statement and Billings**

   Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   A.  Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B.  Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at J.P. Morgan Chase and Company on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

## COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.

COPAS  1984  ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5.    **Audits**

A.    A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.    The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.    **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.    **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.    **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3.    **Labor**

A.    (1)    Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)    Salaries of First level Supervisors in the field.

(3)    Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)    Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B.    Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.    Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.    **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations / ~~but subject to the following limitations:~~ **shall be charged at actual cost incurred by Operator.**

~~A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

~~B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

~~C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed ___ **fifteen** ___ percent (___**15**___%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section i, Paragraph 3;~~ **and the costs and expenses incurred in connection with hearings and other matters before governmental bodies and agencies and costs and expenses incurred in examining and curing title.**

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

- 3 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

**12.     Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.     Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.     Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.   In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.     Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1.     Overhead - Drilling and Producing Operations**

    i.     As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

        ( X ) Fixed Rate Basis, Paragraph IA, or
        (    ) Percentage Basis, Paragraph IB

        Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.   The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    ii.     The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

        (    ) shall be covered by the overhead rates, or
        ( X ) shall not be covered by the overhead rates.

    iii.     The ~~salaries, wages and Personal Expenses of Technical Employees and/or~~ costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

        (    ) shall be covered by the overhead rates, or
        ( X ) shall not be covered by the overhead rates.

    A.     Overhead - Fixed Rate Basis     **See ADDITIONAL REVISIONS page 9.**

        (1)   Operator shall charge the Joint Account at the following rates per well per month:

            Drilling Well Rate $_____9,000.00_____
               (Prorated for less than a full month)

            Producing Well Rate $____900.00_____

        (2)   Application of Overhead - Fixed Rate Basis shall be as follows:

           (a)   Drilling Well Rate

               (1)   Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. ~~Overhead - Percentage Basis~~

(1) ~~Operator shall charge the Joint Account at the following rates:~~

(a) ~~Development~~

~~_____ Percent (_____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.~~

(b) ~~Operating~~

~~_____ Percent (_____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.~~

(2) ~~Application of Overhead - Percentage Basis shall be as follows:~~

~~For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.~~

2.    Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS   1984   ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

**COPAS**

Account for overhead based on the following rates for any Major Construction project in excess of $__25,000.00_____:

A. ____5____ % of first $100,000 or total cost if less, plus

B. ____4____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ____3____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ____5____ % of total costs through $100,000; plus

B. ____4____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ____3____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV. **PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

(a) Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at / cost. ~~Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

(b) For grades which are special to one mill only, prices shall be computed at / cost. ~~the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

- 6 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

~~pound Oil Field Haulers Association interstate truck rate shall be used.~~

(c) Special end finish tubular goods shall be priced at / <sup>cost.</sup> ~~the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.~~

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at / <sup>cost.</sup> ~~the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.~~

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced / <sup>at cost.</sup> ~~under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

(b) Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at / <sup>cost.</sup> ~~Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced / <sup>at cost.</sup> ~~f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.~~

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at / <sup>cost.</sup> ~~quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.~~

(3) Other Material shall be priced at / <sup>cost.</sup> ~~the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at / <sup>cost.</sup> ~~the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).~~

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current / <sup>market value.</sup> ~~new price, as determined by Paragraph A.~~

(2) Material used on and moved from the Joint Property

(a) At ~~seventy-five percent (75%) of~~ current / <sup>market value.</sup> ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or~~

(b) At ~~sixty-five percent (65%) of~~ current / <sup>market value.</sup> ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material~~

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current / <sup>market value.</sup> ~~new price as determined by Paragraph A.~~

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at / <sup>current market value.</sup> ~~fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.~~

- 7 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



  (2) Condition D

    Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

    (a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

    (b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

  (3) Condition E

    Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

 D. Obsolete Material

  Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

 E. Pricing Conditions

  (1) Loading or unloading costs may be charged to the Joint Account at / ~~the rate of twenty-five cents (25¢)~~ **actual costs incurred by operator** ~~per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

  (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

 Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator, **provided, however, if a Non-Operator elects to furnish material in kind, such material must (a) meet the quality specifications set by Operator, and (b) be inspected by Operator with inspection costs to be billed to the Joint Account.**

4. **Warranty of Material Furnished By Operator**

 Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

**V. INVENTORIES**

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

 At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

 Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

**ADDITIONAL REVISIONS**

(1)   In the event the subject well is expected to be above the State threshold for H2S sour gas operations, the Drilling Well rate set forth in Art. III.1.A(1) will be increased by $2000.00 per month and the associated Producing Well Overhead Rate will be increased an additional $100.00 per month.

## EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated June 1, 2011, by and between Sklar Exploration Company L.L.C., as Operator, and Maple Leaf Exploration LP et al, as Non-Operators.

At all times while operations are conducted under this Agreement, OPERATOR shall maintain for the benefit of all parties hereto, insurance of the types and in the maximum amounts as follows. Premiums for such insurance shall be charged to the Joint Account.

| | | |
|---|---|---|
| (A) | Comprehensive General Liability: Bodily Injury and Property Damage | $1,000,000 each occurrence<br>$2,000,000 aggregate<br>Combined - Single Limits |
| (B) | Automobile Liability: Bodily Injury and Property Damage | $1,000,000 each accident<br>Combined - Single Limits |

(C)   Workmen's Compensation:  Workmen's Compensation Insurance to cover full liability under the Workmen's Compensation Law of the state where operations are being conducted (Alabama, Mississippi, Louisiana and Florida):

$ 1,000,000 accident
$ 1,000,000 disease
$ 1,000,000 aggregate

(D)   OPERATOR'S CONTROL OF WELL INSURANCE WILL COVER DRILLING WELLS ONLY.  PRODUCING WELLS ARE NOT COVERED BY OPERATOR'S CONTROL OF WELL INSURANCE.  Operator's Control of Well Insurance including coverage for well control, underground blowout, re-drilling expenses, removal of wreck or debris, seepage, pollution, cleanup and containment and evacuation expenses as controlled by the working policy and subject to its conditions and exclusions. The limit of such insurance is $5,000,000 any one occurrence. The limit is for 100% interest. In the event NON-OPERATOR carries insurance and does not want to be insured under OPERATOR'S Control of Well Insurance arranged by the OPERATOR, then NON-OPERATOR shall provide a Certificate of Insurance evidencing coverage as stated above and minimum limits of $5,000,000 any one occurrence to the 100% interest prior to spudding the initial well and a Certificate of Insurance shall be submitted to OPERATOR.  Such evidence must indicate that OPERATOR will be given thirty (30) days written advance notice of any material change in or cancellation of NON-Operator's coverage.  Failure by NON-OPERATOR to provide evidence of insurance will be deemed acceptance of OPERATOR'S Control of Well Insurance arranged by the OPERATOR. Those Working Interest Owners who are covered by OPERATOR'S insurance will be invoiced for their proportionate share  of the actual cost of said insurance.

OPERATOR and non-operating working interest owners agree to mutually waive subrogation in favor of each other on all insurance carried by each party and/or to obtain such waiver from the insurance carrier if so required by the insurance contract.  If such a waiver is not obtained, the party failing to do so shall indemnify the other party for any claim by an insurance carrier arising out of Subrogation.

Any liability, loss, damage, claim or expense resulting from the accidents or occurrences not covered by insurance of the character referred to above, or in excess of the insurance actually carried under the above provisions, shall be borne by the parties hereto in the proportion in which they own in the Contract Area.  In the event OPERATOR is unable to procure and maintain any of the insurance enumerated above, OPERATOR shall promptly give written notice thereof to the other parties and in such event resulting loss, damage, claim and expense shall be borne by the parties hereto in proportion to their respective interests in the Unit Area.  Such notice shall also constitute a waiver of the requirement that OPERATOR procure and maintain the insurance which is the subject of this notice.  OPERATOR shall give NON-OPERATOR thirty (30) days written notice prior to canceling any of said insurance.

Oakhay Creek Prospect AFE 062011,7/25/2011,1:23 PM

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| | | | |
|---|---|---|---|
| DATE: | June 20, 2011 | FIELD: | |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Oakhay Creek Prospect | HORIZON: | |
| LOCATION: | 1' FSL & 1309' FEL of Sec. 17, T10N-R15W | PROJ. T.D.: | 14,500' |

PROPOSAL: Drill straight hole to 14,500'

Set 9 5/8" surface casing at 4250'

Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,500 | | 2,500 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | | 125,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 120,000 | | 120,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 407,500 | 32,000 | 439,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | 56,000 | | 56,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 18,000 | 58,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 7,000 | | 7,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 85,000 | | 85,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 22,000 | | 22,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 18,000 | 22,000 | 40,000 |
| 26 | PIPE TESTING | 7,500 | 4,500 | 12,000 |
| 27 | EQUIPMENT RENTALS | 20,000 | 10,000 | 40,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 7,500 | | 7,500 |
| 31 | FUEL | 110,000 | | 110,000 |
| 32 | BITS | 55,000 | 1,500 | 56,500 |
| 33 | TRANSPORTATION & TRUCKING | 15,300 | 18,000 | 33,300 |
| 34 | CONTRACT LABOR | 15,500 | 13,000 | 28,500 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 35,000 | 12,000 | 47,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 50,000 | -50,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 18,000 | 6,000 | 24,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 67,300 | 10,000 | 77,300 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,412,000 | $209,000 | $1,621,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 5,000 | 40,000 | 45,000 |
| 06 | CONDUCTOR CASING | 11,000 | | 11,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $144,000 | $45,000 | $189,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 295,300 | 295,300 |
| 22 | TUBING | | 116,000 | 116,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $476,000 | $476,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 10,700 | 10,700 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $341,000 | $341,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $144,000 | $862,000 | $1,006,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,556,000 | $1,071,000 | $2,627,000 |

APPROVED: _July 26_, 2011.

BY: _[signature]_

**David A. Barlow**
**President & Chief Operating Officer**

OEE Insurance Election (Please check your election below):

☐ Coverage under own policy with limits not less than _____

☒ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

Oakhay Creek Prospect AFE 062011,7/29/2011,1:34 PM

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8658

## AUTHORITY FOR EXPENDITURE

| DATE: | June 20, 2011 | FIELD: | |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Oakhay Creek Prospect | HORIZON: | |
| LOCATION: | 1' FSL & 1309' FEL of Sec. 17, T10N-R15W | PROJ. T.D.: | 14,500' |

| PROPOSAL: | Drill straight hole to 14,500' | | |
|---|---|---|---|
| | Set 9 5/8" surface casing at 4250' | Date last revised: | |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |

| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,500 | | 2,500 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | | 125,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 120,000 | | 120,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 407,500 | 32,000 | 439,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | 56,000 | | 56,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 18,000 | 58,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 7,000 | | 7,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 85,000 | | 85,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 22,000 | | 22,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 18,000 | 22,000 | 40,000 |
| 26 | PIPE TESTING | 7,500 | 4,500 | 12,000 |
| 27 | EQUIPMENT RENTALS | 30,000 | 10,000 | 40,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 7,500 | | 7,500 |
| 31 | FUEL | 110,000 | | 110,000 |
| 32 | BITS | 55,000 | 1,500 | 56,500 |
| 33 | TRANSPORTATION & TRUCKING | 15,300 | 18,000 | 33,300 |
| 34 | CONTRACT LABOR | 15,500 | 13,000 | 28,500 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 35,000 | 12,000 | 47,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 50,000 | -50,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 18,000 | 6,000 | 24,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 67,300 | 10,000 | 77,300 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,412,000 | $209,000 | $1,621,000 |

| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 5,000 | 40,000 | 45,000 |
| 06 | CONDUCTOR CASING | 11,000 | | 11,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $144,000 | $45,000 | $189,000 |

| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS | | 295,300 | 295,300 |
| 22 | TUBING | | 116,000 | 116,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $476,000 | $476,000 |

| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 10,700 | 10,700 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $341,000 | $341,000 |

| | **TOTAL EQUIPMENT** | $144,000 | $862,000 | $1,006,000 |
|---|---|---|---|---|

| | **TOTAL WELL COST** | $1,556,000 | $1,071,000 | $2,627,000 |
|---|---|---|---|---|

APPROVED: _(signature)_   7/27 2011.

RICKY ___
VICE PRESIDENT

OEE Insurance Election (Please check your election below):
☑ Coverage under own policy with limits not less than _____.
☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

Oakhay Creek Prospect AFE 062011,7/26/2011,1:54 PM

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA  71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 20, 2011 | FIELD: | |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Oakhay Creek Prospect | HORIZON: | |
| LOCATION: | 1' FSL & 1309' FEL of Sec. 17, T10N-R15W | PROJ. T.D.: | 14,500' |

PROPOSAL:  Drill straight hole to 14,500'

