Red River La
Gahagan Field

Almond-Hook #1
(HOSS RD SU H)





Snead
UPC 19944
No. 2K3503-183
HASTINGS, MN

Rosbottom Production Corp.
Almond-Hook #1
Gahagan Field
Red River Parish, Louisiana

## WORKOVER

11/27/06     MIRU.  Nut down tree and BOP.  Work with arrow set packer with no movement.  SDFN

11/28/06     RU Blackwarrior to back off tubing.  Ran in hole with 1.5" backoff tool and primer, cord did not fire.  Computer on Blackwarrior truck broken and had to be repaired.  Run back in hole          with backoff tool, gun fired @ 6914' but no backoff.  Ran in hole with freepoint tool.  Set tool @ 4500' showing some movement.  Set tool @ 5000' showing no movement.  Work tubing for 1 hour.  Set tool @ 5200' showing little movement.  Come out of hole with freepoint.  Backed off at 4700'.

11/29/06     Came out of hole w/ tubing.  Hole in tubing at 3164'.  Replaced 6 joints tubing.  Went back in hole with tubing and screwed back on at 4700'.  Worked tubing up and down.  Back in hole with freepoint.  After 2 hours, movement @ 5500'.  Backed off at 5500' and pulled up 4'.  Circulate up heavy mud for 3 hours.  SDFN


*** With the problem of mud on the backside, we plan to continue cleaning out the wellbore and squeeze the hole in the casing which we feel is in the interval 2300-2400.  At this point, Rosbottom Production Corp is submitting the following revised AFE for your review and approval.  As the rig is on location, we request your approval in 24 Hours.  Please feel free to give us a call with any questions.

Revised AFE

| | |
|---|---|
| RIG | $58,000 |
| Squeeze tools | $4,800 |
| Wireline work | $14,000 |
| Squeeze services | $9,600 |
| Drillout eqpt | $5,200 |
| Fishing services | $26,000 |
| Trucking | $11,800 |
| Contingencies | $10,000 |
| **TOTAL** | **$141,000** |

**Please sign and date your approval and fax to our office at 318-219-2275.**

*SKLARCO L.L.C.*

**Company name**

*Dan M Harlow, V.P.-C.O.O.*

**Signature**

*11-30-06*

**Date**

## BLUE SHEET

| | | |
|---|---|---|
| AFE | | PLN/DO |
| SUBMITTAL NO. | | FILE REFER: |
| DATE RECEIVED | 9/29/00 | **30 DAYS!** |
| RESP. DUE DATE | 10/29/00 | |
| COUNTY | Red River | STATE  Louisiana |
| ACREAGE | Almond-Hook #1 | |
| | Flanagan Field | |

SUBMITTED BY: Rosbottom Production Corp.

ADDRESS: 2640 Youree Dr.  / P.O. Box 4387
Shreveport, LA 71104 / 71134

TELEPHONE: (318) 219-1212 / Damon Jordan

PROPOSAL: "Scheduling a rig to pull the Well"

*************************************************************

## LAND DATA

| | | SUBJECT TO: |
|---|---|---|
| TYPE | | |
| STATUS | | |
| MI: | | |
| GWI: | 0.10153454 | |
| ~~NRI~~ NWI: | 0.07594127 | |
| COMMENTS: | Total cost: $36,600.00 | |
| | Our cost: $3,716.23 | |
| | See attached!! | |

*************************************************************

## GEOLOGICAL REVIEW and COMMENTS

OK. Oh

*************************************************************

## ENGINEERING REVIEW and COMMENTS

*************************************************************

## FINAL DISPOSITION

Howard (>$2000)

*************************************************************

| FINAL DISTRIBUTION | | OTHER |
|---|---|---|
| LAND – ORIG. | | |
| KIM – COPY | | |
| ACCOUNT – COPY | | |

*************************************************************

```
                    TRANSMISSION VERIFICATION REPORT

                                        TIME  : 10/20/2006 16:11
                                        NAME  :
                                        FAX   :
                                        TEL   :
                                        SER.# : BROD4J471905


        DATE,TIME               10/20  16:10
        FAX NO./NAME            2192275
        DURATION               00:00:37
        PAGE(S)                 03
        RESULT                  OK
        MODE                    STANDARD
                                ECM
```

**SKLARCO L.L.C.**
**401 EDWARDS STREET, SUITE 1601**
**SHREVEPORT, LOUISIANA 71101**
**TELEPHONE NO: (318) 227-8668**
**FAX NO. (318) 227-9012**
**FAX COVER SHEET**

TO:      Mr. Damon W. Jordan
         Rosbottom Production Corp.
         Fax No. (318) 219-2275

FROM:    Katy R. Smith / Lease Analyst
         Sklarco L.L.C.
         Fax No. (318) 227-9012

Date:    October 20, 2006

Re:      **Almond-Hook #1 Well Election**
         **Gahagan Field**
         **Red River Parish, LA**

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If the reader of this TRANSMITTAL PAGE is not the intended recipient or a representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this FAX or the information contained therein is prohibited. If this transmission is received by anyone other than the addressee, the recipient is requested to call Sklar Exploration Company L.L.C. collect at 318-227-8668, and to immediately return this document to Sklar Exploration Company L.L.C. by United States mail. Sklar Exploration

**SKLARCO L.L.C.**
**401 EDWARDS STREET, SUITE 1601**
**SHREVEPORT, LOUISIANA 71101**
**TELEPHONE NO: (318) 227-8668**
**FAX NO. (318) 227-9012**
**FAX COVER SHEET**

TO:        Mr. Damon W. Jordan
             Rosbottom Production Corp.
             Fax No. (318) 219-2275

FROM:     Katy R. Smith / Lease Analyst

             Sklarco L.L.C.

             Fax No. (318) 227-9012

Date:       October 20, 2006

Re:         **Almond-Hook #1 Well Election**

             **Gahagan Field**

             **Red River Parish, LA**

---

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If the reader of this TRANSMITTAL PAGE is not the intended recipient or a representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this FAX or the information contained therein is prohibited. If this transmission is received by anyone other than the addressee, the recipient is requested to call Sklar Exploration Company L.L.C. collect at 318-227-8668, and to immediately return this document to Sklar Exploration Company L.L.C. by United States mail. Sklar Exploration Company L.L.C. guarantees return postage.

**MESSAGE:**

Please see the attached.

No. of Pages: 3



October 20, 2006

**(VIA FACSIMILE & US MAIL)**
Rosbottom Production Corp.
Attn: Mr. Damon W. Jordan
P.O. Box 4387
Shreveport, LA 71134

RE:    **Almond-Hook #1**
       **Gahagan Field**
       **Red River Parish, Louisiana**

Mr. Jordan:

Please accept the enclosed ballot as Sklarco's consent to pull the Almond-Hook #1 well.

Should you have any questions, please do not hesitate to contact my office.

Sincerely,

Katy R. Smith
Lease Analyst

Enclosure

# ROSBOTTOM PRODUCTION CORP.
Almond-Hook #1
Gahagan Field
Red River Parish, Louisiana

### Workover Procedure

1. Set wireline plug in bottom pkr. if possible (Haynesville Wireline)
2. MIRU workover rig, pump & tank, Nipple down tree, nipple up BOP's
3. Try to release arrow set 1 pkr. may have to rig up wireline truck and shoot holes in tubing above pkr. and circulate mud off pkr. Well has a hole in casing.  Mud was washed out of casing in 1997 when last pulled.
4. POOH with tubing
5. Run multi caliper log
6. Test tubing back in hole
7. Pump 15% FE and Mud Acid, displace to perf's.
8. Swab back.

### AFE

| | | |
|---|---|---:|
| 1. | Workover rig pump & tank (6 days) | $ 21,600.00 |
| 2. | Multi – caliper casing log | 4,000.00 |
| 3. | Redress pkr. | 800.00 |
| 4. | Test Tubing | 1,200.00 |
| 5. | Acid | 4,000.00 |
| 6. | Wireline Truck | 1,600.00 |
| 7. | Miscellaneous | 1,000.00 |
| 8. | Supervision | 2,400.00 |
| | **TOTAL** | **$ 36,600.00** |

Approved By David A. Barlow/V.P.–C.O.O.

Sklarco, LLC

Print Owner Name

# ROSBOTTOM PRODUCTION CORP.
Almond-Hook #1
Gahagan Field
Red River Parish, Louisiana



September 26, 2006

RE: Rosbottom Production Corp.
Almond-Hook #1
Gahagan Fld.
Red River Ph. LA

To The Partners

Please be advised, the referenced well has creased to produce and Rosbottom is currently scheduling a rig to pull the well. We have enclosed a proposal for this workover and ask that you review it and contact us with any questions. Please execute and return the approval letter to us at your earliest convenience.

Yours Truly,

Damon W. Jordan

Well: Almond Hook #1

Field: Gahagan
County: Red River
State: LA
Additional Info: 1-1104
R1-443

Operator: Rosbottom Production
Payor: Rosbottom Production
GWI: 0.10153634
NWI: 0.07579127

| CFB | Name | Beneficial Interest | GWI | NWI |
|---|---|---|---|---|
| | EJS | 0.30147900 | 0.03061107 | 0.02284948 |
| | HOW | 0.30147800 | 0.03061097 | 0.02284940 |
| | MIR | | 0.00000000 | 0.00000000 |
| | SAC | 0.03181200 | 0.00323007 | 0.00241107 |
| | SAS | 0.03181200 | 0.00323007 | 0.00241107 |
| | SCL | | 0.00000000 | 0.00000000 |
| | SKI | 0.03194000 | 0.00324307 | 0.00242077 |
| | SOC | | 0.00000000 | 0.00000000 |
| | SUT | 0.30147900 | 0.03061107 | 0.02284948 |
| | SUZ | | 0.00000000 | 0.00000000 |
| 0.00000000 | | 1.00000000 | 0.10153632 | 0.07579127 |

RI: 0.00545806
ORRI:

| CFB | Name | Beneficial Interest | RI | ORRI |
|---|---|---|---|---|
| | EJS | 0.08325000 | 0.00045439 | 0.00000000 |
| | HOW | 0.08325000 | 0.00045438 | 0.00000000 |
| | MIR | | 0.00000000 | 0.00000000 |
| | SAC | 0.24975000 | 0.00136315 | 0.00000000 |
| | SAS | 0.24975000 | 0.00136315 | 0.00000000 |
| | SCL | | 0.00000000 | 0.00000000 |
| | SKI | 0.25075000 | 0.00136861 | 0.00000000 |
| | SOC | | 0.00000000 | 0.00000000 |
| | SUT | 0.08325000 | 0.00045438 | 0.00000000 |
| | SUZ | | 0.00000000 | 0.00000000 |
| 0.00000000 | | 1.00000000 | 0.00545806 | 0.00000000 |

ROSBOTTOM - ALMOND-HOOK #1 (HOSS RD SU H
GAHAGAN FIELD
RED RIVER PARISH, LA.

ALMOND-HOOK NO. 1

## ASSIGNMENT OF OIL, GAS AND MINERAL LEASES

STATE OF LOUISIANA

PARISH OF RED RIVER

KNOW ALL MEN BY THESE PRESENTS, THAT:

For and in consideration of the sum of One Hundred Dollars ($100.00) and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged,

ROSBOTTOM PRODUCTION CORP., a Louisiana Corporation, herein represented by HAROLD L. ROSBOTTOM, JR., its duly authorized President, whose mailing address is 400 Travis, Suite 1000, Shreveport, Louisiana 71101

herein sometimes called "Assignor", does hereby GRANT, BARGAIN, SELL, TRANSFER, ASSIGN and CONVEY unto the following, herein sometimes collectively called "Assignees", the undivided interests set opposite their names to-wit:

| | |
|---|---|
| T. L. JAMES & CO.<br>Post Office Box 1610<br>Shreveport, Louisiana 71165 | .1875000 |
| CHRISTINE ROGERS<br>1103 Hazel<br>Magnolia, Arkansas 71753 | .0091146 |
| MIKE ROGERS DRILLING CO.<br>Post Office Box 126<br>Magnolia, Arkansas 71753 | .0182292 |
| MIKE ROGERS<br>403 Hazel<br>Magnolia, Arkansas 71753 | .0091146 |
| HAROLD L. ROSBOTTOM, JR.<br>400 Travis, Suite 1000<br>Shreveport, Louisiana 71101 | .0557813 |
| S & P CO.<br>Post Office Box 3735<br>Shreveport, Louisiana 71133-3735 | .2864583 |
| GENE SANDERS<br>301-305 McAlester Building<br>Magnolia, Arkansas 71753 | .0500000 |
| SCOTT STROUD<br>Post Office Box 3735<br>Shreveport, Louisiana 71133-3735 | .0212500 |
| TAKACH AMUSEMENT<br>1841 N. San Jacinto Street<br>Liberty, Texas 77575 | .0050000 |
| WEISER BROWN OPERATING COMPANY<br>Post Office Box 500<br>Magnolia, Arkansas 71753 | .2000000 |
| | .8424480 |

the right, title and interest in and to the oil, gas and mineral leases as described on Exhibit "A" attached hereto and made a part hereof for all purposes.

This assignment is made subject to all terms, covenants, conditions, and provisions of the above described oil, gas and mineral leases.

This assignment is executed and delivered by Assignor to Assignee in accordance with the terms and provisions of that certain Participation Agreement between Assignor and Assignees dated November 6, 1987.

Assignees expressly assume all duties, obligations, terms and covenants of the leases herein assigned, including, but not by way of limitation, the obligation to bear and assume all royalties, overriding royalties, production payments, and other burdens on production affecting the leases herein assigned.

Case 20-03190 Document 1 by Filed 02/26/21 Entered 02/26/21 18:46:49 Page 12 of 155

warranty of title whatsoever, either expressed or implied, not even for return of the purchase price, except against the claims and demands of all persons claiming by, through or under Assignor, but is made with full rights of substitution and subrogation.

This assignment may be signed in any number of counterparts, each of which shall be considered original for all practical purposes.

The provisions contained in this assignment shall be binding upon Assignor and Assignee, their respective heirs, executors, personal representatives, successors and assigns.

IN WITNESS WHEREOF, this instrument is executed on this _5th_ day of _June_, 1992, but effective as of the date of first production.

ASSIGNOR:

WITNESSES:

ROSBOTTOM PRODUCTION CORP.

By: _____
HAROLD L. ROSBOTTOM, JR.
President

ATTEST:

By: _____
MARTHA H. MAY

T. L. JAMES & CO.

By: _____

ASSIGNEES:

CHRISTINE ROGERS

MIKE ROGERS DRILLING CO.

By: _____

MIKE ROGERS

HAROLD L. ROSBOTTOM, JR.

S & P CO.

By: _____
AUGUST ERICKSON, General Manager

GENE SANDERS

SCOTT STROUD

TAKACH AMUSEMENT

By: _____

WEISER BROWN OPERATING COMPANY

By: _____

PARISH OF CADDO

On this 8th day of June, 1992, before me personally appeared HAROLD L. ROSBOTTOM, JR., to me personally known, who, being by me duly sworn, did say that he is the PRESIDENT of ROSBOTTOM PRODUCTION CORP., and that the foregoing instrument was signed and sealed in behalf of the corporation by authority of its Board of Directors, and that he acknowledged the instrument to be the free act and deed of the corporation.

_Tina A. Hamm_
Notary Public in and for Caddo Parish, Louisiana

TINA A. HAMM, Notary Public
Caddo Parish, Louisiana
My Commission is for Life

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 1992, before me personally appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of T. L. JAMES & CO., and that the foregoing instrument was signed and sealed in behalf of the corporation by authority of its Board of Directors, and that he acknowledged the instrument to be the free act and deed of the corporation.

_____
Notary Public in and for

STATE OF _____

COUNTY/PARISH OF _____

On this _____ day of _____, 1992, before me personally appeared CHRISTINE ROBERS, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for

STATE OF _____

COUNTY/PARISH OF _____

On this _____ day of _____, 1992, before me personally appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of MIKE ROGERS DRILLING CO., and that the foregoing instrument was signed and sealed in behalf of the corporation by authority of its Board of Directors, and that he acknowledged the instrument to be the free act and deed of the corporation.

_____
Notary Public in and for

STATE OF _____

COUNTY/PARISH OF _____

On this _____ day of _____, 1992, before me personally appeared MIKE ROGERS, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for


STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 1992, before me personally appeared HAROLD L. ROSBOTTOM, JR., to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for


STATE OF LOUISIANA

PARISH OF CADDO

On this 23rd day of June _____, 1992, before me personally appeared August Erickson _____, to me personally known, who, being by me duly sworn, did say that he is the General Manager of S & P CO., and that the foregoing instrument was signed and sealed in behalf of the corpora~partnership ~tion by authority of its Board of Directors, and that he acknowledged the instrument to be the free act and deed of the corporation. partnership

_Frances M. Bailey_
Notary Public in and for

**FRANCES M. BAILEY**
NOTARY PUBLIC, Caddo Parish, Louisiana
My Commission is for Life


STATE OF _____

COUNTY/PARISH OF _____

On this _____ day of _____, 1992, before me personally appeared GENE SANDERS, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for

STATE OF _____

COUNTY/PARISH OF _____

On this _____ day of _____, 1992, before me personally appeared SCOTT STROUD, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for


STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 1992, before me personally appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of TAKACH AMUSEMENT, and that the foregoing instrument was signed and sealed in behalf of the corporation by authority of its Board of Directors, and that he acknowledged the instrument to be the free act and deed of the corporation.

_____
Notary Public in and for


STATE OF _____

COUNTY/PARISH OF _____

On this _____ day of _____, 1992, before me personally appeared _____, to me personally known, who, being by me duly sworn, did say that he is the _____ of WEISER BROWN OPERATING, and that the foregoing instrument was signed and sealed in behalf of the corporation by authority of its Board of Directors, and that he acknowledged the instrument to be the free act and deed of the corporation.

_____
Notary Public in and for

## EXHIBIT "A"

012-02   Oil, Gas and Mineral Lease dated August 19, 1987, between Rex L. Young, et ux,
Lessor and Rosbottom Production Corp., Lessee, recorded in Volume 233, Page 249
of the Conveyance Records of Red River Parish, Louisiana.

011-01   Oil, Gas and Mineral Lease dated January 27, 1988, between Mary Tom Wilkinson
Almond, et al, Lessor and Rosbottom Production Corp., Lessee, recorded in
Volume 233, Page 428 of the Conveyance Records of Red River Parish, Louisiana,
and subsequently amended by instrument recorded in Volume 246, Page 746 of the
Conveyance Records of Harrison County, Texas.

058-00   Operating Agreement dated January 13, 1989, between the State Mineral Board of
the State of Louisiana, and Cypress Energy Corporation, recorded in Volume 238,
Page 584 of the Conveyance Records of Red River Parish, Louisiana, and sub-
sequently assigned to Rosbottom Production Corp., by instrument recorded in
Volume 238, Page 625 of the Conveyance Records of Red River Parish, Louisiana.

## END OF EXHIBIT "A"

# DIVISION ORDER

TO: **ROSBOTTOM PRODUCTION CORP.**
    **400 Travis Street, Suite 1000**
    **Shreveport, Louisiana 71101**

Number _____ **0036**

Effective with Date of First Production

This division order applies to oil, gas, condensate, distillate or other liquid hydrocarbons or the proceeds from the sale thereof produced from the following described well and land, to wit:

**ROSBOTTOM PRODUCTION CORP.***HOSS RD SU H; ALMOND-HOOK NO. 1
Section 3, Township 12 North, Range 10 West
Red River Parish, Louisiana**

The undersigned certifies and guarantees that the interest set out below opposite his name is the interest owned by him in the oil, gas, condensate, distillate or other liquid hydrocarbons or proceeds from the sale thereof from the above described property.

Until further written notice of a change in ownership as hereinafter provided, you **ROSBOTTOM PRODUCTION CORP.** (hereinafter called "Company"), will give credit for such interest as shown below, to wit:

| CREDIT TO | DIVISION OF INTEREST | ADDRESS |
|---|---|---|

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.**

1. Until further written notice, Company, its assignees, nominees, or vendees, is authorized to purchase or to deliver to other purchasers for the undersigned's account and to receive the proceeds thereof, the oil, gas, condensate, distillate or other liquid hydrocarbons produced from the above described property.

2. For all gas taken hereunder, the undersigned will be paid the market value at the well or wells of such gas which, for all purposes hereunder, shall be considered the price received by Company for such gas, under any presently existing or any future contracts for the sale of gas, at the delivery point, less, as operating conditions in Company's opinion require, an amount sufficient to reimburse it for all reasonable and necessary costs incurred in making delivery of such gas from the wellhead and shall include, but not by way of limitation, the costs of gathering, dehydrating, compressing, treating and transporting the gas.

3. For all oil, condensate, distillate or other liquid hydrocarbons taken hereunder, the price therefor shall be the same price received by Company therefor at the well, after deducting therefrom a reasonable sum to cover the reasonable and necessary costs and expenses of treating and marketing such product. If, in order to market such products, it is necessary to transport same by truck or barge to a marketing point, then, in that event, Company is authorized to deduct from the proceeds for such products reasonable and necessary trucking or barging costs. Proper deductions will be made for water, dirt, sediment and other impurities, and corrections for temperature will be made in accordance with established rules prevailing at the time and place of delivery.

4. The undersigned agrees to indemnify and hold harmless Company or any purchaser from Company from any liabilities for any tax proposed or assessed against any interest hereunder and hereby authorizes Company or any purchaser from Company to deduct and pay such tax or taxes.

5. Payments shall be made monthly by Company's check mailed to the undersigned. However, if the proceeds accruing to any interest hereunder should amount to less than Twenty and No/100 Dollars ($20.00) per month, Company is hereby authorized to withhold payment until such accruals amount to $20.00 or to account for such proceeds on an annual basis, at Company's election.

6. Each of the undersigned warrants the title to the particular interest credited to him herein, but, without impairment of such warranty, agrees that, in case of any adverse claim of title he will furnish a bond satisfactory to Company executed by a surety company as indemnity against such claims and further agrees that Company may retain the proceeds (or sales) price of the oil, gas, condensate, distillate or other liquid hydrocarbons without any obligations to pay interest thereon until such bond be furnished or until the dispute as to ownership be settled in a manner satisfactory to Company. Each of the undersigned hereby ratifies and confirms the oil and gas lease or leases, assignments and/or subleases, unit designation or agreement, and gas sales or processing agreement, and all amendments thereof, pertaining thereto covering the tract or tracts as to which he is credited with an interest, and recognizes said agreements to be presently valid and subsisting in accordance with its or their terms,and the consideration for the execution of this ratification is the proceeds from production obtained from the unit well.

This Indemnifying Division Order has been prepared prior to examination of complete title information and is based upon information furnished by the Operator, and is subject to revision in the event subsequent examination of abstracts or other title material reflects otherwise. The owners certify to the correctness of the above interests and agree to indemnify and hold Operator and Rosbottom Production Corp. harmless from any loss incurred by any owner as a result of payments made erroneously by virtue hereof.

*Signed + returned*
*4/11/91  fc*

EXHIBIT "A"

DIVISION ORDER NO. 0036
HOSS RD SU H; ALMOND-HOOK NO. 1
GAHAGAN FIELD
RED RIVER PARISH, LOUISIANA

| WORKING INTEREST OWNERS | DIVISION OF INTEREST | |
|---|---|---|
| | Before Payout | After Payout |
| HELEN S. ARNOLD<br>Post Office Box 97<br>Shreveport, Louisiana 71161-0097 | .00741894 | .00738377 |
| EDDIE DUNN<br>Post Office Box 1426<br>Shreveport, Louisiana 71164 | .00346680 | .00346680 |
| EQUITY OIL CO.<br>401 Market, Suite 1200<br>Shreveport, Louisiana 71101 | .00693411 | .00693411 |
| GOLDSBERRY PETROLEUM<br>401 Market, Suite 1200<br>Shreveport, Louisiana 71101 | .07481363 | .07481363 |
| JOANN HORTON GOODWIN, Individually and as Usufruct for L. A. Goodwin, Danny Wayne Goodwin and Dianne Goodwin<br>284 Pennsylvania<br>Shreveport, Louisiana 71105 | .00126563 | .00126563 |
| WILLIAM R. GUFFEY<br>1116 One Energy Square<br>4925 Greenville Avenue<br>Dallas, Texas 75206 | .00499875 | .00497505 |
| EUGENE HOLMAN, JR.<br>Post Office Box 1263<br>Sun Valley, Idaho 83353 | .00478406 | .00478406 |
| T. L. JAMES & CO., INC.<br>Post Office Box 1610<br>Shreveport, Louisiana 71165 | .09967808 | .09920557 |
| ROBERT L. KREIDLER<br>Post Office Box 6464<br>Cincinnati, Ohio 45202 | .01730518 | .01722315 |
| LEE S. MUDD<br>9424 Primrose<br>Shreveport, Louisiana 71108 | .00020872 | .00020872 |
| JOHN G. NELSON<br>2620 Centenary Boulevard<br>Shreveport, Louisiana 71104 | .00086696 | .00086696 |
| EDWARD G. POWELL<br>Post Office Box 21373<br>Shreveport, Louisiana 71120 | .00370920 | .00369162 |
| CHRISTINE ROGERS<br>1103 Hazel<br>Magnolia, Arkansas 71753 | .00452881 | .00452881 |

DIVISION ORDER NO. 0036
HOSS RD SU H; ALMOND-HOOK NO. 1
GAHAGAN FIELD
RED RIVER PARISH, LOUISIANA

| WORKING INTEREST OWNERS-Continued | DIVISION OF INTEREST | |
|---|---|---|
| | Before Payout | After Payout |
| MIKE ROGERS DRILLING COMPANY, INC.<br>Post Office Box 126<br>Magnolia, Arkansas 71753 | .00905764 | .00905764 |
| MIKE ROGERS<br>403 Hazel<br>Magnolia, Arkansas 71753 | .00452881 | .00452881 |
| HAROLD L. ROSBOTTOM, JR.<br>400 Travis, Suite 1000<br>Shreveport, Louisiana 71101 | .05914815 | .05668800 |
| S. & P. CO.<br>Post Office Box 3735<br>Shreveport, Louisiana 71134-3735 | .15228592 | .15156406 |
| GENE A. SANDERS<br>312 McAlister Building<br>Magnolia, Arkansas 71753 | .02484375 | .02484375 |
| SMP, INC.<br>720 Oliver Street, 24th Floor<br>St. Louis, Missouri 63101 | .00020872 | .00020872 |
| SCOTT D. STROUD<br>Post Office Box 565<br>Shreveport, Louisiana 71162 | .01055860 | .01055860 |
| TAKACH AMUSEMENT COMPANY<br>1841 North San Jacinto Street<br>Liberty, Texas 77575 | .00248437 | .00248437 |
| JOHN TAKACH<br>416 Travis, Suite 1109<br>Shreveport, Louisiana 71101 | .00248437 | .00248437 |
| WEISER BROWN OIL COMPANY, INC.<br>Post Office Box 500<br>Magnolia, Arkansas 71753 | .09937500 | .09937500 |
| WHITNEY CORPORATION<br>Post Office Box 6464<br>Cincinnati, Ohio 45202 | .06645205 | .06613705 |
| HERMAN WILLIAMSON, JR.<br>619 Market, Suite 400<br>Shreveport, Louisiana 71101 | .02214844 | .02214844 |
| HERMAN WILLIAMSON JR. and<br>First National Bank Trustees<br>Gladys and Ed E. Hurley<br>Endowment Foundation<br>619 Market, Suite 400<br>Shreveport, Louisiana 71101 | .06644531 | .06644531 |
| TOTAL WORKING INTEREST | .75000000 | .74587200 |

