# OPERATING AGREEMENT
## Non-Federal Lands

OPERATING AGREEMENT

DATED

February 11, 19 65,

FOR UNIT AREA / N½ of NE¼ and SW¼ of NE¼ Section 7 / IN TOWNSHIP ____15S____, RANGE __19W__,

____Ouachita____ PARISH/COUNTY STATE OF __Arkansas__.

YARBOROUGH #2 and #3

BATH-⊕-GRAM
OPERATING AGREEMENT
956A

# TABLE OF CONTENTS

| Paragraph Number | Title | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Title Examination, Loss of Leases and Oil and Gas Interests | 1 |
| 3. | Unleased Oil and Gas Interests | 2 |
| 4. | Interests of Parties | 2 |
| 5. | Operator of Unit | 3 |
| 6. | Employees | 3 |
| 7. | Test Well | 3 |
| 8. | Costs and Expenses | 3 |
| 9. | Operator's Lien | 4 |
| 10. | Term of Agreement | 4 |
| 11. | Limitation on Expenditures | 4 |
| 12. | Operations by Less Than All Parties | 5 |
| 13. | Right to Take Production in Kind | 6 |
| 14. | Access to Unit Area | 7 |
| 15. | Drilling Contracts | 7 |
| 16. | Abandonment of Wells | 7 |
| 17. | Delay Rentals and Shut-in Well Payments | 8 |
| 18. | Preferential Right to Purchase | 8 |
| 19. | Maintenance of Unit Ownership | 9 |
| 20. | Resignation of Operator | 9 |
| 21. | Liability of Parties | 9 |
| 22. | Renewal or Extension of Leases | 9 |
| 23. | Surrender of Leases | 10 |
| 24. | Acreage or Cash Contributions | 10 |
| 25. | Provision Concerning Taxation | 10 |
| 26. | Insurance | 11 |
| 27. | Claims and Lawsuits | 11 |
| 28. | Force Majeure | 11 |
| 29. | Notices | 11 |
| 30. | Other Conditions | 12 |

THE M. L. BATH COMPANIES
SHREVEPORT—LONGVIEW—LAKE CHARLES
BATH-(B)-GRAM
REG. NO. 212-231 U. S. PAT. OFF.
OPERATING AGREEMENT
956A

# OPERATING AGREEMENT

THIS AGREEMENT, entered into this __11th__ day of __February__, 19_65_, between _____David Crow Trustee_____,

hereafter designated as "Operator", and the signatory parties other than Operator.

WITNESSETH, THAT:

WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit "A", and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

## 1. DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them.

(1) The words "party" and "parties" shall always mean a party, or parties, to this agreement.

(2) The parties to this agreement shall always be referred to as "it" or "they", whether the parties be corporate bodies, partnerships, associations, or persons real.

(3) The term "oil and gas" shall include oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons, unless an intent to limit the inclusiveness of this term is specifically stated.

(4) The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Unit Area which are owned by parties to this agreement.

(5) The term "Unit Area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

(6) The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Unit Area or as fixed by express agreement of the parties.

(7) All exhibits attached to this agreement are made a part of the contract as fully as though copied in full in the contract.

(8) The words "equipment" and "materials" as used here are synonymous and shall mean and include all oil field supplies and personal property acquired for use in the Unit Area.

## 2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

**A. Title Examination:**

Each party other than Operator shall promptly submit to Operator abstracts certified from beginning to recent date, together with all title papers in its possession covering leases and oil and gas interests which it is subjecting to this contract. All of these abstracts and title records shall be examined for the benefit of all parties by Operator's attorneys.

Operator shall promptly submit abstracts certified from beginning to recent date, together with all title papers in its possession covering leases and oil and gas interests which it is subjecting to this agreement, to _____ for examination by the latter's attorney for the benefit of all parties.

All title examinations shall be made without charge. Each examining attorney shall prepare a complete title report on each separate tract based upon the abstract record and title papers submitted to him. Each title report shall contain a list of fee owners and their interests, shall state the attorney's opinion concerning validity of their interests, and shall contain an enumeration and description of title defects, if any, a report upon mortgages, taxes, pending suits, and judgments, and unreleased oil and gas leases, and a list of requirements, if any, upon which the examiner's approval of title to the lease or oil and gas interest is contingent. The title report shall also contain a specific description of the oil and gas lease being subjected to this contract, with a statement of its form, term (which will be satisfactory if it has a primary term expiring not sooner than_____), amount of royalty, status of delay rental payments, and unusual drilling

— 1 —

"Joint Loss"

OATH-©-GRAM
OPERATING AGREEMENT
956A

obligations and of excess royalty, oil payments, and other special burdens. A copy of each title opinion, and of each supplemental opinion, and of all final opinions, shall be sent promptly to each party. The opinion of the examining attorney concerning the validity of the title to each oil and gas interest and each lease, and the amount of interest covered thereby shall be binding and conclusive on the parties, but the acceptability of leases as to primary term, royalty provisions, drilling obligations, and special burdens, shall be a matter for approval and acceptance by an authorized representative of each party.

