# CSC ENERGY CORP.

Suite 1401 Mid-South Towers
416 Travis Street
Shreveport, Louisiana 71101
(318) 221-5625
FAX (318) 459-1650

September 20, 2000

Sklar Exploration Company, L.L.C.
Attn: Mr. Howard Sklar
P. O. Box 1753
Shreveport, LA 71166

Re: Participation Agreement
Marsalis Prospect
Claiborne Parish, LA

Dear Mr. Sklar:

When accepted by you in the manner provided below, this letter will evidence an agreement (the "Participation Agreement") covering the referenced prospect between CSC Energy Corp. (hereinafter called "CSC), and Sklar Exploration Company, L.L.C., (hereinafter called "Participant"), as follows:

## I.   EXHIBITS TO PARTICIPATION AGREEMENT

There is attached hereto and made a part hereof the following marked exhibits:

### Exhibit "A" to Letter Agreement

AAPL 610-1989 Model Form Operating Agreement which, subject to the terms and provisions of this Participation Agreement, shall cover all operations conducted pursuant hereto (hereinafter called the "Operating Agreement").

### Exhibit "A-1" to Operating Agreement

Plat depicting Area of Mutual Interest attached to Operating Agreement (hereinafter call the "Prospect AMI").

### Exhibit "A-2" to Operating Agreement

Lease Schedule containing description of the Oil, Gas and Mineral Leases located in the Marsalis Prospect and owned by CSC (hereinafter called the "CSC Leases").

### Exhibit "B" to Participation Agreement

Authority For Expenditure (hereinafter called the "AFE").

## II. AGREEMENT TO CONVEY INTEREST IN LEASES

For and in consideration of the sum of $55,000.00 due and payable to CSC by Participant upon acceptance of this agreement and subject to the terms, provisions and conditions herein contained, CSC hereby agrees to assign Participant an undivided 25% of CSC's leasehold interest in and to the CSC Leases ascribed to the producing unit for the Test Well, as hereinafter defined, and an undivided 20% of CSC's leasehold interest in and to the remainder of the CSC Leases.

The interest acquired hereunder by Participant shall bear its proportionate part of all royalties, overriding royalties and similar encumbrances, if any, with which the CSC Leases are presently burdened and the overriding royalty interest reserved by CSC hereunder, and shall also be subject to an after payout working interest in the Test Well, as hereinafter defined, in favor of CSC as hereinafter provided. Participant agrees to be bound by, and this Participation Agreement is expressly made subject to, all of the terms and provisions of the CSC Leases to the extent of the interest which Participant acquires hereunder.

Subject to the terms of the Operating Agreement attached hereto as Exhibit "A", the assignment of the above described interest in the CSC Leases shall not be due until the Test Well has been drilled to Contract Depth and Participant has paid CSC all sums which Participant is obligated to pay hereunder; provided, however, that such payment and assignment shall not relieve Participant of its other obligations hereunder. Any such assignment shall be made without warranty of title whatsoever except as to claims arising by, through or under CSC.

## III. TEST WELL

On or before November 1, 2000, CSC shall commence or cause to be commenced operations for the drilling of a test well at a location approximately 900' west of the east line and 900' south of the north line of Section 11-T19N-R6W, Claiborne Parish, Louisiana (hereinafter called the "Test Well"), and shall thereafter continue the drilling of the Test Well with due diligence to a measured depth of 9,000', or a depth sufficient to test the Cotton Valley Vaughn Sand, whichever is the lesser depth (hereinafter called "Contract Depth").

## IV. COST OF TEST WELL TO CONTRACT DEPTH

Simultaneous with the acceptance of the Participation Agreement, Participant shall execute the AFE attached hereto as Exhibit "B". Participant shall pay 25% of the actual costs of drilling the Test Well to Contract Depth and logging, coring, conducting all open-hole procedures, and completing; such costs equal $94,175.00 based on the AFE. Participant shall also pay 25% of all costs not included in the AFE in accordance with the appropriate provisions of the Operating Agreement. The well will be drilled on a turnkey basis by a reputable contractor acceptable to CSC.

-2-

## V.  PARTICIPATION BY OTHER PARTIES

In the event parties, other than those listed on Exhibit "A" to the Operating Agreement, hold leases in the drilling unit for the Test Well and choose to participate for a proportionate share of the drilling and completion costs, the cost for Participant of drilling and completing the Test Well shall be proportionately reduced.  This same procedure will be followed on any subsequent wells drilled within the Area of Mutual Interest.

## VI. OPERATIONS AFTER REACHING CONTRACT DEPTH ON A DRILLED WELL

After the Test Well has been drilled and logged to Contract Depth, CSC shall immediately make copies of all electric logs and other open hole test data available to Participant or Participant's representative at the well, or as otherwise directed by Participant.  When CSC has completed such open hole evaluation procedures in the well as CSC deems to be warranted under prevailing conditions and Participant has received all logs and open hole test data, then CSC shall notify Participant whether CSC recommends an attempt to set production casing and complete the well, conduct additional operations, or plug and abandon the well.

Should CSC recommend a completion attempt at any depth and all Participants elect to participate, then CSC shall attempt a completion and Participant shall bear its before payout percentage interest (as set forth on Exhibit "A" to the Operating Agreement) of all costs, risks and expenses of whatsoever nature incurred in connection with the well after CSC makes its recommendation.

In the event CSC recommends an attempt to complete the Test Well at any depth and Participant elects not to participate in the completion attempt or fails to notify CSC in writing within 24 hours of Participant's receipt of CSC's recommendation (in which case Participant shall be conclusively presumed to have elected not to participate in the recommended completion attempt), hereinafter called "non-participating party," such non-participating party shall immediately assign to those parties acquiring interest by or through CSC and participating in the completion attempt all such non-participating party's right, title and interest in and to the CSC Leases, in accordance with the elections made pursuant to the following procedure, and shall have no further interest in the development of this prospect.  Participant shall forfeit the consideration paid therefor as set out in Article II. above, not as a penalty, but as a good-faith agreement of the parties hereto to liquidate their losses should Participant fail to participate in the completion attempt of the Test Well.  Should less than all parties elect to participate in the recommended completion attempt, CSC shall notify the consenting parties who shall have 24 hours to notify CSC in writing of its election to (1) maintain the interest set forth in the before payout column on Exhibit "A" to the Operating Agreement or (2) carry only its proportionate part of the non-consenting interest as deter-mined by dividing all non-consenting interest by the interest of all

-3-

consenting parties as such interests are set forth in the after payout column on Exhibit "A" to the Operating Agreement or (3) carry its proportionate part (as determined in (2) above) of the non-consenting interest together will all or a portion of its proportionate part of any non-consenting interest that any consenting party did not elect to take. Failure to respond within the time provided shall be deemed an election under (1) above.

In the event CSC recommends that the Test Well be plugged and abandoned as a dry hole and Participant fails to notify CSC in writing of Participant's election regarding CSC's recommendation, then Participant shall be conclusively presumed to have elected to follow CSC's recommendation. If neither CSC, Participant nor the other parties who are bearing the cost of the Test Well desire to attempt a completion of the well or conduct other tests or operations in the well, then CSC shall plug and abandon the well.

## VII.   SUBSTITUTE TEST WELL

In the event the Test Well is abandoned prior to reaching Contract Depth due to heaving shale, salt water flow, rock salt, dome formation, lost circulation, impenetrable formation, mechanical difficulty or other conditions rendering further drilling impractical, CSC shall have the right to cease operations and plug the well. Thereafter, CSC shall use its best efforts to enter into another turnkey drilling contract for the purpose and with the intent of drilling a substitute well for the Test Well to Contract Depth.

However, in the event CSC is unable to obtain a turnkey drilling contract for the drilling of the substitute Test Well, but proceeds with a proposal to drill same, and Participant elects not to participate in the drilling of a substitute well for the Test Well, Participant agrees to assign unto the parties participating in the drilling of such substitute Test Well, all its right title and interest in the CSC Leases and Participant shall forfeit the consideration paid therefor as set out in Article II. above, not as a penalty, but as a good-faith agreement of the parties hereto to liquidate their losses should Participant fail to participate in the substitute well for the Test Well.

## VIII.   OPERATIONS BY LESS THAN ALL PARTIES

Except as provided for in Articles VI. and VII. hereinabove, the provisions of the Operating Agreement shall apply and are herein incorporated by reference.

## IX.   OPERATING AGREEMENT

Simultaneous with the execution of this agreement, Participants shall execute the Operating Agreement, attached hereto as Exhibit "A", designating CSC Energy Corp. Operator, which is applicable to all operations contemplated hereunder. For so long as CSC owns an interest in the Prospect AMI, CSC shall alone have the right and authority to designate a successor operator at any time and from time to time. CSC will notify Participant of any change of operator in the normal course

of business.     In the event of a conflict between the terms and
provisions of this Participation Agreement and the Operating Agreement,
or any exhibit attached thereto, this Participation Agreement shall be
the controlling instrument.

## X.   AFTER PAYOUT WORKING INTEREST TO CSC

Participant's undivided interest in and to the CSC Leases ascribed to
the producing unit for the Test Well shall be subject to Participant's
proportionate part (in proportion to the interest set forth in Article
II. hereof) of an after payout, as payout is hereinafter defined,
leasehold working interest equal to 20% of eight-eighths in favor of
CSC.



"Payout" shall be defined as occurring and effective at 7:00 A.M. on
the first day following that period of time in which the sum of the net
proceeds from the sale of production from the Test Well attributable to
the interest of Participant in said well (after deducting royalties,
overriding royalties, and applicable production, severance, windfall
profit and similar taxes measured by production) equals all of
Participant's costs and expenses incurred in connection with the Test
Well, including those costs set forth in Article II. hereof and the
costs of completing, equipping and operating the Test Well to Payout.

In the normal course of business following Payout of the Test Well,
Participant agrees to execute such instruments as are necessary to
document CSC's interest in the CSC Leases ascribed to the producing
unit for the Test Well and all lease and well equipment located
thereon.

## XI.   COSTS AND REVENUES OF SUBSEQUENT WELLS

All well and well related costs, except those associated with the Test
Well, substitutes therefore, or sidetracks thereof, shall be borne
proportionately by Participant with an interest reduced by the back-in
reserved by CSC hereunder, the remainder being borne by other
Participants and CSC.



## XII.   INFORMATION TO BE FURNISHED

CSC shall notify Participant when actual drilling of the Test Well is
commenced and shall furnish Participant with a copy of the Plat of
Location.   During the drilling of the Test Well, Participant and/or
Participant's duly authorized representative shall have access at his
own risk at all times to the derrick floor and shall be given any
available information requested regarding the well, including daily
drilling reports, Monday through Friday, and sufficient notice of all
tests or the running of a log in order for Participant to have a
representative present if Participant so desires.

## XIII.   INSURANCE

At all times while conducting operations under this agreement, Operator (for the account of the parties hereto) shall maintain insurance coverage as provided for on Exhibit "D" attached to the Operating Agreement.

## XIV.   AREA OF MUTUAL INTEREST

The provisions of the Operating Agreement shall apply and are herein incorporated by reference.

## XV.   PROVISION CONCERNING TAXATION

The provisions of the Operating Agreement shall apply and are herein incorporated by reference.

