A.A.P.L. FORM 610 - 1977

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

June 28        , 19 78 ,

OPERATOR ___DELTA DRILLING COMPANY_____

CONTRACT AREA____GUILL GAS UNIT_____

_____

_____

COUNTY·OR PARISH OF___PANOLA_____STATE OF___TEXAS_____

COPYRIGHT 1977    ⸻    ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.    A.A.P.L. NO 610 - 1977 REVISED
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
KRAFTBILT PRODUCTS.    BOX 800, TULSA 74101

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTEREST OF PARTIES IN COSTS AND PRODUCTION | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2 |
| | B. LOSS OF TITLE | 2 |
| | 1. Failure of Title | 2-3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 3 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 3 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5-6 |
| | 2. Operations by Less than All Parties | 6-7 |
| | C. RIGHT TO TAKE PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 7 |
| | E. ABANDONMENT OF WELLS | 7 |
| | 1. Abandonment of Dry Holes | 7 |
| | 2. Abandonment of Wells that have Produced | 7-8 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 8 |
| | A. LIABILITY OF PARTIES | 8 |
| | B. LIENS AND PAYMENT DEFAULTS | 8 |
| | C. PAYMENTS AND ACCOUNTING | 8 |
| | D. LIMITATION OF EXPENDITURES | 9 |
| | 1. Drill or Deepen | 9 |
| | 2. Rework or Plug Back | 9 |
| | 3. Other Operations | 9 |
| | E. ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 9 |
| | F. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 9-10 |
| | G. TAXES | 10 |
| | H. INSURANCE | 10 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 10 |
| | A. SURRENDER OF LEASES | 10-11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTION | 11 |
| | D. SUBSEQUENTLY CREATED INTEREST | 11-12 |
| | E. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | F. WAIVER OF RIGHT TO PARTITION | 12 |
| | ~~G. PREFERENTIAL RIGHT TO PURCHASE~~ | ~~12~~ |
| IX. | INTERNAL REVENUE CODE ELECTION | 12-13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13-14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between _____ **DELTA DRILLING COMPANY** _____
_____, hereinafter designated and
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter
referred to individually herein as "Non-Operator", and collectively as "Non-Operators",

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas in-
terests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore
and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and
as hereinafter provided:

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed
to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid
or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to
limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases cov-
ering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of
land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil
and gas interests intended to be developed and operated for oil and gas purposes under this agreement.
Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule
of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order,
a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area
or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to
be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in
and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects
not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the
plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a
part hereof:

[X] A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to agreement,
    (2) Restrictions, if any, as to depths or formations,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
[X] B. Exhibit "B", Form of Lease.
[X] C. Exhibit "C", Accounting Procedure.
[X] D. Exhibit "D", Insurance.
[X] E. Exhibit "E", Gas Balancing Agreement.
[X] F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.

If any provision of any exhibit, except Exhibit "E", is inconsistent with any provision contained
in the body of this agreement, the provisions in the body of this agreement shall prevail.

ARTICLE III.
INTERESTS OF PARTIES

A. Oil and Gas Interests:

If any party owns an unleased oil and gas interest in the Contract Area, that interest shall be treated for the purpose of this agreement and during the term hereof as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B". As to such interest, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

B. Interest of Parties in Costs and Production:

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A". All production of oil and gas from the Contract Area, subject to the payment of lessor's royalties which will be borne by the Joint Account, shall also be owned by the parties in the same manner during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interests covered hereby.

ARTICLE IV.
TITLES

A. Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including Federal Lease Status Reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C," and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. The Operator shall be responsible for the preparation and recording of Pooling Designations or Declarations as well as the conduct of hearings before Governmental Agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

B. Loss of Title:

1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests, and

(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development

- 2 -

1   or operating costs which it may have theretofore paid, but there shall be no monetary liability on its
2   part to the other parties hereto for drilling, development, operating or other similar costs by reason of
3   such title failure; and

4       (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the
5   operation of the interest which has been lost, but the interests of the parties shall be revised on an acre-
6   age basis, as of the time it is determined finally that title failure has occurred, so that the interest of
7   the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
8   Area by the amount of the interest lost; and

9       (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled
10   on the Contract Area is increased by reason of the title failure, the party whose title has failed shall
11   receive the proceeds attributable to the increase in such interests (less costs and burdens attributable
12   thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;
13   and

14       (d) Should any person not a party to this agreement, who is determined to be the owner of any in-
15   terest in the title which has failed, pay in any manner any part of the cost of operation, development,
16   or equipment, such amount shall be paid to the party or parties who bore the costs which are so refund-
17   ed; and

18       (e) Any liability to account to a third party for prior production of oil and gas which arises by
19   reason of title failure shall be borne by the party or parties in the same proportions in which they shared
20   in such prior production; and

21       (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection
22   with the defense of the interest claimed by any party hereto, it being the intention of the parties
23   hereto that each shall defend title to its interest and bear all expenses in connection therewith.
24

25     2.  Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight,
26   any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously
27   paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against
28   the party who failed to make such payment. Unless the party who failed to make the required payment
29   secures a new lease covering the same interest within ninety (90) days from the discovery of the fail-
30   ure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of
31   the parties shall be revised on an acreage basis, effective as of the date of termination of the lease in-
32   volved, and the party who failed to make proper payment will no longer be credited with an interest in
33   the Contract Area on account of ownership of the lease or interest which has terminated. In the event
34   the party who failed to make the required payment shall not have been fully reimbursed, at the time of
35   the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an
36   acreage basis, for the development and operating costs theretofore paid on account of such interest, it
37   shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the
38   cost of any dry hole previously drilled or wells previously abandoned) from so much of the following
39   as is necessary to effect reimbursement:

40       (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost
41   interest, on an acreage basis, up to the amount of unrecovered costs;

42       (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an
43   acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production
44   from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable
45   to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
46   portion of the oil and gas to be contributed by the other parties in proportion to their respective in-
47   terests; and

48       (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or
49   becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or be-
50   coming a party to this agreement.
51

52     3.  Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2.
53   above, shall not be considered failure of title but shall be joint losses and shall be borne by all parties
54   in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
55   the Contract Area.
56

57                              ARTICLE V.
58                              OPERATOR
59

60   A.  DESIGNATION AND RESPONSIBILITIES OF OPERATOR:
61

62     DELTA DRILLING COMPANY                                 shall be the
63   Operator of the Contract Area, and shall conduct and direct and have full control of all operations on
64   the Contract Area as permitted and required by, and within the limits of, this agreement. It shall con-
65   duct all such operations in a good and workmanlike manner, but it shall have no liability as Operator
66   to the other parties for losses sustained or liabilities incurred, except such as may result from gross
67   negligence or willful misconduct.
68
69
70

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest in the Contract Area, or is no longer capable of serving as Operator, it shall cease to be Operator without any action by Non-Operator, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

**C. Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator, and all such employees shall be the employees of Operator.

