**UNIT AGREEMENT**

**DORCHEAT (UPPER RODESSA) UNIT**

**COLUMBIA COUNTY, ARKANSAS**

# UNIT AGREEMENT

## DORCHEAT (UPPER RODESSA) UNIT

## COLUMBIA COUNTY, ARKANSAS

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 - | Definitions | 1 |
| 1.1 | Unit Area | 1 |
| 1.2 | Unitized Formation | 2 |
| 1.3 | Unitized Substances | 2 |
| 1.4 | Working Interest Owner | 2 |
| 1.5 | Royalty Owner | 2 |
| 1.6 | Tract | 2 |
| 1.7 | Unit Operating Agreement | 3 |
| 1.8 | Unit Operator | 3 |
| 1.9 | Tract Participation | 3 |
| 1.10 | Unit Participation | 3 |
| 1.11 | Outside Substances | 3 |
| 1.12 | Oil and Gas Rights | 3 |
| 1.13 | Extraneous Substances | 4 |
| ARTICLE 2 - | Exhibits | 4 |
| 2.1 | Exhibits | 4 |
| 2.1.1 | Exhibit "A" | 4 |
| 2.1.2 | Exhibit "B" | 4 |
| 2.2 | Exhibits Considered Correct | 4 |
| 2.3 | Correcting Errors | 4 |
| 2.4 | Filing Revised Exhibits | 5 |
| ARTICLE 3 - | Creation and Effect of Unit | 5 |
| 3.1 | Oil and Gas Rights Unitized | 5 |
| 3.2 | Personal Property Excepted | 5 |
| 3.3 | Amendment of Leases | 6 |
| 3.4 | Continuation of Lease and Term Royalties | 6 |
| 3.5 | Titles Unaffected by Unitization | 6 |
| 3.6 | Injection Rights | 6 |
| ARTICLE 4 - | Plan of Operations | 7 |
| 4.1 | Unit Operator | 7 |
| 4.2 | Lien of Unit Operator | 7 |
| 4.3 | Operating Methods | 7 |
| ARTICLE 5 - | Participation | 8 |
| 5.1 | Tract Participation | 8 |
| ARTICLE 6 - | Allocation of Unitized Substances | 8 |
| 6.1 | Allocation of Tracts | 8 |
| 6.2 | Distribution within Tracts | 8 |

TABLE OF CONTENTS - (Cont'd)

|  |  | Page |
|---|---|---|
| 6.3 | Taking Unitized Substances in Kind | 9 |
| 6.4 | Failure to Take in Kind | 9 |
| 6.5 | Responsibility for Royalty Settlements | 10 |
| 6.6 | Division of Royalty | 10 |
| 6.7 | Royalty on Outside Substances | 10 |
| ARTICLE 7 - | Use or Loss of Unitized Substances | 11 |
| 7.1 | Unitized Substances Utilized | 11 |
| 7.2 | Royalty Payments | 11 |
| ARTICLE 8 - | Tracts to be Included in Unit | 11 |
| 8.1 | Unit Tracts Defined by Order | 11 |
| ARTICLE 9 - | Titles | 12 |
| 9.1 | Working Interest Titles | 12 |
| 9.2 | Royalty Owner Titles | 12 |
| 9.3 | Payment of Ad Valorem Taxes to Avoid Title Failure | 12 |
| 9.4 | Production Where Title in Dispute | 13 |
| 9.4.1 | Security in case of Title Failure | 13 |
| 9.4.2 | Market Unitized Substances in Title Dispute | 13 |
| ARTICLE 10 - | Easements or use of Surface | 13 |
| 10.1 | Grant of Easements | 13 |
| 10.2 | Use of Water | 14 |
| 10.3 | Surface Damages | 14 |
| ARTICLE 11 - | Enlargement of Unit Area | 14 |
| 11.1 | Unit Area Enlargement | 14 |
| 11.2 | Order Approving Enlargement | 16 |
| 11.3 | Filing Order with Recorder | 16 |
| 11.4 | New Schedule Under Enlargement | 17 |
| ARTICLE 12 - | Transfer of Interest | 17 |
| 12.1 | Agreement is a Covenant | 17 |
| 12.2 | Effect of Transfers | 17 |
| 12.3 | Subsequent Interests Acquired by Parties | 17 |
| 12.4 | Waiver of Rights to Partition | 17 |
| ARTICLE 13 - | Relationship of Parties | 18 |
| 13.1 | No Partnership | 18 |
| 13.2 | No Sharing of Market | 18 |
| 13.3 | Royalty Owners Free of Costs | 18 |
| 13.4 | Information to Royalty Owners | 18 |
| ARTICLE 14 - | Laws and Regulations | 19 |
| 14.1 | Laws and Regulations | 19 |
| ARTICLE 15 - | Force Majeure | 19 |
| 15.1 | Force Majeure | 19 |

TABLE OF CONTENTS - (Cont'd)

|  |  | Page |
|---|---|---|
| ARTICLE 16 - | Effective Date | 19 |
| 16.1 | Effective Date | 19 |
| 16.2 | Encumbered Interest | 20 |
| 16.3 | Certificate of Effectiveness | 20 |
| ARTICLE 17 - | Term | 21 |
| 17.1 | Term | 21 |
| 17.2 | Termination by Working Interest Owners | 21 |
| 17.3 | Effect of Termination | 21 |
| 17.4 | Salvaging Equipment Upon Termination | 21 |
| ARTICLE 18 - | Counterparts | 21 |
| 18.1 | Separate Counterparts or Ratifications | 21 |
| 18.2 | Joinder in Dual Capacity | 22 |
| ARTICLE 19 - | General | 22 |
| 19.1 | Amendments Affecting Working Interests | 22 |
| 19.2 | Caption | 22 |
| 19.3 | Receipt Acknowledged | 22 |
| ARTICLE 20 - | Release of Dower and Homestead | 22 |
| 20.1 | Wife of Working or Royalty Interest Owner | 22 |

## UNIT AGREEMENT

## DORCHEAT (UPPER RODESSA) UNIT

## COLUMBIA COUNTY, ARKANSAS

THIS AGREEMENT, entered into as of the 1st day of February, 1967, by the parties who sign this instrument, or ratify same, agreeing to be bound by the provisions hereof;

### W I T N E S S E T H:

WHEREAS, in the interest of the public welfare and to prevent waste, to promote the conservation of oil and gas, to increase the ultimate recovery of oil and gas from the Dorcheat Field, Upper Rodessa Formation, in Columbia County, Arkansas, and to protect the rights of all owners of interest therein, it is deemed necessary and desirable to enter into this agreement so as to unitize the Oil and Gas Rights in and to the Unitized Formation covered hereby in order to effect a secondary recovery, pressure maintenance, or other recovery program as hereinafter provided:

### ARTICLE 1

### DEFINITIONS

As used in this agreement, the terms hereinafter set out shall have the following meaning:

1.1  **Unit Area**  shall mean all of that portion of the Upper Rodessa Formation which underlies each of the tracts of land described by Tracts in Exhibit "A" and shown on Exhibit "B" attached hereto, and, in the event of the enlargement of the Unit Area as hereinafter provided for, all of that portion of the Upper Rodessa Formation which underlies each of the tracts and parcels of land within the Unit Area as so enlarged.

1.2  <u>Unitized Formation</u>  shall mean that subsurface portion
or portions of the Unit Area known as the Upper Rodessa Formation
which is found between the depths of 4510 feet to 4540 feet as shown
by the electrical log on the Atlantic Refining Company's Formby
Unit No. 2 well located in the North Half of the Northwest Quarter
of Section 13, Township 18 South, Range 22 West, Columbia County,
Arkansas.

1.3  <u>Unitized Substances</u>  shall include oil, gas, casing-
head gas, gas-condensate and all other hydrocarbons, fluids and pro-
ducts associated therewith, whether liquid, gaseous or mixed, pro-
duced from or contained in any portion of the Unitized Formation but
shall not include "Extraneous Substances" as hereinafter defined.

1.4  <u>Working Interest Owner</u>  shall mean any party, including
a carried Working Interest Owner, holding an interest in Unitized
Substances by virtue of a lease, operating agreement, fee title or
otherwise, which interest is chargeable with and obligated to pay
or bear, either in cash or out of production or otherwise, all or
a portion of the cost of drilling, developing, producing and operat-
ing the Unitized Formation.  The owner of oil and gas mineral rights
free of lease or other instrument conveying the working interest to
others shall be regarded as a Working Interest Owner to the extent
of 7/8 of his interest in Unitized Substances and as a Royalty
Owner with respect to his remaining 1/8 interest therein.

1.5  <u>Royalty Owner</u>  shall mean each party hereto who owns
a right to or interest in any portion of the Unitized Substances
other than that of a Working Interest Owner.

1.6  <u>Tract</u>  means each parcel of land described as such and
given a Tract number in Exhibit "A".  In the event of the enlarge-
ment of the Unit Area pursuant to the terms of this agreement,

-2-

then the term "Tract" shall also mean any one or more tracts or parcels of land (regardless of the size thereof) which may be here-after included in the Unit Area upon any such enlargement and to the whole of which a separate "Tract Participation" (as that term is hereinafter defined) is assigned under the provisions of the enlargement agreement hereinafter provided for.  Each Tract, as of the effective date of this agreement, is shown on the plat attached hereto as Exhibit "B" hereof.

1.7   <u>Unit Operating Agreement</u>   shall mean that agreement entitled "Unit Operating Agreement, Dorcheat (Upper Rodessa) Unit, Columbia County, Arkansas", of the same effective date as the effective date of this agreement, and executed by and between the Working Interest Owners.

1.8   <u>Unit Operator</u>   shall mean the Working Interest Owner designated by the Working Interest Owners pursuant to the terms and provisions of the Unit Operating Agreement to develop and operate the Unitized Formation.  The term "Non-Operator", whenever used, shall mean all Working Interest Owners other than Unit Operator.

1.9   <u>Tract Participation</u>   shall mean that percentage of Unitized Substances produced from the Unitized Formation which is allocated to a Tract under this agreement.

1.10   <u>Unit Participation</u>   of each Working Interest Owner shall mean the sum of the percentages obtained by multiplying such Working Interest Owner's proportionate working interest in each Tract by the Tract Participation of such Tract.

1.11   <u>Outside Substances</u>   shall mean all substances which are obtained from any source other than the Unitized Formation, and which are subsequently injected into the Unitized Formation.

1.12   <u>Oil and Gas Rights</u>   shall mean the rights to explore, develop and operate within the Unit Area for the production of

-3-

Unitized Substances or to share in the production so obtained or the proceeds thereof.

1.13  Extraneous Substances  includes extraneous gas, and also water, air or any other suitable fluid not originally produced from the Unit Area but purchased or acquired for injection and injected into the Unit Area.

ARTICLE 2

EXHIBITS

2.1  Exhibits.  Attached hereto are the following exhibits incorporated herein by reference.

2.1.1  Exhibit "A" is a schedule that describes each Tract in the Unit Area and sets out its Tract Participation.

2.1.2  Exhibit "B" is a plat of the Unit Area, showing the boundary lines of the Unit Area and delineating and numbering the Tracts comprising same.

2.2  Exhibits Considered Correct.  Said exhibits for all purposes of this agreement shall be considered as true and correct unless and until they are revised as herein provided.

2.3  Correcting Errors.  The shapes and descriptions of the respective Tracts have been established using the best information available.  In the event it subsequently appears that any Tract should, because of diverse royalty or working interest ownership on the effective date hereof, be divided into more than one Tract, or that any mechanical miscalculation has been made, Unit Operator, with the approval of Working Interest Owners, may correct such mistake by revising the exhibits to conform to the facts.  Such corrections shall not include any re-evaluation of previously established engineering or geological interpretations used in establishing Tract Participation.  Each such revision of exhibits, if made after this agreement becomes effective, shall be effective at 7:00 o'clock a.m. on the first day of the calendar month next

-4-

following the filing of the exhibit relating thereto or on such sub-
sequent date as is determined by Working Interest Owners.  Any such
revision made prior to the effective date hereof shall be effective
on the effective date.

    2.4  <u>Filing Revised Exhibits</u>.  If and when the exhibits, or
any revision thereof, are revised pursuant to any provision of this
agreement, the Unit Operator shall certify and file the revised
exhibits for record in Columbia County, Arkansas.

ARTICLE 3

<u>CREATION AND EFFECT OF UNIT</u>

    3.1  <u>Oil and Gas Rights Unitized</u>.  Subject to the terms and
conditions of this agreement, all of the Oil and Gas Rights of the
Royalty Owners in and to the land described in Exhibit "A", and all
of the Oil and Gas Rights of the Working Interest Owners in and to
said land are hereby unitized insofar as said respective Oil and
Gas Rights pertain to the Unitized Formation, all to the same
extent as if the entire Unitized Formation has been included in a
single lease executed by all the Royalty Owners as lessors in favor
of all the Working Interest Owners as lessees and as if said lease
had been subject to all of the terms and conditions of this agree-
ment.

    3.2  <u>Personal Property Excepted</u>.  Working Interest Owners
have each individually heretofore placed in or on their wells and
in or on the lands and leases affected by this agreement, various
items of personal property which are lease and well equipment, as
to which all of the Working Interest Owners have the contractual
right, as provided in their respective leases, to remove such
property from the premises, and all of which installations by
Working Interest Owners were made with the intention and under-
standing that all of the same would be and remain personal property
and that no part thereof would be or become fixtures to the realty.

-5-

The Working Interest Owners except from the terms and provisions of this agreement, and hereby sever from said leases and interests in the Tracts described in Exhibit "A" and unitized hereunder, all such lease and well equipment, and, in order to conform their respective investments in such equipment, Working Interest Owners have made a separate agreement with each other with respect thereto.

3.3   <u>Amendment of Leases</u>.  The terms and provisions of the various leases, agreements or other instruments covering the respective Tracts are hereby amended to the extent necessary to make them conform to the terms and provisions of this agreement, but otherwise are to remain in full force and effect.

3.4   <u>Continuation of Lease and Term Royalties</u>.  Operations, including drilling operations, conducted with respect to the Unitized Formation on any part of the Unit Area or production from any part of the Unitized Formation, shall, except for the purpose of determining payments to Royalty Owners, be considered as operations upon or production from each Tract and such operations or production shall continue in force and effect each lease or royalty interest just as though a well had been drilled on and was producing from each such Tract.  Each such lease and royalty interest shall remain in force and effect so long as this agreement remains in force and effect.

3.5   <u>Titles Unaffected by Unitization</u>.  Nothing herein shall be construed to result in the transfer of title to the Oil and Gas Rights covered hereby between the parties hereto or to the Unit Operator, other than the right to exercise such Oil and Gas Rights to the extent set out herein and the right to share in the Unitized Substances or the proceeds therefrom as herein provided.

3.6   <u>Injection Rights</u>.  Royalty Owners hereby grant unto Working Interest Owners the right to inject into the Unitized Formation any substances in whatever amounts the Working Interest

-6-

Owners deem expedient, including the right to place and maintain injection wells at locations on the Unit Area to be chosen by Working Interest Owners. Royalty Owners also grant unto Working Interest Owners the right to use producing or abandoned oil or gas wells for said injection purposes or for water source wells.

ARTICLE 4

PLAN OF OPERATIONS

4.1 <u>Unit Operator</u>. The Working Interest Owners are, as of the effective date of this agreement, entering into a Unit Operating Agreement, and Ashland Oil & Refining Company has been designated as the initial Unit Operator. Unit Operator shall have, subject to the terms, provisions and limitations expressed in such Unit Operating Agreement, the exclusive right to develop and operate the Unit Area for the production of Unitized Substances. Such operations shall be conducted in conformity with the provisions of this agreement and the Unit Operating Agreement. In the event of any conflict be-tween such agreements, the provisions of this agreement shall govern.

4.2 <u>Lien of Unit Operator</u>. Unit Operator shall have a lien upon the interests of other Working Interest Owners in the Unit Area to the extent provided in the Unit Operating Agreement.

4.3 <u>Operating Methods</u>. To the end that the quantity of Unitized Substances ultimately recoverable may be increased and waste prevented, the Working Interest Owners shall, within a reason-able time, make the necessary preparations, with diligence and in accordance with good engineering and production practices, engage in such pressure maintenance and other secondary recovery operations in the Unitized Formation as the Working Interest Owners deem most feasible, necessary or desirable in order to efficiently and economically increase the ultimate recovery of Unitized Substances. Nothing herein contained shall prevent the Working Interest Owners from discontinuing or changing in whole or in part

-7-

any particular method of operation if, in the opinion of the Working

Interest Owners, such method of operation is no longer in accord

with good engineering or production practices.

