UNIT AGREEMENT

BELLWOOD LAKE (PALUXY B) UNIT

BELLWOOD LAKE (PALUXY B) FIELD

SMITH COUNTY, TEXAS

September 19, 1979

# TABLE OF CONTENTS

SECTION                                                       PAGE

Preliminary Recitals . . . . . . . . . . . . . . . . . .    1

## ARTICLE 1

### DEFINITIONS

1.1  . . . . . . . . . Unit Area . . . . . . . . . . . . .   2
1.2  . . . . . . . . . Unitized Formation  . . . . . . .    3
1.3  . . . . . . . . . Unitized Substances . . . . . . .    3
1.4  . . . . . . . . . Oil . . . . . . . . . . . . . . .    3
1.5  . . . . . . . . . Gas . . . . . . . . . . . . . . .    3
1.6  . . . . . . . . . Liquid Hydrocarbons . . . . . . .    3
1.7  . . . . . . . . . Working Interest  . . . . . . . .    3
1.8  . . . . . . . . . Royalty Interest  . . . . . . . .    4
1.9  . . . . . . . . . Royalty Owner . . . . . . . . . .    4
1.10 . . . . . . . . . Working Interest Owner  . . . . .    4
1.11 . . . . . . . . . Tract . . . . . . . . . . . . . .    4
1.12 . . . . . . . . . Unit Operating Agreement  . . . .    4
1.13 . . . . . . . . . Unit Operator . . . . . . . . . .    4
1.14 . . . . . . . . . Tract Participation . . . . . . .    4
1.15 . . . . . . . . . Unit Participation  . . . . . . .    5
1.16 . . . . . . . . . Outside Substances  . . . . . . .    5
1.17 . . . . . . . . . Oil and Gas Rights  . . . . . . .    5
1.18 . . . . . . . . . Unit Operations . . . . . . . . .    5
1.19 . . . . . . . . . Unit Equipment  . . . . . . . . .    5
1.20 . . . . . . . . . Unit Expense  . . . . . . . . . .    5
1.21 . . . . . . . . . Effective Date  . . . . . . . . .    6
1.22 . . . . . . . . . Gender  . . . . . . . . . . . . .    6


## ARTICLE 2

### EXHIBITS

2.1  . . . . . . . . . Exhibits  . . . . . . . . . . . .    6
                      2.1.1 Exhibit A . . . . . . . . .    6
                      2.1.2 Exhibit B . . . . . . . . .    6
2.2  . . . . . . . . . Reference to Exhibits . . . . . .    6
2.3  . . . . . . . . . Exhibits Considered Correct . . .    6
2.4  . . . . . . . . . Correcting Errors . . . . . . . .    6
2.5  . . . . . . . . . Filing Revised Exhibits . . . . .    7

i

SECTION                                                          PAGE

## ARTICLE 3

### CREATION AND EFFECT OF UNIT

3.1 . . . . . . . . . Oil and Gas Rights Unitized . . .   7
3.2 . . . . . . . . . Personal Property Excepted . . .   7
3.3 . . . . . . . . . Amendment of Leases and Other
                      Agreements . . . . . . . . . .   8
3.4 . . . . . . . . . Continuation of Leases, Term
          ʹ           Minerals, Term Royalties, and other
                      Agreements . . . . . . . . . .   8
3.5 . . . . . . . . . Titles Unaffected by Unitization.  10
3.6 . . . . . . . . . Injection Rights . . . . . . . .  10
3.7 . . . . . . . . . Development Obligation . . . . .  11
3.8 . . . . . . . . . Calculation of Unitized
                      Substances . . . . . . . . . .  11
3.9 . . . . . . . . . Oil in Tanks or Otherwise Stored
                      in Unit Area . . . . . . . . .  11

## ARTICLE 4

### PLAN OF OPERATIONS

4.1 . . . . . . . . . Unit Operator . . . . . . . . . .  12
4.2 . . . . . . . . . Method of Operation . . . . . . .  12
4.3 . . . . . . . . . Change of Method of Operation . .  13

## ARTICLE 5

### TRACT PARTICIPATIONS

5.1 . . . . . . . . . Tract Participations . . . . . .  13
5.2 . . . . . . . . . Relative Tract Participations . .  14

## ARTICLE 6

### ALLOCATION OF UNITIZED SUBSTANCES

6.1 . . . . . . . . . Allocation to Tracts . . . . . .  14
6.2 . . . . . . . . . Distribution Within Tracts . . .  14
6.3 . . . . . . . . . DOE Pricing . . . . . . . . . .  15
6.4 . . . . . . . . . Recovery of Royalty on Outside
                      Substances . . . . . . . . . .  19

ii

SECTION                                                    PAGE

### ARTICLE 7

### PRODUCTION AS OF THE EFFECTIVE DATE

7.1 . . . . . . . . . Oil or Liquid Hydrocarbons in
                      Lease Tanks . . . . . . . . . . .   19
7.2 . . . . . . . . . Overproduction . . . . . . . . .    20

### ARTICLE 8

### USE OR LOSS OF UNITIZED SUBSTANCES

8.1 . . . . . . . . . Use of Unitized Substances  . . .   20
8.2 . . . . . . . . . Royalty Payments . . . . . . . .    20

### ARTICLE 9

### TRACTS TO BE INCLUDED IN UNIT

9.1 . . . . . . . . . Qualification of Tracts . . . . .   21

9.2 . . . . . . . . . Subsequent Commitment of Interest
                      to Unit . . . . . . . . . . . . .   23
9.3 . . . . . . . . . Revision of Exhibits . . . . . .    23

### ARTICLE 10

### TITLES

10.1 . . . . . . . . . Removal of Tract from Unit Area .  23
10.2 . . . . . . . . . Revision of Exhibits . . . . . .   24
10.3 . . . . . . . . . Working Interest Titles . . . . .  25
10.4 . . . . . . . . . Royalty Interest Titles . . . . .  25
10.5 . . . . . . . . . Production Where Title is in
                       Dispute . . . . . . . . . . . . .  25
10.6 . . . . . . . . . Payment of Taxes to Protect
                       Title . . . . . . . . . . . . . .  26

### ARTICLE 11

### EASEMENTS OR USE OF SURFACE

11.1 . . . . . . . . . Grant of Easements  . . . . . . .  26
11.2 . . . . . . . . . Use of Water . . . . . . . . . .   27
11.3 . . . . . . . . . Surface Damages . . . . . . . . .  27

iii

SECTION                                                          PAGE

ARTICLE 12

ENLARGEMENTS OF UNIT AREA

12.1 . . . . . . . . . Enlargements of Unit Area . . . .    27

12.2 . . . . . . . . . Determination of Tract
                       Participation . . . . . . . . . .    27
12.3 . . . . . . . . . Effective Date . . . . . . . . .     28

ARTICLE 13

TRANSFER OF TITLE--PARTITION
AND CHANGE OF TITLE

13.1 . . . . . . . . . Transfer of Title . . . . . . . .    28
13.2 . . . . . . . . . Waiver of Rights to Partition . .    28
13.3 . . . . . . . . . Convenant Running with the Land .    28
13.4 . . . . . . . . . Notice of Transfer . . . . . .      29
13.5 . . . . . . . . . Carved-Out Interest Subject to
                       this Agreement . . . . . . . . .     29
13.6 . . . . . . . . . Liability of Transferor and
                       Transferree . . . . . . . . . .      30

ARTICLE 14

RELATIONSHIP OF PARTIES

14.1 . . . . . . . . . No Partnership  . . . . . . . . .    30
14.2 . . . . . . . . . No Joint Refining or Marketing. .    30
14.3 . . . . . . . . . Royalty Owners Free of Costs. . .    31
14.4 . . . . . . . . . Information to Royalty Owners . .    31

ARTICLE 15

LAWS AND REGULATIONS

15.1 . . . . . . . . . Laws and Regulations  . . . . . .    31

ARTICLE 16

FORCE MAJEURE

16.1 . . . . . . . . . Force Majeure . . . . . . . . . .    31

iv

SECTION                                                    PAGE

ARTICLE 17

EFFECTIVE DATE

17.1 . . . . . . . . . Effective Date . . . . . . . . .    32

17.2 . . . . . . . . Partial Disapproval or
                      Invalidation . . . . . . . . . .     33
17.3 . . . . . . . . Revision of Exhibits and Tract
                      Participation . . . . . . . . . .    33
17.4 . . . . . . . . Ipso Facto Termination . . . . .      34

ARTICLE 18

TERM

18.1 . . . . . . . . Term . . . . . . . . . . . . . .      34
18.2 . . . . . . . . Termination by Working Interest
                      Owners . . . . . . . . . . . . .     35
18.3 . . . . . . . . Effect of Termination . . . . . .     35
18.4 . . . . . . . . Salvaging Equipment Upon
                      Termination . . . . . . . . . .      35

ARTICLE 19

EXECUTION

19.1 . . . . . . . . Original, Counterpart, or Other
                      Instrument . . . . . . . . . . .     35
19.2 . . . . . . . . Joinder in Dual Capacity . . . .      36

ARTICLE 20

GENERAL

20.1 . . . . . . . . Amendments Affecting Working
                      Interest Owners . . . . . . . .      36
20.2 . . . . . . . . Action by Working Interest
                      Owners . . . . . . . . . . . . .     36
20.3 . . . . . . . . Lien and Security Interest of
                      Unit Operator . . . . . . . . .      36

EXHIBITS

Exhibit A:    Tracts and Tract Participation . . . . .     51

Exhibit B:    Map of Unit Area . . . . . . . . . . .       65

v

UNIT AGREEMENT
BELLWOOD LAKE (PALUXY B) UNIT
BELLWOOD LAKE (PALUXY B) FIELD
SMITH COUNTY, TEXAS

THIS AGREEMENT, entered into as of the 19th day of September, 1979, by and between the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof,

W I T N E S S E T H:

WHEREAS, the various pooled units identified in Exhibits A and B were created on the dates and in the manner recited in Exhibits A and B, attached hereto, and the instruments creating the same and descriptions referred to in said Exhibits under which said units were created are here referred to for a description of the area included in each unit, together with the lands, leases, and mineral and royalty interests pooled and combined in each unit, as well as for all other purposes; and

WHEREAS, the various oil and gas leases and oil, gas and mineral leases described on said Exhibits A and B as Tract Nos. 6-1 through 9, inclusive, were executed in the manner and on the dates recited in said Exhibits A and B and are here referred to for all purposes; and

WHEREAS, for the purposes of this agreement, it is the desire of the parties hereto that the lands, leases, mineral and royalty interests covered by each of said units (to the extent that each unit is included within the Unit Area) shall be treated in this instrument, as to the Unitized Formation, as though covered by and

1

subject to a single oil, gas and mineral lease owned by Working In-
terest Owners, and to this end said units have been described in
Exhibits A and B as Tract Nos. 1 through 5, inclusive, and, together
with the leases described above as Tract Nos. 6-1 through 9, inclusive,
shall be otherwise referred to in this instrument as "Tract" or
"Tracts"; and

 WHEREAS, in the interest of the public welfare and to promote
conservation and increase the ultimate recovery of oil, gas and
associated minerals from the Bellwood Lake (Paluxy B) Field, in Smith
County, Texas, and to protect the rights of the owners of interests
therein, it is deemed necessary and desirable to enter into this
agreement, in conformity with Sections 101.001 - 101.018, Texas Natural
Resources Code, to unitize the Oil and Gas Rights in and to the Unitized
Formation, in order to conduct a waterflood, secondary recovery,
pressure maintenance, optimum scheduling of producing patterns and
rates or other recovery program for the conservation and utilization
of Oil and Gas as herein provided:

 NOW, THEREFORE, in consideration of the premises and of the
mutual agreements herein contained, it is agreed as follows:

## ARTICLE 1

## DEFINITIONS

 As used in this agreement, the terms herein contained shall
have the following meanings:

 1.1 Unit Area means the lands described by Tracts in Exhibit
A and shown on Exhibit B as to which this agreement becomes effective
or to which it may be extended as herein provided.

2

1.2 Unitized Formation means the subsurface portion of the Unit Area, being the interval, or its correlative equivalent, identified in the Schlumberger Induction Spherically Focused Log dated July 31, 1977, of the Jones-O'Brien, Incorporated No. 1 Willingham Unit Well, Bellwood Lake Field, Smith County, Texas at a depth ranging from 7810 feet to 7868 feet, subsurface.

1.3 Unitized Substances are all oil, gas, gaseous substances, sulphur contained in gas, condensate, distillate, and all associated and constituent liquid or liquefiable hydrocarbons other than Outside Substances that are within the Unitized Formation and that my be produced from wells within the Unit Area.

1.4 Oil means any liquid hydrocarbon, regardless of gravity, capable of being produced from the Unit Area in liquid form at the well by ordinary production methods and which is not the result of condensation of Gas after it leaves the reservoir.

1.5 Gas means hydrocarbons in gaseous form under original reservoir conditions, and is comprises of natural gas, including all of its constituent elements, which elements include (but not by way of limitation) sulphur, gasoline, condensate, distillate, butanes, propanes, and other lighter hydrocarbons.

1.6 Liquid Hydrocarbons means gasoline, condensate, distillate, butanes, propanes, and other lighter hydrocarbons or any mixture thereof condensed, absorbed or separated out of or from the Gas.

1.7 Working Interest means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, including a carried interest, which interest is chargeable with and obligated to pay or bear, either in cash or out of production or

3

otherwise, all or a portion of the cost of drilling, developing, pro-
ducing, and operating the Unitized Formation.  A Royalty Interest
created out of a Working Interest subsequent to the execution of this
agreement by the owner of such Working Interest shall continue to
be subject to such Working Interest burdens and obligations that are
stated in this agreement and the Unit Operating Agreement.

    1.8 Royalty Interest means a right to or interest in any
portion of the Unitized Substances or proceeds thereof other than a
Working Interest.

    1.9 Royalty Owner means a party hereto who owns a Royalty
Interest.

    1.10 Working Interest Owner means a party hereto who owns a
Working Interest.

    1.11 Tract means each parcel of land described as such and
given a Tract number in Exhibit A.

    1.12 Unit Operating Agreement is the agreement entered into by
Working Interest Owners, having the same Effective Date as this agree-
ment, entitled "Unit Operating Agreement, Bellwood Lake (Paluxy B)
Unit, Bellwood Lake (Paluxy B) Field, Smith County, Texas".

    1.13 Unit Operator is the Working Interest Owner designated
by Working Interest Owners under the Unit Operating Agreement to
develop and operate the Unitized Formation, acting as operator and
not as a Working Interest Owner.

    1.14 Tract Participation means the percentage shown on Exhibit
A for allocating Unitized Substances to a Tract under this agreement.

4

1.15 Unit Participation of a Working Interest Owner means the sum of the percentages obtained by multiplying the Working Interest of such Working Interest Owner in each Tract by the Tract Participation of such Tract.

1.16 Outside Substances means all substances obtained from any source other than the Unitized Formation which are injected into the Unitized Formation.

1.17 Oil and Gas Rights are the rights to explore, develop, and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.18 Unit Operations means all operations conducted by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of (1) the development and operation of the Unitized Formation for the production of Unitized Substances or (2) the recovery through wells completed in the Unitized Formation of Outside Substances injected by Working Interest Owners into the Unitized Formation and/or the remainder of the Bellwood Lake (Paluxy B) Field, if any.

1.19 Unit Equipment means all personal property, lease and well equipment, plants, or other facilities and equipment taken over or otherwise acquired for use in Unit Operations.

1.20 Unit Expense means all cost, expense, or indebtedness incurred by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of Unit Operations.

5

1.21 Effective Date is the time and date this agreement becomes effective as provided in Section 17.1.

1.22 Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender includes the masculine and feminine.

ARTICLE 2

EXHIBITS

2.1 Exhibits.  The following exhibits, which are attached hereto, are incoporated herein by reference:

2.1.1 Exhibit A is a schedule that describes each Tract in the Unit Area and shows its Tract Participation.

2.1.2 Exhibit B is a map that shows the boundary lines of the Unit Area and the Tracts therein.

2.2 Reference to Exhibits.  When reference is made to an exhibit, it is to the exhibit as originally attached or, if revised, to the last revision.

2.3 Exhibits Considered Correct.  Exhibits A and B shall be considered to be correct until revised as herein provided.

2.4 Correcting Errors.  The shapes and descriptions of the respective Tracts have been established by using the best information available.  If it subsequently appears that any Tract, because of diverse royalty or working interest ownership on the Effective Date, should have been divided into more than one Tract, or that any mechanical miscalculation or clerical error has been made, Unit Operator, with the approval of Working Interest Owners, may correct the mistake by revising the exhibits to conform to the facts.  The revision shall not include any re-evaluation of engineering or geological

6

interpretations used in determining Tract Participation.  Each such revision of an exhibit made prior to the Effective Date shall become effective on said Effective Date.  Each such revision thereafter shall be effective at 7:00 a.m. on the first day of the calendar month next following the filing for record of the revised exhibit or on such other date as may be determined by Working Interest Owners and set forth in the revised exhibit.

2.5 Filing Revised Exhibits.  If an exhibit is revised, pursuant to this agreement after the Effective Date hereof, Unit Operator shall certify and file the revised exhibit for record in the county or counties in which this agreement is filed.

ARTICLE 3

CREATION AND EFFECT OF UNIT

3.1 Oil and Gas Rights Unitized.  All Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibit A, and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized insofar as the respective Oil and Gas Rights pertain to the Unitized Formation, so that Unit Operations may be conducted with respect to the Unitized Formation as if the Unit Area had been included in a single lease executed by all Royalty Owners, as lessors, in favor of all Working Interest Owners, as lessess, and as if the lease contained all of the provisions of this agreement.

3.2 Personal Property Excepted.  Working Interest Owners have each individually heretofore placed in or on their wells and in or on lands affected by this agreement, various items of personal property which are lease and well equipment, as to all of which Working Interest

7

Owners have the right, as provided in their respective leases, to remove such property from the premises and all of which installations were made with the intention and understanding that all of the same would be and remain personal property and that no part thereof would be or become a part of the realty. Working Interest Owners except from the terms and provisions of this agreement and hereby sever from said lands, for all purposes, all lease and well equipment which may be or may hereafter become located in or on the lands or in the wells on the lands affected hereby. To conform their respective investments in such equipment, Working Interest Owners have made a separate agreement, contained in the Unit Operating Agreement, with each other with respect thereto.

3.3 Amendment of Leases and Other Agreements. The provisions of the various leases, agreements, division and transfer orders, or other instruments covering or affecting the respective Tracts or the production therefrom are amended to the extent necessary to make them conform to the provisions of this agreement, but otherwise shall remain in effect.

3.4 Continuation of Leases, Term Minerals, Term Royalties, And Other Agreements. Unit Operations, including drilling operations, conducted with respect to the Unitized Formation on any part of the Unit Area, or production of Unitized Substances and/or Outside Substances from any part of the Unitized Formation, except for the purpose of determining payments to Royalty Owners, shall be considered as operations upon or production from each Tract, and such operations or production shall continue in effect each unit, pooling agreement

8

and unit designation or declaration instrument, including the
pooling agreements and unit designation or declaration instruments
described in Exhibits A and B, under the terms of which the various
pooled units referred to in the first preliminary recital on Page 1
hereof and identified in Exhibits A and B were created, as amended
hereby, as to all lands, minerals and depths covered thereby just as
if such operations had been conducted and a well or wells had been
drilled on and were producing Unitized Substances from each of said
units identified in Exhibits A and B, each of which units (to the ex-
tent that each unit is included within the Unit Area) is herein referred
to as "Tract" and, provided further, that such operations or production
shall continue in effect each lease, term royalty or mineral interest,
or other agreement, as amended hereby, as to all lands, minerals and
depths covered thereby just as if such operations had been conducted
and a well or wells had been drilled on and were producing Unitized
Substances from each Tract.   Subject to the other provisions hereof,
each oil and gas lease covering lands described in Exhibits A and B
(as the same may have heretofore been amended and/or ratified and as
the same part thereof may have heretofore been pooled and each unit,
pooling agreement and unit designation or declaration instrument de-
scribed in Exhibits A and B (as the same may have heretofore been
amended and/or ratified), all as amended hereby, are hereby ratified
and confirmed as being in full force and effect as to all lands, minerals
and depths covered thereby, irrespective of whether all or a only a por-
tion of any such oil and gas lease and/or unit is included in the Unit
Area and irrespective of whether some portion of such oil and gas lease

9

and/or unit may not be finally approved by the Railroad Commission of the State of Texas for inclusion in the unit created by this agreement or after such approval may be held to be invalid for inclusion in the unit created by this agreement by the judgment of a Court having final jurisdiction of such matters, and if words of grant are necessary to recognize the fact that each such oil and gas lease and each such unit, pooling agreement and unit designation or declaration instrument, as amended hereby, is in full force and effect, same are hereby supplied to accomplish the purposes intended hereby.

