# UNIT AGREEMENT
# PETTIT ZONE UNIT

## BLACK LAKE FIELD
## NATCHITOCHES PH. LOUISIANA

UNIT AGREEMENT

PETTIT ZONE UNIT

BLACK LAKE FIELD

NATCHITOCHES PARISH, LOUISIANA

## TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| | Preliminary Recitals | 1 |

### ARTICLE 1
### DEFINITIONS

| Section | | Page |
|---|---|---|
| 1.1 | Unit Area | 1 |
| 1.2 | Unitized Interval | 1 |
| 1.3 | Unitized Substances | 1 |
| 1.4 | Working Interest | 1 |
| 1.5 | Royalty Interest | 1 |
| 1.6 | Royalty Owner | 1 |
| 1.7 | Working Interest Owner | 2 |
| 1.8 | Tract | 2 |
| 1.9 | Unit Operating Agreement | 2 |
| 1.10 | Unit Operator | 2 |
| 1.11 | Tract Participation | 2 |
| 1.12 | Unit Participation | 2 |
| 1.13 | Outside Substances | 2 |
| 1.14 | Oil and Gas Rights | 2 |
| 1.15 | Unit Operations | 2 |
| 1.16 | Unit Equipment | 2 |
| 1.17 | Unit Expense | 3 |
| 1.18 | Adjusted Acre-Feet | 3 |
| 1.19 | Cycling Plant | 3 |
| 1.20 | Liquid Products | 3 |
| 1.21 | Residue Gas | 3 |
| 1.22 | | 3 |

### ARTICLE 2
### EXHIBITS

| Section | | Page |
|---|---|---|
| 2.1 | Exhibits | 3 |
| 2.2 | Reference to Exhibits | 4 |
| 2.3 | Exhibits Considered Correct | 4 |
| 2.4 | Correcting Errors | 4 |
| 2.5 | Filing Revised Exhibits | 4 |

### ARTICLE 3
### CREATION AND EFFECT OF UNIT

| Section | | Page |
|---|---|---|
| 3.1 | Oil and Gas Rights Unitized | 4 |
| 3.2 | Reservation Agreement | 4 |
| 3.3 | Personal Property Excepted | 4 |
| 3.4 | Amendment of Leases and Other Agreements | 5 |
| 3.5 | Ratification of Leases and Other Agreements | 5 |
| 3.6 | Continuation of Leases and Term Royalties | 5 |
| 3.7 | Title Unaffected by Unitization | 5 |

| Section | | Page |
|---|---|---|
| 3.8 | Injection Rights | 5 |
| 3.9 | Development Obligation | 5 |

ARTICLE 4
PLAN OF OPERATIONS

| 4.1 | Unit Operator | 5 |
| 4.2 | Operating Methods | 5 |
| 4.3 | Change of Operating Methods | 6 |

ARTICLE 5
TRACT PARTICIPATION

| 5.1 | Tract Participation | 6 |
| 5.2 | Revision of Tract Participation | 6 |
| 5.3 | No Retroactive Allocation | 7 |
| 5.4 | Effective Date | 7 |

ARTICLE 6
ALLOCATION OF UNITIZED SUBSTANCES

| 6.1 | Allocation to Tracts | 7 |
| 6.2 | Distribution Within Tracts | 7 |
| 6.3 | Taking Unitized Substances in Kind | 7 |
| 6.4 | Failure to Take in Kind | 7 |
| 6.5 | Royalty Settlements | 8 |
| 6.6 | Responsibility for Royalty Settlements | 8 |
| 6.7 | Outside Substances | 8 |

ARTICLE 7
PRODUCTION AS OF THE EFFECTIVE DATE

| 7.1 | Oil in Lease Tanks | 8 |
| 7.2 | Overproduction | 9 |

ARTICLE 8
USE OR LOSS OF UNITIZED SUBSTANCES

| 8.1 | Use of Unitized Substances | 9 |
| 8.2 | Royalty Payments | 10 |

ARTICLE 9
CYCLING PLANT AND PRESSURE REGULATION SYSTEM

| 9.1 | Construction of Cycling Plant and Pressure Regulation System | 10 |
| 9.2 | Residue Gas | 10 |
| 9.3 | Commingling and Processing Rights | 10 |
| 9.4 | Abandonment of Cycling Plant | 11 |

ARTICLE 10
TITLES

| 10.1 | Production Where Title is in Dispute | 11 |
| 10.2 | Payment of Taxes to Protect Title | 11 |

Section | Page

ARTICLE 11
EASEMENTS OR USE OF SURFACE

| | | |
|---|---|---|
| 11.1 | Grant of Easements | 12 |
| 11.2 | Use of Water | 12 |
| 11.3 | Surface Damages | 12 |

ARTICLE 12
ENLARGEMENTS OF UNIT AREA

| | | |
|---|---|---|
| 12.1 | Enlargements of Unit Area | 12 |
| 12.2 | Determination of Tract Participation | 12 |
| 12.3 | Effective Date | 12 |

ARTICLE 13
CHANGE OF TITLE

| | | |
|---|---|---|
| 13.1 | Covenant Running With The Land | 13 |
| 13.2 | Notice of Transfer | 13 |
| 13.3 | Waiver of Rights to Partition | 13 |

ARTICLE 14
RELATIONSHIP OF PARTIES

| | | |
|---|---|---|
| 14.1 | No Partnership | 13 |
| 14.2 | No Sharing of Market | 13 |
| 14.3 | Royalty Owners Free of Cost | 13 |
| 14.4 | Information to Royalty Owners | 13 |

ARTICLE 15
LAWS AND REGULATIONS

| | | |
|---|---|---|
| 15.1 | Laws and Regulations | 13 |

ARTICLE 16
FORCE MAJEURE

| | | |
|---|---|---|
| 16.1 | Force Majeure | 14 |

ARTICLE 17
EFFECTIVE DATE

| | | |
|---|---|---|
| 17.1 | Effective Date | 14 |
| 17.2 | Certificate of Effectiveness | 14 |

ARTICLE 18
TERM

| | | |
|---|---|---|
| 18.1 | Term | 14 |
| 18.2 | Termination by Working Interest Owners | 14 |
| 18.3 | Effect of Termination | 15 |
| 18.4 | Salvaging Equipment Upon Termination | 15 |
| 18.5 | Certificate of Termination | 15 |

| Section | | Page |
|---|---|---|
| | **ARTICLE 19**<br>**EXECUTION** | |
| 19.1 | Original, Counterpart, or Other Instrument | 15 |
| | **ARTICLE 20**<br>**GENERAL** | |
| 20.1 | Amendments Affecting Working Interest Owners | 15 |
| 20.2 | Action by Working Interest Owners | 15 |
| 20.3 | Lien of Unit Operator | 15 |
| | Exhibit "A" | |
| | Exhibit "B" | |
| | Exhibit "C" | |
| | Exhibit "D" | |

UNIT AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA


THIS AGREEMENT, entered into as of the 25th day of October, 1965, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof;

WITNESSETH:

WHEREAS, for the purpose of more efficiently developing, producing and operating the Black Lake Field in Natchitoches Parish, Louisiana, and in order to prevent surface and underground waste, to obtain the greatest ultimate recovery of Unitized Substances (as hereinafter defined), to promote maximum conservation, and to insure to each of the parties to this agreement its fair and equitable share of the Unitized Substances recovered, it is deemed in the best interest of the parties hereto and of the public, that the Oil and Gas Rights (as hereinafter defined) be unitized, and that the Pettit Zone of the Sligo Formation in the Black Lake Field be developed and operated as a single unit, to the extent hereinafter provided;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, it is agreed as follows:

ARTICLE 1
DEFINITIONS

As used in this agreement, the terms herein contained shall have the following meaning:

1.1    Unit Area means those lands underlain by the Unitized Interval (as hereinafter defined) situated within the Black Lake Field, Natchitoches Parish, Louisiana, outlined on Exhibit "B" hereto.

1.2    Unitized Interval shall mean the Pettit Zone of the Sligo Formation in the Black Lake Field, Natchitoches Parish, Louisiana, as defined in Order No. 686 of the Commissioner of Conservation of the State of Louisiana, dated January 27, 1965, as being that zone occurring in the electric log depth interval of 7,810 feet to 8,060 feet in the Placid Oil Company-Edenborn No. 3, located in Section 11, Township 11 North, Range 6 West, Natchitoches Parish, Louisiana.

1.3    Unitized Substances means all oil, gas, gaseous substances, sulphur contained in gas, condensate, distillate, and all associated and constituent liquid or liquefiable hydrocarbons within or produced from the Unitized Interval, except Outside Substances.

1.4    Working Interest means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, including a carried interest, which interest is chargeable with and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, developing, producing, and operating the Unitized Interval. Any interest in Unitized Substances which is a Working Interest as of the date the owner thereof executes or ratifies this agreement shall thereafter be treated as a Working Interest for all purposes of this agreement and the unit operating agreement.

1.5    Royalty Interest means a right to or interest in any portion of the Unitized Substances or proceeds thereof other than a Working Interest.

1.6    Royalty Owner means a party hereto who owns a Royalty Interest.

1.7    Working Interest Owner means a party hereto who owns a Working Interest. The owner of oil and gas rights that are free of lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest Owner to the extent of seven-eights (7/8ths) of his interest in Unitized Substances, and as a Royalty Owner with respect to his remaining one-eighth (1/8th) interest therein.

1.8    Tract shall mean a parcel of land within the Unit Area with respect to which the Working Interest Owners' ownership, as well as the Royalty Owners' ownership, is the same throughout such parcel. Where only a part of the land covered by any lease, assignment or conveyance subject to this agreement is within the Unit Area, only such part within the Unit Area shall be considered as a Tract. Such Tracts as so presently defined and established are described and given a Tract number in Exhibit "A" and delineated on Exhibit "B"

1.9    Unit Operating Agreement means the agreement entitled "Unit Operating Agreement, Pettit Zone Unit, Black Lake Field, Natchitoches Parish, Louisiana," of the same effective date as the effective date of this agreement and which is entered into by Working Interest Owners.

1.10    Unit Operator means the Working Interest Owner designated by Working Interest Owners under the Unit Operating Agreement to develop and operate the Unitized Interval, acting as operator and not as a Working Interest Owner.

1.11    Tract Participation means the percentage shown on Exhibit "C" for allocating Unitized Substances to a Tract under this agreement.

1.12    Unit Participation of each Working Interest Owner means the sum of the percentages obtained by multiplying the Working Interest of such Working Interest Owner in each Tract by the Tract Participation of such Tract.

1.13    Outside Substances means all substances obtained from any source other than the Unitized Interval and which are injected into the Unitized Interval.

1.14    Oil and Gas Rights means the right to explore, develop, and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.15    Unit Operations means all operations conducted by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of the development and operation of the Unitized Interval for the production of Unitized Substances.

1.16    Unit Equipment means all personal property, lease and well equipment, plants, and other facilities and equipment taken over or otherwise acquired for the joint account for use in Unit Operations.

- 2 -

1.17    Unit Expense means all cost, expense, or indebtedness incurred by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of Unit Operations.

1.18    Adjusted Acre-Feet shall mean the acre-feet of effective pore space in the Unitized Interval as determined by the Working Interest Owners and adjusted on the basis that the total value of Unitized Substances ultimately recoverable per acre foot from the oil productive portion of the Unitized Interval is equivalent to 1.35427 times the total value of Unitized Substances ultimately recoverable per acre foot of the gas cap portion of the Unitized Interval, as calculated pursuant to the provisions of Exhibit "D".

1.19    Cycling Plant shall mean the system of vessels, interconnecting pipes, heaters, condensers, machinery and absorption, distillation and fractionation equipment which, by adjustment of temperatures and pressures, is capable of separating Liquid Products (as hereinafter defined) and Residue Gas (as hereinafter defined) from Unitized Substances, together with compressors, gathering and injection lines and related equipment capable of returning all or any portion of the Unitized Substances to the Unitized Interval, but excluding the injection wells.

1.20    Liquid Products shall mean liquid products normally removed at natural gasoline and cycling plants by separation or absorption, and not products normally manufactured as a result of refining or chemical operations. Liquid Products, for the purpose of this definition, may include ethane, propane, butanes, natural gasoline, or any mixture of them, as may from time to time be designated by the Working Interest Owners, but shall not include oil.

1.21    Residue Gas shall mean the gaseous portion of the Unitized Substances remaining after the recovery of Liquid Products therefrom.

1.22    Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender include the masculine and the feminine.

ARTICLE 2
EXHIBITS

2.1    Exhibits.    Attached hereto are the following exhibits which are incorporated herein by reference.

2.1.1    Exhibit "A" - which is a schedule that lists and describes each Tract in the Unit Area.

2.1.2    Exhibit "B" - which is a map that shows the boundary lines of the Unit Area and the Tracts therein, which map is based on the official United States Government Surveys.

2.1.3    Exhibit "C" - which is a schedule that lists each Tract in the Unit Area and shows its Adjusted Acre-Feet and Tract Participation.

2.1.4    Exhibit "D" - which is the method by which the Adjusted Acre-Feet of net productive pay in the Unitized Interval has been and will be calculated.

- 3 -

2.2   Reference to Exhibits.   When reference herein is made to an exhibit, the reference is to the Exhibit as originally attached or, if revised, to the latest revision.

2.3   Exhibits Considered Correct.   An exhibit shall be considered to be correct until revised as herein provided.

2.4   Correcting Errors.   The shapes and descriptions of the respective Tracts have been established by using the best information available. If it subsequently appears that any Tract, because of diverse royalty or working interest ownership on the effective date hereof, should be divided into more than one Tract, or that any mechanical miscalculation has been made, Unit Operator, with the approval of the Working Interest Owners, may correct the mistake by revising the exhibits to conform to the facts. The revision shall not include any re-evaluation of engineering or geological interpretations used in determining Tract Participation. Each such revision of an exhibit shall be effective at 7:00 A.M. on the first day of the calendar month next following the filing for record of the revised exhibit or on such other date as may be determined by Working Interest Owners and set forth in the revised exhibit.

2.5   Filing Revised Exhibits.   If an exhibit is revised pursuant to this agreement, Unit Operator shall certify and file the revised exhibit for record in Natchitoches Parish, Louisiana.

ARTICLE 3
CREATION AND EFFECT OF UNIT

3.1   Oil and Gas Rights Unitized.   Subject to the provisions of this agreement, all Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibit "A" and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized insofar as the respective Oil and Gas Rights pertain to the Unitized Interval, so that operations may be conducted as if the Unitized Interval had been included in a single lease executed by all Royalty Owners, as Lessors, in favor of all Working Interest Owners, as Lessees, and as if the lease had been subject to all of the provisions of this agreement.

3.2   Reservation Agreement.   Notwithstanding any other provisions of this agreement to the contrary, there are certain reservations of production which are excepted from the provisions and effects of this agreement as evidenced by a separate agreement styled "Reservation Agreement", executed by Working Interest Owners. It is further understood and agreed, however, that the rights and interest of Royalty Owners, as set out herein, shall in no manner be affected or altered by such reservations and exceptions by Working Interest Owners or by the provisions and terms of said agreement with regard to reservation of production.

3.3   Personal Property Excepted.   All lease and well equipment, materials and other facilities heretofore or hereafter placed by any of the Working Interest Owners on the lands covered hereby shall be deemed to be and shall remain personal property belonging to and may be removed by the Working Interest Owners and are hereby excepted from the provisions of this agreement. The rights and interests therein as among Working Interest Owners are covered by the Unit Operating Agreement.

- 4 -

3.4     Amendment of Leases and Other Agreements.   The provisions
of the various leases, agreements, division and transfer orders, or other
instruments covering the respective Tracts or the production therefrom, are
amended to the extent necessary to make them conform to the provisions of
this agreement, but otherwise shall remain in effect.

3.5     Ratification of Leases and Other Agreements.   The various
leases, agreements or other instruments covering the respective Tracts are
hereby ratified, confirmed and adopted.

3.6     Continuation of Leases and Term Royalties.   Operations,
including drilling operations, conducted with respect to the Unitized Interval
on any part of the Unit Area, or production from any part of the Unitized
Interval, except for the purpose of determining payments to Royalty Owners,
shall be considered as operations upon or production from each Tract, and
such operations or production shall continue in effect each lease or term
royalty interest as to all lands covered thereby just as if such operation
had been conducted and a well had been drilled on and was producing from
each Tract.

3.7     Title Unaffected by Unitization.   Nothing herein shall be
construed to result in the transfer of title to the Oil and Gas Rights by any
party hereto to any other party or to Unit Operator.   The intention is to provide
for the co-operative development and operation of the Tracts and for the
sharing of Unitized Substances as herein provided.

3.8     Injection Rights.   Subject to the approval of the Commissioner of
Conservation, Royalty Owners hereby grant unto Working Interest Owners
the right to inject into the Unitized Interval any substances in whatever amounts
Working Interest Owners deem expedient for Unit Operations, including the
right to drill and maintain injection wells on the Unit Area and to use producing
or abandoned oil or gas wells for such purposes.

3.9     Development Obligation.   Nothing herein shall relieve
Working Interest Owners from the obligation to develop reasonably as a whole
the lands and leases committed hereto.

ARTICLE 4
PLAN OF OPERATIONS

4.1     Unit Operator.   Working Interest Owners are, as of the
effective date of this agreement, entering into the Unit Operating Agreement
designating Placid Oil Company as Unit Operator.   Unit Operator shall have
the exclusive right to conduct Unit Operations.   The operations shall conform
to the provisions of this agreement and the Unit Operating Agreement.   If
there is any conflict between such agreements, this agreement shall govern.

4.2     Operating Methods.   To the end that the quantity of Unitized
Substances ultimately recoverable may be increased and waste prevented,
Working Interest Owners shall, with diligence and in accordance with good
engineering and production practices, engage in the following method of
operation: As soon as practicable after the effective date hereof, the Work-
ing Interest Owners shall make necessary arrangements for commencement
of pressure maintenance, cycling or secondary recovery operations in the
Unitized Interval and the use or construction of necessary plants and facilities
therefor, in order that such operations may be initiated within a reasonable
time after such facilities are ready for operation.

- 5 -

4.3   Change of Operating Methods.   Nothing herein shall prevent
Working Interest Owners from discontinuing or changing in whole or in part
any method of operations which, in their opinion, is no longer in accord with
good engineering or production practices.   Other methods of operation may
be conducted or changes may be made by Working Interest Owners from time
to time if determined by them to be feasible, necessary, or desirable to
increase the ultimate recovery of Unitized Substances.   Working Interest
Owners shall not discontinue or substantially change any method of operation,
or conduct other methods of operation without obtaining the approval of the
Commissioner of Conservation.

## ARTICLE 5
## TRACT PARTICIPATION

5.1   Tract Participation.   The Tract Participation for each Tract
is based on the proportion expressed as a percentage that the Adjusted Acre-
Feet underlying the Tract bears to the Total Adjusted Acre-Feet underlying
the Unit Area as same have been calculated in accordance with Exhibit "D".
Exhibit "C" sets out for each Tract the number of Adjusted Acre-Feet of
net productive pay underlying each Tract and its Tract Participation which
is the initial determination of Tract Participation for each Tract and is
subject to revision as provided in this Agreement.   The initial determination
of Tract Participation so set out in Exhibit "C" is hereby accepted and
approved by the parties hereto as being correct, fair and equitable.

5.2   Revision of Tract Participation.   It is recognized that the
Working Interest Owners contemplate the drilling of additional wells on the
Unit Area  to the Unitized Interval subsequent to the effective date of this
agreement and that additional geological information obtained as a result
of drilling into, or through, the Unitized Interval, or in drilling in close
proximity to the Unit Area, may indicate that the acre-feet of net productive
pay in the Unitized Interval underlying the various Tracts to differ in some
degree from conditions now considered to exist.   Therefore, in order to
insure that the correct Tract Participation is assigned to each Tract, based
upon the best possible information available, the Working Interest Owners
shall, immediately upon completion of the drilling of such additional wells,
but in any event no later than one (1) year from the effective date of this
agreement, redetermine the acre-feet of Unitized Interval productive of
gas and the acre-feet of the Unitized Interval productive of oil, using all
information available at such time.   Based upon such redetermination of
acre-feet the Adjusted Acre-Feet shall be recalculated in accordance with
Exhibit "D" (using the ratio stated in Section 1.18 of this Agreement) and
revised Tract Participations shall be made accordingly.   If information
developed by additional drilling on the Unit Area to the Unitized Interval or
in the immediate vicinity thereof subsequent to the revision of Tract Partici-
pations provided for hereinabove, causes such action to be necessary or
required, Working Interest Owners may and are hereby authorized to revise
Tract Participations accordingly, in the same manner and subject to the
same conditions applicable to the first revision of Tract Participations.
The size and shape of the Tracts and Unit Area may also be revised or
altered to the extent necessary or required in order to conform to any
revision or revisions of Tract Participations which may be accomplished
pursuant hereto.   Such revised Tract Participations shall be subject to the
approval of the Commissioner of Conservation, after public hearing called
for that purpose.

- 6 -

5.3    **No Retroactive Allocation.**   There shall be no retroactive allocation or adjustment of Unit Expense or of interests in the Unitized Substances produced or proceeds thereof, by reason of any such revision of Tract Participations; provided, however, this limitation shall not prevent an adjustment of investment by reason of any such revision of Tract Participations.

5.4    **Effective Date.**   The effective date of any such revision shall be as specified in the order or orders of the Commissioner of Conservation applicable to any such revision.   Within thirty (30) days after the effective date of any such revision, Unit Operator shall cause to be prepared and filed in the records of Natchitoches Parish, Louisiana, such revised Exhibits "A", "B", and "C" as may be necessary.

## ARTICLE 6
### ALLOCATION OF UNITIZED SUBSTANCES

6.1    **Allocation to Tracts.**   All Unitized Substances produced, saved and marketed shall be allocated to the several Tracts in accordance with the respective Tract Participations effective hereunder as set forth in Exhibit "C".   The amount of Unitized Substances allocated to each Tract, regardless of whether it is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract.

6.2    **Distribution Within Tracts.**   The Unitized Substances allocated to each Tract shall be distributed among, or accounted for, to the parties entitled to share in the production from such Tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such Tract, or in the proceeds thereof, had this agreement not been entered into, and with the same legal effect.   If any Oil and Gas Rights in a Tract hereafter become divided and owned in severalty as to different parts of the Tract, the owners of the divided interests, in the absence of an agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract, or in the proceeds thereof, in proportion to the surface acreage of their respective part of the Tract.

6.3    **Taking Unitized Substances in Kind.**   The Unitized Substances allocated in each Tract shall be delivered in kind to the respective parties entitled thereto by virtue of the ownership of Oil and Gas Rights therein or by purchase from such owners.   Such parties shall have the right to construct, maintain, and operate within the Unit Area all necessary facilities for that purpose, provided that they are so constructed, maintained, and operated as not to interfere with Unit Operations.   Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of the Unitized Substances shall be borne by the receiving party.   If a Royalty Owner has the right to take in kind a share of Unitized Substances and fails to do so, the Working Interest Owner whose Working Interest is subject to such Royalty Interest shall be entitled to take in kind such share of the Unitized Substances.

6.4    **Failure to Take in Kind.**   If any party fails to take in kind or separately dispose of its share of Unitized Substances, Unit Operator shall have the right, for the time being and subject to revocation at will by the party owning the share, to purchase for its own account or sell to others such share; provided, that, all contracts of sale by Unit Operator, of any other partys'

- 7 -

share of Unitized Substances, shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any such contract be for a period in excess of one year. The proceeds of the Unitized Substances so disposed of by Unit Operator shall be paid to the Working Interest Owner entitled to take in kind such share and such Working Interest Owner shall pay such · proceeds to the parties entitled thereto. Notwithstanding the foregoing, Unit Operator shall not make a sale into interstate commerce of any Working Interest Owner's share of gas production without first giving such other party sixty (60) days notice of such intended sale.

      6.5   <u>Royalty Settlements.</u>  Royalties, overriding royalties and similar payments out of production, payable to Royalty Owners shall be paid on the basis set forth in the leases and other agreements covering the Tract in which each Royalty Owner owns an interest and such royalties and other payments shall be paid and satisfied out of the proceeds of the Unitized Substances allocated to such Tract; provided, however, that for the purpose of computing payment of Royalty Interests on Unitized Substances. produced from the Unitized Interval, the proceeds derived from the sale of such Unitized Substances shall be deemed to be the price received therefor if sold at the Unit Area, or the fair market value thereof at the Unit Area if used off the Unit Area or sold elsewhere than at the Unit Area. Before settlement, deduction shall be made for production, severance, sales, processing, transportation and all other direct taxes which may be applicable to the Unitized Substances. The quantity and quality of Unitized Substances produced, saved and marketed from the Unitized Interval shall be determined in accordance with recognized methods accepted in the industry and approved by the Commissioner of Conservation.

      6.6   <u>Responsibility for Royalty Settlements.</u>  Any party receiving in kind or separately disposing of all or part of the Unitized Substances allocated to any Tract or receiving the proceeds therefrom shall be responsible for the payment thereof to the persons entitled thereto, and shall indemnify all parties hereto, including Unit Operator, against any liability for all royalties, over-riding royalties, production payments, and all other payments chargeable against, or payable out of, such Unitized Substances or the proceeds therefrom.

      6.7   <u>Outside Substances.</u>  In the event Outside Substances are in-jected into the Unitized Interval, no royalties, overriding royalties, or other payments shall be due and payable to the Royalty Owners on such Outside Substances when the same are produced from said Unitized Interval and used or sold. In the event such Outside Substances, when produced from the Unitized Interval, cannot be distinguished from the Unitized Substances produced from such Unitized Interval, then until such time as the volume of such Outside Substances produced and used or sold from such Unitized Interval equals the total volume of such Outside Substances theretofore injected, the Working Interest Owners shall receive, without the obligation to pay royalties, over-riding royalties, or the like, 50% of the substances produced from such Unitized Interval comparable in nature to the Outside Substances.

ARTICLE 7
PRODUCTION AS OF THE EFFECTIVE DATE

      7.1   <u>Oil in Lease Tanks.</u>  Unit Operator shall ascertain the amount of merchantable oil produced from the Unitized Interval as of 7:00 A.M. on

- 8 -

the effective date hereof. The oil that is a part of the prior allowable of
the wells from which it was produced shall remain the property of the
parties entitled thereto the same as if the Unit had not been formed. Any
such oil not promptly removed may be sold by the Unit Operator for the
account of the parties entitled thereto, subject to the payment of all
royalties, overriding royalties, production payments, and all other pay-
ments under the provisions of the applicable lease or other contracts. The
oil that is in excess of the prior allowable of the wells from which it was
produced shall be regarded as Unitized Substances produced after the
effective date hereof.

7.2   Overproduction.   If, as of the effective date hereof, any
Tract is overproduced with respect to the allowable of the wells on that Tract
and the amount of overproduction has been sold, or otherwise disposed of,
such overproduction shall be regarded as a part of the Unitized Substances
produced after the effective date hereof and shall be charged to such Tract
as having been delivered to the parties entitled to Unitized Substances allocated
to such Tract.

ARTICLE 8
USE OR LOSS OF UNITIZED SUBSTANCES

8.1   Use of Unitized Substances.   Working Interest Owners may
use as much of the Unitized Substances as they deem necessary for Unit
Operations, including but not limited to, the injection thereof into the Unitized
Interval, and the operation of the Cycling Plant. It is recognized that certain
amounts of Unitized Substances will be consumed as fuel and shrinkage and
otherwise lost in the cycling operations authorized herein and that Working
Interest Owners may need to acquire or purchase gas, hereinafter called
"make-up gas", from a gas transmission company to inject into the Unitized
Interval for the purpose of maintaining pressures therein. It is contemplated
by the Working Interest Owners that the acquisition or purchase of such make-
up gas will be on an interruptible basis due to the seasonal demands of the gas
transmission company's customers as well as the unavailability of certain
portions of its usual sources of gas at certain times due to natural phenomenon
and other reasons, and that from time to time the gas transmission company
will need to temporarily supplement its gas supply with gas, hereinafter called
"supplementary gas", produced from the Unitized Interval, subject to the
obligation to return to the Working Interest Owners a like quantity and quality
of gas hereinafter called "replacement gas", for injection into the Unitized
Interval by the Working Interest Owners. It is therefore understood and agreed
that, in consideration of the acquisition or purchase of make-up gas by Working
Interest Owners from a gas transmission company, the Working Interest Owners
shall be and are hereby authorized to make available to the gas transmission
company furnishing such make-up gas, supplementary gas from the Unitized
Interval in order to supplement the temporary gas supply requirements of the
gas transmission company, provided, however, that in no event shall the
Working Interest Owners permit the delivery of such supplementary gas to have
or cause a detrimental effect on the Unit Operations contemplated herein. In
such event Working Interest Owners shall meter and keep accurate records
of the amount of supplementary gas delivered to the gas transmission company
from the Unitized Interval and the amount of replacement gas returned by the
gas transmission company to the Working Interest Owners and injected into
the Unitized Interval. The Working Interest Owners shall be and are hereby
authorized to furnish such supplementary gas to the gas transmission company

- 9 -

as long as the cycling operations authorized herein are being carried out;
provided, however, that the Working Interest Owners shall endeavor at
all times to keep in balance and equalize the quantities of supplementary
gas delivered to the gas transmission company and the quantities of replace-
ment gas returned to the Working Interest Owners, and that within one (1)
year following completion of said cycling operations the quantities of
supplementary gas delivered to the gas transmission company and the
quantities of replacement gas returned to the Working Interest Owners
shall be completely balanced and equalized. No royalty, overriding
royalty, production, or other payments shall be payable upon, or with
respect to, the supplementary gas delivered to the gas transmission com-
pany, anything to the contrary contained in this agreement, notwithstanding.
For the purposes of Article 6.7 hereof, such supplementary gas and replace-
ment gas shall not be deemed to be Outside Substances.

      8.2    Royalty Payments. No royalty, overriding royalty, production,
or other payments shall be payable upon, or with respect to, Unitized Sub-
stances used or consumed in Unit Operations, or injected into the Unitized
Interval, or which otherwise may be lost or consumed in the production,
handling, treating, transportation, or storing of Unitized Substances.

ARTICLE 9
CYCLING PLANT AND PRESSURE REGULATION SYSTEM

      9.1    Construction of Cycling Plant and Pressure Regulation System.
The Working Interest Owners agree to commence, or cause to be commenced,
through the Unit Operator, after the effective date of this agreement, and as
soon thereafter as necessary materials are available, the construction of a
Cycling Plant and pressure regulation system for the extraction and recovery
of Liquid Products from Unitized Substances and injecting the Residue Gas
back into the Unitized Interval for the purpose of maintaining the reservoir
pressure, and Unit Operator shall proceed with the construction thereof with
due diligence until the Cycling Plant and pressure regulation system have
been put into operation. The size and type of the Cycling Plant shall be
determined by Working Interest Owners; provided, however, that it shall be
capable of handling the productive capacity of the Unitized Interval, subject
to allowables, marketing factors, force majeure and economic feasibility.
Working Interest Owners shall have the exclusive right to determine the
extent and manner in which cycling and pressure regulation operations are
to be conducted.

      9.2    Residue Gas. The Residue Gas remaining after the process-
ing of Unitized Substances in the Cycling Plant may be injected into the Unitized
Interval, or may be marketed if, in the judgment of the Working Interest Owners,
same is not required in the cycling and pressure regulation operations.

      9.3    Commingling and Processing Rights. Unit Operator shall have
the right to run direct to the Cycling Plant any production of Unitized Substances
which may be processed in the Cycling Plant as a common stream. The Cycling
Plant to be constructed as hereinabove provided shall be built primarily for
the processing of Unitized Substances, and Unitized Substances shall have
priority in this respect, however, Working Interest Owners shall have the
right to handle non-Unitized Substances through and process them in said
Cycling Plant, but only to the extent that there is excess capacity available
in said Cycling Plant over and above the requirements for processing
Unitized Substances. In the event non-Unitized Substances are handled and

- 10 -

processed through the Cycling Plant, it is recognized that it will be neces-
sary to commingle such non-Unitized Substances into and through the Cycling
Plant, to which commingling the parties hereto do hereby consent; provided,
however, that Unit Operator must (1) test the Unitized Substances, on the
one hand, and the non-Unitized Substances, on the other hand, for recover-
able Liquid Products content and meter said Unitized Substances and non-
Unitized Substances for volume by testing and metering methods and devices
recognized and used in the industry, before such commingling; and (2)
account to Royalty Owners for sale of the Royalty share of Liquid Products
and Residue Gas in the respective proportions shown by the testing and
metering before commingling.

No part of the cost of handling and processing non-Unitized Substances,
whether for fuel or otherwise, shall be chargeable against Unitized Substances
or the Liquid Products extracted therefrom.

9.4     Abandonment of Cycling Plant.   Subject to the approval of the
Commissioner of Conservation, Working Interest Owners shall have the
right to abandon the Cycling Plant and pressure regulation system when,
in their sole judgment, the same do not promote conservation or prevent
waste.

ARTICLE 10
TITLES

10.1     Production Where Title is in Dispute.   If the title or right
of any party claiming the right to receive in kind all, or any portion of,
the Unitized Substances allocated to a Tract is in dispute, Unit Operator
shall either:

    (a)        require that the party to whom such
Unitized Substances are delivered or
to whom the proceeds thereof are paid,
furnish security for the proper account-
ing thereof to the rightful owner if the
title or right of such party fails in whole,
or in part, or

    (b)        withhold and market the portion of Unitized
Substances with respect to which title or
right is in dispute and retain the proceeds
thereof until such time as the title or right
thereto is established by a final judgment
of a court of competent jurisdiction, or
otherwise to the satisfaction of Working
Interest Owners, whereupon the proceeds
so retained shall be paid to the party right-
fully entitled thereto.

10.2     Payment of Taxes to Protect Title.   The owners of (1) the
surface right to lands within the Unit Area, and (2) the improvements
located on the lands not utilized for Unit Operations, shall individually be
responsible for the rendition and assessment for ad valorem tax purposes
of all such property and for the payment of such taxes, except as otherwise
provided in any contract or agreement between such owners and a Working
Interest Owner.  If any ad valorem taxes are not paid by such owner respon-
sible therefor when due, Unit Operator may, at any time prior to tax sale,

- 11 -

or expiration of period of redemption after tax sale, pay the same, redeem
such property, and discharge such tax liens as may arise through non-pay-
ment. Any such payment shall be treated as an item of Unit Expense. Unit
Operator shall, if possible, withhold from any delinquent taxpayer or tax-
payers an amount sufficient to defray the costs of such payment or redemption,
such withholding to be credited to the joint account. Such withholding shall
be without prejudice to any other remedy, either at law or at equity, which
may be available for exercise by the Unit Operator or by the Working Interest
Owners.

