## OPERATING AGREEMENT

THIS AGREEMENT, entered into this <u>24th</u> day of <u>February</u>, 1994 , between CHOLLA PETROLEUM, INC., hereinafter designated as "OPERATOR", and the signatory parties other than Operator, sometimes hereinafter referred to individually herein as "NON-OPERATOR" and collectively as "NON-OPERATORS".

WITNESSETH, THAT:

WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased oil and gas interests in, the tracts of land described in Exhibit "A" and all parties have reached an agreement, but not as partners, to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

## 1.  DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them.

(1) The words "party" and "parties" shall always mean a party or parties to this agreement.

(2) The parties to this agreement shall always be referred to as "it" or "they" whether the parties be corporate bodies, partnerships, associations or persons real.

(3) The term "oil and gas" shall include oil, gas, casinghead gas, gas condensate and all other liquid or gaseous hydrocarbons unless an intent to limit the inclusiveness of this term is specifically stated.

(4) The terms "oil and gas lease", "lease" and leasehold" shall mean the oil and gas leases covering tracts of land lying within the unit area which are owned by parties to this agreement.

(5) The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the unit area.

(6) The term "unit area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests developed or operated or intended to be developed or operated, for oil or gas purposes under this agreement.  Such land, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A" and shall include only the land, oil and gas leasehold interests and oil and gas interests described in Exhibit "A".

(7) The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority.  If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the unit area or as specified by the Operator.

-1-

(8) All exhibits attached to this agreement and the lands described therein are made a part of this agreement as fully as though copied in full in this agreement. Reference is hereby made to such exhibits for all purposes of this agreement including a more particular description of the lands covered and subject to this agreement and other defined terms.

(9) The words "equipment" and "materials" as used here are synonymous and shall mean and include all oil field supplies and personal property acquired for use in the unit area.

2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

A. Failure of Title:

Any defects of title in the unit area that exist or that may develop shall be the joint responsibility of all parties and if a title loss occurs, it shall be the loss of all parties with each bearing its proportionate part of the loss and of any liabilities incurred in the loss. If such loss occurs, there shall be no change in or adjustment of the interests of the parties in the remaining portion of the unit area. If the title to any lease or oil and gas interest, is ever rejected by the examining attorney, all parties shall then be asked to state in writing whether they will waive the title defects or whether they will stand on the attorney's opinion. If one or more parties refuse to waive title defects, it shall be the joint and several obligation of the parties refusing to so waive to cure title to their satisfaction.

Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including but not limited to preliminary, supplemental, drillsite, shut-in gas royalty opinions and division order title opinions) shall be borne by the parties in the proportion that the interest of each party bears to the total interest of all parties as such interests appear in Exhibit "A". The Operator shall have the right but not the obligation to prepare and record pooling designations or declarations as well as the right to conduct hearings before Governmental Agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

B. Loss of Leases for Other Than Title Failure:

If any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, the loss shall be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interests in the remaining portion of the unit area.

3. INTERESTS OF PARTIES

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions of this agreement or other written agreement(s) between the parties effected thereby, all costs and liabilities incurred in operations under this agreement shall be borne

-2-

and paid and all equipment and material acquired in operations on the unit area shall be owned by the parties as their interests are given in Exhibit "A".

In the same manner, the parties shall, subject to the provisions of this agreement and any other written agreements between the parties hereto which are effected thereby, also own all production of oil and gas from the unit area subject to the payment of the royalties and overriding royalties, and the satisfaction of other burdens on production, all as set forth in Exhibit "A".

Nothing containing in this Section 3 shall be deemed an Assignment or cross-assignment of interests.

## 4. OPERATOR OF UNIT

Cholla Petroleum, Inc. shall be the Operator of the unit area, and shall con-duct and direct and have full control of all operations of the unit area as permit-ted and required by, and within the limits of, this agreement. Operator shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the non-operators for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

## 5. EMPLOYEES

The number of employees and their selection, and the ours of labor and the compensation for services performed shall be determined by the Operator. All employees shall be the employees of the Operator.

## 6. COSTS AND EXPENSES

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the unit area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expenses basis provided in the Accounting Procedure attached hereto and marked Exhibit "B".

Operator, at its election, shall have the right from time to time, to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the costs to be incurred in the development and opera-tions hereunder during the next three (3) succeeding months or such lesser time period as is deemed appropriate by Operator, which right may be exercised only by submission to each such party of an itemized statement of such estimated costs, together with an invoice for its share thereof. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest at the rate of eighteen percent (18%) per annum until paid or such lesser rate as is the maximum

-3-

rate allowed by law.  Proper adjustment shall be made monthly between advances and actual costs, to the end that each party shall bear and pay its proportionate share of actual costs incurred, and no more.

## 7.  OPERATOR'S LIENS AND SECURITY INTERESTS

Operator is given a first and preferred lien and security interest on the interest of each party in the unit area, and in each party's interest in oil and gas produced therefrom and the proceeds thereof, including resulting from the sale of such oil and gas upon each party's interest in material and equipment and personal property now or hereafter located on the lands described in Exhibit "A" (including both surface and subsurface now or hereafter located on the lands described in Exhibit "A" which are used or useful or held for use in connection with the exploration, development or operating of the leases, oil and gas interests and lands described in Exhibit "A", excluding, however, rigs, drill pipe, compressors, rolling stock, workover rigs and tools), and upon all rights of each party hereto, now or hereafter existing or acquired with respect to all subleases, farmout agreements, assignments of interest, operating rights, contracts, operating agreements, rights of way, franchises, benefits concerning the lands, leases and oil and gas interests described on Exhibit "A" to secure the payment of all sums, including interest, due from each such party to Operator.

Each party assign to Operator its interest in oil and gas from the unit area and the event any party fails to pay any amount owning by it to Operator as its share of such costs and expense or such advance estimate within the time limited for payment thereof pursuant to this agreement, Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of oil or gas, the proceeds accruing to the working interest or interests in the unit area of the delinquent party up to the amount owing, including interest, by such party and apply same to the amount owning, and each such purchaser of oil or gas is expressly authorized to rely upon this assignment of production and the proceeds thereof and Operator's statement as to the amount owing by such party.

Each party hereto hereby consents to and expressly agrees to the provisions of Rider "A" attached hereto and incorporated herein by reference for all purposes, expressly including (a) the perfecting of a security interest and mortgage to secure the debts and obligations to Operator of each party hereto by the recording thereof and/or of this Operating Agreement (at the election of Operator), and (b) the nonjudicial foreclosure procedure set forth in Rider "A".  Operator shall, however, have no obligation, either express or implied, to record Rider "A" or this Operating Agreement or to perfect any lien or security interest and any such

-4-

recording or perfection shall be at the sole and absolute discretion of the Operator without prejudice to any rights of Operator hereunder.

In the event of the neglect or failure of any non-operator to promptly pay its proportionate part of the cost and expense of development and operation when due, the other non-operators and Operator, within thirty (30) days after the rendition of statement therefor by Operator, shall proportionately contribute to the payment of such delinquent indebtedness and the non-operators so contributing shall be entitled to the same lien rights and security interest as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operators under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the non-operators and Operator proportionately in accordance with the contributions theretofore made by them.

