## POOLING AND OPERATING AGREEMENT

THIS AGREEMENT, made and entered into this the _10th_ day of
_January_, 194_8_, by the following named parties, hereinafter referred
to in the neuter gender, whether masculine, feminine or neuter:

> KELLY OIL COMPANY, a Delaware Corporation with offices in Tulsa, Oklahoma;
> THE CHICAGO CORPORATION, a Delaware Corporation with offices in Corpus
> Christi, Texas;
> CLYDE H. ALEXANDER, c/o Creslenn Oil Company, Corsicana, Texas;
> . C. FRAZEL, Commercial National Bank Building, Shreveport, Louisiana;
> N. V. KINSEY, P. O. Box 666, Carthage, Texas;
> DELTA DRILLING COMPANY, a Texas Corporation, P. O. Box 2012, Tyler, Texas, and
> J. KLAR, TRUSTEE, 2900 Mansfield Road, Shreveport, Louisiana.

### W I T N E S S E T H:

WHEREAS, the said parties respectively represent that they are the
owners of the oil, gas and mineral lease, or leases, set out and described
in connection with their respective names on the schedule of leases attached
hereto and marked Exhibit "A", for identification, and made a part hereof by
reference, insofar as said lease, or leases, covers and affects the lands, or
any part thereof, described on Exhibit "B", attached hereto and made a part
hereof by reference; and

WHEREAS, in order to conserve strategic materials, prevent avoid-
able waste, bring about cooperative development and operation of said leases
in accordance with Section 21 of Article 6008, Vernon's Annotated Civil
Statutes of the State of Texas, the parties hereto desire to pool and unitize
said leases, and any other lease or leases hereafter acquired by any party
hereto, insofar as the same cover and affect the gas and gas rights in, to and
under said lands, comprising all of the lands described on said Exhibit "B",
and to set forth their agreement concerning their respective rights, privil-
eges and obligations in, to and on said leases, insofar as they cover and af-
fect the gas and gas rights, in, on and under said lands, and desire to design-
ate in writing one of the parties hereto as the Operator to conduct all drill-
ing and other operations for gas on said lands, for the production, saving and
marketing of gas therefrom;

NOW, THEREFORE, in consideration of the premises, and of the covenants and agreements herein contained, to be kept and performed by each of the parties hereto, respectively, said parties agree with each other as follows:

### ARTICLE I.

The words and terms defined in this Article I shall have the following meaning when used in this agreement, and, regardless of any classification which may be made by the Railroad Commission of Texas, or any other similar State or Federal Regulatory Body having jurisdiction in the premises, the following definitions shall continue in force and effect, and govern with respect to the rights, obligations and privileges of the parties hereunder:

1. OIL is any liquid hydrocarbon, regardless of gravity, capable of being produced in liquid form at the well by ordinary production methods and which is not the result of condensation of gas.

2. GAS, as referred to in this agreement, is any gaseous or liquid hydrocarbon, except oil as above defined, and shall include (but not by way of limitation) condensates (sometimes called "distillates") and other liquid hydrocarbons other than oil. CONDENSATES (sometimes called "DISTILLATES") and OTHER LIQUID HYDROCARBONS are any mixture of liquid hydrocarbons other than oil condensed, absorbed or separated out of, or from the gas.

3. An OIL WELL is any well which shall be so designated or classified as an oil well by the Railroad Commission of Texas.

4. A GAS WELL is any well which shall be so designated or classified as a gas well by the Railroad Commission of Texas.

5. The term "UNITIZED AREA" shall mean __704__ acres of land as described on said Exhibit "B", and said Unitized Area shall be considered to contain, and is hereby fixed at, said number of acres, whether the same actually contains more or less.

6. The term "OPERATOR" shall mean the one of the parties hereto designated as the Operator of the leases within the Unitized Area, insofar as the gas and gas rights therein are concerned.

7. The term "NON-OPERATOR" shall mean any one of these parties other than the one of them that may be designated as Operator as provided in Paragraph 6 above, and the term "NON-OPERATOR" shall mean all such parties other than Operator, whether one or more.

8. The term "JOINT ACCOUNT" shall mean the combined interests of the parties hereto in the gas and gas rights in the Unitized Area.

9. The term "ROYALTY" shall include not only the original royalty provided to be paid the Lessors under any lease covering land in the Unitized Area, but shall also in-

- 2 -

clude any overriding royalty, payment out of production
or any charge limiting the right of the parties hereto
to be the beneficiary of seven-eighths (7/8ths) of the
production of gas from the land covered by any such lease.

### ARTICLE 2.

Said parties hereby unitize or pool all of the leases described in

Exhibit "A", insofar as said leases cover the gas and gas rights in, to and

under all of the lands described on Exhibit "B", and agree that said leases

covering the lands included within the Unitized Area shall be developed and

operated under the terms of this agreement for the joint benefit of these

parties, and all costs and expenses incurred in connection therewith, as well

as all costs and expenses incurred in producing, saving and marketing gas

therefrom, shall be borne by said parties in the proportions of their re-

spective interests in the gas and gas rights in said leases, which said int-

erests, unless and until otherwise determined as provided in Article 3

hereof, are as follows:

| | | | |
|---|---|---|---|
| Sholly Oil Company | | 684.438125 acres, or, | 97.2213246% |
| The Chicago Corporation | (58%) | | .4788192% |
| Clyde H. Alexander | (17%) | | .1403436% |
| W. C. Foxmol | (12½%) | | .1031938% |
| N. V. Kinsey | (12½%) | 5.811875 acres, or, | .1031938% |
| Delta Drilling Company | | 6.875 " or, | .9765625% |
| G. Tolar, Trustee | | 6.875 " or, | .9765625% |

These parties shall severally own, and, subject to the limitations

of this agreement, shall be entitled to receive, currently as produced, their

respective proportions (as above set out) of all gas that may be produced

from the Unitized Area; provided, however, that any encumbrances, overriding

royalties, payments out of production, or other charges against any lease

contributed by any party shall be chargeable solely against the interest of

the party contributing said lease; and the interest or percentage of such

party in the gas produced from the Unitized Area shall be charged with such

payment or payments.

### ARTICLE 3.

Each of the parties shall, upon request, furnish to any other party

satisfactory evidence of its title to the lease or leases contributed by it,

covering lands included in the Unitized Area. If any curative work is re-

quired in order to meet any objections to the title to any lease, the party contributing such lease shall secure such required curative matter and pay the cost and any and all expenses incident to the securing of such curative work. Should title to any lease fail, in whole or in part, or terminate for any reason whatsoever, or should it be determined that the leases contributed by any of the parties do not cover the interest in the gas and gas rights shown in the first and second paragraphs of the preamble of this agreement as owned by said parties, respectively, then in any of such events, and unless the outstanding interest is acquired by the party whose rights are so affected, the interest of the party contributing such lease, to which title has so failed, or so terminated, or there was a determination that the leases do not cover the interest in said gas and gas rights so shown to be owned by it, shall be reduced accordingly; provided, however, that if any party acquires by purchase, new lease, correction lease, renewal, ratification or co-lessor's agreement, such interest on which title has failed, or a lease has terminated, or as to which it has been so determined that the party did not have a lease covering such interest, then, and in that event, the respective rights and obligations of these parties shall be readjusted accordingly as from the beginning.

## ARTICLE 4.

In the event any lease contributed by any party does not contain an adequate pooling provision, providing for the pooling of mineral and royalty interests, or in the event any such lease is subject to any overriding royalties or other payments and the instrument, or instruments, creating such overriding royalty interests or other payments, does not contain adequate provision for the pooling of such interests, then the party so contributing such respective lease which does not contain an adequate pooling provision shall, within thirty (30) days from the date hereof, secure and file for record in the Deed Records of Panola County, Texas, an amendment to such lease and to such other instrument or instruments entitling persons to overriding royalties or other payments out of production, and these parties further agree, by the end of such thirty (30) day period, to execute and file for record a declaration unitizing or pooling all of the royalties and other mineral rights in accordance with the pooling provisions of the leases or amendments thereto.

- 4 -

In the event of the failure of any party to secure any such amendment for the pooling of said royalty, overriding royalty or other payments under any lease or leases contributed by it, the parties so contributing such lease or leases shall pay (through Operator and the Joint Account) any additional royalty or other payments required to be paid because of failure to secure said pooling amendment; and the amount so required to be paid shall be charged against the interest or percentage of the party so failing to secure such pooling amendment.

## ARTICLE 5.

Skelly Oil Company is hereby designated as Operator. Operator shall manage, develop and operate said leases, insofar as they cover and affect the gas and gas rights in, to and under the Unitized Area, at the joint expense and for the Joint Account of these parties, in accordance with the terms and conditions of this agreement, and, subject to the limitation and provisions hereof, shall have full control and management of the operations under said leases for the development and production of gas therefrom and the saving and marketing of such gas; and, in connection therewith, it shall undertake and perform, subject to the terms and provisions of this agreement, all of the obligations of said leases, insofar as they cover and affect the gas and gas rights in, to and under the lands comprising said Unitized Area.

The judgment and discretion of Operator, exercised in good faith, shall be the limit of its liability to any Non-Operator, and Operator shall never be liable to any Non-Operator for any acts done or omitted to be done in good faith in the performance of any of the provisions of this agreement.

The party acting as Operator under this agreement may at any time resign as Operator, effective not less than ninety (90) days after delivery of written notice of such resignation to all the parties hereto (unless the parties sooner agree to such resignation), whereupon the parties hereto shall designate another Operator.

Any party acting as Operator hereunder may at any time be removed and another designated to be Operator in lieu of the existing Operator, provided such substituting shall not be effective until ninety (90) days after written notice thereof to the existing Operator, unless such Operator sooner consents thereto.

The selection of a new Operator or the removal of old Operator shall be by a majority in interest vote.

### ARTICLE 6.

Except as hereinafter provided, Operator shall, in the first instance, advance and pay all costs and expenses incurred in the development and operation of said leases for the Joint Account. All charges or credits to the Joint Account and all matters of Accounting Procedure shall be governed by the provisions hereof and the provisions of the Accounting Procedure attached hereto, marked Exhibit "C" and made a part hereof.

The receipt by the designated Non-Operator of such statement or of any payment shown to be due hereunder shall not prejudice the right of any Non-Operator to protest the correctness thereof, provided, however, that unless the same is protested in writing within two (2) years after the receipt thereof, such statement shall, for all purposes, be considered as correct.

### ARTICLE 7.

It is agreed by the parties hereto that Operator shall commence within sixty (60) days after the execution of this instrument by all parties, operations for the drilling of a well at the location shown in the attached plat marked "Exhibit B", and that Operator shall continue the drilling of said well with reasonable diligence and in a workmanlike manner to a depth sufficient to test the Upper and Lower Pettit formations, or to a depth of 6500 feet below the surface of said Unitized Area, whichever is a lower depth; and if after the completion of said drilling operations gas is discovered in commercially paying quantities, Operator shall complete the same for production of gas. All costs and expense of drilling, completing and equipping said well shall be borne by the parties hereto, in the proportion of their respective interests in the gas and gas rights in the Unitized Area, and said well and all equipment therein and thereto or used in connection therewith, shall thereupon be owned by said parties in the proportions that said parties have paid for said well and said material and equipment.

