## OPERATING AGREEMENT

AGREEMENT entered into as of the date hereinafter set forth by and between LATEX OIL & GAS CO., INC., a Texas Corporation, hereinafter designated as "OPERATOR", and the undersigned parties other than OPERATOR, WITNESSETH THAT:

WHEREAS, the Non-Operating parties, hereinafter set forth, are the owners of oil, gas and mineral leases covering lands located in DeSoto Parish, Louisiana, described as follows, to-wit:

> Southeast Quarter of Southwest Quarter (SE/4 of SW/4) and South Half of Southeast Quarter (S/2 of SE/4) of Section 27, and the East Three-quarters (E-3/4) of Section 34, Township 14 North, Range 16 West;

WHEREAS, it is desired to enter into an operating agreement with respect to such leases.

NOW, THEREFORE, it is agreed as follows:

1.

Subject to the  terms and conditions hereinafter set forth, the above described land (hereinafter referred to as "the premises") shall be developed and operated for gas and gas distillate purposes by OPERATOR.

2.

Each Non-Operating party hereto represents to all parties hereto that he owns and has good title to the oil, gas and mineral leases shown in "Exhibit A" as belonging to him and in the event of loss or failure of title to such lease or leases, or any interest or part thereof, agrees that he shall hold the OPERATOR and the other parties hereto harmless from and shall indemnify them against all loss, cost, damage and expense which may result therefrom; provided, however, that if there should be any loss, lack or failure of title which would cause a revision of the ownership interest such revision of ownership shall not be retroactive as to operating costs and expenses incurred or as to revenue or production obtained prior to such loss, lack or failure of title.

3.

All costs, expenses and liabilities accruing or resulting from the operation of the premises pursuant to this agreement shall be shared and borne and all production of gas and gas distillate from said land, subject to the payment of

-1-

applicable royalties thereon, and all materials and equipment acquired pursuant hereto, shall be owned by the parties hereto in the following respective proportions:

|  | Acreage | Percentage |
|---|---|---|
| Natural Gas & Oil Co., a division of Mississippi River Fuel Corp. - | 195.0000 | 32.49999 |
| Ralph R. Gilster | 140.0208 | 23.33680 |
| James E. Kemp | 140.0208 | 23.33680 |
| Snackover Producing Co. | 37.46875 | 6.24480 |
| Frank W. Scheller | 11.65625 | 1.94271 |
| L. K. Townsend, S. H. Walker & Frank J. Rodie | 13.3334 | 2.22223 |
| Sam Sklar, Trustee | 60.0000 | 10.00000 |
| M. R. Gallion | 2.5000 | .41667 |
|  | 600.0000 | 100.00000 |

4.

OPERATOR shall have full control of the premises subjected hereto and, subject to the provisions hereof, shall conduct and manage the development and operation of said premises for the production of gas and distillate therefrom. OPERATOR shall pay and discharge all costs and expenses incurred pursuant hereto and shall charge each of the parties hereto with his or its respective proportionate share upon the cost and expense basis provided for in the Accounting Procedure attached hereto, marked "Exhibit B" and made a part hereof. Each party hereto other than OPERATOR will promptly pay OPERATOR such costs as are hereunder chargeable to him or it.

5.

If any of the mineral interests or any of the oil and gas leases held by the parties on the premises covered hereby be subject to any overriding royalty, production payment, or other charge in addition to or other than the usual one-eighth (1/8) royalty, the party contributing any such mineral interest or lease shall, at his or its sole cost and expense bear, assume and discharge any such overriding royalty, production payment, or other charge and his or its share of the production or the proceeds thereof shall be subject thereto.

6.

Each party holding an oil and gas lease subjected to this agreement shall, before the due date, pay all delay rentals or shut-in royalties, as the case may be, which may become due under the lease or leases contributed by him or it, and each party paying such rentals or royalties shall, within ten (10) days after the same have been paid, but at least ten (10) days prior to the due date, notify OPERATOR of such payment. The burden of paying such rentals or shut-in royalties

-2-

shall fall entirely upon the party required to make payment thereof hereunder. In the event any lease subject hereto or any interest therein terminates for non-payment of delay rental, the party owning such lease shall make a bona fide effort to secure a new lease covering the same interest and make same subject to this agreement.

7.

The parties hereto agree to the drilling of a well on the pooled leases at the cost and expense of the joint account as herein provided at a location to comply with the Department of Conservation's Order No. 289 not to exceed 660 feet Northeast from the center of said unit comprising the lands first hereinabove described.

Said well shall be drilled to a depth sufficient to reach the base of the Sligo Formation in the Bethany-Longstreet Area of DeSoto Parish, Louisiana, but in no event shall said well be drilled to a depth exceeding 6600 feet unless the parties hereto agree to carry such drilling to a greater depth. OPERATOR shall commence or cause to be commenced the drilling of said well within ten (10) days after the effective date hereof, or if drilling permit be not secured from the Department of Conservation of the State of Louisiana, as soon thereafter as drilling permit is so secured.

OPERATOR may, without further authority, contract the drilling of the above authorized well for the account of the parties hereto at the usual rates now prevailing in the field in which the pooled leases are located.

It is understood that in connection with the drilling of said well, OPERATOR shall furnish to each of you full and complete information concerning the progress of such drilling, and will upon request from you furnish to each of you samples of all cores and cuttings taken and saved from said well, and will upon completion of said well, furnish to each of you a copy of the Schlumberger electrical log, copy of driller's log and any other logs obtained in connection with said well or the drilling thereof. Each of you and your employees shall have, at your own risk, access to said well and the derrick floor for the pur-pose of inspecting the drilling operations so conducted.

Except as to the well hereinabove authorized, no additional well shall be drilled at the cost and expense of the Joint Account unless mutually agreed on by the parties hereto. OPERATOR shall secure the written approval of each

-3-

Non-Operator before incurring against the Joint Account any item of expense, which item itself is in excess of Five Thousand ($5,000) Dollars, except in the drilling, equipping and completing of the well provided for hereinabove and in the drilling, equipping and completing of any additional well as to which well or wells the parties mutually agree; provided, however, that in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, OPERATOR may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but OPERATOR shall, as promptly as possible, report the emergency to the other parties hereto.

8.

In the event the parties cannot mutually agree on the setting of pipe (production casing) in the well authorized hereunder, the party or parties desiring to so set such pipe and attempt to complete said well shall notify each party hereto by Western Union Telegraph at such time as the point of setting such production casing is reached. The other party or parties shall have twelve (12) hours after receipt of such notice within which to notify the party or parties desiring that said production casing (pipe) be set, whether or not they elect to participate in the cost of such operation. The failure to give such notice within said period of twelve (12) hours shall be construed as an election by said party or parties not to participate in the cost of this operation. Upon the expiration of the notice of twelve (12) hours, the party or parties desiring to set such pipe (production casing) shall commence such operations and attempt to complete said well at their sole risk and expense, and if said well obtains production of the minerals covered hereunder in paying quantities, the same shall be completed with due diligence. The party or parties so agreeing to set production pipe, and to attempt to complete said well shall be credited with the entire working interest income therefrom, less the cost of operating such well, until such time as such working interest income, less the cost of operating the well, equals 200% of the cost of such operation (setting pipe and completing said well), whereupon said well shall be owned and operated as a jointly owned well pursuant to the provisions of this agreement.

No well which is producing or has once produced shall be abandoned

-4-

without the mutual consent of the parties hereto; provided, however, if the parties are unable to agree as to the abandonment of any well, then the party or parties not desiring to abandon the well shall pay or tender to each of the parties desiring to abandon his or its proportionate share of the reasonable value of the material and equipment in and on said well, such value to be determined, so far as possible, in accordance with the attached "Exhibit B" - Accounting Procedure.  Upon receipt of said sum each party desiring to abandon such well shall, without express or implied warranty of title, assign to the party or parties paying said sum his or its interest in said well and the equipment therein, together with all of his or its rights in all working interest production therefrom which may thereafter be produced from the formation or formations from which such well is producing.  If there is more than one non-abandoning party, such assignment shall run in favor of the non-abandoning parties in proportion to their respective interests.

9.

The number of employees, the selection of such employees, the hours of labor, and the compensation for services to be paid any and all such employees, shall be determined by OPERATOR.  Such employees shall be the employees of OPERATOR.

10.

