83186

UNIT AGREEMENT

CLARKSVILLE COTTON VALLEY UNIT

RED RIVER COUNTY, TEXAS

**FILED FOR RECORD**
4:05 o'clock _____P___M. on

APR 1 0 1990

MARY HAUSLER, County Clerk
RED RIVER COUNTY
DEPUTY _Korie Moose_

UNIT AGREEMENT

TABLE OF CONTENTS

Section

Page

## ARTICLE 1
### DEFINITIONS

1.1 .....Unit Area..................................................1
1.2 .....Unitized Formation........................................1
1.3 .....Unitized Substances.......................................1
1.4 .....Working Interest..........................................1
1.5 .....Royalty Interest..........................................1
1.6 .....Royalty Owner.............................................2
1.7 .....Working Interest Owner....................................2
1.8 .....Tract....................................................2
1.9 .....Unit Operating Agreement..................................2
1.10 ....Unit Operator............................................2
1.11 ....Tract Participation......................................2
1.12 ....Unit Participation.......................................2
1.13 ....Outside Substances.......................................2
1.14 ....Oil and Gas Rights.......................................2
1.15 ....Unit Operations..........................................2
1.16 ....Unit Equipment...........................................2
1.17 ....Unit Expense.............................................3
1.18 ....Effective Date...........................................3

## ARTICLE 2
### EXHIBITS

2.1 .....Exhibits.................................................3
          2.1.1  Exhibit A.........................................3
          2.1.2  Exhibit B.........................................3
          2.1.3  Exhibit C.........................................3
2.2 .....Reference to Exhibits....................................3
2.3 .....Exhibits Considered Correct..............................3
2.4 .....Correcting Errors........................................3
2.5 .....Filing Revised Exhibits..................................4

## ARTICLE 3
### CREATION AND EFFECT OF UNIT

3.1 .....Oil and Gas Rights Unitized..............................4
3.2 .....Personal Property Excepted...............................4
3.3 .....Amendment of Leases and Other Agreements.................4
3.4 .....Continuation of Leases and Term Interests................4
3.5 .....Titles Unaffected by Unitization.........................4
3.6 .....Injection Rights.........................................4
3.7 .....Develpment Obligation....................................5
3.8 .....Ratification and Extension of Leases and Units...........5

## ARTICLE 4
### PLAN OF OPERATIONS

4.1 .....Unit Operator............................................5
4.2 .....Method of Operation......................................5
4.3 .....Change of Method of Operations...........................6

## ARTICLE 5
### TRACT PARTICIPATIONS

5.1 .....Tract Participations.....................................6
5.2 .....Relative Tract Participations............................6

## ARTICLE 6
### ALLOCATION OF UNITIZED SUBSTANCES

6.1 .....Allocation to Tracts.....................................6
6.2 .....Distribution Within Tracts...............................6
6.3 .....Taking Unitized Substances in Kind.......................7
6.4 .....Failure to Take in Kind..................................7
6.5 .....Responsibility for Royalty Settlements...................8
6.6 .....Royalty on Outside Substances............................8

ARTICLE 7
PRODUCTION AS OF THE EFFECTIVE DATE

7.1 .....Oil or Liquid Hydrocarbons in Lease Tanks.................9
7.2 .....Overproduction..............................................9

ARTICLE 8
USE OR LOSS OF UNITIZED SUBSTANCES

8.1 .....Use of Unitized Substances.................................10
8.2 .....Royalty Payments...........................................10

ARTICLE 9
TRACTS TO BE INCLUDED IN UNIT

9.1 .....Qualification of Tracts....................................
9.2 .....Commitment of Interests to Unit............................10
9.3 .....Revision of Exhibits.......................................12
9.4 .....Acquisition of Uncommitted Interest........................12

ARTICLE 10
TITLES

10.1 .....Removal of Tract from Unit Area...........................12
10.2 .....Revision of Exhibits......................................12
10.3 .....Working Interest Titles...................................13
10.4 .....Royalty Interest Titles...................................13
10.5 .....Production Where Title is in Dispute......................13
10.6 .....Payment of Taxes to Protect Title.........................14

ARTICLE 11
EASEMENTS OR USE OF SURFACE

11.1 .....Grant of Easements........................................
11.2 .....Use of Water..............................................14
11.3 .....Surface Damages...........................................14

ARTICLE 12

12.1 .....Enlargements of Unit Area.................................
12.2 .....Determination of Tract Participation......................15
12.3 .....Effective Date............................................15

ARTICLE 13
TRANSFER OF TITLE-PARTITION

13.1 .....Transfer of Title.........................................
13.2 .....Waiver of Rights to Partition.............................15
13.3 .....Covenant Running With the Land............................15
13.4 .....Notice of Transfer........................................15
13.5 .....Carved-Out Interest Subject to This Agreement.............16
13.6 .....Liability of Transferor and Transferee....................16

ARTICLE 14
RELATIONSHIP OF PARTIES

14.1 .....No Partnership............................................
14.2 .....No Joint Refining or Marketing............................17
14.3 .....Royalty Owners Free of Costs..............................17
14.4 .....Information to Royalty Owners.............................17

ARTICLE 15
LAWS AND REGULATIONS

15.1 .....Laws and Regulations......................................17

ARTICLE 16
FORCE MAJEURE

16.1 .....Force Majeure.............................................17

ARTICLE 17
EFFECTIVE DATE

17.1 .....Effective Date............................................
17.2 .....Partial Disapproval or Invalidation.......................18
17.3 .....Revision of Exhibits and Tract Participation...............18
17.4 .....Ipso Facto Termination....................................18
17.5 .....Certificate of Effectiveness..............................19

ARTICLE 18
TERM

18.1 .....Term...................................................19
18.2 .....Termination by Working Interest Owners...................19
18.3 .....Effect of Termination....................................19
18.4 .....Salvaging Equipment Upon Termination....................19
18.5 .....Certificate of Termination..............................20

ARTICLE 19
EXECUTION

19.1 .....Original, Counterpart, or Other Instrument.............20
19.2 .....Joinder in Dual Capacity................................20

ARTICLE 20
GENERAL

20.1 .....Amendments Affecting Working Interest Owners............20
20.2 .....Action by Working Interest Owners.......................20
20.3 .....Lien and Security Interest of Unit Operator.............20

ARTICLE 21
SUCCESSORS AND ASSIGNS

21.1 .....Successors and Assigns..................................20

EXHIBITS

Exhibit A....Two-phase Tract Participation
Exhibit B....Map of Unit Area
Exhibit C....Schlumberger (Dual Induction-SFL-Sonic) electric log

UNIT AGREEMENT

Clarksville Cotton Valley Unit

Red River County, Texas

THIS AGREEMENT, entered into as of the 25th day of January, 1990, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to become a part hereto,

WITNESSETH:

WHEREAS, in the interest of the public welfare and to promote conservation and increase the ultimate recovery of Unitized Substances from the Clarksville Cotton Valley Field, in Red River County, Texas, and to protect the rights of the owners of interests therein, it is deemed necessary and desirable to enter into this agreement to unitize the Oil and Gas Rights in and to the Unitized Formation in order to conduct Unit Operations as herein provided,

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, it is agreed as follows:

ARTICLE 1

DEFINITIONS

As used in this agreement:

1.1  Unit Area is the land described by Tracts in Exhibit A and shown on Exhibit B as to which this agreement becomes effective or to which it may be extended or reduced as herein provided.

1.2  Unitized Formation is that subsurface portion of the Unit Area commonly known as the Clarksville Cotton Valley Field, Red River County, Texas which is described as that stratigraphic interval or its correlative equivalent between the log depth of 4700' and 5574' in the SFM Holdings, Inc. Willis #1 Well located 2856' FMNSL, 467' FWL of the Wm. Brinton Survey A-45, as shown on the Schlumberger (Dual Induction-SFL-Sonic) electric log run on December 11, 1985, a portion of which log is attached hereto as Exhibit C.

1.3  Unitized Substances are all oil, gas, gaseous substances, sulphur contained in gas, condensate, distillate, and all associated and constituent liquid or liquefiable hydrocarbons other than Outside Substances within or produced from the Unitized Formation from wells within the Unit Area.

1.4  Working Interest is an interest in Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, including a carried working

interest, the owner of which interest is obligated to pay, either in cash or out of production or otherwise, a portion of the cost of drilling, developing, producing, and operating the Unitized Formation; however, Oil and Gas Rights that are free of lease or other instrument creating a Working Interest shall be regarded as a Working Interest to the extent of seven-eighths (7/8) thereof and a Royalty Interest to the extent of the remaining one-eighth (1/8) thereof. A Royalty Interest created out of a Working Interest subsequent to the execution of this agreement by the owner of such Working Interest shall continue to be subject to such Working Interest burdens and obligations that are stated in this agreement and the Unit Operating Agreement.

1.5 <u>Royalty Interest</u> is a right to or interest in any portion of the Unitized Substances or proceeds thereof other than a Working Interest.

1.6 <u>Royalty Owner</u> is a party hereto who owns a Royalty Interest.

1.7 <u>Working Interest Owner</u> is a party hereto who owns a Working Interest.

1.8 <u>Tract</u> is the land described as such and given a Tract number in Exhibit A.

1.9 <u>Unit Operating Agreement</u> is the agreement entered into by Working Interest Owners, having the same Effective Date as this agreement, entitled "Unit Operating Agreement, Clarksville Cotton Valley Unit, Red River County, Texas."

1.10 <u>Unit Operator</u> is the Working Interest Owner designated by Working Interest Owners under the Unit Operating Agreement to conduct Unit Operations, acting as operator and not as a Working Interest Owner.

1.11 <u>Tract Participation</u> is the percentage shown on Exhibit A for allocating Unitized Substances to a Tract.

1.12 <u>Unit Participation</u> of a Working Interest Owner is the sum of the percentages obtained by multiplying the Working Interest of such Working Interest Owner in each Tract that qualifies for inclusion within the Unit Area by the Tract Participation of such Tract.

1.13 <u>Outside Substances</u> are all substances purchased or otherwise obtained from any source other than the Unitized Formation which are injected into the Unitized Formation.

1.14 <u>Oil and Gas Rights</u> are the rights to explore, develop, and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.15 <u>Unit Operations</u> are all operations conducted pursuant to this agreement and the Unit Operating Agreement.

*Unit Equipment* is all personal property, le__ id well equipment, plants and othe_ facilities and equipment taken over or otherwise acquired for the joint account for use in Unit Operations.

1.17 <u>Unit Expense</u> is all cost, expense, or indebtedness incurred by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of Unit Operations.

1.18 <u>Effective Date</u> is the time and date this agreement becomes effective as provided in Section 17.1.

## ARTICLE 2

## EXHIBITS

2.1 <u>Exhibits</u>.  The following exhibits, which are attached hereto, are incorporated herein by reference:

2.1.1 <u>Exhibit A</u> is a schedule that describes each Tract in the Unit Area and shows its Tract Participation.

2.1.2 <u>Exhibit B</u> is a map that shows the boundary lines of the Unit Area and the Tracts therein.

2.1.3 <u>Exhibit C</u> is Schlumberger (Dual Induction/SFL/Sonic) electric log run on December 11, 1985 on SFM Holdings, Inc.'s Willis #1 Well.

2.2 <u>Reference to Exhibits</u>.  When reference is made to an exhibit, it is to the exhibit as originally attached or, if revised, to the last revision.

2.3 <u>Exhibits Considered Correct</u>.  Exhibits A and B shall be considered to be correct until revised as herein provided.

2.4 <u>Correcting Errors</u>.  The shapes and descriptions of the respective Tracts have been established by using the best information available.  If it subsequently appears that any Tract, because of diverse royalty or working interest ownership on the Effective Date, should have been divided into more than one Tract, or that any mechanical miscalculation or clerical error has been made, Unit Operator, with the approval of Working Interest Owners, shall correct the mistake by revising the exhibits to conform to the facts.  The revision shall not include any re-evaluation of engineering or geological interpretations used in determining Tract Participation.  Each such revision of an exhibit made prior to thirty (30) days after the Effective Date shall be effective as of the Effective Date.  Each such revision thereafter made shall be effective at 7:00 a.m. on the first day of the calendar month next following the filing for record of the revised exhibit or on such other date as may be determined by Working Interest Owners and set forth in the revised exhibit.

3

2.5  <u>Filing Revised Exhibits</u>.  If an exhibit is revised, Unit Operator shall execute an appropriate instrument with the revised exhibit attached and file the same for record in Red River County, Texas.

ARTICLE 3

CREATION AND EFFECT OF UNIT

3.1  <u>Oil and Gas Rights Unitized</u>.  All Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibit A and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized insofar as the respective Oil and Gas Rights pertain to the Unitized Formation, so that Unit Operations may be conducted with respect to the Unitized Formation as if the Unit Area had been included in a single lease executed by all Royalty Owners, as lessors, in favor of all Working Interest Owners, as lessees, and as if the lease contained all of the provisions of this agreement.

3.2  <u>Personal Property Excepted</u>.  Except for equipment designated as Unit Equipment by the Working Interest Owners pursuant to the Unit Operating Agreement, all lease and well equipment, materials, and other facilities heretofore or hereafter placed by any of the Working Interest Owners on the lands covered hereby shall be deemed to be and shall remain personal property belonging to and may be removed by Working Interest Owners.  The rights and interests therein as among Working Interest Owners are set forth in the Unit Operating Agreement.

3.3  <u>Amendment of Leases and Other Agreements</u>.  The provisions of the various leases, agreements, division and transfer orders, or other instruments pertaining to the respective Tracts or the production therefrom are amended to the extent necessary to make them conform to the provisions of this agreement, but otherwise shall remain in effect.

3.4  <u>Continuation of Leases and Term Interests</u>.  Production from any part of the Unitized Formation, except for the purpose of determining payments to Royalty Owners, or other Unit Operations shall be considered as production from or operations upon each Tract, and such production or operations shall continue in effect each lease or term mineral or royalty interest as to all lands and formations covered thereby just as if such operations were conducted on and as if a well were producing from each Tract.

3.5  <u>Titles Unaffected by Unitization</u>.  Nothing herein shall be construed to result in the transfer of title to Oil and Gas Rights by any party hereto to any other party or to Unit Operator.

4

3.    Injection Rights.  Royalty Owners hereby grant Working Interest Owners the right to inject into the Unitized Formation and/or in the remainder of the Clarksville (Cotton Valley Sand) Field, if any, any substances in whatever amounts Working Interest Owners deem expedient for Unit Operations, together with the right to drill, use, and maintain injection wells on the Unit Area, and to use for injection purposes any nonproducing or abandoned wells or dry holes, and any producing wells completed in the Unitized Formation.

3.7    Development Obligation.  Nothing herein shall relieve Working Interest Owners from any obligation to develop reasonably as a whole the lands and leases committed hereto.

3.8    Ratification and Extension of Leases and Units.  Each Royalty Owner acknowledges the validity of and confirms all of the terms and provisions of each lease, and each prior pooling document effecting such lease, covering land in whole or in part within the Unit Area under which said Royalty Owner owns a Royalty Interest, as to all minerals in and under all land covered thereby, and it is expressly agreed and understood that each such lease is now in full force and effect and shall, as to all of said minerals, continue in force and effect from the date of execution hereof by each such Royalty Owner until the Effective Date and thereafter in accordance with the respective terms and provisions of each lease and of this Agreement.  Each Royalty Owner does hereby adopt, ratify, and confirm each lease covering land in whole or in part within the Unit Area under which said Royalty Owner owns a Royalty Interest, as to all minerals in and under all land covered thereby.

ARTICLE 4

PLAN OF OPERATIONS

4.1    Unit Operator.  Working Interest Owners are concurrently herewith entering into the Unit Operating Agreement, designating SFM Holdings, Inc. as the initial Unit Operator.  Unit Operator, pursuant to Article 7 of the Unit Operating Agreement, shall have the exclusive right to conduct Unit Operations, which shall conform to the provisions of this agreement and the Unit Operating Agreement.  If there is any conflict between such agreements, this agreement shall govern.

4.2    Method of Operation.  To the end that the quantity of Unitized Substances ultimately recoverable may be increased and waste prevented, Working Interest Owners shall, with diligence and in accordance with good engineering and production practices, engage in pressure maintenance, secondary recovery or other enhanced

5

recovery operations which may include (without limiting the right of the Working Interest Owners to employ other methods) water injection into the Unitized Formation, as well as operating programs during and/or after injection to recover Unitized Substances for sales, which programs may incorporate well locations, producing rates and operating practices designed to provide optimum recovery of Unitized Substances.

4.3 Change of Method of Operations. Nothing herein shall prevent Working Interest Owners from discontinuing or changing in whole or in part any method of operation which, in their opinion, is no longer in accord with good engineering or production practices. Other methods of operation may be conducted or changes may be made by Working Interest Owners from time to time if determined by them to be feasible, necessary, or desirable to increase the ultimate recovery of Unitized Substances.

ARTICLE 5

TRACT PARTICIPATIONS

5.1 Tract Participations. The Tract Participation of each Tract is shown in Exhibit "A" for Phase I and Phase II. Phase I participation shall end and Phase II participation shall commence at 7:00 a.m. on the first day of the month following production of the estimated remaining primary recovery of 264,720 stock tank barrels of oil from the tracts shown on the original Exhibits A and B. If the Unit Area is greater or less than the tracts shown on the original exhibits, the volume of production triggering Phase II participation must be adjusted for the change and recalculated as agreed upon by the Working Interest Owners. All production from 7:00 a.m. on November 1, 1989 shall be counted in calculating when the estimated remaining primary recovery has been produced.

5.2 Relative Tract Participations. If the Unit Area is enlarged or reduced, the revised Tract Participations of the Tracts remaining in the Unit Area and which were within the Unit Area prior to the enlargement or reduction shall remain in the same ratio one to another.

ARTICLE 6

ALLOCATION OF UNITIZED SUBSTANCES

6.1 Allocation to Tracts. All Unitized Substances produced and saved and not required for use in Unit Operations shall be allocated to the several Tracts in accordance with the respective Tract Participations effective during the period that the Unitized Substances were produced. The amount of Unitized Substances

6

allocated to each Tract, regardless of whether the amount is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract.

6.2  **Distribution Within Tracts**.  The Unitized Substances allocated to each Tract shall be distributed among, or accounted for to, the parties entitled to share in the production from such Tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such Tract, or in the proceeds thereof, had this agreement not been entered into, and with the same legal effect.  If any Oil and Gas Rights in a Tract hereafter become divided and owned in severalty as to different parts of the Tract, the owners of the divided interests, in the absence of an agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract, or in the proceeds thereof, in proportion to the surface acreage of their respective parts of the Tract.  Any royalty or other payment which depends upon per well production or pipeline runs from a well or wells on a Tract shall, after the Effective Date, be determined by dividing the Unitized Substances allocated to the Tract by the number of wells on the Tract capable of producing Unitized Substances on the Effective Date; however, if any Tract has no well thereon capable of producing Unitized Substances on the Effective Date, the Tract shall, for the purpose of this determination, be deemed to have one such well thereon.

