EXHIBIT "B"

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT



OPERATING AGREEMENT

DATED

MAY 1 , 19 96 ,

OPERATOR __PENWELL ENERGY, INC.__

CONTRACT AREA __LOTS 1, 2, E/2 NW/4 OF SECTION 19,__

__S/2 OF SECTION 29, N/2 and SE/4 OF__

__SECTION 30, W/2 OF SECTION 33,__

__T-18-S, R-31-E, NMPM__

COUNTY OR PARISH OF __EDDY__ , STATE OF __NEW MEXICO__

SHUGART WEST PROSPECT (NM 050)

COPYRIGHT 1989 — ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.
A.A.P.L. NO. 610 - 1989

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 11 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 14 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: ............................... 15
E. WAIVER OF RIGHTS TO PARTITION: ......................................... 15
F. PREFERENTIAL RIGHT TO PURCHASE: ....................................... 15
IX. INTERNAL REVENUE CODE ELECTION ...................................... 15
X. CLAIMS AND LAWSUITS ..................................................... 15
XI. FORCE MAJEURE ......................................................... 16
XII. NOTICES ............................................................... 16
XIII. TERM OF AGREEMENT .................................................... 16
XIV. COMPLIANCE WITH LAWS AND REGULATIONS ............................... 16
  A. LAWS, REGULATIONS AND ORDERS: ....................................... 16
  B. GOVERNING LAW: ...................................................... 16
  C. REGULATORY AGENCIES: ................................................ 16
XV. MISCELLANEOUS ........................................................ 17
  A. EXECUTION: .......................................................... 17
  B. SUCCESSORS AND ASSIGNS: ............................................. 17
  C. COUNTERPARTS: ....................................................... 17
  D. SEVERABILITY: ....................................................... 17
XVI. OTHER PROVISIONS ..................................................... 17



A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

OPERATING AGREEMENT

1
2     THIS AGREEMENT, entered into by and between Penwell Energy, Inc.
3 hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes
4 hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WITNESSETH:

5
6     WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
7 identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil
8 and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,
9     NOW, THEREFORE, it is agreed as follows:

ARTICLE I.
DEFINITIONS

10
11
12     As used in this agreement, the following words and terms shall have the meanings here ascribed to them:
13     A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of
14 estimating the costs to be incurred in conducting an operation hereunder.
15     B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil
16 and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation
17 and production testing conducted in such operation.
18     C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be
19 developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas
20 Interests are described in Exhibit "A."
21     D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest
22 Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the
23 lesser.
24     E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the
25 cost of any operation conducted under the provisions of this agreement.
26     F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal
27 body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as
28 established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.
29     G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be
30 located.
31     H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.
32     I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as
33 provided in Article VI.B.2.
34     J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a
35 proposed operation.
36     K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous
37 hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is
38 specifically stated.
39     L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts
40 of land lying within the Contract Area which are owned by parties to this agreement.
41     M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein
42 covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.
43     N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a
44 Completion in a shallower Zone.
45     O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned
46 in order to attempt a Completion in a different Zone within the existing wellbore.
47     P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure,
48 restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but
49 are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking,
50 Deepening, Completing, Recompleting, or Plugging Back of a well.
51     Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to
52 change the bottom hole location unless done to straighten the hole or to drill around junk in the hole to overcome other
53 mechanical difficulties.
54     R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and
55 Gas separately producible from any other common accumulation of Oil and Gas.
56     Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes
57 natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

ARTICLE II.
EXHIBITS

58
59
60     The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:
61   __X__ A. Exhibit "A," shall include the following information:
62        (1) Description of lands subject to this agreement,
63        (2) Restrictions, if any, as to depths, formations, or substances,
64        (3) Parties to agreement with addresses and telephone numbers for notice purposes,
65        (4) Percentages or fractional interests of parties to this agreement,
66        (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
67        (6) Burdens on production.
68   _____ B. Exhibit "B," Form of Lease.
69   __X__ C. Exhibit "C," Accounting Procedure. ✓
70   __X__ D. Exhibit "D," Insurance. ✓
71   __X__ E. Exhibit "E," Gas Balancing Agreement. ✓
72   __X__ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.
73   _____ G. Exhibit "G," Tax Partnership.
74   _____ H. Other: _____

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in
2  the body of this agreement, the provisions in the body of this agreement shall prevail.

### ARTICLE III.
### INTERESTS OF PARTIES

5  A. Oil and Gas Interests:

6  If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this
7  agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B,"
8  and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

9  B. Interests of Parties in Costs and Production:

10  Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne
11  and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their
12  interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the
13  Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

14  Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other
15  burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or
16  cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,
17  the royalty burdens on the lease and shall indemnify, defend and hold the other parties free from any liability therefor

18  Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is
19  burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts
20  stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend
21  and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as
22  the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to
23  be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)
24  which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any
25  liability therefor.

26  No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's
27  lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher
28  price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

29  Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,
30  and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in
31  said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

32  C. Subsequently Created Interests:

33  If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security
34  for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production
35  payment, net profits interest, assignment of production or other burden payable out of production attributable to its working
36  interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed
37  hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden
38  payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such
39  burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's
40  Lease or Interest to exceed the amount stipulated in Article III.B. above.

41  The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and
42  alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other
43  parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses
44  chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the
45  same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required
46  under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the
47  production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of
48  said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or
49  parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

### ARTICLE IV.
### TITLES

52  A. Title Examination:

53  Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,
54  if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire
55  Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working
56  interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing
57  Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator
58  all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of
59  charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the
60  examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or
61  by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in
62  procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty
63  opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling
64  Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such
65  interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel
66  in the performance of the above functions.

67  Operator shall be responsible for securing curative matter and pooling amendments or agreements required in
68  connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation
69  and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings
70  before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to
71  the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.
72  Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental
73  agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct
74  charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

B. Loss or Failure of Title:

1. Failure of Title: ~~Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from~~ that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or Interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner ~~of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses of Leases or Interests committed to this agreement, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: ~~In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above,~~ any Lease or Interest acquired by any party hereto (other than the party ~~whose interest has failed or was lost~~) during the ninety (90) day period provided by Article IV.B.1. and Article ~~IV.B.2. above~~ covering all or a portion of the interest ~~that has failed~~ or was lost shall be offered ~~at cost~~ to the party whose interest has failed or was lost, and the provisions of Article VIII.B. ~~shall not apply to such acquisition.~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

Penwell Energy, Inc._____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

* exclusive of Saturdays, Sundays and legal holidays

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or
2  materials supplied.
3      4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced
4  or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the
5  Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until
6  used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as
7  provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator
8  and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in
9  this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the
10 parties otherwise specifically agree.
11     5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator
12 or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to
13 all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of
14 operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access
15 rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate
16 Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such
17 interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any
18 and all reports and information obtained by Operator in connection with production and related items, including, without
19 limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding
20 purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the
21 information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures
22 shall be conducted in accordance with the audit protocol specified in Exhibit "C."
23     6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to
24 each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications
25 required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder.
26 Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.
27     7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not
28 limited to the Initial Well:
29        (a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which
30 drilling operations are commenced.
31        (b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well
32 as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.
33        (c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing
34 Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted
35 hereunder.
36     8. Cost Estimates. Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs
37 incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement.
38 Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.
39     9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers
40 compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-
41 insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall
42 be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties
43 as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on
44 or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted
45 and to maintain such other insurance as Operator may require.
46     In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the
47 parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive
48 equipment.

ARTICLE VI.

DRILLING AND DEVELOPMENT

51 A. Initial Well:
52     On or before the __1st__ day of ____August____, 19 __96__, Operator shall commence the drilling of the Initial
53 Well at the following location:
54 1,980' FN & WL of Section 30, T-18-S, R-31-E, NMPM, Eddy County,
55 New Mexico

60 and shall thereafter continue the drilling of the well with due diligence to approximately 12,000' or
61 to a depth sufficient to adequately test the Morrow formation
62 whichever is the lesser depth.

67     The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation
68 in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.
69 B. Subsequent Operations:
70     1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or
71 if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of
72 producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under
73 this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written
74 notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2   performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a
3   notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4   whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to
5   Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
6   eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply
7   within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8   Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9   within the time and in the manner provided in Article VI.B.6.
10     If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11   contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12   forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13   promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
14   may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15   the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16   by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17   additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18   way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19   acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as
20   specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21   said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22   proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
23   Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
24   reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance
25   with Article VI.B.5. in the event of a Sidetracking operation.
26     2. Operations by Less Than All Parties:
27     (a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or
28   VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29   Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
30   later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31   expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
32   proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting
33   Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
34   the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35   account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The
36   rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37   designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when
38   conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39   agreement.
40     If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41   applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42   recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party,
43   within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of such notice, shall advise the
44   proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45   proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46   the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47   Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48   interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a
49   Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50   proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i) . In the event a
51   drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52   total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may
53   withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54   days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55   If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56   of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57   period provided in Article VI.B.1., subject to the same extension right as provided therein.
58     (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
59   borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60   paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61   encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results
62   in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63   the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64   participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65   shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66   increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,
67   Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68   paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69   well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70   expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking,
71   Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72   provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73   Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74   Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

      * telegram, telex, telecopier, or other form of facsimile

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-
2   Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect
3   to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or
4   market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes,
5   royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production
6   from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

7       (i) __100__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment
8   beyond the wellhead connections (including but not limited to stock-tanks, separators, treaters, pumping equipment and
9   piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first
10   production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other
11   provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that
12   interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning
13   of the operations; and

14       (ii) __300__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening,
15   Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C.,
16   and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections).
17   which would have been chargeable to such Non-Consenting Party if it had participated therein.

18       Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone
19   described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable
20   substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each
21   Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a
22   shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-
23   Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the
24   cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-
25   Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions
26   of this Article VI.B.2. (b) shall apply to such party's interest.

27       (c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or
28   Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in
29   such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full
30   recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to
31   participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking
32   operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at
33   any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such
34   Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the
35   cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __300__ % of
36   that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to
37   such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is
38   proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting
39   Parties in said well.

40       (d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's
41   share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem,
42   production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to
43   Non-Consenting Party's share of production not excepted by Article III.C.

44       In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting
45   Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all
46   such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back,
47   Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each
48   party receiving its proportionate part in kind or in value, less cost of salvage.

49       Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations
50   for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to
51   the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing,
52   Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement
53   of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the
54   Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties
55   shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of
56   the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from
57   the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas
58   produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or
59   periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with
60   any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited
61   against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such
62   Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-
63   Consenting Party.

64       If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided
65   for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day
66   following the day on which such recoupment occurs; and, from and after such reversion, such Non-Consenting Party shall
67   own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as
68   such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking,
69   Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and
70   shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this
71   agreement and Exhibit "C" attached hereto.

72       3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all costs have
73   been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise
74   terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required
2   under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening
3   operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted,
4   whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
5   of the second grammatical paragraph of Article VI.B.2. (a). shall be charged to and borne as part of the proposed operation,
6   but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated
7   between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8   interest as shown on Exhibit "A" of all Consenting Parties.
9      In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party
10   may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in
11   Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended
12   response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending
13   the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be
14   allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's
15   interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.
16      4. Deepening: If less than all the parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17   pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article
18   VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone
19   of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the
20   Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate
21   in the Deepening operation.
22      In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective.
23   such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-
24   Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to
25   participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation
26   is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation,
27   such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses:
28      (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29   quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs
30   and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-
31   Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting
32   Party's share of the costs of Deepening and of participating in any further operations on the well in accordance with the other
33   provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well
34   incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the
35   sole account of Consenting Parties.
36      (b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing
37   in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or
38   reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and
39   equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less
40   those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall
41   also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based
42   on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent
43   Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in
44   connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the
45   cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-
46   Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the
47   well for Deepening.
48      The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
49   to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article
50   VI.F.
51      5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an
52   interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its
53   proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore
54   to be utilized as follows:
55      (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
56   incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.
57      (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
58   such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth
59   at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4.(b) above. Such party's
60   proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking
61   operation is initiated shall be determined in accordance with the provisions of Exhibit "C."
62      6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to
63   propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such
64   party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform
65   an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal
66   holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be
67   conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such
68   alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such
69   proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within
70   twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the
71   subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required
72   shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage
73   interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

\* or Deepening

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation
2  within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3  and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4  is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5  relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within
6  such period shall be deemed an election not to participate in the prevailing proposal.

7  7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be
8  proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9  Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone. *

10  8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
11  Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except
12  with the consent of all parties that have not relinquished interests in the well at the time of such operation.

13  C. Completion of Wells; Reworking and Plugging Back:

14  1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
15  drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling,
16  Deepening or Sidetracking shall include:

17  ☐  Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and
18  equipping of the well, including necessary tankage and/or surface facilities.

19  ☒  Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When
20  such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results
21  thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to
22  participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,
23  together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice
24  shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of
25  notice to Operator to participate in a recommended Completion. attempt or to make a Completion proposal with an
26  accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting
27  with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the
28  procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all
29  necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface
30  facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party
31  receiving such notice to reply within the period above fixed shall constitute an election by that party not to
32  participate in the cost of the Completion attempt, provided, that Article VI.B.6. shall control in the case of
33  conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the
34  provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging
35  Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations
36  thereafter conducted by less than all parties; provided, however, that Article VI.B.2 shall apply separately to each
37  separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting
38  Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party
39  in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier
40  Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any
41  recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in
42  which the Completion attempt is made. Election by a previous Non-Consenting Party to participate in a subsequent
43  Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable
44  materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,
45  insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a
46  Completion attempt.

47  2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
48  Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking,
49  Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
50  Completing and equipping of said well, including necessary tankage and/or surface facilities.

51  D. Other Operations:

52  Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____
53  ____Thirty Thousand_____ Dollars ($ 30,000.00 ____ ) except in connection with the
54  drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously
55  authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
56  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion
57  are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the
58  emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so
59  requesting an information copy thereof for any single project costing in excess of __Twenty-five Thousand___ Dollars
60  ( $ 25,000.00 ___ ). Any party who has not relinquished its interest in a well shall have the right to propose that
61  Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as
62  salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but
63  not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall
64  be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the
65  amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under
66  Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by those Articles). Operator shall deliver such
67  proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent
68  of any party or parties owning at least __60___ % of the interests of the parties entitled to participate in such operation,
69  each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated
70  to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms
71  of the proposal.

72  E. Abandonment of Wells:

73  1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has
74  been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

*  or such well has been approved as an exception to the existing spacing
   pattern for such zone by the appropriate regulatory agency.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2   party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after
3   delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4   proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
5   cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to
6   plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,
7   Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8   forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9   Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10  such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11  abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12  taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13  liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14  restoring the surface, for which the abandoning parties shall remain proportionately liable.
15     2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
16  conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
17  been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to
18  such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19  and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed
20  abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the
21  proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
22  operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23  applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24  against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25  proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26  within the required period or thereafter to conduct operations on such well shall entitle Operator to retain or take possession
27  of such well and plug and abandon the well.
28     Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29  the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30  of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31  the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
32  value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33  operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34  parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35  of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36  insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37  interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-
38  abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39  one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
40  attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located
41  The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42  respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43  Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.
44     Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45  from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46  request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47  charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48  ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49  shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50  further operations therein subject to the provisions hereof.
51     3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
52  between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53  however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54  operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55  in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
56  in a portion of the well shall pay their proportionate shares of abandonment and surface restoration costs for such well as
57  provided in Article VI.B.2.(b).
58  F. Termination of Operations:
59     Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60  Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without
61  consent of parties bearing   85   % of the costs of such operation; provided, however, that in the event granite or other
62  practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63  Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1.; and the
64  provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.
65  G. Taking Production in Kind:
66     ⊠  Option No. 1: Gas Balancing Agreement Attached
67     Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
68  Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
69  treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
70  in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
71  party taking its share of production in kind shall be required to pay for only its proportionate share of such part of
72  Operator's surface facilities which it uses.
73     Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
74  production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐   Option No. 2: No Gas Balancing Agreement:

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

B. Liens and Security Interests:

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. Advances:

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. Defaults and Remedies:

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1989

1 only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator,
2 and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator.
3 Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified
4 below or otherwise available to a non-defaulting party.

5    1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default,
6 specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one
7 or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such
   fifteen (15)
8 Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the
9 default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of
10 the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the
11 Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area
12 after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting
13 party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right
14 to receive information as to any operation conducted hereunder during the period of such default, the right to elect to
15 participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being
16 conducted under this agreement even if the party has previously elected to participate in such operation, and the right to
17 receive proceeds of production from any well subject to this agreement.

18    2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint
19 account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default
20 until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from
21 suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

22    3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the
23 defaulting party at any time after the expiration of the thirty (30) cure period following delivery of the Notice of Default, in
   fifteen (15)
24 which event if the billing is for the drilling of a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a
25 well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting
26 party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with
27 respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party,
28 notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the
29 non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

30    Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure
31 its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such
32 payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-
33 defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the
34 non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership
35 of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein
   fifteen (15)
36    4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or
37 Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting
38 party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may
39 be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of
40 the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of
41 drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the
42 defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided
43 in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining
44 when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

45    5. Costs and Attorneys' Fees. In the event any party is required to bring legal proceedings to enforce any financial
46 obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of
47 collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

48 E. Rentals, Shut-in Well Payments and Minimum Royalties:
49    Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid
50 by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties
   Operator and charged to the joint account.
51 own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to
52 make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper
53 evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or
54 minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which
55 results from such non-payment shall be borne in accordance with the provisions of Article IV.B.1. 3
56    Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to
57 production of a producing well, at least five (5) days (excluding Saturday, Sunday and legal holidays) prior to taking such
58 action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of
59 failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make
60 timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article
61 IV.B.3.

62 F. Taxes:
63    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all
64 property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed
65 thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as
66 to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and
67 Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being
68 subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes
69 resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to
70 such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part
71 upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to
72 the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's
73 working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner
74 provided in Exhibit "C."

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2   prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3   determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4   and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5   the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6   paid by them, as provided in Exhibit "C."
7   Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8   to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

11  A. Surrender of Leases:
12    The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13  or in part unless all parties consent thereto.
14    However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15  notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16  delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a
17  party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18  described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19  implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20  located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the
21  assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22  consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
23  thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B."
24  Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25  accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26  shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27  in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the
28  reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29  acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30  the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less
31  than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the
32  assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33  interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made
34  varies according to depth, then the interest assigned shall similarly reflect such variances.
35    Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38  agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

39  B. Renewal or Extension of Leases:
40    If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41  shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42  promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following
43  delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44  affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45  allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interests held at that time by the
46  parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47  assignment of its proportionate interest therein by the acquiring party.
48    If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49  by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50  the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51  purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52  shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53  less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54  Agreement in the form of this agreement.
55    If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56  renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.
57    The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58  the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the
59  expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60  existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61  the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62  expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63  agreement.
64    The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

65  C. Acreage or Cash Contributions:
66    While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68  be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom
69  the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70  proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the
71  extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any
72  acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above
73  provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74  inside the Contract Area.

- 14 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder,
2    such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

3    D. Assignment; Maintenance of Uniform Interest:

4    For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas
5    Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other
6    disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells,
7    equipment and production unless such disposition covers either:

8    1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or
9    2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells,
10    equipment and production in the Contract Area.

11    Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
12    and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and
13    Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of
14    the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale,
15    encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the
16    instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other
17    disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect
18    to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation
19    conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security
20    interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

21    If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion,
22    may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures,
23    receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to
24    bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-
25    owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of
26    the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale
27    proceeds thereof.

28    E. Waiver of Rights to Partition:

29    If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
30    undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its
31    undivided interest therein.

32    ~~F. Preferential Right to Purchase:~~
33    ☐ (Optional; Check if applicable.)
34    Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
35    Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which
36    shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase
37    price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an
38    optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the
39    same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the
40    purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all
41    purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage
42    its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests,
43    or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets
44    to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any
45    ~~company in which such party owns a majority of the stock.~~

### ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

47    If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the
48    parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each
49    party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle
50    "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and
51    the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected
52    such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal
53    Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by
54    Treasury Regulations §1.761. Should there be any requirement that each party hereby affected give further evidence of this
55    election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal
56    Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action
57    inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
58    Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter
59    1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party
60    hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each
61    such party states that the income derived by such party from operations hereunder can be adequately determined without the
62    computation of partnership taxable income.

### ARTICLE X.
### CLAIMS AND LAWSUITS

66    Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure
67    does not exceed _____ Ten Thousand _____ Dollars ($ _10,000.00_ ) and if the payment is in complete settlement
68    of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over
69    the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling,
70    or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the
71    claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations
72    hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall
73    immediately notify all other parties, and the claim or suite shall be treated as any other claim or suit involving operations hereunder.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1                                    ARTICLE XI.
2                                  FORCE MAJEURE
3        If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other
4    than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties
5    prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the
6    party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the
7    continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or
8    other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of
9    nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other
10   cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party
11   claiming suspension.
12       The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The
13   requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes,
14   lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall
15   be entirely within the discretion of the party concerned.
16                                   ARTICLE XII.
17                                    NOTICES
18       All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise
19   specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex,
20   telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on
21   Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written
22   notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to
23   whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date
24   the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder
25   shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or
26   to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when
27   deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy
28   or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or
29   48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party
30   shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other
31   parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required
32   to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall
33   be deemed delivered in the same manner provided above for any responsive notice.
34                                  ARTICLE XIII.
35                               TERM OF AGREEMENT
36       This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject
37   hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title
38   or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.
39   ☒   Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain in or are continued in
40       force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.
41   ☐   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision
42       of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying
43       quantities, this agreement shall continue in force so long as any such well is capable of production, and for an
44       additional period of _____ days thereafter; provided, however, if, prior to the expiration of such
45       additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking,
46       Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall
47       continue in force until such operations have been completed and if production results therefrom, this agreement
48       shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well
49       drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the
50       Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-
51       completing, Plugging Back or Reworking operations are commenced within _____ days from the
52       date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties
53       not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any
54       operations on the well, whichever first occurs.
55       The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any
56   remedy therefor which has accrued or attached prior to the date of such termination.
57       Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this
58   Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a
59   notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon
60   request of Operator, if Operator has satisfied all its financial obligations.
61                                  ARTICLE XIV.
62                      COMPLIANCE WITH LAWS AND REGULATIONS
63   A. Laws, Regulations and Orders:
64       This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules,
65   regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state,
66   and local laws, ordinances, rules, regulations and orders.
67   B. Governing Law:
68       This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-
69   performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and
70   determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states,
71   the law of the state of _____Texas_____ shall govern.
72   C. Regulatory Agencies:
73       Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any
74   rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or
2 production of wells, on tracts offsetting or adjacent to the Contract Area.
3 With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages,
4 injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation
5 or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission
6 or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not
7 constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of
8 production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such
9 an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such
10 incorrect interpretation or application.

ARTICLE XV.
11
12 MISCELLANEOUS
13 A. Execution:
14 This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been
15 executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of
16 the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which
17 own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have
18 become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no
19 event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this
20 agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of
21 drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease
22 as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs
23 hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds
24 with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a
25 current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the
26 Initial Well which would have been charged to such person under this agreement if such person had executed the same and
27 Operator shall receive all revenues which would have been received by such person under this agreement if such person had
28 executed the same.
29 B. Successors and Assigns:
30 This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31 devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or
32 Interests included within the Contract Area.
33 C. Counterparts:
34 This instrument may be executed in any number of counterparts, each of which shall be considered an original for all
35 purposes.
36 D. Severability:
37 For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws,
38 this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to
39 this agreement to comply with all of its financial obligations provided herein shall be a material default.

