A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

__October 25__ , __2000__ ,

year

OPERATOR      **Camterra Resources, Inc.**

CONTRACT AREA      S/2 of SW/4 of Section 4; and N/2 of NW/4 of Section 9, T23N-R9W, Webster Parish, Louisiana, being

the Camterra Resources, Inc. – HA RE SUU, Haynesville-Mercantile No. 3.

COUNTY OR PARISH OF   **Webster**                          STATE OF   **Louisiana**

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2           OPERATING AGREEMENT

3     THIS AGREEMENT, entered into by and between ___**Camterra Resources, Inc.**_____

4 _____, hereinafter designated and

5 referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein

6 as "Non-Operator", and collectively as "Non-Operators".

7
8               **WITNESSETH:**

9
10     WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in

11 Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the

12 production of oil and gas to the extent and as hereinafter provided,

13
14     NOW, THEREFORE, it is agreed as follows:

15
16               **ARTICLE I.**

17               **DEFINITIONS**

18
19     As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

20     A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons

21 and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

22     B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land

23 lying within the Contract Area which are owned by the parties to this agreement.

24     C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the

25 Contract Area which are owned by parties to this agreement.

26     D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be

27 developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests

28 are described in Exhibit "A".

29     E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or

30 federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-

31 ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

32     F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

33     G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of

34 any operation conducted under the provisions of this agreement.

35     H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate

36 in a proposed operation.

37
38     Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the

39 singular, and the neuter gender includes the masculine and the feminine.

40
41               **ARTICLE II.**

42               **EXHIBITS**

43
44     The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

45 ☑   A. Exhibit "A", shall include the following information:

46       (1) Identification of lands subject to this agreement,

47       (2) Restrictions, if any, as to depths, formations, or substances,

48       (3) Percentages or fractional interests of parties to this agreement,

49       (4) Oil and gas leases and/or oil and gas interests subject to this agreement,

50       (5) Addresses of parties for notice purposes.

51 ☑   B. Exhibit "B", Form of Lease.

52 ☑   C. Exhibit "C", Accounting Procedure.

53 ☑   D. Exhibit "D", Insurance.

54 ☑   E. Exhibit "E", Gas Balancing Agreement.

55 ☑   F. Exhibit "F", ~~Non-Discrimination and Certification of Non-Segregated Facilities.~~**Memorandum of Operating Agreement.**

56 ☐   ~~G. Exhibit "G", Tax Partnership.~~

57     If any provision of any exhibit, except Exhibits "E" ~~and "G"~~, is inconsistent with any provision contained in the body

58 of this agreement, the provisions in the body of this agreement shall prevail.

59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE III.
INTERESTS OF PARTIES

**A.   Oil and Gas Interests:**

The parties hereto do not own any unleased oil and gas interests in the contract area.

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.   **NO EXHIBIT "B" ATTACHED AS NEITHER OPERATOR NOR NON-OPERATOR OWN UNLEASED INTERESTS.**

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____lessors royalties._____, which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

ARTICLE IV.
TITLES

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

☐   Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV
### continued

1  ☑   Option No. 2:   Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall ~~make no~~ charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7     Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12    No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14 ticipate in the drilling of the well.
15
16 **B.   Loss of Title:**
17
18    1.   Failure of Title:   Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19 reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20 from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21 tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22 and gas leases and interests: and,
23    (a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24 entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25 but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26    (b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27 been lost, but the interests of the parties shall be revised on an acreage basis, as of the time   it is determined finally that title failure has oc-
28 curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29 Area by the amount of the interest lost;
30    (c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31 increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32 terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33 well;
34    (d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35 failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36 who bore the costs which are so refunded;
37    (e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38 borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39    (f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40 claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41 connection therewith.
42
43    2.   Loss by Non-Payment or Erroneous Payment of Amount Due:   If, through mistake or oversight, any rental, shut-in well
44 payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45 there shall be no monetary liability against the party who failed to make payment. Unless the party who failed to make the required
46 payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47 which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48 date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49 the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50 required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51 the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53 or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54    (a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55 up to the amount of unrecovered costs;
56    (b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57 oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58 termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59 portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,
60    (c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner ~~of the interest~~
61 lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62
63    3.   Other Losses:   All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66
67
68
69
70

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.
OPERATOR

A.    Designation and Responsibilities of Operator:

  Camterra Resources, Inc. _____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement.  It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

B.    Resignation or Removal of Operator and Selection of Successor:

       1.  Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.  Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator.  Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date.  Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator.  A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

       2.  Selection of Successor Operator:  Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties.  The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected.  The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.    Employees:

       The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.    Drilling Contracts:

       All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area.  If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

ARTICLE VI.
DRILLING AND DEVELOPMENT

A.    Initial Well:

       On or before the ____1st____ day of _____January_____ , (year) ____2000____ , Operator shall commence the drilling of a well for
oil and gas at the following location:


       300' FSL and 1944' FWL of Section 4, Township 23 North, Range 9 West, Webster Parish, Louisiana


and shall thereafter continue the drilling of the well with due diligence to +/- 10,700', or a depth sufficient to test the Haynesville Sand,
Reservoir E, North Shongaloo Red Rock Field, as defined in Conservation Order No.  104-G-10


unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

       Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.   Subsequent Operations:**

1.   Proposed Operations:   Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing  in paying quantities, the party desiring to drill, rework,^ deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation.  The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to rework,^ plug back or drill deeper may be given by telephone  and the response period shall be limited ^ to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.  Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or response given by telephone shall be promptly confirmed in writing.

[interlineation above line 11: recomplete]
[interlineation above line 14-15: recomplete]
[interlineation above line 15-16: twenty-four (24)]

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the ^ forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

[interlineation above line 22-23: twenty-four (24)]

2.   Operations by Less than All Parties:   If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within within ^ ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the ^ forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

[interlineation above line 36-37: sixty (60)]
[interlineation above line 37-38: of]
[interlineation above line 38-39: twenty-four (24)]

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within ^ forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of ^ forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

[interlineation above line 50-51: twenty-four (24)]
[interlineation above line 54-55: twenty-four (24)]

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.  If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1    and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2    ties. Upon commencement of operations for the drilling, reworking, ^recompleting deepening or plugging back of any such well by Consenting Parties
3    in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4    and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5    Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6    market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7    terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8    until it reverts) shall equal the total of the following:

9

10

11

12    (a)   ^400% 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13    connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% plus 100% of each such
14    Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15    Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16    Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17    Party had it participated in the well from the beginning of the operations; and

18

19

20

21    (b)   ____400____ % of that portion of the costs and expenses of drilling, reworking, ^recompleting deepening, plugging back, testing and completing,
22    after deducting any cash contributions received under Article VIII.C., and ____400____ % of that portion of the cost of newly acquired equip-
23    ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24    participated therein.

25

26

27

28    An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29    working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30    conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31    reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32    and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33    the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34    such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35    plicable as between said Consenting Parties in said well.

36

37

38

39    During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40    proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41    taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42    ticle III.D.

43

44

45

46    In the case of any reworking, ^recompleting plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47    of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48    abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49    ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50

51

52

53    Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54    Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55    itemized statement of the cost of drilling, deepening, plugging, plugging back, testing, completing, and equipping the well for production; or, its
56    at option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57    ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58    operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59    curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60    realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61    produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62    well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63    which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64    of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65    above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66

67

68

69

70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI
continued**

1  If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2  the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3  Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4  therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5  back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6  the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

10  Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11  be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12  well conforms to the then-existing well spacing pattern for such source of supply.

16  The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17  except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18  after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19  duction, ceases to produce in paying quantities.

23  3. <u>Stand-By Time:</u>  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24  completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25  reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26  ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27  first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28  matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29  withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30  each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31  ties.

35  4. <u>Sidetracking:</u>  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36  also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37  location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38  mechanical difficulties.  Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39  affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40  to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

44  (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45  the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

49  (b)—If) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50  salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51  provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

55  In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56  shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57  receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58  incurred during such extended response period.  If more than one party elects to take such additional time to respond to the notice, stand
59  by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60  ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.  In all other in-
61  stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

65  C.  **TAKING PRODUCTION IN KIND:**

67  Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68  exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69  marketing purposes and production unavoidably lost.  Any extra expenditure incurred in the taking in kind or separate disposition by any
70  party of its proportionate share of the production shall be borne by such party.  Any party taking its share of production in kind shall be

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
#### continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.
6
7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8 the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,
9 but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-
10 taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to
11 the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas
12 not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such
13 reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event
14 for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-
15 merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.
16
17 **D.**   **Access to Contract Area and Information:**
18
19      Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
20 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
21 and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
22 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
23 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
24 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
25 quests the Information.
26
27 **E.**   **Abandonment of Wells:**
28
29      1. _Abandonment of Dry Holes:_ Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
30 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
31 without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
32 within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
33 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
34 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
35 such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
36 operations in search of oil and/or gas subject to the provisions of Article VI.B.
37
38      2. _Abandonment of Wells that have Produced:_ Except for any well in which a Non-Consent operation has been conducted
39 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
40 producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
41 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
42 thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
43 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
44 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
45 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
46 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
47 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
48 terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
49 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
50 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
51 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 alternate -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. <u>Abandonment of Non-Consent Operations:</u>  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

**ARTICLE VII.**
**EXPENDITURES AND LIABILITY OF PARTIES**

**A.   Liability of Parties:**

The liability of the parties shall be several, not joint or collective.  Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area.  Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally.  It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

**B.   Liens and Payment Defaults:**

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C".  To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.  Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default.  Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties.  Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

**C.   Payments and Accounting:**

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C".  Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.  Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month.  Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received.  If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid.  Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D.   Limitation of Expenditures:**

1. <u>Drill or Deepen:</u>  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the drilling or deepening shall include:

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

☐  Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and/or surface facilities.

☑  Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well.  When such well has reached its authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs.  The parties receiving such notice shall have~ ~forty-eight~ twenty four (24) ~(48)~ hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-tempt.  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-cluding necessary tankage and/or surface facilities.  Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt.  If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well shall include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. Other Operations:  Without the consent of all parties, Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____Twenty Five Thousand_____ Dollars ($_____25,000.00_____ ) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties.  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of _____Fifteen Thousand_____ Dollars ($_____15,000.00_____ ) but less than the amount first set forth above in this paragraph.

E.  **Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties own and have con-tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-visions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

F.  **Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator.  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-tion.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C".

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-mination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

**ARTICLE VII**
**continued**

1  G.  **Insurance:**
2
3       At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof.  Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10      In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                             **ARTICLE VIII.**
14              **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
15
16  A.  **Surrender of Leases:**
17
18      The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21      However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender.  If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B".  Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article.  The party assignor or lessor shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage.  The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning.  If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  B.  **Renewal or Extension of Leases:**
42
43      If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54      Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57      The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein.  Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63      The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  C.  **Acreage or Cash Contributions:**
66
67      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation.  If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

6     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

9 **D. Maintenance of Uniform Interests:**

11 ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12 ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13 ~~equipment and production unless such disposition covers either:~~

15 ~~1. the entire interest of the party in all leases and equipment and production; or~~

17 ~~2. an equal undivided interest in all leases and equipment and production in the Contract~~ Area.

19     Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties.

22     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

29 **E. Waiver of Rights to Partition:**

31     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.

35 ~~**F. Preferential Right to Purchase:**~~

37 ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40 ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41 ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43 ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

47 ## ARTICLE IX.
48 ### INTERNAL REVENUE CODE ELECTION

50     This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Ten Thousand _____ Dollars ($ _____10,000.00_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

### ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### ARTICLE XII.
### NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party before shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐   Option No. 1: So long as any of the oil and gas leases, subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☑   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____120_____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____90_____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A.  **Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.  **Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located.  If the Contract Area is in two or more states, the law of the state of _____Louisiana_____ shall govern.

C.  **Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith.  Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act.  Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

-See Attached-
PAGES NUMBERED  XV-1  -  XV-9
attached hereto and made a part hereof

- 14 -

ARTICLE XV

OTHER PROVISIONS

A.   Clarification of Administrative Overhead Charges

Notwithstanding anything to the contrary contained in this Operating Agreement ("Agreement") or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same.

Long distance telephone calls, fees for legal services, title costs, costs and expenses in connection with preparation and presentation of evidence and exhibits at State of Louisiana Office of Conservation hearings, preparation and handling of applications to and hearings before other state and federal governmental agencies or regulatory bodies.

B.   Subsequently Created Interests

Notwithstanding the provisions of this Agreement to the contrary, if any party hereto shall create an overriding royalty, production payment, net proceeds or profit interest, reversionary working interest, or other burden payable out of production that was not disclosed in EXHIBIT "A" hereto, then such undisclosed interest or burden is not a joint obligation of the parties thereto, (any such undisclosed interest or burden shall hereafter be referred to as a "Subsequently Created Interest") such Subsequently Created Interest shall be specifically subject to all of the terms and provisions of this Agreement, as follows:

1.   If non-consent operations are conducted pursuant to any provision of this Agreement, and the party conducting such operations becomes entitled to receive the production attributable to the interest out of which the Subsequently Created Interest is derived, such party shall receive same free and clear of such Subsequently Created Interest.  The party creating same shall bear and pay all such Subsequently Created Interests and shall indemnify and hold the other parties hereto free and harmless from any and all liability resulting therefrom.

2.   If the owner of the interest from which a Subsequently Created Interest is derived fails to pay, when due, its share of expenses chargeable hereunder, the lien granted the other parties hereto under the provisions of Article VII.B. or under the appropriate state statutes shall cover and affect the Subsequently Created Interest and the rights of the parties shall be the same, as if the Subsequently Created Interest had not been created.

3.   If the owner of the interest from which a Subsequently Created Interest is derived (i) elects to abandon a well under the provisions of Article VI.E hereof, (ii) elects to surrender a lease (or portion thereof) under the provisions of Article VIII.A hereto, (iii) elects not to pay rentals attributable to its interest in any lease and thereby is required to assign the lease or that portion or interest therein for which it elects not to pay rentals to those parties paying such rental, or (iv) elects not to participate in any Obligatory Operation as defined in Article XV.D, any assignment resulting from such election shall be free and clear of the Subsequently Created Interest.

- XV 1 -

4.  The owner creating such interest shall indemnify and hold
    the other parties hereto harmless from any claim or cause
    of action by the owner of the Subsequently Created
    Interest.

C.  <u>Subdivision of Interests</u>

Until the trustee or agent is appointed as set forth in
Article VIII.D., Lines 22-27, the party who assigned to one or
more co-owners shall be considered for all purposes hereof as
such trustee or agent with all rights and responsibilities
thereof.   The trustee or agent appointed or deemed to be
appointed hereunder shall be liable to Operator for all costs,
expenses and liabilities incurred pursuant to this Agreement
attributable to the interests for which the trustee or agent
is appointed or deemed to be appointed.  Operator shall not be
required to account separately for the separate interests
represented by the trustee or agent.

D.  <u>Obligatory Operations</u>

Notwithstanding the other provisions hereof and particularly
Article VI, if the proposed operation is an Obligatory
Operation, a party not participating in such operation shall
assign to the parties participating in the operation all of
its interest in the leases, or portion thereof, and to the
formations and depths covered thereby, which would be lost or
not earned if such operation is not conducted.    Such
assignment shall be due upon the commencement of operations
for such well and shall be free and clear of any and all (i)
mortgages, liens, or other similar encumbrances placed thereon
by the non-participating party or resulting from the non-
participating party's ownership and operations subsequent to
the date of this Agreement; and (ii) Subsequently Created
Interests, but otherwise without warranty of title, either
express or implied.  A well or other operation commenced
within six (6) months prior to the date the lease or leases
(or portions thereof) would expire in the absence of such
operation, and a well or other operation which must be drilled
or conducted to "earn" or maintain a lease or farmout rights,
shall also constitute an "Obligatory Operation."

E.  <u>Past Due Balance</u>

If a Non-Operator has a past-due balance for ninety (90) days
or longer, and, the lien conferred in Article VII.B has been
enforced by notice from the Operator to the defaulting Non-
Operator, for so long as the affected party remains in
default, it shall have no further access to the Contract Area
or information obtained in connection with operations
hereunder and shall not be entitled to vote on any matter
hereunder.  Unless Operator has been notified in writing by
Non-Operator of a grievance over an alleged "past due balance"
or "default" which is then being negotiated, as to any
proposed operation in which it otherwise would have the right
to participate, such party shall have the right to be a
Consenting Party therein only if it pays the amount it is in
default before the operation is commenced; otherwise, it
automatically shall be deemed a Non-Consenting Party to that
operation.  If the Operator becomes in default under the terms
and conditions of this Agreement, the terms of this Paragraph
shall also apply to said Operator.

F.  <u>Assignment of Interest</u>

All the terms, conditions, and provisions of this Agreement
shall extend to and be binding upon each of the parties hereto
and their respective successors and assigns.  The parties
agree that in the event any party hereto in any way conveys,

- XV 2 -

sells, transfers, assigns, mortgages or pledges all or any part of its interest in the leases comprising the Contract Area hereunder, such assignment shall be made expressly subject to the terms and provisions of this Agreement.

G.  Disbursement of Royalties

If a purchaser of any oil, gas or other hydrocarbons produced from the Contract Area declines to make disbursements of all royalties, and other payments out of, or with respect to, production which are payable on the Contract Area, Operator will upon request by any Non-Operator, arrange to receive all payments for oil, gas, or other hydrocarbons attributable to such Non-Operator's interest directly from said purchaser. In this event, Operator will use its best efforts to make disbursements correctly but will be liable for incorrect disbursements only in the event of gross negligence or willful misconduct. In the event Operator distributes revenues from the production of oil and/or gas from any well drilled hereunder, such payments shall commence no later than ninety (90)days after the date of first production. Thereafter, unless otherwise specifically provided herein, all such payments of revenue received from the sale of production shall be mailed no later than on or before the first day of the second calendar month following the calendar month in which the revenue is received by Operator. Any payments of revenues from production which are due overriding royalty interest owners in the Contract Area shall also be subject to this paragraph and treated the same as payments of revenues from production which are due royalty interest owners.

H.  Standard of Conduct of Operations

The Operator of the Contract Area shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this Agreement. In its performance of services hereunder for the Non-Operators, the Operator shall be an independent contractor. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator vis-a-vis any third party. Operator shall conduct its activities under this Agreement as a reasonably prudent Operator, i.e., in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oil field practice, in compliance with applicable laws and regulations. It shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

I.  ARBITRATION OF DISPUTES.

Upon the occurrence of a dispute relative to any provision of this agreement (including all EXHIBITS attached hereto), whether in contract or in tort, or application of any provision of this Agreement or the applicability of arbitration under the terms and conditions of the Commercial Arbitration Rule of the American Arbitration Association, and the following shall apply:

1.  All hearings shall be before a single Arbitrator.

2.  All hearings before the Arbitrator shall be held in Shreveport, Louisiana.

3.  All motions filed of a judicial nature, in connection with the arbitration shall be filed only in the courts of Webster Parish, Louisiana.

4.  Each party to any arbitration shall bear their own

- XV 3 -

expense in relation thereto, including but not by way of limitation, their attorney's fees, if any, and an equal proportion for the expense of the arbitrator.

5.  No arbitration award may include any punitive, exemplary, consequential or indirect damages.

J.  <u>Commingling of Funds</u>

Funds received by Operator under this Agreement need not be segregated or maintained by it as a separate fund but may be commingled with its own funds.

K.  <u>Marketing of Production</u>

Notwithstanding any term or provision contained herein to the contrary, unless the Operator is otherwise notified in writing by Non-Operator at least one full calendar month prior to the beginning of the calendar month in which Non-Operator is electing to market its share of the oil and/or gas produced from a well or wells subject to this Agreement, the parties hereto agree that Operator shall market Non-Operator's share of any oil and/or gas produced from any well drilled pursuant to the terms of this Agreement. Failure by a Non-Operator to exercise said option prior to Operator marketing Non-Operator's share of any oil and/or gas produced from any well drilled pursuant to this Agreement shall be deemed an election to ratify the action of Operator.

L.  <u>Non-Consent Penalties</u>

(a)  In the event a party hereto elects not to participate in the drilling of the initial test well then such Non-Consenting party shall forfeit and relinquish all of their right, title and interest in and to the initial test well and the leasehold which comprises the Drilling Unit for such well.

(b)  In the event a party to this Agreement elects not to participate in the drilling of a well which is drilled subsequent to the initial test well and pursuant to the terms of this Agreement, the non-consenting party shall not be subject to the non-consent penalties set forth in Article VI. B. of this Agreement, but such non-consenting party shall forfeit and relinquish (a) all of their right, title and interest in and to the wellbore of the well in which such non-consenting party elected not to participate, and (b) all of the oil and/or gas produced from such well bore. The parties to this Agreement which consented to and participated in the drilling of such well shall be offered the right to acquire such non-consenting interest in accordance with the applicable provisions of Article VI. B. Each such non-consenting party shall assign their interest in the wellbore (and the oil and/or gas production which is produced from such wellbore) of the well in which such non-consenting party elected not to participate to those parties to this Agreement which elected to acquire the wellbore rights and interests of the non-consenting party.

M.  <u>For Plug Back or Recompletion Operations</u>

Notwithstanding anything to the contrary contained herein and specifically Article VI. B. and Article XV. D., any party who

participated (both by election and payment of their
proportionate share of costs) in the drilling and logging of a
well to the objective depth (including the initial test well),
shall have the right to participate in the completion attempt
of any zone in such well regardless of whether the party had
heretofore elected to go non-consent in the completion attempt
of another zone. It is further understood and agreed that if
less than all of the parties elect to attempt any such
completion, the provisions of Article VI. B. 2., shall apply
to the operations thereafter conducted by less than all
parties provided, however, that Article VI. B. 2., shall apply
separately to each separate completion or recompletion attempt
undertaken hereunder, and an election to become a Non-
Consenting Party as to one completion or recompletion attempt
shall not prevent a party from becoming a Consenting Party in
subsequent completion or recompletion attempts regardless of
whether the Consenting Parties, as to earlier completions or
recompletions, have recouped their costs pursuant to Article
VI. B. 2; provided further, that any recoupment of costs by a
Consenting Party shall be made solely from the production
attributable to the zone in which the completion attempt is
made. In addition, the parties hereto also understand and
agree that if a proposed completion attempt sets forth more
than one set of perforations within the same formation from
which the oil and/or gas production will be commingled and
produced jointly, then the party hereto must either elect to
consent to participate in the entire completion attempt as
proposed, or elect not to consent to such completion proposal,
in which case the Non-Consenting Party hereto shall be subject
to the applicable non-consent penalty described herein.
Election by a previous Non-Consenting Party to participate in
a subsequent completion or recompletion attempt shall require
such party to pay (unless such party has previously paid its
proportionate share) its proportionate share of the appraised
fair market value of the materials and equipment previously
installed in and/or used in connection with the well without
regard to the cost of salvaging same, plus the actual cost of
any connecting pipeline, as well as the appraised fair market
value of any equipment related to the operations of such
pipeline, insofar and only insofar as such materials and
equipment benefit the zone in which such party participates in
a completion attempt.

N.   Proposed Operations Regarding Producing Wells

Notwithstanding any provisions to the contrary in Article
VI.B. or elsewhere in this Agreement, should any party hereto
desire to rework, deepen, sidetrack, plug back, add additional
perforations, and/or recomplete, a well jointly owned by all
the parties which is then producing or capable of producing in
paying quantities, the party desiring to rework, deepen,
sidetrack, plug back, add addition perforations, and/or
recomplete such a well shall give notice of the proposed
operation in the manner specified in Article VI. B. 1., and
the parties receiving such notice shall notify the party
wishing to do the work whether or not they elect to
participate in the cost of the proposed operation. If all
parties elect to participate in such proposed operation,
Operator shall commence the proposed operation in accordance
with the provisions of Article VI. B. 1. If any party
receiving notice of such proposed operation elects not to
participate in the cost of the proposed operation, but parties
owning at least seventy-five percent (75%) interest in said
well elect to participate in the cost of the proposed
operation, the party or parties giving notice and such other
parties who elect to participate in the operation may proceed
with such operations in the manner and subject to the terms
and provisions of Article VI. B. 2.

