A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

__August 1__ , __2013__ ,
<br>year

OPERATOR   **Devon Energy Production Company, L.P.**

CONTRACT AREA   **S/2 of Section 30-T19S-R31E**

COUNTY OR PARISH OF   **Eddy** , STATE OF   **New Mexico**

**SHAULA 30 FED COM 3 H**
**SHAULA 30 FED COM 4 H**

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    IN WITNESS WHEREOF, this agreement shall be effective as of the __1st_____ day of _____August____,

2    __2013___.

3    **Devon Energy Production Company LP**, who has prepared and circulated this form for execution, represents and warrants
     that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form

4    Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or
     modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in

5    Articles _____, have been made to the form.

6    ~~ATTEST OR WITNESS:~~                                    OPERATOR

7
                                                              __Devon Energy Production Company, L.P._____

8    _____        By   _____

9    _____             __Bill A. Penhall_____
                                                   Type or print name
10

11                                                 Title __Vice President_____

12                                                 Date _____

13                                                 ~~Tax ID or S.S. No.~~ _____

14

15                                       NON-OPERATORS

16
17                                                 __Magnum-Hunter Production, Inc._____

     _____        By   _____
18
     _____             _____
19                                                 Type or print name

20                                                 Title _____

21                                                 Date _____

22                                                 ~~Tax ID or S.S. No.~~ _____

23

24                                                 __S & P Co._____
25
     _____        By   _____

26   _____             _____
                                                   Type or print name
27

28                                                 Title _____

29                                                 Date _____

30                                                 ~~Tax ID or S.S. No.~~ _____

31                                                 __Sklarco, LLC_____
32
     _____        By   _____

33   _____             __Gregory L. Renbert_____
                                                   Type or print name
34

35                                                 Title _____

36                                                 Date _____

37                                                 ~~Tax ID or S.S. No.~~ _____

- 18 -

AAPL – FORM 610RS – 1989

## EXHIBIT "H"

**Attached to and made a part of that certain Operating Agreement dated August 1, 2013, between Devon Energy Production Company, L.P., as Operator, and Chi Energy, Inc., et al, as Non-Operators.**

## MODEL FORM RECORDING SUPPLEMENT TO
## OPERATING AGREEMENT AND FINANCING STATEMENT

THIS AGREEMENT, entered into by and between ___Devon Energy Production Company, L.P.___, hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated ___August 1, 2013___ (hereinafter the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1.  This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2.  The parties do hereby agree that:

    A.  The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

    B.  The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

    C.  All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

    D.  Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

    E.  Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

    F.  An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

    G.  The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

        This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

    H.  The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

AAPL Form 610RS-1989 [Shaula 30-3, 30-4]

In Witness Whereof, this agreement shall be effective as of the 1st day of <u>August, 2013</u>.

NON-OPERATOR

SKLARCO, LLC

By: _____

Name: _____Gregory L. Rembert_____

Title: _____V.P.- Land Manager_____

Address: ___401 Edwards St, Ste. 1601___

___Shreveport, LA 71101___

ACKNOWLEDGMENT

Note: The following form of acknowledgment is the short form approved by the Uniform Law on Notarial Acts. The validity and effect of this form in any state will depend upon the statutes of that state.

Acknowledgment in Representative Capacity

STATE OF LOUISIANA          )§
~~COUNTY OF~~ Caddo          )§
Parish

The foregoing instrument was acknowledged before me on September 11th, 2013, by Gregory L. Rembert          as V.P.- Land Manager          of _____ Sklarco, LLC..

My commission expires at death

_____
Notary Public

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

4 ( )

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

__August 1__ , __2013__ ,
<sub>year</sub>

OPERATOR   **Devon Energy Production Company, L.P.**

CONTRACT AREA   **S/2 of Section 30-T18S-R31E**

COUNTY OR PARISH OF   **Eddy**                    , STATE OF   **New Mexico**

**SHAULA 30 FED COM 3 H**
**SHAULA 30 FED COM 4 H**

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

8-20-13 replacement

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 1 |
| III. | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | **TITLES** | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

i

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

|  |  |  |
|---|---|---|
| | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: | 15 |
| | E. WAIVER OF RIGHTS TO PARTITION: | 15 |
| | F. PREFERENTIAL RIGHT TO PURCHASE: | 15 |
| IX. | **INTERNAL REVENUE CODE ELECTION** | 15 |
| X. | **CLAIMS AND LAWSUITS** | 15 |
| XI. | **FORCE MAJEURE** | 16 |
| XII. | **NOTICES** | 16 |
| XIII. | **TERM OF AGREEMENT** | 16 |
| XIV. | **COMPLIANCE WITH LAWS AND REGULATIONS** | 16 |
| | A. LAWS, REGULATIONS AND ORDERS: | 16 |
| | B. GOVERNING LAW: | 16 |
| | C. REGULATORY AGENCIES: | 16 |
| XV. | **MISCELLANEOUS** | 17 |
| | A. EXECUTION: | 17 |
| | B. SUCCESSORS AND ASSIGNS: | 17 |
| | C. COUNTERPARTS: | 17 |
| | D. SEVERABILITY | 17 |
| XVI. | **OTHER PROVISIONS** | 17 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

1

**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between ___DEVON ENERGY PRODUCTION COMPANY, L.P.___,
hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**

**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A.   The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.  **An AFE for a Horizontal or Multi-lateral Well shall clearly stipulate that the well being proposed is a Horizontal or Multi-lateral Well and shall include all Completion operations for the proposed Horizontal or Multi-lateral Well.**

B.   The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C.   The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement.   Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D.   The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.  **When used in connection with a Multi-lateral or Horizontal Well, the term "Deepen" shall mean an operation whereby a Lateral is drilled to a horizontal distance greater than the distance set out in the well proposal approved by the Consenting Parties, or to a horizontal distance greater than the horizontal distance to which the Lateral was previously drilled.**

E.   The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F.   The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority.   If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G.   The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.  **The term "Drillsite" when used in connection with a Horizontal or Multi-lateral Well shall mean the surface location and the Oil and Gas Leases or Oil and Gas Interests within the spacing unit on which the wellbores, including all Laterals, are located.**

H.   The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I.   The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J.   The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K.   The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L.   The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M.   The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N.   The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.  **When used in connection with a Horizontal or Multi-lateral Well, the term "Plug Back" shall mean an operation to test or Complete the well at a stratigraphically shallower geological horizon in which the operation has been or is being Completed and which is not within an existing Lateral.**

O.   The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P.   The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore.   Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q.   The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.  **When used in connection with a Horizontal or Multi-lateral Well, the term "Sidetrack" shall mean the directional control and intentional deviation of a well outside the existing Lateral(s) so as to change the Zone or the direction of a Lateral as originally proposed, unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.**

R.   The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

S.   **The term "Lateral" shall mean that portion of a wellbore that deviates from approximate vertical orientation to approximate horizontal orientation and all wellbore beyond such deviation to Total Measured Depth.**

T.   **The term "Horizontal Well" shall mean a well containing a single Lateral which is drilled, Completed or Recompleted in a manner in which the horizontal component of the completion interval (1) extends at least one hundred (100') feet in the objective formation and (2) exceeds the vertical component of the completion interval in the objective formation.**

U.   **The term "Multi-lateral Well" shall mean a well which contains more than one Lateral which is drilled, Completed or Recompleted in a manner in which the horizontal component of the completion interval of each Lateral (1) extends at least one hundred (100') feet in the objective formation(s) and (2) exceeds the vertical component of the completion interval in the objective formation(s).**

V.   **The term "Total Measured Depth," when used in connection with a Multi-lateral or Horizontal Well, shall mean the distance from the surface of the ground to the terminus of the well, as measured along the wellbore.  Each Lateral taken together with common vertical wellbore shall be considered a single wellbore and shall have a corresponding Total Measured Depth. Notwithstanding the foregoing, in the case of a Multi-Lateral Well, if the production from each Lateral is to be commingled in the common vertical wellbore then the Laterals and vertical wellbore shall be considered collectively as one wellbore.  When the proposed operation(s) is the drilling of, or operation on, a Horizontal or Multi-Lateral Well, the terms "depth" or "total depth" wherever used in the Agreement shall be deemed to read "Total Measured Depth" insofar as it applies to such well.**

W.   **The term "Vertical Well" shall mean a well drilled, Completed or Recompleted other than a Horizontal or Multi-lateral well.**

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989



**ARTICLE II.**

**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

_X_ A. Exhibit "A," shall include the following information:

    (1) Description of lands subject to this agreement,

    (2) Restrictions, if any, as to depths, formations, or substances,

    (3) Parties to agreement with addresses and telephone numbers for notice purposes,

    (4) Percentages or fractional interests of parties to this agreement,

    (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

    (6) Burdens on production.

_____ B. Exhibit "B," Form of Lease.

_X_ C. Exhibit "C," Accounting Procedure.

_X_ D. Exhibit "D," Insurance.

_X_ E. Exhibit "E," Gas Balancing Agreement.

_X_ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

_____ G. Exhibit "G," Tax Partnership.

_X_ H. Other: __Model Form Recording Statement to Operating Agreement and Financing Statement__

_X_ I. Well Information Requirements (sample)

- 1 a - -2-

1     If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in
2 the body of this agreement, the provisions in the body of this agreement shall prevail.

### ARTICLE III.
### INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

6     If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this
7 agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B,"
8 and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

10     Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne
11 and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their
12 interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the
13 Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

14     Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other
15 burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or
16 cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,
17 _____jointly owned royalty burdens_____ and shall indemnify, defend and hold the other parties free from any liability therefor.
18 Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is
19 burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts
20 stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend
21 and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as
22 the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to
23 be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)
24 which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any
25 liability therefor.

26     No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's
27 lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher
28 price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

29     Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,
30 and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in
31 said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

33     If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security
34 for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production
35 payment, net profits interest, assignment of production or other burden payable out of production attributable to its working
36 interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed
37 hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden
38 payable out of production created prior to the date of this agreement, and/or is not of record with the Eddy County Clerk / such burden is not shown on Exhibit "A," / such
39 burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's
40 Lease or Interest to exceed the amount stipulated in Article III.B. above.

41     The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and
42 alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other
43 parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses
44 chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the
45 same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required
46 under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the
47 production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of
48 said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or
49 parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

### ARTICLE IV.
### TITLES

**A. Title Examination:**

53     Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,
54 if a ~~majority in interest of the Drilling Parties so request or~~ Operator so elects, title examination shall be made on the entire
55 Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working
56 interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing
57 Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator
58 all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of
59 charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the
60 examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or
61 by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in
62 procuring abstracts, fees paid outside attorneys / and field landmen / for title examination (including preliminary, supplemental, shut-in royalty
63 opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling
64 Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such
65 interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel
66 in the performance of the above functions.

67     Each party shall be responsible for securing curative matter and pooling amendments or agreements required in
68 connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation
69 and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings
70 before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to
71 the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.
72 Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental
73 agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct
74 charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

1  Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
2  functions.

