SKLAP CO

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

_____ June ___ 1, __2004__ ,
_Year_

OPERATOR   John O. Farmer, Inc. _____

CONTRACT AREA   Horning A Lease _____

_____

_____

COUNTY OR PARISH OF  Norton _____     STATE OF     Kansas _____

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 19...

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between _____ John O. Farmer, Inc. _____

_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☐ B. Exhibit "B", Form of Lease.
☑ C. Exhibit "C", Accounting Procedure.
☑ D. Exhibit "D", Insurance.
☐ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE III.**
**INTERESTS OF PARTIES**

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____ See Exhibit "A" _____ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

**ARTICLE IV.**
**TITLES**

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐   Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
### continued

☑   Option No. 2:   Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

**B. Loss of Title:**

~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests; and,~~

~~(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in connection therewith.~~

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interest; and,~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses:  All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.
OPERATOR

**A.   Designation and Responsibilities of Operator:**

_____John O. Farmer, Inc._____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement.  It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

**B.   Resignation or Removal of Operator and Selection of Successor:**

1.   Resignation or Removal of Operator:   Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, ~~no longer owns an interest hereunder in the Contract Area~~, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.  Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator.  Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date.  Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator.  A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

2.   Selection of Successor Operator:   Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties.  The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected.  The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C.   Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D.   Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area.  If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

ARTICLE VI.
DRILLING AND DEVELOPMENT

~~A.   Initial Well:~~

~~On or before the _____ day of _____, (yer) _____, Operator shall commence the drilling of a well for~~
~~oil and gas at the following location:~~

~~and shall thereafter continue the drilling of the well with due diligence to~~

~~unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-~~
~~countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.~~

~~Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and~~
~~gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which~~
~~event Operator shall be required to test only the formation or formations to which this agreement may apply.~~

