EXHIBIT A to Ratification

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

April 1 , 19 97 ,

OPERATOR  NEWFIELD EXPLORATION COMPANY

CONTRACT AREA  SEE EXHIBIT "A-1" AND "A-2"

COUNTY OR PARISH OF  CAMERON , STATE OF  LOUISIANA

COPYRIGHT 1989 — ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.
A.A.P.L. NO. 610 - 1989

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 11 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

## TABLE OF CONTENTS

|  |  |  |
|---|---|---|
| | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: | 15 |
| | E. WAIVER OF RIGHTS TO PARTITION: | 15 |
| | F. PREFERENTIAL RIGHT TO PURCHASE: | 15 |
| IX. | INTERNAL REVENUE CODE ELECTION | 15 |
| X. | CLAIMS AND LAWSUITS | 15 |
| XI. | FORCE MAJEURE | 16 |
| XII. | NOTICES | 16 |
| XIII. | TERM OF AGREEMENT | 16 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 16 |
| | A. LAWS, REGULATIONS AND ORDERS: | 16 |
| | B. GOVERNING LAW: | 16 |
| | C. REGULATORY AGENCIES: | 16 |
| XV. | MISCELLANEOUS | 17 |
| | A. EXECUTION: | 17 |
| | B. SUCCESSORS AND ASSIGNS: | 17 |
| | C. COUNTERPARTS: | 17 |
| | D. SEVERABILITY: | 17 |
| XVI. | OTHER PROVISIONS | 17 |

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ____Newfield Exploration Company____,
hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes
hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil
and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of
estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil
and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation
and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be
developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas
Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest
Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the
lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the
cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal
body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as
established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be
located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as
provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a
proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous
hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is
specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts
of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein
covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a
Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned
in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure,
restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but
are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking,
Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to
change the bottom hole location unless done to straighten the hole or to drill around junk in the hole to overcome other
mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and
Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes
natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

__X__ A. Exhibit "A," shall include the following information:
    (1) Description of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Parties to agreement with addresses and telephone numbers for notice purposes,
    (4) Percentages or fractional interests of parties to this agreement,
    (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
    (6) Burdens on production.
_____ B. Exhibit "B," Form of Lease.
__X__ C. Exhibit "C," Accounting Procedure.
__X__ D. Exhibit "D," Insurance.
__X__ E. Exhibit "E," Gas Balancing Agreement.
_____ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.
_____ G. Exhibit "G," Tax Partnership.
__X__ H. Other: ____Notice of Operating Agreement____

1     If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in
2 the body of this agreement, the provisions in the body of this agreement shall prevail.

3                         ARTICLE III.
4                  INTERESTS OF PARTIES
5 A. Oil and Gas Interests:

6    ~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this~~
7 ~~agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "D,"~~
8 ~~and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

9 B. Interests of Parties in Costs and Production:

10     Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne
11 and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their
12 interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the
13 Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

14     ~~Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other~~
15 burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or
16 cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,
17 _____ and shall indemnify, defend and hold the other parties free from any liability therefor.
18 Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is
19 burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts
20 stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend
21 and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as
22 the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to
23 be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)
24 which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any
25 liability therefor.

26     No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's
27 lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher
28 price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

29     Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,
30 and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in
31 ~~said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.~~

32 C. Subsequently Created Interests:

33     If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security
34 for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production
35 payment, net profits interest, assignment of production or other burden payable out of production attributable to its working
36 interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed
37 hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden
38 payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such
39 burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's
40 Lease or Interest to exceed the amount stipulated in Article III.B. above.

41     The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and
42 alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other
43 parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses
44 chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the
45 same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required
46 under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the
47 production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of
48 said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or
49 parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

50                         ARTICLE IV.
51                       TITLES

52 A. Title Examination:

53     Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,
54 if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire
55 Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working
56 interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing
57 Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator
58 all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of
59 charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the
60 examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or
61 by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in
62 procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty
63 opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling
64 Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such
65 interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel
66 in the performance of the above functions.            ┌─or attorneys of its affiliates

67     Each party shall be responsible for securing curative matter and pooling amendments or agreements required in
68 connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation
69 and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings
70 before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to
71 the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.
72 Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental
73 agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct
74 charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
2   functions.                                               or of its affiliates

3     No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has
4   been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by
5   all of the Drilling Parties in such well.
6   B. Loss or Failure of Title:
7   ~~1. Failure of Title. Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a~~
8   ~~reduc~~tion of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest
9   (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title
10   failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject
11   to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas
12   Leases and Interests; and,

13     (a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if
14   applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from
15   Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there
16   shall be no additional liability on its part to the other parties hereto by reason of such title failure;

17     (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the
18   Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage
19   basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or
20   Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

21     (c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract
22   Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable
23   to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and
24   burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well
25   attributable to such failed Lease or Interest;

26     (d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest
27   which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid
28   to the party or parties who bore the costs which are so refunded;

29     (e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises
30   by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received
31   production for which such accounting is required based on the amount of such production received, and each such party shall
32   severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

33     (f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of
34   the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title
35   it shall bear all expenses in connection therewith; and

36     (g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an
37   interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder
38   of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest
39   is reflected on Exhibit "A."

40     2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
41   payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas
42   Lease or Interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary
43   liability against the party who failed to make such payment. Unless the party who failed to make the required payment
44   secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make
45   proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A"
46   shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party
47   who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership
48   of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully
49   reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest,
50   calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest,
51   it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole
52   previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

53     (a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease
54   burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or
55   Interest, on an acreage basis, up to the amount of unrecovered costs;

56     (b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed
57   to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and
58   marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination,
59   would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest
60   termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties
61   in proportion to their respective interests reflected on Exhibit "A"; and,

62     (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner
63   ~~of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

64   All 3. ~~Other~~ Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles
65   IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on
66   Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because
67   express or implied covenants have not been performed (other than performance which requires only the payment of money),
68   and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no
69   readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

70   ~~4. Curing Title. In the event of a Failure of Title under Article IV.B2. or a loss of title under Article IV.B.2. above, any~~
71   ~~Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety~~
72   ~~(90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that failed~~
73   ~~or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B.~~
74   ~~shall not apply to such acquisition.~~

A.A.P.L. FORM 610 - MOD⁴ FORM OPERATING AGREEMENT - 39

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

_____Newfield Exploration Company_____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A., or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

*See attached page 4-1.

- 4 -

\*1    subject to the terms of the Exploration Agreement dated effective December 23, 1993, with Texaco Exploration and Production Inc. ("TEPI") relating to the Contract Area ("the Initial Texaco Agreement").

\*2    or owns less than an undivided 25% working interest in the Contract Area, proportionately reduced if TEPI acquires a working interest in the Contract Area pursuant to the Texaco Agreement.

\*3    or at any time after March 16, 1996, Operator fails or refuses to reduce its overhead rates chargeable under the Accounting Procedure within 30 days after receipt of a bona fide written offer to take over as Operator at lower overhead rates from a qualified Non-Operator.  If Operator fails or refuses to lower its overhead rates to equal the proposed rates, the Operator shall be deemed to have resigned under this Article.

\*4    , excluding the interests of the Operator.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1 )

1   liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or
2   materials supplied.

3     4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced
4   or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the
5   Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until
6   used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as
7   provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator
8   and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in
9   this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the
10   parties otherwise specifically agree.

11     5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator
12   or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to
13   all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of
14   operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access
15   rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder, and shall not obligate
16   Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such
17   interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any
18   and all reports and information obtained by Operator in connection with production and related items, including, without
19   limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding
20   purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the
21   information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures
22   shall be conducted in accordance with the audit protocol specified in Exhibit "C."

23     6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to
24   each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications
25   required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder.
26   Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

27     7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not
28   limited to the Initial Well:

29     (a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which
30   drilling operations are commenced.

31     (b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well
32   as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

33     (c) Opeator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing
34   Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted
35   hereunder.

36     8. Cost Estimates. Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs
37   incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement.
38   Operator shall not be liable for errors in such estimates so long as the estimates are made in good faith.

39     9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers
40   compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-
41   insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall
42   be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties *1
43   as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on
44   or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted
45   and to maintain such other insurance as Operator may require.

46     In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the
47   parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive
48   equipment.

49                      ARTICLE VI.
50             DRILLING AND DEVELOPMENT

51   A. Initial Well:

52   On or before the      day of      , 19   , Operator shall commence the drilling of the Initial
*2 53   Well at the following location: within the time period specified in the Texaco Exploration
54   Agreement.
55
56
57
58
59
60   and shall thereafter continue the drilling of the well with due diligence to as required by the Texaco
61   Exploration Agreement.
62
63
64
65
66
67   The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation
68   in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.
69   B. Subsequent Operations:

70     1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or
*3 71   if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of
72   producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective under
73   this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written *4
*5 74   notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

        *See attached page 5-1.

*1   and such insurance shall cover the interests of Non-Operators in the operations conducted in the Contract Area.

