

### A.A.P.L. FORM 610-1982
# MODEL FORM OPERATING AGREEMENT

GOODRICH OIL COMPANY - MIAMI FEE #1
SECOND BAYOU PROSPECT

## OPERATING AGREEMENT

### DATED

<u>August 19</u> , 19 <u>93</u> ,

OPERATOR _____ <u>BRAMMER ENGINEERING, INC.</u> _____

CONTRACT AREA __ <u>That certain area comprised of portions of</u> _____

<u>Sections 10, 11, 12, 13, 14, and 15, Township 14 South, Range 12 West,</u>

<u>as more clearly depicted on the plat attached hereto as Exhibit "A-1"</u>

X̶X̶X̶K̶X̶X̶X̶X̶X̶X̶ PARISH OF ____ <u>CAMERON</u> _____ STATE OF <u>LOUISIANA</u> _____

COPYRIGHT 1982   —   ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS 76137. APPROVED FORM.
A.A.P.L.   NO.   610   ·   1982   REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 7 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8 |
| | 3. Abandonment of Non-Consent Operations | 8-9 |
| | | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 9-10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between Brammer Engineering, Inc., 333 Texas Street, Suite 1325, Shreveport, Louisiana, 71101-5323 _____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
(1) Identification of lands subject to this agreement,
(2) Restrictions, if any, as to depths, formations, or substances,
(3) Percentages or fractional interests of parties to this agreement,
(4) Oil and gas leases and/or oil and gas interests subject to this agreement,
(5) Addresses of parties for notice purposes.
☐ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☐ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

## ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of_____lease burdens_____which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C. Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D. Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

    1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

    2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
## TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

    ☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV
### continued

☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

B. Loss of Title:

~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~ reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests: and,

(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost;

(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;

(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,

(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in ~~connection therewith.~~

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well~~ payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of the Contract Area.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# ARTICLE V.
## OPERATOR

**A. Designation and Responsibilities of Operator:**

Brammer Engineering, Inc., 333 Texas St., Ste.1325, Shreveport, LA. 71101 shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. _Resignation or Removal of Operator:_ Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. _Selection of Successor Operator:_ Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C. Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D. Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

# ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A. Initial Well:**

On or before the 31st day of December , 19 93 , Operator shall commence/the drilling of a well for operations for oil and gas at the following location:

N 30° 20' 39" W 32,371.34' from USC 7 GS Monument "BRAMA"
Section 13, Township 14 South, Range 12 West,
Cameron Parish, Louisiana,

and shall thereafter ~~commence actual drilling operations with due diligence~~ continuously prosecute operations with due diligence to a depth of 8,000 feet, total vertical depth

unless granite or other practically impenetrable substance or condition in the hole, which renders further/drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth. operations

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
continued

1  If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2  well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

B. **Subsequent Operations:**

1. <u>Proposed Operations</u>: Should any party hereto desire to drill any well on the Contract Area other than the well provided
for in Article VI.A., or to rework, deepen,or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice
within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within
the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
response given by telephone shall be promptly confirmed in writing.

*[margin insertions: "recomplete, sidetrack" at line 9; "recomplete, sidetrack" at line 10]*

If all parties elect to participate in such a proposed operation, Operator shall, within thirty (30) one hundred twenty (120) days after expiration of the notice
period of fifteen (15) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
dance with the provisions hereof as if no prior proposal had been made.

2. <u>Operations by Less than All Parties</u>: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties
giving the notice and such other parties as shall elect to participate in the operation shall, within thirty (30) one hundred twenty (120) days after the expiration of
the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
work for the account of the Consenting Parties; ~~provided, however, if less than all parties approve any proposed operation as provided~~
~~in Article VI.B.1. Consenting Parties shall, at the request of a party not participating in such proposed operation, designate an Operator~~
~~to conduct the operations for the Consenting Parties for (a) the proposed or (b) such other operations as agree upon by such Operator~~
~~serving Parties, whereupon such a designated Operator shall conduct the operations for the Consenting Parties as herein provided.~~
~~Article VI.B.2. shall apply thereto.~~

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours
(<u>inclusive</u> of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
such a response shall not exceed a total of forty-eight (48) hours (<u>inclusive</u> of Saturday, Sunday and legal holidays). The proposing party,
at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

*[margin insertions around lines 59-63: "Operator for", "Operator for", "or Consenting", "Parties'", "Consenting Parties'"]*

-5-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  ~~and the costs shall be borne by such Consenting Party in proportion to each~~ Operating ~~share shall be responsible for the account of the Consenting Par~~
2  ~~ties.~~ Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:

11  **300%**
12  (a) ~~100%~~ of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and

21  (b) **300** % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII.C., and **300** % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.

28  An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29  working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31  reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32  and there shall be added to the sums to be recouped by the Consenting Parties ~~two hundred percent (200%)~~ three hundred percent (300%) of that portion of the costs of
33  the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.

39  During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.

46  In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage. **Pursuant**
50  **to Article XV.D., a Non-Consenting Party for an "obligation well/workover" proposal**
51  **shall not be entitled to recoup any salvage value for equipment and forfeits all**
52  **right, title and interest in same.**

53  Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57  ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60  realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

-6-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1      If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2 the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3 Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4 therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5 back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6 the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

10      Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11 be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12 well conforms to the then-existing well spacing pattern for such source of supply.

16      The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17 except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18 after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19 duction, ceases to produce in paying quantities.

23      3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24 completed, and the results thereof furnished to the parties, stand-by costs incurred pending pending a party's notice proposing a
25 reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26 ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27 first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28 matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29 withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30 each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31 ties.

35      4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36 also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37 location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38 mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39 affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40 to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

44      (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45 the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

49      (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50 salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51 provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

55      In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56 shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57 receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
58 incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-
59 by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60 ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61 stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

### C.   TAKING PRODUCTION IN KIND:

67      Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68 exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69 marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70 party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.
2
3       Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.
6
7       In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10  best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.
15
16       In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.
20
21  D.  Access to Contract Area and Information:
22
23       Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the information.
30
31  E.  Abandonment of Wells:
32
33       1.  Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.
41
42       2.  Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, ꭙꭙꭙ Ｘꭙꭙꭙ ꭙꭙ Ｘꭙ ꭙꭙ Ｘꭙ ꭙꭙꭙꭙꭙꭙꭙ ꭙꭙꭙꭙ ꭙꭙꭙ
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70



A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

## ARTICLE VI
### continued

1  XXXX The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.

5

6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.

13

14      3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.

19

20              ARTICLE VII.
21      EXPENDITURES AND LIABILITY OF PARTIES

22

23  A.  Liability of Parties:

24

25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

29

30  B.  Liens and Payment Defaults:

31

32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C".*To the extent that Operator has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense and royalty.

42
        *first and prior* _(above line 32, "a" word)_

43      If any party fails or is unable to pay its share of expense and/or royalty, within sixty (60) days after rendition of a statement therefor by
44  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45  the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46  reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

47  C.  Payments and Accounting:

50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52  tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53  showing expenses incurred and charges made and credits made and received.

54

55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58  with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59  on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60  fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61  due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

63

64  D.  Limitation of Expenditures:

65

66      1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67  pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

68  *Such lien and security interest granted by each party hereto shall include such party's
69  leasehold interests, working interests, operating rights and royalty and overriding
70  royalty interests in the Contract Area now owned or hereafter acquired and in lands
    pooled or unitized therewith or otherwise becoming subject to this agreement, the oil
    and gas when extracted therefrom and equipment situated thereon or used or obtained
    in connection therewith (including without limitation, accounts arising from gas
    imbalances or from the sale of oil and/or gas at the wellhead), contract rights,
    inventory and general intangibles relating thereto or arising therefrom, and all
    proceeds and products of the foregoing.*

_Handwritten/typed insertions in margins:_
- Line 32-33: *first and prior*
- Line 38: *and/or royalty*
- Line 43: *and/or royalty*
- Lines 46-49: *pursuant to Exhibit "C". All legal fees and other expenses of collection arising out of default shall be proportionately borne by the paying parties; such fees or expense shall be added to the unpaid amount of the defaulting party and be similarly subject to reimbursement.*
- Line 45: *plus any interest due*
- Line 41: *royalty.*

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1 ☐   Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.

