

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

May 1, _____, 19 93 ,

OPERATOR ____Fuel Resources, Inc._____

CONTRACT AREA ___Willow Springs Field_____

Toler #2 Well
_____

_____

COUNTY OR PARISH OF _____Gregg_____ STATE OF ____Texas_____

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610  ·  1982  REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between _____Fuel Resources, Inc._____

_____, hereinafter designated and referred to as ''Operator'', and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as ''Non-Operator'', and collectively as ''Non-Operators''.

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit ''A'', and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term ''oil and gas'' shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms ''oil and gas lease'', ''lease'' and ''leasehold'' shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term ''oil and gas interests'' shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term ''Contract Area'' shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit ''A''.

E. The term ''drilling unit'' shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term ''drillsite'' shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms ''Drilling Party'' and ''Consenting Party'' shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms ''Non-Drilling Party'' and ''Non-Consenting Party'' shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit ''A'', shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☐ B. Exhibit ''B'', Form of Lease.
☒ C. Exhibit ''C'', Accounting Procedure.
☒ D. Exhibit ''D'', Insurance.
☒ E. Exhibit ''E'', Gas Balancing Agreement.
☒ F. Exhibit ''F'', Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit ''G'', Tax Partnership.

If any provision of any exhibit, except Exhibits ''E'' and ''G'', is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

# ARTICLE III.
## INTERESTS OF PARTIES

A.  Oil and Gas Interests:

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.  Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of ~~royalties to the extent of~~ existing lease burdens _____ which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.  Excess Royalties, Overriding Royalties and Other Payments:

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.  Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

    1.  If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

    2.  If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

# ARTICLE IV.
## TITLES

A.  Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐  Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
#### continued

1  ☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7  　　　Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10  This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12  　　　No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13  provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14  ticipate in the drilling of the well.
15
16  B.  Loss of Title:
17
18  　　　1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19  reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20  from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21  tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22  and gas leases and interests; and,
23  　　　(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24  entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25  but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26  　　　(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27  been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
28  curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29  Area by the amount of the interest lost;
30  　　　(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31  increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32  terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33  well;
34  　　　(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35  failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36  who bore the costs which are so refunded;
37  　　　(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38  borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39  　　　(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40  claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41  connection therewith.
42
43  　　　2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
44  payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45  there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46  payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47  which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48  date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49  the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50  required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51  the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52  shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53  or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54  　　　(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55  up to the amount of unrecovered costs;
56  　　　(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57  oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58  termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59  portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,
60  　　　(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61  lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62
63  　　　3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64  and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65  the Contract Area.
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE V.

OPERATOR

A. Designation and Responsibilities of Operator:

Fuel Resources, Inc. _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit ''A'' remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit ''A''; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit ''A'' remaining after excluding the voting interest of the Operator that was removed.

C. Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D. Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area ~~and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced~~, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

A. Initial Well:                    Not Applicable.

On or before the _____ day of _____ , 19_____ , Operator shall commence the drilling of a well for oil and gas at the following location:


and shall thereafter continue the drilling of the well with due diligence to


unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  ~~If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the~~
2  ~~well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.~~
3
4
5
6  B.  Subsequent Operations:
7
8      1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided
9  for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10 the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11 other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12 tion and the estimated cost of the operation. The parties receiving such a notice shall have ~~fifteen (15)~~ thirty (30) days after receipt of the notice
13 within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
14 ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15 limited to ~~forty-eight (48)~~ twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within
16 the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17 response given by telephone shall be promptly confirmed in writing.
18
19
20
21     If all parties elect to participate in such a proposed operation, Operator shall, within ~~ninety (90)~~ sixty (60) days after expiration of the notice
22 period of ~~thirty (30)~~ fifteen (15) days (or as promptly as possible after the expiration of the ~~forty-eight (48)~~ twenty-four (24) hour period when a drilling rig is on loca-
23 tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24 ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25 for a period of up to ~~thirty (30)~~ fifteen (15) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26 permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27 amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
28 actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29 if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30 dance with the provisions hereof as if no prior proposal had been made.
31
32
33
34     2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
35 No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36 giving the notice and such other parties as shall elect to participate in the operation shall, within ~~ninety (90)~~ sixty (60) days after the expiration of
37 the notice period of ~~thirty (30)~~ fifteen (15) days (or as promptly as possible after the expiration of the ~~forty-eight (48)~~ twenty-four (24) hour period when a drilling rig is
38 on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
39 work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40 a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41 tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
42 senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43 ditions of this agreement.
44
45
46
47     If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48 notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
49 to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within ~~forty-eight (48)~~ twenty-four (24) hours
50 (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51 ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52 failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
53 such a response shall not exceed a total of ~~forty-eight (48)~~ twenty-four (24) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
54 at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58     The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59 elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
60 operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61 If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62 sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63 ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(b) _400_ % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and _400_ % of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any reworking or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

A.A.P.L. FORM 610 - ▢ODEL FORM OPERATING AGREEMENT - ▢2

## ARTICLE VI
### continued

1     If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2 the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3 Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4 therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5 back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6 the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

7
8
9
10     Notwithstanding the provisions of this Article VI.B.2, it is agreed that without the mutual consent of all parties, no wells shall
11 be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12 well conforms to the then-existing well spacing pattern for such source of supply.

13
14
15
16 ~~The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.~~
17 ~~except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well~~
18 ~~after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-~~
19 ~~duction, ceases to produce in paying quantities.~~
20
21 This article shall apply to all subsequent wells drilled on the Contract Area.
22
23     3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24 completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25 reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26 ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27 first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28 matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29 withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30 each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31 ties. or in the proportion agreed to by the Consenting Parties among themselves as
32 to their interest retained.
33
34
35     4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36 also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37 location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38 mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39 affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
40 to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:
41
42
43
44     (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45 the initial drilling of the well down to the depth at which the sidetracking operation is initiated.
46
47
48
49     (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
50 salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51 provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.
52
53
54
55     In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
56 shall be limited to ~~forty-eight (48)~~ twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
57 receive up to ~~eight (8)~~ four (4) additional days after expiration of the ~~forty-eight (48)~~ twenty-four (24) hours within which to respond by paying for all stand-by time
58 incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-
59 by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60 ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other in-
61 stances the response period to a proposal for sidetracking shall be limited to ~~thirty (30)~~ fifteen (15) days.
62
63
64
65 C. TAKING PRODUCTION IN KIND:
66
67     Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68 exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69 marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70 party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VI
### continued

1 required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4 the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5 its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8 the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9 the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10 best price obtainable in the area for such production.*Any such purchase or sale by Operator shall be subject always to the right of the
11 owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12 delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13 time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14 of one (1) year.      *which shall in no event be less than the price which Operator received
15 for its portion of the oil and gas produced from the Contract Area.
16      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17 deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18 be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19 agreement between the parties hereto, whether such an agreement is attached as Exhibit ''E'', or is a separate agreement.

20

21 D.  Access to Contract Area and Information:

22

23      Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24 and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25 and records relating thereto. Upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26 governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27 each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28 gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29 quests the information.

30

31 E.  Abandonment of Wells:

32

33      1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34 drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35 without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36 within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37 such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38 accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39 such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40 operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42      2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43 hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44 producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46 thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47 those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48 parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49 Exhibit ''C'', less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50 the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51 material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52 terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53 gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54 tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55 duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

-8-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1 "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4 interests in the remaining portion of the Contract Area.

6       Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.

