**A.A.P.L. FORM 610-1982**

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

__November 1__  ,  __2010__  ,
<span style="font-size:smaller">year</span>

OPERATOR  _____**Helis Oil & Gas Company, L.L.C.**_____

CONTRACT AREA  _____**Township 150 North, Range 95 West, 5th P.M.**_____

_____**Section 27:  All**_____

_____**Section 34:  All**_____

COUNTY OR PARISH OF  _____**McKenzie**_____  STATE OF  ____**North Dakota**____

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD , FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM  A A P L  NO  610 – 1982  REVISED

**Henderson 16-34/27H**

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8-9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 9-10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT  1982

## ARTICLE III.
## INTERESTS OF PARTIES

**A.   Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder

**B.   Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A"  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _____those existing_____ which shall be borne as hereinafter set forth

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price

Nothing contained in this Article III B  shall be deemed an assignment or cross-assignment of interests covered hereby

**C.   Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III B , such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden

**D.   Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and

    1   If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest, and,

    2   If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII B  shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party

## ARTICLE IV.
## TITLES

**A.   Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be includ-ed, in the drilling unit around such well  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases  At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge  All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator  Operator shall cause title to be examined by attorneys on its staff or by outside attorneys  Copies of all title opinions shall be furnished to each party hereto  The cost incurred by Operator in this title program shall be borne as follows

☐   Option No  1.   Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division-order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV
### continued

1  ☑ Option No. 2   Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions

6

7      Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders
10  This shall not prevent any party from appearing on its own behalf at any such hearing

11

12      No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13  provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14  ticipate in the drilling of the well

15

16  **B.  Loss of Title:**

17

18      1  Failure of Title.  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19  reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20  from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21  tion will not be subject to Article VIII B , and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22  and gas leases and interests and,
23      (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24  entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25  but there shall be no additional liability on its part to the other parties hereto by reason of such title failure,
26      (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27  been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
28  curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29  Area by the amount of the interest lost,
30      (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31  increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32  terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33  well,
34      (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35  failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36  who bore the costs which are so refunded,
37      (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38  borne by the party or parties whose title failed in the same proportions in which they shared in such prior production, and,
39      (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40  claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41  connection therewith

42

43      2  Loss by Non-Payment or Erroneous Payment of Amount Due.  If, through mistake or oversight, any rental, shut-in well
44  payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45  there shall be no monetary liability against the party who failed to make the required payment  Unless the party who failed to make the required
46  payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47  which acquisition will not be subject to Article VIII B , the interests of the parties shall be revised on an acreage basis, effective as of the
48  date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49  the Contract Area on account of ownership of the lease or interest which has terminated  In the event the party who failed to make the
50  required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51  the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52  shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53  or wells previously abandoned) from so much of the following as is necessary to effect reimbursement
54      (a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up
55  to the amount of unrecovered costs,
56      (b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57  oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58  termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59  portion of the oil and gas to be contributed by the other parties in proportion to their respective interest, and,
60      (c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61  lost, for the privilege of participating in the Contract Area or becoming a party to this agreement

62

63      ~~3  Other Losses   All losses incurred, other than those set forth in Articles IV B 1  and IV B 2  above, shall  be  joint  losses~~
64  ~~and shall be borne by all parties in proportion to their interests  There shall be no readjustment of interests in the remaining portion of~~
65  ~~the Contract Area~~

66

67

68

69

70

.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT 1982

## ARTICLE V.
## OPERATOR

**A.   Designation and Responsibilities of Operator:**

_____ **Helis Oil & Gas Company, L.L.C.** _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct

**B.   Resignation or Removal of Operator and Selection of Successor:**

1 <u>Resignation or Removal of Operator</u>   Operator may resign at any time by giving written notice thereof to Non-Operators If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor  Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator  Such resignation or removal shall not become effective until 7 00 o'clock A M  on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date  Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator  A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator

2 <u>Selection of Successor Operator</u>   Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties  The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected  The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A", provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed

**C.   Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator

**D.   Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A.   Initial Well:**

On or before the _____**11th**_____ day of _____**December**_____, (year) _____**2010**_____, Operator shall commence the drilling of a well for oil and gas at the following location

**Henderson 16-34/27H**
**Surface Location:  350 feet FSL and 1250 feet FEL, Section 34, T150N-R95W**
**Bottom Hole Location:  530 feet FNL & 1250 feet FEL, Section 27, T150N-R95W**

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT .1982

**ARTICLE VI**
**continued**

1    If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2    well as a dry hole, the provisions of Article VI E 1 shall thereafter apply

6    **B.    Subsequent Operations:**

8    1 Proposed Operations  Should any party hereto desire to drill any well on the Contract Area other than the well provided
9    for in Article VI A , or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10   the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11   other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12   tion and the estimated cost of the operation  The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13   within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation  If a drill-
            or becomes available within a period shorter than thirty (30) days,
14   ing rig is on location/, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
         twenty-four (24)
15   limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays  Failure of a party receiving such notice to reply within
16   the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation  Any notice or
17   response given by telephone shall be promptly confirmed in writing

21   If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22   period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) twenty-four (24) hour period when a drilling rig is on loca-
23   tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24   ties hereto, provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25   for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26   permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27   amination or curative matter required for title approval or acceptance  Notwithstanding the force majeure provisions of Article XI, if the
28   actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29   if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30   dance with the provisions hereof as if no prior proposal had been made

34   2 Operations by Less than All Parties   If any party receiving such notice as provided in Article VI B 1 or VII D 1 (Option
35   No 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36   giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration
                                                                                            twenty-four (24)
37   of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
38   on location, as the case may be) actually commence the proposed operation and complete it with due diligence  Operator shall perform all
39   work for the account of the Consenting Parties, provided, however, if no drilling rig or other equipment is on location, and if Operator is
40   a Non-Consenting Party, the Consenting Parties shall either (a) request Operator to perform the work required by such proposed opera-
41   tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work Con-
42   senting Parties, when conducting operations on the Contract Area pursuant to this Article VI B 2 , shall comply with all terms and con-
43   ditions of this agreement

47   If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48   notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
                                                                                                          twenty-four (24)
49   to whether the Consenting Parties should proceed with the operation as proposed  Each Consenting Party, within forty-eight (48) hours
50   (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51   ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52   failure to advise the proposing party shall be deemed an election under (a)  In the event a drilling rig is on location, the time permitted for
                                                                 twenty-four (24)
53   such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays)  The proposing party,
54   at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision

58   The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59   elected to bear same under the terms of the preceding paragraph  Consenting Parties shall keep the leasehold estates involved in such
60   operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties
61   If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62   sole cost, risk and expense  If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63   ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT, 1982

### ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III D payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following

12  (a)  300%-of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations, and

21  (b)  400  % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,
22  after deducting any cash contributions received under Article VIII C , and  400  % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein

28  An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29  working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31  reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
       four hundred percent (400%)
32  and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33  the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI B shall be ap-
35  plicable as between said Consenting Parties in said well

39  During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III D

46  In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged, and upon
48  abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage

53  Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production, or, at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57  ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60  realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided, and if there is a credit balance, it shall be paid to such Non-Consenting Party

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT  1982

### ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well  Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto

Notwithstanding the provisions of this Article VI B 2, it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI A except (a) as to Article VII D 1  (Option No 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well after if has been drilled to the depth specified in Article VI A  if it shall thereafter prove to be a dry hole or, if initially completed for pro-duction, ceases to produce in paying quantities

3  Stand-By Time   When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-ing operation just completed  Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-matical paragraph of Article VI B 2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-ties

4  Sidetracking   Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties  Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows

(a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated

(b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to ~~forty-eight (48)~~ twenty-four (24) hours, ~~exclusive of Saturday, Sunday and legal holidays~~, provided, however, any party may request and receive up to eight (8) additional days after expiration of the ~~forty-eight (48)~~ twenty-four (24) hours within which to respond by paying for all stand-by time incurred during such extended response period  If more than one party elects to take such additional time to respond to the notice, stand by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties  In all other in-stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

C.   TAKING PRODUCTION IN KIND:

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost  Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party  Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT  1982

**ARTICLE VI**
**continued**

required to pay for only its proportionate share of such part of Operator's surface facilities which it uses

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII B , shall be entitled to receive payment directly from the purchaser thereof for its share of all production

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production  Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser  Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year  Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale  Operator will use its best efforts to market Non-Operators' share of oil and gas on the same terms that Operator markets its own share of production.

**D.   Access to Contract Area and Information:**

Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto  Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area  The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the Information

**E.   Abandonment of Wells:**

1  <u>Abandonment of Dry Holes</u>  Except for any well drilled or deepened pursuant to Article VI B 2 , any well which has been drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties  Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within ~~forty-eight (48)~~ twenty-four (24) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ after receipt of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment  All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening such well  Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI B , by immediately assuming all costs, risks and liability of such further operations, including all plugging and abandonment costs.

