

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

Use of this identifying mark is prohibited
except when authorized in writing by the
American Association of Petroleum Landmen

OPERATING AGREEMENT

DATED

OPERATOR _____ GEO-VEST INCORPORATED _____

CONTRACT AREA ___ TOBY HORTON #2, being a well within

the Akin-Ross #1 GU.

_____

_____

_____

COUNTY OR PARISH OF _____ GREGG _____ , STATE OF ____ TEXAS ____

COPYRIGHT 1989 — ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.
A.A.P.L. NO. 610 - 1989

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| |    1. Failure of Title | 3 |
| |    2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| |    3. Other Losses | 3 |
| |    4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| |    1. Resignation or Removal of Operator | 4 |
| |    2. Selection of Successor Operator | 4 |
| |    3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| |    1. Competitive Rates and Use of Affiliates | 4 |
| |    2. Discharge of Joint Account Obligations | 4 |
| |    3. Protection from Liens | 4 |
| |    4. Custody of Funds | 5 |
| |    5. Access to Contract Area and Records | 5 |
| |    6. Filing and Furnishing Governmental Reports | 5 |
| |    7. Drilling and Testing Operations | 5 |
| |    8. Cost Estimates | 5 |
| |    9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| |    1. Proposed Operations | 5 |
| |    2. Operations by Less Than All Parties | 6 |
| |    3. Stand-By Costs | 7 |
| |    4. Deepening | 8 |
| |    5. Sidetracking | 8 |
| |    6. Order of Preference of Operations | 8 |
| |    7. Conformity to Spacing Pattern | 9 |
| |    8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| |    1. Completion | 9 |
| |    2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| |    1. Abandonment of Dry Holes | 9 |
| |    2. Abandonment of Wells That Have Produced | 10 |
| |    3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| |    (Option 1) Gas Balancing Agreement | 10 |
| |    (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 11 |
| | C. ADVANCES: | 11 |
| | D. DEFAULTS AND REMEDIES: | |
| |    1. Suspension of Rights | |
| |    2. Suit for Damages | |
| |    3. Deemed Non-Consent | |
| |    4. Advance Payment | |
| |    5. Costs and Attorneys' Fees | |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | |
| | F. TAXES: | |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | |
| | A. SURRENDER OF LEASES: | |
| | B. RENEWAL OR EXTENSION OF LEASES: | |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | |

i

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: .................................. 15
E. WAIVER OF RIGHTS TO PARTITION: ................................................... 15
F. PREFERENTIAL RIGHT TO PURCHASE: ................................................. 15
IX. INTERNAL REVENUE CODE ELECTION .................................................. 15
X. CLAIMS AND LAWSUITS ............................................................. 15
XI. FORCE MAJEURE ................................................................... 16
XII. NOTICES ....................................................................... 16
XIII. TERM OF AGREEMENT ............................................................ 16
XIV. COMPLIANCE WITH LAWS AND REGULATIONS .......................................... 16
   A. LAWS, REGULATIONS AND ORDERS: ............................................... 16
   B. GOVERNING LAW: .............................................................. 16
   C. REGULATORY AGENCIES: ........................................................ 16
XV. MISCELLANEOUS .................................................................. 17
   A. EXECUTION: .................................................................. 17
   B. SUCCESSORS AND ASSIGNS: ..................................................... 17
   C. COUNTERPARTS: ............................................................... 17
   D. SEVERABILITY: ............................................................... 17
XVI. OTHER PROVISIONS .............................................................. 17



Use of this identifying mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen

ii

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

# OPERATING AGREEMENT

1
2    THIS AGREEMENT, entered into by and between _____GEO-VEST, INC._____,
3    hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes
4    hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."
5                       WITNESSETH:
6    WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
7    identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil
8    and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,
9    NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

12    As used in this agreement, the following words and terms shall have the meanings here ascribed to them:
13    A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of
14    estimating the costs to be incurred in conducting an operation hereunder.
15    B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil
16    and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation
17    and production testing conducted in such operation.
18    C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be
19    developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas
20    Interests are described in Exhibit "A."
21    D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest
22    Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the
23    lesser.
24    E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the
25    cost of any operation conducted under the provisions of this agreement.
26    F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal
27    body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as
28    established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.
29    G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be
30    located.
31    H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.
32    I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as
33    provided in Article VI.B.2.
34    J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a
35    proposed operation.
36    K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous
37    hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is
38    specifically stated.
39    L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts
40    of land lying within the Contract Area which are owned by parties to this agreement.
41    M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein
42    covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.
43    N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a
44    Completion in a shallower Zone.
45    O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned
46    in order to attempt a Completion in a different Zone within the existing wellbore.
47    P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure,
48    restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but
49    are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking,
50    Deepening, Completing, Recompleting, or Plugging Back of a well.
51    Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to
52    change the bottom hole location unless done to straighten the hole or to drill around junk in the hole to overcome other
53    mechanical difficulties.
54    R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and
55    Gas separately producible from any other common accumulation of Oil and Gas.
56    Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes
57    natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.
## EXHIBITS

60    The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:
61    ___X___ A. Exhibit "A," shall include the following information:
62        (1) Description of lands subject to this agreement,
63        (2) Restrictions, if any, as to depths, formations, or substances,
64        (3) Parties to agreement with addresses and telephone numbers for notice purposes,
65        (4) Percentages or fractional interests of parties to this agreement,
66        (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
67        (6) Burdens on production.
68    XXXXXXXXXXXXXXXXXXXXXXXXXXXXX
69    ___X___ C. Exhibit "C," Accounting Procedure.
70    ___X___ D. Exhibit "D," Insurance.
71    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
72    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
73    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
74    _____ H. Other: _____



- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in
2  the body of this agreement, the provisions in the body of this agreement shall prevail.
3  ARTICLE III.
4  INTERESTS OF PARTIES
5  A. Oil and Gas Interests:
6  If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this
7  agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B,"
8  and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.
9  B. Interests of Parties in Costs and Production:
10  Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne
11  and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their
12  interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the
13  Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.
14  Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other
15  burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or
16  cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,
17  ___one-eighth (1/8)___ and shall indemnify, defend and hold the other parties free from any liability therefor.
18  Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is
19  burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts
20  stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend
21  and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as
22  the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to
23  be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)
24  which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any
25  liability therefor.
26  No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's
27  lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher
28  price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.
29  Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,
30  and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in
31  said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.
32  C. Subsequently Created Interests:
33  If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security
34  for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production
35  payment, net profits interest, assignment of production or other burden payable out of production attributable to its working
36  interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed
37  hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden
38  payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such
39  burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's
40  Lease or Interest to exceed the amount stipulated in Article III.B. above.
41  The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and
42  alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other
43  parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses
44  chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the
45  same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required
46  under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the
47  production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of
48  said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or
49  parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.
50  ARTICLE IV.
51  TITLES
52  A. Title Examination:
53  Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,
54  if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire
55  Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working
56  interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing
57  Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator
58  all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of
59  charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the
60  examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or
61  by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in
62  procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty
63  opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling
64  Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such
65  interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel
66  in the performance of the above functions.
67  Each party shall be responsible for securing curative matter and pooling amendments or agreements required in
68  connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation
69  and recording of pooling designations or declarations and communitization agreements as well as the filing of hearings
70  before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to
71  the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.
72  Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental
73  agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be directly
74  charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C" and

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
2  functions.
3      No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has
4  been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by
5  all of the Drilling Parties in such well.
6  B. Loss or Failure of Title:
7      1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a
8  reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest
9  (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title
10  failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject
11  to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas
12  Leases and Interests; and,
13      (a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if
14  applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from
15  Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there
16  shall be no additional liability on its part to the other parties hereto by reason of such title failure;
17      (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the
18  Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage
19  basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or
20  Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;
21      (c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract
22  Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable
23  to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and
24  burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well
25  attributable to such failed Lease or Interest;
26      (d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest
27  which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid
28  to the party or parties who bore the costs which are so refunded;
29      (e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises
30  by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received
31  production for which such accounting is required based on the amount of such production received, and each such party shall
32  severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;
33      (f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of
34  the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title
35  it shall bear all expenses in connection therewith; and
36      (g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an
37  interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder
38  of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest
39  is reflected on Exhibit "A."
40      2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
41  payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas
42  Lease or Interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary
43  liability against the party who failed to make such payment. Unless the party who failed to make the required payment
44  secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make
45  proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A"
46  shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party
47  who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership
48  of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully
49  reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest,
50  calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest,
51  it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole
52  previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
53      (a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease
54  burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or
55  Interest, on an acreage basis, up to the amount of unrecovered costs;
56      (b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed
57  to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and
58  marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination,
59  would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest
60  termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties
61  in proportion to their respective interests reflected on Exhibit "A"; and,
62      (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner
63  of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
64      3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles
65  IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on
66  Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because
67  express or implied covenants have not been performed (other than performance which requires only the payment of money),
68  and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no
69  readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.
70      4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any
71  Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety
72  (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed
73  or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B.
74  shall not apply to such acquisition.

