A.A.P.L. FORM 610 - 1977

# MODEL FORM OPERATING AGREEMENT



## OPERATING AGREEMENT

### DATED

_June 12_ , 19_84_ ,

OPERATOR _____ _TXO PRODUCTION CORP._ _____

CONTRACT AREA ___ _Section 26, Township 19 North, Range 3 West_ ___

_____

_____

~~COUNTY~~X~~OR~~ PARISH OF___ _Lincoln_ ___ STATE OF_Louisiana_

COPYRIGHT 1977    —    ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.    A.A.P.L. NO. 610 - 1977 REVISED
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
KRAFTBILT PRODUCTS,    BOX 800, TULSA, OK 74101

_EVANS "J" #1_

_C-94526-JOA-2_

_DISTRICT JOA-241_

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTEREST OF PARTIES IN COSTS AND PRODUCTION | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2 |
| | B. LOSS OF TITLE | 2 |
| | 1. Failure of Title | 2-3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 3 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 3 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6 |
| | C. RIGHT TO TAKE PRODUCTION IN KIND | 6-7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 7 |
| | E. ABANDONMENT OF WELLS | 7 |
| | 1. Abandonment of Dry Holes | 7 |
| | 2. Abandonment of Wells that have Produced | 7-8 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 8 |
| | A. LIABILITY OF PARTIES | 8 |
| | B. LIENS AND PAYMENT DEFAULTS | 8 |
| | C. PAYMENTS AND ACCOUNTING | 8 |
| | D. LIMITATION OF EXPENDITURES | 9 |
| | 1. Drill or Deepen | 9 |
| | 2. Rework or Plug Back | 9 |
| | 3. Other Operations | 9 |
| | E. ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 9 |
| | F. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 9-10 |
| | G. TAXES | 10 |
| | H. INSURANCE | 10 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 10 |
| | A. SURRENDER OF LEASES | 10-11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTION | 11 |
| | D. SUBSEQUENTLY CREATED INTEREST | 11-12 |
| | E. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | F. WAIVER OF RIGHT TO PARTITION | 12 |
| | G. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12-13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13-14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___TXO PRODUCTION CORP.___

_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided:

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
  (1) Identification of lands subject to agreement,
  (2) Restrictions, if any, as to depths or formations,
  (3) Percentages or fractional interests of parties to this agreement,
  (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
  (5) Addresses of parties for notice purposes.
☒ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.

If any provision of any exhibit, except Exhibit "E", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an unleased oil and gas interest in the Contract Area, that interest shall be treated for the purpose of this agreement and during the term hereof as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B". As to such interest, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

**B. Interest of Parties in Costs and Production:**

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A". All production of oil and gas from the Contract Area, subject to the payment of lessor's royalties ~~which will be borne by the Joint Account~~, shall also be owned by the parties in the same manner during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interests covered hereby.

## ARTICLE IV.
## TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including Federal Lease Status Reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ **Option No. 1:** Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C," and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

☒ **Option No. 2:** Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. The Operator shall be responsible for the preparation and recording of Pooling Designations or Declarations as well as the conduct of hearings before Governmental Agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

**B. Loss of Title:**

1. **Failure of Title:** Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests, and ~~ ~
   ,(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

*for*                          *been responsible*
1  or operating costs/which it may have theretofore/paid, but there shall be no monetary liability on its
2  part to the other parties hereto for/drilling, development, operating or other similar costs by reason of
3  such title failure; and
*subsequently incurred*
4      (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the
5  operation of the interest which has been lost, but the interests of the parties shall be revised on an acre-
6  age basis, as of the time it is determined finally that title failure has occurred, so that the interest of
7  the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
8  Area by the amount of title interest lost; and
9      (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled
10  on the Contract Area is increased by reason of the title failure, the party whose title has failed shall
11  receive the proceeds attributable to the increase in such interests (less costs and burdens attributable
12  thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;
13  and
14      (d) Should any person not a party to this agreement, who is determined to be the owner of any in-
15  terest in the title which has failed, pay in any manner any part of the cost of operation, development,
16  or equipment, such amount shall be paid to the party or parties who bore the costs which are so refund-
17  ed; and
18      (e) Any liability to account to a third party for prior production of oil and gas which arises by
19  reason of title failure shall be borne by the party or parties/in the same proportions in which they shared
20  in such prior production; and
*whose title failed*
21      (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection
22  with the defense of the interest claimed by any party hereto, it being the intention of the parties
23  hereto that each shall defend title to its interest and bear all expenses in connection therewith.
24

25      2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight,
26  any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously
27  paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against
28  the party who failed to make such payment. Unless the party who failed to make the required payment
29  secures a new lease covering the same interest within ninety (90) days from the discovery of the fail-
30  ure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of
31  the parties shall be revised on an acreage basis, effective as of the date of termination of the lease in-
32  volved, and the party who failed to make proper payment will no longer be credited with an interest in
33  the Contract Area on account of ownership of the lease or interest which has terminated. In the event
34  the party who failed to make the required payment shall not have been fully reimbursed, at the time of
35  the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an
36  acreage basis, for the development and operating costs theretofore paid on account of such interest, it
37  shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the
38  cost of any dry hole previously drilled or wells previously abandoned) from so much of the following
39  as is necessary to effect reimbursement:
40      (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost
41  interest, on an acreage basis, up to the amount of unrecovered costs;
42      (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an
43  acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production
44  from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable
45  to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
46  portion of the oil and gas to be contributed by the other parties in proportion to their respective in-
47  terests; and
48      (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or
49  becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or be-
50  coming a party to this agreement.
51

52      3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2.
53  above, shall not be considered failure of title but shall be joint losses and shall be borne by all parties
54  in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
55  the Contract Area.
56

57                          ARTICLE V.
58                           OPERATOR
59

60  A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR:
61

62      TXO PRODUCTION CORP.                                                              shall be the
63  Operator of the Contract Area, and shall conduct and direct and have full control of all operations on
64  the Contract Area as permitted and required by, and within the limits of, this agreement. It shall con-
65  duct all such operations in a good and workmanlike manner, but it shall have no liability as Operator
66  to the other parties for losses sustained or liabilities incurred, except such as may result from gross
67  negligence or willful misconduct.
68
69
70

- 3 -

A.A.P.L. FORM 610   MODEL FORM OPERATING AGREEMENT - 1977

B. **Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest in the Contract Area, or is no longer capable of serving as Operator, it shall cease to be Operator without any action by Non-Operator, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

C. **Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator, and all such employees shall be the employees of Operator.

D. **Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area ~~and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced~~ and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

~~A. Initial Well:~~

~~On or before the_____day of_____, 19___, Operator shall commence the drill~~ing of a well for oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement may be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, it shall first secure the consent of all parties and shall ~~plug and abandon same as provided in Article VI.E.1. hereof.~~

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1    **B. Subsequent Operations:**
2
3        1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area
4    other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled
5    at the joint expense of all parties or a well jointly owned by all the parties and not then producing
6    in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
7    other parties written notice of the proposed operation, specifying the work to be performed, the loca-
8    tion, proposed depth, objective formation and the estimated cost of the operation. The parties receiv-
9    ing such a notice shall have thirty (30) days after receipt of the notice within which to notify the
10   parties wishing to do the work whether they elect to participate in the cost of the proposed operation.
11   If a drilling rig is on location, notice of proposal to rework, plug back or drill deeper may be given
12   by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday,
13   Sunday or legal holidays. Failure of a party receiving such notice to reply within the period above fixed
14   shall constitute an election by that party not to participate in the cost of the proposed operation. Any
15   notice or response given by telephone shall be promptly confirmed in writing.
16
17       2. Operations by Less than All Parties: If any party receiving such notice as provided in Article
18   VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to
19   the benefits of this article, the party or parties giving the notice and such other parties as shall elect
20   to participate in the operation shall, within sixty (60) days after the expiration of the notice period of
21   thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period
22   where the drilling rig is on location, as the case may be) actually commence work on the proposed
23   operation and complete it with due diligence. Operator shall perform all work for the account of the
24   Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Op-
25   erator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform
26   the work required by such proposed operation for the account of the Consenting Parties, or (b) desig-
27   nate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when
28   conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms
29   and conditions of this agreement.
30
31       If less than all parties approve any proposed operation, the proposing party, immediately after the
32   expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest
33   of the parties approving such operation, and (b) its recommendation as to whether the Consenting Par-
34   ties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48)
35   hours (exclusive of Saturday, Sunday or legal holidays) after receipt of such notice, shall advise the
36   proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A",
37   or (b) carry its proportionate part of Non-Consenting Parties' interest,* at its proposing party, at its
38   election, may withdraw such proposal if there is insufficient participation, and shall promptly notify
39   all parties of such decision.      *and failure to advise the proposing party shall
40                                        constitute an election under (b).
41       The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in
42   the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting
43   Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
44   encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such
45   an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole
46   cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions
47   of this Article results in a producer of oil and or gas in paying quantities, the Consenting Parties shall
48   complete and equip the well to produce at their sole cost and risk, and the well shall then be turned
49   over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties.
50   Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such
51   well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party
52   shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and
53   be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's
54   interest in the well and share of production therefrom until the proceeds of the sale of such share,
55   calculated at the well, or market value thereof if such share is not sold (after deducting production
56   taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of
57   or measured by the production from such well accruing with respect to such interest until it reverts)
58   shall equal the total of the following:
59
60       (a) 300% of each such Non-Consenting Party's share of the cost of any newly acquired surface
61   equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators,
62   treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the
63   cost of operation of the well commencing with first production and continuing until each such Non-
64   Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being
65   agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which
66   would have been chargeable to each Non-Consenting Party had it participated in the well from the be-
67   ginning of the operation; and
68
69       (b) 400% of that portion of the costs and expenses of drilling, reworking, deepening, or plugging
70   back, testing and completing, after deducting any cash contributions received under Article VIII.C., and

