UNIT OPERATING AGREEMENT
COQUINA WATERFLOOD UNIT
RODESSA FIELD
CADDO PARISH, LOUISIANA

## TABLE OF CONTENTS

| Article | | Page |
|---|---|---|
| | Preliminary Recitals | 1 |
| 1 | Confirmation of Unit Agreement | 1 |
| 2 | Exhibits | 1 |
| 3 | Supervision of Operations by Working Interest Owners | 2 |
| 4 | Manner of Exercising Supervision | 3 |
| 5 | Individual Rights of Working Interest Owners | 4 |
| 6 | Unit Operator | 5 |
| 7 | Authorities and Duties of Unit Operator | 5 |
| 8 | Taxes | 6 |
| 9 | Insurance | 7 |
| 10 | Adjustment of Investments | 7 |
| 11 | Unit Expense | 10 |
| 12 | Non-Unitized Formations | 11 |
| 13 | Titles | 12 |
| 14 | Liability, Claims, and Suits | 13 |
| 15 | Internal Revenue Provision | 13 |
| 16 | Notices | 14 |
| 17 | Withdrawal of Working Interest Owner | 14 |
| 18 | Abandonment of Wells | 15 |
| 19 | Effective Date and Term | 15 |
| 20 | Abandonment of Operations | 16 |
| 21 | Execution | 16 |
| 22 | Successors and Assigns | 17 |

## EXHIBITS

Exhibit "C"   Working Interest Owner's Participation Percentages
Exhibit "D"   Accounting Procedure
Exhibit "E"   Insurance
Exhibit "F"   Usable Wells Within Unit Area

UNIT OPERATING AGREEMENT
COQUINA WATERFLOOD UNIT
RODESSA FIELD
CADDO PARISH, LOUISIANA


        THIS AGREEMENT, entered into as of the 1st day of _____,
19___, by the parties who have signed the original of this instrument, a
counterpart hereof, or other instrument agreeing to become a party hereto,

                    W I T N E S S E T H :

        WHEREAS, the parties hereto as Working Interest Owners have
executed, as of the date hereof, an agreement entitled, "Unit Agreement,
Coquina Waterflood Unit, Rodessa Field, Caddo Parish, Louisiana," herein
referred to as "Unit Agreement," which, among other things, provides for
a separate agreement to be entered into by Working Interest Owners to
provide for the development and operation of the Unit Area as herein
defined;

        NOW, THEREFORE, in consideration of the mutual agreements herein
set forth, it is agreed as follows:

                        ARTICLE 1
            CONFIRMATION OF UNIT AGREEMENT

        1.1  Confirmation of Unit Agreement.  The Unit Agreement is
hereby confirmed and by reference made a part of this agreement.  The
definitions in the Unit Agreements are adopted for all purposes of this
agreement.  If there is any conflict between the Unit Agreement and this
agreement, the Unit Agreement shall govern.

                        ARTICLE 2
                        EXHIBITS

        2.1  Exhibits.  The following exhibits are incorporated herein
by reference:

        2.1.1   Exhibits A and B of the Unit Agreement.

        2.1.2   Exhibit C, attached hereto, is a schedule showing the
Working Interest of each Working Interest Owner in each Tract, and the per-
centage attributable to each such interest.  Exhibit C, or a revision thereof,
shall not be conclusive as to the information therein, except it may be used
as showing the Unit Participations of the Working Interest Owners for purposes
of this agreement until shown to be in error or is revised as herein
authorized.

        2.1.3   Exhibit D, attached hereto, is the Accounting Procedure
applicable to Unit Operations.  If there is any conflict between this agree-
ment and Exhibit D, this agreement shall govern.

2.1.4  <u>Exhibit E</u>, attached hereto, which contains insurance provisions applicable to Unit Operations.

2.1.5  <u>Exhibit F</u>, attached hereto, which is a schedule of the usable wells as determined by the Working Interest Owners, a usable well being one that is taken over by the Unit on the Effective Date.

2.2  <u>Revision of Exhibits</u>.  Whenever Exhibits A and B are revised, Exhibit C shall be revised accordingly and be effective as of the same date. Unit Operator shall also revise Exhibit C from time to time as required to conform to changes in ownership of which Unit Operator has been notified as provided in the Unit Agreement.  All revised exhibits shall be dated.

2.3  <u>Reference to Exhibits</u>.  When reference is made herein to an exhibit, it is to the exhibit as originally attached or, if revised, to the last revision.

ARTICLE 3
<u>SUPERVISION OF OPERATIONS BY WORKING INTEREST OWNERS</u>

3.1  <u>Overall Supervision</u>.  Working Interest Owners shall exercise overall supervision and control of all matters pertaining to Unit Operations pursuant to this agreement and the Unit Agreement.  In the exercise of such authority, each Working Interest Owner shall act solely in its own behalf in the capacity of an individual owner and not on the behalf of the owners as an entirety.

3.2  <u>Specific Authorities and Duties</u>.  The matters with respect to which the Working Interest Owners shall decide and take action shall include, but not be limited to, the following:

3.2.1  <u>Method of Operation</u>.  The method of operation, including any type of pressure maintenance, secondary recovery, or other recovery program to be employed.

3.3.2  <u>Drilling of Wells</u>.  The drilling of any well whether for production of Unitized Substances, for use as an injection well, or for other purposes.

3.2.3  <u>Well Recompletions and Change of Status</u>.  The recompletion, abandonment, or change of status of any well, or the use of any well for injection or other purposes.

3.2.4  <u>Expenditures</u>.  The making of any single expenditure reasonably estimated to exceed Twenty Thousand Dollars ($20,000.00), provided that approval by Working Interest Owners of the drilling, reworking, deepening or plugging back of any well shall include approval of all necessary expenditures required therefor, and for completing, testing, and equipping the well, including necessary flow lines, separators, and lease tankage.

3.2.5  <u>Disposition of Unit Equipment</u>.  The selling or otherwise disposing of any major item of surplus Unit Equipment, if the current list price of new equipment similar thereto is Twenty Thousand Dollars ($20,000.00) or more.

-2-

3.2.6 **Appearance before a Court or Regulatory Agency**. The designating of a representative to appear before any court or regulatory agency in matters pertaining to Unit Operations; however, such designation shall not prevent any Working Interest Owner from appearing in person or from designating another representative in its own behalf.

3.2.7 **Audits**. The auditing of the accounts of Unit Operator pertaining to Unit Operations hereunder; however, the audits shall:

     (a) not be conducted more than once each year except upon the resignation or removal of Unit Operator, and

     (b) be made upon the approval of owners of a simple majority of the Unit Participation other than that of Unit Operator, at the expense of all Working Interest Owners other than Unit Operator, or

     (c) be made at the expense of those Working Interest Owners requesting such audit, if owners of less than a majority of the Unit Participation, other than that of Unit Operator, request such an audit, and

     (d) be made upon not less than thirty (30) days written notice to Unit Operator.

3.2.8 **Inventories**. The taking of periodic inventories under the terms of Exhibit D.

3.2.9 **Assignments to Committees**. The appointment of committees to study any problems in connection with Unit Operations.

3.2.10 The removal of Unit Operator and the selection of a successor.

3.2.11 The enlargement of the Unit Area.

3.2.12 The adjustment and readjustment of investments.

3.2.13 The termination of the Unit Agreement.

### ARTICLE 4
### MANNER OF EXERCISING SUPERVISION

4.1 **Designation of Representatives**. Each Working Interest Owner shall in writing inform Unit Operator of the names and addresses of the representative and alternate who are authorized to represent and bind such Working Interest Owner with respect to Unit Operations. The representative or alternate may be changed from time to time by written notice to Unit Operator.

-3-

4.2  <u>Meetings</u>.  All meetings of Working Interest Owners shall be called by Unit Operator upon its own motion or at the request of one or more Working Interest Owners having a total Unit Participation of not less than five percent (5%).  No meeting shall be called on less than fourteen (14) days advance written notice, with agenda for the meeting attached.  Working Interest Owners who attend the meeting may amend items included in the agenda and may act upon an amended item or other items presented at the meeting.  The representative of Unit Operator shall be chairman of each meeting.  Notice of each meeting shall specify the time and place of meeting, the place being within the states of Arkansas, Louisiana, Oklahoma or Texas.

4.3  <u>Voting Procedure</u>.  Working Interest Owners shall decide all matters coming before them as follows:

4.3.1  <u>Voting Interest</u>.  Each Working Interest Owner shall have a voting interest equal to its Unit Participation.

4.3.2  <u>Vote Required</u>.  Unless otherwise provided herein or in the Unit Agreement, Working Interest Owners shall determine all matters by the affirmative vote of three (3) or more Working Interest Owners having a combined voting interest of at least eighty percent (80%).

4.3.3  <u>Vote at Meeting by Non-attending Working Interest Owner</u>. Any Working Interest Owner who is not represented at a meeting may vote on any agenda item by letter or telegram addressed to the representative of Unit Operator if its vote is received prior to the vote at the meeting.

4.3.4  <u>Poll Votes</u>.  Working Interest Owners may vote on and decide, by letter or telegram, any matter submitted in writing to Working Interest Owners, if no meeting is requested, as provided in Section 4.2, within thirty (30) days after the proposal is sent to Working Interest Owners.  The vote of each Working Interest Owner must be in the hands of Unit Operator at its offices in Shreveport, Louisiana, within five (5) days following the expiration of said thirty (30) day period.  Unit Operator will give prompt notice of the results of the voting to all Working Interest Owners.

### ARTICLE 5
### INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1  <u>Reservation of Rights</u>.  Working Interest Owners severally reserve to themselves all their rights, except as otherwise provided in this agreement and the Unit Agreement.

5.2  <u>Specific Rights</u>.  Each Working Interest Owner shall have, among others, the following specific rights:

5.2.1  <u>Access to Unit Area</u>.  Access to the Unit Area at all reasonable times to inspect Unit Operations, all wells and the records and data pertaining thereto.

-4-

5.2.2  Reports.  The right to receive from Unit Operator, upon written request, copies of all reports to any governmental agency, reports of crude oil runs and stocks, inventory reports, and all other information pertaining to Unit Operations.  The cost of gathering and furnishing information not ordinarily furnished by Unit Operator to all Working Interest Owners shall be charged to the Working Interest Owner that requests the information.

ARTICLE 6
UNIT OPERATOR

6.1  Initial Unit Operator.  Pennzoil Producing Company is hereby designated as Unit Operator.

6.2  Resignation or Removal.  Unit Operator may resign at any time. Unit Operator may be removed, only for good cause, by Working Interest Owners, at any time, by the affirmative vote of at least two Working Interest Owners having a total of more than ninety-five percent (95%) of the voting interest remaining after excluding the voting interest of Unit Operator.  A Unit Operator that resigns or is removed shall not be released from its obligations hereunder for a period of three (3) months after the resignation or discharge, unless a successor Unit Operator has taken over Unit Operations prior to the expiration of such period.

6.3  Selection of Successor.  Upon the resignation or removal of a Unit Operator, a successor Unit Operator shall be selected by Working Interest Owners.  If the Unit Operator that is removed votes only to succeed itself, the successor Unit Operator may be selected by the affirmative vote of at least ninety-five percent (95%) of the voting interest remaining after excluding the voting interest of the Unit Operator that was removed.

ARTICLE 7
AUTHORITIES AND DUTIES OF UNIT OPERATOR

7.1  Exclusive Right to Operate Unit.  Subject to the provisions of this agreement and to instructions from Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations.

7.2  Workmanlike Conduct.  Unit Operator shall conduct Unit Operation in a good and workmanlike manner as would a prudent operator under the same or similar circumstances.  Unit Operator shall freely consult with Working Interest Owners and keep them informed of all matters which Unit Operator, in the exercise of its best judgment, considers important.  Unit Operator shall not be liable to Working Interest Owners for damages, unless such damages result from its gross negligence or willful misconduct.

7.3  Liens and Encumbrances.  Unit Operator shall endeavor to keep the lands and leases in the Unit Area and Unit Equipment free from all liens and encumbrances occasioned by Unit Operations, except the lien and security interest of Unit Operator granted hereunder.

7.4  Employees.  The number of employees used by Unit Operator in conducting Unit Operations, their selection, hours of labor and compensation shall be determined by Unit Operator.  Such employees shall be the employees of Unit Operator.

-5-

7.5  Records.  Unit Operator shall keep correct books, accounts, and records of Unit Operations.

7.6  Reports to Working Interest Owners.  Unit Operator shall furnish Working Interest Owners monthly reports of Unit Operations.

7.7  Reports to Governmental Authorities.  Unit Operator shall make all reports to governmental authorities that it has the duty to make as Unit Operator.

7.8  Engineering and Geological Information.  Unit Operator shall furnish to a Working Interest Owner, upon written request, a copy of all logs and other engineering and geological data pertaining to wells drilled for Unit Operations.

7.9  Expenditures.  Unit Operator is authorized to make single expenditures reasonably estimated not to exceed Twenty Thousand Dollars ($20,000.00) without prior approval of Working Interest Owners.  If an emergency occurs, Unit Operator may immediately make or incur such expenditures as in its opinion are required to deal with the emergency.  Unit Operator shall report to Working Interest Owners, as promptly as possible, the nature of the emergency and the action taken.

