UNIT  OPERATING  AGREEMENT

KUEHNE RANCH UNIT
CAMPBELL COUNTY, WYOMING

eff 9/1/67

TABLE OF CONTENTS

SECTION                                                          PAGE

          Preliminary Recitals------------------------------  1

                    ARTICLE 1

          CONFIRMATION OF UNIT AGREEMENT

1.1-------Confirmation of Unit Agreement--------------------  1

                    ARTICLE 2

                    EXHIBITS

2.1-------Exhibits------------------------------------------  1
          2.1.1 Exhibits A and B: Reference to Unit Agreement  1
          2.1.2 Exhibit C: Unit Participation---------------  1
          2.1.3 Exhibit D: Accounting Procedure-------------  2
          2.1.4 Exhibit E: Insurance Provisions------------  2
2.2-------Revision of Exhibits------------------------------  2

                    ARTICLE 3

     SUPERVISION OF OPERATIONS BY WORKING INTEREST OWNERS

3.1-------Overall Supervision-------------------------------  2
3.2-------Specific Authorities and Duties-------------------  2
          3.2.1 Method of Operation-------------------------  2
          3.2.2 Drilling of Wells---------------------------  3
          3.2.3 Well Recompletions and Change of Status-----  3
          3.2.4 Expenditures-------------------------------  3
          3.2.5 Disposition of Unit Equipment---------------  3
          3.2.6 Appearance Before a Court or Regulatory Body  3
          3.2.7 Audits-------------------------------------  3
          3.2.8 Inventories-------------------------------  4
          3.2.9 Technical Services-------------------------  4
          3.2.10 Assignments to Committees-----------------  4
          3.2.11 Removal of Unit Operator------------------  4
          3.2.12 Enlargement of Unit Area------------------  4
          3.2.13 Adjustment and Readjustment of Investments-  4
          3.2.14 Termination------------------------------  4

                    ARTICLE 4

          MANNER OF EXERCISING SUPERVISION

4.1-------Designation of Representatives--------------------  4
4.2-------Meetings------------------------------------------  4
4.3-------Voting Procedure----------------------------------  5
          4.3.1 Voting Interest----------------------------  5
          4.3.2 Vote Required------------------------------  5
          4.3.3 Vote at Meeting by Nonattending Working
                Interest Owner-----------------------------  5
          4.3.4 Poll Votes--------------------------------  5

i

SECTION                                                      PAGE

ARTICLE 5

INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1-------Reservation of Rights----------------------------- 6
5.2-------Specific Rights----------------------------------- 6
          5.2.1 Access to Unit Area------------------------- 6
          5.2.2 Reports------------------------------------- 6

ARTICLE 6

UNIT OPERATOR

6.1-------Initial Unit Operator----------------------------- 6
6.2-------Resignation or Removal---------------------------- 6
6.3-------Selection of Successor---------------------------- 7

ARTICLE 7

AUTHORITIES AND DUTIES OF UNIT OPERATOR

7.1-------Exclusive Right to Operate Unit ------------------ 7
7.2-------Workmanlike Conduct------------------------------- 7
7.3-------Liens and Encumbrances---------------------------- 7
7.4-------Employees----------------------------------------- 7
7.5-------Records------------------------------------------- 8
7.6-------Reports to Working Interest Owners--------------- 8
7.7-------Reports to Governmental Authorities-------------- 8
7.8-------Engineering and Geological Information----------- 8
7.9-------Expenditures-------------------------------------- 8
7.10------Wells Drilled by Unit Operator------------------- 8

ARTICLE 8

TAXES

8.1-------Ad Valorem Taxes---------------------------------- 9
8.2-------Other Taxes--------------------------------------- 9

ARTICLE 9

INSURANCE

9.1-------Insurance----------------------------------------- 9
          9.1.1 Workmen's Compensation Law----------------- 9
          9.1.2 Employer's Liability Insurance------------- 9
          9.1.3 Other Insurance---------------------------- 9

ARTICLE 10

ADJUSTMENT OF INVESTMENTS

10.1-------Personal Property Taken Over-------------------- 9
           10.1.1 Wells and Casing------------------------- 10
           10.1.2 Well and Lease Equipment---------------- 10
           10.1.3 Records--------------------------------- 10

ii

| SECTION | | PAGE |
|---|---|---|
| 10.2------Inventory and Evaluation of Personal Property--- | | 10 |
| 10.3------Investment Adjustment-------------------------- | | 10 |
| 10.4------General Facilities----------------------------- | | 11 |
| 10.5------Ownership of Personal Property and Facilities--- | | 11 |

### ARTICLE 11

### UNIT EXPENSE

| 11.1------Basis of Charge to Working Interest Owners------ | | 11 |
|---|---|---|
| 11.2------Budgets---------------------------------------- | | 11 |
| 11.3------Advance Billings------------------------------- | | 12 |
| 11.4------Commingling of Funds--------------------------- | | 12 |
| 11.5------Lien of Unit Operator-------------------------- | | 12 |
| 11.6------Unpaid Unit Expense---------------------------- | | 12 |
| 11.7------Uncommitted Royalty---------------------------- | | 13 |
| 11.8------Construction of Plants and Special Facilities--- | | 13 |

### ARTICLE 12

### NON-UNITIZED FORMATIONS

| 12.1------Right to Operate------------------------------- | | 14 |
|---|---|---|
| 12.2------Multiple Completions--------------------------- | | 14 |

### ARTICLE 13

### TITLES

| 13.1------Warranty and Indemnity------------------------- | | 14 |
|---|---|---|
| 13.2------Failure Because of Unit Operations------------- | | 15 |

### ARTICLE 14

### LIABILITY, CLAIMS AND SUITS

| 14.1------Individual Liability--------------------------- | | 15 |
|---|---|---|
| 14.2------Settlements------------------------------------ | | 15 |

### ARTICLE 15

### INTERNAL REVENUE PROVISION

| 15.1------Internal Revenue Provision--------------------- | | 16 |
|---|---|---|

### ARTICLE 16

### NOTICES

| 16.1------Notices---------------------------------------- | | 16 |
|---|---|---|

### ARTICLE 17

### WITHDRAWAL OF WORKING INTEREST OWNER

| 17.1------Withdrawal------------------------------------- | | 17 |
|---|---|---|

iii

SECTION                                                              PAGE

ARTICLE 18

ABANDONMENT OF WELLS

18.1------Rights of Former Owners--------------------------   17
18.2------Plugging------------------------------------------   18

ARTICLE 19

EFFECTIVE DATE AND TERM

19.1------Effective Date------------------------------------   18
19.2------Term----------------------------------------------   18

ARTICLE 20

ABANDONMENT OF OPERATIONS

20.1------Termination---------------------------------------   18
          20.1.1 Oil and Gas Rights-------------------------   19
          20.1.2 Right to Operate---------------------------   19
          20.1.3 Salvaging Wells----------------------------   19
          20.1.4 Cost of Salvaging--------------------------   19

ARTICLE 21

EXECUTION

21.1------Original, Counterpart, or Other Instrument-------   19

ARTICLE 22

SUCCESSORS AND ASSIGNS

22.1------Successors and Assigns----------------------------   20
22.2------Unit Operator, Agent------------------------------   20

EXHIBITS

          Exhibit C: Unit Participation--------------------
          Exhibit D: Accounting Procedure------------------
          Exhibit E: Insurance Provision-------------------

UNIT OPERATING AGREEMENT

KUEHNE RANCH UNIT, CAMPBELL COUNTY, WYOMING

THIS AGREEMENT, entered into as of the 1st day of September,
1967, by the parties who have signed the original of this instru-
ment, a counterpart thereof, or other instrument agreeing to be
bound by the provisions hereof;

W I T N E S S E T H:

WHEREAS, The parties hereto as Working Interest Owners have
executed, as of the date hereof, an agreement entitled, "Unit
Agreement, Kuehne Ranch Unit, Campbell County, Wyoming", herein
referred to as "Unit Agreement", which, among other things, pro-
vides for a separate agreement to be entered into by Working In-
terest Owners to provide for the development and operation of the
Unit Area as therein defined;

NOW, THEREFORE, In consideration of the mutual agreements
herein set forth, it is agreed as follows:

ARTICLE 1

CONFIRMATION OF UNIT AGREEMENT

1.1 CONFIRMATION OF UNIT AGREEMENT. The Unit Agreement is here-
by confirmed and by reference made a part of this agreement.  The
definitions in the Unit Agreement are adopted for all purposes
of this agreement.  If there is any conflict between the Unit
Agreement and this agreement, the Unit Agreement shall govern.

ARTICLE 2

EXHIBITS

2.1 EXHIBITS. The following exhibits are incorporated herein
by reference:

2.1.1 EXHIBITS A AND B of the Unit Agreement.

2.1.2 EXHIBIT C, attached hereto, which is a schedule
showing the Working Interest of each Working Interest Owner
in each Tract, the percentage of total Unit Participation

1

attributable to each such interest, and the total Unit Par-
ticipation of each Working Interest Owner.  Exhibit C, or a
revision thereof, shall not be conclusive as to the information
therein, except it may be used as showing the Unit Participations
of the Working Interest Owners for purposes of this agreement
until shown to be in error or is revised as herein authorized.

2.1.3 EXHIBIT D, attached hereto, which is the Accounting
Procedure applicable to Unit Operations.  If there is any
conflict between this agreement and Exhibit D, this agreement
shall govern.

2.1.4 EXHIBIT E, attached hereto, which contains insur-
ance provisions applicable to Unit Operations.

2.2 REVISION OF EXHIBITS. Whenever Exhibits A and B are revised,
Exhibit C shall be revised accordingly and be effective as of the
same date.  Unit Operator shall also revise Exhibit C from time
to time as required to conform to changes in ownership of which
Unit Operator has been notified as provided in the Unit Agreement.

ARTICLE 3

SUPERVISION OF OPERATIONS BY WORKING INTEREST OWNERS

3.1 OVERALL SUPERVISION. Working Interest Owners shall exercise
overall supervision and control of all matters pertaining to Unit
Operations pursuant to this agreement and the Unit Agreement.  In
the exercise of such authority, each Working Interest Owner shall
act solely in its own behalf in the capacity of an individual owner
and not on behalf of the owners as an entirety.

3.2 SPECIFIC AUTHORITIES AND DUTIES. The matters with respect
to which the Working Interest Owners shall decide and take action
shall include, but not be limited to, the following:

3.2.1 METHOD OF OPERATION. The method of operation, in-
cluding any type of pressure maintenance, secondary recovery,

-2-

or other recovery program to be employed.

3.2.2 <u>DRILLING OF WELLS</u>. The drilling of any well whether for production of Unitized Substances, for use as an injection well, or for other purposes.

3.2.3 <u>WELL RECOMPLETIONS AND CHANGE OF STATUS</u>. The re-completion, abandonment, or change of status of any well, or the use of any well for injection or other purposes.

3.2.4 <u>EXPENDITURES</u>. The making of any single expenditure in excess of Ten Thousand Dollars ($10,000.00); provided that, approval by Working Interest Owners of the drilling, reworking, deepening, or plugging back of any well shall include approval of all necessary expenditures required therefor, and for completing, testing, and equipping the same, including necessary flow lines, separators, and lease tankage.

3.2.5 <u>DISPOSITION OF UNIT EQUIPMENT.</u> The selling or other-wise disposing of any major item of surplus Unit Equipment, if the current list price of new equipment similar thereto is Ten Thousand Dollars ($10,000.00) or more.

3.2.6 <u>APPEARANCE BEFORE A COURT OR REGULATORY AGENCY</u>. The designating of a representative to appear before any court or regulatory agency in matters pertaining to Unit Operations; provided that, such designation shall not prevent any Working Interest Owner from appearing in person or from designating another representative in its own behalf.

3.2.7 <u>AUDITS</u>. The auditing of the accounts of Unit Operator pertaining to Unit Operations hereunder; provided that, the audits shall

      (a)   not be conducted more than once each year except upon the resignation or removal of Unit Operator,

-3-

(b)   be made at the expense of all Working Interest
      Owners other than the Working Interest Owner
      designated as Unit Operator, and

(c)   be made upon not less than thirty (30) days'
      written notice to Unit Operator.

3.2.8 INVENTORIES. The taking of periodic inventories
under the terms of Exhibit D.

3.2.9 TECHNICAL SERVICES. The authorizing of charges to
the joint account for services by consultants or Unit Operator's
technical personnel not covered by the overhead charges pro-
vided by Exhibit D.

3.2.10 ASSIGNMENTS TO COMMITTEES. The appointment of
committees to study any problems in connection with Unit
Operations.

3.2.11 The removal of Unit Operator and the selection of
a successor.

3.2.12 The enlargement of the Unit Area.

3.2.13 The adjustment and readjustment of investments.

3.2.14 The termination of the Unit Agreement.

ARTICLE 4

MANNER OF EXERCISING SUPERVISION

4.1 DESIGNATION OF REPRESENTATIVES. Each Working Interest
Owner shall in writing inform Unit Operator of the names and ad-
dresses of the representative and alternate who are authorized to
represent and bind such Working Interest Owner with respect to
Unit Operations.  The representative or alternate may be changed
from time to time by written notice to Unit Operator.

4.2 MEETINGS. All meetings of Working Interest Owners shall
be called by Unit Operator upon its own motion or at the request

-4-

of one or more Wo...ing Interest Owners having a total Unit Participation of not less than twenty-five percent (25%). No meeting shall be called on less than fourteen (14) days' advance written notice, with agenda for the meeting attached. Working Interest Owners who attend the meeting shall not be prevented from amending items included in the agenda or from deciding the amended item or other items presented at the meeting. The representative of Unit Operator shall be chairman of each meeting.

