# MODEL FORM OPERATING AGREEMENT—1956
## Non-Federal Lands

W. C. WILLIAMS LEASES

OPERATING AGREEMENT

DATED

FEBRUARY 1 , 1965 ,
(EFFECTIVE AS OF FEBRUARY 1, 1955)

FOR UNIT AREA IN TOWNSHIP_____, RANGE _____,

_____CASS_____ COUNTY, STATE OF__TEXAS_____.

Published and for Sale by
ROSS-MARTIN CO.
Box 800
Tulsa, Oklahoma

Form 610

Form/610  ROSS·MARTIN CO.
           TULSA 1, OKLAHOMA

# TABLE OF CONTENTS

| Paragraph Number | Title | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Title Examination, Loss of Leases and Oil and Gas Interests | 1 |
| 3. | Unleased Oil and Gas Interests | 2 |
| 4. | Interests of Parties | 2 |
| 5. | Operator of Unit | 3 |
| 6. | Employees | 3 |
| 7. | Test Well | 3 |
| 8. | Costs and Expenses | 3 |
| 9. | Operator's Lien | 4 |
| 10. | Term of Agreement | 4 |
| 11. | Limitation on Expenditures | 4 |
| 12. | Operations by Less Than All Parties | 5 |
| 13. | Right to Take Production in Kind | 6 |
| 14. | Access to Unit Area | 7 |
| 15. | Drilling Contracts | 7 |
| 16. | Abandonment of Wells | 7 |
| 17. | Delay Rentals and Shut-in Well Payments | 8 |
| 18. | Preferential Right to Purchase | 8 |
| 19. | Maintenance of Unit Ownership | 9 |
| 20. | Resignation of Operator | 9 |
| 21. | Liability of Parties | 9 |
| 22. | Renewal or Extension of Leases | 9 |
| 23. | Surrender of Leases | 10 |
| 24. | Acreage or Cash Contributions | 10 |
| 25. | Provision Concerning Taxation | 10 |
| 26. | Insurance | 11 |
| 27. | Claims and Lawsuits | 11 |
| 28. | Force Majeure | 11 |
| 29. | Notices | 11 |
| 30. | Other Conditions | 12 |

Form 610 ROSS-MARTIN CO.
TULSA 7, OKLAHOMA

# OPERATING AGREEMENT

THIS AGREEMENT, entered into this __1st__ day of __FEBRUARY_____, 19~~65 XXXXXXX~~
__(EFFECTIVE AS OF FEBRUARY 1, 1955)__ between SKLAR PRODUCING CO., INC.,
hereafter designated as "Operator", and the signatory parties other than Operator.

WITNESSETH, THAT:

WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit "A", and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

## 1. DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them.

(1) The words "party" and "parties" shall always mean a party, or parties, to this agreement.

(2) The parties to this agreement shall always be referred to as "it" or "they", whether the parties be corporate bodies, partnerships, associations, or persons real.

(3) The term "oil and gas" shall include oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons, unless an intent to limit the inclusiveness of this term is specifically stated.

(4) The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Unit Area which are owned by parties to this agreement.

(5) The term "Unit Area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

(6) The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Unit Area or as fixed by express agreement of the parties.

(7) All exhibits attached to this agreement are made a part of the contract as fully as though copied in full in the contract.

(8) The words "equipment" and "materials" as used here are synonymous and shall mean and include all oil field supplies and personal property acquired for use in the Unit Area.

## 2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

**A. Title Examination:** Title has heretofore been examined and approved. If additional title work is required it will be at the expense of the joint account.

~~Each party other than Operator shall promptly submit to Operator abstracts certified from beginning to recent~~ date, together with all title papers in its possession covering leases and oil and gas interests which it is subjecting to this contract. All of these abstracts and title records shall be examined for the benefit of all parties by Operator's attorneys.

Operator shall promptly submit abstracts certified from beginning to recent date, together with all title papers in its possession covering leases and oil and gas interests which it is subjecting to this agreement, to _____ for examination by the latter's attorney for the benefit of all parties.

All title examinations shall be made without charge. Each examining attorney shall prepare a complete title report on each separate tract based upon the abstract record and title papers submitted to him. Each title report shall contain a list of fee owners and their interests, shall state the attorney's opinion concerning validity of their interests, and shall contain an enumeration and description of title defects, if any, a report upon mortgages, taxes, pending suits, and judgments, and unreleased oil and gas leases, and a list of requirements, if any, upon which the examiner's approval of title to the lease or oil and gas interest is contingent. The title report shall also contain a specific description of the oil and gas lease being subjected to this contract, with a statement of its form, term (which will be satisfactory if it has a primary term expiring not sooner ~~than xxxxxxxxxxxxxxxxxxxxxx, xxx xxxxxx xx xxxxxxx, xxx xxx xx xxxxxxxx xxx xxxxxxxx, xxx xxxxxxxxx xxxxxxx~~

—1—

"Joint Loss"

Form 610   ROSS-MARTIN CO.
TULSA 1, OKLAHOMA

~~obligations and duties which may arise under special burdens, copies and correct title opinions~~ and of each supplemental opinion, and of all final opinions, shall be sent promptly to each party. The opinion of the examining attorney concerning the validity of the title to each oil and gas interest and each lease, and the amount of interest covered thereby shall be binding and conclusive on the parties, but the acceptability of leases as to primary term, royalty provisions, drilling obligations, and special burdens, shall be a matter for approval and acceptance by an authorized representative of each party.

All title examinations shall be made, and title reports submitted, within a period of_____days after the submission of abstracts and title papers. Each party shall, in good faith, try to satisfy the requirements of the examining attorneys concerning its leases and interests, and each shall have a period of_____ days from receipt of title report for this purpose. If the title to any lease, or oil and gas interest, is finally rejected by the examining attorney, all parties shall then be asked to state in writing whether they will waive the title defects and accept the leases or interests, or whether they will stand on the attorney's opinion. If one or more parties refuse to waive title defects, this agreement shall, in that case, be terminated and abandoned, and all abstracts and title papers shall be returned to their senders. If all titles are approved by the examining attorneys, or are accepted by all parties, and if all leases are accepted as to primary terms, royalty provisions, drilling obligations and special burdens, all subsequent provisions of this agreement shall become operative ~~immediately, and the parties shall proceed to their performance as they are hereinafter stated~~

**B. Failure of Title:**

After all titles are approved or accepted, any defects of title that may develop shall be the joint responsibility of all parties and, if a title loss occurs, it shall be the loss of all parties, with each bearing its proportionate part of the loss and of any liabilities incurred in the loss. If such a loss occurs, there shall be no change in, or adjustment of, the interests of the parties in the remaining portion of the Unit Area.

**C. Loss of Leases For Other Than Title Failure:**

If any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, the loss shall not be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interests in the remaining portion of the Unit Area.

**3. UNLEASED OIL AND GAS INTERESTS**

If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B" and for the primary term therein stated. As to such interests, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

**4. INTERESTS OF PARTIES**

Exhibit "A" lists all of the parties, and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit "A". All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.

— 2 —

"Joint Loss"

610 ROSS-MARTIN CO.
TULSA 1, OKLAHOMA

If any oil and gas lease covered by this agreement is subject to an overriding royalty, production payment, or other charge over and above the usual one-eighth (⅛) royalty, the party contributing that lease shall assume and alone bear all such excess obligations and shall account for them to the owners thereof out of its share of the working interest production of the Unit Area.

## 5. OPERATOR OF UNIT

SKLAR PRODUCING CO., INC. shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

## 6. EMPLOYEES

The number of employees and their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator. All employees shall be the employees of Operator.

## 7. TEST WELL

The W. C. WILLIAMS NOS. 1, 2, 3, 4, 5 and 6 and the WILLIAMS-STARCKE UNIT have heretofore been drilled. No additional drilling will be performed without the written consent of all parties hereto, subject to the provisions of Paragraph 12 on Pages 5 and 6 of this agreement.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties to the plugging, and the

## 8. COSTS AND EXPENSES

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the Unit Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expense basis provided in the Accounting Procedure attached hereto and marked Exhibit "C". If any provision of Exhibit "C" should be inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the costs to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated costs, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated costs shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest at the rate of six percent (6%) per annum until paid. Proper adjustment shall be made monthly between advances and actual cost, to the end that each party shall bear and pay its proportionate share of actual costs incurred, and no more.

— 3 —

KEUTEM 610 ROSS·MARTIN CO.
TULSA 1, OKLAHOMA

## 9. OPERATOR'S LIEN

Operator is given a first and preferred lien on the interest of each party covered by this contract, and in each party's interest in oil and gas produced and the proceeds thereof, and upon each party's interest in material and equipment, to secure the payment of all sums due from each such party to Operator.

