

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

December 18, 19 86 ,

OPERATOR ___LADD PETROLEUM CORPORATION_____

CONTRACT AREA _SW/4 SE/4 Section 16, and NW/4 NE/4 Section_

_21, T.18S - R.21W_____

_____

COUNTY ~~OR PARISH~~ OF ___Columbia_____ STATE OF ___Arkansas___

Clayton-Franks #1
&
Clayton-Franks #2

Dorcheat Macedonia Field

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610 - 1982  REVISED

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between___Ladd Petroleum Corporation___

_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☒ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

# ARTICLE III.
## INTERESTS OF PARTIES

**A.  Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B.  Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of _one-eighth (1/8)_____which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C.  Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D.  Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

# ARTICLE IV.
## TITLES

**A.  Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the entire ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

## ARTICLE IV
### continued

1  ☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7  ~~Each party~~ Operator shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10  This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12  No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13  provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14  ticipate in the drilling of the well.
15
16  B.  Loss of Title:
17
18  ~~1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19  reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20  from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21  tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22  and gas leases and interests: and,
23  (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24  entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25  but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26  (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27  been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
28  curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29  Area by the amount of the interest lost;
30  (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31  increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32  terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33  well;
34  (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35  failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36  who bore the costs which are so refunded;
37  (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38  borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39  (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40  claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41  connection therewith.
42
43  2.  Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
44  payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45  there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46  payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47  which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48  date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49  the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50  required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51  the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52  shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53  or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54  (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55  up to the amount of unrecovered costs;
56  (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57  oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58  termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59  portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,
60  (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61  ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
62
63  3. ~~Other Losses:~~ All losses incurred, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ of title shall be joint losses
64  and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65  the Contract Area.
66
67
68
69
70

A.A.P.L. FORM 610 - MODI___ ___RM OPERATING AGREEMENT - 19__

ARTICLE V.

OPERATOR

A.  Designation and Responsibilities of Operator:

__Ladd Petroleum Corporation_____shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

B.  Resignation or Removal of Operator and Selection of Successor:

1.  Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2.  Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.  Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

A.  Initial Well:

On or before the_____day of_____, 19____, Operator shall commence the drilling of a well for oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1.

## ARTICLE VI
### continued

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

B. Subsequent Operations:

1. <u>Proposed Operations</u>: Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2. <u>Operations by Less than All Parties</u>: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (<u>inclusive</u> of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,

- 5 -

# ARTICLE VI
## continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(b) __300__ % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and __300__% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any reworking or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

# ARTICLE VI
## continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

and salvable surface equipment used in connection with such well

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning the original remaining in the hole borehole.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

C.  TAKING PRODUCTION IN KIND:

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 19...

## ARTICLE VI
### continued

required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the best price ~~obtainable~~ in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.      *reasonably  obtainable  under  the  circumstances

In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

D.  Access to Contract Area and Information:

Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-quests the information.

E.  Abandonment of Wells:

1.  Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI.B.

2.  Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit



A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

"B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-visions hereof.

~~3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between~~ Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; ~~provided, however,~~ no well shall be permanently plugged and abandoned unless and until all parties ~~having the right~~ to conduct further operations therein have been notified of the proposed abandonment ~~and afforded the~~ opportunity to elect to take over the well in accordance with the provisions of this Article ~~VI.E.~~

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A.  Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

B.  Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

C.  Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within ~~*fifteen (15)~~ days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex-pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

*thirty (30)

D.  Limitation of Expenditures:

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

A.A.P.L. FORM 610 - MOD. .ORM OPERATING AGREEMENT - 19o2

## ARTICLE VII
### continued

1    ☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2    necessary tankage and/or surface facilities.

4    ☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.

15    2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.

20    3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of   fifteen thousand and 00/100's Dollars ($ 15,000.00    )
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing in excess of   fifteen thousand and 00/100's
28 Dollars ($ 15,000.00    ) but less than the amount first set forth above in this paragraph.

30   E.   Rentals, Shut-in Well Payments and Minimum Royalties:

32    Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2.

40    Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

46   F.   Taxes:

48    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58 the manner provided in Exhibit "C".

60    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65 provided in Exhibit "C".

67    Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68 the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

-10-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
continued

G. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter accrued, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leased acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B. Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1 said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2 governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3 it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4 tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

6     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7 consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

9 D. Maintenance of Uniform Interest:

11     For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12 party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13 equipment and production unless such disposition covers either:

15     1. the entire interest of the party in all leases and equipment and production; or

17     2. an equal undivided interest in all leases and equipment and production in the Contract Area.

19     Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20 and shall be made without prejudice to the right of the other parties.

22     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23 require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24 and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25 party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26 into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27 Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

29 E. Waiver of Rights to Partition:

31     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32 undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33 interest therein.

35 F. Preferential Right to Purchase:

37     Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
38 Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the
39 name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms
40 of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase
41 on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-
42 ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-.
43 ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to
44 dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-
45 pany, or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

47 ## ARTICLE IX.
48 ### INTERNAL REVENUE CODE ELECTION

50     This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51 for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52 and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53 purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54 from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55 mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56 ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57 United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58 and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59 evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60 Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61 action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62 Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63 Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64 mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65 tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66 computation of partnership taxable income.

## ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __ten thousand and 00/100's__ - - - - - - - - - - - - - - - - - - - - - - - - Dollars ($ __10,000.00__ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

XX Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of __120__ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within __120__ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

-13-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of Arkansas shall govern.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the ''Crude Oil Windfall Profit Tax Act of 1980'', as same may be amended from time to time (''Act''), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
### OTHER PROVISIONS

**A. No Third-Party Beneficiary Contract:**

This Agreement is made solely for the benefit of those persons who are signatory parties hereto (including those persons succeeding to all or part of the interest of an original party if such succession is recognized under the other provisions hereof), and no other person shall be or claim or be entitled to enforce any rights, benefits or obligations under this Agreement.

**B. Security:**

The lien and security interest granted by each Non-Operator to Operator and by Operator to the Non-Operator under Article VII.B. shall extend not only to such party's oil and gas rights in the Contract Area (which for greater certainty shall include all of each party's leasehold interest and leasehold estate in the Contract Area), the oil and/or gas when extracted and equipment (as mentioned in said Article) but also to all accounts, contract rights, inventory and general intangibles constituting a part of, relating to or arising out of said oil and gas rights, extracted oil and gas and said equipment or which are otherwise owned or held by any such party in the Contract Area. Further, the lien and security interest of each of the said party shall extend to all proceeds and products of all of the property and collateral described in this paragraph and in Article VII.B. as being subject to said lien and security interest. Any party, to the extent it deems necessary to perfect the lien and security interest provided herein, and file this Operating Agreement as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code. Further, and not in limitation of the foregoing, each party hereby grants to Operator full rights, power and authority to execute in each such party's name and on its behalf any financial statement which Operator deems necessary in order to perfect the security interest hereby granted under the applicable Uniform Commercial Code.

-14-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___18th___ day of ___December___, 19_86_.

### OPERATOR

LADD PETROLEUM CORPORATION

ATTEST:

BY: _C.E. Trousdale_                    BY: _C.O. Smith_
C.E. Trousdale                          C.O. Smith
Assistant Secretary                     Vice President

### NON-OPERATORS

JAMES DENNY BARTELL                     TXO PRODUCING PROPERTIES CORP.

