A.A.P.L. FORM 610 - 1977

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

June 14 , 19 82 ,

OPERATOR   Cobra Oil & Gas Corporation

CONTRACT AREA   Sections 30 and 31, Township 20 North, Range 5 West;
Sections 25 and 36, Township 20 North, Range 6 West

COUNTY OR PARISH OF Claiborne          STATE OF Louisiana

COPYRIGHT 1977      —     ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.     A.A.P.L. NO. 610 - 1977 REVISED
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
KRAFTBILT PRODUCTS.     BOX 800, TULSA, OK 74101

Raymond Robinson #1

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTEREST OF PARTIES IN COSTS AND PRODUCTION | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2 |
| | B. LOSS OF TITLE | 2 |
| | 1. Failure of Title | 2-3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 3 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 3 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6 |
| | C. RIGHT TO TAKE PRODUCTION IN KIND | 6-7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 7 |
| | E. ABANDONMENT OF WELLS | 7 |
| | 1. Abandonment of Dry Holes | 7 |
| | 2. Abandonment of Wells that have Produced | 7-8 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 8 |
| | A. LIABILITY OF PARTIES | 8 |
| | B. LIENS AND PAYMENT DEFAULTS | 8 |
| | C. PAYMENTS AND ACCOUNTING | 8 |
| | D. LIMITATION OF EXPENDITURES | 9 |
| | 1. Drill or Deepen | 9 |
| | 2. Rework or Plug Back | 9 |
| | 3. Other Operations | 9 |
| | E. ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 9 |
| | F. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 9-10 |
| | G. TAXES | 10 |
| | H. INSURANCE | 10 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 10 |
| | A. SURRENDER OF LEASES | 10-11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTION | 11 |
| | D. SUBSEQUENTLY CREATED INTEREST | 11-12 |
| | E. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | F. WAIVER OF RIGHT TO PARTITION | 12 |
| | G. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12-13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13-14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 14 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between <u>Cobra Oil & Gas Corporation</u>
<u>                                                                    </u>, hereinafter designated and
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter
referred to individually herein as "Non-Operator", and collectively as "Non-Operators",

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas in-
terests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore
and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and
as hereinafter provided:

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed
to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid
or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to
limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases cov-
ering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of
land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil
and gas interests intended to be developed and operated for oil and gas purposes under this agreement.
Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule
of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order,
a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area
or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to
be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in
and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects
not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the
plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a
part hereof:

☒ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to agreement,
    (2) Restrictions, if any, as to depths or formations,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement.
    (5) Addresses of parties for notice purposes.
☐ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
X G. Exhibit "G" Unit Cost Allocation Agreement

If any provision of any exhibit, except Exhibit "E", is inconsistent with any provision contained
in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## ARTICLE III.
### INTERESTS OF PARTIES

A.  Oil and Gas Interests:

If any party owns an unleased oil and gas interest in the Contract Area, that interest shall be treated for the purpose of this agreement and during the term hereof as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B". As to such interest, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

B.  Interest of Parties in Costs and Production:

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A". All production of oil and gas from the Contract Area, subject to the payment of lessor's royalties which will be borne by the Joint Account, shall also be owned by the parties in the same manner during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interests covered hereby.

## ARTICLE IV.
### TITLES

A.  Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including Federal Lease Status Reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

─  Option No. 1:  Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C," and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

☒  Option No. 2:  Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including ~~preliminary,~~ ~~supplemental,~~ shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. The Operator shall be responsible for the preparation and recording of Pooling Designations or Declarations as well as the conduct of hearings before Governmental Agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

~~No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided; and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.~~

B.  Loss of Title:

1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests, and,

(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1 or operating costs which it may have theretofore paid. but there shall be no monetary liability on its
2 part to the other parties hereto for drilling. development. operating or other similar costs by reason of
3 such title failure: and

4     (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the
5 operation of the interest which has been lost, but the interests of the parties shall be revised on an acre-
6 age basis, as of the time it is determined finally that title failure has occurred, so that the interest of
7 the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
8 Area by the amount of the interest lost; and

9     (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled
10 on the Contract Area is increased by reason of the title failure. the party whose title has failed shall
11 receive the proceeds attributable to the increase in such interests (less costs and burdens attributable
12 thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;
13 and

14     (d) Should any person not a party to this agreement, who is determined to be the owner of any in-
15 terest in the title which has failed. pay in any manner any part of the cost of operation, development,
16 or equipment, such amount shall be paid to the party or parties who bore the costs which are so refund-
17 ed: and

18     (e) Any liability to account to a third party for prior production of oil and gas which arises by
19 reason of title failure shall be borne by the party or parties in the same proportions in which they shared
20 in such prior production; and

21     (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection
22 with the defense of the interest claimed by any party hereto, it being the intention of the parties
23 hereto that each shall defend title to its interest and bear all expenses in connection therewith.

24

25     2. <u>Loss by Non-Payment or Erroneous Payment of Amount Due:</u> If, through mistake or oversight,
26 any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously
27 paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against
28 the party who failed to make such payment. Unless the party who failed to make the required payment
29 secures a new lease covering the same interest within ninety (90) days from the discovery of the fail-
30 ure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of
31 the parties shall be revised on an acreage basis, effective as of the date of termination of the lease in-
32 volved, and the party who failed to make proper payment will no longer be credited with an interest in
33 the Contract Area on account of ownership of the lease or interest which has terminated. In the event
34 the party who failed to make the required payment shall not have been fully reimbursed, at the time of
35 the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an
36 acreage basis, for the development and operating costs theretofore paid on account of such interest, it
37 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the
38 cost of any dry hole previously drilled or wells previously abandoned) from so much of the following
39 as is necessary to effect reimbursement:

40     (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost
41 interest, on an acreage basis, up to the amount of unrecovered costs;

42     (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an
43 acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production
44 from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable
45 to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
46 portion of the oil and gas to be contributed by the other parties in proportion to their respective in-
47 terests; and

48     (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or
49 becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or be-
50 coming a party to this agreement.

51

52     3. <u>Other Losses:</u> All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2.
53 above, shall not be considered failure of title but shall be joint losses and shall be borne by all parties
54 in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
55 the Contract Area.

56

57                                            **ARTICLE V.**
58                                           **OPERATOR**

59

60 **A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR:**

61

62   <u>Cobra Oil & Gas Corporation</u>                                          shall be the
63 Operator of the Contract Area, and shall conduct and direct and have full control of all operations on
64 the Contract Area as permitted and required by, and within the limits of, this agreement. It shall con-
65 duct all such operations in a good and workmanlike manner, but it shall have no liability as Operator
66 to the other parties for losses sustained or liabilities incurred, except such as may result from gross
67 negligence or willful misconduct.

68

69

70

Use of this identifying mark is prohibited except when authorized in writing by the American Association of Petroleum Landmen

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest in the Contract Area, or is no longer capable of serving as Operator, it shall cease to be Operator without any action by Non-Operator, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on owner-ship as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effect-ive date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Op-erator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

**C. Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator, and all such employees shall be the employees of Operator.

**D. Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are com-menced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a sim-ilar nature.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**

**A. Initial Well:**
Without liability for failure to do so,
/On or before the __14th__ day of __June__ , 19 __82__, Operator shall commence the drill-ing of a well for oil and gas at the following location:

Center of the SE¼ NW¼ of Section 31, Township 20 North, Range 5 West

and shall thereafter continue the drilling of the well with due diligence to

9100' or to a depth sufficient to test the upper Cotton Valley Formation, whichever is the lesser.

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give in-dication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, it shall first secure the consent of all parties and shall plug and abandon same as provided in Article VI.E.1. hereof.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

**B. Subsequent Operations:**

1. _Proposed Operations:_ Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to ~~forty-eight (48)~~ twenty-four (24) hours, ~~exclusive of Saturday, Sunday or legal holidays~~. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. _Operations by Less than All Parties:_ If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the ~~forty-eight (48)~~ twenty-four (24) hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest of the parties approving such operation, and (b) its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within ~~forty-eight (48)~~ (24) hours ~~(exclusive of Saturday, Sunday or legal holidays)~~ after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A", or (b) carry its proportionate part of Non-Consenting Parties' interest. The proposing party, at its election, may withdraw such proposal if there is insufficient participation, and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) ~~100%~~ 200% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(b) _500_ % of that portion of the costs and expenses of drilling reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and

- 5 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

500 % of that portion of the cost of newly acquired equipment in the well (to and including the well-head connections), which would have been chargeable to such Non-Consenting Party if it had partici-pated therein.

