# MODEL FORM OPERATING AGREEMENT—1956

### Non-Federal Lands

OPERATING  AGREEMENT

DATED

**OCTOBER 1** , 19 **58** ,

FOR  UNIT  AREA  IN  TOWNSHIP **19 NORTH** , RANGE **6 WEST**

**CLAIBORNE** ~~COUNTY~~ **PARISH**, STATE OF **LOUISIANA**

Published and for Sale by

ROSS-MARTIN CO.

Box 800

Tulsa, Oklahoma

Form 610

# TABLE OF CONTENTS

| Paragraph Number | Title | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Title Examination, Loss of Leases and Oil and Gas Interests | 1 |
| 3. | Unleased Oil and Gas Interests | 2 |
| 4. | Interests of Parties | 2 |
| 5. | Operator of Unit | 3 |
| 6. | Employees | 3 |
| 7. | Test Well | 3 |
| 8. | Costs and Expenses | 3 |
| 9. | Operator's Lien | 4 |
| 10. | Term of Agreement | 4 |
| 11. | Limitation on Expenditures | 4 |
| 12. | Operations by Less Than All Parties | 5 |
| 13. | Right to Take Production in Kind | 6 |
| 14. | Access to Unit Area | 7 |
| 15. | Drilling Contracts | 7 |
| 16. | Abandonment of Wells | 7 |
| 17. | Delay Rentals and Shut-in Well Payments | 8 |
| 18. | Preferential Right to Purchase | 8 |
| 19. | Maintenance of Unit Ownership | 9 |
| 20. | Resignation of Operator | 9 |
| 21. | Liability of Parties | 9 |
| 22. | Renewal or Extension of Leases | 9 |
| 23. | Surrender of Leases | 10 |
| 24. | Acreage or Cash Contributions | 10 |
| 25. | Provision Concerning Taxation | 10 |
| 26. | Insurance | 11 |
| 27. | Claims and Lawsuits | 11 |
| 28. | Force Majeure | 11 |
| 29. | Notices | 11 |
| 30. | Other Conditions | 12 |

# OPERATING AGREEMENT

THIS AGREEMENT, entered into this __1st__ day of ____October____, 19_58_, between __A. J. HODGES INDUSTRIES, INC., a Louisiana Corporation_____,

hereafter designated as "Operator", and the signatory parties other than Operator.

WITNESSETH, THAT:

WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit "A", and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

## 1. DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them.

(1) The words "party" and "parties" shall always mean a party, or parties, to this agreement.

(2) The parties to this agreement shall always be referred to as "it" or "they", whether the parties be corporate bodies, partnerships, associations, or persons real.

(3) The term "oil and gas" shall include oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons, unless an intent to limit the inclusiveness of this term is specifically stated.

(4) The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Unit Area which are owned by parties to this agreement.

(5) The term "Unit Area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

(6) The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Unit Area or as fixed by express agreement of the parties.

(7) All exhibits attached to this agreement are made a part of the contract as fully as though copied in full in the contract.

(8) The words "equipment" and "materials" as used here are synonymous and shall mean and include all oil field supplies and personal property acquired for use in the Unit Area.

## 2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

A. Title Examination:       **(SEE SECTION 30 A)**

"Individual Loss"

~~in which title is approved or accepted, or until the parties fail to select another drillsite. As in the case of the drillsite first selected, so also with successive choices if the time comes that the parties cannot not approve title and are unable to agree upon an alternate drillsite, the contract shall, in that case and at that time, come to an end and all parties shall forfeit their rights and be relieved of obligations under this contract.~~

~~No well other than the first test shall be drilled on the Unit Area until either (1) the title to the drilling unit has been examined by an attorney for one of the parties other than the party whose lease embraces the drillsite, and (2) the title has been approved by the examining attorney or the title has been accepted by all of the parties who are to participate in the drilling of that well.~~

## B. Failure of Title:

Should any oil and gas lease, or interest therein, be lost through failure of title, this agreement shall, nevertheless, continue in force as to all remaining leases and interests, and

(1) The party whose lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid, but there shall be no monetary liability on its part to the other parties hereto by reason of such title failure; and

(2) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the interest lost; and

(3) If the proportionate interests of the other parties hereto in any producing well theretofore drilled on the Unit Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interests (less operating costs attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well; and

(4) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, or equipment previously paid under this agreement, such amount shall be proportionately paid to the party or parties hereto who in the first instance paid the costs which are so refunded; and

(5) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the parties in the same proportions in which they shared in such prior production.

~~C. Loss of Leases for Causes Other Than Title Failure:~~

~~Should any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, or if any lease or interest therein is lost due to the fact that the production therefrom is shut in by reason of lack of market, the loss shall not be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interests in the Unit Area.~~

### 3. UNLEASED OIL AND GAS INTERESTS

If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as "Exhibit "B" and for the primary term therein stated. As to such interests, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest. There being no unleased mineral interests, no Exhibit "B" is attached.

### 4. INTERESTS OF PARTIES

Exhibit "A" lists all of the parties, and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit "A". All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.

— 2 —

"Individual Loss"

If any oil and gas lease covered by this agreement is subject to an overriding royalty, production payment, or other charge over and above the usual one-eighth (⅛) royalty, the party contributing that lease shall assume and alone bear all such excess obligations and shall account for them to the owners thereof out of its share of the working interest production of the Unit Area.

## 5. OPERATOR OF UNIT

**A. J. HODGES INDUSTRIES, INC.** _____shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

## 6. EMPLOYEES

The number of employees and their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator. All employees shall be the employees of Operator.

## 7. TEST WELL

On or before the **15th** day of **OCTOBER**____, 19 **58**, Operator shall commence the drilling of a well for oil and gas in the following location:

**990' South and 430' West of the Northeast Corner of the Southwest Quarter (SW¼) of Section 1, Township 19 North, Range 6 West**

and shall thereafter continue the drilling of the well with due diligence to **make a bona fide test of the McFerrin Sand, or equivalent, of the Sugar Creek Field, expected to be encountered at a depth of approximately 3200 feet below the surface of the ground.**

unless granite or other practically impenetrable substance is encountered at a lesser depth or unless all parties agree to complete the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties to the plugging, and the well shall then be plugged and abandoned as promptly as possible.

## 8. COSTS AND EXPENSES

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the Unit Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expense basis provided in the Accounting Procedure attached hereto and marked Exhibit "C". If any provision of Exhibit "C" should be inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the costs to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated costs, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated costs shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest at the rate of six percent (6%) per annum until paid. Proper adjustment shall be made monthly between advances and actual cost, to the end that each party shall bear and pay its proportionate share of actual costs incurred, and no more.

## 9. OPERATOR'S LIEN

Operator is given a first and preferred lien on the interest of each party covered by this contract, and in each party's interest in oil and gas produced and the proceeds thereof, and upon each party's interest in material and equipment, to secure the payment of all sums due from each such party to Operator.

~~[struck-through paragraph, illegible]~~

In the event of the neglect or failure of any non-operating party to promptly pay its proportionate part of the cost and expense of development and operation when due, the other non-operating parties and Operator, within thirty (30) days after the rendition of statements therefor by Operator, shall proportionately contribute to the payment of such delinquent indebtedness and the non-operating parties so contributing shall be entitled to the same lien rights as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operating parties under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the other non-operating parties and Operator proportionately in accordance with the contributions theretofore made by them.

## 10. TERM OF AGREEMENT

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise; provided, however, that in the event the first well drilled hereunder results in a dry hole and no other well is producing oil or gas in paying quantities from the Unit Area, then at the end of ninety (90) days after abandonment of the first test well, this agreement shall terminate unless one or more of the parties are then engaged in drilling a well or wells pursuant to Section 12 hereof, or all parties have agreed to drill an additional well or wells under this agreement, in which event this agreement shall continue in force until such well or wells shall have been drilled and completed. If production results therefrom this agreement shall continue in force thereafter as if said first test well had been productive in paying quantities, but if production in paying quantities does not result therefrom this agreement shall terminate at the end of ninety (90) days after abandonment of such well or wells. It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## 11. LIMITATION ON EXPENDITURES

Without the consent of all parties: (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling, testing, completing, and equipping of the well, including necessary tankage; (b) No well shall be reworked, plugged back or deepened except a well reworked, plugged back or deepened pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage; (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of   **FIVE THOUSAND & NO/100 * * * * * * * **Dollars ($**5,000.00**) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $**5,000.00**

## 12. OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling of any well on the Unit Area other than the test well provided for in Section 7, or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days (except as to reworking, plugging back or drilling deeper, where a drilling rig is on location, the period shall be limited to forty-eight (48) hours exclusive of Saturday or Sunday) after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

If any party receiving such a notice elects not to participate in the proposed operation (such party or parties being hereafter referred to as "Non-Consenting Party"), then in order to be entitled to the benefits of this section, the party or parties giving the notice and such other parties as shall elect to participate in the operation (all such parties being hereafter referred to as the "Consenting Parties") shall, within thirty (30) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the 48-hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests as shown in Exhibit "A" bear to the total interests of all Consenting Parties. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this section results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty and other interests payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(A) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this section, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(B) 200% of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing, after deducting any cash contributions received under Section 24, and 200% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

— 5 —

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value.

Within sixty (60) days after the completion of any operation under this section, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; if there is a credit balance it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it and from and after such reversion such Non-Consenting Party shall own the same interest in such well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have owned had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the accounting procedure schedule, Exhibit "C", attached hereto.

Notwithstanding the provisions of this Section 12, it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Unit Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this section shall have no application whatsoever to the drilling of the initial test well on the Unit Area, but shall apply to the reworking, deepening, or plugging back of the initial test well after it has been drilled to the depth specified in Section 7, if it is, or thereafter shall prove to be, a dry hole or non-commercial well, and to all other wells drilled, reworked, deepened, or plugged back, or proposed to be drilled, reworked, deepened, or plugged back, upon the Unit Area subsequent to the drilling of the initial test well.

## 13. RIGHT TO TAKE PRODUCTION IN KIND

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.

Each party shall execute all division orders and contracts of sale pertaining to its interest in production from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers thereof for its share of all production.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Notwithstanding the foregoing, Operator shall not make a sale reasonable advance of any other party's share of gas production without first giving such other party notice of such intended sale.

## 14. ACCESS TO UNIT AREA

Each party shall have access to the Unit Area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator shall, upon request, furnish each of the other parties with copies of all drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Unit Area.

## 15. DRILLING CONTRACTS

All wells drilled on the Unit Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. Operator, if it so desires, may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the field, and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such a contract containing work shall be performed by Operator under the same terms and conditions as shall be customary and usual in the field in contracts of independent contractors who are doing work of a similar nature.

## 16. ABANDONMENT OF WELLS

No well, other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. The assignments so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Unit Area.

After the assignment, the assignors shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open. Upon request of the assignees, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

## 17. DELAY RENTALS AND SHUT-IN WELL PAYMENTS

Delay rentals and shut-in well payments which may be required under the terms of any lease shall be paid by the party who has subjected such lease to this agreement, at its own expense. Proof of each payment shall be given to Operator at least ten (10) days prior to the rental or shut-in well payment date. Operator shall furnish similar proof to all other parties concerning payments it makes in connection with its leases. Any party may request, and shall be entitled to receive, proper evidence of all such payments. If, through mistake or oversight, any delay rental or shut-in well payment is not paid or is erroneously paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to pay a rental or shut-in well payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, the interests of the parties shall be revised on an acreage basis effective as of the date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in the Unit Area on account of the ownership of the lease which has terminated. In the event the party who failed to pay the rental or the shut-in well payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(1) proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis, up to the amount of unrecovered costs;

(2) ~~any proceeds derived from the sale of oil and gas attributable to the lost interest, calculated on an acreage basis, up to the amount of unrecovered costs; and~~

(3) any moneys, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest lost, for the privilege of participating in the Unit Area or becoming a party to this contract.

## 18. PREFERENTIAL RIGHT TO PURCHASE

~~Should any party desire to sell all or any part of its interests under this contract, or its rights and interests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

~~Should a sale be made by Operator of its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator. If a new Operator is not so selected, the transferee of the present Operator shall assume the duties of and act as Operator. In either case, the retiring Operator shall continue to serve as Operator, and discharge its duties in that capacity under this agreement, until its successor Operator is selected and begins to function, but the present Operator shall not be obligated to continue the performance of its duties for more than 120 days after the sale of its rights and interests has been completed.~~

— 8 —
"Individual Loss"

## 19. MAINTENANCE OF UNIT OWNERSHIP

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:

(1) the entire interest of the party in all leases and equipment and production; or

(2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

If at any time the interest of any party is divided among and owned by four or more co-owners, Operator may, at its discretion, require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this contract; however, all such co-owners shall enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Unit Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

## 20. RESIGNATION OF OPERATOR

Operator may resign from its duties and obligations as Operator at any time upon written notice of not less than ninety (90) days given to all other parties. In this case, all parties to this contract shall select by majority vote in interest, not in numbers, a new Operator who shall assume the responsibilities and duties, and have the rights, prescribed for Operator by this agreement. The retiring Operator shall deliver to its successor all records and information necessary to the discharge by the new Operator of its duties and obligations.

## 21. LIABILITY OF PARTIES

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

## 22. RENEWAL OR EXTENSION OF LEASES

~~If any party secures a renewal of any oil and gas lease subject to this contract, all other parties shall be notified promptly, and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.~~

~~If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.~~

~~Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.~~

~~The provisions of this section shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this section.~~

~~The provisions of this section shall apply also and in like manner to extensions of oil and gas leases.~~

— 9 —

## 23. SURRENDER OF LEASES

The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties not agree or consent, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

## 24. ACREAGE OR CASH CONTRIBUTIONS

If any party receives while this agreement is in force a contribution of cash toward the drilling of a well or any other operation on the Unit Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly execute an assignment of the acreage, without warranty of title, to all parties to this agreement in proportion to their interests in the Unit Area at that time, and such acreage shall become a part of the Unit Area and be governed by all the provisions of this contract. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Unit Area.

