A.A.P.L. FORM 610 - 1977

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

October 1 ___, 19 80 ,

OPERATOR _____ TEXAS INTERNATIONAL PETROLEUM CORPORATION _____

CONTRACT AREA ___ TIPCO #1 W. Williamson _____

_____

_____

COUNTY OR XXXXRISHX OF ____ Rusk _____ STATE OF __ Texas _____

COPYRIGHT 1977     —     ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.     A.A.P.L. NO. 610   1977 REVISED
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
KRAFTBILT PRODUCTS,     BOX 800, TULSA, OK 74101

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
|  | A. OIL AND GAS INTERESTS | 2 |
|  | B. INTEREST OF PARTIES IN COSTS AND PRODUCTION | 2 |
| IV. | TITLES | 2 |
|  | A. TITLE EXAMINATION | 2 |
|  | B. LOSS OF TITLE | 2 |
|  | 1. Failure of Title | 2-3 |
|  | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
|  | 3. Other Losses | 3 |
| V. | OPERATOR | 3 |
|  | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 3 |
|  | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
|  | 1. Resignation or Removal of Operator | 4 |
|  | 2. Selection of Successor Operator | 4 |
|  | C. EMPLOYEES | 4 |
|  | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
|  | A. INITIAL WELL | 4 |
|  | B. SUBSEQUENT OPERATIONS | 5 |
|  | 1. Proposed Operations | 5 |
|  | 2. Operations by Less than All Parties | 5-6 |
|  | C. RIGHT TO TAKE PRODUCTION IN KIND | 6-7 |
|  | D. ACCESS TO CONTRACT AREA AND INFORMATION | 7 |
|  | E. ABANDONMENT OF WELLS | 7 |
|  | 1. Abandonment of Dry Holes | 7 |
|  | 2. Abandonment of Wells that have Produced | 7-8 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 8 |
|  | A. LIABILITY OF PARTIES | 8 |
|  | B. LIENS AND PAYMENT DEFAULTS | 8 |
|  | C. PAYMENTS AND ACCOUNTING | 8 |
|  | D. LIMITATION OF EXPENDITURES | 9 |
|  | 1. Drill or Deepen | 9 |
|  | 2. Rework or Plug Back | 9 |
|  | 3. Other Operations | 9 |
|  | E. ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 9 |
|  | F. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 9-10 |
|  | G. TAXES | 10 |
|  | H. INSURANCE | 10 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 10 |
|  | A. SURRENDER OF LEASES | 10-11 |
|  | B. RENEWAL OR EXTENSION OF LEASES | 11 |
|  | C. ACREAGE OR CASH CONTRIBUTION | 11 |
|  | D. SUBSEQUENTLY CREATED INTEREST | 11-12 |
|  | E. MAINTENANCE OF UNIFORM INTEREST | 12 |
|  | F. WAIVER OF RIGHT TO PARTITION | 12 |
|  | G. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12-13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13-14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
|  | A. LAWS, REGULATIONS AND ORDERS | 14 |
|  | B. GOVERNING LAW | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between _____ Texas International Petroleum_____
____Corporation_____, hereinafter designated and
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter
referred to individually herein as "Non-Operator", and collectively as "Non-Operators",

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas in-
terests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore
and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and
as hereinafter provided:

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed
to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid
or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to
limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases cov-
ering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of
land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil
and gas interests intended to be developed and operated for oil and gas purposes under this agreement.
Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule
of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order,
a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area
or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to
be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in
and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects
not to participate in a proposed operation.

I. The terms "deepen", "deepened", "deepening" and "deeper drilling" as used
in this Agreement, shall be deemed to include sidetracking operations.
Unless the context otherwise clearly indicates, words used in the singular include the plural, the
plural includes the singular, and the neuter gender includes the masculine and the feminine. Unless
otherwise indicated side tracking operations shall be treated the same as deepening
operations under Article VI.B. and VI.D.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a
part hereof:

☒ A. Exhibit "A", shall include the following information:
  (1) Identification of lands subject to agreement,
  (2) Restrictions, if any, as to depths or formations,
  (3) Percentages or fractional interests of parties to this agreement,
  (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
  (5) Addresses of parties for notice purposes.
☒ B. Exhibit "B", ~~Form of Lease.~~  Plat of Contract Area.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.

If any provision of any exhibit, except Exhibit "E"/ and "F" is inconsistent with any provision contained
in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

## ARTICLE III.
### INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an unleased oil and gas interest in the Contract Area, that interest shall be treated for the purpose of this agreement and during the term hereof as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B". As to such interest, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

**B. Interest of Parties in Costs and Production:**

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A". All production of oil and gas from the Contract Area, subject to the payment of lessor's royalties ~~which will be~~ ~~borne by the Joint Account~~ shall also be owned by the parties in the same manner during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interests covered hereby.

## ARTICLE IV.
### TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite /lease(s) of any proposed well prior to commencement of drilling operations or, ~~if the Drilling Parties so request, title examination shall be made on the leases~~ ~~and or oil and gas interests included, or planned to be included, in the drilling unit around such well.~~ The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable lease(s) At the time a well is proposed, each party contributing lease(s) and or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including Federal Lease Status Reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ **Option No. 1:** Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as, provided in Exhibit "C," and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

☒ **Option No. 2:** Costs incurred by Operator in procuring abstracts, curative matter and fees paid outside attorneys for title examination (including preliminary, and supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. The Operator shall be responsible for the preparation and recording of Pooling Designations or Declarations as well as the conduct of hearings before Governmental Agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney ~~or~~ and title has been accepted by all of the parties who are to participate in the drilling of the well.

**B. Loss of Title:**

1. **Failure of Title:** Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests, and

(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

                    for                        been responsible
or operating costs/which it may have theretofore/paid, but there shall be no monetary liability on its
part to the other parties hereto for drilling, development, operating or other similar costs by reason of
such title failure; and                /subsequently incurred

    (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the
operation of the interest which has been lost, but the interests of the parties shall be revised on an acre-
age basis, as of the time it is determined finally that title failure has occurred, so that the interest of
the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
Area by the amount of the interest lost; and

    (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled
on the Contract Area is increased by reason of the title failure, the party whose title has failed shall
receive the proceeds attributable to the increase in such interests (less costs and burdens attributable
thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;
and

    (d) Should any person not a party to this agreement, who is determined to be the owner of any in-
terest in the title which has failed, pay in any manner any part of the cost of operation, development,
or equipment, such amount shall be paid to the party or parties who bore the costs which are so refund-
ed; and                                       /whose title failed

    (e) Any liability to account to a third party for prior production of oil and gas which arises by
reason of title failure shall be borne by the party or parties in the same proportions in which they shared
in such prior production; and

    (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection
with the defense of the interest claimed by any party hereto, it being the intention of the parties
hereto that each shall defend title to its interest and bear all expenses in connection therewith.


    2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight,
any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously
paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against
the party who failed to make such payment. Unless the party who failed to make the required payment
secures a new lease covering the same interest within ninety (90) days from the discovery of the fail-
ure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of
the parties shall be revised on an acreage basis, effective as of the date of termination of the lease in-
volved, and the party who failed to make proper payment will no longer be credited with an interest in
the Contract Area on account of ownership of the lease or interest which has terminated. In the event
the party who failed to make the required payment shall not have been fully reimbursed, at the time of
the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an
acreage basis, for the development and operating costs theretofore paid on account of such interest, it
shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the
cost of any dry hole previously drilled or wells previously abandoned) from so much of the following
as is necessary to effect reimbursement:

    (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost
interest, on an acreage basis, up to the amount of unrecovered costs;

    (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an
acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production
from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable
to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
portion of the oil and gas to be contributed by the other parties in proportion to their respective in-
terests; and

    (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or
becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or be-
coming a party to this agreement.


    3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2.
above, shall not be considered failure of title but shall be joint losses and shall be borne by all parties
in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
the Contract Area.


                                    ARTICLE V.
                                    OPERATOR


A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR:

TEXAS INTERNATIONAL PETROLEUM CORPORATION _____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on
the Contract Area as permitted and required by, and within the limits of, this agreement. It shall con-
duct all such operations in a good and workmanlike manner, but it shall have no liability as Operator
to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.


                                    - 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

**B. Resignation or Removal of Operator and Selection of Successor:**

1. _Resignation or Removal of Operator:_  Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest in the Contract Area, or is no longer capable of serving as Operator, it shall cease to be Operator without any action by Non-Operator, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of · a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. _Selection of Successor Operator:_  Upon the resignation or removal of Operator, a successor Operator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

**C. Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator, and all such employees shall be the employees of Operator.

**D. Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

### ARTICLE VI.
### DRILLING AND DEVELOPMENT

**A. Initial Well:**

On or before the __30th__ day of ___November___ , 19__80__ Operator shall commence the drilling of a well for oil and gas at the following location:

or soonest rig availability

       1600' FSL and 2200' FEL of the Joseph Logsdon Survey,
       Abstract No. 484, Rusk County, Texas.

and shall thereafter continue the drilling of the well with due diligence to

       10,600' or a depth sufficient to test the Cotton Valley formation

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, it shall first secure the consent of all parties and shall plug and abandon same as provided in Article VI.E.1. hereof.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

**B. Subsequent Operations:**

1. _Proposed Operations:_ Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday or legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. _Operations by Less than All Parties:_ If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall· elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest of the parties approving such operation, and (b) its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A", or (b) carry its proportionate part of Non-Consenting Parties' interest* The proposing party, at its election, may withdraw such proposal if there is insufficient participation, and shall promptly notify all parties of such decision.

*and failure so to advise the proposing party shall constitute an election under (b).

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(b) 300 % of that portion of the costs and expenses of drilling reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and

1 <u>300</u> % of that portion of the cost of newly acquired equipment in the well (to and including the well-
2 head connections), which would have been chargeable to such Non-Consenting Party if it had partici-
3 pated therein.

5 Gas production attributable to any Non-Consenting Party's relinquished interest upon such Party's
6 election, shall be sold to its purchaser, if available, under the terms of its existing gas sales con-
7 tract. Such Non-Consenting Party shall direct its purchaser to remit the proceeds receivable from
8 such sale direct to the Consenting Parties until the amounts provided for in this Article are recov-
9 ered from the Non-Consenting Party's relinquished interest. If such Non-Consenting Party has not
10 contracted for sale of its gas at the time such gas is available for delivery, or has not made the elec-
11 tion as provided above, the Consenting Parties shall own and be entitled to receive and sell such Non-
12 Consenting Party's share of gas as hereinabove provided during the recoupment period.

14 During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share
15 of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of
16 all production, severance, gathering and other taxes, and all royalty, overriding royalty and other
17 burdens applicable to Non-Consenting Party's share of production.

19 In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall
20 be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of
21 all such equipment shall remain unchanged; and upon abandonment of a well after such reworking,
22 plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the
23 owners thereof, with each party receiving its proportionate part in kind or in value, less cost of
24 salvage.

26 Within sixty (60) days after the completion of any operation under this Article, the party con-
27 ducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an in-
28 ventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling,
29 deepening, plugging back, testing, completing, and equipping the well for production; or, at its option,
30 the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed
31 statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being
32 reimbursed as provided above, the Party conducting the operations for the Consenting Parties shall furn-
33 ish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the
34 operation of the well, together with a statement of the quantity of oil and gas produced from it and the
35 amount of proceeds realized from the sale of the well's working interest production during the preceding
36 month. In determining the quantity of oil and gas produced during any month, Consenting Parties
37 shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any
38 amount realized from the sale or other disposition of equipment newly acquired in connection with any
39 such operation which would have been owned by a Non-Consenting Party had it participated therein
40 shall be credited against the total unreturned costs of the work done and of the equipment purchased,
41 in determining when the interest of such Non-Consenting Party shall revert to it as above provided;
42 and if there is a credit balance, it shall be paid to such Non-Consenting party.

44 If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest
45 the amounts provided for above, the relinquished interests of such Non-Consenting Party shall auto-
46 matically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same
47 interest in such well, the material and equipment in or pertaining thereto, and the production there-
48 from as such Non-Consenting Party would have been entitled to had it participated in the drilling,
49 reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be
50 charged with and shall pay its proportionate part of the further costs of the operation of said well in
51 accordance with the terms of this agreement and the Accounting Procedure, attached hereto.

53 Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent
54 of all parties, no wells shall be completed in or produced from a source of supply from which a well
55 located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing
56 well spacing pattern for such source of supply.

58 The provisions of this Article shall have no application whatsoever to the drilling of the initial
59 well described in Article VI.A. except (a) when Option 2, Article VII.D.1., has been selected, or (b)
60 to the reworking, deepening and plugging back of such initial well, if such well is or thereafter shall
61 prove to be a dry hole or non-commercial well, after having been drilled to the depth specified in Article
62 VI.A.

64 C. Right to Take Production in Kind:

65                                            but not the obligation
66 Each party shall have the right/to take in kind or separately dispose of its proportionate share of
67 all oil and gas produced from the Contract Area, exclusive of production which may be used in de-
68 velopment and producing operations and in preparing and treating oil for marketing purposes and
69 production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate dispo-
70 sition by any party of its proportionate share of the production shall be borne by such party. Any

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

* As to a party who fails to take in kind and where Operator elects to purchase or sell such party's gas, Operator shall file all certification forms, reports and related documentation necessary under the Natural Gas Policy Act of 1978. Operator shall have no liability to such party for filing unless Operator has been grossly negligent.

party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment direct from the purchaser thereof for its share of all production.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's share of gas production without first giving such other party thirty (30) days/notice of such intended sale. * prior written

In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any Gas Balancing Agreement between the parties hereto, whether such Agreement is attached as Exhibit "E", or is a separate Agreement.

**D. Access to Contract Area and Information:**

Each party shall have access to the Contract Area at all reasonable times, at its sole risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the information.

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled pursuant to Article VI.B.2., any well which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling of such well. Any party who objects to the plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI.B.

