

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

### OPERATING AGREEMENT

### DATED

April 1, , 19 98 ,

OPERATOR __SHELBY OPERATING COMPANY__

CONTRACT AREA __DEASON UNIT__

COUNTY OR PARISH OF __PANOLA__ , STATE OF __TEXAS__

*This Copy*
*for your*
*files.*

COPYRIGHT 1989 — ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.
A.A.P.L. NO. 610 - 1989

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 11 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

|  |  |  |
|---|---|---|
| | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: | 15 |
| | E. WAIVER OF RIGHTS TO PARTITION: | 15 |
| | F. PREFERENTIAL RIGHT TO PURCHASE: | 15 |
| IX. | INTERNAL REVENUE CODE ELECTION | 15 |
| X. | CLAIMS AND LAWSUITS | 15 |
| XI. | FORCE MAJEURE | 16 |
| XII. | NOTICES | 16 |
| XIII. | TERM OF AGREEMENT | 16 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 16 |
| | A. LAWS, REGULATIONS AND ORDERS: | 16 |
| | B. GOVERNING LAW: | 16 |
| | C. REGULATORY AGENCIES: | 16 |
| XV. | MISCELLANEOUS | 17 |
| | A. EXECUTION: | 17 |
| | B. SUCCESSORS AND ASSIGNS: | 17 |
| | C. COUNTERPARTS: | 17 |
| | D. SEVERABILITY: | 17 |
| XVI. | OTHER PROVISIONS | 17 |



A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

OPERATING AGREEMENT

1                               **OPERATING AGREEMENT**
2     THIS AGREEMENT, entered into by and between __Shelby Operating Company_____,
3 hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes
4 hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."
5                                  **WITNESSETH:**
6     WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
7 identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil
8 and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,
9     NOW, THEREFORE, it is agreed as follows:
10                                **ARTICLE I.**
11                                **DEFINITIONS**
12     As used in this agreement, the following words and terms shall have the meanings here ascribed to them:
13     A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of
14 estimating the costs to be incurred in conducting an operation hereunder.
15     B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil
16 and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation
17 and production testing conducted in such operation.
18     C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be
19 developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas
20 Interests are described in Exhibit "A."
21     D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest
22 Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the
23 lesser.
24     E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the
25 cost of any operation conducted under the provisions of this agreement.
26     F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal
27 body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as
28 established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.
29     G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be
30 located.
31     H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.
32     I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as
33 provided in Article VI.B.2.
34     J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a
35 proposed operation.
36     K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous
37 hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is
38 specifically stated.
39     L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts
40 of land lying within the Contract Area which are owned by parties to this agreement.
41     M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein
42 covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.
43     N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a
44 Completion in a shallower Zone.
45     O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned
46 in order to attempt a Completion in a different Zone within the existing wellbore.
47     P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure,
48 restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but
49 are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking,
50 Deepening, Completing, Recompleting, or Plugging Back of a well.
51     Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to
52 change the bottom hole location unless done to straighten the hole or to drill around junk in the hole to overcome other
53 mechanical difficulties.
54     R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and
55 Gas separately producible from any other common accumulation of Oil and Gas.
56     Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes
57 natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.
58                                 **ARTICLE II.**
59                                **EXHIBITS**
60     The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:
61   __X__ A. Exhibit "A," shall include the following information:
62         (1) Description of lands subject to this agreement,
63         (2) Restrictions, if any, as to depths, formations, or substances,
64         (3) Parties to agreement with addresses and telephone numbers for notice purposes,
65         (4) Percentages or fractional interests of parties to this agreement,
66         (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
67         ~~(6) Burdens on production.~~
68   __X__ B. Exhibit "B," Form of Lease.
69   __X__ C. Exhibit "C," Accounting Procedure.
70   __X__ D. Exhibit "D," Insurance.
71   __X__ E. Exhibit "E," Gas Balancing Agreement.
72   __X__ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.
73   _____ ~~G. Exhibit "G," Tax Partnership.~~
74   _____ H. Other: _____

- 1 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in
2 the body of this agreement, the provisions in the body of this agreement shall prevail.
3                                            ARTICLE III.
4                                     INTERESTS OF PARTIES
5 A. Oil and Gas Interests:
6    If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this
7 agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B,"
8 and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.
9 B. Interests of Parties in Costs and Production:
10    Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne
11 and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their
12 interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the
13 Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.
14    Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other
15 burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or
16 cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,
17 _____25%_____ and shall indemnify, defend and hold the other parties free from any liability therefor.
18 Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is
19 burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts
20 stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend
21 and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as
22 the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to
23 be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)
24 which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any
25 liability therefor.
26    No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's
27 lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher
28 price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.
29    Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,
30 and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in
31 said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.
32 C. Subsequently Created Interests:
33    If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security
34 for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production
35 payment, net profits interest, assignment of production or other burden payable out of production attributable to its working
36 interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed
37 hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden
38 payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such
39 burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's
40 Lease or Interest to exceed the amount stipulated in Article III.B. above.
41    The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and
42 alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other
43 parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses
44 chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the
45 same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required
46 under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the
47 production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of
48 said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or
49 parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.
50                                            ARTICLE IV.
51                                              TITLES
52 A. Title Examination:
53    Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,
54 if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire
55 Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working
56 interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing
57 Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator
58 all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of
59 charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the
60 examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or
61 by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in
62 procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty
63 opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling
64 Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such
65 interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel
66 in the performance of the above functions.
67    Each party shall be responsible for securing curative matter and pooling amendments or agreements required in
68 connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation
69 and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings
70 before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to
71 the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.
72 Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental
73 agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct
74 charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
2   functions.
3       No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has
4   been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by
5   all of the Drilling Parties in such well.
6   B. Loss or Failure of Title:
7       1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a
8   reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest
9   (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title
10  failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject
11  to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas
12  Leases and Interests; and,
13      (a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if
14  applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from
15  Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there
16  shall be no additional liability on its part to the other parties hereto by reason of such title failure;
17      (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the
18  Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage
19  basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or
20  Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;
21      (c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract
22  Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable
23  to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and
24  burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well
25  attributable to such failed Lease or Interest;
26      (d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest
27  which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid
28  to the party or parties who bore the costs which are so refunded;
29      (e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises
30  by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received
31  production for which such accounting is required based on the amount of such production received, and each such party shall
32  severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;
33      (f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of
34  the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title
35  it shall bear all expenses in connection therewith; and
36      (g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an
37  interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder
38  of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest
39  is reflected on Exhibit "A."
40      2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
41  payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas
42  Lease or Interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary
43  liability against the party who failed to make payment. Unless the party who failed to make the required payment
44  secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make
45  proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A"
46  shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party
47  who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership
48  of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully
49  reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest,
50  calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest,
51  it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole
52  previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
53      (a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease
54  burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or
55  Interest, on an acreage basis, up to the amount of unrecovered costs;
56      (b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed
57  to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and
58  marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination,
59  would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest
60  termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties
61  in proportion to their respective interests reflected on Exhibit "A"; and,
62      (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner
63  of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
64      3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles
65  IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on
66  Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because
67  express or implied covenants have not been performed (other than performance which requires only the payment of money),
68  and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no
69  readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.
70      4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any
71  Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety
72  (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed
73  or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B.
74  shall not apply to such acquisition.

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE V.

