A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

NOVEMBER 15 , 19 83 ,

OPERATOR ___CITIES SERVICE OIL AND GAS CORPORATION_____

CONTRACT AREA ___680.54 ACRES, MORE OR LESS, OUT OF THE_____

WILLIAM ROBINSON SURVEY, A-177_____

_____

COUNTY OR PARISH OF _____GREGG_____ STATE OF __TEXAS____

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L.  NO.  610  -  1982  REVISED

E-1 Gas Unit

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| |    1. Failure of Title | 3 |
| |    2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| |    3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| |    1. Resignation or Removal of Operator | 4 |
| |    2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| |    1. Proposed Operations | 5 |
| |    2. Operations by Less than All Parties | 5-6-7 |
| |    3. Stand-By Time | 7 |
| |    4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| |    1. Abandonment of Dry Holes | 8 |
| |    2. Abandonment of Wells that have Produced | 8-9 |
| |    3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| |    1. Drill or Deepen | 9-10 |
| |    2. Rework or Plug Back | 10 |
| |    3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 10 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11-12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between___CITIES SERVICE OIL AND GAS CORPORATION___
_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☐ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT - 1982

# ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of____one-eighth (1/8)_____which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

**C. Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

**D. Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

# ARTICLE IV.
## TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE IV
### continued

1  ☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2  (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3  in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4  hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5  functions.
6
7      Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8  with leases or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling
9  designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
10  This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12      No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13  provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
14  ticipate in the drilling of the well.
15
16  **B. Loss of Title:**
17
18      1. <u>Failure of Title</u>: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a
19  reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days
20  from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-
21  tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil
22  and gas leases and interests: and,
23      (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be
24  entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred,
25  but there shall be no liability on its part to the other parties hereto by reason of such title failure;
26      (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27  been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-
28  curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29  Area by the amount of the interest lost;
30      (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31  increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-
32  terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33  well;
34      (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35  failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36  who bore the costs which are so refunded;
37      (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38  borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39      (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40  claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41  connection therewith.
42
43      2. <u>Loss by Non-Payment or Erroneous Payment of Amount Due</u>: If, through mistake or oversight, any rental, shut-in well
44  payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45  there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46  payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47  which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48  date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49  the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50  required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51  the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52  shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53  or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:
54      (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55  up to the amount of unrecovered costs;
56      (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of
57  oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease
58  termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
59  portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,
60      (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest
61  lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62
63      3. <u>Other Losses</u>: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64  and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65  the Contract Area.
66
67
68
69
70

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE V.
## OPERATOR

**A. Designation and Responsibilities of Operator:**

CITIES SERVICE OIL AND GAS CORPORATION _____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

**C. Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

**D. Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A. Initial Well:**

On or before the 15th day of FEBRUARY , 19 84 , Operator shall commence the drilling of a well for
oil and gas at the following location: approximately eight thousand two hundred forty feet (8,240')
from the Northerly East Line and four thousand three hundred eighty feet (4,380')
from the Easterly South Line of the William Robinson Survey, A-177, Gregg County,
Texas,

and shall thereafter continue the drilling of the well with due diligence to a depth sufficient to test the Travis
Peak Formation or nine thousand three hundred feet (9,300'), whichever is the lesser;

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982
## ARTICLE VI
### continued

1  If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the
2  well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.
3
4
5
6  **B.  Subsequent Operations:**
7
8  1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided
9  for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
10 the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11 other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12 tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13 within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-
14 ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15 limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within
16 the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or
17 response given by telephone shall be promptly confirmed in writing.
18
19
20
21 If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22 period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
23 tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24 ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25 for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26 permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27 amination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI, if the
28 actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29 if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30 dance with the provisions hereof as if no prior proposal had been made.
31
32
33
34 2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Option
35 No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36 giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
37 the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
38 on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all
39 work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40 a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41 tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Con-
42 senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43 ditions of this agreement.
44
45
46
47 If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48 notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
49 to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours
50 (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51 ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52 failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for
53 such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party,
54 at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58 The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59 elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such
60 operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61 If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62 sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63 ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1 and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2 ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3 in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4 and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5 Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6 market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7 terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8 until it reverts) shall equal the total of the following:

12 (a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13 connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14 Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15 Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16 Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17 Party had it participated in the well from the beginning of the operations; and

21 (b) __300__% of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,
22 after deducting any cash contributions received under Article VIII.C., and __300__% of that portion of the cost of newly acquired equip-
23 ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24 participated therein.

28 An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29 working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30 conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31 reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32 and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33 the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34 such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35 plicable as between said Consenting Parties in said well.

39 During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40 proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41 taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42 ticle III.D.

46 In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47 of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48 abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49 ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

53 Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54 Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55 itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56 option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57 ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
59 operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
60 curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
61 realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas
62 produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
63 well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
64 which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
65 of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
66 above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

-6-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for production, ceases to produce in paying quantities.

3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:

(a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

(b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.

In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand-by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other instances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

## C. TAKING PRODUCTION IN KIND:

Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be

-7-

## CITIES SERVICE OIL AND GAS CORPORATION

P. O. Box 300
Tulsa, Oklahoma  74102

July 15, 1986

(ADDRESSEE LIST ATTACHED)

RE:  Operating Agreement, dated November 15, 1983, between
Cities Service Oil and Gas Corporation, as Operator,
and Amoco Production Company, et al, as Non-Operators,
covering lands in the William Robinson Survey, A-177,
Gregg County, Texas.

