A.A.P.L. FORM 610 - 1977

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

__May 28__ , 19_80_ ,

OPERATOR _____ Delta Drilling Company _____

CONTRACT AREA __ Delta Drilling Company et al - _____

__ J. W. Cooke  No. 2 Well _____

_____

COUNTY ~~OR PARISH~~ OF___ Panola _____ STATE OF__ Texas ____

COPYRIGHT 1977    —    ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.   A.A.P.L. NO. 610 - 1977 REVISED
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
KRAFTBILT PRODUCTS,    BOX 800, TULSA 74101

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## GUIDANCE IN THE PREPARATION OF THIS AGREEMENT:

1. Title Page - Fill in blank as applicable.

2. Preamble, Page 1 - Name of Operator.

3. Article II - Exhibits:
   (a) Indicate Exhibits to be attached.
   (b) If it is desired that no reference be made to Non-discrimination, the reference to Exhibit "F" should be deleted.

4. Article IV.A - Title Examination - Select option as agreed to by the parties.

5. Article IV.B - Loss of Title - If "Joint Loss" of Title is desired, the following changes should be made:
   (a) Delete Articles IV.B.1 and IV.B.2.
   (b) Article IV.B.3 - Delete phrase "other than those set forth in Articles IV.B.1 and IV.B.2 above."
   (c) Article VII.F. - Change reference at end of the first grammatical paragraph from "Article IV.B.2" to "Article IV.B.3."

6. Article V - Operator - Enter name of Operator.

7. Article VI.A - Initial Well:
   (a) Date of commencement of drilling.
   (b) Location of well.
   (c) Obligation depth.

8. Article VI.B.2.(b) - Subsequent Operations - Enter penalty percentage as agreed to by parties.

9. Article VII.D.1. - Limitation of Expenditures - Select option as agreed to by parties.

10. Article VII.D.3. - Limitation of Expenditures - Enter limitation of expenditure of Operator for single project and amount above which Operator may furnish information AFE.

11. Article VII.E. - Royalties, Overriding Royalties and Other Payments - Enter royalty fraction as agreed to by parties.

12. Article X. - Claims and Lawsuits - Enter claim limit as agreed to by parties.

13. Article XIII. - Term of Agreement:
    (a) Select Option as agreed to by parties.
    (b) If Option No. 2 is selected, enter agreed number of days in two (2) blanks.

14. Signature Page - Enter effective date.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTEREST OF PARTIES IN COSTS AND PRODUCTION | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2 |
| | B. LOSS OF TITLE | 2 |
| | 1. Failure of Title | 2-3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 3 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 3 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6 |
| | C. RIGHT TO TAKE PRODUCTION IN KIND | 6-7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 7 |
| | E. ABANDONMENT OF WELLS | 7 |
| | 1. Abandonment of Dry Holes | 7 |
| | 2. Abandonment of Wells that have Produced | 7-8 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 8 |
| | A. LIABILITY OF PARTIES | 8 |
| | B. LIENS AND PAYMENT DEFAULTS | 8 |
| | C. PAYMENTS AND ACCOUNTING | 8 |
| | D. LIMITATION OF EXPENDITURES | 9 |
| | 1. Drill or Deepen | 9 |
| | 2. Rework or Plug Back | 9 |
| | 3. Other Operations | 9 |
| | E. ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 9 |
| | F. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 9-10 |
| | G. TAXES | 10 |
| | H. INSURANCE | 10 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 10 |
| | A. SURRENDER OF LEASES | 10-11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTION | 11 |
| | D. SUBSEQUENTLY CREATED INTEREST | 11-12 |
| | E. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | F. WAIVER OF RIGHT TO PARTITION | 12 |
| | G̸X̸X̸X̸X̸K̸X̸M̸X̸X̸X̸X̸M̸X̸X̸X̸D̸X̸X̸X̸X̸X̸M̸X̸P̸X̸X̸X̸X̸A̸X̸A̸X̸ | X̸X̸ |
| IX. | INTERNAL REVENUE CODE ELECTION | 12-13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13-14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ____DELTA DRILLING COMPANY____
_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators",

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☒ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to agreement,
    (2) Restrictions, if any, as to depths or formations,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☐ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.

If any provision of any exhibit, except Exhibit "E", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## ARTICLE III.
### INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an unleased oil and gas interest in the Contract Area, that interest shall be treated for the purpose of this agreement and during the term hereof as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B". As to such interest, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

**B. Interest of Parties in Costs and Production:**

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A". All production of oil and gas from the Contract Area, subject to the payment of lessor's royalties which will be borne by the Joint Account, shall also be owned by the parties in the same manner during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interests covered hereby.

## ARTICLE IV.
### TITLES

**A. Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and /or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and /or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including Federal Lease Status Reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of title. shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C," and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

X] Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. The Operator shall be responsible for the preparation and recording of Pooling Designations or Declarations as well as the conduct of hearings before Governmental Agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

**B. Loss of Title:**

1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests, and
   (a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1 or operating costs which it may have theretofore paid, but there shall be no monetary liability on its
2 part to the other parties hereto for drilling, development, operating or other similar costs by reason of
3 such title failure: and

4     (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the
5 operation of the interest which has been lost, but the interests of the parties shall be revised on an acre-
6 age basis, as of the time it is determined finally that title failure has occurred, so that the interest of
7 the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
8 Area by the amount of the interest lost; and

9     (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled
10 on the Contract Area is increased by reason of the title failure, the party whose title has failed shall
11 receive the proceeds attributable to the increase in such interests (less costs and burdens attributable
12 thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;
13 and

14     (d) Should any person not a party to this agreement, who is determined to be the owner of any in-
15 terest in the title which has failed, pay in any manner any part of the cost of operation, development,
16 or equipment, such amount shall be paid to the party or parties who bore the costs which are so refund-
17 ed; and

18     (e) Any liability to account to a third party for prior production of oil and gas which arises by
19 reason of title failure shall be borne by the party or parties in the same proportions in which they shared
20 in such prior production; and

21     (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection
22 with the defense of the interest claimed by any party hereto, it being the intention of the parties
23 hereto that each shall defend title to its interest and bear all expenses in connection therewith.
24

