*Price*

### A.A.P.L. FORM 610 - 1977

# MODEL FORM OPERATING AGREEMENT

(INDIVIDUAL LOSS FORM)

OPERATING AGREEMENT

DATED

July 1 , 19 86 ,

OPERATOR  TXP Operating Company

CONTRACT AREA  674.25 acres of land, more, or less, comprised of the Mark Miller Survey, A-741, the Charles Graham Survey, A-439, and portions of the Bryant Holmes Survey, A-447, the B. Herring Survey, A-502, and the Mary Johnson Survey, A-571 (see Exhibit "B")

COUNTY OR PARISH OF  Cass  STATE OF  Texas

COPYRIGHT 1977   —   ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.   A.A.P.L. NO. 610 - 1977 REVISED
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
KRAFTBILT PRODUCTS.   BOX 800, TULSA 74101

Revised 10/19/84

xc: Darla Pittman Accounting
8/19/86   pa

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTEREST OF PARTIES IN COSTS AND PRODUCTION | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2 |
| | B. LOSS OF TITLE | 2 |
| | 1. Failure of Title | 2-3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 3 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 3 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6 |
| | C. RIGHT TO TAKE PRODUCTION IN KIND | 6-7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 7 |
| | E. ABANDONMENT OF WELLS | 7 |
| | 1. Abandonment of Dry Holes | 7 |
| | 2. Abandonment of Wells that have Produced | 7-8 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 8 |
| | A. LIABILITY OF PARTIES | 8 |
| | B. LIENS AND PAYMENT DEFAULTS | 8 |
| | C. PAYMENTS AND ACCOUNTING | 8 |
| | D. LIMITATION OF EXPENDITURES | 9 |
| | 1. Drill or Deepen | 9 |
| | 2. Rework or Plug Back | 9 |
| | 3. Other Operations | 9 |
| | E. ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 9 |
| | F. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 9-10 |
| | G. TAXES | 10 |
| | H. INSURANCE | 10 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 10 |
| | A. SURRENDER OF LEASES | 10-11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTION | 11 |
| | D. SUBSEQUENTLY CREATED INTEREST | 11-12 |
| | E. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | F. WAIVER OF RIGHT TO PARTITION | 12 |
| | G. NOTICE OF AGREEMENT TO SELL | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12-13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13-14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

# OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___TXP Operating Company___
_____, hereinafter designated and
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter
referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and or oil and gas in-
terests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore
and develop these leases and or oil and gas interests for the production of oil and gas to the extent and
as hereinafter provided:

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed
to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid
or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to
limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases cov-
ering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of
land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil
and gas interests intended to be developed and operated for oil and gas purposes under this agreement.
Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule
of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order,
a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area
or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to
be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in
and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects
not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the
plural includes the singular, and the neuter gender includes the masculine and the feminine.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a
part hereof:

☒ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to agreement.
    (2) Restrictions, if any, as to depths or formations.
    (3) Percentages or fractional interests of parties to this agreement.
    (4) Oil and gas leases and or oil and gas interests subject to this agreement.
    (5) Addresses of parties for notice purposes.
☒ B. Exhibit "B", Plat showing outline of the Contract Area.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Deferred Production Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G".

If any provision of any exhibit, except Exhibit "E", is inconsistent with any provision contained
in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

ARTICLE III.
INTERESTS OF PARTIES

A.  Oil and Gas Interests:

No     /hereto

If any party owns an unleased oil and gas interest in the Contract Area, that interest shall be treated for the purpose of this agreement and during the term hereof as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B". As to such interest, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B". Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.

B.  Interest of Parties in Costs and Production:

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A". All production of oil and gas from the Contract Area, subject to the payment of lessor's royalties which will be borne by the Joint Account, shall also be owned by the parties in the same manner during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interests covered hereby.

ARTICLE IV.
TITLES

A.  Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations /and or, if the Drilling Parties so request, title examination shall be made on the leases and or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including Federal Lease Status Reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐  Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C," and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

☒  Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall /use its best efforts to secure curative matter and pooling amendments or agreements required in connection with leases or oil and gas interests contributed by such party. The Operator shall be responsible for the preparation and recording of Pooling Designations or Declarations as well as the conduct of hearings before Governmental Agencies for the securing of spacing or pooling orders. This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to participate in the drilling of the well.

B.  Loss of Title:

1.  Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A", this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests, and

(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

for                              been responsible
or operating costs which it may have theretofore paid, but there shall be no monetary liability on its
part to the other parties hereto for/drilling, development, operating or other similar costs by reason of
such title failure; and

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the
operation of the interest which has been lost, but the interests of the parties shall be revised on an acre-
age basis, as of the time it is determined finally that title failure has occurred, so that the interest of
the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
Area by the amount of the interest lost; and

(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled
on the Contract Area is increased by reason of the title failure, the party whose title has failed shall
receive the proceeds attributable to the increase in such interests (less costs and burdens attributable
thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well;
and

(d) Should any person not a party to this agreement, who is determined to be the owner of any in-
terest in the title which has failed, pay in any manner any part of the cost of operation, development,
or equipment, such amount shall be paid to the party or parties who bore the costs which are so refund-
ed; and

(e) Any liability to account to a third party for prior production of oil and gas which arises by
reason of title failure shall be borne by the party or parties/in the same proportions in which they shared
in such prior production; and

(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection
with the defense of the interest claimed by any party hereto, it being the intention of the parties
hereto that each shall defend title to its interest and bear all expenses in connection therewith.

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight,
any rental, shut-in well payment, minimum royalty or royalty payment, is not paid or is erroneously
paid, and as a result a lease or interest therein terminates, there shall be no monetary liability against
the party who failed to make such payment. Unless the party who failed to make the required payment
secures a new lease covering the same interest within ninety (90) days from the discovery of the fail-
ure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of
the parties shall be revised on an acreage basis, effective as of the date of termination of the lease in-
volved, and the party who failed to make proper payment will no longer be credited with an interest in
the Contract Area on account of ownership of the lease or interest which has terminated. In the event
the party who failed to make the required payment shall not have been fully reimbursed, at the time of
the loss, from the proceeds of the sale of oil and gas attributable to the lost interest, calculated on an
acreage basis, for the development and operating costs theretofore paid on account of such interest, it
shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the
cost of any dry hole previously drilled or wells previously abandoned) from so much of the following
as is necessary to effect reimbursement:

(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost
interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an
acreage basis, of that portion of oil and gas thereafter produced and marketed (excluding production
from any wells thereafter drilled) which, in the absence of such lease termination, would be attributable
to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said
portion of the oil and gas to be contributed by the other parties in proportion to their respective in-
terests; and

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or
becomes, the owner of the interest lost, for the privilege of participating in the Contract Area or be-
coming a party to this agreement.

3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2.
above, shall not be considered failure of title but shall be joint losses and shall be borne by all parties
in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
the Contract Area.

## ARTICLE V.
## OPERATOR

A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR:

TXP Operating Company
_____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on
the Contract Area as permitted and required by, and within the limits of, this agreement. It shall con-
duct all such operations in a good and workmanlike manner, but it shall have no liability as Operator
to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

B.  Resignation or Removal of Operator and Selection of Successor:

1.  Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest in the Contract Area, or is no longer capable of serving as Operator, it shall be deemed to have resigned / also Operator without any action by Non-Operator, except the selection of a successor. Operator / may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the affirmative vote of two (2) or more Non-Operator(s) owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of Operator. Such resignation or removal / shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2.  Selection of Successor Operator:  Upon the resignation or removal of Operator, a successor Operator shall be selected by the Parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. If the Operator that is removed fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A", and not on the number of parties remaining after excluding the voting interest of the Operator that was removed.

3.  See Article XV.E. for additional provisions.

C.  Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  Drilling Contracts:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.

ARTICLE VI.
DRILLING AND DEVELOPMENT

A.  Initial Well:

On or before the   1st   day of   September   , 1986, Operator shall commence the drilling of a well for oil and gas at the following location: 467' FSL and 467' FEL of a 50 acre tract of land situated in the Bryant Holmes Survey, A-447, Cass County, Texas, said 50 acre tract being the S/2 of 100 acres described in Warranty Deed dated May 22, 1905, from L. C. Herring, etux, to S. B. Harralson, recorded in Volume Z-4, Page 402, Deed Records of Cass County, Texas, and shall thereafter continue the drilling of the well with due diligence to a depth of 11,100' or a depth sufficient to test that portion of the Smackover formation encountered between the subsurface depths of 10,775' and 10,860' in the TXP Operating Company-Bedgood Estate No. 1 Well located in the John Collom Survey, A-167, Cass County, Texas, whichever is the lesser depth, unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is encountered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, it shall first secure the consent of all parties and shall plug and abandon same as provided in Article VI.E.1. hereof.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

B. Subsequent Operations:

1. Proposed Operations: Should any party hereto desire to drill *or complete* other than the well provided for in Article VI.A., or to rework, deepen or plug back *a dry hole drilled* at the joint expense of all parties or a well jointly owned by all the parties and *not then producing* in paying quantities, the party desiring to drill *rework, deepen, or plug back/such a well shall give the* /rework, deepen, or plug back *or sidetrack* other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of proposal to *complete,* /rework, plug back, or drill deeper *or sidetrack may be given* by telephone and the response period shall be limited to *twenty-four (24)* /forty-eight (48) hours, exclusive of Saturday, Sunday or legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within *ninety (90)* /thirty (30) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the *twenty-four (24)* /forty-eight (48) hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties: provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of (a) the total interest of the parties approving such operation, and (b) its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within *twenty-four (24)* /forty-eight (48) hours (exclusive of Saturday, Sunday or legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A", or (b) carry its proportionate part of Non-Consenting Parties' interest, *The proposing party, at its election, may withdraw such proposal if there is insufficient participation, *and failure to so advise the proposing party shall constitute an election under (b).* and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, /reworked, deepened, or plugged back *completed* under the provisions of this Article results in a producer of oil and or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling/reworking, deepening, or plugging back /of any such *completing* /reworking, deepening, or plugging back *or sidetracking* well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold, (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(b) 300% of that portion of the costs and expenses of drilling, *sidetracking,* /reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and

