A.A.P.L. FORM 610

# MODEL FORM OPERATING AGREEMENT — 1956

### Non-Federal Lands

OPERATING AGREEMENT

DATED

FEBRUARY 27 _ _ , 19_78_,

~~FOR UNIT AREA IN TOWNSHIP~~ _ _ Bauer, South Prospect _ _ _ _ _ _ _ _

_ _ _Jefferson_        _COUNTY, STATE OF    Texas

AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM.        A.A.P.L. NO. 610
MAY BE ORDERED DIRECTLY FROM THE PUBLISHER
KRAFTBILT PRODUCTS,    BOX 800, TULSA 74101

EXHIBIT "D" TO LETTER AGREEMENT OF FEBRUARY 21, 1978
BETWEEN EXETER EXPLORATION COMPANY, CZAR RESOURCES, INC.
AND SKLAR AND PHILLIPS OIL COMPANY.

EXHIBIT "B" TO LETTER AGREEMENT OF NOVEMBER 15, 1979
BETWEEN MATZINGER EXPLORATION COMPANY, CZAR RESOURCES,
INC. AND SKLAR & PHILLIPS OIL CO.

A.A.P.L. FORM 610

# TABLE OF CONTENTS

| Paragraph Number | Title | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Title Examination, Loss of Leases and Oil and Gas Interests | 1 |
| ~~3.~~ | ~~Unleased Oil and Gas Interests~~ | ~~2~~ |
| 4. | Interests of Parties | 2 |
| 5. | Operator of Unit | 3 |
| 6. | Employees | 3 |
| 7. | Test Well | 3 |
| 8. | Costs and Expenses | 3 |
| 9. | Operator's Lien | 4 |
| 10. | Term of Agreement | 4 |
| 11. | Limitation on Expenditures | 4 |
| 12. | Operations by Less Than All Parties | 5 |
| 13. | Right to Take Production in Kind | 6 |
| 14. | Access to Unit Area | 7 |
| 15. | Drilling Contracts | 7 |
| 16. | Abandonment of Wells | 7 |
| 17. | Delay Rentals and Shut-in Well Payments | 8 |
| ~~18.~~ | ~~Preferential Right to Purchase~~ | ~~8~~ |
| 19. | Selection of New Operator | 8 |
| 20. | Maintenance of Unit Ownership | 9 |
| 21. | Resignation of Operator | 9 |
| 22. | Liability of Parties | 9 |
| 23. | Renewal or Extension of Leases | 9 |
| 24. | Surrender of Leases | 10 |
| 25. | Acreage or Cash Contributions | 10 |
| 26. | Provision Concerning Taxation | 10 |
| 27. | Insurance | 11 |
| 28. | Claims and Lawsuits | 11 |
| 29. | Force Majeure | 11 |
| 30. | Notices | 11 |
| 31. | Other Conditions | 12 |

A.A.P.L. FORM 610

# OPERATING AGREEMENT

THIS AGREEMENT, entered into this _____ day of _____, 19___, between _____ Sklar and Phillips Oil Company _____ hereafter designated as "Operator", and the signatory parties other than Operator.

other                as "Non-Operators"

WITNESSETH, THAT:

WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit "A", and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided;

NOW, THEREFORE, it is agreed as follows:

## 1. DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them.

(1) The words "party" and "parties" shall always mean a party, or parties, to this agreement.

(2) The parties to this agreement shall always be referred to as "it" or "they", whether the parties be corporate bodies, partnerships, associations, or persons real.

(3) The term "oil and gas" shall include oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons, unless an intent to limit the inclusiveness of this term is specifically stated.

(4) The term "oil and gas interests" shall mean the oil and gas estates ~~unleased fee and mineral interests in tracts of land lying~~ within the Unit Area which are ~~owned by parties to this agreement~~ or become subject to this agreement.

(5) The term "Unit Area" shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

(6) The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Unit Area or as fixed by express agreement of the parties.

(7) All exhibits attached to this agreement are made a part of the contract as fully as though copied in full in the contract.

(8) The words "equipment" and "materials" as used here are synonymous and shall mean and include all oil field supplies and personal property acquired for use in the Unit Area.

## 2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS

A. Title Examination:

No well shall be drilled on the Unit Area until title to the drill site has been examined on a complete abstract record or search of the County Records by Operator's attorney, who has been approved and accepted by non-operator, and title to both the oil and gas lease and to the fee title of the lessors has been approved by the examining attorney and accepted by all parties. Each title opinion shall contain a list of fee owners and their interests, shall state the attorney's opinion concerning validity of their interest, and shall contain an enumeration and description of title defects, if any, a report upon mortgages, taxes, a list of requirements, if any, upon which the examiner's approval of title to the lease or oil and gas interest is contingent. The title opinion shall also contain a specific description of the oil and gas lease being subjected to this contract, with a statement of its form, term, amount of royalty, status of delay rental payments, and unusual drilling obligations and of excess royalty, oil payments and other special burdens. A copy of said title opinion and applicable curative material shall be sent to all parties not less than ten (10) days prior to the expected date for commencing of drilling operations.

— 1 —

"Joint Loss"

A.A.P.L. FORM 610

Any defects of title that may develop as a result of any such examination or examinations shall be joint responsibilities of all parties and if a title loss occurs, it shall be the loss of all parties, with each bearing its proportionate part of the loss and of any liabilities incurred in the loss.  If such a loss occurs, there shall be no change in, or adjustment of, the intersts of the parties in the remaining portion of the Unit Area.

All costs and expenses incurred by Operator for the title examination and curative work relating thereto shall be borne by the parties hereto in the same proportions which each party shares in the cost and expense of drilling the well for which such title examination and curative work has been conducted.

**B. Failure of Title:**

Any

~~After all titles are approved or accepted, any~~ defects of title that may develop shall be the joint responsibility of all parties and, if a title loss occurs, it shall be the loss of all parties, with each bearing its proportionate part of the loss and of any liabilities incurred in the loss.  If such a loss occurs, there shall be no change in, or adjustment of, the interests of the parties in the remaining portion of the Unit Area.

**C. Loss of Leases For Other Than Title Failure:**

If any lease or interest subject to this agreement be lost through failure to develop or because express or implied covenants have not been performed, or if any lease be permitted to expire at the end of its primary term and not be renewed or extended, the loss shall not be considered a failure of title and all such losses shall be joint losses and shall be borne by all parties in proportion to their interests and there shall be no readjustment of interests in the remaining portion of the Unit Area.

~~3. UNLEASED OIL AND GAS INTERESTS~~

~~If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as Exhibit "B" and for the primary term therein stated.  As to such interests, the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit "B".  Such party shall, however, be subject to all of the provisions of this agreement relating to lessees, to the extent that it owns the lessee interest.~~

### 4. INTERESTS OF PARTIES

Exhibit "A" lists all of the parties, and their respective percentage or fractional interests under this agreement.  Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit "A".  All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.

— 2 —

"Joint Loss"

A.A.P.L. FORM 610

If the interest of any party in any oil and gas lease covered by this agreement is subject to an overriding royalty, production payment, or other charge over and above the usual one-eigthh ($\frac{1}{8}$) royalty, such party shall assume and alone bear all such excess obligations and shall account for them to the owners thereof out of its share of the working interest production of the Unit Area.

## 5. OPERATOR OF UNIT

..Sklar..and .Phillips. Oil .Company _____ shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

## 6. EMPLOYEES

The number of employees and their selection, and the hours of labor and the compensation for services performed, shall be determined by Operator. All employees shall be the employees of Operator.

## 7. TEST WELL

On or before the 10th day of April _____, 19 78. Operator shall commence the drilling of a well for oil and gas ~~in the following location:~~ in accordance with Letter Agreement of even date herewith between the parties to this Joint Operating Agreement

and shall thereafter continue the drilling of the well with due diligence ▶ in accordance therewith.

unless Granite, Salt or other practically impenetrable substance or borehole condition is encountered at a lesser depth or unless all parties bearing the cost, risk and expense of such drilling agree to complete the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and/or gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgment any joint well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties bearing the cost, risk and expense of drilling, to the plugging, and the well shall then be plugged and abandoned as promptly as possible. If unanimous consent is not obtained then the provisions of Section 12 hereof shall govern subsequent operations on such well.

The provisions of this Section 7 shall also apply to any well drilled hereunder as a substitute well to the above well.

## 8. COSTS AND EXPENSES

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge all costs and expenses incurred in the development and operation of the Unit Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the cost and expense basis provided in the Accounting Procedure attached hereto and marked Exhibit "C". If any provision of Exhibit "C" should be inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

Operator shall charge the joint account for actual costs incurred in all operations conducted hereunder. Each party shall pay to Operator its proportionate share of actual costs incurred within thirty (30) days after receipt of an incoice therefor. If any party fails to pay its share of such costs so invoiced, the amount due shall bear interest at the rate of ____Ten____ percent ( 10% ) per annum until paid.

-3-

A.A.P.L. FORM 610

## 9. OPERATOR'S LIEN

Operator is given a first and preferred lien on the interest of each party covered by this contract, and in each party's interest in oil and gas produced and the proceeds thereof, and upon each party's interest in material and equipment, to secure the payment of all sums due from each such party to Operator.

In the event any party fails to pay any amount owing by it to Operator as its share of such costs and expense or such advance estimate within the time limited for payment thereof, Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of oil or gas, the proceeds accruing to the working interest or interests in the Unit Area of the delinquent party up to the amount owing by such party, and each purchaser of oil or gas is authorized to rely upon Operator's statement as to the amount owing by such party.

