## OPERATING AGREEMENT

THIS AGREEMENT, made and entered into the 21st day of ___May___, 1959, by and between TEXACO INC., a Delaware corporation, hereinafter sometimes referred to as "Texaco" and sometimes as "Operator"; and F. R. Jackson; Maxwell D. Simmons; Betty Davis and husband, C. H. Davis; Dorothy Kennedy and husband, George E. Kennedy, Jr.; John C. Robbins, Jr.; John Clinton Robbins; Henry Donaghey as Trustee for the John Clinton Robbins, Sr. Trust; Henry Donaghey as Trustee for the Elizabeth Joyce Robbins Trust No. 2; Henry Donaghey as Trustee for the Dorothy Mae Robbins Trust No. 2; Henry Donaghey as Trustee for the John C. Robbins, II Trust No. 2; Robbins Petroleum Corp., a corporation; H. C. McGrede; Dr. Henry C. McGrede, Jr.; A. R. Graves; B. F. Ashcroft; Perry Thompson; Dr. W. T. Stewart; Mrs. Ruth Ashcroft; L. A. Demmer; Mrs. Maude C. Stewart; B. Reagan McLemore; L.E. Ostrom; Delta Drilling Company, a Texas corporation; Leonard W. Phillips; Albert Sklar; August Erickson; Morris B. White; Sam Y. Dorfman, Jr.; Louis Dorfman; S.L. Florsheim, Jr.; Myron H. Dorfman; A. G. Carter, Jr.; Claude Bateman, Jr.; A. P. Noyes; hereinafter jointly referred to as "non-operators",

### W I T N E S S E T H   T H A T

WHEREAS, the parties above named represent that they own the gas lease-hold estates and unleased mineral interest in and to that certain tract of land fully described in Exhibit "B" which is attached hereto and made a part hereof and which leases covering said tract of land, among other lands, are fully described in Exhibit "A" which is attached hereto and made a part hereof;

WHEREAS, it is the desire of the parties hereto to enter into an operating agreement covering operations for the exploration, development and production of gas, as hereinafter defined, from the tract of land described in Exhibit "B" hereto.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained to be kept and performed by the parties hereto, it is hereby agreed as follows:

1. <u>TITLE EXAMINATION</u>:  Each of the parties hereto represents that it has good title to its respective interests contributed hereto.

2. <u>UNITIZED AREA</u>:  The gas rights only in and under the tract of land described in Exhibit "B" hereto, situated in Rusk County, Texas, herein called

"unitized area" shall be developed and operated for natural gas production pur-
poses by Operator, subject to the provisions herein contained.

　　　3.　INTERESTS OF THE PARTIES: All production of gas from the unitized
area shall be owned and all costs, expenses and liabilities accruing or resulting
from the operation of the unitized area pursuant to this agreement shall be deter-
mined, borne and shared by the parties hereto, as follows:

| | | |
|---|---|---|
| (a) | Texaco Inc. . . . . . . . . . . . . . . . | .50 |
| (b) | F. R. Jackson et al | |
| | Maxwell D. Simmons | |
| | Betty Davis and husband, C. H. Davis | |
| | Dorothy Kennedy and husband, George | |
| | 　　E. Kennedy | |
| | John C. Robbins, Jr. | |
| | John Clinton Robbins | |
| | Henry Donaghey, as Trustee for the | |
| | 　John Clinton Robbins, Sr. Trust | |
| | Henry Donaghey, as Trustee for the | |
| | 　Elizabeth Joyce Robbins Trust No. 2 | |
| | Henry Donaghey as Trustee for the | |
| | 　Dorothy Mae Robbins Trust No. 2 | .4070455 |
| | Henry Donaghey as Trustee for the | |
| | 　John C. Robbins, II Trust No. 2 | |
| | Robbins Petroleum Corp. | |
| | H. C. McGrede | |
| | Dr. Henry C. McGrede, Jr. | |
| | A. R. Graves | |
| | B. F. Ashcroft | |
| | Perry Thompson | |
| | Dr. W. T. Stewart | |
| | Mrs. Ruth Ashcroft | |
| | L. A. Demmer | |
| | Mrs. Maude C. Stewart | |
| | B. Reagan McLemore | |
| | L. E. Ostrom | |
| | A. G. Carter,Jr. | |
| | Claude Bateman, Jr. | |
| | A. P. Noyes | |
| (c) | Delta Drilling Company . . . . . . . . . . | .04647725 |
| (d) | Leonard W. Phillips　. . . . . . . . . . | .0112562137 |
| (e) | Albert Sklar　　. . . . . . . . . . | .0112562137 |
| (f) | August Erickson　. . . . . . . . . . | .0004841348 |
| (g) | Morris B. White　. . . . . . . . . . | .0004841348 |
| (h) | Sam Y. Dorfman, Jr.　. . . . . . . . . . | .0105526967 |
| (i) | Louis Dorfman　. . . . . . . . . . | .0105526967 |
| (j) | S. L. Florsheim, Jr.　. . . . . . . . . . | .0004841348 |
| (k) | Myron H. Dorfman　. . . . . . . . . . | .0014070248 |

　　　Each of the parties hereto shall pay out of its share of such production
that royalty interest attributable to the interest contributed by such party to the
unitized area.

　　　4.　OPERATOR: Texaco Inc. is hereby designated Operator and is herein-
after referred to as "Operator". All other parties to this agreement are herein-
after referred to jointly as "Non-Operators".

　　　5.　TERM OF AGREEMENT: This agreement, unless earlier terminated, shall
remain in full force and effect for six months from the date hereof and for as long

thereafter as gas is or can be produced in paying quantities under the terms of
this agreement, provided that if upon completion of the well drilled by Operator
hereunder, such well is completed as a dry hole and is plugged and abandoned, or
such well is non-productive of gas and is taken over by one or more of the parties
hereto as provided in Paragraph 9 hereof, this agreement shall terminate upon the
abandonment or taking over by one or more of the parties hereto, subject to the
payment of all costs and expenses and final accounting for materials and equipment
as herein provided.  Upon termination hereof, the parties hereto agree to execute
a memorandum evidencing termination of this agreement.

      6.   UNIT DECLARATION:  The parties hereto agree to execute a Unit Declara-
tion covering the above described lands and interests contributed to this agreement,
to be filed in the appropriate records of Rusk County, Texas.  Such Unit Declara-
tion to be duly executed and filed for record prior to the commencement of the well
herein provided for.  Such Unit Declaration shall cover gas, as is hereinafter de-
fined, only.

      7.  DEVELOPMENT, CONTROL AND COST OF OPERATOR:  Operator agrees to com-
mence as soon as practicable the drilling of a well to be located 660 feet from the
most Easterly West line and 1420 feet from the South line of the Henry Wells Survey,
Abst. No. 953, located in Rusk County, Texas, (or a well in lieu thereof if
mechanical difficulties require abandonment of original location), same to be
drilled with due diligence and in a workmanlike manner to a depth sufficient to
penetrate 250' into the Travis Peak formation or 7800' below the surface of the
ground, whichever is the lesser, and complete the same for the joint benefit and
at the joint cost and expense of the parties hereto under the terms and conditions
of this contract. No well other than in this paragraph provided shall be drilled
under this agreement for the joint account and at the joint cost and expense of
the parties hereto.  Operator shall have full control of the unitized area and,
subject to the provisions hereof, shall conduct and manage the development and
operation of said unitized area for gas purposes, for the joint account of the
parties hereto.  Operator shall pay and discharge all costs and expenses incurred
pursuant hereto and shall charge the Non-Operators with their proportionate share
upon the cost and expense basis provided for in the Accounting Procedure attached
hereto,marked Exhibit "C" and made a part hereof.  Non-Operators shall pay Operator
such costs as are hereunder chargeable to them, such payment to be made in the

-3-

manner provided in Exhibit "C".  All production of gas from the unitized area,
subject to the payment of applicable royalties thereon, and all material and equip-
ment acquired pursuant hereto shall be owned by the parties hereto in the propor-
tions set out in paragraph 3 hereof.  Operator shall at all times keep the joint
interest of the parties in and to the leases and equipment thereon free and clear
of all labor and mechanics' liens and encumbrances.

       8.  <u>OPERATIONS BY LESS THAN ALL PARTIES</u>:   When the Operator determines
that operations upon the well herein provided for have reached the point where the
next logical step is either to plug and abandon said well or to commence operations
to attempt to complete such well as a gas well, Operator shall at that time give
Non-Operators notice of such fact and of Operators' decision as to whether to plug
and abandon said well or to attempt to complete said well as a gas well.  Upon
receipt of such notice, Non-Operators shall have a period of forty-eight (48)
hours, exclusive of Saturday or Sunday, in which to notify Operator whether or
not they concur in Operator's decision.  Failure of a party receiving such notice
to so reply to it within the period above fixed shall constitute a concurrence
by that party as to the decision of Operator.  If all of the parties hereto concur
in Operator's decision, Operator shall proceed in accordance therewith at the cost,
risk and expense of the parties hereto.  If any party receiving such notice does
not concur in the decision of Operator and duly notifies Operator of such fact then
the remainder of this paragraph 8 shall apply to and govern all further operations
in connection with said well.

       The party or parties (hereinafter in this paragraph 8, referred to as
Completing Parties) who elect to attempt to complete said well or a gas well shall
as soon as possible after the expiration of said forty-eight (48) period, actually
commence operations to complete said well and shall prosecute such operations with
due diligence.

       The parties hereto who do not join in said completeion operations shall
hereinafter in this paragraph be referred to as "Non-Completing Parties".

       The entire cost and risk of conducting said completion operations shall
be borne by the Completing Parties and shall be shared by them in the proportions
that their respective interests as shown in paragraph 3 hereof bear to the total
interests of all Completing Parties.  If Operator is one of the Completing Parties,
such completion operations shall be conducted by Operator, under Operator's

-4-

management, supervision and control.

If said completion operations are unsuccessful and result in a dry hole, the Completing Parties shall plug and abandon said well at their sole cost, risk and expense.

