

### A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT



EXHIBIT "A"

Attached to and made a part of that certain
Participation Agreement dated January 3, 1985 by and between
Edge Petroleum Corporation and Thomson-Monteith, et al.

OPERATING AGREEMENT

DATED

January 3, , 19 85 ,

OPERATOR __Thomson - Monteith_____

CONTRACT AREA __Lincoln Prospect Being those lands outlined_

_on the plat attached hereto as Exhibit "A-1"_____

_____

COUNTY OR PARISH OF __Lincoln_____ STATE OF __Mississippi__

COPYRIGHT 1982  —  ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 2408 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P L.  NO.  610  ·  1982  REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION | 2-3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4 |
| | A. INITIAL WELL | 4-5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less than All Parties | 5-6-7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 7 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8 |
| | 2. Abandonment of Wells that have Produced | 8 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | |
| | A. LIABILITY OF PARTIES | |
| | B. LIENS AND PAYMENT DEFAULTS | |
| | C. PAYMENTS AND ACCOUNTING | |
| | D. LIMITATION OF EXPENDITURES | |
| | 1. Drill or Deepen | |
| | 2. Rework or Plug Back | |
| | 3. Other Operations | |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | |
| | F. TAXES | |
| | G. INSURANCE | |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | |
| | A. SURRENDER OF LEASES | |
| | B. RENEWAL OR EXTENSION OF LEASES | 11 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 11 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 12 |
| X. | CLAIMS AND LAWSUITS | |
| XI. | FORCE MAJEURE | |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 13 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 14 |
| XVI. | MISCELLANEOUS | 15 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between⎽⎽⎽⎽⎽⎽⎽ Thomson - Monteith ⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽

⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽, hereinafter designated and referred to as ''Operator'', and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as ''Non-Operator'', and collectively as ''Non-Operators''.

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit ''A'', and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided.

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term ''oil and gas'' shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms ''oil and gas lease'', ''lease'' and ''leasehold'' shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term ''oil and gas interests'' shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term ''Contract Area'' shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit ''A''.

E. The term ''drilling unit'' shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as established by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term ''drillsite'' shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms ''Drilling Party'' and ''Consenting Party'' shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms ''Non-Drilling Party'' and ''Non-Consenting Party'' shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof.

☒ A. Exhibit ''A'', shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.
☒ B. Exhibit ''B'', Form of Lease.
☒ C. Exhibit ''C'', Accounting Procedure.
☒ D. Exhibit ''D'', Insurance.
☒ E. Exhibit ''E'', Gas Balancing Agreement
☒ F. Exhibit ''F'', Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit ''G'', Tax Partnership.

If any provision of any exhibit, except Exhibits ''E'' ~~and ''G''~~, is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

# ARTICLE III.
## INTERESTS OF PARTIES

A.  Oil and Gas Interests:    No Party hereto owns an unleased oil and gas interest in the Contract Area.

~~If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.~~

B.  Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of ~~royalties to the extent of~~ _____ ~~which shall be borne as hereinafter set forth.~~ all royalties, overriding royalties, production payments and other burdens on production, which are borne proportionately by all parties hereto.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the ~~royalty amount~~ burdens stipulated hereinabove and shall hold the other parties free from any liability therefor. ~~No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to~~ such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.  Excess Royalties, Overriding Royalties and Other Payments:    which is not borne proportionately by all the parties hereto

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production ~~in excess of the amount stipulated in Article III.B.~~, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.  Subsequently Created Interests:

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A" or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and

1.  If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.  If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

# ARTICLE IV.
## TITLES

A.  Title Examination:

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐  Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provided in Exhibit "C", and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE IV
continued

*and for the matters described in the following paragraph,*

1    ☒ Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
2    (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3    in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex
4    hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other ~~personnel~~ in the performance of the above
5    functions *subject to this agreement*    *employees*
6    *Operator*
7    ~~Each party~~ shall be responsible for securing curative matter and pooling amendments or agreements required in connection
8    with leases on oil and gas interests ~~contributed by such party~~ Operator shall be responsible for the preparation and recording of pooling
9    designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders
10   This shall not prevent any party from appearing on its own behalf at any such hearing.
11
12       No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
13   provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par
14   ticipate in the drilling of the well.
15
16   B.  Loss of Title:
17
18       1.  Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, ~~which loss results in a~~
19   ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20   ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21   ~~tion will not be subject to Article VIII.B., and failing to do so,~~ this agreement, nevertheless, shall continue in force as to all remaining oil
22   and gas leases and interests; ~~and,~~
23   ~~(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24   entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid or incurred
25   but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;
26       (b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has
27   been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc
28   curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract
29   Area by the amount of the interest lost;
30       (c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is
31   increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in
32   terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such
33   well;
34       (d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has
35   failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties
36   who bore the costs which are so refunded;
37       (e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be
38   borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,
39       (f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest
40   claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in
41   connection therewith.
42
43       2.  Loss by Non Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well
44   payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,
45   there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required
46   payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,
47   which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the
48   date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in
49   the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who failed to make the
50   required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to
51   the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it
52   shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled
53   or wells previously abandoned) from so much of the following as is necessary to effect reimbursement.
54       (a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,
55   up to the amount of unrecovered costs.
56       (b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis of that portion of
57   oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such a lease
58   termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs; the proceeds of said
59   portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,
60       (c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is or becomes the owner of the interest
61   lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.
62   *Miscellaneous:    including, but not limited to*
63       3.  ~~Other Losses:~~ All losses incurred, ~~other than~~ those set forth in Articles IV.B.1. and IV.B.2. above, shall be *additional losses*
64   and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remaining portion of
65   the Contract Area.
66
67
68
69
70

A A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE V.

