UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC | ) | |
| EIN: 72-1417930 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 20-12380-EEB |
| SKLARCO, LLC | ) | |
| EIN: 72-1425432 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**NOTICE OF FILING OF REDLINED AMENDED PLAN
AND REDLINED AMENDED DISCLOSURE STATEMENT**

The Debtor, Sklar Exploration Company, LLC ("SEC" or "Debtor"), by and through its attorneys, Kutner Brinen, P.C., hereby files its redlined Amended and Restated Joint Plan of Reorganization dated December 18, 2020, a copy of which is attached hereto as Exhibit A and an Amended Disclosure Statement to Accompany Amended and Restated Joint Plan of Reorganization dated December 18, 2020, a copy of which is attached hereto as Exhibit B.

Dated: March 11, 2021                    Respectfully submitted,


By:___ */s/  Keri L. Riley*_____
              Jeffrey S. Brinen, #20565
              Keri L. Riley, #47605
              **KUTNER BRINEN, P.C.**
              1660 Lincoln Street, Suite 1850
              Denver, CO 80264
              Telephone: (303) 832-2400
              E-Mail: klr@kutnerlaw.com

# Exhibit A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC | ) | |
| EIN: 72-1417930 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | Case No. 20-12380-EEB |
| SKLARCO, LLC | ) | |
| EIN: 72-1425432 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION
DATED DECEMBER 18, 2020**

**KUTNER BRINEN, P.C.**
Jeffrey S. Brinen
Keri L. Riley
1660 Lincoln St., Suite 1850
Denver, CO 80264
Telephone: 303-832-2400
Email: klr@kutnerlaw.com

Counsel to the Debtors
and Debtors-in-Possession

4840-0355-5294v.1
4836-7496-7518.1

## TABLE OF CONTENTS

**ARTICLE I: 1RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS** ........................................................ **1**

   *A.*     *Rules of Interpretation, Computation of Time and Governing Law* ............................ 1

   *B.*     *Defined Terms* ........................................................................................... 2

ARTICLE II: **DESIGNATION OF CLAIMS AND INTERESTS.** ........................................ **10**

**ARTICLE III: SPECIFICATION AND TREATMENT OF UNCLASSIFIED PRIORITY CLAIMS.** ....................................................................................................... **11**

   *3.1*     *Administrative Expense Claims* ............................................................. 11

   *3.2*     *Professional Fee Claims* ..................................................................... 12

   *3.3*     *Priority Tax Claims.* ........................................................................... 12

   *3.4*     *DIP Loan Claim.* ............................................................................... 13

   *3.5*     *U.S. Trustee Payments.* ...................................................................... 13

**ARTICLE IV: SPECIFICATION AND TREATMENT OF CLASS 1 CLAIMS** .............. **13**

   ***4.1 Priority Wage Claims.*** .......................................................................... **13**

**ARTICLE V: SPECIFICATION AND TREATMENT OF SECURED CREDITOR CLAIMS.** ....................................................................................................... **13**

   *5.1 -*     *Class 2 and A - East West Bank.* ......................................................... 13

   *5.2 -*     *Class 3 - Ford Motor Credit.* ............................................................... 15

   *5.3 -*     *Class 4 – Ally Bank.* .......................................................................... 15

   *5.4 -*     *Classes B.1 through B.7 – Mechanics and Materialmen Lien Claimants.* ................. 16

**ARTICLE VI: SPECIFICATION AND TREATMENT OF UNSECURED CREDITOR CLAIMS.** ....................................................................................................... **16**

   *6.1 -*     *Class 5 – Reserved.* ........................................................................... 16

   *6.2 -*     *Class 6 and Class C – General Unsecured Claims Against SEC and Sklarco.* ........... 16

**ARTICLE VII: SPECIFICATION AND TREATMENT OF CLASS 7 AND CLASS D INTERESTS.** ....................................................................................................... **17**

   *7.1 -*     *Class 7 – Interests in SEC.* ................................................................. 17

   *7.2 -*     *Class D – Interests in Sklarco.* ............................................................ 17

**ARTICLE VIII: MEANS FOR IMPLEMENTATION** ..................................................... **18**

   *8.1 -*     *Continued Existence.* .......................................................................... 18

i

| 8.2 - | Operation of Business. | 18 |
|---|---|---|
| 8.3 - | Management Fees and Costs. | 19 |
| 8.4 - | Establishment and Funding Of Creditor Trust. | 19 |
| 8.5 - | Establishment of Reserve Fund | 20 |
| 8.6 - | Appointment of Independent Manager | 20 |
| 8.7 - | Termination of Independent Manager. | 21 |
| 8.8 - | Distributions Upon Occurrence of a Monetizing Event. | 21 |
| 8.9 - | Liquidation and Wind Down of SEC | 22 |
| 8.10 - | Conditions Precedent to the Effective Date of the Plan. | 22 |
| 8.11 - | Effect of Failure of Conditions. | 23 |
| 8.12 - | Distributions to Allowed Claims. | 23 |
| 8.13 - | Objections to and Resolution of Claims | 24 |
| 8.14 - | Establishment of Disputed Claim Reserves. | 24 |
| 8.15 - | Estimation. | 24 |
| 8.16 – | Recoupment. | 25 |

**ARTICLE IX: EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................... 25**

| 9.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases by Sklarco.. 25 |
|---|---|
| 9.2 | Assumption and Rejection of Executory Contracts and Unexpired Leases by SEC. ... 25 |
| 9.3 | Cure | 26 |
| 9.4 | Rejection Damage Claims | 26 |

**ARTICLE X: EFFECT OF CONFIRMATION OF THE PLAN ........................................ 26**

| 10.1 - | Binding Effect. | 26 |
|---|---|---|
| 10.2 - | Vesting of Property. | 26 |
| 10.3 - | Reinstatement and Continuation of Insurance Policies. | 27 |
| 10.4 - | Discharge of Debtors. | 27 |
| 10.5 - | Exculpation | 27 |
| 10.6 - | Injunction. | 27 |
| 10.7 - | Preservation of Causes of Action | 28 |
| 10.8 - | Compromise and Settlement of Claims, Interests, and Controversies | 28 |

**ARTICLE XI. MISCELLANEOUS PROVISIONS ...................................................... 29**

| 11.1 - | Payment of Statutory Fees. | 29 |
|---|---|---|
| 11.2 - | Retention of Jurisdiction. | 29 |
| 11.3 - | Modification of the Plan. | 30 |

ii

| 1. | Pre-Confirmation Modifications. | 30 |
| 2. | Post-Confirmation Immaterial Modifications. | 30 |
| 3. | Post-Confirmation Material Modifications. | 30 |

*11.4 -*   *Governing Law.* .................................................................................................... *30*

*11.5 -*   *Filing or Execution of Additional Documents.* ........................................................ *30*

*11.6 -*   *Exemption from Transfer Tax.* ................................................................................. *30*

*11.7 -*   *Dissolution of Committee.* ....................................................................................... *31*

*11.8 -*   *Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a).* ...... *31*

*11.9 -*   *Exhibits/Schedules.* ............................................................................................... *31*

*11.10 -*   *Notices.* ................................................................................................................. *31*

*11.11 -*   *Vacatur of Confirmation Order.* ............................................................................. *32*

**ARTICLE XII: REQUEST FOR CONFIRMATION** ................................................................. **32**

iii

# INTRODUCTION

Sklar Exploration Company, LLC ("SEC") and Sklarco, LLC ("Sklarco"), as debtors and debtors-in-possession (collectively, the "Debtors"), hereby propose, pursuant to Chapter 11 of Title 11 of the United States Code, the following Joint Plan of Reorganization.

This Plan provides for the reorganization of the Sklarco and the limited reorganization of SEC solely for the purpose of winding down its operations and transitioning operatorship of oil and gas properties to a new duly appointed operator followed by a liquidation of assets. Pursuant to the Plan, Sklarco shall restructure its debts and obligations and continue to operate in the ordinary course of business. A more complete history of the Debtors, their operations, an explanation of this Plan, and a description of the Debtors' financial condition and future business activity is contained in the Disclosure Statement which accompanies this Plan. Reference should be made to the Disclosure Statement by all creditors and parties who intend to cast a ballot for or against this Plan.

# ARTICLE I

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A   *Rules of Interpretation, Computation of Time and Governing Law*

1. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

1

### B.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.1 -    "<u>Administrative Claim</u>" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code, including (a) actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Debtor's Estate and operating its business, including wages, salaries, or commissions for services rendered after the Petition Date, (b) Professional Fees, and (c) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code; *provided*, *however*, that post-Petition Date liabilities incurred or expenses arising in the ordinary course of the Debtor's business, including, but not limited to, trade vendor, employee wage and benefit, and state and local property, sales, and use taxes shall not constitute Administrative Claims for which a proof of Administrative Claim shall be required to be filed.

1.2 -    "<u>Administrative Claims Bar Date</u>" means the deadline for filing Administrative Claims, including Professional Fee Claims, which date shall be set in the Confirmation Order.

1.3 -    "<u>Allowed</u>" means with respect to Claims: (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein and to the maximum extent provided by applicable law, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor, as applicable. For the avoidance of doubt, to the maximum extent provided by applicable law and except as provided herein or otherwise agreed, no Entity may File a Proof of Claim after the Claims Bar Date without further order of the Bankruptcy Court. "Allow" and "Allowing" shall have correlative meanings. .

1.4 -    "<u>Assets</u>" means any and all of either SEC or Sklarco's real or personal property of any nature, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, causes of action, any other general

intangibles of either Debtor, and the property of the Estate under section 541 of the Bankruptcy Code.

1.5 -   "Assumed Contracts" means all executory contracts and unexpired leases assumed by the Debtors under section 365 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court entered prior to or on the Effective Date.

1.6 -   "Available Cash" means net revenue owned by Sklarco and SEC, determined in arrears on a quarterly basis, whether maintained in accounts owned by Sklarco or SEC, after (1) payment of expenses including payment of joint interest billing obligations to third party operators, (2) contribution(s) to the Reserve Fund in accordance with the budgets prepared by the Reorganized Debtors, and (3)(a) prior to a Monetizing Event, payment of interest on account of the EWB Secured Claim ; or (b) after a Monetizing Event resulting in a refinance of the EWB Secured Claim, payment of any required debt service payments required for a new loan, provided however that in no event shall the Available Cash remaining after a Monetization Event be reduced to an amount less than [●].

1.7 -   "Avoidance Actions" means the Debtors' causes of action for any avoidance or recovery action under sections 502, 506, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfers, whether or not litigation has been commenced with respect to such causes of action as of the Effective Date.

1.8 -   "Bankruptcy Code" means title 11 of the United States Code, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing, to the extent such amendments, modifications, or replacements are applicable to the Chapter 11 Cases.

1.9 -   "Bankruptcy Court" means the United States Bankruptcy Court for the District of Colorado, or such other court as may properly exercise jurisdiction over the Chapter 11 Cases.

1.10 -  "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code and the Official Bankruptcy Forms, the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, all as now in effect or hereafter amended, and as applicable to the Chapter 11 Cases.

1.11 -  "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in Denver, Colorado.

1.12 -  "Cash" means cash and cash equivalents, including, without limitation, wire transfers, bank deposits, checks and legal tender of the United States.

1.13 -  "Causes of Action" means any and all of the Estates' and the Debtors' actions, Claims, demands, rights, defenses, counterclaims, suits, causes of action, liabilities, obligations, debts, judgments, remedies, damages, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims, and any other claim, whether known or unknown,

foreseen or unforeseen, direct or indirect, derivative, choate or inchoate, in law, equity, or otherwise, including all Avoidance Actions, and any and all other claims or rights of any value whatsoever, at law or in equity, against any Creditor or other third party, including any and all claims against any Insiders, members, officers, directors, managers or employees of the Debtors; *provided*, *however*, that, when used in the Plan, the term "Causes of Action" does not include any Claim, obligation, suit, judgment, damages, right, remedy, cause of action, charge, cost, debt, indebtedness, or liabilities released or waived pursuant to Paragraph 10.5 of the Plan or by order of the Bankruptcy Court, nor does the term "Causes of Action" include any appeals pending under applicable State Law for the refund of severance taxes.  When used in the Plan, the term "Causes of Action" shall also specifically include any claim, demand, right, and cause of action that may only be asserted by a Person other than the Debtor (including the Holder of a Claim or Interest) on a derivative or other basis.  A Cause of Action shall not under any circumstances be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan. Except as expressly provided herein, nothing in the Plan operates as a release of any of the Causes of Action.

1.14 -   "Chapter 11 Cases" means, together, the Debtors' Chapter 11 cases, pending in the Bankruptcy Court under Case Nos. 20-12377-EEB and 20-12380-EEB, jointly administered under Case No. 20-12377-EEB.

1.15 -   "Claim" means a "claim" against either Debtor, as defined in section 101(5) of the Bankruptcy Code and as supplemented by section 102(2) of the Bankruptcy Code, whether or not asserted, or reduced to judgment, whether known or unknown, liquidated or unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether arising before, on, or after the Petition Date.

1.16 -   "Claims Agent" means Epiq Corporate Restructuring, LLC or such successor claims agent as may be employed by the Debtors with approval of the Bankruptcy Court.

1.17 -   "Claims Bar Date" means, September 28, 2020 or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court to File such Claims.

1.18 -   "Claims Objection Bar Date" means, for each Claim, the later of (a) 120 Days after the Effective Date of the Plan and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

1.19 -   "Class" means one of the classes of Claims or Interests listed in Article II of this Plan.

1.20 -   "Collateral" means any property or interest in property of either Debtor's Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or other applicable law.

1.21 -   "Committee" means the Official Committee of Unsecured Creditors as set forth in the *United States Trustee's Amended Appointment of Official Committee of Unsecured Creditors* (Docket No. 713), as amended from time to time.

1.22 - "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court.

1.23 - "Confirmation Date" means the date that the Bankruptcy Court enters a Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

1.24 - "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.25 - "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

1.26 - "Creditor" means a creditor, within the meaning of section 101(10) of the Bankruptcy Code, of either of the Debtors.

1.27 - "Creditor Trust" means that certain trust created pursuant to the Creditor Trust Agreement as described more fully in Section 8.4.

1.28 - "Creditor Trust Agreement" means the agreement for the formation of the Creditor Trust, filed with the Plan Supplement, which shall be in the form and substance reasonably acceptable to the Debtors, Committee, and East West Bank.

1.29 - "Creditor Trust Allocation" means, beginning on the Effective Date, (a) until a Monetizing Event, 9% of the Available Cash; and (b) after a Monetizing Event, (i) until the Creditor Trust has received $3 million toward the Creditor Trust Payment Obligation in excess of any distributions it may be entitled to receive under Section 8.8(b) below, [●]%80% of Post-Monetization Proceeds; and (ii) after the Creditor Trust has received $3 million toward the Creditor Trust Payment Obligation in excess of any distributions it may be entitled to receive under Section 8.8(b) below, [●]% of Post-Monetization Proceeds; and (iii) after the Creditor Trust has received $8 million toward the Creditor Trust Payment Obligation in excess of any distributions it may be entitled to receive under Section 8.8 below, [●]% of the66.7% of Post-Monetization Proceeds.

1.30 - "Creditor Trust Payment Obligation" means the joint and several obligation of the Reorganized Debtors to make one or more payments the Creditor Trust in the total amount of $22,000,000.

1.31 - "Creditor Trustee" means the duly appointed trustee of the Creditor Trust.

1.32 - "Debtors" means the Debtors who are proposing this Plan, SEC and Sklarco.

1.33 - "Disallowed Claim" means a Claim, or any portion thereof, that (a) has been disallowed by a Final Order, or (b) is not Scheduled or is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a bar date has been established but no proof of claim has been filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, or otherwise deemed timely filed under applicable law.

1.34 - "Disputed Claim" means a Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, including, but not limited to, Claims (a) (i) that have not been Scheduled by either Debtor, but as to which a timely proof of claim has been filed or (ii) have been Scheduled at zero or as contingent, unliquidated, or disputed, but as to which a timely proof of claim in a liquidated amount has been filed and (b) as to which either Debtor, either Reorganized Debtor, or any other party-in-interest has interposed a timely objection or request for estimation, or has sought to subordinate or otherwise limit recovery, in accordance with the Bankruptcy Code and the Bankruptcy Rules, or which is otherwise disputed by either Debtor, either Reorganized Debtor, or other party-in-interest in accordance with applicable law, which objection, request for estimation, action to limit recovery, or dispute has not been withdrawn or determined by a Final Order.  In the event that any part of a Claim is disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distributions under this Plan unless and until a Final Order has been entered allowing such Claim.

1.35 - "Disputed Claim Reserve" means the reserve established and maintained by the Creditor Trust in accordance with Paragraph 8.14 of the Plan.

1.36 - "Distributions" means the properties or interests in property to be paid or distributed under this Plan to the holders of Allowed Claims.

1.37 - "Effective Date" means the date that all conditions to consummation of this Plan set forth in Paragraph 8.10.

1.38 - "Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

1.39 - "Estates" means the estates of the Debtors created by section 541 of the Bankruptcy Code on the Petition Date.

1.40 - "EWB" means East West Bank, a California state banking corporation.

1.41 - "EWB Loan and Security Documents" has the meaning set forth in the EWB Proof of Claim.

1.42 - "EWB Proof of Claim" means the proofs of claim filed on account of the EWB Secured Claim in the respective claims registers of the Debtors, as Claim No. 90, in the Sklarco Chapter 11 Case and as Claim No. 56 in the SEC Chapter 11 Case .

1.43 - "EWB Secured Claim" means the Allowed Secured Claim of EWB in the amount of $24,000,000.00.

1.44 - "Exculpated Party" means SEC, Sklarco, CR3, the Committee, and their respective officers, directors, employees, partners, advisors, attorneys, financial advisors, accountants, and other professionals.

1.45 - "Executory Contract" means every unexpired Joint Operating Agreement, unexpired Lease, and every other contract that is subject to being assumed or rejected by the Debtor under 11 U.S.C. § 365, pursuant to the Plan or pursuant to a separate motion.

6

1.46 - "<u>Final Cash Collateral Order</u>" means the *Final Order Authorizing Use Of Cash Collateral, Granting Adequate Protection, And Providing Related Relief* entered by the Bankruptcy Court on June 15, 2020, in the jointly administered Chapter 11 Cases at docket no. 433.

1.47 - "<u>Final Decree</u>" means the decree or other order of the Bankruptcy Court closing the Chapter 11 Case, as contemplated by section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

1.48 - "<u>Final Order</u>" means an order, ruling, or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court of other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.49 - "<u>General Unsecured Claim</u>" means any Claim that is not (a) entitled to priority under section 507(a) of the Bankruptcy Code or subordinated pursuant to section 510(b) of the Bankruptcy Code, or (b) a Secured Claim, Priority Tax Claim, or Other Priority Claim.

1.50 - "<u>Howard Trust</u>" means the Howard F. Sklar Inter Vivos Trust.

1.51 - "<u>Howard Sklar Trust Allocation</u>" means beginning on the Effective Date, (a) until a Monetizing Event, 1% of the Available Cash; and (b) after a Monetizing Event, (i) until and the Creditor Trust has received $3 million toward the Creditor Trust Payment Obligation in excess of any distributions it may be entitled to receive under Section 8.8(b) below, ~~[●]%~~20% of Post-Monetization Proceeds; and (ii) after the Creditor Trust has received $3 million toward the Creditor Trust Payment Obligation in excess of any distributions it may be entitled to receive under Section 8.8(b) below, ~~[●]% of Post-Monetization Proceeds; and (iii) after the Creditor Trust has received $8 million toward the Creditor Trust Payment Obligation in excess of any distributions it may be entitled to receive under Section 8.8 below, [●]% of the~~33.3% of Post-Monetization Proceeds.

1.52 - "<u>Holder</u>" means an Entity holding a Claim or Interest (as the case may be), and with respect to a Distribution under the Plan, an Entity holding the beneficial interest in a Claim or Interest as of the Distribution Date

1.53 - "<u>Impaired</u>" means, when used with reference to a Claim or Interest, a Claim or Interest (as the case may be) that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.54 -  "Independent Manager" shall mean the person(s) selected to manage the day-to-day affairs of the Debtors as set forth in Paragraph 8.6.

