# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC, | |
| Debtor. | Chapter 11 |
| PRUET PRODUCTION CO., in its individual capacity and as agent and attorney in fact for certain working interest owners, | |
| vs. | A.P. No. 21-_____ |
| SKLAR EXPLORATION COMPANY, LLC | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Comes now Pruet Production Co. ("Pruet") both in its individual capacity and as agent for certain owners of working interests (the "Owners" and together with Pruet, the "Pruet Parties") and brings this complaint against Sklar Exploration Company, LLC ("SEC") based upon the following set of facts:

### INTRODUCTORY STATEMENT

1. The Pruet Parties hold non-operating working interests in oil and gas properties operated by SEC. When SEC commenced its chapter 11 bankruptcy case, SEC held on behalf of the Pruet Parties no less than $649,069.95 in unpaid revenues owned to the Pruet Parties. As the Court is well aware, these revenues were improperly squandered by SEC and its management. These revenues have not been paid to the Pruet Parties and it is apparent that, in light of SEC's imminent liquidation, SEC will never repay them in full. The same operating agreements that obligate SEC to collect and pay revenues to the Pruet Parties obligate the Pruet Parties to make certain payments to SEC. Specifically, SEC issues monthly joint interest billing statements ("JIBs") to the Pruet Parties that are to be paid by the Pruet Parties to SEC. Since this bankruptcy

1381517.2

case was filed on April 1, 2020, the Pruet Parties have diligently paid its post-petition JIBs. Other working interest owners have not done the same.

2. The Pruet Parties are entitled to recoup the unpaid revenues it is owed against its on-going obligation to pay SEC JIBs. Prior to filing this adversary proceeding, the Pruet Parties sought an out of court resolution with SEC regarding the treatment of the Pruet Parties' obligation to pay the JIBs, but SEC has elected yet again to ignore the Pruet Parties. Pruet brings this instant action seeking a determination that the equitable doctrine of recoupment applies and that the Pruet Parties may recoup the unpaid revenues against its obligation to pay JIBs. At the same time the Pruet Parties filed this Complaint, the Pruet Parties also filed a Motion for Authorization to Deposit Funds Pursuant to Federal Rule of Bankruptcy Procedure 7067 (the "Motion to Deposit"). Through the Motion to Deposit, the Pruet Parties seek authority to deposit its JIB payments with the Court until a final ruling is issued in this Adversary Proceeding on the question of whether the Pruet Parties are entitled to recoup.

**PARTIES**

3. Pruet is a party in interest and a Mississippi corporation with its principal place of business in Jackson, Mississippi.

4. Pruet serves as agent for the Owners specifically identified as: Babe Development, LLC; The Coleman Revocable Living Trust; DBC Resources, LP; DBC Resources II LP; DEDE, LLC; DCOD, LLC; Paula W. Denley LLC; Fiddle Investments; Four D LLC; Gaston Oil Company; GJR Investments, Inc.; Darlene K. Hall; Hall and Hall LLC; Hanson Operating Co., Inc.; Hughes 2000 CT LLC; JCE Galbraith Oil & Gas, LLC; JMS Oil & Gas Holdings, LLC; Joyco Investments, LLC; Pam-Lin Corporation; Petroleum Investments, Inc.; RAB Oil & Gas

1381517.2

2

Holdings, LLC; Don B. Saunders Trust; Sawyer Drilling & Services, Inc.; Sugar Oil Properties, LP; Summit LLC; Wallace & Wallace LLC; Leonard E. Williams.

5. SEC is a Louisiana limited liability company and the debtor in the above-referenced bankruptcy case filed on April 1, 2020 (the "Petition Date").

## JURISDICTION & VENUE

6. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C §§ 157 and 1334.

7. This Adversary Proceeding is a core proceeding under 28 U.S.C. §§ 157(b). The Pruet Parties consent to entry of final orders or judgments by this Court.

8. Venue is proper in this Court under 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

### *The SE Brooklyn Operating Agreement*

9. SEC is operator under the Unit Operating Agreement dated November 1, 2018 for what commonly is referred to as the Southeast Brooklyn Oil Unit (the "SE Brooklyn Operating Agreement") in which one or more of the Pruet Parties are identified as working interest owners. A true and correct copy of the SE Brooklyn Operating Agreement is attached hereto as **Exhibit A**.[1]

10. The SE Brooklyn Operating Agreement recognizes that SEC as operator will market and sell oil and gas produced from the unit on behalf of the Pruet Parties and will collect revenues on those owners' behalf. As such, section 11.3 of the agreements provides as follows:

> Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advances or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Working Interest Owners

---

[1] All exhibits attached hereto are incorporated herein by reference.

on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners or applied toward the payment of debts as provided in Section 11.5.  Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners' funds as herein specifically provided, and no funds received by Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

11. Sections 11.1 and 11.2 of the SE Brooklyn Operating Agreement provides that SEC as operator will issue joint-interest billings to the Pruet Parties and that the Pruet Parties will be responsible for their proportional share of costs associated with operation of the Southeast Brooklyn Oil Unit.

