IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT COLORADO

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **SKLAR EXPLORATION COMPANY, LLC** | ) | Case No. 20-12377-EEB |
| **and SKLARCO, LLC** | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **SKLARCO, LLC** | ) | Case No. 20-12380-EEB |
| | ) | |
| | ) | Chapter 11 |
| | ) | |

**THE RUDMAN PARTNERSHIP'S APPLICATION FOR ADMINISTRATIVE
EXPENSE PRIORITY CLAIM PURSUANT TO 11 U.S.C. § 503(b)**

The Rudman Partnership,  ("Rudman"), hereby files its Application for Administrative

Expense Priority Claim Pursuant to 11 U.S.C. § 503(b) ("Application") and respectfully

represents as follows:

**I.**

**OVERVIEW**

1.      Since the Petition Date, Debtors have used  Rudman's oil and gas production

revenue to pay its post-petition obligations.  Rudman's and other non-Debtor working interest

owner ("WIO") production revenues that were either in the SEC Revenue Account at East West

Bank ("EWB") on the Petition Date or thereafter deposited in the Revenue Account, were used by

Debtors  to pay expenses of administration of the bankruptcy estate.

2.      On information and belief, the Debtors have  used Rudman's and other working interest owners' revenue from January and February 2020 production, and in some cases December 2019 production, to pay for Debtors' post-petition operations and obligations. Rudman, on information and belief, estimates that $296,782.302 of Rudman's revenues from oil and gas production was used by Debtors after the Petition Date to pay for the ongoing operation of the bankruptcy estate. Since March or April 2020, SEC has also been deducting from Rudman's revenues and suspending payment of the amount equal to Rudan's alleged share of the unauthorized "management fee" being charged by SEC in connection with the Abbyville Gas Plant.  Rudman seeks the Court's approval of an administrative priority claim in the amount of $296,782.30, or such other amounts as may be shown from Debtors' accounting and production revenue records, arising from Debtors'  use of its funds to pay expenses of administration of the bankruptcy estate and from its improper deduction of management fees attributable to the Abbyville Gas Plant.

## II.

### JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the District of Colorado ("**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). This Court has constitutional authority to enter a final order regarding this matter. *See Stern v. Marshall*, 564 U.S. 462 (2011).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The basis for the relief requested herein is §§ 105(a) and 503(b) of title 11 of the United States Code ("**Bankruptcy Code**").

**III.**

**SEC'S DUTY TO ACCOUNT FOR AND TO PAY REVENUE FROM PRODUCTION
TO RUDMAN AS A NON-OPERATOR WORKING INTEREST OWNER**

6.      The Joint Operating Agreements governing the rights and obligations of SEC, as
Operator, and Rudman and other working interest owners, as Non-Operators,[1] require the Operator
to "keep an accurate record of the joint account hereunder, showing expenses incurred and charges
and credits made and received."  JOA Article VII.C.

7.      Each month, as agent for Non-Operators, SEC markets and receives payments for
the sale of oil and gas of all Non-Operators, which are (or should be) deposited in an account at
East West Bank called the "Revenue Account."  Because revenues are typically received from 30
to 45 days after the month in which the oil and gas was sold, the February 2020 production
revenues were or should have been received by SEC in April 2020.  However, Rudman's
experience is that sometimes payment can occur after 60 days from the month of production.  Also,
approximately $1.2 million in revenues of pre-Petition production owned by Non-Operator WIO's
received in late March 2020 were in the Revenue Account as of the Petition Date.[2]

---

[1] Contractual relationships between Debtors and Rudman are governed by Joint Operating Agreements
("JOA's"), typically utilizing the 1982 American Association of Petroleum Landmen ("AAPL") form
JOA, but customized by the parties with special provisions for each prospect.
The Accounting Procedures attached to each JOA utilized by SEC contain the following definitions:
"Joint Property" shall mean the real and personal property subject to the agreement to which this
Accounting Procedure is attached.
"Joint Operations" shall mean all operations necessary or proper for the development, operation,
protection and maintenance of the Joint Property.
"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of
the Joint Operations and which are to be shared by the Parties.
"Operator" shall mean the party designated to conduct the Joint Operations.
"Non-Operators" shall mean the Parties to this agreement other than the Operator.
[2] *See,* testimony of John Strausser, Debtors' CFO, Transcript of Cash Collateral Hearing held April 27,
2020, pp.138-144.

8.      As part of its duties in maintaining the Joint Account, SEC keeps records that allows it to know the amount of production of oil and gas attributable to each Non-Operator and to calculate to the penny the amount of revenue payable to each Non-Operator.[3]  Significant portions of January 2020 production revenues and all of the February 2020 production revenues have not been paid to Rudman and the other Non-Operators. But it is not because there is any mystery as to the source of the revenue or the amounts each Non-Operator is entitled to receive.

