# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE:<br>SKLAR EXPLORATION COMPANY, LLC,<br>EIN:  72-1417930<br><br>    Debtor. | Case No. 20-12377-EEB<br><br>Chapter 11 |
| SKLARCO, LLC,<br>EIN:  72-1425432<br><br>    Debtor. | Case No. 20-12380-EEB<br><br>Chapter 11 |

**EAST WEST BANK'S OBJECTION TO THE RUDMAN PARTNERSHIP'S APPLICATION FOR ADMINSITRATIVE EXPENSE PRIORITY CLAIM PURSUANT TO 11 U.S.C. § 503(b)**

Secured creditor, East West Bank, a California state banking corporation ("EWB"), in its capacity as a lender and the administrative agent under the Credit Agreement dated June 15, 2018 with Sklar Exploration Company LLC ("SEC") and Sklarco LLC ("Sklarco") (collectively, the "Debtors"), through counsel, hereby objects to *The Rudman Partnership's Application for Administrative Expense Priority Claim Pursuant to 11 U.S.C. § 503(b)*, filed by the Rudman Partnership ("Rudman") on March 22, 2021 [ECF No. 1148] (the "Application"), and respectfully requests that the Application be denied.

The Application is procedurally deficient because Rudman has failed to establish the predicates for relief—ownership of the Debtors' cash on hand and entitlement to SEC's gas plant fee—through a properly filed adversary proceeding.  The Application must be denied on that basis alone.

Even if the Court were to consider (which it should not) the threshold issues in the context of this contested matter, however, the Application still would fail.  Under applicable non-bankruptcy law, Rudman held a mere right to payment as of the bankruptcy

petition date and did not hold an ownership interest in the Debtors' cash deposited in EWB accounts. Accordingly, the Rudman Partnership holds, at best, a general unsecured claim for unpaid revenues, and the Application must be denied. In addition, the use of the cash purportedly at issue was not part of post-petition transaction between Rudman and the Debtors and provided no benefit to the estates, as opposed to Rudman's parochial interests.

In further support of this objection, EWB respectfully submits as follows:

## I. BACKGROUND

1. According to the allegations of the Application, Rudman is a party to "Joint Operating Agreements ('JOAs'), typically utilizing the 1982 American Association of Petroleum Landmen ('AAPL') form JOA, but customized by the parties with special provisions for each prospect." Application at 3, n.1.[1]

2. The JOA provided with Rudman's proof of claim, however, imposed no obligation on SEC to segregate production revenues or to hold them in escrow or trust for Rudman. Indeed, the JOA provided that a non-operator working interest holder could assure its individual ownership of extracted minerals by taking possession of such minerals in kind. Absent such an affirmative act of possession, SEC as the operator had the right "but not the obligation, to purchase such oil or sell it to others at any time from time to time, for the account of the non-taking party." JOA Art. VI.C.

3. SEC's obligations with respect to the "Joint Account" were those of a record keeper, not an escrow agent or trustee. *See* JOA Art. VII.C ("Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received."). Nowhere did the JOA grant an ownership interest to Rudman in the proceeds of extracted minerals, nor require SEC to segregate and hold such proceeds for non-operators. To the contrary, the JOA expressly provided that the parties thereto

---

[1] Demonstrating how the procedural safeguards of an adversary proceeding are necessary here, the vague allegations of the Application appear to conflict with the Rudman Partnership's proof of claim, which references a single JOA. The rejection of that JOA, of course, was authorized by this Court by order dated March 19, 2021 [ECF Nos. 1138, 1151].

2

"shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own self-interest." JOA Art. VII.A.

4. Notwithstanding the JOA, from the outset of these cases, Rudman has been among the most vocal proponents of an ownership theory regarding certain cash held by the Debtors as of the bankruptcy petition date. Notably, however, Rudman never commenced an adversary proceeding or requested injunctive relief to constrain the use of such funds, and the Debtors have expended their petition-date cash on hand in operations (for the benefit of Rudman) as authorized by this Court over Rudman's objection.

