1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | . | Case No. 20-12377-EEB |
| | . | Chapter 11 |
| SKLAR EXPLORATION COMPANY, | . | |
| LLC, and SKLARCO, LLC, | . | Case No. 20-12380-EEB |
| | . | Chapter 11 |
| Debtors. | . | |
| | . | Jointly Administered Under |
| . . . . . . . . . . . . . | . | 20-12377-EEB |
| | . | |
| PRUET PRODUCTION COMPANY, | . | Adversary Proceeding No. |
| | . | 21-ap-01052 |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| SKLAR EXPLORATION COMPANY, | . | |
| LLC, and SKLARCO, LLC. | . | |
| Defendants. | . | |
| | . | |
| . . . . . . . . . . . . . | . | |

**TRANSCRIPT OF ZOOM HEARING ON: NON-EVIDENTIARY HEARING ON THE
STIPULATION REGARDING TRANSITION OF SUCCESSOR OPERATOR TO THE
BROOKLYN OIL UNITS BETWEEN DEBTORS AND THE AD HOC COMMITTEE
AND THE OBJECTION THERETO FILED BY THE RUDMAN PARTNERSHIP**

BEFORE THE HONORABLE ELIZABETH E. BROWN
UNITED STATES BANKRUPTCY JUDGE

MONDAY APRIL 12, 2021
DENVER, COLORADO

TRANSCRIPT REQUESTED BY:     BARNET B. SKELTON, JR.
TRANSCRIPT ORDERED ON:       APRIL 15, 2021
TRANSCRIPT DELIVERED ON:     APRIL 19, 2021
TRANSCRIPT PRICE:            $5.45 PER PAGE; $185.30

```
 1  APPEARANCES:

 2  For the Debtor:                  Keri Riley
                                     Jeff Brinen
 3                                   James Katchadurian

 4  Creditors' Committee:            Chris Johnson

 5  East-West Bank:                  Bryce Suzuki

 6  Ad Hoc Committee of Working      Timothy Swanson

 7  Pruet Oil Company, LLC,          Jeremy Retherford
    Pruet Production Co.             Matt Ochs
 8
    JF Howell Interests, LP:         David R. Taggart
 9
    Howard Sklar, Howard Sklar      Adam Hirsch
10  Trust:

11  Tauber Exploration &             Thomas Shipps
    Production Co., CTM 2005,        Barnet Skelton, Jr.
12  Ltd., I & L Miss I, LP,          Trey Sibley
    Pickens Financial Group,
13  LLC, MER Energy, Ltd., The
    MR Trust, Tara Rudman
14  Revocable Trust, Rudman
    Family Trust, The Rudman
15  Partnership, Feather River
    75, LLC:
16
    Court Recorder:                  Clerk's Office
17                                   U.S. Bankruptcy Court
                                     721 19th Street
18                                   Denver, CO  80202

19  Transcription Service:           AB Litigation Services
                                     216 16th Street, Suite 600
20                                   Denver, CO  80202
                                     (303) 296-0017
21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

```
 1                  (Time Noted:  1:36 p.m.)

 2           THE COURT:  All right.  Now we are -- our next

 3  matter is that of Pruet Production Company versus Sklar

 4  Exploration Company, LLC, and it's Adversary Proceeding

 5  Number 21-1052.  We're here on Pruet Oil's motion for

 6  authorization to deposit funds into the Court's registry.

 7           Could we have appearances for this matter?

 8           MR. RETHERFORD:  Good afternoon, Your Honor.

 9  Jeremy Retherford and Matt Ochs for the Pruet parties.

10           THE COURT:  Thank you.

11           MS. RILEY:  Good afternoon, Your Honor.  This is

12  Keri Riley appearing on behalf of the Defendant, Sklar

13  Exploration Company and Sklarco.  Together with me is my

14  colleague Jeff Brinen, and Mr. Katchadurian is on, as well.

15           THE COURT:  Okay.  Thank you.

16           Anybody else?

17        (No audible response.)

18           THE COURT:  Okay.

19           All right.  So we got this, and we knew that Sklar

20  had not responded, and then we've since seen you all, I think

21  today, submitted a proposed order on this.

