# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Case No. 20-12377-EEB |
| **Sklar Exploration Company, LLC,** | Chapter 11 |
| Debtor. | |
| In re: | Case No. 20-12380-EEB |
| **Sklarco, LLC,** | Chapter 11 |
| Debtor. | **Jointly Administered Under Case No. 20-12377-EEB** |

**RESPONSE OF HOWARD F. SKLAR AND THE HOWARD SKLAR TRUST TO COMMITTEE REPORT SUMMARIZING INVESTIGATIONS RELATING TO DEBTORS' TRANSFERS TO HOWARD SKLAR AND RELATED FAMILY TRUSTS**

Howard F. Sklar, for himself and as trustee, and the Howard Sklar Trust (the "Howard Trust") respectfully submit this response to the Committee Status Report Summarizing Investigations Relating to Debtors' Transfers to Howard Sklar and Related Family Trusts [Docket No. 891] (the "Status Report").

## INTRODUCTION

The Court ordered the unsecured creditors' committee to file a report on its investigation "into tracing funds and/or potential avoidance actions." Unfortunately, the report that the committee filed sacrifices helpful facts and detail for assumptions and conclusions admittedly based on incomplete information. The result is a 15-page advocacy piece that paints an inaccurate picture and unfairly besmirches Mr. Sklar and his family. For example, while the Status Report headlines in bold print that Howard Sklar and other principles have received $19.5 million in the past 4 years, it fails to identify what these payments were for, fails to attach or even reference the documents that led the Committee to its "conclusions," omits the CRO's deposition testimony that Mr. Sklar put more money into the Debtors than he took out during the

4810361.7

period he reviewed, fails to identify which debtor transferred these funds, comes close to acknowledging that some of these funds may not have come from a debtor at all (much did not), and fails to explain how these alleged transfers amount to a single avoidance claim against Mr. Sklar or any of the trusts he oversees. Failing this analysis, the Committee went beyond the Court's directive and also included in its Status Report mischaracterizations of the Debtors' organizational structure and cast dispersions on Mr. Sklar's compliance with his fiduciary obligations. Because the allegations and erroneous conclusions asserted by the committee in its Status Report will likely be the subject of future litigation, Mr. Sklar and the Howard Trust submit this response to preserve their rights.

## FACTUAL BACKGROUND

    **A.**    **The Principals' Relationship to the Debtors**

    1.    Mr. Sklar and certain of his family members formed Sklarco, LLC ("Sklarco") and Sklar Exploration Company, LLC ("SEC" and together with Sklarco, the "Debtors") in 1998. The Howard Trust directly owns 100% of the equity interests in each Debtor, and Mr. Sklar has historically served as the manager of each Debtor. The Debtors are independent entities with distinct purposes and functions.

    *i.*    *Sklarco*

    2.    Sklarco is a family investment vehicle that was formed decades ago to hold legal title to oil, gas, and other interests on behalf of Mr. Sklar, the Howard Trust, and other family trusts and estates (collectively, the "Principals") and to serve as their legal agent in connection with those interests. All of the assets that Sklarco holds are in this capacity, and Sklarco does not have substantial assets outside of those it is holding as agent for the Principals.

    3.    The assets that Sklarco holds consist primarily of oil and gas properties, including applicable mineral leases, working interests, overriding royalty interests, and royalty interests in

properties operated by SEC and other third-party operators. Sklarco holds oil and gas interests in Texas, Louisiana, Mississippi, Alabama, New Mexico, Arkansas, and Florida. Sklarco also held and managed certain non-oil and gas investments for the Principals' benefit, which the Principals themselves paid for and as to which the Principals themselves paid taxes.

