# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>Sklar Exploration Company, LLC,<br>Debtor. | Case No. 20-12377 EEB<br>Chapter 11 |
| In re:<br><br>Sklarco, LLC,<br>Debtor. | Case No. 20-12380 EEB<br>Chapter 11 |
| | **Joint Administered Under<br>Case No. 20-12377 EEB** |

**OBJECTION OF THE RUDMAN PARTNERSHIP, CTM 2005, LTD., AND MER ENERGY, LTD. TO DEBTORS' AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION**

*[Relates to Dkt. No. 1080]*

**NOW INTO COURT**, through undersigned counsel, comes The Rudman Partnership, CTM 2005, Ltd., and MER Energy, Ltd.. ("Respondents"), creditors and parties in interest of Sklar Exploration Company, LLC, ("SEC") in the jointly-administered bankruptcy cases (the "Cases") of SEC and Sklarco, LLC ("Sklarco", and collectively with SEC, the "Debtors"), who file this objection to Debtors' Amended and Restated Joint Plan of Reorganization [Docket No. 1080] (the "Plan"), and respectfully represent as follows:

## The Plan Fails to Satisfy the Applicable Requirement for Confirmation

1. To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[1] As

---

[1] *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009) ("The Debtor must satisfy its burden of proof as to the Amended Plan's compliance with § 1129(a) by a preponderance of evidence.")

1

described in detail below, the Plan does not comply with all relevant provisions of the Bankruptcy Code, and Debtors have failed to meet their burden of demonstrating such compliance by a preponderance of the evidence. Respondents thus respectfully request that the Court deny confirmation of the Plan.

> **A. The Plan does not comply with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

2. Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[2] The principal goal of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[3] Accordingly, the determination of whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 (classification of claims and interests) and 1123 (plan contents) of the Bankruptcy Code.

> **1. The Plan Does Not Satisfy the Classification Requirements of Section 1122 of the Bankruptcy Code.**

3. Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[4]

4. The classification of claims in the Plan does not separately classify the secured claims of working interest owners ("WIO's"), such as those of the Respondents, who have

---

[2] 11 U.S.C. § 1129(a)(1).

[3] *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368.

[4] 11 U.S.C. § 1122(a).

2

asserted secured claims arising from the non-operators' lien granted under the terms of their joint operating agreements ("JOA's), including the rights of setoff and recoupment arising therefrom.[5] The rights of WIO's are unique and cannot properly be lumped into the broad category of general unsecured claims. Debtors' unfair and improper classification of WIO secured claims is deliberate, or at best, deliberately obtuse.[6]

5. Furthermore, the classification cannot be based upon the alleged secured claim of East West Bank ("EWB") priming those of the WIO's, since substantially all of the WIO secured claims were perfected by public recordings filed prior to the recording of EWB's mortgages.

### 2. The Plan Does Not Satisfy All of the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

6. The applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan.

7. The Plan fails to satisfy the claim classification requirements of Section 1123(a)(1) and (3) because it fails to designate or specify the treatment of a class of secured or priority WIO claims despite the filing of proofs of claim for each of those classes.

---

[5] *See, e.g.,* Proof of Claim of The Rudman Partnership, Epiq Claim No. 10121, and numerous other filings in this Case, including: i) *Preliminary Objection to Debtor's Motion for Entry of Order Authorizing Payment of Pre-Petition Joint Interest Billing Obligations as Critical Vendors* (Dkt. No. 60), ii) *Response of Tauber Exploration & Production Company [et al.] to Debtor's Motion to: Honor and Pay Overriding Royalty, Royalty, and Working Interest Obligations; and 2) Offset Joint Interest Billing Obligations* (Dkt. No. 134)*;* and *Supplemental Response of Tauber Exploration & Production Company [et al.] to Debtor's Motion for Authority to Use Cash Collateral* (Dkt. No. 220).

[6] The Plan voting ballots all lumped the Rudman Parties into the general unsecured claim category despite the assertion of secured claims and priority claims in their proofs of claim. The ballots stated that separate ballots would be provided for other classes of creditors but that never occurred. Finally, the Rudman Parties each asserted priority claims in the Proofs of Claim for the amounts of working interest revenues that were not paid to the Rudman Parties and were used by Debtors to fund their post-petition operations.

8. The fifth requirement of Section 1123(a) is that a plan must provide adequate means for its implementation.[7] This Plan contains too many loose implementational ends to count.

