**UNIT AGREEMENT**   Exhibit 3

**FISHPOND OIL UNIT**

**FISHPOND FIELD**

**ESCAMBIA COUNTY, ALABAMA**

THIS AGREEMENT, entered into as of the 11th day of May, 2015, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof;

WITNESSETH:

WHEREAS, in the interest of private and public welfare, to promote, foster and encourage conservation, to enhance the ultimate recovery of oil, gas and associated minerals from the Fishpond Field, Escambia County (hereinafter referred to as "said field") to avoid waste, to prevent the drilling of unnecessary wells and to protect the correlative rights of all owners of the interests in said field, it is deemed necessary and desirable to enter into this agreement creating and establishing a unit comprising the Unit Area, under the applicable provisions of the laws of the State of Alabama, and to unitize the Oil and Gas Rights in and to the Unitized Interval in order to conduct Unit Operations as herein provided.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, it is agreed as follows:

ARTICLE 1

DEFINITIONS

As used in this agreement, the terms herein contained shall have the following meaning:

1.1    UNIT AREA (sometimes referred to as the "Fishpond Oil Unit ") means the lands shown outlined on Exhibit "A" and described as a Unit and by Tracts on Exhibit "B" insofar as said lands relate to the Unitized Interval.

1.2    UNITIZED INTERVAL (sometimes referred to as the "Unitized Formation") means the subsurface portion of the Unit Area (which is within the

Smackover Formation) in the interval between 12,094 feet measured depth (MD) and 12,308 feet measured depth (MD) in the Cedar Creek Land & Timber 10-5 #1 Well, Permit No. 16990-B, as defined by the Schlumberger Platform Express Array Induction/Dipole Sonic/Compensated Neutron/Lithodensity/GR/SP/ML (04/02/2014) measured depth log for said well and including those strata underlying the Unit Area which can be correlated therewith and which are in communication therewith. The UNITIZED INTERVAL consists of the Smackover Oil Pool of the Fishpond Field.

1.3     UNITIZED SUBSTANCES means all oil, gas, gaseous substances, sulfur contained therein, condensate, distillate, and all associated and constituent liquid or liquefiable substances, other than water and Outside Substances, within or produced from the Unitized Interval.

1.4     WORKING INTEREST means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title or otherwise, including a carried interest, which interest is chargeable with and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, developing, producing and operating the Unitized Interval.

1.5     ROYALTY INTEREST means a right to or interest in any portion of the Unitized Substances or proceeds thereof other than a Working Interest, including but not limited to royalty interests, overriding royalty interests and production payment rights.

1.6     ROYALTY OWNER means a party hereto who owns a Royalty Interest in the Unit Area.

1.7     WORKING INTEREST OWNER means a party hereto who owns a Working Interest in the Unit Area.  The owner of Oil and Gas Rights that are free of lease or other instrument conveying the Working Interest to another shall be regarded as a Working Interest Owner to the extent of seven-eighths (7/8ths) of his interest in Unitized Substances, and as Royalty Owner with respect to his remaining one-eighth (1/8th) interest therein.

1.8     TRACT means each parcel of land described as such and given a tract number in Exhibit "B".

1.9     UNIT OPERATING AGREEMENT means the agreement entitled "Unit

2

Operating Agreement, Fishpond Oil Unit, Escambia County, Alabama," of the same effective date as the Effective Date of this agreement, and which is entered into by Working Interest Owners who are parties hereto, and any amendment thereof.

1.10   UNIT OPERATOR means the Working Interest Owner or other party designated by Working Interest Owners under the Unit Operating Agreement to conduct all Unit Operations, pursuant to this Agreement and the Unit Operating Agreement.

1.11   TRACT PARTICIPATION means the percentage shown on Exhibit "B" for allocating Unitized Substances to a Tract under this agreement.   Tract Participations were determined as set forth in Article 5.

1.12   UNIT PARTICIPATION of each Working Interest Owner shall mean the sum of the percentages obtained by multiplying such Working Interest Owner's fractional working interest (either cost bearing or net revenue) in each Tract by the Tract Participation of such Tract.  When the term Unit Participation is used in reference to the interest of a Working Interest Owner or Owners, it shall be deemed to refer to the cost bearing interest of the owner(s) unless the context clearly indicates that it is intended to refer to the net revenue interest of the owner(s).   Unit Participation of a Royalty Interest Owner is the sum of the percentages obtained by multiplying the Royalty Interest of such Royalty Interest Owner in each Tract that qualifies for inclusion within the Unit Area by the Tract Participation of such Tract.

1.13   OUTSIDE SUBSTANCES means all substances obtained from any source other than the Unitized Interval and which are injected into the Unitized Interval.

1.14   OIL AND GAS RIGHTS means the right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof.

1.15   UNIT OPERATIONS means all operations conducted by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of the development and operation of the Unitized Interval for the production of Unitized Substances.

1.16   UNIT EQUIPMENT means all personal property, lease and well

3

equipment, and other facilities and equipment taken over or otherwise acquired for use in Unit Operations pursuant to this Agreement and the Unit Operating Agreement.

1.17   UNIT EXPENDITURE or UNIT EXPENSE means a cost, expense or indebtedness incurred by Working Interest Owners or Unit Operator pursuant to this Agreement and the Unit Operating Agreement for or on account of Unit Operations.

1.18   EFFECTIVE DATE means the date that this agreement becomes effective as determined by Article 16 hereof.

1.19   Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender includes the masculine and the feminine.

ARTICLE 2

EXHIBITS

2.1   EXHIBITS.   Attached hereto are the following exhibits which are incorporated herein by reference:

2.1.1   EXHIBIT "A" which is a map that shows the boundary lines of the Unit Area and the Tracts therein.

2.1.2   EXHIBIT "B" which is a schedule that describes the Unit Area, each Tract in the Unit Area and the Tract Participation of each Tract.

2.1.3   EXHIBIT "C" which is an isopach map showing net porosity feet based on hydrocarbon pore volume.

2.1.4   EXHIBIT "D" which is a schedule that shows the tract parameters for each of the Tracts in the Unit Area.

2.1.5   EXHIBIT "E" which is a schedule showing, as of the date it was prepared, the total Unit Participation of each Working Interest Owner (both cost bearing and net revenue) and Royalty Owner.   Exhibit "E" or a revision thereof, shall not be conclusive as to the information therein, except it may be used as showing the Unit Participations of the Working Interest Owners for purposes of this Agreement until shown to be in error (as the result of a conveyance or otherwise) or revised as herein authorized.

2.2   REFERENCE TO EXHIBITS.   When reference herein is made to an

exhibit, the reference is to the Exhibit as originally attached hereto or, if revised, to the latest revision.

2.3  EXHIBITS CONSIDERED CORRECT.  Except as otherwise provided in this Agreement, an exhibit shall be considered to be correct until revised as herein provided.

2.4  ALTERATION OF TRACT PARTICIPATION.  If it subsequently appears that any mechanical miscalculation or clerical error has been made relating to the Tract Participation of any tract within the Unit Area, the Unit Operator shall correct the error by revising relevant Exhibits to this Unit Agreement.  The revision must be approved by the Supervisor and General Counsel for the Board. The revision shall not include any re-evaluation of engineering or geological interpretations used in determining Tract Participation.  Each such revision of an Exhibit made prior to thirty (30) days after the Effective Date shall be effective as of the Effective Date.  Each such revision thereafter made shall be effective at 7:00 a.m. on the first day of the calendar month next following the filing for record of the revised Exhibit.

If it subsequently appears that the Tract Participation of any tract within the Unit Area is incorrect because of subsequently discovered data or by subsequently discovered errors in the data upon which the original contribution was established, such contribution shall not be altered, unless the Board shall find, after notice and hearing, that such contribution was erroneous because shown to be erroneous by such subsequently discovered data or errors upon which the original contribution was established, and such alteration shall not be effective until the effective date of the State Oil and Gas Board's order.

2.5  FILING REVISED EXHIBIT.  If an exhibit is revised pursuant to this agreement, Unit Operator shall certify and file the revised exhibit for record in the office of the Probate Judge of Escambia County, Alabama, and with the State Oil and Gas Board of Alabama.

ARTICLE 3

CREATION AND EFFECT OF UNIT

3.1  OIL AND GAS RIGHTS UNITIZED.  Subject to the provisions of this agreement, all Oil and Gas Rights of Royalty Owners in and to the lands described

5

in Exhibit "B" and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized, subject to the approval of the State Oil and Gas Board of Alabama, insofar as the respective Oil and Gas Rights pertain to the Unitized Interval, so that operations may be conducted as if the Unitized Interval had been included in a single lease executed by all Royalty Owners, as Lessors, in favor of all Working Interest Owners, as Lessees, and as if the lease had been subject to all of the provisions of this agreement.

3.2  **PERSONAL PROPERTY EXCEPTED.**  All lease and well equipment, materials, and other facilities heretofore or hereafter placed by any of the Working Interest Owners on the lands covered hereby shall be deemed to be and shall remain personal property belonging to and may be removed by Working Interest Owners.  The rights and interests therein, as among Working Interest Owners, are set forth in the Unit Operating Agreement.

3.3  **COSTS AND EXPENSES OF UNIT OPERATIONS.**  The costs and expenses of Unit Operations, including prospective investment costs, shall be allocated and charged to each Tract in the proportion that each Tract shares in Unitized Substances, and shall be paid by the respective Working Interest Owners owning an interest in each such Tract, said allocation and charge being more fully set forth in the Unit Operating Agreement.  Without limitation to the rights and remedies afforded Unit Operator and Working Interest Owners as provided by the Unit Operating Agreement, if the full amount of any charge made against a Tract is not paid by the Working Interest Owner or Owners owing the same, then seven-eighths (7/8ths) of the Unitized Substances allocated to such Tract, proportionately reduced to the interest of such Working Interest Owner which has not paid such charges, may be appropriated by the Unit Operator and marketed and sold for the payment of such charge, together with interest thereon at the prime rate designated by Paragraph 1.3.B of Exhibit "F" of the Unit Operating Agreement or the maximum rate allowed by law, whichever is less.  A one-eighth (1/8th) part of the Unitized Substances allocated to each Tract shall in all events be regarded as royalty to be distributed to and among or the proceeds thereof paid to the respective owners of royalty, other than overriding royalty or production payments, free and clear of Unit Expenditures and free and clear of any lien

therefor.  The owner of any overriding royalty, production payment interest, royalty in excess of one-eighth (1/8th) of production, or other interest not primarily responsible for the payment of costs and expenses of Unit Operations shall, to the extent of such payment or deduction from its share, be subrogated to all the rights of the Unit Operator with respect to the interest or interests primarily responsible for such payment.  Once the Unit Operator has recovered the full amount of any such charge, the Unit Operator will continue to appropriate, market and sell the Unitized Substances attributable to the interest of such delinquent Working Interest Owner or Owners and will distribute the proceeds therefrom to the Owner or Owners of overriding royalty, production payment interest, royalty in excess of one-eighth (1/8th) of production or other interests not primarily responsible for the payment of costs and expenses of Unit Operations, until each of such Owners has received its respective allocation of proceeds together with interest thereon at the prime rate designated by Paragraph 1.3.B of Exhibit "F" of the Unit Operating Agreement  (or the maximum rate allowed by law, whichever is less) from the sale of Unitized Substances.

3.4     PRIOR UNITS PRESERVED AS TRACTS.   Production units of approximately 160 acres, included within the Unit Area, established in accordance with the Special Field Rules for the Fishpond Field by the State Oil and Gas Board of Alabama constitute Tracts hereunder and are delineated and numbered as such on Exhibit "A."  The production allocated to each Tract and each portion of each Tract hereunder shall be considered as produced from such Tract and each portion of such Tract by a well drilled thereon and shall have the same legal force and effect.

3.5     CONTINUATION OF LEASES AND TERM INTERESTS.      Production from any part of the Unitized Formation and Unit Operations on any Tract shall be considered, except for the purpose of determining payments to Royalty Owners, as production from or operations upon each Tract, and such production and/or operations shall continue in effect each lease or term mineral or royalty interest as to all lands and formations covered thereby just as if such operations were conducted on and as if a well were producing from each Tract.   It is agreed that  each lease shall remain in full force and effect from the date of execution

hereof until the Effective Date, and thereafter in accordance with its terms and this Agreement.

3.6    TITLES UNAFFECTED BY UNITIZATION.    Nothing herein shall be construed to result in the transfer of title to Oil and Gas Rights by any party hereto to any other party or to Unit Operator.

3.7    INJECTION RIGHTS.    Royalty Owners hereby grant Working Interest Owners the right to inject into the Unitized Formation any substances, including Unitized Substances and Outside Substances, in whatever amounts Working Interest Owners deem expedient for Unit Operations, together with the right to drill, use and maintain injection wells on the Unit Area, and to use for injection purposes any non-producing or abandoned wells or dry holes and any producing wells completed in the Unitized Interval.

## ARTICLE 4

## PLAN OF OPERATIONS

4.1   UNIT OPERATOR.   Working Interest Owners are, as of the Effective Date of this agreement, entering into the Unit Operating Agreement designating Sklar Exploration Company L.L.C., a Louisiana limited liability company, as initial Unit Operator.   Unit Operator shall have the exclusive right to conduct Unit Operations.  The operations shall conform to the provisions of the Unit Agreement and the Unit Operating Agreement.   If there is any conflict between such agreements, this Agreement shall govern.

4.2  OPERATING METHODS.  Working Interest Owners may, with diligence and in accordance with good engineering and production practices, vary production from wells to reduce water production, engage in enhanced recovery techniques, engage in re-pressuring and/or water injection operations and maintain a rate of production to the end that the quantity of Unitized Substances ultimately recovered shall be maximized and waste prevented.

4.3   CHANGE OF OPERATING METHODS.   Nothing herein shall prevent Working Interest Owners from discontinuing or changing in whole or in part any method of operations which, in their opinion, is no longer in accord with good engineering or production practices.   Other methods of operation may be conducted or changes may be made by Working Interest Owners from time to time

if determined by them to be feasible, necessary or desirable to increase the ultimate recovery of Unitized Substances, subject to any necessary approval of regulatory authorities.

## ARTICLE 5

### TRACT PARTICIPATION

5.1  TRACT PARTICIPATION.  Each Tract shall participate in the Unitized Substances produced from the Unit Area in accordance with the Tract Participation allocated thereto as set forth in Exhibit "B."  The Tract Participation of each Tract in the Unit Area has been calculated as shown on Exhibit "D" by taking into consideration pertinent geological and engineering factors and utilizing a formula consisting of 100% hydrocarbon pore volume determined as follows:

The aerial distribution of hydrocarbon pore volume ("HCPV") was established by mapping the net hydrocarbon-saturated porosity-feet ("HCFT") for the Smackover Formation in each well.  For purposes of the Fishpond Oil Unit, HCFT means the vertical feet of hydrocarbon saturated pore space based on core porosity data, except for intervals of the Smackover Formation where core samples are not available.  Where core samples are not available within a portion of any well, petrophysical log data was also used to determine HCFT for each well. The Fishpond Oil Unit HCFT determinations were made based on a minimum porosity cutoff factor for netting hydrocarbon - saturated porosity – feet, equal to, or greater than, 6% porosity in the Smackover.  The acreage attributable to each HCFT contour within each Fishpond Oil Unit Tract was determined, and the HCPV for each Tract was calculated using the standard pyramid formula to determine the acre-feet of HCPV for the Smackover for each Tract.  Each Tract's Smackover HCPV was posted and summed as the HCPV totals in acre-feet for each Tract.  The HCPV totals for each Tract in the Smackover were summed to determine the total HCPV for the Fishpond Unit such that each Tract's percentage of the total HCPV equals the Tract's HCPV Tract Factor, which is 100% of the participation formula.

## ARTICLE 6

### ALLOCATION OF UNITIZED SUBSTANCES AND OUTSIDE SUBSTANCES

**6.1   ALLOCATION TO TRACTS AND WORKING INTEREST OWNERS.   All Unitized Substances produced and saved shall be allocated to the several Tracts in accordance with the respective Tract Participation effective during the period that the Unitized Substances were produced, subject, however, to the other provisions of this Article 6.   The amount of Unitized Substances allocated to each Tract, regardless of whether it is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract shall be deemed for all purposes to have been produced from such Tract by a well drilled thereon.   All Outside Substances produced and saved shall be allocated to the several Working Interest Owners in accordance with their Unit Participation effective during the period that the Outside Substances were produced subject, however, to the other provisions of this Article 6.**

**6.2   DISTRIBUTION WITHIN TRACTS.   If any Oil and Gas Rights in a Tract are now or hereafter become divided and owned in severalty as to different parts of the Tract, the owners of the divided interests, in the absence of an agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract, or in the proceeds thereof, in proportion to the surface acreage of their respective parts of the Tract.   Except as otherwise provided elsewhere in this Agreement, the Unitized Substances allocated to each Tract or portion thereof shall be distributed among, or accounted for to, the parties entitled to share in the production from such Tract or portion thereof in the same manner, in the same proportions and upon the same conditions as they would have participated and shared in production from such Tract or such portion thereof, or in the proceeds thereof, had this Agreement not been entered into, and with the same legal effect.**

**6.3   TAKING OF PRODUCED UNITIZED SUBSTANCES AND OUTSIDE SUBSTANCES IN KIND.   The Unitized Substances allocated to each Tract shall be delivered to the respective parties entitled thereto by virtue of the ownership of Oil and Gas Rights therein or to the buyers of such Unitized Substances for the account of such parties; and the Outside Substances allocated to each Working**

10

Interest Owner shall be delivered to such owner or the buyer (if any) of Outside Substances for the account of such owner (subject, however, to the provisions of the Unit Operating Agreement). Each Working Interest Owner at any time and from time to time may appoint a designee to physically receive its share of Unitized Substances, Outside Substances or revenue derived therefrom and delivery of such Unitized Substances, Outside Substance or revenue to such designee shall have the same effect as if the same had been delivered to the Working Interest Owner that made the designation. If a Royalty Owner has the right to take in kind a share of Unitized Substances and fails to do so, the Working Interest Owner whose Working Interest is subject to such Royalty Interest shall be entitled to take in kind such share of the Unitized Substances.

If there is any difference in the quality Unitized Substances or Outside Substances produced from different wells in the Unit Area and if that difference affects the value of such substances, Unit Operator shall cooperate with the parties (if any) taking such substances in kind to assure that the Unitized Substances or Outside Substances delivered to those parties are balanced both as to volume and as to quality. Parties taking Unitized Substances or Outside Substances in kind shall have the right to construct, maintain, and operate within the Unit Area all necessary facilities for that purpose, provided that they are constructed, maintained and operated so as not to interfere with Unit Operations. Any extra expenditures incurred by Unit Operator by reason of the delivery in kind of any portion of the Unitized Substances and/or Outside Substances shall be borne by the party taking such substances in kind.

6.4 FAILURE TO TAKE IN KIND. If any party having a right to take in kind fails to take in kind or separately dispose of its share of Unitized Substances or Outside Substances currently as and when produced, the Unit Operator shall have the right but not the obligation to dispose of such production in any reasonable manner (i) for such reasonable period of time as is consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year, and (ii) at not less than the best price offered to Unit

11

Operator for such production (subject to any transportation charges for transporting the same after it leaves Unit Equipment and any charges for treating, processing, marketing or the like), and the account of such party shall be charged therewith as having received the same.  The net proceeds, if any, of the Unitized Substances or Outside Substances so disposed of by the Unit Operator shall be paid to the party for whose account the same is so disposed under the provisions of applicable division orders.

6.5  RESPONSIBILITY FOR ROYALTY SETTLEMENTS.  Any party receiving in kind or separately disposing of all or part of the Unitized Substances allocated to any Tract or receiving the proceeds therefrom shall be responsible for the payment thereof to the persons entitled thereto, and shall indemnify all parties hereto, including Unit Operator, against any liability for all royalties, overriding royalties, production payments, severance tax and all other payments chargeable against or payable out of such Unitized Substances or the proceeds therefrom. In the event a party fails to take and dispose of its part of Unitized Substances in kind, and subject to the provisions of Article 6.4, Unit Operator or the purchaser of unitized substances will make settlement for the proceeds of such production under its Division Order.

6.6  ROYALTY ON OUTSIDE SUBSTANCES.  There shall be no royalty payable on Outside Substances.  If any Outside Substances injected into the Unitized Interval consist of liquefied petroleum hydrocarbons or natural gases, and if the Unitized Substances subsequently produced contain such gases or hydrocarbons as determined by fractional analysis or other appropriate tests, the Working Interest Owners shall have the right to recover such contained gases or hydrocarbons, or their equivalent value from such Unitized Substance, without payment of royalty thereon.  If any Outside Substances of value are injected into the Unitized Interval, and such Outside Substances cannot be distinguished from Unitized Substances, then seventy-five percent (75%) of any like substances contained in Unitized Substances subsequently produced and sold, or used for other than Unit Operations, shall be deemed to be Outside Substances until the aggregate of said seventy-five percent (75%) equals the accumulated volume of such Outside Substances injected into the Unitized Interval, and no payments

12

shall be due or payable to Royalty Owners on such Outside Substances.

6.7    PRODUCED OUTSIDE SUBSTANCES WITH NO VALUE.    Anything herein to the contrary notwithstanding, if any Outside Substance produced in conjunction with Unitized Substances has no value and if that substance can be separated from the Unitized Substances by the Unit Operator, then with the approval of the Working Interest Owners, the Unit Operator shall at Unit Expense separate and re-inject or dispose of such Outside Substance.

## ARTICLE 7

### PRODUCTION AS OF THE EFFECTIVE DATE

7.1    OIL IN LEASE TANKS.  Unit Operator shall gauge all lease and other tanks within the Unit Area to ascertain the amount of merchantable oil or other liquid hydrocarbons produced from the Unitized Interval in such tanks, above the pipe line connections, as of 7:00 a.m. on the Effective Date hereof.  All such oil shall remain the property of the parties entitled thereto the same as if the unit had not been formed.  Any such oil not promptly removed may be sold by the Unit Operator for the account of the parties entitled thereto, subject to the payment of all royalties, overriding royalties, production payments, severance tax and all other payments under the provisions of the applicable lease or other contracts.

## ARTICLE 8

### USE OF UNITIZED SUBSTANCES AND ROYALTY SETTLEMENTS

8.1    USE OF UNITIZED SUBSTANCES.  Working Interest Owners may use or consume as much of the Unitized Substances as they deem appropriate for the operation and development of the Unitized Interval including, but not limited to, the injection thereof into the Unitized Interval.  No royalty, overriding royalty, production or severance tax or other payments shall be payable on account of Unitized Substances used, unavoidably lost or consumed in Unit Operations.

8.2    ROYALTY SETTLEMENT.  Unit Operator is hereby authorized to deliver in kind to Royalty Owners the amount of Unitized Substances to which they are entitled under the provisions of their lease or other contract and to deduct such amounts from the share of each Working Interest Owner responsible therefor. Settlement for Royalty Interest not taken in kind shall be made by the Working Interest Owners in each Tract responsible therefor under existing contracts, laws

13

and regulations, in accordance with the provisions of Article 6 hereof.

## ARTICLE 9

## TITLES

9.1  **WORKING INTEREST TITLES.**  If title to a Working Interest fails, the rights and obligations of Working Interest Owners by reason of the failure of title shall be governed by the Unit Operating Agreement.

9.2  **ROYALTY OWNER TITLES.**  If title to a Royalty Interest fails, the party whose title failed shall not be entitled to share hereunder with respect to such interest.

9.3  **PRODUCTION WHERE TITLE IS IN DISPUTE.**  If the title or right of any party claiming the right to receive in kind all or any portion of the Unitized Substances allocated to a Tract is in dispute, Unit Operator shall either:

(a)  require that the party to whom such Unitized Substances are delivered or to whom the proceeds thereof are paid, furnish security for the proper accounting therefor to the rightful owner if the title or right of such party fails in whole or in part; or

(b)  withhold and market the portion of Unitized Substances with respect to which title or rights is in dispute, and impound the proceeds thereof with such interest thereon as may be required under applicable laws of the State of Alabama until such time as the title or right thereto is established by a final judgment of a court of competent jurisdiction or otherwise to the satisfaction of the Working Interest Owners, whereupon the proceeds so impounded shall be paid to the party rightfully entitled thereto.

9.4  **PAYMENT OF TAXES TO PROTECT TITLE.**  If any taxes are not paid when due by or for any owner of surface rights to lands within the Unit Area, or severed mineral interests or Royalty Interests in such lands, or lands outside the Unit Area on which Unit Equipment is located, Unit Operator may, at any time prior to a tax sale, or expiration of period of redemption after a tax sale, pay the

14

tax and redeem or purchase such rights, interests or property. Any such payment shall be a Unit Expenditure. Unit Operator shall, if possible, withhold from any proceeds derived from the sale of Unitized Substances otherwise due any delinquent taxpayer an amount sufficient to defray the costs of such payment, such withholding to be credited to Working Interest Owners. Such withholding shall be without prejudice to any other remedy available to Unit Operator or Working Interest Owners.

9.5   UNDERLYING AGREEMENTS.   Nothing contained herein shall be construed as altering or impairing the provisions of any leases or other agreements with reference to the proportionate reduction of royalties, overriding royalties, payments out of production, and other obligations, and irrespective of the provisions of any such leases and other agreements, it is understood and agreed that in the event any Royalty Owner or Working Interest Owner owns less than the entirety of the interest or interests claimed by or certified to him in a division order, transfer order, or other agreement, with reference to any Tract, all payments to such party shall be reduced to the proportionate interest actually owned by him in such Tract.

## ARTICLE 10

### EASEMENTS OR USE OF SURFACE

10.   GRANT OF EASEMENTS.   The parties hereto, to the extent of their rights and interests, hereby grant to Working Interest Owners the right to use as much of the surface of the land within the Unit Area as may reasonably be necessary for Unit Operations and for transportation of Unitized and Outside Substances.

10.2  USE OF WATER.  Working Interest Owners shall have free use of water from the Unit Area for Unit Operations except water from any domestic water well, commercial lake, pond, or irrigation ditch of a Surface Owner.

10.3  SURFACE DAMAGES.  Working Interest Owners shall pay the rightful owner for damages to growing crops, timber, fences, improvements, and structures on the Unit Area that result from Unit Operations.

## ARTICLE 11

### ENLARGEMENT OF UNIT AREA

11.1 **ENLARGEMENT OF UNIT AREA.** The Unit Area may be enlarged from time to time by approval of the State Oil and Gas Board of Alabama in accordance with Section 9-17-85 of the Code of Alabama (1975), as amended, and by ratification of this Agreement and the Unit Operating Agreement by the Working Interest Owners owning sixty-six and two-thirds percent (66 2/3%) in interest, as costs are shared, in the area to be added, and the written agreement to the enlargement and ratification of this Agreement by the Royalty Owners owning sixty-six and two-thirds percent (66 2/3%) in interest in the area to be added, all subject to the following:

11.1.1 The portion of Unitized Substances from the Unit Area as enlarged to be allocated to the added area shall be based on the relative contribution which such added area is expected to make, during the remaining course of Unit Operations in accordance with Section 9-17-85 of the Code of Alabama (1975), as amended; and the Unitized Substances so allocated to the added area shall be allocated to the Tracts therein on the basis of the relative contribution of each such Tract and, as to the area added, the Effective Date shall be the effective date of such enlargement.

11.1.2 The remaining portion of the Unitized Substances from the Unit Area as enlarged shall be allocated among the Tracts within the previously established Unit Area in the same proportions as elsewhere herein provided.

11.1.3 The effective date of any enlargement of the Unit Area shall be 7:00 a.m. on the first day of the calendar month following the date on which the order of the State Oil and Gas Board of Alabama, after notice and hearing, approves the enlargement and finds that the enlargement has been agreed to in compliance with the requirements of Section 9-17-85(b)(2) of the Code of Alabama (1975), as amended.

11.2 **NO RETROACTIVE ALLOCATION OF EXPENSES OR PRODUCTION.** There shall be no retroactive allocation or adjustment of Unit Expenditures or of interests in the Unitized Substances produced, or the proceeds thereof, by reason of an enlargement of the Unit Area; provided, however, this limitation shall not prevent an adjustment of investment among the Working Interest Owners pursuant to the Unit Operating Agreement.

16

### 11.3  DETERMINATION OF TRACT PARTICIPATION AND REVISION OF EXHIBITS.

The Unit Operator shall determine the Tract Participation of each Tract within the Unit Area as enlarged and revise Exhibits "A", "B", "C", "D" and "E" accordingly and file for record the revised Exhibits with the State Oil and Gas Board of Alabama and in the office of the Probate Judge of Escambia County, Alabama.

### ARTICLE 12

### CHANGE OF TITLE

12.1  COVENANT RUNNING WITH THE LAND.  This agreement shall extend to, be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors and assigns of the parties hereto, and shall constitute a covenant running with the lands, leases and interests covered hereby.

12.2  NOTICE OF TRANSFER.  Any conveyance of all or any part of any interest owned by any party hereto with respect to any Tract shall be made expressly subject to this Agreement.  No change of title shall be binding upon the Unit Operator, or upon any party hereto other than the party so transferring, until the first day of the calendar month next succeeding the date of receipt by Unit Operator of a photocopy or a certified copy of the recorded instrument evidencing such change in ownership.

12.3  WAIVER OF RIGHTS TO PARTITION.  Each party hereto covenants that, during the existence of this Agreement, it will not resort to any action to partition the Unit Area or the Unitized Interval within the Unit Area or any of the Unit Equipment, and to that extent waives the benefits of all laws authorizing such partition.

### ARTICLE 13

### RELATIONSHIP OF PARTIES

13.1  NO PARTNERSHIP.  The duties, obligations and liabilities of the parties hereto are intended to be several and not joint or collective.  This Agreement is not intended to create, and shall not be construed to create, an association or trust, or to impose a partnership duty, obligation or liability with regard to any one or more of the parties hereto.  Each party hereto shall be individually responsible for its own obligations as herein provided.

13.2  NO SHARING OF MARKET.  This Agreement is not intended to provide, and shall not be construed to provide, directly or indirectly, for any cooperative or joint sale or marketing of Unitized Substances.

13.3  ROYALTY OWNERS FREE OF COSTS.  Subject to the provisions of Article 3.3 hereof, this Agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay for Unit Expenditures unless such Royalty Owner is otherwise so obligated.

13.4  INFORMATION TO ROYALTY OWNERS.  Each Royalty Owner shall be entitled to all information in possession of Unit Operator to which such Royalty Owner is entitled by an existing agreement with any Working Interest Owner.

## ARTICLE 14

## LAWS AND REGULATIONS

14.1  LAWS AND REGULATIONS.  This agreement shall be subject to the valid rules, regulations and orders of the State Oil and Gas Board of Alabama, and to all other applicable Federal, State and municipal laws, rules, regulations and orders.

## ARTICLE 15

## FORCE MAJEURE

15.1  FORCE MAJEURE.  All obligations imposed by this Agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a strike, fire, war, civil disturbance, explosion, act of God, by Federal, State or municipal laws; by any rules, regulations, or order of a governmental agency; by inability to secure materials; or by any other cause or causes beyond reasonable control of the party.  No party shall be required against its will to adjust or settle any labor dispute.  Neither this Agreement nor any lease or other instrument subject thereto shall be terminated by reason of suspension of Unit Operations due to any one or more of the causes set forth in this Article.

## ARTICLE 16

## EFFECTIVE DATE

16.1  EFFECTIVE DATE.  This Agreement shall become binding upon all parties who execute or ratify it as of the date of execution or ratification by such

party and shall become effective notwithstanding the fact that one or more of the Working Interest Owners or one or more of the Royalty Owners shall fail or refuse to execute or ratify this Agreement when the conditions for effectiveness have been met as follows:  (1) when the same has been executed or ratified by parties who own of record legal title to at least an undivided sixty-six and two-thirds percent (66 2/3%) in interest (calculated using the Tract Participation formula) of the Working Interest in the total Unit Area and by parties who own of record legal title to at least sixty-six and two-thirds percent (66 2/3%) in interest (calculated using the Tract Participation formula) of the Royalty Interest in the total Unit Area (for the purpose of this provision, with respect to an interest which is encumbered of record with a mortgage or deed of trust, both the grantor and grantee therein shall be considered as the record owner of legal title thereto, except that when the instrument gives the grantor in such mortgage or deed of trust the right to execute a Unit Agreement, the grantor shall be deemed the record owner); and (2) when an order has been issued by the State Oil and Gas Board of Alabama approving Unit Operation of the Unit Area in accordance with the terms of this Agreement and the Unit Operating Agreement.  The Effective Date of the Unit shall be as specified in the order of the State Oil and Gas Board of Alabama.  If, however, this Agreement does not become effective on or before December 31, 2015, then this Agreement shall _ipso_ _facto_ terminate and thereafter be of no further force and effect unless prior thereto at least two Working Interest Owners owning a combined Unit Participation of at least fifty percent (50%) (calculated using the Tract Participation formula) who have become parties to this Agreement have decided to extend said termination date for a period not to exceed one (1) year.  If said termination date is extended and this Agreement does not become effective on or before said extended termination date, this Agreement shall _ipso_ _facto_ terminate on said extended termination date, and thereafter be of no further force or effect.  For the purpose of this article, and except as hereinabove specifically provided in Section 16.1, ownership shall be computed on the basis of the Tract Participations set forth in Exhibit "B."

     16.2  CERTIFICATE OF EFFECTIVENESS.  Unit Operator shall file for record in Escambia County, Alabama, a Certificate to the effect that this Agreement has

become effective according to its terms and stating further the Effective Date.

## ARTICLE 17

## TERM

17.1  TERM.  The term of this Agreement shall be for the time that Unitized Substances are produced or Unit Operations are conducted without a cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner herein provided.

17.2  TERMINATION.  This Agreement may be terminated by the State Oil and Gas Board after notice and hearing.

17.3  EFFECT OF TERMINATION.  Upon termination of this Agreement, the further development and operation of the Unitized Interval as a Unit shall be abandoned.  Each oil and gas lease and other agreement covering lands within the Unit Area shall remain in force for sixty (60) days after the date on which this Agreement terminates, and for such further period as is provided by the lease or other agreement.

17.4  CERTIFICATE OF TERMINATION.  Unit Operator, subsequent to approval by the State Oil and Gas Board, shall immediately file for record in the office or offices where a counterpart of this Agreement is recorded, a certificate to the effect that this Agreement has been terminated according to its terms and stating further the termination date.

17.5  SALVAGING EQUIPMENT UPON TERMINATION.  If not otherwise granted by the leases or other instruments affecting each Tract unitized under this Agreement, Royalty Owners hereby grant Working Interest Owners a period of one (1) year after the date of termination of this Agreement within which to salvage and remove Unit Equipment.

## ARTICLE 18

## EXECUTION

18.1  ORIGINAL, COUNTERPART, OR OTHER INSTRUMENT.  An owner of Oil and Gas Rights may become a party to this Agreement by signing the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof.  The signing of any such instrument shall have the same effect as if all the parties had signed the same

20

instrument.  All signature pages to this Agreement or counterparts hereof that are executed by Owners of Oil and Gas Rights may be attached to one copy of this Agreement.

18.2  JOINDER IN DUAL CAPACITY.  Execution as herein provided by any party as either a Working Interest Owner or a Royalty Owner shall commit all interests that may be owned or controlled by such party.

18.3  APPROVAL OF UNIT OPERATING AGREEMENT.  Joinder herein shall constitute approval of the Unit Operating Agreement.


## ARTICLE 19

### DETERMINATIONS BY WORKING INTEREST OWNERS

19.1  DETERMINATIONS BY WORKING INTEREST OWNERS. All decisions, determinations, or approvals by Working Interest Owners hereunder shall be made pursuant to the voting procedure of the Unit Operating Agreement, unless otherwise provided  herein.

