1          UNITED STATES BANKRUPTCY COURT
               DISTRICT OF COLORADO

2

3  IN RE:               .   Case No. 20-12377-EEB
                    .   Chapter 11

4  SKLAR EXPLORATION COMPANY,  .
  LLC, and SKLARCO, LLC,    .   Case No. 20-12380-EEB

5                   .   Chapter 11
      Debtors.        .

6                   .   Jointly Administered Under
  . . . . . . . . . . . . . . .  20-12377-EEB

7

8

9

10    **TRANSCRIPT OF ZOOM HEARING ON: NON-EVIDENTIARY HEARING (1)**

11     **THE DEBTORS' MOTION TO ASSUME AGENCY SERVICES AGREEMENT**
    **PURSUANT TO 11 U.S.C. 365 AND APPROVE AMENDMENT TO AGENCY**

12  **SERVICES AGREEMENT (DKT. NO. 1174) AND THE OBJECTION THERETO**
       **AND (2) THE RUDMAN PARTNERSHIP'S APPLICATION FOR**

13  **ADMINISTRATIVE EXPENSE PRIORITY CLAIM PURSUANT TO 11 U.S.C.**
      **503(b) (DKT. NO. 1148) AND THE OBJECTIONS THERETO**

14

15

16     BEFORE THE HONORABLE ELIZABETH E. BROWN
       UNITED STATES BANKRUPTCY JUDGE

17

18         FRIDAY, MAY 28, 2021
          DENVER, COLORADO

19

20

21

22

23  TRANSCRIPT REQUESTED BY:   KUTNER BRINEN DICKEY RILEY, P.C.
  TRANSCRIPT ORDERED ON:     JUNE 2, 2021

24  TRANSCRIPT DELIVERED ON:   JUNE 4, 2021
  TRANSCRIPT PRICE:        $5.45 PER PAGE; $392.40

25

```
 1   APPEARANCES:

 2   For the Debtor:              Keri Riley
                                  James Katchadurian
 3
     United States Trustee:       Paul Moss
 4
     Creditors' Committee:        John Cornwell
 5                                Grant Beiner
                                  Christopher Johnson
 6
     East-West Bank:              Bryce Suzuki
 7
     Anderson Exploration Energy  Eric Lockridge
 8   Co., TCP Cottonwood, L.P.,
     AEEC II, LLC, and Sugar Oil
 9   Properties:

10   Fant Energy Ltd., JJS        Jennifer Hardy
     Interests Escambia, LLC,
11   JJS Interests Steele Kings,
     LLC, JJS Working Interests,
12   LLC:

13   FPCC USA:                    Joseph Bain

14   Franks Exploration Co.,      Jordan Bird
     AEH Investments, J & A
15   Harris Bundero Investment
     Co., Kingston, Hughes Oil
16   South, KMR Investments,
     Tommy Youngblood:
17
     Kudzu Oil Properties,        Craig Geno
18   Alabama Oil Co. & Apple
     River Investments, Alabama
19   Oil & Gas, LLC:

20   Ad Hoc Committee of Working  Timothy Swanson
     Interest Owners:
21
     Pruet Oil Company, LLC,      Jeremy Retherford
22   Pruet Production Co.         Matt Ochs
     (Individually and as agent):
23
     Fant Energy, Ltd:            Brent Cohen
24

25   Liquid Gold Well Service,    Chris Crowley
     Inc.:
```

```
 1
    Appearances continued:
 2
    JF Howell Interests, LP:      David R. Taggart
 3
    Howard Sklar, Howard Sklar    Adam Hirsch
 4  Trust:

 5  Strago Petroleum Corporation, Robert Paddock
    Meritage Energy Ltd.,
 6  Gateway Exploration, Harvest
    Gas Management, G Crew
 7  Properties:

 8  Tauber Exploration &          Barnet Skelton, Jr.
    Production Co., CTM 2005,
 9  Ltd., I & L Miss I, LP,
    Pickens Financial Group,
10  LLC, MER Energy, Ltd., The
    MR Trust, Tara Rudman
11  Revocable Trust, Rudman
    Family Trust, The Rudman
12  Partnership, Feather River
    75, LLC:
13
    Bureau of Land Management,    Katherine A. Ross
14  Office of Natural Resources:

15  Stoneham Drilling Corporation: James B. Bailey

16  Louisiana Tower Operation:    Michael Schuster

17  Lucas Petroleum Group:        Duane Brescia

18
    Court Recorder:               Clerk's Office
19                                U.S. Bankruptcy Court
                                  721 19th Street
20                                Denver, CO  80202

21  Transcription Service:        AB Litigation Services
                                  216 16th Street, Suite 600
22                                Denver, CO  80202
                                  (303) 296-0017
23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

 1                    (Time Noted:  2:14 p.m.)

 2              THE COURT CLERK:  United States Bankruptcy Court

 3    for the District of Colorado is now in session, the Honorable

 4    Elizabeth E. Brown presiding.

 5              THE COURT:  Good afternoon.  Thank you for your

 6    patience.  We're having a lot of technical difficulties, and

 7    no one is in the office to fix it because it's, of course,

 8    Memorial Day weekend.  And I'm going to apologize to you all

 9    for setting this right at the cusp of Memorial Day weekend.

10    I'm sure I was brain-dead when I set this time.

11              So, we are here in the case of *Sklarco and Sklar*

12    *Exploration Company*, both LLCs.  It's Case Number 20-12377.

13              And I have very limited technical access, but I

14    think we're going to be okay.  So let me get my list of

15    participants and we'll go through and enter appearances.

16    Let's start with our Debtors.

17              MS. RILEY:  Good afternoon, Your Honor.  Keri

18    Riley appearing on behalf of the Debtors, Sklar Exploration

19    Company and Sklarco.  Mr. Katchadurian, the CRO, is also at

20    today's hearing, as well as several additional

21    representatives of the company, and Wayne Graham (phonetic)

22    Oil and Gas counsel.

23              THE COURT:  Okay.  Thank you.

24              And the U.S. Trustee's Office?

25              MR. MOSS:  Yes, good afternoon, Your Honor.  Paul

1    Moss on behalf of the U.S. Trustee.

2                 THE COURT:  Thank you.

3                 The Official Committee.

4                 MR. JOHNSON:  Good afternoon, Your Honor.  Chris

5    Johnson on behalf of the Committee.  Also with me are my

6    partners John Cornwell and Mr. Grant Beiner.

7                 THE COURT:  Thank you.

8                 For the Ad Hoc Committee of Working Interest

9    Owners.

10        (No audible response.)

11                THE COURT:  Mr. Swanson, are you there?

12                MR. RETHERFORD:  Your Honor, this is Jeremy

13   Retherford.  I know he's signing back on, he just may not be

14   in yet.

15                THE COURT:  Okay.  All right.  We'll come back to

16   him.

17                The Anderson parties.

18        (No audible response.)

19                THE COURT:  Nobody.  Okay.

20                MR. LOCKRIDGE:  Yes, Your Honor.  I'm sorry.  Eric

21   Lockridge from Kean Miller, LLP here on behalf of the

22   Anderson parties, which include the Anderson Exploration

23   Energy Company, LLC --

24                THE COURT:  Okay.  I'm going to stop you.  We're

25   going to do short and sweet entries today.

```
 1               MR. LOCKRIDGE:  Great.

 2               THE COURT:  No (unintelligible) hear about

 3   everybody's co-counsel.  I just want to know who's going to

 4   speak and for which client, so.  And one client is enough.

 5               MR. LOCKRIDGE:  Great.

 6               THE COURT:  Okay.  Fant Energy.

 7               MR. COHEN:  Good afternoon, Your Honor.  Brent

 8   Cohen appearing on behalf of Fant Energy.

 9               THE COURT:  Thank you.

10               The IRS.

11               MS. ROSS:  Good afternoon, Your Honor.  Katherine

12   Ross with the U.S. Attorney's Office for the IRS.

13               THE COURT:  Thank you.

14               And for Rudman Partnership, et al.

15               MR. SKELTON, JR.:  Barnet Skelton here for Rudman.

16               THE COURT:  Thank you.

17               Stoneham Drilling.

18               MR. BAILEY:  Good afternoon, Your Honor.  James

19   Bailey.

20               THE COURT:  Thank you.

21               For Baker Hughes.

22          (No audible response.)

23               THE COURT:  Nobody.

24               For FPCC.

25               MR. BAIN:  Good afternoon, Your Honor.  Joseph
```

1    Bain on behalf of FPCC.

2              THE COURT:  Thank you.

3              For Franks exploration.

4              MR. BIRD:  Good afternoon, Judge.  Jordan Bird on

5    behalf of Franks Exploration.

6              THE COURT:  Thank you.

7              For JF Howell Interests.

8              MR. TAGGART:  Good afternoon, Judge.  David

9    Taggart on behalf of JF Howell.

10             THE COURT:  Thank you.

11             JJS Working Interests.

12             MS. HARDY:  Good afternoon, Your Honor.  Jennifer

13   Hardy on behalf of JJS.

14             THE COURT:  Thank you.

15             For Howard Sklar and the Sklar -- Howard Sklar

16   Trust.

17             MR. HIRSCH:  Good afternoon, Your Honor.  Adam

18   Hirsch on behalf of Howard Sklar and Trust.

19             THE COURT:  Thank you.

20             Kudzu parties.

21        (No audible response.)

22             THE COURT:  Any -- Mr. Geno or Mr. Swanson?  Maybe

23   they haven't hooked back up yet.  Okay.

24             For Landmark Oil and Gas.

25        (No audible response.)

1          THE COURT:  Mr. Spencer, are you there?

2      (No audible response.)

3          THE COURT:  Nope.  Okay.

4          Liquid Gold.

5          MR. CROWLEY:  Good afternoon --

6          THE COURT:  Anybody?

7          MR. CROWLEY:  Good afternoon, Your Honor.

8  Christopher Crowley for the Creditor, Liquid Gold Well

9  Services.

10          THE COURT:  Thank you.

11          Lucas Petroleum.

12          MR. BRESCIA:  Good afternoon, Your Honor.  Duane

13  Brescia for Lucas Petroleum Grouping.

14          THE COURT:  Thank you.

15          McCombs Energy.

16      (No audible response.)

17          THE COURT:  Nope.  Okay.

18          Pruet Production.

19          MR. RETHERFORD:  Jeremy Retherford and Matt Ochs

20  for Pruet, Your Honor.

21          THE COURT:  Okay.  Thank you.

22          And the Strago Group.

23          MR. PADDOCK:  Good afternoon, Your Honor.  Robert

24  Paddock on behalf of Strago Group.  I believe Lewis Dosier

25  (phonetic), the client representative, is also on.

