Exhibit RUD-C

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

```
IN RE:                          ) Case No. 1:20-bk-12377
                                ) (Jointly Administered)
SKLAR EXPLORATION COMPANY,      ) Chapter 11
LLC AND SKLARCO, LLC,           )
                                ) Courtroom F
                                ) U.S. Custom House
                                ) 721 19th Street
            Debtors.            ) Denver, Colorado 80202-2508
                                )
                                ) May 8, 2020
                                ) 9:43 a.m.
```

**TRANSCRIPT OF DEBTORS' MOTION TO BIFURCATE CASH**
**COLLATERAL ISSUES (DKT. NO. 223)**
**BEFORE HONORABLE ELIZABETH E. BROWN**
**UNITED STATES BANKRUPTCY JUDGE**

```
APPEARANCES VIA ZOOM VIDEO CONFERENCE:

For the Debtors:                Kutner Brinen P.C.
                                By:  KERI L. RILEY, ESQ.
                                1660 Lincoln Street
                                Suite 1850
                                Denver, CO 80264


Transcript requested by:        JOSEPH E. BAIN, ESQ. (Jones
                                Walker) and DUANE J. BRESCIA,
                                ESQ. (Clark Hill Strasburger)
Requested on:                   Friday, May 8, 2020
Provided on:                    Sunday, May 10, 2020
Cost of Transcript:             $429.55 (71 pages @ $6.05/page)
```

**TRANSCRIPTION SERVICE:**          **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone: 215-862-1115**
**Facsimile: 215-862-6639**
**e-mail CourtTranscripts@aol.com**

```
Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.
```

2

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(Continued)


For East-West Bank:                 Bryan Cave Leighton Paisner LLP
                                    By:  CRAIG K. SCHUENEMANN, ESQ.
                                         LYNN P. HENDRIX, ESQ.
                                    1700 Lincoln Street
                                    Suite 4100
                                    Denver, CO 80203

                                    Bryan Cave Leighton Paisner LLP
                                    By:  BRYCE SUZUKI, ESQ.
                                    Suite 2200
                                    Two North Central Avenue
                                    Phoenix, AZ 85004-4406

For the Creditors'                  Munsch Hardt Kopf & Harr PC
Committee:                          By:  CHRISTOPHER D. JOHNSON, ESQ.
                                         JOHN D. CORNWELL, ESQ.
                                         GRANT M. BEINER, ESQ.
                                    700 Milam Street
                                    Suite 2700
                                    Houston, TX 77002

For AEEC II, LLC, et al.:           Kean Miller
                                    By:  ERIC LOCKRIDGE, ESQ.
                                    400 Convention Street
                                    Suite 700
                                    Baton Rouge, LA 70802

For Bri-Chem Supply                 Spencer Fane LLP
Corp., LLC:                         By:  DAVID M. MILLER, ESQ.
                                    1700 Lincoln Street
                                    Suite 2000
                                    Denver, CO 80203

For Fant Energy                     Willkie Farr & Gallagher LLP
Limited:                            By:  JENNIFER HARDY, ESQ.
                                    600 Travis Street
                                    Houston, TX 77002

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(Continued)


Franks Exploration Company,       Cook, Yancey, King & Galloway
LLC, et al.:                      By:  JORDAN B. BIRD, ESQ.
                                  333 Texas Street
                                  Suite 1700
                                  Shreveport, LA 71101


For FPCC USA, Inc.:               Jones Walker LLP
                                  By:  JOSEPH ERIC BAIN, ESQ.
                                       AMY VAZQUEZ, ESQ.
                                  811 Main Street
                                  Suite 2900
                                  Houston, TX 77002


For JF Howell Interests,          Bradley Murchison Kelly & Shea
et al.:                           By:  DAVID R. TAGGART, ESQ.
                                  401 Edwards Street
                                  Suite 1000
                                  Shreveport, LA 71101


For Hopping Green & Sams:         Hopping Green & Sams
                                  By:  TIMOTHY MICHAEL RILEY, ESQ.
                                  119 S. Monroe St.
                                  Suite 300
                                  Tallahassee, FL 32301


For Kudzu Oil Properties,         Moye White
LLC, et al:                       By:  TIMOTHY M. SWANSON, ESQ.
                                  1400 16th St.
                                  6th Floor
                                  Denver, CO 80202


                                  Law Offices of Craig Geno
                                  By:  CRAIG GENO, ESQ.
                                  587 Highland Colony Parkway
                                  Ridgeland, MS 39157


For Landmark Exploration,         Watkins & Eager PLLC
et al.:                           By:  JIM F. SPENCER, JR., ESQ.
                                  P. O. Box 650
                                  Jackson, MS 39205


RUD000080

4

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(Continued)


For The Estate of                 Buechler Law Offices
Pamela Page, Deceased,            By:  MICHAEL J. GUYERSON, ESQ.
et al.:                           999 18th Street
                                  Suite 1230 South
                                  Denver, CO 80202


For PAR Minerals, et al.:         Copeland Cook Taylor & Bush
                                  By:  Christopher Meredith, ESQ.
                                       GLENN TAYLOR, ESQ.
                                  1076 Highland Colony Parkway
                                  Ridgeland, Mississippi 39157


For Pruet Oil Company,            Holland & Hart
LLC, et al.:                      By:  MATTHEW J. OCHS, ESQ.
                                  555 17th Street
                                  Suite 3200
                                  Denver, CO 80202


                                  Balch & Bingham
                                  By:  JEREMY L. RETHERFORD, ESQ.
                                  1901 Sixth Ave N
                                  Suite 1500
                                  Birmingham, AL 35203


For Meritage Energy               Buck Keenan
et al.:                           By:  ROBERT L. PADDOCK, ESQ.
                                  2229 San Felipe
                                  Suite 1000
                                  Houston, TX 77019


For Stoneham Drilling             Bradley Arant Boult Cummings LLP
Corporation:                      By:  JAMES B. BAILEY, ESQ.
                                  1819 5th Ave. North
                                  Birmingham, AL 35203

5

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(Continued)


For Tauber, et al.:            Maynes, Bradford, Shipps
                               & Sheftel, LLP
                               By:   THOMAS H. SHIPPS, ESQ.
                                     SHAY L. DENNING, ESQ.
                               835 E. Second Avenue
                               P.O. Box 2717
                               Suite 123
                               Durango, CO 81301

                               Barnet B. Skelton, Jr., P.C.
                               By:   BARNET B. SKELTON, JR., ESQ.
                               815 Walker
                               Suite 1502
                               Houston, TX 77002

For Fletcher Petroleum         Berger Singerman LLP
Company, LLC:                  By:   MICHAEL NILES, ESQ.
                               313 N. Monroe Street
                               Suite 301
                               Tallahassee, FL 32301


(ADDITIONAL ATTORNEYS MAY HAVE JOINED THE HEARING FOLLOWING THE
APPEARANCES BEING TAKEN BY THE COURT WITHOUT THE OPPORTUNITY TO
          PLACE THEIR APPEARANCE ON THE RECORD)

                          * * *

RUD000082

1   **(IN INSTANCES WHERE VOICES WERE "MUFFLED" OR FADING IN AND OUT**

2   **DUE TO INABILITY TO HEAR, AN INDISCERNIBLE RESULTED)**

3   THE COURT:  Good morning, all.  I am going to begin

4   by making some brief opening remarks, and then I'll take

5   entries of appearances from the parties.

6   First of all, I wanted to start off by apologizing

7   for not being at the April 27th hearing that we had, an audio

8   hearing.  I lost my 97-year-old father that morning, and that

9   was -- even though he was that old, it was still unexpected, as

10  he wasn't ill.  So I'm sure you understand, but I did plan to

11  be there up until that happened.

12  But I want to give a special thanks to Judge McNamara

13  who jumped in at the very last minute.  And I listened to the

14  recording, and he did a wonderful job.

15  Kerstin, can you all hear me?

16  MS. CASS:  Yes.

17  THE COURT:  Okay.

18  MS. CASS:  We can hear you fine.

19  THE COURT:  I just want to make sure.  It's not

20  coming through my headphone, so I'm going to try to see if this

21  -- nope, that's not helping.

22  (The Court engaged in off-the-record colloquy with staff)

23  THE COURT:  While they're fixing this for me, I would

24  appreciate any lawyers -- or all lawyers using their headsets,

25  as well.  As I listened to the recording from April 27th, there

RUD000083

1   were several speakers who came in extremely muffled, and I

2   don't know if that's the reason but I suspect that using

3   headsets would help.  And in particular, I can tell you that it

4   was the bank's attorney, Kudzu's attorney, and FPCC.  So

5   hopefully nobody needs a transcript from that hearing, but if

6   there had to have been one, it was pretty muffled.  So you

7   might want to think about this, especially for our Monday

8   hearing because you want to make sure we have a good record of

9   our proceeding.

10                        (Pause)

11      (The Court engaged in off-the-record colloquy with staff)

12            THE COURT:  All right, let me see where I am on my

13   opening remarks.  Because I've listened to the recording of

14   the prior hearing, you all can probably truncate a little bit

15   your positions or statements that you make today, and even

16   Monday since I have heard them but I know you want to preserve

17   them.

18            This is our courtroom's first Zoom hearing today, and

19   so I'm very glad that you all are here to practice.  It was set

20   up originally as just a practice session, and then the debtor

21   filed the motion to bifurcate, and so we thought we'd hear some

22   oral argument on that today, as well, just to give this a

23   better test drive.

24            Now I'll admit that this motion to bifurcate is, in

25   essence, a request to set aside the objections of the working

8

 1   interest holders, and that's really part and parcel of the

 2   motions we'll be hearing on Monday.  But I thought maybe you

 3   would all kind of like of give a preview of your positions, and

 4   the Court will do a little bit of the same, and that might help

 5   you as you prepare for Monday.

 6          Technology wise, if you can't hear the Court or a

 7   party at any time, please speak up.  I will try my best to call

 8   on parties, and appreciate your waiting to be called on

 9   because, as you know, if we all start speaking together at

10   once, it's kind of a jumbled mess.  That was not an issue in

11   the recording of the April 27th hearing, so that may not be a

12   problem with this group.  But because there are so many

13   attorneys wishing to be heard, it could become that.

14          There are some folks on the line who just want to

15   observe the proceedings, and that is totally fine, but I

16   probably won't call on you since you haven't filed a position

17   paper, either a motion or an objection.  But at the end of this

18   hearing, I will likely open it up, and you can raise whatever

19   you'd like to.

20          At the end of the last hearing, somebody raised a

21   question about what was and wasn't in the data room, and that

22   was a perfectly good thing to bring up before the end of the

23   hearing.  And so if there are things like that, feel free to do

24   that today, as well.

