<span style="color:red">Exhibit RUD-D</span>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

```
IN RE:                          ) Case No. 1:20-bk-12377
                                ) (Jointly Administered)
SKLAR EXPLORATION COMPANY,      ) Chapter 11
LLC AND SKLARCO, LLC,           )
                                ) Courtroom F
                                ) U.S. Custom House
                                ) 721 19th Street
           Debtors.             ) Denver, Colorado 80202-2508
                                )
                                ) May 11, 2020
                                ) 9:33 a.m.
```

**TRANSCRIPT OF EVIDENTIARY HEARING ON: (1) DEBTORS' MOTION FOR
AUTHORITY TO USE CASH COLLATERAL (DKT. NO. 34); (2) DEBTORS'
MOTION FOR AUTHORITY TO PAY PRE-PETITION JOINT INTEREST BILLING
OBLIGATIONS AS CRITICAL VENDORS (DKT. NO. 41) AND (3) MOTION TO
HONOR AND PAY OVERRIDING ROYALTY, ROYALTY, AND WORKING
INTEREST OBLIGATIONS; AND OFFSET JOINT INTEREST BILLING
OBLIGATIONS (DKT. NO. 37); (4) DEBTORS' APPLICATION TO EMPLOY BERG
HILL GREENLEAF & RUSCITTI, LLP AS SPECIAL COUNSEL; (5) MOTION TO
APPROVE PAYMENT PROCEDURE FOR PROFESSIONAL FEES AND COSTS;
AND ALL OBJECTIONS THERETO
BEFORE HONORABLE ELIZABETH E. BROWN
UNITED STATES BANKRUPTCY JUDGE**

```
Transcript requested by:        J. BAIN, ESQ. (Jones Walker),
                                D. BRESCIA, ESQ. (Clark Hill),
                                T SHIPPS, ESQ. (Maynes Bradford),
                                and J. RETHERFORD, ESQ. Balch &
                                Bingham)
Requested on:                   Friday, May 15, 2020
Provided on:                    Monday, May 18, 2020
Cost of Transcript:             $997.35 (183 pgs @ $5.45/pg)
```

**TRANSCRIPTION SERVICE:**        **TRANSCRIPTS PLUS, INC.**
                                  **435 Riverview Circle**
                                  **New Hope, Pennsylvania 18938**
                                  **Telephone:  215-862-1115**
                                  **Facsimile: 215-862-6639**
                                  **e-mail CourtTranscripts@aol.com**

```
 Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.
```

2

APPEARANCES VIA ZOOM VIDEO CONFERENCE:


For the Debtors:                    Kutner Brinen P.C.
                                    By:  KERI L. RILEY, ESQ.
                                         LEE KUTNER, ESQ.
                                    1660 Lincoln Street
                                    Suite 1850
                                    Denver, CO 80264


For East-West Bank:                 Bryan Cave Leighton Paisner LLP
                                    By:  CRAIG K. SCHUENEMANN, ESQ.
                                         LYNN P. HENDRIX, ESQ.
                                    1700 Lincoln Street
                                    Suite 4100
                                    Denver, CO 80203


                                    Bryan Cave Leighton Paisner LLP
                                    By:  BRYCE SUZUKI, ESQ.
                                    Suite 2200
                                    Two North Central Avenue
                                    Phoenix, AZ 85004-4406


For the Creditors'                  Munsch Hardt Kopf & Harr PC
Committee:                          By:  CHRISTOPHER D. JOHNSON, ESQ.
                                         JOHN D. CORNWELL, ESQ.
                                         GRANT M. BEINER, ESQ.
                                    700 Milam Street
                                    Suite 2700
                                    Houston, TX 77002


For AEEC II, LLC, et al.:           Kean Miller
                                    By:  ERIC LOCKRIDGE, ESQ.
                                    400 Convention Street
                                    Suite 700
                                    Baton Rouge, LA 70802


For Baker Hughes:                   Foley & Lardner LLP
                                    By:  TIMOTHY C. MOHAN, ESQ.
                                    600 17th Street
                                    Suite 2020S
                                    Denver, CO 80202

3

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(continued)


For Bri-Chem Supply               Spencer Fane LLP
Corp., LLC:                       By:  DAVID M. MILLER, ESQ.
                                  1700 Lincoln Street
                                  Suite 2000
                                  Denver, CO 80203


For Fant Energy                   Willkie Farr & Gallagher LLP
Limited:                          By:  JENNIFER HARDY, ESQ.
                                  600 Travis Street
                                  Houston, TX 77002


For Fletcher Petroleum            Berger Singerman LLP
Company, LLC:                     By:  MICHAEL NILES, ESQ.
                                  313 N. Monroe Street
                                  Suite 301
                                  Tallahassee, FL 32301


Franks Exploration Company,       Cook, Yancey, King & Galloway
LLC, et al.:                      By:  JORDAN B. BIRD, ESQ.
                                  333 Texas Street
                                  Suite 1700
                                  Shreveport, LA 71101


For FPCC USA, Inc.:               Jones Walker LLP
                                  By:  JOSEPH ERIC BAIN, ESQ.
                                       AMY VAZQUEZ, ESQ.
                                  811 Main Street
                                  Suite 2900
                                  Houston, TX 77002


For JF Howell Interests,          Bradley Murchison Kelly & Shea
et al.:                           By:  DAVID R. TAGGART, ESQ.
                                  401 Edwards Street
                                  Suite 1000
                                  Shreveport, LA 71101

```
APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(continued)


For Kudzu Oil Properties,      Moye White
LLC, et al:                    By:  TIMOTHY M. SWANSON, ESQ.
                               1400 16th St.
                               6th Floor
                               Denver, CO 80202


                               Law Offices of Craig Geno
                               By:  CRAIG GENO, ESQ.
                               587 Highland Colony Parkway
                               Ridgeland, MS 39157

For Landmark Exploration,      Watkins & Eager PLLC
et al.:                        By:  JIM F. SPENCER, JR., ESQ.
                               P. O. Box 650
                               Jackson, MS 39205


For The Estate of             Buechler Law Offices
Pamela Page, Deceased,        By:  MICHAEL J. GUYERSON, ESQ.
et al.:                       999 18th Street
                              Suite 1230 South
                              Denver, CO 80202


For Lucas Petroleum:          Clark Hill Strasburger
                              By:  DUANE BRESCIA, ESQ.
                              720 Brazos
                              Suite 700
                              Austin, TX 78701


For PAR Minerals, et al.:     Copeland Cook Taylor & Bush
                              By:  CHRISTOPHER MEREDITH, ESQ.
                                   GLENN TAYLOR, ESQ.
                              1076 Highland Colony Parkway
                              Ridgeland, Mississippi 39157
```

5

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(continued)


For Pruet Oil Company,          Holland & Hart
LLC, et al.:                    By:  MATTHEW J. OCHS, ESQ.
                                555 17th Street
                                Suite 3200
                                Denver, CO 80202

                                Balch & Bingham
                                By:  JEREMY L. RETHERFORD, ESQ.
                                1901 Sixth Ave N
                                Suite 1500
                                Birmingham, AL 35203

For Strago Group,               Buck Keenan
et al.:                         By:  ROBERT L. PADDOCK, ESQ.
                                2229 San Felipe
                                Suite 1000
                                Houston, TX 77019

For Stoneham Drilling           Bradley Arant Boult Cummings LLP
Corporation:                    By:  JAMES B. BAILEY, ESQ.
                                1819 5th Ave. North
                                Birmingham, AL 35203

For Tauber, et al.:             Maynes, Bradford, Shipps
                                & Sheftel, LLP
                                By:  THOMAS H. SHIPPS, ESQ.
                                     SHAY L. DENNING, ESQ.
                                835 E. Second Avenue
                                P.O. Box 2717
                                Suite 123
                                Durango, CO 81301

                                Barnet B. Skelton, Jr., P.C.
                                By:  BARNET B. SKELTON, JR., ESQ.
                                815 Walker
                                Suite 1502
                                Houston, TX 77002


(ADDITIONAL ATTORNEYS MAY HAVE JOINED THE HEARING FOLLOWING THE
APPEARANCES BEING TAKEN BY THE COURT WITHOUT THE OPPORTUNITY TO
           PLACE THEIR APPEARANCE ON THE RECORD)

                         * * *

<u>INDEX</u>

<u>DEBTORS' WITNESSES</u>                                    <u>PAGE</u>

MARSHALL JONES

 Direct Examination by Ms. Riley                 50

 Cross-Examination by Mr. Bain                    66

 Cross-Examination by Mr. Skelton                 71

 Cross-Examination by Mr. Geno                    89

 Redirect Examination by Ms. Riley               97

 Further Cross-Examination by Mr. Shipps        103

JOHN STRAUSSER

 Direct Examination by Ms. Riley                111

 Cross-Examination by Mr. Skelton               137

 Cross-Examination by Mr. Shipps                161

 Examination by the Court                       164

 Cross-Examination by Mr. Bain                  165

 Cross-Examination by Mr. Geno                  168

 Redirect Examination by Ms. Riley              173

<u>DEBTORS' EXHIBITS</u>                                    <u>ID</u>   <u>EVID</u>

D-1   Sklar Exploration's SOFA and schedules   150   150

D-2   Sklarco's SOFA and schedules             150   150

D-4   Proposed Interim Budget (Dkt Number 271)  92    92

D-8   Statement (April, 2020/Revenue acct/SEC) 113   114

1   **(IN INSTANCES THERE IS WEAK BANDWIDTH, MUFFLED OR**

2   **FADING VOICES, AN INDISCERNIBLE RESULTED)**

3   THE COURT:  Good morning, all.  We are here in the

4   case of In Re Sklar Exploration Company, LLC, which I'll call

5   SEC, and Sklarco, LLC, which I'll just call Sklarco.  And

6   they're jointly administered under Case Number 20-12377.

7   And we're here on five different motions:

8   The final hearing on cash collateral;

9   And -- uh-oh, is this -- can you hear me okay,

10  Kerstin?

11  MS. CASS:  I can, yes.

12  THE COURT:  Okay.  Because I have a little mute

13  signal, so I wasn't sure.

14  All right.  So cash collateral;

15  SEC's motion to pay and offset;

16  Sklarco's motion to pay critical vendors;

17  Special counsel application;

18  And the motion for interim payments for DIP

19  attorneys.

20  All right.  Let's start with our entries of

21  appearance, and I'm going to ask for the debtor first.

22  MR. KUTNER:  Your Honor, Lee Kutner, also appearing

23  with Keri Riley on behalf of the debtor.  And Ms. Riley is

24  going to be taking the lead today, as she has in the prior

25  hearing.

```
 1              THE COURT:  All right, thank you, sir.

 2              And let's go next to the U.S. Trustee, do we have

 3   anybody?

 4                   (No audible response heard)

 5              THE COURT:  I know sometimes when there's an active

 6   Creditors' Committee, that they step aside and assume that

 7   those interests will be met that way.

 8              Let's try East-West Bank.

 9                   (No audible response heard)

10              THE COURT:  Anybody from the bank here today?

11              MR. SUZUKI:  Your Honor, I'm sorry, I had trouble

12   navigating my unmute button there.  Bryce Suzuki from the law

13   firm Bryan Cave Leighton Paisner.  And my colleagues Craig

14   Schuenemann and Lynn Hendrix are also on the line today.  Bank

15   representative Mary Lou Allen is also on the line today.

16              THE COURT:  Very good.  All right, the Creditors'

17   Committee?

18              MR. JOHNSON:  Good morning, Your Honor.  Chris

19   Johnson on behalf of the Committee.  I'm joined by my

20   colleagues John Cornwell and Grant Beiner, and I will be

21   handling the hearing this morning.

22              THE COURT:  Thank you.

23              All right, the Anderson parties?  Mr. Lockridge?

24              MR. LOCKRIDGE:  Good morning, I'm sorry.  This is

25   Eric Lockridge --
```

1          THE COURT:  Okay.

2          MR. LOCKRIDGE:  -- for the Anderson parties, for

3    Anderson Energy, AEEC II, PCP Cottonwood, and Sugar Oil

4    Properties.

5          And, Your Honor, to perhaps save a little time, is it

6    okay for folks if we simply say we're here today for those that

7    we were here for on Friday?

8          THE COURT:  No, I think that would drive court

9    reporters crazy.

10                         (Laughter)

11          MR. LOCKRIDGE:  Okay.

12          THE COURT:  Thank you, though.

13          All right, so Baker Hughes?

14          MR. MOHAN:  Good morning, Your Honor.  This is

15    Timothy Mohan, Foley & Lardner, LLP on behalf of Baker Hughes.

16          THE COURT:  Thank you.

17          MR. MOHAN:  Thank you.

18          THE COURT:  And Bri-Chem?

19          MR. MILLER:  Good morning --

20          THE COURT:  How about Mr. Miller?

21          MR. MILLER:  Good morning, Your Honor.  David Miller

22    appearing on behalf of Bri-Chem Supply Corp, LLC.

23          THE COURT:  Thank you.

24          Next is Fant Energy and its related parties.

25          MS. HARDY:  Good morning, Your Honor.  Jennifer Hardy

 1  of Willkie Farr on behalf of Fant Energy and also the JJS

 2  parties.

 3              THE COURT:  Okay; thank you.

 4              Fletcher Petroleum.

 5              MR. NILES:  Good morning, Your Honor.  This is

 6  Michael Niles from Berger Singerman representing Fletcher

 7  Petroleum Company, LLC, Fletcher Exploration, LLC, and Fletcher

 8  Petroleum Group.

 9              THE COURT:  Okay; thank you.

10              The Franks Exploration parties.

11              MR. BIRD:  Good morning, Judge.  This is Jordan Bird

12  appearing on behalf of Franks Exploration Company, LLC, Bundero

13  Investment Company, LLC, Kingston, LLC, AEH Investments, LLC,

14  J&A Harris LP, Hughes Oil South, LLC, KMR Investments, LLC, and

15  Tommy Youngblood.

16              THE COURT:  Thank you.

17              MR. BIRD:  You're welcome.

18              THE COURT:  Right.  And that takes us to FPCC USA.

19              MR. BAIN:  Good morning, Your Honor.  Joseph Bain of

20  the law firm of Jones Walker on behalf of FPCC USA.

21              THE COURT:  Thank you.

22              MR. BAIN:  And also on, just for the record, is Amy

23  Vazquez, my colleague, and William Hu, who's going to call in

24  from Taiwan, the representative from FPCC.

25              THE COURT:  All right; thank you.

1     MR. BAIN:  Thank you, Your Honor.

2     THE COURT:  JF Howell Interest.  Mr. Taggart?

3     MR. TAGGART:  Hi, can you hear me now, Judge?

4     THE COURT:  I sure can.

5     MR. TAGGART:  Good morning.  David Taggart on behalf

6  of JF Howell Interest, LP and my client representative, Mr.

7  Morgan.  David Morgan should also be on the line with us.

8     THE COURT:  Mr. Morgan, are you on the line?

9     MR. MORGAN:  Yes, I'm on the line.

10    THE COURT:  Okay; thank you.

11    MR. TAGGART:  Thank you.

12    THE COURT:  Well, Mr. Taggart looks like an airline

13 pilot today.

14    MULTIPLE SPEAKERS:  (Indiscernible).

15    THE COURT:  All right.  Hopping Green & Sams.

16          (No audible response heard)

17    THE COURT:  Do we have Mr. Riley?  Timothy Riley,

18 come on down.

19          (No audible response heard)

20    THE COURT:  Okay, I'm going to assume he's not here

21 today.

22    The Kudzu parties.

23    MR. SWANSON:  Good morning, Your Honor.  Tim Swanson

24 from the law firm of Moye White appearing on behalf of Kudzu

25 Oil Properties, LLC, Apple River Investments, LLC, Alabama Oil

1  Company.  Mr. Craig Geno from the Law Office of Craig M. Geno

2  PLLC out of Ridgeland, Mississippi is also on the line, along

3  with the client representative, Mr. Walker Sturdivant.

4       THE COURT:  Very good; thank you.

5       Mr. Sturdivant, you're on the line, as well, for one

6  of our witnesses?

7            (No audible response heard)

8       THE COURT:  Okay.   Landmark entities?

9       MR. SPENCER:  Good morning, Your Honor.  Jim Spencer

10  from the law firm of Watkins & Eager in Jackson, Mississippi on

11  behalf of the Landmark entities.

12       THE COURT:  Thank you.

13       All right.  Barbara Page Lawrence and the Estate of

14  Pamela Page.

15       MR. GUYERSON:  Your Honor, good morning.  Michael

16  Guyerson from the Buechler Law Offices for and on behalf of

17  Barbara Page Lawrence and the Estate of Pamela Page.

18       THE COURT:  All right; thank you.

19       Lucas Petroleum.

20       MR. BRESCIA:  Good morning, Your Honor.  This is

21  Duane Brescia with the law firm of Clark Hill Strasburger

22  representing Lucas Petroleum Group, Inc.

23       THE COURT:  Thank you.

24       PAR Minerals, et al.

25       MR. TAYLOR:  Good morning, Your Honor.  It's Glenn

1  Taylor with Christopher Meredith, we're with Copeland Cook

2  Taylor & Bush in Jackson, Mississippi.  We're representing

3  Eastern Fishing Tools, PAR Minerals, and Coastal Exploration.

4          THE COURT:  And who will -- will you be the one

5  speaking today?

6          MR. TAYLOR:  Your Honor, I hope not to say anything.

7                    (Laughter)

8          THE COURT:  Okay, that's something to aspire to.

9          But as between yourself and Mr. Meredith, who will

10 speak if someone does speak?

11         MR. TAYLOR:  Mr. Meredith.

12         THE COURT:  Okay, got it.

13         MR. TAYLOR:  He's the real bankruptcy lawyer.

14         THE COURT:  Okay.  And, Mr. Meredith, you're on the

15 line, right?

16         MR. MEREDITH:  Yes, Your Honor, I'm here.

17         THE COURT:  Okay; thank you.

18         All right.  Pruet Production?

19         MR. RETHERFORD:  Good morning, Your Honor.  Jeremy

20 Retherford, along with my co-counsel, Matt Ochs on behalf of

21 Pruet Oil Company, as well as Pruet Production Company, both in

22 its individual capacity and as agent and attorney in fact for

23 the working interest owners that were listed in our 2019

24 notice.  Along with me and Mr. Ochs is client representatives

25 Mr. Rich Calhoon for Pruet Oil Company, Mr. David Hilton of

1 Pruet Production, and Stan Kynerd, general counsel for Pruet

2 Production, and I will be taking the lead on speaking.

3          THE COURT:  Okay.  And how about RAPAD Well Service,

4 do you still represent them on this?

5          MR. RETHERFORD:  We do, Your Honor, but they are not

6 appearing for these purposes today.

7          THE COURT:  Got it, okay.

8          Strago Group.

9          MR. PADDOCK:  Good morning, Your Honor.  This is

10 Robert Paddock on behalf of Harvest Gas Management, GCREW

11 Properties, Meritage Energy, Gateway Exploration, and Strago

12 Energy, otherwise known as the Strago Group.

13          Also on the phone today are client representatives

14 John Aubrey and Louis Goza.  I will be speaking on behalf of

15 our group today.

16          THE COURT:  Excellent; thank you.  You're still

17 coming in a little bit soft, so I'm just letting you know.

18          MR. PADDOCK:  Okay; thank you.

19          THE COURT:  That's got to be awkward for you.

20          Stoneham Drilling.

21          MR. BAILEY:  Your Honor, James Bailey on behalf of

22 Stoneham Drilling Corporation, I'm with Bradley Arant Boult

23 Cummings.

24          Thank you.

25          THE COURT:   Thank you.

1          All right, and Tauber Group.

2                    (No audible response heard)

3          THE COURT:  Mr. Shipps?

4          MR. SHIPPS:  Good morning, Your Honor.  I had to

5     unmute.  I'm here this morning, along with Shay Denning, and

6     our firm of Maynes, Bradford, Shipps & Sheftel.  And along with

7     co-counsel, Barnet Skelton.  We're here this morning

8     representing Tauber Exploration & Production Company, CTM 2005

9     Limited, Pickens Financial Group, LLC, I & L Miss I, LP, the

10    Tara Rudman Revocable Trust, Feather River 75 LLC, Rudman

11    Family Trust, MER Energy Limited, MR Oil & Gas, LLC, and the

12    Rudman Partnership.

13         Also present, I understand, are Trey Sibley, and also

14    Mike Pickens, each representing entities of -- well, Mike

15    Pickens on behalf of Pickens Financial Group, LLC, and Mr.

16    Sibley on behalf of the Rudman Partnership.

17         There may also have -- we may have been joined by

18    some additional client representatives, but I didn't see them.

19         For purposes --

20         THE COURT:  Okay.

21         MR. SHIPPS:  For purposes of discussion, Your Honor,

22    if we could refer to the Tauber Group.  And also, while we

23    don't know exactly what's going to happen yet in the hearing,

24    probably Mr. Skelton will be the principal speaker, but there

25    may be some aspects of this where I will also want to

1  separately address the Court.

2           THE COURT:  Okay, just as long as you don't repeat

3  each other.

4           MR. SHIPPS:  Okay.

5           THE COURT:  Okay.  Anybody else that I haven't called

6  on that's on the line or that hasn't been mentioned already?

7                  (No audible response heard)

8           MR. STAUSSER:  John Strausser is on the line, Your

9  Honor, with the debtor.

10          THE COURT:  Okay; thank you.

11          Anybody else?

12          MR. JONES:  Also Marshall Jones with the debtor.

13          THE COURT:  Okay, thank you.  All right, it sounds

14 like that's everybody.

15          All right.  Ms. Riley, let's let you begin.

16          MS. RILEY:  Good morning, Your Honor.

17          First before we get into the merits of the various

18 motions, we do just want to provide the Court with just a brief

19 status update.  We did file a status report in the evening of

20 Friday to just provide kind of a general status update on where

21 we're at in terms of reaching agreement as to the various

22 motions that are pending.

23          With respect to the application to employ special

24 counsel and the motion to pay the joint interest billings for

25 Sklarco, we have agreed with East-West Bank and the Committee

1  that we would defer those, again, to a final cash collateral

2  hearing.

3         THE COURT:  Wait; this is our final cash collateral

4  hearing, so that's confusing to me.

5         MS. RILEY:  So -- all right, Your Honor, at this

6  point, we are asking that the Court enter the stayed interim

7  cash collateral order that the parties have reached an

8  agreement with.  And by "parties," I mean the Committee and the

9  bank.

10        THE COURT:  But you don't have that agreement with

11 your working -- all of your working interest holders, just some

12 of them now.

13        MS. RILEY:  That's correct, Your Honor.  Certain of

14 the working interest holders are still opposing the entry of

15 the third interim cash collateral order.  Namely --

16        THE COURT:  We're going to go forward today as a

17 contested hearing for final use of cash collateral -- for a

18 final order on use of cash collateral.

19        MS. RILEY:  Certainly, Your Honor.

20        With respect to the -- with respect to the interim

21 payment procedures, I'll just address that briefly, as well.

22 We do have an agreed order that we can file with the Court.

23 The only question there is how would the Court like us to

24 present that, whether we file a notice of filing agreed order,

25 or we can attach it to a non-contested certificate.  Just

1  however Your Honor would prefer to receive that.

2          THE COURT:  Let's see, our only objection was the

3  bank on that one, yes.  So you've got the bank's consent.

4          We pretty much use our standard order, which I'm sure

5  you're familiar with, but I'll be happy to see if there's

6  additional language that the bank wants that I'll put into

7  ours.  But as you know, we keep the 20 percent holdback until

8  the end of the case, and it's got to be every 120 days for fee

9  apps.  So if your agreement with the bank varies from those

10 terms, then that may be a problem for the Court.

11         So I'll be happy to look at it.  If you want to

12 submit it as submission -- you know, just do a pleading that

13 says "Submission of Proposed Order on XYZ," and that will do

14 it.  That would get it to us.

15         MS. RILEY:  Certainly, Your Honor.

16         THE COURT:  Okay, so that's good.  One thing off the

17 docket for today.

18         Okay, so let's -- do you want to make a brief opening

19 statement?

20         MS. RILEY:  Certainly, Your Honor.  And I would just

21 clarify for the Court that at this point, we don't have an

22 agreed form of the final cash collateral order.  This is

23 something that is still under negotiation with the bank and the

24 Committee.

25         We do have a proposed form of the third interim order

1  which, again, was filed with the Court on Friday, and it does

2  include certain additional protection.  I did just want to

3  clarify that for all of the parties, as well, as we are still

4  negotiating towards final adequate protection and things along

5  those lines.

6         THE COURT:  Okay.  So the bank's not willing to sign-

7  off on a final order, they're only willing to sign off -- and

8  the Committee -- on a third interim, that's what you're telling

9  me.

10        MS. RILEY:  That's correct, Your Honor.

11        THE COURT:  But with the other parties, you don't --

12  some of the other parties, you do not have any agreement.  So

13  this is awkward.  This is set to be a final hearing on cash

14  collateral, and if you get all the parties to agree to just do

15  an interim and keep pushing it down the road, I'm okay with

16  that.  But when you only have that agreement with a couple of

17  parties, that's a problem.

18        So this is our time set for a trial on final cash

19  collateral.  So I think all parties need to be willing to go

20  forward on that basis.

21        MS. RILEY:  Certainly, Your Honor.

22        THE COURT:  So with that in mind, would you like to

23  make any brief opening remarks?

24        MS. RILEY:  Yes, Your Honor.

25        THE COURT:  Okay.

1          MS. RILEY:  So with respect to the issues raised in

2    the cash collateral, the primary issues in the objections that

3    are raised by the working interest holders relates to the

4    question of whether or not they actually have an interest in

5    the debtors' cash that was on hand on the date of filing.  And

6    that also applies to the cash that was in, both, the revenue

7    account, the debtors' operating account, the benefits account,

8    the payroll account, and the account held by Sklarco.

9          The -- the main question to be decided is not

10   necessarily the nature and extent of their interest, but really

11   relates to are they adequately protected?  Because that is what

12   needs to ultimately be decided in the context of this cash

13   collateral hearing.

14          There is no question that two -- because of the joint

15   operating agreement defining the contractual relationship

16   between the parties, the working interest holders, the various

17   other parties that are part of these operated properties by

18   Sklar Exploration, that they may have an interest in some of

19   the funds, specifically those funds that are maintained in the

20   debtors' revenue account.  Those are where the funds from the

21   sale of oil and gas products are maintained, and that's where

22   they will continue to be maintained on a post petition basis.

