# Exhibit RUD-E

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

```
IN RE:                        ) Case No. 1:20-bk-12377
                              ) (Jointly Administered)
SKLAR EXPLORATION COMPANY,    ) Chapter 11
LLC AND SKLARCO, LLC,         )
                              ) Courtroom F
                              ) U.S. Custom House
                              ) 721 19th Street
        Debtors.             ) Denver, Colorado 80202-2508
                              )
                              ) May 12, 2020
                              ) 9:30 a.m.
```

**TRANSCRIPT OF CONTINUED EVIDENTIARY HEARING ON: (1) DEBTORS'
MOTION FOR AUTHORITY TO USE CASH COLLATERAL (DKT. NO. 34); (2)
DEBTORS' MOTION FOR AUTHORITY TO PAY PRE-PETITION JOINT
INTEREST BILLING OBLIGATIONS AS CRITICAL VENDORS (DKT. NO. 41)
AND (3) MOTION TO HONOR AND PAY OVERRIDING ROYALTY, ROYALTY,
AND WORKING INTEREST OBLIGATIONS; AND OFFSET JOINT INTEREST
BILLING OBLIGATIONS (DKT. NO. 37); (4) DEBTORS' APPLICATION TO
EMPLOY BERG HILL GREENLEAF & RUSCITTI, LLP AS SPECIAL COUNSEL;
(5) MOTION TO APPROVE PAYMENT PROCEDURE FOR PROFESSIONAL FEES
AND COSTS; AND ALL OBJECTIONS THERETO
BEFORE HONORABLE ELIZABETH E. BROWN
UNITED STATES BANKRUPTCY JUDGE**

```
Transcript requested by:      J. BAIN, ESQ. (Jones Walker),
                              D. BRESCIA, ESQ. (Clark Hill),
                              T SHIPPS, ESQ. (Maynes Bradford),
                              and J. RETHERFORD, ESQ. Balch &
                              Bingham)
Requested on:                 Friday, May 15, 2020
Provided on:                  Saturday, May 16, 2020
Cost of Transcript:           $1,291.65 (237 pgs @ $5.45/pg)
```

**TRANSCRIPTION SERVICE:**      **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone:  215-862-1115**
**Facsimile: 215-862-6639**
**e-mail CourtTranscripts@aol.com**

```
 Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
```

2

APPEARANCES VIA ZOOM VIDEO CONFERENCE:


For the Debtors:                    Kutner Brinen P.C.
                                    By:  KERI L. RILEY, ESQ.
                                         LEE KUTNER, ESQ.
                                    1660 Lincoln Street
                                    Suite 1850
                                    Denver, CO 80264


For East-West Bank:                 Bryan Cave Leighton Paisner LLP
                                    By:  CRAIG K. SCHUENEMANN, ESQ.
                                         LYNN P. HENDRIX, ESQ.
                                    1700 Lincoln Street
                                    Suite 4100
                                    Denver, CO 80203


                                    Bryan Cave Leighton Paisner LLP
                                    By:  BRYCE SUZUKI, ESQ.
                                    Suite 2200
                                    Two North Central Avenue
                                    Phoenix, AZ 85004-4406

For the Creditors'                  Munsch Hardt Kopf & Harr PC
Committee:                          By:  CHRISTOPHER D. JOHNSON, ESQ.
                                         JOHN D. CORNWELL, ESQ.
                                         GRANT M. BEINER, ESQ.
                                    700 Milam Street
                                    Suite 2700
                                    Houston, TX 77002


For AEEC II, LLC, et al.:           Kean Miller LLP
                                    By:  ERIC LOCKRIDGE, ESQ.
                                    400 Convention Street
                                    Suite 700
                                    Baton Rouge, LA 70802


For Baker Hughes:                   Foley & Lardner LLP
                                    By:  TIMOTHY C. MOHAN, ESQ.
                                    600 17th Street
                                    Suite 2020S
                                    Denver, CO 80202

RUD000333

3

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(continued)


For Bri-Chem Supply            Spencer Fane LLP
Corp., LLC:                     By:  DAVID M. MILLER, ESQ.
                               1700 Lincoln Street
                               Suite 2000
                               Denver, CO 80203


For Fant Energy                Willkie Farr & Gallagher LLP
Limited:                       By:  JENNIFER HARDY, ESQ.
                                    CHRIS TRUMAN, ESQ.
                               600 Travis Street
                               Houston, TX 77002


For Fletcher Petroleum         Berger Singerman LLP
Company, LLC:                  By:  MICHAEL NILES, ESQ.
                               313 N. Monroe Street
                               Suite 301
                               Tallahassee, FL 32301


Franks Exploration Company,    Cook, Yancey, King & Galloway
LLC, et al.:                   By:  JORDAN B. BIRD, ESQ.
                               333 Texas Street
                               Suite 1700
                               Shreveport, LA 71101


For FPCC USA, Inc.:            Jones Walker LLP
                               By:  JOSEPH ERIC BAIN, ESQ.
                                    AMY VAZQUEZ, ESQ.
                               811 Main Street
                               Suite 2900
                               Houston, TX 77002


For JF Howell Interests,       Bradley Murchison Kelly & Shea
et al.:                        By:  DAVID R. TAGGART, ESQ.
                               401 Edwards Street
                               Suite 1000
                               Shreveport, LA 71101

4

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(continued)


For Kudzu Oil Properties,        Moye White
LLC, et al:                      By:  TIMOTHY M. SWANSON, ESQ.
                                 1400 16th St.
                                 6th Floor
                                 Denver, CO 80202

                                 Law Offices of Craig Geno
                                 By:  CRAIG GENO, ESQ.
                                 587 Highland Colony Parkway
                                 Ridgeland, MS 39157

For Landmark Exploration,        Watkins & Eager PLLC
et al.:                          By:  JIM F. SPENCER, JR., ESQ.
                                 P. O. Box 650
                                 Jackson, MS 39205

For The Estate of                Buechler Law Offices
Pamela Page, Deceased,           By:  MICHAEL J. GUYERSON, ESQ.
et al.:                          999 18th Street
                                 Suite 1230 South
                                 Denver, CO 80202

For Lucas Petroleum:             Clark Hill Strasburger
                                 By:  DUANE BRESCIA, ESQ.
                                 720 Brazos
                                 Suite 700
                                 Austin, TX 78701

For PAR Minerals, et al.:        Copeland Cook Taylor & Bush
                                 By:  CHRISTOPHER MEREDITH, ESQ.
                                      GLENN TAYLOR, ESQ.
                                 1076 Highland Colony Parkway
                                 Ridgeland, Mississippi 39157

RUD000335

5

APPEARANCES VIA ZOOM VIDEO CONFERENCE:
(continued)


For Pruet Oil Company,              Holland & Hart
LLC, et al.:                        By:  MATTHEW J. OCHS, ESQ.
                                    555 17th Street
                                    Suite 3200
                                    Denver, CO 80202

                                    Balch & Bingham
                                    By:  JEREMY L. RETHERFORD, ESQ.
                                    1901 Sixth Ave N
                                    Suite 1500
                                    Birmingham, AL 35203

For Strago Group,                   Buck Keenan
et al.:                             By:  ROBERT L. PADDOCK, ESQ.
                                    2229 San Felipe
                                    Suite 1000
                                    Houston, TX 77019

For Stoneham Drilling               Bradley Arant Boult Cummings LLP
Corporation:                        By:  JAMES B. BAILEY, ESQ.
                                    1819 5th Ave. North
                                    Birmingham, AL 35203

For Tauber, et al.:                 Maynes, Bradford, Shipps
                                    & Sheftel, LLP
                                    By:  THOMAS H. SHIPPS, ESQ.
                                         SHAY L. DENNING, ESQ.
                                    835 E. Second Avenue
                                    P.O. Box 2717
                                    Suite 123
                                    Durango, CO 81301

                                    Barnet B. Skelton, Jr., P.C.
                                    By:  BARNET B. SKELTON, JR., ESQ.
                                    815 Walker
                                    Suite 1502
                                    Houston, TX 77002

(ADDITIONAL ATTORNEYS MAY HAVE JOINED THE HEARING FOLLOWING THE
APPEARANCES BEING TAKEN BY THE COURT WITHOUT THE OPPORTUNITY TO
             PLACE THEIR APPEARANCE ON THE RECORD)

                          * * *

6

<u>INDEX</u>

<u>DEBTORS' WITNESSES</u>                                    <u>PAGE</u>

HOWARD SKLAR

 Direct Examination by Ms. Riley                     15

 Cross-Examination by Mr. Skelton                    28

 Cross-Examination by Mr. Bain                       56

 Cross-Examination by Mr. Geno                       59

 Direct Examination by Ms. Riley                     66

<u>TAUBER GROUP'S WITNESSES</u>

WILLIAM RUCK SIBLEY (TREY)

 Direct Examination by Mr. Shipps                    78

 Cross-Examination by Mr. Suzuki                    105

MICHAEL PICKENS

 Direct Examination by Mr. Shipps                   109

 Cross-Examination by Ms. Riley                     121

 Cross-Examination by Mr. Suzuki                    125

<u>KUDZU'S WITNESSES</u>

WALKER STURDIVANT

 Direct Examination by Mr. Geno                     130

 Cross-Examination by Ms. Riley                     140

INDEX

| DEBTORS' EXHIBITS | ID | EVID |
|---|---|---|
| D-5  Declaration of Howard Sklar | 18 | -- |
| D-9  Statement (operating account) | -- | 75 |
| TAUBER GROUP'S EXHIBITS | ID | EVID |
| A     Escambia Prospect Participation Agreement | 79 | 77 |
| B     Settlement statement (3-31-2020) | 110 | 77 |
| D, E, F, G, H, I, L | -- | 77 |
| J     Letter (Sklarco/2-13-2020) | 99 | 100 |
| L-1  Cash Call Accounting XLSX | 42 | 42 |
| FPCC USA, INC.'S EXHIBITS | ID | EVID |
| E*    Transcript (Docket 85/4-9-2020) | 126 | -- |
| KUDZU PARTIES' EXHIBITS | ID | EVID |
| A     Participation agreement | 132 | 134 |
| B     Document | 133 | 134 |
| C     Document | 133 | 134 |
| EAST-WEST BANK'S EXHIBITS | ID | EVID |
| A*    Proof of claim | 149 | -- |

*Judicial notice for limited purpose

1 **(IN INSTANCES WHERE THERE IS WEAK BANDWIDTH, MUFFLED OR FADING**

2     **VOICES, OR MULTIPLE SPEAKERS, AN INDISCERNIBLE RESULTED)**

3     THE COURT:  Good morning, all.

4     Can you hear me?  Ms. Cass, can you hear me?

5     MS. CASS:  Yes, I can.

6     THE COURT:  You can; okay.

7     MS. CASS:  Yes.

8     THE COURT:  It shows a little mute symbol, but okay.

9     We are here in the case of In Re Sklar Exploration

10 Company, LLC, Sklarco, LLC under Case Number 20-12377.

11     We're here for a hearing on cash collateral, as well

12 as an oil and gas motion.

13     Let's go through and take our appearances, starting

14 with our debtor.

15         (No audible response heard)

16     THE COURT:  Ms. Riley, are you present?  And could

17 you please unmute us.

18     MS. RILEY:  Good morning, Your Honor.  Keri Riley

19 appearing on behalf of the debtor.

20     Mr. Kutner is also on (indiscernible - weak

21 bandwidth), and I believe it's just on mute.  We are also

22 joined today by Howard Sklar, Marshall Jones, and John

23 Strausser.

24     THE COURT:  Thank you.

25     MR. KUTNER:  I apologize, Your Honor; I was on mute.

9

1          THE COURT:  Okay; good morning.

2          MR. KUTNER:  Thank you.

3          THE COURT:  And I assume we do not have the U.S.

4   Trustee again.  Did they show up at the 341 meeting?

5                    (Laughter)

6          MS. RILEY:  They did, Your Honor.

7          THE COURT:  Okay; excellent.  All right, that

8   expresses their confidence in Committee counsel, so I

9   understand.

10         All right.  For the bank?

11         MR. SUZUKI:  Your Honor, I'm sorry, Bryce Suzuki of

12  the law firm Bryan Cave Leighton Paisner LLP.  And my

13  colleagues Craig Schuenemann is also on the line, and I believe

14  our client representative, Mary Lou Allen is also on the line

15  today.

16         THE COURT:  Very good; thank you.

17         And for the Committee?

18         MR. JOHNSON:  Good morning, Your Honor.  Chris

19  Johnson on behalf of the Committee.  And I'm joined by my

20  colleagues John Cornwell and Grant Beiner

21         THE COURT:  Thank you.

22         MR. JOHNSON:  Thank you.

23         THE COURT:  All right, the Anderson parties?  Mr.

24  Lockridge?

25         MR. LOCKRIDGE:  Good morning.  Eric Lockridge from

1 Kean Miller LLP for for Anderson Energy Company, AEEC II, PCP

2 Cottonwood, and Sugar Oil Properties LP.

3          THE COURT:  Thank you.

4          And for Baker Hughes?

5          MR. MOHAN:  Good morning, Your Honor.  Timothy Mohan,

6 Foley & Lardner, LLP on behalf of Baker Hughes.

7          THE COURT:  Thank you.

8          THE COURT:  And Bri-Chem?

9          MR. MILLER:  Good morning, Your Honor.  David Miller

10 appearing on behalf of Bri-Chem Supply Corp, LLC.

11          THE COURT:  Thank you.

12          As you've probably figured out by now, I'm taking the

13 working interest and mechanics liens claimants all in

14 alphabetical order, so you can kind of predict when you need to

15 unmute.

16          Okay.  Next up is Fant Energy.

17          MS. HARDY:  Good morning, Your Honor.  Jennifer Hardy

18 of Willkie Farr & Gallagher on behalf of Fant and the JJS

19 entities.  I'm also joined by my colleague, Chris Truman.

20          THE COURT:  Very good; thank you.

21          Fletcher Petroleum.

22          MR. NILES:  Good morning, Your Honor.  Michael Niles

23 on behalf of Fletcher Petroleum Company, LLC, Fletcher

24 Exploration, LLC, and Fletcher Petroleum Group.

25          THE COURT:  Thank you.

Case:20-12377-MER Doc#:3139-4 Filed:05/08/20 Entered:05/08/20 21:42:12 Page 12 of 238
Case:20-12377-MER Doc#:1398-1 Filed:05/08/20 Entered:05/08/20 13:28:12 Page 1 of 238
238

11

1          And F -- no, I skipped one.  Franks Exploration.

2          MR. BIRD:  Good morning, Judge.  Jordan Bird with

3     Cook, Yancey, King & Galloway on behalf of Franks Exploration

4     Company, Bundero Investment Company, Kingston, LLC, AEH

5     Investments, J&A Harris LP, Hughes Oil South, KMR Investments,

6     and Tommy Youngblood.

7          THE COURT:  Thank you.

8          All right, FPCC.

9          MR. BAIN:  Good morning, Your Honor.  Joseph Bain of

10    the law firm of Jones Walker on behalf of FPCC.

11         THE COURT:  Thank you.

12         THE COURT:  JF Howell Interest.

13         MR. TAGGART:  Good morning.  David Taggart on behalf

14    of JF Howell Interest, LP.  And we also have the client

15    representative, Mr. David Morgan on the line today.

16         THE COURT:  Thank you.  I think we should all take

17    note of what Mr. Taggart is using for his equipment because it

18    really -- the sound is really clear.  So, all right, thank you.

19         The Kudzu parties.

20         MR. SWANSON:  Good morning, Your Honor.  Tim Swanson

21    from the law firm of Moye White.  Also appearing is Mr. Craig

22    Geno from the Law Office of Craig M. Geno in Mississippi.

23         Along with Mr. Geno, we have Walker Sturdivant.

24         THE COURT:  Very good; thank you.

25         All right.  Next up is Landmark entities.

 1          MR. SPENCER:  Good morning, Your Honor.  Jim Spencer

 2   with my colleague Paul Stevenson Watkins & Eager in Jackson,

 3   Mississippi representing the Landmark entities.

 4          THE COURT:  Thank you.

 5          Barbara Page Lawrence and the Estate of Pamela Page.

 6                (No audible response heard)

 7          THE COURT:  Okay.  Nobody -- nobody here for that

 8   one.

 9          All right.  Lucas Petroleum.

10          MR. BRESCIA:  Good morning, Your Honor.  This is

11   Duane Brescia for Lucas Petroleum Group, inc.  Along with me is

12   the client representative, Mr. Fain Brock, its present.

13          THE COURT:  Thank you.

14          PAR Minerals, et al.

15          MR. TAYLOR:  Good morning, Your Honor.  It's Glenn

16   Taylor.  Christopher Meredith and I represent PAR Minerals,

17   Coastal Exploration, and Eastern Fishing Tools.

18          All right.  Pruet Production?

19          MR. RETHERFORD:  Good morning, Your Honor.  Jeremy

20   Retherford, and my co-counsel, Matt Ochs here behalf of Pruet

21   Oil Company, as well as Pruet Production Company, both in its

22   individual capacity and as agent and attorney in fact for the

23   working interest owners listed in our 2019 notice.

24          Along with us is Rich Calhoon, client rep for Pruet

25   Oil Company, Mr. David Hilton with Pruet Production, and Stan

1  Kynerd, with Pruet Production, as well.

2          THE COURT:  Very good; thank you.

3          Strago Group.

4          MR. PADDOCK:  Good morning, Your Honor.  Robert

5  Paddock on behalf of Harvest Gas Management, GCREW Properties,

6  Meritage Energy, Gateway Exploration, and Strago Energy.

7          We also have on the line client representatives John

8  Aubrey and Louis Goza.

9          THE COURT:  Thank you.

10         All right, Stoneham Drilling.

11         MR. BAILEY:  Your Honor, James Bailey on behalf of

12  Stoneham Drilling Corporation

13         THE COURT:  Thank you.

14         And Tauber Group.

15         MR. SHIPPS:  Good morning, Your Honor.  This is Tom

16  Shipps and Shay Denning, as well, from the firm of Maynes,

17  Bradford, Shipps & Sheftel.  Also joined by Barnet Skelton in

18  Houston.

19         We're representing the different Tauber entities,

20  Tauber Exploration & Production Company, Pickens Financial

21  Group, LLC, CTM 2005 Limited, I & L Miss I, LP, Tara Rudman

22  Revocable Trust, the Feather River 75 LLC, Rudman Family Trust,

23  MER Energy Limited, MR Oil & Gas, LLC, and the Rudman

24  Partnership.

25         Also joining us today are from the -- as

1  representatives of those parties are Mike Pickens, from Pickens

2  Financial Group, LLC, and Trey Sibley from the Rudman

3  Partnership.  And also Hiram Lucius from the Tara Rudman

4  Revokable Trust.

5          THE COURT:  Thank you.  Look at how fast we did this

6  today.  It's seven minutes in from our scheduled time.

7  Everybody's checked in, everybody's entered their appearance.

8  We are pros at the Zoom world now.  That's pretty amazing.

9          All right.  So we're going to pick up with the

10 debtors' case, and I believe that the debtor has one more

11 witness to call.

12         So, Ms. Riley, would you call your witness?

13         MS. RILEY:  Yes, Your Honor.  The debtors would call

14 Howard Sklar.

15         THE COURT:  Mr. Sklar, would you please raise your

16 right hand, and the Court's clerk will swear you in.  Raise

17 your right hand, sir.  Is he doing that?

18         MS. CASS:  I cannot --

19         THE COURT:  We can't see him.

20            HOWARD SKLAR, DEBTORS' WITNESS, SWORN

21         THE COURT:  All right.  Mr. Sklar, would you please

22 spell your last name for the court reporter, and give us your

23 full name?

24         THE WITNESS:  My name is Howard Fred Sklar, and the

25 last name's spelled S K L A R.

1    THE COURT:  Thank you.  And what is your business

2  address?

3    THE WITNESS:  My business address, I am

4  (indiscernible - muffled) exact, um -- exact address, I'm

5  sorry, I don't --

6    THE COURT:  Well, okay.  Give us your home address.

7    THE WITNESS:  Okay.  My home address is -- it's 3601

8  Arapahoe Avenue in Boulder, Colorado.

9    THE COURT:  All right.

10    THE WITNESS:  Apartment 420C.

11    THE COURT:  All right.  Ms. Riley, take it over.

12                  DIRECT EXAMINATION

13  BY MS. RILEY:

14  Q    Mr. Sklar, what is your role with respect to the debtors

15  in this case, Sklar Exploration and Sklarco?

16  A    I am the CEO of Sklar Exploration, and I am also the

17  Manager of Sklar Exploration, and Sklarco, and I'm the

18  President, as well, of Sklar Exploration.

19  Q    And who formed Sklarco and Sklar Exploration?

20  A    I did.

21  Q    When did you form those companies?

22  A    I formed those companies in 1998.

23  Q    And have you been the CEO and Manager since that time?

24  A    Yes, I have.

25  Q    What are your job duties as the CEO of Sklar Exploration?

Sklar - Direct/Riley                    16

1  A    I manage to oversee all operations and all of the things

2  that we do here at Sklar Exploration and at Sklarco.  So I'm

3  the Chief Operating Officer -- I'm not the Chief Operating

4  Officer but I'm the Chief Executive Officer.

5  Q    Now prior to forming Sklar Exploration and Sklarco, did

6  you earn any college degrees?

7  A    Yes, I did.

8  Q    All right.  What about your undergraduate degree,

9  approximately when did you earn that?

10  A    Approximately in 1981, I have a bachelors in engineering

11  science and nuclear engineering from the University of

12  Michigan.

13  Q    And after earning your undergraduate degree, what did you

14  do?

15  A    After earning my undergraduate degree, I went on to work

16  as a nuclear engineer for a year at Detroit (indiscernible -

17  muffled) Company.  And after that, I went back to study physics

18  at the University of Michigan and work on my PhD.

19  Q    What was your -- you said you went to the University of

20  Michigan.  What degree did you get from the University of

21  Michigan?

22  A    I got a degree -- a masters of science in physics -- in

23  physics.

24  Q    And were you also working while you were earning that

25  degree?

1  A    I was working as a teaching fellow, University of
2  Michigan.
3  Q    After earning your degree from the University of Michigan,
4  where did you work?
5  A    Then I went to Phillips Academy in Andover and I worked as
6  an instructor of physics at Phillips Academy in Andover from, I
7  believe, 1987 through 1990.
8  Q    After -- so when you said you went on to work towards your
9  PhD, where were you working to get your PhD?
10 A    I was at MIT.  And I first studied physics for two years,
11 and then in '92, I switched from physics to studying geophysics
12 and (indiscernible - muffled) research in geophysics.
13 Q    What degree did you ultimately earn from MIT?
14 A    I ultimately earned a master of science in earth
15 atmosphere and planetary science, so geophysics basically from
16 MIT, specializing in -- in explorations of physics.
17 Q     Now have you taken any other professional development
18 courses after leaving MIT?
19 A    Yes, while I was actually still working at MIT, I began
20 working at Sklar and Phillips Oil Company, a family company.  I
21 also took extensive courses in well logging, reservoir
22 engineering, petroleum engineering, reservoir management, and a
23 myriad of other courses.  In fact, my late father was somewhat
24 upset at me because I was taking so many courses in that -- in
25 that business.

1  Q    Now you said that you went on to work at Sklar and

2  Phillips, when was that?

3  A    I started working there about approximately the end of

4  1992, and that's -- then I also was in the Geophysics

5  Department at MIT, that's where I was doing research in the

6  field in well logging.

7  Q    Was Sklar and Phillips a family business?

8  A    Yes, it was our family business.

9  Q    What did you do at Sklar and Phillips?

10 A    I was a -- I worked in well logging and in general

11 management of the company.

12 Q    Now approximately how many years of experience do you have

13 in the oil and gas industry?

14 A    Almost 30 years.

15 Q    All right.  Now are you familiar with the pleadings that

16 have been filed in this case?

17 A    Yes, I am.

18 Q    Do you recall preparing a declaration in support of the

19 motion for authority to use cash collateral?

20 A    Yes, I do.

21 Q    All right.  And I'll direct you attention to Debtors

22 Exhibit 5, that's the -- labeled as the declaration of Howard

23 Sklar, do you have that in front of you?

24 A    Yes, I have that in front of me.

25 Q    And is this the declaration that you assisted in

1  preparing?

2  A    Yes, it is.

3  Q    If you will turn to the last page, there's a couple of

4  electronic signatures there.  Did you actually sign this

5  document before it was filed?

6  A    Yes.

7        MS. RILEY:  Your Honor, we move for the admission of

8  Debtors' Exhibit 5.

9        THE COURT:  Are there any objections to D-5?

10        UNIDENTIFIED ATTORNEY:  Your Honor, we have the live

11  witness here.  The declaration is hearsay.  He's here to

12  testify, and I object to it being used essentially as a

13  proffer.

14        THE COURT:  Okay.  Ms. Riley, your response?

15        MS. RILEY:  Your Honor, he is available.  They can

16  still cross-examine him on it.  A number of the facts that are

17  in the declaration have already been admitted into evidence, so

18  we believe that it is still admissible, and it is his statement

19  under penalty of perjury, as well.

20        THE COURT:  All right.  Objection is sustained; D-5

21  is not received.

22  BY MS. RILEY:

23  Q    So, Mr. Sklar, I just want to go over kind of some

24  background facts with respect to the business here.  Why did

25  the company file for bankruptcy?

1   A    It filed for bankruptcy because between January of this

2   year and April, oil prices went from over $60 to negative $37.

3   I think it was 37.50 in April, and we saw a catastrophic --

4   catastrophic interruption in our business due to the COVID, as

5   well as the destruction of the price due to the -- due to the

6   price war between Saudi Arabia and Russia.  So we filed for

7   protection because of that.

8   Q    Now prior to the bankruptcy filing, was Sklar Exploration

9   and Sklarco operating profitably?

10  A    Oh, yes.  Yes, we were operating profitably.

11  Q    Approximately how many people does Sklar Exploration

12  currently employ?

13  A    Approximately 45.

14  Q    Has that number changed at all since the bankruptcy

15  filing?

16  A    Yes, we've gotten rid of -- we've had a substantial

17  reduction in force.  We have done all the cost-cutting measures

18  we can to maximize the production without -- and spend a

19  minimum amount of money.  And I've also reduced my salary, and

20  my distributions are zero now.

21  Q    Now Sklar Exploration, where are their wells located here?

22  A    Sklar Exploration has wells in Alabama, predominant

23  Alabama and Florida, but also Louisiana, Texas, Mississippi,

24  we've done exploration in Wyoming, and we've also explored in

25  Montana for helium.

1  Q    And Sklarco, what interest do they have in the oil and gas

2  property?

3  A    Sklarco is the agent nominee and they own the working

4  interest in the properties.

5  Q    To your knowledge, are there any -- are there liens

6  against the assets?

7           THE COURT:  I'm sorry; could you repeat that, Ms.

8  Riley?

9           THE WITNESS:  I had -- it was -- repeat the question?

10 Thank you, Judge.

11 Q    To your knowledge, are there any secured liens against the

12 assets of Sklarco and Sklar Exploration?

13 A    The bank is a secured creditor.

14 Q    Which bank is that?

15 A    This is the East-West Bank.

16 Q    Approximately how many is owed to East-West Bank?

17 A    Approximately 22 million -- over $22 million.  I forgot

18 the exact number.

19 Q    And are you familiar with any hedging agreements that are

20 in place in this case?

21 A    Yes, I am.

22 Q    And what do those hedging agreements cover?

23 A    Those hedging agreements cover basically a lot of

24 production, and so they're designed to -- to help in the case

25 of drop in prices.  And so those are with East-West Bank, and

Sklar - Direct/Riley                                    22

1  those are to hedge -- those are 50 percent of our oil and gas

2  production.

3  Q    And when you say "our oil and gas production," which

4  companies are you referring to there?

5  A    I'm referring to Sklarco, the -- Sklarco and -- I believe

6  the hedges are actually with Sklar Exploration, but it's

7  Sklarco and Sklar Exploration.

8  Q    To your knowledge, is Sklar Exploration hedging the

9  production from any other interest in this case?

10 A    No.

11 Q    With respect to the ongoing use of funds, can Sklar

12 Exploration continue to operate if it's not authorized to use

13 funds to, for instance, pay its bills?

14 A    Yes, it can.

15 Q    Would they still be able to operate if they weren't

16 entitled to use any of their funds, for instance, the funds in

17 the operating account?

18 A    No, we would not.

19 Q    So just to clarify, is Sklar Exploration going to be using

20 revenues attributable to any other parties to operate in this

21 case?

22 A    No.

23 Q    And just to be clear, Sklar Exploration is still operating

24 and running its wells currently, right?

25 A    Yes, they are.

Sklar - Direct/Riley                                          23

1  Q    Now, Mr. Sklar, you were present yesterday for Mr.

2  Strausser's testimony, is that right?

3  A    Yes, I was.

4  Q    And you listened to all of his testimony, right?

5  A    Yes, I did.

6  Q    Do you recall his testimony about some payments from Sklar

7  Exploration to Sklarco?

8  A    Yes, I do.

9  Q    All right.  I'm going to direct your attention to Page 28

10 of Debtors' Exhibit 1, this exhibit has already been admitted.

11 A    Yes, I see that.  Yes, I'm looking at the document.

12 Q    Now --

13       THE COURT:  How do we find Page 28?  Oh, I see.

14 Never mind.  Go ahead.

15       MS. RILEY:  Your Honor, just for reference, this is

16 the page that goes over the payments to insiders, including

17 those payments to Sklarco.

18       THE COURT:  Okay.

19 BY MS. RILEY:

20 Q    So do you recall Mr. Strausser saying that the

21 descriptions of some of those payments were a mistake?

22 A    Yes, I do.

23 Q    Do you agree with that statement?

24 A    Yes, I do.

25 Q    Why is that?

1  A    We have to -- we have to refund that because of -- these

2  were Sklarco transfers to Sklar to pay JIBs, and some of them

3  were actually incorrect in that they were also used for

4  distributions of salary and general distributions to me.

5  Q    And are you currently working with employees of Sklar

6  Exploration/Sklarco to address those -- their description?

7  A    Yes, we're going to address that, and -- I mean -- in the

8  document.

9  Q    Now I'm going to direct your attention to what has been

10 entered as Debtors' Exhibit 2.  These are the statement of

11 financial affairs and schedules for Sklarco.  We're looking for

12 Page 15 where it identifies transfers to you.

13 A    Yes, I see that document.  Yes, I found that.

14 Q    Mr. Sklar, how much were you paid individually from

15 Sklarco between April, 2019 and April, 2020?

16 A    That was $357,654.

17        THE COURT:  Can you repeat that number, please?

18        THE WITNESS:  It's $357,654.

19        THE COURT:  Thank you.

20 Q    Approximately when were those transfers made?

21 A    Those transfers were made in July of 2019, and also in

22 June of 2019.

23 Q    Do you recall approximately what the price per barrel of

24 oil was at that point?

25 A    In June and July, I think it was about 50, maybe $60.

1  Between 50 and 60 a barrel.

2  Q    Below that, there are also payments to the Howard Sklar

3  Trust.  What is the Howard Sklar Trust's relationship to

4  Sklarco and Sklar Exploration?

5  A    Howard Trust is the owner of record, (indiscernible -

6  muffled) to Sklar Exploration and also Sklarco.

7  Q    And approximately how much was the Howard Sklar Trust paid

8  during that time?

9  A    Howard Sklar Trust had salary and distributions of $1.6

10 million roughly.  One six two six two hundred is the exact

11 number on the thing.  One million six hundred twenty-six

12 thousand two hundred dollars.

13 Q    During 2019, would Sklarco -- did Sklarco operate

14 profitably?

15 A    Yes.

16 Q    How much have you invested in the debtors over the past

17 few years?

18 A    I have invested over $72 million of -- into our capital

19 expenditure since 2014.

20 Q    Now I know we've talked briefly about making some

21 operational changes after the bankruptcy filing.  Have you also

22 agreed to the appointment of a CRO in this case?

23 A    Yes, I have.

24 Q    Now what is your intent with respect to this bankruptcy

25 case?

1    A    Our intent is to reorganize, and come out of this, and

2    operate profitably, and go back to where we were before the --

3    before this interruption in this -- price collapse, and go back

4    to business as usual.  Obviously get refinancing and

5    (indiscernible - muffled) start operating again.

6            MS. RILEY:  And, Your Honor, if I may take just a

7    brief moment to just consult my notes here.

8            THE COURT:  Certainly.

9                        (Pause)

10   BY MS. RILEY:

11   Q    So, Mr. Sklar, you mentioned that one of the intentions

12   here was to refinance.  Have the debtors started undertaking

13   any steps in that refinancing process?

14   A    Yes, we have.

15   Q    And what have they started to do?

16   A    We started looking for financing, and we've also started

17   looking for a CRO to try to refinance the bank and come out of

18   this.

19   Q    What are some of the hurdles that you -- or the companies

20   have faced with respect to refinancing right now?

21   A    Well, right now, the price of oil is still very low.  And

22   so the hope is as -- as the country opens up, and the economy

23   opens back up, we will -- once the prices come back, and we

24   find refinancing, and coming out the Chapter 11.

25   Q    To your knowledge, have prices started to increase after

Sklar - Direct/Riley                                    27

1   the bankruptcy filing?

2   A    Yes.  Yes, after the bankruptcy filing, prices were

3   dropping and -- and in last month's production, the average,

4   including one day of negative 37, we averaged at $13, and now -

5   - now prices have already rebounded to the teens.

6   Q    When do you anticipate approximately being able to

7   refinance this company?

8   A    Once prices come back to -- to around the range of where

9   they were, and hopefully when we went into this.  So about $40,

10  we would hope.

11  Q    Do you anticipate that occurring sometime in the year of

12  2020?

13        UNIDENTIFIED ATTORNEY:  Objection, Your Honor; calls

14  -- assumes facts not in evidence.

15        It's also unclear, is he an expert?  Has he been

16  offered as an expert?

17        THE COURT:  Okay.  Sustained, unless you want to lay

18  that foundation.

19        MS. RILEY:  Your Honor, I think we'll move on.

20        THE COURT:  Okay.

21                        (Pause)

22        MS. RILEY:  All right.  Your Honor, I think there are

23  actually no further questions at this time.

24        THE COURT:  Okay.  Let's have the Tauber Group go

25  first.

1                          CROSS-EXAMINATION

2    BY MR. SKELTON:

3    Q    Mr. Sklar, are you telling the Court and these creditors

4    that despite your advanced degrees in physics and other extreme

5    erudite fields, that the best you can hope -- offer is hope

6    that oil prices will go up, is that your plan?

7    A    Our expectation is that prices will go up at some point.

8    Q    Well, you used the word "hope."  Is that all you've got?

9    Do you have anything to back that up?

10   A    Well, I believe that oil prices will go up when people

11   start driving.  Right now, people are at home and they're

12   unable to drive to work.  And so I assume that -- as demand --

13   it's already started picking up.  I assume that oil operators,

14   including me, we need a much higher price than we have at this

15   point.

