UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 20-12377-EEB |
| SKLAR EXPLORATION COMPANY, LLC ) | |
| EIN: 72-1417930 ) | Chapter 11 |
| ) | |
|    Debtor. ) | |
| _____ ) | |
| ) | Case No. 20-12380-EEB |
| SKLARCO, LLC ) | |
| EIN:  72-1425432 ) | Chapter 11 |
| ) | |
| Debtor. ) | |

**BRIEF REGARDING SKLARCO, LLC'S ASSUMPTION OF JOINT OPERATING AGREEMENTS AND UNIT AGREEMENTS REJECTED BY SKLAR EXPLORATION COMPANY, L:C**

Pursuant to the Court's Minute Order dated August 16, 2021 (Docket No. 1251), Sklarco, LLC ("Sklarco"), Sklar Exploration Company, LLC ("SEC," and with Sklarco, "Debtors"), the Official Committee of Unsecured Creditors (the "Committee"), and East West Bank, a California banking corporation ("EWB"), jointly submit this brief in support of assumption by Sklarco of the relevant operating agreements and unit agreements previously rejected by SEC. The parties respectfully submit that Sklarco may lawfully assume the relevant agreements and that the Debtors' joint plan of reorganization may be promptly confirmed.

**Factual Background**

1.  The Debtors filed for relief under chapter 11 of the Bankruptcy Code on April 1, 2020. The Debtors remain Debtors-in-Possession. No trustee or examiner has been appointed in the Chapter 11 Cases. The Debtors continue in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.  SEC is engaged in business as an independent exploration and production company in the oil and gas industry. SEC is an operating company and does not own oil or gas properties. SEC has its principal business office in Boulder, Colorado and has additional offices in Shreveport, Louisiana and Brewton, Alabama. SEC's exploration and production activities are primarily located in East Texas, North Louisiana, South Mississippi, South Alabama and the Florida Panhandle. SEC is also developing properties and opportunities in the western United States,

though no oil or gas production has been produced from the wells in the western United States.

3. Sklarco is a Louisiana limited liability company engaged in business as the owner of certain oil and gas leases and property interests in East Texas, North Louisiana, South Mississippi, South Alabama, the Florida Panhandle, and the western United States.

4. The oil and gas interests owned by Sklarco are primarily comprised of working interests in a variety of properties, but also include overriding royalty interests and royalty interests. The oil and gas assets further comprise almost all of the value of Sklarco's estate, and the only means by which Sklarco generates revenue, and will continue to generate revenue to pay creditors under the proposed *Second Amended and Restated Joint Plan of Reorganization* (Docket No. 1251) ("Plan").

5. Operations of each of the oil and gas properties in which Sklarco holds an interest is governed by an operating agreement or unit operating agreement, commonly referred to as a "JOA". The JOAs are multiparty agreements between the various operators and the working interest owners, resulting in a dozen or more parties to the various agreements, with an even greater number in the larger, more complex unit agreements.

6. Each of the JOAs contemplates a transfer of the interests to new working interest owners, and provides a mechanism by which parties may replace the operator of any given oil and gas properties, notwithstanding the fact that the operator is also a signor to the agreement, and a mechanism whereby working interest owners ("WIOs") may select a replacement operator upon resignation or removal. By way of example, in the Escambia Prospect JOA, attached hereto as Exhibit A, provides:

> 1. Resignation or Removal of Operator. Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence . . . or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.
>
> . . . .
>
> 2. Selection of Successor Operator. Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. . . .

7. Resignation or removal of an operator or transfer of a WIO's interest to a new party does not require the operator or various WIOs to enter into an entirely new agreement. Rather the

interest is transferred subject to the existing JOA, and the new party would be bound by the JOA to the same extent as the former operator, in the case of a replacement operator, or a new WIO in the event of a sale of an interest. *See* Ex. A at 12, § D.

