# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re:<br>Sklar Exploration Company, LLC,<br>Debtor. | Case No. 20-12377 EEB<br>Chapter 11 |
| In re:<br>Sklarco, LLC,<br>Debtor. | Case No. 20-12380 EEB<br>Chapter 11<br>**Jointly Administered Under<br>Case No. 20-12377 EEB** |
| Pruet Production Co., in its individual capacity and as agent and attorney-in-fact for certain working interest owners,<br>Plaintiff,<br>v.<br>Sklar Exploration Company, LLC,<br>Defendant, and<br>East West Bank,<br>Intervenor. | Adversary Pro. No. 21-01052 EEB |

## ORDER DECLARING RIGHTS TO RECOUPMENT AND SETOFF

THIS MATTER comes before the Court on cross motions for summary judgment. The parties dispute whether Plaintiff Pruet Production Co. ("**Pruet**") has the right to offset its prepetition claim against the postpetition debt it owes Debtor-defendant Sklar Exploration Co. ("**SEC**" or "**Debtor**") under the theory of recoupment. East West Bank (the "**Bank**") has intervened in this action because it asserts a security interest in all the Debtors' prepetition assets as well as its postpetition accounts to the extent permitted by the cash collateral order in this case.

## I.  INTRODUCTION

On the petition date, SEC was engaged in the business of operating fifty oil and gas wells located throughout Texas, Louisiana, Mississippi, Alabama, and Florida.[1]  In operating these wells, the Debtor has served the interests of a number of different property interests, including royalty interests, overriding royalty interests, and working interests.  Generally speaking, royalty interests and overriding royalty interests receive royalty payments as a percentage of oil and gas production and are not required to contribute toward payment of operating costs.  *See Elm Ridge Exploration Co., LLC v. Engle*, 721 F.3d 1199, 1204 (10th Cir. 2013).  The working interest owners, however, do have an obligation to pay a proportionate share of the costs.  *Id.*  And they are typically only entitled to receive a portion of the revenue after the operator's prior payment to royalty and overriding royalty interests.

Pruet appears in this action on both its own behalf and as agent for a number of other working interest owners.  In such capacities, it owns working interests in seven different Debtor-operated oil and gas properties.  Prior to the bankruptcy, it paid the Debtor a proportionate share of the costs of operation for each property and in exchange received from the Debtor its share of revenues.  At least that was true until shortly before the Debtor's bankruptcy filing, when the Debtor defaulted on its revenue-distribution obligations.  Recently, Pruet has stopped paying its share of postpetition costs otherwise owed to the Debtor.  In this action, Pruet seeks to utilize the doctrine of recoupment to offset these pre- and postpetition obligations.  In the alternative, Pruet has asserted in its Complaint that it holds a right of set off under 11 U.S.C. § 553.[2]  The Debtor and the Bank seek a declaration that no such right exists.

## II.  DISCUSSION

### A.  Recoupment and Setoff

Setoff and recoupment have a long and intertwined history.  Although often described as distinct legal concepts, some use these terms interchangeably to refer to the offset or netting out of opposing claims between two parties.  Historically, both concepts developed to avoid the "circuity of actions" or avoiding "the absurdity of making A pay B when B owes A."  *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see* A.M., *Recoupment*, Am. L. Reg. 321, 323 (1860); William H. Loyd, *The Development of Set-off*, 64 U. Pa. L. Rev. 541, 569 (1916).  Under the common law system of pleading, which had rigid rules aimed at focusing each suit on a single issue, parties often had to bring two lawsuits to resolve their differences instead of joining both claim and defense or counterclaim in the same suit.  For example, if A and B had entered into a contract under which B agreed to purchase goods from A at a certain price and B failed to pay, A had to sue B for the unpaid purchase price in one lawsuit.

---

[1] Debtor Sklarco, LLC does not act as an operator.  Instead, Sklarco holds working interest in several oil and gas wells, some of which are operated by SEC.

[2] All references hereafter to "§" or "section" shall be references to Title 11, United States Code, unless expressly stated otherwise.

2

But if B alleged that some of the goods were defective, B could not raise that as a defense in the same action. *See Recoupment*, 7 Am. L. Rev. 389, 401-02 (1873). The doctrine of recoupment developed to avoid this multiplicity and allowed B to raise his defense against A in the same action. *Id*.

In its early history, courts limited the application of recoupment to claims involving liquidated debts and to those arising under contract (not torts). In some instances, courts prohibited a defendant from asserting recoupment where his damages exceeded those of the plaintiff. Eventually, courts eased these restrictions. But recoupment has and continues to require a showing that the claims asserted by both parties arise from the same transaction.

The concept of setoff developed from similar practical notions. Although initially somewhat limited under English common law, setoff eventually developed in America to permit a defendant to assert a counterclaim growing out of an independent transaction as an offset to the plaintiff's claims. Like recoupment, setoff was initially limited in some instances to liquidated claims and to claims arising under contract, but those limitations eventually disappeared as well.

The key difference between recoupment and setoff revolves around whether the opposing claim or defense arises independently or from the same transaction. Setoff allows a defendant to assert offsetting claims arising from independent transactions, whereas recoupment was limited to those claims arising from the same transaction alleged by the plaintiff. This distinction carried through when recoupment and setoff formed the basis of our modern pleading rules for compulsory and permissive counterclaims, respectively. *See* 6 Arthur A. Miller, May Kay Kane & A. Benjamin Spencer, *Federal Practice & Procedure* § 1401 (3d ed. 1998). As with recoupment, a compulsory counterclaim arises from the same transaction as the plaintiff's claim, whereas a permissive counterclaim does not. *See* Fed. R. Civ. P. 13.

