## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SKLAR EXPLORATION COMPANY, LLC | ) | Case No. 20-12377-EEB |
| EIN: 72-1417930 | ) | |
| | ) | Chapter 11 |
| Debtor-in-Possession. | ) | |
| | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| SKLARCO, LLC | ) | Case No. 20-12380-EEB |
| EIN: 72-1425432 | ) | |
| | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor-in-Possession. | ) | |
| | ) | |

_____

## MOTION FOR ORDER AUTHORIZING RIGHT OF RECOUPMENT

Anderson Exploration Energy Company, L.C. ("Anderson Exploration"), AEEC II, LLC ("AEEC"), and TCP Cottonwood, L.P. ("TCP") (collectively, the "Anderson Entities") file this Motion for Order Authorizing Right of Recoupment (the "Motion") against Sklar Exploration Company, LLC ("the Debtor") and in support thereof represent as follows:

### INTRODUCTION

1.     The Anderson Entities hold non-operating working interests in certain oil and gas properties operated by the Debtor. When the Debtor commenced its chapter 11 bankruptcy case, the Debtor held on behalf of the Anderson Entities no less than

4820-2234-2910 v2

$466,528.51 in unpaid revenues owned by the Anderson Entities. These revenues have not been paid to the Anderson Entities and it is apparent that the Debtor will never pay them in full.

2.      The operating agreements also provide that the Debtor may, from time to time, make requests for cash calls for operating expenses to the working interest owners (the "Cash Call Advances").

3.      The same operating agreements that obligated the Debtor to collect and pay revenues to the Anderson Entities obligate the Anderson Entities to make certain payments to the Debtor, including, but not limited to the Cash Call Advances. The Debtor also issues monthly joint interest billing statements ("JIBs") to the Anderson Entities that are to be paid by the Anderson Entities to the Debtor pursuant to the operating agreements. Both before and after this bankruptcy case was filed on April 1, 2020 (the "Petition Date"), the Anderson Entities diligently paid their Cash Call Advances and JIBs, with the exception of certain recent JIBs.

4.      The Anderson Entities are entitled to recoup the unpaid revenues they are owed and the Cash Call Advances they have made against their ongoing obligation to pay JIBs to the Debtor.

5.      Prior to filing this Motion, the Anderson Entities sought an out of court resolution with the Debtor regarding the treatment of the unpaid revenues, Cash Call Advances, and obligation to pay the JIBs, but the parties were unable to reach a resolution. The Anderson Entities file this Motion seeking a determination that the

2

equitable doctrine of recoupment applies and that the Anderson Entities may recoup the unpaid revenues and Cash Call Advances against their obligations to pay JIBs.

## THE PARTIES

6.      AEEC, a creditor in the above-captioned bankruptcy case, is a Louisiana limited liability company, with its principal place of business in Shreveport, Louisiana.

7.      Anderson Exploration, a creditor in the above-captioned bankruptcy case, is a Texas limited liability company with its principal place of business in Shreveport, Louisiana.

8.      TCP, a creditor in the above-captioned bankruptcy case, is a Texas limited partnership with its principal place of business in Dallas, Texas.

9.      The Debtor is a Louisiana limited liability company and the debtor in the above-captioned bankruptcy case.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157, 1334.

11.      This is a core proceeding under 28 U.S.C. § 157(b). The Anderson Entities consent to entry of final orders or judgments by this Court.

12.      Venue is proper in this Court under 28 U.S.C. § 1409(a).

## BACKGROUND

13.      The Debtor is the operator of several oil and gas properties for which the Anderson Entities are working interest owners.

14.     The Anderson Entities and the Debtor, along with other non-operator working interest holders, are parties to several operating agreements covering these oil and gas properties, as further described below.

**A.   The Southeast Brooklyn Operating Agreement.**

15.     The Debtor is the operator under that certain Unit Operating Agreement dated November 1, 2018, commonly referred to as the Southeast Brooklyn Oil Unit (as amended, modified, and/or ratified, the "Southeast Brooklyn Operating Agreement") in which Anderson Exploration is a working interest owner. A true and correct copy of the Southeast Brooklyn Operating Agreement is attached to this Motion and fully incorporated herein by reference as **Exhibit 1**.

