# EXHIBIT 1

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease"), made as of the _8_ day of _April_, 2013, by and between 5395 PEARL PARKWAY, LLC, a Colorado limited liability company (herein called "Landlord"), and SKLAR EXPLORATION COMPANY LLC, a Louisiana limited liability company (herein called "Tenant").

### WITNESSETH:

### ARTICLE I

### DEFINITIONS, GRANT, TERM

**Section 1.01.   DEFINITIONS.**   In addition to the terms defined elsewhere in this Lease, the following terms shall have the following meanings:

"**Base Rent**" The initial Base Rent shall be calculated by multiplying the applicable net rentable square feet by the following rates for the respective periods of the Lease as follows:

| Period | $/Sq. Ft. | Net Rentable Square Feet | Annual Rate | Monthly Rate |
|--------|-----------|--------------------------|-------------|--------------|
| 5/1/13-4/30/14 | $16.25 | 7,554 RSF | $122,752.50 | $10,229.38 |
| 5/1/14-4/30/15 | $17.00 | 7,554 RSF | $128,418.00 | $10,701.50 |
| 5/1/15-4/30/16 | $17.75 | 7,554 RSF | $134,083.50 | $11,173.63 |
| 5/1/16-4/30/17 | $18.50 | 7,554 RSF | $139,749.00 | $11,645.75 |
| 5/1/17-4/30/18 | $19.25 | 7,554 RSF | $145,414.50 | $12,117.88 |
| 5/1/18-4/30/19 | $20.00 | 7,554 RSF | $151,080.00 | $12,590.00 |
| 5/1/19-4/30/20 | $20.75 | 7,554 RSF | $$156,745.50 | $13,062.13 |

"**Building**" The building having a physical address of 5395 Pearl Parkway, Boulder, Colorado.

"**Building Net Rentable Area**" 60,017 net rentable square feet.

"**Expiration Date**" April 30, 2020.

"**Landlord's Broker**" Keys Commercial Real Estate, LLC

"**Landlord Payment Address**" 1919 14th Street, Suite 800, Boulder, Colorado 80302, or at such other place as Landlord may from time to time designate in writing.

"**Landlord's Work**" The tenant improvements to be constructed in the Premises, in accordance with and as more fully described in Rider 5.01 hereto.

"**Premises**" The office space known as Suite 110 and Suite 200, in the Building, containing approximately 7,554 rentable square feet, as more particularly described on the floor plan attached as Exhibit A and incorporated herein by this reference.

"**Rent Commencement Date**" May 1, 2013.

"**Tenant's Address**" 5395 Pearl Parkway, Suite 110, Boulder, Colorado 80301.

"**Tenant's Share**" For purposes of this Lease, Tenant's Share shall be based upon the Total Net Rentable Area divided by the Building Net Rentable Area (defined below) and shall be equal to 12.59%.

"**Total Net Rentable Area**" 7,554 net rentable square feet.

**Section 1.02.     PREMISES.** In consideration of the rents, covenants and agreements of this Lease to be observed and performed by Tenant, Landlord demises and leases to Tenant, and Tenant rents from Landlord the Premises together with any improvements, rights-of-way, easements and any other rights, if any, appurtenant thereto. The Premises does not include any portion of the roof of the Building, other exterior surface of the Building or any communication facilities or equipment or other improvements located thereon or attached thereto and other than as expressly provided in Article VIII, this Lease does not grant any rights to Tenant with respect to the roof of the Building, other exterior surface of the Building or any communication or other improvements located thereon or attached thereto. Such rights, if any, must be set forth in a separate written agreement between Landlord and Tenant.

**Section 1.03.     COMMENCEMENT AND EXPIRATION OF LEASE TERM.** The term of this Lease (the "Lease Term") shall commence on the Rent Commencement Date and expire on the Expiration Date (subject to extension as provided in the following sentence).

## ARTICLE II

## USE

**Section 2.01.     USE.** Unless otherwise approved in writing by Landlord (which approval may be given or withheld in Landlord's sole discretion), the Premises shall be used and occupied by Tenant for general office and any reasonably related lawful purposes and for no other purpose. Tenant shall, at all times and at its sole expense, comply with all applicable Laws (as defined below), including, without limitation, all applicable zoning laws, and shall be solely liable for its failure to so comply.

**Section 2.02.     USES PROHIBITED.** Subject to Section 2.01, Tenant shall not do or permit anything to be done in or about the Premises which will in any way increase the existing rate of, or affect, any fire or other insurance upon the Building or cause a cancellation of any insurance policy covering the Building, or generate a traffic flow into the Building exceeding reasonable levels of traffic flow by tenants operating for general office purposes.

**Section 2.03.     SUITABILITY.** Tenant acknowledges that Landlord has made any representation or warranty with respect to the Premises or the Building or with respect to the suitability of either for the conduct of Tenant's business, nor has Landlord agreed to undertake any modification, alteration or improvement to the Premises except as expressly provided in this Lease.

4811-9657-1410.3

# ARTICLE III

# RENT

**Section 3.01.   BASE RENT.**  Commencing on the Rent Commencement Date and on the first day of each calendar month thereafter during the Lease Term, Tenant agrees to pay to Landlord in advance and without any prior notice or demand therefor and without any deduction or set-off whatsoever, the monthly installments of Base Rent as set forth in Section 1.01, together with such increases as are provided for therein.  Landlord hereby agrees to deliver monthly invoices to Tenant's Address (without any obligation to deliver copies to any other party) setting forth Base Rent, Tenant's Share of Operating Expenses and other amounts payable by Tenant to Landlord under this Lease; provided, however, that the failure or delay by Landlord to provide Tenant with any monthly invoice shall not constitute a waiver by Landlord of Tenant's obligation to pay Base Rent, Operating Expenses or any other amounts due hereunder nor relieve Tenant of its obligation to timely pay all amounts due under this Lease.

**Section 3.02.   ADDITIONAL RENT.**  All additional amounts other than Base Rent payable by Tenant under this Lease shall be payable, and referred to in this Lease, as "Additional Rent" and shall be payable on the next date that Base Rent is due pursuant to Section 3.01 unless other payment dates are set forth herein.  Landlord shall have the same rights and remedies with respect to the failure by Tenant to pay Additional Rent as Landlord has with respect to the failure by Tenant to pay Base Rent.  Nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Landlord.

**Section 3.03.   OPERATING EXPENSES.**  Commencing on the Rent Commencement Date and on the first day of each calendar month thereafter during the Lease Term, Tenant shall pay in advance, as Additional Rent for the Premises and the Building, Tenant's Share of Operating Expenses (as defined below), accruing after the Rent Commencement Date, in the amounts described in Section 3.04.

(a)        **Maintenance and Operating Costs.**  The term "Operating Expenses" shall mean the aggregate of those actual costs and expenses paid by or on behalf of Landlord (whether directly or through independent contractors) relating to the ownership, maintenance and operation of the Building which are specifically defined in Rider 3.03 attached hereto and made a part hereof.  Landlord shall make no profit from its collection of Operating Expenses.

(b)        **Controllable Expenses.**  Commencing as of May 1, 2015 and continuing throughout the Lease Term, so long as no Tenant default has occurred and is continuing, Controllable Expenses (as hereafter defined) included in Operating Expenses in any calendar year shall not increase by more than five percent (5%) on an annual, cumulative and compounded basis, over the actual aggregate Controllable Expenses included in Operating Expenses for the immediately preceding Lease year.  For purposes of this section, "Controllable Expenses" shall mean all Operating Expenses except: (1) insurance carried by Landlord with respect to the Building (including the property on which the Building is situated) and/or the operation thereof; (ii) Taxes; (iii) utilities costs, including, without limitation, water, sewer, gas and electricity and (iv) snow and trash removal.

(c)        **Intentionally omitted.**

(d)        **Separate Metering.**  Landlord has installed separate submeter(s) for electric utilities (which includes air conditioning) and reserves the right to install separate submeter(s) for one or more additional utility services provided to the Premises.  As a result of any such

submetering, (i) the cost of the applicable utility shall not be included in Operating Expenses for purposes of calculating Tenant's Share of Operating Expenses, and (ii) Tenant shall pay to Landlord as Additional Rent the actual cost of such utility service(s) to the Premises as calculated by such submeter(s) as set forth on invoices delivered by Landlord to Tenant, inclusive of Landlord's reasonable administrative fee.

Section 3.04. ESTIMATES AND PAYMENTS. Commencing on the Rent Commencement Date and continuing throughout the Lease Term, Tenant agrees to pay monthly, as Additional Rent, one-twelfth (1/12) of Landlord's estimate of Tenant's Share of Operating Expenses for the then current calendar year. Landlord estimates in good faith that Tenant's Share of Operating Expenses for 2013 will be Seven and 50/100 Dollars ($7.50) per rentable square foot of Total Net Rentable Area (which amount is subject to change). Landlord will give Tenant written notice from time to time of such estimated amounts determined in good faith by Landlord based upon Landlord's operating budget, and Tenant shall pay such amounts monthly to Landlord in the same manner and at the same time as Base Rent. Landlord will use reasonable efforts to submit to Tenant by May 1 of each year a detailed statement (which shows each expense individually and in a manner where Tenant can inspect the type and amount of each expense) showing the Operating Expenses on a per rentable square foot basis for the preceding calendar year along with a reconciliation of estimated payments made by Tenant as compared to Tenant's actual payments for such calendar year (each, an "Operating Statement"). However, the failure or delay by Landlord to provide Tenant with an Operating Statement shall not constitute a waiver by Landlord of Tenant's obligation to pay Operating Expenses or of Landlord's right to send an Operating Statement, nor shall it constitute a waiver of its right to reconcile payments of Operating Expenses. Within thirty (30) days after receipt of an Operating Statement, Tenant shall pay to Landlord any undisputed additional amounts owed to Landlord as shown on the Operating Statement. Any monies owed Tenant by Landlord shall be applied by Landlord against the next accruing monthly installment(s) of Operating Expenses due from Tenant, or if the Lease Term has expired, shall be paid to Tenant within sixty (60) days after the date upon which the next monthly installment of Operating Expenses would have accrued had the Lease not expired, provided Tenant has provided Landlord with its current address. Any payments due under this Article III shall be prorated for any partial calendar year occurring during the Lease Term. Tenant's obligation to pay any amounts due under this Article III and Landlord's obligation to refund any overpayments made by Tenant under this Article III for the final year of the Lease Term shall survive the Expiration Date or earlier termination of this Lease. Unless Tenant shall take written exception to any item contained in an Operating Statement within sixty (60) days after delivery thereof, the Operating Statement shall be deemed final and accepted by Tenant.

Section 3.05. AUDIT RIGHTS. The books and records showing all Operating Expenses shall be open to inspection by Tenant, or its designated agents, during Normal Business Hours (as defined in Section 4.01 below) for a period of sixty (60) days after Tenant's receipt of the Operating Statement. If, as a result of such inspection, Tenant objects to any part of Landlord's computation of the actual Operating Expenses, and independent auditors confirm Tenant's objections (within such 60 day inspection period), then Landlord shall, in accordance with Section 3.04 hereof, after Landlord's receipt of written notice of the independent auditor confirmation, apply any excess payment against the next accruing monthly installments of Operating Expenses. If, however, such examination reveals that Tenant has underpaid Additional Rent, then Tenant shall, within fifteen (15) days and in accordance with Section 3.04, pay to Landlord the full amount of such underpayment. Tenant shall be solely responsible for the costs and expenses of such independent auditors unless the aggregate discrepancy between the Landlord's total computation and the independent auditor's total computation is equal to or greater than 5% of Landlord's total computation, in which case Landlord shall be solely responsible for the costs and expenses of such independent auditors.

4

## ARTICLE IV

## SERVICES PROVIDED BY LANDLORD

**Section 4.01.    SERVICES.**  Landlord agrees to furnish, subject to the terms of this Lease, elevator, water, gas and electricity, suitable for the intended use of the Premises, heat and air conditioning ("HVAC") required in Landlord's judgment for the use and occupancy of the Premises, to the Premises during the hours of normal business operation as reasonably determined by Landlord from time to time, being not less than 8:00 a.m. to 9:00 p.m. Monday through Friday (excluding weekends and holidays) (hereinafter called "Normal Business Hours") and basic janitorial services (subject to the terms of Section 12.01). Tenant shall be entitled to HVAC service other than during Normal Business Hours, but Tenant shall be invoiced directly at a rate of $85.00 per hour for any HVAC usage outside of Normal Business Hours, which costs Tenant shall pay within thirty (30) days after receipt of said invoice(s). If Tenant is furnished additional services, or if Tenant's use of the Premises causes additional expense, Tenant will pay the additional expense within thirty (30) days of invoice. If Tenant wishes to install electrical equipment using services which exceed that usually furnished for use in general office space, Tenant will obtain the prior written approval of Landlord, Landlord may cause, at Landlord's expense, a meter or meters to be installed in the Premises to measure any such excess electricity or additional services, and Tenant will pay as Additional Rent the additional cost incurred in connection with such additional services and metering.

**Section 4.02.    INTERRUPTION OF SERVICE.**  Landlord shall not be liable for damages or consequential damages or in any other way in the event of loss, damage, failure, interruption, defect or change in the quantity or character or supply of electricity or any other utility service furnished to the Premises, unless caused by the negligence or willful misconduct of Landlord, its agents, contractors or employees, and Tenant agrees that such supply may be interrupted for inspection, repairs, or in case of emergency; nor shall the foregoing be construed as a constructive eviction of Tenant, or excuse Tenant from failing to perform any of its obligations hereunder. Landlord shall attempt to provide Tenant with reasonable advance notice of any scheduled interruption of services (other than in an emergency), and shall use commercially reasonable efforts to schedule any potentially disruptive, non-emergency repairs, or examination outside Normal Business Hours. Landlord shall only be required to maintain such services as are reasonably possible under the circumstances in the event all or any part of such systems, facilities and equipment are destroyed, damaged or impaired until completion of the necessary repair or replacement. Landlord shall have no liability to Tenant, its agents, employees, contractors, visitors, guests, invitees or licensees for damages or consequential damages or in any other way for losses due to any criminal act or for damages done by unauthorized persons on the Premises and the Building, and Landlord shall not be required to insure against any such losses. Tenant shall cooperate fully in Landlord's efforts to maintain security in the Building.

**Section 4.03.    SECURITY MEASURES.**  Tenant hereby acknowledges that although Landlord may from time to time provide security protection for the Building or any part thereof, in which event the cost thereof shall be recoverable by Landlord as an Operating Expense under this Lease, and Landlord shall have no obligation to provide any such security measures for the benefit of the Tenant, the Premises or the Building. Tenant assumes all responsibility for the protection of Tenant, its agents, employees, contractors, visitors, guests, invitees or licensees and its and their property from acts of third parties.

**Section 4.04.    ACCESS TO PREMISES.**

(a)    Landlord and Landlord's agents and representatives shall have the right to enter the Premises (i) at any time and without notice in case of an emergency; and (ii) at all other

5

times upon 24 hour prior notice to Tenant, for any purpose permitted pursuant to the terms of this Lease, including, but not limited to, examining the Premises, making repairs, auditing Tenant's compliance with this Lease, showing the Premises to prospective purchasers or mortgagees and, during the last year of the Lease Term, prospective tenants, and posting notices of non-responsibility.

(b)     Tenant shall not change any existing locks or add any additional locks to any doors for or within the Premises without the Landlord's prior written consent, and delivery to Landlord of a set of keys for all changed and additional locks.  In an emergency Landlord shall have the right to use any and all means to open the doors to the Premises in order to obtain entry thereto, without liability to Landlord and at Tenant's sole cost of restoration.  Any entry to the Premises by Landlord by any of the foregoing means, or otherwise, shall not be construed or deemed to be a forcible or unlawful entry into or a detainer of the Premises, or an eviction, partial eviction or constructive eviction of Tenant from the Premises or any portion thereof, and shall not relieve Tenant of its obligations under this Lease.

(c)     During the Lease Term, Tenant shall have access to the Premises, the Building and the Parking Facilities with all utilities and services available to it, twenty-four (24) hours a day, seven (7) days a week, fifty-two (52) weeks a year.

Section 4.05.    LANDLORD'S RIGHT TO CURE.  All agreements and provisions to be performed by Tenant under any of the terms of this Lease shall be at Tenant's sole cost and expense if so provided herein and without any abatement of Base Rent or Additional Rent.  If Tenant shall fail to perform any act or to pay any sum of money (other than Base Rent) required to be performed or paid by it hereunder, or shall fail to cure any other default and such failure shall continue beyond any applicable notice and grace period set forth herein, then Landlord may, at its option, and without waiving or releasing Tenant from any of its obligations hereunder, make such payment or perform such act on behalf of Tenant.  All sums paid and all costs incurred by Landlord in taking such action shall be deemed Additional Rent and shall be paid to Landlord on demand.

Section 4.06.    LANDLORD RESERVATIONS.  Landlord reserves and retains all rights to make use of the surface, subsurface and airspace above the surface of the Building and of the interior, exterior and roof of the Building, except as specifically granted to Tenant under this Lease.  Subject to the terms of Section 20.01, Landlord shall have the right to grant any easements, licenses or other rights of use on, over, under and above, and within or upon the Building for such purposes as Landlord determines. Notwithstanding the foregoing, Landlord shall not exercise its rights under this Section 4.06 in a manner which materially and adversely deprives Tenant's right to quiet possession of the Premises under this Lease.

Section 4.07.    TENANT'S OBLIGATIONS.

(a)     Tenant shall pay for, prior to delinquency, all telephone and all other materials, maintenance contracts, supplemental air and other services, not expressly required to be paid by Landlord, which may be furnished to or used in, on or about the Premises during the Lease Term and any renewal hereof.

(b)     Tenant will not, without the written consent of Landlord, use any apparatus or device in the Premises, which will in any way increase the amount of electricity or water beyond the amount customarily furnished or supplied for use of the Premises in accordance with the uses expressly set forth in Section 2.01 hereof; nor connect with electric current, except through

6

existing electrical outlets in the Premises, or water pipes, any apparatus or device, for the purpose of using electric current or water.