Set 9 5/8" surface casing at 4250'          Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,500 | | 2,500 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | | 125,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 120,000 | | 120,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 407,500 | 32,000 | 439,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | 56,000 | | 56,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 18,000 | 58,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 7,000 | | 7,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 85,000 | | 85,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 22,000 | | 22,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 18,000 | 22,000 | 40,000 |
| 26 | PIPE TESTING | 7,500 | 4,500 | 12,000 |
| 27 | EQUIPMENT RENTALS | 30,000 | 10,000 | 40,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 7,500 | | 7,500 |
| 31 | FUEL | 110,000 | | 110,000 |
| 32 | BITS | 55,000 | 1,500 | 56,500 |
| 33 | TRANSPORTATION & TRUCKING | 15,300 | 18,000 | 33,300 |
| 34 | CONTRACT LABOR | 15,500 | 13,000 | 28,500 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 35,000 | 12,000 | 47,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 50,000 | -50,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 18,000 | 6,000 | 24,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 67,300 | 10,000 | 77,300 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,412,000 | $209,000 | $1,621,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 5,000 | 40,000 | 45,000 |
| 06 | CONDUCTOR CASING | 11,000 | | 11,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $144,000 | $45,000 | $189,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 295,300 | 295,300 |
| 22 | TUBING | | 116,000 | 116,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $476,000 | $476,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 35 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 10,700 | 10,700 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | | $341,000 | $341,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $144,000 | $862,000 | $1,006,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,556,000 | $1,071,000 | $2,627,000 |

APPROVED:  _August 5_____, 2011.

BY:  _____

OEE Insurance Election (Please check your election below):

☐ Coverage under own policy with limits not less than_____

☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

Oakbay Creek Prospect Final AFE 062011revised for location 8-10-2011,8/10/2011,2:04 PM

# SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA. 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 20, 2011 | FIELD: | |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Johnson 20-2 No. 1 | HORIZON: | |
| LOCATION: | 209 FNL & 1391 FEL of Sec. 20, T10N-R15W | PROJ. T.D.: | 14,500 |

PROPOSAL: Drill straight hole to 14,500'

Set 9 5/8" surface casing at 4250'        Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,500 | | 2,500 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | | 125,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 120,000 | | 120,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 407,500 | 32,000 | 439,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | 56,000 | | 56,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 18,000 | 58,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 7,000 | | 7,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 85,000 | | 85,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 22,000 | | 22,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 18,000 | 22,000 | 40,000 |
| 26 | PIPE TESTING | 7,500 | 4,500 | 12,000 |
| 27 | EQUIPMENT RENTALS | 30,000 | 10,000 | 40,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 7,500 | | 7,500 |
| 31 | FUEL | 110,000 | | 110,000 |
| 32 | BITS | 55,000 | 1,500 | 56,500 |
| 33 | TRANSPORTATION & TRUCKING | 15,300 | 18,000 | 33,300 |
| 34 | CONTRACT LABOR | 15,500 | 13,000 | 28,500 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 35,000 | 12,000 | 47,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 50,000 | -50,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 18,000 | 6,000 | 24,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 57,300 | 10,000 | 77,300 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,412,000 | $209,000 | $1,621,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 5,000 | 40,000 | 45,000 |
| 06 | CONDUCTOR CASING | 11,000 | | 11,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $144,000 | $45,000 | $189,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 295,300 | 295,300 |
| 22 | TUBING | | 116,000 | 116,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $476,000 | $476,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 10,700 | 10,700 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $341,000 | $341,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $144,000 | $862,000 | $1,006,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,556,000 | $1,071,000 | $2,627,000 |

APPROVED: _[signature]_ 8/15/2011.

BY: _Mark A. Arnold_

OEE Insurance Election (Please check your election below):

☐ Coverage under own policy with limits not less than _____

☒ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

Oakbay Creek Prospect AFE 062011,7/26/2011,1:53 PM

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| | | | |
|---|---|---|---|
| DATE: | June 20, 2011 | FIELD: | |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Oakbay Creek Prospect | HORIZON: | |
| LOCATION: | 1' FSL & 1309' FEL of Sec. 17, T10N-R15W | PROJ. T.D.: | 14,500' |

| PROPOSAL: | Drill straight hole to 14,500' | |
|---|---|---|
| | Set 9 5/8" surface casing at 4250' | Date last revised: |