DIVISION ORDER NO. 0036
HOSS RD SU H; ALMOND-HOOK NO. 1
GAHAGAN FIELD
RED RIVER PARISH, LOUISIANA

| OVERRIDING ROYALTY INTEREST OWNERS | DIVISION OF INTEREST | |
|---|---|---|
| | Before Payout | After Payout |
| HELEN S. ARNOLD<br>Post Office Box 97<br>Shreveport, Louisiana 71161-0097 | .00083800 | .00083800 |
| BORDER COMPANY<br>401 Edwards Street, Suite 1625<br>Shreveport, Louisiana 71101 | .00127100 | .00203400 |
| DONALD L. CLARK<br>Post Office Box 214157<br>Dallas, Texas 75221 | .00056500 | .00090300 |
| EDDIE DUNN<br>Post Office Box 1426<br>Shreveport, Louisiana 71164 | .00041900 | .00041900 |
| EQUITY OIL CO.<br>401 Market, Suite 1200<br>Shreveport, Louisiana 71101 | .00083800 | .00083800 |
| A. PHIL FOSTER<br>Post Office Box 5213<br>Shreveport, Louisiana 71105 | .00105800 | .00169400 ✓ |
| CLINTON W. FULLER, SR.<br>Post Office Box 829<br>Shreveport, Louisiana 71162 | .00013400 | .00021400 |
| GOLDSBERRY PETROLEUM<br>401 Market, Suite 1200<br>Shreveport, Louisiana 71101 | .00181200 | .00181200 |
| HOOD GOLDSBERRY<br>401 Market, Suite 1200<br>Shreveport, Louisiana 71101 | .00092480 | .00092480 |
| JOANN HORTON GOODWIN, Individually and<br>as Usufruct for L. A. Goodwin, Danny<br>Wayne Goodwin and Dianne Goodwin<br>284 Pennsylvania<br>Shreveport, Louisiana 71105 | .00015300 | .00015300 |
| WILLIAM R. GUFFEY<br>1116 One Energy Square<br>4925 Greenville Avenue<br>Dallas, Texas 75206 | .00056500 | .00056500 |
| JAMES B. HARRIS<br>333 Texas, Suite 1414<br>Shreveport, Louisiana 71101 | .00056500 | .00090300 |
| EUGENE HOLMAN, JR.<br>Post Office Box 1263<br>Sun Valley, Idaho 83353 | .00057800 | .00057800 |
| T. L. JAMES & CO., INC.<br>Post Office Box 1610<br>Shreveport, Louisiana 71165 | .00593360 | .00593360 |
| ROBERT L. KREIDLER<br>Post Office Box 6464<br>Cincinnati, Ohio 45202 | .00103010 | .00103010 |

DIVISION ORDER NO. 0036
HOSS RD SU H; ALMOND-HOOK NO. 1
GAHAGAN FIELD
RED RIVER PARISH, LOUISIANA

## OVERRIDING ROYALTY INTEREST OWNERS-Continued DIVISION OF INTEREST

|  | Before Payout | After Payout |
|---|---|---|
| CARMEN J. LINAM<br>2529 East 70th Street, Suite 318<br>Shreveport, Louisiana 71105 | .00026700 | .00042800 |
| HENRY E. LINAM, JR.<br>2529 East 70th Street, Suite 318<br>Shreveport, Louisiana 71105 | .00026700 | .00042800 |
| MERCHANTS NATIONAL BANK OF MOBILE<br>Assignee of R. L. Lees<br>Post Office Drawer 2527<br>Mobile, Alabama 36622 | .00041800 | .00067000 |
| LEE S. MUDD<br>9424 Primrose<br>Shreveport, Louisiana 71108 | .00002500 | .00002500 |
| JOHN G. NELSON<br>2620 Centenary Boulevard<br>Shreveport, Louisiana 71104 | .00010500 | .00010500 |
| EDWARD G. POWELL<br>Post Office Box 21373<br>Shreveport, Louisiana 71120 | .00041900 | .00041900 |
| J. R. QUERBES, III<br>Post Office Box 5<br>Shreveport, Louisiana 71161 | .00105800 | .00169400 |
| REDLEY COMPANY<br>c/o Clinton Fuller<br>401 Edwards, Suite 1625<br>Shreveport, Louisiana 71101 | .00127100 | .00203400 |
| CHRISTINE ROGERS<br>1103 Hazel<br>Magnolia, Arkansas 71753 | .00075070 | .00075070 |
| MIKE ROGERS DRILLING COMPANY, INC.<br>Post Office Box 126<br>Magnolia, Arkansas 71753 | .00150170 | .00150170 |
| MIKE ROGERS<br>403 Hazel<br>Magnolia, Arkansas 71753 | .00075070 | .00075070 |
| HAROLD L. ROSBOTTOM, JR.<br>400 Travis, Suite 1000<br>Shreveport, Louisiana 71101 | .00715550 | .00715550 |
| S. & P CO.<br>Post Office Box 3735<br>Shreveport, Louisiana 71134-3735 | .01091480 | .01091480 |
| GENE A. SANDERS<br>312 McAlister Building<br>Magnolia, Arkansas 71753 | .00158230 | .00158230 |
| SMP, INC.<br>720 Oliver Street, 24th Floor<br>St. Louis, Missouri 63101 | .00002500 | .00002500 |

DIVISION ORDER NO. 0036
HOSS RD SU H; ALMOND-HOOK NO. 1
GAHAGAN FIELD
RED RIVER PARISH, LOUISIANA

## OVERRIDING ROYALTY INTEREST OWNERS-Continued DIVISION OF INTEREST

|  | Before Payout | After Payout |
|---|---|---|
| SCOTT D. STROUD<br>Post Office Box 565<br>Shreveport, Louisiana 71162 | .00067250 | .00067250 |
| TAKACH AMUSEMENT COMPANY<br>1841 North San Jacinto Street<br>Liberty, Texas 77575 | .00015825 | .00015825 |
| JOHN TAKACH<br>416 Travis, Suite 1109<br>Shreveport, Louisiana 71101 | .00015825 | .00015825 |
| WEISER BROWN OIL COMPANY, INC.<br>Post Office Box 500<br>Magnolia, Arkansas 71753 | .00632920 | .00632920 |
| WHITAKER PETROLEUM<br>401 Market, Suite 1200<br>Shreveport, Louisiana 71101 | .00092480 | .00092480 |
| WHITNEY CORPORATION<br>Post Office Box 6464<br>Cincinnati, Ohio 45202 | .00395580 | .00395580 |
| WHITING 1988 PRODUCTION PARTNERSHIP<br>1700 Broadway, Suite 2300<br>Denver, Colorado 80290 | .00665300 | .00665300 |
| HERMAN WILLIAMSON, JR.<br>619 Market, Suite 400<br>Shreveport, Louisiana 71101 | .00267700 | .00267700 |
| HERMAN WILLIAMSON JR. and<br>First National Bank Trustees<br>Gladys and Ed E. Hurley<br>Endowment Foundation<br>619 Market, Suite 400<br>Shreveport, Louisiana 71101 | .00803100 | .00803100 |
| WALTER R. MARTIN husband of<br>Debbie Martin<br>520 Glenwood<br>Bossier City, Louisiana 71111 | .00015300 | .00015300 |
| H. VAUGHN WATKINS, JR. husband of<br>Mary Watkins<br>125 South Congress #1710<br>Jackson, Mississippi 39201-3310 | .00042300 | .00042300 |
| TOTAL OVERRIDING ROYALTY INTEREST | .07333100 | .07745900 |

DIVISION ORDER NO. 0036
HOSS RD SU H; ALMOND-HOOK NO. 1
GAHAGAN FIELD
RED RIVER PARISH, LOUISIANA

| ROYALTY INTEREST OWNERS | DIVISION OF INTEREST |
|---|---|
| REX YOUNG and SANDRA OUTLAW YOUNG<br>Route 1, Box 26<br>Coushatta, Louisiana 71019 | .0093290 |
| STATE OF LOUISIANA<br>Office of Mineral Resources<br>Post Office Box 2827<br>Baton Rouge, Louisiana 70821 | .0257040 |
| LISA LAINE ALMOND LESTER<br>Post Office Box 524<br>Coushatta, Louisiana 71019 | .0402270 |
| MARY TOM WILKINSON ALMOND<br>Post Office Box 1060<br>Coushatta, Louisiana 71019 | .0402270 |
| COMMERCIAL NATIONAL BANK SHREVEPORT<br>TRUSTEE, u/w/o Emmett R. Hook, Jr.<br>Post Office Box 21119<br>Shreveport, Louisiana 71152 | .0305900 |
| JANE G. OHRT<br>c/o CNB Trust Department<br>Post Office Box 21119<br>Shreveport, Louisiana 71152 | .0152960 |
| FRANCES G. JACOBS MASSEY<br>c/o Premier Bank Trust Department<br>Post Office Box 21116<br>Shreveport, Louisiana 71154 | .0152960 |
| TOTAL ROYALTY INTEREST | 0.176669 |

## ROSBOTTOM PRODUCTION CORP.

400 TRAVIS, SUITE 1000 • TELEPHONE 425-1212
SHREVEPORT, LOUISIANA 71101-3117

**TO ALL INTEREST OWNERS**

ROSBOTTOM PRODUCTION CORP. is purchasing production from the lease described in the attached Division/Transfer Order.  Please read the Division/Transfer Order carefully and execute one copy before returning it to this office.  The other copy is for your file.  In order to eliminate the possibility of delayed payments and further correspondence, please follow the instructions outlined below.

| | |
|---|---|
| SIGNATURE | Sign as shown on the Division/Transfer Order.  Two witnesses should also sign where provided.  <u>Your spouse should also sign.</u> |
| CORPORATIONS | If signing for a corporation, signature must be attested and title of signatory party shown. |
| GUARDIANS OR ATTORNEY-IN-FACT | If the Division/Transfer Order is signed by an agent, attorney-in-fact, guardian or any other party other than the named interest owner, please furnish evidence of the rights vested in the signatory party. |
| MAILING ADDRESS | Insert the address to which checks are to be mailed. Print or type.  Do not abbreviate.  If you are already receiving checks from this company, be sure to use the same address to which we are now mailing checks. |
| CHANGE OF ADDRESS | You should notify us promptly of any change in your mailing address.  This notice must be over your own signature or the signature of your appointed agent. Always include your Owner Number (which appears on your check from this company) and your old address, then state your new address with zip code. |
| SOCIAL SECURITY OR FEDERAL ID NUMBER | Insert as provided on Division/Transfer Order and complete IRS Form W-9 attached. |

NOTICE

FAILURE TO PROVIDE YOUR TAXPAYER IDENTIFICATION NUMBER WILL SUBJECT YOU TO A $50.00 FINE FROM THE IRS AND MAY IMPOSE THE 20% BACKUP WITHHOLDING FROM PAYMENTS MADE TO YOU.

Yours very truly,

ROSBOTTOM PRODUCTION CORP.

Harold L. Rosbottom, Jr.
President

HLRjr:mhm
Enclosures

# SKLAR & PHILLIPS OIL CO.

P. O. BOX 3735
SHREVEPORT, LOUISIANA 71133-3735

SPECIAL HANDLING ADDRESS:
2925 MANSFIELD ROAD
SHREVEPORT, LA 71103-3646

May 5, 1994

TELEPHONE (318) 222-1800
FAX (318) 424-1257

Mr. Damon W. Jordan, Geologist
Rosbottom Production Corp.
400 Travis, Suite 1000
Shreveport, Louisiana   71101-3117

                            Re:  Revised AFE
                                 Almond-Hook #1
                                 Gahagan Field
                                 Red River Parish, Louisiana

Dear Mr. Jordan:

S & P Co. has executed and we enclose herewith one approved copy of the
revised AFE covering the proposed dual completion of the referenced well.

Very truly yours,

*Fran Bailey*

Fran Bailey

/fb
Enclosure (1)

Case:20-12377-MER   Doc#:915-1   Filed:02/26/21   Entered:02/26/21 18:46:49   Page26 of 155

**ROSBOTTOM PRODUCTION CORP.**
400 TRAVIS, SUITE 1000 • TELEPHONE 425-1212
SHREVEPORT, LOUISIANA 71101-3117

*Circ for*
*Approval*
*SDS* ✓
*CW* ✓
*AE* ✓

May 2, 1994

TO THE PARTNERS

                                    Re:  Revised AFE
                                         Almond-Hook #1
                                         Gahagan Field
                                         Red River Parish, LA

Gentlemen:

     Please find enclosed a revised AFE for the proposed operation
to dually complete the referenced well.  The revised AFE reflects
changes in the types of materials to be used as well as the
additional surface equipment that will be required.  To date, we
have received all positive responses for the proposed work and
expect to proceed with the completion in the very near future.

     We respectfully request for your acceptance to this revised
AFE by executing this letter and returning it to our office within
10 days.

     If you have any questions or would like to discuss this matter
further, please do not hesitate to call.

                                    Very truly yours,

                                    ROSBOTTOM PRODUCTION CORPORATION

                                    *Damon W. Jordan*

                                    Damon W. Jordan
                                    Geologist

af

Approved By:   _____
               Operations Manager
   Company:    SEPCo
      Date:    5-4-94

*Rec'd 5/5/94*

Rosbottom Production Corporation
**Almond-Hook #1**
North Gahagan Prospect
Section 3-12N-10W
Red River Parish, Louisiana

## Dual Completion Prognosis

1. Rig up workover rig, pump, and tank.

2. Kill tubing with 2% KCL water (as little as possible). Nipple down tree, Nipple up 5000# BOP's. TOH with tubing and arrowset #1 packer.

3. TIH 4-1/2 lock set packer with 6' X 2-3/8 sub with 1.875 "X" nipple for tailpipe. Packer will have Type T on/off tool set at 6980' with 20,000 compression. Test packer.

4. Rig up run wireline unit. TIH with 1.875 blanking plug & set in "X" profile in on/off tool. Pressure test plug and casing.

5. Release tbg from on/off tool. Circulate well with 10.6# CaCl water and spot 1 sack sand on top of blanking plug.

6. Rig up wireline unit. TIH with 3-1/8" Hollow Carrier casing gun. Perforate 6694-6704' and 6708-6712' with four shots per foot.

7. Run C-5 packer and TIH. Set packer at 6650'.

8. Swab, flow test, and evaluate for possible acid stimulation.

9. Circulate with 10.6# CaCl water to kill well. Release C-5 packer at 6650' and come out of hole.

10. Pick up on/off tool, 1.875 sliding sleeve, and 30' 3-1/16 blast joints. Position blast joints opposite perforations. Circulate sand off blanking plug and space out sliding sleeve below 6694-6704' and 6708-6712' perforations.

11. Nipple down BOP's, Nipple up tree. TIH with shifting tool and open sleeve. Swab upper zone through tubing. Flow and clean up.

12. TIH with shifting tool and close sleeve. Pull blanking plug from on/off tool. Swab and clean bottom perforation.

13. Put casing and tubing in sales line.

**Rosbottom Production Corporation**
**Almond-Hook #1**
Cost Estimate

| | |
|---|---:|
| Workover Rig (4 or 5 days @ $1700/day) | $ 8,500.00 |
| Packer, blast jts 20' & 10' total 30', sleeve | 4,150.00 |
| CaCl & 10# water | 2,500.00 |
| Wireline - blanking plug, shifting tool | 1,400.00 |
| Wireline - perforating | 1,613.00 |
| Trucking | 750.00 |
| Wellhead | 500.00 |
| Miscellaneous | 1,500.00 |
| Supervision | 1,600.00 |
| 1 - 2" Meter 2 pen burton recorder with cover (used) | 1,475.00 |
| 1 - 3" Meter run (used) | 735.00 |
| 1 - Adjustable choke (Best) (used) | 300.00 |
| 1 - Valve WKM 2-1/16 5000 wp (used) | 500.00 |
| 1 - Used high-pressure sep. (used) | 1,400.00 |
| TOTAL | $26,923.00 |

# ROSBOTTOM PRODUCTION CORP.

400 TRAVIS, SUITE 1000 • TELEPHONE 425-1212
SHREVEPORT, LOUISIANA 71101-3117

March 29, 1994

*Non consent or Operating Agreement*
*500%/500%*

TO THE PARTNERS:

    Re:  Dual Completion Proposal
         Almond-Hook #1
         Gahagan Field
         Red River Parish, Louisiana

Gentlemen:

    Please be advised that Rosbottom Production Corp, is hereby proposing operations to dually complete the referenced well.  We are currently producing approximately 320 MCFGPD from the Hosston Sand at 7007-7015.  It is our proposal to continue to produce this zone to the tubing, perforate the Hosston Zone from 6694 - 6712 and produce it up the backside.  The additional zone from 6694-6712 is gas productive by log, core, and drillstem test, which calculated a flow rate of approximately 1500 MCFGPD.  The result of this procedure should increase our production rate and allow us to take advantage of current gas prices.

    If you concur with our recommendation to dually complete the referenced well, please indicate your acceptance by executing this letter and returning it to our office for further handling.

    If you have any questions or would like to discuss this matter further, please do not hesitate to call.

                                    Very truly yours,

                                    *Damon Jordan*

                                    Damon Jordan
                                    Geologist

DJ:kms

Approved by: _____

Company: _Secard Phillips Oil Co.__

Date: _4-29-94_____

*Refer to RPL*
*4/29/94*

## ALMOND-HOOK #1

### Prognosis

1. Rig up workover rig and equipment.
2. Nipple down BOP's.  Nipple up tree.
3. Load tubing and casing with KCL water.  Pressure test casing.
4. Release packer.  Pull out of hole.
5. Run retrievable bridge plug in hole with on and off tool.  Set at 6800' above current perforations at 7007-7015'.  Back out of hole with tool.  Dump 1 sack sand on top.
6. Go back in hole with 4-1/2 Arrow Set I.  Set packer at 6600'. Test tubing in hole.
7. Swab down to 3000'.
8. Trainer Surveys will perforate 6694-6704' and 6708-6712' with four s.p.f. with 1-11/16 tubing gun.
9. Swab test & clean perf. up.  Kill tubing.
10. Come back out with Arrow Set I.  Put on and off tool back on. Go back in hole, wash sand, pull RBP out of hole.
11. Put 4-1/2 Arrow Set I back in hole with sliding sleeve 1 jt tubing between and set at 6980'.
12. Swab well down with sleeve open.  Clean well up and then close sleeve.
13. Put casing and tubing in sales line.

### AFE

| | |
|---|---|
| Acid-Eng. Kill Well (8 hrs) | $   804.00 |
| Rig (4 days) | 7,000.00 |
| BOP's | 200.00 |
| Haynesville Wireline - Sliding Sleeve | 600.00 |
| Sliding Sleeve | 1,100.00 |
| Retrievable Bridge Plug, On & Off Tool | 800.00 |
| Trainer Surveys (Perf) | 1,613.00 |
| Miscellaneous | 1,500.00 |
| Supervision | 1,600.00 |
| TOTAL | $15,217.00 |

P. O. BOX 3735

**S & P Co.**
2925 MANSFIELD ROAD
SHREVEPORT, LOUISIANA 71133-3735

PHONE 318 - 222-1600

June 23, 1992

Ms. Tina Hamm
Rosbottom Production Corp.
400 Travis, Suite 1000
Shreveport, Louisiana    71101-3117

Re:   Almond-Hook #1 Assignment

Dear Tina:

Thanks for your letter of June 19th.  Enclosed is the executed assignment
as requested.  Please give us recording data when available.

Sincerely,

Fran Bailey

/fb
Enclosure (1)

# ROSBOTTOM PRODUCTION CORP.
**400 TRAVIS, SUITE 1000 • TELEPHONE 425-1212**
**SHREVEPORT, LOUISIANA 71101-3117**

June 19, 1992

Fran Bailey
Sklar & Phillips
P. O. Box 3735
Shreveport, LA  71133-3735

RE:   Almond-Hook #1 Assignment

Dear Fran:

Pursuant to our telephone conversation, please note that the referenced assignment dated June 5, 1992, wherein your interest is .2864583 is correct in that Rosbottom is assigning the working interest owners their working interest in Robsottom leases only.

Should you have any questions, please give me a call.

Sincerely,

TINA HAMM

$\Delta \nu P - \quad .25$
$Prt \, Fut. - \quad .024 \, 15362$
$\underline{.2864583}$ } in Rosbottom leases

Assignment — O.K.

# ROSBOTTOM PRODUCTION CORP.

400 TRAVIS, SUITE 1000 • TELEPHONE 425-1212
SHREVEPORT, LOUISIANA 71101-3117

June 8, 1992

TO THE PARTNERS

RE:  Almond-Hook No. 1
Red River Parish, Louisiana

Dear Partners:

Please find enclosed Assignment of Oil, Gas and Mineral Leases
covering the above referenced well.  If same meets with your ap-
proval, please execute in the appropriate space provided and
return to our office for us to forward to record.

Should you have any questions, please do not hesitate to call.

Yours very truly,

ROSBOTTOM PRODUCTION CORP.

Martha H. May

Enclosure

*Land Records show S & P int. — .2030479 WI
Rosbottom actually billing that interest.
Why does he assign me 28+ %?*

*SS —*
*Can you explain?*
*fd*

*Assignment incorrect — Should have
assigned .1897762 int. Rosbottom
will furnish correction. fe*

Element - Stock #1

M P Original Interest (Eff)

$25\% \times 66.25\%$ /Reduction from int =

= .165625

Pit Interest = .0364583 $\times$ 66.25% =

.024153362

6.535 052 %  Non-Current

100.0000

6.535 052

93.464 948

$\dfrac{.165625}{93.464948}$ = .00168887

.1656 25

.6241536 2

$\times$ .865 35 052 = .01158047

$\dfrac{.9346 4948}{6.2415362}$ $\times$ .865 35 052

.165625
+ .0168047
.1772 05 47

MP = .165625
+ .0168047
.1772 05 47

Pit Int = .024153362
+ .00168887
.025842 49

.177205 47  (M P)
.025842 49  (Pit Int)
.2030 0479  (Total) (BP Int)

.2030 0479 $\times$ 75% = .15228592
BPO
D/O Int
.2030 0479 (total) (BP Int)

National® 45-107 Eye-Ease / 45-407 20/20 Buff / Made in USA

*Almond Hook*

*APO*

| | 1 | 2 | 3 ORIGINAL INT NRI APO | 4 ADDITIONAL INT NRI APO | 5 ORRI APO | 6 ORRI APO | 7 AGGREGATE NRI APO |
|---|---|---|---|---|---|---|---|
| 1 | Helen S. Arnold | | .00693411 | .00014466 | .0008338 | .000838 | .00822177 |
| 2 | Border Company | | | | .001271 | .002034 | .002034 |
| 3 | Donald L. Clark | | | | .000565 | .000903 | .000903 |
| 4 | Eddie Dunn | | .00340680 | | .000419 | .000419 | .0038858 |
| 5 | Equity Oil Co | | .00693411 | | .0008338 | .000838 | .00777211 |
| 6 | A. Paul Foster | | | | .001038 | .001694 | .001694 |
| 7 | Clinton W. Fuller, Jr | | | | .000134 | .000214 | .000214 |
| 8 | Goldsberry Petroleum | | .07481363 | | .001812 | .001812 | .07682563 |
| 9 | John Horton Goodwin | | .00126563 | | .000153 | .000153 | .00141863 |
| 10 | William R. Guffey | | .00467708 | .00030297 | .000565 | .000565 | .00550005 |
| 11 | James B. Harris | | | | .000565 | .000903 | .000903 |
| 12 | Eugene Holman, Jr. | | .00478406 | | .000578 | .000578 | .00536206 |
| 13 | I.L. James | | .09316406 | .00604151 | .0059336 | .0059336 | .10513917 |
| 14 | Robert Kreidler | | .01017028 | .00104887 | .00103301 | .00103301 | .01825325 |
| 15 | Charmin J. Linam | | | | .000267 | .000428 | .000428 |
| 16 | Henry G. Linam, Jr | | | | .000267 | .000428 | .000428 |
| 17 | Monsanto Bank | | | | .000418 | .00067 | .00067 |
| 18 | Lee S. Mudd | | .00020872 | | .000025 | .000025 | .00023372 |
| 19 | John G. Nelson | | .00080696 | | .000105 | .000105 | .00091196 |
| 20 | Edward G. Powell | | .00340668 | .00027482 | .000419 | .000419 | .00411062 |
| 21 | J.R. Quertez, III | | | | .001058 | .001694 | .001694 |
| 22 | Reba's Company | | | | .001271 | .002034 | .002034 |
| 23 | Christine Rogers | | .00452881 | | .0002884 | .0002884 | .00481721 |
| 24 | M. Rouse Drlg Co. | | .00905764 | | .0005769 | .0005769 | .00963554 |
| 25 | Mike Reces | | .00457881 | | .0002884 | .0002884 | .00481721 |
| 26 | H.C. Rezmonen, Jr | | .02523195 | .03145605 | .012704 | .012704 | .069389 |
| 27 | Shear & Phillips | | .12421875 | .00923009 | .0079115 | .0079115 | .14136034 |
| 28 | Steve A. Sanders | | .02484375 | | .0015823 | .0015823 | .02642605 |
| 29 | SMB, Inc | | .00020872 | | .000025 | .000025 | .00023372 |
| 30 | Scott Small | | .0105586 | | .0006725 | .0006725 | .0112311 |
| 31 | Tarnen Armington | | .00248437 | | .00015825 | .00015825 | .00264262 |
| 32 | John Tarnen & Assoc. | | .00248437 | | .00015825 | .00015825 | .00264262 |
| 33 | Wilkie Dunn | | .099375 | | .0063292 | .0063292 | .1057042 |
| 34 | Whitney Corp. | | .06210938 | .00402767 | .0039558 | .0039558 | .07009285 |
| 35 | Whiting 1988 Partn | | | | .006653 | .006653 | .006653 |
| 36 | Williamson & LWB Trustee | | .06644531 | | .008031 | .008031 | .07447631 |
| 37 | Herman Williamson, Jr. | | .02214844 | | .002677 | .002677 | .02482544 |
| 38 | Petroleum Finance | | .01871542 | | .0011538 | .0011538 | .01926902 |
| 39 | Walter R. Mann | | | | .000153 | .000153 | .000153 |
| 40 | | | | | .000423 | .000423 | .000423 |
| 41 | Royalty | | | | | | .176609 |
| 47 | | | | | .073331 | .077459 | 1.00000006 |

D10-O

.09.0495 to back line
check to back line

National®
45-107 Eye-Ease
45-407 20/20 Buff
Made in USA

*Almond Hook*

*(handwritten notes top right)*
1. No executed Are for Equity
2. No premium of for Goods/Px (see 10-18-89 letter)
3. I did not see that any of these parties signed the JOA, so, how are they such to the non-consent provision

| | ORIGINAL INT. | | EXTRA INT. SUBJECT TO APO REDUCTION | SIGNED ALL INT. | SID MINIMUMS | |
|---|---|---|---|---|---|---|
| 1 | Woods Brian | .1325 | | | .1325 | .1325 |
| 2 | S. Stano | .01407813 | | | .01407813 | .01407813 |
| 3 | J. Toknow | .0033125 | | | .0033125 | .0033125 |
| 4 | Takaci Ann | .0033125 | | | .0033125 | .0033125 |
| 5 | Gene Januaras | .033125 | | | .033125 | .033125 |
| 6 | Art. Futures | .02415362 | (? ).0897802 | | .02415362 | .02415362 |
| 7 | Jerry R. Phillips | .162025 | | .01326929 | .16562.5 | .20301791 |
| 8 | H.L. Rosdahl | .03364261 | | .04522158 | .03364261 | .07886419 |
| 9 | Mike Rogers | .00603842 | | | .00603842 | .00603842 |
| 10 | Christine Rogers | .00603842 | | | .00603842 | .00603842 |
| 11 | M.R. Demuso | .01207685 | | | .01207685 | .01207685 |
| 12 | J.L. James | .12421875 | | .00868535 | .12421875 | .13290041 |
| 13 | Whitney Corp. | .0821025 | | .00579023 | .0821025 | .08860273 |
| 14 | R.L. Kreisler | .0215657 | | .00158787 | .0215657 | .02307357 |
| 15 | | | | | | |
| 16 | | .0625 | | | | |
| 17 | | | | | | |
| 18 | Harold S. Almond | .00924548 | | .00064644 | .00924548 | .00989192 |
| 19 | Braden Company | .01402734 | EO | | | |
| 20 | Donald L. Clark | .00622944 | EO | | .00622944 | |
| 21 | Eddie Dunn | .0046240 | | | .0046240 | .0046274 |
| 22 | A. Paul Foster | .01468020 | EO | | | |
| 23 | C.W. Fuller Sr. | .00107656 | EO | | | |
| 24 | Goldspring Pet. | .07634064 | | | .0997515 | .0997515 |
| 25 | J.H. Goodwin | .00168750 | | | .0016875 | .0016875 |
| 26 | H.Q. Guffey | .00622944 | | .00043556 | .00622944 | .006665 |
| 27 | J.B. Harris | .00622944 | EO | | .00622944 | |
| 28 | Herald Prod. *Equity* | .00924548 | | | | .00924548 |
| 29 | Herman Murfee | .00637875 | | | .00637875 | .00637875 |
| 30 | Mercury Pet. | .0046274 | NON-CONSENT | | | |
| 31 | Carmen Lhamu | .00295313 | NON-CONSENT | .01053904 | | |
| 32 | Henry Lhamu | .00295313 | NON-CONSENT | | | |
| 33 | Lee S. Mund | .00027830 | | | .0027830 | .0027830 |
| 34 | John Nelson | .00115594 | | | .00115594 | .00115594 |
| 35 | C.P. Pinson | .0046240 | | .0003232 | .0046240 | .0049456 |
| 36 | I.R. Querms | .01468020 | EO | | | |
| 37 | Reeder Company | .01402734 | EO | | | |
| 38 | 3MP Inc. *Goldspring* | .00027830 | | | .0027830 | .0027830 |
| 39 | Whiting 1988 | .07340686 | Sonn GP | | | |
| 40 | Williamson T | .08859374 | | | .08859374 | .08859374 |
| 41 | H. Williamson Jr. | .02953125 | | | .02953125 | .02953125 |
| 42 | | | | | | |
| 43 | | .3375 | | .07587952 | | |
| 44 | | | | | | |
| 45 | | | | | | |
| 46 | | | | | | |
| 47 | | 1.00000000 | | | | |

National®
45-107 Eye-Ease
45-407 20/20 Buff
Made in USA

Almond- Hook

Additional Int.