All title examinations shall be made, and title reports submitted, within a period of _____ days after the submission of abstracts and title papers. Each party shall, in good faith, try to satisfy the requirements of the examining attorneys concerning its leases and interests, and each shall have a period of _____ days from receipt of title report for this purpose. If the title to any lease, or oil and gas interest, is finally rejected by the examining attorney, all parties shall then be asked to state in writing whether they will waive the title defects and accept the leases or interests, or whether they will stand on the attorney's opinion. If one or more parties refuse to waive title defects, this agreement shall, in that case, be terminated and abandoned, and all abstracts and title papers shall be returned to their senders. If all titles are approved by the examining attorneys, or are accepted by all parties, and if all leases are accepted as to primary terms, royalty provisions, drilling obligations and special burdens, all subsequent provisions of this agreement shall become operative immediately, and the parties shall proceed to their performance as they are hereinafter stated.

### B. Failure of Title:

After all titles are approved or accepted, any defects of title that may develop shall be the joint responsibility of all parties and, if a title loss occurs, it shall be the loss of all parties, with each bearing its proportionate part of the loss and of any liabilities incurred in the loss. If such a loss occurs, there shall be no change in, or adjustment of, the interests of the parties in the remaining portion of the Unit Area.

### C. Loss of Leases For Other Than Title Failure:

If any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, the loss shall not be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interests in the remaining portion of the Unit Area.

### 3. UNLEASED OIL AND GAS INTERESTS

If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B" and for the primary term therein stated. As to such interests, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

### 4. INTERESTS OF PARTIES

Exhibit "A" lists all of the parties, and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit "A". All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.

— 2 —
"Joint Loss"

BATH-GRAM
OPERATING AGREEMENT
956A

If any oil and gas lease covered by this agreement is subject to an overriding royalty, production payment, or other charge over and above the usual one-eighth (⅛) royalty, the party contributing that lease shall assume and alone bear all such excess obligations and shall account for them to the owners thereof out of its share of the working interest production of the Unit Area.

## 5. OPERATOR OF UNIT

_____David Crow Trustee_____shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

## 6. EMPLOYEES

The number of employees and their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator. All employees shall be the employees of Operator.

## 7. TEST WELL

On or before the _____ day of _____, 19____, Operator shall commence the drilling of a well for oil and gas in the following location:

Two wells have been drilled on this lease and are designated as David Crow Trustee - Yarborough #2 and #3

and shall thereafter continue the drilling of the well with due diligence to —

unless granite or other practically impenetrable substance is encountered at a lessor depth or unless all parties agree to complete the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties to the plugging, and the well shall then be plugged and abandoned as promptly as possible.

## 8. COSTS AND EXPENSES

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the Unit Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expense basis provided in the Accounting Procedure attached hereto and marked Exhibit "C". If any provision of Exhibit "C" should be inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the costs to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated costs, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated costs shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest at the rate of six percent (6%) per annum until paid. Proper adjustment shall be made monthly between advances and actual cost, to the end that each party shall bear and pay its proportionate share of actual costs incurred, and no more.

### 9. OPERATOR'S LIEN

Operator is given a first and preferred lien on the interest of each party covered by this contract, and in each party's interest in oil and gas produced and the proceeds thereof, and upon each party's interest in material and equipment, to secure the payment of all sums due from each such party to Operator.

In the event any party fails to pay any amount owing by it to Operator as its share of such costs and expense or such advance estimate within the time limited for payment thereof, Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of oil or gas, the proceeds accruing to the working interest or interests in the Unit Area of the delinquent party up to the amount owing by such party, and each purchaser of oil or gas is authorized to rely upon Operator's statement as to the amount owing by such party.

In the event of the neglect or failure of any non-operating party to promptly pay its proportionate part of the cost and expense of development and operation when due, the other non-operating parties and Operator, within thirty (30) days after the rendition of statements therefor by Operator, shall proportionately contribute to the payment of such delinquent indebtedness and the non-operating parties so contributing shall be entitled to the same lien rights as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operating parties under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the other non-operating parties and Operator proportionately in accordance with the contributions theretofore made by them.

### 10. TERM OF AGREEMENT

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise; provided, however, that in the event the first well drilled hereunder results in a dry hole and no other well is producing oil or gas in paying quantities from the Unit Area, then at the end of ninety (90) days after abandonment of the first test well, this agreement shall terminate unless one or more of the parties are then engaged in drilling a well or wells pursuant to Section 12 hereof, or all parties have agreed to drill an additional well or wells under this agreement, in which event this agreement shall continue in force until such well or wells shall have been drilled and completed. If production results therefrom this agreement shall continue in force thereafter as if said first test well had been productive in paying quantities, but if production in paying quantities does not result therefrom this agreement shall terminate at the end of ninety (90) days after abandonment of such well or wells. It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

### 11. LIMITATION ON EXPENDITURES

Without the consent of all parties: (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling, testing, completing, and equipping of the well, including necessary tankage; (b) No well shall be reworked, plugged back or deepened except a well reworked, plugged back or deepened pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage; (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of -----Five Thousand and No/100 - - - - - - - - - - - Dollars ($ 5000.00 ) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $ 5,000.00 .