## XVI.   NOTICES

All notices that are required in writing and reports to be furnished or given hereunder shall be deemed given only when received by Participant at the following fax number and/or address:

CSC:                                  PARTICIPANT:

CSC Energy Corp.                      Sklar Exploration
416 Travis Street, Suite 1401         P. O. Box 1753
Shreveport, LA  71101                 Shreveport, LA  71166
Telephone: (318) 221-5625             Tel: (318) 227-8668
Fax:       (318) 459-1650             Fax: (318) 227-9012

## XVII.   AGREEMENT BINDING ON HEIRS, SUCCESSORS AND ASSIGNS

Each of the parties hereto shall have the right to assign all or any portion of its rights and obligations under the terms and provisions of this agreement.  It is agreed, however, that no such assignment shall relieve the assigning party of any obligations hereunder and the assigning party and its assignee shall be jointly and severally bound to perform and satisfy all obligations of the assigning party unless the other parties hereto shall expressly and in writing relieve and release the assigning party from such obligations.  In any such assignment the assigning party shall furnish its assignee with a copy of this agreement and all exhibits attached hereto and the assignees shall agree to be bound by the terms and provisions hereof.

The provisions of this agreement shall be binding upon and inure to the benefit of the parties hereto, their heirs, executors, representatives, successors and assigns.

-6-

**XIII.  EFFECT OF PARAGRAPH HEADINGS**

The headings of the paragraphs herein have been used for convenience only and shall not be used in construing the provisions of this agreement.

**XIX.  ACCEPTANCE**

This agreement shall not be binding upon CSC until Participant shall indicate acceptance of the terms and provisions herein contained by executing in the space provided below and returning a fully executed copy of this Participation Agreement, the signature page of the Operating Agreement, and the AFE for the Test Well to CSC within ten days from the date this Participation is received by Participant , along with Participant's check for the payment called for in Article II. hereof.

Sincerely,

CSC ENERGY CORP.

Joel B. Chevalier
President

AGREED AND ACCEPTED THIS
_____ DAY OF _____, 2000.

SKLAR EXPLORATION COMPANY, L.L.C.

_____
BY: Howard Sklar

EXHIBIT "A"

Attached to and made a part of that certain
Participation Ageement dated September 20, 2000 by and between
CSC Energy Corp. and William T. Allen, III, et al.

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

September 20 , 2000,

OPERATOR _____ CSC ENERGY CORP. _____

CONTRACT AREA _____ THOSE LANDS LOCATED WITHIN THE OUTLINE ON ATTACHED

PLAT LABELED EXHIBIT "A-1" _____

_____

_____

_____

COUNTY/X/X/OX PARISH OF _CLAIBORNE_____ , STATE OF _LOUISIANA_____

COPYRIGHT 1989 — ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.
A.A.P.L. NO. 610 - 1989

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 11 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: ............................... 15
E. WAIVER OF RIGHTS TO PARTITION: ...................................................... 15
F. PREFERENTIAL RIGHT TO PURCHASE: .................................................. 15
IX. INTERNAL REVENUE CODE ELECTION ................................................... 15
X. CLAIMS AND LAWSUITS ...................................................................... 15
XI. FORCE MAJEURE ............................................................................... 16
XII. NOTICES ........................................................................................ 16
XIII. TERM OF AGREEMENT ..................................................................... 16
XIV. COMPLIANCE WITH LAWS AND REGULATIONS ...................................... 16
A. LAWS, REGULATIONS AND ORDERS: .................................................... 16
B. GOVERNING LAW: ........................................................................... 16
C. REGULATORY AGENCIES: .................................................................. 16
XV. MISCELLANEOUS ............................................................................. 17
A. EXECUTION: ................................................................................... 17
B. SUCCESSORS AND ASSIGNS: ............................................................. 17
C. COUNTERPARTS: ............................................................................ 17
D. SEVERABILITY: .............................................................................. 17
XVI. OTHER PROVISIONS ........................................................................ 17

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1                 OPERATING AGREEMENT

2     THIS AGREEMENT, entered into by and between CSC Energy Corp. _____ ,

3 hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes

4 hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

5                  WITNESSETH:

6     WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land

7 identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil

8 and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

9     NOW, THEREFORE, it is agreed as follows:

10                  ARTICLE I.

11                  DEFINITIONS

12     As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

13     A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of

14 estimating the costs to be incurred in conducting an operation hereunder.

15     B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil

16 and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation

17 and production testing conducted in such operation.

18     C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be

19 developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas

20 Interests are described in Exhibit "A."

21     D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest

22 Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the

23 lesser.

24     E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the

25 cost of any operation conducted under the provisions of this agreement.

26     F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal

27 body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as

28 established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

29     G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be

30 located.

31     H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

32     I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as

33 provided in Article VI.B.2.

34     J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a

35 proposed operation.

36     K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous

37 hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is

38 specifically stated.

39     L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts

40 of land lying within the Contract Area which are owned by parties to this agreement.

41     M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein

42 covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

43     N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a

44 Completion in a shallower Zone.

45     O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned

46 in order to attempt a Completion in a different Zone within the existing wellbore.

47     P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure,

48 restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but

49 are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking,

50 Deepening, Completing, Recompleting, or Plugging Back of a well.

51     Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to

52 change the bottom hole location unless done to straighten the hole or to drill around junk in the hole to overcome other

53 mechanical difficulties.

54     R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and

55 Gas separately producible from any other common accumulation of Oil and Gas.

56     Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes

57 natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

58                  ARTICLE II.

59                  EXHIBITS

60     The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

61   __X__ A. Exhibit "A," shall include the following information:

62        (1) Description of lands subject to this agreement,

63        (2) Restrictions, if any, as to depths, formations, or substances,

64        (3) Parties to agreement with addresses and telephone numbers for notice purposes,

65        (4) Percentages or fractional interests of parties to this agreement,

66        (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

67        (6) Burdens on production.

68   _____ B. Exhibit "B," Form of Lease.

69   __X__ C. Exhibit "C," Accounting Procedure.

70   __X__ D. Exhibit "D," Insurance.

71   __X__ E. Exhibit "E," Gas Balancing Agreement.

72   _____ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

73   _____ G. Exhibit "G," Tax Partnership.

74   _____ H. Other:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in
2 the body of this agreement, the provisions in the body of this agreement shall prevail.

### ARTICLE III.
### INTERESTS OF PARTIES

5 A. Oil and Gas Interests:

6    If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this
7 agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B,"
8 and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

9 B. Interests of Parties in Costs and Production:

10    Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne
11 and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their
12 interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the
13 Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

14    Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other
15 burdens may be payable and except as otherwise expressly provided in this agreement, ~~xxxxxxxxxx~~ shall pay or deliver, or
16 cause to be paid or delivered, all burdens on ~~xxxxxxxxxxxx~~ production from the Contract Area ~~xxxxxxxxxxxxxxxxxxxxx~~
    _for the benefit of the parties hereto_      _Operator_
17 _____ and shall indemnify, defend and hold the other parties free from any liability therefor.
    _parties hereto_      _Operator and_

18    Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is
19 burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts
20 stipulated ~~xxxx~~ _herein_, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend
21 and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as
22 the Drilling Unit for the productive Zone(s) is identical with the Contract Area, ~~xxxxxxx~~ _Operator_ shall pay or deliver, or cause to
    _for the benefit of the parties hereto_
23 be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)
24 ~~xxxxxxxxxxxxxxxxx~~ _all parties hereto_ contributed to this agreement, and shall indemnify, defend and hold the other parties free from any _Operator and_
25 liability therefor.

26    No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's
27 lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher
28 price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

29    Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,
30 and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in
31 said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

32 C. Subsequently Created Interests:

33    If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security
34 for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production
35 payment, net profits interest, assignment of production or other burden payable out of production attributable to its working
36 interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed
37 hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden
38 payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such
39 burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's
40 Lease or Interest to exceed the amount stipulated in Article III.B. above.

41    The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and
42 alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other
43 parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses
44 chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the
45 same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required
46 under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the
47 production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of
48 said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or
49 parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

### ARTICLE IV.
### TITLES

52 A. Title Examination:

53    Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,
54 if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire
55 Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working
56 interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing
57 Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator
58 all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of
59 charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the
60 examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or
61 by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in
62 procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty
63 opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling
64 Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such
65 interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel
66 in the performance of the above functions.

67    Each party shall be responsible for securing curative matter and pooling amendments or agreements required in
68 connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation
69 and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings
70 before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to
71 the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.
72 Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental
73 agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct
74 charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
2 functions.
3     No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has
4 been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by .
5 all of the Drilling Parties in such well.
6 B. Loss or Failure of Title:
7     1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a
8 reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest
9 (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title
10 failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject
11 to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas
12 Leases and Interests; and,·
13     (a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if
14 applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from
15 Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there
16 shall be no additional liability on its part to the other parties hereto by reason of such title failure;
17     (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the
18 Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage
19 basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or
20 Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;
21     (c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract
22 Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable
23 to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and
24 burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well
25 attributable to such failed Lease or Interest;
26     (d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest
27 which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid
28 to the party or parties who bore the costs which are so refunded;
29     (e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises
30 by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received
31 production for which such accounting is required based on the amount of such production received, and each such party shall
32 severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;
33     (f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of
34 the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title
35 it shall bear all expenses in connection therewith; and
36     (g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an
37 interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder
38 of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest
39 is reflected on Exhibit "A."
40     2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
41 payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas
42 Lease or Interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary
43 liability against the party who failed to make such payment. Unless the party who failed to make the required payment
44 secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make
45 proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A"
46 shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party
47 who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership
48 of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully
49 reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest,
50 calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest,
51 it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole
52 previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
53     (a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease
54 burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or
55 Interest, on an acreage basis, up to the amount of unrecovered costs;
56     (b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed
57 to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and
58 marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination,
59 would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest
60 termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties
61 in proportion to their respective interests reflected on Exhibit "A"; and,
62     (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner
63 of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
64     3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles
65 IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on
66 Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because
67 express or implied covenants have not been performed (other than performance which requires only the payment of money),
68 and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no
69 readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.
70     4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any
71 Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety
72 (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed
73 or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.D.
74 shall not apply to such acquisition.

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

4     __CSC Energy Corp.__     shall be the Operator of the Contract Area, and shall conduct
5 and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of
6 this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor
7 not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance
8 with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the
9 Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third
10 party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike
11 manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and
12 regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred
13 except such as may result from gross negligence or willful misconduct.

14 B. Resignation or Removal of Operator and Selection of Successor:

15     1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators.
16 If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of
17 serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a
18 successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest
19 based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be
20 deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and
21 Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an
22 operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall
23 mean not only gross negligence or willful misconduct but also the material breach or inability to meet the standards of
24 operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

25     Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first
26 day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator
27 or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of
28 Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a
29 Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single
30 subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

31     2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a
32 successor Operator shall be selected by the parties. ~~The successor Operator shall be selected from the parties owning an~~
33 ~~interest in the Contract Area at the time such successor Operator is selected.~~ The successor Operator shall be selected by the
34 affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A";
35 provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to
36 succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority
37 interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was
38 removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to
39 the operations conducted by the former Operator to the extent such records and data are not already in the possession of the
40 successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint
41 account.

42     3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have
43 resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal
44 bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all
45 Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or
46 assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in
47 possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators,
48 except the selection of a successor. During the period of time the operating committee controls operations, all actions shall
49 require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In
50 the event there are only two (2) parties to this agreement, during the period of time the operating committee controls
51 operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a
52 member of the operating committee, and all actions shall require the approval of two (2) members of the operating
53 committee without regard for their interest in the Contract Area based on Exhibit "A."

54 C. Employees and Contractors:

55     The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the
56 hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or
57 contractors shall be the employees or contractors of Operator.

58 D. Rights and Duties of Operator:

59     1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive
60 contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in
61 the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges
62 shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by
63 Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors
64 who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator
65 shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and
66 standards prevailing in the industry.

67     2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay
68 and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall
69 charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C."
70 Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits
71 made and received.

72     3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts
73 of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in
74 respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or
2  materials supplied.

3     4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced
4  or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the
5  Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until
6  used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as
7  provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator
8  and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in
9  this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the
10  parties otherwise specifically agree.