**D. Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.<br>DRILLING AND DEVELOPMENT

**A. Initial Well:**           *Availability of Drilling Rig

On or before the __*__ day of_____*_____, 19 78 , Operator shall commence the drilling of a well for oil and gas at the following location:

Location of Operator's choice on the Benj. Strickland Survey A-587, Panola County, Texas.   (Location site has been prepared for rig.)

and shall thereafter continue the drilling of the well with due diligence to

drilling to a depth sufficient to test the Cotton Valley Sand, or 10,300 feet below the surface, whichever is the lesser.

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, it shall first secure the consent of all parties and shall plug and abandon same as provided in Article VI.E.1. hereof.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

**B. Subsequent Operations:**

1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday or legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest of the parties approving such operation, and (b) its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A", or (b) carry its proportionate part of Non-Consenting Parties' interest. The proposing party, at its election, may withdraw such proposal if there is insufficient participation, and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(b) 300% of that portion of the costs and expenses of drilling, reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and

- 5 -

1   300 % of that portion of the cost of newly acquired equipment in the well (to and including the well-
2   head connections), which would have been chargeable to such Non-Consenting Party if it had partici-
3   pated therein.
4
5       Gas production attributable to any Non - Consenting Party's relinquished interest upon such Party's
6   election, shall be sold to its purchaser, if available, under the terms of its existing gas sales con-
7   tract. Such Non - Consenting Party shall direct its purchaser to remit the proceeds receivable from
8   such sale direct to the Consenting Parties until the amounts provided for in this Article are recov-
9   ered from the Non - Consenting Party's relinquished interest. If such Non - Consenting Party has not
10  contracted for sale of its gas at the time such gas is available for delivery, or has not made the elec-
11  tion as provided above, the Consenting Parties shall own and be entitled to receive and sell such Non-
12  Consenting Party's share of gas as hereinabove provided during the recoupment period.
13
14      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share
15  of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of
16  all production, severance, gathering and other taxes, and all royalty, overriding royalty and other
17  burdens applicable to Non-Consenting Party's share of production.
18
19      In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall
                              completing
20  be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of
21  all such equipment shall remain unchanged; and upon abandonment of a well after such/reworking, completion attempt
22  plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the
23  owners thereof, with each party receiving its proportionate part in kind or in value, less cost of
24  salvage.
25
26      Within sixty (60) days after the completion of any operation under this Article, the party con-
27  ducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an in-
28  ventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling,
29  deepening, plugging back, testing, completing, and equipping the well for production; or, at its option,
30  the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed
31  statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being
32  reimbursed as provided above, the Party conducting the operations for the Consenting Parties shall furn-
33  ish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the
34  operation of the well, together with a statement of the quantity of oil and gas produced from it and the
35  amount of proceeds realized from the sale of the well's working interest production during the preceding
36  month. In determining the quantity of oil and gas produced during any month, Consenting Parties
37  shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any
38  amount realized from the sale or other disposition of equipment newly acquired in connection with any
39  such operation which would have been owned by a Non-Consenting Party had it participated therein
40  shall be credited against the total unreturned costs of the work done and of the equipment purchased,
41  in determining when the interest of such Non-Consenting Party shall revert to it as above provided;
42  and if there is a credit balance, it shall be paid to such Non-Consenting party.
43
44      If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest
45  the amounts provided for above, the relinquished interests of such Non-Consenting Party shall auto-
46  matically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same
47  interest in such well, the material and equipment in or pertaining thereto, and the production there-
48  from as such Non-Consenting Party would have been entitled to had it participated in the drilling,
49  reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be
              completing
50  charged with and shall pay its proportionate part of the further costs of the operation of said well in
51  accordance with the terms of this agreement and the Accounting Procedure, attached hereto.
52
53      Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent
54  of all parties, no wells shall be completed in or produced from a source of supply from which a well
55  located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing
56  well spacing pattern for such source of supply.
57
58      The provisions of this Article shall have no application whatsoever to the drilling of the initial
59  well described in Article VI.A. except (a) when Option 2, Article VII.D.1., has been selected, or (b)
60  to the reworking, deepening and plugging back of such initial well, if such well is or thereafter shall
61  prove to be a dry hole or non-commercial well, after having been drilled to the depth specified in Article
62  VI.A.
63
64  C.  Right to Take Production in Kind:
65
66      Each party shall have the right to take in kind or separately dispose of its proportionate share of
67  all oil and gas produced from the Contract Area, exclusive of production which may be used in de-
68  velopment and producing operations and in preparing and treating oil for marketing purposes and
69  production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate dis po-
70  sition by any party of its proportionate share of the production shall be borne by such party. Any

- 6 -

1    party taking its share of production in kind shall be required to pay for only its proportionate share
2    of such part of Operator's surface facilities which it uses.
3

4       Each party shall execute such division orders and contracts as may be necessary for the sale of its
5    interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled
6    to receive payment direct from the purchaser thereof for its share of all production.
7

8       In the event any party shall fail to make the arrangements necessary to take in kind or separately
9    dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have
10    the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such
11    oil and gas or sell it to others at any time and from time to time, for the account of the non-taking
12    party at the best price obtainable in the area for such production. Any such purchase or sale by Op-
13    erator shall be subject always to the right of the owner of the production to exercise at any time its
14    right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a
15    purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for
16    such reasonable periods of time as are consistent with the minimum needs of the industry under the
17    particular circumstances, but in no event for a period in excess of one (1) year. Notwithstanding the
18    foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's
19    share of gas production without first giving such other party thirty (30) days notice of such intended
20    sale.
21