## ARTICLE 5

### PARTICIPATION

5.1  <u>Tract Participation</u>.  The Tract Participation of each

tract is shown on Exhibit "A".

## ARTICLE 6

### ALLOCATION OF UNITIZED SUBSTANCES

6.1  <u>Allocation to Tracts</u>.  All Unitized Substances produced

and saved shall be apportioned among and allocated to the several

Tracts within the Unit Area in accordance with the respective Tract

Participations effective hereunder during the respective periods such

Unitized Substances were produced.  The amount of Unitized Substances

so allocated to each Tract and only that amount, regardless of

whether it be more or less than the amount of the actual production

of Unitized Substances from the well or wells, if any, on such Tract

shall for all intents, uses and purposes, be deemed to have been

produced from such Tract.

6.2  <u>Distribution within Tracts</u>.  The Unitized Substances

allocated to each Tract shall be distributed among, or accounted for

to, the parties entitled to share in the production from such Tract

in the same manner, in the same proportions, and upon the same

conditions as they would have participated and shared in the pro-

duction from such Tract, or in the proceeds thereof, had this

agreement not been entered into, and with the same legal force and

effect.  For the purposes of this agreement, if any sliding scale

royalty or sliding scale overriding royalty depends on the average

production per well or the average pipe line runs per well on any

given Tract for any specified period, such average per well pro-

duction or such average per well pipe line runs shall be determined

-8-

from and after the effective date hereof by dividing the production of Unitized Substances allocated hereunder to such Tract by the number of wells located thereon capable of producing as of the effective date hereof.

6.3   Taking Unitized Substances in Kind.  The share of Unitized Substances allocated to each Tract shall be delivered in kind to the parties entitled thereto by virtue of the ownership of Oil and Gas Rights therein or by purchase from such Owners.  Such parties shall have the right to construct, maintain and operate within the Unit Area all necessary facilities for that purpose, provided the same are so constructed, maintained and operated as not to interfere with operations carried on pursuant hereto.  Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of the Unitized Substances shall be borne by the party receiving the same in kind.

6.4   Failure to Take in Kind.  To the extent that any party entitled to take and receive in kind any portion of the Unitized Substances shall fail to take or otherwise dispose adequately of the same currently as and when produced, then so long as such conditions continue, the Unit Operator, subject to revocation at will of such party, and for the account and at the expense of such party shall, in order to avoid curtailing the operation of the Unit Area because of such failure, dispose of such production on a day-to-day basis in any manner Unit Operator sees fit, but at not less than the price which Unit Operator sells its own share of production, and the account of such party shall be charged therewith as having received the same.  The proceeds, if any, of the Unitized Substances so disposed of by the Unit Operator shall be paid to the party for whose account the same is so disposed.

-9-

6.5  <u>Responsibility for Royalty Settlements</u>.  Each Work-
ing Interest Owner receiving in kind or separately disposing of
all or part of the Unitized Substances allocated to any Tract,
or receiving the proceeds therefrom if the same is sold or pur-
chased by the Unit Operator, shall be responsible for the payment
of, and shall indemnify all other Working Interest Owners,
including the Unit Operator, against any liability for any and
all royalties, overriding royalties, production payments and any
and all other payments chargeable against or payable out of such
Unitized Substances or the proceeds therefrom.

6.6  <u>Division of Royalty</u>. In the event the ownership of
the Royalty Interest in any Tract or Tracts should be or become
divided in such manner that one or more portions of any Tract
or Tracts are subject to different ownerships from one or more
of the other portions of the same Tract or Tracts, the Royalty
Interests and other production payments on Unitized Substances
shall, in the absence of a recorded agreement among all Royalty
Owners in such Tract or Tracts fixing the division of ownership
thereof, be divided among such respective portions in the
proportion that the number of surface acres in each such portion
bears to the total number of surface acres in such Tract or
Tracts.

6.7  <u>Royalty on Outside Substances</u>.  If any Outside
Substances consisting of natural gases are injected into the
Unitized Formation, fifty per cent (50%) of any like substances
contained in Unitized Substances subsequently produced and sold,
or used for other than operations hereunder, shall be deemed to

-10-

be Outside Substances until the aggregate of said fifty per cent
(50%) equals the accumulated volume of such natural gases in-
jected into the Unitized Formation, and no payments shall be due
or payable to Royalty Owners on such Outside Substances.  If
the Outside Substances injected be liquefied petroleum gases and
the Unitized Substances subsequently produced contain such
liquefied petroleum gases as determined by fractional analysis
or such other tests as applicable, the Working Interest Owners
shall have the right to recover such contained gases, or their
equivalent value, from such Unitized Substances, without payment
of royalty thereon.

ARTICLE 7

USE OR LOSS OF UNITIZED SUBSTANCES

7.1  Unitized Substances Utilized.  Working Interest
Owners may use such part of Unitized Substances as may be necessary
for the operation and development of the Unit Area and may use
Unitized Substances for injection into the Unitized Formation
in whatever amounts they deem necessary.

7.2  Royalty Payments.  All Unitized Substances injected
into the Unitized Formation, consumed, used or unavoidably lost in
the operation or development of the Unit Area, or in the handling,
treating, transportation or storing of Unitized Substances,
shall be free of royalty payment.

ARTICLE 8

TRACTS TO BE INCLUDED IN UNIT

8.1  Unit Tracts Defined by Order.  On and after the
effective date hereof and until the enlargement or reduction

-11-

thereof, the Unit Area shall be composed of the tracts delineated
and numbered on Exhibit "B" which are included within the Unit
Area by Order of the Arkansas Oil and Gas Commission.

ARTICLE 9

TITLES

9.1   Working Interest Titles.   If title to a working
interest fails, adjustment therefor among the Working Interest
Owners shall be made as provided in the Unit Operating Agreement.

9.2   Royalty Owner Titles.   If title to a royalty in-
terest fails, the Royalty Owner whose title has failed shall not
be entitled to share in participation as to such interest to
which title has failed.

9.3   Payment of Ad Valorem Taxes to Avoid Title Failure.

In order to avoid title failures which might incidentally
cause the title to a working interest or royalty interest to fail,
the owners of (1) the surface rights to lands lying within the
Unit Area, (2) mineral or royalty interests in said lands, and
(3) improvements located on said lands not utilized for Unit
Operations, shall individually be responsible for the rendition
and assessment, for ad valorem tax purposes, of all such property
and for the payment of such taxes, except as otherwise provided
in any contract or agreement between such owners and a Working
Interest Owner or Owners in the Unit Operating Agreement.  If
any ad valorem taxes are not paid by such owners responsible
therefor when due, the Unit Operator may, at any time prior to
tax sale, pay the same, redeem such property, and discharge such
tax liens as may arise through non-payment.  In the event the
Unit Operator makes any such payment or redeems any such property
from tax sale, the Unit Operator shall be reimbursed therefor by

-12-

the Working Interest Owners in proportion to their respective Unit
Participation at the time of such payment, and Unit Operator or
other Working Interest Owners as applicable shall withhold from any
proceeds derived from the sale of Unitized Substances otherwise due
to said delinquent taxpayer or taxpayers an amount sufficient to
defray the costs of such payment or redemption, such withholding to
be distributed among the Working Interest Owners in proportion to
their respective  contributions toward such payment or redemption.

9.4   Production Where Title in Dispute.  If the title or
right of any person claiming the right to receive in kind all or
any portion of the Unitized Substances allocated to a tract is in
dispute, the Unit Operator at the discretion of the Working
Interest Owners shall either:

9.4.1  Require that the person or persons to whom
such Unitized Substances are delivered or to whom the proceeds
thereof are paid, furnish security for the proper accounting there-
for to the rightful owner or owners in the event the title or right
of such person or persons shall fail in whole or in part, or

9.4.2  Withhold and market the portion of Unitized
Substances with respect to which title is in dispute, and impound
the proceeds thereof until such time as the title or right thereto
is established by a final judgment of a court of competent juris-
diction or otherwise to the satisfaction of the Working Interest
Owners, whereupon the proceeds so impounded shall be paid, without
interest, to the person or persons rightfully entitled thereto.

ARTICLE 10

EASEMENTS OR USE OF SURFACE

10.1  Grant of Easements.  The parties hereto, to the ex-
tent of their rights and interests, hereby grant to Working Interest
Owners the right to use as much of the surface of the land within

-13-

the Unit Area as may be reasonably necessary for the development
and operation of the Unit Area hereunder; provided, that nothing
herein shall be construed as leasing or otherwise conveying to the
Unit Operator, or to the Working Interest Owners, a site for a
water, gas injection, processing or other plant or camp site.

10.2  Use of Water.  The Working Interest Owners shall have
free use of water from the Unit Area for operations hereunder ex-
cept water from Royalty Owner's wells, private lakes, ponds, or
irrigation ditches.

10.3  Surface Damages.  The Unit Operator, on behalf of
the Working Interest Owners, shall pay the rightful owners for
damages to growing crops, timber, fences, improvements and structures
on the Unit Area resulting from operations hereunder.

ARTICLE 11

ENLARGEMENT OF UNIT AREA

11.1  Unit Area Enlargement.  At any time within twenty (20)
years from the date upon which this agreement becomes effective, the
Unit Area may be enlarged in the manner and subject to the conditions
hereinafter in this Article set forth.  Any person or persons owning
of record legal title to at least an undivided 75 per cent interest
in the right to drill into and produce oil and/or gas from the Upper
Rodessa Formation underlying any area located outside and contiguous
to the Outline of the Unit Area upon which there is a well producing,
or capable of producing, from the Upper Rodessa Formation, which area
is deemed to be underlain by a part of the same reservoir as the
Upper Rodessa Formation reservoir constituting the Unit Area (such
person or persons being hereinafter in this Article referred to for
convenience as "Applicant"), may apply to or negotiate with Working
Interest Owners for the enlargement of the Unit Area to include that
portion of the Upper Rodessa Formation underlying such area as a
part of the Unit Area.  If as a result of such application or

-14-

negotiations, Working Interest Owners having an aggregate Tract

Participation of at least 75 per cent and Applicant reach an agree-

ment as to:   (a) the Tract Participation in respect to the enlarged

Unit Area to be assigned to the lands constituting the area to be

brought into the Outline of the Unit Area upon its enlargement; and

(b) the adjustment of the investments of Applicant and of Operating

Parties, respectively, then an appropriate enlargement agreement

shall be prepared accordingly which shall provide for the operation

of the enlarged Unit Area under the terms and provisions of this

agreement.   Such enlargement agreement shall contain the following:

>   (1)   A description of land to be added to the Unit
>         Area and the Tract number or Tract numbers to
>         be assigned to the Tract or Tracts contained
>         within the area of land so to be added (it
>         being understood that each such "Tract" may be
>         composed of two or more separately owned parcels
>         of land);
>
>   (2)   A revised Exhibit "A" with respect to each
>         Tract within the Outline of the enlarged Unit
>         Area setting forth similar information with
>         respect to each such Tract as Exhibit "A"
>         attached to this agreement sets forth with
>         reference to the Original Unit Area.
>
>   (3)   A revised Exhibit "B" that shows the enlarged
>         boundary lines of the Unit Area and the Tracts
>         therein.

It is specifically provided that in no event, upon enlargement of

the Unit Area pursuant to this Article, shall there be any alter-

ation, as a result of such enlargement, in the relative values of

the Tract Participation of the various Tracts within the Outline of

the Unit Area as it existed prior to enlargement, or of the relative

-15-

values of the Tract Participation as same existed prior to such en-
largement.

    11.2  <u>Order Approving Enlargement</u>.  At such time as such en-
largement agreement or a counterpart or a ratification thereof shall
have been executed by Working Interest Owners having aggregate Tract
Participation under this agreement of at least 75 per cent and by
persons owning of record legal title to at least an undivided 75 per
cent interest in the right to drill into and produce oil and/or gas
from the Upper Rodessa Formation underlying the area to be added to
the Unit Area upon enlargement, and by persons owning of record
legal title to at least 75 per cent of all royalty and overriding
royalty payable with respect to oil and/or gas produced from the
area so to be added to the Unit Area, Unit Operator shall, on behalf
of Working Interest Owners, file with the Oil and Gas Commission of
the State of Arkansas a petition for an order of enlargement of the
Unit Area to include the additional area in accordance with the terms
of the enlargement agreement hereinabove in this Article referred to.
If the Oil and Gas Commission of the State of Arkansas, upon a hear-
ing with respect thereto, enters an order granting such petition and
enlarging the Unit Area, then from and after the effective date
fixed by the Commission in such order the Unit Area as so enlarged
shall be operated and developed pursuant to the terms and provisions
of this agreement.

    11.3  <u>Filing Order with Recorder</u>.  Within twenty (20) days
after the entering of any order by the Oil and Gas Commission of the
State of Arkansas enlarging the Unit Area, Unit Operator shall file
for record with the Circuit Clerk and Ex-Officio Recorder of
Columbia County, Arkansas, the executed enlargement agreement here-
inabove referred to, or executed counterparts or ratifications
thereof.

-16-

11.4   <u>New Schedule Under Enlargement</u>.  Upon any enlargement
of the Unit Area, the new schedule of Tract Participation set forth
in the enlargement agreement shall be effective and binding until
subsequently amended in connection with an additional enlargement of
the Unit Area in conformance with the provisions of this Article.

ARTICLE 12

<u>TRANSFER OF INTEREST</u>

12.1   <u>Agreement is a Covenant</u>.  All of the terms and pro-
visions of this agreement shall extend to, be binding upon and inure
to the benefit of the respective heirs, devisees, legal representatives,
successors and assigns of the parties hereto, and this agreement shall
constitute a covenant running with the lands and leases covered
hereby.

12.2   <u>Effect of Transfers</u>.  Any transfer, assignment or con-
veyance of all or any part of any interest owned by any party hereto
with respect to any Tract shall be made expressly subject to this
agreement and no such transfer, assignment or conveyance shall be
binding for any purpose upon any party hereto other than the party
so conveying the same, until the first day of the calendar month
next succeeding the date of receipt by the Unit Operator of a
certified copy of the recorded instrument evidencing such change in
ownership.

12.3   <u>Subsequent Interests Acquired by Parties</u>.  In the
event any party acquires any subsequent interest in any Tract in-
cluded within the Unit Area at any time after the effective date
hereof, such interest shall remain subject to this agreement, and,
if the interest acquired was a working interest, such interest shall
also be automatically subject to the Unit Operating Agreement.

12.4   <u>Waiver of Rights to Partition</u>.  Each party hereto
waives the benefit of the provisions of any and all laws of the State
of Arkansas, relating to actions for partition of real and personal

-17-

property, and hereby covenants with each of the other parties that, during the existence of this agreement, such party shall not at any time resort to any action at law or equity to partition the Unit Area, or the facilities used in the development or operation thereof.

## ARTICLE 13

## RELATIONSHIP OF PARTIES

13.1 <u>No Partnership</u>.  The duties, obligations and liabilities of the parties hereto are intended to be several and not joint or collective, and nothing herein contained shall ever be construed to create an association, trust or impose a partnership duty, obligation or liability with regard to any one or more of the parties hereto. Each party hereto shall be individually responsible for its own obligations as herein provided.

13.2 <u>No Sharing of Market</u>.  Nothing in this agreement shall be construed as providing, directly or indirectly, for any co-operative refining or joint sale or cooperative marketing of Unitized Substances.

13.3 <u>Royalty Owners Free of Costs</u>.  It is understood and agreed that this agreement shall never be construed as imposing upon any Royalty Owner any obligation to pay for any development or operating expense unless such Royalty Owner is obligated to pay for same by the terms of agreements existing before the execution of this agreement.

13.4 <u>Information to Royalty Owners</u>.  Each Royalty Owner shall be entitled to all information in possession of Unit Operator to which such Royalty Owner is entitled by his existing agreement with any Working Interest Owner with the express stipulation that if, by reason of this agreement, such information is not available, the nearest approximation or equivalent of such information shall be made available.

-18-

## ARTICLE 14

### LAWS AND REGULATIONS

14.1  <u>Laws and Regulations</u>.  This agreement shall be subject to all laws, rules, regulations, and orders of any State or Federal governmental authorities having or claiming jurisdiction.  It is not the intention of this agreement to limit, restrict or prorate unit production, it being recognized that such powers are exclusively exercised by governmental authority.