3.5 Titles Unaffected by Unitization. Nothing herein shall be construed to result in the transfer of title to Oil and Gas Rights by any party hereto to any other party or to Unit Operator. The intention is to provide for the cooperative development and operation of the Tracts and for the sharing of Unitized Substances as herein provided.

3.6 Injection Rights. Royalty Owners hereby grant unto Working Interest Owners the right to inject into the Unitized Formation and/or in the reminder of the Bellwood Lake (Paluxy B) Field, if any, any substances, including but not limited to water, gas, inert gases, flue gases, and/or Outside Substances, in whatever amounts Working Interest Owners deem expedient for Unit Operations, including but not limited to the right (a) to use all injection wells, if any, located on said Unit Area as of the effective date hereof, (b) to drill and maintain injection wells on the Unit Area, (c) to use producing or abandoned oil and gas wells completed in the Unitized Formation and (d) to acquire other wells for such purposes.

10

3.7 Development Obligation.  Nothing herein shall relieve Working Interest Owners from any obligation to develop reasonably as a whole the lands and leases committed hereto.

3.8 Calculation of Unitized Substances.  Royalty Owners hereby agree with Working Interest Owners that Working Interest Owners shall not be obligated to segregate Unitized Substances from substances which are not unitized hereunder, and Working Interest Owners shall not be required to build or maintain any separate stock tanks or other measuring devices for such purpose.  Working Interest Owners shall have the right to settle with Royalty Owners for Unitized Substances and for substances which are not unitized hereunder on the basis of (1) an estimate of Working Interest Owners as to the amount of each such substance produced, as determined by periodic well tests in accordance with engineering standards acceptable in the industry, or (2) metering and sampling or other method approved by the Railroad Commission of Texas.

3.9 Oil In Tanks or Otherwise Stored In Unit Area.  Unit Operator shall determine the quantity of Oil in tanks or otherwise stored in Unit Area to ascertain the amount of merchantable Oil produced from the Unitized Formation so stored as of 7:00 a.m. on the Effective Date hereof and shall account for same in accordance with the ownership thereof.

11

## ARTICLE 4

### PLAN OF OPERATIONS

4.1 Unit Operator.  Working Interest Owners are, as of
the effective date of this agreement, entering into the Unit Operating
Agreement designating Jones-O'Brien, Incorporated, as Unit Operator.
Unit Operator shall have the exclusive right to conduct Unit Operations.
The operations shall conform to the provisions of this agreement and
the Unit Operating Agreement.  If there is any conflict between such
agreements, this agreement shall govern.

4.2 Method of Operation.  To the end that the quantity of
Unitized Substances ultimately recoverable may be increased and
waste prevented, Working Interest Owners shall, subject to the pro-
visions of this Article 4, with diligence and in accordance with good
engineering and production practices, engage in one or more of the
following methods of operation:  (1) waterflooding operations by the
injection of water, fresh and/or salt, and/or Outside Substances,
through one or more injection wells and at such rates as Working
Interest Owners may determine to be suitable from time to time, (2)
secondary recovery and/or pressure maintenance operations to the extent
warranted by good engineering and production practices, and (3) operat-
ing programs during and/or after injection to recover Oil and Gas
for sales, which programs will incorporate well locations, producing
rates, and operating practices designed to provide optimum recovery of
Oil and Gas and/or Liquid Hydrocarbons.

12

4.3 Change of Method of Operation.  Nothing herein shall prevent Working Interest Owners from discontinuing or changing in whole or in part any method of operation which, in their opinion, is no longer in accord with good engineering or production practices. Other methods of operation may be conducted or changes may be made by Working Interest Owners from time to time if determined by them to be feasible, necessary, or desirable to increase the ultimate recovery of Unitized Substances.

## ARTICLE 5

### TRACT PARTICIPATIONS

5.1 Tract Participations.  The Tract Participation of each Tract is a decimal interest as shown for Phase I and for Phase II on Exhibit A.  Phase I Participation shall end and Phase II Participation will commence at 7:00 a.m. on the first day of the first calendar month after the cumulative oil production from the oil wells within the Bellwood Lake (Paluxy B) Field reaches a total of 895,000 barrels.  It is recognized that this Unit Agreement will become effective at a date after which production was first obtained from the Bellwood Lake (Paluxy B) Field.  However, for the purpose of calculating the beforementioned 895,000 barrels, the cumulative oil production shall be deemed to have commenced with the first production from the first oil well completed in the Bellwood Lake (Paluxy B) Field.

13

5.2 Relative Tract Participations.  If the Unit Area is enlarged or reduced, the revised Tract Participations of the Tracts remaining in the Unit Area and which were within the Unit Area prior to the enlargement or reduction shall remain in the same ratio one to another.

## ARTICLE 6
### ALLOCATION OF UNITIZED SUBSTANCES

6.1 Allocation to Tracts.  All Unitized Substances produced and saved shall be allocated to the several Tracts in accordance with the respective Tract Participations effective during the period that the Unitized Substances were produced.  The amount of Unitized Substances allocated to each Tract, regardless of whether the amount is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract.

6.2 Distribution Within Tracts.  The Unitized Substances allocated to each Tract shall be distributed among, or accounted for to, the parties entitled to share in the production from such Tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such Tract, or in the proceeds thereof, had this agreement not been entered into, and with the same legal effect.  If any Oil and Gas Rights in a Tract hereafter become divided and owned in severalty as to different parts of the Tract, the owners of the divided interests, in the absence of an agreement providing for a different division, shall share in the Unitized Substances allocated to the

14

Tract, or in the proceeds thereof, in proportion to the surface
acreage of their respective parts of the Tract.

6.3  <u>DOE Pricing</u>.  It is anticipated that at the effective
date of unitization, crude oil produced, saved and sold from the
Bellwood Lake (Paluxy B) Unit will be subject to the rules and
regulations of the U. S. Department of Energy (DOE). Section 212.75
of the DOE regulations currently provides for the classification of
crude oil for pricing purposes as (1)  Newly Discovered Crude Oil,
(2) Stripper Well Crude Oil, (3) New Crude Oil and (4) Old Crude
Oil.

Under Section 212.131 of the DOE regulations, a Unit certifica-
tion is allowed each month to include in the Newly Discovered Crude
Oil portion thereof, a number of barrels described as Imputed Newly
Discovered Crude Oil.  The Unit certification is further allowed
each month to include in the Stripper Well Crude Oil portion thereof,
a number of barrels described as Imputed Stripper Well Crude Oil,
and in the New Crude Oil portion thereof, a number of barrels
described as Imputed New Crude Oil.

In view of the above, and notwithstanding the provisions
of Section 6.1, crude oil produced, saved and sold shall be
allocated as follows:

(a)  <u>Imputed Newly Discovered and Imputed Stripper Well
     Crude Oil</u> - The first oil produced, saved and sold
     each month up to a quantity equal to the sum of
     the Unit's Imputed Newly Discovered Crude Oil and
     Imputed Stripper Well Crude Oil shall be allocated
     to the individual Tracts contributing either

15

Imputed Newly Discovered Crude Oil or Imputed Stripper
Well Crude Oil to the Unit certification in the propor-
tion that the individual Tract's total contribution of
Imputed Newly Discovered Crude Oil or Imputed Stripper
Well Crude Oil bears to the total of the Unit's Imputed
Newly Discovered Crude Oil and Imputed Stripper Well
Crude Oil.  This allocation to the individual Tract shall
be known as that Tract's Imputed Free Market Crude Oil.
Should any Tract in any month be allocated out of Unit
production in accordance with its Tract Participation a
total number of barrels of oil that is less than the
Imputed Free Market Crude Oil that such Tract has con-
tributed to the Unit certification, then such Tract's
allocation of Imputed Free Market Crude Oil shall be
reduced by the amount that the Tract's allocation of
Imputed Free Market Crude Oil exceeds the amount of oil
to be allocated in accordance with its Tract Participation.
The amount in excess of its Tract Participation shall be
termed Excess Imputed Free Market Crude Oil.  The total
Excess Imputed Free Market Crude Oil of all Tracts shall
be allocated to all Tracts, including Tracts which have
not contributed either Imputed Newly Discovered Crude Oil
or Imputed Stripper Well Crude Oil to the Unit certification,
in proportion to the quantities that the Unit production
allocated a Tract by its Tract Participation exceeds the
quantity of Imputed Free Market Crude Oil allocated to
such Tract.

16

(b) <u>Imputed New Crude Oil</u> - Oil produced, saved, and sold
each month from the Unit after a quantity of oil equal to
the sum of the Unit's Imputed Newly Discovered Crude Oil
and Imputed Stripper Well Crude Oil is produced, saved
and sold, up to a quantity equal to the Unit's Imputed
New Crude Oil, shall be allocated to the individual
Tracts contributing Imputed New Crude Oil to the Unit
certification in the proportion that the individual
Tract's contributions of such Imputed New Crude Oil bears
to the total of the Unit's Imputed New Crude Oil. This
allocation to the individual Tract shall be known as that
Tract's Imputed New Crude Oil. Should any Tract in any
month be allocated out of Unit production in accordance
with its Tract Participation a total number of barrels
that is less than the sum of its Imputed Free Market
Crude Oil, its Excess Imputed Free Market Crude Oil, and
the Imputed New Crude Oil that such Tract has contributed
to the Unit certification, then such Tract's allocation
of Imputed New Crude Oil shall be reduced by the quantity
that the sum of the Tract's Imputed Free Market Crude
Oil, its Excess Imputed Free Market Crude Oil and its
Imputed New Crude Oil exceeds the total quantity of oil
to be allocated in accordance with its Tract Participation.
The amount in excess of its Tract Participation shall be
termed Excess Imputed New Crude Oil. The total Excess
Imputed New Crude Oil of all Tracts shall be allocated to
all Tracts, including Tracts which have not contributed

17

Imputed New Crude Oil to the Unit certification, in proportion to the quantities that the Unit production allocated a Tract by its Tract Participation exceeds the sum of the Imputed Free Market Crude Oil, excess Imputed Free Market Crude Oil and Imputed New Crude Oil allocated to such tract.

(c) Remaining Crude Oil - All other crude oil produced and saved from the Unit each month shall be allocated to each Tract in proportion to the quantities that each Tract's allocation of Unit Production, in accordance with its Tract Participation, exceeds the sum of the allocated Imputed Free Market Crude Oil, Excess Imputed Free Market Crude Oil, Imputed New Crude Oil and Excess Imputed New Crude Oil.

(d) Duration and Effect - Article 6.3 shall remain in effect only so long as necessary for the Unit to comply with applicable laws, rules and regulations of appropriate governmental authorities. Should such laws, rules and regulations hereafter change substantially so as to alter the basis for a certification of Unit production as set forth above, then in this event a method of allocating the certified quantities among the Unit ownership shall be implemented by the Unit Operator which as nearly as possible achieves the stated intention hereof. In any event, this provision will automatically terminate in its entirety upon the termination of Phase I. Article 6.3 is

18

deemed supplementary to the other provisions of this Agreement and the provisions of the Unit Operating Agreement so that nothing contained herein shall alter the terms of such agreements, including but not limited to the portions thereof dealing with tract participation, allocation of Unit production, and allocation of investment and operating costs.

6.4 Recovery Of Royalty On Outside Substances.  If any Outside Substance is injected by the Working Interest Owners and/or the Unit Operator or for their account pursuant to this Agreement and the Unit Operating Agreement into the Unitized Formation and/or the remainder of the Bellwood Lake (Paluxy B) Field, seventy-five percent (75%) of any like substance contained in Unitized Substances subsequently produced and sold, or used for other than Unit Operations, shall be deemed to be the Outside Substance so injected until the total volume thereof equals the total volume of the Outside Substance so injected.  No payments shall be due or payable to Royalty Owners on Outside Substances.

## ARTICLE 7

### PRODUCTION AS OF THE EFFECTIVE DATE

7.1 Oil Or Liquid Hydrocarbons In Lease Tanks.  Unit Operator shall gauge or otherwise determine the amount of merchantable Oil or other Liquid Hydrocarbons produced from the Unitized Formation that are in lease and power oil tanks as of 7:00 a.m. on the Effective Date. Oil or other Liquid Hydrocarbons in treating vessels, separation equipment, and tanks below pipeline connections shall not be considered to be

19

merchantable.  Any merchantable Oil or other Liquid Hydrocarbons that are a part of or attributable to the prior allowable of the wells from which they were produced shall remain the property of the parties entitled thereto as if this agreement had not been entered into.  Any such merchantable Oil or other Liquid Hydrocarbons not promptly removed may be sold by Unit Operator for the account of the Working Interest Owners entitled thereto who shall pay all royalty due thereon under the provisions of applicable leases or other contracts. Any Oil or Liquid Hydrocarbons in excess of that attributable to the prior allowable of the wells from which they were produced shall be regarded as Unitized Substances produced after the Effective Date.

7.2 Overproduction.  If, as of the Effective Date, any Tract is overproduced with respect to the allowable of the wells on that Tract, and if the amount of overproduction has been sold or otherwise disposed of, such overproduction shall be regarded as a part of the Unitized Substances produced after the Effective Date and shall be charged to such Tract as having been delivered to the parties entitled to Unitized Substances allocated to such Tract.

## ARTICLE 8
### USE OR LOSS OF UNITIZED SUBSTANCES

8.1 Use of Unitized Substances.  Working Interest Owners may use as much of the Unitized Substances as they deem necessary for Unit Operations, including but not limited to the injection thereof into the Unitized Formation.

8.2 Royalty Payments. No royalty, overriding royalty, production, or other payments shall be payable upon, or with respect to

20

Unitized Substances used or consumed in Unit Operations, or which otherwise may be lost or consumed in the production, handling, treating, processing, compressing, dehydrating, transportation, or storing of Unitized Substances.

## ARTICLE 9

### TRACTS TO BE INCLUDED IN UNIT

9.1 Qualification of Tracts.  On and after the effective date hereof and until the enlargement or reduction thereof, the Unit Area shall be composed of the Tracts listed in Exhibit A and that corner or have a common boundary (Tracts separated only by a public highway or a railroad right-of-way shall be considered to have a common boundary) and that otherwise qualify as follows:

> 9.1.1 Each Tract as to which Working Interest Owners owning one hundred percent (100%) of the Working Interest, have become parties to this agreement and as to which Royalty Owners owning sixty-five percent (65%) or more of the Royalty Interest have become parties to this agreement.

> 9.1.2 Each Tract as to which Working Interest Owners owning one hundred percent (100%) of the Working Interest have become parties to this agreement, and as to which Royalty Owners owning less than sixty-five percent (65%) of the Royalty Interest have become parties to this agreement, and as to which (a) all of the Working Interest Owners in such Tract have joined in a request for the inclusion of such Tract in the Unit Area, and as to which (b) Seventy-five percent (75%) of the combined voting interests of Working Interest Owners in all Tracts that meet the requirements of Section 9.1.1 have voted in favor of the inclusion of such Tract.  For the purpose of this Section 9.1.2, the voting interest of a Working Interest Owner shall be equal to the ratio that its Unit Participation attributable to Tracts that qualify under Section 9.1.1 bears to the total Unit Participation of all Working Interest Owners attributable to all Tracts that qualify under Section 9.1.1.

21

9.1.3 Each Tract as to which Working Interest Owners owning less than one hundred percent (100%) of the Working Interest have become parties to this agreement, regardless of the percentage of Royalty Interest therein that is committed hereto; and as to which (a) the Working Interest Owner who operates the Tract and all of the other Working Interest Owners in such Tract who have become parties to this agreement have joined in a request for inclusion of such Tract in the Unit Area, and have executed and delivered an indemnity agreement indemnifying and agreeing to hold harmless the other Working Interest Owners in the Unit Area, their successors and assigns, against all claims and demands that may be made by the owners of Working Interest in such Tract who are not parties to this agreement, and which arise out of the inclusion of the Tract in the Unit Area; and as to which (b) seventy-five percent (75%) of the combined voting interest of Working Interest Owners in all Tracts that meet the requirements of Section 9.1.1 and 9.1.2 have voted in favor of the inclusion of such Tract and to accept the indemnity agreement. For the purpose of this Section 9.1.3, the voting interest of each Working Interest Owner shall be equal to the ratio that its Unit Participation attributable to Tracts that qualify under Sections 9.1.1 and 9.1.2 bears to the total Unit Participation of all Working Interest Owners attributable to all Tracts that qualify under Sections 9.1.1 and 9.1.2. Upon the inclusion of such a Tract in the Unit Area, the Unit Participation that would have been attributed to the non-subscribing owners of the Working Interest in such Tract, had they become parties to this agreement and the Unit Operating Agreement, shall be attributed to the Working Interest Owners in such Tract who have become parties to such agreements, in proportion to their respective Working Interests in the Tract.

9.1.4 Each Tract, regardless of the percentage of Working Interest or Royalty Interest therein that has been committed hereto, as to which (a) the Working Interest Owner who operates the Tract has become a party to this agreement and (b) Working Interest Owners having seventy-five percent (75%) of the combined voting interest of Working Interest Owners in all Tracts that meet the requirements of Sections 9.1.1, 9.1.2 or 9.1.3 vote in favor of the inclusion of such Tract. For the purpose of this Section 9.1.4, the voting interest of a Working Interest Owner shall be equal to the ratio

22

that its Unit Participation attributable to Tracts that qualify under Sections 9.1.1, 9.1.2, or 9.1.3 bears to the total Unit Participation of all Working Interest Owners attributable to all Tracts that qualify under Sections 9.1.1, 9.1.2, or 9.1.3. Upon the inclusion of such a Tract in the Unit Area, the Unit Participation that would have been attributed to the nonsubscribing owners of the Working Interest in such Tract, had they become parties to this agreement and the Unit Operating Agreement, shall be attributed to the Working Interest Owners in all Tracts that meet the requirements of Sections 9.1.1, 9.1.2, or 9.1.3, in proportion to their respective Unit Participations attributable to the Tracts that qualify under Sections 9.1.1, 9.1.2, and 9.1.3.

9.2 Subsequent Commitment of Interest to Unit. After the effective date of this agreement, the commitment hereto of any interest in any Tract within the Unit Area shall be upon such terms and conditions as may be negotiated by Working Interest Owners and the owner of such interest.

9.3 Revision of Exhibits. In the event any of the Tracts described in Exhibit A fail to qualify for inclusion in the Unit Area as of the effective date hereof, Unit Operator shall recompute, using the original basis of computation, the Tract Participation for each of the qualifying Tracts and shall revise Exhibits A and B accordingly. Said revised exhibits shall be effective as of the effective date hereof.

ARTICLE 10

TITLES

10.1 Removal of Tract from Unit Area. If a Tract ceases to have sufficient Working Interest Owners or Royalty Owners committed to this agreement to meet the conditions of Article 9 because of

23

failure of title of any party hereto, such Tract shall be removed from the Unit Area effective as of 7:00 a.m. on the first day of the calendar month in which the failure of title is finally determined; however, the Tract shall not be removed from Unit Area if, within ninety (90) Days after the date of final determination of the failure of title, the Tract requalifies under a Section of Article 9. Provided, however, it is agreed that nothing in this Section 10.1 shall ever be construed as removing from the Unit Area any Tract as to the parcels of land contained therein as to which there is no title failure. Such Tract, reduced by the parcel or parcels of land removed from the Unit Area because of failure of title of any party hereto shall remain in the Unit Area and shall not be required to requalify under any of the provisions of Article 9 and if under the foregoing procedures an attempt is made to requalify such Tract and fails, then such Tract as to the parcels of land contained therein as to which there is no failure of title shall remain in the Unit Area just as though there had never been any failure of title to any of the parcels of land contained therein except that said Tract shall be reduced in size to the extent of those parcels of land removed therefrom because of failure of title.