## ARTICLE 11
## EASEMENTS OR USE OF SURFACE

11.1  **Grant of Easements.**  The parties hereto to the extent of their
rights and interests, hereby grant to Working Interest Owners the right to
use as much of the surface of the land within the Unit Area as may reasonably
be necessary for Unit Operations; provided that, nothing herein shall be
construed as leasing or otherwise conveying to Working Interest Owners a
site for a processing or other plant, or camp-site.

11.2  **Use of Water.**  Working Interest Owners shall have free use
of water from the Unit Area for Unit Operations, except water from any well,
pond, or irrigation ditch of a Royalty Owner.

11.3  **Surface Damages.**  Working Interest Owners shall pay the
owner for damages to growing crops, timber, fences, improvements, and
structures on the Unit Area that result from Unit Operations.

## ARTICLE 12
## ENLARGEMENTS OF UNIT AREA

12.1  **Enlargements of Unit Area.**  The Unit Area may be enlarged
to include acreage reasonably proved to be productive upon such terms as
may be determined by the Working Interest Owners, subject to approval of
the Commissioner of Conservation of the State of Louisiana, including, but
not limited to, the following:

12.1.1  The participation to be allocated to the acreage shall
be reasonable, fair and based on all available information.

12.1.2  There shall be no retroactive allocation or adjustment
of Unit Expense, or of interest in the Unitized Substances pro-
duced or proceeds thereof. However, this limitation shall
not prevent an adjustment of investment by reason of the
enlargement.

12.2  **Determination of Tract Participation.**  Unit Operator shall
determine the Tract Participation of each Tract within the Unit Area as en-
larged and shall revise Exhibits "A", "B", and "C" accordingly.

12.3  **Effective Date.**  The effective date of any enlargement of the
Unit Area shall be the effective date as specified in the order issued by the
Commissioner of Conservation of the State of Louisiana approving such
enlargement.

ARTICLE 13
CHANGE OF TITLE

13.1   Covenant Running With The Land.   This agreement shall extend to, be binding upon, and inure to the benefit of, the respective heirs, devisees, legal representatives, successors, and assigns of the parties hereto, and shall constitute a covenant running with the lands, leases and interests covered hereby.

13.2   Notice of Transfer.   Any conveyance of all or any part of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this agreement.   No change of title shall be binding on the Unit Operator, or upon any party hereto other than the party so transferring, until the first day of the calendar month next succeeding the date of receipt by Unit Operator of a photocopy or a certified copy of the recorded instrument evidencing such change in ownership.

13.3   Waiver of Rights to Partition.   Each party hereto covenants that, during the existence of this agreement, it will not resort to any action to partition the Unit Area or the Unit Equipment, and to that extent, waives the benefits of all laws authorizing such partition.

ARTICLE 14
RELATIONSHIP OF PARTIES

14.1   No Partnership.   The duties, obligations, and liabilities of the parties hereto are intended to be several and not joint or collective. This agreement is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, obligation, or liability with regard to any one or more of the parties hereto.   Each party hereto shall be individually responsible for its own obligations as herein provided.

14.2   No Sharing of Market.   This agreement is not intended to provide, and shall not be construed to provide, directly or indirectly, for any co-operative refining, joint sale, or marketing of Unitized Substances.

14.3   Royalty Owners Free of Cost.   This agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay for Unit Expense unless such Royalty Owner is otherwise so obligated.

14.4   Information to Royalty Owners.   Each Royalty Owner shall be entitled upon written request to all information in possession of Unit Operator to which such Royalty Owner is entitled by an existing agreement with any Working Interest Owner.

ARTICLE 15
LAWS AND REGULATIONS

15.1   Laws and Regulations.   This agreement shall be subject to the conservation laws of the State of Louisiana;to the valid rules, regulations, and orders of the Commissioner of Conservation of the State of Louisiana; and to all other applicable federal, state, and municipal laws, rules, regulations and orders.   If there is any conflict between such laws, rules, regulations and orders and this agreement, such laws, rules, regulations and orders shall govern.

- 13 -

## ARTICLE 16
### FORCE MAJEURE

16.1    Force Majeure.    All obligations imposed by this agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a strike, fire, war, civil disturbance, act of God; by federal, state or municipal laws; by any rule, regulation, or order of governmental agency; by inability to secure materials; or by any other cause or causes beyond reasonable control of the party.  No party shall be required against its will to adjust or settle any labor dispute. Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of suspension of Unit Operations due to any one or more of the causes set forth in this article.

## ARTICLE 17
### EFFECTIVE DATE

17.1    Effective Date.    This agreement shall become binding upon each party who executes or ratifies it as of the date of execution or ratification by such party and shall become effective as to all parties hereto on the effective date as specified in the order issued by the Commissioner of Conservation of the State of Louisiana unitizing the Unitized Interval; and provided that if this agreement does not become effective on or before June 30, 1966, then this agreement shall ipso facto terminate and thereafter be of no further force and effect, unless prior thereto Working Interest Owners owning a combined Unit Participation of at lease eighty-seven per cent (87%) have become parties to this agreement have decided to extend said termination date for a period not to exceed one (1) year.  If said termination date is so extended and this agreement does not become effective on or before said extended termination date, this agreement shall ipso facto terminate on said extended termination date, and thereafter be of no further force or effect.  For the purposes of this article, ownership shall be computed on the basis of Unit Participation as determined from Tract Participations set forth in Exhibit "C".

17.2    Certificate of Effectiveness.    Unit Operator shall file for record in Natchitoches Parish, Louisiana, a Certificate to the effect that this agreement has become effective according to its terms and stating further the effective date.

## ARTICLE 18
### TERM

18.1    Term.    The term of this agreement shall be for the time that Unitized Substances are produced in paying quantities and as long thereafter as Unit Operations are conducted without a cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner herein provided.

18.2    Termination by Working Interest Owners.    This agreement may be terminated by Working Interest Owners having a combined Unit Participation of at least eighty-seven per cent (87%) whenever such Working Interest Owners determine that Unit Operations are no longer profitable or feasible; provided, however, that Working Interest Owners shall not terminate this agreement prior to the issuance of an order by the Commissioner of Conservation dissolving the unitization of the Unitized Interval.

- 14 -

18. 3   Effect of Termination.   Upon termination of this agreement, the further development and operation of the Unitized Interval as a unit shall be abandoned, Unit Operations shall cease, and thereafter the parties shall be governed by the provisions of the leases and other instruments affecting the separate Tracts.

18. 4   Salvaging Equipment Upon Termination.   If not otherwise granted by the leases, or other instruments affecting each Tract unitized under this agreement, Royalty Owners hereby grant Working Interest Owners a period of six (6) months after the date of termination of this agreement within which to salvage and remove Unit Equipment.

18. 5   Certificate of Termination.   Upon termination of this agreement, Unit Operator shall file for record in Natchitoches Parish, Louisiana, a Certificate to the effect that this agreement has terminated according to its terms and stating further the termination date.

ARTICLE 19
EXECUTION

19. 1   Original, Counterpart, or Other Instrument.   A person may become a party to this agreement by signing the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions thereof. The signing of any such instrument shall have the same effect as if all of the parties had signed the same instrument.

ARTICLE 20
GENERAL

20. 1   Amendments Affecting Working Interest Owners.   Amendments hereto relating wholly to Working Interest Owners may be made if signed by all Working Interest Owners.

20. 2   Action by Working Interest Owners.   Except as herein otherwise provided, any action or approval required by Working Interest Owners hereinunder shall be in accordance with the provisions of the Unit Operating Agreement.

20. 3   Lien of Unit Operator.   Unit Operator shall have a lien upon the interests of Working Interest Owners in the Unit Area to the extent provided in the Unit Operating Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the dates opposite their respective names.

Working Interest Owners

WITNESSES        DATE        PARTY

PLACID OIL COMPANY

By: _____
                          President

ATTEST:

_____
                          Secretary

| WITNESSES | DATE | PARTY |
|---|---|---|

SOCONY-MOBIL OIL CO., INC.

By:_____

ATTEST:

_____

PHILLIPS PETROLEUM COMPANY

By:_____

ATTEST:

_____

NEMOURS CORPORATION

By:_____

ATTEST:

_____

SHELL OIL COMPANY

By:_____

ATTEST:

_____

UNION PRODUCING COMPANY

By:_____

ATTEST:

_____

J. ARON & COMPANY, INC.

By:_____

ATTEST:

_____

| WITNESSES | DATE | PARTY |
|---|---|---|

CHEVRON OIL COMPANY

By:_____

ATTEST:

_____

CRESLENN OIL COMPANY

By:_____

ATTEST:

_____

BEARD OIL COMPANY

By:_____

RELIANCE TRUSTS

By:_____
                    Trustee

BRUCE ANDERSON

J. PAT BEAIRD

C. A. BENTLEY

HARVEY BROYLES

DAVID CROW, TRUSTEE

| WITNESSES | DATE | PARTY |
|-----------|------|-------|

———————————

——————————— ———————————

MAX EVANS,
Individually and as Agent-in-fact
for Jean Evans Kelly and Roger
Tyrone Evans

———————————

——————————— ———————————

JAMES M. FORGOTSON

———————————

——————————— ———————————

T. K. GLENN

———————————

——————————— ———————————

WALTER S. GRANT

———————————

——————————— ———————————

HUGH A. HAWTHORNE

MARGARET HUNT TRUST

By:_____
                        Trustee

———————————

——————————— ———————————

IRWIN I. MUSLOW

———————————

——————————— ———————————

JAMES MUSLOW

———————————

——————————— ———————————

RICHARD L. PETERSON

———————————

——————————— ———————————

GEORGE R. SCHURMON

WITNESSES                DATE                    PARTY

_____        _____        _____

_____

_____        _____        _____

_____

_____        _____        _____

_____

_____        _____        _____

_____

_____        _____        _____

_____

_____        _____        _____

_____

_____        _____        _____

_____

_____        _____        _____

_____

_____        _____        _____

_____

_____        _____        _____

_____

Royalty Interest Owners

WITNESSES                DATE                PARTY

EDENBORN, INC.

_____     _____     By:_____
_____                                       President

ATTEST:

_____
                    Secretary


AUSTIN PETROLEUM CORPORATION

_____     _____     By:_____
_____

ATTEST:

_____


H. T. BAR STOCK FARM, INC.

_____     _____     By:_____
_____

ATTEST:

_____


HUNT OIL COMPANY RETIREMENT
TRUST

_____     _____     By:_____
_____                                       Trustee


INTERNATIONAL PAPER COMPANY

_____     _____     By:_____
_____

ATTEST:

_____


JOINT-S OIL COMPANY

_____     _____     By:_____
_____

ATTEST:

_____

| WITNESSES | DATE | PARTY |
|-----------|------|-------|

MARTIN TIMBER COMPANY

By:_____

ATTEST:

_____

NEMOURS CORPORATION

By:_____

ATTEST:

_____

RENAPPI CORPORATION

By:_____

ATTEST:

_____

RUSTON HARDWARE &
FURNITURE CO., LTD.

By:_____

ATTEST:

_____

SIESTA OIL & EXPLORATION CO., INC.

By:_____

ATTEST:

_____

UNITED GAS PIPELINE COMPANY

By:_____

ATTEST:

_____

WITNESSES  DATE    PARTY

WITT OIL PRODUCTION, INC.

By: _____

ATTEST:

_____

WOODARD-WALKER LAND
& TIMBER CORP.

By: _____

ATTEST:

_____

NATCHITOCHES PARISH SCHOOL
BOARD

By: _____
      Secretary

STATE MINERAL BOARD

By: _____
      Secretary

| WITNESSES | DATE | PARTY |
|-----------|------|-------|
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |
|           |      |       |

## PROOF BY WITNESS

STATE OF_____

PARISH (COUNTY) OF_____

  BEFORE ME, the undersigned authority, this day personally
appeared_____ to me personally
known to be the identical person whose name is subscribed in the foregoing
instrument as an attesting witness, who being first duly sworn, on_____
oath, says: That_____ subscribed_____ name to the foregoing instrument
as a witness, and that_____ knows_____

_____
to be the identical person____ described therein, and who executed the same,
and saw_____ sign the same as_____voluntary act and deed, and
that_____, the said_____
subscribed_____ name to the same at the same time as an attesting witness.

  Sworn to and subscribed before
me, this_____ day of_____
_____,19___

Notary Public in and for_____

## PROOF BY WITNESS

STATE OF_____

PARISH (COUNTY) OF_____

  BEFORE ME, the undersigned authority, this day personally
appeared_____ to me personally
known to be the identical person whose name is subscribed in the foregoing
instrument as an attesting witness, who being first duly sworn, on_____
oath, says: That_____ subscribed_____ name to the foregoing instrument
as a witness, and that_____ knows_____

_____
to be identical person____ described therein, and who executed the same,
and saw_____ sign the same as_____voluntary act and deed, and
that_____, the said_____
subscribed_____ name to the same at the same time as an attesting witness.

  Sworn to and subscribed before
me, this_____ day of_____
_____,19___

Notary Public in and for_____

## CORPORATE ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

      On this_____ day of_____, 19___, before

me personally appeared _____

to me known, who, being by me duly sworn, did say that he is _____

_____of_____, and that said instrument

was signed in behalf of said corporation by authority of its board of directors,

and said_____acknowledged said

instrument to be the free act and deed of said corporation.

                                   _____
                                     Notary Public

My commission expires:

## CORPORATE ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

      On this_____ day of_____, 19___,

before me personally appeared_____

to me known, who, being by me duly sworn, did say that he is _____

_____of_____, and that said

instrument was signed in behalf of said corporation by authority of its board

of directors, and said_____acknowledged

said instrument to be the free act and deed of said corporation.

                                   _____
                                     Notary Public

My commission expires:

### INDIVIDUAL ACKNOWLEDGEMENT

STATE OF_____

PARISH (COUNTY) OF_____

On this_____ day of_____, 19___,

before me personally appeared _____

_____

to me known to be the person___described in and who executed the foregoing

instrument, and acknowledged that___he___executed the same as___free act

and deed.

IN WITNESS WHEREOF I have hereunto set my official hand and
seal on the date hereinabove written.

_____
Notary Public

### INDIVIDUAL ACKNOWLEDGEMENT

STATE OF_____

PARISH (COUNTY) OF_____

On this_____ day of_____, 19___,

before me personally appeared_____

_____

to me known to be the person___described in and who executed the foregoing

instrument, and acknowledged that___he___executed the same as___free act

and deed.

IN WITNESS WHEREOF I have hereunto set my official hand and
seal on the date hereinabove written.

_____
Notary Public

### INDIVIDUAL ACKNOWLEDGEMENT

STATE OF_____

PARISH (COUNTY) OF_____

On this_____ day of_____, 19___,

before me personally appeared_____

to me known to be the person___described in and who executed the foregoing

instrument, and acknowledged that___he___executed the same as___free act

and deed.

IN WITNESS WHEREOF I have hereunto set my official hand and seal
on the date hereinabove written.

_____
Notary Public

EXHIBIT "A"

TO THE UNIT AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA


THE FOLLOWING DESCRIBED LANDS SITUATED IN NATCHITOCHES PARISH,
LOUISIANA, INSOFAR AND ONLY INSOFAR AS SAID LANDS LIE WITHIN THE
UNIT AREA, REPRESENT THE RESPECTIVE TRACTS WHICH ARE INCLUDED
WITHIN AND COMPRISE THE UNIT AREA.

| TRACT NO. | DESCRIPTION |
|---|---|
| 1 | **Township 12 North, Range 6 West** |
| | Section 35:  S/2, S/2 of SW/4 of NE/4, S/2 of SE/4 of NW/4 |
| | Section 36:  W/2 of SW/4, SW/4 of NW/4 |
| | |
| | **Township 11 North, Range 5 West** |
| | Section  7:  W/2 |
| | Section 18:  W/2 |
| | |
| | **Township 11 North, Range 6 West** |
| | Section  1:  All, LESS N/2 of NE/4 |
| | Section  2:  All |
| | Section  3:  All |
| | Section  4:  E/2 |
| | Section  9:  Lots 1 and 8 |
| | Section 10:  All |
| | Section 11:  All |
| | Section 12:  All, LESS S/2 of SE/4 |
| | Section 13:  All, LESS SE/4 of SE/4, and LESS W/4 of SW/4 of SW/4 |
| | Section 14:  All, LESS SE/4 of SE/4 |
| | Section 15:  All, LESS E/2 of SE/4 |
| | Section 21:  NE/4 |
| | Section 23:  NW/4 of NE/4, NE/4 of NW/4, E/2 of NW/4 of NW/4, SE/4 of NE/4, SE/4, and S/2 of SW/4 |
| | Section 24:  NE/4, E/2 of NW/4, N/2 of NW/4 of NW/4, NW/4 of SW/4, E/2 of SW/4, W/2 of SE/4, and NE/4 of SE/4 |
| | Section 25:  W/2, and NW/4 of NE/4, LESS 2-1/2 acres in NE corner of NW/4 of SW/4 in form of square |
| | Section 26:  E/4 of NE/4 of NE/4, SE/4 of NE/4, SE/4 of NW/4, NE/4 of SW/4 |
| | Section 27:  W/2 of NW/4, NW/4 of SW/4, LESS Tracts 55 and 56 hereinafter described |
| | Section 35:  NE/4, W/2 of W/2, SE/4 of SW/4 |
| | |
| | **Township 10 North, Range 6 West** |
| | Section  5:  Lot 2 |
| 2 | **Township 11 North, Range 6 West** |
| | Section 21:  E/2 of SE/4, LESS Tract 46 hereinafter described |
| | Section 22:  SE/4 of SE/4, LESS 1 acre in form of square in NW corner |
| | Section 27:  E/2 of W/2, N/2 of NE/4, SE/4, and SW/4 of SW/4, LESS Tract 57 hereinafter described |

- 1 -

| TRACT NO. | DESCRIPTION |
|---|---|

**3**

Township 11 North, Range 6 West
Section 33:  Lots 3, 4, 5, 6 and 7
Section 34:  NW/4 of NW/4, SW/4
Section 35:  E/2 of NW/4, NE/4 of SW/4

**4**

Township 11 North, Range 6 West
Section 20:  U. S. Lots 1, 2, 3, 4, 5 and 6
Section 21:  NW/4 of NW/4, S/2 of NW/4, SW/4, and W/2 of SE/4
Section 22:  S/2 of NW/4, SW/4
Section 26:  SW/4 of NW/4
Section 27:  SE/4 of NE/4
Section 28:  Lots 2, 3, 6, 7, 8 and 9
Section 29:  Lots 1, 2, 3 and 4
Section 34:  NE/4 of NE/4, S/2 of NE/4
Section 30:  Lot 1
Section 31:  Lots 9 and 16

**5**

Township 11 North, Range 6 West
Section 28:  Lots 14 and 15, SE/4 of SW/4, and W/2 of SW/4, LESS State Lot 15
Section 29:  All, LESS Lots 1, 2, 3 and 4
Section 32:  All, LESS Lots 1, 2 and 3
Section 33:  Lots 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20
Section 30:  Lots 14, 15, 16, 17, 18, 19 and 20
Section 31:  Lots 17 and 18
Section 28:  State Lot 12 as per plat approved by Governor Hall

**6**

Township 11 North, Range 6 West
Section 21:  NE/4 of NW/4
Section 27:  SW/4 of NE/4
Section 33:  E/2 of NE/4 of NE/4
Section 34:  NE/4 of NW/4, and S/2 of NW/4
Section 33:  State Lot 9

**7**

Township 11 North, Range 6 West
Section  8:  SE/4
Section  9:  Lots 4, 5 and 12
Section 12:  S/2 of SE/4
Section 24:  S/2 of NW/4 of NW/4
Section 26:  W/2 of NE/4, N/2 of NW/4
Section 30:  E/2 of SW/4, LESS South 990 feet
Section 31:  Lot 7

Township 12 North, Range 6 West
Section 34:  S/2 of SE/4

**8**

Township 11 North, Range 6 West
Section 20:  All, LESS U. S. Lots 1, 2, 3, 4, 5, 6 and 7, and LESS State Lots 16, 17 and 18, as per plat approved by Governor Hall
Section 19:  Lots 19, 20 and 21

**9**

Township 11 North, Range 6 West
Section  9:  Lots 9, 10, 11, 13 and 14
Section 37:  All, LESS Tract 28 hereinafter described

| TRACT NO. | DESCRIPTION |
|---|---|
| 10 | Township 11 North, Range 6 West |
| | Section 24:   SW/4 of SW/4 |
| | Section 26:   SE/4 of SW/4 |
| | |
| 11 | Township 11 North, Range 6 West |
| | Section 13:   W/4 of SW/4 of SW/4 |
| | Section 14:   SE/4 of SE/4 |
| | |
| 12 | Township 11 North, Range 6 West |
| | Section 23:   SW/4 of NE/4 |
| | Section 28:   Lot 5 |
| | Section 28:   Lot 10 |
| | |
| 13 | Township 11 North, Range 6 West |
| | Section 22:   NE/4 of NE/4 |
| | Section 23:   W/2 of NW/4 of NW/4 |
| | |
| 14 | Township 11 North, Range 6 West |
| | Section 22:   NW/4 of NW/4 |
| | Section 22:   SW/4 of NE/4, LESS 1 acre described as follows: beginning 60 yards north of SW corner of SW/4 of NE/4, Section 22, Township 11 North, Range 6 West, thence east 70 yards, north 70 yards, west 70 yards, and south 70 yards to point of beginning |
| | |
| 15 | Township 11 North, Range 6 West |
| | Section 22:   That part of Lot 1 of Teagle partition lying within said section |
| | Section 23:   That part of Lot 1 of Teagle partition lying within said section |
| | |
| 16 | Township 11 North, Range 6 West |
| | Section 22:   That part of Lot 2 of Teagle partition lying within said section |
| | Section 23:   That part of Lot 2 of Teagle partition lying within said section |
| | |
| 17 | Township 11 North, Range 6 West |
| | Section 4:   SE/4 of SW/4 |
| | Section 9:   N/2 of Lot 3 |
| | |
| 18 | Township 11 North, Range 6 West |
| | Section 9:   W/2 of NE/4 |
| | |
| 19 | Township 11 North, Range 6 West |
| | Section 9:   S/2 of Lot 3 and all that part of Lot 6 lying north of Remy Creek |
| | |
| 20 | Township 11 North, Range 6 West |
| | Section 9:   That portion of Lot 6 lying south of Remy Creek |
| | |
| 21 | Township 11 North, Range 6 West |
| | Section 8:   SE/4 of NE/4 |
| | |
| 22 | Township 11 North, Range 6 West |
| | Section 8:   SE/4 of SW/4, LESS Lot 16 |
| | |
| 23 | Township 11 North, Range 6 West |
| | Section 13:   SE/4 of SE/4 |

- 3 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 24 | Township 11 North, Range 6 West<br>Section 15:   E/2 of SE/4 |
| 25 | Township 11 North, Range 6 West<br>Section 16:   All |
| 26 | Township 11 North, Range 6 West<br>Section 17:   All of fractional Section 17 according to original government plat (being Lot 1 of Section 17 according to government resurvey) |
| 27 | Township 11 North, Range 6 West<br>Section 17:   Lot 2 |
| 28 | Township 11 North, Range 6 West<br>Section 37:   A tract of land situate in southwest part of said section, being bounded on the north, south and east by lands now or formerly owned by Harley B. Howcott, et al, and on the west by traverse of Clear Lake as run by United States Surveyors |
| 29 | Township 11 North, Range 6 West<br>Section 17:   LESS Lots 1 and 2 |
| 30 | Township 11 North, Range 6 West<br>Section 18:   Lot 16 |
| 31 | Township 11 North, Range 6 West<br>Section 24:   SW/4 of NW/4 |
| 32 | Township 11 North, Range 6 West<br>Section 23:   NE/4 of NE/4 |
| 33 | Township 11 North, Range 6 West<br>Section 23:   SE/4 of NW/4 and that portion of the NE/4 of SW/4 lying north and east of a diagonal line drawn from the NW corner to the SE corner of said forty |
| 34 | Township 11 North, Range 6 West<br>Section 23:   SW/4 of NW/4, LESS that part of Lots 1 and 2 of Teagle partition lying within said section |
| 35 | Township 11 North, Range 6 West<br>Section 23:   That part of the NE/4 of SW/4 lying south and west of a diagonal line drawn from the NW corner to the SE corner of said forty |
| 36 | Township 11 North, Range 6 West<br>Section 23:   NW/4 of SW/4 |
| 37 | Township 11 North, Range 6 West<br>Section 22:   E/2 of W/2 of NW/4 of NE/4, and E/2 of NW/4 of NE/4 |
| 38 | Township 11 North, Range 6 West<br>Section 22:   E/2 of NE/4 of NW/4, and W/2 of W/2 of NW/4 of NE/4 |

| TRACT NO. | DESCRIPTION |
|---|---|
| 39 | Township 11 North, Range 6 West<br>Section 22:  W/2 of NE/4 of NW/4 |
| 40 | Township 11 North, Range 6 West<br>Section 22:  Beginning 60 yards north of SW corner of SW/4<br>of NE/4 of said section, thence east 70 yards,<br>north 70 yards, west 70 yards, and south 70<br>yards to point of beginning |
| 41 | Township 11 North, Range 6 West<br>Section 22:  NE/4 of SE/4 |
| 42 | Township 11 North, Range 6 West<br>Section 22:  E/2 of NW/4 of SE/4 |
| 43 | Township 11 North, Range 6 West<br>Section 22:  W/2 of NW/4 of SE/4 |
| 44 | Township 11 North, Range 6 West<br>Section 22:  1 acre in form of square in NW corner of SE/4<br>of SE/4 |
| 45 | Township 11 North, Range 6 West<br>Section 22:  SW/4 of SE/4 |
| 46 | Township 11 North, Range 6 West<br>Section 21:  A tract of land described as beginning at the SE<br>corner of said section, thence west 676 feet,<br>thence north 25 degrees east a distance of 33<br>feet, thence north 44 degrees 4 minutes east a<br>distance of 39 feet, thence north 56 degrees<br>8 minutes east a distance of 108 feet, thence<br>north 76 degrees 30 minutes east a distance of<br>79 feet, thence north 84 degrees 58 minutes<br>east 84.5 feet, thence south 77 degrees 56<br>minutes east a distance of 25 feet, thence north<br>89 degrees 22 minutes east a distance of 85.5<br>feet, thence north 84 degrees 38 minutes east a<br>distance of 275.5 feet, thence south 165 feet to<br>point of beginning |
| 47 | Township 11 North, Range 6 West<br>Section 20:  Lot 7 |
| 48 | Township 11 North, Range 6 West<br>Section 20:  State Lots 16, 17 and 18 as per plat approved by<br>Governor Hall |
| 49 | Township 10 North, Range 6 West<br>Section  4:  Lot 4 or the fractional NW/4 of NW/4 of said<br>section |
| 50 | Township 11 North, Range 6 West<br>Section 26:  W/2 of NE/4 of NE/4, and W/2 of E/2 of NE/4<br>of NE/4<br><br>Township 12 North, Range 6 West<br>Section 35:  SE/4 of NE/4 |

| TRACT NO. | DESCRIPTION |
|---|---|

**51**

Township 11 North, Range 6 West
Section 26:   NE/4 of SE/4

**52**

Township 11 North, Range 6 West
Section 26:   NW/4 of SE/4

**53**

Township 11 North, Range 6 West
Section 26:   SW/4 of SE/4

**54**

Township 11 North, Range 6 West
Section 26:   W/2 of SW/4

**55**

Township 11 North, Range 6 West
Section 27:   A tract of land described as beginning at the NW
corner of said section, thence east 158 feet,
thence south 2 degrees 48 minutes east 89.7 feet,
thence south 20 degrees 21 minutes west 30 feet,
thence south 80 degrees 51 minutes west 40 feet,
thence south 12 degrees 22 minutes west 82 feet,
thence south 57 degrees 45 minutes west 13 feet,
thence south 20 degrees 42 minutes east 47 feet,
thence south 44 degrees 37 minutes east 41 feet,
thence south 62 degrees 40 minutes east 38 feet,
thence south 15 degrees 40 minutes east 71 feet,
thence south 54 degrees 18 minutes east 38 feet,
thence south 70 degrees 51 minutes east 98 feet,
thence south 61 degrees 39 minutes east 45 feet,
thence south 50 degrees 38 minutes east 44 feet,
thence south 9 degrees 5 minutes east 38 feet,
thence south 4 degrees 10 minutes west 66 feet,
thence south 11 degrees 44 minutes west 159 feet,
thence south 17 degrees 31 minutes east 118 feet,
thence south 29 degrees 7 minutes east 234 feet,
thence south 10 degrees 44 minutes west 179 feet,
thence north 51 degrees west 556 feet,
thence south 70 degrees 10 minutes west 34 feet,
thence north 0 degrees 7 minutes east 885 feet to
the point of beginning; and also a tract of land
described as beginning at a point 943 feet south of
NW corner of said section, thence south 60 degrees
3 minutes east 138.5 feet, thence south 53
degrees 23 minutes east 260 feet, thence south 14 degrees
54 minutes west 40.5 feet, thence south 47 degrees
46 minutes west 41 feet, thence south 67 degrees
33 minutes west 105.5 feet, thence south 59
degrees 28 minutes west 221.5 feet, thence north
0 degrees 7 minutes east 382.7 feet to the point of
beginning

**56**

Township 11 North, Range 6 West
Section 27:   A tract of land described as beginning at the SW
corner of NW/4 of SW/4 of said section, thence
east 270 feet, thence north 61 degrees 20 minutes
west 42 feet, thence north 44 degrees 17 minutes
west 110 feet, thence north 20 degrees 20 minutes
west 252 feet, thence north 30 degrees 41 minutes
west 140 feet, thence south 0 degrees 8 minutes
west 457 feet to the point of beginning

- 6 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 57 | **Township 11 North, Range 6 West** |
| | Section 27: A tract of land described as beginning at the NW corner of SW/4 of SW/4 of said section, thence south 0 degrees 8 minutes west 655.5 feet, thence north 69 degrees 53 minutes east 130 feet, thence north 58 degrees 14 minutes east 256 feet, thence north 71 degrees 27 minutes east 321 feet, thence north 7 degrees 13 minutes west 330 feet, thence north 77 degrees 40 minutes west 50 feet, thence south 84 degrees 24 minutes west 110 feet, thence north 84 degrees 32 minutes west 100 feet, thence north 61 degrees 20 minutes west 81 feet, thence west 270 feet to the point of beginning |
| 58 | **Township 11 North, Range 6 West** |
| | Section 28: E/2 of Lot 1 |
| 59 | **Township 11 North, Range 6 West** |
| | Section 28: W/2 of Lot 1 |
| 60 | **Township 11 North, Range 6 West** |
| | Section 28: Portion E of Lot 4, as shown in COB 138, Page 470, Records of Natchitoches Parish, Louisiana |
| 61 | **Township 11 North, Range 6 West** |
| | Section 28: A tract of land described as beginning at 6.30 chains east of NW corner of said section, thence east along section line 1.58 chains, thence south 20 degrees east 6.32 chains, thence west 1.58 chains, thence north 20 degrees west 6.32 chains to the point of beginning |
| 62 | **Township 11 North, Range 6 West** |
| | Section 28: A tract of land described as beginning 6.32 chains east of the NW corner of said section, thence south 20 degrees east 6.32 chains, thence west 1.58 chains, thence north 20 degrees west 6.32 chains, thence east 1.58 chains to the point of beginning |
| 63 | **Township 11 North, Range 6 West** |
| | Section 28: A tract of land described as beginning 4.72 chains east of the NW corner of said section, thence south 20 degrees east 6.32 chains, thence west 3.16 chains, thence north 20 degrees west 6.32 chains, thence east 3.16 chains to the point of beginning; and also a tract of land described as beginning at the NW corner of said section, thence east 1.56 chains, thence south 6.32 chains to the water's edge as of 1939, thence west to the section line, thence north to the point of beginning |

| TRACT NO. | DESCRIPTION |
|---|---|
| 64 | Township 11 North, Range 6 West<br>Section 28:   Portion F of Lot 4, as shown in COB 138, Page 403, LESS Tracts 61, 62 and 63 hereinabove described |
| 65 | Township 11 North, Range 6 West<br>Section 28:   Lot 11 or the SE/4 of SE/4 |
| 66 | Township 11 North, Range 6 West<br>Section 28:   State Lot 15 |
| 67 | Township 10 North, Range 6 West<br>Section  6:   W/2 of W/2 of SE/4 of NE/4 |
| 68 | Township 11 North, Range 6 West<br>Section 34:   NW/4 of NE/4 |
| 69 | Township 11 North, Range 6 West<br>Section 34:   N/2 of East 5 acres of NE/4 of SE/4 |
| 70 | Township 11 North, Range 6 West<br>Section 34:   Lot 6 of Gourdon Subdivision as per Donation Book A, Page 1, corrected Page 10, Records of Natchitoches Parish, Louisiana |
| 71 | Township 11 North, Range 6 West<br>Section 34:   Lot 7 of the Gourdon Subdivision as set out in instrument recorded in Donation Book A, Page 1, as corrected in Donation Book A, Page 10, Records of Natchitoches Parish, Louisiana |
| 72 | Township 11 North, Range 6 West<br>Section 34:   S/2 of East 5 acres of NE/4 of SE/4 |
| 73 | Township 11 North, Range 6 West<br>Section 34:   SE/4 of SE/4 |
| 74 | Township 11 North, Range 6 West<br>Section 34:   Lot 1 of the Gourdon Subdivision as set out in instrument recorded in Donation Book A, Page 1, as corrected in Donation Book A, Page 10, Records of Natchitoches Parish, Louisiana |
| 75 | Township 11 North, Range 6 West<br>Section 34:   Lot 2 of Gourdon Subdivision as per Donation Book A, Page 1, corrected Page 10, Records of Natchitoches Parish, Louisiana |
| 76 | Township 11 North, Range 6 West<br>Section 34:   Lot 3 of Gourdon Subdivision as per Donation Book A, Page 1, corrected Page 10, Records of Natchitoches Parish, Louisiana |
| 77 | Township 11 North, Range 6 West<br>Section 34:   Lot 4 of Gourdon Subdivision as per Donation Book A, Page 1, corrected Page 10, Records of Natchitoches Parish, Louisiana |

| TRACT NO. | DESCRIPTION |
|---|---|
| 78 | **Township 11 North, Range 6 West**<br>Section 34: One square acre in the NE corner of Lot 4 of Gourdon Subdivision as per Donation Book A, Page 1, corrected Page 10, Records of Natchitoches Parish, Louisiana |
| 79 | **Township 11 North, Range 6 West**<br>Section 34: Lot 5 of Gourdon Subdivision as per Donation Book A, Page 1, corrected Page 10, Records of Natchitoches Parish, Louisiana |
| 80 | **Township 11 North, Range 6 West**<br>Section 33: W/2 of NE/4 of NE/4 |
| 81 | **Township 11 North, Range 6 West**<br>Section 33: Lot 2, LESS Tracts 82, 83, 84, 85 and 86 hereinafter described |
| 82 | **Township 11 North, Range 6 West**<br>Section 33: A tract of land described as beginning at the NW corner of Lot 2 of said section, thence run southerly along meander of lake 315 feet, thence east parallel with the north line of Lot 2 a distance of 420 feet, thence north to the north line of Lot 2 a distance of 215 feet, thence west to the point of beginning, a distance of 420 feet |
| 83 | **Township 11 North, Range 6 West**<br>Section 33: A tract of land described as beginning at the NW corner of Lot 2 of said section, thence run south 315 feet along meander of lake for beginning, thence south with meander of lake 210 feet, thence east 420 feet, thence north 210 feet, thence west 420 feet to the point of beginning |
| 84 | **Township 11 North, Range 6 West**<br>Section 33: North 1/3 of parcel commencing at SW corner of Lot 2, thence run north 3-1/2 acres, thence east 2 acres, thence south 3-1/2 acres, thence west 2 acres |
| 85 | **Township 11 North, Range 6 West**<br>Section 33: S/2 of North 2/3 of parcel commencing at SW corner of Lot 2, thence run north 3-1/2 acres, thence east 2 acres, thence south 3-1/2 acres, thence west 2 acres |
| 86 | **Township 11 North, Range 6 West**<br>Section 33: South 1/3 of parcel commencing at SW corner of Lot 2, thence run north 3-1/2 acres, thence east 2 acres, thence south 3-1/2 acres, thence west 2 acres |
| 87 | **Township 11 North, Range 6 West**<br>Section 33: Lot 8 |
| 88 | **Township 11 North, Range 6 West**<br>Section 32: Lots 2 and 3 |

| TRACT NO. | DESCRIPTION |
|-----------|-------------|
| 89 | **Township 11 North, Range 6 West** |
|  | Section 32: Lot 1, LESS that portion of Tract 90-5 which lies within said Lot 1 |
| 90-1 | **Township 11 North, Range 6 West** |
|  | Section 31: That certain tract of land being described as Lot 1 (said Lot 1 being the fractional NE/4 of NE/4 of said section), and also a strip of land 75 feet wide running east and west across the entire northern edge of Lot 8 (said Lot 8 being the fractional SE/4 of NE/4 of said section), LESS Tracts 90-2 and 90-3 hereinafter described; also that certain tract of land described as being a part of Lot 8 (said Lot 8 being the fractional SE/4 of NE/4 of said section) and being a strip of land 50 feet wide north and south and running east and west a distance of 24.6 chains, or the entire length of said Lot 8, and being the North 50 feet of that certain tract acquired by Lynn J. Perot from Jeanne Perot Bracken in an Act of Partition dated February 10, 1953, recorded in Natchitoches Parish, Conveyance Book 218, Page 226, LESS the North .82 acres of Tract 90-4 and LESS Tract 90-8 hereinafter described |
| 90-2 | **Township 11 North, Range 6 West** |
|  | Section 31: A certain tract known as the Morgan Camp, being more particularly described as follows: Begin at a point on the west line of Lot 1 of said section a distance of 3.33 chains north of the SW corner of the above-mentioned lot, thence south 58 degrees 0 minutes east 2.35 chains, thence north 17 degrees 0 minutes east 5.31 chains, thence northwesterly along shore line 2.45 chains, thence south 25 degrees 30 minutes west 4.46 chains, thence south 1.49 chains to the point of beginning, containing 1.36 acres, more or less, the whole being fully shown on map by R. J. Petty, Surveyor |
| 90-3 | **Township 11 North, Range 6 West** |
|  | Section 31: A tract of land described as beginning at a point 296 feet east and 43 feet north of the SW corner of Lot 1 (said Lot 1 being the fractional NE/4 of NE/4 of said section) said point of beginning being marked by a two-inch iron pipe on the north boundary line of a road, thence run south 62 degrees 30 minutes east along said road a distance of 200 feet to a two-inch iron pipe, thence run north 27 degrees 30 minutes east a distance of 403 feet to the present water line of Black Lake marked by a two-inch pipe, thence continue north 27 degrees 30 minutes east to the north boundary line of said Lot 1, thence run north 88 degrees west along said northern boundary line of said Lot 1 a distance of 217 feet to a point, thence run south 27 degrees |

| TRACT NO. | DESCRIPTION |
|---|---|
| 90-3 (continued) | 30 minutes west to the present water line marked by a two-inch pipe on a fence, thence continue south 27 degrees 30 minutes west a distance of 317 feet to the point of beginning |