## 8. TERM OF AGREEMENT

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the unit area, whether by production, exension, renewal or otherwise and/or so long as oil and/or gas production continues from any such lease or oil and gas interest comprising the unit area. It is agreed that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## 9. LIMITATION ON EXPENDITURES

Without the consent of all parties: (a) No well not already drilled as of the date of this agreement shall be drilled on the unit area except any well drilled pursuant to the provisions of Section 10 of the agreement, it being understood that the consent to the drilling of a well shall include consent to al necessary expenditures in the drilling, testing, completing and equipping of the well, including necessary tankage and/or surface or subsurface facilities and appurtenances; (b) No well shall be reworked, plugged back or deepened except a well reworked, plugged back or deepened pursuant to the provisions of Section 10 of this agreement or a well which is reworked, plugged back or deepened in regard to which the total cost for the project does not exceed $20,000.00, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to al necessary expenditures in conducting such operations and the completing and equipping of said well to produce, including necessary tankage and/or surface or subsurface facilities and appurtenances; (c) Operator shall not undertake any single project reasonable estimated to require an

-5-

expenditure in excess of twenty thousand and no/100 Dollars ($20,000.00) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, breakout, environmental hazard, blowout of other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life, property and the environment but Operator shall, as promptly as possible, report the emergency to other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $20,000.00.

## 10.  OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling of any well on the unit area, or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties on the unit area, any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and estimated cost of the operation. The parties receiving such a notice shall have fifteen (15) days (except as to reworking, plugging back or drilling deeper, where a drilling rig is on location, the period shall be limited to twenty-four (24) hours exclusive of Saturday or Sunday) after receipt of such notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

If any party receiving such a notice elects not to participate in the proposed operation (such party or parties being hereafter referred to as "Non-Consenting Party"), then in order to be entitled to the benefits of this section, the party or parties giving the notice and such other parties as shall elect to participate in the operation (all such parties being hereafter referred to as the "consenting Parties") shall, within sixty (60) days after the  expiration of the notice period of fifteen (15) days (or as promptly as possible after the expiration of the 24-hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete if with due diligence.

-6-

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests as shown in Exhibit "A" bear to the total interests of all Consenting Parties. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this section results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights and the share of Non-Consenting Party in all production and revenue interest from the unit area until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty and other interests payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(A)    500% of each Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections of the well (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 200% of each such Non-Consenting Party's share of the cost of operation of the unit area commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this section, it being agreed that each Non-Consenting Party's share of such costs and equipment will be the interest which would have been chargeable to each Non-Consenting party had it participated in the well from the beginning of the operation; and

(B)    500 % of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing, after deducting any cash contributions received under Section 22, the well and 500% of that portion of the cost of newly acquire equipment in the well (to and including the wellhead connection), which would have been chargeable to such Non-Consenting Party if it had participated therein.

-7-

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing an other equipment in the well, but the ownership of all such equipment shall remain unchanged;  and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value (net of all amounts which the Consenting Parties are entitled to receive as specified above) at the time of such abandonment.

Within ninety (90) days after the completion of any operation under this section, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected tot he well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing and equipping the well for production;  or at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month (or at designated intervals if mutually agreeable) thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Operator shall furnish the Non-Consenting Parties with an itemized statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total amounts due the Consenting Parties in determining when the interest of such Non-Consenting Party shall revert to it as above provided;   if there is a credit balance, it shall be paid to such Non-Consenting Party.

If the Parties have not contracted for sale of gas production attributable to any relinquished interest at the time such gas is available for deliver, the Consenting Parties shall own and be entitled to receive and sell such Non-Consenting Party's share of oil and gas and liquid hydrocarbons during the recoupment period and such share of oil, gas and liquid hydrocarbons shall continue to be subject to any sales contract so entered into by the Consenting parties fore the full term thereof even after the expiration of the recoupment period.

If and when the Consenting parties recover from a Non-Consenting Party's interest the amounts provided for above, the Non-Consenting party shall thereafter own the same interest in such well, the operating rights, working interest therein, the material and equipment in or pertaining thereto and the production for the unit area as such Non-Consenting Party would have owned had it participated in the drilling, reworking, deepening or plugging back of such well.  Thereafter,

-8-

such Non-Consenting Party shall be charge with and shall pay its proportionate part of the further costs of the operation of such unit area and the well in accordance with the terms of this agreement and the accounting procedure schedule, Exhibit "B" attached hereto.

## 11.   RIGHT TO TAKE PRODUCTION IN KIND

Each party shall have the right to take in kind or separately dispose of its proportionate share of all oil and gas produced from the unit area, subject to the limitations of any gas or liquid hydrocarbon sales contracts to the contrary binding such interest, and also exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidable lost.   Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties or other payments due on its share of such production and shall hold the other parties free from any liability therefor. Any extra expenditure incurred in the taking in kind of separate disposition by any party of its proportionate share of the production shall be borne by such party.

In the event on or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas and liquid hydrocarbon sales to be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with the standard form of Gas Balancing Agreement of or specified by Operator or such other form as is agreed to by Operator and the concerned parties.

Each party entitled to receive proceeds from the sale of oil and gas hereunder, so long as such entitlement continues, (i) shall execute all Division Orders and Contracts of Sale pertaining to its interest in production from the unit area, (ii) and shall be entitled to received payment direct from the purchaser or purchasers thereof for its share of all production subject to the limitations of any gas or liquid hydrocarbons sales contracts to the contrary binding such interest.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced form the unit area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the price which Operator receives for its portion of the oil and gas produced from the unit area.   Any such purchase of sale by Operator shall be subject always to the right of the

-9-

owner of the production to exercise at any time, subject to the limitation described above, its right to take in kind or separately dispose of its share of all oil and gas not previously delivered to a purchaser.

## 12. ACCESS TO UNIT AREA

Each party shall have access to the unit area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating directly thereto.  Operator shall, upon request, furnish each of the other parties (at the sole expense of the party so requesting) with copies of al drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the unit area.

## 13. DRILLING CONTRACTS

All wells drilled on the unit area shall be drilled and completed on a competitive contract basis at the usual rates prevailing in the area.  Operator, if it so desires, may employ its own tools and equipment in the drilling and/or completing of wells, but its charges therefor shall not exceed the prevailing rates in the field, and such work shall be performed by Operator under the same terms and conditions as shall be customary and usual in the field in contracts of independent contractors who are doing work of a similar nature.

## 14. ABANDONMENT OF WELLS

No well, other than any well which has been drilled or reworked pursuant to Section 10 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties;  provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvageable material and equipment, determined in accordance with the provisions of Exhibit "B", less the total of:  (i) the estimated cost of salvaging, and (ii) the estimated cost of plugging and abandoning.  Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to merchantability, suitability for any purpose, quantity, quality or fitness for use of the equipment and material, all of its interest in the leasehold estate as to, but only as to the drilling unit for the concerning well and further limited to the interval or intervals of the formation or formations then open to production.  The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of

-10-

their respective percentages of participation in the unit area of all assignees. There shall be no readjustment of interest in the remaining portion of the unit area.