### ARTICLE 8.

With the exception of the well hereinabove provided for under Article 7 hereof, no well shall be drilled by Operator for the Joint Account

on any part of the land in the Unitized Area covered by said leases, unless
and until mutually agreed upon in writing by all parties hereto, and no ex-
penditures shall be made by Operator as to any one project or item, in devel-
oping and operating said leases or for any capital investment hereunder in
connection with any such single project or item, in excess of the sum of
Five Thousand Dollars ($5,000.00), without the written consent of all Non-
Operators. Provided, however, that when the parties have agreed upon the
drilling of any well on said lands, Operator is authorized to incur any ex-
penditure necessary in the drilling, completion, maintenance and operation
of such well or wells and the saving and marketing of gas therefrom without
securing the additional consent of any Non-Operator. The costs and expenses
here contemplated shall be such as are necessary in developing, operating and
equipping, for the Joint Account, the leased premises for gas, and for the
producing, saving and marketing thereof.

## ARTICLE 9.

Operator, if it elects to, may require each Non-Operator to pay in
cash to the Joint Account its proportionate part of the estimated cost of
drilling any well, or of any capital investment or other expenditure which
may have been authorized under the provisions hereof, before making any ex-
penditures for such drilling or capital investment. Each Non-Operator agrees
to pay its proportionate part of said amount at least five (5) days before
the expenditure is to be made, after having received statement showing the
estimated amount required and the date such expenditure is to be made; and
if payment is not made within such time, the unpaid balance shall bear int-
erest at the rate of six per cent (6%) per annum until paid. Adjustments be-
tween estimates and actual costs shall be made by Operator and the accounts of
the parties hereto shall be adjusted accordingly.

## ARTICLE 10.

All wells drilled on the Unitized Area for the Joint Account shall
be drilled on a competitive contract basis at the usual rates prevailing in
the field in which said leases are located. Operator, if it so desires, may
employ its own tools and equipment in the drilling, deepening, plugging back
or reworking of wells for the Joint Account; but in such event the charge
therefor shall not exceed the prevailing rate in the field; and such work shall

be performed by Operator under such terms and conditions as shall be customary and usual in the field in contracts of independent contractors who are doing work of similar nature. Before the commencement of the drilling of any well by Operator itself for the Joint Account, instead of by an independent contractor, Operator and all Non-Operators shall agree upon the prevailing rate in the field and upon the contract under which Operator will drill such well.

## ARTICLE 11.

All materials and equipment acquired by Operator in connection with the operations conducted by Operator hereunder for the Joint Account shall be owned by the parties hereto in the same proportion that they contributed to the payment thereof.

Surplus materials and equipment acquired for the Joint Account, when in the judgment of Operator the same are not necessary for the development and operation of said leases, may, with the approval of all Non-Operators, be divided in kind or sold to one or more of the parties hereto, or to others, for the benefit of the Joint Account. Small materials may be transferred from the Joint Account by Operator to its warehouse or to other leases without obtaining formal approval of any Non-Operator. Proper charges and credits shall be made by Operator as provided in Exhibit "C".

## ARTICLE 12.

Operator shall not be liable for damages arising out of injuries to any of the employees of any Non-Operator or damages to any property of any Non-Operator in connection with the operations hereunder on the Unitized Area, except for willful misconduct or gross negligence of Operator.

(a) Whereas, Skelly Oil Company, Operator, heretofore elected to reject the Workman's Compensation Law of Texas as to all its operations in that State, and hence is not subject to said law; therefore, Operator agrees to assume and discharge such liabilities as the parties hereto may incur. For actual damage in cases of injuries to employees, including injuries resulting in death, in the operations conducted on said lands under the provisions of this agreement, Operator agrees that it will not charge to Non-Operator any part of such damages paid by it, or the costs or expenses incident thereto, and in consideration thereof and in lieu of liability on Non-Operator's part for any part thereof, Operator shall charge Non-Operator, and Non-Operator agrees to pay Operator, its proportionate part of an amount equal to the premium,

- 8 -

calculated at manual rates, that Operator would have paid had it been a subscriber under said Workman's Compensation Law, for insurance thereunder, insofar as such operations are concerned. In the event Operator should change its election and become subject to said law, then the cost of the compensation insurance purchased by it shall be borne by each party hereto, in the proportions shown above. However, inasmuch as compensation under the Workmen's Compensation Law of Texas does not cover and include, and is not in lieu of, exemplary or punitive damages, any liability for exemplary damages which may be claimed or which may exist is not intended to be and shall not be covered and included within the foregoing provisions; but, Operator shall purchase a policy of excess insurance to the effect that no one accident shall cost Operator more than $10,000.00 damages regardless of the number of persons involved in any such one accident, and under said policy if the damages paid by Operator do not exceed $10,000.00 then Operator must also pay all the costs and expenses, including attorney's fees, incident thereto, but if the damages paid by Operator exceed $10,000.00, then Operator is required to bear only that proportion of such costs and expenses as $10,000.00 bears to the total damages paid, the insurance company reimbursing Operator for the balance of the damages and the costs and expense; and Operator hereby agrees that it will make no charge against Non-Operator for any part of the premium cost of such excess insurance, but Operator shall charge Non-Operator, and Non-Operator agrees to pay Operator its proportionate part of the amounts, including costs, expenses and/or attorney's fees, that Operator is required to bear or bears as a result of judgments or the compromise and settlement of claims or suits for exemplary damages.

(b)  Operator shall obtain, and at all times while operations are conducted on any of  the lands or leases described herein, shall maintain in effect insurance by a reliable and responsible insurance company or companies, as to the following risks:

First:  Automobile Public Liability Insurance with limits of not less than $25,000.00 per person and $50,000.00 per accident, and Automobile Property Damage Insurance with a limit of not less than $5,000.00.

Second:  General Public Liability Insurance with limits of not less than $50,000.00 per person and $100,000.00 per accident.

- 9 -

Operator shall not provide fire insurance, windstorm insurance, explosion insurance or employer's liability insurance for the benefit of the Joint Account.

If operator elects to assume responsibility for any or all of the foregoing risks to the extent of the protection afforded under the standard form of insurance policies; Operator may do so and charge the Joint Account the premium that would be charged for such insurance coverage at manual rates.

Should Skelly Oil Company cease to be Operator hereunder any new Operator shall carry Workman's Compensation insurance and General Public Liability and Automobile Public Liability and Property Damage Insurance with limits above provided.

## ARTICLE 13.

Operator shall pay or cause to be paid monthly to the owners, as their respective interests may appear, all royalties, overriding royalties, payments out of production, or other amounts or charges, which may be or become payable by reason of the discovery or production of gas from the leases covering the Unitized Area.  When any Non-Operator is receiving in kind its proportionate share of the gas produced from the Unitized Area, as provided in Article 21 hereof, then such Non-Operator shall advise Operator in writing, on or before the tenth (10th) day of the month following that in which the same is sold or used off the premises, of the amount so sold or used off the premises and the price received therefor.

If any delay drilling rentals or shut-in gas well royalties shall become due and payable under the terms of the leases covered hereby the Operator shall at its sole cost and expense administer only those payments coming due under the leases contributed by it to the Unitized Area, and Non-Operator shall at its sole cost and expense be responsible for payment of those delay rentals and shut-in gas well royalties which become due or payable on the leases contributed by it to the Unitized Area, and no such payment shall be charged to the Joint Account; PROVIDED HOWEVER, that in the event all of the royalty owners and lease owners under the entire Unitized Area execute Skelly's form of Panola County Royalty Interest Division Order, the provisions in this numbered paragraph as to payment of shut-in gas well royalties by each party on its respective leases shall apply only until the

- 10 -

well or wells on the Unitized Area are connected to a pipe line and such division orders are executed, and thereafter as to such shut-in gas well royalties the Operator shall have charge of all that part of the leases described in "Exhibit B" covering the jointly owned acreage, and shall handle the payments thereof for the Joint Account of the parties hereto in accordance with the terms of said Royalty Interest Division Order; and shall promptly bill Non-Operator for its proportionate part of any such payment made and Non-Operator shall promptly reimburse Operator therefor.

### ARTICLE 14.

Operator agrees to advance and pay, on behalf of the respective parties hereto, all taxes, either State or Federal, owing on said leases or which may be assessed (as to the interest of each of said parties) against production of gas, whether in the form of a severance or production tax, (but in no event shall Operator be required to pay any Federal or State income taxes for any Non-Operator); and also agrees to render for assessment and pay all taxes which may be legally assessed against the leasehold estates insofar as they cover and affect the Unitized Area as to the gas and gas rights therein; and all taxes so paid shall be charged to the proper parties through the Joint Account. It is understood and agreed that each party shall always be liable for its share of any such taxes.

### ARTICLE 15.

Each party shall have, and is hereby given, a first and prior lien on the interest of each of the others in the oil, gas and mineral leases covering the Unitized Area as to gas and gas rights thereunder, all gas production therefrom, and all proceeds thereof, and in all personal property and equipment thereon or used in connection therewith, as security for the payment of any amount due by any party hereto to any other. Each party agrees and obligates itself, at any time when it shall be in arrears in payment to another party, as Operator or Non-Operator, but only in such event, to execute from time to time as requested by such other party, such instrument or instruments as may be necessary, required or desirable to give and grant to such other party, Operator or Non-Operator, to whom it may be indebted, preference and priority over third parties for the payment of any and all amounts due and owing hereunder.

- 11 -

ARTICLE 16.

1.  Any party now having or hereafter acquiring the right to drill for, produce, save and market oil, as defined herein, on any lease within the Unitized Area, shall have the full right to do so notwithstanding this Agreement; but, in exercising said right, such party shall exercise every reasonable precaution to the end that operations on the Unitized Area for production of gas will not be unreasonably disturbed or interfered with.  Likewise, operations on the Unitized Area for the production of gas shall be so conducted as not to unreasonably interfere with or disturb operations for the production of oil from the leases within the Unitized Area.

2.  Should oil be encountered in any well drilled by Operator hereunder, Operator shall be under no obligation to attempt to complete same as a well productive of oil, but shall have the right to drill such well to any depth it may see fit or to plug said well back to any depth it may see fit, without any obligation to the owner or owners of the oil rights under the lease or leases covering the tract of land upon which said well is located; and Operator shall have the right to set screen and casing in any manner it deems advisable so as to produce gas rather than oil therefrom if the production of gas may be effected thereby; provided, however, that Operator shall properly cement, seal or mud off the oil horizons in such manner as will protect the rights of the owner or owners of such oil rights.  Likewise, should gas be encountered in any well drilled on any lease covering lands within the Unitized Area by the owner or owners of the oil rights in any such lease, the owner or owners of such well shall be under no obligation to attempt to complete same as a well productive of gas but shall have the right to drill such well to any depth, or to plug such well back to any depth, that such owner or owners may desire, without any obligation to the parties owning the gas rights in the Unitized Area; and such owner or owners shall have the right to set screen and casing in any manner it deems advisable so as to produce oil rather than gas therefrom, if the production of oil may be effected thereby; provided, however, that such owner or owners shall properly cement, seal or mud off the gas horizons in such manner as will protect the interests of the owners of the gas rights.