OPERATOR shall have a lien on the interest or interests of each of the other parties hereto that are subjected to this agreement, the gas and distillate produced therefrom, the proceeds thereof, and such party's interest in the material and equipment thereon and therein, to secure OPERATOR in the payment of any sum due to OPERATOR hereunder from each such party.  The lien herein provided for shall not extend to any royalty interests in or under the premises subject hereto or the production therefrom.  And it is agreed that in event any amount due and owing to OPERATOR by any other party hereto is not paid as herein elsewhere provided within fifteen (15) days from the due date thereof, OPERATOR may serve a written order on the purchaser or purchasers of such other party's

-5-

share of such gas and distillate, and the service of such written order shall
authorize and require such purchaser or purchasers to pay to OPERATOR the pro-
ceeds thereafter becoming due and owing for such share until OPERATOR shall
have been fully reimbursed to date for and on account of such other party's
delinquent part of such amounts so due and owing under this agreement, together
with interest thereon at the rate of six percent (6%) per annum, but it is
agreed that this remedy shall not be exclusive; provided, however, that all par-
ties hereto shall have the right to sell and dispose of their respective in-
terests in the gas and distillate produced from the premises subject hereto free
and clear of such lien and the purchaser or purchasers thereof need not take
notice of said lien until default in payment and service of such written order as
above provided, in which events each party hereto agrees that at any time when
it may be in arrears in payments hereunder, but only in such event, it will exe-
cute upon request, such additional instrument as may be necessary or desired to
further evidence such lien and to provide for the prompt discharge thereof.

11.

With respect to his or its proportionate share of the gas and distillate
produced from the premises, exclusive of production which may be used in develop-
ment and producing operations on said premises and in preparing and treating such
production for marketing purposes and production unavoidably lost, each of the
parties hereto, subject to the other provisions of this agreement, shall:

    (1)  Take in kind or separately dispose of his or its said
           proportionate share of such production;

    (2)  Be entitled to receive directly payment for his or its
           proportionate share of the proceeds from the sale of
           such production and execute any division order or con-
           tract of sale on all purchases or sales pertaining to
           his or its interest in such production;

    (3)  Pay or cause to be paid all applicable royalties on
           such production; and

    (4)  Bear any extra expenditure incurred by the taking in
           kind or separate disposition by him or it of his or its
           proportionate share of such production.

In event any party hereto shall fail to make the arrangements necessary to take
in kind or separately dispose of his or its proportionate share of the gas and
distillate produced from said premises, OPERATOR shall have the right, subject
to revocation at will by the party owning same, to purchase such gas and dis-
tillate or sell the same to others for the time being at not less than the

-6-

market price prevailing in the area, any such purchase or sale to be subject always to the right of the owner of such gas and distillate to exercise, at any time, his or its right to take in kind or separately dispose of his or its share of such gas and distillate not previously delivered to a purchaser pursuant hereto.

12.

Surplus material and equipment from the premises, which in the judgment of the OPERATOR, are not necessary for the development and operation thereof, may be sold by OPERATOR to any of the parties to this agreement or to others for the benefit of all parties hereto, or may be divided in kind between such parties. Proper charges and credits shall be made by OPERATOR as provided in the Accounting Procedure, marked "Exhibit B", attached hereto.

13.

Each of the parties hereto shall have access to the premises at all reasonable times to inspect and observe any operations thereon, and shall have access at reasonable times to information pertaining to the development and operation thereof, including OPERATOR'S books and records relating thereto, drilling reports, well logs, tank tables, daily gauge and run tickets, and reports of stock on hand at the first of each month.

OPERATOR shall furnish each of the other parties hereto with copies of monthly summary reports showing the disposition of all gas and distillate production from this unit.

14.

The leases, insofar as same are covered by this agreement, shall not be surrendered unless the parties mutually consent in writing thereto. Should any party at any time desire to surrender the leases subject hereto and the other party or parties should not consent thereto, the party desiring so to surrender (if it still desires to surrender after the other party or parties have refused their consent) shall assign without express or implied warranty of title all of his or its interest in such leases and in the well, material and equipment located thereon, and in the production therefrom, insofar as same pertain to the gas and gas distillate rights in the Pettit Formation covered by this agreement, to the party or parties not desiring to surrender, and thereupon such assigning party shall be relieved from all obligations

-7-

thereafter accruing (but not theretofore accrued) hereunder.  From and after
the making of such assignment the assigning party shall have no further
interest in said leases or in the equipment thereon or the production there-
from, insofar as the same pertain to the gas and gas distillate rights in the
Pettit Formation, but shall be entitled to be paid for his or its interest in
any material on said leases at its reasonable value determined, so far as
possible, as provided in the attached "Exhibit B".  If such assignment shall
run in favor of more than one party hereto, the interest covered thereby shall
be shared by such parties in the proportions that the interest of each party
assignee bears to the total interest of all parties assignee.

15.

It is understood and agreed among the parties hereto that subject to
the right of revocation by any party hereto by written notice to OPERATOR and
pipe line purchaser, OPERATOR shall collect from pipe line purchaser or pur-
chasers all production from this unit 100 percent of the proceeds of such pro-
duction, and Non-Operators hereto shall furnish to OPERATOR a division of the
working interest and royalty interest in the lands and leases contributed by
each of the Non-Operators in this unit and advise OPERATOR as to how to dis-
perse the proceeds of production therefrom.  OPERATOR, if it so desires, may
call upon each of the Non-Operators for title opinions based upon abstracts
down to the date of commencement of production.  If any interest under any of
the leases and lands contributed by each of the Non-Operators should be held
in suspense, such Non-Operator shall so advise OPERATOR.  Furthermore, each
of the Non-Operators agree to notify OPERATOR as to any change or changes of
this division of interest when he or it shall have received notice of such
change or changes, and each Non-Operator agrees to indemnify OPERATOR and
hold OPERATOR harmless in all respects in making said payment for Non-Opera-
tors.

In addition to the other charges set forth in "Exhibit B", attached
hereto, it is hereby agreed that OPERATOR may charge a flat sum of $50.00
per month, commencing with the first date of production, for dispersing the
payments of royalties, overriding or excess royalties, and working interest
under the terms of this paragraph.  This charge is to be borne by the working
interest holders in proportion to his or its respective interest in this unit

-8-

and shall be a charge made to the joint account and included in the monthly
statements of OPERATOR.

Upon receipt of the division of ownership of each of the Non-Operators'
leases, which shall include the royalty ownership, overriding or excess royalty
ownership, production payment ownership, and working interest ownership, effec-
tive as of commencement of production, OPERATOR shall prepare its own division
order for signature of all parties and after same has been executed by all
necessary parties, and after OPERATOR has been paid the proceeds of this pro-
duction, OPERATOR shall make payments to the respective parties within fifteen
(15) days thereafter, unless Non-Operators have advised OPERATOR to suspend any
interest in production.

16.

The liability of the parties hereunder shall be several and not joint
or collective.  Each party shall be responsible only for his or its obligations,
as herein set out, and shall be liable only for his or its proportionate share
of the cost of developing and operating the premises subject hereto.

17.

OPERATOR shall not be liable for any delay or default in performance
under this agreement due to any cause beyond its control and without its fault
or negligence, including, but not restricted to, acts of God or the public
enemy, acts or requests of the Federal or State Government or any Federal or
State Officer purporting to act under authority, or war, fires, floods, storms,
strikes, interruption of transportation, freight embargoes or failure, ex-
haustion or unavailability or delays in delivery of any materials, equipment
or service necessary to the performance of any provision hereof, or the loss
of holes, blowouts or happening of any unforeseen accident, misfortune or
casualty whereby the drilling or completion of any well or the carrying on of
any operation hereunder is delayed or prevented.  Provided, further, that no
party hereto shall be required against its will to adjust a labor dispute.

The provisions of this agreement shall be subject to all federal and
state laws, executive orders, rules or regulations, and to all orders, rules
or regulations of all federal or state officers, agencies, boards or commis-
sions which in any way, directly or indirectly, relate to or affect the per-
formance of any of the provisions of this agreement, but no party hereto shall

-9-

suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this agreement, if such compliance is prevented by, or if such failure results from compliance with any such law, order, rule or regulation; and in the event this agreement or any provision hereof is found to be inconsistent with or contrary to any such law, order, rule or regulation, the latter shall be deemed to control and this agreement shall be regarded as modified accordingly and as so modified shall continue in full force and effect.

-18.

This agreement shall remain in force and effect only in the event of discovery of gas and condensate in the well to be drilled hereunder, and so long thereafter, until all materials, equipment, supplies and properties have been salvaged and disposed of and a final settlement among the parties hereto has been made.

19.

OPERATOR shall render, for ad valorem tax purposes, the premises covered hereby, together with all tangible property, however classified, appurtenant thereof if, and to the extent that OPERATOR deems such property then to be subject to ad valorem taxation and shall pay, for the benefit of the parties hereto, such ad valorem taxes which OPERATOR deems to be assessed validly against such property. When paid, such ad valorem taxes shall be charged to the joint account as provided in the attached "Exhibit B".

20.

At its option, OPERATOR may require each party hereto to advance his or its proportionate part of development and operating costs according to the following conditions:

On or before the first day of each calendar month, OPERATOR shall submit to each other party an itemized estimate of costs and expenses expected to be incurred during the succeeding calendar month. Within ten (10) days after submission of such estimate, each other party hereto shall pay his or its proportionate part of such estimate to OPERATOR. Should any party fail to pay his or its proportionate part of such estimate to OPERATOR within the aforesaid ten (10) day period, the same shall bear interest at the rate of six per cent (6%) per annum. Adjustments between estimates and actual costs shall be made by OPERATOR at the close of each calendar

-19-

month and the accounts of the parties hereto shall be adjusted accordingly.