6.3  **Taking Unitized Substances in Kind**.  The Unitized Substances allocated to each Tract shall be delivered in kind to the respective parties entitled thereto by virtue of the ownership of Oil and Gas Rights therein or by purchase from such owners at the outlet of the Unit's central production facility.  Such parties shall have the right to construct, maintain, and operate within the Unit Area all necessary facilities for that purpose, provided they are so constructed, maintained, and operated as not to interfere with Unit Operations.  Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of Unitized Substances shall be borne by the owner of such portion.  If a Royalty Owner has the right to take in kind a share of Unitized Substances and fails to do so, the Working Interest Owner whose Working Interest is subject to such Royalty Interest shall be entitled to take in kind such share of Unitized Substances.  All parties who exercise the right to take in kind must notify the Unit Operator at least thirty (30) days in advance of the first day of the first

7

calendar month in which such party wishes to take Unitized Substances in kind. Such notice will remain effective until revoked in the same manner.

6.4   <u>Failure to Take in Kind</u>.   If any party fails to take in kind or separately dispose of such party's share of Unitized Substances, Unit Operator shall have the right, but not the obligation, for the time being and subject to revocation at will by the party owning the share, to sell to others such share; however, all contracts of sale by Unit Operator of any other party's share of Unitized Substances shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any such contract be for a period in excess of one year.   The proceeds of the Unitized Substances so disposed of by Unit Operator shall be paid to the Working Interest Owners of each affected Tract or a party designated by such Working Interest Owners who shall distribute such proceeds to the parties entitled thereto.   Notwithstanding the foregoing, Unit Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days' notice of such intended sale.

6.5   <u>Responsibility for Royalty Settlements</u>.   Any party receiving in kind or separately disposing of all or part of the Unitized Substances allocated to any Tract shall be responsible for the payment of all royalties, overriding royalties, production payments, and all other payments burdening that party's interest chargeable against or payable out of such Unitized Substances, and shall indemnify all parties hereto, including Unit Operator, against any liability for such payment.   In all cases where arrangements have been made by Working Interest Owners to have Unit Operator make any of the above-referenced payments for their accounts, each such Working Interest Owner agrees to pay Unit Operator each month a sum of money sufficient to cover all such payments made in its behalf and to furnish Unit Operator with complete information upon which Unit Operator may base such payments, including, if requested to do so, complete abstracts of title to the lands covered by its Working Interest.

6.6   <u>Royalty on Outside Substances</u>.   If any Outside Substance consisting of natural gases is injected into the Unitized Formation, ninety percent (90%) of any like substance contained in Unitized Substances subsequently produced and sold, or used for other than Unit Operations, shall be deemed to be a part of the Outside Substance so injected until the total volume deemed to be such Outside Substance equals the total volume of such Outside Substance so injected.   If any Outside

8

Substance which prior to injection is liquefied petroleum gas or other liquid hydrocarbons is injected into the Unitized Formation, ten percent (10%) of all Unitized Substances produced and sold after one year from the time the injection of such Outside Substance was commenced shall be deemed to be a part of the Outside Substance so injected until the total value of the production deemed to be such Outside Substance equals the total costs of the Outside Substance so injected. Such ten percent (10%) of the Unitized Substances deemed to be Outside Substances will be in addition to that which is being recovered for natural gases as hereinabove provided, if both liquefied petroleum gas or other liquid hydrocarbons and natural gases are injected. No payment shall be due or payable to Royalty Owners on substances produced from the Unitized Formation that are deemed to be Outside Substances.

## ARTICLE 7
### PRODUCTION AS OF THE EFFECTIVE DATE

7.1  <u>Oil or Liquid Hydrocarbons in Lease Tanks</u>.  Unit Operator shall gauge or otherwise determine the amount of merchantable oil or other liquid hydrocarbons produced from the Unitized Formation that are in lease and power-oil tanks as of 7:00 a.m. on the Effective Date.  Oil or other liquid hydrocarbons in treating vessels, separation equipment, and tanks below pipeline connections shall not be considered to be merchantable.  Any merchantable oil or other liquid hydrocarbons that are a part of or attributable to the prior allowable of the wells from which they were produced shall remain the property of the parties entitled thereto as if this agreement had not been entered into.  Any such merchantable oil or other liquid hydrocarbons not promptly removed may be sold by Unit Operator for the account of the Working Interest Owners entitled thereto who shall pay all royalty due thereon under the provisions of applicable leases or other contracts.  Any oil or liquid hydrocarbons in excess of that attributable to the prior allowable of the wells from which they were produced shall be regarded as Unitized Substances produced after the Effective Date.

7.2  <u>Overproduction</u>.  If, as of the Effective Date, any Tract is overproduced with respect to the allowable of the wells on that Tract, and if the amount of overproduction has been sold or otherwise disposed of, such overproduction shall be regarded as a part of the Unitized Substances produced after the Effective Date and shall be charged to such Tract as having been delivered to the parties entitled to Unitized Substances allocated to such Tract.

9

ARTICLE 8

USE OR LOSS OF UNITIZED SUBSTANCES

8.1  Use of Unitized Substances.  Working Interest Owners may use or consume Unitized Substances for Unit Operations, including but not limited to the injection thereof into the Unitized Formation.

8.2  Royalty Payments.  No royalty, overriding royalty, production, or other payments shall be payable on account of Unitized Substances used, lost, or consumed in Unit Operations, or which otherwise may be lost or consumed in the production, handling, testing, processing, compressing, dehydrating, transportation, storing, or sale of Unitized Substances.

ARTICLE 9

TRACTS TO BE INCLUDED IN UNIT

9.1  Qualification of Tracts.  On and after the Effective Date and until the enlargement or reduction thereof, the Unit Area shall be composed of the Tracts listed in Exhibit A that corner or have a common boundary (Tracts separated only by a public highway or a railroad right of way shall be considered to have a common boundary), and that otherwise qualify as follows:

9.1.1  Each Tract as to which Working Interest Owners owning one hundred percent (100%) of the Working Interest have become parties to this agreement, and as to which Royalty Owners owning sixty-five percent (65%) or more of the Royalty Interest have become parties to this agreement.

9.1.2  Each Tract as to which Working Interest Owners owning one hundred percent (100%) of the Working Interest have become parties to this agreement, and as to which Royalty Owners owning less than sixty-five percent (65%) of the Royalty Interest have become parties to this agreement, and as to which (a) all Working Interest Owners in such Tract have joined in a request for the inclusion of such Tract in the Unit Area, and as to which (b) Working Interest Owners having eighty-five percent (85%) or more of the combined voting interests in all Tracts that meet the requirements of Section 9.1.1 have voted in favor of the inclusion of such Tract.  For the purpose of this Section 9.1.2, the voting interest of a Working Interest Owner shall be equal to the ratio that its Unit Participation attributable to Tracts that qualify under Section 9.1.1 bears to the total Unit Participation of all Working Interest Owners attributable to all Tracts that qualify under Section 9.1.1.

10

9.1.3   Each Tract as to which Working Interest Owners owning less than one hundred percent (100%) of the Working Interest have become parties to this agreement, regardless of the percentage of Royalty Interest therein that is committed hereto; and as to which (a) Working Interest Owners, including the Working Interest Owner who operates the Tract, owning a total of eighty-five percent (85%) or more of the Working Interest in such Tract that is committed to this agreement have joined in a request for inclusion of such Tract in the Unit Area, and have executed and delivered, or have obligated themselves to execute and deliver, an indemnity agreement, attached to the Unit Operating Agreement as Exhibit "G", indemnifying and agreeing to hold harmless the other Working Interest Owners in the Unit Area, their successors and assigns, against all claims and demands that may be made by the owners of Working Interests in such Tract who are not parties to this agreement, and which arise out of the inclusion of the Tract in the Unit Area; and as to which (b) Working Interest Owners having eighty-five percent (85%) or more of the combined voting interest in all Tracts that meet the requirements of Sections 9.1.1 and 9.1.2 have voted in favor of the inclusion of such Tract and to accept the indemnity agreement.   For the purpose of this Section 9.1.3, the voting interest of each Working Interest Owner shall be equal to the ratio that its Unit Participation attributable to Tracts that qualify under Sections 9.1.1 and 9.1.2 bears to the total Unit Participation of all Working Interest Owners attributable to all Tracts that qualify under Sections 9.1.1 and 9.1.2. Upon the inclusion of such a Tract in the Unit Area, the Unit Participation that would have been attributed to the nonsubscribing owners of Working Interest in such Tract, had they become parties to this agreement and the Unit Operating Agreement, shall be attributed, in proportion to their respective Working Interests in such Tract, to the Working Interest Owners in the Tract who have executed indemnity agreements.

9.1.4   Each Tract, regardless of the percentage of Working Interest or Royalty Interest therein that has been committed hereto, as to which (a) the Working Interest Owner who operates the Tract has become a party to this Agreement and (b) Working Interest Owners having eighty-five percent (85%) or more of the combined voting interest of Working Interest Owners in all Tracts that meet the requirements of Section 9.1.1 and 9.1.2 or 9.1.3 vote in favor of the inclusion of such Tract.   For the purpose of this Section 9.1.4, the

11

voting interest of each Working Interest Owner shall be equal to the ratio that its Unit Participation attributable to Tracts that qualify under Sections 9.1.1, 9.1.2 and 9.1.3 bears to the total Unit Participation of all Working Interest Owners attributable to all Tracts that qualify under Sections 9.1.1, 9.1.2 and 9.1.3. Upon the inclusion of such a Tract in the Unit Area, the Unit Participation that would have been attributed to the nonsubscribing owners of the Working Interest in such Tract, had they become parties to this Agreement and the Unit Operating Agreement, shall be attributed to the Working Interest Owners in all Tracts that meet the requirements of 9.1.1, 9.1.2 or 9.1.3, in proportion to their respective Unit Participations.

9.2   <u>Commitment of Interests to Unit</u>.  The execution of this agreement by a party shall commit all interests owned or controlled by such party as of the date of execution, and additional interests acquired before the Effective Date.  After the Effective Date, the commitment of any interest in any Tract within the Unit Area shall be upon such terms as may be negotiated by Working Interest Owners and the owner of such interest.

9.3   <u>Revision of Exhibits</u>.  If any of the Tracts described in Exhibit A fail to qualify for inclusion in the Unit Area, Unit Operator shall recompute the Tract Participation of each of the qualifying Tracts, using the original basis of computation, and shall revise Exhibits A and B accordingly.  Such revised exhibits shall be effective as of 7:00 a.m. on the Effective Date.

9.4   <u>Acquisition of Uncommitted Interest</u>.  In the event at any time after the Effective Date hereof any party bound by this Agreement acquires an uncommitted interest in any Tract included in the Unit Area, such interest upon being so acquired shall, with the approval of Working Interest Owners, be subject to this Agreement; and where the interest acquired is a Working Interest, such interest shall also be subject to the Unit Operating Agreement.

ARTICLE 10

TITLES

10.1   <u>Removal of Tract from Unit Area</u>.  If a Tract ceases to have sufficient Working Interest Owners or Royalty Owners committed to this agreement to meet the conditions of Article 9 because of failure of title of any party hereto, such Tract shall be removed from the Unit Area effective as of 7:00 a.m. on the first day of the calendar month in which the failure of title is finally determined unless within ninety (90) days after the date of final determination of the failure of

12

title, the Tract qualifies under a Section of Article 9. Provided, however, it is agreed that nothing in this Section 10.1 shall ever be construed as removing from the Unit Area any Tract as to the parcels of land contained therein as to which there is no title failure. Such Tract, reduced by the parcel or parcels of land removed from the Unit Area because of failure of title of any party hereto shall remain in the Unit Area and shall not be required to requalify under any of the provisions of Article 9 and if under the foregoing procedures an attempt is made to requalify such Tract and fails, then such Tract as to the parcels of land contained therein as to which there is no failure of title shall remain in the Unit Area just as though there had never been any failure of title to any of the parcels of land contained therein except that said Tract shall be reduced in size to the extent of those parcels of land removed therefrom because of failure of title.

10.2  Revision of Exhibits.  If a Tract or parcel of land within a Tract is removed from the Unit Area because of failure of title, Unit Operator, subject to Section 5.2, shall recompute the Tract Participation of each of the Tracts remaining in the Unit Area and shall revise Exhibits A and B accordingly. The revised exhibits shall be effective as of 7:00 a.m. on the first day of the calendar month in which such failure of title is finally determined.

10.3  Working Interest Titles.  If title to a Working Interest fails, the rights and obligations of Working Interest Owners by reason of the failure of title shall be governed by the Unit Operating Agreement.

10.4  Royalty Interest Titles.  If title to a Royalty Interest fails, but the Tract to which it relates is not removed from the Unit Area, the party whose title failed shall not be entitled to share hereunder with respect to such interest.

10.5  Production Where Title is in Dispute.  If the title or right of any party claiming the right to receive in kind all or any portion of the Unitized Substances allocated to a Tract is in dispute, Unit Operator at the direction of Working Interest Owners shall either:

(a) require that the party to whom such Unitized Substances are delivered or to whom the proceeds thereof are paid furnish security for the proper accounting therefor to the rightful owner if the title or right of such party fails in whole or in part, or

(b) withhold and market the portion of Unitized Substances with respect to which title or right is in dispute, and impound the proceeds thereof until such time as the title or right thereto is established by a final judgment of

13

a court of competent jurisdiction or otherwise to the satisfaction of Working Interest Owners, whereupon the proceeds so impounded shall be paid to the party rightfully entitled thereto.

10.6 Payment of Taxes to Protect Title. The owner of surface rights to lands within the Unit Area, or severed mineral interests or Royalty Interests in such lands, or lands outside the Unit Area on which Unit Equipment is located, is responsible for the payment of any ad valorem taxes on all such rights, interests, or property, unless such owner and Working Interest Owners otherwise agree. If any ad valorem taxes are not paid by or for such owner when due, Unit Operator may, with approval of Working Interest Owners, at any time prior to tax sale, or expiration of period of redemption after tax sale, pay the tax, redeem such rights, interests, or property, and discharge the tax lien. Any such payment shall be an item of Unit Expense. Unit Operator shall, if possible, withhold from any proceeds derived from the sale of Unitized Substances otherwise due any delinquent taxpayer an amount sufficient to defray the costs of such payment or redemption, such withholding to be credited to Working Interest Owners. Such withholding shall be without prejudice to any other remedy available to Unit Operator or Working Interest Owners.

ARTICLE 11

EASEMENTS OR USE OF SURFACE

11.1 Grant of Easements. The parties hereto, to the extent of their rights and interests, hereby grant to Working Interest Owners the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for Unit Operations and the removal of Unitized Substances from the Unit Area; however, nothing herein shall be construed as leasing or otherwise conveying to Working Interest Owners a camp site or a plant site for water injection, gas injection, or gas processing.

11.2 Use of Water. Working Interest Owners shall have and are hereby granted free use of water from the Unit Area for Unit Operations, except water from any well, lake, pond, or irrigation ditch of a Royalty Owner. Working Interest Owners may convert any existing or future dry or abandoned wells in the Unit Area to water supply injection and/or disposal wells.

11.3 Surface Damages. Working Interest Owners shall pay the surface owner for damages to growing crops, timber, fences, improvements, and structures on the Unit Area that result from Unit Operations.

14

ARTICLE 12

## ENLARGEMENTS OF UNIT AREA

12.1 <u>Enlargements of Unit Area</u>. The Unit Area may be enlarged from time to time to include acreage reasonably proved to be productive upon such terms as may be determined by Working Interest Owners including, but not limited to, the following:

12.1.1 The acreage shall qualify under a Section of Article 9.

12.1.2 The participation to be allocated to the acreage shall be fair and reasonable, considering all available information.

12.1.3 There shall be no retroactive allocation or adjustment of Unit Expense or of interests in the Unitized Substances produced, or proceeds thereof; however, this limitation shall not prevent an adjustment of investment by reason of the enlargement.

12.2 <u>Determination of Tract Participation</u>. Unit Operator, subject to Sections 5.2 and 12.1, shall determine the Tract Participation of each Tract within the Unit Area as enlarged, and shall revise Exhibits A and B accordingly.

12.3 <u>Effective Date</u>. The effective date of any enlargement of the Unit Area shall be 7:00 a.m. on the first day of the calendar month following compliance with conditions for enlargement as specified by Working Interest Owners and the filing for record of revised Exhibits A and B in Red River County, Texas.

ARTICLE 13

## TRANSFER OF TITLE-PARTITION

13.1 <u>Transfer of Title</u>. Any conveyance of all or any part of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this agreement. No change of title shall be binding upon Unit Operator, or upon any party hereto other than the party so transferring, until 7:00 a.m. on the first day of the calendar month next succeeding the date of receipt by Unit Operator of a photocopy, or a certified copy, of the recorded instrument evidencing such change in ownership.

13.2 <u>Waiver of Rights to Partition</u>. Each Party hereto agrees that, during the existence of this agreement, it will not resort to any action to partition the Unitized Formation or the Unit Equipment, and to that extent waives the benefits of all laws authorizing such partition.

13.3 <u>Covenant Running With the Land</u>. This Agreement shall extend to, be binding upon, and inure to the benefit of, the respective heirs, devisees, legal

15

representatives, successors, and assigns of the parties hereto, and shall constitute a covenant running with the lands, leases, and interests covered hereby.

13.4 _Notice of Transfer_. Any conveyance of all or any part of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this Agreement. No change of title shall be binding on the Unit Operator, or upon any party hereto other than the party transferring, until the first day of the calendar month next succeeding the date of receipt of Unit Operator of a photocopy or certified copy of the recorded instrument evidencing such change in ownership.

13.5 _Carved-Out Interest Subject to This Agreement_. In the event any Working Interest Owners shall, after executing this Agreement, create an overriding royalty, production payment, net profits, or carried interest, or any other interest out of its Working Interest then subject to this Agreement, such carved-out interest shall be subject to the terms and provisions of this Agreement, specifically including, but without limitation, the lien of Unit Operator and the lien of the Working Interest Owners granted under Article 11 of the Unit Operating Agreement. In the event the Working Interest Owner creating such carved-out interest (a) fails to pay any costs or expenses chargeable to such Working Interest Owner under this Agreement and the production of Unitized Substances accruing to the credit of such Working Interest Owner is insufficient for that purpose, or (b) withdraws from the Unit Operating Agreement under the terms and provisions thereof, the carved-out interest shall be chargeable with pro rata portion of all costs and expenses incurred hereunder, the same as though such carved-out interest were a Working Interest committed to this Agreement and the Unit Operating Agreement, and Unit Operator or Working Interest Owners shall have the right to enforce against such carved-out interest the lien and all other rights granted to the Unit Operator and Working Interest Owners for the purpose of collecting the costs and expenses chargeable to said carved-out interest.