ARTICLE XVI.
40
41 OTHER PROVISIONS
42
43 A.  SEISMIC OPERATIONS
44
45 Should the Operator or Non-Operators hereunder wish to propose
46 seismic operations on the joint property, the party proposing the
47 operation shall contact the other parties under this Agreement in
48 writing.  The proposing party shall provide each party with the
49 location and estimated cost of the seismic line or lines, and shall
50 request an election by each party either for or against the
51 operation.  Should two or more parties to this Agreement which own
52 a majority interest, based upon ownership as set out in Exhibit "A"
53 hereto, and inclusive of the proposing party, elect "for" the
54 proposed seismic operation, all parties shall be obligated to bear
55 their proportionate share of the cost of the seismic.  Failure of
56 any party to respond to a seismic proposal within 15 days from
57 receipt thereof shall be construed as a vote "for" the proposed
58 operation.

59
60 B.  DESIGNATION OF BURDENS AGAINST WORKING INTEREST
61
62 If any party hereto hereinafter should create any overriding
63 royalty, production payment, or other burdens against its working
64 interest production and if any other party or parties should
65 conduct non-consent operations pursuant to any provisions of this
66 agreement and, as a result, become entitled to receive the working
67 interest production otherwise belonging to the non-participating
68 party, the party or parties entitled to receive the working
69 interest production of the non-participating party shall receive
70 such production free and clear of burdens against such production
71 which may have been created subsequent to this agreement, and the
72 non-participating party creating such subsequent burdens shall save
73 the participating party or parties harmless with respect to this
74 receipt of such working interest production.

## C.  AREA OF MUTUAL INTERESTS:

The parties hereto hereby create an Area of Mutual Interest ("AMI") comprising the areas shown outlined in red on the attached Exhibit A-1.  This AMI shall remain in force and effect as long as this Operating Agreement remains in effect, unless sooner terminated by the Parties.

During the term of this AMI, if any party hereto ("Acquiring Party"), acquires any oil and gas leases or any interest therein, any unleased mineral interest or any farmouts or other contracts with respect thereto which affect lands and minerals lying within the AMI ("Mineral Interest"), the Acquiring Party shall promptly advise each of the other parties hereto ("Offeree") of such acquisition.  In such event, each Offeree shall be the right to acquire its proportionate interest in such Mineral Interest in accordance with other provisions of this AMI.

Promptly upon acquiring such Mineral Interest, the Acquiring Party shall, in writing, advise the Offerees of such acquisition.  The notice shall include a copy of all instruments of acquisition including, by way of example but not of limitation, copies of the leases, assignments, subleases, farmouts or other contracts affecting the Mineral Interest.  The Acquiring Party shall also enclose an itemized statement of the actual costs and expenses incurred by the Acquiring Party in acquiring such Mineral Interest, excluding, however, costs and expenses of its own personnel ("Acquisition Costs").

Each Offeree shall have a period of thirty (30) days after receipt of the notice within which to furnish the Acquiring Party written notice of its election to acquire its proportionate interest in the offered Mineral Interest. If, however, a well in search of oil or gas is being drilled within the AMI or at a location outside the AMI of which the result could be expected to materially affect the value of the offered Mineral Interest, each Offeree shall have a period of forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) after receipt of the notice within which to elect to acquire its proportionate interest in the Mineral Interest so offered.

It is provided, however, that the forty-eight (48) hour (exclusive of Saturdays, Sundays and legal holidays) election period shall not apply unless the Acquiring Party shall give the notice to the Offerees within two (2) days after the date on which the Acquiring Party acquired the Mineral Interest so offered.   In addition thereto, the Acquiring Party shall also:

(i) furnish Offeree with the approximate location of the well then being drilled and the name of the Operator or drilling contractor drilling the well, and

(ii) specifically advise the Offeree that the Offeree shall have a period of forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) within which to elect to acquire an interest in the offered Mineral Interest.

The above information shall be in addition to the information and copies of instruments provided for above in connection with the usual notices of acquisition of a Mineral Interest.  If the Acquiring Party shall not have received actual written notice of the election of the Offeree to acquire its proportionate interest within the fifteen (15) day or forty-eight hour period, as the case may be, such failure shall constitute an election by such Offeree not to acquire its interest in the Mineral Interest.  Each Offeree accepting the offered Mineral Interest shall be entitled to participate in such Mineral Interest in proportion to which its interest in the AMI bears to the aggregate interest in the AMI of the Acquiring Party and all other Offerees who have elected to acquire an interest in the Mineral Interest so offered.  Promptly after the expiration of the election period, the Acquiring Party shall invoice each Offeree electing to acquire an Interest for its proportionate part of the Acquisition Costs.  Each Offeree shall

17b

immediately reimburse the Acquiring Party for its share of the Acquisition Costs, as reflected by the invoice. Upon receipt of such reimbursement, the Acquiring Party shall execute and deliver an appropriate assignment to such Offeree. If the Acquiring Party does not receive the amount due from the Offeree within ten (10) days after the receipt by the Offeree of the invoice for its costs, the Acquiring Party may, at its election, give written notice to such delinquent party that the failure of the Acquiring Party to receive the amount due within five (5) days after receipt of such notice by the delinquent Offeree shall constitute a withdrawal by the delinquent Offeree of its former election to acquire the interest, and such Offeree shall no longer have the right to acquire an interest in the offered Mineral Interest. Unless the delinquent party pays the amount due within said five (5) day period provided for in said written notice, the delinquent party shall have no right to acquire an interest in the offered Mineral Interest.

Any assignment made by the Acquiring Party shall be made free and clear of any burdens placed thereon by the Acquiring Party but other wise shall be made without warranty of title, either express or implied, even to the return of the purchase price. The assignment shall be made and accepted subject to, and each assignee shall expressly assume its portion of, all of the obligations of the Acquiring Party.

If the Mineral Interest covers lands both within and without the AMI, the Acquiring Party may, at its option, offer either the entire Mineral Interest, or only the portion of the Mineral Interest covering lands within the AMI. If less than the entirety is offered, the Acquiring Party's costs applicable to the offered interest shall be that proportion of the total costs which the Mineral Interest offered bears to the total Mineral Interest. If the entirety of the premises covered by the Mineral Interest is offered and each party hereto acquires its proportionate interest, the lands lying outside the AMI shall become a part of the Contract Area subject hereto but the AMI shall not thereby be enlarged. If less than all of the parties acquire their proportionate interest in the Mineral Interest, the Mineral Interest so acquired shall not be subject to this Operating Agreement, but shall be subject to an operating agreement on a form identical to this Operating Agreement (without this Area of Mutual Interest provision) between the parties hereto who acquired an interest in such Mineral Interest. If less than all the parties acquired their proportionate interest in the Mineral Interest which is included in a drillsite, Exhibit "A" to this Operating Agreement shall be revised to reflect the proportionate ownership on an acreage basis within the drillsite. However, this AMI provision shall not be operative in those cases where a party purchases a company, or substantially all of a company's assets, which holds interest in the AMI.

D.   PRIORITY OF AND LIMITATIONS ON OPERATIONS

When a well which has been authorized under the terms of this Agreement as a vertical well shall have been drilled to the objective authorized in the AFE ("authorized depth"), and all test have been completed and the results thereof furnished to the participating parties, and after Operator has attempted in good faith to reach a mutual agreement with Non-Operator(s) regarding further operations but such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter: (1) a proposal to do additional logging, sidewall coring, or testing; (2) a proposal to attempt to complete the well at the authorized depth in the manner set forth in the AFE (i.e., in accordance with the casing, stimulation and other completion programs set forth in the AFE); (3) a proposal to attempt to complete the well at the authorized depth in a manner different than as set forth in the AFE; (4) a proposal to plug back and attempt to complete the well at a depth shallower than the authorized depth, with priority given to objectives in ascending order up the hole; (5) a proposal to drill the well to a depth below the authorized depth, with priority

given to objectives in descending order; (6) a proposal to sidetrack the well to a new target objective for a vertical or deviated hole, with priority given first in ascending order to targets above the authorized depth; and then in descending order to targets below the authorized depth; and (7) a proposal to drill a first to a lateral drain hole at the authorized depth, and then to objectives in ascending order above the authorized depth, and then to objectives in descending order below the authorized depth.

If at the time the parties are considering a proposed operation, the well is in such condition, in the Operator's judgement, that a reasonably prudent operator would not conduct such operation for fear of mechanical difficulties, placing the hole, equipment or personnel in danger of loss or injury, or fear of loss of the well for any reason without being able to attempt a completion at the authorized depth, then the proposal shall be given no priority to any proposed operation except for plugging and abandoning the well.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1      IN WITNESS WHEREOF, this agreement shall be effective as of the ___1st___ day of ___May___

2    19 _96_.

3    ATTEST OR WITNESS:              OPERATOR

4                        PENWELL ENERGY, INC.

5    _____    By _____

6    _____    Steven R. Foy
7                        Type or print name

8                        Title _Vice President_

9                        Date _May 1, 1996_

10                     Tax ID or S.S. No. _75-2223190_

11

12                   NON-OPERATORS

13

14                      COENERGY CENTRAL EXPLORATION, INC.

15    _____    By _____

16    _____
17                        Type or print name

18                        Title _____

19                        Date _____

20                     Tax ID or S.S. No. _____

21

22                     _____

23    _____    By _____

24    _____
25                        Type or print name

26                        Title _____

27                        Date _____

28                     Tax ID or S.S. No. _____

29                       _____

30    _____    By _____

31    _____
32                        Type or print name

33                        Title _____

34                        Date _____

35                     Tax ID or S.S. No. _____

36

37

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

IN WITNESS WHEREOF, this agreement shall be effective as of the _1st_ day of _May_.

19 _96_.

ATTEST OR WITNESS:                              OPERATOR

                                                PENWELL ENERGY, INC.                    _Cnw_

_____      By _____

_____         Steven R. Foy
                                     Type or print name

                                     Title _Vice President_____

                                     Date _May 1, 1996_____

                                     Tax ID or S.S. No. _75-2223190_


                     NON-OPERATORS

                                     _BLW 5/5_

                                     COENERGY CENTRAL EXPLORATION, INC.

_____      By _____

_____         _M Joy Diedzic_
                                     Type or print name

                                     Title _Vice President_____

                                     Date _5/20/96_____

                                     Tax ID or S.S. No. _38-3220843_


                                     _____

_____      By _____

_____         Type or print name


                                     Title _____

                                     Date _____

                                     Tax ID or S.S. No. _____


                                     _____

_____      By _____

_____         Type or print name


                                     Title _____

                                     Date _____

                                     Tax ID or S.S. No. _____

- 18 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of _____ )

            ) ss.

County of _____ )

       This instrument was acknowledged before me on

_____ by _____

(Seal, if any)                  _____

                                  Title (and Rank) _____

                                  My commission expires: _____

Acknowledgment in representative capacity:

State of __TEXAS_____ )

            ) ss.

County of __MIDLAND_____ )

       This instrument was acknowledged before me on

__May 1, 1996_____ by     Steven R. Foy        as

Vice President of __Penwell Energy, Inc.__
a Texas corporation, on behalf of said corporation.

(Seal, if any)             _Tammy Baimbridge_____

                              Tammy Baimbridge

                            Title (and Rank) __Secretary_____

TAMMY BAIMBRIDGE
Notary Public, State of Texas
My commission expires 9/23/97

                            My commission expires: __9/23/97__

Shugart West Prospect (NM-050)

EXHIBIT "A"

To that certain Operating Agreement dated May 1, 1996, by and
between PENWELL ENERGY, INC., as Operator, and COENERGY CENTRAL
EXPLORATION, INC., as Non-Operator.

1. IDENTIFICATION OF LANDS SUBJECT TO THIS AGREEMENT:

W/2 of Section 19; S/2 of Section 29;
All of Section 30; and W/2 of Section 33,
T-18-S, R-31-E, NMPM, Eddy County, New Mexico

2. RESTRICTIONS, IF ANY, AS TO DEPTHS, FORMATIONS, OR SUBSTANCES

None as the Lots 1,2 and E/2 NW/4 of Section 19,
T-18-S, R-31-E; Limited to depths below 4,500'
subsurface in the S/2 of Section 29;
N/2 and SE/4 of Section 30; and W/2 of Section 33,
T-18-S, R-31-E, NMPM, Eddy County, New Mexico

3. PERCENTAGES OR FRACTIONAL INTERESTS AND ADDRESSES OF PARTIES
TO THIS AGREEMENT:

| | BCP on Initial Well on Contract Area * | ACP on Initial Well on Contract Area & Subsq. Wells *   ** |
|---|---|---|
| Penwell Energy, Inc., et al 600 N. Marienfeld, Suite 1100 Midland, Texas 79701 | 85.0000% | 88.7500% |
| S & P Co. P. O. Box 3735 Shreveport, LA 71133-3735 | 15.0000% | 11.2500% |
| | 100.0000% | 100.0000% |

\*  - If Canadian Kenwood elects not to participate in Initial
Test Well.

\*\* - Percentages may vary as subsequent proration units are
proposed.

revised 7-29-96
joaexa(18M)

EXHIBIT "D-1"
SHUGART WEST PROSPECT

NO EXHIBIT "B"

COPAS - 1984 - ONSHORE

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

601,   BOX 800
TULSA OK 74101

## EXHIBIT   " C "

Attached to and made a part of Operating Agreement by and between Penwell Energy, Inc. and CoEnergy Central Exploration, Inc., as Non-Operator dated May 1, 1996

## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

### I.  GENERAL PROVISIONS

**1.   Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

**2.   Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.   Advances and Payments by Non-Operators**

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at 15% per annum beginning on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.   Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.



COPAS - 1984 - ONSHORE

Recommended by the Council
of Petroleum Accountants
Societies

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First Level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

   (4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II., excluding moving or relocation expenses.

4. **Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

COPAS – 1984 – ONSHORE

Recommended by the Council
of Petroleum Accountants
Societies



B.  If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.  In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.  Services

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.  Equipment and Facilities Furnished By Operator

A.  Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ _____twelve_____ percent (_12_%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.  Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.  Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.  Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

12.  Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13.  Abandonment and Reclamation

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14.  Communications

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15.  Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

COPAS - 1984 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

## III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

      ( X ) Fixed Rate Basis, Paragraph 1A, or
      ( ) Percentage Basis, Paragraph 1B

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

      ( ) shall be covered by the overhead rates, or
      ( X ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

      ( ) shall be covered by the overhead rates, or
      ( X ) shall not be covered by the overhead rates.

   **A. Overhead - Fixed Rate Basis**

     (1) Operator shall charge the Joint Account at the following rates per well per month:

       Drilling Well Rate $ __5,828.00__
       (Prorated for less than a full month)

       Producing Well Rate $ __546.00__

     (2) Application of Overhead - Fixed Rate Basis shall be as follows:

       (a) Drilling Well Rate

         (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

         (2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

       (b) Producing Well Rates

         (1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

         (2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

         (3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

         (4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

         (5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

       (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

   ~~B. Overhead - Percentage Basis~~

     ~~(1) Operator shall charge the Joint Account at the following rates:~~

-4-

COPAS - 1984 - ONSHORE

Recommended by the Council
of Petroleum Accountants
Societies



(a) ~~Development~~

_____ Percent ( _____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) ~~Operating~~

_____ Percent ( _____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. **Overhead – Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $ 25,000.00 :

A. ___5___ % of first $100,000 or total cost if less, plus

B. ___3___ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___2___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account ~~or shall charge the Joint Account for overhead based on the following rates:~~

A. ~~_____ % of total costs through $100,000; plus~~

B. _____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ~~_____ % of total costs in excess of $1,000,000.~~

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. Purchases                                        however Operator shall not be
                                                required to take discounts/
Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

A   New Material (Condition A)

(1)   ~~Tubular Goods Other than Line Pipe~~

   (a) Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

   (b)  For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

   (c)  Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000-pound truck rate, to the railway receiving point nearest the Joint Property.

   (d)  Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)   Line Pipe

   (a)  Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

   (b)  Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

   (c)  Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

   (d)  Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices ~~agreed to by the Parties.~~

(3)   ~~Other~~ Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)   Unused new Material, ~~except tubular goods,~~ moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property ~~Unused new tubulars will be priced as provided above in Paragraph 3 A.(1) and (2).~~

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2)   Material used on and moved from the Joint Property

   (a)  At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

   (b)  At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

(3)   Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1)   Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

COPAS - 1984 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS



(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at ~~the rate of twenty-five cents (25¢) per hundred~~ Operators actual cost. weight on all tubular goods movements. in lieu of actual loading or unloading ~~costs sustained~~ at the stocking point. The above rate shall be adjusted as of the first day ~~of April each year~~ following January 1, 1985 by the same percentage increase or decrease ~~used to adjust~~ overhead rates in Section III, Paragraph 1.A(3). Each year, the rate calculated ~~shall be rounded~~ to the nearest cent and shall be the rate in effect until the first day of April next ~~year. Such rate shall be published each year by the Council of Petroleum Accountants Societies~~.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories. Notice and Representation

At reasonable intervals. inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. Expense of Conducting Inventories

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories. except inventories required due to change of Operator shall be charged to the Joint Account.

EXHIBIT "D"

**Attached to and made a part of Operating Agreement dated May 1, 1996, by and between Penwell Energy, Inc., as Operator, and CoEnergy Central Exploration, Inc., as Non-Operator**

At all times during the conduct of operations hereunder, Operator shall maintain in force the following insurance at the expense of and for the benefit of, the joint account:

(a) Worker's Compensation Insurance with limits of $500,000 for Bodily Injury by Accident and Bodily Injury by Disease, covering Operator's employees and employees of Operator's contractors and subcontractors engaged in operations under this Agreement, in compliance with the laws of the State where the work is to be performed.

(b) Commercial General Liability Insurance covering the parties hereto in connection with all operations conducted by Operator or Operator's contractors and subcontractors with the following limits:

| | |
|---|---:|
| General Aggregate Limit | $2,000,000 |
| Products-Completed Oper. Aggregate Lt. | 1,000,000 |
| Personal Injury Limit | 1,000,000 |
| Each Occurrence Limit | 1,000,000 |
| Fire Damage Limit | 50,000 |
| Medical Expense Limit | 5,000 |
| Underground Equipment | 100,000 |

(c) Umbrella Liability with policy aggregate limit of $5,000,000.

If Operator is audited by it's insurance carrier and determined to owe additional workers compensation over and above what has been charged to the well, such additional amounts will be proportionately charged to the joint account.

The Operator also carries well control insurance. EACH PARTICIPANT WILL AUTOMATICALLY BE INCLUDED AS A NAMED INSURED UNDER THE COVERAGE PROVIDED BY OPERATOR'S POLICY UNLESS WITHIN (10) DAYS OF THE SPUD DATE OF A WELL UNDER THIS AGREEMENT, OPERATOR HAS RECEIVED WRITTEN REFUSAL OF THE COVERAGE PROVIDED BY OPERATOR AND PROOF OF PARTICIPANT'S EQUIVALENT OR BETTER COVERAGE. Joint participants afforded coverage under Operator's policy will be billed for their proportionate share of insurance costs.

Operator's current policy is described a follows:

COVERAGE:

(1) Drilling, completion and production of a well;

(2) Reworking, reconditioning, recompletion, and workover of a well; and

(3) Deepening of a well.

ENDORSEMENTS:

(1) Cost of Well Control;

(2) Deliberate Well Firing;

(3) Underground Blow-out;

(4) Contingent Joint Venture Coverage;

(5) Evacuation Expense Endorsement;

(6) Seepage & Pollution, Clean-up & Contamination;

(7)   Unlimited Redrill;

(8)   Care, Custody and Control; and,

(9)   Making a Well Safe.

## PURPOSE OF COVERAGE:

This policy protects from loss incurred from a well fire, cratering (including the expense of clean-up or containment), seepage, pollution or contamination, expense of re-drilling the hole lost from fire, etc.; and affords care/custody/control legal liability.

LIMITS:                    Control of Well, etc. - $5,000,000 scaled to
                           interest
                           Care, Custody & Control - $500,000

Exhibit "E"

Attached to that certain Operating Agreement
dated May 1, 1996, by and between
Penwell Energy, Inc., as Operator, and
CoEnergy Central Exploration, Inc., as Non-Operator

## GAS BALANCING AGREEMENT

1.   Ownership of Gas Production
     (a)   It is the intent of the parties that each party shall have the right to take in kind and separately dispose of its proportionate share of gas (including casinghead gas) produced from each formation in each well located on acreage ("Contract Area") covered by the Operating Agreement to which this Exhibit is attached ("Operating Agreement").

     (b)   Operator shall control the gas production and be responsible for administering the provisions of this Agreement and shall make reasonable efforts to deliver or cause to be delivered gas to the parties' gas purchasers as may be required in order to balance the accounts of the parties in accordance with the provisions herein contained. For proposes of this Agreement, Operator shall maintain production accounts of the parties based upon the number of MMBtu's actually contained in the gas produced from a particular formation in a well and delivered at the outlet of lease equipment for each party's account regardless of whether sales of such gas are made on a wet or dry basis. All references in this Agreement to quantity or volume shall refer to the number of MMBtu's contained in the gas stream. Toward this end, Operator shall periodically determine or cause to be determined the Btu content of gas produced from each formation in each well on a consistent basis and under standard conditions pursuant to any method customarily used in the industry.

2.   Balancing of Production Accounts
     (a)   Any time a party, or such party's purchaser is not taking or marketing its full share of gas produced from a particular formation in a well ("non-marketing" party), the remaining parties ("marketing" parties) shall have the right, but not the obligation, to produce, take, sell and deliver for such marketing parties' accounts, in addition to the full share of gas to which the marketing parties are otherwise entitled, all or any portion of the gas attributable to a non-marketing party's share of gas produced; provided, however, no marketing party shall be entitled to produce, own and dispose of each month more than two hundred percent (200%) of its share of the gas produced unless it has gas in storage (Gas attributable to a non-marketing party, taken by a marketing party, is referred to in this Agreement as "overproduction"). If there is more than one marketing party taking gas attributable to a non-marketing party, each marketing party shall be entitled to take a non-marketing party's gas in the ratio that such marketing party's interest in production bears to the total interest in production of all marketing parties.

     (b)   A party that has not taken its proportionate share of gas produced from any formation in a well ("Underproduced Party") shall be credited with gas in storage equal to its share of gas produced but not taken, less its share of gas used in lease operations, vented or lost ("underproduction"). Such Underproduced Party, upon giving timely written notice to Operator, shall be entitled, on a monthly basis beginning the month following receipt of notice, to produce, take, sell and deliver. In addition to the full share of gas to which such party is otherwise entitled, a quantity of gas ("make-up gas") equal to fifty percent (50%) of the total share of gas attributable to all parties having cumulative over production (individually called "Overproduced Party"). Such make-up gas shall be credited against such Underproduced Party's accrued underproduction in order of accrual.   Notwithstanding the foregoing and subject to subsection (e) below; (i) an Overproduced Party shall never be obligated to reduce its takes to less than fifty percent (50%) of the quantity to which such party is otherwise entitled and (ii) an Underproduced Party shall never be allowed to make up underproduction during the months of December, January, February, and March.

     (c)   If there is more than one Underproduced Party desiring make-up gas, each such Underproduced Party shall be entitled to make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then desiring make-up gas. Any portion of the make-up gas to which an Underproduced Party is entitled and which is not taken by such Underproduced Party may be taken by any other Underproduced Party(ies).

     (d)   If there is more than one Overproduced Party required to furnish make-up gas, each such Overproduced Party shall furnish make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then required to furnish make-up gas. Except as provided in (e) below, each Overproduced Party in any formation in a well shall be entitled, on a monthly basis, to take its full share of gas less its share of the make-up gas then being produced from the particular formation in the well in which it is overproduced.