Notwithstanding the foregoing, Operator shall re-notify any

- XV 5 -

such Non-Consenting Parties that Operator has received
sufficient elections to proceed with the proposed operation.
Such Non-Consenting Parties shall have an additional twenty-
four (24) hours from receipt of such notice in which to elect
whether or not to participate in the proposed operation or be
subject to the applicable non-consent provisions. In
addition, such Consenting Parties shall have no liability to
such Non-Consenting Parties for any losses related to leaving
such zone or interval which was producing, or capable of
producing in paying quantities. Furthermore, the Non-
Consenting Parties shall not have to bear any expenses related
to returning to a zone or interval which was producing or
capable of producing in paying quantities when the well was
recompleted to a different interval or zone without their
consent; no party shall be required to participate in a
proposed operation to return to a zone or interval which was
producing or capable of producing in paying quantities when
the well was recompleted to a different interval or zone
without the consent or all parties. Those parties which elect
to participate in a proposed operation to return to a zone or
interval which was producing or capable of producing in paying
quantities when the well was recompleted to a different
interval or zone without the consent of all parties shall
carry their proportionate share of the cost attributable to
the Non-Consenting Party or Parties.

O.   Taxes

Article VII.F. or anything else herein to the contrary
notwithstanding, Operator shall pay or cause to be paid all
taxes, either State or Federal, owing or which may be payable
on production from the Contract Area whether in the form of a
severance or production tax, provided, however, if at any time
any party is taking its share of production in kind, such
party shall pay or cause to be paid said taxes as to such
production.

P.   Multiple Well Proposals

No party to this Agreement shall propose the drilling of more
than one well at a time nor shall any party to this Agreement
propose the drilling of a well during the time that drilling
or completion operations are being conducted on another well
except: (1) by the mutual consent of all parties hereto; and
(2) if one or more of said proposed wells are required wells
or required operations as defined in Article XV.D.

In addition, no party to this Agreement shall propose the
drilling of a well during the first sixty (60) days following
the date that the Initial Well is connected to a sales line or
is plugged and abandoned as a dry hole.

Q.   Priority of Operations

(1) At that point in time when (a) the Initial Well achieves
Contract Depth, or (b) any other well achieves its initial
objective depth pursuant to Article VI.B.1., in the event the
parties hereto fail to mutually agree as to the conduct of
operations hereunder, the following elections shall control in
the order hereafter enumerated: (i) conduct logging, coring,
testing, wireline formation testing or evaluation operations
as normally conducted by a prudent operator provided; however,
no party hereto shall be entitled to conduct any additional
logging or testing without indemnifying and holding harmless
the other parties hereto, including Operator, for any and all
claims, demands, losses or damages resulting from such
additional logging or testing; (ii) complete the well in the
zone or interval in which the majority of the working interest
elects to complete; (iii) deepen the well down to a deeper
productive horizon with priority given in descending order;

- XV 6 -

(iv) sidetrack to another bottom hole location; and (v) plug and abandon the well.

(2) After the initial completion attempt on a well drilled hereunder, in the event of subsequent conflicting recompletion or reworking proposals, the proposal receiving the vote of a majority of the working interest shall prevail.

R.   **Information to Non-Operators**

Upon receipt of the written request of a Non-Operator, the Operator shall furnish the Non-Operator with copies of any contracts for the sale or disposition of production from the Contract Area, division order relating thereto, all information relating to the payment of royalties or other payments out of such production and delay rentals, shut-in payments, copies of all reports filed with any State and Federal regulatory agency relating to the Contract Area, and copies of all tests and analyses on or relating to any well including particularly, but not by way of limitation, production tests and bottom hole pressure tests.  Non-Operator shall have complete access to any well at all times during and after drilling with the right to witness all tests conducted. The Operator will furnish all other information as is reasonably requested by a Non-Operator.  Operator will request and offer the Non-Operators the opportunity to ratify Operator's contract for the sale or disposition of oil and gas production from wells located on the Contract Area.

S.   **Typed vs. Printed Portion**

In the event of a conflict between the typewritten portions and printed portions of this Operating Agreement, the typewritten portions shall prevail.

T.   **Headings**

The headings of the several articles and sections of this Agreement are for convenience only, and shall not control or affect the meaning or construction of the terms and provisions hereto.

U.   **Counterpart Execution**

If counterparts of this Agreement are executed, the signatures and acknowledgments of the parties, as affixed thereto, may be combined by Operator in and treated and given effect for all purposes as a single instrument.  This Agreement also may be ratified by separate instruments referring hereto, each of which shall have the effect of the original Agreement and of adopting by reference all of the provisions herein contained.

V.   **Cost of Tubular Goods**

Notwithstanding anything in section IV.2.A. of the COPAS (Exhibit "C" hereof), Operator, at its sole option, will have the right to purchase tubular goods for the joint account at competitive rates, and Operator shall charge the joint account its actual purchase cost without regard as to whether or not such actual cost is higher or lower than the competitive rates for which such casing could have been purchased on the date which such casing was moved on location.

W.   **Camterra Resources, Inc. as Operator**

The parties hereto understand and acknowledge that Camterra Resources, Inc. is the Managing General Partner of Camterra Resources Partners, Ltd., a Texas Limited Partnership. Although Camterra Resources, Inc. only owns interest in the Contract Area by virtue of its ownership interest in Camterra

- XV 7 -

Resources Partners, Ltd., all parties hereto do hereby agree to consider and deem Camterra Resources, Inc. as an interest owner in the Contract Area for purpose of Article V.B.1. hereof so long as Camterra Resources Partners, Ltd. owns an interest in the Contract Area.

X.   <u>Liabilities</u>

Operator shall use its best efforts to comply with all rules and governmental regulations but, notwithstanding any rule or regulation making the Operator responsible for compliance with said rules and regulations, the liability therefore shall be borne by the parties hereto in proportion to their interests including, without limitation, any repayments required by any such governmental agency.  In the event Operator (1) agrees in writing to hold division orders and to disburse proceeds from oil or gas sales including the payment of royalty interests and/or (2) accepts, holds, disburses or otherwise handles any funds on behalf of Non-Operators then each Non-Operator, as to its interest, indemnifies Operator without limitation in connection therewith provided that there is an absence of fraud, intentional misrepresentation, gross negligence or acts of willful misconduct by Operator.

Y.   <u>Federal and State Reporting</u>

Operator hereby agrees to use its best efforts to comply with the rules and regulations of all State or Federal agencies, boards, commissions or other regulatory authorities ("Regulatory Authorities") having jurisdiction of the Contract Area.  To this end, it will file all documentation, reports, affidavits and exhibits required to be filed by the Operator with any such Federal or State regulatory authority, including, but not limited to the Federal Energy Regulatory Commission as required by the Natural Gas Policy Act of 1978, as amended.  The Operator shall not be liable in damages to Non-Operators for its failure to timely or properly file any such instruments where such failure is the result of mere nonfeasance or misfeasance or the result of an incorrect or improper interpretation of the statutes, rules and regulations of any regulatory authority.  As consideration for its undertaking the acts set forth above, Operator shall be compensated for its costs in doing such acts.

Non-Operators hereby covenant and agree that, to the best of their ability, they shall timely provide the Operator with all documentation, affidavits, reports or other materials and information in their possession, or to which they are entitled, which the Operator must have in order to perform those tasks and make the necessary reports to the regulatory authorities.

AA.   <u>Environmental Provisions</u>

Operator will obtain all notices, permits, licenses or similar authorizations, if any, required under any and all applicable laws, statutes, ordinances, rules, regulations, orders, directives or determinations of any governmental entity pertaining to the environment including, without limitation, the Clean Air Act, as amended, the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), as amended, the Clean Water Act, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the toxic Substances Control Act, as amended, the Hazardous Materials Transportation Act, as amended, any state or local laws pertaining to the handling of solid wastes or the use, maintenance, and closure of pits and impoundments, and other environmental conservation or protection laws.

- XV 8 -

Operator will arrange for the transportation and disposal of all hazardous substances and solid wastes generated by, in connection with or as a result of the oil and gas operations within the Contract Area in accordance with any and all applicable federal, state and local laws, statutes, ordinances, rules, regulations, orders, directives or determinations of any governmental entity pertaining to the Environment including, without limitation, the Clean Air Act, as amended, CERCLA, RCRA, the Safe Drinking Water Act, the Toxic Substances Act, and the Hazardous Materials Transportation Act.

Operator will conduct its activities in the Contract Area in a manner that minimizes adverse impacts to the land, air and water, to cultural, biological, visual and other resources and to other land uses or users.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of the _25th_ day of _October_ , _2000_ .

OPERATOR

ATTEST:

Camterra Resources, Inc.

_____

By: _Paul Marchand_
Paul Marchand, President

NON-OPERATORS

WITNESSES:

Camterra Resources Partners, Ltd.
A Texas Limited Partnership
By Camterra Resources, Inc.
It's Managing General Partner

_____

_____

By: _Paul Marchand_
Paul Marchand, President

Stroud Petroleum, Inc.

_____

By: _____
Scott D. Stroud

_____

_____
Quinton B. Carlile

_____

_____
Steve B. Carlile

_____

_____
Kenneth Q. Carlile

Discus Oil Corporation

_____

By: _____
Wayne T. Davis, President

_____

_____
Wayne T. Davis

_____

_____
John J. Doles, Jr.

_____

_____
F. Wayne McWhorter

_____

_____
George Fitts

**EXHIBIT "A"**

Attached to and made a part of the certain Operating Agreement dated as of the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., et al, as Non-Operators.

I.
DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT:

S ½ of SW ¼ of Section 4; and N ½ of NW ¼ of Section 9, Township 23 North, Range 9 West, Webster Parish, Louisiana.

II.
RESTRICTIONS AS TO DEPTHS, FORMATIONS OR SUBSTANCES:

NONE

III.

OIL AND GAS LEASES CONTRIBUTED TO THIS AGREEMENT BY THE FOLLOWING PARTIES IN THE PERCENTAGES AS SET OUT BESIDE THE NAME OF EACH PARTY:

1. Oil, Gas and Mineral Lease dated April 23, 1998, by and between Ozelle S. Powell, et al, as Lessors, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 683 under Registry No. 425344; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 335 under Registry No. 435781 of the Conveyance Records of Webster Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated October 23, 1998, by and between William Clinton Scott, et ux Vernaughn Simpson Scott, as Lessors, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 688 under Registry No. 425345; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 331 under Registry No. 435779 of the Conveyance Records of Webster Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated October 23, 1998, by and between S.M. Richardson, III, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 678 under Registry No. 425343; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 625 under Registry No. 435959 of the Conveyance Records of Webster Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Sandra Richardson Walsh, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 693 under Registry No. 425346; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 333 under Registry No. 435780 of the Conveyance Records of Webster Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Don S. Coleman, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 666 under Registry No. 425339; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 345 under Registry No. 435786 of the Conveyance Records of Webster Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Mary Sue Coleman Bailey, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 675 under Registry No. 425341; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 339 under Registry No. 435783 of the Conveyance Records of Webster Parish, Louisiana.

1

7.  Oil, Gas and Mineral Lease dated October 23, 1998, by and between Hilda Gay Coleman Booker, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 672 under Registry No. 425341; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 906, Page 244 under Registry No. 436262 of the Conveyance Records of Webster Parish, Louisiana.

8.  Oil, Gas and Mineral Lease dated October 23, 1998, by and between Jerald Glenn Fox, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 888, Page 466 under Registry No. 427356; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 627 under Registry No. 435960 of the Conveyance Records of Webster Parish, Louisiana.

9.  Oil, Gas and Mineral Lease dated October 23, 1998, by and between Marian L. Coleman, et vir James S. Coleman, as Lessors, and Clark Energy Company, Inc., as Lessee, recorded Book 884, Page 669 under Registry No. 425340; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 337 under Registry No. 435782 of the Conveyance Records of Webster Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated October 23, 1998, by and between James Lee Fox, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded Book 888, Page 469 under Registry No. 427357; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 343 under Registry No. 435785 of the Conveyance Records of Webster Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Jacklyn Sue Fox Abney, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 888, Page 472 under Registry No. 427358; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 341 under Registry No. 435784 of the Conveyance Records of Webster Parish, Louisiana.

| WORKING INTEREST OWNER | LEASEHOLD OWNERSHIP | UNIT OWNERSHIP |
|---|---|---|
| Quinton B. Carlile (1)<br>P.O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)    Fax: (903-935-0521) | .10000000 | .05000000 |
| Steve B. Carlile    (1)<br>P.O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)    Fax: (903-935-0521) | .04000000 | .02000000 |
| Kenneth Q. Carlile (1)<br>P.O. Box 2069<br>Marshall, TX 75671<br>(903-938-9950)    Fax: (903-935-0521) | .10000000 | .05000000 |
| George Fitts  (1)<br>P. O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)    Fax: (903-935-0521) | .01000000 | .00500000 |
| F. Wayne McWhorter (1)<br>P. O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)    Fax: (903-935-0521) | .01000000 | .00500000 |
| Camterra Resources Partners, Ltd. (1)<br>P. O. Box 2069<br>Marshall, TX 75671<br>(903-938-9950)    Fax: (903-935-0521) | .12957040 | .06478520 |
| Discus Oil Corporation<br>P. O. Box 368<br>Plain Dealing, LA 71064<br>Attention: Wayne T. Davis<br>(318-424-6640)    Fax: (318-326-4255) | .07000000 | .03500000 |

| WORKING INTEREST OWNER | LEASEHOLD OWNERSHIP | UNIT OWNERSHIP |
|---|---|---|
| Turner Exploration Inc.<br>P.O. Box 368<br>Plain Dealing, LA 71064<br>Attention: Bert Turner<br>(318-424-6640)    Fax: (318-326-4255) | .05000000 | .02500000 |
| Smith Operating and Management Company<br>P.O. Box 52<br>Shreveport, LA 71161-0052<br>Attention: Harry L. Avant<br>(318-222-3119)    Fax: (318-222-0566) | .02343750 | .01171875 |
| RNK Energy, Inc.<br>86 Arrowhead Trail<br>New Canaan, CT 06840<br>Attention: Richard A. Derbes<br>(203-972-399)    Fax: (212-703-4924) | .02343750 | .01171875 |
| Clark Energy Company, Inc.<br>509 Market Street, Suite 600<br>Shreveport, LA 71166-1841<br>Attention: Jeffrey F. Clark<br>(318-424-813)    Fax: (318-221-1432) | .02667960 | .01333980 |
| Buck's Boys, L.P.<br>416 Travis Street, Suite 1105<br>Shreveport, LA 71101-5504<br>Attention: James E. Clark<br>(318-221-1605)    Fax: (318-221-1749) | .02000000 | .01000000 |
| Heritage Energy Company<br>500 Market Street, Suite 602<br>Shreveport, LA 71101<br>Attention: John Kinnebrew<br>(318-222-1545)    Fax: (318-222-1432) | .06687500 | .03343750 |
| North American Reserve Corp.<br>422 S. Broadway<br>Tyler, TX 75702<br>Attention: Brent Bossart<br>(903-592-2290)    Fax: (903-592-5747) | .33000000 | .16500000 |
| Totals | 1.0000000 | .50000000 |

(1)  Subject to that one certain Farmout Agreement dated January 1, 1995 by and between Heritage Energy Company and the Carlile Group copies of which are in the respective files of the parties.

## OIL AND GAS LEASES CONTRIBUTED TO THIS AGREEMENT BY THE FOLLOWING PARTIES IN THE PERCENTAGES AS SET OUT BESIDE THE NAME OF EACH PARTY:

12.   Oil, Gas and Mineral Lease dated August 16, 1963, by and between Shelby J. Beene, et al, as Lessors, and Sklar Producing Co., Inc., as Lessee, recorded under Registry No. 187312 of the Conveyance Records of Webster Parish, Louisiana.

13.   Oil, Gas and Mineral Lease dated August 16, 1963, by and between Bernard M. Watters, as Lessor, and Sklar Producing Co., Inc., as Lessee, recorded under Registry No. 187325 of the Conveyance Records of Webster Parish, Louisiana.

14.   Co-Lessor's Agreement dated August 20, 1963, by and between Rosalind B. McKenzie, as Co-Lessor of Agreement recorded under Registry No. 187313 of the Conveyance Records of Webster Parish, Louisiana.

15.   Co-Lessor's Agreement dated October 10, 1963, by and between Elsie M. Watters, as Co-Lessor of Agreement recorded under Registry No. 188150 of the Conveyance Records of Webster Parish, Louisiana.

16.   Co-Lessor's Agreement dated August 23, 1963, by and between Louise W. Hawes, as Co-Lessor of Agreement recorded under Registry No. 190130 of the Conveyance Records of Webster Parish, Louisiana.

17.   Co-Lessor's Agreement dated August 23, 1963, by and between Exa W. Heath, as Co-Lessor of Agreement recorded under Registry No. 187326 of the Conveyance Records of Webster Parish, Louisiana.

18.   Co-Lessor's Agreement dated August 23, 1963, by and between Barbara Ann Watters and Percy M. Watters, as Co-Lessors of Agreement recorded under Registry No. 187916 of the Conveyance Records of Webster Parish, Louisiana.

| WORKING INTEREST OWNER | LEASEHOLD OWNERSHIP | UNIT OWNERSHIP |
|---|---|---|
| Camterra Resources Partners, Ltd.<br>P.O. Box 2069<br>Marshall, TX 75671<br>Attention: Paul Marchand<br>(903-938-9949)    Fax: (903-935-0521) | .54395419 | .27197710 (2) (3) |
| Huffman Investments, L.P.<br>P.O. Box 39<br>Atlanta, TX 75551<br>(903-796-6350)    Fax: (903-796-2472) | .02000000 | .01000000 (2) (3) |
| Steve Copeland<br>524 Trailridge Circle<br>Hallsville, TX 75650<br>(903-668-4427)    Fax: (903-935-0521) | .02000000 | .01000000 (2) (3) |
| Camterra Resources Partners, Ltd.<br>P. O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)    Fax: (903-935-0521) | .06000000 | .03000000 (2) (3) |
| Stroud Petroleum, Inc.<br>P.O. Box 3735<br>Shreveport, LA 71133-3735<br>Attention: Scott D. Stroud<br>(318-222-1800)    Fax: (318-424-1257) | .01000000 | .00500000 |
| SKLARCO, INC.<br>P.O. Box 1753<br>Shreveport, LA 71166<br>(318-???????)    Fax: (318-???????) | .34604581 | .17302290 |
| Totals | 1.0000000 | .50000000 |

(2)   Subject to that one certain Term Farmout Agreement dated March 29, 2000 by and between S & P Co. and Heritage Energy Company, Ratification of Term Farmout Agreement done and signed the 28th day of September, 2000 by August Erickson and Heritage Energy Company and Ratification of Term Farmout Agreement done and signed the 31st day of October, 2000 by W. Harlan Beene and Heritage Energy Company copies of which Agreement and Ratifications are in the files of the respective parties.

(3)   The Oil, Gas and Mineral Leases and Co-Lessor's Agreements, numbered 12 – 18 described above, apply only to the extent they cover the Haynesville Formation defined in Louisiana Office of Conversation Order No. 104-G-10 effective July 23, 1991, less and except the Talley Sand of the Cotton Valley Formation, said sand being identified as that sand lying between 8980 feet and 9010 feet on the Schlumberger Induction Electric Log of Sklar & Phillips Oil Co. – Haynesville-Mercantile #1 located in the NE ¼ of NW ¼ of Section 9, Township 23 North, Range 9 West, Webster Parish, Louisiana.

-End of Exhibit-

4

**EXHIBIT "B"**

Attached to and made a part of that certain Operating Agreement dated as of the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., as Non-Operator.


**THERE IS NO EXHIBIT "B" TO THIS OPERATING AGREEMENT**

-End of Exhibit-

COPAS - 1984 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT  " C "

Attached to and made a part of ___ that certain Operating Agreement dated October 25,2000, by and between Camterra Resources, Inc., as Operator and Camterra Resources Partners, Ltd., et al, as Non-Operator.

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1.    Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.    Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.    Advances and Payments by Non-Operators**

A.    Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.    Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at The Chase Manhattan Bank on the first day of the month in which delinquency occurs plus 2% ~~1%~~ or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.    Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.  No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

5.   **Audits**

   A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

   B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   **Approval By Non-Operators**

   Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   **Ecological and Environmental**

   Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.   **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

3.   **Labor**

   A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations **at the current area contract rate.**

      (2)   Salaries of First level Supervisors in the field **at current area consultant rate.**

      (3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates **at current area consultant rate.**

      (4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

   B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

   D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.   **Employee Benefits**

   Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS

5.   **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.   ~~Transportation~~

~~Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:~~

~~A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

~~B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

~~C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7.   **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.   **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _eight_____ percent (_____8_____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property ~~less 20%.   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.~~

9.   **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.   **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.~~

11.   **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

**12. Insurance**

Net premiums paid for insurance ~~required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.~~

**13. Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14. Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.   In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead – Drilling and Producing Operations**

i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or
(     ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.   The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.   The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(     ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

iii.   The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(     ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

A.   Overhead - Fixed Rate Basis

(1)   Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $_____6000.00_____
    (Prorated for less than a full month)

Producing Well Rate $___600.00_____

(2)   Application of Overhead - Fixed Rate Basis shall be as follows:

(a)   Drilling Well Rate

(1)   Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

COPAS · 1984 · ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead — Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead — Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $_____:

A.    ___3___ % of first $100,000 or total cost if less, plus

B.    ___2___ % of costs in excess of $100,000 but less than $1,000,000, plus

C.    ___1___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

**3.    Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.    ___3___ % of total costs through $100,000; plus

B.    ___2___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.    ___1___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**4.    Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

**IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1.    Purchases shall be at Operator's cost.**

~~Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.~~

**2.    Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

    (1)    Tubular Goods Other than Line Pipe **shall be priced at Operator's cost.**

~~(a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

~~(b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

pound Oil Field Haulers Association interstate truck rate shall be used.

~~(c)   Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.~~

~~(d)   Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.~~

(2)   Line Pipe **shall be priced at cost.**

~~(a)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

~~(b)   Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

~~(c)   Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.~~

~~(d)   Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.~~

(3)   Other Material shall be priced at ^ **Cost** ~~the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~

(4)   Unused new Material, ^ **Shall be priced at Operator's cost.** ~~except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).~~

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

At ~~seventy-five percent (75%)~~ of current ^ **market value** ~~new price, as determined by Paragraph A.~~

(2)   Material used on and moved from the Joint Property

(a)   At ~~seventy-five percent (75%)~~ of current ^ **market value** ~~new price, as determined by a reliable supply store, if Material was originally charged to the Joint Account as new Material or~~

(b)   At ~~sixty-five percent (65%)~~ of current ^ **market value** ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material~~

(3)   Material not used on and moved from the Joint Property

At ~~seventy-five percent (75%) of~~ current ^ **market value** ~~new price as determined by Paragraph A.~~

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1)   Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at ^ **current market value** ~~fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.~~

(2)  Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)  Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.  Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)  Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)  Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.  Pricing Conditions

(1)  Loading or unloading costs may be charged to the Joint Account at the rate of ^ twenty-five cents (25¢) ~~per hundred weight~~ on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

*(superscript above: cost)*

(2)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.  **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material.  Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.  **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.  In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.  **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.  **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of  a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

**EXHIBIT "D"**

Attached to and made a part of that certain Operating Agreement dated effective as of the 25th day of
October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources
Partners, Ltd., et al, as Non-Operators.