3        No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has
4  been examined as above provided, ~~and (2) the title has been approved by the examining attorney or title has been accepted by~~
5  ~~all of the Drilling Parties in such well.~~

6  **B. Loss or Failure of Title:**

7        ~~1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a~~
8  ~~reduction of interest from that shown on Exhibit "A", the party credited with contributing the affected Lease or Interest~~
9  ~~(including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title~~
10  ~~failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject~~
11  ~~to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas~~
12  ~~Leases and Interests; and,~~

13        ~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if~~
14  ~~applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from~~
15  ~~Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there~~
16  ~~shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

17        ~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the~~
18  ~~Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage~~
19  ~~basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or~~
20  ~~Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

21        ~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract~~
22  ~~Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable~~
23  ~~to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and~~
24  ~~burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well~~
25  ~~attributable to such failed Lease or Interest;~~

26        ~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest~~
27  ~~which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid~~
28  ~~to the party or parties who bore the costs which are so refunded;~~

29        ~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises~~
30  ~~by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received~~
31  ~~production for which such accounting is required based on the amount of such production received, and each such party shall~~
32  ~~severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

33        ~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of~~
34  ~~the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title~~
35  ~~it shall bear all expenses in connection therewith; and~~

36        ~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an~~
37  ~~interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder~~
38  ~~of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest~~
39  ~~is reflected on Exhibit "A."~~

40        ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well~~
41  ~~payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas~~
42  ~~Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary~~
43  ~~liability against the party who failed to make such payment.   Unless the party who failed to make the required payment~~
44  ~~secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make~~
45  ~~proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A"~~
46  ~~shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party~~
47  ~~who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership~~
48  ~~of the Lease or Interest which has terminated.   If the party who failed to make the required payment shall not have been fully~~
49  ~~reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest,~~
50  ~~calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest,~~
51  ~~it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole~~
52  ~~previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

53        ~~(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease~~
54  ~~burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or~~
55  ~~Interest, on an acreage basis, up to the amount of unrecovered costs;~~

56        ~~(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed~~
57  ~~to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and~~
58  ~~marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination,~~
59  ~~would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest~~
60  ~~termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties~~
61  ~~in proportion to their respective interests reflected on Exhibit "A"; and,~~

62        ~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner~~
63  ~~of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~ through failure of title

64        3. Other Losses: All losses / of Leases or Interests committed to this agreement, other than those set forth in Articles
65  IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on
66  Exhibit "A."  This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because
67  express or implied covenants have not been performed (other than performance which requires only the payment of money),
68  and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended.  There shall be no
69  readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

70        ~~4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any~~
71  ~~Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety~~
72  ~~(90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed~~
73  ~~or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B.~~
74  ~~shall not apply to such acquisition.~~

- 3 -

**ARTICLE V.**

**OPERATOR**

**A. Designation and Responsibilities of Operator:**

____Devon Energy Production Company, L.P._____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties / for losses sustained or liabilities incurred **their officers, employees or agents** /whether or not due to the negligence of an Operator except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any / single **affiliate,** subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of / two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; **the party or** provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account # in the formation producing as of the time of the resignation or removal of Operator (or, if more than one formations is producing, the deepest producing formation).:

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

1  liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or
2  materials supplied.

3      4. <u>Custody of Funds:</u> Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced
4  or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the
5  Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until
6  used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as
7  provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator
8  and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in
9  this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the
10  parties otherwise specifically agree.

11      5. <u>Access to Contract Area and Records:</u> Operator shall, except as otherwise provided herein, permit each Non-Operator
12  or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to
13  all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of
14  operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access
15  rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate
16  Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such
17  interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any
18  and all reports and information obtained by Operator in connection with production and related items, including, without
19  limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding
20  purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the
21  information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures
22  shall be conducted in accordance with the audit protocol specified in Exhibit "C."

23      6. <u>Filing and Furnishing Governmental Reports:</u> Operator will file, and upon written request promptly furnish copies to
24  each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications
25  required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder.
26  Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

27      7. <u>Drilling and Testing Operations:</u> The following provisions shall apply to each well drilled hereunder, including but not
28  limited to the Initial Well:

29      (a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which
30  drilling operations are commenced.

31      (b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well
32  as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

33      (c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing
34  Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted
35  hereunder.

36  **Any information furnished to or obtained by a Non-Operator pursuant to Articles V.D.5, V.D.6 and V.D.7 shall be maintained as**
37  **confidential by the Non-Operator and shall not be disclosed by the Non-Operator without the prior written consent of Operator.**
   **Notwithstanding anything in this Agreement to the contrary, the rights of a Non-Operator as set forth in Articles V.D.5, V.D.6 and**
   **V.D.7 shall only apply in favor of those Non-Operator parties who are Consenting Parties with respect to a proposed operation,**
38  **until such time as the Consenting Parties are no longer entitled to the Non-Consenting Party's share of production, or the proceeds**
39  **therefrom, attributable to the Non-Consenting Parties did not participate.**

40      8. <u>Cost Estimates:</u> Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs
41  incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement.
42  Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

43      9. <u>Insurance:</u> At all times while operations are conducted hereunder, Operator shall comply with the workers
44  compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-
45  insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall
46  be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties
47  as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on
48  or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted
49  and to maintain such other insurance as Operator may require.

50      In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the
51  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive
52  equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

53  **A. Initial Well:**

55      On or before the **15th** day of **October** , **2013** , Operator shall commence the drilling of the Initial
56  Well at the following location:

57      **SHL: 650' FSL & 150' FWL of Section 29-T18S-R31E; BHL: 400' FSL & 340' FWL of Section 30-T18S-R31E,**
58      **Eddy County, New Mexico.**

60  **A Horizontal Well with a single Lateral to a vertical depth of 8,765 feet or a depth sufficient to penetrate the Bone Spring**
61  **Formation, whichever is the lesser.**

64  and shall thereafter continue the drilling of the well with due diligence to **drill a Lateral with a length of approximately 4800 feet**
65  **to a target terminus of approximately 13,572 feet Total Measured Depth sufficient to test the Bone Spring formation**
66  **Operator shall have the right to cease drilling a Horizontal or Multi-lateral Well at any time, for any reason, and such Horizontal**
   **or Multi-lateral Well shall be deemed to have reached its objective depth so long as Operator has drilled such Horizontal or Multi-**
67  **lateral Well to the objective formation(s) and has drilled horizontally in the objective formation(s) for a distance which is at least**
   **equal to fifty percent (50%) of the length of the Lateral(s) proposed for the operation.**

72  The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation
73  in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.
74

8-20-13 replacement

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

**B. Subsequent Operations:**

    1. <u>Proposed Operations:</u> If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

1  under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2  performed, the location, proposed depth, objective Zone and the estimated cost of the operation.  The parties to whom such a
3  notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4  whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to
5  Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
6  eight (48) hours, / exclusive of Saturday, Sunday and legal holidays.  Failure of a party to whom such notice is delivered to reply
7  within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8  Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9  within the time and in the manner provided in Article VI.B.6.  **See Article XVI.A.**

10      If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11  contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12  forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13  promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
14  may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15  the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16  by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17  additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18  way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19  acceptance.  If the actual operation has not been commenced within the time provided (including any extension thereof as
20  specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21  said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22  proposal had been made.  Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
23  Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
24  reimburse the Drilling Parties in accordance with Article VI.B.4.  In the event of a Deepening operation and in accordance
25  with Article VI.B.5. in the event of a Sidetracking operation.

26      2. Operations by Less Than All Parties:  **See Article XVI.B.**

27      (a) Determination of Participation.  If any party to whom such notice is delivered as provided in Article VI.B.1. or
28  VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29  Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
30  later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31  expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
32  proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting
33  Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
34  the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35  account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work.  The
36  rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37  designated as Operator for an operation in which the original Operator is a Non-Consenting Party.  Consenting Parties, when
38  conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39  agreement.

40      If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41  applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42  recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party,
43  within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the
44  proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45  proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46  the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47  Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48  interests that any Consenting Party did not elect to take.  Any interest of Non-Consenting Parties that is not carried by a
49  Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50  proposal.  Failure to advise the proposing party within the time required shall be deemed an election under (i).  In the event a
51  drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52  total of forty-eight (48) hours / (exclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may
53  withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54  days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55  If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56  of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57  period provided in Article VI.B.1., subject to the same extension right as provided therein.

58      (b) Relinquishment of Interest for Non-Participation.  The entire cost and risk of conducting such operations shall be
59  borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60  paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61  encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results
62  in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63  the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64  participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65  shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66  increased by the subsequent operations of the Consenting Parties.  If any well drilled, Reworked, Sidetracked, Deepened,
67  Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68  paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69  well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70  expense and for the account of the Consenting Parties.  Upon commencement of operations for the drilling, Reworking,
71  Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72  provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73  Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74  Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) __100__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) __300__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __300__ % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F. **This Article VI.B.4. shall not apply to Deepening operations within an existing Lateral or a Horizontal or Multi-lateral Well.**

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C." **This Article VI.B.5. shall not apply to operations in an existing Lateral of a Horizontal or Multi-lateral Well. Drilling Operations which are intended to recover penetration of the objective formation(s) which are conducted in a Horizontal or Multi-lateral Well shall be considered as included in the original proposed drilling operation.**

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

- 8--

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

1   initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation
2   within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3   and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4   is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5   relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within
6   such period shall be deemed an election not to participate in the prevailing proposal. See Article XVI.A.

7       7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be
8   proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9   Area is producing, unless such well conforms to the then-existing well spacing pattern or an approved exception thereto for such Zone or
10  has been approved for drilling, completion in or production from such Zone by order of the regulatory agency with responsibility
    for such matters:

11      8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
12  Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except
13  with the consent of all parties that have not relinquished interests in the well at the time of such operation.

14  **C. Completion of Wells; Reworking and Plugging Back:**

15      1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
16  drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement.   Consent to the drilling,
17  Deepening or Sidetracking shall include:

18      ⊟☒ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and
19  equipping of the well, including necessary tankage and/or surface facilities. **Completion operations shall be included in the**
        **a Horizontal or Multi-lateral**
20      ⊟☒ Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well.  When
        **proposed drilling operations for such well.**                                                         **a Vertical**
21  such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results
        **made available**
22  Thereof  furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to
23  participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,
24  together with Operator's AFE for Completion costs if not previously provided.   The parties receiving such notice
25  shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of
26  notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an
27  accompanying AFE.   Operator shall deliver any such Completion proposal, or any Completion proposal conflicting
28  with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the
29  procedures specified in Article VI.B.6.   Election to participate in a Completion attempt shall include consent to all
30  necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface
31  facilities but excluding any stimulation operation not contained on the Completion AFE.   Failure of any party
32  receiving such notice to reply within the period above fixed shall constitute an election by that party not to
33  participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of
34  conflicting Completion proposals.   If one or more, but less than all of the parties, elect to attempt a Completion, the
35  provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging
36  Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations
37  thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each
38  separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting
39  Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party
40  in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier
41  Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any
42  recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in
43  which the Completion attempt is made.   Election by a previous Non-Consenting party to participate in a subsequent
44  Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable
45  materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,
46  insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a
47  Completion attempt.  **Notwithstanding anything herein to the contrary, Option 1 shall apply to any Horizontal or Multi-**
48      **lateral Well and Option 2 shall apply to any vertical Well.**

49      2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
50  Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement.   Consent to the Reworking,
51  Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
52  Completing and equipping of said well, including necessary tankage and/or surface facilities.  **Operator's notice shall be written and**
        **delivered via telefax where feasible and Non-Operator's election shall be made by telephone or telefax.**
53  **D. Other Operations:**   An election made by Non-Operator by telephone shall be confirmed in writing within forty-eight (48) hours.