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1    ~~If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the~~
2    ~~well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.~~
3
4
5
6    **B.    Subsequent Operations:**
7
8          1.    Proposed Operations:    Should any party hereto desire to drill any well on the Contract Area other than the well provided
9    for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10    the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11    other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12    tion and the estimated cost of the operation.    The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13    within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.    If a drill-
14    ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15    limited to forty-eight (48) hours, ~~exclusive of Saturday, Sunday, and legal holidays~~.    Failure of a party receiving such notice to reply within |
16    the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.    Any notice or
17    response given by telephone shall be promptly confirmed in writing.
18
19
20
21          If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22    period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
23    tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24    ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25    for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26    permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27    amination or curative matter required for title approval or acceptance.    Notwithstanding the force majeure provisions of Article XI, if the
28    actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29    if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30    dance with the provisions hereof as if no prior proposal had been made.
31
32
33
34          2.    Operations by Less than All Parties:    If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
35    No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36    giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
37    the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
38    on location, as the case may be) actually commence the proposed operation and complete it with due diligence.    Operator shall perform all
39    work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40    a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41    tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work.    Con-
42    senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43    ditions of this agreement.
44
45
46
47          If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48    notice period, shall advise the Consenting Parties of the total interest of the parties  approving such operation and its recommendation as
49    to whether the Consenting Parties should proceed with the operation as proposed.    Each Consenting Party, within forty-eight (48) hours
50    ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of such notice, shall advise the proposing party of its desire to (a) limit par- |
51    ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52    failure to advise the proposing party shall be deemed an election under (a).    In the event a drilling rig is on location, the time permitted for
53    such a response shall not exceed a total of forty-eight (48) hours ~~(inclusive of Saturday, Sunday and legal holidays)~~.    The proposing party, |
54    at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58          The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59    elected to bear same under the terms of the preceding paragraph.    Consenting Parties shall keep the leasehold estates involved in such
60    operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61    If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62    sole cost, risk and expense.    If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63    ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:
9
10
11
12      (a)  / 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
           [200%]
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus / 100% of each such
                                                                                                                      [200%]
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each such Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and
18
19
20
21      (b)  ____400____ % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C., and ____400____ % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.
25
26
27
28      An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29  working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31  reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32  and there shall be added to the sums to be recouped by the Consenting Parties / one hundred percent / (100%) of that portion of the costs of
                                                                              [two]                 [200%]
33  the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.
36
37
38
39      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.
43
44
45
46      In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.
50
51
52
53      Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57  ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60  realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1    If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2    the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3    Consenting Party shall own the same interest in such well, the material and equipment in or pertaining  thereto, and the production
4    therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5    back of said well.  Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6    the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.
7
8
9
10    Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11    be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12    well conforms to the then-existing well spacing pattern for such source of supply.
13
14
15
16    The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17    except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18    after if has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19    duction, ceases to produce in paying quantities.
20
21
22
23    3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24    completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25    reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26    ing operation just completed.  Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27    first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28    matical paragraph of Article VI.B.2., shall be charged or borne as part of the proposed operation, but if the proposal is subsequently
29    withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30    each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31    ties.
32
33
34
35    4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36    also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37    location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38    mechanical difficulties.  Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39    affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40    to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:
41
42
43
44    (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45    the initial drilling of the well down to the depth at which the sidetracking operation is initiated.
46
47
48
49    (b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50    salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51    provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.
52
53
54
55    In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56    shall be limited to forty-eight (48) hours, ~~exclusive of Saturday, Sunday and legal holidays~~; provided, however, any party may request and
57    receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58    incurred during such extended response period.  If more than one party elects to take such additional time to respond to the notice, stand
59    by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60    ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.  In all other in-
61    stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.
62
63
64    Disposition of Production
65    C.    ~~TAKING PRODUCTION IN KIND:~~
66
67    ~~Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,~~
68    ~~exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for~~
69    ~~marketing purposes and production unavoidably lost.  Any extra expenditure incurred in the taking in kind or separate disposition by any~~
70    ~~party of its proportionate share of the production shall be borne by such party.  Any party taking its share of production in kind shall be~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1   ~~required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~
2
3       Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4   the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5   its share of all production.
6
7       ~~In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of~~
8   ~~the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not~~
                                    to sell the production from the Contract Area                                    each
9   ~~the obligation, to purchase such oil or sell it~~ / to others at any time and from time to time, for the account of / ~~the non-taking~~ party at the
10  best price obtainable in the area for such production.  ~~Any such purchase or sale by Operator shall be subject always to the right of the~~
11  ~~owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously~~
12  ~~delivered to a purchaser.  Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of~~
13  ~~time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess~~
14  ~~of one (1) year.~~
15
16      ~~In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or~~
17  ~~deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to~~
18  ~~be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing~~
19  ~~agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.~~
20
21  **D.    Access to Contract Area and Information:**
22
                consenting
23  —— Each / party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
                                                                        consenting
25  and records relating thereto.  Operator, upon request, shall furnish each of the other / parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the Information.
30
31  **E.    Abandonment of Wells:**
32
33      1.  Abandonment of Dry Holes:   Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties.  Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within forty-eight (48) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment.   All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well.  Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.
41
42      2.  Abandonment of Wells that have Produced:   Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production.  If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2   assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3   Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4   interests in the remaining portion of the Contract Area.

5

6       Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7   the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8   quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9   templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.

13

14      3. <u>Abandonment of Non-Consent Operations</u>:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.

19

20                                              **ARTICLE VII.**
21                                  **EXPENDITURES AND LIABILITY OF PARTIES**

22

23  **A.    Liability of Parties:**

24

25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

29

30  **B.    Liens and Payment Defaults:**

31

32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

42

43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45  the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46  reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

47

48  **C.    Payments and Accounting:**

49

50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52  tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53  showing expenses incurred and charges and credits made and received.

54

55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58  with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59  on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60  fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61  due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

63

64  **D.    Limitation of Expenditures:**

65

66      1. <u>Drill or Deepen</u>:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67  pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

68

69

70

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VII**
**continued**

1 ☐   Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.
3
4 ☐   Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well.  When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs.  The parties receiving such notice shall have forty-eight
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt.  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities.  Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt.  If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.
14
15      2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20      3. Other Operations:  Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of _____fifteen thousand_____ Dollars ($_____15,000.00_____ ) |
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties.  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of_____fifteen thousand_____ |
28 Dollars ($_____15,000.00_____ ) but less than the amount first set forth above in this paragraph. |
29
30 **E.   Rentals, Shut-in Well Payments and Minimum Royalties:**
31
32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2.
39
40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 **F.   Taxes:**
47
48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator.  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
68 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
### continued

G. **Insurance:**

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. **Surrender of Leases:**

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. **Renewal or Extension of Leases:**

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. **Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VIII**
**continued**

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

5

6    If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

8

9 **D.   Maintenance of Uniform Interests:**

10

11    For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12 party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13 equipment and production unless such disposition covers either:

14

15    1.  the entire interest of the party in all leases and equipment and production; or

16

17    2.  an equal undivided interest in all leases and equipment and production in the Contract Area.