*2   at a mutually agreeable

*3   commercially reasonable quantities in the opinion of the Operator

*4   or if any party should desire to conduct any 3D seismic survey or other type of geophysical, geochemical or magnetic survey ("a Survey"),

*5   or conduct a Survey

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

*1

*2   1   under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
   2   performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a   *3
   3   notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
   4   whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to
   5   Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
   6   eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply
   7   within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
   8   Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
   9   within the time and in the manner provided in Article VI.B.6.
   10      If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
   11   contractually committed to participate therein provided such operations are commenced within the time period hereafter set
   12   forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
   13   promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
   14   may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
   15   the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
   16   by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
   17   additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
*4  18   way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
   19   acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as
   20   specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
   21   said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
   22   proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
   23   Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
   24   reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance
   25   with Article VI.B.5. in the event of a Sidetracking operation.   *5
   26      2. Operations by Less Than All Parties:
   27      (a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or
   28   VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
   29   Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
   30   later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
   31   expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
   32   proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting
   33   Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
   34   the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
   35   account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The
   36   rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
   37   designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when
   38   conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
   39   agreement.
   40      If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
   41   applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
   42   recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party,
   43   within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of such notice, shall advise the
   44   proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
   45   proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
   46   the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
   47   Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
   48   interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a
   49   Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
   50   proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i) . In the event a
   51   drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
   52   total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may
   53   withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
   54   days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
   55   If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
   56   of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
   57   period provided in Article VI.B.1., subject to the same extension right as provided therein.
   58      (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
   59   borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
   60   paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
   61   encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results
   62   in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
   63   the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
   64   participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
   65   shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
   66   increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,
   67   Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
   68   paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
   69   well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
   70   expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking,
   71   Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
   72   provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
   73   Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
   74   Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

*See attached page 6-1.

*1     a Survey or

*2     or Zones in the wellbore or the portion of the Contract Area to be surveyed

*3     A proposal to Rework, Recomplete or Plug Back a well shall be deemed a proposal to test and attempt to restore commercial production from all horizons and depths equal to or shallower than the deepest horizon or depth identified in the notice. The "operation" shall include all operations on such depths so long as the efforts to restore production continues without a cessation of more than 30 days between actual work on the well or wellbore. The cumulative cost of all such continuous operations shall constitute the cost subject to recoupment under Article VI.B.2.(b).

*4     In calculation of the applicable notice or commencement period, the days between October 15 and March 15 shall be counted for calculating notice and response periods but shall not be counted for calculating the period for commencement of operations.

*5     and in accordance with Article VI.B.9. in the event of a Survey.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1 Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-
2 Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect
3 to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or
4 market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes,
5 royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production
6 from such well accruing with respect to such interest until it reverts), shall equal the total of the following:
7         (i) __100__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment
8 beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and
9 piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first
10 production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other
11 provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that
12 interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning
13 of the operations; and
14         (ii) __400__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening,
15 Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C.,
16 and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections),
17 which would have been chargeable to such Non-Consenting Party if it had participated therein.
18         Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone
19 described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable
20 substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each
21 Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a
22 shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-
23 Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the
24 cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-
25 Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions
26 of this Article VI.B.2. shall apply to such party's interest.
27         (c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or
28 Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in
29 such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full
30 recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to
31 participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking
32 operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at
33 any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such
34 Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the
35 cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __150__ % of
36 that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to
37 such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is
38 proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting
39 Parties in said well.
40         (d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's
41 share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem,
42 production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to
43 Non-Consenting Party's share of production not excepted by Article III.C.
44         In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting
45 Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all
46 such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back,
47 Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each
48 party receiving its proportionate part in kind or in value, less cost of salvage.
49         Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations
50 for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to
51 the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing,
52 Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement
53 of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the
54 Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties
55 shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of
56 the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from
57 the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas
58 produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or
59 periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with
60 any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited
61 against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such
62 Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-
63 Consenting Party.
64         If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided
65 for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day
66 following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall
67 own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as
68 such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking,
69 Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and
70 shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this
71 agreement and Exhibit "C" attached hereto.
72         3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have
73 been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise
74 terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

*1

        *See attached page 7-1.

*1    the drilling, Sidetracking or Deepening

1  Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required
2  under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening
3  operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted,
4  whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
5  of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation,
6  but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated
7  between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8  interest as shown on Exhibit "A" of all Consenting Parties.
9      In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party
10  may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in
11  Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended
12  response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending
13  the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be
14  allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's
15  interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.
16.     4. Deepening: If less than all the parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17  pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article
18  VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone
19  of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the
20  Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate
21  in the Deepening operation.
22      In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective,
23  such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-
24  Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to
25  participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation
26  is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation,
27  such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses:
28      (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29  quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs
30  and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-
31  Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting
32  Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other
33  provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well
34  incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the
35  sole account of Consenting Parties.
36      (b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing
37  in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or
38  reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and
39  equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less
40  those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall
41  also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based
42  on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent
43  Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in
44  connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the
45  cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-
46  Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the
47  well for Deepening.
48      The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
49  to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article
50  VI.F.
51      5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an
52  interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its
53  proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore
54  to be utilized as follows:
55      (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
56  incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.
57      (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
58  such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth
59  at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's
60  proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking
61  operation is initiated shall be determined in accordance with the provisions of Exhibit "C."
62      6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to
63  propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such
64  party shall have fifteen (15) days from delivery of the initial proposal or, in the case of a proposal to drill a well or to perform
65  an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal
66  holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be
67  conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such
68  alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such
69  proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within
70  twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the
71  subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required
72  shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage
73  interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

1   initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation
2   within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3   and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4   is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5   relinquish interest in the affected well pursuant to the provisions of Article VI.B.2. ⌐ failure by a party to deliver notice within    *1
6   such period shall be deemed an election not to participate in the prevailing proposal.

7     7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be
8   proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9   Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

10     8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
11   Sidetracking operation under this agreement with respect to any well then capable of producing in ~~paying quantities~~ except    *2
12   with the consent of all parties that have not relinquished interests in the well at the time of such operation.

*3   13   C. Completion of Wells; Reworking and Plugging Back:

14     1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
15   drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling,
16   Deepening or Sidetracking shall include:

17   ☐  ~~Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and~~
18     ~~equipping of the well, including necessary tankage and/or surface facilities.~~

19   ☒  Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. ⌐When    *4
20   such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results
21   thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to
22   participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,
23   together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice
24   shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of
25   notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an
26   accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting
27   with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the
28   procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all
29   necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface
30   facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party
31   receiving such notice to reply within the period above fixed shall constitute an election by that party not to
32   participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of
33   conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the
34   provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging
35   Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations
36   thereafter conducted by less than all parties; ~~provided, however, that Article VI.B.2. shall apply separately to each~~
37   separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting
38   Party as to one Completion or Recompletion attempt shall not prevent a party from ~~becoming~~ a Consenting Party
39   in subsequent Completion or Recompletion attempts regardless whether ~~the Consenting~~ Parties as to earlier
40   Completions or Recompletions have recouped their costs pursuant ~~to~~ Article VI.B.2.; provided further, that any
41   recoupment of costs by a Consenting Party shall be ~~made~~ solely from the production attributable to the Zone in
42   which the Completion attempt is made. ~~Election~~ by a previous Non-Consenting Party to participate in a subsequent
43   Completion or Recompletion ~~attempt~~ shall require such party to pay its proportionate share of the cost of salvable
44   materials and ~~equipment~~ installed in the well pursuant to the previous Completion or Recompletion attempt,
45   insofar ~~and only~~ insofar as such materials and equipment benefit the Zone in which such party participates in a
46   ~~Completion attempt.~~

47     2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
48   Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking,
49   Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
50   Completing and equipping of said well, including necessary tankage and/or surface facilities.

51   D. Other Operations:

52     Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____
53   Twenty-Five Thousand and no/100 _____ Dollars ($ 25,000.00 ) except in connection with the
54   drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously
55   authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
56   emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion
57   are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the
58   emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so
59   requesting an information copy thereof for any single project costing in excess of Ten Thousand and no/100 Dollars
60   ( $ 10,000.00 ). Any party who has not relinquished its interest in a well shall have the right to propose that
61   Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as
62   salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but
63   not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall
64   be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the
65   amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under
66   Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by those Articles). Operator shall deliver such
67   proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent
68   of any party or parties owning at least _____51____ % of the interests of the parties entitled to participate in such operation,
69   each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated
70   to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms
71   of the proposal.

72   E. Abandonment of Wells:

73     1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has
74   been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

*See attached page 9-1.

*1    or in the affected acreage pursuant to the provisions of Article XVI.C. if the operation is a seismic survey

*2    commercially reasonable quantities in the opinion of the Operator

*3    9. <u>Seismic Surveys</u>.  See Article XVI.C.

*4    See Article XVI.H.

1  plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2  party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after
3  delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4  proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
5  cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to
6  plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,
7  Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8  forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9  Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10  such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11  abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12  taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13  liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14  restoring the surface, for which the abandoning parties shall remain proportionately liable.

15  2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
16  conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
17  been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to
18  such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19  and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed
20  abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the
21  proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
22  operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23  applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24  against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25  proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26  within the required period or thereafter to conduct operations on such well shall entitle Operator to retain or take possession
27  of such well and plug and abandon the well.

28  Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29  the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30  of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31  the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
32  value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33  operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34  parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35  of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36  insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37  interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-
38  abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39  one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
40  attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
41  The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42  respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43  Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

44  Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45  from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46  request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47  charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48  ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49  shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50  further operations therein subject to the provisions hereof.