4 ☒   Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.

15     2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.

20     3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of __Fifteen Thousand and No/100__ Dollars ($ 15,000.00 )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of __Fifteen Thousand and No/100__
28 Dollars ($15,000.00 ) but less than the amount first set forth above in this paragraph.

30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:

32     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2. 3.

40     Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, ~~at least five (5) days (excluding Saturday, Sunday and legal holidays) prior to taking such action~~, at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

46 F.   Taxes:

48     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".

60     If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".

67     Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68 the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

-10-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

G. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, ~~such lease to be on the form attached as Exhibit "B".~~ Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within three (3) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than three (3) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

-11-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9 D.  Maintenance of Uniform Interest:
10
11     For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12 party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13 equipment and production unless such disposition covers either:
14
15     1. the entire interest of the party in all leases and equipment and production; or
16
17     2. an equal undivided interest in all leases and equipment and production in the Contract Area.
18
19     Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties.
21 *
22     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29 E.  Waiver of Rights to Partition:
30
31     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.
34
35 ~~F.  Preferential Right to Purchase:~~
36
37 ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38 ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39 ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40 ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41 ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42 ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43 ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44 ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45 ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46
47 ## ARTICLE IX.
48 ### INTERNAL REVENUE CODE ELECTION
49
50     This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. **Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.
67 *If any party hereto creates the necessity for separate measurement facilities,
68  such party shall alone bear the cost of purchase, installation and operation of
69  such facilities.
70 **and the liabilities of the parties to this agreement shall be several, not
   joint or collective.

-12-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Fifteen Thousand and No/100__——————————————————————————————————————Dollars ($__15,000.00__) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.  All claims or suits involving title to any interest subject to this agreement shall be treated as a claim or a suit against all parties hereto.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of ___90___ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreemen. shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within ___90___ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.  Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.  Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Louisiana_____ shall govern.

**C.  Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

### ARTICLE XV.
### OTHER PROVISIONS

**A.**     Except with the consent of all parties and as hereinafter provided, it is specifically provided that no notice shall be given under Article VI hereof which proposes the drilling of more than one well at a time.  Further, the provisions of said Article VI, insofar as same pertains to notification by a party of its desire to drill a well, shall be suspended for so long as (1) a prior notice has been given which is still in force and effect and the period of time during which the well regarding same may be commenced has not expired; or (2) a well is presently drilling hereunder.  This paragraph shall not apply under those circumstances where the well to which notice is directed is a well which is required under the terms of a lease or contract or one required to maintain a lease or a portion thereof in force.

**B.**     Where a well that has been authorized under the terms of this Agreement by all parties (or by one or more, but less than all parties under Article VI.B.2) has been drilled to the objective depth or the objective formation, whichever is the lesser, and the parties participating in the well cannot agree upon the sequence and timing of further operations regarding such well, the following elections shall control in the order enumerated below:

(1)     an election to do additional logging, coring or testing;
(2)     an election to attempt to complete the well at either the objective depth or objective formation;
(3)     an election to deepen said well;
(4)     an election to plug back and attempt to complete said well;
(5)     an election to sidetrack the well; and
(6)     an election to rework said well by generally accepted stimulation techniques whether or not said well had previously produced in commercial quantities or is capable of commercial production;
(7)     an election to temporarily abandon the well; and
(8)     an election to plug and abandon the well.

It is provided, however, that if at any time said participating parties are considering the above elections the hole is in such a condition that, in the opinion of a majority of the parties, a reasonably prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority hereinabove set forth.  In such event, the operation which, in the opinion of a majority in interest of the parties is less likely to jeopardize the well, will be conducted.  It is further understood that if some, but not all parties, elect to participate in the additional logging, coring, or testing, they may do so and the party or parties not participating in such operations shall not be entitled to the logs, cores or the results of the tests but shall suffer no other penalty.

- 14 -

C.     The word "holidays" when used herein is defined as a legal holiday observed by the United States Government and its agencies.

D.     Notwithstanding the other provisions hereof, and particularly Article VI, if the proposed well is an obligation well, a party not participating in drilling the well shall assign to the participating parties its interest in the leases or portion thereof which would be lost or not earned if the well was not drilled. Such assignment shall be due upon the commencement of operations for such well and shall be free and clear of any overriding royalties, production payments, mortgages, liens or other encumbrances placed thereon by or resulting from the Assignor's ownership and operations subsequent to the date of this Agreement but otherwise without warranty of title, either express or implied. An "obligation well" is defined as a well which must be drilled to earn or maintain a lease or portion thereof. A well proposed within the last six (6) months of the primary term of a lease (whether as a unit well or lease well) shall constitute an "obligation well."

In the event a party should propose to rework or recomplete a well which has ceased to produce and such operation is necessary to perpetuate a lease or leases which would otherwise expire, a party choosing to go non-consent on such operation shall assign to the consenting parties its interest in the lease or leases or portion thereof which would expire if the proposed operation was not conducted. Such assignment shall be made in the manner provided for hereinabove for the drilling of an obligation well.

E.     Article XII is amended to add the following:

Any notice(s) and/or response(s) may be made by telephone, but must be confirmed in writing consistent with the other provisions hereof.

F.     If during the drilling of any well being drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority of ownership of the total possessory, cost-bearing interest, and not in numbers, of the owners as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will prevail.

G.     If in drilling any well under the terms of this Agreement the Operator's estimated cumulative costs of operations prior to reaching the proposed depth exceeds 150% of the Authority for Expenditure (AFE) for such well exclusive of the estimated cost of completion, and for reasons which could not be avoided by abandoning the well (as for example well control costs, fishing costs, etc.), it is agreed that Operator shall promptly advise Non-Operator(s). If, after having received such information all parties agree, the Operator may plug and abandon the well or take such other acts as the parties may desire. If the parties cannot agree as to further operations, the following provisions will control:

1.     If a majority in possessory, cost-bearing interest (and not in number) desire to attempt to complete the well at or above the depth reached, further operations shall be conducted as if the well had been drilled to the proposed depth. Those not participating in the completion attempt shall be subject to the same penalties as provided for in Article VI.B for completion by less than all parties when the well has been drilled to the proposed depth.

2.     If a majority in possessory, cost-bearing interest elects to continue operations in an attempt to drill the well to the proposed depth, those not desiring to participate in such further operations may become non-consenting parties subject to the penalty provisions of Article VI.B.2, but the penalty shall be increased to an amount equal to 150% of the amount shown in Article VI.B.2.

3.   .  If a majority in possessory, cost-bearing interest desire to cease further operations and plug and abandon the well without a completion attempt, any one or more of the parties hereto shall have the right to continue drilling in an effort to reach the depth initially proposed in connection with such well. All costs, risk and expense incurred after such takeover by the parties shall be at the sole cost, risk and expense of the parties continuing such further operations. Such parties shall have the right to drill the well to any depth at which they may desire, even beyond the proposed depth. They shall either plug and abandon and restore the surface or complete and equip the well for production in a formation below that reached when such parties took over operations. If the well is completed for production of oil or gas in a formation below that reached after taking over the operations, the Consenting parties shall be entitled to all production from the well attributable to the interest of the non-consenting parties without any reversionary rights on the part of the non-consenting parties. If the parties taking over the operation desire to attempt to complete the well in a formation and at a depth above that reached before the well was taken over by them, they shall notify the non-consenting parties who shall have the right either to participate or not participate in accordance with the provisions of Article VI.B.2 in the operating agreement and subject to the same penalty for failure to participate in the operations. If the parties complete in a formation below the depth reached at which such parties took over operations (but do not also complete in a

formation above that depth), the parties taking over such operation shall pay the non-consenting parties their proportionate part of the value of any pipe which could have been salvaged had the well been plugged and abandoned after deducting reasonable cost for such salvage operation.