14      3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A.  Liability of Parties:

25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

B.  Liens and Payment Defaults:

32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45 the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46 reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

C.  Payments and Accounting:

50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52 tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder,
53 showing expenses incurred and charges and credits made and received.

55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61 due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-
62 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D.  Limitation of Expenditures:

66      1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VII
#### continued

1  ☐ __Option No. 1:__ All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities.
3
4  ☐ __Option No. 2:__ All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.
14
15      2. __Rework or Plug Back:__ Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20      3. __Other Operations:__ Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of __Twenty-Five Thousand__ Dollars ($ __25,000.00__ )
22 except in connection with the, drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of __Fifteen Thousand__
28 Dollars ($ __15,000.00__ ) but less than the amount first set forth above in this paragraph.
29
30  E.   Rentals, Shut-in Well Payments and Minimum Royalties:
31
32      Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2.
39
40      Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46  F.   Taxes:
47
48      Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".
59
60      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".
66
67      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68 the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  G. Insurance:

3      At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

10     ~~In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the~~
11  ~~parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.~~

13                                    ARTICLE VIII.
14             ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

16  A.  Surrender of Leases:

18     The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.

21     However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

36     Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.

41  B.  Renewal or Extension of Leases:

43     If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.

49     If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

54     Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.

57     The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62

63     The provisions of this Article shall also be applicable to extensions of oil and gas leases.

65  C.  Acreage or Cash Contributions:

67     While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## ARTICLE VIII
### continued

said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

D.  Maintenance of Uniform Interest:

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all leases and equipment and production; or

2. an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

E.  Waiver of Rights to Partition:

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

F.  Preferential Right to Purchase:      Deleted

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

## ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter ''K'', Chapter 1, Subtitle ''A'', of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter ''K'', Chapter 1, Subtitle ''A'', of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.

### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed_____Twenty-Five Thousand_____Dollars ($__25,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.

### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.

### NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.

### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☒  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐  Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production: provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

A.  Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.  Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____Texas_____ shall govern.

C.  Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
## OTHER PROVISIONS




A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT -

ARTICLE XVI.

MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of __1st__ day of __May_____, 19 93.

OPERATOR

FUEL RESOURCES, INC.

BY: _____

_____
Ronnie W. Botkin
Vice President

NON-OPERATORS

_____        _____
                                          Sam Y. Dorfman, Jr.

_____        _____
                                          Louis Dorfman

                                          _____
                                          S. L. Florsheim, Jr.

                                          _August Erickson_____
                                          August Erickson

                                          S & P Co.

                                          By: _August Erickson_____
                                          August Erickson
                                          General Manager

                                          _____
                                          Betty W. Upton, Trustee of the
                                          Betty W. Upton Trust

Toler #2

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 82

## ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of __1st__ day of __May__, 19 93 .

### OPERATOR

FUEL RESOURCES, INC.

BY: _____

Ronnie W. Botkin
Vice President

### NON-OPERATORS

_____
Sam Y. Dorfman, Jr.

_____
Louis Dorfman

_____
S. L. Florsheim, Jr.

_____
August Erickson

S & P Co.

By:_____
     August Erickson
     General Manager

_____
Betty W. Upton, Trustee of the
Betty W. Upton Trust

Toler #2

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___1st___ day of ___May___, 19 _93_.

OPERATOR

FUEL RESOURCES, INC.

BY: _____

Ronnie W. Botkin
Vice President

NON-OPERATORS

_____
Sam Y. Dorfman, Jr.

_____
Louis Dorfman

_____
S. L. Florsheim, Jr.

_____
August Erickson

S & P Co.

By: _____

August Erickson
General Manager

_____
Betty W. Upton, Trustee of the
Betty W. Upton Trust

- 15 -

Toler #2

EXHIBIT "A"

Attached to Operating Agreement dated May 1, 1993
between Fuel Resources, Inc., as Operator, and Sam Y.
Dorfman, Jr. et al, as Non-Operators

## I. CONTRACT AREA

All lands included within the boundary of the Joe Toler et al
Gas Unit described in Unit Declaration dated October 30, 1952
recorded in Volume 392, Page 92 of the Deed Records, Gregg Co
Texas.

## II. DEPTH RESTRICTIONS

From the surface to the stratigraphic equivalent of 10,896',
as described in Assignment from Sam Y. Dorfman, Jr. et al to
H&S Production, Inc. dated September 23, 1989, recorded in
Volume 2278, Page 313 of the Deed Records of Gregg County,
Texas, limited, however, to the right to locate wells on and
to produce oil and/or gas from wells located on a certain 160
acre tract described therein.

## III. WORKING INTEREST

| Company | Interest |
|---|---|
| Fuel Resources, Inc. | 70.000000% |
| Sam Y. Dorfman, Jr. | 5.449218% |
| Louis Dorfman | 5.449218% |
| August Erickson | 0.351563% |
| S. L. Florsheim, Jr. | 0.351563% |
| S & P Company | 18.164063% |
| Betty W. Upton, Trustee | 0.234375% |
| | |
| Total | 100.000000% |

## IV. LEASES SUBJECT TO THIS AGREEMENT

Those leases described on Exhibit "A-1" attached hereto.

## V. ADDRESSES OF THE PARTIES

Fuel Resources, Inc.
2121 Sage Road
Houston, Texas 77056

Sam Y. Dorfman, Jr.
8144 Walnut Hill Lane, Suite 1000
Dallas, Texas 75231-4316

Louis Dorfman
8144 Walnut Hill Lane, Suite 1000
Dallas, Texas 75231-4316

S & P Co.
P. O. Box 3735
Shreveport, LA 71133-3735

August Erickson
P. O. Box 3735
Shreveport, LA 71133-3735

S. L. Florsheim, Jr.
8144 Walnut Hill Lane, Suite 1000
Dallas, Texas 75231-4316

Betty W. Upton, Trustee
of the Betty W. Upton Trust
14934 Bramblewood Dr.
Houston, Texas 77079

Revised 10/19/93                                              TOLER2.WKS

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___1st___ day of ___May___, 19 93 .

#### O P E R A T O R

FUEL RESOURCES, INC.

BY: _____

Ronnie W. Botkin
Vice President

#### N O N - O P E R A T O R S

_____

Sam Y. Dorfman, Jr.

_____

Louis Dorfman

_____

S. L. Florsheim, Jr.

_____

August Erickson

S & P Co.

By: _____

August Erickson
General Manager

_____
Betty W. Upton, Trustee of the
Betty W. Upton Trust

- 15 -

Toler #2

EXHIBIT "A-1"