2  <u>Abandonment of Wells that have Produced</u>  Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties  If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto  If, within thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning  Each abandoning party shall assign the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production  If the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or intervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is produced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

- 8 alternate -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE VI**
**continued**

1    "B" The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located The payments by, and the
2 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees There shall be no readjustment of
4 interests in the remaining portion of the Contract Area

5

6       Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article Upon re-
8 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof

13

14      3 <u>Abandonment of Non-Consent Operations</u>  The provisions of Article VI E 1 or VI E 2 above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles, provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI E

19

20                                       **ARTICLE VII.**
21              **EXPENDITURES AND LIABILITY OF PARTIES**

22

23 **A.   Liability of Parties:**

24

25       The liability of the parties shall be several, not joint or collective Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area Accordingly, the liens granted
27 among the parties in Article VII B are given to secure only the debts of each severally It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners

29

30 **B.   Liens and Payment Defaults:**

31

32       Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit "C" To the extent that Operator has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense

42

43       If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45 the interest of each such party bears to the interest of all such parties Each party so paying its share of the unpaid amount shall, to obtain
46 reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph

47

48 **C.   Payments and Accounting:**

49

50       Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52 tionate shares upon the expense basis provided in Exhibit "C" Operator shall keep an accurate record of the joint account hereunder,
53 showing expenses incurred and charges and credits made and received

54

55       Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58 with an invoice for its share thereof Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59 on or before the 20th day of the next preceding month Each party shall pay to Operator its proportionate share of such estimate within
60 fifteen (15) days after such estimate and invoice is received If any party fails to pay its share of said estimate within said time, the amount
61 due shall bear interest as provided in Exhibit "C" until paid Proper adjustment shall be made monthly between advances and actual ex-
62 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more

63

64 **D.   Limitation of Expenditures:**

65

66      1 <u>Drill or Deepen</u>  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67 pursuant to the provisions of Article VI B 2 of this agreement Consent to the drilling or deepening shall include

68

69

70

- 9 -

## ARTICLE VII
### continued

1 ☐ Option No. 1 Horizontal or Multi-Lateral Wells  All necessary expenditures for the drilling or deepening, testing, completing and
2 equipping                       of                    the                    well,                    including
3 necessary tankage and/or surface facilities

4
5 ☐ Option No. 2 Conventional Wells  All necessary expenditures for the drilling or deepening and testing of the well  When such well has
   reached                                                                                                          its
6 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
7 to the Non-Operators who have the right to participate in the completion costs  The parties receiving such notice shall have forty-eight
8 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
9 tempt  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
10 cluding necessary tankage and/or surface facilities  Failure of any party receiving such notice to reply within the period above fixed shall
11 constitute an election by that party not to participate in the cost of the completion attempt  If one or more, but less than all of the parties,
12 elect to set pipe and to attempt a completion, the provisions of Article VI B 2  hereof (the phrase "reworking, deepening or plugging
13 back" as contained in Article VI B 2  shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
14 than all parties

15

16     2  Rework or Plug Back  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
17 plugged back pursuant to the provisions of Article VI B 2 of this agreement  Consent to the reworking or plugging back of a well shall
18 include all necessary expenditures in conducting such operations and completing and equipping said well, including necessary tankage
19 and/or surface facilities

20

21     3  Other Operations  Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
22 to require an expenditure in excess of _____ fifty thousand _____ Dollars ($   50,000.00   _____ )
23 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
24 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
25 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
26 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
27 parties  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
28 an information copy thereof for any single project costing in excess of _____
29 Dollars ($_____ ) but less than the amount first set forth above in this paragraph

30

31 E.   Rentals, Shut-in Well Payments and Minimum Royalties:

32

33     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
34 party or parties who subjected such lease to this agreement at its or their expense  In the event two or more parties own and have con-
35 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
36 behalf of all such parties  Any party may request, and shall be entitled to receive, proper evidence of all such payments  In the event of
37 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
38 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
39 visions of Article IV B 2

40

41     Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
42 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
43 circumstances, prior to taking such action, but assumes no liability for failure to do so  In the event of failure by Operator to so notify
44 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
45 shall be borne jointly by the parties hereto under the provisions of Article IV B 3

46

47 F.   Taxes:

48

49     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
50 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
51 become delinquent  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
52 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
53 Operator  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
54 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
55 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
56 tion  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
57 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
58 value generated by each party's working interest  Operator shall bill the other parties for their proportionate shares of all tax payments in
59 the manner provided in Exhibit "C"

60

61     If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
62 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
63 mination  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
64 interest and penalty  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
65 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
66 provided in Exhibit "C"

67

68     Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
69 to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement

70

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMEN. 1982

## ARTICLE VII
### continued

1  G.   Insurance:
2
3       At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted, provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C"  Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof  Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require
9
10      In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11 parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment
12
13                                   **ARTICLE VIII.**
14                 **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
15
16 A.   Surrender of Leases:
17
18      The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19 or in part unless all parties consent thereto
20
21      However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22 agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23 such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24 thereafter secured, to the parties not consenting to such surrender  If the interest of the assigning party is or includes an oil and gas in-
25 terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26 such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27 lease to be on the form attached hereto as Exhibit "B"  Upon such assignment or lease, the assigning party shall be relieved from all
28 obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29 attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30 duction other than the royalties retained in any lease made under the terms of this Article  The party assignee or lessee shall pay to the
31 party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32 ed acreage  The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33 salvaging and the estimated cost of plugging and abandoning  If the assignment or lease is in favor of more than one party, the interest
34 shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties
35
36      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37 party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area, and the acreage
38 assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39 agreement
40
41 B.   Renewal or Extension of Leases:
42
43      If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44 shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45 renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46 portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47 interests held at that time by the parties in the Contract Area
48
49      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50 who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51 to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease
52 Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement
53
54      Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55 by the acquiring party
56
57      The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58 or cover only a portion of its area or an interest therein  Any renewal lease taken before the expiration of its predecessor lease, or taken or
59 contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision, but any lease taken or con-
60 tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61 the provisions of this agreement
62
63      The provisions in this Article shall also be applicable to extensions of oil and gas leases
64
65 C.   Acreage or Cash Contributions:
66
67      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68 operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69 applied by it against the cost of such drilling or other operation  If the contribution be in the form of acreage, the party to whom the con-
70 tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE VIII
### continued

1  said Drilling Parties shared the cost of drilling the well  Such acreage shall become a separate Contract Area and, to the extent possible, be
2  governed by provisions identical to this agreement  Each party shall promptly notify all other parties of any acreage or cash contributions
3  it may obtain in support of any well or any other operation on the Contract Area  The above provisions shall also be applicable to op-
4  tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area
5
6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7  consideration shall not be deemed a contribution as contemplated in this Article VIII C
8
9  **D.   Maintenance of Uniform Interests:**
10
11      For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12  party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13  equipment and production unless such disposition covers either
14
15      1    the entire interest of the party in all leases and equipment and production, or
16
17      2    an equal undivided interest in all leases and equipment and production in the Contract Area
18
19      Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties
21
22      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25  party's interest within the scope of the operations embraced in this agreement, however, all such co-owners shall have the right to enter
26  into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27  Area and they shall have the right to receive, separately, payment of the sale proceeds thereof
28
29  **E.   Waiver of Rights to Partition:**
30
31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33  interest therein
34
35  ~~F.   Preferential Right to Purchase:~~
36
37      ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the~~
39  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40  ~~of the offer  The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41  ~~on the same terms and conditions the interest which the other party proposes to sell, and, if this optional right is exercised, the purchas-~~
42  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43  ~~ties  However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44  ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45  ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock~~
46
47                      **ARTICLE IX.**
48              **INTERNAL REVENUE CODE ELECTION**
49
50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51  for profit between or among the parties hereto  Notwithstanding any provision herein that the rights and liabilities hereunder are several
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-   1986 as amended
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder  Operator is authorized and directed to ex-
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58  and the data required by Federal Regulations 1 761  Should there be any requirement that each party hereby affected give further
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60  Federal Internal Revenue Service or as may be necessary to evidence this election  No such party shall give any notices or take any other
61  action inconsistent with the election made hereby  If any present or future income tax laws of the state or states in which the Contract
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-   1986 as amended
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws  In making the foregoing elec-
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66  computation of partnership taxable income
67
68
69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

1
2
3
4
5
6
7
8
9
10
11
12
13

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____ **fifty thousand** _____ Dollars ($ _50,000.00_____ ) and if the payment is in complete settlement of such claim or suit If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder

14
15
16
17
18
19
20
21
22

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it, thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable

23
24
25
26

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes, how all such difficulties shall be handled shall be entirely within the discretion of the party concerned

27
28
29
30
31

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension

32
33
34

## ARTICLE XII.
## NOTICES

35
36
37
38
39
40
41
42

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A" The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties

43
44
45

## ARTICLE XIII.
## TERM OF AGREEMENT

46
47
48
49

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below, provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement

50
51
52

☐  ~~Option No 1  So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.~~

53
54
55
56
57
58
59
60
61
62

☑  Option No 2  In the event the well described in Article VI A, or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____120_____ days from cessation of all production, provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein In the event the well described in Article VI A, or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____120_____ days from the date of abandonment of said well

63
64
65
66
67
68
69
70

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT 1982

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.  Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state, and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders

**B.  Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located  If the Contract Area is in two or more states, the law of the state of _____**North Dakota**_____ shall govern

**C.  Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith  Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act  Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act

### ARTICLE XV.
### OTHER PROVISIONS

- 14 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ November ___ , (year) __ 2010 _____

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form~~

O P E R A T O R

Helis Oil & Gas Company, L.L.C.
By:  Helis Energy, L.L.C., Manager

_____          _____
                                      David A. Kerstein
                                      President

N O N - O P E R A T O R S

LandSouth Properties, LLC

_____          _____
_____          Printed Name: _____
_____          Title: _____

Gary Lee McCormick

_____          _____
                                      Printed Name: _____
                                      Title: _____

Lee McCormick Marital Trust

_____          _____
                                      Printed Name: _____
                                      Title: _____

Robert J. McCormick

_____          _____
                                      Printed Name: _____
                                      Title: _____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____November_____ , (year) __2010__

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form~~

O P E R A T O R

Helis Oil & Gas Company, L.L.C.
By: Helis Energy, L.L.C., Manager

_____
David A. Kerstein
President

N O N - O P E R A T O R S

LandSouth Properties, LLC

_____
Printed Name: _Robert McCormick_
Title: _Managing Member_   01/19/11

Gary Lee McCormick

_____
Printed Name: _____
Title: _____

Lee McCormick Marital Trust

_____
Printed Name: _____
Title: _____

Robert J. McCormick

_____
Printed Name: _____
Title: _____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____November____ , (year) ___2010___ .