- 3 -

except when authorized in writing by the
American Association of Petroleum Landmen

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1
2
ARTICLE V.
OPERATOR
3  A. Designation and Responsibilities of Operator:
4       GEO—VEST, INC._____ shall be the Operator of the Contract Area, and shall conduct
5  and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of
6  this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor
7  not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance
8  with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the
9  Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third
10  party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike
11  manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and
12  regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred
13  except such as may result from gross negligence or willful misconduct.
14  B. Resignation or Removal of Operator and Selection of Successor:
15      1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators.
16  If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of
17  serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a
18  successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest
19  based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be
20  deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and
21  Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an
22  operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall
23  mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of
24  operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.
25      Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first
26  day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator
27  or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of
28  Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a
29  Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single
30  subsidiary, parent or successor corporation shall not be the basis for removal of Operator.
31      2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a
32  successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an
33  interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the
34  affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A";
35  provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to
36  succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority
37  interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was
38  removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to
39  the operations conducted by the former Operator to the extent such records and data are not already in the possession of the
40  successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint
41  account.
42      3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have
43  resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal
44  bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all
45  Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or
46  assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in
47  possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators,
48  except the selection of a successor. During the period of time the operating committee controls operations, all actions shall
49  require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In
50  the event there are only two (2) parties to this agreement, during the period of time the operating committee controls
51  operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a
52  member of the operating committee, and all actions shall require the approval of two (2) members of the operating
53  committee without regard for their interest in the Contract Area based on Exhibit "A."
54  C. Employees and Contractors:
55      The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the
56  hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or
57  contractors shall be the employees or contractors of Operator.
58  D. Rights and Duties of Operator:
59      1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive
60  contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in
61  the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges
62  shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by
63  Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors
64  who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator
65  shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and
66  standards prevailing in the industry.
67      2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay
68  and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall
69  charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C."
70  Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits
71  made and received.
72      3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts
73  of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in
74  respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

## A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or
2    materials supplied.
3      4. **Custody of Funds:** Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced
4    or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the
5    Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until
6    used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as
7    provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator
8    and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in
9    this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the
10    parties otherwise specifically agree.
11      5. **Access to Contract Area and Records:** Operator shall, except as otherwise provided herein, permit each Non-Operator
12    or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to
13    all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of
14    operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access
15    rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate
16    Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such
17    interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any
18    and all reports and information obtained by Operator in connection with production and related items, including, without
19    limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding
20    purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the
21    information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures
22    shall be conducted in accordance with the audit protocol specified in Exhibit "C."
23      6. **Filing and Furnishing Governmental Reports:** Operator will file, and upon written request promptly furnish copies to
24    each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications
25    required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder.
26    Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.
27      7. **Drilling and Testing Operations:** The following provisions shall apply to each well drilled hereunder, including but not
28    limited to the Initial Well:
29      (a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which
30    drilling operations are commenced.
31      (b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well
32    as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.
33      (c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing
34    Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted
35    hereunder.
36      8. **Cost Estimates.** Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs
37    incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement.
38    Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.
39      9. **Insurance:** At all times while operations are conducted hereunder, Operator shall comply with the workers
40    compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-
41    insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall
42    be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties
43    as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on
44    or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted
45    and to maintain such other insurance as Operator may require.
46      In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the
47    parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive
48    equipment.

**ARTICLE VI.**
49
50    **DRILLING AND DEVELOPMENT**

51 XXXXXXXXXXXX
52 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
53 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
54
55
56
57
58
59
60 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
61
62
63
64
65
66
67 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
68 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

69 B. Subsequent Operations:
70      1. **Proposed Operations:** If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or
71    if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of
72    producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under
73    this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written
74    notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2   performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a
3   notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4   whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to
5   Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to ~~forty~~  24
6   ~~eight (48)~~ hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply
7   within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8   Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9   within the time and in the manner provided in Article VI.B.6.
10   If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11   contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12   forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13   promptly as practicable after the expiration of the ~~forty-eight (48)~~ hour period when a drilling rig is on location, as the case
14   may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15   the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16   by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17   additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18   way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19   acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as
20   specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21   said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22   proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
23   Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
24   reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance
25   with Article VI.B.5. in the event of a Sidetracking operation.
26   2. Operations by Less Than All Parties:
27     (a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or
28   VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29   Article, the party giving the notice and such other parties as shall elect to participate in the operation shall, no
30   later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31   expiration of the ~~forty-eight (48)~~ hour period when a drilling rig is on location, as the case may be) actually commence the
32   proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting
33   Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
34   the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35   account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The
36   rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37   designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when
38   conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39   agreement.
40   If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41   applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42   recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party,
43   within ~~forty-eight (48)~~ hours (exclusive of Saturday, Sunday and legal holidays) after delivery of such notice, shall advise the
44   proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45   proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46   the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47   Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48   interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a
49   Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50   proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i) . In the event a
51   drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52   total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may
53   withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54   days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55   If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56   of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57   period provided in Article VI.B.1., subject to the same extension right as provided therein.
58     (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
59   borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60   paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61   encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results
62   in a dry hole, then, subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63   the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64   participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65   shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66   increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,
67   Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68   paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69   well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70   expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking,
71   Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72   provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73   Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74   Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-
2    Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect
3    to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well or
4    market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes,
5    royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production
6    from such well accruing with respect to such interest until it reverts), shall equal the total of the following:
7       (i) __400__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment
8    beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and
9    piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first
10   production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other
11   provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that
12   interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning
13   of the operations; and
14       (ii) __400__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening,
15   Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C.,
16   and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections),
17   which would have been chargeable to such Non-Consenting Party if it had participated therein.
18      Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone
19   described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable
20   substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each
21   Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a
22   shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-
23   Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the
24   cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-
25   Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions
26   of this Article VI.B.2. (b) shall apply to such party's interest.
27      (c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or
28   Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in
29   such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full
30   recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to
31   participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking
32   operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at
33   any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such
34   Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the
35   cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __400__ % of
36   that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to
37   such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is
38   proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting
39   Parties in said well.
40      (d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's
41   share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem,
42   production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to
43   Non-Consenting Party's share of production not excepted by Article III.C.
44      In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting
45   Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all
46   such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back,
47   Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each
48   party receiving its proportionate part in kind or in value, less cost of salvage.
49      Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations
50   for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to
51   the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing,
52   Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement
53   of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the
54   Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties
55   shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of
56   the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from
57   the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas
58   produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or
59   periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with
60   any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited
61   against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such
62   Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-
63   Consenting Party.
64      If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided
65   for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day
66   following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall
67   own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as
68   such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking,
69   Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and
70   shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this
71   agreement and Exhibit "C" attached hereto.
72      3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have
73   been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise
74   terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required
2  under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening
3  operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted,
4  whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
5  of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation,
6  but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated
7  between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8  interest as shown on Exhibit "A" of all Consenting Parties.
9      In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party
10  may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in
11  Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended
12  response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending
13  the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be
14  allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's
15  interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.
16      4. Deepening: If less than all the parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17  pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article
18  VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone
19  of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the
20  Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate
21  in the Deepening operation.
22      In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective,
23  such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-
24  Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to
25  participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation
26  is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation,
27  such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses:
28      (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29  quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs
30  and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-
31  Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting
32  Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other
33  provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well
34  incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the
35  sole account of Consenting Parties.
36      (b) If the proposal is made after a Non-Consent Well that has been previously Completed as a well capable of producing
37  in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or
38  reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and
39  equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less
40  those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall
41  also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based
42  on the percentage of such Non-Consenting Party would have owned had it previously participated in such Non-Consent
43  Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in
44  connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the
45  cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-
46  Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the
47  well for Deepening.
48      The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
49  to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article
50  VI.F.
51      5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an
52  interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its
53  proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore
54  to be utilized as follows:
55      (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
56  incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.
57      (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
58  such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth
59  at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's
60  proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking
61  operation is initiated shall be determined in accordance with the provisions of Exhibit "C."
62      6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to
63  propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such
64  party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform
65  an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal
66  holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be
67  conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such
68  alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such
69  proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period or within
70  twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the
71  subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required
72  shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage
73  interest of the parties voting shall have priority over all other competing proposals; in the case of tie votes, the proposal

American Association of Petroleum Landmen

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2    party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after
3    delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4    proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
5    cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to
6    plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,
7    Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8    forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9    Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10    such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11    abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12    taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13    liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14    restoring the surface, for which the abandoning parties shall remain proportionately liable.
15      2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
16    conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
17    been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to
18    such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19    and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed
20    abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the
21    proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
22    operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23    applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24    against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25    proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26    within the required period or thereafter to conduct operations on such well shall entitle Operator to retain or take possession
27    of such well and plug and abandon the well.
28      Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29    the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30    of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31    the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
32    value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33    operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34    parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35    of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36    insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37    interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-
38    abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39    one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
40    attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
41    The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42    respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43    Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.
44      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45    from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46    request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47    charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48    ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49    shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50    further operations therein subject to the provisions hereof.
51      3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
52    between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53    however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54    operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55    in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
56    in a portion of the well shall pay their proportionate shares of abandonment and surface restoration costs for such well as
57    provided in Article VI.B.2.(b).
58   F. Termination of Operations:
59      Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60    Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without
61    consent of parties bearing      % of the costs of such operation; provided, however, that in the event granite or other
62    practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63    Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1. and the
64    provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.
65   G. Taking Production in Kind:
66      ☐   Option No. 1: Gas Balancing Agreement Attached
67      Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
68    Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
69    treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
70    in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
71    party taking its share of production in kind shall be required to pay for only its proportionate share of the cost of
72    Operator's surface facilities which it uses.
73      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
74    production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1     directly from the purchaser thereof for its share of all production.

2         If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate

3     share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by

4     the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to

5     time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by

6     Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to

7     the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any

8     time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser.

9     Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time

10     as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a

11     period in excess of one (1) year.

12         Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator

13     shall have no duty to share any existing market or to obtain a price equal to that received under any existing

14     market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing

15     contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said

16     contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days

17     written notice of such intended purchase and the price to be paid or the pricing basis to be used.

18         All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following

19     month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.

20     Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which

21     records shall be made available to Non-Operators upon reasonable request.

22         In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate

23     pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion-

24     ate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance

25     with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a

26     separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

27     ☒  Option No. 2: No Gas Balancing Agreement:

28         Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from

29     the Contract Area, exclusive of production which may be used in development and producing operations and in

30     preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure

31     incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall

32     be borne by such party. Any party taking its share of production in kind shall be required to pay for only its

33     proportionate share of such part of Operator's surface facilities which it uses.

34         Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in

35     production from the Contract Area, and, except as provided in Article VII.B, shall be entitled to receive payment

36     directly from the purchaser thereof for its share of all production.

37         If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate

38     share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the

39     revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others

40     at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator

41     may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall

42     be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator

43     to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered

44     to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's

45     election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase

46     contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other

47     party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the

48     minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1)

49     year.