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1  400% of that portion of the cost of newly acquired equipment in the well (to and including the well-
2  head connections), which would have been chargeable to such Non-Consenting Party if it had partici-
3  pated therein.
4
5       Gas production attributable to any Non - Consenting Party's relinquished interest upon such Party's
6  election, shall be sold to its purchaser, if available, under the terms of its existing gas sales con-
7  tract. Such Non - Consenting Party shall direct its purchaser to remit the proceeds receivable from
8  such sale direct to the Consenting Parties until the amounts provided for in this Article are recov-
9  ered from the Non - Consenting Party's relinquished interest. If such Non - Consenting Party has not
10 contracted for sale of its gas at the time such gas is available for delivery, or has not made the elec-
11 tion as provided above, the Consenting Parties shall own and be entitled to receive and sell such Non-
12 Consenting Party's share of gas as hereinabove provided during the recoupment period.
13
14      During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share
15 of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of
16 all production, severance, gathering and other taxes, and all royalty, overriding royalty and other
17 burdens applicable to Non-Consenting Party's share of production.
18
19      In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall
20 be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of
21 all such equipment shall remain unchanged; and upon abandonment of a well after such reworking,
22 plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the
23 owners thereof, with each party receiving its proportionate part in kind or in value, less cost of
24 salvage.
25
26      Within sixty (60) days after the completion of any operation under this Article, the party con-
27 ducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an in-
28 ventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling,
29 deepening, plugging back, testing, completing, and equipping the well for production; or, at its option,
30 the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed
31 statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being
32 reimbursed as provided above, the Party conducting the operations for the Consenting Parties shall furn-
33 ish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the
34 operation of the well, together with a statement of the quantity of oil and gas produced from it and the
35 amount of proceeds realized from the sale of the well's working interest production during the preceding
36 month. In determining the quantity of oil and gas produced during any month, Consenting Parties
37 shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any
38 amount realized from the sale or other disposition of equipment newly acquired in connection with any
39 such operation which would have been owned by a Non-Consenting Party had it participated therein
40 shall be credited against the total unreturned costs of the work done and of the equipment purchased,
41 in determining when the interest of such Non-Consenting Party shall revert to it as above provided;
42 and if there is a credit balance, it shall be paid to such Non-Consenting party.
43
44      If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest
45 the amounts provided for above, the relinquished interests of such Non-Consenting Party shall auto-
46 matically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same
47 interest in such well, the material and equipment in or pertaining thereto, and the production there-
48 from as such Non-Consenting Party would have been entitled to had it participated in the drilling,
49 reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be
50 charged with and shall pay its proportionate part of the further costs of the operation of said well in
51 accordance with the terms of this agreement and the Accounting Procedure, attached hereto.
52
53      Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent
54 of all parties, no wells shall be completed in or produced from a source of supply from which a well
55 located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing
56 well spacing pattern for such source of supply.
57
58      The provisions of this Article shall have no application whatsoever to the drilling of the initial
59 well described in Article VI.A. except (a) when Option 2, Article VII.D.1., has been selected, or (b)
60 to the reworking, deepening and plugging back of such initial well, if such well is or thereafter shall
61 prove to be a dry hole or non-commercial well, after having been drilled to the depth specified in Article
62 VI.A.
63
64 C.  Right to Take Production in Kind:
65
66      Each party shall have the right to take in kind or separately dispose of its proportionate share of
67 all oil and gas produced from the Contract Area, exclusive of production which may be used in de-
68 velopment and producing operations and in preparing and treating oil for marketing purposes and
69 production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate dispo-
70 sition by any party of its proportionate share of the production shall be borne by such party. Any-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1 party taking its share of production in kind shall be required to pay for only its proportionate share
2 of such part of Operator's surface facilities which it uses.
3

4     Each party shall execute such division orders and contracts as may be necessary for the sale of its
5 interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled
6 to receive payment direct from the purchaser thereof for its share of all production.
7

8     In the event any party shall fail to make the arrangements necessary to take in kind or separately
9 dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have
10 the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such
11 oil and gas or sell it to others at any time and from time to time, for the account of the non-taking
12 party at the best price obtainable in the area for such production. Any such purchase or sale by Op-
13 erator shall be subject always to the right of the owner of the production to exercise at any time its
14 right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a
15 purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for
16 such reasonable periods of time as are consistent with the minimum needs of the industry under the
17 particular circumstances, but in no event for a period in excess of one (1) year. Notwithstanding the
18 foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's
19 share of gas production without first giving such other party thirty (30) days/notice of such intended
20 sale.                                                       *prior written*
21

22     In the event one or more parties' separate disposition of its share of the gas causes split-stream de-
23 liveries to separate pipelines and or deliveries which on a day-to-day basis for any reason are not
24 exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the
25 balancing or accounting between the respective accounts of the parties shall be in accordance with
26 any Gas Balancing Agreement between the parties hereto, whether such Agreement is attached as
27 Exhibit "E", or is a separate Agreement.
28

29 **D. Access to Contract Area and Information:**
30

31     Each party shall have access to the Contract Area at all reasonable times, at its sole risk to inspect
32 or observe operations, and shall have access at reasonable times to information pertaining to the de-
33 velopment or operation thereof, including Operator's books and records relating thereto. Operator, upon
34 request, shall furnish each of the other parties with copies of all forms or reports filed with govern-
35 mental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports
36 of stock on hand at the first of each month, and shall make available samples of any cores or cuttings
37 taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to
38 Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the
39 information.
40

41 **E. Abandonment of Wells:**
42

43     1. _Abandonment of Dry Holes:_ Except for any well drilled pursuant to Article VI.B.2., any well
44 which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole
45 shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent
46 effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours
47 (exclusive of Saturday, Sunday or legal holidays) after receipt of notice of the proposal to plug and
48 abandon such well, such party shall be deemed to have consented to the proposed abandonment. All
49 such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost,
50 risk and expense of the parties who participated in the cost of drilling of such well. Any party who ob-
51 jects to the plugging and abandoning such well shall have the right to take over the well and conduct
52 further operations in search of oil and or gas subject to the provisions of Article VI.B.
53

54     2. _Abandonment of Wells that have Produced:_ Except for any well which has been drilled or re-
55 worked pursuant to Article VI.B.2. hereof for which the Consenting Parties have not been fully reim-
56 bursed as therein provided, any well which has been completed as a producer shall not be plugged and
57 abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
58 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense
59 of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment
60 of such well, all parties do not agree to the abandonment of any well, those wishing to continue its op-
61 eration shall tender to each of the other parties its proportionate share of the value of the well's salvable
62 material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated
63 cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall
64 assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity,
65 quality, or fitness for use of the equipment and material, all of its interest in the well and related equip-
66 ment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the
67 formation or formations then open to production. If the interest of the abandoning party is or includes
68 an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an
69 oil and gas lease, limited to the interval or intervals of the formation or formations then open to produc-
70 tion, for a term of one year and so long thereafter as oil and or gas is produced from the interval or inter-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1  vals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
2  "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is
3  located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon
4  the relationship of their respective percentages of participation in the Contract Area to the aggregate of
5  the percentages of participation in the Contract Area of all assignees. There shall be no readjustment
6  of interest in the remaining portion of the Contract Area.
7
8      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the op-
9  eration of or production from the well in the interval or intervals then open other than the royalties
10  retained in any lease made under the terms of this Article. Upon request, Operator shall continue to
11  operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
12  templated by this agreement, plus any additional cost and charges which may arise as the result of
13  the separate ownership of the assigned well.
14
15                              ARTICLE VII.
16              EXPENDITURES AND LIABILITY OF PARTIES
17
18  A.  Liability of Parties:
19
20      The liability of the parties shall be several, not joint or collective. Each party shall be responsible
21  only for its obligations, and shall be liable only for its proportionate share of the costs of developing
22  and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are
23  given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall
24  this agreement be construed as creating, a mining or other partnership or association, or to render the
25  parties liable as partners.
26
27  B.  Liens and Payment Defaults:
28
29      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a
30  security interest in its share of oil and or gas when extracted and its interest in all equipment, to secure
31  payment of its share of expense, together with interest thereon at the rate provided in the Accounting
32  Procedure attached hereto as Exhibit "C". To the extent that Operator has a security interest under the
33  Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies
34  of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator
35  for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
36  rights or security interest as security for the payment thereof. In addition, upon default by any Non-
37  Operator in the payment of its share of expense, Operator shall have the right, without prejudice to
38  other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's
39  share of oil and/or gas until the amount owed by such Non-Operator, plus interest has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any de-
41  fault. Operator grants a like lien and security interest to the Non-Operators to secure payment of Op-
42  erator's proportionate share of expense.
43
44      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of
45  a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by
46  Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the in-
47  terest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimburse-
48  ment thereof, be subrogated to the security rights described in the foregoing paragraph.
49
50  C.  Payments and Accounting:
51
52      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses
53  incurred in the development and operation of the Contract Area pursuant to this agreement and shall
54  charge each of the parties hereto with their respective proportionate shares upon the expense basis pro-
55  vided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate
56  record of the joint account hereunder, showing expenses incurred and charges and credits made and
57  received.
58
59      Operator, at its election, shall have the right from time to time to demand and receive from the
60  other parties payment in advance of their respective shares of the estimated amount of the expense to
61  be incurred in operations hereunder during the next succeeding month, which right may be exercised only
62  by submission to each such party of an itemized statement of such estimated expense, together with
63  an invoice for its share thereof. Each such statement and invoice for the payment in advance of esti-
64  mated expense shall be submitted on or before the 20th day of the next preceding month. Each party
65  shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such es-
66  timate and invoice is received. If any party fails to pay its share of said estimate within said time, the
67  amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be
68  made monthly between advances and actual expense to the end that each party shall bear and pay its
69  proportionate share of actual expenses incurred, and no more.
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

D. **Limitation of Expenditures:**

1. **Drill or Deepen:** Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this Agreement, it being understood that the consent to the drilling or deepening shall include:

☐ **Option No. 1:** All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and or surface facilities.