7.10  Wells drilled by Unit Operator.  All wells drilled by Unit Operator shall be at the usual rates prevailing in the area.  Unit Operator may employ its own tools and equipment, but the charge therefor shall not exceed the prevailing rate in the area, and the work shall be performed by Unit Operator under a written contract containing the same terms and conditions as are usual in the area in contracts of independent contractors doing work of a similar nature.

7.11  Border Agreements.  Unit Operator may, after approval by Working Interest Owners, enter into border agreements with respect to lands adjacent to the Unit Area for the purpose of coordinating operations.

## ARTICLE 8
### TAXES

8.1  Ad Valorem Taxes.  Unit Operator shall make and file all necessary ad valorem tax renditions and returns with the proper taxing authorities covering all real and personal property of each Working Interest Owner used or held by Unit Operator in Unit Operations.  Unit Operator shall settle assessments arising therefrom.  All such ad valorem taxes shall be paid by Unit Operator and charged to the Joint Accounts.

8.2  Other Taxes.  Each Working Interest Owner shall pay or cause to be paid all production, severance, gathering, and other taxes imposed upon or in respect to the production or handling of its share of Unitized Substances.

-6-

8.3  Protest of Taxes.  Notwithstanding the provisions of the foregoing Sections 8.1 and 8.2, each Working Interest Owner shall have the right, at its own expense, to protest and resist the payment of any direct tax levied with respect to its share of Unitized Substances, and to protest and resist any proposed rendition or assessment for ad valorem taxes of its interest in the Unit or in its personal property.

ARTICLE 9
INSURANCE

9.1  Insurance.  Unit Operator, with respect to Unit Operations, shall do the following:

9.1.1  Comply with the Workman's Compensation Law of the State of Louisiana.

9.1.2  Provide other insurance as set forth in Exhibit E.

ARTICLE 10
ADJUSTMENT OF INVESTMENTS

10.1  Personal Property to be Taken Over on Date of Unitization. Upon the Effective Date of this agreement, Working Interest Owners shall deliver to Unit Operator the following:

10.1.1  Wells and Casing.  All wells listed on Exhibit F hereto, together with the casing therein.

10.1.2  Well and Lease Equipment.  The tubing in each such well, the wellhead connections thereon, and all other lease and operating equipment that is used in the operation of such wells which Working Interest Owners determine is necessary or desirable for conducting Unit Operations.

10.1.3  Records.  A copy of all production and well records in the possession or control of Working Interest Owners that pertain to such wells.

10.2  Inventory and Evaluation of Personal Property.  Working Interest Owners shall at Unit Expense inventory and evaluate, as determined by Working Interest Owners, the personal property taken over.  Such inventory shall include and be limited to those items of equipment considered controllable under Exhibit D except, upon determination of Working Interest Owners, items considered noncontrollable may be included in the inventory in order to insure a more equitable adjustment of investment.  Inventory shall be conducted by the Unit Operator; however, Working Interest Owners, if they desire, may have qualified personnel of their own present during the taking of inventory.  Inventory shall assign a reasonable market value to the well and lease equipment to be taken into the Unit account, and such value shall be determined on an "as is - where is" basis.  All equipment of similar size, capacity, and condition will be assigned the same value. Casing shall be included in the inventory for record purposes but shall be excluded from evaluation and investment adjustments.

-7-

10.2.1  If at any time during the operation of the Unit, any equipment taken into the Unit account becomes surplus to the needs of the Unit, the contributing Working Interest Owner shall have an opportunity to purchase such equipment at a reasonable current market value but not to exceed inventoried value.  If the contributing Working Interest Owner elects not to purchase said surplus equipment at such value, then it shall be sold or otherwise disposed of in the best interest of the Joint Account.

10.2.2  Well equipment consisting of tubing, sucker rods, and other subsurface equipment, electric lines and motors, pumping unit and wellhead to be taken over by the Unit shall be priced in accordance with the procedure established above.

10.2.3  All lines of 2" O.D. and greater in size to be taken by the Unit shall also be priced in accordance with the above procedure.

10.2.4  Value for heater-treaters and all valves and equipment shall be stated as a lump sum and shall include all fittings.

10.2.5  All lines under 2" O.D. will be contributed free of charge to the Unit.

10.2.6  Approval of Inventory.  The inventory shall be presented by Unit Operator to the Working Interest Owners for approval or revision within ninety (90) days after the taking of said inventory.  Upon approval by the Working Interest Owners of the inventory, Unit Operator shall prepare and furnish each Working Interest Owner a tabulation showing the items which Unit Operator has taken over (being all items which the Working Interest Owners have determined are being used in the prudent operation of the individual wells) and the valuation placed upon each of such items.

10.2.7  Items Not Taken Over by the Unit Operator.  Any items which the Unit Operator does not take over shall remain the property of the respective Working Interest Owner, and a reasonable time shall be allowed for removal of such items from unit property at such Working Interest Owner's expense.

10.3  Tangible Investment Adjustment.  Upon approval by Working Interest Owners of inventory values, each Working Interest Owner shall be credited with the value of its interest in all personal property taken over under Section 10.1.2 and shall be charged with an amount equal to that obtained by multiplying the total value of all personal property taken over under Section 10.1.2 by such Working Interest Owner's Unit Participation at the time the property is taken over.  If the charge against any Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be an item of Unit Expense chargeable against such Working Interest Owner.  If the credit to any Working Interest Owner is greater than the amount charged against such Working Interest Owner, the resulting net credit shall be paid to such Working Interest Owner by Unit Operator out of funds received by it in settlement of the net charges described above.

-8-

10.4   Intangible Investment Value (Well Cost).   All wells listed on Exhibit F which are taken into the Unit have an intangible investment value of $20,000 each, less the actual expense incurred (not to exceed $15,000) of recompletion or remedial work which is required to make such wells serviceable for Unit Operations.   All recompletion or remedial work shall be performed by the Unit Operator at Unit expense.

10.5   Intangible Well Cost Adjustment.   There shall be an adjustment of well cost for each well taken over by the Unit Operator as shown on Exhibit F and based upon the evaluation of each said well as set forth in Section 10.4.   This adjustment among the Working Interest Owners shall be calculated by debiting each Working Interest Owner for an amount equal to his Unit Participation interest multiplied by the well cost and crediting each Working Interest Owner for an amount equal to his proportionate ownership of each such well multiplied by the evaluation of such well as set forth in Section 10.4.   If the debit charges against any Working Interest Owner are greater than the total amount credited to such Working Interest Owner, the resulting net charge shall be paid by such Working Interest Owner and shall be in all respects treated as an item of Unit Expense chargeable against such Working Interest Owner.   If the total credit to any Working Interest Owner is greater than the amount debited against such Working Interest Owner, the resulting net credit shall be paid to such Working Interest Owner by Unit Operator out of funds received by it in settlement of the net charges described above.   The Intangible Well Cost Adjustment shall be made within one year after the Effective Date of this agreement or at the completion of remedial work on the well.

10.6   Intangible (Well Cost) Value for Additional Wells.   After the Effective Date hereof, any well within the Unit Area not listed in Exhibit F made available to the Unit and voted by the Working Interest Owners to be useful in the operation of the Unit either as an injection or production well shall have its well cost determined and computed as follows:

10.6.1   A cased well in good mechanical condition, which has been completed in the Unitized Formation, would be acquired by the Unit for $20,000.

10.6.2   A well which has production casing set and is in good mechanical condition but is in need of recompletion would be acquired by the Unit for $20,000 less the cost of recompletion, not to exceed $15,000.   Recompletion would be performed by the Unit Operator at Unit Expense.

10.6.3   A well which has production casing set but has been junked, permanently abandoned, or is in unknown mechanical condition, and has no value to the present owner, would be acquired by the Unit at no charge.   The Unit would perform any remedial operation required at Unit Expense.   If remedial operations are unsuccessful, the well would have no value and the Unit would plug the well at Unit Expense.

10.7   General Facilities.   The acquisition of warehouses, warehouse stocks, lease houses, camp facility systems, and office buildings necessary for Unit Operations shall be by negotiation by the owners thereof and Unit Operator, subject to the approval of Working Interest Owners.

-9-

10.8  <u>Ownership of Personal Property and Facilities</u>.  Each Working Interest Owner, individually, shall by virtue hereof own an undivided interest, equal to its Unit Participation, in all personal property and facilities taken over or otherwise acquired by Unit Operator pursuant to this agreement.

ARTICLE 11
UNIT EXPENSE

11.1  <u>Basis of Charge to Working Interest Owners</u>.  Unit Operator initially shall pay all Unit Expense.  Each Working Interest Owner shall reimburse Unit Operator for its share of Unit Expense.  Each Working Interest Owner's share shall be the same as its Unit Participation.  All charges, credits, and accounting for Unit Expense shall be in accordance with Exhibit D.

11.2  <u>Budgets</u>.  Before or as soon as practical after the Effective Date hereof, Unit Operator shall prepare a budget of estimated Unit Expense for the remainder of the calendar year, and, on or before the first day of each October thereafter, shall prepare such a budget for the ensuing calendar year.  A budget shall set forth the estimated Unit Expenses by quarterly periods.  Budgets shall be estimates only, and shall be adjusted or corrected by Working Interest Owners and Unit Operator whenever an adjustment or correction is proper.  A copy of each budget and adjusted budget shall promptly be furnished to each Working Interest Owner.

11.3  <u>Advance Billings</u>.  Unit Operator shall have the right to require Working Interest Owners to advance their respective shares of estimated Unit Expense by submitting to Working Interest Owners, on or before the 25th day of any month, an itemized estimate thereof for the succeeding month, with a request for payment in advance.  Within fifteen (15) days thereafter, each Working Interest Owner shall pay to Unit Operator its share of such estimate.  Adjustments between estimated and actual Unit Expense shall be made by Unit Operator at the close of each calendar month, and the accounts of Working Interest Owners shall be adjusted accordingly.

11.4  <u>Commingling of Funds</u>.  No funds received by Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

11.5  <u>Lien of Unit Operator</u>.  Each Working Interest Owner's interest in the Unit Area shall be responsible for his proportionate share of the cost and expense of Unit Operations; and when any owner fails to pay his part thereof when due, then all of such owner's interest in the Unit production and equipment may be appropriated by Operator and marketed and sold for the payment thereof, together with interest at the rate of twelve percent (12%) per annum thereon.  Any surplus received by the Operator from any such sale shall be credited to such owner.  Each Working Interest Owner grants to Unit Operator a lien upon its Oil and Gas Rights in each Tract, its share of Unitized Substances when produced, and its interest in all Unit Equipment as security for payment of its share of Unit Expense, together with interest thereon at the rate of twelve percent (12%) per annum from the date due under

-10-

the terms hereof until paid. Unit Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien or appropriation as herein authorized. In addition, upon default by any Working Interest Owner in the payment of its share of Unit Expense, Unit Operator shall have the right to collect from the purchaser the proceeds from the sale of such Working Interest Owner's share of Unitized Substances until the amount owned by such Working Interest Owner, plus interest as aforesaid, has been paid. Each purchaser shall be entitled to rely upon Unit Operator's written statement concerning the amount of any default.

11.6 <u>Unpaid Unit Expense</u>. If any Working Interest Owner fails to pay its share of Unit Expense within sixty (60) days after rendition of a statement therefor by Unit Operator, each Working Interest Owner agrees, upon request by Unit Operator, to pay its proportionate part of the unpaid share of Unit Expense of the defaulting Working Interest Owner. The Working Interest Owners that pay the share of Unit Expense of a defaulting Working Interest Owner shall be reimbursed by the Unit Operator for the amount so paid, plus any interest collected thereon, upon receipt by Unit Operator of any past due amount collected from the defaulting Working Interest Owner. Any Working Interest Owner so paying a defaulting Working Interest Owner's share of Unit Expenses shall be subrogated to the lien and rights herein granted Unit Operator.

11.7 <u>Carved-out Interest</u>. If any Working Interest Owner shall, after executing this agreement, create an overriding royalty, production payment, net proceeds interest, carried interest, or any other interest out of its Working Interest, such carved-out interest shall be subject to the terms and provisions of this agreement, specifically including, but without limitation, Section 11.5 hereof entitled "Lien of Unit Operator." If the Working Interest Owner creating such carved-out interest (a) fails to pay any Unit Expense chargeable to such Working Interest Owner under this agreement, and the production of Unitized Substances accruing to the credit of such Working Interest Owner is insufficient for that purpose, or (b) withdraws from this agreement under the terms and provisions of Article 17 hereof, the carved-out interest shall be chargeable with a pro rata portion of all Unit Expense incurred hereunder, the same as though such carved-out interest were a Working Interest, and Unit Operator shall have the right to enforce against such carved-out interest the lien and all other rights granted in Section 11.5 for the purpose of collecting the Unit Expense chargeable to the carved-out interest.