4.3 VOTING PROCEDURE. Working Interest Owners shall decide all matters coming before them as follows:

4.3.1 VOTING INTEREST. Each Working Interest Owner shall have a voting interest equal to its Unit Participation.

4.3.2 VOTE REQUIRED. Unless otherwise provided herein or in the Unit Agreement, all matters shall be decided by an affirmative vote of seventy percent (70%) or more voting interest; provided that, should any one Working Interest Owner have more than fifty percent (50%) voting interest, its vote must be supported by the vote of one or more Working Interest Owners having a combined voting interest of at least twenty percent (20%).

4.3.3 VOTE AT MEETING BY NONATTENDING WORKING INTEREST OWNER. Any Working Interest Owner who is not represented at a meeting may vote by letter or telegram addressed to the representative of the Unit Operator if its vote is received prior to the vote on the item.

4.3.4 POLL VOTES. Working Interest Owners may vote on and decide, by letter or telegram, any matter submitted in writing to Working Interest Owners, if no meeting is requested, as provided in Section 4.2, within seven (7) days after the proposal is sent to Working Interest Owners. Unit Operator will give prompt notice of the results of the voting to all Working Interest Owners.

-5-

ARTICLE 5

INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1 RESERVATION OF RIGHTS. Working Interest Owners severally reserve to themselves all their rights, except as otherwise provided in this agreement and the Unit Agreement.

5.2 SPECIFIC RIGHTS. Each Working Interest Owner shall have, among others, the following specific rights:

5.2.1 ACCESS TO UNIT AREA. Access to the Unit Area at all reasonable times to inspect Unit Operations, all wells, and the records and data pertaining thereto.

5.2.2 REPORTS. The right to receive from Unit Operator, upon written request, copies of all reports to any governmental agency, reports of crude oil runs and stocks, inventory reports, and all other information pertaining to Unit Operations. The cost of gathering and furnishing information not ordinarily furnished by Unit Operator to all Working Interest Owners shall be charged to the Working Interest Owner who requests the information.

ARTICLE 6

UNIT OPERATOR

6.1 INITIAL UNIT OPERATOR. Vaughn Petroleum, Inc. is hereby designated as Unit Operator.

6.2 RESIGNATION OR REMOVAL. Unit Operator may resign at any time. Working Interest Owners may remove Unit Operator at any time by the affirmative vote of at least seventy percent (70%) of the voting interest remaining after excluding the voting interest of Unit Operator. A Unit Operator that resigns or is removed shall not be released from its obligations hereunder for a period of three (3) months after the resignation or discharge, unless a

-6-

successor Unit Operator has taken over Unit Operations prior to the expiration of such period.

6.3 <u>SELECTION OF SUCCESSOR</u>. Upon the resignation or removal of a Unit Operator, a successor Unit Operator shall be selected by Working Interest Owners.  If the Unit Operator that is removed votes only to succeed itself, the successor Unit Operator may be selected by the affirmative vote of at least seventy percent (70%) of the voting interest remaining after excluding the voting interest of the Unit Operator that was removed.

ARTICLE 7

AUTHORITIES AND DUTIES OF UNIT OPERATOR

7.1 <u>EXCLUSIVE RIGHT TO OPERATE UNIT</u>. Subject to the provisions of this agreement and to instructions from Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations.

7.2 <u>WORKMANLIKE CONDUCT.</u> Unit Operator shall conduct Unit Operations in a good and workmanlike manner as would a prudent operator under the same or similar circumstances.  Unit Operator shall freely consult with Working Interest Owners and keep them informed of all matters which Unit Operator, in the exercise of its best judgment, considers important.  Unit Operator shall not be liable to Working Interest Owners for damages, unless such damages result from its gross negligence or willful misconduct.

7.3 <u>LIENS AND ENCUMBRANCES</u>. Unit Operator shall endeavor to keep the lands and leases in the Unit Area free from all liens and encumbrances occasioned by Unit Operations, except the lien of Unit Operator granted hereunder.

7.4 <u>EMPLOYEES</u>. The number of employees used by Unit Operator in conducting Unit Operations, their selection, hours of labor,

and compensation shall be determined by Unit Operator.  Such
employees shall be the employees of Unit Operator.

7.5 RECORDS. Unit Operator shall keep correct books, accounts,
and records of Unit Operations.

7.6 REPORTS TO WORKING INTEREST OWNERS. Unit Operator shall
furnish to Working Interest Owners periodic reports of Unit
Operations.

7.7 REPORTS TO GOVERNMENTAL AUTHORITIES. Unit Operator shall
make all reports to governmental authorities that it has the duty
to make as Unit Operator.

7.8 ENGINEERING AND GEOLOGICAL INFORMATION. Unit Operator
shall furnish to a Working Interest Owner, upon written request,
a copy of the log and other engineering and geological data per-
taining to wells drilled for Unit Operations.

7.9 EXPENDITURES. Unit Operator is authorized to make single
expenditures not in excess of Ten Thousand Dollars ($10,000.00)
without prior approval of Working Interest Owners.  If an emer-
gency occurs, Unit Operator may immediately make or incur such
expenditures as in its opinion are required to deal with the
emergency.  Unit Operator shall report to Working Interest Owners,
as promptly as possible, the nature of the emergency and the action
taken.

7.10 WELLS DRILLED BY UNIT OPERATOR. All wells drilled by
Unit Operator shall be at the usual rates prevailing in the area.
Unit Operator may employ its own tools and equipment, but the charge
therefor shall not exceed the prevailing rate in the area, and the
work shall be performed by Unit Operator under the same terms and
conditions as are usual in the area in contracts of independent
contractors doing work of a similar nature.

-8-

ARTICLE 8

TAXES

8.1 AD VALOREM TAXES. Unit Operator shall make and file all necessary ad valorem tax renditions and returns with the proper taxing authorities covering all real and personal property of each Working Interest Owner used or held by Unit Operator in Unit Operations. Unit Operator shall settle assessments arising therefrom. All such ad valorem taxes shall be paid by Unit Operator and charged to the joint account; provided that, if the interest of a Working Interest Owner is subject to a separately assessed overriding royalty interest, production payment, or other interest in excess of a one-eighth (1/8) royalty, such Working Interest Owner shall be given credit for the reduction in taxes paid resulting therefrom.

8.2 OTHER TAXES. Each Working Interest Owner shall pay or cause to be paid all production, severance, gathering, and other taxes imposed upon or in respect of the production or handling of its share of Unitized Substances.

ARTICLE 9

INSURANCE

9.1 INSURANCE. Unit Operator, with respect to Unit Operations, shall do the following:

9.1.1 Comply with the Workmen's Compensation Law of the State of Wyoming.

9.1.2 Carry Employer's Liability and other insurance as required by the laws of the State of Wyoming.

9.1.3 Carry other insurance as set forth in Exhibit E.

ARTICLE 10

ADJUSTMENT OF INVESTMENTS

10.1 PERSONAL PROPERTY TAKEN OVER. Upon the Effective Date hereof, Working Interest Owners shall deliver to Unit Operator the following:

-9-

10.1.1 <u>WELLS AND CASING</u>. All wells completed in the Unitized Formation, together with the casing therein.

10.1.2 <u>WELL AND LEASE EQUIPMENT</u>. The tubing in each such well, the wellhead connections thereon, and all other lease and operating equipment that is used in the operation of such wells which Working Interest Owners determine is necessary or desirable for conducting Unit Operations.

10.1.3 <u>RECORDS</u>. A copy of all production and well records that pertain to such wells.

10.2 <u>INVENTORY AND EVALUATION OF PERSONAL PROPERTY</u>. Working Interest Owners shall at Unit Expense inventory and evaluate in accordance with the provisions of Exhibit D the personal property taken over.

10.3 <u>INVESTMENT ADJUSTMENT</u>. Upon approval by Working Interest Owners of the inventory and evaluation, each Working Interest Owner shall be credited with the value of its interest in all personal property taken over under Section 10.1.2, and shall be charged with an amount equal to that obtained by multiplying the total value of all personal property taken over under Section 10.1.2 by such Working Interest Owner's Unit Participation. If the charge against any Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be an item of Unit Expense chargeable against such Working Interest Owner. If the credit to any Working Interest Owner is greater than the amount charged against such Working Interest Owner, the resulting net credit shall be paid to such Working Interest Owner by Unit Operator out of funds received by it in settlement of the net charges described above.

10.4 <u>GENERAL FACILITIES</u>. The acquisition of warehouses, ware-house stocks, lease houses, camps, facility systems, and office buildings necessary for Unit Operations shall be by negotiation by the owners thereof and Unit Operator, subject to the approval of Working Interest Owners.

10.5 <u>OWNERSHIP OF PERSONAL PROPERTY AND FACILITIES</u>. Each Working Interest Owner, individually, shall by virtue hereof own an undivided interest, equal to its Unit Participation, in all personal property and facilities taken over or otherwise acquired by Unit Operator pursuant to this agreement.

ARTICLE 11

UNIT EXPENSE

11.1 <u>BASIS OF CHARGE TO WORKING INTEREST OWNERS</u>. Unit Operator initially shall pay all Unit Expense. Each Working Interest Owner shall reimburse Unit Operator for its share of Unit Expense. Each Working Interest Owner's share shall be the same as its Unit Par-ticipation. All charges, credits, and accounting for Unit Expense shall be in accordance with Exhibit D.

11.2 <u>BUDGETS</u>. Before or as soon as practical after the effective date hereof, Unit Operator shall prepare a budget of estimated Unit Expense for the remainder of the calendar year, and, on or before the first day of each October thereafter, shall prepare such a budget for the ensuing calendar year. A budget shall set forth the estimated Unit Expense by quarterly periods. Budgets shall be estimates only, and shall be adjusted or corrected by Working Interest Owners and Unit Operator whenever an adjustment or correction is proper. A copy of each budget and adjusted budget shall promptly be furnished to each Working Interest Owner.

-11-

11.3 <u>ADVANCE BILLINGS</u>. Unit Operator shall have the right to require Working Interest Owners to advance their respective shares of estimated Unit Expense by submitting to Working Interest Owners, on or before the 15th day of any month, an itemized estimate thereof for the succeeding month, with a request for payment in advance. Within fifteen (15) days thereafter, each Working Interest Owner shall pay to Unit Operator its share of such estimate. Adjustments between estimated and actual Unit Expense shall be made by Unit Operator at the close of each calendar month, and the accounts of Working Interest Owners shall be adjusted accordingly.

11.4 <u>COMMINGLING OF FUNDS</u>. No funds received by Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

11.5 <u>LIEN OF UNIT OPERATOR</u>. Each Working Interest Owner grants to Unit Operator a lien upon its Oil and Gas Rights in each Tract, its share of Unitized Substances when produced, and its interest in all Unit Equipment, as security for payment of its share of Unit Expense, together with interest thereon at the rate of ten percent (10%) per annum. Unit Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien. In addition, upon default by any Working Interest Owner in the payment of its share of Unit Expense, Unit Operator shall have the right to collect from the purchaser the proceeds from the sale of such Working Interest Owner's share of Unitized Substances until the amount owed by such Working Interest Owner, plus interest as aforesaid, has been paid. Each purchaser shall be entitled to rely upon Unit Operator's written statement concerning the amount of any default.

11.6 <u>UNPAID UNIT EXPENSE</u>. If any Working Interest Owner fails to pay its share of Unit Expense within sixty (60) days after

-12-

rendition of a statement therefor by Unit Operator, each Working
Interest Owner agrees, upon request by Unit Operator, to pay its
proportionate part of the unpaid share of Unit Expense of the
defaulting Working Interest Owner.  The Working Interest Owners
that pay the share of Unit Expense of a defaulting Working In-
terest Owner shall be reimbursed by the Unit Operator for the
amount so paid, plus any interest collected thereon, upon receipt
by Unit Operator of any past due amount collected from the default-
ing Working Interest Owner.  Any Working Interest Owner so paying
a defaulting Working Interest Owner's share of Unit Expenses shall
be subrogated to the lien and rights herein granted Unit Operator.

11.7 <u>UNCOMMITTED ROYALTY</u>.  Should an owner of a Royalty Interest
in any Tract fail to become a party to the Unit Agreement, and,
as a result thereof, the actual Royalty Interest payments with
respect to such Tract are more or less than the Royalty Interest
payments computed on the basis of the Unitized Substances that are
allocated to such Tract under the Unit Agreement, the difference
shall be borne by or inure to the benefit of Working Interest
Owners in proportion to their respective Unit Participations.
Adjustments shall be made by charges and credits to the joint
account.

11.8 <u>CONSTRUCTION OF PLANTS AND SPECIAL FACILITIES.</u> Unit
Operator shall charge the joint account for overhead for the con-
struction of Water or Gas Injection Plants, other special facilities,
or additions thereto, at the rate of five percent (5%) for the
first Fifty Thousand Dollars ($50.000.00) of investment costs and
two and one-half percent (2 1/2%) for all investment costs in
excess thereof.

-13-

ARTICLE 12

NON-UNITIZED FORMATIONS

12.1 <u>RIGHT TO OPERATE</u>. Any Working Interest Owner that now has
or hereafter acquires the right to drill for and produce oil, gas,
or other minerals, from other than the Unitized Formation, shall
have the right to do so notwithstanding this agreement or the Unit
Agreement.  In exercising the right, however, the Working Interest
Owner shall exercise reasonable precaution to prevent unreasonable
interference with Unit Operations.  No Working Interest Owner shall
produce Unitized Substances through any well drilled or operated
by it.  If any Working Interest Owner drills any well into or through
the Unitized Formation, the Unitized Formation shall be protected
in a manner satisfactory to Working Interest Owners so that the
production of Unitized Substances will not adversely be affected.

12.2 <u>MULTIPLE COMPLETIONS</u>. There shall be no multiple completions
in wells producing Unitized Substances or used for injection pur-
poses hereunder.