In the event any party fails to pay any amount owing by it to Operator as its share of such costs and expense or such advance estimate within the time limited for payment thereof, Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of oil or gas, the proceeds accruing to the working interest or interests in the Unit Area of the delinquent party up to the amount owing by such party, and each purchaser of oil or gas is authorized to rely upon Operator's statement as to the amount owing by such party.

In the event of the neglect or failure of any non-operating party to promptly pay its proportionate part of the cost and expense of development and operation when due, the other non-operating parties and Operator, within thirty (30) days after the rendition of statements therefor by Operator, shall proportionately contribute to the payment of such delinquent indebtedness and the non-operating parties so contributing shall be entitled to the same lien rights as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operating parties under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the other non-operating parties and Operator proportionately in accordance with the contributions theretofore made by them.

## 10. TERM OF AGREEMENT

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise; provided, however, that in the event the first well drilled hereunder results in a dry hole and no other well is producing oil or gas in paying quantities from the Unit Area, then at the end of ninety (90) days after abandonment of the first test well, this agreement shall terminate unless one or more of the parties are then engaged in drilling a well or wells pursuant to Section 12 hereof, or all parties have agreed to drill an additional well or wells under this agreement, in which event this agreement shall continue in force until such well or wells shall have been drilled and completed. If production results therefrom this agreement shall continue in force thereafter as if said first test well had been productive in paying quantities, but if production in paying quantities does not result therefrom this agreement shall terminate at the end of ninety (90) days after abandonment of such well or wells. It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## 11. LIMITATION ON EXPENDITURES

Without the consent of all parties: (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling, testing, completing, and equipping of the well, including necessary tankage; (b) No well shall be reworked, plugged back or deepened except a well reworked, plugged back or deepened pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage; (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of_____ FIVE THOUSAND & NO/100 ----------------Dollars ($ 5,000.00 ) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $ 5,000.00 .

—4—

*Form 610* ROSE-MARTIN CO. TULSA 1. OKLAHOMA

## 12. OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling of any well on the Unit Area other than the test well provided for in Section 7, or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days (except as to reworking, plugging back or drilling deeper, where a drilling rig is on location, the period shall be limited to forty-eight (48) hours exclusive of Saturday or Sunday) after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

If any party receiving such a notice elects not to participate in the proposed operation (such party or parties being hereafter referred to as "Non-Consenting Party"), then in order to be entitled to the benefits of this section, the party or parties giving the notice and such other parties as shall elect to participate in the operation (all such parties being hereafter referred to as the "Consenting Parties") shall, within thirty (30) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the 48-hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests as shown in Exhibit "A" bear to the total interests of all Consenting Parties. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this section results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty and other interests payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(A) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this section, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and
300%

(B) ~~200%~~ of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing, after deducting any cash contributions received under Section 24, and ~~200%~~ 300% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

— 5 —

610 ROSS-MARTIN CO.
TULSA 7, OKLAHOMA

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value.

Within sixty (60) days after the completion of any operation under this section, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; if there is a credit balance it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it and from and after such reversion such Non-Consenting Party shall own the same interest in such well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have owned had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the accounting procedure schedule, Exhibit "C", attached hereto.

Notwithstanding the provisions of this Section 12, it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Unit Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this section shall have no application whatsoever to the drilling of the initial test well on the Unit Area, but shall apply to the reworking, deepening, or plugging back of the initial test well after it has been drilled to the depth specified in Section 7, if it is, or thereafter shall prove to be, a dry hole or non-commercial well, and to all other wells drilled, reworked, deepened, or plugged back, or proposed to be drilled, reworked, deepened, or plugged back, upon the Unit Area subsequent to the drilling of the initial test well.

## 13. RIGHT TO TAKE PRODUCTION IN KIND

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.

Each party shall execute all division orders and contracts of sale pertaining to its interest in production from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers thereof for its share of all production.

— 6 —

EXHIBIT 610 ROSS-MARTIN CO.
TULSA 1, OKLAHOMA

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days notice of such intended sale.

## 14. ACCESS TO UNIT AREA

Each party shall have access to the Unit Area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator shall, upon request, furnish each of the other parties with copies of all drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Unit Area.

## 15. DRILLING CONTRACTS

All wells drilled on the Unit Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. Operator, if it so desires, may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the field, and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as shall be customary and usual in the field in contracts of independent contractors who are doing work of a similar nature.

## 16. ABANDONMENT OF WELLS

No well, other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. The assignments so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Unit Area.

After the assignment, the assignors shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open. Upon request of the assignees, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

— 7 —

Form 610 ROSE-MARTIN CO.
TULSA 1, OKLAHOMA

Operator

## 17. DELAY RENTALS AND SHUT-IN WELL PAYMENTS

~~XXXXX XXXXX~~ shall pay all delay rentals and shut-in well payments which may be required under the terms of its lease or leases and submit evidence of each payment to the other parties at least ten (10) days prior to the payment date.  The paying party shall be reimbursed by Operator for 100% of any such delay rental payment and 100% of any such shut-in well payment.  The amount of such reimbursement shall be charged by Operator to the joint account of the parties and treated in all respects the same as costs incurred in the development and operation of the Unit Area.  Each party responsible for such payments shall diligently attempt to make proper payment, but shall not be held liable to the other parties in damages for the loss of any lease or interest therein if, through mistake or oversight, any rental or shut-in well payment is not paid or is erroneously paid.  The loss of any lease or interest therein which results from a failure to pay or an erroneous payment of rental or shut-in well payment shall be a joint loss and there shall be no readjustment of interests in the remaining portion of the Unit Area.  If any party secures a new lease covering the terminated interest, such acquisition shall be subject to the provisions of Paragraph 22 of this agreement.

Operator shall promptly notify each other party hereto of the date on which any gas well located on the Unit Area is shut in and the reason therefor.

## 18. PREFERENTIAL RIGHT TO PURCHASE

Should any party desire to sell all or any part of its interests under this contract, or its rights and interests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer.  The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties.  However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all of its assets, or a sale or transfer of its interests to a subsidiary or parent company, or subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

Should a sale be made by Operator of its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator.  If a new Operator is not so selected, the transferee of the present Operator shall assume the duties of and act as Operator.  In either case, the retiring Operator shall continue to serve as Operator, and discharge its duties in that capacity under this agreement, until its successor Operator is selected and begins to function, but the present Operator shall not be obligated to continue the performance of its duties for more than 120 days after the sale of its rights and interests has been completed.

— 8 —
"Joint Loss"

FORM 610  ROSS-MARTIN CO.
TULSA 1. OKLAHOMA

## 19. MAINTENANCE OF UNIT OWNERSHIP

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:

(1) the entire interest of the party in all leases and equipment and production; or

(2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

If at any time the interest of any party is divided among and owned by four or more co-owners, Operator may, at its discretion, require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this contract; however, all such co-owners shall enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Unit Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

## 20. RESIGNATION OF OPERATOR

Operator may resign from its duties and obligations as Operator at any time upon written notice of not less than ninety (90) days given to all other parties. In this case, all parties to this contract shall select by majority vote in interest, not in numbers, a new Operator who shall assume the responsibilities and duties, and have the rights, prescribed for Operator by this agreement. The retiring Operator shall deliver to its successor all records and information necessary to the discharge by the new Operator of its duties and obligations.

## 21. LIABILITY OF PARTIES

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

## 22. RENEWAL OR EXTENSION OF LEASES

If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this section shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this section.

The provisions in this section shall apply also and in like manner to extensions of oil and gas leases.

— 9 —

Form 610 ROSS-MARTIN CO.
TULSA 1, OKLAHOMA

## 23. SURRENDER OF LEASES

The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties not agree or consent, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Unit Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

## 24. ACREAGE OR CASH CONTRIBUTIONS

If any party receives while this agreement is in force a contribution of cash toward the drilling of a well or any other operation on the Unit Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage, without warranty of title, to all parties to this agreement in proportion to their interests in the Unit Area at that time, and such acreage shall become a part of the Unit Area and be governed by all the provisions of this contract. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Unit Area.

## 25. PROVISION CONCERNING TAXATION

Each of the parties hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954. If the income tax laws of the state or states in which the property covered hereby is located contain, or may hereafter contain, provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the parties agrees that such election shall be exercised. Each party authorizes and directs the Operator to execute such an election or elections on its behalf and to file the election with the proper governmental office or agency. If requested by the Operator so to do, each party agrees to execute and join in such an election.