BY: _____                     BY: _____

CHARLES FREDERICK BARTELL               MAYFIELD CORPORATION

BY: _____                     BY: _____

KATHLEEN HADLEY GOLDSTON                WHITAKER PETROLEUM
                                            a partnership comprised of
                                            Anne W. Murphy and Jeanne
                                            W. Wilkenson

BY: _____                     BY: _____

COASTAL OIL AND GAS CORPORATION         MARY IRIS GOLDSTON CORPORATION

BY: _____                     BY: _____

KATHLEEN HADLEY GOLDSTON, Trustee       W.J. GOLDSTON, JR.
    of residuary Trusts, U/W
    W.J. Goldston, deceased
                                        BY: _____

BY: _____                     GLORIA GOLDSTON KING

JOSEPH C. GOLDSTON, Trustee of
    residuary Trusts, U/W                BY: _____
    W.J. Goldston, deceased

                                        JEANNE GOLDSTON KIES
BY: _____

                                        BY: _____
LOUIS DORFMAN

                                        W.C. PARTEE
BY: _____
                                        BY: _____

- 15 -

SAM Y. DORFMAN, JR. as his
   separate property and estate


BY: _____


SKLAR AND PHILLIPS, INC. *

BY: *August Erickson*
         **AUGUST ERICKSON, Vice President**
SKLAR & PHILLIPS, INC. OPERATOR *


BY: *August Erickson*

         **AUGUST ERICKSON, Vice President**


* This Joint Operating Agreement is executed by Sklar & Phillips, Inc. and
  Sklar & Phillips, Inc. Operator with the understanding that prior Operating
  Agreement dated December 28, 1949 between McAlester Fuel Company and Sam
  Sklar, et al, has expired and is no longer of any force or effect.

EXHIBIT "A"


Attached to and made a part of that certain Joint Operating Agreement
dated December 18, 1986, by and between Ladd Petroleum Corporation,
as Operator, and TXO Producing Properties Corp., et al, as Non-Operators.


CONTRACT AREA:   SW/4 SE/4 Section 16 and NW/4 NE/4 Section 21-T.18S-
R.21W, Columbia County, Arkansas


DEPTH RESTRICTIONS:   This Agreement is for all formations from the
surface to the base of the Smackover Lime forma-
tion, less the subsurface depths of 7,286' to
7,295', 7,542' to 7,552' and 7,570' to 7,573'.


INTERESTS OF THE PARTIES:   The interests of the parties are separate
and different as to the Clayton Franks #1
and the Clayton Franks #2 wellbores.


CLAYTON FRANKS #1 WELL:   SW/4 SE/4 Section 16-T.18S-R.21W (In Decimal
Interest)

| PARTY TO THIS AGREEMENT | WORKING INTEREST | OVERRIDING ROYALTY INTEREST |
|---|---|---|
| Ladd Petroleum Corporation | .64843727 | |
| Mayfield Corporation | .00585943 | |
| Whitaker Petroleum, s partnership comprised of Anne W. Murphy and Jeanne W. Wilkenson | .09374999 | |
| Mary Iris Goldston Corporation | .01757828 | |
| W.J. Goldston, Jr. | | .00026040 |
| Gloria Goldston King | | .00026040 |
| Jeanne Goldston Kies | | .00026040 |
| James Denny Bartell | .00439457 | |
| Charles Frederick Bartell | .00439457 | |
| Kathleen Hadley Goldston | | .00234380 |
| Coastal Oil & Gas Corporation | .03515623 | |
| Kathleen Hadley Goldston & Joseph C. Goldston, Trustees of residuary Trusts, U/W W.J. Goldston, deceased | | .00156250 |
| Louis Dorfman | .01171872 | |
| Sam Y. Dorfman, Jr. as his separate property and estate | .01171872 | |
| TXO Producing Properties Corp. | .06152356 | |
| W.C. Partee | .03515614 | |
| Sklar & Phillips, Inc. | .02343749 | |
| Sklar & Phillips, Inc., operator | .04687499 | |

CLAYTON-FRANKS #2 WELL:   NW/4 NE/4 Section 21-T.18S-R.21W (In Decimal Interest)

| PARTY TO THIS AGREEMENT | BEFORE PAYOUT |
|---|---|
| Ladd Petroleum Corporation | 1.00000000 |
| Mayfield Corporation | |
| Whitaker Petroleum, a partnership comprised of Anne W. Murphy and Jeanne W. Wilkenson | |
| Mary Iris Goldston Corporation | |
| W.J. Goldston, Jr. | |
| Gloria Goldston King | |
| Jeanne Goldston Kies | |
| James Denny Bartell | |
| Charles Frederick Bartell | |
| Kathleen Hadley Goldston | |
| Coastal Oil & Gas Corporation | |
| Kathleen Hadley Goldston & Joseph C. Goldston, Trustees of residuary Trusts, U/W W.J. Goldston, deceased | |
| Louis Dorfman | |
| Sam Y. Dorfman, Jr., as his separate property and estate | |
| TXO Producing Properties Corp. | |
| W.C. Partee | |
| Sklar & Phillips, Inc. | |
| Sklar & Phillips, Inc. | |

NOTE:   AT PAYOUT EACH PARTY WILL ELECT EITHER TO KEEP THEIR ORRI, OR TO CONVERT SAME TO A PROPORTIONATELY REDUCED 37.50% WORKING INTEREST IN THE WELL.

ATTACHED TO AND MADE A PART EXHIBIT "B"
OF THAT CERTAIN JOINT OPER-
AGREEMENT DATED DECEMBER
1986, BY AND BETWEEN
LADD PETROLEUM
CORPORATION, AS
OPERATOR, AND TXO PRODUCING PROPERTIES
CORP., ET AL, AS NON-OPERATORS.

# OIL AND GAS LEASE

## (ARKANSAS — SHUT-IN AND POOLING CLAUSES)

THIS AGREEMENT made and entered into this _____ day of _____ , 19_____ by and between

_____ , hereinafter

called Lessor, whose address is _____

and _____ , hereinafter called Lessee.

WITNESSETH:

1. That Lessor, for and in consideration of the sum of _____ Dollars in hand paid, and of the covenants and agreements hereinafter contained to be performed by the Lessee, does hereby grant, demise, lease and let unto said Lessee the hereinafter described land, for the purpose of carrying on geological, geophysical and other exploration work, and the drilling and operating for, producing and saving all of the oil, gas, and other hydrocarbons, all that certain tract of land, together with any reversionary rights therein, situated in the County of _____ State of Arkansas, and described as follows:

containing _____ acres, more or less, and also, in addition to the above described land, any and all strips or parcels of land, other than those constituting regular governmental subdivisions, adjoining or contiguous to the above described land and owned or claimed by LESSOR, all of the foregoing land being hereinafter referred to as "leased premises." It is the intention of the LESSOR herein that the leased premises cover and include all lands owned or claimed by LESSOR in the above numbered governmental section or sections together with any and all accretions thereto whether or not herein accurately and completely described.

2. This Lease shall remain in force for a primary term of TEN (10) years and as long thereafter as oil, gas or other hydrocarbons is produced from said leased premises or from lands pooled therewith.

3. Lessee shall deliver, free of cost, to Lessor at the wells, or to the credit of Lessor in the pipeline to which the wells may be connected, the equal one-eighth part of all oil and other liquid hydrocarbons produced and saved from the leased premises, or at Lessee's option, to pay Lessor for such one-eighth royalty the market price at the well for such oil and other liquid hydrocarbons of like grade and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease stock tanks.