Gas production attributable to any Non - Consenting Party's relinquished interest upon such Party's election, shall be sold to its purchaser, if available, under the terms of its existing gas sales con-tract. Such Non - Consenting Party shall direct its purchaser to remit the proceeds receivable from such sale direct to the Consenting Parties until the amounts provided for in this Article are recov-ered from the Non - Consenting Party's relinquished interest. If such Non - Consenting Party has not contracted for sale of its gas at the time such gas is available for delivery, or has not made the elec-tion as provided above, the Consenting Parties shall own and be entitled to receive and sell such Non-Consenting Party's share of gas as hereinabove provided during the recoupment period.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party con-ducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an in-ventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Party conducting the operations for the Consenting Parties shall furn-ish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall auto-matically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production there-from as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure, attached hereto.

Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) when Option 2, Article VII.D.1., has been selected, or (b) to the reworking, deepening and plugging back of such initial well, if such well is or thereafter shall prove to be a dry hole or non-commercial well, after having been drilled to the depth specified in Article VI.A.

C. Right to Take Production in Kind:

Each party shall have the right to take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in de-velopment and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate dispo-sition by any party of its proportionate share of the production shall be borne by such party. Any

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1    party taking its share of production in kind shall be required to pay for only its proportionate share
2 of such part of Operator's surface facilities which it uses.
3
4      Each party shall execute such division orders and contracts as may be necessary for the sale of its
5 interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled
6 to receive payment direct from the purchaser thereof for its share of all production.
7
8      In the event any party shall fail to make the arrangements necessary to take in kind or separately
9 dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have
10 the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such
11 oil and gas or sell it to others at any time and from time to time, for the account of the non-taking
12 party at the best price obtainable in the area for such production. Any such purchase or sale by Op-
13 erator shall be subject always to the right of the owner of the production to exercise at any time its
14 right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a
15 purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for
16 such reasonable periods of time as are consistent with the minimum needs of the industry under the
17 particular circumstances, but in no event for a period in excess of one (1) year. Notwithstanding the
18 foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's
19 share of gas production without first giving such other party thirty (30) days notice of such intended
20 sale.
21
22      In the event one or more parties' separate disposition of its share of the gas causes split-stream de-
23 liveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not
24 exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the
25 balancing or accounting between the respective accounts of the parties shall be in accordance with
26 any Gas Balancing Agreement between the parties hereto, whether such Agreement is attached as
27 Exhibit "E", or is a separate Agreement.
28
29   **D.  Access to Contract Area and Information:**
30
31      Each party shall have access to the Contract Area at all reasonable times, at its sole risk to inspect
32 or observe operations, and shall have access at reasonable times to information pertaining to the de-
33 velopment or operation thereof, including Operator's books and records relating thereto. Operator, upon
34 request, shall furnish each of the other parties with copies of all forms or reports filed with govern-
35 mental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports
36 of stock on hand at the first of each month, and shall make available samples of any cores or cuttings
37 taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to
38 Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the
39 information.
40
41   **E.  Abandonment of Wells:**
42
43     1.  <u>Abandonment of Dry Holes:</u> Except for any well drilled pursuant to Article VI.B.2., any well
44 which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole
45 shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent
46 effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours
47 (exclusive of Saturday, Sunday or legal holidays) after receipt of notice of the proposal to plug and
48 abandon such well, such party shall be deemed to have consented to the proposed abandonment. All
49 such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost,
50 risk and expense of the parties who participated in the cost of drilling of such well. Any party who ob-
51 jects to the plugging and abandoning such well shall have the right to take over the well and conduct
52 further operations in search of oil and/or gas subject to the provisions of Article VI.B.
53
54     2.  <u>Abandonment of Wells that have Produced:</u> Except for any well which has been drilled or re-
55 worked pursuant to Article VI.B.2. hereof for which the Consenting Parties have not been fully reim-
56 bursed as therein provided, any well which has been completed as a producer shall not be plugged and
57 abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
58 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense
59 of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment
60 of such well, all parties do not agree to the abandonment of any well, those wishing to continue its op-
61 eration shall tender to each of the other parties its proportionate share of the value of the well's salvable
62 material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated
63 cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall
64 assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity,
65 quality, or fitness for use of the equipment and material, all of its interest in the well and related equip-
66 ment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the
67 formation or formations then open to production. If the interest of the abandoning party is or includes
68 an oil and gas interest, such party shall execute and deliver to the non-abandoning parties an
69 oil and gas lease, limited to the interval or intervals of the formation or formations then open to produc-
70 tion, for a term of one year and so long thereafter as oil and/or gas is produced from the interval or inter-

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1 vals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
2 "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is
3 located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon
4 the relationship of their respective percentages of participation in the Contract Area to the aggregate of
5 the percentages of participation in the Contract Area of all assignees. There shall be no readjustment
6 of interest in the remaining portion of the Contract Area.
7
8 Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the op-
9 eration of or production from the well in the interval or intervals then open other than the royalties
10 retained in any lease made under the terms of this Article. Upon request, Operator shall continue to
11 operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
12 templated by this agreement, plus any additional cost and charges which may arise as the result of
13 the separate ownership of the assigned well.
14
15 **ARTICLE VII.**
16 **EXPENDITURES AND LIABILITY OF PARTIES**
17
18 A.  **Liability of Parties:**
19
20 The liability of the parties shall be several, not joint or collective. Each party shall be responsible
21 only for its obligations, and shall be liable only for its proportionate share of the costs of developing
22 and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are
23 given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall
24 this agreement be construed as creating, a mining or other partnership or association, or to render the
25 parties liable as partners.
26
27 B.  **Liens and Payment Defaults:**
28
29 Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a
30 security interest in its share of oil and or gas when extracted and its interest in all equipment, to secure
31 payment of its share of expense, together with interest thereon at the rate provided in the Accounting
32 Procedure attached hereto as Exhibit "C". To the extent that Operator has a security interest under the
33 Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies
34 of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator
35 for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
36 rights or security interest as security for the payment thereof. In addition, upon default by any Non-
37 Operator in the payment of its share of expense, Operator shall have the right, without prejudice to
38 other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's
39 share of oil and/or gas until the amount owed by such Non-Operator, plus interest has been paid. Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any de-
41 fault. Operator grants a like lien and security interest to the Non-Operators to secure payment of Op-
42 erator's proportionate share of expense.
43
44 If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of
45 a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by
46 Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the in-
47 terest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimburse-
48 ment thereof, be subrogated to the security rights described in the foregoing paragraph.
49
50 C.  **Payments and Accounting:**
51
52 Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses
53 incurred in the development and operation of the Contract Area pursuant to this agreement and shall
54 charge each of the parties hereto with their respective proportionate shares upon the expense basis pro-
55 vided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate
56 record of the joint account hereunder, showing expenses incurred and charges and credits made and
57 received.
58
59 Operator, at its election, shall have the right from time to time to demand and receive from the
60 other parties payment in advance of their respective shares of the estimated amount of the expense to
61 be incurred in operations hereunder during the next succeeding month, which right may be exercised only
62 by submission to each such party of an itemized statement of such estimated expense, together with
63 an invoice for its share thereof. Each such statement and invoice for the payment in advance of esti-
64 mated expense shall be submitted on or before the 20th day of the next preceding month. Each party
65 shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such es-
66 timate and invoice is received. If any party fails to pay its share of said estimate within said time, the
67 amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be
68 made monthly between advances and actual expense to the end that each party shall bear and pay its
69 proportionate share of actual expenses incurred, and no more.
70

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

**D. Limitation of Expenditures:**

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this Agreement, it being understood that the consent to the drilling or deepening shall include:

☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and/or surface facilities.

☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its authorized depth, and all tests have been completed, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have ~~forty-eight (48)~~ twenty-four (24) hours ~~(exclusive of Saturday, Sunday and legal holidays)~~ in which to elect to participate in the setting of casing and the completion attempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement, it being understood that the consent to the reworking or plugging back of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. Other Operations: Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of  Twenty thousand & no/100----------- Dollars ($ 20,000.00          ) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares "Authority for Expenditures" for its own use, Operator, upon request, shall furnish copies of its "Authority for Expenditures" for any single project costing in excess of  Twenty thousand & no/100-------------- Dollars ($ 20,000.00          ).