## 25. PROVISION CONCERNING TAXATION

Each of the parties hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954. If the income tax laws of the state or states in which the property covered hereby is located contain, or may hereafter contain, provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the parties agrees that such election shall be exercised. Each party authorizes and directs the Operator to execute such an election or elections on its behalf and to file the election with the proper governmental office or agency. If requested by the Operator so to do, each party agrees to execute and join in such an election.

Operator shall render for ad valorem taxation all property subject to this agreement which by law should be returned for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill all other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If any tax assessment is considered unreasonable by Operator, it may at its discretion protest such valuation within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. When any such protested valuation shall have been finally determined, Operator shall pay the assessment for the joint account, together with interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

— 10 —

## 26. INSURANCE

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as may be outlined in Exhibit "D" attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Unit Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for operator's fully owned automotive equipment.

## 27. CLAIMS AND LAWSUITS

If any party to this contract is sued on an alleged cause of action arising out of operations on the Unit Area, or on an alleged cause of action involving title to any lease or oil and gas interest subjected to this contract, it shall give prompt written notice of the suit to the Operator and all other parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the parties, with Operator's attorney as Chairman. Suits may be settled during litigation only with the joint consent of all parties. No charge shall be made for services performed by the staff attorneys for any of the parties, but otherwise all expenses incurred in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all parties in proportion to their then interests in the Unit Area. Attorneys, other than staff attorneys for the parties, shall be employed in lawsuits involving Unit Area operations only with the consent of all parties; if outside counsel is employed, their fees and expenses shall be considered Unit Area expense and shall be paid by Operator and charged to all of the parties in proportion to their then interests in the Unit Area. The provisions of this paragraph shall not be applied in any instance where the loss which may result from the suit is treated as an individual loss rather than a joint loss under prior provisions of this agreement, and all such suits shall be handled by and be the sole responsibility of the party or parties concerned.

Damage claims caused by and arising out of operations on the Unit Area, conducted for the joint account of all parties, shall be handled by Operator and its attorneys, the settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement of any one claim does not exceed one thousand ($1000.00) dollars and, if settled, the sums paid in settlement shall be charged as expense to and be paid by all parties in proportion to their then interests in the Unit Area.

## 28. FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all possible diligence to remove the force majeure as quickly as possible.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure" as here employed shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## 29. NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, shall, unless otherwise specifically provided, be given in writing by United States mail or Western Union Telegram, postage or charges prepaid, and addressed to the party to whom the notice is given at the

addresses listed on Exhibit "A". The originating notice to be given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

### 30. OTHER CONDITIONS, IF ANY, ARE:

**(A)     Each of the parties hereto by execution hereof has accepted title to the oil, gas and mineral leases and to the lands affected hereby and there shall be no examination of title to any portion of the property covered hereby, except upon mutual agreement of the parties hereto.**

**(B)     It is understood by and between the parties hereto, and irrespective of any provision contained hereinabove to the contrary, that this agreement relates to and covers only the development and operation of the premises affected hereby for the production of oil and gas from all depths and horizons below 6,050 feet subsurface, and the rights and obligations of the parties hereto under this agreement shall extend to the development and operation of the premises affected hereby for the production of oil and gas from all depths and horizons below 6,050 feet subsurface.**

**(C)     It is understood by and between the parties hereto that any production of oil or gas which may be allocated to the Unit Area, or any portion thereof in accordance with any order issued by the Commissioner of Conservation of the State of Louisiana or other authority having control over such matters, pursuant to any application made to such authority while this agreement is in force, and any such production which may become allocated to the Unit Area or any portion thereof, pursuant to negotiations commenced at any time while this agreement is in force, shall be considered as such production from the Unit Area within the meaning of the last sentence of the first paragraph of Article 4 on Page 2 hereof.**

**(D)     If any party secures a renewal or extension of any oil and gas lease, or a new lease, covering any of the lands comprising the Unit Area, such party shall, by an appropriate instrument, make such renewal, extension or new lease insofar as the same covers lands within the Unit Area subject to this Operating Agreement.**

**(E)     In the event that it becomes necessary for the Operator of this Unit to shut-in the wells or well covered hereby, for any reason, the said Operator shall give each of the Non-Operators notice in writing thereof within fifteen (15) days of such fact, the said notice shall specify which well or wells by name, and shall cite the reasons therefor, together with an estimation of the duration of the shut-down.**

—12—

This agreement may be signed in counterpart, and shall be binding upon the parties and upon their heirs, successors, representatives and assigns.

ATTEST:

__S/ Crawford Garrett__

S/ Myrtle W. Sanders

A. J. HODGES INDUSTRIES, INC.

BY:  S/ A. J. Hodges, Jr.
     A. J. Hodges, Jr.

O P E R A T O R

ATTEST: S/ B. M. Byrd
                    Secretary

UNION PRODUCING COMPANY

BY:  S/ W. H. Spears
     Executive Vice President

ATTEST:

S/ Jmmmie R. Fielder

S/ Faye E. Morrow

S/ Jimmie R. Fielder

S/ Faye E. Morrow

S/ Beth Givens

S/ Joe McGuire

S/ G. W. Pullin, Jr.

S/ Thanda J. Byrum

S/ Beth Givens

S/ Joe McGuire

S/ Robert F. Roberts
ROBERT F. ROBERTS

S/ Allen L. Roberts
ALLEN L. ROBERTS

S/ Leonard W. Phillips
LEONARD W. PHILLIPS

S/ J. R. Butler
J. R. BUTLER

S/ H. Blume Johnson
H. BLUME JOHNSON

— 13 —

THE STATE OF LOUISIANA:

PARISH OF CADDO            :

        BEFORE ME, the undersigned authority, a Notary Public, on this

day personally appeared W. H. Spears, Executive Vice President of UNION
PRODUCING COMPANY, a corporation, known to me to be the person whose
name is subscribed to the foregoing instrument and acknowledged to me that he
executed the same as the act and deed of said corporation for the purposes and
consideration therein expressed and in the capacity therein stated.

        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this the 1st
day of October, A. D., 1958.

                    S/ Mary L. Goodson
                    Notary Public in and for Caddo Parish,
                    Louisiana


THE STATE OF _____:

PARISH OF _____:

        BEFORE ME, the undersigned authority, on this day personally
appeared _____, known to me to be the person whose
name is subscribed to the foregoing instrument, and acknowledged to me that
_he executed the same for the purposes and consideration therein expressed.

        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this the
_____ day of _____, A. D. 195_.


                    Notary Public in and for

STATE OF LOUISIANA:

PARISH OF __CADDO__ :

    BEFORE ME, the undersigned authority, this day personally came and appeared **Crawford Garrett** _____, to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on his oath, says: That he subscribed this name to the foregoing instrument as a witness, and that he knows **A. J. Hodges, Jr.** _____, the person named in said instrument, to be the identical person described therein, and who executed the same, and saw him sign the same as his voluntary act and deed, and that he, the said affiant, subscribed his name to the same at the same time as an attesting witness.

                             **S/ Crawford Garrett** _____

SWORN TO AND SUBSCRIBED before me, this **1st** day of __October__, 19**58**.

                             **S/ Ida B. Hayden** _____
                             Notary Public in and for __Caddo__
                             Parish, Louisiana

STATE OF **TEXAS** :

**COUNTY** OF **Harris** :

    BEFORE ME, the undersigned authority, this day personally came and appeared **G. W. Pullin, Jr.** _____ to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on his oath, says: That he subscribed his name to the foregoing instrument as a witness, and that he knows **J. R. Butler** _____ the person named in said instrument, to be the identical person described therein, and who executed the same, and saw him sign the same as his voluntary act and deed, and that he, the said affiant, subscribed his name to the same at the same time as an attesting witness.

                             **S/ G. W. Pullin, Jr.** _____

SWORN TO AND SUBSCRIBED before me, this **14th** day of __October__, 19**58**.

                             **S/ Earlene Monroe** _____
                             Notary Public in and for **Harris County**
                             State of __Texas__
                             **Earlene Monroe**

STATE OF **TEXAS** :      **Notary Public in and for Harris County, Texas**

**COUNTY** OF **SMITH** :

    BEFORE ME, the undersigned authority, this day personally came and appeared **Jimmie R. Fielder** _____, to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on his oath, says: That he knows **Robert F. Roberts** _____ named in said instrument, to be the identical person described therein, and who executed the same and saw him sign the same as his voluntary act and deed, and that he, the said affiant, subscribed his name to the same at the same time as an attesting witness.

                             **S/ Jimmie R. Fielder** _____

SWORN TO AND SUBSCRIBED before me, this **16th** day of __October__, 19**58**.

                             **S/ Bina Lee Shores** _____
                             Notary Public in and for **Smith**
                             **County** State of **Texas**

STATE OF LOUISIANA:

PARISH OF **CADDO** :

    BEFORE ME, the undersigned authority, this day personally came and appeared **Beth Givens**_____, to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on h**er** oath, says: That **s**he subscribed h**er** name to the foregoing instrument as a witness, and that **s**he knows **Leonard W. Phillips and H. Blume Johnson**____, the person**s** named in said instrument, to be the identical person**s** described therein, and who executed the same, and saw **it them** sign the same as **their** voluntary act and deed, and that **s**he, the said affiant, subscribed her name to the same at the same time as an attesting witness.

**S/ Beth Givens**

    SWORN TO AND SUBSCRIBED before me, this **17** day of **October**___, 19 **58**.

**S/ Lottie Ellis**

Notary Public in and for **Caddo**
Parish, Louisiana

STATE OF **TEXAS** :

**COUNTY** OF **SMITH** :

    BEFORE ME, the undersigned authority, this day personally came and appeared **Jimmie R. Fielder**_____to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on h**is** oath, says: That he subscribed h**is** name to the foregoing instrument as a witness, and that he knows **Allen L. Roberts**_____the person named in said instrument, to be the identical person described therein, and who executed the same, and saw h**im** sign the same as h**is** voluntary act and deed, and that he, the said affiant, subscribed h**is** name to the same at the same time as an attesting witness.

**S/ Jimmie R. Fielder**

    SWORN TO AND SUBSCRIBED before me, this **16th** day of **October**___, 19 **58**

**S/ Bina Lee Shores**

Notary Public in and for **Smith**
**County** State of **Texas**

STATE OF _____:

_____OF_____:

    BEFORE ME, the undersigned authority, this day personally came and appeared _____, to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on h oath, says: That he knows _____named in said instrument, to be the identical person described therein, and who executed the same and saw h sign the same as h voluntary act and deed, and that he, the said affiant, subscribed h name to the same at the same time as an attesting witness.

    SWORN TO AND SUBSCRIBED before me, this _____day of _____, 19__.

Notary Public in and for _____
State of _____

EXHIBIT "A"

Attached to and made a part of OPERATING AGREEMENT dated
October 1                    , 1956, by and between A. J. HODGES
INDUSTRIES, INC., UNION PRODUCING COMPANY, ROBERT
F. ROBERTS, ALLEN L. ROBERTS, LEONARD W. PHILLIPS,
J. R. BUTLER and H. BLUME JOHNSON.

THE UNIT FORMED BY THIS AGREEMENT
AND THE DRILLING UNIT FOR THE FIRST
WELL COMPRISES THE FOLLOWING:

All of Section 1, Township 19
North, Range 6 West, Claiborne
Parish, Louisiana, comprising
640 acres, more or less.

THIS AGREEMENT RELATES TO AND COVERS
ONLY THE DEVELOPMENT AND OPERATION
OF THE PREMISES COVERED HEREBY FOR
THE PRODUCTION OF OIL AND GAS FROM ALL
DEPTHS AND HORIZONS BELOW 6,050 FEET
SUB-SURFACE.

## PERCENTAGE OF PARTICIPATION AND ADDRESSES

| | |
|---|---|
| A. J. Hodges Industries, Inc.<br>Louisiana Bank Building<br>Shreveport, Louisiana | .445066 |
| Union Producing Company<br>P. O. Box 1407<br>Shreveport, Louisiana | .445066 |
| Robert F. Roberts<br>412 West Locust Street<br>Tyler, Texas | .043750 |
| Allen L. Roberts<br>412 West Locust Street<br>Tyler, Texas | .018750 |
| Leonard W. Phillips<br>P. O. Box 3066 Queensborough Station<br>Shreveport, Louisiana | .023684 |
| J. R. Butler<br>2138 Bank of the Southwest Building<br>Houston 2, Texas | .018947 |
| H. Blume Johnson<br>P. O. Box 306<br>Shreveport, Louisiana | .004737 |
| | 1.000000 |

INTEREST CONTRIBUTED BY:

A. J. HODGES INDUSTRIES, INC.                               1/2

UNION PRODUCING COMPANY                                     1/2

1.  That certain oil, gas and mineral lease executed by L. C.
    Gardner, Lessor, in favor of A. R. Wherritt, Lessee,
    dated the 6th day of July, 1951, filed for record in the
    Conveyance Records of Claiborne Parish, Louisiana,
    under Register No. 191,823, insofar and only insofar as
    said lease covers the following described property, to-wit:

        Northwest Quarter of Northwest Quarter (NW¼ of
        NW¼) Section 1, Township 19 North, Range 6 West,
        Claiborne Parish, Louisiana.