2. Abandonment of Wells that have Produced: Except for any well which has been drilled or reworked pursuant to Article VI.B.2. hereof for which the Consenting Parties have not been fully reimbursed as therein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment of such well, all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or intervals of the formation or formations then open to production, for a term of one year and so long thereafter as oil and/or gas is produced from the interval or inter-

1   vals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit
2   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is
3   located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon
4   the relationship of their respective percentages of participation in the Contract Area to the aggregate of
5   the percentages of participation in the Contract Area of all assignees. There shall be no readjustment
6   of interest in the remaining portion of the Contract Area.
7
8       Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the op-
9   eration of or production from the well in the interval or intervals then open other than the royalties
10  retained in any lease made under the terms of this Article. Upon request, Operator shall continue to
11  operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
12  templated by this agreement, plus any additional cost and charges which may arise as the result of
13  the separate ownership of the assigned well.
14
15                                    ARTICLE VII.
16                      EXPENDITURES AND LIABILITY OF PARTIES
17
18  A.  Liability of Parties:
19
20      The liability of the parties shall be several, not joint or collective. Each party shall be responsible
21  only for its obligations, and shall be liable only for its proportionate share of the costs of developing
22  and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are
23  given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall
24  this agreement be construed as creating, a mining or other partnership or association, or to render the
25  parties liable as partners.
26
27  B.  Liens and Payment Defaults:
28
29      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a
30  security interest in its share of oil and or gas when extracted and its interest in all equipment, to secure
31  payment of its share of expense, together with interest thereon at the rate provided in the Accounting
32  Procedure attached hereto as Exhibit "C". To the extent that Operator has a security interest under the
33  Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies
34  of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator
35  for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
36  rights or security interest as security for the payment thereof. In addition, upon default by any Non-
37  Operator in the payment of its share of expense, Operator shall have the right, without prejudice to
38  other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's
39  share of oil and/or gas until the amount owed by such Non-Operator, plus interest has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any de-
41  fault. Operator grants a like lien and security interest to the Non-Operators to secure payment of Op-
42  erator's proportionate share of expense.
43
44      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of
45  a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by
46  Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the in-
47  terest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimburse-
48  ment thereof, be subrogated to the security rights described in the foregoing paragraph.
49
50  C.  Payments and Accounting:
51
52      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses
53  incurred in the development and operation of the Contract Area pursuant to this agreement and shall
54  charge each of the parties hereto with their respective proportionate shares upon the expense basis pro-
55  vided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate
56  record of the joint account hereunder, showing expenses incurred and charges and credits made and
57  received.
58
59      Operator, at its election, shall have the right from time to time to demand and receive from the
60  other parties payment in advance of their respective share of the estimated amount of the expense to
61  be incurred in operations hereunder during the next succeeding month, which right may be exercised only
62  by submission to each such party of an itemized statement of such estimated expense, together with
63  an invoice for its share thereof. Each such statement and invoice for the payment in advance of esti-
64  mated expense shall be submitted on or before the 20th day of the next preceding month. Each party
65  shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such es-
66  timate and invoice is received. If any party fails to pay its share of said estimate within said time, the
67  amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be
68  made monthly between advances and actual expense to the end that each party shall bear and pay its
69  proportionate share of actual expenses incurred, and no more.
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

D.  Limitation of Expenditures:

1. <u>Drill or Deepen</u>:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this Agreement, it being understood that the consent to the drilling or deepening shall include:

☐  <u>Option No. 1</u>:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and/or surface facilities.

☒  <u>Option No. 2</u>:  All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its authorized depth, and all tests have been completed, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion attempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in . the cost of the completion attempt. If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. <u>Rework or Plug Back:</u>  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement, it being understood that the consent to the reworking or plugging back of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. <u>Other Operations:</u>  Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of <u>Twenty Thousand and No/100</u> Dollars ($ <u>20,000</u> ) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares "Authority for Expenditures" for its own use, Operator, upon request, shall furnish copies of its "Authority for Expenditures" for any single project costing in excess of <u>Ten Thousand and No/100</u> Dollars ($ <u>10,000</u> ).

E.  Royalties, Overriding Royalties and Other Payments:

.  Each party shall pay or deliver, or cause to be paid or delivered, all royalties ~~to the extent of~~ _____ due on its share of production and shall hold the other parties free from any liability therefor. If the interest of any party in any oil and gas lease covered by this agreement is subject to any royalty, overriding royalty, production payment, or other charge over ~~and above the aforesaid royalty,~~ such party shall assume and alone bear all such obligations and shall account for or cause to be accounted for, such interest to the owners thereof.

No party shall ever be responsible, on any price basis higher than the price received by such party, to any other party's lessor or royalty owner; and if any such other party's lessor or royalty owner should demand and receive settlements on a higher price basis, the party contributing such lease shall bear the royalty burden insofar as such higher price is concerned.

F.  Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

G. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. Operator shall bill other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

SEE ARTICLE XV.D. FOR ADDITIONAL PROVISIONS

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

H. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be an amount equivalent to the premium which would have been paid had such insurance been obtained. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's fully owned automotive equipment.

ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. If the interest of the assigning party includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not desiring to surrender an oil and gas lease covering such oil and gas interest for a term of one year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall

- 10 -

1   be shared by the parties assignee in the proportions that the interest of each bears to the interest of all
2   parties assignee.
3
4       Any assignment or surrender made under this provision shall not reduce or change the assignor's or
5   surrendering parties' interest, as it was immediately before the assignment, in the balance of the Contract
6   Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter
7   be subject to the terms and provisions of this agreement.
8
9   B.   Renewal or Extension of Leases:
10
11      If any party secures a renewal of any oil and gas lease subject to this Agreement, all other parties
12  shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt
13  of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such
14  lease affects lands within the Contract Area, by paying to the party who acquired it their several proper
15  proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area,
16  which shall be in proportion to the interests held at that time by the parties in the Contract Area.
17
18      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it
19  shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of
20  their respective percentage of participation in the Contract Area to the aggregate of the percentages
21  of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
22  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
23
24      Each party who participates in the purchase of a renewal lease shall be given an assignment of its
25  proportionate interest therein by the acquiring party.
26
27      The provisions of this Article shall apply to renewal leases whether they are for the entire interest
28  covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease
29  taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after
30  the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted
31  for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal
32  lease and shall not be subject to the provisions of this agreement.
33
34      The provisions in this Article shall apply also and in like manner to extensions of oil and gas
35  leases.
36      SEE ARTICLE XV.E. FOR ADDITIONAL PROVISIONS
37  C.   Acreage or Cash Contributions:
38
39      While this agreement is in force, if any party contracts for a contribution of cash toward the drilling
40  of a well or any other operation on the Contract Area, such contribution shall be paid to the party who
41  conducted the drilling or other operation and shall be applied by it against the cost of such drilling or
42  other operation. If the contribution be in the form of acreage, the party to whom the contribution is
43  made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling
44  Parties in the proportions said Drilling Parties shared the cost of drilling the well. If all parties hereto
45  are Drilling Parties and accept such tender, such acreage shall become a part of the Contract Area and
46  be governed by the provisions of this agreement. If less than all parties hereto are Drilling Parties and
47  accept such tender, such acreage shall not become a part of the Contract Area. Each party shall prompt-
48  ly notify all other parties of all acreage or money contributions it may obtain in support of any well or
49  any other operation on the Contract Area.
50
51      If any party contracts for any consideration relating to disposition of such party's share of substances
52  produced hereunder, such consideration shall not be deemed a contribution as contemplated in this
53  Article VIII.C.
54
55  D.   Subsequently Created Interest:
56
57      Notwithstanding the provisions of Article VIII.E. and VIII.G., if any party hereto shall, subsequent
58  to execution of this agreement, create an overriding royalty, production payment, or net proceeds inter-
59  est, which such interests are hereinafter referred to as "subsequently created interest", such subsequently
60  created interest shall be specifically made subject to all of the terms and provisions of this agreement, as
61  follows:
62
63      1.  If non-consent operations are conducted pursuant to any provision of this agreement, and the
64  party conducting such operations becomes entitled to receive the production attributable to the interest
65  out of which the subsequently created interest is derived, such party shall receive same free and clear
66  of such subsequently created interest. The party creating same shall bear and pay all such subsequently
67  created interests and shall indemnify and hold the other parties hereto free and harmless from any and
68  all liability resulting therefrom.
69
70

- 11 -

2. If the owner of the interest from which the subsequently created interest is derived (1) fails to pay, when due, its share of expenses chargeable hereunder, or (2) elects to abandon a well under provisions of Article VI.E. hereof, or (3) elects to surrender a lease under provisions of Article VIII.A. hereof, the subsequently created interest shall be chargeable with the pro rata portion of all expenses hereunder in the same manner as if such interest were a working interest. For purposes of collecting such chargeable expenses, the party or parties who receive assignments as a result of (2) or (3) above shall have the right to enforce all provisions of Article VII.B. hereof against such subsequently created interest.

E.  Maintenance of Uniform Interest:

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1.  the entire interest of the party in all leases and equipment and production; or

2.  an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds hereof.

F.  Waiver of Right to Partition:

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

G.  Preferential Right to Purchase:

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

## ARTICLE IX.
## INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for Federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contains provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each party states that the income derived by such party from Operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single damage claim or suit arising from operations hereunder if the expenditure does not exceed __Five Thousand and No/100_____ Dollars ($ _5,000_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, the party shall immediately notify Operator, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by United States mail or Western Union telegram, postage or charges prepaid, or by teletype, and addressed to the party to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid, or when sent by teletype. Each party shall have the right to change its address at any time, and from time to time, by giving written notice hereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subjected hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease, or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases subject to this agreement are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, and/or so long as oil and/or gas production continues from any lease or oil and gas interest.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1  [x] **Option No. 2:** In the event the well described in Article VI.A., or any subsequent well drilled
2  under any provision of this agreement, results in production of oil and or gas in paying quantities, this
3  agreement shall continue in force so long as any such well or wells produce, or are capable of produc-
4  tion, and for an additional period of ___180___ days from cessation of all production; provided, however,
5  if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in
6  drilling or reworking a well or wells hereunder, this agreement shall continue in force until such op-
7  erations have been completed and if production results therefrom, this agreement shall continue in
8  force as provided herein. In the event the well described in Article VI.A., or any subsequent well
9  drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil
10 and or gas from the Contract Area, this agreement shall terminate unless drilling or reworking opera-
11 tions are commenced within ___180___ days from the date of abandonment of said well.
12
13     It is agreed, however, that the termination of this agreement shall not relieve any party hereto from
14 any liability which has accrued or attached prior to the date of such termination.
15
16                                ARTICLE XIV.
17                 COMPLIANCE WITH LAWS AND REGULATIONS
18
19 A.  Laws, Regulations and Orders:
20
21     This agreement shall be subject to the conservation laws of the state in which the committed
22 acreage is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of
23 said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and
24 orders.
25
26 B.  Governing Law:
27
28     The essential validity of this agreement and all matters pertaining thereto, including, but not lim-
29 ited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and in-
30 terpretation or construction, shall be governed and determined by the law of the state in which the
31 Contract Area is located. If the Contract Area is in two or more states, the law of the state where most
32 of the land in the Contract Area is located shall govern.
33
34                                ARTICLE XV.
35                              OTHER PROVISIONS
36
37 A.  Sale of Gas Production:
38
39     It is recognized by the parties hereto that in addition to each party's share
40 of working interest production as shown in Exhibit "A", such party shall have the
41 right, subject to existing contracts, to market the royalty gas attributable to
42 each lease which it contributes to the Unit Area and to receive payments due for
43 such royalty gas produced from or allocated to such lease or leases. It is agreed
44 that, regardless of whether each party markets or contracts for its share of gas,
45 including the royalty gas under the leases which it contributed to the Unit,
46 such party agrees to pay or cause to be paid to the royalty owners under its lease
47 or leases the proceeds attributable to their respective royalty interest and to
48 hold all other parties hereto harmless for its failure to do so.
49
50 B.  Billing Additional Interests:
51
52     Notwithstanding the provisions of this agreement and of the accounting procedur
53 attached as Exhibit "C", the Parties to this agreement specifically agree that in no
54 event during the term of this contract shall Operator be required to make more than
55 one billing for the entire interest credited to each Party on Exhibit "A". It is
56 further agreed that if any Party to this agreement (hereafter referred to as "Sellin
57 Party") disposes of part of the interest credited to it on Exhibit "A", the Selling
58 Party will be solely responsible for billing its assignee or assignees, and shall
59 remain primarily liable to the other parties for the interest or interests assigned
60 and shall make prompt payment to Operator for the entire amount of statements and
61 billings rendered to it. It is further understood and agreed that if Selling Party
62 disposes of all its interest as set out on Exhibit "A", whether to one or several
63 assignees, Operator shall continue to issue statements and billings to the Selling
64 Party for the interest conveyed until such time as Selling Party has designated and
65 qualified one assignee to receive the billing for the entire interest. In order to
66 qualify one assignee to receive the billing for the entire interest credited to
67 Selling Party on Exhibit "A", Selling Party shall furnish to Operator the following:
68
69
70

- 14 -

1. Written notice of the conveyance and photostatic or certified copies of the assignments by which the transfer was made.

2. The name of the assignee to be billed and a written statement signed by the assignee to be billed in which it consents to receive statements and billings for the entire interest credited to Selling Party on Exhibit "A" hereof; and, further, consents to handle any necessary sub-billings in the event it does not own the entire interest credited to Selling Party on Exhibit "A".

C. Disbursement of Royalties:

If a purchaser of any oil, gas or other hydrocarbons produced from the Unit Area declines to make disbursements of all royalties, overriding royalties and other payments out of, or with respect to, production which are payable on the Unit Area, Operator will, if any Non-Operator so desires, make such disbursements on behalf of said Non-Operator at his direction, provided, Non-Operator shall execute such documents as may be necessary in the opinion of Operator to enable Operator to receive all payments for oil, gas or other hydrocarbons directly from said purchaser. In that event, Operator will use its best efforts to make disbursements correctly but will be liable for incorrect disbursement only in the event of gross or willful negligence.

D. Article VII.G., Addition:

If the Operator is required hereunder to pay ad valorem taxes based in whole or in part upon separate valuations of each party's working interest, then not-withstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the percentage of tax value generated by each party's working interest.