OPERATOR

1
2
3  A. Designation and Responsibilities of Operator:
4       <u>Shelby Operating Company</u> _____ shall be the Operator of the Contract Area, and shall conduct
5  and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of
6  this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor
7  not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance
8  with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the
9  Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third
10 party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike
11 manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and
12 regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred
13 except such as may result from gross negligence or willful misconduct.
14 B. Resignation or Removal of Operator and Selection of Successor:
15    1. <u>Resignation or Removal of Operator:</u> Operator may resign at any time by giving written notice thereof to Non-Operators.
16 If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of
17 serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a
18 successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest
19 based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be
20 deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and
21 Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an
22 operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall
23 mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of
24 operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.
25    Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first
26 day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator
27 or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of
28 Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a
29 Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single
30 subsidiary, parent or successor corporation shall not be the basis for removal of Operator.
31    2. <u>Selection of Successor Operator:</u> Upon the resignation or removal of Operator under any provision of this agreement, a
32 successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an
33 interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the
34 affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A";
35 provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to
36 succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority
37 interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was
38 removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to
39 the operations conducted by the former Operator to the extent such records and data are not already in the possession of the
40 successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint
41 account.
42    3. <u>Effect of Bankruptcy:</u> If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have
43 resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal
44 bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all
45 Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or
46 assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in
47 possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators,
48 except the selection of a successor. During the period of time the operating committee controls operations, all actions shall
49 require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In
50 the event there are only two (2) parties to this agreement, during the period of time the operating committee controls
51 operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a
52 member of the operating committee, and all actions shall require the approval of two (2) members of the operating
53 committee without regard for their interest in the Contract Area based on Exhibit "A."
54 C. Employees and Contractors:
55    The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the
56 hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or
57 contractors shall be the employees or contractors of Operator.
58 D. Rights and Duties of Operator:
59    1. <u>Competitive Rates and Use of Affiliates:</u> All wells drilled on the Contract Area shall be drilled on a competitive
60 contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in
61 the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges
62 shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by
63 Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors
64 who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator
65 shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and
66 standards prevailing in the industry.
67    2. <u>Discharge of Joint Account Obligations:</u> Except as herein otherwise specifically provided, Operator shall promptly pay
68 and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall
69 charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C."
70 Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits
71 made and received.
72    3. <u>Protection from Liens:</u> Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts
73 of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in
74 respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or
2  materials supplied.
3      4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced
4  or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the
5  Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until
6  used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as
7  provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator
8  and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in
9  this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the
10 parties otherwise specifically agree.
11     5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator
12 or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to
13 all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of
14 operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access
15 rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate
16 Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such
17 interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any
18 and all reports and information obtained by Operator in connection with production and related items, including, without
19 limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding
20 purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the
21 information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures
22 shall be conducted in accordance with the audit protocol specified in Exhibit "C."
23     6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to
24 each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications
25 required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder.
26 Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.
27     7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not
28 limited to the Initial Well:
29     (a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which
30 drilling operations are commenced.
31     (b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well
32 as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.
33     (c) Opeator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing
34 Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted
35 hereunder.
36     8. Cost Estimates. Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs
37 incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement.
38 Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.
39     9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers
40 compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-
41 insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall
42 be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties
43 as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on
44 or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted
45 and to maintain such other insurance as Operator may require.
46     In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the
47 parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive
48 equipment.
49                                   ARTICLE VI.
50                         DRILLING AND DEVELOPMENT
51 A. Initial Well:
52     On or before the ___1st___ day of ___July_____ , 19 _98_ , Operator shall commence the drilling of the Initial
53 Well at the following location:
54
55                       590' FSL & 4090' FEL
56                       James Shandoin Survey A-595
57                       Panola County Texas
58
59
60 and shall thereafter continue the drilling of the well with due diligence to 6550' below the surface or the Travis Peak
61 Formation whichever is greater.
62
63
64
65
66
67 The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation
68 in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.
69 B. Subsequent Operations:
70     1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or
71 if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of
72 producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under
73 this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written
74 notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2 performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a
3 notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4 whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to
5 Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
6 eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply
7 within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8 Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9 within the time and in the manner provided in Article VI.B.6.
10     If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11 contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12 forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13 promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
14 may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15 the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16 by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17 additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18 way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19 acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as
20 specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21 said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22 proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or
23 Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,
24 reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance
25 with Article VI.B.5. in the event of a Sidetracking operation.
26     2. Operations by Less Than All Parties:
27     (a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or
28 VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29 Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
30 later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31 expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
32 proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting
33 Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
34 the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35 account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The
36 rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37 designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when
38 conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39 agreement.
40     If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41 applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42 recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party,
43 within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of such notice, shall advise the
44 proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45 proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46 the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47 Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48 interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a
49 Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50 proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i) . In the event a
51 drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52 total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may
53 withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54 days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55 If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56 of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57 period provided in Article VI.B.1., subject to the same extension right as provided therein.
58     (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
59 borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60 paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61 encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results
62 in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63 the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64 participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65 shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66 increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,
67 Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68 paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69 well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70 expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking,
71 Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72 provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73 Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74 Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-
2 Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect
3 to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or
4 market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes,
5 royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production
6 from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

7     (i) __300__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment
8 beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and
9 piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first
10 production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other
11 provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that
12 interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning
13 of the operations; and

14     (ii) __300__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening,
15 Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C,
16 and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections),
17 which would have been chargeable to such Non-Consenting Party if it had participated therein.

18 ~~Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone~~
19 ~~described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable~~
20 ~~substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each~~
21 ~~Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a~~
22 ~~shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-~~
23 ~~Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the~~
24 ~~cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-~~
25 ~~Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions~~
26 ~~of this Article VI.B.2. (b) shall apply to such party's interest.~~

27     (c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or
28 Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in
29 such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full
30 recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to
31 participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking
32 operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at
33 any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such
34 Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the
35 cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __300__ % of
36 that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to
37 such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is
38 proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting
39 Parties in said well.

40     (d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's
41 share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem,
42 production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to
43 Non-Consenting Party's share of production not excepted by Article III.C.

44     In the case of a Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting
45 Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all
46 such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back,
47 Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each
48 party receiving its proportionate part in kind or in value, less cost of salvage.

49     Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations
50 for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to
51 the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing,
52 Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement
53 of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the
54 Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties
55 shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of
56 the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from
57 the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas
58 produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or
59 periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with
60 any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited
61 against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such
62 Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-
63 Consenting Party.

64     If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided
65 for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day
66 following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall
67 own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as
68 such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking,
69 Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and
70 shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this
71 agreement and Exhibit "C" attached hereto.