TO ALL WORKING INTEREST OWNERS:

The parties hereto to hereby agree to amend the referenced Agreement as follows:

Delete Page 8 (with gas balancing agreement) of the Operating Agreement and
substitute therefor the attached alternate Page 8, which makes provisions for
the Operator to dispose of non-operator gas.

Except as herein amended, said Agreement shall remain in full force and effect
as originally written.

If the above meets with your approval, please so indicate in the space provided
below and return one (1) accepted copy of this letter to: Cities Service Oil
and Gas Corporation, P. O. Box 12026, Jackson, Mississippi 39211, Attention:
Mr. Paul T. DeHoff.

Yours very truly,

CITIES SERVICE OIL AND GAS CORPORATION

By _____

Charles J. Shelton, Attorney-in-Fact

MLP:lk

AMOCO PRODUCTION COMPANY                     CONOCO, INC.

By _____              By _____

Working Interest Owners
July 15, 1986
Page 2

GETTY OIL COMPANY

By _____

SKLAR AND PHILLIPS, INC.

By *August Erickson*
      AUGUST ERICKSON, Vice President

REBA POWELL AGENCY

By _____

MARY DICKSON STEWART, TEST. EXEX.
FOR THE AUSTIN E. STEWART ESTATE

By _____


_____
LOUIS DORFMAN


_____
MYRON H. DORFMAN


_____
SAM Y. DORFMAN, JR.


_____
STEPHEN M. STEWART


_____
PAT MAJOR

MOSS PETROLEUM COMPANY

By _____

PARTNERSHIP PROPERTIES CO.

By _____

ELIZABETH F. DORFMAN TRUST

By _____

INTERSTATE BANK DALLAS, N.A., TRUSTEE
OF THE SUSANNA M. RYBURN HEGEMAN TRUST

By _____


_____
PEARL E. POWELL


_____
FRANK S. RYBURN


_____
STEPHANIE STEWART


_____
SUSAN S. HALL

## ADDRESSEE LIST FOR WORKING INTEREST OWNERS

Amoco Production Company
501 Westlake Park Blvd.
P. O. Box 3092
Houston, Texas  77253

Getty Oil Company
5177 Richmond Ave., Suite 800
Houston, Texas  77656

Sklar and Phillips, Inc.
P. O. Box 3735
Shreveport, Louisiana  71103

Reba Powell Agency
c/o Russell E. Brown, Agent
P. O. Box 3404
Longview, Texas  75606

Mary Dickson Stewart, Test. Executrix
for the Austin E. Stewart Estate
1320 Commercial National Bank Bldg.
Shreveport, Louisiana  71101

Pearl E. Powell
4326 Fawn Hollow
Farmers' Branch, Texas  75234

Frank S. Ryburn
c/o Moss Petroleum Company
2641 InterFirst Two
Dallas, Texas  75270

Pat Major
P. O. Box 33
New London, Texas  75682

Conoco, Inc.
P. O. Box 2197
Houston, Texas  77252

Moss Petroleum Company
2641 InterFirst Two
Dallas, Texas  75270

Partnership Properties Co.
P. O. Box 2250
Denver, Colorado  80201

Elizabeth F. Dorfman Trust
Louis Dorfman
Sam Y. Dorfman, Jr.
c/o Dorfman Production Company
2315 Mercantile Bank Bldg.
Dallas, Texas  75201

Susanna M. Ryburn Hegeman Trust
c/o Interstate Bank Dallas, N.A.
Trustee
P. O. Box 84738
Dallas, Texas  75284

Myron H. Dorfman
Department of Petroleum Engineering
University of Texas
Austin, Texas  78712

Stephanie Stewart
Stephen M. Stewart
Susan S. Hall
1320 Commercial National Bank Bldg.
Shreveport, Louisiana  71101

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it,
9  but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-
10  taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to
11  the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas
12  not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such
13  reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event
14  for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate com-
15  merce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.

16

17      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate
18  pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate
19  share of total gas sales to be allocated to it, the balancing or accounting between the respective accounts of the parties shall
20  be in accordance with any gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit
    "E", or is a separate agreement.

21

22  D.  Access to Contract Area and Information:

23

24      Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
25  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
26  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
27  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
28  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
29  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
30  quests the information.

31

32  E.  Abandonment of Wells:

33

34      1.  Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
35  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
36  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
37  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
38  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
39  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
40  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
41  operations in search of oil and/or gas subject to the provisions of Article VI.B.

42

43      2.  Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
44  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
45  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
46  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
47  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
48  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
49  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
50  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
51  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
52  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
53  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
54  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
55  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
56  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

57
58
59
60
61
62
63
64
65
66
67
68
69
70

    6 alternate

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

1 ''B''. The assignments or leases so limited shall encompass the ''drilling unit'' upon which the well is located. The payments by, and the
2 assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3 Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4 interests in the remaining portion of the Contract Area.

6     Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7 the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re-
8 quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9 templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10 well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11 repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12 visions hereof.

14     3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between
15 Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16 permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17 of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18 VI.E.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

25     The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26 shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27 among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28 shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

B. Liens and Payment Defaults:

32     Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33 of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34 at the rate provided in Exhibit ''C''. To the extent that Operator has a security interest under the Uniform Commercial Code of the
35 state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob-
36 taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37 rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38 of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39 the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40 purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41 and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

43     If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44 Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45 the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46 reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

C. Payments and Accounting:

50     Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51 and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52 tionate shares upon the expense basis provided in Exhibit ''C''. Operator shall keep an accurate record of the joint account hereunder,
53 showing expenses incurred and charges and credits made and received.