25     2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight,
26 any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously
27 paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against
28 the party who failed to make such payment. Unless the party who failed to make the required payment
29 secures a new lease covering the same interest within ninety (90) days from the discovery of the fail-
30 ure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of
31 the parties shall be revised on an acreage basis, effective as of the date of termination of the lease in-
32 volved, and the party who failed to make proper payment will no longer be credited with an interest in
33 the Contract Area on account of ownership of the lease or interest which has terminated. In the event
34 the party who failed to make the required payment shall not have been fully reimbursed, at the time of
35 the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an
36 acreage basis, for the development and operating costs theretofore paid on account of such interest, it
37 shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the
38 cost of any dry hole previously drilled or wells previously abandoned) from so much of the following
39 as is necessary to effect reimbursement:

40     (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost
41 interest, on an acreage basis, up to the amount of unrecovered costs;

42     (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an
43 acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production
44 from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable
45 to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
46 portion of the oil and gas to be contributed by the other parties in proportion to their respective in-
47 terests; and

48     (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or
49 becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or be-
50 coming a party to this agreement.
51

52     3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2.
53 above, shall not be considered failure of title but shall be joint losses and shall be borne by all parties
54 in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
55 the Contract Area.
56

57                         ARTICLE V.
58                         OPERATOR
59

60 A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR:
61

62       DELTA DRILLING COMPANY
                                                      shall be the
63 Operator of the Contract Area, and shall conduct and direct and have full control of all operations on
64 the Contract Area as permitted and required by, and within the limits of, this agreement. It shall con-
65 duct all such operations in a good and workmanlike manner, but it shall have no liability as Operator
66 to the other parties for losses sustained or liabilities incurred, except such as may result from gross
67 negligence or willful misconduct.
68

69

70

                - 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

B. **Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest in the Contract Area, or is no longer capable of serving as Operator, it shall cease to be Operator without any action by Non-Operator, except the selection of a successor. Operator may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on owner-ship as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effect-ive date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Op-erator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

C. **Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator, and all such employees shall be the employees of Operator.

D. **Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are com-menced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a sim-ilar nature.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**

A. Initial Well: *Upon availability of rig

On or before the_____*_____ day of_____*_____, 19 *, Operator shall commence the drill-ing of a well for oil and gas at the following location: Approximately 600' north of the J. W. Cooke No. 1 well on the G. W. Bounds, Jr., et al 225 acre (237.53 acres by resurvey) tract, James Rowe Survey, A-561, Panola County, Texas

and shall thereafter continue the drilling of the well with due diligence to a depth of 9500' or a sufficient depth to test the Cotton Valley Formation, whichever is the shallower depth.

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give in-dication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, it shall first secure the consent of all parties and shall plug and abandon same as provided in Article VI.E.1. hereof.

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

B. **Subsequent Operations:**

1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday or legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties: provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest of the parties approving such operation, and (b) its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A", or (b) carry its proportionate part of Non-Consenting Parties' interest. The proposing party, at its election, may withdraw such proposal if there is insufficient participation, and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and have interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(b) _400_ % of that portion of the costs and expenses of drilling reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

__400__% of that portion of the cost of newly acquired equipment in the well (to and including the well-head connections), which would have been chargeable to such Non-Consenting Party if it had partici-pated therein.

Gas production attributable to any Non - Consenting Party's relinquished interest upon such Party's election, shall be sold to its purchaser, if available, under the terms of its existing gas sales con-tract. Such Non - Consenting Party shall direct its purchaser to remit the proceeds receivable from such sale direct to the Consenting Parties until the amounts provided for in this Article are recov-ered from the Non - Consenting Party's relinquished interest. If such Non - Consenting Party has not contracted for sale of its gas at the time such gas is available for delivery, or has not made the elec-tion as provided above, the Consenting Parties shall own and be entitled to receive and sell such Non-Consenting Party's share of gas as hereinabove provided during the recoupment period.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within sixty (60) days after the completion of any operation under this Article, the party con-ducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an in-ventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the Party conducting the operations for the Consenting Parties shall furn-ish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of oil and gas produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall auto-matically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production there-from as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure, attached hereto.

Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such source of supply.

The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A. except (a) when Option 2, Article VII.D.1., has been selected, or (b) to the reworking, deepening and plugging back of such initial well, if such well is or thereafter shall prove to be a dry hole or non-commercial well, after having been drilled to the depth specified in Article VI.A.

C. **Right to Take Production in Kind:**

Each party shall have the right to take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area, exclusive of production which may be used in de-velopment and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate dispo-sition by any party of its proportionate share of the production shall be borne by such party. Any

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment direct from the purchaser thereof for its share of all production.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year. Notwithstanding the foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's share of gas production without first giving such other party thirty (30) days notice of such intended sale.

In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any Gas Balancing Agreement between the parties hereto, whether such Agreement is attached as Exhibit "E", or is a separate Agreement.

**D.  Access to Contract Area and Information:**

Each party shall have access to the Contract Area at all reasonable times, at its sole risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the information.

**E.  Abandonment of Wells:**

1. **Abandonment of Dry Holes:** Except for any well drilled pursuant to Article VI.B.2., any well which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling of such well. Any party who objects to the plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI.B.

2. **Abandonment of Wells that have Produced:** Except for any well which has been drilled or reworked pursuant to Article VI.B.2. hereof for which the Consenting Parties have not been fully reimbursed as therein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment of such well, all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or intervals of the formation or formations then open to production, for a term of one year and so long thereafter as oil and/or gas is produced from the interval or inter-

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

vals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

### ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

B. Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon at the rate provided in the Accounting Procedure attached hereto as Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

C. Payments and Accounting:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

**D. Limitation of Expenditures:**

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened pursuant to the provisions of Article VI.B.2. of this Agreement, it being understood that the consent to the drilling or deepening shall include:

☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and/or surface facilities.

☒ Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its authorized depth, and all tests have been completed, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion attempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement, it being understood that the consent to the reworking or plugging back of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. Other Operations: Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _FIFTEEN  THOUSAND--------------Dollars ($_15,000.00___) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares "Authority for Expenditures" for its own use, Operator, upon request, shall furnish copies of its "Authority for Expenditures" for any single project costing in excess of _FIVE  THOUSAND---------------------Dollars ($_5,000.00___).