- 5 -

1   300% of that portion of the cost of newly acquired equipment in the well (to and including the well-
2 head connections), which would have been chargeable to such Non-Consenting Party if it had partici-
3 pated therein.               (See also Article XV.I.)
4

5     Gas production attributable to any Non - Consenting Party's relinquished interest upon such Party's
6 election. shall be sold to its purchaser, if available, under the terms of its existing gas sales con-
7 tract. Such Non - Consenting Party shall direct its purchaser to remit the proceeds receivable from
8 such sale direct to the Consenting Parties until the amounts provided for in this Article are recov-
9 ered from the Non - Consenting Party's relinquished interest. If such Non - Consenting Party has not
10 contracted for sale of its gas at the time such gas is available for delivery, or has not made the elec-
11 tion as provided above, the Consenting Parties shall own and be entitled to receive and sell such Non-
12 Consenting Party's share of gas as hereinabove provided during the recoupment period.
13

14     During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share
15 of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of
16 all production, severance, gathering and other taxes, and all royalty, overriding royalty and other
17 burdens applicable to Non-Consenting Party's share of production.
18                     drilling, testing, completing,   or sidetracking
19     In the case of any reworking, plugging back,& deeper drilling/operation, the Consenting Parties shall
20 be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of
21 all such equipment shall remain unchanged; and upon abandonment of a well after such operation(s),
22 plugging back or deeper drilling, the Consenting Parties shall account for all such equipment to the
23 owners thereof, with each party receiving its proportionate part in kind or in value, less cost of
24 salvage.
25

26     Within sixty (60) days after the completion of any operation under this Article. the party con-
27 ducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an in-
28 ventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling,
29 deepening, plugging back, testing, completing, and equipping the well for production; or, at its option,
30 the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed
31 statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being
32 reimbursed as provided above, the Party conducting the operations for the Consenting Parties shall furn-
33 ish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the
34 operation of the well, together with a statement of the quantity of oil and gas produced from it and the
35 amount of proceeds realized from the sale of the well's working interest production during the preceding
36 month. In determining the quantity of oil and gas produced during any month, Consenting Parties
37 shall use industry accepted methods such as, but not limited to, metering or periodic well tests. Any
38 amount realized from the sale or other disposition of equipment newly acquired in connection with any
39 such operation which would have been owned by a Non-Consenting Party had it participated therein
40 shall be credited against the total unreturned costs of the work done and of the equipment purchased,
41 in determining when the interest of such Non-Consenting Party shall revert to it as above provided;
42 and if there is a credit balance, it shall be paid to such Non-Consenting party.
43

44     If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest
45 the amounts provided for above, the relinquished interests of such Non-Consenting Party shall auto-
46 matically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same
47 interest in such well, the material and equipment in or pertaining thereto, and the production there-
48 from as such Non-Consenting Party would have been entitled to had it participated in the drilling,
49 reworking, deepening, or plugging back of said well. Thereafter, such Non-Consenting Party shall be
                testing, completing, sidetracking
50 charged with and shall pay its proportionate part of the further costs of the operation of said well in
51 accordance with the terms of this agreement and the Accounting Procedure, attached hereto.
52

53     Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent
54 of all parties, no wells shall be completed in or produced from a source of supply from which a well
55 located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing
56 well spacing pattern for such source of supply.
57

58     The provisions of this Article shall have no application whatsoever to the drilling of the initial
59 well described in Article VI.A. except to the completing, reworking, deepening, plugging
60 back or sidetracking of such initial well, after having been drilled to the depth
61 specified in Article VI.A. The provisions of this Article shall fully apply to
62 all other well(s) proposed upon the Contract Area subsequent to the drilling of
63 the initial well.
64 C. Right to Take Production in Kind:
65

66     Each party shall have the right to take in kind or separately dispose of its proportionate share of
67 all oil and gas produced from the Contract Area, exclusive of production which may be used in de-
68 velopment and producing operations and in preparing and treating oil for marketing purposes and
69 production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate dispo-
70 sition by any party of its proportionate share of the production shall be borne by such party. Any

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1  party taking its share of production in kind shall be required to pay for only its proportionate share
2  of such part of Operator's surface facilities which it uses.
3
4       Each party shall execute such division orders and contracts as may be necessary for the sale of its
5  interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled
6  to receive payment direct from the purchaser thereof for its share of all production.
7
8       In the event any party shall fail to make the arrangements necessary to take in kind or separately
9  dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have
10 the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such
11 oil and gas or sell it to others at any time and from time to time, for the account of the non-taking
12 party at the best price obtainable in the area for such production. Any such purchase or sale by Op-
13 erator shall be subject always to the right of the owner of the production to exercise at any time its
14 right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a
15 purchaser. Any purchase or sale by Operator of any other party's share of oil and gas shall be only for
16 such reasonable periods of time as are consistent with the minimum needs of the industry under the
17 particular circumstances, but in no event for a period in excess of one (1) year. Notwithstanding the
18 foregoing, Operator shall not make a sale, including one into interstate commerce, of any other party's
19 share of gas production without first giving such other party thirty (30) days prior written notice of such intended
20 sale.
21
22     In the event one or more parties' separate disposition of its share of the gas causes split-stream de-
23 liveries to separate pipelines and or deliveries which on a day-to-day basis for any reason are not
24 exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the
25 balancing or accounting between the respective accounts of the parties shall be in accordance with
    ~~Day-to-day Production~~
26 any ~~Gas Balancing~~ Agreement between the parties hereto, whether such Agreement is attached as
27 Exhibit "E", or is a separate Agreement.
28
29 **D.  Access to Contract Area and Information:**
30
31     Each party shall have access to the Contract Area at all reasonable times, at its sole risk to inspect
32 or observe operations, and shall have access at reasonable times to information pertaining to the de-
33 velopment or operation thereof, including Operator's books and records relating thereto. Operator, upon
34 request, shall furnish each of the other parties with copies of all forms or reports filed with govern-
35 mental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports
36 of stock on hand at the first of each month, and shall make available samples of any cores or cuttings
37 taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to
38 Non-Operator, other than that specified above, shall be charged to the Non-Operator that requests the
39 information. However, a Non-Consenting Party under Articles VI.B.2 or XV.J. shall not have the access nor
40 information stated in this article attributable to the well in which such party elected not to participate
41 with the exception of information relating to payout of such well under Article VI.B.2.
42 **E.  Abandonment of Wells:**
43     **1.  Abandonment of Dry Holes:** Except for any well drilled pursuant to Article VI.B.2., any well
44 which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole
45 shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent
46 effort, be unable to contact any party, or should any party fail to reply within ~~forty-eight (48)~~ twenty-four (24) hours
47 (exclusive of Saturday, Sunday or legal holidays) after receipt of notice of the proposal to plug and
48 abandon such well, such party shall be deemed to have consented to the proposed abandonment. All
49 such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost,
50 risk and expense of the parties who participated in the cost of drilling of such well. Any party who ob-
51 jects to the plugging and abandoning such well shall have the right to take over the well and conduct
52 further operations in search of oil and or gas subject to the provisions of Article VI.B.
53
54     **2.  Abandonment of Wells that have Produced:** Except for any well which has been drilled or re-
55 worked pursuant to Article VI.B.2. hereof for which the Consenting Parties have not been fully reim-
56 bursed as therein provided, any well which has been completed as a producer shall not be plugged and
57 abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
58 be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense
59 of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment
60 of such well, all parties do not agree to the abandonment of any well, those wishing to continue its op-
61 eration shall tender to each of the other parties its proportionate share of the value of the well's salvable
62 material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated
63 cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall
64 assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity,
65 quality, or fitness for use of the equipment and material, all of its interest in the well and related equip-
66 ment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the
67 formation or formations then open to production. If the interest of the abandoning party is or includes
68 an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an
69 oil and gas lease, limited to the interval or intervals of the formation or formations then open to produc-
70 tion, for a term of one year and so long thereafter as oil and or gas is produced from the interval or inter-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1  vals of the formation or formations covered thereby, each lease to be on the form attached as Exhibit
2  "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is   (only insofar as it concerns the Contract Area)
3  located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon
4  the relationship of their respective percentages of participation in the Contract Area to the aggregate of
5  the percentages of participation in the Contract Area of all assignees. There shall be no readjustment
6  of interest in the remaining portion of the Contract Area.
7
8      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the op-
9  eration of or production from the well in the interval or intervals then abandoned.  (so assigned)
10  Notwithstanding any other provisions of the terms of this article.  Upon request, Operator shall continue to
11  operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
12  templated by this agreement, plus any additional cost and charges which may arise as the result of
13  the separate ownership of the assigned well.
14
15                           ARTICLE VII.
16              EXPENDITURES AND LIABILITY OF PARTIES
17
18  A.  Liability of Parties:
19
20      The liability of the parties shall be several, not joint or collective. Each party shall be responsible
21  only for its obligations, and shall be liable only for its proportionate share of the costs of developing
22  and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are
23  given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall
24  this agreement be construed as creating, a mining or other partnership or association, or to render the
25  parties liable as partners.
26
27  B.  Liens and Payment Defaults:
28
29      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a
30  security interest in its share of oil and or gas when extracted and its interest in all equipment, to secure
31  payment of its share of expense, together with interest thereon at the rate provided in the Accounting
32  Procedure attached hereto as Exhibit "C". To the extent that Operator has a security interest under the
33  Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies
34  of a secured party under the Code. The bringing of a suit and the obtaining of judgment by Operator
35  for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
36  rights or security interest as security for the payment thereof. In addition, upon default by any Non-
37  Operator in the payment of its share of expense, Operator shall have the right, without prejudice to
38  other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's
39  share of oil and or gas until the amount owed by such Non-Operator, plus interest has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any de-
41  fault. Operator grants a like lien and security interest to the Non-Operators to secure payment of Op-
42  erator's proportionate share of expense.
43
44      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of
45  a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by
46  Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the in-
47  terest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimburse-
48  ment thereof, be subrogated to the security rights described in the foregoing paragraph.
49
50  C.  Payments and Accounting:
51
52      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses
53  incurred in the development and operation of the Contract Area pursuant to this agreement and shall
54  charge each of the parties hereto with their respective proportionate shares upon the expense basis pro-
55  vided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate
56  record of the joint account hereunder, showing expenses incurred and charges and credits made and
57  received.
58
59      Operator, at its election, shall have the right from time to time to demand and receive from the
60  other parties payment in advance of their respective shares of the estimated amount of the expense to
61  be incurred in operations hereunder during the next succeeding month, which right may be exercised only
62  by submission to each such party of an itemized statement of such estimated expense, together with
63  an invoice for its share thereof. Each such statement and invoice for the payment in advance of esti-
64  mated expense shall be/ submitted on or before the 20th day of the next preceding month. Each party   paid
65  shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such es-
66  timate and invoice is received.*If any party fails to pay its share of said estimate within said time, the
67  amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be
68  made monthly between advances and actual expense to the end that each party shall bear and pay its
69  proportionate share of actual expenses incurred, and no more.
70  *but not earlier than the first day of the month for which such advance is demanded.