~~In the event of the neglect or failure of any non-operating party to promptly pay its proportionate part of the cost and expense of development and operation when due, the other non-operating parties and Operator, within thirty (30) days after the rendition of statements therefor by Operator, shall proportionately contribute to the payment of such delinquent indebtedness and the non-operating parties so contributing shall be entitled to the same lien rights as are granted to Operator in this section. Upon the payment by such delinquent or defaulting party to Operator of any amount or amounts on such delinquent indebtedness, or upon any recovery on behalf of the non-operating parties under the lien conferred above, the amount or amounts so paid or recovered shall be distributed and paid by Operator to the other non-operating parties and Operator proportionately in accordance with the contributions theretofore made by them.~~

## 10. TERM OF AGREEMENT

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise; unless sooner terminated by mutual agreement in writing by the parties hereto. It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

## 11. LIMITATION ON EXPENDITURES

Without the consent of all parties:  (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling of the well to casing point, but shall not include testing, completing, and equipping of the well, the provisions for which are set out in Sections 12 and 31-A hereof.  (b) No well shall be reworked, plugged back, deepened, completed or sidetracked except a well reworked, plugged back, deepened, completed or sidetracked pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the reworking, plugging back, completing, side-tracking or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage;  (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of __Ten Thousand__ --------------------------------------- Dollars ($ __10,000.00__ ) except in connection with a well drilling, reworking, deepening, sidetracking or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $ __10,000.00__ .

-4-

A.A.P.L. FORM 610

## 12. OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling/of any well on the Unit Area ~~other than the~~ ~~test well provided for in Section 7, or upon the reworking, deepening or plugging back of a dry hole drilled~~ at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill/rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days (except as to reworking/plugging back and/or drilling deeper, where a drilling rig is on location, the period shall be limited to ~~forty-eight (48)~~ /twenty-four (24) hours exclusive of Saturday or Sunday) after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. All costs incurred while awaiting election by all parties shall be shared by the parties in the same proportion that costs are being borne immediately prior to such election under this Section 12.

If any party receiving such a notice elects not to participate in the proposed operation (such party or parties being hereafter referred to as "Non-Consenting Party"), then in order to be entitled to the benefits of this section, the party or parties giving the notice and such other parties as shall elect to participate in the operation (all such parties being hereafter referred to as the "Consenting Parties") shall, within thirty (30) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the 48-hour period where the drilling rig is on location, as the case may be) actually commence work on the proposed operation and complete it with due diligence. Each Consenting Party shall have the right, but not the obligation, to take its proportionate part of all Non-Consenting Party interest. The Consenting Parties shall mutually agree upon the division among themselve.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests as shown in Exhibit "A" bear to the total interests of all Consenting Parties. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well at their sole cost, risk and expense. If any well drilled, reworked, deepened/or plugged back under the provisions of this /completed, sidetracked section results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the/drilling, reworking, deepening/or plugging back of any such well by Consenting Parties /completion sidetracking in accordance with the provisions of this section, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof (after deducting production taxes, royalty, overriding royalty/and other interests payable out of or measured by the production /except those excess burdens described in paragraph 31- C , from such accruing with respect to such interest until it reverts) shall equal the total of the following:

(A) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this section, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of the operation; and

(B) ~~200%~~ /400% of that portion of the costs and expenses of drilling/reworking, deepening/or plugging back, /completing sidetracking testing and completing, after deducting any cash contributions received under Section 25, and ~~200%~~ /400% % of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

* of any Non-Consenting Party's interest, and no such operations will be started until 100% of the cost thereof has ~~been~~ subscribed to by the Consenting Parties. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties.

A.A.P.L. FORM 610

sidetracking

In the case of any reworking/plugging back or deeper drilling/operation, the Consenting Parties shall
                                                              or completion
be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all
                                                                                                      sidetracki
such equipment shall remain unchanged; and upon abandonment of a well after such reworking,/plugging
                  or completion
back or deeper drilling,/the Consenting Parties shall account for all such equipment to the owners thereof.
with each party receiving its proportionate part in kind or in value.

Within sixty (60) days after the completion of any operation under this section, the party conducting
the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of
the equipment in and connected to the well, and an itemized statement of the cost of drilling, deepening,
plugging back, testing, completing, and equipping the well for production; or, at its option, the operating
party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly
billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided
above, the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all
costs and liabilities incurred in the operation of the well, together with a statement of the quantity of oil
and gas produced from it and the amount of proceeds realized from the sale of the well's working interest
production during the preceding month. Any amount realized from the sale or other disposition of equip-
ment newly acquired in connection with any such operation which would have been owned by a Non-Con-
senting Party had it participated therein shall be credited against the total unreturned costs of the work done
and of the equipment purchased, in determining when the interest of such Non-Consenting Party shall revert
to it as above provided; if there is a credit balance it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the
amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically
revert to it and from and after such reversion such Non-Consenting Party shall own the same interest in such
well, the operating rights and working interest therein, the material and equipment in or pertaining thereto,
and the production therefrom as such Non-Consenting Party would have owned had it participated in the
                               completion, sidetracking
drilling, reworking,/deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be
charged with and shall pay its proportionate part of the further costs of the operation of said well in accord-
ance with the terms of this agreement and the accounting procedure schedule, Exhibit "C", attached hereto.

Notwithstanding the provisions of this Section 12, it is agreed that without the mutual consent of all
parties, no wells shall be completed in or produced from a source of supply from which a well located else-
where on the Unit Area is producing, unless such well conforms to the then-existing well spacing pattern
for such source of supply.

The provisions of this section shall have no application whatsoever to the drilling of the initial test
                                               completing, sidetracking,
well on the Unit Area, but shall apply to the/reworking, deepening, or plugging back of the initial test well
after it has been drilled to the depth specified in Section 7, if it is, or thereafter shall prove to be, a dry
                                                                  completed, sidetracked,
hole or non-commercial well, and to all other wells drilled,/reworked, deepened, or plugged back, or pro-
                  completed, sidetracked
posed to be drilled,/reworked, deepened, or plugged back, upon the Unit Area subsequent to the drilling of
the initial test well.

## 13. RIGHT TO TAKE PRODUCTION IN KIND
                    have the right but not the obligation to
Each party shall/take in kind or separately dispose of its proportionate share of all oil and gas pro-
duced from the Unit Area, exclusive of production which may be used in development and producing oper-
ations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party
shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments
due on its share of such production, and shall hold the other parties free from any liability therefor. Any
extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate
share of the production shall be borne by such party.
                          appropriate
Each party shall execute all/division orders and contracts of sale pertaining to its interest in produc-
tion from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers
thereof for its share of all production.

— 6 —

A.A.P.L. FORM 610

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil ~~and gas~~ produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil ~~and gas~~ or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil ~~and gas~~ not previously delivered to a purchaser. ~~Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days notice of such intended sale.~~

## 14. ACCESS TO UNIT AREA

Each party shall have access to the Unit Area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator shall, upon request, furnish each of the other parties with copies of all drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Unit Area.

## 15. DRILLING CONTRACTS

All wells drilled on the Unit Area shall be drilled/on a competitive contract basis at the usual rates [interlined: and completed] prevailing in the area. Operator, if it so desires, may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the field, and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under/the same terms and conditions as shall be customary and usual [interlined: written contract containing] in the field in contracts of independent contractors who are doing work of a similar nature.

## 16. ABANDONMENT OF WELLS

No well, other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting Parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate as to, but only as to, ~~the interval or intervals of~~ the formation or formations then open to production/ The assignments so limited shall encompass the "drilling unit" upon which the well is located. [interlined: and the subject of such proposed abandonment.] The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Unit Area.

After the assignment, the assignors shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open. Upon request of the assignees, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

— 7 —

A.A.P.L. FORM 610

## 17. DELAY RENTALS AND SHUT-IN WELL PAYMENTS

~~Each party~~ Operator shall pay all delay rentals and shut-in well payments which may be required under the terms of ~~its lease or leases~~ the lease or leases subject hereto and submit evidence of each payment to the other parties ~~at least ten (10) days prior to the payment date. The paying party shall be reimbursed by Operator for 100% of any such delay rental payment and 100% of any such shut-in well payment.~~ The amount of such ~~reimbursement~~ payments shall be charged by Operator to the joint account of the parties and treated in all respects the same as costs incurred in the development and operation of the Unit Area. ~~Each party responsible for such payments~~ Operator shall diligently attempt to make proper payment, but shall not be held liable to the other parties in damages for the loss of any lease or interest therein if, through mistake or oversight, any rental or shut-in well payment is not paid or is erroneously paid. The loss of any lease or interest therein which results from a failure to pay or an erroneous payment of rental or shut-in well payment shall be a joint loss and there shall be no readjustment of interests in the remaining portion of the Unit Area. If any party secures a new lease covering the terminated interest, such acquisiton shall be subject to the provisions of Section 23 of this agreement.

Operator shall promptly notify each other party hereto of the date on which any gas well located on the Unit Area is shut-in and the reason therefore and the date on which said well is restored to production, but operator shall shall incur no liability to any other party should it inadvertently fail to give such notice.

## ~~18. PREFERENTIAL RIGHT TO PURCHASE~~

~~Should any party desire to sell all or any part of its interests under this contract, or its rights and interests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all of its assets, or a sale or transfer of its interests to a subsidiary or parent company, or subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

### SALE OF OPERATOR'S INTEREST
### 19. ~~SELECTION OF NEW OPERATOR~~

all or any part of
Should a sale be made by Operator of /its rights and interests, the other parties shall have the right within sixty (60) days after the date of such sale, by majority vote in interest, to select a new Operator. If a new Operator is not so selected, the transferee of the present Operator shall assume the duties of and act as Operator. In either case, the retiring Operator shall continue to serve as Operator, and discharge its duties in that capacity under this agreement, until its successor Operator is selected and begins to function, but the present Operator shall not be obligated to continue the performance of its duties for more than 120 days after the sale of its rights and interests has been completed.

"Joint Loss"

A.A.P.L. FORM 610

## 20. MAINTENANCE OF UNIT OWNERSHIP

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production, attributable thereto unless such disposition covers either:

(1) the entire interest of the party in all leases and equipment and production; or

(2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

If at any time the interest of any party is divided among and owned by four or more co-owners, Operator may, at its discretion, require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interests within the scope of the operations embraced in this contract; however, all such co-owners shall enter into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Unit Area and they shall have the right to receive, separately, payment of the sale proceeds thereof. Nothing contained herein will be construed to grant or create any preferential right of purchase to any Party.