If said well is completed as a producing gas well, all personal property used therewith and acquired by the Completing Parties, and all production and proceeds from the sale thereof from said well, and all other income derived from the operations of said well (including proceeds from the sale of equipment and material which was placed in or upon said well by the Completing Parties) shall be owned by Completing Parties until such time as Completing Parties have recovered from that portion of said production and proceeds that would have been Non-Completing Parties' share of said production and proceeds if they had joined in said completion operations, after deduction of 100% of all expenses of operating and maintaining said well (including ad valorem, gross production and all other taxes, except income tax) attributable to such portions of said production and proceeds, a sum equal to 200% of what the Non-Completing Parties' share of the cost of said completion operations would have been had the Non-Completing Parties joined in said completion operations. Whereupon said well and the production therefrom shall be owned and operated jointly by the parties hereto, under the terms of this agreement as if all parties had originally joined in said completion operations.

The sale or other disposition of equipment and material, placed in and upon said well by the Non-Completing Parties, shall, for all purposes of this paragraph, be treated as the sale or other disposition of production from said well.

If Operator is a Non-Completing Party the completing Parties shall elect one Completing Party to be Operator and such elected Operator shall operate the unitized area according to all the terms of this agreement.

Operator or elected Operator, whichever the case may be, shall submit division orders crediting each Non-Completing Party with its proportionate part of the royalty and/or overriding royalty, and it shall be the obligation of each Non-Completing Party to pay or cause to be paid all such royalty or over-riding royalty apportionable to its lease or leases or interest committed to this agreement.

A statement of all costs and expenses incurred in said completion

management, supervision and control.

If said completion operations are unsuccessful and result in a dry hole, the Completing Parties shall plug and abandon said well at their sole cost, risk and expense.

If said well is completed as a producing gas well, all personal property used therewith and acquired by the Completing Parties, and all production and proceeds from the sale thereof from said well, and all other income derived from the operations of said well (including proceeds from the sale of equipment and material which was placed in or upon said well by the Completing Parties) until such time as Completing Parties have recovered from that portion of said production and proceeds that would have been Non-Completing Parties' share of said production and proceeds if they had joined in said completion operations, after deduction of 100% of all expenses of operating and maintaining said well (including ad valorem, gross production and all other taxes, except income tax) attributable to such portions of said production and proceeds, a sum equal to 200% of what the Non-Completing Parties' share of the cost of said completion operations would have been had the Non-Completing Parties joined in said completion operations. Whereupon said well and the production therefrom shall be owned and operated jointly by the parties hereto, under the terms of this agreement as if all parties had originally joined in said completion operations.

The sale or other disposition of equipment and material, placed in and upon said well by the Non-Completing Parties, shall, for all purposes of this paragraph, be treated as the sale or other disposition of production from said well.

If Operator is a Non-Completing Party the completing Parties shall elect one Completing Party to be Operator and such elected Operator shall operate the unitized area according to all the terms of this agreement.

Operator or elected Operator, whichever the case may be, shall submit division orders crediting each Non-Completing Party with its proportionate part of the royalty and/or overriding royalty, and it shall be the obligation of each Non-Completing Party to pay or cause to be paid all such royalty or over-riding royalty apportionable to its lease or leases or interest committed to this agreement.

A statement of all costs and expenses incurred in said completion

operations prepared in accordance with the provisions of Exhibit "C" attached here-
to, shall be furnished the Non-Completing Parties within ninety (90) days after the
completion of such well and thereafter Completing Parties shall furnish the Non-
Completing Parties with a similar monthly statement of all costs and expenses of
operating and maintaining said well, including taxes, and the income or revenue
from said well.

Nothing in this paragraph contained shall be construed to grant the
Completing Parties any right to complete said well as an oil well.

9. OIL WELL PROVISION: If the parties hereto determine that the test
well drilled under the provisions of this agreement is not productive of gas in
paying quantities at any depth, but shows that it could be productive of oil, then
Texaco shall have the right to run any and all production tests on said
well at its sole expense, for a period not to exceed thirty (30) consecutive days
next following the date of such mutual determination. If Texaco excercises said
right to run production tests it shall have the further right, at any time during
said 30 days period, to take over such well and attempt to complete it as an oil
well. If Texaco does not wish to run said tests, or if having run said tests
does not elect to take over said well, it shall so notify Non-Operators in writ-
ing and Non-Operators shall have the same rights as Texaco to test and take over
said well with the 30 day time limit to commence to run against Non-Operators
as of the date of said notification by Texaco.

If any Non-Operators elect to run such tests all cost of such test
shall be borne solely by such testing Non-Operators. If any Non-Operators elect
to take over said well, the entire cost and risk of all operations conducted
thereon and all production obtained therefrom shall be borne and owned in the
proportion that their respective interests as shown in paragraph 3 hereof bear
to the total interest of all such Non-Operators electing to take over said well.
If any of the parties hereto so elect to take over such well, such party or
parties shall within thirty days, reimburse the other parties for their propor-
tionate share of the cost of drilling said well to the depth at which the attempt
to complete said well as an oil well is to be made, and the cost of the equipment
acquired in connection with the drilling of said well to said depth and left in
the hole above the depth at which said well is so completed, and if there is
casing in the hole below the depth at which said well is so completed, the party

-6-

or parties taking over said well shall pay the other parties their proportionate
share of the value of the estimated recoverable value of the casing below such
completion depth.  All future costs of such well, including plugging and abandon-
ing, shall be borne by the party or parties taking over said well.  If any of the
Non-Operators elect to take over said well, Texaco shall assign to each such Non-
Operators who so elect, in the proportion that their respective interests as
shown in paragraph 3 hereof bear to the total interest of all such Non-Operators
so electing to take over its interest in the oil rights insofar as such rights
cover the formation from which said well is then producing oil under the acreage
assigned to the well by the well pattern established by any constituted authority.
If said well showing possibilities of production of oil should not be taken over
by any party hereto, it shall be abandoned and plugged at the cost and expense
of the parties hereto.  Operator shall not dually complete the said test well
for both gas and oil, without the consent, in writing, of Non-Operators.

      10.  <u>ROYALTY INTEREST</u>:  If any of the leasehold rights held by the par-
ties in the unitized area be subject to any overriding royalty, production pay-
ment or other charge in addition to the usual one-eighth (1/8th) royalty, the
party contributing any such lease, rights or interest shall bear, assume and
discharge any such overriding royalty, production payment or other charge out
of the interest attributable to it hereunder.  For purposes of this agreement,
any unleased mineral interest subject to the terms of this agreement shall be
treated as royalty for 1/8 and as working interest for 7/8.

      11.  <u>RENTALS</u>:  All rentals to defer the commencement of a well or wells
upon each lease, right or interest subject to this agreement shall, before the
rental paying date provided for therein, be paid in the manner and form required
by such lease, right or interest by the parties hereto contributing same.

      Operator shall pay rentals and shut-in gas well payments on the lease
where its well is located when due and shall give Non-Operators notice when the
well on the unitized area is shut-in, and upon receipt of notice from Operator
that said well is shut-in, each party hereto shall pay any shut-in gas well royalty
payment which must be paid to continue in force the leased acreage contributed by
it and each shall furnish the Operator with evidence of such payments.  The bur-
den of paying such rentals or shut-in well royalty shall fall entirely upon the
party required to make payment thereof, and the other parties shall not be

-7-

charged for any part thereof.  In the event of failure to make proper payment of
any delay rental or shut-in well royalty, through mistake or oversight, where such
rental or shut-in well royalty is required to continue the lease in force (it being
understood that any such failure shall not be regarded as a failure of title within
the meaning of any other section of this agreement), there shall be no money liabil-
ity on the part of the party failing to pay such rental or shut-in well royalty,
but such party shall make a bona fide effort to secure a new lease covering the
same interest and in the event of failure to do so within a reasonable time, the
interest of the parties hereto shall be revised and adjusted so that the party fail-
ing to pay any such rental or shut-in well royalty will not be credited with the
ownership, or receive any benefits hereunder by reason of any lease on which rental
or shut-in well royalty was required but was not paid.

     12. <u>EMPLOYEES</u>:  The number of employees, the selection of such employees,
the hours of labor and the compensation for services to be paid any and all such
employees shall be determined by Operator and such employees shall be the employees
of Operator.

     13. <u>DRILLING OPERATIONS</u>:  The well drilled on the unitized area shall be
drilled on a competitive contract basis at the usual rates prevailing in the field
in which said leases are located.  Operator, if it so desires, may employ its own
tools and equipment in the drilling of said well, but in such event the charge
therefor shall not exceed the prevailing rates in the field, and such work shall
be performed by Operator under the same terms and conditions as shall be customary
and usual in the field in contracts of independent contractors who are doing work
of a similar nature.

     14. <u>AUTHORITY FOR EXPENDITURES</u>:  Operator, before incurring any item
of expenditure in excess of $5,000.00, except expenditures for the drilling and
equipping of the test well hereinbefore provided for, shall secure the express
consent and approval, in writing, of Non-Operators. Operator shall furnish Non-
Operators copies of its authority for expenditures totalling $5,000.00 or more.

     Operator shall submit to Non-Operators an estimate of proposed expendi-
tures for approval by Non-Operators for the well to be drilled for the joint
account under the provisions of this agreement.

     15. <u>INSURANCE</u>:  Operator shall carry the following insurance at the
expense and for the benefit of the parties hereto to cover its operations under

-8-

the terms of this agreement, to-wit:

| TYPE OF INSURANCE | LIMITS |
|---|---|
| A. Workmen's Compensation | Statutory |

B. Employers' Liability

| Bodily injury | $100,000 per person |
|---|---|
| Bodily injury | $300,000 per accident |
| Occupational disease | $100,000 per person |
| Occupational disease | $300,000 aggregate |

C. Comprehensive General Public Liability

| Bodily injury | $100,000 per person |
|---|---|
| Bodily injury | $300,000 per occurrence |
| Property damage | $100,000 per accident |
| Property damage | $300,000 aggregate |

D. Comprehensive Automobile Public Liability

| Bodily injury | $100,000 per person |
|---|---|
| Bodily injury | $300,000 per occurrence |
| Property damage | $ 10,000 per accident |

Operator shall carry no insurance for the benefit of the joint account other than the types hereinbefore described, unless the parties agree otherwise. Uninsured losses shall be for the joint account.  Operator shall require all contractors to conduct all operations under this agreement in full compliance with the Workmen's Compensation Law of the jurisdiction in which the contract work is done and in full compliance with all rules and regulations promulgated under said Law.