OPERATOR

A.  Designation and Responsibilities of Operator:

THOMSON-MONTEITH _____shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

B.  Resignation or Removal of Operator and Selection of Successor:

1.  Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit ''A'' remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.

2.  Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit ''A''; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit ''A'' remaining after excluding the voting interest of the Operator that was removed.

C.  Employees:

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  Drilling Contracts: ——and workover operations conducted
                        ┌and conducted
All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area if it so
desires. Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent
dependent contractors who are doing work of a similar nature.

ARTICLE VI.

DRILLING AND DEVELOPMENT

A.  Initial Well:

On or before the _____ day of _____ , 19___ , Operator shall commence the drilling of a well for
oil and gas at the following location:

The initial well is provided for in Article I.B.2. of the Participation Agreement
ment to which this Agreement is attached as Exhibit "I".

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical is encountered
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

-4-

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

## ARTICLE VI
### continued

~~If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.~~

### B. Subsequent Operations:

1. Proposed Operations: Should any party hereto *owning a present interest in the Contract Area,* desire to drill any well on the Contract Area other than the well provided for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-tion and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drill-ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the n ... period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obta ... permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title or examination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provisions of Article XI. if actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein an ... if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in ac-dance with the provisions hereof as if no prior proposal had been made.

2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VII.D.1. (Opt. ... No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or part ... giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration ... the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform ... work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operat ... a Non-Consenting Party, the Consenting Parties shall either (a) request Operator to perform the work required by such proposed oper-a-tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. The Con-senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-ditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the appli ... notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation a ... to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) h ... (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests ... failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted, such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decis ...

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk

\*\* from a previous operation

- 5 -

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

## ARTICLE VI
### continued

1  and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2  ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3  in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4  and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5  Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6  market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7  terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8  until it reverts) shall equal the total of the following:

9
10
11        200
12  (a) ~~100%~~ of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13  connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus ~~100%~~ of each such
14  Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15  Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16  Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17  Party had it participated in the well from the beginning of the operations; and

18
19
20
21  (b) __500__ % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing
22  after deducting any cash contributions received under Article VIII.C., and __500__ % of that portion of the cost of newly acquired equip-
23  ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24  participated therein.

25
26
27
28  An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29  working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30  conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31  reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well
32  and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33  the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If
34  such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35  plicable as between said Consenting Parties in said well.

36
37
38
39  During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40  proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41  taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42  ticle III.D.

43
44
45
46  In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47  of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48  abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49  ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50
51
52
53  Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54  Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well and an
55  itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or at its
56  option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57  ings. Each ~~month~~ thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
        quarter
58  operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59  curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60  realized from the sale of the well's working interest production during the preceding ~~month~~. In determining the quantity of oil and gas
61  produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering, or per peri-
62  well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63  which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64  of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65  above provided, and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66
67
68
69
70

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

## ARTICLE VI

### continued

1     If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above
2 the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3 Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4 therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5 back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6 the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.
7
8
9
10     Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11 be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is producing, unless such
12 well conforms to the then-existing well spacing pattern for such source of supply.
13
14
15
16     The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.
17 except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well
18 after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-
19 duction, ceases to produce in paying quantities.
20
21
22
23     3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and all tests have been
24 completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
25 reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
26 ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
27 first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
28 matical paragraph of Article VI.B.2, shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
29 withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
30 each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
31 ties.
32
33
34
35     4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
36 also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
37 location (herein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
38 mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
39 affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share
40 to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows
41
42
43
44     (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
45 the initial drilling of the well down to the depth at which the sidetracking operation is initiated
46
47
48
49     (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the value of
50 salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
51 provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.
52
53     [from a previous]
54     [operation]
55     In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location the response time
56 shall be limited to forty-eight (48) [twenty-four (24)] hours, exclusive of Saturday, Sunday and legal holiday; provided, however, any party may, at its election,
57 receive up to eight (8) additional days after expiration of the forty-eight (48) [twenty-four (24)] hours within which to respond by paying for all stand-by time
58 incurred during such extended response period. If more than one party elects to take such additional time to respond on a day-to-day basis
59 by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
60 ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties. In all other cir-
61 stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.
62
63
64
65 C. TAKING PRODUCTION IN KIND:
66
67     Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
68 exclusive of production which may be used in development and producing operations and in preparing and treating oil and gas for
69 marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any
70 party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind and in

A.A.P.L. FORM 610 - MOD    ORM OPERATING AGREEMEN1 - 1. .

## ARTICLE VI
### continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
9  the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the
10  best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
11  owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year.

15

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of t.... .... when
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with ~~any gas~~ balancing
19  agreement ~~between the parties hereto, whether such an agreement is~~ attached as Exhibit "E". ~~or as a separate agreement~~

20

21  D.   Access to Contract Area and Information:

22

23      Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the end of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the information.

30

31  E.   Abandonment of Wells:

32                                                              and except as provided below

33      1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within twenty-four (24) ~~forty-eight (48)~~ hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B

41

42      2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56
57
58
59
60
61
62
63
64
65
66
67
68
69
70