1.55 -  "Insider" means (i) an "insider," as defined in Section 101(31) of the Bankruptcy Code, and (ii) an "affiliate," as defined in Section 101(2) of the Bankruptcy Code.

1.56 -  "Interest" shall mean any member interest, preferred, common, or otherwise, or any other instrument evidencing any ownership interest in the Debtors and any option, warrant or right of any nature, contractual or otherwise, to acquire an ownership interest in the Debtors.

1.57 -  "JIB Obligation" means the amount owed to SEC by certain working interest holders for unpaid joint interest billings issued by SEC on the Effective Date of the Plan.

1.58 -  "Joint Operating Agreement" or "Unit Operating Agreement" or "JOA" means those agreements by and between SEC and various Working Interest Holders concerning management, ownership, and control of each operational or other well or property, as amended from time to time.

1.59 -  "JOA Cure Claim" means the Allowed Claim held by a creditor asserting a claim for an uncured monetary default under the applicable JOA, or such other amount as set by the Bankruptcy Court, for those JOAs assumed by Sklarco prior to or at confirmation of the Plan, if any.

1.60 -  "Lease" means any lease agreement between either Debtor and another Entity.

1.61 -  "Lien" means any charge against or interest in property to secure payment or performance of a claim, debt, or obligation.

1.62 -  "Monetizing Event" means the occurrence of a refinancing of the EWB Secured Claim, a sale by the Reorganized Debtors of all or substantially all of their respective assets, or a sale following a foreclosure on collateral securing the EWB Secured Claim.

1.63 -  "NSAI Reserve Report" means *Estimates of Reserves and Future Revenues to the Combined Interests of Sklar Exploration Company and Sklarco, LLC in Certain Oil and Gas Properties Located in the United States as of September 1, 2020*, by Netherland, Sewell & Associates, Inc.

1.64 -  "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code, other than an Administrative Claim, a Priority Wage Claim, or a Priority Tax Claim.

1.65 -  "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code.

1.66 -  "Petition Date" means April 1, 2020, the date on which the Debtors filed their voluntary petitions commencing the Chapter 11 Cases.

1.67 -  "Plan" means this joint plan under Chapter 11 of the Bankruptcy Code, together with all exhibits and schedules hereto, as it has been or may be amended, modified, or

supplemented from time to time in accordance with section 1127 of the Bankruptcy Code, including the Plan Supplement.

1.68 - "Plan Supplement" means the supplement containing substantially final forms of the Plan Supplement Documents to be filed with the Clerk of the Bankruptcy Court no later than twenty-one (21) days prior to the Confirmation Hearing.

1.69 - "Plan Supplement Documents" means the documents and information as the Debtors determine to be necessary or appropriate to the implementation and/or confirmation of the Plan, including but not limited to any necessary escrow agreements, contractual agreements for the Independent Manager, the Resignation and Transition Schedule and the Creditor Trust Agreement.

1.70 - "Post-Monetization Proceeds" means (i) all Available Cash in the event of a refinancing of the EWB Secured Claim, all Available Cash as adjusted by the new lender; and; or (ii) in the event of a sale by the Reorganized Debtors of all or substantially all of their respective assets or a sale following a foreclosure on collateral securing the EWB Secured Claim, all proceeds of such sale following the payments set forth in Section 8.8(a) and (b).

1.71 - "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.72 - "Priority Wage Claim" means a Claim that is entitled to priority under Section 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

1.73 - "Professional" means any professional employed in the Chapter 11 Cases pursuant to section 327 of the Bankruptcy Code or otherwise, and the professionals seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.74 - "Professional Fee Claim" means a Claim of a Professional for compensation for services rendered, and/or reimbursement of costs and expenses incurred, after the Petition Date and prior to and including the Confirmation Date.

1.75 - "Proof of Claim" means a proof of claim pursuant to section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court, together with supporting documents.

1.76 - "Reorganized SEC, Reorganized Sklarco, or Reorganized Debtors" means the respective Debtors, or collectively the Debtors, as reorganized pursuant to and under the Plan on or after the Effective Date.

1.77 - "Reserve Fund" mean a segregated account established by and for the benefit of the Debtors to be used in consultation with EWB for unbudgeted expenditures such as unanticipated maintenance expenses, repairs for major weather events, and other unbudgeted expenditures.

1.78 - "Resignation and Transition Schedule" shall mean the schedule prepared by SEC to effectuate an orderly resignation from operatorship of the operated oil and gas properties in

9

accordance with the applicable JOAs and State and Federal Law, to transition operations to a new, duly appointed operator, and to complete a final wind down of operations.

1.79 - "Revenue Parties" means working interest holders, overriding royalty interest holders, and royalty interest holders holding an interest in the wells operated by SEC on the Effective Date of the Plan.

1.80 - "Schedules" means the schedules of assets and liabilities, the list of Holders of Interests, and the statement of financial affairs filed by the Debtors in the Chapter 11 Cases under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists, and statements have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009.

1.81 - "Secured Claim" means (a) a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) a Claim that is Allowed as a Secured Claim under this Plan.

1.82 - "Sklar DIP Loan Order" shall mean the Order entered by the Court on June 15, 2020, Docket No. 431, approving a loan by Howard Sklar, the Howard Sklar Trust, the Jacob Sklar Trust, and the Alan Sklar Trust in the total principal amount of $1,233,000..

1.83 - "Sklar DIP Loan Claim" shall mean the claim arising from the loan extended by Howard Sklar, the Howard Sklar Trust, the Jacob Sklar Trust, and the Alan Sklar Trust, as described in the total principal amount of $1 millionSklarco DIP Loan Order.

1.84 - "Tolling Agreement" shall mean a tolling agreement in a form reasonably acceptable to the Creditor Trustee and Howard Sklar extending the limitation periods under Section 546(a) of the Bankruptcy Code to commence an Avoidance Action against Howard Sklar and/or any trust or estate for which Howard Sklar serves as trustee or in a similar capacity to the date that is 180 days after the closing date of a Monetizing Event.

1.85  1.84 -   "Unimpaired Claim" means a Claim that is not Impaired under this Plan.

## ARTICLE II.

## DESIGNATION OF CLAIMS AND INTERESTS

The following is a designation of all classes of Claims and Interests other than those Claims of a kind specified in Sections 507(a)(2), 507(a)(3) or 507(a)(8) of the Code.

**Sklarco**

Class A - The Allowed Secured Claim held by East West Bank.

Class B.1 through B.7– The Allowed Secured Claims held by Mechanics Lien Claimants more specifically identified as follows:

Class B.1 - The Allowed Secured Claim held by Stoneham Drilling Corporation, if any.

Class B.2 - The Allowed Secured Claim held by Premium Oilfield Services, LLC, if any.

Class B.3 - The Allowed Secured Claim held by Weatherford U.S., L.P., if any.

Class B.4 - The Allowed Secured Claim held by Liquid Gold Well Service, Inc., if any.

Class B.5 – The Allowed Secured Claim held by RAPAD Well Service, Inc., if any.

Class B.6 – The Allowed Secured Claim held by Pro-Tek Field Services, LLC, if any.

Class B.7 – The Allowed Secured Claim held by Pioneer Wireline Services, LLC, if any.

Class C – The Allowed General Unsecured Claims against Sklarco.

Class D – The member Interest held by Howard Trust

**SEC**

Class 1 - The Allowed Priority Wage Claims.

Class 2 - The Allowed Secured Claim held by East West Bank.

Class 3 – The Allowed Secured Claim held by Ford Motor Credit.

Class 4 – The Allowed Secured Claim held by Ally Bank.

Class 5 – Reserved.

Class 6 - The Allowed General Unsecured Claims against SEC held by unsecured creditors unless separately classified.

Class 7 - The member Interest held by Howard Trust.

## ARTICLE III.

## SPECIFICATION AND TREATMENT OF UNCLASSIFIED PRIORITY CLAIMS

As provided in Section 1123(a)(1) of the Bankruptcy Code, the Claims against the Debtors covered in this Article III are not classified. The holders of such Allowed Claims are not entitled to vote on the Plan.

3.1     **Administrative Expense Claims**

11

Except as otherwise provided for herein, on the latest of (i) the Effective Date, (ii) the date that is five (5) Business Days after the date an Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date that is five (5) Business Days after the date an Allowed Administrative Claim becomes payable pursuant to any agreement between the applicable Debtor, as the case may be, and the Holder of such Administrative Claim, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding anything to the contrary, that post-Petition Date liabilities incurred or expenses incurred in the ordinary course of the Debtors' business, including, but not limited to, vendor expenses, employee wages and benefits, and state and local property taxes, and severance taxes shall be paid by Debtors in the ordinary course of business without the need for further Bankruptcy Court approval.

Notwithstanding any other provision in this Plan regarding the payment of Administrative Claims, the Confirmation Order shall establish an Administrative Claims Bar Date for filing Administrative Claims, which date shall be 45 days after the Confirmation Date.  Holders of asserted Administrative Claims, except for (i) Professional Fee Claims, (ii) United States Trustee fees, and (iii) post-Petition Date liabilities incurred or expenses arising in the ordinary course of the Debtors' business, shall submit requests and seek allowance and payment of administrative expenses so as to be *actually received* on or before such Administrative Claims Bar Date or forever be barred from doing so.  The notice of entry of the Confirmation Order to be delivered pursuant to Fed. R. Bankr. P. 3020(c) and 2002(f) shall set forth such date and constitute notice of the Administrative Claims Bar Date.  The Reorganized Debtors shall have 45 days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

## 3.2   **Professional Fee Claims**

Each Professional whose retention with respect to the Chapter 11 Cases has been approved by the Bankruptcy Court, who is required by the terms of their engagement to file Fee Applications, and who holds or asserts an Administrative Claim that is a Professional Fee Claim shall be required to file with the Bankruptcy Court, and to serve on all parties required to receive notice, a final Fee Application on or before the Administrative Claims Final Bar Date.  The failure to timely file the Fee Application shall result in the Professional Fee Claim being forever barred and discharged.  A Professional Fee Claim with respect to which a Fee Application has been properly and timely filed shall be treated and paid as an Administrative Claim only to the extent allowed by Final Order.

## 3.3   **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim (a) in the Reorganized Debtors' sole discretion, either (i) on the Effective Date or as soon as practicable thereafter, Cash in an amount equal to such Allowed Priority Tax Claim, or (ii) treatment provided under section 1129(a)(9) of the Bankruptcy Code; or (b) such other treatment as to which the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax

Claim shall have agreed upon in writing.  For the avoidance of a doubt, Allowed Priority Tax Claims shall be paid in full with any statutory interest within five (5) years of the Petition Date.

3.4      **DIP Loan Claim.**

The holders of Sklar DIP Loan Claim, shall be entitled to be paid in one or more cash payments after the creditors in Classes 1 through 6 and A through C are paid in full. The Loan Agreement approved by the Sklar DIP Loan Order shall remain in place and is assumed in full with all restrictions to payment until after all existing secured and unsecured creditors are paid *provided*, for avoidance of doubt, that as provided in the Sklar DIP Loan Order, if any judgment is entered against the Sklar Parties (as defined in the Sklar DIP Loan Order) for any action arising under Section 544, 547, 548, 549, or 550, the amount of such judgment shall be offset first against the balance of such parties' loan, *provided further* that such offset shall not shall not be applied to any limits under applicable insurance policies or judgments for which any insurance company may be liable.

3.5      **U.S. Trustee Payments.**

The Debtors will make all payments required to be paid to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) until the case is closed, converted, or dismissed.  All payments due to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid on the Effective Date, and the Reorganized Debtors shall thereafter pay U.S. Trustee fees due on a quarterly basis until the case is closed, converted, or dismissed.

## ARTICLE IV.

## SPECIFICATION AND TREATMENT OF CLASS 1 CLAIMS

4.1      **Priority Wage Claims.**

Allowed Class 1 Priority Wage Claims shall be paid in full on the Effective Date, unless the holder of a Class 1 claim agrees to an alternative treatment.  The Class 1 claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code.

## ARTICLE V.

## SPECIFICATION AND TREATMENT OF SECURED CREDITOR CLAIMS

**5.1 -      Class 2 and A - East West Bank.**

The Class 2 and A Secured Claims consist of the EWB Secured Claim.  The EWB Secured Claim is impaired by this Plan.  The EWB Secured Claim will be treated under this Plan as follows:

a.      The principal amount of the EWB Secured Claim in Class 2 and A shall be allowed as a Secured Claim in the amount of $24 million, less any payments received post-petition and pre-confirmation, excluding payments for attorney fees, shall retain all liens

13

securing the EWB Secured Claim as of the Petition Date, and shall bear interest at a rate of 6.0% per annum.

       b.     Subject to paragraph (c) below, the EWB Secured Claim shall receive  not less than 90% of Available Cash.  For the avoidance of a doubt, interest on account of the EWB Secured Claim shall continue to be paid on a monthly basis, and calculation of Available Cash shall be determined after deduction of such interest payments.  The Reorganized Debtors shall continue to provide regular cash budgets to, and in consultation with, EWB.

       c.     In the event the market price for crude oil drops below $40/bbl for WTI Crude based on the CL1 Commodity market-close price listed at <https://www.bloomberg.com/quote/CL1:COM> for a period of five (5) or more consecutive days, EWB shall be entitled to adjust the monthly payment amount so that, based on the decline curve set forth in the NSAI Reserve Report, the loan-to-value ratio does not at any time exceed the loan-to-value ratio as of the Effective Date of the Plan (the "Plan LTV Ratio"). EWB may request, from time to time, such other Engineering Reports or Reserve Reports (each as defined in the EWB Loan and Security Documents) to the extent provided in the EWB Loan and Security Documents. A "Borrowing Base Deficiency" within the meaning of that term in the EWB Loan and Security Documents shall occur whenever the loan-to-value ratio exceeds the Plan LTV Ratio.  In the event of a Borrowing Base Deficiency, EWB may, in its sole and absolute discretion, (i) elect temporarily to waive any default based on a Borrowing Base Deficiency, (ii) make such redeterminations provided under the EWB Loan and Security Documents, or (iii) take such other actions provided under the EWB Loan and Security Documents.

       d.     The EWB Secured Claim shall become due and payable on the second anniversary of the Effective Date of the Plan, which amount shall be paid through sale of assets or refinance of the EWB Secured Claim.  No later than six months prior the maturity date of the EWB Secured Claim hereunder, eighteen (18) months after the Effective Date of the Plan, the Debtors in consultation with EWB and the Creditor Trustee, and Howard Sklar, as trustee of the Howard Sklar Trust, shall determine if a marketing and sale process must be commenced; provided however that the Creditor Trustee and Howard Sklar shall not have the ability or authority to veto the decisions made by the Reorganized Debtors and shall not have any authority or right to interfere with EWB's sole and absolute discretion regarding the collateral securing the EWB Secured Claim as provided in accordance with the EWB Loan and Security Documents under the Plan.  Following such consultation with EWB, and the Creditor Trustee, and Howard Sklar, the Reorganized Debtors shall make an election no later than nineteen (19) months after the Effective Date either to pursue a refinancing based on a commercially reasonable likelihood that a refinancing will occur, or to market and sell the Reorganized Debtors' assets.  If the election is made to sell the assets of the Reorganized Debtors, the Reorganized Debtors shall cooperate with EWB to engage an investment banker to market and sell mineral interests held by Sklarco and any and all other assets held by the Reorganized Debtors.  Any sale, refinance, or foreclosure shall be considered a Monetizing Event, and the proceeds shall be distributed in accordance with Section 8.8 herein.  For the avoidance of doubt, nothing herein shall preclude the Reorganized Debtors (through the Independent

Manager), in their reasonable business judgment, from consulting with other parties in interest, including, without limitation, Howard Sklar as trustee of the Howard Sklar Trust, in connection with any refinancing or marketing and sale process nor from providing information concerning any such refinancing or marketing and sale process upon reasonable request, subject to any satisfaction of any confidentiality obligations that may exist.

e.      From and after the Effective Date, except for cash sales and transactions in the ordinary course of business, the Reorganized Debtors shall not sell any assets or interest in which EWB has an interest without the express written consent of EWB.  For the avoidance of a doubt, EWB may authorize one or more sales of less than substantially all of the Reorganized Debtors' assets in which EWB has an interest, provided however that all net proceeds shall be distributed in accordance with Section 8.8 herein. The Creditor Trust may also authorize one or more sales of less than substantially all of the Reorganized Debtors' assets that are allocated to the Creditor Trust pursuant to Section 8.4, below, with the proceeds of any such sales applied to the balance of the Creditor Trust Payment Obligation.

f.      Debtors have the right to prepay the EWB Claim without premium or penalty.

g.      Sklarco shall be required to enter into a hedging program with respect to its interests in a form agreeable to EWB.

h.      The EWB Loan and Security Documents shall remain in full force and effect except as expressly modified herein. On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall execute and deliver such other and further documents, amendments, or modifications, and take such further actions, as may be reasonably requested by East West Bank to implement the provisions of this Plan relating to the EWB Secured Claim.

**5.2 -   Class 3 - Ford Motor Credit.**

The Class 3 Claim is impaired by the Plan.  The Class 3 Claim will retain all liens securing the Claim on the Effective Date of the Plan, and shall be paid in accordance with the underlying contracts until such time as vehicles securing the Class 3 Claim are returned in accordance with the Resignation and Transition Schedule. Any remaining amounts owed on account of the Class 3 Claim following return and liquidation of the vehicles will be treated as a Class 6 unsecured claim.

**5.3 -   Class 4 – Ally Bank.**

The Class 4 Claim is impaired by the Plan.  The Class 4 Claim will retain all liens securing the Claim on the Effective Date of the Plan, and shall be paid in accordance with the underlying contracts until such time as the vehicle(s) securing the Class 4 Claim is returned in accordance with the Resignation and Transition Schedule.  Any remaining amounts owed on account of the Class 4 Claim following return and liquidation of the vehicle(s) will be treated as a Class 6 unsecured claim.

**5.4 -   Classes B.1 through B.7 – Mechanics and Materialmen Lien Claimants.**

Classes B.1 through B.7 consist of the Allowed or arguably allowable classes of creditor claims held by Premium, Stoneham, Weatherford, Liquid Gold, RAPAD, Pro-Tek Field Services, and Pioneer Wireline Services, all of whom assert a secured claim based on mechanics liens arising under applicable State Law for which Notices of Perfection of Liens Under Section 546(b) have been filed.  On the Effective Date of the Plan, the Class B.1 through B.7 Claims shall be deemed unsecured pursuant to 11 U.S.C. § 506 and treated as Class 6 general unsecured claims of SEC.

**ARTICLE VI.**

**SPECIFICATION AND TREATMENT OF
UNSECURED CREDITOR CLAIMS**

**6.1 -   Class 5 – Reserved.**

**6.2 -   Class 6 and Class C – General Unsecured Claims Against SEC and Sklarco.**

Class 6 and Class C are comprised of the Allowed General Unsecured Claims against SEC and Sklarco.  Class 6 and Class C claims shall be treated under this Plan as follows:

a.      On the Effective Date of the Plan, all Class 6 and Class C Creditors will receive a beneficial interest in the Creditor Trust in exchange for their claims

b.      Subject to Section 5.1(c) above, ~~(i)~~ beginning on the Effective Date ~~and until a Monetizing Event, the Reorganized Debtors shall pay [●]% of the Available Cash to the Creditor Trust; and (ii) after a Monetizing Event~~, the Reorganized Debtors shall pay the Creditor Trust Allocation to the Creditor Trust.  The Creditor Trust shall further receive all distributions from or payments on account of all assets and/or interests allocated to the Creditor Trust.  All payments _of the Creditor Trust Allocation_ received by the Creditor Trust shall be applied against the balance of the Creditor Trust Payment Obligation and distributed to beneficiaries on a pro rata basis until the earlier of the date on which the Creditor Trust Payment Obligation is paid in full, or ~~the~~ all Allowed Class 6 and Class C Claims are paid in full.

c.      In the event of a refinance of the EWB Secured Claim, ~~payments on account of~~ the Creditor Trust ~~Payment Obligation~~ shall ~~be readjusted based on the terms of the new loan issued at the time of the refinance, but in no event shall~~ receive the Creditor Trust ~~receive less than [●]% of the Available Cash.~~ Allocation of the Post-Monetization Proceeds as defined in Section 1.29.  The Reorganized Debtors ~~shall continue to calculate Available~~

16

~~Cash in the same manner as before such refinance, and~~ shall continue to make such payments after such refinance until the earlier of the date on which the balance of the Creditor Trust Payment Obligation is paid in full or all Allowed Class 6 and Class C Claims are paid in full.

   d. Notwithstanding anything to the contrary, upon entry of an Order confirming the Plan, the Plan shall be binding on both Reorganized Debtors until the obligations therein are satisfied.