### *The SW Brooklyn Operating Agreement*

12. SEC is operator under the Unit Operating Agreement dated November 1, 2018 for what commonly is referred to as the Southwest Brooklyn Oil Unit (the "SW Brooklyn Operating Agreement") in which one or more of the Pruet Parties are identified as working interest owners. A true and correct copy of the SW Brooklyn Operating Agreement is attached hereto as **Exhibit B**.

13. The SW Brooklyn Operating Agreement recognizes that SEC as operator will market and sell oil and gas produced from the unit on behalf of the working interest owners and will collect revenues on those owners' behalf. As such, section 11.3 of the agreements provides as follows:

> Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advances or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners or applied toward the payment of debts as provided in Section 11.5.  Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners'

funds as herein specifically provided, and no funds received bv Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

14. Sections 11.1 and 11.2 of the SW Brooklyn Operating Agreement provides that SEC as operator will issue joint-interest billings to the Pruet Parties and that the Pruet Parties will be responsible for their proportional share of costs associated with operation of the Southwest Brooklyn Oil Unit.

*The Little Cedar Creek Operating Agreement*

15. SEC is operator under the Unit Operating Agreement dated March 20, 2014 for what commonly is referred to as the Little Cedar Creek Oil Unit II (the "LCC Operating Agreement") in which one or more of the Pruet Parties are identified as working interest owners. A true and correct copy of the LCC Operating Agreement is attached hereto as **Exhibit C**.

16. The LCC Operating Agreement recognizes that SEC as operator will market and sell oil and gas produced from the unit on behalf of the working interest owners and will collect revenues on those owners' behalf. As such, section 11. 3 of the agreements provides as follows:

> Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advances or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners or applied toward the payment of debts as provided in Section 11.5. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners' funds as herein specifically provided, and no funds received bv Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

17. Sections 11.1 and 11.2 of LCC Operating Agreement provides that SEC as operator will issue joint-interest billings to the Pruet Parties and that the Pruet Parties will

be responsible for their proportional share of costs associated with operation of the Little Cedar Creek Oil Unit II.

### *The Hamiter 20-11 Operating Agreement & the Craft Mack 17-4 Operating Agreement.*

18. SEC is operator under the Operating Agreement dated January 1, 2014 for what commonly is referred to as the Hamiter 20-11 Well (the "Hamiter Operating Agreement") in which one or more of the Pruet Parties are identified as working interest owners. A true and correct copy of the Hamiter Operating Agreement is attached hereto as **Exhibit D**.

19. SEC is operator under the Operating Agreement dated July 1, 2008 for what commonly is referred to as the Craft Mack 17-4 Well (the "Craft Mack Operating Agreement") in which one or more of the Pruet Parties are identified as working interest owners. A true and correct copy of the Craft Mack Operating Agreement is attached hereto as **Exhibit E**.

20. Article VII of both the Hamiter Operating Agreement and the Craft Mack Operating Agreement provide that SEC as operator will issue joint-interest billings to the Pruet Parties and that the Pruet Parties will be responsible for their proportional share of costs associated with operation of these wells.

### *The Mt. Carmel Operating Agreement*

21. SEC is operator under the Amended & Restated Operating Agreement dated April 8, 2015 for what commonly is referred to as the Bates 2-2 and the Polk Estate 13-5 wells (the "Mt. Carmel Operating Agreement") in which one or more of the Pruet Parties are identified as working interest owners. A true and correct copy of the Mt. Carmel Operating Agreement is attached hereto as **Exhibit F**.

22. The Mt. Carmel Operating Agreement recognizes that SEC as operator will market and sell oil and gas produced from the wells on behalf of the working interest owners and will collect revenues on those owners' behalf. As such, Article V.E. provides as follows:

> Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to Operators, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of Non-Operators on whose account they are advance or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived.

23. Article VII of the Mt. Carmel Operating Agreement contemplates SEC issuing joint-interest billings to those of the Pruet Parties owning an interest thereunder and that those of the Pruet Parties that own an interest will be responsible for their proportional share of costs associated with operation of the subject wells in which they hold an ownership interest.