9.      Indeed, like most states, Alabama requires the operator or purchaser of production not only to keep such records but to state in detail on a check stub or statement all of the following information accompanying each payment to an "Interest Owner"[4]:

> **(b)** Whenever payment is made for oil or gas production to an interest owner, whether pursuant to a division order, lease, servitude, or other agreement, all of the following information shall be included on or ascertainable from the check stub or on an attachment to the form of payment, unless the information is otherwise provided on a regular basis:
>
> > **(1)** Lease, property or well identification number, if any, or reference to appropriate agreement with identification of the well or unit from which production is attributed.
> >
> > **(2)** Month and year of sales or purchases included in the payment.
> >
> > **(3)** Total barrels of crude oil or MCF of gas purchased or sold.
> >
> > **(4)** Owner's final realizable price per barrel MCF, long ton, or other appropriate measurement.
> >
> > **(5)** Total amount of severance and other production taxes, with the exception of windfall profit tax.
> >
> > **(6)** Net value of total sales from the property after taxes are deducted.
> >
> > **(7)** Interest owner's interest, expressed as a decimal fraction, in production from subparagraph (1) above.
> >
> > **(8)** Interest owner's share of the total value of sales prior to any tax deductions.

---

[3] *See,* testimony of John Strausser, Debtors' CFO, Transcript of Cash Collateral Hearing held April 27, 2020, p. 139, lines 2-17.

[4] Defined as "A person owning a royalty interest or a working interest in an oil or gas well or unit."  Code of Ala. § 9-17-33(a)(3).

**(9)** Interest owner's share of the sales value less the share of the production and severance taxes, as applicable.

Code of Ala. § 9-17-33(b).

10.     It follows that SEC has always known precisely to whom and how much the unpaid December, January and  February revenues (and any other WIO revenues in the Revenue account on or after the Petition Date) were payable, but has not paid to Rudman the revenues attributable to its interests in such oil and gas production.

11.     Instead, SEC used Rudman's unpaid revenue to pay general, administrative, and other operating expenses of the bankruptcy estate during the pendency of this case.

12.     Since SEC took over management of the Abbyville Gas Plant, Rudman has received no revenues from plant operations, even though Rudman and its fellow participants own 100% of the plant.  SEC has no ownership interest other than holding the plant for the benefit of Rudman and the other Escambia prospet participants.   Rudman is informed that SEC is charging the monthly management fee that was not duly authorized under the terms of the Participation Agreement because its imposition was not approved by unanimous consent of the participants.

13.     SEC has breached the Participation Agreement and has taken actions that damage and are inconsistent with Rudman's ownership interest in the plant, by (a) charging a management fee pursuant to an amendment of the JOA that was not unanimously approved by all of the original participants who are signatories to the Escambia Participation Agreement; (b) failing to pay Rudman its share of the net revenues from the operation of the Abbyville Gas Plant; and (c) failing to account to Rudman and the other participants for the revenues earned by the Abbyville Gas Plant; and (d) improperly deducting and suspending the amount of the management fee from Rudman's production revenues.

## IV.

## ARGUMENT AND AUTHORITIES

14.     The Bankruptcy Code defines administrative expenses non-exclusively, to include

"actual and necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

The Supreme Court further explained that administrative expenses should also include "costs

ordinarily incident to operation of a business, and not be limited to costs without which

rehabilitation would be impossible." *Reading Co. v. Brown*, 391 U.S. 471, 483 (1968). Whether

Rudman is entitled to an administrative claim is determined by a two-part test: (1) there must be

a post-petition transaction between the creditor and the debtor; and (2) the estate must receive a

benefit from the transaction. *See, e.g.*, *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir.

2001); *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992); *In re O'Brien

Environmental Energy, Inc.*, 181 F.3d 527, 532–33 (3d Cir. 1999); *In re Mid-American Waste

Sys.*, 228 B.R. 816 (Bankr. D. Del. 1999).

15.     Administrative expense allowance is also awarded for damages due to a debtor's

wrongful action or violation of law. *In re Al Copeland Enters., Inc.*, 991 F.2d 233, 240 (5th Cir.

1993) (citing, among other cases, *Reading*, 391 U.S. at 485). *Reading* recognized that "damages

resulting from the negligence of a receiver acting within the scope of his authority give rise to

'actual and necessary' costs of a Chapter XI arrangement." *Reading*, 391 U.S. at 485. The Fifth

Circuit further recognized that "those injured during the trustee's administration of an estate are

entitled to an administrative priority regardless of whether their injury was caused by a tort or

other wrongdoing." *Al Copeland Enters., Inc.*, 991 F.2d at 239 (citing *New York v. N.L.R.B.*, 709

F.2d 1138, 1143 (7th Cir. 1983)).