5. Indeed, in the *twelve full months* since the commencement of these cases, no working interest holder has commenced an adversary proceeding to determine its purported ownership of the Debtors' cash on hand as of the petition date.[2]

6. The Application similarly assumes the unjustified and unadjudicated legal conclusion that SEC's management fee for the Abbyville Gas Plant "was not duly authorized under the terms of the Participation Agreement." Application at 5, ¶ 12. Again, Rudman has failed to allege with specificity which documents it contends controls this issue, much less commence an adversary proceeding to compel the payment of such funds or for a judgment declaring the respective parties' rights under the allegedly applicable agreements, despite levelling generalized accusations on this issue for the last year.

7. Notably, during the last twelve months, Rudman[3] has benefitted directly from the Debtors' ongoing operations, all while the estates lost money and put EWB's

---

[2] At least some of these issues were considered in connection with various working interest holders' objections to the Debtors' use of cash collateral. EWB fully reserves all rights with respect to the preclusive effect of the Court's prior orders, whether by law of the case, estoppel, or other doctrine, theory, or principle of preclusion. Nothing herein shall be deemed a waiver or forfeiture of such matters.

[3] The Application contains passing references to "all working interest owners." Obviously, Rudman lacks standing to bring an administrative expense application on behalf of all working interest owners, and accordingly, such superfluous references should be disregarded. *See In re*

position at risk. EWB is informed that Rudman alone has received approximately $839,597 in production revenues ($625,315 in cash net of JIB obligations) since the commencement of these cases. Rudman also collected *more than $36 million* in production revenues (more than $17 million in net cash) in the aggregate prior to the bankruptcy filing. In short, Rudman clearly has benefitted from its relationship with the Debtors, particularly post-petition when the Debtors' estates have posted consistent losses.

8. Indeed, Rudman itself has observed "the mounting post-petition losses reflected in the Debtors' operating reports" and cited them as a driving reason to proceed to plan confirmation as expeditiously as possible. [ECF No. 802 at 3, ¶ 3] Of course, Rudman's post-petition revenues have not been subjected to such losses or risk, because the final cash collateral order provided for the segregation and payment of production revenues to Rudman and other working interest holders. Rather, the post-petition risk of loss has been born by EWB.

9. Under these circumstances, the Application has failed to, and cannot, establish the benefit to the estates, as opposed to the benefit to Rudman.

10. In addition, Rudman could have had an allowed administrative expense claim (in the form of a JOA cure claim) that would have been fully paid within 90 days of the effective date of the plan. Rudman refused, preferring to shut down SEC as operator and have its JOA rejected by SEC. To give Rudman an enhanced recovery on the backs of other creditors now would violate the bankruptcy objective of equality of distribution, and if an avalanche of similar applications were filed and granted, potentially no plan could be confirmed in these cases. Perhaps that is the ultimate goal of certain creditors in these cases.

---

*Lazy Days' RV Center Inc.*, 724 F.3d 418, 421 (3d Cir. 2013) ("Federal courts have no jurisdiction to render advisory opinions . . . [and] 'may not decide questions that cannot affect the rights of litigants in the case before them. . . .'") (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).

11. The Court should decline the Application's improper invitation (i) to adjudicate through an administrative expense application matters requiring an adversary proceeding, and (ii) effectively to impose an inequitable *post facto* trust on the Debtors' cash for the benefit of Rudman.

## II. ARGUMENT

### The Application Is Procedurally Improper.

12. As a threshold matter, the Application is a bald attempt to evade the requirements and procedural safeguards of a properly filed adversary proceeding, which is necessary to determine the Application's necessary predicates to relief.

13. The Application merely assumes as adjudicative facts at least two hotly contested issues: (1) whether Rudman somehow "owned" the funds held in the Debtors' EWB deposit accounts on the petition date, apparently based on some kind of trust theory, and (2) whether Rudman is entitled to a greater portion of the Abbyville Gas Plant fee charged by SEC, apparently based on a contract theory. Both questions would have to be resolved in Rudman's favor before even reaching the separate question of administrative expense priority. Rudman has adjudicated neither. It may not do so through the back door via the Application.