22           But here's the concern that the Court has with

23  using the Court's registry.  It is likely that a lot of other

24  working interest owners are going to have the exact same

25  desire to not pay unequivocally to the Debtor for JIBs, and
```

1   so they may very well want to do this as well.  And all of a

2   sudden, it becomes a great deal of administrative burden on

3   the Clerk of Court to not only put the funds in, but to take

4   them out and, you know, go back and forth as people settle or

5   work through issues of accounting, or whatever it might be.

6   And so my suggestion was that maybe you all want to look for

7   an escrow agent to help with this.  Because, like, just

8   Pruet's money alone is, you know, pretty close to three-

9   quarters of a million dollars.

10         MR. RETHERFORD:  Your Honor, this is Jeremy

11  Retherford for Pruet.

12         We certainly have no objection to using an escrow

13  agent.  Just to clarify, the three quarters of a million

14  dollars, is a 650 number, that's the amount of prepetition

15  revenues that have --

16         THE COURT:  Oh, that's right.  That's the unpaid

17  royalties, yeah.

18         MR. RETHERFORD:  That's the unpaid revenues,

19  that's correct, Your Honor.

20         THE COURT:  Yeah.  And so is it monthly or

21  quarterly that you would be likely to be making JIBs, payment

22  on the JIBs all the time?

23         MR. RETHERFORD:  This would be monthly, Your

24  Honor.  But as part of our agreed order, because this is an

25  important issue to both sides, we proposed an expedited

1  scheduling process whereby motions for summary judgment will

2  be filed --

3        THE COURT:  Okay.

4        MR. RETHERFORD:  -- by April the 23rd, with

5  responses due by May 7th.

6        We do believe this is a legal issue so that

7  discovery is not required, so we would -- we would hope that

8  there would be a resolution to this, on the legal issues,

9  sooner than later.  And perhaps that would address some of

10  the Court's concerns with the Court Clerk.

11        THE COURT:  Well, the problem is if I do it for

12  Pruet, then I could get hit with 200 other people asking to

13  do the same thing, and so I can't really treat Pruet

14  differently than the others.  And pretty soon, it becomes an

15  unmanageable thing.  And whenever somebody wants to get money

16  back, because the money goes to Washington, you know, then

17  it's a fairly long lead time to get it back, so.  At least

18  that's what I've been told by our Clerk of Court.

19        So I guess what I'd like you to do is to go to an

20  escrow agent or a bank, it could be a separate bank account,

21  whatever you want to do, that preserves your legal positions

22  to claim recoupment or set-off.  And then just ask for the

23  Court's permission to authorize the Debtor to enter into that

24  escrow agreement so that I'm not setting the terms of it, I'm

25  just saying yes or no as to whether the Debtor is authorized

1   to do it.  And, you know, if it's a simple thing, then

2   that's, I'm sure, going to be no problem to prove, so.

3            MR. RETHERFORD:  We can do that, Your Honor.

4   Thank you.

5            THE COURT:  Okay.  I'm sorry to make you jump

6   through that hoop, but I can perceive this becoming a much

7   bigger problem, so.

8            MR. RETHERFORD:  Thank you, Your Honor.

9            MS. RILEY:  And, Your Honor, this is Keri Riley

10  for the defendant.

11           Would you prefer for us to file a motion to enter

12  into an escrow agent -- or escrow agreement, excuse me, in

13  the main case or in the adversary proceeding?

14           THE COURT:  Main case.  And then it could be

15  something that's the model for everybody else.  I mean, you

16  should talk with the escrow agent that this could multiply,

17  and if there's some way that -- you know, so maybe I only

18  authorize the terms of the escrow arrangement once, but it

19  could be used for any others that come along.

20           MS. RILEY:  Certainly.

21           THE COURT:  Okay.  All right.  Thank you for that,

22  I really appreciate it.  So we'll wait to see that motion.

23           And so for the, just for the record, I'm denying

24  the motion for court registry deposits.

25           Okay.  So our next matter, also related to Sklar,

1  is in the main case, *Sklar Exploration Company, LLC and*

2  *Sklarco, LLC* under Case Number 20-12377.  And this is on the

3  Debtor's stipulation with the Ad Hoc Committee, which has

4  been objected to by Rudman Partnership.

5         Could we have appearances for this matter?  Let's

6  start with our Debtor again.

7         MS. RILEY:  Yes, Your Honor.  Keri Riley appearing

8  on behalf of the Debtors, Sklar Exploration Company and

9  Sklarco, and with me is my colleague Jeff Brinen, and Mr.

10  Katchadurian is here, as well.

11         THE COURT:  Thank you.

12         Okay.  And with the Ad Hoc Committee?

13         MR. SWANSON:  Good afternoon, Your Honor.  Tim

14  Swanson on behalf of the Ad Hoc Committee, whose members are

15  identified in Docket Number 721.

16         THE COURT:  Okay.  Thank you.

17         And let's see, we have an objector.  Let's hear

18  from Rudman next.

19         MR. SKELTON:  Your Honor, Barnet Skelton and Tom

20  Shipps of Maynes, Bradford, Shipps & Sheftel on behalf of the

21  Rudman Partnership.

22         THE COURT:  Thank you.

23         MR. SHIPPS:  Your Honor, I believe we're also

24  joined by Trey Sibley, who's a principal in the Rudman

25  Partnership.

1          THE COURT:  Okay.  Thank you.

2          All right.  Anybody else who wishes to enter their

3   appearance?  It's fine if you just want to be on the line to

4   observe, that's totally fine.  You don't have to enter your

5   appearance, but if you'd like to, I'm happy to take it

6          MR. JOHNSON:  Good afternoon, Your Honor.  This is

7   Chris Johnson on behalf of the Official Committee of

8   Unsecured Creditors.

9          THE COURT:  Okay.  Thank you.