4. Sklarco is a solvent entity on a going concern basis according to recent filings by the Debtors' CRO (as defined below). Based on the most recent reserve report that the CRO commissioned, Sklarco's undivided interest in its oil and gas leases is approximately $28.6 million. (Amended Disclosure Statement to Accompany Amended and Restated Joint Plan of Reorganization Dated December 18, 2020 [Docket No. 1101], Ex. A.) Meanwhile, Sklarco's amended schedules filed by the CRO show liabilities owed *by Sklarco* of approximately $22.6 million. Approximately $22.35 million of these liabilities is owed to East West Bank on account of its secured loan. (Sklarco Summary of Assets and Liabilities, Sklarco Docket No. 51.) Mr. Sklar and the Howard Trust understand that Sklarco's analysis of the proofs of claim filed in its chapter 11 case is ongoing but also understand that Sklarco believes that once the claims reconciliation process is complete, the unsecured claims against Sklarco would be less than $500,000. (Disclosure Statement to Accompany Joint Plan of Reorganization Dated December 18, 2020 [Docket No. 740], at 19.)

    ii. SEC

5. SEC is an independent oil and gas exploration and production company that operates oil and gas properties for various working interest owners, including Sklarco and unaffiliated third parties. As the operator, SEC distributes revenue received from the sale of the working interest owners' oil and gas products to the working interest owners and relies on the

3

payment of joint interest billings from the working interest owners to pay its ongoing expenses and maintain operations.

> iii. The Agency Services Agreement Governs the Relationship Among Sklarco, SEC, and the Principals

6. To memorialize and govern Sklarco's role as agent and nominee for the Principals, Sklarco, SEC, and Howard Sklar (in his various capacities on behalf of the Principals: as manager of Miriam Sklar L.C., as trustee of the Howard Trust, the Alan Grantor Trust, and the Jacob Grantor Trust, and as independent executor of the Succession of Miriam Mandel Sklar) entered into the Agency Services Agreement, effective as of May 1, 2010 (as amended, the "ASA").[1]

7. Under the ASA, each Principal appointed and retained Sklarco to continue to serve as "its true and lawful agent and attorney in fact" and to manage oil and gas interests and other property on its behalf (the "Property"). (ASA, § 1.1.) Each Principal agreed that "the rights, titles and interests in the Property shall be recorded and held in the name of Sklarco, *as nominee for each Principal*." (*Id.* (emphasis added).)

8. The ASA provides for accounting procedures among SEC, Sklarco, and the Principals so that that each Principal's share of expenses are covered. To that end, Sklarco would front the expenses for each Principal in relation to the Property it managed for that Principal. (ASA, § 2.1.) Sklarco then invoices each Principal monthly for its proportionate share of expenses for the preceding month. (*Id.*) Monthly statements were generated showing

---

[1] The ASA was amended on August 31, 2015, to substitute the Jacob Grantor Trust and the Alan Grantor Trust for two predecessor trusts as Principals. A copy of the ASA, including the August 31, 2015 amendment to the ASA, are attached as Exhibit A. The Debtors have proposed to assume the ASA in connection with their Amended and Restated Joint Plan of Reorganization Dated December 18, 2020 [Docket No. 1110] (the "Plan") and filed a motion to do so on April 5, 2021 [Docket No. 1174] (the "ASA Assumption Motion"). If the ASA is assumed, it will be further amended to comport with the Plan (subject to the effective date of the Plan), as described in the ASA Assumption Motion.

4

all charges and credits. (*Id.*) The Principals could then repay Sklarco as invoiced, or Sklarco could simply deduct the charges from funds it held for each Principal's account. (*Id.*) The ASA required Sklarco to keep records of each of these transactions, and it did. (*Id.*)

9. Because SEC contained the infrastructure to perform many of the tasks under the ASA, it did so on the terms of the ASA. To that end, the ASA required the Principals to pay SEC and Sklarco various fees for the services they provided, including a G&A Agency Services Fee, an Interest Agency Services Fee, and an Aircraft Agency Services Fee (collectively, the "Services Fees"). (ASA, §§ 2.2.1-2.8.) The ASA specifically provided that SEC would charge Sklarco, and Sklarco would pay SEC, the Principals' Services Fees. (ASA, §§ 2.2.3, 2.3.)