9. Recently The Rudman Partnership pointed out that while Debtors' Plan alludes to a "Resignation and Transition Schedule" for SEC to turn over its operations to successor operators, no such plan exists and is only referenced as a plan supplement to be filed at some future date. *See* Plan § 8.9 ("Beginning on the Effective Date and continuing in accordance with the [yet to be filed] Resignation and Transition Schedule, the Independent Manager shall . . . [f]acilitate the orderly transition to a new operator . . . ."); *See Amended Disclosure Statement to Accompany Amended and Restated Joint Plan of Reorganization dated December 18, 2020* ("Amended Disclosure Statement") (Dkt. No. 1101) at 23 ("SEC anticipates that the full wind down and transition will take approximately six (6) months. A full schedule of the anticipated transition and wind down will be filed with the Plan Supplement, no later than 21 days prior to the hearing on confirmation of the plan."). The Court ordered Debtors to file proposed stipulation for relief from the automatic stay to allow for removal and replacement of SEC as Operator of prospects other than the Brooklyn Units under the terms of the relevant JOA's, but Debtor has filed nothing and has, to date, not even responded to a proposed stipulation drafted by the Rudman Partnership and sent to Debtors on April 12. Apparently, Debtors would simply rather not deal with these issues that dramatically affect core assets of the Debtors, and critically affect the rights and interests of WIOs.

10. The Plan also mentions disputes between Sklarco and Howard Sklar, individually, and with the Sklar Trusts about ownership of various assets listed in Section 7.2 of the Plan, all

---

[7] 11 U.S.C. § 1123(a)(5).

4

of which are apparently held by one of the Debtors—Sklarco[8]. But despite the intertwined relationships of the Debtors, Howard Sklar, and the Sklar Trusts,[9] the Plan only states that they intend to negotiate resolution of these matters in good faith. What is truly astonishing about this non-resolution of ownership, is that the assets are not encumbered by EWB's mortgage, yet are attributed no value in the Plan's liquidation analysis despite being valued (at book) at **$1,946,836.38** in Schedule 9.03(i) attached to the EWB Credit Agreement![10]

11. The Plan (§ 7.1) asserts that an escrow agent will hold all the membership interests in Debtors, but does not identify the escrow nor how the escrow agent will be compensated. The same is true respecting the unidentified Trustee of the Creditors' Trust (Plan § 8.4). And the Plan leaves no clues as to the source of compensation for these fiduciaries.[11]

12. Most importantly (and this also bears on the Plan's lack of feasibility), there is absolutely no source of financing or capital backing the Plan's implementation – no exit financing, no backstop financing and no commitment of funds from equity (despite the provisions allowing the Sklar Trusts to receive payments during the term of the Plan while unsecured creditors are not paid in full).

### B. The Debtors' Plan Was Not Proposed in Good Faith (Section 1129(a)(3)).

13. Section 1129(a)(3) of the Bankruptcy Code requires that the proponent of a plan

---

[8] Sklarco is described by Howard Sklar as the Sklar family "investment vehicle" that holds "legal title" to all oil and gas interests, as well as certain other assets, on behalf of the Sklar Trusts. *See Response of Howard F. Sklar and the Howard Sklar Trust To Committee Report Summarizing Investigations Relating to Debtors' Transfers to Howard Sklar and Related Family Trusts* ¶¶1-3 (Dkt. No. 1202) ("Response of Howard F. Sklar to Investigations").

[9] "The Howard Trust directly owns 100% of the equity interests in each Debtor, and Mr. Sklar has historically served as the manager of each Debtor." Response of Howard F. Sklar to Investigations ¶1.

[10] *See* Claim No. 29-1, filed May 1, 2020, page 186 of 223.

[11] Also violating 11 U.S.C. § 1123(a)(7).

5

propose the plan "in good faith and not by any means forbidden by law."[12] If confirmed, this Plan will give "good faith" a bad name.