## ARTICLE 19

### GENERAL

20.1  AMENDMENTS AFFECTING WORKING INTEREST OWNERS.  Unless otherwise provided to the contrary elsewhere herein or in the Unit Operating Agreement, amendments hereto or to the Unit Operating Agreement relating wholly to Working Interest Owners may be made if signed or ratified by sixty-six and two thirds percent (66 2/3%) in interest of the Working Interest  Owners and approved by the State Oil and Gas Board.

20.2   ACTION BY WORKING INTEREST OWNERS. Except as otherwise provided in this Agreement, any action or approval required by Working Interest Owners hereunder shall be in accordance with the provisions of the Unit Operating Agreement.

20.3  SEVERABILITY OF PROVISIONS. The provisions of this Agreement are severable and if any section, sentence, clause or part thereof is held to be invalid for any reason, such invalidity shall  not be construed to affect the validity of the remaining provisions of this Agreement.

### ARTICLE 21

21

## SUCCESSORS AND ASSIGNS

21.1  **SUCCESSORS AND ASSIGNS.** This Agreement shall extend to, be binding upon, and inure to the benefit of the Parties  hereto and their respective heirs, devisees, legal representatives, successors, and assigns, and shall constitute a covenant running with the lands, leases, and interests covered

ENTERED INTO as of the day and year first above written.

[SIGNATURE PAGES FOLLOW]

**UNIT AGREEMENT**
**FISHPOND OIL UNIT**
**FISHPOND FIELD**
**ESCAMBIA COUNTY, ALABAMA**

**UNIT OPERATOR**

**SKLAR EXPLORATION COMPANY L.L.C.**

**ATTEST:**

_____          **BY:** _____
                                  **ITS:** _____

**WORKING INTEREST OWNERS**

*[Individual]*

**ATTEST**                **SIGNATURE**              **DATE**

_____   _____   _____

*[Trustee]*

**ATTEST**                **SIGNATURE**              **DATE**

_____   _____   _____
                          **As Trustee of the following trust:**

*[Legal entity]*          **ENTITY NAME:**

                          _____
**ATTEST**                                          **DATE**

_____   **By**_____   _____
                          **Its**_____

23

## ROYALTY AND OVERRIDING ROYALTY OWNERS

**[Individual]**

**ATTEST**                          **SIGNATURE**                                      **DATE**

_____      _____      _____

**[Trustee]**

**ATTEST**                          **SIGNATURE**                                      **DATE**

_____      _____      _____

**As Trustee of the following trust:**

**[Legal entity]**                  **ENTITY NAME:**

                                       _____

**ATTEST**                                                                               **DATE**

_____      **By**_____      _____
                                       **Its**_____

UNIT AGREEMENT
FISHPOND OIL UNIT
FISHPOND FIELD
ESCAMBIA COUNTY, ALABAMA

**UNIT OPERATOR**

SKLAR EXPLORATION COMPANY L.L.C.

ATTEST:

BY: *[signature]*
ITS: PRESIDENT - CHIEF
OPERATING OFFICER

**WORKING INTEREST OWNERS**

*[Individual]*

ATTEST      SIGNATURE      DATE

_____  _____  _____

*[Trustee]*

ATTEST      SIGNATURE      DATE

_____  _____  _____

As Trustee of the following trust:

*[Legal entity]*

ENTITY NAME:

ATTEST      SKLARCO LLC      DATE

By: *[signature]*     5-19-15
Its: PRESIDENT - CHIEF
OPERATING OFFICER

23

ROYALTY AND OVERRIDING ROYALTY OWNERS

*[Individual]*

ATTEST _____    SIGNATURE _____    DATE _____

*[Trustee]*

ATTEST _____    SIGNATURE _____    DATE _____

                              As Trustee of the following trust:

*[Legal entity]*              ENTITY NAME:

ATTEST _____    _____

                              By _____          DATE _____
_____           Its _____



LEGEND

☐ Surface Location if Known
◇ Dry Hole
● Oil Well Location
- - - - Drilling Unit
········· 160 Acre Production Unit
——— Fishpond Field Line
——— Proposed Amended Fishpond Field Limit and Oil Unit Boundary

**Sklar**

UNIT PLAT

**EXHIBIT A**
TO UNIT AGREEMENT FOR
FISHPOND OIL UNIT

## Fishpond Unit Tract Participation Schedule

| Tract | Well or Tract Name | Location | Tract Descriptions | Surface Acreage | Tract Factor |
|---|---|---|---|---|---|
| 1 | CCL&T 9-8 #1 | NE 9-3N-12E | NE/4 of Section 9 | 160.47 | 0.25769042 |
| 2 | CCL&T 10-5 #1 | NW 10-3N-12E | NW/4 of Section 10 | 160.76 | 0.54750769 |
| 3 | 3-12-10-7 | NE 10-3N-12E | SW/4 of NE/4 of Section 10 | 40.23 | 0.00030999 |
| 4 | 3-12-10-10 | SE 10-3N-12E | NW/4 of SE/4 of Section 10 | 40.23 | 0.00074915 |
| 5 | 3-12-10-11 | SW 10-3N-12E | N/2 of SW/4 of Section 10 | 80.35 | 0.19223631 |
| 6 | 3-12-9-9 | SE 9-3N-12E | N/2 of SE/4 of Section 9 | 80.08 | 0.00150625 |

Total: 1.00000000

Sklar

TRACT PARTICIPATION SCHEDULE

**EXHIBIT B**
TO UNIT AGREEMENT FOR
FISHPOND OIL UNIT



### Schedule of Tract Parameters

| Tract | Well or Tract Name | Location | Tract Total Pore Volume* (Acre-Ft) | Tract Factor |
|---|---|---|---|---|
| 1 | CCL&T 9-8 #1 | NE 9-3N-12E | 259.365 | 0.25769642 |
| 2 | CCL&T 10-5 #1 | NW 10-3N-12E | 551.053 | 0.54750789 |
| 3 | 3-12-10-7 | NE 10-3N-12E | 0.312 | 0.00030999 |
| 4 | 3-12-10-10 | SE 10-3N-12E | 0.754 | 0.00074915 |
| 5 | 3-12-10-11 | SW 10-3N-12E | 193.475 | 0.19223031 |
| 6 | 3-12-9-9 | SE 9-3N-12E | 1.516 | 0.00150625 |
| | | Totals: | 1006.475 | 1.00000000 |

* Hydrocarbon Pore Volume for Smackover (6% Cutoff)

Sklar

FISHPOND OIL UNIT TRACT FACTOR-
SCHEDULE OF TRACT PARAMETERS

**EXHIBIT D**
TO UNIT AGREEMENT FOR
FISHPOND OIL UNIT

EXHIBIT E
TO UNIT AGREEMENT
FOR FISHPOND OIL UNIT

## Summary of Unit Net Revenue Interests

| Royalty and Overriding Royalty Interest Ownership | | Total Unit Interest |
|---|---|---|
| Cedar Creek Land & Timber, Inc | R | 0.17560090 |
| Estate of Ed Leigh McMillan II | R | 0.00119030 |
| Elvira McMillan Tate (Mannelly?) | R | 0.00119030 |
| Thomas E. McMillan, Jr. | R | 0.00105145 |
| Robert Cochrane McMillan | R | 0.00105145 |
| Katherine E. McM. Owens | R | 0.00197487 |
| Thomas E. McMillan, Jr. and Robert C. McMillan, as Co-Trustees U/W Iva Lee McMillan | R | 0.00832500 |
| Thomas E. McMillan, Jr., Robert C McMillan, Ed Leigh McMillan, III, and Daniel W. McMillan, as Co-Trustees U/W Ed Leigh McMillan | R | 0.00012500 |
| Allen C. Phillips | R | 0.00902649 |
| Auburn University | R | 0.00510362 |
| Minnie Tate Dubiber | R | 0.00019614 |
| Elvera Tate Hoskins | R | 0.00019614 |
| Albert Clark Tate III | R | 0.00019614 |
| Edward McMillan Tate | R | 0.00019614 |
| Newport Five, LLC | R | 0.00078457 |
| Robert C. McMillan, as Trustee of the Robert C. McMillan 2011 Revocable Trust dated November 29, 2011 | R | 0.00078457 |
| Ed Leigh McMillan III | R | 0.00039229 |
| Daniel W. McMillan | R | 0.00039229 |
| Kersch Group, LLC | R | 0.00196143 |
| SSC Minerals, LLC | R | 0.00147107 |
| Flowing Well, LLC | R | 0.00473223 |
| W.T. Neal Family Stock, LLC | R | 0.01203475 |
| Trustees of the Marital Trust and Trustees of the Family Trust U/W W.T. Neal, Jr. f/b/o Sara Beall Neal | R | 0.00125000 |

| | | |
|---|---|---|
| John R. Miller, III | R | 0.00079691 |
| Nancy M. Melton | R | 0.00057466 |
| David Earl Miller | R | 0.00057466 |
| Jean Miller (Stimpson) | R | 0.00057466 |
| Robert H. Kirby | R | 0.00085886 |
| Jean Kirby Jones | R | 0.00085886 |
| Suzanne W. Zimmer | R | 0.00085886 |
| Laura W. Grier | R | 0.00085886 |
| Linda H. Chavers | R | 0.00220807 |
| Camilla Huxford | R | 0.00171771 |
| James H. Barrow, Jr. and Jamie Barrow, as Trustees of the Barrow Family Revocable Trust | R | 0.00110879 |
| Peter H. Hamilton, Jr | R | 0.00110879 |
| Herschell Lee Abbott, III | R | 0.00055440 |
| Cathryn Abbott Jones | R | 0.00055440 |
| Ernest Fred Bel | R | 0.00110879 |
| James Boyd Bel | R | 0.00110879 |
| Jeanne Bel Ingraham | R | 0.00110879 |
| Janan Goodner Cohen and Reliance Trust Company, as Co-Trustees of the Randall Montgomery Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.00210069 |
| Roderick Wade Goodner , Jr. and Reliance Trust Company, as Co-Trustees of the Roderick Wade Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.00210069 |
| E.D. Scruggs, Jr. | R | 0.00050092 |
| Wendell Phillips Simpson | R | 0.00050092 |
| Kay Mitchell | R | 0.00025046 |
| Haywood Hanna, III | R | 0.00025046 |
| Lyman W. Phillips, Jr. | R | 0.00391675 |
| Frances L. Pope and Robert R. Crittenden, as Trustees of the Family Trust U/W Robert Downing Pope, Jr. | R | 0.00015000 |
| Jenny H. McGowin | R | 0.00061559 |
| Philippa Peyton M. Bethea | R | 0.00061559 |
| Peyton H. Hamilton (Carmichael?) | R | 0.00123119 |

2

| | | |
|---|---|---|
| Stirling H. Hamilton, Jr. | R | 0.00123119 |
| Julie H. Pleus | R | 0.00123119 |
| Claude E. Hamilton, III | R | 0.00123119 |
| William Hamilton, Jr. | R | 0.00123119 |
| Lewis S. Hamilton | R | 0.00123119 |
| Adrian C. Allen, as Trustee of the Adrian C. Allen Revocable Trust | R | 0.00230151 |
| Suzanne C. Allen, as Trustee of the Suzanne C. Allen Revocable Trust | R | 0.00230151 |
| Cynthia S. Rilling | R | 0.00076717 |
| Deborah Jean Shaffer | R | 0.00038359 |
| Michael Adrian Shaffer and Clarissa Shaffer, as Trustees of the Shaffer Family Living Trust | R | 0.00038359 |
| Charles James Shaffer and Katrina Jeanne Shaffer, as Trustees of the CK Shaffer Family Trust | R | 0.00038359 |
| Trant L. Kidd, as Trustee of The Trant L. Kidd Special Trust | R | 0.00011507 |
| Rock Springs Minerals I, LLC | R | 0.00072184 |
| Source Rock Minerals, LLC | R | 0.00029423 |
| Rock Springs Energy, LLC | R | 0.00001569 |
| David Bissmeyer | R | 0.00060392 |
| Susan M. Winchester | R | 0.00076717 |
| James Adrian Allen | R | 0.00076717 |
| Downing Family Properties, LLC | R | 0.01069672 |
| Roabie Downing Johnson | R | 0.00081826 |
| Stella Livingston Hawkins | R | 0.00081826 |
| Wiley W. Downing, IV | R | 0.00015342 |
| Lisa Downing Nordmeyer | R | 0.00015342 |
| John A. Downing | R | 0.00030685 |
| Dan M. Downing | R | 0.00030685 |
| Anna Lillian D. Nelson | R | 0.00030685 |
| Jane Downing Dunaway | R | 0.00027275 |
| Lisa Downing Heaton | R | 0.00027275 |
| John Eric Downing | R | 0.00027275 |
| Albert W. Key | R | 0.00014533 |
| Atwood M. Kimbrough | R | 0.00010900 |
| James C. Kimbrough | R | 0.00005633 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Sr. Trust U/A 3/17/05 | R | 0.00506086 |

3

| | | |
|---|---|---|
| Adrienne P. Watkins, as Trustee of the Adrienne Adrienne P. Watkins Trust U/A 3/17/05 | R | 0.00168695 |
| John H. Gray, Jr., as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Jack M. Watkins, Jr. Family dated September 29, 2011 | R | 0.00168695 |
| Gerald Stephen Herman, as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Adrienne W. Snively Family dated September 29, 2011 | R | 0.00168695 |
| Adrienne P. Watkins | R | 0.00015000 |
| Patricia Downing McFarland | R | 0.00010000 |
| John Robert Downing | R | 0.00007500 |
| Hermine M. Downing | R | 0.00101826 |
| M. Travis Holzborn | R | 0.00050913 |
| Valhalla Royalty, LLC | O | 0.00079418 |
| Eustes Energy, Inc. | O | 0.00799149 |
| Ezelle Energy, L.L.C. | O | 0.00799149 |
| Daboll Resources, L.C. | O | 0.00479490 |
| Christopher A. Farrell | O | 0.00184105 |
| Total Royalty and Overriding Royalty | | 0.32341311 |

Working Interest Ownership

| | | |
|---|---|---|
| Sklarco L.L.C. | W | 0.17029753 |
| JJS Interests Escambia, LLC | W | 0.11907809 |
| Resource Ventures, LLC | W | 0.00064975 |
| Dickson Oil & Gas, LLC | W | 0.00612500 |
| Finn Energy Limited | W | 0.06435848 |
| J.F. Howell Interests, LP | W | 0.02964959 |
| Bundero Investment Co., LLC | W | 0.00741240 |
| Markaco, L.L.C. | W | 0.01297170 |
| Tiembo Ltd. | W | 0.01111860 |
| Craft Exploration Co., LLC | W | 0.00525000 |
| Kudzu Oil Properties, LLC | W | 0.01111860 |
| Landmark Exploration, LLC | W | 0.01111860 |
| Michael K. Pickens, as Trustee of the MKP G-S Trust | W | 0.02204292 |

| Tauber Exploration & Production Co. | W | 0.01312500 |
| McCombs Energy, Ltd. | W | 0.15010107 |
| The Rudman Partnership | W | 0.02969480 |
| Simco Energy, LLC | W | 0.00201537 |
| Pickens Financial Group, LLC | W | 0.00495939 |

Total Working Interest: 0.67658689
Total Royalty and Working Interest: 1.00000000

## SUMMARY OF UNIT OWNERSHIPS AS COSTS ARE SHARED
### (Gross Working Interest)

| Sklarco L.L.C. | W | 26.300777% |
| JJS Interests Escambia, LLC | W | 18.193750% |
| Resource Ventures, LLC | W | 0.099274% |
| Dickson Oil & Gas, LLC | W | 0.875000% |
| Fani Energy Limited | W | 9.265498% |
| J.F. Howell Interests, LP | W | 4.235656% |
| Bundero Investment Co., LLC | W | 1.058914% |
| Marksco, L.L.C. | W | 1.853100% |
| Tiembo Ltd. | W | 1.588371% |
| Craft Exploration Co., LLC | W | 0.750000% |
| Kudzu Oil Properties, LLC | W | 1.588371% |
| Landmark Exploration, LLC | W | 1.588371% |
| Michael K. Pickens, as Trustee of the MKP G-5 Trust | W | 3.241606% |
| Tauber Exploration & Production Co. | W | 1.875000% |
| McCombs Energy, Ltd. | W | 21.443009% |
| The Rudman Partnership | W | 4.242114% |
| Pickens Financial Group, LLC | W | 0.729321% |
| Simco Energy, LLC | W | 1.071868% |

Total Gross Working Interest: 100.000000%

SPECIAL NOTE: The overriding royalty interest and working interest numbers shown above are subject to change upon the realization of the non-consent penalty as described in the JOA for the Cedar Creek Land & Timber 10-5 #1 well.

STATE OIL AND GAS BOARD

Exhibit No. B

Petition By sklar

Item No. 10   Date 12/8/15

Testimony Of Jones

Received By MR

# EXHIBIT B
# UNIT OPERATING
# AGREEMENT

## FISHPOND OIL UNIT

# UNIT OPERATING AGREEMENT

## FISHPOND OIL UNIT

## FISHPOND FIELD

## ESCAMBIA COUNTY, ALABAMA

**THIS AGREEMENT**, entered into as of the 11th day of May, 2015, by the parties who have signed the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof (hereinafter referred to as the "parties hereto");

**WITNESSETH**:

**WHEREAS**, the parties hereto as Working Interest Owners have executed, as of the date hereof, an agreement entitled "Unit Agreement, Fishpond Oil Unit, Fishpond Field, Escambia County, Alabama," herein referred to as "Unit Agreement," which, among other things, provides for a separate agreement to be entered into by Working Interest Owners to provide for the development and operation of the Unit Area as therein defined;

**NOW, THEREFORE**, in consideration of the mutual agreements herein set forth, it is agreed as follows:

## ARTICLE 1

## CONFIRMATION OF UNIT AGREEMENT

1.1   CONFIRMATION OF UNIT AGREEMENT.   The Unit Agreement is hereby confirmed and by reference made a part of this Agreement.  The definitions in the Unit Agreement are adopted for all purposes of this Agreement.  If there is some conflict between the Unit Agreement and this Agreement, the Unit Agreement shall govern.

## ARTICLE 2

## EXHIBITS

2.1  EXHIBITS.  The following exhibits are incorporated herein by reference:

2.1.1  EXHIBITS "A,"  "B," "C," "D" and "E" of the Unit Agreement.

2.1.2  EXHIBIT "F," attached hereto, which is the Accounting Procedure applicable to Unit Operations.  If there is any conflict between this Agreement and Exhibit "F," this Agreement shall govern.

2.1.3  EXHIBIT "G," attached hereto, which contains insurance provisions applicable to

Unit Operations.

2.1.4  EXHIBIT "H," attached hereto, which is a Gas Balancing Agreement applicable to Unit Operations.

2.2  REVISION OF EXHIBITS.  If Exhibits "A," "B," "C" and "D" are revised, Exhibit "E" shall be revised accordingly and be effective as of the same date.

2.2.1  CORRECTION OF EXHIBITS.  If it subsequently appears that any mechanical miscalculation or clerical error has been made or if subsequently discovered data renders any Exhibit incorrect, the Working Interest Owners shall correct the mistake by revising the Exhibits to conform to the facts.

## ARTICLE 3

## SUPERVISION OF OPERATIONS
## BY WORKING INTEREST OWNERS

3.1  OVERALL SUPERVISION.  Working Interest Owners shall exercise overall supervision and control of all matters pertaining to Unit Operations pursuant to this Agreement and the Unit Agreement.  In the exercise of such authority, each Working Interest Owner shall act solely in its own behalf in the capacity of an individual owner and not on behalf of the owners as an entirety; provided, however, that nothing herein shall prevent one or more Working Interest Owners from appointing someone or some entity (which may be another Working Interest Owner or a third party) to act on behalf of such Working Interest Owner(s) in any or all matters relating to this Agreement.

3.2  SPECIFIC AUTHORITIES AND DUTIES.  The matters with respect to which the Working Interest Owners shall decide and take action shall include, but not be limited to, the following:

3.2.1  METHOD OF OPERATION.  The method of operation, including any type of pressure maintenance, secondary recovery, or other recovery program to be employed.

3.2.2  DRILLING OF WELLS.  The drilling of any well whether for production of Unitized Substances, for use as an injection well, or for other purposes.

3.2.3  WELL COMPLETIONS, RECOMPLETIONS AND CHANGE OF STATUS.
The completion of any well drilled under the terms of Article 3.2.2 above, recompletion, abandonment, plugging or change of status of any well, or the use of any well for injection or other purposes.

2

3.2.4  EXPENDITURES.  The making of any single expenditure in excess of Fifty Thousand Dollars ($50,000.00) except in connection with a well, the drilling, re-working, deepening completing, re-completing or plugging back of which has been previously authorized by or pursuant to this Agreement.

3.2.5  DISPOSITION OF UNIT EQUIPMENT.  The selling or otherwise disposing of any major item of surplus or obsolete Unit Equipment, if the current list price of new equipment similar thereto is Fifty Thousand Dollars ($50,000.00) or more.

3.2.6  APPEARANCE BEFORE A COURT OR REGULATORY AGENCY.  The designating of a representative to appear before any court or regulatory agency, in matters pertaining to Unit Operations; provided that such designation shall not prevent any Working Interest Owner from appearing in person or from designating another representative in its own behalf.

3.2.7  AUDITS.  The auditing of the accounts of Unit Operator pertaining to Unit Operations hereunder; however, the audits shall

(a)  not be conducted more than once each year except upon the resignation or removal of Unit Operator, and

(b)  be made upon the approval of the owner or owners of a majority of Working Interest other than that of Unit Operator, at the expense of all Working Interest Owners, or

(c)  be made at the expense of those Working Interest Owners requesting such audit, if owners of less than a majority of Working Interest, other than that of Unit Operator, request such an audit, and

(d)  be made upon not less than thirty (30) days' written notice to Unit Operator and all Working Interest Owners, and

(e)  be otherwise governed by the provisions of Article 1, paragraph 5 of Exhibit "F."

3.2.8  INVENTORIES.  The taking of periodic inventories under the terms of Exhibit "F."

3.2.9  TECHNICAL SERVICES.  The authorizing of charges to the joint account for services by consultants or Unit Operator's technical personnel not otherwise provided for or covered by the overhead charges provided by Exhibit "F" when such charges are reasonably expected to

3

exceed Fifty thousand dollars ($50,000) for a single project.

3.2.10  ASSIGNMENT TO COMMITTEES.  The appointment of committees to study any problems in connection with Unit Operations.

3.2.11  REMOVAL OF UNIT OPERATOR.  The removal of Unit Operator and the selection of a successor as provided in Section 6.2.

3.2.12  ENLARGEMENT OF UNIT AREA.  The enlargement of the Unit Area.

3.2.13  INVESTMENT ADJUSTMENT.  The adjustment and re-adjustment of investments.

3.2.14  INJECTION OF ANY SUBSTANCE.  The injection of any substance into the Unitized Interval (including, but not limited to, water and/or gas either produced from the Unitized Interval or purchased from a party hereto or any third party).

3.2.15  TERMINATION OF UNIT AGREEMENT.  The termination of the Unit Agreement.

## ARTICLE 4

## MANNER OF EXERCISING SUPERVISION

4.1  DESIGNATION OF REPRESENTATIVES.  Each Working Interest Owner shall, in writing, inform Unit Operator of the name and address of its representative who is authorized to represent and bind such Working Interest Owner with respect to Unit Operations.  Each Working Interest Owner may also designate, in writing, alternate(s) who is/are authorized to bind each Working Interest Owner with respect to Unit Operations.  The representative or alternate(s) may be changed from time to time by written notice to Unit Operator.

4.2  MEETINGS.  All meetings of Working Interest Owners shall be called by Unit Operator upon its own motion or at the request of one or more Working Interest Owners having a combined Unit Participation totaling not less than Twenty-Five Percent (25%).  If Unit Operator fails to call a meeting of the Working Interest Owners for a period of ten (10) days after having been requested to do so by one or more of the Working Interest Owners, any one of such Working Interest Owners who requested a meeting may call the same.   Unless otherwise agreed upon by the Working Interest Owners, no meeting shall be called on less than ten (10) days' advance written notice, with agenda attached.  Working Interest Owners attending the meeting and having a combined voting interest sufficient to determine a matter may amend items included in the agenda

4

and may act upon an amended item or other items presented at the meeting. The representative of Unit Operator shall be chairman of each meeting, except any meeting called by a Working Interest Owner following Unit Operator's failure to call a requested meeting as hereinabove provided, and at such meeting the representative of the Working Interest Owner calling the meeting shall be chairman. Meetings shall be held at the time and place stipulated in the notice calling the meeting.

4.3 VOTING PROCEDURES. Working Interest Owners shall decide all matters coming before them as follows:

4.3.1 VOTING INTEREST. Each Working Interest Owner shall have a voting interest equal to its Unit Participation at the time of the vote.

4.3.2 VOTE REQUIRED - GENERALLY. Unless otherwise provided herein or in the Unit Agreement, Working Interest Owners shall determine all matters by the affirmative vote of three (3) or more Working Interest Owners having a combined voting interest, based on Unit Participation, of more than Fifty Percent (50%).

4.3.3 VOTE AT MEETING BY NON-ATTENDING WORKING INTEREST OWNER.

Any Working Interest Owner who is not represented at a meeting may vote by letter, facsimile, or email addressed to the representative of the Unit Operator if its vote is received prior to the vote on the item.

4.3.4 POLL VOTES. Working Interest Owners may vote on and decide, by letter, facsimile, or email, any matter submitted in writing to Working Interest Owners, if no meeting is requested, as provided in Article 4.2, within fifteen (15) days after the proposal is received by Working Interest Owners. Any notice given by facsimile shall be deemed received once same is properly transmitted. If a drilling rig is on location, notice of any proposal concerning the further use of said rig on location may be given by facsimile, email or telephone, and the response period shall be limited to twenty-four (24) hours, inclusive of Saturday, Sunday and legal holidays. Any notice given by telephone shall be promptly confirmed in writing (by letter, email, or facsimile). The failure of any Working Interest Owner to timely reply within said period to any such submittal shall be conclusively construed as a negative vote by such Working Interest Owner. Unit Operator will give prompt notice of the results of the voting to all Working Interest Owners.

4.3.5 BINDING EFFECT OF VOTE. All Working Interest Owners shall be bound for their proportionate share of all costs and expenses of Unit Operations which have been approved by

the vote of Working Interest Owners required by Article 4.3.2 herein.

## ARTICLE 5

### INDIVIDUAL RIGHTS OF WORKING INTEREST OWNERS

5.1   RESERVATION OF RIGHTS.   Working Interest Owners severally reserve to themselves all their rights, except as otherwise provided in this Agreement and the Unit Agreement.

5.2   SPECIFIC RIGHTS.   Each Working Interest Owner shall have, among others, the following specific rights.

5.2.1   ACCESS TO UNIT AREA.   Access to the Unit Area at reasonable times and subject to reasonable safety requirements at its sole risk, to inspect Unit Operations, all wells, equipment and facilities and the records and data pertaining thereto.

5.2.2   REPORTS.   The right to receive from Unit Operator, upon written request, copies of all reports to any governmental agency, monthly reports of crude oil runs and stocks, inventory reports, and all other information pertaining to the Unit Operations.   The cost of gathering and furnishing information not ordinarily furnished by Unit Operator to all Working Interest Owners shall be charged to the Working Interest Owner who requests the information.

## ARTICLE 6

### UNIT OPERATOR

6.1   INITIAL UNIT OPERATOR.   Sklar Exploration Company L.L.C. is hereby designated as initial Unit Operator.

6.2   RESIGNATION OR REMOVAL.   Unit Operator may resign at any time.   Working Interest Owners may remove Unit Operator at any time by the affirmative vote of at least Sixty-six and Two-thirds Percent (66 2/3%) of the voting interest, based on Unit Participation, in the manner specified in Paragraph 4.3, above (excluding Paragraph 4.3.2).   A Unit Operator who resigns or is removed shall not be released from its obligations hereunder for a period of three (3) months after the resignation or discharge, unless a successor Unit Operator has taken over Unit Operations prior to the expiration of such period.

6.3   SELECTION OF SUCCESSOR.   Upon the resignation or removal of a Unit Operator, a successor Unit Operator shall be selected by Working Interest Owners.   The successor Unit Operator shall be selected by the affirmative vote of at least Sixty-Six and Two-Thirds Percent (66

2/3%) of the voting interest, based on Unit Participation.

6.4    DELIVERY OF PROPERTY.   On the effective date of resignation or removal, Unit Operator shall deliver to the successor Unit Operator the possession of everything jointly owned by the Working Interest owners pursuant to this Agreement.

## ARTICLE 7

## AUTHORITIES AND DUTIES OF UNIT OPERATOR

7.1   EXCLUSIVE RIGHT TO OPERATE UNIT.   Subject to the provisions of this Agreement, the Unit Agreement and to instructions from Working Interest Owners, Unit Operator shall have the exclusive right and be obligated to conduct Unit Operations.

7.2   WORKMANLIKE CONDUCT.   Unit Operator shall conduct Unit Operations in a good and workmanlike manner and, in the absence of specific instructions from Working Interest Owners, shall have the right and duty to conduct such operations in the same manner as would a prudent operator under the same or similar circumstances.   Unit Operator shall freely consult with Working Interest Owners and keep them informed of all matters which Unit Operator, in the exercise of its best judgment, considers important.   Unit Operator shall not be liable to Working Interest Owners for damages, unless such damages result from its gross negligence or willful misconduct.

7.3   LIENS AND ENCUMBRANCES.   Unit Operator shall endeavor to keep the lands and leases and Unit Equipment in the Unit Area free from all liens and encumbrances occasioned by Unit Operations, except the lien of Unit Operator granted hereunder.

7.4   EMPLOYEES.   The number of employees used by Unit Operator in conducting Unit Operations, their selection, hours of labor, and compensation shall be determined by Unit Operator, with the employees to be the employees  of the Unit Operator and not of the other Working Interest Owners.

7.5   RECORDS.   Unit Operator shall keep full, true and correct books, accounts, and records of the Unit Operations, which shall be made available for inspection by any Working Interest Owner at Unit Operator's principal place of business during normal business hours.

7.6   REPORTS TO WORKING INTEREST OWNERS. Unit Operator shall furnish to Working Interest Owners monthly reports and shall keep the Working Interest Owners fully informed of Unit Operations.

7.7   REPORTS TO GOVERNMENTAL AUTHORITIES.  Except as otherwise provided in Section 8.2, below, Unit Operator shall make all reports to governmental authorities that are required for Unit Operations.

7.8   ENGINEERING AND GEOLOGICAL INFORMATION.  Unit Operator shall furnish to a Working Interest Owner, upon written request, a copy of all logs and other engineering and geological data pertaining to wells drilled for Unit Operations.

7.9   EXPENDITURES.   Unit Operator shall neither make any single expenditure nor undertake any project costing in excess of Fifty Thousand Dollars ($50,000.00) without prior approval of Working Interest Owners.  In cases of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Unit Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property, but Unit Operator shall report to Working Interest Owners, as promptly as possible, the nature of the emergency and the action taken.

7.10   WELLS DRILLED BY UNIT OPERATOR.  All wells drilled by Unit Operator shall be at the usual rates prevailing in the area.  Unit Operator may, with approval of Working Interest Owners being first obtained, employ its own tools and equipment, or that of an affiliate, but the rates for the services shall not exceed the then current rates charged by Unit Operator or the affiliate to third parties for like kind services.

7.11   DISPOSITION OF UNIT EQUIPMENT.  Unit Operator may dispose of any major item of surplus or obsolete Unit Equipment, subject to the terms and conditions of Article IV of Exhibit "F" of this Agreement, if the current price of new equipment similar thereto is less than Fifty Thousand Dollars ($50,000.00).

7.12   RETURN LINES. Working Interest Owners reserve the right to use unutilized capacity in any Return Lines constructed by Working Interest Owners at Unit Expense after the Effective Date for the transportation of natural gas to wells outside the Unit Area, subject to and conditioned upon (i) the overall and superseding right of the Return Lines to be used for Unit Operations, (ii) the quality and specifications of the natural gas being no less than that for the natural gas which is transported for Unit Operations, and (iii) the approval of Unit Operator, which approval will not be unreasonably withheld.

## ARTICLE 8

## TAXES

8.1  AD VALOREM TAXES.  Unit Operator shall make and file all necessary ad valorem tax renditions and returns with the proper taxing authorities covering Unit Equipment.  Unit Operator shall settle assessments arising therefrom.  Any such ad valorem taxes due and payable shall be paid by the Unit Operator and charged to the joint account in the same manner as other operating expenses.

8.2  OTHER TAXES.  Unit Operator shall pay or cause to be paid all production, severance, gathering, and other taxes imposed upon or in respect to the production of Unitized Substances sold by the Unit Operator.  Any party hereto that takes Unitized Substances in kind shall be responsible for payment of all production, severance, gathering, and other taxes imposed upon or with respect to the production of such Unitized Substances, and for all reports to governmental agencies relating thereto.

## ARTICLE 9

## INSURANCE

9.1  INSURANCE.  Unit Operator, with respect to Unit Operations, shall provide insurance for the benefit of the Joint Account as specified in Exhibit "G."

## ARTICLE 10

## PERSONAL PROPERTY AND ADJUSTMENT OF INVESTMENTS

10.1  PERSONAL PROPERTY TAKEN OVER.  Upon the effective date hereof, Working Interest Owners shall deliver to Unit Operator the following items of Unit Equipment:

10.1.1  WELLS AND CASING.  All wells completed in the Unit Area together with the casing therein.

10.1.2  WELL AND LEASE EQUIPMENT.  The tubing in each such well, the wellhead connections thereon, and all other lease and operating equipment that is used in the operations of such wells which Working Interest Owners determine is necessary or desirable for conducting Unit Operations provided, however, that the meters located near the wells which are utilized to measure Unit Rich Gas produced from each well, together with all of the gathering lines located downstream of those meters which are used to transport Unit Rich Gas for processing and treatment, shall not become Unit Equipment but the Working Interest Owners hereby grant to Unit Operator the

9

nonexclusive rights to use the above-described meters for measurement of Unit Rich Gas, to perform tests on and calibrate the meters, and to repair or replace the meters when necessary with the reasonable expense therefor to be chargeable to the Working Interest Owners (as a Unit Expense) and/or to the then owners of the meters as the Unit Operator shall deem appropriate.

10.1.3  RECORDS.  A copy of all production and well records that pertain to each such well.

10.2  INVENTORY AND EVALUATION OF PERSONAL PROPERTY AND WELLBORES.

Unit Operator shall, on behalf of  the Working Interest Owners and at unit expense within a reasonable time after the effective date hereof, inventory and evaluate the personal property taken over by the Unit Operator under this Article.  Such inventory shall include and be limited to those items of equipment considered controllable under Exhibit "F" except, upon determination of Working Interest Owners, items considered non-controllable may be included in the inventory in order to insure a more equitable adjustment of investment.  Casing shall be included in the inventory for record purposes, but shall be excluded from evaluation and investment adjustment.

10.3  INVESTMENT ADJUSTMENT.  Upon approval by the Working Interest Owners of the inventory and evaluation, each Working Interest Owner shall be credited with the value, as determined in accordance with Article 10.2, of its interest (prior to unitization) in all personal property taken over under this Article 10, and shall be charged with an amount equal to that obtained by multiplying the total value of all personal property taken over under Article 10.1 by such Working Interest Owner's Unit Participation.  If the charge against the Working Interest Owner is greater than the amount credited to such Working Interest Owner, the resulting net charge shall be an item of Unit Expenditure chargeable against such Working Interest Owner.  If the credit to the Working Interest Owner is greater than the amount charged against the Working Interest Owner, the resulting net credit shall be paid to the Working Interest Owner out of funds received by Unit Operator in settlement of the net charges described above.