```
 1                    THE COURT:  Okay.  I don't want to know those
 2       today.  We're in a short time frame here.  Thank you.
 3                    Okay.  So let me go back to the ones that weren't
 4       on.  Mr. Swanson, have you appeared again?
 5                    MR. SWANSON:  But afternoon, Your Honor.  Tim
 6       Swanson on behalf of the Ad Hoc Committee of Working Interest
 7       Owners.
 8                    THE COURT:  And also on behalf of?
 9                    MR. SWANSON:  No.  No, Your Honor, just the Ad Hoc
10       Committee --
11                    THE COURT:  Okay.
12                    MR. SWANSON:  -- this morning.
13                    THE COURT:  Okay.  Very good.
14                    Okay.  So --
15                    MR. SUZUKI:  Your Honor?
16                    THE COURT:  Yes?  Is there anybody else I didn't
17       call?
18                    MR. SUZUKI:  Yes, the bank, Your Honor.
19                    THE COURT:  Oh, oh.
20                    MR. SUZUKI:  Bryce Suzuki on behalf of East-West
21       Bank.  Thank you.
22                    THE COURT:  Thank you.  I don't -- I just missed
23       you.
24                    MR. SUZUKI:  No worries.
25                    THE COURT:  Sorry about that.
```

1         Anybody else I didn't call?

2      (No audible response.)

3         THE COURT:  Okay.

4         All right.  As you all --

5         MR. BRY:  Lindy Bry (phonetic), Working Interest

6   Owner.

7         THE COURT:  Okay.  Thank you.

8         Anyone else?

9         MS. ROSS:  Your Honor, I'm also representing the

10   Office of Natural Resources Revenue.

11         THE COURT:  Okay.

12         MS. ROSS:  Katherine Ross.

13         THE COURT:  Got it.

14         MR. SCHUSTER:  Your Honor, this is Michael

15   Schuster, I'm representing Louisiana Tower Operating for the

16   (unintelligible).

17         THE COURT:  Hang on one second, Mr. Schuster.  I'm

18   writing fast, but it's Louisiana?

19         MR. SCHUSTER:  Tower Operating.

20         THE COURT:  Thank you.

21         Anybody else?  Last chance.

22      (No audible response.)

23         THE COURT:  Okay.  You don't have to enter your

24   appearance if you didn't get it done, so you're free to

25   observe.

1          All right.  As you all know, we have four matters
2 that are pending.  We've got:
3          Plan confirmation with lots of the objections;
4          We've got Sklarco's motions to assume operating
5 agreements;
6          Both Debtor's motion to assume and approve an
7 amendment to the Agency Services Agreement;
8          And Rudman's application for an admin expense.
9          And as I went through these, and then I sort of
10 created a list of, I think it was 21 fundamental issues that
11 are present in either one or more of these motions, I don't
12 know how much they involve factual disputes, but there are a
13 lot of legal disputes for certain.  And what I wanted to do
14 is kind of map out how we're going to go ahead and address
15 these.
16          The thing that I was very disheartened to realize
17 for the first time in reading through the papers is that we
18 may have a fundamental issue here of what Sklarco owns and
19 doesn't own, as well as the real property that's involved
20 with some of the plans.  But by putting this agency agreement
21 in front of me it makes me, of course, question whether
22 Sklarco owns any of these working interests.  Not that it has
23 to, but we have to know for liquidation purposes, for all
24 kinds of reasons, we have to know what really is Sklarco
25 asset wise, or is it just a, you know, another operator, in

 1  essence.  I know it's an agent for the family trust.

 2           And I'm going to start off asking some pointed

 3  questions of our bank.  So I'm sorry for that, Mr. Suzuki,

 4  but I figure you'll know this.

 5           Who exactly are your borrowers?  Is it only these

 6  two debtors?

 7              MR. SUZUKI:  It's these two debtors, Your Honor.

 8              THE COURT:  Do you have guarantors of the Trust?

 9              MR. SUZUKI:  No guarantors on this credit.

10              THE COURT:  When the Debtor apply -- Debtors

11  applied for this line of credit did they disclose the assets

12  of Sklarco?

13              MR. SUZUKI:  They did.  There is -- there was a

14  number of investment assets that were not subject to the

15  bank's lien, and those were disclosed to the bank.  The other

16  assets we understood to be the assets of Sklarco, and those

17  are made subject to the bank's lien.

18           As to that scheduled unencumbered assets, I think

19  most of those are the assets that are at issue that Your

20  Honor is talking about.

21              THE COURT:  Well, I'm getting the impression, and

22  maybe it's incorrect, that Sklarco doesn't really own the

23  working interest ownerships.  They only own the right to get

24  a management fee for being the agent for the trusts, and the

25  trusts are the ones who owe that.  Do you have any knowledge

1    about that in the bank's due diligence?

2         MR. SUZUKI:  I was not involved at that stage of

3    the case.  I can tell you, Your Honor, that the bank relied

4    upon those assets being Sklarco assets, and that the bank has

5    continued throughout this case to rely on those assets being

6    Sklarco assets.  They were disclosed as such, they were

7    scheduled as such, and those Schedules are signed by Mr.

8    Sklar.  And so those assets, we think, are legally Sklarco

9    assets and that's -- we've worked off of that assumption.  It

10   has not been challenged.

11        What is reserved under the Plan, and certainly Mr.

12   Johnson on behalf of the Committee, and Mr. Hirsch on behalf

13   of the Trust, can address this, but what's been reserved

14   under the Plan is not wholesale all of Sklarco's assets.

15   Those under the Plan conclusively are treated as Sklarco

16   assets and administered for the benefit of creditors.

17        THE COURT:  Where you're not then shocked to see

18   this agency agreement?

19        MR. SUZUKI:  Not really, Your Honor.  I mean, we

20   were not -- I did not come into the case aware of the agency

21   services agreement.  When I saw it, it raised eyebrows and

22   potential concerns.  But again, we went back to the fact that

23   the assets had been judicially admitted to be Sklarco assets,

24   and --

25        THE COURT:  Putting a Debtor's representation

1  doesn't make a determination of ownership, as you know.  But,

2  okay, but at least I know what you're operating under, the

3  belief that these were Sklarco assets.

4          MR. SUZUKI:  Correct.

5          THE COURT:  All right.

6          Ms. Riley, please do not interpret my frustration,

7  and frankly somewhat anger, at Counsel.  It is not directed

8  at Counsel.  But has your client been truthful and honest in

9  filling out the Schedules for Sklarco?

10          MS. RILEY:  Yes, Your Honor, they have.  And of

11  course those documents were signed under penalty of perjury,

12  as well. And the assets at issue with respect to the

13  Schedules, those are the working interest owners that we of

14  course have scheduled as being owned by Sklarco.

15          There are additional working interest -- working

16  interests that exist that were administered by Sklarco that,

17  at least from our review, are not included on the Sklarco

18  Schedules.  Those are assets attributed to the -- I always

19  get this name wrong, I believe it's the Maren Silverstein

20  Trust (phonetic), and the succession of Miriam Mandel Sklar -

21          THE COURT:  Right.

22          MS. RILEY:  -- as well as, of course, then there

23  were some of these outside investments that were initially

24  scheduled as being held by Sklarco and sort of their legal

25  title only, and then later amended following a review by the

1    CRO to being held by Sklarco, that there is a question of

2    ownership as to whether or not those belong to some of the

3    trusts that are parties to the Agency Services Agreement or

4    owned by Sklarco.  So those are the assets that are more at

5    issue here.

6              The intent of the amendment to the Agency Services

7    Agreement is to sort of remove any ambiguity as to the

8    ownership of some of these assets, mainly again some of those

9    assets that could be attributed, or would be attributed to

10   the Miriam -- or excuse me, the Miriam Silverstein Trust for

11   the succession of Miriam Mandel Sklar, and ensure that those

12   funds converted remain in the estate to continue to make

13   those payments, particularly because those entities do own --

14   do owe a fairly sizable balance to the Debtors.  I don't

15   recall offhand if it was FCC or Sklarco, but do owe 35

16   (unintelligible) --

17             THE COURT:  Why do they owe money to the Debtors?

18   Why?

19             MS. RILEY:  Each of those entities, because their

20   assets were being managed by Sklarco and FCC, were assessed

21   an agency services fee on a go forward basis.  Over time, as

22   the asset value depreciated, the oil and gas interest

23   attributable to those entities wasn't sufficient to cover

24   that agency services fee.  It's still sufficient to cover the

25   JIBs associated with those interests, it just wasn't

1  sufficient to cover the agency services fee itself, resulting

2  in a fairly sizable balance.

3          The amendment to the Agency Services Agreement,

4  because all of that money is staying in the estate, or I

5  guess in this case in the company as the assets, it's sort of

6  (unintelligible) there, but it allows that money to stay in

7  to be applied to that outstanding receivable balance and

8  remove the agency service fee going forward, because all of

9  that money is staying in, flowing through the companies, it

10  becomes part of that available cash and is ultimately paid

11  out to creditors.

12          THE COURT:  Mr. Skelton, do you want to respond to

13  that?

14      (No audible response.)

15          THE COURT:  You need to unmute.

16          MR. SKELTON, JR.:  Yes.

17          Your Honor, as Alice in Wonderland said, "Things

18  get curiouser and curiouser."

19          THE COURT:  They do.

20          MR. SKELTON, JR.:  And I just, I've -- frankly, I

21  call it like I see it.  I've smelled a rat about this

22  arrangement from the very moment that I found out about it.

23  As the Court will recall, it wasn't scheduled as an executory

24  contract at all.  It didn't show up until we recalled their

25  hand on it.

1        And these issues about Miriam Mandel Sklar and the

2   Silverstein Trust, I don't know of any disclosure anywhere

3   about this.  In the Agency Service Agreement motion they

4   tried to set a soft play, well, they don't really have any

5   money anymore anyway, so we're going to stop charging them

6   the fee.  Well, as thin as the margins are for FCC, there are

7   no margins.  The idea of giving up the right to collect money

8   from a potentially solvent party is astonishing, especially

9   when an insider.  And I just don't think any of this has been

10  adequately disclosed at all.

11        THE COURT:  I have the same impression at this

12  point, that we're essentially back to ground zero.  Which,

13  after all the legal fees everybody's had to incur to get to

14  this point, is very distressing.

15        And I'm frankly a little baffled as to where we

16  go.  If we have this much self-dealing and nondisclosure my

17  inclination is to kick this all to Chapter 7.  So, but I

18  would welcome somebody filing a motion to convert or dismiss,

19  probably convert only, but this is not right.

20        MR. JOHNSON:  Your Honor, if I may?  This is Chris

21  Johnson, for the --

22        THE COURT:  Mr. Johnson.  Okay.

23        MR. JOHNSON:  Thank you, Your Honor.

24        I understand your concern.  Let me first say,

25  despite the shock that, you know, some of the parties have

1  raised, this issue has been kicked around for a while.  As a

2  matter of fact, Mr. Skelton first sent me an email on this in

3  September of 2020.  So he's known about it for close to a

4  year.

5          THE COURT:  Well, why didn't the Debtors, Ms.

6  Riley, file amendments to the Schedules?  They have a duty to

7  do that as soon as something is inaccurate, you discover it's

8  inaccurate.

9          MS. RILEY:  Your Honor, we did actually amend the

10  Schedules to include the Agency Services Agreement fairly