25          One other thing I wanted to mention about technology

1  is that we are creating a record of this, but it's only going

2  to be an audio record, not a video.  And so for the sake of any

3  future court reporter, I'll try to identify you when I call on

4  you so they know who's speaking.

5          But when we get to Monday, if it's an evidentiary

6  hearing and you have an objection, you know, you're going to

7  need to say, "This is Mr. Shipps on behalf of my client, blah,

8  blah, blah" so that the court reporter can clue into who is

9  speaking.

10         All right, okay.  I'll save those remarks.

11         Let's go ahead now and get some appearances, and

12  let's have it first for the debtors.  What I'm going to want

13  you to do with the creditors, when you may have a long list of

14  companies that you represent, let's agree on a sort of

15  shorthand for that group of clients.  And I would like to know,

16  after you say "Attorneys A, B, and C are here," tell me who of

17  A, B, and C is going to be leading the -- is going to be

18  speaking at the hearing today on behalf of that client group.

19         Okay, so let's start with the debtors.

20         MS. RILEY:  Good afternoon, Your Honor -- or good

21  morning, Your Honor.  Keri Riley appearing on behalf of the

22  debtors, Sklar Exploration Company and Sklarco.

23         John Strausser, the CFO, and I believe, Marshall

24  Jones, the Vice President of Operations, is -- are both on the

25  line.

```
 1            THE COURT:  Very good; thank you.

 2            Okay, for the U.S. Trustee's Office?

 3                 (No audible response heard)

 4            THE COURT:  Nobody again?  Okay.

 5            How about for the East-West Bank?

 6            MR. SUZUKI:  Good morning, Your Honor.  Bryce Suzuki

 7  on behalf of East-West Bank.

 8            My colleagues from the law firm, Bryan Cave Leighton

 9  Paisner, are also on the line, Lynn Hendrix and Craig

10  Schuenemann.  I'll be the one primarily addressing the bank's

11  issues today.

12            THE COURT:  Very good; thank you.

13            Okay.  The Creditors' Committee?

14            MR. JOHNSON:  Good morning, Your Honor.  Chris

15  Johnson with the firm of Munsch Hardt on behalf of the

16  Committee.

17            Also with me are my partners, John Cornwell, and

18  associate Grant Beiner.  Mr. Cornwell will be handling the

19  hearing this morning.

20            THE COURT:  Okay; thank you very much.

21            All right, and the Anderson parties?

22                 (No audible response heard)

23            THE COURT:  Do we have Mr. Lockridge on the line?

24            MR. LOCKRIDGE:  Yes, Your Honor; thank you, Your

25  Honor.
```

1          THE COURT:  There you are.

2          MR. LOCKRIDGE:  Thank you, Your Honor.  Eric

3  Lockridge here on behalf of Anderson Exploration Energy

4  Company, TCP Cottonwood, LLP, AEEC II, and Sugar Oil, and we'll

5  just refer to those collectively as the Anderson parties.  I'll

6  be the one speaking for them today.

7          THE COURT:  Excellent.

8          MR. LOCKRIDGE:  Thank you.

9          THE COURT:  Thank you.

10          Baker Hughes?  Do we have Mr. Mohan?

11               (No audible response heard)

12          THE COURT:  Okay.  Bri-Chem Supply Corporation, do we

13  have them?

14          MR. MILLER:  Good morning, Your Honor.  This is

15  David Miller, appearing on behalf of Bri-Chem Supply

16  Corporation LLC, and I believe my client, Mr. Theiss is on the

17  phone, as well.

18          THE COURT:  Okay, very good; thank you.

19          MR. MILLER:  Thank you.

20          THE COURT:  All right.  Fant Energy?  Do we have Ms.

21  Hardy?

22               (No audible response heard)

23          THE COURT:  No, okay.

24          Fletcher Petroleum?

25               (No audible response heard)

```
 1           THE COURT:  All right.  These are all people who
 2   requested to be let into the thing --
 3           MS. HARDY:  Your --
 4           THE COURT:  -- so I thought they'd be here.
 5           MS. HARDY:  Your Honor, I apologize.  It's Jennifer
 6   Hardy from Willkie Farr on behalf of Fant Energy and JJS.
 7   Apologies, I had the mute button --
 8           THE COURT:  Okay, very good; thank you.
 9           Okay, but nobody for Fletcher Petroleum?
10               (No audible response heard)
11           THE COURT:  Okay.  So how about Franks Exploration?
12           MR. BIRD:  Good morning, Judge.  This is Jordan Bird
13   on behalf of Franks Exploration, Bundero Investments, Kingston,
14   LLC, AEH Investment, LLC, J&A Harris, LP, Hughes Oil South,
15   LLC, KMR Investments, and Tommy Youngblood (phonetic).
16           THE COURT:  Okay.  And can I refer to them simply as
17   Franks, and you'll know I mean all your clients?
18           MR. BIRD:  Yes, Your Honor.
19           THE COURT:  Okay; thank you.
20           All right, FPCC?
21           MR. BAIN:  Good morning, Your Honor.  Joseph Bain of
22   the law firm of Jones Walker on behalf of FPCC USA.  And on the
23   line also is my client, Amy Vazquez.
24           THE COURT:  Okay.  And you will be the primary person
25   speaking again?
```

1          MR. BAIN:  Yes, Your Honor.

2          THE COURT:  Okay; thank you.

3          All right, JF Howell Interests?

4          MR. TAGGART:  Good morning, Your Honor.  David

5   Taggart of the firm of Bradley Murchison Kelly & Shea.

6          My client representative, David Morgan, is also

7   listening in this morning on behalf of the Howell Interests.

8   Although I don't expect to be speaking much, to the extent

9   there is something to say, that would be me on behalf of the

10  Howell Interests.

11         THE COURT:  Very good; thank you.

12         Okay.  How about Hopping Green & Sams?  Is Mr. Riley

13  there?

14         MR. RILEY:  Good morning, Your Honor.  Timothy Riley

15  for creditor Hopping Green & Sams.

16         THE COURT:  Okay; thank you.

17         The Kudzu parties.

18         MR. SWANSON:  Good morning, Your Honor.  Tim Swanson

19  from the law firm of Moye White representing the Kudzu Oil

20  Properties, Alabama Oil Company, Apple River Investments.  On

21  the line also is my co-counsel, Mr. Craig Geno.

22         I will be taking the laboring oar this morning.  To

23  the extent Mr. Geno feels compelled, I'm sure he will say what

24  he wants to say.  But good morning, Your Honor.

25         THE COURT:  Thank you.  And I'll all your clients

1  Kudzu, all right.

2           Next the Landmark entities.

3           MR. SPENCER:  Yes, Your Honor; I'm sorry.  I couldn't

4  unmute my phone.  Jim Spencer on behalf of the Landmark

5  entities.

6           And to the extent there's anything that needs to be

7  said, I'll be speaking on their behalf.

8           THE COURT:  Okay; thank you.

9           All right, next, Barbara Page and the Estate of

10 Pamela Page?  Mr. Guyerson, are you there?

11          MR. GUYERSON:  I am, Your Honor; my apologies.  Good

12 morning, it's Michael Guyerson from the Buechler Law Offices

13 appearing on behalf of Barbara Lawrence and the estate of

14 Pamela Page.

15          THE COURT:  Okay; thank you.

16          All right, Lucas Petroleum, Mr. Brescia?

17          MR. BROCK:  My name is Fain Brock, I'm President of

18 Lucas Petroleum, and I believe Duane Brescia's communications

19 are not working right now, so he can't call --

20          THE COURT:  Okay.  We have folks that are going to

21 check periodically the waiting room, which is where you all

22 started, to see if they can connect in as people join.

23          Okay.  Let's see.  PAR Minerals, et al.?  It's either

24 Mr. Meredith or Mr. Taylor.

25          MR. TAYLOR:  May it please the Court, Christopher

1  Meredith and I are with Copeland Cook Taylor and Bush in

2  Jackson, Mississippi, we represent Eastern Fishing Tools, PAR

3  Minerals, and Coastal Exploration.

4          THE COURT:  Okay.

5          MR. TAYLOR:  And we're observing today, please,

6  ma'am.

7          THE COURT:  Okay.  And I'll just -- if I refer to

8  you, it will be as PAR Minerals.

9          MR. TAYLOR:  Yes, ma'am.

10         THE COURT:  Okay?  Next Pruet.

11         MR. RETHERFORD:  Good morning, Your Honor.  Jeremy

12 Retherford with the law firm of Balch & Bingham.  With me also

13 is my co-counsel, Mr. Matt Ochs.  We represent Pruet Oil

14 Company and Pruet Production Company.

15         And also observing from Pruet are Mr. Stan Kynerd,

16 Mr. Rick Calhoon, and Mr. David Hilton.

17         THE COURT:  Okay.  You'll be the person speaking?

18         MR. RETHERFORD:  Yes, ma'am.

19         THE COURT:  Very good; thank you.

20         Okay.  Next is Strago Group.

21         MR. PADDOCK:  Good morning, Your Honor.  This is

22 Robert Paddock on behalf of the Strago Group, which is Harvest

23 Gas Management, GCREW Properties, Meritage Energy, Gateway

24 Exploration, Strago Energy, which I'll refer to as the Strago

25 Group.

1          Also on the line today are client representatives

2    John Aubrey and Louis Goaga (phonetic).  We're taking the

3    position that they will -- I'll be speaking for our group.

4          THE COURT:  Okay.  I'm hearing you, but it's very

5    faint.

6          MR. PADDOCK:  Okay; is this better?

7          THE COURT:  Oh, that is way better; thank you.

8          MR. PADDOCK:  I had to pull the microphone up to my

9    mouth; thank you.

10          THE COURT:  Okay.

11          MR. PADDOCK:  Do I need to repeat that?

12          THE COURT:  No, I think we've got it.

13          MR. PADDOCK:  Thank you.

14          THE COURT:  Thank you.

15          Okay, next Stoneham Drilling?

16          MR. BAILEY:  Your Honor, James Bailey on behalf of

17    Stoneham Drilling, I'm with the firm Bradley Arant Boult

18    Cummings.

19          THE COURT:  Thank you, all right.

20          And then Tauber Group.

21          MR. SHIPPS:  Good --

22          THE COURT:  Mr. Shipps?

23          MR. SHIPPS:  Yes, good morning, Your Honor.  Tom

24    Shipps on behalf of the Tauber Exploration and Production

25    Company, Pickens Financial Group, LLC, CTM 2005 Limited, I&L

 1  Miss I, LP, the Tara Rudman Revokable Trust, Feather River 75,

 2  LLC, Rudman Family Trust, MER Energy Limited, MR Oil & Gas,

 3  LLC, and the Rudman Partnership.

 4      With me this morning is co-counsel from Houston,

 5  Barnet Skelton, Junior.  He will probably be the principal

 6  speaker this morning.