23          However, the objections that have been raised go

24   beyond that and also start to address the question of whether

25   or not they have an interest in the cash based on the amount

1  that they were owed through prepetition unpaid revenues and

2  cash call advances.

3  　　　　The debtor does acknowledge that they received cash

4  call advances on a prepetition basis, specifically Sklar

5  Exploration, and that those funds were used in ongoing

6  operations, and the cash call advances no longer exist.

7  There's simply no funds there any longer.

8  　　　　There is also no question that the funds on hand in

9  the revenue account were insufficient as of the petition date

10  to satisfy all of the unpaid revenues due for the January and

11  February revenue.

12  　　　　On a post petition basis, the debtors believe -- and

13  the debtor -- and we believe that the evidence will show that

14  the working interest holders are adequately protected with

15  respect to their interest.  The budget that has been prepared

16  by the debtor establishes that Sklar Exploration can continue

17  to operate, and operate profitably, using only the funds that

18  it received for its joint interest billings, COPAS

19  reimbursements, payments from hedging agreements, and the

20  revenues from Sklarco, another one of the debtors in these

21  cases, and another entity in which the bank holds a lien in

22  substantially all of their assets.

23  　　　　The evidence will also show that the revenues that

24  had been received on a post petition basis are being maintained

25  in a separate revenue account, and will continue to be

1  maintained in the separate revenue account.  And that the

2  debtor is proposing to pay the revenue parties, specifically

3  the royalty interesting, overriding royalty interest, and

4  working interest for the revenues that were received on a post

5  petition basis.  That begins with the March sales that were

6  received in April, and going forward on a post petition basis,

7  as well.

8       Because the parties are adequately protected,

9  specifically, again, because those revenues are being

10  separately maintained, the balance of the revenue account is

11  not dropping below an amount that it was established at on a

12  prepetition basis, and because Sklar Exploration is not using

13  any of those revenue parties' funds, because they are

14  adequately protected and, therefore, we do believe that the

15  evidence will show that the debtors' use of cash collateral

16  should be permitted in accordance with Section 363 in this

17  case.

18       The use of cash collateral is vital in this case.

19  There is no question that without the use of cash collateral,

20  Sklar Exploration will not be able to continue maintain its

21  operation.  It will have to shut in its wells, and it will

22  cause irreparable harm to the debtors' estate, and to the

23  working interest holders and royalty interest holders, and

24  other revenue parties that are participating in this company.

25       The damage here would not just be for one company,

1    but to many.  And so we would ask that Your Honor authorize the

2    continued used of cash collateral for the debtors' ongoing

3    operations.

4         Thank you.

5         THE COURT:  Thank you.  So I take it we're going to

6    just do cash collateral first, but we know that the SEC's

7    motion to pay and offset is pretty intermingled, so do you have

8    any additional open on that motion?

9         MS. RILEY:  Your Honor, with respect to the motion to

10   pay the interest and authorize certain offsets, I'm just going

11   to refer to that one as the oil and gas motion for the purposes

12   of referring to our motion going forward.

13        THE COURT:  Okay.

14        MS. RILEY:  Again, that is for the intermingled with

15   the issues involved in the cash collateral.  The same request

16   that we're making with respect to that use of cash collateral

17   to pay the revenue parties, starting with the March revenue,

18   and going forward, is incorporated into the -- into that oil

19   and gas motion, and is what we're really requesting through

20   authorization of that oil and gas motion.

21        At this time, we have withdrawn our request at this

22   time, again, to pay those prepetition revenue interests,

23   specifically the January revenues and the February revenues,

24   and will be limited to post petition revenues in going forward.

25        We're -- with respect to the offsets, again, we are

RUD000171

1  just asking for authorization to offset in those limited

2  circumstances where either the joint operating agreements allow

3  us to do an offset as joint interest billings against revenue.

4  For instance, if somebody has failed to pay their joint

5  interest billings for several months, or in those limited

6  situations where parties have specific requested that the

7  debtor net their joint interest billings from the revenue on an

8  ongoing basis, and this is really just carrying those

9  agreements going forward.

10        THE COURT:  Okay.  Would it behoove us all to also

11  have everybody putting in evidence on Sklarco's critical vendor

12  motion at the same time?  Or does it make sense to you to keep

13  that separate?  So we hear testimony for the other two motions,

14  and save it on the third, or not?

15        MS. RILEY:  Your Honor, I think that one does need to

16  be deferred and saved for a later date, specifically because if

17  we can't use cash collateral going forward, then that would

18  impact our ability to pay those joint interest billings, as

19  well.

20        THE COURT:  Okay, that makes sense.  Okay, so knowing

21  that this is a final cash collateral hearing, does the bank

22  wish to make any opening remarks?

23        MR. SUZUKI:  Yes, Your Honor, I'll be very brief.

24        The motion is obviously a motion of the debtors.  At

25  this point, we are supportive of the motion.

1      The terms of a final order, obviously, will need to

2 be ironed out.  But the issues for this hearing, Your Honor, I

3 think are, as Ms. Riley pointed out, pretty straightforward.

4      What we have --

5      THE COURT:  Hang on a second, Mr. Suzuki, because

6 what I've just told Ms. Riley goes for you, as well.  You all

7 want to have a third interim order, and you're agreed on that.

8 But because other parties are not, we are treating this as a

9 final cash collateral hearing.

10      MR. SUZUKI:  Understood.

11      THE COURT:  So you should identify for me probably

12 what your issues are for this becoming a final cash collateral

13 order.

14      MR. SUZUKI:  Well, we're fine with it becoming a

15 final cash collateral order.  Are you -- let me clarify.

16      THE COURT:  Okay.

17      MR. SUZUKI:  Is Your Honor asking about whether the

18 third interim order should become the final cash collateral

19 order?

20      THE COURT:  Yes.  Are there additional provisions you

21 think you need for the final that you're not being offered with

22 the third interim?

23      MR. SUZUKI:  There are.  There are things like carve-

24 outs for professional fees, a review period for challenging the

25 bank's liens, potentially replacement liens being something

1 that I think the Committee and the debtor would need to weigh

2 in on.

3     I have circulated a final form of order to the

4 debtors and the Committee, and I understand that today is the

5 day for the hearing. We -- from the bank's perspective, we

6 would want those additional protections that are not in the

7 third interim order to be part of any final order.

8     THE COURT: Okay. I hope you appreciate that I can't

9 tell you that this is just going to be approval of a third

10 interim. Because unless everybody else gets in line, to use

11 any cash is in the views of the still opposing working interest

12 holders, is prohibited in their minds, so they're going to take

13 that position.

14     So I have to treat this as the final. So if you are

15 opposed to the third interim becoming the final, you've just

16 identified for me now what the issues are, but you should

17 probably -- I mean I'll let you, in closing, develop that

18 further and/or with any of the witnesses.

19     But just -- I don't want anybody having the mistaken

20 impression that at the end of the day, the only order I'm going

21 to sign is a third interim order because it doesn't look like

22 it will be.

23     MR. SUZUKI: Understood. And I think we can reserve

24 those issues for closing argument. As I understand the

25 evidence to be presented, the theory here is that the cash on

1 hand as of the petition date did not belong to the debtors.

2 And I think what Your Honor will see today through the

3 presentation of evidence is that the funds on hand were

4 commingled, that they were insufficient to pay the outstanding

5 amount of these asserted ownership claims, that the documents

6 that are going to be presented are largely unexecuted documents

7 that did not necessarily reflect title ownership by the working

8 interest holders, and that going forward, they will not be able

9 to trace specifically their interest in the minerals that were

10 extract, nor the proceeds that came therefrom.  And there seems

11 to be a backup argument of sorts that there is a lien in favor

12 of these folks.

13          Well, as Your Honor knows, you can't both own

14 something and have a lien in that same property, it's one or

15 the other.

16          And with respect to those lien rights, even if the

17 interest holders were able to somehow trace these proceeds,

18 that sort of stops when they become part of a bank account on

19 which the bank has a lien.  Because under Article 9, an

20 interest -- a perfected security interest in a deposit account

21 trumps an unperfected interest in that cash that were proceeds.

22          So where we're left, I think, Your Honor, is with the

23 cash collateral being the bank's cash collateral, and the cash

24 belonging to the debtor for use and operations.

25          And the alternative here really is that there's no

1　money left to operate and these cases simply fail, and I don't

2　think anyone really wants that.

3　　　　　THE COURT:  Okay; thank you.

4　　　　　MR. SUZUKI:  Thank you.

5　　　　　THE COURT:  All right.  Let's hear from the

6　Committee.

7　　　　　MR. JOHNSON:  Thank you, Your Honor.  Chris Johnson

8　on behalf of the Committee.

9　　　　　Your Honor, we're going forward with the, like you

10　said, the final cash collateral and the intertwined oil and gas

11　motion.  The Committee supports and has negotiated the debtors'

12　use of cash collateral.  There are provisions, you know, in the

13　interim that we feel need to be in whatever's the final,

14　specifically with respect to the debtors' agreement, subject to

15　a determination of the name of the individual and the scope of

16　his authority to the appointment of a CRO.  We understand the

17　Court's comments from the hearing last week, and want to come

18　to some type of consensual agreement on that, but that's going

19　to be important.

20　　　　　I'm sure we'll have an opportunity to work with Mr.

21　Suzuki, Ms. Riley, and Mr. Kutner on the terms of a proposed

22　final cash collateral order to quickly try to iron out those

23　remaining issues.  And if we can't iron them out, I'm sure the

24　Court's prepared to make the decision or ruling.

25　　　　　THE COURT:  Yeah, but you're going to have your lunch

1     hour today to finish this, I think.

2             MR. JOHNSON:  Thank you, Your Honor.

3                 (Laughter)

4             MR. JOHNSON:  No, I -- you know, this is, as I keep

5     telling people, we don't have the opportunity to meet in the

6     hallway, you know?  To get outside in front of the courtroom

7     and hammer out these, so we'll get it done.

8             The Committee does support the continued use of cash

9     collateral, and supports the opportunity of the working

10    interest owners to prove their interest in cash collateral.

11    The same with respect to the oil and gas motion, the Committee

12    supports the debtors' current version of the oil and gas

13    motion, or limited relief that they have stated on the record

14    that they are requesting.

15          With respect to the motion to pay joint interest

16    billings, and the motion to appoint special counsel, as Ms.

17    Riley has said, we had an agreement to continue that, and I

18    think the shorthand was to a final cash collateral hearing.

19    I'd request that the Court allow the parties the additional two

20    weeks that they thought they were going to get.  We believe

21    that we can resolve those two motions without taking up the

22    Court's time and the time of everyone else on this hearing

23    who's really not too interest in those other than the debtors,

24    the bank, and the Committee.  But we think that we had an

25    agreement to continue that for a short period of time.  And the

1    shorthand was simply the final cash collateral hearing, but

2    that was a phrase used to shorthand.

3            And if the Court would grant that to us, I believe

4    that we could resolve those two motions.

5            THE COURT:  Okay, all right; thank you.

6            The Anderson parties, are you still opposed to use of

7    cash collateral and the debtors' other motion that's here

8    today?  Mr. Lockridge?

9            MR. LOCKRIDGE:  Yes, Your Honor.  We support the

10   entry of the order of the oil and gas motion, and we were okay

11   with the form of the interim order of cash collateral.

12           So I'll -- for a moment, I'm just going to reserve my

13   position to see how the hearing transpires on this final order.

14           THE COURT:  Okay, very good; thank you.

15           All right, Baker Hughes?

16           MR. MOHAN:  Your Honor, I have nothing to add right

17   now.

18           THE COURT:  Okay, all right; thank you.

19           Bri-Chem?

20                   (No audible response heard)

21           THE COURT:  Bri-Chem?  Mr. Miller?

22           MR. MILLER:  Good morning, Your Honor; I'm sorry.

23   The mute button is something.

24           Your Honor, as far as cash collateral goes, you may

25   be aware, but right now there is no production coming from the

1    helium well, for which my client claims a lien.

2         However, it's expected that there will be future

3    production.  And we want to make sure that the debtor provides

4    appropriate adequate protection for my client once that

5    production starts.  We've made a demand on the debtor for the

6    name of any customers so we can perfect that lien on production

7    on Friday.  Both Stoneham, as well as Bri-Chem, filed a joint

8    supplemental statement that provided Your Honor with the

9    Montana statutory cites that reflect the lien on the debtors'

10   well, as well as the ability to have the lien reach out to

11   production.

12        So if there's going to --

13        THE COURT:  Thank you for that; we did receive it.

14        MR. MILLER:  Thank you, Your Honor.

15        But to the extent that there's going to be a final

16   cash collateral order today, my client's position is that that

17   should include appropriate protection to segregate any money

18   that would come in from the helium well for the benefit of my

19   client and its lien once we perfect it.  And we understand that

20   in order to perfect it, we do have to sort of notice on the

21   debtors' purchasers, and we will be relying on the debtor to

22   provide us with the name of those parties so we can perfect

23   that lien.

24        And I just want to make sure that appropriate

25   safeguards are put into place in the event that the Court

1    reaches a decision to have a final order on cash collateral

2    today, as opposed to denying use.  Which if you do, obviously

3    we're not going to -- there's no issue to resolve.

4         And if there's continued use, and everybody's rights

5    are preserved as they are right now as far as a lien priority

6    and the like, we're okay as long as the status quo is

7    maintained and nobody gets to use the funds that may emanate

8    from that well going forward without providing us with the

9    safeguards we're entitled to under Montana law and the

10   Bankruptcy Code, Judge.

11        THE COURT:  All right; thank you.

12        MR. MILLER:  Thank you, Your Honor.

13        THE COURT:  All right, Fant Energy?  Ms. Handy -- Ms.

14   Hardy?

15             (No audible response heard)

16        THE COURT:  Ms. Hardy?

17        MS. HARDY:  My apologies, Your Honor.  There's two

18   mute buttons, again, on the phone and the screen, so apologies.

19        Jennifer Hardy on behalf of the Fant parties and the

20   JJS parties.

21        Your Honor, our objection to the DIP was on a very

22   limited basis.  We were not seeking to prove that we had an

23   interest in the prepetition cash on hand, but to just ensure

24   that the working interest holders were not a lender on a going

25   forward basis.

1          Because of that, we did not object to the interim
2    order, the third interim order that's currently being presented
3    to the Court.  But if it was going to be turned into a final
4    order, we just want to ensure that it explicitly segregates
5    working interest revenues and requires that they be paid on a
6    go forward basis to ensure that the working interest holders
7    are not lenders on a go forward basis.
8          THE COURT:  Okay.  Ms. Hardy, if I have to appear
9    with my video of myself, you have to, as well.  And I believe I
10   have the same issue as Mr. Niles coming up for Fletcher
11   Petroleum.  So I'll let you both change your setting so that
12   you appear where we can see you.
13         MS. HARDY:  My apologies, Your Honor.  I had some
14   technical difficulties, but let me see if I can work through
15   them.
16         Thank you.
17         THE COURT:  Okay.  All right, in the meantime, let's
18   hear from Mr. Niles for Fletcher.
19         MR. NILES:  Yes, Your Honor.  And you should be able
20   to --
21         THE COURT:  I do have you now, good.
22         MR. NILES:  Wonderful.  This is Michael Niles for the
23   Fletcher Group.
24         We would voice the same concerns that -- we are just
25   concerned on a go forward basis that our clients are not

1  treated as lenders and that the revenues will be provided on a

2  go forward basis.

3           And to the extent that the third interim order does

4  turn into a final order, we would request that we are

5  identified as an objecting party so that my clients may also

6  have the similar rights.

7           THE COURT:  Okay, very good; thank you.

8           Let's see.  Franks Exploration.

9           MR. BIRD:  Judge, Jordan Bird on behalf of the Franks

10 Exploration.

11          We'd like to reserve our rights and listen to the

12 evidence at the hearing.

13          THE COURT:  So no opening statement really right now?

14          MR. BIRD:  No, Your Honor.

15          THE COURT:  Okay, that's fine.  So you haven't joined

16 on the third interim?

17          MR. BIRD:  No, we haven't.

18          THE COURT:  Okay, very good.

19          Okay.  FPCC, any opening remarks?

20          MR. BAIN:  Yes, Your Honor.

21          THE COURT:  Mr. Bain.

22          MR. BAIN:  My apologies, I was looking for the unmute

23 button.

24          Your Honor, just real briefly.  Our primary concern

25 in this case all along has been lack of transparency and lack

1   of essentially -- for a number of reasons, we have concerns

2   regarding the third interim, and the fact that the debtors --

3   the fact that today is going to be a final hearing, and all

4   that we have is a budget through May 31st, and I have not seen

5   any proposed form of final order raises a number of concerns

6   regarding the lack of transparency.  I don't know where this

7   case goes after May 31st.

8          And, quite frankly, with the way that this has been

9   teed up, my concern is that entry of the order that's been kind

10  of proposed so far essentially gives the debtor a blank check

11  because it can continue to use cash collateral, but we don't

12  know how they're going to use it.  And we don't know really

13  what their plans are for this.

14         And the other thing, Your Honor, without wanting to

15  belabor the point, with the lack of transparency, just to

16  highlight for Your Honor one concern that we have, we received

17  the amended witness and exhibit list yesterday.  And Debtors'

18  Exhibit Number 5 is the declaration of Howard Sklar, and they

19  haven't identified Howard Sklar as a witness.  And I believe

20  that it's going to be their primary source of evidence, and

21  it's just plain hearsay without him actually testifying.

22         THE COURT:  Okay, so you're going to object.

23         MR. BAIN:  We're absolutely going to object.

24         THE COURT:  Okay.

25         MR. BAIN:  So I just want to -- Your Honor, obviously

1   there'll be a time and a place to raise that objection but, you

2   know, just the big picture, it just kind of goes to a lack of

3   transparency. And I don't know why Howard Sklar isn't named as

4   a witness given all of the issues that have been raised.

5         THE COURT: Yeah, I'm a little curious as to why they

6   didn't think this was an important hearing today, as well.

7         So, okay, I'll listen to that objection when you

8   raise it.

9         MR. BAIN: Thank you, Your Honor.

10        THE COURT: Thank you.

11        All right, so let's go to JF Howell, Mr. Taggart?

12        MR. TAGGART: Yes, Your Honor, can you hear me?

13        THE COURT: I can, yup.

14        MR. TAGGART: Good morning, Your Honor.

15   (Indiscernible - weak bandwidth) on behalf of the JF Howell

16   Interests LP. My client is a working interest owners in many

17   of the projects of -- that Sklar Exploration operates across

18   various states.

19        We have looked at the schedule of material contracts

20   attached to the Schedule G filed by the debtors, a will be

21   offering the testimony of Mr. Morgan identifying those various

22   projects in which he holds a working interest.

23        Over the weekend, we did receive the third interim

24   proposed order and motion from Ms. Riley. I was able to

25   clarify with her this morning that my client's interests in

1   each of those projects that are on the current books and

2   records of Sklar Exploration are the same interests that they

3   would propose to pay on a post petition basis going forward.

4   And that my client's payments would be continued to be made by

5   direct deposit, as they have been prepetition.

6           With those clarifications and understandings, my

7   client was prepared to agree to the proposed third interim cash

8   collateral order, as well as the motion on the oil and gas

9   motion.

10          As far as going forward today, my evidence will be

11  Mr. Morgan and the evidence of their participation in those

12  various agreements.

13          THE COURT:  Okay; thank you.

14          The Kudzu parties?  Mr. Swanson?

15          MR. SWANSON:  Good morning, Your Honor, Tim Swanson

16  on behalf of the Kudzu parties.

17          We have not signed onto the third interim order, and

18  we intend to prosecute our objection this morning, and we'll

19  reserve our arguments as they arise throughout the day.

20          Thank you.

21          THE COURT:  Okay, all right; thank you.

22          All right, any opening remarks for Landmark entities,

23  Mr. Spencer?

24          MR. SPENCER:  Thank you, Your Honor.  Thank you, Your

25  Honor.  Jim Spencer for the Landmark entities.

1        We had contacted Ms. Riley and indicated our approval

2   with the third interim order that was circulated, I guess, on

3   Friday, and we are of the same today, although this is a little

4   different hearing now than the final cash collateral order.

5        So our objections still stand, and we have nothing to

6   offer.  We'll just listen, and we'll go along with whatever the

7   Court decides.

8        THE COURT:  Okay.  You know the more I'm listening

9   that you all -- you know, the fact that the budget only goes

10  through the end of May, I guess that means we're having a

11  contested evidentiary hearing on this third interim proposed

12  order.  Because if we don't even have anything of use of cash

13  collateral going months out down the road, there's really not

14  even a request to use it beyond May 31st.

15       So it's going to be an evidentiary hearing today, but

16  on a -- just for this month's use of cash collateral, which is

17  -- I don't know if that's a wise use of all of the resources of

18  you all, but that's where we are, I think.

19       Okay, so next is the Page Estate and Barbara

20  Lawrence.

21       MR. GUYERSON:  Your Honor, Michael Guyerson.

22       We continue to maintain our --

23       THE COURT:  Mr. Guyerson, you're very muffled.  Do

24  you have any way to have a --

25       MR. GUYERSON:  Is that any better?

```
 1                THE COURT:  Is there a microphone?  Well, your --
 2   your earphones are good for you hearing, but where's your --
 3   where is your microphone for speaking?
 4                MR. GUYERSON:  Is that better?
 5                THE COURT:  Nope.
 6                MR. GUYERSON:  It's not better?
 7                THE COURT:  Not really.
 8                MR. GUYERSON:  I apologize.
 9                THE COURT:  I'm just bringing it to you all's
10   attention because the court reporter let us know when she
11   transcribed Friday's hearing that there were several people
12   that were pretty inaudible.  So you all want to make sure your
13   good remarks are preserved on the record.
14                Try it again.
15                MR. GUYERSON:  (Indiscernible - muffled) Your Honor,
16   I'm going to go to my speaker from my computer.
17                THE COURT:  Okay.  Well, it's not that we can't hear,
18   it's that it's muffled.  It's like kind of -- yeah, I know.
19   Try it -- go ahead and we'll just have to go ahead the best we
20   can.
21                MR. GUYERSON:  Your Honor, (indiscernible - muffled)
22   as best I can (indiscernible).
23                My client simply maintain that the debtors holds
24   property that belongs to them, and that it needs to be carved
25   out from either interim or a final cash collateral.  Adequate
```

1  protection for my client is simply carving out their separate

2  property.

3          THE COURT:  Which is 60,000, is that right?

4          MR. GUYERSON:  $60,502.43 is what the debtor admits

5  it holds in suspense for the Estate of Pamela Page.

6          THE COURT:  Okay; thank you.

7          All right, so now Lucas.

8          MR. BRESCIA:  Good morning, again, Your Honor.  This

9  is Duane Brescia for Lucas Petroleum.

10          We were prepared today -- I have not -- I --

11  identified a response to Ms. Riley, but we do -- we're in a

12  position to agree to the third interim order.  We'll reserve

13  the balance of our argument if the order changes from anything

14  like that.

15          We maintain the position, as other working interest

16  owners, that the cash that they are collecting does not belong

17  to the estate, so it is somewhat inappropriately inside of a

18  budget that is to use cash collateral.  As long as they can

19  mark in a budget the receipt of those funds, and will agree to

20  pay those out, I think we'll be okay with those orders going

21  forward.

22          So we'll reserve the balance of our argument today

23  based upon the comments of other counsel with respect to it

24  seeing a final, and as that may be applied to the oil and gas

25  motion.

1          THE COURT:   Okay.  PAR Minerals, et al?

2          MR. MEREDITH:   Your Honor, Christopher Meredith.

3    We're -- don't have a position.   At this point, we're just

4    observing, if that's all right with the Court.

5          THE COURT:   Absolutely.

6          Okay, Pruet.

7          MR. RETHERFORD:   Your Honor, Jeremy Retherford for

8    the Pruet Group.

9          The Pruet Group continues to maintain that cash held

10   by the debtor, particularly in the revenue account on the

11   petition date, is not theirs, it is the working interest

12   owners'.

13         There was language that had been proposed in the

14   third interim order that at least satisfied our concerns, to

15   some extent.   And so we were agreeable to that.

16         We would reserve the right to see if that language

17   makes its way to the final order, and see how the day goes.

18         THE COURT:   Okay.  So you are okay with the third.

19   Because I'm --

20         MR. RETHERFORD:   That's correct, Your Honor.

21         THE COURT:   I'm kind of changing my mind on the fly,

22   I'll be honest about that with -- since I don't have a budget

23   going out further.   This -- what we may have is just a

24   contested hearing on the third interim.   So you won't be doing

25   any cross-examining of witnesses or putting on your own

1  testimony for that.

2          MR. RETHERFORD:  We don't plan to at this point.

3          THE COURT:  Okay; very good.

4          All right, Strago?

5          MR. PADDOCK:  Good morning, Your Honor.  Robert

6  Paddock on behalf of the Strago parties.

7          We would echo the concerns of the working interest

8  owners, and obviously the concern that the Court just raised,

9  that we saw today as a final hearing because that's what it was

10  scheduled on the docket.  And when we saw the proposed budget

11  didn't go out till -- past May 31st, 2020, you know, we just

12  don't know how this debtor is going to get use of cash

13  collateral on a final hearing today.  But that's what was set

14  for the hearing.

15          We will reserve any further arguments as we see how

16  the evidence develops.

17          THE COURT:  Are you okay with the terms of the third

18  interim???

19          MR. PADDOCK:  We are okay with the terms of the third

20  interim, and we do have concerns that have been voiced by other

21  working interest owners with respect to ownership of that cash.

22  But if it was just -- if it was just an interim, we don't have

23  a concern right now.  But I don't know what the evidence is

24  going to be.

25          THE COURT:  Okay, fair enough; thank you.

 1          I'm trying to identify anybody who's going to oppose

 2     this, and I know I have Kudzu so far, and FPCC, and I think

 3     that that is really it so far.

 4          Okay, so now I'm up to Tauber Group.  Mr. Skelton?

 5          MR. SKELTON:  Can you hear me now?

 6          THE COURT:  Now I can.

 7          MR. SKELTON:  Okay.  Judge, back on May 1st, Judge

 8     McNamara signed an order at Docket 210, Paragraph 13, setting

 9     this case -- this motion for a final hearing today.  No motion

10     to continue was filed.  It is continued to be shown on your

11     calendar as a final hearing.

12          And imagine our surprise that the debtor is

13     unprepared to go forward on the motion that everybody has known

14     has been set for this date.