16        So I would say it's not hope, it's expectation --

17   Q    Okay.

18   A    -- that prices will go up.

19   Q    All right.  But you haven't submitted any evidence today.

20   You don't -- none of your exhibits include any kind of

21   financial or economic projections by any engineering companies,

22   do they?

23   A    No, we simply in our budget have the strip as it is today.

24   Q    Okay.  All right.

25   A    What it was a few weeks ago.

Sklar - Cross/Skelton                                              29

1  Q    And you don't have any opinions of any economists, do you?

2  A    I don't directly have any opinions of any economists.  But

3  I understand that our business with no one driving and everyone

4  shut in -- our business will improve.  In fact, I think

5  gasoline prices have already started to rise, so that's just a

6  fact.

7  Q    Well, aside from the engineering and geological

8  capabilities that an operator must have, wouldn't you agree,

9  sir, that honesty is a hallmark of the oil and gas business?

10 A    Yes, sir.

11 Q    And if your working interest partners can't trust you, is

12 it fair to expect them to continue advancing monies to you?

13      MS. RILEY:  Objection; speculation and prejudicial at

14 this point.

15      MR. SKELTON:  Well, I think it is prejudicial

16 because, frankly, that's what's happened, he's lost trust.  I

17 think it's a fair question.

18      THE COURT:  I'll allow.  You may answer, Mr. Sklar.

19      THE WITNESS:  Can you repeat the question just so I

20 can answer it?

21 BY MR. SKELTON:

22 Q    Yeah, okay, we can break it down.  You understand that

23 your working interest owner participants have been cheated by

24 Sklarco, you understand that, don't you?

25 A    I do not believe we have cheated our working interest

Sklar - Cross/Skelton                                30

1   holders.

2   Q    All right.  Now cash call advances were requested

3   beginning in November, and continuing through February, is that

4   correct?

5   A    I believe that's correct.

6   Q    Even March.  And during that time period, Sklar

7   Exploration was unable to pay its debts as they became due,

8   wasn't it?

9   A    I don't believe that that's the case.

10  Q    Well, if that's -- why is it then that -- for instance,

11  that Sklarco has filed a motion to authorize it to pay some

12  $300,000 in joint interest billings?

13  A    We had to pay joint interest billings so we could get our

14  income from outside operators.

15  Q    Well, why didn't you pay them?  If you were -- you said

16  before the bankruptcy, you were operating profitably, that's

17  not true, is it?

18  A    I believe we were operating profitably -- I believe we

19  were operating profitably through January of this year, and

20  through February.  Our income in February was still over a

21  million dollars for our share of the revenue.

22  Q    Well, why is it, though, that in those same months, SEC

23  wasn't paying all of its bills?

24       MS. RILEY:  Objection to lack of foundation at this

25  point.

1          THE COURT:  I'm going to sustain.

2  Q    Mr. Sklar, isn't it true that SEC was not paying its joint

3  interest billings and other debts during January and February?

4          MS. RILEY:  It's the same objection, Your Honor.

5  There's just no evidence so far that -- of any sort of time

6  frame here.

7          THE COURT:  Now he's asking isn't it true, so

8  overruled.  You may answer -- or you should answer, Mr. Sklar.

9  A    We were paying our debts -- we were paying our debts.  We

10 were paying joint interest bills, and we were paying vendors in

11 January and February.

12 Q    But you weren't paying all of them, were you?

13 A    I don't believe we paid every bill.  We pay bills all the

14 time -- every month.

15 Q    All right.  Let's talk about that.  My clients, and other

16 working interest owners, received -- well, if you consider the

17 group as a whole -- millions of dollars in cash call advances,

18 you're familiar with those, aren't you?

19 A    Yes, I'm familiar with cash call advances.

20 Q    All right.  And some of them began as early as November,

21 isn't that correct?

22 A    I would have to check, but I imagine we have cash calls

23 out in November, yes.

24 Q    All right.

25 A    We have cash calls throughout the year.

1  Q    But Sklarco didn't pay its share of any of those cash call

2  advances, did it?

3  A    Sklarco pays the bills as they come in as the work is

4  operated -- as the work is being done.

5  Q    Did Sklarco -- Sklarco's a working interest owner, just

6  like the rest of us, isn't it?

7  A    Yes, it is.

8  Q    And the cash call advance request from SEC went out to

9  Sklarco and all of the other working interest owners, isn't it?

10 A    The cash call advance goes out to working interest

11 owners --

12 Q    Including Sklarco.

13 A    (No verbal response).

14 Q    And Sklarco did not pay any of the cash call advances, did

15 it?

16 A    Sklarco does not pay cash advances.  Sklarco pays the

17 bills as they come in.

18 Q    And --

19 A    As we complete the work.

20 Q    Well, if that's the case -- if that's the case, why is it

21 that in your data room, you have a cash call accounting, and

22 for each and every cash call that is directed to Sklarco, the

23 amount paid is nothing?  Can you explain that?

24 A    As I said, Sklarco pays the bills as the work is

25 completed.  They pay their part of the bills.

Sklar - Cross/Skelton                                    33

1  Q    Well, why is it that Sklarco is treated so favorably?

2  Everyone else has to pony-up their share in advance.

3           MS. RILEY:  Objection.

4  Q    What --

5           MS. RILEY:  Objection, Your Honor.  This is an

6  inappropriate question.

7           THE COURT:  Overruled.

8  BY MR. SKELTON:

9  Q    Isn't Sklarco a party to the same joint operating

10 agreements that all the other working interest owners are a

11 party to?

12 A    Yes, sir.

13 Q    And Sklarco has just as much an obligation to comply with

14 that agreement as any other working interest owner, doesn't it?

15 A    Yes.

16 Q    And there's no special carve out or favoritism to Sklarco

17 in any of the joint operating agreements, is there?

18 A    No, there's not.

19 Q    All right.  And I'm sure you're familiar with the

20 provisions of the joint operating agreement that require that a

21 party that does not pay its cash call advances timely is

22 subject to a 500 percent penalty, are you familiar with that?

23 A    Yes, I'm familiar with that.

24 Q    All right.  And is there any exemption for Sklarco for

25 that 500 percent penalty?

Sklar - Cross/Skelton                    34

1  A    There's not an exemption for Sklarco.

2  Q    Okay.  So how is it -- let's get back to the cash call

3  advances.  These were all in response to AFEs that were sent

4  out to the working interest owners, correct?

5          THE COURT:  Can you give a time frame?

6  Q    From November through March -- November, 2019 through

7  March of 2020, correct?

8  A    Yes, there are cash calls from November through March of

9  2020.

10  Q    Okay.  Now isn't it true that according to filings that

11  you've made in this case, that some $7 million of cash call

12  advances were not spent for the purposes intended?

13  A    That is not true.

14  Q    Well, then why would your lawyers file pleadings that

15  state that?

16  A    Sklarco pays its part of the bills when the work is

17  completed, and we had started work on all of the things that we

18  had cash calls.  So as the work came in, we paid -- we --

19  basically Sklarco owes its part.

20  Q    So you're -- you understand that as you sit here

21  testifying, even though you're in your office, you are under

22  oath, and the --

23  A    Yes, sir.

24  Q    -- words you state are being made under penalty of

25  perjury?

Sklar - Cross/Skelton                    35

1  A    Yes, I understand that.

2  Q    All right.  And you're here testifying that Sklarco has

3  paid every single penny it owes for cash call advances.

4  A    No, I'm not saying that.

5  Q    Okay.

6  A    I am stating -- I'm not stating that we have paid -- we

7  have paid cash call advances.

8  Q    Okay.

9  A    I'm not stating that.

10 Q    All right.  So why is it that the other working interest

11 owners can't just wait until the project is actually being

12 done, and then pay their share?  Why did you dun them money in

13 advance but not yourself?

14 A    I'm not sure I understand the question.

15 Q    Well --

16 A    We -- we pay the bills.  Sklarco knows -- Sklar

17 Exploration knows that Sklarco will pay its share of the bills

18 as they come in.  Obviously there's no risk after a dry hole

19 that Sklarco is not going to pay Sklar Exploration.  Sklarco

20 has always paid its part of the bills.

21 Q    All right.

22 A    As they come in.

23 Q    Well --

24 A    That is the truth.

25 Q    Okay.  Well, again --

Sklar - Cross/Skelton                                    36

1  A    Sklarco does not -- I'm sorry.

2  Q    Again, why is it then that there are -- your CFO yesterday

3  says that Sklarco owes SEC for unpaid joint interest billings.

4            MS. RILEY:  Objection, Your Honor.  I think that Mr.

5  (indiscernible - weak bandwidth).

6            THE COURT:  Ms. Riley, for some reason --

7            MR. SKELTON:  Can't hear her.

8            THE COURT:  Yeah --

9            UNIDENTIFIED ATTORNEY:  It's reverberating.

10            THE COURT:  Yeah.

11            MS. RILEY:  Objection.  The objection, Your Honor,

12  was that I believe that mischaracterizes the CFO's testimony.

13            THE COURT:  Why don't you rephrase it, Mr. Skelton?

14            MR. SKELTON:  Okay.

15  BY MR. SKELTON:

16  Q    Isn't it true that Sklarco has not paid -- let's see.

17            MR. SKELTON:  Strike that.  I'm just going to

18  approach it from a --

19            THE COURT:  Do you have any documents, Mr. Skelton,

20  that you want to offer in this regard?

21            MR. SKELTON:  Well, unfortunately the particular

22  document concerning cash call accounting, we did identify as a

23  witness and it did not -- excuse me -- as an exhibit, and it

24  did not -- I did not, frankly, realize that this particular

25  document demonstrates that Sklarco hadn't paid any of its cash

Sklar - Cross/Skelton                                              37

1  call advances; but he's admitted that.

2         I'd like to offer it, and it's a document that was

3  uploaded to the shared file site by a debtor, I think for

4  the record --

5         THE COURT:  Last night?  Is this what went into the

6  data room last night?

7         MR. SKELTON:  No, this has been there, I'll have to

8  admit, but there's a lot there.  And just, unfortunately, I

9  didn't grasp the significance of this exhibit until last night.

10        THE COURT:  Well, are you using it for impeachment

11 purposes?

12        MR. SKELTON:  Yes.

13        THE COURT:  Is this something you could email or file

14 with the County?

15        MR. SKELTON:  Yes.

16        MS. RILEY:  Your Honor, if I may, this cash call

17 advancing accounting has been uploaded to the data room since,

18 I think, mid-April at this point.  They have raised the cash

19 call advance issue in every single objection that has been

20 filed.  He's already admitted that Sklarco doesn't pay cash

21 call advances, it just pays the bills as they come in for these

22 various projects.

23        I don't see what he's impeaching here when all he's

24 using this to show is the same testimony that he's already

25 elicited.

1    THE COURT:  All right, I'm overruling that objection.

2    The witness has just contradicted apparently what is in this

3    document.

4         There is no prejudice or surprise to the debtor

5    because the debtor put this document in the data room.  So if

6    we can all get access to it, including the witness, somehow,

7    then I'm willing to take a look at it.

8         MR. SKELTON:  Okay.

9         THE COURT:  So --

10        MR. SKELTON:  I will --

11        THE COURT:  Do you want a break to -- so you could do

12   that?

13        MR. SKELTON:  That would be great.

14        THE COURT:  Okay.

15        MR. SKELTON:  But I don't mind going for a little bit

16   on, you know, there are some other closely related issues that

17   don't require me to refer to this document.  But if the Court

18   would prefer to go ahead and get it on the record, let me get

19   it.

20        THE COURT:  What I don't want you to do is just kind

21   of repeat --

22        MR. SKELTON:  I understand.

23        THE COURT:  -- your questions, and then go into it

24   with the document.

25        MR. SKELTON:  Got it, okay.

RUD000369

Sklar - Cross/Skelton                                       39

1          THE COURT:  Let's take a five-minute break.

2          MR. SKELTON:  All right, thank you, Your Honor.

3          THE COURT:  So everybody come back by 10:20.

4          MR. SKELTON:  To whom do I email this?

5          THE COURT:  Good question.  Kerstin, can you help

6   out?

7          MS. CASS:  Yeah, you would email it to the same

8   Courtroom F email that the Zoom --

9          THE COURT:  Okay.

10          MS. CASS:  -- invites come from.

11          MR. SKELTON:  Will do.

12          MS. CASS:  Okay.

13          MR. SKELTON:  Thank you.

14          THE COURT:  Kerstin, how can everybody else get a

15   chance to look at it then?

16          MS. RILEY:  Your Honor, if I may, there's been an

17   email chain going around with all of the documents being

18   exchanged.

19          THE COURT:  Ah, thank you.

20          MS. RILEY:  So I think a "reply all" there -- I think

21   I actually sent out an email last night to that group.

22          MR. SKELTON:  Okay.

23          MS. RILEY:  He may be able to "reply all" there.

24          MR. SKELTON:  I'll do that.

25          THE COURT:  Excellent; thank you.

1      (Recess 10:17:20 a.m./Reconvene 10:22:58 a.m.)

2          THE COURT:  We haven't received it yet, Mr. Skelton.

3  I just wanted to check in on the progress.  We haven't received

4  an email yet.  Can you hear me, Mr. Skelton?  Mr. Skelton?

5          MR. SKELTON:  Yes, I just sent the exhibit to your

6  deputy, as well as to everybody on that email chain.

7          THE COURT:  Okay.

8          MR. SKELTON:  I sent it to -- I think it was Trish.

9          THE COURT:  Okay.

10          MR. SKELTON:  Let me get my hard copy up on that.

11          THE COURT:  We'll keep -- we'll check with Trish.

12          MS. RILEY:  Your Honor, if I may, it is a fairly

13  large file, so it may take a few minutes to get through here.

14          THE COURT:  Got it.  Ms. Riley, a weird thing

15  happened during the break.  We had muted everyone, and you were

16  muted, but as you stepped back to the back of the room, we

17  could hear you talking.  So I tried to tell you, and Mr. Miller

18  tried to tell you, but you couldn't hear us because we were all

19  muted.  So I don't know why that occurred.

20          MS. RILEY:  And I apologize, Your Honor.  I'm

21  actually here in a conference room here with Mr. Sklar, so I

22  think we may have had that one unmuted still.

23          THE COURT:  Ah, got it, okay.

24          MS. RILEY:  So we will be sure to address that going

25  forward.

Sklar - Cross/Skelton                    41

1              THE COURT:  Okay, just wanted to let you know.

2                        (Pause)

3              MR. TAGGART:  Your Honor, this is Dave Taggart, I

4    just received Mr. Skelton's email with the exhibit.

5              MS. CASS:  I think ours just came through, Judge.

6              THE COURT:  Okay.  So is it in my email now, Kerstin?

7              MS. CASS:  Trish is forwarding it right now.

8              THE COURT:  Okay.

9                   (Off-the-record colloquy)

10             THE COURT:  This is going to be difficult because

11   it's sideways.

12             MR. SKELTON:  Right.

13                  (Off-the-record colloquy)

14             THE COURT:  Okay.  Anyway, so now we can see this

15   document.  We can't also see the witness at the same time, so

16   go slowly.

17             MR. SKELTON:  All right.  All right.

18   BY MR. SKELTON:

19   Q    Mr. Sklar, you should have before you a document that's

20   entitled Cash Call Accounting XLSX, and it's dated May 12th,

21   2020, do you see that?

22   A    Yes.  Yes, I have the Cash Call Accounting.

23   Q    All right.  And do you recognize this to be a document

24   that was prepared by Sklar Exploration?

25   A    Yes, I do.

1  Q    All right.  Now with -- we'll walk through it a little

2  bit, and then I'll --

3          MR. SKELTON:  Well, I'm going to offer this as Tauber

4  Exhibit Number L-1.

5          THE COURT:  Okay.  L -- it wouldn't be --

6          MR. SKELTON:  L dash 1.

7          THE COURT:  Okay.  L dash 1.

8          MR. SKELTON:  Well, it's T A U B dash L dash 1.  I

9  was trying to --

10          THE COURT:  Yeah, that's fine.

11          MR. SKELTON:  Okay.

12          THE COURT:  Okay.  Anybody have an objection to the

13  admission of L-1?

14          MS. RILEY:  Just the same objection we raised

15  previously, Your Honor.

16          THE COURT:  Which is just that it's untimely.

17          MS. RILEY:  Yes, Your Honor.

18          THE COURT:  Okay.  I'm overruling that one.

19          Does anybody have any other objection?

20              (No audible response heard)

21          THE COURT:  Okay.  It is received.

22          (Tauber's Exhibit L-1 admitted into evidence)

23  BY MR. SKELTON:

24  Q    All right.  Now, Mr. Sklar, if we'll take the first page,

25  there is a -- it looks to me like -- that there is an

Sklar - Cross/Skelton                                43

1  identification of a particular prospect.  Let's just pick the

2  upper left-hand corner, and it says -- it looks like

3  Picnic (phonetic) Limited 16 dash -- I have to put on my

4  glasses.

5           THE COURT:  Three.

6  Q    16 dash 3 dash -- number 1 pipeline, do you see that?

7  A    Yes, I see that.

8  Q    And then there's also a sub designation of Mount Carmel.

9  Are you familiar with what Mount Carmel is?

10 A    Yes, I am.

11 Q    And what is it?

12 A    Mount Carmel is an area which we're exploring in Florida,

13 and we have three wells now, and we were beginning to build a

14 pipeline to get the gas -- the gas -- it's a sour gas well.  So

15 we were starting on constructing the pipeline so that we could

16 get the oil to market because we had to -- it was poisonous

17 gas, it was H2S.

18 Q    Okay.  Then you see there is a list of working interest

19 owner -- owner with ID owners, and then it says WIO, and then

20 you understand that to be an acronym for working interest

21 owner.

22 A    Yes.

23 Q    And do you see a column that says "date paid" and there

24 are various dates.  And then there's "Amount."

25 A    That is correct.

RUD000374

Sklar - Cross/Skelton                    44

1  Q    But do you also see that the very first entry for Sklarco,
2  date paid is blank, and the -- the column for paid is blank, do
3  you see that?
4  A    Yes, I see that.
5  Q    And there's not any footnote, or other indication, or any
6  explanation as to why it wasn't paid, is there?
7  A    No, there is no footnote.
8  Q    All right.  And so you can see that everybody but one
9  working interest owner paid their share, didn't they?
10  A    Everyone partially paid, yes.
11  Q    Okay, all right.
12  A    Even Sklarco.
13  Q    Then let's go to the next one.  We won't have to go
14  through all of these, but --
15  A    I already stated that Sklarco does not pre-bill.  Sklar
16  Exploration does not --
17        MR. SKELTON:  Objection; non-responsive, Your Honor.
18        THE COURT:  I'll strike that.  Ask your next
19  question.
20  Q    The next -- just for an example, the Janette S. Coal
21  (phonetic), 2511 Number 1 Workover, do you see that?
22  A    Yes, I see that.
23  Q    And you see that Sklarco's share was some 89,160.88, do
24  you see that?
25  A    Yes, I do.

Sklar - Cross/Skelton                                45

1  Q    And there's no indication of any date paid, and there's no

2  indication of any amount paid.

3  A    That is correct.

4  Q    All right.  And I will represent to you that that is the

5  same for every single entry.  There's no indication that

6  Sklarco has paid its share of the joint interest billings -- or

7  cash call advances, is there?

8  A    That's correct.

9  Q    And you're free to -- and, please do look, and if you can

10 find any cash call advances Sklarco paid, I'd like to know

11 about it.

12                      (Pause)

13 A    Sklarco pays the -- pays its portion as --

14          MR. SKELTON:  Objection; non-responsive.

15          THE COURT:  Mr. Sklar, your counsel will have a

16 chance to redirect and let you answer more fully.

17          THE WITNESS:  Okay.  Okay.

18          THE COURT:  You just need to keep these answers to

19 his exact questions.

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Okay.  Next question?

22 BY MR. SKELTON:

23 Q    There's not any indication that Sklarco paid any of these

24 cash call advances on this document prepared by your own

25 accounting people, correct?

Sklar - Cross/Skelton                    46

1  A    That is correct.

2  Q    All right.  Now earlier your lawyer had you look at some

3  entries on the statement of financial affairs.  And you were

4  trying to explain why it is that they were inaccurate, do you

5  remember that?

6  A    (No verbal response).

7  Q    Do you remember you admitted that --

8  A    Yes.

9  Q    -- that there were notations that say "Transfers to pay

10 Sklarco JIBs."  Do you remember that?

11 A    Yes.

12 Q    And you admitted that a number of those entries was not

13 true.

14 A    Yes, I said we were going to amend that.

15 Q    Well, again, this gets down to the sanctity of your oath.

16 And we need to know when you are telling the truth, and we

17 assume that you are trying to tell the truth.  But did you

18 understand when you signed, and you signed every one of these

19 statement of financial affairs, or every -- every -- all the

20 schedules, that you were doing so under penalty of perjury?

21       MS. RILEY:  Objection Your Honor.  408, it's highly -

22 - not 408.  403, it's a highly prejudicial form of asking the

23 question.

24       THE COURT:  Overruled.  You may answer, Mr. Sklar.

25 A    As I said, we were going to correct any mistakes.

1      MR. SKELTON:  Non-responsive; objection.  Move to
2  strike.
3      THE COURT:  It's stricken.
4      Mr. Sklar, the question was did you realize you
5  signed these documents under oath?
6      THE WITNESS:  Yes, I do.
7      MR. SKELTON:  All right.
8      THE WITNESS:  Yes, I realize that, Your Honor.
9  BY MR. SKELTON:
10 Q    And did you take the time to make sure that there were no
11 inaccuracies in the bankruptcy schedules that were -- and
12 statement of financial affairs?
13 A    Yes.
14 Q    Well, then --
15 A    To the best of my ability.
16 Q    Well, then why is it that for -- let's just look at the
17 May 1st, 2019 and the Sklar Exploration statement of financial
18 affairs you state -- this is on Page 28, you looked at this
19 earlier --
20 A    Yes, I see it.
21 Q    Do you see that?
22 A    Yes, there are transfers to pay JIBs.
23 Q    Right.  And the first one, May 1st, 2019 says 225,000 to
24 Sklarco LLC, do you see that?
25 A    That's -- that's correct.

Sklar - Cross/Skelton                          48

1  Q    And was that to pay JIBs?

2  A    As I said, we made a mistake.

3  Q    Was it to pay JIBs or not?

4  A    That was not to pay JIBs.

5  Q    All right.  Because on Page 17 of your Sklarco -- and

6  let's see, just to make sure I get this correct.  The Sklarco

7  statement of financial affairs, that's Exhibit -- Debtors'

8  Exhibit Number 2 -- shows that on that exact date, a $225,000

9  distribution went out to the Howard Trust, correct?

10 A    That is correct.

11 Q    All right.  Now I'm interested in the Sklarco statement of

12 financial affairs for another reason.  Every single payment to

13 the Howard Trust says, "Salary/Distributions."  And, you know,

14 it's either one or the other.  Were they -- were they -- was it

15 salary?

16 A    It was part salary and part distribution.

17 Q    Well, to -- does that mean that there was withholding, and

18 FICA, and all that?

19 A    This is an LLC, and so part -- that requires that I have

20 part of this as a salary, and part as distribution.

21 Q    Okay.  So -- so you can't -- you don't know whether there

22 was any withholding done on your salary distribution?

23 A    I believe in an LLC --

24 Q    I just -- that's just a simple question.  Do you or don't

25 you know whether there was any withholding?

Sklar - Cross/Skelton                           49

1   A    I don't know.

2   Q    Okay.  Now if you'll see going on down into late -- into

3   November and early January, there -- these distributions

4   continue.  The company was experiencing severe financial

5   distress at this time, wasn't it?

6   A    Not in November, no.

7   Q    It wasn't paying its debts as they came due, was it?

8   A    In November, we were paying our debts.  We were paying our

9   debts, and it wasn't until the crash that we were no longer

10  able to pay all of our -- our debts.

11  Q    Okay.  Well, let's get back, again, to the cash call

12  advances.  The truth of the matter is is that you used these

13  cash call advances as an unsecured loan from the working

14  interest owners, didn't you?

15          MS. RILEY:  Objection; mischaracterizes testimony and

16  -- yeah.

17          THE COURT:  I'm going to sustain it on the basis of

18  it calling for a legal conclusion.

19  Q    But you weren't -- you weren't borrowing anymore money

20  from East-West Bank at this time, were you?

21  A    In 11 -- in November?

22  Q    Correct.

23  A    No, we had not borrowed any money in -- from East-West

24  Bank at that time.

25  Q    So the source of financing or the source of funding to pay

Sklar - Cross/Skelton                                        50

1    -- to cover your working capital needs happened to be the

2    working interest owners through their cash call advances,

3    correct?

4            MS. RILEY:  Objection, Your Honor; this is the same

5    question, it still calls for a legal conclusion.

6            THE COURT:  Overruled.  You must answer.

7            THE WITNESS:  I'm not -- I'm not sure what the

8    question is, Your Honor.  The question is that we --

9            THE COURT:  Once the bank's money stopped coming in,

10   you relied on the working interest holder capital calls as a

11   source of your working capital, isn't that true?

12           THE WITNESS:  Yes, Your Honor.  I mean we -- we used

13   -- that's not -- I wouldn't say -- I wouldn't characterize it

14   as strictly we were using cash call money.  We were paying

15   bills with income -- with our income from the operations from

16   the wells.  So, yes, we were -- it's not a fact that we were

17   using cash call money to pay bills.  But it is a fact that,

18   yes, there is -- we had not borrowed anymore money at the time.

19   So I'm not trying to -- I'm not trying to say that I'm -- cash

20   call money came in, and certainly we paid bills.

21   BY MR. SKELTON:

22   Q    Mr. Sklar, there have been identified three major sources

23   or rather three major subjects of the cash call advances.  One

24   of them had to do with a pipeline in Florida, you know about

25   that, right?

1  A    Yes.

2  Q    And that is -- should be an ongoing project, isn't it?

3  A    It was ongoing until -- until the COVID hit, and we had to

4  quit building the pipeline.

5  Q    Yeah, but you used all that money, didn't you, for other

6  purposes?

7        MS. RILEY:  Objection; lack of foundation, unless

8  we're going to walk through every transaction here.

9  Q    Well, isn't it about three and a half million dollars that

10 you issued a cash call advance for the Florida pipeline?

11                        (Pause)

12        THE COURT:  Do you know, Mr. Sklar?

13        THE WITNESS:  The exact amount, Your Honor, I do not

14 have.  But, yes, the total cash call was about three and a half

15 million.  And --

16        THE COURT:  Okay.

17        THE WITNESS:  And -- and some of that had been paid

18 by everyone, and some had not.

19        MR. SKELTON:  All right.

20 BY MR. SKELTON:

21 Q    And we know that Sklarco hadn't paid anything.

22 A    Yes.

23 Q    Okay.  So you did use the money for other working capital

24 needs than those which were stated in the AFEs, didn't you?

25        MS. RILEY:  Objection, again, to lack of foundation,

Sklar - Cross/Skelton                              52

1  Your Honor.

2          THE COURT:  Yeah, let's narrow the question,

3  something more along the lines of you used this 3.5 million for

4  something other than the Florida pipeline

5          MR. SKELTON:  All right, that's a well-stated

6  question.

7  BY MR. SKELTON:

8  Q    Mr. Sklar, can you answer that?

9  A    Yes.  Yes.

10 Q    Yes, you did use it for other purposes.

11 A    Well --

12 Q    And why was that necessary?  Why was that necessary or

13 appropriate?

14         MS. RILEY:  Objection, that's a compound question,

15 Your Honor.

16         THE COURT:  Okay.  Let's break it down, Counsel.

17 Q    Why was it necessary to use that money for other purposes?

18 A    As I stated it, we use all money that comes in to pay

19 bills.

20 Q    Okay.  So that gets us to the -- today's hearing, which is

21 about cash collateral.  And you're representing to the Court

22 and creditors, aren't you, that the budget that you submitted -

23 - that you're going to use that money for the purposes that you

24 state in the budget, is that correct?

25 A    Yes, that is correct.

1  Q    Well, then why should any creditor in this case believe

2  you?

3           MS. RILEY:  Objection, Your Honor.  That, I think,

4  calling for speculation.  I think it's calling for a legal

5  conclusion.  And it's definitely a highly prejudicial question.

6           THE COURT:  Overruled.  You must answer.

7           THE WITNESS:  It's -- what was the -- I'm sorry, Your

8  Honor.

9           THE COURT:  He's asking why should the creditors

10 believe you when you represent that you'll pay only according

11 to the budget that's been submitted with your cash collateral

12 motion when that hasn't been the practice with the use of the

13 cash call advances.

14           THE WITNESS:  Yes, there's no reason to believe -- we

15 submitted this budget based on the amount of money that we

16 think is coming in, and we do not need to use -- going forward,

17 we don't need to use any money other than the income from --

18 that Sklarco gets and the operating accounts that Sklar

19 Exploration has.  So, yes, Your Honor, we are not going to use

20 any money for anything other than exactly what is in this

21 budget, as best we can -- the budget is our assumption based on

22 prices.  But, yes, going forward, we have enough income to

23 where we can pay all the bills, and we can operate these wells

24 on behalf of all of these working interest owners without using

25 any money other than the cash collateral that we've said.

RUD000384

1  BY MR. SKELTON:

2  Q    Well, why is it the case that prior to the filing of this

3  bankruptcy, you were always using the funds of the working

4  interest owners, and how is it that you can change that

5  practice, in effect, turn on a dime?

6          MS. RILEY:  Your Honor, this is a compound question,

7  as well.

8          THE COURT:  Sustained.

9  BY MR. SKELTON:

10 Q    All right.  Mr. Sklar, why is it that you believe that

11 Sklarco and Sklar can all of a sudden change the way they've

12 done business over all this time period?

13         MS. RILEY:  Your Honor, I think this is cumulative,

14 we've been over this at some length at this point.

15         THE COURT:  Overruled on that basis.

16         But, Mr. Skelton, you know, this is stuff you really

17 should just cover in your closing argument.

18         MR. SKELTON:  Okay; got it, all right.

19 Q    If you would just answer that one question, Mr. Sklar.

20 A    We intend to use our income and -- and basically complete

21 all these operations, and continue to operate these wells only

22 using the money that comes in to our interest, to Sklar

23 Exploration's interest.  So we intend, as our budget states,

24 that we can finish all these -- continue to operate these wells

25 without using any money other than our income coming in.

1  Q    Okay.

2  A    We believe that.

3  Q    One -- one final subject area I want to cover with you.

4  You used the term several times in your direct -- answer to

5  direct questions that Sklarco acts as agent and nominee for

6  properties, do you remember that?

7  A    Yes.

8  Q    And for whom does Sklarco act as agent and nominee?

9  A    Sklarco acts on behalf of my trust, and my children's

10 trust, and so it is a nominee to -- to own -- it is an

11 ownership of these working interests.

12 Q    Okay.  Who is the beneficial owner of the working

13 interests?

14        MS. RILEY:  A question, Your Honor:  which working

15 interest?

16        MR. SKELTON:  The working interest of Sklarco.

17        MS. RILEY:  Objection, Your Honor; that question is

18 so very vague.

19        THE COURT:  I'm not sure that it is, but I think he's

20 already answered it, hasn't he, Mr. Skelton?  He said it's his

21 trust, and his kids' trust for the --

22        MR. SKELTON:  Well, there's a little bit more to it

23 than that.  Let me just go to it.

24        THE COURT:  Okay.

25 BY MR. SKELTON:

1  Q    Am I correct that there are agreements under which Sklarco

2  owns properties or operates as -- properties for the Howard

3  Trust, Allen Trust, Sam Trust, and the succession of Miriam

4  Mandel Sklar, as well as the Jacob Grantor Trust?

5  A    Yes.

6  Q    All right.  Now what are your obligations to all of these

7  trusts?  And is that the same true for Sklar Exploration, too -

8  - Sklarco and Sklar Exploration?

9         MS. RILEY:  Objection to relevance, Your Honor.  This

10  is getting very far outside the scope of cash collateral.

11        THE COURT:  Counsel?

12        MR. SKELTON:  Well, Your Honor, I think it's

13  important to understand truly who owns these entities.

14        THE COURT:  And why?

15        MR. SKELTON:  Well, because --

16        THE COURT:  It may very well be for future

17  litigation.  But for cash collateral purposes, show me the tie.

18        MR. SKELTON:  All right.  I think the witness has

19  answered the question, so I'll pass the witness at this time.

20        THE COURT:  Okay.

21        All right, let's see, how about FPCC, Mr. Bain?

22        MR. BAIN:  Yes, Your Honor, just a handful of

23  questions.

24                    CROSS-EXAMINATION

25  BY MR. BAIN:

Sklar - Cross/Bain                                         57

1  Q    Mr. Sklar, do you have Debtors' Exhibit 4 in front of you,

2  the budget that you've been speaking about?

3  A    I have the budget.  I don't have it right in front of me

4  at this point yet, but I know the budget.

5            MS. RILEY:  If you'll give us just half a second --

6            MR. BAIN:  Go ahead.

7                        (Pause)

8            THE WITNESS:  Yes, I have the budget in front of me;

9  yes, sir.

10  BY MR. BAIN:

11  Q    Well, when Mr. Skelton was asking you questions, and I

12  wrote it down, I want to make sure I did it correct.  I believe

13  you stated under oath that this budget means that you'll be

14  able to fund the debtors' operation using income -- and here's

15  the quote, "Income that Sklarco gets," is that fair?

16  A    Yes.  Yes, the income that Sklarco gets, and obviously

17  Sklar Exploration has income from the working interest owners

18  paying their JIB, and also from COPAS income.

19  Q    Did you -- I'm sorry, I didn't mean to talk over you.

20  A    Okay.  Which -- which -- where do you want me to look on

21  the budget, sir?

22  Q    It's the line, "Legal Fees-Sklar's Counsel."  And how much

23  has been allocated to pay Sklarco's counsel?

24  A    I have to find that.

25            MS. RILEY:  If you could maybe direct us to the

1  specific page of the budget.

2              MR. BAIN:  Page 2.

3              THE WITNESS:  Page 2 of the budget.

4              MR. BAIN:  Right below CRO, financial advisors,

5  independent accountant --

6              THE WITNESS:  Okay, I see that.  Yes, sir.

7  BY MR. BAIN:

8  Q    "Legal Fees-Sklar's Counsel"?

9  A    Legal fees, yes.

10 Q    How much has been allocated to pay Ms. Riley, for example?

11             THE COURT:  You're trying to point out the -- which

12 debtor is paying the legal fees.

13             MR. BAIN:  Well, I'm just trying to point out that

14 there hasn't been any allocation for the payment of Ms. Riley's

15 fees in this budget.

16             THE COURT:  Okay.

17             MR. BAIN:  That was my only question, Your Honor.

18             Pass the witness.

19             THE COURT:  Well, do you want his answer?

20             MR. BAIN:  Your Honor, absolutely.

21 Q    Mr. Sklar, do you have an answer to why it says "zero" for

22 Ms. Riley?

23 A    I think probably -- I'm not sure why that is.  I believe

24 there is a fees for creditors, including bank -- I believe that

25 that was actually meant to be -- 85,000 was meant to be the

Sklar - Cross/Bain/Geno                                    59

1 total of the legal fees, that's what I believe, sir.