8. Furthermore, because most oil and gas wells are producing for decades, it is not uncommon for operators to change multiple times, and for oil and gas interests to be sold or conveyed, all while the initial JOA remains in full force and effect. By way of example, the JOA for the Harrison E GU 1 well located in Gregg County, Texas (Ex. 1 to Docket No. 997) was originally formed in 1983, almost 20 years before SEC and Sklarco were formed, and lists Cities Service Oil and Gas Corporation as Operator, but the property is currently operated by EOG Resources, Inc. (Docket No. 997, ¶ 3).

9. Between February 23, 2021 and March 2, 2021, Sklarco filed approximately 111 Motions to Assume, seeking authorization to assume the respective Operating Agreements and Unit Agreement for wells operated by SEC and wells operated by third-party operators in which Sklarco holds a working interest.

10. The following Motions to Assume are currently pending before the Court, with the current operator of the property:

| Docket No. | Property/Well Name | Operator |
|---|---|---|
| 847 | Findley 2-5 | Fletcher Petroleum |
| 855 | Southwest Brooklyn Oil Unit | SEC |
| 857 | Southeast Brooklyn Oil Unit | SEC |
| 859 | Northwest Brooklyn Oil Unit | Pruet Petroleum Co. |
| 863 | Fish Pond | SEC |
| 865 | Silver Creek | SEC |
| 867 | Pate | Fletcher Petroleum |
| 869 | South Harmony | SEC |
| 881 | Kings Dome | SEC |
| 883 | Shipps Creek | SEC |
| 885 | South Woodlawn | SEC |
| 887 | LCCOU II | SEC |
| 889 | LCCOU IV | SEC |
| 892 | Mt. Carmel | SEC |
| 894 | East Caster | SEC |
| 897 | Gibsland | SEC |
| 899 | Red River Participation & Operating Agreement | SEC |
| 901 | West Arcadia Exploration Agreement | SEC |

| 903 | North Beach Participation & Operating Agreement | SEC |
|---|---|---|
| 906 | West Tyler/Swan Participation & Operating Agreement | SEC |
| 908 | Escambia Participation and Operating Agreement | SEC |
| 910 | Oakhay Creek | SEC |
| 914 | Brown Heirs | Sugar Creek Producing Co. |
| 915 | North Gahagan | EnCana Oil & Gas, Inc. |
| 916 | Yarbrough | Black Bird (O'Brian Energy) |
| 917 | Grayson | O'Brian Energy Company |
| 919 | Droke #1 & A-1 | Harmon Operating Company |
| 918 | Canty #1 | Par Minerals Corporation |
| 920 | Guill Gas Unit | Samson Lone Star L.P. |
| 921 | Dupont 38 | Brammer Engineering, Inc. |
| 922 | Wardner | Marathon Oil Company |
| 923 | Young L-1 | Nadel & Gussman |
| 924 | Shugart West 31 | Devon Energy Production |
| 932 | Paluxy B Sand Unit | Goodrich Petroleum Co. |
| 933 | Dorcheat Unit | Rosetta Resources |
| 934 | Bellwood Lake Unit | J-O'B Operating Company |
| 935 | Black Field Unit | Chesapeake Exploration, Ltd. |
| 936 | Schumann | LeClair Operating Co., Inc. |
| 937 | Kelly-Lincoln | Chevron U.S.A. |
| 938 | Mary T. Havens | Vernon E. Faulconer |
| 939 | Clarksville Cotton Valley | St. Mary Land & Exploration Co. |
| 940 | McWhorter Gas Unit | Samson Lone Star L.P. |
| 941 | Thrasher # 3 | The Houston Exploration Co. |
| 942 | Thrasher #4&5 | The Houston Exploration Co. |
| 943 | Thrasher #1 | The Houston Exploration Co. |
| 944 | Shugart West 30 | Devon Energy Production |
| 945 | Fisher Duncan | Dorfman Production Company |
| 946 | Haynesville Mercantile #3 | Camterra Resources, Inc. |
| 947 | Shaula 30 Fed Com 3H & 4H | Devon Energy Production |
| 948 | Denmon #1 | Cobra Oil and Gas Corporation |
| 949 | Horning A Lease | John O'Farmer, Inc. |
| 950 | Miami Fee #11 | Goodrich Petroleum Co. |
| 951 | Miami Fee #1 | Goodrich Petroleum Co. |
| 952 | Taylor Heirs #11-1 | Marathon Oil Company |
| 953 | Stephens #4 | The Houston Exploration Co. |
| 954 | Toler #2 | The Houston Exploration Co. |
| 955 | Toler #1 | The Houston Exploration Co. |
| 956 | Harrison GU E#11 | EOG Resources, Inc. |
| 957 | Stephens #3 | The Houston Exploration Co. |
| 958 | Pate 10-1 #1 | Fletcher Petroleum Corporation |