While recoupment and setoff have been replaced in the pleading context by the Rules of Civil Procedure, they remain distinct doctrines in bankruptcy, where these rights receive very different treatment. The Bankruptcy Code allows setoff in only very narrow circumstances. *Ashland Petroleum Co. v. Appel (In re B&L Oil Co.)*, 782 F.2d 155, 157 (10th Cir. 1986). This is in part because setoff, if unrestricted, would operate as an exception to the fundamental tenet of bankruptcy law that the petition date "operates as a 'cleavage' in time" and that once a petition is filed, debts that arose before the petition may not be satisfied through post-petition transactions." *Id.* at 158. In addition, setoff is at odds with the fundamental bankruptcy policy of equality among similarly situated creditors because it "permits a creditor to obtain full satisfaction of a claim by extinguishing an equal amount of the creditor's obligation to the debtor, i.e., in effect, the creditor receives a preference." *In re Orexigen Therapeutics, Inc.*, 990 F.3d 748, 754 (3d Cir. 2020) (internal quotation omitted); *United States v. Myers (In re Myers)*, 362 F.2d 667, 672 (10th Cir. 2004) ("In the bankruptcy context, setoff allows one creditor to be paid more than other creditors.").

3

To address these concerns, the Code limits the use of setoff, with certain exceptions, to situations in which both debts arose prepetition and where the debts are mutual. 11 U.S.C. § 553(a); *In re Myers*, 362 F.3d at 672. In addition, the automatic stay prevents the exercise of setoff "of any debt owing to the debtor that arose before commencement of the case . . . against any claim against the debtor," thus obligating a creditor to obtain relief from stay before exercising setoff rights. 11 U.S.C. § 362(a)(7).

On the other hand, the Code does grant special status to creditors with valid setoff claims. It treats a setoff claim as a secured claim. 11 U.S.C. § 506(a) ("An allowed claim of a creditor . . . that is subject to setoff under section 553 of this title, is a secured claim . . . to the extent of the amount subject to setoff . . . and is an unsecured claim to the extent that . . . the amount so subject to setoff is less than the amount of such allowed claim."). This means a creditor with a setoff right is entitled to receive "adequate protection" from a debtor to protect against diminution in the value of the creditor's interest occasioned by the debtor's use of the property in question. *Tradex, Inc. v. United States (In re IML Freight, Inc.)*, 65 B.R. 788, 791 (Bankr. D. Utah 1986). In a reorganization case, such as this one, a debtor's plan must classify and treat a setoff claim as secured. *See* 5 *Collier on Bankruptcy* ¶ 553.06[6] (Richard Levin & Henry J. Sommer eds. 16th ed. 2021).

But recoupment receives more preferential treatment. On the one hand, courts recognize that recoupment, like setoff, runs counter to the fundamental bankruptcy policies of equal treatment of like creditors and its differentiation between pre- and postpetition debts. *In re B&L Oil*, 782 F.2d at 158. Nevertheless, recoupment is not subject to the same restrictions as setoff. In fact, the Bankruptcy Code does not mention recoupment at all. A majority of courts have held that recoupment is not subject to the automatic stay. *See Beaumont v. Dept. of Veteran Affairs (In re Beaumont)*, 586 F.3d 776, 781 (10th Cir. 2009). Nor is it limited to the offsetting of prepetition debts. Thus, a creditor with a valid recoupment right may recoup a prepetition obligation against a postpetition debt and may even do so without requiring court approval.

Given this more lenient treatment, it is not surprising that creditors often assert recoupment rather than setoff when seeking to offset obligations. But if a creditor is wrong about having a right to recoup and only holds a right of setoff, then the creditor who effectuates a setoff faces possible liability for a stay violation. A wise creditor, such as Plaintiff here, will initiate an adversary proceeding seeking a court determination as to whether it holds a right of recoupment or setoff.

The Court's determination of recoupment rights will hinge on whether the opposing claims of the parties arise from the "same transaction." Facially, that test might appear clear and easily applied, but in practice it has proven to be anything but. Courts are not in agreement on the applicable test to determine obligations arising from the "same transaction." *See* 5 *Collier*, *supra*, at ¶ 553.10[1]. Some courts apply a more liberal "logical relationship test," which merely requires that the two obligations at issue have enough of a "logical relationship" that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party. *E.g. Newbery Corp. v.*

4

*Fireman's Fund Insurance Co.*, 95 F.3d 1392 (9th Cir. 1996).  Other courts, including the Tenth Circuit, apply the more restrictive "single integrated transaction test," which requires that the two obligations in question "arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations." *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3d Cir. 1992).  Under both tests, courts weigh the equities as part of their analysis.  Unsurprisingly, this has led to very different results.

Even in cases involving similar types of contracts or similar circumstances, decisions vary dramatically.  For every case allowing recoupment there is another that denies it under similar circumstances.  *See* Shalom L. Kohn, *Recoupment Re-Examined*, 73 Am. Bankr. L.J. 353, 358-64 (1999) (describing divergent opinions on recoupment in similar fact situations).  Perhaps the most common recoupment dispute arises, as this case does, from a single contract between the parties.  One could argue that there should be a bright line test that equates a single contract with a single transaction.  But contracts and business relationships are rarely so simplistic.  Do we view a multiple-year supply contract as one transaction or many separate transactions each time the buyer buys and the seller sells its product?  Do we view the duties that each party owes (the buyer to pay and the seller to deliver) as separate transactions?  Like beauty, the concept of the "single transaction" is in the eye of the beholder.

What is even more vexing for a bankruptcy judge is knowing whether its construction of the "single transaction" criteria will be subject to de novo review on appeal or, given that equities may be considered, whether it is subject to the more lenient abuse of discretion standard.  In other words, does the bankruptcy court apply what it views as the most equitable result given all that it knows about the entire bankruptcy case and the debtor's debt structure?  Or does it try to guess at what the circuit court will think are the equities as though that is a purely legal determination?