16.     The Southeast Brooklyn Operating Agreement recognizes that the Debtor, as operator, may market and sell oil and gas produced from the unit on behalf of the working interest owners, including Anderson Exploration. The Debtor is obligated to collect revenues on those owners' behalf. Section 11.3 of the Southeast Brooklyn Operating Agreement provides as follows:

> Unit Operator [the Debtor] shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners advanced or paid to the Unit Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Working Interest Owners on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Working Interest Owners or applied toward the payment of debts as provided in Section 11.5. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Unit Operator and Working Interest Owners for any purpose other than to account for Working Interest owners' funds as herein

4

specifically provided and no funds received by Unit Operator under this agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

17. Section 11.1 of the Southeast Brooklyn Operating Agreement provides that the Debtor, as operator, will issue joint-interest billings to the working interest owners and that the working interest owners will be responsible for their proportional share of costs associated with the operation of the Southeast Brooklyn Oil Unit.

18. Section 11.2 of the Southeast Brooklyn Operating Agreement provides that the Debtor, as operator, "shall have the right to require Working Interest Owners [Anderson Exploration] to advance their respective shares of estimated Unit Expenditures by submitting to Working Interest Owners, . . . an itemized estimate thereof for the succeeding month, with a request for payment in advance."

**B. Robbins Prospect Operating Agreement.**

19. The Debtor is the operator under that certain Operating Agreement dated May 6, 1997, commonly referred to as the Robbins Prospect (as amended, modified, and/or ratified, the "Robbins Prospect Operating Agreement") in which Anderson Exploration is a working interest owner. A true and correct copy of the Robbins Prospect Operating Agreement is attached to this Motion and fully incorporated herein by reference as **Exhibit 2**.

20. The Robbins Prospect Operating Agreement recognizes that the Debtor, as operator, may market and sell oil and gas produced from the unit on behalf of Anderson Exploration and other non-operator working interest owners. The Debtor is obligated to

5

collect revenues on those owners' behalf and account to the owners. Section VI.C of the

Robbins Prospect Operating Agreement provides as follows:

> In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production and shall account to such party for the actual net proceeds received by Operator from the sale of such production.

21.    Exhibit C, Section I.2 of the Robbins Prospect Operating Agreement

provides that the Debtor, as operator, will issue joint-interest billings to the working

interest owners and that the working interest owners will be responsible for their

proportional share of costs associated with the operation of the Robbins Prospect.

22.    The Robbins Prospect Operating Agreement, at Section VII.C, also

provides:

> Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

The section further provides that adjustments between advances and actual expenses shall

be made each month "and appropriate billings, credits, or reimbursements shall thereupon

be made."

**C. East Castor Prospect Operating Agreement.**

23.     The Debtor is the operator under that certain Operating Agreement dated January 1, 2016, commonly referred to as the East Castor Prospect (as amended, modified, and/or ratified, the "East Castor Prospect Operating Agreement") in which AEEC is a working interest owner. A true and correct copy of the East Castor Prospect Operating Agreement is attached to this Motion and fully incorporated herein by reference as **Exhibit 3**.

24.     The East Castor Prospect Operating Agreement recognizes that the Debtor, as operator, may market and sell oil and gas produced from the unit on behalf of the AEEC and other non-operator working interest owners. The Debtor is obligated to collect revenues on  those owners' behalf. Section VI.C of the East Castor Prospect Operating Agreement provides as follows:

> In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation to purchase such oil or sell it to others on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production / at any time and from time to time, for the account of the non-taking party.

25.     Exhibit C, Section I.2 of the East Castor Prospect Operating Agreement provides that the Debtor, as operator, will issue joint-interest billings to the working interest owners and that the working interest owners will be responsible for their proportional share of costs associated with the operation of the East Castor Prospect.

4820-2234-2910 v2

26.     The East Castor Prospect Operating Agreement, at Section VII.C, also provides:

> Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

The section further provides that adjustments between advances and actual expenses shall be made each month "to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more."