(c)    Wherever heat generating machines or equipment are used in the Premises which affect the temperature otherwise maintained by the air conditioning system, Landlord reserves the right to assess Tenant for additional air conditioning or to install supplementary air conditioning units in the Premises and the cost thereof, including the cost of installation, operation and maintenance thereof, shall be paid by Tenant to Landlord within ten (10) days after demand by Landlord. Notwithstanding the foregoing, this Section 4.07(c) shall not apply to Tenant's use of machines and equipment which are typically used in general office settings.

## ARTICLE V

## INTENTIONALLY OMITTED

## ARTICLE VI

## COMPLIANCE WITH LAWS AND RULES

**Section 6.01.    GOVERNMENTAL REGULATIONS.**

(a)    Tenant, at its sole expense, shall comply with all current and future laws, orders and regulations of federal, state, county and municipal authorities and with any directive of any public officer or officers pursuant to law ("Laws") applicable to the Premises which shall impose any violation, order or duty upon Landlord or Tenant with respect to the Premises or the Building or the use or occupation of the Premises or the Building, including, without limitation, all applicable Laws, relating to public health and safety and protection of the environment.

(b)    Tenant will immediately notify Landlord and provide copies upon receipt of all written complaints, claims, citations, demands, inquiries, reports, or notices relating to the condition of the Premises or compliance with Laws. Tenant will promptly cure and have dismissed with prejudice any such actions and proceedings to the satisfaction of Landlord. Tenant will keep the Premises free of any lien imposed pursuant to any Laws, where such lien is imposed as a result of Tenant's failure to comply with applicable Laws as required under this Lease.

## ARTICLE VII

## PARKING

During the Lease Term, Landlord agrees to provide Tenant with the nonexclusive use of the parking area servicing the Building ("Parking Facilities") at a ratio of 4 parking spaces per every 1,000 square feet of Total Net Rentable Area. In addition, Landlord shall provide Tenant with three (3) parking spaces in the Parking Facilities for the exclusive use of Tenant ("Sklar Spaces"). Other than the charges set forth in this Lease for maintenance and repair of the Parking Facilities, there shall be no specific or additional charge for use of the Parking Facilities during the Lease Term. It is specifically understood and agreed that, other than the Sklar Spaces, the Parking Facilities located on the Property shall be for the nonexclusive use of all tenants in the Building, but shall be limited to the use of such tenants' employees, visitors, guests or invitees only. Tenant and its agents, employees, contractors,

7

visitors, guests, invitees or licensees shall not interfere with the rights of Landlord or others entitled to similar use of the Parking Facilities.

Landlord shall not be liable for any damage of any nature to, or any theft of, vehicles, or contents thereof, in or about the Parking Facilities. Excessive use of the Parking Facilities by others shall not be a default or breach of this Lease by Landlord, and shall not suspend or terminate any of Tenant's obligations under this Lease.

**ARTICLE VIII**

**INTENTIONALLY OMITTED**

**ARTICLE IX**

**COMMON USE AREAS**

**Section 9.01.    CONTROL OF COMMON AREAS AND FACILITIES BY LANDLORD.** All common areas and facilities associated with the Building shall at all times be subject to the exclusive control and management of Landlord, and Tenant's use of the same shall be subject to the terms of this Lease.

**ARTICLE X**

**INTENTIONALLY OMITTED**

**ARTICLE XI**

**ALTERATIONS AND SIGNAGE**

**Section 11.01.  ALTERATIONS.**

(a)    **Construction.** After the Rent Commencement Date, Tenant shall not, without Landlord's prior written consent (which shall not be unreasonably withheld), make any alterations, improvements, or additions in, on or about the Premises or the Building (collectively "Alterations"). At the time Landlord approves any Alteration, Landlord shall inform Tenant whether Tenant shall be required to remove such Alteration or whether such Alteration shall become the property of Landlord on the expiration or earlier termination of the Lease; provided, however, that with respect to any Alteration(s) in the amount of $5,000 or less in the aggregate, the parties shall mutually agree whether Tenant shall be required to remove such Alteration.

(b)    **Permits and Approvals.**

(i)    Tenant shall acquire and comply with all necessary permits and approvals from all applicable governmental agencies for work requiring governmental permits or approval. Promptly upon the completion of all such work, Tenant shall furnish Landlord with a copy of each permit, with signatures indicating final governmental approval of the work, and Tenant shall furnish Landlord, at Tenant's sole expense, a printed set of as-built plans, showing the work in place. Landlord shall provide Tenant with electronic files of the Premises at no cost or expense from which any Alterations shall be included or updated and provided to the Landlord.

8

(ii)     Tenant shall be solely responsible for and shall pay when due all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises, the Building, or any interest therein. Tenant shall give Landlord not less than ten (10) days' notice prior to the commencement of any work in the Premises that requires a governmental permit or approval. Tenant shall post notices of Landlord's non-responsibility for payment for Tenant's Alterations in or on the Premises or the Building as provided by law, and Landlord shall have the right to post such notices if Tenant fails to do so. Without limitation, Tenant shall comply with Section 12.04 with respect to all Alterations.

(c)     **Ownership of Alterations.** All Alterations by Tenant shall be made and done in a good and workmanlike manner and of good and sufficient quality and materials, shall comply with all applicable Laws including, without limitation, the Americans With Disabilities Act, as amended from time to time and state and local laws related to disabled, handicapped access and shall be the property of Landlord and remain upon and be surrendered with the Premises at the expiration of the Lease Term, unless Landlord informs Tenant (at the time of Landlord's approval) that removal is required. Landlord's consent to any Alteration shall not be deemed to limit or waive Landlord's right to require Tenant's removal of same.

**Section 11.02.  SIGNS.**

(a)     **Premises/Building Signage.** Tenant may not install signs on the exterior of the Premises or the Building, except as otherwise. The main entrance door sign, monument sign and any interior signs visible from the exterior of the Premises shall be subject to Landlord's prior approval as to size, design, location and lighting, which may be withheld in its sole discretion; provided signs shall not be fluorescent. Upon Tenant's written request, Landlord agrees to provide, at Landlord's expense, standard signage package provided to other tenants in the Building. All signs and placards must comply with the sign criteria promulgated by Landlord from time to time, and all applicable Laws. Sign criteria shall be uniformly applied to all tenants of the Building and shall be enforced impartially. Tenant shall pay all costs of fabrication, installation, maintenance, repair and removal of any signs installed pursuant to this subsection and affected portions of the Premises or Building, as applicable.

(b)     **Removal.** Prior to vacating the Premises, Tenant shall, at its sole cost and expense, remove any Tenant-installed sign(s) and placards from the Premises and the Building, and upon the removal or alteration of any of its sign(s) and placards for any reason, Tenant shall repair, paint, restore or replace the surface beneath such signs or placards damaged by such installation or removal. If Tenant fails to comply with its sign removal and restoration obligations, Landlord may, without liability, enter upon the Premises or the Building, and perform Tenant's sign removal and restoration obligations, all at Tenant's expense.

## ARTICLE XII

### TENANT'S MAINTENANCE, REPAIR AND SURRENDER OF PREMISES

**Section 12.01.  TENANT'S MAINTENANCE.** Tenant shall maintain and repair the Premises, including all interior glass and entryway glass serving the Premises, in good order and repair and shall preserve them in the condition delivered to Tenant on the Rent Commencement Date, normal wear and tear excepted. Tenant shall not permit or commit waste of the Premises or the Building. Tenant shall be responsible for cleaning (other than basic janitorial services if and as provided by Landlord pursuant to

Section 4.01), repainting and redecorating the Premises, cleaning drapes or other window coverings and carpets at reasonable intervals as determined by Tenant in its reasonable discretion, and making repairs, replacements and alterations as needed, in a good and workmanlike manner in accordance with the terms and provisions of this Lease, including those governing the performance of any Alterations to the Premises, using contractors approved by Landlord in its reasonable discretion, and Building-Standard materials.  Tenant shall be responsible for replacing lamps and bulbs in lighting fixtures within the Premises.  Tenant shall, at its own expense, provide janitorial service to any room requiring special procedures.  Tenant shall repair or replace, at Tenant's sole cost, to the extent not covered by insurance, any damage done to the Building or any part thereof caused by Tenant or Tenant's agents, employees, contractors, visitors, guests, invitees or licensees, normal wear and tear excepted.

Section 12.02.  SURRENDER OF THE PREMISES.  On the last day of the Lease Term or on any earlier termination, Tenant shall peaceably and quietly quit and surrender the Premises to Landlord in the same condition as received on the Rent Commencement Date or the date of relocation, as the as the case may be, clean and free of debris, excepting only ordinary wear and tear.  Any damage or deterioration of the Premises shall not be deemed ordinary wear and tear if it could have been prevented by prudent maintenance practices by Tenant and by Tenant's compliance with the provisions of this Lease including the Rules and Regulations attached hereto.  Subject to the provisions regarding removal set forth in Section 11.01 of this Lease, Tenant shall leave all Alterations on the Premises in good operating condition, subject to ordinary wear and tear.  Tenant shall return all keys and access cards provided by Landlord, if applicable.  In the event Tenant fails to return all keys and access cards for the Premises, to the extent provided by Landlord, Tenant shall be assessed the cost of re-keying or replacing the access cards for the Premises at Landlord's then prevailing rate.

Section 12.03.  REIMBURSEMENT.  If Tenant refuses or neglects to repair and maintain the Premises as required hereunder and to the reasonable satisfaction of Landlord, within thirty (30) days after written demand, Landlord may make such repairs without liability to Tenant for any loss or damage that may accrue to Tenant's furniture, fixtures, or other property or to Tenant's business by reason thereof.  Upon completion thereof, Tenant shall pay Landlord's costs for making such repairs plus, as Additional Rent, such additional fees or charges as Landlord may impose from time to time for reasonable overhead, supervision and other costs and services incurred or provided by Landlord in connection with the repairs.

Section 12.04.  LIENS.

(a)    Prohibition.  Tenant shall keep the Premises and the Building free from any liens arising out of any work performed, materials furnished, or obligations incurred by or on behalf of Tenant, except if such work is performed by Landlord on Tenant's behalf.  Should any mechanic's or other lien be filed against the Premises or the Building by reason of Tenant's or its agents' or contractors' acts or omissions or because of a claim against Tenant, Tenant shall cause it to be canceled and discharged of record by bond or otherwise within twenty (20) days after the filing thereof.  Should Tenant fail to discharge such lien within the twenty (20) day period, Landlord may do so by whatever means Landlord deems appropriate, in which event Tenant shall reimburse Landlord, on demand, as Additional Rent, for the amount of the lien or the amount of the bond, if greater, plus all reasonable administrative costs incurred by Landlord in connection therewith.  The remedies provided herein shall be in addition to all other remedies available to Landlord.

(b)    Liability to Third Parties.  Nothing contained in this Lease shall be construed as constituting the consent or request of Landlord, express or implied, to, or for the performance by, any contractor, laborer, materialman or vendor of any labor or services or for the furnishing of

10

any materials for any construction, alteration, addition, repair or demolition of or to the Premises or any part thereof. Tenant and any subtenants shall have no power to do any act or make any contract that may create or be the foundation of any lien, mortgage or other encumbrance upon the reversionary or other estate of Landlord, or any interest of Landlord in the Premises or the Building. Notice is hereby given that Landlord is not and shall not be liable for any labor, services or materials furnished or to be furnished to Tenant or to anyone holding the Premises or any part thereof, and that no mechanics' or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to the Premises or the Building.

## ARTICLE XIII

### INSURANCE AND INDEMNITY

**Section 13.01. TENANT'S INSURANCE.** Tenant shall procure and maintain throughout the Lease Term of this Lease, at its sole cost and expense, the insurance identified on Rider 13.01 which is incorporated in and made a part hereof. The minimum limits of insurance coverage required by Rider 13.01 shall not limit the liability of Tenant for its acts or omissions as provided in this Lease. All insurance required hereunder shall be placed with companies which are rated A-:VII or better by Best's Insurance Guide and licensed to do business in the state in which the Building is located. All such policies shall be written as primary policies not contributing with and not supplemental to the coverage that Landlord may carry, with deductibles not to exceed one percent (1%) of the amount of coverage Tenant shall be responsible for the payment of any deductible in the event of an insured loss. Tenant shall deliver certificates for all such policies prior to the Rent Commencement Date, or, in the case of renewals thereto, fifteen (15) days prior to the expiration of the prior insurance policy, together with evidence that such policies are fully paid for, and that no cancellation, material change or non-renewal thereof shall be effective except upon thirty (30) days' prior written notice from the insurer to Landlord. If Tenant shall fail at any time to procure or maintain the insurance required herein, or to provide proof of insurance as required, or if the insurer notifies Landlord that any coverage is to be canceled or non-renewed, such failure or event shall be an Event of Default hereunder, and Landlord may, at its option, procure such insurance on Tenant's behalf and the cost thereof, inclusive of an administrative fee of 10% of such cost, shall be payable within 10 days after demand, as Additional Rent. Payment by Landlord of any insurance premium or the carrying by Landlord of any such insurance policy shall not be deemed to waive or release the default of Tenant with respect thereto.

**Section 13.02. LANDLORD'S INSURANCE.** Landlord shall maintain at all times during the Lease Term all-risk property insurance for fire and casualty, hazard and extended coverage, covering the Building in amounts equal to the full replacement cost of the Building at the time in question. Upon written request by Tenant, Landlord shall provide to Tenant copies of certificate(s) of insurance evidencing such coverage.

**Section 13.03. SUBROGATION.** Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each hereby waives any and all rights of recovery, claim, action or cause of action against the other for any loss or damage to any property of Landlord or Tenant, arising from any cause that (a) would be insured against under the terms of any property insurance required to be carried under this Lease; or (b) is insured against under the terms of any property insurance actually carried, regardless of whether the same is required hereunder. The foregoing waiver shall apply regardless of the cause or origin of such claim, including but not limited to the negligence of a party, or such party's agents, officers, employees or contractors. The foregoing waiver shall not apply if it would have the effect, but only to the extent of such effect, of invalidating any insurance coverage of Landlord or Tenant. The foregoing waiver shall also apply to any deductible, as if the same were a part of the insurance recovery.

11

Section 13.04.  INDEMNIFICATION AND WAIVER.

(a)    **Tenant's Indemnification.**  Tenant shall indemnify, defend and hold harmless Landlord and its affiliates and its and their officers, directors, employees, attorneys and agents (collectively, the "Indemnitees") from and against any and all third party claims, demands, causes of action, judgments, costs, expenses, and all losses and damages ("Claims") (excluding consequential and punitive damages) arising from Tenant's use of the Premises or from the conduct of its business or from any activity, work, or other acts or things done, permitted or suffered by Tenant in or about the Premises or the Building and shall further indemnify, defend and hold harmless the Indemnitees from and against any and all Claims arising from any breach or default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or arising from any act or omission of Tenant, or any officer, agent, employee, independent contractor, guest, or invitee thereof, and from all costs, reasonable attorney fees and disbursements, and liabilities incurred in the defense of any such Claim or any action or proceeding which may be brought against, out of or in any way related to this Lease. Upon notice from Landlord, Tenant shall defend any such claim, demand, cause of action or suit at Tenant's expense.  The provisions of this Section 13.04 shall survive the expiration or earlier termination of this Lease.

(b)    **Waiver of Landlord Liability.**  As a material part of the consideration to Landlord for this Lease, Landlord shall have no liability for and Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause, and Tenant hereby waives all claims for any and all losses, damages (including consequential or punitive damages) with respect thereto and other costs arising therefrom against Landlord and its affiliates and their respective officers, shareholders, partners, managers, members, employees, contractors and agents, and Tenant waives all claims against such parties for any and all losses, damages (including consequential or punitive damages) and other costs arising from any cause whatever (unless caused by Landlord's negligence or willful misconduct), including, without limitation, any such injury or damage caused by or resulting from (i) fire, explosion, smoke, gas, electricity, water or rain which may leak from any part of the Building or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface or from any other places resulting from dampness or any other cause whatsoever, (ii) the acts or omissions of any other tenant or any officer, agent, employee, contractor or guest of any such tenant (iii) interference with the electrical service, HVAC, utilities or other services to the Premises, (iv) any latent defect in the Premises or Building, (v) any act, omission, event or circumstance for which Tenant is required to insure, or (vi) any construction, Alterations or repair required or permitted to be performed by Tenant or Landlord under this Lease.  Tenant shall give notice to Landlord immediately (but in no event later than 24 hours) in the case of casualty or accidents in the Premises.

## ARTICLE XIV

### OFFSET STATEMENT, ESTOPPEL, ATTORNMENT AND SUBORDINATION

Section 14.01.  **OFFSET STATEMENT, ESTOPPEL.**  At any time and from time to time upon written request by Landlord, Tenant hereby agrees to deliver within ten (10) days after request, an offset statement or estoppel certificate in or upon the form supplied by Landlord or any existing or proposed ground lessor, mortgagee or assignee, certifying (if such be the case):  (a) that Tenant has accepted the Premises (or, if Tenant has not done so, that Tenant has not accepted the Premises, and specifying the reasons therefore); (b) that this Lease is in full force and effect, and (c) that there are no defenses or offsets to the obligations of Tenant hereunder and that there are no defaults by Tenant or

12

Landlord hereunder (or stating those claimed by Tenant), and (d) such other information as may be reasonably required by Landlord or such proposed ground lessor, mortgagee, or assignee.

Section 14.02. ATTORNMENT. Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Premises or in the event of any termination of any underlying lease, attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser or lessor under any underlying lease as Landlord under this Lease, without change in the terms or other provisions of such Lease; provided, however, that the successor in interest, may, at its option, accept or reject such attornment, and shall not be bound by (a) any payment of Base Rent or Additional Rent for more than one month in advance, except prepayments in the nature of security for the performance by the Tenant of its obligations under the Lease, (b) any security deposited with any landlord under the Lease except to the extent said successor actually receives such deposit, (c) any act or omission, or default by any previous landlord under the Lease, (d) any other existing or past offsets or defenses that the Tenant may have under the Lease, and (e) any amendment or modification of the Lease made without the consent of the Assignee or such successor in interest.