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | | | |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | | | |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $0 | $0 | $0 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 2,500 | | 2,500 |
| 02 | LOCATION PREPARATION/DIRT WORK | 125,000 | | 125,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 25,000 | | 25,000 |
| 04 | SURFACE DAMAGES & ROW | | | |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 120,000 | | 120,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 407,500 | 32,000 | 439,500 |
| 11 | DAYWORK WITHOUT DRILL PIPE | 56,000 | | 56,000 |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | | | |
| 13 | ENGINEERING & SUPERVISION | 40,000 | 18,000 | 58,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 7,000 | | 7,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 0 | | |
| 17 | MUD & CHEMICALS | 85,000 | | 85,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 22,000 | | 22,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 18,000 | 22,000 | 40,000 |
| 26 | PIPE TESTING | 7,500 | 4,500 | 12,000 |
| 27 | EQUIPMENT RENTALS | 30,000 | 10,000 | 40,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 7,500 | | 7,500 |
| 31 | FUEL | 110,000 | | 110,000 |
| 32 | BITS | 55,000 | 1,500 | 56,500 |
| 33 | TRANSPORTATION & TRUCKING | 15,300 | 18,000 | 33,300 |
| 34 | CONTRACT LABOR | 15,500 | 13,000 | 28,500 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 35,000 | 12,000 | 47,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | | | |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | | |
| 65 | PLUG & ABANDON COSTS | 50,000 | -50,000 | |
| 78 | INSURANCE | 40,000 | | 40,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 18,000 | 6,000 | 24,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 67,300 | 10,000 | 77,300 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,412,000 | $209,000 | $1,621,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 5,000 | 40,000 | 45,000 |
| 06 | CONDUCTOR CASING | 11,000 | | 11,000 |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $144,000 | $45,000 | $189,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 295,300 | 295,300 |
| 22 | TUBING | | 116,000 | 116,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $476,000 | $476,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 38 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 10,700 | 10,700 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $341,000 | $341,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $144,000 | $862,000 | $1,006,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,556,000 | $1,071,000 | $2,627,000 |

APPROVED: _7/27/11_ , 2011.

BY:

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____
☒ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of insurance prior to spud, owner will be included under and charged for SEC's OEE coverage.

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.      Date last revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $23,000 | $0 | $23,000 |

| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $1,729,000 | $238,000 | $1,967,000 |

| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $134,000 | $45,000 | $179,000 |

| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $495,000 | $495,000 |

| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $344,000 | $344,000 |

| | TOTAL EQUIPMENT | $134,000 | $884,000 | $1,018,000 |
|---|---|---|---|---|

| | TOTAL WELL COST | $1,886,000 | $1,122,000 | $3,008,000 |
|---|---|---|---|---|

APPROVED: _June 7_, 2013.

BY: _____

David A. Barlow
President & Chief Operating Officer

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____
☒ Coverage under Operator's policy

NOTE: If Insured elects coverage under own policy and has not supplied proof of coverage prior to spud, Insured will be included under and charged for SEC's OEE coverage.

☐ Coverage under Operator's policy

EXHIBIT 21

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 5 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.

Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $23,000 | $0 | $23,000 |

| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION: | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $1,729,000 | $238,000 | $1,967,000 |

| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $134,000 | $45,000 | $179,000 |

| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $495,000 | $495,000 |

| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $344,000 | $344,000 |

| | TOTAL EQUIPMENT | $134,000 | $884,000 | $1,018,000 |
|---|---|---|---|---|

| | TOTAL WELL COST | $1,886,000 | $1,122,000 | $3,008,000 |
|---|---|---|---|---|

APPROVED: 06/18 , 2013.

BY:

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____
☑ Coverage under Operator's policy
☐

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

☐ Coverage under Operator's policy

OC

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.     Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | **$23,000** | **$0** | **$23,000** |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION: | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | **$1,729,000** | **$238,000** | **$1,967,000** |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | **$134,000** | **$45,000** | **$179,000** |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | **$0** | **$495,000** | **$495,000** |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | **$0** | **$344,000** | **$344,000** |
| | | | | |
| | **TOTAL EQUIPMENT** | **$134,000** | **$884,000** | **$1,018,000** |
| | | | | |
| | **TOTAL WELL COST** | **$1,886,000** | **$1,122,000** | **$3,008,000** |

APPROVED: _____ 6-14 _____, 2013.     Kudzu Oil Properties, LLC

BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____.
☑ Coverage under Operator's policy
☐

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

☐     Coverage under Operator's policy

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resourco Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.          Date last revised:

| CODE or SUE | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION: | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPING & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |

APPROVED: _N 6/13_ , 2013.

BY: _____

OEE Insurance Election (Please check your election below):
☑ Coverage under own policy with limits not less than _____.
☐ Coverage under Operator's policy
☐

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included and charged for SEC's OEE coverage.