APO

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| | | | | BPO | APO | DEDUCT | NRI APO |
| | | | | × (.75) | . (.7) | ADDITIONAL | TO THIS INT. |
| | | | | | | (SEE BELOW) | |
| 1 | Dean L Phillips | | .01326979 | .00995197 | .00928850 | .00005841 | .00923009 |
| 2 | H. L. Rossbottom Jr | | .04522158 | .03391618 | .03165511 | .00019906 | .03145605 |
| 3 | T. L. James | | .00808535 | .00604401 | .00607974 | .00003823 | .00604151 |
| 4 | Whitney Corporation | | .00579023 | .00434267 | .00405316 | .00002549 | .00402767 |
| 5 | R. L. Kreidler | | .00150787 | .00113090 | .00105551 | .00000664 | .00104887 |
| 6 | Helen J. Arnold | | .00064964 | .00048483 | .00045251 | .00000285 | .00044966 |
| 7 | W. R. Guffey | | .00043556 | .00032668 | .00030489 | .00000192 | .00030297 |
| 8 | Ed Powell | | .0003232 | .0002424 | .00022624 | .00000142 | .00022482 |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | .07587952 | .05690964 | .03311566 | | .05278164 |
| 12 | | | | | | | |
| 13 | | | A | | | | |
| 14 | | | | | | 4 minus 7 = | |
| 15 | | | | | | .004178 | |
| 16 | | | 70 OR | .00053402 | | perfect ! | |
| 17 | | | | | | | |
| 18 | Dean L Phillips | | .17487314 | .00005841 | | | |
| 19 | H. L. Rossbottom Jr | | .59590556 | .00019906 | | | |
| 20 | T. L. James | | .11446238 | .00003823 | | | |
| 21 | Whitney Corporation | | .07630820 | .00002549 | | | |
| 22 | R. L. Kreidler | | .0198719 | .00000664 | | | |
| 23 | Helen J Arnold | | .00851929 | .00000285 | | | |
| 24 | W. R. Guffey | | .00574015 | .00000192 | | | |
| 25 | Ed Powell | | .00425938 | .00000142 | | | |
| 26 | | | 1.00000000 | .00033402 | | | |
| 27 | | | | | | | |
| 28 | | | | | | | |
| 29 | | | | | | | |
| 30 | | | | | | | |
| 31 | | | | | | | |
| 32 | | | | | | | |
| 33 | | | | | | | |
| 34 | | | | | | | |
| 35 | | | | | | | |
| 36 | COLUMN 4 MINUS COLUMN 5 EQUALS .0037939B | | | | | | |
| 37 | HOWEVER WHEN YOU CALCULATE APO OKRI YOU COME UP WITH .004178 | | | | | | |
| 38 | THE DIFFERENCE IS A RESULT OF THE DISPARITY BETWEEN AGREED UPON AWI PARTICIPATION | | | | | | |
| 39 | AND LEASEHOLD OWNERSHIP | | | | | | |
| 40 | THUS THE SPREADING AND SUBTRACTION OF .00033402 WHICH IS THE DIFFERENCE | | | | | | |
| 41 | BETWEEN THE NUMBERS FOUND ON LINES 37 AND 36 | | | | | | |
| 42 | | | | | | | |
| 43 | | | | | | | |
| 44 | | | | | | | |
| 45 | | | | | | | |
| 46 | | | | | | | |
| 47 | | | | | | | |

National®
45-107 Eye-Ease
45-407 20/20 Buff
Made in USA

Almond Hook

| | OWI | .75 | NWI | NRIAPO TO NWI | AGG |
|---|---|---|---|---|---|
| Sylvar G. Phillips | .1626215 | .12921875 | .01326929 | .00923009 | .13344884 |
| H. L. Robinson, Jr. | .03364261 | .02523196 | .04522158 | .03145605 | .05668801 |
| T. L. James & Co. | .12921875 | .09316406 | .00868535 | .00604151 | .09920557 |
| Whitney Corporation | .0828125 | .06210938 | .00579023 | .00402767 | .06613705 |
| R. L. Kreidler | .0215657 | .01617428 | .00150787 | .00104837 | .01722315 |
| Helen S. Arnold | .00924548 | .00693411 | .00064644 | .00044966 | .00738377 |
| W. R. Guffey | .00622944 | .00467208 | .00043556 | .00030297 | .00497505 |
| Ed Powell | .0046224 | .0034668 | .0003232 | .00022482 | .0036962 |

PPC Annscy Group

| Depositor | 1 | 2 | Owner up to .30% | 3 | 4 | Spread |
|---|---|---|---|---|---|---|
| Meyer (Bruce) | 3,325 | | | | | .0003292 |
| Don D. Sproul | .0407873 | | | | | .0006675 |
| Jerry Farrell | .006625 | | | | | .00036165 |
| Gene A. Sromos | .033125 | | .005 | | | .001587 3 |
| Rabellum Joiners | .02315312 | | .05 | | | .0012353 8 |
| John S. Paris 1933 | .165625 | | .25 | | | .002791 5 |
| M.L. Cooperman Jr. | .03906761 | | .0507852 | | | .0016090 |
| Ethel Rogers | .00303982 | | .0091146 | | | .00028984 |
| Christine Rogers | .00003982 | | .01882692 | | | .0002989 4 |
| Mark Rogers | .01202685 | | .01882692 | | | .0005209 |
| J.L. Aames | .12242875 | | .1825 | | | .0039058 |
| Mancey Corp mini | .052.8375 | | .175 | | | |
| Rooner L. Rooner | .00156570 | | .103255 2 | | | .001020 1 |

GOLDORSKY AGENCY GROUP

OR01

| Name | CERT. INT. | | SPENO | |
|---|---|---|---|---|
| James S. Arango | +.53883 | | .010485 | |
| Lynne Dunn | .027395 | .050842. | .010838 | |
| Goldorsky Associates | .013696 | .025018 | .010619 | |
| James Houston Goodmo | .052215 | .009896 | .010181.0 | |
| William R. Gulley | .0115 | .009276 | .000153 | |
| Henry Ora Cooper V | .027595 | .050842 | .010838 | |
| Helmens Horell Partnership | .015.87 | .035072 | .000578 | |
| Lee S. Moore | .009525 | .001531 | .000025 | |
| Jon G. Nixson | .023196 | .025418 | .000105 | |
| Loretta G. Perle | .0625. | 40.7167 | .000031 | |
| Jay Inc. | .002525 | .001931 | .000025 | |
| Manuel Maldonado Jr G | .3515. | | | |
| Ivan Nanenda Joint Tenants | .0675. | 14.2559 | .002071 | |
| Manuel Maldonado, Jr. | 538.83 | 1.000000 | .010485 | |
| J. Title | | | | |

Assigned Hook # 1

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

GREENE, AYRES & MAYO
ATTORNEYS AT LAW
SUITE 1300 BECK BUILDING
400 TRAVIS STREET
SHREVEPORT, LA. 71101

WILLIAM GREENE (1907-1967)
JAMES E. AYRES
ROBERT K. MAYO
~~HORACE R. SMITH~~

July 9, 1990

MAILING ADDRESS
P. O. BOX 57
SHREVEPORT, LA. 71161

PHONE: (318) 222-3292

ROYALTY AND OVERRIDING ROYALTY
DIVISION ORDER TITLE OPINION

Rosbottom Production Corp.
1000 Beck Building
400 Travis Street
Shreveport, Louisiana 71101

Attention:  Mr. Harold L. Rosbottom, Jr.

RE:  ALMOND-HOOK NO. 1
HOSS RD SU H
RED RIVER PARISH, LOUISIANA

Gentlemen:

It is to be noted that this Opinion is limited to unit royalty and overriding royalty ownership.  In accordance with the terms of that certain Operating Agreement dated June 1, 1989, the total unit royalty and unit overriding royalty is equal to 25%.  It is our understanding that you will calculate the unit working interest which will equal the remaining 75%.

UNIT DESCRIPTION TO BE SET
FORTH IN DIVISION ORDER:

718.18 acres located in Sections 3 and 4, Township 12 North, Range 10 West, Red River Parish, Louisiana, comprising the HOSS RD SU H, as shown on plat attached to Order No. 909-A-7, dated May 19, 1989, of the Department of Conservation of the State of Louisiana, recorded in Conveyance Book 240, Page 412 of the records of Red River Parish, Louisiana, and which Order pooled and unitized said lands for the development and production of gas and condensate from the Hosston Formation, Reservoir D, Gahagan Field, Red River Parish, Louisiana, and to which Order and the recordation of same reference is hereby made for all purposes.

The unit above described consists of the following separate tracts:

Tract 1:

All that part of the W 1/2 of SE 1/4, Section 3, T12N, R10W, lying North and East of Coushatta Bayou INSOFAR AS said land is located within the unit above described, containing 37.64 acres.
Unit Participation: 37.64/718.18 or .052410

Tract 2:

The beds and bottoms of Red River, Coushatta Bayou and all other navigable waters located in Sections 3 and 4, T12N, R10W, INSOFAR AS said land is located within the unit above described, containing 92.30 acres.
Unit Participation: 92.30/718.18 or .128519

Rosbottom Production Corp.          Page Two          July 9, 1990

Tract 3:

The E 1/2 of NW 1/4, Section 3, T12N, R10W,
INSOFAR AS said land is located within the
unit above described, containing 78.50 acres.
Unit Participation: 78.50/718.18 or .109304

Tract 4:

The W 1/2 of NW 1/4 and the SW 1/4, Section 3
and all that part of the SE 1/4 of SE 1/4 of
Section 4 lying South and East of Red River, all
in T12N, R10W, INSOFAR AS said land is located
within the unit above described, containing
208.46 acres.
Unit Participation: 208.46/718.18 or .290262

Tract 5:

All that part of the W 1/2 of SE 1/4, Section 3,
T12N, R10W, lying South and West of Coushatta
Bayou, INSOFAR AS said land is located within
the unit above described, containing 37.65 acres.
Unit Participation: 37.65/718.18 or .052424

Tract 6:

All that part of Section 4, T12N, R10W, lying
West of Red River, INSOFAR AS said land is
located within the unit above described, con-
taining 263.63 acres.
Unit Participation: 263.63/718.18 or .367081

EFFECTIVE DATE:

The Division Order issued pursuant to this
Division Order Title Opinion shall be effec-
tive as of first production from the Almond-
Hook No. 1 Well.

DEPTH LIMITATION:

The Division Order issued pursuant to this
Division Order Title Opinion shall be limited
to the Hosston Formation, Reservoir D, as
defined by Order No. 909-A-7 of the Department
of Conservation of the State of Louisiana.

MATTERS EXAMINED

As to Tract 1:

1.  Drill Site Title Opinion dated August 21, 1989,
of Bethard & Davis, addressed to Rosbottom Production Corp.

2.  First Supplemental Title Opinion for Division
Order Purposes dated April 5, 1990, of this firm, addressed
to Rosbottom Production Corp.

Rosbottom Production Corp.    Page Three    July 9, 1990

3. Title Report of Mr. T. M. Sullivan, Landman, dated May 23, 1990, together with the curative documents submitted in connection with said report and together with supplemental drilling and production information submitted by Mr. Sullivan.

As to Tract 2:

1. Title Opinion for Division Order Purposes dated April 5, 1990, of this firm, addressed to Rosbottom Production Corp.

2. Title Report of Mr. T. M. Sullivan, Landman, dated May 23, 1990, together with the curative documents submitted in connection with said report.

As to Tracts 3, 4 and 5:

1. Drill Site Title Opinion dated August 21, 1989, of Bethard & Davis, addressed to Rosbottom Production Corp.

2. First Supplemental and Complemental Title Opinion for Division Order Purposes dated April 6, 1990, of this firm, addressed to Rosbottom Production Corp.

3. Title Report of Mr. T. M. Sullivan, Landman, dated June 6, 1990, together with the curative documents submitted in connection with said report and together with supplemental drilling and production information submitted by Mr. Sullivan.

4. Copy of Correction of Description dated May 1, 1990, executed by Mary Tom Wilkinson Almond and Lisa Laine Almond Lester, recorded in Conveyance Book 246, Page 764, covering that certain Oil, Gas and Mineral Lease dated January 27, 1988.

As to Tract 6:

1. Preliminary Title Opinion dated December 6, 1979, of this firm, addressed to Hood Goldsberry.

2. First Supplemental Title Opinion for Division Order Purposes dated April 5, 1990, of this firm, addressed to Rosbottom Production Corp.

3. Title Report of Mr. T. M. Sullivan, Landman, dated May 23, 1990, together with curative documents submitted in connection with said report.

General Instruments Furnished
by Rosbottom Production Corp:

1. Letter of Rosbottom Production Corp. dated June 8, 1989, addressed to, "All Working Interest Owners", together with copy of Operating Agreement dated June 1, 1989, executed by and between Rosbottom Production Corp., as Operator, and Weiser Brown Oil Company, Inc., et al., as Non-Operators, and covering the unit above described.

2. Farmin Agreement dated October 30, 1989, executed in seven (7) separate counterparts by Clinton W. Fuller, Sr., Border Company, The Redley Company, James B. Harris, J. R. Querbes III, Donald L. Clark and A. Phil Foster in favor of Rosbottom Production Corp., covering the Oil, Gas and Mineral Lease dated February 27, 1979, executed by Emmett R. Hook, et al. unto Equity Oil Company and which lease covers Tract 6 above described.

Rosbottom Production Corp.     Page Four      July 9, 1990

3.   Copy of unrecorded Assignment of Overriding Royalty Interest dated June 12, 1990, executed by Rosbottom Production Corp. in favor of Harold L. Rosbottom, Jr., covering a 2.2% of 8/8 overriding royalty interest in the following Oil, Gas and Mineral Leases:

    (a)   Lease dated August 19, 1987, executed by Rex L. Young, et ux. covering Tract 1 above described;

    (b)   Lease dated January 27, 1988, executed by Mary Tom Wilkinson Almond, et al. covering Tracts 3, 4 and 5 above described.

4.   Copy of unexecuted and unrecorded Assignment of Oil, Gas and Mineral Leases to be executed by Rosbottom Production Corp. in favor of T. L. James & Co., et al. covering an undivided .8424480 leasehold interest in the following Oil, Gas and Mineral Leases:

    (a)   Lease dated August 19, 1987, executed by Rex L. Young, et ux. covering Tract 1 above described;

    (b)   Lease dated January 27, 1988, executed by Mary Tom Wilkinson Almond, et al. covering Tracts 3, 4 and 5 above described;

    (c)   Operating Agreement dated January 13, 1989, between the State Mineral Board of the State of Louisiana and Cypress Energy Corporation covering Tract 2 above described.

5.   Copy of unexecuted and unrecorded Assignment of Oil, Gas and Mineral Leases to be executed by Rosbottom Production Corp. in favor of Robert Kreidler, et al. covering an undivided .1575520 leasehold interest in the Oil, Gas and Mineral Leases set forth under Item 4. last above.

    NOTE:  The instruments listed as Items 4. and 5. last above are applicable to working interest only and same should be considered in your calculation of the unit revenue working interest.

General Instruments
Furnished by Goldsberry Petroleum:

1.   Copy of Assignment dated April 2, 1990, executed by The Whiting 1988 Production Partnership, Ltd. in favor of Goldsberry Petroleum, covering all of its interest in the Emmett R. Hook Lease dated February 27, 1979, insofar as said lease covers lands within the unit above described and wherein the Assignor reserved an overriding royalty interest, as to its proportinate interest, equal to the difference between present burdens on production and 25%. This assignment is recorded in Conveyance Book 246, Page 319.

2.   Copy of Assignment dated March 21, 1990, executed by Walter R. Martin in favor of Goldsberry Petroleum, covering all of his interest in the lease and lands described under Item 1. last above and reserving to Assignor, in proportion

Rosbottom Production Corp.     Page Five      July 9, 1990

to his interest, an overriding royalty equal to the
difference between existing burdens on production and 25%.
This assignment is recorded in Conveyance Book 246, Page 727.

3.   Copy of Assignment dated November 8, 1989, executed
by Helena Production Corporation in favor of Equity Oil Company,
covering all of its interest in the Emmett R. Hook, et al. Lease
dated February 27, 1979, as to all lands and depths covered by
said lease.  This assignment has not been filed for record in
Red River Parish, Louisiana, but was filed for record in
Bossier Parish, Louisiana.

DIVISION ORDER REQUIREMENT NO. 1:  EQUITY OIL
COMPANY SHOULD CAUSE THE ASSIGNMENT LISTED AS
ITEM 3. LAST ABOVE TO BE RECORDED IN RED RIVER
PARISH, LOUISIANA.

NOTE:  The instrument listed as Item 3. last
above is applicable to working interest only
and same should be considered in your calcu-
lation of the unit revenue working interest.

STATUS OF PREVIOUS REQUIREMENTS

As to Tract 1, above described:

A.   All Requirements of the Drill Site Title Opinion
dated August 21, 1989, have been previously satisfied,
waived, superseded or were advisory except for Requirement
No. 4.

Requirement No. 4:  The drilling and production
information furnished by Mr. T. M. Sullivan shows
that the mineral servitudes and mineral leases
subject to this Requirement have prescribed and
terminated.

B.   The Requirements of the First Supplemental Title
Opinion for Division Order Purposes dated April 5, 1990,
are as follows:

First Suppplemental Requirement No. 1:  SATISFIED.
The taxes for the years 1987, 1988 and 1989 are
paid.

First Supplemental Requirement No. 2A:ADVISORY.
To be noted.

First Supplemental Requirement No. 2B: SATISFIED.
Rental receipts furnished by Mr. Sullivan show
that the rentals under the Basic Lease subject
to this Requirement for the years 1988 and 1989
were paid and that said lease is currently being
maintained.

First Supplemental Requirement No. 3: SATISFIED.
Mr. Sullivan, after consultation with Mr. Marvin
Kent, Registered Surveyor, has advised that Tract
1 above described contains 37.64 acres and that
the unit above described contains 718.18 acres.
As a business matter, you should consider the
advisability of obtaining an actual survey of
this unit and of the separate tracts comprising
said unit.

Rosbottom Production Corp.     Page Six      July 9, 1990

As to Tract 2, above described:

A.   The Requirements of the Title Opinion for Division Order Purposes dated April 5, 1990, are as follows:

Requirement No. 1:  SATISFIED.  The drilling and production information furnished by Mr. Sullivan shows that the Operating Agreement covering Tract 2 above described is currently being maintained.

Requirement No. 2:  SATISFIED.  Mr. Sullivan, after consultation with Mr. Marvin Kent, Registered Surveyor, has advised that Tract 2 above described contains 92.30 acres and that the unit above described contains 718.18 acres. As a business matter, you should consider the advisability of obtaining an actual survey of this unit and of the separate tracts comprising said unit.

As to Tracts 3, 4 and 5, above described:

A.   All Requirements of the Drill Site Title Opinion dated August 21, 1989, have been previously satisfied, waived, superseded or are advisory except Requirement No. 4.

Requirement No. 4:  SATISFIED.  The drilling and production information furnished by Mr. T.M. Sullivan shows that the mineral leases subject to this Requirement have terminated.

B.   The Requirements of the First Supplemental and Complemental Title Opinion for Division Order Purposes, dated April 6, 1990, are as follows:

First Supplemental and Complemental Requirement No. 1:  SATISFIED.  The taxes for the years 1987, 1988 and 1989 are paid.

First Supplemental and Complemental Requirement No. 2:  ADVISORY.  To be noted.

First Supplemental and Complemental Requirement No. 3:  SATISFIED.  The rental receipts furnished show that the rentals under the Basic Lease subject to this Requirement have been paid for the years 1989 and 1990 and that said lease is currently being maintained.

First Supplemental and Complemental Requirement No. 4:  SATISFIED.  The Correction of Description dated May 1, 1990, recorded in Conveyance Book 246, Page 764, executed by Mary Tom Wilkinson Almond, et al., in favor of Rosbottom Production Corp. satisfies this Requirement.

First Supplemental and Complemental Requirement No. 5:  SATISFIED.  Mr. Sullivan, after consultation with Mr. Marvin Kent, Registered Surveyor, has advised that Tract 3 above described contains 78.50 acres; that Tract 4 above described contains

Rosbottom Production Corp.    Page Seven    July 9, 1990

208.46 acres; that Tract 5 above described
contains 37.65 acres; and that the unit
above described contains 718.18 acres.  As a
business matter, you should consider the
advisability of obtaining an actual survey of
this unit and the separate tracts comprising
same.

As to Tract 6, above described:

A.  All Requirements of the Preliminary Title Opinion
dated December 6, 1979, have been previously satisfied,
waived, superseded or are advisory except for Requirement
Nos. 5, 7A, 8B and 9.

Requirement No. 5:  SATISFIED.  The drilling
and production information furnished by Mr.T.M.
Sullivan shows that the mineral servitudes and
mineral leases subject to this Requirement have
prescribed and terminated.

Requirement No. 7A:  SATISFIED.  Mr. T. M.
Sullivan has advised that Sallie R. Hook is
now deceased and therefore her usufruct as
to Tract 6 terminated.

Requirement No, 8B:  SATISFIED.  Mr. T. M.
Sullivan has furnished patent information
sufficient to satisfy this Requirement.

Requirement No. 9:  SATISFIED.  Mr. Sullivan
advises that there is no church tract located
within Tract 6.

B.  The Requirements of the First Supplemental Title
Opinion for Division Order Purposes dated April 5, 1990,
are as follows:

First Supplemental Requirement No. 1:  SATISFIED.
The taxes for the years 1987, 1988 and 1989 are
paid.

First Supplemental Requirement No. 2:
OUTSTANDING.  This Requirement is in
connection with that certain mortgage
dated January 19, 1983, recorded in
Mortgage Book 102, Page 92, executed by
R. L. Lees unto Merchants National Bank
of Mobile.  We have been advised that
Mr. Lees and said bank elected not to
participate in the drilling of the Almond-
Hook No. 1 and that the working interest
formerly owned by Mr. Lees was acquired under
the terms of the Operating Agreement dated
June 1, 1989, by Rosbottom Production Corp.,
subject to the overriding royalty interest
retained by Mr. Lees under the terms of said
Operating Agreement.

DIVISION ORDER REQUIREMENT NO. 2:  MERCHANTS
NATIONAL BANK OF MOBILE SHOULD RELEASE THE
AFORESAID MORTGAGE INSOFAR AS SAME COVERS AND

Rosbottom Production Corp.      Page Eight      July 9, 1990

APPLIES TO THE WORKING INTEREST WHICH PASSED
FROM MR. LEES TO ROSBOTTOM PRODUCTION CORP.
UNDER THE TERMS OF THE OPERATING AGREEMENT.
IT IS ASSUMED THAT SAID BANK WILL RETAIN ITS
MORTGAGE AS TO THE RETAINED OVERRIDING ROYALTY
INTEREST OF MR. LEES.

First Supplemental Requirement No. 3:  SATISFIED.
The production information furnished by Mr. T. M.
Sullivan shows that the Basic Lease covering
Tract 6 has been maintained by production from
the Goldsberry-Hook No. 2 Well.

First Supplemental Requirement Nos. 4 and 5:
SATISFIED.  Mr. T. M. Sullivan has furnished
the marital status of the various parties named
in and subject to these Requirements.  You will
see our comments hereafter and you will also
note that certain parties were divorced subse-
quent to their acquiring interest in the Emmett
R. Hook Lease covering Tract 6 and that I am
requiring the former spouses of said parties to
join in the execution of your Division Order
stipulating "NO INTEREST".

First Supplemental Requirement No. 6: SATISFIED.
Mr. Sullivan, after consultation with Mr. Marvin
Kent, Registered Surveyor, advises that Tract 6
contains 263.63 acres and that the unit above
described contains 718.18 acres.  As a business
matter, you should consider the advisability of
obtaining an actual survey of this unit and the
separate tracts comprising same.

First Supplemental Requirement No. 7;  SATISFIED.
Based on a re-examination of that Assignment
dated January 21, 1986, in favor of Lee S. Mudd
and SMP, Inc., which assignment is shown as
Item 4. on Page Six of the First Supplemental
Title Opinion for Division Order Purposes, dated
April 5, 1990, we have concluded that Lee S.
Mudd and SMP, Inc. do in fact own working interest
in the Emmett R. Hook Lease covering Tract 6 above
described.  According to the computer sheet pre-
pared by Rosbottom Production Corp. showing the
working interest in this tract, you have given
credit to Lee S. Mudd and SMP, Inc. for their
respective working interests and such is
correct and proper.

UNIT ROYALTY AND OVERRIDING ROYALTY OWNERSHIP

NOTE:  The unit royalty ownership hereafter
shown is based on record title and is calcu-
lated on a tract-by-tract basis using the
acreage content of the tract and the acreage
content of the unit, as was furnished by
Mr. T. M. Sullivan.

Rosbottom Production Corp.   Page Nine        July 9, 1990

NOTE:  The unit overriding royalty ownership hereafter shown is based on record title, on the terms of the Farmin Agreements dated October 30, 1989, in favor of Rosbottom Production Corp. and on the terms of the Operating Agreement dated June 1, 1989, as applicable.  Further, the unit overriding royalty ownership is calculated on a tract-by-tract basis using the acreage content of the tract and the acreage content of the unit as furnished by Mr. T. M. Sullivan.