—4—

THE M. L. BATH COMPANIES
SHREVEPORT-LONGVIEW-LAKE CHARLES
BATH-GRAM
REG. BAL. U.S.1117 U. S. PAT. OFF.
OPERATING AGREEMENT
956A

## 12. OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling of any well on the Unit Area other than the test well provided for in Section 7, or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (~~30~~) 15 days (except as to reworking, plugging back or drilling deeper, where a drilling rig is on location, the period shall be limited to forty-eight (48) hours exclusive of Saturday or Sunday) after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

If any party receiving such a notice elects not to participate in the proposed operation (such party or parties being hereafter referred to as "Non-Consenting Party"), then in order to be entitled to the benefits of this section, the party or parties giving the notice and such other parties as shall elect to participate in the operation (all such parties being hereafter referred to as the "Consenting Parties") shall, within thirty (30) days after the expiration of the notice period of thirty (~~30~~) 15 days (or as promptly as possible after the expiration of the 48-hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests as shown in Exhibit "A" bear to the total interests of all Consenting Parties. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this section results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty and other interests payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(A) ~~100~~ 150% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus ~~100~~ 150% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this section, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(B) ~~200%~~ 300% of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing, after deducting any cash contributions received under Section 24, and ~~200%~~ 300% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value.

Within sixty (60) days after the completion of any operation under this section, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, pugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; if there is a credit balance it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it and from and after such reversion such Non-Consenting Party shall own the same interest in such well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have owned had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the accounting procedure schedule, Exhibit "C", attached hereto.

Notwithstanding the provisions of this Section 12, it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Unit Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this section shall have no application whatsoever to the drilling of the initial test well on the Unit Area, but shall apply to the reworking, deepening, or plugging back of the initial test well after it has been drilled to the depth specified in Section 7, if it is, or thereafter shall prove to be, a dry hole or non-commercial well, and to all other wells drilled, reworked, deepened, or plugged back, or proposed to be drilled, reworked, deepened, or plugged back, upon the Unit Area subsequent to the drilling of the initial test well.

### 13. RIGHT TO TAKE PRODUCTION IN KIND

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.

Each party shall execute all division orders and contracts of sale pertaining to its interest in production from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers thereof for its share of all production.

Case:20-12377-MER Doc#:916-1 Filed:02/26/21 Entered:02/26/21 18:52:16 Page 9 of 20

THE M.L. BATH COMPANIES
SHREVEPORT-LONGVIEW-LAKE CHARLES
BATH-O-GRAM
REG. NO. 555,393 U.S. PAT. OFF.
OPERATING AGREEMENT
956A

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days notice of such intended sale.

### 14. ACCESS TO UNIT AREA

Each party shall have access to the Unit Area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator shall, upon request, furnish each of the other parties with copies of all drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Unit Area.

### 15. DRILLING CONTRACTS

All wells drilled on the Unit Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. Operator, if it so desires, may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the field, and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as shall be customary and usual in the field in contracts of independent contractors who are doing work of a similar nature.

### 16. ABANDONMENT OF WELLS

No well, other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. The assignments so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Unit Area.

After the assignment, the assignors shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open. Upon request of the assignees, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

—7—

THE M. L. BATH COMPANIES
SHREVEPORT-LONGVIEW-LAKE CHARLES
BATH-GRAM
REG. NO. 513.311 U. S. PAT. OFF.
OPERATING AGREEMENT
956A

## 17. DELAY RENTALS AND SHUT-IN WELL PAYMENTS

Each party shall pay all delay rentals and shut-in well payments which may be required under the terms of its lease or leases and submit evidence of each payment to the other parties at least ten (10) days prior to the payment date. The paying party shall be reimbursed by Operator for 100% of any such delay rental payment and 100% of any such shut-in well payment. The amount of such reimbursement shall be charged by Operator to the joint account of the parties and treated in all respects the same as costs incurred in the development and operation of the Unit Area. Each party responsible for such payments shall diligently attempt to make proper payment, but shall not be held liable to the other parties in damages for the loss of any lease or interest therein if, through mistake or oversight, any rental or shut-in well payment is not paid or is erroneously paid. The loss of any lease or interest therein which results from a failure to pay or an erroneous payment of rental or shut-in well payment shall be a joint loss and there shall be no readjustment of interests in the remaining portion of the Unit Area. If any party secures a new lease covering the terminated interest, such acquisition shall be subject to the provisions of Paragraph 22 of this agreement.

Operator shall promptly notify each other party hereto of the date on which any gas well located on the Unit Area is shut in and the reason therefor.

## 18. PREFERENTIAL RIGHT TO PURCHASE

Should any party desire to sell all or any part of its interests under this contract, or its rights and interests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all of its assets, or a sale or transfer of its interests to a subsidiary or parent company, or subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

Should a sale be made by Operator of its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator. If a new Operator is not so selected, the transferee of the present Operator shall assume the duties of and act as Operator. In either case, the retiring Operator shall continue to serve as Operator, and discharge its duties in that capacity under this agreement, until its successor Operator is selected and begins to function, but the present Operator shall not be obligated to continue the performance of its duties for more than 120 days after the sale of its rights and interests has been completed.