11     5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator
12  or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to
13  all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of
14  operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access
15  rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate
16  Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such
17  interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any
18  and all reports and information obtained by Operator in connection with production and related items, including, without
19  limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding
20  purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the
21  information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures
22  shall be conducted in accordance with the audit protocol specified in Exhibit "C."

23     6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to
24  each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications
25  required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder.
26  Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

27     7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not
28  limited to the Initial Well:

29     (a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which
30  drilling operations are commenced.

31     (b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well
32  as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

33     (c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing
34  Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted
35.  hereunder.

36     8. Cost Estimates. Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs
37  incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement.
38  Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

39     9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers
40  compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-
41  insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall
42  be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties
43  as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on
44  or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted
45  and to maintain such other insurance as Operator may require.

46     In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the
47  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive
48  equipment.

49                        ARTICLE VI.
50               DRILLING AND DEVELOPMENT

51  A. Initial Well:
52     On or before the __1st__ day of __November__ __2000__ , Operator shall commence the drilling of the Initial
53  Well at the following location:

54  900' FEL and 900' FNL of Section 11-Township 19 North-Range 6 West, Claiborne
55  Parish, Louisiana
56

57

58

59

60  and shall thereafter continue the drilling of the well with due diligence to a measured depth of 9,000' or a
61  depth sufficient to test the Cotton Valley Vaughn Sand.
62

63

64

65

66

67  The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation
68  in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.
69  B. Subsequent Operations: ·

70     1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or
71  if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of
72  producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under
73  this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written
74  notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2    performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a
3    notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4    whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to
5    Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
6    eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply
7    within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8    Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9    within the time and in the manner provided in Article VI.B.6.

10    If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11    contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12    forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13    promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
14    may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15    the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16    by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17    additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18    way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19    acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as
20    specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21    said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22    proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
23    Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
24    reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance
25    with Article VI.B.5. in the event of a Sidetracking operation.

26    2. Operations by Less Than All Parties:

27    (a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or
28    VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29    Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
30    later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31    expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
32    proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting
33    Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
34    the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35    account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The
36    rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37    designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when
38    conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39    agreement.

40    If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41    applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42    recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party,
43    within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of such notice, shall advise the
44    proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45    proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46    the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47    Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48    interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a
49    Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50    proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i) . In the event a
51    drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52    total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may
53    withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54    days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55    If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56    of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57    period provided in Article VI.B.1., subject to the same extension right as provided therein.

58    (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
59    borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60    paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61    encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results
62    in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63    the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64    participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65    shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66    increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,
67    Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68    paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69    well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70    expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking,
71    Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72    provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73    Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74    Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-
2 Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect
3 to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or
4 market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes,
5 royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production
6 from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

7       (i) _200_ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment
8 beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and
9 piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first
10 production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other
11 provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that
12 interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning
13 of the operations; and

14       (ii) _500_ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening,
15 Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C.,
16 and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections),
17 which would have been chargeable to such Non-Consenting Party if it had participated therein.

18   Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone
19 described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable
20 substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each
21 Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a
22 shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-
23 Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the
24 cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-
25 Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions
26 of this Article VI.B.2. (b) shall apply to such party's interest.

27   (c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or
28 Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in
29 such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full
30 recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to
31 participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking
32 operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at
33 any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such
34 Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the
35 cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _500_ % of
36 that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to
37 such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is
38 proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting
39 Parties in said well.

40   (d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's
41 share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem,
42 production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to
43 Non-Consenting Party's share of production not excepted by Article III.C.

44   In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting
45 Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all
46 such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back,
47 Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each
48 party receiving its proportionate part in kind or in value, less cost of salvage.

49   Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations
50 for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to
51 the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing,
52 Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement
53 of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the
54 Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties
55 shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of
56 the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from
57 the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas
58 produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or
59 periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with
60 any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited
61 against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such
62 Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-
63 Consenting Party.

64   If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided
65 for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day
66 following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall
67 own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as
68 such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking,
69 Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and
70 shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this
71 agreement and Exhibit "C" attached hereto.

72   3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have
73 been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise
74 terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required
2   under Article VI.B.6. to resolve completion proposals) shall be charged and borne as part of the drilling or Deepening
3   operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted,
4   whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
5   of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation,
6   but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated
7   between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8   interest as shown on Exhibit "A" of all Consenting Parties.

9     In the event that notice for a Sidetracking operation is given while the drilling rig is to be utilized is on location, any party
10   may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in
11   Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended
12   response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending
13   the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be
14   allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's
15   interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

16     4. Deepening: If less than all the parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17   pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article
18   VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone
19   of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the
20   Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate
21   in the Deepening operation.

22     In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective,
23   such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-
24   Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to
25   participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation
26   is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation,
27   such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses:

28     (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29   quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs
30   and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-
31   Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting
32   Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other
33   provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well
34   incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the
35   sole account of Consenting Parties.

36     (b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing
37   in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or
38   reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and
39   equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less
40   those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall
41   also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based
42   on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent
43   Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in
44   connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the
45   cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-
46   Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the
47   well for Deepening.

48     The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
49   to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article
50   VI.F.

51     5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an
52   interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its
53   proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore
54   to be utilized as follows:

55     (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
56   incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

57     (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
58   such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth
59   at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's
60   proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking
61   operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

62     6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to
63   propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such
64   party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform
65   an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal
66   holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be
67   conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such
68   alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such
69   proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period; or, within
70   twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the
71   subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required
72   shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage
73   interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation
2 within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3 and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4 is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5 relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within
6 such period shall be deemed an election not to participate in the prevailing proposal.

7    7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be
8 proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9 Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone. *

10    8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
11 Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except
12 with the consent of all parties that have not relinquished interests in the well at the time of such operation.

13 C. Completion of Wells; Reworking and Plugging Back:

14    1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
15 drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling,
16 Deepening or Sidetracking shall include:

17    ☐   Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and
18      equipping of the well, including necessary tankage and/or surface facilities.

19    ☒   Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When
20 such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results
21 thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to
22 participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,
23 together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice
24 shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of
25 notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an
26 accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting
27 with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the
28 procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all
29 necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface
30 facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party
31 receiving such notice to reply within the period above fixed shall constitute an election by that party not to
32 participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of
33 conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the
34 provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging
35 Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations
36 thereafter conducted by less than all parties; provided, however, that Article VI.B.2 shall apply separately to each
37 separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting
38 Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party
39 in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier
40 Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any
41 recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in
42 which the Completion attempt is made. Election by a previous Non-Consenting Party to participate in a subsequent
43 Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable
44 materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,
45 insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a
46 Completion attempt.

47    2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
48 Recompleted, or Plugged Back pursuant to the provisions of Article VI.D.2. of this agreement. Consent to the Reworking,
49 Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
50 Completing and equipping of said well, including necessary tankage and/or surface facilities.

51 D. Other Operations:

52    Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____
53 twenty-five thousand and 00/100 _____ Dollars ($ 25,000.00 _____ ) except in connection with the
54 drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously
55 authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
56 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion
57 are required to deal with the emergency to safeguard life and property but Operator as, as promptly as possible, shall report the
58 emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so
59 requesting an information copy thereof for any single project costing in excess of ten thousand and 00/100 Dollars
60 ( $ 10,000.00 ). Any party who has not relinquished its interest in a well shall have the right to propose that
61 Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as
62 salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but
63 not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall
64 be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the
65 amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under
66 Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by those Articles). Operator shall deliver such
67 proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent
68 of any party or parties owning at least _____ % of the interests of the parties entitled to participate in such operation,
69 each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated
70 to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms
71 of the proposal.

72 E. Abandonment of Wells:

73    1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has
74 been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

   *  or is approved by the affirmative vote parties owning a majority (51%) interest based on ownership
     as set forth on Exhibit "A".

9

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1. plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2. party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after
3. delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4. proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
5. cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to
6. plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,
7. Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8. forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9. Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10. such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11. abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12. taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13. liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14. restoring the surface, for which the abandoning parties shall remain proportionately liable.

15.    2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
16. conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
17. been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to
18. such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19. and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed
20. abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the
21. proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
22. operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23. applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24. against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25. proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26. within the required period or thereafter to conduct operations on such well shall entitle Operator to retain or take possession
27. of such well and plug and abandon the well.

28.    Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29. the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30. of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31. the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
32. value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33. operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34. parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35. of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36. insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37. interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-
38. abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39. one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
40. attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
41. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42. respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43. Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

44.    Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45. from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46. request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47. charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48. ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49. shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50. further operations therein subject to the provisions hereof.

51.    3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
52. between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53. however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54. operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55. in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
56. in a portion of the well shall pay their proportionate shares of abandonment and surface restoration costs for such well as
57. provided in Article VI.B.2.(b).

58. F. Termination of Operations:
59.    Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60. Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without
61. consent of parties bearing   __51__   % of the costs of such operation; provided, however, that in the event granite or other
62. practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63. Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1. and the
64. provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.
65. G. Taking Production in Kind:  (See Article XVI.H.)
66.    ☒  Option No. 1: Gas Balancing Agreement Attached
67.    Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
68. Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
69. treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
70. in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
71. party taking its share of production in kind shall be required to pay for only its proportionate share of such part of
72. Operator's surface facilities which it uses.
73.    Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
74. production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1      directly from the purchaser thereof for its share of all production.

2      If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate
3  share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by
4  the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to
5  time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by
6  Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to
7  the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any
8  time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser.
9  Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time
10  as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a
11  period in excess of one (1) year.

12      Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator
13  shall have no duty to share any existing market or to obtain a price equal to that received under any existing
14  market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing
15  contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said
16  contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days
17  written notice of such intended purchase and the price to be paid or the pricing basis to be used.

18      All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following
19  month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.
20  Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which
21  records shall be made available to Non-Operators upon reasonable request.

22      In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate
23  pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion-
24  ate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with
25  any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a
26  separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

27  ☐  Option No. 2: No Gas Balancing Agreement:

28      Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from
29  the Contract Area, exclusive of production which may be used in development and producing operations and in
30  preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure
31  incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall
32  be borne by such party. Any party taking its share of production in kind shall be required to pay for only its
33  proportionate share of such part of Operator's surface facilities which it uses.

34      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
35  production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment
36  directly from the purchaser thereof for its share of all production.

37      If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate
38  share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the
39  revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others
40  at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator
41  may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall
42  be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator
43  to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered
44  to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's
45  election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase
46  contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other
47  party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the
48  minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1)
49  year.

50      Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator
51  shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation
52  fee equal to that received under any existing market or transportation arrangement. The sale or delivery by
53  Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not
54  give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil
55  and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written
56  notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give
57  notice to all parties of the first sale of Gas from any well under this Agreement.

58      All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following
59  month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.
60  Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which
61  records shall be made available to Non-Operators upon reasonable request.

62                              ARTICLE VII.
63              EXPENDITURES AND LIABILITY OF PARTIES

64  A. Liability of Parties:

65      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations,
66  and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the
67  liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have
68  any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation
69  hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other
70  partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or
71  principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have
72  established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own
73  respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other
74  with respect to activities hereunder.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    B. Liens and Security Interests:

2      Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas
3    Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any
4    interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection
5    therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense,
6    interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil
7    and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest
8    granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and
9    overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or
10   otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or
11   used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts
12   (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead),
13   contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the
14   foregoing.

15     , To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording
16   supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time
17   following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as
18   a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform
19   Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate
20   to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed
21   herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a
22   financing statement with the proper officer under the Uniform Commercial Code.