22       In the event one or more parties' separate disposition of its share of the gas causes split-stream de-
23    liveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not
24    exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the
25    balancing or accounting between the respective accounts of the parties shall be in accordance with
26    any Gas Balancing Agreement between the parties hereto, whether such Agreement is attached as
27    Exhibit "E", or is a separate Agreement.
28

29   D.  Access to Contract Area and Information:
30

31       Each party shall have access to the Contract Area at all reasonable times, at its sole risk to inspect
32    or observe operations, and shall have access at reasonable times to information pertaining to the de-
33    velopment or operation thereof, including Operator's books and records relating thereto. Operator, upon
34    request, shall furnish each of the other parties with copies of all forms or reports filed with govern-
35    mental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports
36    of stock on hand at the first of each month, and shall make available samples of any cores or cuttings
37    taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to
38    Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the
39    information.
40

41   E.  Abandonment of Wells:
42

43      1.  Abandonment of Dry Holes: Except for any well drilled pursuant to Article VI.B.2., any well
44    which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole
45    shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent
46    effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours
47    (exclusive of Saturday, Sunday or legal holidays) after receipt of notice of the proposal to plug and
48    abandon such well, such party shall be deemed to have consented to the proposed abandonment. All
49    such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost,
50    risk and expense of the parties who participated in the cost of drilling of such well. Any party who ob-
51    jects to the plugging and abandoning such well shall have the right to take over the well and conduct
52    further operations in search of oil and/or gas subject to the provisions of Article VI.B.
53

54      2.  Abandonment of Wells that have Produced: Except for any well which has been drilled or re-
55    worked pursuant to Article VI.B.2. hereof for which the Consenting Parties have not been fully reim-
56    bursed as therein provided, any well which has been completed as a producer shall not be plugged and
57    abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
58    be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense
59    of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment
60    of such well, all parties do not agree to the abandonment of any well, those wishing to continue its op-
61    eration shall tender to each of the other parties its proportionate share of the value of the well's salvable
62    material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated
63    cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall
64    assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity,
65    quality, or fitness for use of the equipment and material, all of its interest in the well and related equip-
66    ment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the
67    formation or formations then open to production. If the interest of the abandoning party is or includes
68    an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an
69    oil and gas lease, limited to the interval or intervals of the formation or formations then open to produc-
70    tion, for a term of one year and so long thereafter as oil and/or gas is produced from the interval or inter-

- 7 -

vals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is
located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon
the relationship of their respective percentages of participation in the Contract Area to the aggregate of
the percentages of participation in the Contract Area of all assignees. There shall be no readjustment
of interest in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the op-
eration of or production from the well in the interval or intervals then open other than the royalties
retained in any lease made under the terms of this Article. Upon request, Operator shall continue to
operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
templated by this agreement, plus any additional cost and charges which may arise as the result of
the separate ownership of the assigned well.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A.  Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible
only for its obligations, and shall be liable only for its proportionate share of the costs of developing
and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are
given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall
this agreement be construed as creating, a mining or other partnership or association, or to render the
parties liable as partners.

B.  Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a
security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure
payment of its share of expense, together with interest thereon at the rate provided in the Accounting
Procedure attached hereto as Exhibit "C". To the extent that Operator has a security interest under the
Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies
of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator
for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
rights or security interest as security for the payment thereof. In addition, upon default by any Non-
Operator in the payment of its share of expense, Operator shall have the right, without prejudice to
other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's
share of oil and/or gas until the amount owed by such Non-Operator, plus interest has been paid. Each
purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any de-
fault. Operator grants a like lien and security interest to the Non-Operators to secure payment of Op-
erator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of
a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by
Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the in-
terest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimburse-
ment thereof, be subrogated to the security rights described in the foregoing paragraph.

C.  Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses
incurred in the development and operation of the Contract Area pursuant to this agreement and shall
charge each of the parties hereto with their respective proportionate shares upon the expense basis pro-
vided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate
record of the joint account hereunder, showing expenses incurred and charges and credits made and
received.

Operator, at its election, shall have the right from time to time to demand and receive from the
other parties payment in advance of their respective shares of the estimated amount of the expense to
be incurred in operations hereunder during the next succeeding month, which right may be exercised only
by submission to each such party of an itemized statement of such estimated expense, together with
an invoice for its share thereof. Each such statement and invoice for the payment in advance of esti-
mated expense shall be submitted on or before the 20th day of the next preceding month. Each party
shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such es-
timate and invoice is received. If any party fails to pay its share of said estimate within said time, the
amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be
made monthly between advances and actual expense to the end that each party shall bear and pay its
proportionate share of actual expenses incurred, and no more.

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

D. Limitation of Expenditures:

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this Agreement, it being understood that the consent to the drilling or deepening shall include:

☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and/or surface facilities.

[X] Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its authorized depth, and all tests have been completed, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion attempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement, it being understood that the consent to the reworking or plugging back of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. Other Operations: Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____Fifteen Thousand_____ Dollars ($15,000.00) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares "Authority for Expenditures" for its own use, Operator, upon request, shall furnish copies of its "Authority for Expenditures" for any single project costing in excess of _____Fifteen Thousand_____ Dollars ($15,000.00).

E. Royalties, Overriding Royalties and Other Payments:

Each party shall pay or deliver, or cause to be paid or delivered, all /burdens to the extent of _____100%_____ due on its share of production and shall hold the other parties free from any liability therefor. If the interest of any party in any oil and gas lease covered by this agreement is subject to any royalty, overriding royalty, production payment, or other charge over and above the aforesaid royalty, such party shall assume and alone bear all such obligations and shall account for or cause to be accounted for, such interest to the owners thereof.

No party shall ever be responsible, on any price basis higher than the price received by such party, to any other party's lessor or royalty owner; and if any such other party's lessor or royalty owner should demand and receive settlements on a higher price basis, the party contributing such lease shall bear the royalty burden insofar as such higher price is concerned.

F. Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non Operator for failure to make timely payments

- 9 -

of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

G. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. Operator shall bill other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

II. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be an amount equivalent to the premium which would have been paid had such insurance been obtained. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's fully owned automotive equipment.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. If the interest of the assigning party includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not desiring to surrender an oil and gas lease covering such oil and gas interest for a term of one year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall

1    be shared by the parties assignee in the proportions that the interest of each bears to the interest of all
2    parties assignee.