## ARTICLE 15

### FORCE MAJEURE

15.1  <u>Force Majeure</u>.  All obligations of each party hereto, except for the payment of money, shall be suspended while said party is prevented from complying therewith, in whole or in part, by fire, flood, high water, windstorm or other acts of God, federal, state or municipal laws, orders, insurrections, civil disturbances and riots or shortages or inability to obtain materials, and inability to obtain at reasonable cost and after the exercise of reasonable diligence, servitudes, rights-of-way grants, permits or licenses, or any other cause beyond the reasonable control of said party; provided, however, that performance shall be resumed within a reasonable time after such cause has been removed; and provided, further, that no party hereto shall be required against its will to adjust or settle any labor dispute, strike, lockout or other labor difficulties; the manner of handling all such difficulties shall be entirely within the discretion of the party involved.  This agreement and the leases subject hereto shall not be terminated by reason of suspension of Unit Operations or obligations due to the aforesaid causes.

## ARTICLE 16

### EFFECTIVE DATE

16.1  <u>Effective Date</u>.  This agreement shall become binding upon each party who executes or ratifies it as of the date of

-19-

execution or ratification by such party and shall become effective
as of 7:00 o'clock a.m. of the first day of the calendar month next
following (a) the approval of this agreement by the Oil and Gas
Commission of the State of Arkansas; and (b) the filing of at
least a counterpart of this agreement for record in the Conveyance
Records of Columbia County, Arkansas, by the Unit Operator; and
provided, further, that if (a) and (b) above are not accomplished on
or before January 1, 1968, this agreement shall ipso facto terminate
on said date (hereinafter called "termination date") and thereafter
be of no further force or effect between the parties who have executed
or ratified this agreement, unless prior thereto this agreement has
been executed or ratified by Working Interest Owners owning at least
seventy-five per cent (75%) of the working interest within the said
Unit Area and Working Interest Owners owning at least seventy-five
per cent (75%) of the working interest in said Unit Area committed
to this agreement, have decided to extend said termination date for
a period not to exceed six months.  If said termination date is to
be extended and (a) and (b) above are not accomplished on or before
said extended termination date, this agreement shall ipso facto
terminate on said extended termination date and thereafter be of no
further force and effect between the parties hereto.

16.2  Encumbered Interest.  For the purpose of this pro-
vision, with respect to an interest which is encumbered of record
with a mortgage or deed of trust both the grantor and grantee there-
in shall be considered as the record owner of legal title thereto,
except that when the instrument gives the grantor in such mortgage
or deed of trust the right to execute a Unit Agreement the grantor
shall be deemed the record owner.

16.3  Certificate of Effectiveness.  The Unit Operator shall
within thirty (30) days after the effective date of this agreement
file for record in the office or offices where a counterpart of

-20-

this agreement is recorded, a declaration to the effect that this agreement has become effective according to its terms and stating further the effective date.

## ARTICLE 17

### TERM

17.1  <u>Term</u>.  The term of this agreement shall be for and during the time that Unitized Substances are produced in paying quantities and as long thereafter as drilling, reworking or other operations are prosecuted without cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner hereinafter provided.

17.2  <u>Termination by Working Interest Owners</u>.  This agreement may be terminated by Working Interest Owners owning seventy-five per cent (75%) of Unit Participation whenever such Working Interest Owners determine that unit operations hereunder are no longer profitable, feasible or in the interest of conservation.

17.3  <u>Effect of Termination</u>.  Upon termination of this agreement, the rights and obligations of the parties affected hereby shall be relegated to and determined by their respective leases, contracts, or other agreements covering separately owned tracts of land theretofore comprising the Unit Area.

17.4  <u>Salvaging Equipment Upon Termination</u>.  If not otherwise covered by the leases unitized under this agreement, Royalty Owners hereby grant  Working Interest Owners a period of six (6) months after termination of this agreement in which to salvage, sell, distribute or otherwise dispose of the unit property.

## ARTICLE 18

### COUNTERPARTS

18.1  <u>Separate Counterparts or Ratifications</u>.  This agreement may be executed in any number of counterparts and each executed counterpart shall have the same force and effect as an original in-

-21-

strument and as if all of the parties to the aggregate counterparts had signed the same instrument; or, may be ratified by a separate instrument in writing referring to this agreement, each such ratification having the force and effect of an executed counterpart hereof, incorporating by reference all of the provisions hereof.

18.2 <u>Joinder in Dual Capacity</u>. It shall not be necessary for persons owning both working interests and royalty interests to execute or ratify this agreement in both capacities in order to commit both classes of interests. Execution or ratification hereof by any such person in one capacity shall also constitute execution in other capacity.

ARTICLE 19

<u>GENERAL</u>

19.1 <u>Amendments Affecting Working Interests</u>. Amendments relating wholly to Working Interest Owners may be made if signed by all Working Interest Owners concerned.

19.2 <u>Caption</u>. The heading or caption of each Article forms no part of the provisions of this agreement and is inserted solely for convenience.

19.3 <u>Receipt Acknowledged</u>. Each party who executes this agreement acknowledges receipt of a complete copy of this agreement, and acknowledges that he had read the same prior to execution hereof by him, and further acknowledges that no representation, verbal or otherwise, not incorporated herein, has been made to him.

ARTICLE 20

<u>RELEASE OF DOWER AND HOMESTEAD</u>

20.1 <u>Each wife</u> of a Working Interest Owner or of a Royalty Owner signing the original of this agreement, a counterport thereof, or other instrument agreeing to be bound by the provisions hereof, releases all of her rights of dower and homestead in and to all of the lands affected hereby to such parties and to the extent necessary to effect the provisions hereof.

-22-

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the date and year first above written.

ATTEST OR WITNESS:                          WORKING INTEREST OWNERS:

_____                     _____

_____                     _____

_____                     _____

_____                     _____

_____                     _____

_____                     _____

_____

                                            ROYALTY INTEREST OWNERS:

_____                     _____

_____                     _____

_____                     _____

_____                     _____

_____                     _____

-23-

STATE OF _____)
                                          )
COUNTY OF _____)                  CORPORATION ACKNOWLEDGEMENT

On this _____ day of _____, 19___, before me,
a Notary Public within and for the County and State aforesaid, duly
commissioned, qualified and acting, appeared in person the within
named _____ and _____,
to me personally well known, who stated that they were the
_____ and _____ of
_____, a corporation, and were
duly authorized in their respective capacities to execute the fore-
going instrument for and in the name and behalf of said corporation,
and further stated and acknowledged that they had so signed, executed
and delivered said foregoing instrument for the consideration, uses
and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official
seal on this the _____ day of _____, 19___.


_____
                                          Notary Public

My commission expires

_____



STATE OF _____)
                                          )
COUNTY OF _____)                  CORPORATION ACKNOWLEDGEMENT

On this _____ day of _____, 19___, before me,
a Notary Public within and for the County and State aforesaid, duly
commissioned, qualified and acting, appeared in person the within
named _____ and _____,
of _____, a corporation, and were
duly authorized in their respective capacities to execute the fore-
going instrument for and in the name and behalf of said corporation,
and further stated and acknowledged that they had so signed, executed
and delivered said foregoing instrument for the consideration, uses
and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official
seal on this the _____ day of _____, 19___.


_____
                                          Notary Public

My commission expires

_____



This instrument prepared by
Bernard B. Athey, Jr.
P. O. Box 1503
Houston, Texas  77001

STATE OF _____)
                                 )
COUNTY OF _____ )                    ACKNOWLEDGEMENT

     On this the _____ day of _____, 19___, before me, the undersigned Notary Public within and for the County and State aforesaid, personally appeared _____

_____
known to me to be the person__ whose name__ (is) (are) subscribed to the within instrument and acknowledged that __he__ executed the same for the purposes therein contained.

     IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
                    Notary Public
My commission expires

_____


STATE OF _____)
                                 )
COUNTY OF _____ )                    ACKNOWLEDGEMENT

     On this the _____ day of _____, 19___, before me, the undersigned Notary Public within and for the County and State aforesaid, personally appeared _____

_____
known to me to be the person__ whose name__ (is) (are) subscribed to the within instrument and acknowledged that __he__ executed the same for the purposes therin contained.

     IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
                    Notary Public
My commission expires

_____


STATE OF _____)
                                 )
COUNTY OF _____ )                    ACKNOWLEDGEMENT

     On this the _____ day of _____, 19___, before me, the undersigned Notary Public within and for the County and State aforesaid, personally appeared _____

_____
known to me to be the person__ whose name__ (is) (are) subscribed to the within instrument and acknowledged that __he__ executed the same for the purposes therein contained.

     IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
My commission expires            Notary Public

_____

EXHIBIT "A"

TO

UNIT AGREEMENT

DORCHEAT (UPPER RODESSA) UNIT

COLUMBIA COUNTY, ARKANSAS

| Tract No. | Tract Name | Tract Description | Percent Unit Participation |
|---|---|---|---|
| 1 | Henderson Unit | S/2 of SW/4 Sec. 12 T-18-S, R-22-W | 6.98021 |
| 2 | Dorcheat Unit | E/2 of NE/4 Sec. 14 T-18-S, R-22-W | 7.43552 |
| 3 | Formby Unit | N/2 of NW/4 Sec. 13 T-18-S, R-22-W | 16.41945 |
| 4 | Phillips Unit | N/2 of NE/4 Sec. 13 T-18-S, R-22-W | 7.93566 |
| 5 | Taylor-Phillips | S/2 of NE/4 Sec. 13 T-18-S, R-22-W | 7.82472 |
| 6 | Claudia A | S/2 of NW/4 Sec. 13 T-18-S, R-22-W | 14.12494 |
| 7 | P. E. Nipper | N/2 of SE/4 Sec. 14 T-18-S, R-22-W | 8.38227 |
| 8 | Kirkpatrick A | N/2 of SW/4 Sec. 13 T-18-S, R-22-W | 7.08205 |
| 9 | C. McWilliams | N/2 of SE/4 Sec. 13 T-18-S, R-22-W | 10.68449 |
| 10 | Caldwell-McWilliams | S/2 of SE/4 Sec. 13 T-18-S, R-22-W | 7.49562 |
| 11 | Kirkpatrick B | S/2 of SW/4 Sec. 13 T-18-S, R-22-W | 5.63507 |



EXHIBIT "B"
TO
UNIT AGREEMENT
DORCHEAT (UPPER RODESSA) UNIT
COLUMBIA COUNTY, ARKANSAS

LEGEND

........  Unit Outline
_____  Tract Boundary
②        Tract Number

0   1   2   3
THOUSANDS OF FEET

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

*This operating agreement ratified & confirmed effective 1-7-1992 by TEX as operator and on 2-19-1992 by S+P Co as non operator* ag

OPERATING AGREEMENT

DATED

August 1 , 19 86 ,

OPERATOR __TEMEX Energy, Inc.__

CONTRACT AREA __Portions of Sections 10, 11, 14, 15 & 16, Township__

__Eighteen South, Range Twenty-One West & Twenty-Two West__

COUNTY OR PARISH OF __Columbia__ STATE OF __Arkansas__

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610 - 1982  REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between __TEMEX Energy, Inc._____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
  (1) Identification of lands subject to this agreement,
  (2) Restrictions, if any, as to depths, formations, or substances,
  (3) Percentages or fractional interests of parties to this agreement,
  (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
  (5) Addresses of parties for notice purposes.
☐ B. Exhibit "B", Form of Lease.      NOT APPLICABLE
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.      NOT APPLICABLE

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# ARTICLE III.
## INTERESTS OF PARTIES

A. Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof ~~as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B"~~, and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B. Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of ~~royalties to the extent of~~   Lessor's royalty   which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C. Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D. Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

# ARTICLE IV.
## TITLES

A. Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

~~☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV
### continued

1  ☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7  ~~Each party~~ **Operator** shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12 No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14 ticipate in the drilling of the well.
15
16 B.  Loss of Title:
17
18 ~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19 reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20 from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21 tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22 and gas leases and interests: and,
23 (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24 entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25 but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26 (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27 been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
28 curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29 Area by the amount of the interest lost;
30 (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31 increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32 terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33 well;
34 (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35 failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36 who bore the costs which are so refunded;
37 (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38 borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39 (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40 claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41 connection therewith.
42
43 2.  Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
44 payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45 there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46 payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47 which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48 date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49 the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50 required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51 the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53 or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54 (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55 up to the amount of unrecovered costs;
56 (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57 oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58 termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59 portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,
60 (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61 ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
62
63 3. ~~Other~~ Losses: All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ **of title** shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

TEMEX Energy, Inc. *Feb 14, 1992* *now TFX Corporation* shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, ~~or becomes insolvent, bankrupt or is placed in receivership,~~ by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator ~~or transfer of Operator's interest to any single subsidiary,~~ parent ~~or successor corporation~~ shall not be the basis for removal of Operator. **becomes insolvent, is placed in or files for bankruptcy (either for liquidation or reorganization), or is placed in re-**

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by **ceiv** the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor **-shi** Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C. Employees:

**+It is the intention of the parties hereto that such resignati** **of Operator shall automatically occur, notwithstanding the Op ertor's election to accept or reject this JOA as an executory con trac**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D. Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

~~A. Initial Well:~~

~~On or before the_____day of_____, 19___, Operator shall commence the drilling of a well for~~ oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to

~~unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.~~

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI
continued

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

B.   Subsequent Operations:

1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit ''A'' or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,



- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
#### continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(b) ___300% of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and __300__% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any reworking or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.   A Non-Consenting Party shall be notified prior to commencing any work, regarding reworking, testing, completing, plugging back any uphole or deeper drilling operations.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
#### continued

1   If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2   the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3   Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4   therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5   back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6   the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

10   Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11   be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12   well conforms to the then-existing well spacing pattern for such source of supply.

16   The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17   except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18   after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19   duction, ceases to produce in paying quantities.

23   3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24   completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25   reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26   ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27   first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28   matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29   withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30   each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31   ties.

35   4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36   also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37   location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38   mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39   affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40   to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

44   (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45   the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

46                                                                                        ┌and salvable surface equipment
47                                                                                        │used in connection with such
48                                                                                        │well
49   (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50   salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51   provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning   the original
52                                  remaining in the hole                                                              borehole.

55   In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56   shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57   receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58   incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-
59   by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60   ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61   stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

65   C.  TAKING PRODUCTION IN KIND:

67   Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68   exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69   marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70   party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1    required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3        Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4    the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5    its share of all production.
6
7        In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8    the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9    the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10   best price ~~obtainable~~ in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11   owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12   delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13   time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14   of one (1) year.     *reasonably obtainable under the circumstances
15
16       In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17   deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18   be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19   agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.
20
21   D.  Access to Contract Area and Information:
22
23       Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24   and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25   and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26   governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27   each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28   gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29   quests the information.
30
31   E.  Abandonment of Wells:
32
33       1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34   drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35   without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36   within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37   such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38   accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39   such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40   operations in search of oil and/or gas subject to the provisions of Article VI.B.
41
42       2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43   hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44   producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45   be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46   thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47   those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48   parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49   Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50   the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51   material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52   terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53   gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54   tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55   duced from the interval or intervals of the formation or formations covered thereby, ~~such lease to be on the form attached as Exhibit~~
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

-8-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  "D". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.

6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.

14  ~~3.  Abandonment of Non-Consent Operations. The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between~~
15  Consenting Parties in the event of the proposed abandonment of any well ~~excepted from said Articles,~~ provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  ~~VI.E.~~

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

23  A.  Liability of Parties:

25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

30  B.  Liens and Payment Defaults:

32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45  the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46  reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

48  C.  Payments and Accounting:

50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52  tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53  showing expenses incurred and charges and credits made and received.

55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58  with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59  on or before the 20th day of the ~~next preceding month.~~ Each party shall pay to Operator its proportionate share of such estimate within
60  * ~~fifteen (15)~~ days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61  due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
63  **thirty (30)      *month preceding the month for which the advance is re-
64  D.  Limitation of Expenditures:                                                          queste

66      1.  Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67  pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

☐ ~~Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and/or surface facilities.~~

☐ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion attempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of    fifteen thousand and 00/100    Dollars ($   15,000.00    ) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of    fifteen thousand and 00/100    Dollars ($   15,000.00    ) ~~but less than the amount first set forth above in this paragraph.~~

E.  Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

F.  Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C".

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982
### ARTICLE VII
continued

G. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, ~~such lease to be on the form attached hereto as Exhibit "B"~~. Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

~~C. Acreage or Cash Contributions:~~

~~While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1   ~~said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be~~
2   governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3   it may obtain ~~in support of any well or any other~~ operation on the Contract Area. The above provisions shall also be applicable to op-
4   ~~tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.~~
5
6   If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7   consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9   D.  Maintenance of Uniform Interest:
10
11   For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12   party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13   equipment and production unless such disposition covers either:
14
15   1. the entire interest of the party in all leases and equipment and production; or
16
17   2. an equal undivided interest in all leases and equipment and production in the Contract Area.
18
19   Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20   and shall be made without prejudice to the right of the other parties.
21
22   If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23   require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24   and approve and pay such party's share of the joint expenses, and to deal generally with, and within power to bind, the co-owners of such
25   party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26   into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27   Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29   E.  Waiver of Rights to Partition:
30
31   If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32   undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33   interest therein.
34
35   ~~F.  Preferential Right to Purchase:~~
36
37   ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38   ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39   ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40   ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41   ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42   ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43   ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44   ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45   ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47   ## ARTICLE IX.
48   ### INTERNAL REVENUE CODE ELECTION
49
50   This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51   for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52   and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53   purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54   from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55   mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56   ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57   United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58   and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59   evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60   Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61   action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62   Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63   Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64   mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65   tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66   computation of partnership taxable income.
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed     ten thousand and 00/100----------------------------------Dollars ($10,000.00      ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☒  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐  Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

-13-

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ___Arkansas_____ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

A.  No Third-Party Beneficiary Contract:

This Agreement is made solely for the benefit of those persons who are signatory parties hereto (including those persons succeeding to all or part of the interest of an original party if such succession is recognized under the other provisions hereof), and no other person shall be or claim or be entitled to enforce any rights, benefits or obligations under this Agreement.