10.2 Revision of Exhibits. If a Tract or parcel of land within a Tract is removed from the Unit Area because of failure of title, Unit Operator shall recompute the Tract Participation of each of the Tracts remaining in the Unit Area utilizing the same basis for such recomputation as was originally utilized to determine its Tract Participation within the Unit Area and shall revise Exhibits A and B accordingly. The revised exhibits shall be effective as of 7:00 a.m.

24

on the first day of the calendar month in which such failure of title is finally determined.

10.3 Working Interest Titles.  If title to a Working Interest fails, the rights and obligations of Working Interest Owners by reason of the failure of title shall be governed by the Unit Operating Agreement.

10.4 Royalty Interest Titles. If title to a Royalty Interest fails, but the Tract to which it relates is not removed from the Unit Area, the party whose title failed shall not be entitled to share hereunder with respect to such interest.

10.5 Production Where Title is in Dispute.  If the title or right of any party claiming the right to receive in kind all or any portion of the Unitized Substances allocated to a Tract or to a parcel of land within a Tract, is in dispute, Unit Operator at the direction and at the discretion of the Working Interest Owners shall either:

(a) require that the party to whom such Unitized Substances are delivered or to whom the proceeds thereof are paid, furnish security for the proper accounting therefor to the rightful owner if the title or right of such party fails in whole or in part, or

(b) withhold and market the portion of the Unitized Substances with respect to which title or right is in dispute, and impound the proceeds thereof until such time as the title or right thereto is established by a final judgment of a court of competent jurisdiction or otherwise to the satisfaction of Working Interest Owners whereupon the proceeds so impounded shall be paid to the party rightfully entitled thereto.

25

10.6 Payment of Taxes to Protect Title.  The owner of surface rights to lands within the Unit Area, or severed mineral interests or Royalty Interests in such lands, or lands outside the Unit Area on which Unit Equipment is located, is responsible for the payment of any ad valorem taxes on all such rights, interests, or property, unless such owner and Working Interest Owners otherwise agree.  If any ad valorem taxes are not paid by or for such owner when due, Unit Operator may, with approval of Working Interest Owners, at any time prior to tax sale, or expiration of period of redemption after tax sale, pay the tax, redeem such rights, interests, or property, and discharge the tax lien.  Any such payment shall be an item of Unit Expense. Unit Operator shall, if possible, withhold from any proceeds derived from the sale of Unitized Substances otherwise due any delinquent taxpayer an amount sufficient to defray the costs of such payment or redemption, such withholding to be credited to Working Interest Owners.  Such withholding shall be without prejudice to any other remedy available to Unit Operator or Working Interest Owners.

## ARTICLE 11

### EASEMENTS OR USE OF SURFACE

11.1 Grant of Easements.  The parties hereto, to the extent of their rights and interests, hereby grant to Working Interest Owners the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for Unit Operations provided that nothing herein shall be construed as leasing or otherwise conveying to Working Interest Owners a camp site or a plant site for water injection, gas injection, processing or other plant or camp site.

26

11.2 Use of Water.  Working Interest Owners shall have free use of water from the Unit Area for Unit Operations, except water from any well, lake, pond, or irrigation ditch of a Royalty Owner.

11.3 Surface Damages.  Working Interest Owners shall pay the owner for damages to growing crops, timber, fences, improvements, and structures on the Unit Area that result from Unit Operations.

## ARTICLE 12

## ENLARGEMENTS OF UNIT AREA

12.1 Enlargements of Unit Area.  The Unit Area may be enlarged to include acreage reasonable proved to be productive, upon such terms as may be determined by Working Interest Owners including, but not limited to, the following:

12.1.1  The acreage shall qualify under a Section of Article 9.

12.1.2  The participation to be allocated to the acreage shall be reasonable, fair and based on all available information.

12.1.3  There shall be no retroactive allocation or adjustment of Unit Expense or of interests in the Unitized Substances produced, or proceeds thereof; however, this limitation shall not prevent an adjustment of investment by reason of the enlargement.

12.2 Determination of Tract Participation.  Unit Operator, subject to Section 5.2, shall calculate the Tract Participation of each Tract within the Unit Area as enlarged, and shall revise Exhibits A and B accordingly.

27

12.3 Effective Date.   The effective date of any enlargement of the Unit Area shall be 7:00 a.m. on the first day of the calendar month following compliance with conditions for enlargement as specified by Working Interest Owners, approval of the enlargements by the Railroad Commission of the State of Texas or other appropriate governmental authority, if required, and the filing for record of revised Exhibits A and B in the records of the County or Counties in which this agreement is recorded.

ARTICLE 13

TRANSFER OF TITLE--PARTITION
AND CHANGE OF TITLE

13.1 Transfer of Title.  Any conveyance of all or any parts of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this agreement.  No change of title shall be binding upon Unit Operator, or upon any party hereto other than the party so transferring, until 7:00 a.m. on the first day of the calendar month next succeeding the date of receipt by Unit Operator of a photocopy, or a certified copy, of the recorded instrument evidencing such change in ownership.

13.2 Waiver of Rights to Partition.  Each party hereto agrees that, during the existence of this agreement, it will not resort to any action to partition the Unitized Formation or the Unit Equipment, and to that extent waives the benefits of all laws authorizing such partition.

13.3 Convenant Running With the Land.  This agreement shall extend to, be binding upon, and inure to the benefit of, the respective heirs, devisees, legal representatives, successors, and assigns of

28

the parties hereto, and shall constitute a convenant running with the lands, leases, and interests covered hereby.

13.4 Notice of Transfer.  Any conveyance of all or any part of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this agreement.  No change of title shall be binding on the Unit Operator, or upon any party hereto other than the party so transferring, until the first day of the calendar month next succeeding the date or receipt by Unit Operator of a photocopy or certified copy of the recorded instrument evidencing such change in ownership.

13.5 Carved-Out Interest Subject to this Agreement.  In the event any Working Interest Owner shall, after executing this agreement, create an overriding royalty, production payment, net profits, or carried interest, or any other interest out of its Working Interest then subject to this agreement, such carved-out interest shall be subject to the terms and provisions of this agreement, specifically including, but without limitation, the lien of Unit Operator. In the event the Working Interest Owner creating such carved-out interest (a) fails to pay any costs or expenses chargeable to such Working Interest Owner under this agreement and the production of Unitized Substances accruing to the credit of such Working Interest Owner is insufficient for that purpose, or (b) withdraws from the Unit Operating Agreement under the terms and provisions thereof, the carved-out interest shall be chargeable with a pro rata portion of all costs and expenses incurred hereunder, the same as though such carved-out interest were a Working Interest, and Unit Operator shall have the right to enforce against

29

such carved-out interest the lien and all other rights granted to a Unit Operator for the purpose of collecting the costs and expenses chargeable to said carved-out interest.

13.6 Liability of Transferor and Transferree.  Any Working Interest Owner assigning or transferring all or a portion of its Working Interest shall remain liable for its share of all costs and expenses incurred hereunder up to the first day of the calendar month next succeeding the date of receipt by Unit Operator of a photocopy or certified copy of the recorded instrument evidencing such change in ownership, and thereafter the transferree or assignee shall become liable for its proportionate share of such costs and expenses, and the transferring or assigning party shall be relieved of its share of such costs and expenses, to the extent of the interest assigned or transferred, beginning on said first day of the calendar month.

## ARTICLE 14

### RELATIONSHIP OF PARTIES

14.1 No Partnership.  The duties, obligations, and liabilities of the parties hereto are intended to be several and not joint or collective.  This agreement is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, obligation, or liability with regard to any one or more of the parties hereto.  Each party hereto shall be individually responsible for its own obligations as herein provided.

14.2 No Joint Refining or Marketing.  This agreement is not intended to provide, and shall not be construed to provide, directly or indirectly, for any cooperative refining, joint sale or marketing of Unitized Substances.

30

14.3 Royalty Owners Free of Costs.  This agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay Unit Expense unless such Royalty Owner is otherwise so obligated.

14.4 Information to Royalty Owners.  Each Royalty Owner shall be entitled to all information in possession of Unit Operator to which such Royalty Owner is entitled by an existing agreement with any Working Interest Owner.

## ARTICLE 15

### LAWS AND REGULATIONS

15.1 Laws and Regulations.  This agreement shall be subject to the conservation laws of the State of Texas; to the valid rules, regulations, and orders of the Railroad Commission of Texas; and to all other applicable federal, state, and municipal laws, rules, regulations, and orders.

## ARTICLE 16

### FORCE MAJEURE

16.1 Force Majeure.  All obligations imposed by this agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a strike, labor dispute, fire, war, civil disturbance, act of God; by federal, state or municipal laws; by any rule, regulation, or other order of a governmental agency; by inability to secure materials; or by any other cause or causes, whether similar or dissimilar, beyond reasonable control of the party. No party shall be required against its will to adjust or

31

settle any strike or labor dispute.  Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of suspension of Unit Operations due to any one or more of the causes set forth in this Article.

## ARTICLE 17

### EFFECTIVE DATE

17.1 Effective Date.  This agreement shall become binding upon each party as of the date such party signs the instrument by which it becomes a party hereto, and unless sooner terminated as provided in Section 17.4, shall become effective as to qualified Tracts as of the time and date determined by vote of the Working Interest Owners in all the qualified Tracts, under the voting procedure as set out in the Unit Operating Agreement, and set forth in a certificate filed for record by Unit Operator in Smith County, Texas, (hereinafter called "original certificate").  The original certificate shall also recite that Tracts comprising sixty percent (60%) or more of the total Tract Participation as shown on Exhibit A have qualified under the provisions of Article 9, the book and page in which a counterpart of this agreement has been recorded, and the fact that approval, in whole or in part, by the Railroad Commission of the State of Texas has been obtained.  The original certificate shall not be filed until after the following requirements have been met:

17.1.1 Tracts comprising sixty percent (60%) or more of the total Tract Participation as shown on Exhibit A have qualified under the provisions of Article 9.

17.1.2 At least one counterpart of this agreement has been filed for record by Unit Operator in Smith County, Texas.

32

17.1.3 This agreement has been approved, in
whole or in part, by the Railroad Commission
of the State of Texas.

17.2 Partial Disapproval or Invalidation.  If this agreement
shall for any reason not be finally approved by the Railroad Commis-
sion of the State of Texas as to any qualified Tract or Tracts or
portion thereof or after such approval be held to be invalid as to
any qualified Tract or Tracts or portion thereof by the judgment of
a Court having final jurisdicion of such matters, this agreement shall
terminate within sixty (60) days from the date of the order of the
Railroad Commission whereby a qualified Tract or Tracts or portion
thereof is disapproved or within sixty (60) days from the date on
which the judgment invaliding a qualified Tract or Tracts or portion
thereof becomes final and thereafter be of no further effect, unless
within said sixty (60) day period Working Interest Owners owning a
combined Unit Participation of at least sixty percent (60%) in those
qualified Tracts which are approved and valid in whole or in part vote
to continue this agreement in force and effect as to the approved and
valid portions of the qualified Tracts, which said approved or valid
portions of the qualified Tracts shall thereafter become the Unit
Area.  The original certificate shall also recite the fact of partial
approval by the Railroad Commission and the subsequent vote to
continue the agreement as aforesaid, provided, however in the case of
partial invalidation by judgment occurring after the effective date
hereof, a supplemental certificate shall be filed for record in the
same counties reciting the facts of partial invalidation and the sub-
sequent vote to continue the agreement as aforesaid.

17.3 Revision of Exhibits and Tract Participation. If any of

33

the qualified Tracts, or a portion or portions thereof, are excluded
from the Unit Area because of action of the Railroad Commission of
the State of Texas or of a Court having final jurisdiction, and Working
Interest Owners owning the requisite Unit Participation vote to continue
this agreement in force and effect as to the approved and valid portions
of the qualified Tracts, all as provided in Section 17.2, Unit Operator
shall recompute, using the original basis of computation, the Tract
Participation of each of the qualifying Tracts which are approved and
valid, in whole or in part, and shall revise Exhibits A and B accord-
ingly.  The revised Exhibits shall be effective on the date determined
by Working Interest Owners and set forth in the revised Exhibits.

17.4 Ipso Facto Termination.  If the requirements of Section
17.1 are not accomplished on or before September 19, 1980, this agree-
ment shall ipso facto terminate on that date (hereinafter called
"termination date"), and thereafter be of no further effect, unless
prior thereto Working Interest Owners owning a combined Unit Participa-
tion of at least sixty percent (60%) have become parties to this agree-
ment and have decided to extend the termination date for a period not
to exceed one (1) year.  If the termination date is so extended and the
requirements of Section 17.1 are not accomplished on or before the
extended termination date, this agreement shall ipso facto terminate
on the extended termination date and thereafter be of no further effect.
For the purpose of this section, Unit Participation shall be as shown
on the Exhibit C attached to the Unit Operating Agreement.

ARTICLE 18

TERM

18.1 Term.  The term of this agreement shall be for the time

34

that Unitized Substances are produced in paying quantities and as long thereafter as Unit Operations are conducted without a cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner herein provided.

18.2 Termination by Working Interest Owners.  This agreement may be terminated by Working Interest Owners having a combined Unit Participation of at least seventy-five percent (75%) whenever such Working Interest Owners determined that Unit Operations are no longer profitable or feasible.

18.3 Effect of Termination.  Upon termination of this agreement, the further development and operation of the Unitized Formation as the Bellwood Lake (Paluxy B) Unit created herein shall be abandoned, Unit Operations shall cease, and thereafter the parties shall be governed by the provisions of the pooling agreements and unit designation or declaration instruments, including the pooling agreements and unit designation or declaration instruments described in Exhibits A and B, leases, and other agreements affecting the separate Tracts.

18.4 Salvaging Equipment Upon Termination.  If not otherwise granted by the leases or pooling agreements or other agreements affecting each Tract unitized under this agreement, Royalty Owners hereby grant Working Interest Owners a period of six (6) months after the date of termination of this agreement within which to salvage and remove Unit Equipment.

ARTICLE 19

EXECUTION

19.1 Original, Counterpart, or Other Instrument. A person

35

may become a party to this agreement by signing the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof.  The signing of any such instrument shall have the same effect as if all the parties had signed the same instrument.

19.2 Joinder in Dual Capacity.  Execution as herein provided by any party as either a Working Interest Owner or a Royalty Owner shall commit all interests that may be owned or controlled by such party.

ARTICLE 20

GENERAL

20.1 Amendments Affecting Working Interest Owners.  Amendments hereto relating wholly to Working Interest Owners may be made if signed by all Working Interest Owners.

20.2 Action By Working Interest Owners.  Any action or approval required by Working Interest Owners hereunder shall be in accordance with the provisions of the Unit Operating Agreement.

20.3 Lien and Security Interest of Unit Operator. Unit Operator shall have a lien upon and a security interest in the interests of Working Interest Owners in the Unit Area as provided in the Unit Operating Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the date evidenced by their certificates of acknowledgment hereof.

36

WORKING INTEREST OWNERS

Jones-O'Brien, Incorporated

ATTEST:

BY _____

_____

_____
Mrs. G. M. Anderson

_____
H. F. Anderson

_____
William G. Anderson

Arcadia Refining Company

ATTEST:

BY _____

_____

_____
James K. Avent

_____
Jack R. Brown

_____
Robert P. Evans

1973 Galbraith "A" Ltd., Partnership

_____
General Partner

37

1976 Galbraith "I" Ltd., Partnership

By_____
   General Partner


_____
J. Donald Guinn


_____
Ralph Howell


_____
Vernon G. Hunt


_____
H. Kelly Ireland


_____
F. Wilbert Lasater


_____
John H. Minton


_____
John T. Palmer


_____
Mrs. Anne D. Shamburger

Sklar & Phillips Oil Company

ATTEST:                          BY_____

_____

38

B. M. Smith
_____

Dale Hipke
_____

ROYALTY OWNERS

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

39

THE STATE OF LOUISIANA    §
                       §
PARISH OF CADDO          §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Jones-O'Brien, Inc., a corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19___.

MY COMMISSION EXPIRES:

                             _____
_____        Notary Public in and for
                             Caddo Parish, Louisiana


THE STATE OF TEXAS    §
                  §
COUNTY OF            §

BEFORE ME, the undersigned authority, on this day personally appeared Mrs. G. M. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that she executed same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19___.

MY COMMISSION EXPIRES:

                             _____
_____        Notary Public in and for
                             County, Texas


THE STATE OF TEXAS    §
                  §
COUNTY OF            §

BEFORE ME, the undersigned authority, on this day personally appeared H. F. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19___.

MY COMMISSION EXPIRES:

                             _____
_____        Notary Public in and for
                             County, Texas

40

THE STATE OF TEXAS          §
                           §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared William G. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____                County, Texas


THE STATE OF TEXAS          §
                           §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Arcadia Refining Company, a corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____                County, Texas


THE STATE OF TEXAS          §
                           §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared James K. Avent, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____                County, Texas

41

THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared Jack R. Brown, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:

_____          _____
                                Notary Public in and for
                                         County, Texas


THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared Robert P. Evans, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:

_____          _____
                                Notary Public in and for
                                         County, Texas


THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared _____, a member of the partnership of 1973 Galbraith "A" Ltd., Partnership, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that the same was the act of the said 1973 Galbraith "A" Ltd., Partnership, a limited partnership, and that he executed the same as its General Partner and as the act of such partnership for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:

_____          _____
                                Notary Public in and for
                                         County, Texas

42

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared _____, a member of the partnership of 1976 Galbraith "I" Ltd., Partnership, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that the same was the act of the said 1976 Galbraith "I" Ltd., Partnership, a limited partnership, and that he executed the same as its General Partner and as the act of such partnership for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____          _____
                                Notary Public in and for
                                        County, Texas

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared J. Donald Guinn, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____          _____
                                Notary Public in and for
                                        County, Texas

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared Ralph Howell, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____          _____
                                Notary Public in and for
                                        County, Texas

43.

THE STATE OF TEXAS       §
                          §
COUNTY OF             §

     BEFORE ME, the undersigned authority, on this day personally appeared Vernon G. Hunt, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                            Notary Public in and for
                                County, Texas

THE STATE OF TEXAS       §
                          §
COUNTY OF             §

     BEFORE ME, the undersigned authority, on this day personally appeared H. Kelly Ireland, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                            Notary Public in and for
                                County, Texas

THE STATE OF TEXAS       §
                          §
COUNTY OF              §

     BEFORE ME, the undersigned authority, on this day personally appeared F. Wilbert Lasater, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                            Notary Public in and for
                                County, Texas

44

THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared John H. Minton, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

                  Notary Public in and for
                      County, Texas

THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared John T. Palmer, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

                  Notary Public in and for
                      County, Texas

THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared Mrs. Anne D. Shamburger, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that she executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

                  Notary Public in and for
                      County, Texas

45

THE STATE OF TEXAS       §
                         §
COUNTY OF                §

     BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Sklar & Phillips Oil Company, a corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____       _____
                               Notary Public in and for
                                     County, Texas

THE STATE OF TEXAS       §
                         §
COUNTY OF                §

     BEFORE ME, the undersigned authority, on this day personally appeared B. M. Smith, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____       _____
                               Notary Public in and for
                                     County, Texas

THE STATE OF TEXAS       §
                         §
COUNTY OF                §

     BEFORE ME, the undersigned authority, on this day personally appeared Dale Hipke, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____       _____
                               Notary Public in and for
                                     County, Texas

46

THE STATE OF TEXAS      §
                             §
COUNTY OF                §

      BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:         _____
                                Notary Public in and for
_____              County, Texas


THE STATE OF TEXAS      §
                             §
COUNTY OF                §

      BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:         _____
                                Notary Public in and for
_____              County, Texas


THE STATE OF TEXAS      §
                             §
COUNTY OF                §

      BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.