90-4        **Township 11 North, Range 6 West**

Section 31:  A tract of land described as beginning at the SW corner of Lot 1 of said section, and being the same point marked steering rod in instrument recorded under Clerk's Registry No. 98817, Records of Natchitoches Parish, Louisiana, thence south 1.87 chains, thence north 89 degrees 50 minutes east 15.76 chains to iron stake, the point of beginning, and being marked "A" on plat of survey of A. J. Brouillette, dated August 25, 1959, thence south 33 degrees 50 minutes east 4.97 chains to point "B" on said plat, thence north 89 degrees 50 minutes east 4.00 chains to point "C", thence north 58 degrees 40 minutes east 2.25 chains to point "D", thence north 3 degrees 39 minutes west 2.99 chains to point "E", thence south 89 degrees 50 minutes west 8.49 chains to point "A", the point of beginning; also a tract of land described as follows:  From the NW corner of Lot 8 (being the fractional SE/4 of NE/4 of said section) run south 125 feet to a point, thence run east 1256.6 feet to a point on a fence, being the point of beginning, thence run north 83 degrees east along said fence a distance of 221 feet to the fence corner, thence run east a distance of 75 feet to the present water line of the lake marked by a two-inch iron pipe, thence continue east to the east boundary of Lot 8, thence run south along the east boundary line of Lot 8 a distance of 30 feet, thence run west to the present water line of the lake marked by a two-inch iron pipe, thence continue west a distance of 320 feet to the point of beginning on the fence line, LESS a tract of .01 acres described as follows:  From the NW corner of Lot 8 (being the fractional SE/4 of NE/4 of said section) run south 125 feet to a point, thence run east 1176 feet to a point on a fence, being the point of beginning, thence run south 6 degrees east along said fence a distance of 10 feet to the fence corner, thence run north 83 degrees east along said fence a distance of 80 feet, thence west a distance of 80.6 feet to the point of beginning, containing 0.01 acres, more or less.

90-5        **Township 11 North, Range 6 West**

Section 31:  A tract of land described as beginning at the corner common to Lots 1, 2, 7 and 8 in said section, thence run south a distance of 125 feet, thence run north 89 degrees 50 minutes east a distance of 1040.2 feet to point "A" on a plat of

- 11 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 90-5 (continued) | survey made by A. J. Brouillette, Surveyor, dated November 28, 1962, thence run south 33 degrees 50 minutes east a distance of 328 feet to point "B", the actual point of beginning of the property herein described and from this actual point of beginning run thence north 89 degrees 50 minutes east a distance of 264 feet to point "C", thence run north 58 degrees 40 minutes east a distance of 173.5 feet to point "E", thence run south 63.9 feet to point "F", thence run south 21 degrees 40 minutes east a distance of 301.7 feet to point "G", thence run south 85 degrees west a distance of 413 feet to point "I",thence run north 0 degrees 28 minutes east a distance of 100 feet to point "O", thence run north 30 degrees 40 minutes west a distance of 220.4 feet to point "B", the point of beginning |
| 90-6 | Township 11 North, Range 6 West<br>Section 31:   A tract of land described as beginning at the corner common to Lots 1, 2, 7 and 8 in said section, thence run south a distance of 125 feet, thence run north 89 degrees 50 minutes east a distance of 1040.2 feet to point "A" on a plat of survey made by A. J. Brouillette, Surveyor, dated November 28, 1962, thence run south 33 degrees 50 minutes east a distance of 328 feet to point "B", thence run south 30 degrees 40 minutes east a distance of 220.4 feet to point "O", thence run south 0 degrees 28 minutes west a distance of 100 feet to point "I", the actual point of beginning of the property being described, and from this actual point of beginning run thence south 7 degrees 53 minutes west a distance of 171.6 feet to point "J", thence run south 83 degrees 20 minutes west a distance of 115.6 feet to point "K", thence run south 9 degrees 55 minutes east a distance of 255 feet to point "L", thence run north 82 degrees 40 minutes east a distance of 260 feet to point "M", thence run south 85 degrees 30 minutes east a distance of 139 feet to point "N", thence run north a distance of 436.8 feet to point "H", and thence run south 85 degrees west a distance of 301.2 feet to point "I", the point of beginning |
| 90-7 | Township 11 North, Range 6 West<br>Section 31:   A tract of land containing 47.68 acres, more or less, being all of Lot 8 (the fractional SE/4 of NE/4 of said section), LESS a strip 125 feet in width, running east and west across the entire northern edge of the tract, and LESS the South 2.26 acres of Tract 90-4, the West 2.3 acres of Tract 90-5, and all of Tract 90-6, said tracts hereinabove described |
| 90-8 | Township 11 North, Range 6 West<br>Section 31:   Lot 5 of the John Peterson Campsites on Clear Lake |

- 12 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 91-1 | **Township 11 North, Range 6 West**<br>Section 31:   Lot 2, LESS Tracts 91-2, 91-3, 91-4 and 91-5 hereinafter described |
| 91-2 | **Township 11 North, Range 6 West**<br>Section 31:   A tract of land being described as a portion of Lot 2 in said section and more particularly described as beginning at the NE corner of the NW/4 of said section, which point is marked by a Government brass cap, and from this point run thence south a distance of 351.35 feet to the point of beginning of the property herein described, and from this point of beginning continue south a distance of 968.65 feet, thence run south 89 degrees 55 minutes east a distance of 1565 feet, thence run north 0 degrees 20 minutes west a distance of 741.32 feet, thence run north 15 degrees 30 minutes west a distance of 233.82 feet, thence run north 89 degrees 50 minutes west a distance of 1498.40 feet to the point of beginning |
| 91-3 | **Township 11 North, Range 6 West**<br>Section 31:   That part of Lot 31 of the Davis campsites on Clear Lake, lying within said section. |
| 91-4 | **Township 11 North, Range 6 West**<br>Section 31:   Lot 32 of the Davis campsites on Clear Lake as per plat by A. J. Brouillette, recorded in Map Book 1, Page 328, Records of Natchitoches Parish, Louisiana |
| 91-5 | **Township 11 North, Range 6 West**<br>Section 31:  . Lots 33 and 34 of Virgil J. Davis Campsites on Clear Lake as per plat by A. J. Brouillette recorded in Map Book 1, Page 328, Records of Natchitoches Parish, Louisiana |
| 92 | **Township 11 North, Range 6 West**<br>Section 31:   Lots 10 and 15, or the W/2 of SE/4 |
| 93-1 | **Township 11 North, Range 6 West**<br>Section 30:   Lot 36 as shown on a plat of survey made by U. S. Roane, C. E. on April 16, 1964, showing the layout of Unit 3 of Virgil Davis Campsites in the SE/4 of said section, which plat is duly of record in the Conveyance Records of Natchitoches Parish, Louisiana |
| 93-2 | **Township 11 North, Range 6 West**<br>Section 30:   A tract of land described as beginning at the SE corner of SE/4 of SW/4 in said section, thence run west a distance of 660 feet, thence run north a distance of 990 feet, thence run east a distance of 660 feet, thence run south a distance of 990 feet to the point of beginning, being the same property acquired by Emaline Desadier, also known as Meline Desadier, from Black Lake |

| TRACT NO. | DESCRIPTION |
|---|---|
| 93-2 (continued) | Lumber Company by deed dated January 27, 1909, and recorded in Conveyance Book 126, Page 158, Records of Natchitoches Parish, Louisiana, LESS Tract 102 hereinafter described; also Lots 8 and 13 (being the fractional W/2 of SE/4 of said section), LESS Tracts 93-1, 93-3, 93-4, 93-5, 1.4 acres of 93-6, and .03 acres of Lot 32 of the Davis Campsites |

93-3   Township 11 North, Range 6 West
Section 30: A tract of land described as beginning at the NW corner of Lot 22 as shown on a plat of survey made by U. S. Roane, C. E., dated February 3, 1962, of record in Map Book 1, Page 270, Records of Natchitoches Parish, Louisiana, and from this point of beginning run thence north 89 degrees 13 minutes west a distance of 165 feet, thence run north 9 degrees 40 minutes east a distance of 225 feet, thence run north 16 degrees 40 minutes west a distance of 110 feet, thence run north 33 degrees 30 minutes east a distance of 142 feet, thence run north 18 degrees 10 minutes east a distance of 133 feet, thence run north 77 degrees 50 minutes east a distance of 122 feet, thence run south 60 degrees 50 minutes east a distance of 67 feet, thence run south 15 degrees 15 minutes east a distance of 140 feet, thence run south 6 degrees 40 minutes east a distance of 438.1 feet, thence run north 89 degrees 13 minutes west along a fence line a distance of 226 feet to the point of beginning, the property herein described being shown on a plat of survey made by A. J. Brouillette, Surveyor, dated March 22, 1963

93-4   Township 11 North, Range 6 West
Section 30: Lots 10, 19, 20, 22, 23, 24 and 25 of the Davis Campsites on Clear Lake, as more particularly described on plat made by U. S. Roane, C. E., dated February 3, 1962, of record in Map Book 1, Page 270, Records of Natchitoches Parish, Louisiana

93-5   Township 11 North, Range 6 West
Section 30: Lots 27 and 28 of Davis Campsites on Clear Lake, as per plat made by U. S. Roane, C. E., dated February 3, 1962, of record in Map Book 1, Page 270, Records of Natchitoches Parish, Louisiana

93-6   Township 11 North, Range 6 West
Section 30: Lot 31 of the Davis Campsites on Clear Lake, as per plat made by A. J. Brouillette, dated August 27, 1963, of record in Map Book 1, Page 328, Records of Natchitoches Parish, Louisiana

- 14 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 94-1 | **Township 11 North, Range 6 West** |

Section 30: A tract of land described as beginning at the NW corner of Lot 2 in said section, and from this point of beginning run thence east to the water's edge, thence run south along the water's edge a distance of 70 yards, thence run west to the center line of said section, thence run north to the point of beginning, and being the same property acquired by Ernest Franklin Lilley from Tom Guin on November 3, 1959, as per deed recorded in Conveyance Book 237, Page 137, Records of Natchitoches Parish, Louisiana

94-2     **Township 11 North, Range 6 West**

Section 30: Government Survey Lots 2, 3, 6 and 7, LESS Tracts 94-1 hereinabove described and also LESS Tracts 94-3, 94-6, 94-7, 94-8, 94-9, 94-10, 94-11, 94-12, 94-13, 94-14, 94-15, 94-16 and 94-17 hereinafter described

94-3     **Township 11 North, Range 6 West**

Section 30: A tract of land described as beginning in the North corner where a small creek flows into Black Lake, thence run west with the meanderings of the creek 86 feet to the actual point of beginning of the property being described herein, thence continue west with the meanderings of the creek a distance of 114 feet, thence run south a distance of 132 feet, thence run east a distance of 114 feet, thence run north a distance of 144 feet to the point of beginning

94-4     **Township 11 North, Range 6 West**

Section 30: A tract of land, as shown on plat of survey made by A. J. Brouillette, dated August 16, 1962, more particularly described as beginning at the NW corner of Lot 3 of said section, thence run south 776.1 feet, thence run east 361.7 feet to the actual point of beginning of the property being described herein, thence run north 10 degrees 33 minutes east 100 feet, thence run north 54 degrees 7 minutes east 100 feet, thence run north 13 degrees 33 minutes west 120.5 feet, thence run south 64 degrees 37 minutes west 145 feet, thence run south 24 degrees 30 minutes east 121 feet, thence run south 6 degrees 13 minutes west 114.4 feet, thence run north 61 degrees 48 minutes east 25 feet to the point of beginning

94-5     **Township 11 North, Range 6 West**

Section 30: A tract of land, as shown on plat of survey made by A. J. Brouillette, dated July 1, 1961, and recorded in Map Book 1, Page 229, Records of Natchitoches Parish, Louisiana, more particularly described as beginning at the NW corner of Lot 3 of said section, thence run south 776.1 feet, thence run east 361.7 feet to the point of beginning of the property being described herein, thence run

- 15 -

| TRACT NO. | DESCRIPTION |
|---|---|

94-5 (continued)
> north 10 degrees 33 minutes east 100 feet,
> thence run north 54 degrees 7 minutes east
> 100 feet, thence run south 34 degrees 48 minutes
> east 100 feet, thence run south 64 degrees 30
> minutes west 173.6 feet to the point of beginning

94-6

**Township 11 North, Range 6 West**

Section 30: A tract of land described as beginning at a quarter section corner on the line between Section 19 and Section 30 where the line between Lot 3 and Lot 2 of a U. S. Government Survey intersects the line between said Section 19 and Section 30, thence run south 1404.4 feet, thence run east 466.6 feet, thence run north 5 degrees 11 minutes east 273 feet, thence run south 60 degrees 50 minutes east 134.5 feet for the actual point of beginning, thence run north 6 degrees 3 minutes east 100 feet, thence run north 83 degrees 10 minutes east 91 feet to the water's edge on Clear Lake, thence run south 0 degrees 50 minutes west 98.3 feet along and with the water's edge, thence run south 83 degrees 10 minutes west 100 feet to the point of beginning. It is understood and agreed that the line for the water's edge is a variable line and the property described shall be from the west side of the property to the water's edge. The property being described herein is shown on one plat of survey dated July 1, 1961, prepared by A. J. Brouillette, Registered Land Surveyor, said property being marked "L. C. Shows". Also a tract of land described as beginning at a quarter section corner on the line between Section 19 and Section 30 where the line between Lot 3 and Lot 2 of a U. S. Government Survey intersects the line between said Section 19 and Section 30, thence run south 1404.4 feet, thence run east 466.6 feet, thence run north 5 degrees 11 minutes east 273 feet, thence run south 60 degrees 50 minutes east 134.5 feet, thence run north 6 degrees 3 minutes east 100 feet for the actual point of beginning, thence run north 6 degrees 3 minutes east 25 feet, thence run north 83 degrees 10 minutes east 91 feet to the water's edge of Clear Lake, thence run south 0 degrees 50 minutes west 25 feet along and with the water's edge, thence run south 83 degrees 10 minutes west 91 feet to the point of beginning. It is understood and agreed that the line for the water's edge is a variable line and the property being described herein shall be from the west side of the property to the water's edge

94-7

**Township 11 North, Range 6 West**

Section 30: A tract of land, as shown on plat of survey made by A. J. Brouillette, dated July 1, 1961, and recorded in Map Book 1, Page 229, Records of Natchitoches Parish, Louisiana, more particularly

- 16 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 94-7 (continued) | |

    described as beginning at point "A" on said plat, thence run north 5 degrees 11 minutes east 148 feet to the actual point of beginning of the property being described herein, thence run south 82 degrees 49 minutes east 200 feet to the water's edge of Clear Lake, thence run north 16 degrees 56 minutes east 100 feet, thence run south 83 degrees 10 minutes west 100 feet, thence run north 60 degrees 50 minutes west 134.5 feet to eastern edge of existing road, thence run south 5 degrees 11 minutes west along the eastern edge of said road a distance of 125 feet to the point of beginning, said point "A" on said plat is described as beginning at the proven U. S. corner between Section 19 and Section 30, thence run south 1404.4 feet to a point, thence run east 466.6 feet to said point "A", said corner being the western common corner to Section 19 and Section 30, being the same property described in that certain deed from O. D. Guin to Rueben E. Brown, recorded in Conveyance Book 243, Page 713, Records of Natchitoches Parish, Louisiana

**94-8**

Township 11 North, Range 6 West

Section 30:    A tract of land described as beginning at point "A" on plat of survey made by A. J. Brouillette, Surveyor, dated April 5, 1962, which is annexed to deed from O. D. Guin to J. A. Harrell dated August 6, 1962, and recorded in the Conveyance Records of Natchitoches Parish, Louisiana, and from this point of beginning, run north 5 degrees 11 minutes east a distance of 98 feet to the actual point of beginning of the property being described herein, thence run north 5 degrees 11 minutes east a distance of 50 feet, thence run south 82 degrees 49 minutes east 200 feet to the water's edge on Clear Lake, thence run in a southwesterly direction along the water's edge to the NE corner of the lot sold by O. D. Guin to J. A. Harrell, thence run north 80 degrees 42 minutes west a distance of 186.3 feet to the point of beginning, said point "A" on said plat is described as beginning at the proven U. S. corner between Section 19 and Section 30, thence run south 1404.4 feet to a point, thence run east 466.6 feet to said point "A"

**94-9**

Township 11 North, Range 6 West

Section 30:    A tract of land described as beginning at point "A" on a plat of survey made by A. J. Brouillette, Surveyor, dated April 5, 1962, which is annexed to Cash Sale Deed dated August 6, 1962, and recorded in Conveyance Book 248, Page 742, Records of Natchitoches Parish, Louisiana, and from this point of beginning run north 5 degrees 11 minutes east a distance of 48 feet to the actual point of beginning of the property being described

| TRACT NO. | DESCRIPTION |
|-----------|-------------|

**94-9 (continued)**

herein, thence run south 80 degrees 42 minutes east a distance of 186.5 feet to the water's edge of Clear Lake, thence run north 5 degrees east a distance of 50 feet, thence run north 80 degrees 42 minutes west a distance of 186.3 feet, thence run south 5 degrees 11 minutes west a distance of 50 feet to the point of beginning, said point "A" is described as beginning at the proven U. S. corner between Section 19 and Section 30, thence run south 1404.4 feet to a point, thence run east 466.6 feet to said point "A"

**94-10**

Township 11 North, Range 6 West
Section 30:  A tract of land described as beginning at the quarter corner between Section 19 and Section 30, thence run south 1404.4 feet, thence run east 466.6 feet to the actual point of beginning marked point "A" on a plat of survey recorded in Book 1, Page 229, of the Conveyance Records of Natchitoches Parish, Louisiana, and from said point "A" run south 74 degrees 49 minutes east approximately 190 feet, or to low water mark on Clear Lake, thence run south 5 degrees west 40.7 feet along low water mark on Clear Lake, thence run north 80 degrees 42 minutes west approximately 189.3 feet, thence run north 6 degrees 41 minutes east 60 feet to the point of beginning, situated in Lot 7 of said section

**94-11**

Township 11 North, Range 6 West
Section 30:  A tract of land described as beginning at the quarter corner between Section 19 and Section 30, thence run south 1404.4 feet, thence run east 466.6 feet to point "A" as shown on a plat of survey prepared by A. J. Brouillette, and of record in Conveyance Book 1, Page 229, Records of Natchitoches Parish, Louisiana, and from said point "A" run south 6 degrees 41 minutes west a distance of 10 feet for the actual point of beginning, thence run south 6 degrees 41 minutes west a distance of 50 feet, thence run south 80 degrees 42 minutes east approximately 190 feet, or to the low water mark of Clear Lake, thence run north 5 degrees east along and with said low water mark a distance of 40.7 feet, thence run in a westerly direction approximately 190 feet to the point of beginning, all situated in Lot 7 of said section

**94-12**

Township 11 North, Range 6 West
Section 30:  A tract of land described as beginning at the quarter section corner between Section 19 and Section 30, which is marked by a brass cap, thence run south a distance of 1404.4 feet, thence run east a distance of 466.6 feet to point "A" as shown on a plat of survey made by A. J. Brouillette, Surveyor, dated July 1, 1961, a copy of which plat is annexed to a deed recorded in

- 18 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 94-12 (continued) | Conveyance Book 249, Page 65, Records of Natchitoches Parish, Louisiana, and from said point "A" run south 6 degrees 41 minutes west a distance of 60 feet for the actual point of beginning of the property being described herein, thence run south 6 degrees 41 minutes west a distance of 50 feet, thence run south 83 degrees 27 minutes east a distance of 190 feet, thence run north 5 degrees east a distance of 40.7 feet, thence run north 80 degrees 42 minutes west a distance of 189.3 feet to the point of beginning |

94-13    Township 11 North, Range 6 West
Section 30:   A tract of land described as beginning at point "A", as shown on a plat of survey made by A. J. Brouillette, Surveyor, dated August 4, 1962, and from said point "A" run south 6 degrees 41 minutes west a distance of 110 feet for the actual point of beginning of the property being described herein, thence run south 83 degrees 27 minutes east a distance of 190 feet to the water's edge of Clear Lake, thence run south 5 degrees west a distance of 39 feet, thence run north 86 degrees 30 minutes west a distance of 191.5 feet, thence run north 6 degrees 41 minutes east a distance of 50 feet to the point of beginning, said point "A" is described as beginning at the proven U. S. quarter section corner between Section 19 and Section 30, thence run south a distance of 1404.4 feet, thence run east a distance of 466.6 feet to said point "A"

94-14    Township 11 North, Range 6 West
Section 30:   A tract of land described as beginning at the NE corner of property now owned by Louis C. Hall, formerly John R. Shows, thence run north with the meanderings of Clear Lake a distance of 260 feet, thence run west between parallel lines a distance of 550 feet, more or less, to the graded road, said property being bounded on the north by property of O. D. Guin, on the east by Clear Lake, on the south by property of Hall, and on the west by a graded road

94-15    Township 11 North, Range 6 West
Section 30:   A tract of land, being located in Lot 7 of said section, more particularly described as beginning at the exact middle of said section, thence run north along the half section line a distance of 7.50 chains to the point of beginning, which is the SW corner of the property being described herein, thence run north 5.60 chains along the half section line to the NW corner of this tract, thence run east 9.50 chains, more or less, to the edge of Clear Lake, thence in a general southerly direction along the edge of Clear Lake to the SE corner of the tract herein described, thence

| TRACT NO. | DESCRIPTION |
|---|---|
| 94-15 (continued) | directly west 7.54 chains, more or less, to the point of beginning, the whole being more fully shown on a plat of survey made by Gaiennie Hyams, Surveyor, dated July 5, 1944 |

94-16

*Deleted 2/1/67*

Township 11 North, Range 6 West

Section 30: A tract of land, being located in Lot 7 of said section, more particularly described as beginning at the SW corner of said Lot 7, thence run north 7.50 chains along a line between Lot 6 and Lot 7 to the actual point of beginning, thence run east 7.54 chains to the waters of Clear Lake, thence in a southerly direction down the shore of Clear Lake a distance of 50 feet, thence in a westerly direction 7.54 chains to the east boundary of Lot 6, thence north 50 feet to the point of beginning, being a strip 50 feet wide taken off the north side of said Lot 7 and being the same 50 feet reserved in an Act of Sale by Terry L. Presswood to F. D. McCreary, shown in a deed dated January 2, 1948

94-17

Township 11 North, Range 6 West

Section 30: A tract of land located in the SW corner of Lot 7 in said section, more particularly described as beginning at the SW corner of Lot 7, thence run north 7.50 chains along a line between Lots 6 and 7 (same as REA power line) to a point, thence east 7.54 chains to the waters of Clear Lake, thence down the shore in a southerly direction to the line between Lots 7 and 8 of said section, thence west 5.80 chains along the line between Lots 7 and 8 to the point of beginning, all as shown on plat of survey by Gaiennie Hyams, Surveyor, dated September 27, 1950, LESS that portion of the above 5 acres reserved by McCreary in sale to Republic recorded in Conveyance Book 207, Page 240, Records of Natchitoches Parish, Louisiana, being a 50 foot strip fronting on Clear Lake running back between parallel lines to the rear line of said tract

95

Township 11 North, Range 6 West

Section 19: Lots 9, 10 and 15

96

Township 11 North, Range 6 West

Section 19: Lot 8, E/2 of Lot 7, LESS Tract 115 hereinafter described

97-1

*Deleted 2/1/67*

Township 11 North, Range 6 West

Section 19: Lots 1 and 2, W/2 of Lot 7, LESS Tracts 97-2, 97-3, 97-4, 97-5, 97-6 and 97-8 hereinafter described

97-2

Township 11 North, Range 6 West

Section 19: A tract of land situated in Lot 1 of said section on the bank of Clear Lake, bounded in front or



| TRACT NO. | DESCRIPTION |
|---|---|
| 97-2 (continued) | northeast by Clear Lake, below or southeast by camp property of W. S. McDonald, above or northwest by camp property sold by W. Peyton Cunningham to Wilfred K. Scroggin, and running to a point in the rear or southwest |

97-3

**Township 11 North, Range 6 West**

Section 19:  A tract of land described as beginning at a point and/or iron stob on the SW corner of Lot 1 of said section, thence run north a distance of 299 feet, thence run east a distance of 387 feet, thence run north a distance of 101 feet to the actual point of beginning of the property being described herein, thence run north 22.5 degrees east a distance of 270 feet or to the edge of Black Lake, thence run along the edge of said lake on a bearing approximately south 68.5 degrees east a distance of 134.5 feet to a point on the boundary between the property hereby described and the lot sold to L. G. Stubblefield, thence run southwest 45 degrees west a distance of 270 feet along the boundary between the property hereby described and the property sold to Stubblefield to a point, thence run north 68.5 degrees west a distance of 90 feet to the point of beginning.  This also includes all land between the lake frontage as above described and the boundary line between Lots 1 and 16 of said section in the lake

97-4

**Township 11 North, Range 6 West**

Section 19:  A tract of land described as beginning at a point and/or iron stob on the SW corner of Lot 1 of said section, thence run north a distance of 299 feet, thence run east a distance of 387 feet, thence run north a distance of 101 feet, thence run south 68.5 degrees east a distance of 90 feet to the actual point of beginning of the property being described herein, thence continue along said line a distance of 90 feet, thence run north 29 degrees east a distance of 275 feet or to edge of Black Lake, thence run west along edge of said lake a distance of 134 feet and 6 inches, thence run southwest a distance of 270 feet to the point of beginning

97-5

**Township 11 North, Range 6 West**

Section 19:  A tract of land described as beginning at a locust tree 10 inches in diameter on the line between Lots 1 and 8 of said section, where said line crosses the lot of ground claimed or owned by Dick and Margaret Templeton, thence 113 feet along the lot line in a westerly direction to a point which is the point of beginning of the lot to be described herein, thence 142 feet west, thence 76.5 feet north to a pine tree 15 inches in diameter situated at the top of the bank of Black

- 21 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 97-5 (continued) | Lake, thence an additional 107.5 feet north to a pine tree 20 inches in diameter, thence to the center of Big Slough, thence on a traverse along the water's edge of Black Lake to a point from which the point of beginning bears south 15 degrees west, thence along said bearing to said point of beginning. Also included is the lake bed in front of the above lot, to the boundary between Lots 1 and 16 of said section, but not in the Slough, being the same land purchased from W. Peyton Cunningham and recorded in Conveyance Book 234, Page 315-1/2, Records of Natchitoches Parish, Louisiana |

97-6

**Township 11 North, Range 6 West**

Section 19: A tract of land described as beginning at a locust tree 10 inches in diameter blazed by A. J. Brouillette, Surveyor, as marking the boundary between Lots 1 and 8 of said section, which tree also marks the boundary between property claimed by Dick and Margaret Templeton and the property hereby described, thence along the fence line of Templeton at a compass bearing of approximately north 30 degrees east to the waters of Black Lake, continuing to the boundary line between Lots 1 and 16 of said section, thence in an arc along the said boundary line of Lots 1 and 16 in a generally northwesterly direction to a point, thence south 15 degrees west along the boundary line of the lot sold to John L. and Dora Walsworth Parker to the south line of Lot 1, thence east along the said south line of Lot 1 to the locust tree, the point of beginning, bounded easterly by property claimed by Templeton and by W. Peyton Cunningham, westerly by Parker, southerly by Lot 8 of said section

97-7

**Township 11 North, Range 6 West**

Section 19: A tract of land containing 1 acre, more or less, situated in a parcel of ground which is described as the NE/4 of NE/4 of NE/4 of said section and the NW/4 of NW/4 and the SW/4 of NW/4 of Section 20, being shown on a plat made by V. G. Hyams, Surveyor, recorded in Book 136, Page 273, Records of Natchitoches Parish, Louisiana; also a tract of land situated in the extreme eastern end of Lot 1 of said Section 19, bounded south by the division line between Lots 1 and 8 of said sections, north or northwest by a camp-site sold by W. Peyton Cunningham, Sr. to W.R. Jones by deed recorded in Conveyance Book 234, Page 336, Records of Natchitoches Parish, Louisiana, east by the Northwest Louisiana Fish and Game Preserve of Black Lake, and west by the campsite belonging to Templeton and acquired from June R. Dalme by deed recorded in Conveyance Book 227, Page 542, Records of Natchitoches Parish, Louisiana

- 22 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 98 | **Township 12 North, Range 6 West**<br>Section 36:   SE/4 of SW/4 south of Fordoche Creek |
| 99 | **Township 11 North, Range 6 West**<br>Section 19:   Lots 16, 17 and 18 |
| 100 | **Township 11 North, Range 6 West**<br>Section 30:   All of Lot 6 lying south of the O. D. Guin Camp<br>Road, and west of the Republic Camp Road |
| 101 | **Township 11 North, Range 6 West**<br>Section 30:   A tract of land described as beginning at the SE<br>corner of Lot 6, thence run west 23.40 chains<br>to a point, thence north 10.15 chains, thence<br>east 23.40 chains to the line between Lots 6 and<br>7 of said section, thence south 10.15 chains along<br>said line to the SE corner of Lot 6, the point of<br>beginning |
| 102 | **Township 11 North, Range 6 West**<br>Section 30:   A tract of land described as beginning at the SW<br>corner of the SE/4 of said section, thence west<br>660 feet, thence north 346 feet for the actual<br>point of beginning, thence run north 644 feet,<br>thence east 660 feet, thence south to the north<br>edge of Gravel Road, thence westerly along the<br>north edge of the said road to the point of<br>beginning |
| 103 | **Township 11 North, Range 6 West**<br>Section 31:   E/2 of E/2 of NW/4 |
| 104 | **Township 11 North, Range 6 West**<br>Section 31:   A tract of land containing 5.1 acres, more or<br>less, situated in Lots 5 and 6 or the S/2 of NW/4<br>of said section, more particularly described as<br>beginning at the NE corner of the SW/4 of said<br>section, thence run west 13.70 chains to point<br>"A", the actual point of beginning, thence west<br>14.67 chains along the south line of the NW/4 of<br>said section to point "B", thence north 2 degrees<br>east 4.30 chains to point "C", thence south 83.30<br>degrees east 14.73 chains to point "D", thence<br>south 2 degrees east 2.60 chains to the point of<br>beginning, the whole being more fully shown on a |