After the assignment, the assignors shall have no further responsibility, liability or interest in the operation of or production form the well in the interval or intervals then open.  Upon request of the assignees, Operator may, in the discretion of Operator, continue to operate the assigned well and drilling unit for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional costs and charges which may arise as the result of the separate ownership of the assigned well and drilling unit.

### 15.  DELAY RENTALS AND SHUT-IN WELL PAYMENTS

Each party shall pay all delay rentals and shut-in well payments which may be required under the terms of the lease or leases and submit evidence of each payment to the other parties at lease ten (10) days prior to the payment date. Operator may also make such delay rentals and shut-in well payments which may be required under the terms of such leases but assumes no liability whatsoever for failure to do so.  The paying party shall be reimbursed by Operator for 100% of any such delay rental pOayment and 100% of any such shut-in well payment.  The amount of such reimbursement shall be charged by Operator to the joint account of the parties and treated in all respects the same as costs incurred in the development and operation of the unit area.  Each party responsible for such payment shall diligently attempt to make proper payment, but shall not be held liable to the other parties in damages for the loss of any lease therein if, through mistake or oversight, any rental or shut-in well payment is not paid or is erroneously paid.  The loss of any lease or interest therein which results from a failure to pay or an erroneous payment of rental or shut-in well payment shall be a joint loss and there shall be no readjustment of interest in the remaining portion of the unit area.  If any party secures a new lease covering the terminated interest, such acquisition shall be subject to the provisions of Section 20 of this agreement.

Operator shall attempt to notify each other party hereto of the date on which any gas well located on the unit area is shut-in or returned to production, but assumes no liability whatsoever for failure to do so.

### 16.  SALE BY OPERATOR

Should a sale be made by Operator of all rights and interests in the unit area to a non-subsidiary, the transferee of the present Operator shall assume the duties of and act as Operator.  The retiring Operator shall continue to serve as Operator and discharge its duties in that capacity under this agreement, until its

-11-

successor Operator begins to function, but the present Operator shall not be obli-
gated to continue the performance of its duties for more than sixty (60) days
after the sale of its rights and interests has been completed.

## 17.  MAINTENANCE OF UNIT OWNERSHIP

For the purpose of maintaining uniformity of ownership in the oil and gas
leasehold interests covered by this contract, notwithstanding any other provisions
to the contrary except for Sections 14 and 21, no party shall sell, encumber,
transfer or make other disposition of its interest in the leases embraced within
the unit area and in wells, equipment and production unless such disposition is
pursuant to either Section 14 or Section 21 or covers either:

    (1)  The entire undivided interest in all leases and equipment and
         production; or

    (2)  An equal undivided interest in all leases and equipment and produc-
         tion in the unit area.

Every such sale, encumbrance, transfer or other disposition made by any party
shall be made expressly subject to this agreement and shall be made without preju-
dice to the rights of the other parties.

Further, in the event of any transfer sale, encumbrance, other disposition or
other act of any Non-Operator within the unit area which gives rise to the need or
necessity for separate storage or measurement of production, the Non-Operator cre-
ating the need or necessity (including by going non-consent or electing out) shall
alone bear the cost of purchase, installation and Operator of the equipment,
fixtures and facilities arising therefrom.

If at any time the interest of any party is divided among and owned by four or
more co-owners, Operator may, at its discretion, require such co-owners to appoint a
single trustee or agent with full authority to received notices, approve
expenditures, receive bills for and approve and pay such party's share of the
joint expenses, and to deal generally with and with power to bind, the co-owners
of such party's interests within the scope of the operations embraced in this
agreement.

## 18.  RESIGNATION OF OPERATOR

Operator may resign with or without cause from its duties and obligation as
Operator at any time upon notice of not less than thirty (30) days given to all
other parties.  Operator may be removed if it becomes bankrupt or is placed in
receivership, such removal to be accomplished by the affirmative signed written
vote of a majority of interest of non-operators, such removal to become effective
immediately upon complete copies thereof being provided to Operator.  In case of
such resignation or removal, all parties to this agreement shall select by major-

-12-

ity vote in interest, not in number, a new Operator who shall assume the responsibilities and duties, and have the rights, prescribed for Operator by this agreement. The resigning or removed Operator shall; (i) deliver to its successor all records and information directly related to the unit area and reasonably necessary to the discharge by the new Operator of its duties and obligations, and (ii) execute such governmental forms as are appropriate to reflect and accomplish a change of operator, such resignation or removal shall be without prejudice to all amounts then due by Non-Operators to such resigning or removed Operator.

## 19.   LIABILITY OF PARTIES

### (Including Environmental)

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations and shall be liable, subject to the provisions of this agreement and any other written agreements between the parties effected thereby, only for its proportionate share of the costs of developing and operating the unit area. Accordingly, the liens and security interests and assignments of production and proceeds granted by each party in Section 7 are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement by construed as creating, a mining or other partnership or association, or to render them liable as partners.

Each party is severally liable for the proportionate share of such party of all liability for an (i) governmentally required clean-up of the unit area or any part thereof, and (ii) all claims in favor of any government body or any other person for damage to the environment;  and, Non-Operators expense associated therewith or arising therefrom in excess of the proportionate share of Operator (if any) save and except to the extent, and only to the extent, such liability, cost or expense directly results from or arises out of the gross and willful negligence of Operator.  No third party except by, through and under Operator to collect amounts due from Non-Operators.  The provisions of this paragraph shall survive the termination of this Operating Agreement or a change of Operator for the maximum time period allowed by law.

## 20.   RENEWAL OR EXTENSION OF LEASES

If any party secures a renewal of any oil and gas lease subject to this agreement, each and all of the other parties shall be notified promptly and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the unit area.

-13-

If some, but less than all, of the parties elect to participate in the pur-
chase of a renewal lease, it shall be owned by the parties who elect to participate
therein, in a ratio based upon the relationship of their respective percentage of
participation in the unit area to the aggregate of the percentages of participa-
tion in the unit area of all parties participating in the purchase of such renewal
lease.  Any renewal lease in which less than all the parties elect to participate
shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given
an assignment of its proportionate interest therein by the acquiring party which
assignment shall be without warranty of title, either express or implied.

The provisions of this section shall apply to renewal leases whether they are
for the entire interest covered by the expiring lease or cover only a portion of
its area or an interest therein.  Only a lease taken before the expiration of its
predecessor lease or taken or contracted for within six (6) months before or
after the expiration of the existing lease shall be deemed a renewal lease sub-
ject to the provisions of this section.

The provisions in this section shall apply also and in like manner to exten-
sions of oil and gas leases.

## 21.  SURRENDER OF LEASES

The leases covered by this agreement, insofar as they embrace acreage in the
unit area, shall not be surrendered in whole or in part unless all parties
consent.