3. Subject to the provisions of this Article 16, the owner or owners of the oil rights in any lease within the Unitized Area shall have the right to purchase any well thereafter owned by the parties owning the gas rights in the Unitized Area, which, at the completion is found to be, or which shall thereafter become, non-productive of gas in paying quantities, but productive only of oil in paying quantities; and the parties owning the gas rights in the Unitized Area shall have the right to purchase any well hereafter owned by the owner or owners of the oil rights in any lease within the Unitized Area, which at the completion is found to be, or which shall thereafter become, non-productive of oil in paying quantities, but productive only of gas in paying quantities. The well or wells as to which this right is exercised shall be transferred and conveyed upon the payment of the actual cost incidental to originally drilling, completing and equipping same from the surface to the horizon bearing the production of the purchaser (but not including any cost of said well below such depth, or of plugging back to said depth), together with the cost of the casing and other material and equipment to such depth therewith transferred and conveyed, except as hereinafter modified in Paragraph 9 of this Article 16, the same to be ascertained and statement thereof rendered. It is agreed that in determining the cost of drilling, completing and equipping any well, and in determining the cost of operating any well, there shall be included such overhead charges as are provided for in Exhibit "C".

4. Should any well drilled by Operator hereunder at the time of completion be, or thereafter become, non-productive of gas in paying quantities, but productive of oil only in paying quantities, and Operator is unable to re-complete said well as a producer of gas, or the parties hereto owning the gas rights in the Unitized Area determine not to so recomplete said well, then Operator shall immediately notify the owner or owners of the oil rights in the lease or leases covering the tract of land, on which said well is located, of the fact that such well has been completed as, or has become, productive of oil only in paying quantities, and afford such owner or owners of the oil rights the right to fully examine and test said well at its, or their own risk, cost and expense. The owner or owners of the oil rights in said lease or leases shall have ten (10) days after receipt of such notice within which to

- 13 -

notify Operator whether or not such owner or owners will be interested in
taking over said well. Upon receipt by Operator of such notice that such
owner or owners of the oil rights will be interested in taking over such well
(if they elect to do so), Operator shall, within forty-five (45) days there-
after, furnish said owner or owners of the oil rights with a complete state-
ment showing the actual cost of drilling, completing and equipping said well
to the horizon producing only oil, together with the cost of the casing and
other material and equipment to such depth; and such owner or owners of the
oil rights shall, within ten (10) days after receipt by it, or them, of such
statement of costs, definitely advise Operator whether or not such owner or
owners of the oil rights will take over said well and pay the cost as disclosed
by said statement. And, except as otherwise provided in Paragraph 9 of this
Article 16, if such owner or owners of the oil rights elects to take over said
well, then and in that event the owner or owners of said oil rights shall pay
to Operator, for the benefit of the Joint Account, the actual cost thereof as
disclosed by said statement; provided, that there shall first be credited
against the actual cost of drilling such well from the surface of the land to
the horizon producing only oil, all of the revenue received from the seven-
eighths (7/8ths) working interest (after deducting costs of operation) from
the sale of production from such well. Upon such payment to Operator, said
well, such casing and other material and equipment, and all oil production
therefrom, shall thereupon be owned by the owner or owners of the oil rights
under the leases covering the particular tract of land on which said well was
drilled. In the event such owner or owners of the oil rights does not elect
to take over said well, or, if having elected to take over said well, fails to
pay to Operator the cost thereof, as hereinabove provided, then, in either
such event, Operator shall, at the expense of the Joint Account, immediately
shut such well in and plug and abandon same, or properly shut said well in for
future deepening or plugging back for the purpose of obtaining production of
gas from a different horizon; provided, however, that in any such event all
production from such well from the date it is completed as, or thereafter
becomes, productive only of oil, to the date said well was shut in, shall be-
long to the Joint Account; and all royalties, overriding royalties, payments
out of production, and other payments provided for in the original lease or

- 14 -

leases and any other instrument affecting said lease or leases shall be paid on such production in accordance therewith by Operator for the Joint Account.

5. Should any well drilled for oil on any tract of land within the Unitized Area by the owner or owners of the oil rights under any lease or leases covering such tract, be at the time of completion, or thereafter become, non-productive of oil in paying quantities, but productive of gas only in paying quantities, then the same terms and provisions with respect to the giving of notice, the right to make tests, the giving of a complete statement showing the actual cost of drilling, completing and equipping said well, and the right to take over such well and amount to be paid therefor, shall apply as in Paragraph 4 of this Article 16; it being intended that the owner or owners of the oil rights in the situation provided in this paragraph shall have the same duties and rights as are provided for Operator in Paragraph 4 of this Article 16, and that the owner or owners of the gas rights shall have the same rights and duties as are given the owner or owners of the oil rights in said Paragraph 4. The provisions of said Paragraph 4, insofar as applicable, are hereby adopted as a part of this Paragraph 5 the same as if reiterated herein. In addition to such rights and duties as are set forth in said Paragraph 4, Operator shall immediately, upon receipt of the first notice provided herein to be given it by the owner or owners of the oil rights, notify each Non-Operator thereof. Operator further agrees, if it is decided that said parties are interested in taking over said well, it will, immediately upon receipt of the statement of costs as aforesaid, furnish each Non-Operator with a copy thereof.

6. Should any well drilled by Operator hereunder produce both oil and gas from the same horizon in paying quantities, the owner or owners of the oil rights in the lease or leases covering the tract of land on which said well is located shall have the right to take and receive at the well all of the oil produced from said well, upon payment to Operator, for the benefit of the Joint Account, of that proportion of the actual cost of drilling, completing and equipping of such well from the surface of the land to the horizon in which said well is so completed and producing both oil and gas (which cost shall not include any cost for drilling below such horizon or of plugging back to such horizon), together with the cost of the casing and other material and equipment to such depth, which the market value at the well of such oil production

- 15 -

bears to the total market value of the entire production from such well during a period of ninety (90) days next succeeding the date of first production of both oil and gas from such well. In determining the actual cost of drilling, completing and equipping such well, as aforesaid, there shall be credited against said actual cost all of the revenues received from the seven-eighths (7/8ths) working interest (after deducting cost of operation) from sale of the production from such well. Upon payment by such owner or owners of the oil rights to Operator, for the benefit of the Joint Account, of its or their proportionate part of the actual cost of drilling, completing and equipping said well, as aforesaid, such owner or owners of the oil rights shall thereafter be entitled to participate in the production from such well, as above provided, and shall thereafter be obligated to pay its, or their, proportionate part of the cost of operating said well for the production of both oil and gas. Such proportionate part, for any month, shall be that proportion of the total cost of operating said well for such month which the value of the oil production for such month bears to the entire value of the production for such month. The right of the owner or owners of the oil rights in such lease to participate in the production from said well, as hereinabove provided, shall be exercised within thirty (30) days after receipt of notice from Operator, setting forth the cost of drilling, completing and equipping such well, as aforesaid, and the average daily production therefrom for the first ninety (90) days that both oil and gas have been produced therefrom, said notice to be given within five (5) days after the expiration of said ninety (90) day period. Unless the option so granted to the owner or owners of said oil rights shall be exercised within the aforesaid period, Operator shall have the right to produce oil therefrom and dispose of same, free of any claim of such owner or owners of the oil rights, until such time as the option to participate in the production from such well is exercised, as hereinafter provided; and, all royalties, overriding royalties and/or payments out of production, provided for in the original lease or leases and any other instrument affecting said lease or leases, shall be paid on such production by the parties owning the the gas rights in said well. In the event such owner or owners of the oil rights should not elect to participate in the production from said well, within the time and in the manner hereinabove specifically provided, such owner or

- 16 -

owners shall, nevertheless, have the right at any time thereafter to partic-
ipate in the production from such well by notifying Operator of the desire of
such owner or owners to so participate in such production and by paying Oper-
ator, for the benefit of the Joint Account, within ten (10) days from the date
it so notified Operator, that proportion of the actual cost of drilling, com-
pleting and equipping such well and the cost of the casing and other material
and equipment, as aforesaid, which the market value at the well of said oil
production bears to the total market value of the entire production from said
well during the period of ninety (90) days next succeeding the date of first
production of both oil and gas from such well, as above provided, but without
any deduction or credit for revenues received by these parties from the sale
of production from said well.  Upon such payment to Operator, for the benefit
of the Joint Account, such owner or owners of the oil rights shall thereupon
participate in the production of such well as hereinabove provided, and shall
thereafter be obligated to pay its, or their, proportionate part of the cost
of operating such well for the production of oil and gas.

7.  Should any well drilled by the owner, or owners, of the oil
rights under any lease or leases covering any tract of land within the Unit-
ized Area, produce both oil and gas from the same horizon in paying quantities,
then the same terms and provisions with respect to the rights and duties of
the parties owning the gas rights in the Unitized Area and with respect to the
rights and duties of the owners of the oil rights, under the tract of land
upon which such well is completed, shall apply as in Paragraph 6 of this Art-
icle 16; it being intended that the owner or owners of the oil rights in the
situation provided in this paragraph shall have the same duties and rights as
are provided for Operator in Paragraph 6 of this Article 16, and that the owner
or owners of the gas rights shall have the same rights and duties as are given
the owner or owners of the oil rights in said Paragraph 6.  The provisions of
said Paragraph 6, insofar as applicable, are hereby adopted as a part of this
Paragraph 7 the same as if reiterated herein.

8.  Any well which may be jointly owned, as hereinabove provided
in Paragraph 6 or Paragraph 7 of this Article 16, which is a gas well defined
in Article 1 hereof, shall at all times be under the control and supervision
of Operator; and the owner or owners of the oil rights shall not, without the

- 17 -

consent of Operator, change or alter the equipment and operation of said well. The obligation of Operator in such case shall be to separate the oil from the gas at the mouth of the well and deliver the oil to the owner or owners of the oil rights at the separator. As to any such jointly owned well which is an oil well, as defined in Article 1 hereof, control shall be vested in the owner or owners of the oil rights in the lease or leases covering the particular tract on which such well is drilled. In such case, the obligation of such owner or owners of the oil rights shall be to separate the gas from the oil at the mouth of the well and deliver such gas to Operator for the benefit of the party or parties owning the gas rights in said well, at the separator, into any pipe line to which Operator may require delivery of such gas; provided that there shall be no liability on such owner or owners of the oil rights for inability to deliver gas, if the pressure in any such pipe line, into which Operator has required the delivery of the gas, is such as to interfere with such delivery.