21.

All notices which are required or authorized to be given hereunder, except as otherwise specifically provided herein, shall be given in writing by mail or telegram, postage or charges prepaid, and addressed to the party to whom such notice is given as follows:

Latex Oil & Gas Co., Inc.
Suite 507, 418 Market Street
Shreveport, Louisiana

Ralph R. Gilster
P. O. Box 1315
Shreveport, Louisiana

James E. Kemp
1720 Life of America Building
Dallas, Texas

Natural Gas & Oil Company
202 Continental-American Building
Shreveport, Louisiana

Smackover Producing Company
P. O. Box 1524
El Dorado, Arkansas

Frank W. Scheller
Keatchie, Louisiana

Messrs. L. K. Townsend, S. H. Walker & Frank J. Rodie
311 Texas Avenue
Shreveport, Louisiana

Sam Sklar, Trustee
P. O. Box 3068, Queensborough Station
Shreveport, Louisiana

M. R. Gallion
317 Sklar Building
Shreveport, Louisiana

22.

OPERATOR shall obtain, and at all times while operations are conducted on the premises, shall maintain in effect insurance by reliable and responsible insurance company or companies, and as to the following risks:

(1) Workmen's Compensation Insurance in accordance with the laws of the State of Louisiana;

(2) Automotive Public Liability Insurance with limits of not less than $100,000 per person and $300,000 per accident, and automotive property damage insurance with a limit of not less than $25,000;

(3) General Public Liability Insurance with limits of not less than $100,000 per person and $300,000 per accident for bodily injury, and not less than $25,000 per accident for property damage.

OPERATOR shall not provide fire insurance, wind storm insurance or explosion insurance for the benefit of the joint account except by mutual

-11-

consent in writing of all parties hereto.

Should OPERATOR cease to be Operator hereunder, any new Operator shall carry Workmen's Compensation Insurance and Automotive Public Liability Insurance and Property Damage Insurance and General Public Liability Insurance with limits as above provided.

23.

It is understood and agreed that notwithstanding anything contained herein to the contrary, this agreement shall cover gas and condensate rights only, and any reference to oil contained in any paragraph hereof shall be considered deleted except as hereinafter stated. It is specifically understood and agreed that in the event said well authorized hereunder to be drilled by OPERATOR should be completed as unproductive of gas, but productive of oil, and so designated by the Department of Conservation of the State of Louisiana, then and in that event, the owner or owners of the leasehold on the quarter quarter section on which said well is located shall have the right and option to take over said well at any time within sixty (60) days after completion of same by notifying the other parties in writing of their intention so to do. If the parties so elect to take over said well they shall bear one hundred percent (100%) of the cost of drilling, testing, equipping and operating same, and shall be the owner or owners of one-hundred per-cent (100%) of the production therefrom, and any costs which have been previously incurred and paid by the other parties hereto shall be refunded to the owner or owners having made such payment by the party or parties then owning said well. If the owner or owners of the leasehold on which said well is located do not elect to exercise the option of so taking over said well within the time above specified, they shall assign to the other parties (without warranty of title) an interest in the oil rights on the quarter quarter section on which said well is located, so that the leasehold interest on such tract down to the depth to which said well shall have been drilled shall be owned by the parties hereto in the same proportion as the gas rights are owned, and OPERATOR herein designated shall operate said well and tract for the joint account of the parties hereto according to their undivided ownership in the oil rights and under all the applicable terms and provisions of this agreement, just as if this agreement specifically covered the oil rights in said tract rather than the gas rights in the entire premises, but this agreement shall be of no further force and effect with respect to the

-12-

gas rights of the entire premises described herein.

24.

Should OPERATOR or any successor Operator hereunder dissolve, liqui-
date or terminate its corporate existence, die, or become incapacitated to act, it
shall thereupon cease to be Operator hereunder.  OPERATOR, or any successor  Opera-
tor, may resign its duties as Operator hereunder by giving not less than sixty
(60) days written notice to non-operators and be relieved of all responsibilities,
duties and obligations hereunder.  OPERATOR may be removed at any time by the par-
ties owning a majority of the leasehold interest covered by this Operating Agree-
ment.  Should OPERATOR, or any successor Operator, for any cause cease to be Opera-
tor hereunder, the Non-Operators shall, within ten (10) days after such time cause
a new Operator to be appointed among the Non-Operators hereunder, and such appoint-
ment shall be made by the parties owning a majority of the leasehold interest in
this unit covered by this Operating Agreement, and such successor Operator shall
take over such operations hereunder under the same terms and conditions of this
Operating Agreement.

Each of the parties hereto agrees to elect to be excluded from the
application of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue
Code of 1954 or such portion or portions thereof as may be permitted or authorized
by the Secretary of the Treasury of the United States or his delegate insofar as
such subchapter or any portion or portions thereof may be applicable to the par-
ties hereto.  Accordingly, each party hereto hereby authorizes and directs Unit
Operator to execute such election or elections on his or its behalf and file the
same with the proper administrative office or agency.  If requested by Unit Opera-
tor, each party hereto agrees to personally execute and join in such election or
elections.

This agreement shall be binding upon the parties hereto, their successors
and assigns, and the terms hereof shall constitute a covenant running with the
lands and leasehold estates covered hereby.

IN WITNESS WHEREOF, the parties hereto have signed this agreement on
this the 7th day of November , 1955, but this agreement shall be
effective and retroactive as of the commencement of drilling operations on the

-13-

test well/~~heretofore~~ to be drilled on the premises, as shown in the attached plat marked "Exhibit C".

WITNESSES:

*[signatures]*

LATEX OIL & GAS CO., INC.

By *[signature]* Ralph R. Gilster
President

OPERATOR

*[signature]*
Ralph R. Gilster

*[signature]*
James E. Kemp

NATURAL GAS & OIL COMPANY; a division of Mississippi River Fuel Corporation

By _____

SMACKOVER PRODUCING COMPANY

By _____
Robert E. Adair

By _____
Leo D. Recknagel

_____
Frank W. Scheller

_____
L. K. Townsend

_____
S. H. Walker

_____
Frank J. Rodie

*[signature]* Sam Sklar, Trustee

_____
M. R. Gallion

-14-

STATE OF LOUISIANA )
                   )
PARISH OF CADDO    )

     On this the 7 day of November, 1955, before me appeared RALPH R. GILSTER to me personally known, who being by me duly sworn did say that he is the PRESIDENT of LATEX OIL & GAS CO., INC., a corporation, and that said instrument was signed and sealed in behalf of said corporation and the said RALPH R. GILSTER acknowledged said instrument to be the free act and deed of said corporation.

     *R. A. Stephens*
     Notary Public in and for Caddo Parish, La.


STATE OF LOUISIANA )
                   )
PARISH OF CADDO    )

     On this the 7 day of November, 1955, before me personally appeared RALPH R. GILSTER, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

     *R. A. Stephens*
     Notary Public in and for Caddo Parish, La.


STATE OF LOUISIANA )
                   )
PARISH OF CADDO    )

     On this the 7 day of November, 1955, before me personally appeared JAMES E. KEMP, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

     *R. A. Stephens*
     Notary Public in and for Caddo Parish, La.


STATE OF LOUISIANA )
                   )
PARISH OF CADDO    )

     On this the _____ day of _____, 1955, before me appeared _____, to me personally known, who being by me duly sworn did say that he is the _____ of NATURAL GAS & OIL COMPANY., a corporation, and that said instrument was signed and sealed in behalf of said corporation and the said _____ acknowledged said instrument to be the free act and deed of said corporation.

     Notary Public in and for Caddo Parish, La.

-15-

STATE OF LOUISIANA )
                   )
PARISH OF CADDO )

On this the _____ day of _____, 1955, before me personally appeared ROBERT E. ADAIR and LEO D. RECKNAGEL, partners composing the SMACKOVER PRODUCING COMPANY, a partnership, to me known to be the persons described in and who executed the foregoing instrument and acknowledged that they executed the same as their free act and deed, and in the capacity therein stated.

_____
Notary Public in and for Caddo Parish, La.

STATE OF LOUISIANA )
                   )
PARISH OF DESOTO )

On this the _____ day of _____, 1955, before me personally appeared FRANK W. SCHELLER, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

_____
Notary Public in and for DeSoto Parish, La.

STATE OF LOUISIANA )
                   )
PARISH OF CADDO )

On this the _____ day of _____, 1955, before me personally appeared L. K. TOWNSEND, S. H. WALKER and FRANK J. RODDIE, to me known to be the persons described in and who executed the foregoing instrument and acknowledged that they executed the same as their free act and deed.