13.6 _Liability of Transferor and Transferee_. Any Working Interest Owner assigning or transferring all or a portion of its Working Interest shall remain liable for its share of all costs and expenses incurred hereunder up to the first day of the calendar month next succeeding the date of receipt by Unit Operator of a photocopy or certified copy of the recorded instrument evidencing such change in ownership, and thereafter the transferree or assignee shall become liable for its proportionate share of such costs and expenses, and the transferring or assigning party shall be relieved of its share of such costs and expenses, to the extent of

16

the interest assigned or transferred, beginning on said first day of the calendar month.

## ARTICLE 14

### RELATIONSHIP OF PARTIES

14.1  <u>No Partnership</u>.  The duties, obligations, and liabilities of the parties hereto are intended to be several and not joint or collective.  This agreement is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, obligation, or liability with regard to any one or more of the parties hereto.  Each party hereto shall be individually responsible for its own obligations has herein provided.

14.2  <u>No Joint Refining or Marketing</u>.  This agreement is not intended to provide, and shall not be construed to provide, directly or indirectly, for any joint refining or marketing of Unitized Substances.

14.3  <u>Royalty Owners Free of Costs</u>.  This agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay Unit Expense unless such Royalty Owner is otherwise so obligated.

14.4  <u>Information to Royalty Owners</u>.  Each Royalty Owner shall be entitled to all information in possession of Unit Operator to which such Royalty Owner is entitled by an existing agreement with any Working Interest Owner, upon written request to Unit Operator.

## ARTICLE 15

### LAWS AND REGULATIONS

15.1  <u>Laws and Regulations</u>.  This agreement shall be subject to the conservation laws of the State of Texas, to the valid rules, regulations and order of the Railroad Commission of the State of Texas and to all other applicable federal, state and municipal laws, rules, regulations and orders.

## ARTICLE 16

### FORCE MAJEURE

16.1  <u>Force Majeure</u>.  All obligations imposed by this agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a labor dispute, fire, war, civil disturbance, act of God; by federal, state, or municipal laws; by any rule, regulation, or order of a governmental agency; by inability to secure materials; or by any other cause or causes, whether similar or dissimilar, beyond reasonable control of the party.  No party shall be required against its will to adjust or settle any labor dispute.

17

Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of failure to commence or of suspension of Unit Operations due to any one or more of the causes set forth in this Article.

## ARTICLE 17

### EFFECTIVE DATE

17.1  <u>Effective Date</u>.  This agreement shall become binding upon each party as of the date such party signs the instrument by which it becomes a party hereto, and, unless sooner terminated as provided in Section 17.2, shall become effective as to qualified Tracts at the time and date as determined by Working Interest Owners owning eighty-five percent (85%) or more of the combined Unit Participation in all the qualified Tracts, which time and date shall be after Tracts comprising seventy-five percent (75%) or more of the Unit Area as shown on the original Exhibit B have qualified under the provisions of Article 9; at least one counterpart of this agreement has been filed for record by Unit Operator in Red River County, Texas; and this agreement has been approved by the Railroad Commission of the State of Texas.

17.2  <u>Partial Disapproval or Invalidation</u>.  If this Agreement shall for any reason not be finally approved by the Railroad Commission of the State of Texas as to any qualified Tract or Tracts or portion thereof or after such approval be held to be invalid as to any qualified Tract or Tracts or portion thereof by the judgment of a Court having final jurisdiction of such matters, this Agreement shall terminate within sixty (60) days from the date on which the judgment invalidating a qualified Tract or Tracts or portion thereof becomes final and thereafter be of no further effect, unless within said sixty (60) day period Working Interest Owners owning a combined Unit Participation of at least sixty percent (60%) in those qualified Tracts which are approved and valid in whole or in part vote to continue this Agreement in force and effect as to the approved and valid portions of the qualified Tracts, which said approved or valid portions of the qualified Tracts shall thereafter become the Unit Area.  The original certificate shall also recite the fact of partial approval by the Railroad Commission and the subsequent vote to continue the Agreement as aforesaid, provided, however, in the case of partial invalidation by judgment occurring after the effective date hereof, a supplemental certificate shall be filed for record in Red River County, Texas reciting the facts of partial invalidation and subsequent vote to continue the agreement as aforesaid.

17.3  <u>Revision of Exhibits and Tract Participation</u>.  If any of the qualified Tracts, or a portion or portions thereof, are excluded from the Unit Area because

18

of action of the Railroad Commission of the State of Texas or of a Court having final jurisdiction, and Working Interest Owners owning the requisite Unit Participation vote to continue this Agreement in force and effect as to the approved and valid portions of the qualified Tracts, all as provided in Section 17.2, Unit Operator shall recompute, using the original basis of computation, the Tract Participation of each of the qualifying Tracts which are approved and valid, in whole or in part, and shall revise Exhibits A and B accordingly. The revised Exhibits shall be effective on the date determined by Working Interest Owners and set forth in the revised Exhibits.

17.4  Ipso Facto Termination. If the requirements of Section 17.1 are not accomplished on or before July 1, 1991, this agreement shall ipso facto terminate on that date (hereinafter called "termination date") and thereafter be of no further effect, unless prior thereto Working Interest Owners owning a combined Unit Participation of at least fifty percent (50%) have become parties to this agreement and Working Interest Owners owning one hundred percent (100%) or more of that percent have decided to extend the termination date for a period not to exceed one (1) year. If the termination date is so extended and the requirements of Section 17.1 are not accomplished on or before the extended termination date, this agreement shall ipso facto terminate on the extended termination date and thereafter be of no further effect. For the purpose of this section, Unit Participation shall be as calculated on the basis of Tract Participations shown on the original Exhibit A.

17.5  Certificate of Effectiveness. Unit Operator shall file for record in Red River County, Texas a certificate stating the Effective Date.

ARTICLE 18

TERM

18.1  Term. The term of this agreement shall be for the time that Unitized Substances are produced in paying quantities or other Unit Operations are conducted without a cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner herein provided.

18.2  Termination by Working Interest Owners. This agreement may be terminated by two or more Working Interest Owners owning a combined Unit Participation of seventy percent (70%) or more whenever such Working Interest Owners determine that Unit Operations are no longer profitable or feasible.

18.3  Effect of Termination. Upon termination of this agreement, the further development and operation of the Unitized Formation as a unit shall be abandoned,

19

and Unit Operations shall cease. Each oil and gas lease and other agreement covering lands within the Unit Area shall remain in force for ninety (90) days after the date on which this agreement terminates, and for such further period as in provided by the lease or other agreement.

18.4 <u>Salvaging Equipment Upon Termination</u>. If not otherwise granted by the leases or other instruments affecting each Tract, Royalty Owners hereby grant Working Interest Owners a period of six (6) months after the date of termination of this agreement within which to salvage and remove Unit Equipment.

18.5 <u>Certificate of Termination</u>. Upon termination of this agreement, Unit Operator shall file for record in Red River County, Texas a certificate that this agreement has terminated, stating its termination date.

ARTICLE 19

EXECUTION

19.1 <u>Original, Counterpart, or Other Instrument</u>. An owner of Oil and Gas Rights may become a party to this agreement by signing the original of this instrument, a counterpart thereof, or other instrument agreeing to become a party hereto. The signing of any such instrument shall have the same effect as if all parties had signed the same instrument.

19.2 <u>Joinder in Dual Capacity</u>. Execution as herein provided by any party as either a Working Interest Owner or a Royalty Owner shall commit all interests owned or controlled by such party.

ARTICLE 20

GENERAL

20.1 <u>Amendments Affecting Working Interest Owners</u>. Amendments hereto relating wholly to Working Interest Owners may be made if signed by all Working Interest Owners.

20.2 <u>Action by Working Interest Owners</u>. Except as otherwise provided in this agreement, any action or approval required by Working Interest Owners hereunder shall be in accordance with the provisions of the Unit Operating Agreement.

20.3 <u>Lien and Security Interest of Unit Operator</u>. Unit Operator shall have a lien upon and a security interest in the interests of Working Interest Owners in the Unit Area as provided in the Unit Operating Agreement.

ARTICLE 21

SUCCESSORS AND ASSIGNS

21.1 <u>Successors and Assigns</u>. This agreement shall extend to, be binding upon, and inure to the benefit of the parties hereto and their respective heirs,

20

devise, legal representatives, successors, and assigns, and shall constitute a covenant running with the lands, leases, and interests covered hereby.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the dates opposite their respective signatures.

ATTEST:

SFM HOLDINGS, INC.

Date: 4/6/90

**TOMMY C. MANN, ASSISTANT SECRETARY**

J. C. WELCH, VICE PRESIDENT-LAND

ATTEST:

THE ANSCHUTZ CORPORATION

Date:_____

ATTEST:

KING RANCH OIL & GAS, INC.

Date:_____

MARY P. POINDEXTER

Date:_____

ATTEST:

THE GRAYROCK CORPORATION

Date:_____

ATTEST:

S & P CO.

Date:_____

21

devisees, ____al representatives, successors, and assigns, and shall constitute a covenant running with the lands, leases, and interests covered hereby.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the dates opposite their respective signatures.

ATTEST:                                     SFM HOLDINGS, INC.

_____                   _____
Date:_____

ATTEST:                                     THE ANSCHUTZ CORPORATION

_____                   _____
Date:_____

ATTEST:                                     KING RANCH OIL AND GAS, INC.

Dwight Bowles                               R. Jarvis, President
Asst. Secretary                             MARY P. POINDEXTER

Date:_____

ATTEST:                                     THE GRAYROCK CORPORATION

_____                   _____
Date:_____

ATTEST:                                     S & P CO.

_____                   _____
Date:_____

21

devisees, ...l representatives, successors, and assigns, and shall constitute a covenant running with the lands, leases, and interests covered hereby.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the dates opposite their respective signatures.

ATTEST:                                SFM HOLDINGS, INC.


_____              _____
Date:_____


ATTEST:                                THE ANSCHUTZ CORPORATION


_____              _____
Date:_____


ATTEST:                                KING RANCH OIL & GAS, INC.


_____              _____
Date:_____

                                       MARY P. POINDEXTER

Date:_March 27, 1990                   By:_____
                                          John M. Shuey, Agent

ATTEST:                                THE GRAYROCK CORPORATION


_____              _____
Date:_____


ATTEST:                                S & P CO.


_____              _August Erickson_____
Date:_March 26, 1990

                                       AUGUST ERICKSON, General Manager


21

devisees, il representatives, successors, and assigns, and shall constitute a covenant running with the lands, leases, and interests covered hereby.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the dates opposite their respective signatures.

ATTEST:                                   SFM HOLDINGS, INC.

_____                   _____

Date:_____

ATTEST:                                   THE ANSCHUTZ CORPORATION

_____                   _____

Date:_____

ATTEST:                                   KING RANCH OIL & GAS, INC.

_____                   _____

Date:_____

                                          MARY P. POINDEXTER

Date:_____                    _____

ATTEST:                                   THE GRAYROCK CORPORATION

William T. Drozd, Sec.-Treasurer          By: *William T. Drozd*
Date: 4-4-60                                   William T. Drozd, President

ATTEST:                                   S & P CO.

_____                   _____

Date:_____

21

ATTEST:

Date: 3-5-90

ATTEST:

Date: 3-5-90

BEN ABNEY, ET AL NO. 2

TED C PARKER, JR. AGENT & ATTORNEY-IN-FA

WESTERN NATURAL GAS CO.

TED C PARKER, JR. PRES.

ROBERT S. FOLSOM

Date: _____

ATTEST:

_____

Date: _____

BELLWETHER EXPLORATION COMPANY

_____

E. H. HAWES, II, TRUSTEE

Date: _____

_____

22

ATTEST:                                    BEN ABNEY, ET AL NO. 2

_____
Date:_____


ATTEST:                                    WESTERN NATURAL GAS CO.

_____
Date:_____


                                           ROBERT S. FOLSOM

Date:_____


ATTEST:                                    BELLWETHER EXPLORATION COMPANY

_____
Date:_____


                                           E. H. HAWES, II, TRUSTEE

Date:_____


22

ATTEST:                                BEN ABNEY, ET AL NO. 2

_____          _____

Date:_____

ATTEST:                                WESTERN NATURAL GAS CO.

_____          _____

Date:_____


                                       ROBERT S. FOLSOM

Date:_____                   _____

ATTEST:                                BELLWETHER EXPLORATION COMPANY

SEAL                                   _____
                                       J. DARBY SERE'
Date:  APR 0 5 1990                    PRESIDENT

                                       E. H. HAWES, II, TRUSTEE

Date:_____                   _____


22

ATTEST:

BEN ABNEY, ET AL NO. 2

Date:_____

TED C PARKER, JR.  AGENT & ATTORNEY-IN-F.

ATTEST:

WESTERN NATURAL GAS CO.

Date:_____

TED C PARKER, JR.  PRES.

ROBERT S. FOLSOM

Date:_____

ATTEST:

BELLWETHER EXPLORATION COMPANY

Date:_____

Date: 3/27/90

E. H. HAWES, II, TRUSTEE

22

STATE OF _____ §
                         §
COUNTY OF _____ §

BEFORE ME, the undersigned authority, a notary public in and for the County and State aforesaid, on this day personally appeared _____ known to me to be the person(s) whose name(s) is (are) subscribed to the foregoing instrument, and acknowledged to me that (s)he (they) executed the same for the purposes and considerations therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, _____.

_____
Notary Public in and for the
County and State aforesaid

STATE OF _Texas_____ §
                       §
COUNTY OF _Dallas_____ §

BEFORE ME, the undersigned authority on this day personally appeared _J. C. Welch_____ known to me to be the person as _Vice President - Land_ of _Santa Fe Holding Co._ and acknowledged to me that _he executed the same for the purposes and consideration therein expressed and as the act and deed of said _J. C. Welch_____.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _2nd_ day of _April_, 19_70_.

_____
Notary Public in and for the
County and State aforesaid

Cheryl Adams
Notary Public, State of Texas
My Comm. Expires 3/4/93

23

STATE OF TEXAS

COUNTY OF HARRIS

    This instrument was acknowledged before me on April 6, 1990 by R. Jarvis, President of King Ranch Oil and Gas, Inc., a Texas corporation, on behalf of said corporation.

MARIANNE P. GILES
Notary Public, State of Texas
My Comm. Expires: 1-26-92

*Marianne P. Giles*
Notary Public in and for The State of Texas

STATE OF <u>LOUISIANA</u>     §
PARISH                        §
~~COUNTY~~ OF <u>CADDO</u>    §

    BEFORE ME, the undersigned authority, a notary public in and for the County and State aforesaid, on this day personally appeared <u>John M. Shuey, Agent</u>, for Mary P. known to me to be the person(s) whose name(s) is (are) subscribed to the          Poindext foregoing instrument, and acknowledged to me that (s)he (they) executed the same for the purposes and considerations therein expressed and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this <u>27</u> day of <u>March</u>, 1990.

                   _Joan S. Porter_
                   Notary Public in and for the
                   ~~County~~ and State aforesaid
                   Parish

STATE OF <u>Louisiana</u>   §
~~Parish~~ OF <u>Caddo</u>  §
~~COUNTY~~ OF <u>Caddo</u>  §

    BEFORE ME, the undersigned authority on this day personally appeared <u>August Erickson</u> known to me to be the person as <u>General Manager</u> of <u>O S + P Co.</u> and acknowledged to me that <u>he</u> executed the same for the purposes and consideration therein expressed and as the act and deed of said <u>S + P Co.</u>

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this <u>26</u>th day of <u>March</u>, 19<u>90</u>.

                   _Frances M. Bailey_
                   Notary Public in and for the
                   ~~County~~ and State aforesaid
                   ~~Parish~~

             **FRANCES M. BAILEY**
         **NOTARY PUBLIC, Caddo Parish, Louisiana**
            **My Commission is for Life**

23

STATE OF _Texas_ §
                        §
COUNTY OF _Dallas_ §

BEFORE ME, the undersigned authority, a notary public in and for the County and State aforesaid, on this day personally appeared _Nicholas T. Diego_ known to me to be the person(s) whose name(s) is (are) subscribed to the foregoing instrument, and acknowledged to me that (s)he (they) executed the same for the purposes and considerations therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _4th_ day of _April_.

_Jacquelyn M. Bentley_
Notary Public in and for the
County and State aforesaid

STATE OF _____ §
                       §
COUNTY OF _____ §

BEFORE ME, the undersigned authority on this day personally appeared _____ known to me to be the person as _____ of _____ and acknowledged to me that __he executed the same for the purposes and consideration therein expressed and as the act and deed of said _____.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, 19___.

_____
Notary Public in and for the
County and State aforesaid

23

STATE OF _____ §
                         §
COUNTY OF _____ §

      BEFORE ME, the undersigned authority, a notary public in and for the County and State aforesaid, on this day personally appeared _____, known to me to be the person(s) whose name(s) is (are) subscribed to the foregoing instrument, and acknowledged to me that (s)he (they) executed the same for the purposes and considerations therein expressed and in the capacity therein stated.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, _____.

                         _____
                         Notary Public in and for the
                         County and State aforesaid

STATE OF _TEXAS_ §
                 §
COUNTY OF _DALLAS_ §

      BEFORE ME, the undersigned authority on this day personally appeared _TED C. PARKER, JR._ known to me to be the person as _ATTORNEY-IN-FACT for DEV ABBEY, ETAL NO.2_ and acknowledged to me that __he executed the same for the purposes and consideration therein expressed and as the act and deed of said _PARTNERSHIP_.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE this _5th_ day of _MARCH_, 19_90_.

                         _Shirley A. Hudkins_
                         Notary Public in and for the
                         County and State aforesaid
                         SHIRLEY A. HUDKINS
                         Commission expires: 4-24-92

23

STATE OF _____  §
                          §
COUNTY OF _____    §


BEFORE ME, the undersigned authority, a notary public in and for the County and State aforesaid, on this day personally appeared _____ known to me to be the person(s) whose name(s) is (are) subscribed to the foregoing instrument, and acknowledged to me that (s)he (they) executed the same for the purposes and considerations therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, _____.


_____
Notary Public in and for the
County and State aforesaid


STATE OF TEXAS       §
                     §
COUNTY OF DALLAS     §


BEFORE ME, the undersigned authority on this day personally appeared TED C PARKER JR known to me to be the person as PRESIDENT of WESTERN NATURAL GAS Co and acknowledged to me that __he executed the same for the purposes and consideration therein expressed and as the act and deed of said CORPORATION.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 5th day of MARCH, 19 9_.


_____
Notary Public in and for the
County and State aforesaid
SHIRLEY A. HUDKINS
Commission Expires: 4-24-92

23

STATE OF _Texas_ §
                       §
COUNTY OF _Dallas_ §

BEFORE ME, the undersigned authority, a notary public in and for the County and State aforesaid, on this day personally appeared _Robert S Folsom_, known to me to be the person(s) whose name(s) is (are) subscribed to the foregoing instrument, and acknowledged to me that (s)he (they) executed the same for the purposes and considerations therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _4th_ day of _April_, _1990_.