     (e)   If Operator in good faith believes that an Overproduced Party has recovered one hundred percent (100%) of such Overproduced Party's share of the recoverable reserves from a particular formation in a well, such Overproduced Party, upon being notified in writing of such fact by Operator, shall cease taking gas from such formation in such well and the remaining parties shall be entitled to take one hundred percent (100%) of such production until the accounts of the parties are balanced. Thereafter, such Overproduced Party shall again have the right to take its share of the remaining production, if any, in accordance with the provisions herein contained. Notwithstanding anything to the contrary herein, after an Overproduced Party has recovered one hundred percent (100%) of its full share of the recoverable reserves as so determined by Operator from a particular formation in a well, such Overproduced Party may continue to produce if such continued production is (i) necessary for lease maintenance purposes, or (ii) permitted by a majority of interest of the parties who have not produced one hundred percent (100%) of their recoverable reserves from such formation in such well after written ballot conducted by Operator.

3.   Cash Balancing Upon Interim Imbalances or Upon Deletion

(a)     On January 15th and July 15th of each Calendar Year Underproduced Party may give notice that he desires cash balancing for any Underproduced volumes. This notice and request to cash balance shall constitute an "Interim Accounting".

(b)     If gas production from a particular formation in a well ceases and no attempt is made to restore production (or substitute therefor) within sixty (60) days, Operator shall distribute, within ninety (90) days of the date the well last produced gas from such formation, a statement of net unrecouped underproduction and overproduction and the months and years in which such unrecouped produced accrued ("Final Accounting").

(c)     Within thirty (30) days of receipt of either Final Accounting or an Interim Accounting, each Overproduced Party shall remit to Operator for disbursement to the Underproduced Parties, a sum of money (which sum shall not include interest) equal to the amount actually received or constructively received under subparagraph (e) below, by Overproduced Party for sales during the month(s) of overproduction, calculated in order of accrual but less applicable taxes, royalties and reasonable costs of marketing and transporting such gas actually paid by such Overproduced Party. Such remittance shall be based on number of MMBtu's of overproduction and shall be accompanied by a statement showing volumes and prices for each month with accrued unrecouped overproduction.

(d)     Within thirty (30) days of receipt of any such remittance by Operator from an Overproduced Party, Operator shall disburse such funds to the Underproduced Party(ies) in accordance with the final accounting. Operator assumes no liability with respect to any such payment (unless such payment is attributable to Operator's overproduction), it being the intent of the parties that each Overproduced Party shall be solely responsible for reimbursing each Underproduced Party for such Underproduced Party's respective share of overproduction taken by such Overproduced Party in accordance with the provisions herein contained. If any party fails to pay any sum due under the terms hereof after demand therefor by the Operator, the Operator may turn responsibility for the collection of such sum to the party or parties to whom it is owed, and Operator shall have no further responsibility for collection.

(e)     In determining the amount of overproduction for which settlement is due, production taken during any month by an Underproduced Party in excess of such Underproduced Party's share shall be treated as make-up and shall be applied to reduce prior deficits in the order of accrual of such deficits.

(f)     An Overproduced Party that took gas in kind for its own use, sold gas to an affiliate, or otherwise disposed of gas in other than a cash sale shall pay for such gas at market value at the time it was produced, even if the Overproduced Party sold such gas to an affiliate at a price greater or lesser than market value.

(g)     If refunds are later required by any governmental authority, each party shall be accountable for its respective share of such refunds as finally balanced hereunder.

4.   Deliverability Tests

At the request of any party, Operator may produce the entire well stream for a deliverability test not to exceed seventy-two (72) hours in duration (or such longer period of time as may be mutually agreed upon by the parties) if required under such requesting party's gas sales or transportation contract.

5.   Nominations

Each party shall, on a monthly basis, give Operator sufficient time and data either to nominate such party's respective share of gas to the transporting pipeline(s) or, if Operator is not nominating such party's gas, to inform Operator of the manner in which to dispatch such party's gas. Except as and to the extent caused by Operator's gross negligence or willful misconduct, Operator shall not be responsible for any fees and/or penalties associated with imbalances charged by any pipeline to any Underproduced or Overproduced Party(ies).

6.   Statements

On or before the twenty-fifth (25th) day of the month following the month of production, each party taking gas shall furnish or cause to be furnished to Operator a statement of gas taken expressed in terms of MMBtu's. If actual volume information sufficient to prepare such statement is not made available to the taking party in sufficient time to prepare it, such taking party shall nevertheless furnish a statement of its good faith estimate of volumes taken. Within twenty (20) days of the receipt of all such statements, Operator shall furnish to each party a statement of the gas balance among the parties, including the total quantity of gas produced from each formation in each well, the portion thereof used in operations, vented or lost, and the total quantity delivered for each party's account. Any error or discrepancy in Operator's monthly statement shall be promptly reported to Operator and Operator shall make a proper adjustment thereof within thirty (30) days after final determination of the correct quantities involved; provided, however, that if no errors or discrepancies are reported to Operator within two (2) years from the date of any statement, such statement shall be conclusively deemed to be correct. Additionally, within thirty (30) days from the end of each calendar year, non-operators shall furnish to Operator, for the sole purpose of establishing records sufficient to verify cash balancing values, a statement reflecting amounts actually received or constructively received under paragraph 3(e), on a monthly basis for the calendar year preceding the immediately concluded calendar year. Operator shall not allow a party to produce gas for its account during any month when such party is delinquent in so furnishing the monthly or annual statements.

7.   Payments of Taxes

Each party taking gas shall pay or cause to be paid any and all production, severance, utility, sales, excise, or other taxes due on such gas.

8.   Operating Expenses

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using gas or whether the sales and use of each are in proportion to their respective interests in such gas.

9.     Overproducing Allowable

Each party shall give Operator sufficient time and data to enable Operator to make appropriate nominations, forecasts and/or filings with the regulatory bodies having jurisdiction to establish allowances. Each party shall at all times regulate its takes and deliveries from the Contract Area so that the well(s) covered hereby shall not be curtailed and/or shut-in for overproducing the allowable production assigned thereto by the regulatory body having jurisdiction.

10.     Payment of Leasehold Burdens

At all times while gas is produced from the Contract Area, each party agrees to make appropriate settlement of all royalties, overriding royalties and other payments out of or in lieu of production for which such party is responsible just as if such party were taking or delivering to a purchaser such party's full share, and such party's full share only, of such gas production exclusive of gas used in operations, vented or lost, and each party agrees to indemnify and hold each other party harmless from any and all claims relating thereto.

11.     Application of Agreement

The provisions of this Agreement shall be separately applicable and shall constitute a separate agreement with respect to gas produce form each formation in each well located on the Contract Area.

12.     Term

This Agreement shall terminate when gas production under the Operating Agreement permanently ceases and the accounts of the parties are finally settled in accordance with the provisions herein contained.

13.     Operator's Liability

Except as otherwise provided herein, Operator is authorized to administer the provisions of this Agreement, but shall suffer no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

14.     Audits

Any Underproduced Party shall have the right for a period of two (2) years after receipt of payment pursuant to a final accounting and after giving written notice to all parties, to audit an Overproduced Party's accounts and records relating to such payment. Any Overproduced Party shall have the right for a period of two (2) years after tender of payment for unrecouped volumes and upon giving written notice to all parties, to audit an Underproduced Party's records as to volumes. The party conducting such audit shall bear its costs of the audit. Additionally, Operator shall have the right for a period of two (2) years after receipt of an annual statement from a non-operator under paragraph 6 after giving written notice to the affected non-operator to audit such non-operators accounts and records relating to such payment. Costs of such audit shall be borne by the joint account.

15.     Successors and Assigns

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties and to their respective successors and assigns, and may be assigned in whole or in part from time to time; provided, however, that (a) any such assignments shall be made subject to this Agreement and as among the parties shall not be valid without the express written acceptance of the terms of this Agreement by the Assignee, (b) the Assignee shall acquire such interest subject to any overproduction and/or underproduction imbalances existing at such time as well as any cash balancing obligation created thereby and (c) no such assignments shall relieve the Assignor from any obligation to the other parties with respect to any overproduction taken by Assignor prior to such assignment.

16.     Liquefiable Hydrocarbons Not Covered Under Agreement

The parties shall share proportionately in and own all liquid hydrocarbons recovered with the gas by lease equipment in accordance with their respective interests.

17.     Conflict

If there is a conflict between the terms of this Agreement and the terms of any gas sales contract covering the Contract Area entered into by any party, the terms of this Agreement shall govern.

18.     Arbitration

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award may be entered in any Court having jurisdiction thereof. The arbitrator shall not award punitive damages in settlement of any controversy or claim.

EXHIBIT "F"

**Attached to and made a part of the Operating Agreement dated May 1, 1996 by and
between Penwell Energy, Inc., as Operator, and CoEnergy Central Exploration, Inc.
as Non-Operator**

## NONDISCRIMINATION AND CERTIFICATION OF NONSEGREGATED FACILITIES

A.   Equal Opportunity Clause (41 CFR 60-1.4). (Applicable only to contracts or purchase orders for more
than $10,000.)

During the performance of this contract, the Operator agrees as follows:

(1) The Operator will not discriminate against any employee or applicant for employment because of
race, color, religion, sex, or national origin. The Operator will take affirmative action to ensure that
applicants are employed, and that employees are treated during employment, without regard to their
race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following:
Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or
terminations, including apprenticeship. The Operator agrees to post in conspicuous places, available
to employees and applicants for employment, notices to be provided by the contracting officer setting
forth the provisions of this nondiscrimination clause.

(2) The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the
Operator, state that all qualified applicants will receive consideration for employment without regard
to race, color, religion, sex, or national origin.

(3) The Operator will send to each labor union or representative of workers with which it has a collective
bargaining agreement or other contract or understanding, a notice to be provided by the agency
contracting officer, advising the labor union or workers' representative of the Operator's commitments
under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice
in conspicuous places available to employees and applicants for employment.

(4) The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and
of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Operator will furnish all information and reports required by Executive Order 11246 of
September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant
thereto, and will permit access to its books, records, and accounts by the contracting agency and the
Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations,
and orders.

(6) In the event of the Operator's noncompliance with the nondiscrimination clauses of this contract or
with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended
in whole or in part and the Operator may be declared ineligible for further Government contracts in
accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such
other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of
September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided
by law.

(7) The Operator will include the provisions of paragraph (1) through (7) in every subcontract or
purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued
pursuant to section 204 of the Executive Order 11246 of September 24, 1965, so that such provisions
will be binding upon each subcontractor or vendor. The Operator will take such action with respect to
any subcontract or purchase order as the contracting agency may direct as a means of enforcing such
provisions including sanctions for noncompliance: Provided, however, that in the event the Operator
becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such
direction by the contracting agency, the Operator may request the United States to enter into such
litigation to protect the interests of the United States.

B.   Certification of Nonsegregated Facilities (41 CFR 60-1.8.) (Applicable only to contracts or purchase
orders which are not exempt from the provisions of the Equal Opportunity Clause set out above.)

The Operator certifies that it does not, and will not, maintain or provide for its employees any
segregated facilities at any of its establishments, and that it does not, and will not, permit its employees
to perform their services at any location, under its control, where segregated facilities are maintained.
The Operator agrees that a breach of this certification is a violation of the Equal Opportunity Clause
in this contract or purchase order. As used in this certification, the term "segregated facilities" means
any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time
clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation
or entertainment areas, transportation, and housing facilities provided for employees which are
segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national
origin, because of habit, local custom, or otherwise. The Operator further agrees that (except where
it has obtained identical certifications from proposed subcontractors for specific time periods) it will

obtain identical certifications from proposed subcontractors prior to the award of

subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors.

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OFNONSEGREGATED FACILITIES. A Certificate of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

C.    <u>Affirmative Action Compliance Program (41 CFR 60-1.40.)</u> (Applicable only if (a) the Operator has 50 or more employees and (b) the contract or purchase order is for $50,000 or more.)

The Operator shall develop a written affirmative action program for each of its establishments, and within 120 days from the effectiveness of this contract or purchase order, shall maintain a copy of separate programs for each establishment, including evaluations of utilization of minority group personnel and the job classification tables, at each local office responsible for the personnel matters of such establishment.

D.    <u>Employer Information Report (41 CFR 60-1.7.)</u> (Applicable only if (a) the Operator has 50 or more employees, and (b) the Operator is not exempt (pursuant to section 60-1.5 of Title 41 of the Code of Federal Regulations) from the requirement for filing Employer Information Report EEO-1, and (c) the contract or purchase order is for $50,000 or more.)

The Operator agrees to file with the appropriate Federal agency annually, on or before the 31st day of March, complete and accurate reports on Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress or such form as may hereafter be promulgated in its place.

E.    <u>Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250.)</u> (Applicable only to contracts or purchase orders for $10,000 or more.)

The affirmative action clause prescribed in section 60-250.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-250.22 of said Regulations) as if set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then within 120 days from the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment which shall set forth the Operator's policies, practices and procedures in accordance with section 60-250.6 of said Regulations.

F.    <u>Affirmative Action for Handicapped Workers (41 CFR 60-741.4.)</u> (Applicable only to contracts or purchase orders for $2,500 or more.)

The Affirmative Action Clause prescribed in section 60-741.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-741.22 of said Regulations) as if set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then, within 120 days of the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment, which program shall set forth the Operator's policies, practices and procedures in accordance with section 60-741.6 of said Regulations.

G.    <u>Utilization of Minority Business Enterprises (Federal Procurement Regulations 1-1.13.)</u> (Applicable only to contracts or purchase orders which may exceed $10,000.)

(1)    It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(2)    The Operator agrees to use his best efforts to carry out this policy in the award of his subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, the term "minority business enterprise" means a business, at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are Negroes, Spanish-speaking American persons, American-Orientals, American-Indians, American-Eskimos, and American Aleuts. Contractors may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.

SHUGART WEST PROSPECT

## PARTIAL ASSIGNMENT OF OIL, GAS AND MINERAL INTEREST

| | |
|---|---|
| **STATE OF NEW MEXICO** | } |
| | } |
| **COUNTY OF EDDY** | } |

S & P Co., a Louisiana Partnership whose mailing address is 330 Marshall Street, Suite 300, Shreveport, Louisiana 71101 (hereinafter referred to as "Assignor") for and in consideration of the sum of One Hundred Dollars ($100.00) cash in hand paid, along with other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby SELL, ASSIGN, TRANSFER, CONVEY and DELIVER unto SKLARCO, L.L.C., a Louisiana Limited Liability Company, whose mailing address is P.O. Box 1753, Shreveport, Louisiana 71166, (hereinafter referred to as "Assignee") an undivided 57.50% of Assignor's interest in and to the following:

A.    the oil and gas leases, unit agreements, and all other interests whatsoever described or referenced on Exhibit "A" attached hereto and made a part hereof for all purposes, including all oil and gas interest of whatsoever nature therein, whether or not described on Exhibit "A" including , without limiting the foregoing in any respect, oil and gas and other leases, mineral interests, leasehold royalties, non-participating royalties, production payments, and net profits interests (all of the foregoing Exhibit "A" interests being hereinafter referred to as "Assets"), expressly including all of Assignor's ownership interests in all acreage, depths, substances and other rights, whether or not fully described therein, and whether or not the descriptions therein are limited as to acreage, depth, substance or other rights covered. Without limiting the foregoing in any respect, Assets also include all of the leasehold acreage and other oil and gas interests associated with, held by production from, and/or included in the units described on Exhibit "A" and in all units formed for the Wells described on Exhibit "A"; and

B.    the oil and gas wells (herein referred to as the "Wells" and units described on Exhibits "A" and all production facilities,water wells, pipeline and gathering lines, saltwater disposal wells, equipment, fixtures, improvements, and all other tangible property whatsoever located on, appurtenant to, or used in connection with the Wells and Assets; and THIS SALE OF THE EQUIPMENT AND ALL OTHER PERSONAL PROPERTY IS MADE ON AN "AS IS, WHERE IS" BASIS WITH ALL FAULTS AS TO ITS CONDITION, AND ASSIGNOR EXPRESSLY DISCLAIMS ALL WARRANTIES AS TO THE CONDITION OF THE EQUIPMENT INCLUDING, WITHOUT LIMITATIONS, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE; and

C.    all presently effective oil and gas sales, purchase, exchange, gathering, transportation and processing contracts, easements, rights-of-way, farmout and farmin agreements, operating agreements, joint venture agreements, unit agreements, unitization and pooling agreements, and all other agreements and interest whatsoever which relate, in any mannner, to the Assets and Wells.

D.    the rights, title and interest of Assignor in and to all files, records and data including, without limitation, all title records, division order and lease files, production records, engineering and geologic evaluations, maps and seismic data, to the extent that such relate to or affect any of the leases, lands or interest described or referred to in Exhibit "A".

RECEPTION
9007821

*Skylark Explor Co LLC*
*401 EDWARDS St STE 1601*
*Shreveport LA 71101*

TO HAVE and HOLD unto the said Assignee, its successors and assigns, subject to and in accordance with all the terms and provisions of the agreements mentioned herein, and subject to the limitations, reservations, covenants and conditions herein set forth.

This assignment is executed without covenant or warranty of title, either express or implied, but with full substitution and subrogation in and to all rights and actions in warranty, which Assignor has or may have against all preceeding owners and vendors except by, through and under S & P Co.

This assignment and all rights, reservations, and covenants in connection herewith shall inure to and be binding on the parties hereto, their heirs, representatives, executors, administrators, successors and assigns.

This assignment is made free and clear of any Mechanic's and Materialman's liens, tax liens, mortgages and other encumbrances which might burden said properties mentioned herein.

Assignor hereby agrees to execute and deliver to Assignee all such other and additional instruments, notices, division orders, transfer orders and other documents and to do all such other and further acts and things as may be necessary to more fully and effectively grant, convey and assign to assignee the interest conveyed hereby or intended so to be.

This instrument is executed on the 27th day of _____June_____, 2000, but made effective _____June 1, 2000_____.

Assignor:                                    Assignee:

    S & P Co.                                    Sklarco, L.L.C.

By: _____        By: _____
    Fred L. Phillips,                            Howard F. Sklar,
    Partner                                      Manager


## ACKNOWLEDGEMENTS

State of Louisiana

Parish of Caddo

Before me, the undersigned authority, on this 27th day of _____June_____, 2000, personally appeared Fred L. Phillips, known to me to be a Partner of S & P Co., a Louisiana Partnership and who acknowledged that he had executed the foregoing instrument for the purpose and consideration therein expressed and in the capacity therein stated.

Given under my hand and seal of office, this 29th day of _____June_____, 2000.

My Commission Expires _with life_                _____Frances M. Bailey_____
                                                  Notary Public in and for Caddo Ph., LA.

State of Louisiana                                **FRANCES M. BAILEY**
                                                  NOTARY PUBLIC, Caddo Parish, Louisiana
Parish of Caddo                                   My Commission is for Life

Before me, the undersigned authority, on this 29th day of _____June_____, 2000, personally appeared Howard F. Sklar, known to me to be the Manager of SKLARCO, L.L.C., a Louisiana Limited Liability Company and who acknowledged that he had executed the foregoing instrument for the purposes and consideration therein expressed and in the capacity therein stated.

Given under my hand and seal of office, this 29th day of _____June_____, 2000.

My Commission Expires                            _____Bettye M. LaCour_____
                    **BETTYE M. LaCOUR**          Notary Public in and for Caddo Ph., LA.
                    NOTARY PUBLIC CADDO PARISH, LA.
                    MY COMMISSION EXPIRES WITH LIFE

EXHIBIT "A"

ATTACHED TO THAT CERTAIN ASSIGNMENT
BY AND BETWEEN S & P Co., AS ASSIGNOR, AND
SKLARCO, L.L.C. AS ASSIGNEE, COVERING
LEASES IN SHUGART WEST PROSPECT,
EDDY COUNTY, NEW MEXICO.

Federal Lease NM LC-029387B from the United States of America, Bureau of Land Management covering Lots 1, 2, E1/2 NW1/4 and E1/2 of Section 30, T18S-R31E, NMPM, Eddy County, New Mexico, insofar and only insofar as said lease covers those depths below 4,500' subsurface.

Federal Lease LC-029387A from the United States of America, Bureau of Land Management covering the NE1/4 SW1/4 of Section 29, T18S-R31E NMPM, Eddy County, New Mexico, insofar and only insofar as said lease covers only those depths below 4,500' subsurface.

Federal Lease NM LC-029387D from the United States of America, Bureau of Land Management covering Lots 3, 4 E1/2 SW1/4 of Section 30, T18s-r31E, NMPM, Eddy County, New Mexico, insofar and only insofar as said lease covers only those depths below 4,000' subsurface to the Base of the Morrow Formation.

Federal Lease NM NM-93772 from the United States of America, Bureau of Land Management covering Lots 3, 4, E1/2 SW1/4 of Section 19, T18S-R31E, NMPM, Eddy County, New Mexico, insorfar and only insofar as said lease covers only those depths below 3,900' subsurface.

Federal Lease NM NM-99038 from the United States of America, Bureau of Land Management covering E1/2 SW1/4 of Section 31, T18S-R31E, NMPM, Eddy County, New Mexico.

STATE OF NEW MEXICO }
County of Eddy        } ss

FILED   AUG 8 2000   FOR RECORD
at 9:54 o'clock A. M., and was duly
recorded in BOOK 390 PAGE 98
of the Records of Eddy County
Jean Etcheverry, County Clerk
By: Randi White Deputy

COUNTY CLERK
SEAL
EDDY COUNTY NEW MEXICO

# PENWELL ENERGY, INC.

1100 ARCO BUILDING
600 N. MARIENFELD
MIDLAND, TEXAS 79701

OFF: (915) 683-2534
FAX: (915) 683-4514

July 29, 1996

S & P Co.
P. O. Box 3735
Shreveport, LA 71133-3735

Re:   Letter Agreement and
Joint Operating Agreement
Shugart West Prospect (NM-050)
Eddy County, New Mexico

Gentlemen:

This letter is to confirm our agreement whereby Penwell Energy, Inc. ("Penwell ") agrees to assign unto S & P Co. ("S & P") without warranty of title, express or implied, the undivided interests in and to those certain oil and gas leases as described on Exhibit "A", attached hereto and made a part hereof ("Said Leases").

The terms and conditions

1.   Penwell shall furnis
or implied, copies of S
opinions and all other pe
pertaining to the captior

2.   Penwell agrees that
shall use its best eff
commenced, operations fo
"30" Federal #1 Well ("In:
gas at the following loca

1980' from the West :
Section 30, T-18-S,
Mexico.

3.   Penwell, as operator
a good and workmanlike i
test the Morrow formation
below the surface of the

4.   Said Leases cover ]
agrees (a) to pay to Per
the sum of $52,504.65 :
leasehold costs.

*[Handwritten notes:]*

1) Why would Devon/Concho not continue to be operator under JOA for Sec 30 (dated 5/1/96)

resigned
transferred

2 questions -
1) Why a JOA for this depth
2) why does S+PCo not have 11.25 (us + them together)

need cc of release; assignment dtd 9/29/99

Letter Agreement
S & P Co.
July 29, 1996
Page -2-

S & P further agrees to pay Penwell 15% of the total actual costs of drilling the Initial Well to casing point and 11.25% of the total actual costs, if any, of completing the Initial Well; and (b) to ratify the Joint Operating Agreement, attached hereto as Exhibit "B", which covers the prospect.

5. It is understood between the parties hereto that Penwell agrees to deliver to S & P a 73% net revenue interest in Said Leases, proportionately reduced.

6. Penwell agrees that in conducting all operations hereunder it shall comply with all Federal and State Laws, rules and regulations applicable to such operations.

7. This agreement shall be binding upon the respective successors and assigns of the parties hereto. In the event any terms of this Agreement conflict with the attached Operating Agreement, it is agreed that the terms of this Agreement will prevail.

If this letter correctly sets forth your understanding of our agreement, please execute in the space provided below and return to the undersigned one (1) fully executed copy of this agreement and the ratification of the attached Joint Operating Agreement, on or before August 15, 1996.

Yours very truly,

Mark Wheeler, CPL
Land Manager, Permian Basin

AGREED TO AND ACCEPTED this __1st__ day of August, 1996.