## INSURANCE

During the period of the joint operations hereunder and continuing thereafter during the entire term
of this contract, Operator shall carry for the joint account the following types and amounts of
coverage:

(a)     Worker's Compensation and Employer's Liability Insurance which will comply with the laws
        of the state in which operations are conducted.

(b)     Comprehensive Automobile Liability Insurance with a combined bodily injury and/or
        property damage limit of not less than $1,000,000 for any one accident.

(c)     Comprehensive General Liability Insurance with bodily injury and/or property damage limits
        of not less than $1,000,000 for any one occurrence.

(d)     Excess or Umbrella Liability Insurance with an annual aggregate limit of not less than
        $2,000,000 in excess of the underlying limits.

Operator shall not be obligated to provide for any other insurance on behalf of the joint account.
Any Party may, at its own expense, acquire such other insurance as its deems proper to protect itself
against any claims, losses, damages, or destruction arising out of operations in the Contract Area.

All losses arising out of the uninsured risks shall be charged to the parties according to their interest
under this contract. Certificates of insurance naming each Non-Operator as an additional insured
evidencing thirty (30) days advance notice of cancellation shall be furnished to Non-Operators by
Operator upon request, provided that the Non-Operator requesting such certificates has accepted the
coverage provided by Operator.

Operator reserves the sole right to select insurance carriers and to select and purchase from such
carriers the types and kinds of coverage available under the above described policy forms, subject to
whatever exclusions Operator agrees to be included in such policy forms. The failure of any of the
above described policies to cover any loss that may occur, or the insolvency of any insurance carriers
selected by the Operator, shall not be deemed as negligence or lack of due diligence upon the part of
the Operator. Non-Operator shall have the right to inspect such policies at the office of the Operator.

-End of Exhibit-

**EXHIBIT "E "**

**GAS BALANCING AGREEMENT**

Attached to and made a part of that certain Operating Agreement effective this the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., et al, as Non-Operators.

1.      Ownership of Gas Production

        (a) It is the intent of the parties that each party shall have the right, but not the obligation, to take in kind and separately dispose of its proportionate share of gas (including casinghead gas) produced from each formation in each well located on acreage ("Contract Area") covered by the Operating Agreement to which this Exhibit is attached ("Operating Agreement").

        (b) Notwithstanding anything herein to the contrary, unless a Non-Operator notifies Operator in writing not less than thirty (30) days prior to the beginning of a production month that the Non-Operator (1) will take or market its full share of gas produced from a particular formation in a well; or (2) will not take or market any gas sold for its account during a given production month, then Non-Operator shall be deemed to have requested of Operator, and Operator hereby agrees that Operator shall have the right, but not the obligation to produce, take or sell the Non-Operators's full share of gas produced from a particular formation in a well on the best terms and conditions available to Operator.

        (c) Operator shall control the gas production and be responsible for administering the provisions of this Agreement and shall make reasonable efforts to deliver or cause to be delivered gas to the parties' gas purchasers as may be required in order to balance the accounts of the parties in accordance with the provisions herein contained. For purposes of this Agreement, Operator shall maintain production accounts of the parties based upon the number of MMBtu's actually contained in the gas produced from a particular formation in a well and delivered at the outlet of lease equipment for each party's account regardless of whether sales of such gas are made on a wet or dry basis. All references in this Agreement to quantity or volume shall refer to the number of MMBtu's contained in the gas stream. Toward this end, Operator shall periodically determine or cause to be determined the Btu content of gas produced from each formation in each well on a consistent basis and under standard conditions pursuant to any method customarily used in the industry.

2.      Balancing of Production Accounts

        (a) Any time a party, or such party's purchaser, is not taking or marketing its full share of gas produced from a particular formation in a well ("non-marketing" party), the remaining parties ("marketing" parties) shall have the right, but not the obligation, to produce, take, sell and deliver for such marketing parties' accounts, in addition to the full share of gas to which the marketing parties are otherwise entitled, all or any portion of the gas attributable to a non-marketing party. (Gas attributable to a non-marketing party, taken by a marketing party, is referred to in this Agreement as "overproduction"). If there is more than one marketing party taking as attributable to a non-marketing party, each marketing party taking gas attributable to a non-marketing party shall be entitled to take a non-marketing party's gas in the ratio that such marketing party's interest in production bears to the total interest in production of all marketing parties.

        (b) A party that has not taken its proportionate share of gas produced from any formation in a well ("Underproduced Party") shall be credited with gas in storage equal to its share of gas produced but not taken, less its share of gas used in lease operations, vented or lost ("underproduction"). Such Underproduced Party, upon giving timely written notice to Operator, shall be entitled, on a monthly basis beginning the month following receipt of notice, to produce, take, sell and deliver, in addition to the full share of gas to which such party is otherwise entitled, a quantity of gas ("make-up gas") equal to fifty percent (50%) of the total share of gas attributable to all parties having cumulative overproduction (individually called "Overproduced Party"). Such make-up gas shall be credited against such Underproduced Party's accrued underproduction in order of accrual. Notwithstanding the foregoing and subject to subsection (e) below: (I) an Overproduced Party shall never to obligated to reduce its takes to less than fifty percent (50%) of the quantity to which such party is otherwise entitled and (ii) an Underproduced Party shall never be allowed to make up underproduction during the months of December, January, February and March without the prior written consent of the Overproduced Party.

        (c) If there is more than one Underproduced Party desiring make-up gas, each such Underproduced Party shall be entitled to make-up gas in the ratio that such party's interest in gas production bears to the total interest in gas production of all parties then desiring make-up gas. Any portion of the make-up gas to which an Underproduced Party is entitled and which is not taken by such Underproduced Party may be taken by any other Underproduced Party(ies).

        (d) If there is more than one Overproduced Party required to furnish make-up gas, each such Overproduced Party shall furnish make-up gas in the ratio that such Overproduced Party's interest in gas production bears to the total interest in gas production of all parties then required to furnish make-up gas. Each Overproduced Party in any formation in a well shall be entitled, on a monthly basis, to take its full share

1

of gas less its share of the make-up gas then being produced from the particular formation in the well in which it is overproduced.

(e) If Operator in good faith believes that an Overproduced Party has recovered one hundred percent (100%) of such Overproduced Party's share of the recoverable reserves from a particular formation in a well, such Overproduced Party, upon being notified in writing of such fact by Operator, shall cease taking gas from such formation in such well and the remaining parties shall be entitled to take one hundred percent (100%) of such production until the accounts of the parties are balanced.  Thereafter, such Overproduced Party shall again have the right to take its share of the remaining production, if any, in accordance with the provisions herein contained.  Notwithstanding anything to the contrary herein, after an Overproduced Party has recovered one hundred percent (100%) of its full share of the recoverable reserves as so determined by Operator from a particular formation in a well, such Overproduced Party may continue to produce if such continued production is (I) necessary for lease maintenance purposes or (ii) is deemed necessary by the Operator to limit or prevent formation damage or drainage or (iii) permitted by a majority of interest of the parties who have not produced one hundred percent (100%) of their recoverable reserves from such formation in such well after written ballot conducted by the Operator.

3.      Cash Balancing Upon Depletion

(a) If gas production from a particular formation in a well ceases and no attempt is made to restore production (or substitute therefor) within ninety (90) days, Operator shall distribute, within one hundred twenty (120) days of the date the well last produced gas from such formation, a statement of net unrecouped underproduction and overproduction and the months and years in which such unrecouped production accrued ("final accounting").

(b) Within thirty (30) days of receipt of such final accounting, each Overproduced Party shall remit to the Underproduced Parties, a sum of money (which sum shall not include interest) equal to the net price received or (constructively received under subparagraph (d) below), by Overproduced Party for sales during the month(s) of overproduction, calculated in order of accrual but less applicable taxes, royalties and reasonable costs of marketing and transporting such gas actually paid by such Overproduced Party.  Such remittance shall be based on number of MMBtu's of overproduction and shall be accompanied by a statement showing volumes and the net price received( or the index price if constructively received under subparagraph (d) below) for each month with accrued unrecouped overproduction.

(c) In determining the amount of overproduction for which settlement is due, production taken during any month by an Underproduced Party in excess of such Underproduced Party's share shall be treated as make-up and shall be applied to reduce prior deficits in the order of accrual of such deficits.

(d) An Overproduced Party that took gas in kind for its own use, sold gas to an affiliate, or otherwise disposed of gas in other than cash sale shall pay for such gas at the Index Price (as defined in paragraph 19 hereof)  at the time it was produced. even if the Overproduced Party sold such gas to an affiliate at a price greater or lesser than market value.

(e) If deemed necessary by the Operator, all parties shall be required to provide to the Operator evidence of royalty, overriding royalty, tax and other burden payments and a reconciliation of same.

(f) If refunds are later required by any governmental authority, each party shall be accountable for its respective share of such refunds as finally balanced hereunder.

4.      Deliverability Tests

At the request of any party, Operator may produced the entire well stream for a deliverability test not to exceed seventy-two (72) hours in duration (or such longer period of time as may be mutually agreed upon by the parties) if required under such requesting party's gas sales or transportation contract.

5.      Nominations

Each party shall, on a monthly basis, give Operator sufficient time and data either to nominate such party's respective share of gas to the transporting pipeline(s) or, if Operator is not nominating such party's gas, to inform Operator of the manner in which to dispatch such party's gas.  Except as and to the extent caused by Operator's gross negligence or willful misconduct.  Operator shall not be reasonable for any fees and/or penalties associated with imbalances charged by any pipeline to any Underproduced or Overproduced Party(ies), provided, however Operator agrees that in a timely manner it will keep all of the parties hereto informed of any over/under deliveries which could cause imbalance penalties so owner can take any necessary remedial action(s).

6.      Statements

On or before the twenty-fifth (25th) day of the month following the month of production, each party taking gas shall furnish or cause to be furnished to Operator a statement of gas taken expressed in terms of MMBtu's.  If actual volume information sufficient to prepare such statement is not made available to the taking

2

party in sufficient time to prepare it, such taking party shall nevertheless furnish a statement of its good faith estimate of volumes taken. Within twenty (20) days of the receipt of all such statement, Operator shall furnish to each party a statement of the gas balance among the parties, including the total quantity of gas produced from each formation in each well, the portion thereof used in operations, vented or lost, and the total quantity delivered for each party's account. Any error or discrepancy in Operator's monthly statement shall be promptly reported to Operator and Operator shall make a proper adjustment thereof within thirty (30) days after final determination of the correct quantities involved; provided, however, that if no errors or discrepancies are reported to Operator within two (2) years from the date of any statement, such statement shall be conclusively deemed to be correct. Additionally, within sixty (60) days from the end of each calendar year, Non-Operators shall furnish to Operator, for the sole purpose of establishing records sufficient to verify cash balancing values, a statement reflecting amounts actually received or constructively received under paragraph 3(e), on a monthly basis for the calendar year preceding the immediately concluded calendar year. Operator shall not allow a party to produce gas for its account during any month when such party is delinquent in so furnishing the monthly or annual statements.

7.    Payment of Taxes

Each party taking gas shall pay or cause to be paid any and all production, severance, utility, sales, excise, or other taxes due on such gas.

8.    Operating Expenses

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using gas or whether the sales and use of each are in proportion to their respective interests in such gas.

9.    Overproducing Allowable

Each party shall give Operator sufficient time and data to enable Operator to make appropriate nominations, forecasts and/or filing with the regulatory bodies having jurisdiction to establish allowable. Each party shall at all times regulate its takes and deliveries from the Contract Area so that the well(s) covered hereby shall not be curtailed and/or shut-in for overproducing the allowable production assigned thereto by the regulatory body having jurisdiction.

10.    Payment of Leasehold Burdens

Unless otherwise provided for in the subject Agreement to which this Agreement is attached as an Exhibit, at all times while gas is produced from the Contract Area, each party taking gas agrees to make appropriate settlement of all royalties, overriding royalties and other payments out of or in lieu of production for which such party is responsible just as if such party were taking or delivering to a purchaser such party's full share, and such party's full share only, of such gas production exclusive of gas used in operations, vented or lost, and each party agrees to indemnify and hold each other party harmless from and all claims relating thereto.

11.    Application of Agreement

The provisions of this Agreement shall be separately applicable and shall constitute a separate agreement with respect to gas produced from each formation in each well located on the Contract Area.

12.    Term

This Agreement shall terminate when gas production under the Operating Agreement permanently ceases and the accounts of the parties are finally settled in accordance with the provisions herein contained.

13.    Operator's Liability

Except as otherwise provided herein, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

14.    Audits

Any Underproduced Party shall have the right for a period of two (2) years after receipt of payment pursuant to a final accounting and after giving written notice to all parties, to audit an Overproduced Party's accounts and records relating to such payment. Any Overproduced Party shall have the right for a period of two (2) years after tender of payment for unrecouped volumes and upon giving written notice to all parties, to audit an Underproduced Party's records as to volumes. The party conducting such audit shall bear its costs of the audit. Additionally, Operator shall have the right for a period to two (2) years after receipt of an annual statement from a Non-Operator under paragraph 6 after giving written notice to the affected Non-Operator, to

3

audit such Non-Operator's accounts and records relating to such payment. Costs of such audit shall be borne by the joint account.

## 15.   Successors and Assigns

The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties and to their respective successors and assigns, and may be assigned in whole or in part from time to time; provided, however, that (a) any such assignment shall be made subject to this Agreement and as among the parties shall not be valid without the express written acceptance of the terms of this Agreement by the Assignee, (b) the Assignee shall acquire such interest subject to any overproduction and/or underproduction imbalances existing at such time as well as any cash balancing obligation created thereby and (c) no such assignment shall relieve the Assignor from any obligation to the other parties with respect to any overproduction taken by Assignor prior to such assignment.

## 16.   Liquefiable Hydrocarbons Not Covered Under Agreement

The parties shall share proportionately in and own all liquid hydrocarbons recovered with the gas by lease equipment in accordance with their respective interests.

## 17.   Conflict

If there is a conflict between the terms of this Agreement and the terms of any gas sales contract covering the Contract Area entered into by any party, the terms of this Agreement shall govern.

## 18.   Assignment of Interest

In the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in the lease or unit to which this Gas Balancing Agreement applies, such Overproduced Party shall notify in writing the other working interest owners who are parties hereto not less than forty-five (45) days prior to closing the transaction. The notice provided by the Overproduced Party shall set forth the most recent gas imbalance on the property being assigned. Any Underproduced Party may demand in writing within twenty (20) days after receipt of the Overproduced Party's notice: (I) a cash settlement attributed to such overproduction in the lease(s) or unit(s), or (ii) natural gas of like grade, quantity and quality from another mutually agreeable source. Upon receiving such demand, the Overproduced Party shall have sixty (60) days to effect cash settlement or agree with the Underproduced Party upon an alternate source of make-up gas. Any Underproduced Party electing to cash settle with the Overproduced Party shall thereby indemnify and hold the Overproduced Party harmless against any such causes of action, claims, losses or other actions which may be claimed by any third party.

The Operator shall be notified of any such demand and of any cash settlement or agreement between the parties hereto to make-up gas in kind pursuant to this section and the gas balance accounts of the parties shall be adjusted accordingly. Any cash settlement pursuant to this section shall be on the same basis as otherwise set forth in the sections entitled and hereunder.

The provisions of this section shall not be applicable in the event an Overproduced Party has disposed of its interest by transfer of its assets, in whole or in part, to a subsidiary or parent company in which such parent or subsidiary owns a majority interest in such Overproduced Party.

## 19.   Index Price

The Index Price shall mean the calculated price paid for gas at the point title thereto passes, and shall be determined by using the quoted index price per MMBTU as published in the first issue of the month of production of <u>Inside FERC's Gas Market Report</u> in the table entitled "Prices of Spot Gas Delivered to Pipelines" (or as may be retitled) under a mutually agreed upon heading determined by the appropriate pipeline connection less tariff transportation, gathering (if any), dehydration, compression and other treating and post-production costs back to the point of title transfer. If such Gas Market Report (as may be retitled) ceases to be published then the index will be subject to negotiation in order to obtain a mutually acceptable substitute report title to gas shall pass at their first point at which gas passes into the main pipeline system.

-End of Exhibit-

4

**EXHIBIT "F"**

Attached to and made a part of that certain Operating Agreement effective this the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., et al, as Non-Operators.

<u>MEMORANDUM OF OPERATING AGREEMENT/RECORDING SUPPLEMENT</u>

| | | |
|---|---|---|
| STATE OF LOUISIANA | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| PARISH OF WEBSTER | § | |

THAT, CAMTERRA RESOURCES, INC., a Texas Corporation and the Managing General Partner of Camterra Resources Partners, Ltd., whose address is P.O. Box 2069, Marshall, Texas 75671-2069, hereinafter referred to as "Operator", has entered into an Operating Agreement with the following undersigned parties, hereinafter referred to as "Non-Operators".

By reason of that certain Operating Agreement dated and effective as of the 25th day of October, 2000, by and between Operator and Non-Operators, Operator and Non-Operators have agreed to joint exploration, development and production of oil, gas and other hydrocarbons underlying the following described lands, to wit:

All those certain lands or tracts lying within the geographic boundaries of HA RE SUU CAMTRERRA RESOURCES, INC. HAYNESVILLE-MERCANTILE No.3 well insofar and only insofar as to the S ½ of SW ¼ of Section 4 and N ½ of NW ¼ of Section 9, Township 23 North, Range 9 West, Webster Parish, Louisiana.

The Operating Agreement provides that every sale, encumbrance, transfer or other disposition made by any party to the Operating Agreement shall be made expressly subject to the Operating Agreement and shall be made without prejudice to the right of other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest covered by the Operating Agreement shall be deemed a party to the Operating Agreement as to the interest conveyed from and after the effective date of the transfer of ownership, provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until they have received a recorded copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee.

Non-Operator has granted Operator a first lien and security interest upon their oil and gas in the above described lands, and the Operator has granted Non-Operator a like first lien security interest as set forth in the Operating Agreement, to wit:

ARTICLE VII

B.    Liens and Security Interests:

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and

1

equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of oil and/or gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder.  Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party.  All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owned against the proceeds from the sale of such defaulting party's share of Oil and Gas.  All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed.  In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other party shall be entitled to utilize the provisions of oil and gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder.  Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may

2

invoke or utilize the mechanic's or materialmen's law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

This Memorandum of Operating Agreement shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code in which the Contract Area is located, and as such may be filed for record in the real estate records of the county or parish in which the Contract Area is located.

The Operating Agreement will continue in force, by its own terms, so long as any of the oil and gas leases subject to the Operating Agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, unless sooner terminated.

This Memorandum of Operating Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes. Counterparts may be combined to form a single instrument of recording purposes. Should one or more of the parties not execute this Memorandum of Operating Agreement, it shall nevertheless be effective and binding on the parties who do execute or ratify it.

IN WITNESS WHEREOF, this Memorandum of Operating Agreement shall be effective as of the 25th day of October, 2000.

WITNESSES:                          OPERATOR:

                                    CAMTERRA RESOURCES, INC.

_____

_____         By: _____
                                    Name: Paul Marchand
                                    Its:    President


                                    NON-OPERATORS:


                                    CAMTERRA RESOURCES PARTNERS, LTD.,
                                    A Texas Limited Partnership
                                    By: Camterra Resources, Inc.
                                    Its: Managing General Partner


_____

_____         By: _____
                                    Name: Paul Marchand
                                    Its:    President

                                    Discus Oil Corporation


_____

_____         By: _____
                                    Name:  Wayne T. Davis
                                    Its:    President

3

Turner Exploration Inc.

_____

_____

By: _____
Name: Bert Turner
Its:     President

Smith Operating and Management Company

By: _____
Name: Harry L. Avant
Its:     President

_____

_____

Clark Energy Company

_____

_____

By: _____
Name: Jeffery F. Clark
Its:     President

Buck's Boys, L. P.

_____

_____

By: _____
Name: James E. Clark
Its:     Trustee

RNK Energy, Inc.

_____

_____

By: _____
Name: Richard A. Derbes
Its:     President

Heritage Energy Company

_____

_____

By: _____
Name: John Kinnebrew
Its:     President

North American Reserve Corp.

_____

_____

By: _____
Name: Brent Bossart
Its:     President

4

Stroud Petroleum, Inc.

_____      By: _____
                             Name: Scott D. Stroud
_____      Its:    President

                             SKLARCO, INC.

_____      By: _____
                             Name:
_____      Its:

                             Huffman Investments, L.P.

_____      By: _____
                             Name: Kelly Huffman
_____      Its:    General Partner

_____

_____      _____

_____      Quinton B. Carlile

_____      _____

_____      Steve B. Carlile

_____      _____

_____      Kenneth Q. Carlile

_____      _____

_____      Wayne T. Davis

_____      _____

_____      John J. Doles, Jr.

_____      _____

_____      F. Wayne McWhorter

_____      _____

_____      George Fitts

_____      _____

                             Steve Copeland

STATE OF TEXAS

COUNTY OF HARRISON

     This instrument was acknowledged before me on the _____ day of _____, 2000, by PAUL MARCHAND, President of CAMTERRA RESOURCES PARTNERS, LTD. Texas Limited Partnership, on behalf of said partnership.

 

                                       _____
                                       Notary Public, in and for the State of Texas
                                       My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

     This instrument was acknowledged before me on the _____ day of _____, 2000, by PAUL MARCHAND, President of CAMTERRA RESOURCES, INC., a Texas Corporation, on behalf of said corporation.