54      ~~Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____~~
55  ~~_____ Dollars ($_____) except in connection with the~~
56  ~~drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously~~
57  ~~authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden~~
58  ~~emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion~~
59  ~~are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the~~
60  ~~emergency to the other parties.   If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so~~
61  ~~requesting an information copy thereof for any single project costing in excess of _____ Dollars~~
62  ~~($_____).  Any party who has not relinquished its interest in a well shall have the right to propose that~~
63  ~~Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as~~
64  ~~salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but~~
65  ~~not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall~~
66  ~~be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the~~
67  ~~amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under~~
68  ~~Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles).   Operator shall deliver such~~
69  ~~proposal to all parties entitled to participate therein.   If within thirty (30) days thereof Operator secures the written consent~~
70  ~~of any party or parties owning at least _____% of the interests of the parties entitled to participate in such operation,~~
71  ~~each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated~~
72  ~~to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms~~
73  ~~of the proposal.~~

74  **E. Abandonment of Wells: 1. Abandonment of Dry Holes:** Except for any well drilled or Deepened pursuant to Article VI.B.2., any
    well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not

- 9 -

be
1  /plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2  party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after
3  delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4  proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
       sidetracking
5  cost, risk and expense of the parties who participated in the cost of drilling / or Deepening such well. Any party who objects to
6  plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,
7  Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8  forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9  Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10 such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11 abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12 taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13 liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14 restoring the surface, for which the abandoning parties shall remain proportionately liable.

15
16      2.  Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
17 conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
                                                                    who participated in the cost of drilling the well
18 been completed as a producer shall not be plugged and abandoned without the consent of all parties./ If all parties consent to
19 such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
                                                            thirty (30)
20 and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed
                                                                  thirty (30)
21 abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days of delivery of notice of the
22 proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
23 operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
24 applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
25 against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
26 proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
27 within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession
28 of such well and plug and abandon the well.

29      Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
30 the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
31 of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
32 the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
33 value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
34 operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
35 parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
36 of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
37 insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
38 interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-
39 abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
40 one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
41 attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
42 The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
43 respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
44 Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

45      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
46 from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
   At its option
47 request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
48 charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
49 ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
50 shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
51 further operations therein subject to the provisions hereof.

52      3.  Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
53 between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
54 however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
55 operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
56 in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
57 in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as
58 provided in Article VI.B.2.(b).

59 **F. Termination of Operations:**
60      Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
61 Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without
62 consent of parties bearing ___51___ % of the costs of such operation; provided, however, that in the event granite or other
63 practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
64 Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the
65 provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

66 **G. Taking Production in Kind:**
67      ☒☒ Option No. 1: Gas Balancing Agreement Attached
                     have the right to
68      Each party shall / take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
69 Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
70 treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
71 in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
72 party taking its share of production in kind shall be required to pay for only its proportionate share of such part of
73 Operator's surface facilities which it uses.
74      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
                                                                     Article VI.B.and
75 production from the Contract Area, and, except as provided in / Article VII.B., shall be entitled to receive payment

directly from the purchaser thereof for its share of all production.

See Article XVI.P.

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.~~

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with the any Gas balancing agreement between the parties hereto, ~~whether such an agreement~~ which is attached as Exhibit "E" / or is a hereto separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

~~☐ Option No. 2: No Gas Balancing Agreement:~~

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

**ARTICLE VII.**
**EXPENDITURES AND LIABILITY OF PARTIES**

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

B. **Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing. See Article XVI.K.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge ~~the recording~~ an instrument in the form attached as Exhibit "H" / ~~supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement~~ or an instrument in the form attached as Exhibit "H" executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, ~~the recording supplement~~ or an instrument in the form attached as Exhibit "H" / executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement, by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. **Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in / all operations other than routine monthly operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within ~~fifteen (15)~~ thirty (30) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. **Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

- 12 -

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. <u>Suspension of Rights:</u> Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. <u>Suit for Damages:</u> Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. <u>Deemed Non-Consent:</u> The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. <u>Advance Payment:</u> If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. <u>Costs and Attorneys' Fees:</u> In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

1    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3  determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4  and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5  the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6  paid by them, as provided in Exhibit "C."

7    Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8  to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

9                                              ARTICLE VIII.
10                          ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
11  A. Surrender of Leases:

12    The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13  or in part unless all parties consent thereto.; however, no consent shall be necessary to release a lease which has expired or otherwise is
    terminated.
14    However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15  notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16  delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a
17  party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18  described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19  implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20  located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the
21  assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22  consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
                                        in commercial quantities
23  thereafter as Oil and/or Gas / is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B."
24  Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25  accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26  shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27  in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the
28  reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29  acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30  the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less
31  than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the
32  assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33  interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made
34  varies according to depth, then the interest assigned shall similarly reflect such variances.

35    Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38  agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

39  B. Renewal or Extension of Leases:

40    If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41  shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42  promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following
43  delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44  affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45  allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the
46  parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47  assignment of its proportionate interest therein by the acquiring party without warranty of title, except as to acts by, through or under:
    the acquiring party.
48    If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49  by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50  the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51  purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52  shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53  less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54  Agreement in the form of this agreement.

55    If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56  renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

57    The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58  the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the
59  expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60  existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61  the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62  expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63  agreement.

64    The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

65  C. Acreage or Cash Contributions:

66    While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68  be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom
69  the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70  proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the
71  extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any
72  acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above
73  provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74  inside Contract Area.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall, sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:~~

~~1.    the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~

~~2.    an equal undivided _____ percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.~~

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~F. Preferential Right to Purchase:~~

~~☐  (Optional; Check if applicable.)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

**ARTICLE IX.**
**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

**ARTICLE X.**
**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Twenty-Five Thousand__ Dollars ($ __25,000.00__ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder. All claims or suits involving title to any interest subject to this agreement shall be treated as a claim against all parties hereto.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT — 1989

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of __ninety (90)__ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ninety (90)_____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of __New Mexico__ shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

1 orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or
2 production of wells, on tracts offsetting or adjacent to the Contract Area.

3   With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages,
4 injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation
5 or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission
6 or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not
7 constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of
8 production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such
9 an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such
10 incorrect interpretation or application.

11 **ARTICLE XV.**
12 **MISCELLANEOUS**
13 **A. Execution:**
14   This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been
15 executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of
16 the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which
17 own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have
18 become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no
19 event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this
20 agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of
21 drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease
22 as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs
23 hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds
24 with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a
25 current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the
26 Initial Well which would have been charged to such person under this agreement if such person had executed the same and
27 Operator shall receive all revenues which would have been received by such person under this agreement if such person had
28 executed the same.

29 **B. Successors and Assigns:**
30   This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31 devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or
32 Interests included within the Contract Area.

33 **C. Counterparts:**
34   This instrument may be executed in any number of counterparts, each of which shall be considered an original for all
35 purposes.

36 **D. Severability:**
37   For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws,
38 this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to
39 this agreement to comply with all of its financial obligations provided herein shall be a material default.

40 **ARTICLE XVI.**
41 **OTHER PROVISIONS**

42

43 A.  <u>Priority of Operations.</u>
44   Where a well has been authorized under the terms of this Agreement by all parties (or by one or more, but less than all parties under Article
45 VI.B.2) and the parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following
46 elections shall control in the order enumerated below:

47   1.  <u>Prior to reaching the objective depth or zone:</u>
48   a.  Drilling a well to its objective depth or objective zone shall have first priority over all other operations and proposals.
49   b.  In the event that impenetrable conditions or mechanical difficulties prevent reaching the objective depth or zone, a proposal to sidetrack
50    in an effort to reach the objective depth or zone shall have priority over a proposal to attempt a completion in a zone already reached.

51   2.  <u>After the objective depth or zone has been reached:</u>
52   a.  An election to do additional logging, coring or testing;
53   b.  An election to attempt to complete the well at either the objective depth or objective zone;
54   c.  An election to deepen said well;
55   d.  An election to plug back and attempt to complete said well;
56   e.  An election to sidetrack the well;
57   f.  An election to rework said well by generally accepted stimulation techniques whether or not said well had previously produced in
58    commercial quantities or is capable of commercial production, subject to the provisions of Article XV.I (Reworking of Producing
59    Completion) hereof;
60   g.  An election to temporarily abandon the well;
61   h.  An election to plug and abandon the well;
62   It is provided, however, that if at any time said participating parties are considering the above elections, the hole is in such a condition that, in
63 the opinion of the party(ies) owning a majority in cost-bearing, possessory interest as set forth on Exhibit "A" hereto, a reasonably prudent operator
64 would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to
65 completing the well in the objective depth or objective zone, such election shall not be given the priority hereinabove set forth. In such event, the
66 operation which, in the opinion of the party(ies) owning a majority in cost-bearing, possessory interest as set forth on Exhibit "A" hereto, is less likely
67 to jeopardize the well, will be conducted. It is further understood that if some, but not all parties, elect to participate in the additional logging, coring,
68 or testing, they may do so, and the party or parties not participating in such operations shall not be entitled to the logs, cores or the results of the tests
69 but shall suffer no other penalty.

70 B.  <u>Operations by Less Than All Parties:</u>
71   Notwithstanding anything herein to the contrary, Article VI.B.2 shall apply separately to each separate completion or recompletion attempt
72 undertaken hereunder, and an election to become a Non-Consenting Party as to one completion or recompletion attempt shall not prevent a party
73 from becoming a Consenting Party in subsequent completion or recompletion attempts, regardless of whether the Consenting Parties as to earlier
74 completions or recompletions have recouped their costs pursuant to Article VI.B.2; provided, further, that any recoupment of costs by a Consenting

Party shall be made solely from the production attributable to the zone in which the completion attempt is made.  Election by a previous Non-Consenting Party to participate in a subsequent completion or recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous completion or recompletion attempt, insofar and only insofar as such materials and equipment benefit the zone in which such party participated in a completion attempt.

C.    Access to Contract Area and Information:

Notwithstanding anything herein to the contrary, it is agreed and understood that any Non-Consenting Party under Article VI.B or Article VII.D.1 (Option 2) who is not an Operator shall be denied access to the well site until thirty (30) days following the date of the release of the rig used to conduct the operation, and further, such Non-Consenting Party shall be denied any information relating to said operation until the Consenting Parties have recouped the non-consent penalty provided for in Article VI.B.2.

D.    Public Announcement:

No public announcement or statement regarding operations hereunder shall be made or released without the approval of the parties unless required by law or regulation or such announcement or statement is the requirement of an applicable Stock Exchange.  Any party making a public announcement as required by law, regulation, order, or applicable Stock Exchange shall immediately furnish the other party with a full transcript of such public announcement or statement.  Except as otherwise provided in this paragraph, no public announcement or statement regarding a well drilled under the terms of this Operating Agreement shall contain at a minimum the following information:

1.    Name of well;
2.    Location of well by section, township, range, county and state;
3.    Tested zone(s), if appropriate;
4.    Test results, if appropriate;
5.    Development/confirmation plans, if appropriate;
6.    Participants and percentages;
7.    Acreage controlled, if appropriate.

Either party may elect to exclude its name from a proposed public announcement or statement and thus remove itself from the approval process.  The Operator of an affected well or operation will coordinate the approvals of any proposed public announcement or statement (but shall not be liable for failure or error in exercising such responsibility).  The Operator of an affected well or operation may make such public announcements as it deems appropriate in the event of an emergency or imminent harm to people, property or environmental without prior consultation with the Non-Operator.

E.    Other Operations:

Notwithstanding anything herein, it is expressly agreed and understood that Operator may undertake without Non-Operator's consent any single project, including a rework, to maintain, restore, continue, increase, or improve production from any well or wells drilled and/or operated under this Agreement so long as such single project is not reasonably estimated to require an expenditure in excess of thirty-five thousand and no/100s dollars ($35,000.00), and may charge and collect the cost of the project as a joint expense, except that if the subject well or wells have been drilled pursuant to the provision of Article VI.B.2, then expenses shall be apportioned pursuant to the provisions of that Article; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property, but Operator, as promptly as possible, shall report the emergency to the other parties.  Operator shall provide Non-Operator with a copy of Operator's Authority for Expenditure or Cost Estimate for said project.