18

19 ~~Every such~~ /Any sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties.

21

22    If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

28

29 **E.   Waiver of Rights to Partition:**

30

31    If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.

34

35 ~~F.   Preferential Right to Purchase:~~

36

37 ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40 ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41 ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43 ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

46

47 **ARTICLE IX.**
48 **INTERNAL REVENUE CODE ELECTION**

49

50    This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.

67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.
CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ twenty-five thousand and no/100 _____ Dollars ($ _____ 25,000.00 _____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

ARTICLE XI.
FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.
NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.
TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XIV.**
**COMPLIANCE WITH LAWS AND REGULATIONS**

**A.   Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.   Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Kansas _____ shall govern.

**C.   Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

**ARTICLE XV.**
**OTHER PROVISIONS**

**A.   Election at Casing Point:**

1. Notwithstanding anything contained hereto to the contrary, after any well has been drilled to the objective depth stated in the initial notice, and appropriate tests have been made, herein referred to as "Casing Point", Operator shall give immediate notice to all parties herein, setting forth its recommendation with respect to the running and setting of a production string of casing and completing the well. Each party shall have a period of 24 hours thereafter within which to notify Operator whether or not it desires to participate in the running and setting of the production string of casing and completion of the well. Failure of a party to so notify Operator within the time required shall be deemed an election not to participate. If all parties elect to participate, Operator shall conduct the proposed operations with respect to the running and setting of the production string of casing and completing the well for the account of all such parties, but, at Casing Point, should any party elect not to participate in the running and setting of a production string of casing and completing the well, then the party or parties electing not to participate in the running and setting of a production string of casing and completing the well shall assign, relinquish and disclaim to the Operator for no additional consideration all right, title and interest in and to the drillsite, the drillsite lease and any leases included in a unit with the drillsite lease. In the event the drillsite lease contains a producing and existing oil well(s), the nonparticipating party's assignment to the Operator shall be limited to insofar as and only insofar as the subject well acreage and the lease's undeveloped acreage and the nonparticipating party shall only retain its interest in the producing and existing oil well(s), not to exceed a ten (10) acre spacing area surrounding each well(s). In addition, the nonparticipating party shall not require the Operator to provide separate storage facilities or metering devices and shall agree to a reasonable and practical method proposed by the Operator in determining production allocation. Any party electing not to participate in the running and setting of a production string of casing and completing the well shall remain and be liable for its proportionate share of all costs incurred to Casing Point.

2. For purposes of this Operating Agreement and the subject prospect, "Casing Point" shall be defined as that point at which:

(a) The Initial Test Well or subsequent test wells have been drilled to the total objective depth; or

(b) An electric log has been run to a total depth; and

(c) All tests and evaluations have been completed, and a recommendation has been made to either set production casing and attempt a completion or to plug and abandon said well

In the event the parties hereto agree to abandon the Initial Test Well or subsequent test wells as dry holes, plugging and abandonment costs will be included in the before Casing Point cost.

- 14 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____June_____ , (year) __2004__ .

__John O. Farmer, Inc._____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.

O P E R A T O R

JOHN O. FARMER, INC.

_____       _____
John O. Farmer III
President

N O N - O P E R A T O R S

JOHN O. FARMER TRUST PROPERTIES, LLC            JOHN O. FARMER III

_____       _____

JOHN O. FARMER IV                                SKLARCO, LLC

_____       _____
                                       David A. Barlow, Chief Operating Officer
S & P CO.                              ZARROW INVESTMENT COMPANY

_____       _____

- 15 -

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

On this 5th day of November, 2004, before me appeared David A. Barlow, to me personally known, who being by me duly sworn, did say that he is the Chief Operating Officer of Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said Sklarco L.L.C., and the said David A. Barlow acknowledged the instrument to be the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana
Notary's Printed Name:
My commission is for Life

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission Is for Life

EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated June 1, 2004, by and between John O. Farmer, Inc., as Operator, and S&P Co., Sklarco L.L.C., and Zarrow Investment Company, as Non-Operators.