51  3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
52  between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53  however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54  operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55  in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
56  in a portion of the well shall pay their proportionate shares of abandonment and surface restoration costs for such well as
57  provided in Article VI.B.2.(b).

58  F. Termination of Operations:

59  Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60  Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without   *1
61  consent of parties bearing ___51___ % of the costs of such operation; provided, however, that in the event granite or other
62  practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63  Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1.; and the
64  provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

65  G. Taking Production in Kind:

66  ☒  Option No. 1: Gas Balancing Agreement Attached

67  Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
68  Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
69  treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
70  in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
71  party taking its share of production in kind shall be required to pay for only its proportionate share of such part of
72  Operator's surface facilities which it uses.

73  Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
74  production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment   *2

*See attached page 10-1.

*1    subject to Article XVI.R.

*2    and Article XVI.K.

1   directly from the purchaser thereof for its share of all production.

2   If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate
3   share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by
4   the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to
5   time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by
6   Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to
7   the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any
8   time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser.
9   Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time
10   as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a
11   period in excess of one (1) year.

12   Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator
13   shall have no duty to share any existing market or to obtain a price equal to that received under any existing
14   market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing
15   contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said
16   contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days
17   written notice of such intended purchase and the price to be paid or the pricing basis to be used.

18   All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following
19   month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.
20   Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which
21   records shall be made available to Non-Operators upon reasonable request.

22   In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate
23   pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion-
24   ate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with
25   any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a
26   separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

27   ☐   Option No. 2: No Gas Balancing Agreement:

28   Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from
29   the Contract Area, exclusive of production which may be used in development and producing operations and in
30   preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure
31   incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall
32   be borne by such party. Any party taking its share of production in kind shall be required to pay for only its
33   proportionate share of such part of Operator's surface facilities which it uses.

34   Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
35   production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment
36   directly from the purchaser thereof for its share of all production.

37   If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate
38   share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the
39   revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others
40   at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator
41   may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall
42   be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator
43   to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered
44   to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's
45   election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase
46   contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other
47   party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the
48   minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1)
49   year.

50   Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator
51   shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation
52   fee equal to that received under any existing market or transportation arrangement. The sale or delivery by
53   Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not
54   give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil
55   and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written
56   notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give
57   notice to all parties of the first sale of Gas from any well under this Agreement.

58   All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following
59   month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.
60   Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which
61   records shall be made available to Non-Operators upon reasonable request.

62   ARTICLE VII.
63   EXPENDITURES AND LIABILITY OF PARTIES

64   A. Liability of Parties:

65   The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations,
66   and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the
67   liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have
68   any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation
69   hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other
70   partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or
71   principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have
72   established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own
73   respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other
74   with respect to activities hereunder.

- 11 -

B. Liens and Security Interests:

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith] to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

~~If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.~~

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. Advances:

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. Defaults and Remedies:

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

*See attached page 12-1.

\*1      and in all production and revenue from production derived from the
         Contract Area

\*2      in Oil and Gas produced or in the proceeds derived therefrom

1 only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator,
2 and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator.
3 Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified
4 below or otherwise available to a non-defaulting party.

5     1. Suspension of Rights: Any party may deliver to another party a Notice of Default, which shall specify the default,
6 specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one
7 or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such
8 Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the
9 default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of
10 the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the
11 Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area
12 after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting
13 party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right
14 to receive information as to any operation conducted hereunder during the period of such default, the right to elect to
15 participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being
16 conducted under this agreement even if the party has previously elected to participate in such operation, and the right to
17 receive proceeds of production from any well subject to this agreement.

18     2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint
19 account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default
20 until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from
21 suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

22     3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the
23 defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in
24 which event if the billing is for the drilling of a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a
25 well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting
26 party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with
27 respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party,
28 notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the
29 non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

30     Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure
31 its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such
32 payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-
33 defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the
34 non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership
35 of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

36     4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or
37 Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting
38 party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may
39 be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of
40 the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of
41 drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the
42 defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided
43 in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining
44 when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

45     5. Costs and Attorneys' Fees. In the event any party is required to bring legal proceedings to enforce any financial
46 obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of
47 collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

48 E. Rentals, Shut-in Well Payments and Minimum Royalties:

49     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid
50 by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties
51 own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to
52 make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper
53 evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or
54 minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which
55 results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

56     Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to
57 production of a producing well, at least five (5) days (excluding Saturday, Sunday and legal holidays) prior to taking such
58 action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of
59 failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make
60 timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article
61 IV.B.3.

62 F. Taxes:

63     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all
64 property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed
65 thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as
66 to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and
67 Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being
68 subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes
69 resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to
70 such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part
71 upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to
72 the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's
73 working interest. Operator shall then bill the other parties for their proportionate shares of all tax payments in the manner
74 provided in Exhibit "C."

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3  determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4  and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5  the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6  paid by them, as provided in Exhibit "C."

7    Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8  to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

9                        ARTICLE VIII.
10          ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
11  A. Surrender of Leases:

12    The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13  or in part unless all parties consent thereto.

14    However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15  notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16  delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a
17  party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18  described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19  implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20  located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the
21  assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22  consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
23  thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B."
24  Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25  accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26  shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27  in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the
28  reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29  acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30  the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less
31  than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the
32  assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33  interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made
34  varies according to depth, then the interest assigned shall similarly reflect such variances.

35    Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38  agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.
39  B. Renewal or Extension of Leases:

40    If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41  shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42  promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following
43  delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44  affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45  allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interests held at that time by the
46  parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47  assignment of its proportionate interest therein by the acquiring party.

48    If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49  by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50  the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51  purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52  shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53  less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54  Agreement in the form of this agreement.

55    If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56  renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

57    The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58  the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the
59  expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60  existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61  the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62  expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63  agreement.

64    The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.
65  C. Acreage or Cash Contributions:

66    While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68  be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom
69  the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70  proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the
71  extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any
72  acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above
73  provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74  inside the Contract Area.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1　If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder,
2　such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
3　D. Assignment; Maintenance of Uniform Interest:
4　　For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas
5　Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other
6　disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells,
7　equipment and production unless such disposition covers either:
8　　1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or
9　　2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells,
10　equipment and production in the Contract Area.
11　　Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
12　and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and
13　Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of
14　the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale,
15　encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the
16　instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other
17　disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect
18　to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation
19　conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security
20　interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.
21　　If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion,
22　may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures,
23　receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to
24　bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-
25　owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of
26　the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale
27　proceeds thereof.
28　E. Waiver of Rights to Partition:
29　　If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
30　undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its
31　undivided interest therein.
32　F. ~~Preferential Right to Purchase:~~　Prior Notice of Intent to Sell:
33　☒ (Optional; Check if applicable.)
34　　Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
*1→35　Area, it shall ~~promptly~~ give written notice to the other parties, with full information concerning its proposed disposition, which
36　shall include the name and address of the prospective transferee ~~(who must be ready, willing and able to purchase), the purchase~~
*2→37　~~price, a legal description sufficient to identify the property, and all other terms of the offer.~~ The other parties shall then have an
*3→38　~~optional~~ ~~prior right,~~ for a period of ten (10) days after the notice is delivered, to purchase ~~for the stated consideration on the~~
39　~~same terms and conditions~~ the interest which the other party proposes to sell, ~~and.~~ If ~~this optional right is exercised,~~ the　*4
40　purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all
41　purchasing parties. However, there shall be no preferential right to purchase ~~in those cases where any party wishes to mortgage~~
42　~~its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests,~~
43　~~or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets~~
44　~~to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any~~
45　~~company in which such party owns a majority of the stock.~~
46　　ARTICLE IX.
47　INTERNAL REVENUE CODE ELECTION
48　　If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the
49　parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each
50　party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle
51　"A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and
52　the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected
53　such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal
54　Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by
55　Treasury Regulations §1.761. Should there be any requirement that each party hereby affected give further evidence of this
56　election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal
57　Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action
58　inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
59　Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter
60　1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party
61　hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, ....
62　each party states that the income derived by such party from operations hereunder can be adequately determined without the
63　computation of partnership taxable income. ─*5
64　　ARTICLE X.
65　CLAIMS AND LAWSUITS
66　　Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure
67　does not exceed Ten Thousand and no/100 Dollars ($　10,000.00　) and if the payment is in complete settlement
68　of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over
69　the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling,
70　or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the
71　claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations
72　hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall
73　immediately notify all other parties, and the claim or suite shall be treated as any other claim or suit involving operations hereunder.

　*See attached page 15-1.

- 15 -

*1      , if known,

*2      not less than

*3      offer to

*4      offer is accepted in the sole discretion of the selling party

*5      The parties elect to use the cumulative method to account for the tax
        consequences of gas balancing in accordance with Section 1.761-2 of the
        Internal Revenue Service Regulations.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
### TERM OF AGREEMENT              Contract Area

This agreement shall remain in full force and effect as to the ~~Oil and Gas Leases and/or Oil and Gas Interests~~ subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

*1 ☒ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise. ——*2

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision~~ of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any ~~operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:                    ┌─ of Texas
This agreement shall be subject to the applicable laws of the state ~~in which the Contract Area is located~~, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:
This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state ~~in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ shall govern.~~ ─ of Texas.