H.      If a proposal is made pursuant hereto for the drilling, sidetracking, deepening, recompletion, or any other operation of any well hereunder where estimated costs exceed $100,000, any party electing to participate in the proposed operation, upon written request of Operator, at Operator's election, shall within fifteen (15) days after making such election either advance its portion of the proposed costs or make arrangements for such payment satisfactory to Operator.  Failure of any party either to advance its share of the costs or to make such arrangement for such payment within the fifteen (15) day period shall constitute a withdrawal of its prior election to participate in the proposed operations and an election by such party to become a non-consenting party to such operations.  If the proposal is for the drilling, deepening or sidetracking of a well, the estimated costs of the operations, exclusive of completion costs, shall be the amount to be considered in determining whether it exceeds the $100,000 provided for above and in determining the amount to be advanced or for which credit arrangements must be satisfactory to the Operator.  The provisions of this Article XV.H shall be in addition and not in lieu of other provisions of the Operating Agreement, and particularly Articles VI.B and C, and the exhibits and attachments hereto.  The rights and obligations as between Operator and other parties as Non-Operators hereto who elect to participate in the proposed operation shall not be affected for reason of Operator's failure either to require advance payment or its failure to require satisfactory credit arrangements by any other party.  If the operations proposed hereunder are not commenced within fifteen (15) days after the aforesaid fifteen (15) day period expires, Operator shall promptly return all funds paid hereunder to the Non-Operators.

I.      Notwithstanding anything to the contrary contained in this Operating Agreement or the Accounting Procedure (Exhibit "C"), the following items pertaining to the Unit Area shall not be considered as administrative overhead, but the Operator shall be entitled to make a direct charge against the Joint Account for same:

> Long distance telephone calls, fees for legal services, title costs, costs and expenses in connection with preparation and presentation of evidence and exhibits at Department of Conservation hearings, preparation and handling of application to and hearings before the Federal Power Commission and other governmental agencies or regulatory bodies.

J.      Funds received by Operator under this agreement need not be segregated or maintained by it as a separate fund but may be commingled with its own funds.

K.      Operator may, from time to time, elect to sign offers to various interstate pipeline companies allowing take or pay credits as provided in 18 C.F.R. 284.8 and 284.9.  For the limited purpose of making these offers, you hereby designate Operator as your agent and you agree to be bound by the offers of take or pay credits signed by Operator affecting sales under this agreement.

L.      Pursuant to any due diligence process which may occur as a result of a sale, transfer of interest, financing, refinancing, pre-payment or any other transaction, Operator may charge a processing fee for furnishing the requested data.  This fee will be chargeable to the non-operator, its successor, or assigns who initiates or causes the request to be made.

M.      Goodrich Oil Company shall be a signatory party to this agreement in its capacity as Operator of record with the State of Louisiana Department of Conservation and as current owner of oil and gas exploration rights in the lands comprising the Contract Area described herein.

- 14b -

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___19th___ day of ___August___, 19 93 .

### OPERATOR

WITNESSES:

BRAMMER ENGINEERING, INC.

By: _____

GOODRICH OIL COMPANY

By: _____

JAMES G. MARSTON, III
Vice President - Land

NON-OPERATORS

_____
L. R. BRAMMER, JR.

_____
IRMA MATTHEWS

_____
STUART ODEN

_____
JAMES G. MARSTON, III

_____
WALLACE H. BROWN, M.D.

_____
JOSEPH A. WADDELL, JR.

- 15 -

WITNESSES:

_____

_____                    **WALTER G. GOODRICH**
_____

_____

_____                    **KEITH EVANS**
_____

_____

_____                    **MICHAEL WATTS**
_____

_____

_____                    **W. TAYLOR MAY**
_____

_____

_____                    **ROLAND FRAUTSCHI**
_____

*Phyllis Longmire*                         **S & P CO.**

*Jim Crawford*                             By: *August Erickson*
                                               _____

                                               **AUGUST ERICKSON, General Manager**

_____                    **J. ARON & COMPANY, INC.**

_____                    By: _____

_____

_____                    **JACK R. ARON**
_____

_____

_____                    **ROBERT ARON**
_____

_____

_____                    **PETER A. ARON**
_____

_____

_____                    **DAVID MEADOWS**
_____

Signature Pages (Cont'd)
Goodrich Oil Company - Miami Fina Fee #1

**WITNESSES:**

_____

_____  LEO BROMBERG _____

_____

_____  JANE B. BORIES _____

_____  AARON OR PEGGY SELBER OIL CO.

_____  By:_____

_____  4 P's PARTNERSHIP

_____  By:_____

_____  BURKENROAD ENERGY COMPANY

_____  By:_____

_____  GOODRICH ENERGY, INC.

_____  By:_____

_____  ROBERT A. BORIES _____

_____

_____  BORIES, SMITH & SCHLIEFF

_____  By:_____

_____  W. HAROLD BROWN, II _____

_____

_____  LEO BROMERG, TRUSTEE FOR

_____  PETER LEVIN

**WITNESSES:**

_____          _____
                                         ROCHELLE RAND "F"
_____


_____          _____
                                         CHARLES REX BROWN
_____


_____          _____
                                         STEVE MORAN
_____


_____          _____
                                         JIM TORGERSON
_____


_____          _____
                                         CHARLES RODMAN
_____


_____          _____
                                         DAVID HALL
_____

## CORPORATE ACKNOWLEDGMENTS

STATE OF LOUISIANA                  §
                                    §
PARISH OF CADDO                     §

On this ____20th____ day of ____August____, 1993, before me came and appeared W. TAYLOR MAY, to me personally known, who being first duly sworn, did say that he is the Vice President of BRAMMER ENGINEERING, INC., a corporation, and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors, and that he executed same as the free act and deed of said corporation for the purposes and consideration therein expressed and in the capacity therein stated.

_Susan V. Morris_
NOTARY PUBLIC, in and for
Caddo Parish, Louisiana

My Commission is for Life.


STATE OF LOUISIANA                  §
                                    §
PARISH OF CADDO                     §

On this ____20th____ day of ____August____, 1993, before me came and appeared JAMES G. MARSTON, III, to me personally known, who being first duly sworn, did say that he is the Vice President - Land of GOODRICH OIL COMPANY, a corporation, and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors, and that he executed same as the free act and deed of said corporation for the purposes and consideration therein expressed and in the capacity therein stated.

_Debora A. Harris_
NOTARY PUBLIC, in and for
Caddo Parish, Louisiana

My Commission is for Life.

DEBORA A. HARRIS, Notary Public
Caddo Parish, Louisiana
My Commission is For Life


STATE OF _____           §
                                    §
PARISH/COUNTY OF _____       §

On this _____ day of _____, 1993, before me came and appeared _____, to me personally known, who being first duly sworn, did say that he is the _____ of _____, a corporation, and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors, and that he executed same as the free act and deed of said corporation for the purposes and consideration therein expressed and in the capacity therein stated.

_____
NOTARY PUBLIC, in and for
_____

My Commission Expires:

_____

## CORPORATE ACKNOWLEDGMENTS
### (Cont'd)

STATE OF _____ §
§
PARISH/COUNTY OF _____ §

On this _____ day of _____, 1993, before me came and appeared _____, to me personally known, who being first duly sworn, did say that he is the _____ of _____, a corporation, and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors, and that he executed same as the free act and deed of said corporation for the purposes and consideration therein expressed and in the capacity therein stated.

_____
NOTARY PUBLIC, in and for

_____

My Commission Expires:

_____

STATE OF _____ §
§
PARISH/COUNTY OF _____ §

On this _____ day of _____, 1993, before me came and appeared _____, to me personally known, who being first duly sworn, did say that he is the _____ of _____, a corporation, and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors, and that he executed same as the free act and deed of said corporation for the purposes and consideration therein expressed and in the capacity therein stated.