TOLER UNIT

| Lessor | Date | Volume | Page |
|---|---|---|---|
| Joe Toler et ux | 5/24/51 | 354 | 322 |
| Amended | 10/23/51 | 365 | 616 |
| Mrs. L. E. Griffith et al | 5/25/51 | 354 | 328 |
| | | 377 | 587 |
| C. S. Bazell et ux | 5/25/51 | 364 | 582 |
| Mrs. Stella Ward | 9/10/51 | 362 | 66 |
| E. O. McWhorter et al | 5/25/51 | 355 | 30 |
| Amended | 1/7/52 | 369 | 283 |
| C. W. Lane | 5/15/52 | 379 | 533 |
| Mrs. Vera Mae Jones Ferree et al | 4/3/52 | 376 | 498 |
| Paul W. Mack et ux | 4/5/52 | 376 | 506 |
| Mrs. Maude Cargile | 5/8/52 | 379 | 238 |
| C. M. Carothers | 7/8/52 | 382 | 279 |
| Kenneth C. Miller | 7/16/52 | 385 | 317 |
| Jimmie Borders Keating | 8/26/52 | 386 | 400 |
| Zell Smith | 6/10/52 | 385 | 320 |
| J. T. Simpson | 6/9/52 | 380 | 320 |
| Mrs. Pearl Everett Keasler et al | 2/15/52 | 372 | 438 |
| Grace L. Ward et al | 6/7/51 | 355 | 193 |
| (Amended) | 10/23/51 | 367 | 572 |
| H. W. McAdoo et ux | 10/8/52 | 390 | 334 |
| Ratification | 10/10/52 | 390 | 337 |
| T. L. Small et ux | 10/15/52 | 391 | 216 |
| W. M. Lamb et ux | 4/3/52 | 376 | 149 |
| R. G. Claer et ux | 4/1/52 | 376 | 492 |
| J. J. Avance et ux | 2/12/52 | 372 | 348 |
| Leo Sparkman et ux | 2/14/52 | 378 | 541 |
| W. B. Phillips et ux | 2/14/52 | 384 | 110 |
| E. L. Blalock et ux | 2/14/52 | 384 | 107 |
| R. G. Claer et ux | 4/18/52 | 376 | 495 |
| Raymond Fountain et ux | 7/28/52 | 385 | 323 |
| Merrill B. Baker et ux | 2/12/52 | 378 | 535 |
| J. H. Walters et ux | 10/1/52 | 390 | 331 |
| Mrs. Birdie Cocke | 6/11/51 | 355 | 441 |
| (Amended) | 10/23/51 | 365 | 620 |

Exhibit 601,   BOX 800
TULSA OK 74101

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT      " C "

Attached to and made a part of  Operating Agreement dated May 1, 1993, between Fuel Resources, Inc.
as Operator.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I.  GENERAL PROVISIONS

1. **Definitions**

    "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

    "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and mainte-nance of the Joint Property.

    "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Opera-tions and which are to be shared by the Parties.

    "Operator" shall mean the party designated to conduct the Joint Operations.

    "Non-Operators" shall mean the Parties to this agreement other than the Operator.

    "Parties" shall mean Operator and Non-Operators.

    "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

    "Technical Employees" shall mean those employees having special and specific engineering, geological or other profes-sional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

    "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

    "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

    "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

2. **Statement and Billings**

    Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Ac-count for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

    A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the bill-ing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

    B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the lower rate of twenty percent (20%) per annum, or the highest rate allowable by law plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

    Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall con-clusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.

-1-



**5. Audits**

    A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

    B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

**6. Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1. Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

**2. Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**3. Labor**

    A.  (1)  Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

         (2)  Salaries of First Level Supervisors in the field.

         (3)  Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

         (4)  Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

    B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

    C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

    D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

**4. Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

**5. Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**6. Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

    A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.



B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ ten percent (__10_%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

COPAS

# III. OVERHEAD

1. **Overhead – Drilling and Producing Operations**

   i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( X) Fixed Rate Basis, Paragraph 1A, or
   (  ) Percentage Basis, Paragraph 1B

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

   (  ) shall be covered by the overhead rates, or
   ( X) shall not be covered by the overhead rates.

   iii.  The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   (  ) shall be covered by the overhead rates, or
   (X ) shall not be covered by the overhead rates.

A. **Overhead – Fixed Rate Basis**

   (1) Operator shall charge the Joint Account at the following rates per well per month:

   Drilling Well Rate $ __4,103.00__
   (Prorated for less than a full month)

   Producing Well Rate $ __469.00__

   (2) Application of Overhead – Fixed Rate Basis shall be as follows:

   (a) Drilling Well Rate

   (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig. completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

   (2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

   (b) Producing Well Rates

   (1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

   (2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

   (3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

   (4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

   (5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

   (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. **Overhead – Percentage Basis**

   (1) Operator shall charge the Joint Account at the following rates:

-4-

COPAS

(a) Development

_____ Percent ( ____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) Operating

_____ Percent ( ____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. **Overhead – Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $ __25,000.00__ :

A. ___5___ % of first ~~$100,000~~ $500,000 or total cost if less, plus

B. ___4___ % of costs in excess of ~~$100,000~~ $500,000 but less than $1,000,000, plus

C. ___3___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ___5___ % of total costs through ~~$100,000~~ $500,000; plus

B. ___4___ % of total costs in excess of ~~$100,000~~ $500,000 but less than $1,000,000; plus

C. ___3___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

COPAS

A. **New Material (Condition A)**

   (1) Tubular Goods Other than Line Pipe

      (a) Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

      (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

      (c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

      (d) Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

   (2) Line Pipe

      (a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

      (b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

      (c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

      (d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

   (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

   (4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2 A (1) and (2).

B. **Good Used Material (Condition B)**

Material in sound and serviceable condition and suitable for reuse without reconditioning:

   (1) Material moved to the Joint Property

      At seventy-five percent (75%) of current new price, as determined by Paragraph A.

   (2) Material used on and moved from the Joint Property

      (a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

      (b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

   (3) Material not used on and moved from the Joint Property

      At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. **Other Used Material**

   (1) Condition C

      Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

**COPAS**

(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

# V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

EXHIBIT "D"

Attached to and made a part of Operating Agreement dated May 1, 1993, between Fuel Resources, Inc., as Operator, and Sam Y. Dorfman, Jr. et al, Non-Operators

Operator shall carry for the benefit and the expense of the Joint Account insurance with responsible carriers as follows:

### A. WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY

1. State Statutory Requirements for Workman's Liability.

2. Employer's Liability: $100,000 each person/$100,000 each accident/$500,000 policy limit

### B. COMPREHENSIVE GENERAL LIABILITY

Combined single limit of $1,000,000 for bodily injury and property damage per occurrence, no aggregate.

### C. AUTOMOBILE LIABILITY (INCLUDING HIRED AND NON-OWNED VEHICLES)

1. Bodily injury with limits of: $500,00 each person/$500,000 aggregate/$1,000,000 each accident

2. Property Damage with limits of: $1,000,000 each accident.

### D. CONTROL OF WELL AND UNDERGROUND DAMAGE

With limitations and deductibles as currently maintained in force and effect by Operator.

### E. EXCESS LIABILITY

Umbrella coverage as from time to time applicable to Operator's activities but not to exceed $25,000,000 per occurrence.

All premiums paid on such insurance shall be charged to the Joint Account. Except by mutual consent of the parties, no other insurances shall be maintained for the Joint Account. Each drilling or other contractor performing work for the Joint Account shall be required to maintain in force, with respect to the work performed by such contractor, the same insurance as those specified in Subdivisions A, B and C above, when applicable. Operator shall make a diligent effort to require drilling contractor to carry casualty insurance on the replacement value of the surface equipment used at the drillsite and to require drilling contractor to furnish Certificate of Insurance to Operator and Non-Operators as additional assureds under the policies and waiving subrogation rights against the Operator and Non-Operators. Whenever Operator performs a drilling or reworking operation for the Joint Account with its own equipment, Operator, at its own expense shall provide the same insurance coverage in respect thereof as would be required if the work were performed by an independent contractor. Operator shall furnish each Non-Operator with appropriate certificates showing the insurance coverage and companies with whom covered prior to commencing operations hereunder and thereafter as such insurance is acquired.

### F. OTHER INSURANCE

Operation shall not be obligated to provide for any other insurance for the Joint Account of the parties hereto. Any party may, at its own expense, acquire such insurance as it deems proper to protect itself against any claim, losses, damages, or destruction arising out of operation of the Unit Premises.

### G NON-OPERATORS

Operator shall require the insurance carrier to furnish waiver of subrogation rights against Non-Operators and to name Non-Operators additional assureds under the policies.