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form.~~

O P E R A T O R

Helis Oil & Gas Company, L.L.C.
By: Helis Energy, L.L.C., Manager

_____     David A. Kerstein
                                      President

N O N - O P E R A T O R S

LandSouth Properties, LLC

_____     Printed Name: _____
_____     Title: _____

Gary Lee McCormick

_____     Printed Name: Gary Lee McCormick
                                      Title: _____

Lee McCormick Marital Trust

_____     Printed Name: _____
                                      Title: _____

Robert J. McCormick

_____     Printed Name: _____
                                      Title: _____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____1st_____ day of _____November_____ , (year) ___2010___

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms-On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____, have been made to the form~~

OPERATOR

Helis Oil & Gas Company, L.L.C.
By: Helis Energy, L.L.C., Manager

_____       _____
                                      David A. Kerstein
                                      President

NON-OPERATORS

LandSouth Properties, LLC

_____       
_____       Printed Name: _____
                                      Title: _____

Gary Lee McCormick

_____       Printed Name: _____
                                      Title: _____

Lee McCormick Marital Trust

_____       Printed Name: _Robert McCormic_____
                                      Title: _Co-Trustee_____ 01/19/11

Robert J. McCormick

_____       Printed Name: _____
                                      Title: _____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _____ 1st _____ day of _____ November _____ , (year) __ 2010 __.

~~_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _____ _____, have been made to the form~~

OPERATOR

Helis Oil & Gas Company, L.L.C.
By: Helis Energy, L.L.C., Manager

_____          David A. Kerstein
                                       President

NON-OPERATORS

                                       LandSouth Properties, LLC

_____          Printed Name: _____
_____                  Title: _____

                                       Gary Lee McCormick

_____          Printed Name: _____
                                       Title: _____

                                       Lee McCormick Marital Trust

_____          Printed Name: _____
                                       Title: _____

                                       Robert J. McCormick

_01/19/11_  _____

_____          Printed Name: _Robert McCormick_
                                       Title: _____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Sklarco, LLC

Printed Name: David A. Barlow
Title:  Vice President - Chief Operating Officer
Sklarco L. L. C.

Lindsay Abernathy

JJS Working Interests, LLC

Printed Name: _____
Title: _____

Henderson 16-34/27H
McKenzie County, North Dakota

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

Sklarco, LLC

_____

Printed Name: _____

Title: _____

JJS Working Interests, LLC

_Debra Duncan-Kirk_

_Debra Duncan-Kirk_

Printed Name: _Justin Simone_

Title: _Manager_

Henderson 16-34/27H
McKenzie County, North Dakota

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT    1982

```
 1
 2
 3
 4
 5                                                              Black Stone Energy Company
 6
 7
 8   _____        _____
 9
10                                          Printed Name: _____
11                                          Title: _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68   Henderson 16-34/27H
69   McKenzie County, North Dakota
70
```

Henderson 16-34/27H

EXHIBIT "A"

Attached to and made a part of that certain Joint Operating Agreement
dated November 1, 2010, by and between Helis Oil & Gas Company, L.L.C., as Operator and
LandSouth Properties, LLC, et al, as Non-Operators

1.   LANDS SUBJECT TO THIS AGREEMENT

Township 150 North, Range 95 West, 5th P.M.
Section 27:  All
Section 34:  All
McKenzie County, North Dakota

2.   RESTRICTIONS AS TO DEPTHS AND FORMATIONS

None

3.   PARTIES TO THIS AGREEMENT AND CONTACT INFORMATION

Helis Oil & Gas Company, L.L.C., et al          Black Stone Energy Company
100 North 27th Street, Suite 255                 1001 Fannin Street, Suite 2020
Billings, Montana  59101                          Houston, Texas 77002
Telephone:  (406) 247-8723                        Telephone: 713-658-0647

LandSouth Properties, LLC                          Gary Lee McCormick
1853 Avenue of America, Suite C                   1853 Avenue of America, Suite C
Monroe, Louisiana 71201                            Monroe, Louisiana 71201
Telephone: 318-323-9685                            Telephone: 318-323-9685

Robert J. McCormick                                Lee McCormick Marital Trust
1853 Avenue of America, Suite C                   1853 Avenue of America, Suite C
Monroe, Louisiana 71201                            Monroe, Louisiana 71201
Telephone: 318-323-9685                            Telephone: 318-323-9685

Sklarco, LLC                                       JJS Working Interest, LLC
401 Edwards Street, Suite 1601                     4295 San Felipe, Ste 207
Shreveport, Louisiana 71101                        Houston, Texas  77027
Telephone: 318-227-8668                            Telephone 713-888-0875

4.   PERCENTAGE INTEREST OF THE PARTIES

Helis Oil & Gas Company, L.L.C., et al ............................... 94.81365%
LandSouth Properties, LLC.................................................... 0.09765%
Gary Lee McCormick............................................................ 0.01215%
Lee McCormick Marital Trust................................................ 0.04700%
Robert J. McCormick ............................................................ 0.01205%
Sklarco, LLC ........................................................................ 0.00997%
JJS Working Interest, LLC.................................................... 0.00753%
Black Stone Energy, Company............................................... 5.00000%

5.   OIL AND GAS LEASES

LESSOR:                       Black Stone Minerals Company, LP
LESSEE:                       Helis Oil & Gas Company, L.L.C.
LEASE DATE:                   January 30, 2010
DESCRIPTION:                  Township 150 North, Range 95 West, 5th P.M.
                              Section 27:  N/2
                              Section 34:  All and other lands
GROSS ACRES:                  2,415.69 gross acres
RECORDING INFORMATION:        Document No.  397421 (Memorandum of Oil and Gas Lease)

1

**EXHIBIT "B"**

Attach and made a part of that certain Joint Operati. greement dated November 1, 2010, by and between Helis Oil & Gas Company, L.L.C., as Operator and LandSouth Properties, LLC, et al, as Non-Operators

PRODUCERS 88—PAID UP
Rev. 5-60, No. 2—4-89

Billings Blue Print
Billings, Montana

# OIL AND GAS LEASE

AGREEMENT, Made and entered into the........................................ day of........................................, 19......, by and between ........................................

whose post office address is ........................................, hereinafter called Lessor (whether one or more) and ........................................ whose post office address is ........................................ hereinafter called Lessee:

WITNESSETH, That the Lessor, for and in consideration of ........................................DOLLARS, cash in hand paid, the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained, has granted, demised, leased and let, and by these presents does grant, demise, lease and let exclusively unto the said Lessee, the land hereinafter described, with the exclusive right for the purpose of mining, exploring by geophysical and other methods, and operating for and producing therefrom oil and all gas of whatsoever nature or kind, with rights of way and easements for laying pipe lines, and erection of structures thereon to produce, save and take care of said products, all that certain tract of land

situated in the County of ........................................, State of ........................................, described as follows, to-wit:

See Exhibit "A" for Additional Provisions

and containing....................acres, more or less.

1. It is agreed that this lease shall remain in force for a term of ten years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling or re-working operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; and operations shall be considered to be continuously prosecuted if not more than ninety (90) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If after discovery of oil or gas on said land or on acreage pooled therewith, the production thereof should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or re-working operations within ninety (90) days from date of cessation of production or from date of completion of dry hole. If oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas is produced from the leased premises or on acreage pooled therewith.

2. This is a PAID-UP LEASE. In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated, except as otherwise provided herein, to commence or continue any operations during the primary term. Lessee may at any time or times during or after the primary term surrender this lease as to all or any portion of said land and as to any strata or stratum by delivering to Lessor or by filing for record a release or releases, and be relieved of all obligation thereafter accruing as to the acreage surrendered.

3. In consideration of the premises the said Lessee covenants and agrees:

1st. To deliver to the credit of Lessor, free of cost, in the pipe line to which Lessee may connect wells on said land, the equal one-eight (⅛) part of all oil produced and saved from the leased premises.

2nd. To pay Lessor one-eighth (⅛) of the gross proceeds each year, payable quarterly, for the gas from each well where gas only is found, while the same is being used off the premises, and if used in the manufacture of gasoline a royalty of one-eighth (⅛), payable monthly at the prevailing market rate for gas.

3rd. To pay Lessor for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of one-eighth (⅛) of the proceeds, at the mouth of the well, payable monthly at the prevailing market rate.

4. Where gas from a well capable of producing gas is not sold or used, Lessee may pay or tender as royalty to the royalty owners One Dollar per year per net royalty acre retained hereunder, such payment or tender to be made on or before the anniversary date of this lease next ensuing after the expiration of 90 days from the date such well is shut in and thereafter on or before the anniversary date of this lease during the period such well is shut in. If such payment or tender is made, it will be considered that gas is being produced within the meaning of this lease.

5. If said Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties (including any shut-in gas royalty) herein provided for shall be paid the said Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

6. Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for Lessee's operation thereon, except water from the wells of Lessor.

7. When requested by Lessor, Lessee shall bury Lessee's pipe lines below plow depth.

8. No well shall be drilled nearer than 200 feet to the house or barn now on said premises without written consent of Lessor.

9. Lessee shall pay for damages caused by Lessee's operations to growing crops on said land.

10. Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

11. The rights of Lessor and Lessee hereunder may be assigned in whole or part. No change in ownership of Lessor's interest (by assignment or otherwise) shall be binding on Lessee until Lessee has been furnished with notice, consisting of certified copies of all recorded instruments or documents and other information necessary to establish a complete chain of record title from Lessor, and then only with respect to payments thereafter made. No other kind of notice, whether actual or constructive, shall be binding on Lessee. No present or future division of Lessor's ownership as to different portions or parcels of said land shall operate to enlarge the obligations or diminish the rights of Lessee, and all Lessee's operations may be conducted without regard to any such division. If all or any part of this lease is assigned, no leasehold owner shall be liable for any act or omission of any other leasehold owner.