50         Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator

51     shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation

52     fee equal to that received under any existing market or transportation arrangement. The sale or delivery by

53     Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not

54     give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil

55     and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written

56     notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give

57     notice to all parties of the first sale of Gas from any well under this Agreement.

58         All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following

59     month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.

60     Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which

61     records shall be made available to Non-Operators upon reasonable request.

62               ARTICLE VII.

63         EXPENDITURES AND LIABILITY OF PARTIES

64     A. Liability of Parties:

65         The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations,

66     and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the

67     liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have

68     any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation

69     hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other

70     partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or

71     principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have

72     established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own

73     respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other

74     with respect to activities hereunder.

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    B. Liens and Security Interests:
2        Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas
3    Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any
4    interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection
5    therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense,
6    interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil
7    and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest
8    granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and
9    overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or
10   otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or
11   used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts
12   (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead),
13   contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the
14   foregoing.
15       To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording
16   supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time
17   following execution hereof, and Operator is authorized to file this agreement or-the recording supplement executed herewith as
18   a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform
19   Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate
20   to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed
21   herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a
22   financing statement with the proper officer under the Uniform Commercial Code.
23       Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to
24   the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security
25   interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or
26   under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement,
27   whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject
28   to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder
29   whether or not such obligations arise before or after such interest is acquired.
30       To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the
31   Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code.
32   The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an
33   election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In
34   addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use
35   of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect
36   from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by
37   such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount
38   owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production
39   may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the
40   default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in
41   this paragraph.
42       If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by
43   Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the
44   proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so
45   paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each
46   paying party may independently pursue any remedy available hereunder or otherwise.
47       If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure
48   or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting
49   party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement
50   of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets
51   and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party
52   hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted
53   hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable
54   manner and upon reasonable notice.
55       Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien
56   law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting
57   the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or
58   utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the
59   payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.
60   C. Advances:
61       Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other
62   parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations
63   hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an
64   itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice
65   for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month.
66   Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and
67   invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as
68   provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expenses to the end
69   that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
70   D. Defaults and Remedies:
71       If any party fails to discharge any financial obligation under this agreement, including without limitation its failure to
72   make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for
73   such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the
74   remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator,
2  and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator.
3  Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified
4  below or otherwise available to a non-defaulting party.
5      1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default,
6  specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one
7  or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such
8  Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the
9  default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of
10 the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the
11 Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area
12 after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting
13 party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right
14 to receive information as to any operation conducted hereunder during the period of such default, the right to elect to
15 participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being
16 conducted under this agreement even if the party has previously elected to participate in such operation, and the right to
17 receive proceeds of production from any well subject to this agreement.
18     2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint
19 account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default
20 until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from
21 suing any defaulting party to collect consequential damages accruing to such party as a result of the default.
22     3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the
23 defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in
24 which event if the billing is for the drilling of a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a
25 well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting
26 party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with
27 respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party,
28 notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the
29 non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.
30     Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure
31 its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such
32 payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-
33 defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the
34 non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership
35 of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.
36     4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or
37 Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting
38 party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may
39 be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of
40 the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of
41 drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the
42 defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided
43 in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining
44 when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.
45     5. Costs and Attorneys' Fees. In the event any party is required to bring legal proceedings to enforce any financial
46 obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of
47 collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.
48 E. Rentals, Shut-in Well Payments and Minimum Royalties:
49     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid
50 by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties
51 own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to
52 make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper
53 evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or
54 minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which
55 results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.
56     Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to
57 production of a producing well, at least five (5) days (excluding Saturday, Sunday and legal holidays) prior to taking such
58 action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of
59 failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make
60 timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article
61 IV.B.3.
62 F. Taxes:
63     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all
64 property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed
65 thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as
66 to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and
67 Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being
68 subject to outstanding excess royalties, overriding royalties or production payments, the reduction in assessed taxes
69 resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to
70 such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part
71 upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to
72 the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's
73 working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner
74 provided in Exhibit "C."

- 13 -

COPYRIGHT 1989 — American Association of Petroleum Landmen

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2   prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3   determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4   and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5   the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6   paid by them, as provided in Exhibit "C."
7   Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8   to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.
9                                         ARTICLE VIII.
10                          ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
11  A. Surrender of Leases:
12      The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13  or in part unless all parties consent thereto.
14      However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15  notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16  delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a
17  party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18  described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19  implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20  located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the
21  assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22  consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
23  thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B."
24  Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25  accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26  shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27  in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the
28  reasonable salvage value of the latter's interest in any well's salvage materials and equipment attributable to the assigned or leased
29  acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30  the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less
31  than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the
32  assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33  interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made
34  varies according to depth, then the interest assigned shall similarly reflect such variances.
35      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38  agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.
39  B. Renewal or Extension of Leases:
40      If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41  shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42  promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following
43  delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44  affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45  allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interests held at that time by the
46  parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47  assignment of its proportionate interest therein by the acquiring party.
48      If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49  by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50  the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51  purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52  shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53  less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54  Agreement in the form of this agreement.
55      If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56  renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.
57      The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58  the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the
59  expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60  existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61  the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62  expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63  agreement.
64      The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.
65  C. Acreage or Cash Contributions:
66      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68  be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom
69  the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70  proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the
71  extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any
72  acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above
73  provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74  inside the Contract Area.

- 14 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder,
2 such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
3   D. Assignment; Maintenance of Uniform Interest:
4     For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas
5 Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other
6 disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells,
7 equipment and production unless such disposition covers either:
8     1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or
9     2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells,
10 equipment and production in the Contract Area.
11     Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
12 and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and
13 Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of
14 the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale,
15 encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the
16 instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other
17 disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect
18 to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation
19 conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security
20 interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.
21     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion,
22 may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures,
23 receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to
24 bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-
25 owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of
26 the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale
27 proceeds thereof.
28   E. Waiver of Rights to Partition:
29     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
30 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its
31 undivided interest therein.
32   F. Preferential Right to Purchase:
33   ☐ (Optional; Check if applicable)
34     Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
35 Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which
36 shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase
37 price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an
38 optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the
39 same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the
40 purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all
41 purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage
42 its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests,
43 or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets
44 to any party or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any
45 company in which such party owns a majority of the stock.

46                          ARTICLE IX.
47               INTERNAL REVENUE CODE ELECTION
48     If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the
49 parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each
50 party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle
51 "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and
52 the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected
53 such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal
54 Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by
55 Treasury Regulations §1.761. Should there be any requirement that each party hereby affected give further evidence of this
56 election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal
57 Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action
58 inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
59 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter
60 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party
61 hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each
62 such party states that the income derived by such party from operations hereunder can be adequately determined without the
63 computation of partnership taxable income.

64                          ARTICLE X.
65              CLAIMS AND LAWSUITS
66     Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure
67 does not exceed __Ten Thousand ————— Dollars ($ __10,000.00__ ) and if the payment is in complete settlement
68 of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over
69 the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling,
70 or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the
71 claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations
72 hereunder over which such individual has no control because of the rights given Operator by this agreement, the party shall
73 immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.
All claims or suits involving title to any drillsite tract subject to this
Agreement shall be treated as a claim or a suit against all parties hereto.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE XI.

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

ARTICLE XII.

NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

ARTICLE XIII.

TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☒ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

ARTICLE XIV.

COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Texas _____ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or
2  production of wells, on tracts offsetting or adjacent to the Contract Area.
3      With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages,
4  injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation
5  or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission
6  or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not
7  constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of
8  production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such
9  an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such
10 incorrect interpretation or application.

ARTICLE XV.

MISCELLANEOUS

13 A. Execution:
14      This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been
15  executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of
16  the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which
17  own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have
18  become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no
19  event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this
20  agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of
21  drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease
22  as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs
23  hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds
24  with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a
25  current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the
26  Initial Well which would have been charged to such person under this agreement if such person had executed the same and
27  Operator shall receive all revenues which would have been received by such person under this agreement if such person had
28  executed the same.
29 B. Successors and Assigns:
30      This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31  devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or
32  Interests included within the Contract Area.
33 C. Counterparts:
34      This instrument may be executed in any number of counterparts, each of which shall be considered an original for all
35  purposes.
36 D. Severability:
37      For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws,
38  this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to
39  this agreement to comply with all of its financial obligations provided herein shall be a material default.

ARTICLE XVI.

OTHER PROVISIONS

42 XVI.(i) Assessments Pursuant to the Offering Circular for which this
43 Operating Agreement is a part of:
44
45 OPERATOR shall have the right, but not the obligation, to levy and
46 or assess on the Non-Operator account not less than Five Percent
47 (5%) and not more than Fifty Percent (50%) of the cash or other
48 consideration accepted by Non-Operator for the conveyance of any
49 denomination, all or part thereof, the Non-Operator working interest
50 to any third party or other Non-Operator. This assessment shall be
51 payable to Operator out of the cash or other consideration accepted
52 by Non-Operator.
53
54 See pages 17.1 through 17.8 for the remaining, other provisions.



Use of this identifying mark is prohibited
except when authorized in writing by the
American Association of Petroleum Landmen

- 17 -

## ARTICLE XVI

A.   Subsequent Operations:

Whenever the time frame of thirty (30) days is specified under "B.   Subsequent Operations:" commencing on page 5 and ending on page 9 of this Operating Agreement, or as it relates directly to any notice periods on Non-Operator; the time frame shall be replaced with five (5) days or such response time specified by Operator on a notice submitted to Non-Operator by Operator.

B.   Advance Payments:

Notwithstanding anything contained herein to the contrary, Operator may, at its election and sole discretion, require any or all Non-Operators payment in advance of the due date for their share (if they are participating) of any delay rental payment, shut-in royalty payment or other lease maintenance payment, or payment in advance of the commencement date for their share (if they are participating) of the estimated, reasonable costs for any proposed work, including but not limited to the costs to drill, complete, rework, deepen, sidetrack, plug back or test any well drilled hereunder, or any other payment provided for herein.   Such election shall be exercised by Operator submitting to Non-Operators a statement of estimated expenses (which must be an AFE in the case of new proposal to drill, complete, rework, deepen, sidetrack, plug back or test) and an invoice for its share of such expenses.