☒ **Option No. 2:** All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its authorized depth, and all tests have been completed. Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion attempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. **Rework or Plug Back:** Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement, it being understood that the consent to the reworking or plugging back of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and or surface facilities.

3. **Other Operations:** Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _ _ _ _ _ _Fifteen Thousand_ _ _ _ _ _ _ _Dollars ($ _15,000.00_ ) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares "Authority for Expenditures" for its own use, Operator, upon request, shall furnish copies of its "Authority for Expenditures" for any single project costing in excess of _ _ _ _ _ _Fifteen Thousand_ _ _ _ _ _ _ _Dollars ($_15,000.00_ ).

E. **Royalties, Overriding Royalties and Other Payments:**

Each party shall pay or deliver, or cause to be paid or delivered, all royalties to the extent of _one-eighth (1/8th)_ due on its share of production and shall hold the other parties free from any liability therefor. If the interest of any party in any oil and gas lease covered by this agreement is subject to any royalty, overriding royalty, production payment, or other charge over and above the aforesaid royalty, such party shall assume and alone bear all such obligations and shall account for or cause to be accounted for, such interest to the owners thereof.

No party shall ever be responsible, on any price basis higher than the price received by such party, to any other party's lessor or royalty owner; and if any such other party's lessor or royalty owner should demand and receive settlements on a higher price basis, the party contributing such lease shall bear the royalty burden insofar as such higher price is concerned.

F. **Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1   of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article
2   IV.B.3.
3
4   **G. Taxes:**
5
6   Beginning with the first calendar year after the effective date hereof, Operator shall render for ad
7   valorem taxation all property subject to this agreement which by law should be rendered for such
8   taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the ren-
9   dition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be
10  limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests con-
11  tributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its
12  being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in
13  ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold
14  estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such
15  reduction. Operator shall bill other parties for their proportionate share of all tax payments in the man-
16  ner provided in Exhibit "C".
17  *See Article XV.D. for additional provisions.*
18  If Operator considers any tax assessment improper, Operator may, at its discretion, protest within
19  the time and manner prescribed by law, and prosecute the protest to a final determination, unless all
20  parties agree to abandon the protest prior to final determination. During the pendency of administrative
21  or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and
22  penalty. When any such protested assessment shall have been finally determined, Operator shall pay
23  the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then
24  be assessed against the parties, and be paid by them, as provided in Exhibit "C".
25
26  Each party shall pay or cause to be paid all production, severance, gathering and other taxes im-
27  posed upon or with respect to the production or handling of such party's share of oil and/or gas pro-
28  duced under the terms of this agreement.
29
30  **H. Insurance:**
31
32  At all times while operations are conducted hereunder, Operator shall comply with the Workmen's
33  Compensation Law of the State where the operations are being conducted; provided, however, that Op-
34  erator may be a self-insurer for liability under said compensation laws in which event the only charge
35  that shall be made to the joint account shall be an amount equivalent to the premium which would have
36  been paid had such insurance been obtained. Operator shall also carry or provide insurance for the
37  benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof.
38  Operator shall require all contractors engaged in work on or for the Contract Area to comply with the
39  Workmen's Compensation Law of the State where the operations are being conducted and to maintain
40  such other insurance as Operator may require.
41
42  In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently
43  receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for
44  such insurance for Operator's fully owned automotive equipment.
45
46                                        ARTICLE VIII.
47               ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
48
49  **A.  Surrender of Leases:**
50
51  The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall
52  not be surrendered in whole or in part unless all parties consent thereto.
53
54  However, should any party desire to surrender its interest in any lease or in any portion thereof, and
55  other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express
56  or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and
57  equipment which may be located thereon and any rights in production thereafter secured, to the parties
58  not desiring to surrender it. If the interest of the assigning party includes an oil and gas interest, the as-
59  signing party shall execute and deliver to the party or parties not desiring to surrender an oil and gas
60  lease covering such oil and gas interest for a term of one year and so long thereafter as oil and/or gas
61  is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B".
62  Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing,
63  but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon,
64  and the assigning party shall have no further interest in the lease assigned and its equipment and pro-
65  duction other than the royalties retained in any lease made under the terms of this Article. The parties
66  assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells
67  and equipment on the assigned acreage. The value of all material shall be determined in accordance
68  with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plug-
69  ging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignor's or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Contract Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

**B.   Renewal or Extension of Leases:**

If any party secures a renewal of any oil and gas lease subject to this Agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall apply also and in like manner to extensions of oil and gas leases.   *See Article XV.E. for additional provisions.*

**C.   Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash toward the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. If all parties hereto are Drilling Parties and accept such tender, such acreage shall become a part of the Contract Area and be governed by the provisions of this agreement. If less than all parties hereto are Drilling Parties and accept such tender, such acreage shall not become a part of the Contract Area. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D.   Subsequently Created Interest:**

Notwithstanding the provisions of Article VIII.E. and VIII.G., if any party hereto shall, subsequent to execution of this agreement, create an overriding royalty, production payment, or net proceeds interest, which such interests are hereinafter referred to as "subsequently created interest", such subsequently created interest shall be specifically made subject to all of the terms and provisions of this agreement, as follows:

1.   If non-consent operations are conducted pursuant to any provision of this agreement, and the party conducting such operations becomes entitled to receive the production attributable to the interest out of which the subsequently created interest is derived, such party shall receive same free and clear of such subsequently created interest. The party creating same shall bear and pay all such subsequently created interests and shall indemnify and hold the other parties hereto free and harmless from any and all liability resulting therefrom.

2. If the owner of the interest from which the subsequently created interest is derived (1) fails to pay, when due, its share of expenses chargeable hereunder, or (2) elects to abandon a well under provisions of Article VI.E. hereof, or (3) elects to surrender a lease under provisions of Article VIII.A. hereof, the subsequently created interest shall be chargeable with the pro rata portion of all expenses hereunder in the same manner as if such interest were a working interest. For purposes of collecting such chargeable expenses, the party or parties who receive assignments as a result of (2) or (3) above shall have the right to enforce all provisions of Article VII.B. hereof against such subsequently created interest.

**E.  Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all leases and equipment and production; or

2. an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds hereof.

**F.  Waiver of Right to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~G.   Preferential Right to Purchase:~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and~~ interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent ~~company, or to any company in which any one party owns a majority of the stock.~~

## ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for Federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1   such party shall give any notices or take any other action inconsistent with the election made hereby.
2   If any present or future income tax laws of the state or states in which the Contract Area is located or
3   any future income tax laws of the United States contain provisions similar to those in Subchapter "K",
4   Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that
5   provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as
6   may be permitted or required by such laws. In making the foregoing election, each such party states that
7   the income derived by such party from Operations hereunder can be adequately determined without the
8   computation of partnership taxable income.
9

10                                    ARTICLE X.
11                            CLAIMS AND LAWSUITS
12

13       Operator may settle any single damage claim or suit arising from operations hereunder if the ex-
14   penditure does not exceed _ _ _ _ _ _ _ _ _ _ _ Four Thousand _ _ _ _ _ _ _ _ _ _ _ _ _ Dollars
15   ($ 4,000.00       ) and if the payment is in complete settlement of such claim or suit. If the amount
16   required for settlement exceeds the above amount, the parties hereto shall assume and take over the
17   further handling of the claim or suit, unless such authority is delegated to Operator. All costs and ex-
18   pense of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense
19   of the parties. If a claim is made against any party or if any party is sued on account of any matter
20   arising from operations hereunder over which such individual has no control because of the rights given
21   Operator by this agreement, the party shall immediately notify Operator, and the claim or suit shall
22   be treated as any other claim or suit involving operations hereunder.
23

24                                    ARTICLE XI.
25                              FORCE MAJEURE
26

27       If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations
28   under this agreement, other than the obligation to make money payments, that party shall give to all
29   other parties prompt written notice of the force majeure with reasonably full particulars concerning it;
30   thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure,
31   shall be suspended during, but no longer than, the continuance of the force majeure. The affected party
32   shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.
33

34       The requirement that any force majeure shall be remedied with all reasonable dispatch shall not
35   require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its
36   wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party
37   concerned.
38

39       .The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other
40   industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood,
41   explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment,
42   and any other cause, whether of the kind specifically enumerated above or otherwise, which is not
43   reasonably within the control of the party claiming suspension.
44

45                                    ARTICLE XII.
46                                   NOTICES
47

48       All notices authorized or required between the parties, and required by any of the provisions of
49   this agreement, unless otherwise specifically provided, shall be given in writing by United States mail
50   or Western Union telegram, postage or charges prepaid, or by teletype, and addressed to the party to
51   whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any
52   provision hereof shall be deemed given only when received by the party to whom such notice is directed,
53   and the time for such party to give any notice in response thereto shall run from the date the originat-
54   ing notice is received. The second or any responsive notice shall be deemed given when deposited in
55   the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid,
56   or when sent by teletype. Each party shall have the right to change its address at any time, and from
57   time to time, by giving written notice hereof to all other parties.
58

59                                    ARTICLE XIII.
60                              TERM OF AGREEMENT
61

62       This agreement shall remain in full force and effect as to the oil and gas leases and or oil and gas in-
63   terests subjected hereto for the period of time selected below: provided, however, no party hereto shall
64   ever be construed as having any right, title or interest in or to any lease, or oil and gas interest con-
65   tributed by any other party beyond the term of this agreement.
66

67   ☐  Option No. 1:  So long as any of the oil and gas leases subject to this agreement remain or are con-
68   tinued in force as to any part of the Contract Area, whether by production, extension, renewal or other--
69   wise, and/or so long as oil and/or gas production continues from any lease or oil and gas interest.
70

                                     - 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

☒ **Option No. 2:** In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of ___120___ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling or reworking a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and·or gas from the Contract Area, this agreement shall terminate unless drilling or reworking operations are commenced within ___120___ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.  Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the committed acreage is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.  Governing Law:**

The essential validity of this agreement and all matters pertaining thereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state where most of the land in the Contract Area is located shall govern.