ARTICLE 12
NON-UNITIZED FORMATIONS

12.1 <u>Right to Operate</u>. Any Working Interest Owner that now has or hereafter acquires the right to drill for and produce oil, gas or other minerals, from other than the Unitized Formation, shall have the right to do so notwithstanding this agreement or the Unit Agreement. Excepting wells which are taken into the Unit under Section 10.1, any Working Interest Owner that has a well which produces from a formation other than the Unitized

-11-

Formation shall have the right to continue to do so after the Effective
Date of this agreement.  In exercising these rights, however, the Working
Interest Owner shall exercise reasonable precaution to prevent inter-
ference with Unit Operations.  If any Working Interest Owner drills any
well into or through the Unitized Formation, the Unitized Formation shall
be protected in a manner satisfactory to Working Interest Owners so that
the production of Unitized Substances will not be adversely affected.

12.2  _Commingled Wells_.  Any well which is completed simultane-
ously in the Unitized Formation and a non-Unit zone (commingled well)
which is not listed on Exhibit F may continue to be produced and operated
independently by the respective working interest owners of such well,
subject to the following provisions:

12.2.1  If Working Interest Owners vote to expand the waterflood
to include such wells and/or if such wells experience "response to water-
flooding," then the wells will be made available to the Unit and delivered
under terms set forth in Section 10.6 of this agreement.  The doubling of
the average daily oil production rate for a sustained period of six months
shall constitute experiencing "response to waterflooding."  No part of the
oil and/or gas produced from such well, except "secondary oil recovery"
will be deemed Unitized Substances.  The amount of "secondary oil recovery"
will be calculated by the Unit Operator and approved by Unit Working
Interest Owners under Section 4.3.2 and will be equal to the oil production
in excess of the average daily oil production for such well during the six-
month period prior to the Effective Date hereof, or will be equal to an
amount based on a reasonable interpretation by Unit Operator based on the
most reliable data available.  All commingled wells producing within the
Unitized Outline will be tested once every two months, and such tests will
be supplied by the operator of such well to the Unit Operator.  Unit Operator
retains the option to witness well tests to verify their accuracy.  If Unit
Operator does not agree with the test results, they are granted the right
to request an additional test by a third party selected by Unit Operator, the
cost of such test to be borne by Working Interest Owners.

12.2.2  Within one year after such well is delivered to the Unit, a
cash settlement will be made from the working interest owners of such well to
the Joint Account equal to the "secondary oil recovery" produced from the
Unitized Formation in such well multiplied by the oil price received at the
time the production was sold, less production taxes, royalty and operating
expenses attributable thereto.

### ARTICLE 13
### TITLES

13.1  _Warranty and Indemnity_.  Each Working Interest Owner represents
and warrants that it is owner of the respective working interest set forth
opposite its name in Exhibit C, and hereby agrees to defend, indemnify and
hold harmless the other Working Interest Owners from any loss due to failure,
in whole or in part, of its title to any such interest, provided that such
indemnity shall be limited to an amount equal to the net value that has been

-12-

received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed. Each failure of title will be deemed to be effective, insofar as this agreement is concerned, as of the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive adjustment of Unit Expense, or retroactive allocation of Unitized Substances or the proceeds therefrom, as a result of title failure.

## ARTICLE 14
## LIABILITY, CLAIMS, AND SUITS

14.1  **Individual Liability.**  The duties, obligations, and liabilities of Working Interest Owners shall be several and not joint or collective; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture, association, or trust among Working Interest Owners.

14.2  **Settlements.**  Unit Operator may settle any single damage claim or suit involving Unit Operations but not involving an expenditure in excess of Ten Thousand Dollars ($10,000.00) provided the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above-specified amount, Working Interest Owners shall assume and take over the further handling of the claim or suit unless such authority is expressly delegated to Unit Operator.  All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Unit Expense.  If a claim is made against any Working Interest Owner or if any Working Interest Owner is sued on account of any matter arising from Unit Operations and over which such Working Interest Owner individually has no control because of the rights given Working Interest Owners and Unit Operator by this agreement and the Unit Agreement, the Working Interest Owner shall immediately notify the Unit Operator, and the claim or suit shall be treated as any other claim or suit involving Unit Operations.

## ARTICLE 15
## INTERNAL REVENUE PROVISION

15.1  **Internal Revenue Provision.**  Each Working Interest Owner hereby elects that it and the operations covered by this agreement be excluded from the application of Subchapter K of Chapter 1 of Sub-Title A of the Internal Revenue Code of 1954, or such portion thereof as the Secretary of the Treasury of the United States or his delegate shall permit by election to be excluded therefrom.  Unit Operator is hereby authorized and directed to execute on behalf of each Working Interest Owner such additional or further evidence of the election as may be required by regulations issued under said Subchapter K.  Should the regulations require each party to execute such further evidence, each Working Interest Owner agrees to execute or join in the execution thereof.  The election hereby made and the other provisions of this paragraph shall apply in like manner to applicable state laws, regulations, and rulings now in effect or hereafter enacted that have an effect similar to the federal provisions referred to herein.

-13-

## ARTICLE 16
### NOTICES

16.1 <u>Notices</u>. All notices or consents required hereunder shall be in writing and shall be deemed to have been properly served when sent by mail or telegram to the address of the representative of each Working Interest Owner as furnished to Unit Operator in accordance with Article 4. Date of notice shall be date of postmark.

## ARTICLE 17
### WITHDRAWAL OF WORKING INTEREST OWNER

17.1 <u>Withdrawal</u>. A Working Interest Owner may withdraw from this agreement by transferring, without warranty of title either express or implied, to the Working Interest Owners who do not desire to withdraw all its Oil and Gas Rights, exclusive of Royalty Interests, together with its interest in all Unit Equipment and in all wells used in Unit Operations, provided that such transfer shall not relieve such Working Interest Owner from any obligation or liability incurred prior to the first day of the month following receipt by Unit Operator of such transfer. The delivery of the transfer shall be made to Unit Operator for the transferees. The transferred interest shall be owned by the transferees in proportion to their respective Unit Participations. The transferees, in proportion to the respective interests so acquired, shall pay the transferor for its interest in Unit Equipment, the salvage value thereof less its share of the estimated cost of salvaging same and of plugging and abandoning all wells then being used or held for Unit Operations, as determined by Working Interest Owners. (In the event such withdrawing owner's interest in the aforesaid salvage value is less than such owner's share of such estimated costs, the withdrawing owner, as a condition precedent to withdrawal, shall pay the Unit Operator, for the benefit of Working Interest Owners succeeding to its interest, a sum equal to the deficiency.) Within sixty (60) days after receiving delivery of the transfer, Unit Operator shall render a final statement to the withdrawing owner for its share of Unit Expense, including any deficiency in salvage value, as determined by Working Interest Owners, incurred as of the first day of the month following the date of receipt of the transfer. Provided all Unit Expense, including any deficiency hereunder, due from the withdrawing owner has been paid in full within thirty (30) days after the rendering of such final statement by the Unit Operator, the transfer shall be effective the first day of the month following its receipt by Unit Operator and, as of such effective date, withdrawing owner shall be relieved from all further obligations and liabilities hereunder and under the Unit Agreement, and the rights of the withdrawing Working Interest Owner hereunder and under the Unit Agreement shall cease insofar as they existed by virtue of the interest transferred.

17.2 <u>Limitation on Withdrawal</u>. Notwithstanding anything set forth in Section 17.1, Working Interest Owners may refuse to permit the withdrawal of a Working Interest Owner if its Working Interest is burdened by any royalties, overriding royalties, production payments, net proceeds interest, carried interest, or any other interest created out of the Working Interest in excess of one-eighth (1/8) lessor's royalty, unless the other Working Interest Owners willing to accept the assignment agree to accept the Working Interest subject to such burdens.

-14-

## ARTICLE 18
## ABANDONMENT OF WELLS

18.1  __Rights of Former Owners__.  If Working Interest Owners decide to abandon permanently any well within the Unit Area prior to termination of the Unit Agreement, Unit Operator shall give written notice thereof to the Working Interest Owners of the Tract on which the well is located, and they shall have the option for a period of ninety (90) days after the sending of such notice to notify Unit Operator in writing of their election to take over and own the well.  Within ten (10) days after the Working Interest Owners of the Tract have notified Unit Operator of their election to take over the well, they shall pay Unit Operator, for credit to the Joint Account, the amount estimated by Working Interest Owners to be the net salvage value of the casing and equipment in and on the well provided, however, that any equipment contributed to the Unit free shall not be charged for by the Unit Operator when such well is turned over  to the proper Working Interest Owners. The Working Interest Owners of the Tract, by taking over the well, agree to seal off effectively and protect the Unitized Formation, and upon abandonment to plug the well in compliance with applicable laws and regulations.

18.2  __Plugging__.  If the Working Interest Owners of a Tract do not elect to take over a well located thereon which is proposed for abandonment, Unit Operator shall plug and abandon the well in compliance with applicable laws and regulations at Unit Expense.

## ARTICLE 19
## EFFECTIVE DATE AND TERM

19.1  __Effective Date__.  This agreement shall become effective on the date and at the time that the Unit Agreement becomes effective.

19.2  __Term__.  This agreement shall continue in effect so long as the Unit Agreement remains in effect, and thereafter until (a) all unit wells have been plugged and abandoned or turned over to Working Interest Owners in accordance with Article 20, (b) all Unit Equipment and real property acquired for the joint account have been disposed of by Unit Operator in accordance with instructions of Working Interest Owners, and (c) there has been a final accounting.

19.3  __Action Prior to Effective Date__.  Working Interest Owners may, prior to the Effective Date of the Unit Agreement, take such action and incur such expenses as are reasonably necessary to commence Unit Operations on the effective date provided three or more Working Interest Owners having eighty percent (80%) of the Unit Participation shown on Exhibit C have executed this agreement.  Such action may include the designing, engineering, and construction of the secondary recovery facilities contemplated hereby, or for any other facilities or equipment required for Unit Operations, the taking of the field survey and the inventory set forth in Article 10.2, and the acquisition of materials, rights-of-way, water rights, and easements therefor.  If the Unit Agreement becomes effective, such costs shall be treated as an item of

-15-

Unit Expense.  If the Unit Agreement does not become effective, then such cost and expenses shall be paid and borne by the Working Interest Owners who have become parties to this agreement in the proportion that the Unit Participation of each such Working Interest Owner, as shown on Exhibit C, bears to the total Unit Participation of all such Working Interest Owners.

## ARTICLE 20
### ABANDONMENT OF OPERATIONS

20.1  _Termination_.  Upon termination of the Unit Agreement, the following will occur:

20.1.1  _Oil and Gas Rights_.  Oil and Gas Rights in and to each separate Tract shall no longer be affected by this agreement, and thereafter the parties shall be governed by the terms and provisions of the leases, contracts, and other instruments affecting the separate Tracts.

20.1.2  _Right to Operate_.  Working Interest Owners of any Tract that desire to take over and continue to operate wells located thereon may do so by paying Unit Operator, for credit to the Joint Account, the net salvage value, as determined by Working Interest Owners, of the casing and the equipment in and on the wells taken over.  The Working Interest Owners of the Tract, by taking over the well, agree upon abandonment to plug each well in compliance with applicable laws and regulations at their sole cost and expense.

20.1.3  _Salvaging Wells_.  Unit Operator shall salvage as much of the casing and equipment in or on wells not taken over by Working Interest Owners of separate Tracts as can economically and reasonably be salvaged and shall cause the wells to be plugged and abandoned in compliance with applicable laws and regulations.

20.1.4  _Cost of Abandonment_.  The cost of abandonment of Unit Operations shall be Unit Expense.

20.1.5  _Distribution of Assets_.  Working Interest Owners shall share in the distribution of Unit Equipment, or the proceeds thereof, in proportion to their Unit Participations.

## ARTICLE 21
### EXECUTION

21.1  _Original, Counterpart or Other Instrument_.  An owner of a Working Interest may become a party to this agreement by signing a counterpart of this agreement or other instrument agreeing to become a party hereto. The signing of any such instrument shall have the same effect as if all parties had signed the same instrument.

-16-

## ARTICLE 22
### SUCCESSORS AND ASSIGNS

22.1 <u>Successors and Assigns</u>.  This agreement shall extend to, be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and upon approval by the Commission shall extend to, be binding upon and inure to the benefit of all persons having an interest in the Unit Area, their respective heirs, devisees, legal representatives, successors and assigns, and shall constitute a covenant running with the lands, leases and interests covered hereby.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the dates opposite their respective signatures.

### WORKING INTEREST OWNERS

WITNESSES:                                PENNZOIL PRODUCING COMPANY

_____                  BY: _____

_____


WITNESSES:                                MOEPSI

_____                  BY: _____

_____


WITNESSES:                                TRITON OIL & GAS CORPORATION

_____                  BY: _____

_____


WITNESSES:                                PETROLEUM CORPORATION OF TEXAS

_____                  BY: _____

_____


WITNESSES:                                IBEX PARTNERSHIP

_____                  BY: _____

_____


-17-

WITNESSES:                              OLINKRAFT, INC.

_____                 By:_____

_____


WITNESSES:                              PHILLIPS PETROLEUM CO.