ARTICLE 13

TITLES

13.1 <u>WARRANTY AND INDEMNITY</u>.  Each Working Interest Owner
represents and warrants that it is the owner of the respective
working interests set forth opposite its name in Exhibit C, and
hereby agrees to indemnify and hold harmless the other Working In-
terest Owners from any loss due to failure, in whole or in part,
of its title to any such interest, except failure of title arising
out of Unit Operations; provided that, such indemnity shall be
limited to an amount equal to the net value that has been received
from the sale or receipt of Unitized Substances attributed to the
interest as to which title failed.  Each failure of title will be
deemed to be effective, insofar as this agreement is concerned, as

-14-

of the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive adjustment of Unit Expense, or retroactive allocation of Unitized Substances or the proceeds therefrom, as a result of title failure.

13.2 FAILURE BECAUSE OF UNIT OPERATIONS. The failure of title to any Working Interest in any Tract by reason of Unit Operations, including non-production from such Tract, shall not change the Unit Participation of the Working Interest Owner whose title failed in relation to the Unit Participations of the other Working Interest Owners at the time of the title failure.

ARTICLE 14

LIABILITY, CLAIMS AND SUITS

14.1 INDIVIDUAL LIABILITY. The duties, obligations, and liabilities of Working Interest Owners shall be several and not joint or collective; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture, association, or trust among Working Interest Owners.

14.2 SETTLEMENTS. Unit Operator may settle any single damage claim or suit involving Unit Operations but not involving an expenditure in excess of Five Thousand Dollars ($5,000.00) provided the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above specified amount, Working Interest Owners shall assume and take over the further handling of the claim or suit unless such authority is expressly delegated to Unit Operator. All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Unit Expense. If a claim is made against any Working Interest Owner or if any Working Interest Owner is sued on account of any matter arising from Unit Operations and over which such Working Interest Owner individually has no control because of the

-15-

rights given Working Interest Owners and Unit Operator by this agreement and the Unit Agreement, the Working Interest Owner shall immediately notify the Unit Operator, and the claim or suit shall be treated as any other claim or suit involving Unit Operations.

ARTICLE 15

INTERNAL REVENUE PROVISION

15.1 INTERNAL REVENUE PROVISION. Each Working Interest Owner hereby elects that it and the operations covered by this agreement be excluded from the application of Subchapter K of Chapter 1 of Sub-title A of the Internal Revenue Code of 1954, or such portion thereof as the Secretary of the Treasury of the United States or his delegate shall permit by election to be excluded therefrom. Unit Operator is hereby authorized and directed to execute on behalf of each Working Interest Owner such additional or further evidence of the election as may be required by regulations issued under said Subchapter K.  Should the regulations require each party to execute such further evidence, each Working Interest Owner agrees to execute or join in the execution thereof.  The election hereby made and the other provisions of this paragraph shall apply in like manner to applicable state laws, regulations, and rulings now in effect or hereafter enacted that have an effect similar to the federal provisions referred to herein.

ARTICLE 16

NOTICES

16.1 NOTICES. All notices required hereunder shall be in writing and shall be deemed to have been properly served when sent by mail or telegram to the address of the representative of each Working Interest Owner as furnished to Unit Operator in accordance with Article 4.

-16-

ARTICLE 17

WITHDRAWAL OF WORKING INTEREST OWNER

17.1 WITHDRAWAL. A Working Interest Owner may withdraw from
this agreement by transferring, without warranty of title, either
express or implied, to the other Working Interest Owners who do
not desire to withdraw, all its Oil and Gas Rights together with
its interest in all Unit Equipment and in all wells used in Unit
Operations.  Such transfer shall not relieve said Working Interest
Owner from any obligation or liability incurred prior to the date
of the delivery of the transfer, which delivery may be made to
Unit Operator as Agent for the transferees.  The interest transferred
shall be owned by the transferees in proportion to their respective
Unit Participations.  The transferees, in proportion to the respective
interests so acquired, shall pay transferor, for its interest in
Unit Equipment, the fair salvage value thereof as estimated and
fixed by Working Interest Owners.  After the date of delivery of
the transfer, the withdrawing Working Interest Owner shall be re-
lieved from all further obligations and liability hereunder and
under the Unit Agreement, and the rights of such Working Interest
Owner hereunder and under the Unit Agreement shall cease insofar
as they existed by virtue of the interest transferred.

ARTICLE 18

ABANDONMENT OF WELLS

18.1 RIGHTS OF FORMER OWNERS. If Working Interest Owners de-
cide to abandon permanently any well within the Unit Area prior to
termination of the Unit Agreement, Unit Operator shall give written
notice thereof to the Working Interest Owners of the Tract on which
the well is located, and they shall have the option for a period
of  sixty (60) days after the sending of such notice to notify
Unit Operator in writing of their election to take over and own

-17-

the well.  Within ten (10) days after the Working Interest Owners
of the Tract have notified Unit Operator of their election to take
over the well, they shall pay Unit Operator, for credit to the
joint account, the amount estimated by Working Interest Owners
to be the net salvage value of the casing and equipment in and
on the well.  The Working Interest Owners of the Tract, by taking
over the well, agree to seal off effectively and protect the
Unitized Formation, and upon abandonment to plug the well in com-
pliance with applicable laws and regulations.

18.2 PLUGGING. If the Working Interest Owners of a Tract do
not elect to take over a well located thereon which is proposed
for abandonment, Unit Operator shall plug and abandon the well in
compliance with applicable laws and regulations.

ARTICLE 19

EFFECTIVE DATE AND TERM

19.1 EFFECTIVE DATE. This agreement shall become effective
on the date and at the time that the Unit Agreement becomes
effective.

19.2 TERM. This agreement shall continue in effect so long
as the Unit Agreement remains in effect, and thereafter until
(a) all unit wells have been abandoned and plugged or turned over
to Working Interest Owners in accordance with Article 20, (b) all
Unit Equipment and real property acquired for the joint account have
been disposed of by Unit Operator in accordance with instructions
of Working Interest Owners, and (c) there has been a final accounting.

ARTICLE 20

ABANDONMENT OF OPERATIONS

20.1 TERMINATION. Upon termination of the Unit Agreement,
the following will occur:

-18-

20.1.1 OIL AND GAS RIGHTS. Oil and Gas Rights in and to each separate Tract shall no longer be affected by this agreement, and thereafter the parties shall be governed by the terms and provisions of the leases, contracts, and other instruments affecting the separate Tracts.

20.1.2 RIGHT TO OPERATE. Working Interest Owners of any Tract that desire to take over and continue to operate wells located thereon may do so by paying Unit Operator, for credit to the joint account, the net salvage value of the casing and equipment in and on the wells taken over, as estimated by Working Interest Owners, and by agreeing to plug properly each well at such time as it is abandoned.

20.1.3 SALVAGING WELLS. Unit Operator shall salvage as much of the casing and equipment in or on wells not taken over by Working Interest Owners of separate Tracts as can economically and reasonably be salvaged, and shall cause the wells to be plugged and abandoned properly.

20.1.4 COST OF SALVAGING. Working Interest Owners shall share the cost of salvaging, liquidation or other distribution of assets and properties used in Unit Operation in proportion to their respective Unit Participations.

ARTICLE 21

EXECUTION

21.1 ORIGINAL COUNTERPART, OR OTHER INSTRUMENT. A party may become a party to this agreement by signing the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof.  The signing of any such instrument shall have the same effect as if all the parties had signed the same instrument.

-19-

ARTICLE 22

SUCCESSORS AND ASSIGNS

22.1 <u>SUCCESSORS AND ASSIGNS</u>.  The provisions hereof shall be covenants running with the lands, leases, and interests covered hereby, and shall be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors, and assigns of the parties hereto.

22.2 <u>UNIT OPERATOR, AGENT</u>.  It is recognized that Working Interest Owners, Estate of Grady H. Vaughn, Jr., Deceased, and Jack C. Vaughn, have designated Vaughn Petroleum, Inc. as their agent to perform and carry out their obligations and duties as Unit Operator under this agreement and the Unit Agreement.  Vaughn Petroleum, Inc. joins herein for the purpose of acknowledging and accepting the agency aforesaid.

IN WITNESS WHEREOF, The parties hereto have executed this agreement on the dates opposite their respective signatures.

Date: 10/2/67

VAUGHN PETROLEUM, INC.

By _____
E. H. GUNTER  President
VICE PRESIDENT

ATTEST:

By _____
Secretary

ESTATE OF GRADY H. VAUGHN, JR., DECEASED

Date: 10/2/67

By _____
Jack C. Vaughn and

_____
E. H. Gunter, Independent Executors

Date: 10/2/67

Date: 10/2/67

_____
Jack C. Vaughn

-20-

Date:_____        _____
                                        R. D. Poindexter

Date:_____        _____
                                        Albert Sklar

Date:_____        _____
                                        L. W. Phillips

Date:_____        _____
                                        Curtis E. Calder, Jr., Trustee

                                    SAMEDAN OIL CORPORATION

Date:_____        By_____
                                              _____ President

                                    ATTEST:

                                    By_____


                                    SAMEDAN ASSOCIATES, INC.

Date:_____        By_____
                                              _____ President

                                    ATTEST:

                                    By_____


                                    KIMBARK EXPLORATION COMPANY

Date:_____        By_____
                                              _____ President

                                    ATTEST:

                                    By_____


Date:_____        _____
                                        George Anderman


Date:_____        _____
                                        Ed Boland

                                    SUPERIOR OIL COMPANY

Date:_____        By_____
                                              _____ President

                                    ATTEST:

                                    By_____

-21-

PAN AMERICAN PETROLEUM CORPORATION

Date:_____       By_____
                                                        _____ President

                                      ATTEST:

                                      By_____


DAVIS OIL COMPANY

Date:_____       By_____
                                                        _____ President

                                      ATTEST:

                                      By_____


Date:_____       _____
                                          Raymond  Chorney


SINCLAIR OIL & GAS COMPANY

Date:_____       By_____
                                                        _____ President

                                      ATTEST:

                                      By_____


UNION OIL COMPANY OF CALIFORNIA

Date:_____       By_____
                                                        _____ President

                                      ATTEST:

                                      By_____


AMERADA PETROLEUM COMPANY

Date:_____       By_____
                                                        _____ President

                                      ATTEST:

                                      By_____


WORKING  INTEREST  OWNERS

-22-

Date:_____        _____
                              Marna M. Kuehne

Date:_____        _____
                              Herman J. Kuehne

Date:_____        _____

Date:_____        _____

ROYALTY OWNERS

-23-

THE STATE OF TEXAS        )
                          )
COUNTY   OF   DALLAS      )

    I, *Helen Bahlau*_____, a Notary Public within and for said County and State, do hereby certify that *E. A. Gunter*_____ and *O. E. Jones*_____, to me personally known and known to me to be the *Vice* President and Secretary, respectively, of VAUGHN PETROLEUM, INC., the grantor in the annexed instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed, and as the free act and deed of the said VAUGHN PETROLEUM, INC., for the uses and purposes therein set forth.

    IN WITNESS WHEREOF, I hereunto set my hand and affixed my official seal this the *2* day of *October*, 1967.

                             *Helen Bahlau*
                               Notary Public

HELEN BAHLAU
Notary Public Dallas County, Texas
My Commission Expires June 1, 1969


THE STATE OF TEXAS        )
                          )
COUNTY   OF   DALLAS      )

    I, *Helen Bahlau*_____, do hereby certify that JACK C. VAUGHN and E. H. GUNTER, personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act, for the uses and purposes therein set forth, and in the capacities therein stated.

    Given under my hand and seal this *2* day of *October*, 1967.

                               *Helen Bahlau*
                               Notary Public

HELEN BAHLAU
Notary Public Dallas County, Texas
My Commission Expires June 1, 1969

THE STATE OF _____ )
                           )        (CORPORATE ACKNOWLEDGMENT)
COUNTY OF _____ )

    I, _____, a Notary Public within and for said County and State, do hereby certify that _____ and _____, to me personally known and known to me to be the _____ President and Secretary, respectively, of _____, the grantor in the annexed instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed, and as the free act and deed of the said _____, for the uses and purposes therein set forth.

    IN WITNESS WHEREOF, I hereunto set my hand and affixed my official seal this the _____ day of _____, 1967.

                                  _____
                                      Notary Public


THE STATE OF_____ )
                   )        (SINGLE ACKNOWLEDGMENT)
COUNTY OF _____ )

    I, _____, do hereby certify that _____ _____, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered said instrument as his free and voluntary act, for the uses and purposes therein set forth, and in the capacity therein stated.

    Given under my hand and seal this _____ day of _____, 1967.