Operator shall render for ad valorem taxation all property subject to this agreement which by law should be returned for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill all other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If any tax assessment is considered unreasonable by Operator, it may at its discretion protest such valuation within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. When any such protested valuation shall have been finally determined, Operator shall pay the assessment for the joint account, together with interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

— 10 —

Form 610   ROSS-MARTIN CO.
TULSA 1, OKLAHOMA

### 26. INSURANCE

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as may be outlined in Exhibit "D" attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Unit Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for operator's fully owned automotive equipment.

### 27. CLAIMS AND LAWSUITS

If any party to this contract is sued on an alleged cause of action arising out of operations on the Unit Area, or on an alleged cause of action involving title to any lease or oil and gas interest subjected to this contract, it shall give prompt written notice of the suit to the Operator and all other parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the parties, with Operator's attorney as Chairman. Suits may be settled during litigation only with the joint consent of all parties. No charge shall be made for services performed by the staff attorneys for any of the parties, but otherwise all expenses incurred in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all parties in proportion to their then interests in the Unit Area. Attorneys, other than staff attorneys for the parties, shall be employed in lawsuits involving Unit Area operations only with the consent of all parties; if outside counsel is employed, their fees and expenses shall be considered Unit Area expense and shall be paid by Operator and charged to all of the parties in proportion to their then interests in the Unit Area. The provisions of this paragraph shall not be applied in any instance where the loss which may result from the suit is treated as an individual loss rather than a joint loss under prior provisions of this agreement, and all such suits shall be handled by and be the sole responsibility of the party or parties concerned.

Damage claims caused by and arising out of operations on the Unit Area, conducted for the joint account of all parties, shall be handled by Operator and its attorneys, the settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement of any one claim does not exceed one thousand ($1000.00) dollars and, if settled, the sums paid in settlement shall be charged as expense to and be paid by all parties in proportion to their then interests in the Unit Area.

### 28. FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all possible diligence to remove the force majeure as quickly as possible.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure" as here employed shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### 29. NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, shall, unless otherwise specifically provided, be given in writing by United States mail or Western Union Telegram, postage or charges prepaid, and addressed to the party to whom the notice is given at the

— 11 —

EXHIBIT 610 ROSS-MARTIN CO. TULSA 1, OKLAHOMA

addresses listed on Exhibit "A". The originating notice to be given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### 30. OTHER CONDITIONS, IF ANY, ARE:

A. Cognizance is here taken that Sklar Producing Co., Inc. owns no interest in the properties subject to this Agreement, but will act as Operator for the Joint Account of the Non-Operators signatory hereto. Sklar Producing Co., Inc. is wholly owned by Albert Sklar and Leonard W. Phillips. In the event Albert Sklar, Sam Sklar and/or Leonard W. Phillips should sell his/their interest in the properties affected hereby, then such sale will be deemed a sale by Operator within the meaning of Article 13, Page 8 of this Agreement.

— 12 —

610 ROSS-MARTIN CO. TULSA 1, OKLAHOMA

This agreement may be signed in counterpart, and shall be binding upon the parties and upon their heirs, successors, representatives and assigns.

ATTEST:

By _John S. Carruth_
John G. Carruth, Secretary

SKLAR PRODUCING CO., INC.

By _August Erickson_
August Erickson, Vice-President

O P E R A T O R

XXXXXX

_____

XXXXXX

_____

_August Erickson_
August Erickson

_Morris B. White_
Morris B. White

_Albert Sklar_
Albert Sklar

_Leonard W. Phillips_
Leonard W. Phillips

_Sam Sklar_
Sam Sklar

_Mary S. Walker_
Mary S. Walker

_S. L. Florsheim, Jr._
S. L. Florsheim, Jr.

J. R. BUTLER & COMPANY

By _m. L. Renter_
VICE PRESIDENT

ELIZABETH F. DORFMAN TRUST

By _S. L. Florsheim, Jr._
S. L. Florsheim, Jr.

ESTATE OF SAM Y. DORFMAN

By _Sam Y. Dorfman, Jr._
Sam Y. Dorfman, Jr.

IDA SKLAR ESTATE

By _Albert Sklar_
Albert Sklar, Executor

RUTH WHITAKER ESTATE PROPERTIES

By _Douglas Whitaker_
Douglas Whitaker

_David Crow_
David Crow

_Mrs. A. W. Fischer_
Mrs. A. W. Fischer

— 13 —

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF OPERATING AGREEMENT
DATED FEBRUARY 1, 1965, (EFFECTIVE AS OF FEBRUARY 1,
1955), BETWEEN SKLAR PRODUCING CO., INC., AS OPERATOR,
AND J. R. BUTLER & COMPANY, ET AL, AS NON-OPERATORS,
COVERING THE W. C. WILLIAMS LEASES, CASS COUNTY, TEXAS.

### LANDS AND LEASES

1. (Lease #877) dated February 2, 1955, executed by Estelle L. R.
   Reed et al in favor of M. E. Weber, recorded in Volume 314,
   Pages 99-102, Deed Records of Cass County, Texas.

2. (Lease #878) dated January 31, 1955, executed by W. C. Williams,
   et ux, in favor of M. E. Weber, recorded in Volume 314, Pages
   103-106, Deed Records of Cass County, Texas.

3. (Lease #880) dated February 3, 1955, executed by Mrs. Willie
   Carney et al in favor of M. E. Weber, recorded in Volume 314,
   Pages 106-110, Deed Records of Cass County, Texas.

4. (Lease #885) dated January 31, 1955, executed by Fred Flanagan
   et al in favor of M. E. Weber, recorded in Volume 314, Pages
   110-113, Deed Records of Cass County, Texas.

5. (Lease #886) dated February 10, 1955, executed by Minnie Lee
   Bussa in favor of M. E. Weber, recorded in Volume 314, Pages
   125-128, Deed Records of Cass County, Texas.

6. (Lease #887) dated February 16, 1955, executed by Mrs. Eunice
   C. Starcke in favor of M. E. Weber, recorded in Volume 311,
   Page 442, Deed Records of Cass Cass County, Texas.

7. (Lease #888) dated February 4, 1955, executed by W. C. Thomas
   in favor of M. E. Weber, recorded in Volume 314, Pages 132-135,
   Deed Records of Cass County, Texas.

8. (Lease #1069) dated May 30, 1955, executed by W. F. Lacy in
   favor of Leonard W. Phillips, recorded in Volume 314, Pages
   412-415, Deed Records of Cass County, Texas.

9. (Lease #1089) dated September 15, 1948, executed by R. H. Price
   et al in favor of L. F. Brothers, recorded in Volume 250, Page
   531, Deed Records of Cass County, Texas.

10. (Lease #2981) dated May 1, 1955, executed by Beulah Burgess
    Reid in favor of Sam Sklar, recorded in Volume 394, Page 52,
    Deed Records of Cass County, Texas.

INSOFAR, AND ONLY INSOFAR as said leases cover and affect the

following described land:

All that certain tract or parcel of land situated in the Bryant
Holmes Survey, Abst. No. 447, Cass County, Texas, described as
follows, to-wit; BEGINNING at the N.E. corner of the Mark Miller
Survey an iron pin for corner; THENCE EAST 108 vrs. to an iron
pin for corner; THENCE NORTH 190 vrs. to an iron pin for corner;
THENCE EAST 254.8 vrs. to an iron pin for corner; THENCE NORTH
349.8 vrs. to an iron pin for corner; THENCE N. 89 E. 301.3 vrs.
to an iron pin for corner; THENCE NORTH 111.9 vrs. to an iron
pin for corner; THENCE EAST 430.9 vrs. to an iron pin for corner;

THENCE NORTH 1 E. 504 vrs. to Black Bayou, 696 Black Bayou, 1383.8 vrs. to an iron pin for corner; THENCE SOUTH 89½ E. 602.6 vrs. to an iron pin for corner; THENCE SOUTH 874 vrs. Black Bayou, 917.6 vrs. to corner, a pine brs. S. 62 W. 5.4 vrs. marked X; THENCE EAST 165 vrs. to Black Bayou at 1447.2 vrs an iron pin on the Texas and Louisiana State Line; S. ½ W. 473 vrs. to Black Bayou, at 612 vrs. Black Bayou at 645.1 vrs. to a stake in Mile Mound on the State Line No. 69, same being the E. SE corner of the Bryant Holmes Survey and the N.E. corner of the G. Crowder Survey, THENCE WEST 310 vrs. to Black Bayou at 1200 vrs. Boggy Creek, at 1847.1 vrs. to the N.W. corner of the G. Crowder Survey; THENCE SOUTH ½ W. 666 vrs. to an iron pin for corner on the W.B.L. of G. Crowder Survey and N.E. corner of a tract of land now owned by Russell Cash. THENCE WEST Af 1314.3 vrs. to an iron pin for corner on the E.B.L. of the Mark Miller Survey; THENCE NORTH 202 vrs. to the place of beginning. The same comprising 490.4 acres, more or less. SAVE & EXCEPT all that certain tract of land containing 165 acres, more or less, described and conveyed in Warranty Deed dated Marcy 29, 1949, executed by W. C. Williams et ux in favor of M. James Brooks, Jr., recorded in Volume 253, Page 73, Deed Records of Cass County, Texas.