4. Lessee shall pay Lessor one-eighth of the proceeds received by Lessee at the well for all gas (including all substances contained in such gas) produced from the leased premises and sold by Lessee. If such gas is used by Lessee off the leased premises or used by Lessee for the manufacture of casinghead gasoline or other products, Lessee shall pay Lessor one-eighth of the prevailing market price at the well for the gas so used.

5. If a well capable of producing gas or gas and gas-condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas-condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this lease will continue in force during all of the time or times while such well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas-condensate capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in Lessee's judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to Lessor within 45 days after the expiration of each period of one year in length (annual period) during which such well is so shut in, as royalty, an amount equal to the annual delay rental herein provided applicable to the interest of Lessor in acreage embraced in this lease as of the end of such annual period and included within the confines of a pooled unit declared under the terms hereof or created by order, rule or regulation of any governmental authority; provided that, if gas or gas-condensate from such well is sold or used as aforesaid before the end of any such annual period, or if, at the end of any such annual period, this lease is being maintained in force and effect otherwise than by reason of such shut-in well, Lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this lease. Such payment may be made or tendered to Lessor or to Lessor's credit in the designated depository bank in the manner prescribed for the payment of delay rentals. Royalty ownership as of the last day of each such annual period as shown by Lessee's records shall govern the determination of the party or parties entitled to receive such payment.

6. If operations for the drilling of a well for oil or gas are not commenced on said land on or before one year from the date hereof, this Lease shall terminate as to both parties, unless the Lessee shall on or before that date pay or tender to the Lessor, or to Lessor's credit in the _____

_____ Bank at

_____ , or its successors, which Bank and its successors are the Lessor's agent and shall continue as the Depository for any and all sums payable under this Lease regardless of changes of ownership in said land, or in the oil and gas, or in the rentals to accrue hereunder, the sum of _____ Dollars which shall operate as a rental and cover the privilege of deferring the commencement of operations for drilling for a period of one year. In like manner, upon like payments or tenders, the commencement of operations for drilling may be further deferred for like periods successively. All payments or tenders may be paid by check or draft of the Lessee or any Assignee thereof, mailed or delivered on or before the rental paying date, either directly to Lessor or to the Depository Bank, and it is understood and agreed that the consideration first recited hereinabove, covers not only the privileges granted to the date when said first rental is payable, but also the Lessee's option of extending that period as aforesaid, and any and all other rights conferred herein.

7. If at any time prior to the discovery of oil or gas on this land, and during the term of this lease, the Lessee shall drill a dry hole or holes on this land, this Lease shall not terminate provided operations for the drilling of a well shall be commenced before the next ensuing rental paying date, or provided that the Lessee begins or resumes the payment of rentals in the manner and amount hereinabove provided for, and in this event the paragraphs hereof governing the payment of rentals, and the manner and effect thereof, shall continue in force.

8. Lessee hereby is given the right at its option, at any time and whether before or after production, to pool for development and operation purposes all or any part or parts of leased premises or rights therein with any other land in the vicinity thereof, or with any leasehold, operating or other rights or interests in such other land so as to create units of such size and surface acreage as Lessee may desire but containing not more than forty-five (45) acres; provided, however, a unit may be established hereunder containing not more than 640 acres plus 10% acreage tolerance if unitized only as to gas rights or only as to gas and gas-condensate, except that units pooled for oil or oil and gas for or in conjunction with repressuring, pressure maintenance, cycling and secondary recovery operations or any one or more of same, may be formed to include not more than 320 acres. If at any time larger units are required under any then applicable law, rule, regulation or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable from any contemplated, drilling or completed well, any such unit may be established or enlarged to conform to the size specified by such law, rule, regulation or order. Each unit shall be created by Lessee's recording a declaration of Pooling containing a description of the unit so created.

Operations on any part of any lands so pooled shall, except for the payment of royalties, be considered operations on leased premises under this lease, and, notwithstanding the status of a well at the time of pooling, such operations shall be deemed to be in connection with a well which was commenced on leased premises under this lease. The term "operations" as used herein shall include, without limitation, the following: commencing, construction of roadways, preparation of drillsite, drilling, testing, completing, reworking, recompleting, deepening, plugging back, repressuring, pressure maintenance, cycling, secondary recovery operations, or the production of oil or gas, or the existence of a shut-in well capable of producing oil or gas.

There shall be allocated to the portion of leased premises included in any such pooling such proportion of the actual production from all lands so pooled as such portion of leased premises, computed on an acreage basis, bears to the entire acreage of the lands so pooled. The production so allocated shall be considered for the purpose of payment or delivery of royalty to be the entire production for the portion of leased premises included in such pooling in the same manner as though produced from such portion of leased premises under the terms of this lease.

9. If ... described, above ... than the entire and undivided mineral estate therein, then the royalties and rentals herein provided for shall be paid the said Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee. There shall be no relationship between the amount of rent ... paid hereunder and the amount of royalties which is ... paid on production.

10. If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, successors or assigns, but no change in the ownership of the land or the minerals in and under the same or assignment of rentals or royalties shall be binding on Lessee unless Lessee shall have been furnished ninety (90) days before payment hereunder of such rentals or royalties, with certified copies of recorded instruments showing evidence of title; and it is hereby agreed that in the event this lease shall be assigned as to a part or as to parts of the land and the assignee or assignees of such part or parts shall fail or make default in the payment of the proportionate part of the rents due from him or them, such default shall not operate to defeat or affect this lease insofar as it covers any part or parts of said land upon which Lessee or any assignee of Lessee shall make due payment of said rental. If six or more parties become entitled to rentals or royalties hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all of such parties designating an agent to receive payment for all.

11. Lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations, except water from the wells of the Lessor. When required by the Lessor, the Lessee shall bury its pipelines below plow depth and shall pay reasonable damages for injury by reason of its operations to growing crops on said land. No well shall be drilled nearer than 200 feet to any house or barn or other structure on said premises as of the date of this Lease without the written consent of the Lessor. Lessee shall have the right at any time during, or after the expiration of this Lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and remove all casing, but the Lessee shall be under no obligation to do so.

12. Notwithstanding anything contained in this Lease to the contrary, it is expressly agreed that if the Lessee shall commence operations as provided herein at any time while this Lease is in force, this Lease shall remain in force and its terms shall continue so long as such operations are prosecuted, and if production results therefrom, then as long as production is maintained.

13. If within the primary term of this Lease production on the leased premises shall cease from any cause, this Lease shall not terminate provided operations for the drilling of a well shall be commenced on or before the next ensuing rental paying date, or provided Lessee begins or resumes the payment of rentals in the manner and amount hereinbefore provided. If, after the expiration of the primary term of this Lease, production on the leased premises should cease from any cause, this Lease shall not terminate provided Lessee commences operations for additional drilling or reworking within sixty days from such cessation, and this Lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production is maintained.

14. Lessee may at any time surrender or cancel this Lease in whole or in part by delivering or mailing such release to the Lessor, or by placing such release of record in the proper County. In case this Lease is surrendered or cancelled as to only a portion of the acreage covered thereby, then all payments and liabilities thereafter accruing under the terms of this Lease as to the portion cancelled shall cease, and any rentals thereafter paid may be apportioned on an acreage basis. As to the portion of the acreage not released, the terms and provisions of this Lease shall continue and remain in full force and effect for all purposes.