**E. Royalties, Overriding Royalties and Other Payments:**

Each party shall pay or deliver, or cause to be paid or delivered, all royalties to the extent of   1/8                              due on its share of production and shall hold the other parties free from any liability therefor. If the interest of any party in any oil and gas lease covered by this agreement is subject to any royalty, overriding royalty, production payment, or other charge over and above the aforesaid royalty, such party shall assume and alone bear all such obligations and shall account for or cause to be accounted for, such interest to the owners thereof.

No party shall ever be responsible, on any price basis higher than the price received by such party, to any other party's lessor or royalty owner; and if any such other party's lessor or royalty owner should demand and receive settlements on a higher price basis, the party contributing such lease shall bear the royalty burden insofar as such higher price is concerned.

**F. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

G. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. Operator shall bill other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

H. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be an amount equivalent to the premium which would have been paid had such insurance been obtained. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's fully owned automotive equipment.

See Article XV D under Other Provisions

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. If the interest of the assigning party includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not desiring to surrender an oil and gas lease covering such oil and gas interest for a term of one year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignor's or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Contract Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

**B.   Renewal or Extension of Leases:**

If any party secures a renewal of any oil and gas lease subject to this Agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall apply also and in like manner to extensions of oil and gas leases.

**C.   Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash toward the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. If all parties hereto are Drilling Parties and accept such tender, such acreage shall become a part of the Contract Area and be governed by the provisions of this agreement. If less than all parties hereto are Drilling Parties and accept such tender, such acreage shall not become a part of the Contract Area. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D.   Subsequently Created Interest:**

Notwithstanding the provisions of Article VIII.E. and VIII.G., if any party hereto shall, subsequent to execution of this agreement, create an overriding royalty, production payment, or net proceeds interest, which such interests are hereinafter referred to as "subsequently created interest", such subsequently created interest shall be specifically made subject to all of the terms and provisions of this agreement, as follows:

1. If non-consent operations are conducted pursuant to any provision of this agreement, and the party conducting such operations becomes entitled to receive the production attributable to the interest out of which the subsequently created interest is derived, such party shall receive same free and clear of such subsequently created interest. The party creating same shall bear and pay all such subsequently created interests and shall indemnify and hold the other parties hereto free and harmless from any and all liability resulting therefrom.

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1    2. If the owner of the interest from which the subsequently created interest is derived (1) fails to
2  pay, when due, its share of expenses chargeable hereunder, or (2) elects to abandon a well under pro-
3  visions of Article VI.E. hereof, or (3) elects to surrender a lease under provisions of Article VIII.A.
4  hereof, the subsequently created interest shall be chargeable with the pro rata portion of all expenses
5  hereunder in the same manner as if such interest were a working interest. For purposes of collecting
6  such chargeable expenses, the party or parties who receive assignments as a result of (2) or (3) above
7  shall have the right to enforce all provisions of Article VII.B. hereof against such subsequently created
8  interest.
9
10 E.  Maintenance of Uniform Interest:
11
12    For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests
13 covered by this agreement, and notwithstanding any other provisions to the contrary, no party shall
14 sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Con-
15 tract Area and in wells, equipment and production unless such disposition covers either:
16
17    1. the entire interest of the party in all leases and equipment and production; or
18
19    2. an equal undivided interest in all leases and equipment and production in the Contract Area.
20
21    Every such sale, encumbrance, transfer or other disposition made by any party shall be made ex-
22 pressly subject to this agreement, and shall be made without prejudice to the right of the other parties.
23
24    If, at any time the interest of any party is divided among and owned by four or more co-owners,
25 Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full
26 authority to receive notices, approve expenditures, receive billings for and approve and pay such party's
27 share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
28 party's interests within the scope of the operations embraced in this agreement; however, all such
29 co-owners shall have the right to enter into and execute all contracts or agreements for the disposition
30 of their respective shares of the oil and gas produced from the Contract Area and they shall have the
31 right to receive, separately, payment of the sale proceeds hereof.
32
33 F.  Waiver of Right to Partition:
34
35    If permitted by the laws of the state or states in which the property covered hereby is located, each
36 party hereto owning an undivided interest in the Contract Area waives any and all rights it may have
37 to partition and have set aside to it in severalty its undivided interest therein.
38
39 G.  Preferential Right to Purchase:
40
41    Should any party desire to sell all or any part of its interests under this agreement, or its rights and
42 interests in the Contract Area, it shall promptly give written notice to the other parties, with full infor-
43 mation concerning its proposed sale, which shall include the name and address of the prospective pur-
44 chaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of
45 the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after
46 receipt of the notice, to purchase on the same terms and conditions the interest which the other party
47 proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the pur-
48 chased interest in the proportions that the interest of each bears to the total interest of all purchasing
49 parties. However, there shall be no preferential right to purchase in those cases where any party wishes
50 to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale
51 of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent
52 company, or to any company in which any one party owns a majority of the stock.
53
54                              ARTICLE IX.
55                  INTERNAL REVENUE CODE ELECTION
56
57    This agreement is not intended to create, and shall not be construed to create, a relationship of part-
58 nership or an association for profit between or among the parties hereto. Notwithstanding any pro-
59 visions herein that the rights and liabilities hereunder are several and not joint or collective, or that this
60 agreement and operations hereunder shall not constitute a partnership, as, for Federal income tax pur-
61 poses, this agreement and the operations hereunder are regarded as a partnership, each party hereby
62 affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter
63 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of
64 the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on
65 behalf of each party hereby affected such evidence of this election as may be required by the Secretary
66 of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but
67 not by way of limitation, all of the returns, statements, and the data required by Federal Regula-
68 tions 1.761. Should there be any requirement that each party hereby affected give further evidence of
69 this election, each such party shall execute such documents and furnish such other evidence as may be
70 required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from Operations hereunder can be adequately determined without the computation of partnership taxable income.

### ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single damage claim or suit arising from operations hereunder if the expenditure does not exceed __Five thousand and no/100's---------------------------__ Dollars ($ _5,000.00_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, the party shall immediately notify Operator, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

### ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

### ARTICLE XII.
### NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by United States mail or Western Union telegram, postage or charges prepaid, or by teletype, and addressed to the party to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid, or when sent by teletype. Each party shall have the right to change its address at any time, and from time to time, by giving written notice hereof to all other parties.

### ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subjected hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease, or oil and gas interest contributed by any other party beyond the term of this agreement.

☐  Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, and/or so long as oil and/or gas production continues from any lease or oil and gas interest

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

X] __Option No. 2:__ In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of __90__ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling or reworking a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and or gas from the Contract Area, this agreement shall terminate unless drilling or reworking operations are commenced within __90__ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

**A.  Laws, Regulations and Orders:**

This agreement shall be subject to the conservation laws of the state in which the committed acreage is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

**B.  Governing Law:**

The essential validity of this agreement and all matters pertaining thereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation, or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state where most of the land in the Contract Area is located shall govern.

### ARTICLE XV.
### OTHER PROVISIONS

Cobra Oil & Gas Corporation is an operating company controlled by A.R. Dillard, Jr.  He shall have the right to remove that corporation as operator and to substitute in its place as operator another corporation controlled by him.

Except as to burdens provided for in letter of even date covering these properties and except as to burdens in favor of third parties as incurred by Dillard in acquisition of the subject acreage (provided such burden is proportionate as to the interest of non-operators under this agreement, if any party hereto should hereafter create any overriding royalty, production payment, or other burden against working interest production other than those defined in the exhibit to the Letter Agreemennt which is part of the Operating Agreement), and if any other party or parties conduct non-consent operations pursuant to any provision of this agreement, and, as the result, become entitled to receive the working interest production otherwise belonging to the non-participating party, the party or parties entitled to receive the working interest production of the non-partcipating party shall receive such production free and clear of burdens against such production which may have been created subsequent to the date of this Agreement, and the non-participating party creating such subsequent burdens, shall save the participating party or parties harmless with respect to the receipt of such working interest production.



- 14 -

### Filings with Governmental Agencies:

The parties hereto authorize and direct the Operator to prepare and submit to the appropriate jurisdictional agency such filings as the Operator may deem necessary in order that proper well classification may be made for the purposes of the Natural Gas Policy Act of 1978 ("NGPA"). In the event that Operator shall have determined that a well does not qualify for a classification requiring a jurisdictional agency determination under the NGPA and any other party hereto desires to request a jurisdictional agency determination that a well qualifies for a particular category under the NGPA, Operator shall, at the request of such party, advise such party in writing that Operator does not intend to request a jurisdictional agency determination for such well. Operator shall use its best efforts to make such filings under the NGPA in sufficient time after completion of a well to enable any party to make such additional filings as may be necessary to enable any party to collect the maximum rate to which it may be entitled. However, Operator shall not be held liable or responsible for failure to file an appropriate request with a jurisdictional agency unless such resulted from gross or willful negligence or misconduct.