2.  That certain oil, gas and mineral lease executed by Mary L.
    Bailey, et al, Lessors, in favor of Union Producing Company
    and A. J. Hodges Industries, Inc., Lessees, dated Sept. 5,
    1956, filed for record under Registry No. _____, in Con-
    veyance Book 225, Page 16 of the records of Claiborne Par-
    ish, Louisiana, insofar and only insofar as said lease covers
    the following described property, to-wit:

        East Half of Northwest Quarter (E½ of NW¼); North-
        east Quarter of Southwest Quarter (NE¼ of SW¼);
        West Half of Northeast Quarter (W½ of NE¼); West
        Half of Southeast Quarter of Northeast Quarter (W½
        of SE¼ of NE¼); and Northeast Quarter of Northeast
        Quarter (NE¼ of NE¼) less four (4) acres in the
        Southeast corner of Northeast Quarter of Northeast
        Quarter (4 acs. in SE Corner of NE¼ of NE¼), said
        four (4) acres extending from the Southeast corner
        of said forty North 175 yds. and from said starting
        point West 110 yds. Section 1, Township 19 North,
        Range 6 West, Claiborne Parish, Louisiana.

            (a)  That certain Co-Lessors' Agreement
            executed by J. C. Pittman, dated January 15,
            1957, joining and concurring in as a co-lessor
            that certain oil, gas and mineral lease execut-
            ed by Mary L. Bailey, et al, insofar and only
            insofar as said Co-Lessors' Agreement applies
            to the above described lands, said Co-Lessors'
            Agreement being recorded in Conveyance Book 195,
            Page 423, Conveyance Records of Claiborne Parish,
            Louisiana.

            (b)  That certain Co-Lessors' Agreement
            executed by Rosie Belle Brown Steen, dated
            October 22, 1956, joining and concurring in as
            a co-lessor that certain oil, gas and mineral
            lease executed by Mary L. Bailey, et al, inso-
            far and only insofar as said Co-Lessors' Agree-
            ment applies to the above described lands, said
            Co-Lessors' Agreement being recorded in Con-
            veyance Book 195, Page 415 of the Conveyance
            Records of Claiborne Parish, Louisiana.

(c) That certain Co-Lessors' Agreement executed by N. H. Wheless, Jr. dated January 15, 1957, joining and concurring in as a co-lessor that certain oil, gas and mineral lease executed by Mary L. Bailey, et al, insofar and only insofar as said Co-Lessors' Agreement applies to the above described lands, said Co-Lessors' Agreement being recorded in Conveyance Book 195, Page 422 of the Conveyance Records of Claiborne Parish, Louisiana.

(d) That certain Co-Lessors' Agreement executed by E. J. Smallwood, dated February 2, 1957, joining and concurring in as a co-lessor that certain oil, gas and mineral lease executed by Mary L. Bailey, et al, insofar and only insofar as said Co-Lessors' Agreement applies to the above described lands, said Co-Lessors' Agreement being recorded in Conveyance Book 195, Page 423 of the Conveyance Records of Claiborne Parish, Louisiana.

3. That certain oil and gas lease executed by J. W. Stevenson, et al, Lessors, in favor of Triangle Drilling Company, Inc., as Lessee, dated November 27, 1928, as filed under Registry No. 67309, and recorded in Volume 73, Page 57 of the Conveyance Records of Claiborne Parish, Louisiana, insofar and only insofar as said lease covers the following described property, to-wit:

Southeast Quarter of Southwest Quarter (SE¼ of SW¼) and Southwest Quarter of Southeast Quarter (SW¼ of SE¼) Section 1, Township 19 North, Range 6 West, Claiborne Parish, Louisiana.

(a) That certain Co-Lessors' Agreement executed by W. T. Peterman, dated December 27, 1929, joining in and concurring in as a co-lessor that certain oil and gas lease executed by J. W. Stevenson, et al, insofar and only insofar as said Co-Lessors' Agreement applies to the above described lands, said Co-Lessors' Agreement being filed as Registry No. 69789, and recorded in Vol. 74, Page 249 of the Conveyance Records of Claiborne Parish, Louisiana.

4. That certain oil, gas and mineral lease executed by Clarence Kilpatrick, et al, Lessors, in favor of Triangle Drilling Company, Inc., Lessee, dated February 28, 1929, filed as Registry No. 68615, and recorded in Vol. 73, Page 152 of the Conveyance Records of Claiborne Parish, Louisiana, insofar and only insofar as said lease covers the following described property, to-wit:

North Half of Southeast Quarter (N½ of SE¼) Section 1, Township 19 North, Range 6 West, Claiborne Parish, Louisiana.

5.    That certain oil, gas and mineral lease executed by
Mrs. J. V. Kilpatrick, et al, Lessors, in favor of
Mrs. Falera Palmer, Lessee, dated February 11,
1930, as filed under Registry No. 70463, and re-
corded in Vol. 73, Page 216 in the Conveyance
Records of Claiborne Parish, Louisiana, insofar
and only insofar as said lease covers the following
described property, to-wit:

> North Half of Southeast Quarter (N$\frac{1}{2}$ of SE$\frac{1}{4}$)
> Section 1, Township 19 North, Range 6 West,
> Claiborne Parish, Louisiana.

6.    That certain oil and gas lease executed by A. J.
Hodges, et al, Lessors, in favor of Triangle
Drilling Company, Inc., Lessee, dated Feb. 19,
1929, as filed under Registry No. 67312, and re-
corded in Vol. 73, Page 60 of the Conveyance
Records of Claiborne Parish, Louisiana, insofar
and only insofar as said lease covers the follow-
ing described property, to-wit:

> East Half of Southeast Quarter of Northeast
> Quarter (E$\frac{1}{2}$ of SE$\frac{1}{4}$ of NE$\frac{1}{4}$) and four (4)
> acres in the Southeast corner of the North-
> East Quarter of Northeast Quarter (4 Acs.
> in SE cor. of NE$\frac{1}{4}$ of NE$\frac{1}{4}$) Section 1, Town-
> ship 19 North, Range 6 West, Claiborne
> Parish, Louisiana.

7.    That certain oil and gas lease executed by H. R. Treadwell,
Lessor, in favor of Triangle Drilling Company, Inc., as
Lessee, dated October 18, 1929, as filed under Registry
No. 69324 in the Conveyance Records of Claiborne Parish,
Louisiana, as amended and corrected by that certain instru-
ment executed by H. R. Treadwell and Triangle Drilling
Company, Inc., dated December 27, 1929, as filed under
Registry No. 69786, and recorded in Vol. 74, Page 246,
in the Conveyance Records of Claiborne Parish, La., in-
sofar and only insofar as said lease as amended and
corrected, covers the following described property, to-
wit:

> East Half of Southeast Quarter of Northeast Quarter
> (E$\frac{1}{2}$ of SE$\frac{1}{4}$ of NE$\frac{1}{4}$) and four (4) acres in the South-
> east corner of the Northeast Quarter of Northeast
> Quarter (4 acs. in SE cor. of NE$\frac{1}{4}$ of NE$\frac{1}{4}$) Section
> 1, Township 19 North, Range 6 West, Claiborne
> Parish, Louisiana.

8.    That certain oil and gas lease executed by W. M. Dobbins,
et al, Lessors, in favor of Triangle Drilling Company, Inc.,
Lessee, dated December 12, 1928, as filed under Registry
No. 67319, and recorded in Vol. 73, Page 67 of the Con-
veyance Records of Claiborne Parish, Louisiana, insofar
and only insofar as said lease covers the following described
property, to-wit:

West Half of Southwest Quarter (W½ of SW¼) and
Southeast Quarter of Southeast Quarter (SE¼ of
SE¼) Section 1, Township 19 North, Range 6 West,
Claiborne Parish, Louisiana.

9.    That certain oil and gas lease executed by W. M. Dobbins,
et al, Lessors, in favor of Triangle Drilling Company, Inc.,
Lessee, dated December 12, 1928, as filed under Registry
No. 67296, and recorded in Vol. 73, Page 45 of the Con-
veyance Records of Claiborne Parish, Louisiana, insofar
and only insofar as said lease covers the following described
property, to-wit:

One (1) acre in the Southwest Corner of Southeast
Quarter of Southeast Quarter (1 ac. in SW cor. of
SE¼ of SE¼) Section 1, Township 19 North, Range
6 West, Claiborne Parish, Louisiana.

10.    That certain oil and gas lease executed by W. M. Dobbins,
Natural Tutor for the minors Lon Henderson Dobbins, et
al, Lessor, in favor of Standard Oil Company of Louisiana,
et al, Lessees, as filed under Registry No. 80690 of the
Conveyance Records of Claiborne Parish, Louisiana, inso-
far and only insofar as said lease covers the following
described property, to-wit:

West Half of Southwest Quarter (W½ of SW¼) and
Southeast Quarter of Southeast Quarter (SE¼ of
SE¼) Section 1, Township 19 North, Range 6 West,
Claiborne Parish, Louisiana.

INTEREST CONTRIBUTED BY:

| | |
|---|---|
| Robert F. Roberts | 7/10 |
| Allen L. Roberts | 3/10 |

That certain oil, gas and mineral lease executed by Mrs. Edith
Levy Brenner, Montefiore Levy and Joseph Hugo Levy, as Lessors,
in favor of F. B. Dunlap, dated January 2, 1958, filed under Register
No. 215484 of the Conveyance Records of Claiborne Parish, Louisiana,
insofar as said lease covers the following described property, to-wit:

Southwest Quarter of Northwest Quarter (SW¼ of
NW¼ Section 1, Township 19 North, Range 6 West,
Claiborne Parish, Louisiana

INTEREST CONTRIBUTED BY:

| | |
|---|---|
| Leonard W. Phillips | 1/2 |
| J. R. Butler | 4/10 |
| H. Blume Johnson | 1/10 |

That certain oil, gas and mineral lease executed by S. C. Cox, et al,
as Lessors, in favor George B. Strong, Lessee, dated January 2,
1958, filed under Register No. 215,433 of the Conveyance Records of
Claiborne Parish, Louisiana, insofar as said lease covers the follow-
ing described property, to-wit:

East Half of Northwest Quarter (E$\frac{1}{2}$ of NW$\frac{1}{4}$);
Northeast Quarter of Southwest Quarter
(NE$\frac{1}{4}$ of SW$\frac{1}{4}$); West Half of Northeast Quarter
(W$\frac{1}{2}$ of NE$\frac{1}{4}$); West Half of Southeast Quarter
of Northeast Quarter (W$\frac{1}{2}$ of SE$\frac{1}{4}$ of NE$\frac{1}{4}$); and
Northeast Quarter of Northeast Quarter (NE$\frac{1}{4}$
of NE$\frac{1}{4}$) less four (4) acres in the Southeast
corner of Northeast Quarter of Northeast
Quarter (4 acs. in SE corner of NE$\frac{1}{4}$ of NE$\frac{1}{4}$),
said four (4) acres extending from the South-
east corner of said forty North 175 yds. and
from said starting point West 110 yds, Section
1, Township 19 North, Range 6 West, Claiborne
Parish, Louisiana.

TOTAL ACRES CONTRIBUTED BY:

| | |
|---|---:|
| A. J. HODGES INDUSTRIES, INC. | 284.84 |
| UNION PRODUCING COMPANY | 284.84 |
| ROBERT F. ROBERTS | 28.00 |
| ALLEN L. ROBERTS | 12.00 |
| LEONARD W. PHILLIPS | 15.16 |
| J. R. BUTLER | 12.13 |
| H. BLUME JOHNSON | 3.03 |
| | 640.00 |

form 601   ROSS-MARTIN CO.
TULSA 1, OKLAHOMA

EXHIBIT   " C "

*PASO-T-1955-2*

Attached to and made a part of **OPERATING AGREEMENT DATED October 1**,
**1958, BY AND BETWEEN A. J. HODGES INDUSTRIES, INC., UNION PRODUCING
COMPANY, ROBERT F. ROBERTS, ALLEN L. ROBERTS, LEONARD W. PHILLIPS,
J. R. BUTLER AND H. BLUME JOHNSON**

# ACCOUNTING PROCEDURE
## (UNIT AND JOINT LEASE OPERATIONS)

### I. GENERAL PROVISIONS

**1. Definitions**

"Joint property" as herein used shall be construed to mean the subject area covered by the agreement to which this "Accounting Procedure" is attached.

"Operator" as herein used shall be construed to mean the party designated to conduct the development and operation of the subject area for the joint account of the parties hereto.

"Non-Operator" as herein used shall be construed to mean any one or more of the non-operating parties.

**2. Statements and Billings**

Operator shall bill Non-Operator on or before the last day of each month for its proportionate share of costs and expenditures during the preceding month. Such bills will be accompanied by statements, reflecting the total costs and charges as set forth under Subparagraph ____ below:

A. Statement in detail of all charges and credits to the joint account.

B. Statement of all charges and credits to the joint account, summarized by appropriate classifications indicative of the nature thereof.

C. Statements as follows:

(1) Detailed statement of material ordinarily considered controllable by operators of oil and gas properties;

(2) Statement of ordinary charges and credits to the joint account summarized by appropriate classifications indicative of the nature thereof; and

(3) Detailed statement of any other charges and credits.

**3. Payments by Non-Operator**

Each party shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of Non-Operator to protest or question the correctness thereof. Subject to the exception noted in Paragraph 5 of this section I, all statements rendered to Non-Operator by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period Non-Operator takes written exception thereto and makes claim on Operator for adjustment. Failure on the part of Non-Operator to make claim on Operator for adjustment within such period shall establish the correctness thereof and preclude the filing of exceptions thereto or making of claims for adjustment thereon. The provisions of this paragraph shall not prevent adjustments resulting from physical inventory of property as provided for in Section VI, Inventories, hereof.

**5. Audits**

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, that Non-Operator must take written exception to and make claim upon the Operator for all discrepancies disclosed by said audit within said twenty-four (24) month period. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator.