E. Article VII.B., Continued:

Notwithstanding anything to the contrary contained herein, each party committing a lease or leases to this agreement shall have the option upon the expiration of each lease to renew or extend such lease and to bear the renewal or extension costs and expenses and thereby retain its original interest and title in said lease. By exercising such option, the parties' working interest shall remain unchanged. If the original lease owner does not exercise its option within sixty (60) days after the expiration date of the original lease, the renewal or extension lease will then be subject to the terms of this article as written above. If any working interest owner other than the original lease owner renews or extends the lease, the renewing or extending party shall furnish the original lease owner an itemized statement of the complete renewal or extension costs and expenses of such lease. The original lease owner shall have sixty (60) days after the receipt of such itemized statement to reimburse the renewing or extending party in full. Failure of the original lease owner to do so shall result in the forfeiture of its option hereunder. The provisions hereof shall only apply to leases or portions of leases located in the Contract Area.

F. Change of Operator:

In addition to any other rights expressly provided herein, after any Operator has acted in that capacity for a period of not less than six months, then any Non-Operator may call a meeting of all working interest owners for the purpose of selecting a new Operator by giving sixty (60) days written notice to all working interest owners. By approval of a total of more than 50% in interest of the work-ing interest owners, a new Operator may be selected from among the working interest owners who shall take over operation of the unit area, on the first day of the calendar month which occurs after the passing of thirty (30) days from the date of the selection of the new Operator. Such successor Operator shall be required to perform the duties of Operator in accordance with this Agreement. In such case, the retiring Operator shall surrender possession of and deliver to the successor Operator the exclusive possession of the premises and all common wells, facilities and funds in the possession of Operator, and all pertinent books of account, records pertaining to the operation of the Unit Area, and all documents, agreements, and other papers relating thereto. Upon the delivery thereof, the retiring Operator shall be released and discharged from and the successor Operator shall assume all of the duties and obligations of Operator hereunder, except any unfulfilled duties and obligations of such retiring Operator which have accrued prior to the successor Operator's assuming operations hereunder, for which the retiring Operator shall remain liable and responsible notwithstanding the reason for its discharge.

ARTICLE XV.

Other Provisions (Continued)

G.  At least twenty-four (24) hours prior to conducting any testing, coring,
logging, completing or abandoning operations, Operator shall notify the other
parties participating in the costs thereof so that they may have a representa-
tive present to witness such tests or operations if they so desire.

H.  In the event this agreement or any provisions hereof is, or the operations
contemplated hereby are, found to be inconsistent with or contrary to any laws,
rules, regulations, ordinances or orders, as set out in Article XIV.A., the
latter shall be deemed to control and this agreement shall be regarded as modi-
fied accordingly and as so modified shall continue in full force and effect.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of __1st__ day of __October__, 19__80__.

OPERATOR

TEXAS INTERNATIONAL PETROLEUM CORPORATION

_____     _W. M. Patterson_
                                     W. M. Patterson, Sr. Vice President


NON-OPERATORS

GETTY OIL COMPANY

_____     _____

CONOCO, INC.

_____     _____

J. C. TRAHAN

                                     _____

SKLAR & PHILLIPS OIL COMPANY

                                     _August Erickson_

W. H. Penn

                                     _____

TIPCO No.1 W. Williamson

EXHIBIT "A"

Attached to and made a part of an Operating Agreement dated October 1, 1980, by and between Texas International Petroleum Corporation (Operator) and Getty Oil Company, Conoco, Inc., J. C. Trahan, Sklar & Phillips Oil Company and W. H. Penn (Non-Operators).

1) UNIT AREA

    (a) Lands subject to Agreement:

        The Unit Area shall include and be comprised of all hydrocarbon substances in all formations and depths set forth under sub-paragraph (b) below under the following described lands situated in Rusk County, Texas:

                SEE ATTACHED EXHIBIT "B"

    (b) Hydrocarbon Substances, Formations and Depths covered by Agreement:

        All horizons less and except the Crane Interval of the Lower Pettit Zone of the Sligo Formation which is currently producing under the terms of that certain Unit Agreement dated November 1, 1958, filed for record on December 22, 1958, filing number 72,427 of the Deed Records of Rusk County, Texas.

2) PERCENTAGE OR FRACTIONAL INTEREST OF THE PARTIES AND THE ADDRESSES TO WHICH NOTICES SHALL BE SENT:

| Party | Interest |
|---|---|
| Texas International Petroleum Corporation<br>3535 N. W. 58th Street, Suite 300<br>Oklahoma City, Oklahoma  73112 | 34.89359% |
| Getty Oil Company<br>6750 West Loop South, Suite 500<br>Houston, Texas  77401 | 31.73540% |
| Conoco, Inc.<br>P. O. Box 2097<br>Houston, Texas  77001 | 27.32688% |
| J. C. Trahan<br>P. O. Box 4382<br>Shreveport, Louisiana  71104 | 0.86294% |
| Sklar & Phillips Oil Company<br>P. O. Box 3735<br>Shreveport, Louisiana  71103 | 4.74972% |
| W. H. Penn<br>c/o Carey W. Penn<br>1500 North Market<br>Shreveport, Louisiana  71101 | 0.43147% |



TEXAS INTERNATIONAL PETROLEUM CORPORATIC
EXHIBIT "B"
Attached to and made a part of that
certain Operating Agreement dated
October 1, 1980.

# TATUM AREA
RUSK COUNTY, TEXAS
## TIPCO #1 W. Williamson
703.41 Acre Unit

Recommended by the
Council of Petroleum
Accountants Societies of
North America

KraftBill 601, TULSA 74101

COPAS — 1974

# EXHIBIT " C "

Attached to and made a part of ....that..certain Operating Agreement
dated October 1, 1980    , by and between TEXAS INTERNATIONAL
PETROLEUM CORPORATION, as Operator, and the various parties
listed on Exhibit "A" to said Operating Agreement, as Non-
Operators.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

### 2. Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3. Advances and Payments by Non-Operators

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### 5. Audits

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

### 6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First Level Supervisors in the field.

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

   D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

3. **Employee Benefits**

   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty-three percent (23%) or percent most recently recommended by the Council of Petroleum Accountants Societies of North America.

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

6. **Services**

   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

7. **Equipment and Facilities Furnished by Operator**

   A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

   B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**

   Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or

( ' ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall ( ) shall not ( X ) be covered by the Overhead rates.

**A. Overhead - Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $_____3700.00_____

Producing Well Rate $_____450.00_____

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

[1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

[2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge be made during suspension of drilling operations for fifteen (15) or more consecutive days

[3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

(b) Producing Well Rates

[1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

[2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

[3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

[4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

[5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

___N/A___ Percent (    %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

___N/A___ Percent (    %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ _25,000.00_ :

A. _3_ % of total costs if such costs are more than $_25,000.00_ but less than $_100,000.00_; plus

B. _3_ % of total costs in excess of $_100,000.00_ but less than $1,000,000; plus

C. _2_ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. **Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

### IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

(2) Material moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —



(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

### 3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

### 4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

### 1. Periodic Inventories, Notice and Representation

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

### 2. Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

### 3. Special Inventories

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

### 4. Expense of Conducting Periodic Inventories

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

EXHIBIT "D"

SCHEDULE OF INSURANCE

Unit Operator shall carry the following insurance covering operations under this agreement at the expense and for the benefit of the parties hereto and shall require contractors and subcontractors to carry the same, to-wit:

1.  Workmen's Compensation and Employer's Liability Insurance as required by the laws of the state where the property is located.

2.  Comprehensive General Liability Insurance covering both bodily injury liability and property damage liability with a Combined Single Limit of $500,000 for each occurrence.

3.  Comprehensive Automobile Public Liability and Property Damage Insurance with a combined single limit of $500,000 for each occurrence.

4.  Insurance coverage on equipment as the Operator deems necessary for the protection of the joint account.

Unit Operator may carry and maintain in force for its benefit insurance of the type and in the amount which Operator in its sole opinion deems necessary to protect it from loss resulting from any claims, damages, causes of action or legal liability in favor of a surface or mineral owner of lands covered hereby, arising out of, in connection with, or as an incident to any act or omission of Operator, its officers, agents or employees in carrying out its responsibilities under this Agreement.

EXHIBIT "E"

GAS BALANCING AGREEMENT

During the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party fails to take its share of gas, the other parties shall be entitled to produce each month one hundred percent of the allowable gas production assigned to the Unit Area by the appropriate governmental entity having jurisdiction, and each of such parties shall take its pro rata share. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interests, but each party taking such gas shall own all of the gas delivered to its purchaser. Each party unable to market its share of the gas produced shall be credited with gas in storage equal to its share of the gas produced, less its share of gas used in lease operations, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to twenty-five percent of each overproduced party's share of gas produced. If more than one party is entitled to the additional gas produced, they shall divide such additional gas in accordance with Unit participation.

In the event production of gas permanently ceases prior to the time that the accounts of the parties have been balanced, a complete balancing shall be accomplished by a money settlement. Such settlement shall be based upon the weighted average price received by each overproduced party for its share of gas produced and sold.

At all times while gas is produced from the Unit Area, each party shall make appropriate settlement of all royalties, overriding royalty interest, and other payments out of or in lieu of production for which it is responsible, as if each party were taking or delivering to a purchaser its share, and its share only, of such gas production. Each party hereto agrees to hold each other party harmless from any and all claims for royalty payments asserted by royalty owners to whom each party is accountable.

NONDISCRIMINATION AND CERTIFICATION OF NONSEGREGATED FACILITIES

**A. Equal Opportunity Clause (41 CFR 60-1.4).** (Applicable only to contracts or purchase orders for more than $10,000.)

During the performance of this contract, the Operator agrees as follows:

(1) The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or terminations, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) The Operator will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Operator will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Operator's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Operator will include the provisions of paragraph (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

**B. Certification of Nonsegregated Facilities (41 CFR 60-1.8).** (Applicable only to contracts or purchase orders which are not exempt from the provisions of the Equal Opportunity Clause set out above.)

The Operator certifies that it does not, and will not, maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not, and will not, permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. The Operator agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this contract or purchase order. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom, or otherwise. The Operator further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods): NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certificate of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

**C. Affirmative Action Compliance Program (41 CFR 60-1.40).** (Applicable only if (a) the Operator has 50 or more employees and (b) the contract or purchase order is for $50,000 or more.)

The Operator shall develop a written affirmative action program for each of its establishments and, within 120 days from the effectiveness of this contract or purchase order, shall maintain a copy of separate programs for each establishment, including evaluations of utilization of minority group personnel and the job classification tables, at each local office responsible for the personnel matters of such establishment.

**D. Employer Information Report (41 CFR 60-1.7).** (Applicable only if (a) the Operator has 50 or more employees, (b) the Operator is not exempt (pursuant to section 60-1.5 of Title 41 of the Code of Federal Regulations) from the requirement for filing Employer Information Report EEO-1, and (c) the contract or purchase order is for $50,000 or more.)

The Operator agrees to file with the appropriate Federal agency annually, on or before the 31st day of March, complete and accurate reports on Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress on such form as may hereafter be promulgated in its place.

**E. Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250).** (Applicable only to contracts or purchase orders for $10,000 or more.)

The affirmative action clause prescribed in section 60-250.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-250.22 of said Regulations) as if set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then within 120 days from the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment which shall set forth the Operator's policies, practices and procedures in accordance with section 60-250.6 of said Regulations.

**F. Affirmative Action for Handicapped Workers (41 CFR 60-741.4).** (Applicable only to contracts or purchase orders for $2,500 or more.)

The affirmative action clause prescribed in section 60-741.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-741.22 of said Regulations) as if set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then, within 120 days of the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment, which program shall set forth the Operator's policies, practices and procedures in accordance with section 60-741.6 of said Regulations.

**G. Utilization of Minority Business Enterprises (Federal Procurement Regulations 1-1.13).** (Applicable only to contracts or purchase orders which may exceed $10,000.)

(1) It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(2) The Operator agrees to use his best efforts to carry out this policy in the award of his subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, the term "minority business enterprise" means a business, at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are Negroes, Spanish-speaking American persons, American-Orientals, American-Indians, American-Eskimos, and American Aleuts. Contractors may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.



# TEXAS INTERNATIONAL PETROLEUM CORPORATION

## MID-CONTINENT DIVISION

September 18, 1980

Sklar & Phillips Oil Co.
P. O. Box 3735
Shreveport, Louisiana  71103

ATTENTION:  Mr. August Erickson

RE:  TIPCO #1 Williamson Unit
Tatum (C.V.) Area
Rusk County, Texas

Gentlemen:

Reference is made to my letter dated July 21, 1980 pertaining to the captioned unit.  It now appears that Sklar & Phillips will own a 4.74972% working interest which is as follows:

| | |
|---|---|
| Robert Cargill | 2.49641% |
| Willis Jarrel | .34972% |
| B. W. Hemphill | 1.90359% |
| | 4.74972% |

Unless otherwise informed, TIPCO will proceed with plans to drill this unit with Sklar & Phillips owning the interest stated above.

Should you have any questions, please call.

Sincerely,

*Keith Derrick*

Keith Derrick

KD/dv

B.W.Hemphill.

1402 I4 Groveland Ave.
Longview Texas 7560⊥

Sclar & Phillips Oil Co.
2900 Mansfield Road.
Shreveport La.

Attention Mr Earikson.

Dear Mr Earikson.-

Please find attached hereto the Recorded infromation that you nead
to draw the assignment from me to your company, Ihope this is what you
nead However if there is any thing else let me know and I will be glad
to furnish it,

I was in Carter Jones office today and talked to Jake Maxwell
he said that he would be glad to tell you what he knowes about EXXONs
I8.500 Foot Proposed Well to be Driklid in the Young Survey Rusk County
Texas.

hen I recive the Assingment I will promptly execute same and
Return to you.

Yours Truely.

B.W.Hemphill

P. O. BOX 3735

**SKLAR & PHILLIPS OIL CO.**
2925 MANSFIELD ROAD
SHREVEPORT, LOUISIANA 71103

PHONE 318 - 222-1800

September 10, 1980

Mr. Keith Derrick
Texas International Petroleum Corp.
3535 N.W. 58th Street
Oklahoma City, Oklahoma 73112

Dear Mr. Derrick:

With reference to our recent telephone conversation, enclosed
is Ratification of Farmout Agreement dated September 8, 1980
executed by B. W. Hemphill and Robert Cargill.  The original
will be filed for record by us.

Thought you would like to have this for your file.