72     3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have
73 been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise
74 terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required
2   under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening
3   operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted,
4   whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
5   of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation,
6   but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated
7   between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8   interest as shown on Exhibit "A" of all Consenting Parties.
9     In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party
10   may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in
11   Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended
12   response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending
13   the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be
14   allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's
15   interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.
16     4. Deepening: If less than all the parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17   pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article
18   VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone
19   of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the
20   Initial Objective without first complying with this Article to afford the Non-Consenting parties the opportunity to participate
21   in the Deepening operation.
22     In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective,
23   such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-
24   Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to
25   participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation
26   is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation,
27   such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses:
28     (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29   quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs
30   and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-
31   Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting
32   Party's share of the costs of Deepening and of participating in any further operations on the well in accordance with the other
33   provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well
34   incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the
35   sole account of Consenting Parties.
36     (b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing
37   in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or
38   reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and
39   equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less
40   those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall
41   also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based
42   on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent
43   Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in
44   connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the
45   cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-
46   Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the
47   well for Deepening.
48     The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
49   to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article
50   VI.F.
51     5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an
52   interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its
53   proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore
54   to be utilized as follows:
55     (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
56   incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.
57     (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
58   such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth
59   at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's
60   proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking
61   operation is initiated shall be determined in accordance with the provisions of Exhibit "C."
62     6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to
63   propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such
64   party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform
65   an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal
66   holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be
67   conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such
68   alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such
69   proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within
70   twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the
71   subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required
72   shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage
73   interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation
2  within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3  and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4  is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5  relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within
6  such period shall be deemed an election not to participate in the prevailing proposal.
7     7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be
8  proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9  Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.
10    8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
11 Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except
12 with the consent of all parties that have not relinquished interests in the well at the time of such operation.
13 C. Completion of Wells; Reworking and Plugging Back:
14    1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
15 drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling,
16 Deepening or Sidetracking shall include:
17    ☒  Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and
18       equipping of the well, including necessary tankage and/or surface facilities.
19    ☐  Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When
20       such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results
21       thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to
22       participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,
23       together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice
24       shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of
25       notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an
26       accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting
27       with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the
28       procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all
29       necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface
30       facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party
31       receiving such notice to reply within the period above fixed shall constitute an election by that party not to
32       participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of
33       conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the
34       provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging
35       Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations
36       thereafter conducted by less than all parties; provided, however, that Article VI.B.2 shall apply separately to each
37       separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting
38       Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party
39       in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier
40       Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any
41       recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in
42       which the Completion attempt is made. Election by a previous Non-Consenting Party to participate in a subsequent
43       Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable
44       materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,
45       insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a
46       Completion attempt.
47    2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
48 Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking,
49 Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
50 Completing and equipping of said well, including necessary tankage and/or surface facilities.
51 D. Other Operations:
52    Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of  Twenty—
53  Five Thousand                                   Dollars ($ 25,000      ) except in connection with the
54 drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously
55 authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
56 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion
57 are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the
58 emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so
59 requesting an information copy thereof for any single project costing in excess of  Twenty Five Thousand   Dollars
60  ( $  25,000    ). Any party who has not relinquished its interest in a well shall have the right to propose that
61 Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as
62 salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but
63 not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall
64 be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the
65 amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under
66 Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by those Articles). Operator shall deliver such
67 proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent
68 of any party or parties owning at least _____-% of the interests of the parties entitled to participate in such operation,
69 each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated
70 to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms
71 of the proposal.
72 E. Abandonment of Wells:
73    1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has
74 been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2   party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after
3   delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4   proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
5   cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to
6   plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,
7   Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8   forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9   Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10  such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11  abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12  taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13  liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14  restoring the surface, for which the abandoning parties shall remain proportionately liable.
15      2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
16  conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
17  been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to
18  such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19  and expense of all the parties hereto. Failure of a party to reply within ~~sixty (60)~~ thirty (30) days of delivery of notice of proposed
20  abandonment shall be deemed an election to consent to the proposal. If, within ~~sixty (60)~~ thirty (30) days after delivery of notice of the
21  proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
22  operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23  applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24  against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25  proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26  within the required period or thereafter to conduct operations on such well shall entitle Operator to retain or take possession
27  of such well and plug and abandon the well.
28      Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29  the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30  of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31  the estimated plugging and abandonment and surface restoration costs and the estimated cost of salvaging are higher than the
32  value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33  operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34  parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35  of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36  insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37  interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-
38  abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39  one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
40  attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
41  The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42  respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43  Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.
44      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45  from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46  request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47  charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48  ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49  shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50  further operations therein subject to the provisions hereof.
51      3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
52  between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53  however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54  operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55  in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
56  in a portion of the well shall pay their proportionate shares of abandonment and surface restoration costs for such well as
57  provided in Article VI.B.2.(b).
58  F. Termination of Operations:
59      Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60  Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without
61  consent of parties bearing ___75___ % of the costs of such operation; provided, however, that in the event granite or other
62  practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63  Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1.; and the
64  provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.
65  G. Taking Production in Kind:
66      ☒  Option No. 1: Gas Balancing Agreement Attached.
67          Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
68  Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
69  treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
70  in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
71  party taking its share of production in kind shall be required to pay for only its proportionate share of such part of
72  Operator's surface facilities which it uses.
73          Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
74  production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1     directly from the purchaser thereof for its share of all production.

2     If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate
3 share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by
4 the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to
5 time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by
6 Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to
7 the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any
8 time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser.
9 Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time
10 as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a
11 period in excess of one (1) year.

12     Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator
13 shall have no duty to share any existing market or to obtain a price equal to that received under any existing
14 market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing
15 contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said
16 contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days
17 written notice of such intended purchase and the price to be paid or the pricing basis to be used.

18     All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following
19 month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.
20 Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which
21 records shall be made available to Non-Operators upon reasonable request.

22     In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate
23 pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion-
24 ate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with
25 any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a
26 separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

27 ☐   **Option No. 2: No Gas Balancing Agreement:**
28     Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from
29 the Contract Area, exclusive of production which may be used in development and producing operations and in
30 preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure
31 incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall
32 be borne by such party. Any party taking its share of production in kind shall be required to pay for only its
33 proportionate share of such part of Operator's surface facilities which it uses.

34     Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
35 production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment
36 directly from the purchaser thereof for its share of all production.

37     If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate
38 share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the
39 revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others
40 at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator
41 may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall
42 be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator
43 to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered
44 to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's
45 election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase
46 contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other
47 party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the
48 minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1)
49 year.

50     Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator
51 shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation
52 fee equal to that received under any existing market or transportation arrangement. The sale or delivery by
53 Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not
54 give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil
55 and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written
56 notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give
57 notice to all parties of the first sale of Gas from any well under this Agreement.

58     All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following
59 month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.
60 Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which
61 records shall be made available to Non-Operators upon reasonable request.

62 ARTICLE VII.
63 EXPENDITURES AND LIABILITY OF PARTIES

64 **A. Liability of Parties:**
65     The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations,
66 and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the
67 liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have
68 any liability to third parties hereunder to satisfy the obligation of any other party in the payment of any expense or obligation
69 hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other
70 partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or
71 principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have
72 established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own
73 respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other
74 with respect to activities hereunder.

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   B. Liens and Security Interests:
2     Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas
3 Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any
4 interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection
5 therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense,
6 interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil
7 and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest
8 granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and
9 overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or
10 otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or
11 used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts
12 (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead),
13 contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the
14 foregoing.
15     To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording
16 supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time
17 following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as
18 a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform
19 Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate
20 to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed
21 herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a
22 financing statement with the proper officer under the Uniform Commercial Code.
23     Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to
24 the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security
25 interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or
26 under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement,
27 whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject
28 to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder
29 whether or not such obligations arise before or after such interest is acquired.
30     To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the
31 Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code.
32 The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an
33 election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In
34 addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use
35 of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect
36 from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by
37 such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount
38 owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production
39 may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the
40 default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in
41 this paragraph.
42     If any party fails to pay its share of cost within ~~one hundred twenty (120)~~ sixty (60) days after rendition of a statement therefor by
43 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the
44 proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so
45 paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each
46 paying party may independently pursue any remedy available hereunder or otherwise.
47     If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure
48 or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting
49 party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement
50 of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets
51 and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party
52 hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted
53 hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable
54 manner and upon reasonable notice.
55     Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien
56 law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting
57 the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or
58 utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the
59 payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.
60   C. Advances:
61     Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other
62 parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations
63 hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an
64 itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice
65 for the payment in advance of estimated expense shall be ~~submitted on or before the 20th day of the next preceding month.~~ Paid
66 ~~Each party shall pay to Operator its proportionate share of such estimate~~ within fifteen (15) days after such estimate and
67 invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as
68 provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end
69 that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.
70   D. Defaults and Remedies:
71     If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to
72 make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for
73 such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the
74 remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator,
2  and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator.
3  Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified
4  below or otherwise available to a non-defaulting party.

5     1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default,
6  specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one
7  or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such
8  Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the
9  default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of
10  the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the
11  Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area
12  after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting
13  party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right
14  to receive information as to any operation conducted hereunder during the period of such default, the right to elect to
15  participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being
16  conducted under this agreement even if the party has previously elected to participate in such operation, and the right to
17  receive proceeds of production from any well subject to this agreement.