55     Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56 of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57 month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58 with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59 on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within
60 fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61 due shall bear interest as provided in Exhibit ''C'' until paid. Proper adjustment shall be made monthly between advances and actual ex-
62 pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

D. Limitation of Expenditures:

66     1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67 pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  ☐  Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2  necessary tankage and/or surface facilities.

3

4  ☒  Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5  authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6  to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight
7  (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8  tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9  cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10  constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11  elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase ''reworking, deepening or plugging
12  back'' as contained in Article VI.B.2. shall be deemed to include ''completing'') shall apply to the operations thereafter conducted by less
13  than all parties.

14

15  2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16  plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging back of a well shall
17  include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18  and/or surface facilities.

19

20  3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21  to require an expenditure in excess of ___Twenty five Thousand_____Dollars ($_25,000.00_____)
22  except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23  previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24  emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required
25  to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26  parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27  an information copy thereof for any single project costing in excess of ___Ten Thousand_____
28  Dollars ($_10,000.00____) but less than the amount first set forth above in this paragraph.

29

30  E.  Rentals, Shut-in Well Payments and Minimum Royalties:

31

32  Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33  party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34  tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35  behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of
36  failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37  ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38  visions of Article IV.B.2.

39

40  Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production
41  of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by
42  circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify
43  Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment
44  shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

45

46  F.  Taxes:

47

48  Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49  subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they
50  become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not
51  be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-
52  Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, over-
53  riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54  owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55  tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding
56  anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57  value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in
58  the manner provided in Exhibit ''C''.

59

60  If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62  mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63  interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint ac-
64  count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
65  provided in Exhibit ''C''.

66

67  Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68  the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

69

70

-10-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  G.  Insurance:
2
3       At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10      In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                      ARTICLE VIII.
14                  ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
15
16  A.  Surrender of Leases:
17
18      The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21      However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement.
40
41  B.  Renewal or Extension of Leases:
42
43      If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47  interests held at that time by the parties in the Contract Area.
48
49      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54      Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55  by the acquiring party.
56
57      The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61  the provisions of this agreement.
62
63      The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65  C.  Acreage or Cash Contributions:
66
67      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70  tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VIII
### continued

1   said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2   governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3   it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4   tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5

6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7   consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8

9   D.  Maintenance of Uniform Interest:
10

11      For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12   party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13   equipment and production unless such disposition covers either:
14

15      1. the entire interest of the party in all leases and equipment and production; or
16

17      2. an equal undivided interest in all leases and equipment and production in the Contract Area.
18

19      Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20   and shall be made without prejudice to the right of the other parties.
21

22      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23   require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24   and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25   party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26   into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27   Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28

29   E.  Waiver of Rights to Partition:
30

31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32   undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33   interest therein.
34

35   F.  Preferential Right to Purchase:
36

37      ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
38   Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, ~~which shall~~ include the
39   name and address of the prospective purchaser (who must be ready, willing and able to purchase), the ~~purchase~~ price, and all other terms
40   of the offer. The other parties shall then have an optional prior right, for a ~~period of ten (10)~~ days after receipt of the notice, to purchase
41   on the same terms and conditions the interest which the other ~~party~~ proposes to sell; and, if this optional right is exercised, the purchas-
42   ing parties shall share the purchased interest ~~in the~~ proportions that the interest of each bears to the total interest of all purchasing par-
43   ties. However, there shall be ~~no preferential~~ right to purchase in those cases where any party wishes to mortgage its interests, or to
44   dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-
45   ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~
46

47                  ARTICLE IX.
48            INTERNAL REVENUE CODE ELECTION
49

50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51   for profit between or among the parties hereto.  Notwithstanding any provision herein that the rights and liabilities hereunder are several
52   and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53   purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54   from the application of all of the provisions of Subchapter ''K'', Chapter 1, Subtitle ''A'', of the Internal Revenue Code of 1954, as per-
55   mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56   ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57   United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58   and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59   evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60   Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61   action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62   Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter ''K'', Chapter 1,
63   Subtitle ''A'', of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64   mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65   tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66   computation of partnership taxable income.
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.

CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed__Fifteen Thousand_____Dollars ($_15,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

ARTICLE XI.

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.

NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.

TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of ___120___ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within ___120___ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

-13-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

A.    The Austin E. Stewart Estate (hereinafter referred to in this Article XV. A. as "Farmor") has elected not to participate in the drilling of the Initial Well provided for in Article VI. A. and, in lieu of actual participation, agree to relinquish to Cities Service Oil and Gas Corporation and Amoco Production Company (hereinafter jointly referred to in this Article XV. A. as "Farmees") all of Farmor's working interest in the Contract Area subject to the provisions of this Article XV. A.

(1)  The Initial Well shall be commenced as provided in Article VI. A. hereinabove and shall be drilled at the sole cost, risk and expense of Farmees and the participating Non-Operators as set out in Exhibit "A" to the depth specified in said Article VI. A.

(2)  In the event the Initial Well is plugged and abandoned as a dry hole or if the Initial Well is lost for any reason prior to being drilled to contract depth, Farmees are granted the right to commence a substitute well or wells for any well which has been lost or plugged and abandoned as a dry hole within one hundred twenty (120) days from the date of completion or cessation of operations in the prior well. Any substitute well or wells drilled hereunder shall be drilled subject to the same terms and conditions as provided for the Initial Well and shall be completed within a reasonable time from the date of commencement. Any reference herein or hereinafter made to the Initial Well shall be deemed to be a reference to any substitute well or wells which may be drilled therefor.