**E. Royalties, Overriding Royalties and Other Payments:**

Each party shall pay or deliver, or cause to be paid or delivered, all royalties /to the extent of    and other burdens
_____100%_____due on its share of production and shall hold the other parties free from any liability therefor. If the interest of any party in any oil and gas lease covered by this agreement is subject to any royalty, overriding royalty, production payment, or other charge over and above the aforesaid royalty, such party shall assume and alone bear all such obligations and shall account for or cause to be accounted for, such interest to the owners thereof.

No party shall ever be responsible, on any price basis higher than the price received by such party, to any other party's lessor or royalty owner; and if any such other party's lessor or royalty owner should demand and receive settlements on a higher price basis, the party contributing such lease shall bear the royalty burden insofar as such higher price is concerned.

**F. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

G. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. Operator shall bill other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.

H. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be an amount equivalent to the premium which would have been paid had such insurance been obtained. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's fully owned automotive equipment.

### ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A.  Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. If the interest of the assigning party includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not desiring to surrender an oil and gas lease covering such oil and gas interest for a term of one year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignor's or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Contract Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

B.  Renewal or Extension of Leases:

If any party secures a renewal of any oil and gas lease subject to this Agreement, all other parties shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall apply also and in like manner to extensions of oil and gas leases.

C.  Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash toward the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. If all parties hereto are Drilling Parties and accept such tender, such acreage shall become a part of the Contract Area and be governed by the provisions of this agreement. If less than all parties hereto are Drilling Parties and accept such tender, such acreage shall not become a part of the Contract Area. Each party shall promptly notify all other parties of all acreage or money contributions it may obtain in support of any well or any other operation on the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

D.  Subsequently Created Interest:

Notwithstanding the provisions of Article VIII.E. and VIII.G., if any party hereto shall, subsequent to execution of this agreement, create an overriding royalty, production payment, or net proceeds interest, which such interests are hereinafter referred to as "subsequently created interest", such subsequently created interest shall be specifically made subject to all of the terms and provisions of this agreement, as follows:

1.  If non-consent operations are conducted pursuant to any provision of this agreement, and the party conducting such operations becomes entitled to receive the production attributable to the interest out of which the subsequently created interest is derived, such party shall receive same free and clear of such subsequently created interest. The party creating same shall bear and pay all such subsequently created interests and shall indemnify and hold the other parties hereto free and harmless from any and all liability resulting therefrom.

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

2. If the owner of the interest from which the subsequently created interest is derived (1) fails to pay, when due, its share of expenses chargeable hereunder, or (2) elects to abandon a well under provisions of Article VI.E. hereof, or (3) elects to surrender a lease under provisions of Article VIII.A. hereof, the subsequently created interest shall be chargeable with the pro rata portion of all expenses hereunder in the same manner as if such interest were a working interest. For purposes of collecting such chargeable expenses, the party or parties who receive assignments as a result of (2) or (3) above shall have the right to enforce all provisions of Article VII.B. hereof against such subsequently created interest.

E.  **Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all leases and equipment and production; or

2. an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds hereof.

F.  **Waiver of Right to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~G.  Preferential Right to Purchase:~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the~~ Contract Area, it shall promptly give written notice to the other parties, ~~with full~~ information concerning its proposed sale, which shall include the name and address ~~of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where~~ any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent ~~company, or to any company in which any one party owns a majority of the stock.~~

### ARTICLE IX.
### INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for Federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from Operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single damage claim or suit arising from operations hereunder if the expenditure does not exceed __FIVE THOUSAND—————————————————————————————Dollars ($ 5,000.00 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the pense of handling of the claim or suit, unless such authority is delegated to Operator. All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, the party shall immediately notify Operator, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by United States mail or Western Union telegram, postage or charges prepaid, or by teletype, and addressed to the party to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid, or when sent by teletype. Each party shall have the right to change its address at any time, and from time to time, by giving written notice hereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subjected hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease, or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, and/or so long as oil and/or gas production continues from any lease or oil and gas interest.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1  [X] Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled
2  under any provision of this agreement, results in production of oil and/or gas in paying quantities, this
3  agreement shall continue in force so long as any such well or wells produce, or are capable of produc-
4  tion, and for an additional period of __180__ days from cessation of all production; provided, however,
5  if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in
6  drilling or reworking a well or wells hereunder, this agreement shall continue in force until such op-
7  erations have been completed and if production results therefrom, this agreement shall continue in
8  force as provided herein. In the event the well described in Article VI.A., or any subsequent well
9  drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil
10 and/or gas from the Contract Area, this agreement shall terminate unless drilling or reworking opera-
11 tions are commenced within __180__ days from the date of abandonment of said well.
12
13     It is agreed, however, that the termination of this agreement shall not relieve any party hereto from
14 any liability which has accrued or attached prior to the date of such termination.
15
16                                    ARTICLE XIV.
17                    COMPLIANCE WITH LAWS AND REGULATIONS
18
19 A.  Laws, Regulations and Orders:
20
21     This agreement shall be subject to the conservation laws of the state in which the committed
22 acreage is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of
23 said state; and to all other applicable federal, state, and local laws, ordinances, rules. regulations, and
24 orders.
25
26 B.  Governing Law:
27
28     The essential validity of this agreement and all matters pertaining thereto, including, but not lim-
29 ited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and in-
30 terpretation or construction, shall be governed and determined by the law of the state in which the
31 Contract Area is located. If the Contract Area is in two or more states, the law of the state where most
32 of the land in the Contract Area is located shall govern.
33
34                                    ARTICLE XV.
35                               OTHER PROVISIONS
36 A.  If any party should hereafter create any overriding royalty,
37     production payment or other burden against its working interest
38     production, and if any other party or parties should conduct
39     non-consent operations pursuant to any provisions of this
40     Agreement, and as a result become entitled to receive the working
41     interest production otherwise belonging to the non-participating
42     party, the party or parties entitled to receive the working
43     interest production of the non-participating party shall receive
44     such production free and clear of burdens against such production
45     which may have been created subsequent to this Agreement and the
46     non-participating party creating such subsequent burdens shall
47     save the participating party or parties harmless with respect to
48     the receipt of such working interest production.
49
50 B.  Notwithstanding the provisions of the Agreement and of the
51     Accounting Procedure attached as Exhibit "C", the parties to this
52     Agreement specifically agree that in no event during the term of
53     this contract shall Operator be required to make more than one
54     billing for the entire interest credited to each party on Exhibit
55     "A". It is further agreed that if any party to this agreement
56     (hereafter referred to as "Selling Party") disposes of part of
57     the interest credited to it on Exhibit "A", the Selling Party
58     will be solely responsible for billing its assignee or assignees,
59     and shall remain primarily liable to the other parties for the
60     interest or interests assigned and shall make prompt payment to
61     Operator for the entire amount of statement and billings rendered
62     to it. It is further understood and agreed that if Selling Party
63     disposes of all of its interest as set out on Exhibit "A",
64     whether to one or several assignees, Operator shall continue to
65     issue statements and billings to the Selling Party for the
66     interest conveyed until such time as Selling Party has designated
67     and qualified one assignee to receive the billing for the entire
68     interest. In order to qualify one assignee to receive the
69     billing for the entire interest credited to Selling Party on
70     Exhibit "A", Selling Party shall furnish to Operator the
       following:

                                    - 14 -

    1.   Written Notice of the conveyance and photostatic or certified
copies of the assignments by which the transfer was made.

    2.   The name of the Assignee to be billed and a written statement
signed by the Assignee to be billed in which it consents to
receive statements and billings for the entire interest
credited to Selling Party on Exhibit "A" hereof; and,
further, consents to handle any necessary sub-billings in the
event it does not own the entire interest credited to Selling
Party on Exhibit "A".

C.   <u>Article VII.G., Addition:</u>

If the Operator is required hereunder to pay ad valorem taxes
based in whole or in part upon separate valuations of each
party's working interest, then notwithstanding anything to the
contrary herein, charges to the joint account shall be made and
paid by the parties hereto in accordance with the percentage of
tax value generated by each party's working interest.

D.   <u>Article VIII.B., Continued:</u>

Notwithstanding anything to the contrary contained herein, each
party committing a lease or leases to this agreement shall have
the option upon the expiration of each lease to renew or extend
such lease and to bear the renewal or extension costs and
expenses and thereby retain its original interest and title in
said lease.  By exercising such option, the parties' working
interest shall remain unchanged.  If the original lease owner
does not exercise its option within sixty (60) days after the
expiration date of the original lease, the renewal or extension
lease will then be subject to the terms of this Article as
written above.  If any working interest owner other than the
original lease owner renews or extends the lease within sixty
(60) days after the expiration thereof, the renewing or extending
party shall furnish the original lease owner an itemized
statement of the complete renewal or extension costs and expenses
of such lease.  The original lease owner shall have sixty (60)
days after the receipt of such itemized statement to reimburse
the renewing or extending party in full.  Failure of the original
lease owner to do so shall result in the forfeiture of its option
hereunder.  The provisions hereof shall only apply to leases or
portions of leases located in the Contract Area.

E.   It is stipulated and agreed by the parties hereto that this
Operating Agreement supercedes and replaces any previously
executed Operating Agreement insofar as any such prior Operating
Agreement covers the lands described in Article I of Exhibit "A"
attached hereto; and it is further stipulated and agreed that all
operations conducted on the lands and leases described in Exhibit
"A", as to all rights below the base of the Travis Peak
Formation, shall be governed by the terms and provisions hereof.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of _2nd_ day of _June_, 19_80_.

OPERATOR

ATTEST:                                      DELTA DRILLING COMPANY

By: _Alan R. Thomas_                         By: _W. R. Wardlow_
ASSISTANT SECRETARY                          VICE PRESIDENT
                                             PRODUCTION-EXPLORATION GROUP

NON-OPERATORS

_____              _____
                                             HENRY GOODRICH


_____              _____
                                             THE HUNTER COMPANY, INC.

                                             By: _____


                                             _____
                                             LOUIS DORFMAN


                                             _____
                                             MYRON H. DORFMAN


                                             _____
                                             SAM Y. DORFMAN


                                             SKLAR & PHILLIPS, INC., _OPERATOR_

                                             By: _____


                                             _____
                                             DAN J. MAHONY, Agent for
                                             Joanna Wood, Lili Fuller and
                                             Emily Comegys

- 15 -

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF the Operating Agreement dated May 28, 1980, between DELTA DRILLING COMPANY, as Operator, and Henry Goodrich, et al, as Non-Operators.

I.  Land and Depth subject to Agreement.

   640 acres, more or less, as more fully described in that certain Declaration of Consolidation and Unitization dated October 6, 1945, recorded in Volume 206, Page 302, Deed Records, Panola County, Texas, as to all rights below the base of the Travis Peak Formation.

II.  Interests and Address of the Parties:

Delta Drilling Company
P. O. Box 2012
Tyler, Texas 75710 .............................. .1593750

Henry Goodrich
2003 Beck Building
Shreveport, Louisiana 71101 ..................... .3149765

The Hunter Company, Inc.
1405 Mid South Towers
Shreveport, Louisiana 71101 ..................... .3149765

Elizabeth Dorfman Trust
1750 Mercantile Dallas Building
Dallas, Texas 75201 ............................. .0398440

Louis Dorfman
1848 Mercantile Dallas Building
Dallas, Texas 75201 ............................. .0132810

Myron H. Dorfman
c/o Dept. Petroleum Engineers
University of Texas
Austin, Texas 78712 ............................. .0132810

Sam Y. Dorfman
1750 Mercantile Dallas Building
Dallas, Texas 75201 ............................. .0132820

Sklar & Phillips, Inc., *OPERATOR*
2925 Mansfield Road
Shreveport, Louisiana 71103 ..................... .0796870

Dan J. Mahony, Agent for Joanna Wood,
Lili Fuller and Emily Comegys
242 Patton
Shreveport, Louisiana 71105 ..................... .0512970

                                                1.0000000

Prod. 88 Rev. — Pooling
Standard Lease 7/1/77
Tex.