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

D.  Limitation of Expenditures:

1.  Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, ex-
cept any well drilled,~~or deepened~~/pursuant to the provisions of Article VI.B.2. of this Agreement. it being
understood that the consent to the drilling,~~or deepening~~/shall include:

~~☐ Option No. 1: All necessary expenditures for the drilling or deepening testing and completing of the well including necessary tankage and or surface facilities.~~

☒ Option No. 2: All necessary expenditures for the drilling,~~or deepening~~/and testing of the well. When
such well has reached its authorized depth, and all/tests have been completed, Operator shall give im-
mediate notice to the Non-Operators who have the right to participate in the completion costs. The parties
receiving such notice shall have ~~twenty-four (24)~~ hours (exclusive of Saturday. Sunday and legal holi-
days) in which to elect to participate in the setting of casing and the completion attempt. Such election.
when made, shall include consent to all necessary expenditures for the completing and equipping of such
well, including necessary tankage and or surface facilities. Failure of any party receiving such notice
to reply within the period above fixed shall constitute an election by that party not to participate in
the cost of the completion attempt. If one or more, but less than all of the parties. elect to set pipe and
to attempt a completion, the provisions of Article VI.B.2. hereof ~~(the phrase "reworking. deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing")~~ shall apply to
the operations thereafter conducted by less than all parties.

2.  Rework or Plug Back: Without the consent of all parties. no well shall be reworked or plugged
back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agree-
ment. it being understood that the consent to the reworking or plugging back of a well shall include
consent to all necessary expenditures in conducting such operations and completing and equipping of
said well, including necessary tankage and or surface facilities.

3.  Other Operations: Operator shall not undertake any single project reasonably estimated to require
an expenditure in excess of   Twenty-Five Thousand ------------- Dollars ($ 25,000.00----- )
except in connection with a well. the drilling,/reworking,/deepening,/completing, recompleting, or plug-
ging back of which has been previously authorized by or pursuant to this agreement; provided, how-
ever, that. in case of explosion. fire, flood or other sudden emergency, whether of the same or different
nature. Operator may take such steps and incur such expenses as in its opinion are required to deal with
the emergency to safeguard life and property but Operator. as promptly as possible. shall report the emer-
gency to the other parties. ~~If Operator prepares "Authority for Expenditures" for its own use~~
Operator, ~~upon request,~~ shall furnish copies of its "Authority for Expenditures" for any single project
costing in excess of   Ten Thousand and No/100-------------------Dollars ($ 10,000.00----- ).

E.  Royalties. Overriding Royalties and Other Payments:

Unless Non-Operator(s) make written arrangements with Operator to Operator's satisfac-
tion, each party shall pay or deliver. or cause to be paid. or delivered. all royalties ~~to the extent it is liable (excluding royalties on oil or gas owners under the lease(s) contributed by such party)~~
due on its share of production and shall hold the other parties free
from any liability therefor. If the interest of any party in any oil and gas lease covered by this agree-
ment/is ~~subject to any royalty, overriding~~ royalty. production payment. or other charge over and above
the aforesaid royalty, such party shall assume and alone bear all such obligations and shall account
for or cause to be accounted for. such interest to the owners thereof.

No party shall ever be responsible. on any price basis higher than the price received by such party,
to any other party's lessor or royalty owner; and if any such other party's lessor or royalty owner should
demand and receive settlements on a higher price basis. the party contributing such lease shall bear the
royalty burden insofar as such higher price is concerned.

F.  Rentals. Shut-in Well Payments and Minimum Royalties:

Rentals. shut-in well payments and minimum royalties which may be required under the terms of
any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their
expense. In the event two or more parties own and have contributed interests in the same lease to this
agreement. such parties may designate one of such parties to make said payments for and on behalf of all
such parties. Any party may request. and shall be entitled to receive. proper evidence of all such pay-
ments. In the event of failure to make proper payment of any rental. shut-in well payment or minimum
royalty through mistake or oversight where such payment is required to continue the lease in force.
any loss which results from such non-payment shall be borne in accordance with the provisions of Article
IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shut-
ting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sun-
day and holidays). or at the earliest opportunity permitted by circumstances, prior to taking such action,
but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-
Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments

- 9 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

G. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. Operator shall bill other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

See Article XV.C. for additional provisions.

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and or gas produced under the terms of this agreement.

H. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be an amount equivalent to the premium which would have been paid had such insurance been obtained. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part hereof. Operator shall require all contractors/engaged in work on or of or subcontractors for the Contract Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's fully owned automotive equipment.

ARTICLE VIII.
ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. If the interest of the assigning party includes an oil and gas interest, the assigning party shall execute and deliver to the party or parties not desiring to surrender an oil and gas lease covering such oil and gas interest for a term of one year and so long thereafter as oil and/or gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B". Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1  be shared by the parties assignee in the proportions that the interest of each bears to the interest of all
2  parties assignee.
3
4       Any assignment or surrender made under this provision shall not reduce or change the assignor's or
5  surrendering parties' interest. as it was immediately before the assignment. in the balance of the Contract
6  Area; and the acreage assigned or surrendered. and subsequent operations thereon. shall not thereafter
7  be subject to the terms and provisions of this agreement.
8
9  B.  Renewal or Extension of Leases:
10
11      If any party secures a renewal of any oil and gas lease subject to this Agreement. all other parties
12  shall be notified promptly, and shall have the right for a period of thirty (30) days following receipt
13  of such notice in which to elect to participate in the ownership of the renewal lease. insofar as such
14  lease affects lands within the Contract Area, by paying to the party who acquired it their several proper
15  proportionate shares of the acquisition cost allocated to that part of such lease within the Contract Area,
16  which shall be in proportion to the interests held at that time by the parties in the Contract Area.
17
18      If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it
19  shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of
20  their respective percentage of participation in the Contract Area to the aggregate of the percentages
21  of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
22  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
23
24      Each party who participates in the purchase of a renewal lease shall be given an assignment of its
25  proportionate interest therein by the acquiring party.
26
27      The provisions of this Article shall apply to renewal leases whether they are for the entire interest
28  covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease
29  taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after
30  the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted
31  for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal
32  lease and shall not be subject to the provisions of this agreement.
33
34      The provisions in this Article shall apply also and in like manner to extensions of oil and gas
35  leases.
36      See Article XV.D. for additional provisions.
37  C.  Acreage or Cash Contributions:
38
39      While this agreement is in force. if any party contracts for a contribution of cash toward the drilling
40  of a well or any other operation on the Contract Area. such contribution shall be paid to the party who
41  conducted the drilling or other operation and shall be applied by it against the cost of such drilling or
42  other operation. If the contribution be in the form of acreage. the party to whom the contribution is
43  made shall promptly tender an assignment of the acreage, without warranty of title. to the Drilling
44  Parties in the proportions said Drilling Parties shared the cost of drilling the well. If all parties hereto
45  are Drilling Parties and accept such tender. such acreage shall become a part of the Contract Area and
46  be governed by the provisions of this agreement. If less than all parties hereto are Drilling Parties and
47  accept such tender. such acreage shall not become a part of the Contract Area. Each party shall prompt-
48  ly notify all other parties of all acreage or money contributions it may obtain in support of any well or
49  any other operation on the Contract Area.
50
51      If any party contracts for any consideration relating to disposition of such party's share of substances
52  produced hereunder. such consideration shall not be deemed a contribution as contemplated in this
53  Article VIII.C.
54
55  D.  Subsequently Created Interest:
56
57      Notwithstanding the provisions of Article VIII.E. and VIII.G., if any party hereto shall. subsequent
58  to execution of this agreement. create an overriding royalty. production payment. or net proceeds inter-
    est, or other type burden against its working interest.
59  est, which such interests are hereinafter referred to as "subsequently created interest", such subsequently
60  created interest shall be specifically made subject to all of the terms and provisions of this agreement. as
61  follows:
62
63      1. If non-consent operations are conducted pursuant to any provision of this agreement. and the
64  party conducting such operations becomes entitled to receive the production attributable to the interest
65  out of which the subsequently created interest is derived. such party shall receive same free and clear
66  of such subsequently created interest. The party creating same shall bear and pay all such subsequently
67  created interests and shall indemnify and hold the other parties hereto free and harmless from any and
68  all liability resulting therefrom.
69
70

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

2. If the owner of the interest from which the subsequently created interest is derived (1) fails to pay, when due, its share of expenses chargeable hereunder, or (2) elects to abandon a well under provisions of Article VI.E. hereof, or (3) elects to surrender a lease under provisions of Article VIII.A. hereof, the subsequently created interest shall be chargeable with the pro rata portion of all expenses hereunder in the same manner as if such interest were a working interest. For purposes of collecting such chargeable expenses, the party or parties who receive assignments as a result of (2) or (3) above shall have the right to enforce all provisions of Article VII.B. hereof against such subsequently created interest.

E.   Maintenance of Uniform Interest:

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all leases and equipment and production; or

2. an equal undivided interest in all leases and equipment and production in the Contract Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the right of the other parties.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds hereof.

F.   Waiver of Right to Partition:

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

G.   ~~Preferential Right to Purchase:~~   NOTICE OF AGREEMENT TO SELL:

Should any party ~~desire to~~ sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, ~~with full information concerning its proposed sale,~~ which /shall include the name and address of the ~~prospective~~ purchaser, ~~(who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~ Any such sale shall be subject to the provisions of this agreement.