## 21. RESIGNATION OR REMOVAL OF OPERATOR

Operator may resign from its duties and obligations as Operator at any time upon written notice of not less than Ninety (90) days given to all other parties. Should Operator or any successor operator hereunder become bankrupt, dissolve, liquidate or terminate its corporate existence or sell or otherwise dispose of its interest in the Unit Area, it shall thereupon cease to be Operator hereunder. The parties hereto other than Operator may remove Operator at any time by a majority vote in interest, not in number, of the interest remaining after excluding the voting interest of Operator. Should Operator or any successor operator for any cause cease to be Operator, all parties hereto (including successor or successors in interest of Operator) by a majority vote in interest, not in number, shall designate another operator to act hereunder from among the parties hereto. Should Operator or any successor operator hereunder resign or be removed as Operator, its rights, titles and interest in the Unit Area shall be unaffected by such resignation, but it shall thereupon become one of the non-operators hereunder and shall thence forth be bound by the terms and provisions hereof as a non-operator. Any party hereto designated as Operator to succeed the Operator herein named shall thereupon succeed to all the duties, powers, obligations, rights and authority given to the Operator herein named with respect to all operations of every kind thereafter conducted on the Unit Area. The retiring Operator shall deliver to its successor all the records and information necessary to the discharge by the new Operator of its duties and obligations.

A.A.P.L. FORM 610

## 20. MAINTENANCE OF UNIT OWNERSHIP

only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

## 23. RENEWAL OR EXTENSION OF LEASES

If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, within thirty (30) days after receiving such notification and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein by the acquiring party.

The provisions of this section shall apply to renewal leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to the provisions of this section.

The provisions in this section shall apply also and in like manner to extensions of oil and gas leases.

— 9 —

A.A.P.L. FORM 610

## 24. SURRENDER OF LEASES

The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.

notification in writing must be given to the other parties hereto at least
However, should any party desire to surrender its interest in any lease or in any portion thereof, and
forty-five (45) days prior to the rental paying date in said lease, and should the
other parties not agree or consent, the party desiring to surrender shall assign, without express or implied, warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. Upon such assignment, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the acreage assigned and the operation of any well thereon, and the assigning party shall have no further interest in the lease assigned and its equipment and production. The parties assignee shall pay to the party assignor the reasonable salvage value of the latter's interest in any wells and equipment on the assigned acreage, determined in accordance with the provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. If the assignment is in favor of more than one party, the assigned interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Unit Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

## 25. ACREAGE OR CASH CONTRIBUTIONS

All contributions, whether of dry hole and/or bottom hole money or acreage, contributed by any third party with respect to drilling of any well on the Unit Area shall be shared and owned by the parties hereto in the same proportions as they bear the cost of the drilling of such well. Any acreage so contributed shall become a part of the Unit Area; provided, all parties joined in the drilling of the well for which the contribution was made, otherwise, the acreage so contributed shall be owned by the drilling parties and not be a part of the Unit Area or subject to the provisions of this agreement.

## 26. PROVISION CONCERNING TAXATION

Each of the parties hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954. If the income tax laws of the state or states in which the property covered hereby is located contain, or may hereafter contain, provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the parties agrees that such election shall be exercised. Each party authorizes and directs the Operator to execute such an election or elections on its behalf and to file the election with the proper governmental office or agency. If requested by the Operator so to do, each party agrees to execute and join in such an election.

Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill all other parties for their proportionate share of all tax payments in the manner provided in Exhibit "C".

If any tax assessment is considered unreasonable by Operator, it may at its discretion protest such valuation within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. When any such protested valuation shall have been finally determined, Operator shall pay the assessment for the joint account, together with interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

— 10 —

A.A.P.L. FORM 610

## 27. INSURANCE

At all times while operations are conducted hereunder, Operator shall comply with the Workmen's Compensation Law of the State where the operations are being conducted. Operator shall also carry or provide insurance for the benefit of the joint account of the parties as may be outlined in Exhibit "D" attached to and made a part hereof. Operator shall require all contractors/engaged in work on or for the Unit Area to comply with the Workmen's Compensation Law of the State where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event Automobile Public Liability Insurance is specified in said Exhibit "D", or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for operator's fully owned automotive equipment.

## 28. CLAIMS AND LAWSUITS

If any party to this contract is sued on an alleged cause of action arising out of operations on the Unit Area, or on an alleged cause of action involving title to any lease or oil and gas interest subjected to this contract, it shall give prompt written notice of the suit to the Operator and all other parties.

The defense of lawsuits shall be under the general direction of a committee of lawyers representing the parties, with Operator's attorney as Chairman. Suits may be settled during litigation only with the joint consent of all parties. No charge shall be made for services performed by the staff attorneys for any of the parties, but otherwise all expenses incurred in the defense of suits, together with the amount paid to discharge any final judgment, shall be considered costs of operation and shall be charged to and paid by all parties in proportion to their then interests in the Unit Area. Attorneys, other than staff attorneys for the parties, shall be employed in lawsuits involving Unit Area operations only with the consent of all parties: if outside counsel is employed, their fees and expenses shall be considered Unit Area expense and shall be paid by Operator and charged to all of the parties in proportion to their then interests in the Unit Area. The provisions of this paragraph shall not be applied in any instance where the loss which may result from the suit is treated as an individual loss rather than a joint loss under prior provisions of this agreement, and all such suits shall be handled by and be the sole responsibility of the party or parties concerned.

Damage claims caused by and arising out of operations on the Unit Area, conducted for the joint account of all parties, shall be handled by Operator and its attorneys, the settlement of claims of this kind shall be within the discretion of Operator so long as the amount paid in settlement of any one claim does not exceed one thousand ($1000.00) dollars and, if settled, the sums paid in settlement shall be charged as expense to and be paid by all parties in proportion to their then interests in the Unit Area.

## 29. FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all possible diligence to remove the force majeure as quickly as possible.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes: how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure" as here employed shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## 30. NOTICES

All notices authorized or required between the parties, and required by any of the provisions of this agreement, shall, unless otherwise specifically provided, be given in writing by United States mail or Western Union Telegram, postage or charges prepaid, and addressed to the party to whom the notice is given at the

— 11 —

A.A.P.L. FORM 610

addresses listed on Exhibit "A". The originating notice to be given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the United States mail or with the Western Union Telegraph Company, with postage or charges prepaid. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

**31. OTHER CONDITIONS, IF ANY, ARE:**

SEE PAGE 12-A

## A.   CASING POINT ELECTION-SUBSEQUENT NON CONSENT PROPOSALS

Notwithstanding anything to the contrary, express or implied herein, it is understood and agreed upon between the parties hereto that the provisions of Section 12 shall have separate application to the cost of completing and equipping any well drilled hereunder, as distinguished from the drilling, reworking, deepening sidetracking or plugging back of a well, and that a party who has elected to join in the drilling, reworking, deepening, sidetracking or plugging back of a well may refrain from joining in the completion thereof; however, a party who has refrained from joining in the drilling, reworking, deepening, sidetracking or plugging back of a well shall have no right to complete or join in the completion thereof. After any well hereunder has been drilled to its authorized or projected depth, and has been adequately tested, Operator shall promptly give notice to Non-Operator of its election as to whether such well should be plugged and abandoned as a dry hole, or casing be set in an attempt to complete the well as a producer, or that such well be drilled deeper or sidetracked.   Non-Operator shall have twenty-four (24) hours (exclusive of Saturdays, Sundays and holidays) after receipt of the aforementioned notice from Operator within which to notify Operator whether it elects to have said well plugged and abandoned as a dry hole, or have casing set in an attempt to complete the well as a producer, or that such well be drilled deeper or sidetracked.   Failure of Non-Operator to so notify Operator within the above specified period of time shall be deemed concurrence with Operator's election. If the parties are able to agree, Operator shall conduct future operations for the Joint Account.   In the event of disagreement, the party or parties wishing to set casing and attempt to complete the well or to deepen the well or to sidetrack may do so at its sole risk, cost, and expense pursuant to the provisions of Section 12 of this agreement and the priority provision set out below; provided, however, that in the event of a conflict between an election to complete, an election to deepen and/or election to sidetrack, the party or parties electing to complete shall have the paramount right, and the party or parties electing to deepen would prevail over an election to sidetrack.

If the Operator is not successful with its first completion attempt and Operator recommends a completion attempt in another zone, or if less than all elect to attempt a completion attempt in another zone, then the previous Non Consent Parties shall be entitled to notice and the option to participate regardless of their election on a previous completion attempt; however, to have such options such parties must have participated in all operations leading up to the initial completion attempt.   This option is a recurring right.

No party to this agreement shall propose the drilling of more than one well at a time, nor shall any party to this agreement propose the drilling of a well during the time that another well is being drilled except (1) by the mutual consent of all parties hereto or (2) if one or more of said proposed wells are obligations neces-sary for the maintenance of any lease hold interest on acreage covered by this agreement.

Without the mutual consent of all parties no re-working or other operations shall be conducted under the provisions of Section 12 hereof so long as any completion is producing in paying quantities in the well with respect to which such proposal is made.

## B.   EFFECTIVE DATE OF THIS AGREEMENT

This agreement will become effective  at casing point of well provided in paragraph 7 on page 3 hereof.

## C.   ADDITIONAL BURDENS

Notwithstanding anything herein to the contrary, if any working interest owner shall, subsequent to the execution of this agreement, create an overriding royalty production payment, net proceeds interest, carried interest, or any other interest out of its working interest (herein called "subsequently created interest"), such subsequently created interest shall be made specifically subject to all the terms and provisions of this agreement.   If the working interest from which subsequently created interest is created elects under any provisions of this agreement not to participate in any operations or activity conducted under any provisions herein and as a result be required to assign its leasehold interest to, or forego its right otherwise to receive production in favor of, the remaining parties hereto who may elect to participate in any such operation or activity, such participating parties shall receive any such interest free and clear of any such subsequently created interest.   In addition, if the working interest owner from which subsequently created interest is created (a) fails to pay when due its share of costs and expenses chargeable hereunder, and its share of production accruing hereunder is insufficient to cover such costs and expenses, or (b) elects to abandon a well under Section 16 hereof, elects to surrender a lease under Section 24 hereof, or otherwise withdraws

from this agreement, the subsequently created interest shall be chargeable with a pro-rata portion of all costs and expenses hereunder in the same manner as if such subsequently created interest were a working interest, and operator shall have the right to enforce against such subsequently created interest the lien and all other rights granted in this agreement, including but not limited to Section 9 hereof, for the purpose of collecting costs and expenses chargeable to the subsequently created interest.