16.  LIABILITY AND RELATIONSHIP OF PARTIES:  The liability of the parties hereunder shall be several and not joint or collective.  Each party shall be responsible for its obligations, as herein set out, and shall be liable for only its proportionate share of the cost of developing and operating said unitized area. It is expressly agreed that it is not the purpose or intention of this agreement to create, nor shall the same be construed as creating, any mining partnership, commercial partnership or other partnership relations, nor shall the operations of the parties hereunder be construed or considered as a joint venture.

Each of the parties hereby agree that this agreement shall not constitute a partnership as defined in the Internal Revenue Code, and specifically elects to be excluded from the application of all of Sub-chapter K of the Internal Revenue Code of 1954, pursuant to Section 761 thereof.

17.  OPERATOR'S LIEN:  Operator shall have a lien on the interest of each of the Non-Operators which is subjected to this agreement, the gas produced

-9-

therefrom, the proceeds thereof and the material and equipment thereon and therein, to secure Operator in the payment of any sum due to Operator hereunder from such Non-Operator.  Unless retained by Operator to satisfy any such lien, all income received by Operator from operations hereunder shall be distributed proportionate- ly to the parties when received. The lien herein provided for shall not extend to any royalty rights attributable to any interest subject hereto.

18.  DISPOSITION OF PRODUCTION:  Each of the parties hereto shall own its proportionate share of the gas produced under this agreement and each of the parties shall take in kind or separately dispose of its proportionate share of the gas produced from the unitized area exclusive of production which may be used in development and producing operations on said premises and that unavoidably lost; and shall pay or cause to be paid all applicable royalties thereon.  Each party hereto shall be entitled to receive direct payment for its proportionate share of the proceeds from any sale of all gas produced, saved and sold from said premises, and on all purchases or sales, each party shall execute proper division orders or contracts of sale pertaining to its interest.  Any extra expenditure incurred by the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.  In the event any Non- Operator shall fail to make the arrangements necessary to take in kind or separate- ly dispose of its proportionate share of the gas produced from said premises, Operator shall have the right, subject to revocation at will by such Non-Operator, to purchase such gas or sell the same to others for the time being at not less than the market price prevailing in the area and not less than the price which Operator receives for its own portion of such gas, any such purchase or sale to be subject always to the right of such Non-Operator to exercise, at any time, its right to take in kind or separately dispose of its share of such gas not previous- ly delivered to a purchaser pursuant hereto.

19.  RIGHTS OF PARTIES HERETO TO INSPECT THE PROPERTY AND RECORDS: The following specific rights, privileges and obligations of the parties hereto are hereby expressly provided, but not by way of limitation or exclusion of any other rights, privileges and obligations of the respective parties:

        (a)  Each shall have access to the entire unitized area at
             all reasonable times to inspect and observe operations
             of every kind and character upon the property.

-10-

(b) Each shall have access at all reasonable times to any
and all information pertaining to the well drilled, produc-
tion secured, gas marketed and to the books, records and
vouchers relating to the operation of the unitized area.

(c) Operator shall furnish Non-Operators hereto with daily
drilling reports, true and complete copies of well logs, tests
and charts, and all applications, permits and reports filed
with or issued by any Federal or State administrative body,
and shall also upon request make available samples and cuttings
from the well drilled on the unitized area.

20. TRANSFER OF INTEREST: This agreement shall not be construed as a
restriction upon the mortgage or other transfer of any interest subject hereto,
however this agreement shall extend to and bind the respective heirs, successors and
assigns of the parties hereto, and it is agreed that the terms, conditions and pro-
visions hereof shall constitute a covenant running with the lands and leasehold
estates covered hereby.  In the event of a sale by Operator of all interest owned
by it, all parties then subject hereto shall elect a new Operator.

21. SURRENDER OF LEASES: The leases, insofar as covered by this agreement,
shall not be surrendered in whole or in part unless the parties mutually consent
thereto.  Should any party at any time desire to surrender a lease or leases or
the part thereof subject hereto and the other parties should not agree or consent
to such surrender, the party desiring to so surrender shall, subject to any reassing-
ment rights reserved by said party's predecessors in title, assign without express
or implied warranty of title all of its gas leasehold interest to a depth of 50
feet below the depth from which the well drilled under the terms of this agreement
is producing, to the parties not desiring to surrender, and thereupon such assign-
ing party shall be relieved from all obligations thereafter (but not theretofore)
accruing hereunder with respect to such lease or leases so assigned.  From and after
the making of such assignment the assigning party shall have no further interest
in the lease or leases assigned insofar as said lease or leases cover the gas and
gas rights to a depth of 50 feet below the depth from which the well drilled under
the terms of this agreement is producing, but shall be entitled to be paid for its
interest in any material on said lease or leases so assigned at its reasonable sal-
vage value determined as provided in the attached Exhibit "C".  If at any time all
of the rights under all of the gas interests covered hereby are owned by one party,
then and in such event this agreement, except as to any accounting or settlement
hereunder not then satisfied and discharged, shall terminate and cease to have any
further force or effect.

-11-

22.  <u>ABANDONMENT</u>:  No well which is producing on said land and is being
operated under this agreement, or which has once produced, shall be abandoned with-
out the mutual consent of the parties owning the well.  If one party desires to
abandon an unproductive or non-commercial well and the other parties do not desire
to abandon same, the party desiring to abandon shall so advise the other parties
in writing, and the latter shall have ten (10) days from the receipt of said notice
in which to elect whether to agree to the abandonment of said well or to purchase
the interest in said well of the party desiring to abandon. (If more than one of
the parties hereto desires to purchase, then they shall decide among themselves
in what proportion such purchase shall be made).  If any party hereto owning an
interest in said well to be abandoned elects to purchase such interest for the
purpose of operating such well, it shall pay to the party desiring to abandon such
well in cash the value of the latter's interest in the salvable pipe and equipment
in and on said well.  In determining the amount of pipe that theoretically can
be salvaged, effect shall be given to the size of the hole, the size and amount
of pipe and the amount and location of cement, the value to be determined in ac-
cordance with the provisions of the attached Exhibit "C" designated as Accounting
Procedure.  Upon receipt of such sum the parties desiring to abandon such well shall
assign, without warranty of title, to the other parties all their interest in said
well.  Such assignment shall include all of such assigning parties' right, title
and interest in and to the gas leasehold estate covering the proration or produc-
tion unit on which said well is located insofar and only insofar as such assigning
parties leases cover, affect and pertain to the zone or pay from which said well
is producing, and shall terminate when such well ceases to produce and is abandoned.
Such abandoning parties as assignor shall not reserve any royalty or other payment
to themselves, but the buying party or parties as assignee shall accept such assign-
ment subject to and shall assume all of the duties, covenants, express or implied,
and obligations imposed upon lessee in such lease with respect to the acreage and
producing zone so assigned.

Upon execution and delivery of the assignment for which provision here-
inbefore is made, the assignors shall have no further interest in said well and
shall have no further liability with respect to the operation thereof. Such
Assignors shall no longer be subject to the terms of this agreement.

23. **TAXES:**  Operator shall render, for ad valorem tax purposes, the entire leasehold rights and interests covered by this agreement, and all physical property located thereon or used in connection therewith, or such part thereof as may be subject to taxation under future laws and shall pay, for the benefit of the joint account, all such ad valorem taxes at the time and in the manner required by law which may be assessed on or against all or any portion of such leasehold and interest and the physical properties located thereon or used in connection there- with.  Operator shall bill Non-Operators for their proportionate share of such tax payments as provided in the Accounting Procedure attached hereto as Exhibit "C".

Gross production, severance, receipts, income or other taxes shall be rendered and paid by each party individually and shall not be handled by the Opera- tor for the benefit of the joint account.

24. **REGULATIONS:**  All of the provisions of this agreement are hereby ex- pressly made subject to all applicable Federal or State laws, orders, rules and regulations, and in the event this agreement or any provisions hereof are found to be inconsistent with or contrary to any such law, order, rule or regulation, the latter shall be deemed to control and this agreement shall be regarded as mod- fied accordingly, and as so modified, shall continue in full force and effect.

Operator shall prepare and furnish to any duly constituted authority, through its proper agency or department, any and all reports, statements and in- formation as may be required to be furnished by Operator.

25. **TITLE:**  In the event of the loss or failure of title, in whole or in part, of either party hereto to any lease or fee ownership or any interest therein, covered hereby, the interest of such party in and to the production ob- tained from the unitized area shall be reduced in proportion to such loss or failure of title as of the date such loss or failure of title is finally deter- mined; provided that such revision of ownership interest shall not be retroactive as to operating costs and expenses incurred or as to revenues or production ob- tained prior to such date; and provided further that each party hereto whose title has been lost or has failed, as aforesaid, shall indemnify the other party hereto against and shall hold such other party harmless from all loss, cost, damage and expense which may result from or in any manner arise because of the delivery to such party of production obtained hereunder from the unitized area or the payment to such party of proceeds derived from the sale of any such production, prior to the

date said loss or failure of title is finally determined.

26.   DEFINITIONS OF "OIL" AND "GAS": The term "gas" whenever used in this agreement shall include gas, gas condensate, distillate, and such other liquid or gaseous hydrocarbons as may be produced from a gas well. The term "oil" whenever used in this agreement shall include oil, casinghead gas, and such other liquid or gaseous hydrocarbons as may be produced from an oil well.