A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT

## ARTICLE VI
### continued

1   "B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2   assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3   Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4   interests in the remaining portion of the Contract Area.
5
6       Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7   the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this Article. Upon re
8   quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con
9   templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro
12  visions hereof.
13
14      3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of the Article
18  VI.E.
19
20                                ARTICLE VII.
21                   EXPENDITURES AND LIABILITY OF PARTIES
22
23  A.  Liability of Parties:
24
25      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally. It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.
29
30  B.  Liens and Payment Defaults:
31
32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the ob
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and gas until the amount owed by such Non-Operator, plus interest, has been paid. Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.
42
43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45  the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain
46  reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.
47
48  C.  Payments and Accounting:
49
50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor
52  tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder
53  showing expenses incurred and charges and credits made and received.
54
55      Operator, at its election, shall have the right ~~from time to time~~ to demand and receive from ~~the~~ all other parties payment in advance
56  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during ~~the next succeeding~~ any
57  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58  with an invoice for its share thereof. ~~Each such statement and invoice for the payment in advance of estimated expense shall be submitted~~
59  ~~on or before the 20th day of the next preceding month.~~ Each party shall pay to Operator its proportionate share of such estimate within
60  fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount
61  due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual ex
62  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more. Operator shall
63  not be required to commence any well or other operation required hereunder until all
64  such payments are made.  Failure to pay by any party hereunder shall be governed by
    D.  Limitation of Expenditures:                                        Article XV.F. herein.
65
66      1. Drill or Deepen. Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67  pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall include
68
69
70

-9-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1 ☐  Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including
2 necessary tankage and/or surface facilities.
3
4 ☒  Option No. 2: All necessary expenditures for the drilling or deepening and testing of the well. When such well has reached its
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice shall have ~~twenty-
7 four~~ (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion at-
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, in-
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the period above fixed shall
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less than all of the parties,
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2, hereof (the phrase "reworking, deepening or plugging
12 back" as contained in Article VI.B.2, shall be deemed to include "completing") shall apply to the operations thereafter conducted by less
13 than all parties.
14
15    2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or
16 plugged back pursuant to the provisions of Article VI.B.2, of this agreement. Consent to the reworking or plugging back of a well shall
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage
18 and/or surface facilities.
19
20    3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project reasonably estimated
21 to require an expenditure in excess of <u>Twenty Five Thousand & 00/100</u> Dollars $ <u>25,000.00</u>
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are necessary
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting
27 an information copy thereof for any single project costing ~~in excess of~~
28 ~~Dollars ($~~       ~~) but~~ less than the amount first set forth above in this paragraph.
29
30 E.   Rentals, Shut-in Well Payments and Minimum Royalties:
31
32    ~~Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have con-
34 tributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of a
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such pay-
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the pro-
38 visions of Article IV.B.2.~~
39
40    ~~Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to pro-
41 of a producing gas well, at least five (5) days (excluding Saturdays, Sunday and legal holidays) or at the earliest opportunity permitted by
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by Operator to so noti-
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well pay-
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.~~
45
46 F.   Taxes:
47
48    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon be-
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens to include but
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such party.
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalty or-
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduc-
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then charges shall be
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate share of all taxes paid in
58 the manner provided in Exhibit "C".
59
60    If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final deter-
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax and the addi-
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them as
65 provided in Exhibit "C".
66
67    ~~Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to
68 the production or handling of such party's share of oil and/or of gas produced under the terms of this agreement.~~
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VII
### continued

1  G.  Insurance:
2
3        At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4  the state where the operations are being conducted, provided, however, that Operator may be a self insurer for liability under said com-
5  pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6  also carry or provide insurance for the benefit of the joint operations as outlined in Exhibit "D", attached to and made a part
7  hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8  law of the state where the operations are being conducted and to maintain such other insurance as Operator may require   may
9  be required in Exhibit "D".
10       In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11  parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                              ARTICLE VIII.
14              ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
15
16  A.  Surrender of Leases:
17
18       The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19  or in part unless all parties consent thereto.
20
21       However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22  agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23  such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25  terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26  such oil and gas interest for a term of one (1) year and so long thereafter as oil and gas is produced from the land covered thereby, such
27  lease to be on the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall be relieved from all
28  obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29  attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30  duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31  party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32  ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33  salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34  shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36       Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39  agreement,*
40                       legal holidays, in the event a well is being drilled
41                       at that time on the lands within the Contract Area.
42  B.  Renewal or Extension of Leases:
43
44       If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
45  shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
46  renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several pro-
47  portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
48  interests held at that time by the parties in the Contract Area  provided, however, the thirty (30) day period
49  shall be changed to forty-eight (48) hours, exclusive of Saturday, Sunday and ——
50       If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
51  who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
52  to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
53  Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.*
54
55       Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
56  by the acquiring party.
57
58       The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
59  or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
60  contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
61  tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
62  the provisions of this agreement.
63
64       The provisions in this Article shall also be applicable to extensions of oil and gas leases.
65
66  C.  Acreage or Cash Contributions:   other than from Trafalgar House Oil & Gas, Inc. and
67                                        Montvale Energy Two, Inc.
68       While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
69  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
70  applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
    tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Party in the proportions
    * but shall be subject to the provisions of an agreement identical to this
      agreement with the exception of a modification to reflect the proper owners
      and percentages of ownership.

                              11

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT   1982

## ARTICLE VIII
### continued

1  said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2  governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3  it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4  tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.
5
6      If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7  consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9  D.  Maintenance of Uniform Interest:
10
11      For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no
12  party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,
13  equipment and production unless such disposition covers either:
14
15      1. the entire interest of the party in all leases and equipment and production; or
16
17      2. an equal undivided interest in all leases and equipment and production in the Contract Area.
18
19      Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20  and shall be made without prejudice to the right of the other parties.
21
22      If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings
24  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25  party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26  into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27  Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.
28
29  E.  Waiver of Rights to Partition:
30
31      If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severality its undivided
33  interest therein.
34
35  F.  Preferential Right to Purchase:
36
37      Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract
38  Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the
39  name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms
40  of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice to purchase
41  on the same terms and conditions the interest which the other party proposes to sell, and, if this optional right is exercised, the purchas-
42  ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-
43  ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to
44  dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all its assets to a subsidiary or parent com-
45  pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.
46
47                                          ARTICLE IX.
48                              INTERNAL REVENUE CODE ELECTION
49
50      This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several,
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if for federal income tax
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects to be excluded
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1954, as per-
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury or the
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements and
58  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761 of the Code is per-
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66  computation of partnership taxable income.
67
68
69
70

12

A.A.P.L. FORM 610   MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed **Ten Thousand and no/100** Dollars ($ **10,000.00** ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of **120** days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A. or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within **120** days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

13

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A.  Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state, and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.  Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ shall govern.