## ARTICLE VII.

## SPECIFICATION AND TREATMENT OF CLASS 7 AND D INTERESTS

### 7.1 - Class 7 – Interests in SEC.

   Class 7 consists of the Interests in SEC.  Class 7 is impaired by the Plan.  On the Effective Date of the Plan, all membership interests shall be placed in escrow and under the control of a party acceptable to EWB, the Creditor Trustee, and Howard Sklar, as trustee of the Howard Sklar Trust, and subject to an escrow agreement and any valid liens until all payments under the Plan are completed.  Following the wind down and liquidation of Reorganized SEC in accordance with Section 8.9, all membership Interests in SEC will be terminated.

### 7.2 - Class D – Interests in Sklarco.

   Class D consists of the Interests in Sklarco.  Class D is impaired by the Plan, in that there is a loss of control for the Interest Holders ~~and,~~ a loss of voting rights as set forth in Paragraph 8.6 of the Plan, and a diminishment of economic value through Sklarco's contributions of Available Cash to satisfy the Creditor Trust Payment Obligation.  On the Effective Date of the Plan, all membership interests shall be placed in escrow and under the control of a party acceptable to EWB and Howard Sklar, as trustee of the Howard Sklar Trust, and subject to any valid liens, and shall be subject to an escrow agreement until all payments under the Plan are completed.  Upon satisfaction of all obligations under the Plan, the Interests in Sklarco shall be returned to the Howard Trust.

   Notwithstanding the foregoing, ~~(i)~~ beginning on the Effective Date ~~and until a Monetizing Event~~, the Reorganized Debtors shall pay ~~[●]% of the Available Cash directly to~~ the Howard Sklar Trust~~; (ii) after a Monetizing Event, the Reorganized Debtors shall pay the Howard Trust~~ Allocation directly to the Howard ~~Trust; and (iii) beginning on the Effective Date, Sklarco shall pay~~ Sklar Trust.

   Howard Sklar in his individual capacity or as trustee (as the case may be) ~~all revenue derived from~~ and other parties in interest assert that they have title in and to, and claims with respect to, the following assets and investments ~~as and when realized by Sklarco, to the extent~~ and all revenue derived therefrom, unencumbered by any lien or security interest granted to EWB~~:~~ (the "Disputed Assets"):

   a. Boulders on Fern Apartment Complex

      b.  Timber Quest
      c.  LTP Opportunity Fund
      d.  Trout Creek
      e.  1908 Brands
      f.  Assets held for Maren Silberstein Revocable Trust and the Succession of Miriam Mandel Sklar

Other parties in interest have disputed any such title or claims.  The parties shall cooperate to resolve their disputes with respect to the Disputed Assets, and any resolution shall be subject to the Section 8.13 of this Plan if not sooner resolved in accordance with Bankruptcy Rule 9019. Notwithstanding Section 10.2 of this Plan and Section 1141(b) of the Bankruptcy Code, all parties rights with respect to the Disputed Assets are reserved (and not waived), including, without limitation, the right to commence an adversary proceeding to determine any party's rights with respect to the Disputed Assets.

In the event of a refinance of the EWB Secured Claim, the Howard Sklar Trust shall not receive an amount less than [●]% of the Available Cashthe Howard Sklar Trust Allocation of the Post-Monetization Proceeds.  The Interest Holders shall also receive distributions solely to the extent necessary to pay taxes attributable to the Reorganized Debtors.

## ARTICLE VIII.

## MEANS FOR IMPLEMENTATION

**8.1 -  Continued Existence.**

SEC and Sklarco, as Reorganized Debtors, shall continue to exist after the Effective Date with all of the powers of a limited liability company under the laws of the State of Louisiana and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable law, except as such rights may be limited and conditioned by the Plan, Confirmation Order, and/or the documents and instruments executed and delivered in connection therewith.  The Reorganized Debtors, may operate their business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, subject only to the terms and conditions of the Plan, the Confirmation Order, and the documents and instruments executed and delivered in connection herewith and therewith.  SEC shall reorganize for the limited purpose of winding down and transitioning its operations, and liquidating its Assets for the benefit of creditors in accordance with the terms of this Plan.

**8.2 -  Operation of Business.**

The Debtors shall be empowered to take such action as may be necessary to perform their obligations under this Plan.  All Executory Contracts assumed by SEC and/or Sklarco in accordance with Article IX shall be in full force and effect, and the Reorganized Debtors shall be empowered to exercise all rights and remedies thereunder, including without limitation, setoff or recoupment of unpaid JIB Obligations against revenue owed to working interest holders for

nonpayment of such JIB Obligations under any JOAs or similar agreements. Notwithstanding anything to the contrary, for the avoidance of a doubt, Reorganized SEC retains all rights, defenses, and arguments related to any claims of recoupment or setoff that may be asserted by any Revenue Parties.

**8.3 -**   **Management Fees and Costs.**

The Reorganized Debtors shall be entitled to compensate their managers, officers and directors with reasonable compensation for services following confirmation of the Plan. Funding for such fees will be derived from the operation of the Debtors' business and working capital.

**8.4 -**   **Establishment and Funding Of Creditor Trust.**

On the Effective Date of the Plan, the Creditor Trust shall be established for the primary purpose of: (1) receiving and pursuing claims and Causes of Action, and distributing the proceeds of such claims and Causes of Action; and (2) receiving funds and using and distributing funds in accordance with this Plan and the Creditor Trust Agreement. The specific terms of Creditor Trust shall be set forth in the Creditor Trust Agreement. The Creditor Trust will be controlled and administered by the Creditor Trustee, which Trustee shall be selected by the Committee.

The Creditor Trustee shall pay all expenses incurred by the Creditor Trust after the Effective Date, including professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court. The Creditor Trust is also permitted to engage such professionals as it deems reasonable and necessary without application to the Bankruptcy Court. The Creditor Trust shall be funded with $250,000 ("Trust Administration Funds~~"), which~~"). The Trust Administration Funds shall be ~~funded through monthly payments~~paid in installments of $50,000 ~~from~~per month or as otherwise agreed to by the ~~Reorganized~~Committee and the Debtors ~~until fully funded~~prior to the Effective Date.

On the Effective Date, all Causes of Action belonging to the Debtors that are not ordinary-course collections under Section 8.6(f) herein, or that are not otherwise released pursuant to the Plan, shall be vested in the Creditor Trust, including any derivative Causes of Action that could have been brought, or may be brought on behalf of the Debtors. The Creditor Trustee, for the Creditor Trust, shall be vested with all right and authority of each of the Debtor corporate entities and their respective members under applicable law to assert or settle claims against directors, officers, or managers (except for claims released pursuant to this Plan). Without limiting any substantive rights of the Creditor Trust in connection with any Avoidance Actions against Howard Sklar or any trust or estate for which he serves as trustee or in a similar capacity, the Creditor Trustee and Howard Sklar shall ~~enter into the Tolling Agreement on the Effective Date~~cooperate with respect to the timing of any Causes of Action asserted against Howard Sklar or any trust or estate for which he serves as trustee or in a similar capacity to save legal fees and costs through and including a Monetizing Event.

In addition to the Trust Administration Funds and all Causes of Action, the Creditor Trust shall further receive an interest in the distributions and/or proceeds from the following assets beginning on the Effective Date of the Plan:

1. ~~SEC's~~The applicable Reorganized Debtor's interest in THP Partners II, LP;
2. ~~The Debtors'~~The applicable Reorganized Debtor's interests in:
   a. The Graham 5-16 Well located in Choctaw County, Alabama;
   b. The Doss E D 3 Well Located in Union, Arkansas;
   c. The East Castor Pipeline located in Bienville, Louisiana;
   d. The Finn Deep Pipeline located in Natchitoches, Louisiana;
   e. The mineral leases identified on Exhibit [●] to the Post-Confirmation Trust Agreement.

The Creditor Trust established under the Plan is established for the purpose of distributing funds transferred to the Creditor Trust, net of all claims, expenses, charges, liabilities, and obligations of the Creditor Trust, to the beneficiaries of the trust in accordance with the terms of the Plan and the Creditor Trust Agreement. The Creditor Trust shall have no objective of continuing or engaging in any trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the Trust. The Creditor Trust shall not conduct business activities other than those associated with or related to the litigation of Causes of Action and distribution of trust assets. It is intended that the Creditor Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of the Treasury Regulations Section 301.7701-4(d). All parties and beneficiaries shall treat the transfers in trust described herein as transfers to the beneficiaries for all purposes of the Internal Revenue Code of 1986, as amended (including Sections 61(a)(12), 483, 1001, 1012, and 1274 thereof). The beneficiaries shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as the grantors of the Creditor Trust and the owners of the Creditor Trust. The Creditor Trustee shall file returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) or (b). All parties, including the beneficiaries and the Creditor Trustee, shall value the Creditor Trust Assets consistently, and such valuations shall be used for all federal income tax purposes. Beneficiaries may wish to consult with a tax professional regarding the tax consequences of holding a beneficial Interest in or receiving a Distribution from the Creditor Trust

Except as expressly provided in the Plan, the Creditor Trust is not, and shall not be deemed, a successor to the Debtors or their Estates, and the Creditor Trust shall not be responsible for any liabilities or obligations of the Debtors other than obligations and Distributions contemplated under the Plan.

## 8.5 - Establishment of Reserve Fund

On the Effective Date of the Plan, the Reorganized Debtors shall establish a Reserve Fund to cover any unanticipated and extraordinary expenses, including but not limited to unanticipated maintenance and repairs due to major weather events. The Reserve Funds shall be limited to $250,000, and shall be maintained at such amount during the term of the Plan, and shall be used at the discretion of the Independent Manager in consultation with EWB.

## 8.6 - Appointment of Independent Manager.

On the Effective Date of the Plan, an independent manager selected by agreement of the Debtors and EWB shall be appointed for each of the Debtors to manage the day-to-day affairs of the Debtors, including but not limited to:

a) Effectuating the terms of the Plan;
b) Maintaining control over all bank accounts and funds held and maintained by the Debtors;
c) Making distributions to creditors, except those distributions to be made by the Creditor Trustee, and the Howard Sklar Trust;
d) Maintaining control over expenditures;
e) Directing business decisions by the Debtors, including performance of any projects for which SEC previously received cash call advances on those Operating Agreements assumed by SEC; and
f) Pursuing collections of any outstanding receivables and enforcing any other payment obligations, including without limitation, any JIB Obligations owed to the Debtors in the ordinary course of business prior to and/or after the Effective Date, including resolution, whether through litigation, settlement, or otherwise, any claims for setoff or recoupment.

In addition to the powers set forth above, the independent manager shall also be responsible for and empowered to effectuate the wind down and dissolution of SEC in consultation with EWB Following confirmation of the Plan, CR3 Partners shall remain in place for a period of up to 30 days to effectuate a transition to the Independent Manager.

### 8.7 -    Termination of Independent Manager.

Once the following two items have been accomplished by the Independent Manager, the management of the Debtors may be turned back to the Reorganized Debtors, the Howard Trust, and Howard Sklar; and the Independent Manager shall resign.  The two items are: 1) refinance of the EWB Secured Claim and distribution of funds in accordance with Section 8.8 below; and 2) satisfaction of all obligations under the Plan, including the payment in full of the Creditor Trust Payment Obligation. or all Allowed Class 6 and Class C Claims in full, whichever is less.

### 8.8 -    Distributions Upon Occurrence of a Monetizing Event.

Upon occurrence of a Monetizing Event, the proceeds of such Monetizing Event shall be distributed as follows:

a.    First, to EWB up to $21 million, less any i) post-petition and pre-confirmation payments for principal, interest, or fees, but excluding payments for attorney fees, and ii) all principal payments received post-confirmation through the date of the Monetizing Event,  and post-confirmation principal payments, excluding any payments for attorney fees, as satisfaction in full of the EWB Secured Claim;

b.    Second, to the Creditor Trust up to the amount of $3 million flowing from the agreed allocation of the EWB Secured Claim, in addition to the amounts received from the sale of any assets in which the Creditor Trust has been granted an interest;

c.    Third,  to the Creditor Trust and the Howard Trust in accordance with the Creditor Trust Allocation and the Howard Sklar Trust Allocation, respectively until the

earlier of i) payment in full of the Creditor Trust Payment Obligation, or ii) payment in full of all Allowed Class 6 and Class C Claims;

   d.  Fourth, all remaining funds, if any, to the Class 7 and Class D Interest Holders.

**8.9 -** **Liquidation and Wind Down of SEC.**

   Beginning on the Effective Date and continuing in accordance with the Resignation and Transition Schedule, the Independent Manager shall:

- Call requisite working interest holder meetings for operated properties and facilitate in holding a vote to replace SEC as operator in accordance with the applicable JOAs;
- Facilitate the orderly transition to a new operator as soon as is practicable under the circumstances and in accordance with applicable State and Federal Law;
- Engage any brokers, auctioneers, or other professionals necessary to effectuate the sale any assets owned by SEC unless otherwise assigned to the Creditor Trust;
- And remit payments to creditors and/or the Creditor Trust following the orderly liquidation of assets.

   Following the transition to one or more new operators and sale of SEC's assets, SEC funds shall be distributed in accordance with the terms of the Plan, and shall be paid first to EWB on account of the EWB Secured Claim, then to any unclassified or classified priority claims, then to the Creditor Trust, then any residual funds will be distributed to Interest Holders.  Following the wind down and liquidation of SEC, all membership Interests in SEC will be terminated.

**8.10 -** **Conditions Precedent to the Effective Date of the Plan.**

   The Plan shall not become effective and the Effective Date of the Plan shall not occur until the first business date on which the following items have been satisfied:

   a.  The Order of Confirmation shall have been entered by the Court and shall have become a Final Order which is not stayed; and

   b.  the Confirmation Date shall have occurred; and

   c.  no request for revocation of the Confirmation Order under Bankruptcy Code section 1144 shall have been made, or if made, remain pending; and

   d.  the Creditor Trust shall have been formed and all formation/organizational documents for the trust shall have been properly executed, delivered, and filed as required by this Plan and applicable law; and

   e.  the appointment of the Creditor Trustee shall have been confirmed by order of the Bankruptcy Court, which may be the Confirmation Order; and

   f.  the Independent Manager shall be selected and appointed by agreement of the Debtors and EWB.

**8.11 -  Effect of Failure of Conditions.**

In the event that the Effective Date does not occur, upon notification submitted by the Debtors to the Bankruptcy Court:  (a) the Confirmation Order shall be vacated and all provisions contained therein, including without limitation, any provisions relating to discharge, shall be null and void, (b) no Distribution under the Plan shall be made, (c) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, (d) the obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors, and (e) nothing contained in the Plan shall (i) prejudice in any manner the rights of the Debtors, (ii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors in any respect, including in any proceeding or case against the Debtors, or (iii) be admissible in any action, proceeding or case against the Debtors in any court or other forum.

**8.12 -  Distributions to Allowed Claims.**

(a)     Delivery of Distributions.

Subject to Article V of this Plan, Distributions under the Plan shall be made by the Creditor Trust to the Holders of Allowed Claims at the addresses set forth on the Schedules, unless such addresses are superseded by a proof of claim or transfer of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date (or at the last known addresses of such Holders if the Creditor Trust has been notified in writing of a change of address).

(b)     Distribution of Cash.

Any payment of Cash by the Creditor Trust pursuant to the Plan shall be made, at the option and in the sole discretion of the Creditor Trustee, by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Creditor Trustee.

(c)     Unclaimed Distributions.

Any Distribution of Cash under the Plan to the Holder of an Allowed Claim that remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan shall be transferred to and become property of the applicable Reorganized Debtor notwithstanding state or other escheat or similar laws to the contrary, and any and all entitlement by the Holder of such Claim to such Distribution shall be extinguished and forever barred.

(d)     Saturdays, Sundays, or Legal Holidays.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be

23

completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

**8.13 -   Objections to and Resolution of Claims.**

From and after the Effective Date, the Reorganized Debtors and the Creditor Trust shall have the ~~sole~~ authority, in their ~~sole~~ discretion, to file, settle, compromise, withdraw, or litigate to judgment all objections, if any, to Administrative Claims and Claims, except the EWB Secured Claim, which Claim is Allowed under this Plan. Unless otherwise ordered by the Court, objections to, or other proceedings concerning, the allowance of Claims (other than objections to Administrative Claims, as provided in Article III.) shall be filed and served upon the Holders of the Claims as to which the objection is made or otherwise commenced as soon as practicable, but in no event later than one hundred and twenty (120) days after the Effective Date.

Objections to, or other proceedings contesting the allowance of, Claims may be litigated to judgment, settled or withdrawn, in the Creditor Trustee's sole discretion.

**8.14 -   Establishment of Disputed Claim Reserves.**

On the initial Distribution Date, the Creditor Trust shall establish a Disputed Claim Reserve for all Disputed Claims that would be paid under this Plan if such Disputed Claims were Allowed Claims in an aggregate amount equal to the liquidated, non-contingent face value of such Claims. To the extent any such Disputed Claim is in whole or in part unliquidated and/or contingent as of the Distribution Date, the Creditor Trust, in its sole discretion, may elect not to deposit any amount in the Disputed Claim Reserve on account of such unliquidated and/or contingent portion of such Disputed Claim. No later than five (5) Business Days following the entry of a Final Order either (a) Allowing such Disputed Claim (in whole or in part) or (b) disallowing such Disputed Claim (in whole or in part), the Creditor Trust shall (i) to the extent such Claim has been Allowed in whole or in part, distribute to the Holder of such Claim an amount equal to the amount such Holder would have received had such Claim (or portion thereof) been an Allowed Claim on the Effective Date, and (ii) to the extent such Claim has been Disallowed, retain the balance of the funds on deposit in such Disputed Claim Reserve equal to the portion of such Claim that has been Disallowed.

**8.15 -   Estimation.**

The Reorganized Debtors or the Creditor Trust may at any time request that the Bankruptcy Court estimate, subject to 28 U.S.C. § 157, any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors, or the Creditor Trust have previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the estimate to be used by the Creditor Trust in calculating potential Distributions under the Plan, or (c) a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Creditor Trust may elect to object to ultimate

payment of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

**8.16 – Recoupment.**

Except as expressly set forth herein, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right or account receivable of the Debtors and/or the Reorganized Debtors unless: (a) such holder actually provides notice thereof in writing to the Debtors and EWB of its intent to perform a recoupment no later than fourteen (14) days following the Confirmation Date; (b) such notice includes the amount to be recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment; and (c) the Debtors and EWB consent to a recoupment within seven (7) days of receipt of the Notice.  If no consent is received within such time period, it shall constitute a rejection or denial of the recoupment claim by the Debtors and EWB.  In the event that the Debtors and/or EWB do not consent to recoupment, such recoupment claim shall be allowed only upon entry of a final order from the Bankruptcy Court, and the party asserting a recoupment claim shall assert such claim in Bankruptcy Court no later than seven (7) days following the Debtors and EWB's rejection of the recoupment claim.  Failure to properly and timely provide notice and/or timely file any claims for recoupment shall result in a release, waiver, and denial of all recoupment claims.

## ~~ARTICLE VIII.~~ARTICLE IX.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 9.1    Assumption and Rejection of Executory Contracts and Unexpired Leases by Sklarco.

On the Effective Date, all Executory Contracts of Sklarco shall be deemed assumed in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, *except* for those Executory Contracts that:  (a) have already been rejected by order of the Bankruptcy Court; (b) are listed as rejected Executory Contracts in the Plan Supplement; or (c) are subject to a motion to reject that is pending on the Effective Date.