### *The South Harmony Operating Agreement*

24. SEC is operator under the Operating Agreement dated July 1, 2017 for what commonly is referred to as the Fleming 30-11, the McLeod 30-11, the Fleming 30-15, and the McLeod 30-11 wells (the "South Harmony Operating Agreement") in which one or more of the Pruet Parties are identified as working interest owners. A true and correct copy of the South Harmony Operating Agreement is attached hereto as **Exhibit G**.

25. The South Harmony Operating Agreement recognizes that SEC as operator will market and sell oil and gas produced from the wells on behalf of the working interest owners will collect revenues on those owners' behalf. As such, Article V.E. provides as follows:

> Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to Operators, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of Non-Operators on whose account they are advance or paid until used for their intended purpose or otherwise delivered to Non-Operators or applied

toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived.

26. Article VII of the South Harmony Operating Agreement contemplates SEC issuing joint-interest billings to those of the Pruet Parties owning an interest thereunder and that those of the Pruet Parties owning an interest will be responsible for their proportional share of costs associated with operation of the subject wells in which they hold an ownership interest.

*The Unpaid Revenues*

27. As of the Petition Date, the Pruet Parties were owed no less than $649,069.95 in revenues that SEC collected on behalf of the Pruet Parties under the governing operating agreements (the "Unpaid Revenues").

28. As has been well-established in this bankruptcy case, SEC's management diverted the Unpaid Revenues for improper uses and the Unpaid Revenues have not been paid to the Pruet Parties.

29. Neither SEC nor its management team directing the improper use of the Unpaid Revenues have indicated to the Pruet Parties that the Unpaid Revenues will ever be repaid under reasonable and acceptable terms.

*The JIBs*

30. Since commencement of this bankruptcy case, SEC has continued to issue JIBs to the Pruet Parties and the Pruet Parties have continued to pay its JIBs in a timely fashion resulting in approximately $928,000.00 in posts-petition JIBs being paid by the Pruet Parties to SEC to date.

31. Not all working interest owners have paid JIBs issued post-petition and at least with some of these owners, SEC has entered into agreements whereby a substantial amount of JIBs will not be required to be paid immediately.

32. The Pruet Parties' obligations to pay JIBs arise under the same contracts and transactions as does SEC's obligations to pay the Unpaid Revenues.

33. As such, the equitable doctrine of recoupment applies and the Pruet Parties are entitled to recoup the Unpaid Revenues by withholding payment of the JIBs and applying such withheld amounts to the outstanding balance of the Unpaid Revenues until such as the Unpaid Revenues are paid in full for each respective owner.

34. The Pruet Parties have requested that SEC recognize the Pruet Parties' right of recoupment, but SEC has failed to do so.

**CAUSE OF ACTION**
**(DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201)**

35. The Pruet Parties re-state and re-allege the averments set forth in the above paragraphs of this Complaint as if fully set forth herein in their entirety.

36. An actual and justifiable controversy exists between the Pruet Parties and SEC and judicial declarations are necessary and appropriate at this time to determine the respective rights and obligations of the parties.

37. The Pruet Parties are entitled to a judicial determination pursuant to 28 U.S.C. § 2201 that they are entitled to recoup—or in the alternative, setoff—the Unpaid Revenues owed each of the Pruet Parties against their respective obligations to pay the JIBs until the earlier of (a) the outstanding balance of the Unpaid Revenues owed each of the Pruet Parties is paid in full, or (b) SEC no longer serves as operator of the units and wells identified herein.

WHEREFORE, the Pruet Parties request that the Court enter a final judgment finding (a) that the doctrine of recoupment—or in the alternative, setoff—applies and that the Pruet Parties are entitled to recoup the Unpaid Revenues owed each of the Pruet Parties against their respective obligations to pay the JIBs until the earlier of (i) the outstanding balance of the Unpaid Revenues owed each of the Pruet Parties is paid in full, or (ii) SEC no longer serves as operator of the units and wells identified herein; and (b) such other and different relief as the Court deems proper and just.

Dated: March 12, 2021

/s/ *Matthew J. Ochs*
Matthew J. Ochs
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
P.O. Box 8749
Denver, CO 80201-8749
Telephone: (303) 295-8299
Facsimile: (303) 416-8951
Email: mjochs@hollandhart.com

-and-

/s/ *Jeremy L. Retherford*
Jeremy L. Retherford
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203-4642
Telephone: (205) 226-3479
Facsimile: (205) 488-5693
Email: jretherford@balch.com

*Attorneys for Pruet Production Co. in its individual capacity and as agent of the Owners*