16.     Debtors admit that production revenues of Rudman and other Non-Operators is not property of the estate. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment.").[5]   The practical consequence of this usage of Rudman's is that it became an unwilling *de facto* DIP lender, without any of the benefits and protections accorded under Section 364 of the Bankruptcy Code.  Debtors have also wrongfully misappropriated from Rudman's revenues the amount of the monthly management fee for the Abbyville Plant that was not approved unanimously by the Participants in the Escambia Prospect.

17.     Debtors' failure to remit such non-estate property and use in the operation of the bankruptcy estate would likewise constitute an administrative claim. *See Reading Co. v. Brown*, 391 U.S. at 486; *In re Hildebrand*, 205 B.R. 278, 286 (Bankr. D. Colo. 1997) (relying on Reading in awarding an administrative claim); *see also Al Copeland Enters., Inc. v. State of Texas (In re Al Copeland Enters., Inc.)*, 991 F.2d at 239-40 (citing *Reading* and concluding that because the debtor's "post-petition decision [not to carry out its obligations under applicable non-bankruptcy law] to pay sales tax revenues] resulted in monetary harm to the State," an award of interest to the State "constitute[d] an administrative expense under 11 U.S.C. § 503(b).").

---

[5] *See* Debtors' Motion for Authority to Pay 1) Overriding Royalty, Royalty, and Working Interest Obligations; and 2) Offset Joint Interest Billing Obligations, (Doc. No. 37, ¶ 16): "Numerous courts have held that the debtor collecting proceeds from oil and gas operations for the benefit of non-operating owners of such properties has only bare legal title to such proceeds, and does not obtain an equitable interest in the proceeds. *E.g., Dahlberg v. ConocoPhillips Co. (In re Reichmann Petroleum Corp.),* 434 B.R. 790, 797-98 (Bankr. S.D. Tex. 2010)(holding that revenue attributable to a working interest was subject to a constructive trust in favor of the working interest holder and not an asset of the debtor's estate); *Vess Oil Corp. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 418 B.R. 98, 106 (Bankr. D. Del. 2009)("[F]unds in the Defendants' possession held for third parties . . . are not part of the Defendants' bankruptcy estates."); *In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) (holding that the debtor's possessory interest in revenues attributable to an interest holder was that of a bailee")."

18.     The *Reading* doctrine, as discussed and expanded upon in *Al Copeland*, is applicable to Rudman's claim. Debtors have a duty under the JOA's and Alabama law to account for and pay to Rudman and other Non-Operators the revenue attributable to their interests. Because Debtors have failed in their statutory obligations to do so and, instead, used the revenue in the operation of their business and the administration of their estates, Rudman is entitled to an administrative expense claim for the entire amount of such unpaid revenue attributable to its interests.

## V.

## PRAYER FOR RELIEF

19.     The Rudman Partnership requests that the Court grant administrative priority to its claim for unpaid production revenues used by Debtors during the pendency of this case for payment of general, administrative and operating expenses, and that such claim be allowed and paid in the amount of $296,782.30, or such other amounts as may be shown from Debtors' accounting and production revenue records, arising from Debtors' use of its funds to pay expenses of administration of the bankruptcy estate and its improper deduction of the Abbyville Plant management fees from Rudman's proceeds of production.

Respectfully submitted,

**Maynes, Bradford, Shipps & Sheftel, LLP**

*/s/ Thomas H. Shipps*
Thomas H. Shipps
*/s/ Shay L. Denning*
Shay L. Denning
Maynes, Bradford, Shipps & Sheftel, LLP
835 E. Second Ave., Suite 123
Durango, CO  81301
Telephone: (970) 247-1755
Facsimile: (970) 247-8827Email:
tshipps@mbssllp.com; sdenning@mbssllp.com

*and*

*/s/ Barnet B. Skelton, Jr.*
Barnet B. Skelton, Jr.
815 Walker, Suite 1502
Houston, TX  77002
Telephone: (713) 659-8761
Cell: (713) 516-7450
Facsimile: (713)659-8764
Email: barnetbjr@msn.com

ATTORNEYS FOR THE RUDMAN
PARTNERSHIP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on March 22, 2021, the foregoing instrument was electronically filed and served via CM/ECF pursuant to L.B.R. 9036-1.  All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing.

/s/ *Barnet B. Skelton, Jr.*
Barnet B. Skelton, Jr.