14. Federal Rule of Bankruptcy Procedure 7001 defines "adversary proceedings" to include any proceeding: (a) "to recover money or property," Fed. R. Bankr. P. 7001(1); (b) "to determine the validity, priority, or extent of a lien or other interest in property," *id*. 7001(2); (c) "to obtain an injunction or other equitable relief," *id*. 7001(7); or (d) "to obtain a declaratory judgment relating to any of the foregoing," *id*. 7001(9).

15. The threshold issues for the Application certainly fall within these categories. Rudman's purported ownership interest in the Debtors' cash, on which EWB asserts a lien, is a necessary element for the Application, but Rudman has never brought an adversary proceeding to adjudicate that issue. Rudman also seeks to determine the parties' respective interests in the Abbyville Gas Plant and/or to recover money that Rudman contends SEC

5

improperly charged for management thereof. At a minimum, Rudman would require declaratory relief determining the rights of the parties under the agreements that Rudman alleges control the issue of the gas plant revenues. To the extent Rudman is not precluded from adjudicating any of these issues, it must do so in a properly filed adversary proceeding.

16. As the Court knows, contested matters in bankruptcy are more informal than adversary proceedings and "are generally designed for the adjudication of simple issues, often on an expedited basis." *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992). Unlike a contested matter, an adversary proceeding requires filing an adequately pleaded complaint, serving a summons and a copy of the complaint on affected parties as necessary defendants, and the filing of responsive pleadings by those defendants. *In Re Mansaray-Ruffin*, 530 F.3d 230, 234 (3rd Cir. 2008).

17. In addition, adversary proceedings permit the assertion of affirmative defenses, motions for a more definite statement or to dismiss the proceeding, and the opportunity for more thorough discovery and evidentiary presentation. *See In re Riding*, 44 B.R. 846, 858-59 (Bankr. D. Utah 1984). These are not trivial requirements but vital procedural safeguards, particularly when complex issues and third-party interests, as EWB's lien interests here, are implicated.

18. Accordingly, "when an adversary proceeding is required" under Rule 7001, "courts are not free to disregard the Rule." *Mansaray-Ruffin*, 530 F.3d at 236. The Fifth Circuit, for example, has underscored the "difficulties that are apt to arise if the bankruptcy court too easily permits parties to circumvent the rules governing adversary proceedings," and has held that rulings that permit such circumvention constitute reversible error. *See In re Zale Corp.*, 62 F.3d 746, 765 (5th Cir. 1995) ("Including a matter governed by Rule 7001 in another matter already before the court . . . does not satisfy the procedural rules required by Rule 7001."). The Seventh Circuit similarly has held that matters governed by

6

Rule 7001 that are presented by motion "will be dismissed," and any related orders "will be vacated." *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990).

19. If a party wants a particular benefit of the Bankruptcy Code, it "must carry the burden of following the mandated procedures" as set forth in Rule 7001. *In re Commercial Western Fin. Co.*, 761 F.2d 1329, 1336-38 (9th Cir. 1985) (reversing order on a contested matter when an adversary proceeding was required). Rudman has failed to do so, and accordingly, the Application must be denied.

**Rudman Never Owned the Cash and Holds a General Unsecured Claim.**

20. Rudman purports to have an ownership interest in certain of the Debtors' commingled cash held in one or more EWB deposit accounts as of the petition date. Rudman, however, never had a real property ownership interest in or to the oil and gas under Alabama law. Rudman similarly never had a separate, stand-alone ownership interest in the proceeds of such oil and gas. Simply stated, Rudman held a contractual payment right under a JOA that SEC has rejected. Accordingly, Rudman has, at best, a general unsecured claim that is not entitled to administrative expense priority.

21. In Alabama, due to the migratory nature of oil and gas, an oil and gas lease "does not grant the ownership of the oil and other minerals, but grants and leases to [lessee] the land described for the purpose of investigating, exploring, prospecting, drilling, mining for and producing oil and other minerals." *Sun Oil Co. v. Oswell*, 62 So. 2d 783, 789 (Ala. 1953). The Alabama Supreme Court affirmed this concept of non-ownership forty years later in *NCNB v. Texas National Bank, N.A*, where the court cautioned parties from quoting caselaw from "ownership theory" jurisdictions, observing that "[o]ne must, however, bear in mind that it is not the gas that is owned in Alabama, but the right to reduce the gas to possession." *NCNB v. Texas National Bank, N.A*, 631 So. 2d 212, 223 (Ala. 1993) ("Alabama determines ownership of oil and gas under the nonownership theory, which recognizes the migratory nature of oil and gas and requires actual possession to establish ownership.").