10          MR. SUZUKI:  Good afternoon, Your Honor.  Bryce

11   Suzuki on behalf of East-West Bank.

12          THE COURT:  Thank you.

13          MR. HIRSCH:  Good afternoon, Your Honor.  Adam

14   Hirsch on behalf of Howard Sklar and the Howard Sklar Trust.

15   I don't think we have an issue here, but just for the record

16   I'm on the line.

17          THE COURT:  Okay.  Thank you.

18          MR. HIRSCH:  Thank you.

19          THE COURT:  All right.  So, you know, I looked at

20   the form of stipulation that was attached, and it is

21   obviously specific to the Brooklyn oil units, and so, you

22   know, I understand Mr. Skelton's objection.  But the other

23   thing that struck me in looking at it was that I don't want

24   the Court to get into the business of somehow being a referee

25   for how the working interest owners elect a new successor

1  operator.

2          The operating agreements are contracts, they

3  specify how that process should work, and if, you know, if

4  you get bogged down and you can't get agreement on how to do

5  the selection process, then, you know, I suppose there could

6  be an adversary or a state court proceeding filed, but it

7  doesn't seem like I need to approve this.

8          If there is a simple relief from stay that says go

9  ahead and follow the documents, and then we have the data

10 room set up so that that process of getting a new operator in

11 place, they have the information they need to evaluate it,

12 that's probably all we really need in the court proceeding.

13         So I'd like to hear from Ms. Riley first.  Why do

14 you think the Court should be ordering the parties to put

15 names forward at a certain date and all of that?

16         MS. RILEY:  Well, Your Honor, the intention here

17 is really just to provide some additional structure to the

18 parties so that, you know, we sort of have some deadlines

19 that we can move things forward with that were agreed to

20 amicably.  And really, it's just to kind of create that

21 structure which is, to a certain degree, a little bit absent

22 from the joint operating agreement.

23         It's also just intended to, again, provide some

24 structure for the means of mailing and returning ballots.

25 That is a little bit different than the joint operating

1   agreements.  The joint operating agreements contemplate that

2   ballots and things along those lines would be sent back to

3   the operator, so Sklar Exploration Company in this case.  But

4   just to essentially memorialize the agreement between those

5   parties there.

6         So really, in terms of the actual process for

7   selecting a replacement operator, we do agree that there are

8   contracts that govern that process and the intent really is,

9   except for otherwise, you know, modified slightly just in

10  terms of procedure for the stipulation, is to follow those

11  operating agreements as closely as possible so that we can

12  ensure that the procedure is proper and would then be

13  approved by the Alabama Oil and Gas Boards once that

14  replacement operator is selected.

15        THE COURT:  Could we make those objectives by, you

16  know, the first step is just a simple stipulation to relief

17  from stay, and then the second step is for each of these

18  particular interests, or projects, that there's a notice that

19  goes out, here's how we are planning to proceed, if you have

20  any concerns please contact the Debtor at X number?  And that

21  way everybody kind of has a chance to see what's happening

22  and it's all kind of out there, but it doesn't put the Court

23  and to the role of acting as some sort of a mediator.

24        And then, you know, sure as you know it, there is

25  going to end up being some dispute after the fact about, you

1   know, well, that wasn't enough time, or, you know, whatever

2   it might be, and then I'm the witness because, you know, I

3   set the deadline.  So I'd like to avoid that level of

4   fighting and just have you -- you know, you can use the Court

5   as a nice vehicle to put out notices to telling people how

6   they can have input and how you're planning to proceed so

7   they can respond to that.  Just make it a "speak now or

8   forever hold your peace" kind of a thing if you want, but

9   don't have me doing orders on that.

10          Would that be --

11          MR. SWANSON:  Your Honor, this is Tim --

12          THE COURT:  -- meet your needs?  Oh, go ahead,

13   Mr. Swanson.

14          MR. SWANSON:  Sorry.  Yes, good afternoon.  And my

15   apologies for interrupting.

16          The parties did very much, I think, endeavor to

17   stick to the terms of exactly what's in those union

18   agreements because, as Your Honor has pointed out, those are

19   heavily negotiated agreements and neither side wanted to

20   upset the apple cart there.

21          And I agree with Ms. Riley, it was kind of

22   intended to give it a little bit of a kick-start so that way,

23   you know, the debtors who, I think from the last hearing

24   admittedly, have a lot on their plates between now and

25   confirmation, can kind of offload some this stuff to ADHC

1   (phonetic), so ADHC can then start sending the ballots, and

2   then ADHC can start receiving the ballots, and then it's

3   transmitted as set forth in the stip.

4          And so the goal was definitely to try and not

5   alter any of the unit agreements.  And so, and I think the

6   parties have really worked together in good faith.  And

7   frankly, we were pleased to be able to finally have agreement

8   on something between the Ad Hoc Committee and the debtors.

9          And so, you know, I think I agree, because we do

10  feel like we're not asking the Court, hopefully, for too

11  much.  If there's a specific provision and perhaps the Court

12  found objection, well, maybe we can help explain or

13  understand the Court's concern a little bit better.  But we

14  really did endeavor to stick to the unit agreements.  The