10. To avoid doubt as to the relationship that was to exist between the parties, the ASA clearly delineated Sklarco's relationship with each Principal as a principal-agent relationship and SEC's relationship with Sklarco as separately contracting entities:

> 3.1 Relationship Between the Principals and Sklarco: The relationship between each of the Principals and Sklarco hereunder is intended to be that of principal and agent, respectively. Nothing contained herein shall be construed so as to constitute the Principals and Sklarco as partners or joint venturers, or either as the employee of the other, or the employees of either as employees of the other.
>
> 3.2 Relationship Between the Operator [SEC] and Sklarco: The relationship between Operator and Sklarco is intended to be that of contractor and owner, respectively. In consideration of the other terms and provisions of this Agreement, SEC agrees to provide to Sklarco, from time to time, such employees of SEC as "seconded employees" as reasonably necessary for Sklarco to perform its duties hereunder. Nothing contained herein shall be construed so as to constitute SEC and Sklarco as partners or joint venturers, or either as the employee of the other.

(ASA, §§ 3.1, 3.2.)

### B. Debtors' Chapter 11 Cases and Committee's Status Report

10. Stressed by market conditions in the oil and gas industry and economic fallout from the COVID-19 pandemic, the Debtors filed petitions commencing the above-captioned

5

chapter 11 cases on April 1, 2020 (the "Petition Date"). The Debtors' chapter 11 cases are jointly administered solely for procedural purposes pursuant to Fed. R. Bankr. P. 1015(b), L.B.R. 1015-1, and the Order Granting Motion for Joint Administration [Docket No. 8]. The Debtors' estates have not been substantively consolidated.

11. The United States Trustee for this region appointed the Official Committee of Unsecured Creditors in SEC's chapter 11 case on April 16, 2020 [Docket No. 99] (the "Committee"). The Committee was not appointed in Sklarco's chapter 11 case and is not a committee of Sklarco creditors. No other committee has been appointed in Sklarco's chapter 11 case.

12. The Court entered an order on June 15, 2020, appointing CR3 Partners, LLC ("CR3") to serve as the Debtors' Chief Restructuring Officer (the "CRO"), effective as of May 21, 2020 [Docket No. 429]. James Katchadurian has served as the team lead for CR3 in acting as the Debtors' CRO.

13. The Committee and other interested parties pursued separate Rule 2004 exams from the Debtors and Mr. Sklar. To that end, the Court entered an Order Granting Motion for 2004 Examination of the Debtors and a separate Order Granting Motion for 2004 Examination of Howard Sklar on October 6, 2020 [Docket Nos. 585, 586]. While the Committee and other parties sought documents and a deposition from the Debtors under Rule 30(b)(6), the only discovery sought of Mr. Sklar was a deposition, which Mr. Sklar gave on November 24, 2020.[2] The Committee never requested documents from Mr. Sklar or any of the family trusts and estates (formally or informally) in connection with its Rule 2004 exam. Mr. Sklar has complied with all discovery requests of him to date, and no one has sought additional formal discovery from Mr.

---

[2] A transcript of Mr. Sklar's deposition is attached as Exhibit A to the Committee's Status Report (the "Sklar Depo.").

6

Sklar or the family trusts or estates since Mr. Sklar's November 24 deposition. Mr. Katchadurian was designated as the Debtors' Rule 30(b)(6) representative; he also gave his deposition testimony on November 24, 2020.[3]

14. Following the Committee's Rule 2004 exam, the Court ordered it to file a report on its investigation "into tracing funds and/or potential avoidance actions" [Docket No. 820]. The Committee filed its Status Report on February 26, 2021.

15. The Status Report is a one-sided advocacy piece against Mr. Sklar and the trusts and estates he oversees rather than a report that truly traces funds or gives fair insight into potential avoidance actions. Mr. Sklar accordingly submits this response to the Committee's Status Report.