14. As the Court observed early on in this proceeding, the financial difficulties of the Debtors were not the result of Covid 19 or the precipitous drop in oil prices in early 2020, but rather were due to the improper actions of Howard Sklar:

```
   But I -- the more I hear, the more convinced I am
3 that you, sir, are the sole cause of the problems that these
4 two debtors are in, and that you're probably going to be the
5 necessary solution to getting out of this fix.
6 So I want to say that directly to you, and know that
7 you heard it from the Court.
8 MR. SKLAR: Yes, Your Honor, I understand.
9 THE COURT: I'm going to probably give a couple of
10 days before I rule on this matter, and you should take full
11 advantage of that time to do what's right because you've put a
12 lot of people in jeopardy.
13 And, you know, it has nothing to do with COVID and
14 the drop in the oil price. It has to do with what you did with
15 these companies using them as your personal piggy bank. That
16 has to -- that will stop going forward regardless.
17 MR. SKLAR: I understand.
18 THE COURT: But you need to make this right.
19 MR. SKLAR: I understand, Your Honor.
20 THE COURT: Okay. Or be prepared to lose it all.
21 MR. SKLAR: I understand.[13]
```

---

[12] 11 U.S.C. § 1129(a)(3) .

[13] Transcript of Continued Evidentiary Hearing on Debtors' Motion to Use Cash Collateral, May 12, 2020, p. 231.

Yet the Plan seeks to reward Mr. Sklar and the family Trusts without any guarantee that creditors are first paid in full.[14] Not only will the Howard Trust be paid a share of future revenues during the life of the Plan, it will retain a beneficial interest in the membership interests of SEC and Sklarco.[15]

15. The Plan also contains another gift to the Sklars, in the form of a settlement Debtors contend is embodied in the Plan, although without any attempt at satisfying Bankruptcy Rule 9019: "The Committee has expressed objection to the Debtors' separateness and resultant asset ownership classifications. <u>The Debtors believe that such objection(s) are resolved through agreed Plan provisions input following negotiations with the Committee and other parties</u>."[16] (underscoring added).

16. There either is or is not a settlement. Even when embodied in a plan of reorganization, a settlement must be vetted under the requirements of Bankruptcy Rule 9019.[17] What Debtors are talking about in euphemistic language is a settlement of substantive consolidation and veil piercing claims. Yet there is no language in the Plan that attempts to meet the standards required in this Circuit for approving settlements under Rule 9019. *See Kearney v. Unsecured Creditors Comm.*, 987 F.3d 1284, 1294-95 (10th Cir. 2021), citing *Kopp v. All*

---

[14] Plan, § 7.2: "[B]eginning on the Effective Date, the Reorganized Debtors shall pay the Howard Sklar Trust Allocation directly to the Howard Sklar Trust."

[15] Plan, §§ 7.1-7.2.

[16] Amended Disclosure Statement [Dkt. No. 1101], Article VI, p. 17.

[17] The standard for evaluating a proposed settlement under Bankruptcy Rule 9019 (discussed below) and Section 1123(a)(3) are substantially the same, with the additional requirement that the Plan "settlement" must comport with the Bankruptcy Code's priority scheme. *See In re Bigler*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) ("The standard for evaluating the validity of a settlement contained in a Chapter 11 plan is the same as the standard for evaluating a settlement between a debtor and another party outside the context of the plan as long as the plan settlement does not violate statutory priority. Stated differently, settlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under Rule 9019.").

7

*American Life Insurance Company (In re Kopexa Realty Venture Company),* 213 B.R. 1020 (10th Cir. BAP 1997) (court should consider the following factors in approving a compromise: "[1] the probable success of the underlying litigation on the merits, [2] the possible difficulty in collection of a judgment, [3] the complexity and expense of the litigation, and [4] the interests of creditors in deference to their reasonable views." *Id.* at 1022).

17. Having ignored the need to address the baseline requirements for approval of a settlement, the Plan cannot constitute a settlement under 11 U.S.C. § 1123(a)(3) or Bankruptcy Rule 9019. Nor could such a settlement pass muster given the Debtors' admissions throughout this case that they commingle their funds and pay each other's obligations on an as needed basis and that SEC could never be viable without Sklarco's cash being left in SEC's bank accounts.

18. From the beginning of this case, Debtors have admitted that money flowed freely between them and that the cash of Debtor and SEC have always been commingled.[18] Indeed, the Debtors' CFO admitted that SEC could not survive without being subsidized by Sklarco.[19] "Due

---

[18] Q    Okay. But – I mean does – do these companies make any semblance of keeping their affairs separate – their financial affairs:
    A    From a cash standpoint, all of the money is pooled and commingled.
Transcript of Cash Collateral Hearing held April 27, 2020, pp. 146-47.