10.4  OWNERSHIP OF PERSONAL PROPERTY AND FACILITIES.  Each Working Interest Owner, individually, shall by virtue hereof, own an undivided interest, equal to its Unit Participation, in all wells, equipment and facilities taken over or otherwise acquired by Unit Operator pursuant to this Agreement.

10

# ARTICLE 11

## UNIT EXPENDITURES

11.1  BASIS OF CHARGE TO WORKING INTEREST OWNERS.  Unit Operator initially shall pay all Unit Expenditures.  Each Working Interest Owner shall reimburse Unit Operator for its share of Unit Expenditure.  Each Working Interest Owner's share shall be the same as its Unit Participation in effect at the time the expense was incurred and paid.  All charges, credits and accounting for Unit Expenditures shall be in accordance with Exhibit "F."  Subject to the limitations on Unit Expenditures by Unit Operator set forth elsewhere in this Agreement, charges for outside attorneys and/or technical experts used in conjunction with Unit Operations, title examination, and/or hearings before Governmental Agencies will be direct charges to the Unit Joint Account, and Unit Operator may charge a reasonable fee for services rendered by its in-house personnel in performing necessary  title examinations and/or appearing as technical experts in hearings before Governmental Agencies

11.2  ADVANCE BILLINGS.  Unit Operator shall have the right to require Working Interest Owners to advance their respective shares of estimated Unit Expenditures by submitting to Working Interest Owners, on or before the 15th day of any month, an itemized estimate thereof for the succeeding month, with a request for payment in advance.  Within fifteen (15) days after receipt thereof, each Working Interest Owner shall pay to Unit Operator its share of such estimate.  Adjustments between estimated and actual Unit Expenditures shall be made by Unit Operator at the close of each calendar month, and the accounts of Working Interest Owners shall be adjusted accordingly.

11.3  COMMINGLING OF FUNDS.  Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advanced or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners or applied toward the payment of debts as provided in Section 11.5. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest Owners' funds as herein specifically provided, and no funds received by Unit Operator under this

11

agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

11.4  LIEN OF UNIT OPERATOR.  Each Working Interest Owner grants to Unit Operator a first and preferred lien upon its Oil and Gas Rights in each Tract, its share of Unitized Substances and Outside Substances when produced, and its interest in all Unit Equipment, as security for payment of its share of Unit Expenditures, together with interest thereon at the prime rate designated by Paragraph 1.3.B of Exhibit "F"; provided, however, if this interest rate exceeds the maximum allowed by Alabama law, then the interest rate will be limited to the maximum permitted under Alabama law.  Each Working Interest Owner also grants to Unit Operator a security interest in its share of oil and/or gas when extracted and a security interest in all equipment as security for payment for its share of Unit Expenditures together with interest thereon.  To the extent that Unit Operator has a security interest under the Uniform Commercial Code of Alabama, Unit Operator shall be entitled to exercise the rights and remedies of a Secured Party under the Code.  The bringing of a suit and the obtaining of judgment by Unit Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In the event any Working Interest Owner takes over as Unit Operator in the manner described elsewhere in this Agreement, Unit Operator shall thereupon grant a like lien to other Working Interest Owners.  Unit Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien.  In addition, upon default by any Working Interest Owner in the payment of its share of Unit Expenditures, Unit Operator shall have the right without prejudice to other existing remedies, to collect from the purchaser the proceeds from the sale of such Working Interest Owner's share of Unitized Substances not to exceed seven-eighths (7/8ths) of the proceeds allocated to the Tract or Tracts in which said Working Interest Owner owns a Working Interest, until the amount owed by such Working Interest Owner, plus interest as aforesaid, has been paid.  However, Unit Operator shall continue to collect such proceeds and distribute same to the Owner or Owners of overriding royalty, production payment interest, royalty in excess of one-eighth (1/8th) of production or other interests not primarily responsible for the payment of Unit Expenditures in the event that any of the proceeds so appropriated by Unit Operator were attributable to the interest of said Owner or Owners.  Each

purchaser shall be entitled to rely upon Unit Operator's written statement concerning the amount of any default.

In such event, each Working Interest Owner hereby authorizes and directs the purchaser to pay Unit Operator pursuant to the terms hereof upon receipt of written notice given by Unit Operator to the purchaser and to such Working Interest Owner.  If any Working Interest Owner shall create any overriding royalty, production payment or other burden against its share of Unitized Substances, and if Unit Operator shall become entitled to receive the proceeds from the sale of such Working Interest Owner's share of Unitized Substances as provided herein, Unit Operator shall receive such production free and clear of such burdens against such production which may have been created subsequent to this Agreement, and the Working Interest Owner creating such subsequent burden shall save harmless Unit Operator with respect to said burden or burdens and shall bear same at its own expense.

11.5  SUBSEQUENTLY CREATED INTEREST.  If any Working Interest Owner shall, after executing this Agreement, create an overriding royalty, production payment, net proceeds interest, carried interest, or any other interest out of its Working Interest, such subsequently created interest shall be subject to the terms and provisions of this Agreement, specifically including, but without limitation, Section 11.4 hereof entitled "Lien of Unit Operator."  If the Working Interest Owner creating such subsequently created interest (a) fails to pay any Unit Expenditure chargeable to such Working Interest Owner under this Agreement, and the production of Unitized Substances accruing to the credit of such Working Interest Owner is insufficient for that purpose, or (b) withdraws from this Agreement under the terms and provisions of Article 17 hereof, the subsequently created interest shall be chargeable with a pro-rata portion of all Unit Expenditure incurred hereunder, the same as though such subsequently created interest were a Working Interest, and Unit Operator shall have the right to enforce against such subsequently created interest the lien for the purpose of collecting the Unit Expenditure chargeable to the subsequently created interest.

**ARTICLE 12**

**NON-UNITIZED FORMATIONS**

12.1  RIGHT TO OPERATE.  Any Working Interest Owner that now has or hereafter acquires the right to drill for and produce oil, gas or other minerals from other than the Unitized Interval shall have the right to do so notwithstanding this Agreement or the Unit Agreement.  In

exercising this right, however, the Working Interest Owner shall exercise reasonable precaution to prevent unreasonable interference with Unit Operations.  No Working Interest Owner shall produce Unitized Substances through any well drilled or operated by it.  If any Working Interest Owner drills any well into or through the Unitized Interval, the Unitized Interval shall be protected in a manner satisfactory to Working Interest Owners so that the production of Unitized Substances will not adversely be affected.

## ARTICLE 13

## TITLES

13.1   REPRESENTATIONS  AND  INDEMNITY.    Each  Working  Interest  Owner represents to the best of its knowledge and belief that it is the owner of the respective working interests set forth opposite its name in Exhibit "E," and hereby agrees to indemnify and hold harmless the other Working Interest Owners from any loss due to failure, in whole or in part, of its title to any such interest, except failure of title arising out of Unit Operations; provided that such indemnity shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed and there will be no retroactive adjustments of Unit Expenditures or allocation of proceeds.

13.2   FAILURE OF TITLE.  Should any interest or lease, or interest therein, be lost through failure of title, this Agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interest.  The party whose lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Unit Operator or the other Working Interest Owners any Unit Expenditure which it may have theretofore paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure. There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised, as of the time it is determined finally that title failure has occurred so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the interest lost.  If the proportionate interest of the other parties hereto in the Unit Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it.  Should any person not a party to this Agreement,

14

who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the Working Interest Owners who bore the costs which are so refunded. Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties whose title failed in the same proportions in which they shared in such prior production. No charge shall be borne by the Working Interest Owners or Unit Operator for legal expenses, fees or salaries, in connection with the defense of the interest claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses incurred thereby, unless such title failure be due to Unit Operations, then the loss shall be borne jointly by Working Interest Owners in proportion to their Unit Participation.

## ARTICLE 14

## LIABILITY, CLAIMS AND SUITS

14.1  INDIVIDUAL LIABILITY.  The duties, obligations, and liabilities of Working Interest Owners shall be individual and not joint or collective; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture, association, or trust among Working Interest Owners.

14.2  SETTLEMENTS.  Unit Operator may settle any single damage claim or suit involving Unit Operations but not involving an expenditure in excess of Fifty Thousand Dollars ($50,000.00) provided the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above specified amount, Working Interest Owners shall assume and take over the further handling of the claim or suit unless such authority is expressly delegated to Unit Operator.  All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Unit Expenditure.  If a claim is made against any Working Interest Owner or if any Working Interest Owner is sued on account of any matter arising from Unit Operations and over which such Working Interest Owner individually has no control because of the rights given Working Interest Owners and Unit Operator by this Agreement and the Unit Agreement, the claim or suit shall be treated as any other claim or suit involving Unit Operations.

14.3  INDEMNIFICATION.

14.3.1  Working Interest Owners agree to indemnify and hold Unit Operator harmless from any and all losses, damages, injuries, claims and causes of action arising out of, incident to, or

resulting directly or indirectly from Unit Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy, Federal Energy Regulatory Commission, State Oil and Gas Board of Alabama or  Alabama Department of Environmental Management or predecessor or successor agencies to the extent Unit Operator's interpretation or application of such rules, rulings, regulations or orders was made in good faith.  Working Interest Owners further agree to reimburse Unit Operator for their proportionate share of any amounts Unit Operator may be required to refund, rebate or pay as a result of an such incorrect interpretation or application of the above-noted rules, rulings, regulations or orders together with the Working Interest Owner's proportionate part of interest and penalties owing by Unit Operator as a result of such incorrect interpretation or application of such rules, rulings, regulations, or orders.

14.3.2   Notwithstanding anything to the contrary contained in this Unit Operating Agreement, in the Accounting Procedure made a part thereof, or in any other attachment hereto or thereto, it is specifically agreed that all costs, liabilities, obligations, and expenses, including, but not limited to, court costs, litigation expenses, expenses incurred in administrative proceedings, attorney's fees, fines, penalties, judgments, and orders incurred by or levied, granted, or issued to or against Unit Operator by any Federal or State court, administrative body, or other agency with respect to violations or alleged violations of, or actions or inactions contrary to, any Federal or State laws, rules and regulations, or any one or more of them, pertaining to pollution, environmental protection, Fair Labor Standards, safety and occupational injuries shall be considered a Unit Expenditure to be paid, respectively, by the parties to this Unit Operating Agreement in the same manner as other Unit Expenditures are allocated and paid, save and except only in those cases where Unit Operator has been proven guilty of gross negligence or willful misconduct causing the costs,  liabilities, obligations, or expenses involved.

## ARTICLE 15

### INTERNAL REVENUE PROVISION

15.1  INTERNAL REVENUE PROVISION.  Notwithstanding any provisions herein that the rights and liabilities of the parties hereunder are several and not joint or collective, or that this Agreement and the operations hereunder shall not constitute a partnership, if for Federal income tax purposes this Agreement and the operations hereunder are regarded as a partnership, then each of the parties hereto hereby elects to be excluded from the applications of all of the provisions of

Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986 as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder. Unit Operator is hereby authorized and directed to execute on behalf of each of the parties hereto such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Federal Regulations 1.761-1(a). Should there by any requirement that each party hereto further evidence this election, each party hereto agrees to execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. Each party hereto further agrees not to give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the State of Alabama, or any future income tax law of the United States contain, or shall hereafter contain, provisions similar to those contained in Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of said Subchapter K is permitted, each of the parties hereto hereby makes such election or agrees to make such election as may be permitted by such laws. In making this election, each of the parties hereto hereby states that the income derived by it from the operations under this Agreement can be adequately determined without the computation of partnership taxable income.

## ARTICLE 16

### NOTICES

16.1    GIVING AND RECEIVING NOTICES.    All notices shall be in writing and delivered in person or by mail, email, overnight delivery service or facsimile; however, if a drilling rig is on location and standby charges are accumulating, such notices shall be given by (i) facsimile or email or (ii) by telephone, and immediately confirmed in writing. Notice shall be deemed given only when received by the Party to whom such notice is directed, except that any notice by overnight delivery service, properly addressed (pursuant to Section 4.1) and marked for next day delivery, with all charges prepaid shall be deemed given twenty-four (24) hours after such notice is delivered to a national overnight delivery service.

16.2    CONTENT OF NOTICE.    Any notice that requires a response shall indicate the maximum time allowed for responding as specified in elsewhere in this Agreement or the Unit

Agreement.  If a proposal involves a well operation, the notice shall include the proposed depth, the objective zone or zones to be tested, the surface and bottom-hole locations, the equipment to be used, and the estimated costs of the operation including all necessary expenditures through installation of the wellhead.

16.3    RESPONSE TO NOTICES.  Each Party's response to a proposal shall be in writing to the Unit Operator.  The maximum response time shall be thirty (30) days; however, if a drilling rig is on location and standby charges are accumulating, the maximum response time to a notice pertaining to such drilling rig shall be forty-eight (48) hours, inclusive of Saturday, Sunday and legal holidays.

16.4    FAILURE TO RESPOND.  Failure of any Party to respond to a notice within the required period shall be deemed to be a negative vote.

## ARTICLE 17

## WITHDRAWAL OF WORKING INTEREST OWNER

17.1  WITHDRAWAL.  A Working Interest Owner may withdraw from this Agreement by transferring, without warranty of title, either express or implied, to the other Working Interest Owners who do not desire to withdraw and are willing to accept such transfer, all of its Oil and Gas Rights, exclusive of Royalty interests, together with its interest in all Unit Equipment and in all wells used in Unit Operations.  Such transfer shall not relieve said Working Interest Owner from any obligation or liability incurred or resulting from an event which occurred prior to the first day of the month following receipt by Unit Operator of such transfer.  The interest transferred shall be owned by the transferees in proportion that the Unit Participation of each transferee bears to the Unit Participation of all transferees who are willing to accept such transfer, or as may be agreed among the transferees.  The transferees, in proportion to the respective interests so acquired, shall pay transferor, for its interest in Unit Equipment, the fair salvage value thereof as estimated and agreed upon by Working Interest Owners less such transferor's share of the estimated cost of salvaging same and of plugging and abandoning all wells then being used or held for Unit Operations.  In the event such withdrawing owner's interest in the aforesaid salvage value is less than such owner's share of such estimated costs, the withdrawing owner, as a condition precedent to withdrawal, shall pay the Unit Operator, for the benefit of Working Interest Owners succeeding to its interest, a sum equal to the deficiency.  Within sixty (60) days after receiving delivery of the

transfer, Unit Operator shall render a final statement to the withdrawing owner for its share of Unit Expenditure, including any deficiency in salvage value, as determined by Working Interest Owners, incurred as of the first day of the month following the date of receipt of the transfer.  Provided all Unit Expenditures, including any deficiency hereunder, due from the withdrawing owner has been paid in full within thirty (30) days after the rendering of such final statement by the Unit Operator, the transfer shall be effective the first day of the month following receipt of said transfer by Unit Operator and, as of such effective date, the withdrawing Working Interest Owner shall be relieved from all further obligations and liability hereunder and under the Unit Agreement, and the rights of such Working Interest Owner hereunder and under the Unit Agreement shall cease insofar as they existed by virtue of the interest transferred.

17.2  LIMITATION ON WITHDRAWAL.  Notwithstanding anything set forth in Section 17.1, Working Interest Owners may refuse to permit the withdrawal of a Working Interest Owner if its Working Interest is burdened by any royalties, overriding royalties, production payments, net proceeds interest, carried interest or any other interest created out of the Working Interest in excess of twenty-five percent (25%), unless the other Working Interest Owners willing to accept the assignment agree to accept the Working Interest subject to such burdens.

17.3  ASSIGNMENT OF INTEREST.  Notwithstanding any Provision in this Article 17 to the contrary, nothing herein shall preclude one or more Working Interest Owners from transferring or assigning to another Working Interest Owner or Owners or a third party all or part of its or their interest in the Unit provided any such assignment is made subject to the Unit Agreement and this Unit Operating Agreement.

## ARTICLE 18

## ABANDONMENT OF WELLS

18.1  RIGHTS OF FORMER OWNERS.  If Working Interest Owners decide to abandon permanently any well within the Unit Area prior to termination of the Unit Agreement, Unit Operator shall give written notice thereof to the Working Interest Owners of the Tract on which the well is located, and they shall have the option for a period of fifteen (15) days after the sending of such notice, or twenty-four (24) hours, inclusive of Saturday, Sunday, or legal holidays if a rig is on location, to notify Unit Operator in writing of their election to take over and own the well and to deepen or plug-back the well to a formation other than the Unitized Interval.  The absence of a reply

from one or more Working Interest Owners during such fifteen (15) day or 24 hour (as applicable) period shall be conclusively presumed to be an election NOT to take over such well. Within ten (10) days after the Working Interest Owners of the Tract have notified Unit Operator of their election to take over the well, they shall pay Unit Operator, for credit to the Working Interest Owners, the amount estimated by Working Interest Owners to be the net salvage value of the casing and equipment in and on the well to be transferred. The Working Interest Owners of the Tract, by taking over the well, agree to seal off effectively and protect the Unitized Interval, and upon abandonment to plug the well at their sole cost, risk and expense in compliance with applicable laws and regulations.

18.2   PLUGGING.  If the Working Interest Owners of a Tract do not elect to take over a well located thereon which is proposed for abandonment, Unit Operator shall plug and abandon the well at the expense of the Working Interest Owners in compliance with applicable laws and regulations.

## ARTICLE 19

## EFFECTIVE DATE AND TERM

19.1   EFFECTIVE DATE.  This Agreement shall become effective on the date and at the time that the Unit Agreement becomes effective, and on such date, this Unit Operating Agreement shall supersede, replace and be used in lieu of any Operating Agreements currently in force and effect governing and controlling operations on the Tracts, or any one or more thereof, insofar and only insofar as (i) any such existing Operating Agreements cover the Unitized Interval and (ii) are in conflict with  or otherwise inconsistent with the terms of this Agreement and/or the Unit Agreement. Except as provided in the preceding sentence any currently effective Operating Agreements that cover all or any portion of any of the Tracts shall remain in effect.

19.2   TERM.  This Agreement shall continue in effect so long as the Unit Agreement remains in effect, and thereafter until (a) all unit wells have been abandoned and plugged or turned over to Working Interest Owners in accordance with Article 20, (b) all Unit Equipment and real property acquired for Unit Operations have been disposed of by Unit Operator in accordance with instructions of Working Interest Owners, and (c) there has been a final accounting.

## ARTICLE 20

## ABANDONMENT OF OPERATIONS

20.1  TERMINATION.  Upon termination of the Unit Agreement, the following will occur:

20.1.1  OIL AND GAS RIGHTS.  Oil and Gas Rights in and to each separate Tract shall no longer be affected by this Agreement, and thereafter the parties shall be governed by the terms and provisions of the leases, contracts and other instruments affecting the separate Tracts.  Ownership and possession of all Oil and Gas in and under and all Oil and Gas Rights in and to the several separate tracts shall revert to the Working Interest Owners thereof.

20.1.2  RIGHT TO OPERATE.  Working Interest Owners of any Tract that desire to take over and continue to operate wells located thereon may do so by paying Unit Operator, for credit to the Working Interest Owners, the net salvage value of the casing and equipment in and on the wells taken over, as estimated by Working Interest Owners, and by agreeing to plug each well in compliance with applicable laws at such time as it is abandoned.

20.1.3  SALVAGING WELLS.  Unit Operator shall salvage as much of the casing and equipment in or on wells not taken over by Working Interest Owners of separate Tracts as can economically and reasonably be salvaged, and shall cause the wells to be plugged and abandoned in compliance with applicable laws and regulations.

20.1.4  COST OF SALVAGE.  Working Interest Owners shall share the cost of salvaging, liquidation or other distribution of assets and properties used in Unit Operation in proportion to the respective Unit Participation.

20.1.5  DISTRIBUTION OF ASSETS.  Working Interest Owners shall share in the distribution of Unit Equipment, or the proceeds thereof, in proportion to their Unit Participations.

20.1.6  COST OF ABANDONMENT AND SURFACE RESTORATION.  The cost of abandonment of Unit Operations and surface restoration of the Unit Area shall be a Unit Expenditure.

## ARTICLE 21

## EXECUTION

21.1  ORIGINAL, COUNTERPART OR OTHER INSTRUMENT.  A Working Interest Owner may become a party to this Agreement by signing the original of this instrument, a counterpart thereof, or other instrument ratifying and agreeing to be bound by the provisions hereof.  The signing of any such instrument shall have the same effect as if all the parties had signed the same instrument.  All signature pages to this Agreement or counterparts hereof that are executed by

Working Interest Owners may be attached to one copy of this Agreement.

## ARTICLE 22

## SUCCESSORS AND ASSIGNS.

22.1  SUCCESSORS AND ASSIGNS.  The provisions hereof shall be covenants running with the lands, leases and interests covered hereby, and shall be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors and assigns of the parties hereto.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the dates opposite their respective signatures.

[SIGNATURE PAGES FOLLOW]

UNIT OPERATING AGREEMENT

FISHPOND OIL UNIT

FISHPOND FIELD

ESCAMBIA COUNTY, ALABAMA


UNIT OPERATOR


SKLAR EXPLORATION COMPANY L.L.C.

ATTEST:

_____        By: _____
Its:_____        Its: _____


NON-OPERATORS
WORKING INTEREST OWNERS

*[Individual]*

ATTEST                SIGNATURE                    DATE

_____        _____        _____

*[Trustee]*

ATTEST                SIGNATURE                    DATE

_____        _____        _____
                      As Trustee of the following trust:


*[Legal entity]*          ENTITY NAME:

ATTEST                _____        DATE

_____        By_____        _____
                      Its_____

UNIT OPERATING AGREEMENT

FISHPOND OIL UNIT

FISHPOND FIELD

ESCAMBIA COUNTY, ALABAMA


UNIT OPERATOR


SKLAR EXPLORATION COMPANY L.L.C.

ATTEST:

Its: _Controller_          By: _____
                          Its: PRESIDENT - CHIEF
                              OPERATING OFFICER

NON-OPERATORS
WORKING INTEREST OWNERS

*[Individual]*

ATTEST                    SIGNATURE                DATE

_____          _____          _____

*[Trustee]*

ATTEST                    SIGNATURE                DATE

_____          _____          _____

                         As Trustee of the following trust:

*[Legal entity]*         ENTITY NAME:

                         SKLARCO L.L.C.

ATTEST                                            DATE
                         By: _____  5-A-15
_____          Its: PRESIDENT - CHIEF
                              OPERATING OFFICER

23

COPAS 2005 Accounting Procedure
Recommended by COPAS

c o p a s

### Exhibit "F–"
## ACCOUNTING PROCEDURE
## JOINT OPERATIONS

Attached to and made part of _the Operating Agreement dated as of May 15, 2015, if required_ Oil Unit

## I. GENERAL PROVISIONS

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

1. **DEFINITIONS**

   All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement.

   **"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

   **"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

   **"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

   **"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

   **"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

   **"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to identify serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

   **"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

   - Responsibility for field employees and contract labor engaged in activities that can include: field operations, maintenance, construction, well remedial work, equipment movement and drilling
   - Responsibility for day-to-day direct oversight of rig operations
   - Responsibility for day-to-day direct oversight of construction operations
   - Coordination of job priorities and approval of work procedures
   - Responsibility for optimal resource utilization (equipment, Materials, personnel)
   - Responsibility for meeting production and field operating expense targets
   - Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
   - Responsibility for all emergency responses with field staff
   - Responsibility for implementing safety and environmental practices
   - Responsibility for field adherence to company policy
   - Responsibility for employment decisions and performance appraisals for field personnel
   - Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders

   **"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

   **"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

1

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

"**Joint Property**" means the real and personal property subject to the Agreement.

"**Laws**" means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"**Non-Operators**" means the Parties to the Agreement other than the Operator.

"**Offshore Facilities**" means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, docks, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located Offshore.

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

"**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

"**Operator**" means the Party designated pursuant to the Agreement to conduct the Joint Operations.

"**Parties**" means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

"**Participating Interest**" means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees to or is otherwise obligated to pay and bear.

"**Participating Party**" means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

"**Personal Expenses**" means reimbursed costs for travel and temporary living expenses.

"**Railway Receiving Point**" means the railroad nearest the Joint Property for which freight rates are published, even though an actual railroad may not exist.

"**Shore Base Facilities**" means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials, debarkation point for drilling and production personnel and services, communication, scheduling and dispatching center, and other associated functions serving the Joint Property.

"**Supply Store**" means a recognized source or common stock point for a given Material item.

"**Technical Services**" means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations, provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (Overhead). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

## 2. STATEMENTS AND BILLINGS

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section 4.2 and/or Section 1.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

2

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

## c o p a s

**3.  ADVANCES AND PAYMENTS BY THE PARTIES**

A.  Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing in advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.  Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1)  being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2)  being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3)  being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4)  charges outside the adjustment period, as provided in Section 4 (Adjustments).

**4.  ADJUSTMENTS**

A.  Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within that period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section 1.5 (Expenditure Audits).

B.  All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section 4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1)  a physical inventory of Controllable Material as provided for in Section V (Inventories of Controllable Material); or

(2)  an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property; or

(3)  a government/regulatory audit; or

(4)  a working interest ownership or Participating Interest adjustment.

**5.  EXPENDITURE AUDITS**

A.  A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section 1.4 (Adjustments). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for each hydrocarbon or they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

3

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis, however, the timely (90) day time period shall not exceed the twenty-four (24) month requirement for taking specific detailed written exception as required in Section 14 A (Adjustments) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") itself, with respect to the claims made therein, precludes the Operator from asserting a statute of limitations defense against such claim, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for as long as any Non-Operator exercises its comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section 1.5.B or 1.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section 1.5.B or 1.5.C.

B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.5.B (Advances and Payments by the Parties).

C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section 1.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section 1.5.B (Advances and Payments by the Parties).

D.   If any Party fails to meet the deadlines in Sections 1.5.B or 1.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section 1.5.D or it may revoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and position of the Non-Operators participating throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be deferred to subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional relief, if to its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.   ☑ Optional Provision - Forfeiture Penalties:
If the Non-Operators fail to meet the deadline in Section 1.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Sections 1.5.B or 1.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made without interest to the Joint Account.

6.   APPROVAL BY PARTIES

A.   GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

4

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section 1.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section 1.6.B.

B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____ two (____ 2 ___) or more Parties, one of which is the Operator, having a combined working interest of at least _____ sixty-seven ___ percent (___ 67 ___%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C. AFFILIATES

For the purpose of administering the voting procedures of Sections 1.6.A and 1.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest of Participating Interest of such Affiliates.

For the purpose of administering the voting procedures in Sections 1.6.A, if a Non-Operator is an Affiliate of the Operator, vote under Section 1.6.A shall remove the interest in interest of the Non-Operator, after including the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1. RENTALS AND ROYALTIES

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2. LABOR

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations.

(2) Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (Equipment and Facilities Furnished by Operator) or are not a function covered under Section III (Overhead).

(3) Operator's employees providing First Level Supervision.

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (Overhead).

(5) Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (Overhead).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (General Matters).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

5

D.  Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.  Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (General Matters).

F.  Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.  Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and .F, based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.  Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

## 3.  MATERIAL

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material Purchases, Transfers, and Dispositions). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

## 4.  TRANSPORTATION

A.  Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.  Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below.

(1)  If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2)  If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, demurrage, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

## 5.  SERVICES

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (Overhead), or Section II.7 (Affiliates), or excluded under Section II.9 (Legal Expense). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (Overhead).

## 6.  EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.  The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (Labor). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____ eight _____ percent ( ____ 8 %) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.5.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.5.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

## 7.   AFFILIATES

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_____. If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (General Matters).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (General Matters), if the charges exceed $_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (Communications).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established in the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

## 8.   DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operators written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

## 9.   LEGAL EXPENSE

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (General Matters) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for preserving abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

## 10.   TAXES AND PERMITS

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

7

**c o p a s**

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding all indirect or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*)

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

## 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

## 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from personnel (outside as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

## 14. ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

## 15. OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*)

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controlled Material*)
- procurement
- administration
- accounting and auditing
- pit dispatching

c o p a s

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before, or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall exclude the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

I. **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

- ☒ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
- ☐ **(Alternative 2)** Percentage Basis, Section III.1.C

A. TECHNICAL SERVICES

(i) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead - Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for On-site Technical Services, including third party Technical Services:

- ☒ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

- ☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

(ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead - Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for Off-site Technical Services, including third party Technical Services:

- ☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

- ☒ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

- ☐ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B. OVERHEAD—FIXED RATE BASIS

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 15,527.02 _____ (prorated for less than a full month)

Producing Well Rate per month $ 1,594.01 _____

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

9

c o p a s

(b)   Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations commence, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)   Application of Overhead—Producing Well Rate shall be as follows:

(a)   An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b)   Each active completion in a multi-completion well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c)   A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections II.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d)   An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e)   Any well not meeting the criteria set forth in Sections III.1.B.(1) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)   The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C.   OVERHEAD—PERCENTAGE BASIS

(1)   Operator shall charge the Joint Account at the following rates:

(a)   Development Rate _____ percent (____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (Legal Expense) and all Material salvage credits;

(b)   Operating Rate _____ percent (____) % of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (Rentals and Royalties) and II.9 (Legal Expense), all Material salvage credits, the value of substances purchased for enhanced recovery, all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2)   Application of Overhead—Percentage Basis shall be as follows:

(a)   The Development Rate shall be applied to all costs in connection with:

[i]   drilling, redrilling, sidetracking, or deepening of a well
[ii]   a well undergoing plugback or workover operations for a period of five (5) or more consecutive work days
[iii]   preliminary expenditures necessary in preparation for drilling
[iv]   expenditures incurred in abandoning when the well is not completed as a producer
[v]   construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (Overhead–Major Construction and Catastrophe)

(b)   The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (Overhead–Major Construction and Catastrophe).

2.   OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernable as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

   (1)   ____5____ % of total costs if such costs are less than $100,000; plus

   (2)   ____3____ % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)   ____1____ % of total costs in excess of $1,000,000

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

   (1)   ____5____ % of total costs if such costs are less than $100,000; plus

   (2)   ____3____ % of total costs in excess of $100,000 but less than $1,000,000; plus

   (3)   ____1____ % of total costs in excess of $1,000,000

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be excluded. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (Labor), II.5 (Services), or II.7 (Affiliates), the provisions of this Section III.2 shall govern.

**3.   AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (Amendments).

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1.   DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the material can be used as for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

**2.   TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from it storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (Disposition of Surplus) and the Agreement to which this Accounting Procedure is attached.

**A.   PRICING**

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used as the standard of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (General Matters). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multipliers (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

   (a)   For all country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special coils) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (Freight).

   (b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (Freight).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

**B.   FREIGHT**

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for all country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special oil items shall be calculated from the mills shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for structural tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special and tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property, are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (Transportation) of this Accounting Procedure.

**C.   TAXES**

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.
c o p a s

3. CONDITION

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (Pricing), IV.2.B (Freight), and IV.2.C (Taxes). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (General Matters). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external cleaning and wrapping, will be credited on new Material provided these services were not reported for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (Pricing), IV.2.B (Freight), and IV.2.C (Taxes) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (Pricing), IV.2.B (Freight), and IV.2.C (Taxes) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, and Material transferred from the Joint Property that was not placed in service on the property shall be credited or charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (Pricing), IV.2.B (Freight), and IV.2.C (Taxes) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose, but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe, shall be priced at used line pipe prices. Casing, tubing, or drill pipe used at higher pressure service from that standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. In other cases, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (General Matters).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

(1) Preparation Costs

Subject to Section II (Direct Charges) and Section III (Overhead) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of services. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (Direct Purchases) or IV.2.A (Pricing), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**c o p a s**

3. **DISPOSITION OF SURPLUS**

Surplus Material in this Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (Transfers).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (Transfers), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4. **SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (Transfers) or Section IV.3 (Disposition of Surplus), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (Pricing) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (Transfers). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (Transfers) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

14

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

c o p a s

## 1. DIRECTED INVENTORIES

Physical inventories shall be performed by the Operator upon written request of a majority or a working interest of the Non-Operators (hereinafter, "directed inventory"), provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account, provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section 1.6.A (General Matters). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expense for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

## 2. NON-DIRECTED INVENTORIES

### A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

### B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

### C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (Directed Inventories), V.2.A (Operator Inventories), or V.2.B (Non-Operator Inventories), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (Directed Inventories).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

15

EXHIBIT "G"
UNIT OPERATING AGREEMENT
FISHPOND OIL UNIT
INSURANCE

Unit Operator shall maintain for the benefit of all Working Interest Owners insurance of the types and with limits as designated below. Such insurance may carry reasonable deductibles or self-insured retention limits, not to exceed $200,000, as determined by Unit Operator. Deductibles and self-insured retention limits shall be borne by the Working Interest Owners in the proportion in which they own in the Unit Area. Actual net premiums for such insurance shall be charged to the Joint Account, and the Unit Operator shall credit the Working Interest Owners with any refunds, bonuses or other credits.

Working Interest Owners acknowledge that Unit Operator and/or other Working Interest Owners may carry insurance with limits and insured risks greater than as herein provided, and that any such additional limits and additional protections are for the benefit only of the party carrying and maintaining such additional limits or kinds of insurance. Other Working Interest Owners shall not bear any part of the premium for any such additional limits or kinds of insurance that may be maintained by Unit Operator and other Working Interest Owners for the benefit only of the Unit Operator or other Working Interest Owner.

Working Interest Owners shall be named as Additional Insureds on the liability insurance policies provided below, but only with respect to the performance of the work under the Unit Operating Agreement and only to the limits shown in this agreement. This insurance shall be primary to any insurance carried by Working Interest Owners.

All such insurance shall be carried by an insurer or insurers acceptable to Unit Operator and shall be maintained in full force and effect during the term of this Agreement. If so requested, Unit Operator agrees to furnish or cause to be furnished to each of the Working Interest Owners certificates of insurance evidencing such insurance coverage.

Working Interest Owners agree that the limits and coverage set forth herein are adequate as of the effective date hereof. In the event that Unit Operator is unable to procure and maintain any of the insurance as herein provided, Unit Operator shall give prompt written notice to Working Interest Owners, and such notice, which shall be effective 30 days after receipt shall constitute a waiver of the requirement that Unit Operator procure and maintain the insurance which is the subject of the notice. Any liabilities resulting from accidents or occurrences not covered by the following insurance, or for which insurance is not available, or in excess of the limits of insurance as herein provided, shall be borne by the Working Interest Owners in the proportion in which they own in the Unit Area unless arising out of the gross negligence or willful misconduct of the Unit Operator.

Unit Operator and Working Interest Owners agree to mutually waive Subrogation in favor of each other on all insurance carried by each party and/or to obtain such waiver from the insurance carrier if so required by the insurance contract. If such a waiver is not obtained, the party failing to do so shall indemnify the other party against any claim by an insurance carrier arising out of Subrogation.

UNIT OPERATOR'S INSURANCE REQUIREMENTS:

a.  Workers Compensation insurance in full compliance with all applicable state and federal laws and regulations.

b.  Employer's Liability insurance in the limits of $1,000,000 per accident covering injury or death to any employee who may be outside the scope of the Workers Compensation statute of the state in which the work is performed.

c.  Commercial (or Comprehensive) General Liability insurance with combined single limits per occurrence (and any general aggregate if applicable) of $1,000,000 for Bodily Injury and Property Damage, including Property Damage due to Blowout and Cratering, Completed Operations, and Broad Form Contractual Liability as respects any written contract into which the Unit Operator may enter under the terms of this agreement.

d.  Automobile Liability insurance covering owned, non-owned and hired automotive equipment with limits for Bodily Injury and Property Damage of $1,000,000.

e.  Unit Operator shall carry Control of Well insurance covering the costs of controlling a Blowout, the expenses involved to redrilling or restoring the well, and certain other related costs. (These are descriptive terms only and exact coverage can be found only in the policy.) The limit for this insurance is $7,500,000.00 for drilling and $1,000,000.00 for producing and shut-in per occurrence with a deductible/self-retention limit as determined reasonable by Unit Operator not to exceed $200,000. Working Interest Owners not wishing to be covered under this policy must notify Unit Operator prior to spud date and provide evidence of satisfactory insurance with minimum limits in the amounts hereinabove provided, and by such refusal of coverage each such Working Interest Owner agrees to be responsible for his proportionate share of such loss, and the Unit Operator agrees not to charge each such Working Interest Owner for any of the premiums associated with Control of Well insurance.

f.  Excess Liability Insurance, umbrella form, with limits of Five Million dollars ($5,000,000) for each occurrence and Ten Million dollars ($10,000,000) aggregate.

g.  Property insurance covering loss or damage to Unit Equipment in such amounts as Operator shall, in its sole discretion, deem reasonable considering the nature, age and value of the equipment, the cost of replacement equipment, and the cost and availability of such insurance.