11  early on in the case, I believe it was within the first month

12  or two, to ensure that that was disclosed.  I believe a copy

13  of the Agency Services Agreement, although I am trying to

14  verify this, was also included in the data room, or was

15  otherwise provided to creditors potentially who had signed

16  the protective order.  Again, I am trying to verify that.

17  But this was listed on the amended Schedule G fairly early

18  on.

19          MR. JOHNSON:  So, I'm sorry, again, Your Honor --

20          THE COURT:  Go ahead.

21          MR. JOHNSON:  -- Chris Johnson for the Committee.

22          So the parties have known about this for a long

23  time.  We put very little stock into an allegation that

24  Sklarco did not own these assets.  The only party to really

25  raise that issue had been Mr. Sklar, and Mr. Hirsch and I

1    engaged in extensive negotiations over this issue.  This

2    issue, Mr. Sklar, and Mr. Hirsch is on -- is at this hearing

3    and he can testify as to whether or not Mr. Sklar is actually

4    asserting that Sklarco does not own these assets, or that

5    they are not being contributed to pay the creditors of

6    Sklarco and FCC under this plan.

7         THE COURT:  Well, the other issue that it raises

8    for me is whoever the beneficiaries are of however many

9    trusts are involved, they are not getting any due process if

10   the person they're relying on has huge conflicts of interest.

11   So I am not comfortable proceeding without them being a party

12   to whatever adversary or whatever it might be.

13         Well, let me go back to the fundamental question:

14   What are we doing in Chapter 11?  Shouldn't we turn this over

15   to a neutral and inexpensive party, like a Chapter 7 trustee?

16         MS. RILEY:  Your Honor, at this point what the

17   Chapter 11 Plans propose to do, really dedicates all of these

18   assets to creditors, with only a very small amount going to

19   Howard Sklar to settle certain issues.  But really, the asset

20   value here is going to creditors throughout the life of this

21   plan.  And whether it ends up through a monetizing event with

22   a refinance or a sale, again the majority of those funds are

23   going to creditors to be administered.

24         This is a very hard negotiated plan, all of the

25   parties were involved in those negotiations, and it's

1  supported by the bank, by the Committee, by a number of

2  working interest owners, and by, frankly, a majority of the

3  creditors who voted to accept the Plan, as well.  And Mr.

4  Sklar was involved in those negotiations and has also agreed

5  to the Plan.

6          THE COURT:  The Debtor says in one -- one side of

7  its mouth in the disclosure statement that, yes, we meet the

8  best interest of creditors test because in a liquidation in

9  Chapter 7 the bank would not even be fully paid and it would

10 be much underpaid.  And then we have the treatment in the

11 plan of the bank that is $24,000 -- $24 million secured claim

12 entitled to continue accruing interest.

13         So, you know, a lot of -- and now I'm really

14 questioning what is the bank's collateral.  And as I reread

15 the disclosure statement this morning I saw that the drop-

16 dead date for challenging the bank's position was moved

17 several times, and now it's -- it was a date that's already

18 been passed for confirmation.  It didn't say the earlier of

19 or the later of.  But somebody needs to be looking at this.

20         And -- oh, go ahead.  Who is speaking?

21         MR. JOHNSON:  Your Honor, this is Chris Johnson.

22         That's my burden.  And you just recently entered

23 an order extending --

24         THE COURT:  Did I?

25         MR. JOHNSON:  -- the deadline to July 31st for the

1    entry of an order allowing or denying confirmation.

2              This Court will recall, you know, the original

3    challenge period was June of last year, June or July of 2020

4    --

5              THE COURT:  (Unintelligible).

6              MR. JOHNSON:  -- the Committee, you know, did

7    support our stands.  The Committee did investigate the bank's

8    liens.  You know, we investigated the bank's liens --

9              THE COURT:  Well, I'm sure you look at the normal

10   things we look for, the, you know, are the security documents

11   all perfected and in order.  But did you look at what are the

12   real assets that the bank has a lien on?

13             MR. JOHNSON:  Your Honor, we did not.  And we

14   still don't believe that this Agency Services Agreement,

15   which permits Sklarco to bind all of the parties to the

16   agreement and to commit their assets, somehow divests Sklarco

17   of the right of the ownership of those assets.  And that

18   claim has been waived essentially under this Plan.

19             Those trusts under this Plan waive an argument

20   that they --

21             THE COURT:  They are parties to the Plan.  They

22   haven't signed off on the Plan, have they?

23             MR. JOHNSON:  And Mr. Hirsch can address that

24   directly, Your Honor, as to what Mr. Sklar's rights are with

25   respect to those specific entities.

1          THE COURT:  Okay.

2          MR. JOHNSON:  But to the extent he is the trustee

3   for those trusts, I believe he has the ability to do that.

4          So I know that's an issue for the Court, whether

5   or not those parties are receiving their due process, and

6   maybe Mr. Hirsch can address that for us.

7          THE COURT:  Mr. Hirsch.

8          MR. HIRSCH:  Yes, Your Honor.  A couple things

9   here.

10          One, I think on tack as to the liens -- and by the

11  way, also I represent Howard Sklar and the Howard Sklar

12  Trust.

13          THE COURT:  Understood.

14          MR. HIRSCH:  Howard Sklar -- Howard Sklar is also

15  trustee for, he has two sons Alan and Jake, he's trustee for

16  those trusts, as well.  He and his sons have been involved

17  throughout the entire process.

18          THE COURT:  But they haven't signed off, have

19  they?

20          MR. HIRSCH:  They -- Mr. Sklar, as trustee for

21  those trusts, has signed off, Your Honor.  They have voted in

22  favor of the Plan, as well.

23          THE COURT:  Well, that --

24          MR. HIRSCH:  And that (unintelligible) --

25          THE COURT:  That's different than --

1          MR. BRY:  Mr. Hirsch, he hasn't given me any

2    notice.  That's (unintelligible) Bry.

3          THE COURT:  Mr. Bry, you need to wait until I call

4    on you.  Oh, wait a minute, Mr. Bry, what -- what are -- say

5    that again.

6          MR. BRY:  I said Mr. Hirsch did not notify me in

7    anything concerning this -- these proceedings.

8          THE COURT:  But you are a working interest owner.

9    We're talking now about the family trusts of Howard Sklar.

10          MR. BRY:  Understood, and (unintelligible).

11          THE COURT:  Okay.

12          All right.  So back to that.

13          You know, we've got a person who has a lot of

14   conflict of interest now giving advice to these trusts, but I

15   guess that's -- maybe that's their risk they take.  But are

16   you going to be willing to put in writing that your client

17   is, on behalf of all these trusts and himself, is giving up

18   any claim of ownership to the assets that are owned by

19   Sklarco?  And I guess we better get a list of them.

20          MR. JOHNSON:  Well, Your Honor, I think that the

21   answer to that is really in the assumption under the Agency

22   Services Agreement.  What, the Agency Services Agreement,

23   what that did was it appointed Sklarco's agent on the

24   (unintelligible).  What we needed to do in order to make that

25   consistent with the Plan so that there wouldn't be issues as

1   to title and ownership would be to have an amendment that

2   would allow the contribution of those assets from Sklarco

3   that each of the trusts would sign off on, and there's a

4   (unintelligible) but it's not in the amendment, so that they

5   would be on board with this.  But that would enable those

6   assets to be contributed to the FCC creditors and their

7   estate as the bank contemplates.

8          As far as the liens are concerned, there's no

9   dispute as to the bank's liens on those assets.  I think Mr.

10  Sklar and the trusts and, you know, Sklarco, those assets

11  were pledged, and under the Agency Services Agreement I

12  believe Sklarco had the authority as agent nominated for the

13  beneficiary trust to enter into the loan with East-West Bank

14  and to pledge those assets.  So I don't --

15          THE COURT:  I don't --

16          MR. JOHNSON:  -- think there's any dispute as to

17  the liens or valid -- or whether or not they're valid from

18  the perspective of who may be the beneficial owners of those

19  assets.

20          THE COURT:  Let me ask Mr. Skelton how you would

21  imagine we proceed from this point.

22          MR. SKELTON, JR.:  Well, Judge, way on back when

23  we filed the motion to appoint a Chapter 11 trustee, or

24  alternatively to convert, rather than, you know, rule on the

25  motion it was ruled that it would be just abated.  I believe

1    --

2            THE COURT:  So it is -- it is already --

3            MR. SKELTON, JR.:  It's alive.  It's teed up.

4            THE COURT:  Thank you.  Thank you for reminding me

5    of that.

6            MR. SKELTON, JR.:  I just don't think at this

7    point -- now, keep in mind, FCC is a dead duck now.  I mean,

8    it's already -- it's already rejected its contract.

9            THE COURT:  Understood.

10           MR. SKELTON, JR.:  We're proceeding onward what on

11   that.  And really a lot of the complexity of the case really

12   has to do with what FCC and Sklarco basically just gets

13   checks in the mail and supposedly pays its bills.  I don't --

14           So I strongly urge that we stop, we've got all of

15   these -- with all of these layers of professional fees to

16   arrive at this point and have such murkiness about the facts

17   is astonishing and we've just got to call a stop to it and

18   put a scalpel to this situation and get a -- get a

19   disinterested fiduciary in the saddle.

20           MS. RILEY:  And, Your Honor --

21           MR. SKELTON, JR.:  That's my view.

22           THE COURT:  Ms. Riley.

23           MS. RILEY:  If I may?

24           The Agency Services Agreement was actually

25   attached to Mr. Skelton's motion to convert that was filed

1   back in, it looks like May of 2020.  So it --

2           THE COURT:  But the issue isn't just if there was

3   an agency agreement out there.  It's trying to sort out who

4   has these assets and, you know, whether we can proceed

5   forward without a determination of that.

6           MS. RILEY:  And, Your Honor, I think at the very

7   least, obviously we have the Schedules, those are filed.

8   They disclosed all of Sklarco's assets, they disclosed all of

9   FCC's assets in those Schedules, as well.

10          There was one piece of land that was inadvertently

11  omitted, we will amend to include that as well, but that is

12  addressed in some of the substantive pleadings, and again the

13  parties have known about it.

14          But at least as to a majority of these assets, it

15  is our position that really moving forward on this Plan is

16  the only means by which creditors of FCC are going to get a

17  meaningful recovery from the assets at the Sklarco level.

18  Because, really, Sklarco is contributing significant funds

19  and paying FCC creditors going forward.  And, really, that's

20  the only method to do that, is to proceed forward with the

21  Plan, as opposed to having significant litigation over

22  substantive consolidation issues, because I think that's

23  really the alternative here.

24          THE COURT:  And it may be.

25          MS. RILEY:  And with the -- with the various --

1          THE COURT:  It may be.  And I can't confirm this

2   Plan.  I mean, it's facially unconfirmable.  It violates the

3   Absolute Priority Rule.  I mean, I don't even have to hold a

4   single hearing to determine that.  You would have to admit

5   that, wouldn't you?  It --

6          MS. RILEY:  Well, Your Honor -- sorry, I didn't

7   mean to interrupt.

8          So at this point, creditors have voted to accept

9   the Plan for both FCC and for Sklarco.  As to the FCC Plan,

10  or, excuse me, as to the FCC Absolute Priority Rule, those