 7      Also we have client representatives for the Tauber

 8  Group, Jim Goolsby; for the Rudman Partnership, Trey Sibley;

 9  and Mike Pickens from the Pickens Financial Group, LLC; and I

10  think we may have another client, Will Ledt (phonetic), who may

11  be in the waiting room.  I know he was on the call, and then

12  wasn't able to get on, I don't believe.

13      But if we could just refer to our group as the Tauber

14  Group, I think that would --

15      THE COURT:  Excellent.

16      MR. SHIPPS:  -- be the easiest way to proceed.  And,

17  again, Mr. Skelton will be the principal spokesman.

18      THE COURT:  Okay; thank you, sir.

19      All right.  Who have I not called on that is here,

20  and would like to enter their appearance?

21          (No audible response heard)

22      THE COURT:  Okay, we got everybody it sounds like.

23  I'll give you another second, if you have us on mute, and you

24  want to enter your appearance, please do so now.

25      MR. NILES:  Good morning, Your Honor.  This is

1 Michael Niles on behalf of Fletcher Petroleum Company, LLC.

2         THE COURT: Okay. Mr. Niles, I see your name, but I

3 can't hear you; it's very faint. Can you repeat?

4         MR. NILES: I apologize, Your Honor, is this better?

5         THE COURT: Much better.

6         MR. NILES: Good morning, Your Honor. This is

7 Michael Niles from Berger Singerman on behalf of Fletcher

8 Petroleum Company, LLC.

9         THE COURT: Excellent; thank you.

10         Anybody else?

11                 (No audible response heard)

12         THE COURT: Okay. Well, it only took us a half an

13 hour to get through the entries of appearances.

14                     (Laughter)

15         THE COURT: That's not too bad.

16         Okay. So I wanted to start with sort of a refresher

17 on what we're going to plan to be hearing on Monday so that we

18 all have our course of action planned ahead of time.

19         I know that we are going to take up the cash

20 collateral motion for final approval, and I know there are many

21 outstanding objections still to that.

22         Ms. Riley, let me ask you, what's left in the pay and

23 offset motion? I know that you've already paid, or at least

24 gotten approval to pay, the royalty interest and the overriding

25 royalty interest, and you're withdrawing a request to pay the

1 working interest.  But one of the things that occurred to me is

2 the offsetting of the JIBs.

3          I heard a question, I can't remember now who said it,

4 but they raised the question of well, if our cash advances are

5 gone, are you still going to give us credit for them on the

6 joint billing statements.  And I never really heard an answer,

7 and I think everybody might want to know the debtors' position

8 on that.  Can you speak to that right now?

9          MS. RILEY:  Certainly, Your Honor.  And I did just

10 want to clarify that with respect to payment of the working

11 interest holders, while the request has been withdrawn, to a

12 certain extent, although we would certainly like to pay them

13 for the January and February prepetition revenues at some

14 point, we do still intend to pay the working interest holders,

15 along with the royalty interest holders, and overriding royalty

16 interest holders for all revenues received on a post petition

17 basis.

18          THE COURT:  Great.

19          MS. RILEY:  Which would start with the revenues from

20 the March production.

21          THE COURT:  Okay.

22          MS. RILEY:  With respect to the offsets, part of the

23 request was to offset joint interest billings against revenues.

24 And we do just want to clarify that that is where we have been

25 expressly requested to do so in writing.  There are a number of

1   parties who have requested that we allow those offsets on an

2   ongoing basis.  They don't want to have their own

3   administrative hassle of having to send in a payment for the

4   joint interest billing, while also receiving a revenue check.

5   So there are some parties who have requested that we net them.

6            THE COURT:  All right.

7            MS. RILEY:  There are also certain circumstances

8   where parties have failed to pay their joint interest billings.

9   But under several of the joint operating agreements, it does

10  allow for some sort of netting or recoupment there, as well.

11  That, I think, we could probably agree to table for the time

12  being.

13           When it comes to the cash call advances, I don't

14  believe that we have an agreement to continue to make offsets

15  against those generally, but perhaps with more as kind of a

16  limited scope.  A number of the cash call advances that have

17  been made -- in fact, most of them -- are for projects that are

18  ongoing and larger in scale, such as drilling --

19           THE COURT:  Like construction projects.

20           MS. RILEY:  Correct, Your Honor.

21           THE COURT:  Okay.

22           MS. RILEY:  Drilling of new wells, (indiscernible -

23  muffled) pipeline.  There's construction of helium well, I

24  think, in Montana, as well as a -- I think, an oil and gas well

25  in Montana.  These are where the majority of those cash call

RUD000097

1  advances are.

2        We don't anticipate, at least given the current

3  status of the case, and given current oil prices, that drilling

4  operations are going to be continuing, at least on an immediate

5  basis.  So we don't anticipate there being any credits against

6  those cash call advances where it's for these large scale

7  operations.

8        On some of the smaller projects that do have ongoing

9  operations, we're issuing joint interest billings, and there's

10  also revenue being produced from certain wells, there, I

11  believe, that we could still provide credit against the cash

12  call advances, but I know objections have been raised to that

13  by -- I believe it was East-West Bank, perhaps the Committee,

14  as well.

15        THE COURT:  Okay.  So no agreement on the offsetting

16  of the cash advances.

17        You are waiting for written requests from working

18  interest holders, if they want to continue the usual practice

19  of offsetting against net revenues.

20        MS. RILEY:  That's correct, Your Honor.

21        THE COURT:  Okay, all right; thank you.

22        So is it safe to say that what we're really going to

23  hear on Monday is the cash collateral motion, rather than the

24  pay and offset?  I mean they're sort of subsumed together in a

25  way, but since this is now narrower in scope, we won't really

1  be hearing additional evidence for that motion, will we?

2          MS. RILEY:  Not necessarily, Your Honor.  I mean I

3  think a lot of it does go to kind of the same issues because,

4  of course, we are requesting to use cash collateral, parties

5  are asserting an interest in the cash based on in addition to

6  certain cash call advances.  There's January and February

7  revenues that remain unpaid at this point.

8          THE COURT:  Okay.  And then Sklarco's critical vendor

9  motion, I assume we're going to hear evidence on that.  Some

10 folks have challenged whether it's really critical, and whether

11 we have enough information about it.  And so I assume we're

12 going to hear from witnesses on Monday on that issue.

13         MS. RILEY:  Your Honor, I believe that that is one of

14 the issues that will be addressed.  We are still in discussions

15 with the primary objecting party, who is East-West Bank here,

16 and we may be able to reach a resolution with them.

17         Some of the other parties have raised an objection

18 really just to the extent that I think Sklar Exploration's

19 money would be used to pay those joint interest billings, so

20 there may be some evidence on that, as well.

21         THE COURT:  Okay.  Then I was going to -- it hasn't

22 been noticed to be heard on Monday, but could we go ahead and

23 address the special counsel employment application, as well?

24 That involves objections by the bank and the Committee only.

25         MS. RILEY:  Yes, Your Honor, I believe that we could

1    add them, as well.

2            THE COURT:  Mr. Johnson, is that okay with you, as

3    well, for the Committee?

4            MR. JOHNSON:  Yeah, thank you, Your Honor.  I thought

5    that we had an agreement to carry that to the final cash

6    collateral.

7            THE COURT:  Okay.

8            MR. JOHNSON:  That will allow the parties to work

9    through this.

10           THE COURT:  Okay.  So you're okay with that being

11   heard on Monday?

12           MR. JOHNSON:  Well, actually I think Ms. Riley is

13   going to tell you that we think Monday is another interim

14   order, and she's going to ask you for a final cash collateral

15   hearing in the future.

16           THE COURT:  Okay.  Let's go ahead and do that next.

17   But don't let me forget, I have the same question as to the

18   interim payment motion, and the Strago motion to assume or

19   reject.  So we'll come back to that, okay.

20           Ms. Riley, what's changing for Monday now?

21           MS. RILEY:  So with respect to the cash collateral, I

22   was going to use this opportunity to provide a general status

23   update a little bit later in the hearing.  But we have been

24   working fairly extensively with both the Committee and East-

25   West Bank, as well as working with the working interest holders

1  who have filed objections to try to reach a consensual third

2  interim cash collateral order.  We have an agreement with the

3  bank; we have an agreement with the Committee.  I think there's

4  still some minor changes that need to be incorporated.

5          We've also gotten some comments and requested changes

6  back from some of the working interest holders which have been

7  incorporated.

8          However, there are still a number of parties who are

9  still raising objections to the use of cash collateral on even

10  a third interim basis.

11          And just -- we recognize that the order hasn't been

12  finalized or filed with the Court, but the third interim order

13  would provide some additional benchmarks and protection.  For

14  instance, it requires the debtor to work with the Committee and

15  the bank to appoint a CRO who would step in and participate in

16  the day-to-day management and operations of the debtors.

17          THE COURT:  Okay.

18          MS. RILEY:  It also continues to require the debtors

19  to keep the funds from the revenues separate, and it continues

20  to essentially maintain the protections afforded to try to hold

21  the status quo while we continue to work towards a final cash

22  collateral order and the final cash collateral issue.

23          But given the fact that we do still have objections

24  from a number of these parties, I think there are still issues

25  to be raised on Monday.

1        Oh, and it does also require the payment of the March

2   revenue, specifically directs that Sklar Exploration to make

3   the revenue payments for the March revenues to royalty,

4   overriding royalty and working interest holders.

5        THE COURT:  Okay.  Well, to the extent it might be

6   helpful to the parties as they continue to negotiate a

7   consensual resolution on cash collateral, having listened to

8   the arguments, I have -- I guess I'll let you know what my

9   tentative thinking is now, and you can also argue, and try to

10  talk me into a different position.

11       But as I listened to them, to the extent that people

12  are saying you can't spend the money for operations because

13  it's my cash advances, and those are not property of the

14  estate, I think it would be a very tough sell, in this

15  jurisdiction at least, to be able to assert that ownership

16  interest over the funds.

17       So for one thing, the funds are probably long gone at

18  this point.  I think we -- the debtor has admitted that several

19  times.

20       But even if some were still to exist in this

21  jurisdiction, at least, it requires tracing.  And that would be

22  difficult, I'm guessing, from the state of the records.  So,

23  you know, it's not to foreclose you out of that, and maybe

24  you'll tell me that Alabama law applies, or some other law, and

25  it doesn't require tracing.  But that's something that I would

1    need to hear from you on.

2          To the extent that the objectors were raising the

3    issue that net revenues are their property, and this operator

4    only gets their agreed compensation, and they don't get to just

5    use our net revenues as a form of DIP financing to fund the

6    operations of this business, I found that to be a very

7    compelling argument.