15          This is very disturbing for a number of reasons.  The

16     debtors' counsel seem to believe that they can just send out an

17     interim -- proposed interim order and -- without hearing people

18     withdraw their objections, arrogate to themselves the authority

19     to declare that this is really just an interim.  Well, it's

20     not.

21          THE COURT:  Well, let me stop you there, Mr. Skelton,

22     because if your clients are opposed to this third interim

23     order, we're having an evidentiary hearing on that today.  And

24     I know you've been around the block long enough to know that

25     debtors do interims to try to resolve issues over, and over,

1  and over again.  That kind of flexibility is built into the

2  very fabric of Chapter 11.

3         But I am not going to treat this as just interim, to

4  the extent anybody's rights are going to be impaired by the

5  third interim.  So let me know where you stand on that.

6         MR. SKELTON:  Okay.  We're opposed to the interim.

7         THE COURT:  Okay.

8         MR. SKELTON:  And we also believe that the problem is

9  not having a budget that goes out, you know, like you would

10  expect for a final.

11         There is a real problem that's coming, and that is

12  because oil prices have gone down so much, that the money that

13  will be coming in in the future is going to be far less.  So

14  the so-called adequate protection is problematic.

15         And, frankly, we just don't believe this case has

16  much of a shelf life.  And just doing an interim is a band aid

17  solution that doesn't address what's coming around the bench,

18  which is much lower revenues because of the prices.  And the

19  only solace we get out of this proposal is that the debtor

20  promises that it's not going to use our money, and yet in Ms.

21  Riley's pleadings, she has stated more than once that our money

22  is essential for the SEC's working capital.

23         So we're opposed, and also agree with Mr. Bain that

24  it's shocking that Mr. Sklar is not here, that declaration is

25  hearsay, although I can understand why the debtor might not

 1 want him to be here, but nonetheless.  So we are opposed to the

 2 relief.

 3          THE COURT:  Okay; thank you.

 4          Okay, I think that's everybody then.  So I would

 5 expect then as we take witnesses, I'm only going to be hearing

 6 -- I want to confirm that I have this right, that I'm only

 7 going to be hearing people -- examine witnesses from the

 8 debtor, the bank -- I don't know about the Committee.

 9          Then I'm going to go down to FPCC.  I'm not sure

10 about Howell, whether -- I think they were not sure, so I'll

11 reserve the right for JF Howell to examine.  Kudzu, and Tauber.

12          Are there any other former objectors that if this is

13 treated as an approval of the third interim only, that you will

14 expect to be able to examine witnesses.  Anybody beside debtor,

15 bank, FPCC, maybe JF Howell, Kudzu, and Tauber?

16          MR. TAGGART:  Your Honor, this is David Taggart.  If

17 the hearing today is considered an evidentiary hearing on the

18 proposed third interim order, then we are okay with that, and

19 we would not be examining witness if it's just on the third

20 proposed interim order.

21          THE COURT:  Okay.  Thank you for that clarification.

22          Anybody else?

23              (No audible response heard)

24          THE COURT:  Okay.

25          MR. BAILEY:  Your Honor?

```
 1              THE COURT:  Yes?
 2              MR. BAILEY:  James Bailey on behalf of Stoneham
 3   Drilling.  And I'm sorry, I don't think I was called in the --
 4   going down for opening.
 5              THE COURT:  Oh, I'm sorry about that, okay.  Tell me
 6   about Stoneham.
 7              MR. BAILEY:  Sure, Your Honor.  And I don't want to
 8   repeat what Bri-Chem stated.  We're similarly situated, and
 9   provided the notice of -- regarding the Montana law.
10              Your Honor, I would note one thing:  We are in
11   agreement on the third interim, we're fine with the third
12   interim.  If we're going to final, and Your Honor needs
13   evidence regarding the asserted lien rights or anything like
14   that, then I'd just like to reserve the right to present that.
15   But at Your Honor's request, I circulated our lien filing.
16   It's not the recorded version, but it was the version that went
17   to the Phillips County recorder.  I didn't hear any objections
18   on that, but if anybody's going to raise one, I'd like the
19   opportunity to get a corporate record, if necessary.  I don't
20   believe it's necessary, but I just wanted to preview that, Your
21   Honor.
22              THE COURT:  Thank you.  I'm sorry I skipped you, and
23   you're -- okay.  So I've registered you as okay with the third
24   interim.
25              MR. BAILEY:  Thank you, Your Honor.
```

1          Okay, does anybody want the ability to be called on

2   to examine witnesses today beyond debtor, bank, FPCC, Kudzu,

3   and Tauber?

4          MR. BAIN:  Your Honor, if I may, this is Joseph Bain

5   on behalf of FPCC.

6          When I made my initial remarks, we were looking at a

7   final order, so if I may supplement just for two seconds --

8          THE COURT:  Okay.

9          MR. BAIN:  -- and kind of tell you where we are.

10         THE COURT:  All right.

11         MR. BAIN:  Your Honor, obviously our concerns are

12  more systemic than they are focused on the third interim.  I

13  would suggest that perhaps it may make sense to have the

14  debtors put on their evidence, and then possibly take a short

15  recess to see if we can get our concerns addressed in the third

16  interim, and that may short circuit --

17         THE COURT:  I'm happy to take breaks along the way

18  where it would help the parties.  But if you're anticipating

19  they're going to put on all their witnesses, and then you

20  caucus, and then you decide whether you're going to examine any

21  of those witnesses, that is not going to work for me.  So --

22         UNIDENTIFIED ATTORNEY:  And, Your Honor, maybe --

23  and, again, I'm thinking out loud, a little bit, as well, just

24  given where -- how things have transpired this morning.

25  Possibly if we have a supplemental from the debtors as to how

1  they want to proceed on this basis because when debtors'

2  counsel initially announced there was certainly -- I would just

3  like to hear from them how they propose to use this time with

4  Your Honor, and then perhaps a recess after that point to let

5  us --

6          THE COURT:  Well, I can tell you right now that what

7  we're going to do is we're going to take the debtors' first

8  witness.  And if that is simply a proffer of the declaration of

9  Mr. Sklar, then I'm going to hear the objections to that, and

10  rule on it.

11          Then they're going to offer their next witness.  And

12  anybody who wants to examine that witness who's opposed to the

13  third interim order is going to have an opportunity to do so,

14  just like any trial, so that's how we'll proceed.

15          Now if you all want to take a break at some point

16  because you think there's a chance for more consensual

17  arrangements, I'm willing to do modest breaks.  But this is the

18  time set aside for our trial, so I'm not going to let you have

19  hours to do that, so --

20          UNIDENTIFIED ATTORNEY:  Very good, thank you, Your

21  Honor; that's all.

22          THE COURT:  Okay, thank you.

23          All right, Ms. Riley, would you please call your

24  first witness?

25          MS. RILEY:  Certainly, Your Honor.  And just -- I

1  know I'm going a little bit out of order here, but just to give

2  some additional information to the Court as far as exhibits.

3  We have stipulated to the authenticity of all of the exhibits

4  that have been designated today.

5      We are also stipulating to the admissibility of all

6  the joint operating agreements and unit operating agreements

7  that have been designated today.

8      We are reserving all of our remaining objections,

9  including particularly relevancy objections.

10     THE COURT:  Okay.  So for me to take the stip, I've

11  got to know -- and maybe we do this -- you give me a list on

12  the break, you know, that it's -- we can't just to A, B, C, D

13  because there are so many different parties.  So we need their

14  initials, plus Exhibit 1, 2, 3, whatever it is.

15     MS. RILEY:  And, Your Honor, I think that that may

16  have shifted some just because certain parties are no longer

17  planning to present evidence.

18     THE COURT:  Correct.

19     MS. RILEY:  So, you know, I think as -- once we get

20  to a break, we can provide that list now that we've narrowed

21  down who exactly is intending to present evidence.

22     THE COURT:  Well, maybe we just do it as we go along.

23     MS. RILEY:  Certainly, Your Honor.

24     THE COURT:  Since it's not so many parties anymore.

25     Okay, all right.  So call your first witness, please.

Jones - Direct/Riley                                    50

1          MS. RILEY:  All right.  Your Honor, the debtor would
2     call Marshall Jones the COO.
3          THE COURT:  Okay.  Mr. Jones, please come forward and
4     be sworn by the Court's clerk.
5          Ms. Cass, if you will swear him in.
6          MS. CASS:  Raise your right hand.
7          MARSHALL JONES, DEBTORS' WITNESS, SWORN
8          THE COURT:  Please state your name for the record.
9          THE WITNESS:  My name is Marshall Jones.
10         THE COURT:  All right.  And your address?  Work
11    address?
12         THE WITNESS:  5395 Pearl Parkway, Boulder, Colorado.
13         THE COURT:  Thank you.
14         THE WITNESS:  80301.
15         THE COURT:  All right.  Go ahead, Ms. Riley.
16                    DIRECT EXAMINATION
17    BY MS. RILEY:
18    Q    So, Mr. Jones, do you currently work for the debtors?
19    A    I do.
20    Q    What is your position?
21    A    I am currently the Vice President and Chief Operating
22    Officer.
23    Q    And what are your job duties as the Chief Operating
24    Officer?
25    A    I help manage day-to-day operations for the companies.

1  Q    How long have you been working for the debtors?

2  A    For 15 years.  Nearly 15 years in July.

3  Q    During those 15 years, have you always been the COO?

4  A    No, I have not.

5  Q    What was your position prior to becoming the COO of the

6  company?

7  A    When I joined the company in 2005, I joined as petroleum

8  landman.  And I worked as a landman for years, managing the

9  Alabama prospects.  And over the years, I had roles as senior

10 landman or a land manager, and I also had the title of Vice

11 President of Business Development prior to being the Chief

12 Operating Officer.

13 Q    What did you do as a landman?

14 A    Well, as far as the Alabama properties, when I worked to

15 manage those, I put together all the leasehold, or managed

16 brokers that put together all the leasehold, I managed the

17 title -- abstracting title, making sure the (indiscernible -

18 muffled) went in on time before we drilled any wells.

19 Q    And what were some of your job duties as the Vice

20 President of Business Development?

21 A    Well, it was -- it was a lot of relationship-building with

22 some of the people on this call.  Also I helped screen deals

23 and bring -- bring new exploratory deals to the table, and

24 helped in any aspect I could as far, you know, growing the

25 company.

1  Q    Now are you familiar with Sklarco's operations, as well as

2  Sklar Exploration's operations?

3  A    I am.

4  Q    And what does Sklarco do?

5  A    Sklarco is the working interest owner in our operated

6  properties and our non-operated properties.  We also the title

7  holder in all of our leasehold.

8  Q    Now when you say operated properties, what do you mean by

9  that?

10  A    Sklar Exploration, our operating company, is the operator

11  of the oil and gas properties in which Sklarco has the working

12  interest.

13  Q    And what do you mean by non-operated property?

14  A    A third party is an operator.  We just have an interest in

15  those properties.

16  Q    What does Sklar Exploration do as the operator of these

17  properties?

18  A    We actively manage the processes of drilling, and

19  completing, and producing oil and gas wells, and associated

20  assets, including pipelines and gas facilities, and surface

21  equipment.  We have got a staff of geologists and

22  geophysicists, and a land staff, and accounting staff, and an

23  engineering staff to help facilitate all that.

24  Q    Where are Sklar Exploration's operated properties located?

25  A    The majority of them are in the gulf coast states, in

Jones - Direct/Riley                    53

1  Texas, Louisiana, Mississippi, Alabama, and Florida.  And we

2  have newer properties in the states of Wyoming and Montana.

3  Q    Are the properties in Montana currently producing?

4  A    They are not.

5  Q    And what are the -- what's the nature of the properties

6  located in Montana?

7  A    It's an exploratory helium well.

8  Q    And with respect to the Wyoming wells, are those currently

9  producing?

10 A    No, actually, they're not.  They are waiting to be

11 (indiscernible - muffled) abandoned.  They are very marginally

12 (indiscernible).

13 Q    Now as the operator -- well, what does -- is Sklar

14 Exploration responsible for maintaining insurance on all of the

15 operated properties?

16 A    Yes.

17 Q    And what kind of insurance do they maintain?

18 A    Standard (indiscernible - muffled) comprehensive

19 insurance, and worker's comp, and liability, well control, all

20 of the -- full coverages customary in oil and gas operations.

21 Q    Does Sklar Exploration own an interest in any of its

22 operated or oil and gas properties?

23 A    No, it does not.

24 Q    Now you mentioned that Sklarco does, approximately what

25 percentage does Sklarco own in these properties?

Jones - Direct/Riley                                54

1  A    Sklarco usually owns between ten percent and 30 percent,
2  depending on what property we're talking about.
3  Q    Are there other parties who own an interest in the
4  properties owned by -- or operated by Sklar Exploration?
5  A    Yes.
6  Q    What are the nature of those interests?
7  A    We have working interest, and we have royalty interest,
8  and override royalty interest in various properties.
9  Q    And what does it mean to be a royalty interest holder?
10 A    That is the interest of production, it's a cost-free
11 interest in the well and production, and usually reserved for
12 the mineral interest or the landowner, they don't pay the
13 bills.  They go to the mailbox and pick up a check.
14 Q    How does that differ from, for instance, a working
15 interest holder?
16 A    The working interest is an interest that bears the cost of
17 drilling, and completing, and -- in producing and operating the
18 wells.
19 Q    Now with respect to the non-operated properties that
20 Sklarco has an interest in, approximately what percentage does
21 it have in those properties?
22 A    Across the board (indiscernible - muffled) 20 percent.
23 The Sklars have been in the business for a long time, and they
24 have legacy properties all over the country.  And some of them
25 vary for very -- very small interest up to, you know, 20

Jones - Direct/Riley                                    55

1  percent probably.

2  Q    With respect to the operated properties, does -- which

3  entity is responsible for selling the oil and gas that's

4  produced?

5  A    Sklar Exploration.

6  Q    Is all of the oil and gas sold to the same purchaser?

7  A    No, it is not.  It's various purchasers throughout the

8  country.

9  Q    So for instance, for the operated properties in Alabama,

10 who generally purchases that produced oil and gas?

11 A    The majority of our crude barrels goes to two refineries:

12 Goodway Refining in Atmore, Alabama, and Shell Refinery in

13 Saraland, Alabama outside Mobile.

14        And the associated gas to those oil wells in Alabama

15 are sold to the Southeast Alabama Gas District through our

16 gathering lines.

17 Q    What about the properties located in Louisiana?

18 A    We have a couple of first purchasers for our natural gas

19 wells in Louisiana: GEP Haynesville is one of them, Texla

20 Energy is another --

21        THE COURT:  Can you go a little more slowly when

22 you're raffling off names?

23        THE WITNESS:  Certainly.

24        THE COURT:  So GEP?

25        THE WITNESS:  So GEP Haynesville is a -- is a natural

Jones - Direct/Riley                                      56

1  gas purchaser --

2            THE COURT:  Okay.

3            THE WITNESS:  -- Northwest Louisiana, as well as

4  Texla Energy.

5            THE COURT:  Thank you.

6  BY MS. RILEY:

7  Q    And what about the wells operated in Texas, where is that

8  oil and where is that oil and gas sold?

9  A    Plains Marketing, a subsidiary of Plains All America, it

10 picks up our oil and purchases our oil in Texas, Mississippi,

11 and Alabama, as well.

12 Q    When SEC is selling its oil and gas products, how is it

13 transported to the purchaser?

14 A    All of our crude barrels are trucked to refineries.  We

15 don't have any oil pipelines in place, so all of our production

16 -- oil production is trucked mainly by Plains Marketing.

17            The natural gas is transported through various

18 pipelines and gathering systems.

19 Q    At the time of transporting all of its product to the

20 purchaser, is any of the oil and gas separated out by well?

21 A    Not physically, no.

22 Q    Now you say "not physically," what do you mean by that?

23 A    If a truck comes and picks up, you know, 100 barrels from

24 one well, and it goes down the road and picks up another load,

25 if you will, those -- those barrels are not separated at that

Jones - Direct/Riley                                    57

1    point in time.  When they are delivered to the refinery, they

2    are commingled.

3    Q    Does Sklar Exploration track its production?

4    A    Yes, daily.

5    Q    And how is that production tracked?

6    A    Through tank gauges on individual oil wells, we have

7    sophisticated software that keeps track of those gauges and the

8    level of capacity in those tanks on each well site.

9         And then we have what you call EFMs, electric flow

10   meters, that gauge the natural gas at our gas well.

11   Q    And what is that daily production used for in terms of

12   tracking?

13   A    To track the daily production on a day-to-day basis, the

14   checks and balances, if you will.

15   Q    And does Sklar Exploration maintain records as to how much

16   production is produced by each well, or is it all grouped

17   together?

18   A    Yes, we do.

19        THE COURT:  That was an either or.  What are you

20   saying yes to?

21        THE WITNESS:  We do track for each property our daily

22   production.

23   BY MS. RILEY:

24   Q    Now prior to the bankruptcy filing, had Sklar Exploration

25   started any exploratory operations?

1   A    Yes, we did.  We were currently in three exploratory

2   projects.

3   Q    And where are those exploratory projects located?

4   A    Mississippi, Alabama, and Montana.

5   Q    And I'm just going to ask if you could just make sure that

6   you're speaking close to the computer when you're answering so

7   we can all hear the question -- or hear the answer.

8   A    I'm sorry.

9   Q    When an exploratory operation is undertaken, how does

10  Sklar Exploration fund those operations?

11  A    Through cash call advances to working interest owners.

12  Q    What is a cash call advance?

13  A    It is a prebill on an AFE that we propose to the working

14  interest owners for an estimated cost associated with that

15  proposal, whether it's a drilling of the wells, or a workover,

16  or building of a pipeline or whatever the operation may be.

17  Q    Were cash call advances issued with respect to the

18  exploratory prospects?

19  A    Yes, they were.

20  Q    Approximately when were those cash calls requested?

21  A    Beginning -- or the end of last year, beginning of this

22  year.

23  Q    When a cash call advance is requested, where are those

24  funds deposited?

25  A    In Sklar Exploration's operating account.

Jones - Direct/Riley                                    59

1  Q     Prior to the bankruptcy case, do you know approximately

2  how much was received for cash call advances?

3  A     Approximately $7 million.

4  Q     And what were those funds used for?

5  A     Well, they went into the Sklar operating account to be

6  used for ongoing operations, and to pay bills.

7  Q     Now for the Montana exploratory prospect, had work

8  commenced as far as drilling for the Montana prospect?

9  A     Yes, we had drilled the well to TD and were in the middle

10 of the completion.  When the COVID-19 shelter in place hit

11 Montana, the governor implemented a shelter in place, and we

12 were a week away from finishing the completion.

13 Q     And I'm sure there's a lot of people more familiar with

14 oil and gas terms than me on this call, but if you could just

15 explain to us what it means to be drilled to TD.

16 A     That's total depth.  It's your total footage that you

17 drill out to to (indiscernible - muffled) pay zones that you're

18 exploring for.

19 Q     Approximately how much additional work would be required

20 to complete the Montana operation?

21 A     Probably a week or two, I would imagine.  They have to

22 drill the (indiscernible - muffled) out, and run tubing, and

23 preparate the pay zone, and possibly acidize to get a good flow

24 test, and we would hope to fully test the well for a few weeks

25 if there's helium.

1  Q    And once that well is completed, would that well be able

2  to be brought online?

3  A    Not in a rapid manner.  Helium is a little bit different

4  than any other oil and gas well.  You have to build a -- a

5  special facility -- processing facility to capture the helium

6  because it's -- as everybody knows, helium's a very escapable

7  gas.  And there's only a select few people in the industry that

8  build those facilities.  So we have been told that it could be

9  anywhere from six months to a year to bring that well online.

10 Q    Now turning to the Mississippi exploratory prospect, had

11 any work commenced on the Mississippi prospect?

12 A    Yes, everything leading up to the actual drilling of the

13 well or receiving the rig to start the drilling operations was

14 completed.  The -- the -- you know, permitted, surveyed,

15 permitted, build the location, did all the regulatory work.

16 The rig was days away from moving in until the catastrophic

17 downturn in the market.  But, yes, we were well on our way to

18 to start drilling.

19 Q    And what about the Alabama prospect?

20 A    Same with it.  We had two rigs basically moving in, or

21 about to move in around the same time, prior to the

22 catastrophic downturn in oil price.  Again, in Alabama we built

23 the location, had all the regulatory and title work done and

24 just, you know, waiting to sign the drilling contract for the

25 drilling rig (indiscernible - muffled).

1  Q    Were there any other project or prospects the SEC --

2  excuse me -- Sklar Exploration had requested cash call advances

3  for?

4  A    Yes.  One of the bigger ones was a three and a half mile

5  pipeline in Santa Rosa County, Florida to bring a smackover

6  sour oil well online.  We need a pipeline to transport the sour

7  gas to Jay Field in order to produce the oil because the State

8  of Florida will not let you produce or flare sour gas for very

9  long, so we needed a place to take the gas.  We had, you know,

10 done all the surveys for the pipeline, we had engaged

11 landowners to buy right-of-ways, we had started the permitting

12 process and regulatory process, ordered pipe, but still it's a

13 long process and we're probably six months from -- six to nine

14 months from completing that, depending on, you know, how this

15 COVID-19 transpires down in Florida.

16 Q    Now on some of these exploratory projects, if the prospect

17 is -- doesn't result in a producing well, for instance, a dry

18 hole, are any of the cash call advances refunded?

19 A    No.

20 Q    And at any point, can -- or does SEC ever refund a cash

21 call advance in the middle of one of these operations?

22 A    No, we do not.

23 Q    Now you mentioned that COVID-19 had shutdown production on

24 a few of the ongoing operations.  What impacts has the COVID-19

25 crisis had on Sklar Exploration's business operation?

 1  A    A tremendous impact.  We suspended the operations on any

 2  ongoing, you know, drilling of the two wells I mentions, or

 3  building of the pipeline when the price of oil collapsed due to

 4  the COVID-19 pandemic, and on top of that, the Saudi

 5  Arabia/Russia price share war, you know, where prices dropped,

 6  you know, tremendously over that amount of time.

 7  Q    What ultimately caused the bankruptcy filing in this case?

 8  A    Exactly that, the drop in the price of oil due to the

 9  COVID-19 pandemic, and the market share war, and the absolutely

10  collapse of demand for oil.

11  Q    So just for some context, do you generally follow the

12  trend in oil prices?

13  A    I do, daily.

14  Q    What was -- approximately what was the price per barrel of

15  oil in January?

16  A    $60.  It was 57 to $60.

17  Q    And what about February?

18  A    February, I'd have to go back and look at the exact

19  number, but it's -- it probably dropped ten bucks.

20  Q    And do you know approximately what the price per barrel

21  was on the petition date?

22  A    $20.  $20 per barrel was April --

23  Q    Have you continued to follow the price of oil after the

24  bankruptcy case was filed?

25  A    I have.

1  Q    And can you just tell us approximately what the value per

2  barrel is currently?

3  A    Well, let me see.  WTI is hovering around 24 and a half

4  dollars.

5  Q    And is that the generally price index that's used when

6  Sklar Exploration was selling its oil?

7  A    We also incorporate some differentials.  We get a premium

8  on P plus and LLS, which is Louisiana Light Sweet differential,

9  but -- but, yeah, WTI is the benchmark.

10 Q    Now turning to the third interim cash collateral order

11 that's been proposed, are you familiar with that order?

12 A    I am.

13 Q    And what are some of the additional terms that that third

14 interim order requires?

15 A    For us to engage and employ a Chief Restructuring Officer.

16 Q    Has the debtor agreed to the employment or engagement of a

17 Chief Restructuring Officer here?

18 A    Yes, we have.

19 Q    And why is that?

20 A    We feel like a CRO would act as a neutral party and help

21 facilitate Sklar in planning and reorganizing throughout the

22 Chapter 11 process.

23 Q    Has the -- have the debtors begun discussions with the

24 bank and the Unsecured Creditors' Committee with respect to the

25 appointment of a CRO?

Jones - Direct/Riley                                      64

1  A    Yes, we have.

2  Q    To your knowledge, does the third interim order also

3  require payment of revenues to interest holders?

4  A    Yes, it does.

5  Q    Does the debtors intend to continue paying those interest

6  holders going forward post petition?

7  A    Absolutely.

8          MS. RILEY:  And, Your Honor, if I may have just a

9  brief moment just to consult with my notes here.

10         THE COURT:  Okay; sure.

11                      (Pause)

12 BY MS. RILEY:

13 Q    So with respect to the payment of the revenue interest

14 going forward, which parties would be getting paid for those

15 revenue interests?

16 A    The working interest and the royalty override interest.

17         MS. RILEY:  All right, Your Honor.  I have no further

18 questions at this time.

19         THE COURT:  All right.  Any cross by the bank?

20         MR. SUZUKI:  Not by the bank, Your Honor.

21         THE COURT:  Okay.  How about Mr. Bain for FPCC?

22         MR. BAIN:  Yes, Your Honor.  And my apologies, I'm

23 looking for the witness' name.  I've got --

24         THE WITNESS:  Marshall Jones.

25         MR. BAIN:  Marshall Jones.  I apologize for that, Mr.

TRANSCRIPTS PLUS, INC.
PHONE 215-862-1115 ● E-MAIL CourtTranscripts@aol.com
RUD000212

 1  Jones.

 2                    CROSS-EXAMINATION

 3  BY MR. BAIN:

 4  Q    Mr. Jones, I just have a few questions to clarify some

 5  things that you stated.

 6  A    Sure.

 7  Q    You testified that Sklarco -- and I wrote down the quote

 8  here, "Owns ten to 30 percent of the revenue," is that a fair

 9  characterization?

10  A    No, I said Sklarco's owns ten to 30 percent of working

11  interest in the properties --

12  Q    Okay.  Let me --

13  A    -- that Sklar Exploration operates.

14  Q    I'm sorry, with not being in person, it's hard for me to

15  not --

16  A    I understand.

17  Q    So I'm -- would you mind repeating what you just said?  I

18  don't want it to get lost.

19  A    Sklarco holds anywhere from ten to 30 percent working

20  interest in property that Sklar Exploration operates.

21  Q    Okay.  And if I heard you right, you said that they own

22  it, is that right?

23  A    Well, yeah.

24  Q    What do you mean by that?  What do you mean that they own

25  it?  Like what rights do they have as the owner of that -- of

Jones - Cross/Bain                                    66

1  those working --

2  A    We pay our -- we pay our pro rata share for the bills for

3  the drilling, and completion, and for the production of those

4  wells that we have a working interest on.