2 Q    That's not what it says.

3 A    No, you're correct, that's (indiscernible - weak

4 bandwidth).  That line, I think, is possibly incorrect.

5 Q    Your --

6 A    We didn't -- yes, it's -- yes, it is true that it left out

7 legal fees for Ms. Riley exactly, and Mr. Kutner.  Yes, they

8 left that out of the budget, that's correct.

9         MR. BAIN:  All right; thank you.

10        THE COURT:  Okay.

11        MR. BAIN:  Pass the witness.

12        THE COURT:  All right, let's hear from Kudzu, Mr.

13 Geno.

14        MR. GENO:  Thank you, Your Honor; it please the

15 Court.

16                   CROSS-EXAMINATION

17 BY MR. GENO:

18 Q    Good morning, Mr. Sklar.  My name is Craig Geno, and I

19 represent the entities known as the Kudzu entities.

20 A    Yes, sir.

21 Q    Mr. Sklar, who made the ultimate decision that Sklar and

22 Sklarco to use the cash advances the way the companies used

23 them?

24 A    The management of the company.

25 Q    And who is that?

Sklar - Cross/Geno                                    60

1  A     That's myself, Mr. Jones, Cory Ezelle, and also Mr.

2  Strausser.

3  Q     Who has the ultimate decision-making authority at the

4  debtors?

5            MS. RILEY:  Objection; asked and answered.

6            THE COURT:  Overruled.  Mr. Sklar, you must answer.

7            THE WITNESS:  I must answer.

8  A     Who has the ultimate authority?

9  Q     Yes, sir.  If I have to find the sign that says "The buck

10 stops here," and I walked into your office, on whose

11 (indiscernible - weak bandwidth) that sign?

12 A     "The buck stops here."  I am the CEO of the company -- of

13 the company, Sklar Exploration and Sklarco, yes, sir.

14 Q     And who made the decision not to pay the working interest

15 owners revenue for January and February?

16 A     We simply didn't have the money.

17 Q     That's not my question.  Maybe I asked a bad question,

18 I'll try again.

19 A     Okay.

20 Q     Who made the ultimate decision to not pay the working

21 interest owners revenue for January and February, 2020?

22 A     Myself and the management of this company.

23 Q     Does the buck stop with you on that issue, that question,

24 as well?

25 A     Once again, I'm the CEO.

Sklar - Cross/Geno                                    61

1  Q     Is that a yes?

2  A     Yes, sir.

3  Q     Thank you.  Is it your contemplation that a CRO would have

4  "The buck stops here" sign on his or her desk if they are

5  appointed?

6  A     Yes, I assume so, yes.  The CRO would be responsible for

7  carrying out all of the -- the fact that going forward, we

8  would be able to operate this company, and continue to -- and

9  not need any other money from outside.

10 Q     You say "we would operate the company."  Who is "we"?

11 A     Sklar Exploration and Sklarco.  Sklar Exploration is the

12 operating company, and Sklarco is the owner of the interest.

13 So Sklar Exploration -- we feel in our budget that Sklar

14 Exploration can operate these wells profitably on our cash

15 collateral.

16 Q     Under --

17 A     Using our cash collateral.

18 Q     Under the ultimate leadership of the CRO?

19 A     I assume the CRO works in concert with our -- with our

20 company, yeah.  So a CRO and us would be making sure that we'd

21 do exactly what we were planning to do.

22 Q     So is it your contemplation that the CRO would have the

23 ultimate decision-making authority of both debtors?

24       MS. RILEY:  Objection, Your Honor; I think this is

25 asked and answered at this point.

1              THE COURT:  I agree; sustained.

2              MR. GENO:  Thank you, Your Honor.

3              THE COURT:  Anything further, Mr. Geno?

4              MR. GENO:  Yes, ma'am.

5   BY MR. GENO:

6   Q    Mr. Sklar, are you familiar with the volume of oil and gas

7   sales it would take to comply with the budget that's Debtors'

8   Exhibit 4?

9              MS. RILEY:  Mr. Geno, is there a particular line item

10  in the budget you'd like us to reference?

11             MR. GENO:  Yeah, the revenue -- the oil and gas

12  revenue line.

13                         (Pause)

14             THE WITNESS:  Excuse me, sir, I have to refresh

15  the --

16  A    Yes.  Yes, sir.  On the April production?  The April

17  production is -- is what we -- I believe that's what we

18  produced.

19  Q    Is that -- I'm sorry, I didn't mean to interrupt you; I

20  apologize.  Please finish.

21  A    I'm sorry, yes.  The April production that's on this

22  budget, the production of 85,500 barrels of oil, and 315

23  million cubic feet of gas, yes, that is -- that is what's on

24  the budget, yes, sir.

25  Q    Is that the same volume of oil and gas that you sold

Sklar - Cross/Geno                                63

1  before the bankruptcy?

2  A    I'm not -- I'm not sure exactly what the volumes were

3  every month, but I could look at that.  The volumes are stable,

4  and that is a real number, yes, sir.

5  Q    So the answer to my question is yes, it's the same volume

6  post petition as it was prepetition.

7  A    It's -- yeah, it is, roughly.  It may be -- we had shut

8  some wells in, so I'm going to defer to our engineering, but,

9  yes, that -- that number is perhaps somewhat smaller because we

10 had shut some wells in.  But for April, that's -- that's

11 correct.

12 Q    But you're doing that with fewer employees than you had at

13 the time the bankruptcy was filed, is that right?

14 A    Yes, sir.

15 Q    Mr. Sklar, I, during the break, roughly estimated

16 (indiscernible - weak bandwidth) arithmetic the amount of cash

17 call advances that Sklarco has not made, and I'll represent to

18 you my math shows that's about $2.1 million.  Does that sound

19 about right to you?

20         THE COURT:  I'm sorry, sir, I don't understand the

21 question.  Can you rephrase that?

22         MR. GENO:  Yes, ma'am.  Yes, ma'am.  On the Tauber

23 exhibits that was just admitted, Your Honor, if you take line

24 item by line item where Sklarco has not paid its cash call

25 advances, my (indiscernible - weak bandwidth) through the

1  arithmetic shows that's about $2.1 million, adding all those

2  line items across all of the documents that were produced.

3  BY MR. GENO:

4  Q    Does that -- and my question for Mr. Sklar, Your Honor,

5  was did that sound about right to you, Mr. Sklar.

6  A    Is the question how much is Sklarco's part of all of the

7  cash calls going forward?

8  Q    Much better --

9  A    Is that the question?

10 Q    Much better stated.

11 A    Is that what you're asking?

12 Q    Yes, sir.

13 A    That when we complete those operations, how much will

14 about -- of those cash calls, how much will be due once we've

15 considered those operations, how much of that will be

16 attributable to Sklarco, the sum of those operations.

17 Q    That is not my question.  My question is how much has

18 Sklarco not paid of its cash call advances according to the

19 documents that were in the data room and just admitted into

20 evidence a few minutes ago?

21       THE COURT:  That's Exhibit L-1 for the record.

22 A    This is the document of the cash call -- what we call the

23 cash call tracker?  Is the question that, yes, we've answered

24 that we have not paid our part of that because we pay our part

25 as the work is completed.

Sklar - Cross/Geno                                    65

1  Q     So is it your testimony then that the other cash call

2  advance parties that made their cash call advances is Sklarco

3  waits until the project is fully completed?

4  A     No, that is not correct.

5  Q     When in your view is Sklarco going to pay the $2,100,000

6  for cash call advances?

7  A     As we complete the operations, Sklarco pays their part as

8  the operations come in.  So as we get bills, the -- the -- for

9  these operations, which take a long time to do, yes, as we --

10  as the bills come in, Sklarco pays their part.

11  Q     What is Sklarco's revenue being used for under the

12  (indiscernible - weak bandwidth) cash collateral budget

13  currently that's Debtors' Exhibit 4?

14          MS. RILEY:  Just -- if I can pull that back up.

15                    (Pause)

16  Q     Do you remember the question, Mr. Sklar?

17  A     Yes, sir.  You're saying what is Sklarco's part of the

18  revenue?  Is Sklarco's part of the revenue, you're saying,

19  enough to fund this budget?

20  Q     No, sir.  My question is what is Sklarco's revenue being

21  used for under this budget?

22  A     Under this budget?

23  Q     Yes, sir.

24  A     Sklarco's part of the revenue goes into the Sklar

25  Exploration account to pay the bills and pay the operating

1  expense and pay everyone's salary, and to operate these wells.

2  Q    And is that Sklarco's revenue, a hundred percent of its

3  income is going to pay those bills?

4  A    Yes, sir.

5  Q    (Indiscernible - multiple speakers).

6  A    In --

7  Q    I'm sorry.

8  A    In additional to, Sklar Exploration owns hedges.  So we

9  have on the budget that Sklar Exploration has hedges for the

10 production.  So that is included in the budget.  Sklarco's part

11 of the budget, as we've said, goes into the Sklar Exploration

12 operating account to pay bills, to operate the wells, and -- as

13 well as we are saying that we're including the income from the

14 hedges.  That is Sklar Exploration's income, yes, sir.

15 Q    Did you finish your answer?

16 A    Yes, sir.

17 Q    Okay.

18         MR. GENO:  Nothing further, Your Honor.

19         Thank you, Mr. Sklar.

20         THE WITNESS:  Thank you.

21         THE COURT:  Thank you.

22         All right, redirect?

23         MS. RILEY:  Yes, Your Honor.

24                     REDIRECT EXAMINATION

25 BY MS. RILEY:

1  Q    Now just briefly, with Mr. Geno, we were talking about the

2  CRO and what the CRO would be doing.  Have the terms of the CRO

3  been determined at this point or are they still under

4  discussion?

5                        (Pause)

6             THE COURT:  That was a question for you, Mr. Sklar.

7             THE WITNESS:  For me?

8             THE COURT:  Yes.

9  A    Those are terms of the CRO --

10            THE COURT:  You need to lean forward, we're not

11 hearing you.

12            THE WITNESS:  Okay; I'm sorry.

13 A    The terms -- the exact terms of the CRO have not been

14 determined at this point.

15            MS. RILEY:  Your Honor, I'm just going to take a

16 brief moment.  I apologize, there's a power cord that needs to

17 be plugged in here.

18            THE COURT:  Okay.

19            MS. RILEY:  Sorry.

20                        (Pause)

21 BY MS. RILEY:

22 Q    With respect to the cash call advances, there has been a

23 lot of testimony -- a lot of questions about Sklarco's payment

24 of those cash call advances.  I want to take a step back.

25 Prior to the bankruptcy filing, where have the -- has Sklarco

Sklar - Redirect/Riley                          68

1  pooled its funds with Sklarco?

2  A    Yes.

3  Q    And what is Sklarco's revenue from production generally

4  used for?

5  A    Sklarco's revenue is used for paying salaries, it is used

6  for paying JIBs, it is used for paying its part of the

7  operations as they are completed.

8  Q    Now to your knowledge, why, for instance, would Sklar

9  Exploration issue a cash call advance?

10 A    Sklar Exploration issues cash call advances on projects

11 that are risky projects that may or may not bring in

12 productivity because these are only for either extensive

13 workovers, or drilling wildcat wells, or offset wells, drilling

14 -- drilling development wells.  All of those things which are

15 risky and they're not something which you could bill after the

16 fact if they didn't work.  So Starcom (phonetic), like every

17 operator, prebills all of these operations.

18 Q    And I think you mean Sklar Exploration would prebill those

19 amounts?

20 A    Yes, excuse me.  Yes, Sklar Exploration prebills all of

21 the working interest owners for something risky, and then we

22 keep the money on account.

23 Q    If a cash call advance wasn't issued, and Sklar

24 Exploration still undertook one of these riskier operations,

25 what would be the alternative method for it to receive funds

Sklar - Redirect/Riley                          69

1  from working interest holders to pay for those?

2  A    It would have to bill them after -- after the fact.  It

3  would have to put them on a JIB.  And if it was a dry well,

4  they will not pay.

5  Q    Now you said that part of the reason why cash call

6  advances weren't issued to Sklarco was because Sklar

7  Exploration knew that it would pay its bills for those

8  operations.  What did you mean by that?

9  A    As I said earlier, Sklarco -- there's no risk.  Sklarco

10 would pay its part of these operations if they -- if they work,

11 or if they're a dry well, or whatever, we pay our part of the

12 operation as the bills come in.

13 Q    So for instance, on one of these projects where a cash

14 call advance had been issued, if a bill came in for, for

15 instance, the purchase of materials, how would that be applied

16 where a cash call advance had been paid?

17 A    As -- that goes to the JIB, not only for Sklarco, but it

18 goes to the JIB to all of the working -- when the working

19 interest owners get their joint interest bill, they are

20 credited against that cash call as the work is completed.  So

21 that money is on account, if you will.  And so as the work is

22 complete on their JIB every month, they will see their -- their

23 part of that bill, each working interest owners' part of the

24 bill will be paid -- will be credited against their cash call.

25 Q    And would a portion of Sklarco's revenue that's being

Sklar - Redirect/Riley                    70

1  pooled with Sklar Exploration be used to pay that bill?

2  A    Yes.

3  Q    Now there were also some questions about the price trends

4  for oil.  So first, just remind us, how many years of

5  experience do you have in the oil and gas industry?

6  A    Thirty years -- almost 30 years.

7  Q    And as the CEO of an oil and gas company, do you follow

8  price trends?

9  A    Yes.

10 Q    And based on your years of experience here, would you

11 anticipate the prices would continue to increase going forward?

12          UNIDENTIFIED ATTORNEY:  Objection.

13          UNIDENTIFIED ATTORNEY:  Objection.

14          UNIDENTIFIED ATTORNEY:  Assumes facts not in

15 evidence.  He's testified that he has experience with geology,

16 not with market trends.

17          UNIDENTIFIED ATTORNEY:  Your Honor, I also --

18 objection, and add to the objection, she's trying to qualify

19 him as an expert on redirect, when she didn't qualify him as an

20 expert on direct.

21          THE COURT:  Okay.  And, Mr. Skelton, do you have

22 anything to add to the objection?

23          MR. SKELTON:  No.

24          THE COURT:  Okay.  I'm sustaining --

25          MR. SKELTON:  It's well-stated.

1          THE COURT:  All right.  I'm sustaining the objection.

2          Ms. Riley, do you want to lay a foundation or -- I

3   mean the part of the point is you didn't offer him as an expert

4   in the beginning, so --

5          MS. RILEY:  Certainly, Your Honor, and we don't think

6   this necessarily goes to expert testimony so much as his

7   experience here.

8          THE COURT:  Well, when you're asking about future

9   trends and the price, that is expert testimony.  So I'm

10  sustaining the objections.

11  BY MS. RILEY:

12  Q    Now there were also questions about the charts that were

13  prepared with respect to payments to insiders for Sklar

14  Exploration and Sklarco.

15         THE COURT:  We're getting a bad echo, for some

16  reason.  Can you try that one more time?

17  Q    So there was some testimony -- a few questions about the

18  preparation of the schedules and statement of financial affairs

19  for Sklar Exploration and Sklarco, do you remember that?

20  A    Yes, I do.

21  Q    And with those documents, did you assist with the

22  preparation of those documents?

23  A    I -- I looked over those documents, yes.  I looked over

24  them, and I did not prepare those documents.  I looked over

25  them, and to the best of my knowledge.

Sklar - Redirect/Riley                    72

1  Q     Did you --

2  A     I didn't actually prepare those.

3  Q     Did you assist in providing information for the

4  preparation of those documents?

5  A     Yes, I provided information for those documents, yes.

6  Q     And when you were providing that information, was there a

7  large volume of information that you all were going over to

8  prepare those documents?

9  A     Yes, an extremely large volume of information.

10 Q     And what is the intention with respect to making any

11 required amendments for the statement of financial affairs and

12 schedules?

13       UNIDENTIFIED ATTORNEY:  Objection, Your Honor; asked

14 and answered on direct.

15       THE COURT:  Yeah, I'll sustain.

16 Q     Was there a time frame provided for amending those

17 documents?

18 A     We're going to amend those documents as soon as possible.

19 Q     In going forward, what source of the funding is going to

20 be used to maintain Sklar Exploration's operations here?

21       UNIDENTIFIED ATTORNEY:  Objection, Your Honor; asked

22 and answered.

23       MS. RILEY:  Your Honor, this is something that was

24 gone over during cross-examination.  We should have the

25 opportunity to redirect on it.

Sklar - Redirect/Riley                                    73

1          THE COURT:  I'm sorry, I missed the question.  Can

2  you repeat it?

3  Q    What sources of funds are going to be used to maintain

4  Sklar Exploration's operations going forward post petition?

5          THE COURT:  That has been covered.  Do you have some

6  new direction you're going to take that in?

7          MS. RILEY:  Well, Your Honor, there have been

8  questions on cross-examination certainly over the use of the

9  funds here.  So I think that he should have the opportunity to,

10 again, restate where the money's coming from to fund operation.

11         THE COURT:  Well, he said it's going to come from the

12 hedging contracts and from production, you know, the net

13 revenues from Sklarco.  So you're looking for something beyond

14 that?

15         MS. RILEY:  We can move on.

16         THE COURT:  Because you asked about sources of funds.

17         MS. RILEY:  Certainly, we can move on, Your Honor.

18         THE COURT:  Okay.

19 BY MS. RILEY:

20 Q    Post petition, after the bankruptcy filing, as Sklar

21 Exploration issued any new cash call advances?

22 A    No, we have not.

23 Q    And does the budget list any new cash call advances?

24 A    No, it does not.

25 Q    Do you anticipate -- or does Sklar Exploration anticipate

Sklar - Redirect/Riley                                     74

1  issuing cash call advances at any point during the month of

2  May?

3  A    No, not during the month of May.

4  Q    Now there were also questions about payment of legal fees,

5  and the fact that that wasn't in the budget.  To your

6  recollection, was a retainer paid to your attorneys in this

7  case?

8  A    Yes, it was.

9         MS. RILEY:  Your Honor, if you'll give me just a

10 minute, I don't think I have any other questions, I just want

11 to take a short moment to review my notes.

12        THE COURT:  Okay, sure.

13                    (Pause)

14        MS. RILEY:  Your Honor, no further questions.

15        THE COURT:  All right.  Thank you, Mr. Sklar.  That

16 completes your testimony.

17        I assume debtor has no further witnesses, is that

18 true?

19        MS. RILEY:  That's correct, Your Honor.

20        THE COURT:  Do you have other exhibits that you wish

21 to offer?  We've got D-1, D-2, D-4 -- Kerstin, do we have any

22 others?

23        MS. CASS:  D-8.

24        THE COURT:  D-8, which are the bank statements.

25        MR. SKLAR:  Thank you, Your Honor.

```
 1            THE COURT:  Certainly.  Ms. Riley, do you want any of
 2   your other exhibits -- D-3, D-5, D-6, D-7, D-9?
 3            MS. RILEY:  Your Honor, I think we'll offer D-9 just
 4   for the purposes of completeness here.  That's just the bank
 5   statement for the operating account.
 6            THE COURT:  Okay.  Any objection to D-9?
 7            UNIDENTIFIED ATTORNEY:  None here.
 8            THE COURT:  Okay.  Not hearing any objection, it is
 9   received.
10            (Debtors' Exhibit D-9 admitted into evidence)
11            THE COURT:  Okay.  So that concludes the debtors'
12   case, correct?
13            MS. RILEY:  Yes, Your Honor, although we would
14   reserve the ability to recall witnesses as necessary for
15   impeachment or rebuttal.
16            THE COURT:  Okay, very good.
17            All right, shall we start in with, I guess, Tauber's
18   case, Mr. Skelton?
19            MR. SKELTON:  Your Honor --
20            MR. SHIPPS:  Your Honor --
21            MR. SKELTON:  -- Mr. Shipps is going to be conducting
22   examination of a couple of witnesses.  But I thought just
23   before we go any further, let's go ahead and -- Tauber will
24   offer its Exhibit TAU-A through TAU-L, and we've already got in
25   TAU-L-1, which is what was admitted today.
```

    1          THE COURT:  Okay.  Any objection to those exhibits?

    2          MR. SUZUKI:  Your Honor, Bryce Suzuki on behalf of

    3   East-West Bank.

    4          No real issue with most of those.  I do note that

    5   Exhibit C is just an excerpt from an otherwise undisclosed

    6   agreement, and an agreement that's not otherwise in evidence.

    7   I just don't know what that is, so I'm hesitant --

    8          THE COURT:  The Castleberry Prospect --

    9          MR. SUZUKI:  Yeah.

   10          THE COURT:  -- JOA.

   11          MR. SUZUKI:  And so, you know, it may become clearer

   12   upon examination what that's about, and we may not have

   13   objections.  They're classifying it as a demonstrative, but I

   14   think it's from a document not otherwise in evidence.

   15          So we would reserve our rights at least with respect

   16   to that exhibit.

   17          THE COURT:  Okay.

   18          MS. RILEY:  And --

   19          THE COURT:  All right.  Ms. Riley?

   20          MS. RILEY:  Your Honor, with respect to Exhibit J, K,

   21   and H, we do have objections on the basis of relevancy there.

   22   This, again -- these exhibits, just to preview for the Court --

   23   go to the gas point issues that were raised yesterday but,

   24   again, just really don't go to the cash collateral issue here.

   25          MR. SHIPPS:  Your Honor?

```
 1              THE COURT:  Yes, Mr. Shipps?

 2              MR. SHIPPS:  We intend to introduce and take

 3  testimony with regard to Exhibit J, which is the letter of

 4  February 13th, 2020.  This does go to testimony that was raised

 5  yesterday to Mr. Strausser, the CFO, regarding the intentions

 6  to charge joint interest billings with respect to management

 7  fee.

 8              THE COURT:  Okay.  Before you --

 9              MR. SHIPPS:  And it goes to --

10              THE COURT:  I'm going to interrupt before you go into

11  much detail.  What I'm going to do is take the unobjected

12  exhibits in now.  And the objected one, you can lay the

13  foundation, etc., as we go along, okay?  And so try to

14  reintroduce them.

15              But for now, C, J, K, and H are not coming in.  But

16  that means A, B, D, E, F, G, I guess I, and L, plus L-1 are all

17  -- so we've got A through I and L and L-1 are received.

18              MS. CASS:  But not C.

19              THE COURT:  Not now.

20              MS. CASS:  You said A through L.

21              THE COURT:  Oh, I did, okay, you're right.  A, B, and

22  then -- and then D through I are received, as well as L and L-

23  1, okay.

24         (Tauber's Exhibits A, B, D, E, F, G, H, I, L admitted

25  into evidence)
```

Sibley - Direct/Shipps                    78

1          THE COURT:  Thank you.  Call your first witness, Mr.

2  Shipps.

3          MR. SHIPPS:  Yes, Your Honor.  I'd like to call Trey

4  Sibley.

5          THE COURT:  Mr. Sibley, please come forward to be

6  sworn.  And you'll need to speak so we can see you on the

7  camera.  Say, hello, good morning, whatever.

8          MR. SIBLEY:  Good morning.

9          THE COURT:  Thank you.

10         MS. CASS:  Please raise your right hand.

11      WILLIAM R. SIBLEY (TREY), TAUBER'S WITNESS, SWORN

12         MS. CASS:  Thank you.

13                   DIRECT EXAMINATION

14 BY MR. SHIPPS:

15 Q   Mr. Sibley, would you please state your full name and your

16 address for the record?

17 A   My full name is William Ruck Sibley the Third, I go by

18 Trey Sibley as a nickname, and my office address is 4851 LBJ

19 Freeway, Suite 210, Dallas, Texas 75244.

20         THE COURT:  Can you spell the Sibley last name?

21         THE WITNESS:  S, as in Sam, I B, as in boy, L E Y.

22 Q   Mr. Sibley, you are serving as a representative for the

23 Rudman Partnership, is that correct?

24 A   Yes, sir, that's correct.

25 Q   And could you describe your relationship with the Rudman

Sibley - Direct/Shipps                                    79

1  Partnership?

2  A    I've been with the Rudman family for almost 40 years, and

3  I am currently the general manager, the general counsel, and

4  the attorney in fact.

5  Q    And are you familiar with prospect participation

6  agreements?

7  A    Yes, sir, I am.

8  Q    And have you gained that familiarity in the role that you

9  play for the Rudman Partnership?

10 A    Yes, sir.

11 Q    And is the Rudman Partnership a -- well, are you familiar

12 with the Escambia Prospect Participation Agreement?

13 A    Yes, sir, I am.

14 Q    And is the Rudman Partnership part of that?

15 A    Yes, sir, they are.

16 Q    I would like to direct your attention to our Exhibit A,

17 please, Mr. Sibley.  And I'd like to ask you some questions

18 principally about the structure of a participation agreement.

19 Moving first, if you would take a look at that participation

20 agreement.  Do you have that in front of you?

21 A    Yes, sir, I do.

22 Q    And that's the Escambia Prospect Participation Agreement,

23 correct?

24 A    Yes, sir.

25 Q    Well, if you could just walk through for the Court, and

1  just kind of describe what the structure of this document is,

2  if you were to look, say for example, through Pages 1 through

3  6, that would essentially be the text of the agreement,

4  wouldn't it?

5          MS. RILEY:  Objection; leading.  And I'm going to

6  pull ahead and question the relevancy of this line of

7  questioning, as well.

8          THE COURT:  Okay.  Sustained on the leading, but tell

9  us about relevancy.

10          MR. SHIPPS:  This document actually outlines -- and I

11  think it's important to go through the structure, Your Honor,

12  so that you can see the elements of a participation agreement,

13  particularly the joint operating agreement, and how it ties to

14  a prospect agreement, which directly goes to issues of cash

15  advances, it goes to joint interest billings, and it goes to

16  whether or not those cash advances can be returned.  It

17  describes the relationships that parties to SEC, with respect

18  to SEC's ability to use JIBs, as well as cash advances.

19          MS. RILEY:  Your Honor, if I may.  A lot of these

20  facts have already been admitted, certainly with respect to the

21  interest of the various parties.

22          So I -- again, I just -- I question the relevancy of

23  going through this in detail as it's duplicative at the point

24  where it's been admitted.

25          MR. SHIPPS:  Your Honor -- I'm sorry.

1          THE COURT:  Yes, go ahead.

2          MR. SHIPPS:  I think it -- we are going to go through

3   the structure of one of these agreements quickly.

4          THE COURT:  Okay.

5          MR. SHIPPS:  And we do not intend to waste the

6   Court's time to go ahead and belabor points.

7              It's important for the Court to understand the

8   structure of one of these documents.

9          THE COURT:  Okay, I will allow it.  But the

10  particular question you asked was leading.  So if you'll

11  rephrase.

12         MR. SHIPPS:  Right.

13  BY MR. SHIPPS:

14  Q    Mr. Sibley, could you please characterize Pages 1 through

15  6 of this exhibit?

16  A    It's the terms and conditions of the acquisition of an --

17  of the interest of the parties in this particular prospect.

18  Q    And what is the purpose of the participation agreement?

19  A    It is, in general terms, it's the purchase agreement of an

20  asset and the requirements of both the operator and the non-

21  operators in their respective roles throughout the exploration

22  and development of the project itself.

23  Q    And if you look quickly at Pages 6 through 10, what do

24  those pages represent?

25  A    They're the signature pages of the parties to the

Sibley - Direct/Shipps                                    82

1  participation agreement.

2  Q    And turning to Page 11, what does -- what's the purpose of

3  Page 11?

4  A    Page 11 itemizes the attachments of the exhibits that are

5  attached on to the original participation agreement for the

6  Escambia prospect.

7  Q    And if you go to Page 12 --

8         UNIDENTIFIED ATTORNEY:  Could you slow down a little

9  bit?  I'm having trouble tracking.

10        MR. SHIPPS:  Sorry.

11        THE COURT:  He's afraid I'm going to cut him off,

12  so --

13        MR. SHIPPS:  I am, indeed.

14                        (Laughter)

15        THE COURT:  Okay.  But we'll slow down just a little.

16        UNIDENTIFIED ATTORNEY:  I'm there.

17        MR. SHIPPS:  Okay.

18 BY MR. SHIPPS:

19 Q    Would you please identify Exhibit -- Page 12 of the

20 exhibit?  Describe what that is?

21 A    This is generally referred to as a contract area or the

22 area of mutual interest that the parties stipulate to that the

23 participation agreement and the ensuing operating agreement

24 refers to.  It's a geographical boundary which limits people's

25 -- parties' obligations and responsibility.

Sibley - Direct/Shipps                                          83

1  Q    And -- so this appears to be a fairly sizeable area, is it
2  not, in this plat?
3  A    That is correct, sir.
4  Q    And is each one of those particular governmental sections
5  a square mile?
6  A    Yes, sir.
7  Q    So if you were to count those, it'd be, what,
8  approximately 56 square miles of property, wouldn't it?
9  A    I'm going to trust you; yes, sir.
10 Q    All right.  And then turning to the next page, on Page 13,
11 and Page 13 through Page 16, marked as Exhibit A-1 to this
12 participation agreement, what's the purpose of that portion of
13 the agreement?
14 A    This is a general description of the leases that were
15 acquired by the seller, or Sklarco in this particular prospect,
16 participation agreement that are itemized as being the interest
17 that -- the undivided interest that all of the parties will be
18 acquiring as part of the purchase and sale via the terms and
19 conditions of the participation agreement.
20 Q    And so if you were to turn to Page 17 with regard to
21 Exhibit B, what does that portion of this agreement do?
22 A    It's generally just the form of the assignment where the
23 Sklarco entities will be assigning the proportionate interest
24 to the participating parties in the prospect itself.
25 Q    And if you'd turn to Page 20, that, in fact, is a -- is an

Sibley - Direct/Shipps 84

1  attachment, is it not, to that form of assignment?

2  A    I'm sorry; what page, sir?

3  Q    Page 20 of our exhibit.

4  A    Yes, sir, it's the -- again, the legal description of the

5  leases that will be used for the assignment of the transfer of

6  the undivided interest.

7  Q    And so assuming that everything ultimately works out with

8  respect to the initial well, you would anticipate, would you

9  not -- well, how would that -- that description fit in with

10  respect to what would happen next?

11  A    Actually regardless of the outcome of the initial well and

12  the prospect, these leases will be assigned by the selling

13  party, the Sklarco party in this case, to the undivided

14  interest owners in accordance with the agreement.

15  Q    And moving on to Page 26, Exhibit C, can you briefly

16  describe for the Court what that is?

17  A    These are -- it looks like executed AFEs by a few of the

18  parties that have authorized the expenditures on their behalf

19  for the drilling of wells in this prospect.

20  Q    And then moving to Page 31, Exhibit D to the participation

21  agreement, what is that document, sir?

22  A    This is the model form operating agreement which is

23  attached as an exhibit to the original participation agreement,

24  and the model form operating agreement is the general daily

25  agreement that controls the day-to-day operations of the

1  exploration efforts in the prospect.

2  Q    And without stopping to look at particular provisions of

3  that JOA yet, I would as you to quickly flip through Pages 31

4  through Page 54, and ask you to identify -- actually I beg your

5  pardon.  Page 31 to Page 46, and ask if you could identify what

6  those pages do?

7  A    These are the printed form of this agreement which has

8  been modified in various areas which, again, reflect the

9  obligations of both the operator and the non-operators, and the

10 elections of the operators and the non-operators regarding the

11 operations to take place within this particular prospect.

12 Q    Looking at Page 47, it -- what -- what does Page 47 do

13 with respect to this JOA?

14 A    Generally we refer to these as Article 15 provisions which

15 are additional provisions that different parties add to the

16 model form operating agreement which are prepared in connection

17 generally with prior problems that the parties have had, and

18 trying to deal with gray areas that the printed form of the

19 agreement did not cover.

20 Q    And then if we would turn to Page 55.

21        MS. RILEY:  Your Honor, at this point, this document

22 has been admitted, I am still waiting for this to get tied back

23 to some of these cash collateral issues.

24        THE COURT:  I'm going to allow him to go just a

25 little bit longer.

1          MS. RILEY:  Certainly.

2    Q     And 55 are signature pages, correct, for this JOA?

3    A     Yes, sir.

4    Q     And the joint operating agreement itself did have

5    attachments, as well, doesn't it?

6    A     Yes, sir, it does.

7    Q     And so if we were to look on Page 60, for example, that

8    would be Exhibit A to the JOA, and what does it do?

9    A     It describes the -- by geographical description the

10   acreage to be included in this particular prospect agreement.

11   Again, it's a recital of the general geographical boundaries of

12   this particular prospect, as well as it also itemizes the

13   interest of the respective parties in this particular prospect.

14   Q     Well, and we don't have to go through each of these, but I

15   would ask you, there are several additional attachments to the

16   JOA itself, correct?

17   A     Yes, sir.

18   Q     And for example on Page 69, we have Exhibit C, what is

19   that?

20   A     That is what we referred to as the COPAS joint accounting

21   procedure document that controls payments, billings,

22   regulations, what is authorized, what is not authorized, the

23   operations that all of the parties will be incurring through

24   the prospect, exploration and development.

25   Q     And if we get to Page 83, would you just describe that

Sibley - Direct/Shipps                                        87

1  briefly?

2  A    It's a gas balancing agreement, which is a typical

3  attachment off of the operating agreement, to refer to

4  undivided parties' interest in production, generally gas, in

5  this particular item for each parties' respective share.  In

6  some instances, in exploration, some parties separately dispose

7  of the undivided share of the production.  And other times, it

8  is all -- I'm sorry -- it is all marketed by the operator

9  itself.

10 Q    Okay.  Now I would like you -- well, and finally, the last

11 few pages of this exhibit are acknowledgments, are they not?

12 Notarized acknowledgments.

13 A    Yes, sir, they are, sir.

14 Q    And those are acknowledging the authenticity of the

15 signatures of the participants, correct?

16 A    That's correct, sir.

17 Q    Now I would like to direct your attention to Section 2.01

18 on Page 4 of the participation agreement.

19            MS. RILEY:  I'm sorry; what page is that, again?

20            MR. SHIPPS:  It's Page 4, Section 2.01.

21 A    Is that 2.1, sir?

22 Q    Yeah, I'm sorry, 2.1.  And that addresses the JOA, does it

23 not?

24 A    Yes, sir, it does.

25 Q    And I wonder if you could read that for the Court, please?

Sibley - Direct/Shipps                                88

1          MS. RILEY:  Objection, Your Honor; this is already in

2    evidence.  I think if we can maybe be a little more direct in

3    what we're asking about.

4          THE COURT:  Well, I'm either going to have to hear

5    about this in his closing or through this witness.

6          Normally witnesses stumble and trip, but Mr. Sibley

7    is doing a marvelous job going carefully and quickly.  So I'm

8    going to allow it.

9          MR. SHIPPS:  And, Your Honor, rather than have him

10   read it, let me just ask a couple of questions about this

11   paragraph.