4

| 959 | McKenzie N.D. Sec. 27&34 | QEP Energy Company |
|---|---|---|
| 960 | McKenzie N.D. Sec. 28 &33 | Helis Oil & Gas Company |
| 961 | McKenzie N.D. Sec. 29 & 32 | QEP Energy Company |
| 962 | McKenzie N.D. Sec. 28 | Helis Oil & Gas Company |
| 963 | Toby Horton GU # 1-12 | Burlington Resources |
| 964 | W.M. Stevens #1 & #2 | EOG Resources, Inc. |
| 979 | Fairway (James Lime) | Hunt Oil Company |
| 980 | Cottle-Reeves | Anadarko Petroleum Corporation |
| 981 | B.H Clements #1 | Plains Marketing |
| 982 | Evans J #1 | Nadel & Gussman |
| 983 | Stockton #1 | J-O'B Operating Company |
| 984 | Coquina Waterflood Unit | Rodessa Operating |
| 985 | Ellen Graham #1 | O'Brian Energy Company |
| 986 | Francis #1, #2, #3 | Fuller Production, Inc. |
| 987 | Kuehne Ranch Unit | Helis Oil and Gas Company |
| 988 | W.C. Williams Leases | Classic Oil & Gas, Inc. |
| 989 | Clayton-Franks | Questar |
| 990 | Smith Estate #1 | Cypress Operating, Inc. |
| 991 | Robinson #1 | Sugar Creek Producing Co. |
| 992 | Brown A-3 | Sugar Creek Producing Co. |
| 993 | R.L. Bond No. 1 | Marathon Oil Company |
| 994 | Hairgrove #1 and #2 | Clayton Williams |
| 995 | Williamson #3 | Energen Resources, MAQ, Inc. |
| 996 | Deason #1 | Shelby Operating Company |
| 997 | Harrison E GU 1 | EOG Resources, Inc. |
| 998 | Cooke J.W. #2 | Anadarko Petroleum Corporation |
| 999 | Lillie J. Price | Samedan Oil Corporation |
| 1000 | Lohman #1 | Phillips Energy |
| 1001 | H.B. Frost Gas Unit | Anadarko Petroleum Corporation |
| 1002 | Beall, R#1 | Samson Lone Star L.P. |
| 1003 | C.W. Lee | Samson Lone Star L.P. |
| 1004 | West Grice Unit 17-13 #1 | Zadeck Energy Group, Inc. |
| 1005 | Harrison C-1 | EOG Resources, Inc. |
| 1006 | HB Frost Unit #23H | Anadarko Petroleum Corporation |

11. SEC has rejected all of the JOAs to which it is a party, and is currently in the process of resigning as operator, facilitating the selection of a new operator through establishment of data rooms and sending out ballots for elections, and transitioning to a new, duly selected successor operator following the voting in accordance with the applicable JOAs and State Law.

12. Sklarco seeks to assume all of the operating agreements to ensure that its interests are preserved and maintained, and the value of its estate is preserved for the benefit of creditors under the Plan.

13. A number of objections were raised to some of the assumption motions, and where either resolved by Stipulation, or through a withdrawal of the objection. The objections generally argued that Sklarco owed a cure obligation as a result of the alleged non-payment of cash call advances. While these objections are no longer at issue, Sklarco intended to establish at trial that on a pre- and post-petition basis, Sklarco has historically contributed a majority of its revenue to fund SEC's ongoing operations, far in excess of its required payments for joint interest billing obligations and any cash calls it may have been required to fund, such that in November 2019, Sklarco had an intercompany credit with SEC in an amount greater than $30 million.