### B. Tenth Circuit Precedent

Given the great variability in recoupment case law, this Court will focus on binding Tenth Circuit precedent.  There are two key cases interpreting the "same transaction" test in the bankruptcy context: *Ashland Petroleum Co. v. Appel (In re B&L Oil Co.)*, 782 F.2d 155 (10th Cir. 1986) and *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956 (10th Cir. 1996).  The *B&L Oil* case involved an oil supply contract in which a creditor agreed to purchase crude oil produced by the debtor on a monthly basis.  Prior to the petition date, the creditor had overpaid the debtor for oil.  Postpetition, the creditor sought to recoup this prepetition debt by withholding funds the creditor owed the debtor for postpetition deliveries.  To determine whether recoupment applied, the Tenth Circuit first acknowledged that both claims arose from a single contract but concluded that that fact alone did not satisfy the same transaction test.  Rather, the Court reasoned that recoupment should be applied where the claims are so "closely intertwined" that the creditor's claim is "essentially a defense" to the debtor's claim rather than a separate obligation.  *Id*. at 157.  Applying this reasoning, the Tenth Circuit held that the creditor's overpayment was "*not* essentially a defense" to debtor's

5

claims for payment on post-bankruptcy deliveries. *Id*. at 158 (emphasis supplied). Instead, the two obligations were "easily separable and independently determinable." *Id*.

The Tenth Circuit then went on to conclude that recoupment was nevertheless permissible based on the equities of the case. Since the oil supply contract was executory and the debtor intended to assume it, the Tenth Circuit emphasized that the debtor could not "accept the benefits of an executory contract without its burdens." *Id*. at 159. Furthermore, the court noted that the creditor's overpayments were not required by the contract but were instead made by mistake. The court concluded it would be unjust for other creditors to share in the money meant to correct the creditor's mistake.

The Tenth Circuit took a decidedly more restrictive approach to recoupment ten years later in the case of *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.)*, 82 F.3d 956 (10th Cir. 1996). While still paying lip service to the *B&L Oil* case, the court explicitly adopted the more narrow "single integrated transaction" test first established by the Third Circuit in *University Medical Center. v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3d Cir.1992). In *Peterson Distributing*, the debtor was a wholesale and retail supplier of petroleum products that had entered into a franchise agreement with Conoco pursuant to which Conoco sold petroleum products to the debtor on credit, who then resold those products to its customers. The debtor paid for some of the product it purchased from Conoco by assigning credit card invoices to Conoco. Under their contractual payment arrangement, Conoco would automatically withdraw from the debtor's bank account the amount owing to Conoco for petroleum purchases on a bi-weekly basis. The amount the debtor owed was reduced automatically by the face amount of the credit card invoices assigned to Conoco. When the debtor filed for bankruptcy, it owed Conoco a debt for prepetition purchases of petroleum. Conoco owed the debtor a debt for credit card invoices assigned to it. Conoco argued it was entitled to recoup its credit card invoice debt against the amount debtor owed it for petroleum purchases.

The Tenth Circuit construed the "same transaction" test narrowly as follows: "for claims to arise from the 'same transaction' for the purposes of recoupment both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id*. at 960 (internal quotation omitted). The fact that both claims arose out of one contract was not enough, by itself, to satisfy the test. *Id*. Instead, the claims must be "so closely intertwined that allowing the debtor to escape its obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all unsecured creditors share equally in the debtor's estate." *Id.*

The debtor's franchise agreement with Conoco did not meet this narrow test. That contract, rather than constituting one transaction, the Tenth Circuit concluded, provided for several kinds of related but separate transactions that would occur over the course of the parties' business relationship. Two of those separate transactions were the sale of petroleum products to the debtor and the debtor's assignment of credit card invoices. In determining that these were separate transactions, the Tenth Circuit

6

focused on the fact that the debtor's assignment of credit cards invoices did not directly pay for the Conoco petroleum products it purchased. Rather, Conoco maintained an account for the debtor that it adjusted on a bi-weekly basis. It credited the amount of assigned credit card invoices (which arose from both Conoco product sales and other sales) to the debtor's account. Depending on the status of the account at the time, particular invoices might be applied to pay off the debtor's previously incurred debt. If the debtor assigned invoices in an amount than was greater than its debt for petroleum products, then Conoco would pay the debtor for the surplus. The Debtor could elect not to assign any credit card invoices to Conoco even while continuing to purchase petroleum products from Conoco. Indeed, after the petition date, Conoco required the Debtor to pay cash for petroleum products. These factors led the Tenth Circuit to conclude that "assignments of the credit card invoices cannot be viewed as part of the same transaction as Conoco's sale of products to [debtor], notwithstanding the fact that a single integrated contract governed the rights of both parties with regard to both transactions." *Id*. at 963.

The Tenth Circuit went on to determine that there were no overriding equitable reasons to apply recoupment. Unlike the contract at issue in the *B&L Oil* case, the franchise agreement would not be assumed by the debtor. Thus, the equitable principle of "accepting the benefits and burdens" of a contract did not apply. If any party would be unjustly enriched by recoupment, the court noted, it would be Conoco. This is because recoupment would essentially give Conoco a security interest in the assigned credit card invoices that it did not bargain for and that was unknown to and undiscoverable by other unsecured creditors. The court concluded that, if Conoco desired to stand in front of other creditors with respect to the credit card invoices and their proceeds, it should have perfected a security interest under the Uniform Commercial Code. The court saw no reason to allow Conoco a windfall at the expense of the other unsecured creditors.

Based on this precedent, this Court discerns three interrelated inquiries that guide a recoupment analysis in a case involving a contract. First, the fact that the two claims arise from one contract is not determinative. Instead, a court must consider whether the claims are so closely intertwined that they constitute a single integrated transaction or are separate transactions that are independently determinable. There is no bright line boundary between these two possibilities. Rather, as described by one commentator, it is more of a "sliding scale." Shalom L. Kohn, *Recoupment Re-Examined*, 73 Am. Bankr. L.J. 353, 370 (1999). "The more integral the connection between the claims asserted by and against the creditor, the more the creditor should be permitted to net them, and have only the difference between those claims subjected to the bankruptcy process. . . . [and] the more attenuated the connection between the two claims, the more appropriate it would be for the debtor to have the benefit in bankruptcy of its asset (the receivable from the creditor) without reduction." *Id*.