27.     The East Castor Prospect Operating Agreement contains a provision for advancement of costs, located at Section XV.D, which states:

> Notwithstanding any other provisions herein, Operator shall have the right to request and receive from each Non-Operator payment(s) in advance of its respective share of (i) the dry hole cost for the initial well to be drilled . . . (ii) the dry hole cost for any other well to be drilled hereunder to which such Non-Operator has consented, and (iii) the cost of any completion, reworking, recompletion, sidetracking, deepening or plugging back operation to which such Non-Operator has consented . . . Such advanced payments shall be held by Operator for the account of the Non-Operators and applied, with interest, against the actual costs incurred in the applicable operation.

**D. Fin Deep Prospect Operating Agreement.**

28.     The Debtor is the operator under that certain Operating Agreement dated August 1, 2015, commonly referred to as the Fin Deep Prospect (as amended, modified, and/or ratified, the "Fin Deep Prospect Operating Agreement") in which AEEC is a

8

4820-2234-2910 v2

working interest owner. A true and correct copy of the Fin Deep Prospect Operating Agreement is attached to this Motion and fully incorporated herein by reference as **Exhibit 4**.

29.     The Fin Deep Prospect Operating Agreement recognizes that the Debtor, as operator, may market and sell oil and gas produced from the unit on behalf of AEEC and other non-operator working interest owners. The Debtor is obligated to collect revenues on  those owners' behalf. Section VI.C of the Fin Deep Prospect Operating Agreement provides as follows:

> In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil or sell it to others on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production / at any time and from time to time, for the account of the non-taking party.

30.     Exhibit C, Section I.2 of the Fin Deep Prospect Operating Agreement provides that the Debtor, as operator, will issue joint-interest billings to the working interest owners and that the working interest owners will be responsible for their proportional share of costs associated with the operation of the Fin Deep Prospect.

31.     The Fin Deep Prospect Operating Agreement, at Section VII.C, also provides:

> Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by

> submission to each such party of an itemized statement of
> such estimated expense, together with an invoice for its share
> thereof.

The section further provides that adjustments between advances and actual expenses shall be made each month "to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more."

32.   The Fin Deep Prospect Operating Agreement contains a provision for advancement of costs similar to the East Castor Operating Agreement, located at Section XV.D.

### E.  West Bryceland Saddle Prospect Operating Agreement.

33.   The Debtor is the operator under that certain Operating Agreement dated December 1, 2012, commonly referred to as the West Bryceland Saddle Prospect (as amended, modified, and/or ratified, the "West Bryceland Saddle Prospect Operating Agreement") in which AEEC is a working interest owner. A true and correct copy of the West Bryceland Saddle Prospect Operating Agreement is attached to this Motion and fully incorporated herein by reference as **Exhibit 5**.

34.   The West Bryceland Saddle Prospect Operating Agreement recognizes that the Debtor, as operator, may market and sell oil and gas produced from the unit on behalf of AEEC and other non-operator working interest owners. The Debtor is obligated to collect revenues on  those owners' behalf. Section VI.C of the West Bryceland Saddle Prospect Operating Agreement provides as follows:

> In the event any party shall fail to make the arrangements
> necessary to take in kind or separately dispose of its
> proportionate share of the oil produced from the Contract

10

Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil or sell it to others on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production / at any time and from time to time, for the account of the non-taking party.

35.     Exhibit C, Section I.2 of the West Bryceland Saddle Prospect Operating Agreement provides that the Debtor, as operator, will issue joint-interest billings to the working interest owners and that the working interest owners will be responsible for their proportional share of costs associated with the operation of the West Bryceland Saddle Prospect.

36.     The West Bryceland Saddle Prospect Operating Agreement, at Section VII.C, also provides:

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

The section further provides that adjustments between advances and actual expenses shall be made each month "to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more."

37.     The West Bryceland Saddle Prospect Operating Agreement contains a provision for advancement of costs similar to the East Castor Operating Agreement, located at Section XV.D.