Section 14.03. SUBORDINATION. This Lease, and all rights and interests of Tenant hereunder, at Landlord's option, shall be subordinate to any ground lease, mortgage, deed of trust, or any other hypothecation or security now or hereafter placed upon the Building or any interest of Landlord therein (collectively "Mortgage") and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding such subordination, Tenant's right to quiet possession of the Premises shall not be disturbed if Tenant is not in default unless this Lease is otherwise terminated pursuant to its terms. If any mortgagee, trustee or ground lessor shall elect to have this Lease be senior to the lien of its Mortgage, and shall give written notice thereof to Tenant, this Lease shall be deemed senior to such Mortgage, whether this Lease is dated prior or subsequent to the date of said Mortgage or the date of recording thereof. Tenant agrees to execute any documents required to effectuate an attornment, a subordination, or to make this Lease prior to the lien of any Mortgage. Tenant's failure to execute such documents within ten (10) days after written demand shall constitute an Event of Default by Tenant hereunder without further notice to Tenant.

## ARTICLE XV

## ASSIGNMENT AND SUBLETTING

Section 15.01. ASSIGNMENT AND SUBLETTING.

(a)     Landlord's Consent Required. Tenant shall not voluntarily or by operation of law assign, transfer, sublet, mortgage, collaterally assign, or otherwise transfer or encumber (referred to as "Assignment of Interest") all or any part of Tenant's interest in the Lease or in the Premises, without Landlord's prior written consent, which shall not be unreasonably withheld. Tenant hereby agrees that Landlord shall be deemed to be reasonable in withholding its consent if (i) for the first four years of the Lease Term, the proposed assignment or sublease is for a rental rate less than the current rental rate and terms being offered by Landlord in the Building for space comparable to the Premises; (ii) for the first four years of the Lease Term, the proposed assignment or sublease is to any party who is then a tenant of the Building if Landlord has comparable area available at that time; (iii) the proposed sublease or assignment results in two or more tenants per suite included in the Premises; (iv) there exists an Event of Default, as defined in Section 18.01 below, at the time of request for consent or on the effective date of such subletting or assigning; (v) the proposed subtenant or assignee is, in Landlord's good faith judgment, incompatible with other tenants in the Building, or seeks to

13

use any portion of the Premises for a use not consistent with other uses in the Building, or is financially incapable of assuming the obligations of this Lease; or (vi) Landlord's mortgagee for the Project shall object to such proposed assignment and/or subletting. Tenant shall submit to Landlord the name of a proposed assignee or subtenant, the terms of the proposed assignment or subletting, the nature of the proposed subtenant's or assignee's business, and such information as to the assignee's or subtenant's financial responsibility and general reputation as Landlord may reasonably require. Landlord may also consider the amount of square feet of the Premises proposed to be subleased and the number of employees the subtenant anticipates will utilize the Premises. Tenant shall pay Landlord, as Additional Rent hereunder, Landlord's reasonable costs incurred in reviewing any such request in an amount not to exceed one thousand dollars ($1,000.00), including fees and costs of Landlord's attorneys and accountants, such fees not to exceed one thousand five hundred dollars ($1,500.00). Landlord shall respond to Tenant's written request for consent hereunder within fifteen (15) days after delivery of a request for Landlord's approval. Failure of Landlord to respond shall be deemed disapproval. Any attempted Assignment of Interest without Landlord's prior written consent shall be void, and shall constitute a material default and breach of this Lease without a requirement for notice to Tenant under any provision of this Lease.

(b)     No assignment of this Lease or subletting of some or all of the Premises shall release Tenant of Tenant's obligations hereunder or alter the primary liability of Tenant to pay all Base Rent and Additional Rent due under this Lease and to perform all obligations to be performed by Tenant under this Lease.

(c)     Notwithstanding the foregoing, Landlord may within fifteen (15) days after receipt of a written request from Tenant to approve an assignment or sublease, notify Tenant of Landlord's election to terminate this Lease (or if a subletting of only a part of the Premises is involved, terminate this Lease only as to the part and reduce the Base Rent, Additional Rent and other monetary obligations of Tenant proportionately), which election, if made, shall be effective no less than sixty (60) nor more than ninety (90) days after the date of such election. If such election is made by Landlord, Tenant shall surrender the Premises (or if a subletting of only a part of the Premises is involved, only that part) to Landlord on the effective date of such termination, and Tenant shall thereafter incur no further liability under this Lease for the Premises (or for that part of the Premises required to be surrendered). Notwithstanding the foregoing, Tenant may, within fifteen (15) days after receipt of Landlord's election to terminate the Lease, withdraw its request to assign or sublease the Premises, which terminates Landlord's election to terminate the Lease. The provisions of this Section 15.01(c) shall not apply to a Permitted Transfer (as defined in Section 15.01(e) below).

(d)     Upon any default by Tenant under this Lease, Landlord may proceed directly against Tenant or anyone else responsible for the performance of this Lease, including the subtenant, without first exhausting Landlord's remedies against any other person or entity responsible therefor to Landlord, or any security held by Landlord or Tenant. Landlord's written consent to any assignment or subletting of the Premises by Tenant shall not constitute an acknowledgment that no default then exists under this Lease of the obligations to be performed by Tenant, nor shall such consent be deemed a waiver of any then existing default, except as may be otherwise stated in writing by Landlord at the time. No assignment of this Lease shall be effective unless and until Tenant shall deliver to Landlord an agreement in form and substance reasonably satisfactory to Landlord pursuant to which such assignee assumes and agrees to be bound by all of the terms, covenants, conditions, provisions and agreements of this Lease. No sublease entered into by Tenant shall be effective unless it contains an

14

agreement of the subtenant to be bound by all of the terms, covenants, conditions, provisions and agreements of this Lease applicable to the subleased portion of the Premises. Tenant shall use only such form of sublease as has been approved by Landlord, in Landlord's reasonable discretion.

(e)     Notwithstanding anything to the contrary herein, Tenant may, without obtaining Landlord's consent, make an Assignment of Interest to the following parties (each, a "transferee") on the following conditions (a "Permitted Transfer"): (i) any subsidiary or affiliate of Tenant of which Tenant owns a controlling interest; (ii) any controlling parent corporation of Tenant; (iii) any subsidiary or affiliate of Tenant's parent corporation of which such parent owns a controlling interest; and (iv) any corporation into which Tenant merges or consolidates or which purchases all or substantially all of the assets or stock of Tenant, provided that the resulting corporation has a net worth at least equal to Tenant's net worth as of the Rent Commencement Date; the foregoing subsections (i) through (iv), inclusive, of this Section 15.01(e) are subject to the following conditions: (A) unless Tenant shall not survive a merger, Tenant remains primarily liable on all of its obligations hereunder; (B) the transferee assumes and is bound by all obligations of Tenant for payment of all amounts of Base Rent, Additional Rent and other sums and the performance of all covenants required by Tenant pursuant to this Lease; (C) the transferee complies with the usage restrictions of this Lease; and (D) not less than thirty (30) days prior to the effective date of the Assignment of Interest, Tenant notifies Landlord of the proposed Permitted Transfer and thereafter provides Landlord with such evidence as Landlord may reasonably require to establish that such Assignment of Interest meets the requirements of a Permitted Transfer; provided, that in the event such Assignment of Interest does not satisfy the requirements for a Permitted Transfer set forth in this subsection (e), Landlord shall have the right to disapprove of any such Assignment of Interest.

(f)     Tenant shall pay Landlord fifty percent (50%) of Assignment of Interest and/or Permitted Transfer net proceeds that exceed Tenant's Base Rent and Additional Rent (on a per square foot basis), after Tenant is reimbursed for Tenant's reasonable and customary out-of-pocket costs incurred in such Assignment of Interest and/or Permitted Transfer, including attorneys' fees, Alterations, tenant improvement costs and broker commissions. For purposes of this Section, all money or value in whatever form received by Tenant from or on account of any party as consideration for an Assignment of Interest or Permitted Transfer shall be deemed to be proceeds received by Tenant.

## ARTICLE XVI

## DESTRUCTION OF PREMISES AND BUILDING

**Section 16.01. DESTRUCTION OF THE PREMISES.** If the Premises shall be damaged by fire, the elements, accident or other casualty, but are not thereby rendered untenantable in whole or in part, Landlord shall cause such damage to be repaired, and the Base Rent and Additional Rent shall not be abated. If the Premises shall be rendered partially or wholly untenantable by reason of such occurrence, Landlord shall cause such damage to be repaired, and until the Premises have been restored and rendered tenantable, the Base Rent and Additional Rent shall abate, or Landlord may at its election terminate this Lease and the tenancy hereby created by giving to Tenant within the sixty (60) days following the date of said occurrence, written notice of Landlord's election to so terminate and in the event of such termination Base Rent and Additional Rent shall be adjusted as of such date. Landlord's obligation to repair under this Section 16.01 (i) is expressly limited to the extent of any insurance proceeds paid to and received by Landlord, and (ii) shall at all times be subject to obtaining all necessary approvals from all applicable

governmental entities, and the holder of any Mortgage and the willingness of such holder to make the proceeds of casualty insurance policies available to Landlord for such purposes. Landlord shall not be liable for any delay that is beyond the reasonable control of Landlord in the completion of the repair and restoration of the Premises. Landlord shall use said proceeds to restore the Premises to the condition it was in following completion of the tenant improvements, and in such event, Tenant shall at its sole expense restore and replace the alterations and other improvements installed by or on behalf of Tenant.

Section 16.02. **DESTRUCTION OF BUILDING.** In the event that fifty percent (50%) or more of the rented and rentable ground floor area of the Building shall be damaged or destroyed by fire or other cause, notwithstanding that the Premises may be unaffected by such fire or other cause, Landlord may at Landlord's option either (1) repair such damage or destruction as soon as reasonably practicable at Landlord's expense (to the extent the required materials are readily available through usual commercial channels) to its condition existing at the time of the damage, including all improvements other than Tenant's Alterations, fixtures or equipment that are removable by Tenant (or which Landlord has required Tenant to remove) upon the termination of this Lease, and this Lease shall continue in full force and effect, or (2) give written notice to Tenant within sixty (60) days after the date of occurrence of such damage of Landlord's intention to cancel and terminate this Lease, in which case this Lease shall terminate as of the date of the occurrence of such damage.

Section 16.03. **WAIVER.** Landlord and Tenant waive the provisions of any statute that relates to termination of leases when leased property is destroyed and agree that such event shall be governed by the terms of this Lease.

Section 16.04. **NOTICE OF DAMAGE.** Tenant shall give immediate written notice to Landlord of any damage caused to the Premises by fire or other casualty.

## ARTICLE XVII

## EMINENT DOMAIN

Section 17.01. **TOTAL CONDEMNATION OF PREMISES.** If the whole of the Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, then the term of this Lease shall cease and terminate as of the date of title vesting in such proceeding and all Base Rent and Additional Rent and any other amounts due hereunder shall be paid up or adjusted, as the case may be, to that date and Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease.

Section 17.02. **PARTIAL CONDEMNATION.** If any part of the Premises shall be acquired or condemned as aforesaid, and in the event that such partial taking or condemnation shall render the Premises unsuitable for the business of Tenant, then the term of this Lease shall cease and terminate as of the date of title vesting in such proceeding. Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease and Base Rent and Additional Rent shall be adjusted to the date of such termination. In the event of a partial taking or condemnation which is not extensive enough to render the Premises unsuitable for the business of Tenant, then Landlord shall promptly restore the Premises to a condition comparable to its condition at the time of such condemnation less the portion lost in the taking, and this Lease shall continue in full force and effect and Base Rent and Additional Rent shall be equitably adjusted, unless Landlord shall exercise any right to relocate Tenant granted to Landlord under this Lease.

Section 17.03. **LANDLORD'S DAMAGES.** In the event of any condemnation or taking as aforesaid, whether whole or partial, Tenant shall not be entitled to any part of the Landlord's award paid

16

for such condemnation and Landlord is to receive the full amount of such Landlord's award, Tenant hereby expressly waiving any right or claim to any part thereof.

Section 17.04. TENANT'S DAMAGES. Although all Landlord's damages in the event of any condemnation are to belong to Landlord whether such damages are awarded as compensation for diminution in value of the leasehold or to the fee of the Premises, Tenant shall have the right to claim and recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be exposed in removing Tenant's furniture, fixtures, leasehold improvements and equipment. In the event of any condemnation or taking as aforesaid, whether whole or in part, Tenant shall not be entitled to any part of the Landlord's award paid for such condemnation. However, if Tenant's award is granted in a lump sum with Landlord's award, Landlord shall pay to Tenant therefrom such amount as is due to Tenant.

## ARTICLE XVIII

## EVENTS OF DEFAULT

Section 18.01. EVENTS OF DEFAULT

(a)     **Definition.** In addition to any other event specified in this Lease as an "event of default" or "Event of Default", the occurrence of any one or more of the following events during the Lease Term (each, individually, an "Event of Default" and collectively, "Events of Default") shall constitute a breach of this Lease by Tenant and Landlord may exercise the rights set forth in this Lease or as otherwise provided at law or in equity:

(i)     Tenant shall fail to pay any Base Rent or any Additional Rent (or cure any other default which is curable by the payment of money) when due; provided, however, that Tenant shall be entitled to written notice of late payment and a five calendar day grace period one time per calendar year during the Lease Term.

(ii)     Tenant shall default in the performance of or compliance with any of the other covenants, agreements, terms or conditions of this Lease to be performed by Tenant (other than any default curable by the payment of money), and, unless expressly provided elsewhere in this Lease that no notice and/or opportunity to cure such default is to be afforded Tenant, such default shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant, or, in the case of a default which cannot with due diligence be cured within thirty (30) days, Tenant fails to commence such cure promptly within such thirty (30) day period and thereafter diligently prosecute such cure to completion within ninety (90) days. Notwithstanding the above, Tenant must immediately remedy any default that imminently threatens an injury or harm to any person or property.

(iii)     Tenant shall become insolvent within the meaning of the United States Bankruptcy Code, as amended from time to time (the "Code"); shall have ceased to pay its debts in the ordinary course of business; shall be unable to pay its debts as they become due; shall make a general assignment for the benefit of creditors; shall file, take any action to file, or notify Landlord that Tenant intends to file, a petition, case or proceeding under any section or chapter of the Code, or under any similar law or statute of the United States or any state thereof relating to bankruptcy, insolvency,

17

reorganization, winding up or composition or adjustment of debts; shall be adjudicated as a bankrupt or insolvent; shall seek to or consent to or acquiesce in the appointment of any receiver, trustee, liquidator or other custodian of Tenant or any material part of its properties, whether or not it relates to their interests in this Lease; or Tenant shall notify Landlord that it anticipates the occurrence of any of the foregoing conditions; or take any other action for the purpose of effecting any of the foregoing clauses.

(iv)    Intentionally Omitted.

(v)    Any execution or attachment is issued against Tenant or any of its property whereupon the Premises shall be taken or occupied or attached, or attempted to be taken or occupied or attached by someone other than Tenant, which execution or attachment is not vacated within thirty (30) days thereafter.

(vi)    Intentionally Omitted.

(vii)    Tenant does or permits to be done anything which creates a lien upon the Premises or the Building and such lien is not discharged (or otherwise bonded over) by Tenant within twenty (20) days after the filing thereof or such other specific time period as may be expressly stated in this Lease.

(viii)    This Lease shall be transferred to or shall pass to or devolve upon any other person or party except in the manner set forth in Section 15.01.

**Section 18.02.  LANDLORD'S REMEDIES UPON DEFAULT.**

(a)    **Termination or Possession.**  Upon the occurrence of any Event of Default, Landlord shall have the option to pursue any one or more of the following remedies, in addition to, or in lieu of, any and all remedies available to Landlord under the laws of the State of Colorado:

(i)    Landlord may give Tenant written notice of its election to terminate this Lease, effective on the date specified therein, whereupon Tenant's right to possession of the Premises shall cease and this Lease, except as to Tenant's liability determined in accordance with this Lease, shall be terminated.

(ii)    In accordance with applicable law, Landlord and its agents may immediately re-enter and take possession of the Premises, or any part thereof, either by summary proceedings, or by any other applicable action or proceeding, or by force or otherwise (without being liable for indictment, prosecution or damages therefor) and may repossess the Premises as Landlord's former estate and expel Tenant and those claiming through or under Tenant, and remove the effects of both or either, without being deemed guilty in any manner of trespass, and without prejudice to any remedies for arrears of Base Rent and Additional Rent or Tenant's breach of covenants or conditions.

(iii)    Should Landlord elect to re-enter as provided herein above or should Landlord take possession pursuant to legal proceedings or pursuant to any notice provided by law, Landlord may, without terminating this Lease, relet the Premises or any part thereof in Landlord's or Tenant's name, but for the account of Tenant, for such term or terms (which may be more or less than the period which would otherwise have constituted the balance of the Lease Term) and on such terms and conditions (which may

18

include concessions of free rent and alteration, repair and improvement of the Premises) as Landlord, in its sole discretion, may determine, and Landlord may collect and receive the rents therefor without relieving Tenant of any liability under this Lease or otherwise affecting any such liability, except that all amounts actually collected shall be offset against damages otherwise payable by Tenant; provided, that Landlord shall not be liable for failure to relet the Premises or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise to affect any such liability. No such re-entry or taking possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such intention is given to Tenant. No notice from Landlord hereunder or under a forcible entry and detainer statute or similar law shall constitute an election by Landlord to terminate this Lease unless such notice specifically so states. Landlord reserves the right following any such re-entry and/or reletting to exercise its right to terminate this Lease by giving Tenant written notice thereof, in which event this Lease will terminate as specified in said notice.

(iv)    Landlord may give Tenant written notice of its election to terminate any unexercised right of expansion, right of first offer, right of first refusal, right of renewal and/or any other similar right granted to Tenant under the terms of this Lease.

(b)    **Right to Re-Enter.** Tenant, on its own behalf and on behalf of all persons claiming through or under Tenant, including all creditors, does further hereby waive any and all rights which Tenant and all such persons might otherwise have under any present or future law to redeem the Premises, or to re-enter or repossess the Premises, or to restore the operation of this Lease, after (i) Tenant shall have been dispossessed by a judgment or by warrant of any court or judge, or (ii) any re-entry by Landlord, or (iii) any expiration or termination of this Lease and the Lease Term, whether such dispossession, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease. The words "re-enter", "re-entry" and "re-entered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings. In the event of a breach or threatened breach by Tenant, or any persons claiming through or under Tenant, of any term, covenant or condition of this Lease on Tenant's part to be observed or performed, Landlord shall have the right to enjoin such breach and the right to invoke any other remedy allowed by law or in equity as if re-entry, summary proceedings and other special remedies were not provided in this Lease for such breach. The right to invoke the remedies hereinbefore set forth are cumulative and shall not preclude Landlord from invoking any other remedy allowed at law or in equity.