☐          Coverage under Operator's policy

DC

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.      Date last revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION: | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |

APPROVED _____ , 2013. Tauber Exploration + Production Co.
(Richard E. Tauber, President)

BY: _____

OEE Insurance Election (Please check your election below)
☑ Coverage under own policy with limits not less than _____  SEE CERT.
☐ Coverage under Operator's policy
☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

W MD

EXHIBIT 2

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

## SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

### AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.          Date last revised:

| CODE or SUE | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 82 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |

| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISIONG | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |

| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |

| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |

| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |

| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
|---|---|---|---|---|

| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |
|---|---|---|---|---|

APPROVED: _____, 2013.

BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage own own policy with limits not less than_____.
☒ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

☐   Coverage under Operator's policy

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.T.D., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

## SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

### AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.

Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |

APPROVED: _____, 2013.

BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage own own policy with limits not less than _____.

☐ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied evidence of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

☐ Coverage under Operator's policy

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.          Date last revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |

| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION: | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |

| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |

| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |

| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |

| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
|---|---|---|---|---|

| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |
|---|---|---|---|---|

APPROVED: _____, 2013.

BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____.

☐ Coverage under Operator's policy
   ☒

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included and charged for SEC's OEE coverage.

☐    Coverage under Operator's policy

DC

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.         Date last revised:

| CODE or SUE | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION: | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |

APPROVED: _June 28_ , 2013.

BY: _James W. Sklar_

OEE Insurance Election (Please check your election below)

☐ Coverage under own policy with limits not less than _____.

☑ Coverage under Operator's policy

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included and charged for SEC's OEE coverage.

☐      Coverage under Operator's policy

DC

FROM :                                      FAX NO. :3185249111              Jun. 17 2013 05:17PM P2

# SKLAR Exploration Company L.L.C.

461 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8666

## AUTHORITY FOR EXPENDITURE

| | | | |
|---|---|---|---|
| DATE: | June 5, 2013 | FIELD: | Wildcat |
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.                     Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | LEASEHOLD COSTS | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 83 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | TOTAL LEASEHOLD COSTS | $23,000 | $0 | $23,000 |
| | | | | |
| 9200/9300 | INTANGIBLE DRILLING & COMPLETION | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION | 48,000 | 16,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 38,000 | 10,000 | 48,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 6,000 | | 6,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 160,000 | | 160,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 76 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | TOTAL INTANGIBLE DRILLING & COMPLETION | $1,723,000 | $236,000 | $1,957,000 |
| | | | | |
| 9500 | TANGIBLE EQUIPMENT - DRILLING | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | TOTAL TANGIBLE EQUIPMENT - DRILLING | $134,000 | $45,000 | $178,000 |
| | | | | |
| 9520 | TANGIBLE EQUIPMENT - COMPLETION | | | |
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | TOTAL TANGIBLE EQUIPMENT - COMPLETION | $0 | $495,000 | $495,000 |
| | | | | |
| 9535 | SURFACE PRODUCTION EQUIPMENT | | | |
| 30 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | TOTAL SURFACE PRODUCTION EQUIPMENT | $0 | $344,000 | $344,000 |
| | | | | |
| | TOTAL EQUIPMENT | $134,000 | $884,000 | $1,018,000 |
| | | | | |
| | TOTAL WELL COST | $1,886,000 | $1,122,000 | $3,008,000 |

APPROVED: _June   12_ , 2013.                  _Northstar Producing 1 LP_

BY: _Kurt Joy_

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____

NOTE: If no insurance and/or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

☒ Coverage under Operator's policy _____

☒ Coverage under Operator's policy

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.
401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.          Date last revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |
| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |

APPROVED: _June 12_____, 2013.

BY: _Kurt Ley___  _Northstar Producing 1 LP_

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____
☒ Coverage under Operator's policy

**NOTE:** If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be insured and charged for SEC's OEE coverage.

☐   Coverage under Operator's policy

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.
Date last revised:

| CODE or SUB | CLASSIFICATION: | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |

| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
|---|---|---|---|---|
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION: | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |

| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
|---|---|---|---|---|
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |

| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
|---|---|---|---|---|
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |

| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
|---|---|---|---|---|
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |

| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
|---|---|---|---|---|

| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |
|---|---|---|---|---|

APPROVED: Wimb Park Ltd. , 2013.

BY: Rch M Waw

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____.
☐ Coverage under Operator's policy
☐

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

☐ Coverage under Operator's policy

Attached to and made a part of that certain Participation Agreement (Oakhay Creek Prospect) dated effective as of March 1, 2013, by and between Sklar Exploration Company L.L.C., Sklarco L.L.C., JJS Working Interests LLC, Resource Ventures, LLC, Kudzu Oil Properties, LLC, Pickens Financial Group, LLC, Tauber Exploration & Production Company, Gardner Energy Corporation, Lane Oil & Gas Corporation, Stateside Oil, Inc., Goolsby Interests LLC, Northstar Producing I, LP, Wimberley Park Ltd., and CTM 2005, LTD.