TRACT 1, AS ABOVE DESCRIBED:
UNIT PARTICIPATION OF .052410

Royalty Interest:

Rex L. Young and wife,
Sandra Outlaw Young                        .178000 x .052410
                                              .009329   RI

Overriding Royalty Interest:

Harold L. Rosbottom, Jr.,
husband of Leslie F. Rosbottom             .022000 x .052410
                                              .001153   ORI

Rosbottom Production Corp. for the
account of those working interest
participants (in proportion to
their respective working interest)
who hold title by, through and under
Rosbottom Production Corp., as per
the terms of Article XV.A. of the
Operating Agreement dated June 1, 1989     .050000 x .052410
                                              .002621   ORI

TOTAL ROYALTY AND OVERRIDING
ROYALTY FOR TRACT 1(25% x .052410):           .013103

TRACT 2, AS ABOVE DESCRIBED:
UNIT PARTICIPATION OF .128519

Royalty Interest:

The State of Louisiana, represented
by the State Mineral Board ("free
carried" interest as per Operating
Agreement dated January 13, 1989)          .200000 x .128519
                                              .025704   RI

Overriding Royalty Interest:

Rosbottom Production Corp. for the
account of those working interest
participants (in proportion to
their respective working interest)
who hold title by, through and under
Rosbottom Production Corp., as per
the terms of Article XV.A. of the
Operating Agreement dated June 1, 1989     .050000 x .128519
                                              .006426   ORI

TOTAL ROYALTY AND OVERRIDING
ROYALTY FOR TRACT 2 (25% x .128519):          .032130

Rosbottom Production Corp.       Page Ten       July 9, 1990

TRACT 3, AS ABOVE DESCRIBED:
UNIT PARTICIPATION OF .109304

Royalty Interest:

| | |
|---|---|
| Lisa Laine Almond Lester, separate property | .178000 x .109304 |
| | .019456  RI |

Overriding Royalty Interest:

| | |
|---|---|
| Harold L. Rosbottom, Jr., husband of Leslie F. Rosbotton | .022000 x .109304 |
| | .002405  ORI |

| | |
|---|---|
| Rosbottom Production Corp. for the account of those working interest participants (in proportion to their respective working interest) who hold title by, through and under Rosbottom Production Corp., as per the terms of Article XV.A. of the Operating Agreement dated June 1, 1989 | .050000 x .109304 |
| | .005465  ORI |

TOTAL ROYALTY AND OVERRIDING ROYALTY
FOR TRACT 3 (25% x .109304):                       .027326

TRACT 4, AS ABOVE DESCRIBED:
UNIT PARTICIPATION OF .290262

Royalty Interest;

| | |
|---|---|
| Lisa Laine Almond Lester, separate property | 29/32 x .178000 x .290262 |
| | .046822  RI |
| Mary Tom Wilkinson Almond, separate property | 3/32 x .178000 x .290262 |
| | .004844  RI |

Overriding Royalty Interest:

| | |
|---|---|
| Harold L. Rosbottom, Jr., husband of Leslie F. Rosbottom | .022000 x .290262 |
| | .006386  ORI |

| | |
|---|---|
| Rosbottom Production Corp. for the account of those working interest participants (in proportion to their respective working interest) who hold title by, through and under Rosbottom Production Corp., as per the terms of Article XV.A. of the Operating Agreement dated June 1, 1989 | .050000 x .290262 |
| | .014513  ORI |

TOTAL ROYALTY AND OVERRIDING ROYALTY
FOR TRACT 4 (25% x .290262):                       .072565

TRACT 5, AS ABOVE DESCRIBED;
UNIT PARTICIPATION OF .052424

Royalty Interest;

| | |
|---|---|
| Lisa Laine Almond Lester, separate property | 1/2 x .178000 x .052424 |
| | .004666  RI |

<u>Rosbottom Production Corp.</u>  Page Eleven      July 9, 1990

| | |
|---|---|
| Mary Tom Wilkinson Almond, separate property | 1/2 x .178000 x .052424 |
| | .004666  RI |

<u>Overriding Royalty Interest</u>:

| | |
|---|---|
| Harold L. Rosbottom, Jr., husband of Leslie F. Rosbottom | .022000 x .052424 |
| | .001153  ORI |
| Rosbottom Production Corp. for the account of those working interest participants (in proportion to their respective working interest) who hold title by, through and under Rosbottom Production Corp., as per the terms of Article XV.A. of the Operating Agreement dated June 1, 1989 | .050000 x .052424 |
| | .002621  ORI |

| | |
|---|---|
| TOTAL ROYALTY AND OVERRIDING ROYALTY FOR TRACT 5(25% x .052424): | |
| | .013106 |

<u>TRACT 6, AS ABOVE DESCRIBED</u>;
UNIT PARTICIPATION OF .367081

<u>Royalty Interest</u>:

| | |
|---|---|
| Commercial National Bank in Shreveport, Trustee U/W of Emmett R. Hook, Jr. | 1/2 x 1/6 x .367801 |
| | .030590  RI |
| Jane G. Ohrt, separate property | 1/4 x 1/6 x .367081 |
| | .015296  RI |
| Frances G. Jacobs Massey, separate property | 1/4 x 1/6 x .367081 |
| | .015296  RI |

<u>Overriding Royalty Interest</u>:

| | |
|---|---|
| *Border Company, a partnership (Farmout) | .0415625 x .083334 x .367081 |
| | .001271  ORI/BPO |
| *Donald L. Clark, husband of Linda Clark (Farmout) | .0184576 x .083334 x .367081 |
| | .000565  ORI/BPO |
| *A. Phil Foster, separate property (Farmout) | .0346080 x .083334 x .367081 |
| | .001058  ORI/BPO |
| *Clinton W. Fuller, Sr., husband of Myrtle Fuller (Farmout) | .0043750 x .083334 x .367081 |
| | .000134  ORI/BPO |
| *James B. Harris, separate property (Farmout) | .0184576 x .083334 x .367081 |
| | .000565  ORI/BPO |
| *J. R. Querbes III, separate property (Farmout) | .0346080 x .083334 x .367081 |
| | .001058  ORI/BPO |
| Ann Olene Querbes, divorced from J. R. Querbes III | NO INTEREST |

Rosbottom Production Corp.     Page Twelve         July 9, 1990

*Redley Company, a
partnership (Farmout)                 .0415625 x .083334 x .367081
                                              ,001271  ORI/BPO

**Merchants National Bank
of Mobile for the account
of R. L. Lees, a single
man (non-consent)                     .0136970 x .083334 x .367081
                                              .000418  ORI/BPO

**Carmen Jones Linam,
separate property                     .0087500 x .083334 x .367081
(non-consent)                                 .000267  ORI/BPO

**Henry E. Linam, Jr.,
separate property                     .0087500 x .083334 x .367081
(non-consent)                                 .000267  ORI/BPO

Betty Linam, divorced from
Henry E. Linam, Jr.                                   NO INTEREST

The Whiting 1988 Production            .2175018 x .0833334 x .367081
Partnership, Ltd. (leasehold                  .006653  ORI
interest assigned to Goldsberry
Petroleum, reserving this over-
riding royalty interest)

Walter R. Martin, husband
of Debbie Martin (lease-               .005000 x .083334 x .367081
hold interest assigned to                     .000153  ORI
Goldsberry Petroleum,
reserving this overriding
royalty interest)

***H. Vaughan Watkins, Jr.,           .0138432 x .083334 x .367081
husband of Mary Watkins                       .000423  ORI
(leasehold interest to be
assigned to Goldsberry
Petroleum, reserving this
overriding royalty interest)

Goldsberry Operating Company,         .538830 x .083334 x .367081
Inc. for the account of those                 .016485  ORI
working interest participants
(in proportion to their respec-
tive working interest) who hold
title by, through and under Hood
Goldsberry, as per the terms of
Article XV.A. of the Operating
Agreement dated June 1, 1989

TOTAL ROYALTY AND OVERRIDING ROYALTY
FOR TRACT 6(25% x .367081):                              .091770

*  After the occurrence of "payout" as defined in those
Farmin Agreements dated October 30, 1989, the overriding
royalty interest of these parties shall increase, pro-
portionately, to the difference between existing burdens
on production and 30%.

**  After the occurrence of "payout" as defined under Article
XV.B.1. of the Operating Agreement dated June 1, 1989, the
overriding royalty interest of these parties shall increase,
proportionately, to the difference between existing burdens
on production and 30%.

<u>Rosbottom Production Corp.</u>    <u>Page Thirteen</u>    <u>July 9, 1990</u>

\*\*\* Goldsberry Petroleum is in the process of securing an assignment from H. Vaughan Watkins, Jr. covering his leasehold interest in this unit and said Assignor will reserve the overriding royalty interest above set forth.

<u>DIVISION ORDER REQUIREMENT NO. 3</u>: GOLDSBERRY PETROLEUM SHOULD SECURE THE AFORESAID ASSIGNMENT FROM H. VAUGHAN WATKINS, JR., ET UX. AND SAME SHOULD BE FILED FOR RECORD IN RED RIVER PARISH, LOUISIANA.

TOTAL UNIT ROYALTY AND OVERRIDING ROYALTY INTEREST: <u>.250000</u>

<u>UNIT WORKING INTEREST</u>

All participating working interest owners in proportion to their respective working interest    <u>.750000</u>

<u>NOTE</u>: It is our understanding that Rosbottom Production Corp. will calculate the division of unit revenue working interest as among the participating working interest owners. Said interest should be calculated by multiplying the working interest of each working interest owner by the decimal fraction of .750000. The working interest of each working interest owner is based upon the "frozen" or stipulated working interest as set forth for each party in the Operating Agreement dated June 1, 1989.

<u>DESCRIPTION OF OIL, GAS AND MINERAL LEASES
APPLICABLE TO THIS UNIT</u>

1. Lease dated August 19, 1987, recorded in Conveyance Book 233, Page 249, executed by Rex L. Young, et ux. unto Rosbottom Production Corp. (Tract 1 above described)

2. Operating Agreement (in lieu of Oil, gas and Mineral Lease) dated January 13, 1989, recorded in Conveyance Book 238, Page 584, executed by the State Mineral Board on behalf of the State of Louisiana, and by Cypress Energy Corporation. (Tract 2 above described)

3. Lease dated January 27, 1988, recorded in Conveyance Book 233, Page 428, executed by Mary Tom Wilkinson Almond, et al. unto Rosbottom Production Corp., together with Correction of Description dated May 1, 1990, recorded in Conveyance Book 246, Page 764. (Tracts 3, 4 and 5 above described)

4. Lease dated February 27, 1979, recorded in Conveyance Book 172, Page 782, executed by Emmett R. Hook, et al. unto Equity Oil Company. (Tract 6 above described)

<u>ASSIGNMENTS OF OIL, GAS AND MINERAL LEASES</u>

Please see those assignments listed under the heading, "Matters Examined" above, together with those assignments set forth in the prior Title Opinions.

<u>DIVISION ORDER REQUIREMENT NO. 4</u>: REFERENCE IS MADE TO THOSE UNRECORDED AND UNEXECUTED ASSIGNMENTS TO BE EXECUTED BY ROSBOTTOM PRODUCTION CORP. WHICH ARE SET FORTH UNDER THE HEADING "MATTERS EXAMINED" ABOVE. THESE ASSIGNMENTS SHOULD BE EXECUTED AND FILED FOR RECORD IN RED RIVER PARISH, LOUISIANA.

Rosbottom Production Corp.    Page Fourteen    July 9, 1990

### GENERAL COMMENT

Rosbottom Production Corp. should issue its Royalty and Overriding Royalty Division Order pursuant to this Opinion and said division order should be executed by all interested parties.  In those instances where an interest is credited to a married person, the spouse of such party should join in the execution of your division order.  Under Tract 6 above we call to your attention that there are two (2) named parties who are shown to have "No Interest".  These two (2) parties should execute your division order stipulating "No Interest".

### CONCLUSION

Subject to the satisfaction of any outstanding Requirements of prior title opinions and subject to the Division Order Requirements herein made, and subject to an actual survey of the unit above described and the separate tracts comprising same, it is our opinion that those parties credited with a royalty interest and with an overriding royalty interest have good and valid title to said interest and that you may safely disburse the proceeds of production from this unit attributable to the royalty and overriding royalty interests in accordance with the decimal fractions hereinabove set forth.

Very truly yours,

GREENE, AYRES, & MAYO

James E. Ayres

JEA:icb
Enclosures: 2 copies

PAGE NO. 1
02/27/91

DIVISION OF INTEREST

LALNG. ALMOND-HIGH #1

| NAME | DECK CODES | CODES | WORKING INTEREST | OIL INTEREST | GAS INTEREST | P/S SUS REV OTC GAS | WPT WPT TAX | SEV SEV NT | DIST DIST NET OIL GAS BILL |
|------|-----------|-------|------------------|-------------|-------------|---------------------|-------------|-----------|---------------------------|
| MARY TOM WILKINSON ALMOND, AGT | ALMOW | W | 0.00000000 | 0.04022700 | 0.04022700 | | | | |
| CBR, TRUSTEE U/W/O | CBRHO | W | 0.00000000 | 0.00159000 | 0.00159000 | | | | |
| JANE EDMUND C/O ONE TRUST | CWHO | W | 0.00000000 | 0.04355280 | 0.04355280 | | | | |
| LISA LAINE A LESTER | LLESTLE | W | 0.00000000 | 0.04022700 | 0.04022700 | | | | |
| OFFICE OF MINERAL RESOURCES | L OFFMR | W | 0.00000000 | 0.02570400 | 0.02570400 | | | | |
| FRANCES C. PROUSS-MASSEY C/O | PRIMA | W | 0.00000000 | 0.04357940 | 0.04357940 | | | | |
| REV. L YOUNG & TAMORA YOUNG | Y YONRE | W | 0.00000000 | 0.00152200 | 0.00152200 | | | | |
| ALMOND HOOK OVERRIDES | O ALMOR | W | 0.00000000 | 0.07355100 | 0.07355100 | | | | |
| ALMOND-HOOK SURCHARGE | V ALMSUR | W | 0.00000000 | | | | | | |
| HELEN S WORNOLD | R WORHO | W | 0.00981192 | 0.00741894 | 0.00741894 | | | | |
| BORDER COMPANY | B BORCO | W | 0.00000000 | 0.00741813 | 0.00741813 | | | | |
| DONALD L CLARK | C CLARDE | W | 0.00000000 | | | | | | |
| EDDIE DUNN | E DUNHO | W | 0.00412740 | 0.00404580 | 0.00404580 | | | | |
| EQUITY FIELD | O EQUITY | W | 0.01942948 | 0.01659741 | 0.01659741 | | | | |
| OLINTON M FULLER, SR. | F FULLER | W | 0.00000000 | 0.00000000 | 0.00000000 | | | | |
| JORDAN ABINGTON PETROLEUM | O GOLDYS | W | 0.03981810 | 0.02481842 | 0.02481842 | | | | |
| WILLIAM P STEELE | F PARLELL | W | 0.03243310 | 0.01737943 | 0.01737943 | | | | |
| JAMES B HARRIS | R HARRIS | W | 0.00000000 | 0.00000000 | 0.00000000 | | | | |
| ANDREW BROUGHTON CORP. | E ABRCO | W | 0.00000000 | 0.00000000 | 0.00000000 | | | | |
| EUGENE HOLMAN JR | M HOLMHO | W | 0.00637838 | 0.00424040 | 0.00424040 | N Y | | | N |
| J C C JAMES & CO. | R JAMSTE | W | 0.13296610 | 0.09967805 | 0.09967805 | N Y | | | N |
| ROBERT KREIDLER | R KREIHO | W | 0.02299351 | 0.01230518 | 0.01230518 | | | | |
| CARNELL LINAM | C LINAM | W | 0.00000000 | 0.00000000 | 0.00000000 | | | | |
| HENRY E LINAM, JR | C LINHA | W | 0.00000000 | 0.00000000 | 0.00000000 | | | | |
| WM G MOBILE-ASSIGNEE-A | LEES | A MCKNA | W | 0.00000000 | 0.00000000 | 0.00000000 | | | | |
| LEE'S WORD | N WELSO | W | 0.00027830 | 0.00027830 | 0.00027830 | N Z | | | N |
| JOHN G NELSON | N WELSO | W | 0.00115594 | 0.00086696 | 0.00086696 | N Y | | | N |
| EDWARD G POWELL | N POWED | W | 0.00494560 | 0.00437920 | 0.00437920 | N Y | | | N |
| J R QUERRES III | O QUERJR | W | 0.00000000 | 0.00000000 | 0.00000000 | N | | | |
| RIDLEY COMPANY C/O C-C FULLER | RIDLCO | W | 0.00000000 | 0.00000000 | 0.00000000 | N | | | |
| CHRISTINE ROGERS | ROGECH | W | 0.00436842 | 0.00436288 | 0.00436288 | N | | | |
| MIKE ROGERS DRILLING CO | N ROGEDR | W | 0.01207685 | 0.00905764 | 0.00905764 | N Y | | | N |
| MIKE ROGERS | N ROGEMI | W | 0.00603842 | 0.00452881 | 0.00452881 | N Y | | | N |
| HAROLD J ROBOUITON, JR | N ROSBHA | W | 0.00286419 | 0.00914815 | 0.00914815 | N Y | | | N |
| JOSHUTON PRODUCTION CORP | N ROSBPR | W | 0.00000000 | 0.00000000 | 0.00000000 | N Y | | | N |
| ST J CO | O SHFCH | W | 0.02004791 | 0.01522597 | 0.01522597 | N | | | Y |
| BEAL SANDERS | N SANDGE | W | 0.03513290 | 0.02684835 | 0.02684835 | N | | | Y |
| SMP, INC. | N SMPINC | W | 0.00027830 | 0.00027830 | 0.00027830 | N Y | | | N |
| SCOTT STROUD | N STROSC | W | 0.01407813 | 0.01055860 | 0.01055860 | N Y | | | Y |
| TEXAS MANAGEMENT COMPANY | N TEXAMA | W | 0.00311294 | 0.00234647 | 0.00234647 | N | | | |
| JOHN FALSEGA ASSOCIATES | N TRAGJO | W | 0.00033290 | 0.00249431 | 0.00249431 | N | | | N |
| WEISER BROWN OPERATING COMPANY | N WEISER | W | 0.03225000 | 0.01993500 | 0.01993500 | N | | | Y |

*** CONTINUED ***

PAGE NO. 1
02/27/91

LALMHC - ALMOND-HOOK # 1

DIVISION-OF-INTEREST

| NAME | DECL CODE=2 CODES | WORKING INTEREST | OIL INTEREST | GAS INTEREST | P/S SUS N REV | WI3 OIL | WPT GAS | SEV TAX | DIST WI | DIST OIL | NET GAS BILL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MARY LOU WILKINSON ALMOND, ADV | L ALMCMA | 0.00000000 | 0.04022700 | 0.04022700 | N | 1 | T | Y | Y | N | |
| CRB C TRUSTEE, W/W/D | C CNBRWD | 0.00000000 | 0.03195900 | 0.03195900 | N | 1 | T | Y | Y | N | |
| JANE R SMART-W/R4INS-TRUST | L JRSMWR | 0.00000000 | 0.01592400 | 0.01592400 | N | 1 | T | Y | Y | N | |
| LISA RAINE A LESTER | L LESTLI | 0.00000000 | 0.04022700 | 0.04022700 | N | 1 | T | Y | Y | N | |
| OFFICE OF MINERAL RESOURCES | L OFFIMI | 0.00000000 | 0.02570400 | 0.02570400 | N | 1 | T | Y | Y | N | |
| FRANCES J JACOBS-MOSSEC C/O | L FRJAMO | 0.00000000 | 0.01592400 | 0.01592400 | N | 1 | T | Y | Y | N | |
| NEIL YOUNG & SANDRA YOUNG | L NEYOUNG | 0.00000000 | 0.00932900 | 0.00932900 | N | 1 | T | Y | Y | N | |
| ALMOND HOOK OVERRIDES | O ALMOR | 0.00000000 | 0.07333100 | 0.07333100 | N | 1 | T | Y | Y | N | |
| KARL LMOND-SUSPENSE | N ALMOSU | 0.00000000 | 0.00741874 | 0.00741874 | N | 1 | T | Y | Y | N | |
| HELEN S HAROLD | W HAROHE | 0.00981912 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| DONALD COMPANY | W DONCO | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| EDDIE DUN | W DUNMEO | 0.00582430 | 0.00493941 | 0.00493941 | N | 1 | T | Y | Y | N | |
| FOUITY OIL CO | W EQUITY | 0.00582430 | 0.00493941 | 0.00493941 | N | 1 | T | Y | Y | N | |
| PAUL LESTER | W PGLESLA | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| CLINTON K FULLER, SR | W FULCLS | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| GOLDSBERRY PETROLEUM | W GOLDPE | 0.09973192 | 0.07481543 | 0.07481543 | N | 1 | T | Y | Y | N | |
| JOHN HORTON GOODMAN | W GOODJT | 0.01843640 | 0.01394663 | 0.01394663 | N | 1 | T | Y | Y | N | |
| WILLIAM D GUFFEY | W GUEFWI | 0.00645550 | 0.00459875 | 0.00459875 | N | 1 | T | Y | Y | N | |
| JAMES D HARRIS | W HARRJA | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| HELFER PRODUCTION CORP | W HELFPR | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| EUGENE HOLMAN JR | W HOLMWU | 0.00457875 | 0.00478406 | 0.00478406 | N | 1 | T | Y | Y | N | |
| TCC JAMES & CO | W JAMETC | 0.13290410 | 0.09967808 | 0.09967808 | N | 1 | T | Y | Y | N | |
| ROBERT REEDER | W RREERO | 0.02307453 | 0.01726518 | 0.01726518 | N | 1 | T | Y | Y | N | |
| LOREN LENHAM | W LENHLN | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| HENRY A JOHN SR | W MERCHA | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| NON MOBILE ASSIGNEE R----LESS | | | | | | | | | | | |
| LEE S NUDE | W NUDDLE | 0.00027830 | 0.00027830 | 0.00027830 | N | 1 | T | Y | Y | N | |
| JOHN G NELSON | W NELSJO | 0.00115594 | 0.00086696 | 0.00086696 | N | 1 | T | Y | Y | N | |
| EDWARD E PWELL | W EDWEED | 0.00424560 | 0.00318920 | 0.00318920 | N | 1 | T | Y | Y | N | |
| J R QUEBBES III | W QUEKJR | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| REDLEY COMPANY C/O-C FULLER | W REDLCO | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| CHRISTINE ROGERS | W ROGECH | 0.00000842 | 0.00045288 | 0.00045288 | N | 1 | T | Y | Y | N | |
| MIKE ROGERS DRILLING CO | W ROGEDR | 0.01201685 | 0.00905764 | 0.00905764 | N | 1 | T | Y | Y | N | |
| MIKE ROGERS | W ROGEMI | 0.00060842 | 0.00045288 | 0.00045288 | N | 1 | T | Y | Y | N | |
| HAROLD DON PRODUCTION CORP | W ROSSHA | 0.07886443 | 0.05914813 | 0.05914813 | N | 1 | T | Y | Y | N | |
| S & J PRD. | W SJPRD | 0.00000000 | 0.00000000 | 0.00000000 | N | 1 | T | Y | Y | N | |
| GENE A SANDERS | W SANAGE | 0.03351707 | 0.02478575 | 0.02478575 | N | 1 | T | Y | Y | N | |
| SMP, INC. | W SMPINC | 0.00027830 | 0.00002872 | 0.00002872 | N | 1 | T | Y | Y | N | |
| SCOTT STROUD | W STROSC | 0.01407813 | 0.01055846 | 0.01055846 | N | 1 | T | Y | Y | N | |
| JARACH AMUSEMENT COMPANY | W JARAAM | 0.00031250 | 0.00024643 | 0.00024643 | N | 1 | T | Y | Y | N | |
| JOHN TAYLOR & ASSOCIATES | W JAKAJO | 0.00031250 | 0.00024643 | 0.00024643 | N | 1 | T | Y | Y | N | |
| MEISER BROWN OPERATING COMPANY | W WEISBR | 0.01315000 | 0.00957500 | 0.00957500 | N | 1 | T | Y | Y | N | |

* * CONTINUED * *

SECTION 3 , TOWNSHIP 12 NORTH , RANGE 10 WEST

RED RIVER PARISH, LOUISIANA.



**PLAT SHOWING LOCATION**

**ROSBOTTOM PRODUCTION CORP. —— ALMOND-HOOK No. I**

Located 1650 ft. from the South line and 3630 ft. from the East line

of Section 3. Township 12 North, Range 10 West,

Red River Parish, Louisiana.

Ground Elevation No. I = 133.0 ft. _ _ _ _ _

494
15

DATE: Sept. 27, 1989          SCALE: I" = 800'

I HEREBY CERTIFY THAT THE ABOVE PLAT
CORRECTLY REFLECTS THE LOCATION AS STAKED
ON THE GROUND.

MARVIN T. KENT
REG. LAND SURVEYOR LA. REG. NO. 318
PHONE 425-7973,   SHREVEPORT, LA.

STATE OF LOUISIANA
MARVIN T. KENT
REGISTERED
PROFESSIONAL
LAND SURVEYOR

Almond Hook                    12-22

4' Hook @ 12½  15 ohms.
12' Mangum sh. 12½ per 5 to 6 ohms.
1 potential Glen Rose sh.
1 —      Paluxy sd.

SKLAR & PHILLIPS OIL CO.

P. O. BOX 3735

2925 MANSFIELD ROAD

SHREVEPORT. LOUISIANA 71133-3735

PHONE 318 - 222-1800

June 19, 1989

Rosbottom Production Corp.
400 Travis, Suite 1000
Shreveport, Louisiana    71101-3117

Re:   Almond-Hook #1 (HOSS RD SU H)
      Gahagan Field
      Red River Parish, Louisiana

Gentlemen:

Enclosed are AFE's and Operating Agreement executed on behalf of Sklar
& Phillips Oil Co. and Petroleum Futures covering our participation in
the above well.

Very truly yours,


Fran Bailey

/fb
Enclosures

$$S \alpha P - 25.70 \times 66.25\% = \frac{165625}{\cancel{16525}}$$

$$Pct. Futures \quad .0364583 \times .6625 = .0241562$$

$$.1897786$$

$\mathcal{I} \mathcal{L} P$ @ green

$RJm$ @ black ✓

## ROSBOTTOM PRODUCTION CORP.
### 400 TRAVIS, SUITE 1000 • TELEPHONE 425-1212
### SHREVEPORT, LOUISIANA 71101-3117

June 8, 1989

<u>TO ALL WORKING INTEREST OWNERS</u>

                                   RE:   Rosbottom Production Corp.
                                         ***Almond-Hook No. 1
                                         HOSS RD SU H
                                         Gahagan Field
                                         Red River Parish, Louisiana

Gentlemen:

In keeping with our agreement reached during a meeting on Novem-
ber 30, 1988, with Hood Goldsberry, etal, you will find enclosed
herewith a Joint Operating Agreement and an Authority For Expen-
diture (AFE) prepared for your execution.  You have previously
agreed with Goldsberry to participate in the drilling of the cap-
tioned well and at Goldsberry's request, we are circulating the
Joint Operating Agreement and AFEs to individual working interest
owners for execution.  Inasmuch as several of you did not attend
the Goldsberry meeting, we will also explain the nature of our
joint operating area.

Goldsberry and Rosbottom formed a joint operating area covering
the confines of HOSS RD SU H as defined by Louisiana Conservation
Order No.  909-A-7 in the Gahagan Field,  Red River Parish,
Louisiana.  The Goldsberry group maintained certain lands outside
HOSS RB SU A Hook No. 1, which lands fell within the confines of
the  newly  formed  Hosston unit.   Rosbottom etal,  owned  the
remainder of such acreage and in facilitation of commencement of
operations for the drilling of the 7600' Hosston test, we agreed
upon acreage content wherein the unit area was agreed to comprise
approximately 800 net acres with Goldsberry etal owning 270/800
and Rosbottom etal owning 530/800.  By the joint contributions of
net acreage, this ownership sharing by Goldsberry and Rosbottom
within  the  joint  operating  area  created  the  interest 33.75%
Goldsberry etal and 66.25% Rosbottom etal.   As you will note on
the enclosed Louisiana Conservation Order No.  909-A-7, HOSS RD SU
H is purported to cover 718.18± acres.  This is a rough estimate
by the State of Louisiana.  Goldsberry and Rosbottom both agree
the unit will be closer to 800 acres than the 718 referenced.
Therefore the original percentages shall remain constant for pur-
poses of the Joint Operating Agreement.