— 8 —
"Joint Loss"

THE M L BATH COMPANIES
SHREVEPORT—LOGGIE—LAKE CHARLES
BATH-O-GRAM
REG. NO. 512,333 U. S. PAT. OFF.
OPERATING AGREEMENT
956A

## 19. MAINTENANCE OF UNIT OWNERSHIP

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:

(1) the entire interest of the party in all leases and equipment and production; or

(2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

If at any time the interest of any party is divided among and owned by four or more co-owners, Operator may, at its discretion, require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this contract; however, all such co-owners shall enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Unit Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

## 20. RESIGNATION OF OPERATOR

Operator may resign from its duties and obligations as Operator at any time upon written notice of not less than ninety (90) days given to all other parties. In this case, all parties to this contract shall select by majority vote in interest, not in numbers, a new Operator who shall assume the responsibilities and duties, and have the rights, prescribed for Operator by this agreement. The retiring Operator shall deliver to its successor all records and information necessary to the discharge by the new Operator of its duties and obligations.

## 21. LIABILITY OF PARTIES

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

## 22. RENEWAL OR EXTENSION OF LEASES

If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this section shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease need not be taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this section.

The provisions in this section shall apply also and in like manner to extensions of oil and gas leases.

BATH-(G)-GRAM
OPERATING AGREEMENT
956A

### 23. SURRENDER OF LEASES

The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties not agree or consent, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Unit Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

### 24. ACREAGE OR CASH CONTRIBUTIONS

If any party receives while this agreement is in force a contribution of cash toward the drilling of a well or any other operation on the Unit Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage, without warranty of title, to all parties to this agreement in proportion to their interests in the Unit Area at that time, and such acreage shall become a part of the Unit Area and be governed by all the provisions of this contract. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Unit Area.

### 25. PROVISION CONCERNING TAXATION

Each of the parties hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954. If the income tax laws of the state or states in which the property covered hereby is located contain, or may hereafter contain, provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the parties agrees that such election shall be exercised. Each party authorizes and directs the Operator to execute such an election or elections on its behalf and to file the election with the proper governmental office or agency. If requested by the Operator so to do, each party agrees to execute and join in such an election.

Operator shall render for ad valorem taxation all property subject to this agreement which by law should be returned for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill all other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If any tax assessment is considered unreasonable by Operator, it may at its discretion protest such valuation within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. When any such protested valuation shall have been finally determined, Operator shall pay the assessment for the joint account, together with interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

### 26. INSURANCE

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as may be outlined in Exhibit "D" attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Unit Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for operator's fully owned automotive equipment.

### 27. CLAIMS AND LAWSUITS

If any party to this contract is sued on an alleged cause of action arising out of operations on the Unit Area, or on an alleged cause of action involving title to any lease or oil and gas interest subjected to this contract, it shall give prompt written notice of the suit to the Operator and all other parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the parties, with Operator's attorney as Chairman. Suits may be settled during litigation only with the joint consent of all parties. No charge shall be made for services performed by the staff attorneys for any of the parties, but otherwise all expenses incurred in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all parties in proportion to their then interests in the Unit Area. Attorneys, other than staff attorneys for the parties, shall be employed in lawsuits involving Unit Area operations only with the consent of all parties; if outside counsel is employed, their fees and expenses shall be considered Unit Area expense and shall be paid by Operator and charged to all of the parties in proportion to their then interests in the Unit Area. The provisions of this paragraph shall not be applied in any instance where the loss which may result from the suit is treated as an individual loss rather than a joint loss under prior provisions of this agreement, and all such suits shall be handled by and be the sole responsibility of the party or parties concerned.

Damage claims caused by and arising out of operations on the Unit Area, conducted for the joint account of all parties, shall be handled by Operator and its attorneys, the settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement if any one claim does not exceed one thousand ($1000.00) dollars and, if settled, the sums paid in settlement shall be charged as expense to and be paid by all parties in proportion to their then interests in the Unit Area.

### 28. FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all possible diligence to remove the force majeure as quickly as possible.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure" as here employed shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### 29. NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, shall, unless otherwise specifically provided, be given in writing by United States mail or Western Union Telegram, postage or charges prepaid, and addressed to the party to whom the notice is given at the

— 11 —

addresses listed on Exhibit "A". The originating notice to be given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### 30. OTHER CONDITIONS, IF ANY, ARE:

(a) Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C") the following items pertaining to the Unit Area shall not be considered as administrative overhead, but Operator shall be entitled to make a direct charge against the joint account for same:

> Long distance telephone calls, fees for legal services, title costs, costs and expenses in connection with preparation and presentation of evidence and exhibits at Department of Conservation hearings, preparation and handling of application to and hearings before the Federal Power Commission and other governmental agencies or regulatory bodies.