23     Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to
24   the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security
25   interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or
26   under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement,
27   whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject
28   to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder
29   whether or not such obligations arise before or after such interest is acquired.

30     To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the
31   Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code.
32   The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an
33   election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In
34   addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use
35   of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect
36   from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by
37   such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount
38   owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production
39   may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the
40   default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in
41   this paragraph.

42   ~~If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by~~
43   ~~Operator,~~ the non-defaulting parties, including Operator, shall, upon request by ~~Operator, pay~~ the unpaid amount in the
44   proportion that the interest of each such party ~~bears to the interest of~~ all such parties. The amount paid by each party so
45   paying its share of the unpaid ~~amount~~ shall be secured by the liens and security rights described in Article VII.B., and each
46   ~~paying party may independently pursue any remedy available hereunder or otherwise.~~

47     If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure
48   or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting
49   party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement
50   of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets
51   and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party
52   hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted
53   hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable
54   manner and upon reasonable notice.

55     Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien
56   law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting
57   the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or
58   utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the
59   payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

60   C. Advances:    (See Article XVI.B and XVI.C)

61     Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other
62   parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations
63   hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an
64   itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice
65   for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month.
66   Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and
67   invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as
68   provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end
69   that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

70   D. Defaults and Remedies:

71     If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to
72   make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for
73   such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the
74   remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator,
2  and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator.
3  Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified
4  below or otherwise available to a non-defaulting party.

5    1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default,
6  specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one
7  or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such
8  Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the
9  default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of
10  the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the
11  Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area
12  after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting
13  party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right
14  to receive information as to any operation conducted hereunder during the period of such default, the right to elect to
15  participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being
16  conducted under this agreement even if the party has previously elected to participate in such operation, and the right to
17  receive proceeds of production from any well subject to this agreement.

18    2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint
19  account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default
20  until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from
21  suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

22    3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the
23  defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in
24  which event if the billing is for the drilling of a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a
25  well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting
26  party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with
27  respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party,
28  notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the
29  non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

30    Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure
31  its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such
32  payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-
33  defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the
34  non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership
35  of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

36    4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or
37  Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting
38  party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may
39  be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of
40  the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of
41  drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the
42  defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided
43  in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining
44  when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

45    5. Costs and Attorneys' Fees. In the event any party is required to bring legal proceedings to enforce any financial
46  obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of
47  collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

48  E. Rentals, Shut-in Well Payments and Minimum Royalties:  (See Article XVI.F.)

49    Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid
50  by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties
51  own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to
52  make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper
53  evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or
54  minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which
55  results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

56    Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to
57  production of a producing well, at least five (5) days (excluding Saturday, Sunday and legal holidays) prior to taking such
58  action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of
59  failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make
60  timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article
61  IV.B.3.

62  F. Taxes:

63    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all
64  property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed
65  thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as
66  to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and
67  Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being
68  subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes
69  resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to
70  such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part
71  upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to
72  the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's
73  working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner
74  provided in Exhibit "C."

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2   prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3   determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4   and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5   the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6   paid by them, as provided in Exhibit "C".
       Operator, proportionately for the benefit of the parties hereto.
7   Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8   to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.
9                                          ARTICLE VIII.
10                    ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
11  A. Surrender of Leases:
12       The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13  or in part unless all parties consent thereto.
14       However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15  notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16  delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a
17  party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18  described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19  implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20  located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the
21  assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22  consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
23  thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B".
24  Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25  accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26  shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27  in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the
28  reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29  acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30  the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less
31  than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the
32  assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33  interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made
34  varies according to depth, then the interest assigned shall similarly reflect such variances.
35       Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38  agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.
39  B. Renewal or Extension of Leases:
40       If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41  shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42  promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following
43  delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44  affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45  allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interests held at that time by the
46  parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47  assignment of its proportionate interest therein by the acquiring party.
48       If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49  by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50  the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51  purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52  shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53  less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54  Agreement in the form of this agreement.
55       If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56  renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.
57       The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58  the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the
59  expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60  existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61  the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62  expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63  agreement.
64       The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.
65  C. Acreage or Cash Contributions:
66       While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68  be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom
69  the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70  proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the
71  extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any
72  acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above
73  provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74  inside the Contract Area.

- 14 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder,
2 such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
3 D. Assignment; Maintenance of Uniform Interest:
4  For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas
5 Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other
6 disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells,
7 equipment and production unless such disposition covers either:
8  1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or
9  2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells,
10 equipment and production in the Contract Area.
11  Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
12 and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and
13 Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of
14 the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale,
15 encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the
16 instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other
17 disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect
18 to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation
19 conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security
20 interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.
21  If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion,
22 may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures,
23 receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to
24 bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-
25 owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of
26 the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale
27 proceeds thereof.
28 E. Waiver of Rights to Partition:
29  If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
30 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its
31 undivided interest therein.
32 ~~F. Preferential Right to Purchase:~~
33 ☐ (Optional: Check if applicable.)
34  Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
35 Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which
36 shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase
37 price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an
38 optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the
39 same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the
40 purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all
41 purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage
42 its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests,
43 or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets
44 to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any
45 ~~company in which such party owns a majority of the stock.~~

ARTICLE IX.

INTERNAL REVENUE CODE ELECTION

48  If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the
49 parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each
50 party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle
51 "A", of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and
52 the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected
53 such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal
54 Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by
55 Treasury Regulations §1.761. Should there be any requirement that each party hereby affected give further evidence of this
56 election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal
57 Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action
58 inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
59 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter
60 1, Subtitle "A", of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party
61 hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each
62 such party states that the income derived by such party from operations hereunder can be adequately determined without the
63 computation of partnership taxable income.

ARTICLE X.

CLAIMS AND LAWSUITS

66  Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure
67 does not exceed ten thousand and 00/100 Dollars ($ 10,000.00 ) and if the payment is in complete settlement
68 of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over
69 the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling,
70 or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the
71 claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations
72 hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall
73 immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1                       ARTICLE XI.
2                     FORCE MAJEURE
3     If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other
4 than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties
5 prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the
6 party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the
7 continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or
8 other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of
9 nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other
10 cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party
11 claiming suspension.
12     The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The
13 requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes,
14 lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall
15 be entirely within the discretion of the party concerned.
16                     ARTICLE XII.
17                     NOTICES
18     All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise
19 specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex,
20 telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on
21 Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written
22 notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to
23 whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date
24 the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder
25 shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or
26 to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when
27 deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy
28 or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or
29 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party
30 shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other
31 parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required
32 to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall
33 be deemed delivered in the same manner provided above for any responsive notice.
34                     ARTICLE XIII.
35                TERM OF AGREEMENT
36     This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject
37 hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title
38 or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.
39    ☐  Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in
40         force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.
41    ☒  Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision
42         of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying
43         quantities, this agreement shall continue in force so long as any such well is capable of production, and for an
44         additional period of     90     days thereafter; provided, however, if, prior to the expiration of such
45         additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking,
46         Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall
47         continue in force until such operations have been completed and if production results therefrom, this agreement
48         shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well
49         drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the
50         Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-
51         completing, Plugging Back or Reworking operations are commenced within     90     days from the
52         date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties
53         not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any
54         operations on the well, whichever first occurs.
55     The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any
56 remedy therefor which has accrued or attached prior to the date of such termination.
57     Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this
58 Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a
59 notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon
60 request of Operator, if Operator has satisfied all its financial obligations.
61                     ARTICLE XIV.
62           COMPLIANCE WITH LAWS AND REGULATIONS
63 A. Laws, Regulations and Orders:
64     This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules,
65 regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state,
66 and local laws, ordinances, rules, regulations and orders.
67 B. Governing Law:
68     This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-
69 performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and
70 determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states,
71 the law of the state of ─────────────────────── shall govern.
72 C. Regulatory Agencies:
73     Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any
74 rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations, or

- 16 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or
2  production of wells, on tracts offsetting or adjacent to the Contract Area.
3      With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages,
4  injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation
5  or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission
6  or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not
7  constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of
8  production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such
9  an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such
10  incorrect interpretation or application.

<h2 style="text-align:center">ARTICLE XV.</h2>
<h3 style="text-align:center">MISCELLANEOUS</h3>

13  A. Execution:
14      This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been
15  executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of
16  the parties to which it is tendered, or which are listed on Exhibit "A" as owning an interest in the Contract Area or which
17  own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have
18  become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no
19  event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this
20  agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of
21  drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease
22  as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs
23  hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds
24  with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a
25  current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the
26  Initial Well which would have been charged to such person under this agreement if such person had executed the same and
27  Operator shall receive all revenues which would have been received by such person under this agreement if such person had
28  executed the same.
29  B. Successors and Assigns:
30      This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31  devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or
32  Interests included within the Contract Area.
33  C. Counterparts:
34      This instrument may be executed in any number of counterparts, each of which shall be considered an original for all
35  purposes.
36  D. Severability:
37      For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws,
38  this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to
39  this agreement to comply with all of its financial obligations provided herein shall be a material default.

<h2 style="text-align:center">ARTICLE XVI.</h2>
<h3 style="text-align:center">OTHER PROVISIONS</h3>

43  A.    PRIORITY OF PROPOSED OPERATIONS

45      1.    When any well drilled under the provisions of this Agreement has been drilled to the agreed upon objective depth, if the
46  parties participating in the drilling of such well cannot mutually agree upon the conduct of further operations, the operations proposed to be
47  conducted shall be governed by the following sequence of priority:

49      (a)    A proposal to do additional logging, coring or testing; then

51      (b)    A proposal to attempt to complete the well in the objective formation; then

53      (c)    A proposal to plug the well back and to attempt a completion in a formation above the objective formation;
54          then

56      (d)    A proposal to deepen the well; then

58      (e)    A proposal to sidetrack the well; then

60      (f)    A proposal to plug and abandon.

62      If, at the time said participating parties are considering any of the above proposals, the hole is in such a condition that a
63  prudent Operator would not conduct proposal (a) for fear of placing the hole in jeopardy or losing the same prior to an attempt to complete the well
64  in the objective formation, proposal (a) shall not be given the priority set forth above. If additional logging, coring or testing is conducted, it shall
65  be done at the sole risk, cost and expense of the parties participating therein, who shall be responsible for any damage to the wellbore resulting
66  from such testing. The parties not participating in such additional testing shall be subject to the non-consent provisions of Article VI.B.2. and shall
67  not be entitled to logs, information or data resulting from such tests. After the additional logging, coring or testing is performed, each Participant
68  shall then be given a re-election to participate in the next proposed operation until such time as a proposal is made to attempt a completion or to
69  plug and abandon the well. If the decision is made to plug and abandon the well before a completion attempt has been made, the parties who
70  participated in the drilling of this well shall be responsible for their proportionate share of the plugging and abandoning costs.
71      2.    Notwithstanding anything to the contrary hereinabove set forth, the term "Proposed Operations" shall expressly include
72  reworking and sidetracking as well as any other operations as may, from time to time, be accepted practices in the area and locality in which the
73  operations are to be pursued.

17

3.      Except as hereinafter provided, it is specifically provided that no notice shall be given hereunder which proposes the drilling of more than one well at a time. Further, the provisions of said Article VI.B., insofar as same pertains to notification by a party of its desire to drill a well, shall be suspended for so long as (1) a prior well proposal has been given which is still in force and effect and the period of time to participate in such proposal, or if fully subscribed, the period of time during which the well regarding same may be commenced has not expired, or (2) a well is presently drilling hereunder.  This paragraph shall not apply under those circumstances where the well to which notice is directed is a well which is required under the terms of a lease or contract or one required to maintain a lease or farmout or a portion thereof in force, including any well or operation in Article VI.A. above.  Any provision of this Sub-paragraph 3. may be waived by a vote of a total of at least fifty-one percent (51%) of the Working Interest Ownership which would be affected by any such proposal.