3

4      Any assignment or surrender made under this provision shall not reduce or change the assignor's or
5    surrendering parties' interest, as it was immediately before the assignment, in the balance of the Contract
6    Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter
7    be subject to the terms and provisions of this agreement.

8

9    **B.  Renewal or Extension of Leases:**

10

11      If any party secures a renewal of any oil and gas lease subject to this Agreement, all other parties
12    shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt
13    of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such
14    lease affects lands within the Contract Area, by paying to the party who acquired it their several proper
15    proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area,
16    which shall be in proportion to the interests held at that time by the parties in the Contract Area.

17

18      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it
19    shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of
20    their respective percentage of participation in the Contract Area to the aggregate of the percentages
21    of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
22    Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

23

24      Each party who participates in the purchase of a renewal lease shall be given an assignment of its
25    proportionate interest therein by the acquiring party.

26

27      The provisions of this Article shall apply to renewal leases whether they are for the entire interest
28    covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease
29    taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after
30    the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted
31    for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal
32    lease and shall not be subject to the provisions of this agreement.

33

34      The provisions in this Article shall apply also and in like manner to extensions of oil and gas
35    leases.

36

37    **C.  Acreage or Cash Contributions:**

38

39      While this agreement is in force, if any party contracts for a contribution of cash toward the drilling
40    of a well or any other operation on the Contract Area, such contribution shall be paid to the party who
41    conducted the drilling or other operation and shall be applied by it against the cost of such drilling or
42    other operation. If the contribution be in the form of acreage, the party to whom the contribution is
43    made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling
44    Parties in the proportions said Drilling Parties shared the cost of drilling the well. If all parties hereto
45    are Drilling Parties and accept such tender, such acreage shall become a part of the Contract Area and
46    be governed by the provisions of this agreement. If less than all parties hereto are Drilling Parties and
47    accept such tender, such acreage shall not become a part of the Contract Area. Each party shall prompt-
48    ly notify all other parties of all acreage or money contributions it may obtain in support of any well or
49    any other operation on the Contract Area.

50

51      If any party contracts for any consideration relating to disposition of such party's share of substances
52    produced hereunder, such consideration shall not be deemed a contribution as contemplated in this
53    Article VIII.C.

54

55    **D.  Subsequently Created Interest:**

56

57      Notwithstanding the provisions of Article VIII.E. and VIII.G., if any party hereto shall, subsequent
58    to execution of this agreement, create an overriding royalty, production payment, or net proceeds inter-
59    est, which such interests are hereinafter referred to as "subsequently created interest", such subsequently
60    created interest shall be specifically made subject to all of the terms and provisions of this agreement, as
61    follows:

62

63      1.  If non-consent operations are conducted pursuant to any provision of this agreement, and the
64    party conducting such operations becomes entitled to receive the production attributable to the interest
65    out of which the subsequently created interest is derived, such party shall receive same free and clear
66    of such subsequently created interest. The party creating same shall bear and pay all such subsequently
67    created interests and shall indemnify and hold the other parties hereto free and harmless from any and
68    all liability resulting therefrom.

69

70

1     2. If the owner of the interest from which the subsequently created interest is derived (1) fails to
2 pay, when due, its share of expenses chargeable hereunder, or (2) elects to abandon a well under pro-
3 visions of Article VI.E. hereof, or (3) elects to surrender a lease under provisions of Article VIII.A.
4 hereof, the subsequently created interest shall be chargeable with the pro rata portion of all expenses
5 hereunder in the same manner as if such interest were a working interest. For purposes of collecting
6 such chargeable expenses, the party or parties who receive assignments as a result of (2) or (3) above
7 shall have the right to enforce all provisions of Article VII.B. hereof against such subsequently created
8 interest.
9

10 E.   Maintenance of Uniform Interest:
11

12     For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests
13 covered by this agreement, and notwithstanding any other provisions to the contrary, no party shall
14 sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Con-
15 tract Area and in wells, equipment and production unless such disposition covers either:
16

17     1. the entire interest of the party in all leases and equipment and production; or
18

19     2. an equal undivided interest in all leases and equipment and production in the Contract Area.
20

21     Every such sale, encumbrance, transfer or other disposition made by any party shall be made ex-
22 pressly subject to this agreement, and shall be made without prejudice to the right of the other parties.
23

24     If, at any time the interest of any party is divided among and owned by four or more co-owners,
25 Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full
26 authority to receive notices, approve expenditures, receive billings for and approve and pay such party's
27 share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
28 party's interests within the scope of the operations embraced in this agreement; however, all such
29 co-owners shall have the right to enter into and execute all contracts or agreements for the disposition
30 of their respective shares of the oil and gas produced from the Contract Area and they shall have the
31 right to receive, separately, payment of the sale proceeds hereof.
32

33 F.   Waiver of Right to Partition:
34

35     If permitted by the laws of the state or states in which the property covered hereby is located, each
36 party hereto owning an undivided interest in the Contract Area waives any and all rights it may have
37 to partition and have set aside to it in severally its undivided interest therein.
38

39 G.   Preferential Right to Purchase:
40

41     Should any party desire to sell all or any part of its interests under this agreement, or its rights and
42 interests in the Contract Area, it shall promptly give written notice to the other parties, with full infor-
43 mation concerning its proposed sale, which shall include the name and address of the prospective pur-
44 chaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of
45 the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after
46 receipt of the notice, to purchase on the same terms and conditions the interest which the other party
47 proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the pur-
48 chased interest in the proportions that the interest of each bears to the total interest of all purchasing
49 parties. However, there shall be no preferential right to purchase in those cases where any party wishes
50 to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale
51 of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent
52 company, or to any company in which any one party owns a majority of the stock.
53