B.  Security:

The lien and security interest granted by each Non-Operator to Operator and by Operator to the Non-Operator under Article VII.B. shall extend not only to such party's oil and gas rights in the Contract Area (which for greater certainty shall include all of each party's leasehold interest and leasehold estate in the Contract Area), the oil and/or gas when extracted and equipment (as mentioned in said Article) but also to all accounts, contract rights, inventory and general intangibles constituting a part of, relating to or arising out of said oil and gas rights, extracted oil and gas and said equipment or which are otherwise owned or held by any such party in the Contract Area. Further, the lien and security interest of each of the said party shall extend to all proceeds and products of all of the property and collateral described in this paragraph and in Article VII.B. as being subject to said lien and security interest. Any party, to the extent it deems necessary to perfect the lien and security interest provided herein, may file this Operating Agreement as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code. Further, and not in limitation of the foregoing, each party hereby grants to Operator full rights, power and authority to execute in each such party's name and on its behalf any financial statement which Operator deems necessary in order to perfect the security interest hereby granted under the applicable Uniform Commercial Code.

-14-

C.  Bankruptcy:

If, following the granting of relief under the Bankruptcy
Code to any party hereto as debtor thereunder, this Agreement
should be held to be an executory contract within the meaning
of 11 U.S.C. § 365, then the Operator, or (if the Operator is
the debtor in bankruptcy) any other party, shall be entitled
to a determination by debtor or any trustee for debtor within
thirty (30) days from the date an order for relief is entered
under the Bankruptcy Code as to the rejection or assumption
of this Operating Agreement.  In the event of an assumption,
Operator or said other party shall be entitled to adequate as-
surances as to future performance of debtor's obligation here-
under and the protection of the interest of all other parties.

D.  Operations by Less Than All Parties:

The following shall be added at Line 24 on Page 6:

(c)  If operations are necessary to maintain lease acreage
which would otherwise expire under its own terms or are
necessary to earn leasehold interests under a farmout or
other exploration agreement, the penalty shall be changed
from that in (a) and (b) to "Relinquish, with no right of
reversion,  all right, title and interest in and to the
acreage so affected to the "Consenting Parties".

E.  Drilling Wells:

No party to this agreement shall propose the drilling of
more than one well at a time, nor shall any party to this agree-
ment propose the drilling of a well during the term that another
well is being drilled except:  (1) by the mutual consent of all
parties hereto; or (2) if one or more of said proposed wells
are obligations necessary for the maintenance of any lease interest
on acreage covered by this agreement.


F.  All damage or injury to the Contract Area and to any joint
property thereon not covered by insurance and required herein,
shall, unless caused by or resulting from the gross negligence
or willful misconduct of a party hereto, be shared by the
parties hereto in proportion to their respective interests in
the Contract Area.  Any liability or damages arising out of
personal injury to, or death of, third parties or injury to or
destruction of property of third parties, resulting from opera-
tions conducted hereunder for the joint account, not covered by
insurance required herein, shall, unless caused by or resulting
from the gross negligence or willful misconduct of a party hereto,
be shared in proportion to their respective interests in the
unit area.  Except for losses, expenses, claims, damages and
injuries caused by or resulting from the gross negligence or
willful misconduct of a party hereto, each party to the Agree-
ment agrees to hold the other parties indemnified and harmless
from and against any loss, expense, claim or demand for its
proportionate share of any damage or injury to joint property
or liability in damages arising out of personal injury to, or
death of third parties, or injury to or destruction of property
of third parties.  Each party shall be responsible for all
losses, expenses, costs, claims, damages and injuries of any
nature or kind, caused by or resulting from its gross negligence
and/or willful misconduct, and each party hereto agrees to in-
demnify and hold harmless the other parties to this Agreement
for all such losses, expenses, costs, claims, damages and in-
juries, ~~caused by or resulting from such its gross negligence and/or~~
~~willful misconduct~~ Any party individually may acquire such ad-
ditional insurance as it desires to protect itself against any
liability not covered by insurance required herein.  All insurance
purchased individually by a party to this Agreement shall con-
tain a waiver by the insurance company of all right of subrogation
in favor of the parties to this Agreement.

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___1st___ day of ___August___ 19 _86_ .

OPERATOR

TEMEX ENERGY, INC.

BY: _____
R. E. Grappe
Vice President

NON-OPERATORS

| | |
|---|---|
| Helen N. Ascher | Indian Wells Oil Co. |
| U/W/O Elmer E. Batzell | Monsanto Oil Company |
| Kenneth S. Blancett | R & N Associates |
| Joyce Parham Chapel | Mrs. Stephen S. Reese |
| F. A. Clark | Guy Sample |
| F. F. Cunningham | Robert I. Sewell, Jr. |
| Ernestine Demuth | Frances Siegel |
| Stephen O. Smith | Nancy Smreker Speer |

Additional Signature Page One (1)

Attached to and made a part of that certain Operating Agreement dated August
1, 1986, by and between Temex Energy, Inc., as Operator, and Helen N. Ascher,
et al, as Non-Operators.


_____          _____
Grady Vaughn III/J. Nichols                  Kimran Oil Company


_____          _____
R. N. Ascher                                 U/W/O George Bauerdorf


_____          _____
Brazos Young Corporation                     Cities Service Oil & Gas Corp.


_____          _____
Coastal Oil & Gas Corporation                Robert S. Davis


_____          _____
TXO Producing Properties Corp.               Elsie Lou Keith


_____          _____  _____
Michael H. O'Brien                           Betty Sklar Phillips


_____          _____
T. J. Raney & Sons                           Roberts & Murphy, Inc.


_____          _____  _____
Robert I. Sewell, Sr.                        Albert Sklar


_____          _____
Mrs. Billye Y. Smreker                       Stephens Production Company


_____          _____
Grady Vaughn III                             Georgetta R. Durden


_____          _____
Simeon Edward Hayner                         First Interstate National Bank
                                                of California

Additional Signature Page Two (2)

Attached to and made a part of that certain Operating Agreement dated August
1, 1986, by and between Temex Energy, Inc., as Operator, and Helen N. Ascher,
et al, as Non-Operators.


H. E. Russell _____          Wayne E. Russell _____


D. Diane Schlensker _____     Charles H. Smreker _____


Joe Smreker, Jr. _____         William H. Smreker _____


C. H. Young _____

EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated August
1, 1986, by and between Temex Energy, Inc., as Operator, and Helen N. Ascher,
et al, as Non-Operators.

1.    Contract Area:

Township 18 South Range 22 West, Columbia County, Arkansas

    Section 10:  SE/4 SW/4 and S/2 SE/4
    Section 11:  S/2 SW/4 and SW/4 SE/4
    Section 14:  NE/4, S/2 NW/4 and N/2 SW/4
    Section 15:  N/2 and N/2 SE/4
    Section 16:  N/2 NE/4 and NE/4 NW/4

    Containing 1,080 acres, more or less.

*see Revised Ex "A"
dated July 7, 198?
+ July 10*

2.    Interests and addresses of Parties:

Dorcheat Unit #8. 11, 12, 18, 21

    Helen N. Ascher                      .0077010
    45 East 72nd Street
    New York, New York   10021

    U/W/O Elmer E. Batzell               .0014620
    Edward G. Gallager, TR
    810 American Security Bldg.
    730 15th Street, NW
    Washington, D.C.  20005

    Kenneth S. Blancett                  .0008060
    P.O. Box 2986
    Denver, Colorado  80201

    Joyce Parham Chapel                  .0003416
    1109 Moore Avenue
    El Dorado, Arkansas  71730

    F. A. Clark                          .0077010
    P.O. Box 311
    Boston, MA  02101

    F. F. Cunningham                     .0002169
    11 South Carthage Circle
    Ft. Smith, Arkansas  72901

    Ernestine Demuth                     .0029520
    c/o Bernard Gartlir
    469 Fifth Avenue
    New York, New York  10017

    Indian Wells Oil Company
    Hunton/Indian Wells 1983 Fund        .0123844
    4200 E. Skelly Drive #600
    Tulsa, Oklahoma  74135

    Monsanto Oil Company                 .1339500
    1300 Post Oak Tower
    5051 Westheimer
    Houston, Texas  77056

    R & N Associates                     .0016720
    4100 McEwen Road, Suite 240
    Dallas, Texas  75244

    Mrs. Stephen S. Reese                .0000297
    301 Lecta
    Ft. Smith, Arkansas  72901

EXHIBIT "A"
PAGE 2

Guy Sample                                          .0013890
c/o Trust Department
Commercial National Bank
P.O. Box 21119
Shreveport, Louisiana  71152-0001

Robert I. Sewell, Jr.                              .0005275
185 Oakley Drive
Shreveport, Louisiana  71105

Frances Siegel                                     .0073374
11100 Braesridge Drive #1301
Houston, Texas  77071

Stephen O. Smith                                   .0005160
P.O. Box 504
Ruston, Louisiana  71270

Nancy Smreker Speer                                .0000297
P.O. Box 150
Fayetteville, Arkansas  72702

Grady Vaughn III/J. Nichols                        .0030961
Lock Box 85 #3000
2121 San Jacinto Street
Dallas, Texas  75201

Kimran Oil Company                                 .0225088
200 N. Jefferson #500
El Dorado, Arkansas  71730

R. N. Ascher                                       .0044580
P.O. Box 228
Guerneville, CA  95446

U/W/O George Bauerdorf                             .0045110
Thelma Bauerdorf /C. Cartwright, TR
9363 Wilshire Boulevard
Suite 211
Beverly Hills, CA  90210

Brazos Young Corporation                           .0065010
2170 Buckthorne Place
Suite 400
The Woodlands, Texas  77380

Cities Service Oil & Gas Corp.                     .1098550
900 Colorado State Bank Building
1600 Broadway #900
Denver, Colorado  80202

Coastal Oil & Gas Corporation                      .1299850
Bayview Federal Building
811 N. Carancha
Corpus Christi, Texas  78402

Robert S. Davis                                    .0004773
1605 Slattery Building
Shreveport, Louisiana  71101

TXO Producing Properties Corp.                     .0677142
700 Garrison Building
523 Garrison Avenue
Fort Smith, AR  72901-2598

Elsie Lou Keith                                    .0007477
955 Highland Drive
Magnolia, Arkansas  71753

EXHIBIT "A"
Page 3


Michael H. O'Brien                          .0004773
618 Turtle Creek
Shreveport, Louisiana  71115

Betty Sklar Phillips                        .0036687
P.O. Box 3735
Shreveport, Louisiana  71133-3735

T. J. Raney & Sons                          .0021930
1516 NBC Building
San Antonio, Texas  78205

Roberts & Murphy, Inc.                      .0225088
P.O. Box 7125
Shreveport, Louisiana  71107

Robert I. Sewell, Sr.                       .0016920
1250 Pardue Court
Shreveport, Louisiana  71104

Albert Sklar                                .0036687
c/o Sklar & Phillips
P.O. Box 3735
Shreveport, Louisiana  71133-3735

Mrs. Billye Y. Smreker                      .0013646
301 South 10
Ft. Smith, Arkansas  72901

Stephens Production Company                 .0022957
P.O. Box 248
Ft. Smith, Arkansas  72901

Grady Vaughn III                            .0092883
Lock Box 85 #3000
2121 San Jacinto Street
Dallas, Texas  75201

Georgetta R. Durden                         .0001928
2120 S. 46th Street
Fort Smith, Arkansas  72901

Simeon Edward Hayner                        .0062410
P. O. Box 559
Deerfield, Illinois  60015

First Interstate National Bank              .0062410
of California
707 Wilshire Blvd.
Los Angeles, California  90017

H. E. Russell                               .0167022
P. O. Box 1888
Magnolia, Arkansas  71753

Wayne E. Russell                            .0018558
Route 2 Box 21
Magnolia, Arkansas  71753

D. Diane Schlensker                         .0123720
P. O. Box 1330
Richardson, Texas  75080

Charles H. Smreker                          .0000297
D-30 2927 Crossview
Houston, Texas  77063

Joe Smreker, Jr.                            .0000297
4 Cherry Valley Dr.
Little Rock, Arkansas  72211

EXHIBIT "A"
PAGE 5

Guy Sample                              .0024605
c/o Trust Department
Commercial National Bank
P.O. Box 21119
Shreveport, Louisiana  71152-0001

Robert I. Sewell, Jr.                   .0009345
185 Oakley Drive
Shreveport, Louisiana  71105

Frances Siegel                          .0073374
11100 Braesridge Drive #1301
Houston, Texas  77071

Stephen O. Smith                        .0005160
P.O. Box 504
Ruston, Louisiana  71270

Nancy Smreker Speer                     .0000111
P.O. Box 150
Fayetteville, Arkansas  72702

Grady Vaughn III/J. Nichols             .0030961
Lock Box 85 #3000
2121 San Jacinto Street
Dallas, Texas  75201

Kimran Oil Company                      .0225088
200 N. Jefferson #500
El Dorado, Arkansas  71730

R. N. Ascher                            .004450
P.O. Box 228
Guerneville, CA  95446

U/W/O George Bauerdorf                  .0045110
Thelma Bauerdorf /C. Cartwright, TR
9363 Wilshire Boulevard
Suite 211
Beverly Hills, CA  90210

Brazos Young Corporation                .0065010
2170 Buckthorne Place
Suite 400
The Woodlands, Texas  77380

Cities Service Oil & Gas Corp.          .0411960
900 Colorado State Bank Building
1600 Broadway #900
Denver, Colorado  80202

Coastal Oil & Gas Corporation           .0487444
Bayview Federal Building
811 N. Carancha
Corpus Christi, Texas  78402

Robert S. Davis                         .0008455
1605 Slattery Building
Shreveport, Louisiana  71101

TXO Producing Properties Corp.          .0677142
700 Garrison Building
523 Garrison Avenue
Fort Smith, AR  72901-2598

Elsie Lou Keith                         .0007478
955 Highland Drive
Magnolia, Arkansas  71753

EXHIBIT "B"

(There is no Exhibit"B")

Recommended by the Council
of Petroleum Accountants
Societies

COPAS 601,   BOX 800
TULSA OK 74101

# EXHIBIT " C "

Attached to and made a part of _that certain Agreement between Temex Energy, Inc., Operator_
_and Helen N. Ascher, et al, as Non-Operators._

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I.  GENERAL PROVISIONS

### 1.   Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure
is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and mainte-
nance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Opera-
tions and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision
of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other profes-
sional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems
for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as
most recently recommended by the Council of Petroleum Accountants Societies.

### 2.   Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Ac-
count for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure,
lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except
that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in
detail.

### 3.   Advances and Payments by Non-Operators

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their
share of estimated cash outlay for the succeeding month's operation within ~~fifteen (15)~~ days after receipt of the bill-
ing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each
monthly billing to reflect advances received from the Non-Operators.      thirty (30)

B.   Each Non-Operator shall pay its proportion of all bills within ~~fifteen (15)~~ days after receipt. If payment is not made      thirty (30)
within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _Inter-First_
_Bank, N.A., Ft. Worth_ on the first day of the month in which delinquency occurs plus 1% or the maximum
contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever
is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4.   Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof;
provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall con-
clusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year,
unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on
Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed
period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable
Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.



5.  **Audits**

    A.  A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

    B.  The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.  **Approval By Non-Operators**

    Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.  **Ecological and Environmental**

    Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.  **Rentals and Royalties**

    Lease rentals and royalties paid by Operator for the Joint Operations.