MY COMMISSION EXPIRES:         _____
                                Notary Public in and for
_____              County, Texas


47

```
THE STATE OF TEXAS          §
                            §
COUNTY OF                   §
```

BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____
Notary Public in and for
                    County, Texas

_____

```
THE STATE OF TEXAS          §
                            §
COUNTY OF                   §
```

BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____
Notary Public in and for
                    County, Texas

_____

```
THE STATE OF TEXAS          §
                            §
COUNTY OF                   §
```

BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____
Notary Public in and for
                    County, Texas

_____

48

THE STATE OF TEXAS         §
                          §
COUNTY OF                 §

    BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:              _____
                                    Notary Public in and for
_____                 County, Texas

THE STATE OF TEXAS         §
                          §
COUNTY OF                 §

    BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:              _____
                                    Notary Public in and for
_____                 County, Texas

THE STATE OF TEXAS         §
                          §
COUNTY OF                 §

    BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:              _____
                                    Notary Public in and for
_____                 County, Texas

49

```
THE STATE OF TEXAS                §
                                  §
COUNTY OF                         §
```

BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:            _____
                                  Notary Public in and for
_____             County, Texas

```
THE STATE OF TEXAS                §
                                  §
COUNTY OF                         §
```

BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:            _____
                                  Notary Public in and for
_____             County, Texas

```
THE STATE OF TEXAS                §
                                  §
COUNTY OF                         §
```

BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that ____ executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:            _____
                                  Notary Public in and for
_____             County, Texas

50

EXHIBIT A

UNIT AGREEMENT
BELLWOOD LAKE (PALUXY B) UNIT
BELLWOOD LAKE (PALUXY B) FIELD
SMITH COUNTY, TEXAS

TRACTS AND TRACT PARTICIPATION

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 1 | C. E. Willingham No. 1 Unit | 80.00 | .31768695 | .16759382 |

TRACT DESCRIPTION

Jones-O'Brien, Incorporated - C. E. Willingham No. 1 Unit - containing 80 acres of land in the George Myers Survey, A-643, Smith County, Texas, as described in the Declaration of Pooled Unit dated September 12, 1977, recorded in Volume 1641, Pages 814-18, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 2 | Cook No. 1 Unit | 80.00 | .10978017 | .22166637 |

TRACT DESCRIPTION

Jones-O'Brien, Incorporated - Cook No. 1 Unit - containing 80 acres of land in the George Myers Survey, A-643, Smith County, Texas, as described in the Declaration of Pooled Unit dated June 15, 1977, recorded in Volume 1627, Pages 373-378, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 3 | Cook "A" No. 2 Unit | 80.00 | .11105352 | .08359385 |

TRACT DESCRIPTION

Jones-O'Brien, Incorporated - Cook "A" No. 2 Unit - containing 80 acres of land in the George Myers Survey, A-643, Smith County, Texas, as described in the Declaration of Pooled Unit dated February 28, 1978, recorded in Volume 1666, pages 113-120, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 4 | P. F. Piles No. 2 Unit | 80.00 | .14342090 | .28144239 |

### TRACT DESCRIPTION

Jones-O'Brien, Incorporated - P. F. Piles No. 2 Unit - containing 80 acres of land in the George Myers Survey, A-643, Smith County, Texas, as described in the Declaration of Pooled Unit dated April 29, 1977, recorded in Volume 1620, pages 475-481, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 5 | Babb No. 1 Unit | 80.00 | .31319321 | .20191629 |

### TRACT DESCRIPTION

Arcadia Refining Company - Babb No. 1 Unit - containing 80 acres of land in the George Myers Survey, A-643 and the E. D. Holland Survey, A-478, Smith County, Texas, as described in Unit Declaration dated March 21, 1978, recorded in Volume 1672, Page 115 of the Deed Records of Smith County, Texas, and in Amendment to Unit Declaration dated October 11, 1978, recorded in Volume 1708, Page 767 of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-1 | Robert B. Rainey, et ux | .70 | .00015681 | .00141130 |

### TRACT DESCRIPTION

Being .70 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease dated February 10, 1977, from Robert B. Rainey, et ux to B. M. Smith, covering land situated in the George Myers Survey, A-643, said lease being recorded in Volume 1615, Page 709 of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-2 | Bill J. Cohen, et ux | .59 | .00007549 | .00067941 |

### TRACT DESCRIPTION

Being .59 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Bill J. Cohen, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 337, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-3 | Carter E. Allred, et ux | .60 | .00001970 | .00017729 |

### TRACT DESCRIPTION

Being .60 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Carter E. Allred, et ux to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 324 of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-4 | James Harold Woodward, et ux | 1.29 | .00000504 | .00004539 |

### TRACT DESCRIPTION

Being 1.29 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from James Harold Woodward, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 395 of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-5 | William Burcham Talley, et ux | .84 | .00000378 | .00003404 |

### TRACT DESCRIPTION

Being .84 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from William Burcham Talley, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 387, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-6 | Robert M. Welch, et ux | 1.55 | .00017352 | .00156164 |

### TRACT DESCRIPTION

Being 1.55 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Robert M. Welch, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 393, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-7 | M. Herschel Knight, et ux | .40 | .00008952 | .00080564 |

### TRACT DESCRIPTION

Being .40 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from M. Herschel Knight, et ux, to B. M. Smith, dated February 10, 1977, covering land in the George Myers Survey, A-643, said lease being recorded in Volume 1615, Page 689, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-8 | Robert C. Johnston, et ux | .292 | .00007470 | .00067232 |

### TRACT DESCRIPTION

Being .292 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Robert C. Johnston, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 355, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-9 | Luther R. Hanna, et ux | .262 | .00007123 | .00064111 |

### TRACT DESCRIPTION

Being .262 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Luther R. Hanna, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 349, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-10 | W. P. Tinsley, et ux | .53 | .00012072 | .00108649 |

### TRACT DESCRIPTION

Being .53 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from W. P. Tinsley, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 381, of the Deed Records of Smith County, Texas.

54

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-11 | W. P. Tinsley, et ux | 1.34 | .00014877 | .00133896 |

### TRACT DESCRIPTION

Being 1.34 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from W. P. Tinsley, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 381, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-12 | Normadeane Enright | .491 | .00010197 | .00091769 |

### TRACT DESCRIPTION

Being .491 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Normadeane Enright to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 339, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-13 | Herman C. Johnston, et ux | .64 | .00008195 | .00073756 |

### TRACT DESCRIPTION

Being .64 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Herman C. Johnston, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 353, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-14 | William Burcham Talley, et ux | .58 | .00000504 | .00004539 |

### TRACT DESCRIPTION

Being .58 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from William Burcham Talley, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 387, of the Deed Records of Smith County, Texas.

55

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-15 | Robert R. Shepard, et ux | .49 | .00000709 | .00006382 |

### TRACT DESCRIPTION

Being .49 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Robert R. Shepard, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 371, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-16 | E. W. Scates, et ux | .51 | .00000347 | .00003120 |

### TRACT DESCRIPTION

Being .51 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from E. W. Scates, et ux, to Arcadia Refining Company, dated October 27, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1650, Page 634, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-17 | Herman C. Johnston, et ux | .67 | .00004318 | .00038864 |

### TRACT DESCRIPTION

Being .67 acres of land, more or less, more particulary described in that one certain Oil and Gas Lease from Herman C. Johnston, et ux, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 353, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-18 | Kelly Tyler Federal Credit Union | .66 | .00000804 | .00007233 |

### TRACT DESCRIPTION

Being .66 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Kelly Tyler Federal Credit Union to Arcadia Refining Company, dated January 30, 1978, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1664, Page 242, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-19 | O. P. Stripling, et al | .77 | .00005595 | .00050352 |

### TRACT DESCRIPTION

Being .77 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from O. P. Stripling, et al, to Arcadia Refining Company, dated April 12, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1623, Page 375, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-20 | Robert H. Kinsey | 1.054 | .00019275 | .00173471 |

### TRACT DESCRIPTION

Being 1.054 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Robert H. Kinsey to Arcadia Refining Company, dated January 30, 1978, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1669, Page 130, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-21 | Reeder C. Johnson, et ux | 2.122 | .00047232 | .00425092 |

### TRACT DESCRIPTION

Being 2.122 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Reeder C. Johnson, et ux, to B. M. Smith, dated January 10, 1979, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1724, Page 242, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-22 | John Robert Perdue, Sr., et ux | .513 | .00004082 | .00036737 |

### TRACT DESCRIPTION

Being .513 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from John Robert Perdue, Sr., et ux, to Arcadia Refining Company, dated January 26, 1978, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1664, Page 254, of the Deed Records of Smith County, Texas.

57

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|-----------|------------|------------------|------------------------------|----------|
| 6-23 | Max W. Rodman | .017 | .00000236 | .00002128 |

### TRACT DESCRIPTION

Being .017 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Max W. Rodman to Arcadia Refining Company, dated November 11, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1664, Page 266, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|-----------|------------|------------------|------------------------------|----------|
| 6-24 | Max W. Rodman | .190 | .00002364 | .00021276 |

### TRACT DESCRIPTION

Being .190 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Max W. Rodman to Arcadia Refining Company, dated November 11, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1664, Page 266, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|-----------|------------|------------------|------------------------------|----------|
| 6-25 | Max W. Rodman | .151 | .00001592 | .00014326 |

### TRACT DESCRIPTION

Being .151 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Max W. Rodman to Arcadia Refining Company, dated November 11, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1664, Page 266, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|-----------|------------|------------------|------------------------------|----------|
| 6-26 | Max W. Rodman | .077 | .00000520 | .00004681 |

### TRACT DESCRIPTION

Being .077 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Max W. Rodman to Arcadia Refining Company, dated November 11, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1664, Page 266, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-27 | J. W. Britton, et ux | 1.11 | .00039982 | .00359846 |

### TRACT DESCRIPTION

Being 1.11 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from J. W. Britton, et ux, to B. M. Smith, dated January 10, 1977, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1724, Page 248, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-28 | Dalton E. Nowlin, et al | 1.14 | .00040108 | .00360982 |

### TRACT DESCRIPTION

Being 1.14 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Dalton E. Nowlin, et al, to B. M. Smith, dated January 10, 1979, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1724, Page 246, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-29 | Dalton E. Nowlin, et al | .58 | .00015776 | .00141982 |

### TRACT DESCRIPTION

Being .58 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Dalton E. Nowlin, et al, to B. M. Smith, dated January 10, 1979, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1724, Page 246, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-30 | Reeder C. Johnson, et ux | .564 | .00007864 | .00070779 |

### TRACT DESCRIPTION

Being .564 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Reeder C. Johnson, et ux, to B. M. Smith, dated January 10, 1979, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1724, Page 242, of the Deed Records of Smith County, Texas.

59

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-31 | Dudley J. Smith & Greenbriar Shop. Ctr. | 1.43 | .00028951 | .00260560 |

### TRACT DESCRIPTION

Being 1.43 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Dudley J. Smith and Greenbriar Shop. Ctr., to B. M. Smith, dated January 10, 1979, covering land in the E. D. Holland Survey, A-478, said lease being recorded in Volume 1724, Page 250, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-32 | Gertrude Baber, et al | .7409 | .00009488 | .00085388 |

### TRACT DESCRIPTION

Being .7409 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Gertrude Baber, et al, to Jones-O'Brien, Inc., dated June 7, 1979, covering land in the George Myers Survey, A-643, said lease being recorded in Volume 1750, Page 16, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-33 | Mrs. Robbie Maxfield | .496 | .00007139 | .00064254 |

### TRACT DESCRIPTION

Being .496 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Mrs. Robbie Maxfield, to Jones-O'Brien, Inc., dated June 11, 1979, covering land in the George Myers Survey, A-643, said lease being recorded in Volume 1745, Page 566, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-34 | W. G. Maxfield, et ux | 1.7442 | .00033490 | .00301409 |

### TRACT PARTICIPATION

Being 1.7442 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from W. G. Maxfield, et ux, to Jones-O'Brien, Inc., dated June 7, 1979, covering land in the George Myers Survey, A-643, said lease being recorded in Volume 1745, Page 564, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-35 | O. W. Davidson, et ux | 4.1743 | .00002333 | .00020993 |

### TRACT DESCRIPTION

Being 4.1743 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from O. W. Davidson, et ux, to Arcadia Refining Company, dated April 16, 1975, covering land in the George Myers Survey, A-643, said lease being recorded in Volume 1532, Page 169, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-36 | Charles M. Davis, et ux | 2.04235 | .00013097 | .00117869 |

### TRACT PARTICIPATION

Being 2.04235 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Charles M. Davis, et ux, to Arcadia Refining Company, dated April 6, 1977, covering land in the George Myers Survey, A-643, said lease being recorded in Volume 1617, Page 209, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-37 | H. S. Maxfield, et ux | 1.0426 | .00002301 | .00020709 |

### TRACT DESCRIPTION

Being 1.0426 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from H. S. Maxfield, et ux, to Arcadia Refining Company, dated September 27, 1974, covering land in the George Myers Survey, A-643, said lease being recorded in Volume 1515, Page 510, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-38 | Eldon Langford, et ux | .782 | .00007376 | .00066381 |

### TRACT DESCRIPTION

Being .782 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Eldon Langford, et ux, to Arcadia Refining Company, dated March 18, 1977, covering land in the R. Alston Survey, A-43, said lease being recorded in Volume 1615, Page 691, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-39 | Orin W. Davidson, et ux | 1.233 | .00008794 | .00079147 |

### TRACT DESCRIPTION

Being 1.233 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Orin W. Davidson, et ux, to Arcadia Refining Company, dated March 18, 1977, covering land in the R. Alston Survey, A-43, said lease being recorded in Volume 1617, Page 213, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-40 | Major Jones and E. L. Jones | .236 | .00001261 | .00011347 |

### TRACT DESCRIPTION

Being .236 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Major Jones and E. L. Jones to Arcadia Refining Company, dated August 18, 1979, covering land in the R. Alston Survey, A-43, said lease being recorded in Volume 1755, Page 327 of the Deed Records of Smith, County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-41 | L. T. Murry, et ux | 1.208 | .00001135 | .00010213 |

### TRACT DESCRIPTION

The North 1.208 acres of the East Half of the 7.10 acre tract described in that certain Oil, Gas and Mineral Lease dated June 18, 1979, between L. T. Murry and wife, Katye Murry, as Lessor and Jones-O'Brien, Inc. as Lessee, recorded in Volume 1745, Page 570, Deed Records, Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-42 | Major Jones, et ux | .70 | .00000820 | .00007376 |

### TRACT DESCRIPTION

Beginning at the Southwest corner of Tract Number 6-43 described below, thence go S 55°30'W to the East line of that certain 1.00 acre tract described in that certain Oil, Gas and Mineral Lease dated March 11, 1977, between W. F. Williams and wife, V. O. Williams as Lessor and Arcadia Refining Company as Lessee, recorded in Volume 1615, Page 741, Deed Records, Smith County, Texas; thence

62

go N 14°03'W to the Northeast corner of said 1.00 acre tract;
thence go S 56°03'W a distance of 208.88 feet; thence go N 01°03'E
to the center line of State Highway 31; thence go Northeasterly
along the centerline of State Highway 31 to a point from which the
Northwest corner of said Tract Number 6-43 bears S 28° E; thence go
S 28°E to the Northwest corner of said Tract Number 6-43; thence
continue S 28°E along the West line of said Tract Number 6-43 to
the Southwest corner thereof, the point of beginning, containing
.70 acres.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-43 | O. W. Davidson | .488 | .00000284 | .00002553 |

### TRACT DESCRIPTION

Being .488 acres of land, more or less, more particulary described
in that one certain Oil and Gas Lease from O. W. Davidson to
Arcadia Refining Company, dated March 11, 1977, covering land in
the E. D. Holland Survey, A-478, said lease being recorded in
Volume 1617, Page 211, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 6-44 | Maudie Meadows | 2.04235 | .00013096 | .00117869 |

### TRACT DESCRIPTION

Being 2.04235 acres of land, more or less, more particularly described
in that one certain Oil and Gas Lease from Maudie Meadows to
Arcadia Refining Company, dated April 6, 1977, covering land in the
George Myers Survey, A-643, said lease being recorded in Volume
1617, Page 221, of the Deed Records of Smith County, Texas.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 7 | James Doss | 10.4835 | .00006462 | .00058154 |

### TRACT DESCRIPTION

Being 10.4835 acres of land, more or less, more particularly described
in that one certain Oil and Gas Lease from James Doss to Jones-O'Brien,
Inc., dated September 13, 1979, covering land in the G. Myers Survey,
A-643, Smith County Clerk's File No. 24128, 1979 Series.

63

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 8 | Rainey & Edwards | 11.796 | .00030874 | .00277864 |

### TRACT DESCRIPTION

40.874 acres described in the following leases: (1) Lessee: Arcadia Refining Company; Lessor: Davida M. Edwards & Husband, Welby C. Edwards; George Myers Survey, A-643, Smith County, Texas; recorded in Volume 1515, Page 465, of Deed Records of Smith County, Texas. Amendment recorded in Volume 1618, Page 700, of Deed Records of Smith County, Texas; (2) Lessee: Arcadia Refining Company; Lessor: Beatrice Rainey; George Myers Survey, A-643, Smith County, Texas; recorded in Volume 1515, Page 467, of Deed Records of Smith County Texas. Amendment recorded in Volume 1618, Page 692, of Deed Records of Smith County, Texas; SAVE AND EXCEPT: 21.7114 acres included in Jones-O'Brien, Incorporated - P. F. Piles No. 2 Unit (Tract No. 4 hereinbefore described); AND ALSO SAVE AND EXCEPT: Beginning at the Southeast corner of the 40.874 acre tract described above; thence West along the South line of said 40.874 acre tract to the Southwest corner thereof; thence North along the West line of said 40.874 acre tract to the first point of intersection with the Jones-O'Brien, Inc. - P. F. Piles No. 2 Unit (Tract No. 4 hereinbefore described); thence in a straight line to the Southeast corner of said 40.874 acre tract, to the point of beginning.

| Tract No. | Tract Name | Acreage In Tract | Decimal Participation Phase I | Phase II |
|---|---|---|---|---|
| 9 | Tyler Christian Church | .552 | .00015996 | .00143968 |

### TRACT DESCRIPTION

Being .552 acres of land, more or less, more particularly described in that one certain Oil and Gas Lease from Tyler Christian Church, W. W. Golden, Trustee, to Dale Hipke, dated January 18, 1978, covering land in the G. Myers Survey, A-643, Smith County Clerk's File No. 1600, 1978 Series.

461.9142  1.00000000[1/]  1.00000000

[1/] See Article 5.1, "Tract Participation", p. 13, for explanation as to when Phase I Decimal Participation ceases and Phase II Decimal Participation commences.