- 23 -

| TRACT NO. | DESCRIPTION |
|---|---|
| /104 (continued) | plat by Gaiennie Hyams, Surveyor, dated June 7, 1951; also N/2 of NE/4 of SW/4 of said section, LESS Tract 114 hereinafter described |

105    Township 11 North, Range 6 West
      Section 31: E/2 of S/2 of NE/4 of SW/4

106    Township 10 North, Range 6 West
      Section 4: A tract of land in the NE/4 of NW/4 or Lot 3 of said section, which tract was dedicated to the Northwest Louisiana Fish and Game Preserve from Bastrop National Bank, et al, and being more particularly shown on map dated December 5, 1930, by Frank H. Waddill, C. E., and on record in the State Land Office, Baton Rouge, Louisiana

107    Township 10 North, Range 6 West
      Section 6: W/2 of NW/4 of NE/4

108    Township 10 North, Range 6 West
      Section 6: A tract of land located in the E/2 of NW/4 of NE/4 acquired by Mrs. Mabel Cassady Phipps from Arrean B. Richardson, et al, per deed recorded in Conveyance Book 225, Page 42, Records of Natchitoches Parish, Louisiana

109    Township 10 North, Range 6 West
      Section 6: NE/4 of NE/4

110    Township 10 North, Range 6 West
      Section 6: E/2 of W/2 of SE/4 of NE/4

111    Township 10 North, Range 6 West
      Section 6: E/2 of SE/4 of NE/4

112-1   Township 10 North, Range 6 West
      Section 5: Lot 6 of the Sarah Babers Division of lands located in the W/2 of NW/4 of said section, as more fully shown and described by deed and plat recorded in Conveyance Book 192, Page 356, Records of Natchitoches Parish, Louisiana

112-2   Township 10 North, Range 6 West
      Section 5: Lot 7 of the Sarah Babers Division of lands located in the W/2 of NW/4 of said section, as more fully shown and described by deed and plat recorded in Conveyance Book 192, Page 356, Records of Natchitoches Parish, Louisiana

112-3   Township 10 North, Range 6 West
      Section 5: Lot 5 of the Sarah Babers Division of lands located in the W/2 of NW/4 of said section, as more fully shown and described by deed and plat recorded in Conveyance Book 192, Page 356, Records of Natchitoches Parish, Louisiana, LESS Tract 112-4 hereinafter described

- 24 -

| TRACT NO. | DESCRIPTION |
|---|---|
| 112-4 | **Township 10 North, Range 6 West** |
| | Section 5: One acre square, being 208.7 feet on all sides, located in the NW corner of the SW/4 of NW/4 of said section |
| 112-5 | **Township 10 North, Range 6 West** |
| | Section 5: Lot 4 of the Sarah Babers Division of lands located in the W/2 of NW/4 of said section, as more fully described and shown by deed and plat recorded in Conveyance Book 192, Page 356, Records of Natchitoches Parish, Louisiana, LESS Tracts 112-6 and 112-7 hereinafter described |
| 112-6 | **Township 10 North, Range 6 West** |
| | Section 5: A tract of land described as beginning at the SE corner of Lot 4 of the Sarah Babers Division, thence run west 115 feet for the actual point of beginning, thence run west 112 feet, thence run north to the south right-of-way of State Highway 480, thence run southeast along said right-of-way approximately 115 feet, thence run due south to the point of beginning |
| 112-7 | **Township 10 North, Range 6 West** |
| | Section 5: A tract of land in the SE corner of Lot 4 of the Sarah Babers Division of lands in the W/2 of NW/4 of said section, said tract more fully described as beginning at the SE corner of said Lot 4, thence run west approximately 115 feet to the east line of tract owned by James Waldrup, thence run north to the south line of State Highway 480, thence follow said south right-of-way line in an easterly direction to the east line of the W/2 of NW/4, thence run south to the point of beginning |
| 112-8 | **Township 10 North, Range 6 West** |
| | Section 5: One acre on the west side of Lot 3 of the Sarah Babers Division of lands, bounded now or formerly on the west by Peter and Laura Waldrup, north by Berthan Waldrup, and east by Mary Harrison, and south by Edward Waldrup |
| 112-9 | **Township 10 North, Range 6 West** |
| | Section 5: Lot 3 of the Sarah Babers Division of lands located in the W/2 of NW/4 of said section, as more fully shown and described by deed and plat recorded in Conveyance Book 192, Page 356, Records of Natchitoches Parish, Louisiana, LESS Tract 112-8 hereinabove described |
| 112-10 | **Township 10 North, Range 6 West** |
| | Section 5: Lot 2 of the Sarah Babers Division of lands located in the W/2 of NW/4 of said section, as more fully shown and described by deed and plat recorded in Conveyance Book 192, Page 356, Records of Natchitoches Parish, Louisiana, LESS Tract 112-11 hereinafter described |

| TRACT NO. | DESCRIPTION |
|---|---|

**112-11**

Township 10 North, Range 6 West
Section 5: A certain 2 acre tract in the SW corner of Lot 2 of the Sarah Babers Division of lands in the W/2 of NW/4 of said section, more particularly described as a 2 acre square, being 295 feet on all sides, located in the SW corner of said Lot 2

**112-12**

Township 10 North, Range 6 West
Section 5: A tract of land containing 7.5 acres on the south side of SW/4 of NW/4 and the North 10 acres of NW/4 of SW/4

**113**

Township 10 North, Range 6 West
Section 5: E/2 of NW/4

**114**

Township 11 North, Range 6 West
Section 31: A tract of land described as beginning at the NE corner of the NE/4 of SW/4, thence run west 35 yards to the point of beginning, thence run west 35 yards, thence run south 35 yards, thence run east 35 yards, thence run north 35 yards to the point of beginning

**115**

Township 11 North, Range 6 West
Section 19: A tract of land situated in Lot 8 of said section, being more particularly described on a plat made by Gaienne Hyams, Surveyor, as beginning at a point marked "A" on said plat, which point is 8.74 chains east and 6.90 chains north of the SW corner of said Lot 8, thence from this point of beginning run north 49 degrees east 5.60 chains to point "B", thence south 62 degrees east 3.60 chains, thence south 43.5 degrees east 2.49 chains, thence south 33 degrees east 1.96 chains to point "C", the high water contour of Black Lake, thence southwesterly along said contour line of said Black Lake 6.82 chains to point "D", thence north 41 degrees west 8.00 chains to point "A", the point of beginning

**116**

Township 10 North, Range 6 West
Sections 4 & 5: All of the lands now or formerly constituting the beds and bottoms of all water bodies of every nature and description, and all islands and other lands formed by accretion or reliction, except tax lands, situated in Natchitoches Parish, Louisiana, within the following described boundaries: Sections 4 and 5, Township 10 North, Range 6 West, Natchitoches Parish, Louisiana, all more fully shown outlined in red on a plat on file in the State Land Office, Baton Rouge, Louisiana

**117-1**

Township 10 North, Range 6 West
Section 5: A tract of land in the NW/4 of SE/4 of said section containing 17.93 acres, and being that portion of Lot 9 of said section situated and located south and west of the road to Trichel's Camp, the same being more fully shown on a plat of survey dated September 22, 1955 by John S. Hyams, Surveyor

| TRACT NO. | DESCRIPTION |
|---|---|

**117-2**

Township 10 North, Range 6 West

Sections 4 & 5: A portion of Lot 1 in Section 5, containing 8.80 acres, and a portion of Lots 5 (containing 19.97 acres) and 12 (containing 19.97 acres) of Section 4, being the same land which was dedicated by Gus and C. H. Lemoine to Louisiana Fish and Game Preserve, and more fully shown by map dated December 5, 1930, by Frank H. Waddill, C. E., of record in the State Land Office, Baton Rouge, Louisiana

**117-3**

Township 10 North, Range 6 West

Section 5: Lot 1, plus an 11 foot strip on the west side of Lot 1-A of the Dalton Campsites on Clear Lake in said section, being more fully shown on plat by A. J. Brouillette dated July 25, 1958, recorded in Map Book 1, Page 197, Records of Natchitoches Parish, Louisiana

**117-4**

Township 10 North, Range 6 West

Section 5: Lot 1-A, LESS 11 feet off the west side, and Lot 2 and Lot 2-A of the Dalton Campsites on Clear Lake in said section, being more fully shown on plat by A. J. Brouillette, dated July 25, 1958, recorded in Map Book 1, Page 197, Records of Natchitoches Parish, Louisiana

**117-5**

Township 10 North, Range 6 West

Section 5: Lots 2-B, 3, 4 and 5 of the Dalton Campsites on Clear Lake in said section, being more fully shown on plat by A. J. Brouillette, dated July 25, 1958, recorded in Map Book 1, Page 197, Records of Natchitoches Parish, Louisiana



PETTIT ZONE UNIT
**BLACK LAKE FIELD**
NATCHITOCHES PARISH, LOUISIANA
OPERATOR, PLACID OIL COMPANY

*EXHIBIT B*

OUTLINE OF UNIT AREA
AND TRACTS THEREIN



90-1

90-2

90-3

90-5

90-4

90-5

90-6'

90-7

PETTIT ZONE UNIT
**BLACK LAKE FIELD**
NATCHITOCHES PARISH, LOUISIANA
OPERATOR, PLACID OIL COMPANY

EXHIBIT  B - INSERT 1

*DETAIL of TRACT 90*

SECTION 31  T-11-N  R-6-W

SCALE  1 in = 400 feet



PETTIT ZONE UNIT
**BLACK LAKE FIELD**
NATCHITOCHES PARISH, LOUISIANA
OPERATOR, PLACID OIL COMPANY

EXHIBIT  B - INSERT 2

*DETAIL of TRACT 91*

SECTION 31  T-11-N  R-6-W

SCALE  I in. = 400 feet

93-1

93-3

93-2

93-4

93-4

93-5

93-4

93-6

PETTIT ZONE UNIT
**BLACK LAKE FIELD**
NATCHITOCHES PARISH, LOUISIANA
OPERATOR, PLACID OIL COMPANY

EXHIBIT  B - INSERT 3

*DETAIL  of  TRACT  93*

SECTION  30  T-11-N   R-6-W

SCALE  1 in. = 400 feet



PETTIT ZONE UNIT

**BLACK LAKE FIELD**

NATCHITOCHES PARISH, LOUISIANA
OPERATOR, PLACID OIL COMPANY

EXHIBIT  B - INSERT 4

*DETAIL of TRACT 94*

SECTION 30 T-II-N  R-6-W

SCALE  1 in. = 400 feet



| PETTIT ZONE UNIT |
| --- |
| **BLACK LAKE FIELD** |
| NATCHITOCHES PARISH, LOUISIANA |
| OPERATOR, PLACID OIL COMPANY |
| EXHIBIT B – INSERT 5 |
| *DETAIL of TRACT 97* |
| SECTION 19 T-11-N R-6-W |
| SCALE 1 in. = 400 feet |



PETTIT ZONE UNIT
**BLACK LAKE FIELD**
NATCHITOCHES PARISH, LOUISIANA
OPERATOR, PLACID OIL COMPANY

EXHIBIT 8 - INSERT 6

*DETAIL of TRACT 112*

SECTION 5 T-10-N R-6-W

SCALE I in = 400 feet



PETTIT ZONE UNIT

**BLACK LAKE FIELD**
WITH PETTIT OR ST-FORM OIL SAND
OPERATOR, PLACID OIL COMPANY

EXHIBIT B - INSERT 7

*DETAIL of TRACT 117*

SECTION 5  T-10-N  R-6-W

SCALE  1 in = 400 feet

# TOGHE UNIT AGREEMENT
## PETTIT ZONE UNIT
### BLACK LAKE FIELD
#### NATCHITOCHES PARISH, LOUISIANA

## SCHEDULE OF INDIVIDUAL TRACT ADJUSTED ACRE-FEET AND TRACT PARTICIPATION

| Tract No. | Oil Acre-Feet | Adjusted Oil Acre-Feet | Gas Acre-Feet | Total Adjusted Acre-Feet | Tract Participation Percentage |
|---|---|---|---|---|---|
| 1 | 93,580.26 | 126,732.93 | 329,958.01 | 456,690.94 | 44.102639 |
| 2 | 16,205.97 | 21,947.26 | 22,868.37 | 44,815.63 | 4.327845 |
| 3 | 2,925.74 | 3,962.24 | 261.74 | 4,223.98 | 0.407910 |
| 4 | 20,022.00 | 27,115.23 | 103,501.15 | 130,616.38 | 12.613622 |
| 5 | 32,591.82 | 44,139.48 | 79,192.82 | 123,332.30 | 11.910199 |
| 6 | 4,996.58 | 6,766.72 | 6,063.92 | 12,830.64 | 1.239055 |
| 7 | 9,344.42 | 12,654.94 | 6,805.59 | 19,460.53 | 1.879303 |
| 8 | 0.00 | 0.00 | 20,385.35 | 20,385.35 | 1.968613 |
| 9 | 0.00 | 0.00 | 36,513.36 | 36,513.36 | 3.526095 |
| 10 | 2,001.45 | 2,710.50 | 353.73 | 3,064.23 | 0.295913 |
| 11 | 1,801.97 | 2,440.35 | 3,197.35 | 5,637.70 | 0.544433 |
| 12 | 2,929.28 | 3,967.06 | 5,457.11 | 9,424.15 | 0.910090 |
| 13 | 1,082.90 | 1,466.54 | 6,053.72 | 7,520.26 | 0.726231 |
| 14 | 771.65 | 1,045.02 | 8,601.97 | 9,646.99 | 0.931610 |
| 15 | 342.08 | 463.27 | 1,385.58 | 1,848.79 | 0.178538 |
| 16 | 816.97 | 1,106.40 | 2,679.27 | 3,785.67 | 0.365582 |
| 17 | 0.00 | 0.00 | 92.68 | 92.68 | 0.008950 |
| 18 | 0.00 | 0.00 | 1,628.75 | 1,628.75 | 0.157288 |
| 19 | 0.00 | 0.00 | 308.22 | 308.22 | 0.029765 |
| 20 | 0.00 | 0.00 | 170.54 | 170.54 | 0.016469 |
| 21 | 0.00 | 0.00 | 0.46 | 0.46 | 0.000044 |
| 22 | 0.00 | 0.00 | 0.46 | 0.46 | 0.000044 |
| 23 | 89.19 | 120.79 | 0.00 | 120.79 | 0.011665 |
| 24 | 215.98 | 292.50 | 8,209.53 | 8,502.03 | 0.821041 |
| 25 | 0.00 | 0.00 | 33,179.37 | 33,179.37 | 3.204131 |
| 26 | 0.00 | 0.00 | 699.91 | 699.91 | 0.067590 |
| 27 | 0.00 | 0.00 | 60.43 | 60.43 | 0.005836 |
| 28 | 0.00 | 0.00 | 443.31 | 443.31 | 0.042810 |
| 29 | 0.00 | 0.00 | 2,574.52 | 2,574.52 | 0.248621 |
| 30 | 0.00 | 0.00 | 39.25 | 39.25 | 0.003790 |
| 31 | 1,413.43 | 1,914.17 | 1,372.46 | 3,286.63 | 0.317390 |
| 32 | 1,403.59 | 1,900.84 | 2,529.98 | 4,430.82 | 0.427884 |
| 33 | 2,073.30 | 2,807.81 | 6,933.92 | 7,741.73 | 0.747619 |
| 34 | 1,199.35 | 1,624.24 | 3,357.57 | 4,981.81 | 0.481093 |
| 35 | 705.80 | 955.84 | 1,324.31 | 2,280.15 | 0.220194 |
| 36 | 1,345.87 | 1,822.67 | 2,839.16 | 4,661.83 | 0.450193 |
| 37 | 182.65 | 247.36 | 3,113.82 | 3,361.18 | 0.324589 |
| 38 | 109.09 | 147.74 | 3,395.53 | 3,543.27 | 0.342174 |
| 39 | 21.00 | 28.44 | 2,304.83 | 2,333.27 | 0.225324 |
| 40 | 22.97 | 31.11 | 94.03 | 125.14 | 0.012085 |
| 41 | 1,246.18 | 1,687.66 | 3,093.10 | 4,780.76 | 0.461678 |
| 42 | 547.64 | 741.65 | 1,690.95 | 2,432.60 | 0.234916 |
| 43 | 539.07 | 730.05 | 1,819.21 | 2,549.26 | 0.246182 |
| 44 | 35.53 | 48.12 | 81.81 | 129.93 | 0.012547 |
| 45 | 1,226.49 | 1,661.00 | 2,815.04 | 4,476.04 | 0.432251 |
| 46 | 56.67 | 76.75 | 157.69 | 234.44 | 0.022640 |
| 47 | 0.00 | 0.00 | 2,169.55 | 2,169.55 | 0.209513 |
| 48 | 0.00 | 0.00 | 4,357.11 | 4,357.11 | 0.420766 |
| 49 | 4.05 | 5.48 | 0.00 | 5.48 | 0.000529 |
| 50 | 1,090.34 | 1,476.61 | 239.00 | 1,715.61 | 0.165676 |
| 51 | 56.18 | 76.08 | 0.00 | 76.08 | 0.007347 |
| 52 | 392.35 | 531.35 | 0.00 | 531.35 | 0.051312 |
| 53 | 57.60 | 78.01 | 0.00 | 78.01 | 0.007533 |
| 54 | 2,262.96 | 3,064.66 | 380.31 | 3,445.17 | 0.332700 |
| 55 | 219.95 | 297.87 | 498.05 | 795.92 | 0.076862 |
| 56 | 29.41 | 39.83 | 30.31 | 70.14 | 0.006773 |
| 57 | 164.69 | 223.03 | 124.38 | 347.41 | 0.033549 |
| 58 | 481.50 | 652.08 | 1,232.84 | 1,884.92 | 0.182027 |
| 59 | 454.02 | 614.87 | 1,210.77 | 1,825.64 | 0.176302 |
| 60 | 240.22 | 325.32 | 1,633.46 | 1,958.78 | 0.189159 |
| 61 | 7.60 | 10.29 | 104.31 | 114.60 | 0.011067 |
| 62 | 7.32 | 9.91 | 105.19 | 115.20 | 0.011125 |
| 63 | 15.09 | 20.44 | 321.59 | 342.03 | 0.033030 |
| 64 | 69.28 | 93.82 | 802.85 | 896.67 | 0.086591 |
| 65 | 1,131.44 | 1,533.63 | 582.72 | 2,116.35 | 0.204376 |
| 66 | 1,790.35 | 2,426.62 | 1,854.70 | 4,279.32 | 0.413254 |
| 67 | 0.43 | 0.58 | 0.00 | 0.58 | 0.000056 |
| 68 | 843.26 | 1,142.00 | 328.83 | 1,470.83 | 0.142038 |
| 69 | 12.67 | 17.16 | 17.16 | 17.16 | 0.001657 |
| 70 | 216.69 | 293.46 | 0.00 | 293.46 | 0.028339 |
| 71 | 56.66 | 76.73 | 0.00 | 76.73 | 0.007410 |
| 72 | 5.58 | 7.56 | 0.00 | 7.56 | 0.000730 |
| 73 | 22.43 | 30.38 | 0.00 | 30.38 | 0.002934 |
| 74 | 123.21 | 166.86 | 0.00 | 166.86 | 0.016114 |
| 75 | 96.71 | 130.97 | 0.00 | 130.97 | 0.012648 |
| 76 | 56.71 | 76.80 | 0.00 | 76.80 | 0.007417 |
| 77 | 22.46 | 30.42 | 0.00 | 30.42 | 0.002938 |
| 78 | 2.07 | 2.80 | 0.00 | 2.80 | 0.000270 |
| 79 | 1.29 | 1.75 | 0.00 | 1.75 | 0.000169 |
| 80 | 538.94 | 729.87 | 34.06 | 763.93 | 0.073773 |
| 81 | 767.32 | 1,039.16 | 75.26 | 1,114.42 | 0.107620 |
| 82 | 75.75 | 102.59 | 23.01 | 125.60 | 0.012129 |
| 83 | 75.96 | 102.87 | 23.48 | 126.35 | 0.012202 |
| 84 | 36.02 | 48.78 | 1.72 | 50.50 | 0.004877 |
| 85 | 35.56 | 48.16 | 0.76 | 48.92 | 0.004724 |
| 86 | 34.98 | 47.37 | 0.24 | 47.61 | 0.004598 |
| 87 | 25.43 | 34.44 | 0.00 | 34.44 | 0.003326 |
| 88 | 1,575.39 | 2,133.50 | 226.87 | 2,360.37 | 0.227941 |
| 89 | 338.58 | 458.53 | 137.58 | 596.11 | 0.057566 |
| 90.1 | 764.99 | 1,036.00 | 727.32 | 1,763.32 | 0.170284 |
| 90.2 | 26.01 | 35.22 | 24.17 | 56.69 | 0.005475 |
| 90.3 | 122.67 | 166.13 | 131.60 | 297.73 | 0.028752 |
| 90.4 | 89.54 | 121.26 | 54.69 | 175.95 | 0.016991 |
| 90.5 | 75.47 | 102.21 | 42.71 | 144.92 | 0.013995 |
| 90.6 | 109.79 | 148.69 | 35.41 | 184.10 | 0.017779 |
| 90.7 | 1,042.91 | 1,412.38 | 256.80 | 1,669.18 | 0.161193 |
| 90.8 | 6.72 | 9.10 | 3.67 | 12.77 | 0.001233 |
| 91.1 | 59.34 | 80.36 | 197.21 | 277.57 | 0.026805 |
| 91.2 | 336.46 | 455.66 | 365.80 | 821.46 | 0.079328 |
| 91.3 | 0.47 | 0.64 | 2.60 | 3.24 | 0.000313 |
| 91.4 | 3.94 | 5.34 | 19.08 | 24.42 | 0.002358 |
| 91.5 | 12.42 | 16.82 | 40.43 | 57.25 | 0.005529 |
| 92 | 685.66 | 928.37 | 166.41 | 1,094.98 | 0.105742 |
| 93.1 | 0.00 | 0.00 | 5.87 | 5.87 | 0.000567 |
| 93.2 | 8.44 | 11.43 | 1,054.27 | 1,065.70 | 0.102915 |
| 93.3 | 0.00 | 0.00 | 98.87 | 98.87 | 0.009548 |
| 93.4 | 0.00 | 0.00 | 80.67 | 80.67 | 0.007790 |
| 93.5 | 0.00 | 0.00 | 29.91 | 29.91 | 0.002888 |
| 93.6 | 3.92 | 5.31 | 40.32 | 45.63 | 0.004406 |
| 94.1 | 0.00 | 0.00 | 0.03 | 0.03 | 0.000003 |
| 94.2 | 0.00 | 0.00 | 119.55 | 119.55 | 0.011545 |



PETIT ZONE UNIT
BLACK LAKE FIELD
NA' .ITOCHES PARISH, LOUISIANA

## SCHEDULE OF INDIVIDUAL TRACT ADJUSTED ACRE-FEET AND TRACT PARTICIPATION

| Tract No. | Oil Acre-Feet | Adjusted Oil Acre-Feet | Gas Acre-Feet | Total Adjusted Acre-Feet | Tract Participation Percentage |
|---|---|---|---|---|---|
| 94.3 | 0.00 | 0.00 | 0.24 | 0.24 | 0.000023 |
| 94.4 | 0.00 | 0.00 | 2.85 | 2.85 | 0.000275 |
| 94.5 | 0.00 | 0.00 | 2.13 | 2.13 | 0.000206 |
| 94.6 | 0.00 | 0.00 | 4.30 | 4.30 | 0.000415 |
| 94.7 | 0.00 | 0.00 | 6.24 | 6.24 | 0.000603 |
| 94.8 | 0.00 | 0.00 | 3.51 | 3.51 | 0.000339 |
| 94.9 | 0.00 | 0.00 | 3.07 | 3.07 | 0.000296 |
| 94.10 | 0.00 | 0.00 | 3.56 | 3.56 | 0.000344 |
| 94.11 | 0.00 | 0.00 | 3.34 | 3.34 | 0.000323 |
| 94.12 | 0.00 | 0.00 | 2.90 | 2.90 | 0.000280 |
| 94.13 | 0.00 | 0.00 | 3.12 | 3.12 | 0.000301 |
| 94.14 | 0.00 | 0.00 | 34.16 | 34.16 | 0.003299 |
| 94.15 | 0.00 | 0.00 | 41.05 | 41.05 | 0.003966 |
| 94.16 | 0.00 | 0.00 | 5.65 | 5.65 | 0.000546 |
| 94.17 | 0.00 | 0.00 | 43.96 | 43.96 | 0.004245 |
| 95 | 0.00 | 0.00 | 504.50 | 504.50 | 0.048720 |
| 96 | 0.00 | 0.00 | 427.61 | 427.61 | 0.041294 |
| 97.1 | 0.00 | 0.00 | 23.09 | 23.09 | 0.002230 |
| 97.2 | 0.00 | 0.00 | 0.41 | 0.41 | 0.000040 |
| 97.3 | 0.00 | 0.00 | 2.84 | 2.84 | 0.000274 |
| 97.4 | 0.00 | 0.00 | 2.26 | 2.26 | 0.000218 |
| 97.5 | 0.00 | 0.00 | 11.37 | 11.37 | 0.001098 |
| 97.6 | 0.00 | 0.00 | 11.13 | 11.13 | 0.001075 |
| 97.7 | 0.00 | 0.00 | 13.00 | 13.00 | 0.001255 |
| 98 | 6.27 | 8.49 | 0.00 | 8.49 | 0.000820 |
| 99 | 0.00 | 0.00 | 411.73 | 411.73 | 0.039761 |
| 100 | 0.00 | 0.00 | 3.10 | 3.10 | 0.000299 |
| 101 | 0.00 | 0.00 | 9.39 | 9.39 | 0.000907 |
| 102 | 0.00 | 0.00 | 22.06 | 22.06 | 0.002130 |
| 103 | 84.34 | 116.22 | 11.92 | 126.14 | 0.012181 |
| 104 | 11.95 | 16.18 | 1.94 | 18.12 | 0.001750 |
| 105 | 3.45 | 4.67 | 0.69 | 5.36 | 0.000518 |
| 106 | 0.16 | 0.22 | 0.00 | 0.22 | 0.000021 |
| 107 | 0.21 | 0.28 | 0.05 | 0.33 | 0.000032 |
| 108 | 32.58 | 44.12 | 6.24 | 50.36 | 0.004863 |
| 109 | 241.39 | 326.91 | 29.59 | 356.50 | 0.034427 |
| 110 | 2.83 | 3.83 | 0.00 | 3.83 | 0.000370 |
| 111 | 30.95 | 41.91 | 0.00 | 41.91 | 0.004047 |
| 112.1 | 99.81 | 135.17 | 10.88 | 146.05 | 0.014106 |
| 112.2 | 102.55 | 138.88 | 9.25 | 148.13 | 0.014305 |
| 112.3 | 71.89 | 97.36 | 0.87 | 98.23 | 0.009486 |
| 112.4 | 4.01 | 5.43 | 0.25 | 5.68 | 0.000549 |
| 112.5 | 58.06 | 78.63 | 0.00 | 78.63 | 0.007593 |
| 112.6 | 5.03 | 6.81 | 0.00 | 6.81 | 0.000658 |
| 112.7 | 4.86 | 6.58 | 0.00 | 6.58 | 0.000635 |
| 112.8 | 2.45 | 3.32 | 0.00 | 3.32 | 0.000321 |
| 112.9 | 29.01 | 39.29 | 0.00 | 39.29 | 0.003794 |
| 112.10 | 18.50 | 25.05 | 0.00 | 25.05 | 0.002419 |
| 112.11 | 0.34 | 0.46 | 0.00 | 0.46 | 0.000044 |
| 112.12 | 0.94 | 1.27 | 0.00 | 1.27 | 0.000123 |
| 113 | 397.91 | 538.88 | 10.97 | 549.85 | 0.053099 |
| 114 | 0.83 | 1.12 | 0.12 | 1.24 | 0.000120 |
| 115 | 0.00 | 0.00 | 90.25 | 90.25 | 0.008715 |
| 116 | 208.46 | 282.31 | 0.19 | 282.50 | 0.027281 |
| 117.1 | 51.36 | 69.56 | 0.00 | 69.56 | 0.006717 |
| 117.2 | 36.49 | 49.42 | 0.00 | 49.42 | 0.004772 |
| 117.3 | 2.44 | 3.30 | 0.00 | 3.30 | 0.000319 |
| 117.4 | 1.57 | 2.13 | 0.00 | 2.13 | 0.000206 |
| 117.5 | 0.49 | 0.66 | 0.00 | 0.66 | 0.000064 |
| | 220,147.30 | 298,138.88 | 737,379.54 | 1,035,518.42 | 100.000000 |

<u>EXHIBIT D</u>

TO THE UNIT AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

<u>METHOD BY WHICH THE ACRE-FEET OF NET PRODUCTIVE PAY IN THE</u>

<u>UNITIZED INTERVAL HAS BEEN AND WILL BE CALCULATED</u>

Exhibit "C" of the Unit Agreement sets out for each Tract the number of Adjusted

Acre-Feet under each Tract and its Tract Participation. Such Adjusted Acre-

Feet and Tract Participation determinations were made by the Engineering and

Geological Committees of the Black Lake Field Operator's Committee in

accordance with the following described rules, and said rules shall govern any

future determinations of Adjusted Acre-Feet and Tract Participation which may

be necessary as a result of a revision as provided for in said Unit Agreement

subject to such adjustment of Section III hereof as may be necessary due to the

production of Unitized Substances subsequent to the Effective Date of the Unit

Agreement.

Section I:   <u>DETERMINATION OF ACRE-FEET OF NET PRODUCTIVE PAY</u>

A. THE LATEST AVAILABLE WELL DATA WAS USED TO

CONSTRUCT SUBSURFACE STRUCTURAL AND ISOPACHOUS

MAPS FOR THE PETTIT POROSITY OF THE UNITIZED

INTERVAL, BY THE GEOLOGICAL COMMITTEE.

1. The following rules were utilized in preparing these

subsurface maps.

(a). Base Map - A base map prepared from actual U. S.

and other surveys was employed for all geological

maps.

(b). Correlation of Tops and Bases for the Pettit

Porosity of the Unitized Interval Induction Electric

arveys were correlated with B   Hole Compensated Sonic Logs, if available, for each well. In the event a Bore Hole Compensated Sonic Log had not been run on a given well a conventional Sonic Log was used.

When correlating the Bore Hole Compensated Sonic Log, or Sonic Log, with the Induction Electric Survey, if any difference was noted in the measured depths between the two logs, the Induction Electric Survey was assumed correct and Bore Hole Compensated Sonic Log, or Sonic Log depths were corrected accordingly.

The Pettit Porosity of the Unitized Interval was determined from the spontaneous potential curve of the Induction Electric Survey. The Pettit Porosity was then correlated with the Bore Hole Compensated Log, or Sonic Log. The depth for the top and base of the Pettit Porosity was selected at the point of intersection of the sonic curve with the microsecond line, on the Interval Transit Time Scale, equivalent to 8 percent porosity, as determined for each well.

(c). Gas/Oil and Oil/Water Contacts - Each contact was based on either, or a combination of, electric log characteristics, core analysis and well test data. The contacts as established by the Geological Committee will only be changed if proven to be invalid by actual well tests.

(d). Net Productive Feet of Gas and Oil Pay - The net productive feet of oil and gas pay for the Pettit Porosity of the Unitized Interval were determined

-2-

rom Bore Hole Compensated S. : Logs, or Sonic

Logs. The amount of net productive feet of pay for

a given well was determined by adding the feet,

between the top and base of the Pettit Porosity, the

sonic curve registered equal to or greater than the

microsecond line, on the Interval Transit Time

Scale, determined to be equivalent to 8 percent

porosity.

(e). Preparation of Structural Maps - Each map was

prepared by interpolation between well control

points by correlation of tops and bases, as identified

in (b) above, for the Pettit Porosity of the Unitized

Interval.

(f). Preparation of Isopachous Maps - Each map was

prepared using equidistant contour spacing between

well control points established by net productive

pay thicknesses as determined in (d) above.

B. THE ACRE-FEET OF NET PRODUCTIVE OIL AND GAS PAY
WERE DETERMINED FROM THE ISOPACHOUS MAPS BY
THE ENGINEERING COMMITTEE.

1. The following rules were utilized in determining the acre-
feet of net productive pay underlying each Tract in the
Unitized Interval.

(a). The acre-feet of net productive pay underlying each

Tract were determined by planimetering and

applying the following rules:

(1). The net productive pay underlying each Tract

was planimetered and the reading recorded until

two successive readings or two of three readings

agreed within the tolerance as provided for by

the Engineering Committee, whereupon the

average of such two readings was applied.

-3-

A planimeter constant was determined for each section by adjusting the planimetered area for the section to the surveyed area of of the section.

(3). The trapezoidal rule was used for converting the planimetered readings to acre-foot volumes.

Trapezoidal Rule:  Volume=$\frac{Kh}{2}$ $(A_n + A_{n+1})$

(b). It was assumed that there is uniform change of pay thickness between the geological contours of different net productive pay thickness; however, in areas where it was deemed necessary to add contours to increase planimeter accuracy these interior contours were so drawn that the sum of the oil and gas pay on the isopach maps for these areas would equal the total pay as shown on the total hydrocarbon isopach map.  Areas within the last geological contour was considered to have an average net productive pay thickness the same as the last geological contour, unless modified by interior well data.

(c). All Tract descriptions were in conformance with approval survey data.

(d). The area calculated for each Tract, by planimetering, was corrected to the surveyed area as determined for each Tract.

Section II:   DETERMINATION OF VOLUMES OF HYDROCARBONS IN PLACE FOR THE UNITIZED INTERVAL

A. FORMATION PORE VOLUME.

1. Porosity values were determined from laboratory analyses by accepted methods of analyses of core samples

-4-

or log analysis where core data was not available.

(a). Porosity values of less than eight (8.0%) of the bulk volume were not considered.

(b). The porosity values of eight (8.0%) percent or greater which were in the gas cap were volumetrically averaged to determine the porosity value for the gas cap, while the porosity values of eight (8.0%) percent or greater which were in the oil column were volumetrically averaged to determine the porosity value for the oil column.

B.  AVERAGE CONNATE WATER SATURATION

1.  The average connate water saturation was determined for the oil column and for the gas cap by using data as calculated from electric log analysis, capillary pressure data, analysis of cores cut with oil base mud, and analysis of cores cut with conventional mud.

C.  OIL AND GAS VOLUME DETERMINATIONS UNDER ORIGINAL RESERVOIR CONDITIONS.

1.  The volume of in place oil and gas under original reservoir conditions was determined by the difference between the formation pore volume and the volume of water in the corresponding oil column and/or gas cap.