However, should any party desire to surrender its interest in any lease or in
any portion thereof and other parties not agree or consent, the party desiring to
surrender shall assign, without express or implied warranty of title, all of its
interest in such lease, or portion thereof, and any well, material and equipment
which may be located on the portion of the unit area covered by the assigned
interest and any rights in production thereafter secured on such portion of the
unit area to the parties not desiring to surrender it.  Upon such assignment, the
assigning party shall be relieved from any obligations thereafter accruing, but
not thereto fore accrued, with respect to the interest assigned and the operation
of any well thereon, and the assigning party shall have no further interest in the
lease interest assigned, the production therefrom and the equipment located
thereon.  The parties assignee shall pay to the party assignor the reasonable sal-
vage value of the latter's interest in any wells and equipment as assigned, deter-
mined in accordance with the provisions of Exhibit "B", less the total of (i) the
estimated costs of salvaging, and (ii) the estimated cost of plugging and
abandoning. If the assignment is in favor of more than one party, the assigned

-14-

interest and the payment therefor shall be shared by the parties assigned in the proportions that the interest of each bears to the interest of all parties assigned. Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the unit area; and the interest assigned or surrendered, and subsequent operations thereof, shall not thereafter be subject to the terms and provisions of this agreement SAVE and EXCEPT if Operator so elects by written notice in which event the acreage assigned shall at the option of Operator therein exercised by deemed subject to an agreement identical to this Operating Agreement between all parties assigned and Operator.

## 22.  ACREAGE OR CASH CONTRIBUTIONS

If any party receives while this agreement is in force a contribution of cash toward the drilling of a well or any other operation on the Unit Area, such contribution shall be paid to the party who conducted the drilling or other operations and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage without warranty of title, to all parties to this agreement sharing in the cost of drilling the well or other operation in the proportion that their individual interests in the unit area at the time bear to the total of all interests sharing in the well or operation cost. If all parties hereto are so sharing such acreage shall become a part of the unit area and be governed by all the provisions of th9is agreement, otherwise it shall not be deemed part of the unit area. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the unit area.

## 23.  PROVISIONS CONCERNING TAXATION

### (INTERNAL REVENUE CODE ELECTION)

This agreement is not intended to create and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for Federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A" of the Internal Revenue Code of 1986, as amended (the "Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby

-15-

affected such evidence of this election as may be required by the Secretary of the
Treasury of the United States or the Federal Internal Revenue Service, including
specifically, but not by way of limitation, all of the returns, statements and
the data required by Regulations enacted pursuant to the Code.   Should there by
any requirement that each party hereby affected give further evidence of this
election, each such party shall execute such documents and furnish such other evi-
dence as may be required by the Federal Internal Revenue Service or as may be nec-
essary to evidence this election.   No such party shall give any notices or take
any other action inconsistent with the election made hereby.   If any present or
future income tax laws of the state or states in which the unit area is located or
any future income tax laws of the United States contain provisions similar to
those in Subchapter "K", Chapter 1, Subtitle "A", of the Code under which an elec-
tion similar to that provided by Section 761 of thereof is permitted, each party
hereby affected shall make such election as may be permitted or required by such
laws.   In making the foregoing elections, each such party states that the income
derived by such party from operations hereunder can be adequately determined
without the computation of partnership taxable income.

### (OTHER TAXES)

Operator shall endeavor to render for ad valorem taxation, all property sub-
ject to this agreement which by law should be rendered for such taxes, and it may
pay (but shall suffer no liability to non-operators for an unintentional failure
to so render and is under no obligation of any kind to so pay) all such taxes
assessed thereon before they become delinquent.   Operator shall bill all other
parties for their proportionate share of all tax payments made on their behalf, if
any are so made, in the manner provided in Exhibit "B".

If any tax assessment is considered unreasonable by Operator, it may at its
discretion protest such valuation within the time and manner prescribed by law,
and prosecute the protest to a final determination, unless a majority in interest
of the parties agree to abandon the protest prior to final determination.   When
any such protested valuation shall have been finally determined, Operator may, at
its option, pay the assessment for the joint account, together with interest and
penalty accrued, and the total cost, so paid, if any, shall then be assessed
against the parties, and be paid by them, as provided in Exhibit "B".

### 24.  INSURANCE

At all times while operations are conducted hereunder, Operator shall comply
with the Workmen's Compensation Law of the State where the operations are being
conducted.   Operator shall also carry or provide insurance as may be outlined in
Exhibit "C" attached to and made a part hereof.

-16-

## 25.  CLAIMS AND LAWSUITS

If any party to this agreement is sued on al alleged cause of action arising out of operations or lack thereof on the unit area, or by an governmental body on a claim relating to the Unit Area, or on an alleged cause of action involving title to any lease or oil and gas interest subjected to this agreement, it shall give prompt written notice of the suit to the Operator and all other parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the parties, with Operator's attorney as chairman.  Except as otherwise herein provided, suits may be settled during litigation only with the joint consent of all parties effected by such settlement; provided however, that if a majority in interest desire to settle and a minority in interest fail after notice to so consent within three (3) days, such minority shall proportionately among such minority indemnify the majority (i) from any further expense thereafter incurred in the defense of such suit, and (ii) any excess liability suffered by reason of such minority declining to so consent.  No charge shall be made for services performed by the staff attorneys for any of the parties, but otherwise all expenses incurred in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all parties in proportion to their then interests in the unit area.

Attorneys other than staff attorneys for the parties, may be employed by Operator in lawsuits involving unit area operations, title and environmental matters and, if outside counsel is employed, their fees and expenses shall be considered unit area expense and shall be paid by Operator and charged to all of the parties in proportion to their then interests in the unit area without regard to its provisions of Section 9.  The provisions of this paragraph shall not be applied in any instance where the loss which may result fr9om the suit is treated as an individual loss (except for governmental body claims relating to the Unit Area and environmental matters) rather than a joint loss under prior provisions of this agreement and all such suits shall be handled by and be the sole responsibility of the party or parties concerned.

Damage claims caused by and arising out of operations on the unit area, title and environmental matters conducted for the joint account of the parties, shall be

-17-

handled by Operator and outside counsel selected by Operator. The settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement of any one claim does not exceed Twenty Thousand ($20,000.00) dollars; and, if settled, the sums paid i settlement and the fees and expenses of outside counsel, if any, shall be charged as expense to and be paid by all parties in proportion to their then interests in the unit area.

## 26.  FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other then the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all possible diligence to remove the force majeure as quickly as possible.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts or other labor difficulty or the sale of hydrocarbons produced from the Unit Area by the party involved, contrary to its wishes; and, all such difficulties shall be handled entirely within the discretion of the party concerned.