9. When the right to purchase and take over a well under the provisions of this Article 16 arises after six (6) months from the time the well is completed, as, for instance, when a well has produced one product, but, by being drilled deeper, plugged back or from some other cause, begins to produce the other product, then, and in that event, the party or parties having the right to purchase such well shall (if said right is exercised) pay a fair price for the casing and other equipment in and on the well, based on the fair value of same as secondhand equipment, and shall pay the actual cost of originally drilling said well from the surface to the horizon bearing the production of such purchasing party or parties, but without any deductions or credits for revenues received by the selling party or parties from the sale of production from such well; and, upon such payment to the selling party or parties, the purchasing party or parties shall thereafter own such well, the casing and other material and equipment therein and thereon and all production therefrom.

10. Should all of the parties owning the gas rights under the Unitized Area mutually agree to the abandonment of any well owned by them, then, and in that event, such owners of such gas rights shall first give the owner or owners of the oil rights in the lease or leases covering the particular

tract of land on which such well was drilled the same notice and opportunity of purchasing and taking over said well, as provided in Paragraph 4 of this Article 16, with respect to a well which produces oil only; but the price to be paid for such well shall be the fair salvage value of said well, and any casing or other material and equipment therein and thereon, but without any deductions or credits for revenues received from the sale of production therefrom.  In the event any such well is taken over by the owner or owners of the oil rights, in accordance with the provisions hereof, then, from and after the date said well is so taken over, the parties owning the gas rights shall be relieved of any further responsibility or liability in connection with such well and for the plugging thereof, unless and until such well becomes productive of gas and the parties owning the gas rights take such well over in accordance with any of the provisions of this Article 16.

11. Should the owner or owners of the oil rights under any lease or leases covering any tract of land within the Unitized Area decide to abandon any well owned by it, such owner or owners of the oil rights shall give the parties owning the gas rights the same notice and opportunity of purchasing and taking over of said well, as provided in Paragraph 5 of this Article 16, with respect to a well which produces gas only; but the price to be paid for such well shall be the fair salvage value of such well, including any casing or other material and equipment in and on such well, but without any deductions or credits for revenues received from the sale of production therefrom. In the event any such well is taken over by the parties owning the gas rights, in accordance with the provisions hereof, then, from and after the date said well is so taken over, such owner or owners of the oil rights shall be relieved from any further responsibility or liability in connection with such well and for the plugging thereof, unless and until such well becomes productive of oil and the parties owning the oil rights take such well over, in accordance with any of the provisions of this Article 16.

12. It is intended that the reciprocal rights, of the owner or owners of the oil rights and the parties owning the gas rights (as hereinabove set out in Article 16), to take over a well, producing only the product owned by such owner or owners of the oil rights, or the parties owning the gas rights, respectively, and to receive its, or their, part of the production from wells

producing both oil and gas from the same horizon, or to take over any well or wells (as provided in Paragraphs 10 and 11 of this Article 16) in accordance with the provisions of this Article 16, shall apply not only at the time of the completion of any well, but throughout the life of this agreement. If any well is taken over under the terms and provisions of any paragraph of this Article 16, and thereafter the character of said well changes so as to cause such well to come within the contemplation of any other paragraph of this Article, then all of the terms and provisions of such latter paragraph shall become operative as to such well and the production therefrom, and the rights of the parties shall be governed and controlled accordingly.  In determining whether or not a well comes within the contemplation of any of said paragraphs of this Article, the character of said well shall be determined by a ninety (90) day test.  Each of the parties hereto shall have the right and privilege at any time, and from time to time, to make, or cause to be made, production and gas-oil ratio tests on any and all wells drilled on the Unitized Area, as well as the right to adequate samples of the production therefrom, for the purpose of establishing the character of such well or wells, and in order to determine which terms and provisions, if any, of this Article are applicable thereto.

### ARTICLE 17.

If, in the opinion of any party hereto, any well drilled hereunder by Operator for the Joint Account is at the time of completion or thereafter becomes, incapable of producing gas in paying quantities, and such party desires to plug and abandon such well, then the party, so desiring to plug and abandon same, shall advise the other parties in writing that it desires to so plug and abandon such well.  If the parties owning the gas rights mutually agree to plug and abandon such well, then Operator shall, if the owner or owners of the oil rights under the lease or leases covering the tract of land on which said well is located do not take said well over in accordance with the provisions of Paragraph 10 of Article 16 hereof, plug and abandon same at the joint expense of the parties hereto.  However, if any one or more of the parties owning the gas rights desires not to plug and abandon said well, but desires to take said well over in its then condition for the purpose of deepening or plugging same back or making additional tests thereof, then the party

- 20 -

or parties desiring so to do, shall have the right, if exercised within forty-eight (48) hours from receipt of said notice from such other party that it desires to plug and abandon same, to, at its sole cost, expense and liability, take over such well in its then condition and to deepen or plug back same or make additional tests thereof; and Operator shall thereupon relinquish possession of such well to such party or parties, and thereupon Operator shall be relieved of any and all future liabilities in connection therewith. Such party or parties so taking over said well shall hold Operator harmless from any and all claims arising from said operations of said well incurred subsequent to the time possession of said well was assumed by such party or parties. In the event the party or parties, who was notified by another party that it desires to plug and abandon such well, fails to give notice within said forty-eight (48) hour period, to the party desiring to abandon said well, that it desires to take over such well, Operator shall give the owner or owners of the oil rights under the lease or leases covering the tract on which said well is located the notice and opportunity of purchasing and taking over said well as provided in Paragraph 10 of Article 16 hereof; and in the event such owner or owners of such oil rights do not elect to take such well over, or fail to do so, as provided in said Paragraph 10, then, and in that event, Operator shall thereafter have the right to proceed with the plugging and abandoning operations.

It is understood and agreed that Operator assumes no obligation to deliver any such well to any party hereto desiring to take over said well, in any particular condition; nor does Operator assume any obligation, under the conditions herein set forth, to install any material or equipment in, upon or about said well at the time the same shall be delivered to the party or parties taking same over, but such party or parties shall have the right, at reasonable rates, to rent any material or equipment of Operator at the location, which such party or parties may require. All costs, expenses and liabilities incurred from and after the time such party takes over said well and assumes possession thereof shall be borne exclusively by the party or parties taking said well over. However, should the party or parties taking such well over, after assuming possession thereof, complete same as a producer of gas in paying quantities, the operation of each well shall thereupon immediately be taken

over by Operator; and Operator shall operate such well at the expense of the party or parties who took over such well, but the party or parties who took over such well shall own the equipment placed therein and thereon by said party or parties, and the production therefrom, until said party or parties shall have received, out of such production, after deducting royalties and operating expenses, an amount equal to triple the sum expended by such party or parties in such additional operations on said well; provided, however, that the party or parties taking such well over shall not have the right to complete such well (if classified as a gas well as defined in Article 1 hereof) as a producer of gas in any formation from which any other well, so classified as a gas well hereunder, on the Unitized Area is completed capable of producing gas in paying quantities. After the party or parties taking such well over has received out of production the sum above mentioned, such well, the equipment therein and thereon, and the production therefrom, shall be owned by all parties owning the gas rights in the same proportions, and in the same manner, as provided in Article 2 hereof, the same as if said well had been drilled and completed for the Joint Account; and all further operations in connection therewith shall be conducted by Operator under and pursuant to the terms hereof. If, however, such well fails to produce gas in paying quantities, but produces oil only in paying quantities, or is completed as a dry hole, the party or parties taking over such well shall not be entitled to any credits or reimbursements from the other party or parties, or from the Joint Account, in connection with such well; and such party or parties shall tender such well to the party or parties owning the oil rights under the lease or leases covering the tract of land on which said well is located, in accordance with the provisions of Article 16 hereof. If such owner or owners of the oil rights do not take said well over, then the party or parties taking such well over shall plug and abandon same at its sole cost and expense.

The foregoing provisions shall be available to any of the parties owning the gas rights in the event the well is drilled by one of such parties to a specified depth and such party intends to abandon the same and the other party or parties desire to take over said well for the purpose of deepening or plugging back same, or making additional and further tests thereof. The foregoing provisions shall also be available to any of the parties owning the

gas rights, in the event any well has been completed as a producer of gas in paying quantities and thereafter is deemed incapable of further production of gas in paying quantities, or is completed as a dry hole, and the party owning said well intends to abandon same, and the other party or parties desire to take said well over for the purpose of deepening or plugging same back or making additional tests thereof.

## ARTICLE 18.

1.  In the event any well or wells producing gas only is tendered to the owners of the gas rights, by the owner or owners of the oil rights, as provided in Paragraph 5 of Article 16 hereof, and one or more of the parties owning the gas rights does not desire to take said well over, and one or more of the other parties owning the gas rights does desire to take said well over, then the party or parties so desiring to take said well over shall have the right to do so at its or their sole cost and expense; but the operation of such well shall thereupon immediately be taken over by Operator, and Operator shall operate such well at the expense of the party or parties taking over such well. The party or parties so taking over such well shall own the well and equipment and material transferred therewith and all equipment and material placed therein and thereon by said party or parties and the production therefrom, until said party or parties shall have received out of the production, after deducting royalties and operating expenses, an amount equal to double the sum expended by such party in acquiring and equipping such well. Provided, however, no party, without the mutual consent of all parties owning the gas rights in the Unitized Area, shall have the right to take over any well (if classified as a gas well as defined in Article 1 hereof) completed in, or thereafter to complete same as a producer of gas in, any formation from which any other well, so classified as a gas well hereunder, on the Unitized Area, is completed capable of producing gas in paying quantities. After the party or parties taking over such well has received out of production the sum above mentioned, such well, the equipment therein and thereon and the production therefrom, shall be owned by all parties owning the gas rights, in the same proportions and in the same manner as provided in Article 2 hereof, the same as if said well had been drilled and completed for the Joint Account of these parties; and all further operations in connection therewith shall be conducted by Operator under and pursuant to the terms hereof.

2.  In the event any well drilled by the owner or owners of the oil
rights under any lease or leases covering any tract of land within the Unit-
ized Area produces both oil and gas, and thereupon becomes subject to the pro-
visions of Article 16 hereof, entitling the parties owning the gas rights to
take the gas production from such well, and one or more of such parties de-
sires not to participate in the production from such well, but the other party
or parties desires to participate in such production, then, and in that event,
the party or parties so desiring to participate in such production shall there-
upon, at its or their, sole cost and expense, pay to the party or parties
owning the oil rights the amount provided in Article 16 hereof; and Oper-
ator shall take and receive such gas at the expense of the party or parties
desiring to receive such production.  Further, if said well comes within the
classification of a gas well as defined in Article 1 hereof, Operator shall
take over the operation of such well; and said well shall be operated at the
expense of the party or parties desiring to receive such gas production, and
such owner or owners of said oil rights, until such time as such party or
parties have received out of production, after deducting royalties and oper-
ating expenses applicable to the gas production, an amount equal to double
the sum paid by such party or parties to the owner or owners of the oil rights
in order to receive the gas production from such well.  Thereafter the pro-
portionate interest in said well, the equipment therein and thereon, appli-
cable to the gas and gas rights, and all of the gas production therefrom, shall
be owned by all parties owning the gas rights, in the same proportions and in
the same manner as provided in Article 2 hereof; and all further operations
in connection therewith shall be conducted by Operator, under and pursuant
to the terms hereof, for the Joint Account.