_____
Notary Public in and for Caddo Ph., La.

STATE OF LOUISIANA )
                   )
PARISH OF CADDO )

On this the 8 day of November, 1955, before me personally appeared SAM SKLAR to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

_____
Notary Public in and for Caddo Parish, La.

-16-

STATE OF LOUISIANA )
                        )
PARISH OF CADDO   )

        On this the _____ day of _____, 1955, before me personally appeared M. R. GALLION, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

_____
Notary Public in and for Caddo Parish, La.

EXHIBIT "A"

DESCRIPTION OF LEASES TO OPERATING AGREEMENT
COVERING SE/4 OF SW/4 AND S/2 OF SE/4 OF SEC-
TION 27, AND EAST THREE-QUARTERS OF SECTION
34, TOWNSHIP 14 NORTH, RANGE 16 WEST, DESOTO
PARISH, LOUISIANA

The following described oil, gas and mineral leases owned by: -

(A)  Natural Gas & Oil Company, a division of Mississippi
     River Fuel Corporation

1.  Lease dated April 22, 1954, made by Nancy Ann Havens, represented by Mary
    Frances Havens, as Lessors, to M. R. Gallion as Lessee, which lease is
    filed under Registry No. 235948 and recorded in Conveyance Book 203, page
    305 of the Records of DeSoto Parish, Louisiana, to which reference is here-
    by made for all purposes.

2.  Lease dated April 21, 1954, made by Mary F. Havens, Charles Franklin Havens
    and Mabel Marie Havens, as Lessors, to Z. T. Gallion, as Lessee, which lease
    is filed under Registry No. 235949 and recorded in Conveyance Book 203, page
    309 of the Records of DeSoto Parish, Louisiana, to which reference is hereby
    made for all purposes.

3.  Lease dated April 21, 1954, made by Annie L. Moore, as Lessor, to Z. T.
    Gallion as Lessee, which lease is filed under Registry No. 235950 and re-
    corded in Conveyance Book 203, page 311 of the Records of DeSoto Parish,
    Louisiana, to which reference is hereby made for all purposes.

4.  Lease dated April 26, 1954, made by Russell N. Baker, Alice D. Frizzell and
    Mary Louise Baker, as Lessors, to Z. T. Gallion, as Lessee, which lease is
    filed under Registry No. 235958 and recorded in Conveyance Book 203, page
    321 of the Records of DeSoto Parish, Louisiana, to which reference is hereby
    made for all purposes.

5.  Lease dated March 20, 1954, made by W. H. Bagley and Maurine Lagrone Bagley,
    his wife, as Lessors, to Jarrell B. Jackson, as Lessee, which lease is filed
    under Registry No. 235119 and recorded in Conveyance Book 203, page 39 of
    the Records of DeSoto Parish, Louisiana, to which reference is hereby made
    for all purposes.

6.  Lease dated April 14, 1954, made by James T. Humphries as Lessor, to Z. T.
    Gallion, as Lessee, which lease is filed under Registry No. 235955 and re-
    corded in Conveyance Book 203, page 319 of the Records of DeSoto Parish,
    Louisiana, to which reference is hereby made for all purposes.

     -  (B) - Ralph R. Gilster et al (Owned in the following proportions):
             Ralph R. Gilster - 3/8; James E. Kemp - 3/8; Smackover
             Producing Company - 3/16; Frank W. Scheller - 1/16

1.  No. 329 - Lease dated August 12, 1954, made by Frances Hassell Thompson et
    al, as Lessors, to Margaret Hasslocher, as Lessee, which lease is filed under
    Registry No. 237661 and recorded in Conveyance Book 204, page 137 of the Re-
    cords of DeSoto Parish, Louisiana, to which reference is hereby made for all
    purposes.

2.  No. 329A - Lease dated December 6, 1954, made by Frances Hassell Thompson,
    Tutrix for the minor, Blanche Annette Thompson, as Lessor, to Ralph R.
    Gilster et al, as Lessees, which lease is filed under Registry No. 240015
    of the Records of DeSoto Parish, Louisiana, to which reference is hereby
    made for all purposes.

3. No. 477 - Lease dated October 12, 1955, made by Mrs. Eloise Mayeux Smith et al, as Lessors, to Smackover Producing Company, as Lessee, which lease is filed under Registry No. 246532 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

4. No. 288 - Lease dated February 2, 1954, made by J. A. Hassell et al, as Lessors, to A. M. Pynter, as Lessee, which lease is filed under Registry No. 234334 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

5. No. 301 - Lease dated August 2, 1954, made by Joyce LaGrone, as Lessor, to Ralph R. Gilster et al, as Lessee, which lease is filed under Registry No. 237180 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

6. No. 260 - Lease dated December 29, 1952, made by Riemer Calhoun, as Lessor, to Marshall Calhoun, as Lessee, which lease is recorded under Registry No. 227863 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

(C) Ralph R. Gilster et al (Owned in the following proportions):
Ralph R. Gilster - 13/32; James E. Kemp - 13/32; Smackover
Producing Company - 5/32 and Frank W. Scheller - 1/32

1. No. 252 - Lease dated May 17, 1954, made by Roy H. Belcher, et ux, as Lessors, to and in favor of Margaret Hasslocher, as Lessee, which lease is filed under Registry No. 236313 and recorded in Conveyance Book 203, page 455 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

2. No. 252A - Lease dated May 27, 1954, made by Oscar J. Beard, as Lessor, to Margaret Hasslocher, as Lessee, which lease is filed under Registry No. 236341 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

(D) Ralph R. Gilster et al (Owned in the following proportions):
Ralph R. Gilster - 1/2; - James E. Kemp - 1/2

1. No. 283 - Lease dated August 2, 1954, made by Mrs. June Gerhardt et al, as Lessor, to Margaret Hasslocher, as Lessee, which lease is filed under Registry No. 237556 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

2. No. 336 - Lease dated July 17, 1954, made by John T. White et al, as Lessor, to Margaret Hasslocher, as Lessee, (an undivided 2/3 interest), which lease is filed under Registry No. 237277 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

3. No. 482 - Lease dated July 23, 1946, made by J. B. Foster, as Lessor, to R. Lacy, as Lessee, which lease is filed under Registry No. 177087 and recorded in Conveyance Book 164, page 557 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

4. No. 481 - Lease dated July 23, 1955, made by Mary T. Havens, et al, as Lessors, to Virgil L. Dixon, as Lessee, which lease is filed under Registry No. 246444 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

5. No. 481A - Lease dated July 23, 1955, made by Mabel M. Havens Johnston, as Lessor, to Virgil L. Dixon, as Lessee, which lease is filed under Registry No. 246540 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes.

6. No. 481B - Lease dated July 24, 1954, made by W. R. Thompson, as Lessor, to Virgil L. Dixon, as Lessee, which lease is recorded in Conveyance Book 203, page 545 of the Records of DeSoto Parish, Louisiana, as said lease was ratified by W. R. Thompson under date of October 15, 1955, and filed for record under Registry No. 246539 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes;

7. **No. 481C** – Lease dated July 23, 1954, made by Mary Frances Thompson Havens, Tutrix for the minor Nancy Ann Havens, as Lessor, to Virgil L. Dixon, as Lessee, which lease is recorded in Conveyance Book 204, page 3 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes;

8. **No. 481D** – Lease dated October 18, 1955, made by Mary Frances Thompson Havens, Tutrix for the minor, Nancy Ann Havens, as Lessor, to Virgil L. Dixon, as Lessee, which lease is recorded under Registry No. 246541 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes;

(E) L. K. Townsend, et al (owned in the following proportions):
    L. K. Townsend 1/3; S. H. Walker 1/3 and Frank J. Rodie 1/3

1. An undivided 1/3 interest in that certain oil, gas and mineral lease dated the 17th day of September, 1954, made by Rubia S. Turner White, Tutrix for the minors, Bobby Clyde White, Darttl Maxine White and Coba Lester White, to L. K. Townsend, S. H. Walker and Frank J. Rodie, as Lessees, which lease is recorded in Conveyance Book 204, page 367 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes;

(F) Sam Sklar, Trustee

1. Lease dated March 9, 1946, made by S. R. Thompson, as Lessor, to E. T. Oakes, as Lessee, which lease is filed for record under Registry No. 174026 and recorded in Conveyance Book 161, page 381 of the Records of DeSoto Parish, Louisiana, to which reference is hereby made for all purposes;

(G) M. R. Gallion – unleased 2½ acre mineral interest

1. An unleased mineral interest covering an undivided 1/2 interest in the following described tract:

    Beginning at Northeast corner of SE/4 of SW/4 of Section
    34, Township 14 North, Range 16 West, and running South
    100 yards and from thence West 255 yards, thence North 100
    100 yards, thence East 255 yards to place of beginning.