SANDRA LEE MULL
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
AUGUST 7, 1993

_Sandra Lee Mull_
Notary Public in and for the
County and State aforesaid

STATE OF _____ §
                       §
COUNTY OF _____ §

BEFORE ME, the undersigned authority on this day personally appeared _____ known to me to be the person as _____ and acknowledged to me that ___he executed the same of for the purposes and consideration therein expressed and as the act and deed of said _____.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, 19___.

_____
Notary Public in and for the
County and State aforesaid

23

STATE OF _____ §
                       §
COUNTY OF _____ §

BEFORE ME, the undersigned authority, a notary public in and for the County and State aforesaid, on this day personally appeared known to me to be the person(s) whose name(s) is (are) subscribed to the foregoing instrument, and acknowledged to me that (s)he (they) executed the same for the purposes and considerations therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, _____.

_____
Notary Public in and for the
County and State aforesaid

STATE OF *Texas* §
                  §
COUNTY OF *Harris* §

BEFORE ME, the undersigned authority on this day personally appeared *D. Burton Sess*, known to me to be the person as *President* of *Bellwether Exploration Co.* and acknowledged to me that _he executed the same for the purposes and consideration therein expressed and as the act and deed of said *Corporation*.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this *5th* day of *April*, 19 *90*.

*Mickey K. Dethloff*
Notary Public in and for the
County and State aforesaid

23

STATE OF _OKLA_ §
§
COUNTY OF _TULSA_ §

BEFORE ME, the undersigned authority, a notary public in and for the County and State aforesaid, on this day personally appeared _E.H. HAWES II, TRUSTEE_ known to me to be the person(s) whose name(s) is (are) subscribed to the foregoing instrument, and acknowledged to me that (s)he (they) executed the same for the purposes and considerations therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _27_ day of _March_ .

_Mary Ann Martin_
Notary Public in and for the
County and State aforesaid

MY COMMISSION EXPIRES 5-18-9_

STATE OF _Okla._ §
§
COUNTY OF _Tulsa_ §

BEFORE ME, the undersigned authority on this day personally appeared _____ known to me to be the person as _____ of _____ and acknowledged to me that __he executed the same for the purposes and consideration therein expressed and as the act and deed of said _____ .

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _27th_ day of _March_ , 19_90_

_Mary Ann Martin_
Notary Public in and for the
County and State aforesaid

MY COMMISSION EXPIRES 5-18-93

23

EXHIBIT A TO UNIT AGREEMENT

Clarkeville Cotton Valley Unit
Red River County, Texas

TRACTS AND TRACT PARTICIPATIONS

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Tract Participation Phase I |
|---|---|---|---|---|---|
| 1 SFM Holdings, Inc. | Ross A #2 Unit | | 80.00 | 0.016389063 | 0.012996904 |
| 2 SFM Holdings, Inc. | | Volume 84, Page 110 | 36.531 | 0.000148427 | 0.000314008 |

A tract of land in the Lucy A. Collum Survey, A-177, Red River County, Texas containing 36.531 acres of land, more or less, and being further described as follows:

BEGINNING at a point which is North 12° 57' West 2125.522 feet, thence South 89° 50' East 1074.978 feet from the most southerly corner of the Lucy A. Collum Survey, said point being in the bank of Claphand Creek; THENCE in a southerly direction with the meanders of said creek South 32° 34' West 8.163 feet, South 85° 43' West 100.076 feet, South 41° 53' West 63.399 feet, South 20° 04' West 95.636 feet, South 23° 47½' East 30.957 feet, North 88° 44' East 129.847 feet, South 28° 14' East 36.004 feet, South 12° 46' West 135.238 feet, South 18° 26' West 72.112 feet, South 5° 13' East 89.277 feet, South 43° 6' West 126.579 feet, South 23° 26' West 106.806 feet, South 1° 14' East 70.851 feet, South 29° 31' East 84.339 feet, South 48° 32½' West 112.25 feet, South 7° 15½' West 61.799 feet, South 47° 22' West 62.458 feet, North 30° 20' West 121.592 feet, North 82° 12' West 37.75 feet, South 62° 31½' West 72.255 feet, South 32° 4½' West 36.005 feet, South 7° 6' West 62.373 feet, South 40° 58' West 148.385 feet, South 7° 13' East 39.338 feet, South 50° 49' East 70.165' North 84° 28' East 111.065 feet, South 57° 40' East, 74.116 feet, South 25° 27' East 47.852 feet, South 9° 44' West 95.435 feet, South 83° East 67.85 feet, South 23° 48' West 177.944 feet, North 77° 58' East 89.113 feet, South 44° 23' East 30.113 feet, South 1° 40' West 114.332 feet, South 13° 35' East 100.031 feet, South 2° 32' West 21.99 feet to a point in the most southerly SE boundary of the Lucy A. Collum Survey; THENCE with said boundary line North 57° 26' East 1463.58 feet; THENCE North 1003.664 feet; THENCE North 89° 50' West 1064.48 feet to Claphand Creek, the P.O.B.

LESS AND EXCEPT all that portion of Right-of-Way of State Highway No. 66 which runs across the above described tract of land.

Recording Information
for Units and/or Tract
Descriptions

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase II |
|---|---|---|---|---|---|
| 3 SFM Holdings, Inc. | | A tract of land in the Lucy A. Collum Survey A-177, Red River County, Texas, containing 29.09 acres, more or less, and being further described as follows:<br><br>Beginning at the most southerly corner of the Lucy A. Collum Survey; THENCE North 12° 57' West 2125.52 feet; THENCE South 89° 50' East 1074.98 feet to a point in the bank of Clapland Creek; THENCE in a southerly direction with the meanders of said creek South 32° 34' West 8.163 feet, South 85° 43' West 100.076 feet, South 41° 53' West 63.399 feet, South 20° 41' West 95.636 feet; South 23° 47¼' East 30.957 feet, North 88° 44' East 129.867 feet, South 28° 14' East 36.004 feet, South 12° 46' West 135.238 feet, South 18° 26' East 72.312 feet, South 5° 13' East 89.277 feet, South 43° 6' West 126.579 feet, South 23° 24' West 106.806 feet, South 1° 14' East 70.851 feet, South 29° 31' East 84.339 feet, South 48° 32½' West 112.25 feet, North 30° 20' West 61.799 feet, South 47° 22' West 62.458 feet, North 7° 15½' West 121.592 feet, North 82° 12' West 37.75 feet, South 62° 31½' West 72.255 feet, South 32° 4½' West 36.005 feet, South 7° 6' West 62.373 feet, South 50° 49' East 70.365 feet, North 84° 28' East 111.065 feet, South 57° 40' East 74.116 feet, South 27° 27' East 47.852 feet, South 9° 44' West 95.435 feet, South 83° 48' East 67.85 feet, South 23° 48' West 177.944 feet, North 77° 58' East 89.113 feet, South 44° 23' East 30.113 feet, South 1° 40' West 114.332 feet, South 13° 35' East 100.031 feet, South 2° 32' West 21.99 feet to a point in the most southerly SE boundary of the Lucy A. Collum Survey; THENCE South 57° 26' West 509.26 feet with said boundary to the P.O.B. | 29.09 | 0.000404164 | 0.001495228 |
| 4 SFM Holdings, Inc. | | A tract of land in the Lucy A. Collum Survey, A-177 and in the Matthias Ward Survey, A-944, Red River County, Texas being that portion of the right-of-way of State Highway No. 66, containing 4.495 acres, more or less, which is excepted from Tracts 2 and 5 of this Exhibit A to the Unit Agreement for the Clarksville Cotton Valley Field Unit. | 4.495 | 0.000067840 | 0.000207916 |

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase |
|---|---|---|---|---|---|
| 5 SFM Holdings, Inc. | | A tract of land in the Matthias Ward Survey, A-944, Red River County, Texas, containing 9.882 acres, more or less, and being further described as follows:<br><br>BEGINNING at a point in the northern boundary of the Matthias Ward Survey A-944, said point being North 57° 26' East 586.34 feet from the most southerly corner of the Lucy A. Collum Survey A-177; THENCE East 1168.49 feet; THENCE North 746.336 feet to a point in the northern boundary of the Matthias Ward Survey; THENCE with said boundary South 57° 26' West 1386.5 feet to the P.O.B.<br><br>LESS AND EXCEPT all that portion of Right-of-Way of State Highway No. 66 which crosses the southwest corner of the above described tract.<br><br>Amended   Volume 86, Page 456<br>Original   Volume 82, Page 200 | 9.882 | 0.000710474 | 0.0019737... |
| 6 SFM Holdings, Inc. | Ross #1 Unit | All that certain lot or parcel of land, containing 69.9094 acres, more or less, being a part of the William Brinton Survey, A-45, and Samuel Sims Survey, A-778, Red River County, Texas, and being the same land described in that Warranty Deed dated June 28, 1944, recorded in Volume 162, Page 306 of the Deed Records of Red River County, Texas, from P. T. Taylor and wife, Tommie, to C. V. Howland, and being described therein as follows: BEGINNING at a stake, the East Boundary line of said survey 400 varas North of its Southeast corner; THENCE West 780 varas to a stake on the East side of Highway No. 37; THENCE South 582 varas to a stake; THENCE East 780 varas a stake; THENCE North 582 varas a stake, the place of beginning containing 80.4 acres, more or less; LESS AND EXCEPT a portion of an 18.4 acre tract described in a Warranty Deed from C. V. Howland and wife, Sobina, dated May 2, 1951, recorded in Volume 188, Page 559 of the Deed Records. | 80.00 | 0.016465497 | 0.0362470... |
| 7 King Ranch Oil & Gas, Inc. | Howland #1 Unit | and<br><br>All that certain lot or parcel of land, containing 10.0906 acres, more or less, being part of the William Brinton Survey, A-45, Red River County, Texas, and being part of a 50 acre tract now or formerly owned by Mrs. Martha Bartley, said tract being further described as follows: | 80.00 | 0.019392960 | 0.019393... |

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase II |
|---|---|---|---|---|---|
| | | BEGINNING at the SW corner of that 80.4 acre tract described in a Warranty Deed dated June 28, 1944, recorded in Volume 162, Page 306 of the Deed Records of Red River County, Texas, from P. T. Taylor and wife, Tommie, to C. V. Howland; THENCE East 1883.6647 feet; THENCE South 233.3465 feet; THENCE West 1883.6647 feet; THENCE North 233.3465 feet to the point of beginning. | | | |
| 8  SFM Holdings, Inc. | Willis Unit #1 | Amended   Volume 87, Page 90<br>Original   Volume 81, Page 500<br>Amended   Volume 80, Page 391<br>Original   Volume 79, Page 608 | 80.00 | 0.049791695 | 0.080819028 |
| 9  SFM Holdings, Inc. | | All that certain tract or parcel of land situated in Red River County, Texas, about five miles SW from the city of Clarksville and being a part of the Wm. Brinton Survey, and being more particularly described by metes and bounds as follows: FIRST TRACT: Beginning at the NE corner of an 8½ acre tract deeded to Albert Martin by H. C. Slate on the 24th day of December, 1941; Thence North 87 varas a stake same being the SE corner of a four acre tract deed to Robert Kennemore; Thence West with Kennemore's south boundary line 324 varas his SW corner in Enos Elder's east boundary line; thence South 87 varas to a stake same being Albert Martins NW corner; and Thence East 324 varas to the beginning containing five (5) acres, more or less. SECOND TRACT: Beginning at the NE corner of a five acre tract hereto- fore deeded to Travis Owens and wife by H. C. Slate and wife; Thence North 70 varas; Thence West 324 varas to a stake in Enos Elder's East boundary line; Thence South 70 varas a stake same being the NW corner of said five acre tract; and Thence East 324 varas to the beginning, containing four (4) acres, more or less. Being the same land conveyed by Frank J. Wright, and wife, Leona D. Wright to Ross Mays and 565, Deed Records Red River County, Texas. THIRD TRACT: All that certain tract or parcel in the Wm. Brinton Survey and being a part of a certain 26.7 acre tract described in deed from H. C. Slate to Mrs. Leona Slate dated May, 1942, and recorded in Deed Book 156, Page 351 of the Deed Records of Red River County, Texas, to which reference is here made for all legal purposes, and said land is more particularly described by metes and bounds as follows: Beginning at | 13.7281 | 0.000479816 | 0.000891360 |

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase II |
|---|---|---|---|---|---|
| | | a stake in the West boundary line of the Wm. Sims survey, Abstract No. 778; 102.3 varas North of said Sims' SW corner; THENCE South 113.3 varas a stake same being the NE corner of a four acre tract heretofore deeded to Robert Kennemore by H. C. Slate; Thence West with Kennemore's north boundary line 324 varas to his NW corner same being the SW corner of the 26.7 acre tract; and THENCE East 324 varas to the place of beginning containing 6.7 acres more or less. Being the same land conveyed by James Wright and wife, Margaret Wright, to Ross Mays on the 16th day of April A.D. 1947, Recorded in Volume 173, Pages 565 and 566, Deed Records, Red River County, Texas. | | | |
| | | LESS AND EXCEPT a 1.971927 acre tract, being part of a 6.7 acre tract in the William Brinton Survey, A-45, sold by Mrs. Leona Slate to Walter E. Martin and wife, Mrs. Pearline Irene Martin, by deed dated 6/25/42, recorded in Book 156, Page 479, Red River County Deed Records, and being described as follows: | | | |
| | | Beginning at a point in the East side of State Highway No. 37, 284 feet North of the S.W. corner of the Samuel W. Sims Survey, A-778; said point being the S.E. corner of a 20 acre tract deeded to S. L. Wright and his wife; thence South 127.7819 feet; thence West 927.77 feet to a point on the west borderline of the above mentioned 6.7 acre tract; thence North 127.7819 feet; thence East along the southern border of the S. L. Wright 20 acre tract 927.77 feet to the P.O.B. less that portion in the State Highway No. 37 along the East side thereof (1.971927 acres). | | | |
| 10 SFM Holdings, Inc. | | All that portion of the right-of-way of State Highway 66 (F. M. Highway 909), being 100 feet wide, which borders on, or crosses Tracts 9 and 11 of this Exhibit A to the Unit Agreement of the Clarksville Cottm Valley Field Unit, being a part of the William Brinton Survey A-45, Red River County, Texas. | 1.61 | 0.000037826 | 0.00006193 |
| 11 SFM Holdings, Inc. | | Two tracts of land in the William Brinton Survey, A-45, Red River County, Texas, together being 13.5 acres and being further described as follows: | 13.5 | 0.000039471 | 0.000013273 |
| | | FIRST TRACT:  8.5 acres of land, more or less, being the same land described in a deed from Otis Herman Porterfield et ux, Rossie, to J. L. Stoker et ux, Wanda, dated 3-18-68, recorded in Volume 253, | | | |

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase II |
|---|---|---|---|---|---|
| 12 SFM Holdings, Inc. | | Page 678 of the Deed Records of Red River County, Texas, and being described by metes and bounds as follows:<br><br>BEGINNING at the NE corner of a 5 acre tract deeded to Louis Martin and wife, Opal Martin, on or about the 24th day of December, 1941; THENCE North 147½ varas a stake, same being the SE corner of a 5 acre tract deeded to Travis Owens and wife on or about 24th day of December, 1941; THENCE West with said Owen's SBL 324 varas to his SW corner; THENCE South 147½ varas, a stake, Louis Martin's NW corner; THENCE East 324 varas to beginning, containing 8½ acres, more or less.<br><br>SECOND TRACT: 5.0 acres of land, more or less, being the same land described in a deed from Otis Herman Porterfield et ux, Rossie, to J. L. Stoker, et ux, Wanda, dated 3-18-68, recorded in Volume 253, Page 678 of the Deed Records of Red River County, Texas, and being described by metes and bounds as follows:<br><br>BEGINNING at the NE corner of a certain five acre tract heretofore deeded by Charlie Wilson to the Colored School and Church stake in road; THENCE North 87 varas a stake the SE corner of an eight and one-half (8½) acre tract heretofore deeded to Albert A. Martin and wife, Irene Martin on or about the 24th day of December, 1941; THENCE West 324 varas a stake, same being said Albert Martin's SW corner; THENCE South 87 varas a stake, same being the NW corner of said School and Church lot; and THENCE East 324 varas to the place of beginning and containing 5 acres more or less.<br><br>A tract of land in the W. R. Howell Survey, A-1348, Red River County, Texas, being part of a parcel of land containing 66.38 acres, more or less, which is described in a Warranty Deed dated November 17, 1969, recorded in Volume 263, Page 720 of the Deed Records of Red River County, Texas, from Albert T. Russell and wife, Mary L. Russell, to Thurman W. Russell, a single man, said tract being further described as follows: Beginning at the NW corner of the W. R. Howell Survey, A-1348; THENCE East 1986 feet to a point in the west boundary line of F. M. Highway 909; THENCE South 1113 feet to a point northerly NE corner of said survey; THENCE West 211 feet; THENCE South 262 feet to a point where the west boundary line of F.M. Highway 909 crosses the south boundary line of the Howell Survey; THENCE West with said boundary line 1775 feet to the SW corner of the Howell Survey; THENCE North 1375 feet to the P.O.B., containing 61.42 acres, more or less. | 61.42 | 0.000293564 | 0.000369383 |

Recording Information
for Units and/or Tract
Descriptions

| Tract Number & Operator | Tract Name | | Acres | Tract Participation Phase I | Phase II |
|---|---|---|---|---|---|
| 13 SFM Holdings, Inc. | Elder Units #1, 2, 4, 5 | 320 acres of land, more or less, being part of the M.E.P. & P. RR Survey A-628, Red River County, Texas, and being further described as follows:<br><br>Beginning at the SE corner of the M.E.P. & P. RR Survey A-628; THENCE West along the southern boundary of the survey 3277.77 feet to its SW corner, THENCE North along the west boundary of the survey 3189.48 feet to the SW corner of tract No. 14 (also known as SFM's Elder Unit #A-3), THENCE East 2137.8761 feet; THENCE North 1630.03 feet to the NE corner of SFM's Elder Unit #A-3; THENCE West with the north boundary of said unit 938 feet; THENCE North 390 feet; THENCE East 2420 feet to a point in the most northerly east boundary of the M.E.P. & P. RR Survey; THENCE South 12° 45' East with said boundary line 1395 feet (to the NE corner of a 2.15 acre tract in the SFM Willis #1 Unit); THENCE South 57° 52' West 777.5 feet; THENCE South to and continuing along the most southerly east boundary of the M.E.P. & P. RR Survey 3423.48 feet to the P.O.B. | 320.0 | 0.348858416 | 0.325419019 |
| 14 SFM Holdings, Inc. | Elder #A-3 Unit | Volume 86, Page 281<br><br>A tract of land in the Francis Blundell Survey, A-30, Red River County, Texas, being part of a certain tract of land, containing 128.67 acres and described in a Warranty Deed dated November 1, 1942, recorded in Volume 157, Page 628 of the Deed Records of Red River County, Texas, from Pan American Life Insurance Company to M. A. Wright, and being further described as follows:<br><br>Beginning at a point in the east boundary line of said Francis Blundell Survey 3966.57 feet north of its SE corner; THENCE continuing North 1140.82 feet; THENCE West 2236.11 feet; THENCE South 1140.82 feet; THENCE East 2236.11 feet to the P.O.B.; | 80.00 | 0.016790020 | 0.034023424 |
| 15 SFM Holdings, Inc. | | LESS AND EXCEPT three tracts of land being further described as follows:<br><br>TRACT A (0.75 acres): Being a part of the Francis Blundell Survey, Abst. No. 30, and a part of a 40 acre tract heretofore owned by J. N. Snangler, and being described by metes and bounds as follows:<br>BEGINNING at the Southeast corner of a 2 acre tract deeded out of the most Eastern Northwest corner of said 40 acre tract for school | 56.23 | 0.000710884 | 0.006788261 |

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase II |
|---|---|---|---|---|---|

purposes, a stake in the E.B.L. of said 40 acre tract; THENCE West with the S.B.L. of said school tract, 75 varas to the S.W. corner of same, a stake; THENCE South 56½ varas to a stake for corner; THENCE East 75 varas to the E.B.L. of said 40 acre tract, 56½ varas to the place of beginning, the E.B.L. of said 40 acre tract; THENCE North with containing three-fourths (3/4) of an acre of land, more or less.