S & P CO.

By: _____
Name/Title: August Erickson, General Manager

/cmw:N.052(152m)
xc: Steve Foy

EXHIBIT "A"

Attached to that certain Letter Agreement
dated July 29, 1996 between PENWELL ENERGY, INC.
and S & P CO.

Oil and Gas Lease(s) "Said Lease" Subject to This Agreement:

Federal Lease LC-029387B from the United States of America,
Bureau of Land Management covering Lots 1,2, E/2 NW/4  of
Section 19, and Lots 1,2, E/2 NW/4 and E/2 of Section 30,
T-18-S, R-31-E, NMPM, Eddy County, New Mexico, insofar and
only insofar as said lease covers all depths  in the acreage
in Section 19 and only those depths below 4,500' subsurface
in the acreage in Section 30.

Federal Lease LC-029387A from the United States of America,
Bureau of Land Management covering the S/2 of Section 29,
T-18-S, R-31-E, NMPM, Eddy County, New Mexico, insofar and
only insofar as said lease covers only those depths below
4,500' subsurface.

Federal Lease NM-12211 from the United States of America,
Bureau of Land Management covering the W/2 of Section 33,
T-18-S, R-31-E, NMPM, Eddy County, New Mexico, insofar and
only insofar as said lease covers only those depths below
4,500' subsurface.

Federal Lease LC-029387D from the United States of America,
Bureau of Land Management covering Lots 3, 4, E/2 SW/4 of
Section 30, T-18-S, R-31-E, NMPM, Eddy County, New Mexico,
insofar and only insofar as said lease covers only those
depths below 4,000' subsurface.

Federal Lease NM-93772 from the United States of America,
Bureau of Land Management covering Lots 3, 4, E/2 SW/4 of
Section 19, T-18-S, R-31-E, NMPM, Eddy County, New Mexico,
insofar and only insofar as said lease covers only those
depths below 3,900' subsurface.

Summary of Interests to be Conveyed to S & P Co.

15.0000000% WI Before Casing Point of Initial Test Well (if
            Canadian Kenwood elects not to participate in
            Initial Test Well)
 9.5117340% WI Before Casing Point of Initial Test Well (if
            Canadian Kenwood elects to participate in
            Initial Test Well)

EXHIBIT "A"
Page -2-

Attached to that certain Letter Agreement
dated July 29, 1996 between PENWELL ENERGY, INC.
and S & P CO.


11.2500000% WI After Casing Point of Initial Test Well (if
            Canadian Kenwood elects not to participate in
            Initial Test Well)
 7.1338005% WI After Casing Point of Initial Test Well (if
            Canadian Kenwood elects to participate in
            Initial Test Well)
 8.2125000% NRI(if Canadian Kenwood elects not to par-
            ticipate in Initial Test Well)
 5.2076743% NRI(if Canadian Kenwood elects to participate in
            Initial Test Well)


** WI & NRI Percentages on Subsequent Wells will be
   calculated as additional proration units are formed.
   NRI's range from 73% to 80.5% on portions of prospect
   acreage.

Shugart West "31" Federal Com #1

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 29th _____ day of _____ March _____ , 19 2001 .

Concho Resources Inc. _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles  as seen throughout the Operating Agreement _____, have been made to the form.

OPERATOR

### CONCHO RESOURCES INC.

Date:  March 30, 2001

_____
David W. Copeland, Vice President

NON-OPERATORS

### MATADOR PETROLEUM CORP.

Date: _____

Printed Name: C BARON OSBORNE
Title: VICE PRESIDENT

### DEVON SFS OPERATING INC.

Date: _____

Printed Name:
Title:

### LOUIS DREYFUS NATURAL GAS CORP.

Date: _____

Printed Name:
Title:

### SKLARCO, L.L.C.

Date: _____

Darrell R. Garrett

Printed Name:
Title:

### S & P CO.

Date: _____

Printed Name:
Title:

### CANNON EXPLORATION CO.

Date: _____

Printed Name:
Title:

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT - 1982

Shugart West "31" Federal Com #1

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____29th_____ day of _____March_____ , ~~19~~2001 .

Concho Resources Inc._____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __as seen throughout the__ __Operating Agreement_____, have been made to the form.

OPERATOR

### CONCHO RESOURCES INC.

Date:  March 30, 2001 _____

_____
David W. Copeland, Vice President

NON-OPERATORS

### MATADOR PETROLEUM CORP.

Date: _____

Printed Name: _____
Title:

### DEVON SFS OPERATING INC.

Date: _____

Printed Name: R. D. Clark
Title:         Vice President

### LOUIS DREYFUS NATURAL GAS CORP.

Date: _____

Printed Name: _____
Title:

### SKLARCO, L.L.C.

Date: _____

Printed Name: _____
Title:

### S & P CO.

Date: _____

Printed Name: _____
Title:

### CANNON EXPLORATION CO.

Date: _____

Printed Name: _____
Title:

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Shugart West "31" Federal Com #1

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____29th_____ day of _____March_____ , 19 2001 .

Concho Resources Inc._____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __as seen throughout the__ Operating Agreement _____, have been made to the form.

OPERATOR

**CONCHO RESOURCES INC.**

Date: March 30, 2001 _____      _____
                                          David W. Copeland, Vice President

NON-OPERATORS

**MATADOR PETROLEUM CORP.**

Date: _____      _____
                                          Printed Name: _____
                                          Title:

**DEVON SFS OPERATING INC.**

Date: _____      _____
                                          Printed Name: _____
                                          Title:

**LOUIS DREYFUS NATURAL GAS CORP.**

Date: _____      _____
                                          Printed Name: _____  J.C. Welch, Vice President — Lan
                                          Title:

**SKLARCO, L.L.C.**

Date: _____      _____
                                          Printed Name: _____
                                          Title:

**S & P CO.**

Date: _____      _____
                                          Printed Name: _____
                                          Title:

**CANNON EXPLORATION CO.**

Date: _____      _____
                                          Printed Name: _____
                                          Title:

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Shugart West "31" Federal Com #1

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____29th_____ day of _____March_____ , ~~19~~2001 .

Concho Resources Inc._____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __as seen throughout the__ Operating Agreement_____, have been made to the form.

OPERATOR

**CONCHO RESOURCES INC.**

Date:  March 30, 2001_____

_____
David W. Copeland, Vice President

NON-OPERATORS

**MATADOR PETROLEUM CORP.**

Date:_____

Printed Name:_____
Title:

**DEVON SFS OPERATING INC.**

Date:_____

Printed Name:_____
Title:

**LOUIS DREYFUS NATURAL GAS CORP.**

Date:_____

Printed Name:_____
Title:

**SKLARCO, L.L.C.**

Date: April 12, 2001

*Darrell R. Garrett*
Printed Name:DARRELL R. GARRETT
Title: Attorney-in-Fact

**S & P CO.**

Date:_____

Printed Name:_____
Title:

**CANNON EXPLORATION CO.**

Date:_____

Printed Name:_____
Title:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Shugart West "31" Federal Com #1

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____29th_____ day of _____March_____ , ~~19~~ 2001 .

__Concho Resources Inc._____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __as seen throughout the__ __Operating Agreement_____, have been made to the form.

O P E R A T O R

**CONCHO RESOURCES INC.**

__Date:  March 30, 2001_____

_____
**David W. Copeland, Vice President**

N O N - O P E R A T O R S

**MATADOR PETROLEUM CORP.**

__Date:_____

_____
**Printed Name:**
**Title:**

**DEVON SFS OPERATING INC.**

__Date:_____

_____
**Printed Name:**
**Title:**

**LOUIS DREYFUS NATURAL GAS CORP.**

__Date:_____

_____
**Printed Name:**
**Title:**

**SKLARCO, L.L.C.**

__Date:_____

_____
**Printed Name:**
**Title:**

**S & P CO.**

__Date:    April 4, 2001_____

_August Erickson_
**Printed Name:** August Erickson
**Title:** General Manager

**CANNON EXPLORATION CO.**

__Date:_____

_____
**Printed Name:**
**Title:**

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Shugart West "31" Federal Com #1

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ____29th____ day of ____March____ , ~~19~~ 2001 .

Concho Resources Inc. _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __as seen throughout the__ __Operating Agreement__ _____, have been made to the form.

OPERATOR

**CONCHO RESOURCES INC.**

Date: **March 30, 2001** _____

_____
**David W. Copeland, Vice President**

NON-OPERATORS

**MATADOR PETROLEUM CORP.**

Date: _____

_____
Printed Name: _____
Title: _____

**DEVON SFS OPERATING INC.**

Date: _____

_____
Printed Name: _____
Title: _____

**LOUIS DREYFUS NATURAL GAS CORP.**

Date: _____

_____
Printed Name: _____
Title: _____

**SKLARCO, L.L.C.**

Date: _____

_____
Printed Name: _____
Title: _____

**S & P CO.**

Date: _____

_____
Printed Name: _____
Title: _____

**CANNON EXPLORATION CO.**

Date: _APRIL 11, 2001_

_Todd M. Wilson_
Printed Name: _Todd M. Wilson_
Title: _PRESIDENT_

- 15 -

Shugart West "31" Fed Com #1 JOA

NON-OPERATORS (Continued):

**THE ROGER T. AND HOLLY L. ELLIOTT
FAMILY LIMITED PARTNERSHIP**

By: _Roger T. Elliott_

Printed Name: _Roger T. Elliott_
Title: _Partner_
Date: _4-10-2001_

**DILLARD, FISHER & HEASLEY PARTNERSHIP**

By: _Neil Fisher_

Printed Name: _Neil Fisher_
Title: _PARTNER_
Date: _4-10-01_

Revised 4/9/01

AAPL – FORM 610RS - 198

# EXHIBIT "G"

### MODEL FORM RECORDING SUPPLEMENT TO

Shugart West "31" Fed Com #1

### OPERATING AGREEMENT AND FINANCING STATEMENT

THIS AGREEMENT, entered into by and between _____ **Concho Resources Inc.** _____,

hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated _____ **March 29, 2001,** _____ (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and said Contract Area located in T-18-S, R-31-E, South Half (S/2) of Section 31, Eddy Co., NM.

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead),

- 1 -

contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C. To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party or parties stating the amount due as a result of the default, and all parties waive any from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D. If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E. If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F. The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G. To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H. The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

- 2 -

8. Other provisions.                                                     Shugart West "31" Fed Com #1

_____ **Concho Resources Inc.,** who has prepared and circulated this form for execution, represents and warrants
that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model
Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by
Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion
and that are clearly recognizable as changes in Articles __**as seen throughout the agreement**__, have been made to the form.

IN WITNESS WHEREOF, this agreement shall be effective as of the __**29th**__ day of _____**March**_____,
year: __**2001**__.

ATTEST OR WITNESS:

                                                    OPERATOR
                                         **CONCHO RESOURCES INC.**

_____          By: _____**David W. Copeland**_____
                                              Type or Print Name
_____          Title: _____**Vice President**_____
                                          Date: _____**March 30, 2001**_____
_____          Address: _____110 W. Louisiana, Suite 410,
                                                   Midland TX  79701

ATTEST OR WITNESS:

                                                    NON-OPERATORS
                                         **MATADOR PETROLEUM CORP.**

                                         _____

_____          By: _____
                                              Type or Print Name
_____          Title: _____
                                          Date: _____
_____          Address: ___8340 Meadow Rd., Suite 158, Pecan Creek
                                                   Dallas, TX 75231

ATTEST OR WITNESS:

                                         _____**DEVON SFS OPERATING INC.**_____

                                         _____

_____          By: _____
                                              Type or Print Name
_____          Title: _____
                                          Date: _____
                                          Address: 20 N. Broadway, Suite 1500, Oklahoma City, OK 73102

ATTEST OR WITNESS:

                                         _____**LOUIS DREYFUS NATURAL GAS CORP.**_____

                                         _____

_____          By: _____
                                              Type or Print Name
_____          Title: _____
                                          Date: _____
                                          Address: _____14000 Quail Springs Parkway, #600,
                                                   Oklahoma City, OK 73134

ATTEST OR WITNESS:

                                         _____**SKLARCO, L.L.C.**_____

                                         _____

_____          By: _____
                                              Type or Print Name
_____          Title: _____
                                          Date: _____
                                          Address: 401 Edwards St., Suite 1601, Shreveport, LA 71101

- 3 -

8. Other provisions.

Shugart West "31" Fed Com #1

_____ **Concho Resources Inc.**, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __as seen throughout the agreement__, have been made to the form.

IN WITNESS WHEREOF, this agreement shall be effective as of the __29th__ day of _____ **March** _____, year: __2001__.

ATTEST OR WITNESS:

OPERATOR
**CONCHO RESOURCES INC.**

By: _____ **David W. Copeland** _____
Type or Print Name
Title: _____ **Vice President** _____
Date: _____ **March 30, 2001** _____
Address: _____ 110 W. Louisiana, Suite 410, _____
_____ Midland TX 79701 _____

ATTEST OR WITNESS:

NON-OPERATORS
**MATADOR PETROLEUM CORP.**

By: __C BARRY OSBORNE__
Type or Print Name
Title: __VICE PRESIDENT__
Date: __5-31-01__
Address: __8340 Meadow Rd., Suite 158, Pecan Creek__
__Dallas, TX 75231__

ATTEST OR WITNESS:

**DEVON SFS OPERATING INC.**

By: _____
Type or Print Name
Title: _____
Date: _____
Address: 20 N. Broadway, Suite 1500, Oklahoma City, OK 73102

ATTEST OR WITNESS:

**LOUIS DREYFUS NATURAL GAS CORP.**

By: _____
Type or Print Name
Title: _____
Date: _____
Address: _____ 14000 Quail Springs Parkway, #600, _____
_____ Oklahoma City, OK 73134 _____

ATTEST OR WITNESS:

**SKLARCO, L.L.C.**

By: _____
Type or Print Name
Title: _____
Date: _____
Address: 401 Edwards St., Suite 1601, Shreveport, LA 71101

- 3 -

AAPL – FORM 610RS - 19...

8. Other provisions.                                                Shugart West "31" Fed Com #1

     **Concho Resources Inc.,** who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __as seen throughout the agreement__, have been made to the form.

     IN WITNESS WHEREOF, this agreement shall be effective as of the __29th__ day of _____**March**_____, year: __2001__.

ATTEST OR WITNESS:                                        **OPERATOR**
                                                        **CONCHO RESOURCES INC.**

    _____

_____   By: _____**David W. Copeland**_____
                                                        Type or Print Name
                                        Title: _____**Vice President**_____
_____   Date: _____**March 30, 2001**_____
                                        Address: _____110 W. Louisiana, Suite 410,_____
                                                        _____Midland TX  79701_____


ATTEST OR WITNESS:                                        **NON-OPERATORS**
                                                        **MATADOR PETROLEUM CORP.**

                                        _____

_____   By: _____
                                                        Type or Print Name
                                        Title: _____
_____   Date: _____
                                        Address: _____8340 Meadow Rd., Suite 158, Pecan Creek_____
                                                        _____Dallas, TX 75231_____


ATTEST OR WITNESS:

                                        _____**DEVON SFS OPERATING INC.**_____

_____   By: _____**R. D. Clark**_____
                                                        Type or Print Name
                                        Title: _____**Vice President**_____
_____   Date: _____
                                        Address: 20 N. Broadway, Suite 1500, Oklahoma City, OK 73102


ATTEST OR WITNESS:

                                        _____**LOUIS DREYFUS NATURAL GAS CORP.**_____

_____   By: _____
                                                        Type or Print Name
                                        Title: _____
_____   Date: _____
                                        Address: _____14000 Quail Springs Parkway, #600,_____
                                                        _____Oklahoma City, OK 73134_____


ATTEST OR WITNESS:

                                        _____**SKLARCO, L.L.C.**_____

_____   By: _____
                                                        Type or Print Name
                                        Title: _____
_____   Date: _____
                                        Address: 401 Edwards St., Suite 1601, Shreveport, LA 71101

- 3 -

AAPL – FORM 610RS - 19

8. Other provisions.

Shugart West "31" Fed Com #1

_____**Concho Resources Inc.,**_ who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __as seen throughout the agreement__, have been made to the form.

IN WITNESS WHEREOF, this agreement shall be effective as of the __29th__ day of _____**March**_____, year: __2001__.

ATTEST OR WITNESS:

OPERATOR
**CONCHO RESOURCES INC.**

_____

By: _____**David W. Copeland**_____
          Type or Print Name
Title: _____**Vice President**_____
Date: _____**March 30, 2001**_____
Address: _____110 W. Louisiana, Suite 410,_____
                 Midland TX  79701

ATTEST OR WITNESS:

NON-OPERATORS
**MATADOR PETROLEUM CORP.**

_____

By: _____
          Type or Print Name
Title: _____
Date: _____
Address: _____8340 Meadow Rd., Suite 158, Pecan Creek_____
                 Dallas, TX 75231

ATTEST OR WITNESS:

**DEVON SFS OPERATING INC.**

_____

By: _____
          Type or Print Name
Title: _____
Date: _____
Address: 20 N. Broadway, Suite 1500, Oklahoma City, OK 73102

ATTEST OR WITNESS:

**LOUIS DREYFUS NATURAL GAS CORP.**

_____

By: _____
          Type or Print Name
Title: J.C. Welch, Vice President – Land
Date: _____
Address: _____14000 Quail Springs Parkway, #600,_____
                 Oklahoma City, OK 73134

ATTEST OR WITNESS:

**SKLARCO, L.L.C.**

_____

By: _____
          Type or Print Name
Title: _____
Date: _____
Address: 401 Edwards St., Suite 1601, Shreveport, LA 71101

AAPL – FORM 610RS - 19⸏ ⸏ ⸏

8. Other provisions.

Shugart West "31" Fed Com #1

      **Concho Resources Inc.,** who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __as seen throughout the agreement__, have been made to the form.

      IN WITNESS WHEREOF, this agreement shall be effective as of the **29th** day of _____**March**_____, year: **2001**.

**ATTEST OR WITNESS:**

                     **OPERATOR**
                **CONCHO RESOURCES INC.**

By: _____ **David W. Copeland** _____
             **Type or Print Name**
Title: _____ **Vice President** _____
Date: _____ **March 30, 2001** _____
Address: _____ 110 W. Louisiana, Suite 410, _____
          Midland TX  79701

**ATTEST OR WITNESS:**

                  **NON-OPERATORS**
       **MATADOR PETROLEUM CORP.**

By: _____
             **Type or Print Name**
Title: _____
Date: _____
Address: _____ 8340 Meadow Rd., Suite 158, Pecan Creek _____
          Dallas, TX 75231

**ATTEST OR WITNESS:**

        **DEVON SFS OPERATING INC.**

By: _____
             **Type or Print Name**
Title: _____
Date: _____
Address: 20 N. Broadway, Suite 1500, Oklahoma City, OK 73102

**ATTEST OR WITNESS:**

      **LOUIS DREYFUS NATURAL GAS CORP.**

By: _____
             **Type or Print Name**
Title: _____
Date: _____
Address: _____ 14000 Quail Springs Parkway, #600, _____
          Oklahoma City, OK 73134

**ATTEST OR WITNESS:**

           **SKLARCO, L.L.C.**

By: DARRELL R. GARRETT
             **Type or Print Name**
Title: Attorney-in-Fact
Date: 4-12-2001
Address: 401 Edwards St., Suite 1601, Shreveport, LA 71101

8. Other provisions.                                                Shugart West "31" Fed Com #1

~~who has prepared and circulated this form for execution, represents and warrants
that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS 1989 Model
Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by
Forms On A Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion
and that are clearly recognizable as changes in Articles _____; have been made to the form.~~

~~IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____,
year_____;~~

~~ATTEST OR WITNESS:~~                                                     ~~OPERATOR~~

                                                        By: _____
                                                                  ~~Type or Print Name~~
                                                        Title: _____
                                                        Date: _____
                                                        Address: _____

ATTEST OR WITNESS:

                                          NON-OPERATORS (Continued)
                                                  S & P CO.

                                          _August Erickson_ (signature)

                                          By: _August Erickson_
                                                     Type or Print Name
                                          Title: General Manager
                                          Date: April 4, 2001
                                          Address: P. O. Box 3735, Shreveport, Louisiana 71133

ATTEST OR WITNESS:

                                              CANNON EXPLORATION CO.

                                          By: _____
                                                     Type or Print Name
                                          Title: _____
                                          Date: _____
                                          Address: 3608 South CR 1184, Midland, Texas 79706

ATTEST OR WITNESS:

                                                  ROGER T. ELLIOTT

                                          By: _____
                                                     Type or Print Name
                                          Title: _____
                                          Date: _____
                                          Address: 4105 Baybrook, Midland, Texas 79707

ATTEST OR WITNESS:

                                                  HOLLYHOCK CORP.

                                          By: _____
                                                     Type or Print Name
                                          Title: _____
                                          Date: _____
                                          Address: 4105 Baybrook, Midland, Texas 79707

8. Other provisions.                                                    Shugart West "31" Fed Com #1

~~_____; who has prepared and circulated this form for execution, represents and warrants
that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS 1989 Model
Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by
Forms On A Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion
and that are clearly recognizable as changes in Articles_____; have been made to the form.~~

~~IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____,
year _____;~~

ATTEST OR WITNESS:                                            OPERATOR

_____          _____
_____          _____
_____          _____
_____; By: _____
_____          Type or Print Name
_____          Title: _____
_____          Date: _____
                                           Address: _____

ATTEST OR WITNESS:                                NON-OPERATORS (Continued)
                                                  S & P CO.
                                           _____
_____          _____
_____          By: _____
                                           Type or Print Name
                                           Title: _____
                                           Date: _____
                                           Address: P. O. Box 3735, Shreveport, Louisiana  71133

ATTEST OR WITNESS:
                                           _____
                                                  CANNON EXPLORATION CO.
                                           _____
                                           *Todd M. Wilson*
*Carol L. Wilson, Sec.*                    By: *Todd M. Wilson*
                                           Type or Print Name
_____          Title: *President*
                                           Date: *APRIL 11, 2001*
                                           Address:  3608 South CR 1184, Midland, Texas  79706

ATTEST OR WITNESS:
                                                  ROGER T. ELLIOTT
                                           _____
_____          _____
                                           By: _____
                                           Type or Print Name
                                           Title: _____
                                           Date: _____
                                           Address: 4105 Baybrook, Midland, Texas  79707

ATTEST OR WITNESS:
                                                  HOLLYHOCK CORP.
                                           _____
_____          _____
                                           By: _____
                                           Type or Print Name
                                           Title: _____
                                           Date: _____
                                           Address: 4105 Baybrook, Midland, Texas  79707

AAPL - FORM 610RS - 1

8. Other provisions.

Shugart West "31" Fed Com #1

_____; who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS 1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms-On-A Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____; have been made to the form.

IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____, year _____;

ATTEST OR WITNESS:                                    OPERATOR

_____    _____

_____    _____

_____    _____

_____    By: _____
                                     Type or Print Name
                                     Title: _____
                                     Date: _____
                                     Address: _____

ATTEST OR WITNESS:                   NON-OPERATORS (Continued)
                                     S & P CO.

_____    _____

_____    _____

_____    By: _____
                                     Type or Print Name
                                     Title: _____
                                     Date: _____
                                     Address: P. O. Box 3735, Shreveport, Louisiana  71133

ATTEST OR WITNESS:
                                     CANNON EXPLORATION CO.

_____    _____

_____    _____

_____    By: _____
                                     Type or Print Name
                                     Title: _____
                                     Date: _____
                                     Address: 3608 South CR 1184, Midland, Texas  79706

ATTEST OR WITNESS:
                                     THE ROGER T. AND HOLLY L. ELLIOTT
                                     FAMILY LIMITED PARTNERSHIP, L.P.