 

                                       _____
                                       Notary Public, in and for the State of Texas
                                       My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

     On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Wayne T. Davis, to me personally known, who by me being duly sworn, did say, that he is the President of Discus Oil Corporation and that the above and foregoing instrument was signed on behalf of said Discus Oil Company by the authority of its Board of Directors, and the said Wayne T. Davis acknowledged said instrument to be the free act and deed of said Corporation.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

 

                                         _____
                                       Notary Public, in and for the State of Louisiana
                                       My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

     On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Bert Turner, to me personally known, who by me being duly sworn, did say, that he is the President of Turner Exploration Inc. and that the above and foregoing instrument was signed on behalf of said Turner Exploration Inc. by the authority of its Board of Directors, and the said Bert Turner acknowledged said instrument to be the free act and deed of said Corporation.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

 

                                         _____

Notary Public, in and for the State of Louisiana
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

       On this _____ day of_____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Harry L. Avant, to me personally known, who by me being duly sworn, did say, that he is the President of Smith Operating and Management Company and that the above and foregoing instrument was signed on behalf of said Smith Operating and Management Company by the authority of its Board of Directors, and the said Harry L. Avant acknowledged said instrument to be the free act and deed of said Company.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                 _____
                                   Notary Public, in and for the State of Louisiana
                                   My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

       On this _____ day of_____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Jeffrey F. Clark, to me personally known, who by me being duly sworn, did say, that he is the President of Clark Energy Company, Inc. and that the above and foregoing instrument was signed on behalf of said Clark Energy Company, Inc. by the authority of its Board of Directors, and the said Jeffrey F. Clark acknowledged said instrument to be the free act and deed of said Corporation.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                   _____
                                   Notary Public, in and for the State of Louisiana
                                   My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

       On this _____ day of_____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared James E. Clark, to me personally known, who by me being duly sworn, did say, that he is the Trustee of Buck's Boys, L.P. and that the above and foregoing instrument was signed on behalf of said Buck's Boys, L.P. by the authority of its Board of Directors, and the said James E. Clark acknowledged said instrument to be the free act and deed of said Limited Partnership.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                   _____
                                   Notary Public, in and for the State of Louisiana
                                   My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared John Kinnebrew, to me personally known, who by me being duly sworn, did say, that he is the President of Heritage Energy Company. and that the above and foregoing instrument was signed on behalf of said Heritage Company, Inc. by the authority of its Board of Directors, and the said John Kinnebrew acknowledged said instrument to be the free act and deed of said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Louisiana
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Richard A. Derbes, to me personally known, who by me being duly sworn, did say, that he is the President of RNK Energy, Inc. and that the above and foregoing instrument was signed on behalf of said RNK Energy, Inc. by the authority of its Board of Directors, and the said Richard A. Derbes acknowledged said instrument to be the free act and deed of said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of _____
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF SMITH

On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Brent Bossart, to me personally known, who by me being duly sworn, did say, that he is the President of North American Reserve Corp. and that the above and foregoing instrument was signed on behalf of said North American Reserve Corp. by the authority of its Board of Directors, and the said Brent Bossart acknowledged said instrument to be the free act and deed of said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Wayne T. Davis, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Louisiana
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Steve Copeland, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared F. Wayne McWhorter, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON


On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared George Fitts, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON


On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Quinton B. Carlile, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON


On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Steve B. Carlile, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Kenneth Q. Carlile, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Scott D. Stroud, to me personally known, who by me being duly sworn, did say, that he is the President of Stroud Petroleum, Inc. and that the above and foregoing instrument was signed on behalf of said Stroud Petroleum, Inc. by the authority of its Board of Directors, and the said Scott D. Stroud acknowledged said instrument to be the free act and deed of said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Louisiana
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Kelly Huffman, to me personally known, who by me being duly sworn, did say, that he is the General Partner of Huffman Investments, L.P. and that the above and foregoing instrument was signed on behalf of said Huffman Investments L.P. by the authority of its Board of Directors, and the said Kelly Huffman acknowledged said instrument to be the free act and deed of said Limited Partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

11

STATE OF LOUISIANA

PARISH OF _____

      On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared _____, to me personally known, who by me being duly sworn, did say, that he is the _____ of SKLARCO, INC. and that the above and foregoing instrument was signed on behalf of said SKLARCO, INC. by the authority of its Board of Directors, and the said _____ acknowledged said instrument to be the free act and deed of said Company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                           _____
                           Notary Public, in and for the State of Louisiana
                           My Commission Expires: _____

-End of Exhibit-

12

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

__October 25__ , __2000__ ,
*year*

OPERATOR        **Camterra Resources, Inc.**

CONTRACT AREA      S/2 of SW/4 of Section 4; and N/2 of NW/4 of Section 9, T23N-R9W, Webster Parish, Louisiana, being

the Camterra Resources, Inc. – HA RE SUU, Haynesville-Mercantile No. 3.

COUNTY OR PARISH OF   **Webster**                    STATE OF      **Louisiana**

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM.   A.A.P.L. NO. 610 – 1982 REVISED

*JOA  10-25-00*
*Haynesville Merc #3*

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___ **Camterra Resources, Inc.** ___

_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
  (1) Identification of lands subject to this agreement,
  (2) Restrictions, if any, as to depths, formations, or substances,
  (3) Percentages or fractional interests of parties to this agreement,
  (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
  (5) Addresses of parties for notice purposes.
☑ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☑ E. Exhibit "E", Gas Balancing Agreement.
☑ F. Exhibit "F", ~~Non-Discrimination and Certification of Non-Segregated Facilities.~~**Memorandum of Operating Agreement.**
☐ ~~G. Exhibit "G", Tax Partnership.~~

If any provision of any exhibit, except Exhibits "E" ~~and~~ "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
### INTERESTS OF PARTIES

**A.   Oil and Gas Interests:**

The parties hereto do not own any unleased oil and gas interests in the contract area.

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to hold the royalty interest reserved in such lease and the interest of the lessee thereunder.  **NO EXHIBIT "B" ATTACHED AS NEITHER OPERATOR NOR NON-OPERATOR OWN UNLEASED INTERESTS.**

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ lessors royalties. ~~, which shall be borne as hereinafter set forth.~~

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
### TITLES

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ- ed, in the drilling unit around such well.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases.  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.  Copies of all title opinions shall be furnished to each party hereto.  The cost incurred by Operator in this title program shall be borne as follows:

☐   Option No. 1:   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

☑   Option No. 2:   Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

B.   **Loss of Title:**

1.   Failure of Title:   Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests: and,

(a)   The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b)   There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;

(c)   If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;

(d)   Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e)   Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,

(f)   No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in connection therewith.

2.   Loss by Non-Payment or Erroneous Payment of Amount Due:   If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a)   Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;

(b)   Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,

(c)   Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3.   Other Losses:   All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.

OPERATOR

A.  Designation and Responsibilities of Operator:

_Camterra Resources, Inc._____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

B.  Resignation or Removal of Operator and Selection of Successor:

1.  Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

2.  Selection of Successor Operator:  Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.  Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

A.  Initial Well:

On or before the ____1st____day of _____January_____ , (year) ___2000___ , Operator shall commence the drilling of a well for
oil and gas at the following location:


300' FSL and 1944' FWL of Section 4, Township 23 North, Range 9 West, Webster Parish, Louisiana


and shall thereafter continue the drilling of the well with due diligence to +/- 10,700', or a depth sufficient to test the Haynesville Sand,
Reservoir E, North Shongaloo Red Rock Field, as defined in Conservation Order No. 104-G-10


unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

**B.  Subsequent Operations:**

1.  <u>Proposed Operations:</u>  Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework,^recomplete deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma- tion and the estimated cost of the operation.  The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drill- ing rig is on location, notice of a proposal to rework,^recomplete plug back or drill deeper may be given by telephone  and the response period shall be limited ^twenty-four (24) to-forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.  Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the ^twenty four (24) hour period when a drilling rig is on loca- tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par- ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex- amination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor- dance with the provisions hereof as if no prior proposal had been made.

2.  <u>Operations by Less than All Parties:</u>  If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within-within ^sixty (60) ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the ^twenty four (24) forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera- tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.  Con- senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con- ditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within ^twenty four (24) forty-eight (48) hours (exclusive-of-Saturday, Sunday-and-legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par- ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of ^twenty four (24) forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense.  If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro- ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, recompleting ^ deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) ~~400%~~ 400% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), ~~plus 100%~~ plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(b) ____400____ % of that portion of the costs and expenses of drilling, reworking, recompleting ^ deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and ____400____ % of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any reworking or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

In the case of any reworking, recompleting ^ plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, ~~plugging~~ plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
continued

1     If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2 the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3 Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4 therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5 back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6 the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

10     Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11 be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12 well conforms to the then-existing well spacing pattern for such source of supply.

16     The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17 except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18 after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19 duction, ceases to produce in paying quantities.

23     3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24 completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25 reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26 ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27 first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28 matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29 withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30 each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31 ties.

35     4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36 also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37 location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38 mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39 affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40 to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

44     (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45 the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

49     (b)~~If~~ If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50 salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51 provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

55     In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56 shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57 receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58 incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand
59 by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60 ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61 stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

65 C.   **TAKING PRODUCTION IN KIND:**

67     Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68 exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69 marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70 party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI
continued

1   required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3        Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4   the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5   its share of all production.
6
7        In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8   the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,
9   but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-
10  taking party at the best price obtainable in the area for such production.  Any such purchase or sale by Operator shall be subject always to
11  the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas
12  not previously delivered to a purchaser.  Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such
13  reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event
14  for a period in excess of one (1) year.  Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-
15  merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.
16
17  D.   Access to Contract Area and Information:
18
19       Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
20  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
21  and records relating thereto.  Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
22  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
23  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of
24  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
25  quests the Information.
26
27  E.   Abandonment of Wells:
28
29       1.  Abandonment of Dry Holes:  Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
30  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
31  without the consent of all parties.  Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
32  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
33  such well, such party shall be deemed to have consented to the proposed abandonment.  All such wells shall be plugged and abandoned in
34  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
35  such well.  Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
36  operations in search of oil and/or gas subject to the provisions of Article VI.B.
37
38       2.  Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
39  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
40  producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall
41  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  If, within
42  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
43  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
44  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
45  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall assign
46  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
47  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
48  terval or intervals of the formation or formations then open to production.  If the interest of the abandoning party is or includes an oil and
49  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
50  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
51  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

- 8 alternate -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2   assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3   Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4   interests in the remaining portion of the Contract Area.
5
6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7   the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8   quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9   templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10   well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11   repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12   visions hereof.
13
14      3. <u>Abandonment of Non-Consent Operations:</u> The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15   Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16   permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17   of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18   VI.E.
19
20                                      **ARTICLE VII.**
21                    **EXPENDITURES AND LIABILITY OF PARTIES**
22
23   **A.   Liability of Parties:**
24
25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26   shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27   among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28   shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30   **B.   Liens and Payment Defaults:**
31
32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33   of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34   at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35   state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36   taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37   rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38   of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39   the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40   purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41   and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44   Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45   the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46   reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.
47
48   **C.   Payments and Accounting:**
49
50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51   and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52   tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53   showing expenses incurred and charges and credits made and received.
54
55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56   of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57   month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58   with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59   on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60   fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61   due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62   pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
63
64   **D.   Limitation of Expenditures:**
65
66      1. <u>Drill or Deepen:</u> Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67   pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:
68
69
70

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

1 ☐   Option No. 1:   All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.
3
4 ☑   Option No. 2:   All necessary expenditures for the drilling or deepening and testing of the well.   When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs.   The parties receiving such notice shall have ^twenty four^ forty-eight
7 (48) (24) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt.   Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities.   Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt.   If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.
14
15      2. Rework or Plug Back:   Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement.   Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20      3. Other Operations:   Without the consent of  all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____Twenty Five Thousand_____ Dollars ($_____25,000.00_____ )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties.   If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of _____Fifteen Thousand_____
28 Dollars ($_____15,000.00_____ ) but less than the amount first set forth above in this paragraph.
29
30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:
31
32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense.   In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties.   Any party may request, and shall be entitled to receive, proper evidence of all such payments.   In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2.
39
40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so.   In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F.   Taxes:
47
48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent.   Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator.   If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion.   If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest.   Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination.   During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty.   When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

G.  **Insurance:**

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A.  **Surrender of Leases:**

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B.  **Renewal or Extension of Leases:**

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C.  **Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1  said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2  governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3  it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4  tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7  consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

9  **D.  Maintenance of Uniform Interests:**

11     ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12  ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13  ~~equipment and production unless such disposition covers either:~~

15  ~~1.   the entire interest of the party in all leases and equipment and production; or~~

17  ~~2.   an equal undivided interest in all leases and equipment and production in the Contract~~ Area.

19     Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties.

22     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25  party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26  into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27  Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

29  **E.  Waiver of Rights to Partition:**

31     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33  interest therein.

35  ~~F.   Preferential Right to Purchase:~~

37     ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40  ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41  ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43  ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44  ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45  ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

47  ## ARTICLE IX.
48  ### INTERNAL REVENUE CODE ELECTION

50     This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of ~~1986~~, as per-
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63  Subtitle "A", of the Internal Revenue Code of ~~1986~~, under which an election similar to that provided by Section 761 of the Code is per-
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66  computation of partnership taxable income.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ Ten Thousand _____ Dollars ($ _____10,000.00_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

### ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### ARTICLE XII.
### NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases, subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____120_____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____90_____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A.   **Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, or-dinances, rules, regulations, and orders.

B.   **Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Louisiana_____ shall govern.

C.   **Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offset-ting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or ap-plication was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
### OTHER PROVISIONS

-See Attached-
**PAGES NUMBERED XV-1 - XV-9**
**attached hereto and made a part hereof**

ARTICLE XV

OTHER PROVISIONS

A.   Clarification of Administrative Overhead Charges

Notwithstanding anything to the contrary contained in this Operating Agreement ("Agreement") or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same.

Long distance telephone calls, fees for legal services, title costs, costs and expenses in connection with preparation and presentation of evidence and exhibits at State of Louisiana Office of Conservation hearings, preparation and handling of applications to and hearings before other state and federal governmental agencies or regulatory bodies.

B.   Subsequently Created Interests

Notwithstanding the provisions of this Agreement to the contrary, if any party hereto shall create an overriding royalty, production payment, net proceeds or profit interest, reversionary working interest, or other burden payable out of production that was not disclosed in EXHIBIT "A" hereto, then such undisclosed interest or burden is not a joint obligation of the parties thereto, (any such undisclosed interest or burden shall hereafter be referred to as a "Subsequently Created Interest") such Subsequently Created Interest shall be specifically subject to all of the terms and provisions of this Agreement, as follows:

1.   If non-consent operations are conducted pursuant to any provision of this Agreement, and the party conducting such operations becomes entitled to receive the production attributable to the interest out of which the Subsequently Created Interest is derived, such party shall receive same free and clear of such Subsequently Created Interest.  The party creating same shall bear and pay all such Subsequently Created Interests and shall indemnify and hold the other parties hereto free and harmless from any and all liability resulting therefrom.

2.   If the owner of the interest from which a Subsequently Created Interest is derived fails to pay, when due, its share of expenses chargeable hereunder, the lien granted the other parties hereto under the provisions of Article VII.B. or under the appropriate state statutes shall cover and affect the Subsequently Created Interest and the rights of the parties shall be the same, as if the Subsequently Created Interest had not been created.

3.   If the owner of the interest from which a Subsequently Created Interest is derived (i) elects to abandon a well under the provisions of Article VI.E hereof, (ii) elects to surrender a lease (or portion thereof) under the provisions of Article VIII.A hereto, (iii) elects not to pay rentals attributable to its interest in any lease and thereby is required to assign the lease or that portion or interest therein for which it elects not to pay rentals to those parties paying such rental, or (iv) elects not to participate in any Obligatory Operation as defined in Article XV.D, any assignment resulting from such election shall be free and clear of the Subsequently Created Interest.

- XV 1 -

4.   The owner creating such interest shall indemnify and hold
the other parties hereto harmless from any claim or cause
of action by the owner of the Subsequently Created
Interest.

C.   <u>Subdivision of Interests</u>

Until the trustee or agent is appointed as set forth in
Article VIII.D., Lines 22-27, the party who assigned to one or
more co-owners shall be considered for all purposes hereof as
such trustee or agent with all rights and responsibilities
thereof.   The trustee or agent appointed or deemed to be
appointed hereunder shall be liable to Operator for all costs,
expenses and liabilities incurred pursuant to this Agreement
attributable to the interests for which the trustee or agent
is appointed or deemed to be appointed.   Operator shall not be
required to account separately for the separate interests
represented by the trustee or agent.

D.   <u>Obligatory Operations</u>

Notwithstanding the other provisions hereof and particularly
Article VI, if the proposed operation is an Obligatory
Operation, a party not participating in such operation shall
assign to the parties participating in the operation all of
its interest in the leases, or portion thereof, and to the
formations and depths covered thereby, which would be lost or
not earned if such operation is not conducted.   Such
assignment shall be due upon the commencement of operations
for such well and shall be free and clear of any and all (i)
mortgages, liens, or other similar encumbrances placed thereon
by the non-participating party or resulting from the non-
participating party's ownership and operations subsequent to
the date of this Agreement; and (ii) Subsequently Created
Interests, but otherwise without warranty of title, either
express or implied.   A well or other operation commenced
within six (6) months prior to the date the lease or leases
(or portions thereof) would expire in the absence of such
operation, and a well or other operation which must be drilled
or conducted to "earn" or maintain a lease or farmout rights,
shall also constitute an "Obligatory Operation."

E.   <u>Past Due Balance</u>

If a Non-Operator has a past-due balance for ninety (90) days
or longer, and, the lien conferred in Article VII.B has been
enforced by notice from the Operator to the defaulting Non-
Operator, for so long as the affected party remains in
default, it shall have no further access to the Contract Area
or information obtained in connection with operations
hereunder and shall not be entitled to vote on any matter
hereunder.   Unless Operator has been notified in writing by
Non-Operator of a grievance over an alleged "past due balance"
or "default" which is then being negotiated, as to any
proposed operation in which it otherwise would have the right
to participate, such party shall have the right to be a
Consenting Party therein only if it pays the amount it is in
default before the operation is commenced; otherwise, it
automatically shall be deemed a Non-Consenting Party to that
operation.   If the Operator becomes in default under the terms
and conditions of this Agreement, the terms of this Paragraph
shall also apply to said Operator.

F.   <u>Assignment of Interest</u>

All the terms, conditions, and provisions of this Agreement
shall extend to and be binding upon each of the parties hereto
and their respective successors and assigns.   The parties
agree that in the event any party hereto in any way conveys,

- XV 2 -

sells, transfers, assigns, mortgages or pledges all or any
part of its interest in the leases comprising the Contract
Area hereunder, such assignment shall be made expressly
subject to the terms and provisions of this Agreement.

G.   Disbursement of Royalties

If a purchaser of any oil, gas or other hydrocarbons produced
from the Contract Area declines to make disbursements of all
royalties, and other payments out of, or with respect to,
production which are payable on the Contract Area, Operator
will upon request by any Non-Operator, arrange to receive all
payments for oil, gas, or other hydrocarbons attributable to
such Non-Operator's interest directly from said purchaser.   In
this event, Operator will use its best efforts to make
disbursements correctly but will be liable for incorrect
disbursements only in the event of gross negligence or willful
misconduct.   In the event Operator distributes revenues from
the production of oil and/or gas from any well drilled
hereunder, such payments shall commence no later than ninety
(90)days after the date of first production.   Thereafter,
unless otherwise specifically provided herein, all such
payments of revenue received from the sale of production shall
be mailed no later than on or before the first day of the
second calendar month following the calendar month in which
the revenue is received by Operator.   Any payments of revenues
from production which are due overriding royalty interest
owners in the Contract Area shall also be subject to this
paragraph and treated the same as payments of revenues from
production which are due royalty interest owners.

H.   Standard of Conduct of Operations

The Operator of the Contract Area shall conduct and direct and
have full control of all operations on the Contract Area as
permitted and required by, and within the limits of this
Agreement.   In its performance of services hereunder for the
Non-Operators, the Operator shall be an independent
contractor.   Operator shall not be deemed, or hold itself out
as, the agent of the Non-Operators with authority to bind them
to any obligation or liability assumed or incurred by Operator
vis-a-vis any third party.   Operator shall conduct its
activities under this Agreement as a reasonably prudent
Operator, i.e., in a good and workmanlike manner, with due
diligence and dispatch, in accordance with good oil field
practice, in compliance with applicable laws and regulations.
It shall have no liability as Operator to the other parties
for losses sustained or liabilities incurred, except such as
may result from gross negligence or willful misconduct.

I.   ARBITRATION OF DISPUTES.

Upon the occurrence of a dispute relative to any provision of
this agreement (including all EXHIBITS attached hereto),
whether in contract or in tort, or application of any
provision of this Agreement or the applicability of
arbitration under the terms and conditions of the Commercial
Arbitration Rule of the American Arbitration Association, and
the following shall apply:

1.   All hearings shall be before a single Arbitrator.

2.   All hearings before the Arbitrator shall be held in
Shreveport, Louisiana.

3.   All motions filed of a judicial nature, in
connection with the arbitration shall be filed only
in the courts of Webster Parish, Louisiana.

4.   Each party to any arbitration shall bear their own

- XV 3 -

expense in relation thereto, including but not by
way of limitation, their attorney's fees, if any,
and an equal proportion for the expense of the
arbitrator.

5.   No arbitration award may include any punitive,
exemplary, consequential or indirect damages.

J.   <u>Commingling of Funds</u>

Funds received by Operator under this Agreement need not be
segregated or maintained by it as a separate fund but may be
commingled with its own funds.

K.   <u>Marketing of Production</u>

Notwithstanding any term or provision contained herein to the
contrary, unless the Operator is otherwise notified in writing
by Non-Operator at least one full calendar month prior to the
beginning of the calendar month in which Non-Operator is
electing to market its share of the oil and/or gas produced
from a well or wells subject to this Agreement, the parties
hereto agree that Operator shall market Non-Operator's share
of any oil and/or gas produced from any well drilled pursuant
to the terms of this Agreement.  Failure by a Non-Operator to
exercise said option prior to Operator marketing Non-
Operator's share of any oil and/or gas produced from any well
drilled pursuant to this Agreement shall be deemed an election
to ratify the action of Operator.

L.   <u>Non-Consent Penalties</u>

(a)   In the event a party hereto elects not to
participate in the drilling of the initial test
well then such Non-Consenting party shall forfeit
and relinquish all of their right, title and
interest in and to the initial test well and the
leasehold which comprises the Drilling Unit for
such well.

(b)   In the event a party to this Agreement elects not
to participate in the drilling of a well which is
drilled subsequent to the initial test well and
pursuant to the terms of this Agreement, the non-
consenting party shall not be subject to the non-
consent penalties set forth in Article VI. B. of
this Agreement, but such non-consenting party shall
forfeit and relinquish (a) all of their right,
title and interest in and to the wellbore of the
well in which such non-consenting party elected not
to participate, and (b) all of the oil and/or gas
produced from such well bore.  The parties to this
Agreement which consented to and participated in
the drilling of such well shall be offered the
right to acquire such non-consenting interest in
accordance with the applicable provisions of
Article VI. B.   Each such non-consenting party
shall assign their interest in the wellbore (and
the oil and/or gas production which is produced
from such wellbore) of the well in which such non-
consenting party elected not to participate to
those parties to this Agreement which elected to
acquire the wellbore rights and interests of the
non-consenting party.

M.   <u>For Plug Back or Recompletion Operations</u>

Notwithstanding anything to the contrary contained herein and
specifically Article VI. B. and Article XV. D., any party who

- XV 4 -

participated (both by election and payment of their
proportionate share of costs) in the drilling and logging of a
well to the objective depth (including the initial test well),
shall have the right to participate in the completion attempt
of any zone in such well regardless of whether the party had
heretofore elected to go non-consent in the completion attempt
of another zone.  It is further understood and agreed that if
less than all of the parties elect to attempt any such
completion, the provisions of Article VI. B. 2., shall apply
to the operations thereafter conducted by less than all
parties provided, however, that Article VI. B. 2., shall apply
separately to each separate completion or recompletion attempt
undertaken hereunder, and an election to become a Non-
Consenting Party as to one completion or recompletion attempt
shall not prevent a party from becoming a Consenting Party in
subsequent completion or recompletion attempts regardless of
whether the Consenting Parties, as to earlier completions or
recompletions, have recouped their costs pursuant to Article
VI. B. 2; provided further, that any recoupment of costs by a
Consenting Party shall be made solely from the production
attributable to the zone in which the completion attempt is
made.   In addition, the parties hereto also understand and
agree that if a proposed completion attempt sets forth more
than one set of perforations within the same formation from
which the oil and/or gas production will be commingled and
produced jointly, then the party hereto must either elect to
consent to participate in the entire completion attempt as
proposed, or elect not to consent to such completion proposal,
in which case the Non-Consenting Party hereto shall be subject
to the applicable non-consent penalty described herein.
Election by a previous Non-Consenting Party to participate in
a subsequent completion or recompletion attempt shall require
such party to pay (unless such party has previously paid its
proportionate share) its proportionate share of the appraised
fair market value of the materials and equipment previously
installed in and/or used in connection with the well without
regard to the cost of salvaging same, plus the actual cost of
any connecting pipeline, as well as the appraised fair market
value of any equipment related to the operations of such
pipeline, insofar and only insofar as such materials and
equipment benefit the zone in which such party participates in
a completion attempt.