"Necessary Expenditures", as used in Article VI.C. of this Operating Agreement, shall not include sidetracking operations unless covered specifically in an Authority for Expenditures approved by the Participating Parties.

F.    Laws and Regulations:

All of the provisions of this Agreement are expressly subject to all applicable laws, orders, rules and regulations of any governmental body or agency having jurisdiction in the premises, and all operations contemplated hereby shall be conducted in conformity therewith.  Any provision of this Agreement which is inconsistent with any such laws, orders, rules or regulations is hereby modified so as to conform therewith, and this Agreement, as so modified, shall continue in full force and effect.

G.    Regulatory Filings:

Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator, all operational notices, filings, reports and applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder.  Each Non-Operator shall provide to Operator on a timely basis all information necessary for Operator to make such filings.  Operator shall use its best judgment in making any of the filings, and preparing any of the notices, reports and applications referred to above.  However, in no event shall Operator have any liability to any Non-Operator in making and prosecuting any such filing or in rendering any notice, report or application, absent bad faith, gross negligence or willful misconduct.  Any penalties incurred as a result of any incorrect filing, notice, report or application shall, in absence of bad faith, gross negligence or willful misconduct, be charged to the parties owning the production to which the penalty pertains.

H.    All Transfers Subject to this Agreement:

Each party hereto covenants and agrees for itself, its successors and assigns, that any sale, assignment, sublease, mortgage, pledge or other instrument affecting the leases and lands subject to this instrument (whether of an operating or non-operating interest or a mortgage, pledge or other security interest) will be made and accepted subject to this instrument and the party acquiring the interest or security shall expressly agree to be bound by all its terms and provisions.  Any party hereto who executes any instrument in favor of any party without complying with the provisions of this paragraph shall indemnify, defend and hold the other parties hereto harmless from and against any and all claims or causes of action by any person whomsoever and for any expenses and losses sustained as a result of the failure of such party to comply with these provisions.

I.    Operator's Billing Requirements:

Notwithstanding anything to the contrary contained herein, or in the accounting procedure attached hereto as Exhibit "C", the parties to this agreement specifically agree that in no event during the term of this contract shall Operator be required to make more than one billing for the entire interest credited to each party on Exhibit "A".  It is further agreed that if any party to this agreement (hereinafter referred to as "Selling Party") disposes of part of the interest credited to it on Exhibit "A", the Selling Party will be solely responsible for billing its assignee(s), and shall remain primarily liable to the other parties hereto for the interest or interests assigned and shall make prompt payment to Operator for the entire amount of statements and billings rendered to it or accountable to it by virtue of such interests as shown on Exhibit "A".  It is further understood and agreed that if Selling Party disposes of all its interest as set out on Exhibit "A", whether to one or to several assignees, Operator shall continue to issue statements and billings to the Selling Party for the entire interest conveyed until such time as Selling Party has designated and qualified one assignee to receive the billings for the entire interest and such designated assignee has been approved and accepted by Operator.

In order to qualify one assignee to receive the billing for the entire interest credited to Selling Party on Exhibit "A", Selling Party shall furnish to Operator such information as may be requested, including, but not limited to, the following:

1.    Written notice to Operator of the conveyance followed by photostatic or certified copies of the recorded assignments as soon as available.

2.    The name of the assignee to be billed along with such assignee's written consent to receive statements and billings for the entire interest credited to Selling Party on Exhibit "A", hereto, and further, agreeing to handle any necessary sub-billings attributable to such interest in the event such designated assignee does not own the entire interest credited to Selling Party on Exhibit "A".

- 17 - (b)

The parties agree that the sale of any interest in the leases covered by this Agreement shall be made specifically subject to the provisions of this section.

J.   **Billings to Direct Account:**

All expenses, including salaries, wages and expenses of personnel, legal or consultant fees, and administrative filing fees and court costs, shall be a direct charge, borne by the Joint Account as provided in Exhibit "C" and shall not be included in administrative overhead Part III on Exhibit "C" if incurred for obtaining spacing, pooling or other orders or rulings from state regulatory bodies or courts deemed by the Operator, in its sole judgment, as necessary.

K.   **Lien:**

The lien and security interest granted by each Non-Operator to Operator and by Operator to Non-Operator under Article VII.B. shall extend not only to such party's oil and gas rights in the Contract Area (which for greater certainty shall include all of each party's leasehold interest and leasehold estate in the Contract Area), the oil and/or gas when extracted and equipment (as mentioned in said Article) but also to all accounts, contract rights, inventory and general intangibles constituting a part of, relating or arising out of said oil and gas rights, extracted oil and gas and said equipment or which are otherwise owned or held by any such party in the Contract Area.  Further, the lien and security interest of each of said parties shall extend to all proceeds and products of all of the property and collateral described in this paragraph and in Article VII.B. as being subject to said lien and security interest.  Any party, to the extent it deems necessary to perfect the lien and security interest provided herein, may file this Operating Agreement as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code.  Further, and not in limitation of the foregoing, each party hereby grants to Operator full right, power and authority to execute in each such party's name and on its behalf any financing statement which Operator deems necessary in order to perfect the security interest hereby granted under the applicable Uniform Commercial Code.

L.   **Legal Costs:**

In the event Operator shall ever be required to bring legal proceedings in order to collect any sums due from any Non-Operators under this Agreement, then Operator shall also be entitled to recover all court costs, costs of collection and a reasonable attorney's fee, which the lien provided for herein shall also secure.

M.   **Controlling Language:**

In the event of a conflict between the provisions of this Article XVI. and any other provision of this Operating Agreement, the provisions of this Article XVI. shall control and prevail.

N.   **Operator Indemnity:**

1.   Notwithstanding any provision contained herein to the contrary, Operator shall not be obliged to perform nor shall be liable for its failure to perform or to continue any work or incur any expenditure or indebtedness hereunder for the Joint Account until all funds requested of Non-Operators pursuant to cash calls given in accordance with the applicable provisions hereof have been received by Operator.

2.   Any provision of this Agreement to the contrary notwithstanding, and without limiting any other provision of this Agreement (including, again without limitation Article V.A.), Operator shall not be liable to the other parties for any failure of Operator, except such failures as may result from willful misconduct, to comply with the requirements of any Federal, state or local ordinance, statute, law, rule, regulation or procedure, pertaining to the establishment of prices for oil, gas or other minerals, or to the classification of wells for such purpose, or pertaining to any other matter related to the regulation of entitlements, supply, demand, allocation, delivery, contracting for or pricing of oil, gas or other minerals, it being understood and agreed by all parties that compliance with current laws and regulations is subject to confusion and to numerous risks, uncertainties, conflicting opinions and burdensome filing requirements.  Any liability for refund of sums obtained because the parties have been paid amounts in excess of lawful prices shall be borne severally by the parties to the same extent that such excess funds were paid to the parties.

O.   **AFE:**

An AFE is an estimate only of costs; in no way shall the execution of an AFE limit the liability of the party.

P.   **Take in Kind:**

In the event any Party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have the right, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party, and Operator will use its best efforts to market Non-Operator's share of oil and gas on the same terms that Operator markets its own share of such production.  Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind or separately dispose of its share of all oil and gas not previously delivered to a purchaser by the giving of written notice thereof to Operator at least thirty (30) days prior to its requested taking (the "Taking Date"); such notice shall be deemed effective on the first day of the next month following the Taking Date.  Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Q.   **Conflict of Terms:**

Notwithstanding anything in this Agreement to the contrary, in the event of any conflict between the provisions of Article I through Article XV of this Agreement and the provisions of this Article VI, the provisions of this Article XVI shall control.

R.   **Priority of Operations – Horizontal Wells:**

Notwithstanding Article VI.B.6 or anything else in this Agreement to the contrary, it is agreed that where a Horizontal or Multi-lateral Well subject to this Agreement has been drilled to the objective formation and the Consenting Parties cannot agree upon the sequence and timing of further operations regarding such Horizontal or Multi-lateral Well, the following elections shall control in the order of priority enumerated hereafter:

1.   An election to do additional logging, coring, or testing;

2.   An election to attempt to Complete drilling operations of all proposed Laterals;

3.   An election to extend or Deepen a Lateral;

4.   An election to kick out and drill an additional Lateral in the same formation;

5.   An election to Plug Back the well to a formation or Zone above the formation in which a Lateral was drilled; if there is more than one proposal to Plug Back, the proposal to Plug Back to the next deepest prospective Zone or formation shall have priority over a proposal to plug back to a shallower prospective Zone or formation;

6.   An election to Sidetrack; and

7.   An election to plug and abandon said well as provided for in Article VI.E.

It is provided, however, that if at the time the Consenting Parties are considering any of the above elections, the hole is in such a condition that a reasonably prudent Operator would not conduct the operating contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the hole prior to Completing the Horizontal or Multi-lateral Well in the objective formation, such election shall be eliminated from priorities hereinabove set forth.

- 17 - ( c )

S. <u>Relinquishment For Non-Consent to Horizontal Drilling</u>

In the event any party to this Agreement elects not to participate in a Horizontal or Multi-lateral Well which is proposed pursuant to Article VI.B., the non-Consenting Party shall on commencement of operations for the Horizontal or Multi-lateral Well., relinquish to the Consenting Parties one hundred percent (100%) of the non-Consenting Party's right, title, and interest in and to that portion of the Contract Area included within the Drilling Unit for the Horizontal or Multi-lateral Well and one hundred percent (100%) of the non-consenting Party's right, title, and interest in and to that portion of the Contract Area included within the corresponding proration or spacing unit, less and except the wellbores of any existing completed wells in which such party participated and own a current working interest and within thirty (30) days (inclusive of Saturdays, Sunday and legal holidays) from rig release of the Horizontal or Multi-lateral Well.

T.

This Operating Agreement shall replace and supersede all Operating Agreements now in effect between all or any portion of the parties hereto covering the Contract Area, excluding the wellbore of the Big Red Federal Com 1 (API 30-015-32113) and West Shugart 30 Federal 9 (API 30-015-29429).

17 (d)

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

IN WITNESS WHEREOF, this agreement shall be effective as of the __1st__ day of _____**August**_____,
__2013__ .

**Devon Energy Production Company LP**, who has prepared and circulated this form for execution, represents and warrants
that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form
Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or
modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in
Articles _____, have been made to the form.

~~ATTEST OR WITNESS:~~                           **OPERATOR**

                                                 __Devon Energy Production Company, L.P.__

_____      By _____

_____         __Bill A. Penhall__
                                          Type or print name

                                          Title __Vice President__

                                          Date _____

                                          ~~Tax ID or S.S. No.~~_____


                         **NON-OPERATORS**


                                          __Magnum-Hunter Production, Inc.__

_____      By _____
_____
                                          Type or print name

                                          Title _____

                                          Date _____

                                          ~~Tax ID or S.S. No.~~_____


                                          __S & P Co.__

_____      By _____
_____
                                          Type or print name

                                          Title _____

                                          Date _____

                                          ~~Tax ID or S.S. No.~~_____


                                          __Sklarco, LLC__

_____      By _____
_____
                                          Type or print name

                                          Title _____

                                          Date _____

                                          ~~Tax ID or S.S. No.~~_____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

JJS Working Interests, LLC

By _____

_____
Type or print name

Title _____

Date _____

~~Tax ID or S.S. No.~~ _____

Chi Energy, Inc.

By _____

_____
Type or print name

Title _____

Date _____

~~Tax ID or S.S. No.~~ _____

Chevron USA, Inc.