**1.  LANDS SUBJECT TO THIS AGREEMENT:**

This agreement is intended to cover the following acreage:

        N/2 NE/4 Section 30, Township 3 South, Range 23 West, Norton Co., KS;
        N/2 SW/4 NE/4 Section 30, Township 3 South, Range 23 West, Norton Co., KS;

also know as the Horning A Lease, further described in that oil and gas lease dated April 21, 1962, by and between W. C. Horning and Rilda M. Horning, as Lessors, and W. R. Yeager, as Lessee, recorded in Book 15, Page 173 of the Records of Norton County, Kansas.

**2.  RESTRICTIONS, IN ANY, AS TO DEPTHS, FORMATION OR SUBSTANCES:**

This agreement is intended to cover the acreage described above only from the surface down to 3,800 feet.

**3.  PARTIES TO THE AGREEMENT, ADDRESSES AND TELEPHONE NUMBERS, FOR NOTICE PURPOSES AND PERCENTAGE OR FRACTIONAL INTEREST OF PARTIES TO THIS AGREEMENT:**

John O. Farmer, et al
370 West Wichita Avenue
P. O. Box 352
Russell, KS 67665                62.500000%
Telephone:    (785) 483-3144
Fax:            (785) 483-6020

S&P Co.
330 Marshall Street, Suite 300
Shreveport, Louisiana 71101         5.781250%
Telephone:    (318) 222-1800
Fax:            (318) 424-1257

Sklarco L.L.C.
401 Edwards Street, Suite 1601
Shreveport, Louisiana 71101         6.718750%
Telephone:    (318) 227-8668
Fax:            (318) 227-9012

Zarrow Investment Company
Attn: Oil Division
401 South Boston, Suite 900         25.000000%
Tulsa, Oklahoma
Telephone: (918) 295-8000
Fax:            (918)

## EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement dated June 1, 2004, by and between John O. Farmer, Inc., as Operator, and S&P Co., Sklarco L.L.C., and Zarrow Investment Company, as Non-Operators.

### Specimen, Form 601 COPAS

### ACCOUNTING PROCEDURE
### (JOINT OPERATIONS)

### I. GENERAL PROVISIONS

1.      Definitions
"Joint Property" shall mean the real and personal property subject to the agreement to which this "Accounting Procedure" is attached.
"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.
"Operator" shall mean the party designated to conduct the Joint Operations.
"Non-Operators" shall mean the non-operating parties, whether one or more.
"Joint Account" shall mean the account showing the charges and credits accruing because of the Joint Operations and which are to be shared by the Parties.
"Parties" shall mean Operator and Non-Operators.
"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.
"Controllable Material" shall mean material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.
2.      Conflict with Agreement
In the event of a conflict between the provisions of this Accounting Procedure and the provisions of the agreement to which this Accounting Procedure is attached, the provisions of the agreement shall control.
3.      Collective Action by Non-Operators
 Where an agreement or other action of Non-Operators is expressly required under this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the agreement or action of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.
4.      Statements and Billings
Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of costs and expenses, for the preceding month.  Such bills will be accompanied by statements reflecting the total charges and credits as set forth under Subparagraph below:
    A. Statement in detail of all charges and credits to the Joint Account.
    B. Statement of all charges and credits to the Joint Account, summarized by appropriate classifications indicative of the nature thereof.
    C. Statement of all charges and credits to the Joint Account summarized by appropriate classifications indicative of the nature thereof, except that items of Controllable Material and unusual charges and credits shall be detailed.
5.      Payment and Advances by Non-Operators
Each Non-Operator shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six percent(6%) per annum until paid.
6.      Adjustments
Payment of any such bills shall not prejudice the right of any Non-Operators to protest or question the correctness thereof; provided however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four(24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.  No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions or this paragraph shall not prevent adjustments resulting from a physical inventory of the Joint Property as provided for in Section VII.
7.      Audits
A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided however, the making of an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph C of this Section 1. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator.