C. Regulatory Agencies:
Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

*See attached page 16-1.

- 16 -

\*1    the parties have the right or ability to earn additional rights or lands under the Texaco Agreement.  Thereafter, the parties shall either extend the terms of this Agreement for so long as

\*2    or execute separate Operating Agreements in this form as to each separate portion of the Contract Area as the parties may agree,

A.A.P.L. FORM 610 - MO    'L FORM OPERATING AGREEMENT    989

1   orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or
2   production of wells, on tracts offsetting or adjacent to the Contract Area.
3       With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages,
4   injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation
5   or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission
6   or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not
7   constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of
8   production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such
9   an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such
10  incorrect interpretation or application.

11                                  ARTICLE XV.
12                                 MISCELLANEOUS
13  A. Execution:
14      This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been
15  executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of
16  the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which
17  own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have
18  become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no
19  event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this
20  agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of
21  drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease
22  as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs
23  hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds
24  with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a
25  current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the
26  Initial Well which would have been charged to such person under this agreement if such person had executed the same and
27  Operator shall receive all revenues which would have been received by such person under this agreement if such person had
28  executed the same.
29  B. Successors and Assigns:
30      This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31  devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or
32  Interests included within the Contract Area.
33  C. Counterparts:
34      This instrument may be executed in any number of counterparts, each of which shall be considered an original for all
35  purposes.
36  D. Severability:
37      For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws,
38  this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to
39  this agreement to comply with all of its financial obligations provided herein shall be a material default.
40                                  ARTICLE XVI.
41                                OTHER PROVISIONS
42
43
44              See attached pages 17-1 through 17-5.
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70
71
72
73
74



# ARTICLE XVI.

## OTHER PROVISIONS

A.     Texaco Agreements.  In accordance with the Exploration Agreement dated December 23, 1993 between Texaco Exploration and Production Inc. ("Texaco") and the Parties ("Initial Texaco Agreement") Nuevo, XCO and Texaco have executed a final Exploration Agreement with a form of Operating Agreement attached to that Agreement dated June 2, 1995 ("Final Texaco Agreement").  In the event Texaco exercises its right to acquire or convert its interest to a working interest in all or any part of the Contract Area, the relationship between Newfield, XCO, Odyssey and Texaco shall be governed by the form of Operating Agreement attached to the Final Texaco Agreement.   Notwithstanding execution of any Operating Agreement with Texaco, the relationship between Newfield, XCO and Odyssey, and their successors and assigns relating to the Contract Area shall continue to be governed by this Agreement or one or more sub-Operating Agreements applicable to only a portion of the Contract Area in substantially the same form as this Agreement. At such time as the Parties to this Agreement have ceased continuous drilling operations under the Final Texaco Agreement and their ownership rights have been determined pursuant to Section III.P. of the Final Texaco Agreement, any party may demand that the Parties execute separate operating agreements as to individual units, blocks or tracts substantially in the same form as this Agreement.  In the event of a conflict between the Initial Texaco Agreement, the Final Texaco Agreement and this Agreement, the terms of the applicable Newfield/XCO/Odyssey Operating Agreement shall prevail with regard to the relationship between Newfield, XCO and Odyssey and their successors and assigns.

B.     Field Operations.  Newfield, XCO and Odyssey acknowledge that the Initial Texaco Agreements requires Newfield, XCO and Odyssey to enter into Texaco's Contract Pumper and Production Handling Agreement whereby Texaco will conduct the actual day-to-day field operations for all wells completed in the Contract Area.  Effective as of the date field operation of a completed well is turned over to Texaco, the combined overhead rate payable to Newfield for each producing well in accordance with the Accounting Procedure attached to this Agreement shall be reduced by one half of the amount paid to Texaco as pumper for that well.

C.     Article VI.B.9. Seismic Surveys.  The Final Texaco Agreement provides Newfield, XCO and Odyssey with various options including, but not limited to, the right to drill a well following reprocessing of certain 2D seismic data or the right to conduct a 3D seismic survey across all or a portion of the Contract Area.   All proposals and decisions relating to those options shall be made in accordance with this Agreement.  No party shall have the right to conduct a Survey on an area greater than 2,000 acres during any one operations window (March 15 through October 15) without the unanimous consent of all parties.  If a party proposes a survey on an area greater than 2,000 acres and one or more parties elect not to participate or is deemed to have elected not to participate in the proposal, the proposing party will circulate

17-1

to the consenting parties a revised proposal covering not more than 2,000 acres of the Contract Area. The Non-Consenting Party will be a Non-Consenting Party as to the 2,000 acre survey area.

The effect of the non-consent election as to a survey shall be that the Non-Consenting Party shall have no right to obtain access to the survey data or data derived from the survey. In the event an operation is proposed by any party based in whole or in part on the survey, the Non-Consenting Party shall be entitled to receive the notice and to participate in the proposed operation, provided that the Non-Consenting Party pays to the Operator (for the account of the Consenting Parties in the survey) 150% of that portion of costs and expenses of the survey and the analysis of the survey data which would have been chargeable to such Non-Consenting Party if it had participated in the survey.

D.  Drilling Operations By Less Than All Parties Prior to Earning Well. If all parties hereto cannot mutually agree upon the drilling of the Initial Test Well on a Selection Block, or any well on a Selection Block subsequent to the Initial Test Well drilled prior to any such well being deemed an Earning Well, then such well shall be drilled under the provisions of Article VI.B.; provided, that notwithstanding anything to the contrary contained in Article VI.B., upon commencement of such operations by Consenting Parties, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's right, title and interest in and to (1) such well, the equipment therein, thereon and appurtenant thereto, the leasehold operating rights with respect thereto and share of production therefrom and (2) all leasehold rights, interests and acreage, as to all depths, contained within such Selection Block.

E.  Completion of an Earning Well. If a well with respect to which a completion attempt is made pursuant to Article VI.C.1 (Option No. 2) hereof is successfully completed by Consenting Parties as the Earning Well on a Selection Block, then notwithstanding anything to the contrary contained in this Operating Agreement, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's right, title and interest in and to (1) such well, the equipment therein, thereon and appurtenant thereto, the leasehold operating rights with respect thereto and share of production therefrom and (2) all leasehold rights, interest and acreage, as to all depths, contained within such Selection Block.

F.  Drilling of Development Well By Less Than All Parties. If all parties hereto cannot mutually agree upon the drilling of a Development Well within a Selection Block, then such well shall be drilled under the provisions of Article VI.B.; provided, that notwithstanding anything to the contrary contained in Article VI.B., upon commencement of such operations by Consenting Parties, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's right, title and interest in and to (1) such well, the equipment therein, thereon and appurtenant thereto, the leasehold operating rights

with respect thereto and share of production therefrom and (2) all leasehold rights, interests and acreage, as to all depths, included within the surface boundaries of any spacing or conservation unit established for such well, whether by designation, declaration or regulatory order.

G.   Limitations on Expenditures.  Notwithstanding anything to the contrary contained in this Operating Agreement, consent by a party to an operation proposed under the terms of Article VI. hereof shall be deemed consent solely to the expenditure by such party of its proportionate share of (i) the total amount set forth in the AFE submitted in conjunction with such proposal and (ii) any amounts which may be payable in accordance with the provisions of subparagraph I. below.

H.   Supplemental AFE.  If Operator determines that the cost of an operation proposed in accordance with Article VI. hereof will exceed the approved AFE amount therefor, Operator shall give prompt written notice to all parties who initially participated in such operation in the form of a supplemental AFE with a revised estimate of the total cost of completing the operation as originally proposed, whereupon each party shall have a period of 48 hours from receipt of such notice within which to elect to either (i) continue to participate in such operation to the extent of its full interest or (ii) become a Non-Consenting Party with respect to such operation with the same effect as if such party had made an affirmative election not to participate in the operation as originally proposed and to incur the penalties set forth in subparagraph D, E or F as applicable to such election.  Failure by a party to evidence an election within such 48 hour period shall be conclusively deemed an election not to participate in further operations.  Any party which elects, or is deemed to have elected, not to participate further shall forfeit and relinquish, without right of reimbursement, all sums theretofore expended by such party in the conduct of such operation.

I.   Cost Obligation Regarding Plugging, Abandonment and Surface Restoration.  If, but only if, all parties elect to abandon an operation as provided in subparagraph H. above (that is, all parties elect not to participate in operations covered by a supplemental AFE), all parties including any Non-Consenting Party as to the supplemental AFE shall further bear and discharge all costs and expenses thereafter incurred in connection with plugging and abandoning the well and restoring the surface location, including, but not limited to, any costs incurred by reason of downhole conditions which require remediation prior to abandonment ("Trouble Costs").

If some but not all parties shall elect to continue the operation covered by the supplemental AFE and the operation is an operation covered by the forfeiture provisions of Article XVI. [subparagraph D, E or F] above, then a Non-Consenting Party shall have no liability whatsoever for plugging, abandonment or restoration costs or Trouble Costs in connection with the well.

17-3

If some but not all parties shall elect to continue the operation covered by the supplemental AFE and the operation is an operation covered by the penalty provisions of Article VI.B.2., then a Non-Consenting Party shall be liable only for its proportionate share of the estimated costs of plugging and abandoning the well and restoring the surface in the condition that the well and the surface were in at the time of the non-consent election. The Non-Consenting Party shall have no liability for incremental abandonment or restoration costs resulting from the non-consent operation or Trouble Costs relating to difficulties encountered in continuation of drilling, working on or abandoning the well.