_____
NOTARY PUBLIC, in and for

_____

My Commission Expires:

_____

STATE OF _____ §
§
PARISH/COUNTY OF _____ §

On this _____ day of _____, 1993, before me came and appeared _____, to me personally known, who being first duly sworn, did say that he is the _____ of _____, a corporation, and that the foregoing instrument was signed on behalf of said corporation by authority of its Board of Directors, and that he executed same as the free act and deed of said corporation for the purposes and consideration therein expressed and in the capacity therein stated.

_____
NOTARY PUBLIC, in and for

_____

My Commission Expires:

_____

## PARTNERSHIP ACKNOWLEDGMENTS


STATE OF _Louisiana_          §
                             §
PARISH/~~COUNTY~~ OF _Caddo_   §

    On this _5th_ day of _October_, 1993, before me came and appeared _August E. Dickson_, to me personally known, who being first duly sworn, did say that he is the _General Manager_ of _S & P Co._, a partnership, and acknowledged that __he executed the said instrument on behalf of said partnership, pursuant to the authority of its Partnership Agreement, as the free act and deed of said partnership for the purposes and consideration therein set forth.


                        _Frances M. Bailey_
                      NOTARY PUBLIC, in and for
My Commission Expires:         _Caddo Parish, La._
_with life_

                        FRANCES M. BAILEY
                NOTARY PUBLIC, Caddo Parish, Louisiana
                     My Commission is for Life


STATE OF _____          §
                                 §
PARISH/COUNTY OF _____   §

    On this _____ day of _____, 1993, before me came and appeared _____, to me personally known, who being first duly sworn, did say that he is the _____ of _____, a partnership, and acknowledged that __he executed the said instrument on behalf of said partnership, pursuant to the authority of its Partnership Agreement, as the free act and deed of said partnership for the purposes and consideration therein set forth.


                        _____
                      NOTARY PUBLIC, in and for
My Commission Expires:         _____

_____

## INDIVIDUAL ACKNOWLEDGMENTS

STATE OF _____

PARISH/COUNTY OF _____

    On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he__ executed same as _____ free act and deed.

                                                      _____

                                                    NOTARY PUBLIC, in and for

My Commission Expires:                              _____

_____

STATE OF _____

PARISH/COUNTY OF _____

    On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he__ executed same as _____ free act and deed.

                                                       _____

                                                    NOTARY PUBLIC, in and for

My Commission Expires:                              _____

_____

STATE OF _____

PARISH/COUNTY OF _____

    On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he__ executed same as _____ free act and deed.

                                                       _____

                                                    NOTARY PUBLIC, in and for

My Commission Expires:                              _____

_____

## INDIVIDUAL ACKNOWLEDGMENTS

STATE OF _____

PARISH/COUNTY OF _____

     On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he___ executed same as _____ free act and deed.

                                      _____

                                      NOTARY PUBLIC, in and for

My Commission Expires:                         _____

_____


STATE OF _____

PARISH/COUNTY OF _____

     On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he___ executed same as _____ free act and deed.

                                        _____

                                        NOTARY PUBLIC, in and for

My Commission Expires:                         _____

_____


STATE OF _____

PARISH/COUNTY OF _____

     On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he___ executed same as _____ free act and deed.

                                        _____

                                        NOTARY PUBLIC, in and for

My Commission Expires:                         _____

_____

## INDIVIDUAL ACKNOWLEDGMENTS

STATE OF _____

PARISH/COUNTY OF _____

    On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he___ executed same as _____ free act and deed.

                                          _____

                                       NOTARY PUBLIC, in and for

My Commission Expires:                _____

_____

STATE OF _____

PARISH/COUNTY OF _____

    On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he___ executed same as _____ free act and deed.

                                            _____

                                       NOTARY PUBLIC, in and for

My Commission Expires:                _____

_____

STATE OF _____

PARISH/COUNTY OF _____

    On this _____ day of _____, 1993, before me personally came and appeared _____, to me personally known to be the person who executed the foregoing instrument and who acknowledged that ___he___ executed same as _____ free act and deed.

                                            _____

                                       NOTARY PUBLIC, in and for

My Commission Expires:                _____

_____

Attached to and made a part of that certain Operating Agreement dated August 19, 1993, by and between BRAMMER ENGINEERING, INC., as Operator, and L. R. BRAMMER, JR., ET AL, as Non-Operators covering the Goodrich Oil Company - Miami Fee #1 Well, Second Bayou Prospect, Cameron Parish, Louisiana.

## EXHIBIT "A"

**I.    LANDS COVERED BY THIS AGREEMENT:**

That certain area comprised of portions of Sections 10, 11, 12, 13, 14 and 15, Township 14 South, Range 12 West, Cameron Parish, Louisiana, as more particularly shown on Exhibit "A-1" attached hereto.

**II.    DEPTH RESTRICTIONS:** None.

**III.    NAMES, ADDRESSES AND INTERESTS OF THE PARTIES:**

| Name | Drilling | Completion | Operations | |
|------|----------|------------|------|------|
| | | | BPO | APO |
| L. R. Brammer, Jr.<br>333 Texas Street, Suite 1325<br>Shreveport, LA  71101 | .02000000 | .02000000 | .01880000 | .01760000 |
| Irma Matthews<br>9417 Oleander Drive<br>Shreveport, LA  71118 | .00060000 | .00060000 | .00060000 | .00060000 |
| Stuart Oden<br>Post Office Box 1806<br>Shreveport, LA  71162-1806 | | | | .01900000 |
| James G. Marston, III<br>Post Office Box 1932<br>Shreveport, LA  71166 | | | | .01900000 |
| Wallace H. Brown, M.D.<br>c/o Charles L. Williams, CPA<br>3218 Line Avenue, Suite 217<br>Shreveport, LA  71101 | .05700000 | .05700000 | .04750000 | .04309030 |
| Joe Waddell<br>406 Travis Street, Suite 900<br>Shreveport, LA  71101 | .00380000 | .00380000 | .00316666 | .00287268 |
| Walter G. Goodrich<br>333 Texas Street, Suite 1350<br>Shreveport, LA  71101 | .01000000 | .01000000 | .01000000 | .02807169 |
| Keith Evans<br>333 Texas Street, Suite 1325<br>Shreveport, LA  71101 | .00220000 | .00220000 | .00280000 | .00340000 |

| Name | Drilling | Completion | Operations | |
|------|----------|------------|------|------|
| | | | BPO | APO |
| Michael Watts<br>333 Texas Street, Suite 1350<br>Shreveport, LA 71101 | .00475000 | .00475000 | .00475000 | .02330900 |
| W. Taylor May<br>333 Texas Street, Suite 1325<br>Shreveport, LA 71101 | .00220000 | .00220000 | .00280000 | .00340000 |
| Roland Frautschi<br>333 Texas Street, Suite 1350<br>Shreveport, LA 71101 | | | | .01900000 |
| S & P Company<br>Post Office Box 3735<br>Shreveport, LA 71133-3735 | .16500000 | .16500000 | .15000000 | .11250000 |
| J. Aron & Company, Inc.<br>336 Magazine Street<br>New Orleans, LA 70130 | .12540000 | .10450000 | .10450000 | .09823000 |
| Jack R. Aron<br>336 Magazine Street<br>New Orleans, LA 70130 | .04560000 | .03800000 | .03800000 | .03572000 |
| Robert Aron<br>336 Magazine Street<br>New Orleans, LA 70130 | .03420000 | .02850000 | .02850000 | .02679000 |
| Peter A. Aron<br>336 Magazine Street<br>New Orleans, LA 70130 | .02280000 | .01900000 | .01900000 | .01786000 |
| David Meadows<br>333 Texas Street, Suite 1350<br>Shreveport, LA 71101 | | | | .01900000 |
| Leo Bromberg<br>c/o Goodrich Oil Company<br>Attention: Roland Frautschi<br>333 Texas Street, Suite 1350<br>Shreveport, LA 71101 | | | | .01500000 |
| Jane B. Bories<br>336 Magazine Street<br>New Orleans, LA 70130 | .01710000 | .01425000 | .01425000 | .01339500 |
| Aaron or Peggy Selber Oil Co.<br>Post Office Box 21830<br>Shreveport, LA 71120 | .01710000 | .01425000 | .01425000 | .01339500 |
| 4 P's Partnership<br>Post Office Box 21830<br>Shreveport, LA 71120 | .01140000 | .00950000 | .00950000 | .00893000 |