EXHIBIT "E"

Attached to and made a part of Operating Agreement dated May 1, 1993, between Fuel Resources, Inc., as Operator, and Sam Y. Dorfman, Jr. et al, as Non-Operator.

GAS BALANCING AGREEMENT

The parties to the Operating Agreement to which this Exhibit "E" is attached own the working interest in the gas rights underlying the Contract Area covered by such agreement in accordance with the percentages of participants as set forth in Exhibit "A" to the Operating Agreement.

Subject to all of the terms of the Operating Agreement, each party has the right to take its share of gas produced from the Contract Area and market the same. In the event any of the parties hereto is not at any time taking or marketing its share of gas or has contracted to sell its share of gas produced from the Contract Area to a purchaser which does not at any time while this agreement is in effect take the full share of gas attributable to the interest of such party, the terms of this agreement shall automatically become effective.

During the period or periods when any party hereto has no market for its share of gas produced from any proration unit within the Contract Area, elects for any reason not to sell its gas, or its purchaser does not take its full share of gas produced from such proration unit, the other parties shall be entitled to produce each month one hundred percent of the allowable gas production assigned to such proration unit by the State regulatory body having jurisdiction and shall be entitled to take and deliver to its or their purchaser all of such gas production. All parties hereto shall share in and own the liquid hydrocarbons recovered from such gas by lease equipment in accordance with their respective interests and subject to the Operating Agreement to which this agreement is attached, but the party or parties taking such gas shall own all of the gas delivered to its or their purchaser.

On a cumulative basis, each underproducing party shall be credited with gas in storage equal to its full share of the gas produced, less its share of gas used in lease operations, vented or lost, and less that portion such party took or marketed. The Operator under said Operating Agreement will establish and maintain currently a gas account to show the gas imbalance which exists between all the parties and will furnish each of these parties a monthly statement showing the total quantity of gas produced, the amount used in lease operations, vented or lost, the total quantity of gas taken or delivered to market for the account of each party, and the monthly and cumulative over and under account of each party. The Operator shall be responsible for determining the final accounting of the underproduction and overproduction and the amounts due to be paid to, or by, each party.

At all times while gas is produced from the Unit Area, each party hereto will make settlement with the respective royalty owners to whom they are accountable, just as if each party were taking or delivering to a purchaser its share, and its share only, of such gas production. Each party hereto agrees to hold each other party harmless from any and all claims for royalty payments asserted by royalty owners to whom each party is accountable. The term "royalty owner" shall include owners of royalty, overriding royalties, production payments, net profits interests and other similar interests.

After notice to the Operator, any party at any time may begin taking or delivering to its purchaser its full share of the gas produced from a proration unit under which it has gas in storage less such party's share of gas used in operations, vented or lost. In addition to such share, each party, including the Operator, until it has recovered its gas in storage and balanced the gas account as to its interest, shall be entitled to take or deliver to its purchaser a share of gas determined by multiplying twenty-five (25%) of the interest in the current gas production of the party or parties without gas in storage by a fraction, the numerator of which is the interest in the proration unit of such party with gas in storage and the denominator of which is the total percentage interest in such proration unit of all parties with gas in storage currently taking or delivering to a purchaser.

This agreement shall constitute a separate agreement as to each reservoir in the Unit Area, except if production from two or more reservoirs is comingled in the wellbore so that the gas from each such reservoir cannot be separately metered, the comingled producing horizons shall then be considered to be a single reservoir for the purpose of this agreement. When gas production from a reservoir in a proration unit permanently ceases in an unbalanced condition, the underproduced party may take gas production from the other proration units in the Unit Area producing from the same reservoir. Production cannot be taken from one reservoir for the purpose of balancing underproduction from other reservoirs.

Each party producing and taking or delivering as to its purchaser shall pay any and all production taxes due on such gas.

Nothing herein shall be construed to deny any party the right, from time to time, to produce or take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

In the even production of gas permanently ceases prior to the time that the accounts of the parties have been balanced, a complete balancing shall be accomplished by a money settlement. Such settlement shall be based on the price or prices received by each overproduced party for its share of the overproduced gas less royalties and taxes and without interest. It is recognized that there may be changes in the price per Mcf of gas received by those parties receiving more than their pro rata share of gas. It is therefore agreed that any production taken by any party over and above that attributable to its respective interest shall be credited to the first unbalanced underproduction of such party from time to time, or in other words, any currently accruing overproduction by an underproduced party shall offset underproduction in the order of accrual.

For gas sold in intrastate commerce the settlement price shall be the price received for the sale of the gas by the overproduced parties. For gas sold in interstate commerce, the price shall be that which is actually received for the gas by the overproduced parties, provided however, each underproduced party shall be responsible for any amounts paid to it by an overproduced party which are subject to refund and shall indemnify the overproduced party or parties against any such amounts until such time as final determination is made with respect thereto.

Nothing herein contained shall change or affect the obligations of each party to bear and pay its proportionate share of all costs, expenses, and liabilities as provided in the Operating Agreement.

This Agreement shall become effective in accordance with its terms and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors, legal representatives and assigns.

If any party sells or assigns an interest in the working interest in the land owned by it when such party is an underproduced party, the sale or assignment shall include all interest of the selling or assigning party in the gas, all right to make up gas and all right to any money payment which may ultimately be due hereunder, in the absence of specific provisions in the assignment instrument otherwise. Operator and each other parties hereto may treat the sale or assignment accordingly and the selling or assigning party shall look solely to its purchaser or assignee for any interest in the gas or money payment that such party may have or to which it may be entitled.

EXHIBIT "F"

Attached to and made a part of Operating Agreement dated May 1, 1993, between Fuel Resources, Inc., as Operator, and Sam Y. Dorfman, Jr. et al, as Non-Operator.

EQUAL EMPLOYMENT OPPORTUNITY PROVISION

During the performance of this Contract, the Operator agrees as follows:

1. The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following:

Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selecting for training, including apprenticeship.   The Operator agreements to post in conspicuous places, available to employees and applicants for employment, notices to be provided for the contracting officer setting forth the provisions of this non-discrimination clause.

2.     The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

3.     The Operator will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

4.     The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and all of the rules, regulations and relevant orders of the Secretary of Labor.

5.     The Operator will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and the by rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

6.     In the event of Operator's non-compliance with the non-discrimination clauses of this contract or with any of such rules, regulations or orders, this contract may be cancelled, terminated or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rules, regulations or order of the Secretary of Labor, or as otherwise provided by law.

7.     The Operator will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless these exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor.   The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance; Provided, however, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

     Operator acknowledges that it may be required to file Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress, with the appropriate agency within thirty (30) days of the date of contract award if such report has not been filed for the current year, and otherwise comply with or file such other compliance reports as may be required under Executive Order 11246, as amended, and Rules and Regulations adopted thereunder.

     Operator further acknowledges that it may be requires to develop a written affirmative action compliance program as required by the Rules and Regulations approved by the Secretary of Labor under authority of executive Order 11246, and supply Non-Operators with a copy of such program is they so request.

CERTIFICATION OF NON-SEGREGATED FACILITIES

     Operator assures Non-Operators that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.   For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are, in fact segregated on a basis of race, color, religion or national origin because of habit, local custom or otherwise.   It is further understood and agreed that maintaining or providing segregated facilities for its employees, or permitting its employees to perform their services at any location under uts control where segregated facilities are maintained, is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965.

     Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor dated May 21, 1968, and the provisions of the equal opportunity clause enumerated contracts between the United States of America and Non-Operators.