12. Lessee, at its option, is hereby given the right and power at any time and from time to time as a recurring right, either before or after production, as to all or any part of the land described herein and as to any one or more of the formations hereunder, to pool or unitize the leasehold estate and the mineral estate covered by this lease with other land, lease or leases in the immediate vicinity for the production of oil and gas, or separately for the production of either, when in Lessee's judgment it is necessary or advisable to do so, and irrespective of whether authority similar to this exists with respect to such other land, lease or leases. Likewise, units previously formed to include formations not producing oil or gas, may be reformed to exclude such non-producing formations. The forming or reforming of any unit shall be accomplished by Lessee executing and filing of record a declaration of such unitization or reformation, which declaration shall describe the unit. Any unit may include land upon which a well has theretofore been completed or upon which operations for drilling have theretofore been commenced. Production, drilling or reworking operations or a well shut in for want of market anywhere on a unit which includes all or a part of this lease shall be treated as if it were production, drilling or reworking operations or a well shut in for want of a market under this lease. In lieu of the royalties elsewhere herein specified, including shut-in gas royalties, Lessor shall receive on production from the unit so pooled royalties only on the portion of such production allocated to this lease; such allocation shall be that proportion of the unit production that the total number of surface acres covered by this lease and included in the unit bears to the total number of surface acres in such unit. In addition to the foregoing, Lessee shall have the right to unitize, pool, or combine all or any part of the above described lands as to one or more of the formations thereunder with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental authority and, from time to time, with like approval, to modify, change or terminate any such plan or agreement and, in such event, the terms, conditions, and provisions of this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development or operation and, particulary, all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement, and this lease shall not terminate or expire during the life of such plan or agreement. In the event that said above described lands or any part thereof, shall hereafter be operated under any such cooperative or unit plan of development or operation whereby the production therefrom is allocated to different portions of the land covered by said plan, then the production allocated to any particular tract of land shall, for the purpose of computing the royalties to be paid hereunder to Lessor, be regarded as having been produced from the particular tract of land to which it is allocated and not to any other tract of land; and the royalty payments to be made hereunder to Lessor shall be based upon production only as so allocated. Lessor shall formally express Lessor's consent to any cooperative or unit plan of development or operation adopted by Lessee and approved by any governmental agency by executing the same upon request of Lessee.

13. All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor Lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of any such Law, Order, Rule or Regulation.

14. Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee shall have the right at any time to redeem for Lessor, by payment, any mortgages, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof, and the undersigned Lessors, for themselves and their heirs, successors and assigns, hereby surrender and release all right of dower and homestead in the premises described herein, insofar as said right of dower and homestead may in any way affect the purposes for which this lease is made, as recited herein.

15. Should any one or more of the parties hereinabove named as Lessor fail to execute this lease, it shall nevertheless be binding upon all such parties who do execute it as Lessor. The word "Lessor," as used in this lease, shall mean any one or more or all of the parties who execute this lease as Lessors. All the provisions of this lease shall be binding on the heirs, successors and assigns of Lessor and Lessee.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

........................................ ........................................

........................................ ........................................

........................................ ........................................

........................................ ........................................

### ACKNOWLEDGMENT FOR INDIVIDUAL

STATE OF.........................⎫ ss.
COUNTY OF.....................⎭

On this .............. day of ................................ 19 ........, before me personally appeared

.............................................................................................

known to me to be the person(s) described in and who executed the foregoing instrument, and who acknowledged to me that he (she, they) executed the same.

.............................................
Notary Public

My commission expires:

....................................        Residing at........................................

--- --- --- --- --- --- --- --- --- --- --- --- --- --- --- ---

### ACKNOWLEDGMENT FOR INDIVIDUAL

STATE OF.........................⎫ ss.
COUNTY OF.....................⎭

On this .... .......... day of ................................ 19 ........,  before me personally appeared

.............................................................................................

known to me to be the person(s) described in and who executed the foregoing instrument, and who acknowledged to me that he (she, they) executed the same.

.............................................
Notary Public

My commission expires:

....................................        Residing at........................................

--- --- --- --- --- --- --- --- --- --- --- --- --- --- --- ---

### ACKNOWLEDGMENT FOR CORPORATION

STATE OF.........................⎫ ss.
COUNTY OF.....................⎭

On this .............. day of ................................ 19 ........, before me personally appeared

....................................................known to me to be the ...........................

of ............. ...............................................................................

the corporation that executed the within instrument, and acknowledged to me that such corporation executed the same.

.............................................
Notary Public

My commission expires:

....................................        Residing at........................................

--- --- --- --- --- --- --- --- --- --- --- --- --- --- --- ---

# RECORDING DATA

EXHIBIT "A"

This rider is attached to and made a part of that certain Oil and Gas Lease dated _____
by and between _____, as Lessor, and
_____, as Lessee

The Oil and Gas Lease referenced herein is expressly modified and amended as set forth herein.  To
the extent that the terms of the lease and this rider are inconsistent, this rider shall be deemed
controlling.  In all other respects, the lease is hereby ratified except as otherwise amended in this
rider as follows:

16.  Notwithstanding anything to the contrary herein contained, wherever the fraction one-eighth
(1/8th) is stated in Paragraph 3 herein, it shall be amended to read three-sixteenths (3/16ths).

SIGNED FOR IDENTIFICATION:

_____



# Exhibit " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

1    Attached to and made part of __that certain Joint Operating Agreement dated November 1, 2010, by and between__ _____
2    _____ __Helis Oil & Gas Company, L.L.C., as Operator, and__ _____
3    _____ __LandSouth Properties, LLC, et al, as Non-Operators__ _____
4
5
6                                **I. GENERAL PROVISIONS**
7
8    **IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE**
9    **COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE**
10   **BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**
11
12   **IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE**
13   **PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT**
14   **FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT**
15   **OF THE PARTIES IN SUCH EVENT.**
16
17   **I.   DEFINITIONS**
18
19      All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement
20
21      **"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this
22      definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities
23      of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an
24      individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity
25
26      **"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting
27      Procedure is attached
28
29      **"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified
30      in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS)
31
32      **"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest
33      Railway Receiving Point to the property
34
35      **"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS
36
37      **"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is
38      to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable
39      field personnel
40
41      **"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's
42      field employees and/or contract labor directly employed On-site in a field operating capacity First Level Supervision functions may
43      include, but are not limited to

44
45        •   Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance,
46            construction, well remedial work, equipment movement and drilling
47        •   Responsibility for day-to-day direct oversight of rig operations
48        •   Responsibility for day-to-day direct oversight of construction operations
49        •   Coordination of job priorities and approval of work procedures
50        •   Responsibility for optimal resource utilization (equipment, Materials, personnel)
51        •   Responsibility for meeting production and field operating expense targets
52        •   Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
53            part of the supervisor's operating responsibilities
54        •   Responsibility for all emergency responses with field staff
55        •   Responsibility for implementing safety and environmental practices
56        •   Responsibility for field adherence to company policy
57        •   Responsibility for employment decisions and performance appraisals for field personnel
58        •   Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group
59            or team leaders
60
61      **"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be
62      shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement
63
64      **"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection,
65      maintenance, repair, abandonment, and restoration of the Joint Property
66

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc (COPAS)



**c o p a s**

"**Joint Property**" means the real and personal property subject to the Agreement

"**Laws**" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property

"**Non-Operators**" means the Parties to the Agreement other than the Operator

"**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure

"**On-site**" means on the Joint Property when in direct conduct of Joint Operations  The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account

"**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations

"**Parties**" means legal entities signatory to the Agreement or their successors and assigns  Parties shall be referred to individually as "Party "

"**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear

"**Participating Party**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement

"**Personal Expenses**" means reimbursed costs for travel and temporary living expenses

"**Railway Receiving Point**" means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist

"**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials, debarkation point for drilling and production personnel and services, communication, scheduling and dispatching center, and other associated functions serving the Joint Property

"**Supply Store**" means a recognized source or common stock point for a given Material item

"**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations, provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*)  Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties

2.  **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month  Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense  Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications  Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified

The Operator may make available to Non-Operators any statements and bills required under Section I 2 and/or Section I 3 A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies  The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein  A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission  Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies  Such election may be changed upon thirty (30) days prior written notice to the Operator

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc  (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable, or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement, or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice, or

(4) charges outside the adjustment period, as provided in Section I 4 (*Adjustments*)

**4. ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I 5 (*Expenditure Audits*)

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I 4 B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3) a government/regulatory audit, or

(4) a working interest ownership or Participating Interest adjustment

**5. EXPENDITURE AUDITS**

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I 4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



**c o p a s**

those Non-Operators approving such audit

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis, however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I 4 A (*Adjustments*) above All claims shall be supported with sufficient documentation

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure If the Non-Operators fail to comply with the additional deadlines in Section I 5 B or I 5 C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I 5 B or I 5 C

B    The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report Denied exceptions should be accompanied by a substantive response If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report Interest shall be calculated using the rate set forth in Section I 3 B (*Advances and Payments by the Parties*)

C    The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt, provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties Unless otherwise provided for in Section I 5 E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report Interest shall be calculated using the rate set forth in Section I 3 B (*Advances and Payments by the Parties*)

D    If any Party fails to meet the deadlines in Sections I 5 B or I 5 C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I 5 D or it may invoke the dispute resolution procedures included in the Agreement, if applicable The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process, however, each Non-Operator shall have the right to represent itself Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position A resolution meeting may be held as often as agreed to by the Parties Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo Despite such action, the Parties shall continue to try to resolve the dispute by mediation

E.    ☐ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I 5 C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators If the Operator fails to meet the deadlines in Section I 5 B or I 5 C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account*

6.    **APPROVAL BY PARTIES**

A    GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc  (COPAS)



**c o p a s**

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators

This Section I 6 A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I 6 B

B    AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____**two**_____ (___**2**___) or more Parties, one of which is the Operator, having a combined working interest of at least ___**one hundred**___ percent (__**100**__%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required

C    AFFILIATES

For the purpose of administering the voting procedures of Sections I 6 A and I 6 B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates

For the purposes of administering the voting procedures in Section I 6 A, if a Non-Operator is an Affiliate of the Operator, votes under Section I 6 A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items

**1.    RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations

**2.    LABOR**

A    Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for

(1)    Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)    Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II 6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)    Operator's employees providing First Level Supervision,

(4)    Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)    Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*)

Charges for the Operator's employees identified in Section II 2 A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category

Charges for personnel chargeable under this Section II 2 A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U S employee pursuant to this Section II 2, unless otherwise approved by the Parties pursuant to Section I 6 A (*General Matters*)

B    Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II 2 A, excluding severance payments or other termination allowances Such costs under this Section II 2 B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II 2 A If percentage assessment is used, the rate shall be based on the Operator's cost experience