Payment of an advance shall in no event relieve a Non-Operator of its obligation to pay its share of the actual costs of an approved operation, and when the actual costs have been determined, Operator shall adjust the accounts of the parties by refunding any net amounts due or invoicing the parties for additional sums owing, which additional sums shall be paid in accordance with the Accounting Procedure.

If Non-Operator so billed fails to pay its share on or before due date of a lease maintenance payment or within ten (10) days after receipt of said invoice for any other proposed operation, as applicable, Operator may notify such Non-Operator that it is in default.   If the defaulting Non-Operator does not tender its advance payment within five (5) days after notification of default, then such Non-Operator shall be subject to the following penalties:

(1)   In the case of a lease maintenance payment, Non-Operator shall forfeit and surrender to the Operator or its Designee(s) its interest in any lease for which the payment is to be made;

(2)   In cases other than lease maintenance payment, Operator, at its election, may either (a) proceed to foreclose on the liens against the default party's interests as provided for in Article XVI.L., or (b) deem Non-Operator to be a Non-Consenting Party under this Operating Agreement.

The penalties contained herein are in addition to those rights and remedies set forth elsewhere in this Agreement, except when such other rights and remedies are conflicting or inconsistent herewith, in which case the remedies herein contained, when exercised, shall replace such other rights and remedies.

C.   Operating Accounts:

The Operator may establish a separate escrow account at a state or national banking association for each portion of the Contract Area which does not have identical working interest ownership with all other portions of the Contract Area.   The Operator shall deposit into each such escrow account all cost and expense funds tendered by parties, and all payments for the sale of oil, gas, and other minerals, which may be received by the Operator with respect to the portion of the Contract Area to which such account relates.   The Operator shall pay the costs and expenses of operations of each portion of the Contract Area from funds on deposit in the escrow account to which such portion of the Contract Area relates, and the Operator is authorized to maintain a balance in each such account at all times equal to one hundred and twenty percent (120%) of the highest average monthly operating cost of the portion of the Contract Area to which such account relates, with any excess amount being remitted to the

A09\A09\1\104115                              17.1

parties in accordance with their ownership. Such remittances shall be made by the tenth (10th) day of the calendar month with respect to funds on account as of the last day of the immediately preceding calendar month. The initial escrow account balances shall be provided by the parties to the Operator on his request on the effective date of this Agreement in such amounts may be reasonably estimated by the Operator to be equal to one month of operating expenses for each respective portion of the Contract Area. In the event that any escrow account balance shall, as of the end of any calendar month, fall below the level which the Operator is authorized to maintain pursuant to this section, the parties owning an interest in the related portion of the Contract Area shall within ten (10) days of receipt of an invoice for same pay to the Operator their prorata portions of the amount necessary to re-establish the account at its authorized level.

D.    Operator Protection:

1.    Non-Operators hereby release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of any statutes, rules, rulings, regulations, orders or other pronouncements of any governmental authority relating to the Contract Area, including, but not limited to, the classification of wells, or the pricing, allocation, production and/or marketing of oil, gas or other hydrocarbons or liquids or liquid products therefrom to the extent Operator's interpretations or application of such statutes, rules, rulings, regulations, orders or other pronouncements were made in good faith. Non-Operators further agree to reimburse Operator for their proportionate share of any amounts Operator may be required to refund, rebate or pay as a result of an incorrect interpretation or application of such statutes, rules, rulings, together with Non-Operator's proportionate part of interest and penalties owing by Operator as a result of such incorrect interpretation or application of such statutes, rules, rulings, regulations, orders or other pronouncements.

2.    Notwithstanding anything to the contrary contained herein, Operator shall be entitled to charge to the Joint Account as follows:

(1)    Fees for legal services, ad valorem tax consultant, and expense in connection with preparation and presentation of evidence and exhibits at Railroad Commission hearings; preparation and handling of applications to and hearings before the Federal Power Commission. The Federal Energy Administration and other governmental agencies or regulatory bodies; provided, if Operator deems that such costs for any one item or project may exceed $75,000.00, consent of Non-Operators shall be obtained.

(2)    In the event Operator received 100% payment of the proceeds of production and Operator disperses royalties, then Operator shall be entitled to charge the Joint Account with the actual cost of the necessary division order title opinions, preparation of division orders and third party charges for making distribution or royalties, not to exceed actual cost, in addition to the fixed rate basis overhead set forth in Exhibit "C" hereto, Paragraph III, A (1) thereof.

3.    Notwithstanding anything in this Agreement to the contrary: (a) the Operator shall not be obligated to expend any funds or to incur any obligation for the payment of money unless fund sufficient to cover such obligations have been provided to the Operator by the parties; (b) the Operator shall not be obligated to perform or cause to be performed any work or activity whatsoever with respect to any portion of the Contract Area if the Operator has not been paid all Operator's fees and expenses which are due with respect to such portion of the Contract Area; and (c) the Operator shall not be deemed to be in breach of this Agreement for any reason whatsoever if the Operator exercises its rights pursuant to (a) or (b) preceding.

E.    Assignment:

    No assignment or other transfer or disposition of an interest subject to this Agreement shall be effective as to Operator or the other parties hereto until the first day of the month following the month in which (i) Operator receives an authenticated copy of the instrument evidencing such assignment, transfer or disposition and (ii) the person receiving such assignment, transfer or disposition has become obligated by instrument satisfactory to Operator to observe, perform and be bound by all of the covenants, terms and conditions of this Agreement. Prior to such date, neither Operator nor any other party shall be required to recognize such assignment, transfer or disposition for any purpose but may continue to deal exclusively with the party making such assignment, transfer or disposition in all matters under this Agreement including billings. No assignment or other transfer or disposition of an interest subject to this Agreement shall relieve a party of its obligations accrued prior to the effective date aforesaid. Further, no assignment, transfer or other disposition shall relieve any party of its liability for its share of costs and expenses which may be incurred in any operation to which such party has previously agreed or consented prior to the effective date aforesaid for the drilling, testing, completing and equipping, reworking, recompleting, side-tracking, deepening, plugging-back, or plugging and abandoning of a well even though such operation is performed after said effective date.

    In the event of transfer, sale, encumbrance or other disposition of interest within the Contract Area which creates the necessity of separate measurement of production, the party creating the necessity for such measurement shall alone bear the cost of purchase, installation and operation of such facilities.

F.    Attorneys Fees:

    In the event Operator shall ever be required to consult an attorney or bring legal proceedings in order to collect any sums due from any non-operators under this Agreement, then Operator shall also be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, whether or not a lawsuit was actually filed, which the lien provided for herein shall also secure.

G.    Overhead Rate Adjustment Provisions:

    In the event the drilling well rates or the producing well rates provided for in Section III.1.A.(3) of the Accounting Procedure shall ever be less than the prevailing rates being charged by financially responsible prudent operators in the area for comparable operations, then Operator may give written notice of such higher prevailing rates to Non-Operators. The higher prevailing rates specified in such notice shall become the effective rates hereunder as of the first day of the month following thirty (30) days from the giving of such notice unless a Non-Operator by written notice to Operator within said thirty (30) day period shall do either of the following:

    a.    Object to the proposed rates on the basis the same does not represent the prevailing rate as aforesaid. In such event, the parties shall attempt to agree upon such prevailing rates, failing which such rates shall be determined by law.

    b.    Propose to operate for a lesser rate (which shall never be less than the rate then in effect under the Agreement) than that proposed by Operator's notice. In this event, Non-Operator shall take over operations as of the beginning of the month following said thirty (30) day period unless the existing Operator shall agree to operate at such lesser rate.

    Any new rates established pursuant to this provision shall be subject to adjustment in the manner provided by Section III.A.(3) of the Accounting Procedure.

H.   Right of Operator to Disburse Net Proceeds:

Operator, at its election, shall have the right from time to time to receive from the purchaser or purchasers of the products revenues attributable to Non-Operator's interest in oil, gas, sulfur and other liquid or vaporous hydrocarbons produced from the Contract Area and disburse or have disbursed by its agent, the revenues to the owner of such revenues less all sums owed by Non-Operator to Operator.

I.   Option of Non-Operator Regarding Marketing Gas:

At Non-Operator's election, Operator agrees to use its best efforts to market Non-Operator's gas, casinghead gas, distillate and by products (the "Products") at the same price, terms and conditions received by Operator for its gas, casinghead gas, distillate and by products. In dealing with the Products hereunder, Non-Operators agree that Operator is authorized to do and perform each and every act and thing necessary to market the Products which Operator deems in its discretion to be proper or advisable, including, but not limited to, doing business with itself and all persons, natural or corporate, in privity with them or any of them, in the compression, dehydration, treating, gathering, transmission, or preparation of the Products for market, including the marketing of the Products on pipeline systems owned by Operator or by some, but not all, of the Non-Operators, and to pay for such services at the rates charged by others providing the same services in the area.  Non-Operators acknowledge that any such pipeline systems may service gas, casinghead gas, distillate and by products produced by third parties.  Operator shall not be liable for any action or default of itself or of any other person or entity in connection with the marketing of the Products, unless caused by Operator's own gross negligence or bad faith.  Operator agrees to disclose its actions in marketing the Products to Non-Operators upon request.

J.   Perpetuities:

It is not the intent of the parties that any provisions herein violate any applicable law regarding the rule against perpetuities, the suspension of the absolute power of alienation or other rule regarding the vesting or duration of estates, and this agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the parties. In the event, however, any provisions hereof is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than the maximum period) permitted by such rule which will result in no violation.  To the extent such maximum period is permitted to be determined by reference to "lives in being," the parties agree that "lives in being" shall refer to the lifetime of the last to die of the now living lineal descendants of any person executing this Agreement.

This Agreement is made solely for the benefit of those persons who are signatory parties hereto (including those persons succeeding to all or part of the interest of an original party if such succession if recognized under the other provisions hereof), and no other person shall have or claim or be entitled to enforce any rights, benefits or obligations under this Agreement.