### ARTICLE XV.
### OTHER PROVISIONS

**A.  Sale of Gas Production:**

It is recognized by the parties hereto that in addition to each party's share of working interest production as shown in Exhibit "A", such party shall have the right, subject to existing contracts, to market the royalty gas attributable to each lease which it contributes to the Contract Area and to receive payments due for such royalty gas produced or allocated to such lease or leases. It is agreed that, regardless of whether each party markets or contracts for its share of gas, including the royalty gas under the leases which it contributed to the Contract Area, such party agrees to pay or cause to be paid to the royalty owners under its lease or leases the proceeds attributable to their respective royalty interest and to hold all other parties hereto harmless for its failure to do so.

**B.  Billing Additional Interests:**

Notwithstanding the provisions of this agreement and of the accounting procedure attached as Exhibit "C", the Parties to this agreement specifically agree that in no event during the term of this contract shall Operator be required to make more than one billing for the entire interest credited to each Party on Exhibit "A". It is further agreed that if any Party to this agreement (hereafter referred to as "Selling Party") disposes of part of the interest credited to it on Exhibit "A", the Selling Party shall be solely responsible for billing its assignee or assignees, and shall remain primarily liable to the other parties for the interest or interests assigned and shall make prompt payment to Operator for the entire amount of statements and billings rendered to it. It is further understood and agreed that if Selling Party disposes of all its interest as set out on Exhibit "A", whether to one or several assignees, Operator shall continue to issue statements and billings to the Selling Party for the interest conveyed until such time as Selling Party has designated and qualified one assignee to receive the billing for the entire interest. In order to qualify one assignee to receive the billing for the entire interest credited to Selling Party on Exhibit "A", Selling Party shall furnish to Operator the following:

1. Written notice of the conveyance and photostatic or certified copies of the assignments by which the transfer was made.

2. The name of the assignee to be billed and a written statement signed by the assignee to be billed in which it consents to receive statements and billings for the entire interest credited to Selling Party on Exhibit "A" hereof; and, further, consents to handle any necessary sub-billings in the event it does not own the entire interest credited to Selling Party on Exhibit "A".

- 14 -

## C. Disbursement of Royalties:

If a purchaser of any oil, gas or other hydrocarbons produced from the Contract Area declines to make disbursements of all royalties, overriding royalties, working interests, and other payments out of, or with respect to, production revenues which are payable on the Contract Area, Operator may, at its option, from time to time, make disbursements on behalf of any Non-Operator who requests in writing that Operator do so.  Each Non-Operator for whom such disbursement is made shall furnish Operator with the following:

1. Such documents as may be necessary in the opinion of Operator to enable Operator to receive all payments for oil, gas or other hydrocarbons directly from the purchaser thereof.

2. An initial list of names, addresses, and interests (to a seven place decimal), on a tract, unit, purchase contract, or other such basis as, in the opinion of Operator, is necessary for efficient administration, for all royalty, overriding royalty and other interest owners who are entitled to proceeds from the sale of production attributable to such Non-Operator's interest. Also, any changes to the initial list shall be furnished promptly to Operator in writing.

Operator will use its best efforts to make disbursements correctly, but will be liable for incorrect disbursement only in the event of gross negligence or willful misconduct. Any Non-Operator for whom such disbursements are made hereby agrees to indemnify and hold harmless Operator for any loss, including court costs and attorney's fees, which may be incurred as a result of Operator's making such disbursements in the manner prescribed by Non-Operator.

## D. Article VII.G., Addition:

If the Operator is required hereunder to pay ad valorem taxes based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the percentage of tax value generated by each party's working interest.

## E. Article VIII.B., Addition:

Notwithstanding anything to the contrary contained herein, each party committing a lease or leases to this agreement shall have the option upon the expiration of each lease to renew or extend such lease and to bear the renewal or extension costs and expenses and thereby retain its original interest and title in said lease.  By exercising such option, the parties' working interests shall remain unchanged.  If the original lease owner does not exercise its option within sixty (60) days after the expiration date of the original lease, the renewal or extension lease will then be subject to the terms of this article as written above.  If any working interest owner other than the original lease owner renews or extends the lease, the renewing or extending party shall furnish the original lease owner an itemized statement of the complete renewal or extension costs and expenses of such lease.  The original lease owner shall have sixty (60) days after the receipt of such itemized statement to reimburse the renewing or extending party in full.  Failure of the original lease owner to do so shall result in the forfeiture of its option hereunder.  The provisions hereof shall only apply to leases or portions of leases located in the Contract Area.

F.  Notwithstanding any language in Article VI.B.2. to the contrary each non-consenting party to a reworking, deepening or plugging back operation (including "completing" if Option No. 2 in Article VII.D.1. is selected) on a well conducted pursuant to Article VI.B.2. shall, upon commencement of such operation, be deemed to have relinquished to consenting parties, and the consenting parties shall own and be entitled to receive, in proportion to their respective interest, all of such non-consenting party's interest in the well and share of production therefrom, only insofar as the interval or intervals of the formation or formations which are the subject of the reworking, deepening or plugging back operation and to which such non-consenting party does not desire to join in the reworking, deepening or plugging back thereof until the proceeds or market value thereof (after deducting production taxes, excise taxes, royalty, overriding royalty and other interest payable out of, or measured by the production from such well, only insofar as the production secured from the interval or intervals of the formation or formations which are subject to said reworking, deepening or plugging back operation, accruing with respect to such interest until it reverts) shall equal the total of those certain costs as further described in sub-paragraphs (a) and (b) of the third grammatical paragraph under Article VI.B.2. If, prior to payout

- 14A -

of the initial completion attempt following the drilling or deepening of a well in which less than all parties participated, a subsequent operation is proposed for such well, then any party who elects to participate in the new proposal but who had not participated in such initial completion attempt must pay their share (based on their cost-bearing interest in the new proposal) of the unrecovered completion cost, insofar as such cost are attributable to running and cementing casing from the surface through the interval or intervals of the formation or formations which are the subject of the new proposal.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _12th_ day of _June_, 19 _84_.

OPERATOR

WITNESSES:

TXO PRODUCTION CORP.

BY: _Victor C. Smith_
VICTOR C. SMITH
Agent and Attorney-in-Fact

NON-OPERATORS

WITNESSES:

_____

_____    DAVID CROW
_____


_____    GRETCHEN SMITH CROW
_____


_____    TAYLOR MILTON
_____


_____    EUGENE P. CUNNINGHAM
_____


                                 DOUBLE B OIL COMPANY


                                 BY: _____
_____

_____


*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

- 15 -

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

WITNESSES:

SKLAR OIL COMPANY

_Jim N. Crawford_

_Phyllis Curtis_

BY: _____

Albert Sklar, Managing Partner

_____

_____

DAVID L. BILLINGSLEY

_____

_____

A. FRANK TIMMINS

_____

_____

BONNIE TIMMINS

CROW DRILLING & PRODUCING CO.

_____

_____

BY: _____

_____

_____

THEODORE SINGELIS

_____

_____

CARLOS J. CACIOPPO

_____

_____

RICHARD W. GIBSON

_____

_____

MARY GIBSON

-15A-

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

*WITNESSES:*

_____          _____
_____          *MAX M. MORELOCK*


_____          _____
_____          *JASMINE C. MORELOCK*


_____          _____
_____          *FRANKLIN JONES, JR.*


_____          _____
_____          *ELIZABETH FRANCIS JONES*


_____          _____
_____          *FRANKLIN JONES, SR.*


_____          _____
_____          *HUDLAH HARRISON JONES*


_____          _____
_____          *BARBARA W. WOOD*


_____          _____
_____          *WILLIAM R. WOOD, III*


_____          _____
_____          *CHARLES COBB, IV*

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

*WITNESSES:*

_____        _____
_____        *PEGGY JEAN BRIAN WEBER*

_____        _____
_____        *REBA JEANNETTE LAWRENCE*

_____        _____
_____        *MARY VIRGINIA CRAYTON, Trustee ·*
                                          *U/W/O Phillip L. Crayton*

-15C-

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

---

## ACKNOWLEDGMENTS

STATE OF LOUISIANA {

PARISH OF CADDO {

BEFORE ME, the undersigned authority, on this day personally came and appeared VICTOR C. SMITH, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of said TXO PRODUCTION CORP., a corporation, and that he executed the same as the act and deed of such corporation for the purposes and consideration therein expressed and in the capacity therein stated.

Given under my hand and seal of office this _____ day of _____,
1985.