_____                 By:_____

_____


WITNESSES:                              CITIES SERVICE COMPANY

_____                 By:_____

_____


WITNESSES:

_____                 _____
                                             James A. Hunter
_____


WITNESSES:                              GRAYROCK CORPORATION

_____                 By:_____

_____


WITNESSES:                              VAUGHN PETROLEUM, INC.

_____                 By:_____

_____


WITNESSES:                              ARDIS & COMPANY

_____                 By:_____

_____


WITNESSES:

_____                 _____
                                             Ray A. Eubank
_____


-18-

WITNESSES:

_____                    _____
                                                  William H. Bowie
_____


WITNESSES:

_____                    _____
                                                  H. G. Westerman
_____

EXHIBIT C

TO THE UNIT OPERATING AGREEMENT
COQUINA WATERFLOOD UNIT
RODESSA FIELD
T 23 N - R 16 W
CADDO PARISH, LOUISIANA

| Working Interest Owner | Working Interest Percent | Unit Participation by Tracts | Total Unit Participation of Owners |
|---|---|---|---|
| Ardis & Company | | | |
| Tract 14-13 | 100.0000000 | 0.1112909 | |
| Total Participation | | 0.1112909 | 0.1112909 |
| | | | |
| William H. Bowie | | | |
| Tract 20-4 | 6.2500000 | 0.2788909 | |
| Tract 29-1 | 6.2500000 | 0.1019608 | |
| Total Participation | | 0.3808517 | 0.3808517 |
| | | | |
| Cities Service Company | | | |
| Tract 22-5 | 100.0000000 | 0.3229156 | |
| Tract 22-13 | 100.0000000 | 0.0392270 | |
| Total Participation | | 0.3621426 | 0.3621426 |
| | | | |
| Sidney M. Cook, et al | | | |
| Tract 15-6 | 55.0000000 | 0.4424665 | |
| Total Participation | | 0.4424665 | 0.4424665 |
| | | | |
| Ray H. Eubank | | | |
| Tract 20-4 | 3.1250000 | 0.1394455 | |
| Tract 29-1 | 3.1250000 | 0.0509804 | |
| Total Participation | | 0.1904259 | 0.1904259 |
| | | | |
| Grayrock Corporation | | | |
| Tract 14-6 | 25.0000000 | 0.0689105 | |
| Total Participation | | 0.0689105 | 0.0689105 |
| | | | |
| James A. Hunter | | | |
| Tract 14-6 | 50.0000000 | 0.1378210 | |
| Total Participation | | 0.1378210 | 0.1378210 |
| | | | |
| Ibex Partnership | | | |
| Tract 20-4 | 21.8750000 | 0.9761183 | |
| Tract 29-1 | 21.8750000 | 0.3568629 | |
| Total Participation | | 1.3329812 | 1.3329812 |
| | | | |
| MOEPSI (Mobil) | | | |
| Tract 21-2 | 100.0000000 | 12.7715741 | |
| Tract 28-1 | 100.0000000 | 0.4322029 | |
| Tract 28-2 | 100.0000000 | 0.9843326 | |
| Total Participation | | 14.1881096 | 14.1881096 |

| Working Interest Owner | Working Interest Percent | Unit Participation by Tracts | Total Unit Participation of Owners |
|---|---|---|---|
| Olinkraft, Inc. | | | |
| Tract 16-1 | 62.5000000 | 1.2216610 | |
| Total Participation | | 1.2216610 | 1.2216610 |
| | | | |
| Pennzoil Producing Company | | | |
| Tract 9-1 | 100.0000000 | 0.2987725 | |
| Tract 9-2 | 100.0000000 | 0.4272529 | |
| Tract 9-3 | 100.0000000 | 0.4606166 | |
| Tract 10-3 | 100.0000000 | 0.6184937 | |
| Tract 10-4 | 100.0000000 | 0.3652572 | |
| Tract 11-1 | 100.0000000 | 0.5430711 | |
| Tract 11-2 | 100.0000000 | 0.1347965 | |
| Tract 11-3 | 100.0000000 | 0.0921480 | |
| Tract 11-4 | 100.0000000 | 0.0538722 | |
| Tract 11-5 | 100.0000000 | 0.4183964 | |
| Tract 12-1 | 100.0000000 | 1.1496832 | |
| Tract 12-2 | 100.0000000 | 0.3482720 | |
| Tract 12-3 | 100.0000000 | 0.2276775 | |
| Tract 13-1 | 100.0000000 | 0.4951935 | |
| Tract 14-1 | 100.0000000 | 0.6576442 | |
| Tract 14-2 | 100.0000000 | 0.1968543 | |
| Tract 14-3 | 100.0000000 | 0.1451416 | |
| Tract 14-4 | 100.0000000 | 0.1756178 | |
| Tract 14-5 | 100.0000000 | 0.1837613 | |
| Tract 14-7 | 100.0000000 | 0.5431158 | |
| Tract 14-8 | 100.0000000 | 3.1705407 | |
| Tract 14-9 | 82.2600000 | 1.0264339 | |
| Tract 14-10 | 100.0000000 | 0.3481507 | |
| Tract 14-11 | 100.0000000 | 0.5451400 | |
| Tract 14-12 | 100.0000000 | 0.4912728 | |
| Tract 15-1 | 100.0000000 | 1.5781941 | |
| Tract 15-2 | 100.0000000 | 1.5596317 | |
| Tract 15-3 | 100.0000000 | 1.9791647 | |
| Tract 15-4 | 100.0000000 | 4.3146535 | |
| Tract 15-5 | 100.0000000 | 2.8598136 | |
| Tract 15-6 | 45.0000000 | 0.3620181 | |
| Tract 15-7 | 100.0000000 | 0.9617996 | |
| Tract 15-8 | 100.0000000 | 0.9446931 | |
| Tract 16-1 | 37.5000000 | 0.7329966 | |
| Tract 16-2 | 100.0000000 | 2.0099806 | |
| Tract 16-3 | 100.0000000 | 3.7667614 | |
| Tract 16-4 | 100.0000000 | 2.0745241 | |
| Tract 16-5 | 100.0000000 | 2.1907510 | |
| Tract 16-6 | 100.0000000 | 5.4304559 | |
| Tract 17-1 | 100.0000000 | 2.9683610 | |
| Tract 17-2 | 100.0000000 | 1.3830440 | |
| Tract 17-3 | 100.0000000 | 0.5084161 | |
| Tract 17-4 | 100.0000000 | 0.9314673 | |
| Tract 20-1 | 100.0000000 | 0.9350100 | |

| Working Interest Owner | Working Interest Percent | Unit Participation by Tracts | Total Unit Participation of Owners |
|---|---|---|---|
| Pennzoil Producing Company (Cont'd) | | | |
| Tract 20-2 | 100.0000000 | 0.8998295 | |
| Tract 20-3 | 100.0000000 | 2.3240825 | |
| Tract 20-5 | 100.0000000 | 0.1470784 | |
| Tract 21-1 | 100.0000000 | 1.4330159 | |
| Tract 21-3 | 100.0000000 | 1.9665479 | |
| Tract 21-4 | 100.0000000 | 1.3741738 | |
| Tract 21-5 | 100.0000000 | 1.2841533 | |
| Tract 21-6 | 100.0000000 | 1.8850185 | |
| Tract 22-1 | 100.0000000 | 5.5118216 | |
| Tract 22-2 | 100.0000000 | 1.8641541 | |
| Tract 22-3 | 100.0000000 | 2.0997372 | |
| Tract 22-6 | 100.0000000 | 0.2334447 | |
| Tract 22-7 | 100.0000000 | 0.0589149 | |
| Tract 22-8 | 100.0000000 | 0.1998740 | |
| Tract 22-9 | 100.0000000 | 0.0905224 | |
| Tract 22-10 | 100.0000000 | 0.6327700 | |
| Tract 22-12 | 100.0000000 | 0.5033714 | |
| Tract 23-1 | 100.0000000 | 0.3093275 | |
| Tract 29-2 | 100.0000000 | 0.1545239 | |
| Tract 29-3 | 100.0000000 | 1.4813071 | |
| Tract 29-4 | 100.0000000 | 0.4126828 | |
| Tract 29-5 | 100.0000000 | 0.7888412 | |
| Total Participation | | 76.2641054 | 76.2641054 |
| | | | |
| Petroleum Corporation of Texas | | | |
| Tract 20-4 | 21.8750000 | 0.9761183 | |
| Tract 29-1 | 21.8750000 | 0.3568692 | |
| Total Participation | | 1.3329812 | 1.3329812 |
| | | | |
| Phillips Petroleum Co. | | | |
| Tract 9-4 | 100.0000000 | 0.3756909 | |
| Tract 10-1 | 100.0000000 | 0.2842138 | |
| Tract 10-2 | 100.0000000 | 0.0270948 | |
| Total Participation | | 0.6869995 | 0.6869995 |
| | | | |
| Triton Oil & Gas Corporation | | | |
| Tract 20-4 | 43.7500000 | 1.9522366 | |
| Tract 29-1 | 43.7500000 | 0.7137257 | |
| Total Participation | | 2.6659623 | 2.6659623 |
| | | | |
| Vaughn Petroleum, Inc. | | | |
| Tract 14-6 | 25.0000000 | 0.0689105 | |
| Total Participation | | 0.0689105 | 0.0689105 |
| | | | |
| W. R. West | | | |
| Tract 22-4 | 100.0000000 | 0.1296123 | |
| Total Participation | | 0.1296123 | 0.1296123 |

-3-

| Working Interest Owner | Working Interest Percent | Unit Participation by Tracts | Total Unit Participation of Owners |
|---|---|---|---|
| H. G. Westerman | | | |
| Tract 20-4 | 3.1250000 | 0.1394455 | |
| Tract 29-1 | 3.1250000 | 0.0509804 | |
| Total Participation | | 0.1904259 | 0.1904259 |
| Unleased | | | |
| Tract 14-9 | 17.7400000 | 0.2213583 | |
| Tract 22-11 | 100.0000000 | 0.0029837 | |
| Total Participation | | 0.2243420 | 0.2243420 |

-4-

601.  TULSA  74101

Recommended by the
Council of Petroleum
Accountants Societies of
North America

## EXHIBIT " D "

Attached to and made a part of ............Unit Operating Agreement............
.........................Coquina Waterflood Unit........................
.........................Rodessa Field.........................
.........................Caddo Parish, Louisiana.........................

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

### I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

**2. Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5. Audits**

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

**6. Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

### 1. Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

### 2. Labor

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

    (2) Salaries of First Level Supervisors in the field.

    (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

### 3. Employee Benefits

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

### 4. Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

### 5. Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

### 6. Services

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

### 7. Equipment and Facilities Furnished by Operator

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

### 8. Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

### 9. Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or

(   ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (   ) shall not ( X ) be covered by the Overhead rates.

**A. Overhead - Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $ 2,400

Producing or Injection Well Rate $ 240

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

[1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

[2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

[3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

(b) Producing Well Rates

[1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

[2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

[3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

[4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

[5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

B. Overhead - Percentage Basis

    (1) Operator shall charge the Joint Account at the following rates:

        (a) Development

            _____ Percent (   %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

        (b) Operating

            _____ Percent (   %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

    (2) Application of Overhead - Percentage Basis shall be as follows:

        For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

## 2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ \_\_25,000\_\_ :

A. \_\_\_\_5\_\_\_\_ % of total costs if such costs are more than $ \_\_25,000\_\_ but less than $ \_\_100,000\_\_ ; plus

B. \_\_\_\_3\_\_\_\_ % of total costs in excess of $ \_\_100,000\_\_ but less than $1,000,000; plus

C. \_\_\_\_2\_\_\_\_ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

## 3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator should provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

## 1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

## 2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

    (1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

    (2) Line Pipe

        (a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

        (b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

    (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

    (1) Material moved to the Joint Property

        (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

    (2) Material moved from the Joint Property

        (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five per-cent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

   (1) Condition C

     Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Para-graph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, pro-vided Condition C value plus cost of reconditioning does not exceed Condition B value.

   (2) Condition D

     All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dis-pose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

   Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service ren-dered by such Material.

E. Pricing Conditions

   (1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

   (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

**3. Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

**4. Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

**1. Periodic Inventories, Notice and Representation**

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inven-tory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

**2. Reconciliation and Adjustment of Inventories**

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory ad-justments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

**3. Special Inventories**

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

**4. Expense of Conducting Periodic Inventories**

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

EXHIBIT "E"

Attached to and made a part of the Operating Agreement
covering the Coquina Waterflood Unit, Rodessa Field,
Caddo Parish, Louisiana.


A.  Pennzoil Producing Company is self-insured and will provide only
insurance coverage required to comply with the Workmen's Compensation Laws
of the State and/or Employer's Liability if required.  Premiums for the
insurance specified above shall be charged to the Joint Account.  Any
party may, at its own expense, provide for itself such additional insurance
as it deems advisable to protect itself against liability not covered by
insurance of Operator.

B.  Operator shall not be liable for damages arising out of injuries
to any of the employees of Non-Operator or for damages to any property of
Non-Operator in connection with the operations hereunder for the Joint
Account on the operations covered herein, except for willful misconduct or
gross negligence of operator.