                                    _____
                                      Notary Public

KUEHNE RANCH UNIT
CAMPBELL COUNTY, WYOMING

EXHIBIT A

TRACTS AND TRACT PARTICIPATION

| TRACT NO. | TRACT NAME | LAND DESCRIPTION | ACRES | TRACT PARTICIPATION |
|---|---|---|---|---|
| 1. | L.A.Williams | SW$\frac{1}{4}$ NW$\frac{1}{4}$ & NW$\frac{1}{4}$ SW$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .00046 |
| 2. | I.J.Cuthbert #1 | E$\frac{1}{2}$ NW$\frac{1}{4}$ & NE$\frac{1}{4}$ SW$\frac{1}{4}$ Sec. 12-51N-70W | 120 | .00718 |
| 3. | Federal W-0296791A | W$\frac{1}{2}$ NE$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .00239 |
| 4. | Kane #1 | E$\frac{1}{2}$ NE$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .00097 |
| 5. | H.J. Kuehne #1 | N$\frac{1}{2}$ SE$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .08382 |
| 6. | Federal W-0296442 | Lot 3 Sec. 7-51N-69W | 36.40 | .00002 |
| 7. | M. Kuehne #2 | S$\frac{1}{2}$ SW$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .07456 |
| 8. | H. J. Kuehne #12-1 | S$\frac{1}{2}$ SE$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .06665 |
| 9. | H. J. Kuehne | Lot 4 & SE$\frac{1}{4}$ SW$\frac{1}{4}$ Sec. 7-51N-69W | 76.51 | .00227 |
| 10. | M. Kuehne | NW$\frac{1}{4}$ NW$\frac{1}{4}$ Sec. 13-51N-70W | 40 | .00003 |
| 11. | M. Kuehne | E$\frac{1}{2}$ NW$\frac{1}{4}$ Sec. 13-51N-70W | 80 | .00617 |
| 12. | M. Kuehne #13-1 | W$\frac{1}{2}$ NE$\frac{1}{4}$ Sec. 13-51N-70W | 80 | .47553 |
| 13. | M. Kuehne #1-A | E$\frac{1}{2}$ NE$\frac{1}{4}$ Sec. 13-51N-70W | 80 | .19165 |
| 14. | M. Kuehne #1 | W$\frac{1}{2}$ NW$\frac{1}{4}$ Sec. 18-51N-69W | 80 | .08576 |
| 15. | M. Kuehne | E$\frac{1}{2}$ NW$\frac{1}{4}$ Sec. 18-51N-69W | 80 | .00251 |
| 16. | M. Kuehne | NW$\frac{1}{4}$ NE$\frac{1}{4}$ Sec. 18-51N-69W | 40 | .00003 |
|  |  |  |  | 1.00000 |



| WORKING INTEREST OWNER | WORKING INTEREST IN TRACT | UNIT PARTICIPATION |
|---|---|---|
| Est. G.H.Vaughn,Dec. | .12500 | .0083312 |
| Jack C. Vaughn | .12500 | .0083312 |
| R. D. Poindexter | .06250 | .0041656 |
| Albert Sklar | .06250 | .0041656 |
| L. W. Phillips | .06250 | .0041656 |
| C.E. Calder, Jr. Tr. | .06250 | .0041656 |
| Samedan Oil Corp. | .37500 | .0249937 |
| Samedan Associates, Inc. | .12500 | .0083313 |
| | | |
| Est. G.H.Vaughn,Dec. | .12500 | .0002837 |
| Jack C. Vaughn | .12500 | .0002837 |
| R. D. Poindexter | .06250 | .0001419 |
| Albert Sklar | .06250 | .0001419 |
| L. W. Phillips | .06250 | .0001419 |
| C. E. Calder,Jr. Tr. | .06250 | .0001419 |
| Samedan Oil Corp. | .37500 | .0008513 |
| Samedan Associates,Inc. | .12500 | .0002838 |
| | | |
| Pan American Pet. | 1.00000 | .0000300 |
| | | |
| Est. G.H.Vaughn, Dec. | .04167 | .0002570 |
| Jack C. Vaughn | .04167 | .0002570 |
| R. D. Poindexter | .02084 | .0001286 |
| Albert Sklar | .02084 | .0001286 |
| L. W. Phillips | .02083 | .0001285 |
| C. E. Calder,Jr., Tr. | .02083 | .0001285 |
| Samedan Oil Corp. | .12498 | .0007711 |
| Samedan Associates,Inc. | .04167 | .0002571 |
| Kimbark Expl. Co. | .33333 | .0020566 |
| George Anderman | .16667 | .0010284 |
| Ed Boland | .16667 | .0010284 |
| | | |
| Est. G.H.Vaughn,Dec. | .12500 | .0594413 |
| Jack C. Vaughn | .12500 | .0594413 |
| R. D. Poindexter | .06250 | .0297206 |
| Albert Sklar | .06250 | .0297206 |
| L. W. Phillips | .06250 | .0297206 |
| C. E. Calder, Jr.,Tr. | .06250 | .0297206 |
| Samedan Oil Corp. | .37500 | .1783238 |
| Samedan Associates,Inc. | .12500 | .0594413 |
| | | |
| Union Oil of Calif. | 1.00000 | .1916500 |

| TRACT NO. | TRACT NAME | WORKING INTEREST OWNER | WORKING INTEREST IN TRACT | UNIT PARTICIPATION |
|---|---|---|---|---|
| 14. | M. Kuehne #1 | Est. G.H.Vaughn, Dec. | .12500 | .0107200 |
|  |  | Jack C. Vaughn | .12500 | .0107200 |
|  |  | R. D. Poindexter | .06250 | .0053600 |
|  |  | Albert Sklar | .06250 | .0053600 |
|  |  | L. W. Phillips | .06250 | .0053600 |
|  |  | C. E. Calder, Jr., Tr. | .06250 | .0053600 |
|  |  | Samedan Oil Corp. | .37500 | .0321600 |
|  |  | Samedan Associates, Inc. | .12500 | .0107200 |
|  |  |  |  |  |
| 15. | M. Kuehne | Est.G.H.Vaughn, Dec. | .06250 | .0001569 |
|  |  | Jack C. Vaughn | .06250 | .0001569 |
|  |  | R.D. Poindexter | .03125 | .0000785 |
|  |  | Albert Sklar | .03125 | .0000785 |
|  |  | L. W. Phillips | .03125 | .0000784 |
|  |  | C. E. Calder, Jr. Tr. | .03125 | .0000784 |
|  |  | Samedan Oil Corp. | .18750 | .0004706 |
|  |  | Samedan Associates, Inc. | .06250 | .0001569 |
|  |  | Amerada Pet.Co. | .50000 | .0012550 |
| 16. | M. Kuehne | Amerada Pet.Co. | 1.00000 | .0000300 |
|  |  |  |  | 1.0000000 |

KUEHNE RANCH UNIT
CAMPBELL COUNTY, WYOMING

EXHIBIT C

UNIT PARTICIPATION

SUMMARY

| WORKING INTEREST OWNER | TRACT NOS. | UNIT PARTICIPATION BY TRACTS | TOTAL UNIT PARTICIPATION OF EACH OWNER |
|---|---|---|---|
| Est. G. H. Vaughn, Dec. | 1 | .0000096 | |
| " | 2 | .0001495 | |
| " | 8 | .0083312 | |
| " | 9 | .0002837 | |
| " | 11 | .0002570 | |
| " | 12 | .0594413 | |
| " | 14 | .0107200 | |
| " | 15 | .0001569 | .0793492 |
| Jack C. Vaughn | 1 | .0000096 | |
| " | 2 | .0001495 | |
| " | 8 | .0083312 | |
| " | 9 | .0002837 | |
| " | 11 | .0002570 | |
| " | 12 | .0594413 | |
| " | 14 | .0107200 | |
| " | 15 | .0001569 | .0793492 |
| R. D. Poindexter | 1 | .0000048 | |
| " | 2 | .0000748 | |
| " | 8 | .0041656 | |
| " | 9 | .0001419 | |
| " | 11 | .0001286 | |
| " | 12 | .0297206 | |
| " | 14 | .0053600 | |
| " | 15 | .0000785 | .0396748 |
| Albert Sklar | 1 | .0000048 | |
| " | 2 | .0000748 | |
| " | 8 | .0041656 | |
| " | 9 | .0001419 | |
| " | 11 | .0001286 | |
| " | 12 | .0297206 | |
| " | 14 | .0053600 | |
| " | 15 | .0000785 | .0396748 |

.0396746
.2779349

| WORKING INTEREST OWNER | TRACT NOS. | UNIT PARTICIPATION BY TRACTS | TOTAL UNIT PARTICIPATION OF EACH OWNER |
|---|---|---|---|
| L. W. Phillips | 1 | .0000048 | |
| " | 2 | .0000748 | |
| " | 8 | .0041656 | |
| " | 9 | .0001419 | |
| " | 11 | .0001285 | |
| " | 12 | .0297206 | |
| " | 14 | .0053600 | |
| " | 15 | .0000784 | .0396746 |
| | | | |
| C. E. Calder, Jr. Tr. | 1 | .0000048 | |
| " | 2 | .0000748 | |
| " | 8 | .0041656 | |
| " | 9 | .0001419 | |
| " | 11 | .0001285 | |
| " | 12 | .0297206 | |
| " | 14 | .0053600 | |
| " | 15 | .0000784 | .0396746 |
| | | | |
| Samedan Oil Corporation | 1 | .0000288 | |
| " | 2 | .0004488 | |
| " | 8 | .0249937 | |
| " | 9 | .0008513 | |
| " | 11 | .0007711 | |
| " | 12 | .1783238 | |
| " | 14 | .0321600 | |
| " | 15 | .0004706 | .2380481 |
| | | | |
| Samedan Associates, Inc. | 1 | .0000096 | |
| " | 2 | .0001496 | |
| " | 8 | .0083313 | |
| " | 9 | .0002838 | |
| " | 11 | .0002571 | |
| " | 12 | .0594413 | |
| " | 14 | .0107200 | |
| " | 15 | .0001569 | .0793496 |
| | | | |
| Kimbark Exploration Co. | 1 | .0000767 | |
| " | 2 | .0011967 | |
| " | 11 | .0020566 | .0033300 |
| | | | |
| George Anderman | 1 | .0000383 | |
| " | 2 | .0005983 | |
| " | 11 | .0010284 | .0016650 |
| | | | |
| Ed Boland | 1 | .0000383 | |
| " | 2 | .0005983 | |
| " | 11 | .0010284 | .0016650 |

| WORKING INTEREST OWNER | TRACT NOS. | UNIT PARTICIPATION BY TRACTS | TOTAL UNIT PARTICIPATION OF EACH OWNER |
|---|---|---|---|
| Superior Oil Company | 1 | .0002300 | |
| " | 2 | .0035900 | .0038200 |
| Pan American Petroleum Corp. | 3 | .0023900 | |
| " | 4 | .0006732 | |
| " | 10 | .0000300 | .0030932 |
| Davis Oil Company | 4 | .0002244 | |
| " | 5 | .0261938 | |
| " | 6 | .0000200 | .0264382 |
| Raymond Chorney | 4 | .0000724 | |
| " | 5 | .0157163 | .0157887 |
| Sinclair Oil & Gas Company | 5 | .0419100 | .0419100 |
| Union Oil of California | 7 | .0745600 | |
| " | 13 | .1916500 | .2662100 |
| Amerada Petroleum Company | 15 | .0012550 | |
| " | 16 | .0000300 | .0012850 |
| TOTAL | | 1.0000000 | 1.0000000 |

EXHIBIT "D"

Recommended by the Council of Petroleum Accountants Societies of North America.

Attached to , made a part of Unit Operating Agreement
dated September 1, 1967, Kuehne Ranch Unit,
Campbell County, Wyoming

# ACCOUNTING PROCEDURE
### (JOINT OPERATIONS)

## I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this "Accounting Procedure" is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the nonoperating parties, whether one or more.

"Joint Account" shall mean the account showing the charges and credits accruing because of the Joint Operations and which are to be shared by the Parties.

"Parties" shall mean Operator and Non-Operators.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

**2. Conflict with Agreement**

In the event of a conflict between the provisions of this Accounting Procedure and the provisions of the agreement to which this Accounting Procedure is attached, the provisions of the agreement shall control.

**3. Collective Action by Non-Operators**

Where an agreement or other action of Non-Operators is expressly required under this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the agreement or action of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

**4. Statements and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of costs and expenses, for the preceding month. Such bills will be accompanied by statements reflecting the total charges and credits as set forth under Subparagraph A below:

A. Statement in detail of all charges and credits to the Joint Account.

B. Statement of all charges and credits to the Joint Account, summarized by appropriate classifications indicative of the nature thereof.

C. Statement of all charges and credits to the Joint Account summarized by appropriate classifications indicative of the nature thereof, except that items of Controllable Material and unusual charges and credits shall be detailed.

**5. Payment and Advances by Non-Operators**

Each Non-Operator shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid.

**6. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operators to protest or question the correctness thereof; provided however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of the Joint Property as provided for in Section VII.

**7. Audits**

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided however, the making of an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 6 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator.

## II. DIRECT CHARGES

Subject to limitations hereinafter prescribed, Operator shall charge the Joint Account with the following items:

**1. Rentals and Royalties**

Delay or other rentals and royalties when such rentals and royalties are paid by Operator for the Joint Account of the Parties.

**2. Labor**

A. Salaries and wages of Operator's employees directly engaged on the Joint Property in the conduct of the Joint Operations, and salaries or wages of technical employees who are temporarily assigned to and directly employed on the Joint Property.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to the employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1 of Section III; except that in the case of those employees only a pro rata portion of whose salaries and wages are chargeable to the Joint Account under Paragraph 1 of Section III, not more than the same pro rata portion of the benefits and allowances herein provided for shall be charged to the Joint Account. Cost under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II and Paragraph 1 of Section III. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1 of Section III.

D. Reasonable personal expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II and for which expenses the employees are reimbursed under Operator's usual practice.

— 1 —

3. Employee Benefits

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost; provided however, the total of such charges shall not exceed ten percent (10%). Operator's labor costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II and Paragraph 1 of Section III.

4. Material

Material purchased or furnished by Operator for use on the Joint Property. So far as it is reasonably practical and consistent with efficient and economical operation, only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

5. Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:
A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store or railway receiving point where like material is available, except by agreement with Non-Operators.
B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store or railway receiving point, except by agreement with Non-Operators. No charge shall be made to Joint Account for moving Material to other properties belonging to Operator, except by agreement with Non-Operators.
C. In the application of subparagraphs A and B above, there shall be no equalization of actual gross trucking costs of $100 or less.

6. Services

A. The cost of contract services and utilities procured from outside sources other than services covered by Paragraph 8 of this Section II and Paragraph 2 of Section III.
B. Use and service of equipment and facilities furnished by Operator as provided in Paragraph 5 of Section IV.

7. Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or any other cause, except to the extent that the damage or loss could have been avoided through the exercise of reasonable diligence on the part of Operator. Operator shall furnish Non-Operators written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

8. Legal Expense

All costs and expenses of handling, investigating and settling litigation or claims arising by reason of the Joint Operations or necessary to protect or recover the Joint Property, including, but not limited to, attorneys' fees, court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claims; provided, (a) no charge shall be made for the services of Operator's legal staff or other regularly employed personnel (such services being considered to be Administrative Overhead under Section III), except by agreement with Non-Operators, and (b) no charge shall be made for the fees and expenses of outside attorneys unless the employment of such attorneys is agreed to by Operator and Non-Operators.

9. Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

10. Insurance Premiums

Premiums paid for insurance required to be carried on the Joint Property for the protection of the Parties.

11. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator for the necessary and proper conduct of the Joint Operations.

## III. INDIRECT CHARGES

Operator may charge the Joint Account for indirect costs either by use of an allocation of district expense items plus a fixed rate for administrative overhead, and plus the warehousing charges, all as provided for in Paragraphs 1, 2, and 3 of this Section III OR by combining all three of said items under the fixed rate provided for in Paragraph 4 of this Section III, as indicated next below:

### OPERATOR SHALL CHARGE THE JOINT ACCOUNT UNDER THE TERMS OF:

☐ Paragraphs 1, 2 and 3. (Allocation of district expense plus fixed rate for administrative overhead plus warehousing.)

☒ Paragraph 4. (Combined fixed rate)

1. District Expense

Operator shall charge the Joint Account with a pro rata portion of the salaries, wages and expenses of Operator's production superintendent and other employees serving the Joint Property and other properties of the Operator in the same operating area, whose time is not allocated directly to the properties, and a pro rata portion of the cost of maintaining and operating a production office known as Operator's ............................................................................................ office located at or near ...................................................... (or a comparable office if location changed), and necessary sub-offices (if any), maintained for the convenience of the above-described office, and all necessary camps, including housing facilities for employees if required, used in connection with the operations of the Joint Property and other properties in the same operating area. The expense of, less any revenue from, such facilities may, at the option of Operator, include depreciation of investment or a fair monthly rental in lieu of depreciation. Such charges shall be apportioned to all properties served on some equitable basis consistent with Operator's accounting practice.

2. Administrative Overhead

Operator shall charge administrative overhead to the Joint Account at the following rates, which charge shall be in lieu of the cost and expense of all offices of the Operator not covered by Paragraph 1 of this Section III, including salaries, wages and expenses of personnel assigned to such offices. Such charges shall be in addition to the salaries, wages and expenses of employees of Operator authorized to be charged as direct charges as provided in Paragraphs 2 and 8 of Section II.

### WELL BASIS (RATE PER WELL PER MONTH)

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) First Five | | All Wells Over Ten |
|---|---|---|---|---|
| | | | Next Five | |
| ................. | ................. | ................. | ................. | ................. |
| ................. | ................. | ................. | ................. | ................. |
| ................. | ................. | ................. | ................. | ................. |
| ................. | ................. | ................. | ................. | ................. |

The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting, or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Paragraph 2 of Section III, unless such cost and expense are agreed upon between Operator and Non-Operators as a direct charge to the Joint Account.

— 2 —

None—either direct or indirect

4. **Combined Fixed Rates**
Operator shall charge the Joint Account for the services covered by Paragraph 1, 2 and 3 of this Section III, the following fixed per well rates:

WELL BASIS (RATE PER WELL PER MONTH)

| Well Depth | DRILLING WELL RATE (Use Total Depth) Each Well | PRODUCING WELL RATE (Use Current Producing Depth) First Five | Next Five | All Wells Over Ten |
|---|---|---|---|---|
| All Depths | $650.00 | $135.00 | $125.00 | $115.00 |

Said fixed rate (does) (shall not) include salaries and expenses of production foremen.

5. **Application of Administrative Overhead or Combined Fixed Rates**
The following limitations, instructions and charges shall apply in the application of the per well rates as provided under either Paragraph 2 or Paragraph 4 of this Section III:
   A. Charges for drilling wells shall begin on the date each well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.
   B. The status of wells shall be as follows:
      (1) Producing gas wells, injection wells for recovery operations, water supply wells utilized for water flooding operations and salt water disposal wells shall be considered the same as producing wells.
      (2) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the well schedule at the time the shutdown is effected. When such a well is plugged a charge shall be made at the producing well rates.
      (3) Wells being plugged back, drilled deeper, converted to a source or input well, or which are undergoing any type of workover that requires the use of a drilling or workover rig shall be considered the same as drilling wells.
      (4) Temporarily shut-down wells, which are not produced or worked upon for a period of a full calendar month, shall not be included in the well schedule, provided however, wells shut in by governmental regulatory body shall be included in the well schedule only in the event the allowable production is transferred to some other well or wells on the Joint Property. In the event of a unit allowable, all wells capable of producing will be counted in determining the charge.
      (5) Gas wells shall be included in the well schedule if directly connected to a permanent sales outlet even though temporarily shut in due to overproduction or failure of purchaser to take the allowed production.
      (6) Wells completed in multiple horizons, in which the production is not commingled down hole, shall be considered as a producing well for each separately producing horizon.
   C. The well rates shall apply to the total number of wells being drilled or operated under the agreement to which this Accounting Procedure is attached, irrespective of individual leases.
   D. The well rates shall be adjusted on the first day of April of each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the preceding calendar year as shown by "The Index of Average Weekly Earnings of Crude Petroleum and Gas Production Workers" as published by the United States Department of Labor, Bureau of Labor Statistics. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.
6. For the construction of compressor plants, water stations, secondary recovery systems, salt water disposal facilities, and other such projects, as distinguished from the more usual drilling and producing operations, Operator in addition to the Administrative Overhead or Combined Fixed Rates provided for in Paragraph 2 and 4 of this Section III, shall charge the Joint Account with an additional overhead charge as follows:
   A. Total cost less than $25,000, no charge.
   B. Total cost more than $25,000 but less than $100,000, __5__ % of total cost.
   C. Total cost of $100,000 or more, __5__ % of the first $100,000 plus __2 1/2__% of all over $100,000 of total cost.
   Total cost shall mean the total gross cost of any one project. For the purpose of this Paragraph the component parts of a single project shall not be treated separately and the cost of drilling wells shall be excluded.
7. The specific rates provided for in this Section III may be amended from time to time by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. BASIS OF CHARGES TO JOINT ACCOUNT
Subject to the further provisions of this Section IV, Operator will procure all Material and services for the Joint Property. At the Operator's option, Non-Operator may supply Material or services for the Joint Property.
1. **Purchases**
   Material purchased and service procured shall be charged at the price paid by Operator after deduction of all discounts actually received.
2. **Material furnished from Operator's Warehouse or Other Properties**
   A. New Material (Condition "A")
      (1) Tubular goods, two inch (2") and over, shall be priced on Eastern Mill base (i. e. Youngstown, Ohio; Lorain, Ohio; and Indiana Harbor, Indiana) on a minimum carload basis effective at date of movement and f. o. b. railway receiving point nearest the Joint Property, regardless of quantity. In equalized hauling charges, Operator is permitted to include ten cents (10c) per hundred-weight on all tubular goods furnished from his stocks in lieu of loading and unloading costs sustained.
      (2) Other Material shall be priced at the current replacement cost of the same kind of Material, effective at date of movement and f. o. b. the supply store or railway receiving point nearest the Joint Property where Material of the same kind is available.
      (3) The Joint Account shall not be credited with cash discounts applicable to prices provided for in this Paragraph 2 of Section IV.
   B. Used Material (Condition "B" and "C")
      (1) Material in sound and serviceable condition and suitable for reuse without reconditioning, shall be classified as Condition "B" and priced at seventy-five per cent (75%) of the current price of new Material.
      (2) Material which cannot be classified as Condition "B" but which,
         (a) After reconditioning will be further serviceable for original function as good secondhand Material (Condition "B"), or
         (b) Is serviceable for original function but substantially not suitable for reconditioning, shall be classified as Condition "C" and priced at fifty per cent (50%) of current new price.
      (3) Obsolete Material or Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use. Material no longer suitable for its original purpose but usable for

*Should such construction become necessary, rates will then be negotiated.

~~some other purpose, shall be priced on a basis comparable with that of items normally used for such other~~ purpose.

(4) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Materi'

**3. Premium Prices**

Whenever Material is not readily obtainable at prices specified in Paragraphs 1 and 2 of this Section IV because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in procuring such Material, in making it suitable for use, and in moving it to the Joint Property, provided, that notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

**4. Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

**5. Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of equipment and facilities at rates commensurate with cost of ownership and operation. Such rates shall include cost of maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on investment not to exceed six per cent (6%) per annum, provided such rates shall not exceed those currently prevailing in the immediate area within which the Joint Property is located. Rates for automotive equipment shall generally be in line with the schedule of rates adopted by the Petroleum Motor Transport Association, or some other recognized organization, as recommended uniform charges against Joint Property operations. Rates for laboratory services shall not exceed those currently prevailing if performed by outside service laboratories. Rates for trucks, tractors and well service units may include wages and expenses of operator.

B. Whenever requested, Operator shall inform Non-Operators in advance of the rates it proposes to charge.

C. Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## V. DISPOSAL OF MATERIAL

The Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus Condition "A" or "B" Material. The disposition of surplus Controllable Material, not purchased by Operator, shall be subject to agreement between Operator and Non-Operators, provided Operator shall dispose of normal accumulations of junk and scrap Material either by transfer or sale from the Joint Property.

**1. Material Purchased by the Operator or Non-Operators**

Material purchased by either the Operator or Non-Operators shall be credited by the Operator to the Joint Account for the month in which the Material is removed by the purchaser.

**2. Division In Kind**

Division of Material in kind, if made between Operator and Non-Operators, shall be in proportion to the respective interests in such Material. The Parties will thereupon be charged individually with the value of the Material received or receivable. Proper credits shall be made by the Operator in the monthly statement of operations.

**3. Sales to Outsiders**

Sales to outsiders of Material from the Joint Property shall be credited by Operator to the Joint Account at the net amount collected by Operator from vendee. Any claim by vendee related to such sale shall be charged back to the Joint Account if and when paid by Operator.

## VI. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

Material purchased by either Operator or Non-Operators or divided in kind, unless otherwise agreed to between Operator and Non-Operators shall be priced on the following basis:

**1. New Price Defined**

New price as used in this Section VI shall be the price specified for New Material in Section IV.

**2. New Material**

New Material (Condition "A"), being new Material procured for the Joint Property but never used, at one hundred per cent (100%) of current new price (plus sales tax if any).

**3. Good Used Material**

Good used Material (Condition "B"), being used Material in sound and serviceable condition, suitable for reuse without reconditioning:

A. At seventy-five per cent (75%) of current new price if Material was charged to Joint Account as new, or

B. At sixty-five per cent (65%) of current new price if Material was originally charged to the Joint Account as secondhand at seventy-five percent (75%) of new price.

**4. Other Used Material**

Used Material (Condition "C"), at fifty per cent (50%) of current new price, being used Material which:

A. Is not in sound and serviceable condition but suitable for reuse after reconditioning, or

B. Is serviceable for original function but not suitable for reconditioning.

**5. Bad-Order Material**

Material (Condition "D"), no longer suitable for its original purpose without excessive repair cost but usable for some other purpose at a price comparable with that of items normally used for such other purpose.

**6. Junk Material**

Junk Material (Condition "E"), being obsolete and scrap Material, at prevailing prices.

**7. Temporarily Used Material**

When the use of Material is temporary and its service to the Joint Property does not justify the reduction in price as provided for in Paragraph 3 B of this Section VI, such Material shall be priced on a basis that will leave a net charge to the Joint Account consistent with the value of the service rendered.

## VII. INVENTORIES

The Operator shall maintain detailed records of Material generally considered controllable by the Industry.

**1. Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Material, which shall include all such Material as is ordinarily considered controllable. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator, who shall in that event furnish Non-Operators with a copy thereof.

**2. Reconciliation and Adjustment of Inventories**

Reconciliation of inventory with charges to the Joint Account shall be made, and a list of overages and shortages shall be jointly determined by Operator and Non-Operators. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable to Non-Operator only for shortages due to lack of reasonable diligence.

**3. Special Inventories**

Special inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

## EXHIBIT "E"

Attached to Operating Agreement dated <u>September 1</u>,
1967, by and between <u>Estate of Grady H. Vaughn, Jr., Deceased et al</u>
and <u>Marna M. Kuehne et al</u>

## INSURANCE PROVISIONS

With respect to operations conducted hereunder, Operator
shall carry, for the benefit and joint expense of the parties,
insurance with responsible insurance carriers as follows:

(A). Comprehensive General Public Liability and Property
Damage Insurance with limits of

($100,000.00) covering injury to or death of one person,
and

($300,000.00) covering injury to or death of more than
one person by reason of one accident, and

($100,000.00 aggregate) covering accidental loss of or
damage to property of third persons.

(B). Automobile Public Liability and Property Damage In-
surance with limits of

($100,000.00) covering injury to or death of one person
and

($300,000.00) covering injury to or death of more than
one person by reason of one accident, and

($100,000.00) covering damage to property of third persons
by reason of one accident.

(C). Workman's Compensation Insurance as required by the
law of the state or states in which the Operator will conduct
operations hereunder.

No other insurance shall be carried at the expense of the
joint account except by mutual consent of the parties. Operator
shall promptly notify Non-Operators of any loss, damage or claim
not covered by insurance carried for the benefit of the joint
account.