* * * * * * * * * *

## OWNERSHIP OF LANDS AND LEASES

J. R. Butler & Company ------------------------- .37002150
   2138 Bank of the Southwest Bldg.Houston 2, Tex.

David Crow ---------------------------------- .12334050
   2000 Beck Bldg., Shreveport, Louisiana

Elizabeth F. Dorfman Trust ---------------------- .04480728
Sam Y. Dorfman Estate ------------------------- .04480728
S. L. Florsheim, Jr. ------------------------------ .00289081
   836 Mercantile Dallas Bldg., Dallas, Tex.

Mary S. Walker ------------------------------- .00289081
   207 Dalzell St., Shreveport, Louisiana

~~Douglas Whitaker~~ Ruth Whitaker Estate Properties .12334050
   303 Sklar Bldg., Shreveport, Louisiana

Mrs. A. W. Fischer ---------------------------- .01327600
   2443 Calle del Oro, La Jolla, California

August Erickson ------------------------------ .00289081
Morris B. White ------------------------------ .00289081
Albert Sklar --------------------------------- .08961457
Leonard W. Phillips --------------------------- .08961457
Sam Sklar ---------------------------------- .04480733
Ida Sklar Estate ----------------------------- .04480728
   P. O. Box 3735, Shreveport, Louisiana          _____

                                              1.00000000

THE W. L. BATH COMPANIES
BARM ORAN
NEO. 38, 315,311 IS. S. PAT. OFF
TEX. 14A REV. WITH POOLING PROVISIO... 12-50

# OIL, GAS AND MINERAL LEASE

AGREEMENT, Made and entered into this_____day of_____, 19_____
by and between

hereinafter called Lessor (whether one or more), and_____, Lessee,
(whether one or more and sometimes referred to as "it", whether natural person or corporation), WITNESSETH:

1. That the Lessor, for and in consideration of_____

_____DOLLARS ($_____),
cash in hand paid, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained, has demised, leased and let,
and by these presents does demise, lease and let exclusively unto the said Lessee, its successors, and assigns, the land hereinafter described, with the exclusive
right of exploring for mineral indications, and to employ therein the Torsion Balance, Seismograph, or other device or method, and with the right of operat-
ing for and producing therefrom oil, gas, casinghead gas, casinghead gasoline, sulphur and other minerals, with rights of way and easements for pipe lines,
telephone and telegraph lines, tanks, power houses, stations, gasoline plants and fixtures for producing, treating and caring for such products, and housing
and boarding employees, and any and all other rights and privileges necessary, incident to, or convenient for the economical exploration, development and

operation of said land for oil, gas, casinghead gas, casinghead gasoline, sulphur, and other minerals; said land being situated in the County of_____

_____, State of Texas and more particularly described as follows:

and for rental paying purposes and all other purposes of this lease estimated to contain_____acres, but this lease shall cover and include
all land owned or claimed by Lessor, by limitation or otherwise, contiguous to or forming a part of the land described or referred to above, whether the same
be more or less than the estimated acreage and whether such land be in the same or adjoining surveys. Lessor hereby acknowledges that this is a lease in
gross and not by the acre and the bonus money paid and the rentals and royalties provided for herein shall be effective to cover all such lands irrespective of
the number of acres actually contained therein.

2. It is agreed that this lease shall remain in force for a term of ten (10) years from this date (hereinafter called "primary term") and as long there-
after as oil, gas, sulphur or other minerals or any of them is produced from said land by Lessee or any of the obligations or conditions hereinafter specified
in lieu of production are fulfilled.

3. In consideration of the premises, and as royalties hereunder, the said Lessee covenants and agrees:

(a) To deliver to the credit of Lessor, free of cost, in the pipe line to which it may connect its wells, the equal one-eighth (1/8) part of all oil
produced and saved from said leased premises. Lessee may from time to time purchase any such royalty oil in its possession, paying the market price there-
for prevailing on the date of purchase for the field where produced.

(b) To pay Lessor for all gas (whether casinghead gas or other gaseous substance) including condensate (sometimes called "distillate" or "natural
gasoline") produced and saved from said land the following:

(1) On gas in its natural state or otherwise, sold, or utilized off the premises for purposes other than in the manufacture of gasoline or other
products, therefrom, the market price at the well of 1/8th of the gas so sold or utilized; provided that on gas sold at the well, the royalty shall be calculated
at 1/8th of the amount realized from such sale at the mouth of the well;

EXHIBIT "B"

THE STATE OF TEXAS,

COUNTY OF........................................ } BEFORE ME............................................a Notary Public

in and for the County of...................................................................State of Texas, on this day personally appeared

..........................................................................................................................and

..........................................................................................., his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said...................................................................................wife of the said

...........................................................................................having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said ................................................................. acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This...................day of.............................., A. D. 19.....

.....................................................

Notary Public in and for...................County, Texas.

No....................

Oil, Gas and Mineral Lease

FROM

TO

Dated..............................., 19.....

No. Acres..............................

.........................................County, Texas

Term.......................................

This instrument was filed for record on the..........

day of...................., 19......, at.....

o'clock..............M., and duly recorded in..........

Book..................Page..................

....................of Records of this office

....................County Clerk.

By....................Deputy.

When Recorded return to

TEX. 14A REV. WITH POOLING PROVISION

BATH-GRAM

THE STATE OF TEXAS,

COUNTY OF........................................ }

BEFORE ME,......................................................................., Notary Public in and for the County of

.......................................and State of Texas, on this day personally appeared...........................................

..........................................................................................................................

known to me to be the person.... whose name..........subscribed to the foregoing instrument, and acknowledged to me that....he....executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this the...................day of........................................, A. D. 19.....

.....................................................

Notary Public in and for...................County, Texas.

CORPORATION ACKNOWLEDGMENT

THE STATE OF TEXAS,

COUNTY OF........................................ } BEFORE ME, the undersigned, a Notary Public,

......................................................................, in and for said County, Texas, on this day personally appeared

...................................................................................known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said...............................

..........................................................................................................................

a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the...................day of..........................., A. D. 19.....

(L. S.)

.....................................................

Notary Public in and for...................County, Texas.

(2)  On condensate, if separated from the gas by ordinary field type separators at the well, sold or utilized off the premises, 1/8th of the market price at the well of the condensate so sold or utilized; and if, as a practical and economical lease operation, condensate may be recovered in commercial quantities through field type separators, then Lessee agrees to install and operate same except where the provisions of the following Subparagraphs (3) or (4) are applicable;

(3)  On gas in its natural state or otherwise, sold for use in the extraction or manufacture of gasoline or other products therefrom 1/8th of the net amount received by Lessee from such sale;

(4)  On gas used by Lessee itself for the recovery, manufacture or extraction therefrom of condensate, gasoline or other liquid hydrocarbons in any gasoline or other manufacturing plant 1/8th of the net proceeds derived from the sale of such condensate, gasoline and other liquid hydrocarbons so recovered, extracted or manufactured, and 1/8th of the market price at the outlet side of such plant of any residue gas remaining after the recovery, extraction or manufacture of said products and sold at the outlet side of such plant, or utilized by Lessee off the leased premises.  Said net proceeds derived from the sale of the condensate, gasoline and other liquid hydrocarbons shall be determined by deducting from the sales price received from such products the actual cost of transportation of the gas to the plant, together with the actual cost of recovery, extraction or manufacture of such recovered, manufactured or extracted products.  The amount of condensate, gasoline and other liquid hydrocarbons recovered, extracted or manufactured by Lessee in any such gasoline or other manufacturing plant, from the gas produced from the premises leased herein, as well as the amount of residue gas remaining upon which Lessor's royalty shall be paid shall be determined in a manner commonly recognized and used in the oil and gas industry.  Nothing herein shall be construed as obligating the Lessee to extract, manufacture or recover condensate, gasoline or other liquid hydrocarbons in any gasoline or other manufacturing plant.