15. All provisions hereof, express or implied, shall be subject to all Federal and State Laws and the orders, rules and regulations of all governmental agencies administering the same, and this Lease shall not in any way be terminated wholly or partially, nor shall the Lessee be liable in damages for failure to comply with any of the express or implied provisions hereof if such failure accords with any such laws, orders, rules or regulations. Should the Lessee be prevented during the last year of the primary term hereof from drilling a well hereunder by the order of any constituted authority having jurisdiction, or if Lessee shall be unable during said period to drill a well hereunder due to the equipment necessary in the drilling thereof not being available for any cause, the primary term of this Lease shall continue until one year after said order is suspended or said equipment is available, but the Lessee shall continue to make delay rental payments as hereinabove provided for during such extended time.

16. Lessor hereby warrants and agrees to defend the title to the land herein described and agrees that the Lessee, at its option, may pay or discharge in whole or in part any taxes, encumbrances, or other liens existing, levied or assessed against the above-described lands, and in the event Lessee exercises such option, it shall be subrogated to the rights of any holder or holders thereof and may reimburse itself by applying any royalty or rentals accruing hereunder to the amount of any such encumbrance, tax or other lien paid by Lessee.

17. Lessee hereby is given the right to acquire for its own benefit, deeds, leases, or assignments covering any interest or claim in leased premises which LESSEE or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to LESSOR. In the event the validity of this Lease be disputed by LESSOR or by any other person, then, for the period such dispute remains undisposed of: LESSEE shall be relieved of all obligations hereunder to explore or develop leased premises; all royalties, rentals, or other payments which would otherwise accrue shall be suspended for such period; and this lease automatically shall be extended for an additional period equal to the duration of such period.

18. The undersigned hereby release and relinquish all rights of dower, curtesy and homestead in the premises herein described, insofar as said right of dower, curtesy and homestead may in any way effect the purposes for which this lease is made as recited herein.

19. This Lease and all its terms, conditions and stipulations shall extend to and be binding on all successors in title of said Lessor or Lessee.

IN WITNESS WHEREOF this Lease is executed as of the date first set out hereinabove.

_____

_____

_____

SOCIAL SECURITY # _____

STATE OF _____ }
                          } SS.          (INDIVIDUAL — ARKANSAS)
COUNTY OF _____ }

Before me _____, a Notary Public in and for

_____ County, Arkansas, on this day personally appeared _____

_____ known to me to be the person whose name _____ subscribed to the foregoing instrument, and acknowledged to me that _____ he _____ executed the same for the purposes and considerations therein expressed, including the relinquishment of dower, homestead and curtesy.

Given under my hand and seal of office this _____ day of _____, 19 _____.

My commission expires:

_____
Notary Public

STATE OF _____ }
                          } SS.          (JOINT — ARKANSAS)
COUNTY OF _____ }

On this _____ day of _____, 19 _____, before me the undersigned Notary Public in and for said County and State, personally appeared _____, and _____ his wife, known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged that they executed the same as their free and voluntary act and deed for the purposes and consideration therein mentioned and set forth, including the relinquishment of dower, curtesy and homestead. In witness whereof I have hereunto set my hand and official seal.

My commission expires:

_____
Notary Public

STATE OF _____ }
                          } SS.          (CORPORATION — ARKANSAS)
COUNTY OF _____ }

On this _____ day of _____, 19 _____, before me the undersigned Notary Public, duly commissioned, qualified and acting, within and for said County and State, appeared in person the within-named _____, to me personally well known, who stated that they were the _____ President and _____ Secretary of _____, a corporation and were duly authorized in their respective capacities to execute the foregoing instrument for and in the name and behalf of said corporation, and further stated and acknowledged that they had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth. In testimony whereof, I have hereunto set my hand and official seal this _____ day of _____ 19 _____.

_____
Notary Public

My Commission Expires:

This Instrument Prepared By _____ Address _____

COPAS — 1974
Recommended by the
Council of Petroleum
Accountants Societies

*Kraftbilt* 601, BOX 800
TULSA OK 74101



# EXHIBIT "c"

Attached to and made a part of that certain Joint Operating Agreement dated December 18, 1986, by and between Ladd Petroleum Corporation, as Operator, and TXO Producing Properties Corp., et al, as Non-Operator.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

**2. Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators. thirty (30)

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5. Audits**

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

**6. Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

# II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1. Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**2. Labor**

    A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

        (2) Salaries of First Level Supervisors in the field.

        (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

    B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

    C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

    D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

**3. Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

**4. Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**5. Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

    A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

    B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

    C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

**6. Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

**7. Equipment and Facilities Furnished by Operator**

    A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

    B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

**8. Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**9. Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

# III. OVERHEAD

**1. Overhead – Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or

( ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall ( ) shall not (XX) be covered by the Overhead rates.

**A. Overhead – Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $___3,654.00_____

Producing Well Rate $___417.00_____

(2) Application of Overhead – Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

[1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

[2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

[3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

(b) Producing Well Rates

[1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

[2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

[3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

[4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

[5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead – Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (   %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

_____ Percent (   %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:
For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. **Overhead – Major Construction**    *To be negotiated

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $   *   :

A. _____ % of total costs if such costs are more than $_____ but less than $_____; plus

B. _____ % of total costs in excess of $_____ but less than $1,000,000; plus

C. _____ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. **Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

(2) Material moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five per-cent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Para-graph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, pro-vided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dis-pose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service ren-dered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inven-tory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory ad-justments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT DATED DECEMBER 18, 1986, BY AND BETWEEN LADD PETROLEUM CORPORATION, AS OPERATOR, AND TXO PRODUCING PROPERTIES CORP., ET AL, AS NON-OPERATOR.


EXHIBIT "D"

TO OPERATING AGREEMENT


Minimum Insurance to be carried:

1. **Workmen's Compensation**

   To comply with the Laws of the State of Arkansas


2. **Employer's Liability**

   $300,000.00 bodily injury each person
   $500,000.00 bodily injury each accident


3. **Public Liability**

   $300,000.00 bodily injury each person
   $500,000.00 bodily injury each accident
   $300,000.00 property damage each accident


4. **Automobile Public Liability**

   $300,000.00 bodily injury each person
   $500,000.00 bodily injury each accident
   $300,000.00 property damage each accident


5. **Other Insurance**

   No other insurance shall be carried at the expense of the joint account except by mutual consent of the parties hereto.

EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated December 18, 1986, LADD PETROLEUM CORPORATION, as Operator, and the other Signatory Parties, as Non-Operators.

## GAS BALANCING AGREEMENT

### 1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party fails to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interests, but each party taking such gas shall own all of the gas delivered to its purchaser. Each party unable to market its share of the gas produced shall be credited with gas in storage equal to its share of the gas produced, less its share of gas actually taken by it and less its share of gas used in lease operations, vented or lost, such party hereinafter referred to as the underproduced party.

### 2.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each underproduced party shall, until it has recovered its gas in storage and balanced its gas account on a MCF basis, be entitled to take or deliver a volume of gas equal to Fifty Percent (50%) of each overproduced party's share of gas produced. If more than one (1) party is entitled to the stated volume of the overproduced party's share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all entitled parties who desire to take such gas. Make-up volumes of gas shall be applied on a first-in-first-out basis; i.e., the first overproduced gas shall be the first make up gas by the underproduced party. Each party, shall at all times, use its best efforts to regulate its takes and deliveries from the Contract Area so as not to jeopardize the continued viability of any lease committed thereto or effect the shut-in of a lease for overproducing the allowable, if any, assigned thereto by the regulatory body having jurisdiction.