Operator's responsibility for filing shall cease at such time as filings must be made by each party separately.

### Windfall Profits Tax Act of 1980:

The Non-Operators hereto authorize Operator to prepare and submit such documents as may be required to be submitted to the Purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Windfall Profits Tax Act of 1980" (the "WPTA") and the Non-Operators agree to indemnify and hold Operator harmless for any and all liabilities caused as a result of any action taken by Operator on the basis of any certification prepared by Operator unless Operator is grossly negligent or acts with willful misconduct in taking such action or preparing such certification. Operator agrees to submit all documents on behalf of Non-Operators unless Operator gives written notice to the contrary.

### Non-Discrimination:

In the performance of this agreement, Operator shall not engage in any conduct or practice which violates any law, order or regulation prohibiting discrimination against any person by reason of his or her race, religion, color, sex, national origin, or age; and Operator further agrees to comply fully with the nondiscrimination provisions of Section 202 of Executive Order No. 11246 (30F.R. 12319), as amended which are hereby included as Exhibit "F".

A. Sale of Gas Production

. It is recognized by the parties hereto that in addition to each parties share of working interest production as shown on Exhibit "A" such party shall have the right, subject to existing contracts, to market the royalty gas attributable to each lease which is contributed to the Unit Area and to receive payments due for such royalty gas produced from or allocated to such lease or leases. It is agreed that regardless of whether each party markets or contracts for its share of gas, including the royalty gas under the leases which it contributed to the Unit, such party agrees to pay or cause to be paid to the royalty owners under its lease or leases the proceeds attributable to their respective royalty interest and to hold all other parties harmless for its failure to do so.

B. Billing Additional Interests

Notwithstanding the provisions of this agreement and of the accounting procedure attached as Exhibit "C", the parties to this agreement specifically agreed that in no event during the term of this contract shall Operator be required to make more than one billing for the entire interest credited to each Party on Exhibit "A".. It is further agreed that if any Party to this. agreement (hereinafter referred to as "Selling Party") disposes of part of the interest credited to it on Exhibit "A", the Selling Party will be solely responsible for billing its assignee or assignees and shall remain primarily liable to the other parties for the interest or interest assigned and shall make prompt payment to Operator for the entire amount of statements and billing rendered to it. It is further understood and agreed that if Selling Party disposes of all of its interest as set out on Exhibit "A", whether to one or several assignees, Operator shall continue to issue statements and billings to the Selling Party for the interest conveyed until such time as Selling Party has designated and qualified one assignee to receive the billings for the entire interest. In order to qualify any assignee to receive the billing for the entire interest credited to Selling Party on Exhibit "A", Selling Party shall furnish to Operator the following:

1. Written notice of the conveyance and photostatic or certified copies of the assignments by which the transfer was made.

2. The name of the assignee to be billed in which it consents to receive statements and billings for the entire interest credited to Selling Party on Exhibit "A" hereof; and, further, consents to handle any necessary sub-billings in the event it does not own the entire interest credited to Selling Party on Exhibit "A".

C. Disbursements of Royalties

If a purchaser of any oil, gas or other hydrocarbons produced from the Unit Area declines to make disbursements of all royalties, overriding royalties and other payments out of, or with respect to production which are payable on the Unit Area, Operator will, if any Non-Operator so desires, make such disbursements on behalf of said Non-Operator at his direction, provided, Non-Operator shall execute such documents as may be necessary in the opinion of Operator to enable Operator to receive all payments for oil, gas or other hydrocarbons directly from said purchaser. In that event, Operator will use its best efforts to make disbursements correctly but will be liable for incorrect disbursements only in the event of gross or willful negligence.

D. Article VII. G. Addition

If the Operator is required hereunder to pay ad valorem taxes based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the percentage of tax value generated by each party's working interest.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___14th__ day of ___June_____, 19 _82_ .

OPERATOR

Attest:                                    Cobra Oil and Gas Corporation


_____              By:_____
                                            Robert W. Osborne, Vice President


NON-OPERATORS

Attest:                                    Sugar Creek Producing Company


_____              By:_____


Attest:                                    Pennzoil Producing Company


_____              By:_____




                                       _____  _____
                                       Leonard Phillips
H. Blume Johnson
                                       4D Company
J.R. Butler

By:_____           By:_____
                                            A.R. Dillard, Jr.
                                            General Partner



_____
Robert W. Osborne

- 15 -

STATE OF __Louisiana_____ :

   Parish ____ OF __ Caddo_____ :

     On this _____ day of _____, 19__, before me came and appeared
_____, to me personally known, who being
first duly sworn did say that he is _____ of,
_Sugar Creek Producing Company_____, and that the said instrument
was signed in behalf of said corporation by authority of its Board of
Directors, and he acknowledged the instrument to be the free act and deed
of the corporation.

                                    _____
                                    Notary Public in and for
                                    _____, Louisiana


STATE OF ___Louisiana_____ :

   Parish ____ OF __ Caddo_____ :

     On this _____ day of _____, 19__, before me came and appeared
_____, to me personally known, who being
first duly sworn did say that he is _____ of,
_Pennzoil Producing Company_____, and that the said instrument
was signed in behalf of said corporation by authority of its Board of
Directors, and he acknowledged the instrument to be the free act and deed
of the corporation.

                                      _____
                                    Notary Public in and for
                                    _____, Louisiana


STATE OF ___Texas_____ :

   County ____ OF _____ :

     On this _____ day of _____, 19__, before me came and appeared
_A.R. Dillard, Jr._____, to me personally known, who being
first duly sworn did say that he is __Managing Partner_____ of,
_4D Company, a Partnership_____, and that the said instrument
was signed in behalf of said partnership by authority of its Board of
Directors, and he acknowledged the instrument to be the free act and deed
of the partnership.

                                      _____
                                    Notary Public in and for
                                    _____, Louisiana


STATE OF _____ :

   _____ OF _____ :

     On this _____ day of _____, 19__, before me came and appeared
_____, to me personally known, who being
first duly sworn did say that he is _____ of,
_____, and that the said instrument
was signed in behalf of said corporation by authority of its Board of
Directors, and he acknowledged the instrument to be the free act and deed
of the corporation.

                                      _____
                                    Notary Public in and for
                                    _____, Louisiana

STATE OF __Louisiana__

PARISH OF __Caddo__

      On this _8_ day of _July_, 19__ before me personally appeared __Leonard Phillips__ to me personally known to be the person who executed the foregoing instrument and who acknowledged that _he executed it as _his_ own free act and deed.

                             _Quin Crawford_
                         Notary Public in and for
                         _Caddo Ph, La_, Louisiana


STATE OF __Louisiana__

PARISH OF __Caddo__

      On this _____ day of _____, 19__ before me personally appeared __H. Blume Johnson__ to me personally known to be the person who executed the foregoing instrument and who acknowledged that _he executed it as _____ own free act and deed.

                         Notary Public in and for
                         _____, Louisiana


STATE OF __Louisiana__

PARISH OF __Caddo__

      On this _____ day of _____, 19__ before me personally appeared __J.R. Butler, by,__ to me personally known to be the person who executed the foregoing instrument and who acknowledged that _he executed it as _____ own free act and deed.

                         Notary Public in and for
                         _____, Louisiana


STATE OF _____

PARISH OF _____

      On this _____ day of _____, 19__ before me personally appeared __Robert W. Osborne__ to me personally known to be the person who executed the foregoing instrument and who acknowledged that _he executed it as _____ own free act and deed.

                         Notary Public in and for
                         _____, Louisiana

Exhibit "A"


Attached to and made a part of that certain Operating Agreement pertaining to the Sugar Creek Prospect, Claiborne Parish, Louisiana between Cobra Oil and Gas Corporation, as operator and 4D Company and Robert W. Osborne, etal as non operators.