### II. DEVELOPMENT AND OPERATING CHARGES

*Subject to limitations hereinafter prescribed, Operator shall charge the joint account with the following items:*

**1. Rentals and Royalties**

Delay or other rentals, when such rentals are paid by Operator for the joint account; royalties, when not paid directly to royalty owners by the purchaser of the oil, gas, casinghead gas, or other products.

**2. Labor**

A. Salaries and wages of Operator's employees directly engaged on the joint property in the development, maintenance, and operation thereof, including salaries or wages paid to geologists and other employees who are temporarily assigned to and directly employed on a drilling well.

B. Operator's cost of holiday, vacation, sickness and disability benefits, and other customary allowances applicable to the salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. Costs under this Subparagraph 2 B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Costs of expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages as provided under Subparagraphs 2 A, 2 B, and Paragraph 11 of this Section II.

**3. Employee Benefits**

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost, provided that the total of such charges shall not exceed ten per cent (10%) of Operator's labor costs as provided in Subparagraphs A and B of Paragraph 2 of this Section II and in Paragraph 11 of this Section II.

**4. Material**

Material, equipment, and supplies purchased or furnished by Operator for use of the joint property. So far as it is reasonably practical and consistent with efficient and economical operation, only such material shall be purchased for or transferred to the joint property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

**5. Transportation**

Transportation of employees, equipment, material, and supplies necessary for the development, maintenance, and operation of the joint property subject to the following limitations:

A. If material is moved to the joint property from vendor's or from the Operator's warehouse or other properties, no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point where such material is available, except by special agreement with Non-Operator.

—1—

## EXHIBIT "D"

ATTACHED TO AND MADE A PART OF OPERATING
AGREEMENT DATED __October 1__, 1958, BY AND
BETWEEN A. J. HODGES INDUSTRIES, INC., UNION
PRODUCING COMPANY, ROBERT F. ROBERTS,
ALLEN L. ROBERTS, LEONARD W. PHILLIPS, J. R.
BUTLER AND H. BLUME JOHNSON

SPECIAL PROVISIONS AND LIMITATIONS WITH REGARD TO
INSURANCE COVERAGE:

### AUTOMOTIVE

| | |
|---|---|
| For each person Bodily Injury Liability | $ 100,000.00 |
| For each accident | 300,000.00 |
| Property damage each accident | 50,000.00 |

### COMPREHENSIVE GENERAL LIABILITY

| | |
|---|---|
| For each person Bodily Injury | $ 100,000.00 |
| For each accident | 300,000.00 |
| Aggregate products | 300,000.00 |
| Property damage each accident | 25,000.00 |
| Property damage aggregate operations | 50,000.00 |
| Property damage aggregate protective | 50,000.00 |
| Property damage aggregate products | 50,000.00 |
| Property damage aggregate contractual | $ 50,000.00 |

Standard Workmen's Compensation as per laws of the State of
Louisiana.

We only maintain insurance coverage on our interest in leasehold
equipment unless requested by NON-OPERATORS.

## This Copy For Your Files

### AMENDMENT TO OPERATING AGREEMENT

THIS AGREEMENT ENTERED into on the dates hereinafter set forth between Sugar Creek Producing Company, Operator, and the other signatory parties hereto, Non-Operators:

### WITNESSETH:

WHEREAS, the parties hereto, or their predecessors in interest, have entered into an Operating Agreement dated October 1, 1958 (the "Operating Agreement"), covering depths below the subsurface depth of 6,050' as to lands in Section 1, Township 19 North, Range 6 West, Claiborne Parish, Louisiana; and

WHEREAS, the depths presently covered by the Operating Agreement encompass all of the Cotton Valley Formation, Reservoir A, in the Sugar Creek Field (as defined in Louisiana Office of Conservation Order No. 23-P, effective November 21, 1978), as well as a portion of the Travis Peak Sands of the Hosston Formation in the Sugar Creek Field (as defined in Louisiana Office of Conservation Order No. 23-H-3, effective September 22, 1977); and

WHEREAS, the Louisiana Office of Conservation has previously created a drilling and production unit for the Cotton Valley Formation, Reservoir A, in Sugar Creek Field, encompassing the entirety of Section 1, Township 19 North, Range 6 West, Claiborne Parish, Louisiana; and

WHEREAS, the Louisiana Office of Conservation has previously created drilling and production units for the Travis Peak Sands of the Hosston Formation in Sugar Creek Field, one of which, designated TP SUI, covers the North Half of Section 1, Township 19 North, Range 6 West, and the South Half of Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana, and another of which, designated TP SUH, covers the South Half of Section 1 and the North Half of Section 12, all in Township 19 North, Range 6 West, Claiborne Parish, Louisiana; and

WHEREAS, the parties desire to amend the Operating Agreement: (a) to cover all depths below the top of the Travis Peak Sands of the Hosston Formation as to lands in Section 1, Township 19 North, Range 6 West; and (b) to cover the South Half of Section 36, Township 20 North, Range 6 West, and the North Half of Section 12, Township 19 North, Range 6 West, as to depths within the Travis Peak Sands of the Hosston Formation; so as to provide for future operations on the drilling and production units designated TP SUI and TP SUH;

dls/amendment to operating agreement.sugarcreek

NOW THEREFORE, for and in consideration of the benefits accruing to each party hereto from the execution of this agreement, which is acknowledged by each party hereto to be full and adequate consideration for its execution of this agreement, the parties covenant and agree as follows:

1

The parties do hereby amend the Operating Agreement by substituting the Exhibit "A" attached hereto and made a part hereof for the Exhibit "A" attached to the Operating Agreement as originally executed.

2

The parties do hereby amend the Operating Agreement to delete the provision contained in Section 30, subparagraph (B), it being understood that the depths covered by the Operating Agreement as a result of this amendment shall be as reflected on the attached Exhibit "A".

3

Except as amended in the manner provided in Articles 1 and 2 above, the Operating Agreement, as previously amended, shall remain in full force and effect.

4

This Amendment may be signed in counterparts and shall be binding on each party signing the original or counterpart hereof, its heirs, successors, representatives and assigns.

5

This Amendment shall be binding on each party signing same, or a counterpart hereof, upon its execution, but shall become effective as of the date on which all parties have signed this Amendment or a counterpart hereof.

IN WITNESS WHEREOF, the parties have signed on the date set forth opposite its name.

SUGAR CREEK PRODUCING COMPANY

By: _____

Date: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
Robert E. Smitherman

Date: _____

COMSTOCK OIL & GAS, INC.

By: _____

Date: _____

PHILLIPS ENERGY, INC.

By: _____

Date: _____

_____
Robert L. Williamson

Date: _____

GEOTECH PRODUCTION, INC.

By: _____

Date: _____

OTTER CREEK, L.L.C.

By: _____

Date: _____

SOUTHTRUST BANK

By: _____

Date: _____

CAGNEY & COMPANY

By: _____

Date: _____

STATE OF LOUISIANA,
PARISH OF CADDO.

On this _____ day of _____, 2003, before me appeared _____, to me known, who, being by me duly sworn, did say:

That he is the _____ of **SUGAR CREEK PRODUCING COMPANY**, a _____ corporation, and that the foregoing instrument was signed in behalf of said corporation by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.

STATE OF LOUISIANA,
PARISH OF CADDO.

On this _____ day of _____, 2003, before me personally appeared **ROBERT E. SMITHERMAN**, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.

STATE OF TEXAS,
COUNTY OF _____.

On this _____ day of _____, 2003, before me appeared _____, to me known, who, being by me duly sworn, did say:

That he is the _____ of **COMSTOCK OIL & GAS, INC.**, a _____ corporation, and that the foregoing instrument was signed in behalf of said corporation by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC in and for
_____ County, Texas.

My Commission Expires: _____.

STATE OF LOUISIANA,
PARISH OF CADDO.

On this _____ day of _____, 2003, before me appeared _____, to me known, who, being by me duly sworn, did say:

That he is the _____ of **PHILLIPS ENERGY, INC.,** a _____ corporation, and that the foregoing instrument was signed in behalf of said corporation by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.

STATE OF LOUISIANA,
PARISH OF CADDO.

On this _____ day of _____, 2003, before me personally appeared **ROBERT L. WILLIAMSON,** to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC in and for
Caddo Parish, Louisiana.

STATE OF COLORADO,
COUNTY OF _____.

On this _____ day of _____, 2003, before me appeared _____, to me known, who, being by me duly sworn, did say:

That he is the _____ of **GEOTECH PRODUCTION, INC.,** a _____ corporation, and that the foregoing instrument was signed in behalf of said corporation by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC in and for
_____ County, Colorado.

My Commission Expires: _____.

dls/amendment to operating agreement.sugarcreek                5

STATE OF TEXAS,
COUNTY OF _____.

On this _____ day of _____, 2003, before me appeared _____, to me known, who, being by me duly sworn, did say:

That he is the _____ of **OTTER CREEK, L.L.C.,** a _____ limited liability company, and that the foregoing instrument was signed in behalf of said company by authority of its operating agreement, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC in and for
_____ County, Texas.

My Commission Expires: _____.

STATE OF ALABAMA,
COUNTY OF _____.

On this _____ day of _____, 2003, before me appeared _____, to me known, who, being by me duly sworn, did say:

That he is the identical person who executed the foregoing instrument in his capacity as _____ of **SOUTHTRUST BANK,** and that such instrument was executed by **SOUTHTRUST BANK,** a _____ banking institution, by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said bank.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC in and for
_____ County, Alabama.

My Commission Expires: _____.

STATE OF TEXAS,
COUNTY OF _____.

       On this _____ day of _____, 2003, before me appeared _____, to me known, who, being by me duly sworn, did say:

       That he is the _____ of **CAGNEY & COMPANY,** a _____ corporation, and that the foregoing instrument was signed in behalf of said corporation by authority of its Board of Directors, and said Appearer acknowledged said instrument to be the free act and deed of said corporation.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                              _____

                              NOTARY PUBLIC in and for
                              _____ County, Texas.

                              My Commission Expires: _____.

## EXHIBIT "A"

Attached to and made a part of the Operating Agreement dated
October 1, 1958, originally executed by A. J. Hodges Industries, Inc.;
Union Producing Company; Robert F. Roberts; Allen L. Roberts;
Leonard W. Phillips, J. R. Butler and H. Blume Johnson.

1.   **LANDS COVERED BY OPERATING AGREEMENT.**  The Unit Area shall consist of
all of Section 1, Township 19 North, Range 6 West, the South Half (S 1/2) of Section 36,
Township 20 North, Range 6 West, and the North Half (N 1/2) of Section 12, Township 19
North, Range 6 West, all in Claiborne Parish, Louisiana, subject to the depth limitations set
forth below.

2.   **DEPTHS COVERED BY OPERATING AGREEMENT.**

(a)   As to lands in Section 1, Township 19 North, Range 6 West, this Operating
Agreement shall cover all depths lying below the top of the Travis Peak Sands of the Hosston
Formation in Sugar Creek Field, as defined in Office of Conservation Order No. 23-H-3,
effective September 22, 1977.

(b)   As to lands in the North Half (N 1/2) of Section 12, Township 19 North, Range 6
West, and as to lands in the South Half (S 1/2) of Section 36, Township 20 North, Range 6
West, this Operating Agreement shall cover all depths lying within the Travis Peak Sands
of the Hosston Formation in Sugar Creek Field, as defined in Office of Conservation Order
No. 23-H-3, effective September 22, 1977.

3.   **INTERESTS OF THE PARTIES.**

(a)   Operations related to, and production from, depths lying below the top of the Cotton
Valley Formation, Reservoir A, as defined in Office of Conservation Order No. 23-P,
effective November 21, 1978, in wells located in Section 1, Township 19 North, Range 6
West, Claiborne Parish, Louisiana:

| | |
|---|---|
| Sugar Creek Producing Company | .58895585 |
| Robert E. Smitherman | .01705230 |
| Comstock Oil & Gas, Inc. | .33379950 |
| Phillips Energy, Inc. | .02368400 |
| Robert L. Williamson | .01302135 |
| Geotech Production, Inc. | .00473700 |
| Southtrust Bank | .00937500 |
| Cagney & Company | .00937500 |
| Total | 1.00000000. |

(b)   Operations related to, and production from, depths lying between the depths of 6,050
feet subsurface and the base of the Travis Peak Sands of the Hosston Formation in Sugar
Creek Field (as said base is defined in Office of Conservation Order No. 23-H-3, effective
September 22, 1977), in wells located on TP SUH (comprised of the South Half (S 1/2) of
Section 1 and the North Half (N 1/2) of Section 12, Township 19 North, Range 6 West,
Claiborne Parish, Louisiana):

| | |
|---|---|
| Sugar Creek Producing Company | .67255005 |
| Robert E. Smitherman | .00266450 |
| Comstock Oil & Gas, Inc. | .30972450 |
| Phillips Energy, Inc. | .00370070 |
| Robert L. Williamson | .01062015 |
| Geotech Production, Inc. | .00074010 |

Total                    1.00000000.

(c)      Operations related to, and production from, depths lying between the depths of 6,050 feet subsurface and the base of the Travis Peak Sands of the Hosston Formation in Sugar Creek Field (as said base is defined in Office of Conservation Order No. 23-H-3, effective September 22, 1977), in wells located on TP SUI (comprised of the North Half (N 1/2) of Section 1, Township 19 North, Range 6 West, and the South Half (S 1/2) of Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana):

| | |
|---|---|
| Sugar Creek Producing Company | .7214301 |
| Robert E. Smitherman | .0366169 |
| Comstock Oil & Gas, Inc. | .1420435 |
| Phillips Energy, Inc. | .0508568 |
| Robert L. Williamson | .0088034 |
| Geotech Production, Inc. | .0101713 |
| Otter Creek, L.L.C. | .0056640 |
| Southtrust Bank | .0150390 |
| Cagney & Company | .0093750 |

Total                    1.00000000.