                        Best regards,

                        SKLAR & PHILLIPS OIL CO.

le
enclosure                        Lottie Ellis

ROBERT CARGILL

P. O. BOX 992   AREA CODE 214  757-3322
LONGVIEW, TEXAS 75601

September 8, 1980

Mr. Gus Erickson
Sklar & Phillips Oil Company
P. O. Box 3735
Shreveport, Louisiana  71103

Dear Gus:

Enclosed is a Ratification of Farmout Agreement executed by B. W. Hemphill
and Robert Cargill.

Thank you for your patience.  Mr. Himphill, apparently, has been out of
town for some time.

Yours truly,

John C. Miller

JCM/ao

Enclosures

SKLAR & PHILLIPS OIL CO.

P. O. BOX 3735

2925 MANSFIELD ROAD
SHREVEPORT, LOUISIANA 71103

PHONE 318 - 222-1800

August 28, 1980

Mr. Robert Cargill
P. O. Box 992
Longview, Texas  75601

                                      RE:  Farmout Agreement

Dear Mr. Cargill:

     I enclose a supplemental farmout agreement covering four (4) leases
in which you and Mr. B. W. Hemphill own an interest.  Some of these leases
are already covered by our farmout agreement as to your interests, but not
as to Mr. Hemphill's.  I figured this was the simplest way of accomplishing
this matter.

     By copy of this letter to Mr. Hemphill, I ask that he stop by your
office and execute said farmout agreement.  If there are any questions, I
ask that you please call.

                              Yours very truly,

                              August Erickson

AE:  jc

CC:  Mr. B. W. Hemphill
     1402 Groveland Avenue
     Longview, Texas  75601

RATIFICATION OF FARMOUT AGREEMENT

TO:   CARTER JONES DRILLING COMPANY, INC.

SKLAR & PHILLIPS OIL CO.

THE UNDERSIGNED working interest owners of oil and gas units operated by CARTER-JONES DRILLING COMPANY, INC., of Kilgore, Texas hereby RATIFY, CONFIRM and ADOPT that certain Farmout Agreement dated November 30, 1979, by and between CARTER-JONES DRILLING COMPANY, INC., and SKLAR & PHILLIPS OIL CO., a copy of which said farmout agreement is attached hereto and made a part hereof.

THE FOLLOWING described leases are to be made a part of said farmout agreement, to-wit:

Oil, gas and mineral lease dated December 2, 1953 from Verlin Nicely, et ux, as Lessor and Neal Woods, as Lessee, said lease being recorded in Book 515 Page 518 of the Deed Records of Rusk County, Texas, covering 15 acres, m/l.

Oil, Gas and mineral lease dated April 1, 1952 from Jack Murray, et ux, as Lessor and B. W. Hemphill, as Lessee, said lease being recorded in Book 482, Page 174 of the Deed Records of Rusk County, Texas, covering 26.54 gross acres, m/l.

Oil, gas and mineral lease dated January 22, 1957 from Mary Lou Wilson, et vir, as Lessor and B. W. Hemphill as Lessee, said lease being recorded in Book 609, Page 274 of the Deed Records of Rusk County, Texas, covering 26.54 gross acres, m/l.

Oil, Gas and mineral lease dated February 2, 1952 from Juneta Jackson, et al as Lessor and B. W. Hemphill, as Lessee, said lease being recorded in Book 485 Page 343 of the Deed Records of Rusk County, Texas, covering 40 acres, m/l.

EXECUTED and signed on the date appearing hereinbelow.

IN TESTIMONY WHEREOF, witness my hand on this the _8th_ day of _Sept._, 1980.

_____
B. W. HEMPHILL

_____
ROBERT CARGILL

Page 1

STATE OF TEXAS:

COUNTY OF _Gregg_ :

BEFORE ME, the undersigned authority, on this day personally appeared B. W. HEMPHILL, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed .

GIVEN UNDER my hand and seal of office, on this the _8th_ day of _September_ , 1980.

My Commission expires:
_12 - 31 - 80_

_____
Notary Public in and for
_Gregg_ County, Texas


STATE OF TEXAS:

COUNTY OF _Gregg_ :

BEFORE ME, the undersigned authority, on this day personally appeared ROBERT CARGILL, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER my hand and seal of office, on this the _8th_ day of _Sept_ , 1980.

My Commission expires:
_12-31- 80_

_____ JOHN C. MILLER
Notary Public in and for
_Gregg_ County, Texas

and other interests payable out of or measured
and operating costs, an amount sufficient to r
drilling, testing, completing, equipping, oper
taxes on each well drilled under this Agreemen
as to such well has occurred under the terms a

  The cost and expenses hereinabove re
of the test well (or of any other well or well
shall be based on actual invoices and receipts
If the test well is completed as a well capabl
commercial quantities, then within sixty (60)
well, you shall notify us in writing at the ad
completion and furnish with the notice, a summ
cost and expenses of drilling, completing and
with a copy of all invoices and receipts evide.
shall also promptly furnish to us copies of al
and income receipts within sixty (60) days fr
filed with any governmental agency of the Stat
purchaser of production.  In addition to the p
rated above, we shall also have the right, whicn
and from time to time, to audit your books and re
thereto, question the correctness thereof and mat
relative to the determination of when pay out
and during the twenty-four (24) month period i
month during which the pay out is accomplished
in the percentage of working interest and over
each as above provided, you agree to cooperate
purchaser of production of all necessary accou
quested by the purchaser, to join in the execu
division orders to accomplish such change in i

  It is further understood and agreed
rest in production so reserved by each of us i
shall be delivered into the tanks, pipelines o
which the well or wells are connected to our c
costs and expenses, including, but not limited
development, operations and production, but sut
of any applicable severance, occupation, produc

overriding royalty interest in any gas, including casinghead gas, produced and saved from the proration unit attributable to the test well, shall be based on the value of the gas sold, which value shall be deemed to be the total proceeds received by you from any such sale, or if not sold, but used off the premises, the value thereof shall be based upon the existing market price at the time in the area for gas sold for the same purpose.

Any such assignment shall reserve unto the Assignors, their successors and assigns, the right to use as much of the surface of the leasehold estate assigned as is necessary to explore for, produce, save and market, oil and gas from any portion of the leasehold estate covered by the leases owned insofar as the strata and stringer reserved by Assignor and not assigned is concerned. Further, such assignment shall contain an express obligation and agreement on the part of the Assignee to perform all obligations, express or implied, of the Assignor under the leases assigned insofar as such obligations are applicable to the rights assigned as well as all obligations contained in this Farmout Agreement.

Further, such assignment by the undersigned shall be made without warranty of title, either express or implied, except that the Assignor has not heretofore transferred or encumbered the leasehold rights and privileges assigned. In this connection, however, we do covenant and warrant that the Oil and Gas Leases described on Exhibit "A" are presently in force and effect and are being held by production of oil and/or gas in commercial quantities and that we have not received any requests by any owners of any rights under such leases for a release of such oil and gas leases and we have not received any requests by any owner of any interest under such oil and gas leases for further development of the acreage or units covered by this Farmout Agreement for the reasons of non-production in commercial quantities. In the event there is any failure of title on the leases assigned by the undersigned, the over – riding royalty held or owned by such or any working interest received or to be received by re-assignment, shall be reduced in proportion to the failure of title.

VII.   INFORMATION AND REPORTS:

As a further express consideration for this Agreement and not as a covenant, you agree to furnish to:

Carter-Jones Drilling Company at P. O. Box 1597, Kilgore, Texas, 75662, the following:

1.(a)  Daily drilling reports on the progress of the wells which shall include drilling depth, information on all tests, including character, thickness, name of any formation penetrated, shows of oil, gas or water and detailed reports on all drill stem tests.

-6-

(b)  Two certified copies of all forms furnished
to any governmental authority.

(c)  Two copies of all electrical logging surveys.

(d)  Two certified copies of the well log upon
completion.

(e)  Two certified copies of the plugging record,
if any.

(f)  Samples of all cores and cuttings, if so
requested.

2.  Other Information Required:

(a)  A dual induction log with compensated sonic
log from total depth up hole to cover any potential
productive zone.

(b)  A compensated neutron density log combined
with a gamma ray log and a caliper log from total
depth up hole to cover any productive zones.

VIII.  DELAY RENTALS:  It is agreed that from and after
the date of this Agreement, we will pay any delay rent-
als which may become due on any of the Oil and Gas
Leases subject to this Agreement which are not being
held by production of oil and/or gas under the terms
of such Oil and Gas Leases.  In this connection, it is
understood and agreed that all or the greater portion
of the Oil and Gas Leases described on Exhibit "A"
attached hereto are being maintained in force and
effect and held by production of oil and/or gas in
commercial quantities on oil and gas wells operated
and/or controlled by us on the acreage covered by such
Oil and Gas Leases.

IX.  CONSENT REQUIREMENT:  This Agreement is personal
in nature and may not be assigned by you without our
written consent being first obtained.  When requesting
consent to make an assignment of all or a portion of
this Agreement, you will advise us the names and
addresses of the parties with whom the assignment is
being or will be made by you.

X.  STATUS OF PARTIES:  In the drilling of the test
well and otherwise complying with the terms and pro-
visions of this Agreement, you are acting independently
of us and not as a partner in any capacity, mining or
otherwise.  We shall have no responsibility whatsoever
in connection with the drilling of said well and it
shall be drilled at your sole cost, risk and expense.
You further agree to hold us harmless from any and
all debts, claims or damages incurred in connection
with the performance of this Agreement.

In regard to all provisions of this Agreement, it is
understood and agreed that time is of the essence.

XI.  OTHER PROVISIONS:

1.  Additional Wells:  It is understood and
agreed upon the completion of the test well, you will
earn the full unit acreage attributable to such well
as hereinabove specified.

You will have the right to earn additional
unit acreage by the drilling of additional wells to a
depth sufficient to test the Cotton Valley Formation,

-7-

the second such well to be commenced by actual operations for drilling not later than one hundred twenty (120) days from the spud date of the initial test well. When this second well has been drilled and completed, at a location of your choice on the acreage described and depicted on Exhibit "A", an assignment will be made to you of unit acreage attributable to such second well on the basis of 640 acres plus or minus a tolerance of ten (10%) per cent thereof, either in the form of the Unit Designation and/or Acreage as described and depicted on Exhibit "A" or on the form of the unit to be selected by you around such second well.

You will have the right to earn all or any part of the acreage and Oil and Gas Leases described and depicted on Exhibit "A" attached hereto by the drilling and completion of additional wells drilled to a depth sufficient to test the Cotton Valley Formation, provided that no more than one hundred twenty (120) days elapses between the spud date of the preceeding well and the commencement of actual operations for drilling on the subsequent well. Each subsequent well so drilled and completed shall earn for you the unit acreage attributable to such well or the acreage selected by you around such well for a total of 640 acres plus or minus a tolerance of ten (10%) per cent thereof, and an assignment will be made immediately to you for the acreage earned thereby in accordance with the terms and provisions of this Agreement, it being the intent of both of us and of the parties hereto that a regular and continuous drilling program be established so that you will drill all of the acreage and Oil and Gas Leases described and depicted on Exhibit "A" attached hereto, with each well so drilled and completed, earning and being entitled to receive assignment to the acreage in the unit to which said well is drilled or acreage selected by you comprising the unit attributable to each such well.

2. **Deficient Net Revenue Interest:**  In the event that Carter-Jones Drilling Company or its associates can not deliver to you an acceptable title opinion on each drill site tract, together with an opinion on the balance of the proposed unit indicating that Carter-Jones does, in fact, own and control sufficient working interest to grant to you the net revenue interest of seventy (70%) per cent in the units and Oil and Gas Leases set out and described on Exhibit "A" attached hereto, then and in that event, Sklar & Phillips Oil Co. will have the option of refusing to drill such unit or, alternatively, Sklar & Phillips may waive the net revenue requirement and accept such net revenue interest as first party or Carter-Jones can deliver, with after payout adjustments to be agreed upon by first party and Sklar & Phillips as to such units on which the net revenue requirement does not reach seventy (70%) per cent. As to acreage not earned by Sklar & Phillips by timely drilling as above provided for, not due to title or net revenue deficiency, Sklar & Phillips will lose its rights hereunder, except as to acreage developed previously as herein provided for, but shall suffer no further penalties.

XII.  It is further understood and agreed by the undersigned that this Farmout Agreement is to be considered as a part of a multiple transaction wherein you are acquiring certain leases and acreage from James M. Noonan and E. S. Boase and you will also acquire and receive a separate Farmout Agreement covering approximately 2,560 gross acres from Carter-Jones and Robert Cargill with an approximate net of 1,600 acres owned or controlled by Carter-Jones and Cargill and their privities. In this connection, the undersigned expressly covenants and agrees that for the purposes of the one hundred twenty (120) days

-8-

provision between the spud date of one well and the commencement of acutal operations for drilling on a subsequent well in order for you to perpetuate this Farmout Agreement and to earn additional leases and acreage, such provisions shall be applicable to the Noonan acreage, the Boase acreage, the Tatum Lower Pettit acreage and the acreage and leases set forth on Exhibit "A" hereto and drilling operations on any unit or acreage shall be considered to meet the requirements for continuous drilling operations set forth herein and such drilling operations will perpetuate and keep this Farmout Agreement in full force and effect, it being the intent to treat the approximately 14 gas units covered by this Farmout Agreement, the Noonan and Boase Assignments and the Tatum Lower Pettit acreage as one transaction and unit for purposes of drilling, earning acreage and keeping this Farmout Agreement in full force and effect.

If the terms and provisions of this Agreement in its entirety are acceptable to you, will you kindly indicate your approval by signing below in the space provided and returning one executed copy of this Agreement to us within five (5) days.  Failure to do so will result in cancellation of this Agreement at our option.


ATTEST:                                CARTER-JONES DRILLING COMPANY, INC.

_____        By: _____
       Secretary                        J. K. Maxwell – President



This Agreement is APPROVED AND ACCEPTED
this 30th day of November, 1979.

SKLAR & PHILLIPS OIL CO.


By: _____
        Vice-President


-9-

THE STATE OF TEXAS:

COUNTY OF GREGG:

       BEFORE ME, the undersigned authority, on this day personally appeared J. K. MAXWELL, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed, and in the capacity of Managing Partner of Carter-Jones Drilling Company, a partnership.

       GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the _____ day of _____, 1979.


                              _____
                              Notary Public in and for
                              Gregg County, Texas.


THE STATE OF TEXAS:

COUNTY OF GREGG:

       BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared AUGUST ERICKSON, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said SKLAR & PHILLIPS OIL CO., a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

       GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the _____ day of _____, 1979.


                              _____
                              Notary Public in and for
                              Gregg County, Texas .

THE STATE OF TEXAS:

COUNTY  OF  GREGG:


BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared J. K. MAXWELL, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said CARTER-JONES DRILLING COMPANY, INC., a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the __30th__ day of __November__, 1979.


_Dorothy L. Spencer_
Notary Public in and for
Gregg County, Texas.

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF AGREEMENT DATED NOVEMBER 30, 1979 BETWEEN CARTER-JONES DRILLING COMPANY, ET AL, AND SKLAR & PHILLIPS OIL CO.

TRACT 1.  CARTER-JONES DRILLING COMPANY - WOOLWORTH UNIT NO. 1, 651.05 acres, more or less.

   (a)   Lease executed by Dr. J. D. Woolworth, Lessor, to Frank L. Oberthier, Lessee, dated October 4, 1943, recorded in Vol. 149, page 230, Deed Records of Panola County, Texas.

   (b)   Lease executed by Dr. J. D. Woolworth, Lessor, to Ann Lacy Lillard and Patsy Lacy Griffith, Lessees, recorded in Vol. 200, page 1, Deed Records of Panola County, Texas.

        INSOFAR AS SAID LEASES COVER AND AFFECT 651.05 ACRES, MORE OR LESS, DESCRIBED BY METES AND BOUNDS IN DECLARATION OF UNIT DATED FEBRUARY 2, 1954 BY CARTER-JONES DRILLING COMPANY, RECORDED IN VOL. 348, PAGE 132-135, DEED RECORDS OF PANOLA COUNTY, TEXAS, TO WHICH INSTRUMENT AND THE RECORD THEREOF REFERENCE IS HERE MADE.

TRACT 2.  CARTER-JONES DRILLING COMPANY - WOOLWORTH UNIT NO. 2, 643.44 acres, more or less.

   (a)   Lease executed by Dr. J. D. Woolworth, Lessor, to Frank L. Oberthier, Lessee, dated October 4, 1943, recorded in Volume 149, page 230, Deed Records of Panola County, Texas.

        INSOFAR AS SAID LEASE COVERS AND AFFECTS 643.44 ACRES, MORE OR LESS, DESCRIBED BY METES AND BOUNDS IN ASSIGN-MENT DATED MARCH 19, 1954 FROM G. J. HOLLANDSWORTH TO CARTER-JONES DRILLING COMPANY, RECORDED IN VOL. 354, PAGE 547, DEED RECORDS OF PANOLA COUNTY, TEXAS, TO WHICH INSTRUMENT AND THE RECORD THEREOF REFERENCE IS HERE MADE.

TRACT 3.  CARTER-JONES DRILLING COMPANY - WOOLWORTH UNIT NO. 1-A, 640 acres, more or less.

   (a)   Lease executed by Dr. J. D. Woolworth, Lessor, to Frank L. Oberthier, Lessee, dated October 4, 1943, recorded in Volume 149, page 230, Deed Records of Panola County, Texas.

INSOFAR AS SAID LEASE COVERS AND AFFECTS 283.13 ACRES, MORE OR LESS, AS DESCRIBED IN POOLING AFFIDAVIT AND DEPICTED ON PLAT HEREINAFTER IDENTIFIED.

(b)  Lease executed by E. L. Burnett and B. H. Burnett, Lessors, to R. Lacy, Lessee, dated July 14, 1943, recorded in Vol. 147, page 144 of the Deed Records of Panola County, Texas.

INSOFAR AS SAID LEASE COVERS AND AFFECTS 323.37 ACRES OUT OF THE NEEDHAM YATES SURVEY, A-792, AS DESCRIBED IN POOLING AFFIDAVIT AND DEPICTED ON PLAT HEREINAFTER IDENTIFIED.

W. E. Reed 26.81 acre tract, being all of the N. Yates Survey A-936, Panola County, Texas, as described in Pooling Affidavit and depicted on plat hereinafter identified.

W. E. Reed 6.69 acre tract, being out of the extreme East or Southeast Corner of the D. Humphries Survey A-296 of Panola County, Texas.

The Pooling Affidavit above referred to was executed by J. K. Maxwell as Agent for Carter-Jones Drilling Company, dated and acknowledged before Allen G. May, Notary Public, on August 26, 1954 and said document is a part of the file of the Railroad Commission of the State of Texas, Kilgore, Texas, for above described Unit Well.

A copy of the plat above referred to is also a part of the file of the said Railroad Commission and a copy of same is also attached hereto for descriptive purposes.

TRACT 4.  CARTER-JONES - BURNETT NO. 2 GAS UNIT, 704 acres, more or less.

(a)  Lease executed by E. L. Burnett and B. H. Burnett, Lessors, and R. Lacy, Lessee, dated July 14, 1943, recorded in Vol. 147, page 138, Deed Records of Panola County, Texas.

INSOFAR AS SAID LEASE COVERS AND AFFECTS 704 ACRES OF LAND, MORE OR LESS, OUT OF THE JASPER COLLINS SURVEY A-923-23; T.C.R.R. SURVEY A-858; JASPER COLLINS SURVEY A-924-23 AND NEEDOM YATES SURVEY A-792, ALL IN PANOLA COUNTY, TEXAS. Said 704 acres, more or less, are depicted on plat attached hereto styled "Carter-Jones Drlg.Co. Burnett No. 2 Gas Unit, 704.00 Ac., Panola County, Texas. Plat prepared by C. C. Holloway, Licensed Civil Engineer and is dated 3-16-57.

-2-

TRACT 5. CARTER-JONES DRILLING COMPANY - O. HESSER NO. 1 GAS UNIT,
634 acres, more or less, and being those lands and leases
described in Unit Declaration dated April 13, 1954 by
G. C. Clark, et al, recorded in Vol. 352, page 590, Deed
Records of Panola County, Texas; by Carter-Jones Drilling
Co., et al, recorded in Vol. 352, page 605, Deed Records
of Panola County, Texas; and Amendatory Declaration of
Unitization dated June 17, 1955 by Henry C. Holland, et
al, recorded in Vol. 377, page 397, Deed Records of
Panola County, Texas.

TRACT 6. CARTER-JONES DRILLING COMPANY - C. E. HARRIS NO. 1 and
NO. 2 UNIT, 704 acres, more or less, and being those
lands and leases described in Declaration of Unit dated
May 25, 1953, recorded in Volume 338, page 547, Deed
Records of Panola County, Texas.

TRACT 7. CARTER-JONES (FORMERLY BOBBY MANZIEL) - OLIN INDUSTRIES
UNIT NO. 1, 676.58 acres, more or less, being the leases
described in Unit Declaration by Bobby Manziel, et al,
recorded in Vol. 342, page 239, Deed Records of Panola
County, Texas.  The acreage included within said Gas
Unit is depicted on plat recorded in Plat Book 3, page
406 of the Records of Panola County, Texas.

TRACT 8. CARTER-JONES DRILLING COMPANY - M. E. ADAMS UNIT NO. 1,
669.50 acres, more or less, Rusk County, Texas, being
the lands and leases described in Unit Declaration
dated January 22, 1955 by Carter-Jones Drilling Company,
et al, filed for record April 7, 1955, recorded April 9,
1955 under File No. 44185 of the Records of Rusk County,
Texas.

-3-

Insert over size here



C. COFFEE
A-976
J. D. Woolworth

JASPER COLLINS
A-923-23
T.C.R.R. H-28'

25.89 AC.

T.C.R.R. H-8
A-858

JASPER COLLINS
924-23
640

1036

5280'

5280'

5280'

I, C.C. Holloway, Licensed Civil Engineer,
hereby certify that the plat hereon
truly represents a survey made by
me on the ground. C.C. Holloway
3-16-57

SABINE   RIVER

1322'

1347'

127'

2.

N

CARTER-JONES DRLG. CO.
BURNETT BROS.

LYONS & LOGAN
BURNETT LSE.

1061.6

183

N   F   R   E   E   D   O   M     Y   A   T   E   S
A-792

5280'

R. LADT, INC.

117.82 Ac.

CARTER-JONES DRLG. CO.
BURNETT No. 2 GAS UNIT
704.00 AC.
PANOLA CO. TEX.



# TEXAS INTERNATIONAL PETROLEUM CORPORATION

## MID-CONTINENT DIVISION

July 31, 1980

Sklar & Phillips Oil Company
P.O. Box 3735
Shreveport, Louisiana   71103

ATTENTION:  Mr. August Erickson

RE:  TIPCO #1 Williamson
Tatum (C.V.) Area
Rusk County, Texas

Gentlemen:

Enclosed is a revised unit plat covering the captioned unit.  Your working interest is unchanged.

Also enclosed is a revised AFE covering this unit.  We have contracted for a smaller rig with an anticipated spud date around October 1.

If you have any questions, please call.

Sincerely,

Keith Derrick

Keith Derrick
Landman

KD/jd

SUITE 300 • 3535 NORTHWEST FIFTY-EIGHTH STREET • OKLAHOMA CITY, OKLAHOMA 73112

TWX • 910 831-3326 • TEI OKC • (405) 947-8682



# THOMAS O'BAR
## A-26

## JNO A. GRAY

### TEXAS INTERNATIONAL PETROLEUM CORPORATION
### TIPCO

# TATUM AREA
## RUSK COUNTY, TEXAS
# TIPCO #1 W. WILLIAMSON
### 703.41 Acre Unit

Well Name  TIPCO #1  W. WILLIAMSON _____ Lease No. _____ Field  Oak Hill _____ Date 7/17/80

County  Rusk/Panola _____ State  Texas _____ Proj TD 10,600' Spud Date _____ Compl. Date _____

Location  JOSEPH LODGSTON SURVEY, A-484 _____ Formation  Cotton Valley _____ Depth 9000'

Prospect Number _____ Prospect Name  Cotton Valley Developemnt

BCP INT WI _____ BCP TAN WI _____ ACP INT WI _____ ACP TAN WI _____

Type  D  Op/Non-Op  O  Division  O  Status  P  Gas Well _____ Oil Well _____

| | DRY HOLE | COMPL. |
|---|---|---|
| **1. LOCATION EXPENSE:** | | |
| 01 Stake, Prepare, and Restoration of Location.................. | 70,000 | 70,000 |
| 02 Conductor Casing _____ ' of _____ " @ $ _____ /Ft.. | 3,000 | 3,000 |
| | 73,000 | 73,000 |
| **2. TURNKEY, LESS TANGIBLES:** | | |
| 01 To Casing Point................................................ | | |
| 02 Through Wellhead.............................................. | | |
| 03 Through Tanks................................................. | | |
| **3. CONTRACT EXPENSE:** | | |
| 01 Rig Move In and Out........................................... | 65,000 | 65,000 |
| 02 Footage Rate  10,600  ' @ $  26.00  /Ft............ | 276,000 | 276,000 |
| 03 Daywork:  2  Days:  to  $ 6000 /Day WDP.. | 12,000 | 12,000 |
| 04 Daywork: _____ Days: _____ to _____ $ _____ /Day WODP. | | |
| 05 Completion or Workover Rig: _____ 15  Days @ $ 2000 /Day. | | 30,000 |
| | 353,000 | 383,000 |
| **4. SERVICES AND SUPPLIES:** | | |
| 01 Marine Expense: $ _____ /Day for _____ Days.............. | | |
| 02 Cement, Services, Casing Crews, and Equipment.............. | 28,000 | 45,000 |
| 03 Logging, Coring and Analysis, DST.......................... | 25,000 | 25,000 |
| 04 Gamma Ray-Neutron; Temperature Surveys and Perforating..... | | 20,000 |
| 05 Mud and Additives............................................ | 30,000 | 30,000 |
| 06 Mud Logging Unit:  30  Days @ $  600 /Day........... | 18,000 | 18,000 |
| 07 Fuel......................................................... | 25,000 | 35,000 |
| 08 Water........................................................ | 15,000 | 30,000 |
| 09 Bits _____ " @ $ _____ /Bit; _____ " @ $ _____ /Bit. | | 2,000 |
| 10 Rental Equipment............................................. | 30,000 | 50,000 |
| 11 Trucking..................................................... | 15,000 | 30,000 |
| 12 Acidizing or Fracing......................................... | | 250,000 |
| 13 Miscellaneous................................................ | 62,000 | 62,000 |
| 14 Overhead: Drlg $ 500; Geol. _____ Da.@ $ _____ ;Engr. 16 ;Da.@$ 500 | 8,000 | 16,000 |
| | 256,000 | 613,000 |
| TOTAL INTANGIBLES (1,2,3,4) | 682,000 | 1,069,000 |
| **5. TUBULAR GOODS AND DOWN-HOLE MATERIAL:** | | |
| 01  3200  ' of  9-5/8  " Surface Casing @ $  16.00 /Ft.... | 52,000 | 52,000 |
| 02 _____ ' of _____ " Production Casing @ $ _____ /Ft..... | | |
| 03 _____ ' of _____ " Liner @ $ _____ /Ft.............. | | |
| 04  10,600  ' of  5-1/2  " Production Casing @ $ 11.00 /Ft.... | | 128,000 |
| 05  10,600  ' of  2-3/8  " Tubing @ $  5.19 /Ft.............. | | 55,000 |
| 06 Rods, Down-Hole Pump, Gas Lift Equipment, Packer, etc........ | | 10,000 |
| 07 Casinghead and Christmas Tree............................... | 7,000 | 30,000 |
| TOTAL TANGIBLES (5) | 59,000 | 275,000 |
| TOTAL WELL COST WITHOUT LEASE EQUIPMENT (1 through 5) | 741,000 | 1,344,000 |
| **6. SURFACE EQUIPMENT:** | | |
| 01 Separator, Heater Treater, Dehydrator, and/or Line Heater..... | | 30,000 |
| 02 Tanks: _____ @ $ _____ /Tank.............................. | | 10,000 |
| 03 Pipe and Fittings............................................ | | 6,000 |
| 04 Labor........................................................ | | 6,000 |
| 05 Pumping Unit................................................. | | |
| 06 Miscellaneous................................................ | | 7,000 |
| | | 59,000 |
| **7. LEASEHOLD:** | | |
| 01 Leasehold.................................................... | 5,000 | 10,000 |
| GRAND TOTAL - WELL AND LEASEHOLD COSTS | 746,000 | 1,413,000 |

Prepared by W.F. Gustafson _____ 7/17/80

| Approvals: | Initial | Date |
|---|---|---|
| Geological | _____ | _____ |
| Production | _____ | _____ |
| Drilling | _____ | _____ |
| Engineering | _____ | _____ |
| Land | _____ | _____ |
| Manager | _____ | _____ |

PARTNER APPROVAL: _____ DATE _____

COMPANY:  SKLAR & PHILLIPS OIL COMPANY

By: _____
(Title)

SW of west —

Covered by Salum Lower Pettit Unit
F/O. Do not have copy of lease —
Un Unit Agreement — Tract 215
   Glassel Martin, etal — W.H. Bryant (lessee)
recorded in Vol. 461/400 Rusk Co.