18     2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint
19  account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default
20  until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from
21  suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

22     3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the
23  defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in
24  which event if the billing is for the drilling of a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a
25  well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting
26  party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with
27  respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party,
28  notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the
29  non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

30     Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure
31  its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such
32  payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-
33  defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the
34  non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership
35  of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

36     4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or
37  Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting
38  party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may
39  be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of
40  the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of
41  drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the
42  defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided
43  in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining
44  when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

45     5. Costs and Attorneys' Fees. In the event any party is required to bring legal proceedings to enforce any financial
46  obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of
47  collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

48  E. Rentals, Shut-in Well Payments and Minimum Royalties:

49     Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid
50  by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties
51  own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to
52  make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper
53  evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or
54  minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which
55  results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

56     Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to
57  production of a producing well, at least five (5) days (excluding Saturday, Sunday and legal holidays) prior to taking such
58  action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of
59  failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make
60  timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article
61  IV.B.3.

62  F. Taxes:

63     Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all
64  property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed
65  thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as
66  to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and
67  Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being
68  subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes
69  resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to
70  such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part
71  upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to
72  the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's
73  working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner
74  provided in Exhibit "C."

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2     prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3     determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4     and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5     the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6     paid by them, as provided in Exhibit "C."
7      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8     to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

9                        ARTICLE VIII.
10          ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
11   A. Surrender of Leases:
12      The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13   or in part unless all parties consent thereto.
14      However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15   notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16   delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a
17   party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18   described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19   implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20   located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the
21   assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22   consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
23   thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B."
24   Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25   accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26   shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27   in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the
28   reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29   acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30   the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less
31   than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the
32   assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33   interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made
34   varies according to depth, then the interest assigned shall similarly reflect such variances.
35      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36   party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37   assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38   agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.
39   B. Renewal or Extension of Leases:
40      If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41   shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42   promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following
43   delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44   affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45   allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interests held at that time by the
46   parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47   assignment of its proportionate interest therein by the acquiring party.
48      If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49   by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50   the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51   purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52   shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53   less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54   Agreement in the form of this agreement.
55      If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56   renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.
57      The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58   the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the
59   expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60   existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61   the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62   expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63   agreement.
64      The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.
65   C. Acreage or Cash Contributions:
66      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67   operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68   be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom
69   the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70   proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the
71   extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any
72   acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above
73   provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74   inside the Contract Area.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1     If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder,
2  such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
3  D. Assignment; Maintenance of Uniform Interest:
4     For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas
5  Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other
6  disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells,
7  equipment and production unless such disposition covers either:
8     1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or
9     2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells,
10  equipment and production in the Contract Area.
11     Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
12  and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and
13  Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of
14  the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale,
15  encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the
16  instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other
17  disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect
18  to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation
19  conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security
20  interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.
21     If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion,
22  may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures,
23  receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to
24  bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-
25  owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of
26  the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale
27  proceeds thereof.
28  E. Waiver of Rights to Partition:
29     If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
30  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its
31  undivided interest therein.
32  F. Preferential Right to Purchase:
33  ☒ (Optional; Check if applicable.)
34     Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
35  Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which
36  shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase
37  price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an
38  optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the
39  same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the
40  purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all
41  purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage
42  its interests, or to transfer title to its interests to its interests to a mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests,
43  or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets
44  to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any
45  company in which such party owns a majority of the stock.

46                        ARTICLE IX.
47            INTERNAL REVENUE CODE ELECTION
48     If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the
49  parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each
50  party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle
51  "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and
52  the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected
53  such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal
54  Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by
55  Treasury Regulations §1.761. Should there be any requirement that each party hereby affected give further evidence of this
56  election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal
57  Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action
58  inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
59  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter
60  1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party
61  hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each
62  such party states that the income derived by such party from operations hereunder can be adequately determined without the
63  computation of partnership taxable income.

64                        ARTICLE X.
65            CLAIMS AND LAWSUITS
66     Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure
67  does not exceed __Twenty Thousand__ Dollars ($ __20,000__ ) and if the payment is in complete settlement
68  of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over
69  the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling,
70  or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the
71  claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations
72  hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall
73  immediately notify all other parties, and the claim or suite shall be treated as any other claim or suit involving operations hereunder.

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE XI.
FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

ARTICLE XII.
NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

ARTICLE XIII.
TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ 120 _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ 120 _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Texas _____ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or
2 production of wells, on tracts offsetting or adjacent to the Contract Area.
3    With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages,
4 injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation
5 or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission
6 or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not
7 constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of
8 production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such
9 an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such
10 incorrect interpretation or application.

## ARTICLE XV.
## MISCELLANEOUS

13 A. Execution:
14    This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been
15 executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of
16 the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which
17 own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have
18 become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no
19 event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this
20 agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of
21 drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease
22 as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs
23 hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds
24 with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a
25 current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the
26 Initial Well which would have been charged to such person under this agreement if such person had executed the same and
27 Operator shall receive all revenues which would have been received by such person under this agreement if such person had
28 executed the same.
29 B. Successors and Assigns:
30    This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31 devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or
32 Interests included within the Contract Area.
33 C. Counterparts:
34    This instrument may be executed in any number of counterparts, each of which shall be considered an original for all
35 purposes.
36 D. Severability:
37    For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws,
38 this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to
39 this agreement to comply with all of its financial obligations provided herein shall be a material default.

## ARTICLE XVI.
## OTHER PROVISIONS



A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1          IN WITNESS WHEREOF, this agreement shall be effective as of the __1st__ day of __April__,
2   19 _98_ .

3   ATTEST OR WITNESS:                           OPERATOR

4   _____             SHELBY OPERATING COMPANY
5   _____             By _____
6   _____
7                                                Patrick B. Shelby
                                                 Type or print name

8                                                Title _President_____
9                                                Date _____
10                                               Tax ID or S.S. No. _75-25108316_____
11

12                              NON-OPERATORS

13

14                                               JFS Resources, Inc.,
15  _____             By _____
16  _____
17                                               Jeanne Fields Shelby
                                                 Type or print name

18                                               Title _President_____
19                                               Date _____
20                                               Tax ID or S.S. No. _75-2687461_____
21

22                                               _____
23  _____             By _____
24  _____
25                                               Sharon A. Shelby
                                                 Type or print name

26                                               Title _____
27                                               Date _____
28                                               Tax ID or S.S. No. _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_____
29                                               PS Resources, Inc.,
30  _____             By _____
31  _____
32                                               Patrick B. Shelby
                                                 Type or print name

33                                               Title _President_____
34                                               Date _____
35                                               Tax ID or S.S. No. _75-1948332_____
36

37

- 18 -

## NON-OPERATORS

S & P Company
_____

By _____*August Erickson*_____

_AUGUST ERICKSON, General Manager_
Type or print name

Title_____

Date_____

Tax ID or S. S. No._____


By _____

_Betty Upton_____
Type of print name

Title_____

Date_____

Tax ID or S. S. No._____


Sam Y. Dorfman, Jr. Living Trust

By _____

_____
Type or print name

Title_____

Date_____

Tax ID or S. S. No._____


By _____

_Louis Dorfman_____
Type or print name

Title_____

Date_____

Tax ID or S. S. No._____

18-A

## ACKNOWLEDGMENTS

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, the undersigned authority, on this day personally appeared Jeanne Fields Shelby, known to me to be the person whose name is subscribed to the foregoing instrument as President of **JFS RESOURCES, INC.**, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity stated, and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of _____, A. D., 1998.

Notary Public in and for the
State of _____,

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, the undersigned authority, on this day personally appeared Patrick B. Shelby, known to me to be the person whose name is subscribed to the foregoing instrument as President of **PS RESOURCES, INC.**, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity stated, and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 30 day of _____, A. D., 1998.