(3)  Upon completion of the Initial Well, or any substitute well therefor, as a well capable of producing oil and/or gas in paying quantities, Farmor shall assign to Farmees an undivided seventy percent (70%) of its right, title and interest in the leases contributed hereto by Farmor insofar

REVISED 12-16-83                               -14-

as they cover lands lying within the Contract Area, from the top of the Travis
Peak Formation down to and including, but not below, one hundred feet (100')
below the total depth drilled in the Initial Well.  Farmor shall also relinquish
to Farmees all of its remaining interest in the Initial Well and the unit
for production therefor and Farmees shall be deemed to own said interests
subject to the reservation by Farmor of an overriding royalty equal to the
difference between the Lessor's royalty, any overriding royalty or other
burden in existence as of the date hereof and twenty-five percent (25%) of
all production from the Initial Well, with the right to elect either to retain
said overriding royalty or to receive a working interest as hereinafter provided.
The overriding royalty herein reserved by Farmor shall be reduced by the
proportion that Farmor's net acre contribution to the Contract Area bears
to the total acres in the Contract Area.

(4)  Operator shall furnish Farmor notices and well information
as provided in this Agreement and a monthly itemized statement of the cost
of operations and the quantity and quality of oil, gas or other minerals
which are produced from the Initial Well.  Operator shall promptly notify
Farmor when the value of all oil, gas, casinghead gas, distillate and/or
condensate and other minerals which are produced and saved from the Initial
Well (or any substitute or replacement well therefor) (together with the
processed value, if any, of such production and the proceeds from the sale
of any material and equipment from the said well) less (1) severance, production,
"windfall profits", and/or mineral ad valorem or other taxes measured by
production and assessed on/or against the Initial Well, the unit for production
for the said well or production from the said well, (2) the Lessor's royalty,
(3) any overriding royalty in existence as of the date hereof and (4) Farmor's
overriding royalty, equals one hundred percent (100%) of the total cost and
expense of drilling, testing, completing and equipping of the said Initial
Well and any substitute or replacement well therefor (including one hundred
percent (100%) of the cost of operations for the said well, and any substitute
or replacement well therefor, incurred up to the time such value equals the
total cost).  Such notice shall be furnished to Farmor at the address reflected
in Exhibit "A" and Farmor shall have the option, to be exercised within thirty
(30) days from receipt of said notice, either to elect to receive a working
interest in the percentage set forth in Exhibit "A" or retain its overriding
royalty.

(5)  If Farmor elects to receive a working interest, Farmees shall
release to Farmor an undivided thirty percent (30%) of Farmor's original
interest in the unit for production for the Initial Well and thereafter the
interests of the parties in the Initial Well and unit for production therefor
shall be in the percentages set forth in Exhibit "A" and the overriding royalty
shall terminate.  The effective date of the release of working interest and
termination of the overriding royalty shall be the date that the value of
production from the Initial Well equals the total cost of the Initial Well
as herein provided.  For the purpose of computing the day in which the value
of production equals said total cost, the overriding royalty payable to Farmor
and the working interest income, together with all cost and expense shall
be calculated on a daily basis for the actual month in which the said value
equals the said total cost.  Said cost and expense, including the overriding
royalty payable to Farmor and/or the working interest income, shall be appor-
tioned on a daily basis for said month and the cost, expense and revenue
shall be adjusted to the day so calculated.  In the event Farmor does not
elect to receive a working interest, Farmor shall assign its remaining interest
in the unit for production for the Initial Well to Farmees and Farmees shall
own the interest of Farmor in the Initial Well and unit for production therefor.

(6)  In the event Farmees fail to commence or complete the Initial
Well, or any substitute well, the only liability for such failure will be
the loss of the right to receive an assignment from Farmor.

(7)  Operator, upon request, shall furnish Farmor copies of all
logs run, test information obtained and reports filed in connection with
the Initial Well.

B.  Cities Service's interest under this Agreement is subject to that
certain gas sales contract with Texas Eastern Transmission Corporation,
dated May 3, 1981.

REVISED 12-16-83                    -14A-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ____15th____ day of ____NOVEMBER____, 19_83_.

### OPERATOR

CITIES SERVICE OIL AND GAS CORPORATION

By ___Bryan B. Roberts___ DGH

_____    Bryan B. Roberts    Attorney-in-Fact

### NON-OPERATORS

AMOCO PRODUCTION COMPANY
CONOCO, INC.
ELIZABETH F. DORFMAN TRUST
LOUIS DORFMAN
_____    SAM Y. DORFMAN, JR.
MYRON H. DORFMAN
GETTY OIL COMPANY
SUSANNA RYBURN HEGEMAN TRUST
PAT MAJOR
_____    MOSS PETROLEUM COMPANY
REBA POWELL AGENCY
PEARL E. POWELL
FRANK S. RYBURN
SKLAR AND PHILLIPS, INC.
MARY DICKSON STEWART, TEST. EXECUTRIX
FOR THE AUSTIN E. STEWART ESTATE
STEPHANIE STEWART
STEPHEN M. STEWART
SUSAN S. HALL
PETRO-LEWIS CORPORATION

STATE OF OKLAHOMA )
                  )SS
COUNTY OF TULSA   )

This instrument was acknowledged before me on the _8th_ day of _December_, 1983 by __Bryan B. Roberts__, as Attorney-in-Fact on behalf of CITIES SERVICE OIL AND GAS CORPORATION.