EXHIBIT "B"

# OIL AND GAS LEASE

THIS AGREEMENT, made this      day of      , 19

by and between

herein called "Lessor" (whether one or more), and

, herein called "Lessee", WITNESSETH THAT:

1. The Lessor, for and in consideration of One Dollar ($1.00) and other good and valuable consideration in hand paid, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained, does hereby grant, demise, lease and let exclusively unto Lessee, its successors and assigns, the hereinafter described land, for the purpose and with the exclusive right of investigating, exploring, prospecting (by seismograph or other method or device), drilling, mining and operating for and producing (by such method or methods as Lessee may deem advisable including repressuring and pressure maintenance of subsurface formations with fluids or gases), saving, taking, storing, treating, transporting and marketing oil, gas (including helium, carbon dioxide and any substance produced in a gaseous state), casinghead gas, condensate, all other liquid and gaseous hydrocarbons, sulphur, and all substances produced therewith or incidental to the production thereof (all the foregoing specifically named and other substances being herein referred to as oil, gas, and other leased substances, or simply as leased substances), together with rights of way and easements for roads, pipe lines, telephone and telegraph lines, power lines, radio and electronic communications facilities; and for erecting and using power houses and stations, tanks and reservoirs for storing oil and salt water and other substances produced from the wells, and for erecting and using gasoline plants, pressure and repressure and recycling plants, and all other machinery, fixtures, equipment and structures deemed necessary or convenient thereon; together with any and all other rights and privileges necessary, incident to or convenient for or in connection with the purposes hereof and the exercise of Lessee's rights hereunder; said

land being described as follows, situated in the County of      , State of      , to-wit:

containing      acres, more or less; and for the purpose of calculating rental payments hereunder said land shall be deemed to contain exactly that number of acres, whether it actually contains more or less. Lessor intends to and hereby leases not only the above described land, but all lands owned or claimed by Lessor adjacent to said land up to the boundaries of the adjoining owners.

2. This lease shall be effective on and including the date hereof (herein called the "effective date"), and in addition thereto and subject to the other provisions hereof this lease shall be for a term of      years from and after the effective date hereof (herein called the "primary term") and as long thereafter as oil, gas and other leased substances or any of them are produced from said land hereunder or land pooled therewith, or operations (as hereinafter defined) are continuously prosecuted as hereinafter provided on said land or land pooled therewith, or this lease is continued in force under any provision hereof or otherwise.

3. The royalties to be paid by Lessee are:

A. On oil, including condensate and other liquid hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered in kind to Lessor at the well in tanks or facilities provided by Lessor, or in kind to the credit of Lessor into the pipe line or other transportation facility connected to or otherwise utilized in transporting oil from the wells. Lessee may from time to time purchase any royalty oil and other liquid hydrocarbons in its possession, paying therefor the net market price thereof (as defined below), computed at the well. In either case the Lessor's interest shall bear its proportion of the cost of treating the oil to make it marketable and of transporting it from the wells to point of delivery to the purchaser.

B. On gas, including casinghead gas and other gaseous substances produced and saved from said land, the royalty shall be: (1) in case Lessee shall itself use gas in the extraction of gasoline, distillate or other products therefrom, one-eighth of the net proceeds (as defined below) received by Lessee from the sale of the gasoline, distillate and other products extracted therefrom and which are saved and marketed; and one-eighth of the net proceeds received by Lessee from the sale of residue gas remaining after such extraction; being in each case the net proceeds computed at the tail gate of the plant after such extraction; (2) in case gas is sold at the wells, one-eighth of the net proceeds received by Lessee from the sale thereof, computed at the well; (3) in all other cases when gas is sold, one-eighth of the net proceeds received by Lessee from the sale thereof, computed at the well; and (4) in case Lessee shall not sell but shall use gas for operations other than operations under this lease, one-eighth of the net market price thereof, computed at the well. In either case the Lessor's interest shall bear its proportion of the cost of treating, gathering, processing (including compressing) gas and extracting the products thereof, storing, and transporting the gas and products thereof from the well or plant as the case may be, to the point of delivery to the purchaser or user.

C. On all other leased substances produced and saved, including substances produced with or incidental to the production of hydrocarbons and sulphur from said land, and saved, the royalty shall be one-eighth of the net proceeds received by Lessee from the sale thereof computed at the well; and when not sold but used by Lessee for operations other than operations under this lease, the royalty shall be one-eighth of the net market price of such substances so used, computed at the well, except that on sulphur the royalty shall be $1.00 per long ton.

D. No royalty shall be payable on oil, gas and other leased substances, or products thereof, or residue gas, produced from said land and used by Lessee for operations on said land, or disposed of for no consideration to Lessee either through unavoidable loss or leakage, or in order to produce or recover leased substances, or returned to a subsurface formation.

(over)

E. The term "net market price" as used in this lease means the price prevailing in the field where said land is located of substances of the same or subs tially the same kind, quality, quantity and characteristics as leased substances or products thereof, as determined by comparable sales or as established by gov mental authority; and if there are no comparable sales or governmental price controls, such price as determined by Lessee to be fair and reasonable; less reasonable cost of treating, gathering, processing (including compressing gas and extracting the products thereof), storing, and transporting same from the well or p. as the case may be, to the point of delivery to the purchaser or user. The term "net proceeds" as used in this lease means proceeds received by Lessee from .: of leased substances or products thereof, less costs mentioned above in this paragraph.

F. It is the intention of the parties hereto (except as to leased substances the Lessor may take in kind), subject to applicable governmental regulations price controls, that the Lessee shall have and is granted the sole and unlimited right to sell the leased substances for such price and upon such terms and condi and for such duration as the Lessee in its sole discretion deems advisable; provided that any such sale and contract of sale is made by Lessee in good faith as a pru operator, at arm's length (or as favorable to Lessor as if at arm's length), and is fair and reasonable at the time and under the circumstances existing when entered and it is agreed that royalty paid hereunder on or based on net proceeds from any such sale or contract of sale, or on net market price as determined hereunder, satisfy the provisions of this lease with respect to the payment of royalty hereunder.