ARTICLE IX.
INTERNAL REVENUE CODE ELECTION

This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association for profit between or among the parties hereto. Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for Federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from Operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.
### CLAIMS AND LAWSUITS

Operator may settle any single damage claim or suit arising from operations hereunder if the expenditure does not exceed ___Fifteen Thousand and No/100_____Dollars ($15,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the expense of handling, settling, or otherwise discharging such claim or suit, unless such authority is delegated to Operator. All costs and expenses of the parties. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, the party shall immediately notify Operator, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
### NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by United States mail or Western Union telegram, postage or charges prepaid, or by teletype, and addressed to the party to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid, or when sent by teletype. Each party shall have the right to change its address at any time, and from time to time, by giving written notice hereof to all other parties.

## ARTICLE XIII.
### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and or oil and gas interests subjected hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease, or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, and/or so long as oil and/or gas production continues from any lease or oil and gas interest.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

1  X  Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled
2  under any provision of this agreement, results in production of oil and or gas in paying quantities, this
3  agreement shall continue in force  so long as any such well or wells produce, or are capable of produc-
4  tion, and for an additional period of __120__ days from cessation of all production: provided, however,
5  if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in
6  drilling or reworking a well or wells hereunder, this agreement shall continue in force until such op-
7  erations have been completed and if production results therefrom, this agreement shall continue in
8  force as provided herein. In the event the well described in Article VI.A., or any subsequent well
9  drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil
10 and or gas from the Contract Area, this agreement shall terminate unless drilling or reworking opera-
11 tions are commenced within __120__ days from the date of abandonment of said well.
12
13      It is agreed, however, that the termination of this agreement shall not relieve any party hereto from
14 any liability which has accrued· or attached prior to the date of such termination.
15
16
17                              ARTICLE XIV.
18              COMPLIANCE WITH LAWS AND REGULATIONS
19 A.  Laws, Regulations and Orders:
20
21      This agreement shall be subject to the conservation laws of the state in which the committed
22 acreage is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of
23 said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and
24 orders.
25
26 B.  Governing Law:
27
28      The essential validity of this agreement and all matters pertaining thereto, including, but not lim-
29 ited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and in-
30 terpretation or construction, shall be governed and determined by the law of the state in which the
31 Contract Area is located. If the Contract Area is in two or more states, the law of the state where most
32 of the land in the Contract Area is located shall govern.
33
34
35                              ARTICLE XV.
36                            OTHER PROVISIONS
37 A.  Sale of Gas Production:
38
39      It is recognized by the parties hereto that in addition to each party's share
40 of working interest production as shown in Exhibit "A", each party shall have the
41 right, subject to existing contracts, to market the royalty gas attributable to
42 each lease which it contributes to the Contract Area and to receive payments due for
43 such royalty gas produced from or allocated to such lease or leases.  It is agreed
44 that, regardless of whether each party markets or contracts for its share of gas,
45 including the royalty gas under the leases which it contributed to the Contract Area,
46 each party agrees to pay or cause to be paid to the royalty owners under its lease
47 or leases the proceeds attributable to their respective royalty interest and to hold
48 all other parties hereto harmless for its failure to do so.
49
50 B.  Billing Additional Interests:
51
52      Notwithstanding the provisions of this agreement and of the accounting procedure
53 attached as Exhibit "C", the Parties of this agreement specifically agree that in
54 no event during the term of this contract shall Operator be required to make more
55 than one billing for the entire interest credited to each Party on Exhibit "A".  It
56 is further agreed that if any Party to this agreement (hereafter referred to as
57 "Selling Party") disposes of part of the interest credited to it on Exhibit "A",
58 the Selling Party will be solely responsible for billing its assignee or assignees,
59 and shall remain primarily liable to the other parties for the interest or interests
60 assigned and shall make prompt payment to Operator for the entire amount of state-
61 ments and billings rendered to it.  It is further understood and agreed that if
62 Selling Party disposes of all its interest as set out on Exhibit "A", whether to
63 one or several assignees, Operator shall continue to issue statements and billings
64 to the Selling Party for the interest conveyed until such time as Selling Party
65 has designated and qualified one assignee to receive the billing for the entire
66 interest.  In order to qualify one assignee to receive the billing for the entire
67 interest credited to Selling Party on Exhibit "A", Selling Party shall furnish to
68 Operator the following:
69
70      1.  Written notice of the conveyance and photostatic or certified copies of the
71 recorded assignments by which the transfer was made.

- 14 -

2. The name of the assignee to be billed and a written statement signed by the assignee to be billed in which it consents to receive statements and billings for the entire interest credited to Selling Party on Exhibit "A" hereof; and, further, consents to handle any necessary sub-billings in the event it does not own the entire interest credited to Selling Party on Exhibit "A".

C.  Article VII.G. Regarding Taxes; Additional Provisions:

Operator shall pay or cause to be paid for the joint account all taxes, either State or Federal, owing or which may be payable on production from the Contract Area whether in the form of a severance or production tax; provided, however, if at any time any party is taking its share of production in kind, such party shall pay or cause to be paid said taxes as to such production unless Operator agrees otherwise in writing.

D.  Article VIII.B. Regarding Renewal or Extension of Leases; Additional Provisions:

Notwithstanding anything to the contrary contained herein, each party contributing a lease of leases to this agreement shall have the option upon the expiration of each lease to renew or extend such lease and to bear the renewal or extension costs and expenses and thereby retain its original interest and title in said lease. By exercising such option, the parties' working interest shall remain unchanged. If the contributing lease owner does not exercise its option within sixty (60) days after the expiration date of the contributed lease, the renewal or extension lease will then be subject to the terms of Article VIII.B. set forth on page eleven hereof. If any working interest owner other than the contributing lease owner renews or extends the lease prior to the end of said sixty (60) day period, the renewing or extending party shall furnish the contributing lease owner an itemized statement of the complete renewal or extension costs and expenses of such lease. The contributing lease owner shall have thirty (30) days after the receipt of such itemized statement to reimburse the renewing or extending party in full and thereafter be entitled to an assignment of such lease. Failure of the contributing lease owner to do so shall result in the forfeiture of its option hereunder. The provisions hereof shall only apply to leases or portions of leases located in the Contract Area.

E.  Change of Operator:

Notwithstanding the provisions of Article V.B., at any time after Operator has been acting hereunder for a period of two (2) years from the date on which it was originally designated Operator, any Non-Operator owning at lease ten percent (10%) working interest may notify Operator in writing of more cost efficient terms under which Non-Operator would be prepared to act as Operator. Unless within 30 days from receipt of such notice Operator agrees in writing to continue to act as Operator on the terms outlined by Non-Operator, said Non-Operator shall become Operator on the said terms at the end of the 30 days following the end of said 30-day period. Similarly, at any time after the new Operator has been acting as Operator hereunder for a period of two (2) years, any Non-Operator owning at least ten percent (10%) working interest may notify Operator in writing of the terms under which such Non-Operator would be prepared to act as Operator, and unless, within 30 days from receipt of such notice, Operator agrees in writing to continue to act as Operator on the terms outlined by said Non-Operator, such Non-Operator shall become Operator on the same terms at the end of the 30 days following the end of said 30-day period. If a change of Operator occurs under this paragraph or under Article V.B., the retiring Operator shall promptly deliver to the successor Operator all records and information necessary for successor Operator to discharge its duties and obligations as Operator.

F.  Limitations on Well Proposals:

It is specifically provided that no notice shall be given under Article VI hereof which proposes the drilling of more than one well. Further, the provisions of said Article VI, insofar as same pertains to notification by a party of its desire to drill a well, shall be suspended for so long as (1) a prior notice has been given which is still in force and effect and the period of time during which the well regarding same may be commenced has not expired, or (2) a well is presently drilling hereunder. This paragraph shall not apply under these circumstances where the well to which notice is directed is a well which is required under the terms of a lease or contract or one required to maintain a lease or a portion thereof in force.

G. Limitation on Proposals Regarding Producing Well(s):.

It is agreed that without the mutual consent of all parties no reworking or other operations shall be conducted under the provisions of Article VI hereof, so long as any completion is producing in paying quantities in the well with respect to which such proposal is made.

H. Sequence and Timing of Operations at Proposed Objective Depth:

Notwithstanding any provisions in this agreement to the contrary, the following provisions of this paragraph shall take precedence over any other provisions which may be in conflict therewith. It is agreed that where a well, which has been authorized under the terms of this agreement by all parties, or by one or more but less than all parties under Article VI, shall have been drilled to the proposed objective depth and the parties participating in the well cannot mutually agree upon the sequence and timing of further operations regarding said well, the following elections shall control in the order enumerated hereafter: (1) an election to attempt to complete the well at either the objective depth or objective formation; (2) an election to plug back and attempt to complete said well; (3) an election to deepen said well; and (4) an election to sidetrack the well. Notwithstanding anything provided in this Article XV.H., any party which desires to perform additional logging, coring or testing other than logging, coring or testing that would be performed by a prudent Operator, before attempting a completion which has been proposed by another party may do so at its sole cost, risk and expense.

I. Operations Necessary to Maintain a Lease(s) In Force:

Notwithstanding the provisions of this Agreement and particularly Article VI, if any proposed operations are necessary to maintain a lease covered by this agreement in force or an agreement to earn a lease(s) which would otherwise expire unless such operations are conducted, then in lieu of being penalized under Article VI.B.2. (a) and (b), each Non-Consenting Party shall assign to Consenting Parties all of such Non-Consenting Party's right, title and interest in and to the lease(s) or portion thereof or such agreement which would be lost or not earned if such operations were not conducted. Such assignment shall be promptly due upon commencement of said proposed operations by Consenting Parties and if the assignment is in favor of more than one party the assigned interest shall be shared by the Consenting Parties in the proportions that the interest of each bears to the interest of all Consenting Parties unless otherwise agreed to in writing. Thereafter, such acreage covered by said assignment shall not be subject to the terms of this agreement, but shall be deemed to be subject to an agreement identical to this changed only in Exhibit "A" to indicate the Consenting Parties and their percentages of interest. For purposes of defining necessary operations to maintain a lease or agreement to earn a lease(s) in force which would otherwise expire, such operations will be deemed necessary if proposed within six (6) months of the date the lease or agreement would otherwise expire in the absence of such operation.