## D. OPERATIONS REQUIRED TO EARN OR MAINTAIN A LEASE IN FORCE

Notwithstanding anything to the contrary herein contained, it is understood and agreed that the non-consent provisions of Paragraph 12 shall be applicable only to any well or operation which is not necessary to perpetuate an expiring lease or leases or interest therein or to earn an additional lease or lease or interest therein pursuant to any farmout or other agreement. Any well or operation which is necessary to perpetuate or earn a lease or interest therein shall be deemed to be a "required well" or a "required operation". As to any required well or required operation proposed by any party hereto in which any other party hereto elects to not participate, the non-participating party shall release and relinquish forever, proportionately to the participating parties, all of non-participating party's interest in and to the lease or leases or interest therein which would be perpetuated by such required well or required operation together with any lease or interest therein pooled therewith to form a proration unit under the regulations of the applicable state regulatory body having such jurisdiction. The interest in such leases shall be assigned by the non-participating party to the participating parties without warranty of title except as to claims by, through or under assignor and shall be free of any additional burdens, and shall remain subject to this joint operating agreement. Nothing herein shall be construed as requiring a relinquishment of such non-participating party's interest in any producing wells or units.

## E. AGREEMENT SUBJECT TO APPLICABLE LAWS-REPORTING

This agreement and the respective rights and obligations of the parties hereunder shall be subject to all valid and applicable State and Federal laws, rules, regulations and orders, and in the event this agreement or any provision hereof is or the operations contemplated hereby are, found to be inconsistent with or contrary to any such law, rule, regulation or order, the latter shall be deemed to control and this agreement shall be regarded as modified accordingly, and as so modified, to continue in full force and effect. Operator shall prepare and furnish to any duly constituted authority having jurisdiction in the premises through its proper agency or department any and all reports, statements and information that may be requested when such reports are required to be filed by Operator.

Operator shall act as the representative of all parties hereto in all hearings and proceedings before administrative bodies concerning the Unit Area, and, subject to approval by Non-Operators, all costs and expenses incurred by Operator directly or by retention of outside personnel in participation in such hearings or proceedings shall be proper charge against the joint account; provided, however, that nothing herein contained shall prohibit any of the parties other than Operator from participating in any such hearing or proceedings in his or its own behalf and at his or its own cost and expense.

This Operating Agreement shall not be construed to provide that any party hereto shall be obligated to represent any other party hereto before the Federal Power Commission.

The Operator shall at all times consult freely with the other parties concerning the operations being or to be conducted on the Unit Area and shall permit any party hereto to collaborate in any litigation or hearings before any administrative body, state or federal, affecting the Unit Area or the production therefrom.

## F. COPIES OF CONTROLLING DOCUMENTS/REPORTS

The Operator shall furnish the Non-Operator with copies of any contracts for the sale or disposition of production from the Unit Area, division orders relating thereto, all information relating to the payment of royalties or other payments out of such production and delay rental shut-in payments, copies of all reports filed with any state or federal regulatory agency relating to the Unit Area, and copies of all tests and analyses on or relating to any well subject to this agreement including particularly, but not by way of limitation, production tests and bottom hole pressure tests.

12-B

## G. RECIPROCAL OPERATING ELECTION

If at any time after one (1) year or more after oil, gas or other minerals are found in commercial quantities on said Unit Area, any Non-Operator (or Non-Operators) considers the cost of operating the Unit Area to be excessive and one of the said Non-Operators is willing to operate the same for a period of one (1) year at a cost less than the cost of operating under the direct control of Operator, such Non-Operators shall deliver to Operator a written statement detailing the items of expense contributing to the alleged excessive costs proposing that one of the Non-Operators assume such operations, and specifying the proposed economies.  Within ten (10) days of such statement, Operator shall elect in writing delivered to such Non-Operators to either (a) surrender operations to one of the proposing Non-Operators for a period of one (1) year upon the terms contained in Non-Operators' proposal, or (b) agree to operate the Unit Area for such period of one (1) year at a cost consistent with the economies proposed by Non-Operators.  If Operator elects to surrender operations, then one of such proposing Non-Operators, upon obtaining written approval of all other parties to this agreement approving the change in operation, forthwith shall become Operator for a minimum period of one (1) year as fully as though such Non-Operator had been herein designated Operator under the terms hereof as modified by his proposed economies.

## H. AREA OF MUTUAL INTEREST

The parties hereby establish the area outlined in red on the plat attached hereto as Exhibit "E" as an Area of Mutual Interest.  Unless sooner terminated by mutual agreement, the Area of Mutual Interest shall remain in effect during the term of this operating agreement.

If any party hereto shall acquire any royalty, mineral or leasehold interest, or acquire the right to acquire such interest within the Area of Mutual Interest, then the party acquiring such interest or right shall give notice to all other parties hereto of the acquisition of such interest or the right to acquire such interest and shall include full particulars of the interest to be acquired and the cost and other terms of such acquisition.  Such notice shall be given within twenty (20) days after the acquisition of the interest or right.  Each of the parties receiving such notice shall then have twenty (20) days in which to notify the acquiring party whether it desires to participate in such acquisition by bearing its proportionate part of the cost thereof and/or participating in the requirements precedent to such acquisition.  Provided, however, that if a well is drilling in the Area of Mutual Interest, the notice of acquisition shall be given as promptly as possible and the notice of election shall be given within forty-eight (48) twenty-four (24) hours (not including Sundays and holidays).  Failure to reply shall be construed and constitute an election not to share in the acquisition.

If any party elects not to take its proportionate share of such acquisition, then all the parties participating therein shall have the right, but not the obligation, to share such nonparticipating party's proportional share in the proportions that their respective interests bear to the total interest of all parties who elect to participate.

If all parties participate in such acquisition, the acquired interest shall be subject to the operating agreement.  If some elect not to participate, then the acquiring parties shall own such interest free and clear of this agreement.

## I. TAXES

Operator shall pay or cause to be paid all taxes, state of federal, owing or which may be payable on the production from this Unit Area whether in the form of a severance or production tax; provided, however, that at any time any party is taking its share of production in kind, such party shall pay or cause to be paid said taxes as to said production.

At and during such time, or times, as non-operator is exercising the right to take in kind or separately dispose of its proportionate part of the production as set forth in Section 13 hereof, non-operator shall pay or arrange for the payment of all production, severance, gathering, sales or similar taxes imposed upon such part.  At and during such time, or times, as Operator is purchasing or selling non-operator's proportionate part of the production as set forth in said Section 13, Operator shall pay or arrange for the payment of all production, severance, gathering, sales or similar taxes imposed upon such part.

12-C

J. WELL DENSITY GOVERNING DRILLING AND COMPLETION BY LESS THAN ALL PARTIES

No well drilled or completed by less than all parties pursuant to the provisions of Section 12 hereof shall be completed as a gas well in the same formation as any other gas well then producing, or capable of producing, gas in commercial quantities from the Unit Area, if, as a result of the completion of said well, there would exist on the Unit Area a well dinsity in the same formation of more than one producing gas well to 640 acres plus a tolerance of 10% thereof; provided that, if any regulatory body having jurisdiction should establish or prescribe a smaller production allowable unit, less than all the parties may complete such a gas well pursuant to the provisions of Section 12 hereof so long as its completion does not result in a well density in the same gormation greater than that established or prescribed by the aforesaid regulatory body. No well drilled or completed by less than all of the parties pursuant to the provisions of Section 12 hereof shall be completed as an oil well in the same formation as any other oil well then producing from the Unit Area if, as a result of the completion of said well, there would exist on the Unit Area well density in the same formation of more than one producing oil well to 80 acres, provided that, if any regulatory body having jurisdiction should establish or prescribe a production allowable unit less than 80 acres, less than all of the parties may complete such an oil well pursuant to the provisions of Section 12 hereof so long as its completion does not result in a well density in the same formation greater than that established or prescribed by the aforesaid regulatory body.

~~K. LOUISIANA TAX ELECTION~~

~~(If leases are located in Louisiana)~~
~~Each party hereto elects to be excluded from the application of all pro-~~
~~visions of Sub-Part D of Part II, Chapter 1, Title 47, Louisiana Revised Statutes~~
~~of 1950, as amended as permitted and authorized by Section 220.3 of said revised~~
~~statutes and the regulations promulgated thereunder.~~

L. METERING OF PRODUCTION

If a diversity of the working interest ownership in production from a lease subject to this agreement occurs as a result of operations by less than all parties pursuant to any provisions of this agreement, it is agreed that the oil and other liquid hydrocarbons produced from the well or wells completed by the consenting party or parties shall be separately measured by standard metering equipment to be properly tested periodically for accuracy, and the setting of a separate tank battery will not be required unless the purchaser of the production or the governmental regulatory body having jurisdiction will not approve metering for separately measuring the production.

M. RETENTION OF OBLIGATION EXPENSE OR LIABILITY

Nothing contained in this agreement shall be deemed to relieve any party hereto of any legal obligation, expense or liability which may result from the express or implied provisions and covenants of any lease subject hereto or any agreement relating to such lease. Such obligations and liabilities, if any, shall be borne by the parties in the same proportion as their respective interests therein.

N. REMIT PRODUCTION PROCEEDS

Subject to the provisions of Paragraph 9 of this Operating Agreement, in the event any purchaser of production from the Unit Area remits all of the proceeds therefor to the Operator for distribution, the Operator shall remit to each royalty and working interest owner his or its proportionate share of said proceeds received by the Operator within thirty (30) days after the receipt by the Operator of such proceeds. Operator's cost of such distribution shall be charged to the Joint Account.