27.   FORCE MAJEURE: All obligations of each party hereto, except for the payment of money, shall be suspended while said party is prevented from complying therewith, in whole or in part, by strikes, fire, war, civil disturbances, acts of God, federal, state or municipal laws, orders or regulations, inability to secure materials or other causes beyond the reasonable control of said party; provided, however, that performance shall be resumed within a reasonable time after such cause has been removed; and provided further that no party shall be required against its will to adjust or settle any labor dispute. This agreement or the leases or other interests subject hereto shall not be terminated by reason of suspension of unit operations due to the aforesaid causes.

28.   PARTIES REPRESENTED BY F. R. JACKSON:

(a)  Subject to the provisions of this paragraph 28, F.R. Jackson shall be, and is hereby designated to represent the following parties to this agreement:
A  G. Carter, Jr.; Claude Bateman, Jr.; A P. Noyes; Maxwell D. Simmons; Betty Davis and husband, C. H. Davis; Dorothy Kennedy and husband, George E. Kennedy, Jr.; John C. Robbins, Jr.; John Clinton Robbins; Henry Donaghey as Trustee for the John Clinton Robbins, Sr. Trust; Henry Donaghey as Trustee for the Elizabeth Joyce Robbins Trust No. 2; Henry Donaghey as Trustee for the John C. Robbins, II Trust No. 2; Robbins Petroleum Corp., a corporation; H.C. McGrede; Dr. Henry C. McGrede, Jr.; A. R. Graves; B. F. Ashcroft; Perry Thompson; Dr. W. T. Stewart; Mrs. Ruth Ashcroft; L.A. Demmer; Mrs. Maude C. Stewart; B. Reagan McLemore; L.E. Ostrom; Henry Donaghey as Trustee for the Dorothy Mae Robbins Trust No. 2.
(b)  Any notice required or permitted under the terms of this agreement, to be given by Operator to Non-Operators, shall be deemed given to the parties hereinbefore in this paragraph named when such notice is given to F. R. Jackson.

(c)  Where any notice, approval or designation of intent is required or permitted under the terms of this agreement, to be given by Non-Operator to Operator, notice, approval or designation of intent, given by F. R. Jackson to Operator,

-14-

shall be deemed by Operator as notice, approval or designa-
tion of intent by the parties hereinbefore  in this para-
graph named.  Failure by F. R. Jackson to give any such notice,
approval or designation of intent, shall be deemed to be
failure to give notice, approval or designation of intent by
all of the parties hereinbefore in this paragraph named.

(d)  Where any statement, billing, or request for reimburse-
ment is required or permitted under the terms of this agreement
to be given by Operator to Non-Operators, any such statement,
billing, or request for reimbursements as concerns any or all
of the parties hereinbefore in this paragraph named, shall be
addressed to F. R. Jackson and F. R. Jackson will pay or
reimburse Operator, as the case may be, in any and all
instances where any such statement, billing or request for
reimbursement as concerns any or all of the parties herein-
fore in this paragraph named, is addressed to F. R. Jackson.

(e)  Where any disbursement of production, money or materials
is required by the terms of this agreement to be made by
Operator to Non-Operators, Operator insofar as such
disbursement is to any or all of the parties hereinbefore in
this paragraph named, shall make such disbursement to F. R.
Jackson, and receipt thereof and acknowledgment of the
sufficiency thereof by F. R. Jackson, shall be deemed as
receipt and acknowledgment of sufficiency by the parties
hereinbefore in this paragraph named.

(f)  This paragraph is in no way to be construed to give
F. R. Jackson the right to dispose of any production
accruing to the parties hereinbefore in this paragraph
named except that accruing to F. R. Jackson, nor shall
this paragraph be construed to give F. R. Jackson the right
to dispose of any interest contributed by the parties here-
inbefore in this paragraph named to this agreement, except
as to any interest owned by F. R. Jackson.

-15-

(g)  The terms of this paragraph shall be binding upon the parties hereinbefore in this paragraph named, their heirs, assigns and successors.

29.  NOTICE:  All notices required or authorized to be given hereunder, except as otherwise specifically provided, shall be given in writing by United States mail or Western Union Telegraph, and addressed to the party to whom such notice is given as follows:

    Texaco Inc.
    Texaco Building
    1512 Commerce Street
    Dallas 1, Texas

    F. R. Jackson
    P.O. Box 147
    Longview, Texas

    Delta Drilling Company
    P. O. Box 2012
    Tyler, Texas

    Leonard W. Phillips
    P. O. Box 3068, QB Station
    Shreveport, Louisiana

    Albert Sklar
    P.O. Box 3068, QB Station
    Shreveport, Louisiana

    August Erickson
    P. O. Box 3068, QB Station
    Shreveport, Louisiana

    Morris B. White
    P. O. Box 3068, QB Station
    Shreveport, Louisiana

    Sam Y. Dorfman, Jr.
    836 Mercantile Dallas Building
    Dallas 1, Texas

    Louis Dorfman
    836 Mercantile Dallas Building
    Dallas 1, Texas

    S. L. Florsheim, Jr.
    836 Mercantile Dallas Building
    Dallas 1, Texas

    Myron H. Dorfman
    500 Sklar Building
    Shreveport, Louisiana

The original notice to be given under any provisions hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any response thereto shall run from the date the

-16-

originating notice is received.  The second or any subsequent responsive notice
shall be deemed given when deposited in the United States Post Office or with
Western Union Telegraph Company, with postage or charges prepaid.

    30. <u>COUNTERPART EXECUTION</u>:  This agreement may be executed in any
number of counterparts and each counterpart so executed shall have the same force
and effect as an original instrument and as if all of the parties to the aggregate
counterparts had signed the same instrument.

    IN WITNESS WHEREOF, the parties hereto have signed this agreement the
day and year first above written.

Approved as to:

Terms s/FMM
Form s/WPG
Acctg. s/JOP


ATTEST:

By    s/ N.L.Webster
      Asst.   Secretary

ATTEST:

By s/Betty Robbins Davis
        Secretary


TEXACO INC.

By  s/ E. M. Rowser
     Attorney in Fact

           OPERATOR

DELTA DRILLING COMPANY

By  s/ Chris Zeppa
      Vice  President

ROBBINS PETROLEUM CORP.

By  s/John Clinton Robbins
       President

    s/ F. R. Jackson
      F. R. Jackson

    s/ Maxwell D. Simmons
      Maxwell D. Simmons

    s/ Betty Davis
      Betty Davis

    s/ C. H. Davis
      C. H. Davis

    s/ Dorothy Kennedy
      Dorothy Kennedy

    s/ George E.Kennedy,Jr.
      George E. Kennedy,Jr.

    s/ John C. Robbins,Jr.
      John C. Robbins,Jr.

    s/ John Clinton Robbins
      John Clinton Robbins

-17-

s/ Henry Donaghey

Henry Donaghey as Trustee for

    (1) John Clinton Robbins, Sr., Trust
    (2) Elizabeth Joyce Robbins, Trust No. 2
    (3) Dorothy Mae Robbins, Trust No. 2
    (4) John C. Robbins, II, Trust No. 2

s/ H. C. McCrede
_____
H. C. McGrede

s/ Henry C. McGrede, Jr.
_____
Dr. Henry C. McGrede, Jr.

s/ A. R. Graves
_____
A. R. Graves

s/ B. F. Ashcroft
_____
B. F. Ashcroft

s/ Perry Thompson
_____
Perry Thompson

s/ Dr. W. T. Stewart
_____
Dr. W. T. Stewart

s/ Mrs. Ruth Ashcroft
_____
Mrs. Ruth Ashcroft

s/ L. A. Demmer
_____
L. A. Demmer

s/ Mrs. Maude C. Stewart
_____
Mrs. Maude C. Stewart

s/ B. Reagan McLemore
_____
B. Reagan McLemore

s/ L. E. Ostrom
_____
L. E. Ostrom

s/ Leonard W. Phillips
_____
Leonard W. Phillips

s/ Albert Sklar
_____
Albert Sklar

s/ August Erickson
_____
August Erickson

s/ Morris B. White
_____
Morris B. White

s/ Sam Y. Dorfman, Jr.
_____
Sam Y. Dorfman, Jr.


s/ Louis Dorfman
_____
Louis Dorfman


s/ S. L. Florsheim, Jr.
_____
S. L. Florsheim, Jr.


s/ Myron H. Dorfman
_____
Myron H. Dorfman


s/ A. G. Carter, Jr.
_____
A. G. Carter, Jr.


s/ Claude Bateman, Jr.
_____
Claude Bateman, Jr.

s/ A. P. Noyes
_____
A. P. Noyes

NON-OPERATORS

WCS-AQ

-19-

EXHIBIT "A" attached to and made
a part of that certain Operating Agreement
dated May_____, 1959, executed by TEXACO
Inc., Delta Drilling Company, F. R. Jackson et al

(1) Dated June 8, 1954, executed by Mrs. Annie Mae Mercer, a widow;
Doris Mercer Nyvall and husband, Vernon Nyvall; Talmadge Mercer and
wife, LaVerne Mercer; Jakey Mae Mercer Still and husband, Jimmy Still;
Mrs. Jessie Mercer Wood and husband, Joe Wood; Mary Bess Mercer, a
feme sole, and Garland Mercer, as Lessor, unto H. A Bornefeld, Jr.,
as Lessee, recorded in Volume 529 at page 202 of the Deed Records of
Rusk County, Texas.

(2) Dated June 14, 1954, executed by Mrs. Birdie Mercer Meadows, a
widow, as Lessor, unto H. A. Bornefeld, Jr., as Lessee, recorded
in Volume 529 at page 199 of the Deed Records of Rusk County, Texas.

(3) Dated June 25, 1958, executed by C. E. Mercer and wife, Hazel Mercer;
Hamilton Mercer and wife, Elizabeth Mercer; and Eric Mercer and wife,
Esma Mercer, as Lessor, unto Maxwell D. Simmons, as Lessee, recorded
in Volume 659 at page 437 of the Deed Records of Rusk County, Texas.

(4) Dated June 30, 1958, executed by Bert Brightwell and wife, Ruth
Brightwell, as Lessor, unto L. E. Ostrom, as Lessee, recorded in
Volume 635 at page 580 of the Deed Records of Rusk County, Texas.