C.  Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

ARTICLE XV.
OTHER PROVISIONS

(Continued on pages 14a - 14g)

14

A.   Rentals, Shut-In Well Payments and Minimum Royalties:

All rentals, shut-in well payments and minimum royalties which may be required under the terms of any oil and gas lease or leases shall be administered and paid by Operator and charged to the Joint Account. Operator shall diligently attempt to make or cause to be made the proper payment of any such rentals, shut-in well payments or minimum royalties, but shall not be held liable to the other parties in damages for loss of any lease or interest therein if through mistake or oversight Operator shall fail to make any such payment or such payment is erroneous in any respect. Any such loss of any lease or interest therein shall be borne jointly by the parties hereto under the provisions of Article IV.B. Each party hereto shall be obligated to bear its proportionate share of any and all rentals necessary to continue the oil and gas leases in force and effect, unless it timely gives notice as provided below. If any party does not wish to bear its proportionate share of any such rental, such party shall give Operator and all other parties hereto written notice of such election within thirty (30) days after receiving notification from Operator that such a rental is due for payment, and shall be released from its obligations to bear its proportionate share of any rentals which accrue under the terms of the lease or leases specified in such written notice.

Unless mutually agreed otherwise, the proportionate share of the rental attributable to any such lease or leases, which would have been borne by the party electing not to participate in the payment of such rental, shall be borne by the parties hereto who elect to participate in the payment thereof, in the proportion that the interest of each bears to the total of their interests, and the party electing not to participate in the payment of such rental shall assign all of its interest in the lease or leases in which such rental was due, to the parties electing to participate in the payment thereof in the respective proportions that they bear the rental on any such lease or leases. Any lease in which less than all parties elect to participate in the payment of a rental shall no longer be subject to this agreement but shall be subject to the provisions of an agreement identical to this agreement with the exception of a modification to reflect the proper owners and percentages of ownership. Operator shall furnish proper evidence of payment of each rental paid hereunder, to all of the parties hereto.

B.   Taxes - Additional Provisions:

Operator shall pay or cause to be paid out of each party's share of oil and/or gas produced under the terms of this agreement, all production, excise, severance, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of production; provided, however, if at any time any party is taking its share of production in kind pursuant to the provisions of Article VI.C., such party shall pay or cause to be paid said taxes as to such production unless Operator agrees otherwise in writing.

14A

C.   Proposed Operations - Additional Provisions:

Notwithstanding anything to the contrary in Article VI.B.1. hereof, it is agreed that no notice shall be given pursuant to said Article VI.B.1. which proposes the drilling of more than one well, or which proposes the reworking, deepening or plugging back of a well jointly owned by all the parties that is then producing in paying quantities. Further, the provisions of the said Article VI.B.1., insofar as same pertains to notification by a party of its desire to drill a well, shall be suspended for so long as (1) a prior notice proposing the drilling of a well has been given which is still in force and effect and the period of time during which the well regarding same may be commenced has not expired, or (2) a well is presently drilling hereunder. This paragraph shall not apply under those circumstances where the well to which the notice is directed is required under the terms of a lease or contract or one required to maintain a lease or a portion thereof in force, or where the parties hereto mutually agree to the contrary.

D.   Priority of Elections:

Notwithstanding any provision of this agreement to the contrary, where a well commenced hereunder has been drilled to its authorized depth and the parties having the right to make an election regarding the sequence and timing of further operations regarding said well cannot reach a mutual agreement thereto, it is agreed that the following elections shall control in the order enumerated hereafter:

1.   an election to conduct additional well logging surveys, coring operations or testing operations on the well.

2.   an election to attempt to complete the well in the deepest interval in which a completion attempt has not previously been made.

3.   an election to plug back and attempt to complete the well in the deepest interval in which a completion attempt has not previously been made.

4.   an election to deepen the well.

5.   an election to sidetrack the well

6.   an election to plug and abandon the well.

It is provided, however, that if at the time said parties are considering any of the above elections the hole is in such a condition that a reasonable prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such election shall not be given the priority hereinabove set forth.

Notwithstanding anything to the contrary in this Article, any party which desires to perform additional logging, coring or testing before attempting a completion which has been proposed by any party may do so at its sole cost, risk and expense, and said party shall be responsible to all other non-participating parties in said operation for any consequential or incidental damages whatsoever which may occur as a result of said additional logging, coring or testing.

E.   Assignment of Interest:

Except where specifically provided to the contrary herein, where under the terms of this agreement a party hereto is required to assign to one or more of the other parties its interest in one or more oil and gas leases or a portion thereof, it is agreed that any such assignment shall be made free and clear of all leasehold burdens, liens and encumbrances placed thereon by Assignor, and shall be made without warranty of any kind, express or implied except against those parties claiming by, through and under Assignor, but not otherwise.

F.   Liens and Payment Defaults - Additional Provisions:

Notwithstanding any provision of this agreement to the contrary, if any party fails to pay its proportionate share of any bill submitted by Operator pursuant to the terms hereof for any operation it agreed to participate in hereunder, except where a bill is contested in good faith by such party, within the fifteen (15) day period allocated in Article I.3. of Exhibit "C" or Article VII.C. hereof, then Operator shall notify such party by certified mail of such non-payment.   If within fifteen (15) days after rendition of said notice of non-payment Operator has not received proper payment from such party, then operator, without prejudice to other existing remedies, may, at its option, consider such non-payment to constitute an election by the defaulting party not to participate in the operation(s) to which the unpaid bill applied, under Article VI.B.2., in the same manner and to the same extent and with the same force that a failure to reply within the prescribed period constitutes an election not to participate.