Each Executory Contract assumed pursuant to this Plan shall vest and be fully enforceable by Reorganized Sklarco in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

### 9.2    Assumption and Rejection of Executory Contracts and Unexpired Leases by SEC.

On the Effective Date, all Executory Contracts of SEC shall be deemed rejected in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, *except* for those Executory Contracts that:  (a) have already been assumed by order of the Bankruptcy Court; (b) are listed as assumed Executory Contracts in the Plan Supplement; or (c) are subject to a motion to assume that is pending on the Effective Date and assumption is later authorized by the Bankruptcy Court.

Each Executory Contract assumed pursuant to this Plan or prior order the Bankruptcy Court shall vest and be fully enforceable by SEC in accordance with its terms, except as such terms are

modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

**9.3     Cure.**

Except as otherwise agreed to by the parties or otherwise provided in the Plan, on the Effective Date, the applicable Debtor or Reorganized Debtor, as the case may be, shall cure any and all undisputed defaults under any Executory Contract that is assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code. Unless the parties to the contract or lease agree otherwise, all disputed defaults, including JOA Cure Claims, if any, that are required to be cured shall be cured promptly as agreed by the parties or determined by the Bankruptcy Court after the entry of a Final Order determining the amount, if any, of the liability with respect thereto, and (ii) the initial Periodic Distribution Date.

**9.4     Rejection Damage Claims.**

All Claims for damages arising from the rejection of an Executory Contract pursuant to the Plan shall be filed with the Bankruptcy Court no later than the first Business Day that is twenty-eight (28) days after the Effective Date or the first Business Day that is twenty-eight (28) days after the entry of the Final Order approving the rejection, if such Final Order is entered after the Confirmation Date. Every such Claim that is timely filed, as and when it becomes and Allowed Claim, shall be treated as a General Unsecured Claim against SEC under Class 7 of the Plan. Every such Claim that is not timely filed by the deadline to do so shall be forever barred, unenforceable, and discharged, and the Creditor holding the Claim shall not receive or be entitled to any Distribution under the Plan on account of such Claim. Notwithstanding anything contained in this Plan, the Creditor Trust, and the applicable Debtor or Reorganized Debtor, reserve the right to object to any Claim arising from the rejection of an Executory Contract.

~~**ARTICLE IX.**~~**ARTICLE X.**

**EFFECT OF CONFIRMATION OF THE PLAN**

**10.1 -   Binding Effect.**

The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding upon, and will inure to the benefit of, the heir, executor, administrator, successor or assign of such Person.

**10.2 -   Vesting of Property.**

On the Effective Date of the Plan all property of the estates shall revest in the Debtors free and clear of all liens except those specifically set forth in the Plan or as otherwise provided in the Plan. The Reorganized Debtors shall thereafter hold, use, dispose, or otherwise deal with such Property, or operate its business, free of any restrictions imposed by the Bankruptcy Code or by the Court. Except to the extent released herein, all Causes of Action are hereby preserved in full for the benefit of the Creditor Trust. After the Effective Date, in accordance with Section 8.4, the Creditor Trust shall own and retain, and may prosecute, enforce, compromise, settle, release, or

otherwise dispose of, the Avoidance Actions in their sole discretion without the need of any approval by the Bankruptcy Court.

**10.3 -  Reinstatement and Continuation of Insurance Policies.**

Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Effective Date, each of the Debtors' insurance policies in existence on and as of the Confirmation Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code.

**10.4 -  Discharge of Debtors.**

The Debtors shall receive a discharge on the Effective Date of the Plan pursuant to Section 1141(d). Confirmation of the Plan and the occurrence of the Effective Date of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan as set forth in the Plan. Any obligation or note, previously in default, so modified, shall be cured as modified as of the Effective Date. This provision shall be operable regardless of whether the Plan provides for any obligation to be evidenced by a rewritten loan or security document following confirmation of the Plan.

**10.5 -  Exculpation**

**Except as set forth in this Plan, neither the Debtors, the Creditors' Committee, the CRO, nor any of their agents, representatives, attorneys, accountants or advisors shall have or incur any liability in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming the Plan, or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with the restructuring of the Debtors pursuant to the Plan during the pendency of the Debtors' Chapter 11 Cases and through the date of confirmation of the Plan; provided that the foregoing shall have no effect on the liability for a breach of the Plan or any other document, instrument, or agreement executed and delivered in connection with the Plan, or that otherwise results from any act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct; provided further that nothing in this Plan shall limit the liability of any retained attorney in violation of Rule 1.8(h)(1) of the Colorado Rules of Professional Conduct. For the avoidance of a doubt, there shall be no liability limitation for the Debtors, its Insiders, and affiliates for their actions or omissions occurring before the Petition Date, *or after the Confirmation Date*, or their actions or omissions after the Petition Date that are not official actions made in good faith, nor shall it release the Debtor from any obligations arising under contracts entered into on a post-petition basis.**

**10.6 -  Injunction.**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims against, or Interests in, the Debtors, or who assert rights in or against the Debtors or**

their Property, that arose before or were held as of the Effective Date for SEC and Sklarco, along with their respective Insiders, employees, agents, officers, directors, principals or representatives are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against or affecting the Debtors, their Estates, their Assets, their Property, the Reorganized Debtors, or any of their property or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor with respect to any such Claim or Equity Interest, (b) the enforcement, attachment, collection, levy or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, their Estates, their Assets, the Property, the Reorganized Debtors, or any of the property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor on account of any such Claim or Interest; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their Estates, the Assets, the Property, the Reorganized Debtors, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons on account of any such Claim or Interest; (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Interest; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; (f) taking any action to interfere with the implementation of the Plan; and (g) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan, such as commencing or continuing in any manner, any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan; *provided*, *however*, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan.

## 10.7 -   Preservation of Causes of Action

Except as otherwise provided in this Plan, all rights and all Causes of Action, including all tax setoff and refund rights arising under section 505 of the Bankruptcy Code, are retained, vested in the Creditor Trust and preserved pursuant to Bankruptcy Code section 1123(b).  From and after the Effective Date, the Creditor Trust shall have the sole right to investigate, pursue or compromise all Causes of Action.  Except as expressly provided in this Plan or the Confirmation Order, nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of a Claim, Cause of Action, right of setoff, or other legal or equitable defense that either Debtor has that is not specifically waived or relinquished by this Plan.

## 10.8 -   Compromise and Settlement of Claims, Interests, and Controversies

Without limiting the discharge and injunction provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan incorporates a good-faith compromise and settlement of Claims and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed

Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest, with respect to all Holders of Claims or Interests that have consented or are deemed to have consented to such compromise and settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The date of confirmation of the Plan by a Final Order shall constitute the Challenge Termination Date, to the extent it has not otherwise occurred prior thereto, within the meaning of the Final Cash Collateral Order, and the acknowledgements and releases in favor of EWB set forth in the Final Cash Collateral Order shall be binding on all parties, including without limitation the Committee, the Creditor Trust, and the Reorganized Debtors, subject only to the treatment of the EWB Secured Claim under the Plan. For the avoidance of doubt, the preserved Causes of Action under the Plan do not include any claims or causes of action of any kind against EWB. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.

## ~~ARTICLE X.~~ARTICLE XI.

## MISCELLANEOUS PROVISIONS

### 11.1 - __Payment of Statutory Fees.__

All fees payable on or before the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by the Reorganized Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the Reorganized Debtors as and when such fees become due.

### 11.2 - __Retention of Jurisdiction.__

Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for the following purposes:

1. Determination of the allowability of claims upon objection to such claims by the Debtors-in-Possession or by any other party in interest, including the liquidation of Disputed Claims;

2. Determination of the request for payment of claims entitled to priority under 11 U.S.C. Section 507(a)(2), including compensation of the parties entitled thereto;

3. Resolution of any disputes regarding interpretation of the Plan or the Creditor Trust;

4. Resolution of any disputes regarding the Creditor Trust Payment Obligation;

5. Implementation of the provisions of the Plan and entry of injunctions and other orders in aid of consummation of the Plan, including without limitation, appropriate orders to protect the Reorganized Debtors from action by creditors;

6. Modification of the Plan pursuant to 11 U.S.C. §1127;

7. Adjudication of any Causes of Action, brought by the Creditor Trust; and

29

8.      Entry of a final decree.

**11.3 -  Modification of the Plan.**

1.      Pre-Confirmation Modifications.

The Debtors may alter, amend, or modify the Plan before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

2.      Post-Confirmation Immaterial Modifications.

After the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, may, with the approval of the Bankruptcy Court, without notice to all holders of Claims or Interests, insofar as it does not materially and adversely affect the Holders of Claims or Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

3.      Post-Confirmation Material Modifications.

After the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may alter or amend the Plan in a manner which, as determined by the Bankruptcy Court, materially and adversely affects Holders of Claims or Interests, provided that such alteration or modification is made after notice and a hearing as provided in section 1127 of the Bankruptcy Code.

**11.4 -  Governing Law.**

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Colorado (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

**11.5 -  Filing or Execution of Additional Documents.**

On or before the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**11.6 -  Exemption from Transfer Tax.**

Pursuant to Section 1146(c) of the Code, the issuance, transfer, or exchange of notes or equity securities under the Plan by the Debtor, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or the making or delivery of any deed or instrument of transfer under, in furtherance of, or in connection with the Plan or the Agreements shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

11.7 - **Dissolution of Committee**

On the Effective Date, the Committee will dissolve and the members of the Committee and the Committee's Professionals shall be deemed terminated, and the members of the Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, other than for purposes of filing and/or objecting to final fee applications in connection with Professional Fee Claims.

11.8 - **Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a).**

The Debtors may request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) and Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order and (b) authorization to consummate the Plan immediately after entry of the Confirmation Order.

11.9 - **Exhibits/Schedules.**

All exhibits and schedules to the Plan and the Plan Supplement are incorporated into and constitute a part of the Plan as if fully set forth herein.

11.10 - **Notices.**

All notices, requests, and demands hereunder to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> a.  To:
> Sklar Exploration Company, LLC
> Sklarco, LLC
> c/o ~~James Katchadurian~~ [Independent Manager]
> ~~450 Lexington Ave.,~~
> ~~Fourth Floor~~
> ~~New York, NY 10017~~
>
> ~~Email: James.Katchadurian@cr3partners.com~~
>
> With a copy to:
> Jeffrey S. Brinen
> Keri L. Riley
> Kutner Brinen, P.C.
> 1660 Lincoln St., Suite 1850
> Denver, CO 80264
> Email: klr@kutnerlaw.com
>
> b.  To the Committee, at:
> Christopher Johnson

31

John Cornwell
Munsch Hardt Kopf & Harr, P.C.
700 Milam St., Suite 2700
Houston, TX 77002
Email: cjohnson@munsch.com
~~Email: jcornwell@munsch.com~~
Email: jcornwell@munsch.com

c. To the Creditor Trust
   [to be provided]

d. To an allowed claimant, at the addresses set forth in the allowed Proof of Claim, if filed, other, at the address set forth for the claimant in the Debtor's Schedules filed with the Court.

11.11 - **Vacatur of Confirmation Order.**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) prejudice in any manner the rights of the Debtors, (b) constitute an admission, acknowledgment, offer, or undertaking by the Debtors in any respect, including in any proceeding or case against either Debtor, or (c) be admissible in any action, proceeding or case against the Debtors in any court or other forum.

## ARTICLE XII

## CONFIRMATION REQUEST

12.1 - The Debtors, as proponents of the Plan, request confirmation of the Plan pursuant to 11 U.S.C. §1129. The Debtors will solicit acceptance of the Plan after their Disclosure Statement has been approved by the Court and is transmitted to the creditors, interest holders and parties in interest. In the event the Debtors do not obtain the necessary acceptances of its Plan, they may make application to the Court for confirmation of the Plan pursuant to 11 U.S.C. §1129(b). The Court may confirm the Plan if it does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interests that is impaired and has not voted to accept the Plan.

DATED: ~~February 26~~March 11, 2021

SKLAR EXPLORATION, LLC

By: __/s/ James Katchadurian_____
James Katchadurian, Chief Restructuring Officer

SKLARCO, LLC

32

By: ___/s/ James Katchadurian_____
     James Katchadurian, Chief Restructuring Officer


Jeffrey S. Brinen
Keri L. Riley
Kutner Brinen, P.C.
1660 Lincoln St., Suite 1850
Denver, CO 80264
Telephone:  303- 832-2400
Email: klr@kutnerlaw.com

ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION

# Exhibit B

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC | ) | |
| EIN: 72-1417930 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 20-12380-EEB |
| SKLARCO, LLC | ) | |
| EIN: 72-1425432 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**AMENDED DISCLOSURE STATEMENT TO ACCOMPANY
AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION
DATED DECEMBER 18, 2020**

**KUTNER BRINEN, P.C.**
Jeffrey S. Brinen
Keri L. Riley
1660 Lincoln St., Suite 1850
Denver, CO  80264
Telephone:  303-832-2400
Email:  klr@kutnerlaw.com

Counsel to the Debtors
and Debtors in Possession

1

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING MOUNTAIN TIME ON [_____],
2021 (UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE**

      TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE
DEBTORS' NOTICE AND CLAIMS AGENT, [● TO BE DETERMINED] MUST <u>ACTUALLY</u>
RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

<b>IMPORTANT INFORMATION FOR YOU TO READ</b>

      ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS
DISCLOSURE STATEMENT AND THE DEBTORS' PLAN OF REORGANIZATION IN
THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

      THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE
STATEMENT FOR THEIR PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN
FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS
DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR
ANY OTHER PURPOSE.

      THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND
EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE
SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE
PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT
OR UPON THE MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS
"FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE
SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF
ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE
IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS
"MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE
THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.
THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE
NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND
UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER
MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING
STATEMENTS. THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER
INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES
ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS
OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE
PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY
PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

      THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO
SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND
IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES
LAWS OR OTHER SIMILAR LAWS. ANY SECURITIES DESCRIBED HEREIN WILL BE

ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND

PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION X HEREIN, "RISK TO CREDITORS."

## I.     INTRODUCTION AND OVERVIEW

Sklar Exploration Company, LLC ("SEC"), a Louisiana limited liability company, and Sklarco, LLC ("Sklarco" and together, the "Debtors"), a Louisiana limited liability, filed their voluntary petitions pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Colorado "Bankruptcy Court") on April 1, 2020 (the "Petition Date"). SEC's Chapter 11 Case is pending in the Bankruptcy Court under Case No. 20-12377-EEB. Sklarco's Chapter 11 Case is pending in the Bankruptcy Court under Case No. 20-12380-EEB. Both cases are jointly administered for procedural purposes under Case No. 20-12377-EEB.

The Debtors are submitting this Disclosure Statement in accordance with 11 U.S.C. § 1125 to provide information regarding the Debtors' Amended Joint Plan of Reorganization (as may be further amended, supplemented, or modified from time to time, the "Plan") dated December 18, 2020. A copy of the Plan and ballot for acceptance or rejection of the Plan accompanies this Disclosure Statement and incorporated herein by reference. All capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings given to them in Article I, Section B of the Plan. The rules of interpretation set forth in Article I, Section A govern the interpretation of this Disclosure Statement.

**Voting Requirements.** Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are Impaired and that will (or may) receive or retain property or any interest in property under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims and Interests that are not Impaired are not entitled to vote and will be deemed to accept the Plan. Classes of Claims and Interests that will not receive or retain any interest in property under the Plan are not entitled to vote and will be deemed to reject the Plan. Voting on the Plan shall be in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a voting Class shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting, without including the vote of any insider. Each holder of an Allowed Claim in Classes A through D (as to Sklarco), and 2 through 7 (as to SEC) shall be entitled to vote to accept or reject the Plan. If a holder of a Claim holds more than one Claim in any one Class on a per Debtor basis, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

**Recommendation.** The Debtors believe that the Plan is fair and equitable, maximizes the value of the Debtors' respective estates, and provides the greatest likelihood for recovery to claimholders, including unsecured creditors. Accordingly, the Debtors believe that approval of the Plan is in the best interests of their estates and their respective creditors, and urge acceptance and approval of the Plan by all creditors and interest holders.

## II.     CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the United States Bankruptcy Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals. Chapter 11 allows the debtors to retain its assets during the administration of its Chapter 11 case as a debtor-in-possession.

Following confirmation of the Plan, Chapter 11 allows the debtors to retain their assets as a reorganized debtor or as otherwise provided in the Plan. If the Plan is approved by the Court, the Plan is the permanent restructuring of the debtors' financial obligations. The Plan also provides a means through which the debtors will restructure or repay their obligations. The Plan will provide the debtors with an opportunity to maximize the return for creditors through continued operations.

The Plan divides creditors into classes of similarly situated creditors. All creditors of the same Class are treated in a similar fashion. All Interests are also classified and treated alike. Each Class of creditors or interest holders is either impaired or unimpaired under the Plan. A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled or if the Plan provides for the cure of a default and reinstatement of the maturity date of the claim as it existed prior to default.

The Debtors filed a Motion to Set Bar Date for Filing Claims and Requests for Allowance of Administrative Expense Claims Under Bankruptcy Code § 503(b)(9) ("Bar Date Motion"). On July 23, 2020, the Court entered an Order establishing September 28, 2020 as the as the last day: a) for filing of any Proof of Claim for a pre-petition claim or interest; and b) by which motions or requests for allowance of administrative expense claims pursuant to 11 U.S.C. §503(b)(9) must be filed ("Bar Date"). The Plan provides that Claims and Interests of all Classes shall be Allowed only if such Claims are either: a) evidenced by a timely filed Proof of Claim or Interest; or b) appear in the Schedules filed by the Debtors and are not scheduled as disputed, contingent or unliquidated, unless subsequently Allowed by the Court. Creditors may check as to whether or not their Claims are scheduled as disputed, contingent or unliquidated by reviewing the Schedules and the amendments thereto filed by the Debtors in the Bankruptcy Court for the District of Colorado, or by viewing the claims register maintained by Epiq at: https://dm.epiq11.com/case/skr/claims. Alternatively, creditors may contact counsel for the Debtors or the Debtors directly in order to determine how their claim was scheduled.

Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Court to confirm the Plan. The Plan, however, must be accepted by at least one impaired Class of Claims by a majority in number and two-thirds in amount, without including insider acceptance of those Claims of such Class actually voting on the Plan. Assuming one impaired Class votes to accept the Plan, it may be confirmed over its rejection by other Classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under and has not accepted the Plan. The Bankruptcy Code requires that if interest holders retain an interest or receive anything under the Plan, then the unsecured creditor classes must either be paid the full value of their claims or vote to accept the Plan. In this case, the Debtors are proposing to install an Independent Manager to oversee and operate Sklarco, to effectuate an orderly wind down of SEC and transition to a new operator for the operated properties, to make distributions to the Creditor Trust from Available Cash, to assume and cure certain Operating Agreements on behalf of Sklarco, and to maintain equity interests in escrow pending completion of certain events under the Plan. Since the Debtors believe that the Plan provides the best alternative for creditors, all creditors are urged to vote to accept the Plan.

If all Classes of Claims and Interests vote to accept the Plan, the Court may confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, Section 1129 requires that the Plan be in the best interest of the holders of Claims and

Interests and be feasible through a showing that confirmation will not be followed by the need for further financial reorganization of the Debtors.