22. Under the Participation Agreement included with Rudman's proof of claim, Sklarco did not own the oil and gas, but rather held a "leasehold" right to explore for and extract it. The Participation Agreement could not, and did not, create an ownership interest in oil and gas for Rudman, because Sklarco could not convey any greater interest than that which it possessed. *Chancy v. Chancy Lake Homeowners Ass'n, Inc.*, 55 So. 3d 287, 297 (Ala. Civ. App. 2010). Stated differently, Rudman's interest could never be any greater than Sklarco's interest in the non-ownership "leasehold." *See Apache Corp. v. W & T Offshore, Inc.*, 626 F.3d 789, 797 (5th Cir. 2010) (plaintiff's working interest in offshore oil and gas lease only gave whatever rights plaintiff's predecessor had because a party cannot assign what it does not own, or convey any rights greater than that which it held).

23. Nor did the much vaunted JOA grant any ownership interests in the proceeds of production. The rejected JOA merely obligated SEC to keep an accurate accounting of the expenses and credits for each non-operator. Thus, any claim for unpaid revenues against SEC is merely an unsecured contract claim. *See*, *e.g.*, *In re Johnson*, 513 B.R. 333, 338 (Bankr. S.D. Ill. 2014) (in non-ownership jurisdiction, assignments to the debtor only gave him contractual rights to payments for oil extracted in the future, and these contractual rights to payments were personal property contract rights).

24. The Application's citation to an Alabama Code § 9-17-33 does nothing to change this result. That statute merely required SEC to keep certain records and convey certain information to working interest holders; it says nothing about the legal characterization of Rudman's working interests. Certainly, it does not establish that Rudman's working interest is a real property ownership interest or even purport to address the issue. It does nothing more than acknowledge that parties to a contract are obligated to account for various items when making payments on oil or gas production. Contractual rights to payment are regularly impaired in bankruptcy, and Alabama Code § 9-17-33 does not change that result nor further Rudman's argument.

8

**Rudman's Pre-Petition Claim Is Not Entitled to Priority.**

25. Statutory priorities are to be narrowly construed to foster the presumption that a debtor's limited resources will be equally distributed among creditors. *In re Amarex, Inc.*, 853 F.2d 1526, 1530 (10th Cir. 1988). Accordingly, the burden of proving entitlement to a priority is on the party claiming such priority. *Id*.

26. Here, Rudman asserts a priority claim for "the actual, necessary costs and expenses of preserving the estate" under section 503(b)(1)(A) of the Bankruptcy Code. Rudman acknowledges that to qualify for administrative expense priority under this section, Rudman has the burden of proving that the asserted expense (1) arises out of a post-petition transaction between the creditor and the debtor-in-possession, and (2) provided benefit to the estate. Application at 6, § 14. The Application satisfies neither prong of the test.

27. First, there was no post-petition transaction between SEC and Rudman. Rather, the Debtors had certain cash on hand in deposit accounts maintained with EWB, and EWB's lien indisputably extended to such deposit accounts.[4] The fact that the Debtors had some cash in the bank as of the petition date does not establish a post-petition transaction with Rudman. To conclude otherwise would make every debtor in possession with a positive bank balance subject to administrative expense claims by account creditors the first second after a chapter 11 filing.