15  Debtor's (unintelligible) counsel is heavily involved in

16  this, as well.

17          THE COURT:  Well, I'm glad to hear that, then.

18  And I know your intentions on both Debtor's side and the Ad

19  Hoc Committee's side are pure intentions to follow the letter

20  of the operating agreement and to signal to other parties

21  that this is how it's going to work out, and so object if you

22  think you need to.  But I've explained to you now why I don't

23  believe that it's wise for the Court to make these court

24  orders.

25          I'm happy to have you continue to stipulate, and

1   then to file a notice with the stipulation that just says,

2   here's how we're planning to do it, contact us by X date if

3   you think otherwise.  But I'm not going to get into the

4   business of ensuring that you've complied with the operating

5   agreement and the gaps that you filled in with dates, et

6   cetera, that it's been done properly or not.

7           If you want to expand the scope of the -- what's

8   the name of the noticing?  Epic (phonetic) is that the

9   (unintelligible).

10          MR. SWANSON:  Yeah, the Debtor's noticing agent,

11  Epic.

12          THE COURT:  Right.

13          If you want to expand the scope, you know, with a

14  short, little application or a motion to do that to include

15  this, I doubt that anybody's going to object.  And if they

16  don't, I certainly won't stand in a way of it.  So if that

17  needs to happen, I don't remember off the top of my head what

18  the scope of their engagement is.  And I'm happy to have you

19  file the stips with the notice, but that's probably all

20  you're going to get from the Court.

21          MR. SKELTON:  Judge, if I --

22          MR. SWANSON:  You know, maybe --

23          MR. SKELTON:  -- might be heard?  Well, go ahead.

24          THE COURT:  Yes.  Go ahead, Mr. Skelton.

25          MR. SKELTON:  Really one of the issues that we

1    have, I mean, I'd be fine with an order granting relief from

2    the automatic stay across the board to allow parties to JOAs

3    to enforce provision for removal of the operator, FCC, and

4    selection of a successor.

5              And one of the issues that I raised was that,

6    really, there's not a clear statement by FCC as to when it's

7    going to resign.  And so I suppose FCC's got to make a

8    decision we go this route, either it resigned on some

9    acceptable date certain, or the parties, the non-operators,

10   ought to be free to follow the provisions of their JOAs and,

11   you know, vote to remove, and then vote to have a successor.

12   So it does require, a resignation requires an affirmative

13   action by FCC.  So we kind of need to know, okay, is FCC

14   going to resign or not?

15             But through the stipulation and subsequent

16   conversations that Mr. Shipps and I had with Ms. Riley and

17   Mr. Graham, there seems to be a view that all of this won't

18   happen unless there is a plan confirmed, and that really is

19   an impossible provision from our standpoint, from Rudman's

20   standpoint.  But, you know, we do need to have clarification,

21   either the Debtor is going to resign or it has to be removed

22   as per the contractual provisions and we would need, I think,

23   relief from the stay to do that.

24             THE COURT:  Well, let me preempt what I'm sure Ms.

25   Riley is probably going to suggest, and that is they're

1   trying very hard not to leave a gap.  And so if there's a

2   large period of time before the Alabama Oil and Gas Board,

3   for example, would take to approve it, they're trying not to

4   leave creditors in the lurch with no operator.  So how do we

5   accomplish that goal if we have to put in a specific date?

6          MR. SKELTON:  Well, first of all, let me just give

7   you an example.  In the Escambia to an operating agreement

8   there is, there's really provisions of this, because if the

9   operator resigns there's a 90-day period during which it's

10  still in effect the operator unless the successor is --

11         THE COURT:  Okay.

12         MR. SKELTON:  -- takes charge.

13         And so we believe contractually -- and frankly,

14  most of these agreements were drafted by Mr. Graham, or his

15  firm, some of them using very standard provisions in the

16  industry.  I don't think this issue, and of course if the Oil

17  and Gas counsel or Mr. Graham wants to speak up, but approval

18  of the Oil and Gas Board, yes, it certainly requires SP

19  units, and it's, at a minimum, even on just regular

20  prospects, non-unionized, there's, you know, a successor

21  operator has to be qualified by the Board.  But we just

22  assume that is not going to be an issue, in our view.

23         THE COURT:  Okay.

24         MR. SKELTON:  So, anyway, we're --

25         THE COURT:  All right.  Let me -- let me hear from

1    Ms. Riley on that point first before we move on.

2           MS. RILEY:  Yes, Your Honor.

3           So we do acknowledge that there is a provision

4    under these, or at least most of these operating agreements,

5    that provides for the resigning operator to remain in place

6    for a period of approximately 90 days while a new operator

7    comes in.  The concern, of course, is that to the extent that

8    a new operator hasn't stepped forward to take over these

9    properties we could be in a situation where during that 90-

10   day period we don't have somebody transitioning in.

11          We could also be in a situation where if it takes

12   the Alabama Oil and Gas Board longer than 90 days to approve

13   somebody, we still have an issue with potentially having to

14   shutting a well and not having an operator for the property.

15          So we do have concerns with, sort of, rushing that

16   process or moving it forward in that manner.

17          In terms of proposing, sort of, a date certain by

18   which FCC would resign as operator, that was always intended,

19   and is still intended, to be included as part of the