**RESPONSE**

16. The Committee's Status Report is admittedly based on incomplete information and does very little to help understand a true analysis of avoidance actions that the Debtors' estates may have. The Committee could have simply advised the Court that its investigation into avoidance actions was ongoing and that additional information would be necessary to provide a complete and accurate picture of what occurred in the four years preceding the Petition Date. Instead, it chose to file papers superficially and prematurely condemning Mr. Sklar and the family trusts he oversees. The Committee's assumptions and conclusions in the absence of necessary information that can likely only be derived from a true forensic accounting are misleading and should be ignored.

17. Mr. Sklar and the Howard Trust submit this response to preserve their rights in the event that the Committee's Status Report is used or cited in any subsequent litigation.

---

[3] A transcript of Mr. Katchadurian's deposition is attached as Exhibit B to the Committee's Status Report (the "Katchadurian Depo.").

**A.   The Committee's $19.5 million "Conclusion" of Alleged Transfers Gives No Insight Into Avoidance Actions and is Unhelpful to the Court or Any Party in this Case.**

18.   The Committee's Status Report asserts in bold print a definitive $19.5 million "short answer" to the Court's question of how much money went to Howard Sklar and family trusts and estates. But the Committee is in no position yet to provide any answer, much less a "short" one, on what avoidance actions the Debtors' estates may have. The Committee admits:

- Its analysis is "principally based on deposition testimony of Mr. Sklar and the Debtors' representative, and limited documents received in connection with Bankruptcy Rule 2004 discovery requests propounded on the Debtors (but not Howard Sklar or the trusts)." (Status Report, at 1.)

- The scope of its discovery to date "was not intended to be comprehensive discovery of all issues or claims against Mr. Sklar or other insiders . . . ." (*Id*. at 1-2.)

- Despite giving a definitive "short answer" to the Court's inquiry over a four-year period, it had only received production of SEC and Sklarco bank records "going back a little over a year from the Petition Date" and that it "still lacks information necessary to paint the entire picture of what happened to the prepetition funds and all of the transfers to and from the Sklar Family Trusts." (*Id*., at 5.)

The Committee's boldly stated $19.5 million "short answer" to the Court's request is thus based on limited discovery efforts, incomplete information, and a limited presentation of information obtained to date.

19.   Despite drawing its bold "conclusion," the Committee fails to make any attempt to explain why the withdrawal of $19.5 million, if that's even the right number, is improper. Indeed, the Status Report fails to consider any of the following in its "analysis":

- How much Mr. Sklar has contributed to the Debtors in the same 4-year period. Mr. Sklar has contributed to SEC millions of dollars of his own working interest revenue, revenue from other outside investments, and proceeds from the sale of outside assets for the benefit of SEC's creditors.

- Mr. Sklar and the Principals hold working interests just like many of SEC's other creditors. They are no less entitled to their working interest revenue than any of SEC's working interest owners. Nothing is improper about Mr. Sklar or the family trusts and estates drawing this revenue from the Debtors over the past 4 years just as the other working interest owners have. The Committee's Status Report fails to address how

8

much of the $19.5 million it highlights may be attributable to working interest revenue. **At the same time, SEC has paid its other working interest and royalty owners hundreds of millions of dollars of gross revenue and royalties in the same 4-year period.**[4]

- While the Committee provides no documentation to show what distributions from the Debtors it is reviewing, Mr. Sklar suspects based on his own review that a substantial portion of these alleged transfers are actually from revenue derived from non-oil and gas interests held by the various family trusts and have nothing to do with SEC or its creditors (which the Committee represents).

- The Status Report does very little to distinguish which Debtor is making the $19.5 million in distributions. To the extent assets held by Sklarco as agent/nominee under the ASA are being distributed to Sklarco Principals, SEC's creditors have no interest in those assets, and no avoidance action would lie for any such distributions. Indeed, Sklarco itself is a solvent entity and transfers from Sklarco alone simply cannot be fraudulent transfers as to SEC's creditors.