[19] A    To more fully answer your question, the – Sklar Exploration on its own, without Sklarco subsidizing part of the general and administrative expenses of the combined entities could not survive. And so this reflected the fact that Sklarco, in effect, pays, not only its share of the operating costs, but it – provides money to Sklar Exploration to pay its general administrative expenses that can't be recouped.
    Q    Okay. Well, I guess I'm getting more confused. Sklarco has, just like all the other working interest owner, joint interest billing obligations, right?
    A    That's correct.
    Q    It gets a bill just like anybody else. So if its revenues aren't going into its own accounts, how does it pay for anything?
    A    Through the commingled cash account.
Transcript of Cash Collateral Hearing held April 27, 2020, pp. 147-148.

8

to the nature of the Debtors' operations, a majority of Sklarco's funds are pooled with SEC to ensure that SEC can continue to maintain the operations of the wells."[20]

19. Viewing the totality of circumstances surrounding this case and the Plan proposed by Debtors, the Court has ample justification to find that the Plan was not proposed in good faith. "A plan may, in light of its proponent's actions or relationships, be incapable of achieving goals consistent with the Code . . . we do not rule out the possibility that a plan could be unconfirmable under § 1129(a)(3) because of the proponent's conflicts of interest or improper conduct." *Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 685 F.3d 1160, 1179 (10th Cir. 2012). Despite the retention of the CRO, Howard Sklar's fingerprints are all over Debtors' Plan and demonstrate he continues to pull the Debtors' strings and is the *de facto* Plan proponent. As such, the Plan is tainted by his conflicts of interest and self-dealing and cannot be confirmed under Section 1129(a)(3).

### C. The Plan Is Not in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).

20. The best interests of creditors test of section 1129(a)(7) of the Bankruptcy Code requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[21] The best interests test applies to each non-consenting member of an impaired class, and is generally satisfied through a comparison of the estimated recoveries for a

---

[20] Debtors' Motion for Entry of Order Authorizing the Debtors To Continue Use of Existing Bank Accounts ¶4 [*sic*], (Dkt.. No. 36).

[21] 11 U.S.C. § 1129(a)(7).

debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[22]

21. Debtors' liquidation analysis is not based upon any expert opinion establishing the value of Debtors' assets, whether in reorganization or liquidation. The only report on which the valuation is based is merely a reserve analysis by Netherland Sewell & Associates ("NSAI") dated November 4, 2020, which clearly disclaims any opinion as to fair market value: "Future net revenues presented in this report, whether discounted or undiscounted, should not be construed as being the fair market value of the properties."

> It is extremely important for lawyers and other professionals dealing with reserve reports to recognize that the report is not a determination of fair market value. Although Generally Accepted Accounting Principles, as modified by the SEC rules, require companies to report reserves based on the lower of cost or PV10 of proved reserves, it is essential to understand that such number is not fair market value. The reserve report is the base data upon which any FMV calculation must be based but the report, itself, is not a determination of FMV.

Rhett G. Campbell, *Valuing Oil & Gas Reserves in Court* at 3, 23rd Annual Advanced Oil, Gas and Energy Resources Law Course, State Bar of Texas 2005.

22. Since Debtors' liquidation analysis is not based upon any determination of fair market value, whether in Chapter 11 or Chapter 7, Debtors cannot meet their burden of establishing that the present value of recoveries under the Plan are at least as great as those that would have been obtained under a Chapter 7 liquidation. And the NSAI report is not even reliable to serve as "base data" for a FMV calculation since it is premised upon a pricing strip

---

[22] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n. 23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code a bankruptcy court was required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

10

that commences at $42.76 per barrel and predates the significant rise in oil prices to today's price of over $62 per barrel.

23. The liquidation analysis is also deficient because it omits any valuation of the causes of action identified in the Committee's Report (Dkt. No. 891) filed on February 26, 2021, which identifies potentially avoidable transfers to the Sklar Trusts of at least $19.5 million during the 4 years prior to the Petition Date.[23]

24. Finally, the liquidation analysis attributes zero value to the so called "disputed assets" which EWB valued (at book) at **$1,946,836.38** in Schedule 9.03(i) attached to the EWB Credit Agreement![24]

25. Since the liquidation analysis is either based upon a reserve report that disclaims any determination of market value and otherwise expresses no value at all for important estate assets, it cannot satisfy the requirements of Section 1129(a)(7).

### D. The Plan Is Not Feasible and Is Likely to Be Followed By the Need for Further Financial Reorganization (Section 1129(a)(11)).

26. Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan." [25]

---

[23] *See In re Tenderloin Health*, 849 F.3d 1231, 1235-38 (9th Cir. 2017) (avoidance action proceeds should be considered in hypothetical Chapter 7 liquidation for purposes of "best interests" test); *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) ("best interests" test requires "an estimation of the value of all of the bankruptcy estate's assets, including such hard to determine values as disputed and contingent claims, the potential disallowance of claims (under § 502(d)), the probability of success and value of causes of action held by the estate, and, in this case, potential preference actions.").

[24] *See* Claim No. 29-1, filed May 1, 2020, page 186 of 223.

[25] 11 U.S.C. § 1129(a)(11).

11

27. Debtors' Plan simply "kicks the can." There is no recapitalization, exit financing or backstop financing. Debtors simply hope there will be revenues to fund all operations and fund the Plan. A "bankruptcy court has an obligation to scrutinize [a] plan carefully to determine whether it offers a reasonable prospect of success and is workable. . . . The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts of the case." *In re Paige*, 685 F.3d at 1187.

28. Not only is there no showing of Debtors' ability to fund ordinary oil and gas operations, there is likewise no demonstrable source of funding for litigation that is likely to be brought by the Creditors' Trust against Sklarco for substantive consolidation or on veil piercing grounds. "To be feasible under Section 1129(a)(11), "a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor." *Id.* at 1188.

29. As such, the Plan fails to demonstrate it is feasible under Section 1129(a)(11) and confirmation should be denied.

    **E.**    **The Plan is Not Fair and Equitable Because it Violates the Absolute Priority Rule. (Section 1129(b)).**

30. The condition that a plan be fair and equitable with respect to a class includes the requirement that "[w]ith respect to a class of interests . . . the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property. §§ 1129(b)(2), 1129(b)(2)(C)(ii). This requirement, known as the absolute priority rule, "requires that certain classes of claimants be paid in full before any member of a subordinate class is paid." *See Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180 n. 4 *(10th Cir.2002)*. The Tenth Circuit has indicated that a plan can be fair and equitable once the absolute priority rule is satisfied. *In re Paige,* 685 F.3d at 1183-84.

31. Debtors' Plan allows the Howard Trust to receive distributions under the Plan and to retain its ownership of membership interests in Debtors (subject only to an escrow agreement) despite the fact that creditors have not been paid in full. The Plan seeks to reward Mr. Sklar and his Trust without any guarantee that creditors are first paid in full.[26] Not only will the Howard Trust be paid a share of future revenues during the life of the Plan, it will retain a beneficial interest in the membership interests of SEC and Sklarco.[27] As such, the Plan cannot satisfy the absolute priority rule, the Plan cannot be crammed down, and confirmation must be denied.

## Prayer

Respondents respectfully request that this Court enter an order denying confirmation of Debtors' Amended and Restated Joint Plan of Reorganization.

Dated this 23rd day of April, 2021.

Respectfully submitted,

**Maynes, Bradford, Shipps & Sheftel, LLP**

*/s/ Thomas H. Shipps*
Thomas H. Shipps
*/s/ Shay L. Denning*
Shay L. Denning
Maynes, Bradford, Shipps & Sheftel, LLP
835 E. Second Ave., Suite 123
Durango, CO 81301
Telephone: (970) 247-1755
Facsimile: (970) 247-8827
Email: tshipps@mbssllp.com;
sdenning@mbssllp.com

---

[26] Plan, § 7.2: "[B]eginning on the Effective Date, the Reorganized Debtors shall pay the Howard Sklar Trust Allocation directly to the Howard Sklar Trust."

[27] Plan, §§ 7.1-7.2.

and

*/s/ Barnet B. Skelton, Jr.*
Barnet B. Skelton, Jr.
Attorney at Law
815 Walker, Suite 1502
Houston, TX 77002
Telephone: (713) 516-7450
Facsimile: (713)659-8764
Email: barnetbjr@msn.com

Counsel for Respondents

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on April 23, 2021, the foregoing instrument was electronically filed and served via CM/ECF pursuant to L.B.R. 9036-1. All attorneys and parties identified with the Court for electronic service on the record in this case were served by electronic service in accordance with the CM/ECF system on the date of filing

/s/ *Barnet B. Skelton, Jr.*
Barnet B. Skelton, Jr.