EXHIBIT "H"

Fishpond Oil Unit
Unit Operating Agreement

GAS BALANCING AGREEMENT

Subject to and under the terms of the above described Unit Operating Agreement (hereinafter "Operating Agreement"), the parties hereto own and are entitled to share in the Unitized Substances and Outside Substances produced from the wells in the Unit Area. Capitalized terms used herein shall have the meaning ascribed to them in the Operating Agreement.

Each party shall have the right, but not the obligation, to make arrangements to sell or utilize its share of the gas produced from the Unitized Interval ("gas"). However, one or more of the parties may be unable to take or market its interest in the gas production from time to time, therefore, to permit any party to produce and dispose of its interest in the gas production from the Unitized Interval with as much flexibility as possible, the parties hereto agree to the storage and balancing agreement herein set forth.

1.

Subject to the provisions of the Operating Agreement to which this Exhibit is attached, during the period or periods when any party hereto has no market for, or its purchaser is unable to take or if any party elects not to take its share of gas, the other parties, or any of them, shall be entitled to produce and take said share, and each of such taking parties shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participation percentages of all taking parties. All parties hereto shall share in and own the condensate and other liquids recovered by lease equipment at the well in accordance with their respective interest, but each party taking such gas shall own all of the gas delivered to its purchaser. Any party whose share of gas is not marketed (either by the party or by the Unit Operator for the party) shall be credited with gas in storage equal to its share of the gas produced, less its share of the gas used in lease operation, vented or lost. Unit Operator shall maintain a current account of the gas balance between the parties and shall furnish all parties herein statements showing the total quantity of gas produced, used in lease operations, vented or lost, and the total quantity of condensate recovered.

2.

After notice to Unit Operator, any party may begin taking or delivering its share of the gas produced in addition to its share, each party, until it has recovered its gas in storage and balanced its gas account, shall be entitled to take or deliver a volume of gas equal to fifty percent (50%) of each overproduced party's share of gas produced. If more than one party is entitled to the stated volume of the overproduced parties' share of gas, each shall have the right to take all or any part of its pro rata share thereof, said pro rata share being based on the ratio of its participation percentage under this Operating Agreement to the participating percentages of all entitled parties. Each party shall at all times use its best efforts to regulate its takes and deliveries from the Unit Area so the lease will not be shut-in for overproducing the allowable, if any, assigned thereto by the regulatory body having jurisdiction.

3.

At all times while gas is produced from the Unitized Interval, any party taking or marketing gas shall furnish to the Unit Operator monthly reports of the volumes of gas delivered to its purchaser during the preceding month and to the revenue attributable thereto, and any such party shall pay to the Unit Operator a percentage of the proceeds of such sale equal to the aggregate percentage of any and all royalties and overriding royalties which are payable on gas produced by any such party, and Unit Operator will, in turn, make settlement for all royalties and overriding royalties which are payable on gas produced from the Unitized Interval. In the event that the total royalties and overriding royalties so paid to the Unit Operator be insufficient to discharge royalty and overriding royalty obligations on gas produced and marketed from the Unitized Interval, then any such deficiency will be borne by the party whose interest is burdened by the royalty or overriding royalty as to which the deficiency was asserted. Any party or parties contributing separate leases to the Unit Area shall furnish the Unit Operator with division order title opinions on which Unit Operator shall be entitled to rely in making distribution of royalties and overriding royalties share of production of liquid hydrocarbons recovered from the gas by lease equipment.

4.

Any party producing and taking or delivering gas to the purchaser shall pay any and all production taxes due on such gas. Also, any party producing and taking or delivering gas to its purchaser shall pay, or

-- 1 --

cause to be paid, royalty and other obligations payable out of production due to its royalty owners based on the volume of gas actually taken for its account.

5.

Nothing herein shall be construed to deny any party the right, from time to time, to produce and take or deliver to the purchaser its full share of the allowable gas production to meet the deliverability tests required by its purchaser.

6.

Should production of gas from the Unitized Interval be permanently discontinued before the gas account is balanced, cash settlement will be made between the underproduced and overproduced parties. In making such cash settlement, each overproduced party shall make payment to Unit Operator along with sufficient accounting documentation as hereinafter described and Unit Operator shall make disbursement to the underproduced parties. In making such settlement, the underproduced party or parties will be paid a sum of money by the overproduced party or parties attributable to the overproduction which said overproduced party sold, less applicable production taxes and royalties theretofore paid, less any reasonable dehydration, compression, treating, processing, gathering or transportation costs actually incurred, including amortized capital costs associated with the design, construction or operation of any plants to dehydrate, compress, treat or process gas, in connection with the sale of the overproduction, at the price and based on the proceeds actually received by the overproduced party at the time and from time to time the overproduced party delivered and sold that portion of production that was attributable to the share of the underproduced party. For gas taken but not sold, settlement shall be based on the price which the taking party would have received under its purchase agreement if the gas had been sold at the time taken, or, in absence of a contract, at the weighed average price of the parties selling gas at the time the gas was taken.

In the event any gas sold under this Agreement is subject to a regulated price by the FERC or a successor agency or governmental authority with jurisdiction thereover, the price basis shall be the rate collected, from time to time, which is not subject to possible refund, as provided by NGPA or as required by the FERC pursuant to the final determination, order, or settlement applicable to the gas sold from any reservoir (other than the general refund obligation of 18 CFR Section 273.301 or its successor regulation and the potential refund obligations arising from the lack of absolute finality provided by Section 502 (d) (1) and (2) of the NGPA plus any additional collected amount to be accounted for at such time as final determination is made with respect thereto but shall not exceed their contractually entitled price of the underproduced party). Notwithstanding the foregoing, should the underproduced party desire to receive such additional collected amount which is subject to possible refund pending the issuance of said final determination, order, or settlement, such underproduced party shall be entitled to the payment thereof from the overproduced party of parties upon the underproduced party executing and delivering to said overproduced party or parties an acceptable agreement in which the underproduced party agrees to repay to the overproduced party of parties that amount so paid that is required by said final determination, order, or settlement to be refunded, plus the interest thereon specified in the pertinent Order of the Commission.

Notwithstanding anything within this Agreement to the contrary, in no event shall an underproduced party be entitled to an overproduction payment which is attributable to a price which was higher than the underproduced party could have collected under the term of its gas purchase contract, if in existence, at the time the gas was taken by the overproduced party. Further, no overproduced party shall ever be required to make an overproduction payment to any underproduced party, which exceeds the amount the overproduced party actually received for the gas at the time it was produced.

7.

This Agreement shall be and remain in force and effect for a term concurrent with the term of that certain Unit Operating Agreement between the parties described above to which it comprises the exhibit noted hereinabove.

8.

Nothing herein shall change or affect each party's obligation to pay its proportionate share of all costs and liabilities incurred in Unit operations as its share thereof is set forth in the above described Operating Agreement nor shall it change or affect any rights or obligations of any party under the Unit Agreement referenced in the Operating Agreement.

9.

The terms, covenants and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. The parties hereto agree to give notice of the existence of this agreement to any successor to interest and make any transfer of any interest in the lease or any part thereof subject to the terms of this Agreement.

-2-

# EXHIBIT C
# FISHPOND UNIT
# NET REVENUE
# AND WORKING
# INTEREST OWNERSHIP

## FISHPOND OIL UNIT

STATE OIL AND GAS BOARD

Exhibit No. _C_

Petition By _Sklar_

Item No. _12_ Date _6/23/15_

Testimony Of _Jones_

_MR_

EXHIBIT C
FISHPOND UNIT NEW REVENUE AND
WORKING INTEREST OWNERSHIP

Summary of Unit Net Revenue Interests

## GROSS WORKING INTERESTS

| | | Gross Working Interest | Trust Factor | UNIT Gross Working Interest |
|---|---|---|---|---|
| **Trust 1** | | | | |
| Sklarco L.L.C. | W | 24.837500% | 0.25769642 | 6.400535% |
| JJS Interests Escambia, LLC | W | 18.193750% | 0.25769642 | 4.688464% |
| Resource Ventures, LLC | W | 0.093750% | 0.25769642 | 0.024159% |
| Dickson Oil & Gas, LLC | W | 0.875000% | 0.25769642 | 0.225484% |
| Fant Energy Limited | W | 8.750000% | 0.25769642 | 2.254844% |
| J.F. Howell Interests, LP | W | 4.000000% | 0.25769642 | 1.030786% |
| Bandera Investment Co., LLC | W | 1.000000% | 0.25769642 | 0.257696% |
| Marksco, L.L.C. | W | 1.750000% | 0.25769642 | 0.450969% |
| Tiembo Ltd. | W | 1.500000% | 0.25769642 | 0.386545% |
| Craft Exploration Co., LLC | W | 0.750000% | 0.25769642 | 0.193272% |
| Kudzu Oil Properties, LLC | W | 1.500000% | 0.25769642 | 0.386545% |
| Landmark Exploration, LLC | W | 1.500000% | 0.25769642 | 0.386545% |
| Michael K. Pickens, as Trustee of the MKP G-S Trust | W | 3.750000% | 0.25769642 | 0.966362% |
| Tauber Exploration & Production Co. | W | 1.875000% | 0.25769642 | 0.483181% |
| McCombs Energy, Ltd. | W | 20.250000% | 0.25769642 | 5.218353% |
| The Rudman Partnership | W | 9.375000% | 0.25769642 | 2.415904% |
| **Trust 2** | | | | |
| Sklarco L.L.C. | W | 27.510135% | 0.54750789 | 15.062003% |
| JJS Interests Escambia, LLC | W | 18.193750% | 0.54750789 | 9.961223% |
| Simco Energy, LLC | W | 1.957721% | 0.54750789 | 1.071868% |
| Resource Ventures, LLC | W | 0.103840% | 0.54750789 | 0.056853% |
| Dickson Oil & Gas, LLC | W | 0.875000% | 0.54750789 | 0.479069% |
| Fant Energy Limited | W | 9.691535% | 0.54750789 | 5.306192% |
| J.F. Howell Interests, LP | W | 4.430416% | 0.54750789 | 2.425688% |
| Bandera Investment Co., LLC | W | 1.107604% | 0.54750789 | 0.606422% |
| Marksco, L.L.C. | W | 1.938307% | 0.54750789 | 1.061238% |
| Tiembo Ltd. | W | 1.661406% | 0.54750789 | 0.909633% |
| Craft Exploration Co., LLC | W | 0.750000% | 0.54750789 | 0.410631% |
| Kudzu Oil Properties, LLC | W | 1.661406% | 0.54750789 | 0.909633% |
| Landmark Exploration, LLC | W | 1.661406% | 0.54750789 | 0.909633% |
| Michael K. Pickens, as Trustee of the MKP G-S Trust | W | 4.153519% | 0.54750789 | 2.274082% |
| Tauber Exploration & Production Co. | W | 1.875000% | 0.54750789 | 1.026577% |
| McCombs Energy, Ltd. | W | 22.428911% | 0.54750789 | 12.280044% |
| **Trust 3** | | | | |
| Sklarco L.L.C. | W | 24.837500% | 0.00030999 | 0.007699% |
| JJS Interests Escambia, LLC | W | 18.193750% | 0.00030999 | 0.005640% |
| Resource Ventures, LLC | W | 0.093750% | 0.00030999 | 0.000029% |
| Dickson Oil & Gas, LLC | W | 0.875000% | 0.00030999 | 0.000271% |
| Fant Energy Limited | W | 8.750000% | 0.00030999 | 0.002712% |
| J.F. Howell Interests, LP | W | 4.000000% | 0.00030999 | 0.001240% |
| Bandera Investment Co., LLC | W | 1.000000% | 0.00030999 | 0.000310% |
| Marksco, L.L.C. | W | 1.750000% | 0.00030999 | 0.000542% |
| Tiembo Ltd. | W | 1.500000% | 0.00030999 | 0.000465% |
| Craft Exploration Co., LLC | W | 0.750000% | 0.00030999 | 0.000232% |
| Kudzu Oil Properties, LLC | W | 1.500000% | 0.00030997 | 0.000465% |
| Landmark Exploration, LLC | W | 1.500000% | 0.00030999 | 0.000465% |
| Michael K. Pickens, as Trustee of the MKP G-S Trust | W | 3.750000% | 0.00030999 | 0.001162% |
| Tauber Exploration & Production Co. | W | 1.875000% | 0.00030999 | 0.000581% |
| McCombs Energy, Ltd. | W | 20.250000% | 0.00030999 | 0.006277% |
| The Rudman Partnership | W | 9.375000% | 0.00030999 | 0.002906% |
| **Trust 4** | | | | |
| Sklarco L.L.C. | W | 24.837500% | 0.00074915 | 0.018607% |
| JJS Interests Escambia, LLC | W | 18.193750% | 0.00074915 | 0.013630% |
| Resource Ventures, LLC | W | 0.093750% | 0.00074915 | 0.000070% |
| Dickson Oil & Gas, LLC | W | 0.875000% | 0.00074915 | 0.000656% |
| Fant Energy Limited | W | 8.750000% | 0.00074915 | 0.006555% |
| J.F. Howell Interests, LP | W | 4.000000% | 0.00074915 | 0.002997% |
| Bandera Investment Co., LLC | W | 1.000000% | 0.00074915 | 0.000749% |
| Marksco, L.L.C. | W | 1.750000% | 0.00074915 | 0.001311% |

Page 1 of 14

Exhibit C
DOCKET NO. 9-5-16-114
Item # 3-2015
Prepared by: Marshall Jones

| | | | | |
|---|---|---|---|---|
| Tiembo Ltd. | W | 1.500000% | 0.00074915 | 0.001124% |
| Craft Exploration Co., LLC | W | 0.750000% | 0.00074915 | 0.000562% |
| Kudzu Oil Properties, LLC | W | 1.500000% | 0.00074915 | 0.001124% |
| Landmark Exploration, LLC | W | 1.500000% | 0.00074915 | 0.001124% |
| Pickens Financial Group, LLC | W | 3.750000% | 0.00074915 | 0.002809% |
| Tauber Exploration & Production Co. | W | 1.875000% | 0.00074915 | 0.001405% |
| McCombs Energy, Ltd | W | 20.250000% | 0.00074915 | 0.015170% |
| The Rudman Partnership | W | 9.375000% | 0.00074915 | 0.007023% |

**Tract 5**

| | | | | |
|---|---|---|---|---|
| Sklarco L.L.C. | W | 24.837500% | 0.19223051 | 4.774520% |
| JJS Interests Escambia, LLC | W | 18.193750% | 0.19223031 | 3.497390% |
| Resource Ventures, LLC | W | 0.093750% | 0.19223031 | 0.018022% |
| Dickson Oil & Gas, LLC | W | 0.875000% | 0.19223031 | 0.168202% |
| Fant Energy Limited | W | 9.750000% | 0.19223031 | 1.884015% |
| J.F. Howell Interests, LP | W | 4.000000% | 0.19223031 | 0.768921% |
| Bandera Investment Co., LLC | W | 1.000000% | 0.19223031 | 0.192230% |
| Markszo, L.L.C. | W | 1.750000% | 0.19223031 | 0.336403% |
| Tiembo Ltd. | W | 1.500000% | 0.19223031 | 0.288345% |
| Craft Exploration Co., LLC | W | 0.750000% | 0.19223031 | 0.144173% |
| Kudzu Oil Properties, LLC | W | 1.500000% | 0.19223031 | 0.288345% |
| Landmark Exploration, LLC | W | 1.500000% | 0.19223031 | 0.288345% |
| Pickens Financial Group, LLC | W | 3.750000% | 0.19223031 | 0.720864% |
| Tauber Exploration & Production Co. | W | 1.875000% | 0.19223031 | 0.360432% |
| McCombs Energy, Ltd | W | 20.250000% | 0.19223031 | 3.892664% |
| The Rudman Partnership | W | 9.375000% | 0.19223031 | 1.802159% |

**Tract 6**

| | | | | |
|---|---|---|---|---|
| Sklarco L.L.C. | W | 24.837500% | 0.00150625 | 0.037411% |
| JJS Interests Escambia, LLC | W | 18.193750% | 0.00150625 | 0.027404% |
| Resource Ventures, LLC | W | 0.093750% | 0.00150625 | 0.000141% |
| Dickson Oil & Gas, LLC | W | 0.875000% | 0.00150625 | 0.001318% |
| Fant Energy Limited | W | 9.750000% | 0.00150625 | 0.013186% |
| J.F. Howell Interests, LP | W | 4.000000% | 0.00150625 | 0.006025% |
| Bandera Investment Co., LLC | W | 1.000000% | 0.00150625 | 0.001506% |
| Markszo, L.L.C. | W | 1.750000% | 0.00150625 | 0.002636% |
| Tiembo Ltd. | W | 1.500000% | 0.00150625 | 0.002259% |
| Craft Exploration Co., LLC | W | 0.750000% | 0.00150625 | 0.001130% |
| Kudzu Oil Properties, LLC | W | 1.500000% | 0.00150625 | 0.002259% |
| Landmark Exploration, LLC | W | 1.500000% | 0.00150625 | 0.002259% |
| Pickens Financial Group, LLC | W | 3.750000% | 0.00150625 | 0.005648% |
| Tauber Exploration & Production Co. | W | 1.875000% | 0.00150625 | 0.002824% |
| McCombs Energy, Ltd. | W | 20.250000% | 0.00150625 | 0.030502% |
| The Rudman Partnership | W | 9.375000% | 0.00150625 | 0.014121% |

| | | | | |
|---|---|---|---|---|
| | | **Gross Working Interest Total** | | 100.000002% |

## NET REVENUE INTERESTS

**Tract 1**

| | | Net Revenue Interest | Tract Factor | UNIT Net Revenue Interest |
|---|---|---|---|---|
| Sklarco L.L.C. | W | 0.16082281 | 0.25769642 | 0.04144346 |
| JJS Interests Escambia, LLC | W | 0.11907869 | 0.25769642 | 0.03068600 |
| Resource Ventures, LLC | W | 0.00061359 | 0.25769642 | 0.00015812 |
| Dickson Oil & Gas, LLC | W | 0.00612500 | 0.25769642 | 0.00157839 |
| Fant Energy Limited | W | 0.06125000 | 0.25769642 | 0.01578391 |
| J.F. Howell Interests, LP | W | 0.02800000 | 0.25769642 | 0.00721550 |
| Bandera Investment Co., LLC | W | 0.00700000 | 0.25769642 | 0.00180387 |
| Markszo, L.L.C. | W | 0.01225000 | 0.25769642 | 0.00315678 |
| Tiembo Ltd. | W | 0.01050000 | 0.25769642 | 0.00270581 |
| Craft Exploration Co., LLC | W | 0.00525000 | 0.25769642 | 0.00135291 |
| Kudzu Oil Properties, LLC | W | 0.01050000 | 0.25769642 | 0.00270581 |
| Landmark Exploration, LLC | W | 0.01050000 | 0.25769642 | 0.00270581 |
| Michael K. Pickens, as Trustee of the MKP G/S Trust | W | 0.02550000 | 0.25769642 | 0.00657126 |
| Tauber Exploration & Production Co. | W | 0.01312500 | 0.25769642 | 0.00338227 |
| McCombs Energy, Ltd. | W | 0.14175000 | 0.25769642 | 0.03652847 |
| The Rudman Partnership | W | 0.06562500 | 0.25769642 | 0.01691131 |
| Sklarco L.L.C. | W | 0.17812500 | 0.54750789 | 0.09752649 |
| JJS Interests Escambia, LLC | W | 0.11907809 | 0.54750789 | 0.06519619 |
| Sinoe Energy, LLC | W | 0.01281125 | 0.54750789 | 0.00701137 |
| Resource Ventures, LLC | W | 0.00067965 | 0.54750789 | 0.00037210 |
| Dickson Oil & Gas, LLC | W | 0.00612500 | 0.54750789 | 0.00335349 |
| Fant Energy Limited | W | 0.06784074 | 0.54750789 | 0.03714334 |
| J.F. Howell Interests, LP | W | 0.03101291 | 0.54750789 | 0.01697951 |

EXHIBIT<br/>DOCKET NO. 3-3-13-12A<br/>Date: 9-3-2013<br/>Entered by: Marshal Jones

| | | | | |
|---|---|---|---|---|
| Bandera Investment Co., LLC | W | 0.00773323 | 0.54750789 | 0.00424499 |
| Markaco, L.L.C. | W | 0.01356815 | 0.54750789 | 0.00742363 |
| Tiembo Ltd. | W | 0.01162988 | 0.54750789 | 0.00636743 |
| Craft Exploration Co., LLC | W | 0.00525000 | 0.54750789 | 0.00287443 |
| Kudzu Oil Properties, LLC | W | 0.01162984 | 0.54750789 | 0.00636743 |
| Landmark Exploration, LLC | W | 0.01162988 | 0.54750789 | 0.00636743 |
| Michael K. Pickens, as Trustee of the MKP G-S Trust | W | 0.02124390 | 0.54750789 | 0.01163179 |
| Tauber Exploration & Production Co | W | 0.03312500 | 0.54750789 | 0.01813604 |
| McCombs Energy, Ltd. | W | 0.15700287 | 0.54750789 | 0.08596031 |
| Sklarco L.L.C | W | 0.16082261 | 0.00030999 | 0.00004985 |
| JJS Interests Escambia, LLC | W | 0.11907809 | 0.00030999 | 0.00003691 |
| Resource Ventures, LLC | W | 0.00061359 | 0.00030999 | 0.00000019 |
| Dickson Oil & Gas, LLC | W | 0.00612500 | 0.00030999 | 0.00000190 |
| Fant Energy Limited | W | 0.06125000 | 0.00030999 | 0.00001899 |
| J.F. Howell Interests, LP | W | 0.02300000 | 0.00030999 | 0.00000568 |
| Bandera Investment Co., LLC | W | 0.00700000 | 0.00030999 | 0.00000217 |
| Markaco, L.L.C. | W | 0.01225000 | 0.00030999 | 0.00000380 |
| Tiembo Ltd. | W | 0.01050000 | 0.00030999 | 0.00000325 |
| Craft Exploration Co., LLC | W | 0.00525000 | 0.00030999 | 0.00000163 |
| Kudzu Oil Properties, LLC | W | 0.01050000 | 0.00030999 | 0.00000325 |
| Landmark Exploration, LLC | W | 0.01050000 | 0.00030999 | 0.00000325 |
| Michael K. Pickens, as Trustee of the MKP G-S Trust | W | 0.02550000 | 0.00030999 | 0.00000790 |
| Tauber Exploration & Production Co | W | 0.03312500 | 0.00030999 | 0.00000407 |
| McCombs Energy, Ltd. | W | 0.14175000 | 0.00039999 | 0.00004394 |
| The Rudman Partnership | W | 0.06565390 | 0.00030999 | 0.00002034 |
| Sklarco L.L.C | W | 0.16082261 | 0.00074915 | 0.00012048 |
| JJS Interests Escambia, LLC | W | 0.11907809 | 0.00074915 | 0.00008921 |
| Resource Ventures, LLC | W | 0.00061359 | 0.00074915 | 0.00000046 |
| Dickson Oil & Gas, LLC | W | 0.00612500 | 0.00074915 | 0.00000459 |
| Fant Energy Limited | W | 0.06125000 | 0.00074915 | 0.00004589 |
| J.F. Howell Interests, LP | W | 0.02300000 | 0.00074915 | 0.00002098 |
| Bandera Investment Co., LLC | W | 0.00700000 | 0.00074915 | 0.00000524 |
| Markaco, L.L.C. | W | 0.01225000 | 0.00074915 | 0.00000918 |
| Tiembo Ltd. | W | 0.01050000 | 0.00074915 | 0.00000787 |
| Craft Exploration Co., LLC | W | 0.00525000 | 0.00074915 | 0.00000393 |
| Kudzu Oil Properties, LLC | W | 0.01050000 | 0.00074915 | 0.00000787 |
| Landmark Exploration, LLC | W | 0.01050000 | 0.00074915 | 0.00000787 |
| Pickens Financial Group, LLC | W | 0.02550000 | 0.00074915 | 0.00001910 |
| Tauber Exploration & Production Co | W | 0.03312500 | 0.00074915 | 0.00000943 |
| McCombs Energy, Ltd | W | 0.14175000 | 0.00074915 | 0.00010619 |
| The Rudman Partnership | W | 0.06562500 | 0.00074915 | 0.00004916 |
| Sklarco L.L.C | W | 0.16082281 | 0.19223031 | 0.03091502 |
| JJS Interests Escambia, LLC | W | 0.11907809 | 0.19223031 | 0.02289042 |
| Resource Ventures, LLC | W | 0.00061359 | 0.19223031 | 0.00011795 |
| Dickson Oil & Gas, LLC | W | 0.00612500 | 0.19223031 | 0.00117741 |
| Fant Energy Limited | W | 0.06125000 | 0.19223031 | 0.01177411 |
| J.F. Howell Interests, LP | W | 0.02300000 | 0.19223031 | 0.00538245 |
| Bandera Investment Co., LLC | W | 0.00700000 | 0.19223031 | 0.00134561 |
| Markaco, L.L.C. | W | 0.01225000 | 0.19223031 | 0.00235482 |
| Tiembo Ltd. | W | 0.01050000 | 0.19223031 | 0.00201842 |
| Craft Exploration Co., LLC | W | 0.00525000 | 0.19223031 | 0.00100921 |
| Kudzu Oil Properties, LLC | W | 0.01050000 | 0.19223031 | 0.00201842 |
| Landmark Exploration, LLC | W | 0.01050000 | 0.19223031 | 0.00201842 |
| Pickens Financial Group, LLC | W | 0.02550000 | 0.19223031 | 0.00490182 |
| Tauber Exploration & Production Co | W | 0.03312500 | 0.19223031 | 0.00252302 |
| McCombs Energy, Ltd | W | 0.14175000 | 0.19223031 | 0.02724865 |
| The Rudman Partnership | W | 0.06562500 | 0.19223031 | 0.01261511 |
| Sklarco L.L.C | W | 0.16082261 | 0.00156625 | 0.00024224 |
| JJS Interests Escambia, LLC | W | 0.11907809 | 0.00156625 | 0.00017936 |
| Resource Ventures, LLC | W | 0.00061359 | 0.00156625 | 0.00000092 |
| Dickson Oil & Gas, LLC | W | 0.00612500 | 0.00156625 | 0.00000923 |
| Fant Energy Limited | W | 0.06125000 | 0.00156625 | 0.00009226 |
| J.F. Howell Interests, LP | W | 0.02300000 | 0.00156625 | 0.00004218 |
| Bandera Investment Co., LLC | W | 0.00700000 | 0.00156625 | 0.00001054 |
| Markaco, L.L.C. | W | 0.01225000 | 0.00156625 | 0.00001845 |
| Tiembo Ltd. | W | 0.01050000 | 0.00156625 | 0.00001582 |
| Craft Exploration Co., LLC | W | 0.00525000 | 0.00156625 | 0.00000791 |
| Kudzu Oil Properties, LLC | W | 0.01050000 | 0.00156625 | 0.00001582 |
| Landmark Exploration, LLC | W | 0.01050000 | 0.00156625 | 0.00001582 |
| Pickens Financial Group, LLC | W | 0.02550000 | 0.00156625 | 0.00003841 |
| Tauber Exploration & Production Co | W | 0.03312500 | 0.00156625 | 0.00001977 |
| McCombs Energy, Ltd. | W | 0.14175000 | 0.00156625 | 0.00021351 |

Exhibit C
DOCKET NO. 2013-13-A
Item # 3-2012
Prepared by: Stratford Jones

| | | | | |
|---|---|---|---|---|
| The Rudman Partnership | W | 0.06562500 | 0.00156625 | 0.0000981 |
| Cedar Creek Land & Timber, Inc. | R | 0.17860000 | 0.25769642 | 0.04525148 |
| Estate of Ed Leigh McMillan II | R | 0.00119030 | 0.25769642 | 0.00030674 |
| Elvira McMillan Tate (Maternally?) | R | 0.00119030 | 0.25769642 | 0.00030674 |
| Thomas E. McMillan, Jr. | R | 0.00105145 | 0.25769642 | 0.00027095 |
| Robert Cushman McMillan | R | 0.00105145 | 0.25769642 | 0.00027095 |
| Katherine E. McM. Owens | R | 0.00197485 | 0.25769642 | 0.00050892 |
| Thomas E. McMillan, Jr. and Robert C. McMillan, as Co-Trustees U/W Ira Lee McMillan | R | 0.00932500 | 0.25769642 | 0.00144532 |
| Thomas E. McMillan, Jr., Robert C. McMillan, Ed Leigh McMillan, III, and Daniel W. McMillan, as Co-Trustees U/W Ed Leigh McMillan | R | 0.00012500 | 0.25769642 | 0.0000322 |
| Allen C. Phillips | R | 0.00902649 | 0.25769642 | 0.00332609 |
| Auburn University | R | 0.00510362 | 0.25769642 | 0.00131518 |
| Minnie Tate Dubilier | B | 0.00019614 | 0.25769642 | 0.00005054 |
| Elvira Tate Hoskins | R | 0.00019614 | 0.25769642 | 0.00005054 |
| Albert Clark Tate III | R | 0.00019614 | 0.25769642 | 0.00005054 |
| Edward McMillan Tate | R | 0.00019614 | 0.25769642 | 0.00005054 |
| Newport Five, LLC | R | 0.00078457 | 0.25769642 | 0.00020218 |
| Robert C. McMillan, as Trustee of the Robert C. McMillan 2011 Revocable Trust dated November 29, 2011 | R | 0.00078457 | 0.25769642 | 0.00020218 |
| Ed Leigh McMillan III | R | 0.00039229 | 0.25769642 | 0.00010109 |
| Daniel W. McMillan | R | 0.00039229 | 0.25769642 | 0.00010109 |
| Keswick Group, LLC | R | 0.00196143 | 0.25769642 | 0.00050545 |
| SSC Minerals, LLC | R | 0.00147107 | 0.25769642 | 0.00037906 |
| Flowing Well, LLC | R | 0.00473223 | 0.25769642 | 0.00121944 |
| W.T. Neal Family Stock, LLC | R | 0.01203475 | 0.25769642 | 0.00310131 |
| Trustees of the Marital Trust and Trustees of the Family Trust U/W W.T. Neal, Jr. f/b/o Sara Beall Neal | R | 0.00125000 | 0.25769642 | 0.00032217 |
| John R. Miller, III | R | 0.00079691 | 0.25769642 | 0.00020536 |
| Nancy M. Miller | R | 0.00057466 | 0.25769642 | 0.00014806 |
| David Earl Miller | R | 0.00057466 | 0.25769642 | 0.00014806 |
| Jean Miller (Simpson) | R | 0.00057466 | 0.25769642 | 0.00014806 |
| Robert H. Kirby | R | 0.00085886 | 0.25769642 | 0.00022133 |
| Jean Kirby Jones | R | 0.00085886 | 0.25769642 | 0.00022133 |
| Suzanne W. Zimmer | R | 0.00085886 | 0.25769642 | 0.00022133 |
| Laura W. Grier | R | 0.00085886 | 0.25769642 | 0.00022133 |
| Linda H. Chavers | R | 0.00220803 | 0.25769642 | 0.00056901 |
| Camilla Hartford | R | 0.00171771 | 0.25769642 | 0.00044268 |
| James H. Barrow, Jr. and James Barrow, as Trustees of the Barrow Family Revocable Trust | R | 0.00110179 | 0.25769642 | 0.00028573 |
| Peter B. Hamilton, Jr. | R | 0.00110879 | 0.25769642 | 0.00028571 |
| Herschel Lee Abbott, III | R | 0.00055440 | 0.25769642 | 0.00014287 |
| Cathryn Abbott Jones | R | 0.00055440 | 0.25769642 | 0.00014287 |
| Ernest Fred Bel | R | 0.00110879 | 0.25769642 | 0.00028573 |
| James Boyd Bel | R | 0.00110879 | 0.25769642 | 0.00028573 |
| Joanne Bel Ingraham | R | 0.00110879 | 0.25769642 | 0.00028573 |
| Jason Goodsee Cohen and Reliance Trust Company, as Co-Trustees of the Randall Montgomery Goodsee Trust Share of Trust A under the Evelyn M Britnoe Declaration of Trust | R | 0.00210060 | 0.25769642 | 0.00054134 |
| Roderick Wade Goodsee , Jr. and Reliance Trust Company, as Co-Trustee of the Roderick Wade Goodsee Trust Share of Trust A under the Evelyn M Britnoe Declaration of Trust | R | 0.00210060 | 0.25769642 | 0.00054134 |
| E.D. Scruggs, Jr. | R | 0.00050092 | 0.25769642 | 0.00012909 |
| Wendell Phillips Simpson | R | 0.00050092 | 0.25769642 | 0.00012909 |
| Kay Mitchell | R | 0.00025046 | 0.25769642 | 0.00006454 |
| Haywood Hanna, III | R | 0.00025046 | 0.25769642 | 0.00006454 |
| Lyman W. Phillips, Jr. | R | 0.00391675 | 0.25769642 | 0.00100933 |
| Frances L. Pope and Robert R. Crittenden, as Trustees of the Family Trust U/W Robert Downing Pope, Jr. | R | 0.00013000 | 0.25769642 | 0.00003353 |
| Jerry H. McGowan | R | 0.00061559 | 0.25769642 | 0.00015864 |
| Philippe Peyton M. Bettina | R | 0.00061559 | 0.25769642 | 0.00015864 |
| Peyton H. Hamilton (Carmichael?) | R | 0.00123119 | 0.25769642 | 0.00031727 |
| Sterling H. Hamilton, Jr. | R | 0.00123119 | 0.25769642 | 0.00031727 |