11  creditors are getting paid without equity interests retaining

12  or receiving anything, because once FCC completes its

13  liquidation and wind down the interests in FCC are

14  terminated.

15         THE COURT:  I should have --

16         MS. RILEY:  It's only --

17         THE COURT:  -- been more specific.  It's Sklarco,

18  its side of this Plan is what's in violation of the Absolute

19  Priority Rule.  Because the Sklar Trust is going to get

20  payments during the course of the Chapter 11, or during the

21  course of the Plan, and they're going to retain their equity

22  interests.  So that's a violation --

23         MR. SUZUKI:  Your Honor, may I be heard?

24         THE COURT:  Mr. Suzuki.

25         MR. SUZUKI:  Bryce Suzuki on behalf of the bank.

1          THE COURT:  I think I'll come back to you in a

2   minute, Mr. Suzuki.

3          Ms. Riley.

4          MS. RILEY:  And, Your Honor, as to the Sklarco

5   Plan.  Again, creditors have voted to accept the Plan as to

6   Sklarco (unintelligible) --

7          THE COURT:  Voting -- voting is one thing.  That

8   tells us whether we have a consensual plan or not.  But

9   confirmation requirements still have to be satisfied, and we

10  do have objectors to confirmation --

11         MS. RILEY:  But, Your Honor --

12         THE COURT:  -- who have objected on this basis.

13         MS. RILEY:  Certainly.  But the objectors are

14  creditors of FCC, they are not creditors of Sklarco.

15         THE COURT:  Well, that's assuming we don't have a

16  basis for piercing the corporate veil or substantive

17  consolidation.

18         MS. RILEY:  And, Your Honor, the --

19         THE COURT:  Go ahead.

20         MS. RILEY:  But, Your Honor, those claims haven't

21  been brought yet.  There have been allegations raised in

22  objections to motions, but at this point we are 13 months

23  into the case, no parties have filed a motion seeking to

24  substantively consolidate these estates, no parties have

25  filed a adversary proceeding seeking to substantively

1   consolidate these estates.  So as of right now, they do

2   remain separate debtors.  And so, really, when we're looking

3   at the objections, the objections that been filed have been

4   filed by creditors of FCC.

5          And the issue that I think we have as well is that

6   as we proceed forward, again the question becomes, you know,

7   what is really going to -- what is that substantive

8   consolidation fight going to look like?  And frankly, I think

9   that moving forward with this plan that has been heavily

10  negotiated and accepted by the majority of these parties is

11  still going to provide a more meaningful recovery than really

12  derailing the plan process at this point.  And having to go

13  and have that substantive consolidation fight is going to be

14  very time-consuming, very expensive --

15          THE COURT:  Okay.  Thank you.

16          Mr. Skelton.

17          MR. SKELTON, JR.:  Yes.

18          THE COURT:  I know there are other objectors, and

19  I'll let you -- the others voice their --

20          MR. SKELTON, JR.:  Okay.

21          THE COURT:  -- response to that, as well.  But,

22  Mr. Skelton, why don't you begin.  She says that your client,

23  or clients, are not creditors of Sklarco and have no standing

24  to be heard on Sklarco's Absolute Priority Rule.

25          MR. SKELTON, JR.:  Well, first of all, we've raise

1   the cure objection, and we have stated that Sklarco owes

2   money that must be paid in order to assume any executory

3   contract.

4         Secondly, we've also raised the issue -- and I'll

5   be happy to convert any of these motions to an adversary

6   proceeding if they want it.  I've raised the substantive

7   consolidation.  But honestly, this is an issue that should

8   have been raised by, shall we -- I hate to say it, but the

9   committee, or it should be raised by a Chapter 11 or 7

10  trustee, or however the Court wants to proceed.

11        But this is the -- as what Mr. Cornwell I believe,

12  of the Committee Counsel said, substantive consolidation is

13  the elephant in the room in this case.  And it -- and it was

14  the elephant in the room from the get-go, because when Mr.

15  Strasser (phonetic) testified at the cash collateral hearing

16  on April 27th and May 11th that this company, FCC could never

17  survive but for the co-mingling of cash.  That has been the -

18  - that was proved.  Really, almost everything I need to prove

19  was proven in that cash collateral hearing.

20        And so if we let this continue on under the same,

21  shall we say administration, we're going to absolutely

22  hemorrhage, the burn rate is going to be terrible.

23        And there's one last thing that really, really

24  bothers me, and that is when this case was filed, even as bad

25  as conditions were in April of 2020, guess what value Howard

1   Sklar put on the estate's oil and gas asset?  He used a

2   reserve report that was dated as of April 1st, 2020, and it

3   was $75 million.  Now they come up with a report that's stale

4   and dated already that was done --

5            THE COURT:  That wasn't a valuation, it was just a

6   reserve.

7            MR. SKELTON, JR.:  No.  It's just a reserve

8   report.  I mean, the IRS -- reserve reports aren't value.

9            So here's what just really bothers me that's

10  behind the scenes.  That the Sklar family is sitting back

11  there chuckling about the fact that these assets are really

12  worth a ton more, and the unsecured creditors in this case,

13  and FCC and Sklarco, deserve to have an interested fiduciary

14  that will come to blows on the substantive consolidation

15  issue and will give an opportunity for these assets to be

16  liquidated these creditors paid.  Because I sense that

17  there's the money there to do it at $66 plus intermediate

18  accrued values.

19            THE COURT:  All right.

20            Fant Energy, Mr. Cohen, do they want to add

21  anything?

22            MR. COHEN:  I'll be very brief, Your Honor.

23            These are issues that to a degree have been raised

24  in the context of our objection to the remaining six motions

25  to assume.  And that is, we have calculated roughly $1

1 million in cash calls that were not paid and identified that

2 as the basis for our objection on those six participation

3 agreements and JOAs.

4       The response has been that Sklarco had overpaid,

5 and therefore, somewhere in all of this there's a credit back

6 that means that Sklarco is somehow current.  And it gets back

7 to the recurring theme, Your Honor, is that we have these two

8 entities represented by the same firm, with the same CRO and

9 the same CEO, and somehow we're supposed to sort out the

10 debits and credits of these accounting procedures, to the

11 extent they exist, when, in fact, things have been so

12 intermingled I'm not sure how we ever sort it out.

13       And so, Your Honor, the issues that Fant has

14 raised with respect to the Sklarco assumption motions sort of

15 are part of this overall theme in that I don't know how this

16 gets sorted out as the case is currently postured.

17       Thank you.

18       THE COURT:  And when it's impossible to sort it

19 out that, to me, is a pretty good basis for at least veil

20 piercing.  But I'm mindful that we may have different sets of

21 creditors for these two debtor's and we may have -- you know,

22 the trusts maybe need to be part of the veil piercing.  I

23 don't know if that can even happen legally.

24       But I'm -- I am -- I am not satisfied with the

25 response on the Absolute Priority Rule.  The Court has a duty

1  to make sure -- I don't know.

2         At the outset of this case I wanted to see if the

3  Debtors had a chance to really survive and be profitable and

4  avoid all the costs of the litigation, to sort out the co-

5  mingling, just figure out whether we need present

6  consolidation, et cetera.  But I do not have a good feeling

7  at this point about this case, about the level of disclosure,

8  and so I guess I want to know what is the harm of going to

9  Chapter 7 at this point.

10        And I am going to give you all time to think and

11 talk in reaction to what the Court's raised.  But I -- I'm

12 not going to outright deny confirmation today because -- I

13 can't remember who it was that told me, forgive me, it may

14 have been you, Mr. Johnson, but there's a pushing of the date

15 for challenging the bank's liens that's now July 15, or

16 confirmation denial or approval.  So if I outright deny it

17 today the time to challenge the bank has gone.

18        That -- why was that --

19        MR. JOHNSON:  Your Honor, that was -- the reason

20 for that, it should have been, you know, within two days

21 after the Court enters an order denying or granting

22 confirmation, to keep the challenge deadline from being left

23 open.

24        But, Your Honor, can I just make two points?

25        One, the Absolute Priority Rule applies when a

1   class of creditors has not voted to accept the plan.   In this

2   case, all creditors and all classes have voted to accept the

3   plan.   Creditors, I think this the point Ms. Riley and Mr.

4   Suzuki were trying to make --

5            THE COURT:   Okay.

6            MR. JOHNSON:   -- is that where the classes of

7   creditors have voted to accept, that rule is not applicable.

8   In this case we have classes of creditors that have voted to

9   accept the Plan.

10           The other point I wanted to make, Your Honor, is

11   with respect to substantive consolidation.   Everyone is

12   absolutely right, the Committee has raised this issue, the

13   Committee has thought that this was a significant issue.   But

14   what we saw when we got in this case, Judge, were two

15   debtors, one of which had all the assets and one of which had

16   all the debts.   And this committee represents the debtor that

17   has all the debts, and we saw the unfairness of that

18   situation.   And we have fought from day one to put together a

19   plan in which the creditors of FCC are treated equally with

20   the creditors of Sklarco, what you would get in a substantive

21   consolidation plan.

22           And what we've done in this plan that is currently

23   before you is substantively consolidate it, without a motion,

24   and without argument, and without challenge by Mr. Sklar or

25   any other party.   We have a plan that substantively

1   consolidates Sklarco's assets with FCC's creditors.

2           All of the assets of both entities are contributed

3   to a single trust where creditors of both debtors share party

4   persu, subject to a very small carveout for Mr. Hirsch's

5   client, Mr. Sklar.  That deal, Your Honor, essentially

6   provides that 90 percent of all of the assets of Sklarco and

7   FCC, after payment of the bank debt, go to unsecured

8   creditors.  So we have substantive consolidation already

9   built into the Plan without fighting it.

10          The best I could do, Your Honor, is filed that

11  motion for substantive consolidation.  Mr. Hirsch would fight

12  that, the Court would ultimately rule on that.  There is a

13  risk that I could not, you know, or the Committee would lose

14  that argument, and there's going to be a cost and a time

15  delay to get there.  And what we've done in this Plan is

16  taken out the risk and taken out the cost and taken out the

17  delay.

18          The same thing with respect to the ASA, the asset

19  that -- you know, the Agency Services Agreement.  There's

20  only one party who would challenge whether or not those

21  assets belong to Sklarco; those are the trusts that are

22  represented by Mr. Sklar, and he has consented.  So is Mr.

23  Skelton going to argue that those assets are not Sklarco

24  assets?  Because no one else on this call or at this hearing

25  is arguing that.  They're contributing those assets to

 1  unsecured creditors, so we've won that battle, as well.

 2          We won the same battle with respect to

 3  intracompany claims.  All of these battles have been

 4  considered and have been won from the standpoint of unsecured

 5  creditors.  Why would I go file a sub con motion when I've

 6  already won it?

 7          Why would I file an intracompany claim or a claim

 8  to challenge an intercompany receivable or collect a debt

 9  against Sklarco when Sklarco has already contributed all of

10  its assets to the unsecured creditors pursuant to the trust?