8          And so to the extent any budget is built on using

9    people's net revenues, this is post petition net revenues that

10   I'm talking about, then I will probably side on that of

11   things.

12         So I hope that that kind of helps both sides a little

13   bit as you continue to work with each other.

14         Anything further, Ms. Riley, status report wise?

15         MS. RILEY:  Well, Your Honor, I would just like to

16   report that we have prepared a third interim budget that would

17   be accompanying the third interim order, of course.  And it

18   does separate out as part of that budget those funds that are

19   attributable to Sklar Exploration and Sklarco versus the

20   revenue account.

21         So it does attempt to make it very clear that the

22   revenues that are coming in are going to be maintained in the

23   revenue account, used to pay out the revenue parties.  Sklarco,

24   of course, would get its portion, which would be maintained and

25   Sklar Exploration (indiscernible - muffled) to fund operation.

1          But apart from that, the funds that are going to be

2   used to pay the ongoing expenses of this bankruptcy case,

3   including payment of utilities, payment of operating expenses,

4   payment of salaries, that is not coming from those post

5   petition revenues that have been received, and the funds in the

6   revenue account that were there, I think, as of the petition

7   date, again, subject to payment of Sklarco's revenues, have

8   been maintained in that account.

9          THE COURT:  Okay.  And when you say there's a

10  segregated revenue account, I want to make sure I understand

11  what you mean by that because I know that the debtor is an

12  operator for 50 or 60 different wells, and there are a lot of

13  different working interest holders, some small, some big.  So

14  it's just one revenue account where all that money is

15  commingled, but you have separate bookkeeping entries, is that

16  how it works?

17         MS. RILEY:  That's correct.  So all of the revenue

18  that is generated based off to the sale of the oil and gas that

19  is produced is deposited into the debtors' designated revenue

20  account at East-West Bank.  The statement, I believe, that was

21  actually attached to Tauber's objection to the motion to

22  bifurcate does specifically identify it as the revenue account,

23  and that's where those funds are maintained.

24         When you look at the statement itself, it doesn't

25  separate out the deposits very well, but records of where those

1  funds are coming from are generally maintained by the debtor.

2          THE COURT:  Okay.  Because that doesn't appear to

3  have been the case prepetition, but changes have been made to

4  do strict accounting going forward, is that right?

5          MS. RILEY:  That's -- that's correct, Your Honor.

6          THE COURT:  Okay, all right.  And maybe some of the

7  parties here will want further clarification, but I think I

8  understand that.

9          And the East-West Bank is not going to assert or have

10  any setoff rights against that revenue account, is that

11  correct?

12          MR. SUZUKI:  I think --

13          THE COURT:  Maybe I should -- yeah, go ahead.

14          MR. SUZUKI:  I'm happy to address that on behalf of

15  the bank, Your Honor.

16          THE COURT:  Okay.

17          MR. SUZUKI:  And let me provide perhaps just some

18  additional context that may be helpful to the Court.  We came

19  into this next budget period uncertain whether we were going to

20  try to push through on a final cash collateral order in light

21  of some of the arguments and positions of the parties.  In

22  collaboration with the Committee and the debtors, we determined

23  that it would probably be better to try and work out a

24  compromise reflected in a third interim order, and try to put

25  parties' minds at ease about what was going to happen with

1   respect to the revenues, in particular post petition revenues.

2            And the bank has agreed, and this is reflected in the

3   draft third interim order that's being traded among the

4   parties, the bank has agreed that on a post petition basis,

5   those revenues can be paid out to the working interest

6   holders.

7            THE COURT:  Okay.

8            MR. SUZUKI:  And, you know, candidly, the bank was

9   always amenable to that because we understand what those issues

10  are.  And without conceding, you know, who owns what, and is it

11  a bona fide ownership claim versus a claim based on the right

12  to payment, and all of those things, that sort of becomes

13  academic when we say, "Yeah, you can have the funds."

14           So on a post petition basis, the debtors are

15  segregating those funds, and those will be paid out to the

16  working interest holders.  And from April 1, the petition date,

17  going forward, they're looking at collection of revenues from

18  March coming in, and those being paid out.

19           THE COURT:  Okay.  But I still want an affirmative

20  statement that the bank will not assert setoff rights against

21  that revenue account because these interim orders, and maybe a

22  final cash collateral, that you have a sunset --

23           MR. SUZUKI:  Right.

24           THE COURT:  -- and so I want to know that.

25           MR. SUZUKI:  And absolutely, we could provide that.

1  What I've told some of the working interest holders is that

2  while the bank is not willing to stipulate to a legal

3  conclusion definitively on things like ownership because we

4  just don't have the time to go through each and every

5  agreement, research the applicable state law, etc., and go

6  through that, that we are perfectly fine representing, as Your

7  Honor's requested.  We're not going to seek later setoff; we're

8  not going to seek, from the bank's perspective, at least, the

9  estate's, I can't speak for them obviously.  But from the

10  bank's perspective, we're not going to seek to pull that money

11  back, we're not going to claw it back, not going to set it off,

12  not going to assert setoff rights on those funds that are duly

13  segregated as working interest funds.

14        THE COURT:  Excellent; thank you.

15        Okay, all right.  So you may have good fortune

16  working things out consensually by Monday, in which case it

17  will be a very short hearing.  But if not, are there going to

18  be witnesses on the cash collateral issues, or primarily just

19  legal argument?

20        MS. RILEY:  Well, Your Honor, I think that we would

21  need to have some witnesses on the cash collateral issue, and

22  particularly to the extent that we do have parties that are

23  saying, "Look, you are using our money to continue to fund your

24  operations on a post petition basis."  I do think that some

25  evidence may be necessary on that particular issue,

1  notwithstanding the fact that some of what we're spending the

2  money on is paying them for their interest.

3          THE COURT:  Okay.  And -- okay.

4          Can we ask -- is it possible for the parties to

5  stipulate to the admission of exhibits at the beginning of the

6  hearing on Monday, to the extent somebody wants the Court to

7  have the joint operating agreement, or whatever contractual

8  arrangement, entered into the record?

9          MS. RILEY:  Your Honor, I think that that would be

10 possible to do.  And I think depending on the outcome of this

11 hearing, and to really kind of narrow down those issues that

12 will be determined and that will be discussed on Monday, we

13 could probably circulate a stipulation to exhibits and

14 witnesses, and it may even be able to cut down on some of the

15 number of witnesses that have been designated.

16         I know a number of the parties are just there to

17 authenticate exhibits.  To the extent we can stipulate to the

18 admission, for instance a joint operating agreement, that may

19 eliminate the need for one to five witnesses.

20         THE COURT:  Great; that would be helpful.

21         Okay, all right.  Let me see -- I think I'm just

22 going to open this up to all of our objectors now.  And given

23 what you've heard so far, is anything -- anybody want to weigh

24 in on what's been said so far?  And just remind us who your

25 client is.

1          (No audible response heard)

2          THE COURT:  Anybody?  Nobody?

3          MR. SKELTON:  Your Honor?

4          THE COURT:  Yes, Mr. Skelton?

5          MR. SKELTON:  For the Tauber Group.

6          Well, Judge, first of all, we think that this motion

7  to bifurcate should be denied, and that we should proceed on to

8  the cash collateral hearing on Monday.  We have made it pretty

9  clear in our pleadings what our position is, and that is there

10 isn't any mystery about what everybody knows.

11         It's the job of this debtor to have scrupulously

12 accurate records.  And it does have, down to the ninth decimal,

13 everybody's interest.  So it's really a questions of

14 multiplying it out, that's what operators do.

15         And so our big beef, as you can tell, is that we

16 don't want to be involuntary DIP lenders and we don't want our

17 money used.

18         We're also concerned that there has been post

19 petition use of our money.  Because one of the exhibits that

20 we'll want to introduce, redacted, on Monday will be the full

21 balance revenue account statement.  And basically there are

22 four accounts:

23         The revenue account, which only should be receiving

24 revenues from the sale of oil or gas.  And you can tell from

25 looking at the entries where it came from.  This is from

1  Goodrich Refining, this is from Plains Marketing, etc.

2          THE COURT:  Okay.

3          MR. SKELTON:  And there's an operating account.

4  Revenues shouldn't drop down into operating unless there's

5  authorization.  So the only people with an interest in that

6  money in the revenue account are the working interest owners,

7  the royalty owners, and the overriding royalty owners, and

8  nobody else.  Sklar Exploration is a shell, it owns nothing

9  other than equipment, furniture, etc.

10          So the money that should go -- the only money that

11  should go into the operating account would be the fees that are

12  charged by Sklar Exploration for its ongoing operations in

13  accordance with the JOAs, and JIB payments, and what are

14  referred to as AFE payments, which would be for the -- all

15  those cash calls were made pursuant to what are called in the

16  industry AFEs, which means authorization for expenditure.

17          And so what happened is, you know, Sklar Exploration

18  sent out these AFEs, "Hey we need this much advanced, that much

19  advanced."  They got our money in November/December, and they

20  spent it on other things (indiscernible - voice fading).  I

21  think -- the debtor has admitted it didn't spend it on

22  (indiscernible - voice fading).

23          That money's gone.  We now are asking (indiscernible

24  - voices fading).  Yes, at the beginning of the case, we were

25  mainly horrified, shocked, whatever about the use of our money.

1    But now we're in a damage control mode and, by gosh, no more of

2    our money should be used absent the appropriate approvals by

3    us, etc., and right now we don't approve.

4           So then what other money -- accounts are out there?

5    There's two other:

6           There's a -- there is a benefits account, which the

7    operating account would drop down money into the benefits

8    account for employee benefits;

9           And then there's a payroll account to which money

10   would drop down from operating to pay payroll, and that has

11   happened.  If you look at the full April bank statement --

12   statements, you see there's a (indiscernible - voice fading)

13   funds.

14          Our concern, among our many concerns, is that on the

15   very day that this case was filed, April 1st, $800,000 was

16   drawn down from the revenue account into the operating account,

17   and that was before any cash collateral order.

18          Now the debtor might say, "Well, that's still another

19   account of the debtor."  But it's not true that they haven't

20   been tampering with that money.

21          And then on April 30th, there was another $400,000 or

22   so that was dropped down into the operating account.

23          So there's already been what we would regard as

24   unauthorized use of working interest funds.

25          And then the final thing, just to simplify it -- and

1  really the debtor admits this, the math is simple.  On average,

2  Sklarco, which is the only debtor entity that owns any interest

3  in oil and gas prospects, has from 20 to 30 percent across the

4  various prospects.  Everything else, by definition, belongs to

5  the working interest owners.

6      And the way it should work is that money comes in

7  from the refineries and from the gas processing plants.  Then

8  out of that fund, the -- out of the revenue account, the taxing

9  authorities are paid, and the -- then the royalty owners are

10  paid, and the overriding royalty owners are paid, and the

11  working interest owners get their net revenue, their NRI, after

12  that.  That's the way it should work.