5  Q    All right.  And the rights you get as a result of that

6  ownership, it's not -- what I'm trying to get at is what would

7  happen if someone took that, would you --

8          MS. RILEY:  Objection, Your Honor; this calls for a

9  legal conclusion.

10          MR. BAIN:  Your Honor, I couldn't even get my

11  question out.

12          THE COURT:  I know.  Let's hear the full question.

13          MR. BAIN:  Just to avoid confusion, let me rephrase

14  my question.

15  BY MR. BAIN:

16  Q    I don't want to belabor the point, Mr. Jones, but I just

17  want to have a better understanding of what the company's

18  position is when you say that they own these working interests.

19  Their -- what rights do they have as the owner of that

20  property?

21  A    Well, if they -- they pay for their pro rata share for the

22  cost of operating and drilling of any oil and gas properties

23  governed under, you know, the participation agreement or

24  operating agreement governing, you know, the various

25  properties.

Jones - Cross/Bain                                   67

1  Q    And do they receive anything in exchange for making those

2  payments, and signing whatever documents created that interest?

3  A    If there's production, yes, they do.

4  Q    And what do they receive?

5  A    Revenue.

6  Q    Revenue; thank you.  You mentioned in your prior testimony

7  that there's been some discussions about employing a CRO, do

8  you recall that?

9  A    I do.

10 Q    And what powers would the CRO have based off of where --

11 what is --

12        MR. BAIN:  Strike that.

13 Q    What powers would the CRO have based off of your

14 understanding of what those discussions are?

15 A    I think those discussions are ongoing and would have to be

16 spelled out and agreed upon between us and the Creditors'

17 Committee and the bank.  But, in general, a CRO would be, you

18 know, brought on to help manage and, you know, our accounting,

19 and a intermediator with Sklar and you guys, and the bank, and

20 the Creditors' Committee.

21 Q    And isn't it true that no working interest holders have

22 been included in those discussions?

23 A    I'm not aware of that.

24 Q    Thank you.  Mr. Jones, you've previously testified about

25 the budget.  And with regards to the budget, does it assume

Jones - Cross/Bain                              68

1    that all of the JIBs will be paid by the working interest

2    holders?

3            THE COURT:  Let's make sure for the record what

4    budget we're talking about, and get it identified and marked.

5            MR. BAIN:  Yes, Your Honor.

6            THE COURT:  Is this the one attached to the third

7    interim -- proposed third interim cash collateral order?

8            MR. BAIN:  That was filed -- I'm referring to the one

9    that was filed as Docket Number 271.  I'm not sure what the

10   witness has been provided; it's the debtors' witness.

11           THE COURT:  Can my staff help me?  Is 271 the one

12   that just got filed, I believe, on Friday?

13           FEMALE SPEAKER:  It is, Your Honor.  And that budget

14   is also designated as Debtors' Exhibit 4.

15           THE COURT:  Okay.  So we'll call this Debtors' 4, D-

16   4.

17           And do you want to move for its admission, Mr.

18   Bain?

19           MR. BAIN:  Your Honor, debtors' counsel previously

20   spoke about it, and I was just trying to get clarity on the

21   testimony.

22           THE COURT:  Well, what we didn't do at the outset,

23   because it looked like it was going to take more time, is do a

24   stipulation that identified specific documents by their exhibit

25   numbers.  And we have to create a clear record, so if you're

1 going to talk about this document, and have the witness talk

2 about it, we need to identify it, mark it as an exhibit, get it

3 admitted.

4          So I'm just asking you to go through that usual

5 formal process now.

6          MR. BAIN:  Your Honor, it's not our exhibit, it's the

7 debtors' exhibit.

8          THE COURT:  Well, if you're going to ask the witness

9 questions about it, she didn't do that.

10          MR. BAIN:  Sure.  I can change my tact with regards

11 to the budget because I don't -- again, it's the debtors'

12 exhibit, and I just feel awkward trying to admit their

13 exhibits, so I can ask a different question.

14          THE COURT:  Okay.

15 BY MR. BAIN:

16 Q    Mr. Jones, are the debtors assuming that all of JIB

17 payments are going to be made going forward?

18 A    We would hope so, yeah.

19 Q    And have you heard any discussion about some concern

20 there?

21 A    I have.

22 Q    And would you -- and what would be the nature of those

23 discussions?

24 A    That the working interest owners don't want to pay their

25 JIBs.

1  Q    Okay.  Finally, are you familiar with the motion to

2  bifurcate that was filed by the debtors?

3  A    Yes, I was on the call on Friday.

4  Q    And if I use the term "adversary proceeding," would you

5  know what that means?

6  A    Yes.

7  Q    Have the debtors anticipated or reserved any monies to pay

8  for defending adversary proceedings?

9  A    Say that again; I'm sorry.

10  Q    Sure, let me -- let me ask it more plainly.  Have the

11  debtors of Sklar -- either of the debtors, reserved or

12  accounted for any money that has been put aside to defend

13  adversary proceedings?

14  A    Yeah, I think there's a budget.  There's a line item in

15  the budget for that.

16  Q    Would that just include the debtors' counsel --

17          MR. BAIN:  Strike that, Your Honor.  Strike that.

18          Your Honor, if I may take a moment just to check my

19  notes.

20          THE COURT:  Okay.

21                    (Pause)

22          MR. BAIN:  Your Honor, I pass the witness.

23          THE COURT:  Okay.  Let's go next to Tauber, Mr.

24  Skelton?

25          MR. SKELTON:  Yes, Your Honor.

 1                    CROSS-EXAMINATION

 2   BY MR. SKELTON:

 3   Q    Mr. Jones, you said you started out as a landman, is that

 4   correct?

 5   A    That's correct.

 6   Q    So you poked around courthouse, met with lessors, you

 7   determined -- potential lessors, determined what interest they

 8   had in oil and gas properties, is that correct?

 9   A    Yes, sir.

10   Q    And one of the jobs of a landman, isn't it, to create from

11   title examination and maintain accurate ownership records for

12   each lessor and, frankly, also for all other interest owners,

13   isn't that correct?

14   A    (Indiscernible - muffled) chain of title and -- yes,

15   that's correct.

16   Q    And is it fair to say that one of the functions that SEC

17   as an operator performs is to keep meticulous, updated,

18   current, and accurate records of ownership?

19   A    Yeah, we -- we abstract all title to various properties,

20   and get title opinions rendered, from skilled attorneys in

21   various jurisdictions of our operation to help with that, but,

22   yes.  If it is a producing well, we have meticulous records

23   from a division order title opinion that helps us draft

24   division orders, and those are set and signed by working

25   interest owners and royalty owners.  So everybody is agreeing

1  to what that interest is.

2  Q    Right, and that's typically kept like up to eight or ten

3  decimals, isn't it?

4  A    Yes.

5  Q    All right.  Now at any given time, SEC knows the exact

6  working interest and net revenue interest of each working

7  interest owner, doesn't it?

8  A    Yes.

9  Q    All right.

10 A    We do.

11 Q    That's --

12 A    We do.

13 Q    That's part of its job as the -- under the joint operating

14 agreements, to maintain the joint account and accurate figures

15 for each party's ownership, correct?

16 A    Yes, it is.

17 Q    All right.  And the reason --

18 A    (Indiscernible - muffled) we have ownership decks for each

19 property.

20 Q    Right.  Go ahead and tell the judge what an ownership deck

21 is, that's a term of art in the industry.

22 A    Sure, it's basically a breakdown, Your Honor, of

23 individual interest of ownership, whether it's working,

24 royalty, override in a particular property.

25 Q    All right.  So that -- that ownership deck, first, it is a

Jones - Cross/Skelton                              73

1  summary of SEC's records of the decimal ownership interest of

2  each royalty owner, overriding royalty interest owner, and

3  working interest owner, isn't it?

4  A    That's right.

5  Q    And so, for instance, you said that Sklarco has from ten

6  to 30 percent working interest in, you know, various prospects.

7  But as to any given well, or prospect, or unit, SEC knows

8  exactly what Sklarco's working interest is, doesn't it?

9  A    If it's producing property property and a property

10 (indiscernible - muffled), yes.

11 Q    All right.  And it also knows what Sklarco's net revenue

12 interest is, doesn't it?

13 A    That's correct.

14 Q    And could you distinguish for the Judge just quickly, you

15 know, the distinction between what a working interest is and

16 the meaning of net revenue interest, and how that fits into,

17 frankly, what Sklarco and all other working interest owners get

18 paid?

19 A    The working interest is the actual, you know, interest

20 that the -- it's the cost of -- the varying interests of cost

21 to drill, and produce, and operate the well.

22         And the net revenue interest is what you -- the

23 decimal you are paid on, and after, you know, all the royalties

24 are paid out, and whatever lease burdens you may have on that

25 property.  That's -- that's your net revenue interest.

Jones - Cross/Skelton                                   74

1  Q    All right.  And so while the working interest percentage

2  is used in calculating, for instance, what a working interest

3  owner's share of certain expenses are, correct, that's --

4  that's one use for the working interest percentage, correct?

5  A    Well, it's whatever the particular working interest owner

6  decides that they want to take on (indiscernible - muffled).

7  Q    Okay.  But once they take it --

8  A    Yes.

9  Q    Yeah, once you've executed an assignment -- and, by the

10  way, Sklarco executed assignments of interest to each of the

11  working interest owners, didn't it?

12  A    We try to assign out to all working interest owners

13  (indiscernible - muffled) producing properties in a timely

14  fashion, right.

15  Q    Okay.  And so for instance, just take the Escambia

16  prospect in Alabama, Sklarco and SEC developed that prospect,

17  identified it, and -- were you involved in that?

18  A    Yes, I was a landman at the time, but, yes.

19  Q    All right.  But is it correct for me to say that Sklar

20  Exploration, SEC's MO, the way it does business, is to go out

21  and find other parties, such as my clients, the Tauber Group,

22  to participate in these prospects?

23  A    That's correct.

24  Q    And that's --

25  A    Well --

Jones - Cross/Skelton                                       75

1   Q    That's how you raise money, too, right?

2   A    Yeah, we don't want to take a hundred percent of the risk

3   to drill the well.  So we --

4   Q    All right.

5   A    We have working interest owners that help pay for all

6   those operations.

7   Q    Right.  And -- and I noticed that when you were talking

8   about the rights of a working interest owner earlier, you

9   talked a lot about the obligation to pay.  But the fact is that

10  the working interest owners, the reason they invest is because

11  they hope to get paid their share of the revenues, correct?

12  A    That's correct.

13  Q    All right.  Now each and every month -- you mentioned some

14  refineries like Goodway and so forth, that purchase production.

15  A    Um-hum.

16  Q    SEC delivers oil, and it delivers gas, and it's paid money

17  for what it delivers, correct?

18  A    Right.

19  Q    And also because SEC has these sophisticated measuring

20  devices, y'all can, in real time, every day tell exactly how

21  much oil or gas has come out of each and every well, can't it?

22  A    Yes.

23  Q    All right.  There's no mystery about it.

24  A    That's right.

25  Q    All right.  So you've got meters, gauges, other devices

Jones - Cross/Skelton                            76

1  that help you keep up with it in real time, correct?

2  A    We do.

3  Q    Okay.  Now when your oil and gas is delivered to the

4  purchaser, like, for instance, let's take -- because you know

5  that some of the biggest checks come into the revenue account

6  from that Goodway Refining, correct?

7  A    That's right.

8  Q    All right.  Where's that located?

9  A    Atmore, Alabama.

10 Q    Okay.  So when that product is sold, you know the quantity

11 that is sold, and you know the price for which it was sold,

12 correct?

13 A    Yes.

14 Q    And you have accurate records which, even though you might

15 have trucks that go by and pick up oil from various wells,

16 y'all track exactly how much comes from each well, correct?

17 A    Yes.

18 Q    Okay.

19 A    We have daily (indiscernible - muffled) for each property.

20 Q    All right.  And let's just look at it from the standpoint

21 of Sklarco.  To the extent that Sklarco, for instance, might

22 have a ten percent interest in a particular well that product

23 is sold from, it expects to get paid for that product, correct?

24 A    We do.

25 Q    All right.  And all other working interest owners likewise

Jones - Cross/Skelton                          77

1   expect to get paid for the products that are sold from their

2   wells, don't they?

3   A    I expect so, right.

4   Q    Right.  Well, why -- if you think there might be a

5   different answer to that question, please explain it to me.

6   Why would there be a different answers?

7   A    There's not.  You expect to get paid, yes.

8   Q    Right.  What's good for the goose -- let's just say the

9   goose is Sklarco -- is good for the gander, right?

10  A    Yes.

11  Q    All right.  So at any given point in time, would it be

12  possible for a working interest owner to pick up the phone and

13  call in to SEC and say, "Say, you know, I know y'all just got a

14  big check from Goodway, you know, what's my share of that after

15  payment of" -- and y'all would be able to calculate it,

16  wouldn't you?

17  A    Yes.

18  Q    All right.  There wouldn't be any mystery about it.

19  A    I don't believe so.

20  Q    And if there was a mystery, it would mean that y'all

21  hadn't done your job correctly, correct?

22  A    That's right.

23  Q    Right, all right.  So during the month of March, preceding

24  -- in the days preceding the filing of the bankruptcy petition,

25  you're familiar that a substantial amount of revenue came into

Jones - Cross/Skelton                          78

1  the Sklar -- SEC revenue account, correct?

2  A    Yes.

3  Q    All right.  And -- and we can get into the exhibits at

4  some point, but are you familiar with the fact that the Sklarco

5  revenue account had a balance of only about $408,000 on March

6  19th?

7  A    I would have to refer to an accounting on that, but --

8  Q    All right.

9  A    -- I can't confirm that here.

10 Q    All right.  But are you also familiar with the fact that

11 just between Goodway Refining and -- well, let's see, Goodway

12 Refining deposited or wired 3,973,144 on or about March 20th?

13        MS. RILEY:  Your Honor, to the extent that we're

14 referring to amounts that are reflected in the bank statement,

15 I'm just going to ask that Mr. Skelton go ahead and designated

16 and introduce his exhibits.

17        MR. SKELTON:  Okay.

18        THE COURT:  Well, if this is the proper witness to do

19 that with.

20        MR. SKELTON:  Well, let's see.  Ms. Riley, are you

21 going to call your CFO?

22        MS. RILEY:  Yes, sir.

23        MR. SKELTON:  Okay, all right.  Well, I think I'll

24 reserve questions for the CFO.  What is his name?

25        MS. RILEY:  John Strausser.

Jones - Cross/Skelton                              79

1      MR. SKELTON:  Okay, all right.

2  BY MR. SKELTON:

3  Q    But getting back to your job, as a COO, is part of your

4  job description to know exactly how much revenue is owed to

5  each and every working interest owner, including Sklarco?

6  A    On a monthly basis, accounting shares with me what those

7  numbers are, and I review those.  So I have general idea of

8  what comes in and what comes out.

9  Q    Okay.  Now on April 1st, are you aware that $800,000 was

10  drawn down out of the SEC revenue account and deposited in the

11  SEC operating account?

12  A    Yes.

13  Q    All right.  Why was $800,000 taken out of the revenue

14  account and put into the operating account?

15  A    That was -- I believe -- I'd have to defer to my

16  accounting team and the CFO, but Sklarco shared the revenue

17  back to the Sklar operating account to pay bills.

18  Q    Okay.  So you think that 800 grand belonged to Sklarco?

19  A    I'm not sure on -- I can't give confirm that, Mr. Skelton.

20  Q    Well, I thought earlier you testified that the way that

21  SEC pays its bills is by either, A, sending out AFEs for

22  capital type projects; or, B, billing for joint interest

23  billings, isn't that correct?

24  A    That's right.

25  Q    All right.  So why -- you didn't mention that one of the

Jones - Cross/Skelton                                    80

1  ways it pays its bills is by taking revenue out of the revenue

2  account.

3  A    Sklarco shares the revenue.

4  Q    Okay.  So you're here saying under oath that you are

5  positive that $800,000 represented Sklarco money.

6  A    I would need verification from our CFO.

7  Q    Well -- well, I mean did you participate in any decision-

8  making about the drawing down of those funds?

9  A    Mr. Skelton, it's a matter of course every month,  and

10 nothing has changed in our accounting functions every month of

11 every year for the last -- for 20 years.  So I do have a

12 general concept of what, you know, moves between accounts,

13 yes.

14 Q    Okay.  So you're -- you can state on the record under oath

15 that none of that money represented working interest owner --

16 other non-Sklar working interest owner revenues.

17 A    I'm pretty certain of that, yes.

18 Q    Okay.  Now on April 30th, there was another drawdown from

19 the revenue account down to the operating account, about

20 $400,000.

21      MS. RILEY:  Your Honor, at this point, I am going to

22 object and request that any sort of bank statements be

23 introduced.

24      MR. SKELTON:  Yeah, Judge, I'm going to ask him

25 whether he knows of such a withdraw.  I can do it without

1  discussing the bank statement quite yet.  I would -- let me

2  rephrase the question.

3           THE COURT:  Okay.

4  BY MR. SKELTON:

5  Q    Mr. -- sir, are you familiar with a sum of approximately

6  $400,000 being deposited from the revenue account into the

7  operating account at the end of April?

8  A    Again, I would have to defer to my accounting team and my

9  CFO, Mr. Strausser, to confirm that.

10 Q    Well -- okay.  But in terms of operations, a COO is in

11 charge of operations.  Presumably that means that you're a

12 person who knows what operations need to take place, and how

13 much money they cost, right?

14 A    That's correct.

15 Q    All right.  So you don't remember why $400,000 and change

16 was drawn out of the revenue account during this bankruptcy

17 case?

18           MS. RILEY:  Objection; that mischaracterizes his

19 testimony.  He didn't confirm whether or not there was a

20 withdraw.

21           MR. SKELTON:  All right.

22 BY MR. SKELTON:

23 Q    Do you know if there was a withdraw?

24           THE COURT:  I'm going to sustain the objection.

25           MR. SKELTON:  All right.

Jones - Cross/Skelton                                    82

1          THE COURT:  Okay.

2    Q    Do you know if there was such a withdraw, sir?

3    A    I've seen a lot of money and bank statements in the last

4    few weeks, Mr. Skelton.

5    Q    Okay.

6    A    -- and for confirmation --

7          THE COURT:  Come closer to the microphone, please.

8    A    For confirmation, you would have to ask my CFO.

9    Q    Okay.  Now earlier, you talked about how among the ways

10   that SEC receives money from working interest owners is by the

11   use of what is called an AFE, do you remember that?

12   A    Correct, now that's an estimate of what the cash call

13   (indiscernible - muffled), yes.

14   Q    But it is an acronym for authorization for expenditure,

15   isn't it?

16   A    That's correct.

17   Q    And each AFE is a representation to the working interest

18   owners of what Sklarco -- or rather SEC intends to do with the

19   money, correct?

20   A    Correct, it's a line item itemized by, you know, various

21   description of what the operation is going to entail, but it is

22   an estimate.

23   Q    All right.  It's an estimate, but there's no question, is

24   there, that the AFEs represent to the working interest owners

25   precisely how money will be spent on a particular project,

Jones - Cross/Skelton                                        83

1  correct?

2  A    Correct.

3  Q    It is not an authorization for a general working capital

4  loan, is it?

5  A    No, it's not.

6  Q    All right.  And -- and your lawyer has admitted that --

7  and you have admitted that none of that $7 million in AFE money

8  was used for its intended purpose.

9         MS. RILEY:  Objection; mischaracterizes testimony.

10 Q    Is that correct?

11        THE COURT:  Counsel?

12 Q    Is that correct?

13        THE COURT:  No, you need to respond to her objection.

14        MR. SKELTON:  I don't believe it does mischaracterize

15 his testimony.

16        THE COURT:  I'm going to sustain it, and ask that you

17 ask it another way.

18        MR. SKELTON:  Okay, all right.

19 BY MR. SKELTON:

20 Q    Will you admit here on the record under oath that none of

21 the $7 million you referred to as having been paid through cash

22 call advances was used for its intended purpose?

23 A    No, I believe some of the case was used towards some of

24 the operations.

25 Q    How much?

Jones - Cross/Skelton                    84

1  A    I don't know specifically, Mr. Skelton.

2  Q    Well, if there is a $7 million shortfall, why is there a

3  shortfall?  Why didn't you just hold onto the money and use it

4  for -- and save it until it was the appropriate time to spend

5  money on those projects?

6  A    Because that's not how our accounting and operations work.

7  Q    And so -- so please explain, how does your accounting and

8  operation work?

9  A    When we receive bills, they don't come in for sometimes,

10 you know, 30, 60 days in arrears after the operations completed

11 or -- or ongoing.  And -- so when we pay a current bills or

12 payables with operating -- out of the operating account.

13 Q    Okay.  Well, why did you need to use that money?  If your

14 MO is to send out AFEs and joint interest billings to working

15 interest owners to generate money to pay bills, why did you

16 need to use any of that $7 million?

17 A    Because we're a very busy company, and have a lot of

18 ongoing operation and properties that, you know, bills need to

19 be paid.

20 Q    Right.  So in other words, you were just going to use that

21 money to float.  You were just planning to float with that

22 seven million, weren't you?

23 A    You can characterize it as that, I -- I -- you know, it's

24 -- it's the procedures that we've used for 30 years, Mr.

25 Skelton.  You know, we have an operating account, and a revenue

Jones - Cross/Skelton                                    85

1  account and -- you know, I think everybody knows the float

2  works.

3  Q    Okay.  But you just got caught this time, right?

4  A    (Indiscernible - multiple speakers)

5         MS. RILEY:  Objection.  Your Honor, that's highly

6  prejudicial.

7         THE COURT:  Overruled.

8  Q    You got caught, didn't you?

9  A    Well, when you have a catastrophic unprecedented downturn

10  in oil prices, and your revenue drops by, you know, 65 percent,

11  it's tough to -- to pay bills.

12  Q    Well, wait a minute, you told us earlier that the January

13  prices were 57 to $60, February was about ten bucks lower, 40

14  to $50.  You spent that money during that time period, didn't

15  you?

16  A    I would have to go back and look at, you know, payables in

17  detail.

18  Q    Okay.  And you'll admit, won't you, that there are a lot

19  of outstanding service company bills, etc., that y'all were not

20  paying, correct?

21  A    We had a lot of vendors that (indiscernible - muffled),

22  yes.

23  Q    All right.  Now part of what your lawyers are asking the

24  Court to approve is to basically let the debtor use money that

25  was in the bank account as of April 1st, do you understand

Jones - Cross/Skelton                                86

1  that?

2  A    Yes.

3  Q    All right.  And so that money was primarily proceeds from

4  a production that was -- that occurred back in January and

5  February when prices were a lot better than they are now,

6  correct?

7            MS. RILEY:  Objection; lack of foundation.

8            THE COURT:  Let's establish some.

9            MR. SKELTON:  Okay.

10 BY MR. SKELTON:

11 Q    Do you recall testifying that the January prices for oil

12 were 57 to $60 a barrel?

13 A    I do.

14 Q    Do you recall testifying that February prices were about

15 $10 less?

16 A    Yes.

17 Q    All right.  And do you recall testifying that April prices

18 are about $20 a barrel, correct?

19 A    That's right.

20 Q    All right.  So am I correct that the debtor wants to use

21 these revenues that were generated when prices were between 40

22 and $60 a barrel?

23            MS. RILEY:  Objection, Your Honor; there's still a

24 lack of foundation.  We haven't established that it's the

25 revenue account we're talking about, versus an operating

Jones - Cross/Skelton                                          87

1   account, versus the benefits account here.

2            THE COURT:  Okay.  Let's go ahead and clarify.

3            MR. SKELTON:  Okay.

4   BY MR. SKELTON:

5   Q    The money that goes into the revenue account is revenue,

6   right?

7   A    Correct.

8   Q    All right.  So revenues that were generated in January and

9   February were based on a much higher oil price than we

10  currently have, correct?

11  A    Correct.

12  Q    All right.  So am I correct that your -- in this interim

13  cash collateral order, the adequate protection is that we are

14  being granted a lien on Sklarco properties and revenues based

15  on current prices rather than 57 to -- 40 to 50 -- $60 a

16  barrel?

17  A    Yes.

18  Q    Okay.  Now given the fact that prices have gone down from

19  60 to 20 since January, how does SEC propose to pay its

20  expenses if all it does is use Sklarco's revenues and whatever

21  joint interest billings it generates?

22  A    I think the budget completely spells it out on how we

23  intend to do that.

24  Q    And what -- and so you believe that there's sufficient

25  money just from Sklarco's revenues and whatever joint interest

1  billings you send out.

2  A    I do.

3  Q    But hasn't it been the practice of SEC to offset against

4  joint interest billings amounts that SEC owes to the working

5  interest owners?

6  A    Yes.

7  Q    And isn't it true that you intend to continue that

8  practice?

9  A    I think that decision has to be made through the courts,

10  but that we would like to do that, yes.

11  Q    Okay.  So if you offset against joint interest billings,

12  that means to the extent of the offset, you're not getting

13  paid.

14  A    That's true.

15  Q    All right.  So where's the money going to come from if

16  you're not getting paid in full in cash for the JIBs?

17  A    Well, through Sklarco's revenue in our hedge position

18  that's in place with --

19  Q    Okay.  All right, well, let's briefly talk about that and

20  then I'll -- since you mentioned hedges.  According to the

21  information in the data room, East-West Bank has issued puts

22  and collars on production, is that correct?

23  A    That's right.

24  Q    All right.  Has SEC hedged production that is attributable

25  to the non-Sklarco working interest owners?

Jones - Cross/Skelton                                    89

1  A     No.

2  Q     Okay.  So it's just hedging Sklarco revenues.

3  A     Sklarco barrels, yes.

4  Q     Okay, Sklarco barrels, all right.  All right.  Who was

5  involved in -- who is involved in the decision tree to decide

6  basically what revenues to pay to working interest owners and

7  what revenues not to pay?

8          MS. RILEY:  Objection, Your Honor.  I'm just going to

9  ask for clarification as to a time frame here.

10         MR. SKELTON:  Okay.

11 BY MR. SKELTON:

12 Q     During the bankruptcy case, am I correct that SEC has made

13 a decision not to pay its working interest owners?

14 A     No, I think we want to pay their working interest owners.

15 Q     All right.  All right, but that's just now going forward,

16 correct?

17 A     Yes.

18 Q     All right.  Who is involved in making the decision not to

19 pay the working interest owners the revenues that were

20 generated in March -- or rather the money that came in in late

21 March?

22 A     The management team.

23 Q     And who is the management team?

24 A     Mr. Howard Sklar, myself, John Strausser, our CFO, and a

25 couple others.