12         THE COURT:  Okay; fair enough.

13         MR. SHIPPS:  Okay?

14   BY MR. SHIPPS:

15   Q    Section 2.1, this designates the operator, does it not,

16   Mr. Sibley?

17   A    Yes, sir, it does, sir.

18   Q    And who's designated as the operator with respect to this

19   prospect agreement?

20   A    SEC.

21   Q    And on the final sentence of Section 2.01, what does that

22   -- what does that refer to?

23   A    It refers to any contradictory language between this

24   particular participation agreement and any other agreements

25   that may be affecting this particular prospect.

1  Q    And in the event of a conflict between the text in the

2  participation agreement and the JOA, which governs?

3  A    The participation agreement.

4  Q    And moving to Section 3.6 on the following page, Page 5, I

5  ask if you -- if you could review that, read that section,

6  please, for the Court.

7  A    "This agreement and its attachments constitute the entire

8  agreement of the parties with respect to the subject matter

9  hereof, and any other promises, inducements, representations,

10 warranties, or agreements with respect to the subject matter

11 hereof have been superceded hereby and are not intended to

12 survive this agreement except as otherwise expressly provided

13 herein, no amendment or modification to this agreement -- of

14 this agreement shall be effective unless set forth in writing,

15 and signed by a duly authorized officer of each of the

16 parties."

17 Q    So with respect to an amendment to this document, is it

18 your understanding it would require unanimous approval of the

19 parties?

20        MS. RILEY:  Objection; assumes facts not in evidence,

21 lack of foundation, and leading.

22        THE COURT:  On that basis, I'm overruling, on those

23 grounds.

24 Q    Mr. Sibley, could you answer the question, will this --

25 would the amendment to this agreement require unanimous

Sibley - Direct/Shipps                                    90

1  execution by the parties?

2          UNIDENTIFIED ATTORNEY:  Objection, Your Honor; calls

3  for a legal conclusion.

4          THE COURT:  Sustained on that basis.

5  BY MR. SHIPPS:

6  Q    Mr. Sibley, what's your interpretation of that agreement

7  in the context of an amendment?

8          UNIDENTIFIED ATTORNEY:  Objection; relevance.  This

9  witness' interpretation of the agreement is not a matter before

10 the Court.

11         THE COURT:  Sustained.

12 Q    Based upon that provision, do you believe it will be

13 possible to amend this agreement in the absence of a signature

14 of all the parties?

15         UNIDENTIFIED ATTORNEY:  Same objection.

16         MS. RILEY:  Objection, Your Honor.

17         THE COURT:  Same ruling.

18 Q    If I could direct your attention to Page 48 --

19         THE COURT:  Thank you for numbering all the pages.

20         MR. SHIPPS:  There are lots of documents, Your Honor.

21         THE COURT:  I know, you get a gold star.

22                         (Laughter)

23 Q    Now -- are you there, Mr. Sibley?

24 A    Yes, sir, I am, sir.

25 Q    And we've jump back into the joint operating agreement,

Sibley - Direct/Shipps                                          91

1  haven't we?

2  A    Yes, sir, we have, sir.   (Indiscernible - weak bandwidth)

3  provisions.

4  Q    So we're in the special other provisions of the JOA.   And

5  I would direct your attention to Paragraph E, "Advancement of

6  Cost."

7  A    Yes, sir.

8  Q    And specifically, what does this -- what does this

9  provision deal with in your experience?

10  A    It is not uncommon for operators to call for expenses in

11  advance of particular operations.   These requirements set forth

12  in this particular paragraph or this section, several full

13  paragraphs, I guess, deal with the timing, the utilization of

14  the funds, how early they can be called, what is to be done

15  with the funds by the operator, how are they to be used, and

16  how are they to be protected.   In general, it allows the

17  operator to call for funds in advance, and controls the use of

18  those same funds.

19  Q    With respect to -- are there ever -- in your experience,

20  are there times when there have been requests for advances and

21  cash calls?

22            UNIDENTIFIED ATTORNEY:   Your Honor, foundation;

23  relevance.   We're getting into expert witness territory.

24            THE COURT:   Okay.   Do you want to rephrase, Mr.

25  Shipps?

1          MR. SHIPPS:   Yes.

2   BY MR. SHIPPS:

3   Q    This provisions permits the operator to make requests,

4   advances of cash calls, does it not?

5   A    Yes.

6          MS. RILEY:  Objection, Your Honor.  I think we're

7   running into the same issues.

8          THE COURT:  Sustained.

9   BY MR. SHIPPS:

10  Q    In your experience, have there -- have you -- have you

11  experienced situations where operators have made cash call

12  requests?

13  A    Yes, sir, I have, sir.

14  Q    And in your experience, have there been times when the

15  operation for which the cash call has been received have not

16  been undertaken?

17  A    Yes, sir.

18  Q    And is there -- in your experience, what happens with

19  respect to the funds that have been advanced in such an

20  instance?

21         MS. RILEY:  Your Honor, objection to lack of

22  foundation here.

23         MR. SUZUKI:  And relevance from the bank, Your Honor.

24  Prior experience does not pertain to this document, nor this

25  debtor.

Sibley - Direct/Shipps                                        93

1          THE COURT:  Sustained.

2          It seems, Mr. Shipps, that you're really trying to

3   use this witness as an expert on how these things are supposed

4   to go, or how they're supposed to go under these particular

5   documents, but you haven't really offered him as an expert.

6   You haven't qualified, you didn't give a report, etc.

7          So do you have any other questions?  I mean if you

8   just want him to point out relevant provisions so that you

9   don't have to do that in your closing, I'm open to that because

10  he's a good witness.  So --

11         MR. SHIPPS:  Yes, I would like to have him point out

12  the last section of the first paragraph of E, Advancement of

13  Cost.

14         THE COURT:  Okay.  Do you know what you're being

15  asked to do, Mr. Sibley?

16         THE WITNESS:  Uh --

17         THE COURT:  I think he wants you to read the last two

18  sentences.

19         THE WITNESS:  I'm sorry; the last paragraph, Your

20  Honor?

21  BY MR. SHIPPS:

22  Q    I beg your pardon.  The last two sentences of the first

23  paragraph.

24         THE COURT:  Section E.

25  A    Starting with "Such requests"?

1  Q    And the sentence before that, starting with the sentence

2  before, and then to the end.

3  A    I'm sorry, I want to make sure I'm not wasting anyone's

4  time.  This is the first paragraph of Section E, Advancement of

5  Cost.

6  Q    Correct.

7  A    "Notwithstanding any other provisions herein" --

8            MULTIPLE SPEAKERS:  (Indiscernible).

9  Q    I'm sorry, Mr. Sibley.  I was just asking you to focus on

10 the last two sentences of that paragraph.

11 A    Okay.  Starting with "The amount,"  three lines -- four

12 lines from the bottom.  "The amount of such non-operator's

13 advanced payment shall be based upon the latest AFE for such

14 operation.  Such advanced payment shall be held by operator for

15 the account of the non-operators and applied with interest

16 against the actual cost incurred in the applicable operation."

17 Q    And turning to the next -- or skipping one paragraph, and

18 moving to the next one, starting with "Payment in advance,"

19 could you read that, please, for the Court?

20           MR. SUZUKI:  Your Honor, the bank has an objection

21 here.  There is no dispute before Your Honor that the advanced

22 funds are gone.

23           The only argument with respect to cash collateral is

24 that they owned a portion of the funds in the bank account on

25 the petition date.  These provisions all relate to funds

Sibley - Direct/Shipps                                        95

1  advanced that no one is disputing are part of the issue when it

2  comes to cash collateral.  Those funds are gone.

3       And while it may give rise to claims, this whole line

4  of questioning is irrelevant.  So it's a relevancy objection.

5       MR. SHIPPS:  Your Honor --

6       THE COURT:  Okay.  Mr. Shipps?

7       MR. SHIPPS:  Yes, Your Honor.  This next provision in

8  particular deals with refunding of cash advances that have not

9  been devoted to the purpose for which they were initially

10 intended.

11      And to the extent that we have requested recoupment

12 as an equitable remedy with respect to the JOA or the JIB

13 payments in the context of offsetting under this motion with

14 regard to our document 37, we believe that this goes critically

15 to the issue, the ability of these working interest owners to

16 recoup that money without having the revenues offset.

17      THE COURT:  Okay.  But how does that go to the use of

18 cash collateral?

19      MR. SHIPPS:  Right, I --

20      THE COURT:  Has the cash collateral budget in your

21 view built in that there won't be a credit or a recoupment that

22 will be allowed?

23      MR. SHIPPS:  I'm specifically looking at the motion

24 37, dealing with the oil and gas motion, which is also being

25 heard, as I understand, today.

Sibley - Direct/Shipps                                      96

1        THE COURT:  That's correct.

2        MR. SHIPPS:  And that -- and that request made by the

3  debtors is that they be able to offset future revenues to pay

4  joint interest billings.

5        And to the extent that these cash advance funds

6  should be recouped by the working interest owners, those funds

7  would not be available.  And -- and -- those funds should not

8  be permitted to be used as an offset against joint interest

9  billings because, in fact, the working interest owners are

10  entitled to have those funds present in themselves.

11        THE COURT:  Okay.  But back to my question, so that I

12  can tie this directly to the cash collateral and the oil and

13  gas motion that's being heard.  The -- is it your view then

14  that the budget is built on not allowing that sort of an offset

15  or credit for future JIBs?

16        MR. SHIPPS:  Yes.

17        THE COURT:  Okay.  I'm going to need you, at some

18  point, to tie that back to the budget for me.

19        MR. SHIPPS:  And we will do that through Mr. Pickens,

20  as well.

21        THE COURT:  Okay, all right.  Then go ahead with this

22  additional provision in Section E, but let's do it quickly

23  because we do have the document.

24        MR. SHIPPS:  All right, okay.

25  BY MR. SHIPPS:

1  Q    If you could, please, read that next to the last -- or

2  that next paragraph starting with "Payment in advance."

3  A    "Payment in advance shall, in no event, relieve a non-

4  operator of its obligations to pay its share of the actual cost

5  of a drilling operation.  And when the actual costs have been

6  determined, operator shall adjust the account for the party by

7  refunding any net amounts due or invoicing the parties for

8  additional sums owing which additional funds shall be paid in

9  accordance with the accounting procedure as set forth in

10 Exhibit C to this agreement."

11 Q    Thank you.

12          MR. SHIPPS:  Now I would like to turn the witness'

13 attention to what we have marked as TAU Exhibit -- excuse me,

14 Your Honor --

15                      (Pause)

16 Q    Mr. Sibley, I'll ask you ask you a couple of questions.

17 Were you present during the testimony of Marshall Jones, COO,

18 and John Strausser, yesterday?

19 A    Yes, sir, I was, sir.

20 Q    And do you recall Ms. Riley, debtors' counsel, asking Mr.

21 Marshall whether cash call advances are ever requested -- are

22 ever requested to be returned in the course of a drilling

23 project?

24 A    Yes, sir.

25 Q    And do you recall what Mr. Marshall's response was?

Sibley - Direct/Shipps                    98

1  A    Yes, sir.

2  Q    And what did he say?

3  A    As I recall, he said funds are generally returned for the

4  funds that are unused in a particular operation, and but they

5  also --

6           MS. RILEY:  Objection, Your Honor.  This

7  mischaracterizes testimony, it's not what he said at all.

8           THE COURT:  Yeah, we've got his testimony.  So what

9  is your question, Mr. Shipps, for this witness?  We don't need

10 him to tell us what another witness said, so where are you

11 headed?

12 BY MR. SHIPPS:

13 Q    If a project for which cash advances have been obtained

14 does not go forward, is there a mechanism, are those funds ever

15 returned to the working interest owners?

16           MS. RILEY:  Objection; calls for a legal conclusion.

17           THE COURT:  Sustained.

18                    (Pause)

19           THE COURT:  Do you have any questions, any factual

20 questions for this witness, Mr. Shipps?  If not, I'm going to

21 draw this to a close.

22           MR. SHIPPS:  Yes, I wish to -- if we could move to

23 Exhibit J.

24 Q    Mr. Sibley, do you have Exhibit J?

25 A    Yes, sir.

The header contains overlapping text from multiple filing stamps.

1  Q    And what is that?

2  A    It's a letter from Sklarco regarding the transfer of the

3  Abbeville gas plant.

4  Q    And what's the date of that letter?

5  A    February 13, 2020.

6  Q    And did you receive a copy of this on behalf of the Rudman

7  Partnerships?

8  A    Yes, sir, we did.

9           MR. SHIPPS:  Move its admission, Your Honor.

10          MS. RILEY:  Objection to relevance, Your Honor.

11          THE COURT:  Okay.  Talk about the relevance.

12          MR. SHIPPS:  This particular document purports to

13 impose a management fee associated with the Abbeville plant,

14 and -- and the -- and the issue related to this document is

15 whether or not that fee can be imposed upon those working

16 interest owners who have not signed the document.

17          THE COURT:  Okay.

18          MS. RILEY:   Your Honor --

19          THE COURT:  And that goes back to the line item on

20 the budget that assumes that that management fee will be

21 received, is that right?

22          MR. SHIPPS:  That's correct.

23          MS. RILEY:  Your Honor, if I may respond.

24          THE COURT:  Sure.

25          MS. RILEY:  Really what that seems to ask for here is

1 for this witness to draw legal conclusions about the mechanism

2 by which an -- a management fee could be imposed here.  And,

3 frankly, whether or not that management fee can be imposed is

4 not an issue relevant to cash collateral here.  It's an issue

5 that arises under State law, and under these agreements, and

6 should go and be decided in the Alabama State Court.  It is not

7 part of this proceeding.

8          THE COURT:  Mr. Suzuki, do you have any additional

9 objection?

10          MR. SUZUKI:  No, Your Honor, I think that's right.

11 To resolve that dispute is going to require a legal conclusion,

12 which is properly before a court in another jurisdiction.

13          THE COURT:  Okay, all right.

14          Let me -- Mr. Shipps?

15          MR. SHIPPS:  Yes, Your Honor.

16          THE COURT:  You don't need to respond, I'm going to

17 allow the exhibit in, but you can't ask the witness questions

18 that go towards his legal conclusion as to this dispute.  But

19 if you want this Exhibit J in to show that there is at least --

20 you know, you'll argue later that there is at least a question

21 whether that line item in the budget will really be realized,

22 that's fine.  So J is received.

23          (Tauber's Exhibit J admitted into evidence)

24          MR. SHIPPS:  Thank you, Your Honor.

25 BY MR. SHIPPS:

1  Q    With respect to this document, Mr. Sibley, this, too, has

2  different parts to it.  Pages 1 through 3 of this document is

3  the text of the letter, is it not?

4           THE COURT:  Okay.  We don't need him to walk us

5  through the document.

6           MR. SHIPPS:  Okay.

7           THE COURT:  Do you have a factual question for the

8  witness about this?

9           MR. SHIPPS:  Yes.

10  BY MR. SHIPPS:

11  Q    Turning to Page 5, and turning to the last sentence of

12  Page 5, could you read that, please, for the Court?

13  A    The last sentence of Page 5?

14  Q    The last sentence of the text on Page 5, prior to the

15  date.

16  A    "This amendment to the operating agreement may be executed

17  with any number of counterparts, each of which shall be deemed

18  an original, all of which shall constitute one and the same

19  agreement" -- I'm sorry, I skipped one here.  "A signed copy of

20  the amendment to operating agreement delivered by facsimile,

21  email or other means of electronic transmission will be deemed

22  to have the same legal effect as delivery of an original signed

23  copy of this agreement.  The amendment to the operating

24  agreement is effective and binding by each party who executes a

25  counterpart hereof."

Sibley - Direct/Shipps                     102

1  Q    And did you, on behalf of the Rudman Partnership, execute

2  this operating agreement on behalf of the Rudman Partnership?

3  A    You're talking about the amendment to the operating or the

4  actual operating agreement?

5  Q    The amendment to the operating agreement.

6  A    No, sir, I did not.

7  Q    And are you aware of any other Rudman entities that did

8  not sign that document?

9       MS. RILEY:  Objection, Your Honor; lack of

10 foundation, Your Honor.  I don't believe that this witness has

11 testified that he is involved with any other Rudman entities.

12      MR. SHIPPS:  Fair enough.

13 BY MR. SHIPPS:

14 Q    The Rudman Partnership did not sign, is that correct, Mr.

15 Sibley?

16 A    That is correct, sir.

17      MR. SHIPPS:  I don't have any questions -- further

18 questions for this witness, Your Honor.

19      THE COURT:  All right.  It strikes me that cross-exam

20 may not be necessary because if you go into asking him legal

21 conclusions with other parts of the documents, you're going to

22 open up that whole line of inquiry for Mr. Shipps.  So we have

23 the document in evidence, it says what it says, you can argue

24 in closing other parts of it.  So is it necessary to have any

25 cross-exam of this witness, Ms. Riley?

1          MS. RILEY:  Your Honor, we may just want a brief re -

2    - cross-exam on the participation of this -- of the Rudman

3    Partnership in this -- in the debtors.

4          THE COURT:  Well, you know what, why don't you think

5    about that over our lunch break?  Because if you open up the

6    door to asking him how this works, then he can, on redirect, go

7    pretty far afield into that, and I don't think you want that.

8          So just think about that, and we'll take our lunch

9    break.  Should we take just an hour?  Is that going to be

10   sufficient?  I don't know if we're running into problems with

11   finishing on time today, so --

12         MS. RILEY:  Your Honor, I think an hour would be fine

13   for the debtors.

14         THE COURT:  Anybody disagree or have a problem with -

15   - if we restart at 1 o'clock Mountain time?

16                (No audible response heard)

17         THE COURT:  Okay.  Not hearing that, then we will

18   resume at 1 o'clock.

19         Thank you, all.

20         UNIDENTIFIED ATTORNEY:  Thank you.

21         MS. CASS:  Court is now in recess.

22       (Recess 12:01:18 p.m./Reconvene 1:02:22 p.m.)

23         THE COURT:  Thank you.  All right, if I can get to

24   something with a case number on it, I'll recall the case.

25   We're here in the case of Sklar Exploration Company, LLC and

RUD000434

 1 Sklarco, LLC under Case Number 20-12377.  This is a continued

 2 hearing on cash collateral and an oil and gas motion.

 3         And rather than go through all the entries of

 4 appearances again, we'll just have the parties appear as they

 5 question witnesses, etc.

 6         All right.  So we've now concluded the debtors' case,

 7 and we've begun on the case of Tauber.  We were -- not sure --

 8 we were concluded, weren't we, Mr. Shipps, with your witness,

 9 Mr. Sibley.

10         MR. SHIPPS:  Sibley.

11         THE COURT:  Right?

12         MR. SHIPPS:  Yes, Your Honor, we had concluded Mr.

13 Sibley.

14         THE COURT:  Okay.  Do you have another witness to

15 call at this time?

16         MR. SHIPPS:  Yes, I'd like to call Mike Pickens,

17 please.

18         THE COURT:  Mr. Pickens, please raise your right

19 hand, and the Court's clerk will swear you in.  And say your

20 name or something so that we get your picture.

21         MR. PICKENS:  All right.  Mike Pickens.

22         MS. CASS:  Please raise your right hand.

23          MICHAEL PICKENS, TAUBER'S WITNESS, SWORN

24         MS. CASS:  Thank you.

25         MR. SUZUKI:  Your Honor, I'm sorry to interrupt, I

1  did have a few questions for the prior witness.

2              THE COURT:  Oh.

3              MR. SUZUKI:  I don't know if you wanted to do that

4  now or you wanted them to present both their witnesses.

5              THE COURT:  I'm sorry.

6              MR. SUZUKI:  No, I apologize.

7              THE COURT:  Then we're go back to Mr. Sibley.  Mr.

8  Sibley, could you state your name so we see your picture again?

9                         (Pause)

10             THE COURT:  Mr. Sibley, if you're on mute, you need

11 to unmute.

12             MR. SIBLEY:  Sorry, Your Honor.  Trey Sibley.

13             THE COURT:  We'll just remind you that you're still

14 under oath.  And go ahead, Mr. Suzuki, and you can ask your

15 questions on cross.

16             MR. SUZUKI:  Thank you.

17   WILLIAM R. SIBLEY (TREY), TAUBER'S WITNESS, PREVIOUSLY SWORN

18                      CROSS-EXAMINATION

19 BY MR. SUZUKI:

20 Q    Good morning, Mr. Sibley; my name is Bryce Suzuki, I

21 represent East-West Bank in this matter.  I wanted to ask you

22 just a couple of factual questions, I don't want to go over the

23 documents that were inquired about on your direct examination.

24 But if you have Tauber Exhibit A there with you, can you pull

25 that document out?

1  A    Is that the participation agreement?

2  Q    It is, indeed, sir.

3  A    I have it, sir.

4  Q    Okay.  And Exhibit B to that agreement --

5       THE COURT:  Can you (indiscernible - weak bandwidth)

6  because you frozen on the screen for a little bit so we

7  couldn't hear you.

8       MR. SUZUKI:  I did, Your Honor?

9       THE COURT:  You did.

10      MR. SUZUKI:  Okay.

11 BY MR. SUZUKI:

12 Q    Do you have Exhibit B to -- of that document?

13 A    Yes, sir.

14      THE COURT:  Of what document, that's the piece we're

15 missing?

16      MR. SUZUKI:  Oh, I'm sorry, Your Honor.  This is the

17 participation agreement, which is Exhibit -- Tauber Exhibit A.

18      THE COURT:  Thank you.

19 Q    So Exhibit B of Tauber Exhibit A on Page 17 of Tauber

20 Exhibit A is the formal assignment of oil, gas, and other

21 mineral leases, is that correct, sir?

22 A    Yes, sir.

23 Q    And I noticed that most of the other exhibits, if they're

24 agreements, are signed in this document, would you agree with

25 that?

1  A    Yes, sir.

2  Q    This document, however, is not signed, would you agree

3  with that?

4  A    Yes, sir.

5  Q    Why is that?

6  A    We hadn't paid the money yet to earn the assignments.  We,

7  the non-operators, who are purchasing an interest in the

8  prospect from the Sklar organization.

9  Q    As you sit here today, Mr. Sibley, do you know if that

10  document was signed?

11  A    I want to make sure you're -- I'm understanding your

12  question.  You're talking about the Exhibit B, assignment of

13  leases, which is attached as Exhibit B to the participation

14  agreement.

15  Q    That is correct.

16  A    I believe it has been signed and recorded, sir.

17  Q    Okay.  I -- as you sit here today, do you know whether

18  it's been signed?

19  A    No, sir, I do not.

20  Q    As you sit here today, do you know if it's been recorded?

21  A    I do not know, our files are closed in our office.

22  Q    What other efforts have you undertaken to see whether this

23  document's been signed or recorded?

24  A    I have personally taken none.

25  Q    With respect -- that's all I have on that document.  With

Sibley - Cross/Suzuki                                     108

1   respect to Exhibit J, Tauber Exhibit J, how did this document

2   come to -- well, let me ask.  Is this document in your

3   possession, other than as it was presented today?

4   A    I have a copy of this document, Exhibit J, yes.

5   Q    You had a copy of this document, Exhibit J, prior to the

6   debtors' bankruptcy filing, sir?

7   A    Yes, sir.

8   Q    Okay.  And did you provide this particular document to

9   your counsel for today's hearing?

10  A    I don't recall.

11  Q    Okay.  If you go to Page 7 of Exhibit J, Tauber Exhibit J,

12  and this is the reason why I ask, there is a signature there

13  from Richard Tauber, do you see that?

14  A    Yes, sir.

15  Q    So is this a document that Mr. Tauber provided for today's

16  hearing, or is it a document that you provided for today's

17  hearing?

18  A    I didn't provide this document to Mr. Shipps, so I don't

19  know exactly where he got it.

20  Q    Okay.

21       MR. SUZUKI:  Okay.  Those are the only questions I

22  have, Your Honor.

23       THE COURT:  How about the debtor, Ms. Riley, did you

24  have questions or cross-exam?

25       MS. RILEY:  No, Your Honor; thank you.

 1          THE COURT:  Okay, all right.  Is there any redirect?

 2          MR. SHIPPS:  No, Your Honor.

 3          THE COURT:  Okay.  Then thank you, Mr. Sibley, for

 4  your time today, we appreciate that.

 5          And, Mr. Shipps, if you'll call your next witness,

 6  Mr. Pickens.

 7          Mr. Pickens, we'll remind you that you are still

 8  under oath.  And for the sake of any court reporter, let's make

 9  sure we have the proper spelling of your last name.

10          MR. PICKENS:  Sure.  The last name is spelled

11  Pickens, P I C K E N S.

12          THE COURT:  Thank you.

13      MICHAEL PICKENS, TAUBER'S WITNESS, PREVIOUSLY SWORN

14                      DIRECT EXAMINATION

15  BY MR. SHIPPS:

16  Q    Okay, Mr. Pickens -- and what is your address, please?

17  A    It is 10100 North Central Expressway, Suite 200, Dallas,

18  Texas 75231.

19  Q    And what is your role with respect to Pickens Financial

20  Group, LLC?

21  A    I'm the President and CEO.

22  Q    And has Pickens Financial Group, LLC had interactions with

23  the Sklar organizations?

24  A    Yes, they have.

25  Q    And could you describe briefly for the Court what those

1  interactions have been?

2  A     We have participated with Sklar Exploration as a non-

3  operator working interest owner in various prospects, including

4  this one, since 2006 when it first began.

5  Q     And when you say --

6  A     (Indiscernible - multiple speakers).

7  Q     And when you --

8  A     (Indiscernible - multiple speakers).

9  Q     I'm sorry.  And when you say "this one," which one do you

10  mean, Mr. Pickens?

11  A     The Escambia Prospect.

12  Q     (Indiscernible - weak bandwidth) attention to Tauber

13  Exhibit B, please.

14  A     Yes, sir.

15        MR. SHIPPS:  Oh, all right.  I was getting signals

16  there from the Big Brother, I think, for a second.

17  Q     With respect to the -- this document, what is that

18  document?

19  A     It -- it is the settlement statement dated March the 3rd -

20  - sorry -- March the 31st, 2020.  It's a copy of the joint

21  interest billings and whatnot for that month.

22  Q     And what's the purpose of the settlement statement?

23  A     It's a reflection of what the charges are and the payments

24  that have been made by Pickens Financial Group to Sklar

25  Exploration.  In addition, it lists out the joint interest

Pickens - Direct/Shipps                         111

1  billings for the previous month for the units and the wells

2  that we participate in with Sklar.

3  Q    And so on this document, can you tell whether or not this

4  document shows that Pickens owed any money that was past due?

5         MS. RILEY:  Your Honor, if we're going to be talking

6  about this exhibit, it really needs to be admitted.

7         THE COURT:  Oh, thank you.  It does, but it has been,

8  I believe.

9         MR. SHIPPS:  It has been, yeah.

10        MS. RILEY:  Oh, my apologies.

11        THE COURT:  The stipulation.

12        MS. RILEY:  That's correct, Your Honor.  I apologize.

13        THE COURT:  Okay.

14  A    I can tell from the exhibit that we are paid up, there's

15  no balance forward.  In the top section entitled "Statement of

16  Accounts," you'll see at the very bottom the line item that

17  says "New balance forward," zero dollars and zero cents.

18  Q    And with respect to this document, is there anything that

19  indicates credits or prepayments for Pickens?

20  A    Yes, sir.  The next section down titled "Prepaid Balance

21  by A Project," lists out the wells that we have previously paid

22  monies in based on billed AFEs for work to be performed.

23  Q    And with respect to this document, can you tell whether

24  there is now a request being made for additional amounts due?

25  A    Yes, at the very bottom of this -- of the first page and

1  on the second page where it says "Summary by Lease," they

2  indicate what expenses are being billed for this month for the

3  various wells or units or gas plant.

4  Q    And with respect to credits, going back to credits, if you

5  look in the second column there, there's a column called AFE

6  number, would you describe what that signifies?

7  A    So the AFE is the abbreviation for authority for

8  expenditure, and that number indicates what operation we have

9  approved, and we have also approved not only the operation, but

10 the expected expenses to go along with it.

11          And then with this, you can tell we have paid our

12 share of those expenses.

13 Q    And so just -- if we were to look, for example, down on

14 the last credit area for the Myrtice Ellis credit, do you see

15 that?

16 A    Yes, sir, AFE 317.

17 Q    And what -- what was AFE 317 for?

18 A    That was for the drilling of the Myrtice Ellis well.  They

19 sent out an AFE for that well in December 20, '19.

20 Q    And -- and it shows your remaining credit on that as being

21 how much?

22 A    At the end of this statement, it shows the balance

23 remaining of $30,229.63.

24 Q    And so I assume you authorized the AFE, is that correct?

25 A    That is correct.  We signed the AFE, and we authorized the

1  operation to drill the well.

2  Q    And do you know what the status of that well is now?

3  A    Yes, on March the 23rd --

4        MS. RILEY:  Objection; hearsay.

5  A    Well, Sklar sent me an email telling me that they were

6  suspending operations until further notice on the drilling of

7  this well.

8  Q    And --

9        MR. SUZUKI:  We move to strike that on the basis that

10 the source of knowledge is definitionally hearsay.

11       THE COURT:  All right.  Counsel?

12       MR. SHIPPS:  I'll restate the question.

13       THE COURT:  Okay.

14 BY MR. SHIPPS:

15 Q    Have you received a communication from SEC regarding the

16 status of that well?

17       THE COURT:  That's a yes or no question.

18 A    Yes.

19 Q    And based -- well, and did that statement indicate whether

20 this well has been drilled or not?

21       MS. RILEY:  Objection to hearsay, Your Honor.

22       THE COURT:  Any response?

23       MR. SKELTON:  Your Honor --

24       THE COURT:  Do you have an exception?

25       MR. SKELTON:  Your Honor, admission -- it's admission

1  of a party opponent.

2          THE COURT:  Ms. Riley?

3          MS. RILEY:  Well, Your Honor, I think, to a certain

4  extent, there's still a lack of foundation here as to exactly

5  who's making the statement, what their connection is to Sklar.

6          THE WITNESS:  Marshall Jones sent the email to all of

7  the non-op working interest owners.

8          THE COURT:  Okay.  You should not speak --

9          MR. SHIPPS:  Yeah.

10         THE COURT:  -- until the Court resolves these

11 objections, but thank you for your willingness to offer that.

12         Tell me, just technically speaking, Ms. Riley, why

13 you're opposing this if, in fact, the debtor did send out a

14 notice?

15         MS. RILEY:  Well, Your Honor, I think to a certain

16 extent, the information that they're getting into has already

17 been brought into evidence, so this is cumulative to the

18 (indiscernible - multiple speakers).

19         THE COURT:  And how has it been brought in?  With

20 which document?

21         MS. RILEY:  Well, it -- all right, I don't think that

22 there's a documentary evidence.  But I know that there was

23 testimony that operations on the Myrtice Ellis well had been

24 suspended from -- I believe it was, in fact, Mr. Jones.  So we

25 have a direct source of evidence here; we're just kind of

1   replowing the same ground again.

2          But additionally, Your Honor, I'm just not sure that

3   this witness is ultimately going to be the best person to be

4   talking about the debtors' operation when we have that

5   testimony from the debtor.

6          THE COURT:  Well, he's talking about a notice that he

7   received.  Do you deny that they got a notice from the debtor?

8          MS. RILEY:  Your Honor, we only have his testimony

9   here that they received the notice, we don't have a copy of the

10  notice.

11         THE COURT:  Okay, that's fair.  Do we have a copy of

12  the notice, Mr. Shipps?

13         MR. SHIPPS:  Your Honor, a copy of the notice has not

14  been designated as an exhibit for today's hearing, but we do

15  have a copy of the notice.

16         THE COURT:  Tell me a little bit, Mr. Shipps, about

17  why you want to bring this testimony out about the notice.

18         MR. SHIPPS:  Because Mr. Pickens is then going to

19  indicate, Your Honor, that he has requested a return of his

20  funds based upon the status of the project.

21         THE COURT:  Well, then let's just ask him about that.

22         MR. SHIPPS:  Okay.

23         THE COURT:  Let's forget about the notice.

24  BY MR. SHIPPS:

25  Q    And have you requested that your funds be returned?

1  A    Yes, sir.  Four days after I received the supposed notice,

2  I requested that since the operations had been suspended until

3  further notice, that they return those funds to me.  This was

4  prior to the filing of the bankruptcy, and I designated the AFE

5  number and the exact amount that it had paid, and I gave them

6  my wiring instructions in indicating that they could send it to

7  me by check or by wire.

8  Q    And did you receive those funds?

9  A    No, sir, I did not.

10 Q    Now if you were able to recoup those funds against the

11 liability that's shown on your statement, would you have to pay

12 any additional settlement cost, JIB cost for --

13         MS. RILEY:  Objection.  Your Honor, this calls for a

14 legal conclusion.

15         THE COURT:  No, he's asking about a -- the netting

16 out of the account, so I'll allow.  But go ahead and finish

17 your question first, Mr. Shipps.

18 BY MR. SHIPPS:

19 Q    If you were allowed to recoup the funds that you have

20 advanced against the liability associated with this amount due,

21 would you owe any money?

22 A    No, sir.  As you can see from the document where it says

23 the balance remaining on this one specific AFE was $30,229, and

24 if you go to the next page, it says "Prepaid this amount,"

25 indicating 18,223, meaning that they would still owe me an

 1  additional $12,000 just based off of that one prepayment

 2  compared to this one statement.

 3        THE COURT:  Counsel, I don't understand that answer,

 4  because it's saying "pay this amount," not -- not this is a

 5  credit.  So --

 6        MR. SHIPPS:  Okay.

 7        THE COURT:  -- you're saying if you -- if you

 8  recouped, and got the 30,000 back, there'd be a 12,000 left

 9  that was due to him, okay, all right.

10  BY MR. SHIPPS:

11  Q    And, Mr. Pickens, if you were to look back to the areas

12  that describes credits, what's the total amount that you have

13  credited to your account?

14  A    The total balance credited was 1,000 -- $112,840.55 prior

15  to this statement with the prepayments that had been applied.

16  That left a remaining balance of $105,110 -- sorry --

17  $105,110.78.

18  Q    Do you know what the status is of each of the products for

19  each -- or each of the projects for which a cash advance has

20  been collected?

21  A    Based on the witnesses that the debtor has called, they

22  have suspended all operations.  And so I can assume that all of

23  these AFEs that have been sent out have been suspended until

24  some future time.  And just like I did for the Myrtice Ellis

25  well, I had request back my cash because I can hold my cash

1 better than they can.  So with no further operations on these

2 AFEs, I would request my funding back.

3 Q    Mr. Pickens, I'd like to switch subjects for just a

4 minute.  And if we could, have you had an opportunity to review

5 Debtors' Exhibit 4, the proposed budget?

6 A    Yes, sir.

7 Q    And specifically, do you recall what amount has been

8 assigned for management fees for the Alabama plants?

9 A    Yes, sir, I have it here in front of me, and they have

10 requested $118,625 per month.