14. SEC and Sklarco remain separate and distinct parties to the various JOAs for those properties operated by SEC, with differing rights and responsibilities under the applicable contract. As set forth more fully herein, because the various JOAs to survive regardless of the rejection of the JOAs by SEC, Sklarco may still assume all of the JOAs to which it is a party, and assumption is a sound exercise of Sklarco's business judgment and in the best interests of Sklarco, creditors, and the Debtors' estates.

## **Sklarco May Assume Agreements Rejected by SEC**

15. What happens when two debtors in separate bankruptcy cases are contract counterparties and make contrary decisions about whether to reject or assume their contract? The law is clear that as long as each debtor exercises valid business judgment, each may make that decision for itself. Nothing in the Bankruptcy Code makes one debtor's assumption contingent on assumption by the other, nor precludes assumption by one of the debtors if the other rejects. *See generally In re Noranda Aluminum, Inc.*, 549 B.R. 725, 733 (Bankr. E.D. Mo. 2016) (approving rejection by one debtor when the other assumes the same agreement, and declining "the invitation to add a special provision to Bankruptcy Code § 365 when Congress has elected to do so for other types of contracts or leases"). Situations may arise in which rejection by one debtor makes assumption by the other difficult as a practical matter, but as discussed below, that is not the case here.

16. Generally, if a debtor decides in its good-faith business judgment that assumption of a particular contract is beneficial to the estate, assumption should be approved. *See In re Mile*

6

*High Medal Systems, Inc.*, 899 F.2d 887, 896 (10th Cir. 1990); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986). There is no dispute that Sklarco has exercised valid business judgment in deciding to assume the agreements at issue. Those agreements define Sklarco's contractual rights with respect to its mineral interests and the revenues to which Sklarco is entitled.

17. SEC's decision to reject those same agreements does not diminish Sklarco's rights and means only that SEC is deemed to have breached the agreements on a prepetition basis. *See Sunbeam Products, Inc. v. Chicago American Manufacturing, LLC*, 686 F.3d 372, 377 (7th Cir. 2012) ("What § 365(g) does by classifying rejection as breach is establish that in bankruptcy, as outside of it, the other party's rights remain in place."). Outside of bankruptcy, a breach does not eliminate the rights the contract has conferred on the non-breaching party. Rejection of an agreement in bankruptcy similarly may not have that effect. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. Colo. L. Rev. 845, 848 (1988) ("Rejection does not change the substantive rights of the parties to the contract or lease . . . ."). Rather, upon rejection "the [rejecting] debtor's unfulfilled obligations are converted to damages . . . . But nothing about this process implies that any rights of the other contracting party have been vaporized." *Sunbeam Prods.*, 686 F.3d 377.

18. As the Supreme Court recently reiterated, "[a] rejection does not terminate the contract. When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1662 (2019). Indeed, multiple courts have recognized that when a debtor rejects a contract, parties may not want the contract to be terminated, particularly where termination of an agreement would impact the property interests defined in the contracts, as is the case here. *See In re Continental Airlines*, 981 F.2d 1450, 1459-60 (5th Cir. 1993); *In re El Paso Refinery, L.P.*, 220 B.R. 37, 45-46 (Bankr. W.D. Tex. 1998).

19. Nothing in the Bankruptcy Code suggests an exception to these principles when the counterparty to a rejected contract happens to be a debtor in bankruptcy. *See Noranda Aluminum*, 549 B.R. at 730 (concluding "there is no specific statutory provision providing special treatment" for contract rejection/assumption decisions simply because both parties to the contract are in bankruptcy).