The second inquiry is whether the claim asserted by the creditor is more like a defense to the debtor's claim rather than a separate, independent claim. The *B&L Oil* case does not provide much detail regarding this inquiry other than to say, "when the creditor's claim arises from the same transaction as the debtor's claim, it is *essentially a*

7

*defense to the debtor's claim* against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable." *In re B&L Oil*, 782 F.2d at 157 (internal quotation omitted) (emphasis added). As described by one commentator:

> In any action between the estate and another, the defendant is entitled to show through recoupment that he or she is not liable in part or in full for the plaintiff's claim due to matters or events arising out of the same transaction. As long as this right of reduction is asserted as a defense and not as an independent claim for relief, it does not constitute a "claim," nor is there any aspect of a preference about it. In proper form, a right of recoupment is merely a defensive right that assists in the just and proper determination of the defendant's liability.

5 *Collier on Bankruptcy* ¶ 553.10 (Richard Levin & Henry J. Sommer eds. 16th ed. 2021).

Courts use this same reasoning to explain why the automatic stay applies to setoff but not to recoupment. The automatic stay generally prohibits a creditor from taking any action to collect on a prepetition "claim" against the debtor. *See* 11 U.S.C. § 362(a)(1), (a)(6). Courts have held that the party that recoups is merely asserting a defense, not collecting on a "claim." *See Beaumont v. Dept. of Veteran Affairs (In re Beaumont)*, 586 F.3d 776, 781 (10th Cir. 2009) (stating that if recoupment applies, "then there is no 'debt' or 'claim' here as defined in the Bankruptcy Code, and [defendant] has not violated the automatic stay nor the discharge injunction" by exercising recoupment rights). Setoff, on the other hand, is considered a "claim" and is subject to the automatic stay. 11 U.S.C. § 362(a)(7).

The third inquiry considers the equities. This is not so much a separate inquiry as a principle that underlies the entire analysis. In both Tenth Circuit cases discussed, the court considered whether it would be inequitable for the debtor to enjoy the benefits of a transaction without also meeting its obligations. The court also remained mindful that recoupment runs counter to the fundamental bankruptcy policy of equality among creditors and to the "cleavage in time" created by the filing of a petition. Thus, a key consideration is whether there are equitable reasons for applying recoupment that outweigh these fundamental bankruptcy policies.

### C.    Application to This Case

#### 1.    Recoupment

The two claims that Pruet seeks to recoup in this case are: (1) a prepetition debt that the Debtor owes to Pruet for its share of oil and gas revenues; and (2) a postpetition debt Pruet owes the Debtor for Pruet's share of operating costs.[3] To

---

[3] Although there are seven different properties at issue, Pruet only seeks to recoup unpaid revenues owing for a particular property against expenses owing under that same property. In other words, Pruet

8

determine if these two claims arise from the same or separate transactions, it is helpful to have an overview of the parties' relationship.

Working interests like those held by Pruet are generally created and governed by a "joint operating agreement" or "**JOA**" between the various working interest owners (also referred to as "non-operators") and the operator. Joint operating agreements are ubiquitous in the oil and gas industry. The basic purpose of a JOA has been described as:

> an operating agreement "pools" leases and fractional interests in leases or mineral rights within the defined contract area under the day-to-day direction of an individual or corporation designated as the "operator." This brings additional expertise to the venture and spreads the risks of drilling and the cost of operations. An operating agreement provides a decision-making process, a risk-allocation mechanism, and a financial instrument for the parties involved in exploration and production operations within the contract area.

John S. Lowe, *Some Recurring Issues in Operating Agreements and What AAPL's Drafting Committee Might Do About Them*, 60 Rocky Mtn. Min. L. Inst. 27-1, 27-3 (2014).

The JOAs that govern the seven properties in question are substantially similar because they are based on forms widely used in the industry. Three of the agreements are based on a form entitled "Unit Operating Agreement" or "**Unit Form**" because they cover "unitized" leasehold interests, or interests that have been consolidated because they cover a common source of supply. *See Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1410 (10th Cir. 1990) (generally describing unitized leasehold interests). The other four agreements cover non-unitized leasehold interests and use a form called "Model Form Operating Agreement, AAPL Form 610-1982" or "**AAPL Form**." Although there are some differences between them, all seven agreements are substantially similar in purpose and as to the relevant terms. The Court will refer to all of them generally as the "JOAs," a term of art used in this industry.

All the JOAs share a common exhibit—the "**COPAS** Accounting Procedure Joint Operations." "COPAS" stands for Council of Petroleum Accountant Societies, the entity that developed the accounting procedures that apply to most joint operating agreements. This widely used accounting procedure "allocates the liabilities and expenditures for which all parties to the Joint Operating Agreement will be responsible and defines the ways in which an Operator will account for the costs incurred in operating an oil well. . . . Specific provisions of the Accounting Procedure address such matters as direct charges, pricing, inventories and overhead." *Exxon Corp. v. Crosby-Mississippi Res., Ltd.*, 775 F. Supp. 969, 972 (S.D. Miss. 1991).

---

does not seek to recoup unpaid revenues owing under one property against expenses owing for a different property. *See* Pruet Motion for Summary Judgment, ¶ 30.