**F.  North Pachuta Prospect Operating Agreement.**

38.     The Debtor is the operator under that certain Operating Agreement dated February 20, 2019, commonly referred to as the North Pachuta Prospect (as amended, modified, and/or ratified, the "North Pachuta Prospect Operating Agreement") in which AEEC is a working interest owner. A true and correct copy of the North Pachuta Prospect Operating Agreement is attached to this Motion and fully incorporated herein by reference as **Exhibit 6**.

39.     The North Pachuta Prospect Operating Agreement recognizes that the Debtor, as operator, may market and sell oil and gas produced from the unit on behalf of AEEC and other non-operator working interest owners. The Debtor is obligated to collect revenues on  those owners' behalf. Section VI.C of the North Pachuta Prospect Operating Agreement provides as follows:

> In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil or sell it to others on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production / at any time and from time to time, for the account of the non-taking party.

40.     Section V.E of the North Puchuta Prospect Operating Agreement provides:

> Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of Non-Operators on whose account they are advanced or paid until used for their intended purposes or otherwise delivered to Non-Operators or applied

12

toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operator.

41.    Exhibit C, Section I.2 of the North Pachuta Prospect Operating Agreement provides that the Debtor, as operator, will issue joint-interest billings to the working interest owners and that the working interest owners will be responsible for their proportional share of costs associated with the operation of the North Pachuta Prospect.

42.    The North Pachuta Prospect Operating Agreement, at Section VII.C, also provides:

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

The section further provides that adjustments between advances and actual expenses shall be made each month "to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more."

43.    The North Pachuta Prospect Operating Agreement contains a provision for advancement of costs similar to the East Castor Operating Agreement, located at Section XV.D.

### G. Brewton Prospect Operating Agreement.

44.     The Debtor is the operator under that certain Operating Agreement dated January 23, 2015, commonly referred to as the Brewton Prospect (as amended, modified, and/or ratified, the "Brewton Prospect Operating Agreement") in which TCP is a working interest owner. A true and correct copy of the Brewton Prospect Operating Agreement is attached to this Motion and fully incorporated herein by reference as **Exhibit 7**.

45.     The Brewton Prospect Operating Agreement recognizes that the Debtor, as operator, may market and sell oil and gas produced from the unit on behalf of TCP and other non-operator working interest owners. The Debtor is obligated to collect revenues on those owners' behalf. Section VI.C of the Brewton Prospect Operating Agreement provides as follows:

> In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil or sell it to others on the same terms and basis as Operator is marketing Operator's and other Non-Operators' share of production / at any time and from time to time, for the account of the non-taking party.

46.     Section V.E of the Brewton Prospect Operating Agreement provides:

> Operator shall hold for the account of Non-Operators any funds of Non-Operators advanced or paid to Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of Non-Operators on whose account they are advanced or paid until used for their intended purposes or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds

14

were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operator.

47.    Exhibit C, Section I.2 of the Brewton Prospect Operating Agreement provides that the Debtor, as operator, will issue joint-interest billings to the working interest owners and that the working interest owners will be responsible for their proportional share of costs associated with the operation of the Brewton Prospect.

48.    The Brewton Prospect Operating Agreement, at Section VII.C, also provides:

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

The section further provides that adjustments between advances and actual expenses shall be made each month "to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more."

49.    The Brewton Prospect Operating Agreement contains a provision for advancement of costs similar to the East Castor Operating Agreement, located at Section XV.D.

4820-2234-2910 v2

**H. Mt. Carmel Prospect Operating Agreement.**

50.     The Debtor is the operator under that certain Operating Agreement dated

April 8, 2015, commonly referred to as the Mt. Carmel Prospect (as amended, modified,

and/or ratified, the "Mt. Carmel Prospect Operating Agreement") in which TCP is a

working interest owner. A true and correct copy of the Mt. Carmel Prospect Operating

Agreement is attached to this Motion and fully incorporated herein by reference as

**Exhibit 8**.

51.     The Mt. Carmel Prospect Operating Agreement recognizes that the Debtor,

as operator, may market and sell oil and gas produced from the unit on behalf of TCP and

other non-operator working interest owners. The Debtor is obligated to collect revenues

on  those owners' behalf. Section VI.C of the Mt. Carmel Prospect Operating Agreement

provides as follows:

> In the event any party shall fail to make the arrangements
> necessary to take in kind or separately dispose of its
> proportionate share of the oil and/or gas produced from the
> Contract Area, Operator shall the right, subject to the
> revocation at will by the party owning it, but not the
> obligation, to purchase such oil or sell it to others on the same
> terms as Operator is marketing Operator's and/or other Non-
> Operator's share of production at any time and from time to
> time, for the account of the non-taking party..