(c)    **Damages.**

(i)    In the event this Lease is terminated in accordance with the provisions of Section 18.02(a)(i), Tenant shall remain liable to Landlord for damages in an amount equal to the Base Rent and any Additional Rent and any other sums due hereunder as of the date of termination of this Lease plus the Base Rent and any Additional Rent which would have been owing by Tenant hereunder for the balance of the Lease Term (collectively, the "Aggregate Gross Rent") had this Lease not been terminated, less the net proceeds, if any, received as a result of any reletting of the Premises by Landlord subsequent to such termination, after deducting all of Landlord's expenses including, without limitation, all repossession costs, brokerage commissions, legal expenses, reasonable attorney fees, expenses of employees, alteration and repair costs and expenses of preparation for such reletting (collectively, the "Reletting Costs"). Landlord shall be

19

entitled to collect Base Rent, any Additional Rent and all other damages from Tenant monthly on the days on which Base Rent and any Additional Rent would have been payable hereunder if this Lease had not been terminated. Alternatively, at the option of Landlord, in the event this Lease is so terminated, Landlord shall be entitled to recover forthwith against Tenant, as liquidated damages and not as a penalty, the present value of the Aggregate Gross Rent and Reletting Costs less the aggregate rental value of the Premises for what otherwise would have been the unexpired balance of the Lease Term. In the event Landlord shall relet the Premises for the period which otherwise would have constituted the unexpired portion of the Lease Term (or any part thereof), the amount of Base Rent and Additional Rent and other sums payable by the tenant thereunder shall be deemed prima facie to be the rental value for the Premises (or the portion thereof so relet) for the term of such reletting. Tenant shall in no event be entitled to any rents collected or payable in respect of any reletting, whether or not such rents shall exceed the Base Rent and any Additional Rent reserved in this Lease. Tenant shall bear the burden of proof in any proceeding to determine the "rental value" for purposes of the above calculation.

(ii)     If Landlord does not elect to terminate this Lease, but takes possession, Tenant shall pay to Landlord the Base Rent and any Additional Rent which would be payable hereunder if such repossession had not occurred, less the net proceeds received by Landlord, if any, of any reletting of the Premises by Landlord after deducting the Reletting Costs to the extent not paid to Landlord pursuant to the following sentence. Tenant shall pay Base Rent and Additional Rent due Landlord, monthly, on the days on which rent would have been payable hereunder if possession had not been retaken.

(d)     **Cumulative Remedies.** Suit or suits for the recovery of Base Rent, Additional Rent and other amounts and damages may be brought by Landlord, from time to time, at Landlord's election, and nothing in this Lease shall be deemed to require Landlord to await the date when this Lease would have expired had there been no default by Tenant, or no termination, as the case may be. Each right and remedy provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, including, but not limited to, suits for injunctive relief and specific performance. The exercise or beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise. All such rights and remedies shall be considered cumulative and nonexclusive. All costs incurred by Landlord in connection with collecting any Base Rent and Additional Rent or other amounts and damages owing by Tenant pursuant to the provisions of this Lease, or to enforce any provision of this Lease, including reasonable attorney fees from the date such matter is turned over to an attorney, whether or not one or more actions are commenced by Landlord, shall also be paid by Tenant to Landlord.

(e)     **Miscellaneous.**

(i)     This Lease shall continue in effect for so long as Landlord does not terminate it, and Landlord may enforce all its rights and remedies under this Lease, including the right to recover the Base Rent and any Additional Rent, as the same become due under this Lease. Acts of maintenance or preservation or efforts to relet the Premises or the appointment of a receiver upon the initiative of Landlord to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's rights to

20

possession unless Landlord shall have specifically elected to terminate this Lease. No payments of money by Tenant to Landlord after the expiration or other termination of this Lease after the giving of any notice by Landlord to Tenant shall reinstate or extend the Lease Term, or make ineffective any notice given to Tenant prior to the payment of such money. After the service of notice or the commencement of a suit, or after final judgment granting Landlord possession of the Premises, Landlord may receive and collect any sums due under this Lease, and the payment thereof shall not make ineffective any notice, or in any manner affect any pending suit or any judgment theretofore obtained.

(ii)    If Tenant is in default under the terms hereof, Landlord shall have the right to remove all the Tenant's property from the Premises and dispose of said property in such a manner as determined best by Landlord, at the sole cost and expense of Tenant and without liability of Landlord for the actions so taken, subject to the rights of any mortgagee of Landlord.

## Section 18.03.  BANKRUPTCY.

(a)    In the event that Tenant shall become or be adjudicated bankrupt or insolvent, or if Tenant shall file or acquiesce in a petition in any court in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, or if Tenant shall make an assignment or other conveyance in trust for the benefit of its creditors, or if any execution or attachment shall be issued against Tenant or Tenant's property whereupon the Premises shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant and such execution or attachment shall not be dismissed, vacated, discharged or bonded within sixty (60) days after issuance of same, or if a receiver or Trustee shall be appointed for Tenant and such receivership be not discharged within twenty (20) days from the date of such appointment, then upon the happening of any of said events, the term hereby demised shall, at the option of the Landlord, cease and determine, it being expressly agreed that the covenant hereinafter contained against the assignment of this Lease shall cover the case of the assignment of this Lease by operation of law as well as the assignment of this Lease by a voluntary act of Tenant.

(b)    If this Lease shall be so canceled and terminated, neither Tenant nor any person claiming through or under Tenant by virtue of any statute or order of any court shall be entitled to remain in possession of the Premises but shall forthwith quit and surrender the Premises. In no event, without the written approval of Landlord, which approval may be granted or withheld at its sole discretion, shall this Lease be or be considered an asset of Tenant's estate in bankruptcy or insolvency, or any receiver or trustee (hereafter referred to as a "Trustee") with respect thereto.

(c)    To the extent that Landlord's right to cancel this Lease in accordance with the provisions of Article XVIII of this Lease is invalid or unenforceable under the Bankruptcy Reform Act of 1978 (the "Act"), as the same may be amended from time to time, or any other statute or rule of law, then the following provisions shall apply, to the extent valid and enforceable.

(d)    If there has been a default by Tenant under any provision of this Lease (other than this Section 18.03), the Trustee may not assume this Lease, unless, at the time of assumption of this Lease, the Trustee:

(i)    cures, or provides adequate assurance (to Landlord's reasonable satisfaction) that the Trustee will promptly cure such default; and

21

4811-9657-1410.3

(ii) provides adequate assurance (to Landlord's reasonable satisfaction) of future performance under the Lease, which shall include, without limitation, adequate assurance:

(A) of the source of rent and other consideration due under such Lease; and

(B) that assumption or assignment of such Lease will not breach substantially any provision, such as a radius, location, use or exclusivity provision, in any other lease, financing agreement or master agreement relating to the Building.

(e) If there has been a default by Tenant, the Trustee may not require the Landlord to provide services or supplies incidental to this Lease before assumption of this Lease unless the Landlord is compensated under the terms of this Lease for any unpaid services, supplies, Rent, Additional Rent, and any other amounts due under this Lease but unpaid by Tenant before assumption of this Lease.

(f) If this Lease is terminated under the provisions of this Section 18.03, or by reason of rejection by the Trustee, Landlord shall be entitled to the recovery of damages, and such other remedies, as are provided for in this Article XVIII. The foregoing sentence shall not, however, limit or prejudice the right of Landlord to petition for and obtain as liquidated damages in any bankruptcy, insolvency, receivership, reorganization or arrangement proceeding an amount equal to the maximum allowed by the Act or any other statute or rule of law governing such proceedings and in effect at the time when such damages are to be proved, whether or not such amount be greater, equal to or less than the amount of the damages referred to in the preceding sentence.

Section 18.04. **LANDLORD DEFAULT.** If Tenant believes that Landlord is in default of any of Landlord's obligations hereunder, Tenant shall give Landlord written notice of default. If Landlord does not cure such default within 30 days after notice, or, if the default cannot reasonably be cured within a 30-day period, if Landlord has not begun to take curative action or is not diligently pursuing completion of such curative action, then Tenant may, as its sole remedy for such default, bring an action for specific performance, damages, or both. Tenant's default notice shall be sent to mortgagees as specified later in this Lease. Under no circumstances shall Tenant be entitled to terminate this Lease, offset Base Rent or Additional Rent, or use self-help in the event of a default or alleged default by Landlord under this Lease.

Section 18.05. **LEGAL EXPENSES.** In the event that either party hereto shall bring legal action against the other party, then the substantially prevailing party shall be entitled to reimbursement from the other party for all expenses thus incurred, including reasonable legal fees.

Section 18.06. **INTENTIONALLY OMITTED.**

Section 18.07. **WAIVER OF JURY TRIAL.** THE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OR INJURY OR DAMAGE.

4811-9657-1410.3

**Section 18.08.  LATE PAYMENT FEES AND INTEREST CHARGE.**  In the event that any installment or payment of Base Rent or Additional Rent is not received when due for the applicable month of the Lease Term, or a check is tendered to Landlord which is returned by Landlord's bank for insufficient funds (each, a "late payment"), then for each and every such late payment, in addition to the payment then in arrears, Tenant shall immediately pay to Landlord, as Additional Rent, a late payment fee equal to five percent (5%) of the unpaid principal sum due plus simple interest accruing on the unpaid principal sum at the rate of eighteen percent per annum (18%) beginning on the date such money becomes due and payable until such money is paid in full.  The provisions in this Lease providing for the payment of a late payment fee shall not be construed to extend the date for payment of any sums required to be paid by Tenant hereunder or to relieve Tenant of its obligation to pay all such sums at the time or times herein stipulated.  Notwithstanding the imposition of such late payment fees pursuant to this Section 18.08, Tenant shall be in default under this Lease if any or all payments required to be made by Tenant are not made at the time herein stipulated, and neither the demand for, nor collection by, Landlord of such delinquent principal sums and late payment fees shall be construed as a cure of such default on the part of Tenant.

## ARTICLE XIX

### HOLDING OVER; SUCCESSORS

**Section 19.01.  HOLDING OVER.**  Any holding over after the expiration of the Lease Term hereof shall be construed to be a tenancy from month to month and the minimum monthly rent payable during such holdover period shall be an amount equal to 125% the Base Rent and Additional Rent payable during the last twelve month period of the Lease Term (pro rated on a monthly basis) and shall otherwise be on the terms and conditions herein specified, so far as applicable.

**Section 19.02.  SUCCESSORS.**  All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors, and assigns of the said parties, and if there shall be more than one party hereto as Tenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein.  No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as provided in Section 15.01 hereof.

## ARTICLE XX

### QUIET ENJOYMENT

**Section 20.01.  NO HINDRANCE.**  Landlord warrants that it has full right and power to execute and perform this Lease and to grant the estate demised herein and that Tenant, on payment of Base Rent and Additional Rent and performing the covenants herein contained, shall peaceably and quietly have, hold and enjoy the demised Premises for the uses and purposes herein set forth during the full Lease Term.  Landlord is hereby vested with full power and authority to subordinate Tenant's interest hereunder to any mortgage, deed of trust, or other lien hereafter placed on the Premises, and, subject to the provisions of Article XIV hereof, Tenant agrees upon demand to execute such further instruments subordinating this Lease as Landlord may request, provided such further subordination shall be upon the express condition that this Lease shall be recognized by the mortgagee and that the rights of Tenant shall remain in full force and effect during the Lease Term so long as Tenant shall continue to perform all of the covenants of this Lease.

4811-9657-1410.3

# ARTICLE XXI

## MISCELLANEOUS

**Section 21.01.  WAIVER.**  No waiver by the parties hereto of any default or breach of any term, condition or covenant of this Lease shall be deemed to be waiver of any subsequent default or breach of the same or any other term, condition or covenant contained herein.  The acceptance of Base Rent and Additional Rent or any other payment hereunder shall not be deemed a waiver of any preceding breach, and no waiver shall be deemed to have been given except if same be in writing.  The failure of the Landlord to collect any amount due pursuant to this Lease, whether Base Rent or Additional Rent, shall not act as a waiver of the collection of such amount, provided, however, that no action shall be brought to collect any such amount more than three (3) years after the expiration of this Lease.

**Section 21.02.  COUNTERPART.**  This Lease may be executed in counterparts with the same force and effect as if the parties had executed one instrument, and each such counterpart shall be deemed to constitute an original hereof.  Landlord and Tenant agree that the delivery of any executed copy of this Lease and all its constituent Exhibits, Riders and parts by facsimile or electronic portable document format shall be legal and binding and shall have the same full force and effect as if an original executed copy of this Lease had been delivered.

**Section 21.03.  ACCORD AND SATISFACTION.**  No payment by Tenant or receipt by Landlord of a lesser amount than the rent herein stipulated shall be deemed to be other than on account of the stipulated rent, nor shall any endorsement or statement on any check or any letter which may accompany any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

**Section 21.04.  ENTIRE AGREEMENT.**  This Lease, the Riders and the Exhibits attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written between them other than are herein set forth.  Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless prior written notification of such alteration, amendment, change or addition shall have been provided to and signed by both Landlord and Tenant.

**Section 21.05.  CHANGE OF NAME.**  Tenant agrees to provide Landlord with written notice of any change in the advertised name of the business operated in the Premises within 10 days after Tenant makes any such change.

**Section 21.06.  NO PARTNERSHIP.**  Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of Tenant's business or otherwise, or a joint venturer or a member of a joint enterprise with Tenant.

**Section 21.07.  FORCE MAJEURE.**  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay ("Force Majeure Delay").  The provisions of

this section shall not operate to excuse Tenant from prompt payment of Base Rent, Additional Rent or any other payments required of Tenant by the terms of this Lease.

Section 21.08.   NOTICES, PLACE RENT PAYABLE.

(a)      Any and all notices required or which either party herein may desire to give to the other (each, a "Notice") shall be made in writing and shall be given by certified or registered mail, postage prepaid, return receipt requested, or by a nationally recognized overnight courier, such as Federal Express or Airborne Express, or by personal service, or by electronic facsimile with proof of receipt, and shall be deemed to be given on the third business day after the date of posting in a United States Post Office or branch post office or one day after delivery to the overnight courier, or upon effecting personal service or delivery by facsimile, and shall be delivered to Landlord's Payment Address or Tenant's Address, as appropriate.  The parties agree that copies of all Notices to be delivered to Landlord and Tenant hereunder shall be simultaneously delivered to the specified addresses for copies set forth in Section 1.01, if any. Either party may, by notice given in the manner provided in this Section 21.08(a), designate a different address or addresses for communications intended for it.  Anything contained herein to the contrary notwithstanding, any bills or invoices for Base Rent, any Additional Rent or any Landlord's Operating Statement may be given by hand or by mail (which need not be registered or certified) and, if so given, shall be deemed given on the date of delivery or refusal, if by hand, or on the third (3rd) business day following the date of posting, if mailed.

(b)      Notices given hereunder by any party may be given by legal counsel for such party or by Landlord's agent.  The foregoing notice provisions shall in no way prohibit notice from being given as provided in the rules of civil procedure of the state in which the Building is located, as the same may be amended from time to time and any notice so given shall constitute notice herein.

Section 21.09.   CAPTIONS AND SECTION NUMBERS.   The captions, section numbers and article numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such sections or articles of this Lease, nor in any way affect this Lease.

Section 21.10.   TENANT DEFINED, LANDLORD DEFINED.   The word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more.   The term "Landlord" shall be deemed and taken to mean the Landlord, its successors and assigns.  If there shall be more than one party hereto as Tenant, the liability of each party under this Lease as Tenant shall be joint and several, and any notice required or permitted by the terms of this Lease may be given by or to any one thereof.   The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, or a group of two or more individuals or corporations.   The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or Tenant and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

Section 21.11.   GOVERNING LAW, PARTIAL INVALIDITY.   This Lease shall be construed and governed by the laws of Colorado.  If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable under the laws of the said State, or otherwise, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or

25

unenforceable, shall not be affected thereby and each term, covenant and condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**Section 21.12. REPRESENTATION OF PARTIES.** The parties hereto represent and warrant to each other that neither has been represented by any broker in connection with the negotiation and/or execution of this Lease other than Landlord's Broker on behalf of Landlord, and that there are no claims for brokerage commissions or finder's fees in connection therewith except as may be payable to Landlord's Broker, and that neither has dealt with a person, firm or corporation in connection herewith. Each of the parties hereto agrees to indemnify and hold harmless the other party against and from all liabilities arising from any such claim including, without limitation, the cost of counsel fees in connection therewith.

**Section 21.13. NO OPTION.** The submission of this Lease for examination does not constitute a reservation of or option for the Premises and this Lease becomes effective as a lease only upon execution and delivery thereof by Landlord and Tenant.

**Section 21.14. RECORDING.** Tenant shall not record this Lease or a memorandum hereof without the prior written consent of Landlord. Upon Landlord's request, Tenant agrees to execute and acknowledge a short form lease in recordable form, indicating the names and addresses of Landlord and Tenant, a description of the Premises, the Lease Term, the Lease and Rent Commencement Dates and Expiration Date, and options for renewal, if any, but omitting Base Rent and other terms of this Lease. Further, upon Landlord's request, Tenant agrees to execute and acknowledge a termination of lease in recordable form to be held by Landlord until the Expiration Date or earlier termination of the Lease Term.

**Section 21.15. NO PERSONAL LIABILITY.** IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT THERE SHALL BE NO PERSONAL LIABILITY ON LANDLORD OR TENANT OR ANY MEMBER, SHAREHOLDER, PARTNER, MANAGER, AGENT, EMPLOYEE OR COUNSEL OF LANDLORD OR TENANT IN RESPECT TO ANY OF THE COVENANTS, CONDITIONS OR PROVISIONS OF THIS LEASE. In no event shall Landlord or Tenant be liable to Tenant for any failure of other tenants in the Building to occupy their spaces or operate their businesses, or for any loss or damage that may be occasioned by or through the acts or omissions of other tenants. Notwithstanding anything to the contrary provided in this Lease, neither Landlord, Tenant, nor any member, manager, general or limited partner in or of Landlord or Tenant, whether direct or indirect, nor any direct or indirect member, manager or partner in such members or partners, nor any disclosed or undisclosed officers, managers, members, shareholders, principals, directors, employees, partners, servants or agents of Landlord or Tenant, nor any of the foregoing, nor any investment adviser or other holder of any equity interest in Landlord or Tenant, their successors, assigns, agents, or any mortgagee in possession shall have any personal liability with respect to any provisions of this Lease. If Landlord is in breach or default with respect to its obligations or otherwise, Tenant shall look solely to Landlord's interest in the Building for the satisfaction of Tenant's remedies and any judgment or award entered against Landlord.