# SKLAR Exploration Company L.L.C.

401 Edwards St. Suite 1601
Shreveport, LA 71101
(318) 227-8668

## AUTHORITY FOR EXPENDITURE

| DATE: | June 5, 2013 | FIELD: | Wildcat |
|---|---|---|---|
| OPERATOR: | Sklar Exploration Company LLC | STATE: | Mississippi |
| WELL: | Jamie Dixon Kilgore et al 27-1 #1 | HORIZON: | Hosston |
| LOCATION: | Sec. 21, T10N-R15W, Smith County | PROJ. T.D.: | 14,411' MD = 14,303' TVD |

PROPOSAL: Drill directional hole to BHL of 2133' FEL & 2399' FNL of Section 21.
Set 9 5/8" surface casing at 4250'.
Set 5-1/2" production casing at 14,411'.                     Date last revised:

| CODE or SUB | CLASSIFICATION | DRY HOLE | COMPLETION | TOTAL |
|---|---|---|---|---|
| 9100 | **LEASEHOLD COSTS** | | | |
| 81 | LEGAL FEES, TITLE OPINIONS, CURATIVE | 19,000 | | 19,000 |
| 86 | LEASE BONUS | | | |
| 84 | LEASE EXTENSION | | | |
| 88 | DELAY RENTALS | | | |
| 89 | BROKERAGE | 4,000 | | 4,000 |
| 90 | LANDMAN COSTS | | | |
| 91 | RECORDING FEES | | | |
| | **TOTAL LEASEHOLD COSTS** | $23,000 | $0 | $23,000 |
| | | | | |
| 9200/9300 | **INTANGIBLE DRILLING & COMPLETION** | | | |
| 01 | SURVEY, DOC HEARINGS, PERMITS | 6,000 | | 6,000 |
| 02 | LOCATION PREPARATION/DIRT WORK | 160,000 | | 160,000 |
| 03 | LOCATION CLEAN UP & PIT CLOSURE | 45,000 | | 45,000 |
| 04 | SURFACE DAMAGES & ROW | 7,000 | | 7,000 |
| 05 | SETTING CONDUCTOR CASING | 13,000 | | 13,000 |
| 06 | RIG MOBILIZE/DEMOBILIZE | 150,000 | | 150,000 |
| 07 | DRILLING - FOOTAGE | | | |
| 08 | DRILLING - TURNKEY | | | |
| 10 | DAYWORK WITH DRILL PIPE | 516,000 | 34,000 | 550,000 |
| 11 | DAYWORK WITHOUT DRILL PIPE | | | |
| 12 | DAYWORK - RIG EQUIPMENT & REPAIR | 14,000 | | 14,000 |
| 13 | ENGINEERING & SUPERVISION | 46,000 | 18,000 | 64,000 |
| 14 | RIG INSTRUMENTATION & MONITORING | 12,000 | | 12,000 |
| 15 | COIL TUBING UNIT | | | |
| 16 | DIRECTIONAL DRILLING TOOLS & SVCS | 100,000 | | 100,000 |
| 17 | MUD & CHEMICALS | 75,000 | | 75,000 |
| 18 | MUD DISPOSAL | | | |
| 23 | MUD LOGGING | 28,000 | | 28,000 |
| 24 | CEMENTING & EQUIPMENT | 35,000 | 38,000 | 73,000 |
| 25 | CASING CREW & LAYDOWN MACHINE | 25,000 | 22,000 | 47,000 |
| 26 | PIPE TESTING | 9,000 | 5,000 | 14,000 |
| 27 | EQUIPMENT RENTALS | 36,000 | 10,000 | 46,000 |
| 28 | FISHING TOOLS & SVCS | | | |
| 29 | TELEPHONE & COMMUNICATIONS | 5,000 | | 5,000 |
| 30 | WATER | 18,000 | | 18,000 |
| 31 | FUEL | 150,000 | | 150,000 |
| 32 | BITS | 55,000 | 2,000 | 57,000 |
| 33 | TRANSPORTATION & TRUCKING | 14,000 | 18,000 | 32,000 |
| 34 | CONTRACT LABOR | 16,000 | 13,000 | 29,000 |
| 35 | SAFETY & H2S TRAINING | | | |
| 36 | LOGGING & WIRELINE | 40,000 | 12,000 | 52,000 |
| 37 | DRILL STEM & PRODUCTION TESTING | | | |