You will note within the Joint Operating Agreement, there is
created a "frozen" interest identical to the above named percent-
ages covering those zones from the surface of the earth to the
base of the Hosston Formation.  Although Goldsberry is acquiring

Almond-Hook No. 1
Red River Parish, Louisiana
June 8, 1989
Page  2

no interest in the originally owned Rosbottom leases and although
Rosbottom owns no interest in the Goldsberry leases, it is the
intention of Goldsberry and Rosbottom to have the entire AMI
treated as a "frozen interest" area so that any cost, risk and
expense or any production, proceeds and benefits attributable to
any oil, gas and mineral leasehold interest, however large or
small, owned by either or both of them in whatever portions,
shall be shared, borne, paid, received and enjoyed by Goldsberry
and Rosbottom in the portions set forth hereinabove. Therefore,
in the event a completion attempt is made in the Paluxy, Glen
Rose, Rodessa or such other shallower intervals above the Hosston
and likewise, including the Hosston, then such ownership of the
well, production rights and all rights incident thereto shall be
in accordance with those percentages set forth hereinabove. It
was recognized by both Goldsberry and Rosbottom during the meet-
ing cited above a potential problem exists inasmuch as the
Hosston unit formed for our joint operating area is different in
configuration than the existing Glen Rose units as established by
the Louisiana Office of Conservation in Sections 3 and 4,
Township 12 North, Range 10 West, DeSoto and Red River Parishes,
Louisiana. In an effort to create harmony amongst ourselves, the
Joint Operating Agreement provides that any completion in the
wellbore proposed under the terms of the Joint Operating Agree-
ment shall be conducted on a "frozen" interest basis as provided
herein. Therefore, should the initial test well encounter Glen
Rose pay sands, then the ownership of the wellbore in those pay
sands shall be commensurate with the Joint Operating Agreement
referenced herein rather than the units as established by the
Louisiana Office of Conservation; likewise, this will apply to
any well drilled by Rosbottom within HOSS RD SU G.

The Joint Operating Agreement included herewith, includes a con-
tract area of identical proportion to the Goldsberry-Rosbottom
joint operating area and is identical in form to HOSS RD SU H as
defined by Louisiana Conservation Order No. 909-A-7. Rosbottom
Production Corp., the majority interest owner, shall be Operator.

If the enclosed Joint Operating Agreement is in keeping with your
understanding of our arrangement, we respectfully request your
execution along with the AFE and return to our office for further
handling. For your reference, the Joint Operating Agreement has
been reviewed by Goldsberry and approved along with the AFE. We
intend to commence operations prior to the close of the Summer,
1989; therefore, we respectfully request your immediate review,
execution and return. If you should have any questions or if you

Almond-Hook No. 1
Red River Parish, Louisiana
June 8, 1989
Page  3


would like to discuss this area at greater length, please do not
hesitate to advise; otherwise, we look forward to your immediate
return of the enclosed instruments.

                         Yours very truly,

                         ROSBOTTOM PRODUCTION CORP.


                         Harold L. Rosbottom, Jr.
                         President

HLRjr:mhm
Enclosures

*Bus — Recommend option we take — A.S. OK'ED*
*# ~ 11/3/89  BOS*

# ROSBOTTOM PRODUCTION CORP.

400 TRAVIS, SUITE 1000 • TELEPHONE 425-1212
SHREVEPORT, LOUISIANA 71101-3117

October 31, 1989

*To Scott for Rec.*
*E*

**TO THE WORKING INTEREST OWNERS**

RE: Additional Available Interest
Almond-Hook No. 1
HOSS RD SU H
Gahagan Field
Red River Parish, Louisiana

Gentlemen:

A complete tabulation of the various working interest owners from the Goldsberry group and the Rosbottom group which have agreed to jointly drill the Almond-Hook No. 1 well, reveals several small working interest owners who prefer to farm out their interest rather than participate. Keeping this fact in mind and pursuant to the terms, conditions and special provisions of the Joint Operating Agreement previously executed for the Almond-Hook No. 1, we hereby offer for you to increase your percentage ownership within the Almond-Hook No. 1 unit area and the drilling of the Hosston test to be located thereon. The interest which is available to the group is 6.535052% which we receive through a farmin providing 75% net revenue interest leases until payout with an increase of overriding royalty equal to 5% thereafter. We believe the subject location to be attractive for the Hosston, Rodessa and Glen Rose intervals and highly recommend increase in ownership by those parties who are able. It is critical that the interest available be consumed and we hope you will elect to proportionately increase for this relatively minor interest.

In order to bring you up to date, we are currently making location for the subject Almond-Hook No. 1 in anticipation of moving in Mike Rogers' rig during the month of December, 1989. If we can provide any information or answer any questions, please do not hesitate to advise; otherwise, we look forward to timely receipt of your election regarding the available interest.

Yours very truly,

ROSBOTTOM PRODUCTION CORP.

Harold L. Rosbottom, Jr.
President

HLRjr:mhm
Enclosure

Additional Available Interest
Almond-Hook No. 1
HOSS RD SU H
Gahagan Field
Red River Parish, Louisiana
October 31, 1989
Page Two


### ELECTION FORM

I/We hereby elect to retain our original percentage ownership in
the Almond-Hook No. 1 unit area and the drilling of the test
well.

PETROLEUM FUTURES


_____


I/We hereby elect to increase our percentage ownership as to the
available interest due to farmout of certain working interest
owners in the Almond-Hook No. 1 unit area and the drilling of the
test well.

PETROLEUM FUTURES

_August T Erickson_
_____


I/We hereby elect to increase additionally our proration portion
of any interest available through non-consenting parties as to
the available interest due to farmout of certain working interest
owners in the Almond-Hook No. 1 unit area and the drilling of the
test well.

PETROLEUM FUTURES


_____

# ROSBOTTOM PRODUCTION CORP.

*Gus — Recommend*
*option # 2 — ok's)*
*by A.S. 11/13/89*
*Ins*

400 TRAVIS, SUITE 1000 • TELEPHONE 425-1212
SHREVEPORT, LOUISIANA 71101-3117

October 31, 1989

**TO THE WORKING INTEREST OWNERS**

RE:  Additional Available Interest
     Almond-Hook No. 1
     HOSS RD SU H
     Gahagan Field
     Red River Parish, Louisiana

Gentlemen:

A complete tabulation of the various working interest owners from the Goldsberry group and the Rosbottom group which have agreed to jointly drill the Almond-Hook No. 1 well, reveals several small working interest owners who prefer to farm out their interest rather than participate.  Keeping this fact in mind and pursuant to the terms, conditions and special provisions of the Joint Operating Agreement previously executed for the Almond-Hook No. 1, we hereby offer for you to increase your percentage ownership within the Almond-Hook No. 1 unit area and the drilling of the Hosston test to be located thereon.  The interest which is available to the group is 6.535052% which we receive through a farmin providing 75% net revenue interest leases until payout with an increase of overriding royalty equal to 5% thereafter.  We believe the subject location to be attractive for the Hosston, Rodessa and Glen Rose intervals and highly recommend increase in ownership by those parties who are able.  It is critical that the interest available be consumed and we hope you will elect to proportionately increase for this relatively minor interest.

In order to bring you up to date, we are currently making location for the subject Almond-Hook No. 1 in anticipation of moving in Mike Rogers' rig during the month of December, 1989.  If we can provide any information or answer any questions, please do not hesitate to advise; otherwise, we look forward to timely receipt of your election regarding the available interest.

Yours very truly,

ROSBOTTOM PRODUCTION CORP.

Harold L. Rosbottom, Jr.
President

HLRjr:mhm
Enclosure

Additional Available Interest
Almond-Hook No. 1
HOSS RD SU H
Gahagan Field
Red River Parish, Louisiana
October 31, 1989
Page Two

ELECTION FORM

I/We hereby elect to retain our original percentage ownership in the Almond-Hook No. 1 unit area and the drilling of the test well.

SKLAR & PHILLIPS OIL CO.

_____

I/We hereby elect to increase our percentage ownership as to the available interest due to farmout of certain working interest owners in the Almond-Hook No. 1 unit area and the drilling of the test well.

SKLAR & PHILLIPS OIL CO.

*August Erickson*
AUGUST ERICKSON, Vice President

I/We hereby elect to increase additionally our proration portion of any interest available through non-consenting parties as to the available interest due to farmout of certain working interest owners in the Almond-Hook No. 1 unit area and the drilling of the test well.

SKLAR & PHILLIPS OIL CO.

_____

## AUTHORIZATION FOR EXPENDITURE

DRILL & COMPLETE  ROSBOTTOM PRODUCTION CORP. *** ALMOND - HOOK NO. 1.  at a mutually agreeable location in HOSS RD SU H. DESOTO and RED RIVER PARISHES, LOUISIANA.

ESTIMATED DEPTH ____7500'____ CONTRACTOR  To Be Decided

### DETAIL COST ESTIMATED

| | PRODUCER | DRY HOLE |
|---|---|---|
| **INTANGIBLE COSTS:** | | |
| Drilling: | | |
| Drilling to   7500' TK | $165,000 | $165,000 |
| Day Work      1 day @ 3400 | 3,500 | --- |
| Road, Location, Permit and Damages | 20,000 | 15,000 |
| Drilling Mud and Chemicals | TK | TK |
| Guide, Float Shoes, Collars & Centralizers | 4,000 | TK |
| Surface Casing   1800' - 8-5/8" | TK | TK |
| Core & Drill Stem Test   Analysis | 10,800 | 10,800 |
| Electric Logs, Sidewall Cores | TK | TK |
| Perforating & Gamma Ray Log | 4,500 | --- |
| Cement and Cement Service | 6,000 | TK |
| Miscellaneous: | | |
| Mud Logging Unit | 6,000 | 6,000 |
| Tong & Crews, Run Pipe & Tubing | 10,500 | TK |
| Miscellaneous Supplies & Services | 15,000 | 3,000 |
| Technical Supervision | 4,900 | 2,000 |
| Administrative Overhead | 3,000 | 3,000 |
| **TOTAL INTANGIBLE COSTS** | $253,200 | $204,800 |
| | | |
| **PERMANENT EQUIPMENT:** | | |
| Production Casing   7500' - 4-½" N-Grade | $ 37,500 | |
| Tubing              7500' - 2 3/8" | 20,625 | |
| Production Packer | 3,500 | |
| Casing Head & Tubing Head Assembly | 5,500 | |
| Christmas Tree Assembly | 3,000 | |
| Tank Battery & Surface Producing Equipment | 30,000 | |
| **TOTAL PERMANENT EQUIPMENT** | $100,125 | |
| | | |
| **TOTAL ESTIMATED COST** | $353,325 | $204,800 |

COMPANY   SKLAR & PHILLIPS OIL CO.                    FOR  .16562500    INTEREST

DATE   6 - 19 - 89                    APPROVAL

SKLAR & PHILLIPS OIL CO.

By: _R J May_

R. J. May  Operations Manager

## AUTHORIZATION FOR EXPENDITURE

DRILL & COMPLETE ROSBOTTOM PRODUCTION CORP. *** ALMOND - HOOK NO. 1. at a mutually agreeable location in HOSS RD SU II. DESOTO and RED RIVER PARISHES, LOUISIANA.

ESTIMATED DEPTH ___7500'___ CONTRACTOR _To Be Decided_

### DETAIL COST ESTIMATED

| INTANGIBLE COSTS: | PRODUCER | DRY HOLE |
|---|---|---|
| **Drilling:** | | |
| Drilling to 7500' TK | $165,000 | $165,000 |
| Day Work 1 day @ 3400 | 3,500 | --- |
| Road, Location, Permit and Damages | 20,000 | 15,000 |
| Drilling Mud and Chemicals | TK | TK |
| Guide, Float Shoes, Collars & Centralizers | 4,000 | TK |
| Surface Casing 1800' - 8-5/8" Analysis | TK | TK |
| Core & Drill Stem Test | 10,800 | 10,800 |
| Electric Logs, Sidewall Cores | TK | TK |
| Perforating & Gamma Ray Log | 4,500 | --- |
| Cement and Cement Service | 6,000 | TK |
| **Miscellaneous:** | | |
| Mud Logging Unit | 6,000 | 6,000 |
| Tong & Crews, Run Pipe & Tubing | 10,500 | TK |
| Miscellaneous Supplies & Services | 15,000 | 3,000 |
| Technical Supervision | 4,900 | 2,000 |
| Administrative Overhead | 3,000 | 3,000 |
| TOTAL INTANGIBLE COSTS | $253,200 | $204,800 |

| PERMANENT EQUIPMENT: | | |
|---|---|---|
| Production Casing 7500' - 4-½" N-Grade | $ 37,500 | |
| Tubing 7500' - 2 3/8" | 20,625 | |
| Production Packer | 3,500 | |
| Casing Head & Tubing Head Assembly | 5,500 | |
| Christmas Tree Assembly | 3,000 | |
| Tank Battery & Surface Producing Equipment | 30,000 | |
| TOTAL PERMANENT EQUIPMENT | $100,125 | |

| TOTAL ESTIMATED COST | $353,325 | $204,800 |
|---|---|---|

COMPANY __PETROLEUM FUTURES__ FOR __.02415362__ INTEREST

DATE __6/19/89__ APPROVAL

PETROLEUM FUTURES
BY: _____
Fred L. Phillips, General Manager

STATE OF LOUISIANA
OFFICE OF CONSERVATION
BATON ROUGE, LOUISIANA

May 19, 1989

ORDER NO. 909-A-7

Order concerning the establishment of rules and
regulations and creation of drilling and production
units for the Hosston Formation, Reservoir D, in the
GAHAGAN FIELD, Red River Parish, Louisiana.

************************************************

Pursuant to power delegated under the laws of the State of Louisiana, and
particularly Title 30 of Louisiana Revised Statutes of 1950, and after a
public hearing held under Docket No. 89-199 in Baton Rouge, Louisiana, on May
2, 1989, upon the application of Rosbottom Production Corp., following legal
publication of notice and notice in accordance with the rules prescribed by
the Commissioner of Conservation, the following Order is issued and
promulgated by the Commissioner of Conservation as being reasonably necessary
to conserve the natural resources of the State, to prevent waste as defined by
law, to avoid the drilling of unnecessary wells, and otherwise to carry out
the provisions of the laws of this State.

DEFINITION

The Hosston Formation, Reservoir D, in the Gahagan Field, Red River
Parish, Louisiana, is defined as that gas and condensate bearing zone
occurring in the electric log depth interval from 6,510' through 7,278' in the
Rosbottom Production Corp. - Stothart Well No. 1 located in the SW 1/4 of
Section 34, Township 13 North, Range 10 West, Red River Parish, Louisiana.

FINDINGS

The Commissioner of Conservation finds as follows:

1. That the establishment of rules and regulations and the creation of
drilling and production units for the Hosston Formation, Reservoir D, in the
Gahagan Field, Red River Parish, Louisiana, are necessary to insure orderly
development, to prevent waste, and to avoid the drilling of unnecessary wells.

2. That the available geological, engineering or other appropriate
information indicates that the drilling and production units shown on the plat
labeled, "Rosbottom Production Corp. Exhibit No. 1 for Docket No. 89-199," a
copy of which is attached hereto and made a part hereof, are reasonable and
should be approved and adopted; that each unit can be efficiently and
economically drained by one well located thereon; and the creation of such
units should reasonably insure to the owners of each separate tract included
therein an opportunity to recover or receive their just and equitable share of
the contents of the reservoir.

3. That the separately owned tracts, mineral leases and other property
interests within each of the units created herein should be force pooled and
integrated with each separate tract sharing in unit production on a surface
acreage basis of participation.

4. That any future wells drilled to the Hosston Formation, Reservoir D,
within or outside of any unit created herein should be located no closer than
1,000 feet to any unit line and no closer than 2,000 feet to any well
completed in, drilling to, or for which a permit shall have been granted to
drill to that reservoir; with exceptions for the Rosbottom Production Corp. -
Stothart Well No. 1 in HOSS RD SUD and the Rosbottom Production Corp. - Almond
Well No. 1 in HOSS RD SUG at the locations shown on the attached plat.

5. That unit wells should be designated as shown on the attached plat.

6. That Rosbottom Production Corp. should be designated as the Operator
of the units created herein.

ORDER NO. 909-A-7

Page 2

O R D E R

NOW, THEREFORE, IT IS ORDERED THAT:

1.  The units shown on the plat labeled, "Rosbottom Production Corporation Exhibit No. 1 for Docket No. 89-199", a copy of which is attached hereto and made a part hereof, be and they are hereby approved, adopted, and established as drilling and production units for the exploration for and production of gas and condensate from the Hosston Formation, Reservoir D, in the Gahagan Field, Red River Parish, Louisiana.

These units have not been surveyed and when a survey plat of said units showing the exterior limits thereof, the total acreage therein, and the acreage in each separately owned tract, has been submitted to and accepted by the Commissioner of Conservation or any member of his staff, insofar as it shows the exterior limits of the units, said plat shall be substituted for the above exhibit and made a part of this order by reference.  In the event of conflicting claims of ownership of acreage in any unit, such acreage may be so identified on the survey plat.  Such identification of acreage subject to conflicting claims shall not be construed as an acknowledgement of the validity of any such claim and shall not affect any other acreage in separately owned tracts in the units.

The survey plat shall be prepared in accordance with the requirements for unit plats and survey plats adopted by the Commissioner of Conservation.  It is recognized that the exterior boundaries of the units, as surveyed, may differ from those lines shown on the attached plat because of the requirements that by survey the geologically significant wells be correctly located with respect to each other and to the unit boundaries that they control.

2.  The separately owned tracts, mineral leases and other property interests within each of the units established herein are hereby pooled, consolidated and integrated in accordance with Section 10, Title 30 of Louisiana Revised Statutes of 1950, with each tract sharing in unit production in the proportion that the surface area of such tract bears to the entire surface area of the unit in which it is situated.  Also, all operations on and production from each unit shall be considered operations on and production from each of the separate tracts within said unit and under the terms of each of the mineral leases affecting said tracts.

3.  Future wells drilled to the Hosston Formation, Reservoir D, shall be located in accordance with Finding No. 4 hereof; with exceptions for the Rosbottom Production Corp. - Stothart Well No. 1 in HOSS RD SUD and the Rosbottom Production Corp. - Almond Well No. 1 in HOSS RD SUG at the locations shown on the attached plat.

4.  Unit wells are designated in accordance with Finding No. 5 hereof.

5.  Rosbottom Production Corp. is designated as Operator of the units created herein.

6.  Except as they may be in conflict herewith, the provisions of all applicable Statewide Orders shall apply to the units created herein.

7.  When additional geological, engineering or other appropriate information becomes available which would indicate a required change or revision in the unit boundaries adopted herein, or which would indicate a required change or revision of other provisions of this Order, then the party or parties in possession of additional information shall petition the Commissioner of Conservation for a public hearing for the purpose of considering appropriate changes.

This Order shall be effective on and after May 2, 1989.

MBK/lc
Rosbottom Prod. Corp.
Exhibit No. 1 for
Docket No. 89-199
Attached
S

OFFICE OF CONSERVATION
OF THE STATE OF LOUISIANA

T. PATRICK BATCHELOR
COMMISSIONER OF CONSERVATION



A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

EXHIBIT "D"

ROSBOTTOM PRODUCTION CORP.***ALMOND-HOOK NO. 1
W/2 & W/2 SE/4 SECTION 3 & E/2 SECTION 4-T12N-R10W
HOSS RD SU H
DESOTO and RED RIVER PARISHES, LOUISIANA

OPERATING AGREEMENT

DATED

June    1  , 19 89 ,

OPERATOR   ROSBOTTOM PRODUCTION CORP.

CONTRACT  AREA   W/2 & W/2 SE/4 SECTION 3 and E/2 SECTION 4, TOWNSHIP 12

NORTH, RANGE 10 WEST, HOSS RD SU H, MORE PARTICULARLY KNOWN AS THE

"ROSBOTTOM ETAL-GOLDSBERRY ETAL JOINT AREA OF INTEREST IN THE NORTH

GAHAGAN AREA"
COUNTY OR PARISHES OF  DESOTO & RED RIVER   STATE OF  LOUISIANA

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN  ASSOCIATION  OF  PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610  -  1982  REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9-10 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 11 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11-12 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 15 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between___ROSBOTTOM PRODUCTION CORP., 400 Travis, Suite 1000, Shreveport, Louisiana 71101_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

ARTICLE I.

DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

ARTICLE II.

EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
   (1) Identification of lands subject to this agreement,
   (2) Restrictions, if any, as to depths, formations, or substances,
   (3) Percentages or fractional interests of parties to this agreement,
   (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
   (5) Addresses of parties for notice purposes.
☒ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# ARTICLE III.
## INTERESTS OF PARTIES

A.  Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.  Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _one-eighth (1/8th)_ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.  Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.  Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and: *nor appears of record in the Parish where the acreage subject hereto is situated

1.  If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.  If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

# ARTICLE IV.
## TITLES

A.  Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in and gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE IV
continued

☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

· Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

B. Loss of Title:

1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests; and,

(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;

(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;

(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,

(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in connection therewith.

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

· 3 ·

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE V.
OPERATOR

A. Designation and Responsibilities of Operator:

ROSBOTTOM PRODUCTION CORP. _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed. *unless otherwise agreed to by the consenting parties.

C. Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D. Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.
DRILLING AND DEVELOPMENT

A. Initial Well:

On or before the __1st__ day of __September__ , 19 89 , Operator shall commence the drilling of a well for oil and gas at the following location:

at a legal location to be mutually agreed upon in HOSS RD SU H, DeSoto and Red River Parishes, Louisiana

and shall thereafter continue the drilling of the well with due diligence to a subsurface depth of 7500' or a depth sufficient to test the Upper Hosston Formation, whichever of the foregoing depths is the lesser,

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

· 4 ·

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE VI

continued

1    If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2    well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

B.   Subsequent Operations:

1.   Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided
for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice
within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within
the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
dance with the provisions hereof as if no prior proposal had been made.

VI.E.1.
2.   Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1., or VI.D.1. (Option
No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
ditions of this agreement.
*unless otherwise agreed to by the consenting parties,

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours
(exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
ticipation to such party's interest as shown on Exhibit ''A'' or (b) carry its proportionate part of Non-Consenting Parties' interests, and
failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

## ARTICLE VI
### continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 500% ~~100%~~ of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 500% ~~100%~~ of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(b) __500__ % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and __500__ % of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any reworking or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

· 6 ·

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE VI

continued

1  If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2  the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3  Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4  therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5  back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6  the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

10  Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11  be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12  well conforms to the then-existing well spacing pattern for such source of supply.

16  The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17  except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18  after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19  duction, ceases to produce in paying quantities.

23  3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24  completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25  reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26  ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27  first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28  matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29  withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30  each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31  ties.

35  4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36  also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37  location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38  mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39  affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40  to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

44  (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45  the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

49  (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50  salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51  provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

55  In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56  shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57  receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58  incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-
59  by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60  ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61  stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

65  C.  TAKING PRODUCTION IN KIND:

67  Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68  exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69  marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70  party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE VI
continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3       Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.
6
7       In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10  best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.
15
16       In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.
20
21  D.  Access to Contract Area and Information:
22
23       Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the information.
30
31  E.  Abandonment of Wells:
32
33       1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.
41
42       2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

### ARTICLE VI
#### continued

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

### ARTICLE VII.
#### EXPENDITURES AND LIABILITY OF PARTIES

A.  Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

B.  Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

C.  Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D.  Limitation of Expenditures:

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VII
continued

1  ☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities.

4  ☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.

15  2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.

20  3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of FIFTEEN THOUSAND AND NO/100------- Dollars ($ 15,000.00----- )
22 except in connection with, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of FIFTEEN THOUSAND AND NO/100----------
28 Dollars ($ 15,000.00----- ) but less than the amount first set forth above in this paragraph.

30 E.  Rentals, Shut-in Well Payments and Minimum Royalties:

32  Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2.

40  Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

46 F.  Taxes:

48  Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".

60  If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".

67  Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68 the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VII
continued

G. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

-11-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
continued

said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

D. Maintenance of Uniform Interest:

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all leases and equipment and production; or

2. an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

E. Waiver of Rights to Partition:

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

F. ~~Preferential Right to Purchase:~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~ Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, ~~which shall include the~~ name and address of the prospective purchaser (who must be ready, willing and able to purchase), ~~the purchase~~ price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period ~~of ten (10)~~ days after receipt of the notice, to purchase on the same terms and conditions the interest which the other ~~party proposes to sell;~~ and, if this optional right is exercised, the purchasing parties shall share the purchased interest ~~in the proportions~~ that the interest of each bears to the total interest of all purchasing parties. However, there shall be ~~no preferential~~ right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of ~~its interests~~ by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com~~pany, or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

### ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.

CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed ___FIVE THOUSAND AND NO/100------------------------------------------ Dollars ($__5,000.00------) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

ARTICLE XI.

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.

NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.

TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☒   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of ___90___ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within ___90___ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

-13-

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A.  Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.  Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ___LOUISIANA___ shall govern.

C.  Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

A. AREA OF MUTUAL INTEREST. In the interest of exploration and development, the parties hereto hereby establish an Area of Mutual Interest (AMI)* comprised of approximately 800 net acres in DeSoto and Red River Parishes, Louisiana, to-wit:

TOWNSHIP 12 NORTH-RANGE 10 WEST

E/2 Section 4 (lands outside of the Hook and Ohrt units) and
W/2 and the W/2 SE/4 Section 3
HOSS RD SU H
DeSoto and Red River Parishes, Louisiana

The AMI shall remain in full force and effect from the date hereof until June 1, 1991, at which time the AMI will terminate as to all acreage not then included within a production unit for a producing well. Only acreage included within a producing unit or units after June 1, 1991, shall remain subject to the AMI. Any such producing acreage shall then be operated in accordance with the terms and conditions of this Joint Operating Agreement covering the producing wells to which the acreage is attributable.

From the date of commencement of the AMI, in the event the parties hereto, whether singly or jointly, should acquire any leases, whether in whole or in part, either by purchase, farmout or other means within the AMI, then the parties hereto may share any such leasehold interest in accordance with their proportionate interests as set forth hereinbelow. The costs and ex-

- 14 -

penses of acquiring any interests within the AMI shall be borne
and paid for by all the parties hereto in the amount equal to the
interest attributable to each respective party.

The provisions of the AMI are not intended and shall not be con-
strued to create a preferential right to purchase between the
parties and shall not apply to the sale and purchase of interests
between the parties to this agreement.

Within the AMI, both Rosbottom Production Corp. etal (Rosbottom)
and Goldsberry Operating Company, Inc. etal (Goldsberry) owned
existing oil, gas and mineral leases separately and apart from
each other, but did desire to explore, drill and develop for oil
and gas within such area with all cost, risk, burdens, expense,
benefits and rewards to be shared between Rosbottom and
Goldsberry in proportion to their respective lease ownership
within the confines of the Goldsberry and Rosbottom agreed upon
"Prospect Area", defined as all of the lands within the AMI, to
contain approximately 800 net acres, being the E/2 Section 4
(lands outside the Hook and Ohrt units) and W/2 and W/2 SE/4 Sec-
tion 3-T12N-R10W, DeSoto and Red River Parishes, Louisiana, more
particularly known as the "Rosbottom etal - Goldsberry etal Joint
Area of Interest in the North Gahagan Area.  Within the Prospect
Area, leases then owned solely by Rosbottom and described in Ex-
hibit "A" herein were agreed to cover and pertain to 530 net
acres. The Goldsberry leases described in Exhibit "A", previously
owned solely by Goldsberry were agreed to cover 270 net acres.