(b) In the event Operator receives 100% payment for the proceeds of production and Operator disburses royalties, then Operator shall be entitled to charge the joint account with the actual cost of the necessary division order title opinions, division orders and the sum of $50.00 per month for disbursing such royalties.

THE N. L. BATH COMPANIES
SHREVEPORT-LONGVIEW-LAKE CHARLES
BATH-G-GRAM
OPERATING AGREEMENT
956A

This agreement may be signed in counterpart, and shall be binding upon the parties and upon their heirs, successors, representatives and assigns.

ATTEST:

_____

_____
DAVID CROW TRUSTEE

NON-OPERATORS

ATTEST:

John G. Carruth          Secretary

WITNESSES:

_____
SKLAR & PHILLIPS, INC.
Albert Sklar  President

_____
SAM SKLAR

_____
LOUIS DORFMAN

_____
SAM Y. DORFMAN

ESTATE OF IDA SIEGEL SKLAR

By_____
Albert Sklar, Executor

— 13 —

# EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement by and between David Crow Trustee, as Operator, and Sklar & Phillips, Inc., etal as Non-Operators:

## DESCRIPTION OF LAND

$N\frac{1}{2}$ of $NE\frac{1}{4}$ and $SW\frac{1}{4}$ of $NE\frac{1}{4}$ of Section 7, Township 15S, Range 19W, Ouachita County, Arkansas.

| NAME AND ADDRESS | | PERCENTAGE OF PARTICIPATION |
|---|---|---|
| David Crow Trustee, | 2000 Beck Building, Shreveport, Louisiana | .875000 |
| Sklar & Phillips, Inc. | P. O. Box 3735, Shreveport, Louisiana | .031250 |
| Sam Sklar | P. O. Box 3735 Shreveport, Louisiana | .031250 |
| Estate of Ida Siegel Sklar | " " | .031250 |
| Louis Dorfman | 863 Mercantile Dallas Bank Bldg., Dallas, Texas | .015625 |
| Sam Y. Dorfman | 863 Mercantile Dallas Bank Bldg., Dallas, Texas | .015625 |

LEASES COVERING AND APPLYING TO ABOVE UNIT AND LAND:

1. On April 13, 1956, Reed Royalty Trust, by Arthur F. King, Clyde S. Reed and Ralph M. Lucas, Trustees, executed an Oil and Gas Lease for a primary term of two years unto F. P. Borden covering the $N\frac{1}{2}$ of $NE\frac{1}{4}$ of Section 7, Township 15 South, Range 19 West, Ouachita County, Arkansas. This lease appears of record in Book 223 at Page 347. Said lease contains the following clause: "excepting from the foregoing lease all oil, gas and mineral rights below a level 100 feet below the depth of the deepest well completed on the above described tract within the initial term of two years from this date, which rights Lessor reserves for itself, its successors and assign."

2. On April 13, 1956, Frankie Fehlman executed and Oil and Gas Lease for a primary term of five years from date thereof unto F. P. Borden covering the $N\frac{1}{2}$ of $NE\frac{1}{4}$ of Section 7, Township 15 South, Range 19 West, Ouachita County, Arkansas. This lease appears of record in Book 223 at Page 347.

3. On April 13, 1956, Mrs. Georgia E. Yarborough executed an Oil and Gas Lease for a primary term of five years from date thereof unto F. P. Borden covering the $N\frac{1}{2}$ of $NE\frac{1}{4}$ of Section 7, Township 15 South, Range 19 West, Ouachita County, Arkansas. Said lease appears of record in Book 223 at page 345.

4. On April 27, 1956, W. R. Vaughan, an unmarried man, executed an oil and gas lease for a primary term of two years from date thereof unto F. P. Borden covering the $N\frac{1}{2}$ of $NE\frac{1}{4}$ of Section 7, Township 15 South, Range 19 West, Ouachita County, Arkansas. This lease appears of record in Book 223 at page 531.

5. On April 27, 1956, R. L. Briggs and wife executed an oil and gas lease for a primary term of two years from date thereof unto F. P. Borden covering the $N\frac{1}{2}$ of $NE\frac{1}{4}$ of Section 7, Township 15 South, Range 19 West, Ouachita County, Arkansas. This lease appears of record in Book 223 at page 475.

6. On April 10, 1958, Floyd Jordan and wife executed an oil and gas lease for a primary term of one year from date thereof unto David Crow, Trustee, covering the $N\frac{1}{2}$ of $NE\frac{1}{4}$ of Section 7, Township 15 South, Range 19 West, together with other land, Ouachita County, Arkansas. This lease appears of record in Book 253 at page 675. Said lease reserves 1/16th of 7/8 overriding royalty.

Mid-Continent Committee Form No. 2-B

Model Form—Adopted by
Mid-Continent Oil & Gas Association
(1938)

**"EXHIBIT C"**

Attached to and made a part of __that certain Operating Agreement by and between David Crow Trustee, as Operator, and Sklar & Phillips, Inc., etal as Non-Operators__

# ACCOUNTING PROCEDURE

## (UNIT AND JOINT LEASE SCHEDULE)

The term "joint property" as herein used shall be construed to mean the subject area covered by the agreement to which this "Accounting Procedure" is attached.