B.      **INITIAL COMPLETION ATTEMPT ON WELLS**

Operator shall not bill Non-Operator for completion costs of a well prior to reaching objective depth or prior to the time the well is logged and other tests are run therein.  At such time as logging and other open hole testing has been completed, Operator has notified Non-Operator of its completion attempt recommendation and Non-Operator has made or is deemed to have made its election with respect to the completion recommendation, Operator may bill Non-Operator for Non-Operator's proportionate part of anticipated costs, and Non-Operator shall have twenty (20) days from receipt of said invoice to advance its anticipated completion costs.  In the event Operator has not received Non-Operators remittance as required, Operator shall send such non-paying, Non-Operator a second billing and such non-paying, Non-Operator shall have ten (10) days from receipt of said second billing to advance its anticipated completion costs.  **Failure to timely pay in accordance with the above shall be deemed an election not to participate in said well and such non-paying, Non-Operator's interest shall automatically be subject to forfeiture under the applicable provisions of Article XVI.D. hereinbelow, unless said failure to timely pay anticipated completion costs occurs on the first well completion attempt hereunder.** In accordance with the Participation Agreement, dated September 20, 2000, to which this Operating Agreement is attached as Exhibit "A", should the failure to timely pay anticipated completion costs occur on the first well completion attempt hereunder, then the party failing to timely pay will forfeit all of its' right, title, and interest in and to said well and all Oil and Gas Leases and Oil and Gas interests within said prospect and will no longer have any right, title, or interest in any further development therein.

C.      **OPERATIONS SUBSEQUENT TO INITIAL COMPLETION ATTEMPTS**

Any subsequent AFE submitted by Operator to drill, rework, deepen, sidetrack, plug back or recomplete any well shall be deemed to be a demand upon each party electing to participate in such operation to pay in advance its proportionate share of well costs related to such operation stated thereon.  Each party electing to participate in such operation shall execute, approve and return the AFE to Operator, together with its proportionate share of such AFE well costs within the response time set forth in Article VI.B. of this Operating Agreement.  If such well costs are not so paid, Operator shall send such non-paying, consenting party an invoice for its proportionate share of such AFE well costs and such non-paying, consenting party shall have ten (10) days from receipt of said invoice to remit such costs.  In the event a non-paying, consenting party fails to remit its proportionate share of such AFE well costs, Operator, in its sole discretion, may declare such party to be a non-consenting party to such operations and the non-consenting party's interest shall automatically be subject to the applicable provisions of Article VI.B. or Article XVI.D. as the case may be. If less than all parties elect to participate in such operation and the consenting parties agree that there is insufficient participation, then Operator may cancel said AFE and operation by giving written notice to such effect to the other parties.  Such notice shall be given within seven (7) days following the date of expiration of the response time provided for in Article VI.B. of this Operating Agreement, and with such notice Operator shall refund the costs previously paid in connection with such AFE.

D.      **SUBSEQUENT WELL PROPOSALS AND OPERATIONS BY LESS THAN ALL PARTIES**

Should the Initial Well described in Article VI.A. be plugged and abandoned as a dry hole, and should any party hereto propose the drilling of an additional well on the Contract Area, then the proposing party or Operator shall furnish or cause to be furnished to all parties, an AFE reflecting the estimated cost of drilling and completing such well, together with any and all of the data pertinent thereto.  Within thirty (30) days following receipt of the AFE and accompanying data, each party shall elect whether or not to participate in the drilling of the proposed well by notifying the proposing party and Operator in writing.  Should any party fail to furnish timely notice of its election, that shall constitute a conclusive presumption that it has elected not to participate in the proposed well.

It is hereby agreed that any party that elects not to participate ("non-participating party") in said well, shall, by virtue of its election not to participate, forfeit, relinquish and assign all of its' right, title and interest in and to the Oil and Gas Interests and Oil and Gas Leases in the producing unit for said well **and in the prospect** and shall have no interest in the further development therein.

If the Initial Well described in Article VI.A. is completed as a commercial well, should any party hereto propose the drilling of any additional well on the Contract Area, then the proposing party or Operator shall furnish or cause to be furnished to all parties, an AFE reflecting the estimated cost of drilling and completing such well, together with any and all of the data pertinent thereto.  Within thirty (30) days following receipt of the AFE and accompanying data, each party shall elect whether or not to participate in the drilling of the proposed well by notifying the proposing party and Operator in writing.  Should any party fail to furnish timely notice of its election, that shall constitute a conclusive presumption that it has elected not to participate in the proposed well.

It is hereby agreed that if owners representing a majority of the working interest elect to drill such well, but any party elects not to participate ("non-participating party") in such a subsequently proposed well, then, by virtue of its election not to participate, such non-participating party shall relinquish and immediately assign proportionately to the parties electing to take their pro rata share of the non-participating party's interest, all of its' right, title and interest in and to the Oil and Gas Interests and Oil and Gas Leases in the producing unit for such well, together with all leasehold operating rights and share of production therefrom, reserving only its' interest in any other producing wellbore within said unit in which it was a participant. In the absence of a declared unit or unit formed by the appropriate governmental authority ("producing unit"), the non-participating party shall assign proportionately to the parties electing to take their pro rata share of the non-participating party's interest, all of its' right, title and interest in and to the Oil and Gas Interests and Oil and Gas Leases in forty (40) acres around such well, in the case of an oil well, and one hundred sixty (160) acres around such well, in the case of a gas well, in as near the form of a square as is practicable, together with all leasehold operating rights and share of production therefrom.

In the event a producing unit is subsequently formed for wells where producing units were absent prior to the drilling of the well, the non-participating party shall assign, proportionately to the parties electing to take the pro-rata share of the non-participating party's interest, all of its right, title and interest in and to the Oil and Gas Interests and Oil and Gas Leases in the producing unit, reserving to itself any other producing

wellbore within said unit in which it was a participant. However, nothing contained herein shall be construed as requiring a relinquishment of such non-participating party's interest in any producing wells on the Contract Area in which such party was a paying participant.

       2.      The other applicable provisions of this Operating Agreement, including those incorporated in this Article XVI., shall control all non-consent operations, other than those described in this Section D. of Article XVI.

### E.    OBLIGATORY OPERATIONS

       Other than the initial completion attempt on the first well drilled hereunder, the parties hereto agree that the non-consent provisions of Article VI.B.2. shall be applicable to wells or operations within the Contract Area, except as set forth hereinabove in Article XVI.D. and except for those wells or operations which are deemed to be a "Required Well" or "Required Operation." A "Required Well" or "Required Operation" is defined for the purposes of this Agreement as any well or operation required or necessary to maintain an Oil and Gas Lease within the Contract Area in effect if such lease (or a portion thereof) otherwise would remain in effect for only six (6) months or less following the date of the proposal of said well or operation, or is required or necessary to acquire or earn an interest in an Oil and Gas Lease under a farmin or acreage contribution contract.

       As to any Required Well or Required Operation proposed by any party hereto in which any other party hereto elects not to participate, the non-participating party shall release and relinquish forever proportionately to the participating parties upon completion of the proposed Required Well or Required Operation, all of non-participating party's interest in and to the lease(s) or interest(s) affected thereby, or in an agreement to earn a lease(s) which are perpetuated by such Required Well or Required Operation. Nothing herein shall be construed as requiring a relinquishment of such non-participating party's interest in any other producing wells or units in which such party was a paying participant.

### F.    ELECTION NOT TO PAY DELAY RENTAL, SHUT-IN OR MINIMUM ROYALTY PAYMENTS

       Each party hereto shall be obligated to bear its proportionate part of any and all rentals, shut-in well payments and minimum royalties necessary to continue in force and effect the leases covered hereby unless and until such party timely gives the notice provided for in the next sentence hereof. At least ten (10) days prior to the date on which the payment of any rental, shut-in well payment or minimum royalty necessary to continue in force a lease is due, Operator shall make a written recommendation to Non-Operators as to whether or not such payment should be paid. If any party does not wish to bear its proportionate part of any such payment necessary to continue in force any lease covered hereby (the "Non-Paying Party"), such Non-Paying Party shall give the Operator and other Non-Operators written notice of such election within 48 hours of said election notice, exclusive of weekends and holidays, and the Non-Paying Party shall be released from its obligation to bear its proportionate part of any such payments that accrue under the terms of the lease or leases specified in such written election notice. Unless mutually agreed otherwise, the proportionate part of such payment attributable to any such lease that would have been borne by the Non-Paying Party shall be borne by the parties hereto that elect to make the required payment (the "Paying Parties"), in the proportion that the interest of each Paying Party bears to the total interests of all Paying Parties, and the Non-Paying Party shall assign to the Paying Parties, without express or implied warranty of title (but free of any Subsequently Created Interest or lien created or placed on such lease or leases by such party), all of its interest in the lease or leases specified in such written election notice in the respective proportions that the Paying Parties bear such payment on any such lease or leases. In the event that a Party fails to provide the election notice provided herein, said party shall nevertheless remain liable for its proportionate share of said obligations. It is further hereby agreed and understood that Operator shall be responsible for the payment of rentals, shut-in royalty and minimum royalty with respect to the leases subject hereto which are jointly owned with the Operator.

### G.    AREA OF MUTUAL INTEREST

       1.      Parties hereto hereby create an Area of Mutual Interest ("AMI") consisting of the Contract Area described in Exhibit "A-1."

       2.      During the term of this agreement, if any party hereto ("Acquiring Party") acquires or proposes to acquire, renew, or extend any oil and gas leases, or obtains any unleased mineral interests or any farmouts or other contracts (all referred to as "Mineral Interests") with respect thereto, which affect lands and minerals lying within the AMI, the Acquiring Party shall promptly advise each of the other parties hereto ("Offeree") of such acquisition or proposal. In such event, each Offeree shall have the right to obtain its proportionate interest in such Mineral Interests in accordance with the other provisions of this AMI.

       3.      Each Offeree shall have a period of fifteen (15) days after receipt of the proposal notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered Mineral Interests. If, however, a well in search of oil or gas is being drilled or completed within the AMI, each Offeree shall have a period of forty-eight (48) hours, exclusive of weekends and holidays, after receipt of the notice within which to elect to acquire its proportionate interest in the Mineral Interests so offered.

       If the Acquiring Party shall not have received actual written notice of election of Offeree to acquire its proportionate interest within the fifteen (15) day or forty-eight (48) hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest in the Mineral Interests. Each Offeree accepting the offered Mineral Interests shall be entitled to participate in such Mineral Interests in the proportion to which its interest under this Operating Agreement as set forth in Exhibit "A" hereto bears to the aggregate interest under this Operating Agreement as set forth in Exhibit "A" hereto of the Acquiring Party and all other Offerees who have elected to acquire an interest in the Mineral Interests so offered, said interest being determined by the timing of the acquisition as set forth in Paragraph 3(a.) and 3 (b.) hereinbelow.

       3(a.)    All Mineral Interests purchased within the AMI prior to payout (as defined in that Participation Agreement dated September 20, 2000 and attached herewith) of the initial test well drilled hereunder shall be offered and, in the event accepted, paid by Offeree based on their before payout interests (BPO Interests) as set forth on Exhibit "A" attached to this Operating Agreement. All costs associated with said offered Mineral Interests shall be added to the cost of the initial test well as a proportionate share of Offerees' costs and expenses.

       3(b.)    All Mineral Interests purchased within the AMI after payout (as defined in that Participation Agreement dated September 20, 2000 and attached herewith) of the initial test well drilled hereunder shall be offered and, in the event accepted, paid by Offeree based on their after payout interests (APO Interests) as set forth on Exhibit "A" attached to this Operating Agreement.