54                           **ARTICLE IX.**
55                   **INTERNAL REVENUE CODE ELECTION**
56

57     This agreement is not intended to create, and shall not be construed to create, a relationship of part-
58 nership or an association for profit between or among the parties hereto. Notwithstanding any pro-
59 visions herein that the rights and liabilities hereunder are several and not joint or collective, or that this
60 agreement and operations hereunder shall not constitute a partnership, if, for Federal income tax pur-
61 poses, this agreement and the operations hereunder are regarded as a partnership, each party hereby
62 affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter
63 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of
64 the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on
65 behalf of each party hereby affected such evidence of this election as may be required by the Secretary
66 of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but
67 not by way of limitation, all of the returns, statements, and the data required by Federal Regula-
68 tion 1.761. Should there be any requirement that each party hereby affected give further evidence of
69 this election, each such party shall execute such documents and furnish such other evidence as may be
70 required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No

                                 -13-

such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from Operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single damage claim or suit arising from operations hereunder. ~~if the ex-~~ ~~penditure does not exceed _____ and if the payment is in complete settlement of such claim or suit. If the amount~~ ~~required for settlement exceeds the above amount, the parties hereto shall assume and take over the further~~ ~~handling of the claim or suit, unless such authority is delegated to Operator.~~ All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, the party shall immediately notify Operator, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by United States mail or Western Union telegram, postage or charges prepaid, or by teletype, and addressed to the party to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid, or when sent by teletype. Each party shall have the right to change its address at any time, and from time to time, by giving written notice hereof to all other parties.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subjected hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease, or oil and gas interest contributed by any other party beyond the term of this agreement.

[ ] Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, and so long as oil and/or gas production continues from any lease or oil and gas interest.

1  [X]  Option No. 2:  In the event the well described in Article VI.A., or any subsequent well drilled
2  under any provision of this agreement, results in production of oil and/or gas in paying quantities, this
3  agreement shall continue in force  so long as any such well or wells produce, or are capable of produc-
4  tion, and for an additional period of ___180___ days from cessation of all production; provided, however,
5  if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in
6  drilling or reworking a well or wells hereunder, this agreement shall continue in force until such op-
7  erations have been completed and if production results therefrom, this agreement shall continue in
8  force as provided herein.  In the event the well described in Article VI.A., or any subsequent well
9  drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil
10  and/or gas from the Contract Area, this agreement shall terminate unless drilling or reworking opera-
11  tions are commenced within ___180___ days from the date of abandonment of said well.
12
13      It is agreed, however, that the termination of this agreement shall not relieve any party hereto from
14  any liability which has accrued or attached prior to the date of such termination.
15
16                              ARTICLE XIV.
17                    COMPLIANCE WITH LAWS AND REGULATIONS
18
19  A.  Laws, Regulations and Orders:
20
21      This agreement shall be subject to the conservation laws of the state in which the committed
22  acreage is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of
23  said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and
24  orders.
25
26  B.  Governing Law:
27
28      The essential validity of this agreement and all matters pertaining thereto, including, but not lim-
29  ited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and in-
30  terpretation or construction, shall be governed and determined by the law of the state in which the
31  Contract Area is located.  If the Contract Area is in two or more states, the law of the state where most
32  of the land in the Contract Area is located shall govern.
33
34                              ARTICLE XV.
35                            OTHER PROVISIONS
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 14 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of __28th__ day of __June__ , 19 __78__ .

OPERATOR

DELTA DRILLING COMPANY

ATTEST

_Lou R. Thomas_
Asst. Secretary

By _James L. White_
Executive Vice-President

NON-OPERATORS

ELIZABETH DORFMAN TRUST

By: _____
        Trustee

_____
Louis Dorfman

_____
Myron H. Dorfman

_____
Sam Y. Dorfman, Jr.

THE HUNTER COMPANY

By_____
Title

R. LACY, INC.

By_____
Title

GETTY OIL COMPANY

By:_____
Title

SKLAR & PHILLIPS, INC.

By _____
Title

ATTEST:
_____
Secretary

ATTEST:
_____
Secretary

ATTEST:
_____
Secretary

ATTEST:
_John S. Carruth_
Secretary

- 1 -

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF <u>DELTA DRILLING COMPANY ET AL,</u>
<u>#1 GRILL GAS UNIT OPERATING AGREEMENT DATED JUNE 28, 1978</u>

I.   <u>LANDS SUBJECT TO CONTRACT</u>
     640 acres out of the Eli Bowen Survey, A-47, and the Benjaman Strickland
     Survey A-587, Panola County, Texas, more fully described in that Declara-
     tion of Unit executed by Delta Drilling Company dated April 15, 1946, and
     being of record in Vol. 216, Page 584, Deed Records of Panola County, Texas.

II.  <u>RESTRICTION AS TO DEPTHS</u>
     All rights below the base of the Travis Peak Formation estimated to be all
     rights below 8470 feet from the surface.

III. <u>OPERATING (OR BILLING) INTEREST OF THE PARTIES AND THEIR ADDRESSES FOR</u>
     <u>NOTICE PURPOSES</u>

| Owner | Billing Interest |
|---|---|
| Delta Drilling Company<br>P. O. Box 2012<br>Tyler, Texas 75710 | .2100156 |
| Elizabeth Dorfman Trust<br>1750 Mercantile Dallas Bldg.<br>Dallas, Texas 75201 | .0525039 |
| Louis Dorfman<br>1848 Mercantile Dallas Bldg.<br>Dallas, Texas 75201 | .0175014 |
| Myron H. Dorfman<br>c/o Dept. Petroleum Engineers<br>University of Texas<br>Austin, Texas 78712 | .0175012 |
| Sam Y. Dorfman, Jr.<br>1750 Mercantile Dallas Bldg.<br>Dallas, Texas 75201 | .0175013 |
| ~~The Hunter Company~~ *Seagull mid South*<br>~~906 Market Street~~ *Union Pacific Oil & Gas Co.*<br>~~Shreveport, Louisiana 71102~~ | .14505-47<br>~~.2901094~~<br>.14505-47 |
| R. Lacy, Inc.<br>P. O. Box 2146<br>Longview, Texas 75601 | .3272500 |
| Skelly Oil Company<br>NOW Getty Oil Company<br>6750 West Loop South, Suite 500<br>Bellaire, Texas 77401 | .1626094 |
| Sklar & Phillips, Inc.<br>2925 Mansfield Road<br>Shreveport, Louisiana 71103 | .1050078 |

OIL AND GAS LEASES SUBJECT TO THIS AGREEMENT

1.  Lease dated December 11, 1943, made by J. B. Dial, Lessor, to
    Delta Drilling Company, Lessee, and recorded at Page 251, Vol.
    156, Deed Records of Panola County, Texas.