3.  **Labor**

    A.  (1)  Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

        (2)  Salaries of First Level Supervisors in the field.

        (3)  Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

        (4)  Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

    B.  Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

    C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

    D.  Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

4.  **Employee Benefits**

    Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

5.  **Material**

    Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.  **Transportation**

    Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

    A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.



    B.  If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

    C.  In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

**7.   Services**

    The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

**8.   Equipment and Facilities Furnished By Operator**

    A.  Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _thirty-three & one-third_ percent (33 1/3%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

    B.  In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

**9.   Damages and Losses to Joint Property**

    All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**10.   Legal Expense**

    Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

**11.   Taxes**

    All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

**12.   Insurance**

    Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.   Abandonment and Reclamation**

    Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.   Communications**

    Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.   Other Expenditures**

    Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

COPAS

## III. OVERHEAD

1. **Overhead – Drilling and Producing Operations**

    i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

    ( X ) Fixed Rate Basis, Paragraph 1A, or
    (  ) Percentage Basis, Paragraph 1B

    Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

    (  ) shall be covered by the overhead rates, or
    ( X ) shall not be covered by the overhead rates.

    iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

    (  ) shall be covered by the overhead rates, or
    ( X ) shall not be covered by the overhead rates.

    A. **Overhead – Fixed Rate Basis**

    (1) Operator shall charge the Joint Account at the following rates per well per month:

    Drilling Well Rate $ __3,654.00__
       (Prorated for less than a full month)
    Producing Well Rate $ __417.00__

    (2) Application of Overhead – Fixed Rate Basis shall be as follows:

    (a) Drilling Well Rate

    (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

    (2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

    (b) Producing Well Rates

    (1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

    (2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

    (3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

    (4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

    (5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

    (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

    B. **Overhead – Percentage Basis**

    (1) Operator shall charge the Joint Account at the following rates:

-4-

COPAS

(a) Development

_____ Percent ( _____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent ( _____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. Overhead – Major Construction   *TO BE NEGOTIATED

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $ _____ :

A. _____ % of first $100,000 or total cost if less, plus

B. _____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. _____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. Catastrophe Overhead        *TO BE NEGOTIATED

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. _____ % of total costs through $100,000; plus

B. _____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. _____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

-5-

COPAS

A.  New Material (Condition A)

  (1)  Tubular Goods Other than Line Pipe

    (a) Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

    (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

    (c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

    (d) Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

  (2)  Line Pipe

    (a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

    (d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

  (3)  Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

  (4)  Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2 A (1) and (2).

B.  Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1)  Material moved to the Joint Property

    At seventy-five percent (75%) of current new price, as determined by Paragraph A.

  (2)  Material used on and moved from the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

    (b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

  (3)  Material not used on and moved from the Joint Property

    At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.  Other Used Material

  (1)  Condition C

    Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.



    (2)  Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

    (a)  Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

    (b)  Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

    (3)  Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

  D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

  E.  Pricing Conditions

    (1)  Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

    (2)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

**3.  Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

**4.  Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

**1.  Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

**2.  Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

**3.  Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

**4.  Expense of Conducting Inventories**

  A.  The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

  B.  The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT
DATED AUGUST   1ST, 1986, BY AND BETWEEN TEMEX ENERGY, INC.,
AS OPERATOR, AND HELEN N. ASCHER, ET AL, AS NON-OPERATORS.


EXHIBIT "D"

TO OPERATING AGREEMENT


Minimum Insurance to be carried:

1. <u>Workmen's Compensation</u>

   To comply with the Laws of the State of  Arkansas

2. <u>Employer's Liability</u>

   $300,000.00 bodily injury each person
   $500,000.00 bodily injury each accident

3. <u>Public Liability</u>

   $300,000.00 bodily injury each person
   $500,000.00 bodily injury each accident
   $300,000.00 property damage each accident

4. <u>Automobile Public Liability</u>

   $300,000.00 bodily injury each person
   $500,000.00 bodily injury each accident
   $300,000.00 property damage each accident

5. <u>Other Insurance</u>

   No other insurance shall be carried at the expense
   of the joint account except by mutual consent of the
   parties hereto.

EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement
dated August 1st, 1986, TEMEX ENERGY, INC., as Operator, and the
other Signatory Parties, as Non-Operators.

## GAS BALANCING AGREEMENT

1.

Subject to the provisions of the Operating Agreement to which
this Exhibit is attached, during the period or periods when any
party hereto has no market for, or its purchaser is unable to take
or if any party fails to take its share of gas, the other parties,
or any of them, shall be entitled to produce and take said share,
and each of such taking parties shall have the right to take all
or any part of its pro rata share thereof, said pro rata share
being based on the ratio of its participation percentage under
this Operating Agreement to the participation percentages of all
taking parties. All parties hereto shall share in and own the
condensate recovered at the surface in accordance with their re-
spective interests, but each party taking such gas shall own all
of the gas delivered to its purchaser. Each party unable to mar-
ket its share of the gas produced shall be credited with gas in
storage equal to its share of the gas produced, less its share of
gas actually taken by it and less its share of gas used in lease
operations, vented or lost, such party hereinafter referred to as
the underproduced party.

2.

After notice to Operator, any party may begin taking or de-
livering its share of the gas produced. In addition to its share,
each underproduced party shall, until it has recovered its gas in
storage and balanced its gas account on a MCF basis, be entitled
to take or deliver a volume of gas equal to Fifty Percent (50%) of
each overproduced party's share of gas produced. If more than one
(1) party is entitled to the stated volume of the overproduced
party's share of gas, each shall have the right to take all or any
part of its pro rata share thereof, said pro rata share being
based on the ratio of its participation percentage under this
Operating Agreement to the participation percentages of all en-
titled parties who desire to take such gas. Make-up volumes of
gas shall be applied on a first-in-first-out basis; i.e., the
first overproduced gas shall be the first make up gas by the
underproduced party. Each party, shall at all times, use its best
efforts to regulate its takes and deliveries from the Contract
Area so as not to jeopardize the continued viability of any lease
committed thereto or effect the shut-in of a lease for over-
producing the allowable, if any, assigned thereto by the regula-
tory body having jurisdiction.

3.

At all times while gas is produced from the Contract Area,
each party taking or delivering gas hereunder will make settle-
ment for the landowner's royalties (not exceeding Lessor's base
royalty in the total monthly proceeds received by such parties)
and all other leasehold burdens that are shared jointly under the
terms of the attached Operating Agreement. For all other lease-
hold burdens, not jointly shared under the terms of the Operating
Agreement, such burdens shall be paid by the party creating same.
Each party (hereinafter referred to as "said party") hereto agrees
to hold each other party harmless from any and all claims for
royalties and other payments for which said party is responsible
pursuant to this Section 3.

4.

Each party producing and taking or delivering gas to the pur-
chaser shall pay any and all production and severance taxes due on
such gas.

5.

Nothing herein shall be construed to deny any party the
right, from time to time, to produce and take or deliver to the
purchaser its full share of the allowable gas production to meet
the deliverability tests required by its purchaser.

6.

Upon depletion, all overproduced parties shall account to the
underproduced parties in the following manner.  The Operator shall
determine the amount of underproduction and overproduction for
each underproduced party and each overproduced party.  Each over-
produced party shall pay to each underproduced party (in the pro-
portion that the underproduction of each underproduced party bears
to the underproduction of all underproduced parties) an amount of
money equal to the lesser of the amount received by the overpro-
duced party for its overproduction at the time and from time to
time when the overproduced party delivered and sold such overpro-
duction of gas, or the amount for which the underproduced party
could have sold the underproduction to it's purchaser, such lesser
amount to be less any production severence taxes, less any
royalties paid pursuant to Section 3 hereof by the overproduced
party, and less any other payments made by the overproduced party
to obligees of the underproduced party, to the extend said taxes,
royalties and other payment by the overproduced party were re-
quired by law and amounted to a discharge of the obligations of
the underproduced party therefore.  If there was no such price to
establish the amount received by the overproduced party because
the overproduced party took such gas for its own purposes instead
of selling it, the price shall be deemed to be either, (a) the
price the underproduced party would have collected under its gas
contract had it taken its share of gas and sold it at the time it
was entitled to do so, or, (b) for periods of time during which
the underproduced party did not have a gas contract, a price de-
termined by the weighted average of the wellhead gas prices during
the relevant period of time for those wells producing gas of the
same vintage (or subject to the same pricing categories and price
ceilings) located within the Contract Area here involved.  Prices
received for production by selling parties from any well where an
imbalance occurs, will be considered in any price determination
required.  In the event an accounting is necessary between over-
produced and underproduced parties when all or a portion of the
monies collected by the overproduced parties was collected subject
to possible refund as provided by the Federal Energy Regulatory
Commission or other governmental authority, then the overproduced
parties will pay and the underproduced parties will accept their
proportionate share of such monies with the understanding and
agreement that should a refund be required of all or a portion of
the monies so collected then the underproduced parties agree to
refund to the overproduced parties that portion of the monies paid
by the overproduced parties to the underproduced parties that is
required to be refunded plus any interest required to be paid
thereon.  Such refund shall be made within thirty (30) days of
receipt by the underproduced parties of a statement reflecting the
amount of refund due and the interest due thereon.

7.

Operator shall maintain a current account on a MCF basis of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered. Such statements shall be prepared for each individual well where a balancing situation exists, and shall additionally include the price each party received for its gas or would have received for its gas had it sold gas during the month. These monthly prices will be used if an accounting is required upon depletion as stated in Section 6.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred as its share thereof as set forth in the Operating Agreement.

9.

If any party to this Operating Agreement, including Operator, becomes insolvent, is placed in or files for bankruptcy (either for liquidation or reorganization), or is placed in receivership, then the provisions of Section 6 shall immediately go into effect as if depletion had occurred. Accounting of said party's over-production/underproduction shall be made to satisfy any other outstanding obligations that said party may have with any other party to this Agreement.

10.

This agreement shall constitute a separate agreement as to each producing well and proration unit within the Contract Area and becomes effective and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties hereto, their successors, legal representatives and assigns.

EXHIBIT "F"

These Federal Contract Requirements are attached to and made a
part of a contract dated August 1st, 1986, between certain parties
named therein, including TEMEX Energy, Inc., hereinafter called
"Contractor".

A.  Equal Opportunity Clause (41CFR 60-1.4)

During the performance of this Contract, Contractor agrees as
follow:

(1)  Contractor will not discriminate against any employee or
applicant for employment because of race, color, religion, sex or
national origin.  Contractor will take affirmative action to
ensure that applicants are employed, and that employees are
treated during employment, without regard to their race, color,
religion, sex or national origin.  Such action shall include, but
not be limited to the following:  Employment, upgrading, demotion,
or transfer, recruitment or recruitment advertising; layoff or
termination; rates of pay or other forms of compensation; and
selection for training, including apprenticeship.  Contractor
agrees to post in conspicuous places, available to employees and
applicants for employment, notices to be provided by the
contracting officer setting forth the provisions of this
nondiscrimination clause.

(2)  Contractor will, in all solicitations or advertisements
for employees placed by or on behalf of Contractor, state that all
qualified applicants will receive consideration for employment
without regard to race, color, religion, sex or national origin.

(3)  Contractor will send to each labor union or
representative of workers with which Contractor has a collective
bargaining agreement or other contract or understanding, a notice
to be provided by the agency contracting officer, advising the
labor union or workers' representative of Contractors' commitments
under Section 202 of Executive Order 11246 of September 24, 1965,
and shall post copies of the notice in conspicuous places
available to employees and applicants for employment.

(4)  Contractor will comply with all provisions of Executive
Order 11246 of September 24, 1965, and of the rules, regulations,
and relevant orders of the Secretary of Labor.

(5)  Contractor will furnish all information and reports
required by Executive Order 11246 of September 24, 1965, and by
the rules, regulations, and orders of the Secretary of Labor, or
pursuant thereto, and will permit access to his books, records,
and accounts by the contracting agency and the Secretary of Labor
for purposes of investigation to ascertain compliance with such
rules, regulations, and orders.

(6)  In the event of Contractor's noncompliance with the
nondiscrimination clauses of this contract or with any of such
rules, regulations, or orders, this contract may be cancelled,
terminated or suspended in whole or in part and Contractor may be
declared ineligible for further Government contracts in accordance
with procedures authorized in Executive Order 11246 of September
24, 1965, and such other sanctions may be imposed and remedies
invoked as provided in Executive Order 11246 of September 24,
1965, or by rule, regulation, or oder of the Secretary of Labor,
or as otherwise provided by law.

(7)   Contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Ords 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor.   Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance; _Provided, however,_ that in the event Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

B.   Employee Information Reports (41CFR 60-1.7)

If the value of this contract is $50,000 or more and if Contractor has 50 or more employees, Contractor agrees to file timely, complete and accurate reports on Standard Form 100 (EEO-1) with the appropriate federal agency.

C.   Affirmative Action Program (41CFR 50-1.40)

If the value of this contract is $50,000 or more and Contractor has 50 or more employees, Contractor agrees to develop a written affirmative action compliance program as required by law.

D.   Certification of Nonsegregated Facilities (41CFR 60-1.8)

Contractor certifies that it does not and will not maintain or provide for its employees any segregated facilities at any or its establishments, and that is does not and will not permit its employees to perform their services at any location under its contract, where segregated facilities are maintained.   Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this contract.   As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, lockerrooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom or otherwise.   It further agrees that (except where it has obtained identical certifications from proposed subcontractos for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of Equal Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):   NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES.   A Certification of Nonsegregated Facilities, as required by the May 9, 1967, order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7435, May 19, 1967) must be submitted prior to the award of subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause.   The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).   (Note:   The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.).

E.   Minority Business Enterprises (41CFR 1-1.1310-2)

    1.   Utilization.

        (a)  It is the policy of the Government that minority
business enterprises shall have the maximum practicable
opportunity to participate in the performance of Government
contracts.

        (b)  The Contractor agrees to use his best efforts to
carry out this policy in the award of his subcontract to the
fullest extent consistent with the efficient performance of this
contract.  As used in this contract, the term "minority business
enterprise" means a business, at least 50 percent of which is
owned by minority group members or, in case of publicly owned
businesses, at least 51 percent of the stock of which is owned by
minority group members.  For the purposes of this definition,
minority group members are Negroes, Spanish-speaking American
persons, American-Orientals, American-Indians, American-Eskimos,
and American Aleuts.  Contractors may rely on written
representations by subcontractors regarding their status as
minority business enterprises in lieu of an independent
investigation.

    2.   Subcontracting Program.

        (a)  The Contractor agrees to establish and conduct a
program which will enable minority business enterprises (as
defined in the clause entitled "Utilization of Minority Business
Enterprises") to be considered fairly as subcontractors and
suppliers under this contract.  In this connection, the Contractor
shall:

            (1)  Designate a liaison officer who will administer
the Contractor's minority business enterprises program.

            (2)  Provide adequate and timely consideration of the
potentialities of known minority business enterprises in all
"make-or-buy" decisions.

            (3)  Assure that known minority business enterprises
will have an equitable opportunity to omplete for subcontracts,
particularly by arranging solicitations, time for the preparation
of bids, quantities, specifications, and delivery schedules so as
to facilitate the participation of minority business enterprises.

            (4)  Maintain records showing (i) procedures which
have been adopted to comply with the policies set forth in the
clause, including the establishment of a source list of minority
business enterprises, (ii) awards to minority business enterprises
on the source list, and (iii) specific efforts to identify and
award contract to minority business enterprises.

            (5)  Include the Utilization of Minority Business
Enterprises clause is subcontracts which offer substantial
minority business enterprises subcontracting opportunities.

            (6)  Cooperate with the Contracting Officer in any
studies and surveys of the Contractor's minority business
enterprises procedures and practices that the Contracting Office
may from time to time conduct.

            (7)  Submit periodic reports of subcontracting to
known minority business enterprises with respect to the records
referred to in subparagraph (4), above, in such form and manner
and at such time (not more often than quarterly) as the
Contracting Officer may prescribe.

(b)  The Contractor further agrees to insert, in any
subcontract hereunder which may exceed $500,000, provisions
which shall conform substantially to the language of this
clause, including this paragraph (b), and to notify the
Contracting Officer of the names of such subcontractors.

F.  Affirmative Action for Disabled Veterans and Veterans of the
Vietnam Era. (41CFR 60-250)

The regulations in this part apply to all government contracts
and subcontracts for the furnishing of supplies or services or for
the use of real or personal property (including construction) for
$10,000 or more.