64



65



South Boundary of Tract 5

Detail of Area ⑥ on Exhibit "B" Part 1

LEGEND

▨ UNIT BOUNDARY

— TRACT BOUNDARIES

③ TRACT NUMBERS (See Exhibit "A" for Description)

JONES-O'BRIEN INCORPORATED

Exhibit "B" Part 2

Unit Agreement-Bailwood Lake (Pelvay B ) Field, Smith County, Texas, dated September 19,1979, Containing 461.1%42 Acres

UNIT OPERATING AGREEMENT

BELLWOOD LAKE (PALUXY B) UNIT

BELLWOOD LAKE (PALUXY B) FIELD

SMITH COUNTY, TEXAS

September 19, 1979

UNIT OPERATING AGREEMENT

BELLWOOD LAKE (PALUXY B) UNIT

BELLWOOD LAKE (PALUXY B) FIELD

SMITH COUNTY, TEXAS


September 19, 1979

TABLE OF CONTENTS

SECTION                                                      PAGE

Preliminary Recitals . . . . . . . . . . . . . . . . .   1

ARTICLE 1

CONFIRMATION OF UNIT AGREEMENT

1.1  . . . . . . . . . Confirmation of Unit
                      Agreement . . . . . . . . . . .   1
1.2  . . . . . . . . . Amendment of Joint Operating
                      Contracts and Other Agreements. .   2

ARTICLE 2

EXHIBITS

2.1  . . . . . . . . . Exhibits  . . . . . . . . . . .   2
                      2.1.1  Exhibits A and B . . . . .   2
                      2.1.2  Exhibit C  . . . . . . . .   2
                      2.1.3  Exhibit D  . . . . . . . .   2
                      2.1.4  Exhibit E  . . . . . . . .   3

2.2  . . . . . . . . . Revision of Exhibits  . . . . .   3
2.3  . . . . . . . . . Reference to Exhibits . . . . .   3

ARTICLE 3

SUPERVISION OF OPERATIONS BY WORKING INTEREST OWNERS

3.1  . . . . . . . . . Overall Supervision . . . . . .   3
3.2  . . . . . . . . . Specific Authority and Duties . .   3
                      3.2.1  Method of Operation  . . .   4
                      3.2.2  Drilling of Wells  . . . .   4
                      3.2.3  Well Recompletions and
                             Change of Status . . . . .   4
                      3.2.4  Expenditures . . . . . . .   4
                      3.2.5  Disposition of Unit
                             Equipment  . . . . . . . .   4
                      3.2.6  Appearance before a Court
                             or Regulatory Agency . . .   5
                      3.2.7  Audits . . . . . . . . . .   5
                      3.2.8  Inventories  . . . . . . .   5
                      3.2.9  Technical Services . . . .   6

i

SECTION                                                    PAGE

                    3.2.10 Assignments to
                           Committees . . . . . . . .      6
                    3.2.11 The Removal of Unit
                           Operator . . . . . . . .        6
                    3.2.12 The Enlargement of the Unit
                           Area . . . . . . . . . .        6
                    3.2.13 The Adjustment and Readjust-
                           ment of Investments . . .       6
                    3.2.14 The Termination of the Unit
                           Agreement . . . . . . . .       6
                    3.2.15 Outside Agreements . . . .      6


                    ARTICLE 4

          MANNER OF EXERCISING SUPERVISION

4.1 . . . . . . . . Designation of Representatives. .      6
4.2 . . . . . . . . Meetings . . . . . . . . . . . .       7
4.3 . . . . . . . . Voting Procedure . . . . . . . .       7
                    4.3.1  Voting Interest . . . . .       7
                    4.3.2  Vote Required - Generally.       7
                    4.3.3  Vote at Meeting by Non-
                           attending Working Interest
                           Owner . . . . . . . . . .       8
                    4.3.4  Poll Votes . . . . . . . .      8


                    ARTICLE 5

     INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1 . . . . . . . . Reservation of Rights . . . . . .      8
5.2 . . . . . . . . Specific Rights . . . . . . . . .      9
                    5.2.1  Access to Unit Area . . .       9
                    5.2.2  Reports . . . . . . . . .       9
5.3 . . . . . . . . Taking Unitized Substances in
                    Kind . . . . . . . . . . . . .         9
5.4 . . . . . . . . Failure to Take in Kind . . . . .      10
5.5 . . . . . . . . Responsibility for Royalty
                    Settlements . . . . . . . . . .        10


                    ARTICLE 6

                    UNIT OPERATOR

6.1 . . . . . . . . Initial Unit Operator . . . . . .      11
6.2 . . . . . . . . Resignation or Removal . . . . .       11
6.3 . . . . . . . . Selection of Successor . . . . .       12

ii

SECTION                                                                    PAGE

### ARTICLE 7

### AUTHORITY AND DUTIES OF UNIT OPERATOR

| | | |
|---|---|---|
| 7.1 | . . . . . . . . . Exclusive Right to Operate Unit . | 12 |
| 7.2 | . . . . . . . . . Workmanlike Conduct . . . . . . . | 12 |
| 7.3 | . . . . . . . . . Liens and Encumbrances . . . . . | 12 |
| 7.4 | . . . . . . . . . Employees . . . . . . . . . . . . | 13 |
| 7.5 | . . . . . . . . . Records . . . . . . . . . . . . . | 13 |
| 7.6 | . . . . . . . . . Reports to Working Interest Owners . . . . . . . . . . . . | 13 |
| 7.7 | . . . . . . . . . Reports to Governmental Authorities . . . . . . . . . . | 13 |
| 7.8 | . . . . . . . . . Engineering and Geological Information . . . . . . . . . . | 13 |
| 7.9 | . . . . . . . . . Expenditures . . . . . . . . . . . | 13 |
| 7.10 | . . . . . . . . . Wells Drilled by Unit Operator. . | 14 |
| 7.11 | . . . . . . . . . Border Agreements . . . . . . . . | 14 |

### ARTICLE 8

### TAXES

| | | |
|---|---|---|
| 8.1 | . . . . . . . . . Ad Valorem Taxes . . . . . . . . | 14 |
| 8.2 | . . . . . . . . . Other Taxes . . . . . . . . . . . | 15 |

### ARTICLE 9

### INSURANCE

| | | |
|---|---|---|
| 9.1 | . . . . . . . . . Insurance . . . . . . . . . . . . | 15 |

### ARTICLE 10

### ADJUSTMENT OF INVESTMENTS

| | | |
|---|---|---|
| 10.1 | . . . . . . . . . Personal Property Taken Over . . | 16 |
| | 10.1.1 Wells and Casing . . . . | 16 |
| | 10.1.2 Well and Lease Equipment. | 16 |
| | 10.1.3 Records . . . . . . . . . | 16 |
| 10.2 | . . . . . . . . . Inventory of Personal Property. . | 17 |
| 10.3 | . . . . . . . . . Investment Adjustment . . . . . . | 17 |
| 10.4 | . . . . . . . . . General Facilities . . . . . . . | 17 |
| 10.5 | . . . . . . . . . Ownership of Personal Property and Facilities . . . . . . . . . . . | 18 |

iii

SECTION                                               PAGE

## ARTICLE 11

### UNIT EXPENSE

11.1 . . . . . . . . . Basis of Charge to Working Interest
                       Owners . . . . . . . . . . . . . .   18
11.2 . . . . . . . . . Budgets . . . . . . . . . . . . .    18
11.3 . . . . . . . . . Advance Billings . . . . . . . .     19
11.4 . . . . . . . . . Commingling of Funds . . . . . .     19
11.5 . . . . . . . . . Lien and Security Interest of
                       Unit Operator . . . . . . . . . .    19
11.6 . . . . . . . . . Unpaid Unit Expense . . . . . . .    20
11.7 . . . . . . . . . Carved-Out Interest . . . . . . .    21
11.8 . . . . . . . . . Uncommitted Royalty . . . . . . .    21

## ARTICLE 12

### NONUNITIZED FORMATIONS

12.1 . . . . . . . . . Right to Operate . . . . . . . .     22

## ARTICLE 13

### TITLES

13.1 . . . . . . . . . Warranty and Indemnity . . . . .     22
13.2 . . . . . . . . . Failure Because of Unit
                       Operations . . . . . . . . . . .     23

## ARTICLE 14

### LIABILITY, CLAIMS, AND SUITS

14.1 . . . . . . . . . Individual Liability . . . . . .     23
14.2 . . . . . . . . . Settlements . . . . . . . . . . .    23

## ARTICLE 15

### INTERNAL REVENUE PROVISION

15.1 . . . . . . . . . Internal Revenue Provision . . .     24

## ARTICLE 16

### NOTICES

16.1 . . . . . . . . . Notices . . . . . . . . . . . . .    25

iv

SECTION                                              PAGE

ARTICLE 17

WITHDRAWAL OF WORKING INTEREST OWNER

17.1 . . . . . . . . . Withdrawal  . . . . . . . . . . .   26

ARTICLE 18

ABANDONMENT OF WELLS

18.1 . . . . . . . . . Rights of Former Owners . . . . .   26
18.2 . . . . . . . . . Plugging  . . . . . . . . . . . .   27

ARTICLE 19

EFFECTIVE DATE AND TERM

19.1 . . . . . . . . . Effective Date  . . . . . . . . .   28
19.2 . . . . . . . . . Term  . . . . . . . . . . . . . .   28

ARTICLE 20

ABANDONMENT OF OPERATIONS

20.1 . . . . . . . . . Termination . . . . . . . . . . .   28
                      20.1.1  Oil and Gas Rights  . . .   28
                      20.1.2  Right to Operate  . . . .   28
                      20.1.3  Salvaging Wells . . . . .   29
                      20.1.4  Cost of Salvaging . . . .   29
                      20.1.5  Cost of Abandonment . . .   29
                      20.1.6  Distribution of Assets  .   29

ARTICLE 21

EXECUTION

21.1 . . . . . . . . . Original, Counterpart, or Other
                      Instrument  . . . . . . . . . . .   29

ARTICLE 22

22.1 . . . . . . . . . Successors and Assigns  . . . . .   30

v

SECTION                                                          PAGE

ARTICLE 23

CHANGES OF OWNERSHIP PRIOR TO EXECUTION

23.1 . . . . . . . . . Changes of Ownership Prior to
                      Execution . . . . . . . . . . . .   30

ARTICLE 24

UNITIZATION EXPENSE

24.1 . . . . . . . . . Unitization Expense . . . . . . .   31

EXHIBITS

Exhibit C - Unit Participation . . . . . . . . . . . .   42

Exhibit D - Accounting Procedure Joint Operations  . . .   50

Exhibit E - Insurance  . . . . . . . . . . . . . . . .   55

vi

UNIT OPERATING AGREEMENT
BELLWOOD LAKE (PALUXY B) UNIT
BELLWOOD LAKE (PALUXY B) FIELD
SMITH COUNTY, TEXAS

THIS AGREEMENT, entered into as of the 19th day of September, 1979, by and between the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof;

W I T N E S S E T H:

WHEREAS, the parties hereto as Working Interest Owners have executed, as of the date hereof, an agreement entitled "Unit Agreement, Bellwood Lake (Paluxy B) Unit, Bellwood Lake (Paluxy B) Field, Smith County, Texas", herein referred to as "Unit Agreement", which, amoung other things, provides for a separate agreement to be entered into by Working Interest Owners to provide for the development and operation of the Unit Area as therein defined,

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, it is agreed as follows:

ARTICLE 1

CONFIRMATION OF UNIT AGREEMENT

1.1 CONFIRMATION OF UNIT AGREEMENT.  The Unit Agreement is hereby confirmed and by referenced made a part of this agreement.  The definitions in the Unit Agreement are adopted for all purposes of this agreement.  If there is any conflict between the Unit Agreement and this agreement, the Unit Agreement shall govern.

1

1.2 AMENDMENT OF JOINT OPERATING CONTRACTS AND OTHER AGREEMENTS.  The provisions of existing Joint Operating Contracts and other agreements pertaining to a Unitized Substance or the Unitized Formation or operations with respect to either, are amended to the extent necessary to make them conform to the provisions of this agreement, but otherwise shall remain in effect.

## ARTICLE 2
### EXHIBITS

2.1 EXHIBITS.  The following exhibits are incorporated herein by reference:

2.1.1 EXHIBITS A AND B of the Unit Agreement.

2.1.2 EXHIBIT C, attached hereto, which is a schedule showing the Working Interest of each Working Interest Owner in each Tract, the percentage of total Unit Participation attributable to each such interest, and the total Unit Participation of each Working Interest Owner.  Exhibit C, or a revision thereof, shall not be conclusive as to the information therein, except it may be used as showing the Unit Participations of Working Interest Owners for purposes of this agreement until shown to be in error and revised as herein authorized.

2.1.3 EXHIBIT D, attached hereto is the Accounting Procedure applicable to Unit Operations.  If there is any conflict between this agreement and Exhibit D, this agreement shall govern.

2

2.1.4 EXHIBIT E, attached hereto, contains insurance provisions applicable to Unit Operations.

2.2 REVISION OF EXHIBITS.  Whenever Exhibits A and B are revised, Exhibit C shall be revised accordingly and be effective as of the same date.  Unit Operator shall also revise Exhibit C from time to time as required to conform to changes in ownership of which Unit Operator has been notified as provided in the Unit Agreement.

2.3 REFERENCE TO EXHIBITS.  When reference is made herein to an exhibit, it is to the exhibit as originally attached or, if revised, to the last revision.

ARTICLE 3

SUPERVISION OF OPERATIONS BY WORKING INTEREST OWNERS

3.1 OVERALL SUPERVISION.  Working Interest Owners shall exercise overall supervision and control of all matters pertaining to Unit Operations pursuant to this agreement and the Unit Agreement.  In the exercise of such authority, each Working Interest Owner shall act solely in its own behalf in the capacity of an individual owner and not on behalf of the owners as an entirety.

3.2 SPECIFIC AUTHORITY AND DUTIES.  The matters with respect to which Working Interest Owners shall decide and take action shall include, but not be limited to, the following:

3

3.2.1 METHOD OF OPERATION.  The method of operation, including the type or types of pressure maintenance, secondary recovery, or other recovery program to be employed.

3.2.2  DRILLING OF WELLS.  The drilling of any well whether for production of Unitized Substances, for use as an injection well, or for other purposes.

3.2.3 WELL RECOMPLETIONS AND CHANGE OF STATUS.  The recompletion, abandonment, or change of status of any well, or the use of any well for injection or other purposes or the acquisition of wells for Unit Operations.

3.2.4  EXPENDITURES.  The making of any single expenditure in excess of Twelve Thousand Five Hundred Dollars ($12,500.00) for any single item, project, or installation provided that approval by Working Interest Owners of the drilling, reworking, deepening, or plugging back of any well shall include approval of all necessary expenditures required therefor, and for completing, testing, and equipping the same, including necessary flow lines, separators, and lease tankage and, provided further, that no separate approval shall be required of any expenditure authorized as part of some other expenditure.

3.2.5  DISPOSTION OF UNIT EQUIPMENT.  The selling or otherwise disposing of any major item of surplus Unit Equipment, if the current price of new equipment similar thereto if Five Thousand Dollars ($5,000.00) or more.

4

3.2.6 APPEARANCE BEFORE A COURT OR REGULATORY AGENCY. The designating of a representative to appear before any court or regulatory agency in matters pertaining to Unit Operations; however, such designation shall not prevent any Working Interest Owner from appearing in person or from designating another representative in its own behalf.

3.2.7 AUDITS. The auditing of the accounts of Unit Operator pertaining to Unit Operations hereunder; however, the audits shall

(a)  not be conducted more than once each year except upon the resignation or removal of Unit Operator, and

(b)  be made upon the approval of a majority of the Working Interest Owners having a combined majority voting interest after excluding the vote and the voting interest of the Unit Operator, at the expense of all Working Interest Owners, or

(c)  be made at the expense of those Working Interest Owners requesting such audit, if owners of less than a majority of the Working Interest, other than that of Unit Operator, request such an audit, and

(d)  be made upon not less than thirty (30) days' written notice to Unit Operator.

3.2.8 INVENTORIES. The taking of periodic inventories under the terms of Exhibit D.

5

3.2.9 TECHNICAL SERVICES.  The authorizing of charges to the joint account for services by consultants or Unit Operator's technical personnel not covered by the overhead charges provided by Exhibit D.

3.2.10 ASSIGNMENTS TO COMMITTEES.  The appointment of committees to study any problems in connection with Unit Operations.

3.2.11  THE REMOVAL OF UNIT OPERATOR.  The removal of Unit Operator and the selection of a successor.

3.2.12  THE ENLARGEMENT OF THE UNIT AREA.  The enlargement of the Unit Area.

3.2.13  THE ADJUSTMENT AND READJUSTMENT OF INVESTMENTS. The adjustment and readjustment of investments.

3.2.14  THE TERMINATION OF THE UNIT AGREEMENT.  The termination of the Unit Agreement.

3.2.15  OUTSIDE AGREEMENTS.  The approval or disapproval of any arrangements or agreements for coordinating Unit Operations hereunder with operations of a similar nature upon lands outside the Unit Area.

## ARTICLE 4
### MANNER OF EXERCISING SUPERVISION

4.1  DESIGNATION OF REPRESENTATIVES.  Each Working Interest Owner shall in writing inform Unit Operator of the names and addresses of the representative and alternate who are authorized

6

to represent and bind such Working Interest Owner with respect
to Unit Operations.  The representative or alternate may be changed
from time to time by written notice to Unit Operator.

4.2 MEETINGS.  All meetings of Working Interest Owners shall
be called by Unit Operator upon its own motion or at the request
of one or more Working Interest Owners having a total Unit
Participation of not less than twenty-five percent (25%).  No
meeting shall be called on less than seven (7) days' advance
written notice or three days's telegraphic notice with agenda for
the meeting attached.  Working Interest Owners who attend the meet-
ing may amend items included in the agenda and may act upon an
amended item or other items presented at the meeting.  The representa-
tive of Unit Operator shall be chairman of each meeting.

4.3  VOTING PROCEDURE.  Working Interest Owners shall decide
all matters coming before them as follows:

4.3.1  VOTING INTEREST. Each Working Interest Owner
shall have a voting interest equal to its Unit Participation.
A division of the interest of a Working Interest Owner (by
sale or otherwise) shall in no event increase either the
number of votes or the voting interest to which that
interest is originally entitled.

4.3.2 VOTE REQUIRED - GENERALLY.  Unless otherwise
provided herein or in the Unit Agreement, all matters
shall be decided by an affirmative vote of eleven (11)

7

or more Working Interst Owners having a combined
voting interest of seventy percent (70%) or more.

4.3.3  VOTE AT MEETING BY NONATTENDING WORKING INTEREST
OWNER.  Any Working Interest Owner who is not represented
at a meeting may vote on any agenda item by letter or
telegram addressed to the representative of Unit Operator
if its vote is received prior to the vote at the meeting.

4.3.4  POLL VOTES.  Working Interest Owners may vote on
and decide, by letter or telegram, any matter submitted in
writing to Working Interest Owners.  If a meeting is not
requested, as provided in section 4.2, within seven (7) days
after a written proposal is sent to Working Interest Owners,
the vote taken by letter or telegram shall become final.
Unit Operator will give prompt notice of the results of
such voting to all Working Interest Owners.

## ARTICLE 5

### INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1  RESERVATION OF RIGHTS.  Working Interest Owners severally
reserve to themselves all their rights, except as otherwise provided
in this agreement and the Unit Agreement.

8

5.2 SPECIFIC RIGHTS.  Each Working Interest Owner shall have, among others, the following specific rights:

5.2.1  ACCESS TO UNIT AREA.  Access to the Unit Area at all reasonable times to inspect Unit Operations, all wells, and the records and data pertaining thereto.

5.2.2  REPORTS.  The right to receive from Unit Operator, upon written request, copies of all reports to any governmental agency, reports of crude oil runs and stocks, inventory reports, and all other information pertaining to Unit Operations. The cost of gathering and furnishing information not ordinarily furnished by Unit Operator to all Working Interest Owners shall be charged to the Working Interest Owner that requests the information.

5.3  TAKING UNITIZED SUBSTANCES IN KIND.  The Unitized Substances allocated to each Tract shall be delivered in kind to the respective parties entitled thereto by virtue of the ownership of Oil and Gas rights therein or by purchase from such owners.  Such parties shall have the right to construct, maintain, and operate within the Unit Area all necessary facilities for that purpose, provided they are so constructed, maintained, and operated as not to interfere with Unit Operations.  Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of Unitized Substances shall be borne by the owner of such portion.  If a Royalty Owner has the right to take in kind a share of Unitized Substances and

9

fails to do so, the Working Interest Owner whose Working Interest is subject to such Royalty Interest shall be entitled to take in kind such share of Unitized Substances.