D.  THE FORMATION VOLUME FACTOR AND SOLUTION GAS OIL RATIO  WAS DETERMINED BY RESERVOIR FLUID ANALYSIS.

E.  THE COMPRESSIBILITY FACTOR, SHRINKAGE, AND LIQUID PRODUCT AND CONDENSATE YIELD OF THE GAS CAP WAS DETERMINED FROM A RECOMBINED SEPARATOR SAMPLE ANALYSIS.

-5-

F. THE ORIGIN. RESERVOIR PRESSURE AND . .MPERATURE
WAS DETERMINED FROM BOTTOM HOLE PRESSURE AND
TEMPERATURE SURVEYS.

G. THE VOLUME OF GAS ORIGINALLY IN PLACE WAS CALCULATED
AT STANDARD CONDITIONS OF 15.025 PSIA AND 60° F.

   1. These same standard conditions also apply to all subsequently
   mentioned gas volumes.

Section III: ULTIMATE RECOVERABLE HYDROCARBONS FOR THE
UNITIZED INTERVAL

A. ULTIMATE RECOVERABLE HYDROCARBONS FROM THE OIL
COLUMN.

   1. The ultimate recovery of oil, solution gas, and Liquid
   Products from the solution gas was calculated for the oil
   column, by assuming:

      (a). The oil column would be depleted under a pressure
      maintenance program during cycling and then produced
      under pressure depletion during blowdown until reaching
      an uneconomic producing rate.

B. ULTIMATE RECOVERABLE HYDROCARBONS FROM THE GAS CAP.

   1. The ultimate recovery of gas, condensate, and Liquid Products
   in the gas cap was calculated assuming:

      (a). The producing reservoir mechanism would be gas
      cycling with full pressure maintenance.

      (b). Upon completion of gas cycling, blowdown of the gas cap
      would begin and continue until reaching an uneconomic
      producing rate.

Section IV: DETERMINATION OF THE VALUE OF THE ULTIMATE RECOVERABLE
HYDROCARBONS IN THE UNITIZED INTERVAL

A. THE VALUE OF ONE (1) ACRE-FOOT OF NET PRODUCTIVE OIL PAY WAS DETERMINED AS FOLLOWS:

1. The ultimate recoverable oil as determined under Section III was divided by the net productive acre-feet of oil pay as determined under Section I in order to determine the ultimate recoverable oil in barrels per acre-foot.

2. The prices used for ultimate recoverable products from an acre-foot of net productive oil pay will be the well head price less severance taxes.

3. The ultimate recoverable oil in barrels per acre-foot was multiplied by the price of $2.69 per barrel.

4. The ultimate recoverable solution gas as determined under Section III was divided by the net productive acre-feet of oil pay as determined under Section I in order to determine the ultimate recoverable solution gas per acre-foot.

5. The ultimate recoverable solution gas per acre-foot was multiplied by the price of $0.162 per MCF.

6. The ultimate recoverable Liquid Products as determined under Section III were divided by the net productive acre-feet of oil pay as determined under Section I in order to obtain the ultimate recoverable Liquid Products per acre-foot.

7. The ultimate recoverable Liquid Products per acre-foot were multiplied by their respective prices per barrel as follows:

   (a). The ultimate recoverable ethane per acre-foot was multiplied by the price of $0.908 per barrel.

-7-

(b).   Tne ultimate recoverable propane per acre-foot was
multiplied by the price of $1.204 per barrel.

(c).   The ultimate recoverable n-butane per acre-foot was
multiplied by the price of $2.365 per barrel.

(d).   The ultimate recoverable i-butane per acre-foot
was multiplied by the price of $2.785 per barrel.

(e).   The ultimate recoverable natural gasoline per acre-
foot was multiplied by the price of $2.93 per barrel.

(f).   The ultimate recoverable condensate per acre-foot
was multiplied by the price of $2.75 per barrel.

8.   The value of one (1) acre-foot of net productive oil pay
was obtained by adding the value of ultimate recoverable
oil per acre-foot (as determined in No. 3 above), the
value of the ultimate recoverable solution gas per acre-
foot (as determined in No. 5 above), and the values
obtained for the ultimate recoverable Liquid Products
per acre-foot (as determined in No. 7 above).

B.   THE VALUE OF ONE (1) ACRE-FOOT OF NET PRODUCTIVE
GAS PAY WAS DETERMINED AS FOLLOWS:

1.   The ultimate recoverable gas as determined under
Section III was divided by the net productive acre-feet
of gas pay as determined under Section I in order to
determine the ultimate recoverable gas per acre-foot.

2.   The prices used for ultimate recoverable products from
an acre-foot of net productive gas pay will be the well
head price less severance taxes.

3.   The ultimate recoverable gas per acre-foot was multiplied
by the price of $0.162 per MCF.

-8-

4. The ultimate recoverable condensate as determined under Section III was divided by the net productive acre-feet of gas pay as determined under Section I in order to determine the ultimate recoverable condensate per acre-foot.

5. The ultimate recoverable barrels of condensate per acre-foot was multiplied by the price of $2.75 per barrel.

6. The ultimate recoverable Liquid Products as determined under Section III were divided by the net productive acre-feet of gas pay as determined under Section I in order to obtain the ultimate recoverable Liquid Products per acre-foot.

7. The ultimate recoverable Liquid Products per acre-foot were multiplied by their respective prices per barrel as follows:

   (a). The ultimate recoverable ethane per acre-foot was multiplied by the price of $0.908 per barrel.

   (b). The ultimate recoverable propane per acre-foot was multiplied by the price of $1.204 per barrel.

   (c). The ultimate recoverable n-butane per acre-foot was multiplied by the price of $2.365 per barrel.

   (d). The ultimate recoverable i-butane per acre-foot was multiplied by the price of $2.785 per barrel.

   (e). The ultimate recoverable natural gasoline per acre-foot was multiplied by the price of $2.93 per barrel.

8. The value of one (1) acre-foot of net productive gas pay was obtained by adding the value of ultimate recoverable gas per acre-foot (as determined in No. 3 above), the value of the ultimate recoverable condensate per acre-foot

- 9 -

obj     ed for the ultimate recoverabl    quid Products

per acre-foot (as determined in No. 7 above).

Section V:   CALCULATION OF THE ADJUSTED ACRE-FEET AND TRACT

PARTICIPATION FOR EACH TRACT IN THE UNITIZED INTERVAL.

A.   THE ADJUSTED ACRE-FEET FOR EACH TRACT IN THE UNITIZED

INTERVAL WERE CALCULATED AS FOLLOWS:

1. (a).  The total value of the ultimate recoverable hydrocarbons

per acre-foot in the gas cap (as determined under Section

IV) was equated as being equal to unity.  The relative

equivalent value of the ultimate recoverable hydrocarbons

from the oil column was then determined by dividing the

value of the ultimate recoverable hydrocarbons in one (1)

acre-foot of net productive oil pay (as determined under

Section IV) by the value of the ultimate recoverable

hydrocarbons in one (1) acre-foot of net productive

gas pay (as determined in Section IV).

(b).  The relative equivalent value of (1) acre-foot of net

productive oil pay to (1) acre-foot of net productive gas

pay was determined to be 1.35427.

2.  The net productive oil pay acre-feet for each Tract (as determined

under Section I) was tabulated.

3.  The oil adjusted acre-feet for each Tract was then calculated

by multiplying the acre-feet (tabulated in No. 2 above) by the

relative equivalent value factor as calculated under No. 1

above.

4.  The net productive gas pay acre-feet for each Tract ( as

determined under Section I) was tabulated.

- 10 -

5. The gas adjusted acre-feet for each Tract was calculated by multiplying the acre-feet (tabulated in No. 4 above) by a factor of one (l).

B. **THE TRACT PARTICIPATION FOR EACH TRACT IN THE UNITIZED INTERVAL WAS CALCULATED AS FOLLOWS:**

1. The Tract Participation for each Tract was calculated by dividing the sum of the oil adjusted acre-feet and the gas adjusted acre-feet underlying said Tract by the sum of the total oil adjusted acre-feet and the total gas adjusted acre-feet as calculated for the entire Unitized Interval in accordance with the formula expressed below:

$$\text{Tract Participating Interest} = \frac{a + b \text{ (for each Tract )}}{A + B \text{ (for all Tracts)}} \times 100$$

where: a = Adjusted Acre-Feet of oil net productive pay underlying each Tract.

b = Adjusted Acre-Feet of gas net productive pay underlying each Tract.

A= Total Adjusted Acre-Feet of oil net productive pay within the Unitized Interval.

B= Total Adjusted Acre-Feet of gas net productive pay within the Unitized Interval.

- 11 -

# UNIT OPERATING AGREEMENT
# PETTIT ZONE UNIT

**BLACK LAKE FIELD**
**NATCHITOCHES PH. LOUISIANA**



**NERCO OIL & GAS, INC.**
8100 N.E. PARKWAY DRIVE
VANCOUVER, WASHINGTON 98662
P.O. BOX 9931
VANCOUVER, WASHINGTON 98668
TELEPHONE: (206) 892-1148
TELECOPIER: (206) 253-3260
TELEX: (910) 250-3557

November 22, 1989

TO:  WORKING INTEREST OWNERS

RE:  Exhibit "E"
     Unit Operating Agreement
     dated October 25, 1965
     Pettit Zone Unit
     Black Lake Field
     Natchitoches Parish, Louisiana

Gentlemen:

Enclosed herewith please find a copy of the revised Exhibit "E" to the above referenced agreement which has been filed in the records of Natchitoches Parish, Louisiana. This revision includes those changes to working interest ownership of which NERCO has been made aware of as of September 29, 1989.

                    Very truly yours,

                    NERCO OIL & GAS, INC.

                    S. J. Giardina, Jr.
                    Senior Landman

SJG:sk

Enclosure

## WORKING INTEREST OWNERS

Pettit Zone Unit
Black Lake Field
Natchitoches Parish, LA

Chevron U.S.A., Inc.
P.O. Box J, Section 732S
Concord, CA   94524

Pennzoil Company
P.O. Box 2967
Houston, TX   77252

Phillips Petroleum Company
P.O. Box 1967
Houston, TX   77251-1967

Reliance Trusts
Robert Henderson, Trustee
BancTexas Quorum Bldg.
Suite 435
14901 Quorum Drive
Dallas, TX   75240

Linda Kay Adams
3701 Western Avenue
Mattoon, Illinois 61938

John M. Beard
Energy Plaza, Suite 1405
3030 Northwest Expressway
Oklahoma City, OK   73112

Beard Oil Company
ATTN:   Ivan D. Allred, Jr.
Enterprise Plaza, Suite 200
5600 North May Avenue
Oklahoma City, OK   73112

Alberta Erskine Broyles
P.O. Box 1511
Shreveport, LA   71165

Citation Oil & Gas Corp.
Suite 250
8223 Willow Place South
Houston, TX   77070-5623

David Crow, Trustee
666 Travis Street, Suite 900
Shreveport, LA   71101

Herbert L. Dillon, Jr.
510 Bering Dr., Suite 300
Houston, TX   77057

J. I. Dilsaver
P.O. Box 649
Mattoon, Illinois   61938

Melvin L. Doggett
1035 Oma St.
Natchitoches, LA   71457

Max Evans
Route 6, Box 730
Natchitoches, LA   71457

Walter L. Farrington, Jr.
P.O. Box 130234
Tyler, Texas   75713-0234

Thomas K. Glenn
P.O. Box 1511
Shreveport, LA   71165

Oxoco, Inc.
(Hawthorne Oil & Gas Corp.)
1717 St. James Place
Suite 200
Houston, TX   77056-4102

Bruce Anderson
900 Allied Bank Plaza
1000 Louisiana Street
Houston, Texas   77002

Joan Evans Kelley
107 Lenora
Pineville, LA   71360

Mrs. Loraine Jordan Kent
2001 Pepper Ridge Dr.
Shreveport, LA   71105

Natchez Street Oil & Gas
Limited Partnership
c/o Hawthorne Oil & Gas Corp.
P.O. Box 27725
Houston, Texas   77227-7725

John C. Loftin
P.O. Box 7100
Monroe, LA  71201

Ronald E. Morris
14 Country Club Road
Mattoon, IL  61938

Irvin Muslow
P.O. Box 999
Shreveport, LA  71163

James Muslow
333 Texas, Suite 2222
Shreveport, LA  71101-3687

Marvin L. Muslow
P.O. Box 967
Shreveport, LA  71163

Nemours Corporation
1625 Louisiana Tower
401 Edards Street
Shreveport, LA  71101-3175

A. F. Nickelson
P.O. Box 5311
Shreveport, LA  71135-5311

S & P Co., A Louisiana
Partnership
P.O. Box 3735
Shreveport, LA  71133-3335

Doris B. Wagner, Life Estate
1803 Lynwood Drive
Champaign, Illinois  61821

T. E. and Helen Chapman
15415 Empanada Drive
Houston, TX  77083

Verado Energy, Inc.
8144 Walnut Hill Lane
Suite 650, Lockbox 31
Dallas, TX  75231-4316

Manville Sales Corporation
ATTN:  Don W. Park
1000 Jonesboro Road
West Monroe, LA  71294

CSM, Inc.
P.O. Box 83302
Dallas, TX  75283-3302

Wyatt Land, Inc.
P.O. Box 8596
Shreveport, LA  71148

Young-United Companies, Inc.
5220 Spring Valley Road,
Suite 530
Dallas, TX  75240

Mobil Oil Expl. & Prod.
Southeast, Inc.
MOEPSI, c/o MEPUS
P.O. Box 650232
Dallas, TX  75265-0232

STATE OF LOUISIANA                                    BLACK LAKE FIELD

PARISH OF NATCHITOCHES

REVISION TO EXHIBIT "E" OF
UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD

WHEREAS, the Unit Operating Agreement, Pettit Zone Unit in the Black Lake Field, was entered into as of October 25, 1965, and was duly recorded in Oil and Gas Book 212, Page 386, Instrument No. M-93913 (hereinafter "the "Unit Agreement");

WHEREAS, there have been several amendments to the Unit Agreement resulting from orders of the Louisiana Commissioner of Conservation, including revision of Exhibit "E" to said Unit Agreement;

WHEREAS, NERCO Oil & Gas, Inc. has been elected as the new operator under the Unit Agreement;

WHEREAS, Paragraph 2.2 of the Unit Agreement provides in pertinent part:

> "Unit operator shall also revise Exhibit "E" from time to time as required to conform to changes in ownership of which unit operator has been notified and as provided in the unit agreement."

WHEREAS, NERCO Oil & Gas, Inc., as unit operator, has been advised of changes in ownership within the Pettit Zone Unit, and desires to further revised Exhibit "E" to the Unit Agreement pursuant to the authorization of Paragraph 2.2 of said Unit Agreement;

THEREFORE, NERCO Oil & Gas, Inc., as unit operator, does hereby revised Exhibit "E" to the Unit Agreement so that Exhibit "E" shall now read as shown on the revised Exhibit "E" attached hereto and made a part hereof.

This instrument is executed this 29th day of September, 1989.

WITNESSES:                                    NERCO OIL & GAS, INC.


By: _____
                                              John Eichenauer
                                              Vice President

STATE OF WASHINGTON

COUNTY OF CLARK

On this 29th day of September, 1989, before me appeared John
Eichenauer, to me personally known, who, being by me duly sworn,
did say that he is the Vice President of NERCO OIL & GAS, INC.,
and that the foregoing instrument was signed in behalf of said
corporation by authority of its Board of Directors and said John
Eichenauer acknowledged said instrument to be the free act and
deed of said corporation.

Notary Public in and for the State
of Washington
My Commission Expires: 9-1-91

ATTACHED TO AND MADE A PART OF THAT CERTAIN
REVISION TO EXHIBIT "E" OF UNIT OPERATING
AGREEMENT, PETTIT ZONE UNIT, BLACK LAKE FIELD,
DATED SEPTEMBER 29, 1989.

EXHIBIT "E"

REVISION III

TO THE UNIT OPERATING AGREEMENT

PETTIT ZONE UNIT

BLACK LAKE FIELD

NATCHITOCHES PARISH, LOUISIANA

SCHEDULE SHOWING WORKING INTEREST OWNERS, TRACT NUMBER WORKING
INTEREST PERCENT IN TRACT, UNIT PARTICIPATION PERCENT ALLOCABLE
TO TRACT, WORKING INTEREST UNIT PARTICIPATION PERCENT TO TRACT
AND WORKING INTEREST UNIT PARTICIPATION PERCENT

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| NERCO OIL & GAS, INC. | 1A | 81.092441% | 45.178334% | 36.636214% | |
| | 1B | 81.092441% | 0.054499% | 0.044195% | |
| | 2 | 81.092441% | 4.658796% | 3.777931% | |
| | 3 | 81.092441% | 0.331014% | 0.268427% | |
| | 4A | 30.409665% | 11.568088% | 3.517817% | |
| | 4B | 30.409665% | 1.033530% | 0.314293% | |
| | 5 | 81.092441% | 11.180300% | 9.066378% | |
| | 6 | 81.092441% | 1.159727% | 0.940451% | |
| | 7 | 81.092441% | 1.866518% | 1.513605% | |
| | 10 | 81.092441% | 0.216211% | 0.175331% | |
| | 10A | 81.092441% | 0.011763% | 0.009539% | |
| | 11 | 81.092441% | 0.589166% | 0.477769% | |
| | 13 | 81.092441% | 0.797690% | 0.646866% | |
| | 14 | 81.092441% | 1.005225% | 0.815161% | |
| | 15 | 81.092441% | 0.207687% | 0.168418% | |
| | 16 | 81.092441% | 0.445701% | 0.361430% | |
| | 19 | 81.092441% | 0.015856% | 0.012858% | |
| | 20 | 81.092441% | 0.014955% | 0.012127% | |
| | 21 | 81.092441% | 0.000017% | 0.000014% | |
| | 23 | 81.092441% | 0.021419% | 0.017369% | |
| | 24 | 81.092441% | 0.848543% | 0.688104% | |
| | 25 | 81.092441% | 3.122862% | 2.532405% | |
| | 26 | 81.092441% | 0.019271% | 0.015627% | |
| | 31 | 81.092441% | 0.324383% | 0.263050% | |
| | 32 | 81.092441% | 0.449894% | 0.364830% | |
| | 33 | 81.092441% | 0.795759% | 0.645300% | |
| | 34 | 81.092441% | 0.551038% | 0.446850% | |
| | 35 | 81.092441% | 0.265128% | 0.214999% | |
| | 36 | 81.092441% | 0.555223% | 0.450244% | |
| | 37 | 81.092441% | 0.354314% | 0.287322% | |
| | 38 | 81.092441% | 0.345041% | 0.279802% | |
| | 39 | 81.092441% | 0.223254% | 0.181042% | |
| | 41 | 81.092441% | 0.558313% | 0.452750% | |
| | 42 | 81.092441% | 0.285121% | 0.231212% | |
| | 43 | 81.092441% | 0.296557% | 0.240485% | |
| | 44 | 81.092441% | 0.019210% | 0.015578% | |
| | 45 | 81.092441% | 0.491488% | 0.398560% | |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| NERCO OIL & GAS, INC. | 46 | 81.092441% | 0.030621% | 0.024831% | |
| CONTINUED | 47 | 81.092441% | 0.180025% | 0.145987% | |
| | 48 | 81.092441% | 0.315530% | 0.255871% | |
| | 50 | 81.092441% | 0.219352% | 0.177878% | |
| | 51 | 81.092441% | 0.080304% | 0.065120% | |
| | 52 | 81.092441% | 0.103900% | 0.084255% | |
| | 53A | 81.092441% | 0.018800% | 0.015245% | |
| | 54 | 81.092441% | 0.156971% | 0.127292% | |
| | 55 | 81.092441% | 0.099478% | 0.080669% | |
| | 56 | 81.092441% | 0.010453% | 0.008477% | |
| | 58 | 81.092441% | 0.245323% | 0.198938% | |
| | 59 | 81.092441% | 0.223478% | 0.181224% | |
| | 60 | 81.092441% | 0.155320% | 0.125953% | |
| | 61 | 81.092441% | 0.007686% | 0.006233% | |
| | 63 | 81.092441% | 0.032452% | 0.026316% | |
| | 64 | 81.092441% | 0.078437% | 0.063606% | |
| | 65 | 81.092441% | 0.276561% | 0.224270% | |
| | 66 | 81.092441% | 0.406980% | 0.330030% | |
| | 67 | 40.546221% | 0.020779% | 0.008425% | |
| | 74 | 81.092441% | 0.000878% | 0.000712% | |
| | 75 | 81.092441% | 0.000004% | 0.000003% | |
| | 82 | 81.092441% | 0.011743% | 0.009523% | |
| | 83 | 81.092441% | 0.013785% | 0.011179% | |
| | 84 | 81.092441% | 0.005224% | 0.004236% | |
| | 85 | 81.092441% | 0.004900% | 0.003974% | |
| | 86 | 81.092441% | 0.004566% | 0.003703% | |
| | 90.1E | 40.546221% | 0.001023% | 0.000415% | |
| | 90.1F | 40.546221% | 0.000573% | 0.000232% | |
| | 90.3 | 81.092441% | 0.014541% | 0.011792% | |
| | 90.5 | 81.092441% | 0.014732% | 0.011947% | |
| | 90.8 | 81.092441% | 0.000483% | 0.000392% | |
| | 91.2 | 20.273110% | 0.001755% | 0.000356% | |
| | 91.4 | 40.546221% | 0.000067% | 0.000027% | |
| | 93.6 | 40.546221% | 0.000062% | 0.000025% | |
| | 107 | 45.614498% | 0.028858% | 0.013163% | |
| | 110 | 81.092441% | 0.015179% | 0.012309% | |
| | 111 | 81.092441% | 0.063530% | 0.051518% | |
| | 112.1 | 48.777103% | 0.054199% | 0.026437% | |
| | 112.2 | 47.836431% | 0.048177% | 0.023046% | |
| | 112.3 | 39.548784% | 0.044459% | 0.017583% | |
| | 112.4 | 81.092441% | 0.003082% | 0.002499% | |
| | 112.5 | 39.548784% | 0.029489% | 0.011663% | |
| | 112.6 | 81.092441% | 0.002420% | 0.001962% | |
| | 112.7 | 81.092441% | 0.002381% | 0.001931% | |
| | 112.8 | 81.092441% | 0.002927% | 0.002374% | |
| | 112.9 | 48.192410% | 0.022655% | 0.010918% | |
| | 112.10 | 39.548784% | 0.026139% | 0.010338% | |
| | 112.12 | 13.177522% | 0.018387% | 0.002423% | |
| | 112.13 | 13.177522% | 0.011257% | 0.001483% | |
| | 112.14 | 81.092441% | 0.001728% | 0.001401% | |
| | 112.15 | 60.819331% | 0.000233% | 0.000142% | |
| | 116 | 81.092441% | 0.039123% | 0.031726% | |
| | 117.3 | 81.092441% | 0.000677% | 0.000549% | |
| | 117.5A | 81.092441% | 0.000506% | 0.000410% | |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| NERCO OIL & GAS, INC. | 117.5B | 81.092441% | 0.000198% | 0.000161% | |
| CONTINUED | 117.5C | 81.092441% | 0.000149% | 0.000121% | |
| | 117.6 | 81.092441% | 0.000085% | 0.000069% | |
| | 117.7 | 81.092441% | 0.000033% | 0.000027% | |
| | 120 | 20.273110% | 0.020609% | 0.004178% | |
| | 122 | 81.092441% | 0.000293% | 0.000238% | |
| | 124 | 81.092441% | 0.000521% | 0.000422% | |
| | 125 | 81.092441% | 0.007702% | 0.006246% | |
| | 128 | 40.546221% | 0.005270% | 0.002137% | |
| | 129 | 81.092441% | 0.000031% | 0.000025% | |
| | | | | ---------------- | |
| | | | | | 68.930979% |
| MANVILLE SALES | 1A | 18.529408% | 45.178334% | 8.371278% | |
| CORPORATION | 1B | 18.529408% | 0.054499% | 0.010098% | |
| | 2 | 18.529408% | 4.658796% | 0.863247% | |
| | 3 | 18.529408% | 0.331014% | 0.061335% | |
| | 4A | 6.948528% | 11.568088% | 0.803812% | |
| | 4B | 6.948528% | 1.033530% | 0.071815% | |
| | 5 | 18.529408% | 11.180300% | 2.071643% | |
| | 6 | 18.529408% | 1.159727% | 0.214891% | |
| | 7 | 18.529408% | 1.866518% | 0.345855% | |
| | 10 | 18.529408% | 0.216211% | 0.040063% | |
| | 10A | 18.529408% | 0.011763% | 0.002180% | |
| | 11 | 18.529408% | 0.589166% | 0.109169% | |
| | 13 | 18.529408% | 0.797690% | 0.147807% | |
| | 14 | 18.529408% | 1.005225% | 0.186262% | |
| | 15 | 18.529408% | 0.207687% | 0.038483% | |
| | 16 | 18.529408% | 0.445701% | 0.082586% | |
| | 19 | 18.529408% | 0.015856% | 0.002938% | |
| | 20 | 18.529408% | 0.014955% | 0.002771% | |
| | 21 | 18.529408% | 0.000017% | 0.000003% | |
| | 23 | 18.529408% | 0.021419% | 0.003969% | |
| | 24 | 18.529408% | 0.848543% | 0.157230% | |
| | 25 | 18.529408% | 3.122862% | 0.578648% | |
| | 26 | 18.529408% | 0.019271% | 0.003571% | |
| | 31 | 18.529408% | 0.324383% | 0.060106% | |
| | 32 | 18.529408% | 0.449894% | 0.083363% | |
| | 33 | 18.529408% | 0.795759% | 0.147449% | |
| | 34 | 18.529408% | 0.551038% | 0.102104% | |
| | 35 | 18.529408% | 0.265128% | 0.049127% | |
| | 36 | 18.529408% | 0.555223% | 0.102880% | |
| | 37 | 18.529408% | 0.354314% | 0.065652% | |
| | 38 | 18.529408% | 0.345041% | 0.063934% | |
| | 39 | 18.529408% | 0.223254% | 0.041368% | |
| | 41 | 18.529408% | 0.558313% | 0.103452% | |
| | 42 | 18.529408% | 0.285121% | 0.052831% | |
| | 43 | 18.529408% | 0.296557% | 0.054950% | |
| | 44 | 18.529408% | 0.019210% | 0.003559% | |
| | 45 | 18.529408% | 0.491488% | 0.091070% | |
| | 46 | 18.529408% | 0.030621% | 0.005674% | |
| | 47 | 18.529408% | 0.180025% | 0.033358% | |
| | 48 | 18.529408% | 0.315530% | 0.058466% | |
| | 50 | 18.529408% | 0.219352% | 0.040645% | |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| MANVILLE SALES | 51 | 18.529408% | 0.080304% | 0.014880% | |
| CORPORATION CONTINUED | 52 | 18.529408% | 0.103900% | 0.019252% | |
| | 53A | 18.529408% | 0.018800% | 0.003484% | |
| | 54 | 18.529408% | 0.156971% | 0.029086% | |
| | 55 | 18.529408% | 0.099478% | 0.018433% | |
| | 56 | 18.529408% | 0.010453% | 0.001937% | |
| | 58 | 18.529408% | 0.245323% | 0.045457% | |
| | 59 | 18.529408% | 0.223478% | 0.041409% | |
| | 60 | 18.529408% | 0.155320% | 0.028780% | |
| | 61 | 18.529408% | 0.007686% | 0.001424% | |
| | 63 | 18.529408% | 0.032452% | 0.006013% | |
| | 64 | 18.529408% | 0.078437% | 0.014534% | |
| | 65 | 18.529408% | 0.276561% | 0.051245% | |
| | 66 | 18.529408% | 0.406980% | 0.075411% | |
| | 67 | 9.264704% | 0.020779% | 0.001925% | |
| | 74 | 18.529408% | 0.000878% | 0.000163% | |
| | 75 | 18.529408% | 0.000004% | 0.000001% | |
| | 82 | 18.529408% | 0.011743% | 0.002176% | |
| | 83 | 18.529408% | 0.013785% | 0.002554% | |
| | 84 | 18.529408% | 0.005224% | 0.000968% | |
| | 85 | 18.529408% | 0.004900% | 0.000908% | |
| | 86 | 18.529408% | 0.004566% | 0.000846% | |
| | 90.1E | 9.264704% | 0.001023% | 0.000095% | |
| | 90.1F | 9.264704% | 0.000573% | 0.000053% | |
| | 90.3 | 18.529408% | 0.014541% | 0.002694% | |
| | 90.5 | 18.529408% | 0.014732% | 0.002730% | |
| | 90.8 | 18.529408% | 0.000483% | 0.000089% | |
| | 91.2 | 4.632352% | 0.001755% | 0.000081% | |
| | 91.4 | 9.264704% | 0.000067% | 0.000006% | |
| | 93.6 | 9.264704% | 0.000062% | 0.000006% | |
| | 107 | 10.422792% | 0.028858% | 0.003008% | |
| | 110 | 18.529408% | 0.015179% | 0.002813% | |
| | 111 | 18.529408% | 0.063530% | 0.011772% | |
| | 112.1 | 11.145439% | 0.054199% | 0.006041% | |
| | 112.2 | 10.930498% | 0.048177% | 0.005266% | |
| | 112.3 | 9.036792% | 0.044459% | 0.004018% | |
| | 112.4 | 18.529408% | 0.003082% | 0.000571% | |
| | 112.5 | 9.036792% | 0.029489% | 0.002665% | |
| | 112.6 | 18.529408% | 0.002420% | 0.000448% | |
| | 112.7 | 18.529408% | 0.002381% | 0.000441% | |
| | 112.8 | 18.529408% | 0.002927% | 0.000542% | |
| | 112.9 | 11.011840% | 0.022655% | 0.002495% | |
| | 112.10 | 9.036792% | 0.026139% | 0.002362% | |
| | 112.12 | 3.011029% | 0.018387% | 0.000554% | |
| | 112.13 | 3.011029% | 0.011257% | 0.000339% | |
| | 112.14 | 18.529408% | 0.001728% | 0.000320% | |
| | 112.15 | 13.879056% | 0.000233% | 0.000032% | |
| | 116 | 18.529408% | 0.039123% | 0.007249% | |
| | 117.3 | 18.529408% | 0.000677% | 0.000125% | |
| | 117.5A | 18.529408% | 0.000506% | 0.000094% | |
| | 117.5B | 18.529408% | 0.000198% | 0.000037% | |
| | 117.5C | 18.529408% | 0.000149% | 0.000028% | |
| | 117.6 | 18.529408% | 0.000085% | 0.000016% | |
| | 117.7 | 18.529408% | 0.000033% | 0.000006% | |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| MANVILLES SALES | 120 | 4.632532% | 0.020609% | 0.000955% | |
| CORPORATION CONTINUED | 122 | 18.529408% | 0.000293% | 0.000054% | |
| | 124 | 18.529408% | 0.000521% | 0.000097% | |
| | 125 | 18.529408% | 0.007702% | 0.001427% | |
| | 128 | 9.264704% | 0.005270% | 0.000488% | |
| | 129 | 18.529408% | 0.000031% | 0.000006% | |
| | | | | ---------------- | |
| | | | | | 15.750551% |
| YOUNG-UNITED COMPANIES, | 1A | 0.378151% | 45.178334% | 0.170842% | |
| INC. | 1B | 0.378151% | 0.054499% | 0.000206% | |
| | 2 | 0.378151% | 4.658796% | 0.017617% | |
| | 3 | 0.378151% | 0.331014% | 0.001252% | |
| | 4A | 0.141807% | 11.568088% | 0.016404% | |
| | 4B | 0.141807% | 1.033530% | 0.001466% | |
| | 5 | 0.378151% | 11.180300% | 0.042278% | |
| | 6 | 0.378151% | 1.159727% | 0.004386% | |
| | 7 | 0.378151% | 1.866518% | 0.007058% | |
| | 10 | 0.378151% | 0.216211% | 0.000818% | |
| | 10A | 0.378151% | 0.011763% | 0.000044% | |
| | 11 | 0.378151% | 0.589166% | 0.002228% | |
| | 13 | 0.378151% | 0.797690% | 0.003016% | |
| | 14 | 0.378151% | 1.005225% | 0.003801% | |
| | 15 | 0.378151% | 0.207687% | 0.000785% | |
| | 16 | 0.378151% | 0.445701% | 0.001685% | |
| | 19 | 0.378151% | 0.015856% | 0.000060% | |
| | 20 | 0.378151% | 0.014955% | 0.000057% | |
| | 21 | 0.378151% | 0.000017% | 0.000000% | |
| | 23 | 0.378151% | 0.021419% | 0.000081% | |
| | 24 | 0.378151% | 0.848543% | 0.003209% | |
| | 25 | 0.378151% | 3.122862% | 0.011809% | |
| | 26 | 0.378151% | 0.019271% | 0.000073% | |
| | 31 | 0.378151% | 0.324383% | 0.001227% | |
| | 32 | 0.378151% | 0.449894% | 0.001701% | |
| | 33 | 0.378151% | 0.795759% | 0.003009% | |
| | 34 | 0.378151% | 0.551038% | 0.002084% | |
| | 35 | 0.378151% | 0.265128% | 0.001003% | |
| | 36 | 0.378151% | 0.555223% | 0.002100% | |
| | 37 | 0.378151% | 0.354314% | 0.001340% | |
| | 38 | 0.378151% | 0.345041% | 0.001305% | |
| | 39 | 0.378151% | 0.223254% | 0.000844% | |
| | 41 | 0.378151% | 0.558313% | 0.002111% | |
| | 42 | 0.378151% | 0.285121% | 0.001078% | |
| | 43 | 0.378151% | 0.296557% | 0.001121% | |
| | 44 | 0.378151% | 0.019210% | 0.000073% | |
| | 45 | 0.378151% | 0.491488% | 0.001859% | |
| | 46 | 0.378151% | 0.030621% | 0.000116% | |
| | 47 | 0.378151% | 0.180025% | 0.000681% | |
| | 48 | 0.378151% | 0.315530% | 0.001193% | |
| | 50 | 0.378151% | 0.219352% | 0.000829% | |
| | 51 | 0.378151% | 0.080304% | 0.000304% | |
| | 52 | 0.378151% | 0.103900% | 0.000393% | |
| | 53A | 0.378151% | 0.018800% | 0.000071% | |
| | 54 | 0.378151% | 0.156971% | 0.000594% | |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| YOUNG-UNITED COMPANIES, | 55 | 0.378151% | 0.099478% | 0.000376% | |
| INC., CONTINUED | 56 | 0.378151% | 0.010453% | 0.000040% | |
| | 58 | 0.378151% | 0.245323% | 0.000928% | |
| | 59 | 0.378151% | 0.223478% | 0.000845% | |
| | 60 | 0.378151% | 0.155320% | 0.000587% | |
| | 61 | 0.378151% | 0.007686% | 0.000029% | |
| | 63 | 0.378151% | 0.032452% | 0.000123% | |
| | 64 | 0.378151% | 0.078437% | 0.000297% | |
| | 65 | 0.378151% | 0.276561% | 0.001046% | |
| | 66 | 0.378151% | 0.406980% | 0.001539% | |
| | 67 | 0.189075% | 0.020779% | 0.000039% | |
| | 74 | 0.378151% | 0.000878% | 0.000003% | |
| | 75 | 0.378151% | 0.000004% | 0.000000% | |
| | 82 | 0.378151% | 0.011743% | 0.000044% | |
| | 83 | 0.378151% | 0.013785% | 0.000052% | |
| | 84 | 0.378151% | 0.005224% | 0.000020% | |
| | 85 | 0.378151% | 0.004900% | 0.000019% | |
| | 86 | 0.378151% | 0.004566% | 0.000017% | |
| | 90.1E | 0.189075% | 0.001023% | 0.000002% | |
| | 90.1F | 0.189075% | 0.000573% | 0.000001% | |
| | 90.3 | 0.378151% | 0.014541% | 0.000055% | |
| | 90.5 | 0.378151% | 0.014732% | 0.000056% | |
| | 90.8 | 0.378151% | 0.000483% | 0.000002% | |
| | 91.2 | 0.094538% | 0.001755% | 0.000002% | |
| | 91.4 | 0.189075% | 0.000067% | 0.000000% | |
| | 93.6 | 0.189075% | 0.000062% | 0.000000% | |
| | 107 | 0.212710% | 0.028858% | 0.000061% | |
| | 110 | 0.378151% | 0.015179% | 0.000057% | |
| | 111 | 0.378151% | 0.063530% | 0.000240% | |
| | 112.1 | 0.227458% | 0.054199% | 0.000123% | |
| | 112.2 | 0.223071% | 0.048177% | 0.000107% | |
| | 112.3 | 0.184424% | 0.044459% | 0.000082% | |
| | 112.4 | 0.378151% | 0.003082% | 0.000012% | |
| | 112.5 | 0.184424% | 0.029489% | 0.000054% | |
| | 112.6 | 0.378151% | 0.002420% | 0.000009% | |
| | 112.7 | 0.378151% | 0.002381% | 0.000009% | |
| | 112.8 | 0.378151% | 0.002927% | 0.000011% | |
| | 112.9 | 0.224730% | 0.022655% | 0.000051% | |
| | 112.10 | 0.184424% | 0.026139% | 0.000048% | |
| | 112.12 | 0.061449% | 0.018387% | 0.000011% | |
| | 112.13 | 0.061449% | 0.011257% | 0.000007% | |
| | 112.14 | 0.378151% | 0.001728% | 0.000007% | |
| | 112.15 | 0.283613% | 0.000233% | 0.000001% | |
| | 116 | 0.378151% | 0.039123% | 0.000148% | |
| | 117.3 | 0.378151% | 0.000677% | 0.000003% | |
| | 117.5A | 0.378151% | 0.000506% | 0.000002% | |
| | 117.5B | 0.378151% | 0.000198% | 0.000001% | |
| | 117.5C | 0.378151% | 0.000149% | 0.000001% | |
| | 117.6 | 0.378151% | 0.000085% | 0.000000% | |
| | 117.7 | 0.378151% | 0.000033% | 0.000000% | |
| | 120 | 0.094538% | 0.020609% | 0.000019% | |
| | 122 | 0.378151% | 0.000293% | 0.000001% | |
| | 124 | 0.378151% | 0.000521% | 0.000002% | |
| | 125 | 0.378151% | 0.007702% | 0.000029% | |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| YOUNG-UNITED COMPANIES, | 128 | 0.189075% | 0.005270% | 0.000010% | |
| INC., CONTINUED | 129 | 0.378151% | 0.000031% | 0.000900% | |
| | | | | ---------------- | |
| | | | | | 0.321439% |
| | | | | | |
| MOBIL OIL EXPLORATION AND | 4A | 62.500000% | 11.568088% | 7.230055% | |
| PRODUCTION SOUTHEAST, | 4B | 62.500000% | 1.033530% | 0.645956% | |
| INC. | 8 | 100.000000% | 0.926518% | 0.926518% | |
| | 29 | 100.000000% | 0.077371% | 0.077371% | |
| | | | | ---------------- | |
| | | | | | 8.879900% |
| | | | | | |
| PHILLIPS PETROLEUM | 9 | 100.000000% | 3.195719% | 3.195719% | |
| COMPANY | 17 | 100.000000% | 0.000023% | 0.000023% | |
| | 28 | 100.000000% | 0.037113% | 0.037113% | |
| | | | | ---------------- | |
| | | | | | 3.232855% |
| | | | | | |
| BRUCE ANDERSON | 12 | 50.000000% | 0.874759% | 0.437380% | |
| | | | | ---------------- | |
| | | | | | 0.437380% |
| | | | | | |
| BEARD OIL COMPANY | 12 | 37.500000% | 0.874759% | 0.328035% | |
| | | | | ---------------- | |
| | | | | | 0.328035% |
| | | | | | |
| JOHN M. BEARD | 12 | 12.500000% | 0.874759% | 0.109345% | |
| | | | | ---------------- | |
| | | | | | 0.109345% |
| | | | | | |
| CHEVRON USA, INC. | 90.1 | 100.000000% | 0.090005% | 0.090005% | |
| | 90.1A | 50.000000% | 0.000342% | 0.000171% | |
| | 90.1B | 50.000000% | 0.000010% | 0.000005% | |
| | 90.1C | 50.000000% | 0.000002% | 0.000001% | |
| | 90.1D | 50.000000% | 0.002334% | 0.001167% | |
| | 90.1E | 50.000000% | 0.001023% | 0.000512% | |
| | 90.1F | 50.000000% | 0.000573% | 0.000287% | |
| | 90.7 | 100.000000% | 0.103690% | 0.103690% | |
| | 91.1 | 50.000000% | 0.001083% | 0.000542% | |
| | 91.2 | 25.000000% | 0.001755% | 0.000439% | |
| | 91.5 | 50.000000% | 0.000298% | 0.000149% | |
| | 93.2 | 50.000000% | 0.000933% | 0.000467% | |
| | 108 | 100.000000% | 0.055180% | 0.055180% | |
| | 109 | 100.000000% | 0.178024% | 0.178024% | |
| | 112.2 | 41.010000% | 0.048177% | 0.019757% | |
| | 112.5 | 51.230000% | 0.029489% | 0.015107% | |
| | 112.9 | 3.734870% | 0.022655% | 0.000846% | |
| | | | | ---------------- | |
| | | | | | 0.466349% |
| | | | | | |
| VERADO ENERGY, INC. | 88 | 50.000000% | 0.481697% | 0.240849% | |
| | 91.1 | 25.000000% | 0.001083% | 0.000271% | |
| | 91.2 | 25.000000% | 0.001755% | 0.000439% | |
| | 91.4 | 25.000000% | 0.000067% | 0.000017% | |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| VERADO ENERGY, INC. | 91.5 | 25.000000% | 0.000298% | 0.000075% | |
| CONTINUED | 93.2 | 25.000000% | 0.000933% | 0.000233% | |
| | 93.6 | 25.000000% | 0.000062% | 0.000016% | |
| | 113 | 50.000000% | 0.163348% | 0.081674% | |
| | 118 | 50.000000% | 0.001697% | 0.000849% | |
| | | | | ---------------- | |
| | | | | | 0.324423% |
| RELIANCE TRUSTS | 62 | 100.000000% | 0.012443% | 0.012443% | |
| | 80 | 100.000000% | 0.093910% | 0.093910% | |
| | 81 | 100.000000% | 0.116320% | 0.116320% | |
| | 112.3 | 51.230000% | 0.044459% | 0.022776% | |
| | 112.9 | 33.594500% | 0.022655% | 0.007611% | |
| | 112.10 | 51.230000% | 0.026139% | 0.013391% | |
| | 112.12 | 83.750000% | 0.018387% | 0.015399% | |
| | 112.13 | 83.750000% | 0.011257% | 0.009428% | |
| | 117.1 | 100.000000% | 0.025849% | 0.025849% | |
| | 117.2 | 100.000000% | 0.008483% | 0.008483% | |
| | 127 | 100.000000% | 0.000033% | 0.000033% | |
| | | | | ---------------- | |
| | | | | | 0.325643% |
| DAVID CROW, TRUSTEE | 88 | 25.000000% | 0.481697% | 0.120424% | |
| | 91.1 | 12.500000% | 0.001083% | 0.000135% | |
| | 91.2 | 12.500000% | 0.001755% | 0.000219% | |
| | 91.4 | 12.500000% | 0.000067% | 0.000008% | |
| | 91.5 | 12.500000% | 0.000298% | 0.000037% | |
| | 93.2 | 12.500000% | 0.000933% | 0.000117% | |
| | 93.6 | 12.500000% | 0.000062% | 0.000008% | |
| | 113 | 25.000000% | 0.163348% | 0.040837% | |
| | 118 | 25.000000% | 0.001697% | 0.000424% | |
| | | | | ---------------- | |
| | | | | | 0.162209% |
| MAX EVANS | 18 | 33.333300% | 0.098999% | 0.033000% | |
| | | | | ---------------- | |
| | | | | | 0.033000% |
| WYATT LAND, INC. | 18 | 33.333300% | 0.098999% | 0.033000% | |
| | | | | ---------------- | |
| | | | | | 0.033000% |
| JOAN EVANS KELLY | 18 | 33.333400% | 0.098999% | 0.033000% | |
| | | | | ---------------- | |
| | | | | | 0.033000% |
| NEMOURS CORPORATION | 92 | 25.000000% | 0.191337% | 0.047834% | |
| | | | | ---------------- | |
| | | | | | 0.047834% |
| S & P COMPANY A LOUISIANA PARTNERSHIP | 92 | 25.000000% | 0.191337% | 0.047834% | |
| | | | | ---------------- | |
| | | | | | 0.047834% |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| NATCHEZ STREET OIL & GAS | 89 | 50.000000% | 0.073385% | 0.036693% | |
| LIMITED PARTNERSHIP | 90.6 | 50.000000% | 0.018811% | 0.009406% | |
| | 92 | 25.000000% | 0.191337% | 0.047834% | |
| | | | | ---------------- | |
| | | | | | 0.093933% |
| OXOCO, INC. | 89 | 50.000000% | 0.073385% | 0.036693% | |
| | 90.6 | 50.000000% | 0.018811% | 0.009406% | |
| | 92 | 25.000000% | 0.191337% | 0.047834% | |
| | | | | ---------------- | |
| | | | | | 0.093933% |
| PENNZOIL COMPANY | 68 | 100.000000% | 0.082774% | 0.082774% | |
| | | | | ---------------- | |
| | | | | | 0.082774% |
| IRWIN I. MUSLOW | 88 | 6.250000% | 0.481697% | 0.030106% | |
| | 91.1 | 3.125000% | 0.001083% | 0.000034% | |
| | 91.2 | 3.125000% | 0.001755% | 0.000055% | |
| | 91.4 | 3.125000% | 0.000067% | 0.000002% | |
| | 91.5 | 3.125000% | 0.000298% | 0.000009% | |
| | 93.2 | 3.125000% | 0.000933% | 0.000029% | |
| | 93.6 | 3.125000% | 0.000062% | 0.000002% | |
| | 113 | 6.250000% | 0.163348% | 0.010209% | |
| | 118 | 6.250000% | 0.001697% | 0.000106% | |
| | | | | ---------------- | |
| | | | | | 0.040552% |
| MARVIN L. MUSLOW | 88 | 6.250000% | 0.481697% | 0.030106% | |
| | 91.1 | 3.125000% | 0.001083% | 0.000034% | |
| | 91.2 | 3.125000% | 0.001755% | 0.000055% | |
| | 91.4 | 3.125000% | 0.000067% | 0.000002% | |
| | 91.5 | 3.125000% | 0.000298% | 0.000009% | |
| | 93.2 | 3.125000% | 0.000933% | 0.000029% | |
| | 93.6 | 3.125000% | 0.000062% | 0.000002% | |
| | 113 | 6.250000% | 0.163348% | 0.010209% | |
| | 118 | 6.250000% | 0.001697% | 0.000106% | |
| | | | | ---------------- | |
| | | | | | 0.040552% |
| JAMES MUSLOW | 88 | 12.500000% | 0.481697% | 0.060212% | |
| | 91.1 | 6.250000% | 0.001083% | 0.000068% | |
| | 91.2 | 6.250000% | 0.001755% | 0.000110% | |
| | 91.4 | 6.250000% | 0.000067% | 0.000004% | |
| | 91.5 | 6.250000% | 0.000298% | 0.000019% | |
| | 93.2 | 6.250000% | 0.000933% | 0.000058% | |
| | 93.6 | 6.250000% | 0.000062% | 0.000004% | |
| | 113 | 12.500000% | 0.163348% | 0.020419% | |
| | 118 | 12.500000% | 0.001697% | 0.000212% | |
| | | | | ---------------- | |
| | | | | | 0.081106% |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| JOHN C. LOFTIN | 112.1 | 39.850000% | 0.054199% | 0.021598% | |
| | | | | | 0.021598% |
| CSM, INC. | 90.4 | 100.000000% | 0.014169% | 0.014169% | |
| | 112.11 | 100.000000% | 0.004094% | 0.004094% | |
| | | | | | 0.018263% |
| MRS. LORAINE JORDAN KENT | 107 | 21.875000% | 0.028858% | 0.006313% | |
| | | | | | 0.006313% |
| WALTER L. FARRINGTON, JR. | 120 | 75.000000% | 0.020609% | 0.015457% | |
| | | | | | 0.015457% |
| SUSPENSE ACCOUNT TRACT 126 | 126 | 100.000000% | 0.009430% | 0.009430% | |
| | | | | | 0.009430% |
| H. DILLON, JR. | 119 | 100.000000% | 0.008314% | 0.008314% | |
| | | | | | 0.008314% |
| ALBERTA ERSKIN BROYLES | 107 | 21.875000% | 0.028858% | 0.006313% | |
| | | | | | 0.006313% |
| A.  F. NICKELSON | 90.1D | 50.000000% | 0.002334% | 0.001167% | |
| | | | | | 0.001167% |
| THOMAS K. GLENN | 90.2 | 100.000000% | 0.001127% | 0.001127% | |
| | | | | | 0.001127% |
| SUSPENSE ACCOUNT TRACT 121 | 121 | 100.000000% | 0.000765% | 0.000765% | |
| | | | | | 0.000765% |
| T. E.  & HELEN CHAPMAN | 117.4 | 100.000000% | 0.000632% | 0.000632% | |
| | | | | | 0.000632% |
| MELVIN DOGGETT AND MONTY DOGGETT | 90.1A | 50.000000% | 0.000342% | 0.000171% | |
| | | | | | 0.000171% |