The term "force majeure" as here employed shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, weather, explosion, governmental restraint, unavailability of equipment, unavailability of third party transportation, compression or treatment facilities, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## 27.  NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, shall, unless otherwise specifically provided, by given in writing by United States mail or Western Union Telegram, postage or charges prepaid, and addressed to the party to whom the notice is given at the addresses listed on Exhibit "A". The notice to be given under any provision hereof shall be deemed given and received three days after having been deposited in the United States mail or 24 hours after sent by Western Union telegram and the time for any party to given any notice in response to a notice shall run from the

-18-

earlier of the date the originating notice is actually received or deemed given or received.  The second notice or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid.  Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## 28.  LATER CREATED INTERESTS

If any party hereto hereafter should create any overriding royalty, production payment, or other burden against its interest in the unit area after the date of this agreement and if any other party or parties should receive an assignment pursuant to Sections 14 or 21 of this agreement or conduct nonconsent operations pursuant to Section 10 of this agreement and, as a result, become entitle to receive the unit area, oil and gas interest or lease interest, or production otherwise belonging to, other party, OR if the Operator or one or more parties hereto become entitled to receive the unit area, oil and gas interest or lease interest, or production otherwise belonging to, another party pursuant to Section 7 of this agreement, the Operator, party or parties entitled to receive such interest of another party shall receive same free and clear of burdens which may have been created subsequent to this agreement and the party creating such subsequent burdens shall save entitled Operator, party or parties harmless with respect to the receipt thereof.

## 29.  FILINGS

Operator may, but shall suffer no liability to non-operators for its failure to do so, apply to the appropriate State or Federal agency(ies) which have jurisdiction for the highest possible price determination for oil or gas attributable to any well drilled or operated pursuant to this agreement.  Operator further agrees, upon request, to supply all parties with copies of all information submitted in support of said application.  Operator is authorized to charge and invoice the joint account for its reasonable overhead and the charges of consultants incurred with respect to any such filing.

## 30.  GOVERNING LAW

The essential validity of this agreement and all matters pertaining thereto including,  but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the State of Texas.

-19-

This agreement may be signed in multiple counterparts each of which shall be considered an original for all purposes and shall be binding upon the parties and upon their heirs, successors, representatives and assigns. Also, this agreement shall be binding upon all parties who sign same, without regard to whether all parties do sign.

### 31. WAIVER OF PARTITION RIGHTS

If permitted by the laws of the state or states in which the unit area is located, each party waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest herein.

### 32. OTHER PROVISIONS

See Rider "A"

This Agreement shall be held effective beginning at 7:00 o'clock A.M., C.S.T., on the __24th__ day of __February__, 1994.

LEASE: __Schumann #1__

COUNTY: __Concho__

### O P E R A T O R

ATTEST:                                     CHOLLA PETROLEUM, INC.

Secretary                                   BY: _____
                                            Loyd W. Powell, Jr., President

### (EXECUTION BY OPERATOR IS ALSO AS A PARTY)
### (OTHER THAN OPERATOR)

WITNESS/ATTEST:                             S & P CO.

WITNESS/ATTEST:                             AUGUST ERICKSON, General Manager

- 20-

STATE OF TEXAS      §

COUNTY OF DALLAS      §

    This instrument was acknowledged before me on this _4TH_ day of _MARCH_ , 1994, by LOYD W. POWELL, PRESIDENT of CHOLLA PETROLEUM, INC., a Texas corporation, on behalf of said corporation.

My Commission Expires:

GARY GARRISON
NOTARY PUBLIC
State of Texas
Comm. Exp. 06-22-96

Notary Public in and for the State of
T E X A S

_GARY GARRISON_
Notary's Printed/Typed Name

## CORPORATE ACKNOWLEDGEMENT

STATE OF _Louisiana_ §
Parish
~~COUNTY~~ OF _Caddo_ §

    This instrument was acknowledged before me on this _18th_ day of _March_ , 1994, by _August Erickson_ , as _General Manager_ of _S + P Co._ , a _Louisiana partnership_ ~~corporation~~, on behalf of said ~~corporation~~. Partnership

My Commission Expires:
_with life_

_Frances M. Bailey_
Notary Public in and for the State of
~~T E X A S~~ _Louisiana_

_Frances_ FRANCES M. BAILEY
Notary's Printed/Typed Name

## INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____ §

COUNTY OF _____ §

    This instrument was acknowledged before me on this ____ day of _____, 1994, by _____ for the purposes herein stated.

My Commission Expires:
_____

_____
Notary Public in and for the State of
T E X A S

_____
Notary's Printed/Typed Name

-21-

Rider A - To Operating Agreement
Cholla Petroleum, Inc.

### FINANCING STATEMENT, MORTGAGE AND MEMORANDUM OF OPERATING AGREEMENT

This document is presented to the Secretary of State of Texas for filing as a Financing Statement pursuant to TEX. BUS. COM. CODE. ANN. § 9.401, and to the County Clerk of those counties in Texas referred to on Schedule 1 hereto, for filing in the Financing Statement Records and the Real Estate Records as a Financing Statement pursuant to TEX. BUS. COM. CODE ANN. § 9.401, to perfect security interests and as a Mortgage (with power of nonjudicial sale under deed to trust) and as an assignment of production to secure debt, mutually granted to the parties to that certain Operating Agreement dated _February 24, 1994_, between Cholla Petroleum, Inc., as Operator and Palo Verde Oil Company, et al as Non-Operators. The names and addresses of the Secured Parties and Debtors are as follows:

| Secured Parties' Names and Addresses | Debtor's Name and Addresses |
|---|---|
| Cholla Petroleum, Inc. 5949 Sherry Lane Suite 850 Dallas, Texas 75225 | Cholla Petroleum, Inc. 5949 Sherry Lane Suite 850 Dallas, Texas 75225 |
| See Schedule 1 attached hereto and incorporated herein. | See Schedule 1 attached hereto and incorporated herein. |

If Operator should elect to proceed to foreclose the lien of Operator as against the interest of a Non-Operator having an interest in the contract Area, or if Non-Operator should elect to proceed to foreclose the lien of Non-Operator as against the interest of Operator having an interest in the Contract Area, this Operating Agreement does hereby include provisions for nonjudicial sale under the laws of the State of Texas, and Loyd W. Powell, Jr., is hereby appointed as Trustee for such purpose. In such instance, the party initiating the foreclosure shall be called "Secured Party" and the party whose interest is foreclosed shall be called "Debtor." Upon such default, said Trustee or Secured Party shall at least 21 days preceding the date of nonjudicial sale serve written notice of the proposed sale by certified mail on Debtor according to the records of Secured Party. Service of such notice shall be deemed completed upon deposit of a notice enclosed in a post-paid wrapper properly addressed to the Debtor and each other party obligated to pay said obligations at the most recent address or addresses as shown on the records of Secured Party in a post office or other official depository under the care and custody of the United State Postal Service. The affidavit of any person having knowledge of the facts to the effect that such services was completed shall be prima facie evidence of the facts of service. After such notice, said Trustee shall proceed to sell all of the interest in Debtor in the Unit Area land and leases, described on attache Exhibit "A" incorporated herein by reference for all purposes and the personal property located thereon and the oil and gas produced therefrom including (i) both surface and subsurface property and equipment now or hereafter located on the lands described in Exhibit "A" which are used or useful or held for use in connection with the exploration, development or operation of the leases, oil and gas interest, and