### ARTICLE 19.

Operator shall properly plug all wells which may be abandoned by it
hereunder and the cost thereof shall be charged to the Joint Account.  No well,
on the Unitized Area, which is productive of gas, shall be abandoned except
with the consent of all parties hereof; provided, however, that if any Non-
Operator does not notify Operator of its approval or disapproval of the abandon-
ment of any such well within thirty (30) days after receipt of notice from
Operator of Operator's intention to abandon such well, such Non-Operator shall
be deemed to have consented to such abandonment.

- 24 -

## ARTICLE 20.

If, while this agreement is in force, any party owning the gas rights desires to drill a well on the Unitized Area for gas, the party desiring to drill such well shall so notify the other parties in writing of the proposed location thereof and the estimated depth and cost thereof. Within thirty (30) days from receipt of such notice, the parties so notified shall advise the party giving such notice whether or not the notified parties desire to join in the cost of drilling such well; and, if the notified parties inform the party giving such notice that they desire to join in the cost thereof, then Operator shall drill said well for the Joint Account. Failure of any notified party to reply to the party so giving notice that it desires to drill such well, within said thirty (30) day period, shall be construed as an election on the part of such party so notified not to share in the cost thereof; and the party or parties desiring to drill such well may drill same at its or their own cost, expense and liability. In the event such well produces gas in paying quantities, the operation of such well shall thereupon be immediate-ly taken over by Operator and Operator shall operate such well at the expense of the party or parties drilling same; but the party or parties so drilling such well shall own the equipment therein and thereon and the production therefrom until such party or parties shall have received, out of such pro-duction, an amount equal to double the sum spent by such party or parties in drilling, completing and equipping such well, after first deducting royalties and operating expenses, provided, however, the party or parties drilling such well shall not have the right to complete same as a producer of gas (if class-ified as a gas well as defined in Article 1 hereof) in any formation from which any other well, so classified as a gas well, on the Unitized Area is completed, capable of producing gas in paying quantities. After the party or parties drilling such well has received, out of production, the aforesaid amount, the well, the equipment therein and thereon and the production therefrom, shall be owned by these parties in the same proportions and under the same conditions as provided in Article 2 hereof, the same as if said well had been drilled for the Joint Account. Further operations in connection therewith shall be con-ducted by Operator under and pursuant to the terms hereof. If such well fails to produce gas in paying quantities, but produces oil only in paying quantities,

- 25 -

or is completed as a dry hole, the party or parties drilling such well shall
not be entitled to any credits or reimbursements from the other party or parties,
or from the Joint Account, in connection with such well; and such party shall
tender such well to the party or parties owning the oil rights under the lease
or leases covering the tract of land on which said well is located, in accord-
ance with the provisions of Article 16 hereof.  Provided, however, any amount
paid by the owner or owners of the oil rights, on the taking over of such well,
shall belong to the party drilling such well, and shall not be for the benefit
of the Joint Account.  If such owner or owners of the oil rights does not take
said well over, then the party or parties drilling said well shall plug and
abandon same at its or their sole cost and expense.  The provisions of this
Article 20, insofar as the same relate to Operator, shall not apply to any
well or wells Operator is obligated to drill for the Joint Account.

ARTICLE 21.

Each party hereto shall always have the right and privilege, sub-
ject to the further provisions hereof, to take in kind its proportionate share
of the gas produced and saved from the Unitized Area by Operator; but, in such
event, any Non-Operator, if so electing to take and receive its proportionate
share thereof in kind, shall give Operator at least sixty (60) days advance
written notice of the time it desires to receive its proportionate share of
such gas so produced and saved from the Unitized Area; and it shall, at its
sole cost and expense, provide adequate facilities for receiving its propor-
tionate share of such gas so produced and saved, and shall bear and pay any
extra expense incurred by Operator in delivering same separately to such Non-
Operator.  Provided, however, in the event any Non-Operator so elects to take
and receive its proportionate share of said gas in kind, it shall thereafter,
during the entire period that Operator may be selling its proportionate share
of said gas, separately, under any contract or arrangement, be obligated to
take and receive, currently as produced, its entire proportionate share of all
of the gas produced and saved by Operator from said Unitized Area.

If at any time Operator desires to enter into any contract, or
other arrangement for the sale of the gas produced and saved by Operator from
the Unitized Area, for a period of more than thirty (30) days, and which does
not provide for its cancellation on not more than thirty (30) days notice,

- 26 -

Operator shall notify each Non-Operator that it desires to enter into such contract or arrangement; and it shall simultaneously therewith furnish each Non-Operator with full information concerning all the terms and conditions under which such sale is to be made. Each Non-Operator shall have thirty (30) days from the date of said notice within which to notify Operator whether or not it desires to join in said contract or other arrangement for the sale of said gas. In the event any Non-Operator notifies Operator within said thirty (30) day period that it desires to join in said contract or arrangement, Operator shall enter into said contract or arrangement for the joint benefit of itself and such Non-Operator or Non-Operators so giving said notice; and Operator shall thereupon have the full power and right to execute and deliver any such contract, or make any such arrangement, in its capacity as Operator, without the necessity of any formal joinder therein by such Non-Operator or Non-Operators, thereby binding such party or parties on such contract or arrangement. In the event any Non-Operator refuses to consent to any such contract or arrangement, or fails to notify Operator within said thirty (30) day period that it desires to join in said contract or arrangement, Operator may, if it elects to do so, require such Non-Operator to take in kind all of its proportionate share of the gas produced and saved by Operator from said Unitized Area. If Operator elects to require such Non-Operator to take in kind its said proportionate share of such gas, it shall, not later than ten (10) days after expiration of said thirty (30) day period, notify such Non-Operator that it desires it to take its proportionate share of such gas in kind; and, in the event such Non-Operator fails to do so, within sixty (60) days after being so notified by Operator, or to furnish, within said sixty (60) day period, at its own cost and expense, adequate facilities for receiving same, or, after furnishing such facilities, fails or refuses to commence receiving its entire proportion thereof that may be produced and saved by Operator, within said sixty (60) days after it is so notified by Operator, or, after commencing receiving same, fails or refuses to continue to receive same, then, and in any such event, Operator shall have, and is hereby given, the power and right, and it shall be obligated to sell such Non-Operator's proportionate share of said gas, or any portion thereof not being received in kind by such Non-Operator then or thereafter, (the obligation to sell any Non-

Operator's share being limited to the ability of Operator, by use of reasonable diligence, to secure a market therefor, and to a prior right in Operator to market jointly owned gas), along with Operator's proportionate share thereof, under any contract or arrangement Operator may deem advisable. And thereafter such Non-Operator shall not have the right to take its proportionate share of said gas (or portion thereof so included by Operator under any such contract or arrangement) in kind, until the termination or cancellation of any such contract or arrangement for the sale of said gas; and this power and right of Operator shall be a continuing and recurring power and right throughout the life of this agreement, as long as, and whenever, any Non-Operator is not taking its proportionate share of said gas, or any part thereof, in kind.

Operator shall have, and is hereby given, the power and right, without the further consent of any Non-Operator, to sell such Non-Operator's proportionate share (or such portion thereof not then being received in kind by such Non-Operator as hereinabove provided) of the gas produced and saved from the Unitized Area under any contract or arrangement cancelable on not more than thirty (30) days notice, along with Operator's share thereof, while such gas is not being sold under any contract or other arrangement as above provided, until such time as such Non Operator elects to receive its proportionate part thereof in kind, and furnishes, at its sole cost and expense, adequate facilities for receiving same in kind.

ARTICLE 22.

No assignment, judicial sale, mortgage or transfer affecting the gas rights under the leases covering the Unitized Area, the gas production therefrom or the gas equipment thereon, shall be made, unless the same shall cover the entire undivided interest of the Assignor, Mortgagor or Seller in the gas rights under all of said leases within the Unitized Area, the gas production from said leases and the gas equipment thereon. In the event any party desires to sell all of its interest in the gas rights in the leases embraced in the Unitized Area, together with the gas production therefrom and the equipment thereon used in producing such gas, the other parties, if they desire to do so, shall have a preferential right to purchase the same. In such event, the party desiring to sell shall promptly communicate to the other parties the offer received by such party from a purchaser ready, able and willing to pur-

- 28 -

chase same, together with the name and address of such prospective purchaser; and the other parties hereto shall thereupon have an option, for a period of ten (10) days after receipt of said notice, to purchase such party's interest on like terms.   Provided, however, the preferential right or rights to purchase given in this Article shall not apply where any party desires to mortgage its interest or to dispose of its interest to a subsidiary or affiliate of such party by merger, reorganization, consolidation or sale of all of such party's assets.

ARTICLE 23.

In the event it is determined, by title examination or otherwise, that the leases described on Exhibit "A", and shown thereon as owned by the respective parties, or any of them, do not cover the entire oil, gas and other minerals and mineral rights in the respective tracts of land described on Exhibit "B", as stated in the first paragraph of the preamble of this agreement, or in the event title to said leases, or any part of them, should fail in whole or in part or said leases should terminate for any reason whatsoever, then, and in any such event, the party who is shown in said preamble as having a lease covering said interest shall have the preferential right for a period of six (6) months from the date of this agreement within which to acquire a lease, renewal, ratification or co-lessor's agreement, covering such interest; and all of the provisions hereof shall thereupon apply to such new lease or renewal lease with the same force and effect as though said new lease, renewal lease or additional acquired interest had been originally described in, and included as, one of the leases originally subject to this agreement.

ARTICLE 24.

Non-Operators shall, without limitation of any rights and privileges herein granted, have the following specific rights and privileges:

    (a)  Access to the Unitized Area at all reasonable times to inspect the work of development and operation for gas.

    (b)  The right to inspect logs, samples and cuttings from any and all wells drilled by Operator hereunder; and, in this connection, Operator agrees to keep accurate logs of all wells drilled by Operator on said Unitized Area, and, upon request, Non-Operators shall be furnished with copies of all such logs and any other information pertaining to the drilling of any well for gas; and when gas bearing sand is encountered, Non-Operators shall be given the opportunity to have a representative present to witness any test made thereof.  Non-Operators shall,

- 29 -

likewise, upon request, be furnished with reasonable
amount of samples and cuttings from any well drilled
for gas that Operator may have in its possession at
the time such request is made.

(c) The right to inspect and audit, at all reasonable times,
the books of Operator and its records and invoices per-
taining to the matter of accounting arising hereunder.
Provided, however, such right of inspection and audit-
ing is hereby limited to a period of two (2) years
next preceding the time the party elects to make such
inspection and auditing.