601 ROSS-MARTIN CO. TULSA, OKLAHOMA

EXHIBIT " B "                                         *PASO-T-1955-2*

Attached to and made a part of.......**Operating Agreement covering the
Latex Oil & Gas Co., Inc., - Mary T. Havens et al fl., comprising
portions of Secs. 27 & 34-16N-16W, DeSoto Parish, La., by and
between Latex Oil & Gas Co., Inc.; Natural Gas & Oil Co., et al**

# ACCOUNTING PROCEDURE

## (UNIT AND JOINT LEASE OPERATIONS)

### I. GENERAL PROVISIONS

**1. Definitions**

"Joint property" as herein used shall be construed to mean the subject area covered by the agreement to which this "Accounting Procedure" is attached.

"Operator" as herein used shall be construed to mean the party designated to conduct the development and operation of the subject area for the joint account of the parties hereto.

"Non-Operator" as herein used shall be construed to mean any one or more of the non-operating parties.

**2. Statements and Billings**

Operator shall bill Non-Operator on or before the last day of each month for its proportionate share of costs and expenditures during the preceding month. Such bills will be accompanied by statements, reflecting the total costs and charges as set forth under Subparagraph......**A**.......below:

A. Statement in detail of all charges and credits to the joint account.

B. Statement of all charges and credits to the joint account, summarized by appropriate classifications indicative of the nature thereof.

C. Statements as follows:

   (1) Detailed statement of material ordinarily considered controllable by operators of oil and gas properties;

   (2) Statement of ordinary charges and credits to the joint account summarized by appropriate classifications indicative of the nature thereof; and

   (3) Detailed statement of any other charges and credits.

**3. Payments by Non-Operator**

Each party shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of Non-Operator to protest or question the correctness thereof. Subject to the exception noted in Paragraph 5 of this section I, all statements rendered to Non-Operator by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period Non-Operator takes written exception thereto and makes claim on Operator for adjustment. Failure on the part of Non-Operator to make claim on Operator for adjustment within such period shall establish the correctness thereof and preclude the filing of exceptions thereto or making of claims for adjustment thereon. The provisions of this paragraph shall not prevent adjustments resulting from physical inventory of property as provided for in Section VI, Inventories, hereof.

**5. Audits**

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, that Non-Operator must take written exception to and make claim upon the Operator for all discrepancies disclosed by said audit within said twenty-four (24) month period. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator.

### II. DEVELOPMENT AND OPERATING CHARGES

*Subject to limitations hereinafter prescribed, Operator shall charge the joint account with the following items:*

**1. Rentals and Royalties**

Delay or other rentals, when such rentals are paid by Operator for the joint account; royalties, when not paid directly to royalty owners by the purchaser of the oil, gas, casinghead gas, or other products.

**2. Labor**

A. Salaries and wages of Operator's employees directly engaged on the joint property in the development, maintenance, and operation thereof, including salaries or wages paid to geologists and other employees who are temporarily assigned to and directly employed on a drilling well.

B. Operator's cost of holiday, vacation, sickness and disability benefits, and other customary allowances applicable to the salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. Costs under this Subparagraph 2 B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Costs of expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages as provided under Subparagraphs 2 A, 2 B, and Paragraph 11 of this Section II.

**3. Employee Benefits**

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost, provided that the total of such charges shall not exceed ten per cent (10%) of Operator's labor costs as provided in Subparagraphs A and B of Paragraph 2 of this Section II and in Paragraph 11 of this Section II.

**4. Material**

Material, equipment, and supplies purchased or furnished by Operator for use of the joint property. So far as it is reasonably practical and consistent with efficient and economical operation, only such material shall be purchased for or transferred to the joint property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

**5. Transportation**

Transportation of employees, equipment, material, and supplies necessary for the development, maintenance, and operation of the joint property subject to the following limitations:

A. If material is moved to the joint property from vendor's or from the Operator's warehouse or other properties, no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point where such material is available, except by special agreement with Non-Operator.

—1—

(4) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the overhead schedule at the time the shutdown is effected. When such wells are plugged, overhead shall be charged at the producing well rate during the time required for the plugging operation.

(5) Wells being plugged back, drilled deeper, or converted to a source or input well shall be included in the overhead schedule the same as drilling wells.

(6) Temporarily shut-down wells (other than by governmental regulatory body) which are not produced or worked upon for a period of a full calendar month shall not be included in the overhead schedule; however, wells shut in by governmental regulatory body shall be included in the overhead schedule only in the event the allowable production is transferred to other wells on the same property. In the event of a unit allowable, all wells capable of producing will be counted in determining the overhead charge.

(7) Wells completed in dual or multiple horizons shall be considered as two wells in the producing overhead schedule.

(8) Lease salt water disposal wells shall not be included in the overhead schedule unless such wells are used in a secondary recovery program on the joint property.

C. The above overhead schedule for producing wells shall be applied to the total number of wells operated under the Operating Agreement to which this accounting procedure is attached, irrespective of individual leases.

D. It is specifically understood that the above overhead rates apply only to drilling and producing operations and are not intended to cover the construction or operation of additional facilities such as, but not limited to, gasoline plants, compressor plants, repressuring projects, salt water disposal facilities, and similar installations. If at any time any or all of these become necessary to the operation, a separate agreement will be reached relative to an overhead charge and allocation of district expense.

E. The above specific overhead rates may be amended from time to time by agreement between Operator and Non-Operator if, in practice, they are found to be insufficient or excessive.

**13. Operator's Fully Owned Warehouse Operating and Maintenance Expense**
(Describe fully the agreed procedure to be followed by the Operator.)

Operator shall be entitled to assess warehouse handling charges on materials held in inventory for more than ninety (90) days prior to the transfer of joint property; 2% on tubular goods (2" and over) and 5% on major items of equipment or machinery such as separators, heaters, etc.

**14. Other Expenditures**

Any expenditure, other than expenditures which are covered and dealt with by the foregoing provisions of this Section II, incurred by the Operator for the necessary and proper development, maintenance, and operation of the joint property.

### III. BASIS OF CHARGES TO JOINT ACCOUNT

**1. Purchases**

Material and equipment purchased and service procured shall be charged at price paid by Operator after deduction of all discounts actually received.

**2. Material Furnished by Operator**

Material required for operations shall be purchased for direct charge to joint account whenever practicable, except that Operator may furnish such material from Operator's stocks under the following conditions:

A. New Material (Condition "A")

(1) New material transferred from Operator's warehouse or other properties shall be priced f.o.b. the nearest reputable supply store or railway receiving point where such material is available at current replacement cost of the same kind of material. This will include material such as tanks, tubing, rods, engines, and other major equipment. Tubular goods, two-inch (2") and over, on the basis of mill price or Operator's actual cost and f.o.b. railway receiving point nearest the joint account operation, regardless of quantity transferred.

(2) Other material shall be priced on basis of a reputable supply company's preferential price list effective at date of transfer and f.o.b. the nearest receiving point nearest the joint account operation where such material is available.

(3) Cash discount shall not be allowed.

B. Used Material (Condition "B" and "C")

(1) Material which is in sound and serviceable condition and is suitable for reuse without reconditioning shall be classed as Condition "B" and priced at seventy-five per cent (75%) of new price.

(2) Material which cannot be classified as Condition "B" but which,
(a) After reconditioning will be further serviceable for original function as good secondhand material (Condition "B"), or
(b) Is serviceable for original function but substantially not suitable for reconditioning,
shall be classed as Condition "C" and priced at fifty per cent (50%) of new price.

(3) Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use.

(4) Tanks, buildings, and other equipment involving erection costs shall be charged at applicable percentage of knocked-down new price.

**3. Premium Prices**

Whenever materials and equipment are not readily obtainable at the customary supply point and at prices specified in Paragraphs 1 and 2 of this Section III because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the joint account for the required materials on the basis of the Operator's direct cost and expense incurred in procuring such materials, in making it suitable for use, and in moving it to the location, provided, however, that notice in writing is furnished to Non-Operator of the proposed charge prior to billing the Non-Operator for the material and/or equipment acquired pursuant to this provision, whereupon Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from the Operator, to furnish in kind, or in tonnage as the parties may agree, at the location, nearest railway receiving point, or Operator's storage point within a comparable distance, all or part of his share of material and/or equipment suitable for use and acceptable to the Operator. Transportation costs on any such material furnished by Non-Operator, at any point other than at the location, shall be borne by such Non-Operator. If, pursuant to the provisions of this paragraph, any Non-Operator furnishes material and/or equipment in kind, the Operator shall make appropriate credits therefor to the account of said Non-Operator.

**4. Warranty of Material Furnished by Operator**

Operator does not warrant the material furnished beyond or back of the dealer's or manufacturer's guaranty; and in case of defective material, credit shall not be passed until adjustment has been received by Operator from the manufacturers or their agents.

**5. Operator's Exclusively Owned Facilities**

The following rates shall apply to service rendered to the joint account by facilities owned exclusively by Operator:

A. Water, fuel, power, compressor and other auxiliary services at rates commensurate with cost of providing and furnishing such service to the joint account but not exceeding rates currently prevailing in the field where the joint property is located.