TRACT B (0.25 acres): All that certain lot or parcel of land, containing 0.25 acres, more or less, being a part of the Francis Blundell Survey, A-30, Red River County, Texas, and being the same land described in that Warranty Deed dated June 11, 1933, recorded in Volume 133, Page 447 of the Deed Records, from Nettie A. Lowery and husband, J. L. Lowery, to the Trustees of the Sherry Baptist Church, and being described as follows: BEGINNING at the S.W. corner of a 3/4 acre tract heretofore deeded by H. C. Benton and wife, M. M. Stagner; THENCE West 104-4/10 feet a stake: THENCE North 104-4/10 feet to a stake: THENCE East 104-4/10 feet to a stake in the W. B. line of said 3/4 acre tract; THENCE South with said line 104-4/10 feet to the place of beginning, containing one fourth of an acre.

TRACT C (1.33 acres): All that certain lot or parcel of land, containing 1.33 acres, more or less, being a part of the Francis Blundell Survey, A-30, Red River County, Texas, and being the same land described in that Warranty Deed dated March 1986, recorded in Volume 301, Page 651 of the Deed Records, from M. A. Wright and wife, Mary, to Allen K. Callahan and wife, Sandra H. Callahan, and being described therein as follows: BEGINNING at a metal pipe in the South and East line of a County road; same being South 349.08 varas and West, 252.42 varas from the Northeast corner of said 133 acre tract of land; also same being South, 1247.58 varas and West, 252.42 varas from the Northeast corner of said Francis Blundell Survey; THENCE S. 44° 30' E, a distance of 100.34 Varas to a metal pipe set for a corner; THENCE S. 45° 30' W, a distance of 75.14 Varas to a metal pipe set for a corner; THENCE N 44° 30' W, a distance of 100.34 Varas to a metal pipe set for a corner in the South and East line of said County road; THENCE N 45° 30' E, along the South and East line of said road, 75.14 Varas to the place of beginning and containing 1.33 acres of land.

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase II |
|---|---|---|---|---|---|
| 15-A SFM Holdings, Inc. | | All that certain lot or parcel of land, containing 1.33 acres, more or less,being a part of the Francis Blundell Survey, A-30, Red River County, Texas, and being the same land described in that Warranty Deed dated March 1986, recorded in Volume 301, Page 651 of the Deed Records, from M. A. Wright and wife, Mary, to Allen K. Callahan and wife, Sandra H. Callahan, and being described therein as follows: BEGINNING at a metal pipe in the South and East line of a County road; same being South 349.08 varas and West, 252.42 varas from the Northeast corner of said 133 acre tract of land; also same being South, 1247.58 varas and West, 252.42 varas from the Northeast corner of said Francis Blundell Survey; THENCE S. 44° 30' E, a distance of 100.34 Varas to a metal pipe set for a corner; THENCE S. 45° 30' W, a distance of 75.14 Varas to a metal pipe set for a corner; THENCE N 44° 30' W, a distance of 100.34 Varas to a metal pipe set for a corner in the South and East line of said County road; THENCE N 45 ° 30' E, along the South and East line of said road, 75.14 Varas to the place of beginning and containing 1.33 acres of land. | 1.33 | 0.000049750 | 0.00032072 |
| 16 SFM Holdings, Inc. | Milton #1 Unit | Volume 88, Page 420 | | | |
| 17 SFM Holdings, Inc. | | A tract of land in the Francis Blundell Survey, A-30, Red River County, Texas, being part of that 41.66 acres, more or less, described in a Warranty Deed dated July 29, 1965, recorded in Volume 241, Page 458 of the Deed Records of Red River County, Texas, from Robert Payton Bartley and wife, Laura Bartley, to A. B. Lennox, Martha Lennox and C. D. Lennox, Jr.; and being further described as follows: | 80.0 | 0.057711952 | 0.07099191 |
| | | Beginning at the NW corner of what is known as the Meadows 203 acre tract formerly owned by H.H. and C.D. Lennox, in the West boundary line of said original survey and 2952.77 feet North from the SW corner of said survey; THENCE East 1021.91 feet; THENCE North 847.22 feet to a point in the south line of a 41.66 acre tract sold by Alexander K. Fuller and wife, A. E. Fuller, to J. M. Humphrey, on February 28, 1899, as shown by deed therefore recorded in Deed Book 35, Page 294, Red River County, Texas; THENCE West with the South boundary line of said Humphrey tract 1021.91 feet to his SW corner in the west boundary line of the Blundell Survey; THENCE South 847.22 feet to the P.O.B. | 19.88 | 0.000536556 | 0.00122755 |

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase I |
|---|---|---|---|---|---|
| 18 SFM Holdings, Inc. | Lennox Unit #2 | 80 acres of land, more or less, being part of Francis Blundell Survey A-30, Red River County, Texas, and being further described as follows: | 80.00 | 0.127468534 | 0.088970804 |
| | | Beginning at a point which is 2952.77 feet north and 2995.57 feet west of the SE corner of the Francis Blundell Survey A-30; THENCE West 1531.675 feet to a point in the west boundary of the Blundell Survey; THENCE South with said boundary 2275.16 feet; THENCE East 1531.675 feet; THENCE North 2275.16 feet to the P.O.B. | | | |
| 19 SFM Holdings, Inc. | Lennox Unit #1 | 80 acres of land, more or less, being part of the Francis Blundell Survey A-30, Red River County, Texas, and being furtehr described as follows: | 80.00 | 0.113131503 | 0.098562444 |
| | | Beginning at a point which is 2952.77 feet north and 1463.89 feet west of the SE corner of the Francis Blundell Survey A-30; THENCE West 1531.675 feet; THENCE South 2275.16 feet; THENCE East 1531.675 feet; THENCE North 2275.16 feet to the P.O.B. | | | |
| 20 SFM Holdings, Inc. | Lennox Unit #3 | 80 acres of land, more or less, being part of the Francis Blundell Survey A-30, Red River County, Texas, and being further described as follows: | 80.00 | 0.035566130 | 0.087233491 |
| | | Beginning at a point in the east boundary line of the Francis Blundell Survey, said point being 2932.77 feet north of the SE corner of said survey; THENCE West 1463.89 feet to a point in the east line of Tract #19 (also known as the SFM Lennox #1 Unit); THENCE South with said line 2380.51 feet; THENCE East 1463.89 feet to a point in the east boundary line of the Francis Blundell Survey; THENCE North with said boundary 2380.51 feet to the P. O. B. | | | |
| 21 SFM Holdings, Inc. | | A tract of land in the Francis Blundell Survey, A-30, the William Walker Survey, A-911, and in the William Brinton Survey, A-46, Red River County, Texas, being described in three tracts as follows: FIRST TRACT: A tract of land in the Francis Blundell Survey, A-30, containing 66.21 acres, more or less, and Beginning at the SW corner of said Blundell Survey; THENCE North 677.61 feet; THENCE East 3063.35 feet; THENCE South 125.35 feet; THENCE East 1463.89 feet to a point in the east boundary line of the Blundell Survey; THENCE South 552.26 feet to the SE corner of said | 312.21 | 0.003393252 | 0.010760779 |

| Tract Number & Operator | Tract Name | Recording Information for Units and/or Tract Descriptions | Acres | Tract Participation Phase I | Phase II |
|---|---|---|---|---|---|
| | | survey; THENCE West with the south boundary line of the Blundell Survey 4527.24 feet to the P.O.B. | | | |
| | | SECOND TRACT: All of the William Brinton Survey, A-46, containing 76 acres, more or less. | | | |
| | | THIRD TRACT: A tract of land in the William Walker Survey, A-911, being further described as follows: Beginning at the SW corner of the Francis Blundell Survey, A-30, which is also the most northerly NW corner of the William Walker Survey, A-911; THENCE East 4527 feet to the most northerly NE corner of said Walker Survey; THENCE South 1476 feet to a corner in said survey boundary, also being the Southwest corner of the William Brinton Survey, A-46 ; THENCE West 5,044 feet to a point in the west boundary line of the William Walker Survey; THENCE North with said boundary 1401 feet to the most southerly northwest corner of the Walker Survey; THENCE East with the survey boundary 517 feet to a corner; THENCE North 75 feet to the P.O.B., containing 170 acres, more or less. | | | |
| 22 SFM Holdings, Inc. | | A tract of land in the Benjamin S. Shew Survey, A-199, and the Charles R. Haskell Survey, A-437, Red River County, Texas, and being further described as follows:

Beginning at the NE corner of the Benjamin Shew Survey, A-199, which is also the SE corner of the Charles Haskell Survey A-437; THENCE North along the east boundary of the Haskell Survey 2213 feet; THENCE West 2975 feet; THENCE South 657 feet; THENCE West 1534 feet to a point in the west boundary line of the Haskell Survey, also being the NE corner of the A. J. Strickland Survey, A-1365; THENCE South with survey's SW corner; THENCE West 166 feet to the NW corner of the Benjamin Shew Survey; THENCE South with the west boundary line of said survey 3173 feet; THENCE East 4158 feet to a point in the most southerly east boundary of the Shew Survey; THENCE North 1728 feet to a corner in the Shew Survey; THENCE East with the survey boundary 516.67 feet to another corner; THENCE North with the most northerly east boundary of the Shew Survey 1444 feet to the P.O.B. | 525.92 | 0.191562206 | 0.1263719 |

**LEGEND**
........... TRACT BOUNDARY
— — — WATERFLOOD UNIT BOUNDARY

santa fe minerals, inc.

CLARKSVILLE (COTTON VALLEY) UNIT
RED RIVER COUNTY, TEXAS

EXHIBIT B TO UNIT AGREEMENT
CLARKSVILLE COTTON VALLEY FIELD UNIT
RED RIVER COUNTY, TEXAS

AUTHORED BY  S. COBB
DATE  2/2/90
SCALE  1" = 2000'



TYPE LOG

CLARKSVILLE (Cotton Valley) UNIT
WILLIS #1

Top of Cotton Valley 4700'

UNITIZED INTERVAL

Base of Cotton Valley 5574'

**Santa Fe Minerals, Inc.**

CLARKSVILLE (COTTON VALLEY) UNIT

RED RIVER COUNTY, TEXAS

EXHIBIT C TO UNIT AGREEMENT
CLARKSVILLE COTTON VALLEY FIELD UNIT

THE STATE OF TEXAS }
COUNTY OF RED RIVER } I, MARY HAUSLER, Clerk of County Court in and
for said County, do hereby certify that the foregoing instrument was filed
for record in my office the *10* day of *April* 19 *90* at *4:05 PM*
and duly recorded the *17* day of *April* 19 *90* in the *Oil & Gas*
record of said County, in Vol *92* pages *83-136*
Witness my hand and the seal of the County Court of said County, at my
office in Clarksville, the day and year last above written.
By *Lorraine Whittle*                    MARY HAUSLER, COUNTY CLERK
             Deputy                          Red River County, Texas

**FILED FOR RECORD**
*4:05* o'clock *P* M. on

APR 1 0 1990

MARY. HAUSLER, County Clerk
RED RIVER COUNTY
DEPUTY *Lorie Moose*

**RECORDED
AND
COMPARED**

UNIT OPERATING AGREEMENT

CLARKSVILLE COTTON VALLEY UNIT

RED RIVER COUNTY, TEXAS

UNIT OPERATING AGREEMENT

TABLE OF CONTENTS

Section                                                                  Page

ARTICLE 1
CONFIRMATION OF UNIT AGREEMENT
1.1 .....Confirmation of Unit Agreement...................................1
1.2 .....Amendment of Joint Operating Contracts and Other Agreements...1

ARTICLE 2
EXHIBITS
2.1 .....Exhibits................................................................1
        2.1.1  Exhibits A, B and C of the Unit Agreement..............1
        2.1.2  Exhibit D, Unit Participation............................1
        2.1.3  Exhibit E, Accounting Procedure........................2
        2.1.4  Exhibit F, Insurance Provisions.........................2
        2.1.5  Exhibit G, Indemnity Agreement.........................2
2.2 .....Revision of Exhibits.................................................2
2.3 .....Reference to Exhibits...............................................2

ARTICLE 3
SUPERVISION OF OPERATIONS BY WORKING INTEREST OWNERS
3.1 .....Overall Supervision................................................2
3.2 .....Specific Authority and Duties....................................2
        3.2.1  Method of Operation....................................2
        3.2.2  Drilling of Wells........................................3
        3.2.3  Well Recompletions and Change of Status............3
        3.2.4  Expenditures...........................................3
        3.2.5  Disposition of Unit Equipment..........................3
        3.2.6  Appearance Before a Court or Regulatory Agency........3
        3.2.7  Audits..................................................3
        3.2.8  Inventories............................................4
        3.2.9  Technical Services.....................................4
        3.2.10 Assignments to Committees............................4
        3.2.11 Removal of Unit Operator.............................4
        3.2.12 Enlargement of Unit Area.............................4
        3.2.13 Adjustment and Readjustment of Investments...........4
        3.2.14 Termination of Unit Agreement........................4
        3.2.15 Border Agreements....................................4
        3.2.16 Amendment or Modification of Exhibit G................4

ARTICLE 4
MANNER OF EXERCISING SUPERVISION
4.1 .....Designation of Representatives..................................4
4.2 .....Meetings................................................................4
4.3 .....Voting Procedure.....................................................5
        4.3.1  Voting Interest........................................5
        4.3.2  Vote Required.........................................5
        4.3.3  Vote at meeting by Nonattending Working Interest Owner.5
        4.3.4  Poll Votes.............................................5

ARTICLE 5
INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS
5.1 .....Reservation of Rights...............................................5
5.2 .....Specific Rights......................................................6
        5.2.1  Access to Unit Area..................................6
        5.2.2  Reports...............................................6

ARTICLE 6
UNIT OPERATOR
6.1 .....Unit Operator........................................................6
6.2 .....Resignation or Removal.............................................6
6.3 .....Selection of Successor.............................................6

ARTICLE 7
AUTHORITY AND DUTIES OF UNIT OPERATOR
7.1 .....Exclusive Right to Operator Unit.................................6
7.2 .....Workmanlike Conduct................................................7

7.3     .....Liens and Encumbrances...........................................7
7.4     .....Employees........................................................7
7.5     .....Records..........................................................7
7.6     .....Reports to Working Interest Owners...............................7
7.7     .....Reports to Governmental Authorities..............................7
7.8     .....Engineering and Geological Information...........................7
7.9     .....Expeditures......................................................7
7.10    .....Wells Drilled by Unit Operator...................................7
7.11    .....Border Agreements................................................8
7.12    .....Indemnities......................................................8

ARTICLE 8
TAXES
8.1     .....Ad Valorem Taxes.................................................8
8.2     .....Other Taxes......................................................8

ARTICLE 9
INSURANCE
9.1     .....Insurance........................................................9

ARTICLE 10
ADJUSTMENT OF INVESTMENTS
10.1    .....Personal Property Taken Over.....................................9
        10.1.1  Wells.........................................................9
        10.1.2  Well and Lease Equipment......................................9
        10.1.3  Records.......................................................9
10.2    .....Inventory and Evaluation of Personal Property....................9
10.3    .....Investment Adjustment...........................................10
10.4    .....Readjustment of Investment Prior to Phase II....................10
10.5    .....General Facilities..............................................10
10.6    .....Ownership of Personal Property and Facilities...................10

ARTICLE 11
UNIT EXPENSE
11.1    .....Basis of Charge to Working Interest Owners......................11
11.2    .....Budgets.........................................................11
11.3    .....Advance Billings................................................11
11.4    .....Commingling of Funds............................................11
11.5    .....Lien and Security Interest of Unit Operator.....................11
11.6    .....Unpaid Unit Expense.............................................12
11.7    .....Carved-out Interest.............................................13
11.8    .....Uncommitted Royalty.............................................13

ARTICLE 12
NONUNITIZED FORMATION
12.1    .....Right to Operate................................................14

ARTICLE 13
TITLES
13.1    .....Warranty and Indemnity..........................................14
13.2    .....Failure Because of Unit Operations..............................14

ARTICLE 14
LIABILITY, CLAIMS, AND SUITS
14.1    .....Individual Liability............................................15
14.2    .....Settlements.....................................................15

ARTICLE 15
LAWS AND REGULATIONS
15.1    .....Internal Revenue Provision......................................15

ARTICLE 16
NOTICES
16.1    .....Notices.........................................................16

ARTICLE 17
WITHDRAWAL OF WORKING INTEREST OWNER
17.1    .....Withdrawal......................................................16

ARTICLE 18
ABANDONMENT OF WELLS
18.1 .....Rights of Former Owners...................................17

ARTICLE 19
EFFECTIVE DATE AND TERM
19.1 .....Effective Date....................................................17
19.2 .....Term...............................................................17

ARTICLE 20
ABANDONMENT OF OPERATIONS
20.1 .....Termination.......................................................18
          20.1.1  Oil and Gas Rights.......................................18
          20.1.2  Right to Operate.........................................18
          20.1.3  Salvaging Wells..........................................18
          20.1.4  Cost of Abandonment......................................18
          20.1.5  Distribution of Assets...................................18

ARTICLE 21
RIGHTS OF WAY AND EASEMENTS
21.1 .....Assignment to Unit Operator......................................18
21.2 .....Rental Payments..................................................19

ARTICLE 22
EXECUTION
21.1 .....Original, Counterpart, or Other Instrument.......................19

ARTICLE 23
SUCCESSORS AND ASSIGNS
22.1 .....Successors and Assigns...........................................19

EXHIBITS
Exhibit D....Working Interest Ownership by Tracts and Attributable
             Unit Participation
Exhibit E....Accounting Procedure
Exhibit F....Insurance Provisions
Exhibit G....Indemnity Agreement

UNIT OPERATING AGREEMENT

CLARKSVILLE COTTON VALLEY UNIT

RED RIVER COUNTY, TEXAS

THIS AGREEMENT, entered into as of the 25th day of January, 1990, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to become a party hereto,

WITNESSETH:

WHEREAS, the parties hereto as Working Interest Owners have executed, as of the date hereof, an agreement entitled "Unit Agreement, Clarksville Cotton Valley Unit, Red River County, Texas", herein referred to as "Unit Agreement", which, among other things, provides for a separate agreement to be entered into by Working Interest Owners to provide for Unit Operations as therein defined,

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, it is agreed as follows:

ARTICLE 1

CONFIRMATION OF UNIT AGREEMENT

1.1 Confirmation of Unit Agreement. The Unit Agreement is hereby confirmed and by reference made a part of this agreement. The definitions in the Unit Agreement are adopted for all purposes of this agreement. If there is any conflict between the Unit Agreement and this agreement, the Unit Agreement shall govern.