_Neil Justs_                        By: _Roger T Elliott_
                                     Type or Print Name
                                     Title: _Partner_
_____    Date: _4-10-2001_
                                     Address: 4105 Baybrook, Midland, Texas  79707

ATTEST OR WITNESS:
                                     DILLARD, FISHER & HEASLEY PARTNERSHIP

_Roger T. Elliott_                  By: _Neil Justs_
                                     Type or Print Name
                                     Title: _Partner_
_____    Date: _4-10-01_
                                     Address: 405 W. Wall, Suite 1510, Midland, Texas  79701

Revised 4/9/01

- 3 -

## ACKNOWLEDGMENTS

STATE OF TEXAS     §
                              §

COUNTY OF MIDLAND   §

This instrument was acknowledged before me on this 29th day of March, 2001, by David W. Copeland, as Vice President of **Concho Resources Inc.**, a Delaware corporation, and on behalf of said corporation.

Given under my hand and seal this the 29th day of March, 2001.

Notary Public in and for State of Texas

TAMMY BAIMBRIDGE
Notary Public
STATE OF TEXAS
My Comm. Exp. 09/23/01

STATE OF TEXAS     §
                             §

COUNTY OF _____   §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Matador Petroleum Corp.**, a _____ corporation, and on behalf of said corporation.

Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____

STATE OF OKLAHOMA   §
                             §

COUNTY OF _____   §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Devon SFS Operating Inc.**, a _____ corporation, and on behalf of said corporation.

Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Oklahoma

My Commission Expires:

_____

## ACKNOWLEDGMENTS

STATE OF TEXAS          §
                        §
COUNTY OF MIDLAND       §
                        §

    This instrument was acknowledged before me on this 29th day of March, 2001, by David W. Copeland, as Vice President of **Concho Resources Inc.**, a Delaware corporation, and on behalf of said corporation.

    Given under my hand and seal this the 29th day of March, 2001.

_____
Notary Public in and for State of Texas

STATE OF TEXAS          §
                        §
COUNTY OF _DALLAS_      §
                        §

    This instrument was acknowledged before me on this _31st_ day of ~~April~~ *May*, 2001, by _C. Barry Osborne_, as _Vice President_ of **Matador Petroleum Corp.**, a _Texas_ corporation, and on behalf of said corporation.

    Given under my hand and seal this the _31st_ day of ~~April~~ *May*, 2001.

```
┌─────────────────────────────┐
│       JANICE A. ARCHER      │
│   Notary Public, State of Texas │
│  My Commission Expires 12-18-02 │
└─────────────────────────────┘
```

_Janice A. Archer_
Notary Public in and for State of Texas

My Commission Expires:
_12-18-2002_

STATE OF OKLAHOMA       §
                        §
COUNTY OF _____ §
                        §

    This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Devon SFS Operating Inc.**, a _____ corporation, and on behalf of said corporation.

    Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Oklahoma

My Commission Expires:
_____

## ACKNOWLEDGMENTS

STATE OF TEXAS          §
                        §
COUNTY OF MIDLAND       §

This instrument was acknowledged before me on this 29th day of March, 2001, by David W. Copeland, as Vice President of **Concho Resources Inc.**, a Delaware corporation, and on behalf of said corporation.

Given under my hand and seal this the 29th day of March, 2001.

_____
Notary Public in and for State of Texas

STATE OF TEXAS          §
                        §
COUNTY OF _____    §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Matador Petroleum Corp.**, a _____ corporation, and on behalf of said corporation.

Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____

STATE OF OKLAHOMA       §
                        §
COUNTY OF OKLAHOMA      §

This instrument was acknowledged before me on this 10th day of ~~April~~ July, 2001, by R. D. Clark, as Vice President of **Devon SFS Operating Inc.**, a Delaware corporation, and on behalf of said corporation.

Given under my hand and seal this the _____ day of April, 2001.

_Kelly W. Robertson_
Notary Public in and for State of Oklahoma

My Commission Expires:
5/27/2005

KELLY W. ROBERTSON
Oklahoma County
Notary Public in and for
State of Oklahoma
My commission expires May 27, 2005.

-5-

Exhibit "G"
Recording Supplement to Operating Agreement and Financing Statement
Shugart West "31" Fed Com #1

## ACKNOWLEDGMENTS (Continued)

STATE OF OKLAHOMA §
§
COUNTY OF ____OKLAHOMA____ §

This instrument was acknowledged before me on this _17_ day of April, 2001, by __J.C. Welch; Vice President -xas- Land_____ of **Louis Dreyfus Natural Gas Corp.,** a _____ corporation, and on behalf of said corporation.

Given under my hand and seal this the _17_ day of April, 2001.

_Eloise E. Olsen_
Notary Public in and for State of Oklahoma

My Commission expires:
_____

STATE OF LOUISIANA §
§
PARISH OF CADDO §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____, being _____ of **Sklarco Co.,** on behalf of said company.

Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Louisiana

STATE OF LOUISIANA §
§
PARISH OF CADDO §

This instrument was acknowledged before me on this _____ day of April, 2001, by August Erickson, being General Manager of **S&P Co.,** a Louisiana Partnership, on behalf of said partnership.

Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Louisiana

-6-

## ACKNOWLEDGMENTS (Continued)

STATE OF OKLAHOMA                  §
                                   §
COUNTY OF _____          §

    This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Louis Dreyfus Natural Gas Corp.**, a _____ corporation, and on behalf of said corporation.

    Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Oklahoma

My Commission Expires:

_____


STATE OF LOUISIANA        §
                          §
PARISH OF CADDO           §

    This instrument was acknowledged before me on this 12th day of April, 2001, by DARRELL R. GARRETT , being Attorney-in-Fact of **Sklarco Co.**, on behalf of said company.

    Given under my hand and seal this the 12th day of April, 2001.

_Deborah C Walker_
Notary Public in and for State of Louisiana

DEBORAH C. WALKER, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE


STATE OF LOUISIANA        §
                          §
PARISH OF CADDO           §

    This instrument was acknowledged before me on this _____ day of April, 2001, by August Erickson, being General Manager of **S&P Co.**, a Louisiana Partnership, on behalf of said partnership.

    Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Louisiana

## ACKNOWLEDGMENTS (Continued)

STATE OF OKLAHOMA     §
                                §

COUNTY OF _____   §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Louis Dreyfus Natural Gas Corp.**, a _____ corporation, and on behalf of said corporation.

Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Oklahoma

My Commission Expires:

_____

STATE OF LOUISIANA     §
                                §

PARISH OF CADDO      §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____, being _____ of **Sklarco Co.**, on behalf of said company.

Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Louisiana

STATE OF LOUISIANA     §
                                §

PARISH OF CADDO      §

This instrument was acknowledged before me on this __3rd__ day of April, 2001, by August Erickson, being General Manager of **S&P Co.**, a Louisiana Partnership, on behalf of said partnership.

Given under my hand and seal this the __3rd__ day of April, 2001.

_____
Notary Public in and for State of Louisiana

JILL N. CRAWFORD
NOTARY PUBLIC CADDO PARISH, LA.
MY COMMISSION EXPIRES WITH LIFE

Exhibit "G"
Recording Supplement to Operating Agreement and Financing Statement
Shugart West "31" Fed Com #1

## ACKNOWLEDGMENTS (Continued)

STATE OF TEXAS                                    §
                                                 §
COUNTY OF MIDLAND                                §

This instrument was acknowledged before me on this _10th_ day of April, 2001,
by _Roger T. Elliott_ as _Partner_ of **The Roger T. and Holly L.**
**Elliott Family Limited Partnership, L.P.**.

_Charlotte Heasley_
Notary Public in and for State of Texas

My Commission Expires:

Charlotte Heasley
Notary Public, State of Texas
My Commission Expires 06-15-2002

STATE OF TEXAS                                    §
                                                 §
COUNTY OF MIDLAND                                §

This instrument was acknowledged before me on this _____ day of April, 2001,
by _____.as _____ of **Cannon**
**Exploration Co.**, on behalf of said company.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____

STATE OF TEXAS                                    §
                                                 §
COUNTY OF MIDLAND                                §

This instrument was acknowledged before me on this _10th_ day of April, 2001,
by _Neil Fisher_.as _Partner_ of **Dillard,**
**Fisher & Heasley Partnership**, and on behalf of said partnership.

_Barbara A. Reid_
Notary Public in and for State of Texas

My Commission Expires:
_09/26/02_

BARBARA A. REID
Notary Public, State of Texas
My Commission Expires 09-26-02

Revised 4/9/01

## ACKNOWLEDGMENTS (Continued)

STATE OF TEXAS          §
                        §
COUNTY OF MIDLAND       §

    This instrument was acknowledged before me on this _____ day of April, 2001, by **Roger T. Elliott**.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____


STATE OF TEXAS          §
                        §
COUNTY OF MIDLAND       §

    This instrument was acknowledged before me on this _11TH_ day of April, 2001, by _Todd M. Wilson_ .as _President_ of **Cannon Exploration Co.**, on behalf of said company.

*Virginia Lee Pollard*
Notary Public in and for State of Texas

[NOTARY SEAL: VIRGINIA LEE POLLARD — NOTARY PUBLIC STATE OF TEXAS — COMMISSION EXPIRES: FEBRUARY 8, 2004]

My Commission Expires:

_____


STATE OF TEXAS          §
                        §
COUNTY OF MIDLAND       §

    This instrument was acknowledged before me on this _____ day of April, 2001, by _____.as _____ of **Hollyhock Corp.**, a _____ corporation, and on behalf of said corporation.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____



September 5, 2001

Mr. Ken Gray
Devon Energy Production Company, L.P.
20 North Broadway, Ste 1500
Oklahoma City, OK 73102-8260

Re:    JOA /Ratifications
       Frontier Hills Prospect
       Indian Draw Prospect
       Wagon Wheel Prospect
       Shugart West Prospect
       Eddy County, New Mexico

Dear Mr. Gray:

Enclosed are the four JOA's that were attached to the previously sent Participation
Agreements.

Please let me know if you need additional documentation.

Sincerely,

Deborah C. Walker
Contract Landman

Enclosures

Cc:    Darrell Garrett



August 13, 2001

Mr. Ken Gray
Devon Energy Production Company, L.P.
20 North Broadway, Ste 1500
Oklahoma City, OK  73102-8260

Re:     Participation Agreements
        Frontier Hills Prospect
        Indian Draw Prospect
        Wagon Wheel Prospect
        Shugart West Prospect
        Eddy County, New Mexico

Dear Mr. Gray:

Pursuant to your request directed to Darrell Garrett, enclosed are copies of the referenced Participation Agreements.

Sklarco, L.L.C. received 57.5% of the S & P Co. 11.25% interest.

If we can provide any other documentation, please advise.

Sincerely,

*Deborah Walker*

Deborah C. Walker
Contract Landman

Enclosures

Cc:     Darrell Garrett

*Ken Gray. - Devon op1*
*Penwell Agreement*
*Devon →*
*week ago Mendez*
*- Devon owes Asn + JOA*

# PENWELL ENERGY, INC.

1100 ARCO BUILDING
600 N. MARIENFELD
MIDLAND, TEXAS 79701

OFF: (915) 683-2534
FAX: (915) 683-4514

July 29, 1996

S & P Co.
P. O. Box 3735
Shreveport, LA 71133-3735

Re:  Letter Agreement and
Joint Operating Agreement
Shugart West Prospect (NM-050)
Eddy County, New Mexico

Gentlemen:

This letter is to confirm our agreement whereby Penwell Energy, Inc. ("Penwell ") agrees to assign unto S & P Co. ("S & P") without warranty of title, express or implied, the undivided interests in and to those certain oil and gas leases as described on Exhibit "A", attached hereto and made a part hereof ("Said Leases").

The terms and conditions of this Agreement are as follows:

1.  Penwell shall furnish to S & P without warranty, express or implied, copies of Said Leases, contract files, title opinions and all other pertinent instruments and information pertaining to the captioned prospect in its possession.

2.  Penwell agrees that on or before October 1, 1996, it shall use its best efforts to commence, or cause to be commenced, operations for the drilling of the Shugart West "30" Federal #1 Well ("Initial Well") in search of oil and/or gas at the following location:

> 1980' from the West Line and 1980' from the North Line of Section 30, T-18-S, R-31-E, NMPM, Eddy County, New Mexico.

3.  Penwell, as operator, agrees to drill the Initial Well in a good and workmanlike manner, in an attempt to adequately test the Morrow formation at a depth of approximately 12,000' below the surface of the ground.

4.  Said Leases cover 1562.88 gross mineral acres. S & P agrees (a) to pay to Penwell, on or before August 15, 1996, the sum of $52,504.65 for its proportionate share of the leasehold costs.

Letter Agreement
S & P Co.
July 29, 1996
Page -2-

S & P further agrees to pay Penwell 15% of the total actual costs of drilling the Initial Well to casing point and 11.25% of the total actual costs, if any, of completing the Initial Well; and (b) to ratify the Joint Operating Agreement, attached hereto as Exhibit "B", which covers the prospect.

5.   It is understood between the parties hereto that Penwell agrees to deliver to S & P a 73% net revenue interest in Said Leases, proportionately reduced.

6.   Penwell agrees that in conducting all operations hereunder it shall comply with all Federal and State Laws, rules and regulations applicable to such operations.

7.   This agreement shall be binding upon the respective successors and assigns of the parties hereto.   In the event any terms of this Agreement conflict with the attached Operating Agreement, it is agreed that the terms of this Agreement will prevail.

If this letter correctly sets forth your understanding of our agreement, please execute in the space provided below and return to the undersigned one (1) fully executed copy of this agreement and the ratification of the attached Joint Operating Agreement, on or before August 15, 1996.

Yours very truly,

Mark Wheeler, CPL
Land Manager, Permian Basin


AGREED TO AND ACCEPTED this __1st__ day of August, 1996.

S & P CO.

By: _August Erickson_
Name/Title: _August Erickson, General_ Manager

/cmw:N.052(152m)
xc: Steve Foy

EXHIBIT "A"

Attached to that certain Letter Agreement
dated July 29, 1996 between PENWELL ENERGY, INC.
and S & P CO.

Oil and Gas Lease(s) "Said Lease" Subject to This Agreement:

Federal Lease LC-029387B from the United States of America,
Bureau of Land Management covering Lots 1,2, E/2 NW/4 of
Section 19, and Lots 1, 2, E/2 NW/4 and E/2 of Section 30,
T-18-S, R-31-E, NMPM, Eddy County, New Mexico, insofar and
only insofar as said lease covers all depths  in the acreage
in Section 19 and only those depths below 4,500' subsurface
in the acreage in Section 30.

Federal Lease LC-029387A from the United States of America,
Bureau of Land Management covering the S/2 of Section 29,
T-18-S, R-31-E, NMPM, Eddy County, New Mexico, insofar and
only insofar as said lease covers only those depths below
4,500' subsurface.

Federal Lease NM-12211 from the United States of America,
Bureau of Land Management covering the W/2 of Section 33,
T-18-S, R-31-E, NMPM, Eddy County, New Mexico, insofar and
only insofar as said lease covers only those depths below
4,500' subsurface.

Federal Lease LC-029387D from the United States of America,
Bureau of Land Management covering Lots 3, 4, E/2 SW/4 of
Section 30, T-18-S, R-31-E, NMPM, Eddy County, New Mexico,
insofar and only insofar as said lease covers only those
depths below 4,000' subsurface.

Federal Lease NM-93772 from the United States of America,
Bureau of Land Management covering Lots 3, 4, E/2 SW/4 of
Section 19, T-18-S, R-31-E, NMPM, Eddy County, New Mexico,
insofar and only insofar as said lease covers only those
depths below 3,900' subsurface.

Summary of Interests to be Conveyed to S & P Co.

15.0000000% WI Before Casing Point of Initial Test Well (if
              Canadian Kenwood elects not to participate in
              Initial Test Well)
 9.5117340% WI Before Casing Point of Initial Test Well (if
              Canadian Kenwood elects to participate in
              Initial Test Well)

EXHIBIT "A"
Page -2-

Attached to that certain Letter Agreement
dated July 29, 1996 between PENWELL ENERGY, INC.
and S & P CO.


11.2500000% WI After Casing Point of Initial Test Well (if
              Canadian Kenwood elects not to participate in
              Initial Test Well)
 7.1338005% WI After Casing Point of Initial Test Well (if
              Canadian Kenwood elects to participate in
              Initial Test Well)
 8.2125000% NRI(if Canadian Kenwood elects not to par-
              ticipate in Initial Test Well)
 5.2076743% NRI(if Canadian Kenwood elects to participate in
              Initial Test Well)


** WI & NRI Percentages on Subsequent Wells will be
   calculated as additional proration units are formed.
   NRI's range from 73% to 80.5% on portions of prospect
   acreage.



May 30, 2001

Concho Resources Inc.
Suite 410, 110 West Louisiana
Midland, Texas 79701

Attention:     Mr. Gary M. Young
               Land Consultant

Re:            Operating Agreement dated March 29, 2001
               West Shugart "31" Federal Com #1
               S/2 Section 31, T18S, R31E, NMPM
               Eddy County, New Mexico

Dear Gary:

Enclosed is Sklarco's acceptance of the changes and revisions to the above referenced operating agreement.

                              Sincerely,


                              Tyler E. Adams, Jr.
                              Landman

Encls.

# CONCHO RESOURCES INC.

Suite 410
110 W. Louisiana
Midland, Texas 79701

(915) 683-7443
FAX 683-7441

May 23, 2001

Sklarco, L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana  71101

Re:   Operating Agreement dated March 29, 2001
      West Shugart "31" Federal Com #1
      S/2 Section 31, T18S, R31E, NMPM
      Eddy County, New Mexico

Gentlemen:

All the comments have now been received concerning the captioned Operating Agreement.  The following changes have been included on the revised pages to the Operating Agreement enclosed herewith.  Subject to your approval, please substitute the revised pages into your copy of the Operating Agreement and return the attached copy of this letter to the undersigned acknowledging your acceptance of the revisions.

1.    Article XV.A., page 14, the following sentence has been added to the end of paragraph A:  "It is further understood and agreed that if some, but not all parties elect to participate in the additional logging, coring or testing they may do so and the party or parties not participating in such operations shall not be entitled to the logs, cores or the results of the tests but shall suffer no other penalty."

2.    Article XV.B., page 14, paragraph B. has been deleted and replaced with the following expanded version; however the intent of the original language is not changed:"Notwithstanding anything to the contrary contained in Article V.B. above, in the event that Concho Resources Inc. ("Concho"), ceases to be Operator, either through sale of its interest in the Contract Area or by the acquisition or sale of Concho by or to an unrelated third party, or Concho is otherwise deemed to have resigned as Operator pursuant to Article V.B.1 above, the parties hereto agree that Concho shall be succeeded by Matador Petroleum Corporation, or such affiliated operating entity as may be designated by Matador Petroleum Corporation, as Operator hereunder.  Any other change of Operator shall be governed solely by Article V.B."

3.    Exhibit "C" – Accounting Procedure, page 6, Article IV., paragraph 1, the phrase …"however, Operator shall not be required to take discounts." has been deleted at the request of several parties.

4.    The Title Opinion did not pick up some recent title changes.  Revised Exhibit "A", Exhibit "G" and signature pages showing the appropriate changes in working interest owners are also enclosed.

A full set of signature pages will be forwarded to all parties shortly.  Should you have any questions or comments in this regard, please give me a call.

Your patience in getting this matter concluded is greatly appreciated.

Yours truly,

Gary M. Young
Land Consultant

The above changes and revisions are agreeable and accepted this 30th day of May, 2001.

SKLARCO, L.L.C.

By: Darrell R. Garrett

Printed Name:

enclosure
GY/tb:shugartwest(95)

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located.  If the Contract Area is in two or more states, the law of the state of _____**New Mexico**_____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith.  Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act.  Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

### ARTICLE XV.
### OTHER PROVISIONS

**A. Priority of Operations**

Notwithstanding anything contained herein to the contrary, it is agreed that where a well which has been authorized under the terms of this agreement by all parties, or by one or more but less than all parties under Article VI.B.2, shall have been drilled to the contract depth or the objective formation, whichever is less, and the parties participating in the well cannot mutually agree upon the sequence and timing of further operation regarding such well, the following elections shall control in the order enumerated hereafter:

1. an election to do additional logging, coring or testing;

2. an election to attempt to complete the well at either the objective depth or objective formation;

3. an election to plug back and attempt to complete said well; however, if more than one proposal to plug back is made, the proposal to plug back to the deeper prospective interval shall have priority over proposals to plug back to shallower prospective intervals;

4. an election to sidetrack the well; and

5. an election to deepen said well.

It is provided, however, that if at the time said participating parties are considering any of the above elections the hole is in such a condition that a reasonably prudent operator would not conduct the operations comtemplated by the particular election involved for fear of placing the hole or objective formation in jeopardy, such election shall be eliminated from the sequence set forth above. It is further understood and agreed that if some, but not all parties elect to participate in the additional logging, coring or testing they may do so and the party or parties not participating in such operations shall not be entitled to the logs, cores or the results of the tests but shall suffer no other penalty.

**B. Selection of Successor Operator**

Notwithstanding anything to the contrary contained in Article V.B above, in the event that Concho Resources Inc.  ("Concho"), ceases to be Operator, either through sale of its interest in the Contract Area or by the acquisition or sale of Concho by or to an unrelated third party, or Concho is otherwise deemed to have resigned as Operator pursuant to Article V.B.1 above, the parties hereto agree that Concho shall be succeeded by Matador Petroleum Corporation, or such affiliated operating entity as may be designated by Matador Petroleum Corporation, as Operator hereunder.  Any other change of Operator shall be governed solely by Article V.B.

Revised 5/23/01

COPAS  1984  ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $_____.

A. _____5_____% of first $100,000 or total cost if less, plus

B. _____3_____% of costs in excess of $100,000 but less than $1,000,000, plus

C. _____2_____% of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.    **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account ~~or shall charge the Joint Account for overhead based on the following rates:~~

~~A. _____% of total costs through $100,000; plus~~

~~B. _____% of total costs in excess of $100,000 but less than $1,000,000; plus~~

~~C. _____% of total costs in excess of $1,000,000.~~

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.    **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV.    **PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.    **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received/. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.    **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

~~(1)    Tubular Goods Other than Line Pipe~~

~~(a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

~~(b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

Revised 5/23/01

- 6 -

Shugart West "31" Federal Com #1

## EXHIBIT "A"

**Attached to and made a part of that certain
Operating Agreement dated March 29, 2001,
between Concho Resources Inc., as Operator, and
Matador Petroleum Corp., et al, as Non-Operators.**

1.  Identification of lands subject to this agreement:

    <u>Township 18 South, Range 31 East, N.M.P.M., Eddy County, New Mexico</u>
    Section 31: Lots 3, 4, E/2SW/4, SE/4 (S/2)
    Containing 311.64 acres, more or less
    Eddy County, New Mexico

2.  Restrictions as to depths, formations or substances:

    Certain shallow rights are excluded from this Agreement as identified in
    Paragraph 4 below.