N.   Proposed Operations Regarding Producing Wells

        Notwithstanding any provisions to the contrary in Article
VI.B. or elsewhere in this Agreement, should any party hereto
desire to rework, deepen, sidetrack, plug back, add additional
perforations, and/or recomplete, a well jointly owned by all
the parties which is then producing or capable of producing in
paying quantities, the party desiring to rework, deepen,
sidetrack, plug back, add addition perforations, and/or
recomplete such a well shall give notice of the proposed
operation in the manner specified in Article VI. B. 1., and
the parties receiving such notice shall notify the party
wishing to do the work whether or not they elect to
participate in the cost of the proposed operation.   If all
parties elect to participate in such proposed operation,
Operator shall commence the proposed operation in accordance
with the provisions of Article VI. B. 1.   If any party
receiving notice of such proposed operation elects not to
participate in the cost of the proposed operation, but parties
owning at least seventy-five percent (75%) interest in said
well elect to participate in the cost of the proposed
operation, the party or parties giving notice and such other
parties who elect to participate in the operation may proceed
with such operations in the manner and subject to the terms
and provisions of Article VI. B. 2.

Notwithstanding the foregoing, Operator shall re-notify any

- XV 5 -

such Non-Consenting Parties that Operator has received sufficient elections to proceed with the proposed operation. Such Non-Consenting Parties shall have an additional twenty-four (24) hours from receipt of such notice in which to elect whether or not to participate in the proposed operation or be subject to the applicable non-consent provisions. In addition, such Consenting Parties shall have no liability to such Non-Consenting Parties for any losses related to leaving such zone or interval which was producing, or capable of producing in paying quantities. Furthermore, the Non-Consenting Parties shall not have to bear any expenses related to returning to a zone or interval which was producing or capable of producing in paying quantities when the well was recompleted to a different interval or zone without their consent; no party shall be required to participate in a proposed operation to return to a zone or interval which was producing or capable of producing in paying quantities when the well was recompleted to a different interval or zone without the consent or all parties. Those parties which elect to participate in a proposed operation to return to a zone or interval which was producing or capable of producing in paying quantities when the well was recompleted to a different interval or zone without the consent of all parties shall carry their proportionate share of the cost attributable to the Non-Consenting Party or Parties.

O.   Taxes

Article VII.F. or anything else herein to the contrary notwithstanding, Operator shall pay or cause to be paid all taxes, either State or Federal, owing or which may be payable on production from the Contract Area whether in the form of a severance or production tax, provided, however, if at any time any party is taking its share of production in kind, such party shall pay or cause to be paid said taxes as to such production.

P.   Multiple Well Proposals

No party to this Agreement shall propose the drilling of more than one well at a time nor shall any party to this Agreement propose the drilling of a well during the time that drilling or completion operations are being conducted on another well except: (1) by the mutual consent of all parties hereto; and (2) if one or more of said proposed wells are required wells or required operations as defined in Article XV.D.

In addition, no party to this Agreement shall propose the drilling of a well during the first sixty (60) days following the date that the Initial Well is connected to a sales line or is plugged and abandoned as a dry hole.

Q.   Priority of Operations

(1) At that point in time when (a) the Initial Well achieves Contract Depth, or (b) any other well achieves its initial objective depth pursuant to Article VI.B.1., in the event the parties hereto fail to mutually agree as to the conduct of operations hereunder, the following elections shall control in the order hereafter enumerated: (i) conduct logging, coring, testing, wireline formation testing or evaluation operations as normally conducted by a prudent operator provided; however, no party hereto shall be entitled to conduct any additional logging or testing without indemnifying and holding harmless the other parties hereto, including Operator, for any and all claims, demands, losses or damages resulting from such additional logging or testing; (ii) complete the well in the zone or interval in which the majority of the working interest elects to complete; (iii) deepen the well down to a deeper productive horizon with priority given in descending order;

- XV 6 -

(iv) sidetrack to another bottom hole location; and (v) plug and abandon the well.

(2) After the initial completion attempt on a well drilled hereunder, in the event of subsequent conflicting recompletion or reworking proposals, the proposal receiving the vote of a majority of the working interest shall prevail.

R.    Information to Non-Operators

Upon receipt of the written request of a Non-Operator, the Operator shall furnish the Non-Operator with copies of any contracts for the sale or disposition of production from the Contract Area, division order relating thereto, all information relating to the payment of royalties or other payments out of such production and delay rentals, shut-in payments, copies of all reports filed with any State and Federal regulatory agency relating to the Contract Area, and copies of all tests and analyses on or relating to any well including particularly, but not by way of limitation, production tests and bottom hole pressure tests. Non-Operator shall have complete access to any well at all times during and after drilling with the right to witness all tests conducted. The Operator will furnish all other information' as is reasonably requested by a Non-Operator. Operator will request and offer the Non-Operators the opportunity to ratify Operator's contract for the sale or disposition of oil and gas production from wells located on the Contract Area.

S.    Typed vs. Printed Portion

In the event of a conflict between the typewritten portions and printed portions of this Operating Agreement, the typewritten portions shall prevail.

T.    Headings

The headings of the several articles and sections of this Agreement are for convenience only, and shall not control or affect the meaning or construction of the terms and provisions hereto.

U.    Counterpart Execution

If counterparts of this Agreement are executed, the signatures and acknowledgments of the parties, as affixed thereto, may be combined by Operator in and treated and given effect for all purposes as a single instrument. This Agreement also may be ratified by separate instruments referring hereto, each of which shall have the effect of the original Agreement and of adopting by reference all of the provisions herein contained.

V.    Cost of Tubular Goods

Notwithstanding anything in section IV.2.A. of the COPAS (Exhibit "C" hereof), Operator, at its sole option, will have the right to purchase tubular goods for the joint account at competitive rates, and Operator shall charge the joint account its actual purchase cost without regard as to whether or not such actual cost is higher or lower than the competitive rates for which such casing could have been purchased on the date which such casing was moved on location.

W.    Camterra Resources, Inc. as Operator

The parties hereto understand and acknowledge that Camterra Resources, Inc. is the Managing General Partner of Camterra Resources Partners, Ltd., a Texas Limited Partnership. Although Camterra Resources, Inc. only owns interest in the Contract Area by virtue of its ownership interest in Camterra

- XV 7 -

Resources Partners, Ltd., all parties hereto do hereby agree to consider and deem Camterra Resources, Inc. as an interest owner in the Contract Area for purpose of Article V.B.1. hereof so long as Camterra Resources Partners, Ltd. owns an interest in the Contract Area.

X.   Liabilities

Operator shall use its best efforts to comply with all rules and governmental regulations but, notwithstanding any rule or regulation making the Operator responsible for compliance with said rules and regulations, the liability therefore shall be borne by the parties hereto in proportion to their interests including, without limitation, any repayments required by any such governmental agency.  In the event Operator (1) agrees in writing to hold division orders and to disburse proceeds from oil or gas sales including the payment of royalty interests and/or (2) accepts, holds, disburses or otherwise handles any funds on behalf of Non-Operators then each Non-Operator, as to its interest, indemnifies Operator without limitation in connection therewith provided that there is an absence of fraud, intentional misrepresentation, gross negligence or acts of willful misconduct by Operator.

Y.   Federal and State Reporting

Operator hereby agrees to use its best efforts to comply with the rules and regulations of all State or Federal agencies, boards, commissions or other regulatory authorities ("Regulatory Authorities") having jurisdiction of the Contract Area.  To this end, it will file all documentation, reports, affidavits and exhibits required to be filed by the Operator with any such Federal or State regulatory authority, including, but not limited to the Federal Energy Regulatory Commission as required by the Natural Gas Policy Act of 1978, as amended.  The Operator shall not be liable in damages to Non-Operators for its failure to timely or properly file any such instruments where such failure is the result of mere nonfeasance or misfeasance or the result of an incorrect or improper interpretation of the statutes, rules and regulations of any regulatory authority.  As consideration for its undertaking the acts set forth above, Operator shall be compensated for its costs in doing such acts.

Non-Operators hereby covenant and agree that, to the best of their ability, they shall timely provide the Operator with all documentation, affidavits, reports or other materials and information in their possession, or to which they are entitled, which the Operator must have in order to perform those tasks and make the necessary reports to the regulatory authorities.

AA.  Environmental Provisions

Operator will obtain all notices, permits, licenses or similar authorizations, if any, required under any and all applicable laws, statutes, ordinances, rules, regulations, orders, directives or determinations of any governmental entity pertaining to the environment including, without limitation, the Clean Air Act, as amended, the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), as amended, the Clean Water Act, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the toxic Substances Control Act, as amended, the Hazardous Materials Transportation Act, as amended, any state or local laws pertaining to the handling of solid wastes or the use, maintenance, and closure of pits and impoundments, and other environmental conservation or protection laws.

- XV 8 -

Operator will arrange for the transportation and disposal of all hazardous substances and solid wastes generated by, in connection with or as a result of the oil and gas operations within the Contract Area in accordance with any and all applicable federal, state and local laws, statutes, ordinances, rules, regulations, orders, directives or determinations of any governmental entity pertaining to the Environment including, without limitation, the Clean Air Act, as amended, CERCLA, RCRA, the Safe Drinking Water Act, the Toxic Substances Act, and the Hazardous Materials Transportation Act.

Operator will conduct its activities in the Contract Area in a manner that minimizes adverse impacts to the land, air and water, to cultural, biological, visual and other resources and to other land uses or users.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of the 25th day of October, 2000.

OPERATOR

ATTEST:                                          Camterra Resources, Inc.

_____          By: _Paul Marchand_
                                                         Paul Marchand, President

NON-OPERATORS

WITNESSES:                                    Camterra Resources Partners, Ltd.
                                                       A Texas Limited Partnership
                                                       By Camterra Resources, Inc.
                                                       It's Managing General Partner

_____          By: _Paul Marchand_
                                                         Paul Marchand, President
_____

                                                       Stroud Petroleum, Inc.

_____          By: _____
                                                         Scott D. Stroud
_____

_____          _____
                                                         Quinton B. Carlile
_____

_____          _____
                                                         Steve B. Carlile
_____

_____          _____
                                                         Kenneth Q. Carlile
_____

                                                       Discus Oil Corporation

_____          By: _____
                                                         Wayne T. Davis, President
_____

_____

_____          _____
                                                         Wayne T. Davis
_____

_____          _____
                                                         John J. Doles, Jr.
_____

_____          _____
                                                         F. Wayne McWhorter
_____

_____          _____
                                                         George Fitts

**EXHIBIT "A"**

Attached to and made a part of the certain Operating Agreement dated as of the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., et al, as Non-Operators.

I.

## DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT:

S ½ of SW ¼ of Section 4; and N ½ of NW ¼ of Section 9, Township 23 North, Range 9 West, Webster Parish, Louisiana.

II.

## RESTRICTIONS AS TO DEPTHS, FORMATIONS OR SUBSTANCES:

NONE

III.

## OIL AND GAS LEASES CONTRIBUTED TO THIS AGREEMENT BY THE FOLLOWING PARTIES IN THE PERCENTAGES AS SET OUT BESIDE THE NAME OF EACH PARTY:

1. Oil, Gas and Mineral Lease dated April 23, 1998, by and between Ozelle S. Powell, et al, as Lessors, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 683 under Registry No. 425344; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 335 under Registry No. 435781 of the Conveyance Records of Webster Parish, Louisiana.

2. Oil, Gas and Mineral Lease dated October 23, 1998, by and between William Clinton Scott, et ux Vernaughn Simpson Scott, as Lessors, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 688 under Registry No. 425345; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 331 under Registry No. 435779 of the Conveyance Records of Webster Parish, Louisiana.

3. Oil, Gas and Mineral Lease dated October 23, 1998, by and between S.M. Richardson, III, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 678 under Registry No. 425343; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 625 under Registry No. 435959 of the Conveyance Records of Webster Parish, Louisiana.

4. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Sandra Richardson Walsh, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 693 under Registry No. 425346; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 333 under Registry No. 435780 of the Conveyance Records of Webster Parish, Louisiana.

5. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Don S. Coleman, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 666 under Registry No. 425339; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 345 under Registry No. 435786 of the Conveyance Records of Webster Parish, Louisiana.

6. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Mary Sue Coleman Bailey, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 675 under Registry No. 425341; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 339 under Registry No. 435783 of the Conveyance Records of Webster Parish, Louisiana.

7. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Hilda Gay Coleman Booker, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 884, Page 672 under Registry No. 425341; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 906, Page 244 under Registry No. 436262 of the Conveyance Records of Webster Parish, Louisiana.

8. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Jerald Glenn Fox, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 888, Page 466 under Registry No. 427356; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 627 under Registry No. 435960 of the Conveyance Records of Webster Parish, Louisiana.

9. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Marian L. Coleman, et vir James S. Coleman, as Lessors, and Clark Energy Company, Inc., as Lessee, recorded Book 884, Page 669 under Registry No. 425340; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 337 under Registry No. 435782 of the Conveyance Records of Webster Parish, Louisiana.

10. Oil, Gas and Mineral Lease dated October 23, 1998, by and between James Lee Fox, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded Book 888, Page 469 under Registry No. 427357; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 343 under Registry No. 435785 of the Conveyance Records of Webster Parish, Louisiana.

11. Oil, Gas and Mineral Lease dated October 23, 1998, by and between Jacklyn Sue Fox Abney, as Lessor, and Clark Energy Company, Inc., as Lessee, recorded in Book 888, Page 472 under Registry No. 427358; and by Oil, Gas and Mineral Lease Ratification and Extension recorded in Book 905, Page 341 under Registry No. 435784 of the Conveyance Records of Webster Parish, Louisiana.

| WORKING INTEREST OWNER | LEASEHOLD OWNERSHIP | UNIT OWNERSHIP |
|---|---|---|
| Quinton B. Carlile (1)<br>P.O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)   Fax: (903-935-0521) | .10000000 | .05000000 |
| Steve B. Carlile   (1)<br>P.O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)   Fax: (903-935-0521) | .04000000 | .02000000 |
| Kenneth Q. Carlile (1)<br>P.O. Box 2069<br>Marshall, TX 75671<br>(903-938-9950)   Fax: (903-935-0521) | .10000000 | .05000000 |
| George Fitts  (1)<br>P. O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)   Fax: (903-935-0521) | .01000000 | .00500000 |
| F. Wayne McWhorter (1)<br>P. O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)   Fax: (903-935-0521) | .01000000 | .00500000 |
| Camterra Resources Partners, Ltd. (1)<br>P. O. Box 2069<br>Marshall, TX 75671<br>(903-938-9950)   Fax: (903-935-0521) | .12957040 | .06478520 |
| Discus Oil Corporation<br>P. O. Box 368<br>Plain Dealing, LA 71064<br>Attention: Wayne T. Davis<br>(318-424-6640)   Fax: (318-326-4255) | .07000000 | .03500000 |

| WORKING INTEREST OWNER | LEASEHOLD OWNERSHIP | UNIT OWNERSHIP |
|---|---|---|
| Turner Exploration Inc.<br>P.O. Box 368<br>Plain Dealing, LA 71064<br>Attention: Bert Turner<br>(318-424-6640)    Fax: (318-326-4255) | .05000000 | .02500000 |
| Smith Operating and Management Company<br>P.O. Box 52<br>Shreveport, LA 71161-0052<br>Attention: Harry L. Avant<br>(318-222-3119)    Fax: (318-222-0566) | .02343750 | .01171875 |
| RNK Energy, Inc.<br>86 Arrowhead Trail<br>New Canaan, CT 06840<br>Attention: Richard A. Derbes<br>(203-972-399)    Fax: (212-703-4924) | .02343750 | .01171875 |
| Clark Energy Company, Inc.<br>509 Market Street, Suite 600<br>Shreveport, LA 71166-1841<br>Attention: Jeffrey F. Clark<br>(318-424-813)    Fax: (318-221-1432) | .02667960 | .01333980 |
| Buck's Boys, L.P.<br>416 Travis Street, Suite 1105<br>Shreveport, LA 71101-5504<br>Attention: James E. Clark<br>(318-221-1605)    Fax: (318-221-1749) | .02000000 | .01000000 |
| Heritage Energy Company<br>500 Market Street, Suite 602<br>Shreveport, LA 71101<br>Attention: John Kinnebrew<br>(318-222-1545)    Fax: (318-222-1432) | .06687500 | .03343750 |
| North American Reserve Corp.<br>422 S. Broadway<br>Tyler, TX 75702<br>Attention: Brent Bossart<br>(903-592-2290)    Fax: (903-592-5747) | .33000000 | .16500000 |
| Totals | 1.0000000 | .50000000 |

(1)  Subject to that one certain Farmout Agreement dated January 1, 1995 by and between Heritage Energy Company and the Carlile Group copies of which are in the respective files of the parties.

## OIL AND GAS LEASES CONTRIBUTED TO THIS AGREEMENT BY THE FOLLOWING PARTIES IN THE PERCENTAGES AS SET OUT BESIDE THE NAME OF EACH PARTY:

12.   Oil, Gas and Mineral Lease dated August 16, 1963, by and between Shelby J. Beene, et al, as Lessors, and Sklar Producing Co., Inc., as Lessee, recorded under Registry No. 187312 of the Conveyance Records of Webster Parish, Louisiana.

13.   Oil, Gas and Mineral Lease dated August 16, 1963, by and between Bernard M. Watters, as Lessor, and Sklar Producing Co., Inc., as Lessee, recorded under Registry No. 187325 of the Conveyance Records of Webster Parish, Louisiana.

14.   Co-Lessor's Agreement dated August 20, 1963, by and between Rosalind B. McKenzie, as Co-Lessor of Agreement recorded under Registry No. 187313 of the Conveyance Records of Webster Parish, Louisiana.

15.   Co-Lessor's Agreement dated October 10, 1963, by and between Elsie M. Watters, as Co-Lessor of Agreement recorded under Registry No. 188150 of the Conveyance Records of Webster Parish, Louisiana.

16.   Co-Lessor's Agreement dated August 23, 1963, by and between Louise W. Hawes, as Co-Lessor of Agreement recorded under Registry No. 190130 of the Conveyance Records of Webster Parish, Louisiana.

3

17. Co-Lessor's Agreement dated August 23, 1963, by and between Exa W. Heath, as Co-Lessor of Agreement recorded under Registry No. 187326 of the Conveyance Records of Webster Parish, Louisiana.

18. Co-Lessor's Agreement dated August 23, 1963, by and between Barbara Ann Watters and Percy M. Watters, as Co-Lessors of Agreement recorded under Registry No. 187916 of the Conveyance Records of Webster Parish, Louisiana.

| WORKING INTEREST OWNER | LEASEHOLD OWNERSHIP | UNIT OWNERSHIP |
|---|---|---|
| Camterra Resources Partners, Ltd.<br>P.O. Box 2069<br>Marshall, TX 75671<br>Attention: Paul Marchand<br>(903-938-9949)    Fax: (903-935-0521) | .54395419 | .27197710 (2) (3) |
| Huffman Investments, L.P.<br>P.O. Box 39<br>Atlanta, TX 75551<br>(903-796-6350)    Fax: (903-796-2472) | .02000000 | .01000000 (2) (3) |
| Steve Copeland<br>524 Trailridge Circle<br>Hallsville, TX 75650<br>(903-668-4427)    Fax: (903-935-0521) | .02000000 | .01000000 (2) (3) |
| Camterra Resources Partners, Ltd.<br>P. O. Box 2069<br>Marshall, TX 75671<br>(903-938-9949)    Fax: (903-935-0521) | .06000000 | .03000000 (2) (3) |
| Stroud Petroleum, Inc.<br>P.O. Box 3735<br>Shreveport, LA 71133-3735<br>Attention: Scott D. Stroud<br>(318-222-1800)    Fax: (318-424-1257) | .01000000 | .00500000 |
| SKLARCO, INC.<br>P.O. Box 1753<br>Shreveport, LA 71166<br>(318-???????)    Fax: (318-???????) | .34604581 | .17302290 |
| Totals | 1.0000000 | .50000000 |

(2) Subject to that one certain Term Farmout Agreement dated March 29, 2000 by and between S & P Co. and Heritage Energy Company, Ratification of Term Farmout Agreement done and signed the 28th day of September, 2000 by August Erickson and Heritage Energy Company and Ratification of Term Farmout Agreement done and signed the 31st day of October, 2000 by W. Harlan Beene and Heritage Energy Company copies of which Agreement and Ratifications are in the files of the respective parties.

(3) The Oil, Gas and Mineral Leases and Co-Lessor's Agreements, numbered 12 – 18 described above, apply only to the extent they cover the Haynesville Formation defined in Louisiana Office of Conversation Order No. 104-G-10 effective July 23, 1991, less and except the Talley Sand of the Cotton Valley Formation, said sand being identified as that sand lying between 8980 feet and 9010 feet on the Schlumberger Induction Electric Log of Sklar & Phillips Oil Co. – Haynesville-Mercantile #1 located in the NE ¼ of NW ¼ of Section 9, Township 23 North, Range 9 West, Webster Parish, Louisiana.

-End of Exhibit-

**EXHIBIT "B"**

Attached to and made a part of that certain Operating Agreement dated as of the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., as Non-Operator.

**THERE IS NO EXHIBIT "B" TO THIS OPERATING AGREEMENT**

-End of Exhibit-

COPAS   1984   ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT " C "

Attached to and made a part of ___that certain Operating Agreement dated October 25,2000, by and between Camterra Resources, Inc., as Operator and Camterra Resources Partners, Ltd., et al, as Non-Operator.___

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1.   Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

### 2.   Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3.   Advances and Payments by Non-Operators

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at The Chase Manhattan Bank on the first day of the month in which delinquency occurs plus 2% 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4.   Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

COPAS

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations at the current area contract rate.

(2) Salaries of First level Supervisors in the field at current area consultant rate.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates at current area consultant rate.

(4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4. **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS

5.    **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.    ~~Transportation~~

~~Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:~~

~~A.    If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.~~

~~B.    If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.~~

~~C.    In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges.  The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7.    **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.    **Equipment and Facilities Furnished By Operator**

A.    Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _eight_ percent (__8__%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.    In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property ~~less 20%.   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.~~

9.    **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.    **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties.  All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.~~

11.    **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS

**12.  Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.  Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.  Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property.  In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.  Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III.  OVERHEAD

**1.  Overhead - Drilling and Producing Operations**

i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph IA, or
(    ) Percentage Basis, Paragraph IB

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II.  The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

iii.  The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

A.  Overhead - Fixed Rate Basis

(1)  Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $_____6000.00_____
(Prorated for less than a full month)

Producing Well Rate $___600.00_____

(2)  Application of Overhead - Fixed Rate Basis shall be as follows:

(a)  Drilling Well Rate

(1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached.  The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B.  Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (_____%) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent (_____%) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.   Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS   1984   ONSHORE
Recommended by the
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $_____:

A.    ____3____ % of first $100,000 or total cost if less, plus

B.    ____2____ % of costs in excess of $100,000 but less than $1,000,000, plus

C.    ____1____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.   **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.    ____3____ % of total costs through $100,000; plus

B.    ____2____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.    ____1____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.   **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV.   **PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.   **Purchases shall be at Operator's cost.**

~~Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.~~

2.   **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.   New Material (Condition A)

(1)   Tubular Goods Other than Line Pipe **shall be  priced at Operator's cost.**

~~(a)  Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

~~(b)  For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

- 6 -

pound Oil Field Haulers Association interstate truck rate shall be used.

(c) ~~Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.~~

(d) ~~Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.~~

(2) Line Pipe shall be priced at cost.