By _____

_____
Type or print name

Title _____

Date _____

_____

McCombs Energy, LLC

By _____

_____
Type or print name

Title _____

Date _____

_____

Jeremiah, LLC

By _____

_____
Type or print name

Title _____

Date _____

_____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

__Joseph H. Byrne__

By _____

_____
**Type or print name**

**Title** _____

**Date** _____


__Thunderbolt Petroleum, Inc.__

By _____

_____
**Type or print name**

**Title** _____

**Date** _____


__Pocahontas Oil Co., Inc.__

By _____

_____
**Type or print name**

**Title** _____

**Date** _____


__O. D. Albright, III__

By _____

_____
**Type or print name**

**Title** _____

**Date** _____

_____


__W D W  Operators, Inc.__

By _____

_____
**Type or print name**

**Title** _____

**Date** _____

- 18 -

## EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated <u>August 1, 2013</u>, by and between Devon Energy Production Company, L.P., as Operator, and Chi Energy, Inc., et al, as Non-Operators.

### CONTRACT AREA 'A'

1.   **Description of lands subject to this Agreement:**

     N/2 S/2 Section 30-T18S-R31E, Eddy County, New Mexico, containing 155.46 acres MOL

2.   **Restrictions, if any, as to depths, formations, or substances:**

     Depths from 4,500' below the surface of the earth to the base of the Bone Spring formation

3.   **Parties to Agreement with addresses and telephone numbers for notice purposes:**

     Devon Energy Production Company, L.P.
     333 West Sheridan Avenue
     Oklahoma City, Oklahoma 73102
     Attn: Meg Muhlinghause 405-228-4416
     Fax: 405-552-8113

     Magnum-Hunter Production, Inc.
     600 N. Marienfeld
     Midland, TX 79701
     Attn: Mark Compton 432-571-7896
     Fax: 432-571-7840

     S & P Co.
     330 Marshall Street, Suite 300
     Shreveport, LA 71101
     Attn: Jill Crawford 318-222-1800
     Fax: 318-424-1257

     SklarCo, LLP
     401 Edwards Street, Suite 1601
     Shreveport, LA 71101
     Attn: Greg Rembert 318-227-8668
     Fax 318-227-9435

     JJS Working Interests, LLC
     4295 San Felipe, Suite 207
     Houston, TX 77056-2951
     Attn: Justin Simons 713-888-0875
     Fax 866-406-9550

     Chi Energy, Inc.
     P.O. Box 1799
     Midland, TX 79702
     Attn: John Qualls 432-685-5001
     Fax 432-687-2662

     Chevron USA, Inc.
     1400 Smith Street, Room 43005
     Houston, TX 77002
     Attn: Stephanie Magers 713-658-1877
     Fax _____

     McCombs Energy, L.L.C.
     5599 San Felipe, Suite 1200
     Houston, TX 77056
     Attn: Ricky Haikin 713-621-0033
     Fax: 713-621-1670

3H - Exhibit "A"

4H - Exhibit "B"

page 1 of 5

8-20-13 replacement

Exhibit 'A'                          August 1, 2013                          page 2 of 5
S/2 Sec. 30-19S-31E

Jeremiah LLC
P.O. Box 924
Hobbs, NM 88241
Attn: Mike McVay 575-397-3311
Fax: 575-393-7455

Joseph H. Byrne
21 Brentwood Club
Lubbock, TX 79407
806-792-1182

Thunderbolt Petroleum, Inc.
P.O. Box 10523
Midland, TX 79702-7523
Attn: Robert Lee 432-682-1251
Fax 432-682-1875

Pocahontas Oil Co., Inc.
P.O. Box 60476
Midland, TX 79711
Attn: Phillips L. Lawson 432-563-0449
Fax 432-563-0459

O. D. Albright, III
P.O. Box 10981
Midland, TX 79702
432-684-0504
Fax 432-686-0569

W D W Operators, Inc.
P.O. Box 9760
Midland, TX 79708
Attn: Dan Linebarger 432-685-5066
Fax  432-682-1158


4.    **Percentages or fractional interests of parties to this Agreement:**

| | |
|---|---|
| Devon Energy Production Company, L.P. | 57.478809% |
| Magnum-Hunter Production, Inc. | 11.027556% |
| S & P Co. | 3.690660% |
| SkarCo, LLP | 3.690009% |
| JJS Working Interests, LLC | 1.303236% |
| Chi Energy, Inc. | 8.340998% |
| Chevron USA, Inc. | 7.289975% |
| McCombs Energy, LLC | 5.468028% |
| Jeremiah, LLC | .684292% |
| Joseph H. Byrne | .228097% |
| Thunderbolt Petroleum, Inc. | .228097% |
| Pocahontas Oil Co., Inc. | .228097% |
| O. D. Albright, III | .228097% |
| W. D. W. Operators, Inc. | .114049% |
| TOTAL | 100.000000% |

8-20-13 replacement

Exhibit 'A'                        August 1, 2013                        page 3 of 5
S/2 Sec. 30-18S-31E

5.     **Schedule of Oil and Gas Leases:**

Lessor:          United States of America
Lessee:          18-31, Inc.
Serial No.:      NMLC 02387-B
Date:            November 1, 1991
Recorded:        Unrecorded
Description:     Insofar and only insofar as said lease covers the
                 N/2 SE/4 of Section 30-T18S-R31E, Eddy County, NM
Royalty Rate:    12.5%
ORRI:            As shown of record this date


Lessor:          United States of America
Lessee:          Canadian Kenwood Company (73%) and
                 T. R. Parker Estate (27%)
Serial No.:      NMLC 029387-D
Date:            November 1, 1991
Recorded:        Unrecorded
Description:     Insofar and only insofar as said lease covers the
                 Lot 3 and NE/4 SW/4 of Section 30-T18S-R31E, Eddy County, NM
Royalty Rate:    12.5%
ORRI:            As shown of record this date


6.     **Agreements:**



CONTRACT AREA 'B'

1.     **Description of lands subject to this Agreement:**

S/2 S/2 Section 30-T18S-R31E, Eddy County, New Mexico,
containing 155.54 acres MOL

2.     **Restrictions, if any, as to depths, formations, or substances:**

Depths from 4,500' below the surface of the earth to the base of the Bone Spring
formation

3.     **Parties to Agreement with addresses and telephone numbers for notice purposes:**

Devon Energy Production Company, L.P.
333 West Sheridan Avenue
Oklahoma City, Oklahoma 73102
Attn: Meg Muhlinghause 405-228-4416
Fax: 405-552-8113

Magnum-Hunter Production, Inc.
600 N. Marienfeld
Midland, TX 79701
Attn: Mark Compton  432-571-7896
Fax: 432-571-7840

S & P Co.
330 Marshall Street, Suite 300
Shreveport, LA 71101
Attn: Jill Crawford  318-222-1800
Fax: 318-424-1257

8-20-13 replacement

Exhibit 'A'                           August 1, 2013                        page 4 of 5
S/2 Sec. 30-19S-31E

SklarCo, LLP
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Attn: Greg Rembert 318-227-8668
Fax 318-227-9435

JJS Working Interests, LLC
4295 San Felipe, Suite 207
Houston, TX 77056-2951
Attn: Justin Simons 713-888-0875
Fax 866-406-9550

Chi Energy, Inc.
P.O. Box 1799
Midland, TX 79702
Attn: John  Qualls 432-685-5001
Fax 432-687-2662

Chevron USA, Inc.
1400 Smith Street, Room 43005
Houston, TX 77002
Attn: Stephanie Magers  713-658-1877
Fax _____

McCombs Energy, L.L.C.
5599 San Felipe, Suite 1200
Houston, TX 77056
Attn: Ricky Haikin 713-621-0033
Fax:  713-621-1670

Jeremiah LLC
P.O. Box 924
Hobbs, NM 88241
Attn: Mike McVay 575-397-3311
Fax:  575-393-7455

Joseph H. Byrne
21 Brentwood Club
Lubbock, TX 79407
806-792-1182

Thunderbolt Petroleum, Inc.
P.O. Box 10523
Midland, TX 79702-7523
Attn: Robert Lee 432-682-1251
Fax 432-682-1875

Pocahontas Oil Co., Inc.
P.O. Box 60476
Midland, TX 79711
Attn: Phillip L. Lawson 432-563-0449
Fax 432-563-0459

O. D. Albright, III
P.O. Box 10981
Midland, TX 79702
432-684-0504
Fax 432-686-0569

Exhibit 'A'                    August 1, 2013                    page 5 of 5
S/2 Sec. 30-18S-31E


W D W Operators, Inc.
P.O. Box 9760
Midland, TX 79708
Attn: Dan Linebarger  432-685-5066
Fax 432-682-1158


4.   **Percentages or fractional interests of parties to this Agreement:**

| | |
|---|---|
| Devon Energy Production Company, L.P. | 34.625542% |
| Magnum-Hunter Production, Inc. | 11.021886% |
| S & P Co. | 2.459174% |
| SkarCo, LLP | 2.458740% |
| JJS Working Interests, LLC | .868378% |
| Chi Energy, Inc. | 17.759580% |
| Chevron USA, Inc. | 15.521752% |
| McCombs Energy, LLC | 11.642477% |
| Jeremiah, LLC | 1.456988% |
| Joseph H. Byrne | .485663% |
| Thunderbolt Petroleum, Inc. | .485663% |
| Pocahontas Oil Co., Inc. | .485663% |
| O. D. Albright, III | .485663% |
| W. D. W. Operators, Inc. | .242831% |
| TOTAL | 100.000000% |


5.   **Schedule of Oil and Gas Leases:**

Lessor:        United States of America
Lessee:        18-31, Inc.
Serial No.:    NMLC 02387-B
Date:          November 1, 1991
Recorded:      Unrecorded
Description:   Insofar and only insofar as said lease covers the
               S/2 SE/4 of Section 30-T18S-R31E, Eddy County, NM
Royalty Rate:  12.5%
ORRI:          As shown of record this date


Lessor:        United States of America
Lessee:        Canadian Kenwood Company (73%) and
               T. R. Parker Estate (27%)
Serial No.:    NMLC 029387-D
Date:          November 1, 1991
Recorded:      Unrecorded
Description:   Insofar and only insofar as said lease covers the
               Lot 4 and SW/4 SW/4 of Section 30-T18S-R31E, Eddy County, NM
Royalty Rate:  12.5%
ORRI:          As shown of record this date


6.   **Agreements:**


8-20-13 replacement

**EXHIBIT "B"**

Attached to that certain Operating Agreement dated August 1, 2013, by and between Devon Energy Production Company, L.P., as Operator and Chi Energy, Inc., et al, as Non-Operators.


There is no Exhibit "B" to this Operating Agreement

c o p a s

# Exhibit "C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

Attached to and made part of  Operating Agreement dated August 1, 2013 by and between Devon Energy Production Company, L.P., as Operator, Chi Energy, Inc., et al, as Non-Operators

S/2 of Section 30-T18S-R31E, Eddy County, New Mexico

## I. GENERAL PROVISIONS

IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.

IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.

1.  **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

"**Affiliate**" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

"**Agreement**" means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

"**Controllable Material**" means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

"**Equalized Freight**" means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

"**Excluded Amount**" means a specified excluded trucking amount most recently recommended by COPAS.

"**Field Office**" means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

"**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

*   Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
*   Responsibility for day-to-day direct oversight of rig operations
*   Responsibility for day-to-day direct oversight of construction operations
*   Coordination of job priorities and approval of work procedures
*   Responsibility for optimal resource utilization (equipment, Materials, personnel)
*   Responsibility for meeting production and field operating expense targets
*   Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
*   Responsibility for all emergency responses with field staff
*   Responsibility for implementing safety and environmental practices
*   Responsibility for field adherence to company policy
*   Responsibility for employment decisions and performance appraisals for field personnel
*   Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

"**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement. *or incurred*

"**Joint Operations**" means all operations/ ~~necessary or proper~~ for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property. *Authorized under the Agreement*

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

8-20-13 replacement

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

"**Joint Property**" means the real and personal property subject to the Agreement.