### II. DIRECT CHARGES

Subject to limitations hereinafter prescribed, Operator shall charge the Joint Account with the following items:

1. Rentals and Royalties
    Delay or other rentals and royalties when such rentals and royalties are paid by Operator for the Joint Account of the Parties.
2. Labor
    A. Salaries and wages of Operator's employees directly engaged on the Joint Property in the conduct of the Joint Operations,

and salaries or wages of technical employees who are temporarily assigned to and directly employed on the Joint Property.

B.  Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to the employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph I of Section III; except that in the case of those employees only a  pro rata portion of whose salaries and wages are chargeable to the Joint Account under Paragraph 1 of Section III, not more than the same pro rata portion of the benefits and allowances herein provided for shall be charged to the Joint Account. Cost under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph I of Section III. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.  Expenditures or contributions made pursuant to assessment imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages chargeable to the Joint Account  under Paragraphs 2A and 2B of this Section II  and Paragraph I of Section III.

D.  Reasonable personal expenses or those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and for  which expenses the employees are reimbursed under Operator's usual practice.

3.      Employee Benefits

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, sleek purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost; provided however, the total of such charges shall not exceed ten percent (10%) of Operator's labor costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph I of Section III.

4.      Material

Material purchased or furnished by Operator for use on the Joint Property. So far as it is reasonably practical and consistent with efficient and economical operation, only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use: and the accumulation  of surplus stocks shall be avoided.

5.      Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint  Account for a distance greater than the distance from the nearest reliable supply store or railway receiving point where like material is available except by agreement with Non-Operators.

B.  If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store or railway receiving point, except by agreement with Non-Operators. No charge shall he made to Joint Account for moving Material to other properties belonging to Operator,  except by agreement with Non-Operators.

C.  In the application of subparagraphs A and B above, there shall be no equalization of actual gross trucking costs of $100 or less.

6.      Services

A.  The cost of contract services and utilities procured from outside sources other than services covered by Paragraph 8 of this Section II and Paragraph 2 of Section III.

B.  Use and service of equipment and facilities furnished by Operator as provided in Paragraph 5 of Section IV.

7.      Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm. theft. accident, or any other cause, except to the extent that the damage or loss could have been avoided through the exercise of reasonable diligence on the part of Operator. Operator shall furnish Non-Operators written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

8.      Legal Expense

All costs and expenses of handling, investigating and settling litigation or claims arising by reason of the Joint Operations or necessary to protect to recover the Joint Property, including, but not limited to, attorneys' fees, court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claims: provided, (a) no charge shall be made for the services of Operator's legal staff or other regularly employed personnel (such services being considered to the Administrative Overhead under Section III), except by agreement with Non-Operators. and (b) no charge shall he made for the fees and expenses of outside attorneys unless the employment of such attorneys is agreed to by Operator and Non-Operators.

9.      Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof or the production therefrom, and which taxes have been paid by the Parties.

10.     Insurance Premiums

Premiums paid for insurance required to be carried on the Joint Property for the protection of the Parties.

11.     Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator for the necessary and proper conduct of the Joint Operations.

## III. INDIRECT CHARGES

Operator may charge the Joint Account for indirect costs either by use of an allocation of district expense items plus a fixed rate

for administrative overhead, and plus the warehousing charges, all as provided for in Paragraphs 1,2, and 3 of this Section III OR by combining all three of said items tinder the fixed rate provided for in Paragraph 4 of this Section III, as indicated next below:

OPERATOR SHALL CHARGE THE JOINT ACCOUNT UNDER THE TERMS OF:
  Paragraphs 1,2 and 3. (Allocation of district expense plus fixed rate for administrative overhead plus warehousing.)
  Paragraph 4. (Combined fixed rate)

1.      District Expense
        Operator shall charge the Joint Account with a pro rata portion of the salaries, wages and expenses of Operator's production superintendent and other employees serving the Joint Property and other properties of the Operator in the same operating area. whose time is not allocated directly to the properties, and a pro rata portion of the cost of maintaining and operating a production office known as Operator's office located at or near        (or a comparable office if location changed), and necessary sub-offices (if any). maintained for the convenience or the above-described office, and all necessary camps, including housing facilities for employees if required. used in connection with the operations of the Joint Property and other properties in the same operating area. The expense of, less any revenue from, such facilities may, at the option of Operator, include depreciation of investment or a fair monthly rental in lieu of depreciation. Such charges shall be apportioned to all properties served on some equitable basis consistent with Operator's accounting practice.