J.   Right to Assignment of Record Title. Each party shall be entitled to a recordable assignment of its respective interest at such time as the Parties are granted a lease from Texaco. The assignment will be delivered to each party within 30 days after the Texaco Lease is delivered by Texaco.

K.   Payment of Production Revenues and Burdens. To the extent from time to time that any party exercises its right under this Operating Agreement to take and market its share of production from a Contract Area, each Non-Operator shall give written notice to its purchaser(s) that all proceeds should be paid to the Operator of the property. The Operator shall be responsible for dispensing all burdens affecting any production from said leases in addition to the payment of all rentals and/or shut-in monies required to maintain said leases in force and effect. Operator shall disburse the net proceeds to each Non-Operator by the end of the month following month of receipt by Operator, together with a copy of all statements received from purchaser(s). Each Non-Operator shall have the right to revoke its instruction to its purchaser(s) upon not less than 30 days written notice with a copy to Operator. Thereafter, such Non-Operator shall remit to Operator all burdens payable on the Non-Operator's share of production which shall be disbursed by Operator to the owner of the burden.

L.   Use of Data. Operator shall arrange for the initial reprocessing of the Texaco 2D data. Thereafter, each party shall have the right to use the data and to conduct geological and geophysical analyses and interpretation thereof, subject only to the confidentiality restrictions in the Initial or Final Texaco Agreements. Operator shall consult with Non-Operators on a regular and timely basis with respect to all studies conducted regarding the Contract Area. As to all confidential or proprietary data relating to the Contract Area other than the Texaco 2D data, no party shall release any confidential data, such as any geological, geophysical or reservoir information or any logs or other information regarding the progress, tests or results of any well drilled or any other operation conducted unless and until the third party to whom the data will be disclosed has executed a suitable confidentiality and non-circumvention agreement.

M.   Area of Mutual Interest. An Area of Mutual Interest ("AMI") is hereby established between the parties to this Agreement covering the Contract Area and the three mile extended boundary around the Contract Area described in the Final Texaco Agreement. Should any party acquire a mineral, leasehold, royalty, overriding royalty or any other interest within the AMI, it shall promptly provide written notice

17-4

of the acquisition to all parties along with a copy of the acquisition documents which shall constitute an offer to the other party to acquire its undivided interest on the same terms and cost. Any party participating in the acquisition of an interest within the AMI shall be subject to any rights Texaco may have to same as provided for in the Final Texaco Agreement. If all parties elect to acquire a working or mineral interest in an AMI property, the property shall be considered part of the Contract Area under this Operating Agreement. If some but less than all parties elect to acquire their share of the offered interest, the acquiring parties shall enter into a new operating agreement for the acquired property substantially in the same form as this Operating Agreement. The provisions of this subparagraph shall cease to apply at such time as the parties no longer have the right to acquire additional leases from Texaco pursuant to the Final Texaco Agreement.

N.    Arbitration. Operator and Non-Operators agree that this Agreement shall be governed by the laws of the State of Texas and any dispute that arises with respect to this Agreement shall be arbitrated before a single arbitrator in accordance with the Texas General Arbitration Act ("Act") and using the rules (but not using the offices or the auspices) of the American Arbitration Association ("Rules"). The decision of the Arbitrator rendered pursuant to the Act and Rules shall be binding and may be enforced in any courts of competent jurisdiction. Any arbitration proceedings pursuant to this Agreement shall be held in Houston, Harris County, Texas. Any dispute that arises relating to the Contract Area in which Texaco is a complaining party or a necessary party shall be resolved among all parties using the dispute resolution procedure attached to the Final Texaco Agreement and under Louisiana law without regard to the arbitration provision set forth above.

O.    Assignment. In the event any party assigns all or part of its interest in the Contract Area to a third party other than Texaco, that third party shall acquire its undivided interest subject to the terms and conditions of this Agreement, and the Texaco Operating Agreement, if it is in effect. The acquiring party shall ratify this Agreement and any applicable Operating Agreement contemporaneously with acquisition of their undivided interest.

P.    Confidentiality. Except as otherwise provided herein and subject to the terms of the Final Texaco Agreement, no party shall divulge to any third party any geophysical data acquired, obtained or developed by the parties hereto involving the Contract Area subsequent to the effective date of this Agreement, or any drilling information relative to any well or wells drilled as a result hereof, other than depth and information customarily publicized, without first obtaining the written consent of the other parties to release any such information, which consent shall not be unreasonably withheld; provided, however, that such consent shall not be necessary for any party to divulge such information to a party from whom they may receive a contribution for the drilling of a well hereunder, or to a party who is the record owner of an interest in such a well, but only if such party to whom the information is to be disclosed agrees to be subject to this provision prior to disclosure. All such information and data shall be treated as strictly confidential. Nothing contained herein shall be deemed to prevent disclosure of any such information or data if such disclosure is required by applicable laws or rules and regulations of any administrative or governmental agency or entity.

17-5

Q.   <u>Media/News Releases</u>.  No party hereto shall, at any time, issue to the press or other media any news releases, or distribute any information or photographs, concerning the Contract Area, without the prior approval of all of the other parties hereto.  When all of the parties have reviewed such material and all parties have approved the issuance of the material, the party desiring such release shall have the principal responsibility for its issuance.  The only other exception to the foregoing shall be that in the event of an emergency involving extensive property damage, operations failure, loss of human life or other clear emergency, the party designated as Operator hereunder is authorized to furnish such minimum, strictly factual information as shall be necessary to satisfy the legitimate public interest on the part of the press and duly constituted authorities, if time does not permit the obtaining of prior approval by other parties.  Said Operator shall thereupon promptly advise the other parties of the information so furnished.

R.   <u>Termination of Operations</u>.  In the event the required consent is obtained to terminate an operation pursuant to Article VI.F. above, the parties voting to continue the operation shall have the right and option to take over control and operation of the well within the applicable time period in Article VI.E. at their sole risk and expense.

S.   As between Newfield, XCO and Odyssey, this Operating Agreement shall supersede that certain Operating Agreement dated June 2, 1995, by and between Nuevo Energy Company, as Operator, and XCO Production Company, as Non-Operator, for all purposes pertaining to the Contract Area.

1         IN WITNESS WHEREOF, this agreement shall be effective as of the  __1st__  day of  __April__  ,

2   19 __97__ .

3   ATTEST OR WITNESS:                      OPERATOR

4                                         Newfield Exploration Company

5     *Nancy Marlach*            By *William Schneider*

6
7     *Robt R Lewis*               __William Schneider__
                                    Type or print name

8                                Title __EXPLORATION MANAGER__

9                                Date __6/19/97__

10                                Tax ID or S.S. No. _____

11

12                            NON-OPERATORS

13

14                                   XCO Production Company

15

16     *Shelly Kaminski*                By *signature*

17                                     __Robert A. Gray__
                                    Type or print name

18                                Title __Chairman__

19                                Date __7/17/97__

20                                Tax ID or S.S. No. __76 - 0296517__

21

22                                   Odyssey Petroleum Company

23                             By *Kenneth W. Welch*

24     *Martha Passo*                     __Kenneth W. Welch__
25                                     Type or print name

26                                Title __Vice President - LAND__

27                                Date __9-4-97__

28                                Tax ID or S.S. No. __76 - 0447672__

29                                _____

30   _____              By _____

31
32   _____             Type or print name

33                                Title _____

34                                Date _____

35                                Tax ID or S.S. No. _____

36

37

A.A.P.L. FORM 610 - MO̶L̶ FORM OPERATING AGREEMENT   1989

1                                    ACKNOWLEDGMENTS

2        Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The

3        validity and effect of these forms in any state will depend upon the statutes of that state.

4

5        ~~Individual Acknowledgment:~~ *in representative capacity:*

6        State of _Texas_ )

7                                   ) ss.

8        County of _Dallas_ )

9             This instrument was acknowledged before me on

10       _September 4, 1997_ by _Kenneth W. Welch as_

11       _Vice President of Land of Odyssey Petroleum Company._

12       (Seal, if any)                                  _Mary Lou Holder_

13       ┌─────────────────────────┐
         │  MARY LOU HOLDER         │     Title (and Rank) _Notary Public_
14       │  MY COMMISSION EXPIRES   │
         │  August 22, 2001         │     My commission expires: _____
15       └─────────────────────────┘

16       Acknowledgment in representative capacity:

17       State of _Texas_ )

18                                   ) ss.

19       County of _Harris_ )

20            This instrument was acknowledged before me on

21       _19 June 1997_ by _William Schneider_

22       _Exploration_ of _Newfield Exploration Company_ as

23       _Manager_
         (Seal, if any)                                 _Rhonda Vaughn_

24                                              Title (and Rank) _Notary Public_

25       ┌─────────────────────────┐
         │  RHONDA VAUGHN           │     My commission expires: _____
26       │  Notary Public, State of Texas │
         │  My Commission Expires 11-27-99 │
         └─────────────────────────┘

27

28

29

30

31

32

33

34

35

36

37

A.A.P.L. FORM 610 - MO[    ]L FORM OPERATING AGREEMENT   \989

1                                    ACKNOWLEDGMENTS

2        Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The

3   validity and effect of these forms in any state will depend upon the statutes of that state.