| Name | Drilling | Completion | Operations BPO | *APO* |
|---|---|---|---|---|
| Burkenroad Energy Company<br>336 Magazine Street<br>New Orleans, LA 70130 | .05700000 | .04750000 | .04750000 | .04465000 |
| Goodrich Energy, Inc.<br>333 Texas Street, Suite 1350<br>Shreveport, LA 71101 | .11905000 | .17795000 | .21258334 | .19923603 |
| Robert A. Bories<br>336 Magazine Street<br>New Orleans, LA 70130 | .01140000 | .00950000 | .00950000 | .00893000 |
| Bories, Smith & Schlieff<br>336 Magazine Street<br>New Orleans, LA 70130 | .01140000 | .00950000 | .00950000 | .00893000 |
| W. Harold Brown, II<br>c/o Charles L. Williams, CPA<br>3218 Line Avenue, Suite 217<br>Shreveport, LA 71101 | .02850000 | .02850000 | .02375000 | .02154515 |
| Leo Bromberg, Trustee for<br>Peter Levin<br>c/o Goodrich Oil Company<br>Attention: Roland Frautschi<br>333 Texas Street, Suite 1350<br>Shreveport, LA 71101 | .10000000 | .10000000 | .10000000 | .07500000 |
| Rochelle Rand "F"<br>c/o Goodrich Oil Company<br>Attention: Roland Frautschi<br>333 Texas Street, Suite 1350<br>Shreveport, LA 71101 | .10000000 | .10000000 | .10000000 | .07500000 |
| Charles Rex Brown<br>c/o Charles L. Williams, CPA<br>3218 Line Avenue, Suite 217<br>Shreveport, LA 71101 | .02850000 | .02850000 | .02375000 | .02154515 |
| Jim Torgerson<br>333 Texas Street, Suite 1325<br>Shreveport, LA 71101 | .00200000 | .00200000 | .00200000 | .00200000 |
| Charles R. Rodman<br>333 Texas Street, Suite 1325<br>Shreveport, LA 71101 | .00100000 | .00100000 | .00100000 | .00100000 |
| David Hall<br>333 Texas Street, Suite 1325<br>Shreveport, LA 71101 | .00100000 | .00100000 | .00100000 | .00100000 |

Page 3 of Exhibit "A"
Goodrich Oil Company - Miami Fee #1
Cameron Parish, Louisiana

| Name | Drilling | Completion | Operations | |
|------|----------|------------|------------|------|
| | | | BPO | *APO* |
| Stephen G. Moran<br>333 Texas Street, Suite 1325<br>Shreveport, LA 71101 | .00100000 | .00100000 | .00100000 | .00100000 |
| | 1.00000000 | 1.00000000 | 1.00000000 | 1.00000000 |

*APO* -- The APO Operations interests shown above are subject to revision relative to the option of Texaco Exploration and Production, Inc. to either increase its overriding royalty interest at payout or to convert the overriding royalty interest to a working interest at payout, pursuant to that certain Oil and Gas Lease effective April 15, 1993, between Texaco and Goodrich Oil Company.

- - - END OF EXHIBIT "A" - - -

Attached to and made a part of that certain Operating Agreement dated August 19, 1993, by and between BRAMMER ENGINEERING, INC., as Operator, and L. R. BRAMMER, JR., ET AL, as Non-Operators, covering the Goodrich Oil Company - Miami Fee #1 Well, Second Bayou Prospect, Cameron Parish, Louisiana.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EXHIBIT "A-1"



CONTRACT AREA  ━ ━ ━ ━ ━

Portions of Sections 10, 11, 12, 13, 14, and 15
Township 14 South, Range 12 West
Cameron Parish, Louisiana

FORM 601,   BOX 800
TULSA OK 74101

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT " C "

Attached to and made a part of __that certain Operating Agreement dated August 19, 1993, by and between Brammer Engineering, Inc., as Operator, and L. R. Brammer, Jr., et al, as Non-Operators, covering the Goodrich Oil Company -Miami Fee #1 Well, Second Bayou Prospect, Cameron Parish, Louisiana.__

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1.  Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

### 2.  Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3.  Advances and Payments by Non-Operators

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the ~~prime rate in effect~~ of 1½% ──────────────── on the first day of the month in which delinquency occurs ~~plus 1%~~ or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4.  Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after ~~twenty-four (24)~~ _twelve (12)_ months following the end of any such calendar year, unless within the said ~~twenty-four (24)~~ _twelve (12)_ month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.

COPAS - 1984 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

**COPAS**

**5.    Audits**

A.    A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.    The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

**6.    Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.    Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

**2.    Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**3.    Labor**

A.    (1)    Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2)    Salaries of First Level Supervisors in the field.

(3)    Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)    Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.    Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.    Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

E.    Operator shall charge for services rendered by Operator's engineers and field personnel directly employed on the joint property based on Operator's customary fees for consulting services.

**4.    Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5.  **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.  **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.  If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.  In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.  **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.  **Equipment and Facilities Furnished By Operator**

A.  Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ten_____ percent ( __10__ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.  **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.  **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.  **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



## 12. Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

## 13. Abandonment and Reclamation

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

## 14. Communications

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

## 15. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

### 1. Overhead – Drilling and Producing Operations

i.   As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or
(   ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(   ) shall be covered by the overhead rates, or
( x ) shall not be covered by the overhead rates.

iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(   ) shall be covered by the overhead rates, or
( x ) shall not be covered by the overhead rates.

### A. Overhead – Fixed Rate Basis

(1)  Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $ 8,000
(Prorated for less than a full month)

Producing Well Rate $ 800

(2)  Application of Overhead – Fixed Rate Basis shall be as follows:

(a)  Drilling Well Rate

(1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

COPAS - 1984 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2)   Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)   Producing Well Rates

(1)   An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2)   Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)   An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)   A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)   All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)   The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

(4) Operator shall charge a monthly Royalty Disbursement Fee of $50.00 per division order.

B.   Overhead - Percentage Basis

(1)   Operator shall charge the Joint Account at the following rates:

(a)   Development

_____ Percent (____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b)   Operating

_____ Percent (____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2)   Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.   **Overhead – Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS - 1984 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ __25,000.00__ :

A. ____5____ % of first $100,000 or total cost if less, plus

B. ____4____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ____3____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

**3. Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ____5____ % of total costs through $100,000; plus

B. ____4____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ____3____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**4. Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1. Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2. Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

(a) Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



pound Oil Field Haulers Association interstate truck rate shall be used.

    (c)    Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

    (d)    Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

  (2)    Line Pipe

    (a)    Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (b)    Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

    (c)    Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

    (d)    Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

  (3)    Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

  (4)    Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

**B.**    Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1)    Material moved to the Joint Property

      At seventy-five percent (75%) of current new price, as determined by Paragraph A.

  (2)    Material used on and moved from the Joint Property

    (a)    At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

    (b)    At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

  (3)    Material not used on and moved from the Joint Property

      At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

**C.**    Other Used Material

  (1)    Condition C

      Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

**3.   Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

**4.   Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

**1.   Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

**2.   Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

**3.    Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

**4.    Expense of Conducting Inventories**

A.    The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.    The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## EXHIBIT "D"
### (Revised 6/1/93)

Attached to and made a part of that certain Operating Agreement dated August 19, 1993, by and between BRAMMER ENGINEERING, INC., as Operator, and L. R. BRAMMER, JR., ET AL, as Non-Operators, covering the Goodrich Oil Company - Miami Fee #1 Well, Second Bayou Prospect, Cameron Parish, Louisiana.