     Whoever knowingly and willingly makes any false, fictitious or fraudulent representation may be liable to criminal prosecution under 18 U.S.C.:1001.



# H & S PRODUCTION, INC.

June 10, 1993

S & P Company
P.O. Box 3735
Shreveport, LA  71133-3735

Attn:  Mr. August Erickson

Re:    Tolar #2

Dear Mr. Erickson:

Earlier this week you received a new Division Order for after payout on the captioned well.  Your interest was incorrect, therefore, we are enclosing a new Exhibit "B", which will show your new after payout net revenue interest.

Please attach one copy of the exhibit to each of the Division Orders and return one copy to our office.  Retain one copy for your files.  If you have questions regarding these changes, please feel free to call.

Sincerely,

Carol Shelton

CAS/lj

*Bubba Florsheim advised D/O is O.K.    ps*

5001 LBJ FREEWAY  •  SUITE 900  •  FARMERS BRANCH, TEXAS 75244  •  (214) 980-9752

Tract or Unit Designation:
Tolar #2
Date:  September 20, 1990
Effective: Date of First
           Production

## GAS
## DIVISION ORDER

**To:**   **H & S PRODUCTION, INC.**
5001 LBJ Freeway, Suite 900
Farmers Branch, Texas  75244

The undersigned and each of them, severally and not jointly, represent and warrant that they, respectively, are the legal owners of the interest in the gas and other gaseous liquid hydrocarbons which are produced from the lease or unit designated above and particularly described in Exhibit "A" attached hereto, in the proportions shown in the Division of Interest attached hereto and made a part hereof as Exhibit "B", and subject to any conditions contained in said Exhibit "B", said Exhibits being made a part hereof for all purposes.

The addressee set out above, hereinafter called "Operator" (whether one or more), until further written notice from the undersigned to Operator, is hereby authorized to cause to be taken the above described production, to receive payment therefore from the takers or purchasers thereof, and remit to the owners shown in the Division of Interest attached as Exhibit "B", in the proportions shown opposite their respective names, all sums received by Operator for same.  Assignees of Operator may continue payment under this division order without the necessity of issuing new division orders.

For all gas taken hereunder, the undersigned will be paid the price received by Operator for such gas, under any presently existing or any future contracts for the sale of gas, at the delivery point, less, as operating conditions in Operator's opinion require, an amount sufficient to reimburse Operator for all costs incurred in making delivery of any such gas from the wellhead and shall include, but not by way of limitation, the costs of gathering, dehydrating, compressing, treating, and transporting the gas, and payment on such basis shall be deemed to be the market value at the well or wells of such gas which for all purposes.

The undersigned authorize Operator to withhold from the proceeds of any products sold or delivered hereunder the amount of any tax placed thereon or on the production thereof by any governmental authority, and to pay the same in our behalf to the extent that the undersigned are required to bear any such tax.

Operator's obligation to the undersigned, with respect to the above described production, or the proceeds therefrom is limited to the payment, in accordance with the Division of Interest herein specified and of the provisions hereof, of, the monies received by Operator from the purchasers or takers of the above described production less severance or other taxes levied thereon required or authorized to be deducted by law.

Payment for each month may be made by check of Operator, mailed to each of said owners at the address shown below, within a reasonable length of time after payment is received by Operator. Operator may withhold, without interest, the amount due any interest owner hereunder until the sum accrued thereto is Twenty-Five Dollars ($25.00) or more, per annum.

In case of adverse claim of title to the land or interest in the production or the proceeds therefrom, Operator shall be protected against all reasonable costs and expense necessarily incurred in defending any such claim, and Operator may withhold payment, without interest, until such adverse claim is fully determined. Satisfactory evidence of title will be furnished to Operator by the undersigned on request.

S+P Co: APO
. 60 5468 75 X . 30 X . 82 8311 = . 15 045 493  WI
                      + . 000 85 989
                      . 15 131 481

**YOUR COPY**  Signed
returned
6/14/93
for

Settlements and payments hereunder for interests of the undersigned may be made on the basis of called acreage recited for each tract in the oil and gas leases held by operator without necessity for a resurvey, or if operator deems advisable, a resurvey may be made and settlement may be based on the resurvey.

Unless other provision is specifically set out in this division order, Operator is hereby relieved of any responsibility for determining when any of the above interests shall increase, diminish, be extinguished, or revert to other parties as a result of the lapse or termination of a right or interest, the completion or discharge of money or other payments from said interest, or as a result of the increase or decrease in production, or as a result of any other cause of which Operator does not receive written notice and Operator is authorized to continue to remit pursuant to the Division of Interest set out in Exhibit "B" until thirty (30) days after Operator receives notice in writing to the contrary by mail. Each of the undersigned whose interest shall hereafter vest in another not signing a division or transfer order agrees to hold Operator harmless from any loss in connection with such charges in ownership which results from Operator's reliance on the foregoing authorization.

It is understood that any vendee or assignee of any interest in the property covered hereby or the production therefrom shall take subject to the terms hereof and Operator shall not be bound by any sale or assignment of any interest in said property or the production of oil therefrom or the proceeds from the sale of gas sold or used off the property until the written notice thereof shall be furnished Operator in the form of the original or certified copy of the instrument by which said sale or assignment was made. Any change of interest hereunder shall be made subject to this division order and shall be effective at 7:00 o'clock A.M. on the first day of the calendar month following such notice.

The provisions hereof shall be binding upon and inure to the benefit of all parties who execute this instrument, their heirs, successors and assigns, whether or not all owners listed execute same, and no subsequent change of ownership from that set out herein, however accomplished, shall have any effect to change the binding force of the agreements herein made with reference to said lease or leases or the said instrument creating said unit, as the case may be. A counterpart hereof may be executed by any party or parties, and all counterparts so executed shall be considered as one original instrument.

This division order is dated and signed as of the date shown and shall be effective as to each of the undersigned as of said date.

**PLEASE SIGN YOUR NAME IN THE SPACE INDICATED FOR SIGNATURE, PRINT YOUR NAME, ADDRESS, AND SOCIAL SECURITY NUMBER IN THE APPROPRIATE SPACES AND HAVE YOUR SIGNATURE WITNESSED.**

WITNESSES (Two for each owner)

OWNER:
S & P CO.

1) _Fran Bailey_          6/7/93
Signature of witness    date

By: _August P Erickson_
Signature of owner

P. O. Box 3735
Address

August Erickson, General Manager
(Print name)

Shreveport, LA  71133-3735
City/State

P. O. Box 3735
(Address)

2) _Phyllis Longmire_     6/7/93
Signature of witness    date

Shreveport, Louisiana    71133-3735
City/State

P. O. Box 3735
Address

72-1075069
(Social Security or Tax ID Number)

Shreveport, LA  71133-3735
City/State

## EXHIBIT "B"
## TOLAR #2 DIVISION OF INTEREST

**A.**  **WORKING INTEREST - AFTER PAYOUT**

| | |
|---|---|
| Aspen Services | .53633137 |
| H & S Production, Inc. | .01449545 |
| Sandollar Oil & Gas, Inc. | .01449545 |
| Smith Oil Company, Inc. | .01449545 |
| Sam Dorfman | .04468434 |
| Louis Dorfman | .04468434 |
| S & P Company | .15131481 |
| August Erickson | .00292867 |
| S. L. Florsheim, Jr. | .00292867 |
| Betty Jo Walker Upton | .00195245 |
| **TOTAL WORKING INTEREST:** | **.82831100** |

# EXHIBIT "A"

| | |
|---|---|
| **OPERATOR:** | H & S Production, Inc. |
| **PROPERTY NAME:** | Tolar #2 |
| **COUNTY:** | Gregg        **STATE:**   Texas |

**LEGAL DESCRIPTION:**    612.44 acres of land, more or less, out of the I.C. Skillern and David Ferguson Surveys, Gregg County, Texas, as more particularly described in the Declaration of Unitization and Designation of Unit (Designated as the Sklar, et al. - Joe Tolar, et al. Unit) dated October 30, 1952, recorded in Volume 392, Page 92, Deed of Records, Gregg County, Texas. INSOFAR AND ONLY INSOFAR as to production obtained from the surface down to the stratigraphic equivalent of 7,795' as shown on the Schlumberger electric log run in the Dorfman et al - Joe Tolar #2 Well.