C    Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II 2 A and B

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc  (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc

D    Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II 2 A when the expenses are incurred in connection with directly chargeable activities

E    Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II 2 A  Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or  that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account  Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I 6 A (*General Matters*)

F    Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II 2 A  This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session  The training cost shall be charged or allocated to the property or properties directly benefiting from the training  The cost of the training course shall not exceed prevailing commercial rates, where such rates are available

G    Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II 2 A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS

H    Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II 2 A

3.    **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*)  Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations  The accumulation of surplus stocks shall be avoided

4.    **TRANSPORTATION**

A    Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations

B    Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below  Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below

(1)    If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property  The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property  The Operator shall consistently  apply the selected alternative

(2)    If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight  Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight

5.    **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II 7 (*Affiliates*), or excluded under Section II 9 (*Legal Expense*)  Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors")

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*)

6.    **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows

A    The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation  The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II 2 A (*Labor*)  Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ percent (_____%) per annum, provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc  (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc

c o p a s

~~equipment and facilities investment have been fully depreciated~~ The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property

B    In lieu of charges in Section II 6 A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%) If equipment and facilities are charged under this Section II 6 B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates

**7.    AFFILIATES**

A    Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ **1,000.00** If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I 6 A (*General Matters*)

B    For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I 6 A (*General Matters*), if the charges exceed $ **1,000.00** in a given calendar year

C    The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation, provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II 12 (*Communications*)

If the Parties fail to designate an amount in Sections II 7 A or II 7 B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0 00)

**8.    DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator

**9.    LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I 6 A (*General Matters*) or otherwise provided for in the Agreement

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement

**10.    TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc

c o p a s

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I 6 A (*General Matters*)

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account

## 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U S Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems") If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II 6 (*Equipment and Facilities Furnished by Operator*) If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation

## 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II 2 (*Labor*), II 5 (*Services*), or Section III (*Overhead*), as applicable

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable

## 14. ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws

## 15. OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations Charges made under this Section II 15 shall require approval of the Parties, pursuant to Section I 6 A (*General Matters*)

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II 13, III 1 A(ii), and III 2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc

**c o p a s**

1      • human resources
2      • management
3      • supervision not directly charged under Section II 2 (*Labor*)
4      • legal services not directly chargeable under Section II 9 (*Legal Expense*)
5      • taxation, other than those costs identified as directly chargeable under Section II 10 (*Taxes and Permits*)
6      • preparation and monitoring of permits and certifications, preparing regulatory reports, appearances before or meetings with
7        governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections, reviewing,
8        interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws
9
10 Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing
11 overhead functions, as well as office and other related expenses of overhead functions
12
13 **I.    OVERHEAD—DRILLING AND PRODUCING OPERATIONS**
14
15      As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this
16      Section III, the Operator shall charge on either
17
18      ☑ **(Alternative 1)** Fixed Rate Basis, Section III 1 B
19      ☐ **(Alternative 2)** Percentage Basis, Section III 1 C
20
21    A   TECHNICAL SERVICES
22
23      (i)    Except as otherwise provided in Section II 13 (*Ecological, Environmental, and Safety*) and Section III 2 (*Overhead – Major*
24          *Construction and Catastrophe*), or by approval of the Parties pursuant to Section I 6 A (*General Matters*), the salaries, wages,
25          related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical
26          Services
27
28          ☑ **(Alternative 1 – Direct)** shall be charged <u>direct</u> to the Joint Account
29
30          ☐ **(Alternative 2 – Overhead)** shall be covered by the <u>overhead</u> rates
31
32      (ii)   Except as otherwise provided in Section II 13 (*Ecological, Environmental, and Safety*) and Section III 2 (*Overhead – Major*
33          *Construction and Catastrophe*), or by approval of the Parties pursuant to Section I 6 A (*General Matters*), the salaries, wages,
34          related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical
35          Services
36
37          ☐ **(Alternative 1 – All Overhead)** shall be covered by the <u>overhead</u> rates
38
39          ☐ **(Alternative 2 – All Direct)** shall be charged <u>direct</u> to the Joint Account
40
41          ☑ **(Alternative 3 – Drilling Direct)** shall be charged <u>direct</u> to the Joint Account, <u>**only**</u> to the extent such Technical Services
42          are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary
43          abandonment, or abandonment if a dry hole Off-site Technical Services for all other operations, including workover,
44          recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section
45          III 2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates
46
47      Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations
48      set forth in Section II 7 (*Affiliates*) Charges for Technical personnel performing non-technical work shall not be governed by this Section
49      III 1 A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed
50
51   B   OVERHEAD—FIXED RATE BASIS
52
53      (1)   The Operator shall charge the Joint Account at the following rates per well per month
54
55          Drilling Well Rate per month $   **10,028.00**       (prorated for less than a full month)
56
57          Producing Well Rate per month $   **1,002.80**
58
59      (2)   Application of Overhead—Drilling Well Rate shall be as follows
60
61          (a)   Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion
62             equipment used on the well is released, whichever occurs later Charges for offshore and inland waters drilling wells shall
63             begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion
64             equipment moves off location, or is released, whichever occurs first No charge shall be made during suspension of drilling
65             and/or completion operations for fifteen (15) or more consecutive calendar days
66

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days

(3) Application of Overhead—Producing Well Rate shall be as follows

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III 1 B (2)(a) or (b) This one-well charge shall be made whether or not the well has produced

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet

(e) Any well not meeting the criteria set forth in Sections III 1 B (3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement, provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement The adjustment shall be computed by applying the adjustment factor most recently published by COPAS The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates")

C OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates

(a) Development Rate _____ percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II 9 (*Legal Expense*) and all Material salvage credits

(b) Operating Rate _____ percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II 1 (*Rentals and Royalties*) and II 9 (*Legal Expense*), all Material salvage credits, the value of substances purchased for enhanced recovery, all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property

(2) Application of Overhead—Percentage Basis shall be as follows

(a) The Development Rate shall be applied to all costs in connection with

[i] drilling, redrilling, sidetracking, or deepening of a well
[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days
[iii] preliminary expenditures necessary in preparation for drilling
[iv] expenditures incurred in abandoning when the well is not completed as a producer
[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III 2 (*Overhead–Major Construction and Catastrophe*)

(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III 2 (*Overhead–Major Construction and Catastrophe*)

2. **OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc (COPAS)



Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster  The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event

A    If the Operator absorbs the engineering, design and drafting costs related to the project

(1)    ____5____% of total costs if such costs are less than $100,000, plus

(2)    ____3____% of total costs in excess of $100,000 but less than $1,000,000, plus

(3)    ____2____% of total costs in excess of $1,000,000

~~B    If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account~~

~~(1)    _____% of total costs if such costs are less than $100,000, plus~~

~~(2)    _____% of total costs in excess of $100,000 but less than $1,000,000, plus~~

~~(3)    _____% of total costs in excess of $1,000,000~~

Total cost shall mean the gross cost of any one project  For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded  For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included  Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries  Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions

In the event of any conflict between the provisions of this Section III 2 and the provisions of Sections II 2 (*Labor*), II 5 (*Services*), or II 7 (*Affiliates*), the provisions of this Section III 2 shall govern

3.   **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I 6 B (*Amendments*)

### IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions  The Operator shall provide all Material for use in the conduct of Joint Operations, however, Material may be supplied by the Non-Operators, at the Operator's option  Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter

1.   **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received  The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct  A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location  Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase  If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc

## 2. TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer, provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer Material shall be disposed of in accordance with Section IV 3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached

A   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I 6 A (*General Matters*) Transfers of new Material will be priced using one of the following pricing methods, provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS)

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV 2 B (*Freight*)

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV 2 B (*Freight*)

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property

B   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS) If not using CEPS, transportation costs shall be calculated as follows

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point

(4) Transportation costs for Material other than that described in Sections IV 2 B (1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred All transportation costs are subject to Equalized Freight as provided in Section II 4 (*Transportation*) of this Accounting Procedure

C   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc (COPAS)



**D   CONDITION**

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV 2 A (*Pricing*), IV 2 B (*Freight*), and IV 2 C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss, provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I 6 A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV 2 A (*Pricing*), IV 2 B (*Freight*), and IV 2 C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV 2 D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV 2 A (*Pricing*), IV 2 B (*Freight*), and IV 2 C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV 2 A (*Pricing*), IV 2 B (*Freight*), and IV 2 C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e g , power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I 6 A (*General Matters*)

(5)   Condition "E" – Junk shall be priced at prevailing scrap value prices.

**E   OTHER PRICING PROVISIONS**

(1)   Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV 1 (*Direct Purchases*) or IV 2 A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual")

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual")

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc  (COPAS)



c o p a s

**3. DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations  The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator  To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached  If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV 2 (*Transfers*)

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV 2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement  The Operator shall provide documentation supporting the classification of the Material as Condition C

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material

**4. SPECIAL PRICING PROVISIONS**

A   PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property  Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV 2 (*Transfers*) or Section IV 3 (*Disposition of Surplus*), as applicable

B   SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item  If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV 2 A (*Pricing*) or scrap value, whichever is higher  In no event shall the amount charged exceed the value of the item commensurate with its use

C   MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV 2 (*Transfers*)  Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report  Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV 2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc  (COPAS)



c o p a s

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc

**1. DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"), provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory All Parties shall be governed by the results of any directed inventory

Expenses of directed inventories will be borne by the Joint Account, provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs The Operator is expected to exercise judgment in keeping expenses within reasonable limits Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory Expenses of directed inventories may include the following

A   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I 6 A (*General Matters*) The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation

B   Actual transportation costs and Personal Expenses for the inventory team

C   Reasonable charges for report preparation and distribution to the Non-Operators

**2. NON-DIRECTED INVENTORIES**

A   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account

B   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork

C   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V 1 (*Directed Inventories*), V 2 A (*Operator Inventories*), or V 2 B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory, provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V 1 (*Directed Inventories*)

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc (COPAS)

# EXHIBIT "D"

Attached to and made a part of that certain Joint Operating Agreement
dated November 1, 2010, by and between Helis Oil & Gas Company, L.L.C., as Operator and
LandSouth Properties, LLC, et al, as Non-Operators

# INSURANCE

At all times while operations are conducted hereunder, Operator shall carry and charge to the Joint Account insurance of the types and in the amounts as follows:

**Workers' Compensation** insurance in full compliance with all applicable state and federal laws and regulations; Employers Liability insurance with limits of $100,000 per accident covering injury or death to any employee that may be outside the scope of the Workers' Compensation Statute of the state in which the work is performed.