K.   Execution:

This Agreement shall be binding upon each Non-Operator when this Agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this Agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area.  Operator may, however, by written notice to all Non-Operators who have become bound by this Agreement as aforesaid, given at any time prior to terminate this Agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of operations.  In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest.

L.   Security:

Each non-operator grants to Operator the following:

(a)   A lien upon all of its interests in the property described in Exhibit "A";

(b)   A lien upon all of its right, title and interest existing or arising in oil and gas leases and minerals within the Contract Area or lands pooled or unitized therewith in addition to those described on Exhibit "A";

(c)   A lien upon all amendments, corrections, modifications, confirmations, renewals, ratifications, and extensions of any of the oil and gas leases located within the Contract Area in which it now or hereafter owns an interest;

(d)   A lien upon all of its right, title and interest existing or arising in all oil wells, gas wells, injection wells, disposal wells, and all other wells hereafter located within the Contract Area or pooled or unitized therewith;

(e)   A lien upon all of its right, title and interest existing and arising in all other real property and improvements located within the Contract Area or lands pooled or unitized therewith;

(f)   A security interest in all of its right, title and interest existing or arising in oil, gas, casinghead gas, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons, and all products extracted, manufactured or refined therefrom, and all other minerals, produced from the Contract Area or lands pooled or unitized therewith;

(g)   A security interest in all personal property (including, but not limited to, equipment, inventory, tools and tubular goods) now owned or hereafter acquired by it in connection with the Contract Area or lands pooled or unitized therewith;

(h)   A security interest in all fixtures now owned or hereafter acquired by it which are affixed to lands, leases or improvements within the Contract Area or lands pooled or unitized therewith;

(i)   A security interest in all accounts and general intangibles existing or arising in connection with the Contract Area or lands pooled or unitized therewith, or relating to production from the Contract Area or lands pooled or unitized therewith.

(j)   A security interest in all contract rights existing or arising in connection with the Contract Area or lands pooled or unitized therewith or oil and gas produced therefrom;

(k)   A security interest in all of the existing or arising products and proceeds of the property described in subparagraph (a) through (j) above.

Operator grants a like lien and security interest to each non-operator upon Operator's interests.

The lien and security interest granted Operator and Non-Operators shall secure every monetary obligation or liability created under the terms of the operating agreement, including but not limited to:

(a)   Every party's obligation to pay its share of expense;

(b)   Every party's obligation to pay interest, fee and costs;

(c)   The obligations of Operator to make payments to third parties on behalf of itself and non-operators;

A09\A09\1\104115                              17.5

(d)   The obligations of Operator to deliver to non-operators and third parties oil and gas and proceeds from the sale of oil and gas;

(e)   After the removal or resignation of an Operator, the obligations of the former Operator to make payments to non-operators and third parties during the period of its operatorship;

(f)   The recovery of sums due Consenting Parties as a result of operations by less than all parties;

(g)   All other obligations of the Operator to pay, repay or account for monies held by it which are the property of, or due to, non-operators or third parties or which are held by Operator for the benefit of non-operators or third parties; and

(h)   All other debts, liabilities, obligations, damages, interest, fees, and costs existing or arising between or among the parties to the operating agreement to the extent that those items relate to the operating agreement, to the Contract Area, to lands pooled or unitized with the Contract Area, or to oil or gas produced therefrom.

Any party, to the extent it deems necessary to perfect the lien and security interest provided herein, may file this Operating Agreement or a memorandum thereof as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code. Further, and not in limitation of the foregoing, each party hereby grants to Operator full right, power and authority to execute in each such party's name and on its behalf any memorandum of this Operating Agreement or financing statement which Operator deems necessary in order to perfect the security interest hereby granted under the applicable state laws and Uniform Commercial Code.

If Operator should elect to proceed to foreclose the lien of Operator as against the interest of a Non-Operator having an interest in the Contract Area, or if Non-Operator should elect to proceed to foreclose the lien of Non-Operator as against the interest of Operator having an interest in the Contract Area, this Operating Agreement does hereby include provisions for non-judicial sale under the laws of the State of Texas and Carlos B. Griffin, Jr., is hereby appointed as Trustee for such purpose. In such instance, the party initiating the foreclosure shall be called "Secured Party" and the party whose interest is foreclosed shall be called "Debtor." Upon such default, said Trustee or Secured Party shall at least twenty-one (21) days preceding the date of non-judicial sale serve written notice of the proposed sale by certified mail on Debtor according to the records of Secured Party. Service of such notice shall be deemed completed upon deposit of a notice enclosed in a post-paid wrapper properly addressed to the Debtor and each other party obligated to pay said obligations at the most recent address or addresses as shown on the records of Secured Party in a post office or other official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the facts of service. After such notice, said Trustee shall proceed to sell all of the interests of Debtor in the Contract Area at public auction to the highest bidder for cash after having given written notice of the time and place of sale and in the manner and after the advertisement of such sale as is now required by the statutes of the State of Texas in making sales of real estate under deeds of trust. Sale of a part of the realty would not exhaust the power of sale and sales may be made from time to time until all of the property is sold or the obligations paid in full. Said Trustee shall have authority to appoint an attorney in fact to act as Trustee in conducting the foreclosure sale and executing a deed to the purchasers; and it is further agreed that said Trustee or his successor may sell said property together or in lots and/or parcels as to him shall deem expedient and after such sales as aforesaid shall make, execute and deliver to the purchaser or purchasers thereof good and sufficient deeds, assignments or other lawful conveyances to vest in said purchaser or purchasers title to the Debtor in the Contract Area in fee simple together with all personal property used or obtained in connection therewith and together with all of the proceeds of production attributable thereto including proceeds of production held by any party for the payment to Debtor. From the proceeds of said sale said Trustee shall first pay all charges, costs and expenses in executing these provisions and secondly pay any sums due by the Trustee for taxes in the preservation of the security and thereafter pay all of the remaining sums to Secured Party for the satisfaction of the debts of Debtor hereunder and the balance, if any, shall be paid to Debtor.

It is agreed that such sale shall be a perpetual bar against Debtor and its heirs, successors and assigns and legal representatives and all other persons claiming under him, them or any of them. It is further agreed that said Trustee or any holder or holders of said obligation or Secured Party shall have the right to become the purchaser or purchasers at such sale if the highest bidder or bidders in which event the bid or bids may be credited upon said indebtedness of Debtor. It is stipulated and agreed that in case of any sale hereunder by Trustee or his successor all prerequisites of said sale shall be presumed to have been performed and any conveyance given hereunder all statements of fact or recitals therein made as to the non-payment of money secured or as to any default under the terms hereof or as to the request of the Trustee to enforce this trust or as to the proper and due appointment of any successor or substitute Trustee or as to the advertisement or sale or the time, place and terms of sale or as to any other preliminary act or thing shall be taken in all courts of law and equity as prima facie evidence that the facts so stated are true. Secured Party may appoint a substitute or successor Trustee in the event the Trustee above named is unable for any reason to serve.

M.   Bankruptcy:

If, following the granting of relief under the Bankruptcy Code to any party hereto as debtor thereunder, this Agreement should be held to be an executory contract within the meaning of 11 U.S.C. § 365, then the Operator, or (if the Operator is the debtor in bankruptcy) any other party, shall be entitled to a determination by debtor or any trustee for debtor within thirty (30) days from the date an order for relief is entered under the Bankruptcy Code as to the rejection or assumption of this Operating Agreement. In the event of an assumption, Operator or said other party shall be entitled to adequate assurances as to future performance of debtor's obligation hereunder and the protection of the interest of all other parties.

N.   Operating Agreement Subject to

An AFE/Ballot orignoally dated April 25th, 2003:
   This Agreement subject to the terms and conditions of that
   certain Drilling AFE/BALLOT dated April 25th, 2003 covering
   the drilling of multiple wells, one specifically being the
   TOBY HORTON #2 (within the Akin-Ross #1 GU).

O.   Termination of Drilling:

If, respecting any well, Operator is required to drill hereunder (including any initial well provided for in Article VI.A. and any subsequent well proposed under Article VI.B. and consented to by one or more parties) which has not reached its objective depth, Operator acquires significant information bearing upon the advisability of commencement of drilling or continuing drilling of such well, Operator may, by written notice to all parties participating in such well, propose to terminate the obligation to commence or to continue (as the case may be) drilling such well, which proposal shall contain a statement of the event(s) constituting the significant information. Each such Non-Operator shall have forty-eight (48) hours within which to respond to said proposal, which time period shall be inclusive of Saturday, Sunday and legal holidays if a drilling rig is on location but otherwise exclusive of such days, and a failure to respond within said time period shall be deemed to be consent to such proposal. Such proposal shall be deemed to be approved when consented to by parties participating in such well having an interest (as set out on Exhibit A) which, when added to the interest of Operator in such well, exceeds fifty percent (50%) of the total interests of all parties participating in such well.

In the event the requisite consent to the proposal to terminate has been received, Operator shall immediately notify all Non-Operators participating in such well of that fact. Thereupon, any such participating Non-Operator who did not consent to termination of operations shall have the right, to be exercised by written notice to all parties who participated in such well given within forty-eight (48) hours following receipt of the Operator's notice mentioned in the preceding sentence (said time to be computed inclusive of Saturdays, Sundays and legal holidays if a drilling rig is on location, otherwise exclusive of said days), to takeover applications and drill the well to its original objective depth, in which event all of the provisions of Article VI.B. shall apply to the drilling of such well from the point of takeover in the same manner and with the same force and effect as if such well had been completed as a dry hold at the point of takeover and the parties taking over said well had done so pursuant to a deepening proposal made under Article VI.B. In such event all parties who elected to takeover or join in the

takeover of said well shall be deemed to be Consenting Parties from the point of takeover and all other parties shall be deemed to be Non-Consenting Parties for the purposes thereof. In the event none of the parties elect to take over operations for the purpose of further drilling such well, then: (i) if operations for the well have not commenced and the Operator has received any advance or pre-payment from any Non-Operator, the same shall be returned to such Non-Operator without interest; (ii) if operations have not commenced and the well was the initial well under Article VI:A., this Agreement shall terminate and be of no further force or effect; and (iii) if drilling of the well has commenced, the Operator shall give notice to all parties of the depth at which drilling operations will be terminated, which notice shall be accompanied by any proposal of Operator to complete the well at any depth in the bore hole. The parties receiving any such completion notice shall elect whether or not to join in such completion within the time and in accordance with the provisions of Article VII.D.1., Option No. 1, and thereupon all the provisions of said Article and Option shall apply. In the event Operator does not propose a completion, the well shall not be plugged and abandoned without first complying with the provisions of Article VI.E.