_____
NOTARY PUBLIC, in and for
Caddo Parish, Louisiana


STATE OF LOUISIANA {

PARISH OF CADDO {

BEFORE ME, the undersigned authority, on this day personally came and appeared DAVID CROW and GRETCHEN SMITH CROW, known to me to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

Given under my hand and seal of office this _____ day of _____,
1985.



My Commission Expires:
_____

_____
NOTARY PUBLIC, in and for
Caddo Parish, Louisiana


STATE OF NEW YORK {

COUNTY OF _____ {

BEFORE ME, the undersigned authority, on this day personally came and appeared TAYLOR MILTON, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Given under my hand and seal of office this _____ day of _____,
1985.



My Commission Expires:
_____

_____
NOTARY PUBLIC, in and for
_____ County, New York

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

ACKNOWLEDGMENTS
*(Continued)*

STATE OF ILLINOIS   }
                    }
COUNTY OF _____ }

BEFORE ME, the undersigned authority, on this day personally came and appeared EUGENE P. CUNNINGHAM, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:

_____

                              _____
                              NOTARY PUBLIC, in and for
                              _____ County, Illinois


STATE OF TEXAS   }
                 }
COUNTY OF _____ }

BEFORE ME, the undersigned authority, on this day personally came and appeared _____, who being first duly sworn deposes and says that _he was one of the subscribing witnesses to the execution of the foregoing instrument for and on behalf of DOUBLE B OIL COMPANY; that the same was executed for and on behalf of said company by _____, who signed his name thereto as the duly authorized representative of the company in the presence of affiant and the other subscribing witness to that signature, whose name (signature) is affixed as such; and that _he (affiant) now recognizes all said signatures to be true and genuine.

                              _____
                              (Affiant)

Sworn to and subscribed before me, Notary, on this _____ day of _____, 1985.

My Commission Expires:

_____

                              _____
                              NOTARY PUBLIC, in and for
                              _____ County, Texas

Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.

---

## ACKNOWLEDGMENTS

STATE OF LOUISIANA )
)
PARISH OF CADDO    )

BEFORE ME, the undersigned authority, on this day personally came and appeared _____ Phyllis Curtis _____, who being first duly sworn deposes and says that 5he was one of the subscribing witnesses to the execution of the foregoing instrument for and on behalf of SKLAR OIL COMPANY; that the same was executed for and on behalf of said company by _____ Albert Sklar _____, who signed his name thereto as the duly authorized representative of the company in the presence of affiant and the other subscribing witness to that signature, whose name (signature) is affixed as such; and that 5he (affiant) now recognizes all said signatures to be true and genuine.

_Phyllis Curtis_
(Affiant)

Sworn to and subscribed before me, Notary, on this 17th day of _September_, 1985.

_Frances M. Bailey_
NOTARY PUBLIC, in and for
Caddo Parish, Louisiana

FRANCES M. BAILEY
NOTARY PUBLIC, Caddo Parish, Louisiana
My Commission is for Life

My Commission Expires:
_with life_

STATE OF LOUISIANA )
)
PARISH OF CADDO    )

BEFORE ME, the undersigned authority, on this day personally came and appeared DAVID L. BILLINGSLEY, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

_____
NOTARY PUBLIC, in and for
Caddo Parish, Louisiana

My Commission Expires:
_____

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

---

ACKNOWLEDGMENTS
(Continued)

STATE OF TEXAS     I

COUNTY OF _____   I

    BEFORE ME, the undersigned authority, on this day personally came and appeared A. FRANK TIMMINS and BONNIE TIMMINS, known to me to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

    Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:

                               NOTARY PUBLIC, in and for
_____               _____ County, Texas


STATE OF LOUISIANA   I

PARISH OF CADDO      I

    BEFORE ME, the undersigned authority, on this day personally came and appeared _____, who being first duly sworn deposes and says that _he was one of the subscribing witnesses to the execution of the foregoing instrument for and on behalf of CROW DRILLING & PRODUCING CO.; that the same was executed for and on behalf of said company by _____, who signed his name thereto as the duly authorized representative of the company in the presence of affiant and the other subscribing witness to that signature, whose name (signature) is affixed as such; and that _he (affiant) now recognizes all said signatures to be true and genuine.

                                     (Affiant)

    Sworn to and subscribed before me, Notary, on this _____ day of _____, 1985.

My Commission Expires:

                                 NOTARY PUBLIC, in and for
_____               Caddo Parish, Louisiana

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

ACKNOWLEDGMENTS
(Continued)

STATE OF ILLINOIS

COUNTY OF _____

BEFORE ME, the undersigned authority, on this day personally came and appeared THEODORE SINGELIS, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:

_____

NOTARY PUBLIC, in and for
_____ County, Illinois

STATE OF TEXAS

COUNTY OF _____

BEFORE ME, the undersigned authority, on this day personally came and appeared CARLOS J. CACIOPPO, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

Given under my hand and seal of office this _____ day of _____, . 1985.

My Commission Expires:

_____

NOTARY PUBLIC, in and for
_____ County, Texas

STATE OF LOUISIANA

PARISH OF CADDO

BEFORE ME, the undersigned authority, on this day personally came and appeared RICHARD W. GIBSON and MARY GIBSON, known to me to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:

_____

NOTARY PUBLIC, in and for
Caddo Parish, Louisiana

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

ACKNOWLEDGMENTS
(Continued)

STATE OF LOUISIANA   }
                     }
PARISH OF CADDO      }

BEFORE ME, the undersigned authority, on this day personally came and appeared MAX M. MORELOCK and JASMINE C. MORELOCK, known to me to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:

_____

NOTARY PUBLIC, in and for<br>
Caddo Parish, Louisiana

STATE OF TEXAS   }
                 }
COUNTY OF _____ }

BEFORE ME, the undersigned authority, on this day personally came and appeared FRANKLIN JONES, JR. and ELIZABETH FRANCIS JONES, known to me to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:

_____

NOTARY PUBLIC, in and for<br>
_____ County, Texas

STATE OF TEXAS   }
                 }
COUNTY OF _____ }

BEFORE ME, the undersigned authority, on this day personally came and appeared FRANKLIN JONES, SR. and HUDLAH HARRISON JONES, known to me to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:

_____

NOTARY PUBLIC, in and for<br>
_____ County, Texas

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

---

ACKNOWLEDGMENTS
(Continued)

STATE OF TEXAS      l
                     l
COUNTY OF _____ l

    BEFORE ME, the undersigned authority, on this day personally came and appeared BARBARA W. WOOD, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

        Given under my hand and seal of office this _____ day of _____,
1985.

                                                _____
                                      NOTARY PUBLIC, in and for
My Commission Expires:                  _____ County, Texas
_____

STATE OF OKLAHOMA    l
                        l
COUNTY OF _____ l

    BEFORE ME, the undersigned authority, on this day personally came and appeared WILLIAM R. WOOD, III, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

        Given under my hand and seal of office this _____ day of _____,
1985.

                                                _____
                                      NOTARY PUBLIC, in and for
My Commission Expires:                  _____ County, Oklahoma
_____

STATE OF TEXAS      l
                     l
COUNTY OF _____ l

    BEFORE ME, the undersigned authority, on this day personally came and appeared CHARLES COBB, IV, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

        Given under my hand and seal of office this _____ day of _____,
1985.

                                                _____
                                      NOTARY PUBLIC, in and for
My Commission Expires:                  _____ County, Texas
_____

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

ACKNOWLEDGMENTS
(Continued)

STATE OF TEXAS        §
                      §
COUNTY OF _____   §

BEFORE ME, the undersigned authority, on this day personally came and appeared PEGGY JEAN BRIAN WEBER, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:                    _____
                                          NOTARY PUBLIC, in and for
_____                   _____ County, Texas


STATE OF TEXAS        §
                      §
COUNTY OF _____   §

BEFORE ME, the undersigned authority, on this day personally came and appeared REBA JEANNETTE LAWRENCE, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:                    _____
                                          NOTARY PUBLIC, in and for
_____                   _____ County, Texas


STATE OF TEXAS        §
                      §
COUNTY OF _____  §

BEFORE ME, the undersigned authority, on this day personally came and appeared MARY VIRGINIA CRAYTON, as Trustee U/W/O Phillip L. Crayton, known to me to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

Given under my hand and seal of office this _____ day of _____, 1985.

My Commission Expires:                    _____
                                          NOTARY PUBLIC, in and for
_____                   _____ County, Texas

*Attached to and made a part of that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

---

*EXHIBIT "A"*

I.   CONTRACT AREA:

Section 26, Township 19 North, Range 3 West, Lincoln Parish, Louisiana.