C.  Operator shall require its contractors and sub-contractors con-
ducting operations on the operations covered herein to comply with the
Workmen's Compensation Laws of the State in which the operations covered
herein is located and to carry such other insurance in such amounts as
Operator shall deem necessary.

D.  Operator shall promptly notify Non-Operator of any loss, damage
or claim against the Joint Account.

EXHIBIT "F"

Wells Usable by Unit
Coquina Waterflood Unit
Rodessa Field
Caddo Parish, Louisiana

| Operator, Well Name | Well Location (T23N-R16W) |
|---|---|
| **MOEPSI (Mobil)** | |
| Norton Levee Board No. A-4 | Section 21 |
| Norton Levee Board No. A-8 | Section 21 |
| **Pennzoil Producing Company** | |
| Fee 574 No. 1 | Section 16 |
| Fee 574 No. 2 (Water source ) | Section 16 |
| Fee 574 No. 3 | Section 16 |
| Fee 574 No. 4 | Section 16 |
| Rodessa Oil and Land Co. No. B-28 | Section 15 |
| Thad Gipson No. 2 | Section 15 |
| **Sklar & Phillips Oil Company** | |
| T. F. Hardin No. 1 | Section 16 |

94-80

Gus —
I have read —
You can have for
your files
Bob

Ferrell Burgess (Dist Mgr)
Jim Cummings (Land)
Aseff (Engr.)

Pennzoil
861-7631

## Unit Agreement
# Coquina Waterflood Unit
### Rodessa Field
### Caddo Parish, Louisiana

Oun Interest owned by Skelar + Phillips, Inc.

Tract # 14-10   S+P Inc ½   Arapaho ½   TF Seabach

Tract # 16-2   S+P Inc Full —   J. R. Hardin L.

UNIT AGREEMENT
COQUINA WATERFLOOD UNIT
RODESSA FIELD
CADDO PARISH, LOUISIANA

TABLE OF CONTENTS

Article                                                                     Page

         Preliminary Recitals                                        1
1        Definitions                                                 1
2        Exhibits                                                    3
3        Creation and Effect of Unit                                 4
4        Plan of Operations                                          5
5        Tract Participation                                         5
6        Allocation of Unitized Substances                           6
7        Production as of the Effective Date                         7
8        Use or Loss of Unitized Substances                          8
9        Titles                                                      8
10       Easements or Use of Surface                                 9
11       Enlargements of Unit                                        9
12       Change of Title                                            10
13       Relationship of Parties                                    10
14       Laws and Regulations                                       11
15       Force Majeure                                              11
16       Effective Date                                             11
17       Term                                                       12
18       Execution                                                  12
19       General                                                    13

EXHIBITS

Exhibit "A"        Description of and Percentage of Participation
                   of Each Tract Comprising The Unit Area

Exhibit "B"        Unit Outline with Tract Designations

UNIT AGREEMENT
COQUINA WATERFLOOD UNIT
RODESSA FIELD
CADDO PARISH, LOUISIANA

THIS AGREEMENT, entered into as of the first day of _____, 19__, to be effective as herein provided, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof;

W I T N E S S E T H :

WHEREAS, in the interest of the public welfare and to promote conservation and increase the ultimate recovery of oil and gas from a portion of the Coquina Zone, Rodessa Field, Caddo Parish, State of Louisiana, and to protect the rights of the owners of interests therein, it is deemed necessary and desirable to enter into this agreement to unitize the Oil and Gas Rights in and to the Unitized Formation in order to conduct the secondary recovery program as herein provided;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, it is agreed as follows:

ARTICLE 1
DEFINITIONS

As used in this agreement, the terms herein contained shall have the following meaning:

1.1  Unit Area means the lands described by Tracts in Exhibit A and shown on Exhibit B as to which this agreement becomes effective or to which it may be extended as herein provided.

1.2  Unitized Formation means that subsurface portion of the Unit Area known as the Coquina Zone and more generally described as follows:

The Coquina Formation is that strata of the Rodessa Zone encountered and shown on the electric log at the interval 5,976 feet to 5,996 feet in the Pennzoil Producing Company - Rodessa Oil and Land Company No. 12 located in the SE/4 of the NW/4 of Section 22-T23N-R16W, Caddo Parish, Louisiana, and all zones correlative and interconnected therewith in and under the Unit Area.

1.3  Unitized Substances means all oil, gas, gaseous substances, sulphur contained in gas, condensate, distillate, and all associated and/or constituent substances other than outside substances produced from the Unitized Formation, subject to the provisions of Section 12.2 of the Unit Operating Agreement.

1.4  Working Interest means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, including a carried interest, which interest is chargeable with and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of

the cost of drilling, developing, producing and operating the Unitized Formation.

1.5   Royalty Interest means a right to or interest in any portion of the Unitized Substances or proceeds thereof other than a Working Interest.

1.6   Royalty Owner means a party hereto who owns a Royalty Interest.

1.7   Working Interest Owner means a party hereto who owns a Working Interest.   The owner of oil and gas rights that are free of lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest Owner to the extent of seven-eights (7/8) of his Interest in Unitized Substances, and a Royalty Owner with respect to his remaining one-eight (1/8) interest therein.

1.8   Tract means each parcel of land described as such and given a Tract Number in Exhibit A.

1.9   Unit Operating Agreement means that agreement entitled "Unit Operating Agreement, Coquina Waterflood Unit, Rodessa Field, Caddo Parish, Louisiana" of the same effective date as the effective date of this agreement and which is entered into by Working Interest Owners.

1.10   Unit Operator means the Working Interest Owner designated by Working Interest Owners under the Unit Operating Agreement to develop and operate the Unitized Formation, acting as operator and not as a Working Interest Owner.

1.11   Tract Participation means the percentage shown on Exhibit A for allocating Unitized Substances to a Tract under this agreement.

1.11.1   Acre Foot means 43,560 cubic feet of the Unitized Formation containing unitized substances as determined under each tract shown on Exhibit A by the Working Interest Owners.

1.12   Unit Participation of each Working Interest Owner means the sum of the percentages obtained by multiplying the undivided interest in the Working Interest in each Tract of such Working Interest Owner by the Tract Participation of such Tract.

1.13   Outside Substances means all substances obtained from any source other than the Unitized Formation and which are injected into the Unitized Formation.

1.14   Oil and Gas Rights means the right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.15   Unit Operations means all operations conducted by Working Interest Owners or Unit Operator on behalf of Working Interest Owners pursuant to this agreement and the Unit Operating Agreement as a result of the development and operation of the Unitized Formation for the production of Unitized Substances.

- 2 -

1.16   <u>Unit Equipment</u> means all personal property, lease and well equipment, plants and other facilities and equipment taken over or otherwise acquired by the joint account for use in Unit Operations.

1.17   <u>Unit Expense</u> means all cost, expense or indebtedness incurred by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of Unit Operations.

1.18   Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender include the masculine and the feminine.

1.19   <u>Effective Date</u> is the time and date this agreement becomes effective as provided in Section 16.1.

1.20   <u>Joint Account</u> means the account showing charges paid and credits received in the conduct of joint operations.

ARTICLE 2
EXHIBITS

2.1   <u>Exhibits</u>.  Attached hereto are the following exhibits which are incorporated herein by reference.

2.1.1   <u>Exhibit A</u>, which is a schedule that describes each Tract in the Unit Area and shows its Tract Participation.

2.1.2   <u>Exhibit B</u>, which is a map that shows the boundary lines of the Unit Area and the Tracts therein.

2.2   <u>Reference to Exhibits</u>.  When reference herein is made to an exhibit, the reference is to the Exhibit as originally attached or, if revised, to the latest revision.

2.3   <u>Exhibits Considered Correct</u>. An exhibit shall be considered to be correct until revised as herein provided.

2.4   <u>Correcting Errors</u>.  The shapes and descriptions of the respective Tracts have been established by using the best information available.  If it subsequently appears that any Tract, because of diverse royalty or working interest ownership on the effective date hereof, should be divided into more than one Tract, or that any mechanical miscalculation has been made, Unit Operator, with the approval of Working Interest Owners, may correct the mistake by revising the exhibits to conform to the facts.  The revision shall not include any re-evaluation of engineering or geological interpretations used in determining Tract Participation. Each such revision of an exhibit shall be effective at 7:00 A.M., on the first day of the calendar month next following the filing for record of the revised exhibit or on such other date as may be determined by Working Interest Owners and set forth in the revised exhibit.  All revised exhibits shall be dated.

2.5   <u>Filing Revised Exhibits</u>.  If an exhibit is revised pursuant to this agreement, Unit Operator shall certify and file the revised exhibit for record in the parish or parishes in which this agreement is filed.

- 3 -

## ARTICLE 3
## CREATION AND EFFECT OF UNIT

3.1   Oil and Gas Rights Unitized.  Subject to the provisions of this agreement, all Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibit A, and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized insofar as the respective Oil and Gas Rights pertain to the Unitized Formation, so that operations may be conducted as if the Unitized Formation had been included in a single lease executed by all Royalty Owners, as lessors, in favor of all Working Interest Owners, as lessees, and as if the lease had been subject to all of the provisions of this agreement.

3.2   Personal Property Excepted.  All lease and well equipment, materials and other facilities heretofore or hereafter placed by any of the Working Interest Owners on the lands covered hereby shall be deemed to be and shall remain personal property belonging to and may be removed by the Working Interest Owners.  The rights and interests therein as among Working Interest Owners are covered by the Unit Operating Agreement.

3.3   Amendment of Leases and Other Agreements.  The provisions of the various leases, agreements, division and transfer orders, or other instruments covering the respective Tracts or the production therefrom are amended to the extent necessary to make them conform to the provisions of this agreement, but otherwise shall remain in effect.

3.4   Continuation of Leases and Term Royalties.  Operations, including drilling operations, conducted with respect to the production of hydrocarbons from the Unitized Formation on any part of the Unit Area, or production from any part of the Unitized Formation, except for the purpose of determining payments to Royalty Owners, shall be considered as operations upon or production from each Tract, and such operations or production shall continue in effect on each lease or term royalty interest as to all lands covered thereby just as if such operations had been conducted and a well had been drilled on and was producing from each Tract.

3.5   Titles Unaffected by Unitization.  Nothing herein shall be construed to result in the transfer of title to the Oil and Gas Rights by any party hereto to any other party or to Unit Operator.  The intention is to provide for the co-operative development and operation of the Tracts and for the sharing of Unitized Substances as herein provided.

3.6   Injection Rights.  Royalty Owners hereby grant unto Working Interest Owners the right to inject into the Unitized Formation water, salt water, gas, air or any other substances in whatever amounts Working Interest Owners deem expedient for Unit Operations, including the right to drill and maintain injection wells on the Unit Area and to use producing or abandoned oil and gas wells for such purposes. Moreover, Working Interest Owners shall have the right to drill, maintain and operate one or more injection well or wells at a location or locations on the Unit Area to be chosen by the Working Interest Owners.  Royalty Owners also hereby grant to Working Interest Owners the right to use producing and abandoned oil and gas wells and to drill wells on the Unit Area for such injection purposes together with the right to produce, use and store, either from the Unit Area or from lands described in any leases, portions of which comprise the Unit Area, salt water or any other substances necessary, desirable or incidental to injection into the Unitized Formation regardless of the formation or formations underlying the Unit Area from which salt water or other substances may be produced.

- 4 -

3.7  <u>Development Obligation</u>.  Nothing herein shall relieve Working
Interest Owners from the obligation to develop reasonably as a whole the lands
and leases committed hereto.

ARTICLE 4
PLAN OF OPERATIONS

4.1  <u>Unit Operator</u>.  Working Interest Owners are, as of the Effective
Date of this agreement, entering into the Unit Operating Agreement designating
Pennzoil Producing Company as Unit Operator.  Unit Operator shall have the exclu-
sive right to conduct Unit Operations.  The Operations shall conform to the
provisions of this agreement and the Unit Operating Agreement.  If there is any
conflict between such agreements, this agreement shall govern.

4.2  <u>Operating Methods</u>.  To the end that the quantity of Unitized
Substances ultimately recoverable may be increased and waste prevented, Working
Interest Owners shall, with diligence and in accordance with good engineering
and production practices, conduct a reasonable pressure maintenance or secondary
recovery operation by means of the injection of water, salt water, gas, air or
other substances, or any combination of two or more thereof, into the Unitized
Formation.  Working Interest Owners shall install and operate such pressure main-
tenance or secondary recovery facilities as are, in the best judgement of Working
Interest Owners, adapted to the most efficient, practical and economical operation
of the Unit Area for the conservation and efficient recovery of Unitized Substances,
having due regard both to the interest of Working Interest Owners and Royalty
Owners.  Such other methods of operation as may from time to time be determined
by Working Interest Owners to be feasible, necessary or desirable to efficiently
and economically increase the ultimate recovery of Unitized Substances may be
conducted by Working Interest Owners.  All oil and gas contained in the Unitized
Formation underlying the Unit Area shall be produced and sold as rapidly as
possible without excessive damage to the reservoirs.