# U N I T   A G R E E M E N T

KUEHNE RANCH UNIT
CAMPBELL COUNTY, WYOMING

10/67

TABLE OF CONTENTS

SECTION                                                          PAGE

                    Preliminary Recitals----------------------------   1


                              ARTICLE 1

                             DEFINITIONS

1.1-------Unit Area----------------------------------------   1
1.2-------Unitized Formation-------------------------------   1
1.3-------Unitized Substances------------------------------   1
1.4-------Working Interest---------------------------------   2
1.5-------Royalty Interest---------------------------------   2
1.6-------Royalty Owner------------------------------------   2
1.7-------Working Interest Owner---------------------------   2
1.8-------Tract--------------------------------------------   2
1.9-------Unit Operating Agreement-------------------------   2
1.10------Unit Operator------------------------------------   2
1.11------Tract Participation------------------------------   3
1.12------Unit Participation-------------------------------   3
1.13------Outside Substances-------------------------------   3
1.14------Oil and Gas Rights-------------------------------   3
1.15------Unit Operations----------------------------------   3
1.16------Unit Equipment-----------------------------------   3
1.17------Unit Expense-------------------------------------   3
1.18------Singular and Plural-Gender-----------------------   3


                              ARTICLE 2

                              EXHIBITS

2.1-------Exhibits-----------------------------------------   4
          2.1.1 Exhibit A: Tracts and Tract Participation---   4
          2.1.2 Exhibit B: Map of Unit Area-----------------   4
2.2-------Reference to Exhibits----------------------------   4
2.3-------Exhibits Considered Correct----------------------   4
2.4-------Correcting Errors--------------------------------   4
2.5-------Filing Revised Exhibits--------------------------   4


                              ARTICLE 3

                    CREATION AND EFFECT OF UNIT

3.1-------Oil and Gas Rights Unitized----------------------   5
3.2-------Personal Property Excepted-----------------------   5
3.3-------Amendment of Leases and Other Agreements---------   5
3.4-------Continuation of Leases and Term Royalties--------   5
3.5-------Titles Unaffected by Unitization-----------------   6
3.6-------Injection Rights---------------------------------   6


                              ARTICLE 4

                         PLAN OF OPERATIONS

4.1-------Unit Operator------------------------------------   6
4.2-------Operating Methods--------------------------------   6
4.3-------Change of Operating Methods----------------------   7

SECTION                                                              PAGE

ARTICLE 5

TRACT PARTICIPATION

5.1------Tract Participation------------------------------ 7
5.2------Relative Tract Participations--------------------- 7

ARTICLE 6

ALLOCATION OF UNITIZED SUBSTANCES

6.1------Allocation to Tracts----------------------------- 7
6.2------Distribution Within Tracts----------------------- 8
6.3------Taking Unitized Substances in Kind-------------- 8
6.4------Failure to Take in Kind-------------------------- 8
6.5------Responsibility for Royalty Settlements---------- 9
6.6------Royalty on Outside Substances------------------- 9

ARTICLE 7

PRODUCTION AS OF THE EFFECTIVE DATE

7.1------Oil in Lease Tanks------------------------------- 9

ARTICLE 8

USE OR LOSS OF UNITIZED SUBSTANCES

8.1------Use of Unitized Substances----------------------- 10
8.2------Royalty Payments--------------------------------- 10

ARTICLE 9

TRACTS TO BE INCLUDED IN UNIT

9.1------Qualification of Tracts--------------------------- 10
9.2------Subsequent Commitment of Interest to Unit-------- 12
9.3------Revision of Exhibits----------------------------- 12

ARTICLE 10

TITLES

10.1------Removal of Tract From Unit Area------------------ 13
10.2------Revision of Exhibits---------------------------- 13
10.3------Working Interest Titles------------------------- 13
10.4------Royalty Owner Titles---------------------------- 13
10.5------Production Where Title is in Dispute------------ 13

ARTICLE 11

EASEMENTS OR USE OF SURFACE

11.1------Grant of Easements------------------------------ 14
11.2------Use of Water------------------------------------ 14
11.3------Surface Damages--------------------------------- 14

ARTICLE 12

ENLARGEMENTS OF UNIT AREA

12.1------Enlargements of Unit Area------------------------ 15

ii

SECTION                                                          PAGE

12.2------Determination of Tract Participation-------------   15
12.3------Effective Date----------------------------------   15

ARTICLE 13

CHANGE OF TITLE

13.1------Covenant Running With the Land-------------------   15
13.2------Notice of Transfer------------------------------   16
13.3------Waiver of Rights to Partition--------------------   16

ARTICLE 14

RELATIONSHIP OF PARTIES

14.1------No Partnership-----------------------------------   16
14.2------No Sharing of Market----------------------------   16
14.3------Royalty Owners Free of Costs--------------------   17
14.4------Information to Royalty Owners-------------------   17

ARTICLE 15

LAWS AND REGULATIONS

15.1------Laws and Regulations----------------------------   17

ARTICLE 16

FORCE MAJEURE

16.1------Force Majeure-----------------------------------   17

ARTICLE 17

EFFECTIVE DATE

17.1------Effective Date----------------------------------   18
17.2------Ipso Facto Termination--------------------------   18

ARTICLE 18

TERM

18.1------Term--------------------------------------------   19
18.2------Termination by Working Interest Owners----------   19
18.3------Effect of Termination---------------------------   19
18.4------Salvaging Equipment Upon Termination------------   19

ARTICLE 19

EXECUTION

19.1------Original, Counterpart, or Other Instrument-------   20
19.2------Joinder in Dual Capacity------------------------   20

iii

SECTION                                                              PAGE

## ARTICLE 20

### GENERAL

20.1------Amendments Affecting Working Interest Owners----     20
20.2------Action by Working Interest Owners---------------     20
20.3------Lien of Unit Operator---------------------------     20
20.4------Unit Operator, Agent----------------------------     20

### EXHIBITS

Exhibit A:   Tracts and Tract Participation------
Exhibit B:   Map of Unit Area--------------------

iv

UNIT AGREEMENT

KUEHNE RANCH UNIT, CAMPBELL COUNTY, WYOMING

THIS AGREEMENT, entered into as of the 1st day of September, 1967, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof;

W I T N E S S E T H:

WHEREAS, In the interest of the public welfare and to promote conservation and increase the ultimate recovery of oil, gas, and associated minerals from the Kuehne Ranch Field, in Campbell County, Wyoming, and to protect the rights of the owners of interests therein, it is deemed necessary and desirable to enter into this agreement to unitize the Oil and Gas Rights in and to the Unitized Formation in order to conduct a secondary recovery, pressure maintenance, or other recovery program as herein provided;

NOW, THEREFORE, In consideration of the premises and of the mutual agreements herein contained, it is agreed as follows:

ARTICLE 1

DEFINITIONS

As used in this agreement, the terms herein contained shall have the following meaning:

1.1 UNIT AREA means the lands described by Tracts in Exhibit A and shown on Exhibit B as to which this agreement becomes effective or to which it may be extended as herein provided.

1.2 UNITIZED FORMATION means that subsurface portion of the Unit Area commonly known or described as the Minnelusa Formation.

1.3 UNITIZED SUBSTANCES means all oil, gas, gaseous substances, sulphur contained in gas, condensate, distillate, and all associated and constituent liquid or liquefiable hydrocarbons within or produced from the Unitized Formation.

-1-

1.4 WORKING INTEREST means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, including a carried interest, which interest is chargeable with and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, developing, producing, and operating the Unitized Formation.

1.5 ROYALTY INTEREST means a right to or interest in any portion of the Unitized Substances or proceeds thereof other than a Working Interest.

1.6 ROYALTY OWNER means a party hereto who owns a Royalty Interest.

1.7 WORKING INTEREST OWNER means a party hereto who owns a Working Interest.  The owner of oil and gas rights that are free of lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest Owner to the extent of seven-eighths (7/8) of his interest in Unitized Substances, and as a Royalty Owner with respect to his remaining one-eighth (1/8) interest therein.

1.8 TRACT means each parcel of land described as such and given a Tract number in Exhibit A.

1.9 UNIT OPERATING AGREEMENT means the agreement entitled "Unit Operating Agreement, Kuehne Ranch Unit, Campbell County, Wyoming," of the same effective date as the effective date of this agreement, and which is entered into by Working Interest Owners.

1.10 UNIT OPERATOR means the Working Interest Owner designated by Working Interest Owners under the Unit Operating Agreement to develop and operate the Unitized Formation, acting as operator and not as a Working Interest Owner.

-2-

1.11 <u>TRACT PARTICIPATION</u> means the percentage shown on Exhibit A for allocating Unitized Substances to a Tract under this agreement.

1.12 <u>UNIT PARTICIPATION</u> of each Working Interest Owner means the sum of the percentages obtained by multiplying the Working Interest of such Working Interest Owner in each Tract by the Tract Participation of such Tract.

1.13 <u>OUTSIDE SUBSTANCES</u> means all substances obtained from any source other than the Unitized Formation and which are injected into the Unitized Formation.

1.14 <u>OIL AND GAS RIGHTS</u> means the right to explore, develop, and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.15 <u>UNIT OPERATIONS</u> means all operations conducted by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of the development and operation of the Unitized Formation for the production of Unitized Substances.

1.16 <u>UNIT EQUIPMENT</u> means all personal property, lease and well equipment, plants, and other facilities and equipment taken over or otherwise acquired for the joint account for use in Unit Operations.

1.17 <u>UNIT EXPENSE</u> means all cost, expense, or indebtedness incurred by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of Unit Operations.

1.18 Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender include the masculine and the feminine.

-3-

ARTICLE 2

EXHIBITS

2.1 <u>EXHIBITS</u>.  Attached hereto are the following exhibits which are incorporated herein by reference:

2.1.1 <u>EXHIBIT A</u>, which is a schedule that describes each Tract in the Unit Area and shows its Tract Participation.

2.1.2 <u>EXHIBIT B</u>, which is a map that shows the boundary lines of the Unit Area and the Tracts therein.

2.2 <u>REFERENCE TO EXHIBITS</u>. When reference herein is made to an exhibit, the reference is to the Exhibit as originally attached or, if revised, to the latest revision.

2.3 <u>EXHIBITS CONSIDERED CORRECT</u>. An exhibit shall be considered to be correct until revised as herein provided.

2.4 <u>CORRECTING ERRORS</u>.  The shapes and descriptions of the respective Tracts have been established by using the best infor-mation available.  If it subsequently appears that any Tract, be-cause of diverse royalty or working interest ownership on the effective date hereof, should be divided into more than one Tract, or that any mechanical miscalculation has been made, Unit Operator, with the approval of Working Interest Owners, may correct the mistake by revising the exhibits to conform to the facts.  The revision shall not include any re-evaluation of engineering or geological interpretations used in determining Tract Participation.  Each such revision of an exhibit shall be effective at 7:00 a.m. on the first day of the calendar month next following the filing for record of the revised exhibit or on such other date as may be determined by Working Interest Owners and set forth in the revised exhibit.

2.5 <u>FILING REVISED EXHIBITS</u>.  If an exhibit is revised pur-suant to this agreement, Unit Operator shall certify and file the revised exhibit for record in the County or Counties in which this agreement is filed.

-4-

ARTICLE 3

CREATION AND EFFECT OF UNIT

3.1 OIL AND GAS RIGHTS UNITIZED. Subject to the provisions
of this agreement, all Oil and Gas Rights of Royalty Owners in
and to the lands described in Exhibit A, and all Oil and Gas
Rights of Working Interest Owners in and to said lands, are hereby
unitized insofar as the respective Oil and Gas Rights pertain to
the Unitized Formation, so that operations may be conducted as
if the Unitized Formation had been included in a single lease
executed by all Royalty Owners, as lessors, in favor of all Work-
ing Interest Owners, as lessees, and as if the lease had been
subject to all of the provisions of this agreement.

3.2 PERSONAL PROPERTY EXCEPTED. All lease and well equipment,
materials, and other facilities heretofore or hereafter placed by
any of the Working Interest Owners on the lands covered hereby
shall be deemed to be and shall remain personal property belong-
ing to and may be removed by the Working Interest Owners.  The
rights and interests therein as among Working Interest Owners are
covered by the Unit Operating Agreement.

3.3 AMENDMENT OF LEASES AND OTHER AGREEMENTS. The provisions
of the various leases, agreements, division and transfer orders,
or other instruments covering the respective Tracts or the pro-
duction therefrom are amended to the extent necessary to make them
conform to the provisions of this agreement, but otherwise shall
remain in effect.

3.4 CONTINUATION OF LEASES AND TERM ROYALTIES. Operations,
including drilling operations, conducted with respect to the Unitized
Formation on any part of the Unit Area, or production from any
part of the Unitized Formation, except for the purpose of deter-
mining payments to Royalty Owners, shall be considered as operations
upon or production from each Tract, and such operations or production

-5-

shall continue in  .fect each lease or term r  alty interest as
to all lands covered thereby just as if such operations had
been conducted and a well had been drilled on and was producing
from each Tract.

3.5 <u>TITLES UNAFFECTED BY UNITIZATION</u>. Nothing herein shall
be construed to result in the transfer of title to the Oil and
Gas Rights by any party hereto to any other party or to Unit
Operator.  The intention is to provide for the cooperative develop-
ment and operation of the Tracts and for the sharing of Unitized
Substances as herein provided.

3.6 <u>INJECTION RIGHTS</u>. Royalty Owners hereby grant unto Work-
ing Interest Owners the right to inject into the Unitized Formation
any substances in whatever amounts Working Interest Owners deem
expedient for Unit Operations, including the right to drill and
maintain injection wells on the Unit Area and to use producing or
abandoned oil or gas wells for such purposes.

ARTICLE 4

PLAN OF OPERATIONS

4.1 <u>UNIT OPERATOR</u>.  Working Interest Owners are, as of the
effective date of this agreement, entering into the Unit Operating
Agreement, designating Vaughn Petroleum, Inc. as Unit Operator.
Unit Operator shall have the exclusive right to conduct Unit
Operations.  The operations shall conform to the provisions of this
agreement and the Unit Operating Agreement.  If there is any con-
flict between such agreements, this agreement shall govern.

4.2 <u>OPERATING METHODS</u>. To the end that the quantity of Unitized
Substances ultimately recoverable may be increased and waste pre-
vented, Working Interest Owners shall, with diligence and in
accordance with good engineering and production practices, conduct
a secondary recovery program for the Unit Area by injection of
Unitized Substances or Outside Substances into one or more wells

-6-

located in the Unit Area and producing Unitized Substances from one or more wells located in the Unit Area.

4.3 <u>CHANGE OF OPERATING METHODS</u>. Nothing herein shall prevent Working Interest Owners from discontinuing or changing in whole or in part any method of operation which, in their opinion, is no longer in accord with good engineering or production practices. Other methods of operation may be conducted or changes may be made by Working Interest Owners from time to time if determined by them to be feasible, necessary, or desirable to increase the ultimate recovery of Unitized Substances.