(5)  While gas or condensate from a gas well is not sold or utilized off the premises Lessee may pay or tender to Lessor or to the credit of Lessor in the depository Bank named below, at the rate of $200.00 per year, payable quarterly, and due on or before the last day of each quarter for such time as said gas or condensate is not sold or utilized off the premises, and upon such payment by Lessee to Lessor it will be considered that gas is being produced from said land.  If gas or condensate from any gas well is not sold or utilized off the premises for a period of three (3) months or more after the completion of such well, it is agreed that for the purposes of the payments above referred to the quarterly period shall commence on the date of completion of such well; and if, at any time after gas or condensate has been sold or utilized off the premises from such well, the sale of gas or condensate or the use thereof off the premises, shall cease for a period of three (3) months or more such quarterly periods shall commence on the date the last gas or condensate was sold from such well or used off the premises.  When the sale of gas or condensate, or the use thereof off the premises is first commenced from any well, or is resumed after being discontinued, no such payments shall be due or payable for the quarterly period in which such sale or use of said gas or condensate is commenced or resumed.

(c)  To pay to the Lessor as royalty the sum of One Dollar ($1.00) per long ton (2240 pounds) for all sulphur produced and marketed from said leased premises and if any minerals other than oil, gas and sulphur are found and produced from said land, the Lessee shall deliver or pay to the Lessor the usual prevailing royalty on such minerals in kind or value at Lessee's election.

4.  Lessee may pay any royalty or make any other payment due Lessor by depositing said monies to the credit of Lessor in the Bank hereinafter named as Depository; and any payment, tender or deposit under this lease may be made jointly to any adverse claimants of the same interest, or to claimants whose interests are indefinite or undetermined in amount.

5.  All taxes levied on the severance or production of oil, gas, sulphur and other minerals hereunder shall be due and payable in the following proportions:
One-eighth by Lessor and seven-eighths by Lessee.

6.  If drilling operations are not commenced on said land on or before one year from the date hereof this lease shall then terminate as to both parties,

unless Lessee shall pay or tender to Lessor or to the credit of Lessor in_____

Bank at_____(which bank is Lessor's agent)

the sum of_____Dollars ($_____

(hereinafter called "rental"), which shall extend for twelve months the time within which drilling operations may be commenced.  Thereafter, annually, in like manner, and upon like payments or tenders, the commencement of drilling operations may be further deferred for periods of twelve months during the primary term.  The payments or tenders of rental may be made by the check or draft of Lessee mailed or delivered to Lessor or to said bank, on or before such date of payment.  Drilling operations hereunder shall be deemed to be commenced when the first material is placed on the ground.  Notwithstanding any devolution, change or division in the ownership of said land, the payments or tenders of rentals, or shut-in gas royalties, in the manner herein provided shall be binding on the successors, assigns or legal representatives of Lessor.  In the event of the death of any person entitled to rentals, or shut-in gas royalties, hereunder, Lessee may pay or tender such rentals, or shut-in gas royalties, to the credit of the deceased or the estate of the deceased until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, then until Lessee is furnished with satisfactory evidence to it as to the heirs or devisees of the deceased and that all debts and taxes of the estate have been paid.  If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, Lessee shall not be held in default for failure to make such payments or tenders until thirty days after Lessor shall deliver to Lessee an instrument in writing, duly executed and acknowledged, naming another bank as agent to receive such payments or tenders.  And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the rights and privileges granted to the date when said rental is payable as aforesaid, but also Lessee's option of extending the period as aforesaid, and any and all other rights herein conferred.  Lessee may at any time execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations of this lease as to the acreage surrendered.  Thereafter the rentals and all other payments hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases.

7.  If prior to the discovery of oil, gas, sulphur or other minerals on said land Lessee should drill a dry hole or holes thereon, this lease shall not be terminated thereby, if Lessee, on or before the next ensuing rental paying date after the expiration of sixty (60) days from the abandonment of such dry hole, commences further drilling operations or commences or resumes the payment or tender of rentals.  If after the discovery of oil, gas, sulphur or other minerals the production thereof should cease from any cause, and the well or wells on the leased land, or upon the lands with which the leased land, or part thereof, may be pooled or unitized, becomes incapable of further production of any and all such products, this lease shall not be terminated thereby if Lessee commences reworking operations or additional drilling operations within sixty days thereafter, or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the next ensuing rental paying date, after the expiration of sixty (60) days from the time such well or wells becomes incapable of further production as aforesaid, or fulfills any of the obligations herein provided for in lieu of drilling or production.  If at the expiration of the primary term oil, gas, sulphur or other minerals have not been found on said land but Lessee is then engaged in drilling operations thereon, this lease shall remain in force so long as drilling operations are prosecuted, and, if they result in the finding of oil, gas, sulphur or other minerals, so long thereafter as oil, gas, sulphur or other minerals are or can be produced from any well on said land.  If such well, being drilled when the primary term expires, should have to be abandoned or should be a dry hole, then Lessee shall have the option to commence other drilling operations, within sixty days from the completion or abandonment of such attempt, for drilling of another well on said land in search of oil, gas, sulphur, or other minerals and in like manner this lease may be maintained in existence after the primary term by the drilling of other wells until oil, gas, sulphur or other minerals are found in paying quantities, provided not more than sixty days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of another.

8.  The Lessee shall have the exclusive right to take all waste oil, from its own wells, or coming on this property from other sources, and agrees to pay to Lessor an equal one-eighth thereof, if utilized or sold.

9.  The rentals, royalties and any other payments provided for herein are based upon the full fee simple ownership of the land herein described, or of the oil, gas and other minerals in and under said land.  Without impairment of Lessee's rights under the warranties herein, it is agreed that if Lessor owns an interest in said land, or in said oil, gas and other minerals, less than the entire fee simple estate (whether such lesser interest is expressly stipulated herein or not), then the royalties and rentals and any other payments to be paid Lessor shall be reduced proportionately.  Failure of Lessee to reduce the rentals provided for hereunder shall not impair the right of Lessee to reduce the royalties and other payments.  Any non-participating or other outstanding royalty interest shall be deducted from the royalties herein provided for and shall not be paid in addition thereto.

10.  Lessee shall have the right to use, free of cost, gas, oil and water produced on said land, also waste oil, for its operations thereon, except water from wells of Lessor.

11.  When requested by Lessor, Lessee shall bury its pipe lines below plow depth.

12.  No well shall be drilled nearer than 200 feet to the house or barn now on said premises, without the written consent of the Lessor.

13.  Lessee shall pay for damages caused by its operations to growing crops on said land.

14.  Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

15.  If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors, assigns, but notwithstanding any actual or constructive knowledge or notice thereof, to Lessee, no change or division in the ownership of the lands, royalties, delay rentals, or other monies which may become due and payable hereunder shall be binding upon the owner of this lease until the actual receipt by such lease owner of written notice thereof, and until the transfers or assignments, in the event such division or change is accomplished in that manner, have been properly filed for record in the records of the county where the land lies, and copies thereof certified by the County Clerk, or the originals showing the County Clerk's certificate of record, shall have been delivered to the then record owner of this lease, or of the portion or portions thereof to which such transfers or assignments apply; said notice and copies or originals of the instruments herein-above or hereinafter mentioned, to be delivered to such record owner at his or its principal place of business.  In the event such change or division in ownership is accomplished by will or devise or by judgment of a court or is established by or dependent upon probate or other court proceedings of any kind, certified

copies of such will, judgment and court proceedings shall be furnished to the record owner of this lease before such change or division in ownership is binding upon said lease owner. Any payment of rentals, royalties or other amounts payable hereunder, made by Lessee before being furnished with notice and proper proof of change or division in ownership as above provided for shall fully protect Lessee against the claims of the new owner or claimant, even though payment is made prior to the actual due date thereof. And it is hereby agreed in the event this lease shall be assigned as to a part or as to parts of the above described lands and the assignee or assignees of such part or parts shall fail or make default in the payment of the proportionate part of the rents due from him or them such default shall not operate to defeat or affect this lease in so far as it covers a part or parts of said lands upon which said Lessee or any assignee thereof shall make due payment of said rental. If Lessee, or any assignee of Lessee, assigns this lease, either in whole or in part, Lessee or any such assignee of Lessee shall be relieved of all obligations hereunder with respect to the assigned portion or portions arising subsequent to the date of assignment.