### 3.

At all times while gas is produced from the Contract Area, each party taking or delivering gas hereunder will make settlement for the landowner's royalties (not exceeding Lessor's base royalty in the total monthly proceeds received by such parties) and all other leasehold burdens that are shared jointly under the terms of the attached Operating Agreement. For all other leasehold burdens, not jointly shared under the terms of the Operating Agreement, such burdens shall be paid by the party creating same. Each party (hereinafter referred to as "said party") hereto agrees to hold each other party harmless from any and all claims for royalties and other payments for which said party is responsible pursuant to this Section 3.

4.

Each party producing and taking or delivering gas to the purchaser shall pay any and all production and severance taxes due on such gas.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Upon depletion, all overproduced parties shall account to the underproduced parties in the following manner. The Operator shall determine the amount of underproduction and overproduction for each underproduced party and each overproduced party. Each overproduced party shall pay to each underproduced party (in the proportion that the underproduction of each underproduced party bears to the underproduction of all underproduced parties) an amount of money equal to the lesser of the amount received by the overproduced party for its overproduction at the time and from time to time when the overproduced party delivered and sold such overproduction of gas, or the amount for which the underproduced party could have sold the underproduction to it's purchaser, such lesser amount to be less any production severence taxes, less any royalties paid pursuant to Section 3 hereof by the overproduced party, and less any other payments made by the overproduced party to obligees of the underproduced party, to the extend said taxes, royalties and other payment by the overproduced party were required by law and amounted to a discharge of the obligations of the underproduced party therefore. If there was no such price to establish the amount received by the overproduced party because the overproduced party took such gas for its own purposes instead of selling it, the price shall be deemed to be either, (a) the price the underproduced party would have collected under its gas contract had it taken its share of gas and sold it at the time it was entitled to do so, or, (b) for periods of time during which the underproduced party did not have a gas contract, a price determined by the weighted average of the wellhead gas prices during the relevant period of time for those wells producing gas of the same vintage (or subject to the same pricing categories and price ceilings) located within the Contract Area here involved. Prices received for production by selling parties from any well where an imbalance occurs, will be considered in any price determination required. In the event an accounting is necessary between overproduced and underproduced parties when all or a portion of the monies collected by the overproduced parties was collected subject to possible refund as provided by the Federal Energy Regulatory Commission or other governmental authority, then the overproduced parties will pay and the underproduced parties will accept their proportionate share of such monies with the understanding and agreement that should a refund be required of all or a portion of the monies so collected then the underproduced parties agree to refund to the overproduced parties that portion of the monies paid by the overproduced parties to the underproduced parties that is required to be refunded plus any interest required to be paid thereon. Such refund shall be made within thirty (30) days of receipt of the underproduced parties of a statement reflecting the amount of refund due and the interest due thereon.

7.

Operator shall maintain a current account on a MCF basis of the gas balance between the parties and shall furnish all parties thereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.  Such statements shall be prepared for each individual well where a balancing situation exists, and shall additionally include the price each party received for its gas or would have received for its gas had it sold gas during the month.  These monthly prices will be used if an accounting is required upon depletion as stated in Section 6.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred as its share thereof as set forth in the Operating Agreement.

9.

If any party to this Operating Agreement, including Operator, becomes insolvent, is placed in or files for bankruptcy (either for liquidation or reorganization), or is placed in receivership, then the provisions of Section 6 shall immediately go into effect as if depletion had occurred.  Accounting of said party's overproduction/underproduction shall be made to satisfy any other outstanding obligations that said party may have with any other party to this Agreement.

10.

This agreement shall constitute a separate agreement as to each producing well and proration unit within the Contract Area and becomes effective and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties hereto, their successors, legal representatives and assigns.

EXHIBIT "F"

These Federal Contract Requirements are attached to and made a part of a contract dated December 18, 1986, between certain parties named therein, including Ladd Petroleum Corporation, hereinafter called "Contractor".

A.  **Equal Opportunity Clause (41CFR 60-1.4)**

During the performance of this Contract, Contractor agrees as follow:

(1)  Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin.  Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin.  Such action shall include, but not be limited to the following:  Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)  Contractor will, in all solicitations or advertisements for employees placed by or on behalf of Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3)  Contractor will send to each labor union or representative of workers with which Contractor has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of Contractors' commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4)  Contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5)  Contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6)  In the event of Contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or oder of the Secretary of Labor, or as otherwise provided by law.

(7) Contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Ords 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance; <u>Provided, however,</u> that in the event Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

B.  <u>Employee Information Reports (41CFR 60-1.7)</u>

If the value of this contract is $50,000 or more and if Contractor has 50 or more employees, Contractor agrees to file timely, complete and accurate reports on Standard Form 100 (EEO-1) with the appropriate federal agency.

C.  <u>Affirmative Action Program (41CFR 50-1.40)</u>

If the value of this contract is $50,000 or more and Contractor has 50 or more employees, Contractor agrees to develop a written affirmative action compliance program as required by law.

D.  <u>Certification of Nonsegregated Facilities (41CFR 60-1.8)</u>

Contractor certifies that it does not and will not maintain or provide for its employees any segregated facilities at any or its establishments, and that is does not and will not permit its employees to perform their services at any location under its contract, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this contract. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, lockerrooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom or otherwise. It further agrees that (except where it has obtained identical certifications from proposed subcontractos for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of Equal Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods): NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Nonsegregated Facilities, as required by the May 9, 1967, order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7435, May 19, 1967) must be submitted prior to the award of subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually). (Note: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.).

E.  **Minority Business Enterprises (41CFR 1-1.1310-2)**

1. **Utilization.**

(a)  It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(b)  The Contractor agrees to use his best efforts to carry out this policy in the award of his subcontract to the fullest extent consistent with the efficient performance of this contract.  As used in this contract, the term "minority business enterprise" means a business, at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members.  For the purposes of this definition, minority group members are Negroes, Spanish-speaking American persons, American-Orientals, American-Indians, American-Eskimos, and American Aleuts.  Contractors may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.

2. **Subcontracting Program.**

(a)  The Contractor agrees to establish and conduct a program which will enable minority business enterprises (as defined in the clause entitled "Utilization of Minority Business Enterprises") to be considered fairly as subcontractors and suppliers under this contract.  In this connection, the Contractor shall:

(1)  Designate a liaison officer who will administer the Contractor's minority business enterprises program.

(2)  Provide adequate and timely consideration of the potentialities of known minority business enterprises in all "make-or-buy" decisions.

(3)  Assure that known minority business enterprises will have an equitable opportunity to omplete for subcontracts, particularly by arranging solicitations, time for the preparation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation of minority business enterprises.

(4)  Maintain records showing (i) procedures which have been adopted to comply with the policies set forth in the clause, including the establishment of a source list of minority business enterprises, (ii) awards to minority business enterprises on the source list, and (iii) specific efforts to identify and award contract to minority business enterprises.

(5)  Include the Utilization of Minority Business Enterprises clause is subcontracts which offer substantial minority business enterprises subcontracting opportunities.