    1)   Lands subject to this agreement:

Section 30:  S½ SW¼; NE¼ SW¼; S½ NW¼ SW¼

Section 31:  W½; W½ W½ SE¼; W½ W½ NE¼


               Township 20 North, Range 5 West
               Claiborne Parish, Louisiana

Section 25:  E½ SE¼ SE¼

Section 36:  E½ E½ NE¼; E½ E½ SE¼


               Township 20 North, Range 6 West
               Claiborne Parish, Louisiana

    2)   Addresses and Working Interests of Parties:

| | |
|---|---|
| Cobra Oil and Gas Corporation<br>1600 Tenth<br>Wichita Falls, Texas   76301 | .000000 |
| Sugar Creek Producing Company<br>1310 Beck Building<br>Shreveport, La.   71101 | .213540 |
| Pennzoil Producing Company<br>P.O. Box 6088<br>Shreveport, La.   71106 | .213540   * |
| Leonard Phillips<br>P.O. Box 3735<br>Shreveport, La.   71103<br>Attn:  S.A. Womack | .004094 |
| Miller and Lents, LTD<br>for Account of J.R. Butler<br>C/O 2138 Bank of the Southwest Building<br>Houston, Texas   77002<br>Attn:  Ken Cheatham | .003281 |
| H. Blume Johnson<br>666 Travis Street<br>Shreveport, La.   71101 | .000813 |
| 4D Company<br>1600 Tenth Street<br>Wichita Falls, Texas   76301 | .423549 |
| Robert W. Osborne<br>1600 Tenth Street<br>Wichita Falls, Texas   76301 | .141183 |
| | 1.000000% |

    3)  Depth limitation:  There is excepted from this agreement all depths from the surface of the earth to the base of the Hosston Formation.


  * As of the date of this agreement these parties have not committed their interest.  In the event these parties elect to participate, the interest of all parties will be as set out above.  In the event they elect to farmout, their working interest will be borne by:

      4D Company       75%
      Robert W. Osborne   25%

- 1 -

EXHIBIT "A"
PAGE 2

The land subject to this agreement as identified in paragraph 1 above comprises the Louisiana Office of Conservation 640 acre unit known as the Cotton Valley Formation Reservior A, Sand Unit E, in Sugar Creek Field, Claiborne Parish, Louisiana.  The interest of the parties with respect to the Cotton Valley Unit are as set out in paragraph 2 above.

4)   Ownership of excepted formations or depths:

The ownership of mineral leases or mineral rights affecting land which would be placed in a Louisiana Office of Conservation Unit for the initial well or allocated to the initial well for allowable purposes in the event the initial well is completed as a well capable of commercial production from a depth shallower than the base of the Hosston Formation is as follows;

4D Company
1600 Tenth Street
Wichita Falls, Texas   76303                      75%

Robert W. Osborne
1600 Tenth Street
Wichita Falls, Texas   76301                      25%
                                                 1.00%

Page 1

SUGAR CREEK AREA
EXHIBIT "A"
CLAIBORNE PARISH, LOUISIANA

INTEREST CONTRIBUTED BY:
SUGAR CREEK PRODUCING COMPANY
PENNZOIL PRODUCING COMPANY

| LEASE NO. | LESSOR | DATE OF LEASE | RECORDED BOOK | PAGE | DESCRIPTION |
|---|---|---|---|---|---|
| 1 | Mary L. Bailey, etal | 9/5/56 | 225 | 16 | Insofar and only insofar as said lease covers the: E½ of SE¼, E½ of NE¼ of SE¼ Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| 2 | Rosie Belle Brown Steen | 10/22/65 | 195 | 415 | Insofar and only insofar as said Co-Lessor's agreement covers the: E½ of SE¼ of SE¼; E½ of NE¼ of SE¼ Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| 3 | J. C. Pittman | 1/15/57 | 195 | 423 | Insofar and only insofar as said Co-Lessor's Agreement covers the: E½ of SE¼ of SE¼; E½ of NE¼ of SE¼ Section 36, Township 20 North, Range 6 West Claiborne Parish, Louisiana |
| 4 | N. H. Wheless, Jr. | 1/15/57 | 195 | 422 | Insofar and only insofar as said Co-Lessor's Agreement covers the: E½ of SE¼; E½ of NE¼ of SE¼ Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| 5 | E. J. Smallwood | 2/2/57 | 195 | 428 | Insofar and only insofar as said Co-Lessor's Agreement covers the: E½ of SE¼ of SE¼; E½ of NE¼ of SE¼ Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| 6 | Sam Andrews, et al | 3/7/29 | 73 | 56 | Insofar and only insofar as said lease covers: W½ of SW¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 7 | A. J. Hodges, et al | 2/18/29 | 73 | 83 | Insofar and only insofar as said lease covers: W½ of SW¼ of SE¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |

Page 2

SUGAR CREEK AREA
EXHIBIT "A"
CLAIBORNE PARISH, LOUISIANA

INTEREST CONTRIBUTED BY:
SUGAR CREEK PRODUCING COMPANY
PENNZOIL PRODUCING COMPANY

| LEASE NO. | LESSOR | DATE OF LEASE | RECORDED BOOK | PAGE | DESCRIPTION |
|---|---|---|---|---|---|
| 8 | T. W. Aubrey, et al | 2/8/30 | Reg. No. | 70374 | Insofar and only insofar as said lease covers; E½ of SW¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 9 | J. G. Wilson | 2/11/30 | Reg. No. | 70413 | Insofar and only insofar as said lease covers: E½ of SW¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 10 | Annie Harris, et al | 8/4/30 | Reg. No. | _____ | Insofar and only insofar as said lease covers: W¼ of SW¼ of NE¼ Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 11 | Annie Harris, et al | 5/31/33 | Reg. No. | 88961 | Insofar and only insofar as said lease covers: W¼ of NW¼ of SE¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 12 | W. S. Coleman, et al | 2/6/59 | Reg. No. | 21987 | Insofar and only insofar as said lease covers: E½ of SE¼ of SE¼ Section 25, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| 13 | Elmo Coleman | 3/12/59 | Reg. No. | _____ | Insofar and only insofar as said Co-Lessor's Agreement covers: E½ of SE¼ of SE¼ Section 25, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| 14 | T. L. Benson | 1/26/59 | Reg. No. | _____ | Insofar and only insofar as said lease covers the E½ of SE¼ of SE¼ Section 25, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |

SUGAR CREEK AREA
EXHIBIT "A"
CLAIBORNE PARISH, LOUISIANA

INTEREST CONTRIBUTED BY:
4D COMPANY
ROBERT W. OSBORNE

| LEASE NO. | LESSOR | DATE OF LEASE | RECORDED BOOK | RECORDED PAGE | DESCRIPTION |
|---|---|---|---|---|---|
| 851-1 | Kilpatrick Investments, Inc. | 4/14/82 | 528 | 430 | S½ NW¼, SW¼ SW¼ of Section 30 and NE¼ NW¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-2(a) | Edwin E. Glenn, Jr. et ux | 5/3/82 | 527 | 806 | Insofar and only Insofar as said lease covers: E½ SW¼ of Section 30, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-2(b) | William Lane Hightower et ux | 5/3/82 | 527 | 329 | Insofar and only Insofar as said lease covers: E½ SW¼ of Section 30, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-2(c) | Lucille H. Millikin | 5/3/82 | 527 | 341 | Insofar and only Insofar as said lease covers: E½ SW¼ of Section 30, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-2(d) | Lottie M. Hightower | 5/3/82 | 527 | 333 | Insofar and only Insofar as said lease covers: E½ SW¼ of Section 30, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-2(e) | T. B. Hightower et ux | 5/3/82 | 527 | 337 | Insofar and only Insofar as said lease covers: E½ SW¼ of Section 30, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-2(f) | Marguerite Hightower Rich | 5/3/82 | 527 | 325 | Insofar and only Insofar as said lease covers: E½ SW¼ of Section 30, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-2(g) | Robert Knipmeyer | 5/3/82 | | | Insofar and only Insofar as said lease covers: E½ SW¼ of Section 30, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |

SUGAR CREEK AREA
EXHIBIT "A"
CLAIBORNE PARISH, LOUISIANA

INTEREST CONTRIBUTED BY:
4D COMPANY
ROBERT W. OSBORNE

| LEASE NO. | LESSOR | DATE OF LEASE | RECORDED BOOK | PAGE | DESCRIPTION |
|---|---|---|---|---|---|
| 851-3(a) | Louise Brill Benson | 5/10/82 | 527 | 802 | NE¼ NW¼ of Section 31 and S. 60 acres of W½ SW¼ of Section 30, Township 20 North, Range 5 West, and E½ SE¼ SE¼ of Section 25, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| 841-4(a) | J. B. Caskey et al | 7/17/79 | 482 | 289 | E½ E½ NE¼ of Section 36, Township 20 North, Range 6 West and W½ NW¼; SE¼ NW¼ of Section 31, Township 20, North, Range 5 West, Claiborne Parish, Louisiana |
| 851-4(b) | Raymond Robinson et al | 7/17/79 | 474 | 967 | E½ E½ NE¼ of Section 36, Township 20 North, Range 6 West and W½ NW¼; SE¼ NW¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-4(c) | Oren Baker et ux | 7/17/79 | 485 | 764 | E½ E½ NE¼ of Section 36, Township 20 North, Range 6 West and W½ NW¼; SE¼ NW¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-4(d) | Lorie Baker Jarman et vir | 7/17/79 | 482 | 285 | E½ E½ NE¼ of Section 36, Township 20 North, Range 6 West and W½ NW¼; SE¼ NW¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| 851-4(e) | Hazel Caskey Hickman et vir | 7/17/79 | 485 | 768 | E½ E½ NE¼ of Section 36, Township 20 North, Range 6 West and W½ NW¼ pf Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| | James Dayton Sims | 6/9/82 | 528 | 842 | W½ NW¼ NE¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| | Peggy Ann Sims Reese | 6/11/82 | 528 | 846 | W½ NW¼ NE¼ of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |
| | Irwin I. Muslow | 6/8/82 | | | E½ SE¼ SE¼ of Section 25, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| | Virginia H. Brinkman | 6/8/82 | | | E½ SE¼ SE¼ of Section 25, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |

SUGAR CREEK AREA
EXHIBIT "A"
CLAIBORNE PARISH, LOUISIANA

INTEREST CONTRIBUTED BY:
4D COMPANY
ROBERT W. OSBORNE

| LEASE NO. | LESSOR | DATE OF LEASE | RECORDED BOOK | RECORDED PAGE | DESCRIPTION |
|---|---|---|---|---|---|
| | Etah Colvin Cook, et al | 6/8/82 | | | Insofar and only insofar as said Co-Lessor's Agreement covers: E½ SE¼ SE¼ of Section 25, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| INTEREST CONTRIBUTED BY: LEONARD W. PHILLIPS J. R. BUTLER H. BLUME JOHNSON | | | | | |
| 1 | S. C. Cox, et al | 1/25/58 | 215 | 433 | Insofar and only insofar as said lease covers: E/2 of SE/4 of SW/4; E/2 of NE/4 of SE/4; E/2 of SE/4 of NE/4 all in Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana |
| 2 | Richland Baptist Church | 6/30/83 | 198 | 832 | Insofar and only insofar as said lease covers: One-Half (1/2) acre in Southwest corner of SW/4 of SW/4 of Section 31, Township 20 North, Range 5 West, Claiborne Parish, Louisiana |

*This lease does not due to Feal description. See T.O. in Brown A-1 page 7 thru 10.*

There is no EXHIBIT "B" to this Operating Agreement.

COPAS — 1974

Recommended by the Council of Petroleum Accountants Societies of North America

ßuu 601,   BOX 800, TULSA OK 74101

## EXHIBIT   "C"

Attached to and made a part of ....Operating Agreement between Cobra Oil & Gas Corporation, as Operator and 4 D Company and Robert W. Osborne, et al, as Non-Operators.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

2. **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

5. **Audits**

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

6. **Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

COPAS

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First Level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

   D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3. **Employee Benefits**

   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

6. **Services**

   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

7. **Equipment and Facilities Furnished by Operator**

   A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

   B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**

   Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

COPAS

10. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

11. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

12. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

# III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( X ) Fixed Rate Basis, Paragraph 1A, or
   (   ) Percentage Basis, Paragraph 1B.

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (   ) shall not (X ) be covered by the Overhead rates.

A. **Overhead - Fixed Rate Basis**

   (1) Operator shall charge the Joint Account at the following rates per well per month:

   Drilling Well Rate $ 4,240.00
   Producing Well Rate $ 424.00

   (2) Application of Overhead - Fixed Rate Basis shall be as follows:

   (a) Drilling Well Rate

   [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

   [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

   [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

   (b) Producing Well Rates

   [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

   [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

   [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

   [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

   [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

   (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

COPA

B. Overhead - Percentage Basis

  (1) Operator shall charge the Joint Account at the following rates:

    (a) Development

      _____ Percent (   %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

    (b) Operating

      _____ Percent (   %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

  (2) Application of Overhead - Percentage Basis shall be as follows:

    For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. Overhead - Major Construction  (to be negotiated)

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $_____:

A. _____% of total costs if such costs are more than $_____ but less than $_____; plus
B. _____% of total costs in excess of $_____ but less than $1,000,000; plus
C. _____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

  (1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

  (2) Line Pipe

    (a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

    (b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

  (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1) Material moved to the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

  (2) Material moved from the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

COPAS

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. Expense of Conducting Periodic Inventories

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

— 5 —

EXHIBIT "D"

## SCHEDULE OF INSURANCE TO BE CARRIED

Type of Coverage

(a)  Employers' Liability and
     extension of Workmen's
     Compensation and Employers'
     Liability to cover marine
     operations where applicable.

(b)  Comprehensive General
     Liability (includes Premises
     Liability, Independent Con-
     tractors, Completed Operations,
     and Blanket Contractual Liability
     Coverage on all operations. It
     also includes underground property
     damage of $25,000 on operated
     leases and $50,000 on non-operated
     leases).

(c)  Comprehensive Automobile Liability

Liability Limits of Not Less Than:

Statutory - $500,000 limit for
            Employers Liability

Bodily Injury - $500,000 each person
              - $500,000 each accident

Property Damage - $100,000 each accident

Bodily Injury  $250,000 each person
             - $500,000 each accident

Property Damage - $100,000 each accident

EXHIBIT "E"

Attached to and made a part of that certain
Operating Agreement dated June 14, 1982,
by and between Cobra Oil & Gas Corporation
and the Non-Operators named therein.

## GAS BALANCING AGREEMENT

1. Each party shall have the right to take in kind and separately dispose
of its proportionate share of the gas produced from gas wells on the Unit
Area and shall be entitled to an opportunity to produce its fair share of
the allowable production from a gas well (including lawful tolerances)
established by appropriate regulatory authority.

2. It is the intent that each party be entitled to gas produced in the
proportion that its ownership interest bears to the sum of the ownership
interests. It is the intent that the Unit Operator have the duty of con-
trolling gas well production and the responsibility of administering the
provisions of this agreement. Unit Operator shall cause deliveries to be
made to the gas purchasers at such rates as may be required to give effect
to the intent that the gas production accounts of all parties are to be
brought into balance under the provisions contained herein.

3. To give effect to the intent of this agreement, the Unit Operator shall
be governed by the following rights of each party:

(a)   When the well's current production is less than the well
allowable due to either the capacity of the well to produce or
the Unit Operator causing the well to produce below allowable
in order to properly balance well allowable overproduction:

(1)   Each underproduced party (a party who has taken
a lesser volume of gas than the quantity such party is
hereby entitled) shall have the right to take a greater
amount of gas than its proportionate share of the well's
current production, provided that the right to take such
greater amount shall be in proportion that its interest
bears to the total interest of all underproduced parties
desiring to take more than their proportionate share of
the well's current production.

(2)   Each overproduced party (a party who has taken a
greater volume of gas than the quantity such party is
herein entitled) shall reduce its respective take in the
proportion that such party's interest bears to the total
interest of all overproduced parties, but in no event
shall any overproduced party be required to reduce its
take to less than SEVENTY-FIVE percent (75%) of such
overproduced party's proportionate share of the well's
current production.

(b)  When the well's current production is less than the well
allowable due to combined pipeline takes or for reasons other than
in subparagraph (a) above:

(1)   Each underproduced party shall have the right as
in subparagraph (a) (1) above.

EXHIBIT "E"
Page 2

    (2)   Each overproduced party shall reduce its respective take in the proportion that such party's interest bears to the total interest of all overproduced parties, but in no event shall any overproduced party be required to reduce its take to less than SEVENTY-FIVE percent (75%) of such overproduced party's proportionate share of the well allowable.

(c)  When the well's current production is equal to or greater than the well allowable:

    (1)   Each underproduced party shall have the right to take a greater amount of gas than its proportionate share of the well allowable, provided that the right to take such greater amount shall be in proportion that its interest bears to the total interests of all underproduced parties desiring to take more than their proportionate share of the well allowable.