(d)      Operations related to, and production from, depths lying between the top of the Travis Peak Sands of the Hosston Formation in Sugar Creek Field (as said top is defined in Office of Conservation Order No. 23-H-3, effective September 22, 1977) and the depth of 6,050 feet subsurface, in wells located on TP SUH (comprised of the South Half (S 1/2) of Section 1 and the North Half (N 1/2) of Section 12, Township 19 North, Range 6 West, Claiborne Parish, Louisiana):

| | |
|---|---|
| Sugar Creek Producing Company | .7290605 |
| Robert E. Smitherman | .0026645 |
| Comstock Oil & Gas, Inc. | .2550370 |
| Phillips Energy, Inc. | .0037007 |
| Robert L. Williamson | .0087972 |
| Geotech Production, Inc. | .0007401 |

Total                    1.00000000.

(e)      Operations related to, and production from, depths lying between the top of the Travis Peak Sands of the Hosston Formation in Sugar Creek Field (as said top is defined in Office of Conservation Order No. 23-H-3, effective September 22, 1977) and the depth of 6,050 feet subsurface, in wells located on TP SUI (comprised of the North Half (N 1/2) of Section 1, Township 19 North, Range 6 West, and the South Half (S 1/2) of Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana), less and except the interval and well described below in subparagraph (f) of this Paragraph 3:

| | |
|---|---|
| Sugar Creek Producing Company | .7190087 |
| Robert E. Smitherman | .0366169 |
| Comstock Oil & Gas, Inc. | .1443873 |
| Phillips Energy, Inc. | .0508568 |
| Robert L. Williamson | .0088810 |
| Geotech Production, Inc. | .0101713 |
| Otter Creek, L.L.C. | .0056640 |
| Southtrust Bank | .0150390 |
| Cagney & Company | .0093750 |

Total                    1.00000000.

(f)      Operations related to, and production from, the depths of 5,765 feet and 5,781 feet, electric log measurements, in the Sugar Creek Producing Company--Brown A No. 2 Well,

located in the North Half (N 1/2) of Section 1, Township 19 North, Range 6 West, Claiborne Parish, Louisiana:

| | |
|---|---|
| Sugar Creek Producing Company | .5650087 |
| Robert E. Smitherman | .0366169 |
| Comstock Oil & Gas, Inc. | .2943873 |
| Phillips Energy, Inc. | .0508568 |
| Robert L. Williamson | .0128810 |
| Geotech Production, Inc. | .0101713 |
| Otter Creek, L.L.C. | .0056640 |
| Southtrust Bank | .0150390 |
| Cagney & Company | .0093750 |
| Total | 1.00000000. |

It is expressly understood that the interests of the parties specified in this subparagraph (f) of Paragraph 3 shall be applicable only to the depths specified above in the wellbore of the Brown A No. 2 Well. If any other well located on TP SUI (comprised of the North Half (N 1/2) of Section 1, Township 19 North, Range 6 West, and South Half (S 1/2) of Section 36, Township 20 North, Range 6 West), should encounter these depths as productive, the interests of the parties shall be as set forth above in subparagraph (e) of Paragraph 3.

4. **ADDRESSES OF PARTIES**.

Geotech Production, Inc.
7844 South Espana Way
Aurora, Colorado 80016-1918

Otter Creek, L.L.C.
Post Office Box 1557
Sealy, Texas 77474

Phillips Energy, Inc.
330 Marshall Street, Suite 300
Shreveport, Louisiana 71101

Southtrust Asset Management Company
A Division of Southtrust Bank
Post Office Box 830804
Birmingham, Alabama 35283-0804
Kathryn G. Roberts R/T-Account #11-10-025702
Parcel 4

Comstock Oil & Gas, Inc.
5300 Town and Country Boulevard
Suite 500
Frisco, Texas 75034

Robert L. Williamson
Post Office Box 1772
Shreveport, Louisiana 71166-1772

Cagney & Company
3303 N. Midkiff
Post Office Box 7326
Midland, Texas 79705

Robert E. Smitherman
Post Office Box 1756

Shreveport, Louisiana 71166

Sugar Creek Producing Company
Post Office Box 1756
Shreveport, Louisiana 71166.

5.    <u>**LEASES COVERED BY OPERATING AGREEMENT.**</u>

(a)    Lease dated September 5, 1956, executed by Mary L. Bailey, et al., lessors, in favor of Union Producing Company and A. J. Hodges Industries, Inc., lessees, recorded in COB 225, p. 16, Conveyance Records of Claiborne Parish, Louisiana.

(b)    Co-Lessor's Agreement dated January 15, 1957, executed by J. C. Pittman, lessor, in favor of Union Producing Company and A. J. Hodges Industries, Inc., lessees, recorded in COB 195, p. 423, Conveyance Records of Claiborne Parish, Louisiana.

(c)    Co-Lessor's Agreement dated October 22, 1956, executed by Rosie Belle Brown Steen, lessor, in favor of Union Producing Company and A. J. Hodges Industries, Inc., lessee, recorded in COB 195, p. 415, Conveyance Records of Claiborne Parish, Louisiana.

(d)    Co-Lessor's Agreement dated January 15, 1957, executed by N. H. Wheless, Jr., lessor, in favor of Union Producing Company and A. J. Hodges Industries, Inc., lessees, recorded in COB 195, p. 422, Conveyance Records of Claiborne Parish, Louisiana.

(e)    Co-Lessor's Agreement dated February 2, 1957, executed by E. J. Smallwood, lessor, in favor of Union Producing Company and A. J. Hodges Industries, Inc., lessees, recorded in COB 195, p. 428, Conveyance Records of Claiborne Parish, Louisiana.

(f)    Lease dated October 1, 1956, executed by Mrs. Elizabeth Craighead, et al., lessors, in favor of Union Producing Company and A. J. Hodges Industries, Inc., lessees, recorded in Volume 221, p. 245, Conveyance Records of Claiborne Parish, Louisiana.

(g)    Lease dated January 4, 1958, executed by Robert H. Wimberly and Guy Wimberly, Jr., lessors, in favor of F. B. Dunlap, lessee, recorded under Registry No. 215349, Conveyance Records of Claiborne Parish, Louisiana.

(h)    Lease dated February 21, 1958, executed by Effie May White Shaw, lessor, in favor of F. B. Dunlap, lessee, recorded under Registry No. 215804, Conveyance Records of Claiborne Parish, Louisiana.

(i)    Lease dated February 28, 1958, executed by Mrs. Lou Annie Cowser, lessor, in favor of F. B. Dunlap, lessee, recorded under Registry No. 215906, Conveyance Records of Claiborne Parish, Louisiana.

(j)    Lease dated January 14, 1958, executed by Virginia H. Brinkman, et al., lessors, in favor of F. B. Dunlap, lessee, recorded under Registry No. 215432, Conveyance Records of Claiborne Parish, Louisiana.

(k)    Lease dated October 2, 1959, executed by Mrs. Elizabeth Craighead, et al., lessors, in favor of H. M. Doss, lessee, recorded in the Conveyance Records of Claiborne Parish, Louisiana.

(l)    Lease dated August 1, 1957, executed by Virgil F. White, et al., lessors, in favor of H. M. Doss, lessee, recorded in the Conveyance Records of Claiborne Parish, Louisiana.

(m)   Lease dated October 10, 1959, executed by Lonnie C. White and M. Eddy White, lessors, in favor of H. M. Doss, lessee, recorded in the Conveyance Records of Claiborne Parish, Louisiana.

(n)   Lease dated September 19, 1959, executed by James E. White, et ux., lessors, in favor of H. M. Doss, lessee, recorded in the Conveyance Records of Claiborne Parish, Louisiana.

(o)   Lease dated July 6, 1951, executed by L. C. Gardner, lessor, in favor of A. R. Wherritt, lessee, recorded under Registry No. 191823, Conveyance Records of Claiborne Parish, Louisiana.

(p)   Lease dated January 2, 1958, executed by Mrs. Edith Levy Brenner, Montefiore Levy and Joseph Hugo Levy, lessors, in favor of F. B. Dunlap, lessee, recorded under Registry No. 215494, Conveyance Records of Claiborne Parish, Louisiana.

(q)   Oil, Gas and Mineral Lease dated November 27, 1928, executed by J. W. Stevenson, et al., lessors, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 67309, Volume 73, p. 57, Conveyance Records of Claiborne Parish, Louisiana.

(r)   Co-Lessor's Agreement dated December 27, 1929, executed by W. T. Peterman, lessor, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 69789, Volume 74, p. 249, Conveyance Records of Claiborne Parish, Louisiana.

(s)   Oil, Gas and Mineral Lease dated February 28, 1929, executed by Clarence Kilpatrick, et al., lessors, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 68615, Volume 73, p. 152, Conveyance Records of Claiborne Parish, Louisiana.

(t)   Oil, Gas and Mineral Lease dated February 11, 1930, executed by Mrs. J. V. Kilpatrick, et al., lessors, in favor of Mrs. Falera Palmer, lessee, recorded under Registry No. 70463, Volume 73, p. 216, Conveyance Records of Claiborne Parish, Louisiana.

(u)   Oil, Gas and Mineral Lease dated February 19, 1929, executed by A. J. Hodges, et al., lessors, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 67312, Volume 73, p. 60, Conveyance Records of Claiborne Parish, Louisiana.

(v)   Oil, Gas and Mineral Lease dated October 18, 1929, executed by H. R. Treadwell, lessor, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 69324, in the Conveyance Records of Claiborne Parish, Louisiana, and corrected by instrument executed by H. R. Treadwell and Triangle Drilling Company, Inc., dated December 27, 1929, recorded under Registry No. 69786, Volume 74, p. 246, Conveyance Records of Claiborne Parish, Louisiana.

(w)   Oil and Gas Lease dated December 12, 1928, executed by W. M. Dobbins, et al., lessors, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 67319, Volume 73, p. 67, Conveyance Records of Claiborne Parish, Louisiana.

(x)   Oil and Gas Lease dated December 12, 1928, executed by W. M. Dobbins, et al., lessors, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 67296, Volume 73, p. 45, Conveyance Records of Claiborne Parish, Louisiana.

(y)   Oil and Gas Lease dated October 28, 1931, executed by W. M. Dobbins, Natural Tutor for the minors Lon Henderson Dobbins, et al., lessors, in favor of Standard Oil Company of Louisiana, et al., lessees, recorded under Registry No. 80690, Conveyance Records of Claiborne Parish, Louisiana.

(z)    Oil, Gas and Mineral Lease dated January 2, 1958, executed by S. C. Cox, et al., lessors, in favor of George B. Strong, lessee, recorded under Registry No. 215433, Conveyance Records of Claiborne Parish, Louisiana.

(aa)    Oil, Gas and Mineral Lease dated January 23, 1929, executed by G. M. Kilpatrick, et al., lessors, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 67404, Book 71, p. 582, Conveyance Records of Claiborne Parish, Louisiana.

(bb)    Oil, Gas and Mineral Lease dated October 31, 1932, executed by J. W. Stevenson, et al., lessors, in favor of United Gas Public Service Company, Standard Oil Company of Louisiana and Sugar Creek Syndicate, Inc., lessees, recorded under Registry No. 85566, Conveyance Records of Claiborne Parish, Louisiana.

(cc)    Co-Lessor's Agreement dated December 12, 1928, executed by W. T. Peterman by W. H. Hodges, Jr., as Agent and Attorney in Fact, joining and concurring in as co-lessor in that certain Oil, Gas and Mineral Lease executed by W. M. Dobbins, et al., lessors, in favor of Triangle Drilling Company, Inc., lessee, recorded under Registry No. 69788, Conveyance Records of Claiborne Parish, Louisiana.



CURA SUD

Tr. 36-1   .0123698
Tr. 36-2A   .0148027
Total .0271725

our % X = .39035903

.0106103

Brown A-3 Alt
CURA SUD

*Brown A #2*
*Sec. 1, T19N R6W*
*(TP SU1)*

March 12, 2007

Ms. Jill Crawford
S & P Co.
330 Marshall Street, Suite 300
Shreveport, Louisiana 71101

                              Re:    Sugar Creek Field, Claiborne Parish,
                                     Louisiana

Dear Jill:

As you are aware and as we discussed on the telephone on Thursday, Sklarco L.L.C. has acquired new interests in the West Arcadia, Sugar Creek, Athens and Lisbon Fields in Bienville and Claiborne Parishes, Louisiana over the past nine years since the Sklar and Phillips families separated their interests. Nevertheless, S & P Co. (or some other juridical or natural person associated with the Phillips family) still owns record title to oil and gas leases covering lands located in Sugar Creek Field as agent and nominee for Sklarco L.L.C., among others. Save for the Sugar Creek Producing Company – CV RA SUD; J. E. White #1 Well in which Phillips relinquished its interest by electing not to participate in an operation subject to the non-consent penalty under the JOA, and the Cobra Oil & Gas Corp. – CV RA SUE; Robinson #1-Alt. Well, expenses and revenue attributable to our working interest are being invoiced and disbursed by the Operator of the affected wells, Sugar Creek Producing Co., directly to Phillips Energy, Inc., which in turn invoices and disburses revenue to us and the other beneficial owners. Phillips Energy, Inc. is also disbursing revenue attributable to royalty and overriding royalty interests which burden that lease. Your accounting statements describe the affected wells as the "Brown A-3 – Sugar Creek", "Brown A-2 – Sugar Creek", "Brown #1 – Sugar Creek" and "Dobbins A-3".