7/23/80                    Jim
Carolyn
Give Book to Lottie —
   Make us copy of AFE & Plat
      For Well File
   Tubular goods too high — ?

P. O. BOX 3735

## SKLAR & PHILLIPS OIL CO.
2925 MANSFIELD ROAD
SHREVEPORT, LOUISIANA 71103

PHONE 318 - 222-1800

July 24, 1980

Mr. Robert Cargill
P. O. Box 1166
Longview, Texas 75601

  Re: Tipco #1 W. Williamson
    Tatum (C.V.) Area
    Rusk County, Texas

Dear Mr. Cargill:

Enclosed is letter from TIPCO to us dated July 21, 1980, copy of Authority for Expenditure approved by us July 23, 1980 and copies of location plat and plat of the Tatum Waterflood Unit.

Mr. Erickson requested that this be sent to you for your information and files.

      Yours very truly,

      SKLAR & PHILLIPS OIL CO.

le        Lottie Ellis

enclosures



*TIPCO*

# *TEXAS INTERNATIONAL PETROLEUM CORPORATION*
July 21, 1980

Sklar & Phillips Oil Co.
P. O. Box 3735
Shreveport, Louisiana 71103

ATTENTION: Mr. August Erickson

RE: TIPCO #1 W. Williamson
Tatum (C.V.) Area
Rusk County, Texas

Gentlemen:

Subject to rig availability, Texas International Petroleum Corporation proposes the drilling of a 10,600' Cotton Valley test at a location of 1050' FSL and 2200' FEL of the Joseph Logsden Survey, Abstract – 484, Rusk County, Texas. This unit will comprise 703.41 acres and be known as the TIPCO #1 Williamson.

The Working Interest Owners and their net acres are as follows:

|                    | WORKING INTEREST | NET ACRES |
|--------------------|------------------|-----------|
| TIPCO              | 30.07136%        | 211.525   |
| Conoco             | 27.32688%        | 192.22    |
| Getty              | 31.73540%        | 223.23    |
| Sklar & Phillips   | 2.49641%         | 17.56     |
| B. Harrington      | 4.41848%         | 31.08     |
| J. Reed            | 0.40375%         | 2.84      |
| W. Jarrell         | 0.34972%         | 2.46      |
| B. Hemphill        | 1.90359%         | 13.39     |
| W. Penn            | 0.43147%         | 3.035     |
| J. Trahan          | 0.86294%         | 6.07      |
|                    | 100.00000%       | 703.41    |

Attached is an AFE estimating a Dry Hole cost of $846,000 and a Completed Cost of $1,513,000. Please note the rig move in rate of $165,000. Unless a local rig can be obtained, TIPCO will move a deep rig from Leon County. We estimate the cost of this move to be around $165,000. Due to the small amount of production from the Tatum Lower Pettit Unit and the shortage of rigs, we believe this expense is necessary in evaluating the acreage. Also, enclosed is a plat showing the unit.

*SUITE 300 • 3535 NORTHWEST FIFTY-EIGHTH STREET • OKLAHOMA CITY, OKLAHOMA 73112*

*TWX • 910 831-3326 • TEI OKC • (405) 947-8682*

Sklar & Phillips
July 21, 1980
Page Two


An Operating Agreement is presently being prepared.  Should you agree
with our proposal, please execute and return the AFE at your earliest
convenience.  If you have any questions, please advise.

Sincerely

*Keith Derrick*

Keith Derrick
Landman

KD/dv
attachment

## TIPCO WELL COST ESTIMATE

AFE No. _____

Well Name __TIPCO #1 W. WILLIAMSON__    Lease No. _____    Field __Oak Hill__    Date 7/17/80

County __Rusk/Panola__    State __Texas__    Proj TD __10,600'__    Spud Date _____    Compl. Date _____

Location _____    Formation __Cotton Valley__    Depth __9000'__

Prospect Number _____    Prospect Name __Cotton Valley Developemnt__

BCP INT WI _____    BCP TAN WI _____    ACP INT WI _____    ACP TAN WI _____

Type __D__    Op/Non-Op __O__    Division __O__    Status __P__    Gas Well _____    Oil Well _____

| | DRY HOLE | COMPL. |
|---|---|---|
| 1. LOCATION EXPENSE: | | |
| 01 Stake, Prepare, and Restoration of Location.............. | 70,000 | 70,000 |
| 02 Conductor Casing _____ ' of _____ " @ $ _____ /Ft.. | 3,000 | 3,000 |
| | 73,000 | 73,000 |
| 2. TURNKEY, LESS TANGIBLES: | | |
| 01 To Casing Point.............. | | |
| 02 Through Wellhead.............. | | |
| 03 Through Tanks.............. | | |
| | | |
| 3. CONTRACT EXPENSE: | | |
| 01 Rig Move In and Out.............. | 165,000 | 165,000 |
| 02 Footage Rate __10,600__ ' @ $ __26.00__ /Ft.............. | 276,000 | 276,000 |
| 03 Daywork: __2__ Days: ____ to ____ $ 6000 /Day WDP.. | 12,000 | 12,000 |
| 04 Daywork: ____ Days: ____ to ____ $ ____ /Day WODP. | | |
| 05 Completion or Workover Rig: __15__ Days @ $ __2000__ /Day. | | 30,000 |
| | 453,000 | 483,000 |
| 4. SERVICES AND SUPPLIES: | | |
| 01 Marine Expense: $ _____ /Day for _____ Days.............. | | |
| 02 Cement, Services, Casing Crews, and Equipment.............. | 28,000 | 45,000 |
| 03 Logging, Coring and Analysis, DST.............. | 25,000 | 25,000 |
| 04 Gamma Ray-Neutron; Temperature Surveys and Perforating....... | | 20,000 |
| 05 Mud and Additives.............. | 30,000 | 30,000 |
| 06 Mud Logging Unit: __30__ Days @ $ __600__ /Day.............. | 18,000 | 18,000 |
| 07 Fuel.............. | 25,000 | 35,000 |
| 08 Water.............. | 15,000 | 30,000 |
| 09 Bits ____ " @ $ ____ /Bit; ____ " @ $ ____ /Bit. | | 2,000 |
| 10 Rental Equipment.............. | 30,000 | 50,000 |
| 11 Trucking.............. | 15,000 | 30,000 |
| 12 Acidizing or Fracing.............. | | 250,000 |
| 13 Miscellaneous.............. | 62,000 | 62,000 |
| 14 Overhead: Drlg $ 500; Geol. __ Da.@ $ __ ;Engr. 16 ;Da:@$ 500 | 8,000 | 16,000 |
| TOTAL INTANGIBLES (1,2,3,4) | 256,000 | 613,000 |
| | 782,000 | 1,169,000 |
| 5. TUBULAR GOODS AND DOWN-HOLE MATERIAL: | | |
| 01 __3200__ ' of __9-5/8__ " Surface Casing @ $ 16.00 /Ft... ? | 52,000 | 52,000 |
| 02 ____ ' of ____ " Production Casing @ $ ____ /Ft..... | | |
| 03 ____ ' of ____ " Liner @ $ ____ /Ft.............. | | |
| 04 __10,600__ ' of __5-1/2__ " Production Casing @ $ 11.00 /Ft ? | | 128,000 |
| 05 __10,600__ ' of __2-3/8__ " Tubing @ $ __5.19__ /Ft ? | | 55,000 |
| 06 Rods, Down-Hole Pump, Gas Lift Equipment, Packer, etc..... | | 10,000 |
| 07 Casinghead and Christmas Tree.............. | 7,000 | 30,000 |
| TOTAL TANGIBLES (5) | 59,000 | 275,000 |
| TOTAL WELL COST WITHOUT LEASE EQUIPMENT (1 through 5) | 841,000 | 1,444,000 |
| 6. SURFACE EQUIPMENT: | | |
| 01 Separator, Heater Treater, Dehydrator, and/or Line Heater..... | | 30,000 |
| 02 Tanks: ____ @ $ ____ /Tank.............. | | 10,000 |
| 03 Pipe and Fittings.............. | | 6,000 |
| 04 Labor.............. | | 6,000 |
| 05 Pumping Unit.............. | | |
| 06 Miscellaneous.............. | | 7,000 |
| | | 59,000 |
| 7. LEASEHOLD: | | |
| 01 Leasehold.............. | 5,000 | 10,000 |
| | | |
| GRAND TOTAL - WELL AND LEASEHOLD COSTS | 846,000 | 1,513,000 |

Prepared by __W.F. Gustafson__    __7/17/80__

| Approvals: | Initial | Date |
|---|---|---|
| Geological | _____ | _____ |
| Production | _____ | _____ |
| Drilling | _____ | _____ |
| Engineering | _____ | _____ |
| Land | _____ | _____ |
| Manager | _____ | _____ |

PARTNER APPROVAL: ____    DATE 7/23/80

COMPANY: SKLAR & PHILLIPS OIL

By: _____ Prod Mgr. (Title)



TEXAS INTERNATIONAL PETROLEUM CORPORATION

TIPCO

# TATUM AREA
## RUSK COUNTY, TEXAS
## TIPCO #1 W. Williamson
### 703.41 Acre Unit



TIPCO #1 W. WILLIAMSON

| TRACT | ACS | TIPCO | CONOCO | GETTY | B. HARRINGTON | J. REED, JR. | W. JARRELL | CARGILL | B. HEMPHILL | PENN | TRAHAN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 207,208,214 | 123.08 | 123.08 | | | | | | | | | |
| 206,241,242 240,212,213 220 | 192.22 | | 192.22 | | | | | | | | |
| 215 | 54.92 | 27.47 | | | 23.45 | 2.14 | 1.86 | | | | |
| 216 | 26.78 | 1.67 | | | | | | 11.72 | 13.39 | | |
| 221 | 10.90 | 10.90 | | | | | | | | | |
| 222 | 26.41 | | | 26.41 | | | | | | | |
| 228,229,211 | 106.78 | | | 106.78 | | | | | | | |
| 210 | 5.84 | | | | | | | 5.84 | | | |
| 188,189 | 60.17 | | | 60.17 | | | | | | | |
| 209 | 48.56 | 39.455 | | | | | | | | 3.035 | 6.07 |
| 181,182 179,180 | 29.87 | | | 29.87 | | | | | | | |
| 232A | 17.88 | 8.95 | | | 7.63 | .70 | .60 | | | | |
| TOTALS: | 703.41 | 211.525 | 192.22 | 223.23 | 31.08 | 2.84 | 2.46 | 17.56 | 13.39 | 3.035 | 6.07 |
| WORKING INTEREST (%): | | 30.07136 | 27.32688 | 31.73540 | 4.41848 | 0.40375 | 0.34972 | 2.49641 | 1.90359 | 0.43147 | 0.86294 |

CIS F POTTER
J. DONALD GUINN
JOHN H. MINTON, JR.
RANDALL L. ROBERTS
H. KELLY IRELAND
THOMAS H. BUCHANAN
JON D. SMITHSON
JAMES S. ROBERTSON, JR
LEONARD E. DAVIS
MICHAEL E. JONES

OF COUNSEL:
GEORGE K. GILBERT
F. MORRIS MASON

POTTER, GUINN, MINTON, ROBERTS & IRELAND

ATTORNEYS AT LAW

4TH FLOOR PEOPLES NATIONAL BANK BUILDING
AREA CODE 214 PHONE 597 8311
TYLER, TEXAS

MAILING ADDRESS:
P. O. BOX 359
TYLER, TEXAS—75710

May 1, 1979

## ORIGINAL TITLE OPINION

State:     Texas
County:   Rusk
Fee:       W. R. Williamson, Et Ux,
           Et Al.

IN RE:

48.55 acres of land, more or less, part of the Joseph
Logsdon Survey, Abstract No. 484, Rusk County, Texas,
described as Unit Tract No. 208 of the Tatum (Lower
Pettit) Unit, sometimes called 50 acres of land, more
or less, and described as follows:

BEGINNING at the N. E. corner of tract No. 1, a stake
on the N. B. Line of the original 400 acres tract;
THENCE S. 2806.5 feet to a stake on the N. B. Line of
D. E. Cobb tract, a stake from which a pine 12 inches
in dia. brs N 42 degrees 30 minutes E. 17 feet, a pine
10 inches in dia brs N 61 W 25 feet;
THENCE E. 796.8 feet to a corner on said Cobb N. B.
Line, from which a pine 10 inches in dia brs N 16 E.
14 feet, and a pine ___ inches in dia brs N 60 degrees
30 minutes W. 22 feet;
THENCE N. 2660.7 feet to a stake on the N. B. Line of
the original 400 acre tract;
THENCE N. 79 degrees 38 minutes W. 799.8 feet to the
place of beginning, containing 50 acres of land.

TEXAS INTERNATIONAL PETROLEUM COMPANY
SUITE 300
3535 NORTHWEST 58TH STREET
OKLAHOMA CITY, OKLAHOMA 73112

ATTENTION:  Mr. Truett Guy

Gentlemen:

This Original Title Opinion is based upon an examination of
the records of Arnold Abstract Company, Henderson, Rusk County,
Texas, and the Rusk County Clerk's office covering all instru-
ments shown by said abstractor's records as being pertinent to
the title and recorded in Rusk County from the sovereignty of
the soil down to April 13, 1979, at 5:00 p.m.