ANGELA L. FISK
Notary Public, State of Texas
My Comm. Expires 1-12-2002

Notary Public in and for the
State of _____,

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, the undersigned authority on this day personally appeared Sharon A. Shelby, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of _____, A. D., 1998.

Notary Public in and for the
State of _____,

## ACKNOWLEDGMENTS

THE STATE OF *Louisiana*

~~COUNTY~~ Parish OF *Caddo*

BEFORE ME, the undersigned authority, on this day personally appeared *August Erickson*, known to me to be the person whose name is subscribed to the foregoing instrument as *General Manager* of **S & P Company**, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity stated, and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the ____ 15th ____ day of ____ May ____, A. D., 1998.


*Frances M. Bailey*
Notary Public in and for the
State of *Louisiana*,

**FRANCES M. BAILEY**
NOTARY PUBLIC, Caddo Parish, Louisiana
My Commission is for Life

THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, the undersigned authority on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of **Sam Y. Dorfman Jr. Living Trust**, and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity stated, and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the ____ day of _____, A. D., 1998.


_____
Notary Public in and for the
State of _____,

THE STATE OF TEXAS

COUNTY OF _____

BEFORE ME, the undersigned authority on this day personally appeared Betty Upton, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the ____ day of _____, A. D., 1998.


_____
Notary Public in and for the
State of _____,

**ACKNOWLEDGMENTS**

THE STATE OF TEXAS

COUNTY OF DALLAS

      BEFORE ME, the undersigned authority on this day personally appeared <u>Louis Dorfman,</u> known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of _____, A. D., 1998.


                                _____
                                  Notary Public in and for the
                                  State of _____,

THE STATE OF TEXAS

COUNTY OF DALLAS

      BEFORE ME, the undersigned authority on this day personally appeared <u>Patrick B. Shelby,</u> known to me to be the person whose name is subscribed to the foregoing instrument as <u>President</u> of **Shelby Operating Company,** and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity stated, and as the act and deed of said corporation.

      GIVEN UNDER MY HAND AND SEAL OF OFFICE this the __30__ day of _April_____, A. D., 1998.

ANGELA L. FISK
Notary Public, State of Texas
My Comm. Expires 1-12-2002

                                _____
                                  Notary Public in and for the
                                  State of _Texas_____,

**EXHIBIT "A" (Sub #1) Plat**

Attached to and made a part of that certain OPERATING AGREEMENT for the Deason Unit, dated effective April 1, 1998, located in Panola County, Texas.



*Plat Showing:*
*PROPOSED WELL LOCATION*
*SHELBY OPERATING — DEASON #1*

*Located 4090 feet from the East line and 590 feet from the South line of the JAMES SHANDOIN SURVEY, A-595, PANOLA COUNTY, TEXAS.*

*Also located 1150 feet from the West line and 508 feet from the North line of a 100.427 ACRE UNIT.*

**EXHIBIT "A"** (Sub #'s 2 and 5)

Attached to and made a part of that certain OPERATING AGREEMENT for the Deason Unit, dated effective April 1, 1998, located in Panola County, Texas.

Schedule of Leases:

1.  Oil, Gas and Mineral Lease dated October 5, 1954 between W. T. McGee, et ux, as Lessor, and Fred Whitaker, as Lessee, recorded in Volume 362, Page 299, Panola County, Texas.

2.  Oil, Gas and Mineral Lease dated October 2, 1954 between John L. Murrell, et ux, as Lessor, and W. A. Byrd, as Lessee, recorded in Volume 365, Page 41, Panola County, Texas.

3.  Oil, Gas and Mineral Lease dated October 8, 1954 between H. J. Theriot, et ux, as Lessor, and Fred Whitaker, as Lessee, recorded in Volume 362, Page 493, Panola County, Texas.

4.  Oil, Gas and Mineral Lease dated August 11, 1955 between Mrs. Bonnie Adams Harris, as Lessor, and Fred Whitaker, as Lessee, recorded in Volume 376, Page 517, Panola County, Texas.

5.  Oil, Gas and Mineral Lease dated October 5, 1954 between M. T. Hines, et ux, as Lessor, and Fred Whitaker, as Lessee, recorded in Volume 362, Page 296, Panola County, Texas.

6.  Oil, Gas and Mineral Lease dated November 26, 1954 between J. R. Ellis, et ux, as Lessor, and Fred Whitaker, as Lessee, recorded in Volume 365, Page 280, Panola County, Texas.

7.  Oil, Gas and Mineral Lease dated March 6, 1998 between Daisy Ann Callaway, et vir, as Lessor, and JFS Resources, Inc. and PS Resources, Inc., as Lessees, recorded in Volume 1030, Page 749, Panola County, Texas.

8.  Oil, Gas and Mineral Lease dated June 30, 1995 between Margaret J. Deason, as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 956, Page 293, Panola County, Texas.

9.  Oil, Gas and Mineral Lease dated July 29, 1950 between H. O. Freeman, et ux, as Lessor, and Sam Sklar, as Lessee, recorded in Volume 301, Page 30, Panola County, Texas.

10. Oil, Gas and Mineral Lease dated August 14, 1995 between Deloris Faye White Campbell, as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 962, Page 158, Panola County, Texas.

11. Oil, Gas and Mineral Lease dated August 7, 1995 between Ollie Grant Brewster, as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 958, Page 724, Panola County, Texas.

12. Oil, Gas and Mineral Lease dated August 7, 1995 between Willie Jonathan Grant, as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 958, Page 730, Panola County, Texas.

13. Oil, Gas and Mineral Lease dated August 7, 1995 between Lois Grant Simmons, as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 958, Page 727, Panola County, Texas.

14. Oil, Gas and Mineral Lease dated August 15, 1995 between Gwendolyn Carol White Ware, as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 962, Page 155, Panola County, Texas.

dcexha

**EXHIBIT "A"** (Sub #'s 2 and 5)

Attached to and made a part of that certain OPERATING AGREEMENT for the Deason Unit, dated effective April 1, 1998, located in Panola County, Texas.

Schedule of Leases continued:

15.   Oil, Gas and Mineral Lease dated August 14, 1995 between John H. White, Jr., as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 962, Page 84, Panola County, Texas.

16.   Oil, Gas and Mineral Lease dated August 16, 1995 between Alfred Leo Milam, Jr., as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 962, Page 81, Panola County, Texas.

17.   Oil, Gas and Mineral Lease dated August 16, 1995 between Doretha Gulley Cain, as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 962, Page 78, Panola County, Texas.

18.   Oil, Gas and Mineral Lease dated August 17, 1995 between Helen Gulley Thomas, as Lessor, and Jeanne Fields Shelby and Patrick B. Shelby, as Lessees, recorded in Volume 962, Page 138, Panola County, Texas.

All other oil and gas leases, co-lessors agreements, amendments to leases, ratifications, mineral deeds and other agreements now held or that may hereafter be acquired by JFS Resources, Inc. and/or PS Resources, Inc. insofar as the same affect the unitized area, any part thereof, or any interest therein.

Insofar and only insofar as the above leases and documents cover gas and gas condensate at depths commencing at, and located only below, 3,000' below the surface under the lands described in said respective leases and documents and set out in Exhibit "A" (Sub #1) Plat, and from such depth down to the top of the stratigraphic equivalent of the Waskom (Cotton Valley "D" Sand) formation as producing in the H. F. Edgar #1 Well, RRC# 017278.

deexha

**EXHIBIT "A" (Sub #'s 3 and 4)**
**(Cont'd)**

To Operating Agreement dated 4-1-1998 between Shelby Operating Company, as Operator and  JFS Resource, Inc., et al as Non-Operator covering the Deason Unit.