My commission expires:

NOV 1 0 1984
_____

___Dianne Kaupe___
                        Notary Public
in and for Tulsa County, Oklahoma

EXHIBIT "A" – Attached to and made a part of Operating Agreement dated November 15, 1983, between CITIES SERVICE OIL AND GAS CORPORATION and AMOCO PRODUCTION COMPANY, ET AL.

(1)  IDENTIFICATION OF LANDS SUBJECT TO AGREEMENT (CONTRACT AREA):

680.54 acres, more or less, out of the William Robinson Survey, A-177, Gregg County, Texas, as shown on the plat attached hereto and made a part hereof as Exhibit "A-1".

(2)  RESTRICTIONS AS TO DEPTHS OR FORMATIONS:

From the top of the Travis Peak Formation down to and including, but not below, one hundred feet (100') below the total depth drilled in the Initial Well provided for in Article VI.A.

(3)  PERCENTAGES OR FRACTIONAL INTERESTS OF PARTIES TO THIS AGREEMENT:

| | Working Interest Before Payout of Initial Well | Working Interest After Payout of Initial Well * |
|---|---|---|
| Cities Service Oil and Gas Corporation | 53.38249% | 51.28764% |
| Amoco Production Company | 31.14926% | 29.92701% |
| Conoco, Inc. | 1.08736% | 1.08736% |
| Petro-Lewis Corporation | .38203% | .38203% |
| Elizabeth F. Dorfman Trust | .24489% | .24489% |
| Louis Dorfman | .18368% | .18368% |
| Myron H. Dorfman | .12245% | .12245% |
| Sam Y. Dorfman, Jr. | .18368% | .18368% |
| Getty Oil Company | 2.99510% | 2.99510% |
| Susanna Ryburn Hegeman Trust | .24490% | .24490% |
| Pat Major | .04347% | .04347% |
| Moss Petroleum Company | .97959% | .97959% |
| Reba Powell Agency | 3.16585% | 3.16585% |
| Pearl E. Powell | 3.16585% | 3.16585% |
| Frank S. Ryburn | .24489% | .24489% |
| Sklar and Phillips, Inc. | .73470% | .73470% |
| Austin E. Stewart Estate | -0- | 3.31710% |
| Stephanie Stewart | .56327% | .56327% |
| Stephen M. Stewart | .56327% | .56327% |
| Susan S. Hall | .56327% | .56327% |
| | 100.00000% | 100.00000% |

*Assuming Farmor elects to receive a working interest in accordance with Article XV.A.(5).

(4)  OIL AND GAS LEASES AND/OR OIL AND GAS INTERESTS SUBJECT TO THIS AGREEMENT:

| | |
|---|---|
| CITIES SERVICE'S LEASE NO: | 4200046/4200046 |
| DATE OF LEASE: | April 29, 1930 |
| LESSOR: | P. D. Harrison |
| LESSEE: | B. A. Skipper |
| RECORDING DATA: | Book 4, Page 386 |

| | |
|---|---|
| CITIES SERVICE'S LEASE NO: | 4200050/4200050 |
| DATE OF LEASE: | April 24, 1930 |
| LESSOR: | F. K. Lathrop, et al |
| LESSEE: | B. A. Skipper |
| RECORDING DATA: | Book 4, Page 429 |

REVISED 12-16-83

EXHIBIT "A"
Page Two

| | |
|---|---|
| CITIES SERVICE'S LEASE NO: | 4200069/4200069 |
| DATE OF LEASE: | May 22, 1930 |
| LESSOR: | G. B. Tenery, et al |
| LESSEE: | B. A. Skipper |
| RECORDING DATA: | Book 4, Page 336 |

| | |
|---|---|
| CITIES SERVICE'S LEASE NO: | 4200145/4200145 |
| DATE OF LEASE: | August 25, 1953 |
| LESSOR: | J. M. Hunter, et ux |
| LESSEE: | Arkansas Fuel Oil Corporation |
| RECORDING DATA: | Book 416, Page 447 |

| | |
|---|---|
| DATE OF LEASE: | April 24, 1930 |
| LESSOR: | Mrs. Emma Killingsworth |
| LESSEE: | J. E. Farrell |
| RECORDING DATA: | Book 4, Page 468 |

| | |
|---|---|
| DATE OF LEASE: | April 24, 1930 |
| LESSOR: | J. C. McKinley, et al |
| LESSEE: | B. A. Skipper |
| RECORDING DATA: | Book 60, Page 204 |

(5) ADDRESSES OF PARTIES FOR NOTICE PURPOSES:

Cities Service Oil and Gas Corporation
P. O. Box 300
Tulsa, Oklahoma  74102
Attention:  Manager-Land

With copy to:

Cities Service Oil and Gas Corporation
P. O. Box 12026
Jackson, Mississippi  39211
Attention:  Manager-Land

Amoco Production Company
501 Westlake Park Blvd.
P. O. Box 3092
Houston, Texas  77253
Attention: Mr. John Studdard

Conoco, Inc.
P. O. Box 2197
Houston, Texas  77252
Attention:  Mr. Steve Nicandros

Petro-Lewis Corporation
P. O. Box 90500
Houston, Texas  77290
Attention:  Ms. Lana Caterson

Elizabeth F. Dorfman Trust
Louis Dorfman
Sam Y. Dorfman, Jr.
c/o Dorfman Production Company
2315 Mercantile Bank Bldg.
Dallas, Texas  75201

Myron H. Dorfman
Department of Petroleum Engineering
University of Texas
Austin, Texas  78712

EXHIBIT "A"
Page Three

      Getty Oil Company
      5177 Richmond Ave., Suite 800
      Houston, Texas   77656
      Attention: Ms. Leslie Hocker

      Susanna Ryburn Hegeman Trust
      c/o InterFirst Bank of Dallas, Trustee
      P. O. Box 84738
      Dallas, Texas   75283
      Attention:  Trust Services Energy Dept.