4. If operations for the drilling of a well are not commenced on said land or on land pooled therewith on or before one year from and after the effective hereof, this lease shall terminate as to both parties, unless on or before one year from and after the effective date hereof the Lessee shall pay or tender to the L:

a rental of ..........................................................................................................................................................................................................................................
which shall cover the privilege of deferring commencement of such operations for a period of twelve (12) months. In like manner and upon like payments or ten.: annually, the commencement of said operations may be further deferred for successive periods of the same number of months each, during the primary term.

ment or tender may be made to the Lessor or to the credit of Lessor in ...........................................................................................................................

at ........................................................................................................ , or any successor, which depository bank, or any successor thereof, is and shall continue to be agent for the Les: and Lessor's successors and assigns. If such bank (or any successor bank) shall fail, liquidate, or be succeeded by another bank, or for any reason fail or refuse accept rental, Lessee shall not be held in default until thirty days after Lessee shall deliver to Lessee a recordable instrument, making provision for another meth:: payment, or tender, and any depository charge is a liability of the Lessor. The payment or tender of rental may be made by check or draft of Lessee, mailed or deli: ed to said bank or lessor, on or before the rental paying date. If Lessee shall, in good faith and with reasonable diligence, attempt to pay any rental, but shall fai.: pay or incorrectly pays some portion thereof, this lease shall not terminate unless Lessee, within thirty (30) days after written notice from the Lessor of its erro: failure, shall fail to rectify the same.

5. If Lessee obtains production of oil, gas or other leased substances on said land or on land with which the leased premises or any portion thereof has been poo! and if, during the life of this lease either before or after the expiration of the primary term, all the wells are shut in before or after production therefrom becaus: the lack either of a market at the well or wells or of an available pipe line outlet in the field, or because in Lessee's good faith judgment it is not advisable to pro: and sell such production for the time being, this lease shall not terminate but shall continue in effect during such shut-in period as though production were act: being obtained on the premises within the meaning of Paragraph 2 hereof, and for all purposes hereof it shall be deemed that production in paying quantities is b: so obtained, and on or before the anniversary of the effective date hereof next ensuing after the expiration of 90 days from the date all such production is shut in, . annually thereafter on or before such anniversary date so long as all such production is shut in and not commenced or re-commenced on or before any such succes: anniversary date, Lessee shall pay or tender to the royalty owners or to the credit of royalty owners in any depository bank specified in this lease, as royalty. amoung equal to the annual delay rental that would then be payable as provided in Paragraph 4 hereof. Such payment or tender may be made by check or draft Lessee, mailed or delivered to said bank or royalty owners, on or before said anniversary date. The owners of the royalty as of the date of such payment shall entitled thereto in proportion to their ownership of the royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Noth in this paragraph contained shall abridge the right of Lessee to surrender or release this lease in whole or in part, or to otherwise maintain this lease in force : effect under its other provisions, and no shut-in royalty shall be due for or with respect to a shut-in period during which this lease is otherwise maintained in :: and effect.

6. If before commencement of production of oil, gas or other leased substances on said land or on land pooled therewith, Lessee should drill a dry hol: holes thereon, or should abandon the drilling of a hole or holes thereon, or if, after the commencement of production of oil, gas or other leased substances there the production thereof should cease from any cause, this lease shall not be terminated thereby if Lessee commences or resumes operations or production within day: days thereafter on said land or on land pooled therewith; or (if it be within the primary term) the Lessee either (i) if there be no further rental paying date thereaf: date thereafter, commences or resumes the payment or tender of rentals or commences or resumes operations or production on said land or on land pooled there.: on or before the next ensuing rental paying date after the expiration of ninety days from the date of abandonment of such hole or the cessation of production. (iii) complies with any of the provisions hereof in lieu of operations or production. If at the expiration of the primary term oil, gas or other leased substances or of them are not being produced on said land or on land pooled therewith but Lessee is then engaged in operations thereon, or if Lessee shall have ceased operat as the same or other operations are prosecuted (on the same or different wells) with no cessation of more than ninety consecutive days, and, whether or not they r: in the production of oil, gas or other leased substances, so long thereafter as oil, gas or other leased substances are produced from or operations are prosecuted the same or different wells) on said land or on land pooled therewith, with no cessation of more than ninety consecutive days. Whenever used in this lease the w "operations" means and includes operations for and the mining, drilling, testing, completing, re-completing, reworking, deepening, plugging back or repairing of a : or hole, repairing or replacing production equipment, or any other operations, in search for or in an effort to obtain or re-establish production of, oil, gas and ot leased substances, and includes the production of leased substances whether or not in paying quantities. All operations hereunder shall be deemed to be continu prosecuted if not more than ninety consecutive days elapse between the completion of all operations at one well or location and the commencement or recommencer of operations at the same or another well or location.

7. Lessee is hereby granted the right and power at any time and from time to time, without Lessor's joinder, to pool, combine or unitize this lease, the le: hold estate and Lessor's royalty estate created hereby, as to all or any part of the land covered hereby, and as to any one or more subsurface strata or formations, any other land, lease or leases, royalty or mineral estate or estates, or portions thereof or subsurface strata or formations thereunder, regardless of the owner thereof, so as to create one or more pooled units or operating units, as to oil, gas and other leased substances, or either or any of them. Each such unit created for including casinghead gas, shall contain not more than eighty (80) acres plus a tolerance of 10% thereof, and each such unit created for gas, including condens orders, rules and regulations of any Federal, State or other governmental authority having or claiming jurisdiction has heretofore or shall at any time hereafter pres: or permit the creation of units larger than those specified hereinabove, then any unit or units created hereunder may contain or may be redesignated so as to conta: as the case may be, not more than the maximum number of acres so prescribed or permitted, plus any prescribed or permitted tolerance; the Lessee being specific authorized and empowered but not obligated to create units of such size, shape and content as to obtain the maximum allowable of production from any well or w: Pooled units may be formed hereunder and unit designations filed before or after the commencement or completion of a well and before or after production is obtai: on that portion of this lease included in any such unit or on any other acreage included therein. In the event any such unit or units is/are so created by Lessee, Les: agrees to accept and shall receive out of the production or the proceeds from the production from such unit or units, such portion of the royalty specified herein and the commencement of a well, or the completion of a well to production of either oil, gas or other leased substances on any portion of a unit in which all or : part of the land described herein is embraced, or production of oil, gas or other leased substances therefrom shall have the same effect under the terms of this leas: if a well were commenced, completed or producing oil, gas or other leased substances on the land embraced by this lease. Lessee shall execute in writing and fil: record in the records of the County in which the lands herein leased are located, a unit designation instrument identifying and describing the pooled acreage, or instrument supplemental thereto redesignating same, as the case may be. Either prior to the severing of production from any unit created under the authority her: above granted, or after cessation of production. therefrom, Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent. executing in writing and placing of record in the County or Counties in which the lands making up such unit may be located, an instrument identifying and dissoi: such unit. If it is determined that any acreage, interest, mineral or stratum is not subject to the unit designation instrument and is not included in the pooled u the unit shall not be terminated thereby but shall continue in force as to the remaining acreage, interests, minerals and stratum, unless otherwise provided in lea and other instruments pertaining thereto and of record on the effective date of the unit; and neither Lessee nor any other interest owner shall be liable to any party hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representativ successors and assigns.