J. Demand for Payment:

Notwithstanding anything to the contrary herein contained, if any non-operating party fails to pay its proportionate part of invoices sent by Operator pursuant to the expense basis provided in said Accounting Procedure for the cost and expense of any operation it agreed to participate in pursuant to the terms of this Agreement within 30 days after rendition of notice of non-payment and demand for payment, the other non-operating parties and Operator, without prejudice to other existing remedies, may, at their option, consider such non-payment to constitute an election not to participate under Article VI.B.2 or Article XV.B., whichever article is applicable, of this agreement in the same manner, to the same extent, and with the same force that a failure to reply within the prescribed period constitutes an election not to participate.

K. Dispute Regarding Proposed Depth:

If, during the drilling of any well being drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth), the opinion of a majority in interest, and not in numbers, of the owners (which are Drilling Parties) as shown by Exhibit "A" shall control and be binding upon all parties. If the parties are equally divided, the opinion of the Operator will control.

-145-

1.  L.  Except as otherwise specifically provided herein, during the term of this
2.  Agreement, all geophysical, geological and engineering information acquired here-
3.  under shall be the property of the parties hereto as herein provided, and the parties
4.  agree, and do hereby bind themselves, their successors and assigns, to accept and
5.  keep such information confidential and for the exclusive use of the parties con-
6.  cerned for the term hereof.  Except as otherwise specifically provided herein, well
7.  information shall be the sole and confidential property of the parties participating
8.  in the cost of the well, and may be disposed of in any manner they may determine
9.  by unanimous agreement, without the consent of any other parties to this Agreement.
10.
11.     The following guidelines shall apply to the contents and substance of news
12.  releases provided, however, that such guidelines shall not prohibit any party from
13.  issuing news releases in accord with the foregoing and shall not impose notice or
14.  consent requirements other than those contained in this Agreement:
15.
16.     (i)  No release to the news media will be made until Operator is satisfied
17.          that a well has been adequately tested to determine potential commer-
18.          ciality.  Upon receipt of all final test results which indicate, in
19.          Operator's opinion, a commercial discovery, Operator will prepare a
20.          release using the following News Release Content Guidelines:
21.
22.               (a)  Name of Well
23.               (b)  Location of Well by Parish or County and State
24.               (c)  Tested Interval(s)
25.               (d)  Test(s) Results
26.               (e)  Development/Confirmation Plans
27.               (f)  Participants and Percentages
28.
29.     (ii)  Proposed releases will be wired to the non-operators 24 hours (exclusive
30.          of Saturdays, Sundays and holidays) before being issued to news media.
31.          Any non-operator may offer comments on the news release and if it is
32.          not satisfied with the contents of the release it may have its name
33.          excluded from the release by so advising Operator of this election during
34.          this 24-hour period.  Operator shall have sole discretion over the final
35.          text of any such news release.  Any participating non-operator may prepare
36.          its own release, using the Content Guidelines, following receipt of
37.          Operator's proposed release.  A copy thereof shall be wired to the other
38.          parties, who may require their name be removed within 24 hours following
39.          receipt of the proposed release.
40.
41.     (iii)  Subject to the data secrecy provisions of this Agreement and notwith-
42.          standing the foregoing, any party may include information concerning
43.          the Contract Area in its annual and quarterly shareholder reports in
44.          accord with guidelines established as aforesaid.
45.
46.     (iv)  Notwithstanding the foregoing, it is understood and agreed that news
47.          releases regarding catastrophe related events shall be the exclusive
48.          right of the Operator, which responsibility shall necessarily be exer-
49.          cised by Operator on its own initiative.  However, whenever practicable,
50.          all parties with an interest in the particular event will be consulted
51.          prior to any such news release.
52.
53.     (v)  Notwithstanding any other provision of this Agreement, any party may
54.          disclose information, without the consent of the other parties, (1)  to
55.          governmental agencies when required by such agency, (2)  to reputable
56.          financial institutions in connection with a bona fide financial trans-
57.          action, (3)  to accredited engineering firms for the purpose of evaluation
58.          on a confidential basis, (4)  to reputable and financially responsible
59.          third parties with whom a party is engaged in a bona fide effort to sell
60.          all or part of its interest in the Contract Area or this Agreement, and
61.          (5) third parties with whom a party is engaged in a bona fide effort to
62.          effect a merger or consolidation or which third party proposes to acquire
63.          all or a controlling part of the stock in a party hereto or to purchase
64.          all or substantially all of the assets of a party hereto or affiliates
65.          of parties thereto; provided that any third party, who is permitted access
66.          to confidential data pursuant to this Paragraph, shall agree in writing
67.          not to communicate such information to anyone and to make no use of such
68.          information adverse to the parties hereto within the area covered by such
69.          information during the period of time such information remains confidential
70.          hereunder; and provided further that the party disclosing the confidential
71.          data shall indemnify and hold the other parties hereto harmless against
72.          losses resulting from its disclosure to non-governmental third parties.

-14c-

M.   Unless otherwise mutually agreed to in writing by all parties to this Agreement, the Unit Declaration filed in the county records for the first well drilled and completed hereunder as a well capable of producing gas in paying quantities from any zone or formation covered by this agreement shall be identical in area to the "Contract Area" as defined herein and shall be limited to the depths and formations described in Article III of Exhibit "A" hereto.

N.   The Percentage Participation figure for each party hereto as set forth on Exhibit "A" hereto, shall be adjusted as to each producing well, the equipment therein and thereon, and the production therefrom, to correspond to each such party's contribution of its leasehold interest to the unit declared for the well as determined by division order title opinion rendered for such unit by the examining attorney, retroactive to the effective date of this agreement. If any party's interest in any such well increases pursuant to the foregoing adjustments, then within sixty (60) days from the date of the division order title opinion, such party shall account to those parties whose interest in the well has decreased pursuant to the adjustment, for the percentage of all costs associated with such well equal to the percentage increase of that party's interest in the well plus interest calculated separately for each expenditure comprising said costs from the date that each such expenditure was paid at the rate of interest set forth in paragraph 3 of Article I of the Accounting Procedure which is attached hereto as Exhibit "C" and made a part hereof.

The parties hereto agree to execute all legal documents necessary to formally complete the adjustment of ownership described above within a reasonable time after the date of such division order title opinion.

O.   This agreement shall supercede any and all operating agreements previously executed by, or previously agreed to be executed by, the parties hereto, or any two (2) or more of the parties hereto, but insofar, and only insofar, as this agreement covers and pertains to the Contract Area.

-14d-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1977

ARTICLE XVI.

MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of __1st__ day of __July__, 19 _86_.

OPERATOR
TXP Operating Company, a limited partnership,
By:  Transco Exploration Company
     its Managing General Partner

By: _____
    W. B. Miller
    Senior Vice President – Exploration

NON-OPERATORS
Samedan Oil Corporation

By: _____
Name:  R.E. Renner
Title: V. President & General Manager

Pennzoil Producing Company

By: _____
Name:
Title:

Ray B. Powers, Jr.

By: _____
Name:
Title:

MAT Energy, Inc.

By: _____
Name:
Title:

- 15 -

STATE OF _Texas_               }

COUNTY OF _Harris_             }

On this _15th_ day of _August_____, 19_86_, before me, the undersigned authority in and for said jurisdiction, personally appeared _W. B. Miller_, to me personally known, who, being by me duly sworn did say that he is the _Sr. Vice President - Onshore Exploration_ of Transco Exploration Company, that Transco Exploration Company, a Delaware Corporation, is the Managing General Partner of TXP Operating Company, a Texas limited partnership and that the foregoing instrument was signed by him and delivered on behalf of Transco Exploration Company, by authority of its Board of Directors, in its capacity and on behalf of TXP Operating Company and that he acknowledged that instrument to be the free act and deed of TXP Operating Company.

My Commission Expires:

_11-18-89_

By: _Shari L. Forrest_
    Notary Public in and for
    _____ County, _____.

SHARI L. FORREST
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES 11—18—89

STATE OF _Texas_              }

COUNTY OF _Harris_            }

On this _19th_ day of _August_____, 1986, before me appeared _R. d. Kenner_, who being by me duly sworn, did say that he is the _V. President & Gen. Mgr._ of _Samedan Oil Corporation_ a _Delaware_ corporation, and that the foregoing instrument was executed on behalf of the corporation by authority of its Board of Directors and that he acknowledged such instrument to be the free act and deed of the corporation.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my notarial seal as of the day and year first above written.

My Commission Expires:

_1-14-87_

By: _Patti Anderson_
Notary Public in and for the
State of _Texas_

PATTI ANDERSON
Notary Public, State of Texas
My Commission Expires January 14, 1987

STATE OF _____        }

COUNTY OF _____        }

On this _____ day of _____, 1986, before me appeared _____, who being by me duly sworn, did say that he is the _____ of _____ a _____ corporation, and that the foregoing instrument was executed on behalf of the corporation by authority of its Board of Directors and that he acknowledged such instrument to be the free act and deed of the corporation.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my notarial seal as of the day and year first above written.

My Commission Expires:

_____

By: _____
Notary Public in and for the
State of _____

STATE OF _____          §

COUNTY OF _____          §

    On this _____ day of _____, 1986, before me appeared _____, who being by me duly sworn, did say that he is the _____ of _____, a _____ corporation, and that the foregoing instrument was executed on behalf of the corporation by authority of its Board of Directors and that he acknowledged such instrument to be the free act and deed of the corporation.

    IN WITNESS WHEREOF I have hereunto set my hand and affixed my notarial seal as of the day and year first above written.

My Commission Expires:

_____

By: _____
Notary Public in and for the
State of _____


THE STATE OF _____          §

COUNTY OF _____          §


    Before me, the undersigned authority, on this day personally appeared _____ known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same as his free act and deed for the purposes and consideration therein expressed.

    Given under my hand and seal of office this _____ day of _____, 1986.

My Commission Expires

_____

Name: _____
Notary Public in and for the State
of _____

EXHIBIT "A"

Attached to and made a part of Operating Agreement dated
July 1, 1986, between TXP OPERATING COMPANY, Operator,
and PENNZOIL PRODUCING COMPANY, ETAL.