~~O. NON-DISCRIMINATION~~

~~The parties hereto agree to comply with the nondiscrimination provisions of~~
~~Section 202 (1) to (7), inclusive, of Executive Order No. 11246, 30 F.R. 12310~~
~~(which are incorporated herein by reference), and all rules and regulations issued~~
~~pursuant thereto.~~

P.  ~~SUPERSEDES/REPLACES PRIOR   OPERATING AGREEMENTS~~

~~This Operating Agreement supersedes and replaces any and all, if any,
Operating Agreements of even or earlier date, covering all or a portion of
the Unit Area between all or a portion of the Parties hereto.~~

## Q.  TITLES TO PARAGRAPHS

The titles or paragraph headings used in this Section, Provision or
Paragraph 31 are subordinate in all respects to the provisions set out in
such paragraph and the balance of this Operating Agreement.

## R.  BLOWOUT PREVENTER WARRANTY

Operator warrants and agrees that on any well drilled pursuant to this
Agreement, a blowout preventer of standard make will be set on the surface
casing and said blowout preventer shall be installed and tested in accordance
with usual practice.

## S.  CONFLICT/PREVAIL

In the event of a conflict between the provisions of this Article 31
and any other provision of this Operating Agreement, the provisions of this
Article 31 shall control and prevail.

A.A.P.L. FORM 610

This agreement may be signed in counterpart, and shall be binding upon the parties and upon their heirs, successors, representatives and assigns.

SKLAR AND PHILLIPS OIL COMPANY

ATTEST:

*John G. Carruth*

JOHN G. CARRUTH, Secretary

By: *August Erickson*

AUGUST ERICKSON, Vice Pres.

O P E R A T O R

ATTEST:

*Freda L. Austerlitz*

FREDA L. AUSTERLITZ
Assistant Secretary

ATTEST:

_____

EXETER EXPLORATION COMPANY

BY: _____
J. Allen Gardner, President

CZAR RESOURCES, INC.

By: *Phillip K. Snyder*

| APPROVED | |
|---|---|
| Acctg | |
| Drl/Prod | |
| Geol | |
| Land | |

— 13 —

EXHIBIT "A"

Definition of North and South Prospects


The South Prospect is that area on the upside of
a fault and the North Prospect is that area on the down-
side of the same fault which fault is encountered in the
Cypress Oil Company #1 Lum Edwards well located in the
T. & N. O. Railroad Company Survey 81, A-21 at a point
700' FNL and 400' FEL of a 150 acre lease tract, at a
depth of 8070' (70' cut out by Schlumberger measurement)
and in the Cypress Oil Company #1 Tyrell et al Unit #1
well in the W. C. Dunhill Survey, A-602 at a point 550'
FWL and 450' FNL of a 225 acre lease tract, at a depth
of 7210' (60' cut out by Schlumberger measurement).

The approximate position of the fault at Nodosaria
level is shown by a green line on the plat following this
page.  The two wells referred to above are circled in red.

The Area of Mutual Interest is defined as that area
outlined on the following page in red.


INTEREST OF THE PARTIES

All costs prior to casingpoint, as defined in paragraph 2
on page 2 of letter agreement dated February 21, 1978, will
be born as set out in said paragraph 2 on page 2.

All costs after casingpoint, as defined above, has been
reached will be born as follows:

Exeter Exploration Company                         5/8

Sklar & Phillips Oil Co.                           3/16

Czar Resources, Inc.                               3/16.

-1-



EXHIBIT "A" - Page -2-

Area of Mutual Interest is shown by
Red outline

Approximate position of fault at
Nodosaria level is shown by a green
line.

BAUER, SOUTH PROSPECT  -  #10-021
Jefferson County, Texas

Scale:  1" = 3000'

COPAS -- 1974

Kraftbill 601.  TULSA  74101

Recommended by the Council of Petroleum Accountants Societies of North America

# EXHIBIT "C"

Attached to and made a part of   Joint Operating Agreement

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

### 2. Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3. ~~Advances and~~ Payments by Non-Operators

~~Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.~~

Each Non-Operator shall pay its proportion of all bills within ~~fifteen (15)~~ thirty (30) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### 5. Audits

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

### 6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

### 1. Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

### 2. Labor

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations. at the current area contract rate.

(2) Salaries of First Level Supervisors in the field. at the current area consultant rate.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates. at the current area consultant rate.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

### 3. Employee Benefits

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed twenty per cent (20%).

### 4. Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

### 5. Transportation

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

### 6. Services

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1. ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

### 7. Equipment and Facilities Furnished by Operator

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property ~~less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.~~

### 8. Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

### 9. Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

— 2 —

**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

**1. Overhead – Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

    (   ) Fixed Rate Basis, Paragraph 1A, or

    (   ) ~~Percentage Basis, Paragraph 1B.~~

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (  ) shall not (  ) be covered by the Overhead rates.

**A. Overhead – Fixed Rate Basis**

(1) Operator shall charge the Joint Account at the following rates per well per month:

    Drilling Well Rate $ 1500.00 _____

    Producing Well Rate $ 300.00 _____

(2) Application of Overhead – Fixed Rate Basis shall be as follows:

    (a) Drilling Well Rate

        [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

        [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days.

        [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

    (b) Producing Well Rates

        [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

        [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

        [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

        [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

        [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

COPAS

~~B. Overhead - Percentage Basis:~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

(a) Development

_____ Percent (    %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

(b) Operating

_____ Percent (    %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:
For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

## 2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $_____ :

A. _____% of total costs if such costs are more than $_____ but less than $_____ ; plus

B. _____% of total costs in excess of $_____ but less than $1,000,000; plus

C. _____% of total costs in excess of $1,000,000.  | TO BE NEGOTIATED |

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

## 3. Amendment of Rates

~~The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.~~

# IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

## 1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

## 2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

(1) Tubular goods, except line pipe, shall be priced at the current new price in effect on date of movement on a maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the lowest published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

(2) Line Pipe

(a) Movement of less than 30,000 pounds shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

(b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store or f.o.b. railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV.

(2) Material moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as new Material, or



(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Section IV, if Material was originally charged to the Joint Account as good used Material at seventy-five percent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. **Other Used Material (Condition C and D)**

   (1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

   (2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at prevailing prices. Material no longer suitable for its original purpose but usable for some other purpose, shall be priced on a basis comparable with that of items normally used for such other purpose. Operator may dispose of Condition D Material under procedures normally utilized by the Operator without prior approval of Non-Operators.

D. **Obsolete Material**

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. **Pricing Conditions**

   (1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) per hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained, when actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Section II.

   (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished by Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shortages shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventory adjustments shall be made by Operator with the Joint Account for overages and shortages, but Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.

4. **Expense of Conducting Periodic Inventories**

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed to by the Parties.

EXHIBIT "D"


ATTACHED TO AND MADE A PART OF JOINT OPERATING AGREEMENT
DATED _____ COVERING BAUER, SOUTH
PROSPECT, JEFFERSON COUNTY, TEXAS.


## INSURANCE


Operator, at all times while conducting operations under this
agreement, shall carry at least the following:

A.  Workmen's Compensation and/or Employers Liability
    insurance in amounts reasonably sufficient to cover
    liability for injury to or death of Operator's
    employees, such insurance, if required by laws of
    the state in which the leased lands are located, to
    be in conformity with such laws.

B.  General Public Liability and Property Damage Insur-
    ance with limits of not less than $300,000.00
    covering injury to or death of one or more persons
    by reason of occurrence, and Property Damage Liability
    Insurance with limits of not less than $100,000.00
    for each occurrence.

C.  Automobile Public Liability and Property Damage
    Insurance with limits of not less than $100,000.00
    covering injury or death of one person and not
    less than $300,000.00 covering injury or death
    of more than one person by reason of one accident,
    and not less than $50,000.00 covering property of
    third persons.

If Operator elects to carry such insurance under its present
policies, Operator shall make a reasonable charge therefor.
If separate policies are secured, the actual premiums paid
shall be included as a part of the operating costs.  Operator
will not be required to carry fire, tornado, or any other
type of insurance on the property of the parties hereto.

EXHIBIT "E"

ATTACHED TO AND MADE A PART OF JOINT OPERATING AGREEMENT DATED FEBRUARY 21, 1978, COVERING BAUER, SOUTH, PROSPECT, JEFFERSON COUNTY, TEXAS

AREA OF INTEREST





November 7, 1979

Sklar & Phillips Oil Co.
2925 Mansfield Road
Shreveport, Louisiana  71103

Czar Resources, Inc.
2520 One Allen Center
Houston, Texas  77002

Re:   South Bauer Prospect
<u>Jefferson County, Texas</u>

Gentlemen:

    You are referred to our farmout letter agreement of even date herewith with respect to subject Prospect.

    We agree that the Exeter overriding royalty interest prior to conversion to working interest, and the Exeter working interest after such conversion are properly computed and stated in Exhibit "A" attached hereto.

    W. E. Belt, Jr., Harry M. Perry and Frank Lovett collectively designated "Trio" in said Exhibit "A", are each the owner of a 1% of 8/8 overriding royalty interest in production from the oil, gas and mineral leases comprising captioned Prospect; and each of them hereby assigns unto Exeter one-half of his said overriding royalty interest until conversion by Exeter of its reserved overriding royalty interest to working interest as provided in said farmout letter agreement; provided that upon such conversion the overriding royalty interests herein assigned to Exeter shall automatically revert to each of such Assignors.  Said parties and Exeter agree to execute the recordable instruments necessary to make the assignment and reversion of such overriding royalty interests effective of record.

    Please indicate your acceptance hereof and agreement hereto by having a copy hereof signed by an authorized representative

EXETER EXPLORATION COMPANY • C/O TRIO EXPLORATION CONSULTANTS • 217 SOUTHWEST TOWER • HOUSTON, TEXAS 77002 • PHONE 713/659-9410

-2-

of each of your companies and returning the copy so signed to Exeter within five (5) days after the date hereof.