(5) Dated September 10, 1958, executed by John J. O'Kane, Jr., Co., a
co-partnership acting by and through Robert N. Kullman, managing
Partner, as Lessor, unto Gerson M. Haesly, as Lessee, recorded in
Volume 646 at page 463 of the Deed Records of Rusk County, Texas.

(6) Dated September 10, 1958, executed by James J. Jacoby, as Lessor,
unto GersonM. Haesly, as Lessee, recorded in Volume 646 at page 461
of the Deed Records of Rusk County, Texas.

(7) Dated September 10, 1958, executed by John J. Reynolds, as Lessor
unto F. R. Jackson, as Lessee, recorded in Volume 646 at page 463
of the Deed Records of Rusk County, Texas.

(8) Dated October 8, 1958, executed by Lasca, Inc., as Lessor, unto
F. R. Jackson, as Lessee, recorded in Volume 660 at page 74-6 of
the Deed Records of Rusk County, Texas, as amended by that certain
amendment dated_____, 1959, recorded in
Volume_____at page_____of the Deed Records of Rusk County, Texas

(9) Dated July 25, 1958, executed by Leon M. Wright et ux, Mary Lou Wright,
as Lessor, unto Lamar Neill as Lessee, recorded in Volume 651 at
page 205 of the Deed Records of Rusk County, Texas.

(10) Dated June 5, 1954, executed by H. G. Crews, as Lessor, unto
H. A Bornefeld, Jr., as Lessee, recorded in Volume 529 at page 206
of the Deed Records of Rusk County, Texas.

(11) Dated November 9, 1956, executed by James J. Jacoby, as Lessor, unto
H. A. Bornefeld, Jr., as Lessee, recorded in Volume 588 at page 558
of the Deed Records of Rusk County, Texas.

(12) Dated November 9, 1956, executed by John J. O'Kane, Jr., and Co.,
a co-partnership, as Lessor, unto H. A. Bornefeld, Jr., as Lessee,
recorded in Volume 588 at page 556 in the Deed Records of Rusk County,
Texas.

(13) Dated July 28, 1954, executed by T. A. Hamra and Albert Hamra, as Lessor unto H. A. Bornefeld, Jr., as Lessee, recorded in Volume 533 at page 480 of the Deed Records of Rusk County, Texas

(14) Dated August 18, 1958, executed by Mrs. Mollie Beren and I. B. Beren, and Mrs. Mollie Beren, Irvin B. Beren, David O. Beren and Jacob Feldman, Independent Executors of Estate of Jacob Beren, deceased; and P. A. Wiley, as Lessor unto Gerson M. Haesly, as Lessee, recorded in Volume 646, page 461, of the Deed Records of Rusk County, Texas.

(15) Dated September 10, 1958, executed by John J. Reynolds, as Lessor, unto F. R. Jackson, as Lessee, recorded in Volume 646 at page 463 of the Deed Records of Rusk County, Texas.

(16) Dated July 25, 1958, executed by Lasca, Inc., as Lessor, unto F. R. Jackson, as Lessee, recorded in Volume 660 at page 77, of the Deed Records of Rusk County, Texas, as amended by that certain amendment dated_____, 1959; recorded in Volume_____page_____, of the Deed Records of Rusk County, Texas.

(17) Dated July 1, 1958, executed by John G. Martin and wife, Willie Bell Martin, as Lessor, unto L. E. Ostrom, as Lessee, recorded in Volume 636 at page 251, of the Deed Records of Rusk County, Texas.

(18) Dated February 25, 1959, executed by Eula Mae Bass, a feme sole, as Lessor, unto Maxwell D. Simmons, as Lessee, recorded in Volume 660 at page 269 of the Deed Records of Rusk County, Texas.

(19) Dated February 25, 1959, executed by Robert L. Bass and wife, Bonnie Bass, as Lessor, unto Maxwell D. Simmons, as Lessee, recorded in Volume 660 at page 273 of the Deed Records of Rusk County, Texas.

(20) Dated June 22, 1954, executed by L. L. Skeeters and wife, Ellein Skeeters, as Lessor, unto Mark Haesly, as Lessee, recorded in Volume 532, at page 381, of the Deed Records of Rusk County, Texas.

(21) Dated September 10, 1958, executed by James J. Jacoby, as Lessor, unto Gerson M. Haesly, as Lessee, recorded in Volume 646 at page 461, of the Deed Records of Rusk County, Texas.

(22) Dated January 10, 1958, executed by I. H. Fambrough, a single man, as Lessor, unto Lamar Neil, as Lessee, recorded in Volume 625, at page 549, of the Deed Records of Rusk County, Texas.

(23) Dated January 9, 1958, executed by Mrs. Lena Lee, a widow, as Lessor, unto Lamar Neil, as Lessee, recorded in Volume 625, at page 547, of the Deed Records of Rusk County, Texas.

(24) Dated January 7, 1958, executed by T. O. Scales and wife, Elizabeth Scales, as Lessor unto Lamar Neil, as Lessee, recorded in Volume 625, at page 551, of the Deed Records of Rusk County, Texas.

(25) Dated January 9, 1958, executed by V. B. Fambrough, as Lessor, unto Lamar Neil, as Lessee, recorded in Volume 625, at page 545, of the Deed Records of Rusk County, Texas.

(26) Dated April 30, 1959, executed by Aubrey Arnold et ux, Irene Arnold;
Ruth Arnold McCary et vir, Alvin McCary; Kathleen Arnold Rasco et vir,
Edwin Rasco; Evelyn Arnold Ray et vir, Lawrence E. Ray; and A. D.
Arnold, Jr., et ux, Donna, as Lessor, unto F. R. Jackson, as Lessee,
recorded in Volume_____, at page_____, of the Deed Records of
Rusk County, Texas.

(27) Dated April 27, 1959, executed by A. C. Fambrough, as Lessor, unto
F. R. Jackson, as Lessee, recorded in Volume 665, at page 571, of
the Deed Records of Rusk County, Texas.

(28) Dated April 29, 1959, executed by R. I. Fambrough, as Lessor, unto
F. R. Jackson as Lessee, recorded in Volume 665, at page 573, of the
Deed Records of Rusk County, Texas.

(29) Dated April 28, 1959, executed by D. C. Fambrough, as Lessor, unto
F. R. Jackson, as Lessee, recorded in Volume 665 at page 569 of the
Deed Records of Rusk County, Texas.

(30) Dated April 28, 1959, executed by Katie Mable Fambrough, a feme sole;
Emma Agnes Fambrough, a feme sole; and Carl N. Fambrough, as Lessor,
unto F. R. Jackson as Lessee, recorded in Volume 665, at page 567,
of the Deed Records of Rusk County, Texas.

(31) Dated April 29, 1959, executed by Mary Ethel Fambrough McGowen, a
feme sole, as Lessor, unto R. R. Jackson, as Lessee, recorded in
Volume 665, at page 575, of the Deed Records of Rusk County, Texas.

(32) Dated April 30, 1959, executed by Lillian Fambrough Stapp et vir,
E. A. Stapp, as Lessor, unto F. R. Jackson, as Lessee, recorded in
Volume 665 at page 577 of the Deed Records County, Texas.

(33) Dated April 25, 1959, executed by Belle Phillips Wyle, a widow,
as Lessor, unto F. R. Jackson, as Lessee, recorded in Volume 665,
at page 579, of the Deed Records of Rusk County, Texas.

(34) Dated April 25, 1959, executed by Jewel Phillips Hall, a widow, as
Lessor, unto F. R. Jackson, as Lessee, recorded in Volume 665 at page
581 of the Deed Records of Rusk County, Texas.

(35) Dated April 28, 1959, executed by Mrs. Berthal Sheppard; Flora Shipp;
Mina Phillips Harlan et vir, W. H. Harlan; James O. Mohon; and
Mrs. Mattye Lou Kyzer Williamson, as Lessor, unto F. R. Jackson,
as Lessee, recorded in Volume 665, at page 565, of the Deed Records of
Rusk County, Texas.

(36) Dated May 13, 1959, executed by E. E. Adams; Joe Frank Adams; Frances
Boatright et vir, Peter L. Boatright; Rexie Paine Adams, a feme sole;
and Opal Nelson et vir, E. Todd Nelson, as Lessor, unto F. R. Jackson,
as Lessee, recorded in Volume_____, at page_____, of the
Deed Records of Rusk County, Texas.

(37) Dated January 14, 1958, executed by J. E. Adams, a widower, as Lessor,
unto Lamar Neill, as Lessee, recorded in Volume 625, at page 553, of
the Deed Records of Rusk County, Texas.

(38) Dated January 15, 1958, executed by James Adams; Jerry Adams; Claude
Adams; Almeda Adams Diggs et vir, Joe Diggs; being all of the heirs
at law of Sam Adams, Jr., deceased, as Lessor, unto Lamar Neill, as
Lessee, recorded in Volume 626, at page 180, of the Deed Records of
Rusk County, Texas.

(39) Dated January 14, 1958, executed by Bonnie Bass et vir, Robert Bass;
Mary Taylor et vir; J. M. Taylor; Louise Morris et vir, M. J. Morris;
Ida Jewel Cole et vir, Roy Cole; Noma Horton et vir, Elgin Horton;
Van Fambrough; Jane Smith et vir, Paul T. Smith; Dorothy Chappell
et vir, Earl Chappell; S. P. Fambrough; Delroy Fambrough; and Audna
Fambrough, as Lessor, unto Lamar Neill, as Lessee, recorded in
Volume 626, at page 188 of the Deed Records of Rusk County, Texas.

(40) Dated January 9, 1958, executed by V. B. Fambrough, a widower,
unto Lamar Neill, as Lessee, recorded in Volume 625 at page 545
of the Deed Records of Rusk County, Texas.

(41) Dated January 27, 1958, executed by J. E. Sheffield, as Lessor,
unto A. G. Carter, Jr., as Lessee, recorded in Volume 623 at page
369 of the Deed Records of Rusk County, Texas.

(42) Dated January 27, 1958, executed by W. D. Northcutt, as Lessor,
unto A. G. Carter, Jr., as Lessee, recorded in Volume 623, Page 373
of the Deed Records of Rusk County, Texas.