G.   Laws, Regulations and Orders - Additional Provisions:

In the event this agreement or any provision hereof is, or the operations contemplated are, found to be inconsistent with or contrary to any laws, rules, regulations, ordinances or orders, as set out in Article XIV.A., the latter shall be deemed to control and this agreement shall be regarded as modified accordingly and as so modified shall continue in full force and effect.

H.   Area of Mutual Interest:

It is agreed that the lands subject to this agreement as described in Exhibit "A" of this agreement shall constitute an Area of Mutual Interest, hereinafter sometimes referred to as "AMI", between the parties hereto, which

shall remain in force and effect for a period of three (3) years from the date hereof, unless this agreement terminates at an earlier date, in which case the AMI shall terminate upon the termination date of this agreement.

In the event any leasehold interests or contractual right to earn interests therein, hereinafter sometimes referred to as "acquisition", covering any of the lands located within the AMI are acquired by any of the parties hereto, directly or indirectly, the other parties shall be notified promptly and furnished with a copy of all legal instruments, paid drafts or checks, itemized statement of the actual costs incurred, and all other pertinent and available data concerning the acquisition, and they shall have the right for a period of fifteen (15) days following receipt of such notice (or within forty-eight hours, exclusive of Saturday, Sunday and other legal holidays, following receipt thereof in the event a well is being drilled at that time in the AMI) in which to notify the acquiring party of its election whether or not to participate in such acquisition by bearing its proportionate share (based upon the respective percentages of participation in the Contract Area) of the costs allocated to that part of such acquisition which covers lands within the AMI, and if applicable, assuming its proportionate share of any obligations or requirements associated with the acquisition. Failure of a party receiving such a notice from the acquiring party to reply within the above specified period of time shall constitute an election by that party not to participate in such acquisition. Any acquisition in which all the parties hereto elect to participate shall become subject to this agreement.

If some, but less than all parties elect to participate in such acquisition, the proportionate shares of the acquisition costs and ownership shall be in the ratio based upon the relationship of the respective percentages of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in said acquisition. Any such acquisition in which less than all parties elect to participate shall not become subject to this agreement, but shall instead become subject to the provisions of an agreement identical to this agreement with the exception of a modification to reflect the proper owners and percentages of ownership.

Each party electing to participate in such acquisition shall pay the acquiring party its share of the acquisition cost as determined hereinabove, within fifteen (15) days after the expiration of the above specified notice period. Upon the acquiring party's receipt of such payment for each participating party's share of such acquisition, said acquiring party, shall execute and deliver an assignment of the appropriate shares of such acquisition to each participating party, insofar as the acquisition covers lands which are located within the AMI.

It is agreed that each lease or right, title or interest therein acquired under the terms of this AMI shall be subject to the following burdens:

1. An overriding royalty interest in favor of Robert Schneeflock equal to three and one-eigth percent of eight-eighths (3.125% of 8/8) on all leases with a burden of twenty-one and eight hundred and seventy-five one hundredths percent (21.875%) or less OR two percent (2.00% of 8/8) on all leases with a burden greater than twenty-one and eight hundred and seventy-five one hundred percent (21.875%) of all oil, gas and associated hydrocarbons produced and sold from or attributable to the lands covered by each such lease which are located within the AMI. An additional overriding royalty interest in favor of Michael P. Moore equal to one-eighth of one-percent of eight eighths (.125% of 8/8) of all oil, gas and associated hydrocarbons produced and sold from or attributable to the lands covered by each such leases which are located within the AMI. Said overriding royalty interest shall be free of all costs and expenses except taxes attributable to the overriding royalty and the production therefrom. In the event any such lease covers less than the full undivided fee estate in the oil, gas and associated hydrocarbons in the lands covered thereby which are located in the AMI, or in the event the leasehold interest acquired covers less than one hundred percent (100%) of the leasehold estate in said lease insofar as it covers lands in the AMI, then as to such lease the overriding royalty interest shall be proportionately reduced. Said overriding royalty interest shall apply to any extensions, renewals, top leases or new leases covering any rights, titles or interests in any of the AMI leases, which may be acquired directly or indirectly by any of the parties hereto within six (6) months of the expiration of such lease or leases.

2. The twenty-five percent (25%) reversionary interest reserved to Edge Petroleum Corporation, in Article I.A.4. of the Participation Agreement to which this Operating Agreement is attached as Exhibit "A", shall also apply to each lease or right, title or interest therein acquired under the terms of this AMI, and shall also apply to any extensions, renewals, top leases or new leases covering any rights, titles or interests in any of the AMI leases which may be acquired directly or indirectly by any of the parties hereto within six (6) months of the expiration of such lease or leases. The twenty-five percent (25%) reversionary interest shall not be reduced as a result of a backin working interest reserved to a third party to this agreement in any lease or oil and gas interest acquired within the AMI.

It is stipulated that the provisions of this AMI shall not apply to any acquisitions as a result of merger, consolidation, reorganization or an acquisition from a parent, subsidiary or affiliated corporation.

I. Conduct of Operations:

Any well drilled pursuant to the terms of this agreement shall be drilled to its authorized depth unless prior to reaching said depth:

1.  conditions are encountered which would render further drilling by a prudent operator impractical and Operator is forced to abandon the well; or

2.  all Drilling Parties mutually agree to complete the well at a lesser depth than the authorized depth.

Operator shall make reasonable tests (except where impractical due to conditions existing in the well bore) of all formations encountered during drilling which give indication of containing oil and/or gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgement, a well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the well as dry hole, it shall plug and abandon same as provided in Article VI.E.1. hereof.