### III.    OVERVIEW OF THE PLAN AND MEANS OF EXECUTION

The Plan divides creditors and interest holders into the following nine Classes.  Treatment of each of the Classes is discussed in greater detail below and in the Plan.  The following table summarizes the Classes as to each Debtor, whether or not each such Class is impaired, and, to the extent determinable, the treatment of each Class:

#### A.  *Sklarco and Sklar Exploration Company*

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|
| 1 – Allowed Unsecured Claims specified in Section 507(a)(4) and 507(a)(5) of the Code as having priority against SEC | Unimpaired | Paid in full on the Effective Date of the Plan unless otherwise agreed to by the Debtor and the Class 1 Claimants.  Only one (1) Class 1 Claim is believed to exist. |
| 2 and A – Allowed Secured Claim held by East West Bank | Impaired | EWB Secured Claim will be allowed in amount owed on the Confirmation Date of the Plan, and will retain all liens that secured its Claim as of the Petition Date. EWB Secured Claim shall bear interest at a rate of 6% per annum and shall receive not less than 90% of Available Cash. The EWB Secured Claim shall become due and payable on the second anniversary of the Effective Date of the Plan through either sale or refinance. |
| B.1 – B.7 – Allowed Secured Claim held by Mechanics Lien Claimants | Impaired | Deemed unsecured pursuant to 11 U.S.C. § 506 and treated as Class 6 general unsecured creditors holding claims against SEC. |
| 3 – Allowed Secured Claim held by Ford Motor Credit | Impaired | The Class 3 Claimant shall retain all liens securing its claim as existed on the Petition Date, and shall be paid in accordance with the contractual terms until the vehicles securing the claim are returned in accordance with the Resignation and Transition Schedule. |
| 4 – Allowed Secured Claim held by Ally Bank | Unimpaired | The Class 4 Claimant shall retain all liens securing its claim as existed on the |

| | | |
|---|---|---|
| | | Petition Date, and shall be paid in accordance with the contractual terms until the vehicle(s) securing the claim is returned in accordance with the Resignation and Transition Schedule. |
| 5 – Reserved | n/a | n/a |
| 6 and C – Allowed General Unsecured Claims against SEC and Sklarco | Impaired | Class 6 and Class C Creditors shall receive a beneficial interest in the Creditor Trust on the Effective Date of the Plan, and shall receive distributions of payments made on account of the Creditor Trust Payment Obligation, which amount is not less than $22 million.  The Creditor Trust shall also receive the proceeds and/or payments on account of certain assets assigned to the Creditor Trust, as well as certain distributions upon occurrence of a Monetizing Event. |
| D – Interests in Sklarco | Partially Impaired | All equity interests will be placed in escrow and subject to an escrow agreement and any valid liens until the occurrence of certain events.  Class D interests will also receive certain distributions as set forth more fully herein. |
| 7 – Interests in SEC | Impaired | All equity interests will be placed in escrow and subject to an escrow agreement and any valid liens.  Upon completion of the wind down by SEC, all membership interests will be canceled. |

## IV.   BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

### A.  *Overview of Operations for SEC and Sklarco*

SEC and Sklarco were duly formed in 1998 as Louisiana limited liability companies by Howard Sklar and certain additional members of the Sklar family.  Since its inception, SEC has operated as an independent exploration and production company, and Sklarco has operated as the owner of certain oil and gas leases and property interests in Texas, Louisiana, Mississippi, Alabama, Florida, and the Western United States, including Wyoming and Montana.

8

SEC maintains its headquarters in Boulder, Colorado, with additional offices in Shreveport, Louisiana and Brewton, Alabama. Pre-petition, SEC operated a number of oil and gas wells for the benefit of the various interest holders. As of the Petition Date, SEC operated approximately 60 wells and two gas plants associated with certain of the operated properties. SEC was further engaged in several exploratory drilling operations, including a helium well in Montana, and developing a new prospect in Florida.

Pre-petition, Sklarco was engaged solely as the holder of oil and gas leases and interests in properties operated by SEC and by third-party operators. Sklarco also held and managed certain outside investments for the benefit of the sole holder of the membership interests, the Howard Trust, and additional Sklar Family trusts.

SEC and Sklarco operated successfully for over twenty (20) years, and in 2018 and 2019 generated gross revenue in the amount of $19,022,035 and $15,780,254 respectively. In 2018, the Debtors refinanced their existing line of credit with East West Bank ("EWB") as Agent and Lead Arranger. On or about June 15, 2018, the Debtors entered into a Credit Agreement, Promissory Note, and Pledge and Security Agreement (together the "Loan Documents") for a secured line of credit with a maximum credit of $50,000,000. In accordance with the Security Agreement, the Debtors granted the EWB a secured interest in substantially all of the Debtors' assets, including their inventory, equipment, accounts, deposit accounts, investment property, accounts receivables, and Sklarco's oil and gas assets.

### B. *Events Leading to Bankruptcy Filing*

Prior to the bankruptcy filing, SEC initiated a number of exploratory projects, including drilling and completing an exploratory well in Montana, and building a pipeline in the Mount Carmel prospect in Florida. Several exploratory operations experienced significant cost overruns for SEC and Sklarco in 2019, resulting in a financial strain on SEC's ongoing operations.

In December 2019, SEC was notified for the first time of a covenant violation with respect to the current ratio required in accordance with the Loan Documents. Following the asserted covenant violation, the Debtors engaged in negotiations with EWB to resolve the asserted covenant violation and enter into a forbearance agreement. However, beginning in March 2020, the Debtors' revenue also declined as a result of the significant decrease in the price of oil caused by ongoing attempts by Russia, Saudi Arabia, and the United Arab Emirates to gain market share by reducing the price of oil in the global market.

As a result of the decrease in the price of oil and the corresponding decrease in revenue, the Debtors became more reliant on their hedging agreements to maintain cash flow. The COVID-19 pandemic further exacerbated the Debtors' financial issues, as the price of oil dropped from an average price of $57 per barrel in January 2020 to approximately $20 per barrel on the Petition Date. The additional decrease in revenue made the Debtors more reliant on the hedging agreements to maintain their cash flow, however, the unresolved notice of default from EWB placed the Debtors' hedges in jeopardy of a forced sale from EWB. As a result, SEC and Sklarco filed their voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code on April 1,

2020 to preserve the hedging agreements and their assets, restructure their operations, and remain going concerns.

## V.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

The Debtors have complied with all requirements of the Bankruptcy Code and of the Office of the U.S. Trustee, including attending the Initial Debtor Interview and its Meeting of Creditors, and complied with all Orders entered by the Bankruptcy Court. On April 2, 2020, the Court entered an order directing the joint administration of the Bankruptcy Cases <u>for procedural purposes only</u>. The Debtors are not substantively consolidated. The following items have also been addressed during the course of the Chapter 11 case:

### <u>Appointment of Official Committee of Unsecured Creditors</u>.

On April 16, 2020, the United States Trustee appointed an Official Unsecured Creditors' Committee ("Committee") in SEC's case. In accordance with the United States Trustee's Second Amended Appointment of Official Committee of Unsecured Creditors, the Committee is comprised of Stoneham Drilling Corporation, Mesa Fluids, LLC, TCP Cottonwood, L.P., Kelley Brothers Contractors, Inc. and Baker Hughes Company.

### <u>Cash Collateral Use</u>.

In accordance with the Loan Documents, the Debtors' cash and accounts are subject to EWB's lien.  On April, 6, 2020, the Debtors filed their Motion for Authority to Use Cash Collateral, seeking authorization to use cash collateral on an interim and final basis.  Objections to the Debtors' use of cash collateral were filed by a number of working interest holders on the basis that certain of the funds received by SEC were not property of the Debtors, as the funds included revenue attributable to other working interest holders from the oil and gas properties operated by SEC.  After extensive negotiations, the Debtors agreed to a proposed Interim Order Authorizing Use of Cash Collateral, and Second Interim Order Authorizing Use of Cash Collateral.  However, the objecting parties continued to raise objections to the Debtors' use of cash collateral, and on May 11 and May 12, 2020, the Court conducted a two-day evidentiary hearing on the Debtors' continued use of cash collateral, following which the Court entered the Third Interim Order Authorizing Use of Cash Collateral while the Debtors continued negotiations with EWB and the Committee regarding the final form of proposed Order.

On May 22, 2020, the Debtors filed their Motion for Approval of Final Cash Collateral Order, seeking approval of an agreed form of Order authorizing the Debtors use of cash collateral on a final basis.  The Final Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Providing Related Relief ("Final Cash Collateral Order") was entered by the Court on June 15, 2020.  The Debtors have been operating under the Final Cash Collateral Order during the pendency of their Chapter 11 cases, subject to periodic updates to the budget.

<u>The Final Cash Collateral Order granted the Committee until July 17, 2020, the right to challenge the EWB liens and claims (the "Challenge Period").  The parties extended the Challenge Period several times while they conducted informal discovery and engaged in extension negotiations.  Those negotiations culminated in an agreement reached in principle at the mediation described below, the terms of which are embodied in the Plan.  As of the filing of this Disclosure</u>

Statement, the Challenge Period is extended through the earlier of April 31, 2021, or the confirmation of the Plan.

### Approval of Post-Petition Loan from Howard Sklar, et al.

On May 17, 2020, the Debtors filed a Motion for Approval of Lending Agreement and For Authority to Incur Debt on an Administrative, Unsecured Basis, seeking approval of a post-petition loan in the original principal amount of $1,233,000 (the "Post-Petition Loan") from Howard Sklar ("Sklar"), the Howard Sklar Trust ("Howard Trust"), the Jacob Sklar Trust ("Jacob Trust"), and the Alan Sklar Trust ("Alan Trust" and together the "Sklar Parties") to provide additional available cash for ongoing operations.

In accordance with the approved Loan Agreement, repayment of the Post-Petition Loan is subordinated to unsecured creditors, notwithstanding its status as an administrative expense claim. The Post-Petition Loan accrues interest at a rate of 5% per annum and, if any judgment is entered against the Sklar Parties for any action arising under 11 U.S.C. § 544, 547,548, 559, or 550, the amount of such judgment shall be offset first against the balance of the Loan.

The funds for the Post-Petition Loan came primarily from outside accounts held by the Sklar Parties. However, $223,000 of the funds for the Post-Petition Loan consisted of the Howard Trust's interest in funds from an outside investment, Trout Creek Ventures, that were held in Sklarco's bank account as of the Petition Date. The Chief Restructuring Officer ("CRO") later determined that Sklarco, and not the Howard Trust, held the equitable interest in the funds from Trout Creek Ventures, reducing the balance of the Post-Petition Loan to $1 million. The Howard Trust disputes this determination.

### Debtors' Motion for Entry of Order Authorizing Debtors' Employment of CR3 Partners as Chief Restructuring Officer and Tauber Group's Motion to Appoint Chapter 11 Trustee or Convert Case to Chapter 7.

In connection with the Debtors' ongoing use of cash collateral, the Debtors agreed to the appointment of a Chief Restructuring Officer based on the agreement of EWB and the Committee. On May 21, 2020, the Debtors filed their Motion for Entry of Order Authorizing Debtors' Employment of CR3 Partners as Chief Restructuring Officer ("CRO Motion"), seeking authorization to engage James Katchadurian and CR3 Partners to act as CRO during the Debtors' Chapter 11 cases. CR3 is a nationally recognized turnaround and performance improvement firm. CR3's team of over 38 professionals have a wealth of knowledge and experience providing restructuring advisory services and have an excellent reputation for services rendered in complex cases throughout the United States, with experience in the oil and gas industry.

The intent in engaging CR3 to act as the CRO for the Debtors was to have an independent third party take control of the Debtors' day-to-day operations, and replace Howard Sklar as the person with decision-making authority during the pendency of the Bankruptcy Cases. Appointment of a CRO was further intended to remove any internal conflict and ensure that a neutral third party was in control of the Debtors' business decisions.

Around the same time that the Debtors sought the appointment of CR3 as CRO, a group of creditors comprised of Tauber Exploration & Production Company, CTM 2005, Ltd., Pickens Financial Group, LLC, I & L Miss I, LP, MER Energy, Ltd, MR Oil & Gas, LLC, Tara Rudman Revocable Trust, Feather River 75, LLC, Rudman Family Trust, and The Rudman Partnership,

11

(collectively the "Tauber Group"), filed a Motion to Appoint a Chapter 11 Trustee or Convert the case to one under Chapter 7 of the Bankruptcy Code (the "Trustee Motion"). The Trustee Motion alleged that the Debtors and their management breached their fiduciary duties in mismanaging funds of working interest holders, and that internal conflicts warranted appointment of a Chapter 11 trustee, or in the alternative, conversion of the cases to cases under Chapter 7.  The Trustee Motion was joined by several other working interest holders.

The Official Committee of Unsecured Creditors objected to the Trustee Motion on the basis that it believed that the appointment of a CRO represented the best and most expedient option to preserve the value of the estates, protect all parties from future cash management and operational issues, investigate past accounting and cash management related matters, and proceed with the Debtors' reorganization efforts. EWB similarly objected to the extraordinary remedy of appointing a Chapter 11 trustee or conversion, instead supporting the appointment of a CRO.

Debtors vehemently objected to the Trustee Motion, asserting that the pleading was nothing more than an attempt to force the Debtors into a liquidating sale for the purpose of obtaining the assets of Sklarco and control of valuable wells, which would be otherwise unavailable to SEC creditors. The Debtors further asserted that the appointment of a Chapter 11 trustee would result in significant additional administrative expense to the estate, costs which would be mitigated through the appointment of a CRO. Additionally, because the end result of a Chapter 11 trustee would undoubtedly be a liquidation of SEC's assets, the value of which are significantly less than that the amount of EWB Secured Claim, there would be no recovery for any unsecured creditors in the event of an appointment of a Chapter 11 trustee, and conversion to a Chapter 7 would have a similar result.

Following a hearing on the CRO Motion and the Trustee Motion on June 11, 2020, the Tauber Group and the parties joining in the Trustee Motion agreed to the appointment of a CRO in lieu of a Chapter 11 Trustee subject to certain revisions to the proposed form of order.  The Trustee Motion has been held in abeyance since that time.

On June 15, 2020, the Court entered an Order Granting Debtors' Motion for Entry of Order Authorizing Debtors' Employment of CR3 Partners as Chief Restructuring Officer ("CRO Order").  Following entry of the CRO Order, CR3 has had control over the Debtors' ongoing business decisions, and has made all decisions related to the Debtors ongoing restructuring efforts. In accordance with the CRO Order, CR3 has also undertaken a thorough analysis of SEC's pre-petition cash management

### **Assumption of Oil and Gas Leases.**

On October 13, 2020, the Debtors filed their Motion to Assume Nonresidential Real Property Mineral Leases Pursuant to 11 U.S.C. § 365, seeking authorization to assume the mineral leases held by Sklarco on the Petition Date. Sklarco is a party to approximately 4,000 mineral leases (the "Mineral Leases") located across the United States, a majority of which are located in Alabama, Louisiana, Mississippi, and Texas, with a smaller number in Montana, Wyoming, Florida, Arkansas, and Arizona. The Mineral Leases form the basis of Sklarco's interest in the various properties, and are the primary source of value to Sklarco's estate.  In assuming the Mineral Leases,

12

Sklarco preserved the value of the estate for the benefit of its creditors.  The Court entered an Order authorizing Sklarco's assumption of the Mineral Lease on October 30, 2020.

### **Completion of Montana Helium Well**

Pre-petition, SEC was in the process of drilling an exploratory helium well in Montana that, if proven, would be a significant source of revenue for the Debtors.  The initial helium well was nearing completion in March 2020 when state wide shut downs required SEC to cease work on the helium well prior to completion and testing.  Post-petition, SEC elected to utilize a portion of the Post-Petition Loan to complete and test the prospective helium well.  Testing revealed that the initial well did not have significant measurable quantities of helium, thus rendering the well uneconomic.  Given the poor results for the initial well, SEC ceased further exploratory operations in Montana, and will not be completing any further wells.

### **Interpleader Actions Filed by Plains Marketing, L.P and Southeast Oil and Gas District.**

Two separate adversary proceedings have been filed against the Debtors: (1) *The Southeast Alabama Gas District v. Sklar Exploration Company LLC, Sklarco LLC, Kelley Brothers Contractors, Inc. GE Oil & Gas Pressure Control LP, and Baker Hughes Oilfield Operations*, filed on July 20, 2020. (Case No. 20-01210) and (2) *Plains Marketing, L.P. v. Sklar Exploration Company LLC, Sklarco LLC, Kelley Brothers Contractors, Inc. GE Oil & Gas Pressure Control LP, and Lufkin Industries, LLC*, filed on June 24, 2020. (Case No. 20-01191).  Both cases are interpleader actions wherein the Plaintiffs are purchasers of oil or gas produced and processed by Sklar operated wells and facilities in Alabama.  Both purchasers received notices from certain vendors of SEC asserting statutory liens against not only the property interests of the Debtors, but also the produced oil and gas and/or the proceeds from the sale of such oil and gas.  Upon receipt of the notices, the Southeast Alabama Gas District ("SEAGD") held approximately $146,949.12 payable to SEC for gas purchased in suspense following receipt of the notices pending determination by the Court or resolution of the asserted liens by the parties.  Plains Marketing, L.P. ("Plains") similarly held approximately $29,785.99 payable to SEC for oil sold to Plains in suspense pending an Order from the Court, or resolution of the asserted liens.

In both interpleader actions, SEAGD and Plains sought to interplead the funds pursuant to Fed. R. Civ. P. 22 on the basis that the funds were subject to multiple claims by various parties. In response, the Debtors asserted that the liens filed by the vendors cannot, as a matter of Alabama Law, attach to the produced oil and gas or to the proceeds from the sale thereof.  Ultimately, the Debtors, the vendors, SEAGD and Plains entered into a global settlement agreement, pursuant to which the vendors agreed to release their liens on any produced oil or gas or the proceeds therefrom, and SEAGD and Plains agreed to release the funds held in suspense to SEC and dismiss the adversary actions.  On November 23, 2020, the Bankruptcy Court entered an Order Approving Global Settlement Agreement to Resolve Adversary Proceedings.  Pursuant to the agreement, SEAGD and Plains are to release the funds within fifteen days of the Order becoming final, following which the parties will file a stipulation for dismissal of the Adversary Proceedings.

### *Ad Hoc* **Committee's Motion to Modify Automatic Stay**

On November 18, 2020, the self-appointed *Ad Hoc* Committee, a group of working interest holders holding an interest in the Southeast and Southwest Brooklyn Oil Units ("South Brooklyn Oil Units") and a company that operates two adjacent units, filed a *Motion to Modify the Automatic Stay to: (A) Hold a Meeting of the Working Interest Owners in the Brooklyn Oil Units; (B) Take a Contractually Authorized Vote to Remove Sklar Exploration Company, LLC as Operator of the Brooklyn Oil Units; and (c) Upon an Affirmative Vote Take All Steps Necessary to Effectuate the Removal* ("Stay Relief Motion"). The Stay Relief Motion seeks to modify the stay to remove SEC as operator of the South Brooklyn Oil Units, ostensibly to allow the operator of the adjacent Northeast and Northwest Brooklyn Oil Units, Pruet Production Company, a member of the *Ad Hoc* Committee, to take over operation of the South Brooklyn Oil Units.

The Debtors timely filed their Objection to the Stay Relief Motion on December 10, 2020, asserting that the Stay Relief Motion failed to establish cause for removal of SEC as operator, as the interests held by the working interest holder are not diminishing in value, and the *Ad Hoc* Committee likely does not have the votes to remove SEC as operator. Furthermore, SEC's continued operation of the South Brooklyn Oil Units is a necessary part of SEC's reorganization efforts, as SEC receives significant revenue from the operation of the South Brooklyn Oil Units, because of the reimbursement for general and administrative expenses associated with the Units. SEC further receives management fees from operating the gas plant located on the Brooklyn Oil Units, although the *Ad Hoc* Committee has represented that it does not intend to seek removal of SEC as operator of the gas plant.

A hearing on the Stay Relief Motion was held on December 17, 2020, following which the Court held that issues raised in the Stay Relief Motion related primarily to feasibility of a Plan of Reorganization. As a result, the Court continued the final hearing on the Stay Relief Motion to be heard in conjunction with a hearing on confirmation of the Plan to the extent not resolved prior to confirmation.

### **Collection Efforts Related to Unpaid Joint Interest Billings**

During the pendency of the bankruptcy case, SEC has struggled with ongoing collection efforts with respect to joint interest billing obligations ("JIBs") owed to SEC by various working interest owners ("WIOs"). As the operator, SEC is required to distribute revenue received from the sale of oil and gas products owned by the WIOs to such parties, and relies on the payment of JIBs from such WIOs to pay its ongoing expenses and maintain operations. Post-petition, a number of WIOs began to withhold payment of JIBs in an effort to assert certain setoff or recoupment rights. As a result of the withholding of JIB payments by WIOs, SEC suffered from increasing cash shortfalls with limited ability to enforce its rights under the JOAs as a result of heavily negotiated language in the Final Cash Collateral Order.