28. To qualify under section 503(b)(1)(A), the "post-petition transaction" obviously must have occurred ***post-petition***. *See*, *e.g.*, *In re Mid Region Petroleum*, 1 F.3d 1130, 1132-34 (10th Cir. 1993) (disallowing administrative expense priority to claims for

---

[4] Rudman objected to the use of cash collateral based on the same argument it now makes—*i.e.*, that it owned the cash and would be a "de facto lender" if the cash was not returned to Rudman. Indeed, the Application reproduces portions of Rudman's supplemental objections to the use of cash collateral nearly verbatim. [ECF Nos. 220, 259] The Court effectively overruled those objections in connection with the third interim and final cash collateral orders. Any remaining preserved issues must be adjudicated in an adversary proceeding, as discussed above.

payment on leased railroad cars because post-petition possession was not a post-petition transaction conferring a benefit to the debtor-in-possession in the operation of its business); *In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291, 1293-96 (10th Cir. 2001) (rejecting administrative expense priority to employee claims for lump-sum payments because the employees could not show that the claim resulted from a post-petition transaction with the debtor-in-possession, or that the lump sum represented consideration for a benefit provided to the estate); *In re Bayly Corp.*, 163 F.3d 1205, 1208-1211 (10th Cir. 1998) (denying administrative expense status for employee benefit claims that matured due to post-petition plan termination because such benefits were consideration for labor provided pre-petition); *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984) ("If the inducement came from a pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession.").

29. Similarly, Rudman has failed to establish a benefit to the estates, as opposed to a benefit to Rudman's parochial interests. As discussed above, Rudman did not own the cash collateral used by the Debtors, and therefore, Rudman could not possibly have conferred a benefit on the estates by the Debtors merely using ***their own cash*** (with the consent of EWB as the senior secured lender).[5]

30. But even if Rudman did have an ownership interest in the cash (which it did not), the use of that cash permitted Rudman to collect post-petition net revenues of no less than $625,315, all while the estates were losing money and Sklarco covered SEC's cash losses by expending EWB's cash collateral. *See In re White Motor Corp.*, 831 F.2d 106 (6th Cir. 1987) (holding that consideration must be given to the debtor's bankruptcy estate that directly and substantially benefits the estate); *Broadcast Corp. v. Broadfoot*, 54 B.R. 606, 611 (N.D. Ga. 1985) ("use of the words 'actual' and 'necessary' indicate that the estate

---

[5] The *Reading* exception similarly has no application here. Rudman has failed to establish, in a properly filed adversary proceeding, that SEC has received gas plant fees wrongfully or that it owned EWB's cash collateral.

must accrue a real benefit from the transaction for which the claim is filed"), *aff'd sub nom.*, *In re Siibscription Television of Greater Atlanta*, 789 F.2d 1530 (11th Cir.1986). Granting to Rudman an additional $290,000+ priority claim would only compound the injury to EWB and would come at the expense of unsecured creditor recoveries.

31. In keeping with the goal of equality of distribution, section 503(b)(1)(A) was not intended to "saddle debtors with special post-petition obligations lightly or give preferential treatment to certain select creditors by creating a broad category of administrative expenses." *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 897 (Bankr. E.D. Pa. 1987). That is exactly what Rudman urges here.

### III. JOINDER AND RESERVATION OF RIGHTS

32. EWB hereby joins in the Debtors' objection to the Application and reserves its rights to join in any other objections filed by other parties.

33. EWB reserves all applicable rights with respect to the Application, this objection, and any joinders to other objections, including without limitation EWB's rights to move to strike and/or respond to any new arguments raised by Rudman on reply, to supplement this objection as necessary or appropriate, to request a status conference on an expedited basis and/or seek vacatur of any evidentiary hearing on the Application to the extent Rudman seeks to set one in contravention of Rule 7001 and applicable law, and to issue subpoenas and seek discovery to the extent this matter is permitted to move forward as a contested matter, all without prejudice to EWB's appellate and other rights.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

11

## IV. CONCLUSION

34. Based on the foregoing, EWB respectfully requests that the Court deny the Application, and grant to EWB such other and further relief as it deems just and proper.

DATED this 5th day of April, 2021.

SNELL & WILMER L.L.P.

By: */s/ Bryce A. Suzuki*
Bryce A. Suzuki
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Phone: 602-382-6000
Email: bsuzuki@swlaw.com

Stephanie A. Kanan
1200 17th Street, Suite 1900
Denver, Colorado 80202
Phone: (303) 634-2086
Email: skanan@swlaw.com

## **CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that on this 5th day of April 2021, a copy of the foregoing document was filed via ECF and was served by electronic transmission to all registered ECF users appearing in this case.

                */s/ Bryce A. Suzuki*