20   resignation and transition plan, and it will be part of the

21   plan supplement filed no later, and I believe it would be May

22   7th.

23          THE COURT:  Okay.

24          MS. RILEY:  So there will be a date certain.  But

25   we believe that it does make sense in this case, just given

1  how things are so related together, to keep that as part of

2  the resignation and transition plan as part of a plan

3  confirmation issue.

4       In terms of stipulating to relief from stay, we

5  could likely do that, but I think it would still be required

6  to go out on notice to all creditors, just given that there

7  is no other pending motion for relief from stay that has been

8  filed by any party other than the Ad Hoc Committee with

9  respect to the Brooklyn units.

10      THE COURT:  Okay.  And let me see if Mr. Swanson

11 has anything to add on this at this point.

12      MR. SWANSON:  Your Honor, I think I'm hearing the

13 Court and Ms. Riley clearly.  It sounds like we probably need

14 to go back, I think, and maybe reform the stipulation.  But I

15 think one thing that would be important is just clarifying

16 that the stay has -- relief from stay has been granted and

17 that the purpose, I guess the limiting purpose of the

18 stipulation, we would clarify that, and then the

19 establishment of the data room.  And from there, I mean, the

20 targets just have to rely upon their prepetition agreements.

21      I believe that's what I'm hearing from the Court

22 and Ms. Riley.

23      THE COURT:  Mr. Skelton had filed his objection,

24 though, saying that the stip is only specific to the Brooklyn

25 oil units; is that true?

1          MR. SWANSON:  This stip is, we would agree with

2    Mr. Skelton that this is only related to the Brooklyn oil

3    unit and to no other.

4          We originally tried to propose a more global or

5    generic stip as to all units, but that just wasn't something

6    I think the debtors were prepared to address, and so we are -

7    - we're very focused on Brooklyn and agree that this one only

8    pertains to Brooklyn.

9          THE COURT:  Okay.  So Mr. Skelton --

10         MS. RILEY:  And, Your Honor, I --

11         THE COURT:  -- or anyone else could file a broader

12   motion for relief from stay asking for relief from stay as to

13   all operations, or operating agreements, that have been

14   rejected, right?

15         MR. SKELTON:  Well, we certainly could do that and

16   make it a more in globo.  You know, but there are some, you

17   know, some issues that may be resolved simply by making it

18   clear that the parties are given relief from the stay to

19   follow the contractual provisions of the relevant JOAs that

20   they're involved in.  But there's --

21         THE COURT:  What happens, like, let's say it's a

22   different product, Escambia or whichever one, and there's --

23         MR. SWANSON:  Uh-huh.

24         THE COURT:  -- 50 working interest owners that

25   have the ability to do such a motion or to start the

1   mechanisms under the operating agreement to replace the

2   operator, so if you got 50 different people, or even if it

3   was a dozen people, all going off in different directions

4   trying to set that up, that could sort of be chaos, right?

5          MR. SKELTON:  Well, the way that -- again, getting

6   back to the basics.  The way that JOAs are setup a vote can

7   be called to remove the operator.  And if that -- that's one

8   route.  The other is that the operator can resign.

9          And so there's no question that Ms. Riley is

10  continuing to cling to this notion that everything has to be

11  tied to the plan, and this just doesn't work because if the

12  plan is not confirmed, then where are we?

13         THE COURT:  Right.

14         MR. SWANSON:  So we really need to go with a route

15  that is not contingent upon the plan being confirmed, in my

16  view.

17         THE COURT:  The assumption in the agreements, if

18  that were happening by FCC, would have to be tied to the

19  plan, but the rejection doesn't need to be.

20         Ms. Riley, any response to that?

21         MS. RILEY:  Your Honor, at this point we believe

22  that it is the most efficient to tie the resignation and

23  replacement of FCC as operator to plan confirmation.  However

24  --

25         THE COURT:  Why?

1          MS. RILEY:  -- we've actually --

2          THE COURT:  Why?

3          MS. RILEY:  Well, because there are, I mean,

4   frankly, a lot of properties that need to be dealt with,

5   there's still potential replacement operators that need to be

6   identified.  We are certainly more than willing, and in fact

7   are in the process, of setting up a data room for all of the

8   properties so that potential replacement operators can, you

9   know, come in, see what documents are out there, see if

10  they're interested in taking over as replacement operators.

11  And to the extent that other parties want to accelerate that

12  process, we are certainly willing to discuss that with them.

13  And, in fact, have actually been in discussions, in

14  preliminary discussions with Mr. Skelton on a form of

15  stipulation that would do exactly that.

16          But given how the wind down of FCC is contemplated

17  under the plan, and given how these things are tied together,

18  procedurally it does make the most sense to tie all those

19  together so that we aren't sending out, you know, 60 notices

20  on stipulations for relief from stay or something along those

21  lines, instead can get it done in one cohesive process.

22          THE COURT:  Well, I support that.  I think Mr.

23  Skelton supports the idea of having one stipulation, or one

24  motion, that addresses all the different properties.  But I

25  still am not hearing from you, really, a specific reason why

 1   it's tied to the plan process.  I know that you say that

 2   there's an orderly transition, and we'll see it on May 7th,

 3   that's being proposed, but essentially FCC is just going to