20. Meanwhile, the Committee failed to advise that the Debtors' CRO testified in his Rule 2004 deposition that Mr. Sklar has put more money into SEC than he took out during the period he reviewed:

> A. . . . But I do know in the aggregate that the amount of money that he [Mr. Sklar] contributed into Sklar Exploration exceeded the amount of expense and JIBs and cash calls, et cetera, that he would have withdrawn, including any distributions to Mr. Sklar.
>
> Q. So what you're saying, Mr. Katchadurian, if I understand you correctly is, on a macro level, the money that Mr. Sklar put in is less than the money he took out?
>
> A. No. The other way. The money in, attributable to his revenue, investment income and the rest, would have been greater than the amount he took out on a macro basis.

(Katchadurian Depo, 66:20-67:7.) This testimony and analysis are critical to evaluating avoidance actions that parties may consider pursuing. The Committee's failure to address it illustrates the Status Report's unreliability.

21. In preparing this response, Mr. Sklar had initially intended to help the Court and other parties in interest by providing a detailed analysis responding to the Committee's

---

[4] Mr. Sklar believes that this number exceeds $300 million based on information reviewed to date.

9

allegations. The general nature of the Committee's conclusions and inadequacy of their tracing efforts, however, make a specific response difficult, if not impossible. Because the Committee fails to cite much in support of its conclusions, any point-by-point response would necessitate a pile of assumptions and guesses as to what in the 21 gigabytes of data that the Committee reviewed led them to their "short answer" of $19.5 million. To the extent that the Committee's analysis is merely based on a review of bank statements or other accounting records for the Howard Trust, the Alan Sklar Trust, the Jacob Sklar Trust, and the Succession of Miriam Mandel Sklar, simply showing deposits to the trusts' and estate's accounts, the analysis falls short of a proper tracing for avoidance action purposes (as the Committee itself acknowledges) because it fails to account for the purposes of these transfers, money that was recontributed to offset these transfers, or which Debtor made the transfers, if the transfer was even made by one of the Debtors.[5]

22. As an additional example of the Committee's unreliable analysis, it focuses uniquely on $425,513.20 of transfers that Sklarco made to the Howard Trust, the Alan Trust, and the Jacob Trust in May 2019. (Status Report, ¶ 16; Sklar Depo., Exhibit 7, p. 30.) But in doing so, the Committee ignores that (1) in that same month $544,342.12 was paid into Sklarco from non-SEC sources (Sklar Depo, 44:19-21; Ex. 7, p. 30), and (2) Sklarco was then (and remains) a solvent entity. SEC is not the only operator for the working interests that Sklarco holds for the

---

[5] Much of the alleged $19.5 million in transfers is described as a deposit to one of the trusts from an "unknown source." (Status Report, at 6 n.4, 5, 8, 9, 10.) Mr. Sklar expects that this revenue was generated from outside investments held by the trusts and has nothing to do with the Debtors. For example, the $1,575,466.75 that the Committee highlights as being transferred *from the Debtors* to the "SMMS Trust" is the exact same amount that Mr. Sklar's records show the succession received on August 17, 2016, from an investment in Cavalier Wireless that it held outside of Sklarco. Similarly, the $1,830,231.86 that the Committee includes in alleged transfers to the Howard Trust is the exact same amount that Mr. Sklar's records show that the Howard Trust received on August 10, 2016, and September 9, 2016, from a similar investment in Cavalier Wireless and investments sold from the Howard Trust's Charles Schwab account (both investments held outside of Sklarco). Additional examples abound, including, among others, the alleged $1,511,040.93 sent to the Howard Trust in 2020, as to which the Howard Trust has no record. But the Committee wrongly includes all of these amounts in its bold "short answer" of what Mr. Sklar and the family trusts allegedly took from the Debtors.

Principals, and a distribution of Principals' revenue share from those outside-operated working interests and other third-party sources while Sklarco is solvent has no bearing on potential avoidance actions that creditors of SEC may seek to bring. (Nor would a transfer of any other working interest revenue to Sklarco Principals.) The Committee's implication to the contrary belies the Status Report's credibility.