Page 4 of 14

Exhibit 5
DOCKET NO. 2:11-23-224
Date: 2-2017
Prepared by: Maryland James

| Name | | | | |
|---|---|---|---|---|
| John H. Pitts | R | 0.00123119 | 0.25769642 | 0.00031727 |
| Claude E. Hamilton, III | R | 0.00123119 | 0.25769642 | 0.00031727 |
| William Hamilton, Jr. | R | 0.00123119 | 0.25769642 | 0.00031727 |
| Lewis S. Hamilton | R | 0.00123119 | 0.25769642 | 0.00031727 |
| Adrian C. Allen, as Trustee of the Adrian C. Allen Revocable Trust | R | 0.00230151 | 0.25769642 | 0.00059300 |
| Suzanne C. Allen, as Trustee of the Suzanne C. Allen Revocable Trust | R | 0.00230151 | 0.25769642 | 0.00059300 |
| Cynthia S. Rilling | R | 0.00076717 | 0.25769642 | 0.00019770 |
| Deborah Jean Shaffer | R | 0.00038359 | 0.25769642 | 0.00009885 |
| Michael Adrian Shaffer and Clarissa Shaffer, as Trustees of the Shaffer Family Living Trust | R | 0.00038359 | 0.25769642 | 0.00009885 |
| Charles James Shaffer and Katrina Jeanne Shaffer, as Trustees of the CK Shaffer Family Trust | R | 0.00038359 | 0.25769642 | 0.00009885 |
| Trant L. Kidd, as Trustee of The Trant L. Kidd Special Trust | R | 0.00011507 | 0.25769642 | 0.00002965 |
| Rock Springs Minerals I, LLC | R | 0.00072184 | 0.25769642 | 0.00018602 |
| Source Rock Minerals, LLC | R | 0.00029423 | 0.25769642 | 0.00007582 |
| Rock Springs Energy, LLC | R | 0.00091569 | 0.25769642 | 0.00000804 |
| David Boatmeyer | R | 0.00000392 | 0.25769642 | 0.00000101 |
| Susan M. Winchester | R | 0.00076717 | 0.25769642 | 0.00019770 |
| James Adrian Allen | R | 0.00076717 | 0.25769642 | 0.00019770 |
| Downing Family Properties, LLC | R | 0.01069672 | 0.25769642 | 0.00275651 |
| Robbie Downing Johnson | R | 0.00081826 | 0.25769642 | 0.00021082 |
| Stella Livingston Hawkins | R | 0.00081820 | 0.25769642 | 0.00021082 |
| Wiley W. Downing, IV | R | 0.00015342 | 0.25769642 | 0.00003954 |
| Lisa Downing Nordmeyer | R | 0.00015342 | 0.25769642 | 0.00003954 |
| John A. Downing | R | 0.00030685 | 0.25769642 | 0.00007901 |
| Dan M. Downing | R | 0.00030685 | 0.25769642 | 0.00007907 |
| Anna Lillian D. Nelson | R | 0.00030685 | 0.25769642 | 0.00007907 |
| Jane Downing Dunaway | R | 0.00027275 | 0.25769642 | 0.00007029 |
| Lisa Downing Henson | R | 0.00027275 | 0.25769642 | 0.00007029 |
| John Eric Downing | R | 0.00027275 | 0.25769642 | 0.00007029 |
| Albert W. Key | R | 0.00014533 | 0.25769642 | 0.00003745 |
| Atwood W. Kimbrough | R | 0.00010900 | 0.25769642 | 0.00002809 |
| James C. Kimbrough | R | 0.00003633 | 0.25769642 | 0.00000936 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Sr. Trust U/A 3/17/05 | R | 0.00596686 | 0.25769642 | 0.00130411 |
| Adrienne P. Watkins, as Trustee of the Adrienne P. Watkins Trust U/A 3/17/05 | R | 0.00166695 | 0.25769642 | 0.00043472 |
| John H. Gray, Jr., as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Jack M. Watkins, Jr. Family dated September 29, 2011 | R | 0.00166695 | 0.25769642 | 0.00043472 |
| Gerald Stephen Herman, as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Adrienne W. Snively Family dated September 29, 2011 | R | 0.00166695 | 0.25769642 | 0.00043472 |
| Adrienne P. Watkins | R | 0.00013000 | 0.25769642 | 0.00003863 |
| Patrice Downing McFarland | R | 0.00010000 | 0.25769642 | 0.00002577 |
| John Robert Downing | R | 0.00007500 | 0.25769642 | 0.00001933 |
| Hermine M. Downing | R | 0.00101826 | 0.25769642 | 0.00026240 |
| M. Travis Holshom | R | 0.00050913 | 0.25769642 | 0.00013120 |
| Vehalla Royalty, LLC | O | 0.00075000 | 0.25769642 | 0.00019327 |
| Easton Energy, Inc. | O | 0.00754683 | 0.25769642 | 0.00194486 |
| Ezelle Energy, L L C | O | 0.00754683 | 0.25769642 | 0.00194486 |
| Dabolt Resources, L C | O | 0.00452813 | 0.25769642 | 0.00116688 |
| Christopher A. Farrell | O | 0.00173062 | 0.25769642 | 0.00044604 |
| Cedar Creek Land & Timber, Inc. | R | 0.17560000 | 0.54750789 | 0.09614239 |
| Estate of Ed Leigh McMillan II | R | 0.00119030 | 0.54750789 | 0.00065170 |
| Elvira McMillan Tate (Munnelly?) | R | 0.00119030 | 0.54750789 | 0.00065170 |
| Thomas E. McMillan, Jr. | R | 0.00101145 | 0.54750789 | 0.00057568 |
| Robert Cochrane McMillan | R | 0.00105145 | 0.54750789 | 0.00057568 |
| Katherine E. McM. Owens | R | 0.00197487 | 0.54750789 | 0.00108126 |
| Thomas E. McMillan, Jr. and Robert C. McMillan, as Co-Trustees U/W Iva Lee McMillan | R | 0.00832500 | 0.54750789 | 0.00455860 |
| Thomas E. McMillan, Jr., Robert C. McMillan, Ed Leigh McMillan, III, and Daniel W. McMillan, as Co-Trustees U/W Ed Leigh McMillan | R | 0.00012500 | 0.54750789 | 0.00006844 |
| Allen C. Phillips | R | 0.00002640 | 0.54750789 | 0.00494207 |

Exhibit C
DOCKET NO. 2015-233A
Item A.3.2013
Prepared by: Marshall Jones

| Name | | | | |
|---|---|---|---|---|
| Auburn University | R | 0.00510362 | 0.54750789 | 0.00279427 |
| Minnie Tate Dubilier | R | 0.00076614 | 0.54750789 | 0.00010739 |
| Elvira Tate Hoskins | R | 0.00019614 | 0.54750789 | 0.00010739 |
| Albert Clark Tate III | R | 0.00019614 | 0.54750789 | 0.00010739 |
| Edward McMillan Tate | R | 0.00019614 | 0.54750789 | 0.00010739 |
| Newport Five, LLC | R | 0.00078457 | 0.54750789 | 0.00042956 |
| Robert C. McMillan, as Trustee of the Robert C. McMillan 2011 Revocable Trust dated November 29, 2011 | R | 0.00078457 | 0.54750789 | 0.00042956 |
| Ed Leigh McMillan III | R | 0.00039229 | 0.54750789 | 0.00021478 |
| Daniel W. McMillan | R | 0.00039229 | 0.54750789 | 0.00021478 |
| Kettuch Group, LLC | R | 0.00196143 | 0.54750789 | 0.00107390 |
| SSC Minerals, LLC | R | 0.00147107 | 0.54750789 | 0.00080542 |
| Flowing Well, LLC | R | 0.00473223 | 0.54750789 | 0.00259092 |
| W.T. Neal Family Stock, LLC | R | 0.01203475 | 0.54750789 | 0.00658912 |
| Trustees of the Marital Trust and Trustees of the Family Trust U/W W.T. Neal, Jr. f/b/o Sara Beall Neal | R | 0.00125000 | 0.54750789 | 0.00068438 |
| John R. Miller, III | R | 0.00079691 | 0.54750789 | 0.00043631 |
| Nancy M. Melton | R | 0.00063466 | 0.54750789 | 0.00034743 |
| David Earl Miller | R | 0.00057466 | 0.54750789 | 0.00031463 |
| Jean Miller (Stimpson) | R | 0.00057466 | 0.54750789 | 0.00031463 |
| Robert H. Kirby | R | 0.00085886 | 0.54750789 | 0.00047023 |
| Jone Kirby Jones | R | 0.00085886 | 0.54750789 | 0.00047023 |
| Suzanne W. Zimmer | R | 0.00085886 | 0.54750789 | 0.00047023 |
| Laura W. Grier | R | 0.00085886 | 0.54750789 | 0.00047023 |
| Linda H. Chaney | R | 0.00220807 | 0.54750789 | 0.00120894 |
| Camilla Huxford | R | 0.00171771 | 0.54750789 | 0.00094046 |
| James H. Barrow, Jr. and Janie Barrow, as Trustees of the Barrow Family Revocable Trust | R | 0.00110879 | 0.54750789 | 0.00060707 |
| Peter B. Hamilton, Jr. | R | 0.00110879 | 0.54750789 | 0.00060707 |
| Herschell Lee Abbott, III | R | 0.00055440 | 0.54750789 | 0.00030354 |
| Cathryn Abbott Jones | R | 0.00055440 | 0.54750789 | 0.00030354 |
| Ernest Fred Bel | R | 0.00110879 | 0.54750789 | 0.00060707 |
| James Boyd Bel | R | 0.00110879 | 0.54750789 | 0.00060707 |
| Jeanne Bel Ingraham | R | 0.00110879 | 0.54750789 | 0.00060707 |
| Janan Goodner Cohen and Reliance Trust Company, as Co-Trustees of the Randall Montgomery Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.00210069 | 0.54750789 | 0.00115014 |
| Roderick Wade Goodner, Jr. and Reliance Trust Company, as Co-Trustees of the Roderick Wade Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.00210069 | 0.54750789 | 0.00115014 |
| E.D. Scruggs, Jr. | R | 0.00050092 | 0.54750789 | 0.00027426 |
| Wendell Phillips Simpson | R | 0.00050092 | 0.54750789 | 0.00027426 |
| Kay Mitchell | R | 0.00025046 | 0.54750789 | 0.00013713 |
| Haywood Hanna, III | R | 0.00025046 | 0.54750789 | 0.00013713 |
| Lyman W. Phillips, Jr. | R | 0.00391615 | 0.54750789 | 0.00214445 |
| Frances L. Pope and Robert R. Crittenden, as Trustees of the Family Trust U/W Robert Downing Pope, Jr. | R | 0.00015000 | 0.54750789 | 0.00008213 |
| Jonny H. McGowin | R | 0.00061559 | 0.54750789 | 0.00033704 |
| Philippa Payton M. Burbea | R | 0.00061559 | 0.54750789 | 0.00033704 |
| Payton H. Hamilton (Carmichael?) | R | 0.00123119 | 0.54750789 | 0.00067409 |
| Sterling H. Hamilton, Jr. | R | 0.00123119 | 0.54750789 | 0.00067409 |
| Julie H. Picus | R | 0.00123119 | 0.54750789 | 0.00067409 |
| Claude E. Hamilton, III | R | 0.00123119 | 0.54750789 | 0.00067409 |
| William Hamilton, Jr. | R | 0.00123119 | 0.54750789 | 0.00067409 |
| Lewis S. Hamilton | R | 0.00123119 | 0.54750789 | 0.00067409 |
| Adrian C. Allen, as Trustee of the Adrian C. Allen Revocable Trust | R | 0.00230151 | 0.54750789 | 0.00126009 |
| Suzanne C. Allen, as Trustee of the Suzanne C. Allen Revocable Trust | R | 0.00230151 | 0.54750789 | 0.00126009 |
| Cynthia S. Rilling | R | 0.00076717 | 0.54750789 | 0.00042001 |
| Deborah Jean Shaffer | R | 0.00035359 | 0.54750789 | 0.00021002 |
| Michael Adrian Shaffer and Clarissa Shaffer, as Trustees of the Shaffer Family Living Trust | R | 0.00035359 | 0.54750789 | 0.00021002 |
| Charles James Shaffer and Katrina Jeanne Shaffer, as Trustees of the | R | 0.00038359 | 0.54750789 | 0.00021002 |

Exhibit C
DOCKET NO. 3-0-13-144
Page 6 of 14
Prepared by: Marshel Jones

CK Shaffer Family Trust

| Name | | | | |
|---|---|---|---|---|
| Trini L. Kidd, as Trustee of The Trini L. Kidd Special Trust | R | 0.00011507 | 0.54750789 | 0.00006300 |
| Rock Springs Minerals I, LLC | R | 0.00072164 | 0.54750789 | 0.00039521 |
| Source Rock Minerals, LLC | R | 0.00029423 | 0.54750789 | 0.00016109 |
| Rock Springs Energy, LLC | R | 0.00001569 | 0.54750789 | 0.00000656 |
| David Bisemeyer | R | 0.00000392 | 0.54750789 | 0.00000215 |
| Susan M. Winchester | R | 0.00076717 | 0.54750789 | 0.00042003 |
| James Adrian Alten | R | 0.00076717 | 0.54750789 | 0.00042003 |
| Downing Family Properties, LLC | R | 0.03106967 | 0.54750789 | 0.01585654 |
| Roathe Downing Johnson | R | 0.00081826 | 0.54750789 | 0.00044808 |
| Stella Livingston Hawkins | R | 0.00081826 | 0.54750789 | 0.00044800 |
| Wiley W. Downing, IV | R | 0.00015342 | 0.54750789 | 0.00008400 |
| Lisa Downing Nordmeyer | R | 0.00015342 | 0.54750789 | 0.00008400 |
| John A. Downing | R | 0.00030665 | 0.54750789 | 0.00016800 |
| Dan M. Downing | R | 0.00030665 | 0.54750789 | 0.00016800 |
| Anna Lillian D. Nelson | R | 0.00030655 | 0.54750789 | 0.00016800 |
| Jane Downing Dunaway | R | 0.00027275 | 0.54750789 | 0.00014933 |
| Lisa Downing Heaton | R | 0.00027275 | 0.54750789 | 0.00014933 |
| John Eric Downing | R | 0.00027275 | 0.54750789 | 0.00014933 |
| Albert W. Key | R | 0.00014533 | 0.54750789 | 0.00007957 |
| Atwood M. Kimbrough | R | 0.00010900 | 0.54750789 | 0.00005968 |
| James C. Kimbrough | R | 0.00003633 | 0.54750789 | 0.00001989 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Sr. Trust U/A 3/17/05 | R | 0.05506086 | 0.54750789 | 0.00277086 |
| Adrienne P. Watkins, as Trustee of the Adrienne P. Watkins Trust U/A 3/17/05 | R | 0.00168695 | 0.54750789 | 0.00092362 |
| John H. Gray, Jr., as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Jack M. Watkins, Jr. Family dated September 29, 2011 | R | 0.00168695 | 0.54750789 | 0.00092362 |
| Gerald Stephen Herman, as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Adrienne W. Saverley Family dated September 29, 2011 | R | 0.00168695 | 0.54750789 | 0.00092362 |
| Adrienne P. Watkins | R | 0.00015000 | 0.54750789 | 0.00008213 |
| Patricia Downing McFarland | R | 0.00010000 | 0.54750789 | 0.00005475 |
| John Robert Downing | R | 0.00007500 | 0.54750789 | 0.00004106 |
| Hermine M. Downing | R | 0.00101626 | 0.54750789 | 0.00055751 |
| M. Travis Holzbern | R | 0.00050913 | 0.54750789 | 0.00027815 |
| Valhalla Royalty, LLC | O | 0.00083070 | 0.54750789 | 0.00045481 |
| Eunies Energy, Inc | O | 0.00835895 | 0.54750789 | 0.00457659 |
| Eagle Energy, L.L.C. | O | 0.00835895 | 0.54750789 | 0.00457659 |
| Duboil Resources, L C | O | 0.00501537 | 0.54750789 | 0.00274595 |
| Christopher A. Farrell | O | 0.00192571 | 0.34750789 | 0.01105434 |
| Cedar Creek Land & Timber, Inc | R | 0.17560000 | 0.00030999 | 0.00005443 |
| Estate of Ed Leigh McMillan II | R | 0.00119030 | 0.00030999 | 0.00000037 |
| Elvira McMillan Tate (Maxwell?) | R | 0.00119030 | 0.00030999 | 0.00000037 |
| Thomas E. McMillan, Jr. | R | 0.00105145 | 0.00030999 | 0.00000033 |
| Robert Cochrane McMillan | R | 0.00105145 | 0.00030999 | 0.00000033 |
| Katherine E. McM. Owens | R | 0.00197467 | 0.00030999 | 0.00000061 |
| Thomas E. McMillan, Jr. and Robert C. McMillan, as Co-Trustees U/W Iva Lee McMillan | R | 0.00832500 | 0.00030999 | 0.00000258 |
| Thomas E. McMillan, Jr., Robert C. McMillan, Ed Leigh McMillan, III, and Daniel W. McMillan, as Co-Trustees U/W Ed Leigh McMillan | R | 0.00012500 | 0.00030999 | 0.00000004 |
| Allen C. Phillips | R | 0.00902649 | 0.00030999 | 0.00000280 |
| Auburn University | R | 0.00310462 | 0.00030999 | 0.00000118 |
| Minnie Tate Dubliser | R | 0.00019614 | 0.00030999 | 0.00000006 |
| Elvira Tate Hunkins | R | 0.00019614 | 0.00030999 | 0.00000006 |
| Albert Clark Tate III | R | 0.00019614 | 0.00030999 | 0.00000006 |
| Edward McMillan Tate | R | 0.00019614 | 0.00030999 | 0.00000006 |
| Newport Five, LLC | R | 0.00078457 | 0.00030999 | 0.00000024 |
| Robert C. McMillan, as Trustee of the Robert C. McMillan 2011 Revocable Trust dated November 29, 2011 | R | 0.00078457 | 0.00030999 | 0.00000024 |
| Ed Leigh McMillan III | R | 0.00039229 | 0.00030999 | 0.00000012 |
| Daniel W. McMillan | R | 0.00039229 | 0.00030999 | 0.00000012 |
| Kersch Group, LLC | R | 0.00196143 | 0.00030999 | 0.00000061 |
| SSC Minerals, LLC | R | 0.00147107 | 0.00050999 | 0.00000046 |
| Flowing Well, LLC | R | 0.00473123 | 0.00030999 | 0.00000147 |
| W.T. Neal Family Stock, LLC | R | 0.01205475 | 0.00030999 | 0.00000373 |

Exhibit C
DOCKET NO. S-03133-113
Date: 3-2-2012
Princess et. Marshall Jones

| | | | |
|---|---|---|---|
| Trustees of the Marital Trust and Trustees of the Family Trust U/W W. T. Neal, Jr. f/b/o Sara Beall Neal | R | 0.00135000 | 0.00030999 | 0.00000036 |
| John R. Miller, III | R | 0.00076691 | 0.00030999 | 0.00000025 |
| Nancy M. Mullens | R | 0.00054466 | 0.00030999 | 0.00000018 |
| David Earl Miller | R | 0.00054466 | 0.00030999 | 0.00000018 |
| Joan Miller (Simpson) | R | 0.00054466 | 0.00030999 | 0.00000018 |
| Robert H. Kirby | R | 0.00085886 | 0.00030999 | 0.00000027 |
| Jess Kirby Jones | R | 0.00085886 | 0.00030999 | 0.00000027 |
| Suzanne W. Zimmer | R | 0.00085886 | 0.00030999 | 0.00000027 |
| Laura W. Gear | R | 0.00085896 | 0.00030999 | 0.00000027 |
| Linda H. Chivers | R | 0.00220807 | 0.00030999 | 0.00000068 |
| Camilla Haxford | R | 0.00171771 | 0.00030999 | 0.00000053 |
| James H. Bartow, II and James Bartow, as Trustees of the Bartow Family Revocable Trust | R | 0.00110279 | 0.00030999 | 0.0000003c |
| Peter B. Hamilton, Jr. | R | 0.00110279 | 0.00030999 | 0.00000034 |
| Herschell Lee Abbott, III | R | 0.00055440 | 0.00030999 | 0.00000017 |
| Cathryn Abbott Jones | R | 0.00055440 | 0.00030999 | 0.00000017 |
| Ernest Fred Bel | R | 0.00110279 | 0.00030999 | 0.00000034 |
| James Boyd Bel | R | 0.00110279 | 0.00030999 | 0.00000034 |
| Jeanne Bel Ingraham | R | 0.00110279 | 0.00030999 | 0.00000034 |
| Janan Goodner Cohen and Reliance Trust Company, as Co-Trustees of the Randall Montgomery Goodner Trust Share of Trust A under the Evelyn M. Brittan Declaration of Trust | R | 0.00210069 | 0.00030999 | 0.00000065 |
| Roderick Wade Goodner, Jr. and Reliance Trust Company, as Co-Trustees of the Roderick Wade Goodner Trust Share of Trust A under the Evelyn M. Brittan Declaration of Trust | R | 0.00210069 | 0.00030999 | 0.00000065 |
| E.D. Scruggs, Jr. | R | 0.00050092 | 0.00030999 | 0.00000016 |
| Wendell Phillip Simpson | R | 0.00050092 | 0.00030999 | 0.00000016 |
| Kay Mitchell | R | 0.00025046 | 0.00030999 | 0.00000008 |
| Haywood Harris, III | R | 0.00025046 | 0.00030999 | 0.00000008 |
| Lyman W. Phillips, Jr. | R | 0.00391675 | 0.00030999 | 0.00000121 |
| Frances L. Pope and Robert R. Crittenden, as Trustees of the Family Trust U/W Robert Downing Pope, Jr. | R | 0.00015000 | 0.00030999 | 0.00000005 |
| Jenny H. McGowin | R | 0.00061559 | 0.00030999 | 0.00000019 |
| Philippe Peyton M. Bethea | R | 0.00061559 | 0.00030999 | 0.00000019 |
| Peyton H. Hamilton (Carmichael)? | R | 0.00123119 | 0.00030999 | 0.00000036 |
| Stirling H. Hamilton, Jr. | R | 0.00123119 | 0.00030999 | 0.00000038 |
| Julie H. Fleus | R | 0.00123119 | 0.00030999 | 0.00000033 |
| Claude E. Hamilton, III | R | 0.00123119 | 0.00030999 | 0.00000036 |
| William Hamilton, Jr. | R | 0.00123119 | 0.00030999 | 0.00000038 |
| Lewis S. Hamilton | R | 0.00123119 | 0.00030999 | 0.00000038 |
| Adrian C. Allen, as Trustee of the Adrian C. Allen Revocable Trust | R | 0.00230151 | 0.00030999 | 0.00000071 |
| Suzanne C. Allen, as Trustee of the Suzanne C. Allen Revocable Trust | R | 0.00230151 | 0.00030999 | 0.00000071 |
| Cynthia S. Rilling | R | 0.00076717 | 0.00030999 | 0.00000024 |
| Deborah Jean Shaffer | R | 0.00038359 | 0.00030999 | 0.00000012 |
| Michael Adrian Shaffer and Clarissa Shaffer, as Trustees of the Shaffer Family Living Trust | R | 0.00038359 | 0.00030999 | 0.00000012 |
| Charles James Shaffer and Katrina Jeanne Shaffer, as Trustees of the CK Shaffer Family Trust | R | 0.00038359 | 0.00030999 | 0.00000012 |
| Traci L. Kidd, as Trustee of The Traci L. Kidd Special Trust | R | 0.00015150? | 0.00030999 | 0.00000004 |
| Rock Springs Minerals I, LLC | R | 0.00072161 | 0.00030999 | 0.00000022 |
| Suoto Rock Minerals, LLC | R | 0.00029423 | 0.00030999 | 0.00000009 |
| Rock Springs Energy, LLC | R | 0.00001569 | 0.00030999 | 0.00000000 |
| David Bissmeyer | P | 0.00000392 | 0.00030999 | 0.00000000 |
| Susan M. Winchester | R | 0.00076717 | 0.00030999 | 0.00000024 |
| James Adrian Allen | R | 0.00076717 | 0.00030999 | 0.00000024 |
| Downing Family Properties, LLC | R | 0.01069652 | 0.00030999 | 0.00000332 |
| Rozlin Downing Johnson | R | 0.00081826 | 0.00030999 | 0.00000025 |
| Stella Livingston Hawkins | R | 0.00081826 | 0.00030999 | 0.00000025 |
| Wiley W. Downing, IV | R | 0.00015342 | 0.00030999 | 0.00000005 |
| Lisa Downing Nindmeyer | R | 0.00015342 | 0.00030999 | 0.00000005 |
| John A. Downing | R | 0.00030685 | 0.00030999 | 0.00000010 |

EXHIBIT C
DOCKET NO. 20-03-124
Date: 4-2-2021
Prepared by: Manibat Jones

| | | | | |
|---|---|---|---|---|
| Dan M. Downing | R | 0.00030885 | 0.00030999 | 0.00000010 |
| Anita Lillian D. Nelson | R | 0.00030885 | 0.00030999 | 0.00000010 |
| Jane Downing Dunaway | R | 0.00027275 | 0.00030999 | 0.00000008 |
| Lisa Downing Hauser | R | 0.00027275 | 0.00030999 | 0.00000008 |
| John Eric Downing | R | 0.00027275 | 0.00030999 | 0.00000008 |
| Albert W. Key | R | 0.00014535 | 0.00030999 | 0.00000005 |
| Atwood M. Kimbrough | R | 0.00010900 | 0.00030999 | 0.00000003 |
| James C. Kimbrough | R | 0.00003633 | 0.00030999 | 0.00000001 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Sr. Trust U/A 3/17/05 | R | 0.00500886 | 0.00030999 | 0.00000157 |
| Adrienne P. Watkins, as Trustee of the Adrienne Adrienne P. Watkins Trust U/A 3/17/05 | R | 0.00168695 | 0.00030999 | 0.00000052 |
| John H. Gray, Jr., as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Jack M. Watkins, Jr. Family dated September 29, 2011 | R | 0.00168695 | 0.00030999 | 0.00000052 |
| Gerald Stephen Herman, as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Adrienne W. Snively Family dated September 29, 2011 | R | 0.00168695 | 0.00030999 | 0.00000052 |
| Adrienne P. Watkins | R | 0.00015000 | 0.00030999 | 0.00000008 |
| Pamela Downing McFarland | R | 0.00010000 | 0.00030999 | 0.00000002 |
| John Robert Downing | R | 0.00007500 | 0.00030999 | 0.00000002 |
| Hermine M. Downing | R | 0.00101826 | 0.00030999 | 0.00000032 |
| M. Travis Holshorn | R | 0.00050913 | 0.00030999 | 0.00000016 |
| Valhalla Royalty, LLC | O | 0.00075000 | 0.00030996 | 0.00000023 |
| Eustis Energy, Inc. | O | 0.00754688 | 0.00030999 | 0.00000234 |
| Enrile Energy, L.L.C | O | 0.00754688 | 0.00030999 | 0.00000234 |
| Daboll Resources, L.C | O | 0.00452853 | 0.00030999 | 0.00000140 |
| Christopher A. Farrell | O | 0.00173862 | 0.00030999 | 0.00000054 |
| Cedar Creek Land & Timber, Inc. | R | 0.17560000 | 0.00074915 | 0.00013155 |
| Estate of Ed Leigh McMillan II | R | 0.00119030 | 0.00074915 | 0.00000089 |
| Elvira McMillan Tate (Manerelly?) | R | 0.00119030 | 0.00074915 | 0.00000089 |
| Thomas E. McMillan, Jr. | R | 0.00105145 | 0.00074915 | 0.00000079 |
| Robert Cochrane McMillan | R | 0.00105145 | 0.00074915 | 0.00000079 |
| Katherine E. McM. Owens | R | 0.00197487 | 0.00074915 | 0.00000148 |
| Thomas E. McMillan, Jr. and Robert C. McMillan, as Co-Trustees U/W Iva Lou McMillan | R | 0.00832500 | 0.00074915 | 0.00000624 |
| Thomas E. McMillan, Jr., Robert C. McMillan, Ed Leigh McMillan, III, and Daniel W. McMillan, as Co-Trustees U/W Ed Leigh McMillan | R | 0.00012500 | 0.00074915 | 0.00000009 |
| Allen C. Phillips | R | 0.00902049 | 0.00074915 | 0.00000676 |
| Auburn University | R | 0.00510362 | 0.00074915 | 0.00000382 |
| Minnie Tate Daballer | R | 0.00019614 | 0.00074915 | 0.00000015 |
| Elvira Tate Hoskins | R | 0.00019614 | 0.00074915 | 0.00000015 |
| Albert Clark Tate III | R | 0.00019614 | 0.00074915 | 0.00000015 |
| Edward McMillan Tate | R | 0.00019614 | 0.00074915 | 0.00000015 |
| Newport Five, LLC | R | 0.00078457 | 0.00074915 | 0.00000059 |
| Robert C. McMillan, as Trustee of the Robert C. McMillan 2011 Revocable Trust dated November 29, 2011 | R | 0.00078457 | 0.00074915 | 0.00000059 |
| Ed Leigh McMillan III | R | 0.00039229 | 0.00074915 | 0.00000029 |
| Daniel W. McMillan | R | 0.00039229 | 0.00074915 | 0.00000029 |
| Kersch Group, LLC | R | 0.00196143 | 0.00074915 | 0.00000147 |
| SSC Minerals, LLC | R | 0.00147107 | 0.00074915 | 0.00000110 |
| Flowing Well, LLC | R | 0.00473223 | 0.00074915 | 0.00000355 |
| W. T. Neal Family Stock, LLC | R | 0.01203475 | 0.00074915 | 0.00000902 |
| Trustees of the Marital Trust and Trustees of the Family Trust U/W W.T. Neal, Jr. Fleta Sara Beall Neal | R | 0.00125000 | 0.00074915 | 0.00000094 |
| John R. Miller, III | R | 0.00079951 | 0.00074915 | 0.00000060 |
| Nancy M. Mellins | R | 0.00057466 | 0.00074915 | 0.00000043 |
| David Earl Miller | R | 0.00057466 | 0.00074915 | 0.00000043 |
| Joan Miller (Slimpson) | R | 0.00057466 | 0.00074915 | 0.00000043 |
| Robert H. Kirby | R | 0.00085836 | 0.00074915 | 0.00000064 |
| Jean Kirby Jones | R | 0.00085836 | 0.00074915 | 0.00000064 |
| Suzanne W. Zimmer | R | 0.00085836 | 0.00074915 | 0.00000064 |
| Laura W. Grier | R | 0.00085836 | 0.00074915 | 0.00000064 |
| Linda H. Chavers | R | 0.00220807 | 0.00074915 | 0.00000165 |
| Camilla Husband | R | 0.00171771 | 0.00074915 | 0.00000129 |
| James H. Barrow, Jr. and Jamie Barrow, as Trustees of the Barrow | R | 0.00110879 | 0.00074915 | 0.00000083 |

Exhibit C
DOCKET No. 8-043-116
Doc. 4.3 BLF
Prepared by: Marshall Jones

| | | | | |
|---|---|---|---|---|
| Family Revocable Trust | | | | |
| Peter B. Hamilton, Jr. | R | 0.00110879 | 0.00074915 | 0.00000083 |
| Herschell Lee Abbott, III | R | 0.00055440 | 0.00074915 | 0.00000042 |
| Cathryn Abbott Jones | R | 0.00055440 | 0.00074915 | 0.00000042 |
| Ernest Fred Bel | R | 0.00110879 | 0.00074915 | 0.00000083 |
| James Boyd Bel | R | 0.00110879 | 0.00074915 | 0.00000083 |
| Jeanne Bel Ingraham | R | 0.00110879 | 0.00074915 | 0.00000083 |
| Janan Goodner Cohen and Reliance Trust Company, as Co-Trustees of the Randall Montgomery Goodner Trust, Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.00210069 | 0.00074915 | 0.00000157 |
| Roderick Wade Goodner, Jr. and Reliance Trust Company, as Co-Trustees of the Roderick Wade Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.00210069 | 0.00074915 | 0.00000157 |
| E.D. Scruggs, Jr. | R | 0.00050092 | 0.00074915 | 0.00000038 |
| Wendell Phillipe Simpson | R | 0.00050092 | 0.00074915 | 0.00000038 |
| Kay Mitchell | R | 0.00025046 | 0.00074915 | 0.00000019 |
| Haywood Hanna, III | R | 0.00025046 | 0.00074915 | 0.00000019 |
| Lyman W. Phillips, Jr. | R | 0.00391675 | 0.00074915 | 0.00000293 |
| Frances L. Pope and Robert R. Crittenden, as Trustees of the Family Trust U/W Robert Downing Pope, Jr. | R | 0.00015000 | 0.00074915 | 0.00000011 |
| Jenny H. McGowin | R | 0.00061559 | 0.00074915 | 0.00000046 |
| Philippa Payson M. Betbez | R | 0.00061559 | 0.00074915 | 0.00000046 |
| Peyton H. Hamilton (Carmichael?) | R | 0.00123119 | 0.00074915 | 0.00000092 |
| Stirling H. Hamilton, Jr. | R | 0.00123119 | 0.00074915 | 0.00000092 |
| John H. Pinза | R | 0.00123119 | 0.00074915 | 0.00000092 |
| Claude E. Hamilton, III | R | 0.00123119 | 0.00074915 | 0.00000092 |
| William Hamilton, Jr. | R | 0.00123119 | 0.00074915 | 0.00000092 |
| Lewis S. Harrihon | R | 0.00123119 | 0.00074915 | 0.00000092 |
| Adrian C. Allen, as Trustee of the Adrian C. Allen Revocable Trust | R | 0.00230151 | 0.00074915 | 0.00000172 |
| Suzanne C. Allen, as Trustee of the Suzanne C. Allen Revocable Trust | R | 0.00230151 | 0.00074915 | 0.00000172 |
| Cynthia S. Rilling | R | 0.00076717 | 0.00074915 | 0.00000057 |
| Deborah Jenn Shaffer | R | 0.00038359 | 0.00074915 | 0.00000029 |
| Michael Adrian Shaffer and Clarissa Shaffer, as Trustees of the Shaffer Family Living Trust | R | 0.00038359 | 0.00074915 | 0.00000029 |
| Charles James Shaffer and Katrina Jeanne Shaffer, as Trustees of the CK Shaffer Family Trust | R | 0.00038359 | 0.00074915 | 0.00000029 |
| Trent L. Kidd, as Trustee of The Trent L. Kidd Special Trust | R | 0.00011507 | 0.00074915 | 0.00000009 |
| Rock Springs Minerals I, LLC | R | 0.00072184 | 0.00074915 | 0.00000054 |
| Source Rock Minerals, LLC | R | 0.00029423 | 0.00074915 | 0.00000022 |
| Rock Springs Energy, LLC | R | 0.00005369 | 0.00074915 | 0.00000004 |
| David Weinmeyer | R | 0.00000392 | 0.00074915 | 0.00000000 |
| Susan M. Winchester | R | 0.00076717 | 0.00074915 | 0.00000057 |
| James Adrian Allen | R | 0.00076717 | 0.00074915 | 0.00000057 |
| Downing Family Properties, LLC | R | 0.01069672 | 0.00074915 | 0.00000801 |
| Roubie Downing Johnson | R | 0.00041826 | 0.00074915 | 0.00000031 |
| Stella Livingston Hawkins | R | 0.00081826 | 0.00074915 | 0.00000061 |
| Willcy W. Downing, IV | R | 0.00015342 | 0.00074915 | 0.00000011 |
| Lisa Downing Niedmeyer | R | 0.00015342 | 0.00074915 | 0.00000011 |
| John A. Downing | R | 0.00030685 | 0.00074915 | 0.00000023 |
| Dixi M. Downing | R | 0.00030685 | 0.00074915 | 0.00000023 |
| Anna Lillian D. Nelson | R | 0.00030685 | 0.00074915 | 0.00000023 |
| Jane Downing Dunaway | R | 0.00027275 | 0.00074915 | 0.00000020 |
| Lisa Downing Heaton | R | 0.00027275 | 0.00074915 | 0.00000020 |
| John Eric Downing | R | 0.00027275 | 0.00074915 | 0.00000020 |
| Albert W. Key | R | 0.00014533 | 0.00074915 | 0.00000011 |
| Atwood M. Kimbrough | R | 0.00010900 | 0.00074915 | 0.00000008 |
| James C. Kimbrough | R | 0.00003633 | 0.00074915 | 0.00000003 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Sr. Trust U/A 3/17/05 | R | 0.00506036 | 0.00074915 | 0.00000376 |
| Adrienne P. Watkins, as Trustee of the Adrienne P. Watkins Trust U/A 3/17/05 | R | 0.00168695 | 0.00074915 | 0.00000126 |
| John H. Gray, Jr., as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Jack M. Watkins, Jr. | R | 0.00168695 | 0.00074915 | 0.00000126 |