11          THE COURT:  Okay.

12          MR. JOHNSON:  The only -- I'm sorry.

13          THE COURT:  Let me --

14          MR. JOHNSON:  Thank you, Your Honor.

15          THE COURT:  Let me stop you there.

16          I will acknowledge that we don't have an Absolute

17  Priority Rule issue if we have all our classes accepting.  So

18  that's off the table.

19          I think where I got off track with this is the

20  suggestion that somebody is going to pull the rug out at the

21  last minute and say these assets are really owned by the

22  Trusts and not by Sklarco.

23          MR. JOHNSON:  Right.

24          THE COURT:  In which case --

25          MR. JOHNSON:  And they will not do that, Your

1   Honor.

2           THE COURT:  Well, I don't have that in writing.

3           MR. JOHNSON:  (Unintelligible).

4           THE COURT:  And it needs to be in writing, and

5   there needs to be a clear delineation of what assets we're

6   talking about.  What do the -- what does the Trust own versus

7   what does Sklarco own.  And I think that until these debts

8   are paid, and if you talk about sub con is in the Plan, well,

9   it sure isn't as far as the trusts, but that can be --

10          MR. JOHNSON:  Correct.

11          THE COURT:  That can be fixed, if you get all

12   these trusts and Mr. Sklar personally in the loop, then maybe

13   we do have that without all the litigation.  But we're not

14   there --

15          MR. JOHNSON:  Thank you, Your Honor.

16          THE COURT:  But we're not there yet.

17          MR. JOHNSON:  Understood.  We think we got there

18   with respect to the ASA and the modification, because in the

19   ASA modification those trusts agree that all of those assets

20   are bound to the Plan obligations.  But we will continue to

21   work on that if that's not absolutely clear.

22          UNIDENTIFIED MALE:  And, Your Honor, if I can

23   flesh out what Mr. Johnson just said to add on to that?

24   There was a termination provision in the ASA that allowed the

25   Trusts to terminate and there would be a potential

1  (unintelligible) or something in the various papers we filed

2  as part of the amendment so that we wouldn't pull the rug out

3  from under anybody.  The trust went ahead and waived the

4  right to do that until all creditors are paid in full under

5  the Plan --

6            THE COURT:  Which trust?

7            UNIDENTIFIED MALE:  -- (unintelligible) --

8            THE COURT:  Which trust?

9            UNIDENTIFIED MALE:  All of them.  All of the trust

10  subject to the ASA and these assets of Sklarco, Your Honor.

11  Because we didn't want to pull the rug out from under

12  anybody.  So that -- that was -- as Mr. Johnson said, that

13  was the initial thought and what was baked into the ASA

14  amendment so that it would mesh and jive with the Plan.

15            THE COURT:  Okay.  How long do you think is it

16  reasonable to ask that Sklar and Sklar -- and the various

17  trusts that he is an agent for, to get them to put into

18  writing exactly what you just said, and Mr. Johnson said, as

19  well as provide a fleshed out list of what are assets of the

20  trusts versus assets of Sklarco?

21            UNIDENTIFIED MALE:  Your Honor, we may need a few

22  weeks on that.  And not to delay things, but we're dealing

23  with a number of oil and gas interests and wells that are in

24  various counties and states throughout the country.  We're

25  going to -- and maybe Mr. Johnson, Mr. Suzuki, and Ms. Riley

 1   would to be able to weigh in on this in terms of scope.

 2             But in addition to that there may be tax

 3   implications, in terms of what we end up putting in writing,

 4   given how taxes have paid historically, and I want to make

 5   sure --

 6             THE COURT:  Okay.

 7             UNIDENTIFIED MALE:  -- that we're being careful

 8   about that and properly vetting the accounts and that sort of

 9   thing.

10             THE COURT:  Time is --

11             UNIDENTIFIED MALE:  And (unintelligible) --

12             THE COURT:  Time is -- yeah, excuse me for

13   interrupting, but -- excuse me.  Time is not of the essence

14   in this case, except as to the burn rate in this Chapter 11,

15   and as to the need to transition quickly these operating

16   agreements.  And if we can get those emergent needs taken

17   care of, we can take our time on some of these other things.

18   So your request for a few weeks, let's say a month, is

19   granted.

20             But, Ms. Keri -- or, Ms. Riley, how -- what's the

21   stage of that data room at this point that would allow

22   potential new operators to look at this?

23             MS. RILEY:  So, Your Honor, at this point, in

24   accordance with your resignation transition schedule, the

25   focus has primarily been on these sort of tranche one

1   properties, which includes the Brooklyn oil units which are

2   by and large the most complex of the assets or units --

3            THE COURT:  Okay.  Ms. Riley, I'm going to stop

4   you, because one thing I read over and over from a lot of the

5   parties is this transition schedule you've proposed is not

6   acceptable.  It allows this Debtor to continue to have a huge

7   burn rate for two more years, and all we're doing under this

8   Plan is kicking the can two years down to see if the Debtor

9   can sell or refinance with no clear path to doing so.

10           So that data room was supposed to be set up in

11  full right away, not just as to Brooklyn or one other major

12  property.  It needs to be fully set up and accessible.  So

13  what is the reasonable time frame for you to focus on that as

14  the first goal here?

15           MS. RILEY:  I think for the data room to be

16  completed on all of the properties I think it is going to

17  take a month, quite frankly, Your Honor.  The Debtor is

18  dedicating significant resources to it.  At this point, our

19  data room is currently 13 gigabytes, so we are dealing with

20  terabytes of information.

21           Again, the focus has been on the Brooklyn units,

22  because we have identified -- well, frankly, potential

23  successor operators have come forward, they've singed NDAs,

24  they have access to that data room.  The CRO has made himself

25  available.  There has been some intercompany issues, but

1  we're working through those, and again, the CRO as made

2  himself available to those potential successor operators to

3  address questions, set up site visits, and ensure that that

4  process can move forward.

5          Some of the information in the data room does

6  apply to other properties as well, but because the big push

7  was on the Brooklyn data units, that's where the focus has

8  been.  And now they're starting to work on the Escambia and

9  Fish Khan (phonetic) units as well, because they're all still

10 part of (unintelligible) -- because they're all still part of

11 that sort of tranche one of properties.

12         THE COURT:  Okay.

13         MS. RILEY:  We acknowledge that the --

14         THE COURT:  This is not going fast enough.  It is

15 a clear priority of everyone and it needs to happen now.  So

16 I'm going to give you that month, but I will not give you any

17 further extensions.  I will convert the case, both cases, to

18 Chapter 7, I may do that anyway, but I will for sure do it if

19 this data room is not set up properly.

20         And, Mr. Swanson, can I call on you to work with

21 the Debtor to make sure it's accessible and it's got the

22 right stuff there?

23         MR. SWANSON:  Your Honor, I appreciate you calling

24 on me.  We have been trying to work with the Debtors tooth

25 and nail for the last two months and we've been pushing and

1    pushing.  We've had our business people reach out to their

2    business people, who won't return phone calls or emails.  And

3    what we are hearing is that some of the business people at

4    the Debtors' will not talk to our business folks.

5          And so we are getting a lot of pushback in getting

6    this complete on Brooklyn.  Which, as everybody knows,

7    Brooklyn is the crown jewel of all these assets.  And so from

8    our perspective, absent having some accountability or

9    consequences, you know, we have been living this transition

10   for the better part of a month, since the Court entered the

11   order approving the stip.  But all the documents that we've

12   asked for in the data room have been known since the latter

13   part of March, and we've just gotten roadblock after

14   roadblock, Your Honor.

15         But we'll continue to work with them, but we need

16   to have some level of accountability on the other side.

17         THE COURT:  What do you think are sufficient

18   hammers to put in place?

19         MR. SWANSON:  Well, I think that if the longer

20   this drags out that there should be, you know, potentially

21   attorney's fees for having to continue to -- and I can give

22   you minute by minute details of what we've done since March.

23   Perhaps there needs to be monetary sanctions after a date

24   certain if the data room is not complete on Brooklyn.

25         THE COURT:  Mr. Skelton, any thoughts on

1   sufficient hammers to put in place?

2        (No audible response.)

3            THE COURT:  You put -- you're on mute.

4            MR. SKELTON, JR.:  I will say that I think that

5   there needs to be a drop dead date for this -- these cases.

6   And I think we need to pick a date, if it's 30 days or so,

7   right at the end of June, that it either we'll set a hearing

8   on conversion, or other relief the Court feels appropriate,

9   and I think sanctions and attorney's fees for all this stuff.

10           And, you know, I mean, Mr. Swanson and I, and I'm

11  sure others, could say this is a can of worms, there's other

12  worms we haven't even talked about, but right now, and I

13  brought it up on --

14           THE COURT:  Don't go there.

15           MR. SKELTON, JR.:  Yeah.  All right.

16           Well, anyway, bottom line is, I think some kind of

17  hammer is absolutely essential.

18           THE COURT:  Mr. (unintelligible) --

19           UNIDENTIFIED MALE:  Your Honor?

20           THE COURT:  Ms. Riley.

21           MS. RILEY:  Your Honor, and I will say that we

22  acknowledge that there have been communication issues.  We

23  are committed to getting those resolved and keeping this

24  moving forward and keeping it -- keeping the resignation and

25  transition moving forward, which is part of the reason why

1  the CRO has made himself available to the successor operators

2  to address any questions and issues that come up.

3         I think that we're not at all opposed to the

4  attorney fees, if there is some need to continue to enforce

5  these provisions.  But I would suggest that, at the very

6  least, a month is necessary.

7         With respect to a sort of drop dead date for the

8  cases.  I don't know that the -- I think for the purposes of

9  the record we can't agree to automatic conversion of these

10 cases if certain benchmarks aren't met at this point, because

11 we would want time to do additional briefing and to address

12 those issues because --

13         THE COURT:  The Plan is proposing this horrendous

14 amount of administrative expense continuing on.  We're

15 existing with horrendous amount of administrative expense

16 burning through each month and, you know, there has to be an

17 end to this.  So the Debtor is going to get the one month to

18 get everything on Mr. Swanson's list, unless it doesn't

19 exist.  And if that doesn't happen, I will convert both cases

20 to Chapter 7 and we'll just get a neutral trustee in here in

21 charge of things running it for a very low cost.

22         MR. RETHERFORD:  Your Honor?

23         THE COURT:  Yes.

24         MR. RETHERFORD:  Jeremy Rutherford on behalf of

25 Pruet, which is one of the candidates for successor operator.

1          In addition to getting the information, and it's

2     been requested multiple times, we need cooperation from the

3     business minds at Sklar.  We were told this week that they

4     will not communicate with us, and --

5          THE COURT:  So who are we talking about, the COO

6     and the CFO?

7          MR. RETHERFORD:  I believe it was the COO and the

8     landman.

9          THE COURT:  Okay.

10         Ms. Riley, why is that?

11         MS. RILEY:  Your Honor, to be perfectly honest,