13      And one final thing, the way the payment of JIBs

14  should work is that we're billed -- in a perfect world, in the

15  non-you stole seven million of my dollars world -- we'll get a

16  bill, and we'll pay it, and if we don't pay it within 60 days,

17  the JOAs say then after demand notice you haven't paid, I can

18  offset.  So either -- as Ms. Riley said, there may be some

19  people who just said I don't care, just go ahead and net my

20  JIBs.

21      But most all of the working interest owners, or those

22  of any consequence, they get their bills, they take a look at

23  them, and they pay the JIBs, that's in the pre-bankruptcy

24  perfect world.  And then they'll do the same on the AFEs.

25      So that's -- so there shouldn't be netting out of the

1 revenue account to accomplish payment of the JIBs. The revenue

2 accounts should stay, shall we say, pristine.

3     THE COURT: Well, I think I heard -- I understood

4 from Ms. Riley that she's no longer -- if the motion could be

5 read to assume that it was an immediate netting, that she's

6 only saying now that if somebody gives a written request to do

7 that netting up-front will that occur.

8     So if your client, and others like your client, would

9 like to have the float for those 60 days, I don't think she's

10 going to push that issue.

11     Is that right, Ms. Riley?

12     MS. RILEY: Well, Your Honor, to the extent there are

13 certain parties who are refusing to pay their joint interest

14 billings, you know, I don't know that we would agree to just

15 float them for 60 days on that aspect.

16     But I mean certainly we're not going to engage in

17 immediate netting or anything along those lines. I mean we're

18 still going to operate in accordance with those joint operating

19 agreements.

20     THE COURT: Well, he's telling me that his documents

21 provide that he gets up to 60 days to pay. And then there's a

22 demand letter, maybe it's an earlier demand letter. But those

23 are the things that I'll have to have people point out to me in

24 documents if this still is an issue, but it may not be, so.

25     MS. RILEY: And, Your Honor, I think it's -- that

RUD000113

1   there's up to 60 days before we're allowed to, you know, issue

2   that demand and start to look at that recoupment or netting

3   effect.  But I don't know that that's necessarily the specified

4   time frame for payment.

5           THE COURT:  Okay.  Well, we'll have to check that

6   out.  If you all -- but to the extent you can confer later

7   today, and try to sort that out ahead of time, that would be

8   great.  But if not, we'll -- we'll talk about that further on

9   Monday.

10          Mr. Skelton, was there anything else since I

11  interrupted you?

12          MR. SKELTON:  Well, only one comment on the what --

13  what has been called like the JIB motion, the offsetting

14  motion, whatever.  The initial pitch by the debtor in the first

15  filing -- the first iteration of that motion was that, "Look,

16  yes, we used your seven million dollars, but we're going to

17  offset it against future JIBs."  Well, I gather that that

18  position has changed --

19          THE COURT:  It looks like it.

20          MR. SKELTON:  -- and that it may not -- it changed

21  "Now, we'll offset it if it relates to the exact prospect for

22  which you made a cash advance.  We're not going to offset

23  JIBs."

24          And so -- well, there is just a litany of concerns

25  that we have about that:

1          One is that -- well, first, I've raised the issue --

2     and Tom Shipps and I have raised the issue of recoupment, but

3     we think that what's good for the goose is good for the gander.

4     The debtor took our money that was for designated purposes,

5     this is all across the board all working interest owners, and

6     used it for whatever purpose it wanted to, whether it be giving

7     money to Howard Sklar's trust or whatever, we don't really

8     know, but it wasn't for the right purpose.

9          And so it seems quite inequitable for the debtor to

10    say, "Well, yeah, we took all your money, and we spent it

11    however we wanted to across the board, and not on -- for the

12    purpose intended, but we're only going to allow an offset

13    against the precise prospect for which you made your payment,

14    and if it's for something else, sorry."

15         So that's an issue that we think is fundamentally

16    unfair.  That kind of sums up our position.

17         THE COURT:  Okay.  You know, one of the things that

18    I'm inclined to say is that things may not have been done

19    properly prepetition, and maybe in the weeks immediately

20    following post petition.  And at some point, if you all lose

21    confidence in Mr. Sklar, you'll do something.  And maybe this

22    appointment of the CRO will be a sufficient step for now; maybe

23    you'll want to do something further later.

24         But I'm -- other than you raising a specific request

25    to change management, I'm going to see that as water under the

1  bridge.  Your clients have every right to be incensed about it

2  and, you know, and every right to be protected from this

3  happening again.

4          But I'm not going to be wanting to hear a lot of the

5  anguish over what's already happened.

6          MR. SKELTON:  Understood.

7          THE COURT:  Okay.

8          MR. SKELTON:  And just a final comment on the CRO.  A

9  CRO is (indiscernible - voice fading) only as good as whatever

10 power they're given and, frankly, a lot of times, who it is.  I

11 -- I would say shuffling papers in a small office in the back

12 (indiscernible - voice fading).  You know, we want somebody

13 with some (indiscernible - voice fading).  And, frankly, our

14 inclination would be to make our decision, it might be more

15 inclined towards going to a trustee unless we really had a full

16 (indiscernible - voice fading) CRO that could really accomplish

17 things.

18         THE COURT:  I'm glad you raised that because the

19 lawyers who practice in Denver probably already know this about

20 me, but I need that CRO to be tethered to either the corporate

21 governance structure, so they're an officer, and maybe also a

22 board member, but they cannot essentially be a trustee.  They

23 can't propose their own plan.  So you either want a trustee or

24 an examiner with powers, or you want a CRO.  But if they're a

25 CRO, they have to fit into the normal corporate governance

1 process.

2       MR. SKELTON:  And I would say that, frankly,

3 especially given that power (indiscernible - voice fading) we

4 would be more inclined to seek a trustee or examiner.

5       THE COURT:  Okay.  I'm going to also tell you, Mr.

6 Skelton, that I keep getting a signal that your network

7 bandwidth is low, so you might want to think about that before

8 Monday.  I don't know what that means or what you do about it,

9 but --

10       MR. SKELTON:  All right; thank you, Your Honor.

11       THE COURT:  Okay.

12       All right, how about anybody else in terms of

13 objectors that want to weigh in on what's been said so far

14 today?

15       MR. BAIN:  Yes, Your Honor.  Joseph Bain on behalf of

16 FPCC.

17       THE COURT:  Okay.

18       MR. BAIN:  I'm going to try very hard not to

19 duplicate what Mr. Skelton said, but I echo --

20       THE COURT:  Thank you.

21       MR. BAIN:  I echo his concerns, and I appreciate Your

22 Honor's comments about the trustee.  I think that that's

23 indicative of where this case may need to go.

24       Just two points real quickly:

25       One -- one is a concern that we've raised with the

1  parties that we just wanted to highlight for Your Honor with

2  this concept of the motion to bifurcate.  My concern there is

3  more of a pragmatic one than necessarily a legal one, I just

4  see where this case is.  If they start filing a bunch of

5  adversary proceedings, it probably is going to go to Chapter 7

6  pretty quickly because I just don't see how that -- I

7  understand 7001, and I understand that everyone has rights

8  under that.  But I just -- a lot of my experience is painted

9  off of EPE bankruptcy case, which is very similar to this case

10  where there was questions about whether or not they should --

11  whether or not these interests were royalty interests, and what

12  it meant under Louisiana law, and this is all offshore.

13          In that case, once the lawyers started filing

14  adversary proceedings, it went to Chapter 7 very quickly.  And

15  that's -- it's not necessarily a legal argument, it's just

16  something I wanted to highlight for Your Honor of a concern

17  that's amongst the parties.

18          THE COURT:  Okay.

19          MR. BAIN:  The other comment, and more of a question

20  or clarification, perhaps to debtors' counsel.  But their

21  comment about the pay and setoff motion, and the fact that if

22  the parties requested that they stop setting off, we were going

23  to do that this week, but we were concerned about triggering

24  the automatic stay.  So I didn't know if we could get some sort

25  of stipulation.  I'm just trying to conserve the -- obviously

1    our assets, but also the estate's.

2          THE COURT:  I think making your position known

3    through a letter to the debtor, they've invited that.  So I

4    would not view that as a violation of the automatic stay.

5    You're letting them know that -- how you want to handle setoffs

6    or netting in the -- going forward, so -- if that's what you're

7    referring to.

8          MR. BAIN:  Absolutely, and I appreciate that; thank

9    you, Your Honor.

10          THE COURT:  Okay; thank you.

11          Anybody else?

12          MR. SUZUKI:  Your Honor, may I be heard just with

13    respect to Monday's hearing?

14          THE COURT:  Sure.

15          MR. SUZUKI:  I think it's helpful to take a step

16    back, and understand the scope of Monday's hearing because as I

17    sit here, I'm not sure what it is.

18          We're going to propose a third interim order.  And

19    from what I understand, the position of the working interest

20    holders is not with respect to the post petition revenues owed

21    to them, which are going to be paid, it's really about the cash

22    on hand as of the petition date.  And --

23          THE COURT:  Which are gone now, right?

24          MR. SUZUKI:  A lot of it is.  In the other interim

25    orders, their rights were preserved.  And so what I think we're

RUD000119

1   living with is the assertion that somehow the cash on hand as

2   of the petition date is not owned, at least in part, and I

3   think some of the working interest holders would say in total,

4   by other parties.

5          And so if what Monday is going to turn into is an

6   assertion that, under 541 they own the funds of the debtor, and

7   if they prevail, there's no need for cash collateral because

8   there is no cash, and the cases automatically, just out of

9   necessity, are going to have to convert to a 7.

10         THE COURT:  Unless you want to do DIP financing.

11         MR. SUZUKI:  Well, and this is the fear, no one's

12  approached us about DIP financing.  The bank would have to look

13  long and hard about that, but those authorizations cannot

14  possibly come in a day, two days, or even a week.

15         And so forcing the bank into that corner on notice of

16  a weekend that Monday's hearing is going to circumvent the

17  protections of 7001, is going to determine what's property of

18  the estate, that we're going to go through some kind of tracing

19  exercise, I guess, about what the funds on hand as of the

20  petition date are, to me, that is -- it does not afford the

21  bank -- and the debtors can speak for themselves -- it

22  certainly doesn't afford the bank due process, and so we

23  supported the motion to bifurcate on that basis.

24         And to Your Honor's point, prior to the setting aside

25  of these funds, and strict accounting, and the go forward

1  disbursements that are going to be made, the bank fully

2  supports.