Jones - Cross/Geno                                    90

1  Q    Okay.  Okay.

2           MR. SKELTON:  All right, I'll pass the witness.

3           THE COURT:  All right.  Let's see, Mr. Swanson for

4  Kudzu.  Kudzu, I always say it wrong.

5           MR. SWANSON:  My colleague, Mr. Craig Geno, is

6  actually going to be -- my co-counsel will be taking the

7  witness.

8           THE COURT:  Okay.  Mr. Geno.

9           MR. GENO:  Thank you, Your Honor.

10                     CROSS-EXAMINATION

11  BY MR. GENO:

12  Q    Mr. Jones, my name is Craig Geno, I represent Alabama Oil

13  Company, Apple River Investments, LLC, and Kudzu Company -- or

14  Kudzu Oil Properties.  Are you familiar with those entities?

15  A    I am.

16  Q    What is their relationship to Sklar Exploration?

17  A    They are the working interest owners on several properties

18  we operate.

19  Q    Prior to January of 2020, did my clients -- and if I were

20  to call them the Kudzu Group, that will shorten this a little

21  bit -- did they always receive their working interest share of

22  oil revenues received by Sklar Exploration?

23  A    Yes.

24  Q    Was there any doubt in your mind that they were not

25  entitled to receive those revenues?

Jones - Cross/Geno                                    91

```
 1  A    No.
 2  Q    And do the documents that exist between the Kudzu Group
 3  and Sklar Exploration provide that they are to receive those
 4  working interest revenues?
 5  A    Yes.
 6  Q    Mr. Skelton asked you some questions about the cash
 7  advances, do you remember those, the cash call --
 8  A    Right.
 9                      (Pause)
10  A    I do.
11  Q    Were the cash call advances that were made to the Kudzu
12  Group designed to be enough cash call to complete the
13  Mississippi well that they were earmarked for?
14       MS. RILEY:  Objection; calls for a legal conclusion
15  as to the earmarking.
16       THE COURT:  You may answer based on your personal
17  knowledge.
18  A    Yes, the AFE that was proposed should have covered Kudzu's
19  and the rest of the parties that you named, their share of the
20  cost.
21  Q    Has that well been drilled?
22  A    It has not.
23  Q    Why not?
24  A    Because of the pandemic and the price of oil drastically
25  dropping over the last couple months.
```

1  Q    To your knowledge, were all of the cash call advances that

2  were submitted by the Kudzu Group used in connection with that

3  well?

4  A    Yes.

5  Q    Mr. Jones, what does the budget -- the current budget

6  rely upon with respect to the price of oil per barrel going

7  forward?

8           THE COURT:  Again, we're going to need to know what

9  budget, so --

10           THE WITNESS:  There were a lot of budgets, yes.

11           MR. GENO:  It was the -- it's the last -- the one

12  that was submitted to the Court on Friday afternoon, Your

13  Honor.

14           THE COURT:  So that is Docket Number 271, and we're

15  marking it D-4, okay.  So you want to offer into evidence D-4?

16           MR. GENO:  Yes, ma'am.

17           THE COURT:  Okay.  Any objection?

18           MS. RILEY:  No objection, Your Honor.

19           THE COURT:  Okay.  Not hearing any objection, D-4 is

20  received.

21           (Debtors Exhibit D-4 admitted into evidence)

22           THE COURT:  Okay.  Go ahead.

23           MR. GENO:  Thank you, Your Honor.

24  BY MR. GENO:

25  Q    Did you understand the question, Mr. Jones?  You -- do you

1  remember the question?

2  A     I do remember it, and I might ask you to repeat it, but

3  I'm trying to put my hands on the actual budget while we do

4  this.

5  Q     What is the price of oil that that budget relies on in

6  making its projections per barrel?

7          MS. RILEY:  If -- Your Honor, if we may take just a

8  brief second -- I know there's a question pending, just to make

9  sure that we have the right exhibit in front of our witness.

10          THE COURT:  D-4.  So -- oh, you're saying he may not

11  have it.

12          THE WITNESS:  Right.

13          THE COURT:  It --

14          MS. RILEY:  So if you'll give me just a moment, Your

15  Honor.  He does have them, we just need to get him to the right

16  area.

17          THE COURT:  Okay.

18     (Off-the-record colloquy with Ms. Riley and Witness)

19          MR. GENO:  Your Honor, I don't have any objection to

20  Ms. Riley pointing out to the witness where that projection

21  appears on the budget, if that will speed things along.

22          THE COURT:  Okay.  So do you have the ability to

23  highlight for the witness, Ms. Riley?

24          MS. RILEY:  Um --

25          THE COURT:  I don't know the technology.

1                    (Laughter)

2            MR. GENO:  Your Honor --

3            THE COURT:  Let's just ask him, does he know what

4  price of oil is reflected in the budget that these numbers are

5  all based on, see if he knows.

6            THE WITNESS:  I would like to verify that by looking

7  at the actual price per barrel.  Generally I think we used what

8  the NYMEX (indiscernible - muffled) be for the upcoming

9  (indiscernible).

10           THE COURT:  Which was what?

11           THE WITNESS:  I don't see it on here.  Can someone

12 tell me which line item it is or -- maybe I'm looking at the

13 wrong budget here.

14                    (Pause)

15           THE COURT:  I see a gas price estimate under cash

16 receipts and an oil price estimate.

17           MS. RILEY:  So, Mr. Marshall, I'm just going to

18 direct your attention --

19           THE WITNESS:  (Indiscernible - multiple speakers)

20 $13.40.

21           UNIDENTIFIED ATTORNEY:  I'm sorry, Mr. Jones, I

22 didn't catch that.  Would you say that again, please?

23           THE WITNESS:  (Indiscernible - muffled) price

24 estimate $13.40.

25           UNIDENTIFIED ATTORNEY:  I'm -- I'm --

Jones - Cross/Geno                                          95

1          THE COURT:  Does that sound right to you?

2          THE WITNESS:  I think we used several price

3   (indiscernible - muffled) throughout our budget.  I just make

4   sure that, you know, I'm looking and talking about the same

5   thing.  Or I'd have to defer to my CFO who generated the

6   budget.

7          MR. GENO:  Thank you.

8   BY MR. GENO:

9   Q    In any event, I think it's safe to say that the price per

10  barrel you've relied on in the budget is far less than 57 to

11  $60 a barrel, the price you said was for WTI in January,

12  right?

13  A    Unfortunately, yes.

14  Q    That is substantially less than the 47 to $50 per barrel

15  that you said was the price in February, right?

16  A    That's correct.

17  Q    And at those prices -- those prices in January and

18  February, you left the working interest owners being owed

19  money, and you left vendors being owed money, right?

20  A    Yes.

21  Q    And now you're projecting to pay everyone, including the

22  working interest owners and the royalty and the overrides on

23  oil per barrel that is substantially less than the price in

24  January and February when you couldn't pay all your bills --

25  A    Again, I think --

Jones - Cross/Geno                                        96

1  Q    -- right?

2  A    -- the budget shows that we can do that, even at these

3  prices.

4  Q    But you couldn't at 57 to 60 and 47 to $50 per barrel

5  before the bankruptcy, right?

6          MS. RILEY:  Objection, Your Honor; I think that sort

7  of mischaracterizes his testimony here.

8          THE COURT:  I'm overruling it, so you should answer.

9  But then I think we need to move on.  I'm not sure this is the

10  best witness to discuss the budget, so --

11          MR. GENO:  Thank you, Your Honor.

12  BY MR. GENO:

13  Q    Do you remember the question, Mr. Jones?

14  A    Would you repeat yourself, please?

15  Q    Sure.  The price that you are projecting and relying upon

16  in being cash flow positive going forward is substantially less

17  than the price of WTI in January and February of this year, is

18  that right?

19  A    That's right.

20          MR. GENO:  Thank you, Mr. Jones; thank you, Your

21  Honor.

22          No further questions.

23          THE COURT:  All right, thank you.

24          Any redirect by the debtor?

25          MS. RILEY:  Yes, Your Honor.

1                    REDIRECT EXAMINATION

2   BY MS. RILEY:

3   Q    So with respect to the decrease in revenue -- again, if

4   you could just repeat for us, approximately what was that total

5   decrease in revenue?

6   A    Somewhere between 60 and 65 percent.

7   Q    And when we're talking about the decrease in revenue, who

8   does that apply to here between the two debtors?

9   A    Sklarco.

10  Q    When -- with respect to funds for Sklar Exploration's

11  ongoing operation, what funds is it generally relying on?

12  A    The funds in their operating account and the cash calls in

13  the --

14  Q    Would that also include deposits for, for instance, the

15  hedging agreements?

16  A    Absolutely.

17  Q    And where are those funds deposited?

18  A    In Sklar's operating account.

19  Q    And what about Sklarco's revenue, do you known

20  approximately -- which account that's being maintained in

21  currently?

22  A    In Sklar's revenue account.

23  Q    And is Sklarco's revenue ever transferred over to the

24  operating account for ongoing operations?

25  A    Yes.

Jones - Redirect/Riley                                    98

1   Q    Now with respect to the cash call advances, prior to the

2   bankruptcy case, where were those cash call advances

3   maintained?

4   A    In Sklar's operating account.

5   Q    To your knowledge, was there any requirement to maintain

6   those funds separately?

7   A    No.

8   Q    Has anything changed with respect to how cash call

9   advances, to the extent any new ones are issued, how those will

10  be handled post petition?

11  A    I think they would be segregated.

12  Q    And with respect to treatment of the revenues post

13  petition, to your knowledge, are those being maintained

14  separately, as well?

15  A    Yes.

16  Q    Has Sklar Exploration changed how it's managing its

17  revenue on a post petition basis, as well?

18  A    I believe so, yes.

19  Q    And what are some of those changes?  And we'll be asking

20  this to Mr. Strausser, as well.

21  A    The segregation of monies coming into the operating and

22  revenue accounts.

23  Q    Now with respect to the deposits that we've been referring

24  to for the March revenue, again, what parties are going to be

25  paid from that March revenue?

Jones - Redirect/Riley                                    99

1  A    Well, hopefully the working interest owners, but also the

2  royalty and overriding royalty interest owners.

3  Q    And were those for the funds that were received post

4  petition?

5  A    Yes.

6  Q    Does Sklar Exploration intend to maintain those payments

7  to the interest holders going forward?

8  A    Absolutely.

9  Q    Are you familiar with the original oil and gas motion that

10 was filed in this case?

11 A    I am.

12 Q    And do you recall, what did that motion request to do?

13                         (Pause)

14 A    To --

15 Q    Did --

16 A    Go ahead.

17 Q    Did it request authorization to pay the January and

18 February revenues, as well?

19 A    Yes.

20 Q    Does that guarantee that there were funds available in

21 their respective accounts to do so?

22 A    Say -- ask that again, please.

23 Q    Were there any representations in that motion that there

24 were funds available to make those payments immediately?

25 A    No.

Jones - Redirect/Riley                                    100

1  Q    Do you recall, were there objections to that motion?

2  A    I do.

3  Q    Approximately how many, if you know?

4  A    I don't know off the top of my head, but quite a few.

5  Q    Now with respect to the cash call advances, has Sklar

6  Exploration indicated any intent to make parties pay the

7  request of cash call advances again?

8  A    Absolutely not.

9  Q    Is there any dispute as to the ownership interest that has

10 been asserted by the various working interest parties?

11 A    No.

12 Q    And with the working interest parties, are all of them

13 required to pay joint interest billings?

14 A    Yes.

15 Q    Have some of the working interest holders requested that

16 their joint interest billings be offset against revenue?

17 A    They have.

18 Q    Does that apply universally to all of them?

19 A    No.

20 Q    So is it fair to say that some of the working interest

21 holders should be paying in their joint interest billings?

22 A    Yes.

23 Q    And based on the operational changes, do you believe that

24 Sklar Exploration can continue to operate profitably through

25 this case?

1  A     I do.

2  Q     And --

3          MS. RILEY:  All right.  Your Honor, I think that

4  there's no further questions.

5          THE COURT:  Okay; thank you.

6          All right, so we've concluded this witness'

7  testimony.  And it's about quarter till noon, we haven't had a

8  morning break, I am sensitive that some people may want a break

9  at some point now or later, and how long we're going to take

10 for lunch.  Any suggestions?

11         MR. SHIPPS:  Your Honor?

12         THE COURT:  Yes?

13         MR. SHIPPS:  This is Tom Shipps, and I apologize

14 because I know that you don't want to repeat, and with multiple

15 attorneys asking the same witness questions, but there are two

16 very short items that I would like to be able to ask Mr. Jones,

17 I wouldn't do this other than the complications of the Zoom.

18         THE COURT:  Well, it's not really a Zoom issue.  If

19 you had something, you should have really raised it when Mr.

20 Skelton was done.  But I guess you're saying with Zoom, you

21 can't pass him a note.

22         MR. SHIPPS:  That's correct, Your Honor.

23         THE COURT:  Okay, that I understand.  But, you know,

24 I wish you would have spoken up after he said he was done.  But

25 if nobody else --

Jones                                                  102

1           MR. SHIPPS:  I apologize.

2           THE COURT:  That's all right.  If nobody else cares,

3    I'll let you do it.  Is anyone opposed to a couple follow-up

4    questions --

5           MS. RILEY:  Well, Your Honor --

6           THE COURT:  -- by Mr. Shipps?

7           MS. RILEY:   Your Honor, I would ask that he, number

8    one, be limited to the scope of the direct.

9           But additionally, I mean, Tauber has had the

10   opportunity to question this witness, as well, so -- I

11   recognize there are challenges with the Zoom hearing, but it

12   would sort of seem like they're getting two bites at the apple

13   here.

14          THE COURT:  Ah.

15          MR. SHIPPS:  Judge --

16          THE COURT:  You know, I think everybody's got a cell

17   phone, right, in the day and age?  So you can always text to

18   your partner, right?

19          MR. SHIPPS:  I did that, Your Honor.

20          THE COURT:  Okay.  But he -- he didn't look

21   apparently.

22          MR. SHIPPS:  He was trying to concentrate on the

23   hearing, I'm sure.

24          THE COURT:  Uh-huh, okay.  Well, that's just raising

25   a good point on how we do this because this is new for

1    everybody.  Maybe when somebody thinks they're done, they'd

2    say, "Your Honor, can I have just a moment?"  And they check

3    their phone.

4          MR. SHIPPS:  I -- Your Honor, I had my phone in my

5    hand and I was waving.

6                         (Laughter)

7          THE COURT:  And, Ms. Riley, as far as exceeding the

8    scope of the direct, there's been a lot of cross already that

9    exceeded the scope of the direct, and there was never an

10   objection to that.  And there was redirect that exceeded the

11   scope of the cross, so I don't know, I think that as to this

12   witness, that's a little bit waived.

13         So I'm going to let Mr. Shipps ask his two questions,

14   and then we all know going forward how we're going to do this

15   even better.

16         Okay, Mr. Shipps.

17         MR. SHIPPS:  Thank you, Your Honor.

18                  FURTHER CROSS-EXAMINATION

19   BY MR. SHIPPS:

20   Q    Mr. Jones, in the course of your activities for SEC, is it

21   the normal practice of the operator when it either issues

22   assignments or obtains back signatures on JOAs to record in the

23   appropriate county the documents memorializing the entry into

24   those documents?

25         MS. RILEY:  Objection to relevance, Your Honor.

1          THE COURT:  Counsel?

2          MR. SHIPPS:  Your Honor, this witness has testified

3    about his familiarity with respect to land operations, with

4    regard to SEC.

5          At a previous hearing, we had requested that the

6    debtors actually put into the data room copies of recorded

7    information that's ultimately going to be critical to the issue

8    of priority of liens.  And we have had, because of COVID-19, an

9    inability to get into the public county records.

10         THE COURT:  Yeah, okay.  It's not really directly

11   tied to cash collateral use, but I'm going to still allow it.

12         Go ahead, Mr. Jones.

13   A    Yeah, under normal course, we do record supplemental

14   recordings in the various jurisdictions of probate in the

15   courthouses.  If you tell me exactly what you're looking for,

16   maybe we can put that in the data room, but I can't -- I can't

17   testify that every supplement -- recording supplement has been

18   recorded on every document that's ever been drafted.

19   Q    I appreciate that.

20         MR. SHIPPS:  And, Your Honor, for the record, I would

21   like to renew the request that recorded memorandums of JOAs

22   that have been recorded by SEC be placed into the data room for

23   access to all the parties.

24         THE COURT:  Okay.  And the Court is ordering that

25   that be done within two weeks' time so that we have a response

Jones - Cross/Shipps                    105

1   to this.

2              It doesn't mean they have it all --

3              MR. SHIPPS:  Understood.

4              THE COURT:  -- but to the extent that they do, they

5   need to put it in the data room within two weeks from today.

6              MR. SHIPPS:  And, Your Honor, if I could, on the

7   second question.

8              THE COURT:  Okay.

9   BY MR. SHIPPS:

10  Q    With regard to the Debtors' Exhibit 4, which is the

11  proposed interim budget, I believe it is on the first page of

12  that exhibit, there is a reference to Alabama Gas Plant

13  Management Fees.  And it shows that in the time period of May

14  9th through May 31st, there's a revenue to be received in the

15  amount of $118,625.  And I would ask you, Mr. Jones, if you

16  know what the source of that revenue is?

17  A    I do.

18  Q    Could you explain to the Court, please?

19  A    The -- those monies are attributable to our management fee

20  of the operating the North Beach and Abbeville gas facilities

21  in Conecuh County, Alabama.

22             MR. SHIPPS:  I guess that's my two questions, but I'd

23  sure like to ask --

24             THE COURT:  That's your two questions.

25             MR. SHIPPS:  Okay; thank you, Your Honor.

```
 1                    (Laughter)

 2              THE COURT:  You're going to find a way to get it in

 3   through the CFO.

 4              MR. SHIPPS:  Right.

 5              THE COURT:  Okay, all right.  So shall we take our

 6   lunch break now?  And if so, for how long?

 7              MS. RILEY:  Well, Your Honor, we also do have the 341

 8   to deal with this afternoon, as well.

 9              THE COURT:  Okay.

10              MS. RILEY:  And that's scheduled to begin at 1:30.  I

11   know the Court had -- previously had the Chapter 11 scheduling

12   conference that was --

13              THE COURT:  For 3.

14              MS. RILEY:  -- scheduled to have been at 3.

15              THE COURT:  So would you propose -- I mean I want to

16   give people a chance to actually have a lunch.  I suppose you

17   could eat through the 341, right, at your desk?  What are you

18   proposing?  I'm open.

19              MS. RILEY:  Well, Your Honor, I guess we could take

20   an hour for lunch break and plan to reconvene at 3.  I know my

21   second witness -- we should be able to get done with him today,

22   but I'm not sure what other witnesses we are planning to call.

23   We were just concerned, of course, because this is, you know,

24   ongoing use of cash collateral, and there are operations that

25   do need to be maintained.
```

1            THE COURT:  Do you intend to offer the declaration of

2    Mr. Sklar?

3            MS. RILEY:  Not at this point, Your Honor.  I know

4    that Mr. Sklar has been designated as a may call witness, but

5    obviously we do have both Mr. Jones and Mr. Strausser who are

6    very heavily involved in day-to-day operations and are

7    testifying on that basis.

8            Mr. Sklar can testify, as well, just on general

9    background.

10           THE COURT:  I'm just curious, why is he not a part of

11   these proceedings?

12           MS. RILEY:  Well, Your Honor, he did want to be, but

13   we thought that given the limited scope of what we were really

14   addressing here in this third interim order, he does have a lot

15   of background knowledge and a lot of, you know, general

16   overview, we wanted to really give people some more of the

17   details here, as well.  And we felt that that --

18           THE COURT:  I do appreciate that, but he's drawing a

19   large salary; it's a lot less than what he was drawing before.

20   But if he is so essential to the business, that this business

21   that's struggling so much is still going to pay him so much,

22   it's just curious to the Court that he is not choosing to be a

23   part of what are some pretty important hearings for the future

24   of the companies.

25           MS. RILEY:  And, Your Honor, I would point out again,

1  he did really want to be a part of this hearing, but we really

2  were trying to limit the scope here to focus in on those cash

3  collateral issues, and really provide details as to the budget,

4  the day-to-day operations, and things along those lines just,

5  again, to really kind of hone in the focus here.

6          THE COURT:  Okay.  What if we went another half an

7  hour, then people can have their quick lunches at their desk or

8  in their homes, and then you call in for the 341?  What if we

9  went to, say, 12:30 today, is that -- is everybody okay?  If

10 anybody wants to take a five-minute break before that, we can

11 do that.

12         MS. RILEY:  Your Honor, I think a five-minute break

13 might be helpful here.

14         THE COURT:  Okay.  Let's do the five-minute break.

15 So that means come back by noon.

16         MS. RILEY:  Thank you, Your Honor.

17         MS. CASS:  Court is now in recess.

18         (Recess 11:54:42 a.m./Reconvene 12:01:43 p.m.)

19         THE COURT:  All right.  So who is your next witness,

20 Ms. Riley?

21         MS. RILEY:  Your Honor, the debtor would like to call

22 John Strausser.

23         THE COURT:  Mr. Strausser, please come forward and be

24 sworn by the Court's clerk.

25         MS. CASS:  Please raise your right hand.

```
 1              JOHN STRAUSSER, DEBTORS' WITNESS, SWORN

 2              THE COURT:  Please be seated.  And, Mr. Strausser, is

 3   John with J O H N?

 4              THE WITNESS:  Yes, Your Honor.

 5              THE COURT:  Okay.  We're not getting your picture at

 6   all when you talk.  Can you speak up a lot more, please?

 7              THE WITNESS:  How is this volume?

 8              THE COURT:  It's still soft, and for some reason --

 9   oh, you're in the same room with Mr. Jones.  Okay, sorry, I

10   hadn't clued in to that.  It just says Marshall Jones, and

11   so --

12              MR. SKLAR:  This is Howard Sklar.

13              MR. JONES:  No, Your Honor, this is Howard Sklar.

14              THE COURT:  Okay, thank you, Mr. Sklar, for showing

15   up for today's hearings.  We know they're very important to

16   your company.

17              MR. SKLAR:  Yes.

18              THE COURT:  Okay.  So -- but where is Mr. Strausser?

19              THE WITNESS:  Your Honor, I can see the video of my

20   face but -- can Your Honor not?

21              THE COURT:  We can barely hear you, so that tells me

22   the court reporter won't be able to, and we do not have your

23   pictures.

24              THE WITNESS:  Excuse me.

25                           (Pause)
```

RUD000257

Strausser                                                110

1        THE COURT:  Is he in the same office with you, Mr.

2   Jones and Mr. Sklar?

3        MR. JONES:  He is, he's down the hall.

4        THE COURT:  Could he come down to your office since

5   he's having technical difficulties where he's at.

6        MR. JONES:  Sure, that's no problem.  Yes, Your

7   Honor.

8        THE COURT:  Okay.  Just ask him to come down to your

9   office, and we'll go from there.

10                      (Pause)

11        THE COURT:  Ah, there you are.  It's pretty fuzzy,

12  but we do see you.

13                      (Pause)

14        THE COURT:  Okay.  So take a seat, Mr. Strausser.

15        MS. RILEY:  He should be there in just a moment, Your

16  Honor.  We apologize for the technical difficulties here.  We

17  tried this yesterday, and everything worked.

18        THE COURT:  Well, you know what, I think it's going

19  amazingly well for how -- what novices we all are at doing

20  this, so I'm pleased, and we'll work through this.  Is it a

21  long walk for him to go from his office to theirs?

22        MS. RILEY:  Actually he has just showing up on camera

23  right now.

24        THE COURT:  There we are.  Okay, so Mr. Strausser,

25  let's see if we can hear you better.  Could you state your name

Strausser - Direct/Riley                           111

1  for the record?

2           THE WITNESS:  John Strausser.

3           THE COURT:  Much better.  And John is spelled with an

4  H in it?

5           THE WITNESS:  Yes, Your Honor.

6           THE COURT:  And Strausser, how do you spell that?

7           THE WITNESS:  S T R A U S S E R.

8           THE COURT:  Very good.  Okay, and your business

9  address?

10          THE WITNESS:   5395 Pearl Parkway.

11          THE COURT:  Thank you.

12          THE WITNESS:  In Boulder.

13          THE COURT:  In Boulder, all right.

14          Take it away, Ms. Riley.

15          MS. RILEY:  All right.

16                        DIRECT EXAMINATION

17 BY MS. RILEY:

18 Q    So, Mr. Strausser, do you work for the debtors in this

19 case?

20 A    I do.

21 Q    And what is your current title?

22 A    Vice President and Chief Financial Officer.

23 Q    As the Chief Financial Officer, what are your job duties?

24 A    I assist Mr. Sklar in the management of the financial

25 reporting, treasury, and accounting functions.

1 Q    How long have you worked for the debtors?

2 A    Six months.

3 Q    And prior to working for the debtors, where did you work?

4 A    I worked for KPMG LLP, which is one so-called big four

5 international accounting firms.

6 Q    What did you do at KPMG?

7 A    I was an audit managing director.

8 Q    What kind of things would you do as the audit managing

9 director?

10 A    We performed financial statement audits for -- for our

11 clients.  The clients in industries that I served were

12 typically upstream exploration production companies, similar to

13 Sklar, oilfield service companies, and construction companies.

14 Q    And approximately how many years did you work at KPMG?

15 A    I was at KPMG for over 17 years, 14 of those years were in

16 the New Orleans operating office, and three years were in the

17 firm's national office in New York City.

18 Q    Now over your last six months with the debtors, have you

19 become familiar with their operations and their revenue?

20 A    Yes, as much as one can absorb in that amount of time.

21 Q    With respect to Sklar Exploration -- between the two

22 debtors, again, just which company sells the oil and gas?

23 A    Sklar Exploration sells the oil and gas.

24 Q    Approximately when does Sklar Exploration get paid for the

25 sales of its oil and gas products?

1  A    Sklar gets paid one month in arrears.  Typically the first

2  of those payments come in on or around the 20th of the month,

3  and other payments come in through the end of the month in the

4  month following the month of the actual production.

5  Q    Now when those payments are made, where is that -- where

6  are those funds received?

7  A    Those funds are received into Sklar Exploration's revenue

8  account.

9          MS. RILEY:  Your Honor, I'm going to ask that

10  everyone refer to Debtors' Exhibit 8.