11 Q    And have you been asked to approve that management fee?

12 A    Yes, Sklar Exploration asked all the non-op working

13 interest owners to approve an amendment to the Escambia County

14 joint operating agreement/participation agreement.  I did not

15 approve it, I did not sign it, and that agreement, per their

16 own president, requires --

17          MS. RILEY:  Objection, Your Honor; this is starting

18 to get into legal conclusions.

19          THE COURT:  Sustained.  But we will keep his

20 statement that he did not approve or sign it.

21 BY MR. SHIPPS:

22 Q    Now if -- if the assessment of those management fees is

23 not appropriate, and not lawful, how would -- and if, in fact,

24 that $118,000 per month was not collectible, how would that

25 affect the debtors' budget?

1          MR. SUZUKI:  Objection.

2          MS. RILEY:  Objection, Your Honor.

3          MR. SUZUKI:  Calls for speculation, opinion.

4          THE COURT:  I think it's also just unnecessary, Mr.

5     Shipps.

6          MR. SHIPPS:  Okay.

7          THE COURT:  He takes that off the --

8          MR. SHIPPS:  All right.

9          THE COURT:  -- off the revenue, okay.

10    BY MR. SHIPPS:

11    Q    Mr. Pickens, are you -- have there been previous efforts

12    to amend the Escambia prospect operating agreement?

13         MS. RILEY:  Objection to relevance, Your Honor.

14         THE COURT:  Overruled.

15    A    Yes, sir.  To my knowledge, there has been three attempts

16    resulting in one amendment to the operating agreement

17    previously.

18    Q    And have there been unsuccessful attempts?

19    A    Yes.  They -- they had to revise their proposed language

20    three times because it was not accepted by all of the

21    participants.  And per their president, they needed full

22    agreement --

23         MS. RILEY:  Objection, Your Honor.

24    A    -- (indiscernible - multiple speakers).

25         THE COURT:  Okay.

1          MS. RILEY:  Move to strike.

2          THE COURT:  As what, hearsay?

3          MS. RILEY:  Hearsay and relevance.

4          THE COURT:  Well, I'll sustain it on the hearsay

5   basis.

6   BY MR. SHIPPS:

7   Q    But, Mr. Pickens, in your understanding, there have been

8   at least two prior occasions where amendment of the operating

9   agreement has been unsuccessful, correct?

10  A    Yes, in 2012, letters from their president (indiscernible

11  - multiple speakers).

12         MR. SUZUKI:  Your Honor, move to strike; assumes

13  facts not in evidence.  And, again, the basis of the purported

14  knowledge here is hearsay in documents that are not before the

15  Court.

16         THE COURT:  All right.  I'll strike his reference to

17  2012 communication.  His statement as to two unsuccessful

18  attempts remains.

19         MR. SHIPPS:  And I don't believe I have any further

20  questions of Mr. Pickens, although Mr. Skelton may have.

21         THE COURT:  Mr. Skelton?

22         MR. SHIPPS:  Mr. Skelton, I don't know if you had any

23  additional questions for the witness.

24         MR. SKELTON:  No, I do not.

25         THE COURT:  Okay; thank you.

1       All right, does any party have cross-exam for this

2   witness, let's start with the debtor?

3           MS. RILEY:  Yes, Your Honor.

4                       CROSS-EXAMINATION

5   BY MS. RILEY:

6   Q    So I want to direct your attention to Tauber Exhibit B.

7   If you could just let me know when you've got that pulled up.

8                       (Pause)

9   A    Okay.

10  Q    So if we're looking at the top portion, we, of course,

11  have that prepaid balance by project.  And these specifically

12  identify what prospect or project each of those is for, right?

13  A    It identifies wells that lie within different prospects.

14  Q    So, for instance, if we look at -- and, again, we were

15  talking about the Myrtice Ellis well, that's a specific line

16  item, right?

17  A    Yes.

18  Q    Now if we look down at the summary by lease, turn to Page

19  2 of this exhibit, we see then about halfway down, Myrtice

20  Ellis, and an expense of $3,365.67, right?

21  A    That is correct.

22  Q    And, in fact, there's also a prepayment applied balance in

23  that same amount, isn't there?

24  A    That is correct.

25  Q    That corresponds with the amount that we see up above for

1  the prepayments applied, right?

2  A    Correct.

3  Q    And the other expenses are specifically identified by

4  lease here, aren't they?

5  A    Can you be more specific?

6  Q    Well, all right.  So let's talk about, for instance, the

7  Castleberry prospect.  Castleberry prospect has an expense of

8  $51.10, right?

9  A    Yes, it does.

10  Q    And the CCL and T 24-1 Number 1 has an expense of $134.75.

11  A    It does.

12  Q    And that continues for the CCL and T 13-11 Number 1,

13  $724.45, right?

14  A    Yes.

15  Q    And each of these represent a different operating unit,

16  isn't that right?

17  A    I don't know what you mean by "operating unit."

18  Q    well, for instance, the Fishpond Oil unit, the expense is

19  $1,944, that's the CCL and T 24-1 Number 1, isn't it?

20  A    The 24-1 is not inside the Fishpond Oil unit, correct.

21  Q    Now you said that your company -- well, let me ask you

22  this.  Just remind us, is it your company or you individually

23  who is participating as a working interest holder in this

24  property?

25  A    Pickens Financial Group LLC is the non-participant of

Pickens - Cross/Riley                    123

1  record.

2  Q    And Pickens Financial Group has been participating since,

3  I think you said, 2006, right?

4  A    Correct.

5  Q    And, in fact, since that time, isn't it true that Pickens

6  Financial Group has earned a -- netted -- I believe it was

7  almost $5 million, isn't that right?

8  A    I have not run the numbers, and I don't know if that

9  includes the revenue that has not been paid to me for February.

10 Q    But you would agree that it's earned well over a million

11 dollars, right?

12 A    I can't agree.  I don't know how you've calculated them,

13 and I've not looked back.

14 Q    So you don't know how much revenue that you've earned out

15 of these companies?

16 A    Excuse me.  Out of the companies?

17 Q    Out of Sklar Exploration.  You don't know how much money

18 Pickens Financial has earned from Sklar Exploration.

19 A    That's not why I'm here.

20 Q    Well, moving back to the -- the request for the return of

21 funds --

22 A    Yes.

23 Q    Have you participated in new operations previously?

24 A    In proposed operations with AFEs?

25 Q    Yes.

1  A    Yes, I have.

2  Q    Have you ever requested a refund during the middle of

3  those AFEs -- or in the middle of those projects previously?

4  A    Yes, when wells have been suspended or terminated for any

5  reason, I would request my money back because we would always

6  prefer to hold our own money until it's necessary for the

7  operations.

8  Q    Have you ever requested it from these companies, Sklar

9  Exploration specifically?

10  A    I think there is a very good chance, I have; I do not

11  recall.

12  Q    And you would agree that earlier this year, the entire

13  world kind of ground to a halt, didn't it?

14  A    No.

15  Q    Well, Mr. Pickens, it would appear that you're talking to

16  us from your home.  So wouldn't you agree that the shutdown has

17  affected operations universally?

18  A    I know I still get up and I go to work every day, I just

19  do it from home.

20        MS. RILEY:  All right, Your Honor, I don't think I

21  have any further questions.

22        THE COURT:  All right.  Any cross from the bank, Mr.

23  Suzuki?

24                    (Pause)

25        MR. SUZUKI:  Sorry, Your Honor, I was having some

Pickens - Cross/Suzuki                              125

1  technical difficulties.

2           Just a couple of factual questions.

3                    CROSS-EXAMINATION

4  BY MR. SUZUKI:

5  Q    Mr. Pickens, at any point in your relationship with Sklar

6  Exploration, have you requested to take your -- your oil, you

7  share of minerals coming out of the ground, have you requested

8  to take that in kind and handle the sale of that oil on your

9  own?

10 A    I have not.

11 Q    Since the bankruptcy filing, have you done so?

12 A    I have not.

13          MR. SUZUKI:  That's all I have, Your Honor.

14          THE COURT:  Okay.  Anybody else wishing to cross-

15 examine this witness?

16              (No audible response heard)

17          THE COURT:  No?  All right.  Then thank you, Mr.

18 Pickens.

19          MR. PICKENS:  Thank you.

20          THE COURT:  Appreciate your time.

21          Does Tauber have any further witnesses?

22          MR. SHIPPS:  No, Your Honor.

23          THE COURT:  Okay, all right.

24          Do we have any witnesses or any evidence to be

25 offered by FPCC?

1    MR. BAIN:  Good afternoon, Your Honor.  Just to avoid

2  duplication that's already been put on the record --

3    THE COURT:  Just make sure you're speaking close to

4  the microphone.

5    MR. BAIN:  Yes, Your Honor.

6    To avoid any duplication of what's already been put

7  in the record, the only exhibit that we would ask is -- we

8  would actually ask that the Court take judicial notice of

9  Exhibit Number 4, which is the transcript from the first day

10  hearing.

11    THE COURT:  Okay.  What date is that transcript?

12    MR. BAIN:  April 9th.

13    THE COURT:  Okay.  Anybody have an objection to the

14  transcript being considered part of the evidence in this

15  matter?

16    MR. SUZUKI:  Well, Your Honor, you can certainly take

17  judicial notice that the hearing occurred, that the statements

18  were made.  The truth or falsity of the statements made, and

19  the substance of the statements are not capable of ready and

20  accurate determination by sources who can't be reasonably

21  questioned.

22    So to the extent the request is to take judicial

23  notice that the hearing occurred, that the statements made in

24  the transcript were made, we don't have a problem with that.

25    THE COURT:  But you're raising hearsay for the

127

1 substance --

2          MR. SUZUKI:  Exactly.

3          THE COURT:  -- of what's said.

4          MR. SUZUKI:  Exactly.

5          THE COURT:  Okay.  Can you tell us why you're

6 offering this for judicial notice, Mr. Bain?

7          MR. BAIN:  Yes, Your Honor, we made -- we took

8 positions in our objection that certain statements made by

9 debtors' counsel go directly to their position with regards to

10 what the nature of our property interest is, and (indiscernible

11 - muffled) in forming the Court's decision, and we plan to

12 raise it at our closing argument.

13          THE COURT:  Well, if you -- you know, you should call

14 counsel as a witness then if that's what your intention is

15 because I'm going to sustain the hearsay objection.

16          So he's right, judicial notice is very limited, and

17 it will show that there is a transcript docketed for the April

18 9th hearing, and that people said things in that transcript.

19 But I'm not going to take that as evidence of the truth of the

20 matters asserted in those statements.

21          MR. BAIN:  Your Honor, that's all we're asking is

22 that -- would the Court take judicial notice just the way you

23 said it.

24          THE COURT:  Okay, all right.  Then we'll take

25 judicial notice of Docket Number 4 [sic], the transcript of the

1  April 9 hearing, but only for that limited purpose.

2          Okay, anything else, Mr. Bain?

3          MR. BAIN:  No, Your Honor.

4          THE COURT:  Okay; thank you.

5          And then that takes us to Kudzu?

6          MS. CASS:  Your Honor, this is Kerstin.  Was that an

7  exhibit of FPCC?  Should it be Exhibit FPCC?

8          THE COURT:  No, it's not coming into evidence, he

9  just wants judicial notice taken that there is a transcript at

10 Docket Number 4.

11         MS. CASS:  It is not at Docket Number 4.

12         THE COURT:  Oh, what docket number is it?

13         MR. BAIN:  We designated --

14         MS. CASS:  I would have --

15         MR. BAIN:  I'm sorry; I didn't mean to talk over you.

16 We've designed it as Exhibit Number 4.

17         THE COURT:  So it's in your exhibit notebook?

18         MR. BAIN:  I'm sorry, Exhibit E.  Exhibit E.  In our

19 exhibit notebook, yes, Your Honor.

20         THE COURT:  Hold on.  Did you say E, as in elephant?

21         MR. BAIN:  Yes, Your Honor.

22         THE COURT:  All right.  So I guess this is FPCC-E.

23         MS. RILEY:  And, Your Honor, I believe it's Exhibit

24 Number 85.

25         THE COURT:  Of the debtors'?

 1              MS. RILEY:  Or sorry, not exhibit --

 2              THE COURT:  Oh, docket number?

 3              MS. RILEY:  -- but Docket Number 85.

 4              THE COURT:  All right, got it; thank you.

 5         All right, but we're just go ahead and take their

 6    Exhibit FPCC-E, but we're only taking judicial notice for the

 7    limited purposes I've just described.

 8              MR. BAIN:  Thank you.

 9              THE COURT:  Does that help, Ms. Cass?

10              MS. CASS:  Yes, thank you.

11              THE COURT:  Okay, all right.  So on to Kudzu, Mr.

12    Geno?

13              MR. GENO:  Thank you, Your Honor.  If it please the

14    Court, we call Walker Sturdivant.

15              THE COURT:  Mr. Sturdivant, if you'll come forward,

16    please, and be sworn, please.

17              MR. STURDIVANT:  Yes, Your Honor.

18              THE COURT:  Which means state your name.

19              MR. STURDIVANT:  Walker Sturdivant.

20              THE COURT:  Thank you.

21         Go ahead, Ms. Cass.

22           WALKER STURDIVANT, KUDZU'S WITNESS, SWORN

23              THE COURT:  I'm going to ask you, sir, to please

24    state and spell your name.

25              THE WITNESS:  Walker Sturdivant, S T U R D I V, as in

1 Victor, A N T.

2          THE COURT:  Okay.  I heard you okay, but it's very

3 faint.  So let's see if we can't get you closer to your

4 microphone.

5          THE WITNESS:  Is this better?

6          THE COURT:  A little bit.  Can other folks hear?  Mr.

7 Geno, can you hear him?

8          MR. GENO:  Yes, ma'am.

9          THE COURT:  Ms. Riley, can you hear him?

10          MS. RILEY:  Yes, Your Honor.

11          THE COURT:  Okay.  I'm going to ask you to speak up,

12 as well, because the court reporter that might eventually

13 transcribe this hearing is probably going to struggle a little

14 bit with the amount of volume, so thank you.  And your address

15 -- your business address, Mr. Sturdivant?

16          THE WITNESS:  It's 9798 Sturdivant Road, Glendora,

17 Mississippi 38928.

18          THE COURT:  Thank you.  Go ahead, Mr. Geno.

19          MR. GENO:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21 BY MR. GENO:

22 Q    Mr. Sturdivant, would you tell us briefly your formal

23 educational background?

24 A    I graduated from Vanderbilt University in 1975, I went to

25 the University of Mississippi Law School and got a JD in 1978,

1  an then I went to NYU or New York University and got an LLM in

2  taxation.

3  Q    When did you graduate from Mississippi -- University of

4  Mississippi School of Law?

5  A    1978.

6  Q    When did you graduate from NYU?

7  A    1979.

8  Q    Have you practiced law previously?

9  A    I practiced for eight years, from 1979 to 1986, '87.  And

10 had been practicing -- and have been farming with my family in

11 Glendora, Mississippi since 1986, '87.

12 Q    Are you still a member of the Mississippi bar?

13 A    Yes, I am.

14 Q    Have you invested in oil and gas properties other than

15 your investment with the Sklar family of companies?

16 A    Yes, through Alabama Oil Company, the entity that we used

17 invests in oil and gas properties.

18 Q    How many years have you been investing in oil and gas

19 properties?

20 A    Well, Alabama Oil Company has been investing since I was a

21 kid, my father and mother owned it.  So it's been probably over

22 50 years.

23 Q    Who owns Alabama Oil Company presently?

24 A    My 93-year-old mother and my four siblings and I own an

25 equal interest in Alabama Oil Company.

1  Q    Are you here today as a corporate representative of

2  Alabama Oil Company?

3  A    Yes, I am.

4  Q    Are you familiar with an entity known as Apple River

5  Investments?

6  A    Yes, I am.

7  Q    Are you here to testify as a representative of Apple River

8  Investments today?

9  A    Yes, I am.

10  Q    Are you also familiar with an entity Kudzu, K U D Z U, Oil

11  properties?

12  A    Yes, I am.

13  Q    Are you also here on behalf of Kudzu Oil Properties to

14  testify today?

15  A    I am, yes.

16  Q    And can we refer to all three of those entities like we

17  had before, as the Kudzu parties?

18  A    Yes, we can.

19  Q    What is the relationship, if any, between the Kudzu

20  parties and Sklar Exploration and Sklarco, LLC?

21  A    The Kudzu parties have entered into participation of

22  agreement and -- through an operating agreement with Sklar as

23  the operator and also Sklar owned working interest in the

24  properties out of North Pachuta Prospect.

25              MR. GENO:  Your Honor, we would ask that the

1  participation agreement Mr. Sturdivant mentioned be marked and

2  entered as Kudzu parties Exhibit A, it's a 11-page document

3  (indiscernible - weak bandwidth) numbered K U D (indiscernible

4  - weak bandwidth) zero zero zero one through 12.

5            THE COURT:  Any objection to Kudzu A?

6            MR. SUZUKI:  Your Honor, I think Exhibit B for the

7  Kudzu parties are actually the exhibits to that document, and

8  just for the sake of completeness, it may be helpful to have

9  both A and B admitted together.

10           THE COURT:  Okay.  Any objection to that, Mr. Geno?

11           MR. GENO:  (Indiscernible - weak bandwidth)

12 duplication among our documents by purpose.

13           THE COURT:  Well, he just wants it complete, and he's

14 saying A and B go together, and you don't have any problem with

15 that.

16           MR. GENO:  I do not.

17           THE COURT:  Not A --

18           MR. GENO:  Actually --

19           THE COURT:  Let's just say A and B, rather than A, so

20 I misspoke.  So A and B together.  Any objection to that coming

21 into evidence?

22           MS. RILEY:  Well, Your Honor, I think it may even be

23 that Exhibit C goes with that one, as well.

24                      (Laughter)

25           THE COURT:  And maybe D.  No, not D.  Okay, so A

Sturdivant - Direct/Geno                    134

1  through C, going once.  Going twice.  Any objection?

2                   (No audible response heard)

3            THE COURT:  Nope, not hearing any.

4            So A through C are received.

5       (Kudzu's Exhibits A through C admitted into evidence)

6            MR. GENO:  Thank you, Your Honor.

7            THE COURT:  Okay.

8  BY MR. GENO:

9  Q    Mr. Sturdivant, do you have this participation agreement

10 that's been marked as Exhibit A in front of you?

11 A    Yes, I do.

12 Q    Who are the parties to the agreement that are designated

13 as participants?

14 A    Sklarco, LLC, Alabama Oil Company, Apple River

15 Investments, LLC, Charles A. Morrison Consulting, Geophysicist,

16 Inc., Kelton Company LLC, Kudzu Oil Properties, LLC, and Cilco

17 Exploration, LLC.

18 Q    Thank you.  If you would turn to Section 1.2, please, sir.

19 A    I have it before me.

20 Q    Is that section, among other things, dealing with what

21 we've been calling cash calls or advance cash calls?

22 A    Yes, it does.

23 Q    And does it mention participants within the body of that

24 paragraph?

25 A    Yes, it does.

1  Q    Are there any exceptions for the participants who are

2  required to make cash calls under that paragraph with respect

3  to timing of the cash calls?

4        MS. RILEY:  Objection; calls for a legal

5  conclusion/opinion.

6        THE COURT:  Well --

7        MR. GENO:  Your Honor, I'm just asking -- I'm sorry.

8        THE COURT:  You're asking him just to read the

9  document and say what it says?

10       MR. GENO:  Yeah.

11       THE COURT:  Okay, I'm not going to allow -- if this

12 starts to drag out, we're not going to do that.  But, Mr.

13 Sturdivant, if you can answer that question quickly, I'll allow

14 it.

15 A    No, it does not provide for any exceptions.

16 Q    Thank you.  Mr. Sturdivant, how much collectively have the

17 Kudzu parties advanced to the debtors under their cash call --

18 the cash call provisions of the participation agreement?

19 A    $1,245,647.79.

20 Q    Was this money advanced for any specific purpose?

21 A    Yes, it was advanced pursuant to an AFE that we received

22 from SEC in order to pay the cost of developing and drilling

23 wells in the North Pachuta prospect.

24 Q    Has that well been drilled?

25 A    No.

1  Q    Are the Kudzu parties also working interest owners in

2  connection with the participation agreement?

3  A    Yes.

4  Q    Have they been paid their January, or February, or March

5  revenues?

6  A    No, we have not.

7  Q    Mr. Sturdivant, are you familiar with the debtors' request

8  in this case to use cash collateral?

9  A    Yes, I am.

10  Q    And have you been present yesterday and today during the

11  testimony and the presentation of the debtors' case for use of

12  cash collateral and listened to the other witnesses testify?

13  A    Yes, I have been present.

14  Q    Are the Kudzu parties continuing their objection to the

15  debtors' request to use cash collateral?

16  A    Yes, we are.

17  Q    Why?

18  A    Because we don't believe that their plan or their budget

19  is sustainable or viable for a number of reasons.  If you look

20  at the money that all of the parties are working interest

21  owners, overriding interest, as well as org interest, put up in

22  the way of cash call advances, that was approximately $7

23  million.  They also -- with revenue payable, there's

24  approximately less than $2 million, for a total of about $9

25  million that was given to SEC.  And at the time -- according to

Sturdivant - Direct/Geno                                        137

1   the budget, if you look at all of the cash that's in both

2   accounts, on April 1 was approximately $3.6 million.  And if

3   you take the approximate nine million from the approximate 3.6

4   million, that means it's $5.3 million that is gone.  That it

5   was given for a specific purpose, to drill wells and develop

6   those wells, and it hasn't been spent for that.  And then the

7   revenue was supposed to be paid to us, which hasn't been.  So

8   they've got that money of approximately $9 million, and yet if

9   you total all of the cash that they had on hand April 1, it's

10  only 3.6.  Meaning there's $5.3 million that is gone.  And we

11  know that the entire time Sklar received all of the money, was

12  in charge of the bank accounts, paid all of the expenses, and

13  were completely in charge of it.

14          The question to me is is when did they lose the $5.3

15  million, which is, based upon the testimony that I've heard

16  over the past two days, was that they've lost money as a result

17  of the precipitous drop in oil prices which occurred in March,

18  and they said they were profitable prior to that.  So they must

19  have lost $5.3 million in March of 2020.

20          MS. RILEY:  Objection to the lack of foundation at

21  this point, Your Honor.

22          MR. GENO:  Your Honor, his testimony is based upon

23  the cash collateral motion and the testimony he's heard during

24  most of the debtors' case in the last two days, that's what

25  he's testifying from.

1    THE COURT:  I'm going to allow it.  Go ahead, Mr.

2  Sturdivant.

3  A    Well, so in -- and this is -- well, my problem with it, if

4  they've gone through $5.3 million in cash -- and exhibit --

5  Debtors' Exhibit 4, the budget, it was presented as I viewed it

6  and understood, to show that their cash position was going to

7  increase from April 1 to May 31.  But their argument is -- I

8  mean it doesn't make sense because when prices went down in

9  March, and they lost $5.3 million, and their budget says that

10 they are assuming -- and it's -- by the way, their budget is a

11 projection or a prediction of what's going to happen in the

12 future.  They project $13.40 price of barrel of oil, which is

13 also low.  In fact, it's lower than what it was in March.

14    And I don't see how they can lose $5.3 million in

15 March, and then argue or support that they're going to make

16 money in April and May when prices are still low.  I mean

17 that's the argument reason why they lost money.  They -- they -

18 - it makes no sense.

19    Now if they -- I guess the other argument would be as

20 to when they lost it --

21    MS. RILEY:  All right, objection as to narrative at

22 this point, Your Honor.

23    THE COURT:  Yeah, Counsel, why don't you rein this in

24 a little bit.

25    MR. GENO:  Yes, ma'am.

Sturdivant - Direct/Geno                    139

1  BY MR. GENO:

2  Q    Any other items of testimony or documents that have

3  convinced you, Mr. Sturdivant, that the debtors can overcome

4  the $5.3 million loss with oil at $13 a barrel or $14 a barrel?

5  A    No, there is not anything else that I've got to offer.

6  It's just I don't see how they can turn around a $5.3 million

7  loss in one month when prices are still low.  And that was the

8  reason that they gave why they lost money, so they should still

9  be losing money, not making money.  So the cash -- if you look

10 at --

11          MS. RILEY:  Objection to narrative, he's answered the

12 question.

13          THE COURT:  Overruled.  I'll let you finish.

14 A    And if you look at the overall cash position -- and,

15 again, their budget -- if you take both accounts together, it

16 started with a total of 3.6 approximately million dollars in

17 cash, and they ended -- or they're projecting to end with 2.8

18 million.  That's $785,000 lost in cash for both accounts.  I

19 mean they really are projecting they're going to continue to

20 bleed money.

21 Q    Thank you, Mr. Sturdivant.

22          MR. GENO:  That concludes our examination, Your

23 Honor.

24          THE COURT:  Okay.

25          Any cross-exam, Ms. Riley?

1          MS. RILEY:  Yes, Your Honor.

2                    (Pause)

3                    CROSS-EXAMINATION

4   BY MS. RILEY:

5   Q    Now, Mr. Sturdivant, how long has the Kudzu parties been

6   participating as a working interest holders with respect to

7   Sklar Exploration?

8   A    I'm not exactly sure, I would say two years.

9   Q    So more than -- so more than one year, right?

10  A    Yes.

11  Q    Do you think it's been less than five years?

12  A    I think so.

13  Q    Now -- and you --

14  A    I'm just not -- I do know about Alabama Oil Company, I'm

15  not exactly sure about Kudzu and Apple River.

16  Q    Sure.  Now you're aware that with respect to Kudzu that

17  over the time that they had been participating with the debtor,

18  that they have netted over $3 million in revenue?

19  A    I'm not aware of that, no.  And I assume you're talking

20  about -- not the Kudzu parties, but Kudzu --

21  Q    Just the --

22  A    That entity.

23  Q    Correct, just the Kudzu has netted over $3 million in

24  revenue since the time it's been participating with these --

25  with Sklar Exploration.

Sturdivant - Cross/Riley                     141

1  A    I'm not --

2           THE COURT:   Is that a question?

3  A    I'm not aware of that.

4  Q    And with respect to the debtors' new operation, you're

5  aware that the -- obviously the shutdown caused by COVID could

6  have had a substantial interruption to the debtors' ongoing

7  operations there, right?

8  A    That is -- yes.

9  Q    And, in fact, you were here when they were testifying that

10 the interruption caused by the COVID crisis was part of the

11 reason that this company --

12 A    I am aware --

13 Q    -- had to suspend operation.

14 A    Yes, I'm aware that that was their testimony.

15 Q    Now you're not in any way involved in the management of

16 this company, right?

17 A    Which company?

18 Q    Sklar Exploration.

19 A    No, I am not.

20 Q    And you're not responsible for the cash flows of any Sklar

21 Exploration's operations, right?

22 A    That is correct.

23 Q    So are you aware that in that budget, it does propose to

24 pay out the working interest holders for their March revenue?

25 A    Yes.

1  Q    And that includes the royalty interest holders, as well,

2  right?

3  A    That is my understanding.

4  Q    And it includes the overriding royalty interests, as well.

5  A    That is my understanding, yes.

6  Q    And that even with those payments being made, that at the

7  end of the day, if those are not separated out, there is still

8  a cash positive number at the end of that budget, isn't that

9  right?

10  A    I don't know if that's true with SEC, maybe with -- are

11  you talking about SEC, or are you talking about Sklarco?  But

12  if you combine both accounts, that is not true.

13  Q    I am talking about the budget.

14  A    I'm looking at the budget, and if you combined both

15  budgets, both of the bank accounts, it started at 3.6 million,

16  and it ends at 2.8.  That is a loss of cash.

17  Q    Well, that is to my question.  My question is that does

18  the budget end at a positive balance?

19  A    Well, it depends on which account we're talking about.  If

20  you're talking about the Sklar account, that's true.  If you're

21  talking about the revenue account, that's not true.  And if

22  you're talking about both accounts, that is not true.

23  Q    We're looking specifically at all other accounts' ending

24  cash balance, that number is higher than zero, isn't that

25  right?

Sturdivant - Cross/Riley                    143

1    A    At the end, yes.  It's 2.1 million.

2    Q    Thank you.  You're aware that there are hedging agreements

3    that are providing revenues to Sklar Exploration, as well,

4    right?

5    A    I am aware of that.

6    Q    And those hedging agreements are, in fact, paying Sklar

7    Exploration funds every single month.

8    A    Yes, based upon the testimony that I've heard, yes.

9    Q    And based upon the testimony you've heard, you know that

10   that money is also going in to fund operations, as well, isn't

11   that right?

12   A    Yes.

13   Q    You're also aware that based on this budget, and the

14   testimony that you've heard, again, that funds have been paid

15   out of that revenue account for some of the royalty interest

16   holders and overriding royalty interest holders for their

17   January amounts, right?

18   A    For the January amounts?

19   Q    And -- January and February, I should specify.

20   A    Yes, that's in the budget.

21            MS. RILEY:  No further questions, Your Honor.

22            THE COURT:  Does the bank have any cross-exam?

23            MR. SUZUKI:  No, Your Honor, nothing from the bank.

24            THE COURT:  Okay.  How about any of the other

25   parties?  FPCC or Tauber, any questions for the witness?

1    MR. BAIN:  No, Your Honor.

2    THE COURT:  Okay.  Any redirect?

3    MR. GENO:  No redirect, Your Honor; thank you very

4 much (indiscernible - weak bandwidth).

5    THE COURT:  All right.  You dropped off, Mr. Geno, at

6 the end there, I couldn't hear you.  That concludes your case?

7    MR. GENO:  Yes, sir.

8    THE COURT:  Okay.

9    MR. GENO:  (Indiscernible - multiple speakers).

10    THE COURT:  All right.  Thank you,

11    All right, so I guess I've heard from every -- every

12 of the objectors that wanted to be heard.  Does debtor have any

13 rebuttal testimony?

14    MS. RILEY:  Your Honor, if we may have just kind of a

15 brief recess just so I can make sure (indiscernible - multiple

16 speakers).

17    THE COURT:  Sure.  Okay, so we'll come back at 2:05.

18    MS. RILEY:  All right.  Thank you, Your Honor.

19    MS. CASS:  Court is now in recess.

20    (Recess 1:57:33 p.m./Reconvene 2:07:05 p.m.)

21    THE COURT:  All right.  So, Ms. Riley, do we have any

22 rebuttal testimony?

23    MS. RILEY:  No, Your Honor; thank you.

24    THE COURT:  Okay.  So we've got everybody's witnesses

25 and exhibits, and are parties prepared to go straight to

145

1    closing arguments or --

2              MULTIPLE SPEAKERS:  (Indiscernible).

3              MR. SUZUKI:  Your Honor, a housekeeping matter?

4              THE COURT:  Okay.

5              MR. SUZUKI:  The bank's claim and the bank's

6    entitlement to adequate protection, I don't think, is at issue

7    here.  We had provided some exhibits, which was essentially our

8    proof of claim.  We're happy to -- if this does become an issue

9    or is an issue in Your Honor's mind, we would prefer to have

10   those of record, or for Your Honor to take judicial notice that

11   the proof of claim has been filed, and that there have been no

12   objections thereto.

13             But the bank's claim obviously in entitlement to

14   adequate protection would only be an issue to the extent

15   raised, we think, and it hasn't been.  It hasn't been

16   challenged, there have been no objection.

17             THE COURT:  It has been challenged to the extent that

18   some of these working interest holders believe that the cash is

19   their collateral or not collateral, but it's not property of

20   the estate so that your lien would not extend to it.  So it has

21   been challenged to that extent.

22             Again in this summary proceeding on cash collateral

23   an the oil and gas motion, we're not going to have any final

24   determinations of parties' interest in the cash, but enough for

25   the Court to say whether or not the use of cash collateral may

1  proceed.  So --

2         MR. SUZUKI:  Well, to that extent, Your Honor, and

3  I'm sorry to jump in, but I think I should shortcut this.  To

4  that extent, I think it's probably sufficient if Your Honor

5  would take judicial notice that the bank has filed the proof of

6  claim, and that to this point, there have been no objections

7  thereto.

8         MR. BAIN:  Your Honor, we would object to that.  We -

9  - I don't know when they filed --

10        THE COURT:  Mr. Bain, if you'll please state your

11 name when you start, okay?

12        MR. BAIN:  Yes, I apologize, Your Honor.  Can you

13 hear me okay?  I think I had --

14        THE COURT:  Yes, now we can.

15        MR. BAIN:  Quite frankly, given the activity, we

16 haven't had an opportunity to review the proof of claim.

17        THE COURT:  Nor should you have had to, there's not a

18 deadline.  So --

19        MR. BAIN:  I just --

20        THE COURT:  Nobody -- I am not going to have any cash

21 collateral order -- if one enters at the end of this

22 proceeding, I am not going to have it specify that the bank has

23 the top priority lien on all the cash that the debtor holds,

24 that's not going to happen.  So I think that should assuage

25 your concerns a little bit.

RUD000477

1          The bank is trying to claim here that nobody's

2   objected to the proof of claim and, therefore, it's an allowed

3   claim.  Well, it may be at the present time, but it's subject

4   to disallowance still, so --

5          MR. BAIN:  Your Honor, our concern is more towards

6   the application section, 363.  363(p) holds that the entity

7   asserting an interest in property has the burden of proof on

8   the issue of the validity of that.  And I would just submit

9   that if the bank has an interest in that cash collateral, it's

10  incumbent on them to prove that up.

11         THE COURT:  Well, the same is true of your client.

12         MR. BAIN:  Yes.

13         THE COURT:  Okay.

14         MR. SUZUKI:  And maybe we can make this easier, just

15  for the record, Your Honor.  We filed our witness and exhibit

16  list and included our proof of claim; we distributed a copy of

17  those documents to all the parties on that email chain.

18         THE COURT:  Right.

19         MR. SUZUKI:  And so it's not like there was any

20  degree of unfair surprise.  And whether parties have reviewed

21  the proof of claim, I don't think should impact either its

22  admissibility or the Court's ability to take judicial notice

23  thereof.

24         THE COURT:  Do you want to offer that exhibit into

25  evidence?

1  MR. SUZUKI:  Yeah, I think we have a stipulation from

2  the debtor.  And to the extent we need to get a bank

3  representative on the line to authenticate those, I guess we

4  can do that.

5  THE COURT:  Well, is it -- what exhibit number is it

6  designated as?

7  MR. SUZUKI:  Mr. Schuenemann who hopefully is on the

8  line can help with this, he delivered those to the Court.  And

9  so it would probably be East-West Bank Exhibit Numbers --

10  THE COURT:  We don't have a bank exhibit notebook.

11  MR. SUZUKI:  Hmmmm.

12  THE COURT:  So I'm not sure it got delivered.

13  MS. CASS:  Your Honor, it was delivered to chambers

14  late.

15  THE COURT:  Late, oh, I see.  Okay, can you look at

16  that, Ms. Cass, and tell me what exhibit number it is?