20.     Indeed, such an exception would severely prejudice a debtor who wishes to assume an agreement rejected by a debtor counterparty, solely because it is in bankruptcy. *See Tempnology*, 139 S. Ct. at 1663 ("A debtor's property does not shrink by the happenstance of bankruptcy . . . .") (quoting D. Baird, Elements of Bankruptcy 97 (6th ed. 2014)). Such exception is not only contrary to the rehabilitative objectives of bankruptcy but would write a non-existent provision into the Bankruptcy Code providing for less favorable treatment of a debtor compared to similarly situated non-debtors. *See Noranda Aluminum*, 549 B.R. at 733 (Bankr. E.D. Mo. 2016) (refusing "to add a special provision to Bankruptcy Code § 365" when parties to an agreement are both debtors).

21.     The agreements at issue here illustrate the point. Upon SEC's rejection of a JOA, the working-interest-holder counterparties who are non-debtors unquestionably retain their prospective rights under the JOA. As set forth above, they have the right, for example, to elect a replacement operator, and they retain any rights to receive prospective distribution of revenue attributable to their respective interests from that operator (including SEC, despite SEC's rejection of the agreements). Certainly the non-debtor working interest holders will not risk losing or be deemed to have relinquished their valuable working interests simply because SEC has rejected the JOA. Precluding Sklarco from assuming the JOA, however, could effectively do just that.[1] Stated differently, Sklarco runs the risk that its rights will "have been vaporized," *Sunbeam,* 686 F.3d at 377, in violation of the letter and spirit of section 365 simply because Sklarco is a debtor in possession and a different debtor has rejected (*i.e.*, breached) its end of the agreement.

22.     The Bankruptcy Court for the Eastern District of Missouri squarely addressed a competing assumption/rejection scenario between two debtors in *In re Noranda Aluminum, Inc.*, 549 B.R. 725 (Bankr. E.D. Mo. 2016). In that case, the Missouri debtor, Noranda Bauxite Ltd. ("Noranda"), sought to reject an onerous sales agreement under which it was required to provide aluminum-production materials to the counterparty, Sherwin Alumina Co., LLC ("Sherwin"), a debtor with its own chapter 11 case pending in the Southern District of Texas. Sherwin had moved to assume the relevant agreement in its bankruptcy case and objected to Noranda's rejection motion, arguing that rejection would force Sherwin into liquidation and cause its 575 employees to lose their jobs. Sherwin contended the situation created "an extraordinary case meriting

---

[1] Rejection by Sklarco would constitute a pre-petition breach of contract and manifest an intent not to perform prospectively under the agreements. The JOAs provide remedies for non-performance that include enhanced damages and penalites, as well as foreclosure of the breaching party's working interests.

application of a heightened standard to the business judgment rule for rejection because one debtor sought to assume the agreement on the first day of its case and the other debtor sought to reject the agreement the first day of its case." *Id.* at 729.

23. The bankruptcy court disagreed. Although the court acknowledged that "both parties are debtors in Chapter 11 cases" and "both face the real prospect of liquidation," the court declined "the invitation to add a special provision to Bankruptcy Code § 365 when Congress has elected to do so for other types of contracts or leases or to impose a heightened standard for rejection where none is merited." *Id*. at 733. The court concluded that the fact the counterparty to a contract is also a debtor should not influence a bankruptcy court's decision under section 365, and granted Noranda's motion despite the contrary position of Sherwin. *Id*.

24. The same principles apply here, and with even greater force, as no other party (including SEC) opposes Sklarco's assumption of the relevant agreements. Unlike the two-party contract in *Noranda Aluminum*, these multi-party agreements are not doomed to failure by SEC's rejection. To the contrary, the working interest holders are already in the process of selecting a replacement operator, and SEC is proactively working through the transition and will continue to do so, as required under the Plan. In short, SEC's rejection creates no legal or practical impediments to Sklarco's assumption.

### The Cases of *In re Railyard Co.* and *In re Patriot Place, Ltd*. Support Assumption

25. In its minute entry, the Court identified two decisions that articulate potential issues with "dueling debtors." Under the facts at hand, however, those decisions support rather than undermine or prohibit Sklarco's assumption motions.