9

A basic principle of the JOAs is that working interest owners ("**WIOs**") will divide all costs associated with developing and operating the leased property based on their respective ownership shares. Thus, the JOAs provide that each WIO is "liable only for its proportionate share of the costs of developing and operating the Contract Area." COPAS Art. VII.A. To achieve this cost-sharing, COPAS requires the operator to pay the costs and then to bill each WIO for its proportionate share.[4] *Id*. Art. VII.C. It also establishes the deadlines for billing and payment. The operator must bill the WIOs on or before the last day of the month, with adequate cost details. WIOs are then required to pay their proportionate share in full within fifteen days.

While the JOAs and accompanying COPAS go into great detail about the allocation and payment of costs associated with operations, they say relatively little about the oil and gas revenues produced by the subject property. Generally, the JOAs provide that each WIO owns a proportionate share of any oil and gas produced. Those JOAs based on the AAPL Form provide that each WIO shall "take in kind or separately dispose of its proportionate share of all oil and gas produced." AAPL Form, § VI.C. The AAPL Form further provides that the WIO can decline to take its proportionate share of oil and gas, in which case the operator has the right, but not the obligation, to sell the oil and gas produced on the property for the benefit of the WIOs. Those JOAs based on the Unit Operating Agreement do not contain these exact provisions but operate in a similar fashion.

Assuming an operator does sell the oil and gas produced, the JOAs and COPAS are surprisingly silent on how and when those revenues should be distributed to WIOs. Indeed commentators have criticized the JOA forms and COPAS for failing to directly deal with the operator's duties in holding and distributing revenues. *See* John Burritt McArthur, *A Twelve-Step Program for COPAS to Strengthen Oil and Gas Accounting Protections*, 49 SMU L. Rev. 1447, 1485-86 (1996) (noting anomaly that COPAS "does not govern revenue practices and that the form JOAs have only a "limited revenue clause"); Jonathan Baughman & Karla Bower, *COPAS Accounting Procedures, and Legal and Practical Considerations*, 2017 Rocky Mtn. Min. L. Inst. 16-1, 16-50 (2017) ([T]he COPAS accounting procedures focus on accounting for the costs of a project and do not govern revenue practices."). One of the few specific provisions in the JOAs about revenues is that the operator is given a lien on each WIO's share of production as security for payment of billed costs. AAPL Form § VII.B; Unit Form, § 11.4. If a WIO defaults in its payment of costs, the operator is given the right to keep sale proceeds from that WIO's share of oil and gas until the outstanding amount owed, plus interest, is paid. *See id.* Most of the JOAs state that revenues held by the operator remain the funds of the WIOs on whose behalf they are collected until distributed. Unit Form, § 11.3; Mt. Carmel and South Harmony JOAs, § V.E. However, the operator is not

---

[4] COPAS gives an operator the option to require WIOs to make advance payments of estimated costs and then make adjustments after the fact to ensure that each WIO only pays its proportionate share of actual expenses. *See* COPAS Art. VII.C. However, none of the parties have argued that the debts at issue in this proceeding were billed in advance by the Debtor.

10

required to segregate revenues and may comingle revenues it collects with other funds. *Id*.

In this bankruptcy case, SEC has elected to reject all the operating agreements under which it serves as an operator, including the seven in which Pruet holds an interest. Nevertheless, until the WIOs have selected a successor operator and it has taken over, which may take several months, the Debtor has committed to continue acting as operator. Since the petition date, it has continued to operate the wells and to pay the necessary costs of operation. As required by COPAS, the Debtor has continued to send out monthly statements to WIOs that require WIOs to pay for their proportionate share of those monthly operating costs. The Debtor refers to these monthly bills as "joint interest billings" or "**JIBs**."

Moreover, the Debtor has continued postpetition to sell oil and gas collected from the wells to third parties. Distribution of the production revenue is generally a three-month process. If all goes according to plan, the Debtor sells the oil and gas in month one, it receives the sales revenues in month two, and distributes them to interest holders in month three.

Historically, the Debtor has treated its billing for JIB obligations separately from its distribution of revenue payments. In any given month, the Debtor does not offset or net out a WIO's revenues against that WIO's JIB obligations, unless specifically requested to do so in writing by a particular WIO.[5] While some WIOs have made this request for administrative convenience, Pruet is not one of them. In addition, as previously noted, the JOAs give the Debtor the right to offset revenues against JIBs when a WIO defaults on payment of JIBs.

When the Debtor filed its petition on April 1, 2020, it owed Pruet and other interest holders revenues from oil and gas produced in February 2020. In addition, it owed some interest owners, including Pruet, revenues for oil and gas produced in January 2020, for which checks had been issued but which had not cleared prior to the bankruptcy filing and which never cleared subsequently due to the bankruptcy filing. For these two months, the Debtor owes Pruet a total of $691,426 in prepetition oil and gas revenues and this amount remains outstanding today.

Pursuant to the Final Order Authorizing Use of Cash Collateral entered by this Court (ECF No. 433), the Debtor has been segregating all postpetition revenues into a separate bank account before distribution and has continued to timely pay postpetition revenues to WIOs, including Pruet, from this account. Despite receiving the postpetition revenue, Pruet stopped paying its monthly postpetition JIBs in March of 2021. It owes the Debtor at least $219,691. This amount has undoubtedly increased since the filing of the parties' summary judgment motions. Moreover, numerous other WIOs have

---

[5] The Court's understanding of the Debtor's general billing practices is taken partly from other pleadings filed in the Debtor's bankruptcy case. The Court does not believe these facts are disputed but they were not covered in the parties' summary judgment papers. Pruet may file a motion to reconsider if it has a legitimate basis for disputing these facts.

followed Pruet's lead and also stopped paying postpetition JIBs. WIOs currently owe the Debtor at least $2,069,533 in past-due, unpaid JIBs.