52.     Section V.E of the Mt. Carmel Prospect Operating Agreement provides

that:

> Operator shall hold for the account of Non-Operators any
> funds of Non-Operators advanced or paid to Operator, either
> for the conduct of operations hereunder or as a result of the
> sale of production from the Contract Area, and such funds
> shall remain the funds of Non-Operators on whose account

they are advanced or paid until used for their intended purposes or otherwise delivered to Non-Operators or applied toward the payment of debts, regardless of whether the debts arise out of the same well or operation for which the funds were advanced or from which the sales proceeds were derived. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators.

53.     Exhibit C, Section I.2 of the Mt. Carmel Prospect Operating Agreement provides that the Debtor, as operator, will issue joint-interest billings to the working interest owners and that the working interest owners will be responsible for their proportional share of costs associated with the operation of the Mt. Carmel Prospect.

54.     The Mt. Carmel Prospect Operating Agreement, at Section VII.C, also provides:

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

The section further provides that adjustments between advances and actual expenses shall be made each month "to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more."

55.     The Mt. Carmel Prospect Operating Agreement contains a provision for advancement of costs similar to the East Castor Operating Agreement, located at Section XV.D.

### I.  Mule Creek Prospect Operating Agreement.

56.    The Debtor is the operator under that certain Unit Operating Agreement dated July 1, 2014, commonly referred to as the Mule Creek Prospect (as amended, modified, and/or ratified, the "Mule Creek Prospect Operating Agreement") in which TCP is a working interest owner. A true and correct copy of the Mule Creek Prospect Operating Agreement is attached to this Motion and fully incorporated herein by reference as **Exhibit 9**.

57.    The Mule Creek Prospect Operating Agreement recognizes that the Debtor, as operator, may market and sell oil and gas produced from the unit on behalf of TCP and other non-operator working interest owners. The Debtor is obligated to collect revenues on  those owners' behalf. Section VI.G of the Mule Creek Operating Agreement provides as follows:

> If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party.

58.    Section V.D.4 of the Mule Creek Prospect Operating Agreement provides:

> Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to

4820-2234-2910 v2

establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

59.     Exhibit C, Section I.2 of the Mule Creek Prospect Operating Agreement provides that the Debtor, as operator, will issue joint-interest billings to the working interest owners and that the working interest owners will be responsible for their proportional share of costs associated with the operation of the Mule Creek Prospect.

60.     The Mule Creek Prospect Operating Agreement, at Section VII.C, also provides:

Operator, at its election, shall have the right from time to time to demand and receive from the one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

The section further provides that adjustments between advances and actual expenses shall be made each month "to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more."

61.     The Mule Creek Prospect Operating Agreement contains a provision for advancement of costs similar to the East Castor Operating Agreement, located at Section XVI.D.

**J.  The Unpaid Revenues.**

62.     As of the Petition Date, the Anderson Entities were owed no less than $466,528.51 in revenues that the Debtor had collected on behalf of the Anderson Entities pursuant to the governing operating agreements (collectively, the "Unpaid Revenues").

63.     As detailed in Anderson Exploration's Proof of Claim (Claim No. 10088), as of the Petition Date, Anderson Exploration was owed no less than $6,455.07 in unpaid revenues collected by the Debtor on Anderson Exploration's behalf.

64.     The $6,455.07 in unpaid revenues owed to Anderson Exploration are owed from the following assets under the operating agreements identified below:

| Asset | Operating Agreement | Unpaid Revenue |
|---|---|---|
| Southeast Brooklyn Oil Unit | Southeast Brooklyn Operating Agreement | $2,719.51 |
| Vickers #1 | Robbins Prospect Operating Agreement | $3,735.56 |
| **Total** | | **$6,455.07** |

65.     As detailed in AEEC's Proof of Claim (Claim No. 10087), as of the Petition Date, AEEC was owed no less than $121,694.23 in unpaid revenues collected by the Debtor on AEEC's behalf.