**Section 21.16. ABANDONED PROPERTY.** Any property owned by Tenant and left in the Premises within 15 days after this Lease terminates, or after Tenant vacates the Premises, shall be deemed abandoned property and Landlord shall have the right, but not the obligation, to dispose of such property, without liability to Tenant for the disposal of such property.

Section 21.17. **AUTHORITY OF TENANT.** Each individual executing this Lease on behalf of Tenant represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of Tenant, and that this Lease is binding upon Tenant in accordance with its terms. Tenant shall, at the time of execution of this Lease, deliver to Landlord a document to this effect.

Section 21.18. **FINANCIAL STATEMENTS.** Tenant shall, when reasonably requested by Landlord, furnish to Landlord a true and accurate statement of its financial condition for its most recent fiscal year, prepared in conformity with generally recognized accounting principles or in another manner acceptable to Landlord. Landlord agrees to treat Tenant's financial statements as confidential and agrees to disclose them on a "need to know" basis only to prospective purchasers or ground lessors of the Premises or to lenders unless otherwise consented to by Tenant.

Section 21.19. **AUTHORITIES FOR ACTION.** Landlord may act through its managing agent for the Building or through any other person who may from time to time be designated by Landlord in writing. Tenant shall designate in writing one or more persons to act on its behalf and may from time to time change such designation by written notice to Landlord. In the absence of any such designation, the person or persons executing this Lease on behalf of Tenant shall be deemed to be authorized to act on behalf of Tenant in any matter provided for herein.

Section 21.20. **SEVERABILITY.** If any term or provision of this Lease or the application thereof to any person or circumstances shall be declared by a judicial body to be illegal, invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and all other terms and provisions of this Lease shall be valid and enforced to the fullest extent permitted by law.

Section 21.21. **INTERPRETATION.**

(a)      Whenever in this Lease any words of obligation or duty are used, such words or expressions shall have the same force and effect as though made in the form of a covenant.

(b)      All pronouns and any variances thereof shall be deemed to refer to the neuter, masculine, feminine, singular or plural, when the context requires.

(c)      No remedy or election given pursuant to any provision in this Lease shall be deemed exclusive unless so indicated, but each shall, wherever possible, be cumulative with all other remedies at law or in equity as otherwise specifically provided herein.

(d)      If, and to the extent that, any of the provisions of any amendment, modification or rider to this Lease conflict or are otherwise inconsistent with any of the preceding provisions of this Lease, whether or not such inconsistency is expressly noted in such amendment, modification or rider, the provisions of such amendment, modification or rider shall prevail.

(e)      The parties mutually agree that the headings and captions contained in this Lease are inserted for convenience of reference only.

(f)      This Lease shall be construed in accordance with the laws of Colorado.

(g)      Landlord and Tenant each acknowledge and warrant that it has been represented by independent counsel and has executed this Lease after being fully advised by said counsel as to its effect and significance. This Lease is the result of negotiations between the parties and their

4811-9657-1410.3

respective attorneys and no provision shall be construed against a party solely on the basis of authorship.

Section 21.22.   **JOINT AND SEVERAL OBLIGATION.**   If this Lease is executed by more than one party as "Tenant", the obligations of such parties as "Tenant" hereunder shall be the joint and several of such parties as "Tenant".

Section 21.23.   **NO LIGHT, VIEW OR AIR EASEMENT.**   This Lease does not grant any rights to light, view, or air to, from or over the Premises to the extent such items are affected by activities occurring off the Premises.  Any diminution or shutting off of light, view, or air by any structure which is now or hereafter erected on or off the Building property shall not affect this Lease or impose any liability on Landlord.

Section 21.24.   **PROHIBITED PERSONS AND TRANSACTIONS.**   Tenant and Landlord (each, a "Representing Party") each represents and warrants to the other (i) that neither the Representing Party nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, (ii) that the Representing Party's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the term of this Lease the Representing Party shall comply with the Executive Order and with the Money Laundering Act.

[END OF DOCUMENT TEXT]

4811-9657-1410.3

**IN WITNESS WHEREOF,** each party hereto has caused this Lease to be executed, all as of the day and year first above written.

LANDLORD:

**5395 PEARL PARKWAY, LLC,** a Colorado limited liability company

By: _Eric J Kramer_

Name: _Eric J. Kramer_

Title: _Manager_

TENANT:

**SKLAR EXPLORATION COMPANY LLC,** a Louisiana limited liability company

By: _Chris Farrell_

Name: _____

Title: _____
Christopher A. Farrell, CPA
Vice President - Chief Financial Officer
Sklar Exploration Company L.L.C.

WHERE TENANT IS A CORPORATION, THIS LEASE SHALL BE SIGNED BY A PRESIDENT OR VICE PRESIDENT AND SECRETARY OR ASSISTANT SECRETARY OF TENANT. ANY OTHER SIGNATORIES SHALL REQUIRE A CERTIFIED CORPORATE RESOLUTION.

EXHIBITS:

    A.    Floor Plan

    B.    Rules and Regulations

RIDERS:

    Rider 1.02 Right of First Offer

    Rider 3.03 Description of Operating Expenses

    Rider 5.01 Tenant Improvement Work Agreement

        Schedule I  Space Plan

        Schedule II  Certificate of Acceptance

    Rider 13.01 Tenant Insurance Requirements

# EXHIBIT A

## FLOOR PLAN



SKLAR EXPLORATION

5395 PEARL PARKWAY
BOULDER, CO 80302

## EXHIBIT B

## RULES AND REGULATIONS

1. No signs, placard, picture, advertisement, name or notice(s) shall be inscribed, displayed, printed or affixed on, or to, any part of the outside or inside of the Building, or to the Tenant suite door or side light, or in the Premises without the consent of Landlord, which consent shall not be unreasonably withheld. Landlord shall have the right to remove any such sign, placard, picture, advertisement, name or notice without notice to, and at the expense of, Tenant. All approved signs or lettering on doors shall be printed, painted, affixed or inscribed by a person approved by Landlord, which approval shall not be unreasonably withheld. Tenant shall not place, or allow anything to be placed, in an area with exposure to the public or near the glass of any window, door, partition or wall which may appear unsightly or inappropriate from outside the Premises.

2. The exterior and interior lobby directory of the Building will be provided exclusively for the display of the name and location of the Tenant and its subsidiaries housed therein (or additional name requisites which have been mutually agreed to by Tenant and Landlord) only and Landlord reserves the right to exclude any other names therefrom.

3. The sidewalks, hall, passages, exits, entrances, elevators and stairways shall not be obstructed in anyway by boxes, crates or trash debris, bicycles or other vehicles, of any of the tenants, or used by them for any purpose other than for ingress to and egress from their respective Premises. The halls, passages, exits, entrances, elevators, and stairways are not for the use of the general public and the Landlord shall, in all cases, retain the right to control and prevent access thereto by all persons whose presence, in the judgment of the Landlord, shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants, provided that nothing therein contained shall be construed to prevent such access to persons with whom the tenants normally deal in the ordinary course of Tenant's business. No Tenant and no employees or invitees of any Tenant shall go upon the roof of the Building nor into the electrical room or boiler room without the consent of Landlord.

4. The Tenant shall not alter any lock or install any new or additional locks or any bolts or access card readers on any door of the Premises without the consent of Landlord. If the Landlord shall give its consent, the Tenant shall, in each case, furnish the Landlord, property manager, maintenance team and Building engineer with a key for any such lock or card for card access, as well as an all access key for use by the fire department. Each Tenant must, upon the termination of its tenancy, return to the Landlord all keys and access cards furnished to such Tenant. In the event of the loss of any keys or access cards, such Tenant shall pay to the Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key or access card, if Landlord shall deem it necessary to make such change. Tenant shall not duplicate any keys obtained from Landlord. Tenant shall notify property management of any card access changes immediately. Subject to the terms of the Lease (specifically pertaining to Tenant installed security systems, if any), all keys (other than card access keys for the Tenant's security system) must be ordered through Landlord. Keys for any door in the Building or Premises may be duplicated only by Landlord. In the event of a Tenant installed security system, Tenant agrees to provide Landlord with an access card/key necessary to gain access to the suite via said Tenant installed security system.

5. The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed. No foreign substance of any kind shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the Tenant who, or whose employees or invitees shall have caused it. Vandalism or negligence

by Tenant or Tenant's employees or invitees causing damage to countertops, wall, flooring or stalls will become the responsibility of Tenant to pay cost of repairs or replacement.

6. Tenant shall not overload the floor of the Premises, or mark, drive nails, screw or drill into the partitions, woodwork, walls, ceilings, floors or plaster or in any way deface the Premises, or any part thereof, without the consent of Landlord. Any such damage caused by Tenant, its agents and employees, shall be paid for by Tenant. Under no circumstances shall Tenant penetrate the floor without the consent of Landlord. Tenant shall be responsible for water connections to ice makers, coffee suppliers and water dispensers. Copper tubing must be used in all connections. Tenant shall pay for any and all repair damages associated with the connections.

7. Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building. Safes or other heavy objects shall, if considered necessary by Landlord, stand on wood strips of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss or damage to any such safe or property from any cause. All damage done to the Building by the moving or maintaining of any such safe or other property shall be repaired at the expense of the Tenant. There shall not be used, in any space, or in the public halls of the Building, either by any tenant or others, any hand trucks except those equipped with rubber tires and side guards.

8. Tenant shall not employ any person or persons other than the janitor of Landlord for the purpose of cleaning the Premises without the consent of Landlord. Except with the written consent of Landlord, no person or persons, other than those approved by Landlord, shall be permitted to enter the Building for the purpose of cleaning the same. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall in no way be responsible to any Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of any Tenant by the janitor or any other employee or person. Janitorial service shall include those tasks identified in the Lease. Janitorial service shall not include cleaning of carpets or rugs, moving of furniture, disposal of excessive trash or unbroken down boxes or other special services. Janitorial service will not be furnished on nights when rooms are occupied after 9:00 p.m. The janitor may, at all times, keep a pass key and shall be allowed admittance to the leased Premises.

9. Tenant shall not use, keep or permit to be used or kept any noxious gas or similar substances in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to the Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, or interfere in any way with other Tenants or those having business therein. No animals (except service animals such as guide dogs), fish or birds are to be brought in or kept in or about the Premises. No Tenant shall make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of this or neighboring Buildings or Premises or those having business with them whether by the use of any musical instrument, radio phonograph, unusual noise, or in any other way. No Tenant shall throw anything out of doors or down the passageways.

10. The Premises shall not be used for manufacturing or for the storage of merchandise except as such storage may be incidental to the use of the Premises for general office purposes. Unless otherwise specifically provided in a lease, no Tenant shall occupy or permit any portion of his Premises to be used for the manufacture or sale of liquor, narcotics, or tobacco in any form, or as a barber shop or manicure shop. No Tenant shall advertise for laborers giving an address at the Premises. The Premises shall not be used for lodging or sleeping or for any illegal purposes.

11.  Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline or inflammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied or consented by Landlord.  Tenant shall not allow open flames within Premises.

12.  Landlord will direct cabling contractors and electricians as to where and how telephone and electrical wires are to be introduced.  No boring or cutting for wires will be allowed without the consent of Landlord.  The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.  Unless Landlord directs otherwise, Tenant shall be responsible for the costs of removing any and all cabling at the expiration, or earlier termination, of their Lease.

13.  No Tenant shall lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Premises in any manner except as approved by the Landlord.  The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by the Tenant by whom, or by whose contractor's employees or invitees, the damage shall have been caused.  Tenant shall use chair pads in all carpeted areas under moveable chairs.  Tenant shall use plastic protection on walls surrounding all copy machines to prevent marring or staining of walls.  Such protection shall be affixed to the wall in a manner acceptable to Landlord.

14.  Tenant shall cause its movers or moving company to use only the loading facilities and elevator designated by Landlord and further, that said movers must use proper floor protection.  In the event Tenant's movers damage the elevator or any other part of the Building, Tenant shall forthwith pay to Landlord the amount required to repair said damage.

15.  On Saturdays, Sundays, legal holidays (as declared by the federal or Colorado state governments) and on other days between the hours of 6:00 p.m. and 8:00 a.m., access to the Building, or to the halls, corridors, elevators or stairways in the Building, or to the Premises may be refused unless the person seeking access is known to the person or employee of the Building in charge and has a pass or is properly identified.  The Landlord shall in no case be liable for damages for any error with regard to the admission to, or exclusion from, the Building of any person.  In case of invasion, mob, riot, public excitement, or other commotion, the Landlord reserves the right to prevent access to the Building during the continuance of the same by closing the doors or otherwise, for the safety of the Tenants and protection of property in the Building and the Building.  Subject to Tenant installed security systems, Landlord reserves the right to close and keep locked all entrance and exit doors of the Building on Saturdays, Sundays, legal holidays, and on other days between the hours of 6:00 p.m. and 8:00 a.m., and during such further hours as Landlord may deem advisable for the adequate protection of said Building and the property of its Tenants.

16.  Tenant shall see that the doors of the Premises are closed and securely locked before leaving the Building and must observe strict care and caution that all water faucets or water apparatus, coffee machines and burners are entirely shut off before Tenant or Tenant's employees leave the Building.  All non-emergency electricity shall likewise be carefully shut off, so as to prevent waste or damage, and for any default or carelessness Tenant shall make good all injuries sustained by other tenants or occupants or the Building or Tenant.  Tenant shall be responsible for costs and expenses of any and all damage as a result of non-compliance with this paragraph 16.

17.  Landlord reserves the right to exclude, or expel, from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building, with assistance from law enforcement if necessary.

B-3

18. The requirements of Tenant will be attended to only upon application at the office of the property manager of the Building by a designated representative of Tenant. It is the responsibility of Tenant to inform Landlord, in writing, of any changes to original or revised applications previously provided. Employees of Landlord shall not perform any work or do anything outside of their regular duties, unless under special instruction from the Landlord, and no employee will admit any person (Tenant or otherwise) to any office without specific instruction from the Landlord.

19. No vending machine or machines of any description shall be installed, maintained or operated upon the Premises without the consent of the Landlord.

20. Landlord shall have the right, exercisable with notice to Tenant, to change the name and the street address of the Building of which the Premises are a part.

21. Tenant agrees that it shall comply with all fire and security regulations that may be issued, from time to time, by Landlord or federal, state, county and municipal authorities and with any directive of any public officer or officers pursuant to law and Tenant also shall provide Landlord with the name of a designated responsible employee to represent Tenant in all matters pertaining to such fire or security regulations.

22. Tenant shall not disturb, solicit or canvass any other occupant of the Building, or the Project, and shall cooperate to prevent the same.

23. Without the written consent of Landlord, Tenant shall not use the name of the Building in connection with, or in promoting or advertising, the business of Tenant except as Tenant's address. Landlord shall have the right to prohibit any advertising by Tenant which, in Landlord's reasonable opinion, tends to impair the reputation of the Building or its desirability as a building for offices, and upon notice from Landlord, Tenant shall refrain from or discontinue such advertising.

24. Subject to the terms of the Lease, Landlord shall furnish heating and air conditioning during normal hours of operation of the Building, established by Landlord from time to time, which are currently set at the hours of 8:00 a.m. to 6:00 p.m. Monday through Friday (excluding weekends and holidays).

25. Tenant shall not permit any contractor or other person making any alterations, additions or installations within the Premises to use the hallways, lobby or corridors as storage or work areas without the consent of Landlord. Tenant shall be liable for the expense of any additional cleaning or other maintenance required to be performed by Landlord as a result of the transportation or storage of materials or work performed within the Building by or for the Tenant.

26. No window shades, blinds, screens or draperies will be attached, or detached, by Tenant without Landlord's consent, which consent shall not be unreasonably withheld. No obstructions shall be placed, hung, or affixed in front of the windows or doors without the consent of Landlord. No awnings shall be permitted on any part of the Premises. Tenant agrees to abide by Landlord's rules with respect to maintaining uniform curtains, draperies, and/or linings at all windows and hallways so that the Building will present a uniform exterior appearance. Cleaning of draperies shall be Tenant's responsibility whether such items are furnished by Landlord or Tenant, and Tenant shall insure that such work is accomplished from time to time, as is needed to maintain a first-class appearance.

27. Landlord shall at all times (upon reasonable advance notice except in the case of emergency or in order to make repairs) have the right, by its employees or agents, to enter the demised Premises to inspect and examine the same.

B-4

28. Landlord reserves the right, by written notice to Tenant, to rescind, alter or waive any rule or regulation at any time prescribed for the Building when, in Landlord's judgment, it is necessary, desirable or proper for the best interest of the Building and its Tenants.

29. Should damage to Building plants occur due, in whole or in part, to Tenant, its agents, employees, contractors, invitees, etc. negligence (including, but not limited to, movers keeping the Building entry doors open on cold days), the replacement cost of said plant(s) will be the responsibility of Tenant.

30. No smoking is allowed in any public area of the Building. Smoking is permitted only in areas designated by Landlord. Notwithstanding the foregoing, smoking may be prohibited (upon notice from Landlord) within a designated area if Landlord determines that smoke odors or emissions from the premises may be entering inside lobbies, common areas, public areas, the premises of other tenants, or the Building ventilation system. Landlord will designate and provide, throughout the term of the lease, a designated smoking area outside of the building for the use of Tenant, its employees and their invitees.

31. Subject to specific terms in the Lease regarding Tenant's parking rights, and provided ingress or egress is not impaired, Landlord reserves the right to change, reconfigure, relocate or rearrange the parking area, to grant reciprocal rights of use to occupants of other buildings in the Project to construct or repair any portion thereof, and to restrict or eliminate the use of any parking area and to do such other acts in and to such areas as Landlord deems necessary or desirable without such actions being deemed an eviction of Tenant or a disturbance of Tenant's use of the Premises and without Landlord being deemed in default. Further, Landlord may, in its sole discretion, convert the parking area to reserved and/or controlled parking and may require Tenant to provide or pay for the provision of parking passes or stickers to Tenant's employees. To the extent allowed by law, Landlord reserves the right to limit the number and location of parking spaces available to any Tenant.