| 38 | CORING & ANALYSIS | | | |
| 39 | GEOLOGICAL | 2,000 | | 2,000 |
| 40 | GEOPHYSICAL | | | |
| 46 | WORKOVER RIG | | 40,000 | 40,000 |
| 47 | PERFORATION SERVICES | | 25,000 | 25,000 |
| 48 | COMPLETION FLUIDS | | 6,000 | 6,000 |
| 49 | STIMULATION SERVICES | | | |
| 50 | INSTALLATION OF WELL EQUIPMENT | | | |
| 51 | PIPELINE EXPENSES & ROW | | | |
| 58 | AUTO EXPENSE | | | |
| 61 | SALT WATER DISPOSAL | | 2,500 | 2,500 |
| 63 | HOT OIL SERVICE | | | |
| 64 | SWABBING UNIT | | 10,000 | 10,000 |
| 65 | PLUG & ABANDON COSTS | 35,000 | -35,000 | |
| 78 | INSURANCE | 25,000 | | 25,000 |
| 79 | COPAS OVERHEAD - DRILLING/COMPLETION | 10,000 | 6,000 | 16,000 |
| 82 | MISCELLANEOUS: ±5% contingency | 82,000 | 11,000 | 93,000 |
| | **TOTAL INTANGIBLE DRILLING & COMPLETION** | $1,729,000 | $238,000 | $1,967,000 |
| | | | | |
| 9500 | **TANGIBLE EQUIPMENT - DRILLING** | | | |
| 02 | SURFACE CASING | 124,000 | | 124,000 |
| 03 | INTERMEDIATE CASING & LINERS | | | |
| 04 | FLOAT EQUIPMENT, HANGERS & RELATED | 3,500 | 5,000 | 8,500 |
| 05 | WELLHEAD EQUIPMENT | 6,000 | 40,000 | 46,000 |
| 06 | CONDUCTOR CASING | | | |
| | **TOTAL TANGIBLE EQUIPMENT - DRILLING** | $134,000 | $45,000 | $179,000 |
| | | | | |
| 9520 | **TANGIBLE EQUIPMENT - COMPLETION** | | | |
| 21 | PRODUCTION CASING & LINERS | | 312,000 | 312,000 |
| 22 | TUBING | | 118,000 | 118,000 |
| 23 | PACKERS | | 15,000 | 15,000 |
| 24 | FLOAT EQUIPMENT, HANGERS & RELATED | | 5,000 | 5,000 |
| 25 | WELLHEAD EQUIPMENT | | 45,000 | 45,000 |
| 26 | RODS, DOWNHOLE PUMPS & RELATED | | | |
| 27 | ARTIFICIAL LIFT EQUIPMENT | | | |
| | **TOTAL TANGIBLE EQUIPMENT - COMPLETION** | $0 | $495,000 | $495,000 |
| | | | | |
| 9535 | **SURFACE PRODUCTION EQUIPMENT** | | | |
| 36 | SURFACE ARTIFICIAL LIFT EQUIPMENT | | | |
| 41 | SURFACE PRODUCTION EQUIPMENT | | 80,000 | 80,000 |
| 42 | COMPRESSION | | | |
| 43 | TANK BATTERY COSTS | | 110,000 | 110,000 |
| 44 | FLOWLINES, FITTINGS, CONNECTIONS | | 90,000 | 90,000 |
| 45 | PIPELINE & GATHERING SYSTEM COSTS | | 50,000 | 50,000 |
| 46 | SALES METERING EQUIPMENT | | 14,000 | 14,000 |
| | **TOTAL SURFACE PRODUCTION EQUIPMENT** | $0 | $344,000 | $344,000 |
| | | | | |
| | **TOTAL EQUIPMENT** | $134,000 | $884,000 | $1,018,000 |
| | | | | |
| | **TOTAL WELL COST** | $1,886,000 | $1,122,000 | $3,008,000 |

APPROVED: _____, 2013.

BY: _____

OEE Insurance Election (Please check your election below):
☐ Coverage under own policy with limits not less than _____.
☑ Coverage under Operator's policy
☐

NOTE: If no election is checked or owner has not supplied proof of coverage prior to spud, owner will be included under and charged for SEC's OEE coverage.

☐ Coverage under Operator's policy