As Goldsberry and Rosbottom have different pre-existing obliga-
tions for overriding royalty interests on lease interests ac-
quired within the AMI pursuant to prior commitments from them to
third parties, it is agreed between Rosbottom and Goldsberry that
regardless of the actual royalty and overriding royalty burdens
on any interest in any lease owned by either of them within the
AMI, all production attributable to any interest therein owned by
either of them shall be accounted for as if such leasehold inter-
est were burdened by a total of 25% of 8/8ths royalty and over-
riding royalty interests, whether such be a fact or not. In es-
sence, it is the intention of each Goldsberry and Rosbottom to
reserve from the leasehold interest contributed by each an over-
riding royalty interest of 25% of 8/8ths out of which each party
shall bear and pay the royalty and overriding royalty interests
actually burdening such party's interests with the difference, if
any, to be kept, retained and owned by either Goldsberry or Ros-
bottom, as the case may be. If any interest within the AMI owned
by either Rosbottom or Goldsberry is burdened with RIs and ORRs
in excess of 25% of 8/8ths, the party owning same shall alone
bear, assume and pay proceeds attributable to such excess.

Although Goldsberry is acquiring no interest in the originally
owned Rosbottom leases and although Rosbottom owns no interest in
the Goldsberry leases, it is the intention of Goldsberry and Ros-
bottom to have the entire AMI treated as a "frozen interest" area
so that any cost, risk and expense or any production, proceeds
and benefits attributable to any oil, gas and mineral leasehold
interest, however large or small, owned by either or both of them
in whatever portions, shall be shared, borne, paid, received and
enjoyed by Goldsberry and Rosbottom in the portions set forth
hereinabove. Therefore, in the event a completion attempt is made
in the Paluxy, Glen Rose, Rodessa or such other shallower inter-
vals above the Hosston and likewise, including the Hosston, then
such ownership of the well, production rights and all rights in-
cident thereto shall be in accordance with those percentages set
forth hereinabove.  It was recognized by both Goldsberry and Ros-
bottom during the meeting cited above a potential problem exists
inasmuch as the Hosston unit formed for our joint operating area
is different in configuration than the existing Glen Rose units
as established by the Louisiana Office of Conservation in Sec-
tions 3 and 4, Township 12 North, Range 10 West, DeSoto and Red
River Parishes, Louisiana.   In an effort to create harmony
amongst ourselves, the Joint Operating Agreement provides that
any completion in the wellbore proposed under the terms of the

Joint Operating Agreement shall be conducted on a "frozen" inter-
est basis as provided herein.  Therefore, should the initial test
well encounter Glen Rose pay sands, then the ownership of the
wellbore in those pay sands shall be commensurate with the Joint
Operating Agreement referenced herein rather than the units as
established by the Louisiana Office of Conservation; likewise,
this will apply to any well drilled by Rosbottom within HOSS RD
SU G.

B.  <u>NON-CONSENT PENALTIES AFTER THE INITIAL TEST WELL HAS BEEN
DRILLED TO CONTRACT DEPTH.</u> When the test well has been drilled to
contract depth, logged and the evaluation procedures have been
completed, if less than all of the parties participating in
drilling the well (including any third parties with whom Rosbot-
tom is entering into agreements pertaining to drilling the test
well) elect to set production casing and attempt to complete the
well as an oil or gas producer, deepen the well or conduct other
operations (according to the list of priorities hereinafter set
forth), then those parties electing not to conduct such addi-
tional operations in the well may do so only under the following
terms:

1. After the initial well has reached total depth, should
one or more, but not all, of the owners wish to participate
in a completion attempt, in the event such completion at-
tempt is made and results in commercial production, the
non-consenting parties shall assign all their right, title
and interest in and to said well and any rights to the
leases in the contract area to the proposing (consenting)
party, reserving all depths one hundred feet (100') below
the base of the porosity interval in which the completion is
made, and reserving an overriding royalty interest equal to
the difference between all royalties and overriding
royalties burdening such leases and twenty-five percent
(25%) of eight-eighths (8/8ths), subject to proportionate
reduction as hereinafter provided. It is further agreed, in
the event non-consent operations are selected by a Par-
ticipant, the overriding royalty interest reserved by the
non-consenting party shall increase to the difference be-
tween all royalties and overriding royalties burdening such
leases and thirty percent (30%) after recoupment by the con-
senting parties of all drilling, completion and separately
considered. Furthermore, in the event a non-consenting party
owns less than full lease interests, it is agreed that the
overriding royalty interests retained will be reduced in
proportion to the undivided oil, gas and mineral interests
actually conveyed. In addition to the above, any non-
consenting party as provided herein shall also assign all
right, title and interest in and to any and all farmout
lease rights which such non-consenting party owns or has a
right to own pursuant to this letter unto the consenting
parties.  Such assignment of farmout lease rights shall
specifically convey all right, title and interest and
reserve no additional burdens over and above the original
farmout terms. The parties hereto agree to timely execute
and deliver any required document or instrument necessary to
effectuate the purposes and intent of this agreement as con-
templated.

2. Should the initial well prove non-productive, and should
one or more, but not all, of the owners wish to drill an ad-
ditional well, any non-consenting party shall assign his in-
terest in and to the leases and/or farmout lease rights unto
the consenting parties in exact accordance with the provi-
sions of Paragraph B, subparagraph (1) above.

3. After production has been established, should one or more
of the owners wish to drill an additional well, any non-
consenting party shall assign his interest in and to the
leases and any farmout lease rights lying outside the con-

fines of any designated producing units unto the consenting
parties in accordance with the provisions of Paragraph B,
subparagraph (1) hereinabove.

4. After production has been established, should any party
elect not to participate in a completion attempt after a
well has reached total depth, operations will be conducted
under a 500% penalty clause as to said well and unit for
non-consent operations as set forth in Article VI.A. and B.
of the Joint Operating Agreement, of which this language is
incorporated as an integral part hereof.

C.  LIMITATION ON DRILLING PROPOSALS: Notwithstanding any provi-
sions in this agreement to the contrary:

1. No proposal shall be made for drilling or the re-entry of
more than one well at a time.

2. No well shall be proposed when another drilling proposal
is pending or between the approval to drill a well and com-
mencement of operations for such well.

3. If a proposal for drilling a well is made while another
well is being drilled on the Contract Area, any party to
whom the proposal is made shall have the right to defer an
election until thirty (30) days after receipt of the
proposal or until fifteen (15) days after all operations
have been completed on the drilling well (completing and
equipping or plugging and abandoning as the case may be),
whichever occurs last.

4. For purposes of this Article XV.C., "Limitation on Drill-
ing Proposals", a drilling well shall also include the
deepening or sidetracking of an existing well, and a
proposal to drill a well on land not included in the Con-
tract Area, but pooled with land in the Contract Area, shall
be considered a proposal to drill pursuant to the terms of
this agreement.

5. The provisions of Article XV.C., "Limitation on Drilling
Proposals", shall not apply to a well subject to the provi-
sions of Article D, "Required Operations".

D.  REQUIRED OPERATIONS. Any well or operation which is necessary
to perpetuate an expiring lease or leases or interest therein, or
to earn an additional lease or leases or interest therein pur-
suant to any farmout or other agreement shall be deemed to be a
"required well" or "required operation" As to any required well
or required operation proposed by any party hereto in accordance
with Article XV.B, "Non-Consent Penalties", in which any other
party hereto elects not to participate, the non-consenting party
shall release and relinquish forever proportionately to the con-
senting parties all of non-consenting party's interest without
any depth limitation in and of the lease or leases or interest
therein which would be perpetuated by such required well or re-
quired operation. The interest in such relinquished leases shall
be assigned by non-consenting party to the consenting parties
without warranty of title except as to claims by, through or un-
der Assignor and any "subsequently created interest" affecting
Assignor's interest shall be handled as provided in Article
III.D.

E.  PAYMENT OF SEVERANCE TAXES. When Non-Operator is exercising
the right to take in kind or separately dispose of its propor-
tionate part of production, Non-Operator shall pay or arrange for
the payment of all production, severance or similar taxes imposed
on such part; but at such times when Operator is purchasing or
selling Non-Operator's share of production, Operator shall ar-
range for payment of such taxes.

F. <u>THIRD PARTY SERVICES.</u> Regardless of any provisions of this Operating Agreement or the Accounting Procedure to the contrary, the Operator may charge to the Joint Account for the contract area the fees and charges incurred for outside engineers, geologists, consultants, brokers, title curative work, attorneys and other third party services incurred in connection with leases owned by or acquired for the Joint Account or operations for the benefit of the Joint Account; all to be borne in the proportions specified on Exhibit "A".

G. <u>CERTIFICATION.</u> Operator may make certifications to oil purchaser and/or governmental bodies of the price category for which oil produced from wells subject to this Operating Agreement qualifies. Operator shall never be liable to any Non-Operator for any loss arising from such certification if it be subsequently determined that such oil qualifies for a higher price category; it being understood and agreed that each Non-Operator's sole remedy is to take his share of such oil in kind and to make such certification for his own account. In the event it is subsequently determined by Operator or by any governmental authority having jurisdiction that oil previously certified by Operator qualifies for a lesser price category than that certified, then each Non-Operator agrees to refund and indemnify and hold Operator harmless from and against Non-Operator's proportionate share (including Non-Operator's proportionate share of any unrecouped overcharge attributable to royalty or overriding royalty oil) of all overcharges, together with interest and penalties, if any, attributable thereto. In the event that Operator does make certifications with respect to Non-Operator's oil, Operator is authorized by Non-Operator to represent the Joint Account in administrative proceedings (including, without limitation, audits, enforcement proceedings, requests for ruling, interpretation and exceptions and litigation arising out of or related to such certification) and further to negotiate and compromise any claim of overcharge. Provided, however, Operator shall not compromise any overcharge claim which would result in a refund liability to the Joint Account of more than $10,000.00 (exclusive of interest) without the consent of Non-Operator. All costs and expenses of such representation by Operator shall be charged to the Joint Account.

H. <u>COSTS INCURRED BY OPERATOR.</u> Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the costs incurred by Operator in procuring curative matters, pooling amendments, preparation and recording of pooling designations or declarations and conducting hearings before governmental agencies or regulatory bodies, including fees and expenses outside of attorneys and/or professional consultants or brokers shall not be considered as administrative overhead, and Operator shall be entitled to make a direct charge against the Joint Account for same.

I. <u>GOVERNMENTAL FILINGS.</u> Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), costs incurred by Operator involving filing with the Federal Energy Regulatory Commission or any other governmental agencies regarding price determination and allowables, shall not be considered as administrative overhead, and the Operator shall be entitled to make a direct charge against the Joint Account for same.

***END OF SPECIAL PROVISIONS***

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___1st___ day of ___June___, 19 89 .

OPERATOR

WITNESSES:                                          ROSBOTTOM PRODUCTION CORP.

_Darla Dorgan_                                     By: _____
                                                      Harold L. Rosbottom, Jr., President

_Traci M. Morris_                                  ATTEST:

                                                   By: _Martha May_
                                                      Martha H. May, Corporate Secretary

NON-OPERATORS

                                                   WEISER BROWN OIL COMPANY, INC.

_____                            By: _____

_____

_____

_____

_____                            SCOTT D. STROUD

_____

_____                            JOHN TAKACH

_____                            TAKACH AMUSEMENT COMPANY

_____                            By: _____

_____

_____

_____                            GENE A. SANDERS

_____                            PETROLEUM FUTURES

_Phyllis Longmire_                                 By: _____
                                                      Fred L. Phillips, General Manager

_Vicki Coleman_                                    SKLAR & PHILLIPS OIL CO.

ATTEST:
_R. J. May_                                        By: _August Erickson_
R. J. May, Assistant Secretary                        August Erickson, Vice President

_____

_____

HAROLD L. ROSBOTTOM, JR.


_____

MIKE ROGERS


_____

CHRISTINE ROGERS

MIKE ROGERS DRILLING COMPANY, INC.

By:_____

T. L. JAMES & CO., INC.

By:_____

WHITNEY CORPORATION

By:_____


_____

ROBERT L. KREIDLER


_____

HELEN S. ARNOLD

BORDER COMPANY

By:_____


_____

DONALD L. CLARK


_____

EDDIE CLARK


_____

A. PHIL FOSTER

CLINTON W. FULLER, SR.

GOLDSBERRY PETROLEUM

By: _____

JOANN HORTON GOODWIN, Individually
and as Usufruct for L. A. Goodwin,
Danny Wayne Goodwin and Diane Goodwin

WILLIAM R. GUFFEY

JAMES B. HARRIS

HELENA PRODUCTION CORP.

By: _____

HOLMAN-MURFEE PARTNERSHIP

By: _____

MERCHANTS NATIONAL BANK OF MOBILE
Assignee of R. L. Lees

By: _____

CARMEN JONES LINAM

HENRY E. LINAM, JR.

LEE S. MUDD

JOHN G. NELSON

EDWARD G. POWELL

_____        J. R. QUERBES, III

_____        REDLEY COMPANY

_____        By:_____

_____        SMP, INC.

_____        By:_____

_____        WHITING 1988 PRODUCTION PARTNERSHIP

_____        By:_____

_____

_____        HERMAN WILLIAMSON, JR. and
_____        First National Bank Trustees for
                               Gladys and Ed E. Hurley

_____        HERMAN WILLIAMSON, JR.
_____

STATE OF _____

COUNTY/PARISH OF _____

On this _____ day of _____, 19__, before me, the undersigned Notary Public in and for said County/Parish and State, personally appeared _____ to me known to be the person(s) described in and who executed the foregoing instrument and acknowledged that _____ executed the same as _____ free act and deed.

Commission Expires:

_____          _____

                                    NOTARY PUBLIC in and for _____

                                    _____

* * * * *

STATE OF _Louisiana_

~~COUNTY/~~PARISH OF _Caddo_

On this _19th_ day of _June_, 19_89_, before me, the undersigned Notary Public in and for said County/Parish and State, personally appeared _August Erickson_, who is the _Vice President_ of _Skean & Phillips Oil Co._, and stated that he/~~she~~ was duly authorized to execute the foregoing instrument for and in the name and on behalf of said ~~partnership~~ _Corporation_, and further stated and acknowledged that he/~~she~~ had executed same for the purposes and considerations therein expressed.

Commission Expires:

_with life_          _Frances M. Bailey_

                     NOTARY PUBLIC in and for _Caddo_

                     _Parish, Louisiana_

* * * * *          FRANCES M. BAILEY
                   NOTARY PUBLIC, Caddo Parish, Louisiana
                   My Commission is for Life

STATE OF ___LOUISIANA_____

COUNTY/PARISH OF ___CADDO_____

On this _12th_ day of ___June_____, 19_89_, before me, the undersigned Notary Public in and for said County/Parish and State, personally appeared HAROLD L. ROSBOTTOM, JR., to me personally known, who, being by me duly sworn, did say that he is the President of ROSBOTTOM PRODUCTION CORP., and that the foregoing instrument was signed and sealed in behalf of the corporation by authority of its Board of Directors, and that he acknowledged the instrument to be the free act and deed of the corporation.

Commission Expires:

  with life          _Gene Mitchell_

                     NOTARY PUBLIC in and for _____

                     Caddo Parish, Louisiana

STATE OF _____

COUNTY/PARISH OF _____

On this _____ day of _____, 19__, before me, the undersigned

Notary Public in and for said County/Parish and State, personally appeared

_____ to me known to be the person(s)

described in and who executed the foregoing instrument and acknowledged that

_____ executed the same as _____ free act and deed.

Commission Expires:

_____

                                    _____

                                    NOTARY PUBLIC in and for _____

                                    _____

* * * * *

STATE OF _Louisiana_

~~COUNTY~~/PARISH OF _Caddo_

On this _19th_ day of _June_, 19_89_, before me, the undersigned

Notary Public in and for said ~~County~~/Parish and State, personally appeared

_Fred L. Phillips_, who is the _General Manager_

of _Petroleum Futures_, and stated that he/~~she~~

was duly authorized to execute the foregoing instrument for and in the name and

on behalf of said partnership, and further stated and acknowledged that he/~~she~~

had executed same for the purposes and considerations therein expressed.

Commission Expires:

_with life_

                                    _Frances M. Bailey_

                                    NOTARY PUBLIC in and for _Caddo_

                                    _Parish Louisiana_

* * * * *   FRANCES M. BAILEY
            NOTARY PUBLIC Caddo Parish, Louisiana
            My Commission is for Life

STATE OF __LOUISIANA__

COUNTY/PARISH OF ___CADDO___

On this _12th_ day of ___June___, 19_89_, before me, the undersigned

Notary Public in and for said County/Parish and State, personally appeared HAROLD

L. ROSBOTTOM, JR., to me personally known, who, being by me duly sworn, did say

that he is the President of ROSBOTTOM PRODUCTION CORP., and that the foregoing

instrument was signed and sealed in behalf of the corporation by authority of its

Board of Directors, and that he acknowledged the instrument to be the free act

and deed of the corporation.

Commission Expires:

  with life

                                    _Hone Mitchell_

                                    NOTARY PUBLIC in and for _____

                                    Caddo Parish, Louisiana

EXHIBIT "A"

Attached to and made a part of that certain
Joint Operating Agreement dated February 1, 1989,
covering lands described herein within
the Rosbottom etal-Goldsberry etal
Joint Area of Interest in the North Gahagan Field Prospect
DeSoto and Red River Parishes, Louisiana.


1. <u>DESCRIPTION OF LANDS IN CONTRACT AREA:</u>

W/2 and W/2 SE/4 Section 3 and E/2 Section 4 (lands outside
the Hook and Ohrt units), Township 12 North, Range 10 West,
HOSS RD SU H, more particularly known as the "Rosbottom etal
and Goldsberry etal Joint Area of Interest" in the North
Gahagan Area, DeSoto and Red River Parishes, Louisiana.


2. <u>DEPTH RESTRICTIONS:</u>

This Joint Operating Agreement shall be limited to those
depths from the surface of the earth down to the base of the
Hosston Formation.


3. <u>INTERESTS AND ADDRESSES OF PARTIES:</u>

| | |
|---|---|
| WEISER BROWN OIL COMPANY, INC.<br>Post Office Box 500<br>Magnolia, Arkansas 71753 | .13250000 |
| SCOTT D. STROUD<br>Post Office Box 565<br>Shreveport, Louisiana 71162 | .01407813 |
| JOHN TAKACH<br>416 Travis, Suite 1109<br>Shreveport, Louisiana 71101 | .00331250 |
| TAKACH AMUSEMENT COMPANY<br>1841 North San Jacinto Street<br>Liberty, Texas 77575 | .00331250 |
| GENE A. SANDERS<br>Post Office Box 867<br>Magnolia, Arkansas 71753 | .03312500 |
| PETROLEUM FUTURES<br>Post Office Box 3735<br>Shreveport, Louisiana 71134-3735 | .02415362 |
| SKLAR & PHILLIPS OIL CO.<br>Post Office Box 3735<br>Shreveport, Louisiana 71134-3735 | .16562500 |
| HAROLD L. ROSBOTTOM, JR.<br>400 Travis, Suite 1000<br>Shreveport, Louisiana 71101 | .03364261 |
| MIKE ROGERS<br>403 Hazel<br>Magnolia, Arkansas 71753 | .00603842 |
| CHRISTINE ROGERS<br>1103 Hazel<br>Magnolia, Arkansas 71753 | .00603842 |
| MIKE ROGERS DRILLING COMPANY, INC.<br>Post Office Box 126<br>Magnolia, Arkansas 71753 | .01207685 |

| | |
|---|---|
| T. L. JAMES & CO., INC.<br>Post Office Box 1610<br>Shreveport, Louisiana 71165 | .12421875 |
| WHITNEY CORPORATION<br>Post Office Box 6464<br>Cincinnati, Ohio 45202 | .08281250 |
| ROBERT L. KREIDLER<br>Post Office Box 6464<br>Cincinnati, Ohio 45202 | .02156570 |
| HELEN S. ARNOLD<br>Post Office Box 97<br>Shreveport, Louisiana 71161-0097 | .00924548 |
| BORDER COMPANY<br>401 Edwards Street, Suite 1625<br>Shreveport, Louisiana 71101 | .01402734 |
| DONALD L. CLARK<br>Post Office Box 214157<br>Dallas, Texas 75221 | .00622944 |
| EDDIE DUNN<br>Post Office Box 1426<br>Shreveport, Louisiana 71164 | .00462240 |
| A. PHIL FOSTER<br>Post Office Box 5213<br>Shreveport, Louisiana 71105 | .01168020 |
| CLINTON W. FULLER, SR.<br>Post Office Box 829<br>Shreveport, Louisiana 71162 | .00147656 |
| GOLDSBERRY PETROLEUM<br>401 Market, Suite 1200<br>Shreveport, Louisiana 71101 | .02634464 |
| JOANN HORTON GOODWIN, Individually and<br>as Usufruct for L. A. Goodwin, Danny<br>Wayne Goodwin and Dianne Goodwin<br>284 Pennsylvania<br>Shreveport, Louisiana 71105 | .00168750 |
| WILLIAM R. GUFFEY<br>1116 One Energy Square<br>4925 Greenville Avenue<br>Dallas, Texas 75206 | .00622944 |
| JAMES B. HARRIS<br>1414 Commercial National Bank Building<br>333 Texas Street<br>Shreveport, Louisiana 71101 | .00622944 |
| HELENA PRODUCTION CORP.<br>Post Office Box 97<br>Shreveport, Louisiana 71161-0097 | .00924548 |
| HOLMAN-MURFEE PARTNERSHIP<br>666 Travis, Suite 202<br>Shreveport, Louisiana 71101-3015 | .00637875 |
| MERCHANTS NATIONAL BANK OF MOBILE<br>Assignee of R. L. Lees<br>Post Office Drawer 2527<br>Mobile, Alabama 36622 | .00462274 |
| CARMEN JONES LINAM<br>2529 East 70th Street, Suite 318<br>Shreveport, Louisiana 71105 | .00295313 |

| | |
|---|---|
| HENRY E. LINAM, JR.<br>2529 East 70th Street, Suite 318<br>Shreveport, Louisiana 71105 | .00295313 |
| LEE S. MUDD<br>9424 Primrose<br>Shreveport, Louisiana 71108 | .00027830 |
| JOHN G. NELSON<br>2620 Centenary Boulevard<br>Shreveport, Louisiana 71104 | .00115594 |
| EDWARD G. POWELL<br>Post Office Box 21373<br>Shreveport, Louisiana 71120 | .00462240 |
| J. R. QUERBES, III<br>Post Office Box 5<br>Shreveport, Louisiana 71161 | .01168020 |
| REDLEY COMPANY<br>c/o Clinton Fuller<br>401 Edwards, Suite 1625<br>Shreveport, Louisiana 71101 | .01402734 |
| SMP, INC.<br>720 Oliver Street, 24th Floor<br>St. Louis, Missouri 63101 | .00027830 |
| WHITING 1988 PRODUCTION PARTNERSHIP<br>1700 Broadway, Suite 2300<br>Denver, Colorado 80290 | .07340686 |
| HERMAN WILLIAMSON JR. and<br>First National Bank Trustees<br>Gladys and Ed E. Hurley<br>Endowment Foundation<br>400 Petroleum Building<br>Shreveport, Louisiana 71101 | .08859374 |
| HERMAN WILLIAMSON, JR.<br>400 Petroleum Building<br>Shreveport, Louisiana 71101 | .02953125 |
| TOTAL: | 1.00000000 |

4. DESCRIPTION OF LEASES IN CONTRACT AREA:

### The Rosbottom Leases

Oil, Gas and Mineral Lease dated October 14, 1987, between State of Louisiana, State Lease No. 12933, Lessor and Rosbottom Production Corp., Lessee, being duly recorded in Book 233, page 129, records of Red River Parish, Louisiana.

Oil, Gas and Mineral Lease dated January 27, 1988, between Mary Tom Wilkinson Almond, Lessor and Rosbottom Production Corp., Lessee, being duly recorded in Book 233, page 428, records of Red River Parish, Louisiana.

Oil, Gas and Mineral Lease dated August 31, 1987, between Mary Tom Wilkinson Almond, etal, Lessors and Rosbottom Production Corp., Lessee, being duly recorded in Book 231, page 454, records of Red River Parish, Louisiana.

Oil, Gas and Mineral Lease dated August 19, 1987, between Rex L. Young, etux, Lessors and Rosbottom Production Corp., Lessee, being duly recorded in Book 231, page 421, records of Red River Parish, Louisiana.

Oil, Gas and Mineral Lease dated August 19, 1987, between Rex L. Young, etux, Lessors and Rosbottom Production Corp., Lessee, being duly recorded in Book 233, page 249, records of Red River Parish, Louisiana.

INSOFAR AND ONLY INSOFAR as the above and foregoing leases cover those lands described herein as the W/2 and W/2 SE/4 Section 3 and E/2 Section 4 (lands outside the Hook and Ohrt units), Township 12 North, Range 10 West, more particularly known as the "Rosbottom etal and Goldsberry etal Joint Area of Interest", DeSoto and Red River Parishes, Louisiana.

### The Goldsberry Etal Leases

Oil, Gas and Mineral Lease dated February 27, 1979, between Equity Oil Company, Lessee and Emmett R. Hook etal, Lessors, recorded in Book 172, page 782, deed records, Red River Parish, Louisiana.

******END OF EXHIBIT "A"******

EXHIBIT "B"

BATH © GRAM

BATH'S FORM LOUISIANA SPEC. 14-0R1-2A-PA-PAIO UP 4-70

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this_____day of_____, 19_____, between

_____
lessor (whether one or more), and_____
lessee, WITNESSETH:

1. Lessor in consideration of_____Dollars ($_____),
in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and
lets exclusively unto Lessee for the purposes of investigating, exploring, prospecting, drilling and mining for and pro-
ducing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines, and other structures
thereon to produce, save, take care of, treat, transport and own said products and for dredging and maintaining canals,
constructing roads and bridges, and building houses for its employees, and, in general, for all appliances, structures,
equipment, servitudes and privileges which may be necessary, useful or convenient to or in connection with any such

operations conducted by Lessee thereon, or on any adjacent lands, the following described land in_____
Parish, Louisiana, to-wit:

Comprising_____acres, more or less.
This lease also covers and includes battures, accretions and all other land owned by Lessor adjacent to the land
particularly described above.

2. Subject to the other provisions herein contained, this lease shall be for a period of_____years from this
date (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land
hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

(a) It is the intention of the parties that this lease shall also extend and apply to all outstanding mineral rights
or servitudes affecting the lands herein described as the same may revert to Lessor, his heirs, or assigns, from time to
time.

3. For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary
term, without any additional payment and without Lessee being required to conduct any operations on the land (either
before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from
drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in
liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered
at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either
case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to
time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing
for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance
produced from said land, when sold by Lessee, one-eighth of the amount realized by Lessee computed at the mouth of
the well, or when used by Lessee off said land or in the manufacture of gasoline or other products, the market
value, at the mouth of the well, of one-eighth of such gas so used; (such gas, casinghead gas, residue gas, or gas of any
other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable
waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed
to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof;) (c) on all other
minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that
on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances
in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should
Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then
Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling

operations by paying Lessor as royalty_____Dollars ($_____)
per year, the first payment being due, if said well should be completed or shut-in after the primary term, within sixty (60)
days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one
year from the date of such completion or cessation. If such a well should be completed during the primary term, the
first payment, if made by Lessee, shall be due on or before the expiration date of the primary term herein fixed. There-
after Lessee's rights may be continued from year to year by making annual payments in the amount stated on or
before the anniversary date beginning with the date of completion of said well (if completed after the primary term)
or the end of the primary term (if completed prior thereto) as the case may be; each of such payments to extend
Lessee's rights for one year. The annual payments herein provided for may be deposited to Lessor's Credit in the

_____Bank of_____, which
bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the

land or mineral rights therein. The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6.   If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a dry hole or holes on the land described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling or reworking thereon, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling or reworking with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7.   Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than forty (40) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than forty (40) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. The commencement of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate, or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the one-eighth (1/8) royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8.   If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9.   Lessee shall have free use of oil, gas, casinghead gas, condensate, coal and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land, without Lessor's consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10.   The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, rentals, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, rentals or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. In the event of an assignment of this lease as to a segregated portion of said land, or as to an undivided interest therein, the rentals payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each, or according to the undivided interest of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder and, if Lessee or assignee of part or parts hereof shall fail or make default in the payment of the proportionate part of the rentals due from such Lessee, or assignee, or fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee thereof shall make payment of said rentals.