The term "Operator" as herein used shall be construed to mean the party designated to conduct the development and operation of the leased premises for the joint account.

The term "Non-operator" as herein used shall be construed to mean any one or more of the non-operating parties.

Operator shall bill Non-operator on or before the last day of each month for its proportionate share of costs and expenditures during the preceding calendar month. Itemized statements shall accompany such bills. Each party shall pay its proportion of all such bills within fifteen (15) days after the receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid. Payment of any such bill shall not prejudice the right of any party to protest or question the correctness thereof; provided that Operator shall not be required to adjust any item unless a claim therefor has been presented within a period of two (2) years from the date of the rendition of any itemized statement.

### I. DEVELOPMENT AND OPERATING CHARGES

Subject to limitations hereinafter prescribed, Operator shall charge the joint account with the following items:

(1) Delay or other rentals, when such rentals are paid by Operator for the joint account; royalties, when not paid direct to royalty owners by the purchaser of the oil, gas, casinghead gas or other products.

(2) Labor, teaming and other services necessary for the development, maintenance and operation of the joint property.

(3) Materials, equipment and supplies purchased and/or furnished by Operator from its warehouse stocks or from its other leases for use on the joint property. In so far as is practical and consistent with efficient and economical operation, only such materials shall be purchased for or transferred to the joint property as are required for immediate use, and the accumulation of warehouse and/or lease stock on the joint property shall be avoided.

(4) Moving materials to the joint property from vendor's or from Operator's warehouse in the district or from other properties of Operator, but in either of the last events no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point.

(5) Moving surplus materials from the joint property to outside vendees, if sold f. o. b. destination, or minor returns to Operator's warehouse or other storage point. No charge shall be made to the joint account for moving major surplus materials to Operator's warehouse or other storage point for a distance greater than the distance to the nearest reliable supply store or railway receiving point, except by special agreement with Non-operator; and no charge shall be made to the joint account for moving materials to other properties belonging to Operator, except by special agreement with Non-operator.

(6) Use of and service by Operator's exclusively owned equipment and utilities as provided in Paragraph (6) of Section II: "Basis of Charges to Joint Account."

(7) Damages or losses incurred by fire, flood, storm or from any other cause not controlable by Operator through the exercise of reasonable diligence. Operator shall furnish Non-operator written notice of damages or losses incurred by fire, storm, flood or other natural or accidental causes as soon as practicable after report of the same has been received by Operator.

(8) Expenses of litigation, liens, judgments and liquidated claims involving the joint property or incident to its development and operation. Actual expenses incurred by Operator or Non-operator in securing evidence pertaining to the joint property shall be a proper charge against the joint account.

(a) When any case, by prior agreement, is handled by Operator's and/or Non-operator's legal staff, thereby eliminating the retaining of outside counsel, a charge commensurate with the cost of services rendered may be made to the joint account. Charges of this nature shall not be rendered until the respective legal departments have agreed upon the proper amount.

(b) Fees and expenses of outside attorneys shall not be charged to the joint account except where the employment of such outside attorneys is authorized by a vote of the majority interests.

(9) All taxes paid for the benefit of the parties hereto including ad valorem, property, gross production, occupation and any other taxes assessed against the jointly-owned properties, the production therefrom or the operations thereon.

(10) Insurance:

(a) Premiums paid for insurance carried for the benefit of the joint account together with all expenditures incurred and paid in settlement of any and all losses, claims, damages, judgments and other expenses, including legal services, not recovered from insurance carrier.

(b) If no insurance is required to be carried, all actual expenditures incurred and paid by Operator in settlement of any and all losses, claims, damages, judgments and any other expenses, including legal services, shall be charged to the joint account.

(11) District and Camp Expense:

(a) District Expense: A proportionate share of the salaries and expenses of Operator's district superintendent and other general district employes serving the joint property whose time is not allocated directly to the joint property, and a proportionate share of the expense of maintaining and operating a district office in conducting the management of operations on the joint property and other properties in the same locality owned and operated by Operator, such charges to be apportioned to such properties served on the following basis:

_____None_____

(b) Camp Expense: The expense of providing and maintaining on or in the vicinity of the joint property all necessary camps, housing facilities for employes and boarding employes, if necessary. When properties other than the joint property are served by these facilities, then an equitable distribution of expense, including depreciation, or a fair monthly rental in lieu of the investment, maintenance and operating cost of buildings and other camp facilities, shall be prorated against all properties so served on the following basis:_____

_____None_____

(12) Overhead charges, which shall be in lieu of any charges for any part of the compensation or salaries paid to managing officers and employes of Operator, including the division superintendent, the entire staff and expenses of the division office located at_____

_____, any portion of the office expense of the principal business office located at

_____, but not in lieu of field office expenses incurred in operating any such properties, and such overhead charges do not include any other expenses of Operator incurred in the development and operation of said properties, and Operator shall have the right to assess against the joint property covered hereby the following overhead charges:

(a) $ 350.00 per month for each drilling well, beginning on the date the well is spudded and terminating when it is on production or is plugged, as the case may be, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

(b) $ _____ per well per month for the first five (5) producing wells.