17b

All Mineral Interests acquired by CSC Energy Corp. which have a 23%, or less, lease revenue burden, shall be delivered proportionately to each offeree timely electing to acquire same, at a Working Net Revenue Interest of 77%, CSC thereby reserving as an overriding royalty interest the difference between 23% and revenue burdens, if any. All acquired Mineral Interests which are burdened with more than a 23% lease revenue burden, shall be proportionately delivered to each Offeree timely electing to acquire same.

Promptly after the time for the election shall have expired, the Acquiring party shall invoice each Offeree electing to acquire said Mineral Interests for its proportionate part of the Acquisition Costs. Each Offeree shall immediately reimburse the Acquiring Party for its share of the Acquisition Costs, as reflected by the invoice. If the Acquiring Party does not receive the amount due from the Offeree within five (5) days after the receipt by the Offeree of the invoice for its costs, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such invoice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of the former election to acquire the interest and such Offeree shall no longer have the right to acquire an interest in the offered Mineral Interests.

4.    Any assignment made by an Acquiring Party other than CSC Energy Corp. shall be made free and clear of any burdens placed thereon for the benefit of the Acquiring Party, but reserving for CSC Energy Corp. an overriding royalty interest being the difference between 23% and lease revenue burdens, if any. As to the parties acquiring title by or through CSC Energy Corp., the assignment shall be made and accepted subject to the terms and provisions of that certain Participation Agreement dated September 20, 2000, to which this Operating Agreement is attached as Exhibit "A" (hereafter the "Participation Agreement"), and each assignee shall expressly assume its portion of all of the obligations of the Acquiring Party or CSC Energy Corp..

5.    If the Mineral Interests cover lands inside and outside the AMI, the Acquiring Party shall offer all Mineral Interests inside and outside the AMI. If each party hereto acquires its proportionate interest, the AMI referred to hereinabove shall be deemed to be enlarged to incorporate those lands lying outside of the original AMI. If less than all of the parties acquire their proportionate interest in the Mineral Interests, the Mineral Interests so acquired outside of the AMI shall not be subject to this Operating agreement, but shall be subject to an Operating Agreement on a form identical to this Operating Agreement (without this Area of Mutual Interest provision) between the parties hereto who acquire an interest in such Mineral Interests.

6.    The provisions of this AMI shall not apply to acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary or affiliated corporation, or, as to individuals, from ascendant or descendants or trusts of which such parties are beneficiaries. Neither shall it apply to sales and acquisitions between partners in a partnership or venturers in a joint venture, or to any acquisition by any party of an interest which interest prior to and at the time of such acquisition was subject to this Operating Agreement, unless such acquisition was the renewal or extension of a lease which at the date of expiration was subject to this Operating Agreement. As used herein a renewal or extension of any lease means any renewal lease, extension or new lease covered by an expiring lease taken before, or taken or contracted for within one (1) year after, the expiration of the predecessor lease.

H.    MARKETING OF GAS

Operator agrees to market all Non-Operator's share of any oil or gas production from the Contract Area under the same terms that Operator is marketing its' share of said production; provided, however, that contracts entered into by Operator in marketing Non-Operator's share of production shall be subject to the limitations set forth in Article VI.G. hereof. Notwithstanding the above, any Non-Operator may choose to separately market its proportionate share of oil or gas production by giving written notice to Operator by the 15th day of the month prior to the month in which said Non-Operator intends to separately market its oil or gas production. Conversely, if said Non-Operator again requests that Operator market its production, either oil or gas, Non-Operator must provide written request of same by the 15th day of the month prior to the month in which Operator is again to market said Non-Operator's production.

I.    INSURANCE

With the exception of minimum limits specified herein and set by State and Federal regulations, Non-Operators may elect not to be covered by any of Operator's insurance coverage provided for the joint account by first providing Operator with written notice and Certificate of Insurance describing coverage and amounts of coverage equal to or greater than that provided for the joint account by Operator.

J.    ADDITIONAL RESPONSE PERIOD WHILE RIG ON LOCATION

In the event any notice requiring response is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the applicable response period within which to respond by paying for all standby time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each such electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all parties so electing.

K.    SUBROGATION

It is hereby expressly agreed that the provisions of this Article XVI. shall supersede any portion of the printed form of the Operating Agreement which is inconsistent herewith, and the other printed provisions of the Operating Agreement to which this Article XVI. is attached are in all things subrogated to the expressed and implied terms and conditions of this Article XVI.

-17c-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1         IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____ ,

2      19 _____ .

3    ATTEST OR WITNESS:                  OPERATOR

4                                                _____

5    _____    By _____

6
7    _____    Type or print name

8                                              Title _____

9                                            Date _____

10                                        Tax ID or S.S. No. _____

11

12                            NON-OPERATORS

13

14                                              _____

15    _____    By _____

16
17    _____    Type or print name

18                                              Title _____

19                                            Date _____

20                                          Tax ID or S.S. No. _____

21

22                                              _____

23    _____    By _____

24
25    _____    Type or print name

26                                              Title _____

27                                            Date _____

28                                          Tax ID or S.S. No. _____

29

30                                            By _____

31
32    _____    Type or print name

33                                              Title _____

34                                            Date _____

35                                          Tax ID or S.S. No. _____

36

37

Use of this stamping mark is prohibited except where authorized in writing by the American Association of Petroleum Landmen

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1                                         ACKNOWLEDGMENTS

2        Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The

3    validity and effect of these forms in any state will depend upon the statutes of that state.

4

5    Individual acknowledgment:

6    State of _____ )

7                               ) ss.

8    County of _____ )

9           This instrument was acknowledged before me on

10   _____ by _____ .

11

12   (Seal, if any)

13                                               Title (and Rank) _____

14                                               My commission expires: _____

15

16   Acknowledgment in representative capacity:

17   State of _____ )

18                               ) ss.

19   County of _____ )

20           This instrument was acknowledged before me on

21   _____ by _____ as

22   _____ of _____ .

23   (Seal, if any)

24                                               Title (and Rank) _____

25                                               My commission expires: _____

26

27

28

29

30

31

32

33

34

35

36

37

## EXHIBIT "A"

Attached to and made a part of that certain Participation Agreement dated September 20, 2000 by and between CSC Energy Corp. and William T. Allen, III, et al.

I.     <u>DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT</u>

Those lands located within the outline on attached plat labeled Exhibit "A-1."

II.     <u>RESTRICTION, IF ANY, AS TO DEPTHS, FORMATIONS, OR SUBSTANCES</u>
None, except that some leases contain special provisions effective at end of primary term (i.e., pugh clauses, release of depths 100' below total depth drilled, etc.).

III.     <u>PARTIES TO THE AGREEMENT WITH ADRESSES AND TELEPHONE NUMBERS FOR NOTICE PURPOSES, AND</u>

IV.     <u>PERCENTAGE INTEREST OF THE PARTIES TO THE AGREEMENT</u>

| PARTICIPANTS | BPO | APO |
|---|---|---|
| Sklar Exploration | 25% | 20% |
| P. O. Box 1753 | | |
| Shreveport, LA  71166 | | |
| Tel:  (318) 227-8668 | | |
| Fax: (318) 227-9012 | | |

V.     <u>OIL AND GAS LEASES SUBJECT TO THIS AGREEMENT*</u>
Those certain Oil, Gas and Mineral Leases set forth on attached lease schedule labeled "Exhibit A-2."

VI.     <u>BURDENS ON PRODUCTION</u>

Refer to Exhibit "A-2."

---

The Oil, Gas and Mineral Leases subject to this agreement bear the net revenue interest set forth on Exhibit "A-2" and are subject to a 20% back-in after payout in favor of CSC Energy Corp.

| PARTICIPANTS | BPO | APO |
|---|---|---|
| Laurence L. Hock<br>416 Travis, Suite 812<br>Shreveport, LA 71101<br>Tel: (318) 221-1225<br>Fax: (318) 226-8974 | 5.00% | 3.75% |
| Johnson Investments, L.L.C.<br>666 Travis, Suite 200<br>Shreveport, LA 71101<br>Tel: (318) 221-4201<br>Fax: (318) 213-2432 | 12.50% | 9.375% |
| James Muslow, Jr.<br>333 Texas Street, Suite 2222<br>Shreveport, LA 71101<br>Tel: (318) 221-8694<br>Fax: (318) 227-2106 | 5.00% | 3.75% |
| Nadel and Gussman Energy,L.L.C.<br>Attn: James Adelson, Pres.<br>15 East 5th, Suite 3200<br>Tulsa, OK 74103<br>Tel: (918) 583-3333<br>Fax: (918) 583-0888 | 25.00% | 18.75% |
| North American Reserve Corp.,<br>Nominee<br>Attn: Brent Bossart, Pres.<br>422 S. Broadway<br>Tyler, TX 75702<br>Tel: (903) 592-2290<br>Fax: (903) 592-5747 | 12.50% | 9.375% |
| Barron Johns O'Neal<br>2210 Line Avenue, Suite 304<br>Shreveport, LA 71104<br>Tel: (318) 221-9671<br>Fax: (318) 425-2343 | 5.00% | 3.75% |
| Petroleum Investments, Inc.<br>416 Travis, Suite 612<br>Shreveport,LA 71101<br>Tel: (318) 221-6143<br>Fax: (318) 221-6186 | 2.00% | 1.50% |
| **TOTALS** | 100.0000% | 100.0000% |

V.   OIL AND GAS LEASES SUBJECT TO THIS AGREEMENT*
Those certain Oil, Gas and Mineral Leases set forth on attached lease schedule labeled
"Exhibit A-2."

VI.   BURDENS ON PRODUCTION
Refer to Exhibit "A-2."

---

The Oil, Gas and Mineral Leases subject to this agreement bear the net revenue interest set forth
on Exhibit "A-2" and are subject to a 25% back-in after payout in favor of CSC Energy Corp.

EXHIBIT "A-1"



Leased Acreage

Farm-in Acreage

CSC Energy Corp.
MARSALIS PROSPECT
Claiborne Parish, LA

LAND & AMI MAP
1" = 3000"