2.  Lease dated December 11, 1943, made by R. C. Childress, et al,
    Lessors, to Delta Drilling Company, Lessee, and recorded at
    Page 245, Vol. 156, Deed Records of Panola County, Texas.

3.  Lease dated March 20, 1944, made by R. C. Childress, Guardian of
    the Estate of Bettie June Childress (a minor), Lessor, to Delta
    Drilling Company, Lessee, recorded at Page 406, Vol. 164, Deed
    Records of Panola County, Texas.

4.  Lease dated October 26, 1944, from Frost Lumber Industries, Inc.,
    of Texas, Lessor, to The Hunter Company, Inc., Lessee, and re-
    corded at Page 464, Vol. 189, Deed Records, Panola County, Texas.

5.  Lease dated October 29, 1943 from Mrs. Maude Anderson et al,
    Lessors, to Delta Drilling Company, Lessee, recorded at Page
    44, Vol. 153, Deed Records, Panola County, Texas.

6.  Lease dated October 30, 1943 from J. D. Mitcham et al, Lessors,
    to Delta Drilling Company, Lessee, recorded at Page 226, Vol.
    157, Deed Records, Panola County, Texas.

7.  Lease dated April 12, 1943 by Mrs. C. C. Steele et al, Lessors,
    to The Hunter Company, Inc., recorded at Page 320, Vol. 146,
    Panola County, Texas, and by correction lease dated July 5,
    1945 from same lessors to same lessee, filed for record in
    Panola County, Texas on August 13, 1945 under County Clerk's
    File No. 31524.

8.  Lease dated September 10, 1943 from J. C. Guill, Jr. et ux,
    Lessors, to H. R. Swetnam, Lessee, recorded at Page 179, Vol.
    149, Deed Records, Panola County, Texas.

9.  Lease dated November 16, 1943 from J. D. Furrh, Lessor, to
    Delta Drilling Company, Lessee, recorded at Page 608, Vol.
    150, Deed Records, Panola County, Texas.

10. Lease dated September 10, 1943 from J. C. Guill, Jr. et ux,
    Lessors, to H. R. Swetman, Lessee, recorded at Page 179, Vol. 149,
    Deed Records of Panola County, Texas, and being Fourth Tract in
    said Lease.

11. Lease dated September 8, 1943 from Eva Osborne, et vir, Lessors,
    to H. R. Swetnam, Lessee, recorded Page 183, Vol. 149, Deed
    Records, Panola County, Texas, and being the N. 50.76 acres of
    the Second Tract in said Lease.

12. Lease dated March 10, 1944, from Louis Werner Saw Mill Company,
    Lessor, to Skelly Oil Company, Lessee, recorded at Page 1, Vol.
    164, Deed Records, Panola County, Texas, and amendment thereto
    dated April 25, 1946, and filed for record April 26, 1946, under
    County Clerk's File No. 36354.

EXHIBIT "A-1"



PLAT SHOWING
DELTA DRILLING CO. ET AL LEASES
6400 ACRE UNIT
PANOLA COUNTY, TEXAS

OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this .......... day of .................................., 19...., between

Lessor (whether one or more), whose address is:.................................................................................................,

and ........................................................................................................, Lessee, WITNESSETH:

1. Lessor in consideration of................................................................................................................Dollars

($................) in hand paid, of the royalties herein provided and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, conducting exploration, geologic and geophysical surveys by seismograph, core test, gravity and magnetic methods, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon and on, over and across lands owned or claimed by Lessor adjacent and contiguous thereto, to produce, save, take care of, treat, transport, and own said products, and housing its employees, the following described land in,.......................................................County, Texas, to wit:

This lease also covers and includes all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether the same be in said survey or surveys or in adjacent surveys, although not included within the boundaries of the land particularly described above.

2. Without reference to the commencement, prosecution or cessation at any time of drilling or other development operations, and/or to the discovery, development or cessation at any time of production of oil, gas or other minerals, and without further payments than the royalties herein provided, and notwithstanding anything else herein contained to the contrary, this lease shall be for a term of ten years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder or as long as this lease is continued in effect as otherwise provided herein.

3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance, produced from said land, and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; while there is a gas well on this lease or on acreage pooled therewith but gas is not being sold or used, Lessee may pay as royalty to the credit of the owner or owners of royalty hereunder in ...............

..........................bank at ..................................., Texas, (which bank and its successors are the royalty owner or owners' agent, and shall continue as depository for all such sums which Lessee may pay hereunder, regardless of changes in ownership of royalties) on or before ninety (90) days after the date on which (1) said well is shut in, or (2) the land covered hereby or any portion thereof is included in a pooled unit on which a well is located, or (3) this lease ceases to be otherwise maintained as provided herein, whichever is the later date, and thereafter at annual intervals, the sum of $ ............., and if such payment is made or tendered, this lease shall not terminate and it will be considered that gas is being produced from this lease in paying quantities; and (c) on all other minerals mined and marketed, one-eighth either in kind or value at the well or mine, at Lessee's election, except that on sulphur mined and marketed, the royalty shall be fifty cents (50¢) per long ton, Lessee shall have free use of oil, gas, coal and water from said land, except water from Lessee's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used.