(a)  The Contractor will not discriminate against any employee
or applicant for employment because he or she is a disabled
veteran or veteran of the Vietnam Era in regard to any position
for which the employee or applicant for employment is qualified.
The Contractor agrees to take affirmative action to employ,
advance in employment, and otherwise treat qualified disabled
veterans and veterans of the Vietnam Era without discrimination
based upon their disability or veteran's status in all employment
practices such as the following:  employment upgrading, demotion
or transfer, recruitment, advertising, layoff or terminiation,
rates of pay or other forms of compensation, and selection for
training, including apprenticeship.

(b)  The Contractor agrees that all suitable employment
openings of the Contractor which exist at the time of the
execution of this contract and those which occur during the
performance of this contract, including those not generated by
this contract and including those at an establishment of the
Contractor other than the ones wherein the contract is being
performed but excluding those of independently operated corporate
affiliates, shall be listed at an appropriate local office of the
State employment service system wherein the opening occurs.  The
Contractor further egrees to provide such reports to such local
office regarding employment openings and hires as may be
required.

State and local government agencies holding Federal
contracts of $10,000 or more shall also list all their suitable
openings with the appropriate office of the State employment
service, but are not required to provide those reports set forth
in paragraphs (d) and (e).

(c)  Listing of employment openings with the employment
service system pursuant to this clause shall be made at least
concurrently with the use of any other recruitment source of
effort and shall involve the normal obligations which attach the
placing of a bona fide job order, including the acceptance of
referrals of veterans and nonveterans.  The listing of employment
openings does not require the hiring any particular job applicant
or from any particular group of job applicants, nothing herein is
intended to relieve the Contractor from any requirements Executive
Orders or regulations regarding nondiscrimination in employment.

(d)  The reports required by paragraph (b) of this clause
shall include, but not be limited to, periodic reports which shall
be filed at least quarterly with the appropriate local office or,
where the Contractor has more than one hiring location in a State,
with the central office of that State employment service.  Such
reports shall indicate for each hiring location (1) the number of
individuals hired during the reporting period, (2) the number of
nondisabled veterans of the Vietnam Era hire, (3) the number of
disabled veterans of the Vietnam Era hired, and (4) the total
number of disabled veterans hired.  The reports should include
covered veterans hired for on-the-job training under 38 USC 1787.
The Contractor shall submit a report within 30 days after the end
of each reporting period wherein any performance is made on this

Contract identifying data for each hiring location. The Contractor shall maintain at each hiring location copies of the reports submitted until the expiration of one year after final payment under the Contract, during which time these reports and related documentation shall be made available, upon request, for examination by any authorized representatives of the Contracting Officer or of the Secretary of Labor. Documentation would include personnel records respecting job openings, recruitment, and placement.

(e)  Whenever the Contractor becomes contractually bound to the listing provisions of this clause, it shall advise the employment service system in each State where it has establishments of the name and location of each hiring location in the State. As long as the Contractor is contractually bound to these provisions and has so advised the State system, there is no need to advise the State system of subsequent contracts. The Contractor may advise the State system when it is no longer bound by this contract clause.

(f)  This clause does not apply to the listing of employment openings which occur and are filled outside of the 50 States, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands.

(g)  The provisions of paragraphs (b), (c), (d), and (e) of this clause do not apply to openings which the Contractor proposes to fill from within his own organization or to fill pursuant to a customary and traditional employee-union hiring arrangement. This exclusion does not apply to a particular opening once an employer decides to consider applicants outside of his own organization or employer-union arrangements for that opening.

(h)  As used in this clause:

(1)  "All suitable employment openings" includes, but is not limited to, openings which occur in the following job categories: production and nonproduction; plant and office; laborers and mechanics; supervisory and nonsupervisory; technical; and executive, administrative, and professional openings as are compensated on a salary basis of less than $25,000 per year. This term includes full-time employment, temporary employment of more than 3 days' duration, and part-time employment. It does not include openings which the Contractor proposes to fill from within his own organization or to fill pursuant to a customary and traditional employer-union hiring arrangement nor opening in an educational institution which are restricted to students of that institution. Under the most compelling circumstances an employment opening may not be suitable for listing, including such situations where the needs of the Government cannot reasonably be otherwise supplied, where listing would be contrary to national security, or where the requirement of listing would otherwise not be for the best interest of the Government.

(2)  "Appropriate office of the State employment service system" means the local office of the Federal State national system of public employment offices with assigned responsibility for serving the area where the employment opening is to be filled, including the District of Columbia, Guam, Puerto Rico, and the Virgin Islands.

(3)  "Openings which the Contractor proposes to fill from within his own organization" means employment openings for which no consideration will be given to persons outside the Contractor's organization (including any affiliates, subsidiaries, and the parent companies) and includes any openings which the Contractor proposes to fill from regularly established "recall" lists.

(4)  "Openings which the Contractor proposes to fill pursuant to a customary and traditional employer-union hiring arrangement" means employment openings which the Contractor proposes to fill from union halls, which is part of the customary and traditional hiring relationship which exists between the Contractor and representatives of his employees.

(i)  The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

(j)  In the event of the Contractor's noncompliance with the requirements of this clause, actions for noncompliance may be taken in accordance with the rules, regulations, relevant orders of the Secretary of Labor issued pursuant to the Act.

(k)  The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Director, provided by or through the Contracting Officer.  Such notice shall state the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam Era for employment, and the rights of applicants and employees.

(l)  The Contractor will notify each labor union or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of the Vietnam Era Veterans Readjustment Assistance Act, and is committed to take affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam Era.

(m)  The Contactor will include the provisions of this clause in every subcontract or purchase order of $10,000 or more unless exempted by rules, regulations, or orders of the Secretary issued pursuant to the Act, so that such provisions will be binding upon each subcontractor or vendor.  The Contractor will take such action with respect to any subcontract or purchase order as the Director of the Office of Federal Contract Compliance Programs may direct to endorce such provisions, including action for noncompliance.

G.  Employment of the Handicapped (20CFR 741.3)

This provision applies to all nonexempt contracts and subcontracts which exceed $2,500 as follows:  (1)  Part A applies to contracts and subcontracts which provide for performance in less than 90 days, (2) Parts A and B apply to contracts and subcontracts which provide for performance in 90 days or more and the amount of the contract or subcontracts is less than $500,000, and (3) Parts A, B, and C apply to contracts and subcontracts which provide for performance in 90 days or more and the amount of the contract or subcontract is $500,000 or more.

PART A

(a)  The Contractor will not discriminate against any employee or applicant for employment because of physical or mental handicap in regard to any position for which the employee or applicant for employment is qualified.  The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified handicapped individuals without discrimination based upon their physical or mental handicap in all employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship.

(b)   The Contractor agrees that, if a handicapped individual files complaint with the Contractor that he is not complying with the requirements of the Act, he will (1) investigate the complaint and take appropriate action consistent with the requirements of 20 CFR 741.29 and (2) maintain on file for three years, the record regarding the complaint and the actions taken.

(c)   The Contractor agrees that, if a handicapped individual files a complaint with the Department of Labor that he has not complied with the requirements of the Act, (1) he will cooperate with the Department in its investigation of the complaint, and (2) he will provide all pertinent information regarding his employment practices with respect to the handicapped.

(d) The Contractor agrees to comply with the rules and regulations of the Secretary of Labor in 20 CFR Ch. VI, Page 741.

(e)   In the event of the Contractor's non-compliance with the requirements of this clause, the Contract may be terminated or suspended in whole or in part.

(f)   The clause shall be included in all subcontracts over $2,500.

## PART B

(g)   The Contract agrees (1) to establish an affirmative action program, including appropriate procedures consistant with the guidelines and the rules of the Secretary of Labor, which will provide the affirmative action regarding the employment of advancement of the handicapped required by P.L. 93-112, (2) to publish the program in his employee's or personnel handbook or otherwise distribute a copy to all personnel, (3) to review his program on or before March 31 of each year and to make such changes as may be appropriate, and (4) to designate one of his principal officials to be responsible for the establishment of operation of the program.

(h)   The Contractor agrees to permit the examination by appropriate contracting agency officials or the Assistant Secretary for Employment Standards or his designee, of pertinent books, documents, papers, and records concerning his employment and advancement of the handicapped.

(i)   The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Assistant Secretary for Employment Standards, provided by the Contracting Officer stating Contractor's obligation under the laws to take affirma-tive action to employ and advance in employment qualified handicapped employees and applicants for employment and the rights and remedies available.

(j)   The Contractor will notify each labor union or representative of workers with which he has a collective bargaining agreement or other contract understanding that the Contractor is bound by the terms of Section 503 of the Rehabilitation Act, and is committed to take affirmative action to employ and advance in employment physically and mentally handicapped individuals.

## PART C

(k)   The Contractor agrees to submit a copy of his affirmative action program to the Assistant Secretary for Employment Standards within 90 days after the award to him of a contract or subcontract.

(1)   The Contractor agrees to submit a summary report to the
Assistant Secretary for Employment Standards, by March 31 of each
year during performance of the Contract, and by March 31 of the
year following completion of the Contract, in the form prescribed
by the Assistant Secretary, covering employment and complaint
experience, accomodations made and all steps taken to effectuate
and carry out the commitments set forth in the affirmative action
program.

A.A.P.L. FORM 610

# MODEL FORM OPERATING AGREEMENT—1956

### Non-Federal Lands

OPERATING AGREEMENT

DATED

_____October 1_____, 19 75 ,

FOR UNIT AREA IN TOWNSHIP    18 South    , RANGE    22 West _____ ,

_____Columbia____ ___ COUNTY, STATE OF    Arkansas

AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM                    A A P L. NO  610
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
ROSS-MARTIN COMPANY,   BOX 800  TULSA  74101

A.A.P.L. FORM 610

# TABLE OF CONTENTS

| Paragraph Number | Title | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Title Examination, Loss of Leases and Oil and Gas Interests | 1 |
| 3. | Unleased Oil and Gas Interests | 2 |
| 4. | Interests of Parties | 2 |
| 5. | Operator of Unit | 3 |
| 6. | Employees | 3 |
| 7. | Test Well | 3 |
| 8. | Costs and Expenses | 3 |
| 9. | Operator's Lien | 4 |
| 10. | Term of Agreement | 4 |
| 11. | Limitation on Expenditures | 4 |
| 12. | Operations by Less Than All Parties | 5 |
| 13. | Right to Take Production in Kind | 6 |
| 14. | Access to Unit Area | 7 |
| 15. | Drilling Contracts | 7 |
| 16. | Abandonment of Wells | 7 |
| 17. | Delay Rentals and Shut-in Well Payments | 8 |
| 18. | Preferential Right to Purchase | 8 |
| 19. | Selection of New Operator | 8 |
| 20. | Maintenance of Unit Ownership | 9 |
| 21. | Resignation of Operator | 9 |
| 22. | Liability of Parties | 9 |
| 23. | Renewal or Extension of Leases | 9 |
| 24. | Surrender of Leases | 10 |
| 25. | Acreage or Cash Contributions | 10 |
| 26. | Provision Concerning Taxation | 10 |
| 27. | Insurance | 11 |
| 28. | Claims and Lawsuits | 11 |
| 29. | Force Majeure | 11 |
| 30. | Notices | 11 |
| 31. | Other Conditions | 12 – 13 |

A.A.P.L. FORM 610

## OPERATING AGREEMENT

THIS AGREEMENT, entered into this ___1st___ day of _____October_____ , 19 _75_ , between
_____ Rustex Oil, Inc. _____
hereafter designated as "Operator", and the signatory parties other than Operator.

WITNESSETH, THAT:

WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit "A", and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

### 1. DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them.

(1) The words "party" and "parties" shall always mean a party, or parties, to this agreement.

(2) The parties to this agreement shall always be referred to as "it" or "they", whether the parties be corporate bodies, partnerships, associations, or persons real.

(3) The term "oil and gas" shall include oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons, unless an intent to limit the inclusiveness of this term is specifically stated.

(4) The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Unit Area which are owned by parties to this agreement.

(5) The term "Unit Area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

(6) The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Unit Area or as fixed by express agreement of the parties.

(7) All exhibits attached to this agreement are made a part of the contract as fully as though copied in full in the contract.

(8) The words "equipment" and "materials" as used here are synonymous and shall mean and include all oil field supplies and personal property acquired for use in the Unit Area.

### 2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

**A. Title Examination:**

~~Each party other than Operator shall promptly submit to Operator abstracts certified from beginning to~~ recent date, together with all title papers in its possession covering leases and oil and gas interests which it is subjecting to this contract. All of these abstracts and title records shall be examined for the benefit of all parties by Operator's attorney.

Operator shall promptly submit abstracts certified from beginning to recent date, together with all title papers in its possession covering leases and oil and gas interests which it is subjecting to this agreement, to _____ . for examination by the latter's attorney for the benefit of all parties.

All title examinations shall be made without charge. Each examining attorney shall prepare a complete title report on each separate tract based upon the abstract record and title papers submitted to him. Each title report shall contain a list of fee owners and their interests, shall state the attorney's opinion concerning validity of their interests, and shall contain an enumeration and description of title defects, if any, a report upon mortgages, taxes, pending suits, and judgments, and unreleased oil and gas leases, and a list of requirements, if any, upon which the examiner's approval of title to the lease or oil and gas interest is contingent. The title report shall also contain a specific description of the oil and gas lease being subjected to this contract, with a statement of its form, term (which will be satisfactory if it has a primary term expiring not sooner than _____ ), ~~amount of royalty, status of delay rental payments, and unusual drilling~~

All abstracts will be prepared by Operator and Operator shall have same examined and an opinion rendered by an attorney of his choice. Any title requirements set forth in said opinions shall be satisfied by Operator. Each non-operator shall pay their pro rata share of cost.

-1-
"Joint Loss"

A.A.P.L. FORM 610

~~obligations and of excess royalty, oil payments, and other special burdens. A copy of each title opinion, and~~ of each supplemental opinion, and of all final opinions, shall be sent promptly to each party. The opinion of the examining attorney concerning the validity of the title to each oil and gas interest and each lease, and the amount of interest covered thereby shall be binding and conclusive on the parties, but the acceptability of leases as to primary term, royalty provisions, drilling obligations, and special burdens, shall be a matter for approval and acceptance by an authorized representative of each party.

All title examinations shall be made, and title reports submitted, within a period of_____days after the submission of abstracts and title papers. Each party shall, in good faith, try to satisfy the requirements of the examining attorneys concerning its leases and interests, and each shall have a period of_____ days from receipt of title report for this purpose. If the title to any lease, or oil and gas interest, is finally rejected by the examining attorney, all parties shall then be asked to state in writing whether they will waive the title defects and accept the leases or interests, or whether they will stand on the attorney's opinion. If one or more parties refuse to waive title defects, this agreement shall, in that case, be terminated and abandoned, and all abstracts and title papers shall be returned to their senders. If all titles are approved by the examining attorneys, or are accepted by all parties, and if all leases are accepted as to primary terms, royalty provisions, drilling obligations and special burdens, all subsequent provisions of this agreement shall become operative ~~immediately, and the parties shall proceed to their performance as they are hereinafter stated.~~

**B. Failure of Title:**

After all titles are approved or accepted, any defects of title that may develop shall be the joint responsibility of all parties and, if a title loss occurs, it shall be the loss of all parties, with each bearing its proportionate part of the loss and of any liabilities incurred in the loss. If such a loss occurs, there shall be no change in, or adjustment of, the interests of the parties in the remaining portion of the Unit Area.

**C. Loss of Leases For Other Than Title Failure:**

If any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, the loss shall not be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interests in the remaining portion of the Unit Area.

### 3. UNLEASED OIL AND GAS INTERESTS

If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B" and for the primary term therein stated. As to such interests, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

### 4. INTERESTS OF PARTIES

Exhibit "A" lists all of the parties, and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit "A". All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.

— 2 —

"Joint Loss"

A.A.P.L. FORM 610    Revised 1967

If the interest of any party in any oil and gas lease covered by this agreement is subject to an overriding royalty, production payment, or other charge over and above the usual one-eigtth (⅛) royalty, such party shall assume and alone bear all such excess obligations and shall account for them to the owners thereof out of its share of the working interest production of the Unit Area.

### 5. OPERATOR OF UNIT

_____ Rustex Oil, Inc. _____shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

### 6. EMPLOYEES

The number of employees and their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator. All employees shall be the employees of Operator.

### 7. TEST WELL

On or before the __18th__ day of ____October____, 19 _75_, Operator shall commence the drilling of a well for oil and gas in the following location:

Southwest Quarter Northeast Quarter (SW¼ NE¼), Section 14, Township 18 South, Range 22 West, Columbia County, Arkansas,

and shall thereafter continue the drilling of the well with due diligence to  8600' or to a depth sufficient to test the Cotton Valley formation, whichever is the lesser depth,

unless granite or other practically impenetrable substance is encountered at a lesser depth or unless all parties agree to complete the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties to the plugging, and the well shall then be plugged and abandoned as promptly as possible.