5.4   FAILURE TO TAKE IN KIND.   If any party fails to take in kind or separately dispose of such party's share of Unitized Substances, Unit Operator shall have the right, but not the obligation, for the time being and subject to revocation at will by the party owning the share, to purchase or sell to others such share; however, all contracts of sale by Unit Operator of any other party's share of Unitized Substances shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any such contract be for a period in excess of one year.   The proceeds of the Unitized Substances so disposed of by Unit Operator shall be paid to the Working Interest Owners of each affected Tract or a party designated by such Working Interest Owners who shall distribute such proceeds to the parties entitled thereto.   Notwithstanding the foregoing, Unit Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days' notice of such intended sale.

5.5 RESPONSIBILITY FOR ROYALTY SETTLEMENTS.   Any party receiving in kind or separately disposing of all or part of the Unitized Substances allocated to any Tract shall be responsible for the payment of all royalties, overriding royalties, production

10

payments, and all other payments chargeable against or payable out of such Unitized Substances, and shall idemnify all parties hereto, including Unit Operator, against any liability for such payment.

In all cases where arrangements have been made by Working Interest Owners to have Unit Operator make any of the above referred to payments for their accounts, each such Working Interest Owner agrees to pay Unit Operator each month a sum of money sufficient to cover all such payments made in its behalf and to furnish Unit Operator with complete information upon which Unit Operator may base such payments, including, if requested to do so, complete abstracts of title to the lands covered by its Working Interest.

## ARTICLE 6
### UNIT OPERATOR

6.1 INITIAL UNIT OPERATOR. Jones-O'Brien, Incorporated, is hereby designated as the Unit Operator.

6.2 RESIGNATION OR REMOVAL. Unit Operator may resign at any time; furthermore, the sale (or other conveyance) of its interest shall constitute the resignation of Unit Operator. Unit Operator may be removed at any time by the affirmative vote of a majority of the Working Interest Owners having a combined voting interest of more than fifty percent (50%) after excluding the vote and the voting interest of Unit Operator. Such resignation or removal shall not become effective for a period of three (3) months after the resignation or removal, unless a successor Unit Operation has taken over Unit Operations prior to the expiration of such period.

11

6.3 SELECTION OF SUCCESSOR.  Upon the resignation or removal of a Unit Operator, a successor Unit Operator shall be selected by Working Interest Owners.  If the Unit Operator that is removed fails to vote or votes only to succeed itself, the successor Unit Operator shall be selected by the affirmative vote of eleven (11) or more Working Interest Owners having a combined voting interest of seventy percent (70%) or more after excluding the vote and the voting interest of the Unit Operator.

## ARTICLE 7
### AUTHORITY AND DUTIES OF UNIT OPERATOR

7.1  EXCLUSIVE RIGHT TO OPERATE UNIT.  Subject to the provisions of this agreement and to instructions from Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations.

7.2  WORKMANLIKE CONDUCT.  Unit Operator shall conduct Unit Operations in a good and workmanlike manner as would a prudent operator under the same or similar circumstances.  Unit Operator shall freely consult with Working Interest Owners and keep them informed of all matters which Unit Operator, in the exercise of its best judgment, considers important.  Unit Operator shall not be liable to Working Interest Owners for damages, unless such damages result from its gross negligence or willful misconduct.

7.3  LIENS AND ENCUMBRANCES.  Unit Operator shall endeavor to keep the lands and leases in the Unit Area and Unit Equipment free

12

from all liens and encumbrances occasioned by Unit Operations, except the lien and security interest of Unit Operator granted hereunder.

7.4   EMPLOYEES.   The number of employees used by Unit Operator in conducting Unit Operations, their selection, hours of labor, and compensation shall be determined by Unit Operator.   Such employees shall be the employees of Unit Operator.

7.5   RECORDS.   Unit Operator shall keep correct books, accounts, and records of Unit Operations.

7.6   REPORTS TO WORKING INTEREST OWNERS.   Unit Operator shall furnish Working Interest Owners periodic reports of Unit Operations, as directed by Working Interest Owners.

7.7   REPORTS TO GOVERNMENTAL AUTHORITIES.   Unit Operator shall make all reports to governmental authorities that is has the duty to make as Unit Operator.

7.8   ENGINEERING AND GEOLOGICAL INFORMATION.   Unit Operator shall furnish to a Working Interest Owner, upon written request, a copy of all logs and other engineering and geological data pertaining to wells drilled for Unit Operations subsequent to the effective date hereof.

7.9   EXPENDITURES.   Unit Operator is authorized to make single expenditures not in excess of Twelve Thousand Five Hundred Dollars ($12,500.00) without prior approval of Working Interest Owners.   Notwithstanding any other provision of this Agreement to the contrary in case of an emergency, Unit Operator may immediately take such steps

13

and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property.  Unit Operator shall report to Working Interest Owners, as promptly as possible, the nature of the emergency and the action taken.

7.10  WELLS DRILLED BY UNIT OPERATOR.  All wells drilled by Unit Operator shall be at the usual rates prevailing in the area. Unit Operator may employ its own tools and equipment, but the charge therefor shall not exceed the usual rates prevailing in the area, and the work shall be performed by Unit Operator under the same terms and conditions as are usual in the area in contracts of independent contractors doing work of a similar nature.

7.11  BORDER AGREEMENTS.  Unit Operator may, after approval by Working Interest Owners, enter into border agreements with respect to lands adjacent to the Unit Area for the purpose of coordinating operations.

## ARTICLE 8

### TAXES

8.1 AD VALOREM TAXES.  Beginning with the first calendar year after the Effective Date hereof, Unit Operator shall make and file all necessary ad valorem tax renditions and returns with the proper taxing authorities covering all real and personal property of each Working Interest Owner used or held by Unit Operator for Unit Operations.  Unit Operator shall settle assessments arising therefrom.  All such ad valorem taxes shall

14

be paid by Unit Operator and charged to the joint account; how-
ever, if the interest of a Working Interest Owner is subject to
a separately assessed overriding royalty interest, production
payment, or other interest in excess of a one-eighth (1/8) royalty,
such Working Interest Owner shall notify Unit Operator of such
interest prior to the rendition date and shall be given credit for
the reduction in taxes paid resulting therefrom.

8.2  OTHER TAXES.  Each Working Interest Owner shall pay or
cause to be paid all production, severance, gathering, and other
taxes imposed upon or with respect to the production or handling
of its share of Unitized Substances.

ARTICLE 9

INSURANCE

9.1  INSURANCE.  Unit Operator, with respect to Unit Operations,
shall:

(a)   comply with the Workman's Compensation Laws of the
State of Texas,

(b)   carry Employer's Liability and other insurance
required by the laws of the State,

(c)   provide other insurance as set forth in Exhibit E,
and

(d)   Unit Operator shall require all third party con-
tractors performing work in or on the Unit Area to carry
insurance for the benefit and protection of the Working Interest
Owners consistent with Unit Operator's minimum requirements.

15

## ARTICLE 10

### ADJUSTMENT OF INVESTMENTS

10.1  PERSONAL PROPERTY TAKEN OVER.  Section 3.2 of the Unit Agreement provides that Working Interest Owners except from the terms and provisions of such agreement, and sever from the lands affected by the agreement, all lease and well equipment, and refers to a separate agreement.  Such separate agreement is hereafter set out.  Upon effective date hereof, Working Interest Owners shall deliver to Unit Operator the following:

10.1.1  Wells and Casing.  All wells completed in the Unitized Formation, together with the casing therein.

10.1.2  Well and Lease Equipment.  The tubing in each such well, the wellhead connections thereon, and all other lease and operating equipment that is used in the operation of such wells which Working Interest Owners determine is necessary or desirable for conducting Unit Operations.

10.1.3  Records.  Copies of all records pertaining to the drilling, testing, completing, recompletion, reworking, and operatio nof such wells, including drilling logs, electrical logs, records of coring, testing, and special work of every nature, laboratory analysis, records of the amounts of production obtained and all other information pertinent to such wells.

16

10.2  INVENTORY OF PERSONAL PROPERTY.  A committee appointed by the Working Interest Owners shall inventory the well and lease equipment referred to in Section 10.1.2 above and evaluate, in accordance with the provisions of Exhibit D, the personal property taken over which the Working Interest Owners determine is necessary and desirable for conducting Unit Operations.

10.3  INVESTMENT ADJUSTMENT.  Upon approval by Working Interest Owners of the inventory and evaluation, each Working Interest Owner shall be credited with the value of its interest in all personal property taken over under Section 10.1.2, and shall be charged with an amount equal to that obtained by multiplying the total value of all personal property taken over under Section 10.1.2 by such Working Interest Owner's Unit Participation.  If the charge against any Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be an item of Unit Expense chargeable against such Working Interest Owner.  If the credit to any Working Interest Owner is greater than the amount charged against such Working Interest Owner, the resulting net credit shall be paid to such Working Interest Owner by Unit Operator out of funds received by it in settlement of the net charges described above.

10.4  GENERAL FACILITIES.  The acquisition of warehouses, warehouse stocks, lease houses, camps, facility systems, and office buildings necessary for Unit Operations shall be by negotiation between the owners thereof and Unit Operator, subject to the

17

approval of Working Interest Owners.  There shall be no adjustment for lease roads or appurtenances thereto.

10.5  OWNERSHIP OF PERSONAL PROPERTY AND FACILITIES.  Each Working Interest Owner, individually, shall by virtue hereof own an undivided interest, equal to its Unit Participation, in all personal property and facilities taken over or otherwise acquired by Unit Operator pursuant to this agreement.

## ARTICLE 11

### UNIT EXPENSE

11.1  BASIS OF CHARGE TO WORKING INTEREST OWNERS.  Unit Operator initially shall pay all Unit Expense.  Each Working Interest Owner shall reimburse Unit Operator for its share of Unit Expense. Each Working Interest Owner's share shall be the same as its Unit Participation.  All charges, credits, and accounting for Unit Expense shall be in accordance with Exhibit D.

11.2  BUDGETS.  Upon the request by Fifty Percent (50%) of the Working Interest Owners, the Unit Operator shall prepare a budget of estimated Unit Expense for the remainder of the calendar year, and, on or before the first day of each November thereafter, shall prepare a budget for the ensuing calendar year.  A budget shall set forth the estimated Unit Expense by quarterly periods. Budgets shall be estimates only, and shall be adjusted or corrected by Working Interest Owners and Unit Operator whenever an adjustment or correction is proper.  A copy of each budget and adjusted budget shall be furnished promptly to each Working Interest Owner.

18

11.3   ADVANCE BILLINGS.   Unit Operator shall have the right, without prejudice to other rights or remedies, to require Working Interest Owners to advance their respective shares of estimated Unit Expense by submitting to Working Interest Owners, on or before the 15th day of any month, an itemized estimate thereof for the succeeding month, with a request for payment in advance. Within fifteen (15) days after receipt of the estimate, each Working Interest Owner shall pay to Unit Operator its share of such estimate.   Adjustments between estimated and actual Unit Expense shall be made by Unit Operator at the close of each calendar month, and the accounts of Working Interest Owners shall be adjusted accordingly.

11.4   COMMINGLING OF FUNDS.   Funds received by Unit Operator under this agreement need not be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

11.5   LIEN AND SECURITY INTEREST OF UNIT OPERATOR.   Each Working Interest Owner grants to Unit Operator a lien upon its Oil and Gas Rights in each Tract, and a security interest in its share of Unitized Substances when extracted and its interest in all Unit Equipment, to secure payment of its share of Unit Expense, together with interest thereon at the rate of ten percent (10%) per annum.   Unit Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien.   To the extent that Unit Operator has a security interest under the Uniform Commercial Code of the

19

State, Unit Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Unit Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Working Interest Owner in the payment of its share of Unit Expense, Unit Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Working Interest Owner's share of Unitized Substances until the amount owed by such Working Interest Owner, plus interest, has been paid. Each purchaser shall be entitled to rely upon Unit Operator's written statement concerning the amount of any default.

11.6  UNPAID UNIT EXPENSE. If any Working Interest Owner fails to pay its share of Unit Expense within sixty (60) days after rendition of a statement therefor by Unit Operator, each Working Interest Owner agrees, upon request by Unit Operator, to pay its proportionate part of Unit Expense of the defaulting Working Interest Owner. Working Interest Owners that pay the share of Unit Expense of a defaulting Working Interest Owner shall be reimbursed by Unit Operator for the amount so paid, plus any interest collected thereon, upon receipt by Unit Operator of any past due amount collected from the defaulting Working Interest Owner. Any Working Interest Owner so paying a defaulting Working Interest Owner's share of Unit Expense shall, to obtain reimbursement thereof, be subrogated to the lien and other rights herein granted Unit Operator.

20

11.7 CARVED-OUT INTEREST.  If any Working Interest Owner shall, after executing this agreement, create an overriding royalty, production payment, net proceeds interest, carried interest, or any other interest out of its Working Interest, such carved-out interest shall be subject to the terms and provisions of this agreement, specifically including, but without limitation, Section 11.5 hereof entitled "Lien and Security Interest of Unit Operator".  If the Working Interest Owner creating such carved-out interest (a) fails to pay any Unit Expense chargeable to such Working Interest Owner under this agreement, and the production of Unitized Substances accuring to the credit of such Working Interest Owner is insufficient for that purpose, or (b) withdraws from this agreement under the terms and provisions of Article 17 hereof, the carved-out interest shall be chargeable with a pro rata portion of all Unit Expense incurred hereunder, the same as though such carved-out interest were a Working Interest, and Unit Operator shall have the right to enforce against such carved-out interest, the lien and all other rights granted in Section 11.5 for the purpose of collecting the Unit Expense chargeable to the carved-out interest.

11.8  UNCOMMITTED ROYALTY.  Should an owner of a Royalty Interest in any Tract fail to become party to the Unit Agreement, and, as a result thereof, the actual Royalty Interest payments with respect to production from such Tract are more or less than the Royalty Interest payments computed on the basis of the Unitized Substances that are allocated to such Tract under the Unit Agreement, the difference shall be borne by or inure to the benefit of Working Interest Owners, in proportion to their respective Unit Participations at the time the Unitized

21

Substances were produced; however, the difference to be borne by or inure to the benefit of Working Interest Owners shall not exceed an amount computed on the basis of one-eighth (1/8) of the difference between the Unitized Substances allocated to the Tract and the Unitized Substances produced from the Tract. Such adjustments shall be made by charges and credits to the joint Account.

## ARTICLE 12

### NONUNITIZED FORMATIONS

12.1 RIGHT TO OPERATE. Any Working Interest Owner that now has or hereafter acquires the right to drill for and produce oil, gas or other minerals, from a formation underlying the Unit Area other than the Unitized Formation, shall have the right to do so notwithstanding this agreement or the Unit Agreement. In exercising the right, however, such Working Interest Owner shall exercise care to prevent unreasonable interference with Unit Operations. No Working Interest Owner shall produce Unitized Substances through any well drilled or operated by it. If any Working Interest Owner drills any well into or through the Unitized Formation, the Unitized Formation shall be protected in a manner satisfactory to Working Interest Owners so that the production of Unitized Substances will not be adversely affected.

## ARTICLE 13

### TITLES

13.1 WARRANTY AND INDEMNITY. Each Working Interest Owner represents and warrants that it is the owner of the respective Working Interests set forth opposite its name in Exhibit C, and agrees to indemnify and hold harmless the other Working Interest Owners from any

22

loss due to failure, in whole or in part, of its title to any such interest, except failure of title arising because of Unit Operations; however, such indemnity and any liability for breach of warranty shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed.  Each failure of title will be deemed to be effective, insofar as this agreement is concerned, as of 7:00 a.m. on the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive adjustment of Unit Expense, or retroactive allocation of Unitized Substances or the proceeds therefrom, as a result of a title failure.

13.2 FAILURE BECAUSE OF UNIT OPERATIONS.  The failure of title to any Working Interest in any Tract because of Unit Operations, including nonproduction from such Tract, shall not change the Unit Participation of the Working Interest Owner whose title failed in relation to the Unit Participations of the other Working Interest Owners at the time of the title failure.

ARTICLE 14

LIABILITY, CLAIMS, AND SUITS

14.1 INDIVIDUAL LIABILITY.  The duties, obligations, and liabilities of Working Interest Owners shall be several and not joint or collective; and nothing herein shall ever be construed as creating a partnership of any kind, joint venture, association, or trust among Working Interest Owners.

14.2 SETTLEMENTS.  Unit Operator may settle any single damage

23

claim or suit involving Unit Operations if the expenditure does not exceed Five Thousand Dollars ($5,000.00) and if the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above amount, Working Interest Owners shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Unit Operator.  All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Unit Expense.  If a claim is made against any Working Interest Owner or if any Working Interest Owner is sued on account of any matter arising from Unit Operations over which such Working Interest Owner individually has no control because of the rights given Working Interest Owners and Unit Operator by this agreement and the Unit Agreement, the Working Interest Owner shall immediately notify Unit Operator, and the claim or suit shall be treated as any other claim or suit involving Unit Operations.

## ARTICLE 15

### INTERNAL REVENUE PROVISION

15.1 INTERNAL REVENUE PROVISION.  Notwithstanding any provisions herein that the rights and liabilities of the parties hereunder are several and not joint or collective, or that this agreement and the operations hereunder shall not constitute a partnership, if for Federal income tax purposes this agreement and the operations hereunder are regarded as a partnership, then each of the parties hereto hereby elects to be excluded from the application of all of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of said Code

24

and the regulation promulgated thereunder. Unit Operator is hereby
authorized and directed to execute on behalf of each of the parties
hereto such evidence of this election as may be required by the Secretary
of the Treasury of the United States or the Federal Internal Revenue
Service, including specifically, but not by way of limitation, all of
the returns, statements, and the data required by Federal Regulations
1.761-1(a). Should there be any requirement that each party hereto
further evidence this election, each party hereto agrees to execute
such documents and furnish such other evidence as may be required by
the Federal Internal Revenue Service or as may be necessary to evidence
this election. Each party hereto further agrees not to give any
notices or take any other action inconsistent with the election made
hereby. If any present or future income tax laws of the State of
Texas, or any future income tax laws of the United States contain, or
shall hereafter contain, provisions similar to those contained in
Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of
1954, under which an election similar to that provided by Section 761
of said Subchapter K is permitted, each of the parties hereto hereby
makes such election or agrees to make such election as may be permitted
by such laws. In making this election, each of the parties hereto
hereby states that the income derived by him from the operations
under this agreement can be adequately determined without the computa-
tion of partnership taxable income.

## ARTICLE 16

### NOTICES

16.1 NOTICES. All notices required hereunder shall be in writing
and shall be deemed to have been properly served when sent by mail or

25

telegram to the address of the representative of each Working Interest Owner as furnished to Unit Operator in accordance with Article 4.

## ARTICLE 17

### WITHDRAWAL OF WORKING INTEREST OWNER

17.1 WITHDRAWAL.  A Working Interest Owner may withdraw from this agreement by transferring, without warranty of title, either express or implied, to the other Working Interest Owners who do not wish to withdraw, all its Oil and Gas Rights, together with its interest in all Unit Equipment and in all wells used in Unit Operations.  The instrument of transfer may be delivered to Unit Operator for the trans-ferrees.  Such transfer shall not relieve said Working Interest Owner from any obligation or liability incurred prior to the date of the delivery of the instrument of transfer.  The interest transferred shall be owned by the transferees in proportion to their respective Unit Participations.  The transferrees, in proportion to the respective interests so acquired, shall pay transferor, for its interest in Unit Equipment, the fair salvage value thereof as estimated and fixed by Working Interest Owners, less the net salvage value of all casing and equipment contributed.  After the date of delivery of the instrument of transfer, the withdrawing Working Interest Owner shall be relieved from all further obligations and liability hereunder and under the Unit Agreement, and the rights of such Working Interest Owner hereunder and under the Unit Agreement shall cease insofar as they existed by virtue of the interest transferred.