| WORKING INTEREST OWNERS | TRACT NO. | W.I. % IN TRACT | UNIT PARTICIPATION % ALLOCABLE TO TRACT | W.I. UNIT PARTICIPATION % IN TRACT | W.I. % UNIT PARTICIPATION |
|---|---|---|---|---|---|
| ADOLPH BERRY | 90.1B | 50.000000% | 0.000010% | 0.000005% | |
| | | | | ---------------- | |
| | | | | | 0.000005% |
| BOND OPERATING COMPANY AND PALM PETROLEUM | 123 | 100.000000% | 0.000001% | 0.000001% | |
| | | | | ---------------- | |
| | | | | | 0.000001% |
| CATHERINE & RIOUX SLYKER | 90.1C | 50.000000% | 0.000002% | 0.000001% | |
| | | | | ---------------- | |
| | | | | | 0.000001% |
| LINDA KAY ADAMS | 112.9 | 0.540120% | 0.022655% | 0.000122% | |
| | 112.15 | 4.166670% | 0.000233% | 0.000010% | |
| | | | | ---------------- | |
| | | | | | 0.000132% |
| J. I.  DILSAVER | 112.9 | 1.080250% | 0.022655% | 0.000245% | |
| | 112.15 | 8.333330% | 0.000233% | 0.000019% | |
| | | | | ---------------- | |
| | | | | | 0.000264% |
| RONALD E.  MORRIS | 112.9 | 0.540120% | 0.022655% | 0.000122% | |
| | 112.15 | 4.166670% | 0.000233% | 0.000010% | |
| | | | | ---------------- | |
| | | | | | 0.000132% |
| DORIS B. WAGNER, LIFE ESTATE | 112.9 | 1.080250% | 0.022655% | 0.000245% | |
| | 112.15 | 8.333330% | 0.000233% | 0.000019% | |
| | | | | ---------------- | |
| | | | | | 0.000264% |
| CITATION OIL & GAS CORPORATION | 67 | 50.000000% | 0.020779% | 0.010390% | |
| | 128 | 50.000000% | 0.005270% | 0.002635% | |
| | | | | ---------------- | |
| | | | | | 0.013025% |
| | | | | | ---------------- |
| | | | TOTAL | | 100.000000% |

ENDORSEMENTS:

FILED
IRBY L. KNOTTS, JR.
CLERK OF DISTRICT COURT
Oct 5    11:45 A.M.'89
BY: S/ Randy Rushy    Dy. Clerk
NATCHITOCHES PARISH, LA.

INSTRUMENT NO. M-202760
OEG BOOK 291
Pg. 343

—————————o—————————

STATE OF LOUISIANA
PARISH OF NATCHITOCHES

I HEREBY CERTIFY THAT THE ABOVE
AND FOREGOING IS A TRUE AND CORRECT
COPY OF THE ORIGINAL INSTRUMENT
AS SAME APPEARS ON FILE IN MY OFFICE
IN THE ABOVE NAMED PARISH AND STATE
TOGETHER WITH ALL ENDORSEMENTS
THEREON APPEARING.

WITNESS MY HAND AND SEAL OF OFFICE
THIS 6TH DAY OF OCT. 81

Dy. Clerk, Tenth Judicial District Court, La.

UNIT OPERATING AGREEMENT

PETTIT ZONE UNIT

BLACK LAKE FIELD

NATCHITOCHES PARISH, LOUISIANA

## TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| | Preliminary Recitals | 1 |
| | **ARTICLE 1**<br>**CONFIRMATION OF UNIT AGREEMENT** | |
| 1.1 | Confirmation of Unit Agreement | 1 |
| | **ARTICLE 2**<br>**EXHIBITS** | |
| 2.1 | Exhibits | 1 |
| 2.2 | Revision of Exhibits | 2 |
| | **ARTICLE 3**<br>**SUPERVISION OF OPERATIONS**<br>**BY WORKING INTEREST OWNERS** | |
| 3.1 | Overall Supervision | 2 |
| 3.2 | Specific Authorities and Duties | 2 |
| | **ARTICLE 4**<br>**MANNER OF EXERCISING SUPERVISION** | |
| 4.1 | Designation of Representatives | 4 |
| 4.2 | Meetings | 4 |
| 4.3 | Voting Procedure | 4 |
| | **ARTICLE 5**<br>**INDIVIDUAL RIGHTS**<br>**OF WORKING INTEREST OWNERS** | |
| 5.1 | Reservation of Rights | 4 |
| 5.2 | Specific Rights | 5 |
| | **ARTICLE 6**<br>**UNIT OPERATOR** | |
| 6.1 | Unit Operator | 5 |
| 6.2 | Resignation | 5 |
| 6.3 | Selection of Successor | 5 |
| | **ARTICLE 7**<br>**AUTHORITIES AND DUTIES OF UNIT OPERATOR** | |
| 7.1 | Exclusive Right to Operate Unit | 5 |

| Section | | Page |
|---|---|---|
| 7.2 | Workmanlike Conduct | 5 |
| 7.3 | Liens and Encumbrances | 6 |
| 7.4 | Employees | 6 |
| 7.5 | Records | 6 |
| 7.6 | Reports to Working Interest Owners | 6 |
| 7.7 | Reports to Governmental Authorities | 6 |
| 7.8 | Engineering and Geological Information | 6 |
| 7.9 | Expenditures | 6 |
| 7.10 | Wells Drilled by Unit Operator | 6 |

ARTICLE 8
TAXES

| 8.1 | Ad Valorem Taxes | 6 |
|---|---|---|
| 8.2 | Other Taxes | 7 |

ARTICLE 9
INSURANCE

| 9.1 | Insurance | 7 |
|---|---|---|

ARTICLE 10
ADJUSTMENT OF INVESTMENTS

| 10.1 | Personal Property Taken Over | 7 |
|---|---|---|
| 10.2 | Inventory and Evaluation of Personal Property | 7 |
| 10.3 | Investment Adjustment | 7 |
| 10.4 | Investment Adjustment on Revision of Tract Participation | 8 |
| 10.5 | General Facilities | 8 |
| 10.6 | Ownership of Personal Property and Facilities | 8 |

ARTICLE 11
UNIT EXPENSE

| 11.1 | Basis of Charge to Working Interest Owners | 8 |
|---|---|---|
| 11.2 | Budget | 8 |
| 11.3 | Advance Billings | 8 |
| 11.4 | Commingling of Funds | 8 |
| 11.5 | Lien of Unit Operator | 8 |
| 11.6 | Unpaid Unit Expense | 9 |
| 11.7 | Expenses Incurred Before Effective Date | 9 |

ARTICLE 12
NON-UNITIZED FORMATIONS

| 12.1 | Right to Operate | 9 |
|---|---|---|

ARTICLE 13
CYCLING PLANT

| 13.1 | Construction of Cycling Plant | 9 |
|---|---|---|
| 13.2 | Acquisition of Plant Site | 10 |

| Section | | Page |
|---|---|---|
| 13.3 | Operation of the Cycling Plant and Pressure Regulation System | 10 |
| 13.4 | Non-Unitized Substances | 11 |

**ARTICLE 14**
**TITLES**

| 14.1 | Warranty and Indemnity | 11 |
| 14.2 | Carved-Out Interest Subject to This Agreement | 11 |

**ARTICLE 15**
**LIABILITY, CLAIMS AND SUITS**

| 15.1 | Individual Liability | 11 |
| 15.2 | Settlements | 12 |

**ARTICLE 16**
**INTERNAL REVENUE PROVISION**

| 16.1 | Internal Revenue Provision | 12 |

**ARTICLE 17**
**NOTICES**

| 17.1 | Notices | 12 |

**ARTICLE 18**
**WITHDRAWAL OF WORKING INTEREST OWNER**

| 18.1 | Withdrawal | 12 |

**ARTICLE 19**
**ABANDONMENT OF WELLS**

| 19.1 | Rights of Former Owners | 13 |
| 19.2 | Plugging | 13 |

**ARTICLE 20**
**EFFECTIVE DATE AND TERM**

| 20.1 | Effective Date | 13 |
| 20.2 | Term | 13 |
| 20.3 | Action Prior to Effective Date | 14 |

**ARTICLE 21**
**ABANDONMENT OF OPERATIONS**

| 21.1 | Termination | 14 |

**ARTICLE 22**
**MAINTENANCE OF UNIT OWNERSHIP**

| 22.1 | Maintenance of Unit Ownership | 15 |

- 3 -

Section                                                                                          Page


ARTICLE 23
RESERVATIONS

23.1          Exhibit "H"                                                                         15
23.2          Reservation                                                                        15


ARTICLE 24
EXECUTION

24.1          Original, Counterpart, or Other Instrument                                         15


ARTICLE 25
SUCCESSORS AND ASSIGNS

25.1          Successors and Assigns                                                              16


Exhibit   "E"

Exhibit   "F"

Exhibit   "G"

Exhibit   "H"

UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

THIS AGREEMENT, entered into as of the 25th day of October, 1965, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof;

WITNESSETH:

WHEREAS, the parties hereto as Working Interest Owners have executed, as of the date hereof, an agreement entitled "Unit Agreement, Pettit Zone Unit, Black Lake Field, Natchitoches Parish, Louisiana", herein referred to as "Unit Agreement", which, among other things, provides for a separate agreement to be entered into by Working Interest Owners to provide for the development and operation of the Unit Area as therein defined; and

WHEREAS, the parties hereto desire to construct, install and operate on the Unit Area (as defined in said Unit Agreement) a Cycling Plant (as defined in said Unit Agreement) and other facilities of adequate capacity and appropriate design to recover and save Liquid Products (as defined in said Unit Agreement) from Unitized Substances (as defined in said Unit Agreement) produced from the Unitized Interval (as defined in said Unit Agreement), and capable of returning Residue Gas (as defined in said Unit Agreement) to said Unitized Interval; and the parties hereto recognize that in this connection it is necessary (a) to unitize the interests of said parties in said Unitized Interval; (b) to unitize the interests of the Royalty Owners (as defined in said Unit Agreement) owning interests in said Unitized Interval; and (c) to make provisions for the construction and operation of said Cycling Plant;

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, it is agreed as follows:

ARTICLE 1
CONFIRMATION OF UNIT AGREEMENT

1.1    Confirmation of Unit Agreement.   The Unit Agreement is hereby confirmed and by reference made a part of this agreement. The definitions in the Unit Agreement are adopted for all purposes of this agreement. If there is any conflict between the Unit Agreement and this agreement, the Unit Agreement shall govern.

ARTICLE 2
EXHIBITS

2.1    Exhibits.   The following exhibits are incorporated herein:

2.1.1    Exhibits "A", "B", "C" and "D" of the Unit Agreement, by reference.

2.1.2    Exhibit "E", attached hereto, is a schedule showing the Working Interest of each Working Interest Owner

in each Tract, the percentage of total Unit Par-
ticipation attributable to such interest, and the
total Unit Participation of each Working Interest
Owner. Exhibit "E", or a revision thereof, shall
not be conclusive as to the information therein,
except it may be used as showing the Unit Par-
ticipations of the Working Interest Owners for
purposes of this agreement until shown to be in
error or is revised as herein authorized.

2.1.3    Exhibit "F", attached hereto, which is the Account-
ing Procedure applicable to Unit Operations. If
there is any conflict between this agreement and
Exhibit "F", this agreement shall govern.

2.1.4    Exhibit "G", attached hereto, which contains
insurance provisions applicable to Unit Operations.

2.1.5    Exhibit "H", attached hereto, which is the schedule
referred to in Article 23 hereof.

2.2    Revision of Exhibits.    Whenever Exhibits "A","B", and "C"
are revised, Exhibit "E" shall be revised accordingly and be effective as
of the same date. Unit Operator shall also revise Exhibit "E" from time to
time as required to conform to changes in ownership of which Unit Operator
has been notified and as provided in the Unit Agreement.

ARTICLE 3
SUPERVISION OF OPERATIONS BY WORKING INTEREST OWNERS

3.1    Overall Supervision.    Working Interest Owners shall exercise
overall supervision and control of all matters pertaining to Unit Operations
pursuant to this agreement and the Unit Agreement. In the exercise of such
authority, each Working Interest Owner shall act solely in its own behalf in
the capacity of an individual owner and not on behalf of the owners as an entirety.

3.2    Specific Authorities and Duties.    The matters with respect to
which the Working Interest Owners shall decide and take action shall include,
but not be limited to, the following:

3.2.1    Method of Operation.    The method of operation, including
any type of cycling and pressure maintenance, secondary recovery,
or other program to be employed.

3.2.2    Drilling of Wells.    The drilling of any well whether for
production of Unitized Substances, for use as an injection well,
or for other purposes.

3.2.3    Well Recompletions and Change of Status.    The recompletion,
abandonment, or change of status of any well, or the use of any
well for injection or other purposes.

3.2.4    Expenditures.    The making of any single expenditure in
excess of Twenty-Five Thousand Dollars ($25,000), except as
provided in Section 7.9 herein, provided that approval by Working

- 2 -

Interest Owners of the drilling, reworking, deepening, or plugging back of any well shall include approval of all necessary expenditures, required therefor, and for completing, testing, and equipping the same, including necessary flow lines, separators, and lease tankage.

3.2.5   Disposition of Unit Equipment.   The selling or otherwise disposing of any major item of surplus Unit Equipment, if the current list price of new equipment similar thereto is Five Thousand Dollars ($5,000) or more.

3.2.6   Appearances Before a Court or Regulatory Agency. The designating of a representative to appear before any court or regulatory agency in matters pertaining to Unit Operations, provided that, such designation shall not prevent any Working Interest Owner at its own expense from appearing in person or from designating another representative in its own behalf.

3.2.7   Audits.   The auditing of the accounts of Unit Operator pertaining to Unit Operations hereunder; provided that, the audits shall:

(a)  not be conducted more than once each year except upon the resignation or removal of Unit Operator,

(b)  be made at the expense of all Working Interest Owners other than the Working Interest Owner designated as Unit Operator, and

(c)  be made upon not less than thirty (30) days written notice to the Unit Operator.

The foregoing provisions of Section 3.2.7 shall be in addition to the separate right of any Working Interest Owner to make audits under the provisions of Section 1, Paragraph 7 of the Accounting Procedure attached hereto as Exhibit "F", which shall always be made at its sole cost and expense.

3.2.8   Inventories.   The taking of periodic inventories under the terms of Exhibit "F".

3.2.9   Technical Services.   The authorizing of charges to the joing account for services by consultants or Unit Operator's technical personnel not covered by the overhead charges provided by Exhibit "F".

3.2.10   Assignments to Committees.   The appointment of committees to study any problems in connection with Unit Operations.

3.2.11   The removal of Unit Operator and the selection of a successor

3.2.12   The revision of Tract Participation

3.2.13   The enlargement of the Unit Area

3.2.14   The adjustment and readjustment of investment

3.2.15   The termination of the Unit Agreement

- 3 -

ARTICLE 4
MANNER OF EXERCISING SUPERVISION

4.1     Designation of Representatives.   Each Working Interest Owner
shall in writing inform Unit Operator of the names and addresses of the
representative and alternate who are authorized to represent and bind such
Working Interest Owner with respect to Unit Operations.  The representative
or alternate may be changed from time to time by written notice to Unit Operator.

4.2     Meetings.   All meetings of Working Interest Owners shall be
called by Unit Operator upon its own motion or at the request of one or more
Working Interest Owners having a total Unit Participation of not less than
ten per cent (10%).   No meeting shall be called on less than fourteen (14)
days advance written notice, with agenda for the meeting attached.   Working
Interest Owners who attend the meeting shall not be prevented from amending
items included in the agenda or from deciding the amended item or other items
presented at the meeting.   The representative of Unit Operator shall be chair-
man of each meeting.

4.3     Voting Procedure.   Working Interest Owners shall decide
all matters coming before them as follows:

4.3.1     Voting Interest.   In voting on any matter, each Working
Interest Owner shall have a voting interest equal to its Unit
Participation in effect at the time of the vote.

4.3.2     Vote Required.   Unless otherwise provided herein or
in the Unit Agreement, all matters shall be decided by an
affirmative vote of seventy-five per cent (75%) or more voting
interest; provided that, should any one Working Interest Owner
have more than seventy per cent (70%) voting interest, its vote
must be supported by the vote of one or more Working Interest
Owners having a voting interest of at least  three and one-half
per cent (3.5%).

4.3.3     Voting at Meeting by Non-attending Working Interest Owners.
Any Working Interest Owner not represented at a meeting may vote
on any item included in the agenda of the meeting by letter or
telegram addressed to the Chairman of the meeting provided
such vote is received prior to the submission of such item to
vote.   Such vote shall not be counted with respect to any item
on the agenda which is amended at the meeting.

4.3.4     Poll Votes.   Working Interest Owners may vote on and
decide, by letter or telegram, any matter submitted in writing
to Working Interest Owners, if no meeting is requested, as pro-
vided in Section 4.2, within seven (7) calendar days after the
proposal is sent to Working Interest Owners.   Unit Operator
will give prompt notice of the results of the voting to all Working
Interest Owners.

ARTICLE 5
INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1     Reservation of Rights.   Working Interest Owners severally
reserve to themselves all their rights, except as otherwise provided in this
agreement and the Unit Agreement.

- 4 -

5.2    Specific Rights.  Each Working Interest Owner shall have, among others, the following specific rights:

5.2.1    Access to Unit Area.  Access to the Unit Area at all reasonable times to inspect Unit Operations, all wells, and the records and data pertaining thereto.

5.2.2    Reports.  The right to receive from Unit Operator, upon written request, copies of all reports to any governmental agency, reports of crude oil runs and stocks, inventory reports, and all other information pertaining to Unit Operations.  The cost of gathering and furnishing information not ordinarily furnished by Unit Operator to all Working Interest Owners shall be charged to the Working Interest Owner who requests the information.

## ARTICLE 6
## UNIT OPERATOR

6.1    Unit Operator.  Placid Oil Company is hereby designated as Unit Operator.  The development and operation contemplated hereunder also includes the construction and operation of the Cycling Plant (as hereinafter provided) and the construction and operation of a suitable system of pressure regulation to serve the Unit Area.  Placid Oil Company is also designated as Operator of said plant and system and as such shall have control and management of the construction and operation of same, subject to the provisions of this agreement and to the valid orders, rules and regulations of the Commissioner of Conservation.

6.2    Resignation.  Unit Operator may resign at any time.  A Unit Operator that resigns shall not be released from its obligations hereunder for a period of three (3) months after the resignation, unless a successor Unit Operator has taken over Unit Operations prior to the expiration of such period.

6.3    Selection of Successor.  Upon the resignation of a Unit Operator, a successor Unit Operator shall be selected by Working Interest Owners.

## ARTICE 7
## AUTHORITIES AND DUTIES OF UNIT OPERATOR

7.1    Exclusive Right to Operate Unit.  Subject to the provisions of this agreement and to instructions from Working Interest Owners and to the orders, directions and limitations lawfully given or imposed by the Commissioner of Conservation of the State of Louisiana upon the application of any interested party and after a public hearing, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations.

7.2    Workmanlike Conduct.  Unit Operator shall conduct Unit Operations in a good and workmanlike manner as would a prudent operator under the same or similar circumstances.  Unit Operator shall freely consult with Working Interest Owners and keep them informed of all matters which Unit Operator, in the exercise of its best judgment, considers important.  Unit Operator shall not be liable to Working Interest Owners for damages unless such damages result from its gross negligence or willful misconduct.

- 5 -

7.3    **Liens and Encumbrances.**  Unit Operator shall endeavor to keep the lands and leases in the Unit Area free from all liens and encumbrances occasioned by Unit Operations, except the lien of Unit Operator granted hereunder.

7.4    **Employees.**  The number of employees used by Unit Operator in conducting Unit Operations, their selection, hours of labor, and compensation shall be determined by Unit Operator.  Such employees shall be the employees of Unit Operator.

7.5    **Records.**  Unit Operator shall keep correct books, accounts, and records of Unit Operations.

7.6    **Reports to Working Interest Owners.**  Unit Operator shall furnish to Working Interest Owners periodic reports of Unit Operations.

7.7    **Reports to Governmental Authorities.**  Unit Operator shall make all reports to governmental authorities that it has the duty to make as Unit Operator.