Section 32 - Page 1

lands described on Exhibit "A", excluding, however, rigs, drill pipe, compressors, rolling stock, workover rigs and tools, (ii) all subleases, farmout agreements, assignments of interest, operating rights, contracts, operating agreements, rights-of-way, franchises, privileges, permits, licenses, easements, appurtenances or benefits concerning the lands, leases and oil and gas interests described on Exhibit "A", and (iii) all proceeds of any of the forgoing now or hereafter but not limited to the proceeds derived form the sale of oil or gas (including liquid hydrocarbons) produced from the lands described in Exhibit "A", at public auction to the highest bidder for cash after having given notice of the time and place of sale and in the manner and after the advertisement of such sale as is now required by the statutes of the State of Texas in making sales of real estate under deeds of trust. Sale of a part of the realty/property will not exhaust the power of sale and sales may be made form time to time until all of the realty/property is sold or the obligation paid in full. Said Trustee shall have authority to appoint and attorney-in-fact to act as Trustee in conducting the foreclosure sale and executing a deed, assignment, bill of sale or other lawful conveyance to the purchasers; and it is further agreed that aid Trustee or his successor may sell said property together or in lots and/or parcels as to him shall deem expedient and after such sales as aforesaid shall make, execute and deliver to the purchaser or purchasers thereof good and sufficient deeds, assignments, bills of sale or other lawful conveyances to vest in said purchaser or purchasers title to the Debtor's interest in the lands and leases described on Exhibit "A" in fee simple together with all personal property used or obtained in connection therewith and together with all oil and gas and liquid hydrocarbons produced therefrom and all of the proceeds of production attributable thereto, including proceeds of production held by any party for the payment to Debtor. From the proceeds of said sale said Trustee shall first pay all charges, costs and expenses in executing these provisions, and secondly, pay all sums due by the Trustee for taxes in the preservation of the security and thereafter pay all of the remaining sums to Secured Party for the satisfaction of the debts of Debtor hereunder, and the balance, if any, shall be paid to Debtor.

It is agreed that such sale shall be a perpetual bar against Debtor and its heirs, successors, assigns and legal representatives and all other persons claiming under Debtor. It is further agreed that said Trustee or any holder or holder of said obligation or Secured Party shall have the right to become the purchaser or purchasers at such sale if the highest bidder or bidders in which event the bid or bids may be credit upon said indebtedness of Debtor. It is stipulated and agreed that in case of any sale hereunder by Trustee or his successors all prerequisites or said sale shall be presume to have been performed and any conveyance given hereunder and statements of fact or recitals therein made as to the nonpayment of money secured or as to any default under the terms hereof or as to the request of the Trustee to enforce this trust or as to the proper and due appointment of any successor or substitute Trustee or as to the advertisement of sale or the time, place and terms of sale or as to any other preliminary act or thing shall be taken in all courts and equity as prima facie evidence that the facts so stated are true. Secured Party may appoint a substitute or successor Trustee.

The collateral to which the security interest and mortgage and assignment of production to secure debt apply are all of each Debtor's interest in all property interests described above including personal property, accounts, inventory and general intangibles and proceeds and products thereof relating or pertaining to the oil and gas leases and lands described in attached Exhibit "A".

Section 32 - Page 2

The undersigned parties further give notice that they entered into the Operating Agreement dated __February 24, 1994__ , (as described above) and which grants certain liens and otherwise affects the title (including but not limited to an assignment of production of oil, gas and liquid hydrocarbons and the proceeds thereof to secure all amounts due in and under such operating agreement) to the oil and gas leases and lands described in attached Exhibit "A". Complete originals of the Operating Agreements are located in the offices of Operator.

SECURED PARTIES'/DEBTORS' SIGNATURES:

CHOLLA PETROLEUM, INC.

By: _____
    Loyd W. Powell, Jr., President

S & P CO.

By: _____

**AUGUST ERICKSON, General Manager**

Section 32 - Page 3

STATE OF TEXAS                  §

COUNTY OF DALLAS         §

    This instrument was acknowledged before me on this 4TH day of *MARCH* , 1994, by LOYD W. POWELL, PRESIDENT of CHOLLA PETROLEUM, INC., a Texas corporation, on behalf of said corporation.

My Commission Expires

```
GARY GARRISON
NOTARY PUBLIC
State of Texas
Comm. Exp. 05/20/96
```

_____
Notary Public in and for the State of
T E X A S
*GARY GARRISON*
_____
Notary's Printed/Typed Name


CORPORATE ACKNOWLEDGEMENT

STATE OF *Louisiana* §

~~COUNTY~~ *Parish* OF *Caddo* §

    This instrument was acknowledged before me on this 14th day of *March* , 1994, by *August Erickson* , as *General Manager* of *S&P Co.* , a *Louisiana partnership* ~~corporation~~, on behalf of said ~~corporation~~ *partnership* .

My Commission Expires:
*with life*
_____

_____
Notary Public in and for the State of
~~T E X A S~~ *Louisiana*
**FRANCES M. BAILEY**
NOTARY PUBLIC, Caddo Parish, Louisiana
_____
Notary's Printed/Typed Name My Commission for Life


INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____ §

COUNTY OF _____ §

    This instrument was acknowledged before me on this ____ day of _____, 1994, by _____ for the purposes herein stated.

My Commission Expires:
_____

_____
Notary Public in and for the State of
T E X A S

_____
Notary's Printed/Typed Name


Section 32 - Page 4

SCHEDULE 1

| Additional Secured Parties' Name and Addresses | Additional Debtor's Name and Addresses |
|---|---|
| Joe Altemore<br>Route 1, Box 65E<br>Crawford, Texas  76638 | Joe Altemore<br>Route 1, Box 65E<br>Crawford, Texas  76638 |
| Cholla Petroleum, Inc.<br>5949 Sherry Lane, Suite 850<br>Dallas, Texas  75225 | Cholla Petroleum, Inc.<br>5949 Sherry Lane, Suite 850<br>Dallas, Texas  75225 |
| Elan Trust<br>c/o First Interstate Bank of Denver<br>Attn:  Terry Oliver<br>P. O. Box 5825<br>Denver, Colorado 80217 | Elan Trust<br>c/o First Interstate Bank Denver<br>Attn:  Terry Oliver<br>P. O. Box 5825<br>Denver, Colorado 80217 |
| E. Richard Neff<br>P. O. Box 1467<br>Edmond, Oklahoma  73083 | E. Richard Neff<br>P. O. Box 1467<br>Edmond, Oklahoma  73083 |
| Palo Verde Oil Company<br>5949 Sherry Lane, Suite 850<br>Dallas, Texas  75225 | Palo Verde Oil Company<br>5949 Sherry Lane, Suite 850<br>Dallas, Texas  75225 |
| Reba P. Powell<br>c/o Russell E. Brown, Agent<br>P. O. Box 3404<br>Longview, Texas  75606 | Reba P. Powell<br>c/o Russell E. Brown, Agent<br>P. O. Box 3404<br>Longview, Texas  75606 |
| Pursuit Energy Corporation<br>5949 Sherry Lane, Suite 755<br>Dallas, Texas  75225 | Pursuit Energy Corporation<br>5949 Sherry Lane, Suite 755<br>Dallas, Texas  75225 |
| S & P Co.<br>P. O. Box 3735<br>Shreveport, Louisiana 71133 | S & P Co.<br>P. O. Box 3735<br>Shreveport, Louisiana 71133 |
| Wilton J. Brown, Inc.<br>P. O. Box 3484<br>San Angelo, Texas  76902 | Wilton J. Brown, Inc.<br>P. O. Box 3484<br>San Angelo, Texas  76902 |