Any and all rights, powers and privileges granted to Non-Operators
in this Article 24 shall (but not by way of limitation) be available to any
party, insofar as said rights, powers and privileges are applicable, in con-
nection with all transactions carried on under this agreement by any party
independent of the Joint Account.

ARTICLE 25.

It is not the intention of this agreement to create the relationship
of partnership between or among the parties hereto; and no act done by any
party pursuant to the provisions hereof shall operate to create such relation-
ship; nor shall the provisions of this agreement be construed as creating such
relationship. The liability of the parties hereto shall be several, and not
joint or collective, and each party shall be responsible only for its obli-
gations as herein set forth, and shall be liable only for its proportionate
share of the costs, expenses and liabilities incurred in developing, oper-
ating, saving and marketing of gas from the leases covering the Unitized Area
subject to this agreement.

ARTICLE 26.

All of the terms and provisions of this agreement are hereby ex-
pressly made subject to all Federal and State laws and to all valid orders,
rules and regulations of any duly constituted authority having jurisdiction
in the premises; and they are also subject to acts of God, inability to ob-
tain material and equipment, strikes, riots and other matters beyond the con-
trol of any of the parties hereto, whether similar or dissimilar. And Oper-
ator shall not be liable to Non-Operators for failure to perform, or delay in
performance of, any of the terms and provisions hereof if such failure or de-
lay is the result of any such cause. Operator shall prepare and furnish to
any such duly constituted authority, through its proper agency or department,

- 30 -

any and all reports, statements and information that may be requested, when such reports are required to be furnished.

## ARTICLE 27.

All notices to be given hereunder shall be given by letters or telegrams, addressed to each of the parties at the respective addresses set forth below, or at such other addresses as they, or any of them, may hereafter designate by letter or telegram given to each of the other parties:

```
Shelly Oil Company, P. O. Box 1650, Tulsa, Oklahoma
The Chicago Corporation, P. O. Box 1702, Corpus Christi, Texas
Clyde H. Alexander, c/o Creslenn Oil Company, Corsicana, Texas
W. C. Feazel, Commercial National Bank Building, Shreveport, Louisiana
M. V. Kinsey, P. O. Box 666, Carthage, Texas
Delta Drilling Company, P. O. Box 2012, Tyler, Texas
S. Sklar, Trustee, 2900 Mansfield Road, Shreveport, Louisiana
```

## ARTICLE 28.

This agreement shall remain in full force and effect during the life of the leases now subject hereto and any additional leases that may become subject hereto, or any renewals or extensions of any of such leases; and thereafter, until all materials, equipment, supplies and properties have been salvaged and disposed of and a final settlement between or among the parties hereto has been made.

## ARTICLE 29.

The terms, conditions and provisions of this agreement shall extend to and be binding upon and inure to the benefit of the respective parties hereto, their heirs, successors and assigns; and this agreement shall constitute a covenant running with the leases and lands covered hereby. Except however, as to the heirs, successors and assigns, as aforesaid, and except as otherwise specifically provided in this contract, the parties hereto mutually agree that this contract is not made, or intended to be, for the benefit of any third parties; and they shall receive no rights herein or hereunder.

- 31 -

IN WITNESS WHEREOF, the parties hereto have executed this agreement on this the ___10th___ day of ___January___, A. D. 1948___.

ATTEST:

SKELLY OIL COMPANY

By _Arch H. Hyden_
      Vice-President

ATTEST:

THE CHICAGO CORPORATION

By _____ (H K Greenleaf)
      Vice-President

_____
Assistant Secretary
      (D. B. McNamara)

Clyde H. Alexander

_____
W. C. Feazel

_____
N. W. Kinsey

ATTEST:

DELTA DRILLING COMPANY

J. M. Bevill

By _____ (J Zeppa)
      President

_____
Secretary

_____
S. Sklar, Trustee

APPROVED AS
TO FORM

THE STATE OF OKLAHOMA  §

COUNTY  OF  TULSA  §


BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared _Arch N. Ryder_ known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said SKELLY OIL COMPANY, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office this the 14th day of _January_ A. D., 1948 .

My Commission Expires Feb. 8, 195_

_Walt J. Buchanan_
Notary Public in and for Tulsa County, Oklahoma


THE STATE OF _Texas_  §

COUNTY  OF _Nueces_  §


BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared H. P. Greenleaf, Vice-President of THE CHICAGO CORPORATION, a corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same as the act and deed of said corporation for the purposes and consideration therein expressed and in the capacity therein stated.

Given under my hand and seal of office, on this the 10 day of _January_ , A. D. 1948 .

_Dorothy Clifton_
Notary Public in and for Nueces
DOROTHY CLIFTON
Notary Public in and for Nueces County, Texas
My Commission Expires June 1, 1949


THE STATE OF _Texas_  §

COUNTY  OF _Dallas_  §


BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared Clyde H. Alexander, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, on this the 12th day of _January_ , A. D. 1948 .

MAYME PATERNOSTRO

_Mayme Paternostro_
Notary Public in and for _Dallas_
_County, Texas_

THE STATE OF _La_     ◊
COUNTY OF _Caddo_     ◊

    BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared W. C. Feazel, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

    Given under my hand and seal of office, on this the _17_ day of _January_, A. D. 1948.

                       ( J. Earl Downs )

                       Notary Public in and for _Caddo Parish_
                       ~~County~~, _Louisiana_

THE STATE OF _Louisiana_ ◊
_Parish_
~~COUNTY~~ OF _Caddo_     ◊

    BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared N. V. Kinsey, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

    Given under my hand and seal of office, on this the _17_ day of _Jarry_, A. D. 1948.

          ( R.J.Beck )

                       Notary Public in and for. _Caddo_
                       ~~County~~ _Parrish, Louisiana_

THE STATE OF TEXAS     ◊
COUNTY OF SMITH     ◊

    BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared _____, President of DELTA DRILLING COMPANY, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of the said DELTA DRILLING COMPANY, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed and in the capacity therein stated.

    Given under my hand and seal of office, this the _14th_ day of _January_, A. D., 1948.

                           ( Joan Faris )
                       Notary Public in and for Smith County, Texas

THE STATE OF LOUISIANA     ◊
PARISH OF CADDO     ◊

    BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared S. Sklar, Trustee, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

    Given under my hand and seal of office, on this the _15_ day of _January_, A. D. 1948.

                          ( P.R.Walker )
                       Notary Public in and for Caddo Parish, Louisiana

EXHIBIT "A"

DESCRIPTION OF LEASES

SKELLY OIL COMPANY – THE CHICAGO CORPORATION –
CLYDE H. ALEXANDER – W. C. FEAZEL – N. V. KINSEY –
DELTA DRILLING COMPANY  AND  S. SKLAR, TRUSTEE
OPERATING AGREEMENT

– – – – – – – – – – – – – – – – – – – – – – – – – –

The following described Oil, Gas and Mineral Leases owned by:

(A) SKELLY OIL COMPANY:

1.  Lease dated March 10, 1944, made by Louis Werner Saw Mill
Company, as lessor, to Skelly Oil Company, as lessee, which
lease is recorded in Vol. 164, Page 1 of the Deed Records
of Panola County, Texas, to which reference is hereby made
for all purposes.

2.  Lease dated September 3, 1947, made by Joyce LaGrone and Ethel
LaGrone, his wife, as lessors, to Skelly Oil Company, as
lessee, which lease is recorded in Vol. 246, Page 574 of the
Deed Records of Panola County, Texas, to which reference is
hereby made for all purposes.

3.  Lease dated August 21, 1947, made by Hezekiah Ragler and wife,
Lillie Cole Ragler; Homer Ragler; Gerutha Ragler Brown and
husband, Police Brown; Effie Irene Cole Sims and husband,
Henry Sims; Morgan Ragler and Mattie Ragler, a single woman,
as lessors, to Skelly Oil Company, as lessee, which lease is
recorded in Vol. 249, Page 124 of the Deed Records of Panola
County, Texas, to which reference is hereby made for all
purposes.

4.  Lease dated October 6, 1947, made by Cornelius (Son) Cole,
Sr., Guardian of the persons and estates of Cornelius Cole,
Jr. and Alice Neal Cole, Minors, as lessor, to Skelly Oil
Company, as lessee, which lease is recorded in Vol. 248,
Page 162 of the Deed Records of Panola County, Texas, to
which reference is hereby made for all purposes.

5.  Lease dated November 21, 1947, made by Frances Turley;
Hazel Turley; Gladys Turley; Eda Cordell and husband, O. L.
Cordell; Elsie Vallier; Mary S. Erickson; Helen S. Erickson
Berry and husband, A. E. Berry; Beatrice C. Fall and husband,
Edward H. Fall; M. K. Cruce; Nellie K. Willis; Dan Cotter;
A. Mabel Earnheart and Juanita Faye Hannum, as lessors, to
Skelly Oil Company, as lessee, which lease was filed for
record on December 12, 1947 under Filing No. 45891 in the
Deed Records of Panola County, Texas, to which reference
is hereby made for all purposes.

6.  Lease dated November 25, 1947, made by Harold Earnheart,
as lessor, to Skelly Oil Company, as lessee, which lease
is recorded in Vol. 247, Page 311 of the Deed Records of
Panola County, Texas, to which reference is hereby made
for all purposes.

7.  Lease dated October 8, 1945, made by Nettie C. Walker;
Jessie A. Wright and Orin T. Wright, her husband, and
Harvey H. Walker and Kathleen W. Walker, his wife, as
lessors, to D. W. Hildebrand, as lessee, which lease is
recorded in Vol. 207, Page 106 of the Deed Records of
Panola County, Texas, to which reference is hereby made
for all purposes.