—3—

LATEX OIL & GAS COMPANY, INC.

Estimated Well Costs

DATE **November 2,** 19 **55**

Well No. **1**   Lease Name **Ravens, et al Unit**   Acct'g No. _____   W.I.P. No. _____   Lease No. _____

Description: _____

District: _____   Field **Bethany-Longstreet**   Parish or County: **DeSoto**   State: **La.**

| Classification of Accounts | New or S.H. | Price | To be Purchased | On Hand | Total |
|---|---|---|---|---|---|
| **WELL EQUIPMENT:** | | | | | |
| Casing: | | | | | |
| 600' - 9-5/8" O.D. 36.3# H-40 Csg | | 3.01 | | | $ 1,806.00 |
| 6600' - 5½" O.D. 15.5# J-55 Csg | | 1.49 | | | 9,834.00 |
| 6600' - 2-3/8" O.D. 4.7# J-55 EUE Tbg | | .56 | | | 3,696.00 |
| Tubing: | | | | | |
| Sucker Rods: | | | | | |
| Other Subsurface Equipment: | | | | | 800.00 |
| Well Head Connections: | | | | | 3,000.00 |
| Pumping Unit: | | | | | |
| Primemover: | | | | | |
| **LEASE EQUIPMENT:** | | | | | |
| Tank Batteries: | | | | | |
| Separators and Heaters: | | | | | |
| Lease Lines: | | | | | |
| Fittings and Small Pipe: | | | | | |
| Other Equipment: | | | | | |
| Installation: | | | | | |
| TOTAL EQUIPMENT COST | | | | | $ 19,136.00 |

| INTANGIBLE DRILLING COSTS | PRICE | CONTRACT SERVICES | OTHER | TOTAL |
|---|---|---|---|---|
| Drilling Cost - Footage: **6600'** | $ 4.25 | $ | $ | $ 28,050.00 |
| Day Work - Rotary Tools: **4 days @ $600 & 4 days @ $500** | | | | 4,400.00 |
| Day Work - Cable Tools: | | | | |
| Labor - Company and Contract: | | | | |
| Auto, Trucking and Service Equip: | | | | 1,000.00 |
| Bridges, Roads, Location, etc: | | | | 750.00 |
| Fuel, Water and Power: | | | | |
| Bits, Coreheads, Rentals & Core Analysis | | | | 1,400.00 |
| Drilling Mud and Chemicals: | | | | 3,200.00 |
| Well Surveys & Logging: | | | | 1,500.00 |
| Cement and Cementing Services: | | | | 3,250.00 |
| Perforating or Shooting: | | | | 1,500.00 |
| Acidizing & Treating: | | | | 1,500.00 |
| Drill Stem Test: | | | | 600.00 |
| Geological and Engineering: | | | | 1,000.00 |
| District and Overhead Expense: | | | | 700.00 |
| Miscellaneous and Unforeseen: | | | | 3,000.00 |
| TOTAL INTANGIBLE COSTS | | | | $ 51,850.00 |
| TOTAL COST | | | | $ 70,986.00 |

COMPANY INTEREST - Income    $ _____   Development _____ $ _____   $ _____

Dry Hole Cost without Oil String: $ **45,556**    Company Interest: $ _____

Dry Hole Cost with Oil String: $ _____    Company Interest: $ _____

Remarks: **No allowance made for separation, dehydration and storage facilities.**

| | | |
|---|---|---|
| | Natural Gas 4-22-59 | Natural Gas 4-22-59 | Ralph Gilster et al. 252   5-11-59 <br> 252A  5-27-59 |
| | 40 Acres | 40 Acres | 40 Acres |
| | C. F. Havens | C. F. Havens | O. J. Beard et al. |

Ralph R. Gilster etal.
329      8-12-59
329A    12-6-59

30 Acres

F. H. Thompson etal.

Ralph R. Gilster etal.
2-2-59
288

50 Acres

J. A. Hassell

Natural Gas
3-21-59

40 Acres

L. B. Moore

R. R. Gilster etal.
11-3-60
484
W/R. M.R. Gallion ½
L. E. Parker ½

5 Acres

Natural Gas
3-26-59

35 Acres

R. N. Baker

Ralph R. Gilster etal.
7-23-59
481

Ralph R. Gilster
8-2-59
283

R.R. Gilster
10-12-60
437
6½ Acres
Eloise Smith

13½ Acres

June Gerhardt

40 Acres

Mary T. Havens etal.

Sam Sklar
3-9-56

**34**

60 Acres

S. R. Thompson

Natural Gas
3-20-59

40 Acres

H. W. Bagley

Ralph R. Gilster etal.
7-17-59
338

40 Acres

J. T. White etal.

Ralph R. Gilster etal.
(Lacy)

40 Acres

J. B. Foster

Ralph R. Gilster etal.
8-2-57
301

25 Acres

J. LaGrone

Ralph R. Gilster etal.
12-29-62
260

55 Acres

R. Calhoun

LEGEND

# EXHIBIT C

PLAT SHOWING OWNERSHIP AND LOCATION
FOR LATEX OIL & GAS ET.AL. MARY T. HAVENS UNIT 1 ETAL
Portions Of Sec. 27 & 34 Twp 14N-Rg.16W
DeSoto Parish, La.

RESIGNATION OF OPERATOR AND APPOINTMENT OF
SUCCESSOR OPERATOR

WHEREAS, on the ___7th___ day of ____November____, 19 _55_,

LATEX OIL & GAS CO., INC. was designated as "OPERATOR" under a certain Operating

Agreement executed by the undersigned and others, which Operating Agreement covered

lands located in ___DeSoto___ Parish, ____Louisiana____,

comprising a unit known as LATEX OIL & GAS CO., INC. - _M. T. Havens #2___

UNIT, to-wit:

Southeast Quarter of Southwest Quarter (SE/4 of SW/4) and
South Half of Southeast Quarter (S/2 of SE/4) of Section
27, and the East Three Quarters (E-3/4) of Section 34,
Township 14 North, Range 16 West.

WHEREAS, LATEX OIL & GAS CO., INC. desires to resign as OPERATOR and the

Non-Operators in said unit hereby accept said resignation effective as of seven (7)

o'clock a.m., January 1, 1957.

WHEREAS, it is also the desire and intention of the undersigned parties to

amend the aforesaid Operating Agreement so that upon the resignation of any OPERATOR

hereunder the Non-Operators may select a successor OPERATOR from the Non-Operators

as provided in said Operating Agreement, or the Non-Operators may select any res-

ponsible party as successor OPERATOR by the unanimous consent of the Non-Operators.

NOW, THEREFORE, all of the Non-Operators mentioned in the aforesaid Operat-

int Agreement have, and by these presents do, nominate, appoint and select JONES-

O'BRIEN, INCORPORATED as the OPERATOR of said unit and it shall operate same sub-

ject to and in accordance with all of the terms, provisions and conditions con-

tained in said Operating Agreement, except as herein set forth, the same as though

it had been nominated, appointed and selected as OPERATOR in the original Operating

Agreement instead of LATEX OIL & GAS CO., INC.  The said JONES-O'BRIEN, INCORPORATED

accepts said appointment as OPERATOR effective as of seven (7) o'clock a.m., January

1, 1957, and agrees to operate said unit and properties in accordance with all of

the terms, provisions and conditions contained in said Operating Agreement, except

as follows:

It is provided in the Operating Agreement affecting this unit that the

Operator shall collect from pipe line purchaser or purchasers of production from

this unit one hundred percent (100%) of the proceeds of such production and JONES-

O'BRIEN, INCORPORATED agrees to collect these proceeds of production from such

pipe line purchaser or purchasers. Upon receipt of same by JONES-O'BRIEN, INCORPORATED, as Operator hereof, it shall pay such proceeds of production (less severance and gathering taxes, and dehydration, extraction, and compression charges when applicable) to Ralph R. Gilster, Post Office Box 1315, Room No. 1803, Beck Building, Shreveport, Louisiana, and thereupon Ralph R. Gilster shall disburse and pay the proceeds of this production from this unit in the same manner and under the same terms and conditions as LATEX OIL & GAS CO., INC. paid same under its division orders affecting this unit. Ralph R. Gilster shall charge JONES-O'BRIEN, INCORPORATED $50.00 per month for this service and JONES-O'BRIEN, INCORPORATED shall bill each of the Non-Operators for his or its proportionate part of such charge. The said Ralph R. Gilster agrees to forever hold JONES-O'BRIEN, INCORPORATED harmless by reason of making any payments hereunder to Ralph R. Gilster, and each of the Non-Operators hereto agrees to hold Ralph R. Gilster harmless by reason of making any payments to such Non-Operator or to such royalty or other mineral payment holder under Non-Operator's lease or leases. Should any Non-Operator be furnished with any change of the ownership of the production under Non-Operator's lease or leases in this unit, then Ralph R. Gilster or any other party who should make payments hereunder, shall not be bound thereby until such time as such Non-Operator shall furnish to Ralph R. Gilster or such other party who might be making current payments hereunder a certified copy of such change or changes in the production from this unit.