1.2 Amendment of Joint Operating Contracts and Other Agreements. The provisions of existing Joint Operating Contracts and other agreements pertaining to a Unitized Substance or the Unitized Formation or operations with respect to either, are amended to the extent necessary to make them conform to the provisions of this agreement and the Unit Agreement, but otherwise shall remain in effect.

ARTICLE 2

EXHIBITS

2.1 Exhibits. The following exhibits are incorporated herein by reference:

2.1.1 Exhibits A, B and C of the Unit Agreement.

2.1.2 Exhibit D attached hereto, is a schedule showing the Working Interest of each Working Interest Owner in each Tract, the portion of each Working Interest Owner's Unit Participation attributable to each such interest, and the Unit Participation of each Working Interest Owner.

Phase I and Phase II Unit Participations shall be applicable for the respective periods of time provided in Section 5.1.1 of the Unit Agreement except where a different phase Tract Participation, Unit Participation, or voting interest is herein stated. Exhibit D, or a revision thereof, shall not be conclusive as to the information therein, except it may be used as showing the Unit Participations of Working Interest Owners for purposes of this agreement until shown to be in error and revised as herein authorized.

2.1.3  _Exhibit E_, attached hereto, is the Accounting Procedure applicable to Unit Operations. If there is any conflict between this agreement and Exhibit E, this agreement shall govern.

2.1.4  _Exhibit F_, attached hereto, contains insurance provisions applicable to Unit Operations.

2.1.5  _Exhibit G_, attached hereto, is the form of indemnity agreement provided for in Article 9 of the Unit Agreement.

2.2  _Revision of Exhibits._  Whenever Exhibits A and B are revised, Exhibit D shall be revised accordingly and be effective as of the same date. Unit Operator shall also revise Exhibit D from time to time as required to conform to changes in ownership of which Unit Operator has been notified as provided in the Unit Agreement.

2.3  _Reference to Exhibits._  When reference is made herein to an exhibit, it is to the exhibit as originally attached or, if revised, to the last revision.

ARTICLE 3

SUPERVISION OF OPERATIONS BY WORKING INTEREST OWNERS

3.1  _Overall Supervision._  Working Interest Owners shall exercise overall supervision and control of all matters pertaining to Unit Operations pursuant to this agreement and the Unit Agreement. In the exercise of such authority, each Working Interest Owner shall act solely in its own behalf in the capacity of an individual owner and not on behalf of the owners as an entirety.

3.2  _Specific Authority and Duties._  The matters with respect to which Working Interest Owners shall decide and take action shall include, but not be limited to, the following:

3.2.1  _Method of Operation._  The method of operation, including but not limited to the type or types of pressure maintenance, secondary recovery, or other recovery program to be employed. The wells proposed to be drilled or

2

converted to injection shall be included in a Plan of Depletion which shall be approved by the Working Interest Owners. The initial Plan of Depletion shall be approved and become effective at the time the Unit Operating Agreement becomes effective, and may be amended from time to time by the Working Interest Owners in accordance with the provisions of Article 4 herein. Approval of the Plan of Depletion by a Working Interest Owner shall not constitute approval to conduct any particular operation proposed in the Plan of Depletion. Approval for each individual operation requiring an Authority for Expenditure as provided in this Agreement shall be obtained by approval of such Authority for Expenditure by the Working Interest Owners.

3.2.2  <u>Drilling of Wells</u>.  The drilling of any well whether for production of Unitized Substances, for use as an injection well, or for other purposes.

3.2.3  <u>Well Recompletions and Change of Status</u>.  The recompletion, abandonment, or change of status of any well, or the use of any well for injection or other purposes or the acquisition of wells for unit operations.

3.2.4  <u>Expenditures</u>.  The making of any single expenditure in excess of Thirty-five Thousand Dollars ($35,000.00); however, approval by Working Interest Owners of the drilling, reworking, deepening, or plugging back of any well shall include approval of all necessary expenditures required therefor, and for completing, testing, and equipping the well, including necessary flow lines, separators, and lease tankage.

3.2.5  <u>Disposition of Unit Equipment</u>.  The selling or otherwise disposing of any major item of surplus Unit Equipment, if the current price of new equipment similar thereto is Seven Thousand Five Hundred Dollars ($7,500.00) or more.

3.2.6  <u>Appearance Before a Court or Regulatory Agency</u>.  The designating of a representative to appear before any court or regulatory agency in matters pertaining to Unit Operations; however, such designation shall not prevent any Working Interest Owner from appearing in person or from designating another representative in its own behalf.

3.2.7  <u>Audits</u>.  The auditing of the accounts of Unit Operator pertaining to Unit Operations hereunder; however, the audits shall

    (a)  not be conducted more than once each year except upon the resignation or removal of Unit Operator, and

3

(b)  be made upon the approval of the owner or owners of a
majority of Working Interest other than that of Unit
Operator, at the expense of all Working Interest Owners other
than Unit Operator, or

(c)  be made at the expense of those Working Interest Owners
requesting such audit, if owners of less than a majority of
Working Interest, other than that of Unit Operator, request
such an audit, and

(d)  be made upon not less than thirty (30) days' written notice
to Unit Operator.

3.2.8  <u>Inventories</u>.  The taking of periodic inventories under the terms
of Exhibit E.

3.2.9  <u>Technical Services</u>.  The authorizing of charges to the joint
account for services by consultants or Unit Operator's technical personnel
not covered by the overhead charges provided by Exhibit E.

3.2.10  <u>Assignments to Committees</u>.  The appointment of committees to
study any problems in connection with Unit Operations.

3.2.11  <u>The removal of Unit Operator</u> and the selection of a successor.

3.2.12  <u>The enlargement</u> of the Unit Area.

3.2.13  <u>The adjustment and readjustment</u> of investments.

3.2.14  <u>The termination</u> of the Unit Agreement.

3.2.15  <u>Border Agreements</u>.  The approval or disapproval of any
arrangements or agreements for coordinating Unit Operations hereunder with
operations of a similar nature upon lands outside the Unit Area.

3.2.16  <u>The amendment or modification</u> of Exhibit G.

ARTICLE 4

MANNER OF EXERCISING SUPERVISION

4.1  <u>Designation of Representatives</u>.  Each Working Interest Owner shall
inform Unit Operator in writing of the names and addresses of the representative
and alternate who are authorized to represent and bind such Working Interest
Owner with respect to Unit Operations.  The representative or alternate may be
changed from time to time by written notice to Unit Operator.

4.2  <u>Meetings</u>.  All meetings of Working Interest Owners shall be called by
Unit Operator upon its own motion or at the request of one or more Working
Interest Owners having a total Unit Participation of not less than Ten percent
(10%).  No meeting shall be called on less than fourteen (14) days' advance

4

written notice, with an agenda including all proposed voting matters for the meeting attached. Working Interest Owners who attend the meeting may amend items included in the agenda and may act upon an amended item or other items presented at the meeting. A ninety percent (90%) vote of all Working Interest Owners, including those not present, is required to consider and act on an amended agenda voting matter or a non-agenda voting matter at the meeting. Any Working Interest Owner not present must be furnished a written description and ballot for any amended agenda voting matter or non-agenda voting matter voted on by those present and must send its vote to the representative of Unit Operator by letter, telegram or facsimile transmission within seven (7) days after the written description and the ballot are sent. The representative of Unit Operator shall be chairman of each meeting.

4.3  <u>Voting Procedure</u>. Working Interest Owners shall decide all matters coming before them as follows:

4.3.1  <u>Voting Interest</u>. Each Working Interest Owner shall have a voting interest equal to its Unit Participation.

4.3.2  <u>Vote Required</u>. Unless otherwise provided herein or in the Unit Agreement, Working Interest Owners shall determine all matters by the affirmative vote of two (2) or more Working Interest Owners having a combined voting interest of at least seventy percent (70%).

4.3.3  <u>Vote at Meeting by Nonattending Working Interest Owner</u>. Any Working Interest Owner who is not represented at a meeting may vote on any agenda item by letter, telegram or facsimile transmission addressed to the representative of Unit Operator if its vote is received prior to the vote at the meeting.

4.3.4  <u>Poll Votes</u>. Working Interest Owners may vote on and decide, by letter, telegram or facsimile transmission any matter submitted in writing to Working Interest Owners. If a meeting is not requested, as provided in Section 4.2, within seven (7) days after a written proposal is sent to Working Interest Owners, the vote taken by letter or telegram shall become final. Unit Operator will give prompt notice of the results of such voting to all Working Interest Owners.

ARTICLE 5

INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1  <u>Reservation of Rights</u>. Working Interest Owners severally reserve to

5

themselves all their rights, except as otherwise provided in this agreement and the Unit Agreement.

5.2 <u>Specific Rights</u>. Each Working Interest Owner shall have, among others, the following specific rights:

5.2.1 <u>Access to Unit Area</u>. Access to the Unit Area at all reasonable times to inspect Unit Operations, all wells, and the records and data pertaining thereto.

5.2.2 <u>Reports</u>. The right to receive from Unit Operator, upon written request, copies of all reports to any governmental agency, reports of crude oil runs and stocks, inventory reports, and all other information pertaining to Unit Operations. The cost of gathering and furnishing information not ordinarily furnished by Unit Operator to all Working Interest Owners shall be charged to the Working Interest Owner that requests the information.

## ARTICLE 6

## UNIT OPERATOR

6.1 <u>Unit Operator</u>. SFM Holdings, Inc. is hereby designated as the initial Unit Operator.

6.2 <u>Resignation or Removal</u>. Unit Operator may resign at any time. The sale (or other conveyance) of its interest shall constitute the resignation of Unit Operator. Unit Operator may be removed at any time by the affirmative vote of at least two (2) or more Working Interest Owners having a combined voting interest of seventy-five (75%) or more of the voting interest remaining after excluding the voting interest of Unit Operator. Such resignation or removal shall not become effective for a period of three (3) months after resignation or removal, unless a successor Unit Operator has taken over Unit Operations prior to the expiration of such period.

6.3 <u>Selection of Successor</u>. Upon the resignation or removal of a Unit Operator, a successor Unit Operator shall be selected by Working Interest Owners. If the Unit Operator that is removed fails to vote or votes only to succeed itself, the successor Unit Operator shall be selected by the affirmative vote of at least two (2) or more Working Interest Owners having a combined voting interest of seventy-five (75%) or more of the voting interest remaining after excluding the voting interest of the Unit Operator that was removed.

## ARTICLE 7

## AUTHORITY AND DUTIES OF UNIT OPERATOR

7.1 <u>Exclusive Right to Operate Unit</u>. Subject to the provisions of this

6

agreement and to instructions from Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations.

7.2  Workmanlike Conduct.  Unit Operator shall conduct Unit Operations in a good and workmanlike manner as would a prudent operator under the same or similar circumstances.  Unit Operator shall freely consult with Working Interest Owners and keep them informed of all material matters.  Unit Operator shall not be liable to Working Interest Owners for damages, unless such damages result from its gross negligence or willful misconduct.

7.3  Liens and Encumbrances.  Unit Operator shall endeavor to keep the lands and leases in the Unit Area and Unit Equipment free from all liens and encumbrances occasioned by Unit Operations, except the lien and security interest of Unit Operator granted hereunder.

7.4  Employees.  The number of employees used by Unit Operator in conducting Unit Operations, their selection, hours of labor, and compensation shall be determined by Unit Operator.  Such employees shall be the employees of Unit Operator.

7.5  Records.  Unit Operator shall keep correct books, accounts, and records of Unit Operations.

7.6  Reports to Working Interest Owners.  Unit Operator shall furnish Working Interest Owners periodic reports of Unit Operations.

7.7  Reports to Governmental Authorities.  Unit Operator shall make all reports to governmental authorities that it has the duty to make as Unit Operator.

7.8  Engineering and Geological Information.  Unit Operator shall furnish to a Working Interest Owner, upon written request, copy(s) of all logs and other engineering and geological data pertaining to wells drilled for Unit Operations.

7.9  Expenditures.  Unit Operator is authorized to make single expenditures not in excess of Thirty-five Thousand Dollars ($35,000.00) without prior approval of Working Interest Owners.  If an emergency occurs, Unit Operator may immediately make or incur such expenditures as in its opinion are required to deal with the emergency.  Unit Operator shall report to Working Interest Owners, as promptly as possible, the nature of the emergency and the action taken.

7.10  Wells Drilled by Unit Operator.  All wells drilled by Unit Operator shall be at the usual rates prevailing in the area.  Unit Operator may employ its own tools and equipment, but the charge therefor shall not exceed the usual rates

7

prevailing in the area, and the work shall be performed by Unit Operator under the same terms and conditions as are usual in the area in contracts of independent contractors doing work of a similar nature.

      7.11  <u>Border Agreements</u>.  Unit Operator may, after approval by Working Interest Owners, enter into border agreements with respect to lands adjacent to the Unit Area for the purpose of coordinating operations.

      7.12  <u>Indemnities</u>.  As to any contract executed by Unit Operator with an independent contractor covering operations or services to be performed in connection with Unit Operations, Unit Operator shall require that any indemnification provision in favor of Unit Operator contained therein shall extend to and inure to the benefit of Working Interest Owners in the same manner as Unit Operator.

## ARTICLE 8

### TAXES

      8.1  <u>Ad Valorem Taxes</u>.  Beginning with the first calendar year after the Effective Date hereof, Unit Operator shall make and file all necessary ad valorem tax renditions and returns with the proper taxing authorities with respect to all property of each Working Interest Owner used or held by Unit Operator for Unit Operations.  Unit Operator shall settle assessments arising therefrom.  All such ad valorem taxes shall be paid by Unit Operator and charged to the joint account; however, if the interest of a Working Interest Owner is subject to a separately assessed overriding royalty interest, production payment, or other interest in excess of one-eighth (1/8) royalty, such Working Interest Owner shall notify Unit Operator of such interest prior to the rendition date and shall be given credit for the reduction in taxes paid resulting therefrom.  If Unit Operator is required hereunder to pay ad valorem taxes based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the percentages of tax value generated by each party's working interest.  Any Working Interest Owner dissatisfied with any assessment of its interest in real or personal property shall have the right, at its own expense, to protest and resist the same.

      8.2  <u>Other taxes</u>.  Each Working Interest Owner shall pay or cause to be paid all production, severance, gathering, and other taxes imposed upon or with respect to the production or handling of its share of Unitized Substances.

ARTICLE 9

INSURANCE

9.1   Insurance.   Unit Operator, with respect to Unit Operations, shall provide insurance coverages as set forth in Exhibit F attached hereto.

ARTICLE 10

ADJUSTMENT OF INVESTMENTS

10.1   Personal Property Taken Over.   Upon the Effective Date, Working Interest Owners shall deliver to Unit Operator the following:

10.1.1   Wells.   All wells completed in the Unitized Formation. At any time prior to the plugging and abandonment of the Lennox #4 well by The Anschutz Corporation ("Anschutz"), Unit Operator has the right but not the obligation to use such well in Unit Operations. Anschutz shall use its best efforts to give Unit Operator at least 10 days prior written notice of its intent to plug and abandon said well. Within 10 days after its receipt of such notice, Unit Operator shall notify Anschutz in writing of its election whether or not to utilize said well in Unit Operations.  Unit Operator assumes no responsibility or liability to plug the well if it is not designated for use in Unit Operations.  Anschutz retains all responsibility and liability to plug the Lennox #4 if Unit Operator elects not to use the well in Unit Operations, including but not limited to providing any financial security required by the Railroad Commission of Texas. If the Lennox #4 Well is used for Unit Operations, then the Lennox #4 Well shall be included in the Investment Adjustment, pursuant to this Article 10.

10.1.2   Well and Lease Equipment.   The casing and tubing in each such well, the wellhead connections thereon, and all other lease and operating equipment that is used in the operation of such wells which Working Interest Owners determine is necessary or desirable for conducting Unit Operations.

10.1.3   Records.   Copies of all records pertaining to the drilling, testing, completing, recompletion, reworking, and operation of such wells, including drilling logs, electrical logs, records of coring, testing, and special work of every nature, laboratory analysis, records of the amount of production obtained and all other information pertinent to such wells.

10.2   Inventory and Evaluation of Personal Property.   A committee appointed by Working Interest Owners shall at Unit Expense inventory and evaluate the personal property taken over and shall be valued in accordance with Section

9

IV of Exhibit E. Such inventory shall include and be limited to those items of equipment considered controllable under Exhibit E except, upon determination of Working Interest Owners, items considered noncontrollable may be included in the inventory in order to insure a more equitable adjustment of investment. Casing shall be included in the inventory for record purposes, but shall be excluded from evaluation and investment adjustment.

10.3 _Investment Adjustment_. Upon approval by Working Interest Owners of the inventory and evaluation, each Working Interest Owner shall be credited with the value of its interest in all personal property taken over under Section 10.1.2, and shall be charged with an amount equal to that obtained by multiplying the total value of all personal property taken over under Section 10.1.2 by such Working Interest Owner's Phase I Unit Participation. If the charge against any Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be an item of Unit Expense chargeable against such Working Interest Owner. If the credit to any Working Interest Owner is greater than the amount charged against such Working Interest Owner, the resulting net credit shall be paid to such Working Interest Owner by Unit Operator out of funds received by it in settlement of the net charges described above.

10.4 _Readjustment of Investment Prior to Phase II_. Prior to the commencement of Phase II the Working Interest Owners shall re-evaluate the investment adjustment provided for in Section 10.3, in order to take into account the relative changes in Unit Participations as of the commencement of Phase II. This re-evaluated adjustment of investment shall determine each Working Interest Owner's obligation for the purchase of personal property acquired for Unit Operations thereafter.

10.5 _General Facilities_. The acquisition of warehouses, warehouse stocks, lease houses, camps, facility systems, and office buildings necessary for Unit Operations shall be by negotiation by the owners thereof and Unit Operator, subject to the approval of Working Interest Owners.