3.  Percentages or fractional interests of parties to this agreement:

    | | |
    |---|---|
    | Concho Resources Inc. | 22.7827% |
    | Matador Petroleum Corp. | 37.1518% |
    | Devon SFS Operating, Inc. | 20.0759% |
    | Louis Dreyfus Natural Gas Corp. | 13.3839% |
    | Sklarco, L.L.C. | 1.6606% |
    | S & P Co. | 1.2274% |
    | Cannon Exploration Co. | 1.8589% |
    | The Roger T. and Holly L. Elliott Family Limited Partnership, L. P. | 1.0843% |
    | Dillard, Fisher & Heasley Partnership | 0.7745% |
    | Total | 100.0000% |

4.  Oil and gas leases and/or oil and gas interests subject to this agreement:

    | | |
    |---|---|
    | Lessor: | U.S.A. NMNM-99038 |
    | Lessee: | Penwell Energy Inc. |
    | Date: | September 1, 1997 |
    | Legal: | Township 18 South, Range 31 East, NMPM |
    | | Section 31: E/2SW/4 |
    | Acres: | 80 acres, more or less |
    | County/State: | Eddy County, New Mexico |
    | Primary Term: | 10 Years |
    | Royalty: | 12.5% |
    | Rental: | $1.50/$2.00 per acre |
    | Recording: | Book 290, Page 197 of the Eddy County Records |

Revised 5/23/01

Shugart West "31" Federal Com #1
Exhibit "A"

Oil and gas leases and/or oil and gas interests subject to this agreement (Continued):

| | |
|---|---|
| Lessor: | U.S.A. NMNM-02460 |
| Lessee: | Victor B. Van Hook |
| Date: | May 1, 1952 |
| Legal: | Township 18 South, Range 31 East, NMPM |
| | Among Other Lands: |
| | Section 31: *Lot 4, |
| | *INSOFAR AND ONLY |
| | INSOFAR AS LOT 4 COVERS RIGHTS |
| | BELOW 3,244 FEET SUBSURFACE. |
| Acres: | 115.86 acres, more or less |
| County/State: | Eddy County, New Mexico |
| Primary Term: | 5 Years |
| Royalty: | 12.5% |
| Rental: | Minimum Royalty |
| Recording: | N/A |

| | |
|---|---|
| Lessor: | U.S.A. LC 062084 |
| Lessee: | The Pure Oil Company |
| Date: | November 1, 1961 |
| Legal: | Township 18 South, Range 31 East, NMPM |
| | Among Other Lands: |
| | Section 31: Lot 3 |
| | INSOFAR AND ONLY INSOFAR AS SAID |
| | LEASE COVERS RIGHTS BELOW 3,540 FEET |
| | SUBSURFACE. |
| Acres: | 35.78 acres, more or less |
| County/State: | Eddy County, New Mexico |
| Primary Term: | 10 Years with option to renew |
| Royalty: | Sliding Scale |
| Rental: | Minimum Royalty |
| Recording: | N/A |

| | |
|---|---|
| Lessor: | U.S.A. NMNM-0560352 |
| Lessee: | Union Oil Company of California |
| Date: | November 1, 1991 |
| Legal: | Township 18 South, Range 31 East, NMPM |
| | Among Other Lands: |
| | Section 31: W/2SE/4, INSOFAR AND ONLY |
| | INSOFAR AS SAID LEASE COVERS RIGHTS |
| | BELOW 3,650 FEET SUBSURFACE. |
| Acres: | 80.00 acres, more or less |
| County/State: | Eddy County, New Mexico |
| Primary Term: | 20 Years |
| Royalty: | 12.5% |
| Rental: | $2.00/acre |
| Recording: | N/A |

Shugart West "31" Federal Com #1
Exhibit "A"

Oil and gas leases and/or oil and gas interests subject to this agreement (Continued):

| | |
|---|---|
| Lessor: | U.S.A. NMNM-0560354 |
| Lessee: | Victor B. Van Hook |
| Date: | May 1, 1952 |
| Legal: | Township 18 South, Range 31 East, NMPM |
| | Among Other Lands: |
| | Section 31: E/2SE/4 |
| Acres: | 80.00 acres, more or less |
| County/State: | Eddy County, New Mexico |
| Primary Term: | 5 Years |
| Royalty: | 12.5% |
| Rental: | Minimum Royalty |
| Recording: | N/A |

5.      Parties to agreement with information for notice purposes:

Concho Resources Inc.
110 W. Louisiana, Suite 410
Midland, Texas 79701
Telephone:     915/683-7443
Fax:               915/683-7441

Matador Petroleum Corp.
8340 Meadow Raod
Suite 158, Pecan Creek
Dallas, Texas 75231
Telephone:     214/987-7172
Fax:               214/691-1415

Devon SFS Operating Inc.
20 N. Broadway, Suite 1500
Oklahoma City, Oklahoma 73102
Telephone:     405/235-3611
Fax:               405/552-4667

Louis Dreyfus Natural Gas Corp.
14000 Quail Springs Parkway
Suite 600
Oklahoma City, Oklahoma 73134
Telephone:     (407) 749-1300
Fax:               (407) 749-6662

Sklarco, L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana 71101
Telephone:     (318) 227-8668
Fax:               (318) 227-9012

Cannon Exploration Co.
3608 South CR 1184
Midland, Texas 79706
Telephone:     (915) 684-0053
Fax:               (915) 684-0053

S & P Co.
P. O. Box 3735
Shreveport, Louisiana 71133-3735
Telephone:     (318) 222-1800
Fax:               (318) 424-1257

Dillard, Fisher & Heasley Partnership
405 W. Wall, Suite 1510
Midland, Texas 79701
Telephone: (915) 682-1000
Fax: (915) 683-4305

The Roger T. and Holly L. Elliott
  Family Limited Partnership, L.P.
4105 Baybrook
Midland, Texas 79707
Telephone:     (915) 687-5969
Fax:               (915) 687-1817

Revised 5/23/01

End of Exhibit "A"

NON-OPERATORS (Continued):

THE ROGER T. AND HOLLY L. ELLIOTT
FAMILY LIMITED PARTNERSHIP

By: _Roger T. Elliott_

Printed Name: _Roger T. Elliott_
Title: _Partner_
Date: _4-10-2001_


DILLARD, FISHER & HEASLEY PARTNERSHIP

By: _Neil Fisher_

Printed Name: _Neil Fisher_
Title: _PARTNER_
Date: _4-10-01_

AAPL – FORM 610RS - 1989

8. Other provisions.                                                                 Shugart West "31" Fed Com #1

~~who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On A Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles ~~_____~~, have been made to the form.~~

~~IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____, year _____.~~

~~ATTEST OR WITNESS:~~                                              ~~OPERATOR~~

                                                                   ~~By:~~ _____
                                                                   ~~Type or Print Name~~
                                                                   ~~Title:~~ _____
                                                                   ~~Date:~~ _____
                                                                   ~~Address:~~ _____

ATTEST OR WITNESS:                                   NON-OPERATORS (Continued)
                                                            S & P CO.

                                                     By: _____
                                                          Type or Print Name
                                                     Title: _____
                                                     Date: _____
                                                     Address:  P. O. Box 3735, Shreveport, Louisiana  71133

ATTEST OR WITNESS:

                                                     CANNON EXPLORATION CO.

                                                     By: _____
                                                          Type or Print Name
                                                     Title: _____
                                                     Date: _____
                                                     Address:  3608 South CR 1184, Midland, Texas  79706

ATTEST OR WITNESS:

                                                     THE ROGER T. AND HOLLY L. ELLIOTT
                                                     FAMILY LIMITED PARTNERSHIP, L.P.

                                                     By: _____
                                                          Type or Print Name
                                                     Title: _____
                                                     Date: _____
                                                     Address: 4105 Baybrook, Midland, Texas  79707

ATTEST OR WITNESS:

                                                     DILLARD, FISHER & HEASLEY PARTNERSHIP

                                                     By: _____
                                                          Type or Print Name
                                                     Title: _____
                                                     Date: _____
Revised 4/9/01                                       Address: 405 W. Wall, Suite 1510, Midland, Texas  79701

Exhibit "G"
Recording Supplement to Operating Agreement and Financing Statement
Shugart West "31" Fed Com #1

## ACKNOWLEDGMENTS (Continued)

STATE OF TEXAS §
§
COUNTY OF MIDLAND §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____ as _____ of **The Roger T. and Holly L. Elliott Family Limited Partnership, L.P.**.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____


STATE OF TEXAS §
§
COUNTY OF MIDLAND §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____.as _____ of **Cannon Exploration Co.**, on behalf of said company.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____


STATE OF TEXAS §
§
COUNTY OF MIDLAND §

This instrument was acknowledged before me on this _____ day of April, 2001, by _____.as _____ of **Dillard, Fisher & Heasley Partnership**, and on behalf of said partnership.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____


Revised 4/9/01

# CONCHO RESOURCES INC.

Suite 410
110 W. Louisiana
Midland, Texas 79701

(915) 683-7443
Fax 683-7441

April 23, 2001

Sklarco, L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana  71101

Re:     **Operating Agreement**
**Exhibit "D"**
**West Shugart "31" Federal Com #1**
**S/2 Section 31, T18S, R31E, NMPM**
**Eddy County, New Mexico**

Gentlemen:

Please find enclosed Exhibit "D"-Insurance Provisions, which was inadvertently omitted from the Operating Agreement dated March 29, 2001, covering the Shugart West "31" Federal Com #1 Well.  Please insert the enclosed exhibit in your copy of the Operating Agreement.  If you have any questions, please feel free to call our office.  Thank you.

Yours truly,

Gary M. Young
Land Consultant

enclosure
/tb:shugartwest(86)

# EXHIBIT "D"

**Attached to and made a part of that certain Operating Agreement
dated March 29, 2001, by and between
Concho Resources Inc. as Operator, and
Matador Petroleum Corp., et al, as Non-Operators,
covering acreage in Eddy County, New Mexico.**

## INSURANCE

Operator shall at all times while conducting operations hereunder, require each and every drilling contractor or drilling subcontractor to carry insurance to protect and save the parties hereto harmless as follows:

(a) Statutory Workman's Compensation Insurance in accordance with the laws of the state in which the operations are to be conducted, and Employer's Liability Insurance with limits not less than $1,000,000 for any one person, and not less than $1,000,000 for any one accident.

(b) Public Liability Insurance with limits of not less than $5,000,000 for any one person, and $5,000,000 for any one accident; and Property Damage Liability Insurance with limits of not less than $5,000,000 per accident.

(c) Automobile Public Liability Insurance with limits of not less than $1,000,000 for any one person, and not less than $1,000,000 for any one accident; and Automobile Property Damage Insurance with limits of not less than $1,000,000 to cover all automotive equipment.

Operator shall require all other contractors or subcontractors conducting operations hereunder to carry insurance of such types and in such amounts as Operator deems adequate to protect the parties hereto. No liability shall attach to Operator in the exercise of its good-faith judgment as to the types and amounts of insurance, if any, to be required of such other contractors.

Operator shall at all times comply with the laws of the state in which the operations are to be conducted covering Workmen's Compensation Insurance. Any other insurance desired by a party hereto shall be carried by such party at its own cost and expense.

It is further understood and agreed that Operator is not a warrantor of the financial responsibility of the insurer with whom such insurance is carried, and that except for willful negligence Operator shall not be liable to Non-Operator for any loss suffered on account of the insufficiency of the insurance carried, or of insurer with whom carried. Operator shall not be liable to Non-Operator for any loss accruing by reason of Operator's inability to procure or maintain the insurance above mentioned. Operator agrees that if at any time during the life of this agreement it is unable to obtain or maintain such insurance, it shall immediately notify in writing Non-Operators of such fact.

It shall be the sole responsibility of each party hereto to provide its own well control insurance, including underground blow out, seepage, and pollution, that Operator shall not provide same for the benefit of the joint account unless prior arrangements to do so have been made, in writing, by the parties hereto.

In the event any party hereto declines any of the applicable coverage(s) herein above provided, then, in such event, nothing concerning the above declined coverages will be charged toward the Joint Account.

Each party hereto to be insured hereunder, shall provide copies of certificates evidencing the above insurance coverage(s) upon request of any other party. In the event any party hereto elects to self-insure, then in such event, it must obtain a Certificate of Financial Responsibility from the applicable Federal and/or State Agencies, provide an acceptable letter of self-insurance or otherwise furnish appropriate acceptable evidence of same relating to said guidelines to the other parties hereto.

End of Exhibit "D"

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Shugart West "31" Federal Com #1

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____29th_____ day of _____March_____, ~~19~~2001.

Concho Resources Inc._____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __as seen throughout the Operating Agreement_____, have been made to the form.

OPERATOR

**CONCHO RESOURCES INC.**

Date:  March 30, 2001_____          _____
                                               David W. Copeland, Vice President

NON-OPERATORS

**MATADOR PETROLEUM CORP.**

Date:_____          _____
                                       Printed Name:_____
                                       Title:

**DEVON SFS OPERATING INC.**

Date:_____          _____
                                       Printed Name:_____
                                       Title:

**LOUIS DREYFUS NATURAL GAS CORP.**

Date:_____          _____
                                       Printed Name:_____
                                       Title:

**SKLARCO, L.L.C.**

Date: April 12, 2001_____          _Darrell R. Garrett_____
                                     Printed Name:DARRELL R. GARRETT
                                     Title: Attorney-in-Fact

**S & P CO.**

Date:_____          _____
                                       Printed Name:_____
                                       Title:

**CANNON EXPLORATION CO.**

Date:_____          _____
                                       Printed Name:_____
                                       Title:

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Shugart West "31" Federal Com #1

ARTICLE XVI.

MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____29th_____ day of _____March_____ , ~~19~~2001 .

Concho Resources Inc._____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __as seen throughout the__ __Operating Agreement_____, have been made to the form.

OPERATOR

**CONCHO RESOURCES INC.**

**Date: March 30, 2001**_____    _____
                                     **David W. Copeland, Vice President**

NON-OPERATORS

**MATADOR PETROLEUM CORP.**

**Date:**_____    _____
                               **Printed Name:**
                               **Title:**

**DEVON SFS OPERATING INC.**

**Date:**_____    _____
                               **Printed Name:**
                               **Title:**

**LOUIS DREYFUS NATURAL GAS CORP.**

**Date:**_____    _____
                               **Printed Name:**
                               **Title:**

**SKLARCO, L.L.C.**

**Date:** _April 13, 2001_    _Darrell R. Garrett_
                               **Printed Name:** DARRELL R. GARRETT
                               **Title:** Attorney-in-Fact

**S & P CO.**

**Date:**_____    _____
                               **Printed Name:**
                               **Title:**

**CANNON EXPLORATION CO.**

**Date:**_____    _____
                               **Printed Name:**
                               **Title:**

- 15 -

# SKLARCO LLC

401 Edwards St. Suite 1601
Shreveport, Louisiana 71101
318/227-8668
318/227-9012 (fax)

## WELL DATA REQUIREMENTS
### NON-OPERATED WELLS

**OPERATOR:**           **Concho Resources Inc.**
**WELL NAME:**           **West Shugart "31" Federal Com #1**
**SURFACE LOCATION:**     **1780' FSL & 1650' FWL**
**BOTTOM HOLE LOCATION:**   **660' FSL & 1650' FWL**
**FIELD/PROSPECT:**       **Shugart**
**COUNTY/STATE:**        **Eddy County, New Mexico**

## DAILY REPORTS

Fax or e-mail daily drilling reports to:

Kim Timon     (318) 227-9012     (318) 227-9435 – log fax     e-mail: Ktimon@sklarexploration.com

## NOTICES:

Notify the following of intention to **Spud, Log, Core, Test, Complete or Abandon:**

Cory Ezelle   (Geology)   office: (318) 227-8668   home: (318) 929-9119   mobile: (318) 458-2257

Terry Buck   (Engineering)   office: (318) 227-8668   home: (318) 746-7862   mobile: (318) 218-3206

Darrell Garrett (Land)   office: (318)227-8668   home: (318) 747-3845   mobile: (318) 347-1699

1. We require a minimum of 24 hours notice prior to spudding, logging, testing, coring or abandoning operations.

2. We reserve the option to have a representative on location for logging, coring or testing.

## REGULATORY, DRILLING, COMPLETION, PRODUCTION DATA     NO. OF COPIES

| | NO. OF COPIES |
|---|:---:|
| Permit to Drill (State & Federal)………………………………………… | 1 |
| Location Plat………………………………………………………….... | 1 |
| Completion Report (incl. directional survey)………………………………. | 1 |
| Well Test Data………………………………………………………… | 3 |
| Monthly Production Reports filed with state agencies…………………………. | 1 |
| Drilling Prognosis……………………………………………………….. | 1 |
| Completion Prognosis…………………………………………………… | 1 |

## GEOLOGICAL/GEOPHYSICAL DATA

| | |
|---|:---:|
| Electric Logs | |
|     Field Prints…………………………………………………… | 3 |
|     Fax Prints …………………………………………………….... | 1 |
|     Final Composites……………………………………………… | 3 |
|     Sepias/floppy.discs…………………………………………… | 1 |
| Core.Reports………………………………………………………….... | 3 |
| Paleo Reports……………………………………………………….... | 3 |
| Mud Logs | |
|     Field Prints…………………………………………………… | 3 |
|     Fax Prints……………………………………………………... | 1 |
|     Sepias/floppy discs…………………………………………….... | 1 |
| DST, Chemical Analysis, Dipmeter, ect.………………………………… | 3 |

# SKLARCO LLC

401 Edwards St. Suite 1601
Shreveport, Louisiana 71101
318/227-8668
318/227-9012 (fax)

## WELL DATA REQUIREMENTS
## NON-OPERATED WELLS

| | |
|---|---|
| **OPERATOR:** | **Concho Resources Inc.** |
| **WELL NAME:** | **West Shugart "31" Federal Com #1** |
| **SURFACE LOCATION:** | **1780' FSL & 1650' FWL** |
| **BOTTOM HOLE LOCATION:** | **660' FSL & 1650' FWL** |
| **FIELD/PROSPECT:** | **Shugart** |
| **COUNTY/STATE:** | **Eddy County, New Mexico** |

## DAILY REPORTS

Fax or e-mail daily drilling reports to:

Kim Timon      (318) 227-9012      (318) 227-9435 – log fax      e-mail: Ktimon@sklarexploration.com

## NOTICES:

Notify the following of intention to **Spud, Log, Core, Test, Complete or Abandon:**

  Cory Ezelle   (Geology)    office: (318) 227-8668   home: (318) 929-9119   mobile: (318) 458-2257

  Terry Buck   (Engineering)   office: (318) 227-8668   home: (318) 746-7862   mobile: (318) 218-3206

  Darrell Garrett (Land)   office: (318)227-8668    home: (318) 747-3845    mobile: (318) 347-1699

1. We require a minimum of 24 hours notice prior to spudding, logging, testing, coring
   or abandoning operations.

2. We reserve the option to have a representative on location for logging, coring or testing.

| **REGULATORY, DRILLING, COMPLETION, PRODUCTION DATA** | **NO. OF COPIES** |
|---|---|
| Permit to Drill (State & Federal)…………………………………………… | 1 |
| Location Plat……………………………………………………………..... | 1 |
| Completion Report (incl. directional survey)………………………………… | 1 |
| Well Test Data……………………………………………………………… | 3 |
| Monthly Production Reports filed with state agencies…………………………. | 1 |
| Drilling Prognosis……………………………………………………….. | 1 |
| Completion Prognosis…………………………………………………… | 1 |

## GEOLOGICAL/GEOPHYSICAL DATA

| | |
|---|---|
| Electric Logs | |
| Field Prints………………………………………………… | 3 |
| Fax   Prints ……………………………………………….... | 1 |
| Final Composites………………………………………………… | 3 |
| Sepias/floppy.discs……………………………………………… | 1 |
| Core.Reports…………………………………………………….. | 3 |
| Paleo Reports……………………………………………………….. | 3 |
| Mud Logs | |
| Field Prints…………………………………………………… | 3 |
| Fax Prints……………………………………………………… | 1 |
| Sepias/floppy discs………………………………………………... | 1 |
| DST, Chemical Analysis, Dipmeter, ect……………………………………. | 3 |

# SKLARCO LLC

401 Edwards St. Suite 1601
Shreveport, Louisiana 71101
318/227-8668
318/227-9012 (fax)

## WELL DATA REQUIREMENTS
### NON-OPERATED WELLS

| | |
|---|---|
| **OPERATOR:** | **Concho Resources Inc.** |
| **WELL NAME:** | **West Shugart "31" Federal Com #1** |
| **SURFACE LOCATION:** | **1780' FSL & 1650' FWL** |
| **BOTTOM HOLE LOCATION:** | **660' FSL & 1650' FWL** |
| **FIELD/PROSPECT:** | **Shugart** |
| **COUNTY/STATE:** | **Eddy County, New Mexico** |

## DAILY REPORTS

Fax or e-mail daily drilling reports to:

Kim Timon    (318) 227-9012    (318) 227-9435 – log fax    e-mail: Ktimon@sklarexploration.com

## NOTICES:

Notify the following of intention to **Spud, Log, Core, Test, Complete or Abandon:**

  Cory Ezelle   (Geology)   office: (318) 227-8668   home: (318) 929-9119   mobile: (318) 458-2257

  Terry Buck   (Engineering)   office: (318) 227-8668   home: (318) 746-7862   mobile: (318) 218-3206

  Darrell Garrett (Land)   office: (318)227-8668   home: (318) 747-3845   mobile: (318) 347-1699

1. We require a minimum of 24 hours notice prior to spudding, logging, testing, coring
   or abandoning operations.

2. We reserve the option to have a representative on location for logging, coring or testing.

| **REGULATORY, DRILLING, COMPLETION, PRODUCTION DATA** | **NO. OF COPIES** |
|---|---|
| Permit to Drill (State & Federal)……………………………………………… | 1 |
| Location Plat…………………………………………………………………..... | 1 |
| Completion Report (incl. directional survey)…………………………………… | 1 |
| Well Test Data………………………………………………………………… | 3 |
| Monthly Production Reports filed with state agencies…………………………... | 1 |
| Drilling Prognosis……………………………………………………………… | 1 |
| Completion Prognosis…………………………………………………………… | 1 |

## GEOLOGICAL/GEOPHYSICAL DATA

| | |
|---|---|
| Electric Logs | |
| Field Prints………………………………………………………… | 3 |
| Fax  Prints …………………………………………………….... | 1 |
| Final Composites…………………………………………………… | 3 |
| Sepias/floppy.discs………………………………………………… | 1 |
| Core.Reports……………………………………………………………... | 3 |
| Paleo Reports………………………………………………………….... | 3 |
| Mud Logs | |
| Field Prints………………………………………………………… | 3 |
| Fax Prints…………………………………………………………... | 1 |
| Sepias/floppy discs………………………………………………….... | 1 |
| DST, Chemical Analysis, Dipmeter, ect……………………………………… | 3 |

# CONCHO RESOURCES INC.

Suite 410
110 W. Louisiana
Midland, Texas 79701

(915) 683-7443
Fax 683-7441

April 2, 2001

Sklarco, L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana  71101

Re:   **Proposed Operating Agreement
West Shugart "31" Federal Com #1
S/2 Section 31, T18S, R31E, NMPM
Eddy County, New Mexico**

Gentlemen:

Please find enclosed the captioned Operating Agreement accompanied by nine extra signature pages, along with a Recording Memorandum and one extra signature and acknowledgment page.  Subject to your approval of the Operating Agreement, please execute and return all nine extra signature pages, along with the notarized signature page for the Recording Memorandum.  A full set of original signature pages will be forwarded to each party as soon as possible.  A recorded copy of the Memorandum will be returned to everyone as soon as it becomes available.

Should you have any questions or comments regarding the Operating Agreement, do not hesitate to call me at 915/683-7443.

Yours truly,

Gary M. Young
Land Consultant

enclosure
GY:tb/shugartwest(78)

AAPL – FORM 610RS - 1989

Slugart West "31" Fed Com #1

8. Other provisions.

      **Concho Resources Inc.**, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __as seen throughout the agreement__, have been made to the form.

      IN WITNESS WHEREOF, this agreement shall be effective as of the **29th** day of _____ **March** _____,
year: **2001** .