(a) ~~Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

(b) ~~Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.~~

(c) ~~Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.~~

(d) ~~Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.~~

(3) Other Material shall be priced at Cost ~~the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.~~

(4) Unused new Material, Shall be priced at Operator's cost. ~~except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).~~

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At ~~seventy-five percent (75%) of~~ current market value ~~new price, as determined by Paragraph A.~~

(2) Material used on and moved from the Joint Property

(a) At ~~seventy-five percent (75%) of~~ current market value ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or~~

(b) At ~~sixty-five percent (65%) of~~ current market value ~~new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material~~

(3) Material not used on and moved from the Joint Property

At ~~seventy-five percent (75%) of~~ current market value ~~new price as determined by Paragraph A.~~

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at current market value ~~fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.~~

COPAS 1984 ONSHORE
Accounting Procedure
of Petroleum Accountants
Societies

COPAS

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.   Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate of ^ twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.   In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of  a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated effective as of the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., et al, as Non-Operators.

## INSURANCE

During the period of the joint operations hereunder and continuing thereafter during the entire term of this contract, Operator shall carry for the joint account the following types and amounts of coverage:

(a) Worker's Compensation and Employer's Liability Insurance which will comply with the laws of the state in which operations are conducted.

(b) Comprehensive Automobile Liability Insurance with a combined bodily injury and/or property damage limit of not less than $1,000,000 for any one accident.

(c) Comprehensive General Liability Insurance with bodily injury and/or property damage limits of not less than $1,000,000 for any one occurrence.

(d) Excess or Umbrella Liability Insurance with an annual aggregate limit of not less than $2,000,000 in excess of the underlying limits.

Operator shall not be obligated to provide for any other insurance on behalf of the joint account. Any Party may, at its own expense, acquire such other insurance as its deems proper to protect itself against any claims, losses, damages, or destruction arising out of operations in the Contract Area.

All losses arising out of the uninsured risks shall be charged to the parties according to their interest under this contract. Certificates of insurance naming each Non-Operator as an additional insured evidencing thirty (30) days advance notice of cancellation shall be furnished to Non-Operators by Operator upon request, provided that the Non-Operator requesting such certificates has accepted the coverage provided by Operator.

Operator reserves the sole right to select insurance carriers and to select and purchase from such carriers the types and kinds of coverage available under the above described policy forms, subject to whatever exclusions Operator agrees to be included in such policy forms. The failure of any of the above described policies to cover any loss that may occur, or the insolvency of any insurance carriers selected by the Operator, shall not be deemed as negligence or lack of due diligence upon the part of the Operator. Non-Operator shall have the right to inspect such policies at the office of the Operator.

-End of Exhibit-

EXHIBIT "E "

## GAS BALANCING AGREEMENT

Attached to and made a part of that certain Operating Agreement effective the this the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., et al, as Non-Operators.

1.    Ownership of Gas Production

(a) It is the intent of the parties that each party shall have the right, but not the obligation, to take in kind and separately dispose of its proportionate share of gas (including casinghead gas) produced from each formation in each well located on acreage ("Contract Area") covered by the Operating Agreement to which this Exhibit is attached ("Operating Agreement").

(b) Notwithstanding anything herein to the contrary, unless a Non-Operator notifies Operator in writing not less than thirty (30) days prior to the beginning of a production month that the Non-Operator (1) will take or market its full share of gas produced from a particular formation in a well; or (2) will not take or market any gas sold for its account during a given production month, then Non-Operator shall be deemed to have requested of Operator, and Operator hereby agrees that Operator shall have the right, but not the obligation to produce, take or sell the Non-Operators's full share of gas produced from a particular formation in a well on the best terms and conditions available to Operator.

(c) Operator shall control the gas production and be responsible for administering the provisions of this Agreement and shall make reasonable efforts to deliver or cause to be delivered gas to the parties' gas purchasers as may be required in order to balance the accounts of the parties in accordance with the provisions herein contained.  For purposes of this Agreement, Operator shall maintain production accounts of the parties based upon the number of MMBtu's actually contained in the gas produced from a particular formation in a well and delivered at the outlet of lease equipment for each party's account regardless of whether sales of such gas are made on a wet or dry basis.  All references in this Agreement to quantity or volume shall refer to the number of MMBtu's contained in the gas stream.  Toward this end, Operator shall periodically determine or cause to be determined the Btu content of gas produced from each formation in each well on a consistent basis and under standard conditions pursuant to any method customarily used in the industry.

2.    Balancing of Production Accounts

(a)  Any  time a party, or such party's purchaser, is not taking or marketing its full share of gas produced from a particular formation in a well ("non-marketing" party), the remaining parties ("marketing" parties) shall have the right, but not the obligation, to produce, take, sell and deliver for such marketing parties' accounts, in addition to the full share of gas to which the marketing parties are otherwise entitled, all or any portion of the gas attributable to a non-marketing party.  (Gas attributable to a non-marketing party, taken by a marketing party, is referred to in this Agreement as "overproduction").  If there is more than one marketing party taking as attributable to a non-marketing party, each marketing party taking gas attributable to a non-marketing party shall be entitled to take a non-marketing party's gas in the ratio that such marketing party's interest in production bears to the total interest in production of all marketing parties.

(b) A party that has not taken its proportionate share of gas produced from any formation in a well ("Underproduced Party") shall be credited with gas in storage equal to its share of gas produced but not taken, less its share of gas used in lease operations, vented or lost ("underproduction").  Such Underproduced Party, upon giving timely written notice to Operator, shall be entitled, on a monthly basis beginning the month following receipt of notice, to produce, take, sell and deliver, in addition to the full share of gas to which such party is otherwise entitled, a quantity of gas ("make-up gas") equal to fifty percent (50%) of the total share of gas attributable to all parties having cumulative overproduction (individually called "Overproduced Party").  Such make-up gas shall be credited against such Underproduced Party's accrued underproduction in order of accrual.  Notwithstanding the foregoing and subject to subsection (e) below: (I) and Overproduced Party shall never to obligated to reduce its takes to less than fifty percent (50%) of the quantity to which such party is otherwise entitled and (ii) an Underproduced Party shall never be allowed to make up underproduction during the months of December, January, February and March without the prior written consent of the Overproduced Party.

(c) If there is more than one Underproduced Party desiring make-up gas, each such Underproduced Party shall be entitled to make-up gas in the ratio that such party's interest in gas production bears to the total interest in gas production of all parties then desiring make-up gas.  Any portion of the make-up gas to which an Underproduced Party is entitled and which is not taken by such Underproduced Party may be taken by any other Underproduced Party(ies).

(d) If there is more than one Overproduced Party required to furnish make-up gas, each such Overproduced Party shall furnish make-up gas in the ratio that such Overproduced Party's interest in gas production bears to the total interest in gas production of all parties then required to furnish make-up gas. Each Overproduced Party in any formation in a well shall be entitled, on a monthly basis, to take its full share

1

of gas less its share of the make-up gas then being produced from the particular formation in the well in which it is overproduced.

(e) If Operator in good faith believes that an Overproduced Party has recovered one hundred percent (100%) of such Overproduced Party's share of the recoverable reserves from a particular formation in a well, such Overproduced Party, upon being notified in writing of such fact by Operator, shall cease taking gas from such formation in such well and the remaining parties shall be entitled to take one hundred percent (100%) of such production until the accounts of the parties are balanced. Thereafter, such Overproduced Party shall again have the right to take its share of the remaining production, if any, in accordance with the provisions herein contained. Notwithstanding anything to the contrary herein, after an Overproduced Party has recovered one hundred percent (100%) of its full share of the recoverable reserves as so determined by Operator from a particular formation in a well, such Overproduced Party may continue to produce if such continued production is (I) necessary for lease maintenance purposes or (ii) is deemed necessary by the Operator to limit or prevent formation damage or drainage or (iii) permitted by a majority of interest of the parties who have not produced one hundred percent (100%) of their recoverable reserves from such formation in such well after written ballot conducted by the Operator.

3.    Cash Balancing Upon Depletion

(a) If gas production from a particular formation in a well ceases and no attempt is made to restore production (or substitute therefor) within ninety (90) days, Operator shall distribute, within one hundred twenty (120) days of the date the well last produced gas from such formation, a statement of net unrecouped underproduction and overproduction and the months and years in which such unrecouped production accrued ("final accounting").

(b) Within thirty (30) days of receipt of such final accounting, each Overproduced Party shall remit to the Underproduced Parties, a sum of money (which sum shall not include interest) equal to the net price received or (constructively received under subparagraph (d) below), by Overproduced Party for sales during the month(s) of overproduction, calculated in order of accrual but less applicable taxes, royalties and reasonable costs of marketing and transporting such gas actually paid by such Overproduced Party. Such remittance shall be based on number of MMBtu's of overproduction and shall be accompanied by a statement showing volumes and the net price received( or the index price if constructively received under subparagraph (d) below) for each month with accrued unrecouped overproduction.

(c) In determining the amount of overproduction for which settlement is due, production taken during any month by an Underproduced Party in excess of such Underproduced Party's share shall be treated as make-up and shall be applied to reduce prior deficits in the order of accrual of such deficits.

(d) An Overproduced Party that took gas in kind for its own use, sold gas to an affiliate, or otherwise disposed of gas in other than cash sale shall pay for such gas at the Index Price (as defined in paragraph 19 hereof) at the time it was produced. even if the Overproduced Party sold such gas to an affiliate at a price greater or lesser than market value.

(e) If deemed necessary by the Operator, all parties shall be required to provide to the Operator evidence of royalty, overriding royalty, tax and other burden payments and a reconciliation of same.

(f) If refunds are later required by any governmental authority, each party shall be accountable for its respective share of such refunds as finally balanced hereunder.

4.    Deliverability Tests

At the request of any party, Operator may produced the entire well stream for a deliverability test not to exceed seventy-two (72) hours in duration (or such longer period of time as may be mutually agreed upon by the parties) if required under such requesting party's gas sales or transportation contract.

5.    Nominations

Each party shall, on a monthly basis, give Operator sufficient time and data either to nominate such party's respective share of gas to the transporting pipeline(s) or, if Operator is not nominating such party's gas, to inform Operator of the manner in which to dispatch such party's gas. Except as and to the extent caused by Operator's gross negligence or willful misconduct. Operator shall not be reasonable for any fees and/or penalties associated with imbalances charged by any pipeline to any Underproduced or Overproduced Party(ies), provided, however Operator agrees that in a timely manner it will keep all of the parties hereto informed of any over/under deliveries which could cause imbalance penalties so owner can take any necessary remedial action(s).

6.    Statements

On or before the twenty-fifth (25th) day of the month following the month of production, each party taking gas shall furnish or cause to be furnished to Operator a statement of gas taken expressed in terms of MMBtu's. If actual volume information sufficient to prepare such statement is not made available to the taking

party in sufficient time to prepare it, such taking party shall nevertheless furnish a statement of its good faith estimate of volumes taken. Within twenty (20) days of the receipt of all such statement, Operator shall furnish to each party a statement of the gas balance among the parties, including the total quantity of gas produced from each formation in each well, the portion thereof used in operations, vented or lost, and the total quantity delivered for each party's account. Any error or discrepancy in Operator's monthly statement shall be promptly reported to Operator and Operator shall make a proper adjustment thereof within thirty (30) days after final determination of the correct quantities involved; provided, however, that if no errors or discrepancies are reported to Operator within two (2) years from the date of any statement, such statement shall be conclusively deemed to be correct. Additionally, within sixty (60) days from the end of each calendar year, Non-Operators shall furnish to Operator, for the sole purpose of establishing records sufficient to verify cash balancing values, a statement reflecting amounts actually received or constructively received under paragraph 3(e), on a monthly basis for the calendar year preceding the immediately concluded calendar year. Operator shall not allow a party to produce gas for its account during any month when such party is delinquent in so furnishing the monthly or annual statements.

## 7.    Payment of Taxes

Each party taking gas shall pay or cause to be paid any and all production, severance, utility, sales, excise, or other taxes due on such gas.

## 8.    Operating Expenses

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using gas or whether the sales and use of each are in proportion to their respective interests in such gas.

## 9.    Overproducing Allowable

Each party shall give Operator sufficient time and data to enable Operator to make appropriate nominations, forecasts and/or filing with the regulatory bodies having jurisdiction to establish allowable. Each party shall at all times regulate its takes and deliveries from the Contract Area so that the well(s) covered hereby shall not be curtailed and/or shut-in for overproducing the allowable production assigned thereto by the regulatory body having jurisdiction.

## 10.    Payment of Leasehold Burdens

Unless otherwise provided for in the subject Agreement to which this Agreement is attached as an Exhibit, at all times while gas is produced from the Contract Area, each party taking gas agrees to make appropriate settlement of all royalties, overriding royalties and other payments out of or in lieu of production for which such party is responsible just as if such party were taking or delivering to a purchaser such party's full share, and such party's full share only, of such gas production exclusive of gas used in operations, vented or lost, and each party agrees to indemnify and hold each other party harmless from and all claims relating thereto.

## 11.    Application of Agreement

The provisions of this Agreement shall be separately applicable and shall constitute a separate agreement with respect to gas produced from each formation in each well located on the Contract Area.

## 12.    Term

This Agreement shall terminate when gas production under the Operating Agreement permanently ceases and the accounts of the parties are finally settled in accordance with the provisions herein contained.

## 13.    Operator's Liability

Except as otherwise provided herein, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

## 14.    Audits

Any Underproduced Party shall have the right for a period of two (2) years after receipt of payment pursuant to a final accounting and after giving written notice to all parties, to audit an Overproduced Party's accounts and records relating to such payment. Any Overproduced Party shall have the right for a period of two (2) years after tender of payment for unrecouped volumes and upon giving written notice to all parties, to audit an Underproduced Party's records as to volumes. The party conducting such audit shall bear its costs of the audit. Additionally, Operator shall have the right for a period to two (2) years after receipt of an annual statement from a Non-Operator under paragraph 6 after giving written notice to the affected Non-Operator, to

3

audit such Non-Operator's accounts and records relating to such payment. Costs of such audit shall be borne by the joint account.

### 15.     Successors and Assigns

The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties and to their respective successors and assigns, and may be assigned in whole or in part from time to time; provided, however, that (a) any such assignment shall be made subject to this Agreement and as among the parties shall not be valid without the express written acceptance of the terms of this Agreement by the Assignee, (b) the Assignee shall acquire such interest subject to any overproduction and/or underproduction imbalances existing at such time as well as any cash balancing obligation created thereby and (c) no such assignment shall relieve the Assignor from any obligation to the other parties with respect to any overproduction taken by Assignor prior to such assignment.

### 16.     Liquefiable Hydrocarbons Not Covered Under Agreement

The parties shall share proportionately in and own all liquid hydrocarbons recovered with the gas by lease equipment in accordance with their respective interests.

### 17.     Conflict

If there is a conflict between the terms of this Agreement and the terms of any gas sales contract covering the Contract Area entered into by any party, the terms of this Agreement shall govern.

### 18.     Assignment of Interest

In the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in the lease or unit to which this Gas Balancing Agreement applies, such Overproduced Party shall notify in writing the other working interest owners who are parties hereto not less than forty-five (45) days prior to closing the transaction. The notice provided by the Overproduced Party shall set forth the most recent gas imbalance on the property being assigned. Any Underproduced Party may demand in writing within twenty (20) days after receipt of the Overproduced Party's notice: (I) a cash settlement attributed to such overproduction in the lease(s) or unit(s), or (ii) natural gas of like grade, quantity and quality from another mutually agreeable source. Upon receiving such demand, the Overproduced Party shall have sixty (60) days to effect cash settlement or agree with the Underproduced Party upon an alternate source of make-up gas. Any Underproduced Party electing to cash settle with the Overproduced Party shall thereby indemnify and hold the Overproduced Party harmless against any such causes of action, claims, losses or other actions which may be claimed by any third party.

The Operator shall be notified of any such demand and of any cash settlement or agreement between the parties hereto to make-up gas in kind pursuant to this section and the gas balance accounts of the parties shall be adjusted accordingly. Any cash settlement pursuant to this section shall be on the same basis as otherwise set forth in the sections entitled and hereunder.

The provisions of this section shall not be applicable in the event an Overproduced Party has disposed of its interest by transfer of its assets, in whole or in part, to a subsidiary or parent company in which such parent or subsidiary owns a majority interest in such Overproduced Party.

### 19.     Index Price

The Index Price shall mean the calculated price paid for gas at the point title thereto passes, and shall be determined by using the quoted index price per MMBTU as published in the first issue of the month of production of <u>Inside FERC's Gas Market Report</u> in the table entitled "Prices of Spot Gas Delivered to Pipelines" (or as may be retitled) under a mutually agreed upon heading determined by the appropriate pipeline connection less tariff transportation, gathering (if any), dehydration, compression and other treating and post-production costs back to the point of title transfer. If such Gas Market Report (as may be retitled) ceases to be published then the index will be subject to negotiation in order to obtain a mutually acceptable substitute report title to gas shall pass at their first point at which gas passes into the main pipeline system.

-End of Exhibit-

**EXHIBIT "F"**

Attached to and made a part of that certain Operating Agreement effective this the 25th day of October, 2000, by and between Camterra Resources, Inc., as Operator, and Camterra Resources Partners, Ltd., et al, as Non-Operators.

<u>MEMORANDUM OF OPERATING AGREEMENT/RECORDING SUPPLEMENT</u>

| | | |
|---|---|---|
| STATE OF LOUISIANA | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| PARISH OF WEBSTER | § | |

THAT, CAMTERRA RESOURCES, INC., a Texas Corporation and the Managing General Partner of Camterra Resources Partners, Ltd., whose address is P.O. Box 2069, Marshall, Texas 75671-2069, hereinafter referred to as "Operator", has entered into an Operating Agreement with the following undersigned parties, hereinafter referred to as "Non-Operators".

By reason of that certain Operating Agreement dated and effective as of the 25th day of October, 2000, by and between Operator and Non-Operators, Operator and Non-Operators have agreed to joint exploration, development and production of oil, gas and other hydrocarbons underlying the following described lands, to wit:

All those certain lands or tracts lying within the geographic boundaries of HA RE SUU CAMTRERRA RESOURCES, INC. HAYNESVILLE-MERCANTILE No.3 well insofar and only insofar as to the S ½ of SW ¼ of Section 4 and N ½ of NW ¼ of Section 9, Township 23 North, Range 9 West, Webster Parish, Louisiana.

The Operating Agreement provides that every sale, encumbrance, transfer or other disposition made by any party to the Operating Agreement shall be made expressly subject to the Operating Agreement and shall be made without prejudice to the right of other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest covered by the Operating Agreement shall be deemed a party to the Operating Agreement as to the interest conveyed from and after the effective date of the transfer of ownership, provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until they have received a recorded copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee.

Non-Operator has granted Operator a first lien and security interest upon their oil and gas in the above described lands, and the Operator has granted Non-Operator a like first lien security interest as set forth in the Operating Agreement, to wit:

ARTICLE VII

B.    Liens and Security Interests:

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and

1

equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of oil and/or gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owned against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other party shall be entitled to utilize the provisions of oil and gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may

2

invoke or utilize the mechanic's or materialmen's law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

This Memorandum of Operating Agreement shall constitute a non-standard form financing statement under the terms of the Uniform Commercial Code in which the Contract Area is located, and as such may be filed for record in the real estate records of the county or parish in which the Contract Area is located.

The Operating Agreement will continue in force, by its own terms, so long as any of the oil and gas leases subject to the Operating Agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, unless sooner terminated.

This Memorandum of Operating Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes.  Counterparts may be combined to form a single instrument of recording purposes.  Should one or more of the parties not execute this Memorandum of Operating Agreement, it shall nevertheless be effective and binding on the parties who do execute or ratify it.

IN WITNESS WHEREOF, this Memorandum of Operating Agreement shall be effective as of the 25th day of October, 2000.


WITNESSES:                          OPERATOR:

                                    CAMTERRA RESOURCES, INC.

_____

_____             By: _____
                                    Name: Paul Marchand
                                    Its:    President


                                    NON-OPERATORS:


                                    CAMTERRA RESOURCES PARTNERS, LTD.,
                                    A Texas Limited Partnership
                                    By:  Camterra Resources, Inc.
                                    Its:  Managing General Partner


_____

_____             By: _____
                                    Name: Paul Marchand
                                    Its:    President

                                    Discus Oil Corporation


_____

_____             By: _____
                                    Name:  Wayne T. Davis
                                    Its:    President


3

Turner Exploration Inc.

_____

_____        By: _____
                               Name: Bert Turner
                               Its:    President

Smith Operating and Management Company

_____        By: _____
                               Name: Harry L. Avant
_____        Its:    President

Clark Energy Company

_____        By: _____
                               Name: Jeffery F. Clark
_____        Its:    President

Buck's Boys, L. P.

_____        By: _____
                               Name: James E. Clark
_____        Its:    Trustee

RNK Energy, Inc.

_____        By: _____
                               Name: Richard A. Derbes
_____        Its:    President

Heritage Energy Company

_____        By: _____
                               Name: John Kinnebrew
_____        Its:    President

North American Reserve Corp.

_____        By: _____
                               Name: Brent Bossart
_____        Its:    President

4

Stroud Petroleum, Inc.

By: _____
Name: Scott D. Stroud
Its:     President

SKLARCO, INC.

By: _____
Name:
Its:

Huffman Investments, L.P.

By: _____
Name: Kelly Huffman
Its:     General Partner


_____
Quinton B. Carlile


_____
Steve B. Carlile


_____
Kenneth Q. Carlile


_____
Wayne T. Davis


_____
John J. Doles, Jr.


_____
F. Wayne McWhorter


_____
George Fitts


_____
Steve Copeland

5

STATE OF TEXAS

COUNTY OF HARRISON

     This instrument was acknowledged before me on the _____ day of _____, 2000, by PAUL MARCHAND, President of CAMTERRA RESOURCES PARTNERS, LTD. Texas Limited Partnership, on behalf of said partnership.

 

                                          _____
                                          Notary Public, in and for the State of Texas
                                          My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

     This instrument was acknowledged before me on the _____ day of _____, 2000, by PAUL MARCHAND, President of CAMTERRA RESOURCES, INC., a Texas Corporation, on behalf of said corporation.