"**Laws**" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"**Non-Operators**" means the Parties to the Agreement other than the Operator.

"**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

"**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"**Parties**" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

"**Participating Party/**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"**Personal Expenses**" means reimbursed costs for travel and temporary living expenses.

"**Railway Receiving Point**" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

"**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

"**Supply Store**" means a recognized source or common stock point for a given Material item.

"**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2.   **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section 1.2 and/or Section 1.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



c o p a s

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within thirty (30) ~~fifteen (15)~~ days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within thirty (30) ~~fifteen (15)~~ days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within thirty (30) ~~fifteen (15)~~ days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

   (1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

   (2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

   (3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

   (4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4. ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

   (1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

   (2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

   (3) a government/regulatory audit, or

   (4) a working interest ownership or Participating Interest adjustment.

**5. EXPENDITURE AUDITS**

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E. ☑ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

6. **APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ **two** _____ ( **2** ) or more Parties, one of which is the Operator, having a combined working interest of at least _____ **fifty** _____ percent ( **50** %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1.   RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2.   LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such charges are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)   Operator's employees providing First Level Supervision,

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



D.   Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.   Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.   Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.   **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   **TRANSPORTATION**

A.   Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.   Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)   If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2)   If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.   **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.   **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.   The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____**eight**_____ percent (__**8.0**__%) per annum; provided, however, depreciation shall not be charged when the



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

7.   **AFFILIATES**

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ _50,000.00_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $ _50,000.00_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

8.   **DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

9.   **LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys and/or outside landmen /for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

10.   **TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**c o p a s**

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration,  and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

### III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are  jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1.  **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

    As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

    ☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
    ☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

    A.  TECHNICAL SERVICES

        (i)  Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

            ☑ **(Alternative 1 – Direct)** shall be charged <u>direct</u> to the Joint Account.

            ☐ **(Alternative 2 – Overhead)** shall be covered by the <u>overhead</u> rates.

        (ii)  Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

            ☑ **(Alternative 1 – All Overhead)** shall be covered by the <u>overhead</u> rates.

            ☐ **(Alternative 2 – All Direct)** shall be charged <u>direct</u> to the Joint Account.

            ☐ **(Alternative 3 – Drilling Direct)** shall be charged <u>direct</u> to the Joint Account, <u>only</u> to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

    Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

    B.  OVERHEAD—FIXED RATE BASIS

        (1)  The Operator shall charge the Joint Account at the following rates per well per month:

            Drilling Well Rate per month $ 7,500.00_____ (prorated for less than a full month)

            Producing Well Rate per month $ 750.00_____

        (2)  Application of Overhead—Drilling Well Rate shall be as follows:

            (a)  Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work-days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C. OVERHEAD—PERCENTAGE BASIS

(1) ~~Operator shall charge the Joint Account at the following rates:~~

(a) ~~Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.~~

(b) ~~Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

(2) ~~Application of Overhead—Percentage Basis shall be as follows:~~

(a) ~~The Development Rate shall be applied to all costs in connection with:~~

~~[i]   drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii]  a well undergoing plugback or workover operations for a period of five (5) or more consecutive work-days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv]  expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v]   construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead Major Construction and Catastrophe*).~~

(b) ~~The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead Major Construction and Catastrophe*).~~

2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**c o p a s**

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1)   \_\_\_\_5\_\_\_\_% of total costs if such costs are less than $100,000; plus

    (2)   \_\_\_\_3\_\_\_\_% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)   \_\_\_\_2\_\_\_\_% of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

    (1)   \_\_\_\_5\_\_\_\_% of total costs if such costs are less than $100,000; plus

    (2)   \_\_\_\_3\_\_\_\_% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)   \_\_\_\_2\_\_\_\_% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

**3.   AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

### IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1.   DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

COPAS

## 2. TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

**D. CONDITION**

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

**E. OTHER PRICING PROVISIONS**

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

3.  **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4.  **SPECIAL PRICING PROVISIONS**

A.  PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B.  SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C.  MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**1. DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.  A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.  Actual transportation costs and Personal Expenses for the inventory team.

C.  Reasonable charges for report preparation and distribution to the Non-Operators.

**2. NON-DIRECTED INVENTORIES**

A.  OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.  NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.  SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

## EXHIBIT 'D'

Attached to that certain Operating Agreement dated <u>August 1, 2013,</u> by and between
Devon Energy Production Company, L.P., as Operator, and Chi Energy, Inc., et al, as Non-
Operators.

The Operator shall carry insurance at the expense of and for the benefit of the joint
account covering Operator's operations upon the Unit Area subject to the Operating
Agreement to which this Exhibit "D" is attached as follows:

    a) Workers' compensation insurance: In compliance with the workers'
       compensation laws of the State of <u>New Mexico,</u> including employer's
       liability with minimum limits of $1,000,000.00

No other insurance will be required other than as set forth above. Any party may, at its
own expense, acquire such other insurance it deems proper to protect itself against any
claims, losses, damages or destruction arising out of operations hereunder.

Operator and each Non-Operator agree to mutually waive subrogation in favor of each
other on all insurance carried by each party and/or obtain such waiver from the insurance
carrier if so required by the insurance contract.

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992      AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
                                                          APPROVED FORM
                                                          A.A.P.L. NO. 6

1 ~~NOTE: Instructions For Use of Gas Balancing~~
2 ~~Agreement MUST be reviewed before finalizing~~
3 ~~this document.~~
4
5
6
7                                    **EXHIBIT "E"**
8                  **GAS BALANCING AGREEMENT ("AGREEMENT")**
9                  **ATTACHED TO AND MADE PART OF THAT CERTAIN**
10        **OPERATING AGREEMENT DATED ___ August 1, 2013**
11 **BY AND BETWEEN ___ Devon Energy Production Company, L.P. ___ , ___ as Operator ___**
12 **AND ___ Chi Energy, Inc., et al. as Non-Operators ___ ("OPERATING AGREEMENT")**
13 **RELATING TO THE ___ S/2 of Section 30-T18S-R31E ___ -AREA,**
14                    **Eddy COUNTY/PARISH, STATE OF ___ New Mexico ___ .**
15
16 **1.    DEFINITIONS**
17    The following definitions shall apply to this Agreement:
18    1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales
19        agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are
20        representative of prices and delivery conditions existing under other similar agreements in the area between
21        unaffiliated parties at the same time for natural gas of comparable quality and quantity.
22    1.02 "Balancing Area" shall mean (**select one**):
23        ☑ each well subject to the Operating Agreement that produces Gas or is allocated a share of Gas production. If a
24           single well is completed in two or more producing intervals, each producing interval from which the Gas
25           production is not commingled in the wellbore shall be considered a separate well.
26        ☐ ~~all of the acreage and depths subject to the Operating Agreement.~~
27        ☐ _____
28        _____
29        _____
30        _____
31    1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced
32        from the Balancing Area during each month.
33    1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified
34        as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made
35        available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by
36        field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel,
37        recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.
38    1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full
39        Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.
40    1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic
41        foot of space at a standard pressure base and at a standard temperature base.
42    1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat
43        required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a
44        constant pressure of 14.73 pounds per square inch absolute.
45    1.08 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the
46        event this Agreement is not employed in connection with an operating agreement, the individual or entity
47        designated as the operator of the well(s) located in the Balancing Area.
48    1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than
49        the Percentage Interest of such Party in the Gas produced from the Balancing Area.
50    1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in
51        the cumulative quantity of all Gas produced from the Balancing Area.
52    1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors,
53        transferees and assigns.
54    1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the
55        Balancing Area pursuant to the Operating Agreement covering the Balancing Area.
56    1.13 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding
57        royalties, production payments or similar interests.
58    1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than
59        the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.
60    1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its
61        Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.
62    1.16 ☐ ~~(Optional) "Winter Period" shall mean the month(s) of~~_____~~in one~~
63        ~~calendar year and the month(s) of~~_____~~in the succeeding calendar year.~~
64 **2.    BALANCING AREA**
65    2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered
66        by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area
67        measured in (**Alternative 1**) ☑ Mcfs or (**Alternative 2**) ☐ MMBtus.
68    2.2 In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more
69        maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area
70        and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.
71 **3.    RIGHT OF PARTIES TO TAKE GAS**
72    3.1 Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes
73        nominated, the name of the transporting pipeline and the pipeline contract number (if available) **or other identifying description** and meter station / relating
74        to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other

                                - 1 -                        8-20-13 replacement

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

1 requirements. Operator is authorized to deliver the volumes so nominated / and confirmed (if confirmation is required) to the *in accordance with each Parties' interest in the well provided however, the Well is capable of delivering the nominated volume for the applicable Party or Parties.*
2 transporting pipeline in accordance with the terms of this Agreement.

3     3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the
4 extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to
5 preserve correlative rights, or to maintain oil production.

6     3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the
7 right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any
8 Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced
9 Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all
10 Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not
11 taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the
12 Balancing Area bear to the total Percentage Interests of such Parties.

13     3.4 All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is
14 underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking
15 Party.

16     3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any
17 Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum
18 Monthly Availability; / provided, however, that this limitation shall not apply to the extent that it would preclude production *unless agreed to by all Parties hereto*
19 that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative
20 rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of
21 production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum
22 efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency,
23 mode of operation, production facility capabilities and pipeline pressures.

24     3.6 In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be
25 produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or
26 to maintain oil production, the Operator may sell / any part of such Party's Full Share of Current Production that such Party fails *if so elects*
27 to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any
28 reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of
29 such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain
30 such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its
31 markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent
32 with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one
33 year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall
34 be deemed to be Gas taken for the account of such Party.

35 **4. IN-KIND BALANCING**

36     4.1 Effective the first day of any calendar month following / atleast _____ thirty _____ (___ 30 ___) days' prior *reasonable notice of*
37 written notice to the Operator, / any Underproduced Party may begin taking, in addition to its Full Share of Current *if required by Operator,*
38 Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined
39 by multiplying ___ thirty-five ___ percent (___ 35 ___%) of the Full Shares of Current Production of all Overproduced Parties by
40 a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which
41 is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an
42 Overproduced Party be required to provide more than ___ thirty-five ___ percent (___ 35 ___%) of its Full Share of Current
43 Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced
44 Party to begin taking Makeup Gas.

45     ~~4.2 ☐ (Optional Seasonal Limitation on Makeup Option 1) Notwithstanding the provisions of Section 4.1, the~~
46 ~~average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1~~
47 ~~shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the~~
48 ~~_____ (_____) months immediately preceding the Winter Period.~~

49     ~~4.2 ☐ (Optional Seasonal Limitation on Makeup Option 2) Notwithstanding the provisions of Section 4.1, no~~
50 ~~Overproduced Party will be required to provide more than _____ percent (_____%) of its Full Share~~
51 ~~of Current Production for Makeup Gas during the Winter Period.~~

52     4.3 ☑ (Optional) Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or
53 (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced
54 Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may
55 be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to
56 ___ one hundred ___ percent (___ 100 ___%) of such Overproduced Party's Full Share of Current Production.

57 **5. STATEMENT OF GAS BALANCES**

58     5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each
59 Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within ~~forty-five (45)~~ / days *sixty (60)*
60 after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of
61 Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between
62 the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or
63 Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum
64 Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to
65 the Operator any data required by the Operator for preparation of the statements required hereunder.