2.      Administrative Overhead
        Operator shall charge administrative overhead to the Joint Account at the following rates, which charge shall be in lieu of the cost and expense of all offices of the Operator not covered by Paragraph 1 of this Section III, including salaries. wages and expenses of personnel assigned to such offices. Such charges shall be in addition to the salaries, wages and expenses of employees of Operator authorized to be charged as direct charges as provided in Paragraphs 2 and 8 of Section II.

WELL BASIS (RATE PER WELL PER MONTH)

|  |  | PRODUCING WELL RATE | $150 per well per month |
|---|---|---|---|
|  |  | (Use Total Depth) | (all depths) |
| Drilling Well Rate $2,500 | (Use Current Producing Depth) |  |  |
| All Wells |  |  |  |
| Well Depth | Each Well | First Five | Next Five | Over Ten |
| ---------- | ------------------ | ---------------- | ---------- | ------------ |
| ---------- | ------------------ | ---------------- | ---------- | ------------ |
| ---------- | ------------------ | ---------------- | ---------- | ------------ |
| ---------- | ------------------ | ---------------- | ---------- | ------------ |
| ---------- | ------------------ | ---------------- | ---------- | ------------ |

        The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting, or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Paragraph 2 of Section III. unless such cost and expense are agreed upon between Operator and Non-Operators as a direct charge to the Joint Account.

3. Operator's Fully Owned Warehouse Operating and Maintenance Expense
          (Describe fully the agreed procedure to be followed by the Operator.)

-----------------------------------------------------------------------
-----------------------------------------------------------------------
-----------------------------------------------------------------------

4. Combined Fixed Rates

        Operator shall charge the Joint Account for the services covered by Paragraph 1,2 and 3 of this Section III, he following fixed per well rates:

### WELL BASIS (RATE PER WELL PER MONTH)

|  |  | PRODUCING WELL RATE |  |  |
|---|---|---|---|---|
| Drilling Well Rate |  | (Use Current Producing Depth) |  |  |
| (Use Total Depth) |  | All Wells |  |  |
| Well Depth | Each Well | First Five | Next Five | Over Ten |
| ---------- | ----------------- | ---------------- | --------------- | --------------- |
| ---------- | ----------------- | ---------------- | --------------- | --------------- |
| ---------- | ----------------- | ---------------- | --------------- | --------------- |
| ---------- | ----------------- | ---------------- | --------------- | --------------- |
| ---------- | ----------------- | ---------------- | --------------- | --------------- |

Said fixed rate (shall) (shall not) include salaries and expenses of production foremen.

5. Application of Administrative Overhead or Combined Fixed Rates

The following limitations, instructions and charges shall apply in the application of the per well rates as provided under either Paragraph 2 or Paragraph 4 of this Section III:

A. Charges for drilling wells shall begin on the date each well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.

B. The status of wells shall be as follows:

(1) Producing gas wells, injection wells for recovery operations, water supply wells utilized for water flooding operations and salt water disposal wells shall be considered the same as producing wells.

(2) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the well schedule at the time the shutdown is effected. When such a well is plugged a charge shall be made at the producing well rates.

(3) Wells being plugged back, drilled deeper, converted to a source or input well, or which are undergoing any type of workover that requires the use of a drilling or workover rig shall be considered the same as drilling wells.

(4) Temporarily shut-down wells, which are not produced or worked upon for a period of a full calendar month, shall not be included in the well schedule, provided however, wells shut in by governmental regulatory body shall be included in the well schedule only in the event the allowable production is transferred to some other well or wells on the Joint Property. In the event of a unit allowable, all wells capable of producing shall be counted in determining the charge.

(5) Gas wells shall be included in the well schedule if directly connected to a permanent sales outlet even though temporarily shut in due to overproduction or failure of purchaser to take the allowed production.

(6) Wells completed in multiple horizons, in which the production is not commingled down hole, shall be considered as a producing well for each separately producing horizon.

C. The well rates shall apply to the total number of wells being drilled or operated under the agreement to which this Accounting Procedure is attached, irrespective of individual leases.