4

5   Individual acknowledgment:

6   State of _____ )

7                             ) ss.

8   County of _____ )

9        This instrument was acknowledged before me on

10  _____ by _____

11

12  (Seal, if any)                                  _____

13                                      Title (and Rank) _____

14                                      My commission expires: _____

15

16  Acknowledgment in representative capacity:

17  State of _*Texas*_ )

18                             ) ss.

19  County of _*Harris*_ )

20        This instrument was acknowledged before me on

21  _*July 17, 1997*_____ by _*Robert A. Gray*_____ as

22  _*Chairman*_____ of _*XCO Production Company*_

23  (Seal, if any)        [Notary Seal: REBECCA ROARK / Notary Public, State of Texas / My Commission Expires 04-08-01]    _*Rebecca Roark*_

24                                      Title (and Rank) _*Notary Public*_

25                                      My commission expires: _*04-08-2001*_

26

27

28

29

30

31

32

33

34

35

36

37

# EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated _____ April 1, 1997 _____ , between
Goodrich Petroleum Company, as Operator, and Wallace H. Brown, M.D. Estate et al as Non-Operator.

1.    <u>Description of lands subject to this Agreement:</u>

   See Exhibit "A-1"

2.    <u>Restrictions, if any, as to depths, formations, or substances:</u>

   None.

3.    <u>Parties to Agreement with addresses and telephone numbers for notice purposes:</u>

   Goodrich Petroleum Company
   815 Walker, Suite 1040
   Houston, TX 77002
   Attention: Robert C. Turnham, Jr.
   Telephone: (713) 780-9494
   Fax: (713) 780-9254

   Bellwether Exploration Company
   c/o Torch Energy Advisors
   1221 Lamar, Suite 1600
   Houston, TX 77010-3039
   Attention: Carol Cooley
   Telephone: (713) 753-1584
   Fax: (713) 210-7083

   XCO Production Company
   550 Westcott, Suite 430
   Houston, TX 77007
   Attention: Mr. Robert A. Gray
   Telephone: (713) 861-2918
   Fax: (713) 861-0026

   Wallace H. Brown, M.D. Estate
   c/o Charles L. Williams, CPA
   P. O. Box 1685
   Shreveport, LA 71165

   Joe Waddell
   416 Travis St., Suite 900
   Shreveport, LA 71101

   S & P Company
   330 Marshall St., Suite 300
   Shreveport, LA 71101

   W. Harold Brown, II
   c/o Charles L. Williams, CPA
   P. O. Box 1685
   Shreveport, LA 71165

   Charles Rex Brown
   c/o Charles Williams, CPA
   P. O. Box 1685
   Shreveport, LA 71165

   Robert Aron
   210 Baronne Street, Suite 1342
   New Orleans, LA 70112

   Peter A. Aron
   210 Baronne Street, Suite 1342
   New Orleans, LA 70112

   Aaron or Peggy Selber Oil Co., LLC
   P. O. Box 21830
   Shreveport, LA 71120

Mark E. Barton
P. O. Box 53701
Lafayette, LA 70505

Stuart Oden
P. O. Box 1806
Shreveport, LA 71166-1806

BSS Energy, LLC
c/o Robert A. Bories
210 Baronne Street, Suite 1342
New Orleans, LA 70112

Grammie, LLC
Thomas Usdin
2820 Calhoun Street
New Orleans, LA 70118

Valquest Partners #36 LP
210 Baronne Street, Suite 1342
New Orleans, LA 70112

Marie Lafaye Badeaux
4900 Lafaye Street
New Orleans, LA 70122

Anna Lafaye Barrois
5637 Bancroft Drive
New Orleans, LA 70122

Thelma Joyce Lafaye Crews
4508 Taft Park
Metairie, LA 70002

Rex D. Cross
1899 Spindrift Drive
La Jolla, CA 92037

Albert Emory Lafaye, Jr.
3113 49th Street
Metairie, LA 70001

Edward E. Lafaye
1600 Gulf Blvd., #214
Clearwater, Fl 33767

H. Eustis Reily
305 Rue St. Ann
Metairie, LA 70005

Rosemary Lafaye Winters
5131 Chamberlain Drive
New Orleans, LA 70122-2527

Bories Management Company, LLC
210 Baronne Street, Suite 1342
New Orleans, LA 70112

SKLARCO, LLC
P. O. Box 1753
Shreveport, LA 71166-1753

Doris T. Brown Estate Trust
c/o Charles L. Williams, CPA
P. O. Box 1685
Shreveport, LA 71165

Brammer Engineering, Inc.
333 Texas Street, Suite 1425
Shreveport, LA 71101

Roland Frautschi
333 Texas Street, Suite 1350
Shreveport, LA 71101

4.   Percentages or fractional interests of parties to this Agreement:   *

|  | Interest |
|---|---|
| Bellwether Exploration Company | 68.000000% |
| XCO Production Company | 15.000000% |
| Goodrich Petroleum Company | 8.859722% |
| Wallace H. Brown, M.D. Estate | .366268% |
| Joe Waddell | .048835% |
| S&P Co. | .884531% |
| W. Harold Brown II | .366268% |
| Charles Rex Brown | .366268% |
| Robert Aron | .455430% |
| Peter A. Aron | .30362% |
| Aaron or Peggy Selber Oil Co. | 1.40459% |
| Mark Barton | .01311% |
| Stuart Oden | .078754% |
| BSS Energy, LLC | 1.404809% |
| Grammie, LLC | .157508% |
| Valquest Partners #36, LP | .477733% |
| Marie Lafaye Badeaux | .025952% |
| Anna Lafaye Barrois | .025952% |
| Thelma Lafaye Crews | .021117% |
| Rex D. Cross | .010006% |
| Albert Emory Lafaye, Jr. | .012966% |
| Edward E. Lafaye | .012966% |
| H. Eustis Reily | .015571% |
| Rosemary Lafaye Winters | .025952% |
| Bories Management Company, LLC | .179412% |
| SKLARCO, LLC | 1.027969% |
| Doris T. Brown Credit Shelter Trust | .366268% |
| Brammer Engineering, Inc. | .010200% |
| Roland Frautschi | .078754% |

*   Subject to reduction by election of Texaco to participate in certain wells at casing point or at payout subject to the Exploration Agreement, dated June 2, 1995, effective December 23, 1993, as amended, by and between Texaco Exploration and Production Inc. and XCO Production Company, et al (the "Texaco Agreement").

5.   Oil and Gas Leases and/or Oil and Gas Interests subject to this Agreement:

1.   Oil, Gas and Other Liquid or Gaseous Minerals Lease dated March 8, 1995 granted by the Cameron Parish School board to Nuevo Energy Company, recorded in Conveyance Book 816, File No. 240885, Official Public Records of Cameron Parish, Louisiana.

2.   Any and all oil and gas leases earned from Texaco pursuant to the Texaco Agreement.

6.   Burdens on production:

Those burdens on production set out in the Texaco Agreement.



GOODRICH PETROLEUM COMPANY

GOODRICH – MIAMI FEE #11 & #12

1" = 4000"     586 Acres

# EXHIBIT "B"

Attached to and made a part of that certain Operating Agreement dated April 1, 1997, between Newfield Exploration Company, as Operator, and XCO Production Company, et al., as Non-Operator.

NO EXHIBIT "B"

Recommended by the Council
of Petroleum Accountants
Societies

KraXrm 601,   BOX 800
TULSA OK 74101

COPAS - 1984 - ONSHORE

·COPAS·

# EXHIBIT    " C "

1   Attached to and made a part of __that certain Operating Agreement dated April 1, 1997, between
2   Newfield Exploration Company, as Operator, and XCO Production Company, et al., non-
3   Operators.__

4
5
6
7

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1.   Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

**2.   Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.   Advances and Payments by Non-Operators**

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at __Texas Commerce Bank, N.A.__ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.   Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.

Recommended by the Council
of Petroleum Accountants
Societies



5.   Audits

A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   Approval By Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   Ecological and Environmental

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.   Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

3.   Labor

A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)   Salaries of First Level Supervisors in the field.

(3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

4.   Employee Benefits

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ten_____ percent ( _10_ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS – 1984 · ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

1. **Overhead – Drilling and Producing Operations**

   i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( X ) Fixed Rate Basis, Paragraph 1A, or
   (    ) Percentage Basis, Paragraph 1B

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property: ⌐site or on location at

   (    ) shall be covered by the overhead rates, or
   ( X ) shall not be covered by the overhead rates.

   iii.  The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   ( X ) shall be covered by the overhead rates, or
   (    ) shall not be covered by the overhead rates.

   A.  **Overhead – Fixed Rate Basis**

   (1)  Operator shall charge the Joint Account at the following rates per well per month:

   * Drilling Well Rate $ _8,850.00 for well_s drilled to more than 12,500'
       (Prorated for less than a full month)

   * Producing Well Rate $ _850.00 for well_s producing from a depth greater than 12,500'

   (2)  Application of Overhead – Fixed Rate Basis shall be as follows:

   (a)  Drilling Well Rate

       (1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

*The rates for shallower wells shall be set forth in the most recent edition of the Ernst & Young Annual Survey of Overhead Rates for onshore South Louisiana.