## INSURANCE

A.  Workmen's Compensation Insurance in an amount equal to the full liability imposed by the laws of the state in which the operation takes place.

B.  Employer's Liability Insurance with limits of not less than $500,000.00 for the accidental injury or death of one or more employees.

C.  Comprehensive General Public Liability Insurance with a combined single limit of $1,000,000.00 for bodily injury and property damage with limits of $1,000,000.00 for each such occurrence and $1,000,000.00 aggregate for products and completed operations.

D.  Automobile Public Liability Insurance with combined single limit of $1,000,000.00 bodily injury and property damage.

E.  Comprehensive Catastrophe Liability Policy for Bodily Injury or Property Damage with a limit of $15,000,000.00 for each occurrence and $15,000,000.00 aggregate provided such insurance is available at rates considered reasonable by Operator. This is excess insurance to the underlying policy limits above and carries a self-insured retention limit of $25,000.00.

F.  For certain wells selected by Operator for coverage: Operator's Extra Expense (Control of Well) with a limit of $15,000,000.00 on drilling wells. This coverage is limited and may be terminated after the well is completed.

G.  Losses for which no insurance is required to be carried or in excess of the limits set forth above, shall be borne by the parties in proportion to their respective interests herein and shall be charged to the joint account.

H.  The premiums for all such insurance policies shall be charged to the joint account.

I.  The Comprehensive General Liability Insurance carries an Additional Insured Working Interest endorsement substantially as follows:

The unqualified word "insured" shall, with respect to development and operation of gas and oil properties by the named insured, is amended to include as an Insured any owner, co-owner, number of joint venture or partner having a non-operating working interest in any oil and gas lease in which the Named Insured has an interest and for whom the Named Insured is responsible for arranging insurance, but only with respect to their liability arising out of such non-operating working interest. The policy is further amended to provide coverage to the insured for non-operating working interest in any oil or gas lease as a co-partner, joint venturer or mining partner.

J.  Insurance coverage is not optional and all working interest owners agree to pay their proportionate share of all such charges made to the joint account. Operator's policy contemplates that all working interest owners are indirect beneficiaries regardless of their primary coverage.

K.    Goodrich Oil Company, listed as Operator in the Louisiana Department of Conservation records and current owner of the Contract Area described in the agreement to which this Exhibit "D" is attached, shall be named by Brammer Engineering, Inc., as an additional insured under its general liability insurance policy to the extent that said policy covers and affects operations subject to this agreement.

## EXHIBIT "E"

# GAS BALANCING AGREEMENT

Attached to and made a part of that certain Operating Agreement dated August 19, 1993, by and between BRAMMER ENGINEERING, INC., as Operator, and L. R. BRAMMER, JR., ET AL, as Non-Operators, covering the Goodrich Oil Company - Miami Fee #1 Well, Second Bayou Prospect, Cameron Parish, Louisiana.

**1.    Ownership of Gas Production**

(a)    It is the intent of the parties that each party shall have the right to take in kind and separately dispose of its proportionate share of gas (including casinghead gas) produced from each formation in each well located on acreage ("Contract Area") covered by the Operating Agreement to which this Exhibit is attached ("Operating Agreement").

(b)    Operator shall control the gas production and be responsible for administering the provisions of this Agreement and shall make reasonable efforts to deliver or cause to be delivered gas to the parties' gas purchasers as may be required in order to balance the accounts of the parties in accordance with the provisions herein contained. For purposes of this Agreement, Operator shall maintain production accounts of the parties based upon the number of MMBtu's actually contained in the gas produced from a particular formation in a well and delivered at the outlet of lease equipment for each party's account regardless of whether sales of such gas are made on a wet or dry basis. All references in this Agreement to quantity or volume shall refer to the number of MMBtu's contained in the gas stream. Toward this end, Operator shall periodically determine or cause to be determined the Btu content of gas produced from each formation in each well on a consistent basis and under standard conditions pursuant to any method customarily used in the industry.

**2.    Balancing of Production Accounts**

(a)    Any time a party, or such party's purchaser, is not taking or marketing its full share of gas produced from a particular formation in a well ("non-marketing" party), the remaining parties ("marketing" parties) shall have the right, but not the obligation, to produce, take, sell and deliver for such marketing parties' accounts, in addition to the full share of gas to which the marketing parties are otherwise entitled, all or any portion of the gas attributable to a non-marketing party. (Gas attributable to a non-marketing party, taken by a marketing party, is referred to in this Agreement as "overproduction"). If there is more than one marketing party taking gas attributable to a non-marketing party, each marketing party shall be entitled to take a non-marketing party's gas in the ratio that such marketing party's interest in production bears to the total interest in production of all marketing parties.

(b)    A party that has not taken its proportionate share of gas produced from any formation in a well ("Underproduced Party") shall be credited with gas in storage equal to its share of gas produced but not taken, less its share of gas used in lease operations, vented or lost ("underproduction"). Such Underproduced Party, upon giving timely written notice to Operator, shall be entitled, on a monthly basis beginning the month following receipt of notice, to produce, take, sell and deliver, in addition to the full share of gas to which such party is otherwise entitled, a quantity of gas ("make-up gas") equal to fifty percent (50%) of the total share of gas attributable to all parties having cumulative overproduction (individually called "Overproduced Party"). Such make-up gas shall be credited against such Underproduced Party's accrued underproduction in order of accrual. Notwithstanding the foregoing and subject to subsection (e) below: (i) an Overproduced Party shall never be obligated to reduce its takes to less than fifty percent (50%) of the quantity to which such party is otherwise entitled and (ii) an Underproduced Party shall never be allowed to make up underproduction during the months of December, January, February and March.

(c)    If there is more than one Underproduced Party desiring make-up gas, each such Underproduced Party shall be entitled to make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then desiring make-up gas. Any portion of the make-up gas to which an Underproduced Party is entitled and which is not taken by such Underproduced Party may be taken by any other Underproduced Party(ies).

(d)    If there is more than one Overproduced Party required to furnish make-up gas, each such Overproduced Party shall furnish make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then required to furnish make-up gas. Except as provided in (e) below, each Overproduced Party in any formation in a well shall be entitled, on a monthly basis, to take its full share of gas less its share of the make-up gas then being produced from the particular formation in the well in which it is overproduced.

(e)    If Operator in good faith believes that an Overproduced Party has recovered one hundred percent (100%) of such Overproduced Party's share of the recoverable reserves from a particular formation in a well, such Overproduced Party, upon being notified in writing of such fact by Operator, shall cease taking gas from such formation in such well and the remaining parties shall be entitled to take one hundred percent (100%) of such production until the accounts of the parties are balanced. Thereafter, such Overproduced Party shall again have the right to take its share of the remaining production, if any, in accordance with the provisions herein contained. Notwithstanding anything to the contrary herein, after an Overproduced Party has recovered one hundred percent (100%) of its full share of the recoverable reserves as so determined by Operator from a particular formation in a well, such Overproduced Party may continue to produce if such continued production is (i) necessary for lease maintenance purposes or (ii) permitted by a majority of interest of the parties who have not produced one hundred percent (100%) of their recoverable reserves from such formation in such well after written ballot conducted by Operator.

3. **Cash Balancing Upon Depletion**

   (a)     If gas production from a particular formation in a well ceases and no attempt is made to restore production (or substitute therefor) within sixty (60) days, Operator shall distribute, within ninety (90) days of the date the well last produced gas from such formation, a statement of net unrecouped underproduction and overproduction and the months and years in which such unrecouped production accrued ("final accounting").

   (b)     Within thirty (30) days of receipt of such final accounting, each Overproduced Party shall remit to Operator for disbursement to the Underproduced Parties, a sum of money (which sum shall not include interest) equal to the amount actually received or constructively received under subparagraph (e) below, by Overproduced Party for sales during the month(s) of overproduction, calculated in order of accrual but less applicable taxes, royalties and reasonable costs of marketing and transporting such gas actually paid by such Overproduced Party. Such remittance shall be based on number of MMBtu's of overproduction and shall be accompanied by a statement showing volumes and prices for each month with accrued unrecouped overproduction.