**S & P Co.**

P. O BOX 3735

2925 MANSFIELD ROAD

SHREVEPORT. LOUISIANA 71133-3735

PHONE 318 - 222-1800

May 28, 1993


Mr. Scott G. Heape
H & S Production, Inc.
5001 LBJ Freeway, Suite 900
Farmers Branch, Texas   75244

Re:  H & S Production, Inc. - Tolar #2
     Willow Springs Field
     Gregg County, Texas

Dear Scott:

Enclosed please find signature pages executed by S & P Co. and August
Erickson electing to convert overriding royalty interest to working
interest, effective at payout, March 31, 1993.

Best regards,


Gus Erickson

AE:fb
Enclosures

xc - Mr. S. L. Florsheim, Jr.
bxc - Kathy Wilhite w/copy election letter



# H & S PRODUCTION, INC.

May 25, 1993

S & P Company
2925 Mansfield Road
Shreveport, Louisiana 71133-3735

Mr. Sam Y. Dorfman, Jr.
c/o Dorfman Production Company
8144 Walnut Hill Lane, Suite 1000 LB 64
Dallas, Texas 75231-4316

Mr. Louis Dorfman
c/o Dorfman Production Company
8144 Walnut Hill Lane, Suite 1000  LB 64
Dallas, Texas 75231-4316

Mr. August Erickson
c/o S & P Company
2925 Mansfield Road
Shreveport, Louisiana 71133-3735

Mr. S. L. Florshiem, Jr.
c/o Dorfman Production Company
8144 Walnut Hill Lane, Suite 1000 LB 64
Dallas, Texas 75231-4316

Ms. Betty Jo Upton
14934 Bramblewood Drive
Houston, Texas 77079

Re:    Tolar No. 2 Well
Gregg County, Texas

Dear Interest Owner:

The H & S Production, Inc. - Tolar No. 2 well has paid out effective March 31, 1993. Under the terms of the Dorfman, et al. - H & S Production, Inc. Farmout Agreement, you have the option to convert your overriding royalty interest to a working interest effective April 1, 1993.  On Exhibit "A" attached hereto we have scheduled your overriding royalty interests and your working interests if you elect to convert.

**YOUR COPY**

5001 LBJ FREEWAY  •  SUITE 900  •  FARMERS BRANCH, TEXAS 75244  •  (214) 980-9752

Page 2
May 25, 1993
Tolar #2

Please evidence your election in the space provided below and return this letter to the address noted hereon.

If you have any questions regarding the status of this well, please let me know.

Sincerely,

H & S Production, Inc.

BY: _____
Scott G. Heape, President

_____ I elect to convert my overriding royalty interest to a working interest effective at payout.

~~_____ I elect to retain my overriding royalty interest.~~

S & P CO.

_August Erickson_____     _5-28-93_____
Signature                           Date
    August Erickson, General Manager

## EXHIBIT "A"

|  | BPO | APO | |
|---|---|---|---|
|  | ORRI | WI | NRI |
| S & P Company | .075684 | .181640 | .150455 |
| Sam Y. Dorfman, Jr. | .022705 | .054492 | .045136 |
| Louis Dorfman | .022705 | .054492 | .045136 |
| August Erickson | .001465 | .003516 | .002912 |
| S. L. Florsheim, Jr. | .001465 | .003516 | .002912 |
| Betty Jo Upton | .000976 | .002344 | .001942 |

## ASSIGNMENT
### (H&S Production, Inc. - Toler No. 2)

STATE OF TEXAS      §
                         §      KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF GREGG     §

That the undersigned, Sam Y. Dorfman, Jr., Louis Dorfman, S.L. Florsheim, Jr., Betty Jo Upton, August Erickson, and S&P Co., a Louisiana partnership, hereinafter called "Assignors", for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby bargain, sell, assign and convey, subject to the exceptions and reservations set forth below, to H&S Production, Inc., 5001 LBJ Freeway, Suite 900, Farmers Branch, Texas 75244, and Aspen Services, a joint venture consisting of Asset Development Services, Inc., a Texas corporation, and Penvest Corporation, a Delaware corporation, 3500 Thanksgiving Tower, Dallas, Texas 75201, hereinafter called "Assignees", in the proportions - H & S Production, Inc. - 7-1/2%, and Aspen Services - 92-1/2%, the oil, gas and mineral leases, and leasehold estates created thereby, described in Exhibit "A" attached hereto and incorporated herein for all purposes insofar only as same cover the right from the surface down to the stratigraphic equivalent of 10,896 feet, being 100 feet below the depth to which production casing has been set in the H&S Production, Inc. - Joe Toler No. 2 Well, in and under the lands described in said Exhibit "A", all located in Gregg County, Texas, limited, however, to the right to locate wells on and to produce oil and/or gas from wells located on the following described lands, together with the ownership of all such production:

> Beginning at a point in the South boundary line of the W.E. Jones, et al. 99.50 acre tract in the I.C. Skillern Survey, A-4, Gregg County, Texas, described as Tract No. 5 in the Declaration of Unitization and Designation of Unit dated October 30, 1952, recorded in Volume 392, Page 92, Deed Records, Gregg County, Texas, creating the Sklar, et al. - Joe Toler, et al. Unit (the "Sklar - Toler Unit"), said point being 543 feet East of the Southwest corner of said Jones tract and the Southwest corner of the Sklar - Toler Unit and said point being the Southwest corner of the 160 acre proration unit assigned to the H&S Production, Inc. - Joe Toler No. 1 Well described in Assignment dated November 28, 1990, recorded in Volume 2202, Page 239A, Deed Records, Gregg County, Texas, executed by Sam Y. Dorfman, Jr., et al. to H&S

Production, Inc. and Aspen Services (the "H&S – Toler No. 1 Proration Unit"); thence North 88° West 543 feet with the South line of said Jones tract to is Southwest corner; thence North 24° 10' West 1047 feet, North 24° 51' West 1452.9 feet, North 24° 47' West 485 feet and North 33° 52' West 942.5 feet with the West boundary line of the Sklar – Toler Unit to its most Westerly Northwest corner; thence North 89° 49' East 1280.3 feet with the Sklar – Toler Unit line to a corner of said Unit; thence North 0° 4' East 758.1 feet with the Sklar – Toler Unit line to a corner of said Unit; thence South 50° 5' East 1180.7 feet with the Sklar – Toler Unit line to a corner of said unit; thence South 89° 47' East 909.1 feet with the Sklar – Toler Unit line to a corner of said unit in the West line of the E.O. McWhorter 137.39 acre tract described as Tract No. 4 in the Sklar – Toler Unit Declaration; thence North 1° 58' East 1129.9 feet with the West boundary line of said McWhorter tract to its Northwest corner; thence South 89° 51' East 373 feet with the North line of said McWhorter tract to a point; thence South 1° 58' West 2039.9 feet to the North line of the I.C. Skillern Survey , being the North line of the H&S – Toler No. 1 Proration Unit; thence North 89° 35' West with the North line of the Skillern Survey to a point in the North line of the W.E. Jones, et al. 99.5 acre tract, said point being the Northwest corner of the H&S – Toler No. 1 Proration Unit; thence Southerly with the Western line of said H&S – Toler No. 1 Proration Unit to the place of beginning, containing 160 acres, more or less, out of the I.C. Skillern Survey, A-4 and the David Ferguson Survey, A-71, Gregg County, Texas, and being the lands outlined on the plat attached hereto as Exhibit "B";