**Commercial General Liability** insurance with limits of $1,000,000 per occurrence for bodily injury and for property damages caused by an occurrence. Non-Operating working interest owners shall be named additional insured on the Commercial General Liability insurance policy, but only with respect to the performance of work hereunder.

**Automobile Liability** insurance covering owned, non-owned, and hired automotive equipment with limits of $1,000,000 combined single limit for bodily injury and property damage. No direct charge shall be made by Operator for premiums paid for such insurance for Operator's fully owned automotive equipment.

Operator shall not carry insurance for the benefit of the Joint Account covering loss or damage to the jointly owned property or production therefrom caused by fire, explosion, windstorm, tornado, flood, vandalism, malicious mischief, or other extended perils; and the Joint Account shall be charged with all loss and expenditures caused or incurred as the result thereof, or as the result of any other casualty for which the Operator is not required to carry insurance hereunder. Operator shall notify Non-Operators of any and all losses of this description. To the extent of any insurance coverage, each party waives its rights of recovery under the insurance contract against all other parties to this Agreement.

Liability, except that covered by insurance, against any of the parties for damages to property of third person, or injury to or death of third persons, or injury to or death of third persons arising out of the joint operations, including expenses incurred in defending claims or actions asserting liability of this character, shall be borne by each of the parties hereto in proportion to their respective undivided interest in the joint operations.

It is understood and agreed that Operator is not a warrantor of the financial responsibility of the insurer with whom such insurance is carried, and that except for willful misconduct, Operator shall not be liable to Non-Operators for any loss suffered on account of the insufficiency of the insurance carried or of the insurers with whom carried.

Operator will provide Cost of Well Control Insurance with limits of a minimum of $3,000,000 per occurrence on land with a minimum of $100,000 deductible. Limits and deductibles are sealed to the interest covered by Operator. Any non-operating partner shall pay their prorata share of the Cost of Well Control Insurance unless a certificate of insurance, with a company acceptable to Operator, evidencing comparable coverage to that carried by Operator and approved by Operator.

In the event the Operator elects to self insure any of the above risks below the stated limits, or to materially reduce the limits of coverage obtained from third party insurers, then Operator will give written notice to all parties to this Agreement of such events.

Henderson 16-34/27H

## EXHIBIT "F"

Attached to and made a part of that certain Joint Operating Agreement
dated November 1, 2010, by and between Helis Oil & Gas Company, L.L.C., as Operator and
LandSouth Properties, LLC, et al, as Non-Operators

## EQUAL EMPLOYMENT OPPORTUNITY

I.    EQUAL EMPLOYMENT OPPORTUNITY PROVISION

During the performance of this contract, the Operator agrees as follows:

(1)    The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Operator will take affirmative action to ensure that applicants are employed and the employees are treated equally during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination; rate of pay or other forms of compensation and selection for training, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this non-discrimination clause.

(2)    The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3)    The Operator will send to each labor union, or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer advising the labor union or workers' representative of the Operator's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4)    The Operator will comply with all provisions of Executive Order No. 11246 of September 24, 1965 and of the rules, regulations and relevant orders of the Secretary of Labor.

(5)    The Operator will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965 and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

(6)    In the event of the Operator's noncompliance with the non-discrimination clauses of this contract or with any of such rules, regulations or orders, this contract may be canceled, terminated or suspended in whole or in part and the Operator may be declared ineligible for further government contracts in accordance with procedures authorized by Executive Order No. 11246 of September 24, 1965 and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965 or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7)    The Operator will include the provisions of Paragraphs 1-7 in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965 so that such provisions will be binding upon each subcontractor or vender. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Operator becomes involved in or is threatened with litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

Operator acknowledges that it may be required to file Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission, the Plans for Progress with Joint Reporting Committee, Federal Depot, Jeffersonville, Indiana, within thirty (30) days of the date of contract award if such report has not been filed for the current year and otherwise comply with or file such other compliance

reports as may be required under Executive Order 11246, as amended, and rules and regulations adopted thereunder.

Operator further acknowledges that he may be required to develop a written affirmative action compliance program as required by the rules and regulations approved by the Secretary of Labor under authority of Executive Order 11246 and supply Non-Operators with a copy of such program if they so request.

## II.   CERTIFICATION OF NON-SEGREGATED FACILITIES

(1)   The Operator assures Non-Operators that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are in fact segregated on a basis of race, color, religion, or national origin because of habit, local custom, or otherwise.  It is further understood and agreed that maintaining or providing segregated facilities for its employees are permitting its employees to perform their services at any location under its control where segregated facilities are maintained is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965.

(2)   Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor dated May 21, 1968, and the provisions of the equal opportunity clause enumerated in contracts between the United States of America and Non-Operators.

(3)   Whoever knowingly and willfully makes any false, fictitious, or fraudulent representation may be liable to criminal prosecution under 18 U.S.C. Sec. 1001.

## III.   OCCUPATIONAL SAFETY AND HEALTH ACT

Operator will observe and comply with all safety and health standards promulgated by the Secretary of Labor under Section 107 of the Contract Work Hours and Standards Act, published in 29 CFR Part 1518 and adopted by the Secretary of Labor as occupational safety and health standards under the Williams-Stager Occupational Safety and Health Act of 1970.  Such safety and health standards shall apply to all subcontractors and their employees as well as to the prime contractor and its employees.

## IV.   VETERAN'S PREFERENCE

Operator agrees to comply with the following insofar as contracts it lets for an amount of $10,000 or more or which will generate 400 or more man-days of employment (each man-day consisting of any day in which an employee performs more than one hour of work) and further agrees to include the following provision in contracts with contractors and subcontractors:

"CONTRACTOR AND SUBCONTRACTOR LISTING REQUIREMENT"

(1)   As provided by 41 CFR 50-250, the contractor agrees that all employment openings of the contractor which exist at the time of the execution of this contract and those which occur during the performance of this contract, including those not generated by the contract and including those occurring at an establishment of the contractor other than the one wherein the contract is being performed, but excluding those of independently operated corporate affiliates, shall, to the maximum extent feasible, be offered for listing at an appropriate local office of the state employment service system wherein the opening occurs and to provide such periodic reports to such local office regarding employment openings and hires as may be required:  Provided, that this provision shall not apply to openings which the contractor fills from within the contractor's organization or are filled pursuant to a customary and traditional employer-union hiring arrangement and that the listing of employment openings shall involve only the normal obligations which attach to the placing of job orders.

(2)   The contractor agrees to place the above provision in any subcontract directly under this contract.

## V.   CERTIFICATION OF COMPLIANCE WITH ENVIRONMENTAL LAWS

Operator agrees to comply with the Clean Air Act (42 U.S.C. Sec. 1857) and the Federal Water Pollution Control Act (33 U.S.C. Sec. 1251) when conducting operations involving nonexempt contracts.  In all nonexempt contracts with subcontractors, Operator shall require:

(1)     No facility is to be utilized by subcontractor in the performance of this contract with the Operator which is listed on the Environmental Protection Agency (EPA) List of Violating Facilities.  See Executive Order No. 11738 of September 12, 1973, and 40 CFR Sec. 15.20.

(2)     Prompt written notification shall be given by subcontractor to Operator of any communication indicating that any such facility is under consideration to be included on the EPA List of Violating Facilities.

(3)     Subcontractor shall comply with all requirements of Section 114 of the Clean Air Act (42 U.S.C. Sec. 1857) and Section 308 of the Federal Water Pollution Control Act (33 U.S.C. Sec. 1251), relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in these Sections, and all regulations and guidelines issued thereunder.

(4)     The foregoing criteria and requirements shall be included in all of subcontractor's nonexempt subcontracts, and subcontractor shall take such action as the government may direct as a means of enforcing such provisions.  See 40 CFR Sec. 15.4 and 5.

## EXHIBIT "H"

Attached to and made a part of that certain Joint Operating Agreement
dated November 1, 2010, by and between Helis Oil & Gas Company, L.L.C., as Operator and
LandSouth Properties, LLC, et al, as Non-Operators

STATE OF NORTH DAKOTA

COUNTY OF McKENZIE

KNOW ALL MEN BY THESE PRESENTS, that Helis Oil & Gas Company, L.L.C., whose address is 100 North 27th Street, Suite 255, Billings, Montana 59101 (hereinafter referred to as "Operator"), and LandSouth Properties, LLC, P.O. Box 4108, Monroe, Louisiana 71211-4108; Gary Lee McCormick, P.O. Box 4108, Monroe, Louisiana 71211-4108; Lee McCormick Marital Trust, P.O. Box 4108, Monroe, Louisiana 71211-4108, Robert J. McCormick, P.O. Box 4108, Monroe, Louisiana 71211-4108; Sklarco, LLC, 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101; JJS Working Interests, LLC, 4295 San Felipe, Suite 20, Houston, Texas 77027; Black Stone Energy Company, 1001 Fannin, Suite 2020, Houston, Texas 77002-6709 (hereinafter collectively referred to as "Non-Operators"), hereby give notice as follows:

WHEREAS, by that certain Joint Operating Agreement dated November 1, 2010 (hereinafter referred to as "Operating Agreement"), by and between Operator and Non-Operators, concerning the participation by Non-Operators, with Operator in the development for oil and gas of that certain "Contract Area", as outlined on the attached Exhibit "A", in McKenzie County, North Dakota, and the acquisition by such Non-Operators of interests therein, Operator was granted the following described liens and security interests under the terms of Article VII.B. of the Operating Agreement (hereinafter referred to as "Operator's Liens"):

## ARTICLE VII.B.
## LIENS AND PAYMENT DEFAULTS

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operator to secure payment of Operator's proportionate share of expense.