"Significant information" for the purposes hereof shall mean the occurrence, subsequent to the proposal by Operator of the initial well or subsequent to any party's proposal of a subsequent well under Article VI.B.1., of an event, such as the logging or testing of a well in the vicinity of the well to which this Article applies or the acquisition of knowledge from the formations penetrated by such well, which, in the sole judgment of Operator exercised in good faith, materially reduces the geologic merits of drilling the well. The foregoing shall in no event include a change in Operator's financial condition.

## ARTICLE XVI.
## MISCELLANEOUS

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _1st_ day of _May_,

OPERATOR

BY: _____
Carlos Barton Griffin, Jr.,
President of GEO-VEST INC.

NON-OPERATORS

_____
Carlos Barton Griffin, Jr. representing
all Non-Operators pursuant to his
authority hereunder.

_____
Signature

_____
Printed Name

17.8

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1                                  ACKNOWLEDGMENTS

2        Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The

3   validity and effect of these forms in any state will depend upon the statutes of that state.

4

5   Individual acknowledgment:

6   State of _____ )

7                              ) ss.

8   County of _____ )

9        This instrument was acknowledged before me on

10  _____ by _____ .

11

12  (Seal, if any)                          _____

13                                          Title (and Rank) _____

14                                          My commission expires: _____

15

16  Acknowledgment in representative capacity:

17  State of _TEXAS_____ )

18                             ) ss.

19  County of __GREGG_____ )

20       This instrument was acknowledged before me on this 1st day of May, 2003

21  _____ by Carlos B. Griffin, Jr. _____ ss

22  President _____ of GEO-VEST, INC.

23  (Seal, if any) .                        *Nancy Newberry Griffin*

24                                          Title (and Rank) _____

25      NANCY NEWBERRY GRIFFIN              My commission expires: _2/24/2005___
        MY COMMISSION EXPIRES
        February 24, 2005
26

27

28

29

30

31

32

33                                                      

34

35

36

37

- 19 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1                                    ACKNOWLEDGMENTS

2       Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The

3       validity and effect of these forms in any state will depend upon the statutes of that state.

4

5       Individual acknowledgment:

6       State of _____ )

7                                ) ss.

8       County of _____ )

9           This instrument was acknowledged before me on

10      _____ by _____

11

12      (Seal, if any)                          _____

13                                              Title (and Rank) _____

14                                              My commission expires: _____

15

16      Acknowledgment in representative capacity:

17      State of _____ )

18                               ) ss.

19      County of _____ )

20          This instrument was acknowledged before me on

21      _____ by _____ as

22      _____ of _____

23      (Seal, if any)                          _____

24                                              Title (and Rank) _____

25                                              My commission expires: _____

26

27

28

29

30

31

32

33

34

35

36

37

- 19 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1        IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____

2

3   ATTEST OR WITNESS:               OPERATOR

4               _____

5   _____    By _____

6
7   _____     Type or print name

8              Title _____

9              Date _____

10             Tax ID or S.S. No. _____

11

12                   NON-OPERATORS

13               SKLARCO L.L.C.

14

15   _____    By   David A. Barlow

16
17   _____     Chief Operating Officer
                         Type or print name

18             Title _____

19             Date _____

20             Tax ID or S.S. No. _____

21

22             _____

23   _____    By _____

24
25   _____     Type or print name

26             Title _____

27             Date _____

28             Tax ID or S.S. No. _____

29

30             By _____

31
32   _____     Type or print name

33             Title _____

34             Date _____

35             Tax ID or S.S. No. _____

36

37

- 18 -

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF CADDO

On this _22nd_ day of _August_ , 2003, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Kim S. Elias_
Notary Public in and for the Parish of Caddo
State of Louisiana

KIM S. ELIAS, Notary Public
Caddo Parish, Louisiana
My Commission is for Life

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1         IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____

2

3  ATTEST OR WITNESS:              OPERATOR

4                                  _____

5  _____    By _____

6
7  _____    Type or print name

8                        Title _____

9                        Date _____

10                     Tax ID or S.S. No. _____

11

12                  NON-OPERATORS
                       SKLARCO L.L.C.

13

14                       _____

15                  By  David A. Barlow

16
17                     Chief Operating Officer
                      Type or print name

18                     Title _____

19                     Date _____

20                     Tax ID or S.S. No. _____

21

22                                    _____

23  _____    By _____

24
25  _____    Type or print name

26                     Title _____

27                     Date _____

28                     Tax ID or S.S. No. _____

29

30  _____    By _____

31
32  _____    Type or print name

33                     Title _____

34                     Date _____

35                     Tax ID or S.S. No. _____

36

37

Use of this trademark mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen

- 18 -

**ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

  On this _2nd_ day of _August_ , 2003, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

  IN WITNESS WHEREOF, I hereunto set my hand and official seal.

              Notary Public in and for the Parish of Caddo
              State of Louisiana

          KIM S. ELIAS, Notary Public
          Caddo Parish, Louisiana
          My Commission is for Life

## EXHIBIT "A"

**Attached and made a part of that certain Operating Agreement covering the Toby Horton #2 by and between GEO-VEST, INC., as Operator, and various Non-Operators.**

A.1) A description of the Lands subject to this Agreement are identified on Exhibit "#2" to this Exhibit (hereinafter referred to as "UNIT", including, but not limited to, the oil, gas and mineral leases described on Exhibit "#3" (hereinafter referred to as "LEASES").

A.2) There are no known restrictions as to depths, formations, or substances, other than those purported to be described and acknowledged in the LEASES.

A.3) All parties to this Agreement have appointed Carlos B. Griffin, Jr. to represent there acknowledgement of this Agreement, therefore Carlos B. Griffin Jr., representing various Non-Operators and SKLARCO, LLC are the parties for the purposes of this clause. Mr. Griffin may be reached @ 903.643.0402-Office, 903.643.0425-Fax and mail to: POB 1157 Kilgore, Texas 75663-1157. SKLARCO LLC telephone numbers are 318.227.8668-Office, 318.227.9012 and mail to 401 Edwards Street, Suite 1601 Shreveport, LA 71101 to the attention of Mr. Ty Adams-Land Manager.

A.4) Carlos B. Griffin, Jr. and etals/99.921562% GWI
SKLARCO LLC/0.078438% GWI

A.5) The Leases subject to this Agreement are the LEASES listed on Exhibit #3 hereto. It is believed 100% of the Gross Working Interest is represented within the UNIT at the time this Exhibit was prepared.

A.6) There are no known Burdens on production, however the Operator has various marketing concerned, which is described on Exhibits #2 and #3 hereto.



Exhibit #2

The Pooled Production Unit Outline

The Leases

## AKIN ROSS GAS UNIT LEASES

| LESSOR | LESSEE | DATE | VOL/PAGE |
|---|---|---|---|
| Nellie Akin | Bruce L. Wilson | 5/24/62 | 613/281 |
| Florine Ross, et al | Bruce L. Wilson | 5/24/62 | 613/278 |
| Rogers Davis, et al | Bruce L. Wilson | 6/11/62 | 613/315 |
| Judy Reynolds Root, et vir | Bruce L. Wilson | 6/14/62 | 613/321 |
| Beulah Davis Evans | Bruce L. Wilson | 6/25/62 | 613/340 |
| Haskins Ray | Bruce L. Wilson | 6/8/62 | 613/311 |
| Ivy Horton, et al | Bruce L. Wilson | 6/16/62 | 613/330 |
| Jack Frost | Bruce L. Wilson | 6/7/62 | 613/307 |
| Minnie Kuhn | Bruce L. Wilson | 5/29/62 | 613/284 |
| Jean Thorne Kimmell, et vir | Bruce L. Wilson | 6/22/62 | 613/335 |
| Liberty National Bank, Trustee, et al | Bruce L. Wilson | 5/31/62 | 613/295 |
| Carl W. Zellner | Bruce L. Wilson | 6/1/62 | 613/299 |
| William A. Brown, et al | Bruce L. Wilson | 7/9/62 | 614/409 |
| Alice Conn Watkins | Bruce L. Wilson | 6/5/62 | 613/303 |
| Alta Mae Douglas, et al | Bruce L. Wilson | 5/31/62 | 613/288 |
| Elmer Covin, et ux | E.C. Spinks | 12/3/62 | 620/468 |
| Billie Trout, et ux | E.C. Spinks | 12/3/62 | 620/466 |
| Ben Spinks | E.C. Spinks | 12/3/62 | 620/464 |
| Edward Garrison Spinks, et al | E.C. Spinks | 12/3/62 | 619/575 |
| E.J. Spinks | E.C. Spinks | 12/3/62 | 619/577 |
| Albert Minchener, et ux | E.C. Spinks | 12/3/62 | 619/579 |
| Paul D. Miller, et ux | E.C. Spinks | 12/3/62 | 619/581 |
| John W. Lawhon | E.C. Spinks | 12/3/62 | 619/584 |
| N. Vic Elder | E.C. Spinks | 12/3/62 | 619/590 |
| Roy Wilson, et ux | E.C. Spinks | 12/3/62 | 619/593 |
| Eila Wilson Lynch, et vir | E.C. Spinks | 12/3/62 | 619/596 |
| Lloyd Spinks, et ux | E.C. Spinks | 12/3/62 | 619/599 |
| Mrs. Ollie Spinks | E.C. Spinks | 12/3/62 | 619/602 |