II.   NAMES, ADDRESSES AND PERCENTAGES OF THE PARTIES:

TXO PRODUCTION CORP.                          .7660000
1200 Louisiana Tower
Shreveport, Louisiana  71101

MURPHY OIL USA, INC.                          .0888672
200 Peach
El Dorado, Arkansas  71730

MUNOCO COMPANY                                .0126953
P. O. Box 70
El Dorado, Arkansas  71731-0070

T. L. JAMES & CO., INC.                       .0097500
P. O. Box 1305
Ruston, Louisiana  71270

ROBERT G. JAMES and LINDA JAMES               .0031562
P. O. Drawer K
Ruston, Louisiana  71270

DAVID CROW and GRETCHEN SMITH CROW            .0396881
900 Travis Place
Shreveport, Louisiana  71101

TAYLOR MILTON                                 .0024932
c/o U.S. Industries, Inc.
250 Park Avenue
New York, New York  10177

EUGENE P. CUNNINGHAM                          .0024887
408 Fair Avenue
Elmhurst, Illinois  60126

DOUBLE B OIL COMPANY                          .0037354
25 Briar Hollow Lane
Houston, Texas  77027

SKLAR OIL COMPANY                             .0298828
2925 Mansfield Road
Shreveport, Louisiana  71133

DAVID L. BILLINGSLEY                          .0004669
2000 Fairfield Avenue
Shreveport, Louisiana  71104

A. FRANK TIMMINS and BONNIE TIMMINS           .0018677
114 West Cotton
Longview, Texas  75601

CROW DRILLING & PRODUCING CO.                 .0149414
900 Travis Place
Shreveport, Louisiana  71101

*Attached to and made a part of that certain Operating Agreement
dated June 12, 1984, by and between TXO PRODUCTION CORP., as
Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators,
covering the Evans "J" #1.*

---

EXHIBIT "A"
(Continued)

| | |
|---|---|
| THEODORE SINGELIS<br>88 Pine Avenue<br>Riverside, Illinois  60546 | .0024887 |
| CARLOS J. CACIOPPO<br>706 Bergstrom<br>Longview, Texas  75670 | .0018677 |
| RICHARD W. GIBSON and MARY GIBSON<br>865 Margaret Place<br>Shreveport, Louisiana  71101 | .0037354 |
| MAX M. MORELOCK and JASMINE C. MORELOCK<br>901 Oneonta<br>Shreveport, Louisiana | .0009338 |
| FRANKLIN JONES, JR. and<br>ELIZABETH FRANCIS JONES<br>P. O. Drawer 1249<br>Marshall, Texas  75760 | .0018677 |
| FRANKLIN JONES, SR. and<br>HUDLAH HARRISON JONES<br>P. O. Drawer 1249<br>Marshall, Texas  75760 | .0018677 |
| BARBARA W. WOOD<br>701 Yorktown Court<br>Longview, Texas  75601 | .0018677 |
| WILLIAM R. WOOD, III<br>6736 Peoria<br>Tulsa, Oklahoma  74136 | .0018677 |
| CHARLES COBB, IV<br>P. O. Box 1799<br>Marshall, Texas  75760 | .0037354 |
| PEGGY JEAN BRIAN WEBER<br>6953 Arboreal<br>Dallas, Texas  75231 | .0009338 |
| REBA JEANNETTE LAWRENCE<br>3727 Oak Cluster<br>San Antonio, Texas  78253 | .0009338 |
| MARY VIRGINIA CRAYTON, Trustee<br>U/W/O Phillip L. Crayton<br>2703 Waubun<br>Marshall, Texas  75670 | .0018677 |
| | 1.0000000 |

BATH (Q) GRAM          BATH'S FORM L(          SPEC 14-BRI-2A.4 (2-77)

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT, made this _____ day of____ _____, 19_____, between

_____
lessor (whether one or more), and_____ _____
lessee, WITNESSETH:

1. Lessor in consideration of_____ _____ _____ _Dollars
($_____), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained,
hereby grants, leases and lets exclusively unto Lessee for the purposes of investigating, exploring, prospecting, drilling
and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone
lines, and other structures thereon to produce, save, take care of, treat, transport and own said products and for dredg-
ing and maintaining canals, constructing roads and bridges, and building houses for its employees, and, in general, for
all appliances, structures, equipment, servitudes and privileges which may be necessary, useful or convenient to or in
connection with any such operations conducted by lessee thereon, or on any adjacent lands, the following described
land in _____ _____ ___ _____ . Parish, Louisiana, to-wit:

*EXHIBIT "B"*

*TO THE OPERATING AGREEMENT*

This lease also covers and includes battures, accretions and all other land owned by Lessor adjacent to the
land particulary described above. For the purpose of calculating the rental payments hereunder provided for, said
land is estimated to comprise_____acres, whether it actually comprises more or less.
2. Subject to the other provisions herein contained, this lease shall be for a period of ten years from the date hereof
(called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land here-
under or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.
(a) It is the intention of the parties that this lease shall also extend and apply to all outstanding mineral rights
or servitudes affecting the lands herein described as the same may revert to Lessor, his heirs or assigns, from time to time.
3. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in
liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered
at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case
to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time
purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the
field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced
from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market
value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-
eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or descrip-
tion whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in
order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or
used either on or off the premises within the meaning of this paragraph 3 hereof; (c) on all other minerals mined and
marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty
shall be One and 50/100 Dollars ($1.50) per long ton. Notwithstanding anything herein to the contrary, it is hereby
agreed that each royalty owner may, at his option, take his royalty share of gas in kind. Within thirty (30) days
after receipt of notice from the owner of the lease of the completion of a well capable of producing gas in paying
quantities upon the leased premises or acreage pooled therewith, each royalty owner shall notify such owner in writing
of his election to take his royalty share of gas in kind or of his election to allow such owner to dispose of such royalty
share of gas. The failure of a royalty owner to make known his election to such owner shall be an election to allow
the owner of the lease to dispose of such gas. If a royalty owner elects to take his royalty share of gas in kind, delivery
of such gas shall be made at the well to him or his designate free of cost, expense and liability to the owner of the
lease. If a royalty owner elects not to take his royalty share of gas in kind, the owner of the lease may contract for
the sale of same upon the same terms and conditions under which such owner disposes of all gas produced and the
royalty owner's proceeds for such gas shall thereafter be based upon the price received therefor by such owner.
4. If operations for drilling or mining are not commenced on said land or on land pooled therewith on or before
one year from this date, this lease shall terminate as to both parties, unless on or before such anniversary date Lessee
shall pay or tender to the Lessor a rental of_____ _____ _____ _____Dollars ($_____)
which shall cover the privilege of deferring commencement of such operations for a period of twelve (12) months. In like
manner and upon like payments or tenders, annually, the commencement of said operations may be further deferred for
successive periods of the same number of months, each during the primary term. Payment or tender may be made to
the Lessor or to the credit of Lessor in_____Bank
at _____, which bank, or any successor thereof shall continue to be
agent for the Lessor, and the Lessor's successors and assigns. If such bank (or any successor bank) shall fail, liquidate, or
be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default until
thirty days after Lessor shall deliver to Lessee a recordable instrument, making provision for another method of payment,

of tender, and any depository office is a liability of the Lessor. The payment or tender of rental may be made by the check or draft of Lessee or by __ ; or draft of any other person, firm or c __ ation (tendered as rental hereunder) mailed or delivered to Lessor __ said bank on or before such date of payment.

5.  This lease will continue in full force and effect within or beyond the primary term as long as any mineral is produced from said land hereunder or from land pooled therewith. If within the primary term and prior to discovery of oil, gas, sulphur or other mineral on said land or on land pooled therewith, Lessee should drill a dry hole or holes thereon or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences or resumes the payment or tender of rentals or commences drilling operations or reworking operations on or before the rental paying date next ensuing after the expiration of ninety days from date of completion of such dry hole or cessation of production. If at any time subsequent to ninety days prior to the beginning of the last year of the primary term Lessee should complete the drilling of a dry hole thereon or on land pooled therewith, or production previously secured should cease from any cause, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term. If such dry hole or holes be completed or abandoned or such production cease within less than ninety days before the end of the primary term, this lease shall continue in force and effect for ninety days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith but Lessee is then engaged in drilling operations or reworking operations thereon, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in drilling operations or reworking operations with no cessation between operations or between such cessation of production and additional operations of more than ninety consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith this lease shall continue in force and effect so long as Lessee is engaged with due diligence in exploration for and/or erecting a plant for the production of sulphur and thereafter, subject to the foregoing provisions hereof, so long as oil, gas, sulphur or other mineral is produced from land hereunder or from land pooled therewith.

6.  Lessee may at any time execute and deliver to Lessor or place of record a release covering all or any part of the acreage embraced in the leased premises or covering any one or more zones, formations or depths underlying all or any part of such acreage and thereupon shall be relieved of all obligations thereafter to accrue with respect to the acreage, zones, formations or depths covered by such release. In event of a release of this lease as to all rights in only a part of the acreage embraced in the leased premises, thereafter the delay rentals hereinabove provided for shall be reduced pro-portionally on an acreage basis.

7.  If a well capable of producing gas or gas and gas condensate in paying quantities located on the leased premises (or acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in because of lack of market or marketing facilities, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this lease will continue in force during all of the time or times while such well is so shut in, whether before or after the expiration of the primary term hereof. Within forty-five (45) days after the expiration of each lease year computed from the date hereof during which such well is so shut in and no gas or gas condensate therefrom is sold or used off the premises, Lessee shall be obli-gated to pay to Lessor as royalty an amount equal to the annual delay rental herein provided applicable to the interest of Lessor in acreage embraced in this lease as of the end of such annual period hereinafter referred to as minimum royalty) or if there has been actual production from the well during any part of the year, Lessee shall within the period stated pay to Lessor the difference between the amount of the proceeds of the royalty payable upon such actual production and the amount of the minimum royalty stipulated if the royalty upon actual production is less than the minimum royalty. Lessee shall use reasonable diligence to market gas or gas and gas condensate capable of being produced from such shut-in well, but shall be under no obligation to market such products under terms, conditions or circumstances which in Lessee's judgment exercised in good faith are unsatisfactory.

8.  Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person or corporation so as to create, by the combination of such lands and leases, one or more operating units, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than forty (40) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal commission, agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than forty (40) acres, then the unit or units herein con-templated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. In the event such operating unit or units is/are so created by Lessee, Lessor agrees to accept and shall receive out of the production or the proceeds from the production from such operating unit or units, such portion of the one-eighth royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units. The commencement of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate, or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of produc-tion therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit.