4.3  <u>Change of Operating Methods</u>.  Nothing herein shall prevent Working
Interest Owners from discontinuing or changing in whole or in part any method of
operation which, in their opinion, is no longer in accord with good engineering
or production practices.  Other methods of operation may be conducted or changes
may be made by Working Interest Owners from time to time if determined by them to
be feasible, necessary or desirable to increase the ultimate recovery of Unitized
Substances.

ARTICLE 5
TRACT PARTICIPATION

5.1  <u>Tract Participation</u>.  The Tract Participation of each tract is
shown in Exhibit A.  The Tract Participation is the sum of the following:  75% of
the proportion that the acre-feet of the Unitized Formation assigned to the tract
bears to the total acre-feet in the Unitized Formation, and 25% of the proportion
that the surface acres of the tract bears to the total surface acres within the
Unit Outline.

- 5 -

## ARTICLE 6
## ALLOCATION OF UNITIZED SUBSTANCES

6.1  **Allocation of Tracts**.  All Unitized Substances produced and saved shall be allocated to the several Tracts in accordance with the respective Tract Participations effective during the period that the Unitized Substances were produced.  The amount of Unitized Substances allocated to each Tract, regardless of whether it is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract and allocated to the Unit Participants as per Unit Participation.

6.2  **Distribution within Tracts**.  The Unitized Substances allocated to each Tract shall be distributed among, or accounted for to, the parties entitled to share in the production from such Tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such Tract, or in the proceeds thereof, had this agreement not been entered into, and with the same legal effect.  If any Oil and Gas Rights in a Tract hereafter become divided and owned in severalty as to different parts of the Tract, the owners of the divided interests, in the absence of an agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract, or in the proceeds thereof, in proportion to the surface acreage of their respective parts of the Tract.  It is agreed that the Unitized Substances allocated to each Tract hereunder shall be considered, for the purposes of paying royalty and overriding royalty, as having been produced from a well located on each said Tract, whether or not any such Tract has a well located thereon producing from the Unitized Formation and such production will not be deemed to have been produced from a well located on said Tract producing from any other formation or geological strata.

6.3  **Taking Unitized Substances in Kind**.  The Unitized Substances allocated to each Tract shall be delivered in kind to the respective parties entitled thereto by virtue of the Ownership of Oil and Gas Rights therein or by purchase from such owners.  Such parties shall have the right to construct, maintain and operate within the Unit Area all necessary facilities for that purpose, provided that they are so constructed, maintained, and operated as not to interfere with Unit Operations.  Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of the Unitized Substances shall be borne by the receiving party.  If a Royalty Owner has the right to take in kind a share of Unitized Substances and fails to do so, the Working Interest Owner whose Working Interest is subject to such Royalty Owner shall be entitled to take in kind such share of the Unitized Substances.

- 6 -

6.4  <u>Failure to Take in Kind</u>.  In the event any party shall fail to make arrangements necessary to take in kind or separately dispose of its proportionate share of the production from the Unit Area, the Unit Operator shall have the right, subject to revocation at will by the party owning same, but not the obligation, to sell and dispose of such production at a price not less than the price which Unit Operator receives for its portion of the production from the Unit Area.  Any contract of sale by the Unit Operator for any other party's share of the production from the Unit Area shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, and in no event for a period in excess of one (1) year.

6.5  <u>Responsibility for Royalty Settlements</u>.  Any party receiving in kind or separately disposing of all or part of the Unitized Substances allocated to any Tract or receiving the proceeds therefrom shall be responsible for the payment thereof to the persons entitled thereto, and shall indemnify all parties hereto, including Unit Operator, against any liability for all royalties, overriding royalties, production payments and all other payments chargeable against or payable out of such Unitized Substances or the proceeds therefrom.  In the event of a sale or a disposal of all or any part of said Unitized Substances by the Unit Operator, the Unit Operator shall pay to the operator of each Tract, or if there be no such operator, to the Working Interest Owners in such Tract, all of the proceeds allocable to such Tract, whereupon said Tract operator, or said Working Interest Owners, shall be responsible and liable for the payment of all royalties, overriding royalties, production payments and all other payments chargeable against or payable out of such proceeds, and the indemnities mentioned in the preceding sentence shall apply to the disbursement of such proceeds.

6.6  <u>Royalty on Outside Substances</u>.  If any Outside Substance is injected into the Unitized Formation, one hundred percent (100%) of any like substance contained in the Unitized Substances subsequently produced and sold, or used for other than Unit Operations, shall be deemed to be the Outside Substance so injected until the total volume thereof equals the total volume of the Outside Substance so injected.  No payments shall be due or payable to Royalty Owners on Outside Substances.

ARTICLE 7

<u>PRODUCTION AS OF THE EFFECTIVE DATE</u>

7.1  <u>Oil in Lease Tanks</u>.  Unit Operator shall gauge all lease and other tanks to be used for storage of Unitized Substances to ascertain the amount of merchantable oil in such tanks, above the pipe line connections, as of 7:00 a.m., on the Effective Date hereof.  All such oil shall remain the property of the parties entitled thereto the same as if the Unit had not been formed.  Any such oil not promptly removed may be sold by the Unit Operator for the account of the parties entitled thereto, subject to the payment of all royalties, overriding royalties, production payments and all other payments under the provisions of the applicable lease or other contracts.  Commencing on the effective date hereof and continuing thereafter for the term of this agreement, all non-unitized oil must be contained and stored within tanks other than those used for Unitized Substances, and all non-unitized gas must either be transported through lines other than those used for Unitized Substances or must be separately metered

- 7 -

from Unitized Substances (at the expense of the owners of the Working Interest in the Non-unitized Formation from which such non-unitized gas is produced) if transported in the same lines with Unitized Substances.

## ARTICLE 8
## USE OR LOSS OF UNITIZED SUBSTANCES

8.1 <u>Use of Unitized Substances</u>. Working Interest Owners may use as much of the Unitized Substances as they deem necessary for Unit Operations, including but not limited to the injection thereof into the Unitized Formation.

8.2 <u>Royalty Payments</u>. No royalty, overriding royalty, production or other payments shall be payable upon, or with respect to, Unitized Substances used or consumed in Unit Operations, or which otherwise may be lost, vented or consumed in the production, handling, treating, transportation or storing of Unitized Substances.

## ARTICLE 9
## TITLES

9.1 <u>Working Interest Titles</u>. If title to a Working Interest fails, the rights and obligations of Working Interest Owners by reason of the failure of title shall be governed by the Unit Operating Agreement.

9.2 <u>Royalty Owner Titles</u>. If title to a Royalty Interest fails, but the Tract to which it relates is not removed from the Unit Area, the party whose title failed shall not be entitled to share hereunder with respect to such interest. The party recovering title to such Royalty Interest shall thereafter succeed to the rights of the former owner.

9.3 <u>Production Where Title is in Dispute</u>. If the title or right of any party claiming the right to receive in kind all or any portion of the Unitized Substances allocated to a Tract is in dispute, Unit Operator at the discretion of Working Interest Owners shall either:

      (a) Require that the party to whom such Unitized Substances are delivered or to whom the proceeds thereof are paid, furnish security for the proper accounting therefor to the rightful owner if the title or right of such party fails in whole or in part, or,

      (b) Withhold and market the portion of Unitized Substances with respect to which title or right is in dispute, and escrow the proceeds thereof until such time as the title or right thereto is established by a final judgement of a court of competent jurisdiction or otherwise to the satisfaction of Working Interest Owners, whereupon the proceeds so impounded shall be paid to the party rightfully entitled thereto.

9.4 <u>Payment of Taxes to Protect Title</u>. The owner of surface rights to lands within the Unit Area, or severed mineral interests or Royalty Interests in such lands, or lands outside the Unit Area on which Unit Equipment is located, is responsible for the payment of any ad valorem taxes on all such rights, interests, or property, unless such owner and Working Interest Owners otherwise agree. If

- 8 -

any ad valorem taxes are not paid by or for such owner when due, Unit Operator may, with approval of Working Interest Owners, at any time prior to tax sale, or expiration of period of redemption after tax sale, pay the tax, redeem such rights, interests, or property, and discharge the tax lien. Any such payment shall be an item of Unit Expense. Unit Operator shall, if possible, withhold from any proceeds derived from the sale of Unitized Substances otherwise due any delinquent taxpayer an amount sufficient to recoup the costs of such payment or redemption, such withholding to be credited to Working Interest Owners. Such withholding shall be without prejudice to any other remedy available to Unit Operator or Working Interest Owners.

## ARTICLE 10
### EASEMENTS OR USE OF SURFACE

10.1 **Grant of Easements**. The parties hereto, to the extent of their rights and interests, hereby grant to Working Interest Owners the right to use as much of the surface of the land within the Unit Area as may reasonably be necessary for Unit Operations, including but without limitation upon the foregoing language, the right to construct, equip, maintain and operate flow lines, pipelines, tanks and other facilities for producing, gathering, processing, storing and disposing of Unitized Substances; provided that, nothing herein shall be construed as leasing or otherwise conveying to Working Interest Owners a site for a water, gas injection, processing or other plant, or camp site. Provided, however, that nothing in this section is intended to, or shall, limit, diminish or detract from any existing easement or other similar rights held by the Working Interest Owners under existing leases, grants or other contracts and agreements.

10.2 **Use of Water**. Working Interest Owners shall have free use of water from the Unit Area for Unit Operations, except water from any well, lake, pond or irrigation ditch of a Royalty Owner.

10.3 **Surface Damages**. Working Interest Owners shall pay the owner for damages to growing crops, timber, fences, improvements and structures on the Unit Area that result from Unit Operations.

## ARTICLE 11
### ENLARGEMENTS OF UNIT

11.1 **Enlargements of Unit**. The Unit Area may be enlarged to include acreage reasonably proved to be productive by adding to or including within the Unit Area a pool or pools or any portion or portions or combinations thereof not theretofore included, and extensions of existing pools. "Pool" is defined as an underground reservoir containing a common accumulation of crude petroleum or natural gas or both. Terms under which Unit enlargement shall occur are outlined as follows:

11.1.1  In providing for allocation of production from the Unit Area, there shall first be allocated to each pool or portion thereof so added a portion of the total production of oil or gas, or both, from all pools affected within the Unit Area, as enlarged, such allocation to be based on the relative contribution which such added pool or portion or extensions thereof are expected to make, during the remaining course of Unit Operations, to the total production of oil or gas, or both, to the Unit as enlarged.

11.1.2  The participation allocated to extensions of the existing pool shall be fair and reasonable, considering all available information, and in conformity with the laws of the State of Louisiana.

- 9 -

11.1.3  The production so allocated to each added pool or portion thereof shall be allocated to the separately owned tracts in the added Unit Area on the basis of the relative contribution of each such tract.

11.1.4  There shall be no retroactive allocation or adjustment of Unit Expense or of interest in the Unitized Substances produced, or proceeds thereof; however, this limitation shall not prevent an adjustment of investment by reason of the enlargement.

11.1.5  The enlargement of the Unit Area shall only be authorized pursuant to the vote of the Working Interest Owners under terms described in Section 4.3.2 of the Unit Operating Agreement.

11.2  <u>Determination of Tract Participation</u>.  Unit Operator, based upon the same relative factors and consideration specified in Section 5.1, shall determine the Tract Participation of each tract within the Unit Area as enlarged, and shall revise Exhibits A and B accordingly.

11.3  <u>Effective Date</u>.  The effective date of any enlargement of the Unit Area shall be 7:00 A.M. on the first day of the calendar month following compliance with conditions for enlargement as specified by Working Interest Owners, approval of the enlargement by the Louisiana Office of Conservation, and the filing for record of revised Exhibits A and B in the records of Caddo Parish, Louisiana.

## ARTICLE 12
## CHANGE OF TITLE

12.1  <u>Covenant Running with the Land</u>.  This agreement shall extend to, be binding upon, and inure to the benefit of, the respective heirs, devisees, legal representatives, successors, and assigns of the parties hereto, and shall constitute a covenant running with the lands, leases and interests covered hereby.

12.2  <u>Notice of Title Transfer</u>.  Any conveyance of all or any part of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this agreement.  No change of title shall be binding on the Unit Operator, or upon any party hereto other than the party so transferring, until the first day of the calendar month next succeeding the date of receipt by Unit Operator of a certified copy of the recorded instrument evidencing such change in ownership.

12.3  <u>Waiver of Rights to Partition</u>.  Each party hereto covenants that, during the existence of this agreement, it will not resort to any action to partition the Unit Area or the Unit Equipment, and to that extent waives the benefits of all laws authorizing such partition.

## ARTICLE 13
## RELATIONSHIP OF PARTIES

13.1  <u>No Partnership</u>.  The duties, obligations and liabilities of the parties hereto are intended to be several and not joint or collective.  This agreement is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, obligation or liability with regard to any one or more of the parties hereto.  Each party hereto shall be individually responsible for its own obligations as herein provided.

- 10 -

13.2 <u>No Sharing of Market</u>. This agreement is not intended to provide, and shall not be construed to provide, directly or indirectly, for any cooperative refining, joint sale or marketing of Unitized Substances.

13.3 <u>Royalty Owners Free of Costs</u>. This Agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay for Unit Expense unless such Royalty Owner is otherwise so obligated.