## ARTICLE 5

### TRACT PARTICIPATION

5.1 <u>TRACT PARTICIPATION</u>. The Tract Participation of each Tract is shown in Exhibit A.

5.2 <u>RELATIVE TRACT PARTICIPATIONS</u>. If the Unit Area is enlarged or reduced, the revised Tract Participations of the Tracts remaining in the Unit Area and which were within the Unit Area prior to the enlargement or reduction shall remain in the same ratio one to another.

## ARTICLE 6

### ALLOCATION OF UNITIZED SUBSTANCES

6.1 <u>ALLOCATION TO TRACTS</u>. All unitized Substances produced and saved shall be allocated to the several Tracts in accordance with the respective Tract Participations effective during the period that the Unitized Substances were produced. The amount of Unitized Substances allocated to each Tract, regardless of whether it is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract, shall be deemed for all purposes to have been produced from such Tract.

-7-

6.2 <u>DISTRIBUTION WITHIN TRACTS</u>. The Unitized Substances allo-
cated to each Tract shall be distributed among, or accounted for
to, the parties entitled to share in the production from such Tract
in the same manner, in the same proportions, and upon the same
conditions as they would have participated and shared in the pro-
duction from such Tract, or in the proceeds thereof, had this agree-
ment not been entered into, and with the same legal effect.  If
any Oil and Gas Rights in a Tract hereafter become divided and owned
in severalty as to different parts of the Tract, the owners of the
divided interests, in the absence of an agreement providing for a
different division, shall share in the Unitized Substances allo-
cated to the Tract, or in the proceeds thereof, in proportion to
the surface acreage of their respective parts of the Tract.

6.3 <u>TAKING UNITIZED SUBSTANCES IN KIND</u>. The Unitized Substances
allocated to each Tract shall be delivered in kind to the respective
parties entitled thereto by virtue of the ownership of Oil and Gas
Rights therein or by purchase from such owners.  Such parties shall
have the right to construct, maintain, and operate within the Unit
Area all necessary facilities for that purpose, provided that they
are so constructed, maintained, and operated as not to interfere
with Unit Operations.  Any extra expenditures incurred by Unit Oper-
ator by reason of the delivery in kind of any portion of the Unitized
Substances shall be borne by the receiving party.  If a Royalty
Owner has the right to take in kind a share of Unitized Substances
and fails to do so, the Working Interest Owner whose Working Inter-
est is subject to such Royalty Interest shall be entitled to take
in kind such share of the Unitized Substances.

6.4  <u>FAILURE TO TAKE IN KIND</u>. If any party fails to take in
kind or separately dispose of its share of Unitized Substances,
Unit Operator shall have the right, for the time being and subject

-8-

to revocation at will by the party owning the share, to purchase

for its own account or sell to others such share; provided that,

all contracts of sale by Unit Operator of any other party's share

of Unitized Substances shall be only for such reasonable periods

of time as are consistent with the minimum needs of the industry

under the circumstances, but in no event shall any such contract

be for a period in excess of one year.  The proceeds of the Unitized

Substances so disposed of by Unit Operator shall be paid to the

party entitled thereto.

6.5 <u>RESPONSIBILITY FOR ROYALTY SETTLEMENTS</u>.  Any party receiving

in kind or separately disposing of all or part of the Unitized

Substances allocated to any Tract or receiving the proceeds there-

from shall be responsible for the payment thereof to the persons

entitled thereto, and shall indemnify all parties hereto, including

Unit Operator, against any liability for all royalties, overriding

royalties, production payments, and all other payments chargeable

against or payable out of such Unitized Substances or the proceeds

therefrom.

6.6. <u>ROYALTY ON OUTSIDE SUBSTANCES</u>.  If any Outside Substance

is injected into the Unitized Formation, seventy-five percent (75%)

of any like substance contained in Unitized Substances subsequently

produced and sold, or used for other than Unit Operations, shall

be deemed to be the Outside Substance so injected until the total

volume thereof equals the total volume of the Outside Substance

so injected.  No payments shall be due or payable to Royalty Owners

on Outside Substances.

ARTICLE 7

PRODUCTION AS OF THE EFFECTIVE DATE

7.1 <u>OIL IN LEASE TANKS</u>. Unit Operator shall gauge all lease

and other tanks within the Unit Area to ascertain the amount of

merchantable oil produced from the Unitized Formation in such tanks,

-9-

above the pipe line connections, as of 7:00 a.m. on the Effective
Date hereof.  All such oil shall remain the property of the parties
entitled thereto the same as if the unit had not been formed.  Any
such oil not promptly removed may be sold by the Unit Operator
for the account of the parties entitled thereto, subject to the
payment of all royalties, overriding royalties, production payments,
and all other payments under the provisions of the applicable lease
or other contracts.

### ARTICLE 8

### USE OR LOSS OF UNITIZED SUBSTANCES

8.1 USE OF UNITIZED SUBSTANCES.  Working Interest Owners may
use as much of the Unitized Substances as they deem necessary for
Unit Operations, including but not limited to the injection thereof
into the Unitized Formation.

8.2 ROYALTY PAYMENTS.  No royalty, overriding royalty, pro-
duction, or other payments shall be payable upon, or with respect
to, Unitized Substances used or consumed in Unit Operations, or
which otherwise may be lost or consumed in the production, handling,
treating, transportation, or storing of Unitized Substances.

### ARTICLE 9

### TRACTS TO BE INCLUDED IN UNIT

9.1 QUALIFICATION OF TRACTS.  On and after the effective date
hereof and until the enlargement or reduction thereof, the Unit
Area shall be composed of the Tracts listed in Exhibit A that corner
or have a common boundary (Tracts separated only by a public high-
way or a railroad right of way shall be considered to have a common
boundary), and that otherwise qualify as follows:

9.1.1 Each Tract as to which Working Interest Owners own-
ing one hundred percent (100%) of the Working Interest have
become parties to this agreement and as to which Royalty Owners
owning seventy-five percent (75%) or more of the Royalty

Interest have become parties to this agreement.

9.1.2 Each Tract as to which Working Interest Owners own-
ing one hundred percent (100%) of the Working Interest have
become parties to this agreement, and as to which Royalty
Owners owning less than seventy-five percent (75%) of the
Royalty Interest have become parties to this agreement, and
as to which (a) all Working Interest Owners in such Tract
have joined in a request for the inclusion of such Tract in
the Unit Area, and as to which (b) eighty percent (80%) of the
combined voting interests of Working Interest Owners in all
Tracts that meet the requirements of Section 9.1.1 have voted
in favor of the inclusion of such Tract. For the purpose of
this Section 9.1.2, the voting interest of a Working Interest
Owner shall be equal to the ratio that its Unit Participation
attributable to Tracts that qualify under Section 9.1.1 bears
to the total Unit Participation of all Working Interest Owners
attributable to all Tracts that qualify under Section 9.1.1.

9.1.3 Each Tract as to which Working Interest Owners own-
ing less than one hundred percent (100%) of the Working Interest
have become parties to this agreement, regardless of the per-
centage of Royalty Interest therein that is committed hereto;
and as to which (a) the Working Interest Owner who operates
the Tract and all of the other Working Interest Owners in
such Tract who have become parties to this agreement have joined
in a request for inclusion of such Tract in the Unit Area,
and have executed and delivered an indemnity agreement indemnify-
ing and agreeing to hold harmless the other Working Interest
Owners in the Unit Area, their successors and assigns, against
all claims and demands that may be made by the owners of Work-
ing Interests in such Tract who are not parties to this agreement,

-11-

and which arise out of the inclusion of the Tract in the Unit Area; and as to which (b) eighty percent (80%) of the combined voting interest of Working Interest Owners in all Tracts that meet the requirements of Section 9.1.1 and 9.1.2 have voted in favor of the inclusion of such Tract and to accept the indemnity agreement. For the purpose of this Section 9.1.3, the voting interest of each Working Interest Owner shall be equal to the ratio that is Unit Participation attributable to Tracts that qualify under Sections 9.1.1 and 9.1.2 bears to the total Unit Participation of all Working Interest Owners attributable to all Tracts that qualify under Sections 9.1.1 and 9.1.2. Upon the inclusion of such a Tract in the Unit Area, the Unit Participation that would have been attributed to the nonsubscribing owners of the Working Interest in such Tract, had they become parties to this agreement and the Unit Operating Agreement, shall be attributed to the Working Interest Owners in such Tract who have become parties to such agreements, in proportion to their respective Working Interests in the Tract.

9.2 <u>SUBSEQUENT COMMITMENT OF INTEREST TO UNIT</u>. After the effective date of this agreement, the commitment of any interest in any Tract within the Unit Area shall be upon such terms as may be negotiated by Working Interest Owners and the owner of such interest.

9.3 <u>REVISION OF EXHIBITS</u>. If any of the Tracts described in Exhibit A fail to qualify for inclusion in the Unit Area, Unit Operator shall recompute, using the original basis of computation, the Tract Participation of each of the qualifying Tracts, and shall revise Exhibits A and B accordingly. The revised exhibits shall be effective as of the effective date hereof.

-12-

ARTICLE 10

TITLES

10.1 REMOVAL OF TRACT FROM UNIT AREA. If a Tract ceases to have sufficient Working Interest Owners or Royalty Owners committed to this agreement to meet the conditions of Article 9 because of failure of title of any party hereto, such Tract shall be removed from the Unit Area effective as of the first day of the calendar month in which the failure of title is finally determined; however, the Tract shall not be removed from the Unit Area if, within ninety (90) days of the date of final determination of the failure of title, the Tract requalifies under a Section of Article 9.

10.2 REVISION OF EXHIBITS. If a Tract is removed from the Unit Area because of the failure of title, Unit Operator, subject to Section 5.2, shall recompute the Tract Participation of each of the Tracts remaining in the Unit Area and shall revise Exhibits A and B accordingly.  The revised exhibits shall be effective as of the first day of the calendar month in which such failure of title is finally determined.

10.3 WORKING INTEREST TITLES. If title to a Working Interest fails, the rights and obligations of Working Interest Owners by reason of the failure of title shall be governed by the Unit Operating Agreement.

10.4 ROYALTY OWNER TITLES. If title to a Royalty Interest fails, but the Tract to which it relates is not removed from the Unit Area, the party whose title failed shall not be entitled to share hereunder with respect to such interest.

10.5 PRODUCTION WHERE TITLE IS IN DISPUTE. If the title or right of any party claiming the right to receive in kind all or any portion of the Unitized Substances allocated to a Tract is in

-13-

dispute, Unit Operator at the discretion of Working Interest Owners
shall either:

> (a)  require that the party to whom such Unitized Sub-
> stances are delivered or to whom the proceeds thereof are
> paid, furnish security for the proper accounting therefor
> to the rightful owner if the title or right of such party fails
> in whole or in part, or

> (b)  withhold and market the portion of Unitized Sub-
> stances with respect to which title or right is in dispute,
> and impound the proceeds thereof until such time as the
> title or right thereto is established by a final judgment of
> a court of competent jurisdiction or otherwise to the satis-
> faction of Working Interest Owners, whereupon the proceeds
> so impounded shall be paid to the party rightfully entitled
> thereto.

## ARTICLE 11

### EASEMENTS OR USE OF SURFACE

11.1  GRANT OF EASEMENTS. The parties hereto, to the extent
of their rights and interests, hereby grant to Working Interest
Owners the right to use as much of the surface of the land within
the Unit Area as may reasonably be necessary for Unit Operations;
provided that, nothing herein shall be construed as leasing or
otherwise conveying to Working Interest Owners a site for a water,
gas injection, processing or other plant, or camp site.

11.2  USE OF WATER.  Working Interest Owners shall have free
use of water from the Unit Area for Unit Operations, except water
from any well, lake, pond, or irrigation ditch of a Royalty Owner.

11.3  SURFACE DAMAGES. Working Interest Owners shall pay the
owner for damages to growing crops, timber, fences, improvements,
and structures on the Unit Area that result from Unit Operations.

-14-

ARTICLE 12

ENLARGEMENTS OF UNIT AREA

12.1 ENLARGEMENTS OF UNIT AREA. The Unit Area may be enlarged
to include acreage reasonably proved to be productive, upon such
terms as may be determined by Working Interest Owners, including
but not limited to, the following:

12.1.1 The acreage shall qualify under a Section of Article 9.

12.1.2 The participation to be allocated to the acreage
shall be reasonable, fair, and based on all available infor-
mation.

12.1.3 There shall be no retroactive allocation or adjust-
ment of Unit Expense or of interests in the Unitized Sub-
stances produced, or proceeds thereof; however, this limitation
shall not prevent an adjustment of investment by reason of the
enlargement.

12.2 DETERMINATION OF TRACT PARTICIPATION. Unit Operator,
subject to Section 5.2, shall determine the Tract Participation of
each Tract within the Unit Area as enlarged, and shall revise
Exhibits A and B accordingly.

12.3 EFFECTIVE DATE. The effective date of any enlargement of
the Unit Area shall be 7:00 a.m. on the first day of the calendar
month following compliance with conditions for enlargement as specified
by Working Interest Owners, approval of the enlargement by the appro-
priate governmental authority, if required, and the filing for
record of revised Exhibits A and B in the records of the County
or Counties in which this agreement is recorded.

ARTICLE 13

CHANGE OF TITLE

13.1 COVENANT RUNNING WITH THE LAND. This agreement shall
extend to, be binding upon, and inure to the benefit of, the respective

-15-

heirs, devisees, legal representatives, successors, and assigns
of the parties hereto, and shall constitute a covenant running
with the lands, leases, and interests covered hereby.

13.2 NOTICE OF TRANSFER. Any conveyance of all or any part
of any interest owned by any party hereto with respect to any Tract
shall be made expressly subject to this agreement. No change of
title shall be binding on the Unit Operator, or upon any party
hereto other than the party so transferring, until the first day
of the calendar month next succeeding the date of receipt by Unit
Operator of a photocopy or a certified copy of the recorded in-
strument evidencing such change in ownership.