16. Lessor hereby warrants and agrees to defend the title to the land herein described, and agrees that the Lessee shall have the right at any time to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right of subrogation herein granted, Lessee shall also have the right to retain any rentals or royalties which may become due Lessor hereunder and to repay itself therefrom, and the retention of such rentals or royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17. Lessee is hereby given the power and right, as to all or any part of the land described herein and as to any one or more of the formations thereunder and the minerals therein or produced therefrom, at its option and without Lessor's joinder or further consent, to at any time, and from time to time, as a recurring power and right, either before or after production, pool and unitize the leasehold estate and the Lessor's royalty estate created by this lease with the rights of third parties, if any, in all or any part of the land described herein and with any other land, lands, lease, leases, mineral and royalty rights, or any of them adjacent, adjoining or located within the immediate vicinity of this lease, whether owned by Lessee or some other person, firm or corporation, so as to create by such pooling and unitization one or more drilling or production units, when in Lessee's judgment it is necessary or advisable to do so in order to comply with the rules and regulations of the Railroad Commission of Texas or other lawful authority, either Federal or State, having jurisdiction in the premises, or when to do so would, in the judgment of Lessee, promote the conservation of oil, gas and other minerals. Each such drilling or production unit, when limited to any one or more formations and to any one or more of the minerals therein or produced therefrom, may from time to time be enlarged and extended by Lessee to additionally include any other formation or formations and any other mineral or minerals therein or produced therefrom. Likewise, when such unit is created with a recited acreage of less than the maximum acreage hereinafter specified (including the acreage tolerance provided for), such unit may from time to time be enlarged and extended by Lessee to additionally include acreage so long as the total does not exceed the maximum so specified. Each such drilling or production unit shall not exceed 40 acres, plus an acreage tolerance not to exceed ten per cent (10%) of 40 acres, when created for the purpose of drilling for or producing oil therefrom and 640 acres, plus an acreage tolerance not to exceed ten per cent (10%) of 640 acres, when created for the purpose of drilling for or producing gas, condensate (sometimes called "distillate"), or any combination of such minerals therefrom; provided, however, if the maximum drilling or production unit fixed or allowed by the Texas Railroad Commission or other regulatory authority, Federal or State, having jurisdiction in the premises, as a basis for the development and operation of or the production from the field in which the above described land is located, be more or less than said maximum, then, in either such event, each such unit created hereunder shall not exceed the maximum so prescribed or permitted and in force in the field at the time such unit is created, plus an acreage tolerance not to exceed ten per cent (10%) of such maximum. As to each such unit so created by Lessee, there shall be allocated to the acreage covered by this lease, and included in the pooled unit, such portion of the production (oil, gas, condensate or other minerals) from said unit as the number of acres out of this lease placed in any such unit, as such unit from time to time may be constituted, bears to the total number of acres included in such unit, and Lessor agrees to accept and shall receive the royalties (shut-in or other kind) elsewhere specified in this lease, based upon the production so allocated to this lease or the proceeds therefrom. It is specially agreed in this connection that the number of acres in this entire lease shall be taken as the number hereinabove estimated whether the actual acreage be more or less, until and unless an actual survey made by or on behalf of Lessee discloses a lesser or greater amount of acreage, in which event such surveyed acreage shall control for the purposes of this pooling provision. The commencement, drilling, completion of, reworking of or production from a well on any portion of the unit created hereunder shall have the same effect upon the terms of this lease as if a well were commenced, drilled, completed, reworked or producing on the land embraced by this lease. Lessee may place and use on each unit created hereunder common measuring and receiving tanks for production from such unit. If Lessee does create any such unit or units under the rights herein granted, then Lessee shall execute in writing and record in the county or counties in which each such unit or units created hereunder may be located an instrument identifying and describing each such unit or units so created. It is agreed in this connection, however, that if, at the time of the execution of this lease by any of the undersigned as Lessor, any such drilling and production unit or units has or have already been created by Lessee or its predecessor in title, either acting singly or jointly with others, in conformity with the terms and provisions hereinabove set out, covering all or any part of the land described in and covered by this lease, no further declaration or supplemental declaration creating such drilling and production unit or ratifying the creation of such unit and adopting the same shall be required; and any such unit heretofore created is hereby adopted, ratified and confirmed, and this instrument as to the creation of any such drilling and production unit shall be retroactively effective as of the date of creation thereof. The development of and production from each such unit shall be in accordance with the valid orders, rules and regulations of the Texas Railroad Commission or other lawful authority, either Federal or State, having jurisdiction in the premises. The provisions of this paragraph shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, legal representatives, successors and assigns. It is agreed, however, that all rights accruing by reason of these pooling provisions or the declaration of a unit or units hereunder shall automatically terminate as to any tract or interest on which this lease finally terminates, whether by release by Lessee or otherwise. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom, Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the county or counties in which such unit may be located, an instrument identifying, describing and dissolving such unit.

18. This lease shall not be terminated or be subject to cancellation or forfeiture in whole or in part and the Lessee shall not be held liable in damages in the event of any failure or delay of Lessee incident to compliance with the terms, provisions, conditions, limitations, or covenants of this lease, whether express or implied, if such failure or delay result directly or indirectly from compliance with, or in obedience to, any Federal or State law, executive order, rule or regulation or because of any interference flowing from war or other causes beyond the control of Lessee whether similar or dissimilar to those just stated. After production has been had, if the Lessee is unable to produce or market at the wells any products from the leased premises by reason of any of the above causes, then during any such period or periods this lease shall nevertheless remain in full force and effect; provided nothing herein shall impair the right of the Lessee to keep this lease in force and effect by the payment of the fixed royalty provided for herein where gas from gas wells is not sold, or utilized off the premises.

19. This lease shall be valid and binding on all parties named herein as Lessor who may sign same regardless of whether or not this lease is executed by all parties named herein as Lessor or by all owners of the minerals in above described land or by other parties at interest.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

_____      _____

_____      _____

_____      _____

_____      _____

_____      _____

# EXHIBIT " C "

Attached to and made a part of Operating Agreement dated February 1, 1965 (Effective as of February 1, 1955), between Sklar Producing Co., Inc. as Operator, and I. R. Butler & Company, et al., as Non-Operators covering the W. C. Williams Leases, Cass County, Texas.

# ACCOUNTING PROCEDURE

### (UNIT AND JOINT LEASE OPERATIONS)

#### I. GENERAL PROVISIONS

**1. Definitions**

"Joint property" as herein used shall be construed to mean the subject area covered by the agreement to which this "Accounting Procedure" is attached.

"Operator" as herein used shall be construed to mean the party designated to conduct the development and operation of the subject area for the joint account of the parties hereto.

"Non-Operator" as herein used shall be construed to mean any one or more of the non-operating parties.

**2. Statements and Billings**

Operator shall bill Non-Operator on or before the last day of each month for its proportionate share of costs and expenditures during the preceding month. Such bills will be accompanied by statements, reflecting the total costs and charges as set forth under Sub-paragraph _____ B _____ below:

A. Statement in detail of all charges and credits to the joint account.

B. Statement of all charges and credits to the joint account, summarized by appropriate classifications indicative of the nature thereof.

C. Statements as follows:

(1) Detailed statement of material ordinarily considered controllable by operators of oil and gas properties;

(2) Statement of ordinary charges and credits to the joint account summarized by appropriate classifications indicative of the nature thereof; and

(3) Detailed statement of any other charges and credits.

**3. Payments by Non-Operator**

Each party shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of Non-Operator to protest or question the correctness thereof. Subject to the exception noted in Paragraph 5 of this section I, all statements rendered to Non-Operator by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period Non-Operator takes written exception thereto and makes claim on Operator for adjustment. Failure on the part of Non-Operator to make claim on Operator for adjustment within such period shall establish the correctness thereof and preclude the filing of exceptions thereto or making of claims for adjustment thereon. The provisions of this paragraph shall not prevent adjustments resulting from physical inventory of property as provided for in Section VI, Inventories, hereof.

**5. Audits**

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, that Non-Operator must take written exception to and make claim upon the Operator for all discrepancies disclosed by said audit within said twenty-four (24) month period. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator.

#### II. DEVELOPMENT AND OPERATING CHARGES

*Subject to limitations hereinafter prescribed, Operator shall charge the joint account with the following items:*

**1. Rentals and Royalties**

Delay or other rentals, when such rentals are paid by Operator for the joint account; royalties, when not paid directly to royalty owners by the purchaser of the oil, gas, casinghead gas, or other products.

**2. Labor**

A. Salaries and wages of Operator's employees directly engaged on the joint property in the development, maintenance, and operation thereof, including salaries or wages paid to geologists and other employees who are temporarily assigned to and directly employed on a drilling well.

B. Operator's cost of holiday, vacation, sickness and disability benefits, and other customary allowances applicable to the salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. Costs under this Subparagraph 2 B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Costs of expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages as provided under Subparagraphs 2 A, 2 B, and Paragraph 11 of this Section II.

**3. Employee Benefits**

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost, provided that the total of such charges shall not exceed ten per cent (10%) of Operator's labor costs as provided in Subparagraphs A and B of Paragraph 2 of this Section II and in Paragraph 11 of this Section II.