(6)  Cooperate with the Contracting Officer in any studies and surveys of the Contractor's minority business enterprises procedures and practices that the Contracting Office may from time to time conduct.

(7)  Submit periodic reports of subcontracting to known minority business enterprises with respect to the records referred to in subparagraph (4), above, in such form and manner and at such time (not more often than quarterly) as the Contracting Officer may prescribe.

(b)   The Contractor further agrees to insert, in any subcontract hereunder which may exceed $500,000, provisions which shall conform substantially to the language of this clause, including this paragraph (b), and to notify the Contracting Officer of the names of such subcontractors.

F.   Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era. (41CFR 60-250)

The regulations in this part apply to all government contracts and subcontracts for the furnishing of supplies or services or for the use of real or personal property (including construction) for $10,000 or more.

(a)   The Contractor will not discriminate against any employee or applicant for employment because he or she is a disabled veteran or veteran of the Vietnam Era in regard to any position for which the employee or applicant for employment is qualified.   The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified disabled veterans and veterans of the Vietnam Era without discrimination based upon their disability or veteran's status in all employment practices such as the following:   employment upgrading, demotion or transfer, recruitment, advertising, layoff or terminiation, rates of pay or other forms of compensation, and selection for training, including apprenticeship.

(b)   The Contractor agrees that all suitable employment openings of the Contractor which exist at the time of the execution of this contract and those which occur during the performance of this contract, including those not generated by this contract and including those at an establishment of the Contractor other than the ones wherein the contract is being performed but excluding those of independently operated corporate affiliates, shall be listed at an appropriate local office of the State employment service system wherein the opening occurs.   The Contractor further egrees to provide such reports to such local office regarding employment openings and hires as may be required.

State and local government agencies holding Federal contracts of $10,000 or more shall also list all their suitable openings with the appropriate office of the State employment service, but are not required to provide those reports set forth in paragraphs (d) and (e).

(c)   Listing of employment openings with the employment service system pursuant to this clause shall be made at least concurrently with the use of any other recruitment source of effort and shall involve the normal obligations which attach the placing of a bona fide job order, including the acceptance of referrals of veterans and nonveterans.   The listing of employment openings does not require the hiring any particular job applicant or from any particular group of job applicants, nothing herein is intended to relieve the Contractor from any requirements Executive Orders or regulations regarding nondiscrimination in employment.

(d)   The reports required by paragraph (b) of this clause shall include, but not be limited to, periodic reports which shall be filed at least quarterly with the appropriate local office or, where the Contractor has more than one hiring location in a State, with the central office of that State employment service.   Such reports shall indicate for each hiring location (1) the number of individuals hired during the reporting period, (2) the number of nondisabled veterans of the Vietnam Era hire, (3) the number of disabled veterans of the Vietnam Era hired, and (4) the total number of disabled veterans hired.   The reports should include covered veterans hired for on-the-job training under 38 USC 1787.   The Contractor shall submit a report within 30 days after the end of each reporting period wherein any performance is made on this

Contract identifying data for each hiring location. The Contractor shall maintain at each hiring location copies of the reports submitted until the expiration of one year after final payment under the Contract, during which time these reports and related documentation shall be made available, upon request, for examination by any authorized representatives of the Contracting Officer or of the Secretary of Labor. Documentation would include personnel records respecting job openings, recruitment, and placement.

(e) Whenever the Contractor becomes contractually bound to the listing provisions of this clause, it shall advise the employment service system in each State where it has establishments of the name and location of each hiring location in the State. As long as the Contractor is contractually bound to these provisions and has so advised the State system, there is no need to advise the State system of subsequent contracts. The Contractor may advise the State system when it is no longer bound by this contract clause.

(f) This clause does not apply to the listing of employment openings which occur and are filled outside of the 50 States, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands.

(g) The provisions of paragraphs (b), (c), (d), and (e) of this clause do not apply to openings which the Contractor proposes to fill from within his own organization or to fill pursuant to a customary and traditional employee-union hiring arrangement. This exclusion does not apply to a particular opening once an employer decides to consider applicants outside of his own organization or employer-union arrangements for that opening.

(h) As used in this clause:

(1) "All suitable employment openings" includes, but is not limited to, openings which occur in the following job categories: production and nonproduction; plant and office; laborers and mechanics; supervisory and nonsupervisory; technical; and executive, administrative, and professional openings as are compensated on a salary basis of less than $25,000 per year. This term includes full-time employment, temporary employment of more than 3 days' duration, and part-time employment. It does not include openings which the Contractor proposes to fill from within his own organization or to fill pursuant to a customary and traditional employer-union hiring arrangement nor opening in an educational institution which are restricted to students of that institution. Under the most compelling circumstances an employment opening may not be suitable for listing, including such situations where the needs of the Government cannot reasonably be otherwise supplied, where listing would be contrary to national security, or where the requirement of listing would otherwise not be for the best interest of the Government.

(2) "Appropriate office of the State employment service system" means the local office of the Federal State national system of public employment offices with assigned responsibility for serving the area where the employment opening is to be filled, including the District of Columbia, Guam, Puerto Rico, and the Virgin Islands.

(3) "Openings which the Contractor proposes to fill from within his own organization" means employment openings for which no consideration will be given to persons outside the Contractor's organization (including any affiliates, subsidiaries, and the parent companies) and includes any openings which the Contractor proposes to fill from regularly established "recall" lists.

(4)    "Openings which the Contractor proposes to fill pursuant to a customary and traditional employer-union hiring arrangement" means employment openings which the Contractor proposes to fill from union halls, which is part of the customary and traditional hiring relationship which exists between the Contractor and representatives of his employees.

(i)    The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

(j)    In the event of the Contractor's noncompliance with the requirements of this clause, actions for noncompliance may be taken in accordance with the rules, regulations, relevant orders of the Secretary of Labor issued pursuant to the Act.

(k)    The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Director, provided by or through the Contracting Officer. Such notice shall state the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam Era for employment, and the rights of applicants and employees.

(1)    The Contractor will notify each labor union or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of the Vietnam Era Veterans Readjustment Assistance Act, and is committed to take affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam Era.

(m)    The Contactor will include the provisions of this clause in every subcontract or purchase order of $10,000 or more unless exempted by rules, regulations, or orders of the Secretary issued pursuant to the Act, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the Director of the Office of Federal Contract Compliance Programs may direct to endorce such provisions, including action for noncompliance.

G.    Employment of the Handicapped (20CFR 741.3)

This provision applies to all nonexempt contracts and subcontracts which exceed $2,500 as follows:  (1) Part A applies to contracts and subcontracts which provide for performance in less than 90 days, (2) Parts A and B apply to contracts and subcontracts which provide for performance in 90 days or more and the amount of the contract or subcontracts is less than $500,000, and (3) Parts A, B, and C apply to contracts and subcontracts which provide for performance in 90 days or more and the amount of the contract or subcontract is $500,000 or more.

PART A

(a)    The Contractor will not discriminate against any employee or applicant for employment because of physical or mental handicap in regard to any position for which the employee or applicant for employment is qualified. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified handicapped individuals without discrimination based upon their physical or mental handicap in all employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship.

(b)   The Contractor agrees that, if a handicapped individual files complaint with the Contractor that he is not complying with the requirements of the Act, he will (1) investigate the complaint and take appropriate action consistent with the requirements of 20 CFR 741.29 and (2) maintain on file for three years, the record regarding the complaint and the actions taken.