    (2)   Each overproduced party shall have the right as in subparagraph (a) (2) above.

(d)  The Unit Operator, at the request of any party, may produce the entire well stream, if necessary, for a deliverability test not to exceed seventy-two (72) hours duration required under such requesting party's gas sales contract and may overproduce in any other situation provided that such overproducing would be consistent with prudent operations.

4.  Each party taking gas shall furnish the Unit Operator a monthly statement of gas taken.  After commencement of production, Unit Operator shall furnish a current account monthly of the gas balance between parties hereto including the total quantity of gas produced, the portion thereof used in Unit operations, vented or lost, and the total quantity of gas delivered to a market.

5.  Each party producing and/or delivering gas to its purchaser shall pay any and all production taxes due on such gas.

6.  The provisions of this agreement shall be separately applicable to each gas well.

7.  When gas sales from a gas well permanently cease, Unit Operator shall be responsible to determine the final accounting of underproduction and overproduction and each overproduced party shall account to and compensate each underproduced party with a sum of money equal to the amount actually received, less applicable taxes, by any overproduced party from the sale of that part of the total cumulative volume of gas produced which the underproduced party was entitled to take and payment for such overproduction shall be in the order of accrual, provided, that if such overproduced party has paid the royalties attributable to such overproduction, the amount of such royalties shall be deducted from such payment.

8.  Each party taking gas shall be responsible for the entire payment to each royalty owner (including owners of overriding royalty and production payments) entitle to payment for the gas which such party takes, such payment to be based upon the gas produced and the price received.

9.  All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interest.

EXHIBIT "E"
Page 3


10. This agreement may be executed in counterparts but will not be binding on any party unless and until all working interest parties in a gas well have accepted this Gas Balancing Agreement without exception.

## EXHIBIT "F"

ATTACHED TO AND MADE A PART OF OPERATING AGREEMENT DATED JUNE 14, 1982, BETWEEN COBRA OIL & GAS CORPORATION, OPERATOR, AND 4D COMPANY AND ROBERT W. OSBORNE, ET AL NON-OPERATORS.

---

## Equal Employment Opportunity Provision

During the performance of this contract, Operator as follows:

1. The Operator will not discriminate against any employees or applicant for employment because of race, color, religion, sex, or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

2. The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

3. The operator will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applications for employment.

4. The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

5. The Operator will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

6. In the event of the Operator's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated, or suspended in whole or in part, and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

EXHIBIT "F"
Page 2


7. The Operator will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

Operator acknowledges that it may be required to file Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress with Joint Reporting Committee, Federal Depot, Jeffersonville, Indiana, within thirty (30) days of the date of contract award if such report has not been filed for the current year and otherwise comply with or file such other compliance reports as may be required Executive Order 11246, as amended and Rules and Regulations adopted thereunder.

Operator assures Non-Operators that it does not and will not maintain or provided for its employees any segregated facilities at any of its extablishments, and that it does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are in fact segregated on a basis of race, color, religion, or national origin, because of habit, local custom or otherwise. It is further understood and agreed that maintaining or providing segregated facilities for its employees or permitting its employees to perform their services at any location under its control where segregated facilities are maintained is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965.

Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor dated May 21, 1968, and the provisions of the equal opportunity clause enumerated in contracts between the United States of America and Non-Operators.

Whoever knowingly and willfully makes any false, fictitious or fraudulent representation may be liable to criminal prosecution under 18 U.S.C. § 1001.

EXHIBIT "G"

Attached to and made a part of that certain
Operating Agreement dated June 14, 1982,
by and between  Cobra Oil and Gas Corporation
and the Non-Operators named therein.

UNIT COST ALLOCATION AGREEMENT

I

Article III B. of the Operating Agreement shall be and it is hereby
amended in its entirety to provide as follows:

"B. (1)  The parties hereto owning interest in the oil, gas and
mineral leases and rights affecting land in the Hosston or shallower
zones shall pay one-half (1/2) of the costs of drilling the Well to
total depth. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXX  Such payment shall be made by the parties in proportion
to their ownership of the said Hosston Unit, as set forth in Exhibit
"A" hereto.

"B. (2)  The parties hereto owning interests in the oil, gas and
mineral leases and rights affecting land in the Cotton Valley Unit
shall pay one-half (1/2) of the costs of drilling the Well to total
depth. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXX  Such payment shall be made by the parties in proportion
to their ownership of the Cotton Valley Unit, as set forth in Exhibit
"A" hereto.

"B. (3)  Exhibit "A", lists all of the parties and their respec-
tive percentage or fractional interests under this Agreement.  All
costs and liabilities incurred in operations under the Agreement not
otherwise allocated, and all expenses incurred in normal operations
of the dually-completed well (excluding Remedial Operations, as de-
fined herein) shall be allocated equally to productive sands and as
thus allocated borne out of each unit respectively applicable there-
to and paid by the parties in accordance with their respective pro-
portionate interest therein.  All equipment and material not allocable
to a particular producing zone, which is acquired in operations on the
contract area, shall be owned in indivision:  One-half by the interest
owners in the Hosston or shallower zones and one-half by the interest
owners in the Cotton Valley Unit.  All production of oil and gas from
the Contract Area, subject to the payment of lessor's royalty which
will be borne by the Joint Account, shall be owned by the parties in
the percentages set forth in Exhibit "A" provided, however, this shall
not be deemed as assignment or cross-assignment of interest covered
hereby."

"B. (4)  In the event a completion attempt is made only in a depth
shallower than the base of the Hosston formation, the parties hereto
owning interest in those zones shall pay 100% of the completion cost.
In the event a completion attempt is made only in a depth deeper than the
base of the Hosston formation, the parties owning interest in those zones
shall pay 100% of the completion cost.  Any testing, such as drill stem
testing, which benefits only one zone shall be paid for 100% by the
owners of that zone.  In the event both the Hosston and shallower zones
are to be completed and the zones below the base of the Hosston are to be
completed, the total cost of setting production casing and cementing pro-
duction casing to the total depth to be completed shall be borne 50% by
the owners of the Hosston or shallower formations and 50% by the owners
of the formations below the base of the Hosston.  Those completion costs
which are beneficial to one formation only, including but not limited to
the cost of tubing, perforating, and stimulating shall be borne 100% by
the owners of the zone which is benefited by such expenditure.  In the
event the owners of those zones deeper than the Hosston formation elect
to set casing and attempt a completion and the owners of the Hosston and
shallower zones do not wish to participate in a completion of the Hosston
or shallower zones, then the cost of setting production casing and
cementing to the base of the Cotton Valley zone to be completed shall be
borne solely by the Cotton Valley owners and all further costs of comple-
tion shall be borne 100% by the Cotton Valley owners.  The election by
those parties owning rights to the zones shallower than the base of the
Hosston not complete shall be treated as an abandonement of the well,
but shall not vest in the parties wishing to complete the well in the
zones deeper than the base of the Hosston formation any rights in any zones
shallower than the base of the Hosston Formation.

(1.2)   The costs of all Remedial Operations shall be borne solely by the owners of the Unit serving the sand benefited.

(1.3)   Any work undertaken to effect the repair of casing leaks, tubing leaks or the correction of any other condition shall be considered to be for the mutual benefit of the owners of both sands and the costs thereof shall be allocated equally to the two productive sands and borne by the respective owners in each Unit in accordance with their respective proportionate interests therein.

(1.4)   If during the performance of Remedial Operations it becomes apparent that any well equipment is in need of repairs or replacement due to normal use, but not due to the Remedial Operations, such repairs or replacement shall be made at the expense and after obtaining the approval of the parties owning the majority interest of such equipment unless such expense is within the limitation authorized in the Operating Agreement.

## 2.   Operating Rights of Owners

(2.1)   The rights, duties and obligations of the owners in each Unit applicable to and serving sands in dually completed wells, as set out in this dual completion agreement and the Operating Agreement, shall not be changed, altered or amended by this dual completion agreement except as specifically provided herein.