We desire to have record title to our interest in these leases and to receive invoices and revenue disbursements directly from the Operator. Accordingly, we have prepared and enclose a Partial Assignment and a Letter In Lieu. If these enclosures meet with your approval, please have them executed by an appropriate representative of S & P Co. and return them to us. We will in turn execute them, record the Partial Assignment and send the Letter In Lieu to Sugar Creek Producing Co. Since we will assume the responsibility of administering our share, we have also enclosed new divisions of interest for the working interest, royalty interest and overriding royalty interest owners in the affected lease and wells for your review. The enclosed Partial Assignment covers our working interest in the Robinson #1-Alt Well, but a Letter In Lieu and division of interest are not required for it since we are already receiving our invoices and revenue directly from Cobra on this well.

Ms. Jill Crawford
S & P Co.
March 12, 2007
Page 2


We have come across two problems relating to this lease regarding which we request your opinion. First, we do not have a copy of an instrument putting record title of this lease into S & P Co. If you have such an instrument, please furnish us a copy. If not, we need to consider whether the appropriate representative of the original record owner, Leonard W. Phillips, should be the party Assignee to the Partial Assignment. Second, you appear to have credited us with 50.2% of the total interest formerly owned by the Sklar and Phillips families collectively as if the lease was owned by Sklar & Phillips, Inc. Our land records, however, indicate that the lease was owned 1/3 by Sam Sklar, 1/3 by Leonard W. Phillips and 1/3 by Albert Sklar, meaning that our share of the Sklar and Phillips families' total interest is 52.5%, not 50.2%. We believe that the error was made by referencing the beneficial ownership of the Brown wells at Danville Field instead of the Brown wells at Sugar Creek Field. If this is correct, then we will need to get it straight going forward. We should also quantify approximately how much difference, in dollars, this has made in the past. If the amount is trivial, then let's forget it. Otherwise, we should probably do an accounting.


Our land records also indicate that S & P Co. owns mineral servitudes burdening lands located within the Sugar Creek Field. One of those mineral interests covering about 88 gross acres located in Section 11, T19N, R6W, is subject to a lease in favor of Petroven, Inc. Record title to this interest was transferred in 2001 subject to the lease, and we have a Division Order from Petro-Chem Operating Co., Inc. covering our royalty share of the proceeds from the CSC Energy Corp. – CV RA SUJ; Henry No. 1 Well, Sugar Creek Field. Another mineral interest covers about 25 gross acres in Section 30, T20N, R5W. This interest was subject to a separate lease in favor of Petroven, Inc., but it is unclear whether that lease is still in effect. Our records reflect that this interest may be in the unit for the CV RA SUC; Sims #1 and the CV RA SUC; Baird #1 Wells, operated by Nadel & Gussman - Jetta Operating Company. However, we do not have a copy of an instrument transferring record title of our share of that interest from S & P Co. to Sklarco L.L.C. If you have one, please furnish us a copy. Otherwise, we will need to address that interest by a separate Mineral Deed instrument.


Yours very truly,



David A. Barlow
Chief Operating Officer


DABvmd
Enclosures
cc:   Land

## PARTIAL ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES, WELLS, EQUIPMENT AND RELATED ASSETS

STATE OF LOUISIANA,

PARISH OF CLAIBORNE.

KNOW ALL MEN BY THESE PRESENTS That:

**S & P CO.**, a Louisiana partnership, whose address is 330 Marshall Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Partner, Fred L. Phillips (hereinafter sometimes referred to as "Assignor");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions described hereinbelow, does hereby grant, bargain, sell, convey, assign, set over and transfer unto:

**SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow (hereinafter sometimes referred to as "Assignee");

an undivided fifty-two and one-half percent (52.5%) of Assignor's right, title and interest in and to the following:

All oil, gas and other mineral leases owned by Assignor covering lands located in the following sections within Claiborne Parish, Louisiana:

Section 1, Township 19 North, Range 6 West
Section 36, Township 20 North, Range 6 West

including, without limitation, those leases, if any, more particularly described in Exhibit "A" attached hereto and by reference made a part hereof (collectively, the "Leases").

The wells owned by Assignor located on lands covered by the Leases or lands pooled or unitized therewith, including, without limitation, those wells, if any, more particularly described in Exhibit "B" attached hereto and by reference made a part hereof (collectively, the "Wells").

All presently existing and valid units, voluntarily formed or formed under orders, regulations, rules or other official acts of any federal, state or other governmental authority having jurisdiction, insofar as they relate to the Leases or Wells, including, without limitation, those units, if any, created by the State of Louisiana Department of Conservation described in Exhibit "C" attached hereto and by reference made a part hereof (collectively, the "Units").

All easements, servitudes or right of way agreements affecting the use of the surface of the lands covered by the Leases or located within the Units or other lands otherwise used in connection with the Wells (collectively, the "Easements").

All improvements, fixtures, personal property and equipment used, or obtained in connection with or otherwise associated with the Wells in connection with the production, treating, storing, transportation or marketing of oil, gas or other minerals which are located in, on or under the lands, properties and interests subject to the Leases, including, without limitation, all connection apparatus, flowlines, gathering lines, transportation lines, dehydrators, compressors, processing plants, treating plants, tanks, separators, line heaters, casing, tubing, water wells, pipes, gauges, supplies, field offices, storage yards, machinery and equipment used in connection with the production of oil, gas or other minerals from such lands, properties or interests (collectively, the "Equipment").

All presently existing and valid oil and gas sales, purchase, transportation, gathering, balancing, exchange and processing contracts, casinghead gas contracts, operating agreements, compression agreements, joint venture agreements, surface leases, letter agreements, pooling agreements, communitization agreements, designations and declarations of units, farmout agreements and contractual rights of every character that relate to the Leases or Wells, including, without limitation, those Contracts, if any, described in Exhibit "D" attached hereto and by reference made a part hereof (collectively, the "Contracts").

All permits, licenses, franchises, approvals, consents, certificates

or other authorizations and other rights granted by governmental authorities  relating to the Leases or Wells (collectively, the "Permits").

TO HAVE AND TO HOLD unto Assignee, its successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

1.  This Assignment is made effective as of April 1, 2007 (the "Effective Date").

2.  This Assignment is made without warranty of title, express or implied, not even return for the purchase price, except that Assignor agrees to warrant title against all defects arising out of claims by Assignor or of persons claiming by, through or under Assignor.

3.  This Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Leases and all other instruments of record affecting those Leases as of the Effective Date.   Assignee assumes its obligations under those Leases, including, without limitation, the obligation to pay its share of royalty and overriding royalty interest burdens thereunder.

4.  This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**S & P CO.**

By: _____
      Fred L. Phillips
      Partner

                                - ASSIGNOR

**SKLARCO L.L.C.**

By: _____
      David A. Barlow
      Chief Operating Officer

                        - ASSIGNEE

**Exhibit "A"**

Attached to and by reference made a part of that certain Partial Assignment Of Oil, Gas And
Other Mineral Leases, Wells, Equipment And Related Assets dated effective as of April 1, 2007,
by and between S & P Co., as Assignor, and Sklarco L.L.C., as Assignee

### Description Of Oil, Gas And Other Mineral Leases

That certain Oil, Gas And Other Mineral Lease dated January 2, 1958, executed by S. C.
Cox and Sherman Crump, as Lessors, in favor of George B. Strong, as Lessee, recorded in Book
230, Page 261 under Registry No. 215,433 of the Records of Claiborne Parish, Louisiana,
covering 456 acres, more or less, being the East Half of Northwest Quarter (E ½ of NW ¼);
Northeast Quarter of Southwest Quarter (NE ¼ of SW ¼); West Half of Northeast Quarter (W ½
of NE ¼); West Half of Southeast Quarter of Northeast Quarter (W ½ of SE ¼ of NE ¼); and
Northeast Quarter of Northeast Quarter (NE ¼ of NE ¼) (less 4 acres in the Southeast corner of
the Northeast Quarter of the Northeast Quarter (NE ¼ of NE ¼), said 4 acres extending from the
Southeast corner of said 40 North 175 yards, and from said starting point West 110 yards); all in
Section 1, Township 19 North, Range 6 West, Claiborne Parish, Louisiana, subject to that certain
Assignment dated January 7, 1958, executed by George B. Strong, as Assignor, in favor of J. R.
Butler, H. Blume Johnson and Leonard W. Phillips, as Assignees, recorded in Book 231, Page
623 under Registry No. 215,674 of the Records of Claiborne Parish, Louisiana.

That certain Oil, Gas And Other Mineral Lease dated January 25, 1958, executed by S. C.
Cox et al., as Lessors, recorded in Book 215, Page 433 of the Records of Claiborne Parish,
Louisiana, covering the East Half of the Southeast Quarter of the Southeast Quarter (E ½ of SE
¼ of SE ¼); the East Half of the Northeast Quarter of the Southeast Quarter (E ½ of NE ¼ of SE
¼); the East Half of the Southeast Quarter of the Northeast Quarter (E ½ of SE ¼ of NE ¼); all
in Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana.

## Exhibit "B"

Attached to and by reference made a part of that certain Partial Assignment Of Oil, Gas And Other Mineral Leases, Wells, Equipment And Related Assets dated effective as of April 1, 2007, by and between S & P Co., as Assignor, and Sklarco L.L.C., as Assignee

## Description Of Wells

Sugar Creek Producing Company – CV RA SUH; Brown A #1 Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 72309/API Number 17027024230000).

Sugar Creek Producing Company – TP SUI; Brown A #2 Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 181400/API Number 17027210850000).

Sugar Creek Producing Company – CV RA SUH; Brown A #2-Alt. Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana.

Sugar Creek Producing Company – CV RA SUH; Dobbins A #3-Alt. Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 225444/API Number 17027222180000).

Sugar Creek Producing Company – TP SUI; Johnson #1-Alt. Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana.

Sugar Creek Producing Company – CV RA SUH; Johnson #1-Alt. Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana.

Sugar Creek Producing Company – CV RA SUD; J. E. White #1Well, Section 36, Township 20 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 80750/API Number 17027024180000).

Sugar Creek Producing Company – CV RA SUD; Brown A #3-Alt.Well, Section 36, Township 20 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 228254/API Number 17027222570000).

Cobra Oil & Gas Corporation – CV RA SUE; Robinson #1-Alt. Well, Section 36, Township 20 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 181601/API Number 17027210480000).

## Exhibit "C"

Attached to and by reference made a part of that certain Partial Assignment Of Oil, Gas And Other Mineral Leases, Wells, Equipment And Related Assets dated effective as of April 1, 2007, by and between S & P Co., as Assignor, and Sklarco L.L.C., as Assignee

## Description Of Units

Sand Unit H of the Cotton Valley Formation Reservoir A of the Sugar Creek Field, Claiborne Parish, Louisiana, defined in Office of Conservation Order No. 23-P effective November 21, 1978, as amended and supplemented by the 23-P Series of Orders.

Sand Unit I of the Travis Peak Sands of the Hosston Formation of the Sugar Creek Field, Claiborne Parish, Louisiana, defined in Office of Conservation Order No. 23-H effective September 22, 1977, as amended and supplemented by the 23-H Series of Orders.

Sand Unit D of the Cotton Valley Formation Reservoir A of the Sugar Creek Field, Claiborne Parish, Louisiana, defined in Office of Conservation Order No. 23-P effective November 21, 1978, as amended and supplemented by the 23-P Series of Orders.

Sand Unit E of the Cotton Valley Formation Reservoir A of the Sugar Creek Field, Claiborne Parish, Louisiana, defined in Office of Conservation Order No. 23-P effective November 21, 1978, as amended and supplemented by the 23-P Series of Orders.

**Exhibit "D"**

Attached to and by reference made a part of that certain Partial Assignment Of Oil, Gas And Other Mineral Leases, Wells, Equipment And Related Assets dated effective as of April 1, 2007, by and between S & P Co., as Assignor, and Sklarco L.L.C., as Assignee

**Description Of Contracts**

That certain Operating Agreement dated October 1, 1958, originally executed by A. J. Hodges Industries, Inc., Union Producing Company, Robert F. Roberts, Allen L. Roberts, Leonard W. Phillips, J. R. Butler and H. Blume Johnson covering all of Section 1, T19N, R6W, the South Half (S/2) of Section 36, T20N, R6W, and the North Half (N/2) of Section 12, T19N, R6W, Claiborne Parish, Louisiana, as amended and revised.

That certain Operating Agreement dated June 14, 1982, by and between Cobra Oil & Gas Corporation, as Operator, and Sugar Creek Producing Company, Pennzoil Producing Company, Leonard Phillips and 4D Company et al., as Non-Operators, covering certain lands including the East Half of the East Half of the Northeast Quarter (E ½ of E ½ of NE ¼) and the East Half of the East Half of the Southeast Quarter (E ½ of E ½ of SE ¼) of Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana.

# ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2007, before me appeared Fred L. Phillips, to me known, who being by me duly sworn, did say that he is the Partner of S & P Co., a Louisiana partnership, and that the foregoing instrument was signed by him on behalf of said partnership, and said Appearer acknowledged said instrument to be the free act and deed of said partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2007, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana



March 12, 2007

Ms. Jill Crawford
S & P Co.
330 Marshall Street, Suite 300
Shreveport, Louisiana 71101

        Re:    Sugar Creek Field, Claiborne Parish,
                Louisiana

Dear Jill:

As you are aware and as we discussed on the telephone on Thursday, Sklarco L.L.C. has acquired new interests in the West Arcadia, Sugar Creek, Athens and Lisbon Fields in Bienville and Claiborne Parishes, Louisiana over the past nine years since the Sklar and Phillips families separated their interests. Nevertheless, S & P Co. (or some other juridical or natural person associated with the Phillips family) still owns record title to oil and gas leases covering lands located in Sugar Creek Field as agent and nominee for Sklarco L.L.C., among others. Save for the Sugar Creek Producing Company – CV RA SUD; J. E. White #1 Well in which Phillips relinquished its interest by electing not to participate in an operation subject to the non-consent penalty under the JOA, and the Cobra Oil & Gas Corp. – CV RA SUE; Robinson #1-Alt. Well, expenses and revenue attributable to our working interest are being invoiced and disbursed by the Operator of the affected wells, Sugar Creek Producing Co., directly to Phillips Energy, Inc., which in turn invoices and disburses revenue to us and the other beneficial owners. Phillips Energy, Inc. is also disbursing revenue attributable to royalty and overriding royalty interests which burden that lease. Your accounting statements describe the affected wells as the "Brown A-3 – Sugar Creek", "Brown A-2 – Sugar Creek", "Brown #1 – Sugar Creek" and "Dobbins A-3".