Based upon an examination of the foregoing, we find title
to the land to be as hereinafter set out, with title to the oil
and gas rights limited to those rights below the Pettit Formation,
to-wit:

SURFACE:

As to 5 acres described in deed of 3-9-59,
Vol. 661, page 455, described as
Beginning on the EBL of the 50 acre tract
222 ft. N of its southeast corner and on
N side of FM road #1797;
Thence N 800 feet;
Thence W 420 feet;
Thence S 420 feet;
Thence E 315 feet;
Thence S 424.1 feet to cor. in north ROW
line of highway;
Thence S 71 deg. 09 min. E.111 ft. to place
of beginning, containing 5 acres of land,
more or less

Ralph D. Beall and
wife, Faye Beall                                        All

As to that portion of the land lying South
of FM road #1797 (estimated to contain 6.18
acres of land)

Jerry W. Sipes                                         All

As to the remainder of the land, being all
that portion lying on N side of FM road #1797
except the 5 acre tract owned by Ralph Beall,
and called 34 acres of land in Contract of
Sale dated May 12, 1970, Vol. 911, page 221

(1) Veterans Land Board of
the State of Texas                                     All

(1) NOTE:  This interest in the land, with no mineral
interest, is subject to Contract of Sale
executed by Veterans Land Board to Ralph
D. Beall


MINERALS AND ROYALTIES:

|  | Interest Owned | Lease Royalty | |
|---|---|---|---|
| (1) Ralph D. Beall and wife, Faye Beall | 1/2 x 46.55/48.55 | 1/8 | RI |
| (1) Jerry W. Sipes | 1/2 x 2/48.55 | 1/8 | RI |

(1) NOTE:  See requirement number 1
pertaining to the above
two interests noted (1).

| Don A. Deason | 1/12 | 1/8 | RI |
|---|---|---|---|
| Mary Aileen Carlisle | 1/12 | 1/8 | RI |
| Hazel West Carroll | 1/12 | 1/8 | RI |

|  | Interest Owned | Lease Royalty | |
|---|---|---|---|
| Graham Beason | 1/8 | 1/8 | RI |
| Lottie Marie Davis | 1/8 | 1/8 | RI |

## OIL & GAS LEASEHOLD:

### Limited to rights below the Pettit Formation

| | | |
|---|---|---|
| Frank Campisi | 1/2 x 5/318 x 1/16 x 7/8 | ORI |
| Emile Monsour | 1/2 x 5/318 x 1/16 x 7/8 | ORI |
| Claude H. Thigpen | 313/318 x 1/16 x 7/8 | ORI |
| (1) Texas International Petroleum Company | 15/16 x 7/8 | WI |

(1) NOTE: Above interest is subject to the Deed of Trust Lien set out under Liens and Encumbrances. See requirement number 4.

## LIENS, ENCUMBRANCES & RIGHTS OF WAY:

A. **Taxes:**

No examination or showing has been made as to the status of taxes. See our following requirement.

B. **Other Liens:**

The interest of Texas International Petroleum Company is subject to the following deed of trust liens:

(a) Deed of trust dated July 23, 1975, of record in Volume 225, page 587 of the Deed of Trust Records executed by Texas International Petroleum Co. to Texas Insurance and Annuity Association of America to secure one note in the original principal amount of $10,000,000.00. The property subject to this deed of trust describes the oil and gas lying "within and under the tracts of land comprising the Tatum (Lower Pettit) Unit and the Tatum (Crane) Unit."

(b) Deed of trust, Security Agreement and Assignment of Production dated December 8, 1977, of record in Volume 252, page 554 of the Deed of Trust Records executed to First Pennsylvania Bank, N.A., Philadelphia, Pennsylvania as "Agent Bank," under which participating banks agreed to make revolving loans up to $100,000,000.00. In addition to the Assignment of Production, the agreement includes after-acquired property and production under the tracts of land in the Tatum (Lower Pettit) Unit and the Tatum (Crane) Unit.

-3-

C. Rights of Way & Easements:

The land is subject to Right of Way Easement granted to Rusk County by W. R. Williamson and wife for road purposes, being dated October 27, 1919, recorded in Volume 325, page 325 of the Deed Records, and dated November 10, 1953, recorded under Serial No. 34280 of the Deed Records.

Additionally, the land is subject to the following Right of Way Easements granted to Crystal Farms Water Supply Corporation, to-wit:

(a)   From Ralph D. Beall and wife, Faye Beall, dated April 29, 1968, of record in Volume 886, page 261 for a perpetual easement to lay, operate, repair, replace and remove a water pipeline across the 5 acre tract of land conveyed to Ralph D. Beall.

(b)   From Jerry Sipes and wife, Jeanette, dated April 29, 1968, recorded in Volume 886, page 299, granting a perpetual easement to lay, operate, repair, replace and remove a water pipeline across the acreage lying south of Farm-to-Market Road No. 1797.

LEASE ANALYSIS:

Lease #1

| | |
|---|---|
| Dated: | June 1, 1955 |
| Recorded: | Volume 552, page 467, Deed Records |
| Lessor: | W. R. Williamson and wife, Nellie Beall Williamson |
| Lessee: | Julian M. Farmer |
| Land described: | 50 acres of land, more or less, being the land under examination |
| Primary term: | Ten years; held by production |
| Royalty: | 1/8 on oil; 1/8 on gas and casinghead gas; 1/10 on all other minerals except sulphur, which shall be 50¢ per long ton |
| Pooling: | Not to substantially exceed 40 acres for oil and 640 acres for gas, each plus 10% tolerance |

Lease #2

| | |
|---|---|
| Dated: | June 2, 1955 |
| Recorded: | Volume 552, page 244 Deed Records |
| Lessor: | A. J. Deason and wife, Lillias W. Deason, Lottie Marie Davis and husband, Elton E. Davis and Graham Deas |

-4-

Lessee:                      Julian M. Farmer

Land described:              Subject land only

Royalty:                     1/8 on oil; 1/8 on gas and
                             casinghead gas; 1/10 on all
                             other minerals except sulphur
                             which shall be 50¢ per long ton

Pooling:                     Not to substantially exceed 40
                             acres for oil and 640 acres for
                             gas, each plus 10% tolerance

## CHAIN OF TITLE:

1. The Joseph Logsdon Survey, containing 387 acres of
land, was patented by the State of Texas to the heirs of Joseph
Logsdon June 25, 1853, as shown by patent of record in Volume H,
page 451 of the Deed Records of Rusk County, Texas.

As it would serve no useful purpose, we do not chain
the very early title.

2. The land under examination is part of a 400 acre tract
of land conveyed to W. G. Banks by deed dated May 3, 1913, of
record in Volume 76, page 114. Banks then conveyed the land to
J. M. Finch by deed dated July 26, 1913, of record in Volume 78,
page 31.

3. By Warranty Deed dated October 12, 1917, of record in
Volume 93, page 20, J. M. Finch and Edwin Lacy conveyed the
land under examination called 50 acres of land, more or less,
to W. R. Williamson.

4. By Mineral Deed dated September 27, 1943, W. R. William-
son and wife, Nellie, conveyed 1/2 of the minerals in the land to
A. J. Deason.

5. By Mineral Deed dated November 27, 1956, A. J. Deason
conveyed an undivided 1/4 of the minerals to D. F. Deason.

By Mineral Deed dated December 23, 1957, of record in
Volume 619, page 359, D. F. Deason conveyed the 1/4 mineral
interest to Don A. Deason, Hazel West Carroll, and Mary Aileen
Carlisle.

Mary Aileen Carlisle was later divorced, and this mineral
interest was conveyed to her in division of the community property
acquired during marriage by deed dated June 15, 1963, of record
in Volume 776, page 349.

6. By Mineral Deed dated November 27, 1956, of record in
Volume 588, page 279, A. J. Deason conveyed to Graham Deason an
undivided 1/8 of the minerals.

7. By Mineral Deed dated November 27, 1956, of record in
Volume 588, page 281, A. J. Deason conveyed an undivided 1/8
of the minerals to Lottie Marie Davis.

8. By Warranty Deed dated August 2, 1954, of record in
Volume 538, page 478, W. R. Williamson and wife, Nellie, conveyed
4.18 acres of land out of the Southwest corner of the land under
examination to G. O. Bennett. All oil, gas and other minerals
were reserved in this conveyance.

By Warranty Deed dated July 13, 1963, of record on Volume 774, page 534, W. R. Williamson et ux conveyed to Albert A. Bennett and wife, Verdie, all that part of the 50 acres tract of land lying on the south side of Highway No. 1797. There is no acreage call in this deed and we have calculated it to cover a 2 acre interest in the land. This 2 acre interest, together with the 4.18 acres, is all of the land lying south of Farm-to-Market Road #1797. G. O. Bennett conveyed the 4.18 acres of land to Albert A. Bennett by deed dated July 8, 1961.

By Warranty Deed dated December 13, 1965, of record in Volume 834, page 444, Albert A. Bennett and wife conveyed all land lying south of the highway to Jerry W. Sipes and wife, Mary Sipes. Jerry Sipes and wife were then divorced in Cause No. 70-89 of the District Court of Rusk County, Texas, and by deed carrying out property settlement in that action Mary Jeanette Sipes, a feme sole, conveyed all interest in the land to Jerry Walter Sipes by deed dated September 18, 1970, of record in Volume 916, page 73. Jerry W. Sipes was then vested with an undivided 1/2 of the minerals in the calculated 2 acre tract of land lying south of the highway.

9. By Warranty Deed dated March 9, 1959, of record in Volume 661, page 455, William R. Williamson and wife, Nellie, conveyed 5 acres of land (described under surface ownership) to Ralph D. Beall and wife, Faye Beall. No reservation was made in this conveyance and an undivided 1/2 of the minerals in the 5 acre tract of land was conveyed.

10. By Warranty Deed dated May 3, 1969, of record in Volume 892, page 668, Nellie Williamson conveyed a called 34 acres of land to B. D. Griffin, but all oil, gas and other minerals were reserved in this conveyance. Griffin then conveyed the land to the Veterans Land Board of the State of Texas by deed dated May 15, 1970, of record in Volume 911, page 219.

By Contract of Sale dated May 12, 1970, recorded in Volume 911, page 221, the Veterans Land Board contracted to sell the 34 acres of land to Ralph Dene Beall, but this does not affect the mineral interest in the land.

11. William Right Williamson died September 21, 1967, and his will was admitted to probate in Cause No. 7396 of the County Court of Rusk County, under which all property was left to his wife, Nellie Alice Williamson.

Nellie Alice Williamson died September 15, 1971, and her will was admitted to probate in Cause No. 71-160 of the County Court of Rusk County, under which all property was devised to Ralph D. Beall.

Pursuant to the above two wills, the 1/2 mineral interest in all of the land except for the estimated 2 acre interest lying south of the road, therefore passed to Ralph Beall by virtue of a deed to 5 acres (item 9 of Chain of Title) and the will of Nellie Alice Williamson.

## As to Leasehold Estate

12. By Assignment dated August 15, 1955, of record in Volume 558, page 367, Julian M. Farmer assigned both of the oil, gas and mineral leases covered by this opinion to J. C. Trahan, Drilling Contractor, Inc., reserving an overriding royalty

-6-

interest of 1/16 x 7/8ths.  The right to pool was conveyed to
the grantee in this assignment.

13.  By Assignment dated October 11, 1955, of record in
Volume 602, page 114, Julian M. Farmer conveyed all of the
reserved overriding royalty interest to Claude H. Thigpen, and
Thigpen conveyed 5/318ths of the overriding royalty interest to
Frank Campis_ and Irvin Basham, Jr. by assignment dated June
17, 1957, of record in Volume 602, page 375.

14.  By Assignment dated December 26, 1962, of record in
Volume 762, page 455, Irvin Basham, Jr. conveyed to Emile Monsour
an undivided 1/2 of 5/318ths of the overriding royalty interest,
being all of his interest in the overriding royalty interest.

15.  The 15/16 of 7/8 working interest owned by J. C.
Trahan, Drilling Contractor, Inc. then passed to Texas Inter-
national Petroleum Corporation by Change of Name Certificate
according to affidavit of Dean Turner dated September 13, 1972,
of record in Volume 953, page 610 of the Deed Records.  According
to this affidavit, the corporate name of J. C. Trahan, Drilling
Contractor, Inc. was changed January 3, 1972.


REQUIREMENTS:

1.

MANDATORY:

The subject land should be surveyed in order to determine
the boundaries and the acreage content thereof, and the exist-
ence of any possible encroachment.

W. R. Williamson and wife, owning all of the surface and
one-half of the minerals, conveyed 5 acres to Ralph Beall (item
9 of Chain of Title), 4.18 acres to G. O. Bennett, reserving
all minerals (item 8, Chain of Title) and that part of the land
lying south of FM Road #1797 estimated to contain 2 acres (item
8 of Chain of Title.)  Assuming that the acreage is 48.55 acres
of land as called in the Tatum (Lower Pettit) Unit, 37.37 acres
of surface and one-half of the minerals in 41.55 acres remained
in W. R. Williamson and wife, Nellie.  We have credited Ralph
Beall (devisee under the will of Nellie Williamson) with this
one-half of the minerals in 41.55 acres of land, together with
the 5 acres conveyed to him (item 9, Chain of Title) for a total
of one-half of the minerals in 46.55 acres.  The mineral interest
is all subject to the oil and gas leases set out in this opinion,
but a survey or a stipulation of the acre-interest owned by
Ralph Beall and wife, Faye, and owned by Jerry W. Sipes will be
necessary for royalty payment purposes.

As to the surface only, we are unable to determine from
the metes and bounds calls in the deed from Nellie Williamson
to Griffin, and thence to the Veterans Land Board describing
34 acres of land, whether this was all of the land owned by
Nellie Williamson at that time, but if any surface remained it
passed under the will of Nellie Williamson to Ralph Beall.

2.

MANDATORY:

Obtain an affidavit from a credible person' upon whom you
are willing to rely, setting forth in detail the facts concerning

-7-

the history of the use, occupancy and possession of the land
for the past twenty-five years or more.