<u>Setting out Parties, Decimal Interests of Parties, Addresses and Telephone Numbers, For Notice Purposes;</u>

| | |
|---|---|
| Shelby Operating Company<br>5535 Yale Boulevard., Suite #200<br>Dallas, TX  75206-5015<br>Phone:  (214) 739-5384<br>Fax:     (214) 739-5766 | 0 |
| JFS Resources, Inc.,<br>5535 Yale Boulevard, Suite #200<br>Dallas, Texas  75206-5015<br>Phone:  (214) 739-5384<br>Fax:     (214) 739-5766 | .32822 |
| PS Resources, Inc.,<br>5535 Yale Boulevard, Suite #200<br>Dallas, Texas  75206-5015<br>Phone:  (214) 739-5384<br>Fax:     (214) 739-5766 | .32822 |
| Sharon A. Shelby<br>5535 Yale Boulevard, Suite #200<br>Dallas, Texas  75206-5015<br>Phone:  (214) 739-5384<br>Fax:     (214) 739-5766 | .00182 |
| S & P Company<br>330  Marshall Street, Suite #300<br>Shreveport, Louisiana  71101<br>Attn: _____<br>Phone:<br>Fax: | .25501 |
| Betty Upton<br>14934 Bramblewood Drive<br>Houston, Texas  77079<br>Phone:<br>Fax: | .00269 |
| Sam Y. Dorfman, Jr. Living Trust<br>8144 Walnut Hill Lane, Suite # 297<br>Lock Box 64<br>Dallas, Texas  75231-4316<br>Attn: _____<br>Phone:<br>Fax: | .04202 |
| Louis Dorfman<br>8144 Walnut Hill Lane, Suite #1000<br>Lock Box 64<br>Dallas, Texas  75231-4316<br>Phone:<br>Fax: | .04202 |

_____
1.00000

Please fill in the telephone numbers and contacts for your Interest
when returning the Execution pages of the Operating Agreement.

EXHIBIT "B"

Producers 88 (7-69) Paid Up
With 640 Acres Pooling Provision   **To Operating Agreement dated** 4-1-1998

°POUND PRINTING & STATIONERY COMPANY
4703-C RICHMOND, HOUSTON, TEXAS 77027 (713) 552-9797

**Between Shelby Operating Company, as Operator, and JFS Resources, Inc., et al as Non-Operators**

# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this _____ day of _____ 19 ____, between

_____

_____

_____

Lessor (whether one or more), whose address is: _____ ,
and _____ ,

1. Lessor, in consideration of _____ , Lessee, WITNESSETH:
of which is hereby acknowledged, and of the covenants and agreements of lessee hereinafter contained, does hereby grant, lease and let unto lessee the land covered hereby for _____ Dollars, receipt
the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar
to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct
roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in lessee's operations in exploring,
drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein
called "said land," is located in the County of _____ , State of _____ , and is described as follows:

This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed
by lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which lessor has a preference right of acquisition. Lessor agrees to execute any
supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment
hereunder, said land shall be deemed to contain _____ acres, whether actually containing more or less, and the above recital of acreage
in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2. Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of ten (10) years from this date, hereinafter
called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3. As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth part of all
oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth part of all
oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth of the cost of treating oil to render it marketable pipe
line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of
the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas
and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at
lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times
thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in,
this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be
continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced
from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow
lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration
of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration
of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby. Lessee
shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued
in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive
the royalties which would be paid under this lease if the wells were producing, and may be deposited in the _____

at _____ , or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. _____ Bank
If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment
herein provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships
thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to
a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event
of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land,
lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units
may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus
10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface
reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at
the time established, or after enlargement, are required under any governmental rule or order, for the drilling or operation of a well at a regular location, or for obtaining maximum
allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size required by such governmental order or
rule. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is
established either on said land, or on the portion of said land included in the unit, on or other land unitized therewith. A unit established hereunder shall be valid and effective
for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations
conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There
shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion
of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such
separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes,
including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which
allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that
the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation
of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation,
any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered
by this lease. Neither shall it impair the right of lessee to release as provided in paragraph 5 hereof, except that lessee may not so release as to lands within a unit while there
are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force lessee may dissolve any
unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon
for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in
force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or
result merely from the inclusion of such separate tracts within this lease but lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent
allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either
as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or
of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

6. Whenever used in this lease the word "operations" shall mean operations for any of the following: drilling, testing, completing, reworking, recompleting, deepening,
plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur
or other mineral, whether or not in paying quantities.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

Kraftbill **601**, BOX 800 TULSA OK 74101

 COPAS

# EXHIBIT " C "

1  Attached to and made a part of __Operating Agreement dated 4/1/98 between Shelby Operating__
2  __Company, as Operator, and JFS Resources, Inc., et al as Non-Operators.__
3
4
5
6
7
8  # ACCOUNTING PROCEDURE
9
10 # JOINT OPERATIONS
11
12 ## I. GENERAL PROVISIONS
13
14 **1.  Definitions**
15
16 "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure
17 is attached.
18 "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and
19 maintenance of the Joint Property.
20 "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint
21 Operations and which are to be shared by the Parties.
22 "Operator" shall mean the party designated to conduct the Joint Operations.
23 "Non-Operators" shall mean the Parties to this agreement other than the Operator.
24 "Parties" shall mean Operator and Non-Operators.
25 "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct
26 supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating
27 capacity.
28 "Technical Employees" shall mean those employees having special and specific engineering, geological or other
29 professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and
30 problems for the benefit of the Joint Property.
31 "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.
32 "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.
33 "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as
34 most recently recommended by the Council of Petroleum Accountants Societies.
35
36 **2.  Statement and Billings**
37
38 Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint
39 Account for the preceding month. Such bills will be accompanied by statements which identify the authority for
40 expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and
41 expense except that items of Controllable Material and unusual charges and credits shall be separately identified and
42 fully described in detail.
43
44 **3.  Advances and Payments by Non-Operators**
45
46 A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their
47       share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the
48       billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust
49       each monthly billing to reflect advances received from the Non-Operators.
50
51 B.   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made
52       within such time, the unpaid balance shall bear interest monthly at ~~the prime rate in effect at~~ One and One-Half
53       ___Percent_____ on the first day of the month in which delinquency occurs plus 1% or the
54       maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located,
55       whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid
56       amounts.
57
58 **4.  Adjustments**
59
60 Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof;
61 provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall
62 conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar
63 year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes
64 claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same
65 prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of
66 Controllable Material as provided for in Section V.
67
68
69 ## COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.
70

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First Level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

4. **Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5.    **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.    **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.    If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.    If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.    In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.    **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.    **Equipment and Facilities Furnished By Operator**

A.    Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed ___Twenty___ percent ( _20_ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.    In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.    **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.    **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.    **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



**12. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13. Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14. Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead – Drilling and Producing Operations**

i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or
(    ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(    ) shall be covered by the overhead rates, or
( X ) shall not be covered by the overhead rates.

A.  Overhead – Fixed Rate Basis

(1)  Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $ __6,600__
   (Prorated for less than a full month)

Producing Well Rate $ __700__

(2)  Application of Overhead – Fixed Rate Basis shall be as follows:

(a)  Drilling Well Rate

(1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

- 4 -

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

    (2)   Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)   Producing Well Rates

    (1)   An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

    (2)   Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

    (3)   An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

    (4)   A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

    (5)   All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)   The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease ~~in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable.~~ The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment. as listed for the prior year in the annual survey of combined Fixed rate Overhead charges for Oil and Gas producers published by Ernst & young yearly, or successor guidelines.