      Pat Major
      P. O. Box 33
      New London, Texas   75682

      Moss Petroleum Company
      2641 InterFirst Two
      Dallas, Texas   75270
      Attention:  Mr. John M. Little, Jr.

      Reba Powell Agency
      c/o Russell E. Brown, Agent
      P. O. Box 3404
      Longview, Texas   75606

      Pearl E. Powell
      4326 Fawn Hollow
      Farmers' Branch, Texas   75234

      Frank S. Ryburn
      c/o Moss Petroleum Company
      2641 InterFirst Two
      Dallas, Texas   75270

      Sklar and Phillips, Inc.
      P. O. Box 3735
      Shreveport, Louisiana 71103
      Attention:  Mr. August Erickson

      Mary Dickson Stewart, Test. Executrix
      for the Austin E. Stewart Estate
      1320 Commercial National Bank Bldg.
      Shreveport, Louisiana   71101

      Stephanie Stewart
      Stephen M. Stewart
      Susan H. Hall
      1320 Commercial National Bank Bldg.
      Shreveport, Louisiana   71101

REVISED 12-16-83

EXHIBIT "A-1"

PLAT OF SURVEY
SHOWING

THE CITIES SERVICE OIL & Gas Corp.
R.D. HARRISON WELL LOC. N° E.1,
BEING 8240° FT. FROM THE NORTHERLY
EAST LINE AND 2380° FT. FROM THE
EASTERLY SOUTH LINE OF THE WILLIAM
ROBINSON SURVEY A-177
COUNTY, TEXAS.

Surveyed; September, 1983
Scale; 1"=1000'Ft.

Revised; 9-13-83 : 10-11-83   11-0-1045

I, Frank Cowan, Registered Public Surveyor N° 2742,
do hereby certify that that above plat was
prepared from an actual survey made on the
ground during the month of September, 1983.

GIVEN UNDER MY HAND & SEAL,
this this 9th day of September, 1983.

Frank Cowan
Registered Public Surveyor N° 2742

COPAS — 1974
Recommended by the Council of Petroleum Accountants Societies of North America

PostOak 601, TULSA 74101



## EXHIBIT " C "

Attached to and made a part of __Operating Agreement dated__
__November 15, 1983, between CITIES SERVICE OIL AND GAS__
__CORPORATION and AMOCO PRODUCTION COMPANY, ET AL.__

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

**2. Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately itemized and fully described in detail.

**3. Advances and Payments by Non-Operators**

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5. Audits**

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

**6. Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —



## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**

   A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

   (2) Salaries of First Level Supervisors in the field.   (Included in Section III. Overhead)

   (3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

   D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.   (Personal Expenses of First Level Supervisors included in Section III. Overhead)

3. **Employee Benefits**

   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies of North America.

4. **Material**

   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. **Transportation**

   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

6. **Services**

   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional·consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

7. **Equipment and Facilities Furnished by Operator**

   A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

   B.. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**

   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**

   Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

COPAS

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at ~~Operator's cost not to exceed~~ manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

# III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

i.  As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or

(    ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.  The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (   ) shall not (X) be covered by the Overhead rates.  **The salaries, wages and personal expenses of First Level Supervisors shall be covered by the overhead rates.**

A.  Overhead - Fixed Rate Basis

(1)  Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $_____7500.00_____

Producing Well Rate $_____625.00_____

(2)  Application of Overhead - Fixed Rate Basis shall be as follows:

(a)  Drilling Well Rate

[1]  Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

[2]  Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

[3]  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

(b)  Producing Well Rates

[1]  An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

[2]  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

[3]  An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

[4]  A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

[5]  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)  The well rates shall be adjusted as of the first day of April each year following ~~the effective date of the agreement to which this Accounting Procedure is attached.~~  shall escalate April 1, 1985 and   April 1, 1985.  The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

REVISED 4-3-85                                          — 3 —

COPAS

B. Overhead - Percentage Basis

  (1) Operator shall charge the Joint Account at the following rates:

    (a) Development

      _____ Percent (    %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

    (b) Operating

      _____ Percent (    %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

  (2) Application of Overhead - Percentage Basis shall be as follows:

    For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

## 2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $25,000.00 :

A.   __5__ % of total costs if such costs are more than $25,000.00 but less than $100,000.00 ; plus

B.   __3__ % of total costs in excess of $100,000.00 but less than $1,000,000; plus

C.   __2__ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

## 3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

# IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

## 1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

## 2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

  (1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

  (2) Line Pipe

    (a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

    (b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

  (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1) Material moved to the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

  (2) Material moved from the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five per-cent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Para-graph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, pro-vided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dis-pose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service ren-dered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

# V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inven-tory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory ad-justments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

— 5 —

6/25/81 (1977)

EXHIBIT "D" - Attached to and made a part of Operating Agreement, dated
November 15, 1983, between CITIES SERVICE OIL AND GAS
CORPORATION and AMOCO PRODUCTION COMPANY, ET AL.

EXHIBIT "D"

INSURANCE

The Operator shall provide for Workmen's Compensation coverage
in accordance with the law of the State where operations are being con-
ducted.  No other insurance shall be provided by the Operator for the
benefit of the parties hereto.