8. If Lessor owns a lesser interest in the above described land than the entire and undivided fee simple estate therein, then the royalties and rentals her provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9. Lessee shall have free use of oil, gas, other leased substances and water from said land, except water from Lessor's wells, for all operations hereund including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any t: during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. W: required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now said land, without Lessor's consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjac: prudent operator would drill under the same or similar circumstances, Lessee agrees to drill such offset well or wells as a reasona:

10. The rights of either party hereunder may be assigned in whole or part and the provisions hereof shall extend to their heirs, executors, administrat successors and assigns. No change or division in ownership of the land, rentals, or royalties, however accomplished, shall operate to enlarge the obligations or dimi: the rights of Lessee, or shall be binding upon Lessee for any purpose, until sixty days after the person acquiring any interest or affected by such change or division . furnished Lessee, at its principal place of business, with the instrument or instruments, or certified copies thereof, constituting such change or division and show this chain of title from the original Lessor. In the event of an assignment of this lease as to a segregated portion of said land, or as to an undivided interest there the rentals payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each, or according to the u: divided interest of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. An assignment of this lease, in w. or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder and, if Lessee or assignee of part or parts hereof shall : or make default in the payment of the proportionate part of the rentals due from such Lessee, or assignee, or fail to comply with any other provisions of the le: such failure shall be the sole responsibility of the defaulting party and shall not affect this lease insofar as it covers a part of said lands upon which Lessee or :

assignee thereof shall not be in default and shall make payment of said rentals. Lessee may at any time execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portion and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases, but all lands so released shall remain subject to easements for rights of way necessary or convenient for Lessee operations on the land retained by it.

11. In case of suit, adverse claim, dispute or question as to the ownership of the rentals or royalties (or some part thereof) payable under this lease, Lessee may not be held in default in payment of such rentals or royalties (or the part thereof in doubt) until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have sixty days after being furnished with the original instrument or instrument disposing of such suit, claim, or dispute (or a certified copy or other thereof), or after being furnished with proof and information sufficient, in Lessee's opinion, to determine the owners of such rentals and royalties and how to rectly pay the same, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend payments without interest until there is a final adjudication or other determination of such dispute.

12. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transpotation, or as a result of some law, rule, regulation, requisition or necessity of the government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of equal to that during which Lessee is so prevented from conducting such drilling, reworking or other operations, or producing oil, gas, or other leased substances the premises.

13. It is expressly understood and agreed that there shall be no obligation on the part of Lessee to offset wells on separate tracts into which the land covered by this lease may be now or hereafter divided by sale, devise or otherwise, or to furnish separate measuring or receiving tanks therefor. Lessee may at any time or to pay or tender all rentals or other sums accruing hereunder to the joint credit of Lessor.

14. Notwithstanding the death of any Lessor, or his successors in interest, the payment or tender of rentals and other amounts hereunder in the manner provided above, shall be binding on the heirs, devisees, executors and administrators of such person. After receiving notice of the death of any Lessor or his successor in interest, the Lessee may continue making payments in the manner set forth above to the estate of the deceased party, or to the credit of such estate in the depository set forth above until sixty days after the Lessee shall have been furnished with certified copies of the court proceedings showing the lawful qualification of executor or administrator for said estate, or in the event there be no administration of said estate in court, until sixty days after the Lessee shall have been furnished with evidence satisfactory to it showing the successors in title to the deceased party.

15. Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right of subrogation herein granted, Lessee shall have the right to retain any rentals or royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such rentals or royalties Lessee shall have the same effects as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

16. This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above. Each Lessor executes this lease individually and in his own right and also for and on behalf of all parties for whom he is authorized and empowered to lease said land.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

Lessor                                    S.S.

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

ACKNOWLEDGMENT

The State of_____ }

County of _____ }

Before me, the undersigned authority, on this day personally appeared

known to me to be the person ___ whose name ____ subscribed to the foregoing instrument, and acknowledged to me that___ he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this ____ day of__ _____ A.D. 19__ _____

My Commission Expires:

_____

Notary Public in and for _____County, _____

ACKNOWLEDGMENT

The State of _____

County of _____ }

Before me, the undersigned authority, on this day personally appeared

known to me to be the person___ whose name _____ subscribed to the foregoing instrument, and acknowledged to me that ___ he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this_____day of___ _____, A.D. 19_____.

My Commission Expires:

_____

Notary Public in and for_____County, _____

---

CORPORATE ACKNOWLEDGMENT

The State of _____

County of _____ }

Before me, the undersigned authority, on this day personally appeared_____

_____President of_____

a corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that executed the same for the purposes and consideration therein expressed, in the capacity therein stated and as the act and deed of corporation.

Given under my hand and seal of office on this_____day of_____, A.D. 19_____.

My Commission Expires:

_____

Notary Public in and for_____County, _____

---

NO. _____

## Oil and Gas Lease

FROM

TO

State of_____ ss.

County of_____

This instrument was filed for record on the_____

day of_____19_____, at_____

o'clock, _____M., and duly recorded in Book_____

Page_____of the_____records

of this office.

County Clerk — Register of Deeds.

By_____Deputy.

When recorded return to

NEW!EUI 601, TULSA 74101

COPAS — 1974

Recommended by the Council of Petroleum Accountants Societies of North America



## EXHIBIT " C "

Attached to and made a part of ...the. Operating..Agreement..dated .May. 28,. 1980,. between. DELTA DRILLING. COMPANY,....as .Operator, and Henry. Goodrich,. et. al.,. as. Non-Operators.

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

### I. GENERAL PROVISIONS

1. **Definitions**

   "Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

   "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

   "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

   "Operator" shall mean the party designated to conduct the Joint Operations.

   "Non-Operators" shall mean the parties to this agreement other than the Operator.

   "Parties" shall mean Operator and Non-Operators.

   "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

   "Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

   "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

   "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

   "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

2. **Statement and Billings**

   Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

   Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

5. **Audits**

   A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

6. **Approval by Non-Operators**

   Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1. Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**2. Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First Level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

**3. Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty — two percent (22%).

**4. Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**5. Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

**6. Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph I. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

**7. Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

**8. Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**9. Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

COPY

## 10. Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

## 11. Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

## 12. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

### I. Overhead - Drilling and Producing Operations

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

    ( X ) Fixed Rate Basis, Paragraph 1A, or

    (   ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (   ) shall not ( * ) be covered by the Overhead rates.

### A. Overhead - Fixed Rate Basis

(1) Operator shall charge the Joint Account at the following rates per well per month:

    Drilling Well Rate $___4,500.00_____

    Producing Well Rate $___450.00_____ _____

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

    [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

    [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

    [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

(b) Producing Well Rates

    [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

    [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

    [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

    [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

    [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

* To be charged at prevailing Delta rates for technical classification for the period used. Delta technical service rates include salaries, fringes, and burden. Travel and other expenses related to technical service to be billed at Delta cost or current rates.

COPAS

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

(a) Development

_____ Percent (   %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

_____ Percent (   %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

## 2. Overhead - Major Construction    * To be negotiated

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $_____*_____:

A. _____*_____% of total costs if such costs are more than $_____ but less than $_____*_____; plus

B. _____*_____% of total costs in excess of $_____*_____ but less than $1,000,000; plus

C. _____*_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

## 3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

## 1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

## 2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

(2) Material moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

COPAS

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. Expense of Conducting Periodic Inventories

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

— 5 —

EXHIBIT "D"

Attached to and made a part of Operating Agreement dated ___May 28, 1980,___

between Delta Drilling Company, (Operator) and ___Henry Goodrich, et al___

_____, (Non-Operator) covering lands in ___Panola___

County, ___Texas_____.

 

Operator shall at all times while operations are conducted under this Agreement carry the following insurance:

(a) Workmen's compensation insurance in accordance with the requirements of the laws of the State of Texas and employer's liability insurance with limitation of not less than One Hundred Thousand ($100,000.00) Dollars for each accident.

(b) Comprehensive general liability insurance with limits for bodily injury of not less than One Hundred Thousand Dollars ($100,000.00) for injury to any one person, and Three Hundred Thousand Dollars ($300,000.00) as to any one accident, and with limits for property damage of not less than Fifty Thousand Dollars ($50,000.00) for each accident.

(c) Automobile liability insurance with limits for bodily injury of not less than One Hundred Thousand Dollars ($100,000.00) for any one person and Three Hundred Thousand Dollars ($300,000.00) as to one accident, and with a limit for property damage of not less than Fifty Thousand Dollars ($50,000.00) for each accident.

Operator shall furnish to Non-Operator a certificate covering each policy of insurance issued pursuant to above.

EXHIBIT " E "

GAS BALANCING AGREEMENT

During the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party fails to take its share of gas, the other parties shall be entitled to produce each month one hundred percent of the allowable gas production assigned to the Contract Area by the appropriate governmental entity having jurisdiction, and each of such parties shall take its prorata share. All parties hereto shall share in and own the condensate recovered at the surface in accordance with their respective interests, but each party taking such gas shall own all of the gas delivered to its purchaser. Each party unable to market its share of the gas produced shall be credited with banked gas equal to its share of the gas produced, less its share of gas used in lease operations, vented or lost. Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties hereto monthly statements showing the total quantity of gas produced, gas sold or banked, used in lease opeations, vented or lost, and the total quantity of condensate recovered.

After notice to Operator, any party may begin taking or delivering its share of the gas produced. In addition to its share, each party, until it has recovered its banked gas and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to twenty-five percent (25%) of each overproduced party's share of gas produced. If more than one party is entitled to the additional gas produced, they shall divide such additional gas in accordance with unit participation.

In the event production of gas permanently ceases prior to the time that the accounts of the parties have been balanced, a complete balancing shall be accomplished by a money settlement. Such settlement shall be based upon the weighted average price received by each overproduced party for its share of gas produced and sold.

At all times while gas is produced from the Contract Area, each party shall make appropriate settlement of all royalties, overriding royalty interest, and other payments out of or in lieu of production for which it is responsible, as if each party were taking or delivering to a purchaser its share, and its share only, of such gas production. Each party hereto agrees to hold each other party harmless from any and all claims for royalty payments asserted by royalty owners to whom each party is accountable.

EXHIBIT " F "

Attached to and made a part of Operating Agreement dated___May 28, 1980,
between___DELTA DRILLING COMPANY___ as Operator, and ___Henry Goodrich, et al,
as Non-Operators.

## EQUAL EMPLOYMENT OPPORTUNITY PROVISION

During the performance of this contract, the Operator agrees as follows:

1. The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment notices to be provided for the contracting officer setting forth the provisions of this non-discrimination clause.

2. The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

3. The Operator will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

4. The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

5. The Operator will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

6. In the event of Operator's non-compliance with the non-discrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rules, regulations, or order of the Secretary of Labor, or as otherwise provided by law.

7. The Operator will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance: Provided, however, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

Operator acknowledges that it may be required to file Standard Form 100 (EEO-1) promulgated jointly by the Office of Federal Contract Compliance, the Equal Employment Opportunity Commission and Plans for Progress with the appropriate agency within thirty (30) days of the date of contract award if such report has not been filed for the current year and otherwise comply with or file such other compliance reports as may be required under Executive Order 11246, as amended and Rules and Regulations adopted thereunder.

Operator further acknowledges that it may be required to develop a written affirmative action compliance program as required by the Rules and Regulations approved by the Secretary of Labor under authority of Executive Order 11246 and supply Non-Operators with a copy of such program if they so request.

## CERTIFICATION OF NON-SEGREGATED FACILITIES

Operator assures Non-Operators that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are in fact segregated on a basis of race, color, religion, or national origin, because of habit, local custom or otherwise. It is further understood and agreed that maintaining or providing segregated facilities for its employees or permitting its employees to perform their services at any location under its control where segregated facilities are maintained is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965.

Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor dated May 21, 1968, and the provisions of the equal opportunity clause enumerated contracts between the United States of America and Non-Operators.

Whoever knowingly and willfully makes any false, fictitious or fraudulent representation may be liable to criminal prosecution under 18 U.S.C. § 1001.