I. Lands and Leases Subject to this Agreement:

"Contract Area": Covers the leases and interests listed on the
following exhibits in the lands situated within the area enclosed by a
heavy black outline on Exhibit "B" to this Agreement:

A. Leases and interests contributed by TXP Operating
Company and Samedan Oil Corporation. (Exhibit "A-1")

B. Leases contributed by Pennzoil Producing Company.
(Exhibit "A-2")

C. Leases contributed by Ray B. Powers, Jr. (Exhibit
"A-3")

D. Leases contributed by MAT Energy, Inc. (Exhibit "A-4")

II. Names, Addresses and Percentage Participation of the Parties:

TXP Operating Company                               44.58104%*
102 N. College Street
InterFirst Plaza Building, Suite 700
Tyler, TX  75702

Samedan Oil Corporation                             44.58104%*
12600 Northborough, Suite 250
Houston, TX  77067

Pennzoil Producing Company                           6.60624%*
P.O. Box 6088
Shreveport, LA  71136-6088

Ray B. Powers, Jr.                                   2.37777%*
1012 Troup Highway, 110 South
Tyler, TX  75707

MAT Energy, Inc.                                     1.85391%*
P.O. Box 2013
Tyler, TX  75710

*Subject to redetermination pursuant to Article XV. N.

III. Restrictions, if any, as to Depths or Formations:

From base of Rodessa Formation to the stratigraphic equivalent of the
deepest depth drilled in the Initial Test Well drilled pursuant to this
Agreement, or substitute well drilled therefor.

IV. Leasehold Burdens:

See Article VII. E.

EXHIBIT "A-1"

ATTACHED TO AND MADE A PART OF THAT OPERATING AGREEMENT
DATED JULY 1, 1986, BETWEEN TXP OPERATING COMPANY
AND PENNZOIL PRODUCING COMPANY, ETAL

(a)  SCHEDULE OF LEASES CONTRIBUTED BY TXP OPERATING COMPANY AND
     SAMEDAN OIL CORPORATION.

1.  LESSOR:      Rodney O. Brown, et al
    LESSEE:      TXP Operating Company
    DATED:       11/01/85
    RECORDED:    763/216

2.  LESSOR:      H. H. Williams
    LESSEE:      TXP Operating Company
    DATED:       11/15/85
    RECORDED:    762/231

3.  LESSOR:      Hardy Williams
    LESSEE:      TXP Operating Company
    DATED:       11/18/85
    RECORDED:    763/233

4.  LESSOR:      Edith Ware
    LESSEE:      TXP Operating Company
    DATED:       11/14/85
    RECORDED:    763/225

5.  LESSOR:      Gladys Hill, et vir
    LESSEE:      TXP Operating Company
    DATED:       11/14/85
    RECORDED:    763/223

6.  LESSOR:      Harry O. Williams
    LESSEE:      TXP Operating Company
    DATED:       11/22/85
    RECORDED:    763/235

7.  LESSOR:      Lillie Cella
    LESSEE:      TXP Operating Company
    DATED:       11/22/85
    RECORDED:    763/219

8.  LESSOR:      Donald L. Williams
    LESSEE:      TXP Operating Company
    DATED:       11/21/85
    RECORDED:    763/227

9.  LESSOR:      Jessie M. Williams
    LESSEE:      TXP Operating Company
    DATED:       11/21/85
    RECORDED:    763/237

10. LESSOR:      Carnie Godwin
    LESSEE:      TXP Operating Company
    DATED:       11/18/85
    RECORDED:    763/221

Exhibit "A-1"
July 1, 1986
Page 2 of 8

11. LESSOR:     Ella Abney
    LESSEE:     TXP Operating Company
    DATED:      11/22/85
    RECORDED:   763/214

12. LESSOR:     Selma Williams
    LESSEE:     TXP Operating Company
    DATED:      11/15/85
    RECORDED:   763/241

13. LESSOR:     Edsel J. Williams
    LESSEE:     TXP Operating Company
    DATED:      11/15/85
    RECORDED:   763/229

14. LESSOR:     Leslie C. Williams
    LESSEE:     TXP Operating Company
    DATED:      11/21/85
    RECORDED:   763/239

15. LESSOR:     R. F. Williams
    LESSEE:     TXP Operating Company
    DATED:      11/14/85
    RECORDED:   764/461

16. LESSOR:     Agnes Thorp
    LESSEE:     TXP Operating Company
    DATED:      11/14/85
    RECORDED:   766/299

17. LESSOR:     Gloria J. Stinson
    LESSEE:     TXP Operating Company
    DATED:      11/21/85
    RECORDED:   764/457

18. LESSOR:     Richard W. Williams
    LESSEE:     TXP Operating Company
    DATED:      11/21/85
    RECORDED:   764/463

19. LESSOR:     Ella Marie Eason
    LESSEE:     TXP Operating Company
    DATED:      11/22/85
    RECORDED:   764/450

20. LESSOR:     Wilma Williams
    LESSEE:     TXP Operating Company
    DATED:      11/23/85
    RECORDED:   764/465

21. LESSOR:     Alan V. Williams
    LESSEE:     TXP Operating Company
    DATED:      11/15/85
    RECORDED:   764/459

Exhibit "A-1"
July 1, 1986
Page 3 of 8


22.  LESSOR:       E. Lee Williams
     LESSEE:       TXP Operating Company
     DATED:        12/20/85
     RECORDED:     765/366


23.  LESSOR:       Henry Williams
     LESSEE:       TXP Operating Company
     DATED:        12/23/85
     RECORDED:     765/370


24.  LESSOR:       Mavis Williams
     LESSEE:       TXP Operating Company
     DATED:        12/27/85
     RECORDED:     765/376


25.  LESSOR:       R. C. Williams
     LESSEE:       TXP Operating Company
     DATED:        12/27/85
     RECORDED:     765/378


26.  LESSOR:       Lottie McDuff Williams
     LESSEE:       TXP Operating Company
     DATED:        12/27/85
     RECORDED:     765/374


27.  LESSOR:       Cecil L. Williams
     LESSEE:       TXP Operating Company
     DATED:        12/20/85
     RECORDED:     765/364


28.  LESSOR:       Willie C. Williams
     LESSEE:       TXP Operating Company
     DATED:        12/27/85
     RECORDED:     765/380


29.  LESSOR:       Kenyon D. Williams
     LESSEE:       TXP Operating Company
     DATED:        11/15/85
     RECORDED:     765/372


30.  LESSOR:       Geraldine Williams
     LESSEE:       TXP Operating Company
     DATED:        12/20/85
     RECORDED:     765/368


31.  LESSOR:       Aubrey Lee Williams
     LESSEE:       TXP Operating Company
     DATED:        12/27/85
     RECORDED:     765/362


32.  LESSOR:       Fay E. Unruh
     LESSEE:       TXP Operating Company
     DATED:        12/28/85
     RECORDED:     765/360

33.  LESSOR:      Allen W. Williams
     LESSEE:      TXP Operating Company
     DATED:       11/21/85
     RECORDED:    765/851

34.  LESSOR:      Minnie Mae Rodgers
     LESSEE:      TXP Operating Company
     DATED:       12/23/85
     RECORDED:    765/847

35.  LESSOR:      A. C. Williams
     LESSEE:      TXP Operating Company
     DATED:       12/23/85
     RECORDED:    765/849

36.  LESSOR:      Katherine Turner
     LESSEE:      TXP Operating Company
     DATED:       12/20/85
     RECORDED:    766/301

37.  LESSOR:      Sherline Long
     LESSEE:      TXP Operating Company
     DATED:       12/28/85
     RECORDED:    767/89

38.  LESSOR:      Wayne Williams
     LESSEE:      TXP Operating Company
     DATED:       12/23/85
     RECORDED:    768/609

39.  LESSOR:      D. J. Wagnon
     LESSEE:      TXP Operating Company
     DATED:       12/28/85
     RECORDED:    768/607

40.  LESSOR:      Vivian Florence Williams, et al
     LESSEE:      TXP Operating Company
     DATED:       07/17/86
     RECORDED:

41.  LESSOR:      Evelyn Parker Dickinson, Ind. & as Ind. Exec.
     LESSEE:      TXP Operating Company
     DATED:       01/23/85
     RECORDED:    737/509

42.  LESSOR:      Carolyn Bedgood Park
     LESSEE:      TXP Operating Company
     DATED:       01/24/85
     RECORDED:    737/692

43.  LESSOR:      Helen Parker Nattier
     LESSEE:      TXP Operating Company
     DATED:       01/24/85
     RECORDED:    738/110

Exhibit "A-1"
July 1, 1986
Page 5 of 8


44. LESSOR:      Jerry N. Cash
    LESSEE:      TXP Operating Company
    DATED:       01/28/85
    RECORDED:    738/720


45. LESSOR:      Sally Cash Neal
    LESSEE:      TXP Operating Company
    DATED:       01/28/85
    RECORDED:    738/731


46. LESSOR:      L. P. Cole
    LESSEE:      TXP Operating Company
    DATED:       02/11/85
    RECORDED:    738/718


47. LESSOR:      Era Mae Parker Boren
    LESSEE:      TXP Operating Company
    DATED:       01/24/85
    RECORDED:    741/750


48. LESSOR:      Betty Flint
    LESSEE:      TXP Operating Company
    DATED:       02/21/86
    RECORDED:    769/505


49. LESSOR:      Norma Jean Elkins
    LESSEE:      TXP Operating Company
    DATED:       02/21/86
    RECORDED:    772/26


50. LESSOR:      Charles W. Oliphant, et al
    LESSEE:      TXP Operating Company
    DATED:       07/29/86
    RECORDED:


51. LESSOR:      Sarah Reynolds Hatler
    LESSEE:      TXP Operating Company
    DATED:       01/24/85
    RECORDED:    737/512


52. LESSOR:      Arthur E. Simpson, et ux
    LESSEE:      TXP Operating Company
    DATED:       01/24/85
    RECORDED:    737/526


53. LESSOR:      Isabel C. Brooks
    LESSEE:      TXP Operating Company
    DATED:       01/27/85
    RECORDED:


54. LESSOR:      Jack S. Waller
    LESSEE:      TXP Operating Company
    DATED:       01/27/85
    RECORDED:    737/700