Very truly yours,

EXETER EXPLORATION COMPANY

By _Ivan E. Kercher_

IVAN E. KERCHER
VICE-PRESIDENT

ACCEPTED AND AGREED TO:

SKLAR & PHILLIPS OIL COMPANY

By _August Erickson_

Date: _11-15-79_


CZAR RESOURCES, INC.

By _[signature]_

Date: _11/13/95_


_W. E. Belt, Jr. [signature]_

W. E. BELT, JR.

Date: _11-13-79_


_Harry M. Perry [signature]_

HARRY M. PERRY

Date: _11-13-79_


_Frank Lovett [signature]_

FRANK LOVETT

Date: _11-13-79_

WELL INFORMATION AND DATA REQUIRED

By

EXETER EXPLORATION COMPANY
c/o Trio Exploration Consultants
217 Southwest Tower
Houston, Texas 77002

TO:                                          WELL:
OPERATOR:
ADDRESS:

I. DAILY DRILLING REPORTS

A. Daily Telephone Call at Operator's Expense no later than 9:00 a.m. to:

|  | (1) or | (2) or | (3) |
|---|---|---|---|
| Name | Vicki Barta | Tracye Pool | Lovett, Perry or Belt |
| Telephone (AC/713) | 659-9410 | 659-9410 | 659-9410 |

B. Telephone Call at Operator's Expense Each Day no later than by 9:00 a.m. on Weekends and Holidays to:

|  | (1) or | (2) or | (3) |
|---|---|---|---|
| Name | Harry M. Perry | Frank Lovett | W. E. Belt, Jr. |
| Telephone (AC/713) | 371-7272 | 371-3444 | 494-2026 |

C. Written Report Mailed Daily Including Weekends and Holidays to:

|  | (1) |
|---|---|
| Name | Vicki Barta |
| Address | 217 Southwest Tower Houston, Texas 77002 |

II. NOTIFICATION PRIOR TO CORING, TESTING, LOGGING, ETC.

Notify us in ample time to have a representative present when you plan to run an electric log, to core or to make any drill stem or production test.

|  | (1) | (2) | (3) |
|---|---|---|---|
| Name | Harry M. Perry | Frank Lovett | W. E. Belt, Jr. |
| Telephone (AC/713) Day | 659-9410 | 659-9410 | 659-9410 |
| Telephone (AC/713) Night | 371-7272 | 371-3444 | 494-2026 |

III. NUMBER OF COPIES SHOWN OF THE FOLLOWING - (and any other material evidencing evaluation of this well) should be mailed or delivered to:

|  | (1) | (2) |
|---|---|---|
| Name (four copies) | Harry M. Perry | William T. Taylor (one copy) Exeter Exploration Company |
| Address | 217 Southwest Tower Houston, Texas 77002 | 2300 Lincoln Center Building Denver, Colorado 80217 |

A. You shall furnish us with five (5) copies of a surveyor's location plat showing the proposed well location and ground elevation of each test well, together with a brief summary of your proposed logging, coring and testing program and any other evaluation program proposed for such well, and notify us the date of commencement of actual drilling immediately after the well has been spudded.

**Exhibit (C)**
**Exhibit (C)**

-1-

B.  You shall save samples of all cuttings and cores in bags marked at the depth from which they came and deliver them to Exeter at the well, or at Exeter's request, to Exeter at 217 Southwest Tower, Houston, Texas 77002.

Samples will be saved at _____ foot intervals from _____ to _____ and at _____ foot intervals from _____ to _____ feet and samples will be deposited with _____

_____
at operator's expense.

C.  You will run an Induction Electric Log and a Density Neutron Log from total depth to bottom of the surface casing.

You will promptly provide EEC with five (5) field prints and four (5) final prints of all runs and the composite of all such logs or other logging evaluation surveys, including all test data and core analysis.

You will furnish the same number of copies to EEC of any other Electric Logs that you may elect to run or that EEC may require.

In the event that Exeter's representative is not present at the well or otherwise to receive the log copies, and/or if you are unable for any reason to deliver or have such log or log copies delivered to Exeter's representative as set out herein, then you agree to promptly, at your cost, telecopy (via telephone) zones of interest in the well to Exeter's representative.

D.  You shall do such coring as a reasonably prudent operator would do and/or take a _____ foot core in the _____
_____ if shows warrant.

Five (5) copies of all core descriptions

E.  You shall conduct drill stem and/or formation tests of all formations encountered which, on the basis of geological or other data would be tested by a reasonably prudent operator.

Five (5) copies of all Drill Stem and Formation Test Reports

F.  In the event EEC elects not to have a representative witness coring or testing of a particular formation, you shall provide a detailed description of the core or test by telephone to EEC as early as practical after the completion of the core or test, followed by a written report delivered or mailed to EEC.

G.  You shall furnish EEC with five (5) copies of all forms filed with State and any other regulatory bodies, as filed.

H.  You shall furnish EEC with five (5) copies of all reports of any kind or nature relating to any well drilled hereunder including but not limited to:

1.  Directional, Temperature, Caliper and Collar Log Surveys

2.  Mud Logging Reports

3.  Drilling Contract

4.  Geological Report with Sample and Core Descriptions, Drilling times, Log, etc.

5.  Dipmeter Survey

6.  Casing and Tubing Report

7.  Perforation Log

-2-

Exhibit (6)

I.   You agree to use your best efforts to control the drilling of any well subject to this agreement so that Bottom Hole Location shall not be more than _____ distant laterally from the surface location. Any greater deviation must be excused in writing by EEC for the well to be considered in compliance with the provisions of this agreement.

J.   Employ the services of a competent geologist to be present during drilling of prospective zones and during such times as coring and/or testing of any formation is being conducted on any well subject to this agreement, who will maintain a written sample and/or core description, four (4) copies of which will be timely furnished to EEC.

K.   EEC, at its sole cost, risk and expense shall have full and free access to each well subject to this agreement and to the Derrick Floor and full and complete information concerning the same, including cores, cuttings and production samples, and the right to observe all test, completion and producing operations.

L.   If well is productive, Operator will furnish to EEC, at Operatator's cost, daily production reports stating daily production of oil and/or gas, water, choke size, tubing pressure, casing pressure, pump strokes or any other applicable data for at least a period of ninety days following completion of well.

M.   Prior to spudding of each well you shall furnish Exeter with:

   a.  Written road directions to reach each well location from a give known or easily found point.

   b.  The name, title, business and residence address and telephone numbers of the geologist who will be in charge of evaluation of each well as well as same information for the geologist who will be present at the well location during evaluation.

   c.  Insurance Certificates proving your compliance with our contractural agreement.


IT IS THE INTENTION OF THIS AGREEMENT THAT EXETER BE FURNISHED WITH ALL INFORMATION OBTAINED BY OPERATOR IN CONNECTION WITH THE DRILLING EVALUATION, TESTING AND COMPLETING OF ANY WELL PROVIDED FOR HEREIN TO THE EXTENT THAT EXETER SHALL BE AS FULLY INFORMED IN CONNECTION THEREWITH AS OPERATOR.

Exhibit (G)

November 7, 1979


Sklar & Phillips Oil Co.
2925 Mansfield Road
Shreveport, Louisiana   71103

Czar Resources, Inc.
2520 One Allen Center
Houston, Texas   77002

Re:   South Bauer Prospect
      Jefferson County, Texas

Gentlemen:

    Exeter Exploration Company (Exeter) is the owner of a
sixty two and one-half per cent (62.5%) interest, and Sklar &
Phillips Oil Co. (S & P) and Czar Resources, Inc. (Czar) are each
the owner of an eighteen and three-fourths per cent (18.75%) in-
terest, in the oil, gas and mineral leases described in Exhibit
"A" attached hereto and hereinafter called "subject leases".  The
tracts of land described in Exhibit "A" are hereinafter called
"the farmout acreage".  The respective interests of Exeter, S & P
and Czar in subject leases are burdened, proportionately, with a
5% of 8/8 overriding royalty interest owned by Evard P. Ellison,
et al; and a 3% of 8/8 overriding royalty interest owned in equal
proportions by W. E. Belt, Jr., Harry M. Perry and Frank Lovett.

    Subject leases do not at present contain pooling provi-
sions, but S & P and Czar will, at their expense, undertake to
secure Lease Amendments and/or Unitization Agreements authorizing
the pooling of subject leases for production of gas, insofar, but
only insofar, as subject leases cover the land described in Exhi-
bit "B" hereto, hereinafter called "the unit".

    If the owners of all royalty interests, overriding roy-
alty interests and other interests in production have then execu-
ted such a Lease Amendment and/or Unitization Agreement, S & P
and Czar will, on or before the 15th day of December, 1979, com-
mence the drilling of an initial well at a location on the unit
and diligently drill said well to a depth of ten thousand one hun-

-2-

dred (10,100) feet, or a depth sufficient to fully and adequately test the Nodasaria Sand, whichever is the lesser depth.  During the drilling of said well Exeter's representatives shall, at the sole risk of Exeter and its said representatives, have free access to the well location and derrick floor at all times, and S & P and Czar will provide to Exeter all information concerning said well which is specified in Exhibit "C" attached hereto.  If, during the drilling of said well, S & P and Czar shall encounter any condition making further drilling impracticable, they may, at their option, within sixty (60) days after abandonment of said well, commence the drilling of a substitute well at a location on the unit and drill said substitute well to the depth hereinabove specified; and if such substitute well is so commenced and drilled it will earn the same rights and interests which the initial well would have earned had it not been abandoned.  The only penalty which will be incurred by S & P and Czar by failing to drill either of said wells as herein provided will be the loss of all of their rights and interests under the provisions hereof.

If, and only if, S & P and Czar commence and drill the said initial well, or the said substitute well, to the depth above specified as herein provided and complete such well as a producer of oil and/or gas in commercial quantities, Exeter will deliver to them an Assignment, without warranty of title, express or implied, of all of Exeter's right, title and interest in subject leases, insofar, but only insofar, as subject leases cover the farmout acreage, excepting from said Assignment and reserving to Exeter an overriding royalty interest consisting of the difference between thirty per cent (30%) of all production and the total of all royalties, overriding royalties and other interests in production which now burden said leases.  The overriding royalty interest so reserved to Exeter will be subject to reduction in the proportion that the interest in said leases so assigned by Exeter bears to the full working interest in said leases.