(43) Dated February 6, 1951, executed by C. W. Lee and wife, Mamie Lee;
C. B. Lee and wife, Dirlie Lee; Kennie Reynolds and husband, T. J.
Reynolds; Glen Lee and wife, Melba Lee; Thelma Lee Roark Orton and
husband, Tom Orton; and F. C. Roark, as Lessor, unto The Texas
Company, a Delaware Corporation, as Lessee, recorded in Volume 462,
at page 264, of the Deed Records of Rusk County, Texas.

(44) Dated February 16, 1951, executed by Old South Royalty Company, Inc.,
a Texas Corporation, as Lessor, unto The Texas Company, a Delaware
Corporation, as Lessee recorded in Volume 463, at page 224, of the
Deed Records of Rusk County, Texas.

(45) Dated February 13, 1951, executed by Rayford Johnson and wife,
Ella Mae Johnson, as Lessor, unto The Texas Company, a Delaware
Corporation, as Lessee recorded in Volume 463, at page 592, of the
Deed Records of Rusk County, Texas.

(46) Dated February 13, 1951, executed by F. C. Johnson and wife,
Lillian Johnson, as Lessor, unto The Texas Company, a Delaware
Corporation, as Lessee, recorded in Volume 462, at page 540, of the
Deed Records of Rusk County, Texas.

(47) Dated February 18, 1951, executed by C. A. Lee and wife, Gertrude
Lee, as Lessor; unto The Texas Company, a Delaware Corporation as
Lessee, recorded in Volume 462 at page 414, of the Deed Records of
Rusk County, Texas.

(48) Dated January 16, 1958, executed by Byron G. Lowrey et ux, Alta Lee
Lowrey, as Lessor, unto M. E. Zoller, as Lessee, recorded in Volume
621, at page 496 of the Deed Records of Rusk County, Texas.

-4-

(49) Dated June 29, 1957, executed by Myrtle Bonds et vir, C. O. Bonds, as Lessor, Unto M. E. Zoller, as Lessee, recorded in Volume 606, at page 608, of the Deed Records of Rusk County, Texas, amended by that certain correction of Description Instrument dated March 20, 1959, executed by Myrtle Bonds et vir, C. O. Bonds, and The Texas Company, a Delaware corporation, recorded in Volume 663, at page 187, of the Deed Records of Rusk County, Texas.

(50) Dated January 15, 1958, executed by T. J. Watt et al, as Lessor, unto Lamar Neill, as Lessee, recorded in Volume 626, at page 183, of the Deed Records of Rusk County, Texas.

(51) Dated January 18, 1958, executed by J. P. Montgomery, Sr., et al, as Lessor, unto Lamar Neill, as Lessee, recorded in Volume 626, at page 194, of the Deed Records of Rusk County, Texas.

(52) Dated April 29, 1959, executed by T. P. Cannon, as Lessor, unto F. R. Jackson, as Lessee, recorded in Vol. 667, Page 192, of the Deed Records of Rusk County, Texas.

(53) Dated May 21, 1959, executed by C. W. Burgess, as Lessor, unto F. R. Jackson, as Lessee, recorded under file No. 3277 in Vol. ____, Page _____, of the Deed Records of Rusk County, Texas.

(54) Dated May 20, 1959, executed by O. P. Adams, as Lessor, unto F. R. Jackson, as Lessee, recorded under file No. 3276 in Vol. _____, Page _____, of the Deed Records of Rusk County, Texas.

(55) Dated May 20, 1959, executed by James R. Matlock, as Lessor, unto F. R. Jackson, as Lessee, recorded under file No. 3301 in Vol. _____, Page _____, of the Deed Records of Rusk County, Texas.

(56) Dated May 9, 1959, executed by Sybyle Burkhart and husband, as Lessor, unto F. R. Jackson, as Lessee, recorded under file No. 3344, in Vol. ____, Page____, of the Deed Records of Rusk County, Texas.

(57) Dated May 6, 1959, executed by W. Oren Wyatt, as Lessor, Unto Claude Bateman, Jr., as Lessee, recorded in Vol. 666, Page 325, of the Deed Records of Rusk County, Texas.

(58) Dated May 9, 1959, executed by W. Y. Dabney, Jr., as Lessor, unto Claude Bateman, Jr., as Lessee, recorded in Vol. 667, Page 320, of the Deed Records of Rusk County, Texas.

EXHIBIT __ to that certain Operating Agr___ent, dated
May , 19__ entered into by and between ___CO INC.,
Operator, and F. R. JACKSON ET AL, DELTA DRILLING CO.,
and ALBERT SKLAR ET AL as Non-operators.



I, Perry Thompson, Registered
Public Surveyor No. 71, do hereby
certify that this plat is true and
correct April 21, 1959.

Perry Thompson

REG. PUB. SURVEYOR NO. 71,
BOX 1445, TEL. PL - 8 8079,
LONGVIEW, TEXAS.

TEXACO INC. ET. AL.
C.W. LEE NO 1
HENRY WELLS AND
LEVY LANDERS SURVEYS
RUSK COUNTY, TEXAS
638.00 AC. GAS UNIT

EXHIBIT "B"
METES AND BOUNDS DESCRIPTION OF TRACT
AS OUTLINED ON THE PLAT TO WHICH THIS
DESCRIPTION IS ATTACHED.

Being all that certain 638.0 acre unit of land, situated in Rusk County, Texas, about 14.5 miles North 8° West from Henderson, out of the Henry Wells, A-953, the M. A. Young, A-883, and the Levy Landers, A-477, Surveys, and more particularly described as follows:

Beginning at a 1" iron pipe in concrete, set at the occupational Southwest corner of the M. A. Young Survey, A-883, and an ell corner of the Levy Landers Survey, A-477, same being the occupational Southwest fence corner of the 40.24 acre tract of land of Leon Wright et al, from which a 12" Pine bears North 51° East 3.5 varas, a 12" Hickory bears North 77° West 13.6 varas;

THENCE, with the occupational line between the M. A. Young and Levy Landers Surveys,
        North 7° 14' East 247.18 varas the occupational West corner between the lands of Leon Wright et al and Mrs. Bryan Mercer,
        North 19° 27' East 163.44 varas,
        North 8° 57' East 289.01 varas to the South Southwest corner of the F. R. Jackson and Maxwell D. Simmons, Lone Star Producing Company No. 1 Gas Unit of 576.98 acres;

THENCE South 80° 38' East, with a South line of said Lone Star Producing Company Gas Unit, across the land of Mrs. Bryan Mercer, 870.21 varas to the occupational line between the lands of Mrs. Bryan Mercer and H. G. Crews et al in the old Fredonia Road;

THENCE, with an East line of said Lone Star Producing Company Gas Unit, same being the occupational line between the land of Mrs. Bryan Mercer on the West and the land of H. G. Crews et al and T. R. Drennan et al on the East, and with the old Fredonia Road,
        North 15° 21' East 5.81 varas,
        North 21° 02' East 89.25 varas,
        North 22° 26' East 180.63 varas,
        North 26° 28' East 158.25 varas,
        North 22° 23' East 97.99 varas,
        North 17° 46' East 123.68 varas to the occupational line between the M. A. Young, A-883, and the Henry Wells, A-953, Surveys;

THENCE South 80° 40' East, with said occupational line between the Young and Wells Surveys, same being a South line of the said Lone Star Producing Company Gas Unit, 334.11 varas to the occupational Northeast corner of the M. A. Young Survey and an ell corner of the Henry Wells, Survey, same also being the East corner between the lands of E. M. Bass and Mrs. Bryan Mercer on the occupational West line of the land of C. W. Lee et al;

THENCE, with the occupational line between the lands of Mrs. Bryan Mercer et al and C. W. Lee et al, same being an East line of the Lone Star Producing Company Gas Unit,
        North 8° 22' East 240.65 varas, the occupational Southwest corner of Tract 6, on the occupational East line of Tract 1 of the H. T. Dickson division of 960 acres of land in the Henry Wells Survey,
        North 10° 58' East, 75.13 varas to West corner between the lands of C. W. Lee et al and the Lone Star Producing Company;

THENCE, with the occupational line between the lands of C. W. Lee et al and the Lone Star Producing Company, same being a line of the Lone Star Producing Company Gas Unit,
        South 81° 32' East 150.26 varas,
        South 10° 58' West 75.13 varas,
        South 81° 32' East 752.02 varas to a 1/2" iron pipe for the occupational South corner between Tracts 6 and 7 of the said Dickson division, same being the occupational South corner between the lands of the Lone Star Producing Company and Reed Daniels, and a Southeast corner of the Lone Star Producing Company Gas Unit,

from said iron pipe a 24" Post Oak bears North 8-3/4° East 7.7 varas;

THENCE South 80° 13' East, with occupational line between the lands of C. W. Lee et al and Reed Daniels, 237.93 varas to an iron bar for the occupational North corner between the lands of C. W. Lee et al and C. B. Lee, from which a 18" Pine bears South 71-1/2° West 4.6 varas;

THENCE, with the occupational line between the lands of C. W. Lee et al and C. B. Lee,       South 5° 19' West, 60.65 varas a 3/4" iron pipe, from which a 5" Elm bears South 50-3/4° West 2.3 varas,
           South 9° 25' West 239.38 varas,
           South 10° 55' West 35.99 varas;

THENCE, across the land of C. W. Lee et al,
           West 289.08 varas,
           South 10° West 238.47 varas to the occupational line between the lands of C. W. Lee et al and R. Johnson;

THENCE South 10° West, across the land of R. Johnson, 198.45 varas to the line between the lands of R. Johnson and F. C. Johnson;

THENCE South 10° West, across the land of F. C. Johnson, 151.95 varas to the occupational line between the lands of F. C. Johnson and C. A. Lee;

THENCE South 10° West, across the land of C. A. Lee, 286.24 varas to the occupational line between the lands of C. A. Lee and Myrtle Bonds;

THENCE South 82° 49' East, with the occupational line between the lands of C. A. Lee and Myrtle Bonds, 136.56 varas to their East corner on the West line of the C. A. Lee 28.65 acre tract of land;

THENCE South 9° 54' West, with the line between the C. A. Lee 28.65 acre tract of land and the land of Myrtle Bonds, 254.30 varas to the West corner between the lands of C. A. Lee and M. Meadows on the South bank of a branch, from which a 16" White Oak bears South 77° East 4.0 varas;

THENCE South 9° 50' West, with the line between the lands of Myrtle Bonds and M. Meadows, 359.11 varas to the occupational Southeast fence corner of Myrtle Bonds;

THENCE North 84° 20' West, with the occupational line between the lands of Myrtle Bonds and John Robert Florence, 974.36 varas to their occupational West corner on the occupational East line of the lands of V. B. Fambrough;

THENCE South 8° 49' West with the occupational line between the lands of V. B. Fambrough and John Robert Florence, 342.34 varas;

THENCE North 62° 11' West, across the land of V. B. Fambrough, 1218.24 varas to the occupational line between the lands of V. B. Fambrough and T. O. Scales;

THENCE across the lands of T. O. Scales,
           North 29° 05' West 311.13 varas,
           North 10° East 51.38 varas to the place of beginning and containing 638.0 acres of land, more or less.