J.  Resignation and Removal of Operator and Selection of Successor - Additional Provisions:

Notwithstanding the provisions of Article V.B., at any time after Operator has been acting hereunder for a period of two (2) years from the date on which it was originally designated Operator, any Non-Operator may notify operator in writing of more cost efficient terms under which such Non-Operator would be prepared to act as Operator. Unless within thirty (30) days from receipt of such notice Operator agrees in writing to continue to act as Operator on the terms outlined by such Non-Operator, said Non-Operator shall become Operator on the said terms at the end of thirty (30) days following the end of said thirty (30) day period. Similarly, at any time after the new Operator has been acting as Operator hereunder for a period of two (2) years, any Non-Operator may notify Operator in writing of the terms under which such Non-Operator would be prepared to act as Operator, and unless, within thirty (30) days from receipt of such notice, Operator agrees in writing to continue to act as Operator on ther terms outlined by said Non-Operator, such Non-Operator shall become Operator on the same terms at the end of thirty (30) days following the end of said thirty (30) day period. If a change of Operator occurs under this paragraph or under Article V.B., the retiring Operator shall promptly deliver to the successor Operator all records and information necessary for successor Operator to discharge its duties and obligations as Operator.

K.  Liens and Payment Defaults - Additional Provisions:

Operator (or Non-Operator, if applicable) may (but shall not be obligated to) prepare and file any affidavit and/or other instrument which it deems necessary to be filed in the appropriate records to give record notice of this agreement and the terms and provisions hereof, including, but not limited to, the lien and security interest granted in Article VII.B. hereof.

L.   Payout Status Reports:

Within sixty (60) days after completion of each producing well hereunder, Operator shall furnish Non-Operator with a detailed statement indicating the costs incurred in the drilling, completion and equipping of such well. Thereafter, until payout, Operator shall provide Non-Operator with ~~monthly~~ quarter statements indicating the well costs and production proceeds attributable to each well for the previous ~~month,~~ quarter along with the cumulative well costs and production proceeds attributable to the well and to the Contract Area.

M.   News Releases:

Any news releases made by any of the parties herto concerning operations conducted hereunder shall contain the names of all of the parties hereto.

N.   Bankruptcy:

If, following the granting of relief under the Bankruptcy Code to any party hereto as debtor thereunder, this Agreement should be held to be an executory contract within the meaning of 11 U.S.C §365, then the Operator, or (if the Operator is the debtor in bankruptcy) any other party, shall be entitled to a determination by debtor or any trustee for debtor within thirty (30) days from the date an order for relief is entered under this Bankruptcy Code as to the rejection or assumption of this Operating Agreement.  In the event of an assumption, Operator or said other party shall be entitled to adequate assurances as to future performance of debtor's obligation hereunder and the protection of the interest of all other parties.

O.   Cash call:

T-M's agreement, as Operator, to commence the initial well and the subsequent initial well (described in Article I.B.2. and 3.,) shall be subject to final closing and further conditioned upon T-M's not being required to commence any well or other operation required or proposed hereunder, until each working interest owner shall have tendered to Operator, its proportionate share of the cost of drilling or such other operation.  T-M, as Operator, agrees to deliver to each participating party an itemized statement of such estimated expense together with an invoice for each party's share thereof.  Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received.

Should any party fail to pay its share of such cost estimate within said specified time, and should the estimated costs not paid be costs attributable to either the initial well, subsequent initial well, or substitute therefor, as described in Article I.B., T-M shall notify Edge and Edge will pay such costs or release T-M from such obligation to drill.

Should the cost estimate cover costs for any well or operation upon a well other than the initial test well or subsequent test well or substitute therefor, a failure to pay by any party hereto shall be considered as a non-consent election and shall be treated and handled as such under the Operating Agreement.

A.A.P.L. FORM 610 · MODEL FORM OPERATING AGREEMENT · 1982

ARTICLE XVI.

MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

IN WITNESS WHEREOF, this agreement shall be effective as of ___3___ day of ___January___, 19_85_

OPERATOR

THOMSON - MONTEITH

By _____

Edward E. Monteith
Chairman of the Board

NON-OPERATORS

EDGE PETROLEUM CORPORATION

Robert H. Chaney
Vice President

SYNDER EXPLORATION

EQUITABLE ENERGY, INC.

STATE OF TEXAS        )
                      )
COUNTY OF DALLAS      )

On this _____ day of January, 1985, before me appeared EDWARD E. MONTEITH, to me personally known, who, being by me duly sworn, did say that he is the Chairman of the Board of THOMSON-MONTEITH, a Texas General Partnership, and that the foregoing instrument was signed on behalf of said Partnership, and said EDWARD E. MONTEITH acknowledged said instrument to be the free act and deed of said Partnership.

_____
Notary Public in and for
the State of Texas

My Commission Expires:

_____
(Print/Type/Stamp Name)

15

STATE OF TEXAS            )
                                 )
COUNTY OF _____    )

      ON this _____ day of _____, 1985, before me appeared ROBERT H. CHANEY, to me personally known, who being by me duly sworn, did say that he is the Vice President of EDGE PETROLEUM CORPORATION, a _____ Corporation, and that the foregoing instrument was signed on behalf of said Corporation, and said ROBERT H. CHANEY acknowledged said instrument to be the free act and deed of said Corporation.


                                  _____
                                  Notary Public in and for
                                   the State of Texas

My Commission Expires:           _____
                                   (Print/Type/Stamp Name)

_____



STATE OF _____    )
                                 )
COUNTY OF _____    )

      On this _____ day of _____, 1985, before me appeared _____ _____, to me personally known, who being by me duly sworn, did say that __ is the _____ of SNYDER EXPLORATION, a _____, and that the foregoing instrument was signed on behalf of said _____, and said _____ acknowledged said instrument to be the free act and deed said _____.