The continued cash shortfalls for SEC resulted in additional reliance on the revenue that would otherwise be paid to Sklarco, resulting in Sklarco contributing significantly more than its proportionate share for the expenses associated with the continued operation of the wells.  As a result of the continued withholding of JIBs by WIOs, on September 4, 2020 the Debtors filed a Motion for Clarification of Orders and to Authorize Immediate Offset of Joint Interest Billing Obligations ("Offset Motion").  A number of WIOs objected to the Offset Motion, and, following a preliminary hearing, the Offset Motion was held in abeyance.  At the Debtors' request, a hearing on the Offset Motion was reset on February 11, 2021.  The Court ultimately denied the Offset Motion as moot, holding that to the extent any JIBs owed by WIOs exceeded the amount owed for pre-petition revenue by SEC, additional JIBs were required to be paid, barring which noncompliant WIOs may be held in contempt of court.

As of the date of filing this Amended Disclosure Statement, several of the parties have become compliant with the Court's order, and SEC reserves the right to seek further remedies against parties who remain noncompliant, or become noncompliant in the future.  Collection of JIBs remains, and will continue to remain an ongoing issue, particularly as SEC proceeds with a wind down and transition of operations to a new operator, as set forth in greater detail herein.

**Committee's Investigation of Potential Claims**

Bankruptcy Code Section 1103(c)(2) empowers an official committee with the authority to investigate the acts, conduct, assets and liabilities of a debtor, as well as other matters relevant to the case or to confirmation of a plan.  In furtherance of its duties, the Committee investigated the Debtors' transactions with Howard Sklar and certain family trusts (the "Related Parties").  This investigation involved the examinations of Howard Sklar, individually, and James Katchadurian, as the representative of the Debtors, and the review of over twenty-one gigabytes of data produced by the Debtors.

At the request of the Bankruptcy Court, the Committee prepared and filed its *Report Summarizing Investigation Relating to Debtors' Transfers to Howard Sklar and Related Family Trusts* (the "Committee Report").  The Committee Report determined that during the four-year period immediately preceding the Petition Date, the Debtors transferred to Related Parties approximately $19.5 million.

The Related Parties dispute the Committee Report, including allegations, implications, and conclusions drawn in the Committee Report, and maintain that it presents a one-sided, incomplete presentation of the facts.  To the extent that the Committee Report serves as a preview of Causes of Action that a creditor trustee or other party may bring against the Related Parties, the Related Parties will contest those Causes of Action and reserve all rights and defenses in connection with any such litigation.  The Related Parties are preparing a response to the Committee Report and will file it with the Court.

**Restructuring and Reorganization Efforts**

15

The Debtors have made significant efforts in their restructuring process to resolve issues raised by parties in this proceeding during its bankruptcy case. The Debtors have conducted a thorough analysis of the properties to evaluate the costs associated with assumption and rejection of contracts. The Debtors further participated in a two-day mediation regarding the terms of the Joint Plan in January 2021.

The mediation resulted in an agreement with EWB and the Committee, the terms of which have been incorporated into the Amended Plan. However, a number of issues remained unresolved with WIOs holding claims against SEC regarding the calculation and treatment of claims associated with assuming JOAs by SEC to allow SEC to remain the operator of the various oil and gas properties. Despite continued efforts, the Debtors were ultimately unable to reach a resolution with the *Ad Hoc* Committee and other WIOs regarding the cure claims. With the prospect of significant litigation over cure claims and uncertainty regarding SEC's ability to retain operatorship of the properties, SEC's reorganization efforts became uneconomic.

Absent the continued uncertainty regarding SEC's continued operatorship of certain properties, SEC continuing as a going concern would provide significant value to creditors. But with the prospect of looming fights regarding operatorship and cure claims, SEC has lost support for its reorganization efforts. As a result, the Amended Plan contemplates a structured wind down of SEC's operations, including resignation of SEC as operator and an orderly transition to any duly appointed operator selected to replace SEC.

## VI.    DESCRIPTION OF ASSETS

The values of the Debtors' assets, owned on the Petition Date, are set forth in detail in the Asset Analysis which is attached as Exhibit A to this Disclosure Statement. All values are stated as of the Petition Date unless otherwise specified. Additional information about the Debtors' assets can be found in their respective Schedules and Statement of Financial Affairs.

**SEC's Assets**

SEC's assets are primarily comprised of its office equipment and furniture, accounts receivables, and its interest as an operator in the JOAs for the properties operated by SEC. The value listed for SEC's office and furniture equipment is based on prior costs and applicable tax records. SEC's office furniture and equipment is disbursed between its three office locations, and is several years old. As a result, while SEC has listed its office equipment and furniture with a combined value of approximately $1 million, the assets would likely receive significantly less in the event of a liquidation.

SEC further has an interest as an operator in the respective JOAs for its operated properties. SEC does not hold an ownership interest in any of the properties for which it is an operator, rather all revenue that is generated and collected from the sale of hydrocarbons is subject to the claims of the royalty interest holders, overriding royalty interest holders, and the working interest holders. As an operator, SEC is entitled to receive reimbursement for joint interest billings for expenditures on the operated property, and reimbursement for a percentage of administrative costs associated

with operating SEC through contractual reimbursement. The JOAs are executory contracts, and SEC is exercising its business judgment in determining which JOAs to assume, and which to reject.

SEC also has significant owed but unpaid receivables from joint interest billing obligations. As of the date of filing this Disclosure Statement, SEC has receivables in amount of $2,513,629.64, of which approximately $2,035,239.40 are past due. SEC previously sought authorization to offset unpaid joint interest billing obligations against post-petition revenue owed to working interest holders. SEC's Motion has been held in abeyance. SEC reserves the right to renew its Motion any time prior to confirmation of the Plan.

## Sklarco's Assets

Sklarco's assets are comprised primarily of its interest in oil and gas properties, including the applicable mineral leases, and its working interests, overriding royalty interests, and royalty interests in properties operated by SEC and third-party operators. On the Petition Date, Sklarco listed the value of its oil and gas interests at $75.4 million based on a reserve report dated April 1, 2020 completed by T. W. McGuire & Associates, Inc. Post-petition, the Debtors retained Nederland Sewell & Associates ("NSAI") in consultation with EWB and the Committee to complete an updated reserve report. NSAI issued its *Estimates of Reserves and Future Revenue Report* ("NSAI Reserve Report") on November 5, 2020, in which NSAI opined that Sklarco's oil and gas interests have a combined present value of approximately $28.6 million.

Sklarco has also scheduled its interest in the well machinery, fixtures, and equipment. While the well equipment was scheduled separately, the well equipment cannot be severed from the oil and gas properties, and therefore has no independent value.

In addition to the oil and gas assets, Sklarco owns interests in certain outside investments, comprised of minority interests in outside companies and limited partnerships. A majority of the outside investments have limited value, and are not currently making distributions to interest holders, or, in some instances, have made final distributions to interest holders. As such, Sklarco has scheduled the value of the interests in outside investments as $0.

The Committee has expressed objection to the Debtors' separateness and resultant asset ownership classifications. The Debtors believe that such objection(s) are resolved through agreed Plan provisions input following negotiations with the Committee and other parties.

## Causes of Action and Avoidance Actions

Certain Causes of Action and Avoidance Actions pursuant to 11 U. S. C. §§ 545 through 550 and related actions exist in this case. The Debtors each listed a number of payments to creditors in an amount greater than $6,825.00, the preference threshold amount, within the 90 days prior to the Petition Date and certain payments to insiders within the two years prior to filing their bankruptcy cases.

Pursuant to Additionally, the Plan,Committee believes that there may be Causes of Action against Related Parties, including but not limited to claims arising from the transactions described in the Committee Report against Howard Sklar, the Howard Sklar Trust, the Alan Trust, the Jacob Trust, the Maren Trust and the Succession of Miriam Mandel Sklar. The Related Parties dispute these claims and reserve all rights and defenses in connection with any such Causes of Action.

Confirmation of this Plan effects no settlement, compromise, waiver or release of any Cause of Action or Avoidance Actions will be reserved to Action or other claim for relief unless this Plan or the Confirmation Order specifically and unambiguously so provides. The non-disclosure or non-discussion of any particular claim, Cause of Action, Avoidance Action or other claim for relief is not and shall not be construed as a settlement, compromise, waiver, or release of any such claim, Cause of Action, Avoidance Action or other claim for relief.

In keeping with § 1123(b)(3) of the Bankruptcy Code and except as otherwise exculpated, released, compromised, or settled in the Plan, the Debtors, the Creditor Trust for the benefit of Class 6 and Class C unsecured Creditor, and may be pursued at the discretion of and the Creditor Trustee, as the case may be, reserve and retain (and transfer to Creditor Trust) any and all claims and rights against any and all third parties, whether such claims and rights arose before, on or after evaluation. In certain instancesthe Petition Date, the Confirmation Date, the Effective Date, and/or any Distribution date including, without limitation, any and all Causes of Action, Avoidance Action and/or other claims for relief that the Debtors, may decline to pursue an Avoidance Action based on a number of factors, and the decision to pursue or not to pursue Avoidance Actions is entirely within the discretion of or the Creditor Trustee. Pursuant to 11 U.S.C. § 546(A)(1), Avoidance Actions must be commenced on or before April 1, 2022, subject to the Tolling Agreement betweenTrust may have against (i) any insurer and/or insurance policies in which either the Debtors, and/or their current or former personnel have an insurable or other interest in or right to make a claim against, any other of the Debtors' insurers; or (ii) any recipient of a transfer identified in the Debtors' statements of financial affairs.

For the avoidance of doubt, the Creditor Trustee shall retain and shall have the sole and exclusive right to prosecute, enforce and/or settle any and all of the claims, rights, Causes of Action and Avoidance Action.

The entry of the Confirmation Order shall not constitute res judicata or otherwise bar, estop or inhibit any actions by the Debtors, the Creditor Trust or the Creditor Trustee and Howard Sklar. Any Avoidance Actions not commenced by that time shall relating to any claims, Causes of Action or Avoidance Action referred to in this subsection or otherwise. Except as specifically set forth in the Plan, the Creditor Trustee shall constitute the representative of the Estates for purposes of retaining, asserting and/or enforcing the claims, Causes of Action and Avoidance Action under § 1123(b)(3)(B) of the Bankruptcy Code. On the Effective Date, the Creditor Trustee may be deemed abandonedsubstituted as a party of record in all pending litigation brought by or against the Debtors without need for further order of the Bankruptcy Court.

## VII.   DESCRIPTION OF LIABILITIES

### A.   Priority Claims

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claim. Section 507(a) of the Code includes but is not limited to claims for: wages, salaries, or commissions, including vacation, sick leave, or severance pay owing to employees; and sales commissions

earned by an individual within 180 days prior to filing the petition. 11 U.S.C. § 507(a)(1)-(4) (2019).

### 1. Administrative Expense Claims

**Professional Fees.** Administrative Claims are those Claims for payments of administrative expenses of the kind specified in § 503(b) or § 1114(e)(2) of the Bankruptcy Code and are entitled to priority pursuant to § 507(a)(2) of the Bankruptcy Code, including but not limited to: the actual, necessary costs and expenses of preserving the estate; payment of professional fees; fees payable to the trustee; and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a final order of the Bankruptcy Court. Professional fee claims have been reduced in part through payments made by the Debtor through both retainers and through interim payments allowed under the terms of the Cash Collateral Order and the interim payment of professional fee order entered during the case. The Administrative Claims include the Professional Fees incurred during the case which remain unpaid, including fees and costs for:

| Claimant | Service | Fees and Costs incurred and paid through January 31, 2021 |
|---|---|---|
| Kutner Brinen, P.C. | Bankruptcy Counsel | Fees:$488,876.00<br>Costs: $10,862.00<br>Paid: $356,978.00 |
| Armbrecht Jackson, LLP | Special Counsel – Oil & Gas, Litigation | Fees: $375,514.00<br>Costs: $3,503.00<br>Paid: $272,425 |
| Munsch Hardt Kopf & Harr, P.C. | Counsel for the Official Committee of Unsecured Creditors | Fees: $668,726.00<br>Costs: $1,991.60<br>Paid: $493,357.60 |
| Epiq Corporate Restructuring, LLC | Claims & Noticing Agent | Paid: $102,119 |
| CR3 Partners, LLC | Chief Restructuring Officer | Fees and Costs: $1,441,674.00<br>Paid: $1,355,940 (excludes retainer) |

### 2. Tax Claims

Priority Tax Claims are defined in the Plan as any Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code and shall include interest solely to the extent that the holder of such Claim is entitled to such interest under section 507(a)(8) of the Bankruptcy Code. The Debtors are current on all post-petition tax filings and tax payments. The claims filed by taxing authorities include:

| Debtor | Taxing Authority | Claim No. | Amount of Claim |
|---|---|---|---|
| SEC | Internal Revenue Service ("IRS") | 57 | $22,954.94 |

| SEC & Sklarco | State of Alabama, Dept. of Revenue | 62 | $247,500.78 |
| SEC & Sklarco | Louisiana Dept. of Revenue | 75 | $40,379.40 |
| SEC & Sklarco | State of Alabama, Dept. of Revenue | 85 | $166,717.36 |
| Sklarco | IRS | 91 | $1,400.00 |
| SEC | State of Florida, Dept. of Revenue | 10063 | $570.90 |
| SEC | State of Florida, Dept. of Revenue | 10064 | $5,113.77 |
| | | **Total** | **$484,637.15** |

Post-petition, SEC sought authorization to pay the severance taxes owed to the State of Alabama Department of Revenue. As such, the total amount owed on account of the Tax Claims has been reduced by $414,218.14 as a result of the payment of the pre-petition severance taxes owed to the State of Alabama, and the total amount that must be paid on the Effective Date for the Tax Claims will be $70,419.01.

### 3. Employee Claims (Class 1).

Pursuant to 11 U.S.C. § 507(a)(4), wages, salaries and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $13,650.00 per employee earned within the 180 days prior to the Petition Date are entitled to priority. SEC was current on all employee wages as of the Petition Date, and therefore does not believe any wage claims exist. Vincent Zito filed Proof of Claim No. 78, asserting a priority claim in the amount of $21,058 for services provided to the Debtors on a pre-petition basis. The Debtors are still investigating this claim. To the extent Allowed, Mr. Zito's priority claim against SEC will be capped at $13,650, and all remaining amounts will be deemed an unsecured claim against SEC.

SEC does not believe that any other Class 1 claims arising under section 507(a)(4) or (a)(5) exist.

### 4. U.S. Trustee Fees

All unpaid U.S. Trustee Fees shall be paid on a current and ongoing basis until the case is closed.

### B. Secured Claims.

A summary of the known Secured Claims for the Debtor's bankruptcy estate is set forth below.

### 1. East West Bank (Class A and Class 2).

The Class A and Class 2 Claim is secured by a lien on substantially all assets owned by SEC and Sklarco. On or about June 15, 2018, SEC and Sklarco entered into a $50,000,000 Senior Secured Revolving Line of Credit Facility, evidenced by a Credit Agreement, Pledge and Security Agreement, and Promissory Note (the "Loan Documents") with East West Bank, as Agent and Lead Arranger. Pursuant to the Loan Documents, SEC and Sklarco granted EWB a lien on: 1) all

personal property and fixture property, deposit accounts, letter of credit rights, securities and all other investment property, and insurance claims; and 2) all oil and gas interests owned by, or later acquired by, SEC and Sklarco. In accordance with the Credit Agreement, EWB did not receive a lien on outside investment owned SEC or Sklarco, or on the oil and gas interests held in the name of Sklarco as nominee for the Estate of Judy Sklar Silberstein, the Judy Trust FBO Maren Silberstein, and the Estate of Miriam M. Sklar.  EWB duly perfected its interests in the Debtors' assets by filing Mortgages and Deeds of Trust in the applicable real property records in Mississippi, Louisiana, Texas, Florida, and Alabama, and by filing UCC-1 financing statements with the Bossier Parish Clerk of Court.

In accordance with the Amended Plan, on the Effective Date of the Plan, the EWB Secured Claim will be $24 million, less any amounts paid to EWB post-petition and pre-confirmation, excluding the amounts paid for EWB's attorney fees.

2. **Ford Motor Credit (Class 3).**

The Class 3 Claim is secured by a purchase money security interest in eighteen vehicles financed through Ford Motor Credit. Ford Motor Credit has filed the following Proofs of Claim:

| Claim No. | Amount | Vehicle Securing Interest |
|---|---|---|
| 1 | $45,777.55 | 2019 Ford F-150; VIN 1FTEW1E47KKF42980 |
| 2 | $26,909.72 | 2018 Ford F-150; VIN 1FTEW1EGXJFC11026 |
| 3 | $45,390.86 | 2020 Ford F-150; VIN 1FTEW1E46LFA82470 |
| 4 | $46,174.15 | 2020 Ford F-250; VIN 1FT7W2B61LEC27148 |
| 5 | $37,489.44 | 2018 Ford F-150; VIN 1FTEW1E50JKF99213 |
| 8 | $30,425.16 | 2019 Ford Ranger Super; VIN 1FTER1FH6KLA66276 |
| 9 | $37,240.69 | 2018 Ford F-150; VIN 1FTEW1EG1JFD41552 |
| 10 | $40,744.57 | 2019 Ford F-250; VIN 1FT7W2BT3KEE99379 |
| 13 | $52,191.98 | 2020 Ford F-150; VIN 1FTEW1E55LFA69055 |
| 21 | $26,447.24 | 2017 Ford F-150; VIN 1FTEW1EF5HFA31230 |
| 22 | $33,556.16 | 2019 Ford Expedition; VIN 1FMJU1JT6KEA01985 |
| 54 | $15,652.22 | 2016 Ford F-150; VIN 1FTEW1EF0GFD50856 |
| 55 | $20,856.81 | 2017 Ford F-250; VIN 1FT7W2B64HED39983 |
| 73 | $21,403.09 | 2016 Ford F-150; VIN 1FTEW1EF5GFD35009 |
| **TOTAL** | **$480,259.64** | |

3. **Ally Bank (Class 4).**

The Class 4 Claim is secured by a purchase money security interest in a 2018 Ford F-150, Vin 1FTEW1CP6JKE16174.  Ally Bank filed Proof of Claim No. 52, asserting a secured claim in the amount of $26,189.19.  The Class 4 Claim is fully secured by the value of the collateral securing the Claim.

4. **Mechanics' Lien Claims (Class B.1 through B.7)**

Classes B.1 through B.5 are comprised of the secured claims of creditors who perfected mechanics or materialmens' liens ("M&M Liens") on a pre-petition basis, or filed a notice pursuant

to 11 U.S.C. § 546 on a post-petition basis. A full list of those creditors asserting mechanics' or materialmens' liens, including those who have not properly perfected their liens pursuant to Section 546, is attached hereto as Exhibit C, including those properties to which the lien attaches.

In each instance, the validity, scope of property covered, priority and enforcement of the liens is determined by State Law in the state in which the lien was filed. In Alabama, where the majority of the Debtors' operations are conducted, the liens are governed by Ala. Code § 35-11-210 *et seq*, pursuant to which properly perfected liens may be enforced against the real property and the improvements thereto upon which labor, material, or equipment was provided pursuant to a valid contract. Assuming compliance with statutory requirements in the respective state, the M&M Liens would attach to the interests in real property of the various working interest holders, including Sklarco, but would not attach to the interests held by the surface owners or mineral owners/lessors.

A majority of the parties who sent notices of M&M Liens failed to perfect their lien as to Sklarco on a pre-petition basis, or file a notice pursuant to section 546 of the Bankruptcy Code on a post-petition basis. Parties who have failed to perfect their lien as to Sklarco are not separately classified. Those parties who have perfected their liens are separately classified, and Sklarco that such claims are wholly unsecured by the value of Sklarco's interest, as the value of Sklarco's oil and gas assets is less than the first priority secured claim of EWB.