 4   close its doors at the end of the day, is that right?

 5                MS. RILEY:  Well --

 6                UNIDENTIFIED MALE:  Your Honor --

 7                MS. RILEY:  -- it is, Your Honor, but there's

 8   still an orderly wind down that needs to happen for that to

 9   occur.  I mean, there is still (unintelligible) --

10                THE COURT:  Rejected contracts, why is that true?

11   I need some specifics.

12                MS. RILEY:  Well, Your Honor, as of right now,

13   we're still operating the properties, we're still in the

14   process of identifying potential replacement operators.

15   There are some, I think, preliminary discussions with parties

16   who are interested in becoming replacement operators.

17   I know Pruet, for instance, is interested in taking over a

18   fair number of the properties, there's another party, I think

19   it's Fletcher Petroleum, that's potentially interested.

20                So we are still in the process of just identifying

21   those properties.  But we want to make sure that this is done

22   in an orderly manner across the board so that we aren't left

23   with, you know, different meetings being called at different

24   times without any sort of input as far as timing for the

25   Debtor, right?

1        So we don't want to, you know, two different
2   working interest owners on the same property calling separate
3   meetings to vote to replace FCC as operator, and then voting
4   a new operating.  We want to make sure that timelines are
5   running as close together as possible as far as approval goes
6   with Alabama Oil and Gas Board, or the other respective oil
7   and gas boards, so that we're not left in a situation where
8   we have different things running at different times and we're
9   trying to, you know, scramble to make sure that there isn't
10  going to be a gap in operations anywhere, while still winding
11  down the company in an orderly manner to make sure that,
12  again, assets are going where they need to be going, that
13  liquidations are happening when they need to be happening,
14  and still resolving the issues related to confirmation of the
15  plan.

16        THE COURT:  Mr. Skelton.

17        MR. SKELTON:  Judge, that -- that really just,
18  let's think about this.  You started out saying, you know, we
19  should just follow what the JOA' say, that's the way they
20  should work.  And so at any given time before this bankruptcy
21  was filed, any number of parties and different JOAs could
22  have initiated the removal and replacement process, and it
23  could have happened in a manner that might be very
24  inconvenient to FCC, but that's just not our problem.

25        They're a lame-duck at this point, and we are

1   extraordinarily concerned that as lame-duck the properties,

2   we just need to move on.  And it's not up to FCC under the

3   operating agreements to decide who is going to be the

4   successor, their working interest owners vote.  So that's the

5   way it needs to occur.

6         And the working interest owners should control this

7   process, not FCC.  FCC has rejected the contract.  It made

8   its bed and now it's got to lay in it.

9         MS. RILEY:  And, Your Honor, if I may just respond

10   to that just very briefly?

11         THE COURT:  Okay.

12         MS. RILEY:  We certainly acknowledge and agree

13   that working interest owners are ultimately the ones who need

14   to be the one to vote to select the replacement operator, but

15   we don't want to be in a situation where there are no

16   replacement operators stepping forward and there's no one for

17   these parties to vote on.

18         We have already indicated multiple times that we

19   are, again, willing to discuss stipulations for relief from

20   stay with respect to these specific properties, and again,

21   have been in preliminary discussions with Mr. Skelton on the

22   two that he has identified, specifically Escambia and Fish

23   Pond.

24         We are more than happy to proceed with those

25   discussions, but I think that it still makes sense to try to

1   keep things as orderly as possible across the board, which is

2   why we believe that to a large degree, except where there are

3   these separate stipulations, they make sense to tie things to

4   confirmation of the plan so that we can keep things moving

5   forward together.

6           MR. TAGGART:  Your Honor, this is David Taggart on

7   behalf of JF Howell interest.  I did not enter my appearance

8   before the hearing, but as the discussion seems to have

9   broadened beyond Alabama, I would like to express the opinion

10  as it relates to the Louisiana and Texas matters and how Ms.

11  Riley's position would affect that if this somehow sets a

12  precedent.

13          THE COURT:  Okay.  Go ahead.

14          MR. TAGGART:  So I had reached out to Ms. Riley

15  some time ago about the particular replacement operators for

16  Louisiana and the Texas properties, and we're scheduled to

17  talk tomorrow morning in more detail about the Texas and

18  Louisiana properties.  And essentially my client has some

19  interest in all of the FCC currently operated properties in

20  Texas and Louisiana.  There may be one or two exceptions, but

21  predominantly I think JF Howell has an interest in them all.

22          So we have been talking to replacement operators,

23  and we have been doing the ground work with the Texas

24  Railroad Commission and the Louisiana Department of Natural

25  Resources, the Commissioner of Conservation, and one of the -

1   - one of the issues there that seems to be sort of a non-

2   sequitur is, if FCC is resigning because they have rejected

3   these operating agreements, then it puts a contingency in the

4   discussions that I don't know how to deal with when I'm

5   talking to the potential replacement operators who are going

6   to be investing time and resources in going through the

7   documents and the information.  Not just the JOAs, but there

8   are literally hundreds of other documents and contracts that