23. The Committee also raises questions concerning the proceeds from the sale of an aircraft by Sklar Transport Company, L.L.C. ("Sklar Transport"). (Status Report, ¶ 30.) But these questions do not shed any light on any avoidance action that may exist for the estate. Sklar Transport is an entity wholly owned by the Howard Trust. It is a sibling entity to the Debtors. As the Committee observes, Sklar Transport owned an aircraft that it leased to SEC. (*Id*. (citing Sklar Depo. 30:30-31:11.).) Sklar Transport sold the aircraft for approximately $9 million, and approximately $7 million of the sale proceeds repaid debt. (*Id*. (citing Sklar Depo. 31:12-32:11.).) The remaining $2 million was contributed to SEC. (*Id*.) Because SEC is a sibling entity to Sklar Transport, any contribution of the remaining equity that Sklar Transport had in the aircraft would have been a *net benefit* to SEC and its creditors, constitutes an ultimate contribution by the Howard Trust through its equity in Sklar Transport, and does not give rise to an avoidance action against Mr. Sklar or any of the family trusts. The Committee gives no such credit.

24. The Committee also limits its analysis to pre-petition transfers but implies that additional transfers may have occurred after the Petition Date. (*See* Status Report, at 6 n.7-9.) The Committee would be well aware of any such transfers based on the Debtors' operating reports and can confirm that no such transfers were made.

11

**B.**     **The Debtors' Organizational Structure is Proper.**

25.     The Committee attempts to make an issue of Sklarco holding substantial assets while the Committee's creditors are creditors of SEC, and it raises questions about the Debtors' dependence on one another. (Status Report, ¶¶ 2, 23-30.) Yet nowhere does the Committee mention the relationship governed by the ASA or the numerous joint operating agreements between SEC and Sklarco. Indeed, the Committee was provided with the ASA well before its deposition of Mr. Sklar, but it did not ask him a single question about it. Not only is the Status Report misleading by failing to acknowledge the ASA or its governance of assets that Sklarco holds, it goes a step further stating that "no management agreement existed between SEC and Sklarco." (Status Report, ¶ 23.) These often-repeated themes cannot stand.

26.     The Debtors were formed more than twenty years ago – Sklarco was set up as a family investment vehicle, and SEC was set up as an exploration and production company. Sklarco's assets consisted of the oil and gas and other Properties contributed to it by Sklarco's Principals, and no creditor of SEC has a claim to them any more than it would to the assets of any other working interest owner whose assets SEC operates. SEC's creditors have long been aware of SEC's structure, and they continued to do business with SEC while receiving hundreds of millions of dollars in gross working interest revenue and royalties in the same 4-year period that the Committee allegedly evaluated for its Status Report.

27.     The ASA clearly and meticulously governs the relationship among the Debtors and Sklarco's Principals. It provides for accounting procedures among SEC, Sklarco, and the Principals so that that each Principal's share of expenses are covered with (1) Sklarco fronting the expenses for each Principal in relation to the Property it managed for that Principal, (2) Sklarco invoicing each Principal monthly for its proportionate share of expenses for the preceding month, (3) monthly statements being generated showing all charges and credits to each

12

Principal, and (4) each Principal either repaying Sklarco as invoiced or Sklarco deducting the charges from funds it held for each Principal's account. (ASA, § 2.1.) The ASA required Sklarco to keep records of each of these transactions, and it did. (*Id.*) The Committee makes no allegation to the contrary; it just acknowledges that it does not have, or has not reviewed, the records.

28. To the extent that the Committee takes issue with Sklarco's relying on SEC employees to help with accounting and other functions, the ASA required Sklarco's Principals to pay fees for those services.[6] (ASA, §§ 2.2.1-2.8.) As Mr. Katchadurian testified, there should be no allegation that Mr. Sklar did not cover his share of these fees. (Katchadurian Depo., 65:9-14, 66:20-67:7; 91:4-7.)