Exhibit C
DOCKET NO. 9.0-23-314
Date: 6.4.2013
Prepared by: Marshall Jones

| | | | | |
|---|---|---|---|---|
| Family, dated September 29, 2011 | | | | |
| Gerald Stephen Herman, as Trustee of the Adreenne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Adreenne W. Seveley Family dated September 29, 2011 | K | 0.0016889| | 0.0007491| | 0.0000012| |
| Adreenne P. Watkins | R | 0.0015000| | 0.0007491| | 0.0000001| |
| Patricia Downing McFarland | R | 0.0005000| | 0.0007491| | 0.0000000| |
| John Robert Downing | R | 0.0007500| | 0.0007491| | 0.0000000| |
| Hermine M. Downing | R | 0.0010182| | 0.0007491| | 0.0000007| |
| M. Travis Holsborn | R | 0.0005091| | 0.0007491| | 0.0000003| |
| Vulhafs Royalty, I LC | O | 0.0075000| | 0.0007491| | 0.0000005| |
| Eunen Energy, Inc. | O | 0.0075468| | 0.0007491| | 0.0000056| |
| Ezelic Energy, L.L.C. | O | 0.0075468| | 0.0007491| | 0.0000056| |
| Deboil Resources, L.C. | O | 0.0042813| | 0.0007491| | 0.0000031| |
| Christopher A. Farrell | U | 0.0173362| | 0.0007491| | 0.0000013| |
| Cedar Creek Laod & Timber, Inc. | R | 0.1336000| | 0.1922303| | 0.0337554| |
| Estate of Ed Leigh McMillan II | R | 0.0019030| | 0.1922303| | 0.0012893| |
| Elvira McMillan Tate (Maverelly?) | R | 0.0019030| | 0.1922303| | 0.0002283| |
| Thomas E. McMillan, Jr. | R | 0.0016145| | 0.1922303| | 0.0002027| |
| Robert Cochrane McMillan | R | 0.0105145| | 0.1922303| | 0.0002012| |
| Katherine E. McM. Owens | R | 0.0197487| | 0.1922303| | 0.0037961| |
| Thomas E. McMillan, Jr. and Robert C. McMillan, as Co-Trustees U/W Iva Lee McMillan | R | 0.0032500| | 0.1922303| | 0.0006012| |
| Thomas E. McMillan, Jr., Robert C. McMillan; Ed Leigh McMillan, III, and Daniel W. McMillan, as Co-Trustees U/W Ed Leigh McMillan | R | 0.0012500| | 0.1922303| | 0.0002401| |
| Allen C. Phillips | R | 0.0902049| | 0.1922303| | 0.0173516| |
| Auburn University | R | 0.0310362| | 0.1922303| | 0.0059107| |
| Minnie Tate Dubisier | R | 0.0019014| | 0.1922303| | 0.0003770| |
| Elvira Tate Hoskins | R | 0.0019614| | 0.1922303| | 0.0003770| |
| Albert Clark Tate III | R | 0.0019614| | 0.1922303| | 0.0003770| |
| Edward McMillan Tate | R | 0.0019614| | 0.1922303| | 0.0003770| |
| Newport Five, LLC | R | 0.0075457| | 0.1922303| | 0.0015092| |
| Robert C. McMillan, as Trustee of the Robert C. McMillan 2011 Revocable Trust dated November 29, 2011 | R | 0.0078457| | 0.1922303| | 0.0015082| |
| Ed Leigh McMillan III | R | 0.0039229| | 0.1922303| | 0.0007541| |
| Daniel W. McMillan | R | 0.0039229| | 0.1922303| | 0.0007541| |
| Kettell Group, LLC | R | 0.0196143| | 0.1922303| | 0.0037705| |
| SSC Minerals, LLC | R | 0.0147107| | 0.1922303| | 0.0002827a| |
| Flowing Well, LLC | R | 0.0047323| | 0.1922303| | 0.0009963| |
| W.T. Neal Family Stock, LLC | R | 0.1203475| | 0.1922303| | 0.0231344| |
| Trustees of the Marital Trust and Trustees of the Family Trust U/W W.T. Neal, Jr. thru Sara Beall Neal | R | 0.0125000| | 0.1922303| | 0.0024029| |
| John R. Miller, III | K | 0.0079691| | 0.1922303| | 0.0015319| |
| Nancy M. Mehoe | R | 0.0057466| | 0.1922303| | 0.0001047| |
| David Earl Miller | R | 0.0057466| | 0.1922303| | 0.0011047| |
| Jean Miller (Slimpson) | R | 0.0057466| | 0.1922303| | 0.0001047| |
| Robert H. Kirby | R | 0.0035886| | 0.1922303| | 0.0016510| |
| Jean Kirby Jones | R | 0.0085886| | 0.1922303| | 0.0016510| |
| Suzanne W. Zimmer | R | 0.0085886| | 0.1922303| | 0.0016510| |
| Laura W. Grier | R | 0.0093886| | 0.1922303| | 0.0016510| |
| Linda H. Chavers | R | 0.0026907| | 0.1922303| | 0.0004946| |
| Camilla Huxford | R | 0.0017171| | 0.1922303| | 0.0003302| |
| James H. Barton, Jr. and Jamie Barton, as Trustees of the Barton Family Revocable Trust | R | 0.0010074| | 0.1922303| | 0.0002131a| |
| Peter B. Hamilton, Jr. | R | 0.0011079| | 0.1922303| | 0.0002131a| |
| Herschell Lee Abbott, III | R | 0.0055440| | 0.1922303| | 0.0010657| |
| Cathryn Abbott Jones | R | 0.0005440| | 0.1922303| | 0.0010657| |
| Ernest Floyd Hel | R | 0.0010079| | 0.1922303| | 0.0002131a| |
| James Boyd Hel | R | 0.0010079| | 0.1922303| | 0.0002131a| |
| Jeanne Bel Ingraham | R | 0.0010079| | 0.1922303| | 0.0002131a| |
| Jason Goodner Cohen and Reliance Trust Company, as Co-Trustees of the Randall Montgomery Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.0021069| | 0.1922303| | 0.0004035a| |
| Roderick Wade Goodner, Jr. and Reliance Trust Company, as Co-Trustees of the Roderick Wade Goodner Trust | R | 0.0021069| | 0.1922303| | 0.0004035a| |

Exhibit C
DOCKET NO. 5-0-17-224
Date: 6-3-2020
Entered by: Standwell Jason

| Name | | | | |
|---|---|---|---|---|
| Share of Trust A under the Evelyn M. Brittan Declaration of Trust | | | | |
| E.D. Scruggs, Jr. | R | 0.00059092 | 0.19223031 | 0.00009629 |
| Wendell Phillips Simpson | R | 0.00080092 | 0.19223031 | 0.00009629 |
| Kay Mitchell | R | 0.00025046 | 0.19223031 | 0.00004815 |
| Haywood Hamm, III | R | 0.00025046 | 0.19223031 | 0.00004815 |
| Lyman W. Phillips, Jr. | F | 0.00391615 | 0.19223031 | 0.00075292 |
| Frances L. Pope and Robert B. Crimmins, as Trustees of the Family Trust U/W Robert Downing Pope, Jr. | B | 0.00015000 | 0.19223031 | 0.00002883 |
| Jessy H. McGavin | R | 0.00061559 | 0.19223031 | 0.00011834 |
| Philippe Peyton M. Bottom | R | 0.00061559 | 0.19223031 | 0.00011834 |
| Peyton H. Hamilton (Carmichael?) | P | 0.00123119 | 0.19223031 | 0.00023667 |
| Stirling H. Hamilton, Jr. | R | 0.00123119 | 0.19223031 | 0.00023667 |
| Julie H. Fines | Y | 0.00123119 | 0.19223031 | 0.00023667 |
| Claude E. Hamilton, III | R | 0.00123119 | 0.19223031 | 0.00023667 |
| William Hamilton, Jr. | R | 0.00123119 | 0.19223031 | 0.00023667 |
| Lewis S. Hamilton | R | 0.00123119 | 0.19223031 | 0.00023667 |
| Adrian C. Allen, as Trustee of the Adrian C Allen Revocable Trust | R | 0.00230351 | 0.19223031 | 0.00044242 |
| Suzanne C. Allen, as Trustee of the Suzanne C Allen Revocable Trust | R | 0.00230351 | 0.19223031 | 0.00044242 |
| Cynthia S. Rilling | R | 0.00078317 | 0.19223031 | 0.00014747 |
| Deborah Jean Shaffer | R | 0.00038359 | 0.19223031 | 0.00007374 |
| Michael Adrian Shaffer and Clarisse Shaffer, as Trustees of the Shaffer Family Living Trust | R | 0.00038359 | 0.19223031 | 0.00007374 |
| Charles James Shaffer and Katrina Justice Shaffer, as Trustees of the CK Shaffer Family Trust | R | 0.00038359 | 0.19223031 | 0.00007374 |
| Terri L. Kidd, as Trustee of The Terri L. Kidd Special Trust | R | 0.00011507 | 0.19223031 | 0.00002212 |
| Rock Springs Minerals I, LLC | R | 0.00072184 | 0.19223031 | 0.00013876 |
| Source Rock Minerals, LLC | R | 0.00029423 | 0.19223031 | 0.00005656 |
| Rock Springs Energy, LLC | R | 0.00001569 | 0.19223031 | 0.00000302 |
| David Bismeyer | F | 0.00000392 | 0.19223031 | 0.00000075 |
| Susan M. Winchester | R | 0.00076717 | 0.19223031 | 0.00014747 |
| James Adrian Allen | R | 0.00076717 | 0.19223031 | 0.00014747 |
| Downing Family Properties, LLC | R | 0.01069672 | 0.19223031 | 0.00205623 |
| Reuben Downing Johnson | R | 0.00081826 | 0.19223031 | 0.00015729 |
| Stella Livingston Hawkins | R | 0.00081826 | 0.19223031 | 0.00015729 |
| Wiley W. Downing, IV | R | 0.00015342 | 0.19223031 | 0.00002949 |
| Lisa Downing Nordmeyer | R | 0.00015342 | 0.19223031 | 0.00002949 |
| John A. Downing | R | 0.00030685 | 0.19223031 | 0.00005899 |
| Dan M. Downing | R | 0.00030685 | 0.19223031 | 0.00005899 |
| Anna Lillian D. Nelvin | R | 0.00030685 | 0.19223031 | 0.00005899 |
| Jane Downing Dunaway | R | 0.00027275 | 0.19223031 | 0.00005243 |
| Lisa Downing Heams | R | 0.00027275 | 0.19223031 | 0.00005243 |
| John Eric Downing | R | 0.00027275 | 0.19223031 | 0.00005243 |
| Albert W. Key | R | 0.00014533 | 0.19223031 | 0.00002794 |
| Atwood M. Kimbrough | R | 0.00010902 | 0.19223031 | 0.00002095 |
| James C. Kimbrough | R | 0.00003633 | 0.19223031 | 0.00000698 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Sr. Trust U/A 3/17/05 | R | 0.00506656 | 0.19223031 | 0.00097285 |
| Adrienne P. Watkins, as Trustee of the Adrienne P. Watkins Trust U/A 3/17/05 | R | 0.00168695 | 0.19223031 | 0.00032428 |
| John W. Gray, Jr., as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Jack M. Watkins, Jr. Family dated September 29, 2011 | R | 0.00168695 | 0.19223031 | 0.00032428 |
| Gerald Stephen Herman, as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Adrienne W. Snively Family dated September 29, 2011 | B | 0.00168695 | 0.19223031 | 0.00032428 |
| Adrienne P. Watkins | R | 0.00015000 | 0.19223031 | 0.00002883 |
| Patricia Downing McFarland | R | 0.00010000 | 0.19223031 | 0.00001922 |
| John Robert Downing | R | 0.00007560 | 0.19223031 | 0.00001442 |
| Hermine M. Downing | R | 0.00101626 | 0.19223031 | 0.00019534 |
| M. Travis Holabom | R | 0.00050913 | 0.19223031 | 0.00009787 |
| Valhalla Royalty, LLC | O | 0.00075000 | 0.19223031 | 0.00014417 |
| Lister Energy, Inc. | O | 0.00754668 | 0.19223031 | 0.00145074 |
| Exofe Energy, L.L.C | O | 0.00254658 | 0.19223031 | 0.00045074 |
| Dubeil Resources, L.C | O | 0.00452831 | 0.19223031 | 0.00037044 |
| Christopher A. Farrell | O | 0.00173862 | 0.19223031 | 0.00033422 |

Exhibit C
DOCKET NO. 3-3-13-14A
Item A 3-3913
Prepared by: Maxwell Jones

Page 12 of 14

| | | | | |
|---|---|---|---|---|
| Cedar Creek Land & Timber, Inc. | R | 0.11560000 | 0.00150625 | 0.00026450 |
| Estate of Ed Leigh McMillan II | R | 9.00119030 | 0.00150625 | 0.00000179 |
| Elvira McMillan Tate (Mancell?) | R | 0.00119030 | 0.00150625 | 0.00000179 |
| Thomas E. McMillan, Jr. | R | 0.00103145 | 0.00150625 | 0.00000155 |
| Robert Cochrane McMillan | R | 0.00103145 | 0.00150625 | 0.00000155 |
| Katherine E. McM. Owens | R | 0.00197487 | 0.00150625 | 0.00000297 |
| Thomas E. McMillan, Jr. and Robert C. McMillan, as Co-Trustees U/W Ivy Lee McMillan | R | 0.00832500 | 0.00150625 | 0.00001254 |
| Thomas E. McMillan, Jr., Robert C. McMillan, Ed Leigh McMillan III, and Daniel W. McMillan, as Co-Trustees U/W Ed Leigh McMillan | R | 0.00012500 | 0.00150625 | 0.00000019 |
| Allen C. Phillips | R | 0.00902649 | 0.00150625 | 0.00001360 |
| Auburn University | R | 0.00510262 | 0.00150625 | 0.00000769 |
| Minnie Tate Dubilier | R | 0.00019614 | 0.00150625 | 0.00000030 |
| Elvira Tate Hankins | R | 0.00019614 | 0.00150625 | 0.00000030 |
| Albert Clark Tate III | R | 0.00019614 | 0.00150625 | 0.00000030 |
| Edward McMillan Tate | R | 0.00019614 | 0.00150625 | 0.00000030 |
| Newport Five, LLC | R | 0.00078457 | 0.00150625 | 0.00000118 |
| Robert C. McMillan, as Trustee of the Robert C. McMillan 2011 Revocable Trust dated November 29, 2011 | R | 0.00078457 | 0.00150625 | 0.00000118 |
| Ed Leigh McMillan III | R | 0.00039229 | 0.00150625 | 0.00000059 |
| Daniel W. McMillan | R | 0.00039229 | 0.00150625 | 0.00000059 |
| Kersch Group, LLC | R | 0.00196143 | 0.00150625 | 0.00000295 |
| SSC Minerals, LLC | R | 0.00147107 | 0.00150625 | 0.00000222 |
| Flowing Well, LLC | R | 0.00477223 | 0.00150625 | 0.00000719 |
| W.T. Neal Family Stock, LLC | R | 0.01207475 | 0.00150625 | 0.00001819 |
| Trustees of the Marital Trust and Trustees of the Family Trust L/W W.T. Neal, Jr. F/b/o Sara Bradl Neal | R | 0.00125000 | 0.00150625 | 0.00000188 |
| John R. Miller, III | R | 0.00079691 | 0.00150625 | 0.00000120 |
| Nancy M. Melton | R | 0.00057466 | 0.00150625 | 0.00000087 |
| David Earl Miller | R | 0.00057466 | 0.00150625 | 0.00000087 |
| Joan Miller (Simpson) | R | 0.00057466 | 0.00150625 | 0.00000087 |
| Robert H. Kitty | R | 0.00085586 | 0.00150625 | 0.00000129 |
| Jean Kelby Jones | R | 0.00085586 | 0.00150625 | 0.00000129 |
| Suzanne W. Zimmer | R | 0.00085586 | 0.00150625 | 0.00000129 |
| Laura W. Grist | R | 0.00085586 | 0.00150625 | 0.00000129 |
| Linda H. Chassey | R | 0.00220607 | 0.00150625 | 0.00000333 |
| Camilla Huxford | R | 0.00171771 | 0.00150625 | 0.00000259 |
| James H. Barrow, Jr. and James Barrow, as Trustees of the Barrow Family Revocable Trust | R | 0.00110879 | 0.00150625 | 0.00000167 |
| Peter B. Hamilton, Jr. | R | 0.00110879 | 0.00150625 | 0.00000167 |
| Herschell Lee Abbott, III | R | 0.00055440 | 0.00150625 | 0.00000084 |
| Cathryn Abbott Jones | R | 0.00055440 | 0.00150625 | 0.00000084 |
| Ernest Fred Bell | R | 0.00110879 | 0.00150625 | 0.00000167 |
| Janet Boyd Bel | R | 0.00110879 | 0.00150625 | 0.00000167 |
| Joanne Bel Ingraham | R | 0.00110879 | 0.00150625 | 0.00000167 |
| Janan Goodner Cohen and Reliance Trust Company, as Co-Trustees of the Randall Montgomery Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.00210069 | 0.00150625 | 0.00000316 |
| Roderick Wade Goodner, Jr. and Reliance Trust Company, as Co-Trustees of the Roderick Wade Goodner Trust Share of Trust A under the Evelyn M. Britton Declaration of Trust | R | 0.00210069 | 0.00150625 | 0.00000316 |
| E.D. Scruggs, Jr. | R | 0.00050092 | 0.00150625 | 0.00000075 |
| Wendell Phillips Simpson | R | 0.00050092 | 0.00150625 | 0.00000075 |
| Kay Mitchell | R | 0.00025046 | 0.00150625 | 0.00000038 |
| Haywood Hanna, III | R | 0.00025046 | 0.00150625 | 0.00000038 |
| Lyman W. Phillips, Jr. | R | 0.00391675 | 0.00150625 | 0.00000590 |
| Frances L. Pope and Robert R. Crittenden, as Trustees of the Family Trust U/W Robert Downing Pope, Jr. | R | 0.00015000 | 0.00150625 | 0.00000023 |
| Jenny H. McGowin | R | 0.00061559 | 0.00150625 | 0.00000093 |
| Philippa Peyton M. Bushes | R | 0.00061559 | 0.00150625 | 0.00000093 |
| Peyton H. Hamilton (Carmichael?) | R | 0.00123119 | 0.00150625 | 0.00000185 |
| Sterling H. Hamilton, Jr. | R | 0.00123119 | 0.00150625 | 0.00000185 |
| Julie H. Pless | R | 0.00123119 | 0.00150625 | 0.00000185 |

Exhibit C
DOCKET NO. 55-29-11A
Date: 9-3-2012
Prepared by: Marshal Auten

| | | | | |
|---|---|---|---|---|
| Ulande E. Hamilton, III | R | 0.00123119 | 0.00150625 | 0.00000183 |
| William Hamilton, Jr. | R | 0.00123119 | 0.00150625 | 0.00000183 |
| Lewis S. Hamilton | R | 0.00123119 | 0.00150625 | 0.00000183 |
| Adrian C. Allen, as Trustee of the Adrian C. Allen Revocable Trust | R | 0.00230151 | 0.00150625 | 0.00000347 |
| Suzanne C. Allen, as Trustee of the Suzanne C. Allen Revocable Trust | R | 0.00230151 | 0.00150625 | 0.00000347 |
| Cynthia S. Rilling | R | 0.00076713 | 0.00150625 | 0.00000116 |
| Deborah Jean Shaffer | R | 0.00038359 | 0.00150625 | 0.00000058 |
| Michael Adrian Shaffer and Clarissa Shaffer, as Trustees of the Shaffer Family Living Trust | R | 0.00038359 | 0.00150625 | 0.00000058 |
| Charles James Shaffer and Katrina Jeanne Shaffer, as Trustees of the CK Shaffer Family Trust | R | 0.00038359 | 0.00150625 | 0.00000058 |
| Trent L. Kidd, as Trustee of the Trent L. Kidd Special Trust | R | 0.00011507 | 0.00150625 | 0.00000017 |
| Rock Springs Minerals I, LLC | R | 0.00072184 | 0.00150625 | 0.00000109 |
| Source Rock Minerals, LLC | R | 0.00029423 | 0.00150625 | 0.00000044 |
| Rock Springs Energy, LLC | R | 0.00001160 | 0.00150625 | 0.00000002 |
| David Bitolmeyer | R | 0.00000392 | 0.00150625 | 0.00000001 |
| Susan M. Winchester | R | 0.00076717 | 0.00150625 | 0.00000116 |
| James Adrian Allen | R | 0.00076717 | 0.00150625 | 0.00000116 |
| Downing Family Properties, LLC | R | 0.01069672 | 0.00150625 | 0.00001611 |
| Ruthie Downing Johnson | R | 0.00081826 | 0.00150625 | 0.00000123 |
| Stella Livingston Hawkins | R | 0.00081826 | 0.00150625 | 0.00000123 |
| Wiley W. Downing, IV | R | 0.00015342 | 0.00150625 | 0.00000023 |
| Lisa Downing Nordmeyer | R | 0.00015342 | 0.00150625 | 0.00000023 |
| John A. Downing | R | 0.00030665 | 0.00150625 | 0.00000046 |
| Dan M. Downing | R | 0.00030665 | 0.00150625 | 0.00000046 |
| Anna Lillian D. Nelson | R | 0.00030685 | 0.00150625 | 0.00000046 |
| Jane Downing Dunaway | R | 0.00027275 | 0.00150625 | 0.00000041 |
| Lisa Downing Hearin | R | 0.00027275 | 0.00150625 | 0.00000041 |
| John Eric Downing | R | 0.00027275 | 0.00150625 | 0.00000041 |
| Albert W. Key | R | 0.00014533 | 0.00150625 | 0.00000022 |
| Atwood M. Kimbrough | R | 0.00010900 | 0.00150625 | 0.00000016 |
| James C. Kimbrough | R | 0.00003633 | 0.00150625 | 0.00000005 |
| Jack M. Watkins, Sr., as Trustee of the Jack M. Watkins, Sr. Trust U/A 3/17/05 | R | 0.00500086 | 0.00150625 | 0.00000762 |
| Adrienne P. Watkins, as Trustee of the Adrienne P. Watkins Trust U/A 3/17/05 | R | 0.00168695 | 0.00150625 | 0.00000254 |
| John H. Gray, Jr., as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Jack M. Watkins, Jr. Family dated September 29, 2011 | R | 0.00168695 | 0.00150625 | 0.00000254 |
| Gerald Stephen Herman, as Trustee of the Adrienne P. Watkins Irrevocable Mineral Rights Trust for the benefit of the Adrienne W. Snively Family dated September 29, 2011 | R | 0.00168695 | 0.00150625 | 0.00000254 |
| Adrienne P. Watkins | R | 0.00015060 | 0.00150625 | 0.00000023 |
| Patricia Downing McFarland | R | 0.00010000 | 0.00150625 | 0.00000015 |
| John Robert Downing | R | 0.00007500 | 0.00150625 | 0.00000011 |
| Bettinie M. Downing | R | 0.00101826 | 0.00150625 | 0.00000153 |
| M. Travis Holtzborn | R | 0.00050913 | 0.00150625 | 0.00000077 |
| Valhalla Royalty, LLC | O | 0.00075000 | 0.00150625 | 0.00000113 |
| Eames Energy, Inc. | O | 0.00754684 | 0.00150625 | 0.00001137 |
| Ezelle Energy, L.L.C. | O | 0.00754688 | 0.00150625 | 0.00001137 |
| Daniel Resources, LC | O | 0.00452913 | 0.00150625 | 0.00000682 |
| Christopher A. Farrell | O | 0.00175862 | 0.00150625 | 0.00000265 |
| | | **Net Revenue Interest Total** | | **1.00000001** |

EXHIBIT C
DOCKET NO. 13-12-11A
Page 4.5/4/03
Prepared by: Marshall Jones

Page 14 of 14



Shreveport Office
401 Edwards St., Ste. 1601
Shreveport, Louisiana 71101
Phone: 318-227-8668
Facsimile: 318-227-9012

Boulder Office
5395 Pearl Parkway, Ste. 200
Boulder, Colorado 80301
Phone: 720-961-5477
Facsimile: 303-443-1551

Steven R. Hatcher, Jr., Attorney

Telephone: 720-306-8310
E-Mail: shatcher@sklarexploration.com

September 14, 2015

To:     Working Interest Owners

Re:     Escambia Prospect, Conecuh & Escambia Counties, Alabama

Dear Owners,

As Operator of the Fishpond Oil Unit of the Fishpond Field, Escambia County, Alabama ("Fishpond Unit"), we are proceeding with operations for gas injection in that unit for purposes of pressure maintenance and secondary recovery. In that connection, we may not only be using gas delivered at the tailgate of the plant attributable to the Fishpond Unit for injection into the Unitized Interval, but we may also purchase gas from the tailgate of the plant attributable to wells located outside of the Fishpond Unit (i.e., Outside Substances). Enclosed is a Gas Purchase Agreement executed by us in our capacity as Operator of the Fishpond Unit whereby we agree to purchase Outside Substances for injection from wells located in our Escambia Prospect. We request that each of you, as a working interest owner in the Escambia Prospect, execute the same as one of the Sellers. Terms of purchase and sale are (and for the duration of the injection program will remain) the same as we are currently selling gas to Southeast Alabama Gas District ("SEAGD"), so you will see no difference in the price received as a Seller whether we purchase that gas and inject it into the Fishpond Unit or continue selling it to SEAGD.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

Steven R. Hatcher, Jr.
Attorney

Enclosure - Gas Purchase Contract

THIS GAS PURCHASE AGREEMENT (this "Agreement"), made and entered into this 27ᵀᴴ day of August, 2015, by and between the parties shown on Exhibit A (hereinafter referred to collectively as "Sellers" and individually as "Seller") and Sklar Exploration Company L.L.C., a Louisiana limited liability company, (i) in its capacity as Operator of Fishpond Oil Unit in the Fishpond Field in Escambia County, Alabama (hereinafter referred to as "Buyer") and (ii) in its capacity as Operator of the wells identified on Exhibit B (hereinafter referred to as "SEC"):

WHEREAS Sellers are parties to a Gas Purchase Contract with Southeast Alabama Gas District (hereinafter referred to as "SEAGD") dated June 1, 2011 (as amended), which, among other things, covers residue gas produced from certain wells described on Exhibit B hereto (the "Contract");

WHEREAS Sellers own working interests in the wells described on Exhibit B (the "Wells") and are entitled to gas produced from those wells;

WHEREAS a majority of the Sellers are also working interest owners in Fishpond Oil Unit of the Fishpond Field, which unit was heretofore established and approved by orders of the State Oil and Gas Board of Alabama ("Fishpond Oil Unit");

WHEREAS the gas produced from the Wells is normally delivered to the Abbyville Plant where the gas is treated and processed, liquids are extracted and residue gas is delivered to a meter at the tailgate of the Plant pursuant to a Services Agreement (the "Abbyville Agreement") dated September 14, 2011 between Sellers and CDM MAX, LLC (now Plains Gas Solutions, LLC hereinafter "PGS") although pursuant to the Abbyville Agreement the gas may on occasion be delivered to the North Beach Plant for processing and treatment;

WHEREAS SEC, as Operator of the wells described on Exhibit B, is also a party to the Contract and is referred to therein (but not herein) as Seller;

WHEREAS as authorized by the Contract, by the Abbyville Agreement and by the Operating Agreement entered into by Sellers and SEC applicable to each well described on Exhibit B, SEC has heretofore received and distributed all revenue allocable to each Seller's interest under the Contract and has paid royalties, taxes and plant charges applicable thereto;

WHEREAS the Contract provides in Article III that "Seller" (as defined therein) reserves certain rights including the right

> "To use Gas produced from the Well(s) committed hereto for developing and operating such properties and other properties of Seller in the vicinity thereof, including but not limited to the sale of Gas to drilling contractors for development of such properties, Gas lift, pressure maintenance, secondary recovery, tertiary recovery, re-pressuring, cycling, deepening, reworking, and drilling, for fulfilling obligations to the lessors under the terms of Seller's oil, gas, and mineral leases, and for treating, separating or processing oil, gas or other minerals."

WHEREAS Sellers desire to sell gas to Buyer (acting on behalf of the Working Interest Owners in Fishpond Oil Unit) for the purpose of utilizing that gas in operating and developing Fishpond Oil

1

Unit and, in particular, for use in pressure maintenance, secondary recovery, re-pressuring and similar operations and for treating, separating or processing oil, gas or other minerals produced from Fishpond Oil Unit; and

WHEREAS Buyer desires to purchase Sellers' gas for the above mentioned purposes;

NOW, THEREFORE, Sellers and Buyers hereby agree as follow:

1. Sellers and SEC (with respect to residue gas attributable to persons whose gas SEC has a right to sell) hereby authorize Buyer to provide a copy of this Agreement to PGS and hereby direct PGS (its successors and assigns), as owner/operator of the Plant pursuant to and subject to the Abbyville Agreement, to deliver to Buyer residue gas owned by Sellers and/or SEC that is allocable to the Wells and is nominated for purchase by Buyer. PGS shall commence the delivery of such residue gas to Buyer upon notice by Buyer to PGS that Buyer is ready to receive deliveries, and continue thereafter so long as such gas is nominated for delivery to Buyer in accordance with Buyer's nominations. Title to all residue gas delivered to Buyer hereunder shall pass to Buyer at the point of delivery into the equipment of Buyer as installed pursuant to paragraph 6, below.

2. The Purchase Price for all residue gas delivered to Buyer hereunder shall be the same as the price Sellers would have received for such gas had it been sold to SEAGD pursuant to the Contract, at the time of sale, and the quality specifications for the residue gas shall be the same as those set forth in the Contract for residue gas delivered to SEAGD, provided, however, that should the Contract not be in effect at the time of a sale hereunder, the price to be paid for the residue gas shall be the price that would have been received under the Contract at the time of sale if the Contract had remained in effect (i.e., shall be calculated in accordance with the pricing provisions of the version of the Contract most recently in  effect), and the quality specifications for that gas shall be as set forth in the version of the Contract most recently in effect, and provided further, that Buyer may agree to waive, in whole or in part, any of the applicable quality specifications for the residue gas.

3. Because a number of the Sellers are working interest owners in Fishpond Oil Unit and are, therefore, to that extent, in effect, also purchasers under this Agreement, each Seller who is both a Seller and Working Interest Owner in Fishpond Oil Unit hereby requests that:  Buyer and SEC net out any amounts due to such Seller hereunder against any amounts due from such Seller as a Working Interest Owner in Fishpond Oil Unit and pay or bill to such Seller only the net amount determined to be due.

4. This Agreement may be terminated by either party upon 30 days written notice to the other party, and the volume of gas purchased hereunder may be modified by Buyer (increased or decreased) at any time and from time to time (provided that the amount may not exceed residue gas owned by Sellers and/or SEC that is allocable to the Wells).

5. This Agreement shall be binding and effective as to those Sellers who execute it (and their successors and assigns) regardless of whether or not all Sellers execute it.

6. Buyer shall (and is hereby authorized to) install (as a Fishpond Oil Unit expense) any valves, piping, or other equipment necessary for it to take the residue gas covered hereby at the tailgate of the North Beach Plant and/or the Abbyville Plant.

2

7. By execution of this Agreement Sellers hereby authorize and empower SEC (as Operator of the Wells) to take actions, or to refrain from taking actions, for and on their behalf with respect to matters or rights reserved or delegated to SEC and/or the Sellers under this Agreement, the Abbyville Agreement, the Contract or any applicable operating agreement. In particular, SEC is hereby authorized to receive all payments for residue gas delivered hereunder, to pay any fees, royalties, taxes or other charges (including plant charges) applicable to such residue gas, and then to distribute the remaining amounts to Sellers as per their interests in said gas pursuant to the Abbyville Agreement and applicable operating agreement(s). The Sellers and SEC do not intend to create by this provision or any other provision of this Agreement a partnership, joint venture or any fiduciary relationship between themselves and, in fact, expressly disclaim any such relationship and reaffirm that SEC shall have no liability under this Agreement or otherwise to Sellers for any losses sustained or liabilities incurred (from whatever cause), except such as may result directly from gross negligence or willful misconduct on the part of SEC.

8. Buyer understands that SEC may from time to time sell gas on behalf of other owners in the Exhibit B wells on a temporary basis, and Buyer further understands that such temporary sales may end and thus the volumes of gas delivered hereunder may be reduced.

9. This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement. No amendment or modification of this Agreement shall be effective unless set forth in a signed written agreement.

10. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, personal representatives, successors and assigns.

11. This Agreement may be executed in any number of counterparts and each counterpart shall constitute and be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. All execution pages may be attached to one copy of this Agreement.

12. This Agreement shall be **governed exclusively by and interpreted in accordance with the laws of the State of Alabama** without regard to any conflict of laws principles or rules.

13. The Parties acknowledge that the right to trial by jury is a constitutional one, but that it may be waived. After consulting (or having had the opportunity to consult) with counsel of their choice, each party knowingly and voluntarily and for their mutual benefit WAIVES ANY RIGHT TO TRIAL BY JURY in the event of litigation regarding the performance or enforcement of, or in any way related to, this agreement.

14. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender includes the masculine and the feminine.

EXECUTED effective as of the date set forth in the first paragraph of this agreement.

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

**BUYER**:

SKLAR EXPLORATION COMPANY L.L.C., in its
capacity as Operator of Fishpond Oil Unit

ATTEST:

By: _____

By: _____

David A. Barlow

Title:   President and COO

Date: _AUGUST 27, 2015_

**OPERATOR OF WELLS ON EXHIBIT B:**

SKLAR EXPLORATION COMPANY L.L.C., in its
capacity as Operator of the wells identified in Exhibit B
under paragraph 8

ATTEST:

By: _____

By: _____

David A. Barlow

Title:   President and COO

Date: _AUGUST 27, 2015_

**SELLERS:**

SKLARCO L.L.C.

ATTEST:

By: _____

By: _____

David A. Barlow

Title:   President and COO

Date: _AUGUST 27, 2015_

4

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

KUDZU OIL PROPERTIES, LLC

ATTEST:

By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____


MCCOMBS ENERGY, LTD.

ATTEST:

By: _____

By: _____
Billy Forney, III
Title:   Vice President

Date: _____


BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:

By: _____

By: _____
Robert P. Bowman
Title:   Manager

Date: _____


DICKSON OIL & GAS, LLC

ATTEST:

By: _____

By: _____
C. Bickham Dickson, III
Title:   Member

Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

FANT ENERGY LIMITED

ATTEST:
By: _____

By: _____
Stephen Swan
Title:

Date: _____


JF HOWELL INTERESTS, LP

ATTEST:
By: _____

By: Howell Investments, LLC

By: _____
David Morgan
Title:   Manager
Date: _____


MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title:   Member

Date: _____


TIEMBO, LTD.

ATTEST:
By: _____

By: _____
Mark Rauch
Title:   Registered Agent

Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

 

**CRAFT EXPLORATION COMPANY, LLC**

ATTEST:

By: _____

By: _____
Steven H. Craft
Title:   Member

Date: _____

 

**JJS INTERESTS ESCAMBIA, LLC**

ATTEST:

By: _____

By: _____
Justin Simons
Title:   Manager

Date: _____

 

**RESOURCE VENTURES, LLC**

ATTEST:

By: _____

By: _____
Mark A. Arnold
Title:   General Manager

Date: _____

 

**LANDMARK EXPLORATION, LLC**

ATTEST:

By: _____

By: _____
Michael Johnson
Title:   Manager

Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

                        PICKENS FINANCIAL GROUP LLC

ATTEST:
By: _____     By: _____
                                  Michael K. Pickens
                                  Title:   Vice President

                                  Date: _____


                        THE RUDMAN PARTNERSHIP

ATTEST:
By: _____     By: _____
                                  W. R. (Trey) Sibley
                                  Title:   Attorney-In-Fact

                                  Date: _____


                        TAUBER EXPLORATION & PRODUCTION CO.