12    I'm not sure.  I think that there is a level of animosity

13    that exists in this case.  I think that there is maybe some

14    hard feelings, but I fully acknowledge that that is not an

15    excuse and not a reason.  So I --

16         THE COURT:  And that's (unintelligible) --

17         MS. RILEY:  -- generally agree that --

18         THE COURT:  Okay.

19         MS. RILEY:  I generally agree that business

20    parties should be working together to get this accomplished,

21    because those are ultimately the parties that need to get

22    this accomplished.

23         THE COURT:  Then you should let both of those

24    individuals know that they will not be considered future

25    candidates for an interim manager, or employees of the

1   interim -- the independent manager.  They will not be

2   candidates for future employees.

3            MR. SKELTON, JR.:  Judge, there is one important

4   thing.  As she mentioned, well Mr. Katchadurian, the CRO,

5   we'll talk to him.

6            The kind of information Mr. Retherford and Mr.

7   Swanson need, they want to talk to the people who have the

8   nitty-gritty knowledge, and talking to the CRO just runs up a

9   bunch of fees into effect.  But we need to be able to get to

10  the line people who know what's really going on.

11           THE COURT:  And they're not making themselves

12  available, so maybe you have to do a 2004 exam, or whatever,

13  to have it happen formally.  And I will grease the skids for

14  that to happen.

15           MR. SWANSON:  Your Honor, if I could put one

16  additional point?  I know that Ms. Riley has been given 30

17  days.  Brooklyn has been in the works for months, can we have

18  a short fuse on Brooklyn?  Because that -- that transition

19  just needs to start occurring, and they've been -- there is a

20  data room already out there but we just need to light that

21  fuse faster.

22           The other tranches of property they want to

23  transition in 30 days, while very important, but Brooklyn has

24  been in the works for a couple of months now.  And so I will

25  propose that by Friday, a week from today, that the data room

 1  be complete so that the elections for the successor can

 2  occur.

 3        That's -- we've been really laser focused, the Ad

 4  Hoc Committee, on trying to get Brooklyn changed, the

 5  transition to effectuate, and so we just need to see that

 6  happen.  And I understand the others are important, but

 7  Brooklyn is the crown jewel and we need to see that happen.

 8        So if we could set Friday as the deadline to

 9  finish Brooklyn, which would be another week, it would go a

10  long way.

11        MS. RILEY:  Your Honor, if I may?

12        THE COURT:  Yes.

13        MS. RILEY:  I believe that Brooklyn is by and

14  large complete.  I know there were a couple of outstanding

15  documents that were still in the process of being uploaded,

16  but at this point I believe that they've addressed all, if

17  not almost all, of the issues that were raised with respect

18  to the documents for the Brooklyn data room.

19        THE COURT:  Okay.  Then you certify that to Mr.

20  Swanson no later than June 4th.

21        MS. RILEY:  All right.

22        THE COURT:  And if that doesn't happen, that will

23  be grounds for conversion.  I have no other choice but to

24  light these fires, because it -- there's a lot of game

25  playing going on.  And it isn't counsel, so don't take it

1  personally, but it is client representatives.

2        And you know, what's hard is operators are going

3  to want to talk to them, and if we have to go the formal

4  discovery route then they're going to get a lot of

5  depositions taken of them by different perspective operators,

6  I imagine.  So they're not helping themselves by taking this

7  stance.

8        MS. RILEY:  And, Your Honor, just again, if I may?

9  And I do apologize for the interruption.

10       But at this point we have received NDAs from two

11  operators.  Of course we acknowledge that there may be

12  additional potential successor operators out there who may be

13  interested in these properties.  We would ask that to the

14  extent that those parties are on this call, or in touch with

15  parties who on this hearing, that they get those NDAs to us

16  so that they can be given access to the data room.  Because

17  if we don't have the NDA, we can't provide that access.

18       THE COURT:  That's fair.

19       MR. SKELTON, JR.:  Just one last thing, Judge, on

20  the subject of this topic.

21       The operator who's being removed should have only

22  this role of supplying information.  It shouldn't -- Sklar

23  Exploration should not be going out hunting down successor

24  operators.  The non-operators are fully aware of the

25  situation and they will see to that.

1          MS. RILEY:  Your Honor --

2          MR. SKELTON, JR.:  Information is what we need.

3  We don't need FCC running the beauty contest for successor

4  operator.

5          THE COURT:  Correct.

6          MS. RILEY:  Your Honor, can I address that point?

7          THE COURT:  You may.

8          MS. RILEY:  We are not out there courting

9  successor operators.  In properties where we know that some

10 exist, we are acknowledging that they're out there, we are

11 contacting them so that they can get access.  But it is not

12 our decision, it has never been FCC's decision to choose the

13 successor operators.  Nothing in any of the documents or

14 pleadings that we have filed purports to put FCC in that

15 role.  They are creating the data room, they are facilitating

16 the voting processes, and they are coordinating to handoff

17 operations; that is it.  They are not choosing the successor

18 operator, and I want to make that point abundantly clear.

19         THE COURT:  That's understood.  But this

20 transition schedule that's been proposed by the Debtors, it

21 looks and smells as though the Debtors want to keep their

22 fingers in all the pies until two years from now, so.  And

23 then to hear that they're not cooperating with questions from

24 prospective operators, that is very troubling, and that's

25 going to get you into Chapter 7 faster than anything.

1            MR. JOHNSON:  Your Honor, Chris Johnson.  May I be

2  heard?

3            THE COURT:  Actually, I'm going to go back to Mr.

4  Suzuki and see if he still has anything for me.

5            MR. SUZUKI:  Your Honor, thank you for giving me

6  the opportunity to address the Court.

7            Mr. Johnson is correct, and I did just want to

8  make the point about the Absolute Priority Rule.  So that's

9  been made.

10           Let me just give a little bit more context to some

11  of Mr. Johnson's comments, Your Honor, because I think that -

12  - and I don't think there can really be any dispute that

13  Chapter 7 conversion would not be a cost-saving mechanism.

14  And believe me, the bank is painfully aware of the burn rate

15  in these cases, and fully supports populating the data room

16  as quickly as possible.  We have been pushing, I think right

17  along with the working interest holders, Mr. Swanson and

18  others, we've had a number of communications on that front,

19  we're right there with them.  We want to see the transition

20  occur as quickly as possible.  And we're not comfortable with

21  the length of the transition schedule, but in the interest of

22  getting the Plan confirmed we're willing to accept that as a

23  worst-case scenario with the independent manager coming in

24  and exercising an independent discretion to get it done

25  sooner, and preferably very quickly, which we're competent an

1  independent manager would do.

2         But backing up even more broadly, Judge, how we

3  got here on this Plan.  It was the product of expensive

4  negotiations.  It was the product of a multi-day, multi-prong

5  mediation.  And so we have not arrived here without

6  considering the issues that Your Honor has raised.  And while

7  those issues are serious, for the reasons that Mr. Johnson

8  talked about, we just don't think that those are impediments

9  here to going forward and getting, for all creditors,

10  including the bank, including unsecured creditors, recoveries

11  that are effectively a substantive consolidation of the

12  assets of these two debtors with any very reasonable period

13  of time.

14         If a Chapter 7 trustee comes in there's just going

15  to be a bunch of litigation, there's going to be new

16  professionals, and we're not going to get there quickly or

17  more economically than we can if we can push this through to

18  confirmation.  The creditors overwhelmingly support this

19  plan.  The voted creditors and FCC, I think 70, close to 75

20  percent voted in favor of the Plan.

21         We do have a few objections.  Most of those, I

22  think, can be taken care of by expediting the data room and

23  the transition issues, which we fully support.  The issues

24  with title to the assets, I think we view those two have been

25  taking care of and that the Debtors, including Mr. Sklar's

1   representative, have made judicial admissions with respect to

2   those.  I understand there's not an adjudication on those

3   issues, but we think that the Schedules pass judicial

4   admissions there.  And (unintelligible) --

5            THE COURT:  They're in writing by each of the

6   trusts, I will accept that, so.

7            MR. SUZUKI:  Yeah.

8            So, you know, I think we are much closer than

9   maybe it seems or feels like because of some of these issues

10  in the case.  But substantively, we have come such a long way

11  and we are so very close, I think, to maximizing the value

12  for all creditors.

13           The bank is not going to receive a bunch of

14  default interest or make a profit on this case.  We're going

15  to be taking (unintelligible) cut, our $24 million claim is

16  going to be pared down.  3 million of it is going to go to

17  unsecured creditors, all adequate protection payments

18  received during the pendency of the case are going to go to a

19  principal pay down, and we're going to come out on the

20  effective date with a claim south of, you know, $18 million,

21  in all likelihood, or $19 million, not 24.  And 3 million of

22  that is going to go to unsecured creditors, as I said.

23           So I would hate to throw out the baby with the

24  bathwater here, and certainly there has been some bathwater

25  in this case; we acknowledge that.  But I think the

1    Committee, the Debtors, us, other working interest holders,
2    we tried to get to a creative just and equitable solution.
3    It's been a hard-fought battle, but we've -- we're here.  And
4    if we can get over the hump on some of these issues, and do
5    it expeditiously that, I think --

6              THE COURT:  Okay.

7              MR. SUZUKI:  -- by all indications is the clearly
8    preferable path forward.

9              One final point, Your Honor.  The independent
10   manager, I think, has been interviewed by a number of the
11   working interest holders.  I don't think I'm speaking out of
12   turn when I say that I think he has a good deal of confidence
13   from the parties, certainly from the bank he does, going
14   forward.  And, you know, maybe involving him in that
15   transition process, sooner rather than later, would help
16   expedite things.  I put that out there.  That's a potential
17   solution that perhaps we can discuss among the parties, as
18   well.

19             So, thank you for allowing me to be heard on those
20   issues, Your Honor.

21             THE COURT:  Sure.

22             MR. SUZUKI:  And I'm happy to answer any
23   questions.

24             THE COURT:  Okay.

25             Mr. Johnson.

 1          MR. JOHNSON:   Thank you, Your Honor.  I'll be

 2  brief.

 3          I mean, Mr. Suzuki has correctly pointed out, you

 4  know, this Plan does resolve many of those issues, but I'm

 5  not sure -- I'm concerned that it would be unwound by

 6  conversion, such as the sub con deal, the deal that we

 7  structured with the bank, the deal that's been cut with Mr.

 8  Sklar and the Trusts to contribute all those assets subject

 9  to the, you know, that allegedly don't belong to Sklarco

10  under the ASA.  So we think that we have addressed many of

11  those issues.

12          But my point is, we certainly understand the Ad

13  Hoc Committee's frustration with this transition services and