3          The cash on hand as of the petition date, the debtors

4  told us in a declaration filed with the first day motions,

5  completely commingled, there was only about $800,000 in the

6  revenue account, there are about five and a half million

7  dollars of claims for January and February, there were three

8  and a half million dollars total funds on hand as of the

9  petition date.  There's just not enough money to pay.

10          So if these objecting parties go forward, rather than

11  do something pragmatic on an interim basis, on Monday and

12  somehow present evidence of tracing, and this is property that

13  belongs to them, and not the estate, on a motion on two days'

14  notice, the cases are over.  And my fear is -- and perhaps

15  cynically, but my fear is forcing a liquidation scenario would

16  be beneficial to certain parties who want to pick up assets on

17  the cheap.

18          Now I'm not saying that those ulterior motives -- I'm

19  not accusing anyone on this -- in this hearing or on this call

20  of that, but certainly there are incentives out there to shut

21  these cases down sooner rather than later.  And the bank's

22  position at this point is we need a little more runway to

23  determine how to maximize value for all the creditors,

24  especially including my client, the bank, which is seeking

25  obviously to maximize recovery on a $23 million loan here.

1          So my concern, if we don't bifurcate, is that we're

2     going to have some kind of odd hearing where we're getting, you

3     know, all kinds of different evidence that, in our view, is not

4     going to be properly before the Court.

5          So all of that is a very long way to say we would

6     like some clarification about what Monday's hearing is exactly,

7     and to understand --

8          THE COURT:  Okay.

9          MR. SUZUKI:  -- the scope, and what we need to do in

10    the presentation of evidence.

11         THE COURT:  Certainly.  First let me address your

12    suggestion that this would be all, you know, a violation of

13    your due process rights to have two days' notice that

14    something is going to be tried on Monday that you had no idea

15    of.

16         These working interest holders have raised these

17    objections from day one, they've been consistent in their

18    positions, and I have said that my inclination at this point is

19    to find that if you can't trace your money into the debtors'

20    bank account, which I would expect won't be doable, but if they

21    can't do it, then I don't think they have an interest in the

22    cash collateral at this stage, except as to the going forward

23    net revenues.

24         But if -- I'm not going to foreclose.  The debtor has

25    said it's all been commingled in the debtors' general operating

1    account.  That's the debtors' assertion, it's -- it's not

2    evidence.

3         And so the debtor -- you know, if somebody wants to

4    come forward and say "I wrote a check for $2.5 million the day

5    before the bankruptcy," and I can see it sitting in this

6    account by the bank statement, I'm not to foreclose them doing

7    that.

8         But everybody should keep in mind that a cash

9    collateral hearing is a summary proceeding, just like a motion

10   for relief from stay is a summary proceeding.  It's really

11   without prejudice to somebody bringing an adversary later to

12   prove otherwise.

13        But at the summary level, I've got to be able to say

14   whether I think somebody's got a working -- I'm sorry, not a

15   working interest -- has an interest in the cash collateral that

16   has to be adequately protected.  I can't just have people's

17   rights cut off without their opportunity to present something

18   on that, and so that shouldn't be a surprise to anybody.

19        Now we were supposed to all have the exhibits in by

20   the 6th; I don't know if we have them all in.  But you all have

21   seen what people are intending to use, or you can see it, so

22   that should help some.

23        But I really appreciate your request for

24   clarification, I think that was good to do.

25             MR. SUZUKI:  Thank you.

 1          THE COURT:  Okay; sure.

 2          Anybody else?

 3          MS. RILEY:  Your Honor, if I may just respond

 4  particularly in light of Mr. Skelton's comments here.  And

 5  certainly if you'd prefer for us to get through the other

 6  working interest objections, that's fine, as well.

 7          THE COURT:  Why don't you come back towards the end?

 8  There may not be anybody else who wants to speak, but why don't

 9  we let them, and then we'll come back, circle back to you.

10          Okay, any other --

11          MR. GUYERSON:  And, Your Honor, it's --

12          THE COURT:  Oh, Mr. Guyerson?

13          MR. GUYERSON:  I'm sorry.  Your Honor, Michael

14  Guyerson.

15          My clients are, I think, more representative of one

16  of the (indiscernible - muffled) working interest holders,

17  there's about a 17-page list of working interest holders

18  attached to the original pleadings; my clients are two of that

19  long list of people.

20          One of my clients, however, falls in a category we

21  haven't talked about yet.  The debtor is holding for the estate

22  of Pamela Page approximately $60,000 in suspension, which I

23  have got indication that on the date of filing, they were

24  holding that money for my client.  I don't know if there's

25  other working interest holders who have money being held in

1   suspension, but those funds, I think, are not property of the

2   debtor, nor are they subject to cash collateral.

3          And because my clients have such a small piece of

4   this pie, I don't know what their economic interest would be in

5   participating in a lengthy hearing, but certainly from their

6   perspective, funds held in suspension is a category that I

7   would ask the Court to at least be aware of --

8          THE COURT:  What documentation have you received from

9   the debtor to substantiate that?

10         MR. GUYERSON:  Your Honor, I've actually submitted my

11  exhibit book --

12         THE COURT:  I know, but I haven't seen it yet.

13                        (Laughter)

14         MR. GUYERSON:  I'm sure you have a lot of binders in

15  front of you, Your Honor.  Exhibit -- Lawrence --

16         THE COURT:  But tell me what's in yours.

17         MR. GUYERSON:  Exhibit -- Lawrence Exhibit B, which

18  I've shared with Ms. Riley already --

19         THE COURT:  Okay.

20         MR. GUYERSON:  -- is a statement from the debtor

21  saying we are holding in suspension $60,500 for your client.

22         THE COURT:  Okay.  So that may be all you need to

23  establish that -- that that's not property of the estate, and

24  it shouldn't -- or that you have an interest in that cash

25  collateral for Monday's hearing.

1          MR. GUYERSON:  And --

2          THE COURT:  Are there other objectors who have

3  similar indications, that funds are held in suspense for your

4  clients?

5          MR. PADDOCK:  Your Honor, this is Robert Paddock for

6  the Strago Group.  Before I start, can you hear me this time?

7          THE COURT:  Yes, I can.

8          MR. PADDOCK:  Okay; thank you.

9          It may be slightly different than Mr. Guyerson, and

10  this is a very small amount, but an example is there's a check

11  written to Strago for the February production that Mr. Strago

12  is (indiscernible - muffled) with the cash, and the check was

13  returned, and the bank would not process it.  Now this is

14  $3,000.  To be honest, we have not filed exhibits because we'd

15  spend $3,000 --

16          THE COURT: Yes, you would.

17          MR. PADDOCK:  -- just trying to get the $3,000.  But

18  I just raise it because of the fact that you mentioned -- I

19  don't know if there are other people that fall into the same

20  category whose checks were not honored because of time, or --

21  and whether that money is separately held in any sort of

22  identified, quote/unquote, "expense account" by the debtor.

23          Again, we haven't tried to do that tracing to this

24  point just because the amount is not material enough.

25          THE COURT:  Understood.

1          MR. PADDOCK:  So that's the only issue we have.

2          We also support the comments made by Mr. Skelton and

3  Mr. Bain with respect to the motion for bifurcation.

4          THE COURT:  Okay; thank you.

5          MR. RETHERFORD:  Your Honor, this is Jeremy

6  Retherford on behalf of the Pruet Group.

7          I believe we have some working interest owners that

8  are similarly situated regarding the checks.

9          THE COURT:  So bounced checks as opposed to here's

10  indication that money is still held in a suspense account for

11  you.

12          MR. RETHERFORD:  That's correct.

13          THE COURT:  Okay; thank you.

14          All right, anybody else?

15          MR. MILLER:  Your Honor?

16          THE COURT:  Yes?

17          MR. MILLER:  This is David Miller for Bri-Chem Supply

18  Corp, LLC.

19          My client is a materialman who has asserted a lien on

20  -- at the debtor's helium well in Montana, the Corwin Number 5,

21  I believe it's called.  We interposed an objection to the use

22  of cash collateral because we do have a lien right as to the

23  well itself.

24          And then the debtor has advised that there has been

25  no production yet from this well.  It's actually a helium well,

1  as opposed to an oil and gas well.  And then under Montana law,

2  once production starts, as long as we send notice to the end

3  customer of the debtor that we have a lien right, then our lien

4  will extend to the proceeds from the well.

5          My last understanding from the debtor was that the

6  debtor had no intention to segregate future monies that come in

7  from production for the benefit of my client.  That may have

8  changed in light of the things that have happened subsequent to

9  the debtor providing me with that notice, but if they have, I

10 just haven't heard about it.

11         So my client, for purposes of cash collateral that

12 actually exists, I don't believe we have an interest quite yet

13 in that, but we know we're going to have some in the future

14 because this is wells.  The only reasons it didn't start

15 production is because of the Montana stay-at-home order that

16 was put into place.  Otherwise, the debtor, I think, would be

17 up and running.

18         I've already provided Ms. Riley with notice of my

19 client's request to know who the debtors' customers will be so

20 that we can perfect that lien if the Court allows, but then

21 we're not sure exactly what's going to happen.  And I would

22 note that it does appear that at least $970,000 or so of cash

23 calls went into this well that apparently are no longer

24 existing.  And to the extent any of that money does exist, you

25 know, the question is whether or not those are trust funds, and

1  whether the debtor can use them as the other parties have

2  already indicated.  Those would be --

3         THE COURT:  Let's just stick for a moment with your

4  client's interest.

5         MR. MILLER:  Yes, Your Honor.

6         THE COURT:  It's more in the nature of a mechanic's

7  lien.

8         MR. MILLER:  Yes, Your Honor.

9         THE COURT:  I would like to -- excuse me.  I would

10  like to have you submit just a one-paragraph pleading where you

11  attach the relevant statutes that give you what you believe is

12  a lien in cash proceeds.  Because normally mechanic's liens

13  just attach to the real estate so you can force the judicial

14  sale of the real estate, but you wouldn't normally have an

15  interest in the cash that's produced from the real estate.  So

16  I'd like to see --

17         MR. MILLER:  Yes, Your Honor.  In the --

18         THE COURT:  Okay.

19         MR. MILLER:  Yes, Your Honor.  We can certainly

20  provide the Montana provision that provides for that.  I will

21  file a supplement, Your Honor.

22         THE COURT:  Thank you.

23         MR. MILLER:  It's referenced in the objection, but

24  not with the specific statute.

25         THE COURT:  Okay; thank you.

1          Okay, who else?

2          MR. BAILEY:  Your Honor, James Bailey on behalf of

3   Stoneham Drilling.

4          Just the perfect time for me to follow-up because my

5   client's in the same situation as Mr. Miller's --

6          THE COURT:  Right.

7          MR. BAILEY:  -- and we raised the objection

8   originally and cited the statute, but I'll work with him and

9   try to make sure we keep the pleadings to a minimum but give

10   you all the information you need, Your Honor.