11          THE COURT:  Do you have that with you, Mr.

12  Strausser?

13          THE WITNESS:  Yes, Your Honor, I do.

14          THE COURT:  Excellent.

15  BY MS. RILEY:

16  Q    And, Mr. Strausser, do you recognize Debtors' Exhibit 8?

17  A    I do.

18  Q    And what is Exhibit 8?

19  A    Exhibit 8 is the April bank statement for the revenue

20  account for Sklar Exploration.

21  Q    And is Exhibit 8 a true and correct copy of that revenue

22  statement?

23  A    Yes.

24          MS. RILEY:  Your Honor, move for the admission of

25  Debtors' Exhibit 8.

Strausser - Direct/Riley                    114

1          THE COURT:  Anyone opposed?

2                 (No audible response heard)

3          THE COURT:  It is received.

4                 (Debtors' Exhibit 8 admitted into evidence)

5  BY MS. RILEY:

6  Q     Sir, I'm going to direct your attention to Page 2, about

7  three-quarters of the way down the page.

8  A     Okay.

9  Q     There is a deposit there for Plains Marketing, LP.  Do you

10 see that?

11 A     I do.

12 Q     What is the amount of that deposit?

13 A     $137,221.36.

14 Q     What is that deposit for?

15 A     That would be representative of the -- a hundred percent

16 of the proceeds from the sales of the March production to

17 Plains Marketing, LP.

18 Q     Now when you say "a hundred percent of the proceeds," what

19 do you mean by that?

20 A     It's from the sale of the entire proceeds from all

21 production that was purchased by Plains.

22 Q     Would that include any amounts for other revenue interest,

23 as well?

24 A     Yes, it would be for the revenue -- for all revenue

25 interest in the -- in the wells to which the production relates

Strausser - Direct/Riley                    115

1  to.

2  Q     Would that include, to your knowledge, Sklarco, as well?

3  A     Yes.

4  Q     And right below that, there is a deposit for Goodway

5  Refining, LLC, what's that amount?

6  A     Similar to Plains, that -- well, the amount's much larger,

7  approximately 2.5 million.  That is the hundred percent

8  proceeds of March production purchased by Goodway Refining.

9  Q     And for both Plains and Goodway Refining, what months do

10 those sales relate to?

11 A     For March, March production.

12 Q     Turning to the third page, again, about halfway down,

13 there is another deposit for Concord Energy, LLC.  What is that

14 for?

15 A     Concord is the marketer of the natural gas liquids that

16 are produced at the -- at the Alabama Gas Plant.

17 Q     And would those be for March sales, as well?

18 A     That's correct.

19 Q     What about Southeast Alabama Gas District, what is that

20 deposit for?

21 A     Southeast Alabama Gas District is the purchaser of the --

22 what's referred to as dry or residue gas out of the tailpipe of

23 the Alabama Gas Plant, and that would be for their purchase of

24 all of the dry or residue gas from March production.

25 Q     And what about Texla Energy Management, Inc.?

Strausser - Direct/Riley                              116

1    THE COURT:  And for the record, it's spelled T E X

2    L A.

3    A    Similar to Southeast Alabama Gas District, that is the

4    proceeds from the sale of the May gas -- uh, March -- I

5    apologize -- March gas produced.

6    Q    Now we also see quite a few returned checks on this

7    particular statement.  To your knowledge, what caused those

8    returned checks?

9    A    My understanding is those checks were not honored because,

10   upon learning of the Chapter 11 filing, East-West Bank

11   suspended our accounts pending court orders for the use of cash

12   collateral.

13   Q    Now turning to the fifth page --

14   A    Okay.

15   Q    -- towards the top, on April 1st, there was a transaction

16   "Online banking transfer."  What is the amount of that

17   transfer?

18   A    $800,000.

19   Q    And where -- where were those funds transferred to?

20   A    Those funds were transferred to the SEC operating account.

21   Q    What were those funds for?

22   A    Those were funds that would have been representative of

23   Sklarco's share of January revenues, which would have been paid

24   out to -- in March to fund Sklarco's share of the ongoing

25   expenses of the business.

1  Q    When -- I want to step back.  When revenue is paid out to

2  the various interest holders, approximately when is it paid out

3  relative to when the product is sold?

4  A    Two months in arrears.  So product is produced, the next

5  month we're paid, the following month we turn around and pay

6  others.

7  Q    So just by way of an example, for instance, if product was

8  sold in January, when would those funds be received?

9  A    Those funds would generally be received in February, and

10 paid out to revenue holders in March.

11 Q    All right.  Turning back to the bank statement, below the

12 800,000, there is another transfer, what is that amount for?

13 A    That's six hundred and eighty (indiscernible - multiple

14 speakers) --

15 Q    (Indiscernible - multiple speakers).

16 A    -- 84 cents.

17 Q    And where were those funds transferred to?

18 A    Those funds were also transferred to the SEC operating

19 account.

20 Q    What were those -- what was that 683,000, approximately,

21 for?

22 A    Sklarco's share of February revenue receipts.

23 Q    Now right below that, there is a preauthorized debit.

24 What is the amount of that preauthorized debit?

25 A    $703,558.02.

1  Q    What is that payment?

2  A    That payment is the ACH payment -- or a direct deposit

3  component of the January and February revenue -- royalty

4  revenue and overriding royalty revenue payments that we had

5  received Court's -- Court authority to pay.

6  Q    Were a number of checks also issued for the January and

7  February royalty payments?

8  A    Yes.

9  Q    And turning to Page 4 of the bank statement, are those the

10  checks that went out to royalty and overriding royalty

11  interests?

12  A    Yes, that would be what those would be for.

13  Q    Were any other payments made out of the revenue account in

14  the month of April?

15  A    No.

16  Q    Now if we look back at the deposits, does -- when we look

17  at the deposits, are those deposits broken out by well, or just

18  deposited all together?

19  A    No, those deposits come in in one lump sum from the

20  various purchasers.

21  Q    At any point, does Sklar Exploration receive an accounting

22  on a well-by-well basis of the revenue it's receiving?

23  A    No, we would compile that for accounting purposes from the

24  meter tickets and other measuring apparatus that we have that -

25  - that the well has or at the tank levels for all of our

Strausser - Direct/Riley                    119

 1  producing wells.

 2  Q    And when that information is compiled, how do you use that

 3  to help you determine the amount of revenue by well?

 4  A    In the month following receipt of the revenue from the

 5  purchaser at a hundred percent, we go through a process that's

 6  called running revenue generically.  What that does it is -- we

 7  take all of the volumetric information on a well-by-well basis,

 8  enter that into the accounting system, and using the decks that

 9  were discussed previously, we use those decks and that

10  production information to calculate the amount that's owed to

11  each royalty interest or revenue interest holder for their

12  share of that production.

13  Q    When does Sklar Exploration generally run the revenue?

14  A    That process generally starts on or around the 20th of the

15  month and concludes around the 25th or 26th of the month.

16  Q    So for instance, after a deposit is received, would it be

17  easy for a working interest holders to call up and see the

18  exact amount they'd be owed the day after the deposit's

19  received?

20  A    No, that would be very difficult.  One of the -- one of

21  the missing components would be calculating severance tax,

22  which is taken off the top of revenue before any revenue

23  interest holder is paid.  And that process takes -- generally

24  it starts in the second week of the month, and runs through on

25  or about the 15th of the month when the severance tax reports

1  are due to the various State Departments of Revenue.

2  Q    And who does Sklar Exploration pay severance taxes to?

3  A    We pay it generally to the Department of Revenue in each

4  state in which we have production.  So that'd be like the

5  Alabama Department of Revenue, Florida Department of Revenue,

6  Louisiana, etc.

7  Q    At any point, does Sklar Exploration provide an accounting

8  to its various interest holders of their revenue and joint

9  interest billings?

10 A    Yes, that is generally provided to each revenue interest

11 holder as we complete the revenue process.

12 Q    When an accounting is provided, what does that accounting

13 represent?

14 A    It shows them what is owed to them on a property-by-

15 property basis, the revenue attributable to them.

16 Q    Does it at any point guarantee that funds are available to

17 pay those amounts?

18 A    No, it does not.

19 Q    When the revenue is maintained in the bank account, is it

20 ever separated out by interest holder?

21 A    No.

22 Q    Does Sklar Exploration ever separate out the revenue by

23 well?

24 A    No.

25 Q    And prior to the bankruptcy filing, was the revenues still

1  maintained in kind of that general fashion?

2  A    Yes.

3  Q    I want to turn to Exhibit 4, this is Debtors' Exhibit 4,

4  this has been introduced.

5  A    Okay.

6  Q    And this is the budget through May 31st.  Did you assist

7  in completing this budget?

8  A    I did.

9  Q    And were you actually the one who completed the budget?

10 A    I compiled the budget but I would say that I did so with

11 the heavy involvement of the rest of the management team,

12 including the field level engineers, head engineers, and -- and

13 the -- the remainder of the accounting group in order to credit

14 this complete and accurate a budget as we could compile.

15 Q    And why did you think that it was necessary to rely on

16 those additional parties?

17 A    They understand the field level activities that drive the

18 cost structure of the company.

19 Q    So looking at the first page of the budget, we look in the

20 week ending April 24th for the operated properties, there is a

21 deposit to oil of approximately 2.7 million.  Does that

22 correspond roughly with the deposit that we saw on the bank

23 statement?

24 A    Yeah, that would be -- that would be meant to -- it's the

25 estimate to correspond to the combination of the Plains

1  Marketing, LP receipt of 137,000, and the Goodway Refining

2  receipt of about 2.5 million that we discussed earlier.

3  Q    And the week ending May 1st, what were those deposits for

4  there?

5  A    That would generally be for the -- for the gas.

6  Q    There's also a line item for the non-operated properties

7  for Sklarco, what are those for?

8  A    Those are estimated revenues received for the non-operated

9  properties, so from -- from the various operators of those

10 properties.

11 Q    And below, it says "Revenues payable to others," what does

12 that refer to?

13 A    If you're talking about the column May 1st, that number

14 was augmented from what was originally in the budget due to the

15 various negotiations, and that is -- that was for the payment

16 of January and February royalty revenue and overriding royalty

17 revenue.  But in general as a go forward for the column that's

18 -- with the heading May 9th or 5/9 through 5/31, that would be

19 related to the payment of all revenue types, including working

20 interest, royalty interest, and overriding royalty interest.

21 And ultimately it's not part of this order, it would be

22 proposed to be paid -- all of those items on a -- on a go

23 forward basis.

24 Q    Now specifically when we're referring to that last column,

25 the revenue payment is -- it says 2.7 million approximately,

1  what month would that be for?

2  A    That would be related to the March production.

3  Q    And just to reiterate, when were the funds from the March

4  production received by Sklar Exploration?

5  A    They would have been received in the last ten days in

6  April.

7  Q    So turning to the second page, there's a highlighted line

8  item for reimbursement of operated property LOE from WIO

9  owners, can you just explain what that means?

10 A    Reimbursement of operated property LOE from working

11 interest owners just means the expectation that owners would

12 pay their -- their joint interest billings that are a portion

13 of the operating cost of the related properties.

14 Q    And what --

15 A    Also -- I would say also included in that line is

16 something that's referred to as COPAS reimbursement.  COPAS is

17 an acronym for Council of Petroleum Accounting Societies, and

18 it basically creates a framework that is in -- that that, along

19 with the joint operating agreements, allows for an operator to

20 recoup or get a cost reimbursement of some of the overhead that

21 it bears to be the operator at the well.

22 Q    When are the reimbursement of operated property -- lease

23 operating expenses generally issued to the various interest

24 holders?

25 A    That's generally in the first week or so of the month

1  following the actual month.  So all of the invoices received in

2  the month prior would be accumulated, and then we would --

3  what's called run the JIB process.  And that JIB process would

4  take those costs which, again, we, as the operator, we get

5  costs at all those invoices at a hundred percent, and we pay

6  those invoices at a hundred percent, or are expected to pay

7  those invoices at a hundred percent.  But we take those, and

8  run them across the working interest component of the decks to

9  identify and calculate what the portion of costs that the other

10 working interest owners in these properties owe back for their

11 share of the cost to operate the properties.

12 Q    Now to your knowledge, are there any parties who have

13 requested that Sklar Exploration offset their joint interest

14 billings from their revenue?

15 A    There are.  It's -- it's -- it's not -- there's nothing

16 uniform across the board, it would be a owner-by-owner

17 election.

18 Q    For those parties who haven't asked for that to be offset,

19 what is generally the collection process for those joint

20 interest billings?

21 A    I believe the terms of the joint interest bills are that

22 they would be due in 15 days from receipt.

23 Q    What happens if, for instance, a party refuses to pay

24 their joint interest billing?

25 A    After a period, we would be allowed to offset their

1  revenue by the -- by their unpaid portion of their joint

2  interest bills.

3  Q     Now you've been present at today's hearing, right?

4  A     Yes.

5  Q     And you've heard a number of the questions about some of

6  these cash call advances, is that right?

7  A     I have.

8  Q     So does the company -- does Sklar Exploration ever offset

9  joint interest billings against cash call advances?

10  A     Well, it has, but it's important to be very careful when

11  we speak about that.  So a JIB statement that we would send to

12  all working interest owners would have two components.  I'll

13  address the cash call liability component first.  So when we

14  cash call someone, they essentially have a credit on our books

15  which sits as a liability.

16          As -- and as others have mentioned, those cash calls

17  relate to certain specific operations and certain specific

18  AFEs.  As invoices come through, those invoices are coded

19  against those AFEs.  And so on a monthly basis, for

20  informational purposes, we would identify, and demonstrate, and

21  show on the joint interest bill that a working interest owner's

22  -- or their credit with us, or their -- or the cash call

23  liability on our books had been reduced by their proportionate

24  share of the expenses that relate to that AFE.  That is largely

25  just an informational item.  There is no ask to pay as it

1 relates to that component of the joint interest bills.

2          Separately, on a joint interest billing statement, we

3 show the normal, what we call LOE, lease operating expense,

4 that is -- that was -- that came through on a property-by-

5 property basis, and what the joint interest bill presents to

6 the working interest owners is their bill for their share of

7 the operating costs from the prior month.

8 Q    Now in addition to Sklarco's portion of the revenue which

9 you identified on the bank statements, and the reimbursement of

10 operated properties which includes the COPAS reimbursement, are

11 there any other sources of revenue or money coming in for Sklar

12 Exploration?

13 A    It would just be the hedging agreements that were

14 discussed earlier.

15 Q    Now to your knowledge, what is covered by those hedging

16 agreements?

17 A    It is -- well, it's designed to have approximately 50

18 percent of Sklarco's production in any given production month.

19 Q    Can you just generally describe how those hedging amounts

20 are calculated, if you know?

21 A    We are paid on the difference between the strike price or

22 the (indiscernible - muffled) price, and the average of the

23 related index, which in the case of our oil hedges is West

24 Texas Intermediate, and whatever that average daily price is.

25 Or in the case of the gas hedges, that would be in the Henry

Strausser - Direct/Riley                    127

1  Hub index.

2  Q    So for instance, when the oil price decreases

3  significantly, what happens to the money coming from those

4  hedging agreements?

5  A    It increases.

6  Q    Has Sklar Exploration hedged anyone else's interest in the

7  production?

8  A    No.

9         MS. RILEY:  All right.  So, Your Honor, I'm happy to

10 continue, but I do just want to be mindful of people's time.

11        THE COURT:  All right.

12        MS. RILEY:  I do know that we said we were going to

13 stop at 12:30.

14        THE COURT:  Yeah, this is a great breaking point;

15 thank you.

16        So we will -- you all will hook in, I'm sure, to the

17 creditors' meeting at 1:30 Colorado time, and we will resume

18 the court hearing at 3 o'clock.  Even if you finish the

19 creditors' meeting earlier, I don't know how we'd get word out

20 to everybody to start earlier, so we'll just count on the 3

21 o'clock start time.

22        The Court does have time available and blocked out

23 for this for tomorrow, if necessary.  So nobody should worry

24 too much about it if we don't finish today, so -- okay.  See

25 you all back at 3 o'clock.

1                Thank you.

2                MS. RILEY:  Thank you, Your Honor.

3                MS. CASS:  Court is now in recess.

4                (Recess 12:32:37 p.m./Reconvene 3:00:26 p.m.)

5                THE COURT:  Thank you; all right.  We are back on the

6    record in the case of in re Sklar Exploration Company, LLC and

7    Sklarco, LLC under Case Number 20-12377.

8                And I'm not going to take appearances again.  I'm

9    going to assume that we have everybody back from the 341

10   meeting.  Unless -- do we have any indication that a lot of

11   folks aren't back, Ms. Cass?

12               MS. CASS:  I think most people are here.

13               THE COURT:  Okay, great.

14               MS. CASS:  I'm showing 51 participants.

15               THE COURT:  Okay, that sounds about right.

16               Okay, so we're going to continue the direct of our

17   CFO, Ms. Riley.  Are you there?

18               MS. RILEY:  Yes, Your Honor.

19               THE COURT:  Okay.  And is our witness still here?

20               THE WITNESS:  Yes, Your Honor.

21               THE COURT:  Very good, Mr. Strausser.  We'll remind

22   you that you're still under oath, okay?

23               THE WITNESS:  Of course.

24               THE COURT:  Very good.  All right, Ms. Riley, please

25   continue.

RUD000276

1    DIRECT EXAMINATION CONTINUED

2  BY MS. RILEY:

3  Q    So, Mr. Strausser, when we left off before the break, we

4  were discussing the hedge settlements, do you remember that?

5  A    I do.

6  Q    So I'm going to direct your attention back to Debtors'

7  Exhibit 4, which is the budget, if you can pull that up.

8  A    Okay.

9  Q    So on the first page of that budget, where are those hedge

10 settlements identified?

11 A    They -- they're a third of the way down the page, a row

12 entitled "Hedge Settlements."

13 Q    And what is the first deposit for the hedge settlements

14 there?

15 A    It's for the week ending April 10th of $173,495.

16 Q    And what is the second deposit?

17 A    267,500.

18 Q    Has that amount actually been received for the hedge

19 settlements yet?

20 A    I'm not sure if that amount has been received yet; it may

21 have in the past few days.

22 Q    And given the price change even just between March and

23 April, do you anticipate that the hedge settlements for April

24 would be more or less than that amount?

25 A    I think the amount noted is representative of

Strausser - Direct/Riley                    130

1  approximately what we would expect to receive.  It was based on

2  our -- at the point in time when that budget was created to be

3  what our expectation of realized prices would -- or what the --

4  what the NYMEX WTI average would be for the month of April.  So

5  there was some -- some of the settlements and spot prices

6  throughout that month were known at that point, and some were a

7  guess based on the forward curve.

8  Q    When those hedge settlements are received, again, are they

9  deposited into the operating account?

10 A    They are.

11 Q    Does Sklar Exploration have to pay out those hedge

12 settlements to anyone else?

13 A    No, we only hedge on behalf of Sklarco's production.

14 Q    And what benefit do the funds from those hedge settlements

15 provide?

16 A    In this time of a very low oil price environment, they are

17 critical to our ability to operate through this price downturn.

18 Q    Now I want to direct your attention to the third page of

19 the budget.

20 A    Okay.

21 Q    Now on the top portion, it says "Revenue Account Beginning

22 Cash Balance."  What does that represent?

23 A    The starting point of $1.8 million was amounts held in the

24 SEC revenue account on the date of filing.

25 Q    And why was this section created that separates out that

1  revenue account?

2  A    This section was intended to demonstrated our -- the

3  agreement that was reached with a number of the parties in the

4  case relative to the fact that amounts that were -- that would

5  go into the revenue account would be held there but for the

6  payment of revenue to the various revenue interest holders, of

7  which Sklarco is one of those.

8  Q    So the you'll see in kind of the third column there, it

9  says "For inflows, 2.7 million." What number is -- what is

10  that amount?

11  A    That -- if you look at Page 1, that number flows from the

12  top section of the budget, and it is the estimate of the to be

13  received 100 percent of revenue from the sale of products from

14  Sklar.

15  Q    And looking over at the next column where there is an

16  outflows to outsider of 1.8 million, what is that amount?

17  A    There's two components to that amount.  As I mentioned

18  before, revenues are first burdened by severance taxes that are

19  paid into various states, so that amount is included in that

20  number.  Also included in that number is the payments that were

21  agreed to for January and February unpaid royalty and

22  overriding royalty interests for Sklar.  Let me --

23  Q    Now I want you to --

24  A    Let me correct my earlier statement.  In this case, in the

25  case of that number, the 1.8 million, that is just the amount

1  payable to royalty and overriding royalty interest holders.

2  Q    Meaning --

3  A    There's no severance tax included in that number.

4  Q    Thank you.  And right below that, there's the outflows to

5  Sklar of 683,000, does that correspond with the transfer to the

6  operating account that we saw in that bank statement?

7  A    It does.

8  Q    To your knowledge, was that transfer to -- of the Sklarco

9  amount over to the operating, was that authorized by the Court?

10 A    That's my understanding, yes.

11 Q    Now looking over at the last column where it says,

12 "Outsource to insiders of 2.895 million," what is that?

13 A    That would be consistent with what I mentioned earlier,

14 and that would be the payment of March revenue to working

15 interest, royalty interest, and overriding royalty interest

16 holders, and the payment of severance taxes to the applicable

17 taxing authorities.

18 Q    Right below that, there is also an outsource to Sklar of

19 514,000, what is that amount based off of?

20 A    That is based on the estimated Sklarco portion of the

21 estimate of revenue for the month that's being paid out.

22 Q    Now what is the ending balance of the revenue account

23 there?

24 A    $691,786.

25 Q    Right below the revenue account section, there's also a

Strausser - Direct/Riley                          133

1  section that starts "All other accounts beginning cash

2  balance," what is that?

3  A    That are -- those are all other accounts of the debtors,

4  exclusive of the revenue account.

5  Q    So what accounts would those be?

6  A    That'd be the operating account, the payroll account, the

7  benefits account, and all those of Sklar Exploration, and the

8  single bank account that exists for Sklarco.

9  Q    When it says "All other inflows and outflows net," what do

10 those numbers represent there?

11 A    That is all inflows and outflows that aren't attributable

12 to revenue.  So that would be payment at a hundred percent of

13 the bills relating to our operating costs, the reimbursement

14 through the JIB process from the other working interest owners

15 for their share of those operating expenses.  And also the

16 general administrative expenses of Sklar Exploration.

17 Q    And would that also incorporate other funds received from,

18 for instance, the hedging agreements?

19 A    Yes.

20 Q    Now if you look at the "All other accounts ending cash

21 balance," does that amount increase or decrease over the

22 budgeted time period?

23 A    It increases.

24 Q    What does that increase mean in the context of the

25 debtors' operation?

1  A    Well, that and then the relevant -- the ledge at the

2  bottom of the budget were intended to demonstrate that Sklar

3  could operate with its own cash flows, and not rely on the

4  revenue of others for the ongoing maintenance of the business.

5  Q    Now if you'll look back again on the first page, for the

6  column -- it's the last column where it says "April

7  production," what is the price per barrel estimate for that

8  April production?

9  A    $13.40.

10 Q    And what about the price per -- price per unit of gas?

11 A    A dollar and 42 cents.

12 Q    And based on those prices, can the debtors still operate

13 profitably with the funds that they are receiving?

14 A    Yes, largely due to the protection afforded and additional

15 funds that the hedges provide.

16 Q    Do they require use of other parties' revenues in order to

17 maintain those operations?

18 A    No, that's the -- that is the reason that the -- that the

19 additional information was added to the budget so that that can

20 be demonstrated.

21 Q    To your knowledge, have oil prices increased at all after

22 April?

23 A    They have.

24 Q    Do you know approximately where they're at now?

25 A    I believe spot prices today for WTI NYMEX is somewhere in

1  the neighborhood of 24 to $25.

2  Q    Now you mentioned an agreement with respect to maintaining

3  revenues.  To your knowledge, on a -- well, on a post petition

4  basis, is Sklar Exploration maintaining revenues in a separated

5  account?

6  A    We have constructively, I guess, and I'm probably going to

7  use terminology in accounting versus legal terms.  But we have

8  constructively isolated the revenue account and we are

9  operating under the premises that funds received for revenue

10  can go into that account, and the only amounts that can go out

11  of that account would be payment to others for their portion of

12  revenues, including payment to Sklarco for its portion of

13  revenue.

14  Q    And Sklarco is paid, at least during this time period,

15  where are the funds for Sklarco going?

16  A    Those would be made via a transfer from the revenue

17  account to the operating account.

18  Q    Does -- with the revenues being isolated, as you

19  mentioned, are they separated out by well in any way?

20  A    No.

21  Q    And are they ever separated out by working interest

22  holder?

23  A    They are not.

24  Q    If SEC didn't have the ability to continue to use its

25  funds to operate, what would happen to the company?

Strausser - Direct/Riley                    136

1  A    We'd be forced to shut in our wells, and wind down the
2  business.
3  Q    What impact would that have on, for instance, Sklarco?
4  A    Sklarco would be -- would be harmed relative to the value
5  of the wells.  The wells -- and it may be a better for an
6  engineer, but shutting in wells can have long-term damage.
7  When wells are brought back online, may have diminished
8  production, no production, there are many things that can
9  disturb the formations during the shut in process.  So it's a -
10 - it's -- it's a process to shut in wells and/or open up wells
11 that is subject to a lot of technical advice from our
12 engineering staff so as not to harm the reservoirs.
13 Q    And would that harm occur to other interest holders, as
14 well, not just Sklarco?
15 A    Everyone who owns an interest in the wells would be
16 harmed.  So that would include the working interest holders,
17 the royalty interest holders, and the overriding royalty
18 interest holders.
19         MS. RILEY:  Your Honor, if I may have just a brief
20 moment to consult my notes here.
21         THE COURT:  Okay.
22                    (Pause)
23         MS. RILEY:  Your Honor, no further questions at this
24 time.
25         THE COURT:  Okay.  Does the bank wish to do any

Strausser - Cross/Skelton                    137

1  direct exam?

2          MR. SUZUKI:  Nothing from the bank at this time.

3          THE COURT:  Okay.  And let's start with Mr. Skelton

4  on behalf of Tauber.

5                  (No audible response heard)

6          THE COURT:  Mr. Skelton?

7          MR. SKELTON:  Yup, you'd think I'd get this right by

8  now.

9                      (Laughter)

10         MR. SKELTON:  Can you hear me okay?

11         THE COURT:  Yes, we can.

12         MR. SKELTON:  Okay.

13                  CROSS-EXAMINATION

14  BY MR. SKELTON:

15  Q    Mr. Strausser, earlier you looked at a bank statement,

16  which is marked as Debtors' Exhibit 8, which is the April 30,

17  2020 revenue account statement, do you have that there with

18  you?