17  MS. CASS:  Yeah, give me a second.

18  THE COURT:  Okay.

19  MR. BAIN:  And, Your Honor, I don't -- and I'm not

20  trying to be difficult here because I don't think we have --

21  THE COURT:  Lean forward, Mr. Bain.

22  MR. BAIN:  Yes, Your Honor.

23  I don't believe that we have a copy of that, so we're

24  kind of flying blind when it comes to that, and I don't know if

25  Mr. Suzuki has a suggestion there.

1        MS. CASS:  It's just marked as A.  Exhibit A, so you

2 may want to add some designations, and reflect that it's for

3 the bank.

4        THE COURT:  Okay.  So we'll say Bank A.  So you're

5 offering that into evidence, Mr. Suzuki?

6        MR. SUZUKI:  Correct.

7        THE COURT:  Okay.  And other participants in this

8 hearing have not received that, so that's a problem, and it

9 came in late to the Court.

10        MR. SUZUKI:  I'm looking at an email, Your Honor,

11 dated May 6th, which was the deadline, and I believe it --

12        THE COURT:  It was the deadline.

13        MR. SUZUKI:  And I'm looking at all of the recipients

14 with our witness and exhibit list, and a large file link with a

15 link to those documents.  So I'm puzzled as to why there's any

16 confusion --

17        THE COURT:  Why did the Court get it late then?

18        MR. SUZUKI:  I don't know the answer to that, Your

19 Honor.

20        THE COURT:  Okay.

21        MS. RILEY:  And, Your Honor, I'll just jump in here.

22 The debtor did receive copies of these on May 6th by way of the

23 email file transfer, as well.  And we have stipulated as to the

24 admissibility of the exhibits.

25        THE COURT:  Well, I'll take judicial notice that the

1   bank has filed a proof of claim, and -- but not, you know, the

2   truth of the matters asserted in that, because that's really

3   not what we're here doing.

4           MR. SUZUKI:  Understood.

5           THE COURT:  Okay, all right.

6           MR. TAGGART:  Your Honor, may I be heard?  David

7   Taggart.

8           THE COURT:  On the bank's proof of claim?

9           MR. TAGGART:  Yes, Your Honor.

10          THE COURT:  Okay, sure.

11          MR. TAGGART:  Part of my understanding of the cash

12   collateral motion, as well as the oil and gas motion, was that

13   both the debtors and the East-West Bank had agreed that for

14   purposes of these motions, that whatever the status of the

15   parties' claims would be maintained as status quo.

16          THE COURT:  That's right.

17          MR. TAGGART:  And that was a significant predicate

18   for my agreement not to present evidence at this hearing.

19          THE COURT:  Okay.  And we are just talking about the

20   third interim cash collateral order that they're requesting.

21          MR. TAGGART:  Yes, Your Honor.

22          THE COURT:  And you're right, it has that language in

23   it, preserving parties' rights.

24          MR. TAGGART:  Thank you, Your Honor.

25          THE COURT:  Whatever they may be.

1    Okay, so that should give everybody a little bit of

2  comfort, except maybe not Mr. Suzuki who was hoping for a home

3  run, but it was a nice try.  No cigar.

4    MR. SUZUKI:  No, I certainly understood we on an

5  interim basis, Your Honor.

6    THE COURT:  Okay.  All right, so with that, is there

7  anybody else who thinks they have a piece of evidence to offer

8  before we close evidence?

9    (No audible response heard)

10    THE COURT:  I'm not hearing that.  I'll assume that

11  it is closed.

12    So is the debtor prepared to proceed now with closing

13  argument?

14    MS. RILEY:  Yes, Your Honor.

15    THE COURT:  Okay.  Take it away.

16    MS. RILEY:  So, Your Honor, with respect to the

17  issues presented before the Court, the primary issue here, of

18  course, is the debtors' continued use of cash collateral which

19  is vital and necessary to the debtors' continued operation in

20  remittance of the debtors' estate in this case.

21    We are, again, requesting that the third interim

22  order that was filed Friday evening at Docket Number 271 be

23  entered.  And it was heavily negotiated with both the bank and

24  the Unsecured Creditors' Committee, but to which several

25  parties have maintained their objections, including the Pruet

1  Group -- excuse me, not including the Pruet Group.  The Pruet

2  Group did provide input as to that third interim order, as did

3  the Anderson Group.

4          The objections are by the Tauber Group, the Kudzu

5  Group, and FPCC.

6          So I just want to briefly discuss what the main

7  thrust of those objections really is here because I think

8  that's important in the determination of the debtors' ability

9  to continue to use the cash collateral and the issues related

10 to adequate protection here.

11         The main thrust of those objections is that the

12 debtors, through their cash collateral budget and through their

13 request to use cash collateral, are using their money, the

14 money in which they have an interest.  And they say they have

15 two primary bases in which they assert an interest there:

16         One is with respect to these cash call advances;

17         And the other is with respect to revenue.  And the

18 revenue we can break out is for the prepetition interest and a

19 post interest.

20         Turning first to the issue of these cash call

21 advances, it has been no secret, and the debtors have admitted

22 on multiple occasions that there are no cash call advances

23 left.  The cash call advances were requested, they were paid,

24 and that the debtors used those in their ongoing operation

25 including, in some instances, beginning the operations on some

1  of these prospects.

2          But the fact of the matter remains that there has

3  been zero evidence presented that ties any of the funds held by

4  the debtors as of the petition date to any of these cash call

5  advances.

6          The only evidence that we have with respect to any of

7  the cash call advances is one statement, and it was from the

8  Pickens Financial Group, that's part of the Tauber Group as far

9  as the objections are concerned, that showed an accounting for

10 the credits for those cash call advances.

11         That there is zero evidence before the Court that

12 shows that they actually have an interest based on a cash call

13 advance in the funds in the debtors' operating account, the

14 revenue account, the benefit account, the payroll account, or

15 Sklarco's account.

16         Then we turn to the issue of the revenues that these

17 parties also assert an interest in.  Now, again, the debtors

18 don't deny that there are various parties who have participated

19 in these wells that they are currently operating, specifically

20 that Sklar Exploration is operating.  Sklarco is one of those

21 participants.  They have, in some instances, an overriding

22 royalty interest, but primarily their interests are a working

23 interest in the properties that are operated by Sklar

24 Exploration.

25         With those revenues, if we look at the various

1  revenues accounts on a prepetition basis, we have testimony

2  that establishes that the balance of that account as of the

3  petition date was approximately $1.8 million.  That is the

4  balance that is reflected on the budget.  That is the balance

5  that is reflected on the bank's statement, as well.

6        We recognize that there are a number of different

7  parties who have interest in those wells.  But what we are

8  missing is any evidence that establishes who has what interest,

9  and how the debtors are using that interest that they are

10 asserting with respect to those funds.

11       Specifically if we look at the debtors' budget, it's

12 evident that the only funds that have been paid out under the

13 budget thus far are Court-authorized payments that have gone

14 out for payment of the January and February revenues to royalty

15 interests and the overriding royalty interest.  And the amount

16 paid out there was $1,853,000, more than the balance of that

17 account as of the petition date.

18       We also know that the only funds to come into that

19 account are the post petition revenues that were received by

20 the debtor on a post petition basis.

21       So at least as far as it relates to this prepetition

22 balance, there's no evidence before the Court that the debtor

23 is proposing to use any of the funds in which (indiscernible -

24 weak bandwidth) have had an interest based on their petition

25 revenue either.

1    Turning to the post petition revenue, again, we've

2  seen it on both the bank's statement, and through the -- Mr.

3  Jones' testimony and Mr. Strausser's testimony here that the

4  funds that came in in the month of April into that revenue

5  account listed on Debtors' Exhibit 8, were for the March

6  revenues that were paid to the debtor.  They were received in

7  April based on the March sales.

8    The debtors' budget listed as Exhibit 4, and entered

9  as Debtors' Exhibit 4, identifies that the payment owed to

10  working interest holders, royalty interest holders, and

11  overriding royalty interest holders, all of which would -- the

12  funds for all of which are maintained in that same revenue

13  account with no separation between wells, between interest

14  holders, between anybody, is all going to be paid out to those

15  respective interest holders, including Sklarco in these cases.

16    And just based on that, their post petition interest

17  in the revenue is adequately protected because our form of

18  adequate protection there is payment of that interest.  So as

19  far as the post petition operations are concerned, again, the

20  post petition interests of these working interest holders is

21  unquestionably adequately protected here.

22    Turning back to some of these issues just related,

23  again, to the prepetition interest in the cash call advances,

24  there's been a lot of testimony about the various participation

25  and the debtors' requirements to both issue these cash call

1  advances, get paid on these cash call advances, and the use of

2  these cash call advances.

3         Well, if we look specifically at Tauber's Exhibit A,

4  it's on, I believe, Page 36 of the joint operating agreement

5  that's attached to the participation agreement, on Page 36, it

6  clearly specifies that there is no requirement for the debtor

7  to maintain these funds separately, that there is no

8  requirement for them to specifically account for all of these

9  funds, apart from just providing that basic accounting with the

10  credit (indiscernible - weak bandwidth). And that it also --

11  that there is no -- that they're entitled to commingle these

12  accounts in their operating account here.

13         So without a specific tracing, there is no basis to

14  assert that the debtors are using anyone's money, other than

15  the debtors' own, to maintain their operations going forward.

16         Additionally, there has been additional testimony or

17  additional assertions by these working interest holders that

18  Sklarco has, by virtue of not being listed as having paid a

19  cash call advance, it's somehow in violation of one of these

20  operating agreements, or is using somebody else's money for

21  their ongoing operations.

22         Well, again, just looking at Tauber's Exhibit A,

23  there is a portion that I do want to read to the Court, and it

24  states specifically -- and this is at Page 48 with the

25  advancement of cost, "That such request for advanced payments

1  may be made upon all non-operators, or upon any one or more of

2  them to the exclusion of others, and shall be made in writing

3  not later than 30 days prior to the anticipated commencement

4  date."

5           So there's nothing in here that requires for Sklarco

6  to pay in any of these alleged cash call advances that they're

7  saying, well, now the debtors have somehow nefariously used

8  their money to fund.

9           The budget that's designated as Debtors Exhibit 4

10  very clearly breaks out the debtors' post petition operation to

11  show how the debtor is able to fund the ongoing operation

12  without using any of the interest held by the revenue interest

13  holders here.

14          Specifically if we look at Exhibit 4, it shows that

15  there is a specific designation for the revenue account.  It

16  shows the inflows and outflows from that account.  And it also

17  shows that with these inflows and outflows --

18          MS. CASS:  Ms. Riley, I'm going to ask you to pause

19  for a minute.  It looks like Judge Brown lost her WiFi

20  connection, so she is not hearing you right now.

21          MS. RILEY:  All right.

22          MS. CASS:  So we're going to do a brief recess while

23  she tries to reboot her computer.

24          MS. RILEY:  Okay.

25          MS. CASS:  Thank you.

1         (Recess 2:24:36 p.m./Reconvene 2:43:43 p.m.)

2         THE COURT:  All right, I am so sorry.  I don't know

3    why I lost connection, but I totally did.  So I can tell you,

4    Ms. Riley, that I left off right when you were talking about

5    Tauber Exhibit A, Page 36, and that's when I lost you.

6              (No audible response heard)

7         THE COURT:  Can she hear me?

8         MS. RILEY:  Yes, I can.

9         THE COURT:  Okay.

10         MS. RILEY:  So, Your Honor, going back to the Tauber

11   exhibit, it starts to go into this -- it continues with this

12   issue of these cash call advances, that people are asserting an

13   interest in the debtors' funds based on these alleged cash call

14   advances.

15         And what Tauber Exhibit A says at Exhibit -- at Page

16   36 is that the debtor -- or -- excuse me -- yes, the debtor is

17   not required to, in any way, segregate those cash call advances

18   or maintain separate accounts for those cash call advances.

19         Instead, the debtor is angle to commingle those in

20   its operating account.  And because those funds are commingled,

21   we know that the Tenth Circuit has told us in the case of

22   *Amdura National Distributing Company,* which is at -- it's

23   *Amdura National Distributing Company versus Amdura Corp., In Re*

24   *Amdura Corp.*, 75 F.3d 1447, that the funds held in an account

25   are presented to be established to be the funds of that

1 particular party. It is then incumbent on the party asserting

2 an interest in those funds to establish through some tracing

3 mechanism or another, that they have some interest in those

4 funds.

5          And in this case, nobody has taken the additional

6 step to go through that exercise and identify specifically what

7 funds held in the debtors' operating account are actually

8 coming from these cash call advances. And they can't because

9 realistically what has happened here, and the debtor has

10 admitted this on multiple occasions, those cash call advances

11 are gone. They were spent, there's no question about that.

12          So that does not establish an interest in cash call

13 advances, and does not establish a means by which they can

14 assert that the debtors are using funds on a post petition

15 basis based on those cash call advances.

16          Now there's also been some testimony raised here with

17 respect to the cash call advances from Sklarco, and

18 specifically Sklarco's participation as a working interest

19 holders in these various projects that have been ongoing. And

20 there's a section that I want to read for the Court,

21 specifically with respect to the cash call advances that were

22 issued by the debtor. This is, again, from Tauber's Exhibit A

23 on Page 48, it says that, "Such request for advanced payments

24 may be made upon all non-operators, or upon any one or more of

25 them to the exclusion of others, and shall be made in writing

1  not later than 30 days prior to the anticipated commencement

2  date for such drilling operations."

3          So really, what that section says is that there's no

4  requirement that Sklar Exploration issue a cash call advance

5  specifically to Sklarco.  And for these parties to come in and

6  say, well, clearly you must be using our money if Sklarco

7  hasn't been issued a cash call advance, there's just no

8  evidence in the record or before the Court that establishes

9  that at all.

10          So really what we're left with is are these interests

11  adequately protected to the extent that they have an interest

12  in the debtors' cash on hand on the date of filing based on

13  those prepetition revenues.

14          Now, again, as we talk about these prepetition

15  revenues, we acknowledge that various parties have an interest

16  in the debtors' funds, specifically those funds maintained in

17  the revenue account.  Because when these oil and gas products

18  are sold, Sklar Exploration received 100 percent of the funds

19  from the sale of the oil and gas.  Those funds were deposited

20  into the revenue account, and then it pays out the various

21  interest holders from that point.

22          THE COURT:  And if I understand you correctly, what

23  you've already told me in your closing is that on the day of

24  the bankruptcy, there was a million eight in the revenue

25  account, is that right?

1          MS. RILEY:  That's right, Your Honor.

2          THE COURT:  And you paid out more than a million

3  eight to the royalty interests and overriding royalty interests

4  since the petition filing.

5          So any funds that existed --

6          MS. RILEY:  Correct, Your Honor.

7          THE COURT:  -- on the petition date are gone.

8          MS. RILEY:  That's correct, Your Honor.

9          THE COURT:  Okay.

10         MS. RILEY:  So we really still don't see how --

11  there's no evidence, again, before the Court that there is an

12  interest in the debtors' property as of the petition date just

13  based on the fact that those funds have been paid out.

14         And to the extent that there is any sort of remaining

15  interest leftover from that, I think it is still adequately

16  protected by the fact that funds are being maintained in that

17  revenue account going forward.

18         Again, the debtor has agreed and has expressed

19  multiple times that those revenue accounts are remaining

20  separate, and will continue to remain separate on a post

21  petition basis, and that revenues will continue to be paid out

22  on a going forward basis from that account.

23         The burden here is not on the debtor to establish

24  that these parties do not have an interest in that revenue

25  account as of the petition date.  The burden is on the parties

1  who are asserting an interest in those funds to establish that

2  interest in those funds.  And none of these parties have gone

3  through the exercise of any sort of tracing or have made any

4  effort whatsoever to identify any funds that they believe

5  belong to them.

6      Now speaking to the issue of adequate protection, the

7  debtor does have the burden here under Section 363 to establish

8  that any interest that's here is adequately protected, and the

9  third interim order does just that.  It provides replacement

10  liens to the extent -- without making any determination.  It

11  does provide replacement liens to the extent that there is any

12  interest in priority.

13      But it goes one step further.  It also requires the

14  appointment of the CRO.  And that's -- that issue matters here

15  in the context of adequate protection.  There have been a lot

16  of allegations and a lot of questioning about the prepetition

17  activities of these debtors, it goes to the cash call advances,

18  it goes to the amounts paid to Howard Sklar, it (indiscernible

19  - weak bandwidth).

20      All of that prepetition activity at this point, it's

21  literally water under the bridge.  We understand that it may

22  impact the relationship of the parties on a post petition

23  basis, and how these parties operate together going forward.

24  But it doesn't provide a basis for them to assert an interest

25  in the property.  And the appointment of a CRO based not just

RUD000493

1   on the debtors' opinion of who the CRO should be, but based on

2   the consultation with East-West Bank, the Committee, and to

3   some reasonable degree, consultation with the working interest

4   holders, as well, is intended to bring in a neutral third party

5   to oversee and manage the day-to-day operations.

6         And Mr. Sklar himself told you that when that CRO

7   comes in, that's going to be the person where the buck stops

8   here, those were the exact words.

9         So if they're bringing in this party who's going to

10  be overseeing and managing the day-to-day operation based on

11  the agreement between the Committee and East-West Bank, and the

12  terms of the CRO -- the appointment of that CRO are going to be

13  negotiated with the -- with East-West Bank and the Committee

14  and, again, to a certain degree, the working interest holders,

15  there is no reason that this prepetition conduct should somehow

16  bear on the debtors' ability to continue to operate going

17  forward when we're bringing it in so we can mitigate these

18  circumstances, provide additional assurances to the various

19  parties, and ensure that there will be some neutrality brought

20  in to the debtors' operation.

21        What really is at issue here is this just the

22  debtors' use of money for the next two weeks?  These issues

23  will be on that because we know that these objections that have

24  been raised by these particular parties haven't just been

25  raised with respect to this third interim order, they have been

1  raised with respect to the debtors' use of cash collateral as a

2  whole.

3        But it's still incumbent on those parties to

4  establish how they have an interest in property, and how

5  they're somehow impairing that interest in property, and they

6  haven't done that for the third interim order, and they won't

7  be able to do that going forward.

8        The debtors' budget specifically breaks out the

9  revenue account so that we can see very clearly that funds in

10  the revenue account are being maintained in the revenue

11  account, and paid out to the revenue parties of which Sklarco

12  is one by virtue of its overriding royalty interest and its

13  working interest.  That isn't going to change after this third

14  interim order.  Those funds are still going to be maintained

15  separately, and the budget is still going to account for them

16  separately.

17        The debtors' budget also shows that how, by using the

18  funds from the hedging agreements, the funds from joint

19  interest billings, and the funds from Sklarco's portion which,

20  by virtue of the second interim order, were to be maintained in

21  Sklar Exploration's operating account and used for ongoing

22  operations by Sklar Exploration, it can maintain its

23  operations.  And that budget shows that not only can they

24  maintain operation, but they can maintain the operation

25  profitably.

1   The net positive cash result there at the end, based

2   on all other accounts and just focusing on Sklarco's portion of

3   the money, and the other funds received by Sklar Exploration,

4   it's positive by over $500,000.

5   I'd like to just briefly talk about the -- the oil

6   and gas motion that we've identified, as well.  And that's the

7   motion to honor and pay the various interests and to request

8   offsets.

9   Now the debtor has already agreed to continue making

10  its payments going forward, and that's what our proposed order

11  on that motion provides, that post petition, any revenues

12  received will be paid out.

13  It doesn't address the prepetition any further, and

14  we've withdrawn our request to pay those prepetition amounts at

15  this time.

16  THE COURT:  Except you are going to pay the March

17  ones, you're just not going to pay January and February.

18  MS. RILEY:  Correct, Your Honor.  And that's because

19  the March revenues were, again, received after the bankruptcy

20  filing.

21  THE COURT:  Okay.

22  MS. RILEY:  They are clearly identifiable in the

23  debtors' bank account.  And so any sort of tracing exercise

24  that needs to go on there to identify those funds, I think that

25  it's a much easier prospect at that point to get to that point

1 because we can see the funds come in, they're sitting there,

2 and we can identify those interests to a greater degree.

3        The funds are still commingled and nobody has traced

4 those funds, but because they were received on a post petition

5 basis and are an amount that is sufficient to pay all of those

6 interests, I think that your tracing mechanism may become

7 easier.  Although that, again, is not necessarily -- the first

8 priority -- extent and priority of all these claims is not

9 necessarily before the Court here.

10        But I do want to address the offsets that are

11 requested here.  Now in some circumstances, parties have

12 requested to be -- to have their joint interest billings offset

13 in future revenues.  We were just asking to be able to continue

14 to honor that requests that were made, again, for the

15 convenience of the parties.  Where it's not permitted by the

16 joint operating agreement, or by some other agreement between

17 the parties, we are not asking to just automatically offset

18 joint interest billings against people's revenues.

19        As it relates to the cash call advances --

20        THE COURT:  Well, wait a second.  So you're just

21 saying where the parties have requested it, you want to

22 continue that practice.

23        MS. RILEY:  Exactly.

24        THE COURT:  Okay.

25        MS. RILEY:  For instance, if Jane Smith doesn't want

1  to have to send in a check for $5 for her joint interest

2  billing, and receive a check for $15 for her nominal interest,

3  we want to be able to honor that request and just send her a

4  check for $10 as opposed to sending in that additional -- or

5  having to have that exchange.

6          THE COURT:  Okay.

7          MS. RILEY:  But one of the objections that had been

8  raised specifically by the Tauber Group here, and just as it

9  goes to Mr. Pickens' testimony, is that they want to be able to

10 offset any amounts that they have been credited for their cash

11 call advances against whatever joint interest billing that they

12 may be issued going forward until those amounts are credited in

13 full.

14         Well, you've heard testimony from Mr. Jones, and I

15 believe Mr. Strausser, as well, that when a project is under --

16 is still ongoing, right, it hasn't concluded, that there's no

17 refunds that are issued.  If a project isn't successful,

18 there's no refunds that are issued.  So nobody has identified a

19 basis to get any refunds here.

20         But more than that, this evidence that -- there is no

21 basis that we should be able to -- that we had commingled these

22 cash call advances between the interests in all the wells,

23 which is essentially what they're asking us to do.  They're not

24 just saying that where, for instance, the bill might be issued

25 against a well that there is a cash call advance for, that they

1  should be able to offset their joint interest bill there.  They

2  want to do it universally.  It's not a  --

3       THE COURT:  Let me ask a question, Ms. Riley.  I

4  understand the argument you're making about the money is gone

5  for the revenue account, but -- and so to the extent you're

6  saying that they haven't been able to trace an interest in cash

7  that exists, that, therefore, they can't meet their burden of

8  proof under 363(p), I understand that.

9       But when somebody has a setoff or a recoupment right,

10 that is, in essence by itself, a secured claim.  And under

11 certain circumstances, the Bankruptcy Code allows for that, on

12 a post petition basis even.

13      So you -- if -- if I were to find that they have the

14 right to do a setoff, or a recoupment for these cash call

15 advances that they have as a credit on their account towards

16 the joint billing statements that they would otherwise have to

17 pay, can this company and its budget operate under this budget

18 if you don't get -- in other words, if you can't use the funds

19 that are subject to recoupment?

20      MS. RILEY:  Well, Your Honor, I think it's necessary

21 to be very clear about what funds may be subject to recoupment

22 here.  Because what we can see from the Tauber Exhibit --

23 you'll have to excuse me, I don't have the exact number here.

24 But the exhibits that -- the joint interest billings designated

25 as Tauber Exhibit B.

1          THE COURT:  B as in boy?

2          MS. RILEY:  B as in boy.  When we look at that, it

3     shows that summary by lease in the joint interest billings

4     issued for each individual lease.  Where there is a bill that

5     is issued for the particular prospect where there's a cash call

6     advance, that is the only circumstance where the cash call

7     advance can be -- there's any sort of recoupments that can be

8     applied or any sort of credits that can be applied.

9          So it can't be applied universally, and this is

10    consistent with the joint operating agreement, as well.  The

11    joint operating --

12         THE COURT:  Okay.  Take me through an example.  Let

13    me get my Exhibit B back.  You were trying to do this with the

14    witness, and I confess that it -- a little bit of it was lost

15    on me.  So you talked about the Castleberry prospect on Page 2

16    of Exhibit T-B.  And you said $51 of expenses, and it shows

17    that Pickens Financial owes $51 for that.

18         So you're saying the off -- the recoupment can only

19    be where there's an entry saying you don't owe anything?

20         MS. RILEY:  So, Your Honor, I think we need to take a

21    step back.  And if we look at the prepaid balance by project,

22    that shows where there is a cash call advance, that's what Mr.

23    Pickens told us.

24         THE COURT:  Okay.

25         MS. RILEY:  That this is his statement for cash call

1 advances.

2       And I think if we look at the Myrtice Ellis well

3 here, that is going to be the most clearest example where we

4 can see some sort of --

5       THE COURT:  Okay.

6       MS. RILEY:  -- recoupment that has occurred.  We see

7 the beginning balance of $33,595.30.  A credit applied of

8 $3,365.67, resulting in a decrease of that credit for that cash

9 call advance.

10       When we looked at the summary by lease, this provides

11 a summary of all of the joint interest bills and all of the

12 expenses that have been incurred on a lease-by-lease basis.

13       THE COURT:  With the prepayments applied.

14       MS. RILEY:  Exactly.

15       THE COURT:  Okay.

16       MS. RILEY:  So if we look, for instance, at the

17 Myrtice Ellis well, and that's on Page 3, it's about halfway

18 through the summary table.

19       THE COURT:  Yes, I see it.

20       MS. RILEY:  We see that here, there is that expense,

21 that bill for that particular lease of $3,665.67 [sic].  We see

22 the application of the prepayment, and then there's no amount

23 owed.

24       So that's essentially -- again, taking that joint

25 interest bill, applying it against the credit so they're not

1  being charged twice for money that they've already paid.

2      THE COURT:  But none of the cash calls that they've

3  made on these other leases have resulted in a zero balance on

4  what they owe.

5      MS. RILEY:  That's correct.  Because, for instance,

6  on the Castleberry prospect, depending on, you know, the

7  circumstances, there may not have been a cash call advance.  So

8  we won't see any sort of prepaid balance by project for, for

9  instance, the Castleberry prospect.

10      We see an expense for $51.10, and then we see that

11  the amount owed is $51.10.  There is no credit that can be

12  applied there, and nor credits shouldn't be allowed to be

13  applied universally across all interest -- across all joint

14  interest billings regardless of whatever project they're for.

15      THE COURT:  So you're saying it should limited -- any

16  recoupment should be limited to amounts prepaid, serving as

17  credits for that particular project or lease only.

18      MS. RILEY:  That's exactly right, Your Honor.

19  Because if we allow for these parties to offset or recoup their

20  cash call advances universally -- the answer to your question

21  is no, this debtor cannot survive.  Parties have to pay their

22  joint interest bills for this debtor to maintain its operations

23  an to continue to pay its expenses.

24      Otherwise what they are essentially asking the debtor

25  to do is, number one, commingle the money that they've paid,

1    even more than it already has been;

2         But, number two, to go out, pull oil and gas out of

3    the ground for free until their prepetition claim is paid in

4    full regardless of what well it comes out of.

5         And, frankly, I don't know of any basis in fact or

6    law that gives them the right to do that.  There's certainly

7    nothing in the joint operating agreement that we've seen that

8    allows them to indiscriminately apply whatever credit they have

9    against all of joint interest billings for all leases which are

10   all governed by separate joint operating agreements across the

11   board.

12        And there's an inequitable argument, as well, that

13   they essentially, again, are going out, asking the debtors to

14   work for free to bring their product out of the ground to

15   market, and then pay them their revenues on top of that.

16        The debtors' ability to use the funds here is

17   necessary to their continued operation.  Mr. Strausser told you

18   that if this debtor cannot -- and Mr. Jones did, as well, as

19   did Mr. Sklar, frankly, that if this debtor cannot use funds

20   that are cash collateral, and that the bank -- who does have

21   the, arguably, largest interest in cash collateral here just

22   based on the debtors' operating account -- has agreed to allow

23   them to use in accordance with the budget, if they can't use

24   those funds, the wells will be shut in, and it's not just going

25   to be negatively impacting this debtor.  It's going to be

1  negatively impacting all of the interest holders here.  It's
2  not just Sklarco that won't get paid, it's the Tauber Group,
3  it's the Kudzu Group, it's FPCC, it's Pruet, it's Anderson.
4  Nobody is going to be getting paid here because there's not
5  going to be any ongoing operation, there's going to be damage
6  to the wells, and there is going to be a negative impact to
7  everyone across the board.

8          THE COURT:  So you're saying they'll be cutting their
9  nose off to spite their face.

10         MS. RILEY:  That's exactly right, Your Honor.  The
11 third --

12         THE COURT:  Okay.

13         MS. RILEY:  The third interim cash collateral order
14 here provides a number of protections that are really intended
15 to maintain the status quo because we're not here today to
16 decide the exact nature, extent, and priority of every single
17 party's interest.  That we've already established, and we've
18 already asserted, needs to be done by adversary proceedings.

19         But to the extent that somebody does have --

20         THE COURT:  I have not agreed with that.  I mean
21 there is -- to some extent, 363(p) says that somebody -- people
22 have burdens, and one of those is theirs to show they have an
23 interest.  It wouldn't say that if there was no ability to, at
24 some summary level, decide who has an interest in cash.

25         MS. RILEY:  Certainly, Your Honor.  And that's -- we

1    acknowledge that, Your Honor.

2          But in any event, there is no evidence before the

3    Court at this point that establishes that interest.  We do have

4    the consent of the bank here, through that third interim order,

5    to use the cash collateral in which they do have a clearly

6    established interest.

7          And the entry of that third interim order is

8    necessary here for the maintenance of the -- for the

9    maintenance of the debtors' estate and for the ongoing

10   operations here.

11         So we would ask that the Court, both, honor the third

12   interim order, and the order on the oil and gas motion, again,

13   that was also filed at Docket Number 271.

14         THE COURT:  Thank you.

15         MS. RILEY:  Thank you.

16         THE COURT:  All right.  Does the bank have a closing

17   statement or argument?

18         MR. SUZUKI:  Yes, Your Honor.  I'll try to be brief,

19   and not repetitive.

20         But I think what we've learned over the last two days

21   is that the great majority of stakeholders in these cases favor

22   moving forward with cash collateral approval provided that the

23   debtors segregate and pay net revenues to working interest

24   holders on a post petition basis, which they've agreed to do,

25   and the bank supports that.

```
 1          And as long a third party fiduciary, like a CRO, is
 2  appointed to oversee day-to-day operations.  Again, the debtors
 3  have made that concession, the bank and the Committee are
 4  supportive of that.
 5          In addition, the bank has conceded that it won't
 6  exercise setoff or other enforcement rights against the funds
 7  that are owed to the working interest holders on a post
 8  petition basis.
 9          And despite all of these assurances, there is, as
10  Your Honor has seen, a small but very vocal minority of
11  interest holders who want to essentially hold these cases
12  hostage until their prepetition claims are paid in full.  And
13  that would result effectively in a shutdown of these
14  operations, destroy the going concern value of the debtors, and
15  result in case closure, or conversion.
16          And I don't mean to write off those parties because
17  (indiscernible - weak bandwidth) which is obvious, Your Honor
18  has observed that, it's understandable.
19          THE COURT:  Okay.
20          MR. SUZUKI:  In fact, the bank shares a lot of those
21  creditor concerns regarding the prepetition conduct and insider
22  transfers that appear to have occurred here.  But taking the
23  pragmatic view, Your Honor, the Code provides mechanisms to
24  address those kind of creditors grievances with respect to
25  those kinds of prepetition issues.  And absent a motion to
```

RUD000506

1 convert or dismiss, shutting down the debtors isn't among the

2 avenues that are endorsed for creditor recovery for prepetition

3 misconduct.

4       This is not an evidentiary hearing on a motion to

5 dismiss or convert; it was not on a complaint to avoid

6 transfers; it wasn't on a complaint to determine the extent of

7 interest under 541; and it was not on a motion to confirm the

8 automatic stay doesn't apply on the recoupment theory. Even

9 though the objecting parties seem to have spent the most time

10 on the issue, frankly, relating to cash call advances that

11 everyone acknowledges are long gone.

12       So while that issue is unfortunate, this was a cash

13 collateral hearing, and those mechanisms in the Code address

14 and, therefore, provide adequate protection for their concerns,

15 ought to be the focus going forward. And the Court can rest

16 fully assured because you heard it straight from Committee

17 counsel's mouth that they're going to be looking very closely

18 at prepetition conduct, and will be taking appropriate action

19 consistent with their fiduciary duties and obligations.

20       But parties who advanced cash calls prepetition,

21 while unfortunate, those are prepetition claims and do not give

22 rise to a blocking position on cash collateral.

23       Moreover, stipulating to the appointment of a CRO, I

24 think, as Ms. Riley has indicated, provides an additional form

25 of adequate protection with respect to those prepetition

 1  issues.

 2          And at the first day hearing, Your Honor told all of

 3  us if we had concerns about prepetition conduct, we were

 4  welcome to tee up a 2004 application, or file a motion to

 5  appoint an examiner trustee.  Well, that was a month ago, no

 6  motion has been filed to convert the case, to appoint a

 7  trustee, for a Rule 2004 examination, to confirm the automatic

 8  stay doesn't apply to some sort of recoupment theory, there's

 9  been no complaint filed under 541.  There's not even been

10  demand, as you heard today, and we're not aware of any, where

11  these objecting parties said we're going to take oil out of the

12  ground in kind, give us the barrels, and we'll go sell them

13  ourselves.

14          So there's been a lot of dirt thrown.  And, again, I

15  can understand some of that.  But really, focusing on the cash

16  collateral issue, I don't think there's any question that

17  adequate protection has been demonstrated and the bank supports

18  moving forward on cash collateral.

19          One final point:  On the evidence, we were focusing

20  on the cash ownership issue, if you can call it that.  What we

21  had is a lot of assertions and innuendo.  But on this record,

22  Your Honor, no objecting party has failed to carry their burden

23  of tracing.  And, in fact --

24          THE COURT:  No party has failed?  I think you mean --

25          MR. SUZUKI:  You're right; thank you for that

1  correction.  No party has successfully carried their burden of

2  tracing.

3       And moreover, no party has even failed to establish

4  an ownership interest in the cash.  And I won't repeat all the

5  evidence that Ms. Riley went over, but I would note that the

6  testimony unequivocally here was that the revenue account was

7  never set up, was never intended, and was never used as a de

8  facto escrow account for interest holders.

9       The testimony was that it was sort of a catcher's

10 mitt for royalty interest, overriding royalty interest, working

11 interest.  And, in fact, it appears to have been a landing

12 point initially for other taxing authorities who also have

13 funds owed to them out of these operations.

14      THE COURT:  I did hear testimony, and I believe it

15 was from Mr. Jones, that he could easily calculate everybody's

16 interest in the revenue account because he clearly did it for

17 Sklarco.  But nobody then took that, and tied it to an account

18 balance on a particular date.  So I didn't -- I don't believe I

19 got the evidence to draw that final conclusion.

20      But they did say that it is possible at any point in

21 time to go in there and run the numbers and say, "These people

22 are all entitled to ... down to the penny."