26. In the case of *In re Railyard Co*., 562 B.R. 481, 488 (Bankr. D.N.M. 2016), the chapter 11 trustee of a landlord's bankruptcy estate sought to reject an onerous lease that, along with myriad additional problems, provided "sweetheart" benefits to an insider tenant. The principals who controlled the landlord debtor prior to the trustee's appointment caused the tenant, which they also controlled, to file a voluntary chapter 11 "to delay possible rejection of the Lease." *Id*. at 486. The trustee sought stay relief in the tenant's case to proceed with an evidentiary hearing on the trustee's rejection motion. The tenant opposed the trustee's stay relief motion and rejection, arguing that its tenancy and the various improvements it had made would ultimately benefit the landlord debtor's estate. *Id*. Despite "unhappy alternatives," the court concluded that it had "no

9

choice but to approve rejection of this particular Lease," as the trustee had satisfied the applicable legal standard under section 365 of the Bankruptcy Code. *Id*. at 488.[2]

27. Notably, the *Railyard* court cited *Noranda Aluminum* for the unremarkable proposition that "a tenant debtor's attempt to assume a lease does not affect the landlord debtor's ability to reject the lease." Id. at 487. The converse is equally true: One debtor's rejection of a contract does not affect a second debtor counterparty's ability to assume the contract. To hold otherwise would put the assumption/rejection decision in the hands of a party other than the debtor in possession in violation of the Bankruptcy Code. *See*, *e.g.*, *In re G. Force Investments, Inc.*, 442 B.R. 646, 649 (Bankr. N.D. Ohio 2010) ("whether the estate should seek to assume or reject an executory contract or lease lies within the sole discretion of the trustee or the debtor-in-possession"). There may be practical difficulties with assumption in certain situations, but nothing in the Bankruptcy Code legally precludes assumption of an agreement that has been rejected by a different debtor, and there are not practical difficulties in this case that would preclude assumption by Sklarco after rejection of the contract by SEC. We are not aware of any caselaw holding to the contrary.

28. Furthermore, the present case and the contracts at issue are highly distinguishable from the contracts at issue in *Railyard* and *Noranda*. In each of those cases, the contracts at issue were two party contracts, and the decision by one party to reject the contract necessarily resulted in a direct impact to the other party's ability to operate under the contract upon assumption. In contrast, the JOAs are multi-party contracts that are created to survive the resignation or removal of an operator without impacting the WIO's ability to continue to perform under the applicable JOAs. Indeed, operators for some of these properties have been changed previously without impacting the rights of the respective WIOs. As a result, the situations at issue in *Railyard* and *Noranda* are inapplicable here.

---

[2] In an unfortunate aside, the *Railyard* court observed that "[t]o the extent [the tenant] resists stay relief because it wishes to assume the Lease in its own bankruptcy case, the objective is futile." *Railyard Co.*, 562 B.R. at 487. The court's statement was hypothetical and is clearly dicta. The tenant had not yet sought to assume the lease, and the issue was not before the court. To the extent the court was suggesting rejection by one debtor precludes assumption by a separate debtor counterparty as a matter of law, the court's dicta is inaccurate and unsupportable. The tenant debtor would have the rights of any other tenant of a rejected lease (subject to avoidance actions or other claims). Although assumption by the tenant could not force the landlord to assume or restore the lease, the tenant debtor would have its rights under section 365(h)(1), for example, and assumption could have been approved to preserve those rights. The court appears, however, to have left such issues for later determination in the context of an actual controversy if properly raised by the parties. *See id*. at 489 ("[B]ecause issues related to post-rejection possession were not expressly plead or litigated, the Court will not rule on them now.").