During the case, the Debtors sought an order from this Court allowing it to offset unpaid postpetition JIBs against postpetition revenues owed to the defaulting WIO. *See* Debtors' Motion for Clarification of Orders and to Authorize Immediate Offset of Joint Interest Billing Obligations, ECF No. 551. Several WIOs opposed that motion. At the time of the motion, SEC was intending to reorganize rather than liquidate and therefore, the Court believed it was unnecessary to resolve the issue because SEC would soon be assuming and curing the operating agreements. Thus, it denied the Debtors' request and instead, as an interim measure, required WIOs to pay outstanding JIBs owed to SEC to the extent that the total amount of JIBs owed by any particular WIO exceeded the amount of that WIO's pre- and postpetition claim (excluding outstanding cash call advances). *See* Minute Order, Feb. 2, 2021, ECF No. 820. Subsequently, SEC changed its mind and has rejected its operating agreements and will liquidate its business.[6] Thus, the issue of recoupment has resurfaced.

The first inquiry the Court must address is whether the $691,426 that the Debtor owes Pruet in prepetition revenues and the $219,619 Pruet owes Debtor in postpetition JIBs arose out of different transactions or a single, integrated transaction. *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 960 (10th Cir. 1996). Even if they arose from separate transactions, this Court must also consider if the two activities—the payment of JIBs and the payment of revenues—are so closely intertwined that allowing the Debtor to avoid paying prepetition revenues while still receiving postpetition JIBs would be inequitable. *Id*. at 962.

Pruet relies heavily on the fact that both debts arise out of the same contract—the JOAs—and cites to the case of *Farmers Union Central Exchange, Inc. v. Security Pacific National Bank (In re Buttes Gas & Oil)*, 72 B.R. 236 (Bankr. S.D. Tex. 1987). That case and another case out of the Southern District of Texas, *Security Pac. Nat'l Bank v. Enstar Petroleum Co. (In re Buttes Resources Co.)*, 89 B.R. 613, 615–16 (S.D.Tex.1988), are the only two bankruptcy recoupment cases that this Court could locate that address claims arising out of an oil and gas JOA. Both Texas cases are different from this one in that the parties' positions are reversed—the debtors were working interest owners and the creditors seeking to recoup were the operators. In both cases, the court held that the creditor-operator was allowed to recoup prepetition expenses owed by the debtor-WIO against postpetition revenues owed to the debtor-WIO. Both courts primarily relied on the fact that both claims arose from a single contract, *i.e.* the JOA. The problem with this reasoning is that it runs counter to the Tenth Circuit's decisions in *B&L Oil* and *Peterson Distributing.* In fact, the Tenth Circuit cited the *Buttes Resources* case as an example of the "overly simplistic" rule of "same contract equals same transaction" that it rejected. *In re Peterson Distrib.*, 82 F.3d at 960.

---

[6] Debtor Sklarco is not liquidating. The Debtors have proposed a joint plan under which Sklarco will reorganize and SEC will liquidate.

12

Since the Tenth Circuit has rejected the approach followed in these two Texas decisions, this Court is compelled to reject them as well. This result is somewhat regrettable because they create a bright-line test, which would clearly guide the parties and would be easy for courts to apply. Instead Tenth Circuit precedents counsel this Court to begin with a careful analysis of the JOAs in this case. They contain provisions that both support and undermine a "same transaction" conclusion.

On the one hand, the JOAs treat expenses and revenues separately. Or more accurately, the provisions of the JOAs deal almost exclusively with the payment of JIBs and not the distribution of revenues. They describe in detail the expenses that the Debtor may charge to Pruet and other WIOs, how the Debtor is to bill those expenses, and the Debtor's collection rights if JIBs are not timely paid. The JOAs do not expressly regulate how and when the Debtor is to pay revenues to WIOs. While the JOAs recognize that WIOs are owners of their fractional share of production and that they may take their share of oil and gas in kind, the JOAs do not guaranty a certain level of production or that Debtor will sell the production. Rather, the JOAs give the Debtor the right but not the obligation to sell.

The separation between JIBs and revenues is echoed in the Debtor's accounting procedures. JIBs are billed and paid separately from the distribution of revenues. The Debtor does not, on a monthly basis, net JIBs against revenues and pay/collect only the difference to Pruet. The two debts are accounted for separately. Moreover, the revenues paid in any given month are not directly tied to the costs incurred in that month. For example, if Debtor paid revenues to Pruet in August, those revenues would be for oil and gas sold in June. The JIBs billed to Pruet in August would represent the costs incurred in July. Thus, a WIO's payment in any given month is not tied to its share of the revenues generated in that month.

These facts support a conclusion that JIBs and revenues are separate transactions even though they arise under one contract. This is similar to *Peterson Distributing*, where the Tenth Circuit separated the debtor's obligation to pay Conoco monthly for petroleum purchases from the creditor's obligation to credit the debtor with the face amount of any credit card receivables assigned to Conoco. The court viewed the assignment of the receivables as a separate transaction. The franchising agreement did not obligate the debtor to assign any receivables to Conoco; it just had to pay Conoco one way or another for its purchases. And when the debtor chose to make these assignments, it was not limited in the type of eligible credit card receivables. These receivables could be based on a customer's purchase of Conoco products from the debtor or it could relate to the customer's payment for any other product or service provided by the debtor. If the debtor assigned Conoco invoices in an amount that exceeded the amount due for product purchases, Conoco would have to pay the debtor the surplus amount. Essentially, the franchise agreement provided the debtor with a convenient way to collect on its receivables. Viewed in this fashion, the court determined it was separate from the debtor's purchases of product. One could argue that these two transactions were still intertwined because the receivables were, at some point, usually applied against the debtor's purchase of Conoco products. But the Tenth Circuit did not see it this way.

13

In this case, the payment of expenses can similarly be viewed as distinct from the distribution of revenue.  The lack of interrelatedness makes sense if you consider that oil and gas production is an inherently risky endeavor.  There are no guarantees that an oil and gas well will generate net revenues for WIOs.  Even if a well does not produce revenue, the costs of operation still need to be paid, which is likely the reason JOAs focus on the allocation and collection of those costs.