66.     The $121,694.23 in unpaid revenues owed to AEEC are owed from the following assets under the operating agreements identified below:

| Asset | Operating Agreement | Unpaid Revenue |
|---|---|---|
| John D. Bryant et al. #1 | West Bryceland Saddle Prospect Operating Agreement | $7,850,.03 |
| Echo Papa 10-10 #1 | East Castor Prospect Operating Agreement | $62,605.31 |

20

Case:20-12377-MER   Doc#:1467   Filed:10/08/21   Entered:10/08/21 15:47:25   Page21 of 28

| Evans 11-4 #1 | East Castor Prospect Operating Agreement | $41,724.47 |
| Rushing et al. #2 | Fin Deep Prospect Operating Agreement | $9,514.42 |
| **Total** | | **$121,694.23** |

67.    As detailed in TCP's Proof of Claim (Claim No. 10089), as of the Petition Date, TCP was owed no less than $338,379.21 in unpaid revenues collected by the Debtor on TCP's behalf.

68.    The $338,379.21 in unpaid revenues owed to TCP are owed from the following assets under the operating agreements identified below:

| Asset | Operating Agreement | Unpaid Revenue |
|---|---|---|
| Bates 2-2 #1 | Mt. Carmel Prospect Operating Agreement | $237,202.19 |
| Garret et al 4-7 #1 | Brewton Prospect Operating Agreement | $1,283.11 |
| Perry Ranch 30-7 #1 | Mule Creek Prospect Operating Agreement | $4,044.26 |
| Polk Estate et al. 13-5 #1 | Mt. Carmel Prospect Operating Agreement | $95,849.65 |
| **Total** | | **$338,379.21** |

69.    The record of the above-captioned bankruptcy case is clear that the Debtor's management diverted funds, including the Unpaid Revenues, for improper uses and the Unpaid Revenues have not been paid to any of the Anderson Entities.

**K. The Cash Call Advances.**

70.    Pursuant to the governing operating agreements, discussed above, the Debtor, as operator, from time to time made requests to the working interest owners

(including the Anderson Entities) for advances of operating expenses on the units, *i.e.*, the Cash Call Advances.

71.     As of the Petition Date, AEEC had paid no less than $264,355.38 for Cash Call Advances on the Howard 12-15 #1 Pipeline that were not used and/or accounted for by the Debtor as required by the North Pachuta Prospect Operating Agreement.

72.     As of the Petition Date, TCP had paid no less than $332,395.72 for Cash Call Advances on the Pitnic 16-3 #1 Pipeline that were not used and/or accounted for by the Debtor as required by the Mt. Carmel Prospect Operating Agreement.

**L.  The JIBs.**

73.     From the commencement of the above-captioned bankruptcy case, the Debtor has continued to issue JIBs to the Anderson Entities and other working interest owners. The Anderson Entities paid the JIBs sent to them through most of the life of the case in a timely fashion, resulting in approximately $418,696.47 in post-petition JIBs being paid by the Anderson Entities to the Debtor to date.

74.     The Anderson Entities' obligations to pay JIBs and payment of the Cash Call Advances arise under the same contracts and transactions as do the Debtor's obligations to pay the Unpaid Revenues.

**M. The Anderson Entities' Request for Recoupment.**

75.     The doctrine of recoupment applies to the Anderson Entities, as they are entitled to recoup the Unpaid Revenues and Cash Call Advances paid by withholding payment of the JIBs and applying such withheld amounts to the outstanding balance of

22

the Cash Call Advances already made and to the Unpaid Revenues until such time as the Unpaid Revenues are paid in full for Anderson Exploration, AEEC, and TCP.