32. If parking spaces are not assigned pursuant to the terms of this Lease, Landlord reserves the right, at any time, to assign parking spaces, and Tenant shall be responsible to ensure that its employees park in the designated areas. Tenant shall, if requested by Landlord, furnish to Landlord a complete list of the license plate numbers of all vehicles operated by Tenant, Tenant's employees and agents.

33. Wherever in this Lease Landlord or Tenant is required to give its consent or approval to any action on the part of the other, such consent or approval shall be in writing in accordance with Section 21.08 (Notices, Place Rent Payable) of the Lease and shall be delivered to the other party prior to such consent or approval being granted. In the event of failure to give any such written consent or approval, the other party shall be entitled to specific performance at law and shall have such other remedies as are reserved to it under this Lease, but in no event shall Landlord or Tenant be responsible in monetary damages for failure to give consent unless said consent is withheld maliciously or in bad faith.

Tenant shall be responsible for the resulting cost and expense of any violation of these Rules and Regulations by Tenant or its agents, contractors, workmen, mechanics, suppliers or invitees.

4811-9657-1410.3

## RIDER 1.02

## RIGHT OF FIRST OFFER

Subject to all rights of tenants in the Building as of the Rent Commencement Date, until the earlier of the (i) date this Rider and the rights hereunder expire pursuant to the terms of this Rider and (ii) Expiration Date (the "Offer Period"), so long as no Event of Default exists under this Lease, Tenant shall have a right of first offer with respect to space located on the first floor of the Building (the "Offer Space"), subject to and in accordance with the terms and conditions set forth in this Rider.  At any time during the Offer Period, Tenant will have the right to lease the Offer Space, if and only if:

(a)     There is no current Event of Default under this Lease at the time Tenant seeks to exercise such right which is continuing after notice and opportunity to cure and (i) within five (5) days after request of Tenant by Landlord, Tenant shall have delivered to Landlord such Tenant deliveries as may be requested by Landlord ("Tenant Deliveries"), and (ii) Landlord shall have approved, in its reasonable discretion, Tenant's creditworthiness (taking into account Tenant's payment and performance history and any adverse changes to Tenant's financial strength since the execution of this Lease).

(b)     Tenant delivers to Landlord written notice exercising its right to lease the Offer Space within five days after receipt of Landlord's notice that Landlord desires to lease all or part of the Offer Space to a third party not affiliated with Landlord.

(c)     If Tenant fails to timely exercise its right to lease the Offer Space as described in clause (b), or fails to execute the Expansion Amendment (as hereafter defined) within 10 days of presentation of the same to Tenant, Tenant will have no further right to lease the Offer Space and this Rider shall be deemed to have no further force or effect whatsoever.  If Tenant exercises its right to lease the Offer Space, Landlord and Tenant will enter into an amendment to this Lease (the "Expansion Amendment") providing for the following terms and conditions:

(i)     The Offer Space will be added to the Premises for a term concurrent with the Lease Term, as the same may be or have been extended.

(ii)     Base Rent per square foot for the Offer Space shall be on the same terms and conditions as this Lease.

(iii)     The commencement date for the leasing of the Offer Space will be the date the Offer Space is ready for occupancy.

(iv)     Tenant will take the Offer Space in an "as is" broom clean condition.

(v)     Tenant shall not have the right hereunder to lease less than all of the Offer Space.

(vi)     All other terms and conditions will be the same as contained in this Lease, excluding any provisions for rent abatement, rent credit, tenant improvement allowance and any other concessions from the Landlord.

(d)     Within 10 days after receipt from Landlord, Tenant shall execute and deliver to Landlord those instruments, including the Expansion Amendment, Landlord may reasonably request to evidence any lease of the Offer Space under this Rider.

4811-9657-1410.3

(e)      The rights of Tenant under this Rider are personal to Sklar Exploration Company LLC and may not be transferred or assigned.  The rights of Tenant under this Rider will expire on the expiration or earlier termination of this Lease.

(f)      Landlord shall not be liable for any damages to Tenant for any failure to deliver possession of the Offer Space by reason of holding over by third parties; provided, however, that Tenant shall not be liable for Base Rent or Additional Rent with respect to the Offer Space until the date upon which possession of the Offer Space is delivered to Tenant.

## RIDER 3.03

## DESCRIPTION OF OPERATING EXPENSES

Operating Expenses shall include:

(i)     <u>Taxes</u> – All taxes, fees and assessments and governmental charges levied by any taxing districts or authorities presently or hereafter created, taxing the Building and any other taxes, fees, charges or assessments attributable to the Building or its operation that Landlord shall be required to pay.  Taxes shall include any excise, privilege, gross receipts or sales tax levied on the rentals or the receipt thereof. If and to the extent that due to a change in the method of taxation or assessment, any franchise, capital stock, capital, rent, income, profit or other tax or charge shall be a substitute for or supplement to any of the foregoing, then all such items shall be included within the term Taxes for the purposes of this Lease. All expenses, including reasonable attorneys' fees and disbursements, experts' and other witnesses' fees, incurred in contesting the validity or amount of any Taxes or in obtaining a refund of Taxes shall be considered as part of the Taxes for the year in which paid.  Without the prior written consent of Landlord, which consent shall not be unreasonably withheld, Tenant may not contest Taxes.

(i)     <u>Insurance</u> - All insurance of any type that Landlord carries on the Building.

(ii)    <u>Maintenance Costs</u> - All costs paid or incurred in connection with the operation or maintenance of the Building, including, without limitation, service facilities, special amenities, all parking areas (whether temporary or permanent) at the Building, access roads, driveways, curb, truck ways, loading areas and docks, retaining walls, lighting facilities, service corridors, pedestrian sidewalks, stairways, plazas, malls, foundations, exterior and demising walls, roofs over the entire Building including the Premises, courts and ramps, decorative walls, landscaped and planting areas and facilities, service lines or conduits for gas, water, electric, sewage, heating, ventilating and air conditioning ("HVAC") services, emergency or back-up power supplies, music and intercom equipment, fire suppression and warning systems, conduits and appurtenances for use by Tenant in common with other tenants, and other areas and facilities related to the Building, whether within or outside the Building and whether located on or off the Building property.  Such maintenance costs shall include, but are not limited to, the following:

(1)     All expenses incurred in connection with the parking spaces associated with the Building, but not limited to, all costs incurred for sweeping; cleaning; litter control; snow and ice removal; removal and replacement of car stops; and resurfacing, repainting, re-striping, and repair and replacement of paved surfaces and curbs.

(2)     All expenses incurred for supplies and materials used in the operation and maintenance of the Building including, but not limited to, uniforms, paper products, cleaning and janitorial supplies and equipment, decorations, painting, and replacement of worn out or damaged building components and equipment.

(3)     The cost of all utilities for the Premises not paid for directly by Tenant, including, but not limited to, the cost of water, electrical service and lighting, excepting those utilities supplied to tenants of the Building at their respective premises to the extent billed to such tenants either directly or by means of submetering.

(4)     The cost of all maintenance and service agreements for the Building and equipment used in the operation of the Building, including, but not limited to, HVAC, alarm service, waste disposal, security and/or guard service, backup power source, window cleaning,

4811-9657-1410.3

fire protection, sprinklers, mechanical systems maintenance, exterminating and landscape maintenance.

     (5)    Management fees (including, without limitation, salaries and fringe benefits of Building employees and employees of the Building's managing agent to the extent chargeable to the Building), reasonable legal fees, accounting costs and disbursements, and other professional services associated with the operation and maintenance of the Building.

     (6)    The cost of maintenance and repair of ceilings, structural components, foundations, exterior walls, gutters, glass, plate glass, show windows, plumbing, pipes and fixtures and other equipment.

     (7)    The cost of all licenses, dues, permits and other governmental charges.

     (8)    Intentionally omitted.

     (9)    Capital improvements designed primarily to reduce Operating Expenses, or required by any governmental or other authority having jurisdiction over the Project or by any insurance carrier for the Project, which costs shall be amortized over the useful life of the capital improvements or structural repair, with interest at the rate of ten percent (10%) per annum on the unamortized amount, in accordance with such reasonable life and amortization schedules and shall be determined by Landlord in accordance with generally accepted accounting principles;

For purposes of determining Tenant's Share as set forth in this Lease, Operating Expenses shall not include Operating Expenses billed directly to another tenant of the Building. Operating Expenses shall also not include: depreciation; principal payments of mortgage and other non-operating debts of Landlord; the cost of repairs or other work to the extent Landlord is reimbursed by insurance or condemnation proceeds or by third parties other than tenants or occupants of the Building; costs in connection with leasing space in the Building, including brokerage commissions; lease concessions, rental abatements and construction allowances granted to specific tenants in the Building; costs incurred in connection with the sale, financing or refinancing of the Building; fines, interest and penalties, incurred due to the late payment of Taxes or Operating Expenses; organizational expenses associated with the creation and operation of the entity which constitutes Landlord; any penalties or damages that Landlord pays to Tenant under this Lease or to other tenants in the Building under their respective leases; or the wages and benefits of any employee who does not devote substantially all of his or her employed time to the Building unless such wages and benefits are prorated to reflect time spent on operating and managing the Building vis-á-vis time spent on matters unrelated to operating and managing the Building.

4811-9657-1410.3

## RIDER 5.01

## TENANT IMPROVEMENT WORK AGREEMENT

(1)     **Tenant Improvements.**

    (a)     Landlord agrees to cause to be completed by Sand Construction of Colorado LLC ("Contractor"), the build out and delivery of the Premises in "turn-key" condition, in a good and workmanlike manner, using building-standard materials and methods/ in accordance with the plans and specifications reasonably agreed upon by Landlord and Tenant and attached hereto as Schedule I ("Space Plan"), subject to the requirements of this Rider 5.01 and the requirements of this Lease ("Landlord's Work"). The costs of the Landlord Work shall include all costs of construction, permits, and all management fees of others in relation to Landlord's Work. Notwithstanding the foregoing, any additional work, improvements or alterations in the to be performed by or on behalf of Tenant and any deviations from the Building-standard methods or materials shall be (i) at Tenant's sole cost and expense, (ii) paid to Landlord within 10 days of written demand, and (iii) subject to (A) Article 11 of the Lease to which this Rider is attached ("Lease") and (B) Landlord's prior written approval, to be given or withheld in Landlord's sole discretion.

(2)     **Certificate of Acceptance.** Upon completion of the Landlord's Work in accordance with this Rider 5.01 and the Lease, Tenant shall execute the Certificate of Acceptance in substantially the same form and substance as attached to this Rider 5.01 as Schedule II.

(5)     **Miscellaneous.**

    a)     Except to the extent otherwise indicated herein, the initially capitalized terms defined in the Lease which are used in this Rider 5.01 shall have the same meaning assigned to them in the Lease.

    b)     The terms and provisions of this Rider 5.01 are intended to supplement and are specifically subject to all the terms and provisions of the Lease. In the event of conflict between the terms of this Rider 5.01 and the Lease, then the provisions of this Rider 5.01 shall govern.

    c)     This Rider 5.01 may not be amended or modified other than by supplemental written agreement executed by authorized representatives of the parties hereto.

    d)     Tenant shall have the right to access the Premises no more than thirty (30) days prior to the Rent Commencement Date for the purposes of installing cabling, furniture, fixtures and equipment provided that Tenant provides notice to and obtains approval from Landlord's contractors with respect to each such entry and Tenants contractors do not interfere with the completion of the "turn key" finish by the Contractor. Scheduling of all cable installation shall be coordinated through the Contractor. In addition to any other conditions or limitations on such license to enter the Premises prior to the Rent Commencement Date, Tenant expressly agrees that none of its agents, contractors, workmen, mechanics, suppliers or invitees shall enter the Premises prior to the Rent Commencement Date unless and until each of them (or their employers) shall have furnished Landlord with reasonably satisfactory evidence of insurance coverage. If at any time such entry shall cause or threaten to cause disharmony or interference, Landlord, in its reasonable discretion, shall have the right to withdraw and cancel such

4811-9657-1410.3

license upon notice to Tenant. Tenant agrees that any such entry into the Premises shall be deemed to be under all of the terms, covenants, conditions and provisions of the Lease, except the covenant to pay periodic Base Rent or Additional Rent. Tenant further agrees that, to the extent permitted by law, Landlord and its principals shall not be liable in any way for any injury or death to any person or persons, loss or damage to any of the installations made in the Premises or loss or damage to property placed therein or thereabout, the same being at Tenant's sole risk.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Rider 5.01 as of the $\cancel{8}$ day of __A pril__, 2013.

**LANDLORD:**

**5395 PEARL PARKWAY, LLC**, a Colorado limited liability company

By: _____
Name: _____
Title: _____

**TENANT:**

**SKLAR EXPLORATION COMPANY LLC**, a Louisiana limited liability company

By: _____
Name: _____
Title: _____
Christopher A. Farrell, CPA
Vice President - Chief Financial Officer
Sklar Exploration Company L.L.C.

Rider 5.01 – Page 2

4811-9657-1410.3

SCHEDULE I

SPACE PLAN

(TO BE ATTACHED)

4811-9657-1410.3



SKLAR EXPLORATION
5395 PEARL PARKWAY
BOULDER, CO 80302

**SCHEDULE II**

**CERTIFICATE OF ACCEPTANCE OF LANDLORD'S WORK**

TENANT: SKLAR EXPLORATION COMPANY LLC

LANDLORD: 5395 PEARL PARKWAY, LLC

LOCATION: SUITES 110 AND 200, 5395 PEARL PARKWAY, BOULDER, COLORADO

    Execution of this Certificate indicates acceptance and final approval by Tenant of the Landlord's Work (as defined in Rider 5.01 attached to that certain Lease Agreement, dated _____, 2013, by and between Landlord and Tenant ("Lease")) constructed pursuant to the terms and conditions of the Lease including Rider 5.01 thereto, and Landlord's acknowledgment of same.

    Executed this _____ day of _____, 20___.

**TENANT:**

**SKLAR EXPLORATION COMPANY LLC**, a
Louisiana limited liability company

By: _____
Name: _____
Title: _____

**LANDLORD:**

**5395 PEARL PARKWAY, LLC**, a Colorado
limited liability company

By: _____
Name: _____
Title: _____

Rider 5.02 – Page 3

## RIDER 13.01

## TENANT INSURANCE REQUIREMENTS

(a)     Comprehensive commercial general liability insurance, including but not limited to premises, operations, and products liability, personal injury liability, contractual liability, and property damage liability coverage at the Building and the business conducted by Tenant thereon. Such insurance shall have a combined single limit of not less than one million dollars ($1,000,000) per occurrence and two million dollars ($2,000,000) in the aggregate for all occurrences within each policy year, or such greater amounts as Landlord may from time to time reasonably require. The Policy shall name Landlord as additional insured.

(b)     Fire and extended coverage insurance covering all items which Tenant may remove from the Premises at the end of the Lease Term, including but not limited to Tenant's personal property, wall coverings, floor coverings, window coverings, alterations, furniture, equipment, and lighting, against loss or damage by fire, water, windstorms, hail, earthquakes (if applicable), explosion, riot, damage from aircraft and vehicles, smoke damage, vandalism and malicious mischief and such other risks as are from time to time covered under "extended coverage" endorsements and special extended coverage endorsements commonly known as "Special Form" endorsements, in an amount equal to the full replacement value thereof from time to time and containing the waiver of subrogation required in Section 13.03 of this Lease.

(c)     State Worker's Compensation Insurance in the statutorily mandated limits and Employers Liability Insurance with limits of not less than five hundred thousand dollars ($500,000), or such greater amount as Landlord may from time to time require.

(d)     Umbrella or Excess Liability Insurance in the amount of not less than three million dollars ($3,000,000) over each of the liability policy limits set forth in this Section, naming Landlord as an additional insured.

(e)     Builder's risk insurance for the full costs of any Alterations constructed by Tenant or Tenant's contractors, naming Landlord as an additional insured.

(f)     Business interruption insurance in an amount equal to the Base Rent and estimated Additional Rent due and payable during the term of the Lease to which this Rider is attached.

(g)     Tenant shall require that any contractor retained by Tenant to construct any Alterations shall carry at least the following insurance:

(i)     Builder's risk insurance for the full cost of any Alterations constructed by Tenant or Tenant's contractors.

(ii)    State Worker's Compensation Insurance in the statutorily mandated limits and Employers Liability Insurance with limits of not less than five hundred thousand dollars ($500,000), or such greater amount as Landlord may from time to time require.

(iii)   Comprehensive commercial general liability insurance, including but not limited to premises liability, independent contractor's protective liability, completed operations and products liability, personal injury liability, contractual liability, property damage liability, and explosion, collapse and underground damage liability. Such insurance shall have a combined single limit of not less than one million dollars ($1,000,000) per occurrence and two million

4811-9657-1410.3

dollars ($2,000,000) in the aggregate for all occurrences within each policy year, or such greater amounts as Landlord may from time to time reasonably require.

(iv)      Comprehensive automobile liability insurance to cover owned automobiles, automobiles under a long-term lease, hired automobiles, employer's non-ownership liability, medical payments and uninsured motorists.  The limits of liability shall be no less than one million dollars ($1,000,000) for each occurrence for bodily injury and personal injury.

(v)      Umbrella or Excess Liability Insurance in the amount of not less than three million dollars ($3,000,000) over each of the liability policy limits set forth in this Section, naming Landlord as an additional insured.

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT (this "First Amendment") is made effective as of *February 10*, 2014, by and between **5395 PEARL PARKWAY, LLC**, a Colorado limited liability company (herein called "**Landlord**"), and SKLAR EXPLORATION COMPANY LLC, a Louisiana limited liability company (herein called "**Tenant**").

**WHEREAS**, Landlord and Tenant are parties to that certain Lease Agreement dated as of April 8, 2013 (the "Original Lease" and, as amended by this First Amendment, the "Lease");

**WHEREAS**, Tenant desires to lease from Landlord, and Landlord desires to lease to Tenant, additional space in the Building; and

**WHEREAS**, Landlord and Tenant desire to amend the Original Lease as and to the extent set forth herein.

**NOW, THEREFORE**, in consideration of their respective promises and undertakings hereunder and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, do covenant and agree as follows:

1.      *Definitions*. All capitalized terms not otherwise defined herein shall have the meanings given to them in the Original Lease.