11.   In case of suit, adverse claim, dispute or question as to the ownership of the rentals or royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such rentals or royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12.   In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or, in the absence of such rulings, forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts

relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13.   When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of the government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14.   It is expressly understood and agreed that the premises leased herein shall, for all the purposes of this lease, be considered and treated as owned in indivision by the Lessor and shall be developed and operated as one lease, and there shall be no obligation on the part of Lessee to offset wells on separate tracts into which the land covered by this lease may be now or hereafter divided by sale, or otherwise, or to furnish separate measuring or receiving tanks, and all rentals, royalties and other payments accruing hereunder shall be treated as an entirety and shall be divided among and paid to Lessor in the proportion that the acreage (mineral rights) owned by each bears to the entire leased acreage. Lessee may at any time or times pay or tender all sums accruing hereunder to the joint credit of Lessor.

15.   Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16.   Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right of subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17.   This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

WITNESSES:

STATE OF LOUISIANA

PARISH OF_____ }

BEFORE ME,_____a Notary Public in and for_____
Parish, Louisiana, on this_____day of_____19_____, personally came and appeared
_____, who in the presence of me, said authority, and
_____and_____
competent witnesses, declares and acknowledges that____he_____the identical person____who executed the foregoing instrument in
writing, that_____signature____ thereto_____own true and genuine signature__, and that____he_____executed said
instrument of_____own free will____, and for the purposes and considerations therein expressed.

Thus done and passed on the day and date hereinabove written, in the presence of the before named and undersigned competent
witnesses, who have hereunto subscribed their names, together with said appearer_____, and me, said Notary, after reading the whole.

WITNESSES:

_____          _____
_____          _____
                                                   _____
_____          _____
                                                                                    Notary Public.

STATE OF LOUISIANA

PARISH OF_____ }

BEFORE ME, the undersigned authority, this day personally appeared_____
to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first
duly sworn, on_____oath, says: That_____subscribed_____name to the foregoing instrument as a witness, and that_____knows_____
_____
_____
the Grantor__named in said instrument, to be the identical person__described therein, and who executed the same, and saw_____sign
the same as_____voluntary act and deed, and that_____, the said_____
subscribed____name to the same at the same time as an attesting witness.

Sworn to and subscribed before me, this_____ }
day of_____, 19____ {
_____ }
Notary Public in and for_____          _____



OIL, GAS AND MINERAL LEASE

No.____

FROM

TO

Parish of

BATH'S FORM LOUISIANA SPEC. 14-BR1-2A-PA-PAID UP 4-70

STATE OF LOUISIANA

PARISH OF_____ }

BEFORE ME, the undersigned authority, this day personally appeared_____
to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first
duly sworn, on_____oath, says: That_____subscribed_____name to the foregoing instrument as a witness, and that_____knows_____
_____
_____
the Grantor__named in said instrument, to be the identical person__described therein, and who executed the same, and saw_____sign
the same as_____voluntary act and deed, and that_____, the said_____
subscribed____name to the same at the same time as an attesting witness.

Sworn to and subscribed before me, this_____ }
day of_____, 19____ {
_____ }
Notary Public in and for_____Parish, Louisiana. }          _____

COPAS — 1974
Recommended by the
Council of Petroleum
Accountants Societies

Exhibit 601, BOX 800 TULSA OK 74101 

# EXHIBIT   " C "

Attached to and made a part of ..that certain Joint Operating..........
.Agreement dated February 1, 1989, covering lands described.
.herein within the Rosbottom etal - Goldsberry etal Joint....
.Area of Interest in the North Gahagan Field Prospect, DeSoto
and Red River Parishes, Louisiana.

# ACCOUNTING  PROCEDURE
# JOINT OPERATIONS

## I.  GENERAL PROVISIONS

1. **Definitions**

    "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

    "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

    "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

    "Operator" shall mean the party designated to conduct the Joint Operations.

    "Non-Operators" shall mean the parties to this agreement other than the Operator.

    "Parties" shall mean Operator and Non-Operators.

    "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

    "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

    "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

    "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

    "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

2. **Statement and Billings**

    Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

    Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

    Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of eighteen percent (18%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

    Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

5. **Audits**

    A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

6. **Approval by Non-Operators**

    Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

COPAS

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First Level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

   D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3. **Employee Benefits**

   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

6. **Services**

   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

7. **Equipment and Facilities Furnished by Operator**

   A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

   B.. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**

   Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties~~. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

COPAS

10. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

11. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

12. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

      ( X ) Fixed Rate Basis, Paragraph 1A, or
      (    ) Percentage Basis, Paragraph 1B.

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (    ) shall not ( X ) be covered by the Overhead rates.

A. **Overhead - Fixed Rate Basis**

   (1) Operator shall charge the Joint Account at the following rates per well per month:

   Drilling Well Rate $ 4,500.00
   Producing Well Rate $ 450.00

   (2) Application of Overhead - Fixed Rate Basis shall be as follows:

      (a) Drilling Well Rate

         [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

         [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

         [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

      (b) Producing Well Rates

         [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

         [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

         [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

         [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

         [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

   (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. **Overhead - Percentage Basis**

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (   %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

_____ Percent (   %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ _15,000.00_ :

A. ___3___% of total costs if such costs are more than $ _15,000.00_ but less than $ _50,000.00_ ; plus

B. ___2___% of total costs in excess of $ _50,000.00_ but less than $1,000,000; plus

C. ___1___% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. **Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. **New Material (Condition A)**

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. **Good Used Material (Condition B)**

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

(2) Material moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

COPAS

    (b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

    (1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

    (2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

    (1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

    (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

EXHIBIT "D"


## INSURANCE

A. Workmen's Compensation Insurance in an amount equal to the full liability imposed by the laws of the States of Louisiana, Texas and Arkansas.

B. Employer's Liability Insurance with a limit of $100,000.00.

C. Comprehensive General Public Liability Insurance with a limit of $500,000.00 for deaths or injuries arising out of one occurrence, and $500,000.00 Aggregate; and Property Damage Insurance with limits of $250,000.00 for each occurrence and $250,000.00 Aggregate.

D. Comprehensive Automobile Public Liability Insurance with a combined single limit of $500,000.00 Bodily Injury and Property Damage.

Losses for which no insurance is required to be carried or in excess of the limits set forth above shall be borne by the parties in proportion to their respective interests herein and shall be charged to the joint account.

The premiums for all insurance policies shall be charged to the joint account.

The Comprehensive General Liability Insurance contains an endorsement substantially as follows:

It is agreed that the "Persons Insured" provision is amended by adding thereto the following:

(1) Under circumstances where the named insured is acting in the capacity of an operator in oil or gas operations, then co-owners, the parties in joint venture or mining partners, but only where such insureds have a financial interest in the operation with the named insured.

(2) Non-operating owners and non-operating co-owners in oil or gas operations for whom the named insured is acting as agent; however, the insurance provided under the policy for such insureds under this subsection shall apply as excess over any other valid and collectible insurance available to such insureds.

EXHIBIT "E"

## GAS BALANCING AGREEMENT

In accordance with the terms of the Operating Agreement, each party hereto has the right to take and market its share of gas produced from the Contract Area. In the event any of the parties hereto is not able to take its share of gas or has contracted to sell its share of gas produced from the Contract Area to a purchaser which is unable at any time while the Operating Agreement is in effect to take the share of gas attributable to the interest of such party, the terms of this balancing agreement shall automatically become effective.

During the period or periods when any party hereto has no market for, or its purchaser is unable to take its share of gas, the other parties shall be entitled to produce each month one hundred percent (100%) of the allowable gas production assigned to the Contract Area by the appropriate govermental entity having jurisdiction, and each of such parties shall have the right to take or deliver its pro rata share of all such production. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interests, but each party taking such gas shall own all the gas delivered to its purchaser. Each party unable to market its share of the gas produced shall be credited with gas in storage equal to its share of the gas produced, less its share of gas used in lease operations, vented or lost. Operator shall maintain a current account of the gas belance between the parties and shall furnish all parties hereto monthly statements showing the total quality of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered. Each party taking gas shall furnish Operator a monthly statement of gas taken.

At all times while gas is produced from the Contract Area, each party hereto will make settlement with the respective royalty owners to whom they are each accountable, just as if each party were taking or delivering to a purchaser its share, and its share only, of such gas production. Each party hereto agrees to hold each other party harmless from any and all claims for royalty payments asserted by royalty owners to whom each party is accountable. Each party producing and/or delivering gas to its purchaser shall pay any and all production taxes due on such gas.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to twenty-five percent (25%) of each overproduced party's share of gas produced. If more than one party is entitled to the additional gas produced, they shall divide such additional gas in accordance with the participation set out in the Operating Agreement.

The Operator, at the request of any party, may produce the entire well stream, if necessary, for a deliverability test not to exceed seventy-two (72) hours duration required under such requesting party's gas sales contract and may overproduce in any other situation, provided that such overproducing would be consistent with prudent operations.

It is the intent of this agreement that during the productive life of each well on the Contract Area each party shall have the opportunity to share in the actual cumulative production from each well in proportion to its interest in the gas. Every reasonable effort shall be made to balance the overdeliveries and underdeliveries on a monthly basis, provided the pipeline handling each party's gas is able to take the share of production to which each party is entitled.

In the event production of gas permanently ceases prior to the time that the accounts of the parties have been balanced, a complete balancing shall be accomplished by a money settlement between the parties. Such settlement shall be based on the price or prices received by each overproduced party for its share of the overproduced gas, without interest, less any applicable taxes paid by the overproduced party. It is recognized that there may be changes in the price per Mcf of gas received by those parties receiving more than their pro rata share of gas. It is therefore agreed that any production taken by any party over and above that attributable to its respective interest shall be credited to the first unbalanced underproduction of such party from time to time or, in other words, any currently accruing overproduction by any underproduced party shall offset underproduction in the order of accrual.

The provisions of this exhibit shall be separately applicable to each well and each reservoir to the end that production from one reservoir in a gas well may not be utilized for the purposes of balancing underproduction from other reservoirs.

******END OF EXHIBIT******

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

EXHIBIT "D"

ROSBOTTOM PRODUCTION CORP.***ALMOND-HOOK NO. 1
W/2 & W/2 SE/4 SECTION 3 & E/2 SECTION 4-T12N-R10W
HOSS RD SU H
DESOTO and RED RIVER PARISHES, LOUISIANA

OPERATING AGREEMENT

DATED

June    1 , 19 89 ,

OPERATOR   ROSBOTTOM PRODUCTION CORP.

CONTRACT  AREA  W/2 & W/2 SE/4 SECTION 3 and E/2 SECTION 4, TOWNSHIP 12

NORTH, RANGE 10 WEST, HOSS RD SU H, MORE PARTICULARLY KNOWN AS THE

"ROSBOTTOM ETAL-GOLDSBERRY ETAL JOINT AREA OF INTEREST IN THE NORTH

GAHAGAN AREA"

COUNTY OR PARISH/OF  DESOTO & RED RIVER   STATE OF  LOUISIANA

COPYRIGHT 1982   —   ALL RIGHTS RESERVED
AMERICAN  ASSOCIATION  OF  PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610  -  1982  REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9-10 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 11 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11-12 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 15 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ROSBOTTOM PRODUCTION CORP., 400 Travis, Suite 1000, Shreveport, Louisiana 71101 , hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

ARTICLE I.
DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

ARTICLE II.
EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☒ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
### INTERESTS OF PARTIES

A.  Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.  Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of ___one-eighth (1/8th)___ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.  Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.  Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and: *nor appears of record in the Parish where the acreage subject hereto is situated

1.  If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.  If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
### TITLES

A.  Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

~~☐  Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

- 2 -

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE IV
continued

1  ☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7      Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12     No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14 ticipate in the drilling of the well.
15
16 B.  Loss of Title:
17
18     1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19 reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20 from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21 tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22 and gas leases and interests; and,
23     (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24 entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25 but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26     (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27 been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
28 curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29 Area by the amount of the interest lost;
30     (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31 increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32 terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33 well;
34     (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35 failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36 who bore the costs which are so refunded;
37     (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38 borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39     (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40 claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41 connection therewith.
42
43     2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
44 payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45 there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46 payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47 which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48 date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49 the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50 required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51 the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53 or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54     (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55 up to the amount of unrecovered costs;
56     (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57 oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58 termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59 portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,
60     (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61 lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62
63     3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66
67
68
69
70

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

ROSBOTTOM PRODUCTION CORP. _____shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed. *unless otherwise agreed to by the consenting parties.

C. Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D. Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

A. Initial Well:

On or before the __1st__ day of ___September___, 19 89 , Operator shall commence the drilling of a well for oil and gas at the following location:

at a legal location to be mutually agreed upon in HOSS RD SU H, DeSoto and Red River Parishes, Louisiana

and shall thereafter continue the drilling of the well with due diligence to a subsurface depth of 7500' or a depth sufficient to test the Upper Hosston Formation, whichever of the foregoing depths is the lesser,

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI

continued

1  If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2  well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.
3
4
5
6  B.  Subsequent Operations:
7
8  1.  Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided
9  for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10  the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11  other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12  tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13  within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
14  ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15  limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within
16  the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17  response given by telephone shall be promptly confirmed in writing.
18
19
20
21  If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22  period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
23  tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24  ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25  for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26  permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27  amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
28  actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29  if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30  dance with the provisions hereof as if no prior proposal had been made.
31
32
33                                                                                          VI.E.1.
34  2.  Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
35  No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36  giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
37  the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
38  on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
39  work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40  a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41  tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
42  senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43  ditions of this agreement.
44  *unless otherwise agreed to by the consenting parties,
45
46
47  If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48  notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
49  to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours
50  (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51  ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52  failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
53  such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
54  at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58  The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59  elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
60  operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62  sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63  ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64
65
66
67
68
69
70

- 5 -

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE VI
continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:

9
10
11
12  (a) XXX% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
      500%                                                                                                      100%
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and
18
19
20
21  (b) __500__% of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C., and __500__% of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.
25
26
27
28  An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29  working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31  reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32  and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33  the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.
36
37
38
39  During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.
43
44
45
46  In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.
50
51
52
53  Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57  ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60  realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.
66
67
68
69
70

· 6 ·

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI

continued

1   If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2   the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3   Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4   therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5   back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6   the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.
7
8
9
10   Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11   be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12   well conforms to the then-existing well spacing pattern for such source of supply.
13
14
15
16   The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17   except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18   after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19   duction, ceases to produce in paying quantities.
20
21
22
23   3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24   completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25   reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26   ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27   first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28   matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29   withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30   each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31   ties.
32
33
34
35   4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36   also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37   location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38   mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39   affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40   to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:
41
42
43
44   (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45   the initial drilling of the well down to the depth at which the sidetracking operation is initiated.
46
47
48
49   (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50   salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51   provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.
52
53
54
55   In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56   shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57   receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58   incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-
59   by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60   ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61   stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.
62
63
64
65   C.  TAKING PRODUCTION IN KIND:
66
67   Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68   exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69   marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70   party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI
continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10  best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.

15

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21  D.  Access to Contract Area and Information:

22

23      Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the information.

30

31  E.  Abandonment of Wells:

32

33      1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42      2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56
57
58
59
60
61
62
63
64
65
66
67
68
69
70



-8-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI

continued

1   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2   assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3   Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4   interests in the remaining portion of the Contract Area.
5
6     Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7   the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8   quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9   templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10   well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11   repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12   visions hereof.
13
14     3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between
15   Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16   permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17   of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18   VI.E.
19
20                                 ARTICLE VII.
21                     EXPENDITURES AND LIABILITY OF PARTIES
22
23   A.  Liability of Parties:
24
25     The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26   shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27   among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28   shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30   B.  Liens and Payment Defaults:
31
32     Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33   of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34   at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35   state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36   taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37   rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38   of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39   the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40   purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41   and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43     If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44   Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45   the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46   reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.
47
48   C.  Payments and Accounting:
49
50     Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51   and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52   tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53   showing expenses incurred and charges and credits made and received.
54
55     Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56   of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57   month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58   with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59   on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60   fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61   due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62   pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
63
64   D.  Limitation of Expenditures:
65
66     1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67   pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
68
69
70

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE VII

continued

1  ☐ ~~Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including~~
2  ~~necessary tankage and/or surface facilities.~~

3

4  ☒  Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12  back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13  than all parties.

14

15      2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.

19

20      3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of   FIFTEEN THOUSAND AND NO/100-------- Dollars ($ 15,000.00----)
22  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of FIFTEEN THOUSAND AND NO/100-----------
28  Dollars ($ 15,000.00----) but less than the amount first set forth above in this paragraph.

29

30  E.  Rentals, Shut-in Well Payments and Minimum Royalties:

31

32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who obligated such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.2.

39

40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46  F.  Taxes:

47

48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit "C".

59

60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65  provided in Exhibit "C".

66

67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68  the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69

70

-10-

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE VII
continued

G. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportion . . .

-11-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VIII
continued

1   said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2   governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3   it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4   tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

5
6       If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7   consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

8
9   D.  Maintenance of Uniform Interest:

10
11       For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12   party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13   equipment and production unless such disposition covers either:

14
15       1. the entire interest of the party in all leases and equipment and production; or

16
17       2. an equal undivided interest in all leases and equipment and production in the Contract Area.

18
19       Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20   and shall be made without prejudice to the right of the other parties.

21
22       If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23   require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24   and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25   party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26   into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27   Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

28
29   E.  Waiver of Rights to Partition:

30
31       If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32   undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33   interest therein.

34
35   ~~F.  Preferential Right to Purchase:~~

36
37   ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38   Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, ~~which~~ shall include the
39   name and address of the prospective purchaser (who must be ready, willing and able to purchase), ~~the purchase~~ price, and all other terms
40   of the offer. The other parties shall then have an optional prior right, for a period of ~~ten (10)~~ days after receipt of the notice, to purchase
41   on the same terms and conditions the interest which the other ~~party proposes~~ to sell; and, if this optional right is exercised, the purchas-
42   ing parties shall share the purchased interest in ~~the proportions~~ that the interest of each bears to the total interest of all purchasing par-
43   ties. However, there shall be ~~no preferential~~ right to purchase in those cases where any party wishes to mortgage its interests, or to
44   dispose of its ~~interests~~ by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-
45   ~~pany, or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

46
47                  ARTICLE IX.
48         INTERNAL REVENUE CODE ELECTION

49
50       This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51   for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52   and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53   purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54   from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55   mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56   ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57   United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58   and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59   evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60   Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61   action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62   Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63   Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64   mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65   tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66   computation of partnership taxable income.

67
68
69
70

-12-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.

CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed___FIVE THOUSAND AND NO/100----------------------------------------Dollars ($_5,000.00------) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

ARTICLE XI.

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.

NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.

TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of ___90___ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within ___90___ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

-13-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ____LOUISIANA____ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

A. AREA OF MUTUAL INTEREST. In the interest of exploration and development, the parties hereto hereby establish an Area of Mutual Interest (AMI)* comprised of approximately 800 net acres in DeSoto and Red River Parishes, Louisiana, to-wit:

TOWNSHIP 12 NORTH-RANGE 10 WEST

E/2 Section 4 (lands outside of Hook and Ohrt units) and
W/2 and the W/2 SE/4 Section 3
HOSS RD SU H
DeSoto and Red River Parishes, Louisiana

The AMI shall remain in full force and effect from the date hereof until June 1, 1991, at which time the AMI will terminate as to all acreage not then included within a production unit for a producing well. Only acreage included within a producing unit or units after June 1, 1991, shall remain subject to the AMI. Any such producing acreage shall then be operated in accordance with the terms and conditions of this Joint Operating Agreement covering the producing wells to which the acreage is attributable.

From the date of commencement of the AMI, in the event the parties hereto, whether singly or jointly, should acquire any leases, whether in whole or in part, either by purchase, farmout or other means within the AMI, then the parties hereto may share any such leasehold interest in accordance with their proportionate interests as set forth hereinbelow. The costs and ex-

- 14 -

penses of acquiring any interests within the AMI shall be borne and paid for by all the parties hereto in the amount equal to the interest attributable to each respective party.

The provisions of the AMI are not intended and shall not be construed to create a preferential right to purchase between the parties and shall not apply to the sale and purchase of interests between the parties to this agreement.

Within the AMI, both Rosbottom Production Corp. etal (Rosbottom) and Goldsberry Operating Company, Inc. etal (Goldsberry) owned existing oil, gas and mineral leases separately and apart from each other, but did desire to explore, drill and develop for oil and gas within such area with all cost, risk, burdens, expense, benefits and rewards to be shared between Rosbottom and Goldsberry in proportion to their respective lease ownership within the confines of the Goldsberry and Rosbottom agreed upon "Prospect Area", defined as all of the lands within the AMI, to contain approximately 800 net acres, being the E/2 Section 4 (lands outside the Hook and Ohrt.units) and W/2 and W/2 SE/4 Section 3-T12N-R10W, DeSoto and Red River Parishes, Louisiana, more particularly known as the "Rosbottom etal - Goldsberry etal Joint Area of Interest in the North Gahagan Area. Within the Prospect Area, leases then owned solely by Rosbottom and described in Exhibit "A" herein were agreed to cover and pertain to 530 net acres. The Goldsberry leases described in Exhibit "A", previously owned solely by Goldsberry were agreed to cover 270 net acres.

As Goldsberry and Rosbottom have different pre-existing obligations for overriding royalty interests on lease interests acquired within the AMI pursuant to prior commitments from them to third parties, it is agreed between Rosbottom and Goldsberry that regardless of the actual royalty and overriding royalty burdens on any interest in any lease owned by either of them within the AMI, all production attributable to any interest therein owned by either of them shall be accounted for as if such leasehold interest were burdened by a total of 25% of 8/8ths royalty and overriding royalty interests, whether such be a fact or not. In essence, it is the intention of each Goldsberry and Rosbottom to reserve from the leasehold interest contributed by each an overriding royalty interest of 25% of 8/8ths out of which each party shall bear and pay the royalty and overriding royalty interests actually burdening such party's interests with the difference, if any, to be kept, retained and owned by either Goldsberry or Rosbottom, as the case may be. If any interest within the AMI owned by either Rosbottom or Goldsberry is burdened with RIs and ORRs in excess of 25% of 8/8ths, the party owning same shall alone bear, assume and pay proceeds attributable to such excess.

Although Goldsberry is acquiring no interest in the originally owned Rosbottom leases and although Rosbottom owns no interest in the Goldsberry leases, it is the intention of Goldsberry and Rosbottom to have the entire AMI treated as a "frozen interest" area so that any cost, risk and expense or any production, proceeds and benefits attributable to any oil, gas and mineral leasehold interest, however large or small, owned by either or both of them in whatever portions, shall be shared, borne, paid, received and enjoyed by Goldsberry and Rosbottom in the portions set forth hereinabove. Therefore, in the event a completion attempt is made in the Paluxy, Glen Rose, Rodessa or such other shallower intervals above the Hosston and likewise, including the Hosston, then such ownership of the well, production rights and all rights incident thereto shall be in accordance with those percentages set forth hereinabove. It was recognized by both Goldsberry and Rosbottom during the meeting cited above a potential problem exists inasmuch as the Hosston unit formed for our joint operating area is different in configuration than the existing Glen Rose units as established by the Louisiana Office of Conservation in Sections 3 and 4, Township 12 North, Range 10 West, DeSoto and Red River Parishes, Louisiana. In an effort to create harmony amongst ourselves, the Joint Operating Agreement provides that any completion in the wellbore proposed under the terms of the

Joint Operating Agreement shall be conducted on a "frozen" interest basis as provided herein. Therefore, should the initial test well encounter Glen Rose pay sands, then the ownership of the wellbore in those pay sands shall be commensurate with the Joint Operating Agreement referenced herein rather than the units as established by the Louisiana Office of Conservation; likewise, this will apply to any well drilled by Rosbottom within HOSS RD SU G.

B. NON-CONSENT PENALTIES AFTER THE INITIAL TEST WELL HAS BEEN DRILLED TO CONTRACT DEPTH. When the test well has been drilled to contract depth, logged and the evaluation procedures have been completed, if less than all of the parties participating in drilling the well (including any third parties with whom Rosbottom is entering into agreements pertaining to drilling the test well) elect to set production casing and attempt to complete the well as an oil or gas producer, deepen the well or conduct other operations (according to the list of priorities hereinafter set forth), then those parties electing not to conduct such additional operations in the well may do so only under the following terms:

1. After the initial well has reached total depth, should one or more, but not all, of the owners wish to participate in a completion attempt, in the event such completion attempt is made and results in commercial production, the non-consenting parties shall assign all their right, title and interest in and to said well and any rights to the leases in the contract area to the proposing (consenting) party, reserving all depths one hundred feet (100') below the base of the porosity interval in which the completion is made, and reserving an overriding royalty interest equal to the difference between all royalties and overriding royalties burdening such leases and twenty-five percent (25%) of eight-eighths (8/8ths), subject to proportionate reduction as hereinafter provided. It is further agreed, in the event non-consent operations are selected by a Participant, the overriding royalty interest reserved by the non-consenting party shall increase to the difference between all royalties and overriding royalties burdening such leases and thirty percent (30%) after recoupment by the consenting parties of all drilling, completion and separately considered. Furthermore, in the event a non-consenting party owns less than full lease interests, it is agreed that the overriding royalty interests retained will be reduced in proportion to the undivided oil, gas and mineral interests actually conveyed. In addition to the above, any non-consenting party as provided herein shall also assign all right, title and interest in and to any and all farmout lease rights which such non-consenting party owns or has a right to own pursuant to this letter unto the consenting parties. Such assignment of farmout lease rights shall specifically convey all right, title and interest and reserve no additional burdens over and above the original farmout terms. The parties hereto agree to timely execute and deliver any required document or instrument necessary to effectuate the purposes and intent of this agreement as contemplated.

2. Should the initial well prove non-productive, and should one or more, but not all, of the owners wish to drill an additional well, any non-consenting party shall assign his interest in and to the leases and/or farmout lease rights unto the consenting parties in exact accordance with the provisions of Paragraph B, subparagraph (1) above.

3. After production has been established, should one or more of the owners wish to drill an additional well, any non-consenting party shall assign his interest in and to the leases and any farmout lease rights lying outside the con-

fines of any designated producing units unto the consenting
parties in accordance with the provisions of Paragraph B,
subparagraph (1) hereinabove.

4. After production has been established, should any party
elect not to participate in a completion attempt after a
well has reached total depth, operations will be conducted
under a 500% penalty clause as to said well and unit for
non-consent operations as set forth in Article VI.A. and B.
of the Joint Operating Agreement, of which this language is
incorporated as an integral part hereof.

C.  LIMITATION ON DRILLING PROPOSALS: Notwithstanding any provi-
sions in this agreement to the contrary:

1. No proposal shall be made for drilling or the re-entry of
more than one well at a time.

2. No well shall be proposed when another drilling proposal
is pending or between the approval to drill a well and com-
mencement of operations for such well.

3. If a proposal for drilling a well is made while another
well is being drilled on the Contract Area, any party to
whom the proposal is made shall have the right to defer an
election until thirty (30) days after receipt of the
proposal or until fifteen (15) days after all operations
have been completed on the drilling well (completing and
equipping or plugging and abandoning as the case may be),
whichever occurs last.

4. For purposes of this Article XV.C., "Limitation on Drill-
ing Proposals", a drilling well shall also include the
deepening or sidetracking of an existing well, and a
proposal to drill a well on land not included in the Con-
tract Area, but pooled with land in the Contract Area, shall
be considered a proposal to drill pursuant to the terms of
this agreement.