(c) $ 50.00 per well per month for the second five (5) producing wells.

(d) $ 35.00 per well per month for all producing wells over ten (10).

In connection with overhead charges, the status of wells shall be as follows:

(1) In-put or key wells shall be included in overhead schedule the same as producing oil wells.

(2) Producing gas wells shall be included in overhead schedule the same as producing oil wells.

(3) Wells permanently shut down but on which plugging operations are deferred, shall be dropped from overhead schedule at the time the shutdown is effected. When such wells are plugged, overhead shall be charged at the producing well rate during the time required for the plugging operation.

(4) Wells being plugged back or drilled deeper shall be included in overhead schedule the same as drilling wells.

(5) Wells which are shut down temporarily and later replaced on production. If and when a well is shut down (other than for proration) and not produced or worked upon for a period of a full calendar month, it shall not be included on the overhead schedule for such month.

(6) Salt water disposal wells shall not be included in overhead schedule.

The above specific overhead rates may be amended from time to time by agreement between Operator and Non-operator if, in practice, they are found to be insufficient or excessive.

(13) Warehouse Handling Charges: _____None_____

(14) Any other expenditure incurred by Operator for the necessary and proper development, maintenance and operation of the joint property, except that Operator shall not charge the joint account with any expenditure or contribution made by Operator towards employes' stock purchase plan, group life insurance, pension, retirement, or bonus, other than such expenditures or contributions imposed or assessed by governmental authority.

## II. BASIS OF CHARGES TO JOINT ACCOUNT

(1) Outside Purchases: All materials and equipment purchased and all service procured from outside sources shall be charged at their actual cost to Operator, after deducting any and all trade and/or cash discounts actually allowed off invoices, or received by Operator.

(2) New materials furnished by Operator (Condition "A"):

New materials transferred to the joint property from Operator's warehouse or other properties shall be priced f. o. b. the nearest supply store or railway receiving point at replacement cost of the same kind of materials. This will include large equipment such as tanks, rigs, pumps, boilers and engines. All tubular goods (2" and over) shall be charged on the basis of mill shipment or carload price. Other materials, where the replacement cost cannot be readily ascertained, may, for the purposes of consistency and convenience, be charged on the basis of a reputable supply company's preferential list price f. o. b. nearest supply store or railway receiving point to the joint property prevailing on the date of transfer of the materials to the joint property.

In determining the value of any transferred materials, all special and preferential discounts shall be allowed but the regular cash discount shall not be considered.

(3) Secondhand materials furnished by Operator (Conditions "B" and "C"):

(a) Tubular goods (2" and over), fittings, machinery and other equipment which is in sound serviceable condition at date of transfer, will be classed as condition "B" and charged at 75% of the price of new materials, in accordance with the provisions of Paragraph (2) above.

(b) Tanks, derricks, and buildings or other equipment involving erection costs shall be charged on a basis not to exceed 75% of knocked-down new price for similar materials.

(c) Other secondhand materials, such as units of machinery or other equipment that is serviceable, but substantially not good enough to be considered first-class secondhand material when transferred to the joint property, shall be classed as condition "C" and charged at 50% of the new price.

(d) There may also be cases where some items of equipment, due to their unusual condition, should be fairly and equitably priced by Operator.

(4) Warranty of Materials Furnished by Operator: Operator does not warrant the materials furnished from its warehouse or other properties beyond or back of the dealer's or manufacturer's guaranty, and in case of defective materials, credit shall not be passed until adjustment has been received by Operator from the manufacturers or their agents.

(5) If materials required are not available in Operator's surplus stocks, Operator shall, whenever in its judgment it is practical to do so, give Non-operator opportunity of furnishing the materials required in proportion to his or its interest, provided that the same can be furnished at the time such materials are required, and further provided that any such materials so furnished shall be in condition acceptable to Operator and shall be charged to the joint account on the same terms and conditions as are provided herein to cover the furnishing of materials by Operator.

(6) Operator's Exclusively-owned Facilities: The following rates shall apply to service rendered to the joint property by facilities owned exclusively by Operator:

(a) Water service, gas, teaming, power, and compressor service: All at rates currently prevailing in the field where the joint property is located.

(b) Automotive Equipment: Rates commensurate with cost of ownership and operation and in line with schedule of rates adopted by the Petroleum Motor Transport Association as recommended uniform standardized charges against the joint account. Automotive charges will be based on use in actual service on or in connection with the joint property. Truck, tractor and pulling unit rates shall include wages and expenses of driver.

(c) A fair rate shall be charged for the use of drilling and cleaning-out tools and any other items of Operator's fully-owned machinery or equipment which shall be ample to cover maintenance, repairs, depreciation and the service furnished the joint property. Provided, however, that such charges shall not exceed those currently prevailing in the field where the joint property is located.

(d) Whenever requested, Operator shall inform Non-operator in advance of the rates it proposes to charge.