## EXHIBIT "A-2"

### Marsalis Brochure Lease Schedule

| Lease No. | Lessor | Lessee | Date | Term | Exp.Date | NRI | Gross Acres | Net Acres | S-T-R | Recording Info. Book/Page |
|---|---|---|---|---|---|---|---|---|---|---|
| MAR-01a | Perry Keith Gantt et ux | CSC Energy | 10/29/99 | 3 yrs. | 10/29/02 | 77% | 226.98 | 155.26 | 11-T19N-R6W | 1218/63 |
| MAR-01b | Mary E. McKee Martin | CSC Energy | 11/10/99 | 3 yrs. | 11/10/02 | 77% | 88 | 7.33 | 11-T19N-R6W | 1218/46 |
| MAR-01c | Anne D. McKee Hulsether | CSC Energy | 11/10/99 | 3 yrs. | 11/10/02 | 77% | 88 | 7.33 | 11-T19N-R6W | 1218/42 |
| MAR-01d | Ella M. McKee Lawrence | CSC Energy | 11/10/99 | 3 yrs. | 11/10/02 | 77% | 22 | 22 | 11-T19N-R6W | 1218/59 |
| MAR-01e | S & P Co. | CSC Energy | 4/26/00 | 3 yrs. | 4/26/03 | 77% | 88 | 11 | 11-T19N-R6W | 1227/121 |
| MAR-01f | Lucia Ellen McKee McCoy | CSC Energy | 1/26/00 | 3 yrs. | 1/26/03 | 77% | 88 | 7.33 | 11-T19N-R6W | 1221/69 |
| MAR-02a | Will Ross Henry, Jr. et ux | CSC Energy | 10/21/99 | 3 yrs. | 10/21/02 | 77% | 127.75 | 74.42 | 2 & 11-19N-6W | 1218/26 |
| MAR-02b | Lynette Henry Kipp | CSC Energy | 10/29/02 | 3 yrs. | 10/29/02 | 77% | 80 | 26.67 | 11-T19N-R6W | 1218/02 |
| MAR-02c | Rita K. Henry Mitchell | CSC Energy | 11/5/99 | 3 yrs. | 11/5/02 | 77% | 186.72 | 63.75 | 2 & 11-19N-6W | 1218/08 |
| MAR-02d | Gloria Eileen Mitchell | CSC Energy | 11/5/99 | 3 yrs. | 11/5/02 | 77% | 144.39 | 24.82 | 2 & 11-19N-6W | 1218/20 |
| MAR-02e | Beverly Mitchell Hettle | CSC Energy | 11/5/99 | 3 yrs. | 11/5/02 | 77% | 144.39 | 24.82 | 2 & 11-19N-6W | 1218/14 |
| MAR-02f | Linda Cowser Jones | CSC Energy | 11/18/99 | 3 yrs. | 11/18/02 | 77% | 40 | 2.5 | 11-T19N-R6W | 1218/273 |
| MAR-02g | John Merrill Barber | CSC Energy | 11/18/99 | 3 yrs. | 11/18/02 | 77% | 40 | 2.5 | 11-T19N-R6W | 1218/277 |
| MAR-02h | Johnette Lee C. Payne | CSC Energy | 11/18/99 | 3 yrs. | 11/18/02 | 77% | 40 | 2.5 | 11-T19N-R6W | 1218/281 |
| MAR-02i | Etta Mae Cowser Ray | CSC Energy | 11/11/99 | 3 yrs. | 11/11/02 | 77% | 40 | 5 | 11-T19N-R6W | 1218/285 |
| MAR-02j | Irene Cowser Deas | CSC Energy | 11/3/99 | 3 yrs. | 11/3/02 | 77% | 40 | 5 | 11-T19N-R6W | 1218/290 |
| MAR-02k | Bobby Gene Barber | CSC Energy | 11/11/99 | 3 yrs. | 11/11/02 | 77% | 40 | 2.5 | 11-T19N-R6W | 1221/65 |
| MAR-03 | Steve Harmon, Jr. et ux | CSC Energy | 10/20/99 | 3 yrs. | 10/20/02 | 77% | 65.3 | 65.3 | 2-T19N-R6W | 1218/32 |
| MAR-04 | Billie Lenard Cardwell | CSC Energy | 11/2/99 | 3 yrs. | 11/2/02 | 77% | 33.98 | 33.98 | 11-T19N-R6W | 1218/38 |
| MAR-05 | Thomas D. Cardwell | CSC Energy | 11/1/99 | 3 yrs. | 11/1/02 | 77% | 28 | 28 | 11-T19N-R6W | 1218/50 |
| MAR-06 | Jimmy W. Harmon | CSC Energy | 11/4/99 | 3 yrs. | 11/4/02 | 77% | 20 | 20 | 2-T19N-R6W | 1218/54 |
| MAR-07 | Annie Slack et al | CSC Energy | 11/19/99 | 3 yrs. | 11/19/02 | 77% | 64.82 | 64.82 | 2-T19N-R6W | 1218/240 |
| MAR-08a | Mildred Tooke Bell | CSC Energy | 12/17/99 | 3 yrs. | 12/17/02 | 77% | 40 | 10 | 11-T19N-R6W | 1218/245 |
| MAR-08b | Elmer A. Tooke | CSC Energy | 12/9/99 | 3 yrs. | 12/9/02 | 77% | 40 | 10 | 11-T19N-R6W | 1218/249 |
| MAR-08c | David Barry Tooke et al | CSC Energy | 12/8/99 | 3 yrs. | 12/8/02 | 77% | 40 | 20 | 2-T19N-R6W | 1218/253 |
| MAR-09a | Julia B. Knighton et al | CSC Energy | 12/29/99 | 3 yrs. | 12/29/02 | 77% | 80 | 8.89 | 11-T19N-R6W | 1218/257 |
| MAR-09b | Joyce Anderson Abts | CSC Energy | 12/13/99 | 3 yrs. | 12/13/02 | 77% | 80 | 4.44 | 11-T19N-R6W | 1218/261 |
| MAR-09c | Ruth Anderson Worden | CSC Energy | 12/13/99 | 3 yrs. | 12/13/02 | 77% | 80 | 4.44 | 11-T19N-R6W | 1218/265 |
| MAR-09d | Charles C. Blittle, Sr. | CSC Energy | 12/14/99 | 3 yrs. | 12/14/02 | 77% | 80 | 2.22 | 11-T19N-R6W | 1218/269 |
| MAR-09e | James T. Bittle | CSC Energy | 12/14/99 | 3 yrs. | 12/14/02 | 77% | 80 | 2.22 | 11-T19N-R6W | 1219/202 |
| MAR-09f | Polly Fleming Buller | CSC Energy | 2/9/00 | 3 yrs. | 2/9/03 | 77% | 80 | 2.96 | 11-T19N-R6W | 1227/117 |
| MAR-09g | Mary Lois Bittle Daniel | CSC Energy | 4/5/00 | 3 yrs. | 4/5/03 | 77% | 80 | 2.22 | 11-T19N-R6W | 1227/113 |
| MAR-09h | Susan Fleming Hotard | CSC Energy | 2/9/00 | 3 yrs. | 2/9/03 | 77% | 80 | 2.96 | 11-T19N-R6W | 1222/125 |

## Marsalis Brochure Lease Schedule

| ID | Name | Company | Date | Term | Date | % | | | Location | Reference |
|---|---|---|---|---|---|---|---|---|---|---|
| MAR-09i | L.L. Robinson, Jr. | CSC Energy | 3/2/00 | 3 yrs. | 3/2/03 | 77% | 80 | 2.5 | 11-T19N-R6W | 1223/278 |
| MAR-09j | Harold B. Clapp | CSC Energy | 12/14/99 | 3 yrs. | 12/14/02 | 77% | 80 | 7.5 | 11-T19N-R6W | 1220/149 |
| MAR-09k | Kilpatrick Investments, Inc | CSC Energy | 4/3/00 | 3 yrs. | 4/3/03 | 75% | 17.73 | 6.53 | 11-T19N-R6W | 1225/101 |
| MAR-09l | Sam & LJC, L.L.C. | CSC Energy | 3/24/00 | 1.5 yr | 9/24/01 | 75% | 87.27 | 32.12 | 11-T19N-R6W | 1225/29 |
| MAR-09m | Norma Jean Rheudasil | CSC Energy | 2/9/00 | 3 yrs. | 2/9/03 | 77% | 80 | 3.33 | 11-T19N-R6W | 1230/190 |
| MAR-09n | Freda Oil Company | CSC Energy | 4/13/00 | 3 yrs. | 4/13/03 | 75% | 80 | 5 | 11-T19N-R6W | 1232/137 |
| MAR-10a | James Rodney White | CSC Energy | 12/7/02 | 3 yrs. | 12/7/02 | 77% | 26.7 | 5.34 | 11-T19N-R6W | 1218/294 |
| MAR-10b | Naomi Watson Brackman | CSC Energy | 11/8/99 | 3 yrs. | 11/8/02 | 77% | 103.45 | 31.035 | 11-T19N-R6W | 1218/299 |
| MAR-10c | Thomas Averett Watson | CSC Energy | 11/9/99 | 3 yrs. | 11/9/02 | 77% | 103.45 | 10.345 | 11-T19N-R6W | 1219/01 |
| MAR-10d | Wilton W. Averett | CSC Energy | 11/2/99 | 3 yrs. | 11/2/02 | 77% | 68.45 | 13.69 | 11-T19N-R6W | 1219/06 |
| MAR-10e | Nelda R. Averett Sibert | CSC Energy | 11/11/99 | 3 yrs. | 11/11/02 | 77% | 93.45 | 9.345 | 11-T19N-R6W | 1219/11 |
| MAR-10f | Dorothy F. Averett Lively | CSC Energy | 11/16/99 | 3 yrs. | 11/16/02 | 77% | 89.45 | 8.945 | 11-T19N-R6W | 1219/16 |
| MAR-10g | Norma Averett McConathy | CSC Energy | 11/2/99 | 3 yrs. | 11/2/02 | 77% | 75.7 | 15.14 | 11-T19N-R6W | 1219/21 |
| MAR-10h | James W. Buckner et ux | CSC Energy | 3/2/00 | 3 yrs. | 12/17/02 | 77% | 24 | 2.4 | 11-T19N-R6W | 1230/194 |
| MAR-11a | William C. Ovitt et ux | CSC Energy | 12/17/99 | 3 yrs. | 12/17/02 | 77% | 20 | 10 | 2-T19N-R6W | 1219/206 |
| MAR-11b | James W. Buckner et ux | CSC Energy | 1/26/00 | 3 yrs. | 1/26/03 | 77% | 20 | 10 | 2-T19N-R6W | 1221/61 |
| MAR-12 | Louise Anderson Thomas | CSC Energy | 1/26/00 | 3 yrs. | 1/26/03 | 77% | 20 | 10 | 2-T19N-R6W | 1220/36 |
| MAR-13 | Keith Ferguson et ux | CSC Energy | 3/18/00 | 3 yrs. | 3/18/03 | 77% | 3 | 3 | 11-T19N-R6W | 1225/05 |
| MAR-14a | Rick N. Shaw | CSC Energy | 3/11/00 | 3 yrs. | 3/11/03 | 77% | 85 | 17.1 | 2-T19N-R6W | 1225/19 |
| MAR-14b | Linda Shaw Fuller | CSC Energy | 3/11/00 | 3 yrs. | 3/11/03 | 77% | 85 | 17.1 | 2-T19N-R6W | 1225/09 |
| MAR-14c | Leland D. Shaw | CSC Energy | 3/11/00 | 3 yrs. | 3/11/03 | 77% | 85 | 17.1 | 2-T19N-R6W | 1225/14 |
| MAR-14d | Melony Shaw Templin | CSC Energy | 3/11/00 | 3 yrs. | 3/11/03 | 77% | 85 | 17.1 | 2-T19N-R6W | 1225/24 |
| MAR-14e | Stan K. Shaw | CSC Energy | 3/11/00 | 3 yrs. | 3/11/03 | 77% | 85 | 17.1 | 2-T19N-R6W | 1225/96 |
| MAR-15a | Sandra Barber Atwood | CSC Energy | 3/18/00 | 3 yrs. | 3/18/03 | 77% | 9 | 3 | 2-T19N-R6W | 1225/01 |
| MAR-15b | James Randall Barber | CSC Energy | 3/18/00 | 3 yrs. | 3/18/03 | 77% | 9 | 3 | 2-T19N-R6W | 1225/277 |
| MAR-15c | Debra Ann Barber | CSC Energy | 3/18/00 | 3 yrs. | 3/18/03 | 77% | 9 | 3 | 2-T19N-R6W | 1225/281 |
| MAR-16a | Patricia Maddry Dumas | CSC Energy | 3/18/00 | 3 yrs. | 3/18/03 | 77% | 35 | 2.92 | 2-T19N-R6W | 1226/159 |
| MAR-16b | Peggy Maddry King | CSC Energy | 3/18/00 | 3 yrs. | 3/18/03 | 77% | 35 | 2.92 | 2-T19N-R6W | 1225/273 |
| MAR-16c | James Maddry et al | CSC Energy | 3/18/00 | 3 yrs. | 3/18/03 | 77% | 35 | 2.92 | 2-T19N-R6W | 1225/285 |
| MAR-16d | Patti D. Rackley | CSC Energy | 4/12/00 | 3 yrs. | 4/12/03 | 77% | 35 | 1.46 | 2-T19N-R6W | 1227/09 |
| MAR-17 | Gary Richard English | CSC Energy | 3/18/00 | 3 yrs. | 3/18/03 | 77% | 9.25 | 9.25 | 2-T19N-R6W | 1228/169 |
| MAR-18 | James Glawson Gantt | CSC Energy | 12/17/99 | 3 yrs. | 12/17/02 | 77% | 10 | 10 | 2-T19N-R6W | 1221/221 |
| MAR-19a | Fred F. Meadows, Jr. | CSC Energy | 3/7/00 | 3 yrs. | 3/7/03 | 77% | 28.5 | 14.25 | 11-T19N-R6W | 1231/65 |
| Farmin/BPO | Eddie C. Cardwell et al | Sugar Creek | 8/22/56 | n/a | HBP | 75% | 40 | 35 | 11-T19N-R6W | 221/211 |
| Farmin/BPO | Gloria Irene Caldwell | Sugar Creek | 9/20/56 | n/a | HBP | 75% | 40 | 5 | 11-T19N-R6W | 221/266 |
| Farmin/BPO | L.C. Gardner | Sugar Creek | 7/6/51 | n/a | HBP | 75% | 30 | 30 | 2-T19N-R6W | 192/162 |
| Farmin/BPO | W.M. Dobbins et al | Sugar Creek | 12/12/28 | n/a | HBP | 75% | 0.5 | 0.4 | 2-T19N-R6W | 73/67 |
| Farmin/BPO | W.M. Dobbins, as Tutor | Sugar Creek | 10/28/31 | n/a | HBP | 75% | 0.5 | 0.1 | 2-T19N-R6W | 86/165 |