4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof as to all oil, gas, or either of them, with other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas in and under and that may be produced from said premises. Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of 10% thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, units thereafter created may conform substantially in size with those prescribed by governmental regulations. Lessee under the provisions hereof may pool or combine acreage covered by this lease or any portion thereof as above provided as to oil in any one or more strata, and as to gas in any one or more strata. The units formed by pooling as to any stratum or strata need not conform in size or area with the unit or units into which the lease is pooled or combined as to any other stratum or strata, and oil units need not conform as to area with gas units. The pooling in any or more instances shall not exhaust the rights of the Lessee hereunder to pool this lease or portions thereof into other units. Lessee shall file for record in the appropriate records of the county in which the leased premises are situated an instrument describing and designating the pooled acreage as a pooled unit; and upon such recordation the unit shall be effective as to all parties hereto, their heirs, successors, and assigns, irrespective of whether or not the unit is likewise effective as to all other owners of surface, mineral, royalty, or other rights in land included in such unit. Lessee may at its election exercise its pooling option before or after commencing operations for or completing an oil or gas well on the leased premises, and the pooled unit may include, but it is not required to include, land or leases upon which a well capable of producing oil or gas in paying quantities has theretofore been completed or upon which operations for the drilling of a well for oil or gas have theretofore been commenced. Operations for drilling on or production of oil or gas from any part of the pooled unit which includes all or a portion of the land covered by this lease, regardless of whether such operations for drilling were commenced or such production was secured before or after the execution of this instrument or the instrument designating the pooled unit, shall be considered as operations for drilling on or production of oil or gas from land covered by this lease whether or not the well or wells be located on the premises covered by this lease, and the entire acreage constituting such unit or units, as to oil and gas, or either of them, as herein provided, shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this lease. For the purpose of computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis—that is to say, there shall be allocated to the acreage covered by this lease and included in the pooled unit that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease and included in the pooled unit bears to the total number of surface acres included in the pooled unit. Royalties hereunder shall be computed on the portion of such production, whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit just as though such production were from such land. The production from an oil well will be considered production from the lease or oil pooled unit from which it is producing and not as production from a gas pooled unit; and production from a gas well will be considered as production from the lease or gas pooled unit from which it is producing and not from an oil pooled unit.

5. If at the expiration of the primary term oil, gas, or other mineral is not being produced on said land, or from land pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon, or shall have completed a dry hole thereon within 60 days prior to the end of the primary term, the lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than 60 consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas, or other mineral is produced from said land, or from land pooled therewith. If, after the expiration of the primary term of this lease and after oil, gas, or other mineral is produced from said land, or from land pooled therewith, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences operations for drilling or reworking within 60 days after the cessation of such production, but shall remain in force and effect so long as such operations are prosecuted with no cessation of more than 60 consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil or other mineral is produced from said land, or from land pooled therewith. Any pooled unit designated by Lessee in accordance with the terms hereof, may be dissolved by Lessee by instrument filed for record in the appropriate records of the county in which the leased premises are situated at any time after the completion of a dry hole or the cessation of production on said unit. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within 350 feet of and draining the leased premises, or land pooled therewith, Lessee agrees to drill such offset well or wells as a reasonable prudent operator would drill under the same or similar circumstances, Lessee may at any time execute and deliver to Lessor or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered.

6. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor's consent.

7. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns, but no change or division in ownership of the land or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U. S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach. If one or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

8. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. No obligation to develop the leased premises shall arise during the primary term. Should oil, gas or other mineral be found in paying quantities be discovered on said premises, then after the expiration of the primary term, Lessee shall develop the acreage retained hereunder as a reasonable prudent operator, but in discharging this obligation it shall in no event be required to drill more than one well per forty (40) acres of the area retained hereunder and capable of producing oil in paying quantities and one well per 640 acres plus an acreage tolerance not to exceed 10% of said area of the area retained hereunder and capable of producing gas or other mineral in paying quantities. If after the expiration of the primary term, Lessee considers that no well or wells have been completed on the leased acreage retained hereunder, the lessor, I, so and shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this section.

9. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land either in whole or in part, and in event Lessee does so it shall be subrogated to such lien with the right to enforce same and apply royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in the oil, gas or other minerals on, in or under said land less than the entire fee simple estate, then the royalties to be paid Lessor shall be reduced proportionately. Should any one or more of the parties named above as Lessor fail to execute this lease, it shall nevertheless be binding upon the party or parties executing the same.

10. Should Lessee be prevented from complying with any express or implied covenant of this lease from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material ......

or be a creation of force and, any federal or state law or state order, rule, regulation of governmental authority, and while so prevented, Lessee's obligation .......... or land pooled therewith, and the time wh......... as presented shall not ..... ..unted against Lessee, an ......... ...e lease to the contrary notwithstanding.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

......................................................................  ......................................................................

......................................................................  ......................................................................

......................................................................  ......................................................................

......................................................................

......................................................................

THE STATE OF TEXAS  }
County of.................................  }

Before me, the undersigned authority, on this day personally appeared ........................................................................

........................................................................................................................................................,

known to me to be the identical person........... whose name......... are/is subscribed to the foregoing instrument, and acknowledged to me that...........he ........... executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this the................. ....................day of............. ...................A. D., 19...........

........................................................................

Notary Public in and for......................................................County, Texas

THE STATE OF TEXAS  }
County of.................................  }

Before me, the undersigned authority, on this day personally appeared ........................................................................

and  wife........................................................................................................., known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this the................. ...........day of.............................A. D., 19...........

........................................................................

Notary Public in and for......................................................County, Texas

THE STATE OF TEXAS  }
County of.................................  }

Before me, the undersigned authority, on this day personally appeared ........................................................................

..................................................., known to me to be the person whose name is

subscribed to the foregoing instrument as........................................ of........................................

acknowledged to me that he executed the same for the purposes and consideration therein expressed, and as the act and deed of said......

........................................................................................................................................................

Given under my hand and seal of office this the.................................day of.............................A. D., 19...........

(L. S.)

Notary Public in and for......................................................County, Texas

PRODUCERS 88 REV. (10 YEAR LEASE) WITH 40/640 ACRES POOLING PROVISION

No.................................

Oil, Gas
and Mineral Lease

FROM

TO

Dated.................................19........

No. Acres.................................

.................................County, Texas

This instrument was filed for record on the.................................

day of.................................19........ at

.................................o'clock.........M, and duly recorded in

Book.................................Page.................................

of the.................................records of this office.

.................................County Clerk

By.................................Deputy

When recorded return to

Exhibit GO1, PURIA 74101

# EXHIBIT "C"

Attached to and made a part of Delta Drilling Company et al.
#1 Guill Gas Unit dated June 28, 1973

# ACCOUNTING PROCEDURE
## JOINT OPERATIONS

### I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

**2. Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5. Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

**6. Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other provisions of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

- 1 -

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or

(   ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (   ) shall not (   ) be covered by the Overhead rates.