### 8. COSTS AND EXPENSES

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the Unit Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expense basis provided in the Accounting Procedure attached hereto and marked Exhibit "C". If any provision of Exhibit "C" should be inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the costs to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated costs, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated costs shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest at the rate of xx percent (xx)% per annum until paid. Proper adjustment shall be made monthly between advances and actual cost, to the end that each party shall bear and pay its proportionate share of actual costs incurred, and no more.

— 3 —
Revised 1967

A.A.P.L. FORM 610

## 9. OPERATOR'S LIEN

Operator is given a first and preferred lien on the interest of each party covered by this contract, and in each party's interest in oil and gas produced and the proceeds thereof, and upon each party's interest in material and equipment, to secure the payment of all sums due from each such party to Operator.

In the event any party fails to pay any amount owing by it to Operator as its share of such costs and expense or such advance estimate within the time limited for payment thereof, Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of oil or gas, the proceeds accruing to the working interest or interests in the Unit Area of the delinquent party up to the amount owing by such party, and each purchaser of oil or gas is authorized to rely upon Operator's statement as to the amount owing by such party.

In the event of the neglect or failure of any non-operating party to promptly pay its proportionate part of the cost and expense of development and operation when due, the other non-operating parties and Operator, within thirty (30) days after the rendition of statements therefor by Operator, shall proportionately contribute to the payment of such delinquent indebtedness and the non-operating parties so contributing shall be entitled to the same lien rights as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operating parties under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the other non-operating parties and Operator proportionately in accordance with the contributions theretofore made by them.

## 10. TERM OF AGREEMENT

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise; provided, however, that in the event the first well drilled hereunder results in a dry hole and no other well is producing oil or gas in paying quantities from the Unit Area, then at the end of ninety (90) days after abandonment of the first test well, this agreement shall terminate unless one or more of the parties are then engaged in drilling a well or wells pursuant to Section 12 hereof, or all parties have agreed to drill an additional well or wells under this agreement, in which event this agreement shall continue in force until such well or wells shall have been drilled and completed. If production results therefrom this agreement shall continue in force thereafter as if said first test well had been productive in paying quantities, but if production in paying quantities does not result therefrom this agreement shall terminate at the end of ninety (90) days after abandonment of such well or wells. It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## 11. LIMITATION ON EXPENDITURES

Without the consent of all parties: (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling, testing, completing, and equipping of the well, including necessary tankage; (b) No well shall be reworked, plugged back or deepened except a well reworked, plugged back or deepened pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage; (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of_____Ten Thousand and No/100-------------------------------Dollars ($ 10,000.00    ) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $ 10,000.00    .

—4—

A.A.P.L. FORM 610

## 12. OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling of any well on the Unit Area other than the test well provided for in Section 7, or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days (except as to reworking, plugging back or drilling deeper, where a drilling rig is on location, the period shall be limited to forty-eight (48) hours exclusive of Saturday or Sunday) after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

If any party receiving such a notice elects not to participate in the proposed operation (such party or parties being hereafter referred to as "Non-Consenting Party"), then in order to be entitled to the benefits of this section, the party or parties giving the notice and such other parties as shall elect to participate in the operation (all such parties being hereafter referred to as the "Consenting Parties") shall, within thirty (30) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the 48-hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests as shown in Exhibit "A" bear to the total interests of all Consenting Parties. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this section results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty and other interests payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(A) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this section, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(B) ~~200%~~ **300%** of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing, after deducting any cash contributions received under Section 25, and ~~200%~~ **300%** of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

— 5 —

A.A.P.L. FORM 610

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value.

Within sixty (60) days after the completion of any operation under this section, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; if there is a credit balance it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it and from and after such reversion such Non-Consenting Party shall own the same interest in such well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have owned had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the accounting procedure schedule, Exhibit "C", attached hereto.

Notwithstanding the provisions of this Section 12, it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Unit Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this section shall have no application whatsoever to the drilling of the initial test well on the Unit Area, but shall apply to the reworking, deepening, or plugging back of the initial test well after it has been drilled to the depth specified in Section 7, if it is, or thereafter shall prove to be, a dry hole or non-commercial well, and to all other wells drilled, reworked, deepened, or plugged back, or proposed to be drilled, reworked, deepened, or plugged back, upon the Unit Area subsequent to the drilling of the initial test well.

### 13. RIGHT TO TAKE PRODUCTION IN KIND

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.

Each party shall execute all division orders and contracts of sale pertaining to its interest in production from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers thereof for its share of all production.

— 6 —

A.A.P.L. FORM 610

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production. xxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

## 14. ACCESS TO UNIT AREA

Each party shall have access to the Unit Area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator shall, upon request, furnish each of the other parties with copies of all drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Unit Area.

## 15. DRILLING CONTRACTS

All wells drilled on the Unit Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. Operator, if it so desires, may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the field, and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as shall be customary and usual in the field in contracts of independent contractors who are doing work of a similar nature.

## 16. ABANDONMENT OF WELLS

No well, other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. The assignments so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Unit Area.

After the assignment, the assignors shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open. Upon request of the assignees, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

—7—

A.A.P.L. FORM 610

## 17. DELAY RENTALS AND SHUT-IN WELL PAYMENTS

Each party shall pay all delay rentals and shut-in well payments which may be required under the terms of its lease or leases and submit evidence of each payment to the other parties at least ten (10) days prior to the payment date. The paying party shall be reimbursed by Operator for 100% of any such delay rental payment and 100% of any such shut-in well payment. The amount of such reimbursement shall be charged by Operator to the joint account of the parties and treated in all respects the same as costs incurred in the development and operation of the Unit Area. Each party responsible for such payments shall diligently attempt to make proper payment, but shall not be held liable to the other parties in damages for the loss of any lease or interest therein if, through mistake or oversight, any rental or shut-in well payment is not paid or is erroneously paid. The loss of any lease or interest therein which results from a failure to pay or an erroneous payment of rental or shut-in well payment shall be a joint loss and there shall be no readjustment of interests in the remaining portion of the Unit Area. If any party secures a new lease covering the terminated interest, such acquisiton shall be subject to the provisions of Section 23 of this agreement.

Operator shall promptly notify each other party hereto of the date on which any gas well located on the Unit Area is shut in and the reason therefor.

## 18. PREFERENTIAL RIGHT TO PURCHASE

~~Should any party desire to sell all or any part of its interests under this contract, or its rights and in-~~terests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all of its assets, or a sale or transfer of its interests to a subsidiary or parent company, ~~or subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

## 19. SELECTION OF NEW OPERATOR

Should a sale be made by Operator of its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator. If a new Operator is not so selected, the transferee of the present Operator shall assume the duties of and act as Operator. In either case, the retiring Operator shall continue to serve as Operator, and discharge its duties in that capacity under this agreement, until its successor Operator is selected and begins to function, but the present Operator shall not be obligated to continue the performance of its duties for more than 120 days after the sale of its rights and interests has been completed.

"Joint Loss"

## 20. MAINTENANCE OF UNIT OWNERSHIP

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:

(1) the entire interest of the party in all leases and equipment and production; or

(2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

If at any time the interest of any party is divided among and owned by four or more co-owners, Operator may, at its discretion, require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this contract; however, all such co-owners shall enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Unit Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

## 21. RESIGNATION OF OPERATOR

Operator may resign from its duties and obligations as Operator at any time upon written notice of not less than ninety (90) days given to all other parties. In this case, all parties to this contract shall select by majority vote in interest, not in numbers, a new Operator who shall assume the responsibilities and duties, and have the rights, prescribed for Operator by this agreement. The retiring Operator shall deliver to its successor all records and information necessary to the discharge by the new Operator of its duties and obligations.

## 22. LIABILITY OF PARTIES

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

## 23. RENEWAL OR EXTENSION OF LEASES

If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this section shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this section.

The provisions in this section shall apply also and in like manner to extensions of oil and gas leases.

A.A.P.L. FORM 610

## 24. SURRENDER OF LEASES

The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties not agree or consent, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Unit Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

## 25. ACREAGE OR CASH CONTRIBUTIONS

If any party receives while this agreement is in force a contribution of cash toward the drilling of a well or any other operation on the Unit Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage, without warranty of title, to all parties to this agreement in proportion to their interests in the Unit Area at that time, and such acreage shall become a part of the Unit Area and be governed by all the provisions of this contract. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Unit Area.

## 26. PROVISION CONCERNING TAXATION

Each of the parties hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954. If the income tax laws of the state or states in which the property covered hereby is located contain, or may hereafter contain, provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the parties agrees that such election shall be exercised. Each party authorizes and directs the Operator to execute such an election or elections on its behalf and to file the election with the proper governmental office or agency. If requested by the Operator so to do, each party agrees to execute and join in such an election.

Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill all other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If any tax assessment is considered unreasonable by Operator, it may at its discretion protest such valuation within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. When any such protested valuation shall have been finally determined, Operator shall pay the assessment for the joint account, together with interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

— 10 —

A.A.P.L. FORM 610

## 27. INSURANCE

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted.  Operator shall also carry or provide insurance for the benefit of the joint account of the parties as may be outlined in Exhibit "D" attached to and made a part hereof.  Operator shall require all contractors engaged in work on or for the Unit Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for operator's fully owned automotive equipment.

## 28. CLAIMS AND LAWSUITS

If any party to this contract is sued on an alleged cause of action arising out of operations on the Unit Area, or on an alleged cause of action involving title to any lease or oil and gas interest subjected to this contract, it shall give prompt written notice of the suit to the Operator and all other parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the parties, with Operator's attorney as Chairman.  Suits may be settled during litigation only with the joint consent of all parties.  No charge shall be made for services performed by the staff attorneys for any of the parties, but otherwise all expenses incurred in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all parties in proportion to their then interests in the Unit Area.  Attorneys, other than staff attorneys for the parties, shall be employed in lawsuits involving Unit Area operations only with the consent of all parties; if outside counsel is employed, their fees and expenses shall be considered Unit Area expense and shall be paid by Operator and charged to all of the parties in proportion to their then interests in the Unit Area.  The provisions of this paragraph shall not be applied in any instance where the loss which may result from the suit is treated as an individual loss rather than a joint loss under prior provisions of this agreement, and all such suits shall be handled by and be the sole responsibility of the party or parties concerned.

Damage claims caused by and arising out of operations on the Unit Area, conducted for the joint account of all parties, shall be handled by Operator and its attorneys, the settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement of any one claim does not exceed one thousand ($1000.00) dollars and, if settled, the sums paid in settlement shall be charged as expense to and be paid by all parties in proportion to their then interests in the Unit Area.

## 29. FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure.  The affected party shall use all possible diligence to remove the force majeure as quickly as possible.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure" as here employed shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## 30. NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, shall, unless otherwise specifically provided, be given in writing by United States mail or Western Union Telegram, postage or charges prepaid, and addressed to the party to whom the notice is given at the

— 11 —

A.A.P.L. FORM 610

addresses listed on Exhibit "A". The originating notice to be given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### 31. OTHER CONDITIONS, IF ANY, ARE:

31.(a)  <u>ELECTION AT CASING POINT.</u>  After any well has been drilled to the objective depth stated in the initial notice and appropriate tests have been made, herein referred to as casing point, Operator shall give immediate notice by telegraph or telephone, to be confirmed in writing, to all participating parties setting forth its recommendation with respect to the running and setting of a production string of casing and completing the well. Each such party shall have a period of forty-eight (48) hours thereafter within which to notify Operator in like manner whether or not it desires to participate in the running and setting of the production string of casing and the completion of the well. Failure of a party to so notify Operator within the time required shall be deemed an election not to participate. If all such parties elect to participate, Operator shall conduct the proposed operation with respect to the running and setting of the production string of casing and completing the well for the account of all such parties; but if less than all of the parties elect to participate, the provisions of Article 12 relating to operations by less than All Parties by a non-participating party shall apply to the running and setting of the production string of casing and completing the well to and including flow line connections at the well head. If the running and setting of the production string of casing and the completion operations result in a dry hole, Operator shall plug and abandon the well at the cost of all parties who participated in the running of casing and the completion of the well. If the decision is made not to set the production string, then the Operator shall plug and abandon the well at the Parties' interest that would have been in effect after casing point.

31.(b)  <u>NONDISCRIMINATION.</u>  In connection with the performance of work under this agreement, the Operator agrees to comply with all of the provisions of Section 301 (1) to (7), inclusive, of Executive Order 10925, as amended, (28 F.R. 6485), which are hereby incorporated by reference in this agreement.

31.(c)  In the event that any Party shall subsequently create against its interests as shown in Exhibit "A" any additional royalty, overriding royalty, production payment, or other burden or charge, such Party shall hold the other Parties to this Agreement harmless from such additional burdens or charges, and shall satisfy and discharge such burdens and charges out of its own funds. As security for the performance of the obligations created by this paragraph, the Parties entitled to be held harmless shall have a lien to secure the performance of the obligations created by this paragraph. Such lien shall exist upon the interest shown in Exhibit "A" to be owned by the Party charged with performing such obligation.

31.(d)  McAlester assumes no liability other than its own interest as may be reflected by the deed records of Columbia County, Arkansas.

31.(e)  If and when the McAlester group becomes working interest owners, then this agreement will be in lieu of and supersede any prior Operating Agreement.

31.(f)  SHARING OF COSTS AND EXPENSES.  The costs and expenses of drilling and completing or plugging the well or wells specified in Section 7 shall be charged and borne as set forth in the Dorcheat Unit Operating Agreement dated September 17, 1975, between Rustex Oil, Inc., et al, and Amarex, Inc.

31.(g)  PART OWNER.  This Agreement covers only the interest in a unit area indicated by the percentages shown on Exhibit "A" and Section 31(a).  This Agreement shall be construed separately from any similar agreement with other parties and the Income Tax Provision set forth above in Section 31(b) shall apply only to such interest.

31.(h)  It is agreed by and between the parties hereto that Amarex, Inc. is to assume the responsibilities of disbursing revenue to the royalty, overriding royalty and working interest owners in accordance with the terms of this Agreement and covering the lands described in Exhibit "A" of this contract.  In consideration for this service, Amarex, Inc. shall charge the joint account on the basis of $50.00 per well per month, effective as to each well during the month that particular well first produces and sells products.

31.(i)  This Operating Agreement shall be subject to the terms and conditions of that certain Assignment and Agreement, Dorcheat Unit, Columbia County, Arkansas dated April 1, 1975, recorded August 21, 1975 in Book 316, Page 229, of the records of Columbia County, Arkansas, by and between McAlester Fuel Company, a Delaware Corporation, Assignor, and Rustex Oil, Inc., Assignee.

A.A.P.L. FORM 610

This agreement may be signed in counterpart, and shall be binding upon the parties and upon their heirs, successors, representatives and assigns.

O P E R A T O R

ATTEST:

_Jim Leonard_
Secretary

RUSTEX OIL, INC.

BY: _H. E. Russell_
H. E. Russell
President

N O N - O P E R A T O R S

ATTEST:

_John Carl Wood_
Ass't. Secretary

ATTEST:

Assistant Secretary

AMAREX, INC.

BY: _Harold J. Reedy_
HAROLD J. REEDY
Vice President

APPROVED:

McALESTER FUEL COMPANY

BY:
Vice President

DIANE SCHLENSKER

— 13 —

EXHIBIT "A"

Attached to and made a part of Operating Agreement dated October 1, 1975, between
Rustex Oil, Inc., as Operator, and Amarex, Inc., et al, as Non-Operators.

1. Lands subject to contract:

TOWNSHIP 18 SOUTH, RANGE 22 WEST

Section 10:  SE¼ SW¼ and S½ SE¼
Section 11:  S½ SW¼ and SW¼ SE¼
Section 14:  NE¼, S½ NW¼ and N½ SW¼
Section 15:  N½ and N½ SE¼
Section 16:  N½ NE¼ and NE¼ NW¼

Columbia County, Arkansas,

containing 1,080 acres, more or less.

2. Percentage interest and addresses of Parties under Agreement:

|  | W.I. TO CSPT. | W.I. TO PO. | W.I. AFTER PO. |
|---|---|---|---|
| McAlester Fuel Company, et al* <br> Post Office Box 10 <br> Magnolia, Arkansas 71753 | – | – | 37.50000 |
| D. Diane Schlensker <br> Post Office Box 1330 <br> Richardson, Texas 75080 | 3.3333 | 3.125 | 1.91665 |
| Rustex Oil, Inc. <br> Post Office Box 888 <br> Magnolia, Arkansas 71753 | 13.3333 | 18.750 | 12.66665 |
| Amarex, Inc. <br> Post Office Box 1678 <br> Oklahoma City, Oklahoma 73101 | 83.3334 | 78.125 | 47.91670 |

*The names, addresses and division of interest of each owner included under
McAlester Fuel Company, et al, above will be supplied to each of these parties
within three (3) months following date of first production from operations con-
templated under this agreement.