## ARTICLE 18

### ABANDONMENT OF WELLS

18.1 RIGHTS OF FORMER OWNERS.  If Working Interest Owners decide

26

to permanently abandon any well within the Unit Area prior to termination of the Unit Agreement, Unit Operator shall give written notice thereof to the Working Interest Owners of the Tract on which the well is located, and they shall have the option for a period of ninety (90) days after the sending of such notice to notify Unit Operator in writing of their election to take over and own the well.  Within ten (10) days after the Working Interest Owners of the Tract have notified Unit Operator of their election to take over the well, they shall pay Unit Operator, for credit to the joint account, the amount determined by Working Interest Owners to be the net salvage value of the casing and equipment in and on the well, less the net salvage of any such casing and equipment contributed by such Working Interest Owners of the Tract for which no credit was received by such Working Interest Owner in the adjustment of investments hereunder.  The Working Interest Owners of the Tract, by taking over the well, agree to seal off the Unitized Formation, and upon abandonment to plug the well in compliance with applicable laws and regulations.  The Working Interest Owner which takes over the well under this provision shall immediately file the necessary forms showing the change in operation with the appropriate State and Federal agencies.

18.2 PLUGGING.  If the Working Interest Owners of a Tract do not elect to take over a well located within the Unit Area that is proposed for abandonment, Unit Operator shall plug and abandon the well in compliance with applicable laws and regulations and at Unit Expense. Any salvage value including the salvage value of casing shall be credited to Working Interest Owners on the basis of their respective Unit Participations.

27

## ARTICLE 19

### EFFECTIVE DATE AND TERM

19.1 EFFECTIVE DATE.  This agreement shall be and become binding on each party as of the date of execution or ratification of such party but shall not become effective for the purpose of conducting Unit Operations hereunder until the effective date of the Unit Agreement, which date shall also be the effective date of this agreement.

19.2 TERM.  This agreement shall continue in effect so long as the Unit Agreement remains in effect, and thereafter until (a) all Unit wells have been plugged and abandoned or turned over to Working Interest Owners in accordance with Article 20; (b) all Unit Equipment and real property acquired for the joint account have been disposed of by Unit Operator in accordance with instructions of Working Interest Owners; and (c) there has been a final accounting, which shall be rendered within sixty (60) days after the sale of the Unit Equipment.

## ARTICLE 20

### ABANDONMENT OF OPERATIONS

20.1 TERMINATION.  Upon termination of the Unit Agreement, the following will occur:

20.1.1 OIL AND GAS RIGHTS.  Oil and Gas Rights in and to each separate Tract shall no longer be affected by this agreement, and thereafter the parties shall be governed by the terms and provisions of the pooling agreements, unit designation or declaration instruments, joint operating contracts, leases and other contracts and instruments affecting the separate Tracts.

20.1.2 RIGHT TO OPERATE. Working Interest Owners of any Tract that desire to take over and continue to operate wells located thereon may do so by paying Unit Operator, for credit

28

to the account of all Working Interest Owners, the net salvage value of the Unit Equipment in and on the wells taken over, less the net salvage value of any such casing and equipment contributed by such Working Interest Owner of the Tract for which no credit was received by such Working Interest Owner in the adjustment of investments hereunder, as estimated by Working Interest Owners, and by agreeing to plug properly each well at such time as it is abandoned.

20.1.3 SALVAGING WELLS.  Unit Operator shall salvage as much of the casing and equipment in or on wells not taken over by Working Interest Owners of separate Tracts as can economically and reasonably be salvaged, and shall cause the wells to be plugged and abandoned in compliance with applicable laws and regulations.

20.1.4 COST OF SALVAGING.  Working Interest Owners shall share the cost of salvaging, liquidation or other distribution of assets and properties used in Unit Operations in porportion to their respective Unit Participations.

20.1.5 COST OF ABANDONMENT.  The cost of abandonment of Unit Operations shall be Unit Expense.

20.1.6 DISTRIBUTION OF ASSETS.  Working Interest Owners shall share in the distribution of Unit Equipment, or the proceeds thereof, in proportion to their Unit Participations.

ARTICLE 21

EXECUTION

21.1 ORIGINAL, COUNTERPART, OR OTHER INSTRUMENT.  A party may become a party to this agreement by signing the original of this

29

instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof.  The signing of any such instrument shall have the same effect as if all parties had signed the same instrument.

## ARTICLE 22

### SUCCESSORS AND ASSIGNS

22.1 SUCCESSORS AND ASSIGNS.  The provisions hereof shall be covenants running with the lands, leases, units and interests covered hereby, and shall extend to, be binding upon, and inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors, and assigns the parties hereto.

## ARTICLE 23

### CHANGES OF OWNERSHIP PRIOR TO EXECUTION

23.1 CHANGES OF OWNERSHIP PRIOR TO EXECUTION.  In view of the diverse character of the ownership of the Working Interest, it is possible, though not contemplated, that the Working Interest, Tract Participation and Unit Participation as shown on Exhibit C may have been incorrectly established or may change as the result of conveyances or deaths occurring between the time of the preparation of this agreement and the time of its execution by all parties.  In either of such events, Unit Operator is authorized to revise Exhibit C to conform to the facts.  The revisions shall not include any change in the Working Interest, Tract Participation or Unit Participation of any party who has previously executed this agreement, except (1) to conform with changes authorized in the Unit Agreement, (2) with the consent of all parties affected by such changes or (3) upon authority

30

of a certified copy of a properly executed and recorded conveyance.

ARTICLE 24

UNITIZATION EXPENSE

24.1 UNITIZATION EXPENSE. Notwithstanding anything herein con-
tained, it is agreed that the parties hereto shall bear their
proportionate part in accordance with the Working Interest Owner
Unit Participation of the expenses incurred by the Unit Operator in
the formation of the Bellwood Lake (Paluxy B) Unit.  The operator
in each Tract will be responsible for trying to obtain the Royalty
Owner signatures for its Tract and the Working Interest Owners in
each Tract will be solely responsible for any expenses that are
incurred therewith.

IN WITNESS WHEREOF, the parties hereto have executed this agree-
ment on the day and date evidenced by their certificates of
acknowledgment hereof.

31

WORKING INTEREST OWNERS

Jones-O'Brien, Incorporated

ATTEST:

_____     BY_____


_____
Mrs. G. M. Anderson


_____
H. F. Anderson


_____
William G. Anderson


Arcadia Refining Company

ATTEST:

_____     BY_____


_____
James K. Avent


_____
Jack R. Brown


_____
Robert P. Evans


1973 Galbraith "A" Ltd., Partnership


_____
General Partner


32

1976 Galbraith "I" Ltd., Partnership

By_____
   General Partner


_____
J. Donald Guinn


_____
Ralph Howell


_____
Vernon G. Hunt


_____
H. Kelly Ireland


_____
F. Wilbert Lasater


_____
John H. Minton


_____
John T. Palmer


_____
Mrs. Anne D. Shamburger

Sklar & Phillips Oil Company

ATTEST:

_____    BY_____

33

B. M. Smith

Dale Hipke

34

THE STATE OF LOUISIANA    §
                          §
PARISH OF CADDO           §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Jones-O'Brien, Inc., a corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19___.

MY COMMISSION EXPIRES:         _____
                               Notary Public in and for
_____        Caddo Parish, Louisiana

THE STATE OF TEXAS        §
                          §
COUNTY OF                 §

BEFORE ME, the undersigned authority, on this day personally appeared Mrs. G. M. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that she executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:         _____
                               Notary Public in and for
_____              County, Texas

THE STATE OF TEXAS        §
                          §
COUNTY OF                 §

BEFORE ME, the undersigned authority, on this day personally appeared H. F. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:         _____
                               Notary Public in and for
_____              County, Texas

35

THE STATE OF TEXAS      §
                       §
COUNTY OF             §

      BEFORE ME, the undersigned authority, on this day personally appeared William G. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

_____
Notary Public in and for
            County, Texas

THE STATE OF TEXAS      §
                       §
COUNTY OF             §

      BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Arcadia Refining Company, corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

_____
Notary Public in and for
            County, Texas

THE STATE OF TEXAS      §
                       §
COUNTY OF             §

      BEFORE ME, the undersigned authority, on this day personally appeared James K. Avent, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

_____
Notary Public in and for
            County, Texas

36

THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared Jack R. Brown, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

        _____
        Notary Public in and for
            County, Texas

THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared Robert P. Evans, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

        _____
        Notary Public in and for
            County, Texas

THE STATE OF TEXAS          §
                           §
COUNTY OF                  §

    BEFORE ME, the undersigned authority, on this day personally appeared _____, a member of the partnership of 1973 Galbraith "A" Ltd., Partnership, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that the same was the act of the said 1973 Galbraith "A" Ltd., Partnership, a limited partnership, and that he executed the same as its General Partner and as the act of such partnership for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____

        _____
        Notary Public in and for
            County, Texas

37

THE STATE OF TEXAS      §
                              §
COUNTY OF               §

         BEFORE ME, the undersigned authority, on this day personally appeared _____, a member of the partnership of 1976 Galbraith "I" Ltd., Partnership, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that the same was the act of the said 1976 Galbraith "I" Ltd., Partnership, a limited partnership, and that he executed the same as its General Partner and as the act of such partnership for the purposes and consideration therein expressed.

         GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                             Notary Public in and for
_____                  County, Texas

---

THE STATE OF TEXAS      §
                              §
COUNTY OF               §

         BEFORE ME, the undersigned authority, on this day personally appeared J. Donald Guinn, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

         GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                             Notary Public in and for
_____                  County, Texas

---

THE STATE OF TEXAS      §
                              §
COUNTY OF               §

         BEFORE ME, the undersigned authority, on this day personally appeared Ralph Howell, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

         GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                             Notary Public in and for
_____                  County, Texas

38

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared Vernon G. Hunt, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____          County, Texas

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared H. Kelly Ireland, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____          County, Texas

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared F. Wilbert Lasater, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____          County, Texas

39

THE STATE OF TEXAS          §
                           §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared John H. Minton, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                             Notary Public in and for
_____                County, Texas

THE STATE OF TEXAS          §
                           §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared John T. Palmer, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                             Notary Public in and for
_____                County, Texas

THE STATE OF TEXAS          §
                           §
COUNTY OF                   §

    BEFORE ME, the undersigned authority, on this day personally appeared Mrs. Anne D. Shamburger, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that she executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                             Notary Public in and for
_____                County, Texas

40

THE STATE OF TEXAS      §
                              §
COUNTY OF                     §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Sklar & Phillips Oil Company, a corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and considera-tion therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____
_____      Notary Public in and for
                                      County, Texas


THE STATE OF TEXAS      §
                              §
COUNTY OF                     §

BEFORE ME, the undersigned authority, on this day personally appeared B. M. Smith, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____
_____      Notary Public in and for
                                      County, Texas


THE STATE OF TEXAS      §
                              §
COUNTY OF                     §

BEFORE ME, the undersigned authority, on this day personally appeared Dale Hipke, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____
_____      Notary Public in and for
                                      County, Texas

41

EXHIBIT C

UNIT OPERATING AGREEMENT

BELLWOOD LAKE (PALUXY B) UNIT

SMITH COUNTY, TEXAS

UNIT PARTICIPATION

| TRACT NO. | WORKING INTEREST OWNERS | WORKING INTEREST IN TRACT | UNIT PARTICIPATION PHASE I | UNIT PARTICIPATION PHASE II |
|---|---|---|---|---|
| 1 | Mrs. G. M. Anderson | .062500 | .01985541 | .01047460 |
| | H. F. Anderson | .031250 | .00992772 | .00523731 |
| | William G. Anderson | .031250 | .00992772 | .00523731 |
| | Robert P. Evans | .012500 | .00397109 | .00209492 |
| | 1973 Galbraith "A" LTD. Part'p. | .022500 | .00714796 | .00377086 |
| | 1976 Galbraith "I" LTD. Part'p. | .090000 | .02859183 | .01508344 |
| | Jones-O'Brien, Incorporated | .250000 | .07942174 | .04189846 |
| | John T. Palmer | .250000 | .07942174 | .04189846 |
| | Sklar & Phillips Oil Co. | .250000 | .07942174 | .04189846 |
| | | 1.000000 | .31768695 | .16759382 |
| 2 | Mrs. G. M. Anderson | .062500 | .00686127 | .01385416 |
| | H. F. Anderson | .031250 | .00343063 | .00692707 |
| | William G. Anderson | .031250 | .00343063 | .00692707 |
| | Robert P. Evans | .012500 | .00137225 | .00277084 |
| | 1973 Galbraith "A" LTD. Part'p. | .022500 | .00247005 | .00498749 |
| | 1976 Galbraith "I" LTD. Part'p. | .090000 | .00988022 | .01994997 |
| | Jones-O'Brien, Incorporated | .250000 | .02744504 | .05541659 |
| | John T. Palmer | .250000 | .02744504 | .05541659 |
| | Sklar & Phillips Oil Co. | .250000 | .02744504 | .05541659 |
| | | 1.000000 | .10978017 | .22166637 |

EXHIBIT C (continued)

| TRACT NO. | WORKING INTEREST OWNERS | WORKING INTEREST IN TRACT | UNIT PARTICIPATION PHASE I | UNIT PARTICIPATION PHASE II |
|---|---|---|---|---|
| 3 | Mrs. G. M. Anderson | .060742 | .00674561 | .00507766 |
| | H. F. Anderson | .030371 | .00337281 | .00253883 |
| | William G. Anderson | .030371 | .00337281 | .00253883 |
| | Robert P. Evans | .012148 | .00134908 | .00101550 |
| | 1973 Galbraith "A" LTD. Part'p. | .021867 | .00242841 | .00182795 |
| | 1976 Galbraith "I" LTD. Part'p. | .087469 | .00971374 | .00731187 |
| | Ralph Howell | .028125 | .00312338 | .00235108 |
| | Jones-O'Brien, Incorporated | .242969 | .02698256 | .02031071 |
| | John T. Palmer | .242969 | .02698256 | .02031071 |
| | Sklar & Phillips Oil Co. | .242969 | .02698256 | .02031071 |
| | | 1.000000 | .11105352 | .08359385 |
| 4 | Mrs. G. M. Anderson | .041666 | .00597579 | .01172659 |
| | H. F. Anderson | .020834 | .00298803 | .00586357 |
| | William G. Anderson | .020834 | .00298803 | .00586357 |
| | Arcadia Refining Co. | .246100 | .03529588 | .06926297 |
| | James K. Avent | .015620 | .00224023 | .00439613 |
| | Jack R. Brown | .003910 | .00056078 | .00110044 |
| | Robert P. Evans | .008334 | .00119527 | .00234554 |
| | 1973 Galbraith "A" LTD. Part'p. | .011250 | .00161349 | .00316623 |
| | 1976 Galbraith "I" LTD. Part'p. | .063750 | .00914308 | .01794195 |
| | J. D. Guinn | .009996 | .00141929 | .00278515 |
| | Vernon G. Hunt | .015620 | .00224023 | .00439613 |
| | H. Kelly Ireland | .001562 | .00022402 | .00043961 |
| | Jones-O'Brien, Incorporated | .166666 | .02390339 | .04690688 |
| | W. Lasater | .166666 | .02390339 | .04690688 |
| | J. H. Minton | .009996 | .00141929 | .00278515 |
| | John T. Palmer | .166666 | .02390339 | .04690688 |
| | Mrs. Anne Shamburger | .046875 | .00672286 | .01319261 |
| | Sklar & Phillips Oil Co. | .125000 | .01792761 | .03518030 |
| | B. M. Smith | .015625 | .00224095 | .00439754 |
| | | 1.000000 | .14342090 | .28144239 |

43

EXHIBIT C (continued)

| TRACT NO. | WORKING INTEREST OWNERS | WORKING INTEREST IN TRACT | UNIT PARTICIPATION PHASE I | UNIT PARTICIPATION PHASE II |
|---|---|---|---|---|
| 5 | Mrs. G. M. Anderson | .020833 | .00652475 | .00420652 |
| | H. F. Anderson | .010417 | .00326253 | .00210336 |
| | William G. Anderson | .010417 | .00326253 | .00210336 |
| | Arcadia Refining Company | .492187 | .15414963 | .09938057 |
| | James K. Avent | .015625 | .00489364 | .00315494 |
| | Jack R. Brown | .007813 | .00244698 | .00157757 |
| | Robert P. Evans | .004167 | .00130508 | .00084139 |
| | 1976 Galbraith "I" LTD. Part'p. | .037500 | .01174475 | .00757186 |
| | J. Donald Guinn | .019792 | .00619872 | .00399633 |
| | Vernon G. Hunt | .046875 | .01468093 | .00946483 |
| | H. Kelly Ireland | .003125 | .00097873 | .00063099 |
| | Jones-O'Brien, Incorporated | .083333 | .02609933 | .01682629 |
| | F. Wilbert Lasater | .019792 | .00619872 | .00399633 |
| | John H. Minton | .019791 | .00619841 | .00399613 |
| | John T. Palmer | .083333 | .02609933 | .01682629 |
| | Mrs. Anne D. Shamburger | .093750 | .02936196 | .01892965 |
| | B. M. Smith | .031250 | .00978729 | .00630988 |
| | | 1.000000 | .31319321 | .20191629 |

44

EXHIBIT C (continued)

| TRACT NO. | WORKING INTEREST OWNERS | WORKING INTEREST IN TRACT | UNIT PARTICIPATION PHASE I | PHASE II |
|---|---|---|---|---|
| 6 and 8* | Mrs. G. M. Anderson | .020833 | .0009668 | .0087011 |
| | H. F. Anderson | .010417 | .0004834 | .0043508 |
| | William G. Anderson | .010417 | .0004834 | .0043508 |
| | Arcadia Refining Company | .492187 | .0228408 | .2055672 |
| | James K. Avent | .015625 | .0007251 | .0065259 |
| | Jack R. Brown | .007813 | .0003626 | .0032632 |
| | Robert P. Evans | .004167 | .0001934 | .0017404 |
| | 1976 Galbraith "I" LTD Part'p. | .037500 | .0017403 | .0156622 |
| | J. Donald Guinn | .019792 | .0009185 | .0082663 |
| | Vernon G. Hunt | .046875 | .0021753 | .0195778 |
| | H. Kelly Ireland | .003125 | .0001450 | .0013052 |
| | Jones-O'Brien, Incorporated | .083333 | .0038672 | .0348050 |
| | F. Wilbert Lasater | .019792 | .0009185 | .0082663 |
| | John H. Minton | .019791 | .0009184 | .0082659 |
| | John T. Palmer | .083333 | .0038672 | .0348049 |
| | Mrs. Anne D. Shamburger | .093750 | .0043506 | .0391557 |
| | B. M. Smith | .031250 | .0014502 | .0130519 |
| | | 1.000000 | .0464067 | .04176606 |
| 7 | Jones-O'Brien, Inc., et al | 1.000000 | .00006462 | .00058154 |
| 9 | Dale Hipke, et al | 1.000000 | .00015996 | .00143968 |
| | TOTAL | | 1.0000000 | 1.00000000 |

* Combined Tracts 6-1 through 6-44, plus Tract 8, all of which have a common Working Interest Ownership

45

## EXHIBIT C (continued)

### SUMMARY

| WORKING INTEREST OWNER | TRACT NOS. | WORKING INTEREST IN TRACT | UNIT PARTICIPATION BY TRACTS | |
|---|---|---|---|---|
| | | | PHASE I | PHASE II |
| Mrs. G. M. Anderson | 1 | .062500 | .01985541 | .01047460 |
| | 2 | .062500 | .00686127 | .01385416 |
| | 3 | .060742 | .00674561 | .00507766 |
| | 4 | .041666 | .00597579 | .01172659 |
| | 5 | .020833 | .00652475 | .00420652 |
| | 6 & 8 | .020833 | .00009668 | .00087011 |
| | Total | | .04605951 | .04620964 |
| H. F. Anderson | 1 | .031250 | .00992772 | .00523731 |
| | 2 | .031250 | .00343063 | .00692707 |
| | 3 | .030371 | .00337281 | .00253883 |
| | 4 | .020834 | .00298803 | .00586357 |
| | 5 | .010417 | .00026253 | .00210336 |
| | 6 & 8 | .010417 | .00004834 | .00043508 |
| | Total | | .02303006 | .02310522 |
| William G. Anderson | 1 | .031250 | .00992772 | .00523731 |
| | 2 | .031250 | .00343063 | .00692707 |
| | 3 | .030371 | .00337281 | .00253883 |
| | 4 | .020834 | .00298803 | .00586357 |
| | 5 | .010417 | .00326253 | .00210336 |
| | 6 & 8 | .010417 | .00004834 | .00043508 |
| | Total | | .02303006 | .02310522 |
| Arcadia Refining Company | 4 | .246100 | .03529588 | .06926297 |
| | 5 | .492187 | .15411963 | .09938057 |
| | 6 & 8 | .492187 | .02228408 | .02055672 |
| | Total | | .19172959 | .18920026 |
| James K. Avent | 4 | .015620 | .00224023 | .00439613 |
| | 5 | .015625 | .00489364 | .00315494 |
| | 6 & 8 | .015625 | .00007251 | .00065259 |
| | Total | | .00720638 | .00820366 |