7.8    **Engineering and Geological Information.**  Unit Operator shall make available to a Working Interest Owner, upon request, a copy of the log and other engineering and geological data pertaining to wells drilled for Unit Operations.

7.9    **Expenditures.**  Subject to the provisions of Section 3.2.4, Unit Operator is authorized to make single expenditures not in excess of Twenty-Five Thousand Dollars ($25,000) without prior approval of Working Interest Owners, except in case of blowout, explosion, fire, flood, or other sudden emergency, Unit Operator may take such steps and incur such expense as, in its opinion, are required to deal with the emergency and to safeguard life and property; provided that Unit Operator shall, as promptly as possible, report the emergency and action taken to the Working Interest Owners.  Unit Operator shall be permitted to perform routine well workovers, repairs and stimulations without additional approval of the Working Interest Owners, provided each such expenditure does not exceed the Twenty-Five Thousand Dollar ($25,000) limit.

7.10    **Wells Drilled by Unit Operator.**  All wells drilled by Unit Operator shall be at the usual competitive rates prevailing in the area.  Unit Operator may employ its own tools and equipment, but the charge therefor shall not exceed the prevailing rate in the area, and the work shall be performed by Unit Operator under the same terms and conditions as are usual in the area in contracts of independent contractors doing work of a similar nature.

ARTICLE 8
TAXES

8.1    **Ad Valorem Taxes.**  Unit Operator shall, beginning in the first calendar year after the effective date hereof, make and file all necessary ad valorem tax renditions and returns with the proper taxing authorities covering all real and personal property of each Working Interest Owner used or held by Unit Operator in Unit Operations.  Unit Operator shall settle assessments arising therefrom.  All such ad valorem taxes shall be paid by Unit Operator and charged to the joint account; provided that, if the interest of a Working Interest Owner is subject to a separately assessed overriding royalty interest, production payment, or other interest in excess of a one-eighth (1/8) royalty, such Working Interest Owner shall be given credit for the reduction in taxes paid resulting therefrom.

- 6 -

8.2    Other Taxes.  Each Working Interest Owner shall pay or cause to be paid all production, severance, gathering, and other taxes imposed upon or in respect to the production or handling of its share of Unitized Substances.

ARTICLE 9
INSURANCE

9.1    Insurance.  Unit Operator, with respect to Unit Operations, shall carry such insurance as set forth in Exhibit "G".

ARTICLE 10
ADJUSTMENT OF INVESTMENTS

10.1    Personal Property Taken Over.  Upon the Effective Date hereof, Working Interest Owners shall deliver to Unit Operator the following:

10.1.1    Wells.  All wells in the Unit Area completed in the Unitized Interval and all wells in the Unit Area drilled to the Unitized Interval upon which operations have been suspended or which have been plugged and abandoned and which the Working Interest Owners determine are necessary for Unit Operations.

10.1.2    Well and Lease Equipment.  The casing and tubing in each such well, the wellhead connections thereon, and all other lease and operating equipment that is used in the operation of such wells which Working Interest Owners determine is necessary or desirable for Unit Operations.

10.1.3    Records.  A copy of all production and well records that pertain to such wells.

10.2    Inventory and Evaluation of Personal Property.  Working Interest Owners shall at Unit Expense inventory and evaluate, as determined by the Working Interest Owners, the personal property taken over.  Such inventory shall include and be limited to those items of equipment normally considered controllable by operators of oil and gas properties, as indicated in the "Materials Classification Manual (revised 1960)", prepared by the Petroleum Accountants Society of Oklahoma, except that certain items normally considered noncontrollable, such as sucker rods, Kobe tubing of sizes less than two inches (2"), and other items as agreed upon by the Working Interest Owners may be included on the inventory in order to insure a more equitable adjustment of investment.  Immediately following completion, such inventory shall be priced as determined by the Working Interest Owners.

10.3    Investment Adjustment.  Upon approval by Working Interest Owners of the inventory and evaluation, each Working Interest Owner shall be credited  with the value of its interest in all personal property taken over under Section 10.1.2 and shall be charged with an amount equal to that obtained by multiplying the total value of all personal property taken over under Section 10.1.2 by such Working Interest Owner's Unit Participation.  If the charge against any Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be an item of Unit Expense chargeable against such Working Interest Owner.  If the credit to any Working Interest Owner is greater than the amount charged against such Working Interest Owner, the resulting net credit shall be paid to such Working Interest Owner by Unit Operator out of funds received by it in settlement of the net charges described above.

- 7 -

10.4    Investment Adjustment on Revision of Tract Participation.  At
the time that tract participations are revised pursuant to Section 5.2 of the
Unit Agreement, the investment attributable to Unit Equipment and Cycling
Plant shall be adjusted between the Working Interest Owners as their Unit
Participations are changed on Exhibit "E" on such basis to be agreed upon
by the Working Interest Owners at the time of such revision.

10.5    General Facilities.  The acquisition of lease roads, warehouses,
warehouse stocks, lease houses, camps, facility systems, and office buildings
necessary for Unit Operations shall be by negotiation by the owner thereof
and Unit Operator, subject to the approval of Working Interest Owners.

10.6    Ownership of Personal Property and Facilities.  Each Working
Interest Owner, individually, shall by virtue hereof own an undivided interest,
equal to its Unit Participation, in all personal property and facilities taken
over or otherwise acquired by Unit Operator pursuant to this agreement.

ARTICLE 11
UNIT EXPENSE

11.1    Basis of Charge to Working Interest Owners.  Unit Operator
initially shall pay all Unit Expenses.  Each Working Interest Owner shall
reimburse Unit Operator for its share of Unit Expense in proportion to its
respective Unit Participation.  All charges, credits and accounting for Unit
Expense shall be in accordance with Exhibit "F" hereof.

11.2    Budget.  Before or as soon as practical after the effective
date hereof, Unit Operator shall prepare a budget of estimated Unit Expense
for the remainder of the calendar year and, on or before the first day of each
October thereafter, shall prepare a budget for the ensuing calendar year.  A
budget shall set forth the estimated Unit Expense by quarterly periods.  Budgets
shall be estimated only, and shall be adjusted or corrected by Working Interest
Owners and Unit Operator whenever an adjustment or correction is proper.  A
copy of each budget and adjusted budget shall promptly be furnished to each
Working Interest Owner.  Approval of the budget shall not constitute approval
of expenditures for any item contained therein.

11.3    Advance Billings.  Unit Operator shall have the right to require
Working Interest Owners to advance their respective shares of estimated Unit
Expense by submitting to Working Interest Owners, on or before the 15th day
of any month, an itemized estimate thereof for the succeeding month, with a
request for payment in advance.  Within fifteen (15) days thereafter, each
Working Interest Owner shall pay to Unit Operator its share of such estimate.
Adjustments between estimated and actual Unit Expense shall be made by Unit
Operator at the close of each calendar month, and the accounts of Working
Interest Owners shall be adjusted accordingly.

11.4    Commingling of Funds.  No funds received by Unit Operator
under this agreement need be segregated or maintained by it as a separate
fund, but may be commingled with its own funds.

11.5    Lien of Unit Operator.  Each Working Interest Owner grants to
Unit Operator a lien upon its Oil and Gas rights in each Tract, its share of
Unitized Substances when produced, and its interest in all Unit Equipment, as
security for payment of its share of Unit Expense, together with interest thereon

- 8 -

at the rate of eight per cent (8%) per annum. Unit Operator shall have the right
to bring suit to enforce collection of such indebtedness with or without foreclosure
of the lien. In addition, upon default by any Working Interest Owner in the pay-
ment of its share of Unit Expense, Unit Operator shall have the right to collect
from the purchaser the proceeds from the sale of such Working Interest Owner's
share of Unitized Substances until the amount owed by such Working Interest
Owner, plus interest as aforesaid, has been paid. Each purchaser shall be
entitled to rely upon Unit Operator's written statement concerning the amount
of any default.

11.6    Unpaid Unit Expense. If any Working Interest Owner fails to
pay its share of Unit Expense within sixty (60) days after rendition of a state-
ment therefor, Unit Operator shall exercise all reasonable actions available
hereunder to collect such share, and if such efforts are unsuccessful, each
Working Interest Owner, upon request by Unit Operator, shall pay its pro-
portionate part of the unpaid share of Unit Expense of a defaulting Working
Interest Owner. The Working Interest Owners that pay the share of Unit
Expense of a defaulting Working Interest Owner shall be reimbursed by the
Unit Operator for the amount so paid plus any interest collected thereon,
upon receipt by Unit Operator of any past due amount collected from the
defaulting Working Interest Owner. Any Working Interest Owner so paying
a defaulting Working Interest Owner's share of Unit Expense shall be subro-
gated to the lien and rights herein granted Unit Operator.

11.7    Expenses Incurred Before Effective Date. It is recognized
that certain expenses incurred before the Effective Date, such as expenses
incurred in having Core Laboratories, Inc. make a study of and prepare a
report and recommendation as to the feasibility of effecting a cycling and
pressure regulation program as to the Unitized Interval, expenses incurred
in obtaining execution of the Unit Agreement and this Agreement, and expenses
incurred in the filing and prosecution of an application for approval of the
Unit Agreement and the cycling and pressure regulation program contemplated
hereunder by the Commissioner of Conservation of the State of Louisiana will
be for the joint benefit of the parties hereto. Such expenses and all other
similar type expenses incurred for the joint benefit of the parties hereto before
the Effective Date as are approved by the Working Interest Owners shall be
treated, charged and borne as Unit Expense.

ARTICLE 12
NON-UNITIZED FORMATIONS

12.1    Right to Operate. Any Working Interest Owner now having or
hereafter acquiring the right to drill for and produce oil, gas or other minerals
from other than the Unitized Interval shall have the right to do so notwithstanding
this agreement or the Unit Agreement. In exercising the right, however, the
Working Interest Owner shall exercise reasonable precaution to prevent unreason-
able interference with Unit Operations. No Working Interest Owner shall produce
Unitized Substances through any well drilled or operated by it. If any Working
Interest Owner drills any well into or through the Unitized Interval, the Unitized
Interval shall be protected in a manner satisfactory to Working Interest Owners
so that the production of Unitized Substances will not be adversely affected.

ARTICLE 13
CYCLING PLANT

13.1    Construction of Cycling Plant. Under the terms of the Unit
Agreement, Working Interest Owners agreed to commence, or cause to be

- 9 -

commenced, through the Unit Operator, after the Effective Date of the Unit
Agreement, and as soon thereafter as necessary materials are available, the
work incident to the construction of a Cycling Plant and pressure regulation
system for the extraction and recovery of Liquid Products from Unitized
Substances and injecting the Residue Gas back into the Unitized Interval for
the purpose of maintaining the reservoir pressure. The size and type of the
Cycling Plant and pressure regulation system shall be determined by the
Working Interest Owners. Accordingly, Unit Operator shall prepare and
submit to the Working Interest Owners, plans and specifications for the
construction of the Cycling Plant and pressure regulation system. Within
thirty (30) days after delivery of said plans and specifications, the parties
hereto shall determine the final type and size of said Cycling Plant and
pressure regulation system and approve the plans and specifications for same,
either as submitted by Unit Operator or as modified by agreement of the parties
hereto. Promptly upon determination of the size and type of the said plant and
system to be constructed and installed, Unit Operator shall invite bids from
at least three independent, responsible and reliable construction companies
or firms for the complete construction and installation of said plant and system.
All bids shall be required to be submitted within forty-five (45) days from the
date of final determination of the type and size of said plant and system to be
constructed. Immediately after the expiration of the time allowed for submission
of bids, the Working Interest Owners shall consider all bids submitted and
shall determine the bids to be accepted and the basis on which the construction
contract is to be awarded. Unit Operator shall supervise the construction
of said plant and system. The approval of the construction contract by Working
Interest Owners shall constitute authority for Unit Operator to make all ex-
penditures necessary in constructing, installing equipment and completing
said plant and system in accordance with such plans and specifications and
such construction contract.

13.2   Acquisition of Plant Site. Prior to the actual construction of
the Cycling Plant, Unit Operator shall, with the approval of the Working Interest
Owners, purchase or acquire at Unit Expense, the surface ownership or a long
term lease on a tract of land of sufficient size and at a suitable location for
the construction of the Cycling Plant and appurtenances. Title to the premises
shall be taken in the name of Unit Operator as Unit Operator hereunder and shall
be held for the benefit of Working Interest Owners. At any time after the final
determination of Tract Participation pursuant to the terms and provisions of
the Unit Agreement, any party hereto shall have the right to receive, on demand,
from Unit Operator, a conveyance of an undivided interest in the plant site in
proportion to said party's Unit Participation.

13.3   Operation of the Cycling Plant and Pressure Regulation System.
On completion of the Cycling Plant and pressure regulation system, the operation
of same shall be the exclusive right and responsibility of Unit Operator and
such operations shall in all respects be considered the same as Unit Operations.
On or before the 20th day of each month, Unit Operator shall prepare and submit
to each party hereto a report of operations relating to the Cycling Plant and
pressure regulation system showing the following:

    (a)    The quantity of Unitized Substances delivered to the
               Cycling Plant for processing and the quantity of
               Residue Gas injected into the Unitized Interval.

    (b)    The quantity of Liquid Products extracted at the
               Cycling Plant during the month.

- 10 -

(c)     The quantity of Liquid Products in stock at the
        beginning of the month and at the end of the month.

(d)     The quantity of Liquid Products shipped or delivered
        from the Cycling Plant.

(e)     Such other data and information as may be necessary
        for proper accounting and settlement between the
        parties.

13.4    Non-Unitized Substances.  Subject to the approval of the
Working Interest Owners, Unit Operator shall have the right to handle and
process non-unitized substances in the Cycling Plant, under such terms
and conditions as may be authorized by the Working Interest Owners.

ARTICLE 14
TITLES

14.1    Warranty and Indemnity.  Each Working Interest Owner
represents and warrants that it is the owner of the respective working interests
as claimed by it, and hereby agrees to indemnify and hold harmless the other
Working Interest Owners from any loss due to failure, in whole or in part, of
its title to any such interest, except failure of title arising out of Unit Operations;
provided that, such indemnity shall be limited to an amount equal to the net
value that has been received from the sale or receipt of Unitized Substances
attributed to the interest as to which titles failed.  Each failure of title will
be deemed to be effective, insofar as this agreement is concerned, as of the
first day of the calendar month in which such failure is finally determined,
and there shall be no retroactive adjustment of Unit Expense, or retroactive
allocation of Unitized Substances or the proceeds therefrom, as the result of
title failure.

14.2    Carved-Out Interest Subject to This Agreement.  In the event
any Working Interest Owner shall, after executing this agreement, create an
overriding royalty, production payment, net profits, or carried interest, or
any other interest out of its interest then subject to this agreement, such
carved-out interest shall be subject to the terms and provisions of this agree-
ment.  In the event the Working Interest Owner owning the interest out of which
the carved-out interest was created withdraws from this agreement under the
terms and provisions of Article 18 hereof, or fails to pay any costs or expenses
chargeable to such Working Interest Owner under this agreement and the pro-
duction to the credit of such Working Interest Owner is insufficient for this
purpose, the owner of the carved-out interest will be liable for its pro-rata
portion of all costs and expenses for which the Working Interest Owner that
created such carved-out interest would have been liable hereunder by virtue
of such Working Interest Owner's entire original interest, just as though such
carved-out interest had not been created.  In this event, the lien provided in
Section 11.5 hereof may be enforced against such carved-out interest in the
same manner as the lien was enforceable against the original interest of which
the carved-out interest was created.

ARTICLE 15
LIABILITY, CLAIMS AND SUITS

15.1    Individual Liability.  The duties, obligations and liabilities of
Working Interest Owners shall be several and not joint or collective; and

- 11 -

nothing herein contained shall ever be construed as creating a partner-
ship of any kind, joint venture, association, or trust among Working
Interest Owners.

     15.2   Settlements. Unit Operator may settle any single damage claim
or suit involving Unit Operations but not involving an expenditure in excess
of Seven Thousand Five Hundred Dollars ($7,500.00) provided the payment
is in complete settlement of such claim or suit. If the amount required for
settlement exceeds the above-specified amount, Working Interest Owners
shall assume and take over the further handling of the claim or suit unless
such authority is expressly delegated to Unit Operator. All costs and ex-
pense of handling, settling, or otherwise discharging such claim or suit
shall be an item of Unit Expense. If a claim is made against any Working
Interest Owner or if any Working Interest Owner is sued on account of any
matter arising from Unit Operations and over which such Working Interest
Owner individually has no control because of the rights given Working Interest
Owners and Unit Operator by this agreement and the Unit Agreement, the
Working Interest Owner shall immediately notify the Unit Operator, and the
claim or suit shall be treated as any other claim or suit involving Unit
Operations.

## ARTICLE 16
### INTERNAL REVENUE PROVISION

     16.1   Internal Revenue Provision. Each Working Interest Owner
hereby elects that it and the operations covered by this agreement be ex-
cluded from the application of Subchapter K of Chapter 1 of Sub-title A of
the Internal Revenue Code of 1954, or such portion thereof as the Secretary
of the Treasury of the United States or his delegate shall permit by election
to be excluded therefrom. Unit Operator is hereby authorized and directed
to execute on behalf of each Working Interest Owner such additional or
further evidence of the election as may be required by regulations issued
under said Subchapter K. Should the regulations require each party to ex-
ecute such further evidence, each Working Interest Owner agrees to execute
or join in the execution thereof. If any present or future income tax laws
of the State of Louisiana, or any future income tax laws of the United States,
contain or shall hereafter contain, provisions similar to those contained in
Subchapter K, Chapter 1, Sub-title A, of the Internal Revenue Code of 1954,
under which an election similar to that provided by Section 761 of said Sub-
chapter K is permitted, each of the parties hereto hereby makes such election
or agrees to make such election as may be permitted by such laws.

## ARTICLE 17
### NOTICES

     17.1   Notices. All notices required hereunder shall be in writing
and shall be deemed to have been properly served when sent by mail or
telegram to the address of the representative of each Working Interest
Owner as furnished to Unit Operator in accordance with Article 4.

## ARTICLE 18
### WITHDRAWAL OF WORKING INTEREST OWNER

     18.1   Withdrawal. A Working Interest Owner may withdraw from
this agreement by transferring, without warranty of title, either express or

- 12 -

implied, to the other Working Interest Owners who do not desire to with-
draw, all its Oil and Gas Rights together with its interest in all Unit Equip-
ment and in all wells used in Unit Operations. Such transfer shall not relieve
said Working Interest Owner from any obligation or liability incurred prior
to the date of the delivery of the transfer, which delivery may be made to
Unit Operator as Agent for the transferees. The interest transferred shall
be owned by the transferees in proportion to their respective Unit Participations.
The transferees, in proportion to the respective interests so acquired, shall
pay transferor, for its interest in Unit Equipment, the fair salvage value
thereof as estimated and fixed by Working Interest Owners. After the date
of delivery of the transfer, the withdrawing Working Interest Owner shall be
relieved from all further obligations and liability hereunder and under the
Unit Agreement, and the rights of such Working Interest Owner hereunder
and under the Unit Agreement shall cease insofar as they existed by virtue
of the interest transferred. Notwithstanding anything hereinabove set forth
in this Section, a Working Interest Owner may not withdraw from this agree-
ment by conveying, assigning, and transferring its interest if said Working
Interest Owner's interest is burdened by any royalties, overriding royalties,
or other burdens in excess of one-fourth (1/4) lessor's royalty, unless the
other Working Interest Owners willing to accept the assignment agree to
accept said interest subject to the royalties, overriding royalties, or other
burdens in excess of a one-fourth (1/4) lessor's royalty then existing and
burdening said interest.

## ARTICLE 19
### ABANDONMENT OF WELLS

19.1    Rights of Former Owners. If Working Interest Owners decide
to abandon permanently any well within the Unit Area prior to termination
of the Unit Agreement, Unit Operator shall give written notice thereof to the
Working Interest Owners of the Tract on which the well is located, and they
shall have the option for a period of ninety (90) days after the sending of such
notice to notify Unit Operator in writing of their election to take over and own
the well. Within ten (10) days after the Working Interest Owners of the Tract
have notified Unit Operator of their election to take over the well, they shall
pay Unit Operator, for credit to the joint account, the amount estimated by
Working Interest Owners to be the net salvage value of the casing and equip-
ment in and on the well. The Working Interest Owners of the Tract, by taking
over the well, agree to seal off effectively and protect the Unitized Formation,
and upon abandonment to plug the well in compliance with applicable laws and
regulations.

19.2    Plugging. If the Working Interest Owners of a Tract do not
elect to take over a well located thereon which is proposed for abandonment,
Unit Operator shall plug and abandon the well in compliance with applicable
laws and regulations.

## ARTICLE 20
### EFFECTIVE DATE AND TERM

20.1    Effective Date. This agreement shall become effective on the
date and at the time that the Unit Agreement become effective.

20.2    Term. This agreement shall continue in effect so long as the
Unit Agreement remains in effect, and thereafter until (a) all unit wells have

- 13 -

been abandoned and plugged or turned over to Working Interest Owners in accordance with Article 21, (b) all Unit Equipment and real property acquired for the joint account have been disposed of by Unit Operator in accordance with instructions of Working Interest Owners, and (c) there has been a final accounting.

    20.3    Action Prior to Effective Date.  Working Interest Owners may, prior to the effective date of the Unit Agreement, take such action and incur such expense as is reasonably necessary to commence Unit Operations on the effective date; provided Working Interest Owners having eighty-seven per cent (87%) of the Unit Participation shown on Exhibit "E" have executed this agreement; and further provided, that such action be decided by the same vote as would have been required to take such action had it been voted upon subsequent to the effective date.  Such action may include the designing, engineering, and construction of the secondary recovery facilities contemplated hereby, or for any other facilities or equipment required for Unit Operations, and the acquisition of materials, rights of way, water rights, and easement therefor. If the Unit Agreement becomes effective, such costs shall be treated as an item of Unit Expense.  If the Unit Agreement does not become effective, the costs and expenses incurred hereunder shall be paid and borne by the Working Interest Owners who have become parties to this agreement in the proportion that the respective Unit Participation of each such Working Interest Owner, as shown on Exhibit "E", bears to the total Unit Participation of all such Working Interest Owners.

ARTICLE 21
ABANDONMENT OF OPERATIONS

    21.1    Termination.  Upon termination of the Unit Agreement, the following will occur:

        21.1.1    Oil and Gas Rights.  Oil and Gas Rights in and to each separate Tract shall no longer be affected by this agreement, and thereafter the parties shall be governed by the terms and provisions of the leases, contracts, and other instruments affecting the separate Tracts.

        21.1.2    Right to Operate.  Working Interest Owners of any Tract that desire to take over and continue to operate wells located thereon may do so by paying Unit Operator, for credit to the joint account, the net salvage value of the casing and equipment in and on the wells taken over, as estimated by Working Interest Owners, and by agreeing to plug properly each well at such time as it is abandoned.

        21.1.3    Salvaging Wells.  Unit Operator shall salvage as much of the casing and equipment in or on wells not taken over by Working Interest Owners of separate Tracts as can economically and reasonably be salvaged, and shall cause the wells to be plugged and abandoned properly.

        21.1.4    Cost of Salvaging.  Working Interest Owners shall share the cost of salvaging, liquidation or other distribution of assets and properties used in Unit Operation in proportion to their respective Unit Participations.

- 14 -

## ARTICLE 22
## MAINTENANCE OF UNIT OWNERSHIP

22.1   Maintenance of Unit Ownership.  For the purpose of main-
taining uniformity of ownership in the Oil and Gas Rights and Unit Equipment,
and notwithstanding any other provisions herein to the contrary, no party
hereto shall sell, encumber, transfer or make other disposition of its
interest in the Oil and Gas Rights and Unit Equipment unless such disposition
covers either:

    (a)    The entire interest of the party in all Oil and Gas Rights and
            Unit Equipment; or

    (b)    An equal undivided interest in all Oil and Gas Rights and
            Unit Equipment.

Every such sale, encumbrance, transfer or other disposition made by any
party shall be made expressly subject to this agreement, and shall be made
without prejudice to the rights of the other parties.

## ARTICLE 23
## RESERVATIONS

23.1   Exhibit "H".  Attached hereto, marked Exhibit "H", and
made a part hereof, is a schedule showing for each Tract the name or
names of the owner or owners of Working Interest in the Tract, and
showing a dollar amount opposite the name of each such owner.  The amounts
shown in Exhibit "H" are final and irrevocable, and shall not be subject to
recalculation or change for any reason whatsoever.

23.2   Reservation.  Notwithstanding any provision to the contrary
contained in this Agreement or in the Unit Agreement, each Working Interest
Owner does hereby reserve and except with respect to each Tract in the Unit
Area in which it owns all or any part of the Working Interest, one-half (1/2)
of seven-eights (7/8) of the first production of Unitized Substances allocated
to such Tracts from the Unitized Interval and which accrues to the Working
Interest herein of such party without regard, for the purpose of calculating
such reservation and exception, to the Royalty Interest with which such Work-
ing Interest may be burdened, until such time as the value of the Unitized
Substances so reserved by all Working Interest Owners equals the total of
the sums shown opposite the names of the Working Interest Owners set out
in Exhibit "H" at which time such reservation shall terminate; provided,
however, that such reservation shall be subject to the provisions of a
separate agreement, bearing the same date as this agreement, which
separate agreement has been executed by each party hereto simultaneously
with its execution or ratification of this agreement, and sets out in more
detail the understandings of the parties hereto with respect to their respective
reservations and the Unitized Substances accruing thereto.

## ARTICLE 24
## EXECUTION

24.1   Original, Counterpart, or Other Instrument.  A party may
become a party to this agreement by signing the original of this instrument,
a counterpart hereof, or other instrument agreeing to be bound by the
provisions hereof.  The signing of any such instrument shall have the same
effect as if all the parties had signed the same instrument.

- 15 -

## ARTICLE 25
## SUCCESSORS AND ASSIGNS

25.1   **Successors and Assigns.**  The provisions hereof shall be covenants running with the lands, leases, and interests covered hereby, and shall be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors, and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the date opposite their respective signatures.

Working Interest Owners

| WITNESSES | DATE | PARTY |
|---|---|---|

PLACID OIL COMPANY

By:_____
President

ATTEST:

_____
Secretary

SOCONY-MOBIL OIL CO., INC.

By:_____

ATTEST:

_____

PHILLIPS PETROLEUM COMPANY

By:_____

ATTEST:

_____

NEMOURS CORPORATION

By:_____

ATTEST:

_____

- 16 -

WITNESSES                DATE                    PARTY

                                                SHELL OIL COMPANY

_____        _____         By:_____

_____                                ATTEST:

                                                _____


                                                UNION PRODUCING COMPANY

_____        _____         By:_____

_____                                ATTEST:

                                                _____


                                                J. ARON & COMPANY, INC.

_____        _____         By:_____

_____                                ATTEST:

                                                _____


CHEVRON O                                       CHEVRON OIL COMPANY

_____        _____         By:_____

_____                                ATTEST:

                                                _____


                                                CRESLENN OIL COMPANY

_____        _____         By:_____

_____                                ATTEST:

                                                _____


                                                BEARD OIL COMPANY

_____        _____         By:_____

                                                RELIANCE TRUSTS

_____        _____         By:_____
                                                                Trustee
_____

| WITNESSES | DATE | PARTY |
|-----------|------|-------|
| | | BRUCE ANDERSON |
| | | J. PAT BEAIRD |
| | | C. A. BENTLEY |
| | | HARVEY BROYLES |
| | | DAVID CROW, TRUSTEE |
| | | MAX EVANS, Individually and as Agent-in-fact for Jean Evans Kelly and Roger Tyrone Evans |
| | | JAMES M. FORGOTSON |
| | | T. K. GLENN |
| | | WALTER S. GRANT |
| | | HUGH A. HAWTHORNE |

WITNESSES                    DATE                    PARTY

                                                     MARGARET HUNT TRUST

_____      _____      By:_____
                                                              Trustee

_____

_____      _____      _____
_____                                     IRWIN I. MUSLOW

_____      _____
_____                                     _____
                                                     JAMES MUSLOW

_____      _____
_____                                     _____
                                                     RICHARD L. PETERSON

_____      _____
_____                                     _____
                                                     GEORGE R. SCHURMON

_____      _____      _____
_____

_____      _____      _____
_____

_____      _____      _____
_____

_____      _____      _____
_____

_____      _____      _____
_____

_____      _____      _____
_____

## PROOF BY WITNESS

STATE OF _____

PARISH (COUNTY) OF _____

     BEFORE ME, the undersigned authority, this day personally
appeared _____ to me personally
known to be the identical person whose name is subscribed in the foregoing
instrument as an attesting witness, who being first duly sworn, on
oath, says: That _____ subscribed _____ name to the foregoing instrument
as a witness, and that _____ knows _____

_____
to be the identical person ____ described therein, and who executed the same,
and saw _____ sign the same as _____ voluntary act and deed, and
that _____ , the said _____
subscribed _____ name to the same at the same time as an attesting witness.

     Sworn to and subscribed before
me, this _____ day of _____
_____ ,19___
_____    _____
Notary Public in and for _____

## PROOF BY WITNESS

STATE OF _____

PARISH (COUNTY) OF _____

     BEFORE ME, the undersigned authority, this day personally
appeared _____ to me personally
known to be the identical person whose name is subscribed in the foregoing
instrument as an attesting witness, who being first duly sworn, on
oath, says: That _____ subscribed _____ name to the foregoing instrument
as a witness, and that _____ knows _____

_____
to be identical person ____ described therein, and who executed the same,
and saw _____ sign the same as _____ voluntary act and deed, and
that _____ , the said _____
subscribed _____ name to the same at the same time as an attesting witness.

     Sworn to and subscribed before
me, this _____ day of _____
_____ ,19___
_____    _____
Notary Public in and for _____

## CORPORATE ACKNOWLEDGEMENT

STATE OF_____

PARISH (COUNTY) OF_____

      On this_____day of_____, 19___, before

me personally appeared _____

to me known, who, being by me duly sworn, did say that he is_____

_____of_____, and that said instrument

was signed in behalf of said corporation by authority of its board of directors,

and said_____acknowledged said

instrument to be the free act and deed of said corporation.

                                        _____

                                        Notary Public

My commission expires:

## CORPORATE ACKNOWLEDGEMENT

STATE OF_____

PARISH (COUNTY) OF_____

      On this_____day of_____, 19___,

before me personally appeared_____

to me known, who, being by me duly sworn, did say that he is_____

_____of_____, and that said

instrument was signed in behalf of said corporation by authority of its board

of directors, and said_____acknowledged

said instrument to be the free act and deed of said corporation.

                                        _____

                                        Notary Public

My commission expires:

## INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

    On this_____day of_____, 19___,

before me personally appeared _____

_____

to me known to be the person___ described in and who executed the foregoing

instrument, and acknowledged that___he___executed the same as____free act

and deed.
    IN WITNESS WHEREOF I have hereunto set my official hand and
seal on the date hereinabove written.

                                   _____
                                    Notary Public

## INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

    On this_____day of_____, 19___,

before me personally appeared_____

_____

to me known to be the person___ described in and who executed the foregoing

instrument, and acknowledged that___he___executed the same as____free act

and deed.
    IN WITNESS WHEREOF I have hereunto set my official hand and
seal on the date hereinabove written.

                                   _____
                                    Notary Public

## INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

    On this_____day of_____, 19___,

before me personally appeared_____

_____

to me known to be the person___ described in and who executed the foregoing

instrument, and acknowledged that___he___executed the same as____free act
and deed.
    IN WITNESS WHEREOF I have hereunto set my official hand and seal
on the date hereinabove written.

                                   _____
                                    Notary Public

David

| | |
|---|---|
| **From:** | Linda |
| **Sent:** | Thursday, April 08, 2004 10:15 AM |
| **To:** | David |
| **Subject:** | Jim Perkins with Exco Resources in |

      Dallas, TX called about his letter to Sklarco dated 3/29/04 offering to
      purchase our interest in Black Lake Field.  Please call him at 214-706-3344.