# EXHIBIT "A"
## OPERATING AGREEMENT

**A.**   Description of Land, Oil and Gas Leasehold Interest and Oil/Gas Interest

Oil, Gas and Mineral Lease dated July 16, 1993, from James C. Shumann, et ux, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 155, Page 597 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated August 12, 1993, from Viola Stewart, a widow, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 157, Page 595 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated August 12, 1993, from Reed B. Loflin, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 156, Page 618 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated August 12, 1993, from Mark McGee, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 156, Page 719 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated August 12, 1993, from Jane L. Thompson, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 156, Page 420 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated August 12, 1993, from Ruth L. Jones, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 156, Page 615 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated August 12, 1993, from Dorothy Davis Green, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 156, Page 423 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated August 12, 1993, from Estate of J. Edd McLaughlin, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 156, Page 621 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated August 12, 1993, from Estate of M. A. McLaughlin, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 156, Page 624 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated September 8, 1993, from James C. Schumann, et ux, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 157, Page 23 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated October 12, 1993, from Mary Louise Simpson Padgett, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 158, Page 327 of the records of Concho County, Texas.

**EXHIBIT "A"**              OPERATING AGREEMENT                         PAGE 1

A.  Description of Land, Oil and Gas Leasehold Interest and Oil/Gas Interest

Oil, Gas and Mineral Lease dated October 12, 1993, from Gene Marshall Simpson, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 157, Page 897 of the records of Concho County, Texas.

Oil, Gas and Mineral Lease dated October 12, 1993, from John Calvin Simpson, Lessor, to Cholla Petroleum, Inc., Lessee, recorded in Volume 157, Page 895 of the records of Concho County, Texas.

In Tract #1 we have a gross and net acres figure of 331.900. In Tract #2 we have a gross and net acres figure of 971.90. In Tract #3 we have a gross of 338.10 and a net of 295.838 acres. If a well is made in Section 2070 we will need to have a receiver appointed in Tract #3 (Section 2069) for missing lessors. The E/2 of Section 69 from the Pfluger's has extensive special clauses. One is that whoever leases from them, they are responsible for any future liability, so Cholla will have to operate forever.

If you elect out on completing the first well in Section 2070, then you are out of the entire 1/2 Section as to all depths for all other wells. In the other four Surveys, 500% penalty clauses will apply for the first well on each 320 acre tract and on each subsequent well in that 320 acre tract.


B.  ROYALTIES, OVERRIDING ROYALTIES AND OTHER BURDENS

| | | |
|---|---|---|
| LANDOWNERS AND OVERRIDING ROYALTIES | = | 23.3% |
| WORKING INTEREST NET REVENUE | = | 76.7% |


C.  NAME AND ADDRESS                    WORKING INTEREST PERCENTAGE

| | |
|---|---|
| Joe Altemore<br>Route 1, Box 65E<br>Crawford, Texas  76638 | 6.750% |
| Cholla Petroleum, Inc.<br>5949 Sherry Lane, Suite 850<br>Dallas, Texas  75225 | 1.000% |
| Elan Trust<br>c/o First Interstate Bank of Denver<br>Attn:  Terry Oliver<br>P. O. Box 5825<br>Denver, Colorado 80217 | 3.125% |
| E. Richard Neff<br>P. O. Box 1467<br>Edmond, Oklahoma  73083 | 3.125% |

EXHIBIT "A"                    OPERATING AGREEMENT                    PAGE 2

| C.   NAME AND ADDRESS | WORKING INTEREST PERCENTAGE |
|---|---|
| Palo Verde Oil Company<br>5949 Sherry Lane, Suite 850<br>Dallas, Texas 75225 | 76.500% |
| Reba P. Powell<br>c/o Russell E. Brown, Agent<br>P. O. Box 3404<br>Longview, Texas 75606 | 3.125% |
| Pursuit Energy Corporation<br>5949 Sherry Lane, Suite 755<br>Dallas, Texas 75225 | 3.250% |
| S & P Co.<br>P. O. Box 3735<br>Shreveport, Louisiana 71133 | 6.250% |
| Wilton J. Brown, Inc.<br>P. O. Box 3484<br>San Angelo, Texas 76902 | 3.125% |

EXHIBIT "B"

ACCOUNTING PROCEDURE
JOINT OPERATIONS

Attached to and made a part of that Operating Agreement (the "agreement") dated _____ February 24, _____ , 19̲9̲4, between CHOLLA PETROLEUM, INC., herein named Operator and ___Palo Verde Oil Company___ , et al.

I. GENERAL PROVISIONS

1.   DEFINITIONS

"Joint Property" shall mean the real (the Unit Area) and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

2.   STATEMENT AND BILLINGS

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month.

EXHIBIT "B" - Page 1

Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility and all charges and credits. Operator may provide, in the discretion of Operator, copies of original invoices. Any unusual charges and credits shall be separately identified and fully described in detail.

3. ADVANCES AND PAYMENTS BY NON-OPERATORS

To the extent provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding months operations. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of eighteen percent (18%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property and Operator are located, whichever is the lesser, plus attorney's fees, court costs and other costs in connection with the collection of unpaid amounts.

4. ADJUSTMENTS

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator shall conclusively be presumed to be true and correct after sixty (60) days following the date when billed unless within the said sixty (60) day period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period.

5. AUDITS

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the sixty (60) day period following the end of such calendar year; provided, however, the making of an audit shall not extent the time for the taking of written exception in Paragraph 4 of this Section I. Where they are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operator's audit cost incurred under this paragraph unless agreed to in writing by the Operator.

EXHIBIT "B" - Page 2

6.    APPROVAL BY NON-OPERATORS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II.   DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.    RENTALS, ROYALTIES AND ENVIRONMENTAL COSTS

Lease rentals and royalties (including overriding and shut-in royalties) and other burdens paid by Operator for the Joint Operations.

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations, such costs may include surveys of an ecological or achaeological nature and pollution control procedures.

2.    LABOR

(1)    Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)    Salaries of First Level Supervisors in the field.