8. Lease dated October 8, 1945, made by A. L. Nims and Katheryn Nims, his wife, as lessors, to D. W. Hildebrand, as lessee, which lease is recorded in Vol. 207, Page 112 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

9. Lease dated November 21, 1947, made by Frances Turley; Hazel Turley; Gladys Turley; Eda Cordell and husband, O. L. Cordell; Elsie Vallier; Mary S. Erickson; Helen S. Erickson Berry and husband, A. E. Berry; Beatrice C. Fall and husband, Edward H. Fall; M. K. Cruce; Nellie K. Willis; Dan Cotter; A. Mabel Earnheart and Juanita Faye Hannum, as lessors, to Skelly Oil Company, as lessee, which lease was filed for record on December 12, 1947 under Filing No. 45889 in the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

10. Lease dated April 26, 1944, made by J. C. Guill, Sr., as lessor, to W. H. Oberthier, as lessee, which lease is recorded in Vol. 195, Page 561 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

11. Lease dated November 25, 1947, made by Harold Earnheart, as lessor, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 247, Page 307 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

12. Lease dated November 26, 1947, made by Loren E. Pryer and Agatha Pryer, his wife; Russell M. Pryer and Mildred Pryer, his wife; Margaret L. Pryer Mahaffy and Lynne M. Pryer, as lessors, to Skelly Oil Company, as lessee, which lease was filed for record on December 12, 1947 under Filing No. 45890 in the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

13. Lease dated April 6, 1944, made by J. C. Guill, Sr., a single man, as lessor, to H. W. Hull, as lessee, which lease is recorded in Vol. 174, Page 350 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

14. Lease dated September 24, 1947, made by Berna Reeves and husband, I. I. Reeves, Gifty Francis and husband, Erroll Francis; Flo Orr and husband, O. C. Orr; Necel Ragsdale and husband, Marvin Ragsdale; Ines Heflin and husband, H. H. Heflin; Versie Covey and husband, Vivian C. Covey, as lessors, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 249, Page 55 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

15. Lease dated September 5, 1947, made by William Joseph Matthews and wife, Velma Matthews, Hazel Matthews Kyle and husband, Fred Kyle; and Estelle Matthews Mullins and husband, C. B. Mullins, as lessors, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 248, Page 435 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

16. Lease dated December 31, 1947, made by Mrs. Alix Ash, a widow, as lessor, to Sid B. Turner, as lessee, which lease was filed for record on January 6th, 1948, under Filing No. 46170 in the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

17. Lease dated August 16, 1944, made by Elijah White and wife, Della White, as lessors, to W. H. Oberthier, as lessee, which lease is recorded in Vol. 201, Page 50 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

18. Lease dated February 23, 1944, made by T. L. Torrans, Jr., as lessor, to W. H. Oberthier, as lessee, which lease is recorded in Vol. 196, Page 505 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

19. Lease dated February 23, 1944, made by H. L. Lasker and A. Schnitt, as lessors, to W. H. Oberthier, as lessee, which lease is recorded in Vol. 197, Page 499 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

20. Lease dated February 23, 1944, made by Jennie Lincoln, a widow, as lessor, to H. W. Hull, as lessee, which lease is recorded in Vol. 174, Page 135 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

21. Lease dated August 8, 1946, made by Herman Jeter, as lessor, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 226, Page 240 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

22. Lease dated June 30, 1947, made by Herman Jeter, Guardian of the estates of Opal Jeter and Charlene Jeter, Minors, as lessor, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 246, Page 568 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

23. Lease dated August 30, 1947, made by Herman Jeter, Guardian of the estate of Charles Jeter, a person of unsound mind, as lessor, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 245, Page 299 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

24. Lease dated December 31, 1947, made by O. W. Alexander and wife, Cammie Alexander and Leroy Wise and wife, Odessa Wise, as lessors, to Skelly Oil Company, as lessee, which lease was filed for record on December 31, 1947, under Filing No. 46073 in the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

25. Lease dated February 18, 1944, made by S. C. Osborne and wife, Eva Furrh Osborne, as lessor, to H. W. Hull, as lessee, which lease is recorded in Vol. 167, Page 151 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

26. Lease dated February 4, 1947, made by Fred Elliott; Johnnie Elliott; Jack Elliott; Chauncey Elliott; Jennie Elliott Lincoln, a widow; Laura Elliott Buard and husband, S. B. Buard; Cora Elliott Johnson and husband, Tom Johnson; Mary Elliott Thomas, a widow, Lonie Elliott Brown and husband, Thomas Brown; and Fannie Elliott Stewart and husband, Lawrence E. Stewart, as lessors, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 242, Page 364 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

27. Lease dated December 11, 1947, made by Frances Elliott Brown, a widow, as lessor, to Skelly Oil Company, as lessee, which lease was filed for record on December 12, 1947, under Filing No. 45887 in the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

28. Lease dated June 2, 1947, made by Fred J. Hill, as lessor, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 250, Page 153 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

29. Lease dated May 30, 1944, made by Jennie Elliott Lincoln, a widow; Mary Elliott Thomas and husband, D. L. Thomas; Francis Brown and husband, Robert Brown; Laura Buard and husband, S. B. Buard; and Lonie Brown and husband, Thomas Brown, as lessor, to H. W. Hull, as lessee, which lease is recorded in Vol. 187, Page 371 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

30. Lease dated May 30, 1944, made by J. T. Johnson and wife, Cora Elliott Johnson, as lessors, to W. H. Oberthier, as lessee, which lease is of record in Vol. 187, Page 364 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

31. Lease dated February 6, 1947, made by Fred Elliott; Johnnie Elliott; Jack Elliott; Chauncey Elliott; Fannie Elliott Stewart and husband, Lawrence E. Stewart, as lessors, to Skelly Oil Company, as lessee, which lease is recorded in Vol. 242, Page 387 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

32. Lease dated July 22, 1946, made by T. L. Torrans, Jr., as lessor, to John Arather, as lessee, which lease is recorded in Vol. 223, Page 510 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

33. Any oil, gas and mineral lease (including any amendment to such lease) heretofore or hereafter to be, acquired by said SKELLY OIL COMPANY, which covers the Unitized Area, or any part thereof, described in the agreement to which this Exhibit "A" is attached as a part.

(B) THE CHICAGO CORPORATION; CLYDE H. ALEXANDER; W. C. FEAZEL AND N. V. KINSEY:

1. Lease dated April 4, 1945, made by Loran E. Pryer and Agatha Pryer, his wife; Russell M. Pryer and Mildred Pryer, his wife; Margaret L. Pryer Mahaffy and Lynne M. Pryer, as lessors, to N. V. Kinsey, as lessee, which lease is recorded in Vol. 197, Page 598 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

2. Lease dated August 8, 1945, made by J. B. Burwell, a widower, as lessor, to N. V. Kinsey, as lessee, which lease is recorded in Vol. 203, Page 89 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

3. Any oil, gas and mineral lease (including any amendment to such lease) heretofore or hereafter to be acquired by said THE CHICAGO CORPORATION; CLYDE H. ALEXANDER; W. C. FEAZEL and N. V. KINSEY, which covers the Unitized Area, or any part thereof, described in the agreement to which this Exhibit "A" is attached as a part.

(C) <u>DELTA DRILLING COMPANY AND S. SKLAR, TRUSTEE:</u>

1. Lease dated October 1, 1943, made by O. W. Alexander and wife, Cammie Alexander, and Leroy Wise and wife, Odessa Wise, as lessors, to H. R. Swetnam, as lessee, which lease is recorded in Vol. 150, Page 336 of the Deed Records of Panola County, Texas, to which reference is hereby made for all purposes.

2. Any oil, gas and mineral lease (including any amendment to such lease) heretofore or hereafter to be, acquired by said DELTA DRILLING COMPANY and S. SKLAR, TRUSTEE, which covers the Unitized Area, or any part thereof, described in the agreement to which this Exhibit "A" is attached as a part.

insofar and only insofar as the foregoing leases, or any of them, cover and affect the lands lying within and comprising a part of the Unitized Area as described in Exhibit "B", attached to and made a part of the Pooling and Operating Agreement to which this Exhibit "A" is attached and made a part; reference being hereby made to each of the above described leases and the respective records thereof for all purposes.

Mid-Continent Committee Form No. 2-B
In stock and for sale by
The OLDS PRESS, Tulsa, Okla.

**"EXHIBIT B"**

Model Form—Adopted by
Mid-Continent Oil & Gas Association
(1918)

Attached to and made a part of..............................................

Skelly Oil Company — KELLY-LINCOLN UNIT ..............................

# ACCOUNTING PROCEDURE
## (UNIT AND JOINT LEASE SCHEDULE)

The term "joint property" as herein used shall be construed to mean the subject area covered by the agreement to which this "Accounting Procedure" is attached.

The term "Operator" as herein used shall be construed to mean the party designated to conduct the development and operation of the leased premises for the joint account.

The term "Non-operator" as herein used shall be construed to mean any one or more of the non-operating parties.

Operator shall bill Non-operator on or before the last day of each month for its proportionate share of costs and expenditures during the preceding calendar month. Itemized statements shall accompany such bills. Each party shall pay its proportion of all such bills within fifteen (15) days after the receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid. Payment of any such bill shall not prejudice the right of any party to protest or question the correctness thereof; provided that Operator shall not be required to adjust any item unless a claim therefor has been presented within a period of two (2) years from the date of the rendition of any itemized statement.

## I. DEVELOPMENT AND OPERATING CHARGES

Subject to limitations hereinafter prescribed, Operator shall charge the joint account with the following items:

(1) Delay or other rentals, when such rentals are paid by Operator for the joint account; royalties, when not paid direct to royalty owners by the purchaser of the oil, gas, casinghead gas or other products.

(2) Labor, teaming and other services necessary for the development, maintenance and operation of the joint property.

(3) Materials, equipment and supplies purchased and/or furnished by Operator from its warehouse stocks or from its other leases for use on the joint property. In so far as is practical and consistent with efficient and economical operation, only such materials shall be purchased for or transferred to the joint property as are required for immediate use, and the accumulation of warehouse and/or lease stock on the joint property shall be avoided.

(4) Moving materials to the joint property from vendor's or from Operator's warehouse in the district or from other properties of Operator, but in either of the last events no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point.

(5) Moving surplus materials from the joint property to outside vendees, if sold f. o. b. destination, or minor returns to Operator's warehouse or other storage point. No charge shall be made to the joint account for moving major surplus materials to Operator's warehouse or other storage point for a distance greater than the distance to the nearest reliable supply store or railway receiving point, except by special agreement with Non-operator; and no charge shall be made to the joint account for moving materials to other properties belonging to Operator, except by special agreement with Non-operator.

(6) Use of and service by Operator's exclusively owned equipment and utilities as provided in Paragraph (6) of Section II: "Basis of Charges to Joint Account."

(7) Damages or losses incurred by fire, flood, storm or from any other cause not controllable by Operator through the exercise of reasonable diligence. Operator shall furnish Non-operator written notice of damages or losses incurred by fire, storm, flood or other natural or accidental causes as soon as practicable after report of the same has been received by Operator.

(8) Expenses of litigation, liens, judgments and liquidated claims involving the joint property or incident to its development and operation. Actual expenses incurred by Operator or Non-operator in securing evidence pertaining to the joint property shall be a proper charge against the joint account.

   (a) When any case, by prior agreement, is handled by Operator's and/or Non-operator's legal staff, thereby eliminating the retaining of outside counsel, a charge commensurate with the cost of services rendered may be made to the joint account. Charges of this nature shall not be rendered until the respective legal departments have agreed upon the proper amount.

   (b) Fees and expenses of outside attorneys shall not be charged to the joint account except where the employment of such outside attorneys is authorized by a vote of the majority interests.

(9) All taxes paid for the benefit of the parties hereto including ad valorem, property, gross production, occupation and any other taxes assessed against the jointly-owned properties, the production therefrom or the operations thereon.

(10) Insurance:

   (a) Premiums paid for insurance carried for the benefit of the joint account together with all expenditures incurred and paid in settlement of any and all losses, claims, damages, judgments and other expenses, including legal services, not recovered from insurance carrier.

   (b) If no insurance is required to be carried, all actual expenditures incurred and paid by Operator in settlement of any and all losses, claims, damages, judgments and any other expenses, including legal services, shall be charged to the joint account.