If for any reason the said Ralph R. Gilster should be incapable or incapacitated to receive the proceeds of this production and to make disbursements thereof, then and in such event, the said JONES-O'BRIEN, INCORPORATED is hereby authorized, directed and empowered to hold in suspense the proceeds of this production until such time as each Non-Operator furnishes to JONES-O'BRIEN, INCORPORATED a title opinion acceptable to it, showing that Non-Operator has a good, valid and merchantable title to the interest claimed by such Non-Operator in this unit. Thereupon, JONES-O'BRIEN, INCORPORATED will pay such Non-Operator's share of the proceeds of production attributable to its leasehold interest plus the royalties payable under Non-Operator's leases or interest in leases and such Non-Operator will pay its own royalties and forever hold JONES-O'BRIEN, INCORPORATED harmless by reason of any such payment or payments.

It is further understood and agreed that the aforesaid Operating Agreement is hereby amended to the effect and to the effect only that upon resignation of any OPERATOR or successor OPERATOR hereof, the Non-Operators may select by unanimous con-

sent any responsible party as successor OPERATOR.

All of the parties hereto do hereby waive the delays and notices for the resignation of OPERATOR and the appointment of a successor OPERATOR insofar as the resignation of LATEX OIL & GAS CO., INC. is concerned and insofar as the appointment of JONES-O'BRIEN, INCORPORATED as OPERATOR is concerned, but all of the provisions relative thereto shall in all respects apply to any resignation or the appointment of any successor OPERATOR hereafter.

This instrument shall be binding upon the parties hereto, their or its successors and assigns, and the terms hereof shall constitute a covenant running with the lands and leasehold estates covered hereby, and may be executed in counterparts, each of which shall have the effect of an original instrument.

IN WITNESS WHEREOF, the parties have signed this agreement on the day and dates set opposite the signatures of the parties hereto, and same to be effective as of seven (7) o'clock a.m., January 1, 1957, even though this instrument may be executed subsequent thereto.

WITNESSES:                         DATE:

_____      _____        LATEX OIL & GAS CO., INC.
_____

                                              By_____
                                                        President

                                              RESIGNING OPERATOR

_____      _____        JONES-O'BRIEN, INCORPORATED
_____

                                              By_____

                                              SUCCESSOR OPERATOR

_____      _____
_____                       Ralph R. Gilster

_____      _____
_____                       James E. Kemp
                                              NATURAL GAS & OIL COMPANY, a division of
                                              Mississippi River Fuel Corporation

_____      _____        By:_____
_____

SMACKOVER PRODUCING COMPANY

_____     _____     By _____
_____                    Leo D. Rocknagel

_____     _____     By _____
_____                    Robert E. Adair

_____     _____     _____
_____                    Frank W. Scheller

_____     _____     _____
                                       L. K. Townsend

_____     _____     _____
_____                    S. M. Walker

_____     _____     _____
_____                    Wirth S. Wilkinson

_____     _____     _____
_____                    Sam Skier

_____     _____     _____
_____                    M. R. Callion

_____     _____     _____
_____

_____     _____     _____
_____

STATE OF LOUISIANA

PARISH OF CADDO

      On this the ____ day of _____, 1957, before me appeared RALPH R. GILSTER, to me personally known, who being by me duly sworn did say, that he is the President of LATEX OIL & GAS CO., INC., a corporation, and that said instrument was signed and sealed in behalf of said corporation and the said RALPH R. GILSTER acknowledged said instrument to be the free act and deed of said corporation.

                                                _____
                                                Notary Public in and for Caddo
                                                Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

      On this the ____ day of _____, 1957, before me appeared _____, to me personally known, who being by me duly sworn did say that he is the _____ of JONES-O'BRIEN, INCORPORATED, a corporation, and that said instrument was signed and sealed in behalf of said corporation and the said _____ acknowledged said instrument to be the free act and deed of said corporation.

                                                _____
                                                Notary Public in and for Caddo
                                                Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

      On this the ____ day of _____, 1957, before me personally appeared RALPH R. GILSTER, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

                                                _____
                                                Notary Public in and for Caddo
                                                Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

      On this the ____ day of _____, 1957, before me personally appeared JAMES E. KEMP, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

                                                _____
                                                Notary Public in and for Caddo
                                                Parish, La.

LATEX SKLAR & CO. INC.

**SAM SKLAR, TRUSTEE**
P. O. BOX 3088,
SHREVEPORT, LOUISIANA

SHREVEPORT, LOUISIANA

January 23, 1957

Mr. Ralph R. Gilster
Latex Oil & Gas Co., Inc.
418 Market Street
Shreveport, Louisiana

Dear Mr. Gilster:

In compliance with your letters of January 18, 1957, we
enclose the following instruments, which have been executed
by Sam Sklar:

1. Resignation of Operator and Appointment of Successor
   Operator for a unit.

2. Resignation of Operator and Appointment of Successor
   Operator for a facility.

We do not have a file copy of the instrument listed as Item
1, above, and would appreciate your furnishing us with same.

RRG:bc
Enclosure

Very truly yours,

SAM SKLAR

le
enclosures

Lottie Ellis
Land Department

COPY

## RESIGNATION OF OPERATOR OF KEATCHIE SEPARATION FACILITY
## AND APPOINTMENT OF SUCCESSOR OPERATOR

WHEREAS, on the 1st day of October, 1955, LATEX OIL & GAS CO., INC.
was designated as OPERATOR of the Keatchie Separation Facility.

WHEREAS, LATEX OIL & GAS CO., INC. desires to resign as OPERATOR of
said facility and the other parties hereto accept said resignation and agree
to the appointment of JONES-O'BRIEN, INCORPORATED as FACILITY OPERATOR, as
hereinafter set forth.

NOW, THEREFORE, the undersigned, being the same parties who executed
the original Keatchie Separation Facility Agreement aforesaid, have and by
these presents do, accept the resignation of LATEX OIL & GAS CO., INC. as
OPERATOR under said Facility Agreement, effective as of 12:01 a.m., January 1,
1957. The said JONES-O'BRIEN, INCORPORATED accepts that appointment as OPERATOR
effective as aforesaid and agrees to operate said unit and properties in accord-
ance with all of the terms, provisions and conditions contained in said Operating
Agreement.

This is to authorize, direct and empower JONES-O'BRIEN, INCORPORATED to
collect all of the proceeds of production, liquids and gas, accruing to the
interest of the undersigned and which are being sold to Texas Eastern Transmission
Corporation and Esso Standard Oil Company and which are being sold through the
Keatchie Separation Facility. JONES-O'BRIEN, INCORPORATED, as OPERATOR, will
make disbursements in accordance with the Operating Agreement pertaining to
this Facility and in accordance with the Operating Agreement among the working
interest owners. This authority is given JONES-O'BRIEN, INCORPORATED until
further notice by the undersigned to the contrary.

It is understood and agreed that Midwest Oil Corporation is the Operator
of the Wurtsbaugh Unit No. 1, comprising all of Section 36, Township 14 North,
Range 16 West; the Wurtsbaugh Unit No. 2, comprising all of Section 35, Township
14 North, Range 16 West; and Wurtsbaugh Unit No. 4, comprising all of Section 11,
Township 13 North, Range 16 West; all in DeSoto Parish, Louisiana, which Company
is running its production through said Facility in accordance with said Facility
Operating Agreement; and JONES-O'BRIEN, INCORPORATED agrees to pay to Midwest Oil
Corporation one hundred percent (100%) of the proceeds of production attributable
from the said units, which is being run into said Facility, (less severance and
gathering taxes). Midwest Oil Corporation agrees to indemnify JONES-O'BRIEN,

INCORPORATED and to hold the latter harmless in all respects by reason of making payment to Midwest Oil Corporation as Operator of the aforesaid units.

It is understood and agreed that Natural Gas and Oil Company, a Division of Mississippi River Fuel Corporation, is the Operator of a unit known as the Eddington Unit No. 1, comprising lands in Sections 27, 28, 33 and 34, Township 14 North, Range 16 West; and Bagley Unit No. 1 , comprising lands in Sections 28, 29, 32 and 33, Township 14 North, Range 16 West; all in DeSoto Parish, Louisiana; which Company is running its production through said Facility in accordance with said Facility Operating Agreement; and JONES-O'BRIEN, INCORPORATED agrees to pay to Natural Gas and Oil Company, a Division of Mississippi River Fuel Corporation, one hundred percent (100%) of the proceeds of production attributable from the said units, which is being run into said Facility, (less severance and gathering taxes). The said Natural Gas and Oil Company, a Division of the Mississippi River Fuel Corporation, agrees to indemnify JONES-O'BRIEN, INCORPORATED and to hold it harmless in all respects by reason of making payment to Natural Gas and Oil Company, a Division of Mississippi Fuel Corporation, as Operator of said units.