10.6 _Ownership of Personal Property and Facilities_. Each Working Interest Owner, individually, shall by virtue hereof own an undivided interest, equal to its Unit Participation, in all personal property and facilities taken over or otherwise acquired by Unit Operator pursuant to this agreement.

10

ARTICLE 11

UNIT EXPENSE

11.1 <u>Basis of Charge to Working Interest Owners</u>.  Unit Operator initially
shall pay all Unit Expense.  Each Working Interest Owner shall reimburse Unit
Operator for its share of Unit Expense.  Each Working Interest Owner's share
shall be the same as its Unit Participation in effect at the time the expense was
incurred.  All charges, credits, and accounting for Unit Expense shall be in
accordance with Exhibit E.

11.2 <u>Budgets</u>.  Before or as soon as practical after the Effective Date,
Unit Operator shall prepare a budget of estimated Unit Expense in accordance with
the plan of depletion for the remainder of the calendar year, and, on or before
the first day of each November thereafter, shall prepare a budget for the ensuing
calendar year.  A budget shall set forth the estimated Unit Expense by quarterly
periods.  Budgets shall be estimates only, and shall be adjusted or corrected by
Working Interest Owners and Unit Operator whenever an adjustment or correction is
proper.  Approval of the annual budget provided for shall not constitute an
approval of expenditures under the budget.  A copy of each budget and adjusted
budget shall be furnished promptly to each Working Interest Owner.

11.3 <u>Advance Billings</u>.  Unit Operator shall have the right, without
prejudice to other rights or remedies, to require all Working Interest Owners to
advance their respective shares of estimated cash outlays for Unit Expenses by
submitting to Working Interest Owners, on or before the 15th day of any month, an
itemized estimate thereof for the succeeding month, with a request for payment in
advance.  Within thirty (30) days after receipt of the estimate, each Working
Interest Owner shall pay to Unit Operator its share of such estimate.
Adjustments between estimated and actual Unit Expense shall be made by Unit
Operator at the close of each calendar month, and the accounts of Working
Interest Owners shall be adjusted accordingly.

11.4 <u>Commingling of Funds</u>.  Funds received by Unit Operator under this
agreement need not be segregated or maintained by it as a separate fund, but may
be commingled with its own funds.

11.5 <u>Lien and Security Interest of Unit Operator</u>.  Each Working Interest
Owner grants to Unit Operator a lien upon its Oil and Gas Rights in each Tract,
and a security interest in its share of Unitized Substances when extracted and
its interest in all Unit Equipment, to secure payment of its share of Unit

11

Expense, together with interest thereon at the highest rate allowed by law. Unit Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien. To the extent that Unit Operator has a security interest under the Uniform Commercial Code of the State of Texas, Unit Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Unit Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Working Interest Owner in the payment of its share of Unit Expense, Unit Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Working Interest Owner's share of Unitized Substances until the amount owed by such Working Interest Owner, plus interest, has been paid. Each purchaser shall be entitled to rely upon Unit Operator's written statement concerning the amount of any default. Unit Operator grants a like lien and security interest and the same rights provided for herein to Working Interest Owners to secure payment of Unit Operator's proportionate share of Unit Expense.

11.6 Unpaid Unit Expense. A Working Interest Owner is in default under this agreement if he fails to pay for any estimated Unit Expense or actual Unit Expense within sixty (60) days after receipt of the billing. No party may enforce a lien against the defaulting Working Interest Owner until the Unit Operator has given written notice of default and the Working Interest Owner fails to remedy the default within fifteen (15) days of receipt. If a Working Interest Owner, in good faith, questions or disputes the correctness of any Unit Expense and notifies the Unit Operator in writing within thirty (30) days after receipt of the billing for such expense, the Working Interest Owner will not be considered in default if he fails to pay the questioned or disputed amount. However, Unit Operator shall have the right to bring suit to enforce collection of the indebtedness and pursue all remedies other than enforcement of the lien against said Working Interest Owner. If any Working Interest Owner fails to pay its share of Unit Expense or otherwise cure the default within the stated period, each Working Interest Owner agrees, upon request by Unit Operator, to pay its proportionate part of the unpaid share of Unit Expense of the defaulting Working Interest Owner. Working Interest Owners that pay the share of Unit Expense of a

12

defaulting Working Interest Owner shall be reimbursed by Unit Operator for the amount so paid, plus any interest collected thereon, upon receipt by Unit Operator of any past due amount collected from the defaulting Working Interest Owner. Any Working Interest Owner so paying a defaulting Working Interest Owner's share of Unit Expense shall, to obtain reimbursement thereof, be subrogated to the lien and other rights herein granted Unit Operator.

11.7 <u>Carved-out Interest</u>. If any Working Interest Owner shall, after executing this agreement, create an overriding royalty, production payment, net proceeds interest, carried interest, or any other interest out of its Working Interest, such carved-out interest shall be subject to the terms and provisions of this agreement, specifically including, but without limitation, Section 11.5 hereof entitled "Lien and Security Interest of Unit Operator". If the Working Interest Owner creating such carved-out interest (a) fails to pay any Unit Expense chargeable to such Working Interest Owner under this agreement, and the production of Unitized Substances accruing to the credit of such Working Interest Owner is insufficient for that purpose, or (b) withdraws from this agreement under the terms and provisions of Article 17 hereof, the carved-out interest shall be chargeable with a pro rata portion of all Unit Expense incurred hereunder, the same as though such carved-out interest were a Working Interest, and Unit Operator shall have the right to enforce against such carved-out interest the lien and all other rights granted in Section 11.5 for the purpose of collecting the Unit Expense chargeable to the carved-out interest.

11.8 <u>Uncommitted Royalty</u>. Should an owner of a Royalty Interest in any Tract fail to become a party to the Unit Agreement and as a result thereof, the actual Royalty Interest payments with respect to such Tract are more or less than the Royalty Interest payments computed on the basis of the Unitized Substances that are allocated to such Tract under the Unit Agreement, the difference shall be borne by or inure to the benefit of Working Interest Owners, in proportion to their respective Unit Participations at the time the Unitized Substances were produced; however, the difference to be borne by or inure to the benefit of Working Interest Owners shall not exceed an amount computed on the basis of one-eighth (1/8) of the difference between the Unitized Substances allocated to the Tract and the Unitized Substances produced from the Tract. Such adjustments shall be made by charges and credits to the joint account.

13

ARTICLE 12

NONUNITIZED FORMATIONS

12.1  Right to Operate.  Any Working Interest Owner that now has or hereafter acquires the right to drill for and produce oil, gas, or other minerals, from a formation underlying the Unit Area other than the Unitized Formation, shall have the right to do so notwithstanding this agreement or the Unit Agreement.  In exercising the right, however, such Working Interest Owner shall exercise care to prevent unreasonable interference with Unit Operations. No Working Interest Owner shall produce Unitized Substances through any well drilled or operated by it.  If any Working Interest Owner drills any well into or through the Unitized Formation, the Unitized Formation shall be protected in a manner satisfactory to Working Interest Owners so that the production of Unitized Substances will not be affected adversely.

ARTICLE 13

TITLES

13.1  Warranty and Indemnity.  Each Working Interest Owner represents and warrants that it is the owner of the respective Working Interests set forth opposite its name in Exhibit D, and agrees to indemnify and hold harmless the other Working Interest Owners from any loss due to failure, in whole or in part, of its title to any such interest, except failure of title arising because of Unit Operations; however, such indemnity and any liability for breach of warranty shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed.  Each failure of title will be deemed to be effective, insofar as this agreement is concerned, as of 7:00 a.m. on the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive adjustment of Unit Expense, or retroactive allocation of Unitized Substances or the proceeds therefrom, as a result of a title failure.

13.2  Failure Because of Unit Operations.  The failure of title to any Working Interest in any Tract because of Unit Operations, including nonproduction from such Tract, shall not change the Unit Participation of the Working Interest Owner whose title failed in relation to the Unit Participations of the other Working Interest Owners at the time of the title failure.

14

ARTICLE 14

LIABILITY, CLAIMS, AND SUITS

14.1  _Individual Liability_.  The duties, obligations, and liabilities of Working Interest Owners shall be several and not joint or collective; and nothing herein shall ever be construed as creating a partnership of any kind, joint venture, association, or trust among Working Interest Owners.

14.2  _Settlements_.  Unit Operator may settle any single damage claim or suit involving Unit Operations if the expenditure does not exceed Twenty Thousand Dollars ($20,000.00) and if the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above amount, Working Interest Owners shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Unit Operator.  All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Unit Expense.  If a claim is made against any Working Interest Owner or if any Working Interest Owner is sued on account of any matter arising from Unit Operations over which such Working Interest Owner individually has no control because of the rights given Working Interest Owners and Unit Operator by this agreement and the Unit Agreement, the Working Interest Owner shall immediately notify Unit Operator, and the claim or suit shall be treated as any other claim or suit involving Unit Operations.

ARTICLE 15

LAWS AND REGULATIONS

15.1  _Internal Revenue Provision_.  Notwithstanding any provisions herein that the rights and liabilities of the parties hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if for Federal income tax purposes this agreement and the operations hereunder are regarded as a partnership, then each of the parties hereto elects to be excluded from the application of all of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder.  Unit Operator is hereby authorized and directed to execute on behalf of each of the parties hereto such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal

15

Regulations 1.761-19(a). Should there be any requirement that each party hereto further evidence this election, each party hereto agrees to execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. Each party hereto further agrees not to give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Unit Area is located, or any future income tax law of the United States, contain provisions similar to those in Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each of the parties agrees to make such election as may be permitted or required by such laws. In making this election, each of the parties states that the income derived by such party from the operations under this agreement can be adequately determined without the computation of partnership taxable income.

### ARTICLE 16

### NOTICES

16.1 _Notices._ All notices required hereunder shall be in writing and shall be deemed to have been properly served when sent by mail, telegram or sent by facsimile transmission to the address or facsimile telephone number of the representative of each Working Interest Owner as furnished to Unit Operator in accordance with Article 4.

### ARTICLE 17

### WITHDRAWAL OF WORKING INTEREST OWNER

17.1 _Withdrawal._ A Working Interest Owner may withdraw from this agreement by transferring, without warranty of title, either express or implied, to the other Working Interest Owners, all its Oil and Gas Rights, exclusive of Royalty Interests, together with its interest in all Unit Equipment and in all wells used in Unit Operations. The instrument of transfer may be delivered to Unit Operator for the transferees. Such transfer shall not relieve the Working Interest Owner from any obligation or liability incurred prior to the date of the delivery of the instrument of transfer. The interest transferred shall be owned by the transferees in proportion to their respective Unit Participations. The transferees, in proportion to the respective interests so acquired, shall pay transferor, for its interest in Unit Equipment, the net salvage value thereof as

16

determined by Working Interest Owners. After the date of delivery of the instrument of transfer, the withdrawing Working Interest Owner shall be relieved from all further obligations and liability hereunder and under the Unit Agreement, and the rights of such Working Interest Owner hereunder and under the Unit Agreement shall cease insofar as they existed by virtue of the interest transferred.

## ARTICLE 18

### ABANDONMENT OF WELLS

18.1  <u>Rights of Former Owners</u>.  If Working Interest Owners decide to permanently abandon any well within the Unit Area prior to termination of the Unit Agreement, Unit Operator shall give written notice thereof to the Working Interest Owners of the Tract on which the well is located, and they shall have the option for a period of ninety (90) days after the sending of such notice to notify Unit Operator in writing of their election to take over and own the well. Within ten (10) days after the Working Interest Owners of the Tract have notified Unit Operator of their election to take over the well, they shall pay Unit Operator, for credit to the joint account, the amount determined by Working Interest Owners to be the net salvage value of the casing and equipment in and on the well. The Working Interest Owners of the Tract, by taking over the well, agree to seal off the Unitized Formation, and upon abandonment to plug the well in compliance with applicable laws and regulations. The Working Interest Owners who take over the well shall immediately file the necessary forms showing change in operation with the appropriate State and Federal agencies.

18.2  <u>Plugging</u>.  If the Working Interest Owners of a Tract do not elect to take over a well located within the Unit Area that is proposed for abandonment, Unit Operator shall plug and abandon the well in compliance with applicable laws and regulations at Unit expense. Any salvage value including salvage value of casing shall be credited to Working Interest Owners on the basis of their respective Unit Participations.

## ARTICLE 19

### EFFECTIVE DATE AND TERM

19.1  <u>Effective Date</u>.  This agreement shall become effective when the Unit Agreement becomes effective.

19.2  <u>Term</u>.  This agreement shall continue in effect so long as the Unit Agreement remains in effect, and thereafter until (a) all Unit wells have been

17

plugged and abandoned or turned over to Working Interest Owners in accordance with Article 20; (b) all Unit Equipment and real property acquired for the joint account have been disposed of by Unit Operator in accordance with instructions of Working Interest Owners; and (c) there has been a final accounting.

ARTICLE 20

ABANDONMENT OF OPERATIONS

20.1 <u>Termination</u>.  Upon termination of the Unit Agreement, the following will occur:

20.1.1 <u>Oil and Gas Rights</u>.  Oil and Gas Rights in and to each separate Tract shall no longer be affected by this agreement, and thereafter the parties shall be governed by the terms and provisions of the leases, contracts, and other instruments affecting the separate Tracts.

20.1.2 <u>Right to Operate</u>.  Working Interest Owners of any Tract that desire to take over and continue to operate wells located thereon may do so by paying Unit Operator, for credit to the joint account, the net salvage value, as determined by Working Interest Owners, of the casing and equipment in and on the wells taken over and by agreeing upon abandonment to plug each well in compliance with applicable laws and regulations.

20.1.3 <u>Salvaging Wells</u>.  Unit Operator shall salvage as much of the casing and equipment in or on wells not taken over by Working Interest Owners of separate Tracts as can economically and reasonably be salvaged, and shall cause the wells to be plugged and abandoned in compliance with applicable laws and regulations.

20.1.4 <u>Cost of Abandonment</u>.  The cost of abandonment of Unit Operations shall be Unit Expense.

20.1.5 <u>Distribution of Assets</u>.  Working Interest Owners shall share in the distribution of Unit Equipment, or the proceeds thereof, in proportion to their Unit Participations.

ARTICLE 21

RIGHTS OF WAY AND EASEMENTS

21.1 <u>Assignment to Unit Operator</u>.  Each Working Interest Owner having rights of way, easements or leasehold interest in surface sites necessary for Unit Operations hereby agrees to assign, to the extent of its right and interest, to Unit Operator for the benefit of the Working Interest Owners, a non-exclusive right and interest in and to such interest.  A Working Interest Owner having such

18

an interest shall, within 180 days after the Effective Date execute and deliver to Unit Operator, in recordable form, an assignment of such rights and interests, together with copies of the instruments creating such interests and any maps or plats further describing and depicting the effective premises.

21.2  Rental Payments.  The owners of such interest agree to make any rental payments or other payments which may become due to avoid termination of any such interest for failure to make such payment prior to 30 days beyond the date formal assignment of such interest to Unit Operator is accomplished as described in Section 21.1 above.  Any payments made under this paragraph shall be a direct charge under Unit Expense.

ARTICLE 22

EXECUTION

21.1  Original, Counterpart, or Other Instrument.  An owner of a Working Interest may become a party to this agreement by signing the original of this instrument, a counterpart thereof, or other instrument agreeing to become a part hereto.  The signing of any such instrument shall have the same effect as if all parties had signed the same instrument.

ARTICLE 23

SUCCESSORS AND ASSIGNS

22.1  Successors and Assigns.  This agreement shall extend to, be binding upon, and inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors, and assigns, and shall constitute a covenant running with the lands, leases, and interests covered hereby.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the dates opposite their respective signatures.


ATTEST:                                    SFM HOLDINGS, INC.


_____        _____

Date:_____


ATTEST:                                    THE ANSCHUTZ CORPORATION


_____        _____

Date:_____


19

ATTEST:                              KING RANCH OIL & GAS, INC.

_____          _____
Date:_____

ATTEST:                              MARY P. POINDEXTER

_____          _____
Date:_____

ATTEST:                              THE GRAYROCK CORPORATION

_____          _____
Date:_____

ATTEST:                              S & P CO.

_____          /s/ August Erikson
Date: 2/27/90

ATTEST:                              BEN ABNEY, ET AL NO. 2

_____          _____
Date:_____

ATTEST:                              WESTERN NATURAL GAS CO.