ATTEST OR WITNESS:

                   OPERATOR
             **CONCHO RESOURCES INC.**

By: _____ **David W. Copeland** _____
            **Type or Print Name**
Title: _____ **Vice President** _____
Date: _____ **March 30, 2001** _____
Address: _____ 110 W. Louisiana, Suite 410,
            Midland TX  79701

ATTEST OR WITNESS:

          NON-OPERATORS
      **MATADOR PETROLEUM CORP.**

By: _____
            **Type or Print Name**
Title: _____
Date: _____
Address: __8340 Meadow Rd., Suite 158, Pecan Creek__
            Dallas, TX 75231

ATTEST OR WITNESS⁺

       ~~DEVON SFS OPERATING INC.~~

By: _____
            **Type or Print Name**
Title: _____
Date: _____
Address: 20 N. Broadway, Suite 1500, Oklahoma City, OK 73102

ATTEST OR WITNESS:

    **LOUIS DREYFUS NATURAL GAS CORP.**

By: _____
            **Type or Print Name**
Title: _____
Date: _____
Address: __14000 Quail Springs Parkway, #600,__
            Oklahoma City, OK 73134

ATTEST OR WITNESS:

         **SKLARCO, L.L.C.**

_Darrell R. Garrett_

By: DARRELL R. GARRETT
         **Type or Print Name**
Title: Attorney-in-Fact
Date: 4-12-2001
Address: 401 Edwards St., Suite 1601, Shreveport, LA 71101

Exhibit "G"
Recording Supplement to Operating Agreement and Financing Statement
Shugart West "31" Fed Com #1

## ACKNOWLEDGMENTS (Continued)

STATE OF OKLAHOMA     §
                           §

COUNTY OF _____ §

        This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Louis Dreyfus Natural Gas Corp.**, a _____ corporation, and on behalf of said corporation.

        Given under my hand and seal this the _____ day of April, 2001.

                  _____
                  Notary Public in and for State of Oklahoma

My Commission Expires:

_____

STATE OF LOUISIANA     §
                         §

PARISH OF CADDO     §

        This instrument was acknowledged before me on this _12th_ day of April, 2001, by _DARRELL R. GARRETT_, being _Attorney-in-Fact_ of **Sklarco Co.**, on behalf of said company.

        Given under my hand and seal this the _12th_ day of April, 2001.

              Deborah C Walker
        Notary Public in and for State of Louisiana
              DEBORAH C. WALKER, NOTARY PUBLIC
                   CADDO PARISH, LOUISIANA
                  MY COMMISSION IS FOR LIFE

STATE OF LOUISIANA     §
                         §

PARISH OF CADDO     §

        This instrument was acknowledged before me on this _____ day of April, 2001, by August Erickson, being General Manager of **S&P Co.**, a Louisiana Partnership, on behalf of said partnership.

        Given under my hand and seal this the _____ day of April, 2001.

                  _____
                  Notary Public in and for State of Louisiana

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

### SHUGART WEST "31" FEDERAL COM #1

OPERATING AGREEMENT

DATED

_____ March 29 _____ , ~~19~~ 2001 ,

OPERATOR   **Concho Resources Inc.**

CONTRACT AREA   **Township 18 South, Range 31 East, N.M.P.M.**

**Section 31: Lots 3, 4, E/2SW/4, SE/4 (S/2)**

**Containing 311.64 acres, more or less**

COUNTY ~~OR PARISH~~ OF   **Eddy**                    STATE OF      **New Mexico**

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED FORM.
A.A.P.L.   NO.   610   –   1982   REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between __Concho Resources Inc.__ , hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

X☐ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☐ B. Exhibit "B", Form of Lease.
X☐ C. Exhibit "C", Accounting Procedure.
X☐ D. Exhibit "D", Insurance.
X☐ E. Exhibit "E", Gas Balancing Agreement.
X☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
X☐ G. Exhibit "G", Tax Partnership. **Memorandum of Operating Agreement & Financing Statement**

If any provision of any exhibit, except Exhibits "B" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
### INTERESTS OF PARTIES

**A.     Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.     Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred   in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ **all existing burdens of record,** _____ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.     Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.     Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
### TITLES

**A.     Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ-ed, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

☐  **Option No. 1:**  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

1  X☐  Option No. 2:  Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7  Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10  This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12  No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13  provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14  ticipate in the drilling of the well.
15
16  **B.  Loss of Title:**
17
18  1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19  reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20  from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21  tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22  and gas leases and interests: and,
23  (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24  entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25  but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26  (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27  been lost, but the interests of the parties shall be revised on an acreage basis, as of the time  it is determined finally that title failure has oc-
28  curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29  Area by the amount of the interest lost;
30  (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31  increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32  terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33  well;
34  (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35  failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36  who bore the costs which are so refunded;
37  (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38  borne by the party or parties whose title failed in the same proportions as they shared in such prior production; and,
39  (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40  claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41  connection therewith.
42
43  2.  Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well
44  payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45  there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46  payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47  which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48  date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49  the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50  required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51  the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52  shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53  or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54  (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55  up to the amount of unrecovered costs;
56  (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57  oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58  termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59  portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,
60  (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61  lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62
63  3.  Other Losses:  All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64  and shall be borne by all parties in proportion to their interests.  There shall be no readjustment of interests in the remaining portion of
65  the Contract Area.
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.

OPERATOR

**A.   Designation and Responsibilities of Operator:**

_____ **Concho Resources Inc.** _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

    1.   <u>Resignation or Removal of Operator:</u>   Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

    2.   <u>Selection of Successor Operator:</u>   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.   Employees:**

    The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

    All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

**A.   Initial Well:**

    On or before the _____**1st**_____ day of _____**June**_____ , ~~19~~ __**2001**__ , Operator shall commence the drilling of a well for oil and gas at the following location:
**Surface location: 1,780' FSL & 1,650' FWL of Section 31, Township 18 South, Range 31 East, N.M.P.M., Eddy County, New Mexico,**

**Bottom Hole location: 660' FSL & 1,650' FWL of Section 31, Township 18 South, Range 31 East, N.M.P.M., Eddy County, New Mexico,**

and shall thereafter continue the drilling of the well with due diligence to
**a depth of 12,300 feet or sufficient to test the Morrow formation, whichever is the lesser depth,**

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

    Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1    If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2  well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

3

4

5

6  **B.   Subsequent Operations:**

7

8    1.   _Proposed Operations:_   Should any party hereto desire to drill any well on the Contract Area other than the well provided
9  for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10  the parties and not then producing_or capable of producing_in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11  other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12  tion and the estimated cost of the operation.   The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13  within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.   If a drill-
14  ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15  limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.   Failure of a party receiving such notice to reply within
16  the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.   Any notice or
17  response given by telephone shall be promptly confirmed in writing.

18

19

20

21    If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22  period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
23  tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24  ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other par-
25  ties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26  permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27  amination or curative matter required for title approval or acceptance.   Notwithstanding the force majeure provisions of Article XI, if the
28  actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29  if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30  dance with the provisions hereof as if no prior proposal had been made.

31

32

33

34    2.   _Operations by Less than All Parties:_   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
35  No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36  giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
37  the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
38  on location, as the case may be) actually commence the proposed operation and complete it with due diligence.   Operator shall perform all
39  work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40  a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41  tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.   Con-
42  senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43  ditions of this agreement.

44

45

46

47    If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48  notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as
49  to whether the Consenting Parties should proceed with the operation as proposed.   Each Consenting Party, within forty-eight (48) hours
50  (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51  ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52  failure to advise the proposing party shall be deemed an election under (a).   In the event a drilling rig is on location, the time permitted for
53  such a response shall not exceed a total of forty-eight (48) hours (_inclusive_ of Saturday, Sunday and legal holidays).   The proposing party,
54  at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

55

56

57

58    The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59  elected to bear same under the terms of the preceding paragraph.   Consenting Parties shall keep the leasehold estates involved in such
60  operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62  sole cost, risk and expense.   If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63  ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

64

65

66

67

68

69

70

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:

12      (a)  100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and

21      (b)____300____% of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C., and ____300____% of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.

28      An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29  working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31  reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32  and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33  the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.

39      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.

46      In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

53      Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57  ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60  realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

- 6 -

A.A.P.L. FORM 610 – MODEL FORM OPERATING AGREEMENT – 1982

### ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. <u>Stand-By Time</u>:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. <u>Sidetracking</u>:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

C.   **TAKING PRODUCTION IN KIND:**

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing the treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3     Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.
6
7     In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8 the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9 the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10 best price obtainable in the area for such production.  Any such purchase or sale by Operator shall be subject always to the right of the
11 owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12 delivered to a purchaser.  Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14 of one (1) year.
15
16     In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17 deliveries which on a day-to-day  basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19 agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.
20
21 **D.**  **Access to Contract Area and Information:**
22
23     Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25 and records relating thereto.  Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of
28 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29 quests the Information.
30
31 **E.**  **Abandonment of Wells:**
32
33     1.  <u>Abandonment of Dry Holes:</u>  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35 without the consent of all parties.  Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36 within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37 such well, such party shall be deemed to have consented to the proposed abandonment.  All such wells shall be plugged and abandoned in
38 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
     elects not to plug and abandon     immediately
39 such well.  Any party who ~~objects to plugging and abandoning~~ such well shall ~~have the right to~~ take over the well and conduct further
40 operations in search of oil and/or gas subject to the provisions of Article VI.B.
41
42     2.  <u>Abandonment of Wells that have Produced:</u>  Except for any well in which a Non-Consent operation has been conducted
43 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44 producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall
45 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  If, within
46 thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall assign
50 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52 terval or intervals of the formation or formations then open to production.  If the interest of the abandoning party is or includes an oil and
53 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2   assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3   Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4   interests in the remaining portion of the Contract Area.
5

6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7   the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8   quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9   templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10   well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11   repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12   visions hereof.
13

14      3.  <u>Abandonment of Non-Consent Operations:</u>  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15   Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16   permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17   of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18   VI.E.
19

20               **ARTICLE VII.**
21         **EXPENDITURES AND LIABILITY OF PARTIES**
22

23   **A.**   **Liability of Parties:**
24

25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26   shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27   among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28   shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29

30   **B.**   **Liens and Payment Defaults:**
31

32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33   of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34   at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35   state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36   taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37   rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38   of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39   the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40   purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41   and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42

43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44   Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45   the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46   reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.
47

48   **C.**   **Payments and Accounting:**
49

50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51   and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52   tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53   showing expenses incurred and charges and credits made and received.
54

55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56   of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57   month, which right may be exercised only by submission to each such party of an ~~itemized statement of~~ such estimated expense, together
                  **Authority for Expenditure (AFE) setting forth**
58   with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59   on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60   fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61   due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62   pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
63

64   **D.**   **Limitation of Expenditures:**
65

66      1.  <u>Drill or Deepen:</u>  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67   pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1 ☐   Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.

3

4 X☐  Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well.  When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs.  The parties receiving such notice shall have forty-eight
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt.  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities.  Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt.  If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.

14

15   2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.

19

20   3. Other Operations:  Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of ____TWENTY-FIVE THOUSAND AND NO/100____ Dollars ($25,000.00_____ )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties.  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____TWENTY-FIVE THOUSAND AND NO/100_____
28 Dollars ($25,000.00_____ ) but less than the amount first set forth above in this paragraph. **Notwithstanding the**
29 **$25,000 limitation, when such project or expenditure involves changing zones in a well an AFE shall be submitted to the parties for**
30 **approval.**

31 **E.   Rentals, Shut-in Well Payments and Minimum Royalties:**

32

33   Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
34 party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties own and have con-
35 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
36 behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of
37 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
38 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
39 visions of Article IV.B.2.

40

41   Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
42 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
43 circumstances, prior to taking such action, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify
44 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
45 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

46

47 **F.   Taxes:**

48

49   Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
50 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
51 become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
52 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
53 Operator.  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
54 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
55 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
56 tion.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
57 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
58 value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in
59 the manner provided in Exhibit "C".

60

61   If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
62 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
63 mination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
64 interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
65 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
66 provided in Exhibit "C".

67

68   Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
69 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1  **G.   Insurance:**

2

3      At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C".   Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof.   Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

9

10     In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

12

13                              **ARTICLE VIII.**
14                  **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

15

16  **A.   Surrender of Leases:**

17

18     The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.

20

21     However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender.   If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B".   Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article.   The party assignor or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage.   The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning.   If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

35

36     Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement, **but shall be deemed to be subject to an Operating Agreement identical to this one modified only to reflect the ownership of**
40  **the acquiring parties and their respective interests.**

41  **B.   Renewal or Extension of Leases:**

42

43     If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.

48

49     If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement, **but shall be deemed to be subject**
53  **to an Operating Agreement identical to this one modified only to reflect the ownership of the acquiring parties and their respective**
54  **interests.**

55     Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
56  by the acquiring party.

57

58     The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
59  or cover only a portion of its area or an interest therein.   Any renewal lease taken before the expiration of its predecessor lease, or taken or
60  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
61  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
62  the provisions of this agreement.

63

64     The provisions in this Article shall also be applicable to extensions of oil and gas leases.

65

66  **C.   Acreage or Cash Contributions:**

67

68     While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
69  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
70  applied by it against the cost of such drilling or other operation.   If the contribution be in the form of acreage, the party to whom the con-
tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
### continued

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9 **D.   Maintenance of Uniform Interests:**
10
11     For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12 party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13 equipment and production unless such disposition covers either:
14
15     1.   the entire interest of the party in all leases and equipment and production; or
16
17     2.   an equal undivided interest in all leases and equipment and production in the Contract Area.
18
19     Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties.
21
22     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29 **E.   Waiver of Rights to Partition:**
30
31     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.
34
35 ~~F.    Preferential Right to Purchase:~~
36
37     ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40 ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41 ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43 ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47     ### ARTICLE IX.
48     ### INTERNAL REVENUE CODE ELECTION
49
50     This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ TEN THOUSAND AND NO/100 _____ Dollars ($_____ 10,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

### ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### ARTICLE XII.
### NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☒☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ 180 _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ 180 _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ **New Mexico** _____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
### OTHER PROVISIONS

**A. Priority of Operations**

Notwithstanding anything contained herein to the contrary, it is agreed that where a well which has been authorized under the terms of this agreement by all parties, or by one or more but less than all parties under Article VI.B.2, shall have been drilled to the contract depth or the objective formation, whichever is less, and the parties participating in the well cannot mutually agree upon the sequence and timing of further operation regarding such well, the following elections shall control in the order enumerated hereafter:

1. an election to do additional logging, coring or testing;
2. an election to attempt to complete the well at either the objective depth or objective formation;
3. an election to plug back and attempt to complete said well; however, if more than one proposal to plug back is made, the proposal to plug back to the deeper prospective interval shall have priority over proposals to plug back to shallower prospective intervals;
4. an election to sidetrack the well; and
5. an election to deepen said well.

It is provided, however, that if at the time said participating parties are considering any of the above elections the hole is in such a condition that a reasonably prudent operator would not conduct the operations comtemplated by the particular election involved for fear of placing the hole or objective formation in jeopardy, such election shall be eliminated from the sequence set forth above.

**B. Selection of Successor Operator**

Notwithstanding anything to the contrary contained in Article V.B above, in the event that Concho Resources Inc. is deemed to have resigned pursuant to Article V.B.1, the parties hereto agree that Concho Resources Inc. shall be succeeded by Matador Petroleum Corporation as Operator. Any other change of Operator shall be governed solely by Article V.B.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Shugart West "31" Federal Com #1

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____29th_____ day of _____March_____, 19 2001.

Concho Resources Inc._____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __as seen throughout the__ Operating Agreement _____, have been made to the form.

OPERATOR

**CONCHO RESOURCES INC.**

**Date: March 30, 2001**

David W. Copeland, Vice President

NON-OPERATORS

**MATADOR PETROLEUM CORP.**

**Date:** _____

Printed Name: _____
Title:

**DEVON SFS OPERATING INC.**

**Date:** _____

Printed Name: _____
Title:

**LOUIS DREYFUS NATURAL GAS CORP.**

**Date:** _____

Printed Name: _____
Title:

**SKLARCO, L.L.C.**

**Date:** _____

Printed Name: _____
Title:

**S & P CO.**

**Date:** _____

Printed Name: _____
Title:

**CANNON EXPLORATION CO.**

**Date:** _____

Printed Name: _____
Title:

- 15 -

Shugart West "31" Fed Com #1 JOA

NON-OPERATORS (Continued):

**ROGER T. ELLIOTT**

By:_____

Printed Name:___Roger T. Elliott_____
Title:_____
Date:_____

**HOLLYHOCK CORP.**

By:_____

Printed Name:_____
Title:_____
Date:_____

NO EXHIBIT "B"

Shugart West "31" Federal Com #1

## EXHIBIT "A"

**Attached to and made a part of that certain
Operating Agreement dated March 29, 2001,
between Concho Resources Inc., as Operator, and
Matador Petroleum Corp., et al, as Non-Operators.**

1.  Identification of lands subject to this agreement:

    <u>Township 18 South, Range 31 East, N.M.P.M., Eddy County, New Mexico</u>
    Section 31:  Lots 3, 4, E/2SW/4, SE/4 (S/2)
    Containing 311.64 acres, more or less
    Eddy County, New Mexico

2.  Restrictions as to depths, formations or substances:

    Certain shallow rights are excluded from this Agreement as identified in
    Paragraph 4 below.

3.  Percentages or fractional interests of parties to this agreement:

    | | |
    |---|---|
    | Concho Resources Inc. | 22.7827% |
    | Matador Petroleum Corp. | 37.1518% |
    | Devon SFS Operating, Inc. | 20.0759% |
    | Louis Dreyfus Natural Gas Corp. | 13.3839% |
    | Sklarco, L.L.C. | 1.6606% |
    | S & P Co. | 1.2274% |
    | Cannon Exploration Co. | 1.8589% |
    | Roger T. Elliott | 0.9294% |
    | Hollyhock Corp. | 0.9294% |
    | Total | 100.0000% |

4.  Oil and gas leases and/or oil and gas interests subject to this agreement:

    Lessor:         U.S.A. NMNM-99038
    Lessee:         Penwell Energy Inc.
    Date:           September 1, 1997
    Legal:          Township 18 South, Range 31 East, NMPM
                    Section 31:  E/2SW/4
    Acres:          80 acres, more or less
    County/State:   Eddy County, New Mexico
    Primary Term:   10 Years
    Royalty:        12.5%
    Rental:         $1.50/$2.00 per acre
    Recording:      Book 290, Page 197 of the Eddy County Records

Shugart West "31" Federal Com #1
Exhibit "A"

Oil and gas leases and/or oil and gas interests subject to this agreement (Continued):

| | |
|---|---|
| Lessor: | U.S.A. NMNM-02460 |
| Lessee: | Victor B. Van Hook |
| Date: | May 1, 1952 |
| Legal: | Township 18 South, Range 31 East, NMPM |
| | Among Other Lands: |
| | Section 31:  *Lot 4, E/2SE/4 |
| | *INSOFAR AND ONLY |
| | INSOFAR AS LOT 4 COVERS RIGHTS |
| | BELOW 3,244 FEET SUBSURFACE. |
| Acres: | 115.86 acres, more or less |
| County/State: | Eddy County, New Mexico |
| Primary Term: | 5 Years |
| Royalty: | 12.5% |
| Rental: | Minimum Royalty |
| Recording: | N/A |

| | |
|---|---|
| Lessor: | U.S.A. LC 062084 |
| Lessee: | The Pure Oil Company |
| Date: | November 1, 1961 |
| Legal: | Township 18 South, Range 31 East, NMPM |
| | Among Other Lands: |
| | Section 31: Lot 3 |
| | INSOFAR AND ONLY INSOFAR AS SAID |
| | LEASE COVERS RIGHTS BELOW 3,540 FEET |
| | SUBSURFACE. |
| Acres: | 35.78 acres, more or less |
| County/State: | Eddy County, New Mexico |
| Primary Term: | 10 Years with option to renew |
| Royalty: | Sliding Scale |
| Rental: | Minimum Royalty |
| Recording: | N/A |

| | |
|---|---|
| Lessor: | U.S.A. NMNM-0560352 |
| Lessee: | Union Oil Company of California |
| Date: | November 1, 1991 |
| Legal: | Township 18 South, Range 31 East, NMPM |
| | Among Other Lands: |
| | Section 31:  W/2SE/4, INSOFAR AND ONLY |
| | INSOFAR AS SAID LEASE COVERS RIGHTS |
| | BELOW 3,650 FEET SUBSURFACE. |
| Acres: | 80.00 acres, more or less |
| County/State: | Eddy County, New Mexico |
| Primary Term: | 20 Years |
| Royalty: | 12.5% |
| Rental: | $2.00/acre |
| Recording: | N/A |

5.    Parties to agreement with information for notice purposes:

| | |
|---|---|
| Concho Resources Inc. | Matador Petroleum Corp. |
| 110 W. Louisiana, Suite 410 | 8340 Meadow Raod |
| Midland, Texas  79701 | Suite 158, Pecan Creek |
| Telephone:    915/683-7443 | Dallas, Texas  75231 |
| Fax:          915/683-7441 | Telephone:    214/987-7172 |
| | Fax:          214/691-1415 |

Shugart West "31" Federal Com #1
Exhibit "A"

Parties to agreement with information for notice purposes (Continued):

Devon SFS Operating Inc.
20 N. Broadway, Suite 1500
Oklahoma City, Oklahoma  73102
Telephone:     405/235-3611
Fax:               405/552-4667

Sklarco, L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana  71101
Telephone:     (318) 227-8668
Fax:               (318) 227-9012

S & P Co.
P. O. Box 3735
Shreveport, Louisiana  71133-3735
Telephone:     (318) 222-1800
Fax:               (318) 424-1257

Roger T. Elliott
4105 Baybrook
Midland, Texas  79707
Telephone:     (915) 687-5969
Fax:               (915) 687-1817

Louis Dreyfus Natural Gas Corp.
14000 Quail Springs Parkway
Suite 600
Oklahoma City, Oklahoma  73134
Telephone:     (407) 749-1300
Fax:               (407) 749-6662

Cannon Exploration Co.
3608 South CR 1184
Midland, Texas  79706
Telephone:     (915) 684-0053
Fax:               (915) 684-0053

Hollyhock Corp.
4105 Baybrook
Midland, Texas  79707
Telephone:     (915) 687-5969
Fax:               (915) 687-1817

End of Exhibit "A"

COPAS   1984   ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT " C "

Attached to and made a part of ___that certain Operating Agreement dated March 29, 2001, between Concho Resources Inc., as Operator, and Matador Petroleum Corp., et al, as Non-Operators, covering the Shugart West "31" Federal Com #1 Well in Eddy County, New Mexico.

## ACCOUNTING PROCEDURE

## JOINT OPERATIONS

### I. GENERAL PROVISIONS

**1.   Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.   Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.   Advances and Payments by Non-Operators**

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____15% per annum beginning on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. All amounts due Operator hereunder shall be paid to Operator at Operator's address shown on Exhibit "A" to the Operating Agreement to which this Exhibit is attached.

**4.   Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

COPAS  1984  ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

**5.    Audits**

A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

**6.    Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.    Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

**2.    Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**3.    Labor**

A.   (1)  Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)  Salaries of First level Supervisors in the field.

(3)  Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)  Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

**4.    Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS  1984  ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.   **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.   **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.   **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.   **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation.   Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _twelve_____percent (_____12_____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%.   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.   **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.   **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.   **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS   1984  ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( X ) Fixed Rate Basis, Paragraph 1A, or
   (    ) Percentage Basis, Paragraph 1B

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

   (    ) shall be covered by the overhead rates, or
   ( X ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   ( X ) shall be covered by the overhead rates, or
   (    ) shall not be covered by the overhead rates.