 

                                          _____
                                          Notary Public, in and for the State of Texas
                                          My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

     On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Wayne T. Davis, to me personally known, who by me being duly sworn, did say, that he is the President of Discus Oil Corporation and that the above and foregoing instrument was signed on behalf of said Discus Oil Company by the authority of its Board of Directors, and the said Wayne T. Davis acknowledged said instrument to be the free act and deed of said Corporation.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

 

                                          _____
                                            Notary Public, in and for the State of Louisiana
                                            My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

     On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Bert Turner, to me personally known, who by me being duly sworn, did say, that he is the President of Turner Exploration Inc. and that the above and foregoing instrument was signed on behalf of said Turner Exploration Inc. by the authority of its Board of Directors, and the said Bert Turner acknowledged said instrument to be the free act and deed of said Corporation.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

 

                                          _____

Notary Public, in and for the State of Louisiana
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

    On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Harry L. Avant, to me personally known, who by me being duly sworn, did say, that he is the President of Smith Operating and Management Company and that the above and foregoing instrument was signed on behalf of said Smith Operating and Management Company by the authority of its Board of Directors, and the said Harry L. Avant acknowledged said instrument to be the free act and deed of said Company.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                         _____
                                       Notary Public, in and for the State of Louisiana
                                       My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

    On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Jeffrey F. Clark, to me personally known, who by me being duly sworn, did say, that he is the President of Clark Energy Company, Inc. and that the above and foregoing instrument was signed on behalf of said Clark Energy Company, Inc. by the authority of its Board of Directors, and the said Jeffrey F. Clark acknowledged said instrument to be the free act and deed of said Corporation.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                         _____
                                       Notary Public, in and for the State of Louisiana
                                       My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

    On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared James E. Clark, to me personally known, who by me being duly sworn, did say, that he is the Trustee of Buck's Boys, L.P. and that the above and foregoing instrument was signed on behalf of said Buck's Boys, L.P. by the authority of its Board of Directors, and the said James E. Clark acknowledged said instrument to be the free act and deed of said Limited Partnership.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                         _____
                                       Notary Public, in and for the State of Louisiana
                                       My Commission Expires: _____

7

STATE OF LOUISIANA

PARISH OF _____

On this ____ day of_____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared John Kinnebrew, to me personally known, who by me being duly sworn, did say, that he is the President of Heritage Energy Company. and that the above and foregoing instrument was signed on behalf of said Heritage Company, Inc. by the authority of its Board of Directors, and the said John Kinnebrew acknowledged said instrument to be the free act and deed of said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Louisiana
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

On this ____ day of_____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Richard A. Derbes, to me personally known, who by me being duly sworn, did say, that he is the President of RNK Energy, Inc. and that the above and foregoing instrument was signed on behalf of said RNK Energy, Inc. by the authority of its Board of Directors, and the said Richard A. Derbes acknowledged said instrument to be the free act and deed of said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of_____
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF SMITH

On this ____ day of_____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Brent Bossart, to me personally known, who by me being duly sworn, did say, that he is the President of North American Reserve Corp. and that the above and foregoing instrument was signed on behalf of said North American Reserve Corp. by the authority of its Board of Directors, and the said Brent Bossart acknowledged said instrument to be the free act and deed of said Company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

      On this ____ day of_____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Wayne T. Davis, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                              _____
                                            Notary Public, in and for the State of Louisiana
                                            My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

      On this ____ day of_____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Steve Copeland, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                              _____
                                            Notary Public, in and for the State of Texas
                                          My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

      On this ____ day of_____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared F. Wayne McWhorter, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                              _____
                                            Notary Public, in and for the State of Texas
                                          My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON


On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared George Fitts, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____

Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON


On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Quinton B. Carlile, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____

Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON


On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Steve B. Carlile, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____

Notary Public, in and for the State of Texas
My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

      On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Kenneth Q. Carlile, to me personally known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                    _____
                                      Notary Public, in and for the State of Texas
                                      My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

      On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared Scott D. Stroud, to me personally known, who by me being duly sworn, did say, that he is the President of Stroud Petroleum, Inc. and that the above and foregoing instrument was signed on behalf of said Stroud Petroleum, Inc. by the authority of its Board of Directors, and the said Scott D. Stroud acknowledged said instrument to be the free act and deed of said Company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                      _____
                                      Notary Public, in and for the State of Louisiana
                                        My Commission Expires: _____

STATE OF TEXAS

COUNTY OF HARRISON

      On this ____ day of _____, 2000, before me the undersigned Notary Public in and for the County and State aforesaid, appeared Kelly Huffman, to me personally known, who by me being duly sworn, did say, that he is the General Partner of Huffman Investments, L.P. and that the above and foregoing instrument was signed on behalf of said Huffman Investments L.P. by the authority of its Board of Directors, and the said Kelly Huffman acknowledged said instrument to be the free act and deed of said Limited Partnership.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                      _____
                                      Notary Public, in and for the State of Texas
                                        My Commission Expires: _____

STATE OF LOUISIANA

PARISH OF _____

      On this _____ day of _____, 2000, before me the undersigned Notary Public in and for the Parish and State aforesaid, appeared _____, to me personally known, who by me being duly sworn, did say, that he is the _____ of SKLARCO, INC. and that the above and foregoing instrument was signed on behalf of said SKLARCO, INC. by the authority of its Board of Directors, and the said _____ acknowledged said instrument to be the free act and deed of said Company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                   _____

                                   Notary Public, in and for the State of Louisiana
                                   My Commission Expires: _____

-End of Exhibit-

12



A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

Use of this identifying mark is prohibited
except when authorized in writing by the
American Association of Petroleum Landmen

OPERATING AGREEMENT

DATED

December 13, 19 94 ,

OPERATOR _____ SKLAR & PHILLIPS OIL CO. _____

CONTRACT AREA S/2 of SW/4 of Section 4; and N/2 of NW/4 of _____

Section 9, Township 23 North, Range 9 West, Webster Parish, Louisiana

SKLAR & PHILLIPS OIL CO. - HA RE SUU, HAYNESVILLE-MERCANTILE NO. 2

COUNTY OR PARISH OF ___WEBSTER_____ STATE OF ___LOUISIANA___

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610 - 1982  REVISED

JOA    12-13-94
Haynesville Merc # 2

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## GUIDANCE IN THE PREPARATION OF THIS AGREEMENT:

1. <u>Title Page</u> - Fill in blanks as applicable.

2. <u>Preamble, Page 1</u> - Enter name of Operator.

3. Article II - Exhibits:
   (a) Indicate Exhibits to be attached.
   (b) If it is desired that no reference be made to non-discrimination, the reference to Exhibit ''F'' should be deleted.

4. <u>Article III.B. - Interests of Parties in Costs and Production</u> - Enter royalty fraction as agreed to by parties.

5. <u>Article IV.A. - Title Examination</u> - Select option as agreed to by the parties.

6. <u>Article IV.B. - Loss of Title</u> - If ''Joint Loss'' of Title is desired, the following changes should be made:
   (a) Delete Articles IV.B.1 and IV.B.2.
   (b) Article IV.B.3 - Delete phrase ''other than those set forth in Articles IV.B.1 and IV.B.2 above.''
   (c) Article VII.E. - Change reference at end of the first grammatical paragraph from ''Article IV.B.2'' to ''Article IV.B.3.''
   (d) Article X. - Add as the concluding sentence - ''All claims or suits involving title to any interest subject to this agreement shall be treated as a claim or a suit against all parties hereto.''

7. <u>Article V - Operator</u> - Enter name of Operator.

8. <u>Article VI.A - Initial Well:</u>
   (a) Date of commencement of drilling.
   (b) Location of well.
   (c) Obligation depth.

9. <u>Article VI.B.2.(b) - Subsequent Operations</u> - Enter penalty percentage as agreed to by parties.

10. <u>Article VI.C. - Taking Production in Kind</u> - If a Gas Balancing Agreement is not in existence nor attached hereto as Exhibit ''E'', then use Alternate Page 8.

11. <u>Article VII.D.1. - Limitation of Expenditures</u> - Select option as agreed to by parties.

12. <u>Article VII.D.3. - Limitation of Expenditures</u> - Enter limitation of expenditure of Operator for single project and amount above which Operator may furnish information AFE.

13. <u>Article IX. - Internal Revenue Code Election</u> - Delete this article in the event the agreement is a Tax Partnership and Exhibit ''G'' is at-tached.

14. <u>Article X. - Claims and Lawsuits</u> - Enter claim limit as agreed to by parties.

15. <u>Article XIII. - Term of Agreement:</u>
    (a) Select Option as agreed to by parties.
    (b) If Option No. 2 is selected, enter agreed number of days in two (2) blanks.

16. <u>Article XIV.B - Governing Law</u> - Enter state as agreed to by parties.

17. <u>Signature Page</u> - Enter effective date.



Use of this reproduction must be prohibited except where authorized in writing by the American Association of Petroleum Landmen.

I

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE (DELETED) | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between_____
_____SKLAR & PHILLIPS OIL CO._____, hereinafter designated and
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein
as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in
Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the
production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons
and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land
lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the
Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be
developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests
are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or
federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-
ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of
any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate
in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the
singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

XX  A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.

XX  B. Exhibit "B", Form of Lease. (SEE PAGE 2, LINES 8 & 9)

XX  C. Exhibit "C", Accounting Procedure.

XX  D. Exhibit "D", Insurance.

☐  E. Exhibit "E", Gas Balancing Agreement.

☐  F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.

☐  G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body
of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.  NO EXHIBIT "B" ATTACHED AS NEITHER OPERATOR NOR NON-OPERATOR OWN UNLEASED INTERESTS.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of     lessors royalties.     ~~which shall be borne as hereinafter set forth~~.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C. Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D. Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
## TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ **Option No. 1:** Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV

### continued

1  ☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall ~~XXXXXX~~ charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7       Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10 This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12      No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13 provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14 ticipate in the drilling of the well.
15
16 **B.  Loss of Title:**
17
18      1. _Failure of Title:_ Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19 reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20 from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21 tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22 and gas leases and interests; and,
23      (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24 entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25 but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26      (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27 been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
28 curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29 Area by the amount of the interest lost;
30      (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31 increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32 terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33 well;
34      (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35 failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36 who bore the costs which are so refunded;
37      (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38 borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39      (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40 claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41 connection therewith.
42
43      2. _Loss by Non-Payment or Erroneous Payment of Amount Due:_ If, through mistake or oversight, any rental, shut-in well
44 payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45 there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46 payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47 which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48 date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49 the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50 required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51 the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53 or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54      (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55 up to the amount of unrecovered costs;
56      (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57 oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58 termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59 portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,
60      (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61 lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62
63      3. _Other Losses:_ All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64 and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65 the Contract Area.
66
67
68
69
70

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE V.
## OPERATOR

**A. Designation and Responsibilities of Operator:**

SKLAR & PHILLIPS OIL CO. _____shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. **Resignation or Removal of Operator:** Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. **Selection of Successor Operator:** Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C. Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D. Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A. Initial Well:**

At earliest possible date after execution by all working interest owners of this Operating Agreement and availability of suitable drilling rig Operator shall commence the drilling of a well for oil and gas at the following location:

2310' East of West Boundary Line and 50' South of North Boundary Line of Section 9, Township 23 North, Range 9 West,

and shall thereafter continue the drilling of the well with due diligence to

11,000', or a depth sufficient to test the Haynesville Sand, Reservoir E, North Shongaloo-Red Rock Field, as defined in Conservation Department Order Nos. 104-G-4 and 104-G-10

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2  well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

6  B.  Subsequent Operations:

8    1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided
9  for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10 the parties and not then producing in paying quantities, the party desiring to drill, rework/ deepen or plug back such a well shall give the
11 other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12 tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13 within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
14 ing rig is on location, notice of a proposal to rework/plug back or drill deeper may be given by telephone and the response period shall be
15 limited to ~~forty-eight (48)~~ twenty-four (24) hours, ~~exclusive of Saturday, Sunday and legal holidays.~~ Failure of a party receiving such notice to reply within
16 the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17 response given by telephone shall be promptly confirmed in writing.

21    If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22 period of thirty (30) days (or as promptly as possible after the expiration of the ~~forty-eight (48)~~ sixty twenty-four (24) hour period when a drilling rig is on loca-
23 tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24 ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25 for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26 permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27 amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
28 actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29 if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30 dance with the provisions hereof as if no prior proposal had been made.

34    2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
35 No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36 giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) twenty-four (24) days after the expiration of
37 the notice period of thirty (30) days (or as promptly as possible after the expiration of the ~~forty-eight (48)~~ twenty-four (24) hour period when a drilling rig is
38 on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
39 work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40 a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41 tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
42 senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43 ditions of this agreement.

47    If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48 notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
49 to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within ~~forty-eight (48)~~ twenty-four (24) hours
50 (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51 ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52 failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
53 such a response shall not exceed a total of ~~forty-eight (48)~~ twenty-four (24) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
54 at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

58    The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59 elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
60 operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61 If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62 sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63 ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1     and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2     ties. Upon commencement of operations for the drilling, reworking/deepening or plugging back of any such well by Consenting Parties
                                             recompleting
3     in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4     and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5     Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6     market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7     terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8     until it reverts) shall equal the total of the following:

11          400%
12     (a) 100%of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13     connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14     Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15     Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16     Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17     Party had it participated in the well from the beginning of the operations; and

20                                          recompleting
21     (b) __400__ % of that portion of the costs and expenses of drilling, reworking/deepening, plugging back, testing and completing,
22     after deducting any cash contributions received under Article VIII.C., and __400__ % of that portion of the cost of newly acquired equip-
23     ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24     participated therein.

28         An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29     working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30     conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31     reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32     and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33     the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34     such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35     plicable as between said Consenting Parties in said well.

39         During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40     proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41     taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42     ticle III.D.

                         recompleting
45         In the case of any reworking,/plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
46     of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
47     abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
48     ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

53         Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54     Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55     itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56     option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57     ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58     operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59     curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60     realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61     produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62     well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63     which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64     of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65     above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro- duction, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen- ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram- matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par- ties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand- by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par- ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in- stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

## C. TAKING PRODUCTION IN KIND:

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

-7-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

3     Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.

7     In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8 the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,
9 but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-
10 taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to
11 the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas
12 not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such
13 reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event
14 for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-
15 merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.

17 D.   Access to Contract Area and Information:

19     Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
20 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
21 and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
22 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
23 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
24 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
25 quests the information.

27 E.   Abandonment of Wells:

29     1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
30 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
31 without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
32 within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of the proposal to plug and abandon
33 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
34 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
35 such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
36 operations in search of oil and/or gas subject to the provisions of Article VI.B.

38     2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
39 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
40 producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
41 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
42 thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
43 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
44 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
45 Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandonment. Each abandoning party shall assign
46 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
47 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
48 terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
49 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
50 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
51 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit



A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

B. Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

C. Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. Limitation of Expenditures:

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

-9-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1   ☐  Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2   necessary tankage and/or surface facilities.
3
4   ☒  Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5   authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6   to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have ~~forty-eight~~ twenty-four
7   ~~(48)~~ hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8   tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9   cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase ''reworking, deepening or plugging
12  back'' as contained in Article VI.B.2. shall be deemed to include ''completing'') shall apply to the operations thereafter conducted by less
13  than all parties.
14
15      2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.
19
20      3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of_____Twenty Thousand_____Dollars ($20,000.00_____)
22  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of___Two Thousand Five Hundred_____
28  Dollars ($_2,500.00_____) but less than the amount first set forth above in this paragraph.
29
30  E.  Rentals, Shut-in Well Payments and Minimum Royalties:
31
32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.2.
39
40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46  F.  Taxes:
47
48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit ''C''.
59
60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65  provided in Exhibit ''C''.
66
67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68  the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

-10-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

G. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

D. **Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all leases and equipment and production; or

2. an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

E. **Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

F.  Preferential Right to Purchase:

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

### ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

-12-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.

CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed_____FIVE THOUSAND AND NO/100 -----------------------------------Dollars ($ 5,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

ARTICLE XI.

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.

NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.

TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☒  Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of ___120___ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within ___90___ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

-13-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Louisiana _____ shall govern.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
### OTHER PROVISIONS

A.  Notwithstanding the provisions of this agreement and of the Accounting Procedure attached as Exhibit "C", the parties to this agreement specifically agree that in no event during the term of this contract shall Operator be required to make more than one billing for the entire interest credited to each party on Exhibit "A". It is further agreed that if any party to this agreement (hereinafter referred to as "Selling Party") disposes of part of the interest credited to it on Exhibit "A", the Selling Party will be solely responsible for billing its assignee or assignees, and shall remain primarily liable to the other parties for the interest or interests assigned and shall make prompt payment to Operator for the entire amount of statements and billing rendered to it. It is further understood and agreed that if Selling Party disposes of all its interest as set out on Exhibit "A", whether to one or several assignees, Operator shall continue to issue statements and billings to the Selling Party for the interest conveyed until such time as Selling Party has designated and qualified one assignee to receive the billings for the entire interest conveyed. In order to qualify one assignee to receive the billing for the entire interest credited to Selling Party on Exhibit "A", Selling Party shall furnish to Operator the following:

1.  Written note of the conveyance and photostatic or certified copies of the assignments by which the transfer was made.

2.  The name of the assignee to be billed and a letter in which said assignee consents to receive statements and billings for the entire interest credited to Selling Party on Exhibit "A" hereof and, further, consents to handle any necessary sub-billings in the event it does not own the entire interest credited to Selling Party on Exhibit "A".

B.  In the event Operator receives 100% payment for the proceeds of production and Operator disburses royalties, then Operator shall be entitled to charge the joint account with the actual cost of the necessary division order title opinions, division orders and the sum of $1.00 per month for each party to whom such monies are disbursed, or $50.00 per month, whichever is the greater. It is understood and agreed between the parties hereto that Operator will only disburse monies for parties signatory to the Gas Purchase Contract executed by it.

14

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ day of _____, 19_____.

### OPERATOR

ATTEST:                                    SKLAR & PHILLIPS OIL CO.

_Charles L. Williams_                      By: _August Erickson_
Charles L. Williams                            August Erickson, Vice President
Secretary-Treasurer

### NON-OPERATORS

WITNESSES:                                 S & P CO.

_Joan Bailey_                              By: _August Erickson_
                                               August Erickson, General Manager
_Phyllis Longmire_

                                           _Scott D. Stroud_
_Joan Bailey_                              Scott D. Stroud

_Phyllis Longmire_

                                           _August Erickson_
_Joan Bailey_                              August Erickson

_Phyllis Longmire_

                                           THE ANDERSON PARTNERS

_____           By: _____

_____

_____           WESTMARC RESOURCES, INC.

_____           By: _____

_____

_____           DISCUS OIL COMPANY

_____           By: _____

_____

_____           SMITH OPERATING AND MANAGEMENT COMPANY

_____           By: _____

_____

_____

_____           William M. Plaster

_____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___13th___ day of ___December___, 19_94_.

### OPERATOR

ATTEST:                                          SKLAR & PHILLIPS OIL CO.

_Charles L. Williams_ (signature)               By: _August Erickson_ (signature)
Charles L. Williams                                  August Erickson, Vice President
Secretary-Treasurer

### NON-OPERATORS

WITNESSES:                                       S & P CO.

_Fran Bailey_ (signature)                        By: _August Erickson_ (signature)
_Phyllis Longmire_ (signature)                       August Erickson, General Manager

_Fran Bailey_ (signature)                        _Scott D. Stroud_ (signature)
_Phyllis Longmire_ (signature)                   Scott D. Stroud

_Fran Bailey_ (signature)                        _August Erickson_ (signature)
_Phyllis Longmire_ (signature)                   August Erickson

                                                 ANDERSON EXPLORATION ENERGY COMPANY, L.C.
_Roger R. Oldphul_ (signature)                   ~~THE ANDERSON PARTNERS~~
_Nancy R. Stephens_ (signature)                  By: _R. E. Bounds_ (signature)
                                                     R. E. Bounds, Jr.
                                                     Agent and Attorney-in-fact

                                                 WESTMARC RESOURCES, INC.

_____                 By: _____


                                                 DISCUS OIL COMPANY

_____                 By: _____


                                                 SMITH OPERATING AND MANAGEMENT COMPANY

_____                 By: _____


_____                     William M. Plaster

-15-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___1st___ day of ___January___, 19 95 .

OPERATOR

ATTEST:                                          SKLAR & PHILLIPS OIL CO.

_____                        By: _____
Charles L. Williams                                  August Erickson, Vice President
Secretary-Treasurer


NON-OPERATORS

WITNESSES:                                       S & P CO.

_____                        By: _____
                                                     August Erickson, General Manager

_____

                                                 _____
_____                            Scott D. Stroud


_____
                                                 _____
_____                            August Erickson


_____                        THE ANDERSON PARTNERS

_____                        By: _____


_____                        UNITEX PROPERTIES, INC.

_____                        By: _____


_____
                                                 _____
_____                            Quinton B. Carlile


_____
                                                 _____
_____                            Steve B. Carlile


_____
                                                 _____
_____                            Kenneth Q. Carlile

Use of this identifying mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen.

- 15 -

Attached to and made a part of that certain Operating Agreement dated December 13, 1994, by and between Sklar & Phillips Oil Co., as "Operator" and S & P Co., et al as "Non-Operators."

**NON-OPERATORS**
(Continued)

WITNESSES:

DISCUS OIL CORPORATION

By: _____

_____
Wayne T. Davis

_____
John P. Doles, Jr.

TURNER EXPLORATION, INC.

By: _____

SMITH OPERATING AND MANAGEMENT COMPANY

By: _____

_____
William M. Plaster

_____
Richard A. Derbes

SHULER DRILLING COMPANY

By: _____

CLARK ENERGY COMPANY, INC.

By: _____

_____
James E. Clark

_____
James Young

_____
W. Harlan Beene

Attached to and made a part of that certain Operating Agreement dated December 13, 1994, by and between Sklar & Phillips Oil Co., as "Operator" and S & P Co., et al as "Non-Operators."

**NON-OPERATORS**
(Continued)

WITNESSES:                                  DISCUS OIL CORPORATION

_____                     By:_____

_____

*Judith M. Pittman Sec't*
*Martha H. Coile*                            _____
                                             Wayne T. Davis


_____                     _____
                                             John W. Doles, Jr.
_____

                                             TURNER EXPLORATION, INC.

_____                     By:_____

_____

                                             SMITH OPERATING AND MANAGEMENT COMPANY

_____                     By:_____

_____


_____                     _____
                                             William M. Plaster
_____


_____                     _____
                                             Richard A. Derbes
_____

                                             SHULER DRILLING COMPANY

_____                     By:_____

_____

                                             CLARK ENERGY COMPANY, INC.

_____                     By:_____

_____


_____                     _____
                                             James E. Clark
_____


_____                     _____
                                             James Young
_____


_____                     _____
                                             W. Harlan Beene
_____

Page (15A)

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ day of _____, 19_____.

OPERATOR

ATTEST:                                          SKLAR & PHILLIPS OIL CO.

_____                        By: _____
Charles L. Williams                                  August Erickson, Vice President
Secretary-Treasurer

NON-OPERATORS

WITNESSES:                                       S & P CO.

_____                        By: _____
                                                     August Erickson, General Manager

_____
                                                 _____
_____                        Scott D. Stroud

_____
                                                 _____
_____                        August Erickson

_____
                                                 THE ANDERSON PARTNERS

_____                        By: _____

_____

_____                        WESTMARC RESOURCES, INC.

_____                        By: _____

_____

_____                        DISCUS OIL COMPANY

_____                        By: _____

_____

_____                        SMITH OPERATING AND MANAGEMENT COMPANY

_____                        By: _____

_____

_____                        William M. Plaster

_____

- 15 -

Attached to and made a part of that certain Operating Agreement dated
December 13, 1994, by and between Sklar & Phillips Oil Co., as "Operator"
and S & P Co., et al as "Non-Operators."

**NON-OPERATORS**
(Continued)

WITNESSES:                          DISCUS OIL CORPORATION

_____             By:_____

_____

_____             _____

_____                Wayne T. Davis

_____             _____
_____                John J. Doles, Jr.

                                    TURNER EXPLORATION, INC.

_____             By:_____

_____

                                    SMITH OPERATING AND MANAGEMENT COMPANY

_____             By:_____

_____

_____             _____
                                       William M. Plaster

_____

_____             _____
                                       Richard A. Derbes

                                    SHULER DRILLING COMPANY

_____             By:_____

_____

                                    CLARK ENERGY COMPANY, INC.

_____             By:_____

_____

_____             _____
                                       James E. Clark

_____

_____             _____
                                       James Young

_____

_____             _____
                                       W. Harlan Beene

Page (15A)

Attached to and made a part of that certain Operating Agreement dated
December 13, 1994, by and between Sklar & Phillips Oil Co., as "Operator"
and S & P Co., et al as "Non-Operators."

**NON-OPERATORS**
(Continued)

WITNESSES:                                DISCUS OIL CORPORATION

_____           By:_____

_____


_____           _____
                                               Wayne T. Davis
_____


_____           _____
                                               John T. Doles, Jr.
_____

*[signature: Jacqueline Pride]*           TURNER EXPLORATION, INC.
*[signature: Crystal R. Wilson]*          By: *[signature]*_____


_____           SMITH OPERATING AND MANAGEMENT COMPANY

_____           By:_____


_____           _____
                                               William M. Plaster
_____


_____           _____
                                               Richard A. Derbes
_____

                                           SHULER DRILLING COMPANY

_____           By:_____

_____

                                           CLARK ENERGY COMPANY, INC.