66     5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or
67 where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation
68 volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and
69 during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit
70 will be charged to the account of the Party failing to provide the required data.

71 **6. PAYMENTS ON GAS**

72     6.1 Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas
73 actually taken by such Party.

74     ~~6.2 ☐ (Alternative 1 - Entitlements) Each Party shall pay or cause to be paid all Royalty due with respect to Royalty~~

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

1  ~~owners to whom it is accountable as if such Party were taking its Full Share of Current Production, and only its Full Share of~~
2  ~~Current Production.~~

3  ~~6.2.1 ☐  (Optional - For use only with Section 6.2 - Alternative I — Entitlement) Upon written request of a Party~~
4  ~~taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than~~
5  ~~its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an~~
6  ~~amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of~~
7  ~~the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that~~
8  ~~such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments~~
9  ~~made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of~~
10  ~~Section 7.5.~~

11  6.2  ☑  **(Alternative 2 - Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to
12  whom it is accountable based on the volume of Gas actually taken for its account.

13  6.3  In the event that any governmental authority requires that Royalty payments be made on any other basis than that
14  provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date
15  required by such governmental authority, and the method provided for herein shall be thereby superseded.

16  **7.   CASH SETTLEMENTS**

17  7.1  Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination
18  of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, or at any time no Gas is taken
19  from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash
20  settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

21  7.2  Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each
22  Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each
23  Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology
24  set out in Section 7.4.

25  7.3  ☑  **(Alternative I - Direct Party-to-Party Settlement)** Within sixty (60) days after receipt of the Final Gas Settlement
26  Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash
27  settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the
28  Operator of the Gas imbalance settled by the Overproduced Party's payment.

29  ~~7.3 ☐  (Alternative 2 — Settlement Through Operator) Within sixty (60) days after receipt of the Final Gas Settlement~~
30  ~~Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the~~
31  ~~Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an~~
32  ~~Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the~~
33  ~~Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the~~
34  ~~Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator~~
35  ~~will have no further responsibility with regard to such settlement.~~

36  7.3.1 ☑  **(Optional - For use only with Section 7.3, Alternative 2 - Settlement Through Operator)** Any Party shall have
37  the right at any time upon thirty (30) days' prior written notice to all other Parties to demand that any settlements due such
38  Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the
39  Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time
40  after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable
41  to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.

42  7.4  ☑  **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds
43  received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the
44  Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the
45  Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the
46  order of accrual.

47  ~~7.4 ☐  (Alternative 2 — Most Recent Sales Basis) The amount of the cash settlement will be based on the proceeds~~
48  ~~received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction~~
49  ~~by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the~~
50  ~~Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until~~
51  ~~the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the~~
52  ~~Balancing Area.~~

53  7.5  The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the
54  Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any
55  Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments
56  amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any reasonable marketing, compression,
57  treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

58  7.5.1 ☑  **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas
59  purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of
60  residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will
61  include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the
62  Overproduction.

63  ~~7.5.2 ☐  (Optional - Valuation For Processed Gas - Option 1) For Overproduction processed for the account of the~~
64  ~~Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction~~
65  ~~will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas~~
66  ~~attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been~~
67  ~~extracted from the Overproduction.~~

68  7.5.2 ☑  **(Optional - Valuation For Processed Gas - Option 2)** For Overproduction processed for the account of the
69  Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash
70  settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from
71  the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to
72  transport, fractionate and handle the liquid hydrocarbons extracted therefrom prior to sale.

73  7.6  To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash
74  settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.

7.7    Interest compounded at the rate of _____**twelve**_____ percent ( **12.0** %) per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest. /**The Operator shall also be required to pay such interest if it has received payment from any Overproduced /Party but failed to timely pay the Underproduced Party.**

7.8    In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

7.9    ☑ (Optional - For Balancing Areas Subject to Federal Price Regulation) That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.

~~7.10  ☐ (Optional - Interim Cash Balancing) At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such settlement within thirty (30) days after the settlement is made.~~

**8.    TESTING**

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after   **thirty**_____ ( **30** ) days' prior written notice to the Operator and shall last no longer than _____**seventy-two**_____ ( **72** ) hours.

**9.    OPERATING COSTS**

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**10.    LIQUIDS**

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

**11.    AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement.

**12.    MISCELLANEOUS**

12.1    As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

12.2    Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3    Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4    This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

1 and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of
2 any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of
3 any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

4   12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the
5 singular, and the neuter gender includes the masculine and the feminine.

6   12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a
7 typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be
8 made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not
9 so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result
10 of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative
11 is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected;
12 and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the
13 selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to
14 include an associated Optional provision.

15   12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed
16 or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any
17 such person or entity.

18   12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party
19 execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and
20 submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such
21 request is made and delivered promptly thereafter to the Party making the request. Upon receipt, the Party making the request
22 shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the
23 Balancing Area.

24   ~~12.9 In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all~~
25 ~~Parties, each Party agrees to compute and report income to the Internal Revenue Service (select one) ☐ as if such Party were~~
26 ~~taking its Full Share of Current Production during each relevant tax period in accordance with such regulations, insofar as same~~
27 ~~relate to entitlement method tax computations; or ☐ based on the quantity of Gas taken for its account in accordance with~~
28 ~~such regulations, insofar as same relate to sales method tax computations.~~  See Page 5a, Item 14.3

29 **13.   ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

30   13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement
31 or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its
32 working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other
33 act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the
34 Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any
35 monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall
36 thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other
37 transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall
38 cause its assignee or other transferee to assume its obligations hereunder.

39   13.2 ☐ **(Optional — Cash Settlement Upon Assignment)** ~~Notwithstanding anything in this Agreement (including but not~~
40 ~~limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions~~
41 ~~of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its~~
42 ~~interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are~~
43 ~~Parties hereto in such Balancing Area of such fact at least _____ (_____) days prior to closing the~~
44 ~~transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within~~
45 ~~_____ (_____) days after receipt of the Overproduced Party's notice, a cash settlement of its~~
46 ~~Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement~~
47 ~~pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash~~
48 ~~settlement pursuant to this Section 13 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60)~~
49 ~~days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced~~
50 ~~Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in~~
51 ~~Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning sixty (60) days~~
52 ~~after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not~~
53 ~~paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the~~
54 ~~Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the~~
55 ~~Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance~~
56 ~~with the provisions of Section 13.1 hereof.~~

57   13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its
58 interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to
59 any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

60 **14.   ~~OTHER PROVISIONS~~**

61                    See Attachment, page 5a

62
63
64
65
66
67
68
69
70
71
72
73
74

## 14. OTHER PROVISIONS

14.1   Any Underproduced Party can require cash settlement from the Overproduced Parties in January of each even numbered year by providing written notice to the Operator.   Section 7 of this Gas Balancing Agreement shall govern cash settlement under this provision.

14.2   In the event any Party feels a Party has produced more than its share of recoverable reserves and wants to prohibit a Party from selling additional Gas, the Party shall  notify the Operator, including its estimate of remaining recoverable reserves.  The Operator shall notify all other Parties. If Parties concur with the recoverable reserve estimate, said Overproduced Party shall be prohibited from selling Gas until Overproduced Party is back in balance.   If the Parties cannot agree on the remaining recoverable reserves, the Operator shall retain an independent reservoir engineer, experienced and competent in the geographical areas of the well(s) in question, to compute the reserves.  Its decision shall be final.  Costs incurred by the independent engineer shall be borne by the Parties hereto.

14.3   The Parties to this Agreement agree to abide by Regulation 1.761-2(d)(2) as promulgated by the Internal Revenue Service.   Regulation 1.761-2(d)(2) requires that all co-producers of natural gas operating under the same joint operating agreement must use the cumulative gas balancing method, as described under this regulation, to report gas balancing for tax purposes.   In the event of a conflict between the provisions of this Section and any other provisions of this Agreement, the provisions of this Section shall control.

8-20-13 replacement

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

**15.   COUNTERPARTS**

This Agreement may be executed in counterparts, each of which when taken with all other counterparts shall constitute a binding agreement between the Parties hereto; ~~provided, however, that if a Party or Parties owning a Percentage Interest in the Balancing Area equal to or greater than a _____ percent (_____%) therein fail(s) to execute this Agreement on or before _____, this Agreement shall not be binding upon any Party and shall be of no further force and effect.~~

IN WITNESS WHEREOF, this Agreement shall be effective as of the ___1st___ day of ___January___, ___2013___.

~~ATTEST OR WITNESS:~~                                                      OPERATOR

                                                                           _____

_____            BY: _____

_____                 _____

                                                                           Type or print name

                                                                           Title _____

                                                                           Date _____

                                                                           Tax ID or S.S. No. _____


                                                                           NON-OPERATORS

                                                                           _____

_____            BY: _____

_____                 _____

                                                                           Type or print name

                                                                           Title _____

                                                                           Date _____

                                                                           Tax ID or S.S. No. _____


                                                                           _____

_____            BY: _____

_____                 _____

                                                                           Type or print name

                                                                           Title _____

                                                                           Date _____

                                                                           Tax ID or S.S. No. _____

EXHIBIT "F"

Attached to and made a part of that certain Operating Agreement dated August 1, 2013, by and between Devon Energy Production Company, L. P. as Operator, and Chi Energy, Inc., et al, as Non-Operators.

## NON-DISCRIMINATION AND CERTIFICATION OF NON-SEGREATED FACILITIES

One or more parties to the attached Operating Agreement may be a Government Contractor as defined by law and therefore be required to obtain certification of compliance with certain applicable federal laws, orders, and regulations vendors, suppliers, parties, contractors, and subcontractors with whom they do business.

To ensure compliance with such requirements, Operator hereby agrees to materially comply with the following provisions contained in the Code of Federal Regulations (to the extent such provisions are applicable to Operator and unless Operator is exempted by applicable law), which are incorporated herein by reference: 41 C.F.R. § 60 – 1.4(a) (Equal Employment Opportunity); 41 C.F.R. § 60 – 741.5(a) (Equal Employment Opportunity for Workers with Disabilities); 41 C.F.R. 60 – 300.5(a) (Equal Opportunity for Disabled and Other Protected Veterans).

In addition, Operator hereby certifies that it: (a) has developed a written Affirmative Action Compliance Program consistent with the rules and regulations published by the Department of Labor in 41 C.F.R. § 60; (b) files an annual Employer Information Report EEO-1 Standard Form 100 in accordance with 41 C.F.R. § 60 – 1.7; and (c) that it does not, and will not maintain any facilities for employees in a segregated manner or permit its employees to perform their services at any location under its control, where segregated facilities are maintained, in accordance with 41 C.F.R. § 60 – 1.8.

AAPL – FORM 610RS – 1989

## EXHIBIT "H"

**Attached to and made a part of that certain Operating Agreement dated August 1, 2013, between Devon Energy Production Company, L.P., as Operator, and Chi Energy, Inc., et al, as Non-Operators.**

## MODEL FORM RECORDING SUPPLEMENT TO
## OPERATING AGREEMENT AND FINANCING STATEMENT

THIS AGREEMENT, entered into by and between __ Devon Energy Production Company, L.P. __, hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated __ August 1, 2013 __ (hereinafter the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1.   This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2.   The parties do hereby agree that:

    A.  The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

    B.  The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

    C.  All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

    D.  Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

    E.  Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

    F.  An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

    G.  The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

        This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

    H.  The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

8-20-13 replacement

AAPL – FORM 610RS - 1989

I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C. To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D. If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E. If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

AAPL – FORM 610RS - 1989

F. The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G. To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H. The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8. Other provisions.