D. The well rates shall be adjusted on the first day of April of each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the preceding calendar year shown by "The Index of Average Weekly Earnings of Crude Petroleum and Gas Production Workers" as published by the United States Department of Labor, Bureau of Labor Statistics. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

6. For the construction of compressor plants, water stations, secondary recovery systems, salt water disposal facilities, and other such projects, as distinguished from the more usual drilling and producing operations, Operator in addition to the Administrative Overhead or Combined Fixed Rates provided for in Paragraph 2 and 4 of this Section III, shall charge the Joint Account with an additional overhead charge as follows:

A. Total cost less than $25,000, no charge.

B. Total cost more than $25,000 but less than $100,000, _____5_____ % of total cost.

C. Total cost of $100,000 or more, _____5_____ % of the first $100,000 plus _____3_____ % of all over $100,000 of total cost. Total cost shall mean the total gross cost of any one project. For the purpose of this Paragraph the component parts of a single project shall not be treated separately and the cost of drilling wells shall be excluded.

7. The specific rates provided for in this Section III may be amended from time to time by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

# IV. BASIS OF CHARGES TO JOINT ACCOUNT

Subject to the further provisions of this Section IV, Operator will procure all Material and services for the Joint Property. At the Operator's option, Non-Operator may supply Material or services for the Joint Property.

1.    Purchases

Material purchased and service procured shall be charged at the price paid by Operator after deduction of all discounts actually received.

2.    Material furnished from Operator's Warehouse or Other Properties

A. New Material (Condition "A")

(1) Tubular goods, two inch (2") and over, shall be priced on Eastern Mill base (i.e. Youngstown, Ohio; Lorain, Ohio; and Indiana Harbor, Indiana) on a minimum carload basis effective at date of movement and f. O. b. railway receiving point nearest the Joint Property, regardless of quantity. In equalized hauling charges, Operator is permitted to include ten cents (10c) per hundred-weight on all tubular goods furnished from his stocks in lieu of loading and unloading costs sustained.

(2) Other Material shall be priced at the current replacement cost of the same kind of Material, effective at date of movement and f.o.b. the supply store or railway receiving point nearest the Joint Property where Material of the same kind is available.

(3) The Joint Account shall not be credited with cash discounts applicable to prices provided for in this Paragraph 2 of Section IV.

B. Used Material (Condition "B" and "C")

(1) Material in sound and serviceable condition and suitable for reuse without reconditioning, shall be classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material.

(2) Material which cannot be classified as Condition "B" but which,

(a) After reconditioning will be further serviceable for original function as good secondhand Material (Condition "B"), or

(b) Is serviceable for original function but substantially not suitable for reconditioning, shall be classified as Condition "C" and priced at fifty per cent (50%) of current new price.

(3) Obsolete Material or Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose.

(4) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.      Premium Prices

Whenever Material is not readily obtainable at prices specified in Paragraphs 1 and 2 of this Section IV because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in procuring such Material, in making it suitable for use, and in moving it to the Joint Property, provided, that notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.      Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

5.      Equipment and Facilities Furnished by Operator

A. Operator shall charge the Joint Account for use of equipment and facilities at rates commensurate with cost of ownership and operation. Such rates shall include cost of maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on investment not to exceed six per cent (6%) per annum, provided such rates shall not exceed those currently prevailing in the immediate area within which the Joint Property is located. Rates for automotive equipment shall generally be in line with the schedule of rates adopted by the Petroleum Motor Transport Association, or some other recognized organization, as recommended uniform charges against Joint Property operations. Rates for laboratory services shall not exceed those currently prevailing if performed by outside service laboratories. Rates for trucks, tractors and well service units may include wages and expenses of operator.

B. Whenever requested, Operator shall inform Non-Operators in advance of the rates it proposes to charge. Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## V. DISPOSAL OF MATERIAL

The Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus Condition "A" or "B" Material. The disposition of surplus Controllable Material, not purchased by Operator, shall be subject to agreement between Operator and Non-Operators, provided Operator shall dispose of normal accumulations of junk and scrap Material either by transfer or sale from the Joint Property.

1.      Material Purchased by the Operator or Non-Operators

Material purchased by either the Operator or Non-Operators shall be credited by the Operator to the Joint Account for the month in which the Material is removed by the purchaser.

2.      Division in Kind

Division of Material in kind, if made between Operator and Non-Operators, shall be in proportion to the respective interests in such Material. The Parties will thereupon be charged individually with the value of the Material received or receivable. Proper credits shall be made by the Operator in the monthly statement of operations.

3.      Sales to Outsiders

Sales to outsiders of Material from the Joint Property shall be credited by Operator to the Joint Account at the net amount collected by Operator from vendee. Any claim by vendee related to such sale shall be charged back to the Joint Account if and when paid by Operator.

## VI. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

Material purchased by either Operator or Non-Operators or divided in kind, unless otherwise agreed to between Operator and Non-Operators shall be priced on the following basis:

1.      New Price Defined

New price as used in this Section VI shall be the price specified for New Material in Section IV.

2.      New Material

New Material (Condition "A"), being new Material procured for the Joint Property but never used, at one hundred per cent (100%) of current new price (plus sales tax if any).

3.      Good Used Material

Good used Material (Condition "B"), being used Material in sound and serviceable condition, suitable for reuse without reconditioning:

A. At seventy-five per cent (75%) of current new price if Material was charged to Joint Account as new, or

B. At sixty-five per cent (65%) of current new price if Material was originally charged to the Joint Account as secondhand at seventy-five percent (75%) of new price.

4.      Other Used Material

Used Material (Condition "C"), at fifty per cent (50%) of current new price, being used Material which:

A. Is not in sound and serviceable condition but suitable for reuse after reconditioning, or

B. Is serviceable for original function but not suitable for reconditioning.

5.      Bad-Order Material

Material (Condition "D"), no longer suitable for its original purpose without excessive repair cost but usable for some other purpose at a price comparable with that of items normally used for such other purpose.

6.      Junk Material

Junk Material (Condition "E") being obsolete and scrap Material, at prevailing prices.

7.      Temporarily Used Material

When the use of Material is temporary and its service to the Joint Property does not justify the reduction in price as provided for in Paragraph 3 B of this Section VI, such Material shall be priced on a basis that will leave a net charge to the Joint Account consistent with the value of the service rendered.

## VII. INVENTORIES

The Operator shall maintain detailed records of Material generally considered controllable by the Industry.

1.      Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Material, which shall include all such Material as is ordinarily considered controllable. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator, who shall in that event furnish Non-Operators with a copy thereof.

2.      Reconciliation and Adjustment of Inventories

Reconciliation of inventory with charges to the Joint Account shall be made, and a list of overages and shortages shall be jointly determined by Operator and Non-Operators. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable to Non-Operator only for shortages due to lack of reasonable diligence.

3.      Special Inventories

Special inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

EXHIBIT "D"

**Attached to and made a part of that certain Operating Agreement dated June 1, 2004, by and between John O. Farmer, Inc., as Operator, and S&P Co., Sklarco L.L.C., and Zarrow Investment Company, as Non-Operators.**

# INSURANCE

Operator shall carry and charge to the joint account insurance in amounts not less than the following:

|     |                                                                        |                                  |
| --- | ---------------------------------------------------------------------- | -------------------------------- |
| A.  | Workers' Compensations                                                 | Statutory                        |
| B.  | Employer's Liability                                                   | $500,000 per accident            |
| C.  | Automobile Liability: Bodily Injury and/or Property Damage             | $1,000,000 combined single limit |
| D.  | Liability other than Automobile: Bodily Injury and/or Property Damage  | $1,000,000 combined single limit |
| E.  | Umbrella Excess Liability Coverage                                     | $15,000,000                      |

All losses not covered by standard form policies of insurance for the above coverage shall be joint losses and shall be borne by the parties as their interests appear at the time of the occurrence.

Operator shall not be required to provide fire, explosion, windstorm or other property hazard insurance on oil in storage or on leasehold equipment and shall not be required to provide underground damage liability insurance. All losses from these causes shall be joint losses and be borne by the parties as their interests appear at the time of the occurrence.

It is understood that Operator does not warrant the financial responsibility of its insurance carrier and , except for willful negligence, Operator shall not be liable to Non-Operator for any loss resulting from insufficiency of the insurance carried or of the insurer with whom carried. It is further understood that Operator shall not be liable to Non-Operator for any loss accruing by reason of Operator's inability to obtain or maintain the above insurance, but Operator shall notify Non-Operator in writing if it is unable to obtain or maintain such insurance.