COPAS - 1984 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent ( _____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent ( _____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ _____ :

A. _____ 5 _____ % of first $100,000 or total cost if less, plus

B. _____ 3 _____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. _____ 2 _____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.    Catastrophe Overhead

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. _____ 3 _____ % of total costs through $100,000; plus

B. _____ 2 _____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. _____ 1 _____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.   Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.    Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.    Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

   (1)   Tubular Goods Other than Line Pipe

      (a)   Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

      (b)   For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

COPAS – Pacenhone
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2)   Material used on and moved from the Joint Property

(a)   At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)   At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

(3)   Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1)   Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

COPAS — 1984 — ONSHORE

(2)    Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)    Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)    Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)    Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.    Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.    Pricing Conditions

(1)    Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)    Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.    Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.    Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.    Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.    Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   Special Inventories

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   Expense of Conducting Inventories

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated April 1,
1997, between Newfield Exploration Company, as Operator, and XCO Production
Company, et al., as Non-Operator.

## INSURANCE

A.  Workers Compensation Insurance in an amount equal to the full liability
imposed by the laws of the State of Louisiana.

B.  Employer's Liability Insurance with a limit of not less than $1,000,000.00
per occurrence.*

C.  Commercial General Liability Insurance including named peril Sudden and
Accidental Pollution Liability with not less than $1,000,000.00 combined
single limit with regard to Bodily Injury or Death and Property damage.**

D.  Automobile Liability Insurance with a limit of not less than $1,000,000.00
per occurrence combine single limit.*

E.  Follow form Umbrella Insurance with limits of not less than $10,000,000.00
per occurrence.**

F.  Control of Well Insurance in the minimum amount of $10,000,000.00.


\*    Includes endorsement providing Waiver of Subrogation in favor of
Non-Operators; provided that such endorsement can be waived when
Operator has arranged these coverages to provide coverage for Non-
Operators as insured, such waiver of this requirement applying only
to Operator and not to independent contractors.

Operator shall carry no insurance for the benefit of the joint account, other
than the types hereinabove described, unless the written consent of the
parties is first obtained

Losses for which no insurance is required to be carried or in excess of the
limits set forth above, shall be borne by the parties in proportion to their
respective interests herein and shall be charged to the joint account:

\*\*    Includes endorsement for Oil and Gas Operations to include co-
owners of oil and gas leases as Insureds.  Co-owners designate
operator as their agent for all purposes including adjustment of any
claim and loss payment, under the policies.

# EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated April 1, 1997, between Newfield Exploration Company, as Operator, and XCO Production Company, et al, as Non-Operator

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992    *

AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM          A.A.P.L. NO. 610-E
MAY BE ORDERED DIRECT BY FROM THE PUBLISHER
EDITION® ™  P.O. BOX 800        TULSA, OK 74101
COPYRIGHT 1992 -- ALL RIGHTS RESERVED

NOTE: Instructions for the of Gas Balancing Agreement MUST be reviewed before finalizing this document.

## EXHIBIT "E"

### GAS BALANCING AGREEMENT ("AGREEMENT")
### ATTACHED TO AND MADE PART OF THAT CERTAIN
### OPERATING AGREEMENT DATED _____

BY AND BETWEEN _____, AND

_____ ("OPERATING AGREEMENT")

RELATING TO THE _____ AREA,

_____ COUNTY/PARISH, STATE OF _____.

THIS AGREEMENT is made by and between Operator and Non-Operators as identified in the Operating Agreement and effective as of its effective date. Each such party, including the Operator, being referred to collectively herein as the "Parties."

## ARTICLE I. DEFINITIONS

The following definitions shall apply to this Agreement:

1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

1.02 "Balancing Area" shall mean each well subject to the Operating Agreement that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

1.03 "Balance" is the condition existing when a party has disposed of a cumulative volume of Gas from a Reservoir which is equal to such party's percentage ownership of the total cumulative volume of Gas disposed of by all parties from such Reservoir.

1.04 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.05 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

1.06 "Imbalance" refers to either the overproduction of an Overproduced Party or the Underproduction of an Underproduced party, as applicable.

1.07 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of Full Share of Current Production.

1.08 "MER" refers to the maximum efficient rate at which a well can be produced for a sustained period of time without resulting in reservoir waste.

1.09 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.10 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.11 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.12 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.13 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.14 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.15 "Percentage Interest" shall mean the percentage or decimal interest of each

1.16 "Reservoir" shall mean each separate and distinct pool or accumulation of Gas or Oil or Gas of both which is not connected or in communication with any other pool or accumulation of oil or gas.

1.17 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.18 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.19 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.20 "Winter Period" shall mean the month of December in one calendar year and the month(s) of January, February, and March in the succeeding calendar year.

ARTICLE 2. BALANCING AREA

2.1  If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing shall be on the basis of Gas taken from the Balancing Area measured in MMBtus.

2.2  In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

ARTICLE 3. RIGHTS OF PARTIES TO TAKE GAS

3.1  Subject to the rights of an Underproduced Party to produce and dispose of Makeup Gas pursuant to this Agreement, each Party shall be entitled to produce and dispose of the Percentage Interest of Gas which can be produced from a Reservoir at the MER of each well completed in such Reservoir.

3.2  Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.3  Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.4  When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.5  All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.6  Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current MER; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.7  In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

ARTICLE 4. MAKEUP GAS

4.1  After written notice to the Operator, no later than the 15th day of the month, the Underproduced Party shall at the beginning of the next month have the right to produce and dispose of Makeup Gas subject to the following conditions:



4.1.2 An Overproduced Party shall not be required to reduce its takes to less than fifty percent (50%) of such overproduced Party's Percentage Interest of Gas.

4.1.3 If there is more than one Overproduced Party, the Makeup Gas will be taken from the Overproduced Parties in the proportion that each Overproduced party's overproduction bears to the total overproduction of all Overproduced Parties, which proportion shall be determined from the last day of the most recently completed month for which relevant accounting reports are available and...

4.1.4 If there is more than one Underproduced Party wishing to deliver and to dispose of Makeup Gas that month, each Underproduced Party will share in the Makeup Gas in the proportion which its Percentage Interest bears to the total Percentage Interests of all Underproduced Parties desiring to take or market such Makeup Gas.

4.2 Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the one (1) month immediately preceding the Winter Period.

4.3 The provisions of this Article shall constitute an Underproduced Party's exclusive right and an Overproduced Party's exclusive obligation with regard to the right of an Underproduced Party to require an Overproduced Party to furnish Makeup Gas.

4.4 Notwithstanding any other provision of this Agreement, at such time and for so long as Operator or, insofar as concerns production by the Operator, any Underproduced Party determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, then Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to one hundred percent (100%) of such Overproduced Party's Full Share of Current Production.

## ARTICLE 5. BALANCING OF GAS ACCOUNTS

5.1 The Operator shall have the duty of controlling production and deliveries of Gas and the responsibility of administering the provisions of this Agreement. The Operator shall use its best efforts to cause Gas to be delivered at the Measurement Point in such manner and at such rates as may be required from time to time to give effect to the intent that any Imbalance shall be brought into Balance in accordance with the provisions hereof.

5.2 The Operator will maintain a separate Gas account for each party. Each month the Operator will furnish each Party a monthly report showing the total quantity of gas produced, the quantity used in joint operations, or which was vented or lost, the quantity of Gas disposed of by each Party, each Party's Percentage Interest of production or Underproduction for that month, and the cumulative Imbalance of all Parties. In the event that production from each Reservoir is not separately measured, then the Operator will allocate production to each Reservoir on the basis of periodic tests of such other methods as are commonly used and accepted in the industry. Each month during which an Overproduced Party takes or markets less than its Percentage Ownership of the total volume of Gas taken or marketed that month by all Parties, that Overproduced Party's Underproduction for that month shall be credited against and offset the earlier Overproduction then attributed to such Party.

5.3 Each Party shall retain all data, information and records pertaining to the Gas produced and the Gas disposed of by such Party, including but not limited to, records pertaining to the volumes of Gas disposed of, the gross and net proceeds received from the disposition of Gas, and the information utilized in that volume, and price, on a Btu basis, for a period expiring three (3) years after the termination of this Agreement.

## ARTICLE 6. PAYMENTS ON PRODUCTION

6.1 Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

6.2 Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.3 In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Article 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

## ARTICLE 7. CASH SETTLEMENTS OF IMBALANCES

7.1 Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3 Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with...

c:\...\eb\gca\balance.gas    3

any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement. Provided however, any Party shall have the right at any time, after receipt of the Final Gas Settlement Statement, upon thirty (30) days prior written notice to all other Parties to demand that any settlement due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sum due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sum not paid until payment is actually received by the Underproduced Party.

7.4  The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

7.5  The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1  For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.

7.6  To the extent the Overproduced Party did not sell all Overproduction under its Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.

7.7  Interest compounded at the rate of twelve percent (12%) per annum or of the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8  In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settlement in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

7.9  That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.

7.10  At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionally based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide a detailed accounting any such cash settlement within thirty (30) days after the settlement is made.

## ARTICLE 8.  OPERATING COSTS AND OWNERSHIP OF LIQUIDS.

8.1  Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

8.2  The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interest in the Balancing Area.

## ARTICLE 9.  AUDIT RIGHTS.

9.1  Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Article 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area.

9.2 Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations.

## ARTICLE 10. CONFLICTS, INDEMNITY AND LIABILITIES

10.1 As between the Parties, in the event of any conflict between the provisions of this Agreement and provisions of any gas sales contract, or in the event of any conflict between the provisions for this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

10.2 Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgements or damages sustained and costs incurred in connection therewith.

10.3 Except as otherwise provided in the Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with he performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party (other than Operator) to pay any amounts owed pursuant to the terms hereof.

## ARTICLE 11. NOTICES

11.1 Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given only when received by the Party to whom the same is directed at the address set forth in the Operating Agreement.

## ARTICLE 12. BINDING EFFECT

12.1 This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

12.2 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

## ARTICLE 13. ASSIGNMENT

13.1 Subject to the provisions of Sections 13.2 and hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

## ARTICLE 14. CUMULATIVE METHOD

14.1 The Parties elect to use the cumulative method to account for the tax consequences of gas balancing in accordance with Section 1.761-2 of the Internal Revenue Service Regulations.



EXHIBIT "F"

Attached to and made a part of that certain Joint Operating Agreement dated April 1, 1997 by and between Newfield Exploration Company, as Operator, and XCO Production Company, et al, as Non-Operator

## EQUAL OPPORTUNITY CERTIFICATONS AND AGREEMENTS

1.    **During the performance of the Contract, the Operator agrees as follows:**

A.    The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting office setting forth the provisions of this non-discrimination clause.

B.    The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

C.    The Operator will send to each labor union or representative or workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting office, advising the labor union or worker's representatives of the Operator's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

D.    The Operator will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and by the rules, regulations and relevant orders of the Secretary of Labor.

E.    The Operator will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

F.    In the event of Operator's non-compliance with the non-discrimination of this contract or with any of such rules, regulations or orders, this contract may be canceled, terminated or suspended, or in whole or in part, and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed or remedies invoked as provided in said Executive Order No. 11246 of September 24, 1965, or by rules, regulations or order of the Secretary of Labor, or as otherwise provided by law.

G.    The Operator will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each

contractor or vendor. The Operator will take such action with respect to any contract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for non-compliance; provided, however, that in the event the Operator becomes involved in or is threatened with litigation with a contractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interest of the United States.

2. **Equal Employment Opportunity Reporting:** The Operator, unless exempt, agrees to file with the appropriate federal agency a complete and accurate report on Standard Form 100 (EEO-1) within thirty (30) days after the signing of this Agreement or the award of any such purchase order, as the case may be, (unless such a report has been filed in the last 12 months), and agrees to continue to file such reports annual, on or before March 31st (41 CFR 60-1.7(a)).

3. **Affirmative Action Compliance Program:** The Operator agrees to develop and maintain a current written affirmative action compliance program for each of its establishments in accordance with the regulations of the Secretary of Labor promulgated under Executive Order No. 11246, as amended (41 CFR 60-01.40).

4. **Veteran's Employment:** In the event the agreement to which this exhibit is attached is for the purpose of carrying with any department or agency of the United States for the procurement of personal property and non-personal services (including construction) for the United States as provided by Section 2012 of Title 38 USC, Operator agrees to give special emphasis to the employment of qualified disabled veterans and veterans of the Vietnam era and to list immediately with the appropriate local employment service office all of its suitable employment openings.

5. **Equal Opportunity in Employment Certificate of Non-Segregated Facilities:** Operator, by entering into the contract to which this Exhibit F is attached, certifies that he does not maintain or provide for his employees any segregated facilities at any of his establishments, and that he does not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. Operator agrees that a breach of this certificate is a violation of the Equal Opportunity clause in this contract. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants, and other eating areas, time clocks, locker rooms, and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color or national origin, because of habit, local custom, or otherwise. He further agrees that (except where it has obtained identical certifications from proposed contracts for specific time periods) he will obtain identical certifications from proposed contractors prior to the award of contracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause, that he will retain such certifications in his files; and that he will forward the following notice to such proposed contractors (except where the proposed contractors have submitted identical certifications for specific time periods).

6. **Notice to Prospective Contractors of Requirement for Certifications of Facilities:** Certification of Non-Segregated Facilities, as required by the May 9, 1967 Order (32 F.R. 7439, May 19, 1967) on Elimination of Segregated Facilities, by the Secretary of Labor, must be submitted prior to the award of a contract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each contract or for all contracts during a period (i.e., quarterly, semi-annually, or annually).

exfoa.xco

## EXHIBIT "G"

Attached to and made a part of that certain Operating Agreement dated April 1,
1997, between Newfield Exploration Company, as Operator, and XCO Production
Company, et al., as Non-Operator.

NO EXHIBIT "G"

## EXHIBIT "H"

Attached to and made a part of that certain Operating Agreement dated April 1, 1997, between Newfield Exploration Company, as Operator, and XCO Production Company, et al., as Non-Operator.

## NOTICE OF OPERATING AGREEMENT

STATE OF LOUISIANA

PARISH OF CAMERON

  Notice is hereby given that the undersigned entered into an Operating Agreement, dated _____, which covers lands, equipment and other personal property on or used in connection with the lands located in Cameron Parish, Louisiana, more fully described on Exhibit "A-1" and "A-2" attached hereto. The Operating Agreement is on the following form: AAPL Form 610 Model Form Operating Agreement - 1989, and contains the terms and conditions commonly found in that form with certain additions and deletions. In particular, it should be noted that the Operating Agreement contains provisions affecting the sharing of expenses and revenues, controlling the relinquishment of interests by non-consenting parties, granting liens and rights of set off and recoupment and generally affecting the rights of the undersigned in the lands and interests subject to the Operating Agreement. The undersigned also give notice that the Operating Agreement may be amended from time to time in the future, and any inquiry as to the contents of the Operating Agreement should also include an inquiry as to the contents of any and all such amendments.

  This instrument is being executed and recorded for the purpose of giving notice to third parties dealing with the undersigned of the existence of the Operating Agreement and also of perfecting the liens and interests set forth therein. The undersigned reserve the right to refuse inspection of the Operating Agreement to parties attempting to obtain information therefrom for purposes prejudicial to the business interests of the undersigned.

  Each party to the Operating Agreement grants to the other party a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith and in all production and revenue for production derived from the Contract Area to secure performance of all of its obligations under this Agreement, including, but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid thereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required thereunder, and the proper performance of operations thereunder. Such lien and security interest granted by each party includes such party's leasehold interests, working interests, operating rights and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to the Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools and tubular goods) and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom and all proceeds and products of the foregoing.

  An Area of Mutual Interest ("AMI") is established between the parties to the Agreement covering the Contract Area and the three mile extended boundary around the "Original Contract Area", as is described on the attached Exhibit "A-2". Should any party acquire a mineral, leasehold, royalty, overriding royalty or any other interest within the AMI, it shall promptly provide written notice of the acquisition to all parties along with a copy of the acquisition documents which shall constitute an offer to the other party to acquire its undivided interest on

the same terms and cost. Any party participating in the acquisition of an interest within the AMI shall be subject to any rights Texaco may have to same as provided for in the Final Texaco Agreement. If all parties elect to acquire a working or mineral interest in an AMI property, the property shall be considered part of the Contract Area under this Operating Agreement. If some but less than all parties elect to acquire their share of the offered interest, the acquiring parties shall enter into a new Operating Agreement for the acquired property substantially in the same form as this Operating Agreement.

This instrument may be executed in multiple counterparts and shall be binding upon all parties signing same, whether all sign or otherwise. To facilitate recordation, a single counterpart containing additional signature and acknowledgment pages from other counterparts may be executed and recorded.

EXECUTED on the date set out below beside each party's name.

Date Executed:_____     OPERATOR:
                                          Newfield Exploration Company

Witness:_____

          _____         _____


          _____


Date Executed:_____     NON-OPERATORS:
                                          XCO Production Company

Witness:_____

          _____         _____


Date Executed:_____     Odyssey Petroleum Company

Witness:_____

          _____         _____

THE STATE OF TEXAS
COUNTY OF HARRIS

Be it known on this _____ day of _____, 1997, before me, the undersigned authority, personally came and appeared _____ _____, the _____ of Newfield Exploration Company, a Delaware corporation, to me personally known, whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses whose names are thereto subscribed as such, being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above and foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

In witness whereof, the said appearer has signed these presents and I have hereunto affixed by hand and seal, together with the said witnesses on the day and date first above written.

_____
Notary Public


THE STATE OF TEXAS
COUNTY OF HARRIS

Be it known on this _____ day of _____, 1997, before me, the undersigned authority, personally came and appeared _____ _____, the _____ of XCO Production Company, a Texas corporation, to me personally known, whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses whose names are thereto subscribed as such, being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above and foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

In witness whereof, the said appearer has signed these presents and I have hereunto affixed by hand and seal, together with the said witnesses on the day and date first above written.

_____
Notary Public


THE STATE OF TEXAS
COUNTY OF _____

Be it known on this _____ day of _____, 1997, before me, the undersigned authority, personally came and appeared_____ _____, the _____ of Odyssey Petroleum Company, a _____ corporation, to me personally known, whose genuine signature is affixed to the foregoing document, who signed said document before me and in the presence of the two witnesses whose names are thereto subscribed as such, being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above and foregoing document as his own free act and deed and for the uses and purposes therein set forth and apparent.

In witness whereof, the said appearer has signed these presents and I have hereunto affixed by hand and seal, together with the said witnesses on the day and date first above written.

_____
Notary Public

notou.exh

# Exhibit A-1

GOODRICH PETROLEUM COMPANY

GOODRICH - MIAMI FEE #11 & #12

1" = 4000'     586 Acres