   (c)     Within thirty (30) days of receipt of any such remittance by Operator from an Overproduced Party, Operator shall disburse such funds to the Underproduced Party(ies) in accordance with the final accounting. Operator assumes no liability with respect to any such payment (unless such payment is attributable to Operator's overproduction), it being the intent of the parties that each Overproduced Party shall be solely responsible for reimbursing each Underproduced Party for such Underproduced Party's respective share of overproduction taken by such Overproduced Party in accordance with the provisions herein contained. If any party fails to pay any sum due under the terms hereof after demand therefor by the Operator, the Operator may turn responsibility for the collection of such sum to the party or parties to whom it is owed, and Operator shall have no further responsibility for collection.

   (d)     In determining the amount of overproduction for which settlement is due, production taken during any month by an Underproduced Party in excess of such Underproduced Party's share shall be treated as make-up and shall be applied to reduce prior deficits in the order of accrual of such deficits.

   (e)     An Overproduced Party that took gas in kind for its own use, sold gas to an affiliate, or otherwise disposed of gas in other than a cash sale shall pay for such gas at market value at the time it was produced, even if the Overproduced Party sold such gas to an affiliate at a price greater or lesser than market value.

   (f)     If refunds are later required by any governmental authority, each party shall be accountable for its respective share of such refunds as finally balanced hereunder.

4. **Deliverability Tests**

   At the request of any party, Operator may produce the entire well stream for a deliverability test not to exceed seventy-two (72) hours in duration (or such longer period of time as may be mutually agreed upon by the parties) if required under such requesting party's gas sales or transportation contract.

5. **Nominations**

   Each party shall, on a monthly basis, give Operator sufficient time and data either to nominate such party's respective share of gas to the transporting pipeline(s) or, if Operator is not nominating such party's gas, to inform Operator of the manner in which to dispatch such party's gas. Except as and to the extent caused by Operator's gross negligence or willful misconduct, Operator shall not be responsible for any fees and/or penalties associated with imbalances charged by any pipeline to any Underproduced or Overproduced Party(ies).

6. **Statements**

   On or before the twenty-fifth (25th) day of the month following the month of production, each party taking gas shall furnish or cause to be furnished to Operator a statement of gas taken expressed in terms of MMBtu's. If actual volume information sufficient to prepare such statement is not made available to the taking party in sufficient time to prepare it, such taking party shall nevertheless furnish a statement of its good faith estimate of volumes taken. Within twenty (20) days of the receipt of all such statements, Operator shall furnish to each party a statement of the gas balance among the parties, including the total quantity of gas produced from each formation in each well, the portion thereof used in operations, vented or lost, and the total quantity delivered for each party's account. Any error or discrepancy in Operator's monthly statement shall be promptly reported to Operator and Operator shall make a proper adjustment thereof within thirty (30) days after final determination of the correct quantities involved; provided, however, that if no errors or discrepancies are reported to Operator within two (2) years from the date of any statement, such statement shall be conclusively deemed to be correct. Additionally, within thirty (30) days from the end of each calendar year, non-operators shall furnish to Operator, for the sole purpose of establishing records sufficient to verify cash balancing values, a statement reflecting amounts actually received or constructively received under paragraph 3(e), on a monthly basis for the calendar year preceding the immediately concluded calendar year. Operator shall not allow a party to produce gas for its account during any month when such party is delinquent in so furnishing the monthly or annual statements.

7. **Payment of Taxes**

   Each party taking gas shall pay or cause to be paid any and all production, severance, utility, sales, excise, or other taxes due on such gas.

8. **Operating Expenses**

   The Operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using gas or whether the sales and use of each are in proportion to their respective interests in such gas.

- 2 -

9.    **Overproducing Allowable**
Each party shall give Operator sufficient time and data to enable Operator to make appropriate nominations, forecasts and/or filings with the regulatory bodies having jurisdiction to establish allowables. Each party shall at all times regulate its takes and deliveries from the Contract Area so that the well(s) covered hereby shall not be curtailed and/or shut-in for overproducing the allowable production assigned thereto by the regulatory body having jurisdiction.

10.   **Payment of Leasehold Burdens**
At all times while gas is produced from the Contract Area, each party agrees to make appropriate settlement of all royalties, overriding royalties and other payments out of or in lieu of production for which such party is responsible just as if such party were taking or delivering to a purchaser such party's full share, and such party's full share only, of such gas production exclusive of gas used in operations, vented or lost, and each party agrees to indemnify and hold each other harmless from and all claims relating thereto.

11.   **Application of Agreement**
The provisions of this Agreement shall be separately applicable and shall constitute a separate agreement with respect to gas produced from each formation in each well located on the Contract Area.

12.   **Term**
This Agreement shall terminate when gas production under the Operating Agreement permanently ceases and the accounts of the parties are finally settled in accordance with the provisions herein contained.

13.   **Operator's Liability**
Except as otherwise provided herein, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

14.   **Audits**
Any Underproduced Party shall have the right for a period of two (2) years after receipt of payment pursuant to a final accounting and after giving written notice to all parties, to audit an Overproduced Party's accounts and records relating to such payment. Any Overproduced Party shall have the right for a period of two (2) years after tender of payment for unrecouped volumes and upon giving written notice to all parties, to audit an Underproduced Party's records as to volumes. The party conducting such audit shall bear its costs of the audit. Additionally, Operator shall have the right for a period of two (2) years after receipt of an annual statement from a non-operator under paragraph 6 after giving written notice to the affected non-operator, to audit such non-operator's accounts and records relating to such payment. Costs of such audit shall be borne by the joint account.

15.   **Successors and Assigns**
The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties and to their respective successors and assigns, and may be assigned in whole or in part from time to time; provided, however, that (a) any such assignment shall be made subject to this Agreement and as among the parties shall not be valid without the express written acceptance of the terms of this Agreement by the Assignee, (b) the Assignee shall acquire such interest subject to any overproduction and/or underproduction imbalances existing at such time as well as any cash balancing obligation created thereby and (c) no such assignment shall relieve the Assignor from any obligation to the other parties with respect to any overproduction taken by Assignor prior to such assignment.

16.   **Liquefiable Hydrocarbons Not Covered Under Agreement**
The parties shall share proportionately in and own all liquid hydrocarbons recovered with the gas by lease equipment in accordance with their respective interests.

17.   **Conflict**
If there is a conflict between the terms of this Agreement and the terms of any gas sales contract covering the Contract Area entered into by any party, the terms of this Agreement shall govern.

18.   **Arbitration**
Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award may be entered in any Court having jurisdiction thereof. The arbitrator shall not award punitive damages in settlement of any controversy or claim.

JOABAL.EXE

# BRAMMER ENGINEERING, INC.

Petroleum Engineering Services
Oil & Gas Operations

Office Phone (318) 429-2345
FAX No. 429-2340

August 25, 1993

Interested Parties

Re:   Goodrich Oil Company - Miami Fee #1
      Sabine National Wildlife Refuge
      Cameron Parish, Louisiana

Gentlemen:

Enclosed for your review and approval in duplicate is a drilling and completion AFE for the subject well.  Also enclosed is a prebill for your proportionate share of the estimated drilling cost.

The drilling cost is high due mainly to an expensive location, the stringent guidelines which we have to operate under while working in the Refuge (i.e. closed loop mud system, total waste haul off, etc.) and the well being directional.

Please sign and return one copy of the enclosed AFE along with a check for your share of the estimated drilling costs as soon as possible.  We anticipate having a rig sometime next week and need to commence drilling operations as soon as possible.  If you have any questions, please call.

Sincerely,

Keith J. Evans

KJE:ds

Enclosures

Commercial National Tower        333 Texas Street, Suite 1325        Shreveport, Louisiana 71101-5323

# BRAMMER ENGINEERING, INC.

### AUTHORITY FOR EXPENDITURE
### (AFE)

| | | | |
|---|---|---|---|
| OPERATOR AND WELL: | **GOODRICH OIL CO. - MIAMI FEE #1** | DATE: | 8/22/93 |
| LOCATION: | **Section 13 - T14S - R12W** | DO NUMBER: | |
| PARISH: | **CAMERON**    STATE: **LOUISIANA** | FIELD: | **SECOND BAYOU** |
| PROPOSED TD: | 8000' TVD | OBJECTIVE HORIZON: | |
| LOGS: | DISFL/Sonic; RFT's | | |
| CORES: | Sidewall Only | MUD LOGGER: | DAL Unit |

| Classification of Account | *Items Included In Turnkey | DRILLING (Daywork) | COMPLETION (Single) | | |
|---|---|---|---|---|---|
| **WELL EQUIPMENT** | | | | | |
| Casing:  Conductor: | 16" to refusal | $4,000 | | | |
| Surface: | 1400'-10 3/4",40.5#,J-55,STC | $18,600 | | | |
| Production: | 8200' - 5 1/2",17#,J-55,LTC | | $49,200 | | |
| Protection: | | | | | |
| Liner: | | | | | |
| Tubing | 8200' - 2 3/8",4.7#,J-55,EUE | | 17,200 | | |
| Sucker Rods | | | | | |
| Subsurface Equipment | | | | | |
| Wellhead Equipment | | 2,500 | 14,000 | | |
| Pumping Unit & Engine | | | | | |
| **TOTAL WELL EQUIPMENT** | | **$25,100** | **$80,400** | | |
| | | | | | |
| **LEASE EQUIPMENT** | | | | | |
| Lease Tanks | | | | | |
| Separators, Heaters, Meter Run, Etc. | | | 8,000 | | |
| Dehydrator/Treater | | | | | |
| Flowline            (4000') | | | 16,000 | | |
| Other | | | | | |
| **TOTAL LEASE EQUIPMENT** | | **$0** | **$24,000** | | |
| **TOTAL WELL AND LEASE EQUIPMENT** | | **$25,100** | **$104,400** | | |
| | | | | | |
| **INTANGIBLE DRILLING & COMPLETION** | | | | | |
| Surveying & Permits | | $8,000 | | | |
| Location Preparation & Damages      (Incl Mitigation) | | 180,000 | 65,000 | | |
| Restore Location | | 15,000 | | | |
| Water Well or Supply | | 2,000 | | | |
| Rig Mob/Demob | | 20,000 | | | |
| Drilling Cost | | | | | |
| Day Work - Rotary Tools      14 Days | | 74,200 | 7,500 | | |
| Fuel/Power | | | | | |
| Drilling Equipment and Tool Rental | | 12,000 | | | |
| Directional Drlg Tools & Services | | 20,000 | | | |
| Fishing Tools & Services | | | | | |
| Bits | | 13,000 | 500 | | |
| Drilling Mud & Chemicals | | 12,000 | 1,500 | | |
| Mud System Eqpt Rental      (Closed Loop) | | 35,000 | 2,500 | | |
| Casing Crews & Tools | | 6,000 | 7,000 | | |
| Float Equipment, Centralizers, Etc. | | 1,500 | 3,000 | | |
| Cement & Cement Services | | 10,000 | 18,000 | | |
| Service Labor/Welding            (Incl Security) | | 17,000 | 11,000 | | |
| Cores & Core Analysis | | 3,000 | | | |
| Mud Logging Unit            DAL Unit | | 3,000 | | | |
| Drill Stem Tests | | | | | |
| Well Surveys & Logging | | 25,000 | 7,000 | | |
| Completion Rig & Equipment | | | 35,000 | | |
| Comp/WO Equipment & Tool Rental | | | 7,000 | | |
| Comp Fluids            (Incl gravel pack) | | | 25,000 | | |
| Perforate/Set Packers, Etc. | | | 8,000 | | |
| Wire Line Packers, Nipples, Etc. | | | 25,000 | | |
| Test Pipe | | | 2,000 | | |
| Stimulation, Etc. | | | | | |
| GPM/Well Test | | | 5,000 | | |
| Saltwater/Mud/Cuttings Disposal | | 35,000 | 2,000 | | |
| Tugs/Boats/Barges | | | | | |
| Trucking/Hauling/Dock Services | | 45,000 | 5,000 | | |
| Communication | | 3,500 | 1,500 | | |
| Geological & Engineering | | 11,000 | 6,000 | | |
| Overhead Expense | | 3,000 | 1,500 | | |
| Insurance            (Including OEE) | | 18,000 | | | |
| Plug & Abandon | | 25,000 | | | |
| Miscellaneous & Unforeseen | | 34,700 | 16,600 | | |
| **TOTAL INTANGIBLE DRILLING & WELL COMPLETION** | | **$609,900** | **$262,600** | | |
| | | | | | |
| **TANK BATTERY AND GATHERING SYSTEM INSTALLATION** | | | | | |
| Non-Controlled Conn., Etc. | | | $8,000 | | |
| Set Surface Equipment | | | 5,000 | | |
| Lay Flowline | | | 20,000 | | |
| **TOTAL INSTALLATION** | | **$0** | **$33,000** | | |
| **TOTAL INTANGIBLE DRILLING AND COMPLETION** | | **$609,900** | **$295,600** | | |
| | | | | | |
| **TOTAL DRILLING AND COMPLETION COST** | | **$635,000** | **$400,000** | | |

APPROVED:  S & P Co

By:  *R. A. Merrill*
       R. G. Merrill, Operations Manager

DATE:  8/30/93

## GOODRICH OIL COMPANY -MIAMI FEE #1
### Second Bayou Field
### Cameron Parish, Louisiana

8/26/93

| OWNER NAME | DRILLING INTEREST | ESTIMATED DRILLING COSTS | COMP. INTEREST | ESTIMATED COMPLETION COSTS |
|---|---|---|---|---|
| L. R. Brammer, Jr. | .04850000 | $30,798 | .04850000 | $19,400 |
| Irma Matthews | .00150000 | $953 | .00150000 | $600 |
| Wallace H. Brown, MD | .05700000 | $36,195 | .05700000 | $22,800 |
| Joe Waddell | .00380000 | $2,413 | .00380000 | $1,520 |
| Walter G. Goodrich | .02375000 | $15,081 | .02375000 | $9,500 |
| Michael Watts | .00475000 | $3,016 | .00475000 | $1,900 |
| S&P Company | .16500000 | $104,775 | .16500000 | $66,000 |
| J. Aron & Company Inc. | .12540000 | $79,629 | .10450000 | $41,800 |
| Jack R. Aron | .04560000 | $28,956 | .03800000 | $15,200 |
| Robert Aron | .03420000 | $21,717 | .02850000 | $11,400 |
| Peter A. Aron | .02280000 | $14,478 | .01900000 | $7,600 |
| Jane B. Bories | .01710000 | $10,858 | .01425000 | $5,700 |
| Aaron or Peggy Selber Oil | .01710000 | $10,858 | .01425000 | $5,700 |
| 4 P's Partnership | .01140000 | $7,239 | .00950000 | $3,800 |
| Burkenroad Energy Co. | .05700000 | $36,195 | .04750000 | $19,000 |
| Goodrich Energy Inc. | .11380000 | $72,263 | .17270000 | $69,080 |
| Robert A. Bories | .01140000 | $7,239 | .00950000 | $3,800 |
| Bories, Smith & Schleiff | .01140000 | $7,239 | .00950000 | $3,800 |
| W. Harold Brown II | .02850000 | $18,098 | .02850000 | $11,400 |
| Leo Bromberg, Tr-Peter Levin | .10000000 | $63,500 | .10000000 | $40,000 |
| Rochelle Rand "F" | .10000000 | $63,500 | .10000000 | $40,000 |
| | 1.00000000 | $635,000 | 1.00000000 | $400,000 |