This Assignment, and the interest herein assigned to Assignees, is expressly subject to all landowner royalties, overriding royalties, production payments and other burdens on production which appeared of record in Gregg County, Texas as of June 1, 1989. Additionally, Assignors expressly except from this Assignment and reserve unto Assignors, their heirs, successors and assigns, the following:

A.  All rights below the stratigraphic equivalent of 10,896 feet, being 100 feet below the depth to which production casing has been set in the H&S Production, Inc.-Joe Toler No. 2 Well, together with all rights of ingress and egress to explore for, develop and operate such reserved rights; and

B.  All rights to locate wells on and to produce oil and/or gas from the subsurface interval covered hereby from wells located on the lands and leases described in Exhibit "A" hereto other than the 160 acres described above, together with the ownership of all such production; and

C.  As an overriding royalty interest, 1/8 x 8/8 of the total production of oil, gas and other minerals produced from or

attributable to the oil, gas and mineral leases described on Exhibit "A" hereto insofar as they cover the leasehold rights herein assigned to Assignees.

The overriding royalty interest reserved herein by Assignors shall be free and clear of all costs and expenses incident to the drilling, testing, operating and maintaining said leases and shall be free and clear of all costs and expenses of producing, gathering, storing, separating, treating, dehydrating, and otherwise producing or making ready for sale or use, the oil, gas and other products; provided, however, such overriding royalty interest shall be subject to and bear its proportionate share of any gross production, severance, ad valorem, excise or other taxes levied or assessed upon such overriding royalty interest or the upon the production attributable thereto.

In the event any lease assigned herein covers less than the mineral fee estate in the lands described on Exhibit "A" hereto, or in the event Assignors own less than the entire interest in such lease insofar as it covers the lands described on Exhibit "A" hereto, the overriding royalty interest provided for above shall be proportionately reduced.

This Assignment, and the interest herein assigned to Assignees, is expressly subject to the terms and provisions of that certain Amended and Restated Farmout Agreement dated as of June 1, 1989, by and between Assignors and Assignees, a memorandum of which is recorded in Volume 2105, Page 524, Public Official Records, Gregg County, Texas, including the right reserved therein by Assignors to convert the overriding royalty interest described and referred to above to a 30% working interest at "payout" as that term is defined in said Farmout Agreement.

TO HAVE AND TO HOLD the interest herein conveyed unto Assignees, their respective successors and assigns, provided, however, that this Assignment is executed without warranty of title, express or implied.

This instrument may be executed in one document signed by all parties, or in separate documents, each binding upon the party or parties who execute same, which shall be counterparts thereof. All

of the subject counterparts, when executed by one or more parties, shall constitute one and the same instrument; and in the event counterparts are executed, Assignees may combine said counterparts to form a single instrument for recording purposes.

EXECUTED this _____ day of _____, 1991.

"ASSIGNORS"

_____
Sam Y. Dorfman, Jr.

_____
Louis Dorfman

_____
S.L. Florsheim, Jr.

_____
Betty Jo Upton

_____
August Erickson

S&P Co., a Louisiana
partnership

By: _____
    August Erickson, General
    Manager

"ASSIGNEES"

H&S Production, Inc.

By:_____
   Scott Heape, President

Aspen Services

    By:  Penvest Corporation

    By: _____
        David S. Hunt, President

    By:  Asset Development
         Services, Inc.

    By: _____
        C. Bert Williams,
        Chairman

STATE OF TEXAS        §
                      §
COUNTY OF Dallas      §

This instrument was acknowledged before me this 6th day of May, 1991 by Sam Y. Dorfman, Jr.

JUNE K. McDOWELL
COMMISSION EXPIRES
OCT. 2, 1991

June K. McDowell
Notary Public in and for the
State of Texas

My Commission Expires:

10-2-91

STATE OF TEXAS        §
                      §
COUNTY OF Dallas      §

This instrument was acknowledged before me this 6th day of May, 1991 by Louis Dorfman.

JUNE K. McDOWELL
COMMISSION EXPIRES
OCT. 2, 1991

June K. McDowell
Notary Public in and for the
State of Texas

My Commission Expires:

10-2-91

STATE OF TEXAS        §
                      §
COUNTY OF Dallas      §

This instrument was acknowledged before me this 6th day of May, 1991 by S. L. Florsheim, Jr.

JUNE K. McDOWELL
COMMISSION EXPIRES
OCT. 2, 1991

June K. McDowell
Notary Public in and for the
State of Texas

My Commission Expires:

10-2-91

STATE OF TEXAS        §
                      §
COUNTY OF _____  §

This instrument was acknowledged before me this _____ day of _____, 1991 by Betty Jo Upton.

_____
Notary Public in and for the
State of Texas

My Commission Expires:

_____

STATE OF _Texas_ §
                        §
COUNTY OF _Dallas_ §

    This instrument was acknowledged before me this _6th_ day of _May_, 1991 by August Erickson.

JUNE K. McDOWELL
COMMISSION EXPIRES
OCT. 2, 1991

_June K. McDowell_
Notary Public in and for the
State of _Texas_

My Commission Expires:

_10-2-91_

STATE OF _Texas_ §
                        §
COUNTY OF _Dallas_ §

    This instrument was acknowledged before me this _6th_ day of _May_, 1991 by _August Erickson_, _General Manager_ of S&P Co., a Louisiana partnership, on behalf of said partnership.

JUNE K. McDOWELL
COMMISSION EXPIRES
OCT. 2, 1991

_June K. McDowell_
Notary Public in and for the
State of _Texas_

My Commission Expires:

_10-2-91_

STATE OF TEXAS §
                   §
COUNTY OF _____ §

    This instrument was acknowledged before me this _____ day of _____, 1991 by _____, _____ of H&S Production, Inc., a _____ corporation, on behalf of said corporation.

_____
Notary Public in and for the
State of Texas

My Commission Expires:

_____

STATE OF TEXAS §
                   §
COUNTY OF _____ §

    This instrument was acknowledged before me this _____ day of _____, 1991 by _____, _____ of Asset Development Services, Inc., a _____ corporation, on behalf of said corporation, in its capacity as joint venturer in Aspen Services, a Texas joint venture.

_____
Notary Public in and for the
State of Texas

My Commission Expires:

_____

STATE OF TEXAS         §
                       §
COUNTY OF _____    §

This instrument was acknowledged before me this _____ day of _____, 1991 by _____, _____ of Penvest Corporation, a _____ corporation, on behalf of said corporation, in its capacity as joint venturer in Aspen Services, a Texas joint venture.

_____
Notary Public in and for the
State of Texas

My Commission Expires:

_____

## Exhibit "A"

## Toler Unit

1. Oil, Gas and Mineral Lease dated May 24, 1951, recorded in Volume 354, Page 322, Deed Records, Gregg County, Texas, as amended by instrument dated October 23, 1951, recorded in Volume 365, Page 616, executed by Joe Toler, et ux., as lessors;

2. Oil, Gas and Mineral Lease dated May 25, 1951, recorded in Volume 354, Page 328, Deed Records, Gregg County, Texas, and in Volume 377, Page 587, Deed Records, Gregg County, Texas, executed by Mrs. L.E. Griffith, et al., as lessors;

3. Oil, Gas and Mineral Lease dated May 25, 1951, recorded in Volume 364, Page 582, Deed Records, Gregg County, Texas, executed by C.S. Bazzell, et ux., as lessors;

4. Oil, Gas and Mineral Lease dated September 10, 1951, recorded in Volume 362, Page 66, Deed Records, Gregg County, Texas, executed by Mrs. Stella Ward, as lessor;

5. Oil, Gas and Mineral Lease dated May 25, 1951, recorded in Volume 355, Page 30, Deed Records, Gregg County, Texas, as amended by instrument dated January 7, 1952, recorded in Volume 369, Page 283, executed by E.O. McWhorter, et al., as lessors;

6. Oil, Gas and Mineral Lease dated May 15, 1952, recorded in Volume 379, Page 533, Deed Records, Gregg County, Texas, executed by C.W. Lane, as lessor;

7. Oil, Gas and Mineral Lease dated April 3, 1952, recorded in Volume 376, Page 498, Deed Records, Gregg County, Texas, executed by Mrs. Vera Mae Jones Ferree, et al., as lessors;

8. Oil, Gas and Mineral Lease dated April 5, 1952, recorded in Volume 376, Page 506, Deed Records, Gregg County, Texas, executed by Paul W. Mack, et ux., as lessors;

9. Oil, Gas and Mineral Lease dated May 8, 1952, recorded in Volume 379, Page 238, Deed Records, Gregg County, Texas, executed by Mrs. Maude Cargile, as lessor;

10. Oil, Gas and Mineral Lease dated July 8, 1952, recorded in Volume 382, Page 279, Deed Records, Gregg County, Texas, executed by C.M. Carothers, as lessor;

11. Oil, Gas and Mineral Lease dated July 16, 1952, recorded in Volume 385, Page 317, Deed Records, Gregg County, Texas, executed by Kenneth C. Miller, as lessor;

12. Oil, Gas and Mineral Lease dated August 26, 1952, recorded in Volume 386, Page 400, Deed Records, Gregg County, Texas, executed by Jimmie Borders Keating, as lessor;

13. Oil, Gas and Mineral Lease dated June 10, 1952, recorded in Volume 385, Page 320, Deed Records, Gregg County, Texas, executed by Zell Smith, as lessor;

14. Oil, Gas and Mineral Lease dated June 9, 1952, recorded in Volume 380, Page 320, Deed Records, Gregg County, Texas, executed by J.T. Simpson, as lessor;

15. Oil, Gas and Mineral Lease dated February 15, 1952, recorded in Volume 372, Page 438, Deed Records, Gregg County, Texas, executed by Mrs. Pearl Everett Keasler, et al., as lessors;

16. Oil, Gas and Mineral Lease dated June 7, 1951, recorded in Volume 355, Page 193, Deed Records, Gregg County, Texas, as amended by instrument dated October 23, 1951, recorded in Volume 367, Page 572, executed by Grace L. Ward, et al., as lessors;

17. Oil, Gas and Mineral Lease dated October 8, 1952, recorded in Volume 390, Page 334, Deed Records, Gregg County, Texas, executed by H.W. McAdoo, et ux., as lessors, and Ratification of Lease and Pooling Agreement dated October 10, 1952, recorded in Volume 390, Page 337, executed by H.W. McAdoo, et ux.;

18. Oil, Gas and Mineral Lease dated October 15, 1952, recorded in Volume 391, Page 216, Deed Records, Gregg County, Texas, executed by T.L. Small, et ux., as lessors;

19. Oil, Gas and Mineral Lease dated April 3, 1952, recorded in Volume 376, Page 149, Deed Records, Gregg County, Texas, executed by W.M. Lamb, et ux., as lessors;

20. Oil, Gas and Mineral Lease dated April 1, 1952, recorded in Volume 376, Page 492, Deed Records, Gregg County, Texas, executed by R.G. Claer, et ux., as lessors;

21. Oil, Gas and Mineral Lease dated February 12, 1952, recorded in Volume 372, Page 348, Deed Records, Gregg County, Texas, executed by J.J. Avance, et ux., as lessors;

22. Oil, Gas and Mineral Lease dated February 14, 1952, recorded in Volume 378, Page 541, Deed Records, Gregg County, Texas, executed by Leo Sparkman, et ux., as lessors;

23. Oil, Gas and Mineral Lease dated February 14, 1952, recorded in Volume 384, Page 110, Deed Records, Gregg County, Texas, executed by W.B. Phillips, et ux., as lessors;

24. Oil, Gas and Mineral Lease dated February 12, 1952, recorded in Volume 384, Page 107, Deed Records, Gregg County, Texas, executed by E.L. Blalack, et ux., as lessors;

25. Oil, Gas and Mineral Lease dated April 18, 1952, recorded in Volume 376, Page 495, Deed Records, Gregg County, Texas, executed by R.G. Claer, et ux., as lessors;

26. Oil, Gas and Mineral Lease dated July 28, 1952, recorded in Volume 385, Page 323, Deed Records, Gregg County, Texas, executed by Raymond Fountain, et ux., as lessors;

27. Oil, Gas and Mineral Lease dated February 12, 1952, recorded in Volume 378, Page 535, Deed Records, Gregg County, Texas, executed by Merrill B. Baker, et ux., as lessors;

28. Oil, Gas and Mineral Lease dated October 1, 1952, recorded in Volume 390, Page 331, Deed Records, Gregg County, Texas, executed by J.H. Walters, et ux., as lessors;

29. Oil, Gas and Mineral Lease dated June 11, 1951, recorded in Volume 355, Page 441, Deed Records, Gregg County, Texas, as amended by instrument dated October 23, 1951, recorded in Volume 365, Page 620, executed by Mrs. Birdie Cocke, as lessor;

30. Oil, Gas and Mineral Lease dated July 1, 1952, recorded in Volume 409, Page 20, Deed Records, Gregg County, Texas, executed by Sallie Hopkins Stuckey, et al., as lessors;

31. Oil, Gas and Mineral Lease dated October 1, 1952, recorded in Volume 421, Page 518, Deed Records, Gregg County, Texas, executed by Jo Keating, et al., as lessors;

32. Oil, Gas and Mineral Lease dated July 1, 1952, recorded in Volume 404, Page 561, Deed Records, Gregg County, Texas, as extended by Agreement dated June 2, 1955, recorded in Volume 458, Page 69, executed by Doris Pugh Mayer, as lessor;

insofar only as said leases cover the rights from the surface down to the stratigraphic equivalent of 10,896 feet, being 100 feet below the depth to which production casing has been set in the H&S Production, Inc.-Joe Toler No. 2 Well, and insofar only as said leases cover the 612.44 acres of land, more or less, included within the boundaries of the Sklar, et al.-Joe Toler, et al. Unit described in Declaration of Unitization and Designation of Unit dated October 30, 1952, recorded in Volume 392, Page 92, Deed Records, Gregg County, Texas.

(TOLER.ASN)

EXHIBIT "B"



DAVID FERGUSON SURVEY
A-71

I.C. SKILLERN SURVEY
A-4

DORFMAN
No. 2 Toler

H & S, PRODUCTION, INC.

JOE TOLER No. 2 160 ACRE UNIT
I.C. Skillern & David Ferguson Survey

Gregg County, Texas

Scale 1"=1000'