NOW, THEREFORE, Operator and Non-Operators hereby give notice of the Operator's Liens granted by Non-Operators all in accordance with the provisions of the Operating Agreement quoted hereinabove, which Operator's Liens consist of: (i) a lien upon all of the rights, titles, and interests of each Operator/Non-Operator, whether now existing or hereafter acquired, in and to (a) the oil, gas, and mineral leases covering the Contract Area (herein referred to as the "Leases"), and (b) all oil, gas, and other minerals in, on, and under the Contract Area; and (ii) a security interest in and to all of the rights, titles, interests, claims, general intangibles, proceeds, and products thereof of each Operator or Non-Operator, whether now existing or hereafter acquired in and to (a) all oil, gas, and other minerals produced from the Leases and the Contract Area when produced, (b) all accounts receivable accruing or arising as the result of the sale of such oil, gas, and other minerals, (c) all cash or other proceeds from the sale of such oil, gas, and other minerals once produced, and (d) all oil and gas wells and other surface and subsurface equipment and facilities of any kind or character located on the Leases, and the Contract Area and the cash or other proceeds realized from the sale thereof.

This instrument may be executed in any number of counterparts, each of which shall be considered original for all purposes.

IN WITNESS WHEREOF, this Agreement is executed this _____ day of _____, 2011.

*Henderson 16-34/27H*

OPERATOR:

Helis Oil & Gas Company, L.L.C.
By:  Helis Energy, L.L.C., Manager

David A. Kerstein
President

NON-OPERATORS:

LandSouth Properties, LLC

Printed Name: _____
Title: _____

Gary Lee McCormick

Printed Name: _____
Title: _____

Lee McCormick Marital Trust

Printed Name: _____
Title: _____

Robert J. McCormick

Printed Name: _____
Title: _____

Sklarco, LLC

Printed Name: _____
Title: _____

JJS Working Interest, LLC

Printed Name: _____
Title: _____

*Henderson 16-34/27H*

OPERATOR:

Helis Oil & Gas Company, L.L.C.
By:  Helis Energy, L.L.C., Manager

David A. Kerstein
President

NON-OPERATORS:

LandSouth Properties, LLC

Printed Name: _Robert J. McCormick_
Title: _Managing Member_

Gary Lee McCormick

Printed Name: _____
Title: _____

Lee McCormick Marital Trust

Printed Name: _____
Title: _____

Robert J. McCormick

Printed Name: _____
Title: _____

Sklarco, LLC

Printed Name: _____
Title: _____

JJS Working Interest, LLC

Printed Name: _____
Title: _____

*Henderson 16-34/27H*

OPERATOR:

Helis Oil & Gas Company, L.L.C.
By:  Helis Energy, L.L.C., Manager

_____
David A. Kerstein
President

NON-OPERATORS:

LandSouth Properties, LLC

_____
Printed Name: _____
Title: _____

Gary Lee McCormick

*Gary Lee McCormick*
Printed Name: *Gary Lee McCormick*
Title: _____

Lee McCormick Marital Trust

_____
Printed Name: _____
Title: _____

Robert J. McCormick

_____
Printed Name: _____
Title: _____

Sklarco, LLC

_____
Printed Name: _____
Title: _____

JJS Working Interest, LLC

_____
Printed Name: _____
Title: _____

*Henderson 16-34/27H*

OPERATOR:

Helis Oil & Gas Company, L.L.C.
By:  Helis Energy, L.L.C., Manager

_____
David A. Kerstein
President

NON-OPERATORS:

LandSouth Properties, LLC

_____
Printed Name: _____
Title: _____

Gary Lee McCormick

_____
Printed Name: _____
Title: _____

Lee McCormick Marital Trust

_____
Printed Name: _Robert McCormick____
Title: __Co-Trustee_____

Robert J. McCormick

_____
Printed Name: _____
Title: _____

Sklarco, LLC

_____
Printed Name: _____
Title: _____

JJS Working Interest, LLC

_____
Printed Name: _____
Title: _____

*Henderson 16-34/27H*

OPERATOR:                          Helis Oil & Gas Company, L.L.C.
                                   By: Helis Energy, L.L.C., Manager

                                   _____
                                   David A. Kerstein
                                   President


NON-OPERATORS:                     LandSouth Properties, LLC

_____
                                   _____
                                   Printed Name: _____
                                   Title: _____



                                   Gary Lee McCormick

_____
                                   _____
                                   Printed Name: _____
                                   Title: _____



                                   Lee McCormick Marital Trust

_____
                                   _____
                                   Printed Name: _____
                                   Title: _____



                                   Robert J. McCormick

_____
                                   _____
                                   Printed Name: *Robert J McCormac* 01/18/17
                                   Title: _____



                                   Sklarco, LLC

_____
                                   _____
                                   Printed Name: _____
                                   Title: _____



                                   JJS Working Interest, LLC

_____
                                   _____
                                   Printed Name: _____
                                   Title: _____

*Henderson 16-34/27H*

OPERATOR:

Helis Oil & Gas Company, L.L.C.
By: Helis Energy, L.L.C., Manager

_____
David A. Kerstein
President


NON-OPERATORS:

LandSouth Properties, LLC

_____          _____
                                         Printed Name: _____
                                         Title: _____


Gary Lee McCormick

_____          _____
                                         Printed Name: _____
                                         Title: _____


Lee McCormick Marital Trust

_____          _____
                                         Printed Name: _____
                                         Title: _____


Robert J. McCormick

_____          _____
                                         Printed Name: _____
                                         Title: _____


Sklarco, LLC

_____          _____
Lindsay Abernathy                        Printed Name: David A. Barlow
                                         Title: Vice President - Chief Operating Officer
                                                Sklarco L. L. C.


JJS Working Interest, LLC

_____          _____
                                         Printed Name: _____
                                         Title: _____

*Henderson 16-34/27H*

OPERATOR:                                   Helis Oil & Gas Company, L.L.C.
                                            By: Helis Energy, L.L.C., Manager

                                            _____
                                            David A. Kerstein
                                            President


NON-OPERATORS:                              LandSouth Properties, LLC

_____
                                            _____
                                            Printed Name: _____
                                            Title: _____


                                            Gary Lee McCormick

_____
                                            _____
                                            Printed Name: _____
                                            Title: _____


                                            Lee McCormick Marital Trust

_____
                                            _____
                                            Printed Name: _____
                                            Title: _____


                                            Robert J. McCormick

_____
                                            _____
                                            Printed Name: _____
                                            Title: _____


                                            Sklarco, LLC

_____
                                            _____
                                            Printed Name: _____
                                            Title: _____


                                            JJS Working Interest, LLC

*Debra Duncan-Kirk*
*Debra Duncan-Kirk*                         Printed Name: *Justin Simon*
                                            Title: *Manager*

*Henderson 16-34/27H*

Black Stone Energy Company

_____          _____
                                         Printed Name: _____
                                         Title: _____

*Henderson 16-34/27H*

STATE OF    LOUISIANA       )
                           )
PARISH OF    Orleans       )

    On this __20th__ day of ___January_____, 2011, before me appeared David A. Kerstein, to me personally known, who, by me duly sworn, did say that he is the President of Helis Energy, L.L.C., Manager of Helis Oil & Gas Company, L.L.C. and that said instrument was signed on behalf of said corporation by authority of its Board of Directors and said David A. Kerstein acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated.

    Witness my hand and official seal

My Commission does not expire

                                 _Linda A Reeg_
Notary Public
State of Louisiana
Printed Name _____
Residing at _____

                             **LINDA ALBE REEG, Notary Public**
                             **No. 61936, State of Louisiana**
                             **Parish of Orleans**
                             **My Commission expires at Death**

STATE OF _____ )
                                     )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____
_____, to me personally known, who, by me duly sworn, did say that he is the _
_____ of LandSouth Properties, LLC and that said instrument was signed on behalf of said corporation and said _____ acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated

    Witness my hand and official seal.

My Commission expires: _____

                             _____
                             Notary Public
                             State of _____
                             Printed Name _____
                             Residing at _____

STATE OF _____ )
                                       )
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 2011, by Gary Lee McCormick, known to me to be the identical person described in and who executed the within and foregoing instrument of writing and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth

    Witness my hand and official seal.

My Commission expires: _____

                             _____
                             Notary Public for the State of _____
                             State of _____
                             Printed Name _____
                             Residing at _____

*Henderson 16-34/27H*

STATE OF    LOUISIANA        )
                            )
PARISH OF    Orleans        )

On this _____ day of _____, 2011, before me appeared David A Kerstein, to me personally known, who, by me duly sworn, did say that he is the President of Helis Energy, L.L.C., Manager of Helis Oil & Gas Company, L L.C. and that said instrument was signed on behalf of said corporation by authority of its Board of Directors and said David A. Kerstein acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated.

      Witness my hand and official seal.

My Commission does not expire

_____
Notary Public
State of Louisiana
Printed Name _____
Residing at _____

STATE OF *Louisiana* )
                     )
COUNTY OF *Ouachita* )

On this 25th day of *January*, 2011, before me appeared *Robert J. McCormick*, to me personally known, who, by me duly sworn, did say that he is the *Managing Member* of LandSouth Properties, LLC and that said instrument was signed on behalf of said corporation and said *Managing Member* acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated

      Witness my hand and official seal.

My Commission expires *with life*

        **Rhonda D. Carlson**
        **Notary ID # 62714**
        **Parish of Ouachita**
        **My Commission Is For Life**

*Rhonda D. Carlson*
Notary Public
State of *Louisiana*
Printed Name *Rhonda D. Carlson*
Residing at *Ouachita, Louisiana*

STATE OF _____ )
                               )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2011, by Gary Lee McCormick, known to me to be the identical person described in and who executed the within and foregoing instrument of writing and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth

      Witness my hand and official seal

My Commission expires _____

_____
Notary Public for the State of _____
State of _____
Printed Name _____
Residing at _____

*Henderson 16-34/27H*

STATE OF   LOUISIANA        )
                           )
PARISH OF      Orleans     )

       On this _____ day of _____, 2011, before me appeared David A. Kerstein, to me personally known, who, by me duly sworn, did say that he is the President of Helis Energy, L L C., Manager of Helis Oil & Gas Company, L.L.C. and that said instrument was signed on behalf of said corporation by authority of its Board of Directors and said David A. Kerstein acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated.

       Witness my hand and official seal

My Commission does not expire.

                             _____
                             Notary Public
                             State of Louisiana
                             Printed Name _____
                             Residing at _____

STATE OF _____        )
                               )
COUNTY OF _____      )

On this _____ day of _____, 2011, before me appeared _____
_____, to me personally known, who, by me duly sworn, did say that he is the _
_____ of LandSouth Properties, LLC and that said instrument was signed on behalf of said corporation and said _____ acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated.

       Witness my hand and official seal.

My Commission expires· _____

                             _____
                             Notary Public
                             State of _____
                             Printed Name _____
                             Residing at _____

STATE OF *Louisiana*        )
COUNTY OF *Ouachita*       )

       The foregoing instrument was acknowledged before me this *25th* day of *January*, 2011, by Gary Lee McCormick, known to me to be the identical person described in and who executed the within and foregoing instrument of writing and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

       Witness my hand and official seal.

My Commission expires: *with life*

                             *Rhonda D. Carlson*
                             Notary Public for the State of *Louisiana*
                             State of *Louisiana*

**Rhonda D. Carlson**
Notary ID # 62714
Parish of Ouachita
My Commission Is For Life

                             Printed Name *Rhonda D. Carlson*
                             Residing at *Ouachita, Louisiana*

*Henderson 16-34/27H*

STATE OF _Louisiana_ )
                             )
COUNTY OF _Ouachita_ )

On this _25th_ day of _January_, 2011, before me appeared _Robert J. McCormick_, to me personally known, who, by me duly sworn, did say that he is the _Co-Trustee_ of the Lee McCormick Marital Trust and that said instrument was signed on behalf of said Trust and said _Co-Trustee_ acknowledged said instrument to be the free act and deed of said Trust in the capacity therein stated.
     Witness my hand and official seal

My Commission expires: _with life_

              _Rhonda D. Carlson_
              Notary Public
              State of _Louisiana_
   **Rhonda D. Carlson**      Printed Name _Rhonda D. Carlson_
     **Notary ID # 62714**     Residing at _Ouachita, LA_
     **Parish of Ouachita**
     **My Commission Is For Life**

STATE OF _____ )
                             )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2011, by Robert J. McCormick, known to me to be the identical person described in and who executed the within and foregoing instrument of writing and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

     Witness my hand and official seal.

My Commission expires: _____

              Notary Public for the State of _____
              State of _____
              Printed Name _____
              Residing at _____

STATE OF _____ )
                             )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____ _____, to me personally known, who, by me duly sworn, did say that he is the _____ of Sklarco, LLC and that said instrument was signed on behalf of said corporation and said _____ acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated
     Witness my hand and official seal.

My Commission expires: _____

              Notary Public
              State of _____
              Printed Name _____
              Residing at _____

STATE OF _____ )
                             )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____ _____, to me personally known, who, by me duly sworn, did say that he is the _____ of JJS Working Interests, LLC and that said instrument was signed on behalf of said corporation and said _____ acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated.
     Witness my hand and official seal.

My Commission expires: _____

              Notary Public
              State of _____
              Printed Name _____
              Residing at _____

*Henderson 16-34/27H*

STATE OF _____ )
                                                            )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____
_____, to me personally known, who, by me duly sworn, did say that he is the _
_____ of the Lee McCormick Marital Trust and that
said instrument was signed on behalf of said Trust and said _____
acknowledged said instrument to be the free act and deed of said Trust in the capacity therein stated.
        Witness my hand and official seal.

My Commission expires: _____       _____
                                                                         Notary Public
                                                                         State of _____
                                                                         Printed Name _____
                                                                         Residing at _____


STATE OF *Louisiana* )
                                                    )
COUNTY OF *Ouachita* )

        The foregoing instrument was acknowledged before me this *25th* day of *January*,
2011, by Robert J. McCormick, known to me to be the identical person described in and who executed
the within and foregoing instrument of writing and acknowledged to me that he executed the same as his
free and voluntary act and deed for the uses and purposes therein set forth.

        Witness my hand and official seal.

My Commission expires: *with life*       *Rhonda D. Carlson*
                                                                      Notary Public for the State of *Louisiana*
        **Rhonda D. Carlson**                            State of *Louisiana*
           Notary ID # 62714                               Printed Name *Rhonda D. Carlson*
           Parish of Ouachita                               Residing at *Ouachita, Louisiana*
        My Commission Is For Life


STATE OF _____ )
                                                            )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____
_____, to me personally known, who, by me duly sworn, did say that he is the _
_____ of Sklarco, LLC and that said instrument was
signed on behalf of said corporation and said _____ acknowledged
said instrument to be the free act and deed of said corporation in the capacity therein stated.
        Witness my hand and official seal.

My Commission expires: _____       _____
                                                                         Notary Public
                                                                         State of _____
                                                                         Printed Name _____
                                                                         Residing at _____


STATE OF _____ )
                                                            )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____
_____, to me personally known, who, by me duly sworn, did say that he is the _
_____ of JJS Working Interests, LLC and that said
instrument was signed on behalf of said corporation and said _____
acknowledged said instrument to be the free act and deed of said corporation in the capacity therein
stated.
        Witness my hand and official seal.

My Commission expires: _____       _____
                                                                         Notary Public
                                                                         State of _____
                                                                         Printed Name _____
                                                                         Residing at _____

*Henderson 16-34/27H*

STATE OF _____ )
                          )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____
_____ / _____, to me personally known, who, by me duly sworn, did say that he is the _____ of the Lee McCormick Marital Trust and that said instrument was signed on behalf of said Trust and said _____
acknowledged said instrument to be the free act and deed of said Trust in the capacity therein stated.
       Witness my hand and official seal

My Commission expires: _____

_____
Notary Public
State of _____
Printed Name _____
Residing at _____


STATE OF _____ )
                          )
COUNTY OF _____ )

       The foregoing instrument was acknowledged before me this _____ day of _____, 2011, by Robert J. McCormick, known to me to be the identical person described in and who executed the within and foregoing instrument of writing and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

       Witness my hand and official seal.

My Commission expires: _____

_____
Notary Public for the State of _____
State of _____
Printed Name _____
Residing at _____


STATE OF *Louisiana* )
                          )
COUNTY OF *Caddo* )

On this *20th* day of *January*, 2011, before me appeared *David A. Barbw* _____, to me personally known, who, by me duly sworn, did say that he is the _ *V.P. - C.O.O.* of Sklarco, LLC and that said instrument was signed on behalf of said corporation and said *he* _____ acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated.
       Witness my hand and official seal.

My Commission expires: *at death*

*Kim J. Elias*
Notary Public
State of ~~Kim S. Elias, Notary Public # 52698~~
Printed Name ~~Caddo Parish, Louisiana~~
Residing at ~~My Commission Is for Life~~


STATE OF _____ )
                          )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____
_____, to me personally known, who, by me duly sworn, did say that he is the _ _____ of JJS Working Interests, LLC and that said instrument was signed on behalf of said corporation and said _____
acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated.
       Witness my hand and official seal

My Commission expires: _____

_____
Notary Public
State of _____
Printed Name _____
Residing at _____

*Henderson 16-34/27H*

STATE OF _____ )
                              )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____ _____, to me personally known, who, by me duly sworn, did say that he is the _ _____ of the Lee McCormick Marital Trust and that said instrument was signed on behalf of said Trust and said _____ acknowledged said instrument to be the free act and deed of said Trust in the capacity therein stated.
        Witness my hand and official seal.

My Commission expires. _____

                            _____
                            Notary Public
                            State of _____
                            Printed Name _____
                            Residing at _____

STATE OF _____ )
                              )
COUNTY OF _____ )

        The foregoing instrument was acknowledged before me this _____ day of _____, 2011, by Robert J. McCormick, known to me to be the identical person described in and who executed the within and foregoing instrument of writing and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

        Witness my hand and official seal.

My Commission expires. _____

                            Notary Public for the State of _____
                            State of _____
                            Printed Name _____
                            Residing at _____

STATE OF _____ )
                              )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____ _____, to me personally known, who, by me duly sworn, did say that he is the _ _____ of Sklarco, LLC and that said instrument was signed on behalf of said corporation and said _____ acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated
        Witness my hand and official seal.

My Commission expires: _____

                            _____
                            Notary Public
                            State of _____
                            Printed Name _____
                            Residing at _____

STATE OF *Texas* )
                              )
COUNTY OF *Harris* )

On this *3rd* day of *February*, 2011, before me appeared *Justin Simons* _____, to me personally known, who, by me duly sworn, did say that he is the _ *Manager* of JJS Working Interests, LLC and that said instrument was signed on behalf of said corporation and said *Manager* acknowledged said instrument to be the free act and deed of said corporation in the capacity therein stated
        Witness my hand and official seal

My Commission expires: *4-13-2013*

                            *Bridgette R. Jones*
                            Notary Public
                            State of *TEXAS*
                            Printed Name *BRIDGETTE R. JONES*
                            Residing at *TEXAS*

BRIDGETTE RENEE JONES
Notary Public, State of Texas
My Commission Expires 04-13-2013

*Henderson 16-34/27H*

STATE OF _____ )
                                   )
COUNTY OF _____ )

On this _____ day of _____, 2011, before me appeared _____
_____, to me personally known, who, by me duly sworn, did say that he is the __
_____ of Black Stone Energy Company and that said
instrument was signed on behalf of said corporation and said _____
acknowledged said instrument to be the free act and deed of said corporation in the capacity therein
stated.
          Witness my hand and official seal.

My Commission expires: _____      _____
                                                   Notary Public
                                                   State of _____
                                                   Printed Name _____
                                                   Residing at _____