| | | | |
|---|---|---|---|
| DeWitt Spinks, et ux | E.C. Spinks | 12/3/62 | 619/587 |
| Mary Louise Spinks | E.C. Spinks | 12/3/62 | 619/605 |
| Mrs. Minnie Spinks, et al | E.C. Spinks | 12/3/62 | 619/608 |
| V.H. Spinks, et ux | E.C. Spinks | 12/3/62 | 619/611 |
| M.H. Spinks, et ux | E.C. Spinks | 12/3/62 | 619/614 |
| E.C. Spinks, et ux | George Joseph and Marcia Clark | 12/3/62 | 619/622 |
| Midhurst Oil Corporation | George Joseph and Marcia Clark | 1/2/63 | 621/352 |
| Henry O. Sharp, et ux | E.C. Spinks | 12/3/62 | 621/355 |
| John E. Lacy | George Joseph, Trustee | 2/7/63 | 623/236 |
| C.S. Bazzell | Crow Drilling Company, et al | 11/15/54 | 448/126 |
| Nancy V. Elder | C.H. Lyons, Jr. | 8/3/53 | 531/313 |
| J.K. Horton, et ux | Bruce L. Wilson | 7/10/62 | 613/349 |
| Mary Couch | Bruce L. Wilson | 6/20/62 | 613/332 |
| Frank E. Poulsen | Bruce L. Wilson | 6/14/62 | 613/323 |
| C.H. Matthews, et al | Bruce L. Wilson | 6/15/62 | 613/326 |
| J. Clyde Tomlinson, et al | George Joseph | 12/17/62 | 620/461 |
| W.R. Wheeler Estate, et al | George Joseph | 12/17/62 | 620/456 |
| Mary Skipper | George Joseph and Marcia Clark | 12/20/62 | 620/459 |
| Longview National Bank | Bruce L. Wilson | 6/11/62 | 613/313 |
| L.N. Skipper | Bruce L. Wilson | 6/13/62 | 613/318 |
| Gladys Caswell Peveto | Bruce L. Wilson | 7/5/62 | 613/345 |
| Gertrude Buckley Windsor, et al | Bruce L. Wilson | 6/25/62 | 613/342 |
| E.T. Porter, et al | Bruce L. Wilson | 6/13/62 | 617/584 |
| Thomas B. Ramey | Bruce L. Wilson | 10/8/62 | 617/580 |
| George P. Hill, et al | Bruce L. Wilson | 8/20/62 | 617/573 |
| W.W. Meeker, et al | Bruce L. Wilson | 8/20/62 | 621/634 |
| Childress Royalty Company, et al | Bruce L. Wilson | 8/30/62 | 617/575 |
| Mrs. D.L. Johnson, et al | British American Oil Oil Producing Company | 8/8/53 | 417/596 |

| | | | |
|---|---|---|---|
| Jennie Louise Orr, et al | C.H. Lyons, Jr. | 1/23/54 | 428/450 |
| Antoinette Redwine Matthews, et al | C.H. Lyons, Jr. | 11/15/54 | 454/452 |
| L. Barnett, et al | Bruce L. Wilson | 10/22/62 | 621/631 |
| J.E. Barnett, et al | Gerson M. Haesly | 1/21/59 | 546/431 |
| Martha Wheeler Armstrong, et vir | Bruce L. Wilson | 2/1/63 | 623/234 |
| Lottie C. Laird | George Joseph, Trustee | 2/16/63 | 623/238 |
| K.W. Blow Estate | Bruce L. Wilson | 5/31/62 | 613/292 |
| R.D. Baskett | Key Production Company, Inc. | 6/9/81 | 1303/234 |
| Madolyn Sweeney, et vir | GEO-VEST, INC. | 11/16/98 | #9826014 |
| Hill Trusts, et al | GEO-VEST, INC. | 6/26/01 | 200113723 |
| James Robert Hill, et al | GEO-VEST, INC. | 6/26/01 | 200114423 |
| H-S Minerals and Realty, LTD. | GEO-VEST, INC. | 7/17/01 | 200115806 |
| Hill Investments, LTD. | GEO-VEST, INC. | 7/17/01 | 200117036 |
| David A. Hart | GEO-VEST, INC. | 8/17/01 | 200118498 |

All recording references made to the Official Public Record of Gregg County, Texas.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

NSAESIII' 601,   BOX 800
TULSA OK 74101

COPAS

# EXHIBIT      " C "

that certain Operating Agreementcovering the Toby Horton #2

Attached to and made a part of _____
by and between Geo-Vest, Inc., as Operator, and Various Non-Operators _____

_____

# ACCOUNTING PROCEDURE
## ☼ JOINT OPERATIONS

### I. GENERAL PROVISIONS

1. **Definitions**

   "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

   "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

   "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

   "Operator" shall mean the party designated to conduct the Joint Operations.

   "Non-Operators" shall mean the Parties to this agreement other than the Operator.

   "Parties" shall mean Operator and Non-Operators.

   "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

   "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

   "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

   "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

   "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

2. **Statement and Billings**

   Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____ _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year ~~within the twenty-four~~ ~~(24) month period following the end of~~ such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First Level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

   (4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

4. **Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

- 2 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably available or practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. ~~Transportation~~

   ~~Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:~~

   A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

   B.  If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C.  In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the ~~amount most recently recommended by the Council of Petroleum Accountants Societies.~~

7. **Services**

   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

   A.  Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____eighteen_____ percent ( __18__ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

   B.  In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. ~~Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.~~

10. **Legal Expense**

    Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

    All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

- 3 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead – Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( xx) Fixed Rate Basis, Paragraph 1A, or
   (    ) Percentage Basis, Paragraph 1B

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

   (    ) shall be covered by the overhead rates, or
   (    ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   (    ) shall be covered by the overhead rates, or
   (    ) shall not be covered by the overhead rates.

   A. **Overhead – Fixed Rate Basis**

      (1) Operator shall charge the Joint Account at the following rates per well per month:

      Drilling Well Rate $ __9,000__
      (Prorated for less than a full month)

      Producing Well Rate $ __500.00__

      (2) Application of Overhead – Fixed Rate Basis shall be as follows:

         (a) Drilling Well Rate

            (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

    (2)  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

  (b)  Producing Well Rates

    (1)  An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

    (2)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

    (3)  An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

    (4)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

    (5)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

  (3)  The well rates~~shall~~ be adjusted ~~as~~of~~the~~first~~day~~of~~April~~ as many times as necessitated by Operator each year following the effective date of the agreement to which this Accounting Procedure is attached. ~~The~~adjustment~~shall~~be~~computed~~by~~multiplying~~the~~rate~~currently~~in~~use~~by~~the~~percent~~of~~increase~~or~~decrease~~in~~the~~average~~weekly~~earnings~~of~~Crude~~Petroleum~~and~~Gas~~Production~~Workers~~for~~the~~last~~calendar~~year~~compared~~to~~the~~calendar~~year~~preceding~~as~~shown~~by~~the~~index~~of~~average~~weekly~~earnings~~of~~Crude~~Petroleum~~and~~Gas~~Production~~Workers~~as~~published~~by~~the~~United~~States~~Department~~of~~Labor,~~Bureau~~of~~Labor~~Statistics,~~or~~the~~equivalent~~Canadian~~index~~as~~published~~by~~Statistics~~Canada,~~as~~applicable.~~The~~adjusted~~rates~~shall~~be~~the~~rates~~currently~~in~~use,~~plus~~or~~minus~~the~~computed~~adjustment.~~ The new rates will be based on rates charged by other operators in the area.

B.  Overhead – Percentage Basis

  (1)  Operator shall charge the Joint Account at the following rates:

    (a)  Development

      _____ Percent ( _____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

    (b)  Operating

      _____ Percent ( _____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

  (2)  Application of Overhead – Percentage Basis shall be as follows:

    For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.  Overhead – Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ _____ * _____ :

A. _____ * _____ % of first $100,000 or total cost if less, plus

B. _____ * _____ % of costs in excess of $100,000 but less than $1,000,000, plus

C. _____ * _____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.   * To be negotiated.

3.   Catastrophe Overhead

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. _____ * _____ % of total costs through $100,000; plus

B. _____ * _____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. _____ * _____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.   * To be negotiated.

4.   Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus ~~Controllable~~ Material not purchased by the Operator shall be ~~agreed to~~ shared by the Parties. Revenues from the

1.   Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.   Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, ~~unless otherwise agreed to by the Parties,~~ shall be priced ~~on the following basis exclusive of cash discounts.~~ at the best available method directed by Operator.

A.   ~~New Material (Condition A)~~

(1)   ~~Tubular Goods Other than Line Pipe~~

(a)   ~~Tubular goods, sized 2¾ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.~~

(b)   ~~For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000~~

- 6 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



1
2     ~~pound Oil Field Haulers Association interstate truck rate shall be used.~~

3     ~~(c)   Special and finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston,~~
4     ~~Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate,~~
5     ~~to the railway receiving point nearest the Joint Property.~~
6
7     (d)   Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices
8           f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate
9           per weight of tubing transferred, to the railway receiving point nearest the Joint Property.
10
11    (2)   Line Pipe
12
13    (a)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or
14          more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above.
15          Freight charges shall be calculated from Lorain, Ohio.
16
17    (b)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000
18          pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment,
19          plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular
20          goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain,
21          Ohio.
22
23    (c)   Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of
24          manufacture at current new published prices plus transportation cost to the railway receiving point
25          nearest the Joint Property.
26
27    (d)   Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall
28          be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at
29          prices agreed to by the Parties.
30
31    (3)   Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable
32          supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the
33          railway receiving point nearest the Joint Property.
34
35    (4)   Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current
36          new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or
37          point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint
38          Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).
39
40    ~~B.   Good Used Material (Condition B)~~
41
42    Material in sound and serviceable condition and suitable for reuse without reconditioning:
43
44    (1)   Material moved to the Joint Property
45
46          At seventy-five percent (75%) of current new price, as determined by Paragraph A.
47
48    (2)   Material used on and moved from the Joint Property
49
50    (a)   At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was
51          originally charged to the Joint Account as new Material or
52
53    (b)   At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was
54          originally charged to the Joint Account as used Material.
55
56    (3)   Material not used on and moved from the Joint Property
57
58          At seventy-five percent (75%) of current new price as determined by Paragraph A.
59
60    The cost of reconditioning, if any, shall be absorbed by the transferring property.
61
62    C.   Other Used Material
63
64    (1)   Condition C
65
66          Material which is not in sound and serviceable condition and not suitable for its original function until
67          after reconditioning shall be priced at fifty percent (50%) of current new price as determined by
68          Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition
69          ~~C value plus cost of reconditioning does not exceed Condition B value.~~
70

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

    (a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

    (b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.   Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

- 8 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.  **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.  **Expense of Conducting Inventories**

A.  The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.  The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

- 9 -

EXHIBIT "D"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
OPERATING AGREEMENT covering the TOBY HORTON #2
BETWEEN GEO-VEST, INC., AS OPERATOR; AND
VARIOUS NON-OPERATORS

INSURANCE

Operator, at all times while conducting operations under this agreement shall comply with the Workmen's Compensation Laws of the State where the operations are being conducted, shall provide Employer Liability Insurance coverage in the amount of $100,000/$250,000, and shall carry the following insurance:

(a)   Comprehensive General Public Liability Insurance, excluding Products Liability Insurance, covering injury to and death of persons with limits of $100,000 per person and $250,000 per accident.

(b)   Automotive Public Liability Insurance covering injury to and death of persons, with limits of $100,000 per person and $250,000 per accident;

(c)   Comprehensive General Public Liability Property Damage Insurance with limits of $100,000 for each occurrence and $250,000 aggregate.

and shall charge the premiums for all insurance to the joint account.

If Operator elects to carry such insurance under its present policies, Operator shall make a reasonable charge therefor.  If separate policies are secured, the actual premiums paid shall be included as part of the operating costs.  Operator will not be required to carry fire, tornado, or any other type of insurance on the property of the parties hereto.

As to Operator's exclusively owned motor vehicles, charges for insurance under (b) and (d) above will be governed solely by those provisions of the Accounting Procedure applicable to charges for equipment furnished by Operator.

If, under the Workmen's Compensation Laws of the State where the operations are being conducted, Operator is authorized to be a self-insurer, and if Operator elects to be a self-insurer under such laws, then in lieu of any premiums for such insurance, Operator shall charge to the joint account an amount not to exceed the amount which would be developed if the operations were insured under standard form insurance policies at manual rates.

## RAILROAD COMMISSION OF TEXAS
### OIL & GAS DIVISION

REV. 6/89

PERMIT TO DRILL, DEEPEN, PLUG BACK, OR RE-ENTER
ON REGULAR OR ADMINISTRATIVE EXCEPTION LOCATION

| PERMIT NUMBER | DATE PERMIT ISSUED OR AMENDED | DISTRICT |
|---|---|---|
| 532433 | 5/28/2003 | 06 |

| API NUMBER | FORM W-1 RECEIVED | COUNTY |
|---|---|---|
| 42 183 31575 | 5/28/2003 | GREGG |

| TYPE OF OPERATION | | ACRES |
|---|---|---|
| DRILL | | 704.00 |

| OPERATOR | NOTICE |
|---|---|
| 300267<br><br>GEO-VEST OF TEXAS, INC.<br>P O BOX 1157<br>KILGORE     TX  75663-1157 | This permit and any allowable assigned may be revoked if payment for fee(s) submitted to the Commission is not honored.<br>District Office Telephone No.:<br><br>903   984-3026 |

| LEASE NAME | WELL NUMBER |
|---|---|
| HORTON, TOBY | 2 |

| LOCATION | TOTAL DEPTH |
|---|---|
| 3.50 MILES N NE   FROM KILGORE | 11,000 |

SECTION, BLOCK and/or SURVEY
SECTION =>          BLOCK =>                    ABSTRACT => 64

SURVEY ==> HADEN EDWARDS

| DISTANCE--LEASE LINES | | DISTANCE--NEAREST WELL ON LEASE |
|---|---|---|
| 575.00 F S     -   1,225.00 F E | | SEE RESTRICTIONS |
| DISTANCE--SURVEY LINES<br>4,072.00 F W    -   7,050.00 F N | | |

### READ IMPORTANT CONDITIONS AND INSTRUCTIONS ON THE BACK OF THIS FORM

FIELD(S) AND LIMITATIONS

| FIELD NAME | LEASE NAME | DEPTH | WELL # | DST |
|---|---|---|---|---|
| WILDCAT | HORTON, TOBY | 11,000 | 2 | 06 |
| | ACRES =>   704.00 | | | |
| DANVILLE (TRAVIS PEAK CONS.) | AKIN ROSS GU 1 | 11,000 | 2 | 06 |
| | ACRES =>   704.00 | | | |
| DANVILLE, EAST (COTTON VALLEY) | AKIN ROSS GU 1 | 11,000 | 2 | 06 |
| | ACRES =>   704.00 | | | |
| PEATOWN (TRANSITION) | HORTON, TOBY | 11,000 | 2 | 06 |
| | ACRES =>   704.00 | | | |
| PEATOWN (YOUNG) | HORTON, TOBY | 11,000 | 2 | 06 |
| | ACRES =>   704.00 | | | |

DAILY TOP OIL =  111 BBLS      DAILY TOP CSGHEAD GAS LIMIT =  222 MCF
                    ** LIMITATIONS **

THE TOP OIL ALLOWABLE AND CASINGHEAD GAS LIMIT PRINTED HEREON DO NOT
CONSTITUTE ASSIGNED ALLOWABLES BUT ARE FOR INFORMATIONAL PURPOSES ONLY.

THE TOP OIL ALLOWABLE AND CASINGHEAD GAS LIMIT IS PRINTED ONLY FOR OIL
FIELDS WITHOUT SPECIAL FIELD RULES.  BEFORE ANY HYDROCARBONS CAN BE
MOVED FROM A LEASE IN THESE FIELDS AN OPERATOR MUST HAVE AN APPROVED
CERTIFICATE OF COMPLIANCE (FORM P-4) OR APPROVED REQUEST FOR CLEARANCE
(FORM P-8).  TOP OIL ALLOWABLES MAY CHANGE AND ANY OVERPRODUCTION OF
AN OIL WELL ALLOWABLE MAY BE SUBJECT TO BEING MADE UP.


THE FOLLOWING RESTRICTIONS APPLY TO ALL FIELDS

*** PLEASE REFER TO ATTACHMENT ***

ATTACHMENT
FOR DRILLING PERMIT NUMBER
532433

THIS WELL SHALL BE COMPLETED AND PRODUCED IN COMPLIANCE WITH
APPLICABLE SPECIAL FIELD OR STATEWIDE SPACING AND DENSITY RULES.
DISTANCE TO NEAREST WELLS: 2460, 1776.
IF COMPLETED IN THESE FIELDS THE LEASE NAME WILL BE AKIN ROSS GU 1
IF COMPLETED IN THESE FIELDS THE LEASE NAME WILL BE TOBY HORTON


THE FOLLOWING RESTRICTIONS APPLY TO THE FIELDS SPECIFIED

WITH THE WELL NUMBER 11.
  DANVILLE (TRAVIS PEAK CONS.)        DANVILLE, EAST (COTTON VALLEY)

WITH THE WELL NUMGER 2.
  WILDCAT                             PEATOWN (TRANSITION)
  PEATOWN (YOUNG)









GEO. W. GRACE SUR. A — 261

HENRY G. HUDSON
SUR. A — 89

HENRY GOUGH SUR. A — 86

HADEN EDWARDS SUR. A — 64

ELEANOR BRADLEY SUR. A — 17

GEO-VEST OF TEXAS, INC.
P. O. BOX 1157   KILGORE, TEXAS, 75663
Telephone: (903) 643-0402   Fax: (903) 643-0425

EXHIBIT "A"
PLAT SHOWING 160 ACRE
AKIN-ROSS OIL UNIT NO. 1-6
HADEN EDWARDS SURVEY A — 64,
GREGG COUNTY, TEXAS.

| DRAWN BY: | MARK ELLIS | CHECKED BY: | C. B. GRIFFIN, JR. |
| DATE: | SEPTEMBER 23RD, 1999 | FIELD BOOK: | |
| SCALE: | 1" = 1000.0 FT. | JOB NO.: "A8GU2" | A8GU20IL |

BY:
C. B. GRIFFIN, JR., P.E.,
PRESIDENT OF GEO-VEST OF TEXAS INC.
THIS PLAT IS TRUE AND CORRECT TO
THE BEST OF MY KNOWLEDGE.

COPY

Post-it® Fax Note   7671   | Date 6/19 | # of pages ▶ 5 |
To Deb Walker | From Scooter
Co./Dept. | Co. Geo-Vest
Phone # | Phone #
Fax # | Fax #

May 27, 2004
Page 21

[7] NOTE:    Please see our Advisory Requirement No. 36 in our Original Title Opinion
                  dated November 18, 1998.

## GAS LEASEHOLD ESTATE:

### As to those Depths from the Surface to 7,700 Feet:

S & P Co., a Louisiana Partnership
    49.8% x  40% x 12.5% x
    59/240 x 3/16 x 86.7/704        =    .00014135 ORI

SKLARCO, L.L.C.
    50.2% x 40% x 12.5% x 59/240 x 3/16 x 86.7/704  =    .00014248 ORI

Forest, Ltd., an Oklahoma Limited Partnership
    9.5% x 12.5% x
    59/240 x 3/16 x 86.7/704        =    .00006741 ORI

Gems, Ltd., an Oklahoma Limited Partnership
    15.5% x 12.5% x
    59/240 x 3/16 x 86.7/704        =    .00010998 ORI

Fleischaker Mineral Company, L.L.C.
    2/3 x 8.33333% x 12.5% x
    59/240 x 3/16 x 86.7/704        =    .00003942 ORI

Teton Properties, L.L.C.
    1/3 x 8.33333% x 12.5% x
    59/240 x 3/16 x 86.7/704        =    .00001971 ORI

SMAC Oil Limited Partnership,
an Oklahoma Limited Partnership
    9.5% x 12.5% x
    59/240 x 3/16 x 86.7/704        =    .00006741 ORI

Rocky Road, L.L.C., an Oklahoma Limited
Liability Company
    6.0% x 12.5% x
    59/240 x 3/16 x 86.7/704        =    .00004257 ORI

McCrary, an Oklahoma Limited Partnership
    11.16667% x 12.5% x
    59/240 x 3/16 x 86.7/704        =    .00007924 ORI

{A09\514\0094\W0256001.1 }