9.  If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties and rentals herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

10.  Lessee shall have and be especially granted the free use of any and all roads and passageways traversing the leased premises, the free use of any facility for subsurface disposal of salt water, and the free use of oil, gas, casinghead gas, condensate, coal and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land, without Lessor's consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

11.  The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, rentals, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, rentals or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. In the event of an assignment of this lease as to a segregated portion of said land, or as to an undivided interest therein, the rentals payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each, or according to the

undivided interest of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder and, if Lessee or assignee of part or parts hereof shall fail or make default in the payment of the proportionate part of the rentals due from such Lessee, or assignee, or fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee thereof shall make payment of said rentals.

12. In case of suit, adverse claim, dispute or question as to the ownership of the rentals or royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such rentals or royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim, or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person; the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

13. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or, in the absence of such rulings, forty (40) acres around each such well in as near a square form as practicable. In the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument. No unreasonable delay in payment of royalties first due upon minerals produced and marketed hereunder shall be deemed to have occurred unless there is delay in payment for an unreasonable time after demand therefor, and no delay in payment of royalties shall be deemed an active breach of obligations of Lessee hereunder.

14. It is expressly understood and agreed that the premises leased herein shall, for all the purposes of this lease, be considered and treated as owned in indivision by the Lessor and shall be developed and operated as one lease, and there shall be no obligation on the part of Lessee to offset wells on separate tracts into which the land covered by this lease may be now or hereafter divided by sale, or otherwise, or to furnish separate measuring or receiving tanks, and all rentals, royalties and other payments accruing hereunder shall be treated as an entirety and shall be divided among and paid to Lessor in the proportion that the acreage (mineral rights) owned by each bears to the entire leased acreage. Lessee may at any time or times pay or tender all rentals or other sums accruing hereunder to the joint credit of Lessor.

15. Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of rentals in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16. Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right of subrogation herein granted, Lessee shall also have the right to retain any rentals or royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such rentals or royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of the government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided, this paragraph shall not relieve Lessee from the necessity of paying rentals during the primary term in order to continue this lease in force solely by force majeure, and during any period this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 7 hereof, without regard to whether or not there is a producing well shut in, located on said land or on land with which the leased premises or any part thereof has been pooled.

18. This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.
WITNESSES:

_____ )
_____ (

_____ )   _____
_____ (   _____

_____ )   _____
_____ (   _____

_____ )   _____
_____ (   _____

_____ )
_____ (

_____ )
_____ (

STATE OF_____ }

_____of_____ }

On this_____day of_____ _____ 19_____, before me personally appeared_____ _____ _____

_____

to me known to be the person described in and who executed the foregoing instrument, and acknowledged that_____ :

executed the same as_____free act and deed.

_____

NOTARY PUBLIC in and for

_____

---

STATE OF_____ }

_____of_____ }

Before me, the undersigned authority, personally came and appeared _____

who being first duly sworn deposes and says that he was one of the subscribing witnesses to the execution of the foregoing instrument by

_____

_____

who signed the same in his presence and that of the other subscribing witness(es) to such signature(s) whose name(s) (signatures) are

affixed as such, and that he now recognizes all said signatures to be true and genuine.

Sworn to and subscribed before me, notary, on this_____day of_____, 19_____.

_____

Notary Public in and for

---

No._____

MINERAL LEASE.

FROM

TO

Parish of_____

THE H. W. BATH COMPANY
BATH, OGDEN
BATH'S FORM LOUISIANA SPEC. 14-BRI-2A-4 (2-77)

---

STATE OF_____ }

_____of_____ }

Before me, the undersigned authority, personally came and appeared _____

who being first duly sworn deposes and says that he was one of the subscribing witnesses to the execution of the foregoing instrument for

and on behalf of_____

a corporation; that the same was executed for and on behalf of that corporation by_____

who signed his name thereto as the duly authorized representative of the corporation in the presence of affiant and the other subscribing witness

to that signature, whose name (signature) is affixed as such; and that he (affiant) now recognizes all said signatures to be true and genuine.

Sworn to and subscribed before me, notary, on this_____day of_____, 19_____.

_____

Notary Public in and for



Kraftbill 601.   BOX 500 TULSA OK 74101

COPAS — 1974
Recommended by the Council of Petroleum Accountants Societies

COPAS

## EXHIBIT " C "

Attached to and made a part of *that certain Operating Agreement dated June 12, 1984, by and between TXO PRODUCTION CORP., as Operator, and MURPHY OIL USA, INC., ET AL, as Non-Operators, covering the Evans "J" #1.*

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

### 2. Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3. Advances and Payments by Non-Operators

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the maximum legal rate permitted by the applicable usury laws in the state in which the joint property is located; or, if the maximum legal permitted rate is less than eighteen percent (18%) per annum and such rate may be modified as agreed between the parties, then, in such event, the unpaid balance shall bear interest monthly at the rate of eighteen percent (18%) per annum. However, pursuant to either rate, attorney's fees, court costs, and all other costs incurred in connection with the collection of these unpaid amounts shall be recoverable.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### 5. Audits

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

### 6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

COPA

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

### 1. Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

### 2. Labor

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First Level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

### 3. Employee Benefits

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

### 4. Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

### 5. Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

### 6. Services

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

### 7. Equipment and Facilities Furnished by Operator

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

### 8. Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

### 9. Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

<h3 style="text-align:center">III. OVERHEAD</h3>

**1. Overhead - Drilling and Producing Operations**

i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

    ( *X* ) Fixed Rate Basis, Paragraph 1A, or
    (   ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.  The salaries, wages and Personal Expenses of Technical Employees and, or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (  ) shall not ( *x* ) be covered by the Overhead rates.

**A. Overhead - Fixed Rate Basis**

  (1) Operator shall charge the Joint Account at the following rates per well per month:

      Drilling Well Rate $_____*5,647*_____
      Producing Well Rate $_____*566*_____

  (2) Application of Overhead - Fixed Rate Basis shall be as follows:

    (a) Drilling Well Rate

      [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

      [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

      [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

    (b) Producing Well Rates

      [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

      [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

      [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

      [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

      [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

  (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

COPA

B. Overhead – Percentage Basis

   (1) Operator shall charge the Joint Account at the following rates:

      (a) Development

         ——————— Percent (    %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

      (b) Operating

         ——————— Percent (    %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

   (2) Application of Overhead – Percentage Basis shall be as follows:

      For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

**2. Overhead – Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ _25,000.00_ :

A. _____5_% of total costs if such costs are more than $_25,000.00_ but less than $_100,000.00_ ; plus

B. _____3_% of total costs in excess of $_100,000.00_ but less than $1,000.000; plus

C. _____2_% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

**3. Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1. Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2. Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

   (1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

   (2) Line Pipe

      (a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

      (b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV. ;

   (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

   Material in sound and serviceable condition and suitable for reuse without reconditioning:

   (1) Material moved to the Joint Property

      (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

   (2) Material moved from the Joint Property

      (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five per-cent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

   (1) Condition C

   Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Para-graph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, pro-vided Condition C value plus cost of reconditioning does not exceed Condition B value.

   (2) Condition D

   All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dis-pose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

   Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service ren-dered by such Material.

E. Pricing Conditions

   (1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

   (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

**3. Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

**4. Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

# V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

**1. Periodic Inventories, Notice and Representation**

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inven-tory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

**2. Reconciliation and Adjustment of Inventories**

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory ad-justments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

**3. Special Inventories**

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

**4. Expense of Conducting Periodic Inventories**

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

EXHIBIT "D"

SCHEDULE OF INSURANCE

Operator shall carry the following insurance covering operations under this agreement at the expense and for the benefit of the parties hereto to-wit:

1. Worker's Compensation and Employer's Liability Insurance as required by the laws of the state where the property is located.

2. Comprehensive General Liability Insurance covering both bodily injury liability and property damage liability with a Combined Single Limit of $500,000 for each occurrence.

3. Comprehensive Automobile Public Liability and Property Damage Insurance with a combined single limit of $500,000 for each occurrence.

EXHIBIT "E"

GAS BALANCING AGREEMENT

I.

From and after the date of initial delivery of gas from the property, a party owner taking and disposing of, during any monthly accounting period, less than its full share of the gas as it is produced, shall be an "underproduced party", if such lesser taking and disposition is not a consequence of other provisions of this Agreement. A party owner's "full share" shall be the amount of a party owner's gas determined in accordance with the provisions of the Operating Agreement. A party owner taking and disposing of during any monthly accounting period, more than its full share of the gas as it is produced, shall be an "overproduced party", if such excess taking and disposition is not a consequence of other provisions of this Agreement. "Underproduction" of any under-produced party, during any monthly accounting period, shall be the difference between such party's full share of gas production, less its full share of gas used in property operations. vented and lost, and the gas delivered to the pipeline(s) for the account of such party owner. "Overproduction" of any overproduced party, during any monthly accounting period, shall be the difference between the gas delivered to the pipeline(s) for the account of such party owner and such party's full share of gas production, less its full share of gas used in property operations, vented and lost.

II.

This Agreement shall become effective on the date of initial deliveries of gas from the property to the pipeline, and shall continue in force and effect until deliveries of gas from the property have ceased and, except as otherwise provided herein, each party shall have the right to take in kind its full share of each separate "gas classification." "Gas classification", as used herein, shall mean each of the price categories provided or established pursuant to the Natural Gas Policy Act of 1978, as same may be amended, by any authority having the right to establish categories thereunder, or pursuant to any other applicable statute or judicial decision establishing gas price categories, including gas not subject to price regulation, which shall be considered as a separate category. Where the gas qualifies for more than one category, the category having the highest price applicable to the source (each separate identifiable geologic source or production contained in a well bore) of gas production shall be used for the determination to be made hereunder. Whenever the gas price category changes, from and after the date of such change, the gas shall no longer be accounted for or be considered in the former category, but shall be accounted for and thereafter be considered to be gas in the new category, until such time as the category is again changed.

III.

Should a party fail to take its full share of the different gas classifications produced from the property, except as provided hereinbelow where such party is to furnish make-up gas, such party's underproduction shall be regarded as remaining in storage in the reservoirs, subject to later recovery in accord with the terms hereof. During any monthly accounting period when a party is unable to take and market its full share (as such quantity may be reduced in accordance with provisions herein for providing make-up gas) of each gas classification, the other joint interest owners shall be entitled to produce and sell all or a portion of such quantity which the party has failed to take. If two or more parties are capable of taking and marketing quantities of gas to which such party was thus entitled but which it failed to take, in the absence of other agreement between them, each may take a share of such underproduction in the direct proportion of its joint interest therein to the total joint interest therein of all parties desiring to take such underproduction, provided, however, that any party or parties having a cumulative underproduction status shall have a first priority to take and market the underproduction over a party or parties having a cumulative overproduction status.

Any party having cumulative underproduction of a particular gas classification category shall be entitled to take a quantity of gas of such particular gas classification ("make-up") in excess of its full share of such gas up to twenty-five percent (25%) of the full share of gas of parties having cumulative overproduction of such particular gas classification. In the event there is more than one cumulative underproduced party seeking to make up underproduction, each such cumulative underproduced party shall be entitled to make up gas in the direct proportion that the cumulative underproduction of such party bears to all cumulative underproduction of all parties then desiring make-up

-1-

gas of the particular gas classification category. In the event there is more than one cumulative overproduced party required to furnish gas for make-up of underproduction, in absence of agreement between the affected parties, each such cumulative overproduced party shall furnish make-up gas (up to the twenty-five percent (25%) limitation heretofore provided) in the direct proportion that the cumulative overproduction of such party bears to all cumulative overproduction of all parties supplying gas of the particular gas classification category.

Any party having cumulative overproduction in any particular gas classification category shall at all times be entitled to seventy-five percent (75%) of its full share of gas of the particular gas classification category in which it is cumulatively overproduced as long as such party remains overproduced. Any portion of such twenty-five percent (25%) make-up gas to which a party is entitled and which is not taken by such party may be taken by other cumulative underproduced party or parties up to the full twenty-five percent (25%) heretofore provided. If there is more than one party desiring make-up gas under this circumstance, the parties taking such make-up gas shall be entitled to such quantities of make-up gas in proportion to the cumulative underproduction of the affected parties, determined as heretofore provided.

All gas taken by a party in accord with the terms of this Agreement, regardless of whether such party is overproduced or underproduced, shall be regarded as gas taken for its own account with title thereto being in such party, whether such gas be attributable to such party's full share of production, or whether it is being taken as overproduction, or whether it is being taken as make-up gas, and shall pay any and all production taxes and royalty due on such gas. All burdens and obligations, other than such royalty and production tax payments, shall be borne by the party having such burden or obligation.

### IV.

The Unit Operator (hereinafter referred to as "Operator") will maintain a separate running account of the quantities of gas, by gas classification category, each party is entitled to, and the quantities of such category taken and marketed by each of the parties. The Operator will also furnish each party monthly statements showing the total quantity of gas produced by each gas classification category, the amount of such category used in the Unit operations, vented or lost, the volume of gas by each such category delivered to pipeline purchaser(s) for the account of each party, and the cumulatie overproduction and underproduction status of each party by each gas classification category.

For purposes of balancing, the measurement point of the gas taken (both quantity and quality) shall be the party's discharge measurement point at or near the well from which the gas is produced. All parties hereto shall share in and own the concomitant crude and condensate (not including gas plant liquids) produced in accordance with their respective interests established pursuant to the provisions of the Operating Agreement, regardless of whether they are able to market their full share of gas.

### V.

Recovery from storage by a cumulative underproduced party from a cumulative overproduced party shall be on a first-in, first-out basis and the cumulative underproduced party shall pay the cumulative overproduced party a storage fee for storing its gas. The storage fee shall be due and payable by such underproduced party to such overproduced party during any monthly accounting period such underproduced party removes gas from storage. The fee to be paid for storing gas in accordance with the provisions of this Agreement, shall be the deficiency in cash between the price that the overproduced party received for gas at the time the underproduction was had, and the price for gas the overproduced party is receiving at the time the underproduction is made up by the underproduced party multiplied by the volume of make-up gas which qualifies for the storage fee charges, less royalty and taxes payable thereon.

Each party shall furnish the Operator upon his request the gas prices necessary to make the gas storage fee computation hereby provided, and the underproduced party(ies) shall remit to Operator monthly the amounts so determined to be due for storage fees. Operator shall in turn make monthly distribution of the storage fees received from the underproduced party(ies) to the party(ies) entitled to be paid the storage fees.

## VI.

At the termination of gas production for a given gas classification category from the property, the overproduced party or parties shall make a monetary settlement of the imbalance by payment to the Operator for the account of the party or parties underproduced in that particular gas classification category, based on the price per Mcf the overproduced party or parties actually received for each Mcf of the overproduced gas. The price used for the above calculation shall be the overproduced party's or parties' bonafide collected gas sales price(s) less royalties, severance, and other production taxes which have been paid with respect to such overproduction. Each of the parties agrees to maintain complete records as to the volume of gas it sold and the price received, so that the above computations can be made. The Operator shall distribute the payments it has received hereunder (from the overproduced party) to the underproduced party or parties entitled thereto in the proportion that each party's cumulative underproduction, for the category of gas for which payment is to be made, bears to the total of such cumulative underproduction. It is understood, however, that the Operator shall rely on the statements made to it, and shall have no liability with respect to the correctness of the funds received by it.

## VII.

Royalties shall be paid in accordance with provisions of the Operating Agreement. The Operator shall be reimbursed by each party taking gas for all royalty due and payable by Operator with respect to production taken by such party. Each party taking gas under the terms hereof shall pay any and all applicable taxes due on or with respect to such production. Each party shall be obligated to pay its working interest share of all costs and liabilities incurred in Unit operations, in accordance with the provisions of the Operating Agreement. Nothing herein shall be construed so as to deny to any party the right, from time to time, to produce and take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

## VIII.

If any portion of the storage fee provided for in Article V or the settlement provided for in Article VI shall be based on prices subject to refund upon order of the Federal Energy Regulatory Commission or any authority having jurisdiction, the paying party or parties shall withhold such amounts subject to refund until prices are fully approved by the Federal Energy Regulatory Commission, unless the party or parties receiving payments furnish a corporate undertaking satisfactory to the paying party(ies).

EXHIBIT "F"

NONDISCRIMINATION AND CERTIFICATION OF NONSEGREGATED FACILITIES

A. Equal Opportunity Clause (41 CFR 60-1.4). (Applicable only to contracts or purchase orders for more than $10,000.)

During the performance of this contract, the Operator agrees as follows:

(1) The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or terminations, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) The Operator will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Operator will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Operator's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Operator will include the provisions of paragraph (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

B. Certification of Nonsegregated Facilities (41 CFR 60-1.8). (Applicable only to contracts or purchase orders which are not exempt from the provisions of the Equal Opportunity Clause set out above.)

The Operator certifies that it does not, and will not, maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not, and will not, permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. The Operator agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this contract or purchase order. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom, or otherwise. The Operator further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods): NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certificate of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

C. Affirmative Action Compliance Program (41 CFR 60-1.40). (Applicable only if (a) the Operator has 50 or more employees and (b) the contract or purchase order is for $50,000 or more.)

The Operator should develop a written affirmative action program for each of its establishments, and, within 120 days from the effectiveness of this contract or purchase order, shall maintain a copy of separate programs for each establishment, including evaluations of utilization of minority group personnel and the job classification tables, at each local office responsible for the personnel matters of such establishment.

D. Employer Information Report (41 CFR 60-1.7). (Applicable only if (a) the Operator has 50 or more employees, (b) the Operator is not exempt (pursuant to section 60-1.5 of Title -1 of the Code of Federal Regulations) from the requirement for filing Employer Information Report EEO-1, and (c) the contract or purchase order is for $50,000 or more.)

The Operator agrees to file with the appropriate Federal agency annually, on or before the 31st day of March, complete and accurate reports on Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress or such form as may hereafter be promulgated in its place.

E. Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250). (Applicable only to contracts or purchase orders for $10,000 or more.)

The affirmative action clause prescribed in section 60-250.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-250.22 of said Regulations) as if set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then within 120 days from the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment which shall set forth the Operator's policies, practices and procedures in accordance with section 60-250.6 of said Regulations.

F. Affirmative Action for Handicapped Workers (41 CFR 60-741.4). (Applicable only to contracts or purchase orders for $2,500 or more.)

The affirmative action clause prescribed in section 60-741.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-741.22 of said Regulations) as if set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then, within 120 days of the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment, which program shall set forth the Operator's policies, practices and procedures in accordance with section 60-741.6 of said Regulations.

G. Utilization of Minority Business Enterprises (Federal Procurement Regulations 1-1.13). (Applicable only to contracts or purchase orders which may exceed $10,000.)

(1) It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(2) The Operator agrees to use his best efforts to carry out this policy in the award of his subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, the term "minority business enterprise" means a business, at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are Negroes, Spanish-speaking American persons, American-Orientals, American-Indians, American-Eskimos, and American Aleuts. Contractors may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.