13.4 <u>Information To Royalty Owners</u>. Each Royalty Owner shall be entitled to all information in possession of Unit Operator to which such Royalty Owner is entitled by an existing agreement with any Working Interest Owner.

ARTICLE 14
LAWS AND REGULATIONS

14.1 <u>Laws and Regulations</u>. This agreement shall be subject to the conservation laws of the State of Louisiana; to the valid rules, regulations and orders of the Louisiana Office of Conservation; and to all other applicable Federal, state and municipal laws, rules, regulations and orders.

ARTICLE 15
FORCE MAJEURE

15.1 All obligations imposed by this agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a strike, fire, war, civil disturbance, act of God; by Federal, state or municipal laws; by any rules, regulation or order of a governmental agency; by inability to secure materials; or by any other cause or causes beyond reasonable control of the party. No party shall be required against its will to adjust or settle any labor dispute. Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of suspension of Unit Operations.

ARTICLE 16
EFFECTIVE DATE

16.1 <u>Effective Date</u>. This agreement shall become binding upon each party as of the date such party signs the instrument by which it becomes a party hereto, and, unless sooner terminated as provided in Section 16.2, shall become effective as to all Working Interest Owners and Royalty Owners having any interest in the Unit Area at the time and date set forth in a resolution adopted by a vote of Working Interest Owners, which resolution shall direct the Unit Operator, after fulfilling the requirements hereinafter set forth, to file of record a certificate in Caddo Parish, Louisiana, which shall set forth the fact of said resolution, the book and page in which a counterpart of this agreement has been recorded, and the docket number and order number of the order of approval by the Louisiana Office of Conservation. The Unit Operator shall not file said certificate until the following requirements have been met:

16.1.1 At least one counterpart of this agreement has been filed for record by Unit Operator in Caddo Parish, Louisiana.

16.1.2 This agreement has been approved by the Louisiana Office of Conservation.

- 11 -

16.2  Ipso Facto Termination.  If the requirements of Section 16.1 are not accomplished on or before ___January 1___, 198$\underline{1}$, this agreement shall ipso facto terminate on that date (hereinafter called "termination date") and thereafter be of no further effect, unless prior thereto Working Interest Owners owning a combined Unit Participation of at least eighty-five percent (85%) have become parties to this agreement and have decided to extend the termination date for a period not to exceed one year.  If the termination date is so extended and the requirements of Section 16.1 are not accomplished on or before the extended termination date, this agreement shall ipso facto terminate on the extended termination date and thereafter be of no further effect.  For the purpose of this section, Unit Participation shall be as shown on the original Exhibit C attached to the Unit Operating Agreement.

ARTICLE 17
TERM

17.1  Term.  The term of this agreement shall be for the time that Unitized Substances are produced in paying quantities and as long thereafter as Unit Operations are conducted without a cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner herein provided.

17.2  Termination by Working Interest Owners.  This agreement may be terminated by three (3) or more Working Interest Owners having a combined Unit Participation of at least eighty-five percent (85%) whenever such Working Interest Owners determine that Unit Operations are no longer profitable or feasible and such termination has been approved by order of the Louisiana Office of Conservation.

17.3  Effect of Termination.  Upon termination of this agreement, the further development and operation of the Unitized Formation as a unit shall be abandoned, Unit Operations shall cease, and thereafter the parties shall be governed by the provisions of the leases and other instruments affecting the separate Tracts.

17.4  Salvaging Equipment upon Termination.  If not otherwise granted by the lease or other instruments affecting each Tract unitized under this agreement, Royalty Owners hereby grant Working Interest Owners a period of six (6) months after the date of termination of this agreement within which to salvage and remove Unit Equipment.

17.5  Certificate of Termination.  Upon termination of this agreement as provided in either Section 17.1 or Section 17.2 above, the Unit Operator shall file for record in Caddo Parish, Louisiana, a certificate reciting the facts as to such termination and the effective date thereof.

ARTICLE 18
EXECUTION

18.1  Original, Counterpart or Other Instrument.  A person may become a party to this agreement by signing the original of this instrument, a counterpart thereof or other instrument agreeing to be bound by the provisions hereof. The signing of any such instrument shall have the same effect as if the executing parties had signed the same instrument.

- 12 -

18.2  <u>Joinder in Dual Capacity</u>.  Execution as herein provided by any party as either a Working Interest Owner or a Royalty Owner shall commit all interests that may be owned or controlled by such party and additional interests thereafter acquired.

ARTICLE 19
<u>GENERAL</u>

19.1  <u>Amendments Affecting Working Interest Owners</u>.  Amendments hereto relating wholly to Working Interest Owners may be made if signed by all Working Interest Owners.

19.2  <u>Action by Working Interest Owners</u>.  Any action, vote or approval required by Working Interest Owners hereunder shall be in accordance with the provisions of the Unit Operating Agreement, Section 4.3.

19.3  <u>Lien of Unit Operator</u>.  Unit Operator shall have a lien upon the interests of Working Interest Owners in the Unit Area to the extent provided in the Unit Operating Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the dates opposite their respective signatures.

WORKING INTEREST OWNERS

WITNESSES:                              PENNZOIL PRODUCING COMPANY

_____         BY: _____

_____


WITNESSES:                              MOEPSI

_____         BY: _____

_____


WITNESSES:                              TRITON OIL & GAS CORPORATION

_____         BY: _____

_____


WITNESSES:                              PETROLEUM CORPORATION OF TEXAS

_____         BY: _____

_____


- 13 -

WITNESSES:                              IBEX PARTNERSHIP

_____              By: _____

_____


WITNESSES:                              OLINKRAFT, INC.

_____              By: _____

_____


WITNESSES:                              PHILLIPS PETROLEUM CO.

_____              By: _____

_____


WITNESSES:                              SKLAR & PHILLIPS OIL CO.

_____              By: _____

_____


WITNESSES:                              McCORMICK OIL & GAS CORP.

_____              By: _____

_____


WITNESSES:

_____              _____
                                              David C. Bintliff
_____


WITNESSES:                              CITIES SERVICE COMPANY

_____              By: _____

_____


WITNESSES:                              BOARD OF COMMISSIONERS OF
                                        THE CADDO LEVEE DISTRICT
_____              By: _____

_____


– 14 –

WITNESSES:                          RODESSA OIL AND LAND CO.

_____         By: _____

_____


WITNESSES:

_____

_____         _____
                                         John Marvin Kennedy


WITNESSES:

_____

_____         _____
                                         Fred E. Hamiter


WITNESSES:

_____

_____         _____
                                         Lettie Lawton Graham


WITNESSES:

_____

_____         _____
                                         P. A. Graham


WITNESSES:                          SCURLOCK OIL COMPANY

_____         By: _____

_____


WITNESSES:

_____

_____         _____
                                         Edward H. Moore


WITNESSES:

_____

_____         _____
                                         Connie Tyson Zylks


- 15 -

WITNESSES:

_____          _____
_____          George Oscar Zylks

WITNESSES:

_____          _____
_____          Walter W. Starcke

WITNESSES:

_____          _____
_____          Oliver A. Starcke

WITNESSES:

_____          _____
_____          Sewell K. Starcke

WITNESSES:

_____          _____
_____          Eleanor A. Starcke Smith

WITNESSES:

_____          _____
_____          Don L. Smith

WITNESSES:

_____          _____
_____          Alton Rape

WITNESSES:

_____          _____
_____          Charlotte Rape

- 16 -

WITNESSES:

_____          _____
                                        Buck Florence
_____

WITNESSES:

_____          _____
                                        Patricia H. Florence
_____

WITNESSES:

_____          _____
                                        Jim N. Heath
_____

WITNESSES:

_____          _____
                                        Frieda Heath
_____

WITNESSES:

_____          _____
                                        Vernon Hampton
_____

WITNESSES:

_____          _____
                                        Mary Belle Garvin Pitts
_____

WITNESSES:

_____          _____

_____

WITNESSES:

_____          _____
                                        James W. Copeland, Jr.
_____

- 17 -

WITNESSES:

_____          _____
                                    Annie Laurie Copeland
_____


WITNESSES:

_____          _____
                                    Gussie Tyson Dodd
_____


WITNESSES:

_____          _____
                                    Norman Douglas Tyson
_____


WITNESSES:

_____          _____
                                    Willie Herbert Tyson
_____


WITNESSES:

_____          _____
                                    Noah Glenn Tyson
_____


WITNESSES:

_____          _____
                                    Mary Virginia Tyson Skaggs
_____


WITNESSES:

_____          _____
                                    J. T. Tyson
_____


WITNESSES:

_____          _____
                                    James H. Fuller, Sr.
_____


- 18 -

WITNESSES:

_____          _____
                                          Susie Nell Fisher Fuller
_____


WITNESSES:

_____          _____
                                          Dorothy Comegys Garber
_____


WITNESSES:

_____          _____
                                          E. H. Teer
_____


WITNESSES:

_____          _____
                                          Alvin Marcus Mitchell
_____


WITNESSES:

_____          _____
                                          Charlie Irene Chance Vaughn
_____


WITNESSES:

_____          _____
                                          Bobbie Joe Chance
_____


WITNESSES:

_____          _____
                                          Donna Lee Chance Bickham
_____


WITNESSES:

_____          _____
                                          Bertha Lee Love,
_____          Curatrix of Interdict,
                                          Rosie Lee Jackson

- 19 -

WITNESSES:

_____          _____
                                 B. W. Brackman

_____

WITNESSES:

_____          _____
                                 Arah Giles Brackman

_____

WITNESSES:

_____          _____
                                 Myrtle M. Peden

_____

WITNESSES:

_____          _____
                                 Sam A. Poole

_____

WITNESSES:

_____          _____
                                 Billie Drew H. Cunningham

_____

WITNESSES:

_____          _____
                                 Johnette Harris Hayslip

_____

WITNESSES:

_____          _____
                                 Murrie Poole Blair

_____

WITNESSES:

_____          _____
                                 James Poole

_____

- 20 -

WITNESSES:

_____

_____                    _____
                                             Katherine Poole West

WITNESSES:

_____

_____                    _____
                                             E. D. West

WITNESSES:

_____

_____                    _____
                                             Hortense W. Stevens

WITNESSES:

_____

_____                    _____
                                             Jim A. Spears

WITNESSES:

_____

_____                    _____
                                             Fredrick J. Barrett

WITNESSES:

_____

_____                    _____
                                             Charles Bruce Spears

WITNESSES:

_____

_____                    _____
                                             Fred Von Harten

WITNESSES:

_____

_____                    _____
                                             Ann Barrett

- 21 -

WITNESSES:

_____          _____
                                          Mary Susan Spears
_____


WITNESSES:

_____          _____
                                          Gordon Sisemore
_____


WITNESSES:

_____          _____
                                          Lennie Rasbury Sisemore
_____


WITNESSES:

_____          _____
                                          Harvey W. Selman
_____


WITNESSES:

_____          _____
                                          Dessie Lawless Solman
_____


WITNESSES:

_____          _____
                                          Edgar O. Selman, Sr.
_____


WITNESSES:

_____          _____
                                          Betty Jean Selman Carlisle
_____


WITNESSES:

_____          _____
                                          Eloise Quinn Selman Tudor
_____


- 22 -

WITNESSES:

_____

_____          _____
                                   Robert R. Selman

WITNESSES:

_____

_____          _____
                                   Jean Osborne Selman

WITNESSES:

_____

_____          _____
                                   Albert C. Selman

WITNESSES:

_____

_____          _____
                                   Donald G. Adcock

WITNESSES:

_____

_____          _____
                                   Marion Adcock Brackman

WITNESSES:

_____

_____          _____
                                   Billy James Adcock

WITNESSES:

_____

_____          _____
                                   Janet Adcock Head

WITNESSES:

_____

_____          _____
                                   Jo Lane Adcock Hardin

- 23 -

WITNESSES:

_____

_____          _____
                                 Carl M. Adcock


WITNESSES:

_____

_____          _____
                                 Dolores George LaVigne


WITNESSES:

_____

_____          _____
                                 Ruel B. Rives


WITNESSES:

_____

_____          _____
                                 Vera Lois Hardin Bentley


WITNESSES:

_____

_____          _____
                                 Margie Hardin Attaway


WITNESSES:

_____

_____          _____
                                 Vonceil Hardin Brinson


WITNESSES:

_____

_____          _____
                                 Marvin L. Muslow


WITNESSES:

_____

_____          _____
                                 Max Blankman


- 24 -

WITNESSES:

_____            _____
                                          Vergia Adams Blankman
_____

WITNESSES:

_____            _____
                                          William Harold Kennedy
_____

WITNESSES:

_____            _____
                                          Sarah Kate Grogan Kennedy
_____

WITNESSES:

_____            _____

_____

WITNESSES:

_____            _____

_____

WITNESSES:

_____            _____

_____

WITNESSES:

_____            _____

_____

WITNESSES:

_____            _____

_____

- 25 -

WITNESSES:

_____    _____

_____

WITNESSES:

_____    _____

_____

WITNESSES:

_____    _____

_____

WITNESSES:

_____    _____

_____

WITNESSES:

_____    _____

_____

WITNESSES:

_____    _____

_____

WITNESSES:

_____    _____

_____

WITNESSES:

_____    _____

_____

EXHIBIT "A"

COQUINA WATERFLOOD UNIT
RODESSA FIELD
T 23 N - R 16 W
CADDO PARISH, LOUISIANA

| Tract Designation | Description | Acres in Tract | Acre Feet in Tract | Percentage of Participation |
|---|---|---|---|---|
| 9-1 | SW¼ of SW¼ | 40.00 | 33.80 | 0.2987725 |
| 9-2 | SE¼ of SW¼ | 40.00 | 86.75 | 0.4272529 |
| 9-3 | SW¼ of SE¼ | 40.00 | 100.50 | 0.4606166 |
| 9-4 | SE¼ of SE¼ | 40.00 | 65.50 | 0.3756909 |
| 10-1 | SW¼ of SW¼ | 40.00 | 27.80 | 0.2842138 |
| 10-2 | 5 acres in the form of a square in NW Corner of SE¼ of SW¼ | 5.00 | 0.00 | 0.0270948 |
| 10-3 | SE¼ of SW¼ (less 5 acres in a square in NW Corner) and SW¼ of SE¼ | 75.00 | 87.40 | 0.6184937 |
| 10-4 | SE¼ of SE¼ | 40.00 | 61.20 | 0.3652572 |
| 11-1 | S½ of SW¼ | 80.00 | 45.15 | 0.5430711 |
| 11-2 | North 754 2/7 feet of SW¼ of SE¼ | 22.86 | 4.50 | 0.1347965 |
| 11-3 | South 377 1/7 feet of N 1,131 3/7 feet of SW¼ of SE¼ | 11.43 | 12.45 | 0.0921480 |
| 11-4 | South 188 4/7 feet of SW¼ of SE¼ | 5.71 | 9.45 | 0.0538722 |
| 11-5 | SE¼ of SE¼ | 40.00 | 83.10 | 0.4183964 |
| 12-1 | S½ of SW¼ | 80.00 | 295.15 | 1.1496832 |
| 12-2 | E½ of NE¼ of SW¼, SW¼ of NE¼ of SW¼ and SE¼ of NW¼ of SW¼ | 40.00 | 54.20 | 0.3482720 |
| 12-3 | W½ of NW¼ of SW¼, NE¼ of NW¼ of SW¼ and NW¼ of NE¼ of SW¼ | 40.00 | 4.50 | 0.2276775 |
| 13-1 | NW¼ OF NW¼ | 40.00 | 114.75 | 0.4951935 |
| 14-1 | NE¼ of NE¼ | 40.00 | 181.70 | 0.6576442 |
| 14-2 | North 565 3/7 feet of NW¼ of NE¼ | 17.14 | 42.85 | 0.1968543 |
| 14-3 | North 377 1/7 feet of the south 754 2/7 feet of NW¼ of NE¼ | 11.43 | 34.29 | 0.1451416 |
| 14-4 | South 377 1/7 feet of the NW¼ of NE¼ | 11.43 | 46.85 | 0.1756178 |
| 14-5 | East 16 acres of NE¼ of NW¼ | 16.00 | 40.00 | 0.1837613 |
| 14-6 | West 24 acres of NE¼ of NW¼ | 24.00 | 60.00 | 0.2756420 |
| 14-7 | NW¼ of NW¼ | 40.00 | 134.50 | 0.5431158 |
| 14-8 | South ½ of NW¼, East ½ of West ½ of SW¼, North ½ of SE¼ of SW¼ and NE¼ of SW¼, Less and Except a 4-acre tract described as follows: Beginning at a point 400 ft. North of the SE Corner of NE¼ of SW¼, thence North 525 ft., thence West 338 ft., thence South 525 ft., thence East 338 ft. to the point of beginning. | 176.00 | 913.60 | 3.1705407 |

Arapaho ½

| Tract Designation | Description | Acres in Tract | Acre Feet in Tract | Percentage of Participation |
|---|---|---|---|---|
| 14-9 | SW¼ of NE¼, NW¼ of SE¼ and 4 acres in NE¼ of SW¼, being same tract less and excepted from Tract 8 | 84.00 | 326.65 | 1.2477922 |
| 14-10 | SE¼ of NE¼ - Sklar & Phillips Inc. ½ | 40.00 | -54.15 | -0.3481507 |
| 14-11 | West ½ of NW¼ of SW¼ | 20.00 | 180.00 | 0.5451400 |
| 14-12 | West ½ of SW¼ of SW¼ | 20.00 | 157.80 | 0.4912728 |
| 14-13 | South ½ of SE¼ of SW¼ | 20.00 | 1.20 | 0.1112909 |
| 15-1 | N½ of NE¼ | 80.00 | 471.75 | 1.5781941 |
| 15-2 | N½ of NW¼ | 80.00 | 464.10 | 1.5596317 |
| 15-3 | South ½ of NW¼ | 80.00 | 637.00 | 1.9791647 |
| 15-4 | South ½ of NE¼ and North ½ of SE¼ | 160.00 | 1,420.85 | 4.3146535 |
| 15-5 | South ½ SW¼ and the West 38 acres of the NW¼ of SW¼ | 118.00 | 915.05 | 2.8598136 |
| 15-6 | NE¼ of SW¼ and the East 2 acres of NW¼ of SW¼ | 42.00 | 237.75 | 0.8044846 |
| 15-7 | SW¼ of SE¼ | 40.00 | 307.05 | 0.9617996 |
| 15-8 | SE¼ of SE¼ | 40.00 | 300.00 | 0.9446931 |
| 16-1 | E½ of NE¼ | 80.00 | 626.90 | 1.9546576 |
| 16-2 | W½ of NE¼ - 54 P line | 80.00 | 649.70 | 2.0099806 |
| 16-3 | NW¼ | 160.00 | 1,195.05 | 3.7667614 |
| 16-4 | West ½ SW¼ | 80.00 | 676.30 | 2.0745241 |
| 16-5 | East ½ SW¼ - Sklar & Phillips, Inc | 80.00 | 724.20 | 2.1907510 |
| 16-6 | SE¼ | 160.00 | 1,880.70 | 5.4304559 |
| Sec. 17-1 | East ½ of North 3/4 and East ½ of North 32.68 acres of SW¼ of SE¼ | 160.34 | 865.25 | 2.9683610 |
| 17-2 | West ½ of the North 3/4, Less and Except the North 30 acres, and the West ½ of the North 32.68 acres of the SW¼ of SE¼ | 130.34 | 278.90 | 1.3830440 |
| 17-3 | South 23.58 acres of SW¼ of SE¼ | 23.58 | 156.87 | 0.5084161 |
| 17-4 | SE¼ of SE¼ | 39.44 | 295.80 | 0.9314673 |
| Sec. 20-1 | NE¼ of NE¼ | 39.59 | 296.93 | 0.9350100 |
| 20-2 | NW¼ of NE¼ | 56.42 | 244.84 | 0.8998295 |
| 20-3 | SW¼ of NE¼ and NW¼ of SE¼ | 112.36 | 706.88 | 2.3240825 |
| 20-4 | SE¼ of NE¼, NE¼ of SE¼, SE¼ of SE¼ and SW¼ of SE¼ lying South of fence | 167.46 | 1,465.02 | 4.4622551 |
| 20-5 | All that part SW¼ of SE¼ lying North of fence | 7.35 | 44.20 | 0.1470784 |
| 21-1 | NE¼ of NE¼ | 40.00 | 501.25 | 1.4330159 |
| 21-2 | E½ of W½, W½ of E½ and SE¼ of NE¼ | 360.00 | 4,459.50 | 12.7715741 |
| 21-3 | W½ of NW¼ lying North of the Rodessa-State Line Road | 74.00 | 645.20 | 1.9665479 |
| 21-4 | NW¼ of SW¼ and that part of SW¼ of NW¼ lying South of Rodessa-State Line Road | 46.00 | 463.60 | 1.3741738 |
| 21-5 | SW¼ of SW¼ | 40.00 | 439.90 | 1.2841533 |
| 21-6 | E½ of SE¼ | 80.00 | 598.20 | 1.8850185 |

- 2 -

| Tract Designation | Description | Acres in Tract | Acre Feet in Tract | Percentage of Participation |
|---|---|---|---|---|
| 22-1 | North ½ of NE¼, SW¼ of NE¼ and 51.50 acres out of NW¼ described as follows: Beginning at a point on West Line of Sec. 22, 51.50 rods South of the NW Corner, thence South 51.50 rods, thence East 160 rods, thence North 51.50 rods, thence West 160 rods to the point of beginning. | 171.50 | 1,888.55 | 5.5118216 |
| 22-2 | Part of the NW¼ of Section 22 being described as follows: Beginning at the NW Corner of said section, thence East 160 rods, thence South 51.50 rods, thence West 160 rods, thence North 51.50 rods to point of beginning. | 51.50 | 653.25 | 1.8641541 |
| 22-3 | Part of NW¼, Sec. 22 described as follows: Beginning at a point on the West line of said section 103 rods South of the NW Corner thereof, thence South to the SW Corner of the NW¼, thence East to a point 466 ft. West of the SE Corner of NW¼, thence North 466 ft. to a point, thence East 466 ft. to a point on the East line of said NW¼, thence North along said East line to a point 103 rods South of NE Corner of NW¼, thence West 160 rods to point of beginning. | 51.67 | 749.96 | 2.0997372 |
| 22-4 | Part of NW¼ of Sec. 22 described as follows: Beginning at the SE Corner of NW¼, thence West 466 ft., thence North 466 ft., thence East 466 ft., thence South 466 ft. to the point of beginning. | 5.00 | 42.25 | 0.1296123 |
| 22-5 | SE¼ of NE¼ | 40.00 | 43.75 | 0.3229156 |
| 22-6 | The West 1,034 ft. of the NW¼ of SW¼ of Sec. 22 lying North of the Rodessa-State Line Road. | 6.53 | 81.63 | 0.2334447 |
| 22-7 | The East 286 ft. of land in the NW¼ of SW¼, lying North of the Old Rodessa-State Road. | 1.48 | 20.97 | 0.0589149 |
| 22-8 | Blocks 1, 2, 3, 4, 8, 9 and 10 of the Bremer Addition in the NW¼ of SW¼ | 6.10 | 68.75 | 0.1998740 |

- 3 -

| Tract Designation | Description | Acres in Tract | Acre Feet in Tract | Percentage of Participation |
|---|---|---|---|---|
| 22-9 | Blocks 5, 6 and 15 of the Bremer Addition in the NW¼ of SW¼ | 2.60 | 31.50 | 0.0905224 |
| 22-10 | SW¼ of SW¼ and that part of NW¼ of SW¼ lying South of the Old Rodessa-State Line Road, less the Bremer Addition. | 61.47 | 123.50 | 0.6327700 |
| 22-11 | Tract or parcel of land containing 0.17 acre being described as follows: South 150 ft. of the North 267.6 ft. of the West 50 ft. of the East 506.5 ft. of the NE¼ of SW¼ | 0.17 | 0.85 | 0.0029837 |
| 22-12 | NE¼ of SW¼, Less the South 150 ft. of the North 267.6 ft. of the West 50 ft. of the East 506.5 ft. thereof. | 39.83 | 118.50 | 0.5033714 |
| 22-13 | 5 acres in the form of a square located in the NW Corner of NW¼ of SE¼ | 5.00 | 5.00 | 0.0392270 |
| 23-1 | NW¼ of NW¼ | 40.00 | 38.15 | 0.3093275 |
| 28-1 | NE¼ of NW¼ | 40.00 | 88.79 | 0.4322029 |
| 28-2 | NW¼ of NW¼ and 5 acres in the form of a square in the NW Corner of SW¼ of NW¼ | 45.00 | 305.17 | 0.9843326 |
| Sac. 29-1 | Lots #1 and #4 of Fractional Sec. 29 | 78.72 | 496.52 | 1.6313731 |
| 29-2 | North 115 ft. of Lot #2 of Fractional Sec. 29 | 4.75 | 53.07 | 0.1545239 |
| 29-3 | Lot #2 of Fractional Section 29, Less and Except 10.81 acres on the South being that part measured 515 ft. on East line and extending to a point at SW Corner, and Less North 115 ft. of Lot #2 | 39.58 | 522.09 | 1.4813071 |
| 29-4 | 10.81 acres being a part of Lot #2 in Fractional Sec. 29 described as follows: Beginning at the SE Corner of Lot #2, thence North 515 ft., thence Southwesterly 1,905 ft. to the La. & Texas State Line, thence East 1,830 ft. to place of Beginning. | 10.81 | 145.93 | 0.4126828 |
| 29-5 | Lot #3 of Fractional Sec. 29 | 54.83 | 202.65 | 0.7888412 |
| | Totals | 4,613.43 | 30,909.37 | 100.0000000 |

- 4 -



PENNZOIL PRODUCING COMPANY
RODESSA FIELD
COQUINA WATERFLOOD UNIT
COQUINA RESERVOIR
CADDO PARISH LOUISIANA