13.3 WAIVER OF RIGHTS TO PARTITION. Each party hereto covenants
that, during the existence of this agreement, it will not resort
to any action to partition the Unit Area or the Unit Equipment,
and to that extent waives the benefits of all laws authorizing such
partition.

ARTICLE 14

RELATIONSHIP OF PARTIES

14.1 NO PARTNERSHIP. The duties, obligations, and liabilities
of the parties hereto are intended to be several and not joint or
collective. This agreement is not intended to create, and shall
not be construed to create, an association or trust, or to impose
a partnership duty, obligation, or liability with regard to any
one or more of the parties hereto. Each party hereto shall be
individually responsible for its own obligations as herein provided.

14.2 NO SHARING OF MARKET. This agreement is not intended to
provide, and shall not be construed to provide, directly or indirectly,
for any cooperative refining, joint sale, or marketing of Unitized
Substances.

-16-

14.3 <u>ROYALTY OWNERS FREE OF COSTS</u>. This agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay for Unit Expense unless such Royalty Owner is otherwise so obligated.

14.4 <u>INFORMATION TO ROYALTY OWNERS</u>. Each Royalty Owner shall be entitled to all information in possession of Unit Operator to which such Royalty Owner is entitled by an existing agreement with any Working Interest Owner.

ARTICLE 15

LAWS AND REGULATIONS

15.1 <u>LAWS AND REGULATIONS</u>. This agreement shall be subject to the conservation laws of the State of Wyoming; to the valid rules, regulations, and orders of the Oil and Gas Conservation Commission of the State of Wyoming; and to all other applicable federal, state, and municipal laws, rules, regulations, and orders.

ARTICLE 16

FORCE MAJEURE

16.1 <u>FORCE MAJEURE</u>. All obligations imposed by this agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a strike, fire, war, civil disturbance, act of God; by federal, state, or municipal laws; by any rule, regulation, or order of a governmental agency; by inability to secure materials; or by any other cause or causes beyond reasonable control of the party. No party shall be required against its will to adjust or settle any labor dispute. Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of suspension of Unit Operations due to any one or more of the causes set forth in this Article.

-17-

ARTICLE 17

EFFECTIVE DATE

17.1 <u>EFFECTIVE DATE</u>. This agreement shall become binding upon
each party as of the date such party signs the instrument by which
it becomes a party hereto, and, unless sooner terminated as pro-
vided in Section 17.2, shall become effective as to qualified Tracts
at the time and date as determined by the Working Interest Owners
in all the qualified Tracts, and set forth in a certificate filed
for record by Unit Operator in Campbell County, Wyoming.  The cer-
tificate shall also recite the percentage of the Unit Area repre-
sented by the Tracts qualified under Article 9, the book and page
in which a counterpart of this agreement has been recorded, and the
case number and order number of the order of approval by Govern-
mental authority, if obtained.  The certificate shall not be filed
until after the following requirements have been met:

17.1.1 This agreement and Unit Operating Agreement have been
executed or ratified by Working Interest Owners owning a
combined Unit Participation of at least ninety percent (90%),
and

17.1.2 This agreement has been executed or ratified by Royalty
Owners owning a combined Royalty Interest of at least ninety
percent (90%), in the Unit Area, and

17.1.3 At least one counterpart of this agreement has been
filed for record by Unit Operator in Campbell County, Wyoming.

17.2 <u>IPSO FACTO TERMINATION</u>. If the requirements of Section 17.1
are not accomplished on or before July 1, 1968, this agreement
shall ipso facto terminate on that date (hereinafter called "ter-
mination date") and thereafter be of no further effect, unless

-18-

prior thereto Working Interest Owners owning a combined Unit Par-
ticipation of at least ninety percent (90%) have become parties
to this agreement and have decided to extend the termination date
for a period not to exceed one (1) year.  If the termination date
is so extended and the requirements of Section 17.1 are not
accomplished on or before the extended termination date, this agree-
ment shall ipso facto terminate on the extended termination date
and thereafter be of no further effect.  For the purpose of this
section, Unit Participation shall be as shown on the original
Exhibit C attached to the Unit Operating Agreement.

ARTICLE 18

TERM

18.1 <u>TERM</u>. The term of this agreement shall be for the time
that Unitized Substances are produced in paying quantities and as
long thereafter as Unit Operations are conducted without a cessation
of more than ninety (90) consecutive days, unless sooner terminated
by Working Interest Owners in the manner herein provided.

18.2 <u>TERMINATION BY WORKING INTEREST OWNERS</u>. This agreement
may be terminated by Working Interest Owners having a combined Unit
Participation of at lease seventy percent (70%) whenever such
Working Interest Owners determine that Unit Operations are no
longer profitable or feasible.

18.3 <u>EFFECT OF TERMINATION</u>. Upon termination of this agreement,
the further development and operation of the Unitized Formation
as a unit shall be abandoned, Unit Operations shall cease, and
thereafter the parties shall be governed by the provisions of the
leases and other instruments affecting the separate Tracts.

18.4 <u>SALVAGING EQUIPMENT UPON TERMINATION</u>. If not otherwise
granted by the leases or other instruments affecting each Tract
unitized under this agreement, Royalty Owners hereby grant Working

-19-

Interest Owners a period of six (6) months after the date of termination of this agreement within which to salvage and remove Unit Equipment.

ARTICLE 19

EXECUTION

19.1 <u>ORIGINAL, COUNTERPART, OR OTHER INSTRUMENT</u>.  A person may become a party to this agreement by signing the original of this instrument, a counterpart thereof, or other instrument agreeing to be bound by the provisions hereof.  The signing of any such instrument shall have the same effect as if all the parties had signed the same instrument.

19.2 <u>JOINDER IN DUAL CAPACITY</u>. Execution as herein provided by any party as either a Working Interest Owner or a Royalty Owner shall commit all interests that may be owned or controlled by such party.

ARTICLE 20

GENERAL

20.1 <u>AMENDMENTS AFFECTING WORKING INTEREST OWNERS</u>.  Amendments hereto relating wholly to Working Interest Owners may be made if signed by all Working Interest Owners.

20.2 <u>ACTION BY WORKING INTEREST OWNERS</u>.  Any action or approval required by Working Interest Owners hereunder shall be in accordance with the provisions of the Unit Operating Agreement.

20.3 <u>LIEN OF UNIT OPERATOR</u>.  Unit Operator shall have a lien upon the interests of Working Interest Owners in the Unit Area to the extent provided in the Unit Operating Agreement.

20.4 <u>UNIT OPERATOR, AGENT</u>.  It is recognized that Working Interest Owners, Estate of Grady H. Vaughn, Jr., Deceased, and Jack C. Vaughn, have designated Vaughn Petroleum, Inc., as their agent to perform and carry out their obligations and duties as

-20-

Unit Operator under this agreement and the Unit Operating Agreement. Vaughn Petroleum, Inc. joins herein for the purpose of acknowledging and accepting the agency aforesaid.

IN WITNESS WHEREOF, The parties hereto have executed this agreement on the dates opposite their respective signatures.

Date: _10/2/67_

VAUGHN PETROLEUM, INC.

By _E. H. Gunter_
E. H. GUNTER        President
VICE PRESIDENT

ATTEST:

By _P. G. Jones_
Secretary

ESTATE OF GRADY H. VAUGHN, JR., DECEASED

Date: _10/2/67_

By _Jack C. Vaughn_
Jack C. Vaughn, and

_E. H. Gunter_

Date: _10/2/67_

E. H. Gunter, Independent Executors

Date: _10/2/67_

_Jack C. Vaughn_
Jack C. Vaughn

Date:_____

_____
R. D. Poindexter

Date:_____

_____
Albert Sklar

Date:_____

_____
L. W. Phillips

Date:_____

_____
Curtis E. Calder, Jr., Trustee

SAMEDAN OIL CORPORATION

Date:_____

By_____
_____ President

ATTEST:

By_____

-21-

SAMEDAN ASSOCIATES, INC.

Date:_____   By_____
                                          _____ President

KIMBARK EXPLORATION COMPANY

Date:_____   By_____
                                          _____ President
                             ATTEST:

                             By_____


Date:_____   _____
                                 George Anderman

Date:_____   _____
                                 Ed Boland

SUPERIOR OIL COMPANY

Date:_____   By_____
                                          _____ President

                             ATTEST:

                             By_____


PAN AMERICAN PETROLEUM CORPORATION

Date:_____   By_____
                                          _____ President

                             ATTEST:

                             By_____


DAVIS OIL COMPANY

Date:_____   By_____
                                          _____ President


Date:_____   _____
                                 Raymond Chorney

SINCLAIR OIL & GAS COMPANY

Date:_____   By_____
                                          _____ President

                             ATTEST:

                             By_____

-22-

UNION OIL COMPANY OF CALIFORNIA

Date:_____   By_____

_____ President

ATTEST:

By_____

AMERADA PETROLEUM COMPANY

Date:_____   By_____

_____ President

ATTEST:

By_____

WORKING INTEREST OWNERS

Date:_____   _____
Marna M. Kuehne

Date:_____   _____
Herman J. Kuehne

Date:_____   _____

Date:_____   _____

ROYALTY OWNERS

-23-

THE STATE OF TEXAS    )
                         )

COUNTY OF DALLAS    )

     I, _Helen Bahlau_, a Notary Public within and for said County and State, do hereby certify that _E.H. Gunter_ and _P.C. Jones_, to me personally known and known to me to be the _Vice_ President and Secretary, respectively, of VAUGHN PETROLEUM, INC., the grantor in the annexed instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed, and as the free act and deed of the said VAUGHN PETROLEUM, INC., for the uses and purposes therein set forth.

     IN WITNESS WHEREOF, I hereunto set my hand and affixed my official seal this the _2_ day of _October_, 1967.

                              _Helen Bahlau_
                              Notary Public

HELEN BAHLAU
Notary Public Dallas County, Texas
Commission Expires June 1, 1969

---

THE STATE OF TEXAS    )
                         )

COUNTY OF DALLAS    )

     I, _Helen Bahlau_, do hereby certify that JACK C. VAUGHN and E. H. GUNTER, personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act, for the uses and purposes therein set forth, and in the capacities therein stated.

     Given under my hand and seal this _2_ day of _October_, 1967.

                              _Helen Bahlau_
                              Notary Public

HELEN BAHLAU
Notary Public Dallas County, Texas
My Commission Expires June 1, 1969

THE STATE OF _____)
                        )          (CORPORATE ACKNOWLEDGMENT)
COUNTY OF _____)

    I, _____, a Notary Public within and for said County and State, do hereby certify that _____ and _____, to me personally known and known to me to be the _____ President and Secretary, respectively, of _____, the grantor in the annexed instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act and deed, and as the free act and deed of the said _____, for the uses and purposes therein set forth.

    IN WITNESS WHEREOF, I hereunto set my hand and affixed my official seal this the _____ day of _____, 1967.

                    _____
                            Notary Public


THE STATE OF _____ )
                             )          (SINGLE ACKNOWLEDGEMENT)
COUNTY OF _____ )

    I, _____, do hereby certify that _____ _____, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered said instrument as his free and voluntary act, for the uses and purposes therein set forth, and in the capacity therein stated.

    Given under my hand and seal this _____ day of _____, 1967.

                    _____
                            Notary Public

KUEHNE RANCH UNIT
CAMPBELL COUNTY, WYOMING

EXHIBIT A

TRACTS AND TRACT PARTICIPATION

| TRACT NO. | TRACT NAME | LAND DESCRIPTION | ACRES | TRACT PARTICIPATION |
|-----------|------------|------------------|-------|---------------------|
| 1. | L.A.Williams | SW$\frac{1}{4}$ NW$\frac{1}{4}$ & NW$\frac{1}{4}$ SW$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .00046 |
| 2. | I.J.Cuthbert #1 | E$\frac{1}{2}$ NW$\frac{1}{4}$ & NE$\frac{1}{4}$ SW$\frac{1}{4}$ Sec. 12-51N-70W | 120 | .00718 |
| 3. | Federal W-0296791A | W$\frac{1}{2}$ NE$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .00239 |
| 4. | Kane #1 | E$\frac{1}{2}$ NE$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .00097 |
| 5. | H.J. Kuehne #1 | N$\frac{1}{2}$ SE$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .08382 |
| 6. | Federal W-0296442 | Lot 3 Sec. 7-51N-69W | 36.40 | .00002 |
| 7. | M. Kuehne #2 | S$\frac{1}{2}$ SW$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .07456 |
| 8. | H. J. Kuehne #12-1 | S$\frac{1}{2}$ SE$\frac{1}{4}$ Sec. 12-51N-70W | 80 | .06665 |
| 9. | H. J. Kuehne | Lot 4 & SE$\frac{1}{4}$ SW$\frac{1}{4}$ Sec. 7-51N-69W | 76.51 | .00227 |
| 10. | M. Kuehne | NW$\frac{1}{4}$ NW$\frac{1}{4}$ Sec. 13-51N-70W | 40 | .00003 |
| 11. | M. Kuehne | E$\frac{1}{2}$ NW$\frac{1}{4}$ Sec. 13-51N-70W | 80 | .00617 |
| 12. | M. Kuehne #13-1 | W$\frac{1}{2}$ NE$\frac{1}{4}$ Sec. 13-51N-70W | 80 | .47553 |
| 13. | M. Kuehne #1-A | E$\frac{1}{2}$ NE$\frac{1}{4}$ Sec. 13-51N-70W | 80 | .19165 |
| 14. | M. Kuehne #1 | W$\frac{1}{2}$ NW$\frac{1}{4}$ Sec. 18-51N-69W | 80 | .08576 |
| 15. | M. Kuehne | E$\frac{1}{2}$ NW$\frac{1}{4}$ Sec. 18-51N-69W | 80 | .00251 |
| 16. | M. Kuehne | NW$\frac{1}{4}$ NE$\frac{1}{4}$ Sec. 18-51N-69W | 40 | .00003 |
| | | | | 1.00000 |