**4. Material**

Material, equipment, and supplies purchased or furnished by Operator for use of the joint property. So far as it is reasonably practical and consistent with efficient and economical operation, only such material shall be purchased for or transferred to the joint property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

**5. Transportation**

Transportation of employees, equipment, material, and supplies necessary for the development, maintenance, and operation of the joint property subject to the following limitations:

A. If material is moved to the joint property from vendor's or from the Operator's warehouse or other properties, no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point where such material is available, except by special agreement with Non-Operator.

—1—

B. If surplus material is moved to Operator's warehouse or other storage point, no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point, except by special agreement with Non-Operator. No charge shall be made to the joint account for moving material to other properties belonging to Operator, except by special agreement with Non-Operator.

**6. Service**

A. Outside Services:
   The cost of contract services and utilities procured from outside sources.

B. Use of Operator's Equipment and Facilities:
   Use of and service by Operator's exclusively owned equipment and facilities as provided in Paragraph 5 of Section III entitled "Operator's Exclusively Owned Facilities."

**7. Damages and Losses to Joint Property and Equipment**

All costs or expenses necessary to replace or repair damages or losses incurred by fire, flood, storm, theft, accident, or any other cause not controllable by Operator through the exercise of reasonable diligence. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after report of the same has been received by Operator.

**8. Litigation Expense**

All costs and expenses of litigation, or legal services otherwise necessary or expedient for the protection of the joint interests, including attorneys' fees and expenses as hereinafter provided, together with all judgments obtained against the parties or any of them on account of the joint operations under this agreement, and actual expenses incurred by any party or parties hereto in securing evidence for the purpose of defending against any action or claim prosecuted or urged against the joint account or the subject matter of this agreement.

A. If a majority of the interests hereunder shall so agree, actions or claims affecting the joint interests hereunder may be handled by the legal staff of one or more of the parties hereto; and a charge commensurate with cost of providing and furnishing such services rendered may be made against the joint account; but no such charge shall be made until approved by the legal departments of or attorneys for the respective parties hereto.

B. Fees and expenses of outside attorneys shall not be charged to the joint account unless authorized by the majority of the interests hereunder.

**9. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the properties which are the subject of this agreement, the production therefrom or the operation thereof, and which taxes have been paid by the Operator for the benefit of the parties hereto.

**10. Insurance and Claims**

A. Premiums paid for insurance required to be carried for the benefit of the joint account, together with all expenditures incurred and paid in settlement of any and all losses, claims, damages, judgments, and other expenses, including legal services, not recovered from insurance carrier.

B. If no insurance is required to be carried, all actual expenditures incurred and paid by Operator in settlement of any and all losses, claims, damages, judgments, and any other expenses, including legal services, shall be charged to the joint account.

**11. District and Camp Expense (Field Supervision and Camp Expense)**

A pro rata portion of the salaries and expenses of Operator's production superintendent and other employees serving the joint property and other properties of the Operator in the same operating area, whose time is not allocated directly to the properties, and a pro rata portion of the cost of maintaining and operating a production office known as Operator's_____ _____Shreveport_____office located at or near___Shreveport,_Louisiana_____ (or a comparable office if location changed), and necessary suboffices (if any), maintained for the convenience of the above-described office, and all necessary camps, including housing facilities for employees if required, used in the conduct of the operations on the joint property and other properties operated in the same locality. The expense of, less any revenue from, these facilities should be inclusive of depreciation or a fair monthly rental in lieu of depreciation on the investment. Such charges shall be apportioned to all properties served on some equitable basis consistent with Operator's accounting practice.

**12. Administrative Overhead**

Operator shall have the right to assess against the joint property covered hereby the following management and administrative overhead charges, which shall be in lieu of all expenses of all offices of the Operator not covered by Section II, Paragraph 11, above, including salaries and expenses of personnel assigned to such offices, except that salaries of geologists and other employees of Operator who are temporarily assigned to and directly serving on the joint property will be charged as provided in Section II, Paragraph 2, above. Salaries and expenses of other technical employees assigned to such offices will be considered as covered by overhead charges in this paragraph unless charges for such salaries and expenses are agreed upon between Operator and Non-Operator as a direct charge to the joint property.

**WELL BASIS (Rate Per Well Per Month)**

| Well Depth | DRILLING WELL RATE Each Well | PRODUCING WELL RATE (Use Completion Depth) | | |
| --- | --- | --- | --- | --- |
| | | First Five | Next Five | All Wells Over Ten |
| ____0-7000'____ | ____$400.00____ | ____$62.50____ | ____-------____ | ____---------____ |
| ---------------- | ---------------- | ---------------- | ---------------- | ---------------- |
| ---------------- | ---------------- | ---------------- | ---------------- | ---------------- |
| ---------------- | ---------------- | ---------------- | ---------------- | ---------------- |

A. Overhead charges for drilling wells shall begin on the date each well is spudded and terminate when it is on production or is plugged, as the case may be, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.

B. In connection with overhead charges, the status of wells shall be as follows:
   (1) Injection wells for recovery operations, such as for repressure or water flood, shall be included in the overhead schedule the same as producing oil wells.
   (2) Water supply wells utilized for water flooding operations shall be included in the overhead schedule the same as producing oil wells.
   (3) Producing gas wells shall be included in the overhead schedule the same as producing oil wells.

—2—

(4) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the overhead schedule at the time the shutdown is effected. When such wells are plugged, overhead shall be charged at the producing well rate during the time required for the plugging operation.

(5) Wells being plugged back, drilled deeper, or converted to a source or input well shall be included in the overhead schedule the same as drilling wells.

(6) Temporarily shut-down wells (other than by governmental regulatory body) which are not produced or worked upon for a period of a full calendar month shall not be included in the overhead schedule; however, wells shut in by governmental regulatory body shall be included in the overhead schedule only in the event the allowable production is transferred to other wells on the same property. In the event of a unit allowable, all wells capable of producing will be counted in determining the overhead charge.

(7) Wells completed in dual or multiple horizons shall be considered as two wells in the producing overhead schedule.

(8) Lease salt water disposal wells shall not be included in the overhead schedule unless such wells are used in a secondary recovery program on the joint property.

C. The above overhead schedule for producing wells shall be applied to the total number of wells operated under the Operating Agreement to which this accounting precedure is attached, irrespective of individual leases.

D. It is specifically understood that the above overhead rates apply only to drilling and producing operations and are not intended to cover the construction or operation of additional facilities such as, but not limited to, gasoline plants, compressor plants, repressuring projects, salt water disposal facilities, and similar installations. If at any time any or all of these become necessary to the operation, a separate agreement will be reached relative to an overhead charge and allocation of district expense.

E. The above specific overhead rates may be amended from time to time by agreement between Operator and Non-Operator if, in practice, they are found to be insufficient or excessive.

**13. Operator's Fully Owned Warehouse Operating and Maintenance Expense**
(Describe fully the agreed procedure to be followed by the Operator.)

----------------------------------------------------------------------------------------------------
----------------------NONE--------------------------------------------------------------------------
----------------------------------------------------------------------------------------------------
----------------------------------------------------------------------------------------------------
----------------------------------------------------------------------------------------------------

**14. Other Expenditures**
Any expenditure, other than expenditures which are covered and dealt with by the foregoing provisions of this Section II, incurred by the Operator for the necessary and proper development, maintenance, and operation of the joint property.

### III. BASIS OF CHARGES TO JOINT ACCOUNT

**1. Purchases**
Material and equipment purchased and service procured shall be charged at price paid by Operator after deduction of all discounts actually received.

**2. Material Furnished by Operator**
Material required for operations shall be purchased for direct charge to joint account whenever practicable, except that Operator may furnish such material from Operator's stocks under the following conditions:

A. New Material (Condition "A")

(1) New material transferred from Operator's warehouse or other properties shall be priced f.o.b. the nearest reputable supply store or railway receiving point, where such material is available, at current replacement costs of the same kind of material. This will include material such as tanks, pumping units, sucker rods, engines, and other major equipment. Tubular goods, two-inch (2") and over, shall be priced on carload basis effective at date of transfer and f.o.b. railway receiving point nearest the joint account operation, regardless of quantity transferred.

(2) Other material shall be priced on basis of a reputable supply company's preferential price list effective at date of transfer and f.o.b. the store or railway receiving point nearest the joint account operation where such material is available.

(3) Cash discount shall not be allowed.

B. Used Material (Condition "B" and "C")

(1) Material which is in sound and serviceable condition and is suitable for reuse without reconditioning shall be classed as Condition "B" and priced at seventy-five per cent (75%) of new price.

(2) Material which cannot be classified as Condition "B" but which,
(a) After reconditioning will be further serviceable for original function as good secondhand material (Condition "B"), or
(b) Is serviceable for original function but substantially not suitable for reconditioning, shall be classed as Condition "C" and priced at fifty per cent (50%) of new price.

(3) Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use.

(4) Tanks, buildings, and other equipment involving erection costs shall be charged at applicable percentage of knocked-down new price.

**3. Premium Prices**
Whenever materials and equipment are not readily obtainable at the customary supply point and at prices specified in Paragraphs 1 and 2 of this Section III because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the joint account for the required materials on the basis of the Operator's direct cost and expense incurred in procuring such materials, in making it suitable for use, and in moving it to the location, provided, however, that notice in writing is furnished to Non-Operator of the proposed charge prior to billing the Non-Operator for the material and/or equipment acquired pursuant to this provision, whereupon Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from the Operator, to furnish in kind, or in tonnage as the parties may agree, at the location, nearest railway receiving point, or Operator's storage point within a comparable distance, all or part of his share of material and/or equipment suitable for use and acceptable to the Operator. Transportation costs on any such material furnished by Non-Operator, at any point other than at the location, shall be borne by such Non-Operator. If, pursuant to the provisions of this paragraph, any Non-Operator furnishes material and/or equipment in kind, the Operator shall make appropriate credits therefor to the account of said Non-Operator.

**4. Warranty of Material Furnished by Operator**
Operator does not warrant the material furnished beyond or back of the dealer's or manufacturer's guaranty; and in case of defective material, credit shall not be passed until adjustment has been received by Operator from the manufacturers or their agents.

**5. Operator's Exclusively Owned Facilities**
The following rates shall apply to service rendered to the joint account by facilities owned exclusively by Operator:

A. Water, fuel, power, compressor and other auxiliary services at rates commensurate with cost of providing and furnishing such service to the joint account but not exceeding rates currently prevailing in the field where the joint property is located.

—3—

B. Automotive equipment at rates commensurate with cost of ownership and operation. Such rates should generally be in line with the schedule of rates adopted by the Petroleum Motor Transport Association, or some other recognized organization, as recommended uniform charges against joint account operations and revised from time to time. Automotive rates shall include cost of oil, gas, repairs, insurance, and other operating expense and depreciation; and charges shall be based on use in actual service on, or in connection with, the joint account operations. Truck and tractor rates may include wages and expenses of driver.

C. A fair rate shall be charged for the use of drilling and cleaning-out tools and any other items of Operator's fully owned machinery or equipment which shall be ample to cover maintenance, repairs, depreciation, and the service furnished the joint property; provided that such charges shall not exceed those currently prevailing in the field where the joint property is located. Pulling units shall be charged at hourly rates commensurate with the cost of ownership and operation, which shall include repairs and maintenance, operating supplies, insurance, depreciation, and taxes. Pulling unit rates may include wages and expenses of the operator.

D. A fair rate shall be charged for laboratory services performed by Operator for the benefit of the joint account, such as gas, water, core, and any other analyses and tests; provided such charges shall not exceed those currently prevailing if performed by outside service laboratories.

E. Whenever requested, Operator shall inform Non-Operator in advance of the rates it proposes to charge.

F. Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## IV. DISPOSAL OF LEASE EQUIPMENT AND MATERIAL

The Operator shall be under no obligation to purchase interest of Non-Operator in surplus new or secondhand material. The disposition of major items of surplus material, such as derricks, tanks, engines, pumping units, and tubular goods, shall be subject to mutual determination by the parties hereto; provided Operator shall have the right to dispose of normal accumulations of junk and scrap material either by transfer or sale from the joint property.

**1. Material Purchased by the Operator or Non-Operator**

Material purchased by either the Operator or Non-Operator shall be credited by the Operator to the joint account for the month in which he material is removed by the purchaser.

**2. Division in Kind**

Division of material in kind, if made between Operator and Non-Operator, shall be in proportion to their respective interests in such material. Each party will thereupon be charged individually with the value of the material received or receivable by each party, and corresponding credits will be made by the Operator to the joint account. Such credits shall appear in the monthly statement of operations.

**3. Sales to Outsiders**

Sales to outsiders of material from the joint property shall be credited by Operator to the joint account at the net amount collected by Operator from vendee. Any claims by vendee for defective material or otherwise shall be charged back to the joint account if and when paid by Operator.

## V. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

*Material purchased by either Operator or Non-Operator or divided in kind, unless otherwise agreed, shall be valued on the following basis:*

**1. New Price Defined**

New price as used in the following paragraphs shall have the same meaning and application as that used above in Section III, "Basis of Charges to Joint Account."

**2. New Material**

New material (Condition "A"), being new material procured for the joint account but never used thereon, at one hundred per cent (100%) of current new price (plus sales tax if any).

**3. Good Used Material**

· Good used material (Condition "B"), being used material in sound and serviceable condition, suitable for reuse without reconditioning:
A. At seventy-five per cent (75%) of current new price if material was charged to joint account as new, or
B. At sixty-five per cent (65%) of current new price if material was originally charged to the joint property as secondhand at seventy-five per cent (75%) of new price.

**4. Other Used Material**

Used material (Condition "C"), at fifty per cent (50%) of current new price, being used material which:
A. After reconditioning will be further serviceable for original function as good secondhand material (Condition "B"), or
B. Is serviceable for original function but substantially not suitable for reconditioning.

**5. Bad-Order Material**

Material and equipment (Condition "D"), which is no longer usable for its original purpose without excessive repair cost but is further usable for some other purpose, shall be priced on a basis comparable with that of items normally used for that purpose.

**6. Junk**

Junk (Condition "E"), being obsolete and scrap material, at prevailing prices.

**7. Temporarily Used Material**

When the use of material is temporary and its service to the joint account does not justify the reduction in price as provided in Paragraph 3 B, above, such material shall be priced on a basis that will leave a net charge to the joint account consistent with the value of the service rendered.

## VI. INVENTORIES

**1. Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the joint account material, which shall include all such material as is ordinarily considered controllable by operators of oil and gas properties.
Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operator may be represented when any inventory is taken.
Failure of Non-Operator to be represented at an inventory shall bind Non-Operator to accept the inventory taken by Operator, who shall in that event furnish Non-Operator with a copy thereof.

**2. Reconciliation and Adjustment of Inventories**

Reconciliation of inventory with charges to the joint account shall be made by each party at interest, and a list of overages and shortages shall be jointly determined by Operator and Non-Operator.
Inventory adjustments shall be made by Operator with the joint account for overages and shortages, but Operator shall be held accountable to Non-Operator only for shortages due to lack of reasonable diligence.

**3. Special Inventories**

Special inventories may be taken, at the expense of the purchaser, whenever there is any sale or change of interest in the joint property; and it shall be the duty of the party selling to notify all other parties hereto as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be represented and shall be governed by the inventory so taken.

— 4 —

EXHIBIT "D"

ATTACHED TO AND MADE A PART OF OPERATING AGREEMENT
DATED FEBRUARY 1, 1965, (EFFECTIVE AS OF FEBRUARY 1,
1955), BETWEEN SKLAR PRODUCING CO., INC., AS OPERATOR
AND J. R. BUTLER & COMPANY, ET AL, AS NON-OPERATORS,
COVERING THE W. C. WILLIAMS LEASES, CASS COUNTY, TEXAS.

## INSURANCE

Operator, at all times while conducting operations under this
agreement, shall carry the following insurance:

(a)    Workmen's Compensation Insurance sufficient to comply
       with the Workmen's Compensation Law for the State in
       which the properties covered hereby are located;

(b)    Employer's Liability Insurance with limits of not less
       than Twenty-five Thousand Dollars ($25,000.00) per
       person;

(c)    Comprehensive General Liability Insurance with bodily
       injury limits of not less than Two Hundred Fifty Thou-
       sand Dollars ($250,000.00) per person and Five Hundred
       Thousand Dollars ($500,000.00) per accident and Proper-
       ty Damage coverage with limits of not less than Fifty
       Thousand Dollars ($50,000.00) per accident;

(d)    Comprehensive Automobile Liability Insurance with bodi-
       ly injury limits of not less than Two Hundred Fifty
       Thousand Dollars ($250,000.00) per person and Five Hun-
       dred Thousand Dollars ($500,000.00) per accident, and
       Property Damage limits of not less than Fifty Thousand
       Dollars ($50,000.00) per accident.

If Operator elects to carry such insurance under its present
policies, Operator shall make a reasonable charge therefor.
If separate policies are secured, the actual premiums paid
shall be included as a part of the operating costs. Operator
will not be required to carry fire, tornado, or any other type
of insurance on the property of the parties hereto.