(c)   The Contractor agrees that, if a handicapped individual files a complaint with the Department of Labor that he has not complied with the requirements of the Act, (1) he will cooperate with the Department in its investigation of the complaint, and (2) he will provide all pertinent information regarding his employment practices with respect to the handicapped.

(d)   The Contractor agrees to comply with the rules and regulations of the Secretary of Labor in 20 CFR Ch. VI, Page 741.

(e)   In the event of the Contractor's non-compliance with the requirements of this clause, the Contract may be terminated or suspended in whole or in part.

(f)   The clause shall be included in all subcontracts over $2,500.

## PART B

(g)   The Contract agrees (1) to establish an affirmative action program, including appropriate procedures consistant with the guidelines and the rules of the Secretary of Labor, which will provide the affirmative action regarding the employment of advancement of the handicapped required by P.L. 93-112, (2) to publish the program in his employee's or personnel handbook or otherwise distribute a copy to all personnel, (3) to review his program on or before March 31 of each year and to make such changes as may be appropriate, and (4) to designate one of his principal officials to be responsible for the establishment of operation of the program.

(h)   The Contractor agrees to permit the examination by appropriate contracting agency officials or the Assistant Secretary for Employment Standards or his designee, of pertinent books, documents, papers, and records concerning his employment and advancement of the handicapped.

(i)   The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Assistant Secretary for Employment Standards, provided by the Contracting Officer stating Contractor's obligation under the laws to take affirmative action to employ and advance in employment qualified handicapped employees and applicants for employment and the rights and remedies available.

(j)   The Contractor will notify each labor union or representative of workers with which he has a collective bargaining agreement or other contract understanding that the Contractor is bound by the terms of Section 503 of the Rehabilitation Act, and is committed to take affirmative action to employ and advance in employment physically and mentally handicapped individuals.

## PART C

(k)   The Contractor agrees to submit a copy of his affirmative action program to the Assistant Secretary for Employment Standards within 90 days after the award to him of a contract or subcontract.

(1)   The Contractor agrees to submit a summary report to the Assistant Secretary for Employment Standards, by March 31 of each year during performance of the Contract, and by March 31 of the year following completion of the Contract, in the form prescribed by the Assistant Secretary, covering employment and complaint experience, accomodations made and all steps taken to effectuate and carry out the commitments set forth in the affirmative action program.

FROM THE DESK OF
**FRAN BAILEY**

Present agreement provides
for actual cost ~~of~~ not
to exceed 20%.

Is this new Amendment
OK?

A+P — 18.75-70 interest
Carruth
says OK

ENSTAR Petroleum Company
3900 Capital Bank Plaza
P.O. Box 4576
Houston, Texas 77210
(713)654-4466

James L. Persky
Controller

July 20, 1984

SKLAR AND PHILLIPS INC
A/W SKLAR & PHILLIPS INC
P O BOX 3735
SHREVEPORT          LA 71103

RE:   Request to Amend Certain
      Operating Agreements
-------------------------------------------------------

Gentlemen:

    ENSTAR Petroleum Company, a division of ENSTAR Corporation,
and successor in interest to C & K Petroleum, Inc. and McAlester
Fuel Company, as operator of the wells listed in the attached
Exhibit A, requests your approval to amend the Operating Agreement(s)
covering such well(s) to provide that the maximum charge for
Employee Benefits may be revised from time to time as recommended
by the Council of Petroleum Accountants Societies (COPAS). The
COPAS recommendation describing the employee benefits limitation
is attached hereto as Exhibit B. This amendment is requested
due to frequent changes that occur in the costs of providing
employee benefits.

    Your agreement is requested to amend the Operating Agreement(s)
covering the property or properties listed in Exhibit A attached
hereto as follows:

        Effective January 1, 1984 and, notwithstanding anything
        to the contrary, the amount which operator may charge
        for Employee Benefits shall be Operator's actual
        cost of Employee Benefits not to exceed the percent
        most recently recommended by the Council of Petroleum
        Accountants Societies.

    All other terms and conditions of the Operating
Agreement(s) not amended hereby shall remain in full force and
effect as originally written.

If this letter correctly sets out the understanding between us, please sign in the space provided below, retain one copy for your files and return the original. This agreement is being executed in counterpart by parties to the Operating Agreement(s) covering the wells listed in Exhibit "A". All such counterparts shall constitute one and the same instrument. This amendment is a severable contract as between ENSTAR, as Operator, and you, as a participant. The failure of one or more of the parties to an Operating Agreement to sign this instrument, shall not in any manner affect the validity and binding effect as to those parties who execute same.

Very Truly Yours,

ENSTAR Petroleum Company
A Division of ENSTAR Corporation

by: James L. Persky
    Controller

ACCEPTED AND AGREED
TO THIS ____13th__ DAY OF
____August_____, 1984,
                    SKLAR & PHILLIPS, INC.

By (Signature): _____*August Erickson*_____

Name (Print)  : _____August Erickson_____

Title (Print) : _____Vice President_____

OWNER #: 021999-00    SKLAR AND PHILLIPS INC                    EXHIBIT A
                      A/W SKLAR & PHILLIPS INC
                      P O BOX 3735
                      SHREVEPORT           LA 71103


         PROPERTY      PROPERTY NAME

         31044         FRANKS*CLAYTON

# COPAS INTERPRETATION #12

ISSUED: October 29, 1982

SUBJECT: Employee Benefits Limitation

## PREFACE:

This COPAS Interpretation has been reviewed by the Petroleum Accountants Societies through representation on the Joint Interest Standing Committee and approved by the Council of Petroleum Accountants Societies and is recommended as a guide in accounting for joint interest operations.

## PROBLEM:

Because of frequent changes in the cost of providing employee benefits and the burden of amending various COPAS Accounting Procedures accordingly, COPAS recently approved a procedure whereby this limitation may be automatically revised without amending the operating agreement. In general, most accounting procedures now provide or are modified to provide that the Operator shall charge the Joint Account for employee benefits an amount equivalent to the Operator's actual cost not to exceed a given percent or the percent most recently recommended by COPAS. A conflict may arise if the Operator's actual cost is less than the amount chargeable under the given percentage since it could be argued the Operator may still charge the percentage most recently recommended by COPAS. Another conflict may arise if the numerical percentage provided for in a particular agreement exceeds the percentage recommended by COPAS in some later year, as it could be argued the Operator may still charge the higher of the two figures.

## INTERPRETATION:

The COPAS intent in publishing an Employee Benefit limit each year is twofold: (1) to place a ceiling on the amount the Operator may charge for Employee Benefits and (2) to provide for automatic revision of this ceiling, based on an annual industry survey of these costs, without formally amending the agreements. Therefore, it is suggested that when Accounting Procedures in existing agreements or new agreements are modified to adopt the COPAS limit for Employee Benefits that the numerical percentage in the printed form be deleted so the Accounting Procedures will provide "Operator's current cost of *Employee Benefits* shall be Operator's actual cost not to exceed the percent most recently recommended by COPAS".

COPYRIGHT © 1982          Council of Petroleum Accountants Societies

# McALESTER FUEL COMPANY

P. O. BOX 10

## MAGNOLIA, ARKANSAS 71753

LAND DEPARTMENT
W. B. SAWYER, MANAGER

April 20, 1976

TELEPHONE
501 / 234-2120

*Clayton Franko*
*7-155*

Colorado Oil and Gas Corporation
General Crude Oil Company
Mr. G. H. Vaughn, Jr
G. H. Vaughn, Jr. and J. C. Vaughn, Trustees
Mr. Jack C. Vaughn
Mr. E. J. Moran
Richard M. Stevens – Life Estate
Mr. W. J. Goldston
Ms. Iris Goldston
Patti Lynn Goldston Mayfield – 1957 Trust
Mayfield Corporation
Mr. J. B. Cutbirth
Mr. B. P. Seay
Mr. Richard M. Stevens
The Magale Foundation, Inc.
Atlantic Richfield Company
Mr. W C. Partee
Douglas Whitaker Estate
Sklar & Phillips, Inc, Operator ⟵
Mr. Sam Y. Dorfman
Mrs. Madeline O. Bartell
Cities Service Oil Company
Mr. C. D. Boreing
Mrs Jimmie Budd
Mrs. Margaret Boreing Budd
Mr. Louis Dorfman

In Re:  Amendment to Operating Agreements
Macedonia Field
Columbia County, Arkansas

Gentlemen:

We have operating jointly owned properties in the captioned field pursuant to the terms of Operating Agreements dated February 4, 1942 as to the Artie Nipper

Colorado Oil and Gas Corporation
General Crude Oil Company et al
April 20, 1976
Page 2

Well; April 5, 1943 as to the Whitehead B Well; December 28, 1949 as to the
Clayton Franks Well and since first production in 1942 on the Nipper Unit #2
Well. The agreements contain Accounting Procedures which are no longer
currently used and which provide for charges which we feel are outdated. A
list of the wells together with a division of expense interest for each well is
enclosed. This tabulation also shows the monthly overhead charge and/or
district and camp expense which have been charged to the joint account since
inception of the Operating Agreements.

It is proposed that effective April 1, 1976, we amend the existing Operating
Agreements to the extent that the COPAS 1974 Accounting Procedure be
adopted. Acceptance of this procedure will permit a fixed rate overhead
charge of $75 per well per month. While this does not bring this charge up
to current standards of $250 or $300 per month per well now being used for
wells of this depth, we believe that the rate will be adequate. The use of this
Accounting Procedure will also enable us to escalate the charge as permitted
by the provisions of Paragraph 1. A. (3) of Article III – OVERHEAD found on
Page 3 of the COPAS 1974 form. In no event will there be any escalation of
this charge prior to April 1, 1977.

If the enclosed Accounting Procedure meets with your approval, please so
indicate on the copy hereof and return it to this office for our files. With
the added cost of all goods and services as compared to those existing when
the agreements were originally executed, we believe that you will agree that
this increase is justified.

Very truly yours,

McALESTER FUEL COMPANY

W. B. Sawyer

WBS:cr
Enclosure

SKLAR & PHILLIPS, INC., OPERATOR
By
   John G. Carruth, Secretary
Date    April 28, 1976

MACEDONIA FIELD
COLUMBIA COUNTY, ARKANSAS
APRIL 14, 1976

| | Nipper Unit #2 | Artie Nipper | Clayton Franks | Whitehead B |
|---|---|---|---|---|
| McAlester Fuel Company | .218754 | .145834 | .1640625 | .568750 |
| Colorado Oil and Gas Corporation | .031250 | .020833 | .0937500 | .081250 |
| General Crude Oil Company | .250000 | -0- | -0- | |
| G. H. Vaughn, Jr. | .031250 | .020833 | -0- | |
| G. H. Vaughn, Jr. & J. C. Vaughn, Trustees | .062500 | .041667 | -0- | |
| Jack C. Vaughn | .031250 | .020833 | -0- | |
| E. J. Moran | .125000 | .083333 | -0- | |
| Richard M. Stevens – Life Estate | .007925 | .005284 | -0- | |
| W. J. Goldston | .041666 | .027778 | .0625000 | |
| Iris Goldston | .031250 | .020833 | .0468740 | |
| Patti Lynn Goldston Mayfield-1957 Trust | .005208 | .003472 | .0078130 | |
| Mayfield Corporation | .005208 | .003472 | .0078130 | |
| J. B. Cutbirth | .041666 | .027778 | -0- | |
| B. P. Seay | .041666 | .027778 | -0- | |
| Richard M. Stevens | .033741 | .022494 | -0- | |
| The Magale Foundation, Inc. | .041666 | .027778 | -0- | |
| Atlantic Richfield Company | -0- | .500000 | -0- | |
| W. C. Partee | -0- | -0- | -0- | |
| Douglas Whitaker Estate | -0- | -0- | .0937500 | |
| Sklar & Phillips, Inc., Operator | | | .2500000 | |
| Sam Y. Dorfman | | | .1875000 | |
| Mrs. Madeline O. Bartell | | | .0312500 | |
| Cities Service Oil Company | | | .0234375 | |
| C. D. Boreing | | | .0312500 | .250000 |
| Mrs. Jimmie Budd | | | | .033334 |
| Mrs. Margaret Boreing Gossett | | | | .033333 |
| Louis Dorfman | | | | .033333 |
| TOTAL | 1.000000 | 1.000000 | 1.0000000 | 1.000000 |

Macedonia Field
April 14, 1976
Page 2
_____

| | | | |
|---|---|---|---|
| Monthly overhead | $25 | $25 | $35 | $25 |
| District and camp expense | 20 | 20 | -0- | 20 |
| TOTAL | $45 | $45 | $35 | $45 |

Proposed fixed rate – to be effective April 1, 1976    All wells – $75 per well per month

Exhibit 601, TULSA 74101   Recommended by the Council of Petroleum Accountants Societies of North America

Accounting Procedure to be effective April 1, 1976, and to be in lieu of and supercede any prior Accounting Procedure attached to Operating Agreement (s) covering the following described wells in Columbia County, Arkansas:

Artie Nipper Well
Whitehead B Well
Clayton Franks Well
Nipper Unit #2

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

**2. Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5. Audits**

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

**6. Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

COPAS

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First Level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

   D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3. **Employee Benefits**

   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

6. **Services**

   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

7. **Equipment and Facilities Furnished by Operator**

   A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

   B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**

   Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —



**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or

(   ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (   ) shall not ( X ) be covered by the Overhead rates.

**A. Overhead - Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $_____1,000.00_____

Producing Well Rate $_____75.00_____

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

[1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

[2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

[3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

(b) Producing Well Rates

[1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

[2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

[3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

[4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

[5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

B. Overhead – Percentage Basis
(1) Operator shall charge the Joint Account at the following rates:
(a) Development
_____Percent (   %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.
(b) Operating
_____Percent (   %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.
(2) Application of Overhead – Percentage Basis shall be as follows:
For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. **Overhead – Major Construction    TO BE NEGOTIATED**
To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of \$_____:
A. _____% of total costs if such costs are more than \$_____but less than \$_____; plus
B. _____% of total costs in excess of \$_____but less than \$1,000,000; plus
C. _____% of total costs in excess of \$1,000,000.
Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. **Amendment of Rates**
The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**
Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**
Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:
A. New Material (Condition A)
(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.
(2) Line Pipe
(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.
(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.
(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.
B. Good Used Material (Condition B)
Material in sound and serviceable condition and suitable for reuse without reconditioning:
(1) Material moved to the Joint Property
(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.
(2) Material moved from the Joint Property
(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —



(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

# V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.