(2.2)   Notwithstanding anything herein to the contrary, in order for the parties having interests in the separate sands or reservoirs in which the well is completed to maintain production from said sands or reservoirs, it is agreed that the parties owning the majority working interest in one sand or reservoir in which said well is completed may, upon giving fifteen (15) days' written notice to the parties having interests in the other sand or reservoir in which said well is completed, take over operation of said well for purposes of restoring production from the sand or reservoir owned by the parties desiring so to take over said well.  However, such parties may not take over or operate said well for purposes of drilling the same deeper or completing the same in a new sand or reservoir, without consent of the parties owning the majority interest in all then-producing zones of said well.  In the event that reworking or recompleting operations in one of the sands or reservoirs presently producing (Remedial Operations) are conducted for either of the producing formations in said well (the other formation being currently productive of oil or gas) the liabilities of the owners conducting such reworking or recompleting operations shall be as follows:

(a)   Any Remedial Operations shall be performed and completed at the sole cost, risk and expense of the participating party (whether one or more) and such party shall, in accordance with the provisions hereof, indemnify and protect the non-participating party (whether one or more) against damage or claims for damage arising out of or in any way connected with such Remedial Operations.

- 2 -

(b)    No liability shall be incurred by Remedial Operations causing production to cease from the formation not requiring Remedial Operations during the time the Remedial Operations are being conducted, as long as such operations are conducted with diligence and without unreasonable delay.

(c)    No liability shall be incurred by the owners of the formation requiring Remedial Operations if such owners make a bona fide attempt to restore the formation not requiring Remedial Operations to its original condition, as long as the formation not requiring Remedial Operations is restored to a status capable of commercial production, even though the rate of production is substantially less than it was prior to commencement of Remedial Operations on the other formation; provided that Remedial Operations and the conduct of such operations shall be such as would be performed by a reasonably prudent Operator under the same or similar circumstances using approved methods and appliances to protect all producing formations.

(d)    In the event the formation not requiring Remedial Operations is not restored to commercial production within sixty (60) days after the Remedial Operations are completed, the owners of the formation which performed the Remedial Operations may elect to continue or commence additional operations in an attempt to restore the damaged formation to a commercial producing status.  If the owners of the formation which performed the Remedial Operations do not elect to continue or commence additional operations in an attempt to restore the damaged formation to a commercial producing status, or, if such operations are unsuccessful in restoring the damaged formation to a commercial producing status, the owners of the formation which performed the Remedial Operations shall be liable to the owners of the formation not requiring Remedial Operations for damages, but such damages shall never exceed the depreciated investment that the owners of the damaged formation have in the dually completed well.  For the purpose of determining the depreciated investment, it shall be considered that the original costs are depreciated at the rate of ten per cent (10%) per annum, commencing with the date of first production.

(2.3)    In case of a blowout, explosion, fire, flood or other sudden emergency that should occur during the course of any Remedial Operations, the owners performing such Remedial Operations shall, at their expense, take such steps as are necessary to deal with the emergency and to safeguard life and property and shall, as promptly as possible, report the emergency and the action taken to the owners of the other sand.

(2.4)    If a blowout, explosion, fire, flood or other emergency should occur at any time other than during the course of Remedial Operations, the cost of dealing with any such emergency shall be allocated equally to the two sands and borne by the respective owners in each Unit respectively applicable thereto in accordance with their respective proportionate interests therein.

- 3 -

3.    Abandonment of a Producing Sand

(3.1)  When and if the parties owning the majority interest of one of the producing sands in a dually completed well desire to abandon such sand, the operations of abandonment shall be performed in a diligent and prudent manner and shall include the use of approved methods and equipment designed to protect all other sands.  If one of the producing sands ceases to produce and the well is no longer to be used for production from such sand, a majority in interest of the owners of the sand which continues to produce shall have the right at its election to:

(3.1.1)  Continue to use the well for production from the remaining sand, but shall be obligated to account to the owner or owners of the abandoned sand as hereinafter provided; or

(3.1.2)  To continue to use the well for production from the remaining formation and also for use in a recompletion (whether one or more).

(3.2)  If the election of the owner or owners of the remaining producing sand is under Paragraph (3.1.1) above, the owner or owners of the remaining producing sand shall within ninety (90) days after the abandonment of a sand which once produced pay to the owner or owners of such abandoned sand for the estimated salvage value (after deducting the estimated cost of salvage operation) of the abandoning party's interest in the well equipment and facilities insofar as it pertains to the formation being abandoned and which will continue to be used in producing from the remaining sand, less such party's proportion of the estimated cost of abandonment. The salvage value of such well equipment and facilities shall be determined in accordance with the Accounting Procedure (Exhibit 'C') attached to the Operating Agreement.  Thereafter, the owners of the remaining production sand shall own the well equipment and facilities.

(3.3)  If the owner or owners of the formation which continues to produce elect under Paragraph (3.1.2) above, such party or parties shall notify the owners of the formation being abandoned that the well is to be used in a recompletion (whether one or more) and there shall be no exchange of investment cost as between the owners of the formation abandoned and the owners of the producing formation until the recompletion operations have been completed, at which time, if the recompletion is successful, there shall be an adjustment of costs between the owners of the producing zones and the owners of the abandoned zone.  In making such adjustment a total depreciated value shall be calculated for the abandoned zone.  The depreciated value of said abandoned zone shall be calculated on the basis of the total investment cost (which investment will include tangible and intangible drilling and equipment costs but will not include operating expenses), which shall be depreciated at the rate of ten per cent (10%) per annum, commencing with date of first production, but such depreciated values shall not be less than the estimated net salvage of the abandoned zone determined in accordance with the said Accounting Procedure (Exhibit 'C') attached to the Operating Agreement.

- 4 -

(3.4)  In the event the recompletion is unsuccessful,
the owners of the remaining producing formation shall pay the
owner of the formation being abandoned an amount determined in
accordance with Paragraph (3.2) above.

(3.5)  The participating party shall notify the owners
of any then producing formation in writing thirty (30) days
before operations are commenced for the purpose of attempting
recompletion, the date such work is to be commenced, the depth
at which it intends to recomplete the well, whether or not
application to the Louisiana Office of Conservation is to
be made, in cases where the formation at such depth is not
unitized, and if so furnish a plat of the proposed unit, the
nature of the operations and the procedure which is to be used
to perform them, the estimated number of days required to com-.
plete such work, and whether or not it will be necessary to
shut in the then producing formation.  All costs and expenses
of recompletion shall be borne by the participating party
attempting the recompletion and the operating rights of the
formation owners and liabilities as between them shall be the
same as those provided in Paragraph 2 hereof for the conduct
of Remedial Operations.

(3.6)  If the well is to be utilized for a recomple-
tion and the participating party notifies the other parties
hereto in writing that it intends to attempt recompletion in a
sand already unitized or with respect to which said party
is going to make application for a unit, including acreage
under lease to the other parties hereto, such other parties
hereto shall have thirty (30) days from receipt of such notice
to elect whether or not they desire to participate in the re-
completion attempt.  If one or more of the other parties hereto
elect to participate in the recompletion attempt, the parties
so electing to participate shall be obligated to bear their
proportion of the cost of the attempted recompletion and if
successful the depreciated cost of the well to the depth used.
The non-participating party in the recompletion attempt in
order to participate in production from the recompletion shall
be required to share its proportion (based on its participation
in the unit established by the Louisiana Office of Conserva-
tion or voluntarily by the Working Interest and Royalty
Interest Owners) of  two  hundred per cent (200%) of the cost
of the recompletion out of its share of production in the
manner provided under the Operating Agreement, and one hundred
per cent (100%) of its proportion of the depreciated cost of
the well to the depth used, determined as set out in Para-
graph (3.3) above.

(3.7)  If the participating party notifies the other
parties hereto that it intends to attempt to recomplete the well
in a formation which is not unitized at the time the recompletion
is attempted, and a unit embracing any acreage under lease to the
other parties hereto is later formed around or allocated to such
recompleted or producing well, then it is further agreed that
the cost chargeable to such parties for participation in, and
joint operation of, any such unit shall not be in excess of
such parties' proportionate part of the cost to the Operator
of such recompleted or producing well serving such unit, that

- 5 -

is, a sum equivalent to (a) the price paid to such party by the participating party in such recompletion less any credit which may be occasioned by the resulting difference in acreage participation in the new unit from the acreage participation in the Unit serving the formation which was abandoned, and for the depth differential where such recompletion is at a depth shallower than the base of the abandoned zone; plus (b) such parties' proportionate share of the cost of recompletion based on participation in the unit established by the Louisiana Office of Conservation or voluntarily by the parties, serving such recompletion, which sum shall be depreciated at the rate of ten per cent (10%) per annum commencing with the date of first production.

(3.8)   The method of allocating well cost to subsequent accounts set out herein will not necessarily control the cost which will be applicable to any new party having an interest in the recompletion who is not a party to this agreement."