We desire to have record title to our interest in these leases and to receive invoices and revenue disbursements directly from the Operator. Accordingly, we have prepared and enclose a Partial Assignment and a Letter In Lieu. If these enclosures meet with your approval, please have them executed by an appropriate representative of S & P Co. and return them to us. We will in turn execute them, record the Partial Assignment and send the Letter In Lieu to Sugar Creek Producing Co. Since we will assume the responsibility of administering our share, we have also enclosed new divisions of interest for the working interest, royalty interest and overriding royalty interest owners in the affected lease and wells for your review. The enclosed Partial Assignment covers our working interest in the Robinson #1-Alt Well, but a Letter In Lieu and division of interest are not required for it since we are already receiving our invoices and revenue directly from Cobra on this well.

Ms. Jill Crawford
S & P Co.
March 12, 2007
Page 2

We have come across two problems relating to this lease regarding which we request your opinion. First, we do not have a copy of an instrument putting record title of this lease into S & P Co. If you have such an instrument, please furnish us a copy. If not, we need to consider whether the appropriate representative of the original record owner, Leonard W. Phillips, should be the party Assignee to the Partial Assignment. Second, you appear to have credited us with 50.2% of the total interest formerly owned by the Sklar and Phillips families collectively as if the lease was owned by Sklar & Phillips, Inc. Our land records, however, indicate that the lease was owned 1/3 by Sam Sklar, 1/3 by Leonard W. Phillips and 1/3 by Albert Sklar, meaning that our share of the Sklar and Phillips families' total interest is 52.5%, not 50.2%. We believe that the error was made by referencing the beneficial ownership of the Brown wells at Danville Field instead of the Brown wells at Sugar Creek Field. If this is correct, then we will need to get it straight going forward. We should also quantify approximately how much difference, in dollars, this has made in the past. If the amount is trivial, then let's forget it. Otherwise, we should probably do an accounting.

Our land records also indicate that S & P Co. owns mineral servitudes burdening lands located within the Sugar Creek Field. One of those mineral interests covering about 88 gross acres located in Section 11, T19N, R6W, is subject to a lease in favor of Petroven, Inc. Record title to this interest was transferred in 2001 subject to the lease, and we have a Division Order from Petro-Chem Operating Co., Inc. covering our royalty share of the proceeds from the CSC Energy Corp. – CV RA SUJ; Henry No. 1 Well, Sugar Creek Field. Another mineral interest covers about 25 gross acres in Section 30, T20N, R5W. This interest was subject to a separate lease in favor of Petroven, Inc., but it is unclear whether that lease is still in effect. Our records reflect that this interest may be in the unit for the CV RA SUC; Sims #1 and the CV RA SUC; Baird #1 Wells, operated by Nadel & Gussman - Jetta Operating Company. However, we do not have a copy of an instrument transferring record title of our share of that interest from S & P Co. to Sklarco L.L.C. If you have one, please furnish us a copy. Otherwise, we will need to address that interest by a separate Mineral Deed instrument.

Yours very truly,

David A. Barlow
Chief Operating Officer

DABvmd
Enclosures
cc:    Land

# LETTER IN LIEU OF TRANSFER AND DIVISION ORDER

March 12, 2007

Mr. Dan Foster
Sugar Creek Producing Company
415 Texas Street
One Texas Centre
Shreveport, LA 71101

Re:     Purchases and disbursements of production
        proceeds from certain properties located in
        the Sugar Creek Field, Claiborne Parish,
        Louisiana, which are held in the name of S
        & P Co. and/or Phillips Energy, Inc. as
        nominee on behalf of various parties.

Gentlemen:

S & P Co. and/or Phillips Energy, Inc. is nominee on behalf of various parties as mentioned above.  It is the desire of certain of those parties represented by S & P Co. and/or Phillips Energy, Inc.  to change their nominee to SKLARCO L.L.C.  This change is inclusive of but not limited to those properties listed on the attached Exhibit "A".

According to the records of S & P Co. and/or Phillips Energy, Inc., you are either purchasing production, distributing revenue, or otherwise accounting for proceeds from those properties listed on Exhibit "A".  It is further understood that S & P Co. and/or Phillips Energy, Inc. or its/their predecessors in title have executed Division Orders and/or Transfer Orders and/or Purchase and Sale Contracts covering production from the Transfer Orders prepared and executed for the properties listed on Exhibit "A".

S & P Co.  and/or Phillips Energy, Inc. do hereby request and instruct you as purchaser to make all future payments of production proceeds derived from production from the properties listed on Exhibit "A" insofar and only insofar as to the interest listed beside each property.  These payments should be made payable to SKLARCO L.L.C. at 401 Edwards Street, Suite 1601, Shreveport, Louisiana 71101.  If you are also invoicing costs attributable to working interests identified on Exhibit "A", then we also hereby

Mr. Dan Foster
Sugar Creek Producing Company
March 12, 2007
Page 2

request and instruct you to issue all future joint interest bills covering costs attributable to the undivided working interest in the properties listed on Exhibit "A" to SKLARCO L.L.C.

SKLARCO L.L.C. agrees to be bound by the terms, conditions, warranties, and covenants of all Transfers and Division Orders which may have heretofore been executed by S & P Co. and/or Phillips Energy, Inc. concerning the properties listed on Exhibit "A" attached hereto. SKLARCO L.L.C. hereby agrees to indemnify you against all loss, cost, expense or damage you may incur by reason of your making payment as herein directed. To the extent the interest being transferred are undivided working interests, SKLARCO L.L.C. also subscribes to and agrees to be bound by the terms and conditions of any applicable joint operating agreements between you and S & P Co. and/or Phillips Energy, Inc. (or yours or their predecessors in title) governing joint operations of those working interests.

It is the intention of the undersigned that there be no suspension of or interruption in the payments to be made by you to SKLARCO L.L.C. hereunder. Until such time as you have amended your records in accordance with this letter and have placed the transferred interest in line for payment, you are authorized and directed to continue to make payments to S & P Co. and/or Phillips Energy, Inc. Any payments so made to S & P Co. and/or Phillips Energy, Inc. shall be adjusted between S & P Co. and SKLARCO L.L.C., and you are hereby relieved of any responsibility regarding the application or distribution of any such payments made to S & P Co. and/or Phillips Energy, Inc.

In order that the parties hereto may have a record evidencing your acceptance of this transfer request, please sign this letter (in triplicate) in the appropriate space and return one fully executed original to S & P Co. and one fully executed original to SKLARCO L.L.C. at their respective addresses. The last original is for your records. If you have any questions or additional requirements concerning this transfer request, please contact Ms. Jill Crawford (S & P Co.) at (318) 222-1800 or Mr. David A. Barlow (SKLARCO L.L.C.) at (318) 227-8668.

Mr. Dan Foster
Sugar Creek Producing Company
March 12, 2007
Page 3

Thank you for your prompt attention to this matter.


S & P Co.                                SUGAR CREEK PRODUCING CO.


BY:_____            BY:_____
  Fred L. Phillips, Partner                Robert E. Smitherman, President



PHILLIPS ENERGY, INC.                    SKLARCO L.L.C.


BY:_____            BY:_____
  Fred L. Phillips, President              David A. Barlow, VP - COO

Mr. Dan Foster
Sugar Creek Producing Company
March 12, 2007
Page 4

## EXHIBIT "A"

Sugar Creek Producing Company – CV RA SUH; Brown A #1 Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 72309/API Number 17027024230000):

| Owner | GWI and NRI |
|---|---|
| S & P Co./Phillips Energy, Inc. | 0.60964097 of 0.02368400 or 0.01443874 |
| Sklarco L.L.C. | 0.39035903 of 0.02368400 or 0.00924526 |

Sugar Creek Producing Company – TP SUI; Brown A #2 Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 181400/API Number 17027210850000):

| Owner | GWI and NRI |
|---|---|
| S & P Co./Phillips Energy, Inc. | 0.60964097 of 0.05085680 or 0.03100439 |
| Sklarco L.L.C. | 0.39035903 of 0.05085680 or 0.01985241 |

Sugar Creek Producing Company – CV RA SUH; Dobbins A #3-Alt. Well, Section 1, Township 19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 225444/API Number 17027222180000):

| Owner | GWI and NRI |
|---|---|
| S & P Co./Phillips Energy, Inc. | 0.60964097 of 0.02368400 or 0.01443874 |
| Sklarco L.L.C. | 0.39035903 of 0.02368400 or 0.00924526 |

Sugar Creek Producing Company – CV RA SUD; Brown A #3-Alt.Well, Section 36, Township 20 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 228254/API Number 17027222570000):

| Owner | GWI and NRI |
|---|---|
| S & P Co./Phillips Energy, Inc. | 0.60964097 of 0.02717250 or 0.01656547 |
| Sklarco L.L.C. | 0.39035903 of 0.02717250 or 0.01060703 |

TP SUH, Sugar Creek Field, Claiborne Parish, Louisiana:

| Owner | GWI and NRI |
|---|---|
| S & P Co./Phillips Energy, Inc. | 0.60964097 of 0.00370070 or 0.00144500 |
| Sklarco L.L.C. | 0.39035903 of 0.00370070 or 0.00225600 |

Dobbins A-3

| Owner Name | Type | S & P Co Paying Interest | Interest*(GWI-NRI)/Total burdens Sklarco Pays | S&P will Pay |
|---|---|---|---|---|
| Bobby Joe Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Bobby Joe Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Ernest L. Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Ernest L. Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Lois S. Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Lois S. Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| R. Wayne Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| R. Wayne Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Kenny S. Crump | O | 0.02734400 | 0.01067715 | 0.01666685 |
| Kenny S. Crump | R | 0.06250000 | 0.02440468 | 0.03809532 |
| S&P for Cynthia R. Dorfman | W | 0.00630800 | | 0.00630800 |
| Louis Dorfman | W | 0.09462800 | | 0.09462800 |
| Florsheim Production Company | W | 0.00427200 | | 0.00427200 |
| Margaret Cox Nanny | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Margaret Cox Nanny | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Shelley D. Roberts | W | 0.00630800 | | 0.00630800 |
| SD Resources Ltd. | W | 0.09462800 | | 0.09462800 |
| Sklarco | W | 0.30616779 | 0.32019540 | |
| Estate of August C. Erickson | W | 0.00427200 | | 0.00427200 |
| S & P co. | W | 0.30372821 | | 0.28970060 |
| Deleted Interest | | | | |
| Total: | | 1.00000000 | 0.39035903 | 0.60964097 |

Note:
.502 x Y = .30616779; so Y = .6098960
.525 x .60989596 = **0.3201954** Should be Sklarco Interest
.475 x .60989596 = **0.2897006** Should be S & P Co's Interest
**0.6098960**

Brown A-1 #1

| Owner Name | Type | Total Interest Due | Interest*(GWI-NRI)/Total burdens Sklarco Pays | S&P will Pay |
|---|---|---|---|---|
| Bobby Joe Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Bobby Joe Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Ernest L. Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Ernest L. Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Lois S. Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Lois S. Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| R. Wayne Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| R. Wayne Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Kenny S. Crump | O | 0.02734400 | 0.01067715 | 0.01666685 |
| Kenny S. Crump | R | 0.06250000 | 0.02440468 | 0.03809532 |
| S&P for Cynthia R. Dorfman | W | 0.00630800 | | 0.00630800 |
| Louis Dorfman | W | 0.09462800 | | 0.09462800 |
| Florsheim Production Company | W | 0.00427200 | | 0.00427200 |
| Margaret Cox Nanny | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Margaret Cox Nanny | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Shelley D. Roberts | W | 0.00630800 | | 0.00630800 |
| SD Resources Ltd. | W | 0.09462800 | | 0.09462800 |
| Sklarco | W | 0.30616779 | 0.32019540 | |
| Estate of August C. Erickson | W | 0.00427200 | | 0.00427200 |
| S & P co. | W | 0.30372821 | | 0.28970060 |
| Deleted Interest | | | | |
| Total: | | 1.00000000 | 0.39035903 | 0.60964097 |

Note:
.502 x Y = .30616779; so Y = .6098960
.525 x .6098960 =  0.3201954 Should be Sklarco Interest
.475 x .6098960 =  0.2897006 Should be S & P Co's Interest
0.6098960

Brown A-2

| Owner Name | Type | Total Interest Due | Interest*(GWI-NRI)/Total burdens Sklarco Pays | S&P will Pay |
|---|---|---|---|---|
| Bobby Joe Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Bobby Joe Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Ernest L. Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Ernest L. Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Lois S. Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| R. Wayne Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| R. Wayne Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Ralph A. Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Kenny S. Crump | O | 0.02734400 | 0.01067715 | 0.01666685 |
| Kenny S. Crump | R | 0.06250000 | 0.02440468 | 0.03809532 |
| S&P for Cynthia R. Dorfman | W | 0.00630800 | | 0.00630800 |
| Louis Dorfman | W | 0.09462800 | | 0.09462800 |
| Florsheim Production Company | W | 0.00427200 | | 0.00427200 |
| Margaret Cox Nanny | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Margaret Cox Nanny | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Shelley D. Roberts | W | 0.00630800 | | 0.00630800 |
| SD Resources Ltd. | W | 0.09462800 | | 0.09462800 |
| Sklarco | W | 0.30616779 | 0.32019540 | |
| Estate of August C. Erickson | W | 0.00427200 | | 0.00427200 |
| S & P co. | W | 0.30372821 | | 0.28970060 |
| Deleted Interest | | | | |
| Total: | | 1.00000000 | 0.39035903 | 0.60964097 |

Note:
.502 x Y = .30616779; so Y = .60989596
    .525 x .60989596 = **0.3201954 Should be Sklarco Interest**
      .475 x .60989596 = 0.2897006 Should be S & P Co's Interest
                  0.6098960

Brown A-3

| Owner Name | Type | Total Interest Due | Interest*(GWI-NRI)/Total burdens Sklarco Pays | S&P will Pay |
|---|---|---|---|---|
| Bobby Joe Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Bobby Joe Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Ernest L. Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Ernest L. Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Lois S. Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| R. Wayne Cox | O | 0.00546880 | 0.00213543 | 0.00333337 |
| R. Wayne Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Ralph A. Cox | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Kenny S. Crump | O | 0.02734400 | 0.01067715 | 0.01666685 |
| Kenny S. Crump | R | 0.06250000 | 0.02440468 | 0.03809532 |
| S&P for Cynthia R. Dorfman | W | 0.00630800 | | 0.00630800 |
| Louis Dorfman | W | 0.09462800 | | 0.09462800 |
| Florsheim Production Company | W | 0.00427200 | | 0.00427200 |
| Margaret Cox Nanny | O | 0.00546880 | 0.00213543 | 0.00333337 |
| Margaret Cox Nanny | R | 0.01250000 | 0.00488093 | 0.00761907 |
| Shelley D. Roberts | W | 0.00630800 | | 0.00630800 |
| SD Resources Ltd. | W | 0.09462800 | | 0.09462800 |
| Sklarco | W | 0.30616779 | 0.32019540 | |
| Estate of August C. Erickson | W | 0.00427200 | | 0.00427200 |
| S & P co. | W | 0.30372821 | | 0.28970060 |
| Deleted Interest | | | | |
| Total: | | 1.00000000 | 0.39035903 | 0.60964097 |

Note:
.502 x Y = .30616779; so Y = .6098960
.525 x .6098960 =   0.3201954 Should be Sklarco Interest
.475 x .6098960 =   0.2897006 Should be S & P Co's Interest
0.6098960

## PARTIAL ASSIGNMENT OF OIL, GAS AND OTHER MINERAL LEASES, WELLS, EQUIPMENT AND RELATED ASSETS

STATE OF LOUISIANA,

PARISH OF CLAIBORNE.

KNOW ALL MEN BY THESE PRESENTS That:

**S & P CO.**, a Louisiana partnership, whose address is 330 Marshall Street, Suite 300, Shreveport, Louisiana 71101, represented herein by its Partner, Fred L. Phillips (hereinafter sometimes referred to as "Assignor");

for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions described hereinbelow, does hereby grant, bargain, sell, convey, assign, set over and transfer unto:

**SKLARCO L.L.C.**, a Louisiana limited liability company, whose address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by its Chief Operating Officer, David A. Barlow (hereinafter sometimes referred to as "Assignee");

an undivided fifty-two and one-half percent (52.5%) of Assignor's right, title and interest in and to the following:

All oil, gas and other mineral leases owned by Assignor covering lands located in the following sections within Claiborne Parish, Louisiana:

Section 1, Township 19 North, Range 6 West
Section 36, Township 20 North, Range 6 West

including, without limitation, those leases, if any, more particularly described in Exhibit "A" attached hereto and by reference made a part hereof (collectively, the "Leases").

The wells owned by Assignor located on lands covered by the Leases or lands pooled or unitized therewith, including, without limitation, those wells, if any, more particularly described in Exhibit "B" attached hereto and by reference made a part hereof (collectively, the "Wells").

All presently existing and valid units, voluntarily formed or formed under orders, regulations, rules or other official acts of any federal, state or other governmental authority having jurisdiction, insofar as they relate to the Leases or Wells, including, without limitation, those units, if any, created by the State of Louisiana Department of Conservation described in Exhibit "C" attached hereto and by reference made a part hereof (collectively, the "Units").

All easements, servitudes or right of way agreements affecting the use of the surface of the lands covered by the Leases or located

within the Units or other lands otherwise used in connection with the Wells (collectively, the "Easements").

All improvements, fixtures, personal property and equipment used, or obtained in connection with or otherwise associated with the Wells in connection with the production, treating, storing, transportation or marketing of oil, gas or other minerals which are located in, on or under the lands, properties and interests subject to the Leases, including, without limitation, all connection apparatus, flowlines, gathering lines, transportation lines, dehydrators, compressors, processing plants, treating plants, tanks, separators, line heaters, casing, tubing, water wells, pipes, gauges, supplies, field offices, storage yards, machinery and equipment used in connection with the production of oil, gas or other minerals from such lands, properties or interests (collectively, the "Equipment").

All presently existing and valid oil and gas sales, purchase, transportation, gathering, balancing, exchange and processing contracts, casinghead gas contracts, operating agreements, compression agreements, joint venture agreements, surface leases, letter agreements, pooling agreements, communitization agreements, designations and declarations of units, farmout agreements and contractual rights of every character that relate to the Leases or Wells, including, without limitation, those Contracts, if any, described in Exhibit "D" attached hereto and by reference made a part hereof (collectively, the "Contracts").

All permits, licenses, franchises, approvals, consents, certificates or other authorizations and other rights granted by governmental authorities relating to the Leases or Wells (collectively, the "Permits").

TO HAVE AND TO HOLD unto Assignee, its successors and assigns, forever, subject to, and in accordance with, the following terms and provisions:

1.      This Assignment is made effective as of April 1, 2007 (the "Effective Date").

2.      This Assignment is made without warranty of title, express or implied, not even return for the purchase price, except that Assignor agrees to warrant title against all defects arising out of claims by Assignor or of persons claiming by, through or under Assignor.

3.      This Assignment, and the interest assigned hereunder, is made subject to the terms and conditions of the Leases and all other instruments of record affecting those Leases as of the Effective Date.   Assignee assumes its obligations under those Leases, including, without limitation, the obligation to pay its share of royalty and overriding royalty interest burdens thereunder.

4.      This Assignment may be executed in any number of counterparts and each counterpart shall constitute and shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument.

This Assignment is executed by the parties on the date set forth in each party's acknowledgment, but effective as of the Effective Date.

**S & P CO.**

By: _____ _____

　　　Fred L. Phillips
　　　Partner

- ASSIGNOR

**SKLARCO L.L.C.**

By: _____

　　　David A. Barlow
　　　Chief Operating Officer

- ASSIGNEE

Exhibit "A"

Attached to and by reference made a part of that certain Partial Assignment Of Oil, Gas And Other Mineral Leases, Wells, Equipment And Related Assets dated effective as of April 1, 2007, by and between S & P Co., as Assignor, and Sklarco L.L.C., as Assignee

## Description Of Oil, Gas And Other Mineral Leases

That certain Oil, Gas And Other Mineral Lease dated January 2, 1958, executed by S. C. Cox and Sherman Crump, as Lessors, in favor of George B. Strong, as Lessee, recorded in Book 230, Page 261 under Registry No. 215,433 of the Records of Claiborne Parish, Louisiana, covering 456 acres, more or less, being the East Half of Northwest Quarter (E ½ of NW ¼); Northeast Quarter of Southwest Quarter (NE ¼ of SW ¼); West Half of Northeast Quarter (W ½ of NE ¼); West Half of Southeast Quarter of Northeast Quarter (W ½ of SE ¼ of NE ¼); and Northeast Quarter of Northeast Quarter (NE ¼ of NE ¼) (less 4 acres in the Southeast corner of the Northeast Quarter of the Northeast Quarter (NE ¼ of NE ¼), said 4 acres extending from the Southeast corner of said 40 North 175 yards, and from said starting point West 110 yards); all in Section 1, Township 19 North, Range 6 West, Claiborne Parish, Louisiana, subject to that certain Assignment dated January 7, 1958, executed by George B. Strong, as Assignor, in favor of J. R. Butler, H. Blume Johnson and Leonard W. Phillips, as Assignees, recorded in Book 231, Page 623 under Registry No. 215,674 of the Records of Claiborne Parish, Louisiana.

That certain Oil, Gas And Other Mineral Lease dated January 25, 1958, executed by S. C. Cox et al., as Lessors, recorded in Book 215, Page 433 of the Records of Claiborne Parish, Louisiana, covering the East Half of the Southeast Quarter of the Southeast Quarter (E ½ of SE ¼ of SE ¼); the East Half of the Northeast Quarter of the Southeast Quarter (E ½ of NE ¼ of SE ¼); the East Half of the Southeast Quarter of the Northeast Quarter (E ½ of SE ¼ of NE ¼); all in Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana.

## Exhibit "B"

Attached to and by reference made a part of that certain Partial Assignment Of Oil, Gas And
Other Mineral Leases, Wells, Equipment And Related Assets dated effective as of April 1, 2007,
by and between S & P Co., as Assignor, and Sklarco L.L.C., as Assignee

## Description Of Wells

Sugar Creek Producing Company – CV RA SUH; Brown A #1 Well, Section 1, Township 19
North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number
72309/API Number 17027024230000).

Sugar Creek Producing Company – TP SUI; Brown A #2 Well, Section 1, Township 19 North,
Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number 181400/API
Number 17027210850000).

Sugar Creek Producing Company – CV RA SUH; Brown A #2-Alt. Well, Section 1, Township
19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana.

Sugar Creek Producing Company – CV RA SUH; Dobbins A #3-Alt. Well, Section 1, Township
19 North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number
225444/API Number 17027222180000).

Sugar Creek Producing Company – TP SUI; Johnson #1-Alt. Well, Section 1, Township 19
North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana.

Sugar Creek Producing Company – CV RA SUH; Johnson #1-Alt. Well, Section 1, Township 19
North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana.

Sugar Creek Producing Company – CV RA SUD; J. E. White #1Well, Section 36, Township 20
North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number
80750/API Number 17027024180000).

Sugar Creek Producing Company – CV RA SUD; Brown A #3-Alt.Well, Section 36, Township
20 North, Range 6 West, Sugar Creek Field, Louisiana (LOC Serial Number
228254/API Number 17027222570000).

Cobra Oil & Gas Corporation – CV RA SUE; Robinson #1-Alt. Well, Section 36, Township 20
North, Range 6 West, Sugar Creek Field, Claiborne Parish, Louisiana (LOC Serial Number
181601/API Number 17027210480000).

## Exhibit "C"

Attached to and by reference made a part of that certain Partial Assignment Of Oil, Gas And Other Mineral Leases, Wells, Equipment And Related Assets dated effective as of April 1, 2007, by and between S & P Co., as Assignor, and Sklarco L.L.C., as Assignee

## Description Of Units

Sand Unit H of the Cotton Valley Formation Reservoir A of the Sugar Creek Field, Claiborne Parish, Louisiana, defined in Office of Conservation Order No. 23-P effective November 21, 1978, as amended and supplemented by the 23-P Series of Orders.

Sand Unit I of the Travis Peak Sands of the Hosston Formation of the Sugar Creek Field, Claiborne Parish, Louisiana, defined in Office of Conservation Order No. 23-H effective September 22, 1977, as amended and supplemented by the 23-H Series of Orders.

Sand Unit D of the Cotton Valley Formation Reservoir A of the Sugar Creek Field, Claiborne Parish, Louisiana, defined in Office of Conservation Order No. 23-P effective November 21, 1978, as amended and supplemented by the 23-P Series of Orders.

Sand Unit E of the Cotton Valley Formation Reservoir A of the Sugar Creek Field, Claiborne Parish, Louisiana, defined in Office of Conservation Order No. 23-P effective November 21, 1978, as amended and supplemented by the 23-P Series of Orders.

## Exhibit "D"

Attached to and by reference made a part of that certain Partial Assignment Of Oil, Gas And Other Mineral Leases, Wells, Equipment And Related Assets dated effective as of April 1, 2007, by and between S & P Co., as Assignor, and Sklarco L.L.C., as Assignee

## Description Of Contracts

That certain Operating Agreement dated October 1, 1958, originally executed by A. J. Hodges Industries, Inc., Union Producing Company, Robert F. Roberts, Allen L. Roberts, Leonard W. Phillips, J. R. Butler and H. Blume Johnson covering all of Section 1, T19N, R6W, the South Half (S/2) of Section 36, T20N, R6W, and the North Half (N/2) of Section 12, T19N, R6W, Claiborne Parish, Louisiana, as amended and revised.

That certain Operating Agreement dated June 14, 1982, by and between Cobra Oil & Gas Corporation, as Operator, and Sugar Creek Producing Company, Pennzoil Producing Company, Leonard Phillips and 4D Company et al., as Non-Operators, covering certain lands including the East Half of the East Half of the Northeast Quarter (E ½ of E ½ of NE ¼) and the East Half of the East Half of the Southeast Quarter (E ½ of E ½ of SE ¼) of Section 36, Township 20 North, Range 6 West, Claiborne Parish, Louisiana.

# ACKNOWLEDGMENTS

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2007, before me appeared Fred L. Phillips, to me known, who being by me duly sworn, did say that he is the Partner of S & P Co., a Louisiana partnership, and that the foregoing instrument was signed by him on behalf of said partnership, and said Appearer acknowledged said instrument to be the free act and deed of said partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana

STATE OF LOUISIANA

PARISH OF CADDO

On this _____ day of _____, 2007, before me appeared David A. Barlow, to me known, who being by me duly sworn, did say that he is the Chief Operating Officer for Sklarco L.L.C., a Louisiana limited liability company, and that the foregoing instrument was signed by him on behalf of said company, and said Appearer acknowledged said instrument to be the free act and deed of said company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the Parish of Caddo
State of Louisiana