We have no information concerning the possession of the
land and this opinion is based entirely upon the record title.
If the land is to be used as a drillsite tract, the present
actual possession of the land must be determined, and if occupied
by a tenant, then a tenant's consent agreement should be obtained
prior to any operations.

3.

MANDATORY:

Tax certificates should be obtained evidencing the payment
of all taxes assessed against the land by all taxing authorities
having jurisdiction.

4.

MANDATORY:

The interest of Texas International Petroleum Company is
subject to the deeds of trust set out under the Liens and
Encumbrances section of this opinion.  Those deeds of trust
describe the oil and gas "lying within and under the tracts of
land comprising" the Tatum (Lower Pettit) Unit and the Tatum
(Crane) Unit in Rusk County, Texas.  The language could be
construed to cover all rights in and under such tracts of land.
If it was not intended to include the rights below the base of
the Pettit Formation, then a release of the rights below the
Pettit Formation should be obtained from the owners of the deeds
of trust.

5.

ADVISORY:

This opinion covers only the rights below the base of
the Pettit Formation.  The rights to the Pettit Formation are
subject to the unit agreement for the Tatum (Lower Pettit) Unit
dated November 1, 1958, of record in Volume 653, page 521, and
effective January 26, 1960, according to Certificate of Effective-
ness recorded in Volume 686, page 215.

There are numerous conveyances of rights relating to that
unit agreement which are not included in this opinion.

6.

ADVISORY:

We have not set out the various deed of trust liens and
mechanic and materialman's liens affecting the surface only,
where the mineral interest is not affected thereby.

7.

ADVISORY:

Except as otherwise specifically stated, this opinion does
not cover such matters as discrepancies in area, taxes, conflicts
in boundary lines or survey lines, rights of parties in possession,
and/or rules and regulations of governmental agencies having or

-8-

asserting jurisdiction not reflected within the materials examined in connection with this opinion.

We further call your attention to the fact that our examination is based entirely upon an examination of the abstracter's and County Clerk's records.  Even though we believe we have made an exhaustive search of the records to determine all instruments recorded in the county relative to this title for the period of time recited above, we must advise you that we do not assume any responsibility for any instruments which we have not personally examined.

Yours very truly,

POTTER, GUINN, MINTON,
ROBERTS & IRELAND

F. Morris Mason

FMM:mj

-9-



# L A N D M A N   R E P O R T

IN RE:  Original Title Opinion
May 1, 1979
Prepared by Potter, Guinn, Minton, Roberts and Ireland

W. R. Williamson, et ux Lease
48.55 Acres, more or less
Joseph Logsdon Survey, A-484
Rusk County, Texas

---

July 7, 1979

Texas International Petroleum Corporation
3535 N.W. 58th Street
Suite 300
Oklahoma City, Oklahoma 73112

Gentlemen:

Your attention is directed to the Comments, Requirements and Exceptions,
Pages 7-9, of the above referenced opinion corresponding with the following:

## I.

No action taken by Landman; Survey requested.

## II.

A copy of an Use & Possession Affidavit is enclosed as Exhibit "A".

## III.

Copies of tax certificates are enclosed as Exhibit "B".

## IV.

No action taken by landman; pretaining to Deed of Trust by Texas Inter-
national Petroleum Corporation.

## V.

Advisory pretaining to depth rights.

## VI.

Advisory pretaining to various deed of trusts.

## VII.

Advisory

This report is respectfully submitted for your approval as per your
request in order to satisfy the Comments, Requirments and Exceptions
contained in the referenced Original Title Opinion.

Yours very truly,

Byron McGough

USE AND POSSESSION

AFFIDAVIT

*Exhib. F "A"*

| STATE OF TEXAS | ⟧ | |
| | ⟧ | KNOW ALL MEN BY THESE PRESENT |
| COUNTY OF RUSK | ⟧ | |

BEFORE ME, the undersigned authority, on this day personally appeared Jack Hampton, known to be a credible person, who after first being duly sworn, on oath, desposes and says to-wit:

My name is Jack Hampton.  I am sixty five years of age, and have live at or near Tatum, Texas nearly all of my adult life and presently living on hiway 1797 out of Tatum, Texas.

I am familiar with the fifty (50) acres, more or less, which is at this time divided into two tracts; one being about 44 acres lying north of hiway 1797 owned by Ralph Beall other being about 6 acres lying south of hiway 1797 owned by Jerry W. Sipes.  I have worked, traveled, hunted and been a neighbor to the above tract for about twenty-five years having land joining to the west; bound by R. G. Beckham on the north; bound by G. Munnerlyn in the past on the east and by George Gilland on the south.

Affiant states that about thirty acres of the above described tract is cleared and suitable for grazing but none is suitable for cultivation.  The balance of the land is that of mixed hardwood and pine timber. The soil is that of sandy loam.  Highway 1797 runs in a east to west direction across the southern part of the tract.  Affiant knowns of no permanent landmarks save that of the state hiway described above.

Affiant recalls the first fee owner being that of Mr. W. R. Williamson as far back as 1930 and farther.  W. R. Williamson continuously possessed and peacefully lived on the above described tract to 1969 but did sell four acres to G. O. Bennett about 1955 and two acres to A. A. Bennett in 1963.  A. A. Bennett having received G. O. Bennett's four acres in 1961.  These two tracts make up the six acres lying on the south side of hiway 1797.  In 1965 after having owned the six acres continuously since about 1961,  A. A Bennett conveyed the tract to Jerry Sipes, who is the current owner .  Jerry Sipes lives on the tract in a fine brick frame home and works for Texas Utilities Company.

In 1959 Mr. Williamson convey five acres to Ralph D. Beall and in 1969 the balance, being about 34 acres to B. D. Griffin, who sells it to Ralph D. Beall, who is the current owner of all the tract lying on the north side of hiway 1797.  Mr. Beall has two frame houses facing south and also facing hiway 1797 as well as one mobile home.  Mr. Beall nor any of the past fee owners have ever commerically farmed the above described fifty acres but have just continuously use the land for their own enjoyment along with a few cows, horses and garners.  Mr. Beall works for the State of Texas.

Affiant does not recall any tentants on the above described fifty acres.

The boundary fences have been in the prese. position as far back as Affiant can recall and are on the original lines and have been kept in good state of repair. The post are mixed in nature ranging from cresoted pine to mixed hardwoods with four to five strands of barbed wire attached to same. The fence is in a cattle turning condition.

No one other than recorded fee owners have ever claimed any rights to the above described tracts and no boundary disputes have ever taken place. No fee owner has ever stated that he or they owned less than their recorded share.

Affiant knowns of no schools, churches nor cemeteries ever being located on the above described tracts.

SO ENDS AFFIANT'S STATEMENT.

*Jack Hampton*

Jack Hampton

STATE OF TEXAS  
COUNTY OF RUSK

Before me, Jackie Miller, on this day personally appeared Jack Hampton, known to me  to be the person whose name is subscribed to the aforegoing instrument, and acknowledge to me that he excuted the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this the 3rd day of July, 1979.

*Jackie Miller*

Notary Public for  
Nacogdoches County, Texas

My Commission Expires  
September 30, 1979

*Exhibit "B"*

## TAX CERTIFICATE

STATE OF TEXAS ◊

COUNTY OF RUSK ◊

I, TOMMY HASKINS, JR., TAX COLLECTOR FOR THE COUNTY OF RUSK, STATE OF TEXAS, HEREBY CERTIFY THAT I HAVE MADE A CAREFUL EXAMINATION OF THE TAX RECORDS IN MY OFFICE AND FIND THAT ALL TAXES DUE AND PAYABLE TO THE TAX ASSESSOR-COLLECTOR OF RUSK COUNTY ON THE FOLLOWING DESCRIBED PROPERTY.

5 000 ACRES OF LAND IN THE J. LOGSDON SURVEY AB-484, LOCATED IN THE TATUM INDEPENDENT SCHOOL DISTRICT.

TO BE PAID IN FULL UP TO AND INCLUDING THE YEAR 1978 AS ASSESSED AGAINST JERRY SIPES AND WITH NO TAXES DUE OR DELINQUENT IN SO FAR AS CAN BE ASCERTAINED FROM THE RECORD OF THIS OFFICE AND ACCORDING TO THE LIST OF TRANSFERS FURNISHED;

GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS 27th DAY OF JUNE 19 79 A. D.

TOMMY HASKINS, JR.
TAX ASSESSOR-COLLECTOR
RUSK COUNTY, TEXAS

BY:

1978 TAXES PAID

Present Owner_____Jerry Sipes_____

Purchaser_____

# TAX CERTIFICATE

The undersigned tax collector, or duly authorized deputy, hereby certifies that the tax rolls have been examined and that all taxes assessed against the following described property have been paid in full, including interest and penalty, and the records of this office reflect no taxes now due and or delinquent against this property as described to us and show that all taxes assessed have been paid in full up to and including the current year EXCEPT AS LISTED BELOW; to the present and former owners listed hereon:

OWNERS AND FORMER OWNERS: (if different on roll please indicate)

    W. R. Williamson
    G. O. Bennett
    A. A. Bennett

PROPERTY DESCRIPTION AS FURNISHED: (if different on rolls please indicate)

    Abst 484        J LOGSDON SURVEY          5.000 Acres        P-14X

THE FOLLOWING DELINQUENT TAXES ARE NOW DUE:

| Assessed to: | Year | Original Tax | Penalty & Interest | Total |
|---|---|---|---|---|

                Taxes clear thru 1978

CURRENT TAXES

| Assessed to: | Original Tax | Total |
|---|---|---|

                                    Tax Collector-Assessor For Tatum Ind. School District

Date___June 28, 1979___          By _Mrs Altha Mooney CTA Deputy_

For:___Bryon McGough & Associates
       Mr. Jackie Miller_____
       P. O. Box 290
       Nacogdoches Texas  75961

Present Owner _____ Ralph Beall _____

Purchaser _____

## TAX CERTIFICATE

The undersigned tax collector, or duly authorized deputy, hereby certifies that the tax rolls have been examined and that all taxes assessed against the following described property have been paid in full, including interest and penalty, and the records of this office reflect no taxes now due and or delinquent against this property as described to us and show that all taxes assessed have been paid in full up to and including the current year EXCEPT AS LISTED BELOW; to the present and former owners listed hereon:

OWNERS AND FORMER OWNERS: (if different on roll please indicate)

| | |
|---|---|
| W. R. Williamson | 5 acre tract |
| W. R. Williamson B. D. Griffin Vet. Land Board | 34 acre tract |

PROPERTY DESCRIPTION AS FURNISHED: (if different on rolls please indicate)

| | | | |
|---|---|---|---|
| Abst 484 | J LOGSDON SURVEY | 5.000 Acres | P-5 |
| Abst 484 | J LOGSDON SURVEY | 34.000 Acres | P-6A |

THE FOLLOWING DELINQUENT TAXES ARE NOW DUE:

| Assessed to: | Year | Original Tax | Penalty & Interest | Total |
|---|---|---|---|---|
| Ralph Beall | 1978 | 121.08 | 13.32 | $134.40 |
| | | | Redemption Cost | 1.00 |
| | | | | $135.40 |

CURRENT TAXES

| Assessed to: | Original Tax | Total |
|---|---|---|
| | | |

Tax Collector-Assessor For Tatum Ind. School District

Date ___ June 28, 1979 ____        By _Mrs Altha Murrey CTA_ Deputy

For ___ Bryon McGough & Associates
Mr. Jackie Miller
P. O. Box 290
Nacogdoches, Texas   75961

TAX CERTIFICATE

STATE OF TEXAS ◊

COUNTY OF RUSK ◊

I, TOMMY HASKINS, JR., TAX COLLECTOR FOR THE COUNTY OF RUSK, STATE OF TEXAS, HEREBY CERTIFY THAT I HAVE MADE A CAREFUL EXAMINATION OF THE TAX RECORDS IN MY OFFICE AND FIND THAT ALL TAXES DUE AND PAYABLE TO THE TAX ASSESSOR-COLLECTOR OF RUSK COUNTY ON THE FOLLOWING DESCRIBED PROPERTY.

5.000 ACRES OF LAND IN THE J. LOGSDON SURVEY AB 484
34 000 ACRES OF LAND IN THE J. LOGSDON SURVEY AB 484
BOTH BEING LOCATED IN THE TATUM INDEPENDENT SCHOOL DISTRICT.

SEE STATEMENT ATTACHED

TO BE PAID IN FULL UP TO AND INCLUDING THE YEAR__1978__
AS ASSESSED AGAINST ___RALPH BEALL___
AND WITH NO TAXES DUE OR DELINQUENT IN SO FAR AS CAN BE ASCERTAINED FROM THE RECORD OF THIS OFFICE AND AC-CORDING TO THE LIST OF TRANSFERS FURNISHED;

GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS __27th__
DAY OF _____JUNE_____ 19_79___ A. D.

TOMMY HASKINS, JR.
TAX ASSESSOR-COLLECTOR
RUSK COUNTY, TEXAS

BY:_____

1978 TAXES: DUE

# DELINQUENT TAX STATEMENT

Statement of Taxes Due on Following Property as Shown by

The Delinquent Tax Rolls of **RUSK COUNTY, TEXAS**

Date: _____ 19 ___

TOMMY HASKINS, JR.,
Tax Assessor-Collector Rusk County,
P. O. Box 988,
Henderson, Texas 75652

By:_____ Deputy

This Statement shows taxes, penalty, and interest accrued as of month indicated. Additional charges accrue each month thereafter.

**PLEASE RETURN THIS STATEMENT WITH REMITTANCE**

NAME_____

ADDRESS_____

| TO WHOM ASSESSED Reference to be taken From Form 18 or D.T.R. | Years Sold or Delinquent | STATE TAXES | | | COUNTY TAXES | | | | | | DESCRIPTION OF PROPERTY | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Ad Valorem | State Tax | P & I | County Ad Valorem | Co. Wide | Spec. Rd. Tax | School District | TOTAL | Abst or Lot No. | Cert. or Sur. No. Blk. No. or Div. | ORIGINAL GRANTEE, CITY OR TOWN | Acres |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| Page____ Line____ Form____ | | | | | | | | | | | | | |
| COSTS ............. TOTAL--- | | | 1.00 | | | | | | | $ | | | |

WAYLAND—HENDERSON

← TOTAL TAXES DUE