B. ~~Overhead – Percentage Basis~~

    ~~(1)   Operator shall charge the Joint Account at the following rates:~~

    (a)   Development

    _____ Percent ( _____ %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

    (b)   Operating

    _____ Percent ( _____ %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

    (2)   ~~Application of Overhead – Percentage Basis shall be as follows:~~

    For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval of the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2.   Overhead – Major Construction

    To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ __20,000__ :

A. ___5___ % of first $100,000 or total cost if less, plus

B. ___3___ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___2___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ___5___ % of total costs through $100,000; plus

B. ___3___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ___2___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.   New Material (Condition A)

    (1)   Tubular Goods Other than Line Pipe

        (a)   Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

        (b)   For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



pound Oil Field Haulers Association interstate truck rate shall be used.

(c)   Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d)   Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)   Line Pipe

(a)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b)   Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c)   Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d)   Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3)   Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)   Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2)   Material used on and moved from the Joint Property

(a)   At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)   At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

(3)   Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1)   Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.   **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS – 1984 – ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated **April 1,** 1998 by and
between Shelby Operating Company, and JFS Resources, Inc., et al as Non-Operators.

INSURANCE

Operator at all times while conducting operations under this agreement shall comply with the
Workmen's Compensation Laws of the State where the operations are being conducted, shall provide
Employer's Liability Insurance coverage in the amount of $500,000 and shall carry the following
insurance:

(a)    Commercial General Liability Insurance, excluding Products Liability Insurance,
covering injury to and death of persons with limits of $1,000,000, per each event.

(b)    Automotive Liability Insurance covering injury to and death of persons, with limits of
the same as (a);

(c )    Commercial General Liability Property Damage Insurance with limits of the same as (a);

and shall charge the premiums for all such insurance to the joint account under the terms of the
governing Operating Agreement.

If Operator elects to carry such insurance under its present policies, it shall make a reasonable
charge therefor. If separate policies are secured, the actual premiums paid shall be included as part of the
operating costs under the terms of the Operating Agreement. Operator will not be required to carry fire,
tornado, or any other type of insurance on the property of the parties hereto.

As to Operator's exclusively owned motor vehicles, charges for insurance under (b) above will
be governed solely by those provisions of the Accounting Procedure applicable to charges for equipment
furnished by Operator.

EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated April 1, 1998 by and between Shelby Operating Company, and JFS Resources, Inc., et al as Non-Operators.

I.

From and after the date of initial delivery of gas from the property, a party owner taking and disposing of, during any monthly accounting period, less than its full share of the gas as it is produced, shall be an "underproduced party", if such lesser taking and disposition is not a consequence of other provisions of this Agreement. A party owner's "full share" shall be the amount of a party owner's gas determined in accordance with the provisions of the Operating Agreement. A party owner taking and disposing of during any monthly accounting period, more than its full share of the gas as it is produced, shall be an "overproduced party", if such excess taking and disposition is not a consequence of other provisions of this Agreement. "Underproduction" of any underproduced party, during any monthly accounting period, shall be the difference between such party's full share of gas production, less its full share of gas used in property operations, vented and lost, and the gas delivered to the pipeline(s) for the account of such party owner. "Overproduction" of any overproduced party, during any monthly accounting period, shall be the difference between the gas delivered to the pipeline(s) for the account of such party owner and such party's full share of gas production, less its full share of gas used in property operations, vented and lost.

II.

This Agreement shall become effective on the date of initial deliveries of gas from the property to the pipeline, and shall continue in force and effect until deliveries of gas from the property have ceased and, except as otherwise provided herein, each party shall have the right to take in kind its full share of each separate "gas classification". "Gas classification", as used herein, shall mean each of the price categories provided or established pursuant to the Natural Gas Policy Act of 1978, as same may be amended, by any authority having the right to establish categories thereunder, or pursuant to any other applicable statue or judicial decision establishing gas price categories, including gas not subject to price regulation, which shall be considered as a separate category. Where the gas qualifies for more than one category, the category having the highest price applicable to the source (each separate identifiable geologic source or production contained in a well bore) of gas production shall be used for the determination to be made hereunder. Whenever the gas price category changes, from and after the date of such change, the gas shall no longer be accounted for or be considered in the former category, but shall be accounted for and thereafter be considered to be gas in the new category, until such time as the category is again changed.

III.

Should a party fail to take its full share of the different gas classifications produced from the property, except as provided hereinbelow where such party is to furnish make-up gas, such party's underproduction shall be regarded as remaining in storage in the reservoirs, subject to later recovery in accord with the terms hereof. During any monthly accounting period when a party is unable to take and market its full share (as such quantity may be reduced in accordance with provisions herein for providing make-up gas) of each gas classification, the other joint interest owners shall be entitled to produce and sell all or a portion of such quantity which the party has failed to take. If two or more parties are capable of taking and marketing quantities of gas to which such party was thus entitled but which it failed to take, in the absence of other agreement between them, each may take a share of such underproduction in the direct proportion of its joint interest therein to the total joint interest therein of all parties desiring to take such underproduction, provided, however, that any party or parties having a cumulative underproduction status shall have a first priority to take and market the underproduction over a party or parties having a cumulative overproduction status.

Any party having cumulative underproduction of a particular gas classification category shall be entitled to take a quantity of gas of such particular gas classification ("make-up") in excess of its full share of such gas up to twenty-five percent (25%) of the full share of gas of parties having cumulative overproduction of such particular gas classification. In the event there is more than one cumulative underproduced party seeking to make up underproduction, each such cumulative underproduced party shall be entitled to make up gas in the direct proportion that the cumulative underproduction of such party bears to all cumulative underproduction of all

parties then desiring make-up gas of the particular gas classification category. In the event there is more than one cumulative overproduced party required to furnish gas for make-up of underproduction, in absence of agreement between the affected parties, each such cumulative overproduced party shall furnish make-up gas (up to the twenty-five percent (25%) limitation heretofore provided) in the direct proportion that the cumulative overproduction of such party bears to all cumulative overproduction of all parties supplying gas of the particular gas classification category.

Any party having cumulative overproduction in any particular gas classification category shall at all times be entitled to seventy-five percent (75%) of its full share of gas of the particular gas classification category in which it cumulatively overproduced as long as such party remains overproduced. Any portion of such twenty-five percent (25%) make-up gas to which a party is entitled and which is not taken by such party may be taken by other cumulative underproduced party or parties up to the full twenty-five percent (25%) heretofore provided. If there is more than one party desiring make-up gas under this circumstance the parties taking such make-up gas shall be entitled to such quantities of make-up gas in proportion to the cumulative underproduction of the affected parties, determined as heretofore provided.

All gas taken by a party in accord with the terms of this Agreement, regardless of whether such party is overproduced or underproduced, shall be regarded as gas taken for its own account with title thereto being in such party, whether such gas be attributable to such party's full share of production, or whether it is being taken as overproduction, or whether it is being taken as make-up gas, and shall pay any and all production taxes and royalty due on such gas. All burdens and obligations, other than such royalty and production tax payments, shall be borne by the party having such burden or obligation.

IV.

The Unit Operator (hereinafter referred to as "Operator") will maintain an account of the quantities of gas, each party is entitled to, and the quantities of such category taken and marketed by each of the parties.

For purposes of balancing, the measurement point of the gas taken (both quantity and quality) shall be the party's discharge measurement point at or near the well from which the gas is produced. All parties hereto shall share in and own the concomitant crude and condensate (not including gas plant liquids) produced in accordance with their respective interests established pursuant to the provisions of the Operating Agreement, regardless of whether they are able to market their full share of gas.

V.

Recovery from storage by a cumulative underproduced party from a cumulative overproduced party shall be on a first in, first out basis and the cumulative underproduced party shall pay the cumulative overproduced party a storage fee for storing its gas. The storage fee shall be due and payable by such underproduced party to such overproduced party during any monthly accounting period such underproduced party removes gas from storage. The fee to be paid for storing gas in accordance with the provisions of this Agreement, shall be the deficiency in cash between the price that the overproduced party received for gas at the time the underproduction was had, and the price for gas the overproduced party is receiving at the time the underproduction is made up by the underproduced party multiplied by volume of make-up gas which qualifies for the storage fee charges, less royalty and taxes payable thereon.

Each party shall furnish the Operator upon his request the gas prices necessary to make the gas storage fee computation hereby provided, and the underproduced party(ies) shall remit to Operator monthly the amounts so determined to be due for storage fees. Operator shall in turn make monthly distribution of the storage fees received from the underproduced party(ies) to the party(ies) entitled to be paid the storage fees.

VI.

At the termination of gas production for a given gas classification category from the property, the overproduced party or parties shall make a monetary settlement of the imbalance by payment to the Operator for the account of the party or parties underproduced in that particular gas classification category, based on the price per Mcf the overproduced party or parties actually received for each Mcf of the overproduced gas. The price used for the above calculation shall be the overproduced party's or parties' bonafide collected gas sales price(s) less royalties,

severance, and other production taxes which have been paid with respect to such overproduction. Each of the parties agrees to maintain complete records as to the volume of gas it sold and the price received, so that the above computations can be made. The Operator shall distribute the payments it has received hereunder (from the overproduced party) to the underproduced party or parties entitled thereto in the proportion that each party's cumulative underproduction, for the category of gas for which payment is to be made, bears to the total of such cumulative underproduction. It is understood, however, that the Operator shall rely on the statements made to it, and shall have no liability with respect to the correctness of the funds received by it.

## VII.

Royalties shall be paid in accordance with provisions of the Operating Agreement. The Operator shall be reimbursed by each party taking gas for all royalty due and payable by Operator with respect to production taken by such party. Each party taking gas under the terms hereof shall pay any and all applicable taxes due on or with respect to such production. Each party shall be obligated to pay its working interest share of all costs and liabilities incurred in Unit operations, in accordance with the provisions of the Operating Agreement. Nothing herein shall be construed so as to deny to any party the right, from time to time, to produce and take or deliver to its purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

## VIII.

If any portion of the storage fee provided for in Article V or the settlement provided for an Article VI shall be based on prices subject to refund upon order of the Federal Energy Regulatory Commission or any authority having jurisdiction, the paying party or parties shall withhold such amounts subject to refund until prices are fully approved by the Federal Energy Regulatory Commission, unless the party or parties receiving payments furnish a corporate undertaking satisfactory to the paying party(ies).

## IX.

This agreement is hereby made subject to the requirements and obligations set out in Federal Energy Regulatory Commission order 500A, et seq., as well as any additional regulation promulgated by Federal Energy Regulatory Commission and/or Texas Railroad Commission concerning the transportation of natural gas.

EXHIBIT "F"

Attached to and made a part of that certain Operating Agreement dated **April 1,** 1998 by and between
Shelby Operating Company, and JFS Resources, Inc., et al as Non-Operators.

## NONDISCRIMINATION AND CERTIFICATION OF NONSEGREGATED FACILITIES

A.  Equal Opportunity Clause (41 CFR 60-1.4)  (Applicable only to contracts or purchase orders for more
than $10,000).  During the performance of this contract, the Operator agrees as follows:

(1)  The Operator will not discriminate against any employee or applicant for employment because
of race, color, religion, sex, or national origin.  The Operator will take affirmative action to ensure that
applicants are employed, and that employees are treated during employment, without regard to their race, color,
religion, sex, or national origin.  Such action shall include, but not be limited to the following:  employment,
upgrading, demotion, or transfer, recruitment advertising, layoff or terminations, including apprenticeship.  The
Operator agrees to post in conspicuous places available to employees and applicants for employment, notices to
be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)  The Operator will, in all solicitations or advertisements for employees placed by or on behalf of
the Operator, state that all qualified applicants will receive consideration for employment without regard to
race, color, religion, sex, or national origin.

(3)  The Operator will send to each labor union or representative of workers with which it has a
collective bargaining agreement or other contract or understanding, a notice to be provided by the agency
contracting officer, advising the labor union or workers' representative of the Operator's commitments under
section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous
places available to employees and applicants for employment.

(4)  The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965,
and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5)  The Operator will furnish all information and reports required by Executive Order 11246 of
September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and
will permit access to its books, records and accounts by the contracting agency and the Secretary of Labor for
purposes of investigation to ascertain compliance with such rules, regulations and orders.

(6)  In the event of the Operator's noncompliance with the nondiscrimination clauses of this
contract or with any of such rules, regulations or orders, this contract may be cancelled, terminated or
suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in
accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other
sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965,
or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law.

(7)  The Operator will include the provisions of paragraph (1) through (7) in every subcontract or
purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to
section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each
subcontractor or vendor.  The Operator will take such action with respect to any subcontract or purchase order
as the contracting agency may direct as a means of enforcing such provisions including sanctions for
noncompliance:  Provided, however, that in the event the Operator becomes involved in, or is threatened with,
litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator
may request the United States to enter into such litigation to protect the interests of the United States.

B.  Certification of Nonsegregated Facilities (41 CFR 60-1.3)
(Applicable only to contracts or purchase orders which are not exempt from the provisions of the Equal
Opportunity Clause set out above.)

The Operator certifies that it does not, and will not, maintain or provide for its employees any
segregated facilities at any of its establishments, and that it does not, and will not, permit its employees to
perform their services at any location, under its control, where segregated facilities are maintained.  The
Operator agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this contract
or purchase order.  As used in this certification, the term "segregated facilities" means any waiting rooms, work
areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other
storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation and
housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on
the basis of race, creed, color, or national origin, because of habit, local custom, or otherwise.  The Operator
further agrees that (except where it has obtained identical certifications from proposed subcontractors for

specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods): NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certificate of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e. quarterly, semi-annually, or annually).

C.   Affirmative Action Compliance Program (41 CFR 60-1.40)
(Applicable only if (a) the Operator has 50 or more employees and (b) the contract or purchase order is for $50,000 or more.)

The Operator shall develop a written affirmative action program for each of its establishments and within 120 days from the effectiveness of this contract or purchase order, shall maintain a copy of separate programs for each establishment, including evaluations of utilization of minority group personnel and the job classification tables, at each local office responsible for the personnel matters of such establishment.

D.   Employer Information Report (41 CFR 60-1.7)   (Applicable only if (a) the Operator has 50 or more employees, (b) the Operator is not exempt (pursuant to section 60-1.5 of Title 41 of the Code of Federal Regulations) from the requirement for filing Employer Information Report EEO-1 and (c) the contract or purchase order is for $50,000 or more).

The Operator agrees to file with the appropriate Federal agency annually, on or before the 31st day of March, complete and accurate reports on Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress or such form as may hereinafter be promulgated in its place.

E.   Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250)
(Applicable only to contracts or purchase orders for $10,000 or more).

The affirmative action clause prescribed in section 60-250.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-250.22 of said Regulations) as is set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then within 120 days from the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action program at each establishment which shall set forth the Operator's policies, practices and procedures in accordance with section 60-250.6 of said Regulations.

F.   Affirmative Action for Handicapped Workers (41 CFR 60-741.4)
(Applicable only to contracts or purchase orders for $2,500 or more).

The affirmative action clause prescribed in section 60-741.4 of Title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-741.22 of said Regulations) as is set out in full at this point. If the Operator (a) has 50 or more employees and (b) this contract or purchase order is for $50,000 or more, then, within 120 days of the effectiveness of this contract or purchase order, the Operator shall prepare and maintain an affirmative action at each establishment, which program shall set forth the Operator's policies, practices and procedures in accordance with section 60-741.6 of said Regulations.

G.   Unitization of Minority Business Enterprises (Federal Procurement Regulations 1-1.13)
(Applicable only to contracts or purchase orders which may exceed $10,000).

(1)   It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(2)   The Operator agrees to use his best efforts to carry out this policy in the award of his subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, the term "minority business enterprise" means a business, at least 50 percent, of which is owned by minority members, or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are Negroes, Spanish-speaking persons, American Orientals, American-Indians, American-Eskimos, and American Aleuts. Contractors may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.