EXHIBIT "E" - Attached to and made a part of Operatig Agreement dated
November 15, 1983, between CITIES SERVICE OIL AND GAS
CORPORATION and AMOCO PRODUCTION COMPANY, ET AL.

GAS STORAGE AND BALANCING AGREEMENT

The parties to the Operating Agreement to which this gas storage
agreement is attached own the working interest in the gas rights underlying
the Unit Area covered by such agreement in accordance with the percentages
of participation as set forth in Exhibit "A" to the Operating Agreement.

In accordance with the terms of the Operating Agreement, each party
thereto has the right to take its share of gas produced from the Unit Area
and market the same. In the event any of the parties hereto is not able
to market its share of gas or has contracted to sell its share of gas produced
from the Unit Area to a purchaser which is unable at any time while this
agreement is in effect to take the share of gas attributable to the interest
of such party, the terms of this storage agreement shall automatically become
effective.

During the period or periods when any party hereto has no market
for its share of gas produced from the Unit Area, or its purchaser is unable
to take its share of gas produced from the Unit Area, the other parties shall
be entitled to produce each month one hundred percent (100%) of the allowable
gas production assigned to such Unit by the Railroad Commission of Texas
and shall be entitled to take and deliver to its or their purchaser all of
such gas production; however, no party shall be entitled to take or deliver
to a purchaser gas production in excess of three hundred percent (300%) of
its current share of either the volumes capable of being delivered or the
allowable gas production if assigned thereto by the Railroad Commission of
Texas unless that party has gas in storage. All parties hereto shall share
in and own the liquid hydrocarbons recovered from such gas by lease equipment
in accordance with their respective interests and subject to the Operating
Agreement to which this gas storage agreement is attached, but the party
or parties taking such gas shall own all of the gas delivered to its or their
purchaser. Each party unable to market its share of the gas produced shall
be credited with gas in storage equal to its share of the gas produced under
this agreement, less its share of gas used in lease operations, vented or
lost.

Each party taking gas shall furnish the Operator a monthly statement
of gas taken. The Operator will maintain a current account of the gas balance
between the parties and will furnish all parties hereto monthly statements
showing the total quantity of gas taken and/or sold by each party and the
monthly and accumulative over and under delivered of each party.

Each party producing and/or delivering gas to its purchaser shall
pay any and all production taxes due on such gas.

At all times while gas is produced from the Unit Area, each party
hereto will make settlement with the respective royalty owners to whom they
are each accountable, just as if each party were taking or delivering to
a purchaser its share, and its share only, of such gas production. Each
party hereto agrees to hold each other party harmless from any and all claims
for royalty payments asserted by royalty owners to whom each party is account-
able.

After notice to the Operator, any party at any time may begin taking
or delivering to its purchaser its share of the gas produced from the Unit
Area. In addition to its share, each party, including the Operator, until
it has recovered its gas in storage and balanced the gas account as to its
interest, shall be entitled to take or deliver to a purchaser a volume of
gas equal to fifty percent (50%) of the overproduced party or parties' share
of gas produced from the Unit Area. If two or more parties are entitled
to fifty percent (50%) of the overproduced party or parties' share of gas
produced, they shall divide such fifty percent (50%) in accordance with their
percentage of participation in the Unit.

EXHIBIT "E"
GAS STORAGE AND BALANCING AGREEMENT
Page 2

Should production of gas be discontinued before the gas account is balanced, a monetary settlement will be made between the underproduced and overproduced parties. In making such settlement, each overproduced party shall be liable to each underproduced party for the amount of money that such party received for its overproduction, less taxes theretofore paid, for a volume of gas equal to its overproduction. The price basis shall be the rate collected from time to time regardless of whether such sum is subject to possible refund subject to Federal Energy Regulatory Commission order. It is agreed in the event a refund must be subsequently made, the non-taking or underproduced parties shall either reimburse the taking party to the extent of the refund due and the taking party shall make refund to the purchaser or the non-taking or underproduced party shall save and protect the taking party and hold it harmless from any claim for such refund and it shall make payment of the amount due to be refunded directly to the gas purchaser. The parties receiving such payment shall indemnify the paying parties for any possible liability with respect to such amounts as may be subject to possible refund as provided by the Federal Energy Regulatory Commission, pursuant to final order or settlement applicable to the gas sold. Such amounts shall be shared by the underproduced parties in the proportion that the under-production of each bears to the underproduction of all parties.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to its purchaser the full well stream for a period not to exceed seventy-two (72) hours to meet the deliverability test required by its purchaser. Each party shall, at all times, use its best efforts to regulate its takes and deliveries from said Unit so that said Unit will not be shut in for overproducing the allowable or for cancellation of allowable because of underproducing the allowable assigned thereto by the state regulatory body.

The provisions of this agreement shall be applied to each well and/or formation completion as if each well or formation completion were a separate well and covered by a separate but identical gas storage and balancing agreement and shall be and remain in force and effect for a term concurrent with the term of the Unit Operating Agreement between the parties.

This agreement shall become effective in accordance with its terms and shall remain in force and effect as long as the Operating Agreement to which it is attached remains in effect, and shall inure to the benefit of and be binding upon the parties hereto, their successors, legal representatives and assigns.

35-210 (10-82)

EXHIBIT " F "

# EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION

During the performance of this contract, the Operator (meaning and referring separately to each party hereto) agrees as follows:

1. **NONSEGREGATED FACILITIES REQUIREMENTS:** The provisions of this Section apply only if the total contract amount exceeds $10,000. A Certification of Nonsegregated Facilities, as required by 41 CFR §1-12.803-10(d)(1) and 60-1.8, shall be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each subcontract or for all subcontracts during a period.

2. **EQUAL EMPLOYMENT OPPORTUNITY:** The provisions of this Section apply only if the total contract amount exceeds $10,000. During the performance of this contract, the Seller agrees that it will comply with all provisions of Executive Order No. 11246 which is incorporated into this agreement by this reference.

3. **EQUAL EMPLOYMENT OPPORTUNITY REPORTING REQUIREMENTS:** The following applies only if Seller has 50 or more employees and holds contracts, subcontracts or purchase orders amounting to more than $50,000: Seller will complete and file Government Standard Form 100, Equal Employment Opportunity Employer Information Report EEO-1 (or such other form as may have superseded it), in accordance with the instructions contained therein.

4. **AFFIRMATIVE ACTION COMPLIANCE PROGRAMS:** The provisions of this Section apply only if Seller has 50 or more employees and holds contracts, subcontracts or purchase orders amounting to more than $50,000.

   (a) In compliance with Paragraph 60-1.40, and in accordance with Sections 60-2.1 through 60-2.32 of the rules of the Office of Federal Contract Compliance Programs, Seller shall develop a written affirmative action compliance program for each of its establishments. Within 120 days from the issue date of this contract, Seller shall maintain a copy of separate affirmative action compliance programs for each of its establishments.

   (b) Seller shall require each of its subcontractors who have 50 or more employees and a subcontract placed hereunder of $50,000 or more to develop a written affirmative action compliance program for each of its establishments in conformance with the requirements of this Section.

5. **EMPLOYMENT OF QUALIFIED HANDICAPPED INDIVIDUALS:** The provisions of this Section apply only if the total contract amount exceeds $2,500. Seller agrees to comply with Section 503 of the Rehabilitation Act of 1973, Section III of the Rehabilitation Act amendments of 1974 and 41 CFR §60-741.4 which are incorporated into this agreement by this reference.

6. **EMPLOYMENT OF VETERANS:** The provisions of this Section apply only if the total contract amount exceeds $10,000. Seller agrees to comply with Section 2012 of the Vietnam Era Veterans Readjustment Act of 1974, and 41 CFR §60-250.4 which are incorporated into this agreement by this reference.

7. **UTILIZATION OF MINORITY BUSINESS ENTERPRISES:** The provisions of this Section apply only if the total contract amount exceeds $10,000.

   (a) It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

   (b) Contractor agrees to use its best efforts to carry out this policy in the award of its subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, the term "minority business enterprise" means a business, at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purpose of this definition, minority group members are Negroes, Spanish-speaking American persons, American-Orientals, American-Indians, American-Eskimos, and American Aleuts. Contractors may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation. 41 CFR §1-1.1310-2(a).

8. **UTILIZATION OF LABOR SURPLUS AREA CONCERNS:** The provisions of this Section apply only if the total contract amount exceeds $10,000.

   (a) It is the policy of the Government to award contracts to labor surplus area concerns that agree to perform substantially in labor surplus areas, where this can be done consistent with the efficient performance of the contract and at prices no higher than are obtainable elsewhere. Contractor agrees to use its best efforts to place its subcontracts in accordance with this policy.

   (b) In complying with subsection (a) of this Section and with subsection (b) of Section 9 of this contract entitled "Utilization of Small Business Concerns," the Contractor in placing his subcontracts shall observe the following order of preference: (1) small business concerns that are labor surplus area concerns, (2) other small business concerns, and (3) other labor surplus area concerns.

   (c)(1) The term "labor surplus area" means a geographical area identified by the Department of Labor as an area of concentrated unemployment or underemployment or an area of labor surplus.

   (2) The term "labor surplus area concern" means a concern that together with its first-tier subcontractors will perform substantially in labor surplus areas.

   (3) The term "perform substantially in a labor surplus area" means that the costs incurred on account of manufacturing, production, or appropriate services in labor surplus areas exceed 50 percent of the contract price. 41 CFR §1-1.805-3(a).

9. **UTILIZATION OF SMALL BUSINESS CONCERNS:** The provisions of this Section apply only if the total contract amount exceeds $10,000.

   (a) It is the policy of the Government as declared by Congress that a fair proportion of the purchases and contracts for supplies and services for the Government be placed with small business concerns.

   (b) Contractor agrees to accomplish the maximum amount of subcontracting to small business concerns that Contractor finds to be consistent with the efficient performance of this contract. 41 CFR §1-1.710-3(a).

10. **AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA:** The provisions of this Section apply only if the total contract amount exceeds $10,000. Seller agrees to comply with Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974 and 41 CFR §60-250.1 which are incorporated into this agreement by this reference.

11. **UTILIZATION OF WOMEN-OWNED BUSINESS CONCERNS:** The provisions of this Section apply only if the total contract amount exceeds $10,000.

   (a) It is the policy of the United States Government that women-owned businesses shall have the maximum practicable opportunity to participate in the performance of contracts awarded by any Federal agency.

   (b) Contractor agrees to use its best efforts to carry out this policy in the award of subcontracts to the fullest extent consistent with the efficient performance of this contract. As used in this contract, a "woman-owned business" concern means a business that is at least 51% owned by a woman or women who also control and operate it. "Control" in this context means exercising the power to make policy decisions. "Operate" in this context means being actively involved in the day-to-day management. "Women" mean all women business owners. Temporary Regulation 54, Appendix to 41 CFR Chapter 1. (See Executive Order 12138).