Exhibit "A-1"
July 1, 1986
Page 6 of 8

55.  LESSOR:        DeDe Spiva Powell
     LESSEE:        TXP Operating Company
     DATED:         01/29/85
     RECORDED:      737/689

56.  LESSOR:        Dr. Deborah Spiva
     LESSEE:        TXP Operating Company
     DATED:         01/29/85
     RECORDED:      738/115

57.  LESSOR:        John E. Waller
     LESSEE:        TXP Operating Company
     DATED:         01/27/85
     RECORDED:      738/118

58.  LESSOR:        Ted D. Waller
     LESSEE:        TXP Operating Company
     DATED:         01/27/85
     RECORDED:      738/738

59.  LESSOR:        Deana W. Copeland
     LESSEE:        TXP Operating Company
     DATED:         01/27/85
     RECORDED:      738/715

60.  LESSOR:        Yvonne S. Grammer
     LESSEE:        TXP Operating Company
     DATED:         02/05/85
     RECORDED:      738/725

61.  LESSOR:        Martha M. Gagnon
     LESSEE:        TXP Operating Company
     DATED:         01/27/85
     RECORDED:      739/230

62.  LESSOR:        Gordon W. Mixon
     LESSEE:        TXP Operating Company
     DATED:         01/27/85
     RECORDED:      739/240

63.  LESSOR:        Hazel Harrist
     LESSEE:        TXP Operating Company
     DATED:         11/27/85
     RECORDED:      764/452

64.  LESSOR:        Irene Hogue, et al
     LESSEE:        TXP Operating Company
     DATED:         11/27/85
     RECORDED:      764/454

65.  LESSOR:        Rosalie Price Nichols
     LESSEE:        TXP Operating Company
     DATED:         06/17/86
     RECORDED:      777/687

Exhibit "A-1"
July 1, 1986
Page 7 of 8

66.  LESSOR:      Lillie Johnson Price
     LESSEE:      TXP Operating Company
     DATED:       06/17/86
     RECORDED:    777/690

67.  LESSOR:      F. A. Williams
     LESSEE:      TXP Operating Company
     DATED:       06/26/86
     RECORDED:

68.  LESSOR:      Mattie Elizabeth Williams Terry
     LESSEE:      TXP Operating Company
     DATED:       07/01/86
     RECORDED:

69.  LESSOR:      John Allen Williams
     LESSEE:      TXP Operating Company
     DATED:       07/01/86
     RECORDED:

70.  LESSOR:      L. D. Williams
     LESSEE:      TXP Operating Company
     DATED:       07/01/86
     RECORDED:

71.  LESSOR:      Shellie Williams
     LESSEE:      TXP Operating Company
     DATED:       07/01/86
     RECORDED:

72.  LESSOR:      Pauline Williams Carter
     LESSEE:      TXP Operating Company
     DATED:       07/14/86
     RECORDED:

73.  LESSOR:      Elsie Cornelia Williams Rod
     LESSEE:      TXP Operating Company
     DATED:       07/01/86
     RECORDED:

74.  LESSOR:      J. C. Williams
     LESSEE:      TXP Operating Company
     DATED:       07/01/86
     RECORDED:

75.  LESSOR:      Florence M. Williams Wilson
     LESSEE:      TXP Operating Company
     DATED:       07/14/86
     RECORDED:

76.  LESSOR:      Frank O. Williams
     LESSEE:      TXP Operating Company
     DATED:       07/01/86
     RECORDED:

Exhibit "A-1"
July 1, 1986
Page 8 of 8

77. LESSOR:      Lillie F. Williams Langston
    LESSEE:      TXP Operating Company
    DATED:       07/14/86
    RECORDED:

(b)  AGREEMENTS CONTRIBUTED BY TXP OPERATING COMPANY AND SAMEDAN OIL
     CORPORATION.

    (1)  Farmout Agreement dated October 25, 1983 between Sklar & Phillips
         Oil Company, et al, and Cities Service Oil and Gas Corporation, as
         amended;

    (2)  Farmout Agreement dated February 28, 1985 between Kerr-McGee
         Corporation and TXP Operating Company, as amended, and

    (3)  Farmout Agreement dated March 8, 1985 between Cities Service Oil and
         Gas Corporation and Transco Exploration Company, as amended.

(DDB802)

EXHIBIT "A-2"

ATTACHED TO AND MADE A PART OF THAT OPERATING AGREEMENT
DATED JULY 1, 1986, BETWEEN TXP OPERATING COMPANY
AND PENNZOIL PRODUCING COMPANY, ETAL

SCHEDULE OF LEASES CONTRIBUTED BY PENNZOIL PRODUCING COMPANY.

1.  LESSOR:      G. C. Williams, et ux
    LESSEE:      M. E. Weber
    DATED:       02/03/55
    RECORDED:    311/438

2.  LESSOR:      F. A. Williams, et ux
    LESSEE:      M. E. Weber
    DATED :      02/07/55
    RECORDED:    311/450

3.  LESSOR:      F. M. Williams
    LESSEE:      M. E. Weber
    DATED        03/11/55
    RECORDED:    311/307

4.  LESSOR:      H. K. Carr
    LESSEE:      Sam Sklar
    DATED:       06/20/56
    RECORDED:    332/247

(DDB805)

EXHIBIT "A-3"

ATTACHED TO AND MADE A PART OF THAT OPERATING AGREEMENT
DATED JULY 1, 1986, BETWEEN TXP OPERATING COMPANY
AND PENNZOIL PRODUCING COMPANY, ETAL

SCHEDULE OF LEASES CONTRIBUTED BY RAY B. POWERS, JR.

1. LESSOR:      Chester Williams
   LESSEE:      Ray B. Powers, Jr.
   DATED:       02/15/84
   RECORDED:    717/649

2. LESSOR:      Mamie Taylor
   LESSEE:      Ray B. Powers, Jr.
   DATED:       02/15/84
   RECORDED:    717/646

3. LESSOR:      Clara Rives
   LESSEE:      Ray B. Powers, Jr.
   DATED:       02/15/84
   RECORDED:    717/643

4. LESSOR:      Mozelle Beck
   LESSEE:      Ray B. Powers, Jr.
   DATED:       02/20/84
   RECORDED:    717/629

5. LESSOR:      Christine Patterson
   LESSEE:      Ray B. Powers, Jr.
   DATED:       02/20/84
   RECORDED:    717/638

6. LESSOR:      R. F. Edwards
   LESSEE:      Ray B. Powers, Jr.
   DATED:       02/15/84
   RECORDED:    717/636

EXHIBIT "A-4"

ATTACHED TO AND MADE A PART OF THAT OPERATING AGREEMENT
DATED JULY 1, 1986, BETWEEN TXP OPERATING COMPANY
AND PENNZOIL PRODUCING COMPANY, ETAL

SCHEDULE OF LEASES CONTRIBUTED BY MAT ENERGY, INC.

1.   LESSOR:     Charlie B. Dozier, et al
    LESSEE:     MAT Energy, Inc.
    DATED:     01/30/85
    RECORDED:    739/746



EXHIBIT "B"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
OPERATING AGREEMENT DATED JULY 1, 1986 BETWEEN
TXP OPERATING COMPANY AND
PENNZOIL PRODUCING COMPANY, ETAL



EXHIBIT "B"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
OPERATING AGREEMENT DATED JULY 1, 1986 BETWEEN
TXP OPERATING COMPANY AND
PENNZOIL PRODUCING COMPANY, ETAL

EXHIBIT   " C "

Attached to and made a part of that certain Operating Agreement dated  July 1, 1986   between TXP Operating Company and Pennzoil Producing Company, etal

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

### 2. Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3. Advances and Payments by Non-Operators

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of  2% above prime rate* annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4. Adjustments                *established by Chase Manhattan Bank

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### 5. Audits

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

### 6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1. Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**2. Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First Level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

**3. Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies of North America.

**4. Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**5. Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $400 or less excluding accessorial charges.

**6. Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

**7. Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

**8. Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**9. Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —



COPAS

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead – Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

    ( X ) Fixed Rate Basis, Paragraph 1A, or

    (    ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property XMXXXXXXXXXX shall not ( X ) be covered by the Overhead rates.

**A. Overhead – Fixed Rate Basis**

RATE PER WELL PER MONTH

I. Land and Inland Waters (Includes Bay Areas)

| | Drilling Well Rate | Producing Well Rate |
|---|---|---|
| All depths | $ 9,017 | $ 902 |

II. Gulf of Mexico (Open Waters)

| | Drilling Well Rate | Producing Well Rate |
|---|---|---|
| All depths | $ 19,134 | $ 1,914 |

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

    (a) Drilling Well Rate

        [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

        [2] Charges for offshore drilling well rates shall begin on the date the contractual rig charges begin and terminate on the date the drilling or completion rig is released under the terms of the drilling contract then in force.

        [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

    (b) Producing Well Rates

        [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

        [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

        [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

        [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

        [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

B  Overhead - Percentage Basis

  (1) Operator shall charge the Joint Account at the following rates:

    (a) Development

      _____ Percent (   %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

    (b) Operating

      _____ Percent (   %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

  (2) Application of Overhead - Percentage Basis shall be as follows:
For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property. Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ 25,000   :

  A.  ___5___ % of total costs if such costs are more than $ 25,000 _____ but less than $100,000 _____ ; plus
  B.  ___3___ % of total costs in excess of $ 100,000 _____ but less than $1,000,000, plus
  C.  ___2___ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

# IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property, however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties. Notwithstanding the above, Controllable Material furnished by Non-Operator which is surplus shall be returned, at Non-Operator's option, to a location designated by Non-Operator at Non-Operator's expense.

1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

  (1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

  (2) Line Pipe

    (a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

    (b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

  (3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

  (1) Material moved to the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

  (2) Material moved from the Joint Property

    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or

— 4 —

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property

C. Other Used Material (Condition C and D)

(1) Condition C.

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. Expense of Conducting Periodic Inventories

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

— 5 —

EXHIBIT "D"

Attached to and made a part of Operating Agreement dated

_____July 1_____, 19 86, by and between _TXP_____

Operating Company and Pennzoil Producing Company, etal .


## INSURANCE COVERAGE

Operator shall carry for the joint account Workers' Compensation Insurance granting full compensation under the Workers' Compensation Law of the State in which the Contract Area is located and Employers' Liability Insurance, including full maritime coverage, if applicable, with limits of not less than $1,000,000.00 for all Operator's employees engaged in work for the joint account. Upon Non-Operator's request, Operator will furnish to Non-Operator certificates of insurance indicating the above described coverage.

In the event Operator is a self-insurer for the coverage above, the charge that shall be made to the joint account shall be an amount equivalent to the premiums which would have been paid had such insurance been obtained.

Liability, except that covered by the above insurance, against any of the parties hereto for damages to property of third persons or injury to or death of third persons arising out of the joint operations, including expenses incurred in defending claims or actions asserting liability of this character, shall be borne separately and individually by the parties hereto in proportion to their respective interests in the joint operations. Non-Operators shall carry General Liability Insurance, and Well Control Insurance with limits not less than $5,000,000 and $10,000,000, respectively. Each party shall furnish to the other parties, within fifteen (15) days from the effective date of the Agreement to which this Exhibit "D" is attached, certificates of insurance indicating the foregoing coverage.

Any party hereto individually may acquire any additional insurance as it desires at its own expense to protect itself against any liability not covered by the insurance specified above.

All insurance purchased individually by a party to this agreement for operations contemplated hereunder shall contain a waiver by the insurance company of all rights of subrogation in favor of the parties of this agreement.

EXHIBIT "E"

Attached to and made a part of Operating
Agreement dated ___July 1, 1986____
between __TXP Operating Company and____
__Pennzoil Producing Company, etal_____  .

## DEFERRED PRODUCTION AGREEMENT

Each party hereto has made or will make arrangements to either sell or take for its own use, either of which such alternatives is hereafter sometimes referred to as "market" or "marketing", its share of the gas produced from the Unit Area, but the parties expect to market at possibly different times or prices. Therefore, in consideration of each party's right to market its share of gas from the Unit Area in accordance with its individual needs, and in consideration of each party's right to share proportionately in the cumulative gas production from the Unit Area, and in consideration of the covenants and agreements herein contained to be kept and performed by each party, said parties agree as follows:

1.    In accordance with the terms of the Operating Agreement, each party hereto has the right to take its share of gas produced from the Unit Area and market same. In the event any party or parties hereto either: (i) are not marketing their share of gas produced from the Unit Area, or (ii) have contracted to sell their share of gas produced from the Unit Area to a purchaser which is not taking the full share of gas attributable to the interest of such party or parties, the terms of this Agreement shall automatically become effective.

2.    During the period or periods when any party hereto is not marketing its share of gas produced from the Unit Area, or its purchaser does not take its full share of gas produced from the Unit Area, the other parties ready to market their share of gas shall be entitled each month to produce, take and deliver, in proportion to their respective rights of participation in the production and reserves of the well or wells, one hundred percent (100%) of the allowable gas production attributable to the nonmarketing party(s) from a well or wells in the Unit Area. All parties shall share in and own the liquid hydrocarbons recovered from such gas by lease equipment in accordance with their respective interests and subject to the Operating Agreement, but the party or parties marketing such gas shall own all of the gas delivered to its or their purchaser. Each party not marketing its share (or only marketing a part of its full share of the gas produced) shall be credited on a cumulative basis with deferred gas production in reservoirs corresponding to the same reservoirs in such well(s) underlying the Unit Area equal to its share of the gas produced therefrom under terms of the Operating Agreement, less its share of gas used in lease operations, vented , flared or lost. Each party marketing gas shall furnish the Operator a monthly statement of gas taken. The Operator will maintain a current account of the gas balance between the parties and will furnish all parties monthly statements showing the total quantity of gas produced by each marketing party, the amount used in lease operations, vented, flared or lost, the total quantity of liquid hydrocarbons recovered therefrom by lease equipment and the quantity of deferred gas production credited to each party in the reservoirs under the terms hereof.

3.    If a well is completed in two or more gas-producing reservoirs, each completion shall constitute a separate well for purposes of this Agreement.

4.    At all times while gas is produced from a well or wells in the Unit Area, each party marketing gas shall make settlements (or make arrangements with Operator for the settlement), as to the share of gas it marketed, for the lessor's royalties and all other leasehold burdens applicable to such marketed gas that are shared jointly under the terms of the Operating Agreement or other related documents. Other leasehold burdens not jointly shared under the terms of the Operating Agreement or other related documents shall be paid by the party creating such burden. Each party agrees to hold each other party harmless from any and all claims for payments of royalty and other leasehold burdens asserted by owners thereof to whom each party is accountable.

5.    Ten (10) days after receipt by Operator of written notice, any party may begin marketing its current ownership share of the gas available for sale from the well or wells on the Unit Area. In addition to its current ownership share of the gas available for sale from the well or wells on the Unit Area, each underproduced party or parties electing to receive the remainder of its share of gas production ("make-up") shall be

(Rev. 2-24-84)

entitled to market its proportionate part (based on the ratio of its current ownership share to the total current ownership shares of all underproduced parties who are marketing their gas) of the underproduced party's or parties' current ownership share(s) of the gas volume available for marketing but not being marketed by the other underproduced party or parties, plus said proportionate part of up to fifty percent (50%) of the overproduced party's or parties' current ownership of the gas volume available for sale, save and except the applicable amount of gas used in lease operations, vented, flared or lost.    (See Attachment I to this Agreement for examples of make-up percentages.

6.    Each party marketing gas shall pay any and all production taxes due on such gas.

7.    The provisions of this Agreement shall be separately applicable to each well in the Unit Area to the end that, except as provided hereinafter in Paragraph 9, production from one gas well will not be utilized for the purpose of balancing deferred gas production from other wells in the Unit Area.  The deferred gas production hereunder shall be balanced to Btu equivalencies.

8.    It is recognized that the purpose of this Agreement is to permit any party not marketing its share of current gas production to defer its production from the reservoir and permit the marketing party or parties to pass clear title to all gas which is marketed on a current basis.  Therefore, when gas production from a gas well permanently ceases, or ceases for more than 120 days, Operator shall promptly determine and notify all parties of the amount of deferred gas production, if any, that was taken or marketed by the overproduced party or parties, such gas being the last overproduced volumes produced from such well or wells. Within sixty (60) days from the cessation of production if the well permanently ceases or within 60 days after a temporary cessation of production of more than 120 days, whichever is the earlier date, the overproduced party or parties shall pay to the owners of any deferred gas production a sum of money equal to the amount actually received by said party or parties, less applicable taxes and royalties paid for such gas; provided, however, that unless the owner(s) of such deferred gas production shall furnish an agreement to hold the overproduced party or parties harmless from financial loss due to action by the Federal Energy Regulatory Commission, or any governmental authority having jurisdiction, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by the Federal Energy Regulatory Commission, or any governmental authority having jurisdiction, including Congress, pursuant to final order or settlement applicable to the gas sold from such well, plus any additional collected amount which is not ultimately required by said Commission or governmental authority to be refunded, such additional collected amount to be accounted for at such time as final determination is made with respect thereto.  In the event the marketing party or parties were taking gas in-kind for their own use and have no gas sales contract, the price basis shall be "market value".  "Market value" is defined as the price being received for the sale of other production of the well, provided that in the event there is more than one price being received for such other production, market value shall be the weighted average of the prices being received from sale of other production from the well.  If there are no sales from the well, then market value shall be the weighted average of the prices being received for gas from the three nearest gas wells to the well that is subject to this Agreement which are producing gas of like quality and quantity and which gas is of the same vintage and NGPA category.  If such payment is not made by the overproduced party or parties to the underproduced party or parties within the sixty (60) day period above provided, the amount due the underproduced party or parties shall bear interest, attorney's fees and expenses as provided in Paragraph 1.3 of the Accounting Procedure attached to the Operating Agreement.

9.    If production from a well should permanently cease or ceases for more than 120 days and if there is one or more wells with a common ownership producing gas from the Unit Area, the underproduced party or parties shall have the option either to require payment as provided in Paragraph 8 above or to make up the amount of their underproduction, to the extent possible, from the interest of the overproduced party or parties in such commonly-owned well or wells and any new commonly-owned wells within the Unit Area.  The Election shall be made in writing within the first 45 days of the 60 day period within which the overproduced party is to make such payment.  Each underproduced party shall have the right to make its own election.  A copy of the written notice to the overproduced party shall be furnished to Operator.  Unless such notice of the election is actually received by the overproduced party within the 45 day period, it shall be conclusively presumed that the underproduced party has elected to receive payment as provided in Paragraph 8 above.  If the underproduced party elects to make up its underproduction from such commonly-owned well(s) and production from such well(s)

-2-

should permanently cease or if there is a cessation for more than 120 days from such well(s), the provisions of Paragraph 8 above shall be applicable to any remaining underproduction.

10.   If any party sells or assigns an interest in the working interest in the leases affected by this Agreement, the sale or assignment shall be made subject to the terms hereof and shall include all rights and obligations of the selling or assigning party in all the gas. Each of the parties shall treat the sale or assignment accordingly and the selling or assigning party shall look solely to its purchaser or assignee for any interest in the gas or money payment that such party may have or to which it may be entitled.  It is provided, however, if at the time of such sale or assignment the interest sold or assigned is in an overproduced status, the grantor or assignor and the grantee or assigneee shall be jointly and severally (in solido) liable to the underproduced party or parties for the amount of the cash settlement which may be due the underproduced party or parties. The liability of the grantor or assignor to such underproduced party or parties shall cease if and when the assigned interest is no longer in an overproduced status even though such interest may hereafter be in an overproduced status.

(NOTE:  "Unit Area" as used in this Deferred Production Agreement shall mean Contract Area as defined in the Operating Agreement to which this Agreement is attached if such Operating Agreement is A.A.P.L. Form 610 - 1977.)

-3-

EXHIBIT "F"

Attached to and made a part of Operating Agreement
dated  1st  day of _____July_____ , 19 86 ,
between TXP Operating Company, and
Pennzbil Producing Company, etal

Equal Employment Opportunity – Unless this contract is within
one of the exemptions provided for in Executive Order 11246,
effective September 24, 1965, as amended by Executive Order
11375 signed October 13, 1967, each of the parties hereto shall
comply with Paragraphs (1) through (7) of Section 202 of Execu-
tive Order 11246 (as amended) which are incorporated herein by
reference.