If either said initial well or said substitute well is completed as a commercial producer, it will be operated under the provisions of the Operating Agreement hereinafter described; and when the owners of the working interest have recovered out of their interest in production from said well all costs of drilling, testing, completing and equipping said well, together with all costs of operating said well during such recovery, hereinafter called "payout", the Operator of the well will give written notice thereof to Exeter and Exeter will have the option to convert its aforesaid overriding royalty interest into a ten per cent (10%) interest in

-3-

subject leases, insofar as they cover the farmout acreage, subject
to ten per cent (10%) of all present burdens; and the parties here-
to will execute a recordable instrument as evidence of such conver-
sion, which shall be made effective as of the first day of the cal-
endar month during which payout occurs.  During payout S & P and
Czar will provide Exeter with quarter-annual written statements show-
ing the status of payout, and Exeter shall have the right to audit
the accounting records of the Operator of the well during normal bus-
iness hours, but not more often than once in each six months period.

If prior to payout S & P and Czar propose to drill an ad-
ditional well or wells on the farmout acreage outside of the unit,
they will give written notice thereof to Exeter, together with a
copy of the AFE for such well; and Exeter will have the option for
a period of ten (10) days after receipt of such notice to convert
its aforesaid overriding royalty interest in the acreage outside the
unit into ten per cent (10%) of the working interest therein, as
hereinabove provided, and participate in the drilling of said well
as a working interest owner under the provisions of the aforesaid
Operating Agreement.

This agreement is subject to the provisions of each of the
following:

(a)   Letter Agreement between Exeter Exploration
      Company and Evard P. Ellison dated December
      19, 1977 and assignments therein provided
      for;

(b)   Letter Agreement between Sklar & Phillips Oil
      Company, Czar Resources, Inc. and Exeter Ex-
      ploration Company dated the 21st day of Feb-
      ruary, 1978; and

(c)   Operating Agreement between Sklar & P'
      Oil Company, Operator, Exeter Explo-
      pany and Czar Resources, Inc. cov
      "Bauer, South Prospect" and dat
      1978;

provided that in the event of confl'
hereof will control.

Except as elsewhere herein st
provided for shall be given by certifiec
quested, or by telegram, addressed to the
as follows:

-4-

Exeter Exploration Company
217 Southwest Tower
Houston, Texas  77002
Attention:  Mr. W. E. Belt, Jr.

Sklar & Phillips Oil Company
P. O. Box 3735
Shreveport, Louisiana  71103
Attention:_____

Czar Resources, Inc.
2520 One Allen Center
Houston, Texas  77002
Attention:_____

        The provisions hereof shall never be construed to establish a partnership, mining partnership, joint venture or other relationship by which any party hereto shall ever be responsible for the debts, obligations or liabilities of any other party hereto. Each party hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Sub-chapter K of Chapter I of Subtitle A of the Internal Revenue Code of 1954.

        The provisions hereof shall be binding upon the successors and assigns of the parties hereto and cannot be changed or modified except by written agreement signed by an authorized representative of each party hereto.

        Please indicate the acceptance hereof and agreement hereto by each of your companies by having a copy signed by an authorized representative of the company and returning the copy so signed to Exeter within five (5) days after the date hereof or this agreement will not become effective.

                        Very truly yours,

                        EXETER EXPLORATION COMPANY

                        By_____

ACCEPTED AND AGREED TO:

SKLAR & PHILLIPS OIL COMPANY            CZAR RESOURCES, INC.

By_____        By_____

Date:_____        Date:_____

EXHIBIT "A"

OIL, GAS AND MINERAL LEASES
COVERING LANDS IN JEFFERSON COUNTY, TEXAS

(1)     10-021-01 - Lease from Mattie V. Lohmann, et al,
        to Jack B. Osborne dated the 22nd day of Septem-
        ber, 1977, recorded Vol. 2044, page 478, of the
        Deed Records of Jefferson County, Texas, cover-
        ing 320 acres out of Section 72, P. W. Farr, Ab-
        stract 749:

            Insofar, but only insofar, as said
            lease covers the north half (N/2) of
            the 320 acres of land described there-
            in.

(2)(a)  10-021-03A - Lease from William Howell Wood, Jr.,
        et al, to Jack B. Osborne dated the 15th day of
        February, 1978, recorded Vol. 2058, page 364, of
        said records; and

   (b)  10-021-03B - Lease from James W. Gober, et ux, to
        Jack B. Osborne dated the 21st day of February,
        1978, recorded Vol. 2058, page 452, of said re-
        cords:

            Each of said leases covering the south-
            west quarter (SW/4) and the west half
            (W/2) of the west half (W/2) of the
            southeast quarter (SE/4) of T. & N.O.
            R.R. Co. Section 65, Abstract No. 213,
            comprising 200 acres of land.

EXHIBIT "B"

DESCRIPTION OF GAS UNIT

160 acres of land in Jefferson County, Texas,
more fully described as follows:

COMMENCE at a point on the North boundary line
of the P. W. Farr Survey, A-749  990 feet East
of the Northwest Corner of said survey;

THENCE South parallel with the West boundary
line of said Farr Survey 1,893.91 feet to a
point;

THENCE East parallel with the North boundary line
of said Farr Survey 1,840 feet to a point;

THENCE North parallel with the West boundary line
of said Farr Survey 1,893.91 feet to the North
boundary line of said Farr Survey;

THENCE continue North parallel with the West boun-
dary line of the T. & N.O. R.R. Survey, A-213,
1,893.91 feet, a total distance on this line of
3,787.82 feet to a point in the T. & N.O. R.R. Sur-
vey;

THENCE West parallel with the South boundary line
of the said T. & N.O. R.R. Survey 1,840 feet to a
point in said T. & N.O. R.R. Survey;

THENCE South parallel with the West boundary line
of said survey 1,893.91 feet to a point in the
South boundary line of said T. & N.O. R.R. Survey,
said point being also in the North boundary line
of the P. W. Farr Survey, A-749 and said point be-
ing also the place of beginning.

EXHIBIT "A"

(1) Exeter O.R.I. = .30 less all other burdens:

10-021-01 - Lohmann - (160 ac.)

```
R.I.            =   .20
O.R.I.          =   .08

Total burden    =   .28
                    ===

                    .30
                -   .28

                    .02    - O.R.I. per F/O Ltr.
            x   .625   - Exeter interest

                    .01250 - Exeter O.R.I. per F/O Ltr.
                    .01500 - from Trio

                    .02750 - Total Exeter O.R.I.
```

10-021-03A - Wood (1/2 int. in 200 ac.)

```
R.I. = 1/12 = .083333
O.R.I.      = .040000

                         .123333
```

10-021-03B - Gober (1/2 int. in 200 ac.)

```
R.I. = 1/8  = .125000
O.R.I.      = .040000

                         .165000
```

Total burden                        .288333

```
                    .300000
                -   .288333

                    .011667 - O.R.I. per F/O Ltr.
            x   .625     - Exeter interest

                    .007282 - Exeter O.R.I. per F/O Ltr.
                    .015000 - from Trio

                    .022282 - Total Exeter O.R.I.
```

-2-

Exeter O.R.I. in Unit:

```
        Lohmann              .027500
        Wood & Gober         .022282

                         2 /.049782

        O.R.I. in Unit       .024891
```

Average Exeter O.R.I. in all farmout acreage:

```
        Lohmann Lease      160/360 x .027500 = .012222
        Wood, et al, Lses.  200/360 x .022282 = .012379

             Average Exeter O.R.I.          .024601
```

(2)   Exeter W.I. after conversion:

Lohmann Lease

```
        1.000
         .28      (R.I. & O.R.I.)

         .72    - W.I.
      x .10

        .072 - Exeter W.I.
```

Wood & Gober Leases:

```
        1.000000
         .288333 (R.I. & O.R.I.)

         .711667  W.I.
      x .10

        .071167  Exeter W.I.
```

Exeter W.I. in Unit:

```
        Lohmann              .072000
        Wood & Gober         .071167

                         2 /.143167

                 .071583 - Exeter W.I. in Unit
```

-3-

<u>Exeter average W.I. in farmout acreage</u>:

| | | |
|---|---|---|
| Lohmann Lease | 160/360 x .072 | = .032 |
| Wood & Gober Leases | 200/360 x .071583 | = .039768 |

Exeter average W.I. in farmout acreage      .071768

EXHIBIT .A

TAX ELECTION

Each party agrees not to elect to be excluded from the application
of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue
Code.  Each party also agrees not to elect to be excluded from the
application of any present or future income tax laws of the state
in which the properties covered hereby are located under which an
election similar to that provided by Section 761 of the Internal
Revenue Code can be made.

The parties agree that for United States income and any applicable
state income tax purposes the gains and losses from sales, abandon-
ments and other disposition of the property and all classes of costs,
expenses and credits, including depreciation and depletion, shall
be shared and accounted for by each party in any applicable United
States income tax or state tax return as follows:

(a)  The production costs shall be allocated as deductions to
     the parties in accordance with their respective contribu-
     tions to such costs.

(b)  The exploration costs and intangible drilling and develop-
     ment costs shall be allocated as deductions to the parties
     in accordance with their respective contributions to such
     costs.

(c)  The depreciation on tangible equipment shall be allocated
     to the parties in accordance with their respective contri-
     butions to the adjusted basis of such equipment.

(d)  The deduction for depletion for each taxable year with
     respect to each separate property shall be determined by
     each party individually based on the partnership income
     from oil and gas production allocated to each such party
     hereunder, except that cost depletion shall be based on
     the respective costs of the leasehold interests attribut-
     able to the leases contributed to the partnership by each
     such party.

(e)  Gains and losses from each sale, abandonment or other dispo-
     sition of property (other than oil, gas or other hydrocar-
     bon substances) shall be allocated to the parties in such
     manner as will reflect the gains and losses that would have
     been includable in their respective income tax returns if
     such property were held by the parties outside this Agree-
     ment.  The computations shall take into account each party's
     share of the proceeds derived from each sale or other dispo-
     sition of such property during the year, selling expenses
     and the parties' respective contributions to the unadjusted
     cost basis of such property, less any allowed or allowable

depreciation, depletion, amortization, credits, or other deductions which have been allocated to each party with respect to such property as provided herein.

(f)   The investment credit allowed by the Internal Revenue Code shall be allocated to the parties in accordance with their respective contributions to qualified investment as defined in the Internal Revenue Code.

(g)   All other classes of costs, expenses and credits not falling within Subsection (a), (b), (c), (d), (e) and (f) above shall be allocated to and accounted for by the parties in accordance with their respective contributions to such costs, expenses and credits.

(h)   Income from sale of oil, gas and other minerals produced, saved and marketed from the leases covered hereby shall be allocated between the parties hereto pursuant to their respective rights and interests under this letter Agreement.

Matzinger Exploration Company ____ shall timely file all tax returns required by any partnership entity created by this Agreement for federal income tax purposes on a calendar year basis and furnish ___ Sklar & Phillips Oil Co. ____ a copy thereof not later than March 15 following the end of each such year. All such tax returns shall be filed in the name of the _Farr Field Prospect, Jefferson County, Texas____ . The cost of preparing and filing such tax returns shall be paid by all parties.

-2-

# SKLAR & PHILLIPS OIL CO.

P. O. BOX 3735                    2925 MANSFIELD ROAD                    TELEPHONE 424-8135
                                 SHREVEPORT, LOUISIANA 71103

February 27, 1978

Exeter Exploration Company
% Trio Exploration Consultants
217 Southwest Tower
Houston, Texas 77002
Att: Mr. W. E. Belt, Jr.

Czar Resources, Inc.
2520 One Allen Center
Houston, Texas 77002
Att: Mr. Kim Swyden

                    Re: Operating Agreement Dated February 27, 1978
                        Bauer, South Prospect
                        Jefferson County, Texas

                              ADDENDUM I

Gentlemen:

Reference is here made to captioned Operating Agreement, and
particularly to Article B on Page 12-A thereof, and to the
provisions of Exhibit "A", attached to and made a part of
Letter Agreement dated February 21, 1978. Cognizance is here
taken that said Article B principally concerns the relation
of relative interests of the parties hereto at "casingpoint".
Said Article recites that captioned Operating Agreement
becomes effective only after Casingpoint.

The purpose of this Addendum is to express the understanding of
the parties hereto, notwithstanding the language of said
Article B on Page 12-A, which is as follows:

"Sklar & Phillips Oil Co. is hereby named Operator of the ini-
tial test well (Sklar & Phillips - Lohmann No. 1, located 467'
North and 2,200' East from the Southwest Corner of Section 72,
P. W. Farr Survey A-749). All of the provisions of captioned
Operating Agreement not inconsistant with this Addendum, and
particularly, the obligation of Operator to maintain insurance
in at least the amounts set out in Exhibit "D" of said Operat-
ing Agreement, shall apply during the drilling and testing of
Initial Test Well prior to the point in time when said Operat-

Exeter Exploration Company, et al
February 27, 1978
Page 2

ing Agreement is effective.

                          Yours very truly,

                          SKLAR & PHILLIPS OIL CO.

                          August Erickson
                          Vice-President

AGREED TO AND ACCEPTED THIS 10th
DAY OF MARCH, 1978

EXETER EXPLORATION COMPANY

By _____

AGREED TO AND ACCEPTED THIS 2nd
DAY OF MARCH, 1978

CZAR RESOURCES, INC.

By _____

| APPROVED |  |
|----------|--|
| Acctg |  |
| Drl/Prod |  |
| Geol |  |
| Land |  |

# SKLAR & PHILLIPS OIL CO.

P. O. BOX 3735              2925 MANSFIELD ROAD             PHONE 318  424-8135
SHREVEPORT, LOUISIANA 71103

November 15, 1979

Matzinger Exploration Company
1300 Southwest Tower
Houston, Texas 77002

        Attention: Mr. Frank Matzinger

        Re:  Lohmann-Gober-Wood Unit No. 1
             Farr Field Prospect
             Jefferson County, Texas

Gentlemen:

Attached hereto is a letter agreement dated November 7, 1979
between Exeter Exploration Company on the one hand and Sklar
& Phillips Oil Co. and Czar Resources, Inc. on the other hand.
This letter sets forth the terms under which you will acquire
a 50% working interest in the gas unit, as described on
Exhibit B to said letter agreement, together with a 50% work-
ing interest in non-unit acreage, all as is provided for in
said agreement.

Sklar & Phillips and Czar Resources, Inc. will drill, or
cause to be drilled, a test well at a location 1550 feet East
and 200 feet South from the Northwest Corner of Section 72,
P. W. Farr Survey A-749, Jefferson County, Texas, and located
on the 160 acre unit described in Exhibit "B" to the letter
agreement above referred to.  Said well will be commenced
immediately upon rig availability and will be drilled to a
depth of 10,100 feet or to a depth sufficient to test the
Nodasaria Sand, whichever is the lesser.  In the drilling of
this test well, and any other well which might be drilled on
the property, Matzinger will be granted, at its risk, access
to the derrick floor at all times and will be furnished daily
telephone drilling reports and notice in time for Matzinger
to have a representative present for any coring, logging or
testing, copies as designated by Matzinger of all electric
logs, core analyses reports and any and all other information

Matzinger Exploration Company
November 15, 1979
Page 2

of whatever nature obtained in the drilling of any well here-
under.

When final electric logs have been run in said test well,
side wall cores taken as necessary and side wall core analyses
obtained and the parties hereto have reached a decision to
(1) attempt completion of the well or (2) plug and abandon as
a dry hole, it will be presumed for the purposes hereof that
"casingpoint" has been reached.  Matzinger will pay to Sklar
& Phillips and Czar two-thirds (2/3) of all actual costs
attributable to road, location, drilling, logging and testing
said well to casingpoint as above defined, and will thereafter
bear fifty percent (50%) of the cost of completing and operat-
ing said well or, in the case of a dry hole, plugging and
abandoning.

In the event the test well is successfully completed as a
producer, Matzinger will be entitled to a seventy percent
(70%) net revenue interest to its fifty percent (50%) working
interest.  The provisions contained in the last paragraph on
page 2 and the first paragraph on page 3 of the November 7,
1979 Exeter-Sklar & Phillips-Czar letter agreement will be
borne and suffered solely by Czar and Sklar & Phillips.

There is attached hereto as Exhibit "A" a Tax Election by the
parties hereto not to elect to be excluded from the application
of Subchapter K of Chapter 1 of Subtitle A of the Internal
Revenue Code.  Exeter Exploration Company is a party to this
agreement solely for the purpose of approving said election,
which is contrary to the election set out in the November 7,
1979 letter agreement between Exeter, Sklar & Phillips and
Czar.

Attached hereto as Exhibit "B" is Operating Agreement dated
February 27, 1978 styled "Bauer, South Prospect".  Said
Operating Agreement, except as to the tax election therein con-
tained, is hereby ratified and confirmed by Matzinger.

If the above properly sets out your understanding of our agree-
ment, please so indicate by signing and returning a copy of

Matzinger Exploration Company
November 15, 1979
Page 3


this letter.

                         Yours very truly,

                         SKLAR & PHILLIPS OIL CO.


                         August Erickson
                         Vice-President


                         CZAR RESOURCES, INC.


                         By_____

AGREED TO AND ACCEPTED
THIS _____ DAY OF NOVEMBER, 1979

MATZINGER EXPLORATION COMPANY

By_____



EXETER EXPLORATION COMPANY


By_____

# SKLAR & PHILLIPS OIL CO.

P. O. BOX 3735

2925 MANSFIELD ROAD
SHREVEPORT, LOUISIANA 71103

PHONE 318  424-8135

December 28, 1979

Matzinger Exploration Company
1300 Southwest Tower
Houston, Texas 77002
  Att: Mr. Wise Lambert

Czar Resources, Inc.
3030 Two Allen Center
Houston, Texas 77002
  Att: Mr. Kim Swyden

Re: Lohmann-Gober-Wood #1
    Jefferson County, Texas

Gentlemen:

For your files and records, we attach copy of Sklar & Phillips
Oil Co. Check No. 53396 to Goldrus Drilling Company in accord-
ance with the provisions of Drilling Contract dated December
5, 1979 between Sklar & Phillips Oil Co., Operator, and
Goldrus Drilling Company.

Yours very truly,

SKLAR & PHILLIPS OIL CO.

August Erickson

AE/e
enclosure

xc: Mr. Francis Raspberry
    1513 First City East Building
    Houston, Texas 77002

N.W. CORNER
P.W. FARR SURVEY,
ABST. NO. 749, SEC. NO. 72
N. LINE SKLAR & PHILLIPS LS.

N.E. COR.
SEC. 72

1550'

200'

LOCATION

NATURAL GROUND
EL. AT LOCATION
IS 27' A.M.S.L.

GEO. V. LOHMANN, ET AL.
FEE — UN-LEASED —

WEST LINE SKLAR & PHILLIPS LS.

SHOP

700

HOUSE

1800'

BARN

EAST LINE SKLAR & PHILLIPS LS.

2600 #

GEO. V. LOHMAN, ET AL.
— UN-LEASED —

MAIN GATE

SW. COR.
SEC. 72

S.E. COR.
SEC. 72

SOUTH LINE SKLAR & PHILLIPS LS.

GEORGE V. LOHMAN
SURFACE OWNER - ½ MINERALS
111 DRYDEN PLACE
PORT ARTHUR, TEXAS.

SKETCH OF P.W. FARR SURVEY
ABST. NO. 749, SECTION NO. 72
JEFFERSON COUNTY, TEXAS.

LOCATION SITUATED 1550' EAST & 200' SOUTH
N.W. COR. SEC. NO. 72        11/14/79

SCALE:
1"=1000' (APPROX)