601  ROSS-MARTIN CO.
TULSA 1, OKLAHOMA

EXHIBIT  " C "

*PASO-T-1955-2*

Attached to and made a part of that certain Operating Agreement
dated 1959, covering 638 acres of land out of the
Harry Wells A-953, the M. A. Young A-883 and the L. Lendey A-477
Survey located in Rusk County, Texas, entered into by and between Texaco Inc.,
Delta Drilling Company and

# ACCOUNTING PROCEDURE

## (UNIT AND JOINT LEASE OPERATIONS)

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint property" as herein used shall be construed to mean the subject area covered by the agreement to which this "Accounting Procedure" is attached.

"Operator" as herein used shall be construed to mean the party designated to conduct the development and operation of the subject area for the joint account of the parties hereto.

"Non-Operator" as herein used shall be construed to mean any one or more of the non-operating parties.

### 2. Statements and Billings

Operator shall bill Non-Operator on or before the last day of each month for its proportionate share of costs and expenditures during the preceding month. Such bills will be accompanied by statements, reflecting the total costs and charges as set forth under Subparagraph C below:

A. Statement in detail of all charges and credits to the joint account.

B. Statement of all charges and credits to the joint account, summarized by appropriate classifications indicative of the nature thereof.

C. Statements as follows:

(1) Detailed statement of material ordinarily considered controllable by operators of oil and gas properties;

(2) Statement of ordinary charges and credits to the joint account summarized by appropriate classifications indicative of the nature thereof; and

(3) Detailed statement of any other charges and credits.

### 3. Payments by Non-Operator

Each party shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of Non-Operator to protest or question the correctness thereof. Subject to the exception noted in Paragraph 5 of this section I, all statements rendered to Non-Operator by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period Non-Operator takes written exception thereto and makes claim on Operator for adjustment. Failure on the part of Non-Operator to make claim on Operator for adjustment within such period shall establish the correctness thereof and preclude the filing of exceptions thereto or making of claims for adjustment thereon. The provisions of this paragraph shall not prevent adjustments resulting from physical inventory of property as provided for in Section VI, Inventories, hereof.

### 5. Audits

A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, that Non-Operator must take written exception to and make claim upon the Operator for all discrepancies disclosed by said audit within said twenty-four (24) month period. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator.

## II. DEVELOPMENT AND OPERATING CHARGES

*Subject to limitations hereinafter prescribed, Operator shall charge the joint account with the following items:*

### 1. Rentals and Royalties

Delay or other rentals, when such rentals are paid by Operator for the joint account; royalties, when not paid directly to royalty owners by the purchaser of the oil, gas, casinghead gas, or other products.

### 2. Labor

A. Salaries and wages of Operator's employees directly engaged on the joint property in the development, maintenance, and operation thereof, including salaries or wages paid to geologists and other employees who are temporarily assigned to and directly employed on the joint property.

B. Operator's cost of holiday, vacation, sickness and disability benefits, and other customary allowances applicable to the salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. Costs under this Subparagraph 2 B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable under Subparagraph 2 A and Paragraph 11 of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Costs of expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's labor cost of salaries and wages as provided under Subparagraphs 2 A, 2 B, and Paragraph 11 of this Section II.

### 3. Employee Benefits

Operator's current cost of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost, provided that the total of such charges shall not exceed ten per cent (10%) of Operator's labor costs as provided in Subparagraphs A and B of Paragraph 2 of this Section II and in Paragraph 11 of this Section II.

### 4. Material

Material, equipment, and supplies purchased or furnished by Operator for use of the joint property. So far as it is reasonably practical and consistent with efficient and economical operation, only such material shall be purchased for or transferred to the joint property as may be required for immediate use; and the accumulation of surplus stocks shall be avoided.

### 5. Transportation

Transportation of employees, equipment, material, and supplies necessary for the development, maintenance, and operation of the joint property subject to the following limitations:

A. If material is moved to the joint property from vendor's or from the Operator's warehouse or other properties, no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point where such material is available, except by special agreement with Non-Operator.

—1—

B. If surplus material is moved to Operator's warehouse or other storage point, no charge shall be made to the joint account for a distance greater than the distance from the nearest reliable supply store or railway receiving point, except by special agreement with Non-Operator. No charge shall be made to the joint account for moving material to other properties belonging to Operator, except by special agreement with Non-Operator.

6. **Service**

A. Outside Services:
The cost of contract services and utilities procured from outside sources.

B. Use of Operator's Equipment and Facilities:
Use of and service by Operator's exclusively owned equipment and facilities as provided in Paragraph 5 of Section III entitled "Operator's Exclusively Owned Facilities."

7. **Damages and Losses to Joint Property and Equipment**

All costs or expenses necessary to replace or repair damages or losses incurred by fire, flood, storm, theft, accident, or any other cause not controllable by Operator through the exercise of reasonable diligence. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after report of the same has been received by Operator.

8. **Litigation Expense**

All costs and expenses of litigation, or legal services otherwise necessary or expedient for the protection of the joint interests, including attorneys' fees and expenses as hereinafter provided, together with all judgments obtained against the parties or any of them on account of the joint operations under this agreement, and actual expenses incurred by any party or parties hereto in securing evidence for the purpose of defending against any action or claim prosecuted or urged against the joint account or the subject matter of this agreement.

A. If a majority of the interests hereunder shall so agree, actions or claims affecting the joint interests hereunder may be handled by the legal staff of one or more of the parties hereto; and a charge commensurate with cost of providing and furnishing such services rendered may be made against the joint account; but no such charge shall be made until approved by the legal departments of or attorneys for the respective parties hereto.

B. Fees and expenses of outside attorneys shall not be charged to the joint account unless authorized by the majority of the interests hereunder.

9. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the properties which are the subject of this agreement, the production therefrom or the operation thereof, and which taxes have been paid by the Operator for the benefit of the parties hereto.

10. **Insurance and Claims**

A. Premiums paid for insurance required to be carried for the benefit of the joint account, together with all expenditures incurred and paid in

B. If the parties hereto or any of them shall insure their respective risks beyond the specific limits of insurance required to be carried by the Operator under the terms of the Agreement, the benefits of such insurance shall inure to the parties procuring and maintaining the same, respectively, and the cost of such insurance shall be borne by such parties, respectively, without reimbursement one from the other and without entering into the accounting hereunder.

necessary subofficies (if any), maintained for the convenience of the above-described office, and all necessary camps, including housing facilities for employees if required, used in the conduct of the operations on the joint property and other properties operated in the same locality. The expense of, less any revenue from, these facilities should be inclusive of depreciation or a fair monthly rental in lieu of depreciation on the investment. Such charges shall be apportioned to all properties served on the equitable basis consistent with Operator's accounting practice a well basis in the ratio of drilling to producing wells, with one drilling well being equivalent to four producing wells.

12. **Administrative Overhead**

Operator shall have the right to assess against the joint property covered hereby the following management and administrative overhead charges, which shall be in lieu of all expenses of all offices of the Operator not covered by Section II, Paragraph 11, above, including salaries and expenses of personnel assigned to such offices, except that salaries of geologists and other employees of Operator who are temporarily assigned to and directly serving on the joint property will be charged as provided in Section II, Paragraph 2, above. Salaries and expenses of other technical employees assigned to such offices will be considered as covered by overhead charges in this paragraph unless charges for such salaries and expenses are agreed upon between Operator and Non-Operator as a direct charge to the joint property.

### WELL BASIS (Rate Per Well Per Month)

| Well Depth | DRILLING WELL RATE<br>Each Well | PRODUCING WELL RATE<br>(Use Completion Depth) | | All Wells |
|---|---|---|---|---|
| | | on Unit | on Unit | on Unit |
| | | First Five — Next Five — Over Ten — | | |
| all | $450 | $50 | | |
| | | | | |
| | | | | |
| | | | | drilling operations are completed or the well |

A. Overhead charges for drilling wells shall begin on the date each well is spudded and terminate when is abandoned or plugged, as the case may be, except that no charge shall be made during the suspension of drilling operations for fifteen (15) or more consecutive days.

B. In connection with overhead charges, the status of wells shall be as follows:

(1) Injection wells for recovery operations, such as for repressure or water flood, shall be included in the overhead schedule the same as producing oil wells.

(2) Water supply wells utilized for water flooding operations shall be included in the overhead schedule the same as producing oil wells.

(3) Producing gas wells shall be included in the overhead schedule the same as producing oil wells.

— 2 —

(4) Wells permanently shut down but on which plugging operations are deferred shall be dropped from the overhead schedule at the time the shutdown is effected. When such wells are plugged, overhead shall be charged at the producing well rate during the time required for the plugging operation.

(5) Wells being plugged back, drilled deeper, or converted to a source or input well shall be included in the overhead schedule the same as drilling wells.

(6) Temporarily shut-down wells (other than by governmental regulatory body) which are not produced or worked upon for a period of a full calendar month shall not be included in the overhead schedule; however, wells shut in by governmental regulatory body shall be included in the overhead schedule only in the event the allowable production is transferred to other wells on the same property. In the event of a unit allowable, all wells capable of producing will be counted in determining the overhead charge.

(7) Wells completed in dual or multiple horizons shall be considered as two wells in the producing overhead schedule.

(8) Lease salt water disposal wells shall not be included in the overhead schedule unless such wells are used in a secondary recovery program on the joint property.

C. The above overhead schedule for producing wells shall be applied to the total number of wells operated under the Operating Agreement to which this accounting procedure is attached, irrespective of individual leases.

D. It is specifically understood that the above overhead rates apply only to drilling and producing operations and are not intended to cover the construction or operation of additional facilities such as, but not limited to, gasoline plants, compressor plants, repressuring projects, salt water disposal facilities, and similar installations. If at any time any or all of these become necessary to the operation, a separate agreement will be reached relative to an overhead charge and allocation of district expense.

E. The above specific overhead rates may be amended from time to time by agreement between Operator and Non-Operator if, in practice, they are found to be insufficient or excessive.

13. **Operator's Fully Owned Warehouse Operating and Maintenance Expense**
(Describe fully the agreed procedure to be followed by the Operator.)

See Paragraph 11 above

14. **Other Expenditures**
Any expenditure, other than expenditures which are covered and dealt with by the foregoing provisions of this Section II, incurred by the Operator for the necessary and proper development, maintenance, and operation of the joint property.

### III. BASIS OF CHARGES TO JOINT ACCOUNT

1. **Purchases**
Material and equipment purchased and service procured shall be charged at price paid by Operator after deduction of all discounts actually received.

2. **Material Furnished by Operator**
Material required for operations shall be purchased for direct charge to joint account whenever practicable, except that Operator may furnish such material from Operator's stocks under the following conditions:

A. New Material (Condition "A")

(1) New material transferred from Operator's warehouse or other properties shall be priced f.o.b. the nearest reputable supply store or railway receiving point, where such material is available, at current replacement cost of the same kind of material. This will include material such as tanks, pumping units, sucker rods, engines, and other major equipment. Tubular goods, two-inch (2") and over, shall be priced on carload basis effective at date of transfer and f.o.b. railway receiving point nearest the joint account operation, regardless of quantity transferred.

(2) Other material shall be priced on basis of a reputable supply company's preferential price list effective at date of transfer and f.o.b. the store or railway receiving point nearest the joint account operation where such material is available.

(3) Cash discount shall not be allowed.

B. Used Material (Condition "B" and "C")

(1) Material which is in sound and serviceable condition and is suitable for reuse without reconditioning shall be classed as Condition "B" and priced at seventy-five per cent (75%) of new price.

(2) Material which cannot be classified as Condition "B" but which,

(a) After reconditioning will be further serviceable for original function as good secondhand material (Condition "B"), or

(b) Is serviceable for original function but substantially not suitable for reconditioning,

shall be classed as Condition "C" and priced at fifty per cent (50%) of new price.

(3) Material which cannot be classified as Condition "B" or Condition "C" shall be priced at a value commensurate with its use.

(4) Tanks, buildings, and other equipment involving erection costs shall be charged at applicable percentage of knocked-down new price.

3. **Premium Prices**
Whenever materials and equipment are not readily obtainable at the customary supply point and at prices specified in Paragraphs 1 and 2 of this Section III because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the joint account for the required materials on the basis of the Operator's direct cost and expense incurred in procuring such materials, in making it suitable for use, and in moving it to the location, provided, however, that notice in writing is furnished to Non-Operator of the proposed charge prior to billing the Non-Operator for the material and/or equipment acquired pursuant to this provision, whereupon Non-Operator shall have the right, by so electing and notifying Operator within 10 days after receiving notice from the Operator, to furnish in kind, or in tonnage as the parties may agree, at the location, nearest railway receiving point, or Operator's storage point within a comparable distance, all or part of his share of material and/or equipment suitable for use and acceptable to the Operator. Transportation costs on any such material furnished by Non-Operator, at any point other than at the location, shall be borne by such Non-Operator. If, pursuant to the provisions of this paragraph, any Non-Operator furnishes material and/or equipment in kind, the Operator shall make appropriate credits therefor to the account of said Non-Operator.

4. **Warranty of Material Furnished by Operator**
Operator does not warrant the material furnished beyond or back of the dealer's or manufacturer's guaranty; and in case of defective material, credit shall not be passed until adjustment has been received by Operator from the manufacturers or their agents.

5. **Operator's Exclusively Owned Facilities**
The following rates shall apply to service rendered to the joint account by facilities owned exclusively by Operator:

A. Water, fuel, power, compressor and other auxiliary services at rates commensurate with cost of providing and furnishing such service to the joint account but not exceeding rates currently prevailing in the field where the joint property is located.

— 3 —

B. Automotive equipment at rates commensurate with cost of ownership and operation. Such rates should generally be in line with the schedule of rates adopted by the Petroleum Motor Transport Association, or some other recognized organization, as recommended uniform charges against joint account operations and revised from time to time. Automotive rates shall include cost of oil, gas, repairs, insurance, and other operating expense and depreciation; and charges shall be based on use in actual service on, or in connection with, the joint account operations. Truck and tractor rates may include wages and expenses of driver.

C. A fair rate shall be charged for the use of drilling and cleaning-out tools and any other items of Operator's fully owned machinery or equipment which shall be ample to cover maintenance, repairs, depreciation, and the service furnished the joint property; provided that such charges shall not exceed those currently prevailing in the field where the joint property is located. Pulling units shall be charged at hourly rates commensurate with the cost of ownership and operation, which shall include repairs and maintenance, operating supplies, insurance, depreciation, and taxes. Pulling unit rates may include wages and expenses of the operator.

D. A fair rate shall be charged for laboratory services performed by Operator for the benefit of the joint account, such as gas, water, core, and any other analyses and tests; provided such charges shall not exceed those currently prevailing if performed by outside service laboratories.

E. Whenever requested, Operator shall inform Non-Operator in advance of the rates it proposes to charge.

F. Rates shall be revised and adjusted from time to time when found to be either excessive or insufficient.

## IV. DISPOSAL OF LEASE EQUIPMENT AND MATERIAL

The Operator shall be under no obligation to purchase interest of Non-Operator in surplus new or secondhand material. The disposition of major items of surplus material, such as derricks, tanks, engines, pumping units, and tubular goods, shall be subject to mutual determination by the parties hereto; provided Operator shall have the right to dispose of normal accumulations of junk and scrap material either by transfer or sale from the joint property.

### 1. Material Purchased by the Operator or Non-Operator

Material purchased by either the Operator or Non-Operator shall be credited by the Operator to the joint account for the month in which the material is removed by the purchaser.

### 2. Division in Kind

Division of material in kind, if made between Operator and Non-Operator, shall be in proportion to their respective interests in such material. Each party will thereupon be charged individually with the value of the material received or receivable by each party, and corresponding credits will be made by the Operator to the joint account. Such credits shall appear in the monthly statement of operations.

### 3. Sales to Outsiders

Sales to outsiders of material from the joint property shall be credited by Operator to the joint account at the net amount collected by Operator from vendee. Any claims by vendee for defective material or otherwise shall be charged back to the joint account if and when paid by Operator.

## V. BASIS OF PRICING MATERIAL TRANSFERRED FROM JOINT ACCOUNT

*Material purchased by either Operator or Non-Operator or divided in kind, unless otherwise agreed, shall be valued on the following basis:*

### 1. New Price Defined

New price as used in the following paragraphs shall have the same meaning and application as that used above in Section III, "Basis of Charges to Joint Account."

### 2. New Material

New material (Condition "A"), being new material procured for the joint account but never used thereon, at one hundred per cent (100%) of current new price (plus sales tax if any).

### 3. Good Used Material

Good used material (Condition "B"), being used material in sound and serviceable condition, suitable for reuse without reconditioning:

A. At seventy-five per cent (75%) of current new price if material ~~enough used at a joint account at a new price~~

~~B. At ninety-five per cent of (65%) or current new price if material was origin by value such as with a joint account was and last it to account to value at seventy-five (75%) of new price~~

### 4. Other Used Material

Used material (Condition "C"), at fifty per cent (50%) of current new price, being used material which:

A. After reconditioning will be further serviceable for original function as good secondhand material (Condition "B"), or

B. Is serviceable for original function but substantially not suitable for reconditioning.

### 5. Bad-Order Material

Material and equipment (Condition "D"), which is no longer usable for its original purpose without excessive repair cost but is further usable for some other purpose, shall be priced on a basis comparable with that of items normally used for that purpose.

### 6. Junk

Junk (Condition "E"), being obsolete and scrap material, at prevailing prices.

### 7. Temporarily Used Material

When the use of material is temporary and its service to the joint account does not justify the reduction in price as provided in Paragraph 3 **B** **A** above, such material shall be priced on a basis that will leave a net charge to the joint account consistent with the value of the service rendered.

## VI. INVENTORIES

### 1. Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the joint account material, which shall include all such material as is ordinarily considered controllable by operators of oil and gas properties.

Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operator may be represented when any inventory is taken.

Failure of Non-Operator to be represented at an inventory shall bind Non-Operator to accept the inventory taken by Operator, who shall in that event furnish Non-Operator with a copy thereof.

### 2. Reconciliation and Adjustment of Inventories

**Operator**

Reconciliation of inventory with charges to the joint account shall be made by ~~each party hereto~~ and a list of overages and shortages shall be ~~jointly determined~~ by Operator and **to** Non-Operator.

turnloghs

Inventory adjustments shall be made by Operator with the joint account for overages and shortages, but Operator shall be held accountable to Non-Operator only for shortages due to lack of reasonable diligence.

### 3. Special Inventories

Special inventories may be taken, at the expense of the purchaser, whenever there is any sale or change of interest in the joint property; and it shall be the duty of the party selling to notify all other parties hereto as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be represented and shall be governed by the inventory so taken.