                                  _____
                                  Notary Public in and for
                                  the State of _____

My Commission Expires:           _____
                                   (Print/Type/Stamp Name)

_____



STATE OF _____    )
                                 )
COUNTY OF _____ . )

      On this _____ day of _____, 1985, before me appeared _____ _____, to me personally known, who being by me duly sworn, did say that he is the _____ of EQUITABLE ENERGY, INC. a _____, and the the foregoing instrument was signed on behalf of said _____, and said _____ acknowledged said instrument to be the free act and deed of said _____.


                                  _____
                                  Notary Public in and for
                                  the State of _____
My Commission Expires:           _____
                                   (Print/Type/Stamp Name)

_____

EXHIBIT "A"


Attached to and made a part of that certain
Operating Agreement dated January 3, 1985, by and between
Thomson-Monteith, as Operator and
Edge Petroleum Corporation, et al, as Non-Operator


I.   Contract Area:  All lands and interests ~~covered by those certain Oil and Gas Leases and Agreements~~ lying within the Area of Mutual Interest outlined on the plat attached hereto as Exhibit "A-1", which said Oil & Gas Leases and Agreements are owned jointly by the parties hereto and or subsequently acquired jointly under the terms of Article XVIII K. herein, by the parties hereto.

II.  Limitation as to depth:  This Agreement shall be effective as to all depths covered by the Oil & Gas Leases, Agreements and interests subject hereto.

III. Interest represented by the parties hereto in the Contract Area:

|                                          | Before Project Payout | After Project Payout |
|------------------------------------------|-----------------------|----------------------|
| Thomson-Monteith                         | 25.00%                | 18.750%              |
| Snyder Exploration                       | 5.40%                 | 4.050%               |
| Sklar & Phillips Oil Co.                 | 12.50%                | 9.375%               |
| Lenord Rauch Jerald Rauch Morris Glesby  | 7.10%                 | 5.325%               |
| Edge Petroleum Corporation               | -0-                   | 25.000%              |
|                                          | 100%                  | 100.00%              |

IV.  Address of Parties for Notice Purposes:

Thomson-Monteith
8080 N. Central
Suite 1600
Dallas, Texas 75206
Attn: Ms. Paula Pate

Snyder Exploration
1360 Post Oak Blvd.
Suite 1500
Houston, Texas 77056
Attn: Mr. Jim Snyder

Equitable Energy, Inc.
2000 Four Allen Center
Houston, Texas 77002
Attn: Mr. D. C. Blue, Jr.

Sklar & Phillips Oil Co.
P. O. Box 3735
Shreveport, LA  7113-3735
Attn: Mr. August Erickson

Edge Petroleum Corporation
1220 Americana Bldg., 811 Dallas
Houston, Texas 77002
Attn: Mr.Robert Chaney

Lenord Rauch
Jerald Rauch
Morris Glesby
P. O. Box 56727
Houston, Texas 77256


V.   Lease Schedule:

As set out on EXHIBIT "A-2"

EXHIBIT "A-1"

Attached to and made a part of that certain
Operating Agreement dated January 3, 1985, by and between
Thomson-MonLeith, as Operators and Edge Petroleum Corporation,
et al, as Non-Opertors.



EXHIBIT "B"


Attached to and made a part of that certain
Operating Agreement dated January 3, 1985, by and between
Thomson-Monteith, as Operator, and
Edge Petroleum Corporation, et al, as Non-Operator


THERE IS NO EXHIBIT "B" TO THIS AGREEMENT.



**601,**   BOX 800, TULSA OK 74101

COPAS — 1974
Recommended by the
Council of Petroleum
Accountants Societies

# EXHIBIT " C "

Attached to and made a part of ___Operating Agreement dated January 3, 1985, by and between Thomson-Monteith, as Operator and Edge Petroleum Corporation, et al as Non-Operator_____

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies of North America.

### 2. Statement and Billings

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

### 3. Advances and Payments by Non-Operators

Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

2% over prime-RepublicBank,

Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of ~~twelve percent (12%)~~ per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### 5. Audits

A. Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

### 6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

— 1 —

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.  Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**2.  Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First Level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the Overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under this Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II.

**3.  Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed ~~twenty per cent (30%)~~ twenty-three percent (23%)

**4.  Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.  Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**5.  Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store, recognized barge terminal, or railway receiving point where like material is normally available, unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store, recognized barge terminal, or railway receiving point unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties

C. In the application of Subparagraphs A and B above, there shall be no equalization of actual gross trucking cost of $200 or less excluding accessorial charges.

**6.  Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 of Section II and Paragraph 1, ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the Overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

**7.  Equipment and Facilities Furnished by Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on investment not to exceed eight per cent (8%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

**8.  Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

**9.  Legal Expense**     ~title examination,~

Expense of handling, ~~investigating~~ and settling litigation or claims, discharging of liens, payment of judgments, and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff ~~or fees or expense of outside attorneys~~ shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.



**10. Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.

**11. Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Workmen's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator cost not to exceed manual rates.

**12. Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1. Overhead - Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

    ( X ) Fixed Rate Basis, Paragraph 1A, or
    (    ) Percentage Basis, Paragraph 1B.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 2A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the Overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall (  ) and not (X) be covered by the Overhead rates.

**A. Overhead - Fixed Rate Basis**

  (1) Operator shall charge the Joint Account at the following rates per well per month:

    Drilling Well Rate $ ___6,000___    ___~~5,000~~___
    Producing Well Rate $ ___600___    ___~~500~~___

  (2) Application of Overhead - Fixed Rate Basis shall be as follows:

    (a) Drilling Well Rate

        [1] Charges for onshore drilling wells shall begin on the date the well is spudded and terminate on the date the drilling or completion rig is released, whichever is later, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

        [2] Charges for offshore drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive days

        [3] Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig, commence through date of rig release except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive days.

    (b) Producing Well Rates

        [1] An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

        [2] Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

        [3] An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

        [4] A one-well charge may be made for the month in which plugging and abandonment operations are completed on any well.

        [5] All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc ) shall not qualify for an overhead charge.

  (3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead - Percentage Basis

   (1) Operator shall charge the Joint Account at the following rates:

      (a) Development

            _____ Percent (    %) of the cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

      (b) Operating

            _____ Percent (    %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

   (2) Application of Overhead - Percentage Basis shall be as follows:

      For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening or any remedial operations on any or all wells involving the use of drilling crew and equipment; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating.

## 2. Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development or operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ __25,000.00__ :

A. __5__ % of total costs if such costs are more than $ __25,000.00__ but less than $ __100,000.00__

B. __3__ % of total costs in excess of $ __100,000.00__ but less than $1,000,000; plus

C. __2__ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells shall be excluded.

## 3. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposal of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

## 1. Purchases

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. If Material found to be defective or returned to vendor for any other reason, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

## 2. Transfers and Dispositions

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by Operator, unless otherwise agreed to by the Parties, shall be priced on the following bases exclusive of cash discounts:

A. New Material (Condition A)

   (1) Tubular goods except line pipe, shall be priced at the current new price in effect on date of movement, in maximum carload or barge load weight basis, regardless of quantity transferred, equalized to the published price f.o.b. railway receiving point or recognized barge terminal nearest the Joint Property where such Material is normally available.

   (2) Line Pipe

      (a) Movement of less than 30,000 pounds shall be priced at the current new price in effect at date of movement, as listed by a reliable supply store nearest the Joint Property where such Material is normally available.

      (b) Movement of 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph 2A (1) of this Section IV

   (3) Other Material shall be priced at the current new price in effect at date of movement, as listed by a reliable supply store or f.o.b railway receiving point nearest the Joint Property where such Material is normally available.

B. Good Used Material (Condition B)

   Material in sound and serviceable condition and suitable for reuse without reconditioning:

   (1) Material moved to the Joint Property

      (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section.

   (2) Material moved from the Joint Property

      (a) At seventy-five percent (75%) of current new price, as determined by Paragraph 2A of this Section, if Material was originally charged to the Joint Account as new Material; or

— 4 —

(b) at sixty-five percent (65%) of current new price, as determined by Paragraph 2A of this Sect. IV, if Material was originally charged to the Joint Account as good used Material at seventy-five per cent (75%) of current new price.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material (Condition C and D)

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function, after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Pa graph 2A of this Section IV. The cost of reconditioning shall be charged to the receiving property vided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

All other Material, including junk, shall be priced at a value commensurate with its use or at preva. prices. Material no longer suitable for its original purpose but usable for some other purpose, sh. priced on a basis comparable with that of items normally used for such other purpose. Operator may pose of Condition D Material under procedures normally utilized by the Operator without prior appr. of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and or value of such Ma is not equivalent to that which would justify a price as provided above may be specially priced as agreed the Parties. Such price should result in the Joint Account being charged with the value of the service dered by such Material.

E. Pricing Conditions

(1) Loading and unloading costs may be charged to the Joint Account at the rate of fifteen cents (15¢) hundred weight on all tubular goods movements, in lieu of loading and unloading costs sustained actual hauling cost of such tubular goods are equalized under provisions of Paragraph 5 of Sect.- II.

(2) Material involving erection costs shall be charged at applicable percentage of the current allowed price of new Material.

### 3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the p. charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so el notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his of such Material suitable for use and acceptable to Operator.

### 4. Warranty of Material Furnished by Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed Joint Account until adjustment has been received by Operator from the manufacturers or their agents

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

### 1. Periodic Inventories, Notice and Representation

At reasonable intervals, Inventories shall be taken by Operator of the Joint Account Controllable M. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any tory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Op. to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator

### 2. Reconciliation and Adjustment of Inventories

Reconciliation of a physical inventory with the Joint Account shall be made, and a list of overages and shall be furnished to the Non-Operators within six months following the taking of the inventory. Inventor justments shall be made by Operator with the Joint Account for overages and shortages, but Operat. held accountable only for shortages due to lack of reasonable diligence.

### 3. Special Inventories

Special Inventories may be taken whenever there is any sale or change of interest in the Joint Property. be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest place. In such cases, both the seller and the purchaser shall be governed by such inventory

### 4. Expense of Conducting Periodic Inventories

The expense of conducting periodic Inventories shall not be charged to the Joint Account unless agreed Parties.

EXHIBIT "D"


Attached to and made a part of that certain
Operating Agreement dated January 3, 1984, between
Thomson-Monteith, as Operator, and
Edge Petroleum Corporation, et al, as Non-Operators


Minimum insurance to be carried:

1. <u>Workmen's Compensation</u>

   To comply with the Laws of the State of Mississippi

2. <u>Employer's Liability</u>

   $100,000.00 bodily injury each person
   $300,000.00 bodily injury each accident

3. <u>Public Liability</u>

   $100,000.00 bodily injury each person
   $300,000.00 bodily injury each accident
   $100,000.00 property damage each accident

4. <u>Automobile Public Liability</u>

   $100,000.00 bodily injury each person
   $300,000.00 bodily injury each accident
   $100,000.00 property damage each accident

5. <u>Other Insurance</u>

   No other insurance shall be carried at the expense of the joint
   account except by mutual consent of the parties hereto.

   Non-Operator shall, upon request, be named as additional insureds insofar
as the limits specified above under Operator's policies of insurance and shall
be furnished evidence thereof. With respect to any obligation of the Operator
to provide insurance for the joint account, Operator's policies shall be
considered to be primary insurances which shall apply to any loss or claim and
Operator's underwriters shall not seek contribution from insurances carried by
members of the joint account.