## C.     Non-Priority Unsecured Creditors.

### *Sklarco*

Sklarco's Class C general unsecured creditors are generally comprised of third-party operators to whom Sklarco owed joint interest billing obligations on a pre-petition basis. Sklarco scheduled unsecured claims in the amount of $244,614.57. Based on the claims register maintained by Epiq, the total amount of unsecured claims asserted against Sklarco is approximately $877,383.14. Sklarco is in the process of investigating all claims filed, and reserves the right to object to any unsecured claims asserted against the incorrect debtor, or that do not have a basis in fact or law. Sklarco anticipates that the total amount of general unsecured claims will ultimately be reduced to less than $300,000.

### *Sklar Exploration Company, LLC*

SEC's Class 6 general unsecured creditors are generally comprised of the unsecured claims of vendors and liabilities arising from cash call advances paid by working interest owners. Based on the claims register maintained by Epiq, the total amount of unsecured claims asserted against SEC are approximately $36,617,000. SEC is in the process of investigating all claims filed, and reserves the right to object to any unsecured claims asserted against the incorrect debtor, or that do not have a basis in fact or law. Based on an initial review of the filed claims, SEC anticipates that the total amount of Class 6 claims will be reduced by at least $18 million. The general unsecured claims arising from cash call liabilities may also be reduced prior to confirmation based on performance of work for which cash call advances were requested on a pre-petition basis. The amount of Class 6 claims may increase based on claims arising from SEC's rejection of certain JOAs.

D.      **Leases and Executory Contracts.**

On the Effective Date of the Plan, the Debtors will assume those executory contracts and unexpired leases, which have not been rejected by Order of the Court prior to the Confirmation Date as set forth in the Plan.  On the date of the entry of an Order confirming the Plan, Debtors shall be the holder of any and all right, title, and interest to the assumed leases and contracts, and as a result, such assumed leases and contracts shall be in full force and effect and shall be binding upon Debtors and the other parties thereto.   Confirmation of the Plan shall constitute a determination that the payments to be made to said creditors pursuant to the Plan satisfy all conditions precedent to assumption and assignment set forth in 11 U.S.C. §§ 365(b) and (f).  As to any rejection of the leases and executory contracts, on the Effective Date of the Plan, the Debtor will reject the executory contracts and unexpired leases to which it is a party listed in the Plan, which have not been assumed by Order of the Court prior to the Confirmation Date.  Executory contracts and unexpired leases will be rejected pursuant to the provisions of 11 U.S.C. § 365.  Any executory contract or unexpired lease not assumed in accordance with the Plan shall be rejected. All proofs of claim with respect to claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Court within twenty (20) days after the earlier of: (i) the date of the Court order approving the Debtor's rejection of such executory contract or unexpired lease; or (ii) the Confirmation Date.  Any claims not filed within such time shall be forever barred against the Debtor, its estate, and property, and as a result, any such Claims shall be disallowed in full. Claims arising from such rejection, to the extent Allowed, shall be treated as non-priority unsecured Claims.

Sklarco has filed ~~a number of~~approximately one hundred and elven (111) motions to assume JOAs to which Sklarco is a party as a working interest owner.  A full list of contracts which Sklarco intends to assume are attached hereto as Exhibit D, and additional motions to assume ~~will~~may be filed ahead of confirmation of the Plan.   Sklarco asserts that it is current on all obligations under the contracts which it intends to assume, and therefore there will be no cost to Sklarco to assume the various contracts~~.~~, however a number of objections to some of the motions have been filed.  Included in the contracts to be assumed is the Agency Services Agreement by and between the Debtors, Howard Sklar, the Howard Trust, the Alan Trust, the Jacob Trust, and the Estate of Miriam Mandel Sklar, which generally provides for the management of certain assets for the benefit of the various Trusts and the Estate of Miriam Mandel Sklar in exchange for a management fee.  The parties contemplate amending the Agency Services Agreement prior to and in conjunction with the assumption of the contract.

SEC intends to reject all executory contracts to which it is a party on the Effective Date of the Plan.  SEC filed an omnibus motion to reject all JOAs to which it is a party on February 26, 2021, and anticipates that its rejection of the JOAs will become effective upon confirmation of the Plan. Notwithstanding the Motion to Reject, SEC intends to continue to perform under the respective JOAs through confirmation and until operatorship of the various parties can be effectively transitioned to a new, duly appointed operator.  SEC anticipates that the full wind down and transition will take approximately six (6) months.  A full schedule of the anticipated transition and wind down will be filed with the Plan Supplement, no later than 21 days prior to a hearing on confirmation of the Plan.

**VIII.    DESCRIPTION OF PLAN**

23

### A.    General Description

The Debtors filed their Plan of Reorganization with the United States Bankruptcy Court for the District of Colorado on December 18, 2020.  The Plan provides for the reorganization of the Debtors under Chapter 11 of the Bankruptcy Code.  Pursuant to the Plan, the Debtors shall restructure their debts and obligations, and Sklarco.  **SEC shall be reorganized for the limited purpose of effectuating an orderly wind down and transition of operatorship to a new, duly appointed operator.**  The Plan provides for the specification and treatment of all creditors and Interest holders of the Debtors.  The Plan identifies whether each Class is impaired or unimpaired.  A Class is unimpaired only if the Plan leaves unaltered the legal, equitable, or contractual obligations between the Debtor and the unimpaired claimants or Interest holders.  The following is a brief summary of the Plan.  The actual text of the Plan should be reviewed for more specific detail.

As provided in Section 1123(a)(1) of the Bankruptcy Code, the Priority Administrative and Tax Claims against the Debtor are not designated as classes.  The holders of such Allowed Claims will be paid in full and are not entitled to vote on the Plan.  The Plan divides the creditors into separate classes.  The classes are set forth as follows:

**Sklarco**

Class A - The Allowed Secured Claim held by East West Bank.

Class B.1 through B.5– The Allowed Secured Claims held by Mechanics Lien Claimants more specifically identified as follows:

Class B.1 - The Allowed Secured Claim held by Stoneham Drilling Corporation, if any.

Class B.2 - The Allowed Secured Claim held by Premium Oilfield Services, LLC, if any.

Class B.3 - The Allowed Secured Claim held by Weatherford U.S., L.P., if any.

Class B.4 - The Allowed Secured Claim held by Liquid Gold Well Service, Inc., if any.

Class B.5 – The Allowed Secured Claim held by RAPAD Well Service, Inc., if any.

Class B.6 – The Allowed Secured Claim held by Pro-Tek Field Services, LLC, if any.

Class B.7 – The Allowed Secured Claim held by Pioneer Wireline Services, LLC, if any.

Class C – The Allowed Unsecured Claims against Sklarco.

Class D – The member Interest held by Howard Trust

24

**SEC**

Class 1 - All Allowed Unsecured Claims specified in Section 507(a)(4) and 507(a)(5) of the Code as having priority.

Class 2 - The Allowed Secured Claim held by East West Bank.

Class 3 – The Allowed Secured Claim held by Ford Motor Credit.

Class 4 – The Allowed Secured Claim held by Ally Bank.

Class 5 – Reserved.

Class 6 - The Allowed Unsecured Claims against SEC held by unsecured creditors unless separately classified.

Class 7 - The member Interest held by Howard Trust.

**B.    The Claims**

**1.    Unclassified Priority Claims**

The holders of Allowed Claims of the type specified in Section 507(a)(2) of the Bankruptcy Code, including the costs and expenses of administration, shall receive cash equal to the Allowed amount of such Claim or a lesser amount or different treatment as may be acceptable and agreed to by the particular holders of such Claims. Such Claims shall be paid in full on the Effective Date, or treated as otherwise agreed by the particular holders of such Claims. Administrative Claims that are Allowed by the Court after the Effective Date of the Plan shall be paid upon allowance or as otherwise agreed by the particular holders of such Claims. At the current time the Debtor has no agreements with administrative claimants to be paid other than in full as of the effective date of the Plan.

All Administrative Claims of professionals are subject to Court approval on notice to creditors with an opportunity for a hearing. Certain Professional Fees may be paid pursuant to interim fee applications and upon Court allowance. The following fees and costs have been incurred by professionals in this case:

| Claimant | Service | Fees and Costs incurred and paid through January 31, 2021 | Claim Expected |
|----------|---------|-----------------------------------------------------------|----------------|
| Kutner Brinen, P.C. | Bankruptcy Counsel | Fees:$488,876.00 Costs: $10,862.00 Paid: $356,978.00 | To Be Determined[1] |

---

[1] Claim is dependent on amount of litigation over the Plan.

| Armbrecht Jackson, LLP | Special Counsel – Oil & Gas, Litigation | Fees: $375,514.00 Costs: $3,503.00 Paid: $272,425 | To Be Determined |
|---|---|---|---|
| Munsch Hardt Kopf & Harr, P.C. | Counsel for the Official Committee of Unsecured Creditors | Fees: $668,726.00 Costs: $1,991.60 Paid: $493,357.60 | To Be Determined |
| Epiq Corporate Restructuring, LLC | Claims & Noticing Agent | Paid: $102,119 | To Be Determined |
| CR3 Partners, LLC | Chief Restructuring Officer | Fees and Costs: $1,441,674.00 Paid: $1,355,940 (excludes retainer) | To Be Determined |

The amounts due to professionals may be reduced by interim payments prior to the Effective Date of the Plan in accordance with the *Order Approving Interim Advance Payment Procedures* and the interim allowance of fees and costs. The Debtors anticipate that they will have sufficient funds available to satisfy these claims on the Effective Date or upon allowance of such fees and costs.

### 2. Tax Claims

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8). The Tax Claims will be paid in full on the Effective Date of the Plan. The Tax Claims that must be paid on the Effective Date are:

| Debtor | Taxing Authority | Claim No. | Amount of Claim |
|---|---|---|---|
| SEC | Internal Revenue Service ("IRS") | 57 | $22,954.94 |
| SEC & Sklarco | State of Alabama, Dept. of Revenue[2] | 62 | $0.00 |
| SEC & Sklarco | Louisiana Dept. of Revenue | 75 | $40,379.40 |
| SEC & Sklarco | State of Alabama, Dept. of Revenue | 85 | $0.00 |
| Sklarco | IRS | 91 | $1,400.00 |
| SEC | State of Florida, Dept. of Revenue | 10063 | $570.90 |
| SEC | State of Florida, Dept. of Revenue | 10064 | $5,113.77 |
| | | **Total** | **$70,419.01** |

### 3. Class 1 Priority Claims

Allowed Class 1 Priority Claims shall be paid in full on the Effective Date. The Class 1 claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code. If the claim of Vincent Zito is an Allowed priority claim arising under Section 507(a)(4), the total Class 1 Priority Claims to be paid on the Effective Date of the Plan will be $13,650. If Mr. Zito's claim is disallowed, SEC does not believe there are any Class 1 Priority Claims.

---

[2] Paid post-petition

4.    **Secured Claims**

a. **East West Bank (Class 2 and Class A).**

Class 2 and Class A are impaired by the Plan.  The principal amount of the EWB Secured Claim will be Allowed in the amount of $24 million, less any payments received post-petition and pre-confirmation, excluding any payments for EWB's attorney fees.  The EWB Secured Claim Claim will continue to retain all liens that secured its Claim as of the Petition Date.  The EWB Secured Claim shall bear interest at a rate of 6% per annum, and shall receive not less than 90% of Available Cash, which amount shall be dependent on the amortization of the EWB Secured Claim and the amount necessary to maintain at least the same loan-to-value ratio as exists on the Effective Date of the Plan.  All payments shall be applied first to interest and then to the principal balance of the EWB Secured Claim.

In the event the market price for crude oil drops below $40/bbl for WTI Crude based on the CL1 Commodity market-close price listed at <https://www.bloomberg.com/quote/CL1:COM> for a period of five (5) or more consecutive days, EWB shall be entitled to adjust the monthly payment amount so that, based on the decline curve set forth in the NSAI Reserve Report, the loan-to-value ratio does not at any time exceed the loan-to-value ratio as of the Effective Date of the Plan (the "Plan LTV Ratio"). EWB may request, from time to time, such other Engineering Reports or Reserve Reports (each as defined in the EWB Loan and Security Documents) to the extent provided in the EWB Loan and Security Documents. A "Borrowing Base Deficiency" within the meaning of that term in the EWB Loan and Security Documents shall occur whenever the loan-to-value ratio exceeds the Plan LTV Ratio.  In the event of a Borrowing Base Deficiency, EWB may, in its sole and absolute discretion, (i) elect temporarily to waive any default based on a Borrowing Base Deficiency, (ii) make such redeterminations provided under the EWB Loan and Security Documents, or (iii) take such other actions provided under the EWB Loan and Security Documents.

The EWB Secured Claim shall become due and payable on the second anniversary of the Effective Date of the Plan through sale of assets or refinance of the EWB Secured Claim.  No later than six months prior the maturity date of the EWB Secured Claim (eighteen (18) months after the Effective Date of the Plan) the Debtors, in consultation with EWB and the Creditor Trustee, ~~and Howard Sklar, as trustee of the Howard Sklar Trust,~~ shall determine if a marketing and sale process must be commenced.  While the Creditor Trustee and Howard Sklar will be consulted, they shall not have the ability or authority to veto the decisions made by the Reorganized Debtors and shall not have any authority or right to interfere with EWB's sole and absolute discretion regarding the collateral securing the EWB Secured Claim in accordance with the EWB Loan and Security Documents under the Plan.  Following such consultation with EWB, and the Creditor Trustee, and Howard Sklar, the Reorganized Debtors shall make an election no later than nineteen (19) months after the Effective Date either to pursue a refinancing based on a commercially reasonable likelihood that a refinancing will occur, or to market and sell the Reorganized Debtors' assets.  For the avoidance of doubt, nothing in the Plan preclude the Reorganized Debtors (through the Independent Manager), in their reasonable business judgment, from consulting with other parties in interest, including, without limitation, Howard Sklar as trustee of the Howard Sklar Trust, in connection with any refinancing or marketing and sale process nor from providing information concerning any such refinancing or marketing and sale process upon reasonable request, subject

27

to any satisfaction of any confidentiality obligations that may exist.

If the election is made to sell the assets of the Reorganized Debtors, the Reorganized Debtors shall cooperate with EWB to engage an investment banker to market and sell mineral interests held by Sklarco and any and all other assets held by the Reorganized Debtors. Any sale, refinance, or foreclosure followed by a sale shall be treated as a Monetizing Event, as set forth more fully in Section [●]VIII.C below.

The payment on account of the EWB Secured Claim will vary based on the actual revenue received by Sklarco on account of its oil and gas interests during the Plan. Based on the Projections attached hereto as Exhibit B, EWB is projected to receive payments in the amount of approximately $2.9 million during the first year of the Plan term.

### b. Ford Motor Credit (Class 3).

Class 3 is impaired by the Plan. The Class 3 Claim will retain all liens securing the Claim on the Effective Date of the Plan, and shall be paid in accordance with the underlying contracts until the vehicles securing the Class 3 Claim are returned in accordance with the Resignation and Transition Schedule. After return and liquidation of the Vehicles, any remaining amounts owed on account of the Class 3 Claim will be treated as a Class 6 general unsecured claim.

### c. Ally Bank (Class 4).

Class 4 is impaired by the Plan. The Class 4 Claim will retain all liens securing the Claim on the Effective Date of the Plan, and shall be paid in accordance with the underlying contracts until the vehicles securing the Class 4 Claim are returned in accordance with the Resignation and Transition Schedule. After return and liquidation of the Vehicles, any remaining amounts owed on account of the Class 4 Claim will be treated as a Class 6 general unsecured claim.

### d. Mechanics Lien (Class B.1 through B.7).

Classes B.1 through B.7 consist of the Allowed or arguably allowable classes of creditor claims held by Premium, Stoneham, Weatherford, Liquid Gold, RAPAD, Pro-Tek Field Services, LLC, and Pioneer Wireline Services, LLC all of whom assert a secured claim based on mechanics liens arising under applicable State Law for which Notices of Perfection of Liens Under Section 546(b) have been filed. The Class B.1 through B.7 Claims are impaired by the Plan. The Class B.1 through B.7 claims arise out of expenses incurred by SEC for the ongoing operation of the wells. On the Effective Date of the Plan, the Class B.1 through B.7 Claims shall be deemed unsecured pursuant to 11 U.S.C. § 506 and treated as Class 6 general unsecured claims of SEC.

### 5.    General Unsecured Claims.

### a. Class 5 – Reserved.

### b. Class 6 – General Unsecured Claims against SEC and Sklarco.

Class 6 and Class C are comprised of the Allowed General Unsecured Claims against SEC and Sklarco, respectively. On the Effective Date of the Plan, all Class 6 and Class C creditors shall

receive a beneficial interest in the Creditor Trust in exchange for their claims. Subject to the maintenance of the Plan LTV Ratio for the EWB Secured Claim, beginning on the Effective Date and continuing until a Monetizing Event, the Reorganized Debtors shall pay [●]% of the remaining 109% of the Available Cash to the Creditor Trust, and the remaining [●]%1% shall be paid to the Howard Sklar Trust. The Creditor Trust shall further receive all distributions from or payments on account of all assets and/or interests allocated to the Creditor Trust.

All payments of the Creditor Trust Allocation received by the Creditor Trust shall be applied against the Creditor Trust Payment Obligation, which the Plan defines as the obligation of the Debtors to make one or more payments to the Creditor Trust up to the total amount of $22 million. In a Monetizing Event, the Creditor Trust shall receive the distributions set forth in Section VIII.C below.

In the event of a refinance of the EWB Secured Claim, payments on account of the Creditor Trust Payment Obligation shall be readjusted based on the terms of the new loan issued at the time of the refinance, and subject to certain limits. After such refinance, the Creditor Trust shall receive the Creditor Trust Allocation of the Post-Monetization Proceeds as follows:

- [●]% of the Available Cash80% of the Post-Monetization Proceeds to the Creditor Trust, and 20% of the Post-Monetization Proceeds to the Howard Sklar Trust, until the Creditor Trust has received $3 million towards the Creditor Trust Payment Obligation in excess of the funds it is to receive pursuant to Section 8.8(b) of the Plan;

- [●]%66.67% of the Available CashPost-Monetization Proceeds to the Creditor Trust, and 33.33% of the Post-Monetization Proceeds to the Howard Sklar Trust, after the Creditor Trust has received more than $3 million but less than $8 million towards the Creditor Trust Payment Obligation in excess of the funds it is to receive pursuant to Section 8.8(b) of the Plan; and

- [●]% of the Available Cash after the Creditor Trust has received $8 million towards the Creditor Trust Payment Obligation in excess of the funds it is to receive pursuant to Section 8.8(b) of the Plan.

Notwithstanding anything to the contrary, in no event shall the Creditor Trust receive less than [●]% of the Available Cash.                    The Reorganized Debtors shall continue to calculate Available Cash in the same manner as before such refinance, and shall continue to make such payments of the Creditor Trust Allocation to the Creditor Trust after such refinance until the earlier of the date on which the balance of the Creditor Trust Payment Obligation is paid in full or all Allowed Class 6 and Class C Claims are paid in full.

———The Available Cash is set forth on the Projections.[3] In preparing the Projections, the Debtors have used a conservative approach in estimating future revenues. Actual revenue received is based on a variety of factors, including but not limited to commodity prices and production of the wells. Based on the Projections, the total Available Cash after payment of the EWB Secured Claim is anticipated to be:

---

[3] The total amount to be divided as between the Creditor Trust and the Howard Trust is set forth in the Projections as the "Total Unsecured Creditor Fund".

| Year | Projected Available Cash After EWB Payments |
|------|---------------------------------------------|
| 2021 | $467,000 |
| 2022 | $309,000 |
| 2023 | $256,000 |

### *Establishment and Funding of the Creditor Trust*

On the Effective Date of the Plan, the Creditor Trust shall be established for the primary purpose of: (1) receiving and pursuing claims and Causes of Action, and distributing the proceeds of such claims and Causes of Action; and (2) receiving funds and using and distributing funds in accordance with this Plan and the Creditor Trust Agreement.  The specific terms of Creditor Trust shall be set forth in the Creditor Trust Agreement.  The Creditor Trust will be controlled and administered by the Creditor Trustee, which Trustee shall be selected by the Committee.

The Creditor Trustee shall pay all expenses incurred by the Creditor Trust after the Effective Date, including professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.  The Creditor Trust is also permitted to engage such professionals as it deems reasonable and necessary without application to the Bankruptcy Court. The Creditor Trust shall be funded with $250,000 ("Trust Administration Funds"), which shall be funded through ~~monthly payments~~installments of $50,000 ~~from~~per month or as otherwise agreed to between the ~~Reorganized~~ Debtors ~~until fully funded~~and the Committee prior to the Effective Date of the Plan.

On the Effective Date, all Causes of Action belonging to the Debtors that are not ordinary-course collections, or that are not otherwise released pursuant to the Plan, shall be vested in the Creditor Trust, including any derivative Causes of Action that could have been brought, or may be brought on behalf of the Debtors.  The Creditor Trustee, for the Creditor Trust, shall be vested with all right and authority of each of the Debtor corporate entities and their respective members under applicable law to assert or settle claims against directors, officers, or managers (except for claims released pursuant to this Plan).

Without limiting any substantive rights of the Creditor Trust in connection with any Avoidance Actions against Howard Sklar or any trust or estate for which he serves as trustee or in a similar capacity, the Creditor Trustee and Howard Sklar shall cooperate with respect to the timing of any Causes of Action asserted against Howard Sklar or any trust or estate for which he serves as trustee or in a similar capacity to save legal fees and costs through and including a Monetizing Event which may include and may include,  without limitation, entering into the a Tolling Agreement on the Effective Date to toll any applicable statute of limitations (to the extent tollable as a matter of law), jointly extending or requesting extensions of  applicable deadlines to answer or otherwise respond to a complaint commencing any such litigation until after a Monetizing Event, settling a scheduling order with respect to any such litigation to commence discovery only

30

after a Monetizing Event, and/or otherwise jointly seeking to stay, abate, or administratively close any such litigation until after a Monetizing Event *provided, however,* the Creditor Trustee's duty to cooperate shall be limited as reasonably required for the Creditor Trustee to fulfill its fiduciary duties..

In addition to the Trust Administration Funds and all Causes of Action, the Creditor Trust shall further receive an interest in the distributions and/or proceeds from the following assets beginning on the Effective Date of the Plan:

1. SEC's interest in THP Partners II, LP:
2. The Debtors' interests in:
   a. The Graham 5-16 Well located in Choctaw County, Alabama;
   b. The Doss E D 3 Well Located in Union, Arkansas;
   c. The East Castor Pipeline located in Bienville, Louisiana;
   d. The Finn Deep Pipeline located in Natchitoches, Louisiana;
   e. The mineral leases identified on Exhibit [●] to the Post-Confirmation Trust Agreement.


-The Creditor Trust established under the Plan is established for the purpose of distributing funds transferred to the Creditor Trust, net of all claims, expenses, charges, liabilities, and obligations of the Creditor Trust, to the beneficiaries of the trust in accordance with the terms of the Plan and the Creditor Trust Agreement. The Creditor Trust shall have no objective of continuing or engaging in any trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the Trust. The Creditor Trust shall not conduct business activities other than those associated with or related to the litigation of Causes of Action and distribution of trust assets. It is intended that the Creditor Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of the Treasury Regulations Section 301.7701-4(d). All parties and beneficiaries shall treat the transfers in trust described herein as transfers to the beneficiaries for all purposes of the Internal Revenue Code of 1986, as amended (including Sections 61(a)(12), 483, 1001, 1012, and 1274 thereof). The beneficiaries shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as the grantors of the Creditor Trust and the owners of the Creditor Trust. The Creditor Trustee shall file returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) or (b). All parties, including the beneficiaries and the Creditor Trustee, shall value the Creditor Trust Assets consistently, and such valuations shall be used for all federal income tax purposes. Beneficiaries may wish to consult with a tax professional regarding the tax consequences of holding a beneficial Interest in or receiving a Distribution from the Creditor Trust

Except as expressly provided in the Plan, the Creditor Trust is not, and shall not be deemed, a successor to the Debtors or their Estates, and the Creditor Trust shall not be responsible for any liabilities or obligations of the Debtors other than obligations and Distributions contemplated under the Plan.

**6.   Interests.**

**a.   Class 7 – Interests in SEC.**

31

Class 7 consists of the membership interests in SEC. Class 7 is impaired by the Plan, in that there is a loss of control for the Interest Holders, a loss of voting rights as set forth in Paragraph 8.6 of the Plan. On the Effective Date of the Plan, all membership interests shall be placed in escrow and subject to an escrow agreement and any valid liens until all payments under the Plan are completed. Following a liquidation and wind down of SEC, all membership interests in SEC will be terminated.

**b.**     **Class D – Interests in Sklarco.**

Class D consists of the membership interests in Sklarco. Class D is impaired by the Plan, in that there is a loss of control for the Interest Holders, a loss of voting rights as set forth in Paragraph 8.6 of the Plan, and a diminishment of economic value through Sklarco's contributions of Available Cash to satisfy the Creditor Trust Payment Obligation. On the Effective Date of the Plan, all membership interests shall be placed in escrow and subject to an escrow agreement and any valid liens until all payments under the Plan are completed. Upon satisfaction of all obligations under the Plan, the Interests in Sklarco shall be returned to the Howard Trust.

The Class D Interest Holders shall also [●]%1% of the Available Cash until the occurrence of the Monetizing Event, (ii) after. Upon occurrence of a Monetizing Event, the Reorganized Debtors Howard Sklar Trust shall pay receive the Howard Sklar Trust Allocation directly to the Howard Trust; and (iii) beginning on as set forth more fully in Section C below. In the event of a refinance of the Effective Date, Sklarco shall pay EWB Secured Claim, the Howard Sklar Trust receive 33.33% of the Post-Monetization Proceeds.

Howard Sklar in his individual capacity or as trustee (as the case may be) all revenue derived from and other parties in interest assert that they have title in and to, and claims with respect to, the following assets and investments as and when realized by Sklarco, to the extent and all revenue derived therefrom, unencumbered by any lien or security interest granted to EWB: (the "Disputed Assets"):

a.  Boulders on Fern Apartment Complex
b.  Timber Quest
c.  LTP Opportunity Fund
d.  Trout Creek
e.  1908 Brands
f.  Assets held for Maren Silberstein Revocable Trust and the Succession of Miriam Mandel Sklar

In the event of a refinance of the EWB Secured Claim, the Howard Sklar Trust shall not receive less than [●]% of the Available Cash. The Interest Holders shall also Other parties in interest have disputed any such title or claims. The parties shall cooperate to resolve their disputes with respect to the Disputed Assets, and any resolution shall be subject to the Plan, or, if resolved prior to confirmation, approval will be sought by motion in accordance with Fed. R. Bankr. P. 9019. All rights with respect to the Disputed Assets are reserved (and not waived), including, without

32

limitation, the right to commence an adversary proceeding to determine any party's rights with respect to the Disputed Assets.

Interest Holders shall further receive distributions solely to the extent necessary to pay taxes attributable to the Reorganized Debtors.

## C.    Distributions Following a Monetizing Event.

Upon occurrence of a Monetizing Event, which the Plan defines as the occurrence of a refinancing of the EWB Secured Claim, a sale by the Reorganized Debtors of all or substantially all of their respective assets, or a sale following a foreclosure on collateral securing the EWB Secured Claim funds shall be distributed as follows:

a.    First, to EWB up to $21 million, less any i) post-petition and pre-confirmation payments for principal, interest, or fees, but excluding payments for attorney fees, and ii) all principal payments received post-confirmation through the date of the Monetizing Event,  and post-confirmation principal payments, excluding any payments for attorney fees, as satisfaction in full of the EWB Secured Claim;

b.    Second, to the Creditor Trust up to the amount of $3 million flowing from the agreed allocation of the EWB Secured Claim, in addition to the amounts received from the sale of any assets in which the Creditor Trust has been granted an interest;

c.    Third, to the Creditor Trust and the Howard Trust in accordance with the Creditor Trust Allocation and the Howard Trust Allocation, respectively until the earlier of i) payment in full of the Creditor Trust Payment Obligation, or ii) payment in full of all Allowed Class 6 and Class C Claims;

d.    Fourth, all remaining funds, if any, to the Class 7 and Class D Interest Holders.

For illustrative purposes, assuming the EWB Secured Claim is reduced from $24 million to approximately $17.7 million[4] on the two year anniversary of the Effective Date of the Plan, and the assets of the Reorganized Debtors not otherwise allocated to the Creditor Trust are sold for $25 million, EWB would receive $14.7 million, the Creditor Trust would receive $3 million in addition to the sale proceeds from assets allocated to the Creditor Trust, and the remaining balance of $7.3 million would be distributed in accordance with Creditor Trust Allocation and the Howard Trust Allocation, resulting in the Creditor Trust receiving approximately $5.3 million in addition to the amounts set forth above, and the Howard Trust received approximately $2.1 million.

## D.    Management and Means for Execution of the Plan.

Pursuant to the Plan, the Debtors shall restructure their debts and obligations and will continue to operate in the ordinary course of business.  Funding for the Plan shall be from income

---

[4] Assumes post-petition, pre-confirmation payments of $1.2 million, and post-confirmation payments of $5.1 million.

derived from Sklarco's ongoing revenue attributed to its oil and gas interests, and SEC's revenue derived from its ongoing operations as operator of certain oil and gas properties.

An Independent Manager(s) shall be appointed for each of the Debtors to manage their day-to-day affairs, including but not limited to:

a)   Effectuating the terms of the Plan;
b)   Maintaining control over all bank accounts and funds held and maintained by the Debtors;
c)   Making distributions to creditors, except those distributions to be made by the Creditor Trustee, and the Howard Sklar Trust;
d)   Maintaining control over expenditures;
e)   Directing business decisions by the Debtors, including performance of any projects for which SEC previously received cash call advances on those Operating Agreements assumed by SEC; and
f)   Pursuing collections of any outstanding receivables and enforcing any other payment obligations, including without limitation, any JIB Obligations owed to the Debtors in the ordinary course of business prior to and/or after the Effective Date, including resolution, whether through litigation, settlement, or otherwise, any claims for setoff or recoupment.

The Independent Manager shall also be responsible for and empowered to effectuate the wind down and dissolution of SEC in consultation with EWB Following confirmation of the Plan, CR3 Partners shall remain in place for a period of up to 30 days to effectuate a transition to the Independent Manager.  The Independent Manager shall remain in place until: 1) the EWB Secured Claim is refinanced and distributions are made in accordance with Section 8.8 of the Plan; and 2) satisfaction of all obligations under the Plan, including the payment in full of all obligations under the Plan.

EWB and the Debtors have made a preliminary selection of Brad Walker to act as the Independent Manager.  Mr. Walker has over 30 years of experience managing, advising, and transacting business in a variety of industries including oil and gas.  Mr. Walker's resume is attached hereto as Exhibit E.

The Projections have anticipated monthly fees to the Independent Manager of $20,000. While the precise terms of the engagement will be detailed in any agreements included in the Plan Supplement, Mr. Walker's hourly rate is $425.  The rates of other parties who may provide services include: 1) Managing Directors: $425/hour; 2) Directors: $250/hour; and 3) Associates: $175/hour. All agreements with the Independent Manager remain subject to further documentation to be provided in the Plan Supplement.

**E.    Exculpation.**

**Except as set forth in this Plan, neither the Debtors, the Creditors' Committee, the CRO, nor any of their agents, representatives, attorneys, accountants or advisors shall have or incur any liability in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming the Plan, or any contract, instrument, release or other**

34

**agreement, or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with the restructuring of the Debtors pursuant to the Plan during the pendency of the Debtors' Chapter 11 Cases and through the date of confirmation of the Plan; provided that the foregoing shall have no effect on the liability for a breach of the Plan or any other document, instrument, or agreement executed and delivered in connection with the Plan, or that otherwise results from any act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct; provided further that nothing in this Plan shall limit the liability of any retained attorney in violation of Rule 1.8(h)(1) of the Colorado Rules of Professional Conduct.  For the avoidance of a doubt, there shall be no liability limitation for the Debtors, its Insiders, and affiliates for their actions or omissions occurring before the Petition Date, *or after the Confirmation Date*, or their actions or omissions after the Petition Date that are not official actions made in good faith, nor shall it release the Debtor from any obligations arising under contracts entered into on a post-petition basis.**

### F.      Recoupment.

Except as expressly set forth in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right or account receivable of the Debtors and/or the Reorganized Debtors unless: (a) such holder actually provides notice thereof in writing to the Debtors and EWB of its intent to perform a recoupment no later than fourteen (14) days following the Confirmation Date; (b) such notice includes the amount to be recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment; and (c) the Debtors and EWB consent to a recoupment within seven (7) days of receipt of the Notice.  If no consent is received within such time period, it shall constitute a rejection or denial of the recoupment claim by the Debtors and EWB.  In the event that the Debtors and/or EWB do not consent to recoupment, such recoupment claim shall be allowed only upon entry of a final order from the Bankruptcy Court, and the party asserting a recoupment claim shall assert such claim in Bankruptcy Court no later than seven (7) days following the Debtors and EWB's rejection of the recoupment claim.  Failure to properly and timely provide notice and/or timely file any claims for recoupment shall result in a release, waiver, and denial of all recoupment claims.

## IX.   PLAN FEASIBILITY

The Debtors' Plan is feasible based upon the Debtors ability to achieve the various components of the Plan.  The Debtors' Plan is contingent on the occurrence of certain events, and will not become effective until: 1) an Order is entered confirming the Debtors' Plan and the Order becomes final; 2) the Confirmation Date has occurred; 3) no request for revocation of the Confirmation Order under Bankruptcy Code section 1144 shall have been made, or if made, remain pending; 4)  the Creditor Trust shall have been formed and all formation/organizational documents for the trust shall have been properly executed, delivered, and filed as required by this Plan and applicable law; 5) an Independent Manager(s) is selected by agreement between the Debtor and EWB.  All payments to be made under the Plan are dependent on the continued production of oil and gas from the properties in which Sklarco has an interest.  While a number of the wells are in secondary recovery, the wells are anticipated to continue producing long enough to meet the obligations under the Plan.

The Debtors' Projections support the feasibility of the Plan. In preparing the Projections, the Debtors have used a conservative approach in estimating future revenues. Actual revenue received is based on a variety of factors, including but not limited to commodity prices and production of the wells. that Because payments to creditors, including EWB are tied to the Debtors' revenue, the Debtors will be able to maintain payments to creditors, even when there are significant price fluctuations. The Plan also prioritized payments to EWB to reduce the loan to a balance that can be refinanced once credit markets recover, which is anticipated to occur in the next two years. In the alternative, the Plan includes contingencies in the event that the Debtors are unable to refinance the EWB Secured Claim.

The Projections use an average $37-$46 per barrel. Given that oil prices are currently approximately $61 per barrel based on WTI NYMEX crude, the Debtors are anticipated to meet or exceed projections. The greatest risk to feasibility is the non-payment of JIBs by working interest owners as SEC effectuates a wind down and transition to a new operator. With limited remedies under the Final Cash Collateral Order, if working interest owners do not pay their JIBs, SEC will continue to experience significant cash shortfalls, and will be unable to meet its obligations and pay expenses as it transitions to a new operator, potentially resulting in the need to shut in wells and significantly reducing revenue to Sklarco and payments to creditors.

## X.    RISK TO CREDITORS

This Disclosure Statement contains statements which look into the future. There is no way to determine the accuracy of these statements. The Debtors have attempted to be conservative in its analysis and believes that the Plan as proposed offers the best option for creditors. The primary risk to creditors in that the Debtors will be unable to meet their projections under the Plan, or a sustained downturn in the demand for oil and gas will drive oil prices too low for the Debtors to maintain operations. The Debtors have attempted to mitigate this risk by tying all payments to revenue actually received, and including the ability to adjust payments to creditors based on significant and sustained drops in the price of oil. There is a risk from major catastrophic weather events, such as hurricanes, which could result in damage to the wells, and a loss of revenue to Sklarco.

The Projections provide a conservative estimation of the Debtors' anticipated projected revenue, based on historical performance and the efforts undertaken to restructure its operations during the bankruptcy case. The principal alternative to the Debtors' reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. As set forth in Section XI below, liquidation of the Debtors will assure a distribution to unsecured creditors less than that proposed by the Plan.

## XI.    TAX CONSEQUENCE

The Debtors are not providing tax advice to creditors or interest holders. **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtors or their counsel to be used, and cannot be used,**

**for the purpose of avoiding federal tax penalties.**  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation.  Generally, unsecured creditors should have no tax impact as a result of Plan confirmation.  The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized.  Interest holders may have very complicated tax effects as a result of Plan confirmation.

## XII.   LIQUIDATION ANALYSIS

The principal alternative to a debtors' reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code.   Chapter 7 is the only alternative for Debtors under the Bankruptcy Code.  Chapter 7 requires the liquidation of the debtors' assets by a Trustee who is appointed by the United States Trustee's office.  In a Chapter 7 case, the Chapter 7 Trustee would take over control of the debtors' assets.  The assets would be liquidated, and the proceeds distributed to creditors in the order of their priorities.

If the Debtors' cases were converted to cases under Chapter 7, EWB would likely seek relief from stay to foreclose on the Debtors' assets.  Even if relief from stay was not granted, and assets were instead liquidated by the Chapter 7 Trustee, no funds would available for unsecured creditors. Because of the recent sustained downturn in the price of oil, and the influx of oil and gas bankruptcies, the oil and gas assets held by Sklarco would likely sell for less than 25% of the current reserve value in a liquidation, significantly less than the EWB Secured Claim.  SEC would similarly receive significantly less for its assets in a liquidation, as its assets are primarily comprised of office equipment and furniture which will have minimal liquidation value.

As a result, as set forth on the Liquidation Analysis attached hereto as Exhibit H (as to Sklarco) and Exhibit I (as to SEC), unsecured creditors of either SEC or Sklarco would receive nothing on account of their claims from the liquidation of assets.  The only value to unsecured creditors would be from any Causes of Action and Avoidance Actions brought by the Chapter 7 Trustee, the proceeds from which would go first to pay Administrative Expense Claims and Priority Claims, and then to pay unsecured creditors.  In contrast, the Plan preserves the full value of the Causes of Action and Avoidance Actions for unsecured creditors by assigning such claims to the Creditor Trust and effectuating an orderly wind down, transition, and liquidation of SEC.  The Plan further provides for continued payments to creditors from Sklarco's revenue, that would be otherwise unavailable to SEC creditors in a Chapter 7 absent significant costly litigation with a highly speculative outcome.  The Debtors' Plan therefore provides a significantly greater recovery for creditors of both Debtors, and the Debtors urge creditors to vote to accept the Plan.

DATED: ~~February 26~~March 11, 2021

SKLAR EXPLORATION, LLC


By:  __/s/ James Katchadurian_____
James Katchadurian, Chief Restructuring Officer


SKLARCO, LLC

By:    */s/ James Katchadurian*
James Katchadurian, Chief Restructuring Officer

Kutner Brinen, P.C. ("KB") has acted as legal counsel to the Debtor on bankruptcy matters during the Chapter 11 case.  KB has prepared this Disclosure Statement with information provided primarily by the Debtor.  The information contained herein has been approved by the Debtor.  KB has not made any separate independent investigation as to the veracity or accuracy of the statements contained herein.

Counsel to the Debtor and Debtor- In-Possession:

KUTNER BRINEN, P.C.


By:    */s/ Keri L. Riley*
Jeffrey S. Brinen
Keri L. Riley
1660 Lincoln St., Suite 1850
Denver, CO 80264
Telephone: (303) 832-2400
Email:  jsb@kutnerlaw.com
Email:  klr@kutnerlaw.com

## EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A:     Asset Analysis

Exhibit B:     Projections

Exhibit C:     Summary of Mechanics' and Materialmens' Liens

Exhibit D:     Contracts to be Assumed by Sklarco

Exhibit E:     ~~Reserved~~Resume of Brad Walker

Exhibit F:     Contracts to be Rejected by Sklarco

Exhibit G:     Contracts to be Rejected by SEC

Exhibit H:     Liquidation Analysis for Sklarco

Exhibit I:     Liquidation Analysis for SEC