9   may be gas marketing, they may be right-of-way, they may be

10  servitudes, trucking, I mean all kinds of contracts that they

11  have to invest time and effort into, and then hanging over

12  all of that is some issue that FCC won't resign unless there

13  is a confirmed plan.

14          It seems to me that in moving forward, kind of

15  across the board, FCC has made a decision to reject the

16  contracts and it now should be up to the operators to

17  identify the successor operator that they want to operate

18  their properties and to move forward expeditiously to get

19  that in place unencumbered by some desire by FCC to keep hold

20  of the reins during their wind down process.

21          Thank you.

22          THE COURT:  Thank you.

23          Anybody else that didn't enter an appearance that

24  wants to weigh in on this issue?

25      (No audible response.)

1          MS. RILEY:  Well, Your Honor, if I may?  I do just

2     want to point out that FCC as an operator is really obligated

3     to continue to operate these properties in an efficient

4     manner and, you know, really make sure that things aren't

5     falling through the cracks anywhere.

6          So, you know, to the extent that there's concerns

7     that they are not going to resign, obviously we want to make

8     sure that there are -- that there is a potential replacement

9     operator in place and we're not just again resigning with

10    nobody there to pick up the pieces and --

11         THE COURT:  What if you --

12         MS. RILEY:  -- continuing to operate these

13    properties.

14         THE COURT:  What if you did a resignation, a

15    formal notice, and said, but if required to continue

16    operating for a period of time until suitable replacements

17    can be elected, we're willing -- we'll do so?

18         I have no idea how that affects your operating

19    expenses.  I'm trying to meet everybody's needs here and see

20    if there is a way to do that, because nobody knows how long

21    it's going to take to get through this process.  But I am

22    hearing from Mr. Taggart and Mr. Skelton that without the

23    resignation and the relief from stay, you know, they may have

24    trouble attracting a successor operator.

25         MR. SWANSON:  Your Honor, this is Tim Swanson.

1          MS. RILEY:  Well --

2          MR. SWANSON:  The Ad Hoc Committee, I think, would

3    be in favor of something like that.  And if the Court may

4    recall, our stipulation doesn't tie to their plan being

5    confirmed and their resignation proceeding.

6          THE COURT:  Right.

7          MR. SWANSON:  But I think the Court has a

8    practical, you know, side of if FCC issues its resignation at

9    an earlier -- at the earliest date of either, I guess,

10   someone being elected as successor operator, or at a later

11   date, at that point I think the Ad Hoc Committee would be in

12   favor of something like that.  And the parties then can

13   follow the vote for the agreement that they struck

14   prepetition.

15         MR. SKELTON:  Well, just one last --

16         THE COURT:  Okay.

17         MR. SKELTON:  This is Barnet Skelton.  One last

18   point.

19         You know, there is a chicken and egg thing here.

20   You either go the resignation route, and that triggers the

21   ability of the working interest owners to vote in a new

22   operator, or you go the removal route, the working interest

23   owners first vote to remove FCC, and then either subsequently

24   or simultaneously, they elected new successor.  So we can't

25   elect a successor unless we either remove them or they

1  resign.  So that's really the way this should work.

2  And like I said, in many of the standard AA, what

3  we call American Association of Petroleum Landmen forms that

4  -- or form the basis for most of these prospects, other than

5  the units, it's all -- it's kind of spelled out.  There's

6  this 90-day period during which things are, you know, worked

7  out.  And that's the --

8  MR. SWANSON:  What's that --

9  MR. SKELTON:  -- standard in the industry and

10  that's just the way it works.

11  MR. SWANSON:  If I may add --

12  THE COURT:  I'm going to give --

13  MR. SWANSON:  -- to Mr. Skelton's --

14  THE COURT:  Mr. Swanson, I'm going to give the

15  final word to Ms. Riley.

16  MS. RILEY:  Your Honor, I think again the concern

17  is that under these agreements if we have 90 days after a

18  resignation to bring in a replacement operator, and there

19  isn't one located, or that transitions in, or that's approved

20  in that 90-day period, we then just have the situation where

21  there's this gap.

22  So, again, you know, we certainly understand the

23  concern that all of these parties have, and we're more than

24  willing to work with people on addressing some of these

25  issues, we just don't want this to be this kind of haphazard

1    approach where we resign and then hope that something can be

2    put together in the next 90 days.

3            And to the extent that we're saying, you know,

4    we'll remain in place as operator beyond those 90 days if

5    nobody is located, I think there's still a concern as to

6    whether or not we are able to do that under the operating

7    agreements themselves, which is why we would prefer to at

8    least identify a potential, one or more potential successor

9    operators, prior to issuing any sort of notice of resignation

10   which would be required under the JOAs.

11           THE COURT:  I keep coming back to the fact that

12   there are heavily negotiated agreements that exist that spell

13   out how this should happen, and they aren't slanted.  From

14   what you all are telling me, they don't have a slant of

15   letting the -- letting the existing our current operator pull

16   all the strings as to how it happens and when it happens and

17   if it happens.  So I am really not in favor, or I'm just not

18   going to grant an approach that keeps this all in the

19   Debtor's bailiwick.

20           I know the Debtor is doing this out of the best of

21   intentions, and also to quell the chaotic factor that could

22   result, but I think that, as I'm hearing from Mr. Skelton and

23   Mr. Taggart, the documents right now, if we were outside of

24   the bankruptcy world, any one of the working interest owners

25   could invoke the process, and all it takes is one, and then

1   the process is going forward.  So even if there were 50

2   people that filed one it wouldn't matter because there would

3   just be, you know, the call for a replacement, and all the

4   hoops have to be jumped through that the agreement puts into

5   place, and for the Debtor to try to continue to stay in to

6   work through this process.

7           And so I just, I'm not hearing that it's standard

8   in the industry, the industry builds this all as a 90-day

9   period, so that must be a sufficient amount of time.  If we

10  get to the end of the 90 days and everybody agrees that the

11  Debtor's help is needed to continue longer, and the Debtor is

12  willing to do that, then I will be the first person to be

13  open to hearing those proposals, but at this point, and at

14  this stage, I don't think that's necessary.

15          So the current stipulation as to the Brooklyn oil

16  units, I don't hear anybody raising an objection to the

17  approach that the Debtor and the Ad Hoc Committee has worked

18  out.  Mr. Skelton is raising issues as to other operating

19  agreements.  So I will approve a stipulation on the Brooklyn

20  oil unit, but it needs to be, as I've previously mentioned, a

21  really plain-vanilla order that just grants the stipulation

22  and doesn't have the Court ordering how it will proceed.

23  It's just giving authority to them, to both of those parties,

24  to go forward.

25          And then as to the others.  Either the Debtor

1   files a stipulated relief from stay, I mean, you talk about a

2   date certain for that, or any party can file a motion for

3   relief from stay.  And again, it would just be a simple

4   plain-vanilla order that said you can follow the process in

5   the operating agreements.

6          The fact that the Debtor is unwilling to resign as

7   of a date certain, there is a provision I'm told that

8   provides for that, that there can instead be a request for

9   removal.  So if the parties are going to -- if they're going

10  to have to be put to doing that because the Debtor won't step

11  aside, then that can happen.

12         But bottom line is, I'll approve Brooklyn oil with

13  a very plain-vanilla authorization order.

14         And I will certainly watch for, and read with

15  care, any further motions that deal with the other

16  properties.

17         And I'm sorry if this puts a monkey wrench into

18  the Debtor's current plan and the supplement that they're

19  proposing to file within a few weeks, but, you know, I'm not

20  certain that -- well, actually, I don't think that this

21  should be tied to the plan process when you're rejecting a

22  contract.  The Debtor has indicated they are walking away

23  from these projects, and so they need to follow through on

24  that.

25         Okay.  That's the Court's ruling.

1          UNIDENTIFIED MALE:  All right.

2          THE COURT:  Let's talk about some deadlines.

3          Ms. Riley, do you want to try to enter into a

4    stipulation with the Ad Hoc Committee, Mr. Skelton, whoever

5    else, that would be plain-vanilla as to the other properties?

6          MS. RILEY:  We are certainly willing to have

7    discussions regarding that.  I would suggest that, given the

8    number of parties that I am certain will want to weigh in

9    here, at a minimum I think we would need two weeks to have

10   that agreement in place.

11         THE COURT:  Okay.  Then I will give two weeks --

12         MR. SKELTON:  Judge --

13         THE COURT:  Well, Mr. Skelton, I'm going to give

14   her the two weeks.

15         MR. SKELTON:  Okay.

16         THE COURT:  And after that time frame, if it

17   hasn't happened, then anybody can file their motion.

18         MR. SKELTON:  Okay.  Thank you, Your Honor.

19         THE COURT:  Sure.

20         Okay.  Anything else?

21         MR. SKELTON:  All right.  That's all I have.

22         THE COURT CLERK:  Your Honor, do you want to set a

23   deadline for a revised stipulation with the Ad Hoc Committee?

24         THE COURT:  Oh, thank you.  Yes.

25         Today is Monday, how about by Friday?  Can we get

1    a revised form of order for the Brooklyn oil units?

2              MS. RILEY:  That works for --

3              MR. SWANSON:  That works for the --

4              MS. RILEY:  -- the Debtor.

5              MR. SWANSON:  -- Ad Hoc Committee.

6              THE COURT:  Okay.  Excellent.  We'll track that

7    deadline.

8              Okay.  I do hear and appreciate very much, Ms.

9    Riley, that the Debtor is not just walking away from any

10   responsibility and is trying to do this in an orderly

11   fashion.  You know, your client is to be commended for that,

12   and don't hear anything that I've said as anything different

13   than that.  I just think that it's better to not tie this to

14   the plan process and to let the other parties invoke their

15   rights if there can't be a stipulation for the relief from

16   stay.

17             Okay.  All right.  Thank you, all.

18             MR. SWANSON:  Thank you, Your Honor.

19             THE COURT:  We'll stand in recess.

20             MR. SKELTON:  Thank you, Your Honor.

21             MR. RETHERFORD:  Thank you, Judge.

22             THE COURT CLERK:  Court is now in recess.

23                     (Time Noted:  2:19 p.m.)

24                          * * * * *

25

1          CERTIFICATE

2        I, RANDEL RAISON, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter, to

5    the best of my ability.

6

7

8    _____          April 16, 2021

9    Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25