29. Mr. Katchadurian even testified in his Rule 2004 deposition that SEC treated Sklarco as it treated other, unaffiliated working interest owners:

> Q. So if a working interest was owned by the Howard Sklar Trust, would SEC have serviced those Howard Sklar Trust-owned working interests the same way that it would have serviced other working interest?
>
> A. Right. Sklarco would have been the agent nominee and Sklarco the working interest owner and the underlying beneficial interest owner would have been the trust. So, yes.
>
> Q. (By Mr. Parker) Treated the same way; right? Is that your testimony?
>
> A. Yes.
>
> Q. Would the Howard Sklar Trust have paid compensation to SEC or Sklarco for the provision of those services?
>
> A. Yes, just like any other working interest owner.
>
> Q. At the same rate?
>
> A. At the same rate.

---

[6] If Principals have failed to pay their fees, claims for recovery of the fees will be preserved under the assumed ASA as amended on the Plan's effective date. (Assumption Motion, ¶ 14.)

(Katchadurian Depo, 98:23-99:15.) There was simply nothing nefarious about how the Debtors were formed, organized, and operated.

**C.     Mr. Sklar's Pre-Petition Lifestyle Has No Bearing on Potential Avoidance Actions.**

30.     The Committee devotes nearly three pages of its Status Report to its analysis and criticism of Mr. Sklar's lifestyle before the Debtors commenced their chapter 11 cases. This focus has no bearing on potential avoidance actions that SEC may have against Mr. Sklar or any other party in SEC's chapter 11 case. As the Committee observes, Mr. Sklar testified that all of his personal expenses were accounted for, and he repaid SEC for funds expended on his personal endeavors.[7] (Status Report, ¶ 18 (citing Sklar Depo, 36:24-27:22).) Then, without citation or reference to a single document, the Committee conclusively states that the alleged process and corresponding tracing of the repayment of these funds is not evidenced in the materials produced by the Debtors in response to the Committee's production requests and the Committee's review and analysis of the documents in its possession from any source do not support Mr. Sklar's claim. (Status Report, ¶ 18.)

31.     But the CRO did in its Rule 2004 deposition. When the Committee's counsel asked Mr. Katchadurian about whether Mr. Sklar reimbursed SEC for personal travel expenses, Mr. Katchadurian testified that from what he reviewed, Mr. Sklar repaid SEC for these charges:

> So we did an analysis of Mr. Sklar's inflows and outflows, the revenue he would have had come into SEC versus the cash calls and JIBs and other expenses, and Mr. Sklar was in the positive in that end process. So my presumption is that, yes, he would have paid his bills.

(Katchadurian Depo., 65:9-14.) When pressed further, while Mr. Katchadurian did not speak to the particular line items for travel, he testified that "[t]he money in, attributable to his [Mr.

---

[7] To the extent the Committee references dog-related expenses, those expenses were all paid by Mr. Sklar directly, not with use of Debtor funds.

14

Sklar's] revenue, investment income and the rest, would have been greater than the amount he took out on a macro basis." (Katchadurian Depo., 66:20-67:7; 91:4-7 ("So again, on a macro basis, the money in from Sklarco on its working interest percentage exceeded the money out to Mr. Sklar and – and its other obligations.").) The Committee failed to advise of the CRO's independent findings and testimony that Mr. Sklar paid his bills in its Status Report.[8] Indeed, Mr. Sklar paid his bills from his working interest revenue, income from other investments, and other assets held outside of the Debtors.

32. In addition to the travel expenses, the Committee expresses "skepticism" as to Mr. Sklar's testimony that he reimbursed SEC for the expenses associated with his auto racing hobby. (Status Report, ¶ 22.) These expenses were incurred in 2016 and 2017 – years for which the Committee categorically claims never received bank records from the Debtors. (Status Report, ¶ 13.) The Committee's skepticism would be understandable if it had reviewed the necessary documents and not seen reimbursements Mr. Sklar referenced. But their failure to review the documentation is not cause for skepticism; it is cause for verification. Mr. Sklar expects that if the Committee reviews SEC's ledgers for this time period, it will find that he properly reimbursed SEC for auto racing expenses.

33. Because Mr. Sklar reimbursed the Debtors for these personal expenses and his contributions to the Debtors exceeded any money he withdrew from the Debtors, allegations concerning how he spent the money he earned has no bearing on any issue before the Court and should be disregarded.

---

[8] The Status Report also references Mr. Sklar's mother's use of the private jet. (Status Report, at 9 n.5.) Mr. Sklar's mother died in 2010. Mr. Sklar fails to see how his mother's use of a jet before her death eleven years ago has any relevance to the Committee's investigation and analysis.

15

**D.     The Committee's Allegations as to Mr. Sklar's Fiduciary Obligations are Unfounded and Inappropriate at this Juncture.**

34.     The Court ordered the Committee to file a report on its investigation "into tracing funds and/or potential avoidance actions" [Docket No. 820]. Instead of staying in that lane, the Committee devotes multiple pages of its Status Report to matters far outside the scope of what the Court ordered and questions Mr. Sklar's compliance with his fiduciary duties. (Status Report, ¶ 31 ("it is possible that claims could be brought against Mr. Sklar, including, but not limited to, breaching the duty of care for his gross mismanagement and for breaching his duty of loyalty arising from his placing his own pecuniary interests above and to the detriment of the Debtors and its creditors.").)

35.     The Court did not ask for an analysis of Mr. Sklar's compliance with his fiduciary duties, and the Plan reserves those claims for the creditor trust. (Plan, § 8.4.) As the Committee acknowledges, director and officer liability insurance is in place and may cover those claims. (Status Report, ¶ 31.) To avoid prejudicing any claims that may be made under these insurance policies, Mr. Sklar declines to respond to any allegations that he failed to comply with his duties. For purposes of this response, however, Mr. Sklar will generally state that he complied with all of his duties to the Debtors and their constituents and will vigorously defend any claim to the contrary if asserted. Mr. Sklar reserves all rights and defenses (and does not waive any right or defense) in connection with any such claims.

**E.     Howard Sklar Has Complied with all Discovery Requests to Date.**

36.     While the Committee acknowledges in its Status Report that its investigations and discovery remain incomplete, Mr. Sklar and the Howard Trust have complied with any and all requests for information that the Committee has made to them. Mr. Sklar and the Howard Trust are unaware of any dispute raised by Committee over discovery from Mr. Sklar, any of the other

16

Principals, or even the Debtors. Any incomplete information that the Committee cites in its Status Report is not a result of any failure of Mr. Sklar to comply with his discovery obligations.

**RESERVATION OF RIGHTS**

37. No adversary suit, contested matter, or other litigation concerning the allegations in the Committee's Status Report has been commenced against Mr. Sklar or any of the other Principals to date. Mr. Sklar and the Howard Trust submit this response to the Committee's Status Report to respond generally to the Committee's allegations and preclude any argument that they waived any rights by failing to do so. Mr. Sklar and the Howard Trust thus reserve all rights and defenses in connection with any litigation that may be brought against them and do not waive any right, defense, or presentation of facts by failing to address them here. Mr. Sklar and the Howard Trust will fully defend themselves to the extent that any litigation is commenced against them. This is simply not the appropriate time or place to litigate any such claims or allegations, and Mr. Sklar and the Howard Trust defer such litigation to a properly asserted adversary proceeding, contested matter, or other action.

Dated: April 23, 2021

By: */s/ Adam L. Hirsch*
Adam L. Hirsch, Reg. No. 44306
Davis Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, Colorado 80202
Telephone: 303.892.9400
Facsimile: 303.893.1379
Email: adam.hirsch@dgslaw.com

*Counsel to Howard F. Sklar and the Howard Sklar Trust*

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on April 23, 2021, the foregoing **RESPONSE OF HOWARD F. SKLAR AND THE HOWARD SKLAR TRUST TO COMMITTEE REPORT SUMMARIZING INVESTIGATIONS RELATING TO DEBTORS' TRANSFERS TO HOWARD SKLAR AND RELATED FAMILY TRUSTS** was filed on the Court's electronic filing system CM/ECF and was electronically served upon all parties receiving electronic notice.

                                          */s/ Robin E. Anderson*
                                          Robin E. Anderson