ATTEST:
By: _____     By: _____
                                  Richard E. Tauber
                                  Title:   President

                                  Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

**ELECTRONIC SIGNATURE PAGE**

**SELLER:**

Exhibit A
To
Gas Purchase Contract

## Sellers

Sklarco, L.L.C.
Attn: David A. Barlow
401 Edwards St., Suite 1601
Shreveport, LA 71101

JJS Interests Escambia LLC
Attn: Mr. Justin Simons
4295 San Felipe, Suite 207
Houston, Texas 77027

Bundero Investment Company, L.L.C.
Attn: Robert P. Bowman, Manager
333 Texas Street, Ste. 300
Shreveport, LA 71101

Craft Exploration Company, L.L.C.
Attn:  Steven H. Craft, Managing Member
325 Lakeshire Parkway
Canton, MS 39046

Dickson Oil & Gas, LLC
Attn: Mr. C. Bickham Dickson, III
P. O. Box 52479
Shreveport, LA  71135

Fant Energy Limited
Attn: Stephen Swan
P. O. Box 55205
Houston, TX  77255

JF Howell Interests, LP
Attn: David Morgan
416 Travis Street, Suite 715
Shreveport, LA  71101
Phone: (318) 221-6382

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157

Landmark Exploration, LLC
Attn: Michael Johnson
P.O. Box 12004
Jackson, MS 39236

Marksco, LLC
Attn: Mark Sealy
333 Texas Street, Ste. 1050
Shreveport, LA 71101

McCombs Energy, Ltd.
Attn:  Larry Wyont, Vice President, Operations
5599 San Felipe St., Suite 1200
Houston, TX  77056-2721

Pickens Financial Group, LLC
Attn: Michael K. Pickens, Vice President
10100 N. Central Expressway Ste. 200
Dallas, Texas  75231-4159

Resource Ventures, LLC
Attn:  Mark A. Arnold
8369 SouthPark Lane, Ste B
Littleton, CO 80120

The Rudman Partnership
Attn: W. R. (Trey) Sibley, III
1700 Pacific Avenue, Suite 4700
Dallas, Texas 75201-4670

**Tauber Exploration & Production Co.**
**Attn: John Robinson**
**55 Waugh Drive, Suite 600**
**Houston, TX 77007**

**Tiembo, Ltd.**
**Attn: Mark Rauch**
**P.O. Box 270415**
**Houston, TX 77277-0415**

**Exhibit B**
**To**
**GAS PURCHASE CONTRACT**

| | |
|---|---|
| Logan 5-7 #1 | CCL&T 33-10 #1 |
| Hamiter 32-3 #1 | CCL&T 35-5 #1 |
| Mary Mack 31-2 #1 | Graddy 34-10 #1 |
| Thomasson 29-10 | CCL&T 3-4 #1 (R12E) |
| CCL&T 35-10 #1 | CCL&T 3-2 #1 |
| CCL&T 35-8 #2 | CCL&T 4-2 #1 |
| Ralls 30-8 #1 | CCL&T 4-3 #1 (R12E) |
| Boothe & Casey 29-6 #1 | CCL&T 32-9 #1 |
| CCL&T 33-2 #1 | Kennedy 36-12 #1 |
| CCL&T 35-11 #1 | Thomasson 33-12 #1 |
| Graddy 34-8 #1 | CCL&T 2-11 #1 |
| CCL&T 33-6 #1 | CCL&T 2-9 #1 (R12E) |
| Jones 34-4 #1 | CCL&T 3-4 #1 (R13E) |
| CCL&T 33-12 #1 | CCL&T 4-1 #1 |
| CCL&T 34-14 #1 | Pate 3-11 #1 |

Any other well operated by Sklar Exploration Company L.L.C. as Operator under the Escambia Prospect JOA, as amended, for and on behalf of the Non-Operators thereunder, located outside the Fishpond Oil Unit.

13

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

KUDZU OIL PROPERTIES, LLC

ATTEST:
By: _*Pamela A Sebren*_                By: _(signature)_
                                        Wirt A. Yerger, III
                                        Title:  Manager

                                        Date:  _9-14-2015_


MCCOMBS ENERGY, LTD.

ATTEST:
By: _____            By: _____
                                        Billy Forney, III
                                        Title:   Vice President

                                        Date: _____


BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:
By: _____            By: _____
                                        Robert P. Bowman
                                        Title:   Manager

                                        Date: _____


DICKSON OIL & GAS, LLC

ATTEST:
By: _____            By: _____
                                        C. Bickham Dickson, III
                                        Title:   Member

                                        Date: _____


5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

### ELECTRONIC SIGNATURE PAGE

**SELLER:**

Signature: *Billy Forney III*
Billy Forney III (Sep 15, 2015)

Email: bforney3@mccombsenergy.com

Title: Vice President

Company: McCombs Energy

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

KUDZU OIL PROPERTIES, LLC

ATTEST:
By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____


MCCOMBS ENERGY, LTD.

ATTEST:
By: _____

By: _____
Billy Forney, III
Title:   Vice President

Date: _____


BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:
By: _____

By: _____
Robert P. Bowman
Title:   Manager

Date: _____


DICKSON OIL & GAS, LLC

ATTEST:
By: _____

By: _____
C. Bickham Dickson, III
Title:   Member

Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

KUDZU OIL PROPERTIES, LLC

ATTEST:

By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____

MCCOMBS ENERGY, LTD.

ATTEST:

By: _____

By: _____
Billy Forney, III
Title:   Vice President

Date: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:

By: _____

By: _____
Robert P. Bowman
Title:   Manager

Date: _____

DICKSON OIL & GAS, LLC

ATTEST:

By: _____

By: _____
C. Bickham Dickson, III
Title:   Member

Date: 9/15/15

5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

FANT ENERGY LIMITED

ATTEST:
By: _____

By: _____
Stephen Swan
Title:

Date: _____ 8/15/15 _____

JF HOWELL INTERESTS, LP

ATTEST:
By: _____

By: Howell Investments, LLC

By: _____
David Morgan
Title:   Manager
Date: _____

MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title:   Member

Date: _____

TIEMBO, LTD.

ATTEST:
By: _____

By: _____
Mark Rauch
Title:   Registered Agent

Date: _____

6

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

### ELECTRONIC SIGNATURE PAGE

**SELLER:**

**Signature:** *David Morgan*
David Morgan (Sep 14, 2015)

**Email:** david@jfhowell.com

**Title:** Manager

**Company:** Howell Investments, LLC

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

FANT ENERGY LIMITED

ATTEST:
By: _____

By: _____
Stephen Swan
Title:

Date: _____


JF HOWELL INTERESTS, LP

ATTEST:
By: _____

By: Howell Investments, LLC

By: _____
David Morgan
Title: Manager
Date: _____


MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title: Member

Date: _____


TIEMBO, LTD.

ATTEST:
By: _____

By: _____
Mark Rauch
Title: Registered Agent

Date: _____

6

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

FANT ENERGY LIMITED

ATTEST:
By: _____

By: _____
Stephen Swan
Title:

Date: _____


JF HOWELL INTERESTS, LP

ATTEST:
By: _____

By: Howell Investments, LLC

By: _____
David Morgan
Title:   Manager
Date: _____


MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title:   Member

Date: _____


TIEMBO, LTD.

ATTEST:
By: _____

By: _____
Mark Rauch
Title:   Registered Agent

Date: 9/15/2015

6

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

### ELECTRONIC SIGNATURE PAGE

**SELLER:**

**Signature:** *Steven H Craft*
Steven H Craft (Sep 22, 2015)

**Email:** julie@thecraftcompanies.com

**Title:** Manager

**Company:** Craft Exploration Company

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: *Justin Simons*
Justin Simons (Sep 29, 2015)

Email: justin@hbcapllc.com

Title: President

Company: JJS Interests Escambia, LLC

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

CRAFT EXPLORATION COMPANY, LLC

ATTEST:
By: _____

By: _____
Steven H. Craft
Title:   Member

Date: _____


JJS INTERESTS ESCAMBIA, LLC

ATTEST:
By: _____

By: _____
Justin Simons
Title:   Manager

Date: _____


RESOURCE VENTURES, LLC

ATTEST:
By: *Julie Teagler*

By: _____
Mark A. Arnold
Title:   General Manager

Date: *September 15, 2015*


LANDMARK EXPLORATION, LLC

ATTEST:
By: _____

By: _____
Michael Johnson
Title:   Manager

Date: _____

7

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

**Signature:** *Michael E. Johnson*
<span style="font-size:smaller">Michael E. Johnson (Sep 13, 2015)</span>

**Email:** mej@lmhomes.net

**Title:** Manager

**Company:** Landmark Exploration, LLC

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

PICKENS FINANCIAL GROUP LLC

ATTEST;
By: _Kathy Laux_

By: _Michael K. Pickens_
Michael K. Pickens
Title:   Vice President

Date:   _9/14/2015_


THE RUDMAN PARTNERSHIP

ATTEST:
By: _____

By: _____
W. R. (Trey) Sibley
Title:   Attorney-In-Fact

Date: _____


TAUBER EXPLORATION & PRODUCTION CO.

ATTEST:
By: _____

By: _____
Richard E. Tauber
Title:   President

Date: _____

8

Signature Page to Gas Purchase Contract (Dated 8/27/15)
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

PICKENS FINANCIAL GROUP LLC

ATTEST:

By: _____

By: _____
Michael K. Pickens
Title:   Vice President

Date: _____


THE RUDMAN PARTNERSHIP

ATTEST:
By: _Frances Manske_____

By: _____
W. R. (Trey) Sibley    III
Title:   Attorney-In-Fact

Date: _September 25, 2015____


TAUBER EXPLORATION & PRODUCTION CO.

ATTEST:

By: _____

By: _____
Richard E. Tauber
Title:   President

Date: _____

8

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Escambia Prospect Working Interest Owners

PICKENS FINANCIAL GROUP LLC

ATTEST:

By: _____

By: _____
Michael K. Pickens
Title:   Vice President

Date: _____


THE RUDMAN PARTNERSHIP

ATTEST:

By: _____

By: _____
W. R. (Trey) Sibley
Title:   Attorney-In-Fact

Date: _____


TAUBER EXPLORATION & PRODUCTION CO.

ATTEST:

By: _____

By: _____
Richard E. Tauber
Title:   President

Date: SEPTEMBER 15, 2015

8



Shreveport Office
401 Edwards St., Ste. 1601
Shreveport, Louisiana 71101
Phone: 318-227-8668
Facsimile: 318-227-9012

Boulder Office
5395 Pearl Parkway, Ste. 200
Boulder, Colorado 80301
Phone: 720-961-5477
Facsimile: 303-443-1551

Steven R. Hatcher, Jr., Attorney

Telephone: 720-306-8310
E-Mail: shatcher@sklarexploration.com

September 14, 2015

To:     Working Interest Owners

Re:     North Beach Prospect, Conecuh County, Alabama

Dear Owners,

As Operator of the Fishpond Oil Unit of the Fishpond Field, Escambia County, Alabama ("Fishpond Unit"), we are proceeding with operations for gas injection in that unit for purposes of pressure maintenance and secondary recovery. In that connection, we may not only be using gas delivered at the tailgate of the plant attributable to the Fishpond Unit for injection into the Unitized Interval, but we may also purchase gas from the tailgate of the plant attributable to wells located outside of the Fishpond Unit (i.e., Outside Substances). Enclosed is a Gas Purchase Agreement executed by us in our capacity as Operator of the Fishpond Unit whereby we agree to purchase Outside Substances for injection from wells located in our North Beach Prospect (but outside of Little Cedar Creek Oil Unit II). We request that each of you, as a working interest owner in the North Beach Prospect, execute the same as one of the Sellers. Terms of purchase and sale are (and for the duration of the injection program will remain) the same as we are currently selling gas to Southeast Alabama Gas District ("SEAGD"), so you will see no difference in the price received as a Seller whether we purchase that gas and inject it into the Fishpond Unit or continue selling it to SEAGD. Please note that Outside Substances purchased from wells located in our North Beach Prospect (but outside Little Cedar Creek Oil Unit II) for injection in the Fishpond Oil Unit will not affect the current gas injection program at Little Cedar Creek Oil Unit II.

If you have any questions, please do not hesitate to contact me.

North Beach Working Interest Owners
September 14, 2015
Page **2** of **2**

Yours very truly,

Steven R. Hatcher, Jr.
Attorney

Enclosure - Gas Purchase Contract

THIS GAS PURCHASE AGREEMENT (this "Agreement"), made and entered into this _27TH_ day of _AUGUST_, 2015, by and between the parties shown on Exhibit A (hereinafter referred to collectively as "Sellers" and individually as "Seller") and Sklar Exploration Company L.L.C., a Louisiana limited liability company, (i) in its capacity as Operator of Fishpond Oil Unit in the Fishpond Field in Escambia County, Alabama (hereinafter referred to as "Buyer") and (ii) in its capacity as Operator of the wells identified on Exhibit B (hereinafter referred to as "SEC"):

WHEREAS Sellers are parties to a Gas Purchase Contract with Southeast Alabama Gas District (hereinafter referred to as "SEAGD") dated August 7, 2009, (as amended), which, among other things, covers residue gas produced from certain wells described on Exhibit B hereto (the "Contract");

WHEREAS Sellers own working interests in the wells described on Exhibit B (the "Wells") and are entitled to gas produced from those wells;

WHEREAS a majority of the Sellers are also working interest owners in Fishpond Oil Unit of the Fishpond Field, which unit was heretofore established and approved by orders of the State Oil and Gas Board of Alabama ("Fishpond Oil Unit");

WHEREAS the gas produced from the Wells is normally delivered to the North Beach Plant where the gas is treated and processed, liquids are extracted and residue gas is delivered to a meter at the tailgate of the Plant pursuant to a Service Agreement (the "North Beach Agreement") dated June 22, 2009, (as amended by instrument dated September 14, 2011) between Sellers and CDM MAX, LLC (now Plains Gas Solutions, LLC hereinafter "PGS") although pursuant to the North Beach Agreement the gas may on occasion be  delivered to the Abbyville Plant for processing and treatment;

WHEREAS SEC, as Operator of the wells described on Exhibit B, is also a party to the Contract and is referred to therein (but not herein) as Seller;

WHEREAS as authorized by the Contract, by the North Beach Agreement and by the Operating Agreement entered into by Sellers and SEC applicable to each well described on Exhibit B, SEC has heretofore received and distributed all revenue allocable to each Seller's interest under the Contract and has paid royalties, taxes and plant charges applicable thereto;

WHEREAS the Contract provides in Article III that "Seller" (as defined therein) reserves certain rights including the right

"To use Gas produced from the Well(s) committed hereto for developing and operating such properties and other properties of Seller in the vicinity thereof, including but not limited to the sale of Gas to drilling contractors for development of such properties, Gas lift, pressure maintenance, secondary recovery, tertiary recovery, re-pressuring, cycling, deepening, reworking, and drilling, for fulfilling obligations to the lessors under the terms of Seller's oil, gas, and mineral leases, and for treating, separating or processing oil, gas or other minerals."

1

WHEREAS Sellers desire to sell gas to Buyer (acting on behalf of the Working Interest Owners in Fishpond Oil Unit) for the purpose of utilizing that gas in operating and developing Fishpond Oil Unit and, in particular, for use in pressure maintenance, secondary recovery, re-pressuring and similar operations and for treating, separating or processing oil, gas or other minerals produced from Fishpond Oil Unit; and

WHEREAS Buyer desires to purchase Sellers' gas for the above mentioned purposes;

NOW, THEREFORE, Sellers and Buyers hereby agree as follow:

1. Sellers and SEC (with respect to residue gas attributable to persons whose gas SEC has a right to sell) hereby authorize Buyer to provide a copy of this Agreement to PGS and hereby direct PGS (its successors and assigns), as owner/operator of the Plant pursuant to and subject to the North Beach Agreement, to deliver to Buyer residue gas owned by Sellers and/or SEC that is allocable to the Wells and is nominated for purchase by Buyer. PGS shall commence the delivery of such residue gas to Buyer upon notice by Buyer to PGS that Buyer is ready to receive deliveries, and continue thereafter so long as such gas is nominated for delivery to Buyer in accordance with Buyer's nominations. Title to all residue gas delivered to Buyer hereunder shall pass to Buyer at the point of delivery into the equipment of Buyer as installed pursuant to paragraph 6, below.

2. The Purchase Price for all residue gas delivered to Buyer hereunder shall be the same as the price Sellers would have received for such gas had it been sold to SEAGD pursuant to the Contract, at the time of sale, and the quality specifications for the residue gas shall be the same as those set forth in the Contract for residue gas delivered to SEAGD, provided, however, that should the Contract not be in effect at the time of a sale hereunder, the price to be paid for the residue gas shall be the price that would have been received under the Contract at the time of sale if the Contract had remained in effect (i.e., shall be calculated in accordance with the pricing provisions of the version of the Contract most recently in effect), and the quality specifications for that gas shall be as set forth in the version of the Contract most recently in effect, and provided further, that Buyer may agree to waive, in whole or in part, any of the applicable quality specifications for the residue gas.

3. Because a number of the Sellers are working interest owners in Fishpond Oil Unit and are, therefore, to that extent, in effect, also purchasers under this Agreement, each Seller who is both a Seller and Working Interest Owner in Fishpond Oil Unit hereby requests that: Buyer and SEC net out any amounts due to such Seller hereunder against any amounts due from such Seller as a Working Interest Owner in Fishpond Oil Unit and pay or bill to such Seller only the net amount determined to be due.

4. This Agreement may be terminated by either party upon 30 days written notice to the other party, and the volume of gas purchased hereunder may be modified by Buyer (increased or decreased) at any time and from time to time (provided that the amount may not exceed residue gas owned by Sellers and/or SEC that is allocable to the Wells).

5. This Agreement shall be binding and effective as to those Sellers who execute it (and their successors and assigns) regardless of whether or not all Sellers execute it.

6. Buyer shall (and is hereby authorized to) install (as a Fishpond Oil Unit expense) any valves, piping, or other equipment necessary for it to take the residue gas covered hereby at the tailgate of the North Beach Plant and/or the Abbyville Plant.

7. By execution of this Agreement Sellers hereby authorize and empower SEC (as Operator of the Wells) to take actions, or to refrain from taking actions, for and on their behalf with respect to matters or rights reserved or delegated to SEC and/or the Sellers under this Agreement, the North Beach Agreement, the Contract or any applicable operating agreement. In particular, SEC is hereby authorized to receive all payments for residue gas delivered hereunder, to pay any fees, royalties, taxes or other charges (including plant charges) applicable to such residue gas, and then to distribute the remaining amounts to Sellers as per their interests in said gas pursuant to the North Beach Agreement and applicable operating agreement(s). The Sellers and SEC do not intend to create by this provision or any other provision of this Agreement a partnership, joint venture or any fiduciary relationship between themselves and, in fact, expressly disclaim any such relationship and reaffirm that SEC shall have no liability under this Agreement or otherwise to Sellers for any losses sustained or liabilities incurred (from whatever cause), except such as may result directly from gross negligence or willful misconduct on the part of SEC.

8. Buyer understands that SEC may from time to time sell gas on behalf of other owners in the Exhibit B wells on a temporary basis, and Buyer further understands that such temporary sales may end and thus the volumes of gas delivered hereunder may be reduced.

9. This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement. No amendment or modification of this Agreement shall be effective unless set forth in a signed written agreement.

10. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, personal representatives, successors and assigns.

11. This Agreement may be executed in any number of counterparts and each counterpart shall constitute and be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. All execution pages may be attached to one copy of this Agreement.

12. This Agreement shall be **governed exclusively by and interpreted in accordance with the laws of the State of Alabama** without regard to any conflict of laws principles or rules.

13. The Parties acknowledge that the right to trial by jury is a constitutional one, but that it may be waived. After consulting (or having had the opportunity to consult) with counsel of their choice, each party knowingly and voluntarily and for their mutual benefit WAIVES ANY RIGHT TO TRIAL BY JURY in the event of litigation regarding the performance or enforcement of, or in any way related to, this agreement.

14. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender includes the masculine and the feminine.

EXECUTED effective as of the date set forth in the first paragraph of this agreement.

3

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

**BUYER**:

SKLAR EXPLORATION COMPANY L.L.C., in its
capacity as Operator of Fishpond Oil Unit

ATTEST:
By: _____

By: _____
David A. Barlow
Title:   President and COO

Date: _AUGUST 27, 2015_

**OPERATOR OF THE WELLS ON EXHIBIT B**:

SKLAR EXPLORATION COMPANY L.L.C., in its
capacity as Operator of the wells identified in Exhibit B
under paragraph 8

ATTEST:
By: _____

By: _____
David A. Barlow
Title:   President and COO

Date: _AUGUST 27, 2015_

**SELLERS**:

SKLARCO L.L.C.

ATTEST:
By: _____

By: _____
David A. Barlow
Title:   President and COO

Date: _AUGUST 27, 2015_

4

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

COASTAL EXPLORATION, INC.

ATTEST: *Anita R Hemphill*
By: _____

*Anita Hemphill, Secretary*

By: *Julius M. Ridgway*

Julius M. Ridgway

Title:   President and Secretary

Date: _____9-14-15_____

TYLER OIL AND GAS, LLC

ATTEST:
By: _____

By: _____

Henry B. Tyler
Title:   Manager

Date: _____

TENEXCO, INC.

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

COASTAL EXPLORATION, INC.

ATTEST:
By: _____

By: _____
Julius M. Ridgway
Title:   President and Secretary

Date: _____


TYLER OIL AND GAS, LLC

ATTEST:
By: _____

By: _____
Henry B. Tyler
Title:   Manager

Date: Dec 7, 2015


TENEXCO, INC.

ATTEST:
By: _____

By: _____
Richard S. Incandela
Title:   President

Date: _____


QUAIL CREEK PRODUCTION CO. ATTEST:

By: _____

By: _____
Thomas E. Biery
Title:   President

Date: _____

5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

COASTAL EXPLORATION, INC.

ATTEST:
By: _____

By: _____
Julius M. Ridgway
Title:   President and Secretary

Date: _____

TYLER OIL AND GAS, LLC

ATTEST:
By: _____

By: _____
Henry B. Tyler
Title:   Manager

Date: _____

TENEXCO, INC.

ATTEST:
By: _____
    Richard Wynne

By: _Richard S. Incandela_____
Richard S. Incandela
Title:   President

Date:   12/8/15 _____

QUAIL CREEK PRODUCTION CO. ATTEST:

By: _____

By: _____
Thomas E. Biery
Title:   President

Date: _____

5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

COASTAL EXPLORATION, INC.

ATTEST:

By: _____        By: _____
                                   Julius M. Ridgway
                                   Title:   President and Secretary

                                   Date: _____


TYLER OIL AND GAS, LLC

ATTEST:

By: _____        By: _____
                                   Henry B. Tyler
                                   Title:   Manager

                                   Date: _____


TENEXCO, INC.

ATTEST:

By: _____        By: _____
                                   Richard S. Incandela
                                   Title:   President

                                   Date: _____


QUAIL CREEK PRODUCTION CO. ATTEST:

By: _____        By: _____
                                   Thomas E. Biery        D. W Dahlgren
                                   Title:   President            VP

                                   Date: 9/21/2015

5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

LONGLEAF ENERGY GROUP, INC.

ATTEST:

By: Amanda S. Holland

By: _____
Thomas E. McMillan, Jr.
Title:   President

Date:   1-04-16

CAYMAN RESOURCES, INC.

ATTEST:
By: _____

By: _____
Vincent J. Manara, III
Title:   President

Date: _____

YATES RESOURCES, LP

ATTEST:
By: _____

By: _____
J. Brooks Yates, Jr.
Title:   President of JBY Management
Corporation, its General Partner

Date: _____

SEPULGA RIVIER FUELS, LLC

ATTEST:
By: _____

By: _____
Cosby H. Martin, Jr.
Title:   Member

Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

LONGLEAF ENERGY GROUP, INC.

ATTEST:

By: _____

By: _____
Thomas E. McMillan, Jr.
Title:   President

Date: _____


CAYMAN RESOURCES, INC.

ATTEST:

By: _____

By: _Vincent J. Manara_____
Vincent J. Manara, III
Title:   President

Date: _9/17/15_____


YATES RESOURCES, LP

ATTEST:

By: _____

By: _____
J. Brooks Yates, Jr.
Title:   President of JBY Management
Corporation, its General Partner

Date: _____


SEPULGA RIVIER FUELS, LLC

ATTEST:

By: _____

By: _____
Cosby H. Martin, Jr.
Title:   Member

Date: _____

6

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

LONGLEAF ENERGY GROUP, INC.

ATTEST:
By: _____

By: _____
Thomas E. McMillan, Jr.
Title:   President

Date: _____


CAYMAN RESOURCES, INC.

ATTEST:
By: _____

By: _____
Vincent J. Manara, III
Title:   President

Date: _____


YATES RESOURCES, LP

ATTEST:
By: _____

By: _____
J. Brooks Yates, Jr.
Title:   President of JBY Management
Corporation, its General Partner

Date: _____


SEPULGA RIVIER FUELS, LLC

ATTEST:
By: _____

By: _____
Cosby H. Martin, Jr.
Title:   Member

Date: _____

6

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: _Cosby H. Martin, Jr._
Cosby H. Martin, Jr. (Sep 14, 2015)

Email: marcolandandpetro@gmail.com

Title: Sole Member

Company: Sepulga River Fuels, LLC

15

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: *Scott Hines*
Scott Hines (Sep 14, 2015)

Email: shines@mhtonline.com

Title: Manager

Company: Conecuh Oil Company, LLC

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

CONECUH OIL COMPANY, LLC

ATTEST:
By: _____

By: _____
Scott Hines
Title:  Manager

Date: _____

CARL HERRIN OIL AND GAS, LLC

ATTEST:
By: _____

By: _____
Carl Herrin
Title:  Manager

Date: _____

PAROUS ENERGY, LLC

ATTEST:
By: _____

By: _____
George S. Dennis
Title:  Managing Member

Date: _____

EMBAYMENT PRODUCTION, LLC

ATTEST:
By: _____

By: _____
William B. Ridgway, Jr.
Title:  Manager

Date: _____

7

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: *William B Ridgway*
William B. Ridgway, Jr. (Sep 10, 2015)

Email: bill@ridgwaymanagement.com

Title: Manager

Company: EMBAYMENT PRODUCTION, LLC

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

VICKERY EXPLORATION, LLC

ATTEST:
By: _____

By: _____
Jimmy D. Vickery
Title:   Manager

Date: _____9 - 15 - 15_____


LUCAS PETROLEUM GROUP, INC.

ATTEST:
By: _____

By: _____
Fain Brock
Title:   President

Date: _____


KUDZU OIL PROPERTIES, LLC

ATTEST:
By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____


TREK EXPLORATION, LLC

ATTEST:
By: _____

By: _____
J. Bradley Jeffreys
Title:   Manager

Date: _____


8

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

VICKERY EXPLORATION, LLC

ATTEST:
By: _____

By: _____
Jimmy D. Vickery
Title:   Manager

Date: _____

LUCAS PETROLEUM GROUP, INC.

ATTEST:
By: _____

By: _____
Fain Brock
Title:   President

Date: _9/15/2015_____

KUDZU OIL PROPERTIES, LLC

ATTEST:
By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____

TREK EXPLORATION, LLC

ATTEST:
By: _____

By: _____
J. Bradley Jeffreys
Title:   Manager

Date: _____

8

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

VICKERY EXPLORATION, LLC

ATTEST:

By: _____

By: _____
Jimmy D. Vickery
Title:  Manager

Date: _____


LUCAS PETROLEUM GROUP, INC.

ATTEST:

By: _____

By: _____
Fain Brock
Title:  President

Date: _____


KUDZU OIL PROPERTIES, LLC

ATTEST:

By: _Pamela A Sebren_

By: _[signature]_
Wirt A. Yerger, III
Title:  Manager

Date: _9 - 14 - 2015_


TREK EXPLORATION, LLC

ATTEST:

By: _____

By: _____
J. Bradley Jeffreys
Title:  Manager

Date: _____

8

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

VICKERY EXPLORATION, LLC

ATTEST:
By: _____

By: _____
Jimmy D. Vickery
Title:   Manager

Date: _____


LUCAS PETROLEUM GROUP, INC.

ATTEST:
By: _____

By: _____
Fain Brock
Title:   President

Date: _____


KUDZU OIL PROPERTIES, LLC

ATTEST:
By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____


TREK EXPLORATION, LLC

ATTEST:
By: _____

By: *J. Bradley Jeffreys* (signature)
J. Bradley Jeffreys
Title:   Manager

Date: *Dec 3, 2015*

8

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: *J. Bradley Jeffreys*
J. Bradley Jeffreys (Sep 14, 2015)

Email:  bradley.jeffreys@gmail.com

Title:  manager

Company:  Jeffreys Drilling LLC

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

PFLANZER PARTNERS, LTD.

ATTEST:
By: _____

By: _____
Joseph Pflanzer
Title: _____

Date: 1 - 5 - 16

MCCOMBS ENERGY, LTD.

ATTEST:
By: _____

By: _____
Billy Forney, III
Title:   Vice President

Date: _____

ANSABEN TRUST

ATTEST:
By: _____

By: _____
David A. Barlow
Title:   Trustee

Date: AUGUST 27, 2015

BOBMARY L.C.

ATTEST:
By: _____

By: _____
Dr. Robert Lafargue
Title:   Member

Date: _____

9

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: *Billy Forney III*
Billy Forney III (Sep 15, 2015)

Email: bforney3@mccombsenergy.com

Title: Vice President

Company: McCombs Energy

15

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

PFLANZER PARTNERS, LTD.

ATTEST:

By: _____     By: _____
                                   Joseph Pflanzer
                                   Title: _____

                                   Date: _____


MCCOMBS ENERGY, LTD.

ATTEST:

By: _____     By: _____
                                   Billy Forney, III
                                   Title:   Vice President

                                   Date: _____


ANSABEN TRUST

ATTEST:

By: _____     By: _____
                                   David A. Barlow
                                   Title:   Trustee

                                   Date:  _AUGUST 27, 2015_


BOBMARY L.C.

ATTEST:

By: _____     By: _____
                                   Dr. Robert Lafargue
                                   Title:   Member

                                   Date: _____


9

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

PFLANZER PARTNERS, LTD.

ATTEST:
By: _____

By: _____
Joseph Pflanzer
Title: _____

Date: _____


MCCOMBS ENERGY, LTD.

ATTEST:
By: _____

By: _____
Billy Forney, III
Title:  Vice President

Date: _____


ANSABEN TRUST

ATTEST:
By: _____

By: _____
David A. Barlow
Title:  Trustee

Date:  AUGUST 27, 2015


BOBMARY L.C.

ATTEST:
By: *Rosemary Lafargue*

By: *Dr. Robert Lafargue*
Dr. Robert Lafargue
Title:  Member

Date:  October 04, 2015

9

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:
By: _J. Philip S._____

By: _Rd P. 3_____
Robert P. Bowman
Title: Manager

Date: ___9/14/15_____

DICKSON OIL & GAS, LLC

ATTEST:
By: _____

By: _____
C. Bickham Dickson, III
Title: Member

Date: _____

FANT ENERGY LIMITED

ATTEST:
By: _____

By: _____
Stephen Swan
Title:

Date: _____

JF HOWELL INTEREST, L.P.
By: Howell Investments, L.L.C.

ATTEST:
By: _____

By: _____
David Morgan

Date: _____

10

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:

By: _____

By: _____
Robert P. Bowman
Title:   Manager

Date: _____

DICKSON OIL & GAS, LLC

ATTEST:

By: _____

By: _____
C. Bickham Dickson, III
Title:   Member

Date: 9/15/15

FANT ENERGY LIMITED

ATTEST:

By: _____

By: _____
Stephen Swan
Title:

Date: _____

JF HOWELL INTEREST, L.P.
By: Howell Investments, L.L.C.

ATTEST:

By: _____

By: _____
David Morgan

Date: _____

10

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

                                    BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:
By: _____        By: _____
                                    Robert P. Bowman
                                    Title:   Manager

                                    Date: _____


                                    DICKSON OIL & GAS, LLC

ATTEST:
By: _____        By: _____
                                    C. Bickham Dickson, III
                                    Title:   Member

                                    Date: _____


                                    FANT ENERGY LIMITED

ATTEST:
By: _____        By: _____
                                    Stephen Swan
                                    Title: _____

                                    Date: 1/18/16 _____


                                    JF HOWELL INTEREST, L.P.
                                    By: Howell Investments, L.L.C.

ATTEST:
By: _____        By: _____
                                    David Morgan

                                    Date: _____

10

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:

By: _____    By: _____
                                 Robert P. Bowman
                                 Title:   Manager

                                 Date: _____

DICKSON OIL & GAS, LLC

ATTEST:

By: _____    By: _____
                                 C. Bickham Dickson, III
                                 Title:   Member

                                 Date: _____

FANT ENERGY LIMITED

ATTEST:

By: _____    By: _____
                                 Stephen Swan
                                 Title:

                                 Date: _____

JF HOWELL INTEREST, L.P.
By: Howell Investments, L.L.C.

ATTEST:

By: _____    By: _____
                                 David Morgan

                                 Date: 12/2/2015

10

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title:  Member

Date: _____


TIEMBO, LTD.

ATTEST:

By: _____

By: _____
Gary S. Glesby
Title:  Registered Agent

Date: _____


SELLARS FAMILY, LLC

ATTEST:
By: _____

By: _____
Jodi Smith
Title:  Managing Member

Date: _____


BROCK RESOURCES, LLC

ATTEST:

By: _____

By: _____
Fain Brock
Title:  President

Date: _____


11

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title:  Member

Date: _____

TIEMBO, LTD.

ATTEST:
By: *Patti L Hanson*

By: _____
~~Gary S. Glesby~~  *MARK S RAUCH*
Title:  Registered Agent

Date: *9/15/2015*

SELLARS FAMILY, LLC

ATTEST:
By: _____

By: _____
Jodi Smith
Title:  Managing Member

Date: _____

BROCK RESOURCES, LLC

ATTEST:

By: _____

By: _____
Fain Brock
Title:  President

Date: _____

11

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title:   Member

Date: _____


TIEMBO, LTD.

ATTEST:

By: _____

By: _____
Gary S. Glesby
Title:   Registered Agent

Date: _____


SELLARS FAMILY, LLC

ATTEST:
By: _Karen Z. Korch_

By: _Jodi Smith_
Jodi Smith
Title:   Managing Member

Date: _9-15-2015_


BROCK RESOURCES, LLC

ATTEST:

By: _____

By: _____
Fain Brock
Title:   President

Date: _____

11

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

MARKSCO, LLC

ATTEST:

By: _____

By: _____
Mark Sealy
Title: Member

Date: _____

TIEMBO, LTD.

ATTEST:

By: _____

By: _____
Gary S. Glesby
Title: Registered Agent

Date: _____

SELLARS FAMILY, LLC

ATTEST:

By: _____

By: _____
Jodi Smith
Title: Managing Member

Date: _____

BROCK RESOURCES, LLC

ATTEST:

By: _____

By: _____
Fain Brock
Title: President

Date: 9/15/2015

11

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: *Hamilton Beazley*
Hamilton Beazley (Sep 23, 2015)

Email: HamiltonBeazley@gmail.com

Title: President

Company: Beazley Petroleum, LLC

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

BEAZLEY PETROLEUM, LLC

ATTEST:

By: _____

By: _____
Hamilton Beazley
Title:  President

Date: _____

ATTEST:
By: _____

_J. C. Ogden_
J.C. OGDEN

Date: _Sept. 16, 2015_

CRAFT EXPLORATION COMPANY, LLC

ATTEST:
By: _____

By: _____
Steven H. Craft
Title:  Member

Date: _____

ASPEN ENERGY, INC.

ATTEST:
By: _____

By: _____
Michael S. Reed
Title:  President

Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: _Steven H Craft_
Steven H Craft (Sep 22, 2019)

Email: julie@thecraftcompanies.com

Title: Manager

Company: Craft Exploration Company

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners


BEAZLEY PETROLEUM, LLC

ATTEST:

By: _____    By: _____
                                 Hamilton Beazley
                                 Title:   President

                                 Date: _____


ATTEST:
By: _____    _____
                                 J.C. OGDEN

                                 Date: _____


CRAFT EXPLORATION COMPANY, LLC

ATTEST:
By: _____    By: _____
                                 Steven H. Craft
                                 Title:   Member

                                 Date: _____


ASPEN ENERGY, INC.

ATTEST:
By: _____    By: _Michael S Reed_____
                                 Michael S. Reed
                                 Title:   President

                                 Date: _9/15/2015_____


12

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

GATEWAY EXPLORATION, LLC

ATTEST:
By: _Choudhna a Melancon_

By: _John R. Moffitt_
Jay Moffitt
Title:

Date: _12/7/15_

JJS INTERESTS NORTH BEACH, LLC

ATTEST:
By: _____

By: _____
Justin Simons
Title:   Manager

Date: _____

RESOURCE VENTURES, LLC

ATTEST:
By: _____

By: _____
Mark A. Arnold
Title:   General Manager

Date: _____

TEPCO, LLC

ATTEST:
By: _____

By: _____
John C. Aubrey
Title:   President

Date: _____

13

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: *Justin Simons*
Justin Simons (Sep 29, 2015)

Email: justin@hbcapllc.com

Title: President

Company: JJS Interests North Beach, LLC

15

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

GATEWAY EXPLORATION, LLC

ATTEST:
By: _____

By: _____
Jay Moffitt
Title:

Date: _____

JJS INTERESTS NORTH BEACH, LLC

ATTEST:
By: _____

By: _____
Justin Simons
Title:   Manager

Date: _____

RESOURCE VENTURES, LLC

ATTEST:
By: _____

By: _____
Mark A. Arnold
Title:   General Manager

Date: 12/4/2015 _____

TEPCO, LLC

ATTEST:
By: _____

By: _____
John C. Aubrey
Title:   President

Date: _____

13

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

GATEWAY EXPLORATION, LLC

ATTEST:
By: _____

By: _____
Jay Moffitt
Title:

Date: _____


JJS INTERESTS NORTH BEACH, LLC

ATTEST:
By: _____

By: _____
Justin Simons
Title:   Manager

Date: _____


RESOURCE VENTURES, LLC

ATTEST:
By: _____

By: _____
Mark A. Arnold
Title:   General Manager

Date: _____


TEPCO, LLC

ATTEST:
By: _____

By: _____
John C. Aubrey
Title:   President

Date: 12/15/2015

13

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

WALLER BROTHERS, INC.

ATTEST:

By: _____          By: _____

Don Waller
Title:   Secretary - Treasurer

Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: North Beach Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

**Exhibit A**
**To**
**Gas Purchase Contract**

<u>**Sellers**</u>

Sklarco, L.L.C.
Attn: David A. Barlow
401 Edwards St., Suite 1601
Shreveport, LA 71101

Coastal Exploration, Inc.
Attn: Julius M. Ridgway
P.O. Box 195
Ridgeland, MS  39158

Lucas Petroleum Group, Inc.
Attn: Fain Brock, President
327 Congress Avenue, Ste 500
Austin, TX  78701-3656

Tyler Oil & Gas, LLC
Attn: Henry B. Tyler, M.D.
137 Bridgewater Crossing
Ridgeland, MS 39157

Conecuh Oil Company, LLC
Attn: Mr. Scott Hines
P.O. Box 3216
Ridgeland, MS 39158

Carl Herrin Oil & Gas, LLC
Attn: Mr. Carl Herrin
P.O. Box 329
Jackson, MS 39215

Parous Energy, LLC
Attn: Mr. George S. Dennis
P.O. Box 2547
Madison, MS  39130-2547

Vickery Exploration, LLC
Attn: Jimmy D. Vickery
333 Summerville Drive
Madison, MS  39110

16

Embayment Production, LLC
Attn: William B. Ridgway, Jr.
P.O. Box 187
Jackson, MS 39205-0187

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, MS  39157

Sellars Family, LLC
Attn: Mrs. Jodi Smith, Managing Member
11128 Windjammer Drive
Frisco, TX  75034

Pflanzer Partners, LTD.
Attn: Joseph Pflanzer, M.D.
2801 Bolton Boone, Suite 101
DeSoto, TX 75115

Tenexco, Inc.
Attn: Mr. Richard S. Incandela
414 N. Clinton, Suite 106
River Forest, IL 60305

McCombs Energy, Ltd.
Attn: Billy Forney, III, Vice President
5599 San Felipe Street, Ste. 1200
Houston, TX 77056-2721

Ansaben Trust
Attn: David A. Barlow, Trustee
505 Geneva Avenue
Boulder, CO  80302

Bobmary L.C.
Attn: Dr. Robert Lafargue
5928 East Ridge Drive
Shreveport, LA 71106

Bundero Investment Company, L.L.C
Attn: Robert P. Bowman, Manager
333 Texas Street, Ste. 300
Shreveport, LA 71101

Dickson Oil & Gas, LLC
Attn: Mr. C. Bickham Dickson, III
P.O. Box 52479
Shreveport, LA 71135

Fant Energy Limited
Attn: Stephen Swan
P.O. Box 55205
Houston, Texas 77255

JF Howell Interests, L.P.
Attn: David Morgan
416 Travis Street, Suite 715
Shreveport, LA 71101

Marksco, LLC
Attn: Mark Sealy
333 Texas Street, Ste. 1050
Shreveport, LA 71101

Tiembo, Ltd.
Attn: Mark Rauch
P.O. Box 270415
Houston, TX 77277-0415

Beazley Petroleum, LLC
Attn:  Dr. Hamilton Beazley
411 West St. Elmo Road #24
Austin, TX  78745

Brock Resources, LLC
Attn:  Fain Brock
2634 Henley Drive
Round Rock, TX  78681

J. C. Ogden
5419 Cedar Creek
Houston, TX  77056

Craft Exploration Company, LLC
Attn:  Steven H. Craft
325 Lakeshire Parkway
Canton, MS  39046

Longleaf Energy Group, Inc.
Attn: Mr. Tom McMillian
P. O. Box 809
Brewton, AL 36427

Quail Creek Production Company
Attn: D. W. Dahlgren
13831 Quail Pointe Drive
Oklahoma City, OK 73134

Sepulga River Fuels, LLC
Attn: Mr. Cosby H. Martin, Jr.
15 Rodgers Lane
Brewton, AL 36426

Trek Exploration, LLC
Attn: Mr. Bradley Jeffreys
3839 McKinney Ave, Suite 155-269
Dallas, TX 75204

Yates Resources, LP
Attn: Brook Yates
3131 Southwestern Blvd
Dallas, TX 75225

Cayman Resources, Inc.
Attn: Vincent J. Manara, III
11911 Steppingstone Lane
Houston, TX 77024

Aspen Energy Inc.
161 St. Matthews Avenue, Suite 16
Louisville, KY 40207

Gateway Exploration, LLC
Attn: Jay Moffitt
3040 Post Oak, Ste 525
Houston, TX 77056

JJS Interests North Beach LLC
4295 San Felipe, Ste 207
Houston, TX 77027

Resource Ventures, LLC
Attn: Mark A. Arnold
8369 SouthPark Lane, Ste B
Littleton, CO  80120

TEPCO, LLC
Attn: John Aubrey
P O Box 61545
Houston, TX  77208-1545

Waller Brothers, Inc.
PO Box 1
Jackson, MS  39205

**Exhibit B**
**To**
**GAS PURCHASE CONTRACT**

Craft Mack 17-4 #1
Craft Ralls 28-16 #1
Craft Ralls 33-7 #1
Craft Smurfit Stone 27-12 #1
Craft Soterra 27-2 #1
Craft Soterra 27-6 #1
Craft Hamiter 20-11 #1

Any other well operated by Sklar Exploration Company L.L.C. as Operator under the North Beach Prospect JOA, as amended, for and on behalf of the Non-Operators thereunder, located outside of the Little Cedar Creek Oil Unit II.



**Exploration Company LLC**

Shreveport Office
401 Edwards St., Ste. 1601
Shreveport, Louisiana 71101
Phone: 318-227-8668
Facsimile: 318-227-9012

Boulder Office
5395 Pearl Parkway, Ste. 200
Boulder, Colorado 80301
Phone: 720-961-5477
Facsimile: 303-443-1551

Steven R. Hatcher, Jr., Attorney

Telephone: 720-306-8310
E-Mail: shatcher@sklarexploration.com

September 14, 2015

To:    Working Interest Owners

Re:    Shipps Creek Prospect, Conecuh & Escambia Counties, Alabama

Dear Owners,

As Operator of the Fishpond Oil Unit of the Fishpond Field, Escambia County, Alabama ("Fishpond Unit"), we are proceeding with operations for gas injection in that unit for purposes of pressure maintenance and secondary recovery. In that connection, we may not only be using gas delivered at the tailgate of the plant attributable to the Fishpond Unit for injection into the Unitized Interval, but we may also purchase gas from the tailgate of the plant attributable to wells located outside of the Fishpond Unit (i.e., Outside Substances). Enclosed is a Gas Purchase Agreement executed by us in our capacity as Operator of the Fishpond Unit whereby we agree to purchase Outside Substances for injection from wells located in our Shipps Creek Prospect. We request that each of you, as a working interest owner in the Shipps Creek Prospect, execute the same as one of the Sellers. Terms of purchase and sale are (and for the duration of the injection program will remain) the same as we are currently selling gas to Southeast Alabama Gas District ("SEAGD"), so you will see no difference in the price received as a Seller whether we purchase that gas and inject it into the Fishpond Unit or continue selling it to SEAGD.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

Steven R. Hatcher, Jr.
Attorney

Enclosure - Gas Purchase Contract

THIS GAS PURCHASE AGREEMENT (this "Agreement"), made and entered into this _27TH_ day of _AUGUST_, 2015, by and between the parties shown on Exhibit A (hereinafter referred to collectively as "Sellers" and individually as "Seller") and Sklar Exploration Company L.L.C., a Louisiana limited liability company, (i) in its capacity as Operator of Fishpond Oil Unit in the Fishpond Field in Escambia County, Alabama (hereinafter referred to as "Buyer") and (ii) in its capacity as Operator of the wells identified on Exhibit B (hereinafter referred to as "SEC"):

WHEREAS Sellers are parties to a Gas Purchase Contract with Southeast Alabama Gas District (hereinafter referred to as "SEAGD") dated June 1, 2011 (as amended), which, among other things, covers residue gas produced from certain wells described on Exhibit B hereto (the "Contract");

WHEREAS Sellers own working interests in the wells described on Exhibit B (the "Wells") and are entitled to gas produced from those wells;

WHEREAS a majority of the Sellers are also working interest owners in Fishpond Oil Unit of the Fishpond Field, which unit was heretofore established and approved by orders of the State Oil and Gas Board of Alabama ("Fishpond Oil Unit");

WHEREAS the gas produced from the Wells is normally delivered to the Abbyville Plant where the gas is treated and processed, liquids are extracted and residue gas is delivered to a meter at the tailgate of the Plant pursuant to a Services Agreement (the "Abbyville Agreement") dated September 14, 2011 between Sellers and CDM MAX, LLC (now Plains Gas Solutions, LLC hereinafter "PGS") although pursuant to the Abbyville Agreement the gas may on occasion be delivered to the North Beach Plant for processing and treatment;

WHEREAS SEC, as Operator of the wells described on Exhibit B, is also a party to the Contract and is referred to therein (but not herein) as Seller;

WHEREAS as authorized by the Contract, by the Abbyville Agreement and by the Operating Agreement entered into by Sellers and SEC applicable to each well described on Exhibit B, SEC has heretofore received and distributed all revenue allocable to each Seller's interest under the Contract and has paid royalties, taxes and plant charges applicable thereto;

WHEREAS the Contract provides in Article III that "Seller" (as defined therein) reserves certain rights including the right

"To use Gas produced from the Well(s) committed hereto for developing and operating such properties and other properties of Seller in the vicinity thereof, including but not limited to the sale of Gas to drilling contractors for development of such properties, Gas lift, pressure maintenance, secondary recovery, tertiary recovery, re-pressuring, cycling, deepening, reworking, and drilling, for fulfilling obligations to the lessors under the terms of Seller's oil, gas, and mineral leases, and for treating, separating or processing oil, gas or other minerals."

WHEREAS Sellers desire to sell gas to Buyer (acting on behalf of the Working Interest Owners in Fishpond Oil Unit) for the purpose of utilizing that gas in operating and developing Fishpond Oil

1

Unit and, in particular, for use in pressure maintenance, secondary recovery, re-pressuring and similar operations and for treating, separating or processing oil, gas or other minerals produced from Fishpond Oil Unit; and

WHEREAS Buyer desires to purchase Sellers' gas for the above mentioned purposes;

NOW, THEREFORE, Sellers and Buyers hereby agree as follow:

1. Sellers and SEC (with respect to residue gas attributable to persons whose gas SEC has a right to sell) hereby authorize Buyer to provide a copy of this Agreement to PGS and hereby direct PGS (its successors and assigns), as owner/operator of the Plant pursuant to and subject to the Abbyville Agreement, to deliver to Buyer residue gas owned by Sellers and/or SEC that is allocable to the Wells and is nominated for purchase by Buyer. PGS shall commence the delivery of such residue gas to Buyer upon notice by Buyer to PGS that Buyer is ready to receive deliveries, and continue thereafter so long as such gas is nominated for delivery to Buyer in accordance with Buyer's nominations. Title to all residue gas delivered to Buyer hereunder shall pass to Buyer at the point of delivery into the equipment of Buyer as installed pursuant to paragraph 6, below.

2. The Purchase Price for all residue gas delivered to Buyer hereunder shall be the same as the price Sellers would have received for such gas had it been sold to SEAGD pursuant to the Contract, at the time of sale, and the quality specifications for the residue gas shall be the same as those set forth in the Contract for residue gas delivered to SEAGD, provided, however, that should the Contract not be in effect at the time of a sale hereunder, the price to be paid for the residue gas shall be the price that would have been received under the Contract at the time of sale if the Contract had remained in effect (i.e., shall be calculated in accordance with the pricing provisions of the version of the Contract most recently in effect), and the quality specifications for that gas shall be as set forth in the version of the Contract most recently in effect, and provided further, that Buyer may agree to waive, in whole or in part, any of the applicable quality specifications for the residue gas.

3. Because a number of the Sellers are working interest owners in Fishpond Oil Unit and are, therefore, to that extent, in effect, also purchasers under this Agreement, each Seller who is both a Seller and Working Interest Owner in Fishpond Oil Unit hereby requests that: Buyer and SEC net out any amounts due to such Seller hereunder against any amounts due from such Seller as a Working Interest Owner in Fishpond Oil Unit and pay or bill to such Seller only the net amount determined to be due.

4. This Agreement may be terminated by either party upon 30 days written notice to the other party, and the volume of gas purchased hereunder may be modified by Buyer (increased or decreased) at any time and from time to time (provided that the amount may not exceed residue gas owned by Sellers and/or SEC that is allocable to the Wells).

5. This Agreement shall be binding and effective as to those Sellers who execute it (and their successors and assigns) regardless of whether or not all Sellers execute it.

6. Buyer shall (and is hereby authorized to) install (as a Fishpond Oil Unit expense) any valves, piping, or other equipment necessary for it to take the residue gas covered hereby at the tailgate of the North Beach Plant and/or the Abbyville Plant.

2

7.  By execution of this Agreement Sellers hereby authorize and empower SEC (as Operator of the Wells) to take actions, or to refrain from taking actions, for and on their behalf with respect to matters or rights reserved or delegated to SEC and/or the Sellers under this Agreement, the Abbyville Agreement, the Contract or any applicable operating agreement. In particular, SEC is hereby authorized to receive all payments for residue gas delivered hereunder, to pay any fees, royalties, taxes or other charges (including plant charges) applicable to such residue gas, and then to distribute the remaining amounts to Sellers as per their interests in said gas pursuant to the Abbyville Agreement and applicable operating agreement(s). The Sellers and SEC do not intend to create by this provision or any other provision of this Agreement a partnership, joint venture or any fiduciary relationship between themselves and, in fact, expressly disclaim any such relationship and reaffirm that SEC shall have no liability under this Agreement or otherwise to Sellers for any losses sustained or liabilities incurred (from whatever cause), except such as may result directly from gross negligence or willful misconduct on the part of SEC.

8.  Buyer understands that SEC may from time to time sell gas on behalf of other owners in the Exhibit B wells on a temporary basis, and Buyer further understands that such temporary sales may end and thus the volumes of gas delivered hereunder may be reduced.

9.  This Agreement and its attachments constitute the entire agreement of the Parties with respect to the subject matter hereof, and any other promises, inducements, representations, warranties or agreements with respect to the subject matter hereof have been superseded hereby and are not intended to survive this Agreement. No amendment or modification of this Agreement shall be effective unless set forth in a signed written agreement.

10. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, personal representatives, successors and assigns.

11. This Agreement may be executed in any number of counterparts and each counterpart shall constitute and be deemed to be an original instrument, but all such counterparts shall constitute but one instrument. All execution pages may be attached to one copy of this Agreement.

12. This Agreement shall be **governed exclusively by and interpreted in accordance with the laws of the State of Alabama** without regard to any conflict of laws principles or rules.

13. The Parties acknowledge that the right to trial by jury is a constitutional one, but that it may be waived. After consulting (or having had the opportunity to consult) with counsel of their choice, each party knowingly and voluntarily and for their mutual benefit WAIVES ANY RIGHT TO TRIAL BY JURY in the event of litigation regarding the performance or enforcement of, or in any way related to, this agreement.

14. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural include the singular, and the neuter gender includes the masculine and the feminine.

EXECUTED effective as of the date set forth in the first paragraph of this agreement.

3

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

**BUYER**:

SKLAR EXPLORATION COMPANY L.L.C., in its
capacity as Operator of Fishpond Oil Unit

ATTEST:
By: _____

By: _____

David A. Barlow
Title:   President and COO

Date: _AUGUST 27, 2015_

**OPERATOR OF WELLS ON EXHIBIT B**:

SKLAR EXPLORATION COMPANY L.L.C., in its
capacity as Operator of the wells identified in Exhibit B
under paragraph 8

ATTEST:
By: _____

By: _____

David A. Barlow
Title:   President and COO

Date: _AUGUST 27, 2015_

**SELLERS**:

SKLARCO L.L.C.

ATTEST:
By: _____

By: _____

David A. Barlow
Title:   President and COO

Date: _AUGUST 27, 2015_

4

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

KUDZU OIL PROPERTIES, LLC

ATTEST:

By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____

MCCOMBS ENERGY, LTD.

ATTEST:

By: _____

By: _____
Billy Forney, III
Title:   Vice President

Date: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:

By: _____

By: _____
Robert P. Bowman
Title:   Manager

Date: _____

DICKSON OIL & GAS, LLC

ATTEST:

By: _____

By: _____
C. Bickham Dickson, III
Title:   Member

Date: _____

5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

FANT ENERGY LIMITED

ATTEST:

By: _____     By: _____
                                      Stephen Swan
                                      Title:

                                      Date: _____

JF HOWELL INTERESTS, LP
By: Howell Investments, LLC

ATTEST:

By: _____     By: _____
                                      David Morgan
                                      Title:   Manager

                                      Date: _____

MARKSCO, LLC

ATTEST:

By: _____     By: _____
                                      Mark Sealy
                                      Title:   Member

                                      Date: _____

TIEMBO, LTD.

ATTEST:

By: _____     By: _____
                                      Mark Rauch
                                      Title:   Registered Agent

                                      Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

CRAFT EXPLORATION COMPANY, LLC

ATTEST:
By: _____

By: _____
Steven H. Craft
Title:  Member

Date: _____


JJS WORKING INTERESTS, LLC
By: Houston Bulldog Capital Management, LLC

ATTEST:
By: _____

By: _____
Justin Simons
Title:  Manager

Date: _____


RESOURCE VENTURES, LLC

ATTEST:
By: _____

By: _____
Mark A. Arnold
Title:  General Manager

Date: _____


LANDMARK EXPLORATION, LLC

ATTEST:
By: _____

By: _____
Michael Johnson
Title:  Manager

Date: _____

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

PICKENS FINANCIAL GROUP LLC

ATTEST:

By: _____

By: _____
Michael K. Pickens
Title: Vice President

Date: _____


TAUBER EXPLORATION & PRODUCTION CO.

ATTEST:

By: _____

By: _____
Richard E. Tauber
Title: President

Date: _____


ASPEN ENERGY, INC.

ATTEST:

By: _____

By: _____
Michael S. Reed
Title: President

Date: _____


ATTEST:

By: _____

_____
JOEL DAVIS

Date: _____

8

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

GATEWAY EXPLORATION, LLC

ATTEST:

By: _____

By: _____
John P. Moffit
Title:   President

Date: _____


GCREW PROPERTIES, LLC

ATTEST:

By: _____

By: _____
George E. Jochetz, III
Title:   President

Date: _____


MER ENERGY, LTD.

ATTEST:

By: _____

By: _____
William C. Herndon
Title:

Date: _____


MERITAGE ENERGY, LTD.

ATTEST:

By: _____

By: _____
John C. Aubrey
Title:

Date: _____

9

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

MJS INTERESTS, LLC

ATTEST:

By: _____

By: _____
Martin Schaffer
Title:

Date: _____


ATTEST:

By: _____

_____
TERA RUDMAN

Date: _____

10

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

**SELLER:**

11

Exhibit A

To

Gas Purchase Contract

**Sellers**

**Sklarco, LLC**
**Attn: David A. Barlow**
**401 Edwards Street, Suite 1601**
**Shreveport, LA 71101**

**JJS Working Interests LLC**
**Attn: Mr. Justin Simons**
**4295 San Felipe, Suite 207**
**Houston, Texas 77027**

**Aspen Energy, Inc.**
**Attn: Michael S. Reed, President**
**161 St. Matthews Avenue, Suite 16**
**Louisville, KY 40207**

**Bundero Investment Company, L.L.C.**
**Attn: Robert P. Bowman, Manager**
**333 Texas Street, Ste. 300**
**Shreveport, LA 71101**

**Craft Exploration Company, L.L.C.**
**Attn:  Steven H. Craft, Managing Member**
**325 Lakeshire Parkway**
**Canton, MS 39046**

**Joel Davis**
**Attn: Joel Davis**
**P.O. Box 540988**
**Houston, Texas 77254-0988**

**Dickson Oil & Gas, LLC**
**Attn: Mr. C. Bickham Dickson, III**
**P. O. Box 52479**
**Shreveport, LA  71135**

Fant Energy Limited
Attn: Stephen Swan
P. O. Box 55205
Houston, TX 77255

Gateway Exploration, LLC
Attn: Jay Moffitt
3040 Post Oak, Ste 525
Houston, Texas 77056

GCREW Properties, LLC
Attn: Mr. George E. Jochetz, III, President
12323 Rip Van Winkle
Houston, TX 77024

JF Howell Interests, LP
Attn: David Morgan, Manager
416 Travis Street, Suite 715
Shreveport, LA 71101

Kudzu Oil Properties, LLC
Attn: Mr. Wirt A. Yerger, III
300 Concourse Blvd, Suite 101
Ridgeland, Mississippi 39157

Landmark Exploration, LLC
Attn: Michael Johnson
P.O. Box 12004
Jackson, MS 39236

Marksco, LLC
Attn: Mark Sealy
333 Texas Street, Ste. 1050
Shreveport, LA 71101

McCombs Energy, Ltd.
Attn: Billy Forney, III, Vice President
5599 San Felipe St., Suite 1200
Houston, TX 77056-2721

MER Energy, Ltd.
Attn: William C. Herndon
6500 Greenville Ave, Ste 110
Dallas, TX 75026

Meritage Energy, Ltd.
Attn: John C. Aubrey
P.O. Box 61545
Houston, Texas 77208-1545

MJS Interests, LLC
Attn: Martin Schaffer
9266 Hathaway Street
Dallas, TX 75220

Pickens Financial Group, LLC
Attn: Michael K. Pickens, Vice President
10100 N. Central Expressway
Ste. 200
Dallas, Texas 75231-4159

Resource Ventures, LLC
ATTN: Mark A. Arnold
8369 SouthPark Lane, Ste B
Littleton, CO 80120

Tera Rudman
1700 Pacific Ave., Suite 4700
Dallas, Texas 75201-4620

Tauber Exploration & Production Co.
Attn: John Robinson
55 Waugh Drive, Suite 600
Houston, TX 77007

Tiembo, Ltd.
Attn: Mark Rauch
P.O. Box 270415
Houston, TX 77277-0415

**Exhibit B**
**To**
**GAS PURCHASE CONTRACT**

CCL&T 24-1 #1
CCL&T 13-16 #1
CCL&T 13-11 #1

Any other well operated by Sklar Exploration Company L.L.C. as Operator under the Shipps Creek Prospect JOA, as amended, for and on behalf of the Non-Operators thereunder.

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

KUDZU OIL PROPERTIES, LLC

ATTEST:
By: Pamela Sebren

By: _____
Wirt A. Yerger, III
Title:  Manager

Date: __10/19/2015__

MCCOMBS ENERGY, LTD.

ATTEST:
By: _____

By: _____
Billy Forney, III
Title:   Vice President

Date: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:
By: _____

By: _____
Robert P. Bowman
Title:  Manager

Date: _____

DICKSON OIL & GAS, LLC

ATTEST:
By: _____

By: _____
C. Bickham Dickson, III
Title:  Member

Date: _____

5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

**Signature:** *Billy Forney III*
Billy Forney III (Sep 15, 2015)

**Email:** bforney3@mccombsenergy.com

**Title:** Vice President

**Company:** McCombs Energy

11

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

KUDZU OIL PROPERTIES, LLC

ATTEST:
By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____

MCCOMBS ENERGY, LTD.

ATTEST:
By: _____

By: _____
Billy Forney, III
Title:   Vice President

Date: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:
By: _____

By: _____
Robert P. Bowman
Title:   Manager

Date: _____

DICKSON OIL & GAS, LLC

ATTEST:
By: _____

By: _____
C. Bickham Dickson, III
Title:   Member

Date: _____

5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

KUDZU OIL PROPERTIES, LLC

ATTEST:
By: _____

By: _____
Wirt A. Yerger, III
Title:   Manager

Date: _____

MCCOMBS ENERGY, LTD.

ATTEST:
By: _____

By: _____
Billy Forney, III
Title:   Vice President

Date: _____

BUNDERO INVESTMENT COMPANY, L.L.C.

ATTEST:
By: _____

By: _____
Robert P. Bowman
Title:   Manager

Date: _____

DICKSON OIL & GAS, LLC

ATTEST:
By: _____

By: _____
C. Bickham Dickson, III
Title:   Member

Date:   9/15/15

5

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

FANT ENERGY LIMITED

ATTEST:
By: _____

By: _____
Stephen Swan
Title:

Date: _____8/15/15_____

JF HOWELL INTERESTS, LP
By: Howell Investments, LLC

ATTEST:
By: _____

By: _____
David Morgan
Title:   Manager

Date: _____

MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title:   Member

Date: _____

TIEMBO, LTD.

ATTEST:
By: _____

By: _____
Mark Rauch
Title:   Registered Agent

Date: _____

6

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

**Signature:** *David Morgan*
David Morgan (Sep 14 2015)

**Email:** david@jfhowell.com

**Title:** Manager

**Company:** Howell Investments, LLC

11

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

FANT ENERGY LIMITED

ATTEST:
By: _____

By: _____
Stephen Swan
Title:

Date: _____

JF HOWELL INTERESTS, LP
By: Howell Investments, LLC

ATTEST:
By: _____

By: _____
David Morgan
Title:   Manager

Date: _____

MARKSCO, LLC

ATTEST:
By: _____

By: _____
Mark Sealy
Title:   Member

Date: _____

TIEMBO, LTD.

ATTEST:
By: _____

By: _____
Mark Rauch
Title:   Registered Agent

Date: _____

6

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

FANT ENERGY LIMITED

ATTEST:

By: _____

By: _____
Stephen Swan
Title:

Date: _____


JF HOWELL INTERESTS, LP
By: Howell Investments, LLC

ATTEST:

By: _____

By: _____
David Morgan
Title:   Manager

Date: _____


MARKSCO, LLC

ATTEST:

By: _____

By: _____
Mark Sealy
Title:   Member

Date: _____


TIEMBO, LTD.

ATTEST:

By: _____

By: _____
Mark Rauch
Title:   Registered Agent

Date:  9/15/2015

6

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

### ELECTRONIC SIGNATURE PAGE

### SELLER:

Signature: *Steven H Craft*
Steven H Craft (Sep 22, 2019)

Email: julie@thecraftcompanies.com

Title: Manager

Company: Craft Exploration Company

11

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

**Signature:** *Justin Simons*
Justin Simons (Sep 29, 2015)

**Email:** justin@hbcapllc.com

**Title:** President

**Company:** JJS Working Interests, LLC

11

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

CRAFT EXPLORATION COMPANY, LLC

ATTEST:
By: _____

By: _____
Steven H. Craft
Title:   Member

Date: _____

JJS WORKING INTERESTS, LLC
By: Houston Bulldog Capital Management, LLC

ATTEST:
By: _____

By: _____
Justin Simons
Title:   Manager

Date: _____

RESOURCE VENTURES, LLC

ATTEST:
By: *Julie Teagler*

By: *Mark A. Arnold*
Mark A. Arnold
Title:   General Manager

Date: *September 15, 2015*

LANDMARK EXPLORATION, LLC

ATTEST:
By: _____

By: _____
Michael Johnson
Title:   Manager

Date: _____

7

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

## ELECTRONIC SIGNATURE PAGE

### SELLER:

**Signature:** *Michael E Johnson*
Michael E Johnson (Sep 14, 2015)

**Email:** mej@lmhomes.net

**Title:** Manager

**Company:** Landmark Exploration, LLC

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

PICKENS FINANCIAL GROUP LLC

ATTEST:
By: _____

By: _____
Michael K. Pickens
Title:  Vice President

Date:  9/23/15

TAUBER EXPLORATION & PRODUCTION CO.

ATTEST:
By: _____

By: _____
Richard E. Tauber
Title:   President

Date: _____

ASPEN ENERGY, INC.

ATTEST:
By: _____

By: _____
Michael S. Reed
Title:   President

Date: _____

ATTEST:
By: _____

_____
JOEL DAVIS

Date: _____

8

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

PICKENS FINANCIAL GROUP LLC

ATTEST:
By: _____

By: _____
Michael K. Pickens
Title: Vice President

Date: _____

TAUBER EXPLORATION & PRODUCTION CO.

ATTEST:
By: _____

By: _____
Richard E. Tauber
Title: President

Date: SEPTEMBER 15, 2015

ASPEN ENERGY, INC.

ATTEST:
By: _____

By: _____
Michael S. Reed
Title: President

Date: _____

ATTEST:
By: _____

_____
JOEL DAVIS

Date: _____

8

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

PICKENS FINANCIAL GROUP LLC

ATTEST:
By: _____

By: _____
Michael K. Pickens
Title:   Vice President

Date: _____

TAUBER EXPLORATION & PRODUCTION CO.

ATTEST:
By: _____

By: _____
Richard E. Tauber
Title:   President

Date: _____

ASPEN ENERGY, INC.

ATTEST:
By: _____

By: _____
Michael S. Reed
Title:   President

Date: 9 - 15 - 2015

ATTEST:
By: _____

_____
JOEL DAVIS

Date: _____

8

## Camille Jenkins

| | |
|---|---|
| **From:** | Joel Davis <joelrd@ix.netcom.com> |
| **Sent:** | Wednesday, September 16, 2015 4:11 PM |
| **To:** | Camille Jenkins |
| **Subject:** | RE: Gas Purchase Agreement Shipps Creek Prospect; Approved. |

Camille,

This will serve as my approval of the
referenced Gas Purchase Agreement.

Thank you,

Joel Davis

---

**From:** Camille Jenkins [mailto:CJenkins@sklarexploration.com]
**Sent:** Monday, September 14, 2015 11:14 AM
**To:** Camille Jenkins
**Cc:** Marshall Jones; Steven Hatcher; David Barlow; Greg Rembert; Cory Ezelle; Don Eustes; Chris Farrell; Sutton Lloyd; Amy Ryckman; Monty Shed
**Subject:** Gas Purchase Agreement Shipps Creek Prospect

Dear Owners:

Please see attached correspondence and Gas Purchase Agreement for the purchase of gas from wells located in the Shipps Creek Prospect, Conecuh & Escambia Counties, Alabama for injection into the Fishpond Oil Unit, Escambia County, Alabama. Should you have any questions, please feel free to contact Steven Hatcher (shatcher@sklarexploration.com; 720-306-8310).

After review of the Gas Purchase Agreement, please execute the appropriate signature page(s) and return to me by email or regular mail or, if you prefer, you can execute the Gas Purchase Contract electronically, by clicking the link below:

https://secure.echosign.com/public/esignWidget?wid=CBFCIBAA2AAABLblqZhCARtf8y4I8ZMok6x9pU_HLi26XHTG-LSUrhd9jGuefTmnsS3vYP13NRJM_Th-BJPQ*

Sincerely,
Camille Jenkins
*Lease Analyst*



5395 Pearl Parkway, Suite 200 • Boulder, CO 80301
direct 720.477.4163 • mobile 225.281.6630

1

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

                                          GATEWAY EXPLORATION, LLC

ATTEST:
By: _____            By: _____
                                          John P. Moffit
                                          Title:   President

                                          Date: _9/17/2015_


                                          GCREW PROPERTIES, LLC

ATTEST:
By: _____            By: _____
                                          George E. Jochetz, III
                                          Title:   President

                                          Date: _9/17/15_


                                          MER ENERGY, LTD.

ATTEST:
By: _____            By: _____
                                          William C. Herndon
                                          Title:


                                          Date: _____


                                          MERITAGE ENERGY, LTD.

ATTEST:
By: _____            By: _____
                                          John C. Aubrey
                                          Title:


                                          Date: _____


9

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

GATEWAY EXPLORATION, LLC

ATTEST:
By: _____

By: _____
John P. Moffit
Title:  President

Date: _____

GCREW PROPERTIES, LLC

ATTEST:
By: _____

By: _____
George E. Jochetz, III
Title:  President

Date: _____

MER ENERGY, LTD.

ATTEST: _Rebecca C. Martin_
By: _____
Wesley

By: _____
William C. Herndon
Title:  VICE PRESIDENT, RUACO, LLC
        it's GENERAL PARTNER
Date:  9-14-2015

MERITAGE ENERGY, LTD.

ATTEST:
By: _____

By: _____
John C. Aubrey
Title:

Date: _____

9

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

GATEWAY EXPLORATION, LLC

ATTEST:
By: _____

By: _____
John P. Moffit
Title:  President

Date: _____

GCREW PROPERTIES, LLC

ATTEST:
By: _____

By: _____
George E. Jochetz, III
Title:  President

Date: _____

MER ENERGY, LTD.

ATTEST:
By: _____

By: _____
William C. Herndon
Title:

Date: _____

MERITAGE ENERGY, LTD.

ATTEST:
By: _____

By: _____
John C. Aubrey
Title: President

Date: 9/15/15

9

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

MJS INTERESTS, LLC

ATTEST:
By: _____

By: _____
Martin Schaffer
Title: Manager

Date: 9/15/2015

ATTEST:
By: _____

_____
TERA RUDMAN

Date: _____

10

Signature Page to Gas Purchase Contract
Fishpond Oil Unit
Sellers: Shipps Creek Prospect Working Interest Owners

MJS INTERESTS, LLC

ATTEST:
By: _____

By: _____
Martin Schaffer
Title:

Date: _____

ATTEST:
By: _____

_____
TARA RUDMAN

Date: _9.21. 15_____

10