14  what's been going on in population of the data room.  We

15  participate in these calls, in these negotiations, and we

16  understand everyone's frustration, and we recognize the

17  Court's concern and the admonition.

18          My only concern is, or question is, this is such

19  an important issue and I would hate for all of us to get here

20  in 30 days and find out that the Debtor has not complied or

21  that, you know, the parties are not comfortable.  Is this

22  something the Court -- should we have a weekly status

23  conference to address where we are?

24          It can be a 30-minute status conference where the

25  parties that are interested in getting in the data room can

1   explain their, you know, what concerns they still have and

2   the Debtor can respond, and that way we are all aware and the

3   Court understands what's going on and where this case is

4   headed.

5           THE COURT:  That's a good suggestion.

6           Ms. Riley, is Mr. Katchadurian in the room with

7   you and he could be in front of the screen?

8           MS. RILEY:  He is not in the room with me, Your

9   Honor.  I believe that I had seen him on the Zoom hearing,

10   but candidly I don't know if he logged back in after the --

11           MR. KATCHADURIAN:  I'm here, Your Honor.

12           MS. RILEY:  -- (unintelligible).

13           MR. KATCHADURIAN:  I'm here, Your Honor.

14           THE COURT:  Okay.  Mr. Katchadurian, right now

15   you're functioning as the boss of all the employees of both

16   Debtors, is that correct?

17           MR. KATCHADURIAN:  I am.

18           THE COURT:  Okay.  So you're getting a pretty

19   hefty fee, and I am going to expect that you're going to ride

20   them to cooperate fully.  So I want to make sure you

21   understand that I'm looking to you to get that to happen.

22   Both the establishment, the completion of the data room, as

23   well as answering the phone calls of potential operators and

24   other parties who want to discuss the transition to another

25   operator.  Can you do that?

1          MR. KATCHADURIAN:  I can.  I'll continue to do

2     that, Your Honor.  It's not for a lack of trying.  As Ms.

3     Riley said, we've populated over 13 gigabytes of data into

4     the Brooklyn data room.  And you know, just in the last week

5     tried to, based on requests from members of the Ad Hoc

6     Committee and Pruet, facilitated various conversations that

7     Pruet has asked for, and I will continue to do that.

8          It is, unfortunately, a very large and unwieldy

9     data set that has to be unloaded to the Cloud.  The uploads

10    are taking, you know, tens of hours to get done, and we're

11    allocating as many resources as we can to it.

12         This, unfortunately, is not a group force

13    exercise.  Someone has to understand what land people at

14    Sklar have done with their (unintelligible), what they're

15    looking at to upload it.  I believe in the past you asked

16    that my team help, you know, with supporting that effort, but

17    we frankly don't have the specific lion's expertise that the

18    -- that the Debtor has and we're relying on a few people to

19    carry this water.

20         And you have my commitment, and I've made the

21    statement to Ad Hocs, and everybody else, that we're working

22    very hard to get this done and get it done expeditiously.

23         THE COURT:  And you think it's reasonable to get

24    the Brooklyn units done in the data room by a week from

25    today?

1          MR. KATCHADURIAN:  I honestly don't know if we can

2     get it done a week from today.  I don't -- I'm not object --

3     I'm not objecting at all to a weekly status conference, and I

4     can certainly loop back with people on Tuesday.  Given the

5     fact that it's Friday afternoon before Memorial Day, I'll try

6     to get to people and find out the reasonableness of that --

7     of that order that you've suggested.

8          But I certainly don't want to jeopardize all the

9     hard work that's been done.  Mr. Suzuki and Mr. Johnson and

10    many people on this phone have worked very hard to get to a

11    consensual plan, and we've all worked, you know, together and

12    we're -- I think we are close to getting value for creditors.

13    And that's been our goal, and we've driven towards that as

14    best as we can, given all of the litigation and all the

15    objectors in this case.  So we'll continue to --

16          THE COURT:  What do you know about --

17          MR. KATCHADURIAN:  -- (unintelligible) --

18          THE COURT:  What do you know about the landman and

19    the COO not returning phone calls, or not being willing to

20    engage in conversation with perspective operators?

21          MR. KATCHADURIAN:  We'll get that done, Your

22    Honor.  We're facilitating -- we're facilitating

23    conversations at the (unintelligible) level, and we're

24    facilitating conversations at all levels, so we'll get that

25    done.

1          MR. RETHERFORD:  Your Honor?  Your Honor, Jim

2    Retherford for Pruet again.  We very much support the idea of

3    the weekly status calls.  And I think it would be most

4    productive for everyone's time if this were not simply

5    lawyers and CRO on the call, but if the CEO and the landman,

6    and anyone else at Sklar that may be needed for the -- for

7    the technical issues that will have to be addressed, to be

8    part of those calls.

9          THE COURT:  Well, why don't we set a Zoom call

10   that some one of you hosts that they have to attend to answer

11   those questions, like a week from Friday?  Would that --

12   would that work?

13         MR. RETHERFORD:  It will, Your Honor.  That's

14   something that we suggested some time back, so I'm glad that

15   everyone is in agreement with it, finally.

16         MR. SKELTON, JR.:  Give me the week, Your Honor,

17   and day.

18         THE COURT:  I'm talking, I think it's June 4th.

19         MR. SKELTON, JR.:  Oh, yeah.  Okay.

20         THE COURT:  I was in such a hurry to go from my

21   office back to here, to home, that I left my cell phone, so I

22   don't have my calendar out.  So it's Friday the 4th.  Okay.

23   Then let's have that happen Friday morning.  And let's do

24   that before we have a status call.  Let's see where you get

25   with that what any roadblocks are.

1          MR. SWANSON:  Your Honor, this is Tim Swanson.

2          Would the Court be participating in that, or would

3    the (unintelligible) this?

4          THE COURT:  No.  No.

5          MR. SWANSON:  Okay.  I --

6          MS. RILEY:  Your Honor?

7          MR. SWANSON:  For progress, you know, we have

8    tried to facilitate these calls time and again, and if the

9    Court's involved I know it would be appreciated, because it

10   does keep the parties' feet to the fire.

11         THE COURT:  I just, you know, it's -- I have to

12   keep my role as the adjudicator separate.  And I know I tend

13   to bleed over in Chapter 11 cases a fair amount because I --

14   when I get frustrated with progress.  So I don't think that's

15   wise.  But I will make myself available that Friday afternoon

16   to handle any discovery disputes.  You can call in to

17   chambers, and we'll say at 1:30 on Friday the 4th that we'll

18   be available if there are issues that have come up.

19         MR. SWANSON:  Thank you.

20         MS. RILEY:  Your Honor, we can --

21         THE COURT:  Okay.

22         Yes, Ms. Riley.

23         MS. RILEY:  We can certainly consider filing

24   weekly status reports for the Court, as well.

25         THE COURT:  That's just more money than is really

1    helpful.  But thank you, I appreciate your willingness.

2              MR. JOHNSON:  Your Honor, so to clarify.  The

3    parties, the business people, the people that actually need

4    to get in the data room will have a call, the Committee is

5    happy to host that if we need to, but I assume the Debtors or

6    someone else can host that.  And then if there are issues

7    that arise from that call Friday morning, we understand that

8    you would be available at 1:30 in the afternoon for a status

9    conference.

10             THE COURT:  Yeah.

11             MR. JOHNSON:  Appreciate that.  Thank you, Your

12   Honor.

13             THE COURT:  Okay.  All right.

14             And it can be business people and lawyers.  So,

15   you know, whoever wants to participate.  This probably --

16             Ms. Riley, you'll have to send out some kind of

17   instructions to tell people how they get to let you know that

18   they're going to be zooming in.  And, you know, I don't know

19   if we're going to end up with too many people for a Zoom

20   connection, but at some point I think that happens.  But I'll

21   trust you all to work that out.

22             Okay.  Anything else then for today?

23             MR. SKELTON, JR.:  Just one item, Your Honor.

24             THE COURT:  Okay.

25             MR. SKELTON, JR.:  Sort of, and from the Wizard of

1  Oz, the man behind the curtain, whatever, is it's the trusts.

2  We have less of the trusts than anything else.

3           THE COURT:  Mr. Hirsch has promised to me that

4  within one month's time I'm going to have, in writing, their

5  commitment to make their assets available for these debts, as

6  well as a delineation of what Sklarco owns versus these

7  trusts own.

8           MR. HIRSCH:  Your Honor, I don't want to go too

9  far afield on that.  I don't --

10          THE COURT:  Okay.

11          MR. HIRSCH:  -- (unintelligible) the Trust has not

12 extended a promise to make their assets themselves available.

13 I think if we're talking about assets of Sklarco, that's a

14 different issue, and I want to make sure we're not confusing

15 the notion of substantively consolidating two debtors with

16 non-debtor trusts, which is way outside of I think what we're

17 talking about here.

18          THE COURT:  Well, when you -- when you talk about

19 this great plan, with it's doing away with a need for

20 substantive consolidation, that, in my mind, and means these

21 trusts and their assets.  Because they have taken $19 million

22 out of the Debtors --

23          MR. HIRSCH:  Your Honor, we filed some papers on

24 that.  I think that $19.5 million number is erroneous for the

25 reasons that we've cited in our response.  And we certainly

1   dispute that.

2           And frankly, I don't know that that's necessary to

3   this confirmation hearing.  The claims against Mr. Sklar and

4   the Trusts would all be preserved under the Plan and those

5   can be brought at the appropriate time, and I expect they

6   will be.

7           But the $19.5 million number, we certainly

8   dispute.

9           MR. SKELTON, JR.:  Well, my suggestion is that we

10  could also have conversations with Mr. Hirsch about voluntary

11  disclosure of information requested by creditors.  And if he

12  doesn't want to do it voluntarily, we would like to have the

13  green light to proceed with, you know, the discovery.

14          MR. HIRSCH:  Your Honor, Mr. Skelton --

15          THE COURT:  And that --

16          MR. HIRSCH:  -- (unintelligible) said Rule 2004

17  rights, they have never commenced that to date.  We will work

18  with them in due course within the procedure to the extent he

19  wants to seek discovery.  I'm not going to mess around

20  (unintelligible).

21          THE COURT:  Mr. Skelton --

22          MR. SKELTON, JR.:  That's not what I said.

23          THE COURT:  Mr. Skelton?

24          MR. SKELTON, JR.:  Yes.

25          THE COURT:  It may be important for you to get

1  those motions on file now.

2          MR. SKELTON, JR.:  Okay.  I will do that.

3          THE COURT:  Then there's no question the time is

4  running.

5          MR. SKELTON, JR.:  Okay.  Thank you.

6          THE COURT:  We are not going to wait around much

7  longer on this case.

8          And one thing I want you all to think about when

9  you're talking and negotiating amongst yourselves about

10  tweaking this Plan in certain aspects, I am very

11  uncomfortable with the process where we set up this

12  liquidation trust and its trustee pursues causes of action

13  and the Court cannot review any of the professional's fee

14  applications.  In the 20 years that I've been on the bench,

15  with the Chapter 11 cases that I've seen that are like this

16  where they set up that liquidation trust, the lawyers who

17  represent the liquidation trustee bill the you know what out

18  of -- out of that trust.  And at the end of the day, I have

19  never seen any distribution to unsecured creditors come out

20  of that sort of format.

21          The settlements are outside the Court's purview,

22  the legal fees are outside of the Court's purview, and lo and

23  behold, nothing ends up in the hands of unsecureds.

24          So maybe this Plan ought to have a provision that

25  at some point they do convert to Chapter 7.  And then a

1   responsible party that's neutral and independent and is not

2   going to charge, except as they distribute funds, might be

3   the best way to handle the litigation.  And they can hire one

4   of you all capable people to be their counsel, but -- you

5   know, because you already have the background in the case.

6           I'm just throwing that out there.

7           MR. SKELTON, JR.:  Okay.

8           UNIDENTIFIED MALE:  Your Honor, if I may?  I just

9   want to be clear, too, so that we're not overextending

10  ourselves on the Trust.  I do not have authority, even now

11  representing to this Court today, that any assets are

12  anything other than assets belonging to the Trust.  Our

13  position is, and always has been, that the relationship of

14  the assets with Sklarco are governed, and continue to be

15  governed, by the Agency Services Agreement.  That continues

16  to be our position.

17          What I will do over the next month, however, is

18  continue to work with the other parties to (unintelligible)

19  the various accounts on the tax issues and to see if we can

20  come to an agreement beyond what we've already come to, to

21  see how that can work with the existing Plan's structure in

22  terms of --

23          THE COURT:  Maybe it will be --

24          UNIDENTIFIED MALE:  -- (unintelligible).

25          THE COURT:  Maybe it will be satisfied by, again,

1  to find what Sklarco owns and putting in writing that nobody

2  is going to try to claim ownership.  None of the Trust's

3  beneficiaries or trustees will try to claim ownership of the

4  Sklarco assets.  Maybe.  I'm not saying that'll do it.

5         UNIDENTIFIED MALE:  That may or may not.  But just

6  to be clear, my commitment over the next month is simply to

7  work with the parties.  And I also have -- and to see what we

8  can come to beyond what we've already agreed to.

9         THE COURT:  Okay.  But when Mr. Johnson tells me

10  that they've got in the Plan a substantive consolidation

11  without all the litigation costs, I stand with great

12  reservation on that point because of the Trusts and what they

13  have, what they've taken from these Debtors, how they've

14  utilized the funds for personal race cars and, you know,

15  private jet planes and all of that, it's disgusting.

16         UNIDENTIFIED MALE:  Well, Your Honor, again, I

17  urge -- I urge the Court and all the parties, it would be our

18  response to that, I have a feeling that if we actually

19  litigate that point we may or may not find that the

20  assumptions that have been made today are accurate on that

21  point.

22         THE COURT:  All right.  We'll just leave it with

23  that for today.

24         UNIDENTIFIED MALE:  Your Honor, may I have one

25  final point on the transition?

1            THE COURT:  Yes, you may.

2            UNIDENTIFIED MALE:  You know, one frustration that

3   we've had, and we hope that this is achieved between now and

4   next Friday, is that the transition and the elections that

5   are to occur under the transition be fair amongst all

6   potential successors and that all of the information is

7   shared fairly and equally amongst all potential successors.

8   And so we've voiced that concern, we hope that that is

9   ongoing.  We've heard rumblings, but between now and then

10  we'd just like the Debtors to confirm that they've shared

11  everything equally to those potential successors who are

12  interested in the Brooklyn oil units.

13            THE COURT:  Well, she tells me that there's only

14  two NDAs that have been signed up at this point.

15            UNIDENTIFIED MALE:  That's what we're hearing from

16  the Debtors.  The oil patch is small down in Alabama and

17  we've heard that there's been information shared between the

18  Debtors and one other potential successor.  And we even

19  asked, just, can you confirm that you've shared everything

20  that you've been sharing with them, please --

21            THE COURT:  Well --

22            UNIDENTIFIED MALE:  -- share with us.  And that's

23  what --

24            THE COURT:  You show me an NDA that some party has

25  signed and that they haven't been given access and I will be

1   all over that.

2            MS. RILEY:  And, Your Honor, if I may?

3            We do also want to ensure that there is equal

4   information given to all the successor operators.  To that

5   end, we have also requested that any questions that come in

6   from the successor operators that need to be answered be

7   compiled into a Word document so that we can respond to them

8   comprehensively, upload those to the data room, and ensure

9   that equality of information continue going forward, as well.

10           THE COURT:  Well, I'm not certain that's going to

11  be sufficient, Ms. Riley, because as people talk and they ask

12  one question --

13           MS. RILEY:  Certainly.

14           THE COURT:  -- and they get an answer, then they

15  think of another question.  So, you know, that is going to

16  slow down this process hugely if you require it all to be in

17  writing.

18           MS. RILEY:  Well, certainly.  But to the extent

19  that there are emails being exchanged, we do hope that those

20  can be compiled into a Word document so that, you know, to

21  the extent maybe the other party has the same question, those

22  answers can be available to them, as well.

23           THE COURT:  All right.

24           MR. LOCKRIDGE:  Your Honor, Eric Lockridge for the

25  Anderson parties.  We'll also make a plan objection about the

1   transaction schedule, and we appreciate Your Honor's comments

2   and the importance of putting the gas on that.

3        Just so that we leave here and everybody has an

4   understanding of what putting documents in the data room

5   means.  As we noted in our objection that what that should

6   mean for each of these projects, the starting point ought to

7   be the schedule that was worked out between the Debtors and

8   the Ad Hoc Committee for the Brooklyn project, which is --

9   which is on file at Docket Number 1190.

10       And there may be projects that don't have all of

11  that data, you know, Brooklyn is bigger than some of these

12  other projects, but we are -- what we are expecting to see in

13  the data room is something similar to that for each one of

14  those -- for each one of those properties.

15       THE COURT:  Okay.  I have no clue the mechanics of

16  uploading this amount of documentation.  Ms. Riley is telling

17  me it's 10 hours just to give some piece of it.  So, you

18  know, you all are going to have to query that and tell me if

19  that's all legitimate.  Because if it is, you know, then

20  maybe they are going as fast as they can.

21       UNIDENTIFIED MALE:  Your Honor, a process

22  suggestion which we've made to the Debtors is that maybe

23  there should be contract landing.  We heard the bank say we

24  are in favor of expediting this process.  Is there contract

25  labor?  Is there overtime?

1          Everybody wants to see this happen quickly, and I
2    find it hard to believe that we can't find other ways or
3    means when everybody says that this -- they want this to
4    happen.
5          THE COURT:  Well, Mr. --
6          UNIDENTIFIED MALE:  We've been going for two
7    months.
8          THE COURT:  Mr. Katchadurian tells me that it
9    requires a landman to really identify what information needs
10   to be uploaded, and then it takes a long time to upload it.
11         Is that right, Mr. Katchadurian?
12         MR. KATCHADURIAN:  That's correct, Your Honor.
13   This is -- this is a skilled process.  This is not just a
14   brief force, otherwise we'd have as many temporary people as
15   we could hire dealing with this.
16         THE COURT:  Okay.
17         MR. KATCHADURIAN:  Unfortunately, it's a skilled
18   process.
19         THE COURT:  So you all need to be talking to each
20   other about the mechanics to see if there are ways to break
21   through the lockdowns, and maybe there aren't, but at least
22   then we have realistic expectations.
23         And before we recess, Mr. Moss, I hope you are
24   looking for a very good, very qualified Chapter 7 trustee,
25   should we need it.

1          MR. MOSS:  Thank you, Your Honor.

2          I would like to let the Court know that early on

3  in the case we only appointed a committee in the FCC case,

4  and Sklarco as a separate group of creditors, so it's very

5  likely that there might be two different 7 trustees appointed

6  to each of these cases.

7          THE COURT:  Right.

8          MR. MOSS:  And so we've looked at the Plan as a

9  compromise, and we understand that assets are flowing into a

10  debtor here that may not have many, if any, assets at this

11  point, Your Honor, so.  It may have claims, but really no

12  assets.  So for those on the phone, and we're going to enter

13  into negotiations and so forth, it's important to recognize

14  that two fiduciaries may be appropriate in these states, Your

15  Honor.

16          THE COURT:  And we've seen that in many cases

17  where they get through the logjam of the fact that they have

18  competing interests and they agree, they reach some

19  settlement to agree to march ahead and charge after assets or

20  claims and split the proceeds, or, you know, whatever split

21  might be reasonable.  So that can still happen, despite the

22  fact that there's two trustees.

23          So I guess I'm going to ask you to look for the

24  two so that they're ready to go if we need them.

25          MR. MOSS:  Yes, Your Honor.  Thank you.

1          THE COURT:  Thank you.

2          Okay.  With that, I know you all have much more

3    that you'd like to say, but I've already impeded your Labor -

4    - or Memorial Day weekend enough as it is, so --

5          THE COURT CLERK:  Your Honor?

6          THE COURT:  Yes?

7          THE COURT CLERK:  This is Kiersten.  Did you want

8    to set a continued hearing on the four pending matters?  How

9    do you want to deal with plan confirmation?

10          THE COURT:  I'm going to hold them in abeyance.

11          We're going to see if we get the deadline met of

12   June the 4th on the data room for Brooklyn, and the

13   communication of a Zoom call on the morning of June the 4th.

14   And then if there are disputes that arise out of that, we're

15   going to have the 1:30 hearing.

16          So we're going to just proceed on those interim

17   things for a little bit, and then we'll keep charging our

18   course.  So just leave all the motions in abeyance at this

19   point.

20          THE COURT CLERK:  Okay.  And are we setting a

21   particular deadline for the data room for the other leases

22   other than Brooklyn?

23          THE COURT:  We did say one month, and I'll --

24          THE COURT CLERK:  So --

25          THE COURT:  -- I'll be open to having that

1  deadline moved up or moved back if everybody is in agreement

2  that more time is needed or less time is needed, so.

3          THE COURT CLERK:  Okay.  June 30 as the deadline?

4          THE COURT:  Is that a weekday?

5          THE COURT CLERK:  That is a Wednesday, June 30th.

6          THE COURT:  Okay.  That's our date.

7          All right.  Okay, I think we're done for today.

8  Thank you, all.

9          UNIDENTIFIED MALE:  Thank you, Your Honor.

10          UNIDENTIFIED MALE:  Thank you, Your Honor.

11          UNIDENTIFIED MALE:  Thank you, Judge.

12          THE COURT CLERK:  This court is now in recess.

13          UNIDENTIFIED MALE:  Thanks, Your Honor.

14                  (Time Noted:  3:39 p.m.)

15                      * * * * *

16                      CERTIFICATE

17      I, RANDEL RAISON, certify that the foregoing is a

18  correct transcript from the official electronic sound

19  recording of the proceedings in the above-entitled matter, to

20  the best of my ability.

21

22

23  _____          June 4, 2021

24  Randel Raison

25