11          THE COURT:  Thank you very much, appreciate that.

12          MR. BAILEY:  Thank you.

13          THE COURT:  Okay.  Anybody else from the objectors on

14   anything that's been said today that you want a chance to

15   respond to?

16          MR. LOCKRIDGE:  Your Honor, this is Eric Lockridge

17   for the Anderson interest, part of the working interest group.

18          Your Honor, we've (indiscernible - muffled) just a

19   brief opposition to the motion to bifurcate because I don't

20   think that that is an issue that can be -- I think the working

21   interest owners' concerns are a cash collateral concern.  And I

22   am concerned that that -- that the motion to bifurcate is

23   really an intent to sideline the concerns and the very

24   legitimate complaints that some working interest owners have.

25          On -- for the working interest owners, we are a

1  diverse group with diverse opinions.  We're not a homogeneous
2  body on how things ought to -- how things ought to be.  And I
3  think we're all -- both the lawyers and clients are in various
4  stages of dealing with the situation that -- it's betrayal is -
5  - is kind of the word that came up a lot when this case was
6  first filed.

7          And there's -- there's a -- people are in different
8  stages of that process, and have different opinions on how to
9  respond to that process.  But we're very important -- we're
10 very important to the creditor body.  I think that the debtor
11 is looking to us to continue to pay JIBs to the debtor.  It's
12 including our money in its budget going forward for paying
13 those JIBS.

14         And so I think it's important to make sure that we
15 are part of any resolution, and we don't get unfairly sidelined
16 and taken out of the conversation, so I just ask Your Honor to
17 keep that in mind.

18         I'm hopeful that there is a path to an agreed
19 resolution, but we need -- the working interest owners need to
20 be part of that.

21         THE COURT:  Okay; thank you.

22         Anybody else?

23         MR. SWANSON:  Good morning, Your Honor, Tim Swanson
24 on behalf of the Kudzu parties.

25         And not to pile on, but we would join with the other

1   working interest holders in the arguments that they've advanced

2   with respect to the bifurcation motion and the cash collateral

3   issues.

4           THE COURT:  Okay.

5           MR. SWANSON:  So we join.

6           THE COURT:  Excellent; thank you.

7           Anybody else?

8           MR. SHIPPS:  Your Honor, this is Tom Shipps.

9           I don't want to take a second bite out of the apple

10  for the Tauber Group, but I did want to bring something up in

11  response to your comments, Your Honor, about looking post

12  petition in terms of the conduct of the debtors.  And I want

13  the Court to be aware that our concerns are about Sklar

14  Exploration's ability to move forward, and our loss of -- their

15  loss of credibility with matters that even have happened post

16  petition.

17          THE COURT:  Okay.

18          MR. SHIPPS:  As an example for that and perhaps as a

19  preview of some of our concerns, in their proposed budget, they

20  are listing, I think as of tomorrow perhaps, a monthly payment

21  of $118,000 a month for managing a gas plant, the Abbeville Gas

22  Plant in Alabama.  And I would just suggest to Your Honor that

23  when the first day hearings were held, counsel for the debtor

24  represented to the Court that, in fact, a -- matters had

25  changed over the course of the last month or so preceding the

1   filing of their petition, that they had moved into an ownership

2   position with respect to the Abbeville Plant, and that they

3   were going to have new revenues that would be plugged into

4   their budget based upon that acquisition.

5        And we have since learned, to the great concern of

6   our clients, that the money that had been paid over many years

7   to purchase that plant had not been completed.  And, in fact,

8   that we now know based upon an expedited motion that, in fact,

9   SEC was in default on payments to the owner of that plant that

10  we had paid for.  And as a result of that, that plant is not

11  owned for the beneficial interest of the working interest

12  owners.  Notwithstanding that representation to the Court, that

13  plant hasn't been owned.

14       And furthermore, even if it were now -- had been

15  transferred to SEC on behalf of the working interest owners,

16  the management fee that's being proposed that is in the budget

17  is one that had not been properly approved.  And I recognize

18  there may be disputes as to what the proper procedure was for

19  approval of management fees, but that's assumed in this budget

20  as being a matter that's resolved.  And we just want the Court

21  to know that it's not resolved, and we think that this is

22  indicative of the ongoing character that's being displayed by

23  SEC, and one that's not acceptable to our clients.

24       THE COURT:  Okay.  I am glad you said that, but let

25  me just caution you that Monday's focus will be on budget and

1  whose interests are being spent.  So to the extent you think

2  that should not be an approved budget item, I definitely want

3  you to raise it.

4       To the extent that you are expressing dissatisfaction

5  with management, I would urge creditors, or the Committee,

6  whoever, to file a motion.  You can get it on the notice

7  period, let it be running, and you can let it sit for a while

8  if you're having good negotiations and you reach a comfort

9  level.

10      But to the extent you want me to jump in and do

11  something to protect creditors further, I've got to have a

12  motion.

13      MR. SHIPPS:  Yeah.

14      THE COURT:  So -- okay.

15      MR. SHIPPS:  Your Honor, thank you, and I understand

16  that.  I just wanted you to know that this wasn't all just

17  prepetition in terms of our concerns.

18      THE COURT:  I do hear that; thank you, okay.

19      MR. SHIPPS:  All right.

20      THE COURT:  All right.

21      MR. CORNWELL:  This is John Cornwell on behalf of the

22  Committee.

23      That seems like a good place for the Committee to

24  jump in and make a statement, but I don't want to come in out

25  of order.

1          THE COURT:  Okay.  No, you can come in now, that's

2     fine.

3          MR. CORNWELL:  Okay; thank you, Your Honor.

4          And first of all, I'm sorry that we can't be there in

5     person, but it's a pleasure to appear before Your Honor for the

6     first time even from so far away.

7          The Committee -- just to cut to the chase -- doesn't

8     take the position -- it hasn't filed papers taking the position

9     with respect to the bifurcation motion.

10         However, I think it's probably no surprise to Your

11    Honor, or all the parties on the line, but it needs to be said

12    for the record, the Committee is looking at the allegations

13    that caused us to find our way into bankruptcy very, very

14    closely, and is taking them very, very seriously.

15         THE COURT:  Okay.

16         MR. CORNWELL:  And, again, it just is not hard to

17    understand how or why, although we're still learning how, I

18    suppose.

19         THE COURT:  Okay.

20         MR. CORNWELL:  To borrow a phrase from Ms. Riley

21    early on in the hearing, the Committee is spending its efforts

22    principally to maintain the status quo.  We think that there --

23    we hope that there is a consensual avenue to protect working

24    interest owners for their prepetition claims, and we think we

25    already have in place -- "we" collectively, the bank, the

1  debtors with participation from the Committee -- a mechanism to

2  get them paid on revenues received post petition.  Which, by

3  the way, are different than revenues generated post petition;

4  we're talking about March forward revenues.

5          So I really just wanted to make the statement for

6  Your Honor, and for all to hear, that if we don't find a

7  consensual resolution, and we don't get through Monday,

8  expectably with a third interim order, then it's really

9  difficult to find a path forward.  And that's what the

10 Committee's focusing on.

11         Thank you, Your Honor.

12         And certainly, if you have any questions --

13         THE COURT:  Has the Committee been pushing the debtor

14 to explore DIP financing as an alternative?  Maybe the debtor

15 is not bankable at this point, I don't know, but --

16         MR. CORNWELL:  We've reviewed the budget, and we've

17 had the discussions.  Right now, the presented budget is a cash

18 flow positive or cash flow neutral budget.

19         So if we need DIP financing, certainly the position

20 of the Committee at this stage of the case is that would be

21 better than conversion.  But we hope to not need it, frankly,

22 Your Honor.

23         THE COURT:  I understand that.  I just -- you know,

24 when you hold the gun up to your head, and you say, "Be careful

25 or I'm going to pull the trigger," you know, there -- everybody

1 knows there are some other options out there that are

2 possibilities.

3 　　　　　MR. CORNWELL:  Yes, indeed.

4 　　　　　THE COURT:  Okay, all right.  Very good.

5 　　　　　MR. CORNWELL:  Thank you.

6 　　　　　THE COURT:  Thank you.

7 　　　　　All right, Ms. Riley, let's -- well, first of all,

8 any other objectors want to be heard today on the bifurcation

9 or anything that's been said about how we intend to proceed on

10 Monday?

11 　　　　　MR. RETHERFORD:  Your Honor, this is Jeremy

12 Retherford for the Pruet Group.

13 　　　　　We filed an objection to the motion for bifurcation.

14 I'm not going to repeat what's been said, but just to say we're

15 in support of that.

16 　　　　　I would make two practical pragmatic points:

17 　　　　　One that may have been made already, that being that

18 to the extent that it is later determined that this group of

19 working interest owners do, in fact, have ownership interests

20 in the cash that was held by the debtor as of the petition

21 date, our concern is that if we're set on the sideline, once

22 that determination is made, the money will have been spent.

23 And so to --

24 　　　　　THE COURT:  Okay.

25 　　　　　MR. RETHERFORD:  To the extent that that's where this

1  is heading, what we're looking for is concrete protection,

2  probably similar to what you would see in a DIP lending

3  situation, so that we know that that money is there if it, in

4  fact, has to be a tracing exercise to get to that point.

5        THE COURT: Let me --

6        MR. RETHERFORD: The second pragmatic point that --

7        THE COURT: Let me interrupt you just to address

8  that. The second interim order that Judge McNamara entered

9  that I saw does provide for, to the extent you have an

10 interest, it would be adequately protected through replacement

11 liens. I don't know if that's acceptable to working interest

12 holders, but at least to that extent, there is some protection.

13       MR. RETHERFORD: And I agree with that, Your Honor.

14 I guess I'm thinking more on a final cash collateral order. I

15 don't know that that's going to be sufficient given -- given

16 that this case is teetering, frankly, with respect to going

17 forward.

18       THE COURT: Okay.

19       MR. RETHERFORD: But the other point I would make,

20 the debtors have invited adversary proceedings to be filed to

21 resolve these issues. And, again, this is just a pragmatic

22 approach or a point, but you've got 14 some odd groups of

23 working interest owners that are actively filing objections.

24 There are hundreds of working interest owners, some large, some

25 small. And I've not done the legal analysis on this, but it

1  would seem that if that's the indication, that APS need to

2  address this point, all of those working interest owners would

3  need to be named as necessary parties.  And I think we can all

4  agree, from the Court's perspective and the lawyers'

5  perspective, what a nightmare that that would turn into.

6          THE COURT:  It certainly could, you're right.  Good

7  point.

8          Okay.  Anybody else besides Ms. Riley?  Or I will

9  turn it over to her.

10              (No audible response heard)

11          THE COURT:  Okay, Ms. Riley.

12          MS. RILEY:  So one of the points that I do want to

13  make very clear to all of the parties who are present at this

14  hearing today is that we hear these concerns, and we understand

15  where they're coming from, and we are working with the

16  Committee and with the bank to try to address some of these

17  concerns.  That's part of the reason why we are exploring this

18  avenue of appointing a CRO.  And it won't just be the debtor

19  appointing a CRO, it's going to be working in connection -- or

20  in conjunction with the Committee, and with the bank in a

21  collaborative process to find somebody that everyone can agree

22  to here so that hopefully we can, you know, start to resolve

23  some of these concerns, bring in a neutral party and, you know,

24  start to work to rebuild some of that credibility here.

25          But I think the comments that have been made today by

1  particularly Mr. Skelton, and echoed by a number of the other

2  working interest holders, as well, is we (indiscernible -

3  muffled) of why we need to have this bifurcation motion.

4  Because the issues that they are raising are that not only did

5  they have an interest in the post petition revenues, which we

6  acknowledge and, again, those revenues that came in on a post

7  petition basis from March are going to be paid under this next

8  third interim order.  But they're going one step further and

9  saying that all of the funds owned by the debtors, whether

10 it's, I think, in some circumstances SEC or Sklarco here,

11 should really be the property of the working interest holders,

12 and that that should continue until those January and February

13 revenues are paid in full, almost a kind of continuing trust

14 creation over the debtors' revenues wherever they're coming

15 from.

16       That, I think, is both ignoring the fact that Sklarco

17 does have an interest in some of these revenues that are going

18 to be used to pay some of these expenses going forward.  I

19 think it overlooks some of the funds coming in from hedging

20 agreements, and it overlooks the funds coming in from joint

21 interest billing.

22       And instead of basically saying that every penny that

23 these debtors have, whether it's either at the petition date or

24 thereafter, belongs to somebody else.  That is not a

25 determination that can or really should be made in the context

1  of the cash collateral hearing.  That is something that needs

2  to be decided in the context of an adversary proceeding in

3  accordance with 7001.  Do we want to have to go down that

4  route?  No, absolutely not.  We would much prefer to find a

5  consensual solution for everyone here.

6      But at this point, given that these issues are being

7  raised repeatedly with every single cash collateral hearing,

8  and every single cash collateral motion, or third interim

9  order, or second interim order, with whatever it may be, I

10  think there has to be a bifurcation here so that it's very

11  clear to all of the parties that what we are talking about

12  going forward is those clearly identifiable funds.  That the

13  post petition revenues for cash collateral purposes that are

14  going to be paid out, and that the issues with respect to

15  tracing, and identifying who owns what funds as of the petition

16  date will be heard through an adversary proceeding.

17      Some of the other issues that I want to address, as

18  well, I know there has been some questions about the checks

19  that didn't clear.  And we allege that there are a number of

20  checks that were outstanding as of the petition date, there

21  always are, they were caught up in the bankruptcy filing.

22  Those were likely from, at that point, probably the January

23  revenue, and the bank did what it was supposed to do.  When the

24  bankruptcy was filed, it cut off access and, you know,

25  disallowed checks that were issued on that account

1  (indiscernible - voice fading) petition date because that's --

2  those checks couldn't be drawn at that point without further

3  authorization by the Court.  So that's why we have this issue

4  of the checks not clearing.

5           But I think that starts to go to the same issue of,

6  you know, what interest did they have as of the petition date.

7  And then going forward, how should that be addressed.

8           Particularly given that cash collateral is this

9  summary proceeding, if we try to go through this tracing

10 exercise with every single working interest holder who has

11 raised an objection as of that date, number one, I don't think

12 that it advances the ball forward in terms of, you know, actual

13 cash collateral here.

14          But, number two, I think we're looking at more of a

15 four-day trial, and there should be discovery, there should be

16 an adversary proceeding filed, there should be an opportunity

17 for all of the various working interest holders to be heard

18 through that proceeding, and have their rights preserved here.

19          Neither issue that I addressed just briefly -- and it

20 goes to some of the other assertions with respect to the DIP

21 financing.  This is something that the debtor has explored.

22 They've been talking to potential finance parties, they've been

23 talking to, you know, strategic advisers about financing

24 options.

25          But from the debtors' perspective, we're still in a

1   situation where oil, even though -- when we started this case,

2   it was at $20 a barrel, and then it went to negative $37 a

3   barrel.  Now I think it's crept its way back up, but it's still

4   nowhere close to a point where any sort of financing company,

5   whether it's East-West Bank, not to put them on the spot here,

6   or any other company, is going to look at this very favorably

7   just given the uncertainty in the market, and everything that

8   has been going on between, you know, the war between Russia and

9   OPEC in terms of flooding the market with additional supply,

10  the decreased demand due to the COVID crisis, there's a lot of

11  factors going on here that could limit the debtors' ability to

12  get DIP financing, and certainly to get DIP financing on any

13  terms that I think any one of these parties would be

14  comfortable approving.

15       And we certainly recognize -- I'll just turn briefly

16  to the issues that have been raised with respect to the gas

17  plant -- that there is a dispute as to the management fee that

18  is being charged here.  We recognize that this goes to some of

19  the concerns, but that's not even an issue that I think this

20  Bankruptcy Court would have jurisdiction to hear.  That's

21  really more kind of the state of law issue, an issue that

22  should be addressed by, frankly, our oil and gas counsel down

23  in Alabama.

24       As it relates to the defaults, there is no default

25  under the agreement to purchase the Abbeville Gas Plant.  The

1  defaults were under the separate -- the gathering agreements

2  and the supply contract with Plains Gas and Marketing, so we

3  recognize that there's a motion pending to address those.

4        But I think, frankly, some of the allegations that

5  have been made by some of these working interest holders goes

6  far beyond what has actually occurred on -- and whether they

7  relate to prepetition issues that we acknowledge we have, but

8  that's what this bankruptcy case is intended to address over

9  time.  These aren't issues that can be corrected and fixed

10 overnight.

11       If this company had the ability to pay all of its

12 creditors in full, they never would have filed for bankruptcy,

13 but that's why we're here.

14       So, Your Honor, I do think that just given the fact

15 that these issues do keep on coming up with respect to the

16 ownership of the funds as of the petition date in the

17 prepetition revenues that (indiscernible - muffled) that's why

18 this motion to bifurcate is necessary so that we can isolate

19 cash collateral from those issues, and address those issues

20 through a proper proceeding.

21       THE COURT:  Thank you.

22       All right, I'm going to go ahead and rule on the

23 motion to bifurcate.  And it probably will be no surprise,

24 given my prior comments, that I'm going to deny the motion.

25       That doesn't mean I intend to have a full-blown

68

adversary proceeding trial on Monday on the working interest

holders' ownership of funds.  But I'm going to have at least

enough opportunity for them to present.  If, for example,

somebody has the designated amount set in the suspension

account just for them, or something similar, some way that they

can clearly trace, then I -- it would not be right for me not

to hear that at this time.

So -- but, again, it's just going to be a summary

ruling at the end of the day.  And so, you know, everybody's

rights are preserved for an adversary at a future time.

So that means Monday is -- it may very well take

longer than the day, so we'll make time as we need to to

accomplish this.

Tell me when the 341 meeting is actually at, what

time is that, Ms. Riley?

MS. RILEY:  Give me just a moment, Your Honor.

THE COURT:  Okay.

MS. RILEY:  It's at 1:30 p.m. on Monday.

THE COURT:  Okay.  So we'll plan our schedule on

Monday so that we can break at that time.  And I assume people

are going to want to have lunch at some point, so be prepared

to tell me at the start of the day on Monday how you want to

schedule in a lunch break, and time for the debtor to go do the

341.  Actually you're probably all doing it by video, aren't

you?  So --

1          MS. RILEY:  I think it's telephonic, Your Honor.

2          THE COURT:  Yeah.

3          MS. RILEY:  I'm not sure how that will work, but

4    we'll play it by ear.

5          THE COURT:  Okay.  So we will have to go through the

6    logging you into Zoom twice on Monday because you'll probably

7    be coming back after the 341.

8          Okay, what else?

9               (No audible response heard)

10         THE COURT:  Let's see.  So work on your stipulation

11   for exhibits, and let's go ahead and -- I didn't hear any

12   objection to addressing special counsel application, interim

13   payment motion, and Strago motion to assume or reject.  But

14   obviously those things will get pushed, you know, if we need

15   the time on the cash collateral motion and the critical vendor

16   motion, etc.

17         Ms. Riley?

18         MS. RILEY:  Your Honor, if I could just briefly

19   address the Strago motion to assume or reject.

20         THE COURT:  Okay.

21         MS. RILEY:  You know, I think we've agreed to a

22   shortened notice, but there still is a seven-day notice period

23   that's, I think, afforded.  And I believe that notice just went

24   out -- I want to say yesterday, but Mr. Paddock can correct me

25   if I'm wrong.

1      THE COURT:  So it's still under an objection period?

2  Because we --

3      MS. RILEY:  That's correct.

4      THE COURT:  Okay, that's fine.  I just knew we

5  already had the debtors' objection, so I assumed the objection

6  period had run.

7      You mean lawyers filed anything before the deadline?

8                    (Laughter)

9      THE COURT:  That's amazing.

10      MS. RILEY:  (Indiscernible - voice fading)

11  occasionally, Your Honor.

12      THE COURT:  Okay.  So we will definitely not be

13  hearing that, nor will we be hearing the crude oil supply

14  contract motion.

15      MS. RILEY:  Correct.

16      THE COURT:  Okay, all right.  Very good.

17      Oh, one last thing.  I did grant today the debtors'

18  motion to limit notice, which was unopposed.  So that means for

19  any of you who have not yet entered a general entry of

20  appearance, you probably should do that to make sure you get

21  future notices.

22      Okay, all right.  So we will see everybody on Zoom on

23  Monday at 9:30 a.m., okay.

24      Thank you, all.

25      MULTIPLE SPEAKERS:  Thank you, Your Honor.

```
1          THE COURT:  We'll stand in recess.

2          MULTIPLE SPEAKERS:  Thank you, Your Honor.

3          THE CLERK:  Court is now in recess.

4       (Whereupon, at 11:13 a.m., the hearing was adjourned.)

5

6                  CERTIFICATE OF TRANSCRIBER

7

8       I, KAREN HARTMANN, a certified Electronic Court

9   Transcriber, certify that the foregoing is a correct transcript

10  from the electronic sound recording of the proceedings in the

11  above-entitled matter.

12

13

14

15

16  Karen Hartmann, AAERT CET 475  Date:  May 10, 2020

17  TRANSCRIPTS PLUS, INC.

18

19

20

21

22

23

24

25
```