19  A    Yes, sir, I do.

20  Q    Okay.  And what is the total balance on hand as of

21  April 1, and before the $800,000 was taken out of the account

22  on that date?

23  A    Two point -- $2,674,825.34.

24  Q    All right.  Now you testified before our lunch break that

25  that $800,000 represented Sklarco's interest in February

1  revenues, is that correct?

2  A    No, sir; January revenues.

3  Q    January revenues, all right.  And why would there be

4  January revenues in the Sklarco account as of April 1st?

5  A    I'm not sure I understand the question.

6  Q    Well, are you saying that Sklarco did not receive its

7  January revenues when received in February or March?

8  A    No, sir, I'm saying that consistent with what I mentioned

9  earlier, we pay out revenues two months after the production

10  month.  And so at the end of -- at the end of March, we

11  calculate the amount of revenues -- or the amount owed to all

12  the interest holders in the revenue related to January

13  production.

14  Q    Okay.  Now earlier, there was testimony from the Chief

15  Operating Officer that the net revenue interest of Sklarco

16  ranged from ten to 30 percent, are you familiar with that?

17  A    Yes, sir.

18  Q    All right.  And I'm just really curious, how is it with a

19  range in net revenue interest of ten to 30 percent, that

20  exactly $800,000 and no cents just happened to be what you

21  calculated to be Sklarco's share of January production?

22  A    Well, that's actually an amount that is less than

23  Sklarco's share of the January revenue.  I believe the total

24  amount was somewhere closer to 870,000.

25  Q    Who made that calculation?

1  A    The accounting system.

2  Q    And how does the accounting system do that?

3  A    The accounting system takes the production volumes that

4  are entered from all of the metering data that we have, it puts

5  them to the various wells to which they relate.  And it runs

6  the total volumes received over the decimals to calculate the

7  amount of revenue that is due to all of the revenue interest

8  holders.

9  Q    Correct.  So in other words, through this accounting

10 system, it's not just Sklarco's interest in revenues that you

11 can figure out, you can figure out anybody's interest,

12 correct?

13 A    That's right.

14 Q    All right, that's the way it's designed.  And that's the

15 job of an operator to be able to do that, or one of its jobs,

16 isn't it?

17 A    That's correct.

18 Q    To maintain the joint account.  Now you -- I guess you'd

19 say you rounded off 870,000 to 800,000.  But is it your

20 testimony here today under oath that the only money Sklarco was

21 owed or entitled to receive out of that revenue account as of

22 April 1st was about $870,000?

23         MS. RILEY:  Objection; mischaracterizes testimony.

24         THE COURT:  Overruled.  You may answer.

25         THE WITNESS:  Can you repeat the question?  I'm not

1  sure I understand, Mr. Skelton?

2  BY MR. SKELTON:

3  Q    Well, as of April 1st -- and that -- that's a very

4  important date in the bankruptcy world, it's what we call the

5  petition date.  It's a line of cleavage between things that

6  happen before, and things that happen afterwards.  And so I

7  want to know whether you calculated, or the system calculated,

8  $870,000 or so to be the total amount that Sklarco had not yet

9  taken out of the revenue account.

10  A    That's correct, relative to the January production.

11  Q    All right.  Well, was there more than that?  What other

12  amounts were in that bank account on the petition date that

13  belonged to Sklarco?

14  A    That would be the reminder of the -- the difference

15  between the calculated amount and the amount that was

16  transferred to operating account.

17  Q    Okay, so $70,000, right?

18  A    Roughly.

19  Q    Okay.  So it follows, doesn't it, that the $2,600,000

20  figure -- let's see, I think I have it right here -- that that

21  opening balance of 2,674,825.34, Sklarco only had an interest

22  in $870,000 of it.  So the rest of it necessarily is owned by

23  the other interest owners, isn't it?

24  A    Yes, that would be right.

25  Q    Okay.  Now the March bank statement -- I'd like you to --

1    MR. SKELTON:  And, Ms. Riley, I don't know whether he

2  has -- does he have with him the Tauber exhibit book?

3    MS. RILEY:  He should have the Tauber exhibits there,

4  as well.

5    MR. SKELTON:  Okay.

6  BY MR. SKELTON:

7  Q    And we're going to go to the last -- it will be in the

8  last of Mr. Shipps' many volumes, but we're going to look at

9  Exhibit N and Exhibit O.

10 A    Mr. Skelton, I do not have those in -- well --

11    THE COURT:  Neither does the Court, it ends with L.

12    MR. SKELTON:  This morning we delivered a

13 supplemental list of exhibits.

14    THE COURT:  Well, that's a problem, that's why we set

15 the deadlines head because the -- you know, the Court is

16 working remotely, so I don't have them.

17    MR. SKELTON:  Okay.  Well, Ms. Riley said she did not

18 have any objection.  I'm sorry, but I didn't realize that.  I

19 had understood that they had been delivered -- hand-delivered

20 this morning, but you're not there, okay.

21    THE COURT:  No, the WiFi band in the courthouse is

22 very unreliable.

23    MR. SKELTON:  Okay.

24    THE COURT:  So we would have a lot more trouble doing

25 this if I was at the courthouse.

1          MR. SKELTON:  Okay.

2          UNIDENTIFIED ATTORNEY:  Your Honor, I don't think

3   that I have been provided with a copy of those exhibits, so if

4   -- maybe Mr. Skelton could provide those electronically, that

5   would be appreciated.

6          THE COURT:  And then maybe we could all see them.

7   That's a good idea.

8          MR. SKELTON:  Yeah, maybe Mr. Shipps can do that.

9   BY MR. SKELTON:

10  Q    But I can ask some questions that I think it would be fair

11  to say that you have general knowledge of.  One of them is that

12  in March, really, there wasn't much revenue deposited until

13  about March 20th, and that's usually the date that it happens,

14  right?

15  A    Yes, sir.

16  Q    Okay.  And so it quickly occurred that there were very

17  major deposits from Goodrich -- Goodway Refining of 3,973,144,

18  Plains Marketing, 589,750, and so forth.  So the money that was

19  in that bank account as of the petition date was money that

20  primarily had been received in the last few days of March,

21  isn't that correct?

22  A    That's correct.

23  Q    Okay.  Now I'd like you to go to your budget, which I

24  believe is Debtors' Exhibit 4.

25  A    Yes, sir, I have that in front of me.

1  Q    Okay.  Okay, let me get to it.  And let's just go -- start

2  with the last page that you were talking with Ms. Riley about

3  where there was this inflow and outflow.  Well, actually the

4  beginning cash balance towards the top of the page where it

5  says, "Revenue Account Beginning Cash Balance," correct?  You

6  see it?

7  A    Yes, sir.

8  Q    And that's $1,827,904, but that is as of April 10th, isn't

9  it?

10  A    That was at the end of the day of April 1st.

11  Q    Well, that's true, but I mean if you go up the column, it

12  -- to the top of the page, it says original budget, April 10th

13  -- or -- April 10th.  But in any event, you're right.  In other

14  words, that 1,827,904 reflects the deduction of $800,000,

15  correct?

16  A    That's correct.

17  Q    And as you stated earlier, since there was only another

18  $70,000 or so that Sklarco was entitled to receive, the balance

19  of that -- 1,827,904 minus about $70,000 is revenue owing to

20  non-debtors, isn't that correct?

21  A    That would be correct.

22  Q    All right.  And if you take your revenue account ending

23  cash balance to the end of this cash collateral budget, am I

24  correct that approximately $1,200,000 of funds belonging to

25  non-debtors has been spent?  Because there's only 691,786 left.

Strausser - Cross/Skelton                           144

1  A    I don't know that I would characterize it that way, Mr.

2  Skelton.

3  Q    Well, if it started out by your admission as being

4  1,827,904 minus 70,000 or so, how is it that that doesn't mean

5  that at the end of the cash collateral period, money that

6  you've admitted belongs to working interest owners has been

7  used?

8  A    The budget shows some four million or so during that

9  period of being paid out to outsiders.  So I don't understand

10  the question; I'm sorry.

11  Q    Well, the -- the -- are you saying that this budget

12  reflects an agreement of the debtors to pay out any remaining

13  revenues belonging to working interest owners -- to the working

14  interest owners even if it was from February?

15  A    This budget shows the payment of revenues to working

16  interest owners for the March production and going forward.

17  Any amounts payables related to January and February to the

18  working interest holders that weren't paid are not reflected in

19  the (indiscernible - muffled) of this accounting.

20  Q    Why not?

21  A    At this time, it's my understanding that we don't have

22  agreement between all parties to make such payments.

23  Q    Okay.  Well, and that does raise another question, but I

24  want to focus in on this.  I had understood that -- from your

25  testimony and the COO's testimony that Sklar was going to fund

Strausser - Cross/Skelton                 145

1  the operations -- or assist in funding the operations of the --

2  of SEC, is that correct?

3  A    That's correct.

4  Q    Well, why would there be outflows to Sklar then?  Why

5  would you be distributing 683,054 to Sklar, and then another

6  514,681 to Sklar?

7  A    Those are the amounts that would be paid into the

8  operating company to support the operating company's expenses.

9  Q    But that's not what it says.  The budget says "Outflows to

10 Sklar."

11         MS. RILEY:  Objection.

12 Q    It does not --

13         MS. RILEY:  Your Honor, this -- this does

14 mischaracterize his testimony.  He testified that the budget

15 shows those transfers.

16         THE COURT:  Overruled.  You should answer, Mr.

17 Strausser.

18         THE WITNESS:  Yeah, sure.

19 A    That represents the amounts payable out of the revenue

20 account which accrue to Sklarco although those -- although

21 those amounts would be moved from the SEC revenue account to

22 the Sklar Exploration operating account, not the accounts of

23 Sklarco.

24 Q    Okay.  But -- I mean does -- do these companies make any

25 semblance of keeping their affairs separate -- their financial

1  affairs?

2  A    From a cash standpoint, all of the money is pooled and

3  commingled.

4  Q    Well, this is problematic.  Outflow to Sklar -- and that's

5  not a mistake.  You don't mean outflow to the operating

6  account.  That says outflow to Sklar, that means Sklarco,

7  doesn't it?

8        MS. RILEY:  Objection, Your Honor; at this point,

9  it's cumulative.

10        THE COURT:  Overruled.

11  A    No, sir.  And maybe the -- maybe the description in the

12  budget could be enhanced, but the 683,000 noted there was

13  transferred from the Sklar revenue account to the Sklar

14  Exploration operating account, and that would be the proposed

15  procedure moving forward, as I understand the agreement in --

16  that has been reached with the Court.

17  Q    Now are you familiar with the term "substantive

18  consolidation"?

19  A    No, I'm not.

20  Q    All right.  Well, let's just put it this way, while y'all

21  might have a joint administration in this case, the assets and

22  liabilities of these two debtors have not been consolidated,

23  meaning into one entity, have they?

24  A    No, sir, they have not.

25  Q    All right.  And so what is the nature of this transaction

1  where money is described in a budget as being an outflow to

2  Sklar, and yet the money is just moved from one SEC account to

3  another?  So are these two amounts -- the two outflows to

4  Sklar, are those loans?  Are they capital contributions?  What

5  are they?

6  A    They are -- they are accounted for as intercompany

7  transfers on our books and records.  I think what you might be

8  referring to is that we could alternatively take that monies

9  and deposit it from the revenue account into Sklarco's

10 accounts, and then move it from Sklarco's accounts to SEC's

11 operating account, but that's not the -- the method of

12 transmission of cash that we've chosen.

13         To more fully answer your question, the -- Sklar

14 Exploration, on its own, without Sklarco subsidizing part of

15 the general administrative expenses of the combined entities

16 could not survive.  And so this reflects the fact that Sklarco,

17 in effect, pays, not only its share of the operating costs, but

18 it -- it provides money to Sklar Exploration to pay its general

19 and administrative expenses that can't be recouped

20 (indiscernible - muffled).

21 Q    Okay.  Well, I guess I'm getting more confused.  Sklarco

22 has, just like all the other working interest owners, joint

23 interest billing obligations, right?

24 A    That's correct.

25 Q    It gets a bill just like anybody else.  So if its revenues

Strausser - Cross/Skelton                              148

1   aren't going into its own accounts, how does it pay for

2   anything?

3   A     Through the commingled cash account.

4   Q     Okay, the commingled cash account.  So between the two

5   companies -- for -- for instance, if there is a billing by SEC

6   to Sklarco, is there a tally kept?  I mean do y'all keep track

7   of whether Sklarco has actually paid all of its joint interest

8   billings?

9   A     Through the use of intercompany accounting.

10  Q     Okay.  And is Sklarco a debtor to Sklar Exploration as of

11  the petition date?

12  A     Yes, it is.

13  Q     How much does Sklarco owe to Sklar Exploration?

14  A     I don't have that number.

15  Q     I would think you would have that number, that's a pretty

16  important number.

17        MS. RILEY:  Your Honor, I don't know that that's a

18  question.

19        MR. SKELTON:  It's a question.

20  Q     Don't you think that's a pertinent important number to

21  know?

22  A     When Sklar Exploration and Sklarco are managed on a

23  combined basis, that's not a -- a number that I pay particular

24  attention to.

25  Q     Okay.  Well, I want to ask you about a couple of other

Strausser - Cross/Skelton                    149

1  exhibits that your own lawyer has marked.  And this has to --

2  I'm trying to understand the business -- the way that Sklarco

3  and SEC interact.  And among the debtors' exhibits are the

4  statement of financial affairs for each company.  And that --

5  and it should be Exhibits 1 and 2.  So if you could look --

6  A    Mr. Skelton, would you give me a moment to collect those?

7  Q    Sure.

8                         (Pause)

9            THE COURT:  Mr. Strausser, as you're repositioning

10 yourself, I want to make sure you are very close to the

11 microphone --

12           THE WITNESS:  Yes.

13           THE COURT:  -- because it's coming in weaker and

14 weaker.

15           THE WITNESS:  Certainly.

16           THE COURT:  Thank you.

17 BY MR. SKELTON:

18 Q    Okay.  The statement of financial affairs of both Sklarco

19 and Sklar Exploration contain --

20           THE COURT:  Well, let's get these document --

21 exhibits admitted and identified, etc.

22           MR. SKELTON:  Okay.  Your Honor, unusual as it is for

23 me to offer somebody else's exhibit, I would like to offer

24 Debtors' Exhibit 1, which is the Sklar Exploration statement of

25 financial affairs and schedules;

1        And Debtors' Exhibit 2, which is Sklarco's statement

2   of financial affairs and -- Sklarco, LLC.  So 1 is Sklar

3   Exploration, 2 is Sklarco, LLC.

4            THE COURT:  Any objection to D-1 and D-2?

5            MS. RILEY:  No objection, Your Honor.

6            THE COURT:  Not hearing any, those are both received.

7       (Debtor's Exhibits D-1 and D-2 admitted into evidence)

8            THE COURT:  Thank you.

9            MR. SKELTON:  Okay.

10  BY MR. SKELTON:

11  Q    Did you assist in preparing the statement of financial

12  affairs?

13  A    I did.

14  Q    All right.  And do you recall that there is attached to

15  each one a list of payments to insiders before the filing?

16  A    Yes, sir, I'm aware.

17  Q    And did you prepare that schedule?

18  A    I assisted in its preparation.

19  Q    Okay.  Let's first look at Exhibit 1, and unfortunately I

20  don't know how to do this other than -- because these are not

21  Bates stamped, but just go past the printed form of the

22  statement of financial affairs and there's a list -- various

23  lists of payments.  And you'll ultimately get to the page where

24  you'll begin seeing payments to insiders.

25  A    Yes, sir.

1  Q    And there is a page -- actually one easy one for you to

2  find that has your name on it, there are payments to John

3  Strausser for various kind of relocation expenses --

4  A    Yes, sir.

5  Q    -- do you see that?

6  A    Yes, sir.

7  Q    Are you on that page?

8  A    I'm on that page.

9  Q    All right.  Well, go down after they finish listing the

10 payments to you for relocating, I guess -- did you relocate

11 from -- to Boulder from -- where'd you -- where'd you come

12 from?

13 A    New Orleans.

14 Q    Okay, all right.  Then there begins a list of payments to

15 Sklarco.  And all of them list -- they say transfer to pay

16 Sklar JIBs, transfer to pay Sklar JIBs, do you see those?

17 A    I do.

18 Q    Okay.  And let's just take an example.  On May 1st, 2019,

19 there is an entry for $225,000 paid to Sklarco, and the entry

20 is "Transfer to pay Sklar JIBs."  Do you see that?

21 A    I do.

22 Q    Now on what basis did you state that this was a transfer

23 to pay JIBs?

24        MS. RILEY:  Your Honor, I'm going to object to this

25 line of questioning.  We're getting pretty far afield from the

Strausser - Cross/Skelton                    152

1   cash collateral issues here.

2            THE COURT:  Counsel, your response?

3            MR. SKELTON:  Judge, when you -- when we look at the

4   Sklarco SOFA, you will understand where I'm going.  I just

5   don't want to telegraph my punch, I'm sorry, but it does relate

6   because I think what this is showing is that the debtor cannot

7   be trusted to accurately depict what it says it is doing or has

8   done.

9            THE COURT:  So that goes to the adequate protection

10  issue.

11           MR. SKELTON:  Yes.

12           THE COURT:  Okay.

13           MR. SKELTON:  That's what I'm -- that's what I'm --

14  and I do believe that I should be given a little latitude to

15  explore this very unusual relationship between SEC and Sklarco.

16           THE COURT:  Okay.  So --

17           MR. SKELTON:  I want to -- go ahead.

18           THE COURT:  I just want to make sure that I'm on the

19  same page.  Exhibit 1 is SEC's SOFA.

20           MR. SKELTON:  Correct.

21           THE COURT:  And its SOFA is showing its transfers to

22  insiders.

23           MR. SKELTON:  Correct.

24           THE COURT:  So on this page of the attachment that

25  you've directed our attention to, this is SEC paying Sklarco.

Strausser - Cross/Skelton                    153

1          MR. SKELTON:  Correct.

2          THE COURT:  For Sklarco's share of joint billing

3    statements.

4          MR. SKELTON:  That's what it says.

5          THE COURT:  Okay.

6          MR. SKELTON:  So what I'd also like Mr. --

7          THE COURT:  So for the record, I'm overruling the

8    objection, and you may proceed.

9          MR. SKELTON:  Okay.

10   BY MR. SKELTON:

11   Q    If you would also look at Exhibit 2, sir -- and, Your

12   Honor -- and just go to the same schedule, and you'll then see

13   the transfers from Sklarco to various trusts.  And there is a

14   page which covers -- there are several different family members

15   that have these trusts, but there is a trust that is referred

16   to as the Howard Trust, and it shows quite a number of very

17   large distributions.  And if you can look at both of those at

18   the same time, I can --

19         THE COURT:  I'm having a hard time finding in Exhibit

20   2 where this is.

21         Ms. Riley, promise me you will never again submit

22   voluminous exhibits without page numbers.

23         MS. RILEY:  Yes, Your Honor.  And I do apologize for

24   that, Your Honor.

25         THE COURT:  So help me get to the page that he is

1    talking about.

2             MS. RILEY:  It's approximately Page 15.  I believe

3    the page starts, "Sklarco payments to insiders," it's a printed

4    PDF of a spreadsheet.

5             THE COURT:  Okay, I've got it now.

6    BY MR. SKELTON:

7    Q    So we were just talking about a transfer from SEC to

8    Sklarco on May 1st, 2019 of $225,000.  And on May 1st, 2019,

9    there is a distribution from Sklarco in the exact amount of

10   $225,000 to the Howard Trust.

11            Can you explain to me, sir, why the exact amount that

12   you characterized in the SEC SOFA -- the statement of financial

13   affairs to pay JIBs was, in fact, used to pay that exact amount

14   to Mr. Sklar's trust?

15   A    It must have been a mistake in classification, inadvertent

16   classification of that amount.

17   Q    Well, it's not the only one, sir.  If you'll look at July

18   11th, a $50,000 transfer to pay JIBs.

19            And then if you go over -- and it's not the exact

20   same date, but on July 9th, 2019, there's a $50,000 payment to

21   the Howard Sklar Trust.

22            Then there are other transfers that appear to

23   coincide very closely with the ones that are received from SEC,

24   but instead of going to pay JIBs, you've got this, you know,

25   really tremendous amount of money going to the Howard Sklar

Strausser - Cross/Skelton                    155

1  Trust, can you -- can you explain that?

2        MS. RILEY:  Again, Your Honor, I'm going to object to

3  relevance at this point; I think we've established the point.

4  If we could maybe get back to some of the cash collateral

5  issues here.

6        THE COURT:  Overruled.

7  BY MR. SKELTON:

8  Q    Can you explain that, sir?

9  A    Can you repeat the question, please, Mr. Skelton?

10 Q    Can you explain why you listed every single transfer to

11 Sklarco as being to pay JIBs, and reconciled that with the fact

12 that on the same or very close dates in the Sklarco statement

13 of financial affairs there are payments out to the Howard Sklar

14 Trust in a very similar amount?

15 A    No, only that there could be mistakes that I made in the

16 characterization of those transfers.

17       THE COURT:  Which is the mistake, what's said in

18 Exhibit 1 or Exhibit 2?

19       THE WITNESS:  In the -- in the Sklar Exploration

20 statement of financial affairs, the transfers from Sklar

21 Exploration to Sklarco.

22       THE COURT:  So it wasn't to pay JIBs, it was, in

23 fact, to pay the Howard Trust.

24       THE WITNESS:  It -- it -- it certainly appears there

25 are -- there are certain of those transfers that were

Strausser - Cross/Skelton                    156

1    incorrectly identified.

2    BY MR. SKELTON:

3    Q    Now let's talk about the management -- or the relationship

4    of the Howard Sklar Trust to these two entities.  Am I correct

5    in understanding that the Howard Sklar Trust owns a hundred

6    percent of the equity of both companies?

7    A    That's right.  That's correct.

8    Q    Okay.  And did you have a hand in preparing -- it's not

9    marked as an exhibit, but there was a combined and consolidated

10   balance sheet that was attached to the original cash collateral

11   motion as Exhibit A, did you prepare that?

12   A    Yes, I would have assisted in that preparation.

13   Q    Okay.  And one thing I have never seen in any balance

14   sheet until this case is instead of showing stockholder's

15   equity or something like that, you have what are some entries

16   that do not sound like ordinary commercial or accounting

17   entries, which include trust principal and total liabilities in

18   trust principal.  Can you explain what the "trust principal"

19   is?

20   A    It equates to stockholder's equity.

21   Q    Okay.  But why is it referred to as trust principal?

22   A    These are the combined and consolidated financial

23   statements of Sklar Exploration, Sklarco, Sklar Transport, the

24   Howard Trust, and the trusts of his two sons, and so the equity

25   -- it's for the benefit of the trusts.

1  Q    Okay.  Now have you got -- do you have any background in

2  forensic accounting?

3  A    I do not.

4  Q    Okay.  Have you done any -- made any effort to basically

5  determine what has been done with the money that was

6  transferred out to the various trusts?

7  A    I'm not sure I understand the question.

8  Q    Well, you came in -- what was the month in which you came

9  into Sklarco or Sklar Exploration?

10  A    November.

11  Q    Okay.

12  A    2019.

13  Q    And did these transfers that continued on into January, at

14  least, catch your attention?

15  A    I was aware of the transfers to the Howard Trust.

16  Q    Okay.  And when you came in in November, would you say

17  that as of that time, the company was already having trouble --

18  or keeping up with the payment of its indebtedness?

19  A    Cash management was -- was a focus.

20  Q    Wasn't focused?

21  A    Was a focus.

22  Q    Was a focus, okay.

23  A    Right.  Right, so outstanding payables.

24  Q    Right.

25  A    (Indiscernible - multiple speakers).

Strausser - Cross/Skelton                    158

1  Q    Because, you know, our clients received and paid cash call

2  advances in November and December at the same time that -- that

3  they weren't spent for the proper purpose, at the same time all

4  this money is being transferred out, did you know that?

5  A    Yes, sir.

6  Q    Okay.  And do you have any explanation as CFO how it could

7  be that the company would spend $7 million that had been paid

8  in for specific projects on other purposes?

9  A    Those amounts were paid on outstanding bills of the

10 company.

11 Q    But not the ones for which they were intended.

12 A    That's correct.

13 Q    Okay.  Going back to Exhibit 4, your budget, it does

14 appear that in order to -- for this budget to work, you've got

15 to use most of the money that was the cash on hand as of the

16 date the petition was filed, isn't that correct?

17 A    That's correct.

18 Q    Okay.  And how do you -- because you now propose to pay

19 all the revenue out, I guess, except Sklarco's, I'm still not

20 understanding how the numbers could work.

21 A    The -- as I mentioned before, the --

22            THE COURT:  You're coming in very softly, Mr.

23 Strausser.

24            THE WITNESS:  I'm sorry.  Is this better?

25            THE COURT:  Yes.

1              THE WITNESS:  Okay.

2   A    As I mentioned earlier, Mr. Skelton, the bottom portion of

3   the budget is intended to show under a hypothetical zero dollar

4   starting balance how the net cash flows attributable to

5   interest only related to Sklar entities that accumulate over

6   the forecast period.

7   Q    Okay, all right.  Just a couple more questions.  Your COO

8   testified earlier today that the filing was necessitated by

9   COVID-19, and just the Russians and the Saudis fighting each

10  other.  But isn't it true that what really happened was that

11  East-West Bank was insisting that you guys close out your

12  hedges?

13  A    No, that's not true.  We had approached East-West Bank

14  about the potential to close out our hedges, and we were

15  attempting to reach a forbearance type agreement, because as

16  mentioned, we were in default at that point in time, and we

17  ultimately decided to leave the hedges in place.

18  Q    All right.  But am I correct, though, that actions being

19  taken by East-West Bank were the primary precipitating cause of

20  the filing of this bankruptcy?

21  A    No, sir, I don't believe so.

22  Q    Okay.  Well, CFOs ordinarily would have to do with not

23  just accounting but also finance, and why is it that the debtor

24  has not reached out to see if any kind of a DIP financing was

25  available?

1          MS. RILEY:  Objection to relevance, Your Honor.

2          THE COURT:  Overruled.

3  A    We have spoken to a number of finance type entities over

4  the past month or so about refinancing options that might be

5  available to us, primarily in conjunction with the formation of

6  a plan (indiscernible - muffled), but those are just -- those

7  are just discussions at this point.

8  Q    And what about the equity owners, has -- has the Howard

9  Sklar Trust -- have you explored any possible infusion of

10 capital from the trust that has been so richly paid over the

11 last year?

12 A    There is not much liquidity or available liquidity sitting

13 inside the Howard Trust for such an infusion.

14 Q    Well, why -- what happened to the liquidity?

15         MS. RILEY:  Objection to speculation, unless he

16 knows.

17         THE COURT:  You may answer to the best of your

18 knowledge.

19 A    Sure, those -- those amounts were distributed from the

20 Howard Trust -- or -- or much of that amount has been

21 distributed to the Howard Trust to pay Mr. Sklar's ongoing

22 needs.

23 Q    And those include -- isn't it about 40 grand a month to

24 pay his ex-wife?

25 A    It's 30, but, yes, sir.

Strausser – Cross/Shipps                          161

1  Q     Okay.

2           MR. SKELTON:  I'll pass the witness.

3           THE COURT:  Okay.  How about Mr. Geno for --

4           MR. SHIPPS:  Your Honor --

5           MR. SKELTON:  Oh, I forgot I was supposed to hand off

6  Mr. Shipps.

7                    (Laughter)

8           THE COURT:  Ah, no.

9           MR. SKELTON:  I forgot.

10          MR. SHIPPS:  I hope wasn't too slow.

11          THE COURT:  You're supposed to get a text from him.

12                    (Laughter)

13          THE COURT:  All right, Mr. --

14          MR. SHIPPS:  Shipps.

15          THE COURT:  I'm sorry, Shipps.

16          MR. SHIPPS:  Your Honor, I apologize, and I will try

17  to be brief with my questioning, and it does cover a different

18  aspect of what Mr. Skelton has talked about and asked questions

19  about in Debtors' Exhibit 4.

20                    CROSS-EXAMINATION

21  BY MR. SHIPPS:

22  Q     So, Mr. Strausser, if I could direct your attention to

23  Page 1 of Debtors' Exhibit 4.  There is an entry about a third

24  of the way down talking about Alabama Gas Plant management fees

25  as being a source of revenue commencing on May 9th.  Do you

1  know what that is in reference to?

2  A    That is in reference to a management fee on input volume

3  to which I think 80 plus percent of the working group that puts

4  product through the Alabama Gas Plants has signed up for.

5  Q    And does that include management of the plant, or

6  gathering systems, or is it exclusive to one or the other?

7  A    It is a combined amount, which is related to input through

8  the two trains that are on that same site.

9  Q    And so it extends then beyond just the providing of

10  services for management of the plant, is that correct?

11  A    No, sir, it's for management of the plant.

12  Q    Oh, so it has no relationship to overseeing the operation

13  of the gathering systems that serve the plant?

14  A    No, that would be covered through COPAS charges to the

15  related wells.

16  Q    And if I could direct your attention to Page 2 of the

17  Debtors' Exhibit 4, near the top of the page, I believe you

18  show as lease operating expenses two entries related to the gas

19  plant, could you identify those?

20  A    Yes, sir, that is gas plant payroll, which is for the

21  individuals that are at the plant.  (Indiscernible - muffled)

22  to operate it, and its operating costs which is the third party

23  costs that it incurs for things like utility bills, compression

24  services in order to run the plant.

25  Q    And so these would be reimbursements to SEC, is that

1  correct?

2  A    Yes.

3  Q    And who owns the plant that would be operated at

4  Abbeville?

5  A    The working interest group in the wells.

6  Q    Do you know what the status of title of the plant is in

7  relationship to Plains?

8         MS. RILEY:  Your Honor, I think at this point, we're

9  starting to get, number one, outside the scope of the direct,

10  and into irrelevant issues.

11         THE COURT:  Counsel, how does this line of inquiry

12  relate?

13         MR. SHIPPS:  Your Honor, the -- I'll withdraw the

14  last question, but I would suggest that the issue about revenue

15  associated with management fees of the Abbeville Plant is

16  important because it is viewed as an ongoing revenue stream for

17  purposes of SEC.  And as we will develop with respect to other

18  witnesses, the decision-making process to approve those

19  management fees required a hundred percent election by all of

20  the working interest owners that were part of the Escambia

21  prospect, and they have not been obtained.

22         MS. RILEY:  Your Honor, that's not a bankruptcy

23  issue, that's an issue that could be determined in State Court.

24  We clearly have a different view of that but, again, that's

25  outside of the scope of this hearing and the cash collateral

1  issue.

2          THE COURT:  Okay, I'm sustaining the objection,

3  although he was withdrawing the last question.

4          Do you have anything else, Mr. Shipps?

5          MR. SHIPPS:  Yes, I do.

6  BY MR. SHIPPS:

7  Q   With respect to the costs associated with the gas plant

8  payroll and the gas plant operating costs, are those going to

9  be included in JIBs?

10  A   They would, yes.

11  Q   So there will not be a separate fee, a separate management

12  fee, they'll just be rolled up into the joint interest

13  billings, is that correct?

14  A   That's correct.

15  Q   And so if there were a working interest owner who had not

16  agreed to pay those fees, would you still assess that joint

17  interest owner that --

18          MS. RILEY:  Same objection, Your -- same objection,

19  Your Honor.

20          THE COURT:  Sustained.

21          MR. SHIPPS:  I have no --

22          THE COURT:  Okay, what else, Mr. Shipps?

23          MR. SHIPPS:  I have no further questions, Your Honor.

24          THE COURT:  All right.

25          I'm going to ask a question of Mr. Strausser.  Who

1   was the CFO of SEC before you took this position?

2           THE WITNESS:  It was a gentleman by the name of

3   Tristan Farel.

4           THE COURT:  How do you spell that, F A R R E L L?

5           THE WITNESS:  F A R E L.

6           THE COURT:  Okay.  And why did he leave, to the

7   extent you know?  Have you heard any rumors as to why he left

8   the company?

9           THE WITNESS:  My understanding is that he left the

10  company to take an opportunity with Samson Oil and Gas Limited,

11  which I believe --

12          THE COURT:  Is he still in the Boulder area?

13          THE WITNESS:  Yes, ma'am, that's my understanding.

14          THE COURT:  Okay.  And when did he leave, in November

15  when you came on?

16          THE WITNESS:  I think it was a month or two prior to

17  my joining the company.

18          THE COURT:  Okay.  So September or October?

19          THE WITNESS:  I believe so.

20          THE COURT:  Okay, thank you.  Okay, let's see, how

21  about Mr. Bain for FPCC?

22          MR. BAIN:  Thank you, Your Honor.  I will -- just two

23  or three questions.

24                      CROSS-EXAMINATION

25  BY MR. BAIN:

1  Q    Mr. Strausser, do you still have Exhibit 1 in front of

2  you, Debtors' Exhibit 1?

3  A    I do.

4  Q    Would you mind turning to Item 30.1?

5            THE COURT:  Where are you seeing those numbers?

6            UNIDENTIFIED ATTORNEY:  (Indiscernible - multiple

7  speakers).

8            MR. BAIN:  Your Honor, on the -- and I apologize, I

9  didn't mean to speak over you.

10            UNIDENTIFIED ATTORNEY:  Are you -- Mr. Bain, you're

11  referring to the entry regarding Flexjet?

12            MR. BAIN:  Yes, sir.

13            And, Your Honor, it's Page 11 of 137, so it's

14  probably the eleventh page in your --

15            THE COURT:  Wait.  You said we're looking at -- oh,

16  D-1, I'm sorry.  I was looking at D-4.  Okay, Page 11, you

17  said?

18            MR. BAIN:  Um-hum, yes, ma'am.

19            THE COURT:  Thank you.  Go ahead.

20            MR. BAIN:  It's Item 30.1.

21            THE COURT:  Okay.

22  BY MR. BAIN:

23  Q    Mr. Strausser, are you familiar with the roughly half a

24  million dollars that was paid to Flexjet?

25  A    I am.

1  Q    And what was that for?

2  A    This was for the personal travel expenses of Mr. Sklar.

3  We would go each month and look at -- look at the travel that

4  occurred within that contract and identify which of those trips

5  had a business purpose versus which were of a personal nature,

6  and we would separately account for those two different

7  activities, personal use versus business use.

8  Q    Okay.  And does Mr. Sklar still have access to the

9  personal jet?

10 A    We have notified them of our intent to let that contract

11 terminate.  And I believe that contract should be terminated on

12 or about now.

13        THE COURT:  How does it terminate, just automatically

14 if it's not renewed?

15        THE WITNESS:  That's correct.  Through a notification

16 to Flexjet, a 90-day notification that was made, I believe in

17 March, mid-March.

18 BY MR. BAIN:

19 Q    And when were -- when was this roughly -- just for the

20 record, it's 503,173 and 35 cents, roughly half a million

21 dollars we're looking at, when was that paid out?

22 A    As monthly bills were received from Flexjet.

23 Q    Okay.

24        MR. BAIN:  Pass the witness.

25        THE COURT:  Okay.  Let's go next to Kudzu, Mr. Geno.

1      MR. GENO:  Thank you, Your Honor; if it please the

2  Court.

3                    CROSS-EXAMINATION

4  BY MR. GENO:

5  Q    Mr. Strausser, my name is Craig Geno, and I represent

6  three of your working interest owners.  Would you turn, please,

7  sir, to Exhibit 4, the last page?

8      MS. RILEY:  Just for the record, is that Debtors'

9  Exhibit 4?

10      MR. GENO:  Yes; thank you, Ms. Riley.

11  A    I'm on that page, sir.

12  Q    Look at the fourth -- the fourth numerical column with the

13  top number a little over 5,900,000, and scroll down to the

14  entry of $683,054 outflow to Sklar, do you see that?

15  A    Yes, sir, I do.

16  Q    Is that a number based on actual calculations or is that

17  an estimate?

18  A    That's a number based on the actual calculation that was

19  made about a week ago when we ran the April payable -- or

20  revenue cycle.

21  Q    Thank you.  And tell me again what that number represents.

22  A    That represents Sklarco's share of the revenue

23  distributable from the two months' prior production.

24  Q    So if you could determine Sklarco's share on that date,

25  could you also determine using the same accounting package the

Strausser - Cross/Geno                    169

1  interest -- dollar amount interest of the working -- other

2  working interest owners?

3  A    Yes, sir.

4  Q    Have you done that?

5  A    Yes, sir.

6  Q    Is that in the data room?

7  A    Not to my knowledge, but the -- but it -- but it could be

8  provided.

9  Q    Do you have any objection to that?

10 A    (No verbal response).

11 Q    Do you have any objection to providing that in the data

12 room?

13          THE COURT:  Let's ask --

14 A    No, sir.

15          THE COURT:  Let's ask Ms. Riley that.

16          MS. RILEY:  I don't have any objection either.

17          THE COURT:  Okay.  So can that be put in -- when?

18 How long would that take, Mr. Strausser?

19          THE WITNESS:  It could be in this evening.

20          THE COURT:  Excellent.  Let's do that.

21          THE WITNESS:  Certainly.

22          THE COURT:  And then, Ms. Riley, let's set a deadline

23 for you to amend Exhibit 1, which is the statement of financial

24 affairs for SEC.  When can you do that to reflect the mistake

25 in treatment of the transfers in relation to Sklarco versus the

 1  Howard Trust?

 2        MS. RILEY:  Your Honor, just given that we may have

 3  to go back and review some records from a prior CFO, I'm going

 4  to ask for about a week on that one, I think.

 5        THE COURT:  Okay, so a week from today.  That sounds

 6  good; thank you.

 7        MR. GENO:  May I proceed, Your Honor?

 8        THE COURT:  Go ahead, Mr. Geno.

 9        MR. GENO:  Thank you.

10  BY MR. GENO:

11  Q    Mr. Strausser, on that same line, would you move two

12  columns over where there's a number that appears 514,681, do

13  you see that?

14  A    Yes, sir, I do.

15  Q    What does that represent?

16  A    That represents an estimate of the March revenue that

17  would be attributed to Sklarco's interests in March production

18  revenue.

19  Q    And is that the same exact number, although it's an

20  estimate, or does it represent the exact same thing as the

21  $683,000 number that is an exact number?

22  A    It's an estimate, but it's representative, yes, of the

23  estimate of Sklarco's share of the revenue.

24  Q    Why is the estimate some $169,000 less than the actual

25  683,000?

Strausser - Cross/Geno                    171

1   A    Well, that's because March realized prices were less than

2   February realized prices.

3   Q    What were March prices?

4   A    They were roughly 29, $30.

5   Q    What were February's?

6   A    Roughly 50.

7   Q    How about January's?

8   A    Roughly 57.

9   Q    And as I understand it, your projections for oil per

10  barrel in this cash flow with this exhibit are about 13 or $14

11  a barrel, is that right?

12  A    That's correct, yes, sir.

13  Q    What percentage of the working interest revenues is

14  represented by the Sklarco working interest?

15  A    It's calculated as the weighted average of approximately

16  16 percent.

17  Q    I'm sorry, did you say 15 percent?

18  A    No, 16.

19  Q    16 percent, thank you.  So if the Sklarco working interest

20  revenues decreased some $160,000 based on actual versus

21  estimated, would that same reduction apply to the other revenue

22  to be received by the working interest owners other than

23  Sklarco?

24  A    Generally, yes.  Although there are a number of factors

25  that could influence that.

1  Q    Tell me about those.

2  A    Well, there could be factors related to individuals that

3  choose to be netted or not netted in the payment of their

4  revenue.  It could be attributable to differences in the mix of

5  production amongst all of the wells because Sklarco does not

6  have a uniform interest in all of the wells, and changes in --

7  that's really the primary things that could alter that

8  relationship.

9  Q    Thank you.  Let's talk about gross revenues, though,

10 without netting or any deductions, would you expect the

11 reductions in receipts by non-Sklarco working interest owners

12 to be closely approximating those to be experienced by

13 Sklarco's working interest revenues?

14 A    Generally speaking, yes.

15 Q    And as I understand it from your testimony, the cash

16 settlements that are reflected on Page 1 are critical to the

17 cash flow budget of the budget that's Debtors' Exhibit 4, is

18 that your testimony?

19 A    Yes, sir.

20 Q    And is that the only difference, Mr. Strausser, in this

21 budget at 13 or $14 of barrel oil versus 57 to $60 per barrel

22 of oil that you enjoyed prior to the bankruptcy case, that one

23 line item?

24 A    So, yes, our -- our gross share of revenues absent the

25 effected of any hedges or hedge proceeds were significantly

1 higher before the precipitous price decline, that's correct.

2          MR. GENO:  Can I have just a moment, Your Honor?

3          THE COURT:  You may.

4          MR. GENO:  Thank you.

5                         (Pause)

6          MR. GENO:  Nothing further.  Thank you, Mr.

7 Strausser.  Thank you, Your Honor.

8          THE COURT:  All right.  So I guess we're ready for

9 redirect by the debtor, if any.

10         MS. RILEY:  Yes, Your Honor.

11                    REDIRECT EXAMINATION

12 BY MS. RILEY:

13 Q    Now, Mr. Strausser, just remind us, when did you start

14 working for the debtors here?

15 A    November 11th was my first day.

16 Q    And since taking on your role as CFO, have you made any or

17 recommended any changes in terms of operations or cash flow

18 management?

19 A    We've discussed things that we might do differently.

20 Q    And have any of those been implemented on a post petition

21 basis?

22 A    Well, the keeping whole of the revenue account that's

23 being done on a post petition basis is (indiscernible

24 background noise) is the primary item, yes.

25 Q    Have you also engaged in some additional cost-cutting

1   measures, such as reducing staff?

2   A    Yes, we have -- we've made a number of -- the decisions

3   related to that, we have -- working with the engineering group,

4   we went through an exercise to attempt to reduce (indiscernible

5   - muffled) operating expenses which were a benefit of not only

6   ourselves, but all the working interest holders.

7           We have made a reduction in force of several

8   individuals.  We have -- we have furloughed several staff

9   members, and we've had a retirement.

10          And in August, we have another individual who has

11  decided to change professions, and won't be replaced.

12  Q    Now directing your attention to the second page of

13  Debtors' Exhibit 4 -- we're going back to the budget again.

14  A    Okay.

15  Q    There's a line item on here for CEO salary, and what is

16  that amount?

17  A    That is the salary that was agreed to by the parties to be

18  paid to Mr. Sklar.

19  Q    And what is the actual dollar amount?

20  A    It's $25,000.

21  Q    Is that monthly or biweekly?

22  A    That's monthly.

23  Q    Is Mr. Sklar going to be receiving any additional

24  distributions or anything along those lines post petition?

25  A    Not out of -- not out of the estates, no.

1  Q    Now you testified that as of the petition date, the

2  approximate amount owed to Sklarco was about $70,000, right?

3  A    In relationship to the difference between the revenue

4  payable and the revenue that was transferred.

5  Q    And was that just -- and was that just for the January

6  revenue?

7  A    That was only attributable to the January revenue, right.

8  Q    Was there also an amount due for the February revenue at

9  that point?

10  A    Not at that point, that would not have been calculated yet

11  at that point because it wouldn't have been calculated until

12  revenue was run for February, which happened in the -- the end

13  week of -- of April.

14  Q    Fair enough.  So when that 683,000 was paid, was that

15  approximately the same time that the revenue was run?

16  A    That's correct.

17  Q    Now when funds are deposited into the revenue account, are

18  those funds just for the working interest holders?

19  A    They'd be for working interest holders, royalty interest

20  holders, overriding interest holders, and also amounts that

21  would be taken, I'll call it, off the top would be payable to

22  the various State Departments of Revenue for severance taxes.

23  Q    And that payment of 1.8 million that we saw in the budget,

24  again, it's the revenue payable to others on the week ending

25  May 1st.  Who specifically was that paid to?

1  A    That was amounts payable to royalty interest holders and

2  overriding royalty interest holders for January and February

3  production revenue, to the extent they hadn't already been

4  distributed.

5  Q    Now, Mr. Strausser, are you familiar with the second cash

6  collateral order that was entered in this case?

7  A    I'm familiar.

8  Q    To your knowledge, what did that second cash collateral

9  order require Sklarco and Sklar Exploration to do with respect

10 to Sklarco's funds?

11 A    To -- each month to move such amounts attributable to

12 Sklarco's interest into the operating account to fund the

13 ongoing operations.

14                        (Pause)

15 Q    Now one of the other things that you mentioned was the --

16 one of the things that may contribute to variation among the

17 payments from February to March revenues was a mix of

18 production based on wells, what did you mean by that?

19 A    What I mean is that the working interest holder group

20 largely holds a working interest, royalty interest, or

21 overriding royalty interest in a number of different wells.

22 Each individual's rights to the revenue related to each of

23 those wells is different.  Said another say, they may own a ten

24 percent net revenue interest in one well, a 20 percent revenue

25 interest in another well.  And to the extent that there is

1  variability in the production from the wells, then by

2  extension, their revenue would be impacted by that in addition

3  to just normal price variations.

4  Q    Now approximately how much was owed in total for February

5  revenues, be it for royalty interest or revenue royalty --

6  royalty interest and working interest?

7  A    I don't know that number off the top of my head.

8  Q    Do you think it was around four million?

9  A    That sounds -- that sounds right.

10        UNIDENTIFIED ATTORNEY:  Objection; leading.

11        THE COURT:  Too late.

12        UNIDENTIFIED ATTORNEY:  Well, I tried to get my

13  unmute, but it --

14        THE COURT:  You've got to be faster on that unmute.

15  BY MS. RILEY:

16  Q    Well, put differently, to your knowledge, was the amount

17  owed for February revenues more or less than the amount that

18  was in the revenue account as of the petition date?

19  A    It was for more.

20  Q    As funds are paid out of the revenue account, is there any

21  way to tell what wells those funds are attributable to?

22  A    I'm sorry; could you ask that question again, please?

23  Q    As funds are paid out from the revenue account, is there

24  any way to -- are the earmarked to any particular wells at any

25  point?

Strausser - Redirect/Riley                      178

1  A     Until we run the revenue cycle, we don't exactly know what

2  each revenue owner is owed.  When monies come in, likewise, the

3  same scenario.  Until we run revenue, we don't know of which

4  those amounts that were received -- to which owners they

5  relate.

6  Q     Has the drop in oil prices had an effect at all on the

7  debtors' operations?

8  A     I would say it significantly -- made a decision to

9  postpone all ongoing operations.  There were a number of

10 exploratory wells, and my understanding is the consensus was

11 not to move forward in a extreme low price environment, but

12 also our share -- Sklarco's share of the income was severely

13 impacted by the price downturn.

14 Q     And going forward on a post petition basis, is Sklar

15 Exploration still proposing to pay out all of the various

16 interest holders on a monthly basis, starting with the March

17 revenue?

18 A     That's correct.

19        MS. RILEY:  Your Honor, I think -- no further

20 questions.

21        THE COURT:  Okay.  Thank you, Mr. Strausser.

22        Just one moment, please.

23                (Pause)

24        THE COURT:  All right.  Does the -- let's sort of

25 take a temperature of where we're at now.  How many witnesses

1  are there, other witnesses for the debtor?  We can't hear you,

2  Ms. Riley, you're muted.

3          MS. RILEY:  I'm sorry, Your Honor.  The debtor may

4  call Howard Sklar, as well.

5          THE COURT:  Okay.  When will you know that?

6          MS. RILEY:  I said "may."  We'll be calling Howard

7  Sklar, as well.

8          THE COURT:  Okay.  And how long, approximately, do

9  you think you have with him for his direct?

10          MS. RILEY:  I would estimate probably about 30-ish

11  minutes.

12          THE COURT:  Okay.  And how about Tauber, how long do

13  you think you have of a cross for Mr. Sklar, any idea?  Mr.

14  Skelton, you need to unmute us.

15          MR. SKELTON:  I didn't realize we'd have the

16  opportunity, but I would say, you know, at least as much time

17  as she takes.

18          THE COURT:  Okay, 30 minutes.

19                      (Laughter)

20          THE COURT:  Okay.  And fair to say, FPCC, Kudzu would

21  be probably 30 minutes combined, at most?

22          MR. BAIN:  Yes, Your Honor.

23          MR. GENO:  Yes, ma'am.

24          THE COURT:  Okay.  So then that's the debtors' last

25  witness, is that right, Ms. Riley?

180

1              MS. RILEY:  That's correct, Your Honor.

2              THE COURT:  Okay.  Then let's start with Tauber.  Who

3    do you anticipate calling tomorrow?

4              MR. SKELTON:  Your Honor, I think I'll let Mr. Shipps

5    address that.

6              THE COURT:  Okay.  Mr. Shipps, take us off mute?

7              MR. SHIPPS:  I'm trying.  Your Honor, we have two

8    witnesses:  Mike Pickens and Trey Sibley, both who are

9    principals with regard to working interest owners.

10             I think they -- if I understand the Judge's ruling

11   with regard to the Abbeville Plant matters, you don't want to

12   hear more information about that, is that correct?

13             THE COURT:  Well, I'm trying to focus on cash

14   collateral and the oil and gas motion.  So it didn't sound to

15   me -- I didn't get a good feeling that that was really

16   pertaining to that, am I wrong?

17             MR. SHIPPS:  Well, probably not directly.  We do have

18   -- it does go to, I think, the budget that you're considering

19   on, at least an interim basis.  And we will have the

20   opportunity, I think, to review those issues in the context of

21   the pending motion to assume the title transfer contract with

22   respect to the Abbeville Plant.  So if we could take that up

23   then, that will shorten the --

24             THE COURT:  Okay.

25             MR. SHIPPS:  -- time for questioning tomorrow for Mr.

1  Sibley and for Mr. Pickens.  And I would say it won't exceed an

2  hour; I would anticipate less than that.

3          THE COURT:  For both witnesses --

4          MR. SHIPPS:  Correct.

5          THE COURT:  -- combined?

6          MR. SHIPPS:  That's correct, Your Honor.

7          THE COURT:  Okay, all right.

8          How about for FPCC, do you have witnesses you intend

9  to call?

10         MR. BAIN:  Your Honor, just possibly for rebuttal,

11 depending on what Mr. Sklar actually testifies to.

12         THE COURT:  Okay.  But you don't know who they'd be.

13         MR. BAIN:  It would be William Hu.

14         THE COURT:  I'm sorry?  Lean forward.

15         MR. BAIN:  Yes, of course.  William Hu.

16         THE COURT:  Okay.  He's your client rep.

17         MR. BAIN:  Yes, ma'am.

18         THE COURT:  Okay.  How about for Kudzu, Mr. Geno?

19         MR. GENO:  Your Honor, we have one witness, Walker

20 Sturdivant, probably only five or ten minutes, depending on

21 what happens with the debtors' last witness.

22         THE COURT:  Got it, okay.  And how -- I forgot to ask

23 how long for Mr. Hu.

24         MR. BAIN:  Your Honor, I wouldn't imagine more than

25 ten, 20 minutes.

```
 1              THE COURT:  Twenty minutes, got it.

 2              Okay, so we should be in pretty good shape to get

 3    through all that, maybe even by the morning or early afternoon,

 4    which should leave a lot of time for cross -- I'm sorry -- for

 5    closing arguments.  So you can tell me how you think you've met

 6    your burdens, each of you.

 7              Okay, start at 9:30 tomorrow, does that work for

 8    everybody?

 9                        (No audible response heard)

10              THE COURT:  Okay, all right.  So everyone have a good

11    evening, and we will see you bright and early.

12              MS. CASS:  Your Honor?

13              THE COURT:  Yes.

14              MS. CASS:  This is Kerstin.  Trish will need to send

15    out a new Zoom invite --

16              THE COURT:  Okay.

17              MS. CASS:  -- for the hearing tomorrow morning, so

18    that it will be arriving in everyone's email.

19              THE COURT:  Excellent, okay.  Can you be sure I get

20    it, too?

21              MS. CASS:  Yes.

22                              (Laughter)

23              THE COURT:  Thank you.

24              Okay, anything else for the good of the order before

25    we recess for today?
```

1          (No audible response heard)

2          THE COURT:  Going once, going twice, all right, sold.

3          Thank you, all.  See you tomorrow.

4          (Whereupon, at 4:32 p.m., the hearing was adjourned.)

5

6

7

8                    CERTIFICATE OF TRANSCRIBER

9

10          I, KAREN HARTMANN, a certified Electronic Court

11 Transcriber, certify that the foregoing is a correct transcript

12 from the electronic sound recording of the proceedings in the

13 above-entitled matter.

14

15

16

17 Karen Hartmann, AAERT CET 475  Date:  May 18, 2020

18 TRANSCRIPTS PLUS, INC.

19

20

21

22

23

24

25