23      MR. SUZUKI:  Yeah, and I guess my response -- I think

24 you're right about that, Your Honor.  But I think he also said

25 it best when he said what we really have here is an accounting

1  construction, a construct that attempts to allocate funds in

2  the account that are owed to a specific party.

3         What they have not been able to do is to say this oil

4  that comes out of the ground, I own an undivided interest in,

5  and that it was put into a barrel, and that barrel went to the

6  refinery, and the refinery paid this massive lump sum that is

7  owed to taxing authorities, royalty interest holders,

8  overrides, etc., that's all commingled in a single account, and

9  you're correct, they have not tied that.

10        So I think the tracing issue has not been

11 established.

12        The other part, the salient issue that I hope you

13 picked up on in some of my examination, was that the only

14 document identified to this point that they argue gives them

15 title to oil and gas rights, and apparently thereafter to

16 proceeds, is an unexecuted form of assignment, and this was the

17 document that's attached to the Tauber Exhibit A at Page 37.

18 The only witness to testify regarding that document admits that

19 it's unexecuted, that he does not know whether it's been

20 executed, that he does not know whether it's been recorded, and

21 has undertaken no personal efforts to verify that the

22 document's been executed, let alone recorded.  And that's

23 significant.

24        On this record, the debtors have not executed, nor

25 recorded documents that the objecting parties contend give them

1   ownership.  And as the Court knows, under 544, the debtor or

2   the estates of the trustee, however you want to look at it has

3   the status of the bone fide purchaser for value.  And

4   unrecorded real property interests, therefore, come into the --

5   into play.  And on this record, there is no ownership of

6   record.  And so they've failed to carry their burden in that

7   respect, as well.

8        The only other thing I would point Your Honor to is,

9   again, with Tauber Exhibit A, at Page 70, rentals and

10  royalties, and a whole bunch of other expenses were expressly

11  agreed to be paid, and it's a provision called direct charges.

12  Again, it's at Page 70, and it says, "The operator shall charge

13  the joint account with the following items," and there is a

14  laundry list of items there to which they consented to payment,

15  which includes rents and royalties, taxes, labor, employee

16  benefits, material services.  So to -- even to the extent they

17  have an interest in the cash, they have prospectively consented

18  to these items being charged against those.

19       The final thought that I would share with Your Honor

20  -- and it wasn't really articulated at the hearing -- but in

21  some of their papers, there was a mention that somehow they may

22  have a security interest if they don't have ownership.  Well,

23  they have failed to establish that, as well.  But even if that

24  were the case, it's very clear, the analysis is pretty easy.

25  Under the UCC, 9-327 under any state that could argue to be

1   applicable here, Alabama, Colorado, California where the bank

2   accounts are located, a security interest of the bank with

3   which deposit accounts are maintained takes priority over all

4   other conflicting security interests in the deposit account

5   regardless of whether deposit account constitutes competing

6   secured party's original collateral or proceeds.

7            So even to the extent they have or are asserting a

8   security interest, it is not senior to the bank's undisputed

9   interest here.

10           THE COURT:  Unless they establish their ownership

11  interest --

12           MR. SUZUKI:  Correct.

13           THE COURT:  -- (indiscernible - multiple speakers)

14  trump.

15           MR. SUZUKI:  Correct, yeah.

16           THE COURT:  All right.

17           MR. SUZUKI:  The bank cannot have a lien on something

18  that the debtor does not own, we acknowledge that.

19           My argument is merely that they haven't established

20  ownership.  And even if they have this fallback position that

21  it is a security interest of some kind, that's still not

22  sufficient.

23           So that's all I had, unless Your Honor has any

24  questions.

25           THE COURT:  No; thank you.

1          MR. SUZUKI:  Thank you.

2          THE COURT:  All right.  Does the Committee wish to

3   make a closing argument?

4          MR. JOHNSON:  Thank you, Your Honor.  I'm not so sure

5   it's argument as much as commentary.

6          As you know, the Committee has not taken a position

7   during these hearings these last two days, but it doesn't mean

8   that we have not been active.  We have spent a significant

9   amount of time negotiating with the debtors, the bank, and the

10  working interest owners in trying to come to an agreement with

11  respect to a third interim cash collateral order.  We believe

12  that that interim cash collateral order that the debtor has

13  proposed encompasses those agreements that tries to maintain

14  the status quo and protects the interest of all the parties.

15  It does more than that because it provides for an

16  acknowledgment of the eventual appointment of a CRO, and we

17  have been taking lead and actively working with the lenders and

18  the debtors on terms of the CRO.  We have provided a term sheet

19  to the debtors with what we think are the powers that CRO

20  needs.  And if we can't get there, Judge, we'll be back in

21  front of you with a trustee motion.

22          THE COURT:  Okay.  So you -- I was just going to ask,

23  so you don't need to condition your agreement to the third

24  interim cash collateral order, if there is going to be one, on

25  the terms of the CRO because -- will you lose your leverage or,

1 as you said, you just file a motion for a trustee.

2         MR. JOHNSON:  I don't think we'll lose our leverage,

3 Judge.  I think everyone has paid close attention to everything

4 that's been said, not only in the last two days, but to your

5 comments at the hearing on Friday, to other comments.

6 Everybody understands the position that management is in.

7         And we're happy -- well, it's not the language we

8 would prefer, but it was negotiated language that's in this

9 third interim, we believe that it does provide a commitment.

10 And because it was rushed, we didn't have an opportunity to

11 negotiate the exact scope or the name of -- you know, the

12 identification of that CRO.

13         But if we can't get there, we will move on.  We take

14 very seriously the allegations that have been made by the

15 various parties, the Committee's obligation to investigate

16 those claims for the benefit of all creditors.  And because we

17 believe that we're trying to protect the interest of all

18 creditors, we believe that the Court and that the debtor has

19 satisfied its burden for a third interim cash collateral order

20 that continues the status quo, allows the debtors to continue

21 to operate, and let's see if we can preserve some value here

22 for everyone.

23         THE COURT:  Okay; thank you.

24         MR. JOHNSON:  Thank you.

25         THE COURT:  Before I hear from the objectors, are

1  there any working interest holders who are now on board with

2  the third interim cash collateral who wish to speak?

3          MR. TAGGART:  David Taggart on behalf of the Howell

4  Interests.

5          THE COURT:  Okay.

6          MR. TAGGART:  Your Honor, I do believe that in my

7  opening comments yesterday, I indicated that Howell Interests

8  were not opposed to the entry of either the third interim cash

9  collateral order or the oil and gas motion, but that that was

10  predicated on some clarifications that I had received from Ms.

11  Riley.  And that related basically to two points:

12          The first point was that in making the payments to

13  the working interest owners, including my clients, of the March

14  revenue and the other post petition revenue, that those

15  payments would be based on the existing net revenue interest

16  maintained by Sklar, and for which my client and the other

17  working interest owners had in the various projects as

18  demonstrated prepetition.  So that there would not be any

19  suspense or changing of what they had been paid prepetition --

20          THE COURT:  I'm not sure I'm following this point.

21          MR. TAGGART:  So if you look at the order, it just

22  simply says that they would pay the net revenue interest

23  prospectively.

24          THE COURT:  Correct.

25          MR. TAGGART:  And I wanted to make sure, because my

1 client's decimal interest to about eight decimal places to the
2 right, it differs in each one of the projects.  That what they
3 meant by that is they would pay us prospectively on the same
4 interest that was shown to our interest prepetition.  And Ms.
5 Riley had indicated that that is, in fact, what was intended,
6 that there won't be any change in those decimal interests.

7          THE COURT:  Okay.

8          MR. TAGGART:  So that was a clarification that I
9 thought was intended in the order, and she confirmed that.

10          THE COURT:  Now you're raising a question for me that
11 is -- you know, what we've heard in testimony today is that
12 Sklarco owed the same cash -- you know, for its -- for its
13 percentage interest, it owned [sic] cash call advances that it
14 did not pay.  And Mr. Sklar said, "Well, that's how we've
15 always operated.  We know we're good for it, even if it's a dry
16 hole, we will pay it."  Well, here's the exact situation when
17 they can't pay.

18          So is there any understanding among the parties that
19 their interest will change as a result of that?  Because these
20 agreements talk about if you don't pay by 60 days or 90 days,
21 whatever it is, you know, there are penalties that you suffer.
22 And the debtors' budget is built on a continued stream as if
23 they had paid, and no penalties.

24          So what's your understanding?

25          MR. TAGGART:  Well, that was the reason I had

1 requested the clarification, Your Honor.  Is so that there

2 would not be any misunderstanding.  So that hypothetically if

3 my client, his owner number is HOWJ05, and let's say that in

4 project A, their interest was .0001, and that's what they had

5 been billed on as their net revenue interest prepetition,

6 that's what they would continue to receive post petition.

7          THE COURT:  But your client met the cash advance

8 requirements, right?

9          MR. TAGGART:  That's right, Judge.  We are current on

10 all of our JIBs, and we did have about $20,000 in cash

11 collateral advances.  But we're agreeing that those will be

12 reserved.

13          I was just really seeking a clarification on the

14 prospective payment for March, etc., revenues.

15          THE COURT:  But there are some interest holders who

16 are refusing to pay JIBs, and then we know Sklar didn't even

17 pay the cash advances.

18          So is what Ms. Riley clarified to you indicating that

19 they'll keep their same working interest regardless of that

20 fact?

21          MR. TAGGART:  That's right.  We -- and my

22 clarification was intended to ensure that my client was not

23 increased in the burden for billings that other parties didn't

24 pay --

25          THE COURT:  Ah, I see why you care, okay.

1          MR. TAGGART:  -- nor was its revenue decreased

2    because other parties may have gotten a different percentage

3    post petition.

4          So as long as they're willing to pay us post petition

5    like we had prepetition, which was the clarification I sought

6    and believe I got, then like I said, we're comfortable with the

7    third interim order.

8          THE COURT:  Okay; thank you.

9          Any other now non-objecting but formerly objecting

10   working interest holders that wish to make an argument or a

11   statement?

12              (No audible response heard)

13         THE COURT:  Okay.  Then let's start in on our

14   objectors, and let's hear from the Tauber Group first.

15         MR. LOCKRIDGE:  Your Honor, this is Eric Lockridge

16   for the Anderson Group --

17         THE COURT:  Oh, okay.  Go ahead, Mr. Lockridge.

18         MR. LOCKRIDGE:  We have a -- we have an objection

19   (indiscernible - muffled) to support the third interim cash

20   collateral order.  I just want to sensitize that the point that

21   Mr. Taggart is making, and how important that is for the budget

22   and for the understanding of the working interest owners going

23   forward.  This budget -- there's a section in the budget that

24   working interest owners have paid their JIBs, there's been

25   statements that some working interest owners have not paid

1  their JIBs.  It's important that for those of us who have

2  agreements (indiscernible - muffled) and are expecting to get

3  our revenue, that that is not going to be a debit of revenue

4  for bills that folks didn't pay.  And that would be any -- any

5  increase to our share of JIBs later for folks who didn't pay,

6  that needs to be a --

7         THE COURT:  Yeah, but how is that fair for them to

8  get revenues when they're not paying expenses?  And I

9  understand why you don't want your share of the expenses to

10  increase, but why are they getting a free ride?  This would --

11  let's say it's working interest holders ABC, and they are so

12  upset about what's happened with the money in this case

13  prepetition that they're not going to pay a single JIB that

14  comes in.  You're saying that we're going to freeze their

15  interest, and they're going to keep it all, but they're saying

16  I'm not going to pay.  So how does this work?

17         MR. LOCKRIDGE:  Yeah, I think that's something that

18  the debtor intends to address going forward.  What my concern

19  is for those that are following the contract and doing what

20  they're supposed to do, we don't want to get -- we don't need -

21  - we don't want to get debited for amounts that may not have

22  come in from others.

23         THE COURT:  I understand that, I just -- it's kind of

24  like the HOA that shares the costs around the homeowners, and

25  then if a lot of the homeowners go belly-up, then the ones that

RUD000519

1  remain have to pay all the HOA dues, right?  So I understand
2  that concept, I just don't know how that happens when some
3  working interest owners are not making their share of the
4  payments.  I don't know how the debtor continues to operate or
5  why that's even fair.  So -- okay.

6          MR. TAGGART:  May I -- may I respond to that briefly,
7  Your Honor?

8          THE COURT:  Sure, Mr. Taggart.

9          MR. TAGGART:  Of the agreements that are in the
10  record, the joint operating agreement does, and particularly
11  the COPAS, does have provisions that if a party doesn't pay
12  their JIBs, then the debtor operator, after a certain period of
13  time, sends a demand notice, and then they can move forward
14  against that individual, or that individual's interest.  But I
15  believe that's adequately spelled out in the agreements for all
16  the parties.

17          THE COURT:  But that could lead to lawsuits, right,
18  if they go after the individual?

19          If they go after the interest, then the -- let's say
20  the interest is somehow surrendered back to the company, that's
21  more revenue to the -- I -- to the operator or to the other
22  non-interest working owners?  How does that work?

23          MR. TAGGART:  Well, my understanding, Your Honor,
24  under the -- I've been doing this about 40 years in the oil and
25  gas business here in Louisiana --

```
 1        THE COURT:  And I have not, so you're going to
 2   educate me.
 3                    (Laughter)
 4        MR. TAGGART:  But typically what happens is when the
 5   operator -- depending on the particular provision of the
 6   operating agreement, the interest is either forfeited or that
 7   interest -- the revenue from that interest is taken by the
 8   operator to pay those expenses, plus a penalty for basically
 9   the risk of having to assume those.
10        So I haven't studied these operating agreements to
11   know how they work.
12        THE COURT:  Okay.
13        MR. TAGGART:  For our purposes, between now and May
14   the 31st, I'm not sure it's a big concern to me, but I think
15   that the debtor does have recourse.
16        THE COURT:  But when you say one of the options was
17   forfeit the interest, who is it forfeited to, the operator or
18   the --
19        MR. TAGGART:  The operator.
20        THE COURT:  Not the other working interest holders,
21   okay.
22        MR. TAGGART:  To the operator.
23        THE COURT:  Okay, all right; thank you.
24        Okay, any other originally objecting working interest
25   holders that are now on board with the third interim cash
```

1  collateral order proposed that wish to speak before I hear from

2  objectors?

3            (No audible response heard)

4            THE COURT:  Okay.  And let's start with the Tauber

5  Group.

6            MR. SKELTON:  Your Honor, Barnet Skelton for the

7  Tauber Group.

8            After listening to debtors' counsel's presentation,

9  and that of the bank's, I almost feel like we must have been

10 listening to two different hearings, and maybe different

11 witnesses.  Because they continue this really unsupportable

12 argument that somehow it is difficult to tell or to trace

13 exactly how much money any given person is owed.

14           Let's start with Mr. Marshall Jones.  And the most

15 important thing that we just can't forget, he testified SEC

16 owns nothing.  It owns no interest in any well anywhere, it's

17 just a shell.  It just operates wells.  And, frankly, it's why

18 it's a shell that can, frankly, be discarded without big loss

19 to the working interest owners.  It has outlived its purpose,

20 it has betrayed everyone's trust.

21           And as Mr. Sklar said today, this business is based a

22 lot of trust.  And once trust is betrayed, it's hard, if not

23 impossible, to get back.

24           Now Ms. Riley was saying that, you know, we shouldn't

25 really get too worked up about all pre-bankruptcy conduct.

1 But, you know, Shakespeare said it best, "What's best is

2 prologue."

3       We cannot look at the future we're facing, even for

4 the next two weeks, without viewing it through the lens what

5 has happened in the past.

6       And I want to go directly to an issue -- and then the

7 other issue -- because I don't want to forget this.  You said a

8 few minutes ago that you didn't really believe we had

9 adequately shown the ownership in that account.  And I will --

10       THE COURT:  Well, what you -- what I said was you did

11 a very nice job through Mr. Jones' testimony of showing that he

12 could go in, and run the numbers, and tell you for any pool of

13 money in that revenue account exactly who it goes to.  Because

14 he can get the daily well logs, and he can true that up with

15 all of the JIBs --

16       MR. SKELTON:  Right.

17       THE COURT:  -- and everything, and calculate it out

18 to the infinite decimal points.

19       But what you didn't take me to then is to then say,

20 okay, on the date of the petition, $1.8 million was in the net

21 revenue account, and it's still there, and my share of that is

22 X dollars.

23       MR. SKELTON:  All right, I did do that, Your Honor,

24 with all due respect.

25       THE COURT:  Okay.

1          MR. SKELTON:  I did do that through --

2          THE COURT:  Then show me.

3          MR. SKELTON:  -- Mr. Strausser.

4          THE COURT:  Okay.

5          MR. SKELTON:  Mr. Strausser was, I thought, very

6    forthcoming.  And I walked him through the opening cash balance

7    on April 1st, which was not 1.8, it was actually $2,674,000 and

8    change.

9          THE COURT:  In the net revenue account on the date of

10   petition.

11         MR. SKELTON:  In the revenue account, correct.

12         THE COURT:  Okay.

13         MR. SKELTON:  Now I asked him -- well, he stated on

14   direct that the withdrawal of $800,000 that occurred on April

15   1st out of the revenue account into the operating was

16   attributable to the interest of Sklarco.  That that was a

17   Sklarco distribution.

18         THE COURT:  Correct.

19         MR. SKELTON:  And so on cross, I said, well, it's

20   very unusual that a party that has, according to his testimony,

21   a blended average of a 16 percent working interest, that

22   somehow it would miraculously come out to exactly 800,000.

23         THE COURT:  And he said it was really more like eight

24   seventy.

25         MR. SKELTON:  Right, eight seventy -- he actually

1    said eight seventy-one.

2              THE COURT:  All right.

3              MR. SKELTON:  And remember when I raised the issue

4    about how could it be exactly eight hundred, he says, well, it

5    wasn't exactly, and, you know, there was a little bit more that

6    was in the bank account.

7              So I said, all right, if we take that into account,

8    you've taken out eight hundred, and you've committed yourself

9    that that is -- that's Sklarco money, then there's -- I said,

10   is there anymore money left in that account that belongs to

11   Sklarco, and he said, yeah, the $71,000.

12             And so I said everything else belongs to the other

13   interest owners, correct?  And he said, yes.

14             And so I am absolutely mystified that Ms. Riley or

15   Mr. Suzuki could say with a straight face that we have some

16   additional burden of going and finding assignments and so

17   forth.

18             First of all, we have established that as to

19   property --

20             THE COURT:  Let me stop you right there, Mr. Skelton,

21   because what you didn't ask him is, "So how much of the 2.674

22   million in that account was my client's?"  You know, to say

23   that this much is Sklarco, and all the rest is the non-

24   operating working interest holders, you have to be able to show

25   me your client's interest, not just the commingled interest of

1  all the non-operating working interest.

2          MR. SKELTON:  I don't think -- I respectfully

3  disagree for this reason:  The debtor has admitted on the

4  record that through its CFO, that it has no interest in that

5  cash.

6          Mr. Suzuki trots out his UCC argument.  Well, we're

7  talking about ownership.

8          So we have Mr. Strausser's admission on the record

9  that the only interest that the debtor had and Sklarco had in

10 that money --

11         THE COURT:  Well, we've got royalty interest and

12 overriding --

13         MR. SKELTON:  Sure.  Sure.

14         THE COURT:  -- royalty interest --

15         MR. SKELTON:  Exactly.

16         THE COURT:  -- and --

17         MR. SKELTON:  Exactly.  And the whole point is

18 whatever the mix is, the issue is not today, "What can I take

19 out of that account?"  The issue is what can the debtor take

20 out?

21         And why is the debtor not -- and remember, working

22 assumption, admission, SEC owns zero.

23         So the only party that's a debtor that could have any

24 interest in those accounts is Sklarco.  And through the

25 testimony of Mr. Strausser, that money -- that amount was --

1   well, basically, after they took the $800,000 out, there's only

2   another, you know, seventy-one that could possibly be

3   Sklarco's.

4           So the issue today is not on cash collateral whether

5   I can trace exactly what Tauber dollars are in that amount.

6   The issue is what has the debtor done to set aside its burden

7   of proof?  Where is the actual proof of its right to use any

8   given dollar amount in those revenue accounts?  It's just not

9   there.

10          And so I have viewed the arguments made by Ms. Riley

11  and Mr. Suzuki this way:  Okay, if I haven't done it, if I

12  haven't proven how much my client's interest is, what have you

13  done?  And what we have is a very convenient admission that

14  that $1,800,000, other than $71,000, doesn't belong to Sklarco,

15  and definitionally, it could not belong to SEC.

16          THE COURT:  Well, what do you make of the fact that

17  Ms. Riley said a million eight plus went out the door to pay

18  the royalty interest and the overriding royalty interests?  So

19  that money is now gone, that's their position.

20          MR. SKELTON:  Well, the answer to that is that money

21  came into the account, and -- later in the month of April, and

22  that payment occurred after that.

23          And so -- and then the other just monstrous argument

24  is that there should be allowed even additional withdrawals by

25  Sklarco, I guess.  Remember yesterday Mr. Strausser admitted

1   that the budget was confusing because it showed these two

2   payments, one of 600 and some odd thousand, one of five hundred

3   to Sklarco.  And he said, well, that really means it's supposed

4   to go in the operating account.

5           And so our position, Your Honor, is is that there is

6   a bright line that the CFO painted on April 1st as to this fund

7   of money -- and let me also say we're going to get to operating

8   agreements in a minute, and I have more gray hairs than I would

9   like to admit in the oil patch and litigation involving this

10  very form of operating agreement.  I've gone to the Fifth

11  Circuit and the Supreme Court of Texas on certified questions

12  on the 1982 AATL joint operating agreement.  And I know a

13  little bit about it, each one can be customized, but the

14  arguments I'm hearing from Ms. Riley and Mr. Suzuki appear to

15  be made out of a lack of experience and understanding of how

16  this document works.

17          THE COURT:  Okay, let's skip the characterizations.

18          MR. SKELTON:  Okay, all right.  All right, well,

19  let's get to the point because I think Ms. Riley is guilty of

20  quite a misrepresentation to the Court.  And let's go to Tauber

21  Exhibit A, Page 36, which is a special provision added to

22  Article 5 of the JOA, and it's called "Custody of Funds."

23          And, you know, it always bothers me when someone

24  doesn't read a very salient provision, and reads others.  She

25  read the part in Item F, which says, oh, no, at the end of E,

1  which says "Nothing creates a fiduciary relationship, nothing

2  requires maintenance by operator of separate accounts for the

3  funds of non-operators."  But she didn't read the first part,

4  which I'll read aloud, "Operator shall hold for the account of

5  non-operators any funds of non-operators advanced or paid to

6  the operator, either for the conduct of operations hereunder or

7  as a result of the sale of production from the contract area.

8  And such funds shall remain the funds of the non-operators on

9  whose account they are advanced or paid until used for their

10 intended purpose or otherwise delivered to non-operators."

11        And this last phrase is important on recoupment, "Or

12 applied towards the payment of debts regardless of whether the

13 debts arose out of the same well or operations for which the

14 funds were advanced or from which the proceeds were derived."

15        And so that drives an absolute stake into the heart

16 of Ms. Riley's argument because she's saying, oh, Judge, you

17 know, yeah, we took all of this money, and it was intended for

18 this or that prospect.  But they can only recoup against if

19 it's a Myrtle [sic] Ellis cash advance, it can only recoup

20 against Myrtle [sic] Ellis JIBs.  But that's not what that

21 clause says, and that is a key contractual provision.

22        THE COURT:  Do you have case law that -- you said

23 you've taken this up the circuits and whatever.  Are there any

24 cases out there, written opinions?

25        MR. SKELTON:  I believe so, Your Honor.  Now the

1  particular issue that I went up on was the liability of a non-

2  operator when an operator failed to pay royalties to royalty

3  owners --

4                    (Cell phone ringing)

5           MR. SKELTON:  I'm sorry.  Failed to pay royalties to

6  royalty owners, the creditors in a bankruptcy case came after

7  my client who was one of many non-operators.

8           THE COURT:  So not on this issue.

9           MR. SKELTON:  No, it's not on this issue.  But what

10  I'm really saying -- I'm not bragging, I'm just saying I've

11  dealt with this form, and I'm familia with it.

12          THE COURT:  Okay.

13          MR. SKELTON:  But I think this is a critical

14  contractual --

15          THE COURT:  Okay, I heard you --

16          MR. SKELTON:  Okay, okay.

17          THE COURT:  -- to look at that language --

18          MR. SKELTON:  Okay.

19          THE COURT:  -- in terms of this -- how narrowly to

20  see the recoupment issue.

21          MR. SKELTON:  Okay.  And the other page was -- let's

22  see, I've got it.  The other page was --

23          THE COURT:  47?

24          MR. SKELTON:   Yeah, I think that's right, on

25  advancement of cost.  And Ms. Riley rather selectively read

1    some language which basically says, "Operator has -- shall have

2    the right to request and receive from each non-operator

3    payments."

4            And then she comes on and says, "Such request for

5    advanced payments may be made upon all non-operators, upon any

6    one or more of them to the exclusion of others."

7            Well, taken out of context, that sort of -- that

8    sounds like a hall pass for Sklarco's conduct in not paying any

9    of its advanced cash calls, but that's not what it means.

10           What it means is in -- in the joint operating

11   agreement, there are situations where the operator or non-

12   operator may propose what are called subsequent operations.

13   It's not the initial test well, everybody's got to be in for

14   that.  But subsequent operations are ones in which the operator

15   says, oh, well, we drilled Well Number 1, we need to go back

16   in, and we need to rework the well, we need -- it's gotten

17   clogged up with some gunk, or one thing or another, okay?

18           So what happens is the operator proposes that

19   project, and the no-ops or non-proposing parties have an amount

20   of time to say I consent, I will do it, or I won't do it.  You

21   can go what is called non-consent.

22           And so what ends up happening is -- let's just

23   suppose 30 percent of the working interest owners went non-

24   consent, the consenting parties end up fronting all the cost

25   for that operation, and so they might get cash call advances,

1  etc.  But the language she's reading in the overall context of

2  the JOA is, well, yeah, there might be nine consenting parties.

3  They can't bill a non-consenting party.

4        And so I don't believe that language is the talisman

5  that she appears to think it is for her position to somehow

6  excuse Sklarco.

7        And I also think it's significant that if Sklarco

8  somehow did have this hall pass which allowed it not to have to

9  participate in cash call advances, why is it listed?  Why is it

10  listed on every single one of those?  And that Exhibit -- what

11  did we call it, L-1 --

12        THE COURT:  Well, let me ask you, Mr. Skelton, you

13  know, I think probably a lot of what the debtor was doing

14  accounting wise and practice wise was in violation of the

15  agreements, you know?  To not make their cash call up front, so

16  they're sharing in the risk up front was wrong.

17        But are you really wanting me to shutdown this

18  company by saying they can't spend any cash?  Is that what

19  you're asking?

20        MR. SKELTON:  Based upon the evidence in this record,

21  yes, I am.

22        THE COURT:  Okay.

23        MR. SKELTON:  I don't --

24        THE COURT:  And your clients are willing to have

25  these wells all shuttered?

1          MR. SKELTON:  No, actually there's a remedy.  There

2   is a remedy that we haven't heard much about.

3          THE COURT:  Okay.

4          MR. SKELTON:  And that remedy is for Mr. Sklar, or

5   one of his trusts who's taken out a couple of million bucks, to

6   belly-up to the bar and bridge.  If he is so certain hope

7   springs eternal, he should come -- he should be our DIP lender.

8          THE COURT:  And I have thought that many a time in

9   the course of these proceedings.  Of course, I cannot force

10  that, but I understand that request.

11         MR. SKELTON:  Okay.

12         THE COURT:  But be careful because what you're saying

13  is I'm going to shoot the debtor here.  So you're assuming

14  somebody's going to come in and be the white knight at the end

15  of the day, and maybe it's Mr. Sklar, maybe it's the bank,

16  maybe it's some unknown party, but that may very well not

17  happen.

18         MR. SKELTON:  Well, our position is, Your Honor, that

19  the real value -- if there's any value, it's in Sklarco.

20  That's what -- we're not going to get paid back unless it's out

21  of Sklarco's hide.  I mean SEC is, frankly, it's office

22  furniture, it's trucks, and stuff like that.

23         THE COURT:  I understand that.  But as I have had

24  other oil and gas cases, it's a pretty difficult process to get

25  a new operator in, it takes a lot of time.

1          MR. SKELTON:  Well --

2          THE COURT:  So those well will be shutdown probably

3  in the meantime.

4          MR. SKELTON:  I don't know that it would be necessary

5  to shut it down if we had a fiduciary, and obviously that's the

6  next step.

7          And let's talk about the paper tiger they're

8  proposing to be the fiduciary.  First of all, there was no

9  motion pending seeking to appoint a CRO.  There were no details

10 provided.  And --

11         THE COURT:  It's not even negotiated yet.

12         MR. SKELTON:  Right, it's not even negotiated.

13         THE COURT:  But I can't get you to file a motion.

14         MR. SKELTON:  Well, Judge, I think you may be seeing

15 something.  And, you know, it's just --

16         THE COURT:  Actions speak louder than words.

17                       (Laughter)

18         MR. SKELTON:  Correct, I understand.  But I've been a

19 busy boy.

20         But bottom line is, Judge, this is a dilemma entirely

21 of Sklar and Sklarco and SEC's management's own making.  We

22 didn't put them in this position, and nobody's -- you know, the

23 debtor is not saying, Judge, just make East-West Bank loan

24 another, say, $2 million, that will help everybody.  And yet

25 somehow, our clients are treated differently.  They're treated

RUD000534

1  as if, well, there's no other choice, and so we have to bear

2  the burden, and we just don't think that's equitable.

3       And finally, Ms. Riley was saying that, you know,

4  it's just not equitable.  Well, to seek equity, you've got to

5  do it and have done it, and they haven't.  They're not

6  deserving of any -- a shed of the chancellor's tear, as they

7  used to say.

8       So we think the motion should be denied.  We think

9  our -- that Sklarco and SEC have absolutely capability of

10 figuring out who -- you know, an equitable division of the

11 funds that were on hand on the petition date, and we should be

12 paid that, and we should be paid going forward.

13          THE COURT:  Okay; thank you.

14          MR. SKELTON:  Thank you.

15          THE COURT:  Okay.  Let's hear from FPCC, Mr. Bain.

16          MR. BAIN:  Yes, thank you, Your Honor.  First of all,

17 can you hear me okay?

18          THE COURT:  I can, but it's always helpful for you

19 that lean towards your computer.

20          MR. BAIN:  Absolutely, (indiscernible - muffled)

21 headphones on a break.

22          Well, Mr. Skelton, I'm going to try very hard not to

23 repeat the concerns that you've raised.  But needless to say,

24 we share a lot of them.  We also share his view of the

25 evidence.

1          But since he started off by quoting Shakespeare, I

2    thought I would start off by quoting Judge Friendly when he was

3    on the Second Circuit where he said, "The conduct of bankruptcy

4    cases not only should be right, but must seem right."  And that

5    was at *Ira Haupt*, 361 F.2d 164.

6          I think that kind of paints the tone for where FPCC

7    is right now.  The bank, in its comments, referred to us a

8    small but vocal minority.  I think it's more complicated than

9    that.  I think a lot of working interest holders are trying to

10   weigh whether or not stopping the use of cash collateral, which

11   inevitably probably will lead to conversion, due to the

12   debtors' unilateral right to convert, whether or not that is

13   better for each interest holder.  And I think that there's a

14   lot of mixed thoughts on that.

15         Truthfully, based off the hearing, I think I started

16   off on Friday saying that we were trying to take a very

17   pragmatic view of where things were, and trying to understand

18   where the debtors were coming from.  I want to highlight before

19   I get into kind of where we are with that.  Another thing that

20   the bank said, but I defer to Mr. Suzuki, he referred to the

21   first day hearing, he said, Judge, you know, this is back in

22   April -- April 9th, and no one filed the motion, and no one

23   has, you know, sought to appoint a trustee, and no one's taken

24   any action.

25         Well, if you look at the transcript, which we've --

1 I'll read it for you, but it was the one exhibit we wanted

2 admitted, it's our Exhibit E, Ms. Riley at the time said -- she

3 referred to a payment of $4 million --

4    THE COURT: I'm not sure I should let you quote from

5 a transcript that we did not receive into evidence. So that's

6 trying to get some evidence in through the back door, and

7 statements of counsel are not evidence. So I don't think you

8 should go there.

9    MR. BAIN: Well, Your Honor, I actually have case law

10 that says it's a judicial admission. And what I would argue --

11 this is oral argument -- is that Your Honor can consider the

12 statements that were made, and consider the value that we're

13 attributing to them, and discount them as may be appropriate.

14    THE COURT: Well, you were trying to get a wholesale

15 transcript in.

16    MR. BAIN: Correct.

17    THE COURT: Are you now trying to get particular

18 lines in that's an admission against interest?

19    MR. BAIN: No, it's an exception to the hearsay rule,

20 Your Honor. It's not hearsay, it's covered under Rule 803(1),

21 the Present Sense Impression. And all I'm trying to say is

22 that this is what Ms. Riley said at the time as a statement of

23 the debtors.

24    THE COURT: No, I'm not going to allow it. So

25 anything else you have for your argument?

1           MR. BAIN:  If Your Honor will give me one moment.

2           THE COURT:  Sure.

3           MR. BAIN:  Your Honor, I don't even need to quote the

4  transcript, we were listening in, and I'll just make an

5  argument.

6           THE COURT:  Okay; fair enough.

7           MR. BAIN:  At the time, Ms. Riley said at the time,

8  the debtors' position was simply --

9           THE COURT:  Ms. Riley, I'll expect you to object here

10 if you need to.

11          MS. RILEY:  And, Your Honor, I think that what he's

12 going into here is really hearsay, and it's not even evidence,

13 it's argument.

14          THE COURT:  Right, okay.  So back to you, Mr. Bain.

15 If you intend to offer her statements through your closing

16 argument without a transcript even, that's still going to be

17 hearsay, so it's the same thing.

18          MR. BAIN:  I understand, Your Honor.  At the first

19 day hearing -- Your Honor, I'll move on.

20          THE COURT:  Okay, that's wise.

21          MR. BAIN:  Your Honor, one of the motions in front of

22 Your Honor is the motion to pay overriding royalty interest

23 holders.  I would point Your Honor to the argument that the

24 debtors made themselves at Paragraphs 15, 16, and 17 when

25 they're characterizing these revenues.

1          Your Honor, I won't go belabor the point but needless
2   to say, they've made -- essentially they've cited the same
3   cases that we did in our objection.  This is something that was
4   noted by Judge McNamara at the second day hearing.  And the
5   only reason why I was pointing that out, the only reason why I
6   raised the issue with regards to the first day hearing is that
7   from a pragmatic looking at where the cases are, I was trying
8   to demonstrate that the debtors' position is coming very close
9   to the bank's position with regards to the last -- the -- the
10  April 9th first day hearing.

11         And, Your Honor, I'm not necessarily arguing that as
12  a basis for -- as a basis for denying the motion.  All I'm
13  simply pointing out is, you know, my client's concern with
14  regards to where this case is going, which obviously goes to
15  more of the adequate protection, whether or not these cases
16  continue, there's enough money in the budget to pay for the
17  litigation that Ms. Riley's client has, in my mind, kind of set
18  us on a path for.

19         Now that being said, I do want to take a moment just
20  to compliment Ms. Riley, I think -- and, frankly, Mr. Suzuki.
21  I think that this is a difficult case.  I mean I've been in Ms.
22  Riley's chair, and it is tough.

23         But at the end of the day, I do think -- and to boil
24  down what I think are the position of the royalty interest as
25  it relates to interim use of cash collateral is looking at

RUD000539

1    Section 363(p) -- excuse me, Your Honor, let me grab a glass of
2    water.  Looking at 363(p), dealing with the burdens, and
3    accepting our characterization of the evidence, which I'm --
4    rather than repeating what Mr. Skelton said, I think it's safe
5    to say I would be agreeing with his characterization.  Namely
6    that the controller essentially testifying that this -- that
7    zero of the assets belonged to SEC, and that this was all
8    Sklarco.

9            So the concern from our standpoint goes inevitably
10   the debtor is asking you to find that this is -- that the bank
11   has an interest in this cash collateral without really there
12   being much testimony about it, which is the reason why I raised
13   my concerns with regards to the proof of claim.  The bank
14   didn't put on a witness.

15           And I listened intently to the -- to the testimony of
16   the witnesses, and I made a few notes, and I won't go through
17   all of it, but Mr. Marshall -- he said that this is an
18   ownership right.  He didn't refer to it as a contractual right,
19   and I was listening very carefully to that because that
20   obviously is very important.

21           At no point did he really testify about that there
22   was a security interest, that the bank had the security
23   interest.  And I don't want to belabor the point because it is
24   an interim order, but just based off of that, if it's not our
25   property, it's inevitably their collateral as the way that this

1  has been posited to you.  And, in fact, one of the -- I've been

2  struggling -- you know, this is obviously a difficult hearing.

3  We started off yesterday with the final cash collateral

4  hearing, I completely understand why we're not there given the

5  budget that's been offered.  But I, throughout it, have been

6  trying to get my arms wrapped around the debtors' position.

7  You know, they are really arguing that we don't have an

8  interest in this.

9        And a couple of things that Ms. Riley said in her

10  closing kind of caught my eye.  She said the bank really has an

11  established interest, and that the bank has the largest

12  interest in cash collateral, I think is was the largest

13  interest in cash collateral.

14        So, Your Honor, it's hard to sit here and say and

15  grant the motion without necessarily inferring that the bank

16  somehow has an interest in this cash collateral.  And, quite

17  frankly, I don't think they've put on any evidence to that

18  effect.

19        So, Your Honor --

20        THE COURT:  You're talking about the money in the

21  revenue account.

22        MR. BAIN:  Right.

23        THE COURT:  Okay.

24        MR. BAIN:  And, Your Honor, unless you have any

25  questions for me, that would be the end of my closing remarks.

1         THE COURT:  Okay, thank you.

2         MR. BAIN:  Thank you.

3         THE COURT:  All right.  Let's see, that brings us to

4 Kudzu.

5         MR. GENO:  (Indiscernible - muffled), Your Honor,

6 I'll do my best not to duplicate my colleagues' argument, but

7 that's --

8         THE COURT:  Thank you, Mr. Geno, appreciate that.

9         MR. GENO:  I'd like to try to address the oil and gas

10 motion since it hasn't had a lot of attention, and the cash

11 collateral motion at the same time.

12         THE COURT:  You need to lean forward.  We're getting

13 bad reception.

14         MR. GENO:  Trust and confidence, Your Honor, in the

15 debtor and debtors' management really goes beyond the payments

16 to the trust and the charitable characterization of those as

17 mislabeled, and the outright taking of the cash advances, and

18 non-payment of the revenues.  It goes to whether or not we have

19 trust and confidence in the debtors' managements confidence.

20 Do we believe the cash flow?  I don't think any of the

21 objecting royalty interest owners believe in the debtors'

22 competence and trustworthiness as far as cash flow is

23 concerned.  After all, it takes the revenue account from a

24 million eight, really as Mr. Skelton pointed out, 2.6 on the

25 day of the filing, down to 691,000 at the end of this budget.

```
 1              It takes Sklarco's revenue contribution from 683,000
 2   that the witness, as the Court noted, testified yes, that's an
 3   exact number, I could calculate that by the accounting that we
 4   have, down to 514,000.  That's $169,000 loss just on 16 percent
 5   of the revenue.  So do we believe the debtors' numbers?  Do we
 6   have confidence in debtors' management in getting us good
 7   numbers?  I'm not so sure that we did.  I'm not so sure that we
 8   should.
 9              Sklarco has --
10              THE COURT:  So you're ready to pull the plug on the
11   debtor.  You want me to deny all the use of cash collateral
12   and, therefore, the debtor either converts or dismisses.
13              MR. GENO:  Yes, Your Honor.
14              THE COURT:  You're ready for that.
15              MR. GENO:  Ready for that.
16              THE COURT:  Okay.
17              MR. GENO:  I don't believe that will happen, but we -
18   - but in the event it does, we're ready for that.
19              THE COURT:  Okay.
20              MR. GENO:  Sklarco, Your Honor, has been given a
21   significant break on just cash advances because under the
22   participation agreement that the Kudzu parties have, our
23   Exhibit A, that provide that in the event any participant,
24   Sklarco is a participant, from which a request for advanced
25   payment was made, does not within the time and manner
```

1  (indiscernible - muffled) provided fully satisfy the request

2  for advanced payment as aforesaid, then the operator, Sklar, at

3  its option, which is apparently it had not exercised, and we

4  have another conflict of interest there because Sklar is not

5  pushing Sklarco to make its cash advance, then the operator, at

6  its option, shall make a second written request by certified

7  mail for such advance.  Participants shall pay aforesaid

8  advances aforesaid within three days.  And if they don't, then

9  the operator shall move to -- the participant, Sklarco, agrees

10  to relinquish all of its rights, title, and interest

11  (indiscernible - muffled) overriding royalty in this entire

12  prospect, including without limitation, contract area, initial

13  well leases, additional leases, (indiscernible - muffled) oil

14  and gas leases (indiscernible - muffled).

15        It goes on to conclude this forfeiture of interest

16  shall be without prejudice and in addition to the rights of the

17  operator participants who paid their shares of the actual cost

18  to drill the initial well to the initial depth to offset -- to

19  offset and/or recover all sums owed to any participant who

20  fails to pay its share of actual cost to drill the initial

21  well.

22        So that contract, Your Honor, had been breached

23  twice:

24        It's been breached by Sklarco for failure to pay its

25  cash advances, (indiscernible - muffled) given a break under

1 that agreement.

2          And it's being breached by Sklar in its conflict of

3 interest by not pushing its sister company to pay its fair

4 share.

5          So when Kudzu motions to assume that's forthcoming

6 comes along, these two participants, the operator and the

7 participant, have to cure those defaults.  But that's one

8 reason we object to use of cash collateral, Your Honor, it's

9 not exactly the issue before the Court today, but it's sort of

10 (indiscernible - muffled).  Where are we going to be in a

11 couple weeks when we push that motion for this contract to be

12 assumed, and these defaults need to be cured, and there are a

13 lot of defaults, and there's a lot of monetary issues there

14 that need to be considered, and that's one of our issues about

15 wanting to shut this (indiscernible - weak bandwidth).  We

16 don't see that use of cash collateral for this interim period

17 is going to help when you've got these issues staring all of us

18 in the face toward the end.

19          For that reason, Your Honor, in the event the Court

20 sees fit to grant the use of cash collateral, we would ask the

21 Court to condition the oil and gas motion on not offsetting any

22 payments that joint interest billing participants might not

23 have made because Sklarco had been given this huge break by

24 Sklar, and by Sklarco not making its payment.  So why, in this

25 interim period, in the event the Court grants use of cash

1  collateral, should any of the joint interest billing people who
2  may not have paid their fair share have to pay that share until
3  they at least get one month's run of revenue from the March
4  revenues?  We can certainly take up that issue in the future,
5  but it may not really make any difference.  And I really
6  couldn't tell from Ms. Riley's remarks whether they actually
7  intend to in this two-week period take money that the joint
8  interest billing participants have not paid and offset it
9  against money they're saying participants' working interest
10 owners would otherwise be entitled to from the March revenue.
11 She used the word "inequitable," as Mr. Skelton pointed out.
12 And it seems to me to be completely inequitable to force
13 revenue that has not been paid for January and February, or
14 March yet, from the joint interest -- all the working interest
15 owners to be offset against revenue if they're going to get
16 maybe just for March, and that may be all they get.

17          Thank you for your time, Your Honor.

18          THE COURT:  I'm going to just throw out a question
19 here, I'm just curious.  What if Mr. Sklar caused the trust or
20 some resources he has to pay in the 2.1 million in cash
21 advances that Sklarco should have paid, but now can't, what if
22 he causes that to happen, do your concerns go away for the
23 short term?

24          MR. GENO:  That's a whole new ball game, Your Honor.
25 The answer is yes.

```
 1            THE COURT:  Okay; good to know.

 2            How about you, Mr. Bain, does that make a big

 3  difference for you?

 4            MR. BAIN:  Your Honor, that would make a material

 5  difference.

 6            THE COURT:  Okay.  How about you, Mr. Skelton?

 7  You're pretty hard to please, I know, but you need to unmute

 8  us.

 9                      (Laughter)

10            MR. SKELTON:  Well, I kind of gave up believing in

11  the Tooth Fairy a while back, but I will never say never.  I

12  mean this seems like such an unlikely event, but that could

13  persuade my clients.  They may be throwing things at the

14  computer screen right now, I don't know.  But we would

15  certainly keep an open mind if there was such a material

16  change, but it would be just for the short very near term,

17  okay?

18            THE COURT:  Okay.  That's probably not going to open

19  those purse strings very far.

20                      (Laughter)

21            THE COURT:  All right.  How about Mr. Geno, does that

22  make the world look different to you?

23            MR. GENO:  Absolutely, yes, it does.  No question,

24  that's a whole new ball game.

25            THE COURT:  All right, just curious.
```

1              MR. SKELTON:  There is one other refinement I might

2    make on interim, and that would be is if the amount of cash

3    allowed to be used for paying JIBs and so forth was limited to

4    whatever -- in other words, no money was taken out of what I

5    consider to be our share.  In other words, I think there's some

6    money that was -- that probably is attributable to Sklarco.  If

7    they could definitely show that, which I don't think they've

8    done.  You know, that might be, at least bridge a couple of

9    weeks if they, you know, use a few hundred grand, you know,

10   that's definitely Sklarco's --

11             THE COURT:  Okay, all right.  Thank you, Mr. Skelton.

12             MR. SKELTON:  Thank you.

13             THE COURT:  You're a tough cookie.

14             All right.  Debtor gets the last shot at this, so you

15   always get the final word on your motion.

16             MR. BRESCIA:  Your Honor, may I speak?

17             THE COURT:  Mr. Brescia, yes.

18             MR. BRESCIA:  Yes.  Yes, thank you, Your Honor.  I

19   represent the Lucas Petroleum Group.  I -- we're having storms

20   down in Austin, and I actually lost power --

21             THE COURT:  Oh, I'm sorry.

22             MR. BRESCIA:  -- right when you asked all the other

23   objecting parties that did not present evidence, so I would

24   like just a minute or two, if I may.

25             THE COURT:  You can have it, okay.

1          MR. BRESCIA:  Thank you.  Thank you, appreciate it.

2          You can't have enough (indiscernible - muffled) and

3   you lose actual power to your whole house.

4          THE COURT:  I do understand, it happened to me today.

5          MR. BRESCIA:  So I will be very brief.  I did want to

6   say something because my client, again, Lucas Petroleum Group,

7   filed objection to both motions being heard today.  At the

8   beginning of this case yesterday, and now that we were prepared

9   to support the interim order, but not a final order yet, and so

10  we were not going to present evidence based upon what we

11  thought the debtor was going to offer, which would be at least

12  a minimum of what the working interest owners would receive.

13         So the two crucial points in that confessions by the

14  bank and the debtor, number one, that they would segregate

15  those funds that are post petition revenues attributable to

16  working interest owners;

17         And then two, that they would be speedily seeking the

18  appointment of the CRO.

19         Now I heard Mr. Suzuki say a couple times that

20  they're not conceding anything, but that they're allowing the

21  money that we think belonged to my client and others going to

22  be paid.  So I just want to make sure --

23         THE COURT:  For March.

24         MR. BRESCIA:  For March, exactly.  You know, the

25  commingling argument does concern me and my client, what

1  happened prepetition.  To some degree, I agree that the parties
2  have stated that that is -- it's not water under the bridge, it
3  goes into the consideration, that there's nothing we can do
4  about it right now.  It does go to the level of trust, etc.
5       I want to make sure that as we go forward in this
6  third interim order, perhaps a final order, that, you know,
7  there's going to be no argument that the funds in the revenue
8  account are somehow commingled as part of the bank's cash
9  collateral, too.  Because I don't think I heard that, and I
10 appreciate Mr. Suzuki stating to that effect because if that's
11 going to be a part of any argument going forward, then that
12 money has to be put in a separate bank account, not part of the
13 bank's commingled cash.
14      THE COURT:  Okay.
15      MR. BRESCIA:  And rather than argue that, I'll let
16 Mr. Suzuki speak to that.
17      THE COURT:  Well, let's get Mr. Suzuki to clarify.
18      MR. SUZUKI:  Thank you.  Your Honor, Bryce Suzuki,
19 obviously on behalf of the bank.
20      You know, Mr. Brescia and I, and others, have been in
21 communication kind of throughout.  And to the extent I haven't
22 made this clear, you know, I'll take responsibility for that.
23 But I thought that the terms I used is the bank has conceded,
24 not that the bank has not conceded.
25      So what we have said in the past is the bank is not

1    in the position to say those funds, you own, period.

2           What we have said is we're not going to assert any

3    rights on a post petition basis with respect to those funds in

4    the revenue account that are attributable to interest holders.

5    Meaning we're not going to seek to set them off; we're not

6    going to dispute the payment of those funds to the interest

7    holders; we're not going to seek to claw those back, we're

8    willing to waive those clawback rights, to the extent we even

9    have them.

10          So those funds, as far as the bank is concerned, can

11   be (indiscernible - weak bandwidth) and we're not going to

12   assert an argument down the road that those funds somehow are,

13   you know, beholden to the bank's liens.

14          So we're not going to set off, we're not going to

15   seek, you know, a lien on those funds.  Those funds will be

16   coming in post petition attributable to the interest holders,

17   can be segregated and paid out to the interest holders.  We're

18   not going to claim an interest in those funds.

19          THE COURT:  Mr. Suzuki, what caused the bank to

20   declare the loan in default?

21          MR. SUZUKI:  It's a bit of a complicated answer, and

22   I'm happy to elaborate.  I took a little bit when someone

23   suggested that the bank was trying to force certain things.

24   The bank was, in fact, abundantly patient, but there were

25   significant issues.  The most significant one was a covenant

1  default.

2         THE COURT:  A covenant -- (indiscernible - multiple

3  speakers) issue covenant?

4         MR. SUZUKI:  It was a borrowing base default, among

5  others.  And --

6         THE COURT:  And that's attributable to the drop in

7  price?

8         MR. SUZUKI:  It -- I don't know all of -- all of

9  those details, Your Honor.

10         THE COURT:  The reason I ask is the debtor wants to

11  say huge drop in price in March, and COVID are the reasons for

12  this bankruptcy.  But the default occurred sometime back in the

13  fall, I believe.

14         MR. SUZUKI:  It did.

15         THE COURT:  And so the oil price was not such

16  shambles at that point in time.

17         MR. SUZUKI:  No.  The other part of that pertained to

18  transfers out of the debtors --

19         THE COURT:  Ah.

20         MR. SUZUKI:  -- and the bank did declare defaults on

21  those bases.  So what I --

22         THE COURT:  Wait.  Wait.  Tell me what you mean by

23  that, "transfers out of the debtors," what?

24         MR. SUZUKI:  So Mr. Sklar or his trusts were taking

25  significant transfers of funds out of the debtors, in violation

1  of covenants, as we saw them, under the --

2        THE COURT:  Thank you; I was suspecting that, okay.

3        MR. SUZUKI:  And so when we say that we understand

4  these concerns, it's not in a vacuum, and it's not just out of

5  human empathy here in this post petition word.  The bank had

6  these issues, declared the default, and we were negotiating

7  with the debtors on a second amendment to the loan and security

8  documents that would have addressed and restricted further the

9  ability to draw funds out of these debtors to insiders.  And

10  that -- we kind of got radio silence, and then the cases were

11  filed with no advanced warning to the bank.

12        So the level of trust isn't high at the bank either,

13  and I don't want anyone to be under the impression that somehow

14  we are best buddies with this borrower, and think that

15  everything's hunky-dory in these cases.  We don't.  We have

16  concerns, but we're looking at a practical approach here that

17  preserves a going concern value.

18        THE COURT:  Understood.  But it does explain to me

19  why the bank hasn't offered a DIP loan to make all this go

20  away.

21        MR. SUZUKI:  Correct.

22        THE COURT:  All this animosity, okay.

23        MR. SUZUKI:  Now it hasn't been asked, but I think

24  that's probably because they know what the answer is likely to

25  be.

```
1         THE COURT:  Yeah, okay.  Do you have any dollar
2   amount that the bank has sort of quantified on the transfers
3   that caused the default?
4         MR. SUZUKI:  I don't as I sit here today; a different
5   law firm was handling that negotiation.  We were brought in
6   after the bankruptcy was filed, so I -- I have a sense of it,
7   but I don't want to give a dollar amount that I'm not sure of,
8   Your Honor.
9         THE COURT:  But I would appreciate you communicating
10  that when you can to the Committee.
11        MR. SUZUKI:  Yes.  And we've opened those lines of
12  communication, they've made some informal document requests,
13  and we've begun, you know, getting documents to the Committee
14  for those purposes.
15        THE COURT:  Okay.  And you should think along the way
16  how much of that information should go into the electronic data
17  room.
18        MR. SUZUKI:  Sure.
19        THE COURT:  Because it doesn't need to be just the
20  documents the debtor wants in there, it needs to be ones that
21  creditors want to see, so --
22        MR. SUZUKI:  Right.
23        THE COURT:  -- I would appreciate that.
24        MR. SUZUKI:  Thank you.
25        THE COURT:  Thank you.  All right.
```

```
 1              MR. BRESCIA:  Your Honor, may I continue?
 2              THE COURT:  Pardon me?
 3              MR. BRESCIA:  May I continue?
 4              THE COURT:  Yes, Mr. Brescia, you may.
 5              MR. BRESCIA:  Okay.  My first question is just to get
 6    that statement on the record.  I have spoken with Mr. Suzuki,
 7    we've worked through some of those, I appreciate him stating
 8    those there at the hearing today.
 9              The second concern we have, of course, was the CRO,
10    which is the main reason why we're not probably objecting more
11    strenuously here today.  We do see the debtors' need to use the
12    cash, and we're willing to wait until the end of this month to
13    see what the debtor comes up with until we can concede.  And
14    the reason I say that is twofold:
15              A lot of discussion today, I won't repeat it, about
16    offset rights and recoupment rights.  I don't think that's a
17    position that the Court can or will rule on here today.  I
18    think those are sort of operational agreements  that may be
19    litigated at another point.
20              You know, based upon the applicable state law of each
21    operating agreement, these recoupment rights can be pretty
22    significant.  The Court mentioned that they were kind of seen
23    as a secured creditor, and I think they are.  With respect to
24    offset, of course, a motion was (indiscernible - muffled)
25    recoupment, that's not the case.  And so they need working
```

1  interest owners to evaluate their rights, they may be able to
2  offset those JIB payments against their prepetition cash
3  advances because it's all part of the same contract.

4      THE COURT:  And Ms. Riley has told me that if that
5  were to happen, this company can't operate because the budget
6  won't work.

7      MR. BRESCIA:  Exactly, I agree.  Because there's
8  $529,000 worth of cash, $553,000 worth of potential recoupments
9  that can be attributed, as well as the $118,000 from the
10 Alabama Gas Plant that there may not be a right to collect, as
11 well.

12     So which is why within the next two weeks, this
13 debtor may run out of cash before it gets to the end of this
14 month.

15     THE COURT:  Okay.

16     MR. BRESCIA:  Rather than (indiscernible - muffled)
17 the parties, the debtor and otherwise, to seek (indiscernible -
18 muffled) small amounts to see it through the next couple months
19 so the appointed CRO can actually do something.

20     I do know two things, in Sklarco's schedules, which
21 were filed in this Court, $75 million value placed upon the
22 leases; a $44 million book value placed upon the equipment, and
23 two million for other things, I guess, that are in the ground.
24 I'm not suggesting that that's what this debtors' assets are
25 worth today, but that's $120 million of potential assets.

1          Even at a 70 percent discount on those values, that's
2    still $36 million of value.  Based upon the bank's lien
3    position of 22 million, there might be some potential equity
4    even at that value that some money can be lent somewhere,
5    whether it's from the bank, which I hope it would consider.
6    I'm not committing the bank to anything right now, I appreciate
7    its concerns.  But also with a DIP loan, it might able to
8    receive some sort of a priming lien because there's definitely
9    room there to do that.

10          Additionally, we also would see the -- the payment by
11   Sklarco to Sklarco's receiving of some capital calls from Mr.
12   Sklar or otherwise as a show of good faith that we can proceed
13   until this CRO can make some meaningful decision on how to go
14   forward.  Because without that money somewhere, the debtor
15   cannot assume these JOAs because it's going to have to make up
16   those shortfalls.

17          THE COURT:  Okay, thank you.

18          MR. BRESCIA:  Thank you, Your Honor.

19          THE COURT:  All right.  All right, Ms. Riley?

20          MS. RILEY:  Thank you, Your Honor.

21          So I want to start by just focusing in, again, on
22   what this hearing is today.  And this hearing is on the use of
23   cash collateral.  We are not here on a motion to dismiss; we
24   are not here on a motion to convert; we are not here on a
25   motion to appoint a trustee.

1        THE COURT:  Nobody's suggesting that.  But when you

2   get right down to it, whether or not this debtor should be

3   allowed to go forward and operate, and use cash collateral,

4   when we look at what's caused this, and the debtor is

5   testifying that it's because of the drop in oil prices in

6   March, and the trade war -- the industry war on gas, and it's

7   due to COVID.

8        This all started sometime back in the fall, if not

9   earlier, with Mr. Sklar pulling money out in big, big amounts.

10  And like when I look at the SOFA where it says that half a

11  million dollars went out for his personal travel on jets, you

12  were saying during the course of the hearing that it was

13  business travel, but the SOFA says personal travel.

14        Even if it was business travel, this is just -- it's

15  appalling that this company is in the position it's in due to

16  one person's actions.  It's my guess as to why the CFO left and

17  we have a brand new person, and why this -- it -- that's --

18  that's why the bank declared the defaults, it's why these

19  people are so upset.  And for Mr. Sklar not to have a serious

20  come to Jesus meeting as to why he shouldn't put that money

21  back in, you know -- I'm going to take all this under

22  advisement, but I'm going to give you a couple of days to have

23  a hard talk with your client because that's where this started,

24  and that's where it needs to end.

25        MS. RILEY:  And, Your Honor, we understand that.  And

1  we understand that there are concerns here, and there are trust

2  issues.  And we fully recognize that those are coming from all

3  sides, and that includes the bank, that includes the working

4  interest holders, I think that includes -- well, I know that

5  includes the Committee, as well.

6          There's no question here that there are those issues

7  that are going to need to be addressed going forward.  And, in

8  fact, discussions have already started --

9          THE COURT:  But they're the answer to your problem,

10 aren't they?

11         MS. RILEY:  Well, I think that's part of an answer,

12 but I don't think that they're the whole answer here.  Because

13 the fact of the matter is that these companies, again, are part

14 of Mr. Sklar who may or may not have those funds to contribute;

15 I don't think that he does, quite frankly.

16         THE COURT:  Well, that's a problem, because it'd be

17 interesting to know where that much money went that fast.  But

18 you've got a bank line of credit that goes up to at least 50

19 million, right?  And they've stopped that because of this trust

20 issue.

21         So if the trust issue is replaced in a meaningful,

22 meaningful way, you've got all kinds of space here to ride out

23 COVID and to ride out the price wars.  But without that, I

24 don't know what we're trying to save.

25         MS. RILEY:  Well, Your Honor, there, I think, at

1   least is some concerning value.  And, again, discussions are

2   ongoing internally, as well, to address some of these issues.

3   And part of that is going to be bringing in the CRO, part of

4   that is going to be -- again, we've also been providing

5   documents to the Committee.  There are more documents that

6   they've requested and, you know, we're continuing to do our

7   best to respond to that.

8         But that doesn't change the fact that we still have

9   an operating company that needs to be able to continue to pull

10   oil out of the ground for the benefit of all of the parties

11   here, that includes Sklarco, as well, but it also includes the

12   Tauber Group, and Kudzu Group, and the --

13         THE COURT:  And they've all said if he doesn't put

14   this money back, we're fine with this debtor going out of

15   business.  It's just an operator, and there's not much value to

16   it, and the trust factor that's so important will be gone and,

17   therefore, we're just fine to let this operator die.

18         MS. RILEY:  But that's really just three interest

19   holders -- or three groups of interest holders here, it's not

20   all of them.  And there are a lot of other interest holders who

21   have not said, "Judge, shut this company down today."

22         THE COURT:  They have said, "We'll give you two more

23   weeks," that's what they've said.

24         MS. RILEY:  And that's right, Your Honor, because --

25         THE COURT:  And we're not going to have two days of

1  hearings every two weeks.

2          MS. RILEY:  And we fully understand that, Your Honor.

3  And I don't think that that's really what any of us are after

4  through this hearing.

5          But for essentially three parties to come in and say

6  that all of the going concern value should be zapped out of

7  this company because we're going to stand in the way of cash

8  collateral while we try to work through these other issues, and

9  these other mechanisms that they have under the Bankruptcy

10  Code, I mean really it's -- it's confusing why they would want

11  to do that when, again, the operating company is still pulling

12  money out, and is proposing to pay them for their post petition

13  revenue.

14          THE COURT:  Okay.  I'm going to put a pause on this

15  for a moment and ask Mr. Sklar -- is he still listening in?

16          MS. RILEY:  I believe so.

17          THE COURT:  Mr. Sklar?  Say your name Mr. Sklar so

18  that you come up on the camera.

19          MS. RILEY:  I think he needs to get into position

20  here.

21          THE COURT:  Okay.  Are you there?  Mr. Sklar, can you

22  hear the Court?

23          MR. SKLAR:  Yes.

24          THE COURT:  All right.  I'm coming off pretty angry

25  at your attorney, and I have no anger towards her.  She's done

1 a marvelous job on debtors' behalf.

2          But I -- the more I hear, the more convinced I am

3 that you, sir, are the sole cause of the problems that these

4 two debtors are in, and that you're probably going to be the

5 necessary solution to getting out of this fix.

6          So I want to say that directly to you, and know that

7 you heard it from the Court.

8          MR. SKLAR:  Yes, Your Honor, I understand.

9          THE COURT:  I'm going to probably give a couple of

10 days before I rule on this matter, and you should take full

11 advantage of that time to do what's right because you've put a

12 lot of people in jeopardy.

13          And, you know, it has nothing to do with COVID and

14 the drop in the oil price.  It has to do with what you did with

15 these companies using them as your personal piggy bank.  That

16 has to -- that will stop going forward regardless.

17          MR. SKLAR:  I understand.

18          THE COURT:  But you need to make this right.

19          MR. SKLAR:  I understand, Your Honor.

20          THE COURT:  Okay.  Or be prepared to lose it all.

21          MR. SKLAR:  I understand.

22          THE COURT:  Okay, all right.  All right, Ms. Riley,

23 you may continue.

24          MS. RILEY:  Your Honor, I think that it still is

25 necessary here to, again, just kind of address some of the

1  points that have been raised because, again, we understand the

2  issues, we understand the problems going forward.  But

3  understanding just in terms of this cash collateral, as well,

4  is the identification of the interest -- the specific interest

5  in property as of the petition date.  And really this is coming

6  back to the revenue issues that have been -- the revenue on a

7  prepetition basis.

8        Now Mr. Skelton has essentially asserted that it's

9  not their burden to establish what interest in the property

10  they have, it's our burden to establish what interest in the

11  property that they have, and that's just not what the

12  Bankruptcy Code says here.

13        So there has to be some mechanism -- and, again, I

14  mean we have been able to identify the payments that are --

15  that should have been made, but Mr. Strausser told everyone

16  that that was an accounting.  It doesn't guarantee that the

17  funds are available.  We've identified those payments -- we've

18  identified those amounts, we've provided it to everybody.  But

19  nobody has come in and pointed to any specific dollar amount

20  that over the next two weeks the debtor is proposing to use

21  (indiscernible - weak bandwidth) belong to them.

22        What the debtor has done in their budget is

23  identified the money that belongs to Sklarco, and has been put

24  into operations, that is going to be used.  And the budget is

25  not difficult to understand, it clearly lays out what the

1   payments that we're going -- the payments that are proposed to

2   be made, it clearly identifies where those payments are going

3   to be going, and then it also identifies where those funds are

4   going to be coming from.  We show the revenue account very

5   clearly at the bottom of the budget.  We show where it says

6   outflows to Sklarco, but then those become inflows to the all

7   other accounts that are then taken against operation.  The

8   second interim order, in fact, requires that Sklarco's revenues

9   going forward are based on that interim period, and that's

10  carried over to the third interim period, as well, go to paying

11  the ongoing operations, as well.  So where we taken the budget

12  clearly identified that this is Sklarco's money that's being

13  used, the hedging agreements that's being used, and there are

14  JIBs in there, as well, which we recognize is -- presents other

15  issues.  That we have established at that point that this is

16  the money that's being used, and it's not their money.

17          So until they can meet their burden to say that we

18  are attempting to use their money to continue to fund our

19  operation, I don't think that they can, in fact, continue to

20  assert that interest, specifically with respect to the funds

21  that are in the operating account.

22          The revenue account is a different story.  We

23  recognize that the revenue account is where all of the revenues

24  that are coming in are going to be kept separate.

25          Mr. Suzuki, I think, just came in and said that the

RUD000564

1  bank's not going to be attempting to do any setoffs there, the

2  bank's not really going to be asserting an interest.

3      The revenue account is separate, and is going to be

4  maintained for the continued segregation, if you will, of those

5  revenue amounts.

6      They're not being used in operations.  Those revenues

7  are not being used to fund these bankruptcy cases in any way.

8      So that, in and of itself, I don't think can be used

9  to deny the debtors' ability to use cash collateral here, at

10  least until those dollar amounts that they own are identified.

11      Another point that I'll just address here was that

12  where -- some of the parties have asserted that there's this

13  apparent loss of revenue or loss of money because the balance

14  in the revenue account decreases.  That's not really an

15  accurate statement of what has actually occurred here.

16      We've clearly identify where other revenue parties

17  have been paid, and while that balance decreases, it doesn't

18  decrease past the point where, you know, we have our starting

19  balance, and then the payments to the other revenue parties for

20  the January and February amount.  And on top of that, it

21  doesn't take into consideration that we're paying out all of

22  that March revenue directly to those interest holders, right?

23  It's going to the working interest, including Sklarco.  It's

24  going to the other royalty interests and the other overriding

25  royalty interests.

1   So that's not really a loss of revenue to the debtor

2 where that balance is decreasing because, again, that's --

3 we're paying them out of that account.

4   Another point that I'll address, as well, is that

5 Kudzu has said, look, they're going to have a very hard time

6 assuming our joint operating agreement because they're going to

7 have to cure all these defaults, including some monetary

8 defaults, and that motion to assume is going to be forthcoming.

9   Well, I am having a difficult time seeing how we can

10 get to a motion to assume when Mr. Geno has also said, you

11 know, shut these companies down, deny them the use of cash

12 collateral.  I don't know if we do get to a motion to assume at

13 that point.

14   This really is a situation where, to a certain

15 extent, they're, as Your Honor said, cutting off their nose to

16 spite their face.

17   They have -- they have an interest in these wells.

18 We're still pulling up oil and gas.  If we can't pay the

19 electricity bill, there's no oil and gas coming out of the

20 ground.  If we can't pay the employees at these various

21 operations, there's not going to be any oil and gas coming out

22 of the ground.  If they can't pay the ongoing trucking

23 expenses, it's not going to be able to make it to the

24 purchasers.

25   There's never going to be a point where we can even

1  start to look at some of these joint operating agreements if we

2  can't pay the necessary suppliers to pull oil and gas out of

3  the ground (indiscernible - weak bandwidth) next two weeks.

4        There's no question that people are upset, and we

5  recognize that; we do.  But we are really doing -- taking big

6  strides here to try to give them adequate protection of what

7  their interests are under the Bankruptcy Code and ensure that

8  those interests remain adequately protected going forward, to

9  the extent that they have them.  That's why we have replacement

10 liens, why we're bringing in a CRO, that's why we're continuing

11 to work with the bank and the Committee to provide them the

12 information that they're requesting, so that they can take the

13 actions necessary here, as well.

14       We've also provided significant information to these

15 working interest holders.  So, you know, the information that

16 we're providing is not just limited to these two parties.  It's

17 -- we have this data room established, and information is being

18 provided there, as well.

19       And so, Your Honor, we do believe that this entry of

20 the third interim order is necessary here to at least maintain

21 the operations for really what's basically 12 days at this

22 point, so that we can continue to work through these issues,

23 and so that many of these parties can start to fully evaluate

24 and assert their rights under the Bankruptcy Code that they are

25 provided.

1          Thank you.

2          THE COURT:  Thank you.  All right, I will take this

3   matter under advisement, and before the end of the week, I will

4   issue a ruling on this.

5          I recognize that your use of cash collateral ended on

6   Monday.  So, you know, everything's kind of frozen here until

7   the Court rules, so let's just remember that.

8          Okay, all right.  Thank you, all.  You all did a

9   marvelous job presenting your arguments and your evidence, and

10  you're to be commended, and you did it all on Zoom, which is

11  quite a feat.  So I appreciate all your patience as we work

12  through the technology.

13         I will probably issue a notice of the oral ruling so

14  that you can all phone in for that sometime later this week,

15  okay?

16         Thank you.

17         MULTIPLE SPEAKERS:  Thank you, Your Honor.

18     (Whereupon, at 4:32 p.m., the hearing was adjourned.)

19

20

21

22

23

24

25

238

1
2
3
4
5
6                    CERTIFICATE OF TRANSCRIBER

7

8       I, KAREN HARTMANN, a certified Electronic Court

9   Transcriber, certify that the foregoing is a correct transcript

10  from the electronic sound recording of the proceedings in the

11  above-entitled matter.

12

13  *[signature: Karen Hartmann]*

14

15  Karen Hartmann, AAERT CET 475  Date:  May 15, 2020

16  TRANSCRIPTS PLUS, INC.

17
18
19
20
21
22
23
24
25