29. In fact, the court in *In re Patriot Place, Ltd.*, 486 B.R. 773, 780 (Bankr. W.D. Tex. 2013), approved the assumption of a lease by the debtor-tenant over the objection of the debtor-landlord. The landlord, Patriot Place Ltd. ("PPL"), proposed a plan in its bankruptcy case that included a sale of the leased property "free and clear" of the leasehold interests of tenant Three Legged Monkey L.P. ("3LM"), which had filed its own voluntary bankruptcy petition. 3LM opposed PPL's plan, moved to assume the lease in its own bankruptcy case, and filed a competing plan in PPL's case. The court consolidated plan confirmation and lease assumption issues to consider the competing interests of the two debtors.

30. After holding evidentiary hearings, the court denied confirmation of both plans but approved 3LM's assumption of the lease, concluding that 3LM had met the applicable requirements for assumption. In its analysis, the court did not even remotely suggest the landlord held a trump card that would preclude 3LM's assumption of the lease. To the contrary, the court concluded that any plan purporting to make the assumption/rejection decision for the opposing debtor was unconfirmable. *Id.* at 810-11; *see also In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10 (Bankr. D. Kan. 2001) (denying a debtor-landlord's competing plan that provided for assumption of the debtor-lessee's ground lease because under § 365(a), only the tenant-debtor "ha[d] the discretion to assume or reject the lease").

31. Both *Railyard* and *Patriot Place* are consistent with Sklarco's assumption of the relevant agreements in this case. Both decisions make clear that a debtor's decision to assume or reject a contract cannot be made subject to a different debtor's discretion. Both decisions employ the same standards applicable to any assumption/rejection motion, without regard to a second debtor being on the other end of the contract. And both decisions approved the requested assumption or rejection over the objections of a competing debtor. Based on *Railyard* and *Patriot Place*, Sklarco's assumption motions should be approved.

### Sklarco Is Entitled to Assume the Agreements Forthwith

32. SEC's rejection "has absolutely no effect upon the contract's continued existence." *Sunbeam Prods.*, 686 F.3d at 377 (quoting *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir.2007)). It is axiomatic that a debtor who assumes an executory contract takes it *cum onere*. *See In re Godwin Bevers Co., Inc.*, 575 F.2d 805, 807 (10th Cir. 1978). Thus, it is legally irrelevant whether Sklarco assumes the agreements now, after a replacement operator is approved, or at some other time. As a practical matter, however, it benefits all creditors for Sklarco

to assume the agreements forthwith so that the plan may be confirmed, the Debtors' cases brought to resolution, and further creditor recoveries pursued.

33. The cost to remain in bankruptcy is enormous,[3] and the mineral assets are non-replenishing. The parties submit that there is no cause to delay assumption of the agreements or confirmation of the plan.

WHEREFORE, the parties respectfully request that the Court enter orders authorizing Sklarco to assume the various operating agreement and unit operating agreement, and confirming the *Second Amended and Restated Joint Plan of Reorganization*.

Dated: August 20, 2021

Respectfully submitted,

By: /s/ Keri L. Riley
Keri L. Riley, #47605
**KUTNER BRINEN DICKEY RILEY, P.C.**
1660 Lincoln St., Suite 1850
Denver, CO 80264
Tel: 303-832-2400
E-mail: klr@kutnerlaw.com
*Counsel for the Debtors*

By: /s/ Christopher D. Johnson
Christopher D. Johnson
**MUNSCH HARDT KOPF & HARR, P.C.**
700 Milam Street, Suite 2700
Houston, Texas 77002
Telephone: (713) 222-1470
Facsimile: (713) 222-1475
cjohnson@munsch.com
*Counsel for the Official Committee Of Unsecured Creditors*

By: /s/ Bryce A. Suzuki
Bryce A. Suzuki
**SNELL & WILMER L.L.P.**
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Phone: 602-382-6000
Email: bsuzuki@swlaw.com
*Counsel for East West Bank*

---

[3] EWB previously explained that "burn rate" is $300-500,000 per month to remain in chapter 11. (Docket No. 1340) An additional delay of even 60 days could cost the estates a million dollars or more. Although operational expenses will continue post-confirmation, the appointment of the Independent Manager, the establishment of the Creditor Trust, and other plan structures should greatly mitigate professional fees, thereby providing a greater recovery to creditors.