On the other hand, it cannot be said that the payment of JIBs is unrelated to the payment of revenues in the JOAs.  The Debtor admits that, upon the written request of a WIO, the Debtor will net JIBs against revenues each month, thereby allowing the WIO to pay/receive the difference.  This monthly netting service, however, is not expressly provided for in the JOAs and is not used by Pruet.  But the JOAs do permit the Debtor to offset revenues and JIBs in one circumstance.  As security for the payment of JIBs, the JOAs give the Debtor a lien on revenues owed to WIOs.  If a WIO fails to pay JIBs, the JOAs give the Debtor the right to offset that debt against any revenues owed to that WIO.  This Court has prevented the Debtor from exercising that right during this bankruptcy case up to this point, but the fact that Debtor has the contractual right to net JIBs to revenues supports a conclusion that those obligations arose from the same transaction.  This fact was important in the *Buttes Resources* case, where the court noted that the debtor's failure to pay JIBs allowed the creditor-operator to withhold proceeds of the oil production to cover the debtor's delinquent expense allocation.  *In re Buttes Resources Co.*, 89 B.R. at 614.  On this basis, the court concluded that the operating agreement was essentially a contract for one transaction—the payment of net revenues to WIOs.  Pruet also asserts that the whole purpose of the JOAs is the delivery of revenues to WIOs.

Are these facts enough to move the sliding scale from separate transactions to the same transaction?  Admittedly, it is a close call.  But in attempting to be faithful to the Tenth Circuit's most recent decision in *Peterson Distributing*, this Court believes that it does not.  Contractually, the JOAs do not give Pruet or any other WIOs the right to net their JIBs to revenues, as Pruet seeks to do in this case.  Moreover, the Tenth Circuit has instructed that recoupment "should not depend on whether the parties expressly anticipated the problem" in their contract.  *Ashland Petroleum Co. v. Appel (In re B&L Oil Co.)*, 782 F.2d 155, 158 (10th Cir. 1986).  The JOAs' separate treatment of revenues and JIBs convinces this Court that they do not constitute a single integrated transaction.

The second inquiry further convinces this Court that recoupment is not applicable here.  That inquiry looks at whether the claim asserted by Pruet is more like a defense rather than an independent claim.  The line between these two is not always clear.  In the *B&L Oil* case, the Tenth Circuit gave an example of a defense: "a building owner [who] resists paying the contract price because of a bankrupt contractor's deficient work."  *In re B&L Oil Co.*, 782 F.2d at 158.   The Tenth Circuit concluded that the creditor's claim for prepetition overpayment for oil was not a defense to the debtor's claim for unpaid postpetition purchases of oil because those claims were "easily separable and independently determinable." *Id*.

14

Thus, the difference centers on whether the offsetting claim would be a defense to the other's claim or merely a counterclaim. With the example of the owner's claim for defective workmanship, the nature of this claim goes toward the debtor's entitlement to assert a claim. With the latter example (creditor's overpayment for oil), the creditor is not questioning the validity of the debtor's claim. Instead it is asserting an independent, offsetting obligation arising from the same contract. While the *B&L Oil* court ultimately went on to apply recoupment on equitable grounds despite this finding, the distinction remains instructive.

Here, Pruet's claim for unpaid prepetition revenues is more like the latter example. It is not really a defense to the Debtor's claim for postpetition JIBs. It does not question the foundation or legal elements of the Debtor's claim. It does not negate the Debtor's contractual right to collect postpetition JIBs or contend those expenses were somehow unwarranted under the JOAs. Rather, Pruet's claim for unpaid revenues is legally distinct from Debtor's claim for unpaid JIBs. If the Debtor had sued Pruet for unpaid JIBs in a lawsuit outside of bankruptcy, Pruet's claim for unpaid revenues, if asserted, would constitute a counterclaim rather than an affirmative defense. This Court dislikes this hyper-technical reliance on pleading formalities, but it did factor into the Tenth Circuit's analysis.

This brings the Court to the third inquiry: the equities of the case. Unsurprisingly, each party argues that the equities favor its own position. Pruet argues it would be unfair to make it pay JIBs when the Debtor has not paid revenues, especially given that the JOAs state that revenues are the property of WIOs. Pruet also points to alleged mismanagement of the Debtors' finances leading up to the petition date and that this bad faith conduct should not be rewarded.

The Debtor and the Bank, on the other hand, argue that recoupment would give Pruet a windfall by allowing it to collect postpetition revenues while not paying postpetition expenses. They also point to other WIOs that have followed Pruet's lead and have stopped paying postpetition JIBs due to alleged recoupment claims. The Debtor contends that, if all WIOs are allowed to recoup without paying postpetition JIBs, the Debtor will not have sufficient funds to continue operations through an orderly transition to new operators and that it could be forced to cease operations and "shut in" the wells it is operating. The Bank adds that recoupment would elevate Pruet's prepetition claim above other unsecured claims by allowing Pruet to be paid in full, while other unsecured claims will receive only a pro rata distribution under the Debtors' current proposed plan. The Bank also points to an alleged "dollar-for-dollar" diminution of its cash collateral caused by the Debtors having to cover the unpaid JIBs with other funds, primarily funds belonging to its co-Debtor Sklarco.

While the Court understands the Bank's concerns about its secured position, the impact or lack thereof on the Bank's collateral is not the proper focus of this inquiry. Neither is the potential impact on other WIOs or the Debtors' proposed plan. Rather the focus is on Pruet and the Debtor and their respective payment rights. Unlike the *B&L Oil* case, the Debtor is not assuming the JOAs. As such, the main equitable reason for allowing recoupment in that case—requiring a debtor to accept the benefits and

15

burdens of an executory contract—is not present here.  While the Debtor has continued to serve as the operator during the bankruptcy case to assist with the transition to new operators, that can hardly be deemed an acceptance of the benefits.  If any party is benefiting from the Debtor's continued postpetition operations, it is Pruet since it is receiving postpetition revenues but not paying its share of the costs associated with the generation of those revenues.

Pruet is rightfully upset that the Debtor has not paid it the prepetition revenues to which it is entitled.  But surely every creditor in every bankruptcy case would have similar complaints about the inequity of a debtor not paying its debts.  In this case, there are other factors that compound the creditor's outrage.  The Official Unsecured Creditors Committee has alleged that, in the four years preceding the Debtor's bankruptcy, Mr. Howard Sklar and/or his family trusts withdrew over $19,500,285 in distributions from the company.  Committee Rpt. Summarizing Investigations Relating to Debtors' Transfers to Howard Sklar & Related Family Trusts, 5, Feb. 2, 2021, ECF No. 891.  However, nothing in the plan releases Mr. Sklar or the trusts for what may have been improper distributions and/or fraudulent conveyances.  Thus, even if this estate is not able to fully repay creditors like Pruet, there may be other sources for recompense.

In evaluating the equities, the Court must return to the Code's underlying principle to treat nonpriority, unsecured creditors equally.  Even where a creditor has an offsetting claim, the Code specifically provides a procedure (§ 553) for assertion of that right in a manner that protects the interests of other creditors.  And § 553 limits a party's offset rights that would otherwise exist outside of bankruptcy.

The question in recoupment cases is whether there is a sufficient equitable reason for a particular creditor to escape these limitations and procedures and be allowed to net out an offsetting claim regardless of the rights and interests of other unsecured creditors.  The Court finds that there is not in this case.  As discussed, Pruet's offsetting claim is not so "closely intertwined" with the Debtor's claim that it would be unfair to allow Debtor to receive postpetition JIBs while not also paying prepetition revenues.  *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.)*, 82 F.3d 956, 962 (10th Cir. 1996).  The Court sees no reason why Pruet should receive better treatment than other unsecured creditors in this case.  Moreover, Pruet has received the postpetition revenues from the Debtor's services.  Revenues that it would not have received but for the operator's efforts on its behalf.  To allow Pruet to realize the benefits without paying the costs associated with the production of those revenues would by itself be inequitable.

Pruet argues further that it "owns" the prepetition revenues owed to it.  But the JOAs do not require the Debtor to segregate revenues from its other funds and prepetition it did not do so.  Any funds in the Debtor's operating account on the petition date have long since been spent.  Pruet cannot identify or trace any specific funds currently held by Debtor that Pruet "owns."  Thus, Pruet is merely owed a debt and is a nonpriority, unsecured creditor.

16

2. **Setoff**

In the alternative, Pruet alleges in its Complaint that it should be entitled to exercise a right of setoff. In their Motions for Summary Judgment, both the Debtor and the Bank ask for a declaratory judgment that Pruet does not have any setoff rights. Pruet did not address setoff in its Motion for Summary Judgment, nor dispute or contest the other parties' setoff assertions as required by Fed. R. Civ. P. 56.

Pruet has the burden to establish a valid setoff right. *Eckles v. Petco, Inc. (In re Balducci Oil Co.)*, 33 B.R. 847, 850 (Bankr. D. Colo. 1983). The Bankruptcy Code does not itself create a right of setoff but instead merely "preserves setoff rights that might otherwise exist under federal or state law." *United States v. Myers (In re Meyers)*, 362 F.3d 667, 672 (10th Cir. 2004). In this case, the parties did not specifically address the source of Pruet's alleged setoff rights. Pruet has not pointed to any provision in the JOAs or relevant state law that gives them a setoff right. Since the burden rests with the creditor to establish such a right, Pruet did not satisfy its burden.

Nevertheless, even if the Court were to assume Pruet held contractual or common law setoff rights under state law, the result would be no different. Pruet would still have to demonstrate that § 553 preserves its rights. Under this section, the creditor must show: (1) it owes a debt to the debtor that arose before the commencement of the bankruptcy proceedings; (2) it holds a claim against the debtor that arose before the commencement of the bankruptcy proceedings; and (3) the creditor's and debtor's obligations must be mutual. *In re Meyers*, 362 F.3d. at 672. "In other words, a right to setoff under § 553 arises only when the mutual debt and claim both arose pre-petition." *Id*.

In this case, the parties admit that Pruet has a claim against the Debtor for unpaid revenues that arose prepetition, satisfying the second element. However, it cannot prove the first element. The debt Pruet owes to the Debtor for unpaid JIBs is not a prepetition debt. It only arose postpetition. Thus, Pruet cannot satisfy § 553's requirements. Section 553 limits the types of otherwise valid setoff claims that may be asserted in bankruptcy. Even assuming that Pruet holds valid setoff rights under state law, § 553 cuts off those rights here. Therefore, it has no greater rights in this bankruptcy than those of a nonpriority, unsecured creditor. *See In re Meyers,* 362 F.3d. at 672; *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 963-64 (10th Cir. 1996) (allowing setoff of only those assigned credit card invoices Conoco accepted prepetition).

### III. CONCLUSION

For the reasons set forth above, the Court concludes that Pruet is not entitled to either recoupment or setoff. Now that the Debtor has rejected the JOAs in question rather than assuming them, there is no further reason to delay the Debtor's ability to assert its contractual rights to withhold postpetition revenues to offset unpaid postpetition JIB obligations. Accordingly, the Debtor's and the Bank's motions for summary judgment requesting declaratory relief are GRANTED and Pruet's motion for

summary judgment is DENIED.  Judgment shall enter in favor of the Debtor and the Bank and against Pruet.  If Pruet decides to move for a stay of this decision pending appeal, it should include with its request the posting of a bond in an amount not less than twice the amount in controversy.

      DATED this 16th day of August, 2021.

      BY THE COURT:

*Elizabeth E. Brown*

Elizabeth E. Brown, Bankruptcy Judge