76. Pursuant to Section 8.16 of the Debtor's Plan, the Anderson Entities provided notice to the Debtor of their intention to seek recoupment against post-petition JIBs for the Unpaid Revenues and Cash Call Advances. A copy of the Anderson Entities' September 7, 2021 letter to the Debtor and East West Bank requesting consent for recoupment is attached to this Motion and incorporated herein by reference as **Exhibit 10**.

77. Section 8.16 of the Debtor's Plan provides:

> Recoupment: Except as expressly set forth herein, in no event shall any Revenue Party be entitled to recoup or assert any rights of setoff against any account receivable or JIB, including any joint interest billing obligations arising after the Effective Date, owed or allegedly owed to the Debtors and/or the Reorganized Debtors unless: (a) such Revenue Party actually provides notice thereof in writing to the Debtors and EWB of its intent to perform a recoupment or setoff no later than fourteen (14) days following the Confirmation Date; (b) such notice includes the amount to be recouped or setoff by the holder of the Claim or Interest and a specific description of the basis for the recoupment or setoff; and (c) the Debtors and EWB consent to a recoupment or setoff within ten (10) days of receipt of the Notice. If no consent is received within such time period, it shall constitute a rejection or denial of the recoupment or setoff claim by the Debtors and EWB. In the event that the Debtors and/or EWB do not consent to recoupment or setoff, such recoupment or setoff claim shall be allowed only upon entry of a final order from the Bankruptcy Court, and the party asserting a recoupment or setoff claim shall assert such claim in Bankruptcy Court by motion no later than twenty-one (21) days following the Debtors and EWB's rejection of the recoupment claim. Upon filing such motion, the Reorganized Debtors, EWB, and other parties in interest shall have fourteen (14) days to file a

response. Failure to properly and timely provide notice and/or timely file any claims for recoupment or setoff against a JIB Obligation, including joint interest billing obligations owed after the Effective Date, by a Revenue Party shall result in a release, waiver, and denial of all recoupment or setoff claims that may be or could have been asserted by such Revenue Party with respect to such JIB Obligations.

78.     The Debtor failed to respond to the Anderson Entities' September 7, 2021 letter within the ten (10) day time period provided for by Section 8.16. As such, the Anderson Entities have filed this Motion seeking an order of this Court permitting recoupment.

## REQUESTS FOR RELIEF

### A. Recoupment of the Unpaid Revenues.

79.     Pursuant to Section 8.16 of the Debtor's Plan, the Anderson Entities have filed this Motion seeking an Order from the Court allowing recoupment of the Unpaid Revenues owed to each of them against their respective obligations to pay the JIBs until the earlier of (a) the outstanding balance of the Unpaid Revenues owed each of the Anderson Entities is paid in full, or (b) the Debtor no longer serves as operator of the units and wells identified herein.

80.     Recoupment, unlike setoff, receives more lenient treatment from bankruptcy courts.

81.     The Tenth Circuit, and others, apply the "single integrated transaction test" to determine whether the obligations at issue "arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction

without also meeting its obligations." *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3rd Cir. 1992).

82.    The Tenth Circuit has held, when examining whether recoupment should apply, that a debtor cannot "accept the benefits of an executory contract without its burdens." *Ashland Petroleum Co. v. Appel (In re B&L Oil Co.)*, 782 F.2d 155, 159 (10th Cir. 1986). While the Debtor has rejected the operating agreements described above, it continued to accept the benefits of those contracts through confirmation of its plan, and continues to serve as operator on all of the properties identified above to this day.[1] The Debtor continues to operate the units, receiving payments from non-operating working interest owners and its share of production from the units operated.

83.    This Court has previously identified three (3) inquiries relating to whether recoupment is appropriate: (1) whether the claims constitute a single integrated transaction or are separate transactions that are independently determinable; (2) whether the claim by the creditor is more like a defense to the debtor's claim than a separate, independent claim; and (3) the equities of the case.

84.    The Unpaid Revenues are revenues from the sale of production by the Debtor, as operator, for each of the Anderson Entities. The operating agreements provide that these revenues are owned by the Anderson Entities and must be accounted for by the Debtor until they are used for their intended purposes, paid to the working interest owner,

---

[1] The Anderson Entities understand that the operator transition process has picked up speed post-confirmation.

or used for the payment of debts.[2] The Debtor has failed to account for these amounts and continues to bill the Anderson Entities and other working interest owners for their share of operating expenses instead of applying the amounts to the JIBs as stated in the operating agreements.

85.     The claim for recoupment of the Unpaid Revenues due under a JOA against the JIBs due under the same JOA comprise a single integrated transaction. The Unpaid Revenues are owned by the Anderson Entities; pursuant to each of the JOAs, those revenues may be used for payment of the relevant Anderson Entity's debt owed to the Debtor under the same JOA. The Debtor has issued post-petition JIBs to the Anderson Entities, a debt they owe to the Debtor. Pursuant to the governing agreements, the Unpaid Revenue due to a working interest owner may be applied to that working interest owner's debts. Accordingly, the Anderson Entities should be permitted to recoup, on a JOA-by-JOA basis, until the amount of the Unpaid Invoices is recovered in full or the Debtor no longer serves as operator of the properties.

**B. Recoupment of the Cash Call Advances.**

86.     Pursuant to Section 8.16 of the Debtor's Plan, the Anderson Entities have filed this Motion seeking an Order from the Court allowing recoupment of the Cash Call Advances paid against their respective obligations to pay the JIBs for the same amounts billed until the earlier of (a) the outstanding balance of the Cash Call Advances made by

---

[2] By way of example, *see* Section V.E of the Mt. Carmel Prospect Operating Agreement, attached as Exhibit 8.

4820-2234-2910 v2

AEEC and TCP are paid in full, or (b) the Debtor no longer serves as operator of the units and wells identified herein.

87.     The Debtor made requests for pre-payment of costs to AEEC associated with the Howard 12-15 #1 Pipeline under the North Pachuta Operating Agreement. As of the Petition Date, AEEC had made payments in the amount of $264,355.38 for Cash Call Advances under the North Pachuta Operating Agreement. The Debtor has continued to bill AEEC post-petition for amounts associated with operations under that agreement without any credit for these pre-payments.

88.     Similarly, the Debtor made requests for pre-payment of costs to TCP associated with the Pitnic 16-3 #1 Pipeline under the Mt. Carmel Prospect Operating Agreement. As of the Petition Date, TCP had made payments in the amount of $332,395.72 for Cash Call Advances under the Mt. Carmel Operating Agreement. The Debtor has continued to bill TCP post-petition for amounts associated with operations under that agreement without any credit for these pre-payments. Accordingly, recoupment of the Cash Call Advances are appropriate.

## CONCLUSION

The Anderson Entities request that the Court enter an Order finding (1) that the recoupment procedure in the Debtor's Plan applies and that the Anderson Entities are entitled to recoup the Unpaid Revenues owed each of the Anderson Entities against their respective obligations to pay the JIBs until the earlier of (a) the outstanding balance of the Unpaid Revenues owed to teach of the Anderson Entities is paid in full, or (b) the Debtor no longer serves as operator of the units and wells identified herein; (2) that the

recoupment procedure in the Debtor's Plan applies and that AEEC and TCP are entitled to recoup the Cash Call Advances made against their respective obligations to pay the JIBs until the earlier of (a) the outstanding balance of the Cash Call Advances made by AEEC and TCP are paid in full, or (b) the Debtor no longer serves as operator of the units and wells identified herein.; and (3) for such other and further relief as the Court deems just and proper.

Dated: October 8, 2021                     Respectfully submitted:

                                           KEAN MILLER LLP
                                           */s/ J. Eric Lockridge*
                                           J. Eric Lockridge
                                           (TX# 24013053, LA #30159)
                                           eric.lockridge@keanmiller.com
                                           KEAN MILLER LLP
                                           400 Convention Street, Suite 700
                                           P. O. Box 3513 (70821-3513)
                                           Baton Rouge, LA  70802
                                           Telephone:  (225) 387-0999
                                           Telecopier: (225) 388-9133

                                           ***Counsel for Anderson Exploration Energy
                                           Company, L.C., TCP Cottonwood, L.P., and
                                           AEEC II, LLC***

4820-2234-2910 v2