2.      *Amendment to Section 1.01—Definitions*. From and after the date hereof and subject to satisfaction of the conditions of effectiveness set forth in Section 7 below, the Original Lease is hereby amended as follows:

(a)      Section 1.01 of the Original Lease is hereby amended by amending and restating the following defined terms in their entirety to read as follows:

(i)      "**Base Rent**" means, prior to the Premises B Rent Commencement Date, the Premises A Base Rent and, from and after the Premises B Rent Commencement Date, the Premises A Base Rent plus the Premises B Base Rent.

(ii)      "**Premises**" means, prior to the Premises B Rent Commencement Date, Premises A and, from and after the Premises B Rent Commencement Date, Premises A plus Premises B (the total rentable square feet of the Premises as of any time of determination being the "**Net Rentable Area**"). The Premises is more particularly described on the floor plan attached as Exhibit A and incorporated herein by this reference.

(iii)      "**Rent Commencement Date**" means the Premises A Rent Commencement Date or the Premises B Rent Commencement Date, as applicable.

(iv)      "**Tenant's Share**" means, prior to the Premises B Rent Commencement Date, the Premises A Tenant's Share and, from and after the Premises B Rent Commencement Date, the Premises A Tenant's Share plus the Premises B Tenant's Share.

(b)      Section 1.01 of the Original Lease is hereby amended by adding the following defined terms in their appropriate alphabetical order to read as follows:

4813-9759-7976.1

(i)     "**Premises A**" means, office space known as Suite 200, in the Building, containing approximately 7,554 rentable square feet (the "**Premises A Net Rentable Area**"), as more particularly described on the floor plan attached as Exhibit A and incorporated herein by this reference.

(ii)    "**Premises B**" means the office space known as Suite 150 in the Building, containing approximately 2,498 net rentable square feet ("**Premises B Net Rentable Area**"), as more particularly described on the floor plan attached as Exhibit A and incorporated herein by this reference.

(iii)   "**Premises A Base Rent**" – The initial Base Rent for Premises A shall be calculated by multiplying the Premises A Net Rentable Area by the following rates for the respective periods of the Lease:

| Period | $/Sq. Ft. | Net Rentable Square Feet | Annual Rate | Monthly Rate |
|---|---|---|---|---|
| 6/23/13-4/30/14 | $16.25 | 7,554 RSF | $122,752.50 | $10,229.38 |
| 5/1/14-4/30/15 | $17.00 | 7,554 RSF | $128,418.00 | $10,701.50 |
| 5/1/15-4/30/16 | $17.75 | 7,554 RSF | $134,083.50 | $11,173.63 |
| 5/1/16-4/30/17 | $18.50 | 7,554 RSF | $139,749.00 | $11,645.75 |
| 5/1/17-4/30/18 | $19.25 | 7,554 RSF | $145,414.50 | $12,117.88 |
| 5/1/18-4/30/19 | $20.00 | 7,554 RSF | $151,080.00 | $12,590.00 |
| 5/1/19-4/30/20 | $20.75 | 7,554 RSF | $156,745.50 | $13,062.13 |

(iv)    "**Premises B Base Rent**" – The initial Base Rent for Premises B shall be calculated by multiplying the Premises B Net Rentable Area by the following rates for the respective periods of the Lease:

| Period | $/Sq. Ft. | Net Rentable Square Feet | Annual Rate | Monthly Rate |
|---|---|---|---|---|
| 5/1/14-4/30/15 | $17.00 | 2,498 RSF | $42,466.00 | $3,538.83 |
| 5/1/15-4/30/16 | $17.75 | 2,498 RSF | $44,351.99 | $3,695.99 |
| 5/1/16-4/30/17 | $18.50 | 2,498 RSF | $46,213.00 | $3,851.08 |

2

| 5/1/17-4/30/18 | $19.25 | 2,498 RSF | $48,086.50 | $4,007.21 |
| 5/1/18-4/30/19 | $20.00 | 2,498 RSF | $49,960.00 | $4,163.33 |
| 5/1/19-4/30/20 | $20.75 | 2,498 RSF | $51,833.50 | $4,319.46 |

(v)      **"Premises A Rent Commencement Date"** means June 23, 2013.

(vi)     **"Premises B Rent Commencement Date"** means May 1, 2014.

(vii)    **"Premises A Tenant's Share"** means 12.59%.

(viii)   **"Premises B Tenant's Share"** means the Premises B Net Rentable Area divided by the Building Net Rentable Area and shall be equal to 4.16%.

(vii)    **"Tenant Work"** means the tenant improvements to be constructed in Premises B, in accordance with and as more fully described in Rider 5.01A hereto.

3.      *Exhibit A—Floor Plan.* Exhibit A attached to the Original Lease is hereby amended and restated in its entirety to provide for the floor plans as set forth on Exhibit A attached to this First Amendment and made a part hereof.

4.      *Rider 5.01A—Tenant Improvement Work Agreement.* Rider 5.01A attached to this First Amendment is hereby attached to the Original Lease as Rider 5.01A thereto and made a part thereof.

5.      *Conditions of Effectiveness.* This First Amendment shall become effective as of the date first written above upon Landlord's receipt of one (1) original of this First Amendment executed by Tenant.

6.      *Lease in Full Force and Effect.* Except to the extent expressly modified by this First Amendment, all terms and conditions of the Original Lease shall remain unchanged and in full force and effect.

7.      *Entire Agreement.* The Original Lease and this First Amendment constitute the entire agreement between the parties and supersede all prior or contemporaneous agreements, representations, warranties, statements, promises and undertakings, whether oral or written. To the extent there is any conflict between this First Amendment and the Original Lease, this First Amendment shall be controlling. This First Amendment and the Original Lease may not be amended, altered or modified except by a writing signed by both Landlord and Tenant.

8.      *Governing Law.* This First Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and shall be governed by and construed in accordance with the laws of the State of Colorado.

9.      *Headings.* Section headings in this First Amendment are included herein for convenience of reference only and shall not constitute a part of this First Amendment for any other purpose.

3

4813-9759-7976.1

10.    *Counterparts.*  This First Amendment may be executed by the parties hereto in one or more counterparts, each of which shall be deemed an original and all of which taken together shall be deemed to constitute one and the same agreement.  Facsimile signatures shall be deemed originals.

11.    *Prohibited Persons and Transactions.*  Tenant and Landlord (each, a "Representing Party") each represents and warrants to the other (i) that neither the Representing Party nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, (ii) that the Representing Party's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the term of the Lease the Representing Party shall comply with the Executive Order and with the Money Laundering Act.

[signature page follows]

4813-9759-7976.1

IN WITNESS WHEREOF, this First Amendment has been duly executed as of the day and year first written above.

LANDLORD:

5395 PEARL PARKWAY, LLC, a Colorado
limited liability company

By: _____
Name: _____
Title: _____

TENANT:

SKLAR EXPLORATION COMPANY LLC, a
Louisiana limited liability company

By: _____
Name: _____
Title: _____
    Christopher A. Farrell, CPA
    Vice President - Chief Financial Officer
    Sklar Exploration Company L.L.C.

4813-9759-7976.1

EXHIBIT A

FLOOR PLAN

2



SKLAR SUITE 500
3,137 RSF

1  EXHIBIT A
SCALE

NOT TO SCALE

PLAN
NORTH

EXHIBIT A

5395 PEARL PARKWAY

EXHIBIT A

5395 PEARL PARKWAY
BOULDER, COLORADO

DATE: 2/7/2014
PROJECT NO.: 5395-1000
DRAWN BY: MH /JG

TITLE:
AS-BUILT PLAN

SHEET NO.:
AB1

APS
DESIGN & PLANNING
denver, colorado
p 1.303.817.4442
mhoiter.aps12@gmail.com

## RIDER 5.01A

## TENANT IMPROVEMENT WORK AGREEMENT

(1)  **Premises B Landlord's Work.**  Landlord and Tenant hereby acknowledge and agree that Landlord shall, at its expense, cause Sand Construction of Colorado LLC ("Contractor"), to Substantially Complete the build out and delivery of Premises B (as defined in the Lease to which this Rider 5.01A is attached, as amended from time to time (the "Lease")) in "turn-key" condition, in a good and workmanlike manner, using building-standard materials and methods, and substantially in accordance with the plans attached hereto as Exhibit A ("Space Plan"), subject to the requirements of this Rider 5.01A and the requirements of the Lease ("Premises B Landlord's Work").  Notwithstanding the foregoing, any additional work, improvements or alterations in the to be performed by or on behalf of Tenant and any deviations from the Space Plan or Building-standard methods or materials shall be (i) at Tenant's sole cost and expense, (ii) paid to Landlord within 10 days of written demand, and (iii) subject to Landlord's prior written approval, to be given or withheld in Landlord's sole discretion.

(2)  **Certificate of Acceptance.**  Upon Substantial Completion (as defined herein) of the Premises B Landlord's Work in accordance with this Rider 5.01A and the Lease, Tenant shall execute the Certificate of Acceptance in substantially the same form and substance as attached to this Rider 5.01A as Schedule I.  "Substantial Completion" or "Substantially Complete" shall mean the date upon which Landlord completes construction of the Premises B Landlord's Work pursuant to the Space Plan, with the exception of any punchlist items and any tenant fixtures, work-stations, built-in furniture, or equipment to be installed by Tenant.  Substantial Completion shall have occurred even though minor details of construction, decoration, landscaping or mechanical adjustments remain to be completed.

(3)  **Disclaimer of Liability.**  Landlord's approval of the Space Plan shall create no responsibility or liability on the part of Landlord for the completeness or design sufficiency with respect to such Space Plan or improvements constructed in conformity therewith.  Tenant shall be solely responsible for ensuring that the design and improvements of the interior of Premises B are adequate to fully satisfy Tenant's intended use of Premises B, provided they are built in accordance with the Space Plan and all applicable local laws and ordinances.

(4)  **No Constructive Eviction.**  Tenant hereby acknowledges that Contractor will be performing the Premises B Landlord's Work during the Lease Term, and Tenant shall not be entitled to any abatement or reduction of Base Rent, Additional Rent or any other amounts payable under the Lease in connection with the Premises B Landlord's Work, nor shall the Premises B Landlord's Work be deemed an eviction, actual or constructive, of Tenant.  Tenant shall at all times cooperate reasonably and in good faith in connection with Contractor's and Landlord's prosecution of the Premises B Landlord's Work, including, without limitation, by granting Landlord, Landlord's agents and Contractor access to the entire Premises and by promptly responding to matters arising in connection with the Premises B Landlord's Work.

**Miscellaneous.**

a)  Except to the extent otherwise indicated herein, the initially capitalized terms defined in the Lease which are used in this Rider 5.01A shall have the same meaning assigned to them in the Lease.

4813-9759-7976.1

b)  The terms and provisions of this Rider 5.01A are intended to supplement and are specifically subject to all the terms and provisions of the Lease. In the event of conflict between the terms of this Rider 5.01A and the Lease, then the provisions of this Rider 5.01A shall govern.

c)  This Rider 5.01A may not be amended or modified other than by supplemental written agreement executed by authorized representatives of the parties hereto.

d)  Tenant shall have a license to access Premises B prior to the Premises B Rent Commencement Date for the purposes of installing cabling, furniture, fixtures and equipment and commencing Tenant's business operations, provided that Tenant provides notice to and obtains approval from Landlord's contractors with respect to each such entry and Tenants contractors do not unreasonably interfere with the completion of the "turnkey" finish by the Contractor. Scheduling of all cable installation shall be coordinated through the Contractor. In addition to any other conditions or limitations on such license to enter Premises B prior to the Rent Commencement Date, Tenant expressly agrees that none of its agents, contractors, workmen, mechanics, suppliers or invitees shall enter Premises B prior to the Premises B Rent Commencement Date unless and until each of them (or their employers) shall have furnished Landlord with reasonably satisfactory evidence of insurance coverage. If at any time such entry shall cause or threaten to cause disharmony or interference, Landlord, in its sole discretion, shall have the right to withdraw and cancel such license upon notice to Tenant. Tenant agrees that any such entry into Premises B shall be deemed to be under all of the terms, covenants, conditions and provisions of the Lease, except the covenant to pay periodic Premises B Base Rent or Operating Expenses with respect to Premises B, which rental obligations will commence on the Premises B Rent Commencement Date. Tenant further agrees that, to the extent permitted by law, Landlord and its principals shall not be liable in any way for any injury or death to any person or persons, loss or damage to any of the installations made in Premises B or loss or damage to property placed therein or thereabout, the same being at Tenant's sole risk.

4813-9759-7976.1

IN WITNESS WHEREOF, the parties hereto have executed this Rider 5.01A as of the _10th_ day of _February_____, 2014.

LANDLORD:

**5395 PEARL PARKWAY, LLC**, a Colorado limited liability company

By: _____
Name: _____
Title: _____Manager_____

TENANT:

**SKLAR EXPLORATION COMPANY LLC**, a Louisiana limited liability company

By: _____
Name: _____
Title: _____

Christopher A. Farrell, CPA
Vice President - Chief Financial Officer
Sklar Exploration Company L.L.C.

EXHIBIT A

SPACE PLAN

[to be attached]







REMODEL SPACE
FOR SKLAR
639 RSF

PROXIMITY PLAN

EXPANSION SPACE FOR SKLAR
2,496 RSF

PRELIMINARY SPACE PLAN

SCALE 3/32"=1'-0"

PLAN NORTH

5395 PEARL PARKWAY

SKLAR REMODEL/ EXPANSION

5395 PEARL PARKWAY
BOULDER, COLORADO

APS
DESIGN & PLANNING

denver, colorado
p | 303.817.4464
mhoder.cbs129@gmail.com

SHEET NO.
SP1

TITLE:
PRELIMINARY
SPACE PLAN

DATE: 12/31/2013
PROJECT NO.5395-1005
DRAWN BY: MH/JG

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT (this "**Second Amendment**") is made effective as of November 20, 2014, by and between **5395 PEARL PARKWAY, LLC**, a Colorado limited liability company (herein called "**Landlord**"), and **SKLAR EXPLORATION COMPANY LLC**, a Louisiana limited liability company (herein called "**Tenant**").

**WHEREAS**, Landlord and Tenant are parties to that certain Lease Agreement dated as of April 8, 2013, as amended by that certain Frist Amendment to Lease Agreement (collectively, the "**Original Lease**" and, as amended by this Second Amendment, the "**Lease**");

**WHEREAS**, Tenant desires to lease from Landlord, and Landlord desires to lease to Tenant, additional space in the Building and Tenant desires to extend the Lease Term; and

**WHEREAS**, Landlord and Tenant desire to amend the Original Lease as and to the extent set forth herein.

**NOW, THEREFORE**, in consideration of their respective promises and undertakings hereunder and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, do covenant and agree as follows:

1.    *Definitions*.  All capitalized terms not otherwise defined herein shall have the meanings given to them in the Original Lease.

2.    *Amendment to Section 1.01—Definitions*.  From and after the date hereof and subject to satisfaction of the conditions of effectiveness set forth in Section 5 below, the Original Lease is hereby amended as follows:

(a)    Section 1.01 of the Original Lease is hereby amended by amending and restating the following defined terms in their entirety to read as follows:

(i)    "**Base Rent**" means, prior to the Premises C Rent Commencement Date, the Premises A Base Rent plus the Premises B Base Rent and, from and after the Premises C Rent Commencement Date, the Premises A Base Rent plus the Premises B Base Rent plus the Premises C Base Rent.

(ii)    "**Expiration Date**" means, with respect to Premises A, Premises B and Premises C, December 31, 2024.

(iii)    "**Premises**" means, prior to the Premises C Rent Commencement Date, Premises A plus the Premises B and, from and after the Premises C Rent Commencement Date, Premises A plus Premises B plus Premises C (the total rentable square feet of the Premises as of any time of determination being the "**Net Rentable Area**").  The Premises is more particularly described on the floor plan attached as Exhibit A and incorporated herein by this reference.

(iv)    "**Premises A Base Rent**" – The initial Base Rent for Premises A shall be calculated by multiplying the Premises A Net Rentable Area by the following rates for the respective periods of the Lease:

4834-5262-5948.1

| Period | $/Sq. Ft. | Net Rentable Square Feet | Annual Rate | Monthly Rate |
|---|---|---|---|---|
| 6/23/13-4/30/14 | $16.25 | 7,554 RSF | $122,752.50 | $10,229.38 |
| 5/1/14-4/30/15 | $17.00 | 7,554 RSF | $128,418.00 | $10,701.50 |
| 5/1/15-4/30/16 | $17.75 | 7,554 RSF | $134,083.50 | $11,173.63 |
| 5/1/16-4/30/17 | $18.50 | 7,554 RSF | $139,749.00 | $11,645.75 |
| 5/1/17-4/30/18 | $19.25 | 7,554 RSF | $145,414.50 | $12,117.88 |
| 5/1/18-4/30/19 | $20.00 | 7,554 RSF | $151,080.00 | $12,590.00 |
| 5/1/19-4/30/20 | $20.75 | 7,554 RSF | $156,745.50 | $13,062.13 |
| 5/1/20-4/30/21 | $21.50 | 7,554 RSF | $162,411.00 | $13,534.25 |
| 5/1/21-4/30/22 | $22.25 | 7,554 RSF | $168,076.50 | $14,006.38 |
| 5/1/22-4/30/23 | $23.00 | 7,554 RSF | $173,742.00 | $14,478.50 |
| 5/1/23-12/31/24 | $23.75 | 7,554 RSF | $179,407.50 | $14,950.63 |

(v)    **"Premises B Base Rent"** – The initial Base Rent for Premises B shall be calculated by multiplying the Premises B Net Rentable Area by the following rates for the respective periods of the Lease:

| Period | $/Sq. Ft. | Net Rentable Square Feet | Annual Rate | Monthly Rate |
|---|---|---|---|---|
| 5/1/14-4/30/15 | $17.00 | 2,498 RSF | $42,466.00 | $3,538.83 |
| 5/1/15-4/30/16 | $17.75 | 2,498 RSF | $44,351.99 | $3,695.99 |
| 5/1/16-4/30/17 | $18.50 | 2,498 RSF | $46,213.00 | $3,851.08 |
| 5/1/17-4/30/18 | $19.25 | 2,498 RSF | $48,086.50 | $4,007.21 |
| 5/1/18-4/30/19 | $20.00 | 2,498 RSF | $49,960.00 | $4,163.33 |
| 5/1/19-4/30/20 | $20.75 | 2,498 RSF | $51,833.50 | $4,319.46 |
| 5/1/20-4/30/21 | $21.50 | 2,498 RSF | $53,707.00 | $4,475.58 |

| 5/1/21-4/30/22 | $22.25 | 2,498 RSF | $55,580.50 | $4,631.71 |
| 5/1/22-4/30/23 | $23.00 | 2,498 RSF | $57,454.00 | $4,787.83 |
| 5/1/23-12/31/24 | $23.75 | 2,498 RSF | $59,327.50 | $4,943.96 |

(vi)    **"Rent Commencement Date"** means the Premises A Rent Commencement Date, the Premises B Rent Commencement Date or plus the Premises C Rent Commencement Date, as applicable.

(vii)    **"Tenant's Share"** means, prior to the Premises C Rent Commencement Date, the Premises A Tenant's Share plus Premises B Tenant's Share and, from and after the Premises C Rent Commencement Date, the Premises A Tenant's Share plus the Premises B Tenant's Share plus the Premises C Tenant's Share.

(b)    Section 1.01 of the Original Lease is hereby amended by adding the following defined terms in their appropriate alphabetical order to read as follows:

(i)    **"Premises C"** means the office space known as Suite 130, in the Building, containing approximately 4,987 rentable square feet (the "**Premises C Net Rentable Area**"), as more particularly described on the floor plan attached as Exhibit A and incorporated herein by this reference.

(ii)    **"Premises C Base Rent"** – The initial Base Rent for Premises C shall be calculated by multiplying the Premises C Net Rentable Area by the following rates for the respective periods of the Lease:

| Period | $/Sq. Ft. | Net Rentable Square Feet | Annual Rate | Monthly Rate |
|---|---|---|---|---|
| 1/1/15-4/30/15 | $17.00 | 4,987 RSF | $84,779.00 | $7,064.92 |
| 5/1/15-4/30/16 | $17.75 | 4,987 RSF | $88,519.25 | $7,376.60 |
| 5/1/16-4/30/17 | $18.50 | 4,987 RSF | $92,259.50 | $7,688.29 |
| 5/1/17-4/30/18 | $19.25 | 4,987 RSF | $95,999.75 | $7,999.98 |
| 5/1/18-4/30/19 | $20.00 | 4,987 RSF | $99,740.00 | $8,311.67 |
| 5/1/19-4/30/20 | $20.75 | 4,987 RSF | $103,480.25 | $8,623.35 |
| 5/1/20-4/30/21 | $21.50 | 4,987 RSF | $107,220.50 | $8,935.04 |
| 5/1/21-4/30/22 | $22.25 | 4,987 RSF | $110,960.75 | $9,246.73 |
| 5/1/22-4/30/23 | $23.00 | 4,987 RSF | $114,701.00 | $9,558.42 |

| 5/1/23-12/31/24 | $23.75 | 4,987 RSF | $118,441.25 | $9,870.10 |
|---|---|---|---|---|

(iii)   **"Premises C Rent Commencement Date"** means January 1, 2015.

(iv)   **"Premises C Tenant's Share"** means the Premises C Net Rentable Area divided by the Building Net Rentable Area and shall be equal to 8.31%.

(v)   **"Tenant Work"** means the tenant improvements to be constructed in Premises B, in accordance with and as more fully described in Rider 5.01B hereto.

3.   *Exhibit A—Floor Plan*.  Exhibit A attached to the Original Lease is hereby amended and restated in its entirety to provide for the floor plans as set forth on Exhibit A attached to this Second Amendment and made a part hereof.

4.   *Rider B—Lease Termination Option*.  Rider B attached to this Second Amendment is hereby attached to the Lease as Rider B thereto and made a part thereof.

5.   *Rider 5.01B—Tenant Improvement Work Agreement*.  Rider 5.01B attached to this Second Amendment is hereby attached to the Lease as Rider 5.01B thereto and made a part thereof.

6.   *Conditions of Effectiveness*.  This Second Amendment shall become effective as of the date first written above upon Landlord's receipt of one (1) original of this Second Amendment executed by Tenant and Landlord.

7.   *Lease in Full Force and Effect*.  Except to the extent expressly modified by this Second Amendment, all terms and conditions of the Original Lease shall remain unchanged and in full force and effect.

8.   *Entire Agreement*.  The Original Lease and this Second Amendment constitute the entire agreement between the parties and supersede all prior or contemporaneous agreements, representations, warranties, statements, promises and undertakings, whether oral or written.  To the extent there is any conflict between this Second Amendment and the Original Lease, this Second Amendment shall be controlling.  This Second Amendment and the Original Lease may not be amended, altered or modified except by a writing signed by both Landlord and Tenant.

9.   *Governing Law*.  This Second Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and shall be governed by and construed in accordance with the laws of the State of Colorado.

10.   *Headings*.  Section headings in this Second Amendment are included herein for convenience of reference only and shall not constitute a part of this Second Amendment for any other purpose.

11.   *Counterparts*.  This Second Amendment may be executed by the parties hereto in one or more counterparts, each of which shall be deemed an original and all of which taken together shall be deemed to constitute one and the same agreement.  Facsimile signatures shall be deemed originals.

4834-5262-5948.1

12.     *Prohibited Persons and Transactions*.   Tenant and Landlord (each, a "Representing Party") each represents and warrants to the other (i) that neither the Representing Party nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, (ii) that the Representing Party's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the term of the Lease the Representing Party shall comply with the Executive Order and with the Money Laundering Act.

[signature page follows]

IN WITNESS WHEREOF, this Second Amendment has been duly executed as of the day and year first written above.

**LANDLORD:**

**5395 PEARL PARKWAY, LLC**, a Colorado limited liability company

By: _____

Name: _____

Title: _____

**TENANT:**

**SKLAR EXPLORATION COMPANY LLC**, a Louisiana limited liability company

By: _____

Name: _____
Christopher A. Farrell, CPA

Title: _____
Vice President - Chief Financial Officer
Sklar Exploration Company L.L.C.

EXHIBIT A

FLOOR PLAN

## RIDER B

### LEASE TERMINATION OPTION

1. Notwithstanding any other provision of this Lease to the contrary, Tenant will have an option to terminate this Lease as to all, but not less than all, of Premises A, Premises B and Premises C (collectively, the "Premises"), upon a minimum of twelve (12) months' prior written notice to Landlord ("Tenant's Notice"). Tenant may first exercise its option to terminate the Lease effective December 31, 2021, and may exercise its termination option each year thereafter for the termination to be effective on December 31st of the applicable year (with the applicable December 31st being the "Termination Date").

2. Upon exercise of it option, Tenant must pay to Landlord, on or prior to the Termination Date, an amount equal to all unamortized costs, calculated as of the Termination Date associated with or allocated to each Premises, calculated as of Rent Commencement Date as to each Premises plus an amount equal to gross rent due and payable for the Premises for the six (6) month period immediately preceding the Termination Date (collectively, the "Termination Payment"). For purposes of this Rider, tenant improvement allowance, brokerage commissions, and architectural fees paid by Landlord in connection with each Premises shall be amortized over the remaining period of the original ten (10) year amortization thereof utilizing an eight percent (8%) cost of funds.

3. The Termination Payment is subject to adjustment and increase in accordance with any and all extensions, expansions or modifications of the Lease, but only insofar as Landlord incurs costs associated with associated with, or allocated to, the Premises, including without limitation any tenant improvement allowance, architectural fees (if applicable), and brokerage commissions, if any. Landlord hereby agrees to endeavor to provide or cause Landlord's Broker to provide Tenant with a final, completed Termination Payment Schedule upon which Tenant and Landlord have mutually agreed and in the form attached hereto as Schedule I (as the same may be amended from time to time, "Termination Payment Schedule"), which Termination Payment Schedule Landlord and Tenant agree to mutually execute within five (5) business days after Landlord's delivery of such completed Termination Payment Schedule.

4. Notwithstanding the foregoing, Tenant's failure to execute the Termination Payment Schedule within said five (5) business day period shall constitute an Event of Default under the Lease (unless the Termination Payment Schedule has not at that point been mutually agreed upon, so long as Landlord and Tenant are using due diligence and acting in good faith to mutually agree upon such Termination Payment Schedule), and in no event will Tenant be relieved of any of its obligations under the Lease to which this Rider is attached including, without limitation, the obligation to timely pay the Termination Payment in connection with delivering Tenant's Notice and electing to terminate this Lease.

4. ~~For purposes of this Rider, tenant improvement allowance, brokerage commissions, and architectural fees paid by Landlord in connection with each Premises shall be amortized over a three (3) year period utilizing an eight percent (8%) cost of funds.~~

5. Tenant will have no right to terminate this Lease if Tenant's Notice or the Termination Payment is not timely delivered.

6. Upon Tenant's compliance with the terms of this Rider, and the surrender provisions set forth in this Lease, and provided that as of the Termination Date, no Event of Default or event that with the

4834-5262-5948.1

passage of time and/or the giving of notice could become an Event of Default has occurred and is continuing, as of the Termination Date this Lease shall terminate and neither Landlord nor Tenant will have any further rights or obligations under this Lease, except with respect to those matters in this Lease which expressly survive the termination of this Lease.  Capitalized terms used but not defined herein shall have the meanings set forth in the Lease to which this Rider is attached.

**SCHEDULE I**
**TERMINATION PAYMENT SCHEDULE**

By their execution hereof, Landlord and Tenant hereby agree that this Termination Payment Schedule sets forth the total Termination Payment due and payable by Tenant in the event that Tenant exercises its ~~one-time~~ right to terminate the Lease in accordance with Rider B attached to the Lease.

| ITEM | AMOUNT |
|---|---|
| Unamortized costs of tenant improvement allowance(s) | $_____ |
| Unamortized costs of broker commissions paid by Landlord | $_____ |
| Architectural Fees | $_____ |
| Gross Rental Payment (6 months) | $_____ |
| **TOTAL TERMINATION PAYMENT** | $_____ |

Executed this _____ day of _____, 20___.

**LANDLORD:**

**5395 PEARL PARKWAY, LLC,** a Colorado limited liability company


By: _____
Name: _____
Title: _____


**TENANT:**

**SKLAR EXPLORATION COMPANY LLC,** a Louisiana limited liability company


By: _____
Name: _____
Title: _____

## RIDER 5.01B

## PREMISES C TENANT IMPROVEMENT WORK AGREEMENT

Landlord agrees to cause Sand Construction LLC ("Contractor") to complete the improvements described on the Construction Cost Estimate attached hereto as Schedule I and the working drawings and space plans attached thereto using Building-standard methods and materials (collectively, "Premises C Improvements"). Notwithstanding anything to the contrary herein or in the Lease, in no event shall Landlord be obligated to make disbursements pursuant to this Rider or otherwise in connection with the Premises C Improvements in an amount that exceeds $350,000 ("Landlord's Costs") and in no event shall Tenant be entitled to any excess, credit, deduction or offset against Base Rent or Additional Rent for any unused portion of Landlord's Costs. Notwithstanding the foregoing, any additional work, improvements or alterations in the to be performed by or on behalf of Tenant and any deviations from the Space Plan or Building-standard methods or materials shall be (i) at Tenant's sole cost and expense, (ii) paid to Landlord within 10 days of written demand, and (iii) subject to Landlord's prior written approval, to be given or withheld in Landlord's sole discretion.

Tenant hereby acknowledges that Contractor will be performing the Premises C Improvements during the Lease Term, as extended. Tenant shall not be entitled to any abatement or reduction of Base Rent, Additional Rent or any other amounts payable under the Lease nor shall the Premises C Improvements or any construction activities or other work associated therewith be deemed an eviction, actual or constructive, of Tenant. Tenant shall at all times cooperate reasonably and in good faith in connection with Contractor's performance of the Premises C Improvements, including, without limitation, by granting Landlord, Landlord's Broker and Contractor access to the Premises and by responding within a reasonable time (not to exceed three (3) business days) to matters arising in connection with the Premises C Improvements. Landlord will cause the Premises C Improvements to comply in all material respects with applicable building codes and other applicable laws. Landlord shall be responsible for payment of invoices to Contractor up to but in no event exceeding the Landlord's Costs and Tenant shall be solely responsible for payment of invoices from Landlord or Contractor for all costs exceeding the Landlord's Costs which invoices must be paid within ten (10) business days after the date of such invoice.

Any other additions, alterations or improvements desired to be made by Tenant other than the Tenant's Work (defined below) shall be subject to the terms of this Lease (as amended from time to time) to which this Rider 5.01B is attached relating to alterations and improvements.

Landlord's approval of the Construction Cost Estimate shall create no responsibility or liability on the part of Landlord for the completeness or design sufficiency with respect to such Construction Cost Estimate or improvements constructed in conformity therewith. Tenant shall be solely responsible for ensuring that the design and improvements of the interior of Premises C are adequate to fully satisfy Tenant's intended use of Premises C, provided they are built in accordance with the Construction Cost Estimate and all applicable local laws and ordinances.

**Miscellaneous.**

a)   Except to the extent otherwise indicated herein, the initially capitalized terms defined in the Lease which are used in this Rider 5.01B shall have the same meaning assigned to them in the Lease.

4834-5262-5948.1

b)    The terms and provisions of this Rider 5.01B are intended to supplement and are specifically subject to all the terms and provisions of the Lease. In the event of conflict between the terms of this Rider 5.01B and the Lease, then the provisions of this Rider 5.01B shall govern.

c)    This Rider 5.01B may not be amended or modified other than by supplemental written agreement executed by authorized representatives of the parties hereto.

d)    Tenant shall have a license to access Premises C prior to the Premises C Rent Commencement Date for the purposes of installing cabling, furniture, fixtures and equipment and commencing Tenant's business operations, provided that Tenant provides notice to and obtains approval from Landlord's contractors with respect to each such entry and Tenants contractors do not unreasonably interfere with the completion of the "turnkey" finish by the Contractor. Scheduling of all cable installation shall be coordinated through the Contractor. In addition to any other conditions or limitations on such license to enter Premises C prior to the Rent Commencement Date, Tenant expressly agrees that none of its agents, contractors, workmen, mechanics, suppliers or invitees shall enter Premises C prior to the Premises C Rent Commencement Date unless and until each of them (or their employers) shall have furnished Landlord with reasonably satisfactory evidence of insurance coverage. If at any time such entry shall cause or threaten to cause disharmony or interference, Landlord, in its sole discretion, shall have the right to withdraw and cancel such license upon notice to Tenant. Tenant agrees that any such entry into Premises C shall be deemed to be under all of the terms, covenants, conditions and provisions of the Lease, except the covenant to pay periodic Premises C Base Rent or Operating Expenses with respect to Premises C, which rental obligations will commence on the Premises C Rent Commencement Date. Tenant further agrees that, to the extent permitted by law, Landlord and its principals shall not be liable in any way for any injury or death to any person or persons, loss or damage to any of the installations made in Premises C or loss or damage to property placed therein or thereabout, the same being at Tenant's sole risk.

IN WITNESS WHEREOF, the parties hereto have executed this Rider 5.01B as of the _20ᵗʰ_ day of ___November___, 2014.

LANDLORD:

**5395 PEARL PARKWAY, LLC**, a Colorado limited liability company

By: _Eric J Kramer_

Name: _Eric J. Kramer_

Title: _Manager_

TENANT:

**SKLAR EXPLORATION COMPANY LLC**, a Louisiana limited liability company

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have executed this Rider 5.01B as of the 20ᵀᴴ day of _Novembeᵣ_, 2014.

LANDLORD:

**5395 PEARL PARKWAY, LLC**, a Colorado
limited liability company

By: _Erik Kramer_
Name: _Eric T. Kramer_
Title: _Manager_

TENANT:

**SKLAR EXPLORATION COMPANY LLC**, a
Louisiana limited liability company

By: _____
Name: _____
Title: _____
    Christopher A. Farrell, CPA
    Vice President - Chief Financial Officer
    Sklar Exploration Company L.L.C.

4834-5262-5948.3

SCHEDULE I

Sand Construction of Colorado LLC
CONSTRUCTION COST ESTIMATE
Sklar Exploration North
5395 Pearl Parkway
1ST Floor
November 4, 2014

We are pleased to submit the following proposal to remodel the space  per the space plan dated 8-25-14 and per the terms below.

| | |
|---|---:|
| PLANS | 8,662.00 |
| PERMIT | 13,254.00 |
| GENERAL CONDITIONS | 12,000.00 |
| SAWCUT AND CONCRETE REPLACMENT | 3,941.00 |
| BLOCK WALL ON DOCK | 2,365.00 |
| FINAL CLEANUP | 1,237.00 |
| BLIND | 5,430.00 |
| DEMOLITION | 4,620.00 |
| FRAMING/ DRYWALL | 30,250.00 |
| GRID & TILE | 12,980.00 |
| CLEAR STORY GLASS | 5,102.00 |
| GLASS WALL AND GLASS DOOR FOR CONFERENCE ROOM | 5,768.00 |
| NEW EXTERIOR GLASS STORE FRONT | 2,050.00 |
| FRAMES & DOORS | 18,630.00 |
| METAL FOR WALLS | 14,350.00 |
| BREAKROOM MILLWORK | 2,976.00 |
| COPY MILLWORK | 2,945.00 |
| RESTROOM SS TOP AND HARDWARE | 3,420.00 |
| WALLPAPER & PAINT | 36,899.00 |
| CARPET/LVT& BASE | 25,364.00 |
| CERMIC TILE FOR RESTROOM | 7,120.00 |
| ELECTRICAL | 16,890.00 |
| 50 NEW 2X4 DIRECT/INDIRECT TROFFERS AND 8 CANS | 21,350.00 |
| MOTION SWITCHES | 4,672.00 |
| FIRE ALARM | 4,680.00 |
| HVAC | 18,210.00 |
| SPRINKLERS | 3,055.00 |
| PLUMBING | 15,643.00 |
| REFRIGERATOR & DISHWASHER | 2,130.00 |
| O&P | 24,137.00 |
| CONTINGENCY | 20,000.00 |
| TOTAL COST ESTIMATE | $    350,130.00 |