5. The provisions of Article XV.C., "Limitation on Drilling
Proposals", shall not apply to a well subject to the provi-
sions of Article D, "Required Operations".

D.  REQUIRED OPERATIONS. Any well or operation which is necessary
to perpetuate an expiring lease or leases or interest therein, or
to earn an additional lease or leases or interest therein pur-
suant to any farmout or other agreement shall be deemed to be a
"required well" or "required operation" As to any required well
or required operation proposed by any party hereto in accordance
with Article XV.B, "Non-Consent Penalties", in which any other
party hereto elects not to participate, the non-consenting party
shall release and relinquish forever proportionately to the con-
senting parties all of non-consenting party's interest without
any depth limitation in and of the lease or leases or interest
therein which would be perpetuated by such required well or re-
quired operation. The interest in such relinquished leases shall
be assigned by non-consenting party to the consenting parties
without warranty of title except as to claims by, through or un-
der Assignor and any "subsequently created interest" affecting
Assignor's interest shall be handled as provided in Article
III.D.

E.  PAYMENT OF SEVERANCE TAXES. When Non-Operator is exercising
the right to take in kind or separately dispose of its propor-
tionate part of production, Non-Operator shall pay or arrange for
the payment of all production, severance or similar taxes imposed
on such part; but at such times when Operator is purchasing or
selling Non-Operator's share of production, Operator shall ar-
range for payment of such taxes.

F. <u>THIRD PARTY SERVICES.</u> Regardless of any provisions of this Operating Agreement or the Accounting Procedure to the contrary, the Operator may charge to the Joint Account for the contract area the fees and charges incurred for outside engineers, geologists, consultants, brokers, title curative work, attorneys and other third party services incurred in connection with leases owned by or acquired for the Joint Account or operations for the benefit of the Joint Account; all to be borne in the proportions specified on Exhibit "A".

G. <u>CERTIFICATION.</u> Operator may make certifications to oil purchaser and/or governmental bodies of the price category for which oil produced from wells subject to this Operating Agreement qualifies. Operator shall never be liable to any Non-Operator for any loss arising from such certification if it be subsequently determined that such oil qualifies for a higher price category; it being understood and agreed that each Non-Operator's sole remedy is to take his share of such oil in kind and to make such certification for his own account. In the event it is subsequently determined by Operator or by any governmental authority having jurisdiction that oil previously certified by Operator qualifies for a lesser price category than that certified, then each Non-Operator agrees to refund and indemnify and hold Operator harmless from and against Non-Operator's proportionate share (including Non-Operator's proportionate share of any unrecouped overcharge attributable to royalty or overriding royalty oil) of all overcharges, together with interest and penalties, if any, attributable thereto. In the event that Operator does make certifications with respect to Non-Operator's oil, Operator is authorized by Non-Operator to represent the Joint Account in administrative proceedings (including, without limitation, audits, enforcement proceedings, requests for ruling, interpretation and exceptions and litigation arising out of or related to such certification) and further to negotiate and compromise any claim of overcharge. Provided, however, Operator shall not compromise any overcharge claim which would result in a refund liability to the Joint Account of more than $10,000.00 (exclusive of interest) without the consent of Non-Operator. All costs and expenses of such representation by Operator shall be charged to the Joint Account.

H. <u>COSTS INCURRED BY OPERATOR.</u> Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the costs incurred by Operator in procuring curative matters, pooling amendments, preparation and recording of pooling designations or declarations and conducting hearings before governmental agencies or regulatory bodies, including fees and expenses outside of attorneys and/or professional consultants or brokers shall not be considered as administrative overhead, and Operator shall be entitled to make a direct charge against the Joint Account for same.

I. <u>GOVERNMENTAL FILINGS.</u> Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), costs incurred by Operator involving filing with the Federal Energy Regulatory Commission or any other governmental agencies regarding price determination and allowables, shall not be considered as administrative overhead, and the Operator shall be entitled to make a direct charge against the Joint Account for same.

***END OF SPECIAL PROVISIONS***

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.

MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ____1st____ day of ____June____ 19 89 .

OPERATOR

WITNESSES:

ROSBOTTOM PRODUCTION CORP.

By: _____
    Harold L. Rosbottom, Jr., President

ATTEST:

By: _____
    Martha H. May, Corporate Secretary

NON-OPERATORS

WEISER BROWN OIL COMPANY, INC.

By: _____

_____

SCOTT D. STROUD

_____

JOHN TAKACH

TAKACH AMUSEMENT COMPANY

By: _____

_____

GENE A. SANDERS

PETROLEUM FUTURES

By: _____

SKLAR & PHILLIPS OIL CO.

By: _____

- 15 -

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

HAROLD L. ROSBOTTOM, JR.

MIKE ROGERS

CHRISTINE ROGERS

MIKE ROGERS DRILLING COMPANY, INC.

By:_____

T. L. JAMES & CO., INC.

By:_____

WHITNEY CORPORATION

By:_____

ROBERT L. KREIDLER

HELEN S. ARNOLD

BORDER COMPANY

By:_____

DONALD L. CLARK

EDDIE CLARK

A. PHIL FOSTER

CLINTON W. FULLER, SR.

GOLDSBERRY PETROLEUM

By:_____


JOANN HORTON GOODWIN, Individually
and as Usufruct for L. A. Goodwin,
Danny Wayne Goodwin and Diane Goodwin


WILLIAM R. GUFFEY


JAMES B. HARRIS

HELENA PRODUCTION CORP.

By:_____

HOLMAN-MURFEE PARTNERSHIP

By:_____

MERCHANTS NATIONAL BANK OF MOBILE
Assignee of R. L. Lees

By:_____


CARMEN JONES LINAM


HENRY E. LINAM, JR.


LEE S. MUDD


JOHN G. NELSON


EDWARD G. POWELL

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

J. R. QUERBES, III

REDLEY COMPANY

By:_____

SMP, INC.

By:_____

WHITING 1988 PRODUCTION PARTNERSHIP

By:_____

HERMAN WILLIAMSON, JR. and
First National Bank Trustees for
Gladys and Ed E. Hurley

HERMAN WILLIAMSON, JR.

EXHIBIT "A"

Attached to and made a part of that certain
Joint Operating Agreement dated February 1, 1989,
covering lands described herein within
the Rosbottom etal-Goldsberry etal
Joint Area of Interest in the North Gahagan Field Prospect
DeSoto and Red River Parishes, Louisiana.


1. DESCRIPTION OF LANDS IN CONTRACT AREA:

W/2 and W/2 SE/4 Section 3 and E/2 Section 4 (lands outside
the Hook and Ohrt units), Township 12 North, Range 10 West,
HOSS RD SU H, more particularly known as the "Rosbottom etal
and Goldsberry etal Joint Area of Interest" in the North
Gahagan Area, DeSoto and Red River Parishes, Louisiana.


2. DEPTH RESTRICTIONS:

This Joint Operating Agreement shall be limited to those
depths from the surface of the earth down to the base of the
Hosston Formation.


3. INTERESTS AND ADDRESSES OF PARTIES:

WEISER BROWN OIL COMPANY, INC.                    .13250000
Post Office Box 500
Magnolia, Arkansas 71753

SCOTT D. STROUD                                   .01407813
Post Office Box 565
Shreveport, Louisiana 71162

JOHN TAKACH                                       .00331250
416 Travis, Suite 1109
Shreveport, Louisiana 71101

TAKACH AMUSEMENT COMPANY                          .00331250
1841 North San Jacinto Street
Liberty, Texas 77575

GENE A. SANDERS                                   .03312500
Post Office Box 867
Magnolia, Arkansas 71753

PETROLEUM FUTURES                                 .02415362
Post Office Box 3735
Shreveport, Louisiana 71134-3735

SKLAR & PHILLIPS OIL CO.                          .16562500
Post Office Box 3735
Shreveport, Louisiana 71134-3735

HAROLD L. ROSBOTTOM, JR.                          .03364261
400 Travis, Suite 1000
Shreveport, Louisiana 71101

MIKE ROGERS                                       .00603842
403 Hazel
Magnolia, Arkansas 71753

CHRISTINE ROGERS                                  .00603842
1103 Hazel
Magnolia, Arkansas 71753

MIKE ROGERS DRILLING COMPANY, INC.                .01207685
Post Office Box 126
Magnolia, Arkansas 71753

| | |
|---|---|
| T. L. JAMES & CO., INC.<br>Post Office Box 1610<br>Shreveport, Louisiana 71165 | .12421875 |
| WHITNEY CORPORATION<br>Post Office Box 6464<br>Cincinnati, Ohio 45202 | .08281250 |
| ROBERT L. KREIDLER<br>Post Office Box 6464<br>Cincinnati, Ohio 45202 | .02156570 |
| HELEN S. ARNOLD<br>Post Office Box 97<br>Shreveport, Louisiana 71161-0097 | .00924548 |
| BORDER COMPANY<br>401 Edwards Street, Suite 1625<br>Shreveport, Louisiana 71101 | .01402734 |
| DONALD L. CLARK<br>Post Office Box 214157<br>Dallas, Texas 75221 | .00622944 |
| EDDIE DUNN<br>Post Office Box 1426<br>Shreveport, Louisiana 71164 | .00462240 |
| A. PHIL FOSTER<br>Post Office Box 5213<br>Shreveport, Louisiana 71105 | .01168020 |
| CLINTON W. FULLER, SR.<br>Post Office Box 829<br>Shreveport, Louisiana 71162 | .00147656 |
| GOLDSBERRY PETROLEUM<br>401 Market, Suite 1200<br>Shreveport, Louisiana 71101 | .02634464 |
| JOANN HORTON GOODWIN, Individually and<br>as Usufruct for L. A. Goodwin, Danny<br>Wayne Goodwin and Dianne Goodwin<br>284 Pennsylvania<br>Shreveport, Louisiana 71105 | .00168750 |
| WILLIAM R. GUFFEY<br>1116 One Energy Square<br>4925 Greenville Avenue<br>Dallas, Texas 75206 | .00622944 |
| JAMES B. HARRIS<br>1414 Commercial National Bank Building<br>333 Texas Street<br>Shreveport, Louisiana 71101 | .00622944 |
| HELENA PRODUCTION CORP.<br>Post Office Box 97<br>Shreveport, Louisiana 71161-0097 | .00924548 |
| HOLMAN-MURFEE PARTNERSHIP<br>666 Travis, Suite 202<br>Shreveport, Louisiana 71101-3015 | .00637875 |
| MERCHANTS NATIONAL BANK OF MOBILE<br>Assignee of R. L. Lees<br>Post Office Drawer 2527<br>Mobile, Alabama 36622 | .00462274 |
| CARMEN JONES LINAM<br>2529 East 70th Street, Suite 318<br>Shreveport, Louisiana 71105 | .00295313 |

| | |
|---|---|
| HENRY E. LINAM, JR.<br>2529 East 70th Street, Suite 318<br>Shreveport, Louisiana 71105 | .00295313 |
| LEE S. MUDD<br>9424 Primrose<br>Shreveport, Louisiana 71108 | .00027830 |
| JOHN G. NELSON<br>2620 Centenary Boulevard<br>Shreveport, Louisiana 71104 | .00115594 |
| EDWARD G. POWELL<br>Post Office Box 21373<br>Shreveport, Louisiana 71120 | .00462240 |
| J. R. QUERBES, III<br>Post Office Box 5<br>Shreveport, Louisiana 71161 | .01168020 |
| REDLEY COMPANY<br>c/o Clinton Fuller<br>401 Edwards, Suite 1625<br>Shreveport, Louisiana 71101 | .01402734 |
| SMP, INC.<br>720 Oliver Street, 24th Floor<br>St. Louis, Missouri 63101 | .00027830 |
| WHITING 1988 PRODUCTION PARTNERSHIP<br>1700 Broadway, Suite 2300<br>Denver, Colorado 80290 | .07340686 |
| HERMAN WILLIAMSON JR. and<br>First National Bank Trustees<br>Gladys and Ed E. Hurley<br>Endowment Foundation<br>400 Petroleum Building<br>Shreveport, Louisiana 71101 | .08859374 |
| HERMAN WILLIAMSON, JR.<br>400 Petroleum Building<br>Shreveport, Louisiana 71101 | .02953125 |
| TOTAL: | 1.00000000 |

4. DESCRIPTION OF LEASES IN CONTRACT AREA:

### The Rosbottom Leases

Oil, Gas and Mineral Lease dated October 14, 1987, between State of Louisiana, State Lease No. 12933, Lessor and Rosbottom Production Corp., Lessee, being duly recorded in Book 233, page 129, records of Red River Parish, Louisiana.

Oil, Gas and Mineral Lease dated January 27, 1988, between Mary Tom Wilkinson Almond, Lessor and Rosbottom Production Corp., Lessee, being duly recorded in Book 233, page 428, records of Red River Parish, Louisiana.

Oil, Gas and Mineral Lease dated August 31, 1987, between Mary Tom Wilkinson Almond, etal, Lessors and Rosbottom Production Corp., Lessee, being duly recorded in Book 231, page 454, records of Red River Parish, Louisiana.

Oil, Gas and Mineral Lease dated August 19, 1987, between Rex L. Young, etux, Lessors and Rosbottom Production Corp., Lessee, being duly recorded in Book 231, page 421, records of Red River Parish, Louisiana.

Oil, Gas and Mineral Lease dated August 19, 1987, between Rex L. Young, etux, Lessors and Rosbottom Production Corp., Lessee, being duly recorded in Book 233, page 249, records of Red River Parish, Louisiana.

INSOFAR AND ONLY INSOFAR as the above and foregoing leases cover those lands described herein as the W/2 and W/2 SE/4 Section 3 and E/2 Section 4 (lands outside the Hook and Ohrt units), Township 12 North, Range 10 West, more particularly known as the "Rosbottom etal and Goldsberry etal Joint Area of Interest", DeSoto and Red River Parishes, Louisiana.

### The Goldsberry Etal Leases

Oil, Gas and Mineral Lease dated February 27, 1979, between Equity Oil Company, Lessee and Emmett R. Hook etal, Lessors, recorded in Book 172, page 782, deed records, Red River Parish, Louisiana.


******END OF EXHIBIT "A"******

EXHIBIT "B"

BATH'S FORM LOUISIANA SPEC. 14-DR1-2A-PA-PAID UP 4-70

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this_____day of_____, 19____, between

lessor (whether one or more), and_____
lessee, WITNESSETH:

1. Lessor in consideration of_____Dollars ($_____),
in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and
lets exclusively unto Lessee for the purposes of investigating, exploring, prospecting, drilling and mining for and pro-
ducing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines, and other structures
thereon to produce, save, take care of, treat, transport and own said products and for dredging and maintaining canals,
constructing roads and bridges, and building houses for its employees, and, in general, for all appliances, structures,
equipment, servitudes and privileges which may be necessary, useful or convenient to or in connection with any such

operations conducted by Lessee thereon, or on any adjacent lands, the following described land in_____
Parish, Louisiana, to-wit:

Comprising_____acres, more or less.
This lease also covers and includes battures, accretions and all other land owned by Lessor adjacent to the land
particularly described above.

2. Subject to the other provisions herein contained, this lease shall be for a period of_____years from this
date (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land
hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

(a) It is the intention of the parties that this lease shall also extend and apply to all outstanding mineral rights
or servitudes affecting the lands herein described as the same may revert to Lessor, his heirs, or assigns, from time to
time.

3. For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary
term, without any additional payment and without Lessee being required to conduct any operations on the land (either
before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from
drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in
liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered
at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either
case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to
time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing
for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance
produced from said land, when sold by Lessee, one-eighth of the amount realized by Lessee computed at the mouth of
the well, or when used by Lessee off said land or in the manufacture of gasoline or other products, the market
value, at the mouth of the well, of one-eighth of such gas so used; (such gas, casinghead gas, residue gas, or gas of any
other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable
waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed
to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof;) (c) on all other
minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that
on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances
in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should
Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then
Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling

operations by paying Lessor as royalty_____Dollars ($_____)
per year, the first payment being due, if said well should be completed or shut-in after the primary term, within sixty (60)
days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one
year from the date of such completion or cessation. If such a well should be completed during the primary term, the
first payment, if made by Lessee, shall be due on or before the expiration date of the primary term herein fixed. There-
after Lessee's rights may be continued from year to year by making annual payments in the amount stated on or
before the anniversary date beginning with the date of completion of said well (if completed after the primary term)
or the end of the primary term (if completed prior thereto) as the case may be; each of such payments to extend
Lessee's rights for one year. The annual payments herein provided for may be deposited to Lessor's Credit in the

_____Bank of_____, which
bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the

land or mineral rights therein. The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a dry hole or holes on the land described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling or reworking thereon, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling or reworking with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than forty (40) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than forty (40) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. The commencement of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate, or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the one-eighth (1/8) royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9. Lessee shall have free use of oil, gas, casinghead gas, condensate, coal and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land, without Lessor's consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, rentals, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, rentals or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. In the event of an assignment of this lease as to a segregated portion of said land, or as to an undivided interest therein, the rentals payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each, or according to the undivided interest of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder and, if Lessee or assignee of part or parts hereof shall fail or make default in the payment of the proportionate part of the rentals due from such Lessee, or assignee, or fail to comply with any other provisions of this lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee thereof shall make payment of said rentals.

11. In case of suit, adverse claim, dispute or question as to the ownership of the rentals or royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such rentals or royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or, in the absence of such rulings, forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts

relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13.   When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of the government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14.   It is expressly understood and agreed that the premises leased herein shall, for all the purposes of this lease, be considered and treated as owned in indivision by the Lessor and shall be developed and operated as one lease, and there shall be no obligation on the part of Lessee to offset wells on separate tracts into which the land covered by this lease may be now or hereafter divided by sale, or otherwise, or to furnish separate measuring or receiving tanks, and all rentals, royalties and other payments accruing hereunder shall be treated as an entirety and shall be divided among and paid to Lessor in the proportion that the acreage (mineral rights) owned by each bears to the entire leased acreage. Lessee may at any time or times pay or tender all sums accruing hereunder to the joint credit of Lessor.

15.   Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16.   Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right of subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17.   This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

WITNESSES:

STATE OF LOUISIANA

PARISH OF_____

       BEFORE ME,_____a Notary Public in and for_____ Parish, Louisiana, on this_____day of_____19_____, personally came and appeared _____, who in the presence of me, said authority, and _____and_____ competent witnesses, declares and acknowledges that____he_____the identical person____who executed the foregoing instrument in writing, that_____signature____ thereto_____own true and genuine signature__, and that____he____executed said instrument of_____own free will_____, and for the purposes and considerations therein expressed.

       Thus done and passed on the day and date hereinabove written, in the presence of the before named and undersigned competent witnesses, who have hereunto subscribed their names, together with said appearer_____, and me, said Notary, after reading the whole.

    WITNESSES:

_____

_____

_____

                                     Notary Public.

---

STATE OF LOUISIANA

PARISH OF_____

       BEFORE ME, the undersigned authority, this day personally appeared_____ to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on_____oath, says: That_____subscribed_____name to the foregoing instrument as a witness, and that_____knows_____ _____ the Grantor__named in said instrument, to be the identical person__described therein, and who executed the same, and saw_____sign the same as_____voluntary act and deed, and that_____, the said_____ subscribed____name to the same as an attesting witness.

      Sworn to and subscribed before me, this_____ day of_____, 19____

_____

Notary Public in and for_____

               _____

No._____

## OIL, GAS AND MINERAL LEASE

FROM

TO

Parish of

BATH'S FORM LOUISIANA SPEC. 14-9R1-2A-PA-PAID UP 4-70

---

STATE OF LOUISIANA

PARISH OF_____

       BEFORE ME, the undersigned authority, this day personally appeared_____ to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on_____oath, says: That_____subscribed_____name to the foregoing instrument as a witness, and that_____knows_____ _____ the Grantor__named in said instrument, to be the identical person__described therein, and who executed the same, and saw_____sign the same as_____voluntary act and deed, and that_____, the said_____ subscribed____name to the same at the same time as an attesting witness.

      Sworn to and subscribed before me, this_____ day of_____, 19____

_____

Notary Public in and for_____Parish, Louisiana.

COPAS — 1974
Recommended by the
Council of Petroleum
Accountants Societies

EXHIBIT 601, BOX 400 TULSA OK 74101 

# EXHIBIT   " C "

Attached to and made a part of ..that certain Joint Operating..........
..Agreement dated February 1, 1989, covering lands described..
..herein within the Rosbottom etal - Goldsberry etal Joint....
..Area of Interest in the North Gahagan Field Prospect, DeSoto..
and Red River Parishes, Louisiana.

# ACCOUNTING  PROCEDURE
# JOINT  OPERATIONS

## I.  GENERAL PROVISIONS

### 1.  Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

### 2.  Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3.  Advances and Payments by Non-Operators

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of eighteen percent (18%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4.  Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### 5.  Audits

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

### 6.  Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

COPAS

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

    Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

    A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

    (2) Salaries of First Level Supervisors in the field.

    (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

    B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.  Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II.  If percentage assessment is used, the rate shall be based on the Operator's cost experience.

    C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

    D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3. **Employee Benefits**

    Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

4. **Material**

    Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.  Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations.  The accumulation of surplus stocks shall be avoided.

5. **Transportation**

    Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

    A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

    B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties.  No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

    C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

6. **Services**

    The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III.  The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates.  The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

7. **Equipment and Facilities Furnished by Operator**

    A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation.  Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum.  Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

    B.. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%.  For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

    All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct.  Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**

    Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

COPAS

10. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

11. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

12. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III.  OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( X ) Fixed Rate Basis, Paragraph 1A, or
   ( — ) Percentage Basis, Paragraph 1B.

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (  ) shall not ( X ) be covered by the Overhead rates.

A. **Overhead - Fixed Rate Basis**

   (1) Operator shall charge the Joint Account at the following rates per well per month:
       Drilling Well Rate $ 4,500.00
       Producing Well Rate $ 450.00

   (2) Application of Overhead - Fixed Rate Basis shall be as follows:

   (a) Drilling Well Rate

       [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

       [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

       [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

   (b) Producing Well Rates

       [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

       [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

       [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

       [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

       [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

   (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

COPAS

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (    %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

_____ Percent (    %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ _15,000.00____ :

A. ___3___ % of total costs if such costs are more than $ _15,000.00_ but less than $ _50,000.00_ ; plus

B. ___2___ % of total costs in excess of $ _50,000.00_ but less than $1,000,000; plus

C. ___1___ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

(2) Material moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

COPAS

    (b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section
IV, if Material was originally charged to the Joint Account as good used Material at seventy-five per-
cent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

   (1) Condition C

     Material which is not in sound and serviceable condition and not suitable for its original function until
after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Para-
graph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, pro-
vided Condition C value plus cost of reconditioning does not exceed Condition B value.

   (2) Condition D

     All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing
prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be
priced on a basis comparable with that of items normally used for such other purpose. Operator may dis-
pose of Condition D Material under procedures normally utilized by the Operator without prior approval
of Non-Operators.

D. Obsolete Material

    Material which is serviceable and usable for its original function but condition and/or value of such Material
is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by
the Parties. Such price should result in the Joint Account being charged with the value of the service ren-
dered by such Material.

E. Pricing Conditions

   (1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per
hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when
actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

   (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down
price of new Material.

3. **Premium Prices**

    Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes
or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the
required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use,
and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed
charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and
notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share
of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished by Operator**

    Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the
Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

    At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material.
Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inven-
tory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators
to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

    Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages
shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory ad-
justments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be
held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

    Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall
be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes
place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**

    The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the
Parties.

EXHIBIT "D"

## INSURANCE

A. Workmen's Compensation Insurance in an amount equal to the full liability imposed by the laws of the States of Louisiana, Texas and Arkansas.

B. Employer's Liability Insurance with a limit of $100,000.00.

C. Comprehensive General Public Liability Insurance with a limit of $500,000.00 for deaths or injuries arising out of one occurrence, and $500,000.00 Aggregate; and Property Damage Insurance with limits of $250,000.00 for each occurrence and $250,000.00 Aggregate.

D. Comprehensive Automobile Public Liability Insurance with a combined single limit of $500,000.00 Bodily Injury and Property Damage.

Losses for which no insurance is required to be carried or in excess of the limits set forth above shall be borne by the parties in proportion to their respective interests herein and shall be charged to the joint account.

The premiums for all insurance policies shall be charged to the joint account.

The Comprehensive General Liability Insurance contains an endorsement substantially as follows:

It is agreed that the "Persons Insured" provision is amended by adding thereto the following:

(1) Under circumstances where the named insured is acting in the capacity of an operator in oil or gas operations, then co-owners, the parties in joint venture or mining partners, but only where such insureds have a financial interest in the operation with the named insured.

(2) Non-operating owners and non-operating co-owners in oil or gas operations for whom the named insured is acting as agent; however, the insurance provided under the policy for such insureds under this subsection shall apply as excess over any other valid and collectible insurance available to such insureds.

EXHIBIT "E"

## GAS BALANCING AGREEMENT

In accordance with the terms of the Operating Agreement, each party hereto has the right to take and market its share of gas produced from the Contract Area. In the event any of the parties hereto is not able to take its share of gas or has contracted to sell its share of gas produced from the Contract Area to a purchaser which is unable at any time while the Operating Agreement is in effect to take the share of gas attributable to the interest of such party, the terms of this balancing agreement shall automatically become effective.

During the period or periods when any party hereto has no market for, or its purchaser is unable to take its share of gas, the other parties shall be entitled to produce each month one hundred percent (100%) of the allowable gas production assigned to the Contract Area by the appropriate govermental entity having jurisdiction, and each of such parties shall have the right to take or deliver its pro rata share of all such production. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interests, but each party taking such gas shall own all the gas delivered to its purchaser. Each party unable to market its share of the gas produced shall be credited with gas in storage equal to its share of the gas produced, less its share of gas used in lease operations, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quality of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered. Each party taking gas shall furnish Operator a monthly statement of gas taken.

At all times while gas is produced from the Contract Area, each party hereto will make settlement with the respective royalty owners to whom they are each accountable, just as if each party were taking or delivering to a purchaser its share, and its share only, of such gas production. Each party hereto agrees to hold each other party harmless from any and all claims for royalty payments asserted by royalty owners to whom each party is accountable. Each party producing and/or delivering gas to its purchaser shall pay any and all production taxes due on such gas.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to twenty-five percent (25%) of each overproduced party's share of gas produced. If more than one party is entitled to the additional gas produced, they shall divide such additional gas in accordance with the participation set out in the Operating Agreement.

The Operator, at the request of any party, may produce the entire well stream, if necessary, for a deliverability test not to exceed seventy-two (72) hours duration required under such requesting party's gas sales contract and may overproduce in any other situation, provided that such overproducing would be consistent with prudent operations.

It is the intent of this agreement that during the productive life of each well on the Contract Area each party shall have the opportunity to share in the actual cumulative production from each well in proportion to its interest in the gas. Every reasonable effort shall be made to balance the overdeliveries and underdeliveries on a monthly basis, provided the pipeline handling each party's gas is able to take the share of production to which each party is entitled.

In the event production of gas permanently ceases prior to the time that the accounts of the parties have been balanced, a complete balancing shall be accomplished by a money settlement between the parties. Such settlement shall be based on the price or prices received by each overproduced party for its share of the overproduced gas, without interest, less any applicable taxes paid by the overproduced party. It is recognized that there may be changes in the price per Mcf of gas received by those parties receiving more than their pro rata share of gas. It is therefore agreed that any production taken by any party over and above that attributable to its respective interest shall be credited to the first unbalanced underproduction of such party from time to time or, in other words, any currently accruing overproduction by any underproduced party shall offset underproduction in the order of accrual.

The provisions of this exhibit shall be separately applicable to each well and each reservoir to the end that production from one reservoir in a gas well may not be utilized for the purposes of balancing underproduction from other reservoirs.

******END OF EXHIBIT******