(e) Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## III. DISPOSAL OF LEASE EQUIPMENT AND MATERIALS

(1) Materials purchased by Operator shall be credited to the joint account and included in the monthly statement of operations for the month in which the materials are removed from the joint property.

(2) Materials purchased by Non-operator shall be invoiced by Operator and paid for by Non-operator to Operator immediately following receipt of invoice and delivery of materials. Operator shall thereupon immediately pass credit to the joint account and include the same in the monthly statement of operations for the month in which the materials were paid for by Non-operator.

(3) Division of materials in kind, if made between Operator and Non-operator, shall be in proportion to their respective interests in the joint property. Each party will thereupon be charged individually with the value of the materials received or receivable and corresponding credits will be made to the joint account by Operator, and both credits shall appear in the same monthly operating statement.

(4) Sales to outsiders of major materials shall be made only with the consent of Non-operator as to both terms and price and where made the proceeds shall be credited by Operator to the joint account at the full amount collected from vendee. Any claims by vendee for defective materials or otherwise shall be charged back to the joint account, if and when paid by Operator.

## IV. BASIS OF PRICING MATERIALS TRANSFERRED FROM JOINT ACCOUNT

Materials and equipment purchased by either Operator or Non-operator, or divided in kind between them, unless otherwise agreed, shall be valued on the following basis of condition and price: (New price as used in the following paragraphs shall have the same meaning and application as that used above in Section II: "Basis of Charges to Joint Account.")

(1) New Materials: (Condition "A") being new equipment or supplies purchased or procured for the joint property but never used thereon; at 100% of current new prices.

(2) Good Secondhand Materials: (Condition "B") being good serviceable materials which are further usable without repair, at:

(a) 75% of current new prices, if materials were new when originally charged to the joint property.

(b) 75% of current new prices less depreciation consistent with their usage on and service to the joint property, if materials were originally charged to the joint property as secondhand at 75% of new prices.

(3) Other Used Materials: (Condition "C") being materials further usable for their original function only after repair and reconditioning; at 50% of current new prices.

(4) Bad Order Materials: (Condition "D") being materials not further usable for their original function but for possible other service; at 25% of current new prices.

(5) Junk: (Condition "E") being obsolete and unserviceable materials; at prevailing junk prices in the district. Where practicable, junk should be disposed of at the joint property.

(6) Temporarily Used Materials: When the use of certain items of equipment on the joint property has been only temporary, and the time of actual use thereon does not justify the deduction of depreciation as listed in (a) and (b) of Paragraph (2) hereof, such materials will be priced on a basis that will leave a net charge against the joint account consistent with the service rendered and adequate for the time the materials were in use.

## V. INVENTORIES

(1) Periodic inventories shall be taken by Operator of the materials and equipment on the joint property, which shall include such materials and equipment as are ordinarily considered controllable by operators of oil and gas properties.

(2) Notice of intention to take inventory shall be given by Operator to Non-operator a week before any inventory is to begin, so that Non-operator may be represented when any inventory is being taken.

(3) Special inventories shall be taken whenever there is any sale or change of interest in the joint property, and it shall be the duty of the party selling to notify the other party as quickly as possible after the transfer of interest takes place. In such cases both the seller and the purchaser shall be represented and shall be governed by the joint inventory.

(4) If the initial test on the joint property is a dry hole and no further tests thereon are immediately contemplated, Non-operator may require that an inventory be taken of all materials as soon as the casing has been recovered from the well and that the materials be classified before any materials are removed from the joint property by Operator or otherwise disposed of.

(5) Failure of Non-operator to be represented at the physical inventory shall bind it to accept the inventory taken by Operator who shall in that event furnish Non-operator with a copy thereof.

(6) Reconciliation of inventory with charges to the joint account shall be made by each party at interest, and a list of overages and shortages shall be jointly determined by Operator and Non-operator.

(7) Inventory adjustments shall be made by Operator on the joint account for overages and shortages, but Operator shall only be held accountable to Non-operator for shortages due to lack of reasonable diligence.

EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement by and between David Crow Trustee, as Operator, and Sklar & Phillips, Inc., etal as Non-Operators.

INSURANCE PROVISION

Operator shall at all times, while operations are conducted hereunder, carry the following insurance:

(a) Workmen's Compensation:

Operator shall carry such Workmen's Compensation and Employer's Liability insurance as may be required by the laws of the state in which the property described in "Exhibit A" is located, provided that Operator may be a self-insurer as to either or both of such risks as permissible under the laws of such state, and in this event, all actual expenditures incurred and paid by operator as a self-insurer shall be charged to the joint account in accordance with Section I 10(a) (b) of the accounting procedure attached hereto.

(b) Public liability insurance in amounts of $100,000.00 for injury to one person and $300,000.00 for injuries in one accident.

(c) Automobile public liability and property damage insurance in amount of $100,000.00 for injury to one person, $100,000.00 for injuries in one accident, and $5,000.00 for property damage.

(d) No other insurance shall be carried by Operator for the benefit of the parties hereto except by mutual consent of the parties.