TOTAL
1,121.5

Recommended by the Council
of Petroleum Accountants
Societies

COPAS – 1984 – ONSHORE

COPAS

Kraftbin **601,**   BOX 800
TULSA OK 74101

# EXHIBIT " C "

Attached to and made a part of   that certain Operating Agreement dated September 20, 2000
by and between CSC Energy Corp. and William T. Allen, III, et al.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

   "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

   "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

   "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

   "Operator" shall mean the party designated to conduct the Joint Operations.

   "Non-Operators" shall mean the Parties to this agreement other than the Operator.

   "Parties" shall mean Operator and Non-Operators.

   "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

   "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

   "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

   "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

   "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

2. **Statement and Billings**

   Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____ _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5.  **Audits**

   A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

   B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.  **Approval By Non-Operators**

   Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.  **Ecological and Environmental**

   Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.  **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

3.  **Labor**

   A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

      (2)   Salaries of First Level Supervisors in the field.

      (3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

      (4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

   B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

   D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

4.  **Employee Benefits**

   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed ___twelve___ percent ( __12__ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12. Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. Abandonment and Reclamation

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. Communications

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

III. OVERHEAD

1. Overhead – Drilling and Producing Operations

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

      ( X ) Fixed Rate Basis, Paragraph 1A, or
      (    ) Percentage Basis, Paragraph 1B

      Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

      (    ) shall be covered by the overhead rates, or
      ( X ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

      (    ) shall be covered by the overhead rates, or
      ( X ) shall not be covered by the overhead rates.

   A. Overhead – Fixed Rate Basis

      (1) Operator shall charge the Joint Account at the following rates per well per month:

         Drilling Well Rate $ ___6,000.00___
         (Prorated for less than a full month)

         Producing Well Rate $ ___600.00___

      (2) Application of Overhead – Fixed Rate Basis shall be as follows:

         (a) Drilling Well Rate

             (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead – Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent ( _____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent ( _____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. Overhead – Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

Recommended by the Council of Petroleum Accountants Societies

COPAS – 1984 ● ONSHORE

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ __50,000.00__ :

A. ____5____ % of first $100,000 or total cost if less, plus

B. ____3____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ____2____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.   Catastrophe Overhead

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ____5____ % of total costs through $100,000; plus

B. ____3____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ____2____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.   Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.   Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.   Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.   New Material (Condition A)

(1)   Tubular Goods Other than Line Pipe

(a)   Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b)   For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

- 6 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

    (a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

    (d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B.    Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

    (b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.    Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.   Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS – 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   Special Inventories

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   Expense of Conducting Inventories

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement
dated September 20, 2000, by and between CSC Energy Corp., as Operator,
and William T. Allen, III, et al, as Non-Operator

1.  Workmen's Compensation Insurance granting full compensation under the Workmen's Compensation Law of the state in which the Contract Area is located and Employer's Liability Insurance with limits of not less than $1,000,000.00 for all employees engaged in work for the joint account.

2.  Commercial General Liability Insurance in such amounts as Operator may from time to time carry, but not less than $1,000,000.00 for any one person injured in any one accident and not less than $1,000,000.00 for more than one person injured in any one accident, and damage to property owned by the joint account caused by any one fire up to a limit of $100,000.00.

3.  Automotive Liability Insurance in such amounts as Operator may from time to time carry, but not less than a combined single limit of $1,000,000.00 for any one person injured in any one accident inclusive of bodily injury and property damage.

4.  Operator shall require contractors and subcontractors performing work for the joint account to provide such insurance as deemed necessary by Operator in relation to the work to be performed by said contractors or subcontractors.

5.  Except as provided hereinabove, Operator shall not carry insurance for the benefit of the joint account covering loss or damage to the jointly owned property or production therefrom caused by fire, explosion, windstorm, tornado, flood, vandalism, malicious mischief, or other extended perils, and the joint account shall be charged with all loss and expenditures caused or incurred as the result of any other casualty for which Operator is not required to carry insurance hereunder.  Operator shall notify Non-Operators of any and all losses of this description.

6.  Liability, except that covered by insurance, against any of the parties for damages to property of third persons, or injury to or death of third persons arising out of the joint operations, including expenses incurred in defending claims or actions asserting liability of this character, shall be borne by each of the parties hereto in proportion to their respective undivided interest in the joint operations.

7.  It is understood and agreed that Operator is not a warrantor of the financial responsibility of the insurer with whom such insurance is carried, and that except for willful negligence Operator shall not be liable to Non-Operators for any loss suffered on account of the insufficiency of the insurance carried or of the insurers with whom carried.

EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement
dated  September 20, 2000, by and between CSC Energy Corp., as Operator,
and William T. Allen, III., as Non-Operator

GAS BALANCING AGREEMENT

Each party hereto has the right to take its share of gas produced from the area covered by this Agreement and to sell its share of gas for itself, and each party hereto has made or will make arrangements either to take or market its share of such gas.  The parties hereto recognize, however, that the marketing or sale of the gas by the respective parties may occur at different times or may result in accordance with each party's ownership interest therein and the following terms and provisions shall be applicable and effective at any and all times that any of the parties hereto are not taking or marketing its share of the gas produced, or its full share thereof, or a purchaser of gas from any party is not taking such party's full share of the gas produced.

I.

During any period when any party or parties are not so taking or marketing their share of such gas ("underproduced parties"), the other parties shall be entitled to produced one hundred percent (100%) of the allowable gas production assigned by a governmental regulatory body having jurisdiction or produce such gas at the maximum efficient rate in the absence of regulation.  Such other parties ("overproducing parties") shall be entitled to take or market all of the gas produced during such period.  All of the parties shall share in and own the liquid hydrocarbons recovered by lease equipment from such gas in accordance with their respective interests and subject to the Operating Agreement to which this Gas Balancing Agreement is attached, but the party or parties taking and marketing such gas shall own such gas.

II.

On a cumulative basis, such underproducing party shall be credited with gas in storage equal to its full share of the gas produced, less its share of gas used in lease operations, vented or lost, and less that portion such party took or marketed.  The operator under said Operating Agreement will establish and maintain currently a gas account to show the gas imbalance which exists between all the parties and will furnish each of these parties a monthly statement showing the total quantity of gas produced, the amount used in lease operations, vented or lost, the total quantity of gas taken or delivered to market for the account of each party, and the monthly and cumulative over and under account of each party.  The Operator shall be responsible for determining the final accounting of the underproduction and overproduction and the amounts due to be paid to, or by, each party.

III.

Each party agrees to indemnify and hold each and every other party harmless from any and all claims for royalty payments asserted by royalty owners to whom each indemnifying party is accountable.  The term "royalty owner" shall include owners of royalty, overriding royalties, production payments and similar interests.

IV.

If an underproduced party desires to take make-up gas, at least ten (10) days prior to the beginning of a calendar month, said underproduced party shall give written notice to the Operator and all other parties and such underproduced party may begin the next month taking or marketing its full share of the gas produced, less such party's share of gas used in operations, vented or lost.  In addition to such underproduced party's share, each underproduced party, until it has recovered its gas in storage and balanced the gas account as to its interest, shall be entitled to currently take or market all or part of the following amounts of gas:

      (a)    If any other party is not then taking or marketing its full share of gas, the underproduced party may take the amount of gas not being taken or marketed by such party, not to exceed 300% of the underproduced party's interest; plus

      (b)    Up to 50% of the interest in the then current gas production of any overproduced party until the gas account of such overproduced party is balanced.

Provided that, all such additional gas taken or marketed by an underproduced party shall first be deemed taken or marketed from any amount available under Subsection (a) above; and, provided further, that if more than one underproduced party desires to take or market additional gas, each such party shall be entitled to take or market that portion of available additional gas represented by Subsection (a) and (b) above, determined by multiplying such amount by a fraction, the numerator of which is the interest of such party and the denominator which is the sum of the interests of all the parties desiring to so take or market additional gas.

V.

Each party producing and taking or marketing gas shall pay any and all production taxes and royalty due on such gas.

## VI.

Nothing herein contained shall be construed as denying any party the right, from time to time, to produce and take or deliver to its purchaser its full share of gas production to meet the deliverability tests required by its purchaser.

## VII.

In the event production of gas is permanently discontinued before the gas account is balanced, settlement will be made between the underproduced and overproduced parties as to the then existing imbalance. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which the overproduced party or parties received, not subject to refund in whole or in part. Such sum shall be less applicable royalty, taxes and similar lease burdens theretofore paid and shall be based on the price actually received by the overproduced party at the time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. Notwithstanding the foregoing, should the underproduced party elect to receive such sum of money which is subject to refund, it shall be entitled to the payment thereof from the overproduced party or parties upon the underproduced party executing and delivering to said overproduced party or parties of a letter in which the underproduced party agrees to repay to the overproduced party or parties that amount so paid that is ultimately required to be refunded. For the purposes of this paragraph, if any underproduced party has recovered part of its gas in storage, the gas recovered shall be deemed the gas first stored.

## VIII.

Nothing herein contained shall change or affect the obligations of each party to bear and pay its proportionate share of all costs, expenses, and liabilities as provided in the Operating Agreement

## IX.

This Gas Balancing Agreement shall become effective in accordance with its terms and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors, legal representatives, and assigns.

## X.

If any party sells or assigns an interest in the working interest in the land owned by it when such party is an underproduced party, the sale or assignment shall include all interest of the selling or assigning party in the gas, all right to make up gas and all right to any money payment which may ultimately be due hereunder, in the absence of specific provision in the assignment instrument otherwise.

## XI.

If any party sells or assigns an interest in the working interest in the land owned by it when such party is an overproduced party, then any underproduced party or parties shall have the right to provoke a cash settlement of the gas accounts as provided for in Article VII.

## XII.

In any situation in which there exists an imbalance of gas, Operator shall make every effort to determine the point in time when an overproducer has taken and produced one hundred percent (100%) of its working interest share of gas reserves. Upon notice by Operator that it believes that such point in time has been reached, Operator shall suspend delivery of such gas to such overproducer and each underproducer shall be entitled to take one hundred percent (100%) of production until recovery of its cumulative underproduction, and from time of such notice until such recovery, the overproducer shall have no rights to the gas.

rev. 2/1/93