**A. Overhead - Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $ __3,000.00__ _____

Producing Well Rate $ __300.00__ _____

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

[1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

[2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

[3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

(b) Producing Well Rates

[1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

[2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

[3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

[4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

[5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

- 3 -

10. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

11. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's law, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

12. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead – Drilling and Producing Operations**

    i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

    ( X ) Fixed Rate Basis, Paragraph 1A, or

    ( ) Percentage Basis, Paragraph 1B.

    Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall ( ) shall not ( ) be covered by the Overhead rates.

    A. **Overhead – Fixed Rate Basis**

    (1) Operator shall charge the Joint Account at the following rates per well per month:

    Drilling Well Rate $ __3,000.00__

    Producing Well Rate $ __300.00__

    (2) Application of Overhead – Fixed Rate Basis shall be as follows:

    (a) Drilling Well Rate

    [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

    [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

    [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

    (b) Producing Well Rates

    [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

    [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

    [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

    [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

    [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

    (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment

COPAS

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (   %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

_____ Percent (   %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. Overhead - Major Construction   * To be negotiated

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $_____*_____:

A. _____*_____% of total costs if such costs are more than $_____ but less than $_____*_____; plus

B. _____*_____% of total costs in excess of $_____*_____ but less than $1,000,000; plus

C. _____*_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

# IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

(2) Material moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if used or was originally charged to the Joint Account as new Material, or

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. Expense of Conducting Periodic Inventories

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

EXHIBIT "D"

Attached to and made a part of Operating Agreement dated June 28, 1978

between Delta Drilling Company, (Operator) and SKLAR & PHILLIPS, INC. et al

_____, (Non-Operator) covering lands in Panola

County, Texas              .

Operator shall at all times while operations are conducted under this Agreement carry the following insurance:

(a) Workmen's compensation insurance in accordance with the requirements of the laws of the State of Texas and employer's liability insurance with limitation of not less than One Hundred Thousand ($100,000.00) Dollars for each accident.

(b) Comprehensive general liability insurance with limits for bodily injury of not less than One Hundred Thousand Dollars ($100,000.00) for injury to any one person, and Three Hundred Thousand Dollars ($300,000.00) as to any one accident, and with limits for property damage of not less than Fifty Thousand Dollars ($50,000.00) for each accident.

(c) Automobile liability insurance with limits for bodily injury of not less than One Hundred Thousand Dollars ($100,000.00) for any one person and Three Hundred Thousand Dollars ($300,000.00) as to one accident, and with a limit for property damage of not less than Fifty Thousand Dollars ($50,000.00) for each accident.

Operator shall furnish to Non-Operator a certificate covering each policy of insurance issued pursuant to above.

EXHIBIT " E "

## GAS BALANCING AGREEMENT

During the period or periods when any party hereto has no
market for, or its purchaser is unable to take or if any party
fails to take its share of gas, the other parties shall be
entitled to produce each month one hundred percent of the
allowable gas production assigned to the Contract Area by the
appropriate governmental entity having jurisdiction, and each
of such parties shall take its prorata share.  All parties
hereto shall share in and own the condensate recovered at the
surface in accordance with their respective interests, but
each party taking such gas shall own all of the gas delivered
to its purchaser.  Each party unable to market its share of the
gas produced shall be credited with banked gas equal to its
share of the gas produced, less its share of gas used in lease
operations, vented or lost.  Operator shall maintain a current
account of the gas balance between the parties and shall furnish
all parties hereto monthly statements showing the total quantity
of gas produced, gas sold or banked, used in lease opeations,
vented or lost, and the total quantity of condensate recovered.

After notice to Operator, any party may begin taking or
delivering its share of the gas produced.  In addition to its
share, each party, until it has recovered its banked gas and
balanced its gas account, shall be entitled to take or deliver
a volume of gas equal to twenty-five percent (25%) of each
overproduced party's share of gas produced.  If more than
one party is entitled to the additional gas produced, they
shall divide such additional gas in accordance with unit
participation.

In the event production of gas permanently ceases prior to
the time that the accounts of the parties have been balanced, a
complete balancing shall be accomplished by a money settlement.
Such settlement shall be based upon the weighted average price
received by each overproduced party for its share of gas produced
and sold.

At all times while gas is produced from the Contract Area,
each party shall make appropriate settlement of all royalties,
overriding royalty interest, and other payments out of or in
lieu of production for which it is responsible, as if each party
were taking or delivering to a purchaser its share, and its
share only, of such gas production.  Each party hereto agrees
to hold each other party harmless from any and all claims for
royalty payments asserted by royalty owners to whom each party
is accountable.

EXHIBIT " ƒ "

Attached to and made a part of Operating Agreement dated_____June 28, 1978_____
between__DELTA DRILLING COMPANY_____ as Operator, and __Sklar & Phillips, Inc. et al__
as Non-Operators.

## EQUAL EMPLOYMENT OPPORTUNITY PROVISION

During the performance of this contract, the Operator agrees as follows:

1. The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment notices to be provided for the contracting officer setting forth the provisions of this non-discrimination clause.

2. The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

·3. The Operator will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

4. The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

5. The Operator will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

6. In the event of Operator's non-compliance with the non-discrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rules, regulations, or order of the Secretary of Labor, or as otherwise provided by law.

7. The Operator will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance: Provided, however, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

Operator acknowledges that it may be required to file Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress with the appropriate agency within thirty (30) days of the date of contract award if such report has not been filed for the current year and otherwise comply with or file such other compliance reports as may be required under Executive Order 11246, as amended and Rules and Regulations adopted thereunder.

Operator further acknowledges that it may be required to develop a written affirmative action compliance program as required by the Rules and Regulations approved by the Secretary of Labor under authority of Executive Order 11246 and supply Non-Operators with a copy of such program if they so request.

## CERTIFICATION OF NON-SEGREGATED FACILITIES

Operator assures Non-Operators that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are in fact segregated on a basis of race, color, religion, or national origin, because of habit, local custom or otherwise. It is further understood and agreed that maintaining or providing segregated facilities for its employees or permitting its employees to perform their services at any location under its control where segregated facilities are maintained is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965.

Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor dated May 21, 1968, and the provisions of the equal opportunity clause enumerated contracts between the United States of America and Non-Operators.

Whoever knowingly and willfully makes any false, fictitious or fraudulent representation may be liable to criminal prosecution under 18 U.S.C. § 1001.