Form 88—(Prod. Pooling) (Arkansas)

Attached to and made a part of Purchase Order 93/04/21 dated Page93 of
Oct 1, 1975, between Rustex Oil, ., as Operator,
an _ rex, Inc. et al as Non-Operators.

# OIL AND GAS LEASE
### (PAID-UP)

AGREEMENT, Made and entered into this...................day of........................................................................, 19............, between

....................................................................................................................................................................................................................

....................................................................................................................................................................................................................

................................................................................................................................ hereinafter called lessor (whether one or more),
and............................................................................................................................................................ hereinafter called lessee.

WITNESSETH, That the said lessor, for and in consideration of.......................................................................................................DOLLARS,
cash in hand paid, receipt of which is hereby acknowledged and of the covenants and agreements hereinafter contained on the part of lessee to be paid, kept and
performed, has granted, demised, leased and let and by these presents does grant, demise, lease and let unto the said lessee, for the sole and only purpose of
exploring by geophysical and other methods, mining and operating for oil (including but not limited to distillate and condensate), gas (including casinghead
gas and helium and all other constituents), and for laying pipe lines, and building tanks, powers, stations and structures thereon, to produce, save and take
care of said products, all that certain tract of land, together with any reversionary rights therein, situated in the County of....................................................

State of.................................................described as follows, to-wit:

and containing....................................acres, more or less.

It is agreed that this lease shall remain in force for a term of.............................years from date (herein call primary term) and as long thereafter as
oil or gas, or either of them, is produced from said land by the lessee.

In consideration of the premises the said lessee covenants and agrees:

1st. To deliver to the credit of lessor free of cost, in the pipe line to which it may connect its wells, the one-eighth (⅛) part of all oil (including but
not limited to condensate and distillate) produced and saved from the leased premises.

2nd. To pay lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in
the manufacture of products therefrom, one-eighth (⅛) at the market price at the well for the gas sold, used off the premises, or in the manufacture of pro-
ducts therefrom, said payments to be made monthly. During any period (whether before or after expiration of the primary term hereof) when gas is not
being so sold or used and the well or wells are shut in and there is no current production of oil or operations on said leased premises sufficient to keep this
lease in force, lessee shall pay or tender a royalty of One Dollar ($1.00) per year per net royalty acre retained hereunder, such payment or tender to be made,
on or before the anniversary date of this lease next ensuing after the expiration of ninety (90) days from the date such well is shut in and thereafter on the
anniversary date of this lease during the period such well is shut in, to the royalty owners. When such payment or tender is made it will be considered that
gas is being produced within the meaning of the entire lease. Lessor shall have the privilege at his risk and expense of using gas from any well, producing
gas only, on the leased premises for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

3rd. To pay lessor for gas produced from any oil well and used off the premises, or for the manufacture of casing-head gasoline or dry commercial
gas, one-eighth (⅛) of the proceeds, at the mouth of the well, at the prevailing market rate for the gas during which time such gas shall be used, said pay-
ments to be made monthly.

If the lessee shall commence to drill a well or commence reworking operations on an existing well within the term of this lease or any extension
thereof, or on acreage pooled therewith, the lessee shall have the right to drill such well to completion or complete reworking operations with reasonable
diligence and dispatch, and if oil or gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such
well had been completed within the term of years first mentioned.

Lessee is hereby granted the right at any time and from time to time to unitize the leased premises or any portion or portio... ...hereof, as to all strata
or any stratum or strata, with any other lands as to all strata or any stratum or strata, for the production primarily of oil or primarily of gas with or
without distillate. However, no unit for the production primarily of oil shall embrace more than 40 acres, or for the production primarily of gas with
or without distillate more than 640 acres; provided that if any governmental regulation shall prescribe a spacing pattern for the development of the field or
allocate a producing allowable based on acreage per well, then any such unit may embrace as much additional acreage as may be so prescribed or as may be used
in such allocation of allowable. Lessee shall file written unit designations in the county in which the leased premises are located. Operations upon and pro-
duction from the unit shall be treated as if such operations were upon or such production were from the leased premises whether or not the well or wells are
located thereon. The entire acreage within a unit shall be treated for all purposes as if it were covered by and included in this lease except that the royalty
on production from the unit shall be as below provided, and except that in calculating the amount of any shut in gas royalties, only that part of the
acreage originally leased and then actually embraced by this lease shall be counted. In respect to production from the unit, Lessee shall pay Lessor, in
lieu of other royalties thereon, only such proportion of the royalties stipulated herein as the amount of his acreage placed in the unit, or his royalty interest
therein on an acreage basis bears to the total acreage in the unit.

If said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties herein pro-
vided shall be paid to the lessor only in the proportion which his interest bears to the whole and undivided fee.

Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for its operations thereon, except water from wells of lessor.
When requested by the lessor, lessee shall bury his pipe lines below plow depth.

No well shall be drilled nearer than 200 feet to the house or barn now on said premises, without the written consent of the lessor.

Lessee shall pay for all damages caused by its operations to growing crops on said land.

Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall ex-
tend to their heirs, executors, administrators, successors or assigns. However, no change or division in ownership of the land or royalties shall enlarge the
obligations or diminish the rights of Lessee. No change in the ownership of the land or royalties shall be binding on the lessee until after the lessee has been
furnished with a written transfer or assignment or a true copy thereof. In case lessee assigns this lease, in whole or in part, lessee shall be relieved of all
obligations with respect to the assigned portion or portions arising subsequent to the date of assignment.

All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules and Regulations, and this lease
shall not be terminated, in whole or in part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or such failure
is the result of any such Law, Order, Rule or Regulation.

This lease shall be effective as to each lessor on execution hereof as to his or her interest and shall be binding on those signing, notwithstanding some
of the lessors above named may not join in the execution hereof. The word "Lessor" as used in this lease means the party or parties who execute this lease
as Lessor, although not named above.

Lessee may at any time and from time to time surrender this lease as to any part or parts of the leased premises by delivering or mailing a release
thereof to lessor, or by placing a release of record in the proper County.

Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the lessee shall have the right at any time to re-
deem for lessor by payment any mortgages, taxes or other liens on the above described lands, in the event of default of payment by lessor, and be subrogated
to the rights of the holder thereof.

Lessor hereby surrenders and releases all right of dower and of homestead in the premises described herein, insofar as said right of dower or of
homestead may in any way affect the purposes for which this lease is made, as recited herein.

....................................................................................................................................................................................................................

....................................................................................................................................................................................................................

IN WITNESS WHEREOF, we sign the day and year first above written.

................................................................                    ................................................................

................................................................                    ................................................................

................................................................                    ................................................................

................................................................                    ................................................................

Lessor

### EXHIBIT  " C "

Attached to and made a part of __Operating Agreement dated October 1, 1975, between Rustex Oil, Inc., as Operator, and Amarex, Inc., et al, as Non-Operators.__

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I.  GENERAL PROVISIONS

**1.  Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

**2.  Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month.  Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.  Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation.  Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt.  If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.  Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.  No adjustment favorable to Operator shall be made unless it is made within the same prescribed period.  The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5.  Audits**

A.  Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I.  Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator.  Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

**6.  Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

COPAS

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.  Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**2.  Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First Level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

**3.  Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

**4.  Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**5.  Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

**6.  Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

**7.  Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

**8.  Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**9.  Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

COPAS

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or
( ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall ( ) shall not ( X ) be covered by the Overhead rates.

A. **Overhead - Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

    * Drilling Well Rate $ 1,200.00
    Producing Well Rate $ 275.00 (includes charges for District Superintendent and pumpers salary and expenses).

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

    * (a) Drilling Well Rate — Not applicable in the event of a turnkey drilling contract.

        [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

        [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

        [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

    (b) Producing Well Rates

        [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

        [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

        [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

        [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

        [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

COPAS

B. Overhead – Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

  (a) Development

    _____ Percent (    %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

  (b) Operating

    _____ Percent (    %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

## 2. Overhead - Major Construction – TO BE NEGOTIATED.

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $_____ :

A. _____% of total costs if such costs are more than $_____ but less than $_____ ; plus

B. _____% of total costs in excess of $_____ but less than $1,000,000; plus

C. _____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

## 3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

# IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

## 1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

## 2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

  (1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

  (2) Line Pipe

    (a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

    (b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

  (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

  Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1) Material moved to the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

  (2) Material moved from the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

   (1) Condition C

   Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

   (2) Condition D

   All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

   Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

   (1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

   (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

## 3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

## 4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

## 1. Periodic Inventories, Notice and Representation

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

## 2. Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

## 3. Special Inventories

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

## 4. Expense of Conducting Periodic Inventories

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

EXHIBIT "D"

Attached to and made a part of Operating Agreement dated October 1, 1975,
between Rustex Oil, Inc., as Operator, and Amarex, Inc., et al, as Non-
Operators.

INSURANCE CARRIED BY OPERATOR:

LIMITS OF LIABILITY

A.  Workmen's Compensation                    $100,000.00

    Employers' Liability                      $100,000.00

B.  Automobile Public Liability
    Bodily Injury (including           $100,000.00 Each Person
    non-owned and hired)               $300,000.00 Each Accident

    Property Damage (including         $100,000.00 Each Accident
    non-owned and hired)

C.  Public Bodily Injury Liability     $300,000.00 Each Person

    Public Property Damage Liability   $ 50,000.00 Each Accident
                                       $100,000.00 Aggregate

SECOND AMENDMENT TO ASSIGNMENT AND AGREEMENT
DORCHEAT UNIT
COLUMBIA COUNTY, ARKANSAS

WHEREAS, by "Assignment and Agreement, Dorcheat Unit, Columbia County,
Arkansas," dated April 1, 1975, and recorded in Book 316, page 229, of the
Oil and Gas Records of Columbia County, Arkansas, which instrument is herein
referred to as "said assignment", McAlester Fuel Company, a Delaware corporation,
to the extent of its interest, did BARGAIN, SELL, TRANSFER, ASSIGN, and CONVEY
to Rustex Oil, Inc., its successors or assigns, herein referred to as "Assignee",
certain rights in and to the Dorcheat Unit, Columbia County, Arkansas.  Reference
to the "said assignment", as it appears of record, is here made for all purposes,
and

WHEREAS, in Book 332, page 64, Oil and Gas Records of Columbia County,
Arkansas, appears an instrument captioned "Amendment to Assignment and Agreement,
Dorcheat Unit, Columbia County, Arkansas" executed under date of April 27, 1976,
by McAlester Fuel Company and Rustex Oil, Inc., which said instrument is
hereinafter sometimes referred to as "FIRST AMENDMENT".  Reference to the said
FIRST AMENDMENT, as it appears of record, is hereby made for all purposes, and

WHEREAS, the parties to the "said assignment" and to said FIRST AMENDMENT
desire to further amend the terms and provisions of the "said assignment" in
the manner hereinafter described.

NOW, THEREFORE, for and in consideration of the sum of TEN DOLLARS
($10.00) and other good and valuable consideration, the receipt and sufficiency
of which is hereby acknowledged, the undersigned parties who execute this
second amendment, a counterpart or ratification thereof, collectively herein
referred to as "assignors", do hereby further amend, confirm and adopt the
"said assignment" to the extent and only to the extent as follows:

1) The 13th and 14th lines of Page 1 of "said assignment" which read

"covers all rights from the earth's surface to the base of the Cotton Valley
formation in and to the following described lands in Columbia County, Arkansas,"

are hereby amended to read and provide as follows:

"covers all rights from the earth's surface to the base of the Smackover
Limestone formation in and to the following described lands in Columbia
County, Arkansas,"

to the end that "said assignment" as amended by said FIRST AMENDMENT and this second amendment, shall operate as an assignment affecting all rights from the surface of the earth to the base of the Smackover Limestone formation, and "said assignment" as amended by said FIRST AMENDMENT and this second amendment is hereby ratified, approved and confirmed.

This instrument is executed without warranty of title of any kind on this ___8th___ day of April, 1981, but shall be effective for all purposes as of 7 o'clock A.M. June 1, 1976.

ATTEST:                                    McALESTER FUEL COMPANY

By _____            By _____
    Assistant Secretary                        Vice President


ATTEST:                                    RUSTEX OIL, INC.

By _____            By _____
    Assistant Secretary                        President


STATE OF ARKANSAS       )
COUNTY OF COLUMBIA      )              ACKNOWLEDGMENT

        On this ___8th___ day of April, 1981, before me the undersigned Notary Public, duly commissioned, qualified and acting, within and for said county and state, appeared in person the within named ___M. C. Jones___ and ___W. B. Sawyer___, to me personally well known, who stated that they were the Vice President and Assistant Secretary of McALESTER FUEL COMPANY, a corporation, and were duly authorized in their respective capacities to execute the foregoing instrument for and in the name and behalf of said corporation, and further stated and acknowledged that they had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this ___8th___ day of April, 1981.

                                    _____
                                        Notary Public

My commission expires:

___8-21-83___


- 2 -

```
STATE OF ARKANSAS        )
                         )              ACKNOWLEDGMENT
COUNTY OF COLUMBIA       )
```

On this ___3rd___ day of April, 1981, before me, the undersigned, A Notary Public, duly commissioned, qualified and acting, within and for said county and state, appeared in person the within named Herbert E. Russell and John B. Burton, to me personally well known, who stated that they were the President and Assistant Secretary of Rustex Oil, Inc., a corporation, and were duly authorized in their respective capacities to execute the foregoing instrument for and in the name and behalf of said corporation, and further stated and acknowledged that they had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this ___3rd.___ day of April, 1981.

_____
Notary Public

My commission expires:

April 17, 1982

RATIFICATION OF
SECOND AMENDMENT TO ASSIGNMENT AND AGREEMENT
DORCHEAT UNIT
COLUMBIA COUNTY, ARKANSAS

STATE OF ARKANSAS       )
                              )
COUNTY OF COLUMBIA      )

     KNOW ALL MEN BY THESE PRESENTS:

     THAT WHEREAS, each signatory party who signs this instrument acknowledges
receipt of a counterpart of the instrument entitled "Second Amendment to
Assignment and Agreement, Dorcheat Unit, Columbia County, Arkansas" dated the
_8th_ day of April, 1981, but effective for all purposes as of 7 o'clock A.M.
June 1, 1976, executed by McAlester Fuel Company, a Delaware corporation, as
assignor, and Rustex Oil, Inc., as assignee, which instrument appears of
record in Book 432   page 129  Oil and Gas Records of Columbia County, Arkansas,
and

     WHEREAS, the undersigned, as working interest owner(s) in the Dorcheat
Unit, desire to ratify and adopt the said "Second Amendment to Assignment and
Agreement, Dorcheat Unit, Columbia County, Arkansas" and be bound by the
provisions thereof.

     NOW, THEREFORE, in consideration of ONE DOLLAR ($1.00) and the benefits
and advantages to be derived by each signatory party pursuant to the provisions
of the said "Second Amendment to Assignment and Agreement, Dorcheat Unit,
Columbia County, Arkansas", all of which are hereby acknowledged to be
sufficient and adequate consideration for execution hereof; the undersigned
who is or claims to be the owner of an undivided interest in the oil and gas
leasehold estate in and to the Dorcheat Unit, does hereby confirm, ratify,
adopt and agree to become a party to and be bound by the provisions of the
said "Second Amendment to Assignment and Agreement, Dorcheat Unit, Columbia
County, Arkansas" as if such party had joined in the execution of the original
thereof.

     Each spouse of a signatory party to this agreement releases all of
his/her rights of curtesy/dower and homestead in and to the lands affected
hereby to the assignee and to the extent necessary to fully effectuate the
provisions of said "Second Amendment to Assignment and Agreement, Dorcheat
Unit, Columbia County, Arkansas."

Page - 2

DATED SIGNED                                    SIGNATURES

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____


STATE OF _____)
                                          )        ACKNOWLEDGMENT
COUNTY OF _____)

        BE IT REMEMBERED, That on this day came in person before me, the under-

signed, a Notary Public, within and for the County and State aforesaid, duly

commissioned and acting _____,

to me well known as the person(s) whose name(s) are subscribed to the foregoing

instrument of writing and stated that \_\_\_\_\_ had executed the same for the

consideration and purposes therein mentioned and set forth.

        WITNESS my hand and seal as such Notary Public on this \_\_\_\_\_ day of

_____, 1981.

                              _____
                                        Notary Public

My commission expires:

_____