46

EXHIBIT C (continued)

| WORKING INTEREST OWNER | TRACT NOS. | WORKING INTEREST IN TRACT | UNIT PARTICIPATION BY TRACTS | |
|---|---|---|---|---|
| | | | PHASE I | PHASE II |
| Jack R. Brown | 4 | .003910 | .0005078 | .0010044 |
| | 5 | .007813 | .0024698 | .0157757 |
| | 6 & 8 | .015625 | .0003626 | .0003632 |
| | Total | | .0304402 | .0300433 |
| Robert P. Evans | 1 | .012500 | .0397109 | .0209492 |
| | 2 | .012500 | .0137225 | .0277084 |
| | 3 | .012148 | .0134908 | .0101550 |
| | 4 | .008334 | .0119527 | .0234554 |
| | 5 | .004167 | .0130508 | .0084139 |
| | 6 & 8 | .004167 | .0001934 | .0017404 |
| | Total | | .0921211 | .0924223 |
| 1973 Galbraith "A" Ltd. Part'p. | 1 | .022500 | .00714796 | .00377086 |
| | 2 | .022500 | .0247005 | .00498749 |
| | 3 | .021867 | .00242841 | .00182795 |
| | 4 | .011250 | .0161349 | .00316623 |
| | Total | | .01365991 | .01375253 |
| 1976 Galbraith "I" Ltd. Part'p. | 1 | .090000 | .02859183 | .01508344 |
| | 2 | .090000 | .00980022 | .01994997 |
| | 3 | .087469 | .00971374 | .00731187 |
| | 4 | .063750 | .00914308 | .01794195 |
| | 5 | .037500 | .01174475 | .00757196 |
| | 6 & 8 | .037500 | .0017403 | .00156622 |
| | Total | | .06924765 | .06942531 |
| J. Donald Guinn | 4 | .009896 | .00141929 | .00278515 |
| | 5 | .01972 | .00198872 | .00399633 |
| | 6 & 8 | .019792 | .0009185 | .0008265 |
| | Total | | .00770986 | .00760811 |
| Ralph Howell | 3 | .028125 | .00312338 | .00235108 |
| | Total | | .00312338 | .00235108 |

47

EXHIBIT C (continued)

| WORKING INTEREST OWNER | TRACT NOS. | WORKING INTEREST IN TRACT | UNIT PARTICIPATION BY TRACTS | |
|---|---|---|---|---|
| | | | PHASE I | PHASE II |
| Vernon G. Hunt | 4 | .015620 | .00224023 | .0043961 |
| | 5 | .046875 | .01468093 | .00946483 |
| | 6 & 8 | .046875 | .00021753 | .00195778 |
| | Total | | .01713869 | .01581874 |
| H. Kelly Ireland | 4 | .001562 | .00022402 | .00043961 |
| | 5 | .003125 | .00097873 | .00063099 |
| | 6 & 8 | .003125 | .00001450 | .00013052 |
| | Total | | .00121725 | .00120112 |
| Jones-O'Brien, Incorporated | 1 | .250000 | .07942174 | .04189846 |
| | 2 | .250000 | .02744504 | .05541659 |
| | 3 | .242969 | .02698256 | .02031071 |
| | 4 | .166666 | .02390339 | .04690688 |
| | 5 | .083333 | .02609933 | .01682629 |
| | 6 & 8 | .083333 | .00038672 | .00348050 |
| | Total | | .18423878 | .18483943 |
| F. Wilbert Lasater | 4 | .009896 | .00141929 | .00278515 |
| | 5 | .019792 | .00619872 | .00399633 |
| | 6 & 8 | .019792 | .00009185 | .00082663 |
| | Total | | .00770986 | .00760811 |
| John H. Minton | 4 | .009896 | .00141929 | .00278515 |
| | 5 | .019791 | .00619841 | .00399613 |
| | 6 & 8 | .019791 | .00009184 | .00082659 |
| | Total | | .00770954 | .00760787 |

48

EXHIBIT C (continued)

| WORKING INTEREST OWNER | TRACT NOS. | WORKING INTEREST IN TRACT | UNIT PARTICIPATION BY TRACTS | |
|---|---|---|---|---|
| | | | PHASE I | PHASE II |
| John T. Palmer | 1 | .250000 | .07942174 | .04189846 |
| | 2 | .250000 | .02744504 | .05541659 |
| | 3 | .242969 | .02698256 | .02031071 |
| | 4 | .166666 | .02390339 | .04690688 |
| | 5 | .083333 | .02609933 | .01682629 |
| | 6 & 8 | .083333 | .00038672 | .00348049 |
| | Total | | .18423878 | .18483942 |
| Mrs. Anne D. Shamburger | 4 | .046875 | .00672286 | .01319261 |
| | 5 | .093750 | .02936186 | .01892965 |
| | 6 & 8 | .093750 | .00043506 | .00391557 |
| | Total | | .03651978 | .03603783 |
| Sklar & Phillips Oil Co. | 1 | .250000 | .07942174 | .04189846 |
| | 2 | .250000 | .02744504 | .05541659 |
| | 3 | .242969 | .02698256 | .02031071 |
| | 4 | .125000 | .01792761 | .03518030 |
| | Total | | .15177695 | .15280606 |
| B. M. Smith | 4 | .015625 | .00224095 | .00439754 |
| | 5 | .031250 | .00978729 | .00630988 |
| | 6 & 8 | .031250 | .00014502 | .00130519 |
| | Total | | .01217326 | .01201261 |
| Jones-O'Brien, Inc., et al | 7 | 1.000000 | .0006462 | .00058154 |
| | Total | | .0006462 | .00058154 |
| Dale Hipke, et al | 9 | 1.000000 | .00015996 | .00143968 |
| | Total | | .00015996 | .00143968 |
| | TOTAL | | 1.00000000 | 1.00000000 |

reached 5/1/85

49

COPAS — 1974
Recommended by the
Council of Petroleum
Accountants Societies of
North America

XEROX 601, TULSA 74101

# EXHIBIT " D "

Attached to and made a part of __Unit Operating Agreement__
_____Bellwood Lake (Paluxy B) Unit_____
_____Bellwood Lake (Paluxy B) Field_____
_____Smith County, Texas_____

(Note: Wherever the work "Joint" is used herein, such use is for accounting
purposes only and ACCOUNTING PROCEDURE shall not be con-
strued as descriptive                          of the legal re-
lationship or otherwise JOINT OPERATIONS    of the Parties
hereto.)

## I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting
Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and
maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint
Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct
supervision of other employees and/or contract labor directly employed on the Joint Property in a field operat-
ing capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other
professional skills, and whose primary function in Joint Operations is the handling of specific operating condi-
tions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual
as most recently recommended by the Council of Petroleum Accountants Societies of North America.

**2. Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the
Joint Account for the preceding month. Such bills will be accompanied by statements which identify the author-
ity for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of in-
vestment and expense except that items of Controllable Material and unusual charges and credits shall be sep-
arately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their
share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing
to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not
made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per
annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint
Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with
the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correct-
ness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any
calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following
the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes
written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall
be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent
adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5. Audits**

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Ope-
rator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month
period following the end of such calendar year; provided, however, the making of an audit shall not extend the
time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this
Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to
conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Opera-
tor. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed
to by the Operator.

**6. Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sec-
tions of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains
no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and
the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Opera-
tors.

50

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First Level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

   D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3. **Employee Benefits**

   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

6. **Services**

   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

7. **Equipment and Facilities Furnished by Operator**

   A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

   B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**

   All fees and expenses of outside council which arise by reason of joint operations such as drilling contracts and other contracts of all kinds, title examination and curative activity, gas and oil sales or other distribution, division orders, unitization agreements, and hearings, and for any other activities relating to the joint property. Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff shall be made unless previously agreed to by the Parties.

51

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

    i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

        ( X ) Fixed Rate Basis, Paragraph 1A, or
        (    ) Percentage Basis, Paragraph 1B.

    Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (  ) shall not ( X ) be covered by the Overhead rates.     whether in the office or the field

**A. Overhead - Fixed Rate Basis**

    (1) Operator shall charge the Joint Account at the following rates per well per month:

        Drilling Well Rate $___3,060.00_____
        Producing Well Rate $___306.00_____

    (2) Application of Overhead - Fixed Rate Basis shall be as follows:

        (a) Drilling Well Rate

            [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

            [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

            [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

        (b) Producing Well Rates

            [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

            [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

            [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

            [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

            [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

    (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

52

2. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent ( %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

_____ Percent ( %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any of or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

**2. Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $_____ :

A. _____ % of total costs if such costs are more than $_____ but less than $_____ ; plus

B. _____ % of total costs in excess of $_____ but less than $1,000,000; plus

C. _____ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

**3. Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1. Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2. Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

(2) Material moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

53

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. Expense of Conducting Periodic Inventories

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

54

EXHIBIT "E"

UNIT OPERATING AGREEMENT
BELLWOOD LAKE (PALUXY B) UNIT
BELLWOOD LAKE (PALUXY B) FIELD
SMITH COUNTY, TEXAS

INSURANCE

A.  WORKMAN'S COMPENSATION - Insurance to fully comply with the laws of the State of Texas

B.  EMPLOYER'S LIABILITY - Insurance with limits of not less than the following:

| | |
|---|---|
| Bodily Injury | $100,000 upon each person |
| | 300,000 each occurrence |
| Property Damage | 100,000 each occurrence |

C.  AUTOMOBILE PUBLIC - Insurance with limits of not less than the following:

| | |
|---|---|
| Bodily Injury | $100,000 per person |
| | 300,000 each occurrence |
| Property Damage | 100,000 each occurrence |

Premiums for such insurance coverage shall be charged to the account of all Working Interest Owners.

55

AMENDMENT TO UNIT OPERATING AGREEMENT
OF THE BELLWOOD LAKE (PALUXY B) UNIT, BELLWOOD
LAKE (PALUXY B) FIELD, SMITH COUNTY,  TEXAS

THIS Agreement made and entered into as of the 19th day
of September, 1979, by and between the parties who have signed
the original of this instrument, a counterpart thereof, or
other instruments agreeing to be bound by the provisions thereof;

WITNESSETH:

WHEREAS, the parties hereto as Working Interest Owners
have executed, as of the date hereof, an agreement entitled
"Unit Operating Agreement, Bellwood Lake Paluxy B Unit, Bellwood
Lake Paluxy B Field, Smith County, Texas" hereinafter referred
to as "Unit Operating Agreement", and

WHEREAS, said Unit Operating Agreement requires amendment
in order to speak the full agreement between the parties, and
this instrument is designed to effect such amendment,

NOW, THEREFORE, in consideration of the mutual agreements
of the parties, said Unit Operating Agreement is hereby amended
and revised in the following particulars:

1.   The following sentence contained in Section 4.2 "MEETINGS"
shall be eliminated and shall no longer be a part of the Unit
Agreement, to-wit:  "Working Interest Owners who attend the
meeting may amend items included in the agenda and may act upon
an amended item or other items presented at the meeting."

2.   The following provision shall be added to Section 7.2
"WORKMANLIKE CONDUCT" as follows, to-wit:  "Unit Operator in

conducting Unit Operations shall, except as may be authorized by vote of Working Interest Owners as provided in Section 4.3 above, follow the following principles in all Unit Operations:

    a.   New downhole equipment only shall be used, and no used or salvaged downhole equipment shall be utilized;

    b.   Water injection necessary to Unit Operations shall be by electrically powered injection equipment;

    c.   Insofar as possible, fulltime unit employees shall perform Unit Operations and the use of contract employee services shall be avoided."

3.   The first sentence of Section 11.2 "BUDGETS" shall be revised to read as follows:  "On or before the first day of each November, Unit Operator shall prepare a budget of estimated Unit Expense for the ensuing calendar year."

4.   The following Section 17.2 shall be added to Article 17 as follows:

"17.2  CONTINUATION AFTER VOTE ON TERMINATION.  In the event a vote shall be taken of the Working Interest Owners on the issue of the termination or continuation of Unit Operations under the Unit Agreement, those Working Interest Owners voting for termination of Unit Operations shall, at the election (made within 15 days after receipt of written notice of the result of said vote) of those Working Interest

-2-

Owners voting against termination of Unit Operations, assign their Working Interest in the Oil and Gas Rights in the Unitized Formation only and in the Unit Equipment, without warranty, to the Working Interest Owners voting to continue Unit Operations in the same manner as hereinabove provided in Article 17.1 of the Unit Operating Agreement with respect to Withdrawal of Working Interest Owner, ('Withdrawal', Unit Operating Agreement,) and Unit Operations in such event shall not terminate, but shall continue until terminated by the remaining Working Interest Owners as authorized by Article 18.2 of the Unit Agreement. The remaining Working Interest Owners hereby specifically agree to assume all responsibility, financial and otherwise, for properly plugging all Unit wells and said remaining Working Interest Owners hereby indemnify and hold harmless said withdrawing Working Interest Owners under this paragraph."

5.   Exhibit E to the Unit Operating Agreement shall be amended in Subsections B. and C. to the following:

"B.   EMPLOYER'S LIABILITY - Insurance with limits of not less than the following:

| | |
|---|---|
| Bodily Injury | $1,000,000 upon each person, 2,500,000 each occurrence |
| Property Damage | 500,000 each occurrence |

C.   AUTOMOBILE PUBLIC - Insurance with limits of not less than the following:

| | |
|---|---|
| Bodily Injury | $1,000,000 per person, 2,500,000 each occurrence |

-3-

Property Damage       $500,000 each occurrence

Except as amended hereby, said Unit Operating Agreement is by these presents adopted, ratified and confirmed.

IN WITNESS WHEREOF the parties hereto have executed this agreement on the day and date evidenced by their certificates of acknowledgment hereof.

WORKING INTEREST OWNERS

ATTEST:                              Jones-O'Brien, Incorporated


_____      By_____


                             _____
                             Mrs. G. M. Anderson


                             _____
                             H. F. Anderson


                             _____
                             William G. Anderson


ATTEST:                      Arcadia Refining Company


_____      By_____


                             _____
                             James K. Avent


-4-

Jack R. Brown
_____

Robert P. Evans
_____

1973 Galbraith "A" Ltd., Partnership

By_____
General Partner

1976 Galbraith "I" Ltd., Partnership

By_____
    General Partner

_____
J. Donald Guinn

_____
Ralph Howell

_____
Vernon G. Hunt

_____
H. Kelly Ireland

_____
F. Wilbert Lasater

-5-

John H. Minton
_____

John T. Palmer
_____

Mrs. Anne D. Shamburger
_____

ATTEST:                          Sklar & Phillips Oil Company

_____          By_____

                                 _____
                                 B. M. Smith

                                 _____
                                 Dale Hipke

-6-

THE STATE OF LOUISIANA    §  
                        §  
PARISH OF CADDO         §

     BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Jones-O'Brien, Inc., a corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19___.

MY COMMISSION EXPIRES:

_____     _____  
                           Notary Public in and for  
                           Caddo Parish, Louisiana

THE STATE OF TEXAS      §  
                       §  
COUNTY OF            §

     BEFORE ME, the undersigned authority, on this day personally appeared Mrs. G. M. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that she executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____     _____  
                           Notary Public in and for  
                              County, Texas

THE STATE OF TEXAS      §  
                       §  
COUNTY OF            §

     BEFORE ME, the undersigned authority, on this day personally appeared H. F. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____     _____  
                           Notary Public in and for  
                              County, Texas

-7-

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared William G. Anderson, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____              County, Texas

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Arcadia Refining Company, corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____              County, Texas

THE STATE OF TEXAS          §
                            §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared James K. Avent, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:          _____
                                Notary Public in and for
_____              County, Texas

-8-

THE STATE OF TEXAS     §
                      §
COUNTY OF            §

    BEFORE ME, the undersigned authority, on this day personally appeared Jack R. Brown, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                                   Notary Public in and for
_____                 County, Texas

THE STATE OF TEXAS     §
                      §
COUNTY OF            §

    BEFORE ME, the undersigned authority, on this day personally appeared Robert P. Evans, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                                   Notary Public in and for
_____                 County, Texas

THE STATE OF TEXAS     §
                      §
COUNTY OF            §

    BEFORE ME, the undersigned authority, on this day personally appeared _____, a member of the partnership of 1973 Galbraith "A" Ltd., Partnership, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that the same was the act of the said 1973 Galbraith "A" Ltd., Partnership, a limited partnership, and that he executed the same as its General Partner and as the act of such partnership for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                                   Notary Public in and for
_____                 County, Texas

-9-

THE STATE OF TEXAS     §
                            §
COUNTY OF             §

    BEFORE ME, the undersigned authority, on this day personally appeared _____, a member of the partnership of 1976 Galbraith "I" Ltd., Partnership, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that the same was the act of the said 1976 Galbraith "I" Ltd., Partnership, a limited partnership, and that he executed the same as its General Partner and as the act of such partnership for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                                       Notary Public in and for
_____                   County, Texas

---

THE STATE OF TEXAS     §
                            §
COUNTY OF             §

    BEFORE ME, the undersigned authority, on this day personally appeared J. Donald Guinn, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                                       Notary Public in and for
_____                   County, Texas

---

THE STATE OF TEXAS     §
                            §
COUNTY OF             §

    BEFORE ME, the undersigned authority, on this day personally appeared Ralph Howell, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

                                       Notary Public in and for
_____                   County, Texas

-10-

THE STATE OF TEXAS §
§
COUNTY OF §

BEFORE ME, the undersigned authority, on this day personally appeared Vernon G. Hunt, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                              Notary Public in and for
_____                County, Texas

THE STATE OF TEXAS §
§
COUNTY OF §

BEFORE ME, the undersigned authority, on this day personally appeared H. Kelly Ireland, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                              Notary Public in and for
_____                County, Texas

THE STATE OF TEXAS §
§
COUNTY OF §

BEFORE ME, the undersigned authority, on this day personally appeared F. Wilbert Lasater, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____        _____
                              Notary Public in and for
_____                County, Texas

-11-

THE STATE OF TEXAS      §
                                §
COUNTY OF               §

     BEFORE ME, the undersigned authority, on this day personally appeared John H. Minton, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:         _____

_____       Notary Public in and for
                                   County, Texas


THE STATE OF TEXAS      §
                                §
COUNTY OF               §

     BEFORE ME, the undersigned authority, on this day personally appeared John T. Palmer, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:         _____

_____       Notary Public in and for
                                   County, Texas


THE STATE OF TEXAS      §
                                §
COUNTY OF               §

     BEFORE ME, the undersigned authority, on this day personally appeared Mrs. Anne D. Shamburger, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that she executed same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:         _____

_____       Notary Public in and for
                                   County, Texas

-12-

THE STATE OF TEXAS      §
                           §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of Sklar & Phillips Oil Company, a corporation, known to me to be the person and officer whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same on behalf of said corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____       _____
                                     Notary Public in and for
_____                         County, Texas


THE STATE OF TEXAS      §
                           §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared B. M. Smith, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____       _____
                                     Notary Public in and for
_____                         County, Texas


THE STATE OF TEXAS      §
                           §
COUNTY OF                   §

BEFORE ME, the undersigned authority, on this day personally appeared Dale Hipke, known to me to be the person whose name is subscribed to the above and foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 19____.

MY COMMISSION EXPIRES:

_____       _____
                                     Notary Public in and for
_____                         County, Texas

-13-