*Letter sent*

*4-08-2004*

1







EXHIBIT "E"
TO THE UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

**SCHEDULE SHOWING WORKING INTEREST OWNERS, TRACT NUMBER WORKING INTEREST PERCENT IN TRACT, UNIT PARTICIPATION PERCENT ALLOCABLE TO TRACT, WORKING INTEREST UNIT PARTICIPATION PERCENT TO TRACT AND WORKING INTEREST UNIT PARTICIPATION PERCENT**

| Working Interest Owners | Tract No. | W.I. % In Tract | Participation % Allocable To Tract | W.I. Unit Participation % In Tract | W.I. % Unit Participation |
|---|---|---|---|---|---|
| Placid Oil Company | 1 | 100.0000 | 44.102639 | 44.102639 | |
| | 2 | 100.0000 | 4.327845 | 4.327845 | |
| | 3 | 100.0000 | 0.407910 | 0.407910 | |
| | 4 | 37.5000 | 12.613622 | 4.730108 | |
| | 5 | 100.0000 | 11.910199 | 11.910199 | |
| | 6 | 100.0000 | 1.239055 | 1.239055 | |
| | 7 | 100.0000 | 1.879303 | 1.879303 | |
| | 10 | 100.0000 | 0.295913 | 0.295913 | |
| | 11 | 100.0000 | 0.544433 | 0.544433 | |
| | 13 | 100.0000 | 0.726231 | 0.726231 | |
| | 14 | 100.0000 | 0.931610 | 0.931610 | |
| | 15 | 100.0000 | 0.178538 | 0.178538 | |
| | 16 | 100.0000 | 0.365582 | 0.365582 | |
| | 19 | 100.0000 | 0.029765 | 0.029765 | |
| | 20 | 100.0000 | 0.016469 | 0.016469 | |
| | 21 | 100.0000 | 0.000044 | 0.000044 | |
| | 23 | 100.0000 | 0.011665 | 0.011665 | |
| | 24 | 100.0000 | 0.821041 | 0.821041 | |
| | 25 | 100.0000 | 3.204131 | 3.204131 | |
| | 26 | 100.0000 | 0.067590 | 0.067590 | |
| | 31 | 100.0000 | 0.317390 | 0.317390 | |
| | 32 | 100.0000 | 0.427884 | 0.427884 | |
| | 33 | 100.0000 | 0.747619 | 0.747619 | |
| | 34 | 100.0000 | 0.481093 | 0.481093 | |
| | 35 | 100.0000 | 0.220194 | 0.220194 | |
| | 36 | 100.0000 | 0.450193 | 0.450193 | |
| | 37 | 100.0000 | 0.324589 | 0.324589 | |
| | 38 | 100.0000 | 0.342174 | 0.342174 | |
| | 39 | 100.0000 | 0.225324 | 0.225324 | |
| | 40 | 100.0000 | 0.012085 | 0.012085 | |
| | 41 | 100.0000 | 0.461678 | 0.461678 | |
| | 42 | 100.0000 | 0.234916 | 0.234916 | |
| | 43 | 100.0000 | 0.246182 | 0.246182 | |
| | 44 | 100.0000 | 0.012547 | 0.012547 | |
| | 45 | 100.0000 | 0.432251 | 0.432251 | |
| | 46 | 100.0000 | 0.022640 | 0.022640 | |
| | 47 | 100.0000 | 0.209513 | 0.209513 | |
| | 48 | 100.0000 | 0.420766 | 0.420766 | |
| | 49 | 87.5000 | 0.000529 | 0.000463 | |
| | 50 | 100.0000 | 0.165676 | 0.165676 | |
| | 51 | 100.0000 | 0.007347 | 0.007347 | |
| | 52 | 100.0000 | 0.051312 | 0.051312 | |
| | 53 | 100.0000 | 0.007533 | 0.007533 | |
| | 54 | 100.0000 | 0.332700 | 0.332700 | |
| | 55 | 100.0000 | 0.076862 | 0.076862 | |
| | 56 | 100.0000 | 0.006773 | 0.006773 | |
| | 57 | 100.0000 | 0.033549 | 0.033549 | |
| | 58 | 100.0000 | 0.182027 | 0.182027 | |
| | 59 | 100.0000 | 0.176302 | 0.176302 | |
| | 60 | 100.0000 | 0.189159 | 0.189159 | |
| | 61 | 100.0000 | 0.011067 | 0.011067 | |
| | 63 | 100.0000 | 0.033030 | 0.033030 | |
| | 64 | 100.0000 | 0.086591 | 0.086591 | |
| | 65 | 100.0000 | 0.204376 | 0.204376 | |
| | 66 | 100.0000 | 0.413254 | 0.413254 | |
| | 69 | 100.0000 | 0.001657 | 0.001657 | |
| | 70 | 100.0000 | 0.028339 | 0.028339 | |
| | 71 | 100.0000 | 0.007410 | 0.007410 | |
| | 72 | 100.0000 | 0.000730 | 0.000730 | |
| | 73 | 100.0000 | 0.002934 | 0.002934 | |
| | 74 | 100.0000 | 0.016114 | 0.016114 | |
| | 75 | 100.0000 | 0.012648 | 0.012648 | |
| | 76 | 100.0000 | 0.007417 | 0.007417 | |
| | 77 | 100.0000 | 0.002938 | 0.002938 | |
| | 78 | 100.0000 | 0.000270 | 0.000270 | |
| | 79 | 100.0000 | 0.000169 | 0.000169 | |
| | 82 | 100.0000 | 0.012129 | 0.012129 | |
| | 83 | 100.0000 | 0.012202 | 0.012202 | |
| | 84 | 100.0000 | 0.004877 | 0.004877 | |
| | 85 | 100.0000 | 0.004724 | 0.004724 | |
| | 86 | 100.0000 | 0.004598 | 0.004598 | |
| | 87 | 100.0000 | 0.003326 | 0.003326 | |
| | 90.3 | 100.0000 | 0.028752 | 0.028752 | |
| | 90.5 | 100.0000 | 0.013995 | 0.013995 | |
| | 90.8 | 100.0000 | 0.001233 | 0.001233 | |
| | 91.3 | 50.0000 | 0.000313 | 0.000156 | |
| | 91.4 | 50.0000 | 0.002358 | 0.001179 | |
| | 93.6 | 50.0000 | 0.004406 | 0.002203 | |
| | 94.4 | 100.0000 | 0.000275 | 0.000275 | |
| | 94.5 | 100.0000 | 0.000206 | 0.000206 | |
| | 94.6 | 100.0000 | 0.000415 | 0.000415 | |
| | 94.7 | 100.0000 | 0.000603 | 0.000603 | |
| | 94.8 | 100.0000 | 0.000339 | 0.000339 | |
| | 94.9 | 100.0000 | 0.000296 | 0.000296 | |
| | 94.10 | 100.0000 | 0.000344 | 0.000344 | |
| | 94.11 | 100.0000 | 0.000323 | 0.000323 | |
| | 94.12 | 100.0000 | 0.000280 | 0.000280 | |
| | 94.13 | 100.0000 | 0.000301 | 0.000301 | |
| | 94.14 | 100.0000 | 0.003299 | 0.003299 | |
| | 95 | 100.0000 | 0.048720 | 0.048720 | |
| | 97.2 | 100.0000 | 0.000040 | 0.000040 | |
| | 97.3 | 100.0000 | 0.000274 | 0.000274 | |
| | 97.4 | 100.0000 | 0.000218 | 0.000218 | |
| | 97.5 | 100.0000 | 0.001098 | 0.001098 | |
| | 97.6 | 100.0000 | 0.001075 | 0.001075 | |
| | 97.7 | 100.0000 | 0.001255 | 0.001255 | |
| | 98 | 100.0000 | 0.000820 | 0.000820 | |
| | 99 | 100.0000 | 0.039761 | 0.039761 | |
| | 106 | 100.0000 | 0.000021 | 0.000021 | |
| | 107 | 100.0000 | 0.000032 | 0.000032 | |
| | 110 | 100.0000 | 0.600037 | 0.000370 | |
| | 111 | 100.0000 | 0.004047 | 0.004047 | |
| | 112.1 | 100.0000 | 0.014104 | 0.014104 | |
| | 112.7 | 100.0000 | 0.000635 | 0.000635 | |
| | 112.8 | 100.0000 | 0.000321 | 0.000321 | |
| | 117.3 | 100.0000 | 0.000319 | 0.000319 | |
| | 117.5 | 100.0000 | 0.000064 | 0.000064 | 83.646985 |

EXHIBIT "E"
TO THE UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

SCHEDULE SHOWING WORKING INTEREST OWNERS, TRACT NUMBER WORKING
INTEREST PERCENT IN TRACT, UNIT PARTICIPATION PERCENT ALLOCABLE TO
TRACT, WORKING INTEREST UNIT PARTICIPATION PERCENT TO TRACT AND
WORKING INTEREST UNIT PARTICIPATION PERCENT

| Working Interest Owners | Tract No. | W.I. % In Tract | Unit Participation % Allocable To Tract | W.I. Unit Participation % In Tract | W.I. % Unit Participation |
|---|---|---|---|---|---|
| Socony-Mobil Oil Company, Inc. | 4 | 62.5000 | 12.613622 | 7.883514 | |
| | 8 | 100.0000 | 1.968613 | 1.968613 | |
| | 29 | 100.0000 | 0.248621 | 0.248621 | 10.100748 |
| Phillips Petroleum Company | 9 | 100.0000 | 3.526095 | 3.526095 | |
| | 17 | 100.0000 | 0.008950 | 0.008950 | |
| | 28 | 100.0000 | 0.042810 | 0.042810 | 3.577855 |
| Bruce Anderson | 12 | 50.0000 | 0.910090 | 0.455045 | |
| | 27 | 50.0000 | 0.005836 | 0.002918 | 0.457963 |
| Beard Oil Company | 12 | 50.0000 | 0.910090 | 0.455045 | 0.455045 |
| Chevron Oil Company | 90.1 | 100.0000 | 0.170284 | 0.170284 | |
| | 90.7 | 100.0000 | 0.161193 | 0.161193 | |
| | 91.1 | 50.0000 | 0.026805 | 0.013403 | |
| | 91.5 | 50.0000 | 0.005529 | 0.002764 | |
| | 93.1 | 50.0000 | 0.000567 | 0.000284 | |
| | 93.2 | 50.0000 | 0.102915 | 0.051458 | |
| | 102 | 50.0000 | 0.002130 | 0.001065 | |
| | 104 | 100.0000 | 0.001750 | 0.001750 | |
| | 108 | 100.0000 | 0.004863 | 0.004863 | |
| | 109 | 100.0000 | 0.034427 | 0.034427 | |
| | 114 | 100.0000 | 0.000120 | 0.000120 | 0.441611 |
| Reliance Trusts | 62 | 100.0000 | 0.011125 | 0.011125 | |
| | 80 | 100.0000 | 0.073773 | 0.073773 | |
| | 81 | 100.0000 | 0.107620 | 0.107620 | |
| | 112.3 | 100.0000 | 0.009486 | 0.009486 | |
| | 112.10 | 100.0000 | 0.002419 | 0.002419 | |
| | 112.12 | 100.0000 | 0.000123 | 0.000123 | |
| | 117.1 | 100.0000 | 0.006717 | 0.006717 | |
| | 117.2 | 100.0000 | 0.004772 | 0.004772 | 0.216035 |
| James M. Forgotson | 88 | 50.0000 | 0.227941 | 0.113970 | |
| | 91.1 | 25.0000 | 0.026805 | 0.006701 | |
| | 91.2 | 25.0000 | 0.079328 | 0.019832 | |
| | 91.3 | 25.0000 | 0.000313 | 0.000078 | |
| | 91.4 | 25.0000 | 0.002358 | 0.000590 | |
| | 91.5 | 25.0000 | 0.005529 | 0.001382 | |
| | 93.1 | 25.0000 | 0.000567 | 0.000142 | |
| | 93.2 | 25.0000 | 0.102915 | 0.025729 | |
| | 93.3 | 25.0000 | 0.009548 | 0.002387 | |
| | 93.4 | 25.0000 | 0.007790 | 0.001947 | |
| | 93.6 | 25.0000 | 0.004406 | 0.001102 | |
| | 101 | 25.0000 | 0.000907 | 0.000226 | |
| | 102 | 25.0000 | 0.002130 | 0.000533 | |
| | 103 | 50.0000 | 0.012181 | 0.006090 | |
| | 105 | 50.0000 | 0.000518 | 0.000259 | |
| | 113 | 50.0000 | 0.053099 | 0.026550 | 0.207518 |
| Max Evans, et al | 18 | 100.0000 | 0.157288 | 0.157288 | 0.157288 |
| Union Producing Company | 68 | 100.0000 | 0.142038 | 0.142038 | 0.142038 |
| Placid Oil Company Suspense Account for Tract 92 | 92 | 100.0000 | 0.105742 | 0.105742 | 0.105742 |
| David Crow, Trustee | 88 | 25.0000 | 0.227941 | 0.056985 | |
| | 91.1 | 12.5000 | 0.026805 | 0.003351 | |
| | 91.2 | 12.5000 | 0.079328 | 0.009916 | |
| | 91.3 | 12.5000 | 0.000313 | 0.000039 | |
| | 91.4 | 12.5000 | 0.002358 | 0.000295 | |
| | 91.5 | 12.5000 | 0.005529 | 0.000691 | |
| | 93.1 | 12.5000 | 0.000567 | 0.000071 | |
| | 93.2 | 12.5000 | 0.102915 | 0.012864 | |
| | 93.3 | 12.5000 | 0.009548 | 0.001193 | |
| | 93.4 | 12.5000 | 0.007790 | 0.000974 | |
| | 93.6 | 12.5000 | 0.004406 | 0.000551 | |
| | 101 | 12.5000 | 0.000907 | 0.000113 | |
| | 102 | 12.5000 | 0.002130 | 0.000266 | |
| | 103 | 25.0000 | 0.012181 | 0.003045 | |
| | 105 | 25.0000 | 0.000518 | 0.000129 | |
| | 113 | 25.0000 | 0.053099 | 0.013275 | 0.103758 |
| James Muslow | 88 | 12.5000 | 0.227941 | 0.028493 | |
| | 91.1 | 6.2500 | 0.026805 | 0.001675 | |
| | 91.2 | 6.2500 | 0.079328 | 0.004958 | |
| | 91.3 | 6.2500 | 0.000313 | 0.000020 | |
| | 91.4 | 6.2500 | 0.002358 | 0.000147 | |
| | 91.5 | 6.2500 | 0.005529 | 0.000346 | |
| | 93.1 | 6.2500 | 0.000567 | 0.000035 | |
| | 93.2 | 6.2500 | 0.102915 | 0.006432 | |
| | 93.3 | 6.2500 | 0.009548 | 0.000597 | |
| | 93.4 | 6.2500 | 0.007790 | 0.000487 | |
| | 93.6 | 6.2500 | 0.004406 | 0.000275 | |
| | 101 | 6.2500 | 0.000907 | 0.000057 | |
| | 102 | 6.2500 | 0.002130 | 0.000133 | |
| | 103 | 12.5000 | 0.012181 | 0.001523 | |
| | 105 | 12.5000 | 0.000518 | 0.000065 | |
| | 113 | 12.5000 | 0.053099 | 0.006637 | 0.051880 |

-2-

EXHIBIT "E"
TO THE UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

SCHEDULE SHOWING WORKING INTEREST OWNERS, TRACT NUMBER, WORKING
INTEREST PERCENT IN TRACT, UNIT PARTICIPATION PERCENT ALLOCABLE TO
TRACT, WORKING INTEREST UNIT PARTICIPATION PERCENT TO TRACT AND
WORKING INTEREST UNIT PARTICIPATION PERCENT

| Working Interest Owners | Tract No. | W.I. % In Tract | Unit Participation % Allocable To Tract | W.I. Unit Participation % In Tract | W.I. % Unit Participation |
|---|---|---|---|---|---|
| Irwin I. Muslow | 88 | 12.5000 | 0.227941 | 0.028493 | |
| | 91.1 | 6.2500 | 0.026805 | 0.001675 | |
| | 91.2 | 6.2500 | 0.079328 | 0.004958 | |
| | 91.3 | 6.2500 | 0.000313 | 0.000020 | |
| | 91.4 | 6.2500 | 0.002358 | 0.000147 | |
| | 91.5 | 6.2500 | 0.005529 | 0.000346 | |
| | 93.1 | 6.2500 | 0.000567 | 0.000035 | |
| | 93.2 | 6.2500 | 0.102915 | 0.006432 | |
| | 93.3 | 6.2500 | 0.009548 | 0.000597 | |
| | 93.4 | 6.2500 | 0.007790 | 0.000487 | |
| | 93.6 | 6.2500 | 0.004406 | 0.000275 | |
| | 101 | 6.2500 | 0.000907 | 0.000057 | |
| | 102 | 6.2500 | 0.002130 | 0.000133 | |
| | 103 | 12.5000 | 0.012181 | 0.001523 | |
| | 105 | 12.5000 | 0.000518 | 0.000065 | |
| | 113 | 12.5000 | 0.053099 | 0.006637 | |
| | | | | | 0.051880 |
| Creslenn Oil Company | 96 | 100.0000 | 0.041294 | 0.041294 | |
| | | | | | 0.041294 |
| Placid Oil Company Suspense Account for Tract 91.2 | 91.2 | 50.0000 | 0.079328 | 0.039664 | |
| | | | | | 0.039664 |
| Hugh A. Hawthorne | 89 | 50.0000 | 0.057566 | 0.028783 | |
| | 90.6 | 50.0000 | 0.017779 | 0.008890 | |
| | | | | | 0.037673 |
| J. Aron and Company, Inc. | 89 | 50.0000 | 0.057566 | 0.028783 | |
| | 90.6 | 50.0000 | 0.017779 | 0.008889 | |
| | | | | | 0.037672 |
| Placid Oil Company Suspense Account for Tract 116 | 116 | 100.0000 | 0.027281 | 0.027281 | |
| | | | | | 0.027281 |
| George R. Schurman | 90.4 | 100.0000 | 0.016991 | 0.016991 | |
| | | | | | 0.016991 |
| Placid Oil Company Suspense Account for Tract 112.2 | 112.2 | 100.0000 | 0.014305 | 0.014305 | |
| | | | | | 0.014305 |
| Placid Oil Company Suspense Account for Tract 94.2 | 94.2 | 100.0000 | 0.011545 | 0.011545 | |
| | | | | | 0.011545 |
| Harvey Broyles | 93.5 | 100.0000 | 0.002888 | 0.002888 | |
| | 94.15 | 100.0000 | 0.003964 | 0.003964 | |
| | 94.17 | 50.0000 | 0.004245 | 0.002122 | |
| | | | | | 0.008974 |
| Margaret Hunt Trust Estate | 115 | 100.0000 | 0.008715 | 0.008715 | |
| | | | | | 0.008715 |
| Placid Oil Company Suspense Account for Tract 112.5 | 112.5 | 100.0000 | 0.007593 | 0.007593 | |
| | | | | | 0.007593 |
| T. K. Glenn | 90.2 | 100.0000 | 0.005475 | 0.005475 | |
| | 94.1 | 100.0000 | 0.000003 | 0.000003 | |
| | 94.3 | 100.0000 | 0.000023 | 0.000023 | |
| | | | | | 0.005501 |
| Placid Oil Company Suspense Account for Tract 93.3 | 93.3 | 50.0000 | 0.009548 | 0.004774 | |
| | | | | | 0.004774 |
| Placid Oil Company Suspense Account for Tract 93.4 | 93.4 | 50.0000 | 0.007790 | 0.003895 | |
| | | | | | 0.003895 |
| Placid Oil Company Suspense Account for Tract 112.9 | 112.9 | 100.0000 | 0.003794 | 0.003794 | |
| | | | | | 0.003794 |
| Placid Oil Company Suspense Account for Tract 30 | 30 | 100.0000 | 0.003790 | 0.003790 | |
| | | | | | 0.003790 |
| J. Pat Beaird | 94.16 | 100.0000 | 0.000546 | 0.000546 | |
| | 97.1 | 100.0000 | 0.002230 | 0.002230 | |
| | 101 | 50.0000 | 0.000907 | 0.000454 | |
| | | | | | 0.003230 |
| Richard L. Peterson | 27 | 50.0000 | 0.005836 | 0.002918 | |
| | | | | | 0.002918 |
| Walter S. Grant | 94.17 | 50.0000 | 0.004245 | 0.002123 | |
| | | | | | 0.002123 |
| James Waldrup | 112.6 | 100.0000 | 0.000658 | 0.000658 | |
| | | | | | 0.000658 |
| Placid Oil Company Suspense Account for Tract 112.4 | 112.4 | 100.0000 | 0.000549 | 0.000549 | |
| | | | | | 0.000549 |
| Placid Oil Company Suspense Account for Tract 100 | 100 | 100.0000 | 0.000299 | 0.000299 | |
| | | | | | 0.000299 |
| Thomas E. & Helen Chapman | 117.4 | 100.0000 | 0.000206 | 0.000206 | |
| | | | | | 0.000206 |

EXHIBIT "E"
TO THE UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

SCHEDULE SHOWING WORKING INTEREST OWNERS, TRACT NUMBER, WORKING
INTEREST PERCENT IN TRACT, UNIT PARTICIPATION PERCENT ALLOCABLE TO
TRACT, WORKING INTEREST UNIT PARTICIPATION PERCENT TO TRACT AND
WORKING INTEREST UNIT PARTICIPATION PERCENT

| Working Interest Owners | Tract No. | W.I. % In Tract | Unit Participation % Allocable To Tract | W.I. Unit Participation % In Tract | W.I. % Unit Participation |
|---|---|---|---|---|---|
| M. H. Carver Estate | 49 | 12.5000 | 0.000529 | 0.000066 | 0.000066 |
| Shell Oil Company | 67 | 100.0000 | 0.000056 | 0.000056 | 0.000056 |
| Nemours Corporation | 22 | 100.0000 | 0.000044 | 0.000044 | 0.000044 |
| C. A. Bentley | 112.11 | 100.0000 | 0.000044 | 0.000044 | 0.000044 |
| | | | | | 100.000000 |

- 4 -

EXHIBIT G

TO THE UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

INSURANCE

Unit Operator shall carry the following insurance with respect to Unit Operations subject to this agreement:

(1)  Workmen's Compensation and Employer's Liability Insurance in accordance with the laws of the State of Louisiana.

(2)  Comprehensive General Public Liability Bodily Injury Insurance with limits of liability of not less than $100,000.00 for the accidental injury or death of one person and $300,000.00 for the accidental injuries or deaths of more than one person as the result of one accident.

(3)  Comprehensive General Public Liability Property Damage Insurance with limits of not less than $50,000.00 for damage to property as a result of one accident.

(4)  Automobile Public Liability Insurance with limits of not less than $100,000.00 for the accidental injury or death of one person and $300,000.00 for the accidental injuries or deaths of more than one person, as the result of one accident, and not less than $25,000.00 for damage to property as a result of one accident.

All insurance coverage required hereby shall be carried at the joint expense and for the benefit of the parties hereto.  Un-insured losses shall be charged to the joint account.

Unit Operator shall carry no insurance for the benefit of the joint account other than the types hereinabove described, unless the parties agree otherwise.

Unit Operator shall require its contractors and subcontractors working and performing services on the Unit Area to comply with the Workmen's Compensation Laws of the State of Louisiana and to carry other insurance of the types specified above and in such amounts as the Working Interest Owners shall deem necessary.

EXHIBIT "H"
TO THE UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

## SCHEDULE OF RESERVATIONS

| WORKING INTEREST OWNER | RESERVATION - $ |
|---|---|
| Bruce Anderson | 55,672.22 |
| J. Aron & Company, Inc. | 2,434.62 |
| J. Pat Beaird | 7,599.39 |
| Beard Oil Company | 48,129.43 |
| C. A. Bentley | 1.00 |
| Harvey Broyles | 1,625.85 |
| M. H. Carver Estate | 1.00 |
| Thomas E. & Helen Chapman | 1.00 |
| Chevron Oil Company | 29,995.97 |
| Creslenn Oil Company | 7,481.53 |
| David Crow, Trustee | 9,329.94 |
| Max Evans, et al | 40,372.03 |
| James M. Forgotson | 18,661.29 |
| T. K. Glenn | 387.26 |
| Walter S. Grant | 384.65 |
| Margaret Hunt Trust | 1,578.96 |
| Hugh A. Hawthorne | 2,435.78 |
| Socony-Mobil Oil Company, Inc. | 1,748,004.22 |
| Irwin I. Muslow | 4,664.67 |
| James Muslow | 4,664.65 |
| Nemours Corporation | 7.97 |
| Richard L. Peterson | 528.67 |
| Phillips Petroleum Company | 783,904.68 |

- 1 -

EXHIBIT "H"
TO THE UNIT OPERATING AGREEMENT
PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

## SCHEDULE OF RESERVATIONS

| WORKING INTEREST OWNER | RESERVATION - $ |
|---|---|
| Placid Oil Company | 13,197,720.27 |
| Reliance Trusts | 10,496.41 |
| George R. Schurman | 980.54 |
| Shell Oil Company | 1.00 |
| Union Producing Company | 11,915.14 |
| James Waldrup | 1.37 |
| Placid Oil Company Suspense Account for Tract 30 | 686.65 |
| Placid Oil Company Suspense Account for Tract 91.2 | 3,244.82 |
| Placid Oil Company Suspense Account for Tract 92 | 3,093.99 |
| Placid Oil Company Suspense Account for Tract 93.3 | 864.95 |
| Placid Oil Company Suspense Account for Tract 93.4 | 705.66 |
| Placid Oil Company Suspense Account for Tract 94.2 | 2,091.70 |
| Placid Oil Company Suspense Account for Tract 100 | 54.17 |
| Placid Oil Company Suspense Account for Tract 112.2 | 189.18 |
| Placid Oil Company Suspense Account for Tract 112.4 | 5.50 |
| Placid Oil Company Suspense Account for Tract 112.5 | 15.42 |
| Placid Oil Company Suspense Account for Tract 112.9 | 7.69 |
| Placid Oil Company Suspense Account for Tract 116 | 58.76 |
| TOTAL | 16,000,000.00 |

RESERVATION AGREEMENT

RESERVATION AGREEMENT

PETTIT ZONE UNIT
BLACK LAKE FIELD
NATCHITOCHES PARISH, LOUISIANA

THIS AGREEMENT, entered into as of the 25th day of October, 1965,
by and among the undersigned parties;

WITNESSETH:

WHEREAS, Each party hereto, as Working Interest Owner,
simultaneously with execution of this agreement, has also executed or
ratified that certain agreement entitled "Unit Agreement" and that certain
agreement entitled "Unit Operating Agreement", both pertaining to the Pettit
Zone Unit, Black Lake Field, Natchitoches Parish, Louisiana, with respect
to the unitization and unitized operation of those certain lands described therein,
said agreements being dated as of the date of this agreement and being herein-
after referred to as the "Unit Agreement" and "Unit Operating Agreement",
respectively; and

WHEREAS, Each party hereto, as the owner of Working Interest in
one or more of the Tracts described in Exhibit A to the Unit Agreement,
has executed or ratified the Unit Agreement and the Unit Operating Agreement,
subject to the oil payment reservation referred to in Article 3 of the Unit
Agreement and provided for in Article 23 of the Unit Operating Agreement,
which latter article is incorporated herein and expressly made a part hereof;
and

WHEREAS, This agreement is the Reservation Agreement referred
to in Article 3 of the Unit Agreement and provided for in Article 23 of the
Unit Operating Agreement:

NOW, THEREFORE, It is agreed by and among the Working Interest
Owners hereto as follows:

I.

(a)  The definitions contained in the Unit Agreement and in the Unit
Operating Agreement are hereby adopted for the purposes of this agreement.

(b)  This agreement shall become effective upon the effective date
of the Unit Agreement and the Unit Operating Agreement.

II.

As referred to in Article 3 of the Unit Agreement and as provided in
Article 23 of the Unit Operating Agreement and notwithstanding any provision
to the contrary therein, each Working Interest Owner hereby excepts from said
Unit Agreement and Unit Operating Agreement and reserves unto itself, with
respect to each Tract in which it owns all or any part of the Working Interest,
one-half (1/2) of seven-eighths (7/8) of the first Unitized Substances from the
Unitized Interval which is produced and saved from such Tract and which accrues
to its Working Interest therein until such time as the total value of the Unitized

Substances which accrue to all such reserved interests as provided herein and in Exhibit H, attached to the Unit Operating Agreement, equals the total amount of all such reservations as set out in said Exhibit H, at which time such reservation shall terminate.

## III.

(a)  The reservations made by the Working Interest Owners hereto respectively, as provided herein and in Article 23 of the Unit Operating Agreement, with respect to Tracts that are included within the Unit Area as of the effective date thereof, are hereby unitized in accordance with and subject to the further provisions of this agreement.

(b)  If it is found that any mathematical errors have occurred in the preparation thereof, Exhibit H shall be amended so as to correct such error. Further reference in this agreement to Exhibit H shall mean original Exhibit H as amended, in the event it is amended as above provided.

(c)  For the purposes of this agreement, seven-eighths (7/8) of the Unitized Substances produced and saved from the Unitized Interval and allocated to the Tracts in accordance with the Unit Agreement shall be deemed to accrue to the Working Interest Owners in such Tracts, respectively, without deduction for any Royalty Interests in excess of one-eighth (1/8), it being intended that one-half (1/2) of seven-eighths (7/8) of the first Unitized Substances produced and saved from the Unitized Interval and allocated to the Tracts as Unitized Substances shall be deemed to accrue to the reservations made by the Working Interest Owners hereto as set forth herein and in Article 23 of the Unit Operating Agreement, until such time as the value of the total quantity of Unitized Substances accrued to said reservations shall equal the total amount of all such reservations as set forth in Exhibit H.  All Unitized Substances accruing to the reservations hereby unitized shall be apportioned among the parties hereto in the proportion which the sum of money set out opposite such Working Interest Owner's name in Exhibit H bears to the total of the sums of money set out opposite the names of all Working Interest Owners set out in Exhibit H.  Each Working Interest Owner hereto shall be entitled to receive in kind its proportionate share of such Unitized Substances currently as and when produced.

(d)  The value of the Unitized Substances accruing at any time to said reservations, as so unitized, shall be the market value thereof as fixed by the posted well price generally prevailing at such time for Unitized Substances of like grade and quality produced from the Unitized Interval, after deducting therefrom the amount of any and all production, severance and like taxes payable thereon or with respect thereto.  If varying well prices are posted for such Unitized Substances at any time, the well price then being paid for the largest quantity of Unitized Substances produced from the Unitized Interval shall be deemed to be the generally prevailing posted well price.

## IV.

(a)  For all purposes of the Unit Agreement and Unit Operating Agreement, the quantity of Unitized Substances which is the subject of the reservations hereinabove provided for shall be treated as production of Unitized Substances from the Unit Area and shall be subject to the provisions of said agreement except insofar as the ownership of such Unitized Substances is concerned, which ownership shall be governed by the provisions of this agreement.

(b)  It is expressly recognized and agreed that the provisions of this agreement shall not alter or affect the Unit Agreement concerning responsibility for payment of Royalty Interest Owners in the Tracts comprising the Unit Area

-2-

and shall not alter or affect the Unit Operating Agreement with respect to the manner of sharing and accounting for development cost and operating expenses.

## V.

(a)  All of the terms and provisions of this agreement shall extend to, be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of the Working Interest Owners hereto, and this agreement shall constitute a covenant running with the leases and lands covered and affected hereby.

(b)  This agreement may be executed in any number of counterparts, and each such counterpart so executed shall have the same force and effect as an original instrument and as if all of the Working Interest Owners to the aggregate counterparts had signed the same document; or the same may be ratified by separate instruments in writing referring to this contract, each such ratification having the force and effect of an executed counterpart hereof and, in effect, incorporating by reference all of the provisions hereof.

(c)  This agreement shall supersede all existing agreements covering or affecting the Tracts comprising the Unit Area to the extent that the provisions of the existing agreements are in conflict with the provisions of this agreement.

IN WITNESS WHEREOF, The Working Interest Owners have executed this agreement in multiple originals as of the date above provided, and it shall be considered that this agreement has been signed concurrently with the Unit Operating Agreement.

## WORKING INTEREST OWNERS

WITNESSES                DATE                    PARTY

                                                 PLACID OIL COMPANY

_____       _____            By:_____
                                                               President
_____

                                                 ATTEST:


                                                 _____
                                                               Secretary

                                                 SOCONY-MOBIL OIL CO., INC.

_____       _____            By:_____
_____
                                                 ATTEST:


                                                 _____

-3-

| WITNESSES | DATE | PARTY |
|-----------|------|-------|

PHILLIPS PETROLEUM COMPANY

By:_____

ATTEST:

_____

NEMOURS CORPORATION

By:_____

ATTEST:

_____

SHELL OIL COMPANY

By:_____

ATTEST:

_____

UNION PRODUCING COMPANY

By:_____

ATTEST:

_____

J. ARON & COMPANY, INC.

By:_____

ATTEST:

_____

CHEVRON OIL COMPANY

By:_____

ATTEST:

_____

| WITNESSES | DATE | PARTY |
|-----------|------|-------|

CRESLENN OIL COMPANY

By: _____

ATTEST:

_____

BEARD OIL COMPANY

By: _____

RELIANCE TRUSTS

By: _____
                              Trustee

_____
BRUCE ANDERSON

_____
J. PAT BEAIRD

_____
C. A. BENTLEY

_____
HARVEY BROYLES

_____
DAVID CROW, TRUSTEE

_____
MAX EVANS,
Individually and as Agent-in-fact
for Jean Evans Kelly and Roger
Tyrone Evans

| WITNESSES | DATE | PARTY |
|-----------|------|-------|
| _____ | | |
| _____ | _____ | JAMES M. FORGOTSON |
| | | |
| _____ | | |
| _____ | _____ | T. K. GLENN |
| | | |
| _____ | | |
| _____ | _____ | WALTER S. GRANT |
| | | |
| _____ | | |
| _____ | _____ | HUGH A. HAWTHORNE |
| | | |
| | | MARGARET HUNT TRUST |
| _____ | | By:_____ |
| _____ | _____ | Trustee |
| | | |
| _____ | | |
| _____ | _____ | IRWIN I. MUSLOW |
| | | |
| _____ | | |
| _____ | _____ | JAMES MUSLOW |
| | | |
| _____ | | |
| _____ | _____ | RICHARD L. PETERSON |
| | | |
| _____ | | |
| _____ | _____ | GEORGE R. SCHURMON |

## PROOF BY WITNESS

STATE OF _____

PARISH (COUNTY) OF _____

    BEFORE ME, the undersigned authority, this day personally appeared _____ to me personally known to be the identical person whose name is subscribed in the foregoing instrument as an attesting witness, who being first duly sworn, on _____ oath, says: That _____ subscribed _____ name to the foregoing instrument as a witness, and that _____ knows _____

to be the identical person _____ described therein, and who executed the same, and saw _____ sign the same as _____ voluntary act and deed, and that _____, the said _____ subscribed _____ name to the same at the same time as an attesting witness.

    Sworn to and subscribed before me, this _____ day of _____ ,19 ___

_____

Notary Public in and for _____

## PROOF BY WITNESS

STATE OF _____

PARISH (COUNTY) OF _____

    BEFORE ME, the undersigned authority, this day personally appeared _____ to me personally known to be the identical person whose name is subscribed in the foregoing instrument as an attesting witness, who being first duly sworn, on _____ oath, says: That _____ subscribed _____ name to the foregoing instrument as a witness, and that _____ knows _____

to be identical person _____ described therein, and who executed the same, and saw _____ sign the same as _____ voluntary act and deed, and that _____, the said _____ subscribed _____ name to the same at the same time as an attesting witness.

    Sworn to and subscribed before me, this _____ day of _____ ,19 ___

_____

Notary Public in and for _____

## CORPORATE ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

On this _____ day of _____ , 19___ , before

me personally appeared _____

to me known, who, being by me duly sworn, did say that he is _____

_____ of _____ , and that said instrument

was signed in behalf of said corporation by authority of its board of directors,

and said _____ acknowledged said

instrument to be the free act and deed of said corporation.

_____
Notary Public

My commission expires:

## CORPORATE ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

On this _____ day of _____ , 19___ ,

before me personally appeared _____

to me known, who, being by me duly sworn, did say that he is _____

_____ of _____ , and that said

instrument was signed in behalf of said corporation by authority of its board

of directors, and said _____ acknowledged

said instrument to be the free act and deed of said corporation.

_____
Notary Public

My commission expires:

## INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

    On this _____ day of _____, 19___,

before me personally appeared _____

_____

to me known to be the person___ described in and who executed the foregoing

instrument, and acknowledged that___ he ___executed the same as ____free act

and deed.
    IN WITNESS WHEREOF I have hereunto set my official hand and
seal on the date hereinabove written.

                _____
                Notary Public

## INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

    On this _____ day of _____, 19___,

before me personally appeared _____

_____

to me known to be the person___ described in and who executed the foregoing

instrument, and acknowledged that___ he ___executed the same as ____free act

and deed.
    IN WITNESS WHEREOF I have hereunto set my official hand and
seal on the date hereinabove written.

                _____
                Notary Public

## INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____

PARISH (COUNTY) OF _____

    On this _____ day of _____, 19___,

before me personally appeared _____

_____

to me known to be the person___ described in and who executed the foregoing

instrument, and acknowledged that___ he ___executed the same as ____free act

and deed.
    IN WITNESS WHEREOF I have hereunto set my official hand and seal
on the date hereinabove written.

                _____
                Notary Public