(3)    Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

B.    Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.  Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II.  If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D.    Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

EXHIBIT "B" - Page 3

3. EMPLOYEE BENEFITS

Operator's costs of plans for employees' group life insurance, hospitaliz-ation, health, pension, retirement, thrift, bonus and other benefit plans applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by Council of Petroleum Accountants Societies of North America (COPAS).

4. MATERIAL

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for reasonably expected use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. TRANSPORTATION

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's ware-house or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal or railway receiving point unless agreed to by the Parties.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking costs of $200 or less excluding accessorial charges.

6. SERVICES

The cost of contract services, equipment and utilities provided by outside sources. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

7. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of owner-ship and operation. Such rates shall include costs of maintenance,

EXHIBIT "B" - Page 4

    repairs, other operating expense, insurance, taxes, depreciation and interest on investment not to exceed ten percent (10%) per annum. Such rates shall in no event exceed average commercial rates currently prevailing in the immediate are of the Joint Property.

B. —| In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 10%.  For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8.  DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, adverse weather, theft, accident or other cause, except those resulting from Operator's gross negligence or willful misconduct.  Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9.  LEGAL EXPENSE

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property.  Operator shall also charge the Joint Account for legal expenses incurred for title opinions and in the formation of units.

10.  TAXES

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

11.  INSURANCE

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties.  In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for workmen's Compensation and/or Employers Liability under the respective state's laws Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

12.  OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

EXHIBIT "B" - Page 5

III.  OVERHEAD

1.  OVERHEAD - DRILLING AND PRODUCING OPERATIONS

   i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on:

       Fixed Rate Basis, Paragraph 1A, for producing wells and for drilling and completion of well.

       Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II.  The cost and expense of services from outside sources in connection with matters of taxation, traffic or accounting shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall not be covered by the Overhead rates.

A.  Overhead - Fixed Rate Basis

   (1)  Operator shall charge the Joint Account at the following rates per well per month:

      Drilling Well Rate:  $ _____3,500_____
      Producing Well Rate: $ _____350_____

   (2)  Application of Overhead - Fixed Rate Basis shall be as follows:

     (a)  Drilling Well Rate

        (1)  Charges for drilling wells shall being on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

        (2)  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate.  Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

EXHIBIT "B" - Page 6

    (3)    An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

    (4)    Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

    (5)    An inactive oil or gas well shut in because of overproduction, failure of purchaser to take the production because of contract negotiations or mechanical problems shall be considered as a one-well charge providing that if it is a gas well it is directly connected to a sales outlet. A gas well not connected to a sales outlet shall be charged at one-half the producing well rate.

    (6)    A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

    (7)    An oil well shut down for mechanical problems shall be deemed an active well if Operator reasonably expects to cure such problems in due course.

    (8)    All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualily for an overhead charge.

(3)    The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics. The adjusted rates shall be the rates currently in use, plus, or minus the computed adjustment.

2.    OVERHEAD - MAJOR CONSTRUCTION

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the

EXHIBIT "B" - Page 7

development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $25,000.00:

A.   6% of total costs of such costs are more than $25,000.00 but less than $100,000; plus

B.   4% of total costs in excess of $100,000 but less than $1,000,000; plus

C.   2% of total costs 1 excess of $1,000.000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3.   AMENDMENT OF RATES

The overhead rates provided for in this Section III may be amended from time to time by mutual agreement between the Parties hereto, if, in practice, the rates are found to be insufficient or excessive. A failure of Operator to charge the maximum rate at any time or from time to time not be deemed an amendment nor shall it prejudice the right of Operator to charge maximum rates at future dates.

### IV.   PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, the interest of Non-Operators in surplus material.

1.   PURCHASES

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.   TRANSFERS AND DISPOSITIONS

Material furnished to the Joint Property and Material furnished from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

EXHIBIT "B" - Page 8

A.   NEW MATER

    (1)   Tubular goods, except line pipe, shall be priced at cost if specifically ascertainable otherwise at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

    (2)   Line Pipe shall be priced at cost if specifically ascertainable otherwise at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

    (3)   Other Material shall be priced at cost if specifically ascertainable otherwise at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

    (4)   Cost may not exceed one hundred and fifteen percent (115%) of the otherwise chargeable price except as specified in 3. following.

B.   USED MATERIAL

    (1)   Material moved to the Joint Property - At fair market value time moved.

    (2)   Material moved from the Joint Property - At fair market value at time moved.

C.   PRICING CONDITIONS

    (1)   Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents ($0.15) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

    (2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   PREMIUM PRICES

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of such Non-Operator's share of such Material suitable for use and acceptable to Operator.

EXHIBIT "B" - Page 9

4.   WARRANTY OF MATERIAL FURNISHED BY OPERATOR

Operator does not warrant the Material furnished or its <u>FITNESS</u> or <u>SUITABILITY</u> for purpose.   In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V.  INVENTORIES

1.   Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Material.  Non-Operators shall be notified upon request of the next inventory date and be allowed to be represented at same.

2.   Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   Special Inventories

Special inventories may at the e3xpense of the requesting party be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place.  In such cases, only the seller and the purchaser shall be governed by such inventory.

4.   Expense of Conduction Periodic Inventories

The expense of conducting periodic inventories shall be charged to the Joint Account except to the extent it constitutes Overhead as defined herein.

EXHIBIT "B" - Page 10

EXHIBIT "C"

INSURANCE AND INDEMNITY

Attached to and made a part of that Operating Agreement Dated   February 24, 1994
_____ between CHOLLA PETROLEUM, INC., OPERATOR,
and   Palo Verde Oil Company, et al NON-OPERATORS

At all times while operations are conducted under this Agreement, Operator shall maintain for the benefit of all parties hereto, insurance of the types and in the amounts as follows or such greater amounts as Operator, in the sole discretion of Operator, deems appropriate.  Premiums for such insurance shall be charged to the Joint Account.

Non-operating working interest owners shall be named as Additional Insureds on the liability insurance policies, but only with respect to the performance of all work hereunder.

All such insurance shall be carried in a company or companies selected by Operator; shall be maintained in full force and effect during the terms of this Operating Agreement; and shall not be cancelled, altered or amended without written notice to Operator.  If so required, Operator agrees to have its insurance carrier furnish certificates of insurance evidencing such insurance coverages.

Non-operating working interest owners agree that the limits and coverage carried by operator are adequate and shall hold Operator harmless if any claim exceeds such limit or is not covered by such policy.  Such coverages and limits may change or be unavailable from time to time and operator does not guarantee their continuance but will use best effort to provide such coverages and limits at reasonable costs.

a.   Workers' Compensation and Employers' Liability Insurance, if applicable, in accordance with the laws of the state of Texas.  The Employers' Liability limit will be $500,000 per accident.

b.   Automobile Public Liability Insurance covering all owned, non-owned and hired vehicles with a combined single limit of not less than $100,000.

c.   Comprehensive General Liability, bodily injury and property damage insurance with a combined single limit of not less than $100,000 for each occurrence//aggregated.  This would include contractual liability coverage.

d.   Umbrella Liability with limits of not less than  $1,000,000 per occurrence and $1,000,000 annual aggregate.