(11) District and Camp Expense:

   (a) District Expense: A proportionate share of the salaries and expenses of Operator's district superintendent and other general district employes serving the joint property whose time is not allocated directly to the joint property, and a proportionate share of the expense of maintaining and operating a district office in conducting the management of operations on the joint property and other properties in the same locality owned and operated by Operator, such charges to be apportioned to such properties served on the following basis: Per Well Basis, one drilling well equals four producing wells.

   (b) Camp Expense: The expense of providing and maintaining on or in the vicinity of the joint property all necessary camps, housing facilities for employes and boarding employes, if necessary. When properties other than the joint property are served by these facilities, then an equitable distribution of expense, including depreciation, or a fair monthly rental in lieu of the investment, maintenance and operating cost of buildings and other camp facilities, shall be prorated against all properties so served on the following basis: Per Well Basis, one drilling well equals four producing wells.

(12) Overhead charges, which shall be in lieu of any charges for any part of the compensation or salaries paid to managing officers and employes of Operator, including the division superintendent, the entire staff and expenses of the division office located at................. Carthage, Texas ..............................., any portion of the office expense of the principal business office located at ................. Tulsa, Oklahoma ..............................., but not in lieu of field office expenses incurred in operating any such properties, and such overhead charges do not include any other expenses of Operator incurred in the development and operation of said properties, and Operator shall have the right to assess against the joint property covered hereby the following overhead charges:

   (a) $ 150.00 per month for each drilling well, beginning on the date the well is spudded and terminating when it is on production or is plugged, as the case may be, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

   (b) $ 35.00 per well per month for the first five (5) producing wells.

   (c) $ 25.00 per well per month for the second five (5) producing wells.

   (d) $ 15.00 per well per month for all producing wells over ten (10).

In connection with overhead charges, the status of wells shall be as follows:

   (1) In-put or key wells shall be included in overhead schedule the same as producing oil wells.

   (2) Producing gas wells shall be included in overhead schedule the same as producing oil wells.

   (3) Wells permanently shut down but on which plugging operations are deferred, shall be dropped from overhead schedule at the time the shutdown is effected. When such wells are plugged, overhead shall be charged at the producing well rate during the time required for the plugging operation.

   (4) Wells being plugged back or drilled deeper shall be included in overhead schedule the same as drilling wells.

   (5) Wells which are shut down temporarily and later replaced on production. If and when a well is shut down (other than for proration) and not produced or worked upon for a period of a full calendar month, it shall not be included on the overhead schedule for such month.

   (6) Salt water disposal wells shall not be included in overhead schedule.

The above specific overhead rates may be amended from time to time by agreement between Operator and Non-operator if, in practice, they are found to be insufficient or excessive.

**(13) Warehouse Handling Charges:** ............................ None.
............................................................................................................................................................................
............................................................................................................................................................................

**(14)** Any other expenditure incurred by Operator for the necessary and proper development, maintenance and operation of the joint property, except that Operator shall not charge the joint account with any expenditure or contribution made by Operator towards employees' stock purchase plan, group life insurance, pension, retirement, or bonus, other than such expenditures or contributions imposed or assessed by governmental authority.

## II. BASIS OF CHARGES TO JOINT ACCOUNT

**(1)** Outside Purchases: All materials and equipment purchased and all service procured from outside sources shall be charged at their actual cost to Operator, after deducting any and all trade and/or cash discounts actually allowed off invoices, or received by Operator.

**(2)** New materials furnished by Operator (Condition "A"):
New materials transferred to the joint property from Operator's warehouse or other properties shall be priced f. o. b. the nearest supply store or railway receiving point at replacement cost of the same kind of materials. This will include large equipment such as tanks, rigs, pumps, boilers and engines. All tubular goods (2" and over) shall be charged on the basis of mill shipment or carload price. Other materials, where the replacement cost cannot be readily ascertained, may, for the purposes of consistency and convenience, be charged on the basis of a reputable supply company's preferential list price f. o. b. nearest supply store or railway receiving point to the joint property prevailing on the date of transfer of the materials to the joint property.
In determining the value of any transferred materials, all special and preferential discounts shall be allowed but the regular cash discount shall not be considered.

**(3)** Secondhand materials furnished by Operator (Conditions "B" and "C"):
   (a) Tubular goods (2" and over), fittings, machinery and other equipment which is in sound and serviceable condition at date of transfer, will be classed as condition "B" and charged at 75% of the price of new materials, in accordance with the provisions of Paragraph (2) above.
   (b) Tanks, derricks, and buildings or other equipment involving erection costs shall be charged on a basis not to exceed 75% of knocked-down new price for similar materials.
   (c) Other secondhand materials, such as units of machinery or other equipment that is serviceable, but substantially not good enough to be considered first-class secondhand material when transferred to the joint property, shall be classed as condition "C" and charged at 50% of the new price.
   (d) There may also be cases wherein some items of equipment, due to their unusual condition, should be fairly and equitably priced by Operator.

**(4)** Warranty of Materials Furnished by Operator: Operator does not warrant the materials furnished from its warehouse or other properties beyond or back of the dealer's or manufacturer's guaranty, and in case of defective materials, credit shall not be passed until adjustment has been received by Operator from the manufacturers or their agents.

**(5)** If materials required are not available in Operator's surplus stocks, Operator shall, whenever in its judgment it is practical to do so, give Non-operator opportunity of furnishing the materials required in proportion to his or its interest, provided that the same can be furnished at the time such materials are required, and further provided that any such materials so furnished shall be in condition acceptable to Operator and shall be charged to the joint account on the same terms and conditions as are provided herein to cover the furnishing of materials by Operator.

**(6)** Operator's Exclusively-owned Facilities: The following rates shall apply to service rendered to the joint property by facilities owned exclusively by Operator:
   (a) Water service, gas, teaming, power, and compressor service: All at rates currently prevailing in the field where the joint property is located.
   (b) Automotive Equipment: Rates commensurate with cost of ownership and operation and in line with schedule of rates adopted by the Petroleum Motor Transport Association as recommended uniform standardized charges against the joint account. Automotive charges will be based on use in actual service on or in connection with the joint property. Truck, tractor and pulling unit rates shall include wages and expenses of driver.
   (c) A fair rate shall be charged for the use of drilling and cleaning-out tools and any other items of Operator's fully-owned machinery or equipment which shall be ample to cover maintenance, repairs, depreciation and the service furnished the joint property. Provided, however, that such charges shall not exceed those currently prevailing in the field where the joint property is located.
   (d) Whenever requested, Operator shall inform Non-operator in advance of the rates it proposes to charge.
   (e) Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## III. DISPOSAL OF LEASE EQUIPMENT AND MATERIALS

**(1)** Materials purchased by Operator shall be credited to the joint account and included in the monthly statement of operations for the month in which the materials are removed from the joint property.

**(2)** Materials purchased by Non-operator shall be invoiced by Operator and paid for by Non-operator to Operator immediately following receipt of invoice and delivery of materials. Operator shall thereupon immediately pass credit to the joint account and include the same in the monthly statement of operations for the month in which the materials were paid for by Non-operator.

**(3)** Division of materials in kind, if made between Operator and Non-operator, shall be in proportion to their respective interests in the joint property. Each party will thereupon be charged individually with the value of the materials received or receivable and corresponding credits will be made to the joint account by Operator. and both credits shall appear in the same monthly operating statement.

**(4)** Sales to outsiders of major materials shall be made only with the consent of Non-operator as to both terms and price and where made the proceeds shall be credited by Operator to the joint account at the full amount collected from vendee. Any claims by vendee for defective materials or otherwise shall be charged back to the joint account, if and when paid by Operator.

## IV. BASIS OF PRICING MATERIALS TRANSFERRED FROM JOINT ACCOUNT

Materials and equipment purchased by either Operator or Non-operator, or divided in kind between them, unless otherwise agreed, shall be valued on the following basis of condition and price: (New price as used in the following paragraphs shall have the same meaning and application as that used above in Section II: "Basis of Charges to Joint Account.")

**(1)** New Materials: (Condition "A") being new equipment or supplies purchased or procured for the joint property but never used thereon; at 100% of current new prices.

**(2)** Good Secondhand Materials: (Condition "B") being good serviceable materials which are further usable without repair, at:
   (a) 75% of current new prices, if materials were new when originally charged to the joint property.
   (b) 75% of current new prices less depreciation consistent with their usage on and service to the joint property, if materials were originally charged to the joint property as secondhand at 75% of new prices.

**(3)** Other Used Materials: (Condition "C") being materials further usable for their original function only after repair and reconditioning; at 50% of current new prices.

**(4)** Bad Order Materials: (Condition "D") being materials not further usable for their original function but for possible other service; at 25% of current new prices.

**(5)** Junk: (Condition "E") being obsolete and unserviceable materials; at prevailing junk prices in the district. Where practicable, junk should be disposed of at the joint property.

**(6)** Temporarily Used Materials: When the use of certain items of equipment on the joint property has been only temporary, and the time of actual use thereon does not justify the deduction of depreciation as listed in (a) and (b) of Paragraph (2) hereof, such materials will be priced on a basis that will leave a net charge against the joint account consistent with the service rendered and adequate for the time the materials were in use.

## V. INVENTORIES

**(1)** Periodic inventories shall be taken by Operator of the materials and equipment on the joint property, which shall include such materials and equipment as are ordinarily considered controllable by operators of oil and gas properties.

**(2)** Notice of intention to take inventory shall be given by Operator to Non-operator a week before any inventory is to begin, so that Non-operator may be represented when any inventory is being taken.

**(3)** Special inventories shall be taken whenever there is any sale or change of interest in the joint property, and it shall be the duty of the party selling to notify the other party as quickly as possible after the transfer of interest takes place. In such cases both the seller and the purchaser shall be represented and shall be governed by the joint inventory.

**(4)** If the initial test on the joint property is a dry hole and no further tests thereon are immediately contemplated, Non-operator may require that an inventory be taken of all materials as soon as the casing has been recovered from the well and that the materials be classified before any materials are removed from the joint property by Operator or otherwise disposed of.

**(5)** Failure of Non-operator to be represented at the physical inventory shall bind it to accept the inventory taken by Operator who shall in that event furnish Non-operator with a copy thereof.

**(6)** Reconciliation of inventory with charges to the joint account shall be made by each party at interest, and a list of overages and shortages shall be jointly determined by Operator and Non-operator.

**(7)** Inventory adjustments shall be made by Operator on the joint account for overages and shortages, but Operator shall only be held accountable to Non-operator for shortages due to lack of reasonable diligence.



SKELLY OIL COMPANY
MAP SHOWING
KELLY – LINCOLN UNIT
PANOLA COUNTY, TEXAS
Scale: 1 inch = 400 feet   Nov. 12, 1947

Total acreage in this unit as reflected
by ground survey 704.00 Ac.

I, Robert D. Polson, an engineer, registered by the State of Texas,
certify the hereon plat is true and correct.
Witness my hand and seal this the 12th day of Nov. ,1947