All of the parties hereto do hereby waive the delays and notices for the resignation of FACILITY OPERATOR and the appointment of a successor FACILITY OPERATOR, insofar as the resignation of LATEX OIL & GAS CO., INC. is concerned and insofar as the appointment of JONES-O'BRIEN, INCORPORATED as FACILITY OPERATOR is concerned, but all of the provisions relative thereto shall in all respects apply to any resignation or the appointment of any successor FACILITY OPERATOR hereafter.

This instrument shall be binding upon the parties hereto, their or its successors and assigns and the terms hereof shall constitute a covenant running with the lands and estates covered hereby and may be executed in counterparts, each of which shall have the affect of an original instrument.

IN WITNESS WHEREOF, the parties have signed this agreement on the day and dates set opposite the signatures of the parties hereto and same to be effective as of 12:01 a.m., January 1, 1957, even though this instrument may be executed subsequent thereto.

WITNESSES:                    DATE:

*Barbara Gitler*              *1/16/57*      LATEX OIL & GAS CO., INC.
*Emily McDaniel*
                                            By *Ralph R. Gilster*
                                               ─────────────────────
                                                    President

                                            RESIGNING OPERATOR


*Shirley Huckaby*            *1-17-57*       JONES-O'BRIEN, INCORPORATED
*Doris R. Hurst*
                                            By *C. W. Gloop*
                                               ─────────────────────
                                                SUCCESSOR OPERATOR

                                            *Ralph R. Gilster*
*Barbara Gitler*             *1/16/57*       ─────────────────────
*Emily McDaniel*                            Ralph R. Gilster


─────────────────    ──────────           ─────────────────────
                                            James E. Kemp


─────────────────    ──────────           SMACKOVER PRODUCING COMPANY

                                            By ──────────────────────
                                               Leo D. Recknagel

                                            By ──────────────────────
                                               Robert E. Adair


─────────────────    ──────────           ─────────────────────
                                            Frank W. Scheller


─────────────────    ──────────           ─────────────────────
                                            Morton Q. Petersen
                                            dba Petersen Drilling Company


─────────────────    ──────────           ─────────────────────
                                            LeRoy Smallenberger


─────────────────    ──────────           MIDWEST OIL CORPORATION


─────────────────    ──────────           By ──────────────────────


─────────────────    ──────────           MID-CENTURY OIL AND GAS COMPANY


                                            By ──────────────────────

_____   _____   A. B. Dow
_____                _____

_____   _____   THE CARTER OIL COMPANY
_____

                                      By_____

_____   _____   L. K. Townsend
_____                _____

_____   _____   S. H. Walker
_____                _____

_____   _____   Frank J. Rodie
_____                _____

_____   _____   NATURAL GAS AND OIL COMPANY
_____

                                      By_____

_____   _____   Sam Sklar
                                        _____

_____   _____   Harvey Broyles
                                        _____

_____   _____   M. C. Crawford
_____                _____

_____   _____   M. R. Gallion
_____                _____

_____   _____   PLACID OIL COMPANY
_____

                                      By_____

_____   _____   SUNRAY-MID-CONTINENT OIL CORPORATION
_____

                                      By_____

STATE OF LOUISIANA

PARISH OF CADDO

On this the 16th day of _____ January _____, 1957, before me
appeared RALPH R. GILSTER, to me personally known, who being by me duly sworn
did say, that he is the President of LATEX OIL & GAS CO., INC., a corporation,
and that said instrument was signed and sealed in behalf of said corporation
and the said RALPH R. GILSTER acknowledged said instrument to be the free act
and deed of said corporation.

_____
Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the 17th day of _____ January _____, 1957, before me appeared
C. W. Ohare _____; to me personally known, who being by me duly sworn did
say that he is the Vice President of JONES-O'BRIEN, INCORPORATED, a corp-
oration, and that said instrument was signed and sealed in behalf of said
oration and the said _____ C. W. Ohare _____ acknowledged said instrument to
be the free act and deed of said corporation.

_____
Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the 16th day of _____ January _____, 1957, before me per-
sonally appeared RALPH R. GILSTER, to me known to be the person described in and
who executed the foregoing instrument and acknowledged that he executed the same
as his free act and deed.

_____
Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me per-
sonally appeared JAMES E. KEMP, to me known to be the person described in and
who executed the foregoing instrument and acknowledged that he executed the same
as his free act and deed.

_____
Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____,1957, before me personally appeared ROBERT E. ADAIR and LEO D. RECKNAGEL, partners composing the SMACKOVER PRODUCING COMPANY, a partnership, to me known to be the persons described in and who executed the foregoing instrument and acknowledged that they executed the same as their free act and deed, and in the capacity therein stated.

Notary Public in and for Caddo Parish, La.


STATE OF LOUISIANA

PARISH OF DESOTO

On this the _____ day of _____, 1957, before me personally appeared FRANK W. SCHELLER, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

Notary Public in and for DeSoto Parish, La.


STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me personally appeared MORTON Q. PETERSEN, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed and in the capacity therein stated.

Notary Public in and for Caddo Parish, La.


STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me personally appeared LEROY SMALLENBERGER, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

Notary Public in and for Caddo Parish,La.

STATE OF COLORADO

COUNTY OF DENVER

On this the _____ day of _____, 1957, before me
appeared _____, to me personally known, who being by
me duly sworn did say that he is the _____ of
MIDWEST OIL CORPORATION, a corporation, and that said instrument was signed and
sealed in behalf of said corporation and the said _____
acknowledged said instrument to be the free act and deed of said corporation.

_____
Notary Public in and for Denver
County, Colorado

STATE OF TEXAS

COUNTY OF HARRIS

On this the _____ day of _____, 1957, before me
personally appeared W. PAUL EDMAN, to me known to be the person described in
and who executed the foregoing instrument and acknowledged that he executed
the same as his free act and deed.

_____
Notary Public in and for Harris
County, Texas

STATE OF TEXAS

COUNTY OF HARRIS

BEFORE ME, the undersigned Notary Public in and for the above-named
County and State, on this day came and appeared W. PAUL EDMAN, and to me well
known to be the person who executed the above foregoing instrument as Agent
and Attorney-in Fact for ALDEN B. DOW and declared and acknowledged that he
executed the same upon the behalf of Alden B. Dow and as his free act and
deed for the purposes and considerations therein set forth and that he was
thereunto duly authorized.

IN FAITH WHEREOF, witness my hand and seal of office on this _____
day of _____, 1957.

_____
Notary Public in and for Harris
County, Texas

STATE OF OKLAHOMA

COUNTY OF TULSA

On this the _____ day of _____, 1957, before me
appeared _____, to me personally known, who
being by me duly sworn did say that he is the _____
of THE CARTER OIL COMPANY, a corporation, and that said instrument was
signed and sealed in behalf of said corporation and the said _____
_____ acknowledged said instrument to be the free act and deed
of said corporation.

_____
Notary Public in and for Tulsa
County, Oklahoma

STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me personally appeared L. K. TOWNSEND, S. H. WALKER and FRANK J. RODIE, to me known to be the persons described in and who executed the foregoing instrument and acknowledged that they executed the same as their free act and deed.

_____
Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF ORLEANS

On this the _____ day of _____, 1957, before me appeared _____, to me personally known, who being by me duly sworn did say that he is the _____ of NATURAL GAS AND OIL COMPANY, A Division of Mississippi River Fuel Corporation, and that said instrument was signed and sealed in behalf of said corporation and the said _____ acknowledged said instrument to be the free act and deed of said corporation.

_____
Notary Public in and for Orleans
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me personally appeared SAM SKLAR, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed and in the capacity stated.

_____
Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me personally appeared HARVEY BROYLES, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

_____
Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me personally appeared M. C. CRAWFORD, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me personally appeared M. R. GALLION, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

Notary Public in and for Caddo
Parish, La.

STATE OF LOUISIANA

PARISH OF CADDO

On this the _____ day of _____, 1957, before me appeared _____, to me personally known, who being by me duly sworn did say that he is the _____ of PLACID OIL COMPANY, and that said instrument was signed and sealed in behalf of said company and the said _____ acknowledged said instrument to be the free act and deed of said company.

Notary Public in and for Caddo
Parish, La.

STATE OF OKLAHOMA

COUNTY OF TULSA

On this the _____ day of _____, 1957, before me appeared _____, to me personally known, who being by me duly sworn did say that he is the _____ of the SUNRAY-MID-CONTINENT OIL CORPORATION, a corporation, and that said instrument was signed and sealed in behalf of said corporation and the said _____ acknowledged said instrument to be the free act and deed of said corporation.

Notary Public in and for Tulsa
County, Oklahoma.