_____          _____
Date:_____

                                     ROBERT S. FOLSOM

Date:_____          _____

ATTEST:                              BELLWETHER EXPLORATION COMPANY

_____          _____
Date:_____

                                     E. H. HAWES, II, TRUSTEE

Date:_____          _____

20

EXHIBIT D
to
UNIT OPERATING AGREEMENT
CLARKSVILLE COTTON VALLEY UNIT
RED RIVER COUNTY, TEXAS

| TRACT NO. | WORKING INTEREST OWNERS | INTEREST IN TRACT | UNIT PARTICIPATION PHASE I | PHASE II |
|---|---|---|---|---|
| 1 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0071702151 | 0.0056861735 |
|   | SFM Holdings, Inc. | 0.43750000 | 0.0071702151 | 0.0056861735 |
|   | The Grayrock Corporation | 0.06250000 | 0.0010243164 | 0.0008123104 |
|   | Mary P. Poindexter | 0.03125000 | 0.0005121582 | 0.0004061553 |
|   | S & P Co. | 0.03125000 | 0.0005121582 | 0.0004061553 |
|   | | 1.00000000 | 0.0163890630 | 0.0129969680 |
| 2 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0000649368 | 0.0001374126 |
|   | SFM Holdings, Inc. | 0.43750000 | 0.0000649368 | 0.0001374126 |
|   | The Grayrock Corporation | 0.06250000 | 0.0000092768 | 0.0000196304 |
|   | Mary P. Poindexter | 0.03125000 | 0.0000046383 | 0.0000098152 |
|   | S & P Co. | 0.03125000 | 0.0000046383 | 0.0000098152 |
|   | | 1.00000000 | 0.0001484270 | 0.0003140860 |
| 3 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0001768218 | 0.0006541623 |
|   | SFM Holdings, Inc. | 0.43750000 | 0.0001768218 | 0.0006541623 |
|   | The Grayrock Corporation | 0.06250000 | 0.0000252602 | 0.0000934518 |
|   | Mary P. Poindexter | 0.03125000 | 0.0000126301 | 0.0000467258 |
|   | S & P Co. | 0.03125000 | 0.0000126301 | 0.0000467258 |
|   | | 1.00000000 | 0.0004041640 | 0.0014952280 |
| 4 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0000296800 | 0.0000909633 |
|   | SFM Holdings, Inc. | 0.43750000 | 0.0000296800 | 0.0000909633 |
|   | The Grayrock Corporation | 0.06250000 | 0.0000042400 | 0.0000129948 |
|   | Mary P. Poindexter | 0.03125000 | 0.0000021200 | 0.0000064973 |
|   | S & P Co. | 0.03125000 | 0.0000021200 | 0.0000064973 |
|   | | 1.00000000 | 0.0000678400 | 0.0002079160 |
| 5 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0003108324 | 0.0008651199 |
|   | SFM Holdings, Inc. | 0.43750000 | 0.0003108324 | 0.0008651199 |
|   | The Grayrock Corporation | 0.06250000 | 0.0000444046 | 0.0001235886 |
|   | Mary P. Poindexter | 0.03125000 | 0.0000222023 | 0.0000617943 |
|   | S & P Co. | 0.03125000 | 0.0000222023 | 0.0000617943 |
|   | | 1.00000000 | 0.0007104740 | 0.0019774170 |
| 6 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0072036549 | 0.0158583351 |
|   | SFM Holdings, Inc. | 0.43750000 | 0.0072036549 | 0.0158583351 |
|   | The Grayrock Corporation | 0.06250000 | 0.0010290936 | 0.0022654764 |
|   | Mary P. Poindexter | 0.03125000 | 0.0005145468 | 0.0011327382 |
|   | S & P Co. | 0.03125000 | 0.0005145468 | 0.0011327382 |
|   | | 1.00000000 | 0.0164654970 | 0.0362476230 |
| 7 | King Ranch Oil & Gas, Inc. | 0.56000000 | 0.0108600576 | 0.0078039159 |
|   | The Grayrock Corporation | 0.08000000 | 0.0015514368 | 0.0011148451 |
|   | Mary P. Poindexter | 0.04000000 | 0.0007757184 | 0.0005574226 |
|   | S & P Co. | 0.04000000 | 0.0007757184 | 0.0005574226 |
|   | Western Natural Gas | 0.05333300 | 0.0010342847 | 0.0007432225 |
|   | Bellwether Exploration Co. | 0.04250400 | 0.0008242784 | 0.0005923172 |
|   | E. H. Hawes II, Trustee | 0.02416300 | 0.0004685921 | 0.0003367250 |
|   | Robert S. Folsom | 0.03626700 | 0.0007033245 | 0.0005054011 |
|   | Ben Abney et al, No. 2 | 0.12373300 | 0.0023995491 | 0.0017242891 |
|   | | 1.00000000 | 0.0193929600 | 0.0139355640 |
| 8 | King Ranch Oil & Gas, Inc. | 0.38281250 | 0.0190608832 | 0.0309385334 |
|   | SFM Holdings, Inc. | 0.38281250 | 0.0190608832 | 0.0309385334 |
|   | The Anschutz Corporation | 0.12500000 | 0.0062239619 | 0.0101023783 |
|   | The Grayrock Corporation | 0.05468750 | 0.0027229833 | 0.0044197905 |
|   | Mary P. Poindexter | 0.02734375 | 0.0013614917 | 0.0022098952 |
|   | S & P Co. | 0.02734375 | 0.0013614917 | 0.0022098952 |
|   | | 1.00000000 | 0.0497916950 | 0.0808190260 |

| TRACT NO. | WORKING INTEREST OWNERS | INTEREST IN TRACT | UNIT PARTICIPATION PHASE I | PHASE II |
|---|---|---|---|---|
| 9 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0002099195 | 0.0003899814 |
| | SFM Holdings, Inc. | 0.43750000 | 0.0002099195 | 0.0003899814 |
| | The Grayrock Corporation | 0.06250000 | 0.0000299884 | 0.0000557116 |
| | Mary P. Poindexter | 0.03125000 | 0.0000149943 | 0.0000278558 |
| | S & P Co. | 0.03125000 | 0.0000149943 | 0.0000278558 |
| | | 1.00000000 | 0.0004798160 | 0.0008913860 |
| 10 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0000165489 | 0.0000270957 |
| | SFM Holdings, Inc. | 0.43750000 | 0.0000165489 | 0.0000270957 |
| | The Grayrock Corporation | 0.06250000 | 0.0000023640 | 0.0000038708 |
| | Mary P. Poindexter | 0.03125000 | 0.0000011821 | 0.0000019354 |
| | S & P Co. | 0.03125000 | 0.0000011821 | 0.0000019354 |
| | | 1.00000000 | 0.0000378260 | 0.0000619330 |
| 11 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0000172686 | 0.0000058061 |
| | SFM Holdings, Inc. | 0.43750000 | 0.0000172686 | 0.0000058061 |
| | The Grayrock Corporation | 0.06250000 | 0.0000024668 | 0.0000008294 |
| | Mary P. Poindexter | 0.03125000 | 0.0000012335 | 0.0000004147 |
| | S & P Co. | 0.03125000 | 0.0000012335 | 0.0000004147 |
| | | 1.00000000 | 0.0000394710 | 0.0000132710 |
| 12 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0001284343 | 0.0001616051 |
| | SFM Holdings, Inc. | 0.43750000 | 0.0001284343 | 0.0001616051 |
| | The Grayrock Corporation | 0.06250000 | 0.0000183478 | 0.0000230864 |
| | Mary P. Poindexter | 0.03125000 | 0.0000091738 | 0.0000115432 |
| | S & P Co. | 0.03125000 | 0.0000091738 | 0.0000115432 |
| | | 1.00000000 | 0.0002935640 | 0.0003693830 |
| 13 | King Ranch Oil & Gas, Inc. | 0.32812500 | 0.1144691678 | 0.1067781156 |
| | SFM Holdings, Inc. | 0.32812500 | 0.1144691678 | 0.1067781156 |
| | The Anschutz Corporation | 0.25000000 | 0.0872146040 | 0.0813547548 |
| | The Grayrock Corporation | 0.04687500 | 0.0163527382 | 0.0152540164 |
| | Mary P. Poindexter | 0.02343750 | 0.0081763691 | 0.0076270083 |
| | S & P Co. | 0.02343750 | 0.0081763691 | 0.0076270083 |
| | | 1.00000000 | 0.3488584160 | 0.3254190190 |
| 14 | King Ranch Oil & Gas, Inc. | 0.32812500 | 0.0055092253 | 0.011639360 |
| | SFM Holdings, Inc. | 0.32812500 | 0.0055092253 | 0.011639360 |
| | The Anschutz Corporation | 0.25000000 | 0.0041975050 | 0.0085058560 |
| | The Grayrock Corporation | 0.04687500 | 0.0007870322 | 0.0015948480 |
| | Mary P. Poindexter | 0.02343750 | 0.0003935161 | 0.0007974240 |
| | S & P Co. | 0.02343750 | 0.0003935161 | 0.0007974240 |
| | | 1.00000000 | 0.0167900200 | 0.0340234240 |
| 15 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0003327774 | 0.0031101735 |
| | SFM Holdings, Inc. | 0.43750000 | 0.0003327774 | 0.0031101735 |
| | The Grayrock Corporation | 0.06250000 | 0.0000475396 | 0.0004443104 |
| | Mary P. Poindexter | 0.03125000 | 0.0000237698 | 0.0002221553 |
| | S & P Co. | 0.03125000 | 0.0000237698 | 0.0002221553 |
| | | 1.00000000 | 0.0007606340 | 0.0071089680 |
| 16 | King Ranch Oil & Gas, Inc. | 0.43658398 | 0.0251961137 | 0.0309937608 |
| | SFM Holdings, Inc. | 0.43658399 | 0.0251961143 | 0.0309937615 |
| | The Anschutz Corporation | 0.00209375 | 0.0001208344 | 0.0001486385 |
| | The Grayrock Corporation | 0.06236914 | 0.0035994448 | 0.0044276800 |
| | Mary P. Poindexter | 0.03118457 | 0.0017997224 | 0.0022138401 |
| | S & P Co. | 0.03118457 | 0.0017997224 | 0.0022138401 |
| | | 1.00000000 | 0.0577119520 | 0.0709915210 |
| 17 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0002347433 | 0.0005370711 |
| | SFM Holdings, Inc. | 0.43750000 | 0.0002347433 | 0.0005370711 |
| | The Grayrock Corporation | 0.06250000 | 0.0000335348 | 0.0000767244 |
| | Mary P. Poindexter | 0.03125000 | 0.0000167673 | 0.0000383622 |
| | S & P Co. | 0.03125000 | 0.0000167673 | 0.0000383622 |
| | | 1.00000000 | 0.0005365560 | 0.0012275910 |

| TRACT NO. | WORKING INTEREST OWNERS | INTEREST IN TRACT | UNIT PARTICIPATION PHASE I | PHASE II |
|---|---|---|---|---|
| 18 | King Ranch Oil & Gas, Inc. | 0.32812500 | 0.0418256127 | 0.0291934798 |
|  | SFM Holdings, Inc. | 0.32812500 | 0.0418256127 | 0.0291934798 |
|  | The Anschutz Corporation | 0.25000000 | 0.0318671335 | 0.0222426513 |
|  | The Grayrock Corporation | 0.04687500 | 0.0059750875 | 0.0041704971 |
|  | Mary P. Poindexter | 0.02343750 | 0.0029875438 | 0.0020852485 |
|  | S & P Co. | 0.02343750 | 0.0029875438 | 0.0020852485 |
|  |  | 1.00000000 | 0.1274685340 | 0.0889706050 |
| 19 | King Ranch Oil & Gas, Inc. | 0.32812500 | 0.0371212744 | 0.0323409496 |
|  | SFM Holdings, Inc. | 0.32812500 | 0.0371212744 | 0.0323409496 |
|  | The Anschutz Corporation | 0.25000000 | 0.0282828758 | 0.0246407235 |
|  | The Grayrock Corporation | 0.04687500 | 0.0053030392 | 0.0046201357 |
|  | Mary P. Poindexter | 0.02343750 | 0.0026515196 | 0.0023100678 |
|  | S & P Co. | 0.02343750 | 0.0026515196 | 0.0023100678 |
|  |  | 1.00000000 | 0.1131315030 | 0.0985628940 |
| 20 | King Ranch Oil & Gas, Inc. | 0.32812500 | 0.0116701364 | 0.0286234892 |
|  | SFM Holdings, Inc. | 0.32812500 | 0.0116701364 | 0.0286234892 |
|  | The Anschutz Corporation | 0.25000000 | 0.0088915325 | 0.0218083729 |
|  | The Grayrock Corporation | 0.04687500 | 0.0016671623 | 0.0040890699 |
|  | Mary P. Poindexter | 0.02343750 | 0.0008335812 | 0.0020445349 |
|  | S & P Co. | 0.02343750 | 0.0008335812 | 0.0020445349 |
|  |  | 1.00000000 | 0.0355661300 | 0.0872334910 |
| 21 | The Anschutz Corporation | 1.00000000 | 0.0033932520 | 0.0107607750 |
| 22 | King Ranch Oil & Gas, Inc. | 0.43750000 | 0.0838084651 | 0.0552877111 |
|  | SFM Holdings, Inc. | 0.43750000 | 0.0838084651 | 0.0552877111 |
|  | The Grayrock Corporation | 0.06250000 | 0.0119726380 | 0.0078982444 |
|  | Mary P. Poindexter | 0.03125000 | 0.0059863189 | 0.0039491222 |
|  | S & P Co. | 0.03125000 | 0.0059863189 | 0.0039491222 |
|  |  | 1.00000000 | 0.1915622060 | 0.1263719110 |
|  | Totals | 22.00000000 | 1.0000000000 | 1.0000000000 |

## COMPOSITE UNIT WORKING INTEREST

| | | |
|---|---|---|
| King Ranch Oil & Gas, Inc. | 0.3654167692 | 0.3606477910 |
| SFM Holdings, Inc. | 0.3545567122 | 0.3528438758 |
| The Anschutz Corporation | 0.1701916991 | 0.1795641503 |
| The Grayrock Corporation | 0.0522023953 | 0.0515211125 |
| Mary P. Poindexter | 0.0261011977 | 0.0257605563 |
| S & P Co. | 0.0261011977 | 0.0257605563 |
| Western Natural Gas | 0.0010342847 | 0.0007432254 |
| Bellwether Exploration Co. | 0.0008242784 | 0.0005923172 |
| E. H. Hawes II, Trustee | 0.0004685921 | 0.0003367250 |
| Robert S. Folsom | 0.0007033245 | 0.0005054011 |
| Ben Abney et al, No. 2 | 0.0023995491 | 0.0017242891 |
|  | 1.0000000000 | 1.0000000000 |

028 01179

Recommended by the Council of Petroleum Accountants Societies

COPAS

## EXHIBIT " E "

Attached to and made a part of **that certain Unit Operating Agreement** dated January 25, 1990 by and between STM Holdings, Inc., Operator, and signatory parties thereto, Non-Operators, covering Clarksville Cotton Valley Unit.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I.  GENERAL PROVISIONS

**1.   Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator. ,

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

**2.   Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.   Advances and Payments by Non-Operators**

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.   Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.

COPAS

5.   **Audits**

A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.   **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3.   **Labor**

A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)   Salaries of First Level Supervisors in the field.

(3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

4.   **Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

5.   **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.   **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

-2-

COPAS

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.  **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.  **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ eight ____ percent (_8%_ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.  **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

-3-

**COPAS**

## III. OVERHEAD

1. **Overhead – Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

      (X) Fixed Rate Basis, Paragraph 1A, or
      ( ) Percentage Basis, Paragraph 1B

      Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

      ( ) shall be covered by the overhead rates, or
      (X) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

      ( ) shall be covered by the overhead rates, or
      (X) shall not be covered by the overhead rates.

   A. **Overhead – Fixed Rate Basis**

      (1) Operator shall charge the Joint Account at the following rates per well per month:

      Drilling Well Rate $ 5,000.00
         (Prorated for less than a full month)

      Producing Well Rate $ 500.00

      (2) Application of Overhead – Fixed Rate Basis shall be as follows:

         (a) Drilling Well Rate

            (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

            (2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

         (b) Producing Well Rates

            (1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

            (2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

            (3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

            (4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

            (5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

      (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

   B. **Overhead – Percentage Basis**

      (1) Operator shall charge the Joint Account at the following rates:

-4-

COPAS

(a) Development

_____ Percent ( ____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent ( ____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.  **Overhead – Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $ _____ :

A. ___5___ % of first $100,000 or total cost if less, plus

B. ___3___ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___1___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.  **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ___3___ % of total costs through $100,000; plus

B. ___2___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ___1___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.  **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.  **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.  **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

-5-

COPAS

A. New Material (Condition A)

   (1) Tubular Goods Other than Line Pipe

      (a) Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

      (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

      (c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

      (d) Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

   (2) Line Pipe

      (a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

      (b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

      (c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

      (d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

   (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

   (4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2 A (1) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

   (1) Material moved to the Joint Property

     At seventy-five percent (75%) of current new price, as determined by Paragraph A.

   (2) Material used on and moved from the Joint Property

      (a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

      (b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

   (3) Material not used on and moved from the Joint Property

     At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

   (1) Condition C

     Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

-6-



(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph I.A(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

EXHIBIT F

Attached to and made a part of that certain Unit Operating Agreement dated
January 25, 1990, by and between SFM Holdings, Inc., Operator,
and the Signatory Parties thereto, Non-Operators,
covering Clarksville Cotton Valley Unit.

## INSURANCE

I.  At all times while operations are conducted hereunder, Operator shall carry or provide the following insurance for the benefit of the joint account of the parties and shall charge the applicable premiums for such insurance to the joint account:

A.  Workers' Compensation Insurance covering Operator's employees in accordance with applicable law.

B.  Employer's Liability Insurance with a limit of $1,000,000 per occurrence.

C.  Comprehensive General Liability Insurance, including Automobile Liability, with a combined Bodily Injury and Property Damage limit of $1,000,000 per occurrence.

Except as set forth in Paragraph I of this Exhibit, Operator shall be under no obligation to carry or provide any other insurance for the benefit of the parties hereto, unless otherwise agreed to by the parties.

II.  To the extent not covered by or in excess of the limits of the applicable insurance coverage maintained by the Operator as set forth in Paragraph I of this Exhibit, all costs and expenses including, but not limited to, those arising from losses, damages, claims, demands, judgments, causes of action, as well as the defense thereof, shall be charged to the parties hereto in proportion to their respective working interest at the time of the occurrence giving rise to such costs and expenses.

III.  Each party individually may acquire, for its sole benefit and at its own cost and expense, such other or additional insurance coverage as it deems necessary to protect itself from any such costs and expenses; provided, however, that all such insurance coverage shall contain a waiver on the part of the underwriters of such insurance of all rights, by subrogation or otherwise, against the parties hereto.

IV.  Operator shall endeavor to require all contractors engaged in operations hereunder to carry Workers' Compensation and Employer's Liability Insurance in reasonable amounts and to maintain such other insurance as Operator deems necessary.

V.  Notwithstanding the foregoing provisions, Operator may self-insure all or any portion of each of the insurance coverages listed above.

EXHIBIT G
TO
UNIT OPERATING AGREEMENT
CLARKSVILLE COTTON VALLEY UNIT
RED RIVER COUNTY, TEXAS
INDEMNITY AGREEMENT

WHEREAS, Section 9.1.3 of an agreement entitled "Unit Agreement, Clarksville Cotton Field Unit, Red River County, Texas, dated January 25, 1990, provides that under certain circumstances and conditions therein stated a Tract that fails to qualify for inclusion in the Unit Area of the Unit may be included if the requisite Working Interest Owners in the Tract as specified in said Section request the inclusion of the Tract in the Unit Area and execute and deliver, or obligate themselves to execute and deliver, an indemnity agreement; and

WHEREAS, Tract _____, described in the Unit Agreement is such a Tract; and

WHEREAS, the undersigned are owners of Working Interest in such Tract who have become parties to the Unit Agreement and the Unit Operating Agreement and desire the inclusion of the Tract in the Unit Area of the Unit.

NOW, THEREFORE, in consideration of and conditioned upon said Tract meeting the other requirements of the aforesaid Section of the Unit Agreement and its inclusion in the Unit Area of the Unit, the undersigned hereby request the inclusion of the above Tract in the Unit Area and agree, together with other owners of Working Interest in the Tract who execute and deliver, or who obligate themselves to execute and deliver like indemnity agreements, to indemnify and hold harmless all other Working Interest Owners in the Unit Area, against all claims and demands required by said Section to be the subject of such indemnity. Any liability arising hereunder shall be borne by the undersigned and other Working Interest Owners in the Tract who are committed to like indemnity agreements in the proportion that the Working Interest of each in the Tract bears to the total Working Interest therein of all the owners of Working Interest in the Tract committed to such indemnity agreements.

This indemnity shall become void with respect to all claims and demands based upon occurrences subsequent to the time when the conditions are met that would initially have qualified such Tract for inclusion in the Unit Area without this indemnity.

This agreement shall be binding upon and inure to the benefit of the heirs, devisees, legal representatives, successors, and assigns of the respective parties initially bound or benefitted by the provisions hereof.

IN WITNESS WHEREOF, each of the undersigned has executed this instrument on the date opposite its signature.