   A.   Overhead - Fixed Rate Basis

   (1)  Operator shall charge the Joint Account at the following rates per well per month:

        Drilling Well Rate $     **6,000.00**
            (Prorated for less than a full month)

        Producing Well Rate $     **600.00**

   (2)  Application of Overhead - Fixed Rate Basis shall be as follows:

        (a)  Drilling Well Rate

             (1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

COPAS  1984  ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. ~~Overhead - Percentage Basis~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development~~

~~=============Percent (============%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.~~

~~(b) Operating~~

~~=============Percent (============%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead - Percentage Basis shall be as follows:~~

~~For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.~~

2. **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $_____;

A.     5     % of first $100,000 or total cost if less, plus

B.     3     % of costs in excess of $100,000 but less than $1,000,000, plus

C.     2     % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.      Catastrophe Overhead

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account ~~or shall charge the Joint Account for overhead based on the following rates:~~

A. ~~_____% of total costs through $100,000, plus~~

B. ~~_____% of total costs in excess of $100,000 but less than $1,000,000, plus~~

C. ~~_____% of total costs in excess of $1,000,000.~~

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.      Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV.      PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.      Purchases

**however, Operator shall not be required to take discounts**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received/. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.      Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.      New Material (Condition A)

~~(1)  Tubular Goods Other than Line Pipe~~

~~(a)  Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

~~(b)  For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

~~pound Oil Field Haulers Association interstate truck rate shall be used.~~

~~(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.~~

~~(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.~~

~~(2) Line Pipe~~

~~(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

~~(b) Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

~~(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.~~

~~(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.~~

(3) ~~Other~~ Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property, **and adjusted by the Historical Price Multiplier.**

(4) Unused new Material, ~~except tubular goods,~~ moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property, **and adjusted by the Historical Price Multiplier.** ~~Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).~~

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

    (2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

    (a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

    (b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

    (3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   **Obsolete Material**

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   **Pricing Conditions**

                                                   **Operators actual cost.**

    (1)   Loading or unloading costs may be charged to the Joint Account at ~~the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.~~

    (2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.    **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.    **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.    **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.    **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS  1984  ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

# Exhibit "E"

## Attached to that certain Operating Agreement
## dated March 29, 2001, by and between
## Concho Resources Inc., as Operator, and
## Matador Petroleum Corp., et al,
## as Non-Operators, covering acreage
## in Eddy County, New Mexico.

## GAS BALANCING AGREEMENT

1.  Ownership of Gas Production

    (a)     It is the intent of the parties that each party shall have the right to take in kind and separately dispose of its proportionate share of gas (including casinghead gas) produced from each formation in each well located on acreage ("Contract Area") covered by the Operating Agreement to which this Exhibit is attached ("Operating Agreement").

    (b)     Operator shall control the gas production and be responsible for administering the provisions of this Agreement and shall make reasonable efforts to deliver or cause to be delivered gas to the parties' gas purchasers as may be required in order to balance the accounts of the parties in accordance with the provisions herein contained. For proposes of this Agreement, Operator shall maintain production accounts of the parties based upon the number of MMBtu's actually contained in the gas produced from a particular formation in a well and delivered at the outlet of lease equipment for each party's account regardless of whether sales of such gas are made on a wet or dry basis. All references in this Agreement to quantity or volume shall refer to the number of MMBtu's contained in the gas stream. Toward this end, Operator shall periodically determine or cause to be determined the Btu content of gas produced from each formation in each well on a consistent basis and under standard conditions pursuant to any method customarily used in the industry.

2.  Balancing of Production Accounts

    (a)     Any time a party, or such party's purchaser is not taking or marketing its full share of gas produced from a particular formation in a well ("non-marketing" party), the remaining parties ("marketing" parties) shall have the right, but not the obligation, to produce, take, sell and deliver for such marketing parties' accounts, in addition to the full share of gas to which the marketing parties are otherwise entitled, all or any portion of the gas attributable to a non-marketing party's share of gas produced; provided, however, no marketing party shall be entitled to produce, own and dispose of each month more than two hundred percent (200%) of its share of the gas produced unless it has gas in storage (Gas attributable to a non-marketing party, taken by a marketing party, is referred to in this Agreement as "overproduction"). If there is more than one marketing party taking gas attributable to a non-marketing party, each marketing party shall be entitled to take a non-marketing party's gas in the ratio that such marketing party's interest in production bears to the total interest in production of all marketing parties.

    (b)     A party that has not taken its proportionate share of gas produced from any formation in a well ("Underproduced Party") shall be credited with gas in storage equal to its share of gas produced but not taken, less its share of gas used in lease operations, vented or lost ("underproduction"). Such Underproduced Party, upon giving timely written notice to Operator, shall be entitled, on a monthly basis beginning the month following receipt of notice, to produce, take, sell and deliver. In addition to the full share of gas to which such party is otherwise entitled, a quantity of gas ("make-up gas") equal to fifty percent (50%) of the total share of gas attributable to all parties having cumulative over production (individually called "Overproduced Party"). Such make-up gas shall be credited against such Underproduced Party's accrued underproduction in order of accrual. Notwithstanding the foregoing and subject to subsection (e) below; (i) an Overproduced Party shall never be obligated to reduce its takes to less than fifty percent (50%) of the quantity to which such party is otherwise entitled and (ii) an Underproduced Party shall never be allowed to make up underproduction during the months of December, January, February, and March.

    (c)     If there is more than one Underproduced Party desiring make-up gas, each such Underproduced Party shall be entitled to make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then desiring make-up gas. Any portion of the make-up gas to which an Underproduced Party is entitled and which is not taken by such Underproduced Party may be taken by any other Underproduced Party(ies).

    (d)     If there is more than one Overproduced Party required to furnish make-up gas, each such Overproduced Party shall furnish make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then required to furnish make-up gas. Except as provided in (e) below, each Overproduced Party in any formation in a well shall be entitled, on a monthly basis, to take its full share of gas less its share of the make-up gas then being produced from the particular formation in the well in which it is overproduced.

    (e)     If Operator in good faith believes that an Overproduced Party has recovered one hundred percent (100%) of such Overproduced Party's share of the recoverable reserves from a particular formation in a well, such Overproduced Party, upon being notified in writing of such fact by Operator, shall cease taking gas from such formation in such well and the remaining parties shall be entitled to take one hundred percent (100%) of such production until the accounts of the parties are balanced. Thereafter, such Overproduced Party shall again have the right to take its share of the remaining production, if any, in accordance with the provisions herein contained. Notwithstanding anything to the contrary herein, after an Overproduced Party has recovered one hundred percent (100%) of its full share of the recoverable reserves as so determined by Operator from a particular formation in a well, such Overproduced Party may continue to produce if such continued production is (i) necessary for lease maintenance purposes, or (ii) permitted by a majority of interest of the parties who have not produced one hundred percent (100%) of their recoverable reserves from such formation in such well after written ballot conducted by Operator.

3.     Cash Balancing Upon Interim Imbalances or Upon Deletion

(a)     On January 15th and July 15th of each Calendar Year Underproduced Party may give notice that he desires cash balancing for any Underproduced volumes. This notice and request to cash balance shall constitute an "Interim Accounting".

(b)     If gas production from a particular formation in a well ceases and no attempt is made to restore production (or substitute therefor) within sixty (60) days, Operator shall distribute, within ninety (90) days of the date the well last produced gas from such formation, a statement of net unrecouped underproduction and overproduction and the months and years in which such unrecouped produced accrued ("Final Accounting").

(c)     Within thirty (30) days of receipt of either Final Accounting or an Interim Accounting, each Overproduced Party shall remit to Operator for disbursement to the Underproduced Parties, a sum of money (which sum shall not include interest) equal to the amount actually received or constructively received under subparagraph (e) below, by Overproduced Party for sales during the month(s) of overproduction, calculated in order of accrual but less applicable taxes, royalties and reasonable costs of marketing and transporting such gas actually paid by such Overproduced Party. Such remittance shall be based on number of MMBtu's of overproduction and shall be accompanied by a statement showing volumes and prices for each month with accrued unrecouped overproduction.

(d)     Within thirty (30) days of receipt of any such remittance by Operator from an Overproduced Party, Operator shall disburse such funds to the Underproduced Party(ies) in accordance with the final accounting. Operator assumes no liability with respect to any such payment (unless such payment is attributable to Operator's overproduction), it being the intent of the parties that each Overproduced Party shall be solely responsible for reimbursing each Underproduced Party for such Underproduced Party's respective share of overproduction taken by such Overproduced Party in accordance with the provisions herein contained. If any party fails to pay any sum due under the terms hereof after demand therefor by the Operator, the Operator may turn responsibility for the collection of such sum to the party or parties to whom it is owed, and Operator shall have no further responsibility for collection.

(e)     In determining the amount of overproduction for which settlement is due, production taken during any month by an Underproduced Party in excess of such Underproduced Party's share shall be treated as make-up and shall be applied to reduce prior deficits in the order of accrual of such deficits.

(f)     An Overproduced Party that took gas in kind for its own use, sold gas to an affiliate, or otherwise disposed of gas in other than a cash sale shall pay for such gas at market value at the time it was produced, even if the Overproduced Party sold such gas to an affiliate at a price greater or lesser than market value.

(g)     If refunds are later required by any governmental authority, each party shall be accountable for its respective share of such refunds as finally balanced hereunder.

4.     Deliverability Tests

At the request of any party, Operator may produce the entire well stream for a deliverability test not to exceed seventy-two (72) hours in duration (or such longer period of time as may be mutually agreed upon by the parties) if required under such requesting party's gas sales or transportation contract.

5.     Nominations

Each party shall, on a monthly basis, give Operator sufficient time and data either to nominate such party's respective share of gas to the transporting pipeline(s) or, if Operator is not nominating such party's gas, to inform Operator of the manner in which to dispatch such party's gas. Except as and to the extent caused by Operator's gross negligence or willful misconduct, Operator shall not be responsible for any fees and/or penalties associated with imbalances charged by any pipeline to any Underproduced or Overproduced Party(ies).

6.     Statements

On or before the twenty-fifth (25th) day of the month following the month of production, each party taking gas shall furnish or cause to be furnished to Operator a statement of gas taken expressed in terms of MMBtu's. If actual volume information sufficient to prepare such statement is not made available to the taking party in sufficient time to prepare it, such taking party shall nevertheless furnish a statement of its good faith estimate of volumes taken. Within twenty (20) days of the receipt of all such statements, Operator shall furnish to each party a statement of the gas balance among the parties, including the total quantity of gas produced from each formation in each well, the portion thereof used in operations, vented or lost, and the total quantity delivered for each party's account. Any error or discrepancy in Operator's monthly statement shall be promptly reported to Operator and Operator shall make a proper adjustment thereof within thirty (30) days after final determination of the correct quantities involved; provided, however, that if no errors or discrepancies are reported to Operator within two (2) years from the date of any statement, such statement shall be conclusively deemed to be correct. Additionally, within thirty (30) days from the end of each calendar year, non-operators shall furnish to Operator, for the sole purpose of establishing records sufficient to verify cash balancing values, a statement reflecting amounts actually received or constructively received under paragraph 3(e), on a monthly basis for the calendar year preceding the immediately concluded calendar year. Operator shall not allow a party to produce gas for its account during any month when such party is delinquent in so furnishing the monthly or annual statements.

7.     Payments of Taxes

Each party taking gas shall pay or cause to be paid any and all production, severance, utility, sales, excise, or other taxes due on such gas.

8.     Operating Expenses

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using gas or whether the sales and use of each are in proportion to their respective interests in such gas.

9.      Overproducing Allowable

Each party shall give Operator sufficient time and data to enable Operator to make appropriate nominations, forecasts and/or filings with the regulatory bodies having jurisdiction to establish allowances. Each party shall at all times regulate its takes and deliveries from the Contract Area so that the well(s) covered hereby shall not be curtailed and/or shut-in for overproducing the allowable production assigned thereto by the regulatory body having jurisdiction.

10.     Payment of Leasehold Burdens

At all times while gas is produced from the Contract Area, each party agrees to make appropriate settlement of all royalties, overriding royalties and other payments out of or in lieu of production for which such party is responsible just as if such party were taking or delivering to a purchaser such party's full share, and such party's full share only, of such gas production exclusive of gas used in operations, vented or lost, and each party agrees to indemnify and hold each other party harmless from any and all claims relating thereto.

11.     Application of Agreement

The provisions of this Agreement shall be separately applicable and shall constitute a separate agreement with respect to gas produce form each formation in each well located on the Contract Area.

12.     Term

This Agreement shall terminate when gas production under the Operating Agreement permanently ceases and the accounts of the parties are finally settled in accordance with the provisions herein contained.

13.     Operator's Liability

Except as otherwise provided herein, Operator is authorized to administer the provisions of this Agreement, but shall suffer no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

14.     Audits

Any Underproduced Party shall have the right for a period of two (2) years after receipt of payment pursuant to a final accounting and after giving written notice to all parties, to audit an Overproduced Party's accounts and records relating to such payment. Any Overproduced Party shall have the right for a period of two (2) years after tender of payment for unrecouped volumes and upon giving written notice to all parties, to audit an Underproduced Party's records as to volumes. The party conducting such audit shall bear its costs of the audit. Additionally, Operator shall have the right for a period of two (2) years after receipt of an annual statement from a non-operator under paragraph 6 after giving written notice to the affected non-operator to audit such non-operators accounts and records relating to such payment. Costs of such audit shall be borne by the joint account.

15.     Successors and Assigns

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties and to their respective successors and assigns, and may be assigned in whole or in part from time to time; provided, however, that (a) any such assignments shall be made subject to this Agreement and as among the parties shall not be valid without the express written acceptance of the terms of this Agreement by the Assignee, (b) the Assignee shall acquire such interest subject to any overproduction and/or underproduction imbalances existing at such time as well as any cash balancing obligation created thereby and (c) no such assignments shall relieve the Assignor from any obligation to the other parties with respect to any overproduction taken by Assignor prior to such assignment.

16.     Liquefiable Hydrocarbons Not Covered Under Agreement

The parties shall share proportionately in and own all liquid hydrocarbons recovered with the gas by lease equipment in accordance with their respective interests.

17.     Conflict

If there is a conflict between the terms of this Agreement and the terms of any gas sales contract covering the Contract Area entered into by any party, the terms of this Agreement shall govern.

18.     Arbitration

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award may be entered in any Court having jurisdiction thereof. The arbitrator shall not award punitive damages in settlement of any controversy or claim.

End of Exhibit "E"

# EXHIBIT "F"

**ATTACHED TO AND MADE A PART OF THE OPERATING AGREEMENT DATED MARCH 29, 2001,
BY AND BETWEEN CONCHO RESOURCES INC., AS OPERATOR, AND
MATADOR PETROLEUM CORP., ET AL, AS NON-OPERATORS,
COVERING ACREAGE IN EDDY COUNTY, NEW MEXICO.**

## NONDISCRIMINATION AND CERTIFICATION OF NONSEGREGATED FACILITIES

A.  Equal Opportunity Clause (41 CFR 60-1.4). (Applicable only to contracts or purchase orders for more than $10,000.)

During the performance of this contract, the Operator agrees as follows:

(1) The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or terminations, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) The Operator will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Operator will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Operator's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Operator will include the provisions of paragraph (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of the Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

B.  Certification of Nonsegregated Facilities (41 CFR 60-1.8.) (Applicable only to contracts or purchase orders which are not exempt from the provisions of the Equal Opportunity Clause set out above.)

The Operator certifies that it does not, and will not, maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not, and will not, permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. The Operator agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this contract or purchase order. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom, or otherwise. The Operator further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the

award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors.

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certificate of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

C.  Affirmative Action Compliance Program (41 CFR 60-1.40.) (Applicable only if (a) the Operator has 50 or more employees and (b) the contract or purchase order is for $50,000 or more.)

The Operator shall develop a written affirmative action program for each of its establishments, and within 120 days from the effectiveness of this contract or purchase order, shall maintain a copy of separate programs for each establishment, including evaluations of utilization of minority group personnel and the job classification tables, at each local office responsible for the personnel matters of such establishment.

D.  Employer Information Report (41 CFR 60-1.7.) (Applicable only if (a) the Operator has 50 or more employees, and (b) the Operator is not exempt (pursuant to section 60-1.5 of Title 41 of the Code of Federal Regulations) from the requirement for filing Employer Information Report EEO-1, and (c) the contract or purchase order is for $50,000 or more.)

The Operator agrees to file with the appropriate Federal agency annually, on or before the 31st day of March, complete and accurate reports on Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress or such form as may hereafter be promulgated in its place.

E.  Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250.) (Applicable only to contracts or purchase orders for $10,000 or more.)

The affirmative action clause prescribed in section 60-250.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-250.22 of said Regulations) as if set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then within 120 days from the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment which shall set forth the Operator's policies, practices and procedures in accordance with section 60-250.6 of said Regulations.

F.  Affirmative Action for Handicapped Workers (41 CFR 60-741.4.) (Applicable only to contracts or purchase orders for $2,500 or more.)

The Affirmative Action Clause prescribed in section 60-741.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-741.22 of said Regulations) as if set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then, within 120 days of the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment, which program shall set forth the Operator's policies, practices and procedures in accordance with section 60-741.6 of said Regulations.

G.  Utilization of Minority Business Enterprises (Federal Procurement Regulations 1-1.13.) (Applicable only to contracts or purchase orders which may exceed $10,000.)

(1) It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(2) The Operator agrees to use his best efforts to carry out this policy in the award of his subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, the term "minority business enterprise" means a business, at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are Negroes, Spanish-speaking American persons, American-Orientals, American-Indians, American-Eskimos, and American Aleuts. Contractors may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.

AAPL – FORM 610RS – 1989

**EXHIBIT "G"**
MODEL FORM RECORDING SUPPLEMENT TO           Shugart West "31" Fed Com #1
**OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between _____ **Concho Resources Inc.** _____ ,
hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to
individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in
which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or
rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated _____ **March 29, 2001,**
(herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands,
Leases and Interests for Oil and Gas; and **said Contract Area located in T-18-S, R-31-E, South Half (S/2) of Section 31, Eddy Co., NM.**

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the
rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights
capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by
reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject
to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do
hereby commit such Leases and Interests to the performance thereof.

B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and
provisions of the Operating Agreement, as supplemented by this agreement.

C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne
and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties
hereto, as provided in the Operating Agreement.

D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on
Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the
Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment
of interests covered hereby.

E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the
Contract Area as provided in the Operating Agreement.

F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter
created, assignments of production given as security for the payment of money and those overriding royalties, production
payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests
in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to
suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and
(iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share
of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the
times and manner provided by the Operating Agreement.

G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred
except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.
This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto,
and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with
the leases or interests included within the lease Contract Area.

H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases
proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-
participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or
loss of title, each party's right to propose operations, obligations with respect to participation in operations on the
Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties
regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial
obligations shall be as provided in the Operating Agreement.

J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment
for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated
on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and
transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of
the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and
Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security
interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained
for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating
Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies
paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas
Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under
this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include
such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the
Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject
to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated
thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular
goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead),

- 1 -

AAPL – FORM 610RS - 1989

contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C. To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party or parties stating the amount due as a result of the default, and all parties waive any from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D. If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E. If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F. The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G. To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H. The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

AAPL – FORM 610RS – 1989

8. Other provisions.

Shugart West "31" Fed Com #1

**Concho Resources Inc.,** who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles **as seen throughout the agreement**, have been made to the form.

IN WITNESS WHEREOF, this agreement shall be effective as of the **29th** day of **March** , year: **2001** .

ATTEST OR WITNESS:

OPERATOR
**CONCHO RESOURCES INC.**

By: _____
David W. Copeland
Type or Print Name
Title: **Vice President**
Date: **March 30, 2001**
Address: 110 W. Louisiana, Suite 410,
Midland TX 79701

ATTEST OR WITNESS:

NON-OPERATORS
**MATADOR PETROLEUM CORP.**

By: _____
Type or Print Name
Title: _____
Date: _____
Address: 8340 Meadow Rd., Suite 158, Pecan Creek
Dallas, TX 75231

ATTEST OR WITNESS:

**DEVON SFS OPERATING INC.**

By: _____
Type or Print Name
Title: _____
Date: _____
Address: 20 N. Broadway, Suite 1500, Oklahoma City, OK 73102

ATTEST OR WITNESS:

**LOUIS DREYFUS NATURAL GAS CORP.**

By: _____
Type or Print Name
Title: _____
Date: _____
Address: 14000 Quail Springs Parkway, #600,
Oklahoma City, OK 73134

ATTEST OR WITNESS:

**SKLARCO, L.L.C.**

By: _____
Type or Print Name
Title: _____
Date: _____
Address: 401 Edwards St., Suite 1601, Shreveport, LA 71101

- 3 -

AAPL – FORM 610RS - 1989

Shugart West "31" Fed Com #1

8. Other provisions.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form-Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.~~

~~IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____, year _____.~~

~~ATTEST OR WITNESS:~~ _____  **OPERATOR**

By: _____
**Type or Print Name**
Title: _____
Date: _____
Address: _____

ATTEST OR WITNESS: _____

**NON-OPERATORS (Continued)**
**S & P CO.**

By: _____
**Type or Print Name**
Title: _____
Date: _____
Address:  P. O. Box 3735, Shreveport, Louisiana  71133

ATTEST OR WITNESS: _____

**CANNON EXPLORATION CO.**

By: _____
**Type or Print Name**
Title: _____
Date: _____
Address:  3608 South CR 1184, Midland, Texas  79706

ATTEST OR WITNESS: _____

**ROGER T. ELLIOTT**

By: _____
**Type or Print Name**
Title: _____
Date: _____
Address: 4105 Baybrook, Midland, Texas  79707

ATTEST OR WITNESS: _____

**HOLLYHOCK CORP.**

By: _____
**Type or Print Name**
Title: _____
Date: _____
Address: 4105 Baybrook, Midland, Texas  79707

## ACKNOWLEDGMENTS

STATE OF TEXAS      §
                                §

COUNTY OF MIDLAND    §

       This instrument was acknowledged before me on this 29th day of March, 2001, by David W. Copeland, as Vice President of **Concho Resources Inc.,** a Delaware corporation, and on behalf of said corporation.

       Given under my hand and seal this the 29th day of March, 2001.

_____
Notary Public in and for State of Texas

> TAMMY BAIMBRIDGE
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. 09/23/01

STATE OF TEXAS      §
                                  §

COUNTY OF _____    §

       This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Matador Petroleum Corp.,** a _____ corporation, and on behalf of said corporation.

       Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Texas

My Commission Expires:

_____

STATE OF OKLAHOMA    §
                                   §

COUNTY OF _____    §

       This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Devon SFS Operating Inc.,** a _____ corporation, and on behalf of said corporation.

       Given under my hand and seal this the _____ day of April, 2001.

_____
Notary Public in and for State of Oklahoma

My Commission Expires:

_____

## ACKNOWLEDGMENTS (Continued)

STATE OF OKLAHOMA   §
                       §
COUNTY OF _____  §

     This instrument was acknowledged before me on this _____ day of April, 2001, by _____, as _____ of **Louis Dreyfus Natural Gas Corp.**, a _____ corporation, and on behalf of said corporation.

     Given under my hand and seal this the _____ day of April, 2001.

                    _____
                    Notary Public in and for State of Oklahoma

My Commission Expires:

_____

STATE OF LOUISIANA   §
                     §
PARISH OF CADDO    §

     This instrument was acknowledged before me on this _____ day of April, 2001, by _____, being _____ of **Sklarco Co.**, on behalf of said company.

     Given under my hand and seal this the _____ day of April, 2001.

                    _____
                    Notary Public in and for State of Louisiana

STATE OF LOUISIANA   §
                     §
PARISH OF CADDO    §

     This instrument was acknowledged before me on this _____ day of April, 2001, by August Erickson, being General Manager of **S&P Co.**, a Louisiana Partnership, on behalf of said partnership.

     Given under my hand and seal this the _____ day of April, 2001.

                    _____
                    Notary Public in and for State of Louisiana

ACKNOWLEDGMENTS (Continued)

STATE OF TEXAS                          §
                                        §
COUNTY OF MIDLAND                       §

          This instrument was acknowledged before me on this _____ day of April, 2001,
by **Roger T. Elliott**.

                            _____
                            Notary Public in and for State of Texas

My Commission Expires:

_____

STATE OF TEXAS                          §
                                        §
COUNTY OF MIDLAND                       §

          This instrument was acknowledged before me on this _____ day of April, 2001,
by _____.as _____ of **Cannon
Exploration Co.**, on behalf of said company.

                            _____
                            Notary Public in and for State of Texas

My Commission Expires:

_____

STATE OF TEXAS                          §
                                        §
COUNTY OF MIDLAND                       §

          This instrument was acknowledged before me on this _____ day of April, 2001,
by _____.as _____ of **Hollyhock
Corp.**, a _____ corporation, and on behalf of said corporation.

                            _____
                            Notary Public in and for State of Texas

My Commission Expires:

_____