_____           By:_____

_____


_____           _____
                                               James E. Clark
_____


_____           _____
                                               James Young
_____


_____           _____
                                               W. Harlan Beene
_____

Page (15A)

Attached to and made a part of that certain Operating Agreement dated
December 13, 1994, by and between Sklar & Phillips Oil Co., as "Operator"
and S & P Co., et al as "Non-Operators."

## NON-OPERATORS
(Continued)

WITNESSES:

DISCUS OIL CORPORATION

By:_____

_____

_____

_____
    Wayne T. Davis

_____

_____
    John T. Doles, Jr.

_____
TURNER EXPLORATION, INC.

By:_____

_____

SMITH OPERATING AND MANAGEMENT COMPANY

_____
By:_____

_____

*Samuel H. Cole*

*Dwight M. Brown Jr.*

*William M. Plaster*
    William M. Plaster

_____
    Richard A. Derbes

_____
SHULER DRILLING COMPANY

By:_____

_____
CLARK ENERGY COMPANY, INC.

By:_____

_____

_____
    James E. Clark

_____
    James Young

_____
    W. Harlan Beene

Attached to and made a part of that certain Operating Agreement dated
December 13, 1994, by and between Sklar & Phillips Oil Co., as "Operator"
and S & P Co., et al as "Non-Operators."

## NON-OPERATORS
(Continued)

WITNESSES:                              DISCUS OIL CORPORATION

_____                 By:_____

_____

_____
_____                 _____
                                         Wayne T. Davis

_____                 _____
_____                 John T. Doles, Jr.

                                         TURNER EXPLORATION, INC.

_____                 By:_____

_____

                                         SMITH OPERATING AND MANAGEMENT COMPANY

_____                 By:_____

_____

_____                 _____
_____                 William M. Plaster

_____                 _____
_____                 Richard A. Derbes

                                         SHULER DRILLING COMPANY

_____                 By:_____

_____                 CLARK ENERGY COMPANY, INC.

_____                 By:_____
_____                 JEFFREY F. CLARK, President

_____                 _____
_____                 James E. Clark

_____                 _____
_____                 James Young

_____                 _____
_____                 W. Harlan Beene

Page (15A)

Attached to and made a part of that certain Operating Agreement dated December 13, 1994, by and between Sklar & Phillips Oil Co., as "Operator" and S & P Co., et al as "Non-Operators."

## NON-OPERATORS
### (Continued)

WITNESSES:

DISCUS OIL CORPORATION

By:_____

_____
Wayne T. Davis

_____
John T. Doles, Jr.

TURNER EXPLORATION, INC.

By:_____

SMITH OPERATING AND MANAGEMENT COMPANY

By:_____

_____
William M. Plaster

_____
Richard A. Derbes

SHULER DRILLING COMPANY

By:_____

CLARK ENERGY COMPANY, INC.

By:_____

_____
James E. Clark

_____
James Young

_____
W. Harlan Beene

Page (15A)

NON-OPERATORS

_Sharon L. Smith_

_Catherine M. Doyle_

_Richard A. Derbes_
Richard A. Derbes

HERITAGE ENERGY COMPANY

By: _____

SHULER DRILLING COMPANY

By: _____


_____
James Young


_____
W. Harlan Beene

NON-OPERATORS

_____          Richard A. Derbes

_____          HERITAGE ENERGY COMPANY

_____          By: _____

_____

_Alice Norris_                     SHULER DRILLING COMPANY
_Valora S. Griffin_                By: _Robert Reynolds_

_____

_____          James Young

_____

_____          W. Harlan Beene

_____

NON—OPERATORS

_____          Richard A. Derbes

_____          HERITAGE ENERGY COMPANY

_____          By:_____

_____

_____          SHULER DRILLING COMPANY

_____          By:_____

_____

_____          _____
                                         James Young

_Dan Naremore_
_Joan Bailey_                            _W. Harlan Beene_
                                         W. Harlan Beene

NON-OPERATORS

_____                    _____
                                                      Richard A. Derbes

_____                    HERITAGE ENERGY COMPANY

_____                    By:_____

_____

_____                    SHULER DRILLING COMPANY

_____                    By:_____

_____

*Tina Williamson*
*James D. Batty*                               *James Young*
                                                James Young

_____

_____                    _____
                                                      W. Harlan Beene

EXHIBIT "A"

Attached to and made part of Operating Agreement dated
December 13, 1994, by and between Sklar & Phillips Oil
Co., as Operator, and S & P Co., et al, as Non-Operator.

I.      DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT:

S/2 of SW/4 of Section 4; and N/2 of NW/4 of Section 9, Township
23 North, Range 9 West, Webster Parish, Louisiana.

II.     RESTRICTIONS AS TO DEPTHS, FORMATIONS OR SUBSTANCES:

The following depths applicable to all leases subject hereto are
excluded from this Operating Agreement:

(1)  All depths from surface to 6,000'.

(2)  All depths below the Base of the Haynesville Formation.

(3)  The Talley Sand of the Cotton Valley Formation, said
     sand being identified as that sand lying between 8980'
     and 9010' on the Schlumberger Induction Electric Log
     of Sklar & Phillips Oil Co. - Haynesville-Mercantile #1
     located in the NE/4 of NW/4 of Section 9, Township 23
     North, Range 9 West, Webster Parish, Louisiana.

III.(A) OIL AND GAS LEASES CONTRIBUTED TO THIS AGREEMENT BY THE FOLLOWING
PARTIES IN THE PERCENTAGES SET OUT BESIDE THE NAME OF EACH PARTY:

1.  Oil, Gas, and Mineral Lease dated April 2, 1993, by and between
    Ozelle S. Powell, et al, as Lessor, and Clark Energy Company,
    Inc., as Lessee, recorded under Registry No. 379503 of the
    Records of Webster Parish, Louisiana.

2.  Co-Lessor's Agreement dated April 8, 1993, by and between
    William Clinton Scott, et ux, as Lessor, and Clark Energy
    Company, Inc., as Lessee, recorded under Registry No. 379504
    of the Records of Webster Parish, Louisiana.

3.  Oil, Gas and Mineral Lease dated May 20, 1983, by and between
    Don S. Coleman, et al, as Lessor, and Western Reserves Oil
    Company, as Lessee, recorded under Registry No. 309945 of
    of the Records of Webster Parish, Louisiana.

| WORKING INTEREST OWNER | LEASE OWNERSHIP | UNIT OWNERSHIP |
|---|---|---|
| Anderson Exploration Energy Company, L.C. ~~The Anderson Partners~~ Attn:  R. E. Bounds, Jr. P.O. Box 2187 Shreveport, LA  71166 (318) 227-2000  FAX:  (318) 425-5935 | .25000000 | .12500000 |
| Unitex Properties, Inc. P.O. Box 2069 Marshall, TX  75671 Attn:  Quinton B. Carlile, President Paul Marchand (903) 935-1430  FAX:  (903) 935-0521 | .02625000 | .01312500 |
| Quinton B. Carlile          1/ P.O. Box 2069 Marshall, TX  75671 (903) 935-1430  FAX:  (903) 935-0521 | .10250000 | .05125000 |
| Steve B. Carlile          1/ P.O. Box 2069 Marshall, TX  75671 (903) 938-9949  FAX: (903) 935-0521 | .08250000 | .04125000 |
| Kenneth Q. Carlile          1/ P.O. Box 2069 Marshall, TX  75671 (903) 938-9949  FAX:  (903) 935-0521 | .08250000 | .04125000 |

| | | |
|---|---|---|
| Discus Oil Corporation<br>P. O. Box 368<br>Plain Dealing, LA  71064<br>(318) 424-6640  FAX:  (318) 326-4255 | .03000000 | .01500000 |
| Wayne T. Davis<br>P. O. Box 368<br>Plain Dealing, LA  71064<br>(318) 424-6640  FAX:  (318) 326-4255 | .02000000 | .01000000 |
| John T. Doles, Jr.<br>P. O. Box 128<br>Plain Dealing, LA  71064<br>(318) 326-4292 | .02000000 | .01000000 |
| Turner Exploration Inc.<br>P. O. Box 368<br>Plain Dealing, LA  71064<br>(318) 424-6640  FAX:  (318) 326-4255 | .05000000 | .02500000 |
| Smith Operating and Management Company<br>P. O. Box 52<br>Shreveport, LA  71161<br>(318) 222-3119  FAX:  (318) 222-0566 | .02343750 | .01171875 |
| William M. Plaster   1/ & 2/<br>610 Marshall Street, Suite 610<br>Shreveport, LA  71101<br>(318) 221-2584  FAX:  (318)  221-2586 | .11550790 | .05775395 |
| Richard A. Derbes<br>86 Arrowhead Trail<br>New Canaan, CT  06840<br>(203) 972-0399  FAX:  (212)  703-4924 | .02343750 | .01171875 |
| Shuler Drilling Company<br>Attn:  Robert Reynolds<br>3514 West Hillsboro Street<br>El Dorado, AR  71730<br>(501) 863-7234  FAX:  (501) 863-6331 | .11968750 | .05984375 |
| Clark Energy Company, Inc.<br>509 Market Street, Suite 600<br>Shreveport, LA 71101<br>(318) 424 -0813 | .02667960 | .01333980 |
| James E. Clark<br>920 McCormick Blvd.<br>Shreveport, LA 71104<br>(318) 221-1605  FAX:  (318) 221-1749 | .02000000 | .01000000 |
| James Young<br>2002 E 70th Street<br>Shreveport, LA  71105<br>(318) 868-7500  FAX:  (318) 868-6639 | .00750000 | .00375000 |
| TOTAL | 1.00000000 | .50000000 |

1/  Subject to that certain Farmout Agreement granted by Heritage Energy
    Company dated January 1, 1995, covering leasehold interests described above
    under article III. (A).

2/  Subject to that certain Farmout Agreement granted by Bob B. Slack, etal
    dated January 1, 1995, covering leasehold interests described above under
    article III. (A).

EXHIBIT "A" - Continued

(B) OIL AND GAS LEASES CONTRIBUTED TO THIS AGREEMENT BY THE FOLLOWING
PARTIES IN THE PERCENTAGES SET OUT BESIDE THE NAME OF EACH PARTY:

4.  Oil, Gas and Mineral Lease dated August 16, 1963, between
    Shelby J. Beene, et al, as Lessor, and Sklar Producing, Co.,
    Inc., as Lessee, being recorded under Registry No. 187312
    of the Conveyance Records of Webster Parish, Louisiana.

5.  Oil, Gas and Mineral Lease dated August 16, 1963, between
    Bernard M. Watters, et al, as Lessor, and Sklar Producing
    Co. Inc., as Lessee, being recorded under Registry No. 187325
    of the Conveyance Records of Webster Parish, Louisiana.

6.  Co-Lessor's Agreement dated August 20, 1963, with Rosalind B.
    McKenzie as Co-Lessor of Agreement, being recorded under
    Registry No. 187313 of the Conveyance Records of Webster
    Parish, Louisiana.

7.  Co-Lessor's Agreement dated October 10, 1963, with Elsie M.
    Watters as Co-Lessor or Agreement, being recorded under Registry
    No. 188150 of the Conveyance Records of Webster Parish, Louisiana.

8.  Co-Lessor's Agreement dated August 23, 1963, with Louise W.
    Hawes as Co-Lessor of Agreement, being recorded under Registry
    No. 190130 of the Conveyance Records of Webster Parish, Louisiana.

9.  Co-Lessor's Agreement dated August 23, 1963, with Exa W. Heath as
    Co-Lessor of Agreement, being recorded under Registry No. 187326
    of the Conveyance Records of Webster Parish, Louisiana.

10. Co-Lessor's Agreement dated August 23, 1963, with Barbara Ann
    Watters and Percy M. Watters as Co-Lessors of Agreement, being
    recorded under Registry No. 187916 of the Conveyance Records of
    Webster Parish, Louisiana.

| WORKING INTEREST OWNER | LEASE OWNERSHIP | UNIT OWNERSHIP |
|---|---|---|
| W. Harlan Beene P.O. Box 5316 Bossier City, LA 71171-5316 (318) 746-1154 or 746-0824 | .10000000 | .05000000 |
| August Erickson P.O. Box 3735 Shreveport, LA 71133-3735 (318) 222-1800  FAX: (318) 424-1257 | .01500000 | .00750000 |
| Scott D. Stroud P.O., Box 3735 Shreveport, LA 71133-3735 (318) 222-1800  FAX: (318) 424-1257 | .01000000 | .00500000 |
| S & P CO. P.O. Box 3735 Shreveport, LA 71133-3735 (318) 222-1800  FAX: (318) 424-1257 | .87500000 | .43750000 |
| TOTAL | 1.00000000 | .50000000 |

EXH-2A

## EXHIBIT "B"

There is no Exhibit "B" to this Operating Agreement.

EXHIBIT 601, TULSA 74101
Recommended by the Council of Petroleum Accountants Societies of North America
COPAS

## EXHIBIT " C "

Attached to and made a part of  Operating Agreement dated December 13, 1994 by and between Sklar & Phillips Oil Co., as Operator, and S & P Co., et al, as Non-Operator.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

### 2. Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3. Advances and Payments by Non-Operators

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at ~~the rate of twelve percent (12%)~~ per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### 5. Audits

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

### 6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

*prime rate at Chase Manhattan Bank plus two percent (2%)

COPAS

# II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1. Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**2. Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations. at the current area contract rate.

(2) Salaries of First Level Supervisors in the field. at current area consultant rate.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates. at current area consultant rate.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

**3. Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed ~~twXeXXXX'X§XKXeXXHXXZ0X%XX~~ twenty-six percent (26%) or that rate most recently recommended by the Council of Petroleum Accountants Societies of North America.

**4. Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**5. Transportation — At Cost.**

~~Transportation of employees and Material necessary for the Joint Operations but subject to the following limita-~~ tions:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost ~~of $200 or less excluding accessorial charges.~~

**6. Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

**7. Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. ~~For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.~~

**8. Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**9. Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, ~~except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.~~

— 2 —

COPAS

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance ~~required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers' Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.~~

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead – Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( XX ) Fixed Rate Basis, Paragraph 1A, or

(      ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (      ) shall not (XX) be covered by the Overhead rates.

**A. Overhead – Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $ 5,000.00

Producing Well Rate $ 500.00

(2) Application of Overhead – Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

[1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

[2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

[3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

(b) Producing Well Rates

[1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

[2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

[3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

[4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

[5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

COPAS

B. Overhead – Percentage Basis

~~(1) Operator shall charge the Joint Account at the following rates:~~

  (a) Development

    _____ Percent ( %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

  (b) Operating

    _____ Percent ( %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

  (2) Application of Overhead – Percentage Basis shall be as follows:
For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. **Overhead – Major Construction** To be agreed upon

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $_____ :

A. _____% of total costs if such costs are more than $_____ but less than $_____ ; plus

B. _____% of total costs in excess of $_____ but less than $1,000,000; plus

C. _____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. **Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases** shall be at Operator's cost.

~~Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.~~

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

  (1) Tubular goods, except line pipe, shall be priced at cost. ~~the current new price in effect on date of movement on a maximum carload or barge-load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.~~

  (2) Line Pipe

    (a) Movement of less than 30,000 pounds shall be priced at cost. ~~the current new price in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.~~

    (b) Movement of 30,000 pounds or more shall be priced at cost. ~~under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.~~

  (3) Other Material shall be priced at cost. ~~the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.~~

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1) Material moved to the Joint Property market value. ~~At seventy-five percent (75%) of~~ current ~~new price, as determined by Paragraph 2A of this Section IV.~~

  (2) Material moved from the Joint Property market value. ~~At seventy-five percent (75%) of~~ current ~~new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material; or~~

— 4 —

COPAS

(b) ~~at sixty-five percent (65%) of current new price, as determined by Paragraph 3A of this Section~~ At current market value. ~~IV, if Material was originally charged to the Joint Account as good used Material at seventy-five per-~~ ~~cent (75%) of current new price.~~

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at ~~fifty percent (50%) of current new price as determined by Para-~~ current market value. ~~graph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, pro-~~ ~~vided Condition C value plus cost of reconditioning does not exceed Condition B value.~~

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of ~~fifteen cents (15¢) per~~ cost ~~hundred-weight~~ on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

EXHIBIT "D"

Attached to and made a part of Operating Agreement dated
December 13, 1994 by and between Sklar & Phillips Oil Co.,
as Operator, and S & P Co., et al, as Non-Operator.

## INSURANCE

Operator, at all times while conducting operations under this agreement,
shall carry the following insurance:

A.  Workmen's Compensation and/or Employers Liability insurance
    in amounts reasonably sufficient to cover liability for injury
    to or death of Operator's employees, such insurance, if
    required by laws of the state in which the leased lands are
    located, to be in conformity with such laws.

B.  General Public Liability and Property Damage Insurance with
    limits of not less than $300,000.00 covering injury to or death
    of one or more persons by reason of occurrence, and Property
    Damage Liability Insurance with limits of not less than
    $100,000.00 for each occurrence.

C.  Automobile Public Liability and Property Damage Insurance with
    limits of not less than $100,000.00 covering injury or death
    of one person and not less than $300,000.00 covering injury
    to or death of more than one person by reason of one accident,
    and not less than $50,000.00 covering property of third persons.

If Operator elects to carry such insurance under its present policies,
Operator shall make a reasonable charge therefor.  If separate policies
are secured, the actual premiums paid shall be included as a part of the
operating costs.  Operator will not be required to carry fire, tornado, or
any other type of insurance on the property of the parties hereto.

EXHIBIT "E"

Attached to and made part of Operating Agreement dated December 13, 1994, by and between Sklar & Phillips Oil Co., as Operator, and S & P Co., et al, as Non-Operator.

## GAS BALANCING AGREEMENT

1. ### Gas Imbalances.

Notwithstanding anything to the contrary in the Operating Agreement to Which this Gas Balancing Agreement is attached, if any party hereto takes and disposes of less than its percentage interest share of gas (including casinghead gas) produced and saved during any calendar month, then the volume not taken by such party may be taken by an other party or parties hereto. If such volume is taken by more than one party, then each taking party shall be entitled to take the proportion thereof that its percentage interest bears to the sum of the percentage interests of all taking parties, or in such other proportions as the taking parties may agree upon among themselves.

2. ### Gas Balancing.

2.1 **Applicability.** This Paragraph 2 shall apply separately to each category established by law, regulation or governmental order for the purpose of regulating or deregulating the price of gas; including but not limited to categories established by the Natural Gas Policy Act of 1978 and regulations or orders of the Federal Energy Regulatory Commission. In the event a category is revised, the category as revised shall be considered a new and separate category.

2.2 **Definitions.** The term "Cumulative Underproduction" means the amount by which the cumulative volume of gas taken by a party within a particular category is less than the cumulative volume that party was entitled to take within such category according to its percentage interest; the term "Cumulative Overproduction" means the amount by which the cumulative volume of gas taken by a party within a category exceeds the cumulative volume that party was entitled to take within such category according to its percentage interest; the term "Underproducer" means a party credited with Cumulative Underproduction; the term "Overproducer" means a party charged with Cumulative Overproduction; and the term "Make-Up Gas" means the volume taken by an Underproducer to make up Cumulative Underproduction pursuant to Paragraph 2.4 below.

2.3 **Operator's Statements.** On or before the end of each calendar month, Operator shall furnish the parties hereto a written statement showing for each category (a) the total volume of gas taken by each party during the second calendar month next preceding that month; (b) the Make-Up Gas taken by each party during the second month next preceding; (c) the cumulative volume of production, if any, of each party as of the end of the second month next preceding.

2.4 **Volumetric Balancing.** By giving written notice to Operator and all other parties hereto at least 15 days before the beginning of a calendar month, an Underproducer shall be entitled to take during that month, in addition to its full percentage interest share of gas, a volume of Make-Up Gas equal to its Cumulative Underproduction, provided that to accommodate such make-up no other party (including an Overproducer) shall ever be required to take less than 50% of its percentage interest share of gas during the month, and provided that the right to take Make-Up Gas shall be subordinate to the right of any other party to take its full percentage interest share of gas from time to time to satisfy the deliverability test requirements of its gas contract. If two or more Underproducers desire to take Make-Up Gas during the same month and the combined volume they desire to take exceeds the volume available as Make-Up Gas, the volume available as Make-Up Gas shall be shared by such Underproducers in proportion to their respective Cumulative Underproduction. Make-Up Gas volumes shall be applied against Cumulative Underproduction and Cumulative Overproduction on a first-in-first-out basis.

2.5 **Oil and Other Minerals.** Regardless of the volume of gas actually taken by any party hereto, such party shall share, as otherwise provided in the Operating Agreement, in the production of crude oil, condensate and other minerals separate from the gas in facilities operated for the joint account.

-1-

2.6   Costs and Expenses.   Regardless of the volume of gas actually taken by any party hereto, such party shall bear costs and expenses as otherwise provided in the Operating Agreement.

2.7   Information to be Furnished Operator.   At Operator's request from time to time each party shall provide Operator with a written statement identifying the purchaser of that party's share of gas, gas volumes sold by month, and the pressure basis in which sales volumes are computed. Each party shall promptly notify Operator in writing of: (i) a change in the identity of the purchaser of that party's share of gas, giving the name and address of the new purchaser, (ii) a temporary or permanent suspension of deliveries of the party's gas, stating the date upon which such suspension is effective and (iii) the first delivery or resumption of deliveries of gas, identifying the purchaser by name and address and the effective date of such first delivery or resumption.

## 3.   Final Cash Balancing.

3.1   Statements.   If all parties have not achieved volumetric gas balance in all categories upon termination of the Operating Agreement or upon a permanent cessation of all gas production thereunder, Operator shall furnish to all parties a statement showing the final Cumulative Overproduction and Cumulative Underproduction of each party by category, and the month and year in which it accrued. Within 60 days after receipt of Operator's statement, each Overproducer shall furnish to all other parties a statement showing the value of its Cumulative Overproduction for each category, based on the price the Overproducer actually received for the gas in a sale to a Nonaffiliate during the month(s) in which the Cumulative Overproduction accrued, less all payments made by the Overproducer pursuant to Paragraph 4 below. In the absence of a sale to a Nonaffiliate, value shall be based on the highest price received by any party hereto in a sale to a Nonaffiliate during the month in question. For the purpose of this agreement, the term "Nonaffiliate" as it relates to a party means any corporation or other business organization not in control of, and not controlled by, and not under common control with, such party. Based upon the statements furnished by Overproducers, the net amount owed by or to each party for all categories combined shall be calculated by Operator and furnished to all parties in a final cash balancing statement.

3.2   Settlements.   Within 60 days after receipt of Operator's final cash balancing statement, each Overproducer shall pay each Underproducer in accordance with the statement and without interest. To the extent any value used to calculate a cash settlement hereunder is subject to refund by the Overproducer pursuant to law, regulation or governmental order, the Underproducer entitled to such cash settlement shall, prior to payment thereof, agree in writing to indemnify the Overproducer against the Underproducer's proportionate part of any refund (including interest) which the Overproducer shall be required to make. Any party may challenge any volumes or values or amounts specified in any of the statements furnished under Paragraph 2.3 or 3.1 above, in the same manner and subject to the same limitations as an invoice from Operator may be challenged under the Operating Agreement or the accounting procedure thereto.

## 4.   Payments on Production.

Each party shall pay all production or severance taxes, excise taxes, royalties, overriding royalties, production payments and other such payments on production for which it is obligated by law or by lease or by contract (including the Operating Agreement), and nothing in this Gas Balancing Agreement shall be construed as affecting such obligations. Each party hereto agrees to indemnify and hold harmless the other parties hereto against all claims, losses or liabilities arising out of it failure to fulfill such obligations.