   (a.) **This instrument is executed by the parties as of the dates of the acknowledgements below and is signed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute but one and the same instrument.**

AAPL Form 610RS – 1989

~~Devon Energy Production Company, L.P., who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exceptions as listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms-On-A-Disk, Inc.   Excepting the signature pages, no changes, alterations or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.~~

IN WITNESS WHEREOF, this agreement shall be effective as of <u>August 1, 2013</u>.

## OPERATOR

_____          <u>**Devon Energy Production Company, L. P.**</u>

By: _____
<u>           Bill A. Penhall           </u>

Title: <u>   Vice President   </u>

Address: <u>333 West Sheridan Ave., Okla. City, OK 73102</u>

## ACKNOWLEDGMENT

Note: The following forms of acknowledgment is the short form approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

STATE OF OKLAHOMA            )§
COUNTY OF OKLAHOMA         )§

The foregoing instrument was acknowledged before me on <u>August</u> ____ , <u>2013,</u>   by   <u>Bill A. Penhall, as</u> <u>Vice President of Devon Energy Production Company, L.P.</u>, an Oklahoma limited partnership, on behalf of said limited partnership.

My commission expires _____

_____
                                    Notary Public

**EXHIBIT "A"**

Attached to and made a part of that certain 'Model Form Recording Supplement to Operating Agreement and Financing Statement' dated <u>August 1, 2013</u>,  by and between Devon Energy Production Company, L.P., as Operator, and Chi Energy,  Inc., et al, as Non-Operators.

CONTRACT AREA 'A'

1.    **Description of lands subject to this Agreement:**

   N/2 S/2 Section 30-T18S-R31E, Eddy County, New Mexico, containing 155.46 acres MOL

2.    **Restrictions, if any, as to depths, formations, or substances:**

   Depths from 4,500' below the surface of the earth to the base of the Bone Spring formation

3.    **Parties to Agreement with addresses and telephone numbers for notice purposes:**

   Devon Energy Production Company, L.P.
   333 West Sheridan Avenue
   Oklahoma City, Oklahoma 73102
   Attn: Meg Muhlinghause 405-228-4416
   Fax:  405-552-8113

   Magnum-Hunter Production, Inc.
   600 N. Marienfeld
   Midland, TX 79701
   Attn: Mark Compton  432-571-7896
   Fax:  432-571-7840

   S & P Co.
   330 Marshall Street, Suite 300
   Shreveport, LA 71101
   Attn:  Jill Crawford 318-222-1800
   Fax: 318-424-1257

   SklarCo, LLP
   401 Edwards Street, Suite 1601
   Shreveport, LA 71101
   Attn: Greg Rembert 318-227-8668
   Fax 318-227-9435

   JJS Working Interests, LLC
   4295 San Felipe, Suite 207
   Houston, TX 77056-2951
   Attn: Justin Simons 713-888-0875
   Fax 866-406-9550

   Chi Energy, Inc.
   P.O. Box 1799
   Midland, TX 79702
   Attn: John  Qualls 432-685-5001
   Fax 432-687-2662

   Chevron USA, Inc.
   1400 Smith Street, Room 43005
   Houston, TX 77002
   Attn: Stephanie Magers 713-658-1877
   Fax _____

   McCombs Energy, L.L.C.
   5599 San Felipe, Suite 1200
   Houston, TX 77056
   Attn: Ricky Haikin 713-621-0033
   Fax:  713-621-1670

8-20-13 replacement

Exhibit 'A'                    August 1, 2013                         page 2 of 5
S/2 Sec. 30-18S-31E


Jeremiah LLC
P.O. Box 924
Hobbs, NM 88241
Attn: Mike McVay 575-397-3311
Fax:  575-393-7455

Joseph H. Byrne
21 Brentwood Club
Lubbock, TX 79407
806-792-1182

Thunderbolt Petroleum, Inc.
P.O. Box 10523
Midland, TX 79702-7523
Attn: Robert Lee 432-682-1251
Fax 432-682-1875

Pocahontas Oil Co., Inc.
P.O. Box 60476
Midland, TX 79711
Attn: Phillips L. Lawson 432-563-0449
Fax 432-563-0459

O. D. Albright, III
P.O. Box 10981
Midland, TX 79702
432-684-0504
Fax 432-686-0569

W D W Operators, Inc.
P.O. Box 9760
Midland, TX 79708
Attn: Dan Linebarger 432-685-5066
Fax  432-682-1158


4.     **Percentages or fractional interests of parties to this Agreement:**

| | | |
|---|---|---|
| Devon Energy Production Company, L.P. | | 57.478809% |
| Magnum-Hunter Production, Inc. | | 11.027556% |
| S & P Co. | | 3.690660% |
| SkarCo, LLP | | 3.690009% |
| JJS Working Interests, LLC | | 1.303236% |
| Chi Energy, Inc. | | 8.340998% |
| Chevron USA, Inc. | | 7.289975% |
| McCombs Energy, LLC | | 5.468028% |
| Jeremiah, LLC | | .684292% |
| Joseph H. Byrne | | .228097% |
| Thunderbolt Petroleum, Inc. | | .228097% |
| Pocahontas Oil Co., Inc. | | .228097% |
| O. D. Albright, III | | .228097% |
| W. D. W. Operators, Inc. | | .114049% |
| | TOTAL | 100.000000% |

8-20-13 replacement

Exhibit 'A'                         August 1, 2013                    page 3 of 5
S/2 Sec. 30-18S-31E

5.   **Schedule of Oil and Gas Leases:**

    Lessor:        United States of America
    Lessee:        18-31, Inc.
    Serial No.:    NMLC 02387-B
    Date:          November 1, 1991
    Recorded:      Unrecorded
    Description:   Insofar and only insofar as said lease covers the
                   N/2 SE/4 of Section 30-T18S-R31E, Eddy County, NM
    Royalty Rate: 12.5%
    ORRI:          As shown of record this date


    Lessor:        United States of America
    Lessee:        Canadian Kenwood Company (73%) and
                   T. R. Parker Estate (27%)
    Serial No.:    NMLC 029387-D
    Date:          November 1, 1991
    Recorded:      Unrecorded
    Description:   Insofar and only insofar as said lease covers the
                   Lot 3 and NE/4 SW/4 of Section 30-T18S-R31E, Eddy County, NM
    Royalty Rate: 12.5%
    ORRI:          As shown of record this date


6.   **Agreements:**




                              CONTRACT AREA 'B'

1.   **Description of lands subject to this Agreement:**

S/2 S/2 Section 30-T18S-R31E, Eddy County, New Mexico,
containing 155.54 acres MOL

2.   **Restrictions, if any, as to depths, formations, or substances:**

Depths from 4,500' below the surface of the earth to the base of the Bone Spring
formation

3.   **Parties to Agreement with addresses and telephone numbers for notice purposes:**

Devon Energy Production Company, L.P.
333 West Sheridan Avenue
Oklahoma City, Oklahoma 73102
Attn: Meg Muhlinghause 405-228-4416
Fax:  405-552-8113

Magnum-Hunter Production, Inc.
600 N. Marienfeld
Midland, TX 79701
Attn: Mark Compton  432-571-7896
Fax:  432-571-7840

S & P Co.
330 Marshall Street, Suite 300
Shreveport, LA 71101
Attn:  Jill Crawford  318-222-1800
Fax: 318-424-1257

Exhibit 'A'                     August 1, 2013                     page 4 of 5
S/2 Sec. 30-18S-31E

SklarCo, LLP
401 Edwards Street, Suite 1601
Shreveport, LA 71101
Attn: Greg Rembert 318-227-8668
Fax 318-227-9435

JJS Working Interests, LLC
4295 San Felipe, Suite 207
Houston, TX 77056-2951
Attn: Justin Simons 713-888-0875
Fax 866-406-9550

Chi Energy, Inc.
P.O. Box 1799
Midland, TX 79702
Attn: John Qualls 432-685-5001
Fax 432-687-2662

Chevron USA, Inc.
1400 Smith Street, Room 43005
Houston, TX 77002
Attn: Stephanie Magers  713-658-1877
Fax _____

McCombs Energy, L.L.C.
5599 San Felipe, Suite 1200
Houston, TX 77056
Attn: Ricky Haikin 713-621-0033
Fax:  713-621-1670

Jeremiah LLC
P.O. Box 924
Hobbs, NM 88241
Attn: Mike McVay 575-397-3311
Fax:  575-393-7455

Joseph H. Byrne
21 Brentwood Club
Lubbock, TX 79407
806-792-1182

Thunderbolt Petroleum, Inc.
P.O. Box 10523
Midland, TX 79702-7523
Attn: Robert Lee 432-682-1251
Fax 432-682-1875

Pocahontas Oil Co., Inc.
P.O. Box 60476
Midland, TX 79711
Attn: Phillip L. Lawson 432-563-0449
Fax 432-563-0459

O. D. Albright, III
P.O. Box 10981
Midland, TX 79702
432-684-0504
Fax 432-686-0569

8-20-13 replacement

Exhibit 'A'                    August 1, 2013                    page 5 of 5
S/2 Sec. 30-18S-31E


W D W Operators, Inc.
P.O. Box 9760
Midland, TX 79708
Attn: Dan Linebarger  432-685-5066
Fax 432-682-1158


4.    **Percentages or fractional interests of parties to this Agreement:**

| | |
|---|---|
| Devon Energy Production Company, L.P. | 34.625542% |
| Magnum-Hunter Production, Inc. | 11.021886% |
| S & P Co. | 2.459174% |
| SkarCo, LLP | 2.458740% |
| JJS Working Interests, LLC | .868378% |
| Chi Energy, Inc. | 17.759580% |
| Chevron USA, Inc. | 15.521752% |
| McCombs Energy, LLC | 11.642477% |
| Jeremiah, LLC | 1.456988% |
| Joseph H. Byrne | .485663% |
| Thunderbolt Petroleum, Inc. | .485663% |
| Pocahontas Oil Co., Inc. | .485663% |
| O. D. Albright, III | .485663% |
| W. D. W. Operators, Inc. | .242831% |
| TOTAL | 100.000000% |


5.    **Schedule of Oil and Gas Leases:**

Lessor:        United States of America
Lessee:        18-31, Inc.
Serial No.:    NMLC 02387-B
Date:          November 1, 1991
Recorded:      Unrecorded
Description:   Insofar and only insofar as said lease covers the
               S/2 SE/4 of Section 30-T18S-R31E, Eddy County, NM
Royalty Rate: 12.5%
ORRI:          As shown of record this date


Lessor:        United States of America
Lessee:        Canadian Kenwood Company (73%) and
               T. R. Parker Estate (27%)
Serial No.:    NMLC 029387-D
Date:          November 1, 1991
Recorded:      Unrecorded
Description:   Insofar and only insofar as said lease covers the
               Lot 4 and SW/4 SW/4 of Section 30-T18S-R31E, Eddy County, NM
Royalty Rate: 12.5%
ORRI:          As shown of record this date


6.    **Agreements:**


8-20-13 replacement

(Non-Operator Sample)

EXHIBIT "I"

Attached to and made a part of that certain Operating Agreement dated August 1, 2013, by and between Devon Energy Production Company, L. P. as Operator, and Chi Energy, Inc., et al, as Non-Operators.

1. State Regulatory forms, including location plats for drilling and completing a well or performing workover operations.

2. Well Prognosis – logging program, casing point, etc.

3. Well Data -
   Mud Log -
   Open Hole Logs -
   Well Surveys –
   Core Analysis -
   Directional Surveys -
   Drillstem Test -
   Drawdown and Buildup data -
   Digital Well Log Data -

4. Daily Drilling reports from spud to completion e-mailed to:


5. Notification for spud, testing, logging, drill stem tests, P&A, etc. to: