# Exhibit A

Base Years

## OFFICE LEASE

THIS LEASE made as of the **8th** day of **FEBRUARY** 19**99** between _____
___ **Sklar**, L.P., a(n) California limited partnership
("Landlord") and _Sklar Exploration Company, L.L.C._____,

a(n) _limited liability company_____
___ 401 Edwards Street, Suite 826_____ whose address is
___ Shreveport, LA  71101_____
_____ ("Tenant").

## WITNESSETH:

## ARTICLE 1

### Premises and Term

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord that certain space known as Suite(s)
__ 1601 _____ ("Premises") described or shown on Exhibit A attached hereto, in the
building known as the ___Louisiana Tower_____ ("Building") located at _____
401 Edwards Street, Shreveport, Louisiana, 71101_____ ("Property") as further described in Article 25), subject to the provisions herein contained. The term ("Term") of this
Lease shall commence on the 1st ____ day of _April_____ 19 99 *** ("Commencement Date"), and end
on the _31st__ day of _March_____ XXX 2004 _____ ("Expiration Date"), unless sooner terminated as provided
herein. The Commencement Date shall be subject to adjustment as provided in Article 4. Landlord and Tenant agree that
for purposes of this Lease the rentable area of the Premises is _4,860_____ square feet and the rentable area of
the Property is _350,292_____ square feet.

*and Rent attributable thereto
**later of 60 days after this Lease is signed by the Landlord or the

## ARTICLE 2

### Base Rent

Tenant shall pay Landlord monthly Base Rent of _Three-Thousand seven-hundred forty-six dollars_
& .25/100----------------------------------------------------------------------------------------- Dollars
( $3,746.25--------- ), in advance on or before the first day of each calendar month during the Term, except that
Base Rent for the first full calendar month for which Base Rent shall be due, shall be paid when Tenant executes this Lease.
If the Term commences on a day other than the first day of a calendar month, or ends on a day other than the last day of a
calendar month, then the Base Rent for such month shall be prorated on the basis of 1/30th of the monthly Base Rent for
each day of such month.    (See Rider 2, Office Rent Step-Ups attached hereto and made a part
hereof).

## ARTICLE 3

### Additional Rent

(A) Taxes. Tenant shall pay Landlord an amount equal to Tenant's Prorata Share of Taxes in excess of the amount of
axes paid by Landlord during the calendar year ___1999____ ("Base Tax Year"). The terms "Taxes" and
Tenant's Prorata Share" shall have the meanings specified therefor in Article 25.

(B) Operating Expenses. Tenant shall pay Landlord an amount equal to Tenant's Prorata Share of Operating
penses in excess of the amount of Operating Expenses paid by Landlord during the calendar year ___1999____
Base Expense Year"). The terms "Operating Expenses" and "Tenant's Prorata Share" shall have the meanings
cified therefor in Article 25.

(C) CPI Escalation. If the CPI on any Adjustment Date shall be greater than the CPI for the Commencement Date,
nthly Base Rent commencing on the Adjustment Date shall be adjusted by adding an amount (the "CPI Escalation
ount") equal to the product obtained by multiplying: (a) the monthly Base Rent, by (b) the percentage increase in the
from the Commencement Date through the Adjustment Date. "Adjustment Date" shall mean each January 1 during
Term. The term "CPI" shall have the meaning specified therefor in Article 25.

*provided, however, that should the initial alterations and improvements be completed
before such time, the Lease term and the rent shall commence on the date of actual
occupancy by the Tenant, with any appropriate proration in Rent.

PLEASE
H. S.
INITIAL

(D) **Manner of Payment.** ~~CPI Escalation Amounts,~~ Taxes, and Operating Expenses shall be paid in the following manner:

(I) Landlord may reasonably estimate in advance the amounts Tenant shall owe for Taxes and Operating Expenses for any full or partial calendar year of the Term. In such event, Tenant shall pay such estimated amounts, on a monthly basis, on or before the first day of each calendar month, together with Tenant's payment of Base Rent. Such estimate may be reasonably adjusted from time to time by Landlord.

(II) Within 120 days after the end of each calendar year, or as soon thereafter as practicable, Landlord shall provide a statement (the "Statement") to Tenant showing: (a) the amount of actual Taxes and Operating Expenses for such calendar year, with a listing of amounts or major categories of Operating Expenses, and such amounts for the Base Years, (b) any amount paid by Tenant toward Taxes and Operating Expenses during such calendar year on an estimated basis, (c) any revised estimate of Tenant's obligations for Taxes and Operating Expenses for the current calendar year, ~~and (d) any increased CPI Escalation Amounts.~~

(III) If the Statement shows that Tenant's estimated payments were less than Tenant's actual obligations for Taxes and Operating Expenses for such year, Tenant shall pay the difference. If the Statement shows an increase in Tenant's estimated payments for the current calendar year, Tenant shall pay the difference between the new and former estimates, for the period from January 1 of the current calendar year through the month in which the Statement is sent. Tenant shall make such payments within thirty (30) days after Landlord sends the Statement.

(Iv) If the Statement shows that Tenant's estimated payments exceeded Tenant's actual obligations for Taxes and Operating Expenses, Tenant shall receive a credit for the difference against payments of Rent next due. If the Term shall have expired and no further Rent shall be due, Tenant shall receive a refund of such difference, within thirty (30) days after Landlord sends the Statement.

~~(v) If the Statement shows an increased CPI Escalation Amount, Tenant shall pay the difference between the former CPI Escalation Amount and the increased CPI Escalation Amount for the period from January 1 of the year in which Landlord sends the Statement, through the month in which the Statement is sent, within thirty (30) days after Landlord sends the Statement. Tenant shall thereafter pay Base Rent, as increased by the CPI Escalation Amount set forth in the Statement.~~

(vi) So long as Tenant's obligations hereunder are not materially adversely affected thereby, Landlord reserves the right to reasonably change, from time to time, the manner or timing of the foregoing payments. In lieu of providing one Statement covering Taxes, Operating Expenses ~~and CPI Escalation Amounts,~~ Landlord may provide separate statements, at the same or different times. No delay by landlord in providing the Statement (or separate statements) shall be deemed a default by Landlord or a waiver of Landlord's right to require payment of Tenant's obligations for actual or estimated Taxes or Operating Expenses, ~~or CPI Escalation Amounts.~~ In no event shall a decrease in Taxes or Operating Expenses below the Base Year amounts, ~~or a decrease in the CPI,~~ ever decrease the monthly Base Rent, or give rise to a credit in favor of Tenant.

(E) **Proration.** If the Term commences other than on January 1, or ends other than on December 31, Tenant's obligations to pay estimated and actual amounts towards Taxes and Operating Expenses for such first or final calendar years shall be prorated to reflect the portion of such years included in the Term. Such proration shall be made by multiplying the total estimated or actual (as the case may be) Taxes and Operating Expenses, for such calendar years, as well as the Base Year amounts, by a fraction, the numerator of which shall be the number of days of the Term during such calendar year, and the denominator of which shall be 365.

(F) **Landlord's Records.** Landlord shall maintain records respecting Taxes and Operating Expenses and determine the same in accordance with sound accounting and management practices, consistently applied. Although this Lease contemplates the computation of Taxes and Operating Expenses on a cash basis, Landlord shall make reasonable and appropriate accrual adjustments to ensure that each calendar year, including the Base Years, includes substantially the same recurring items. Landlord reserves the right to change to a full accrual system of accounting so long as the same is consistently applied and Tenant's obligations are not materially adversely affected. Tenant or its representative shall have the right to examine such records upon reasonable prior notice specifying such records Tenant desires to examine, during normal business hours at the place or places where such records are normally kept by sending such notice no later than forty-five (45) days following the furnishing of the Statement. Tenant may take exception to matters included in Taxes or Operating Expenses, or Landlord's computation of Tenant's Prorata Share of either, by sending notice specifying such exception and the reasons therefor to Landlord no later than thirty (30) days after Landlord makes such records available for examination. Such Statement shall be considered final, except as to matters to which exception is taken after examination of Landlord's records in the foregoing manner and within the foregoing times. Tenant acknowledges that Landlord's ability to budget and incur expenses depends on the finality of such Statement, and accordingly agrees that time is of the essence of this Paragraph. If Tenant takes exception to any matter contained in the Statement as provided herein, Landlord shall refer the matter to an independent certified public accountant, whose certification as to the proper amount shall be final and conclusive as between Landlord and Tenant. Tenant shall promptly pay the cost of such certification unless such certification determines that Tenant was overbilled by more than 2%. Pending resolution of any such exceptions in the foregoing manner, Tenant shall continue paying Tenant's Prorata Share of Taxes and Operating Expenses the amounts determined by Landlord, subject to adjustment after any such exceptions are so resolved.



(G) **Rent and Other Charges.** Base Rent, Taxes, Operating Expenses, ~~CPI Escalation Amounts~~; and any other amounts which Tenant is or becomes obligated to pay Landlord under this Lease or other agreement entered in connection herewith, are sometimes herein referred to collectively as "Rent," and all remedies applicable to the non-payment of Rent shall be applicable thereto. Rent shall be paid at any office maintained by Landlord or its agent at the Property, or at such other place as Landlord may designate.

## ARTICLE 4

### Commencement of Term

The Commencement Date set forth in Article 1 shall be delayed and Rent shall be abated to the extent that Landlord fails: (i) to substantially complete any improvements to the Premises required to be performed by Landlord under any separate agreement signed by both parties, or (ii) to deliver possession of the Premises for any other reason, including but not limited to holding over by prior occupants, except to the extent that Tenant, its contractors, agents or employees in any way contribute to either such failures. If Landlord so fails for a ninety (90) day initial grace period, or such additional time as may be necessary due to fire or other casualty, strikes, lock-outs or other labor troubles, shortages of equipment or materials, governmental requirements, power shortages or outages, acts or omissions of Tenant or other Persons, or other causes beyond Landlord's reasonable control, Tenant shall have the right to terminate this Lease by written notice to Landlord any time thereafter up until Landlord substantially completes any such improvements and delivers the Premises to Tenant. Any such delay in the Commencement Date shall not subject Landlord to liability for loss or damage resulting therefrom, and Tenant's sole recourse with respect thereto shall be the abatement of Rent and right to terminate this Lease described above. Upon any such termination, Landlord and Tenant shall be entirely relieved of their obligations hereunder, and any Security Deposit and Rent payments shall be returned to Tenant. If the Commencement Date is delayed, the Expiration Date shall not be similarly extended, unless the parties expressly agree in writing. During any period that Tenant shall be permitted to enter the Premises prior to the Commencement Date other than to occupy the same (e.g., to perform alterations or improvements), Tenant shall comply with all terms and provisions of this Lease, except those provisions requiring the payment of Rent. If Tenant shall be permitted to enter the Premises prior to the Commencement Date for the purpose of occupying the same, Rent shall commence on such date, and if Tenant shall commence occupying only a portion of the Premises prior to the Commencement Date, Rent shall be prorated based on the number of rentable square feet occupied by Tenant. Landlord shall permit early entry, provided the Premises are legally available and Landlord has completed any work required under this Lease or any separate agreement entered in connection herewith.

## ARTICLE 5

### Condition of Premises

Tenant has inspected the Premises and agrees to accept the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements except as expressly provided in ~~any separate agreement that may be signed by the parties~~ the attached Work Agreement signed by the parties and made a part of this Lease.

## ARTICLE 6

### Use and Rules

Tenant shall use the Premises for offices and no other purpose whatsoever, in compliance with all applicable Laws, and without disturbing or interfering with any other tenant or occupant of the Property. Tenant shall not use the Premises in any manner so as to cause a cancellation of Landlord's insurance policies, or an increase in the premiums thereunder. Tenant shall comply with all rules set forth in Rider One attached hereto (the "Rules"). Landlord shall have the right to reasonably amend such Rules and supplement the same with other reasonable Rules (not expressly inconsistent with this Lease) relating to the Property, or the promotion of safety, care, cleanliness or good order therein, and all such amendments or new Rules shall be binding upon Tenant after five (5) days notice thereof to Tenant. All Rules shall be applied on a non-discriminatory basis, but nothing herein shall be construed to give Tenant or any other Person (as defined in Article 25) any claim, demand or cause of action against Landlord arising out of the violation of such Rules by any other tenant, occupant, or visitor of the Property, or out of the enforcement or waiver of the Rules by Landlord in any particular instance.

## ARTICLE 7

### Services and Utilities

Landlord shall provide the following services and utilities (the cost of which shall be included in Operating Expenses unless otherwise stated herein or in any separate rider hereto):

Tenant shall be permitted to enter the Premises on ~~January 24, 1999~~ lease execution (the "Early Access Date") for purposes of performing alterations and improvements provided that the Premises are legally available. The Commencement Date shall be delayed as provided in this Article to the extent that the Premises are not legally available on the Early Access Date.



(A) Electricity for standard office lighting fixtures, and equipment and accessories customary for offices ~~(up to 250~~ ~~Hours per month)~~ where: (1) the connected electrical load of all of the same does not exceed an average of 4 watts per square foot of the Premises (or such lesser amount as may be available, based on the safe and lawful capacity of the existing electrical circuit(s) and facilities serving the Premises), (2) the electricity will be at nominal 120 volts, single phase (or 110 volts, depending on available service in the Building), and (3) the safe and lawful capacity of the existing electrical circuit(s) serving the Premises is not exceeded.

** and 8:00 a.m. through 5:00 p.m., Saturdays. (See Page 4A - Air Conditioning
*** Overtime)
(B) Heat and air-conditioning to provide a temperature required, in Landlord's reasonable opinion and in accordance     ** 6:30 a.m.
with applicable Law, for occupancy of the Premises under normal business operations, from ~~8:00~~ a.m. until 6:00 p.m.
Monday through Friday, except on Holidays (as defined in Article 25). Landlord shall not be responsible for inadequate air-conditioning or ventilation to the extent the same occurs because Tenant uses any item of equipment consuming more than 500 watts at rated capacity without providing adequate air-conditioning and ventilation therefor.

(C) Water for drinking, lavatory and toilet purposes at those points of supply provided for nonexclusive general use of other tenants at the Property.

(D) Customary office cleaning and trash removal service ~~Monday through Friday and Sunday through Thursday~~ in and     Monday through Friday
about the Premises.

-- (E) Operatorless passenger elevator service (if the Property has such equipment serving the Premises) and freight     *** which shall be available 24 hours a day, 7 days a week
elevator service (if the Property has such equipment serving the Premises), and subject to scheduling by Landlord) in common with Landlord and other tenants and their contractors, agents and visitors.

(F) Landlord shall seek to provide such extra utilities or services as Tenant may from time to time request, if the same are reasonable and feasible for Landlord to provide and do not involve modifications or additions to the Property or existing Systems and Equipment (as defined in Article 25), and if Landlord shall receive Tenant's request within a reasonable period prior to the time such extra utilities or services are required. Landlord may comply with written or oral requests by any officer or employee of Tenant, unless Tenant shall notify Landlord of, or Landlord shall request, the names of authorized individuals (up to 3 for each floor on which the Premises are located) and procedures for written requests. Tenant shall, for such extra utilities or services, pay such charges as Landlord shall from time to time reasonably establish. All charges for such extra utilities or services shall be due at the same time as the installment of Base Rent with which the same are billed, or if billed separately, shall be due within twenty (20) days after such billing.

Landlord may install and operate meters or any other reasonable system for monitoring or estimating any services or utilities used by Tenant in excess of those required to be provided by Landlord under this Article (including a system for reasonably estimating excess usage by Landlord's engineer). If such system indicates such excess services or utilities, Tenant shall pay Landlord's reasonable charges for installing and operating such system and any supplementary air-conditioning, ventilation, heat, electrical or other systems or equipment (or adjustments or modifications to the existing Systems and Equipment), and Landlord's reasonable charges for such amount of excess services or utilities used by Tenant.

Landlord does not warrant that any services or utilities will be free from shortages, failures, variations, or interruptions caused by repairs, maintenance, replacements, improvements, alterations, changes of service, strikes, lockouts, labor controversies, accidents, inability to obtain services, fuel, steam, water or supplies, governmental requirements or requests, or other causes beyond Landlord's reasonable control. None of the same shall be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof, or render Landlord liable to Tenant for damages, or abatement of Rent, or relieve Tenant from performance of Tenant's obligations under this Lease. Landlord in no event shall be liable for damages by reason of loss of profits, business interruption or other consequential damages.

## ARTICLE 8
****
### Alterations and Liens

Tenant shall make no additions, changes, alterations or improvements (the "Work") to the Premises or any electrical or mechanical facilities, including the Systems and Equipment (as defined in Article 25) pertaining to the Premises without the prior written consent of Landlord. Landlord may impose reasonable requirements as a condition of such consent including without limitation the submission of plans and specifications for Landlord's prior written approval, obtaining necessary permits, posting bonds, obtaining insurance, prior approval of contractors, subcontractors and suppliers, prior receipt of copies of all contracts and subcontracts, contractor and subcontractor lien waivers, affidavits listing all contractors, subcontractors and suppliers, use of union labor (if Landlord uses union labor), affidavits from engineers acceptable to Landlord stating that the Work will not adversely affect the Systems and Equipment or the structure of the Property, and requirements as to the manner and times in which such Work shall be done. All Work shall be performed in a good and workmanlike manner and all materials used shall be of a quality comparable to or better than those in the Premises and such Work be performed under Landlord's supervision. ~~In all cases, Tenant shall pay Landlord a reasonable fee to cover~~ ~~Landlord's overhead in reviewing Tenant's plans and specifications and performing any supervision of the Work.~~ If Landlord consents or supervises, the same shall not be deemed a warranty as to the adequacy of the design, workmanship or quality materials, and Landlord hereby expressly disclaims any responsibility or liability for the same. Landlord shall under no circumstances have any obligation to repair, maintain or replace any portion of the Work.

4

****The initial alterations and improvements to the Premises shall be pursuant to the Work Agreement attached hereto and made a part hereof.



**Page 4A**

If: (a) any services or utilities are interrupted or discontinued
as a result of Landlord's negligence, and Tenant is unable to and
does not use, the Premises as a result of such interruption or
discontinuance, and (b) Tenant shall have given written notice
respecting such interruption or discontinuance to Landlord and
Landlord shall have failed to cure such interruption or
discontinuance within ten (10) consecutive days after receiving
such notice, or such additional time as may be required due to acts
of god, force majeure, casualty damage, strikes, shortages of labor
or materials, or other causes beyond Landlord's reasonable control,
Rent hereunder shall thereafter be abated until such time as such
services or utilities are restored or Tenant begins using the
Premises again, whichever shall first occur. Such abatement of
Rent shall be Tenant's sole recourse in the event of a
discontinuance or interruption of services or utilities required to
be provided by Landlord hereunder.


**Air-Conditioning Overtime** - The Tenant shall have the right to
request up to 400 hours of air-conditioning overtime at an hourly
rate of $30.00. Any hours thereafter shall be billed at the then
prevailing hourly rate. Request for overtime hours shall be given
to the management office by 2:00 p.m. on Friday for weekend
overtime requirements.



Tenant shall keep the Property and Premises free from any mechanic's, materialman's or similar liens or other such encumbrances in connection with any Work on or respecting the Premises not performed by or at the request of Landlord, and shall indemnify and hold Landlord harmless from and against any claims, liabilities, judgments, or costs (including attorneys' fees) arising out of the same or in connection therewith. Tenant shall give Landlord notice at least twenty (20) days prior to the commencement of any Work on the Premises (or such additional time as may be necessary under applicable Laws), to afford Landlord the opportunity of posting and recording appropriate notices of non-responsibility. Tenant shall remove any such lien or encumbrance by bond or otherwise within thirty (30) days after written notice by Landlord, and if Tenant shall fail to do so, Landlord may pay the amount necessary to remove such lien or encumbrance, without being responsible for investigating the validity thereof. The amount so paid shall be deemed additional Rent under this Lease payable upon demand, without limitation as to other remedies available to Landlord under this Lease. Nothing contained in this Lease shall authorize Tenant to do any act which shall subject Landlord's title to the Property or Premises to any liens or encumbrances whether claimed by operation of law or express or implied contract. Any claim to a lien or encumbrance upon the Property or Premises arising in connection with any Work on or respecting the Premises not performed by or at the request of Landlord shall be null and void, or at Landlord's option shall attach only against Tenant's interest in the Premises and shall in all respects be subordinate to Landlord's title to the Property and Premises.

## ARTICLE 9

### Repairs

Except for customary cleaning and trash removal provided by Landlord under Article 7, and damage covered under Article 10, Tenant shall keep the Premises in good and sanitary condition, working order and repair (including without limitation, carpet, wall-covering, doors, plumbing and other fixtures, equipment, alterations and improvements whether installed by Landlord or Tenant). In the event that any repairs, maintenance or replacements are required,*Tenant shall promptly arrange for the same either through Landlord for such reasonable charges as Landlord may from time to time establish, or such contractors as Landlord generally uses at the Property or such other contractors as Landlord shall first approve in writing, and in a first class, workmanlike manner approved by Landlord in advance in writing. If Tenant does not promptly make such arrangements, Landlord may, but need not, make such repairs, maintenance and replacements, and the costs paid or incurred by Landlord therefor shall be reimbursed by Tenant promptly after request by Landlord. Tenant shall indemnify Landlord and pay for any repairs, maintenance and replacements to areas of the Property outside the Premises, caused, in whole or in part, as a result of moving any furniture, fixtures, or other property to or from the Premises, or by Tenant or its employees, agents, contractors, or visitors (notwithstanding anything to the contrary contained in this Lease). Except as provided in the preceding sentence, or for damage covered under Article 10, Landlord shall keep the common areas of the Property in good and sanitary condition, working order and repair (the cost of which shall be included in Operating Expenses, as described in Article 25, except as limited therein).

*to the Premises as a result of operations of Tenant, or its employees, agents,
contractors, or visotors.

## ARTICLE 10

### Casualty Damage

If the Premises or any common areas of the Property providing access thereto shall be damaged by fire or other casualty, Landlord shall use available insurance proceeds to restore the same. Such restoration shall be to substantially the condition prior to the casualty, except for modifications required by zoning and building codes and other Laws or by any Holder (as defined in Article 25), any other modifications to the common areas deemed desirable by Landlord (provided access to the Premises is not materially impaired), and except that Landlord shall not be required to repair or replace any of Tenant's furniture, furnishings, fixtures or equipment, or any alterations or improvements in excess of any work performed or paid for by Landlord under any separate agreement signed by the parties in connection herewith. Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereof. However, Landlord shall allow Tenant a proportionate abatement of Rent during the time and to the extent the Premises are unfit for occupancy for the purposes permitted under this Lease and not occupied by Tenant as a result thereof (unless Tenant or its employee or agents caused the damage). Notwithstanding the foregoing to the contrary, Landlord may elect to terminate this Lease by notifying Tenant in writing of such termination within sixty (60) days after the date of damage (such termination notice to include a termination date providing at least ninety (90) days for Tenant to vacate the Premises), if the Property shall be materially damaged by Tenant or its employees or agents, or if the Premises shall be damaged by fire or other casualty or cause such that: (a) repairs to the Premises and access thereto cannot reasonably be completed within 120 days after the casualty without the payment of overtime or other premiums, (b) more than 25% of the Premises is affected by the damage, and fewer than 24 months remain in the Term, 25) shall require that the insurance proceeds or any portion thereof be used to retire the Mortgage debt (or shall terminate the ground lease, as the case may be), or the damage is not fully covered by Landlord's insurance policies, or (d) the cost of the repairs, alterations, restoration or improvement work would exceed 25% of the replacement value of the Building, or the nature of such work would make termination of this Lease necessary or convenient. Tenant hereby specifically acknowledges that this Article represents the entire agreement between the parties respecting damage to the Premises or Property, and Tenant agrees that Landlord's obligation to restore, and the abatement of Rent provided herein, shall be Tenant's sole recourse in the event of such damage. Accordingly, Tenant hereby waives any other rights it may have under any applicable Law to terminate the Lease by reason of damage to the Premises or Property.

*and the provisions on Page 5A

**and Tenant's option to terminate as
outlined in the paragraph on Page 5A,

5

**Page 5A**

Notwithstanding Article 10 of the Lease to the contrary, Tenant may terminate this Lease if Tenant is unable to use all or a substantial portion of the Premises as a result of fire or other casualty not caused by Tenant or its employees or agents, and: (a) Landlord fails to commence restoration work to the Premises and access thereto within sixty (60) days after the damage occurs, (b) Landlord fails to substantially complete such work within 180 days after commencing the same (or if the Premises contains more than 5,000 rentable square feet, then an additional 30 days for each additional 5,000 rentable square feet), or such additional time as may be necessary due to strikes, lock-outs or other labor troubles, shortages of equipment or materials, governmental requirements, power shortages or outages or other causes beyond Landlord's reasonable control, (c) such work is reasonably estimated (which estimate Landlord shall provide within 60 days following the casualty) to take more than 180 days to substantially complete after being commenced (or if the Premises contains more than 5,000 rentable square feet, then an additional 30 days for each additional 5,000 rentable square feet) or (d) more than 25% of the Premises is affected by the damage, and fewer than 12 months remain in the Term. In order to exercise any of the foregoing termination rights, Tenant must send Landlord at least sixty (60) days (but not more than 180 days) advance notice specifying the basis for termination, and such notice must be given no later than thirty (30) days following the occurrence of the condition serving as the basis for the termination right invoked by Tenant. Such termination rights are cumulative. Such termination rights shall not be available to Tenant if: (i) Landlord substantially completes the repairs to the Premises and access thereto within sixty (60) days after Tenant's notice, or (ii) Landlord provides Tenant with new premises under Article 22(E) or otherwise and access thereto within sixty (60) days after Tenant's notice. Notwithstanding anything to the contrary contained herein. If Tenant, or its officers, employees, contractors, invitees or agents delay Landlord in performing the repairs, Landlord shall have additional time to complete the work equal to such delay and Tenant shall pay Landlord all Rent for the period of such delay.



## ARTICLE 11

### Insurance, Subrogation, and Waiver of Claims

Tenant shall maintain during the Term comprehensive (or commercial) general liability insurance, with limits of not less than $1,000,000 combined single limit for personal injury, bodily injury or death, or property damage or destruction (including loss of use thereof) for any one occurrence. Tenant shall also maintain during the Term worker compensation insurance as required by statute, and primary, noncontributory, "all-risk" property damage insurance covering Tenant's personal property, business records, fixtures and equipment, for damage or other loss caused by fire or other casualty or cause including, but not limited to, vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, explosion, business interruption, and other insurable risks in amounts not less than the full insurable replacement value of such property and full insurable value of such other interests of Tenant (subject to reasonable deductible amounts). Landlord shall, as part of Operating Expenses, maintain during the Term comprehensive (or commercial) general liability insurance, with limits of not less than $1,000,000 combined single limit for personal injury, bodily injury or death, or property damage or destruction (including loss of use thereof) for any one occurrence. Landlord shall also, as part of Operating Expenses, maintain during the Term worker compensation insurance as required by statute, and primary, non-contributory, extended coverage or "all-risk" property damage insurance, in an amount equal to at least ninety percent (90%) of the full insurable replacement value of the Property (exclusive of the costs of excavation, foundations and footings, and such risks required to be covered by Tenant's insurance, and subject to reasonable deductible amounts), or such other amount necessary to prevent Landlord from being a co-insured, and such other coverage as Landlord shall deem appropriate or that may be required by any Holder (as defined in Article 25).

Tenant shall provide Landlord with certificates evidencing such coverage (and, with respect to liability coverage, showing Landlord as an additional insured) prior to the Commencement Date, which shall state that such insurance coverage may not be changed or cancelled without at least twenty (20) days' prior written notice to Landlord, and shall provide renewal certificates to Landlord at least twenty (20) days prior to expiration of such policies. Landlord may periodically, but not more often than every five years, require that Tenant reasonably increase the aforementioned coverage. Except as provided to the contrary herein, any insurance carried by Landlord or Tenant shall be for the sole benefit of the party carrying such insurance. Any insurance policies hereunder may be "blanket policies." All insurance required hereunder shall be provided by responsible insurers and Tenant's insurer shall be reasonably acceptable to Landlord. By this Article, Landlord and Tenant intend that their respective property loss risks shall be borne by responsible insurance carriers to the extent above provided, and Landlord and Tenant hereby agree to look solely to, and seek recovery only from, their respective insurance carriers in the event of a property loss to the extent that such coverage is agreed to be provided hereunder. The parties each hereby waive all rights and claims against each other for such losses, and waive all rights of subrogation of their respective insurers, provided such waiver of subrogation shall not affect the right of the insured to recover thereunder .The parties agree that their respective insurance policies are now, or shall be, endorsed such that said waiver of subrogation shall not affect the right of the insured to recover thereunder, so long as no material additional premium is charged therefor.

## ARTICLE 12

### Condemnation

If the whole or any material part of the Premises or Property shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if any adjacent property or street shall be so taken or condemned, or reconfigured or vacated by such authority in such manner as to require the use, reconstruction or remodeling of any part of the Premises or Property, or if Landlord shall grant a deed or other instrument in lieu of such taking by eminent domain or condemnation, Landlord shall have the option to terminate this Lease upon ninety (90) days notice, provided such notice is given no later than 180 days after the date of such taking, condemnation, reconfiguration, vacation, deed or other instrument. Tenant shall have reciprocal termination rights if the whole or any material part of the Premises is taken, or if access to the Premises is materially impaired. Landlord shall be entitled to receive the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Term, and for moving expenses (so long as such claim does not diminish the award available to Landlord or any Holder, and such claim is payable separately to Tenant). All Rent shall be apportioned as of the date of such termination, or the date of such taking, whichever shall first occur. If any part of the Premises shall be taken, and this Lease shall not be so terminated, the Rent shall be proportionately abated.

## ARTICLE 13

### Return of Possession

At the expiration or earlier termination of this Lease or Tenant's right of possession, Tenant shall surrender possession of the Premises and all keys, any key cards, and any parking stickers or cards, to Landlord, and advise Landlord as to the combination of any locks or vaults then remaining in the Premises, and shall remove all trade fixtures and personal property (subject to Article 31). All obligations or rights of either party arising during or attributable to the period ending upon

6

expiration or earlier termination of this Lease, and all obligations or rights of either party hereunder expressly arising on or following such expiration or earlier termination, including without limitation the provisions of this Article, shall survive such expiration or earlier termination. All improvements, fixtures and other items in or upon the Premises (except trade fixtures and personal property belonging to Tenant), whether installed by Tenant or Landlord, shall be Landlord's property and shall remain upon the Premises, all without compensation, allowance or credit to Tenant. However, if prior to such termination or within ten (10) days thereafter Landlord so directs by notice, Tenant shall promptly remove such of the foregoing items as are designated in such notice and restore the Premises to the condition prior to the installation of such items; provided, Landlord shall not require removal of customary office improvements installed pursuant to any separate agreement signed by both parties in connection with entering this Lease (except as expressly provided to the contrary therein), or installed by Tenant with Landlord's written approval (except as expressly required by Landlord in connection with granting such approval). If Tenant shall fail to perform any repairs or restoration, or fail to remove any items from the Premises required hereunder, Landlord may do so, and Tenant shall pay Landlord the cost thereof upon demand. All property removed from the Premises by Landlord pursuant to any provisions of this Lease or any Law may be handled or stored by Landlord at Tenant's expense, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. All property not removed from the Premises or retaken from storage by Tenant within thirty (30) days after expiration or earlier termination of this Lease or Tenant's right to possession, shall at Landlord's option be conclusively deemed to have been conveyed by Tenant to Landlord as if by bill of sale without payment by Landlord. Unless prohibited by applicable Law, Landlord shall have a lien against such property for the costs incurred in removing and storing the same.

## ARTICLE 14

### Holding Over

Unless Landlord expressly agrees otherwise in writing, Tenant shall pay Landlord 200% 150% of the amount of Rent then applicable (or the highest amount permitted by Law, whichever shall be less) prorated on per diem basis for each day Tenant shall retain possession of the Premises or any part thereof after expiration or earlier termination of this Lease. together with all damages sustained by Landlord on account thereof. The foregoing provisions shall not serve as permission for Tenant to hold-over, nor serve to extend the Term (although Tenant shall remain bound to comply with all provisions of this Lease until Tenant vacates the Premises, and shall be subject to the provisions of Article 13). Notwithstanding the foregoing to the contrary, at any time before or after expiration or earlier termination of the Lease, Landlord may serve notice advising Tenant of the amount of Rent and other terms required, should Tenant desire to enter a month-to-month tenancy (and if Tenant shall hold over more than one full calendar month after such notice, Tenant shall thereafter be deemed a month-to-month tenant, on the terms and provisions of this Lease then in effect, as modified by Landlord's notice, and except that Tenant shall not be entitled to any renewal or expansion rights contained in this Lease or any amendments hereto).

## ARTICLE 15

### No Waiver

No provision of this Lease will be deemed waived by either party unless expressly waived in writing signed by the waiving party. No waiver shall be implied by delay or any other act or omission of either party. No waiver by either party of any provision of this Lease shall be deemed a waiver of such provision with respect to any subsequent matter relating to such provision, and Landlord's consent or approval respecting any action by Tenant shall not constitute a waiver of the requirement for obtaining Landlord's consent or approval respecting any subsequent action. Acceptance of Rent by Landlord shall not constitute a waiver of any breach by Tenant of any term or provision of this Lease. No acceptance of a lesser amount than the Rent herein stipulated shall be deemed a waiver of Landlord's right to receive the full amount due, nor shall any endorsement or statement on any check or payment or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the full amount due. The acceptance of Rent or of the performance of any other term or provision from any Person other than Tenant, including any Transferee, shall not constitute a waiver of Landlord's right to approve any Transfer.

## ARTICLE 16

### Attorneys' Fees and Jury Trial

In the event of any litigation between the parties, the prevailing party shall be entitled to obtain, as part of the judgment, all reasonable attorneys' fees, costs and expenses incurred in connection with such litigation, except as may be limited by applicable Law. In the interest of obtaining a speedier and less costly hearing of any dispute, the parties hereby each irrevocably waive the right to trial by jury.



## ARTICLE 17
### Personal Property Taxes, Rent Taxes and Other Taxes

Tenant shall pay prior to delinquency all taxes, charges or other governmental impositions assessed against or levied upon Tenant's fixtures, furnishings, equipment and personal property located in the Premises, and any Work to the Premises under Article 8. Whenever possible, Tenant shall cause all such items to be assessed and billed separately from the property of Landlord. In the event any such items shall be assessed and billed with the property of Landlord, Tenant shall pay Landlord its share of such taxes, charges or other governmental impositions within thirty (30) days after Landlord delivers a statement and a copy of the assessment or other documentation showing the amount of such impositions applicable to Tenant's property. Tenant shall pay any rent tax or sales tax, service tax, transfer tax or value added tax, or any other applicable tax on the Rent or services herein or otherwise respecting this Lease.

## ARTICLE 18
### Reasonable Approvals

Whenever Landlord's approval or consent is expressly required under this Lease (including Article 21) or any other agreement between the parties, Landlord shall not unreasonably withhold or delay such approval or consent (reasonableness shall be a condition to Landlord's enforcement of such consent or approval requirement, and not a covenant), except for matters affecting the structure, safety or security of the Property, or the appearance of the Property from any common or public areas.

## ARTICLE 19
### Subordination, Attornment and Mortgagee Protection

This Lease is subject and subordinate to all Mortgages (as defined in Article 25) now or hereafter placed upon the Property, and all other encumbrances and matters of public record applicable to the Property.* If any foreclosure proceedings are initiated by any Holder or a deed in lieu is granted (or if any ground lease is terminated), Tenant agrees, upon written request of any such Holder or any purchaser at foreclosure sale, to attorn and pay Rent to such party and to execute and deliver any instruments necessary or appropriate to evidence or effectuate such attornment (provided such Holder or purchaser shall agree to accept this Lease and not disturb Tenant's occupancy, so long as Tenant does not default and fail to cure within the time permitted hereunder). However, in the event of attornment, no Holder shall be: (i) liable for any act or omission of Landlord, or subject to any offsets or defenses which Tenant might have against Landlord (prior to such Holder becoming Landlord under such attornment), (ii) liable for any security deposit or bound by any prepaid Rent not actually received by such Holder, or (iii) bound by any future modification of this Lease not consented to by such Holder. Any Holder (as defined in Article 25) may elect to make this Lease prior to the lien of its Mortgage, by written notice to Tenant, and if the Holder of any prior Mortgage shall require, this Lease shall be prior to any subordinate Mortgage. Tenant agrees to give any Holder by certified mail, return receipt requested, a copy of any notice of default served by Tenant upon Landlord, provided that prior to such notice Tenant has been notified in writing (by way of service on Tenant of a copy of an assignment of leases, or otherwise) of the address of such Holder. Tenant further agrees that if Landlord shall have failed to cure such default within the times permitted Landlord for cure under this Lease, any such Holder whose address has been provided to Tenant shall have an additional period of thirty (30) days in which to cure (or such additional time as may be required due to causes beyond such Holder's control, including time to obtain possession of the Property by power of sale or judicial action). Tenant shall execute such documentation as Landlord may reasonably request from time to time, in order to confirm the matters set forth in this Article in recordable form.
   *provided this Lease shall only be subordinate to mortgages entered after the date of this Lease if the holder(s) thereof agree to recognize this Lease and not disturb Tenant's occupancy hereunder (so long as Tenant does not commit an uncured default hereunder).

## ARTICLE 20
### Estoppel Certificate

Tenant shall from time to time, within twenty (20) days after written request from Landlord, execute, acknowledge and deliver a statement (i) certifying that this Lease is unmodified and in full force and effect or, if modified, stating the nature of such modification and certifying that this Lease as so modified, is in full force and effect (or if this Lease is claimed not to be in force and effect, specifying the ground therefor) and any dates to which the Rent has been paid in advance, and the amount of any Security Deposit, (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed, and (iii) certifying such other matters as Landlord may reasonably request, or as may be requested by Landlord's current or prospective Holders, insurance carriers, auditors, and prospective purchasers. Any such statement may be relied upon by any such parties. If Tenant shall fail to execute and return such statement within the time required herein, Tenant shall be deemed to have agreed with the matters set forth therein.

8



# ARTICLE 21

## Assignment and Subletting

**(A) Transfers.** Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, as further described below: (i) assign, mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, by operation of law or otherwise, (ii) sublet the Premises or any part thereof, or (iii) permit the use of the Premises by any Persons (as defined in Article 25) other than Tenant and its employees (all of the foregoing are hereinafter sometimes referred to collectively as "Transfers" and any Person to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "Transferee"). If Tenant shall desire Landlord's consent to any Transfer, Tenant shall notify Landlord in writing, which notice shall include: (a) the proposed effective date (which shall not be less than 30 nor more than 180 days after Tenant's notice), (b) the portion of the Premises to be Transferred (herein called the "Subject Space"), (c) the terms of the proposed Transfer and the consideration therefor, the name and address of the proposed Transferee, and a copy of all documentation pertaining to the proposed Transfer, and (d) current financial statements of the proposed Transferee certified by an officer, partner or owner thereof, and any other information to enable Landlord to determine the financial responsibility, character, and reputation of the proposed Transferee, nature of such Transferee's business and proposed use of the Subject Space, and such other information as Landlord may reasonably require.* Any Transfer made without complying with this Article shall, at Landlord's option, be null, void and of no effect, or shall constitute a Default under this Lease. Whether or not Landlord shall grant consent, Tenant shall pay $500.00 towards Landlord's review and processing expenses, ~~as well as~~ any reasonable legal fees incurred by Landlord, within thirty (30) days after written request by Landlord.

**(B) Approval.** Landlord will not unreasonably withhold its consent (as provided in Article 18) to any proposed Transfer of the Subject Space to the Transferee on the terms specified in Tenant's notice. The parties hereby agree that it shall be reasonable under this Lease and under any applicable Law for Landlord to withhold consent to any proposed Transfer where one or more of the following applies (without limitation as to other reasonable grounds for withholding consent): (i) the Transferee is of a character or reputation or engaged in a business which is not consistent with the quality of the Property, or would be a significantly less prestigious occupant of the Property than Tenant, (ii) the Transferee intends to use the Subject Space for purposes which are not permitted under this Lease, (iii) the Subject Space is not regular in shape with appropriate means of ingress and egress suitable for normal renting purposes, (iv) the Transferee is either a government (or agency or instrumentality thereof) or an occupant of the Property, (v) the proposed Transferee does not have a reasonable financial condition in relation to the obligations to be assumed in connection with the Transfer, or (vi) Tenant has committed and failed to cure a Default at the time Tenant requests consent to the proposed Transfer.

~~**(C) Transfer Premium.** If Landlord consents to a Transfer, and as a condition thereto which the parties hereby agree~~ is reasonable, Tenant shall pay Landlord fifty percent (50%) of any Transfer Premium derived by Tenant from such Transfer. "Transfer Premium" shall mean all rent, additional rent or other consideration paid by such Transferee in excess of the Rent payable by Tenant under this Lease (on a monthly basis during the Term, and on a per rentable square foot basis, if less than all of the Premises is transferred), after deducting the reasonable expenses incurred by Tenant for any changes, alterations and improvements to the Premises, any other economic concessions or services provided to the Transferee, and any customary brokerage commissions paid in connection with the Transfer. If part of the consideration for such Transfer shall be payable other than in cash, Landlord's share of such non-cash consideration shall be in such form as is reasonably satisfactory to Landlord. The percentage of the Transfer Premium due Landlord hereunder shall be paid within ten (10) days after Tenant receives any Transfer Premium from the Transferee.

~~**(D) Recapture.** Notwithstanding anything to the contrary contained in this Article, Landlord shall have the option, by~~ giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice of any proposed Transfer, to recapture the Subject Space. Such recapture notice shall cancel and terminate this Lease with respect to the Subject Space as of the date stated in Tenant's notice as the effective date of the proposed Transfer (or at Landlord's option, shall cause the Transfer to be made to Landlord or its agent, in which case the parties shall execute the Transfer documentation promptly thereafter). If this Lease shall be cancelled with respect to less than the entire Premises, the Rent reserved herein shall be prorated on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the Premises, this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of the same.

**(E) Terms of Consent.** If Landlord consents to a Transfer: (a) the terms and conditions of this Lease, including among other things, Tenant's liability for the Subject Space, shall in no way be deemed to have been waived or modified, (b) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (c) no Transferee shall succeed to any rights provided in this Lease or any amendment hereto to extend the Term of this Lease, expand the Premises, or lease additional space, any such rights being deemed personal to Tenant², (d) Tenant shall deliver to Landlord promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, and (e) Tenant shall furnish upon Landlord's request a complete statement, certified by an independent certified public accountant, or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer. Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof. If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall within thirty (30) days after demand pay the deficiency, and if understated by more than 2%, Tenant shall pay Landlord's costs of such audit. Any sublease hereunder shall be subordinate and subject to the provisions of this Lease, and

\* See insert to Page 10A
\*\* actual out-of-pocket expenses incurred in
\*\*\* up to $1,000.00, which may include



if this Lease shall be terminated during the term of any sublease, Landlord shall have the right to: (i) treat such sublease as cancelled and repossess the Subject Space by any lawful means, or (ii) require that such subtenant attorn to and recognize Landlord as its landlord under any such sublease. If Tenant shall Default and fail to cure within the time permitted for cure under Article 23(A), Landlord is hereby irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any Transferee to make all payments under or in connection with the Transfer directly to Landlord (which Landlord shall apply towards Tenant's obligations under this Lease) until such Default is cured.

(F) **Certain Transfers.** For purposes of this Lease, the term "Transfer" shall also include (a) if Tenant is a partnership, the withdrawal or change, voluntary, involuntary or by operation of law, of a majority of the partners, or a transfer of a majority of partnership interests, within a twelve month period, or the dissolution of the partnership, and (b) if Tenant is a closely held corporation (i.e., whose stock is not publicly held and not traded through an exchange or over the counter), the dissolution, merger, consolidation or other reorganization of Tenant, or within a twelve month period: (i) the sale or other transfer of more than an aggregate of 50% of the voting shares of Tenant (other than to immediate family members by reason of gift or death) or (ii) the sale, mortgage, hypothecation or pledge of more than an aggregate of 50% of Tenant's net assets.  *See Page 10A.

## ARTICLE 22

### Rights Reserved By Landlord

Except to the extent expressly limited herein, Landlord reserves full rights to control the Property (which rights may be exercised without subjecting Landlord to claims for constructive eviction, abatement of Rent, damages or other claims of any kind), including more particularly, but without limitation, the following rights:

(A) To change the name or street address of the Property; install and maintain signs on the exterior and interior of the Property; retain at all times, and use in appropriate instances, keys to all doors within and into the Premises; grant to any Person the right to conduct any business or render any service at the Property, whether or not it is the same or similar to the use permitted Tenant by this Lease; and have access for Landlord and other tenants of the Property to any mail chutes located on the Premises according to the rules of the United States Postal Service.

(B) To enter the Premises at reasonable hours for reasonable purposes, including inspection and supplying cleaning service or other services to be provided Tenant hereunder, to show the Premises to current and prospective mortgage lenders, ground lessors, insurers, and prospective purchasers, tenants and brokers, at reasonable hours, and if Tenant shall abandon the Premises at any time, or shall vacate the same during the last 3 months of the Term, to decorate, remodel, repair, or alter the Premises.

(C) To limit or prevent access to the Property, shut down elevator service, activate elevator emergency controls, or otherwise take such action or preventative measures deemed necessary by Landlord for the safety of tenants or other occupants of the Property or the protection of the Property and other property located thereon or therein, in case of fire, invasion, insurrection, riot, civil disorder, public excitement or other dangerous condition, or threat thereof.

(D) To decorate and to make alterations, additions and improvements, structural or otherwise, in or to the Property or any part thereof, and any adjacent building, structure, parking facility, land, street or alley (including without limitation changes and reductions in corridors, lobbies, parking facilities and other public areas and the installation of kiosks, planters, sculptures, displays, escalators, mezzanines, and other structures, facilities, amenities and features therein, and changes for the purpose of connection with or entrance into or use of the Property in conjunction with any adjoining or adjacent building or buildings, now existing or hereafter constructed). In connection with such matters, or with any other repairs, maintenance, improvements or alterations, in or about the Property, Landlord may erect scaffolding and other structures reasonably required, and during such operations may enter upon the Premises and take into and upon or through the Premises, all materials required to make such repairs, maintenance, alterations or improvements, and may close public entry ways, other public areas, restrooms, stairways or corridors.

~~(E) To substitute for the Premises other premises (herein referred to as the "new premises") at the Property, or another comparable building, provided: (i) the new premises shall be similar to the Premises in area, (ii) Landlord shall give Tenant at least thirty (30) days' written notice before making such change, and the parties shall execute an amendment to the Lease confirming the change within thirty (30) days after either party shall request the same; and (iii) if Tenant shall already have taken possession of the Premises: (a) Landlord shall pay the direct, out-of-pocket, reasonable expenses of Tenant in moving from the Premises to the new premises and improving the new premises so that they are substantially similar to the Premises, and, (b) such move shall be made during evenings, weekends, or otherwise so as to incur the least inconvenience to Tenant.~~

In connection with entering the Premises to exercise any of the foregoing rights, Landlord shall: (a) provide reasonable advance written or oral notice to Tenant's on-site manager or other appropriate person (except in emergencies, or for routine cleaning or other routine matters), and (b) take reasonable steps to minimize any interference with Tenant's business.



10

Page 10A

**ARTICLE 21(F)**

Notwithstanding anything to the contrary in this Article 21, (i) Tenant may change its name without Landlord's prior consent, (ii) ownership interests in Tenant may be transferred to heirs, successors, assigns, or family members of the current owner or owners, or to a trust having as its beneficiaries heirs, successors, assigns, or family members of the current owner or owners, without this transfer constituting a "Transfer" and without Landlord's prior consent, and (iii) Tenant may assign this Lease to a corporation or other entity having substantially the same ownership that Tenant has on the date hereof without Landlord's prior consent, provided, however, that the transferee entity and Tenant execute and deliver to Landlord a written assumption agreement in form and substance reasonably acceptable to Landlord in which the transferee entity assumes and agrees to be bound to Landlord for all of Tenant's obligations under this Lease with the same effect as if the transferee entity were the original tenant under this Lease and Tenant acknowledges that it remains primarily bound under this Lease, and in the case of any such transfer, the parties shall be governed by and comply with the last sentence of Article 21(A) and subsections (a), (b) and (d) of Article 21(E). In addition, notwithstanding anything to the contrary in the foregoing, no assignment or sublease or Landlord's consent thereto will release Tenant from liability under this Lease, and Tenant will remain primarily bound under this Lease notwithstanding any such assignment or sublease or any such consent.



## ARTICLE 23

### Landlord's Remedies

(A) **Default.** The occurrence of any one or more of the following events shall constitute a "Default" by Tenant, which if not cured within any applicable time permitted for cure below, shall give rise to Landlord's remedies set forth in Paragraph (B), below: (i) failure by Tenant to make when due any payment of Rent, unless such failure is cured within ten (10) days after notice; (ii) failure by Tenant to observe or perform any of the terms or conditions of this Lease to be observed or performed by Tenant other than the payment of Rent, or as provided below, unless such failure is cured within thirty (30) days after notice (provided, if the nature of Tenant's failure is such that more than thirty (30) days are reasonably required in order to cure, Tenant shall not be in Default if Tenant commences to cure within such period and thereafter reasonably seeks to cure such failure to completion; (iii) failure by Tenant to comply with the Rules, unless such failure is cured within five (5) days after notice (provided, if the nature of Tenant's failure is such that more than five (5) days are reasonably required in order to cure, Tenant shall not be in Default if Tenant commences to cure within such period and thereafter reasonably seeks to cure such failure to completion; (iv) vacation of all or a substantial portion of the Premises for more than thirty (30) consecutive days, or the failure to take possession of the Premises within sixty (60) days after the Commencement Date; (v) (a) making by Tenant or any guarantor of this Lease ("Guarantor") of any general assignment for the benefit of creditors, (b) filing by or against Tenant or any Guarantor of a petition to have Tenant or such Guarantor adjudged a bankrupt or a petition for reorganization or arrangement under any Law relating to bankruptcy (unless, in the case of a petition filed against Tenant or such Guarantor, the same is dismissed within sixty (60) days), (c) appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located on the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days, (d) attachment, execution or other judicial seizure of substantially all of Tenant's assets located on the Premises or of Tenant's interest in this Lease, (e) Tenant's or any Guarantor's convening of a meeting of its creditors or any class thereof for the purpose of effecting a moratorium upon or composition of its debts, or (f) Tenant's or any Guarantor's insolvency or admission of an inability to pay its debts as they mature; (vi) any material misrepresentation herein, or material misrepresentation or omission in any financial statements or other materials provided by Tenant or any Guarantor in connection with negotiating or entering this Lease or in connection with any Transfer under Article 21; (vii) cancellation of any guaranty of this Lease by any Guarantor; (viii) failure by Tenant to cure within any applicable times permitted thereunder any default under any other lease for space at the Property or any other buildings owned or managed by Landlord or its affiliates, now or hereafter entered by Tenant (and any Default hereunder not cured within the times permitted for cure herein shall, at Landlord's election, constitute a default under any such other lease or leases). Failure by Tenant to comply with the same term or condition of this Lease on three occasions during any twelve month period shall cause any failure to comply with such term or condition during the succeeding twelve month period, at Landlord's option, to constitute an incurable Default, if Landlord has given Tenant notice of each such failure within ten (10) days after each such failure occurs. The notice and cure periods provided herein are in lieu of, and not in addition to, any notice and cure periods provided by Law.

(B) **Remedies.** If a Default occurs and is not cured within any applicable time permitted under Paragraph (A), Landlord shall have the rights and remedies hereinafter set forth, which shall be distinct, separate and cumulative with and in addition to any other right or remedy allowed under any Law or other provisions of this Lease:

(i) Landlord may terminate this Lease, repossess the Premises by detainer suit, summary proceedings or other lawful means, and recover as damages a sum of money equal to: (a) any unpaid Rent as of the termination date including interest at the Default Rate (as defined in Article 25), (b) any unpaid Rent which would have accrued after the termination date through the time of award including interest at the Default Rate, less such loss of Rent that Tenant proves could have been reasonably avoided, (c) any unpaid Rent which would have accrued after the time of award during the balance of the Term, less such loss of Rent that Tenant proves could be reasonably avoided, and (d) any other amounts necessary to compensate Landlord for all damages proximately caused by Tenant's failure to perform its obligations under this Lease, including without limitation all Costs of Reletting (as defined in Paragraph F). For purposes of computing the amount of Rent herein that would have accrued after the time of award, Tenant's Prorata Share of Taxes and Operating Expenses, and CPI Escalation Amounts, shall be projected, based upon the average rate of increase, if any, in such items from the Commencement Date through the time of award.

(ii) If applicable Law permits, Landlord may terminate Tenant's right of possession and repossess the Premises by detainer suit, summary proceedings or other lawful means, without terminating this Lease (and if such Law permits, and Landlord shall not have expressly terminated the Lease in writing, any termination shall be deemed a termination of Tenant's right of possession only). In such event, Landlord may recover: (a) any unpaid Rent as of the date possession is terminated, including interest at the Default Rate, (b) any unpaid Rent which accrues during the Term from the date possession is terminated through the time of award (or which may have accrued from the time of any earlier award obtained by Landlord through the time of award), including interest at the Default Rate, less any Net Re-Letting Proceeds (as defined in Paragraph F) received by Landlord during such period, and less such loss of Rent that Tenant proves could have been reasonably avoided, and (c) any other amounts necessary to compensate Landlord for all damages proximately caused by Tenant's failure to perform its obligations under this Lease, including without limitation, all Costs of Reletting (as defined in Paragraph F). Landlord may bring suits for such amounts or portions thereof, at any time or times as the same accrue or after the same have accrued, and no suit or recovery of any portion due hereunder shall be deemed a waiver of Landlord's right to collect all amounts to which Landlord is entitled hereunder, nor shall the same serve as any defense to any subsequent suit brought for any amount not theretofor reduced to judgment.

(C) **Mitigation of Damages.** If Landlord terminates this Lease or Tenant's right to possession, Landlord shall use reasonable efforts to mitigate Landlord's damages, and Tenant shall be entitled to submit proof of such failure to mitigate as a defense to Landlord's claims hereunder, if mitigation of damages by Landlord is required by applicable Law. If Landlord

11

has not terminated this Lease or Tenant's right to possession, Landlord shall have no obligation to mitigate, and may permit the Premises to remain vacant or abandoned; in such case, Tenant may seek to mitigate damages by attempting to sublease the Premises or assign this Lease (subject to Article 21).

(D) **Specific Performance, Collection of Rent and Acceleration.** Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Paragraph (B), above or any Law or other provision of this Lease), without prior demand or notice except as required by applicable Law: (i) to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof, and (ii) to sue for and collect any unpaid Rent which has accrued. Notwithstanding anything to the contrary contained in this Lease, to the extent not expressly prohibited by applicable Law, in the event of any Default by Tenant not cured within any applicable time for cure hereunder, Landlord may terminate this Lease or Tenant's right to possession and accelerate and declare that all Rent reserved for the remainder of the Term shall be immediately due and payable (in which event, Tenant's Prorata Share of Taxes and Operating Expenses, and CPI Escalation Amounts for the remainder of the Term shall be projected based upon the average rate of increase, if any, in such items from the Commencement Date through the date of such declaration); provided, Landlord shall, after receiving payment of the same from Tenant, be obligated to turn over to Tenant any actual Net Re-Letting Proceeds thereafter received during the remainder of the Term, up to the amount so received from Tenant pursuant to this provision.

(E) **Late Charges and Interest.** Tenant shall pay, as additional Rent, a service charge of Two Hundred Dollars ($200.00) for bookkeeping and administrative expenses, if Rent is not received within five (5) days after its due date. In addition to such service charge, any Rent paid more than thirty (30) days after due shall accrue interest from the due date at the Default Rate (as defined in Article 25), until payment is received by Landlord. Such service charge and interest payments shall not be deemed consent by Landlord to late payments, nor a waiver of Landlord's right to insist upon timely payments at any time, nor a waiver of any remedies to which Landlord is entitled as a result of the late payment of Rent.

(F) **Certain Definitions.** "Net Re-Letting Proceeds" shall mean the total amount of rent and other consideration paid by any Replacement Tenants, less all Costs of Re-Letting, during a given period of time. "Costs of Re-Letting" shall include without limitation, all reasonable costs and expenses incurred by Landlord for any repairs, maintenance, changes, alterations and improvements to the Premises, brokerage commissions, advertising costs, attorneys' fees, any customary free rent periods or credits, tenant improvement allowances, take-over lease obligations and other customary, necessary or appropriate economic incentives required to enter leases with Replacement Tenants, and costs of collecting rent from Replacement Tenants. "Replacement Tenants" shall mean any Persons (as defined in Article 25) to whom Landlord re-lets the Premises or any portion thereof pursuant to this Article.

(G) **Other Matters.** No re-entry or repossession, repairs, changes, alterations and additions, reletting, acceptance of keys from Tenant, or any other action or omission by Landlord shall be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or accept a surrender of the Premises, nor shall the same operate to release the Tenant in whole or in part from any of Tenant's obligations hereunder, unless express written notice of such intention is sent by Landlord or its agent to Tenant. To the fullest extent permitted by Law, all rent and other consideration paid by any Replacement Tenants shall be applied: first, to the Costs of Re-Letting, second, to the payment of any Rent theretofore accrued, and the residue, if any, shall be held by Landlord and applied to the payment of other obligations of Tenant to Landlord as the same become due (with any remaining residue to be retained by Landlord). Rent shall be paid without any prior demand or notice therefor (except as expressly provided herein) and without any deduction, set-off or counterclaim, or relief from any valuation or appraisement laws. Landlord may apply payments received from Tenant to any obligations of Tenant then accrued, without regard to such obligations as may be designated by Tenant. Landlord shall be under no obligation to observe or perform any provision of this Lease on its part to be observed or performed which accrues after the date of any Default by Tenant hereunder not cured within the times permitted hereunder. The times set forth herein for the curing of Defaults by Tenant are of the essence of this Lease. Tenant hereby irrevocably waives any right otherwise available under any Law to redeem or reinstate this Lease.

## ARTICLE 24

### Landlord's Right to Cure

If Landlord shall fail to perform any term or provision under this Lease required to be performed by Landlord, Landlord shall not be deemed to be in default hereunder nor subject to any claims for damages of any kind, unless such failure shall have continued for a period of thirty (30) days after written notice thereof by Tenant; provided, if the nature of Landlord's failure is such that more than thirty (30) days are reasonably required in order to cure, Landlord shall not be in default if Landlord commences to cure such failure within such thirty (30) day period, and thereafter reasonably seeks to cure such failure to completion. The aforementioned periods of time permitted for Landlord to cure shall be extended for any period of time during which Landlord is delayed in, or prevented from, curing due to fire or other casualty, strikes, lock-outs or other labor troubles, shortages of equipment or materials, governmental requirements, power shortages or outages, acts or omissions by Tenant or other Persons, and other causes beyond Landlord's reasonable control. If Landlord shall fail to cure within the times permitted for cure herein, Landlord shall be subject to such remedies as may be available to Tenant (subject to the other provisions of this Lease); provided, in recognition that Landlord must receive timely payments of Rent and operate the Property, Tenant shall have no right of self-help to perform repairs or any other obligation of Landlord, and shall have no right to withhold, set-off, or abate Rent.

12

## ARTICLE 25

### Captions, Definitions and Severability

The captions of the Articles and Paragraphs of this Lease are for convenience of reference only and shall not be considered or referred to in resolving questions of interpretation. If any term or provision of this Lease shall be found invalid, void, illegal, or unenforceable with respect to any particular Person by a court of competent jurisdiction, it shall not affect, impair or invalidate any other terms or provisions hereof, or its enforceability with respect to any other Person, the parties hereto agreeing that they would have entered into the remaining portion of this Lease notwithstanding the omission of the portion or portions adjudged invalid, void, illegal, or unenforceable with respect to such Person.

(A) "Building" shall mean the structure identified in Article I of this Lease.

(B) "CPI" shall mean the Consumer Price Index for All Urban Consumers, All Items (Base year 1967 = 100) published by the United States Department of Labor, Bureau of Labor Statistics (or if a separate index is published by the Bureau of Labor Statistics for a metropolitan area within 100 miles of the Property, then such metropolitan index). If the Bureau of Labor Statistics substantially revises the manner in which the CPI is determined, an adjustment shall be made in the revised index which would produce results equivalent, as nearly as possible to those which would be obtained hereunder if the CPI were not so revised. If the 1967 average shall no longer be used as an index of 100, such change shall constitute a substantial revision. If the CPI becomes unavailable to the public because publication is discontinued, or otherwise, Landlord shall substitute therefor a comparable index based upon changes in the cost of living or purchasing power of the consumer dollar published by a governmental agency, major bank, other financial institution, university or recognized financial publisher. If the CPI is available on a monthly (or alternating monthly) basis, the CPI for the months in which (or immediately preceding, as the case may be) the Commencement Date and Adjustment Date respectively occur shall be used.

(C) "Default Rate" shall mean eighteen percent (18%) twelve percent (12%) per annum, or the highest rate permitted by applicable Law, whichever shall be less.

(D) "Holder" shall mean the holder of any Mortgage at the time in question, and where such Mortgage is a ground lease, such term shall refer to the ground lessor.

(E) "Holidays" shall mean all federally observed holidays, including New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day, Christmas Day, and to the extent of utilities or services provided by union members engaged at the Property, such other holidays observed by such unions.

(F) "Landlord" and "Tenant" shall be applicable to one or more Persons as the case may be, and the singular shall include the plural, and the neuter shall include the masculine and feminine; and if there be more than one, the obligations thereof shall be joint and several, and the word "Tenant" shall include Tenant's assignees, subtenants, concessionaires, licensees and other Transferees as the context may require.

(G) "Law" shall mean all federal, state, county and local governmental and municipal laws, statutes, ordinances, rules, regulations, codes, decrees, orders and other such requirements, applicable equitable remedies and decisions by courts in cases where such decisions are considered binding precedents in the state in which the Property is located, and decisions of federal courts applying the Laws of such State.

(H) "Mortgage" shall mean all mortgages, deeds of trust, ground leases and other such encumbrances now or hereafter placed upon the Property or Building, or any part thereof, and all renewals, modifications, consolidations, replacements or extensions thereof, and all indebtedness now or hereafter secured thereby and all interest thereon.

(I) "Operating Expenses" shall mean all expenses, costs and amounts (other than Taxes) of every kind and nature which Landlord shall pay during any calendar year any portion of which occurs during the Term, because of or in connection with the ownership, management, repair, maintenance, restoration and operation of the Property, including without limitation, any amounts paid for: (a) utilities for the Property, including but not limited to electricity, power, gas, steam, oil or other fuel, water, sewer, lighting, heating, air conditioning and ventilating, (b) permits, licenses and certificates necessary to operate, manage and lease the Property, (c) insurance applicable to the Property, not limited to the amount of coverage Landlord is required to provide under this Lease, (d) supplies, tools, equipment and materials used in the operation, repair and maintenance of the Property, (e) accounting, legal, inspection, consulting, concierge and other services, (f) any equipment rental (or installment equipment purchase or equipment financing agreements), or management agreements (including the cost of any management fee actually paid thereunder and the fair rental value of any office space provided thereunder, up to customary and reasonable amounts), (g) wages, salaries and other compensation and benefits of all persons engaged in the operation, maintenance or security of the Property, and employer's Social Security taxes, unemployment taxes or insurance, and any other taxes which may be levied on such wages, salaries, compensation and benefits, (h) payments under any easement, operating agreement, declaration, restrictive covenant, or instrument pertaining to the sharing of costs in any planned development, and maintenance of all Systems and Equipment and components thereof (including replacement of components), janitorial service, alarm and security service, window cleaning, trash removal, elevator maintenance, cleaning of walks, parking facilities and building walls, removal of ice and snow, replacement of wall and floor coverings, ceiling tiles and fixtures in lobbies, corridors, restrooms and other common or public areas or facilities, maintenance and replacement of shrubs, trees, grass, sod and other landscaped items, irrigation systems, drainage facilities, fences, curbs, and walkways, re-paving and re-striping parking facilities, and roof repairs. If the Property is not fully occupied during all or a portion of any calendar year, Landlord may compute Tenant's Prorata Share of variable Operating Expenses (i.e. those items which vary according to occupancy levels) by excluding from the denominator in such computation the average unoccupied rentable square footage of the Property; in the alternative, without adjusting Tenant's Prorata Share to reflect unoccupied areas, Landlord may, in accordance with sound accounting and management practices, determine the amount of variable Operating Expenses that

13

PLEASE INITIAL

100%

would have been paid had the Property been fully occupied, and the amount so determined shall be deemed to have been the amount of variable Operating Expenses for such year. If Landlord makes such an adjustment, Landlord shall make a comparable adjustment for the Base Expense Year. Notwithstanding the foregoing, Operating Expenses shall not, however, include:

(i) depreciation, interest and amortization on Mortgages, and other debt costs or ground lease payments, if any; legal fees in connection with leasing, tenant disputes or enforcement of leases; real estate brokers' leasing commissions; improvements or alterations to tenant spaces; the cost of providing any service directly to and paid directly by, any tenant; any costs expressly excluded from Operating Expenses elsewhere in this Lease; costs of any items to the extent Landlord receives reimbursement from insurance proceeds or from a third party (such proceeds to be deducted from Operating Expenses in the year in which received); and

(ii) capital expenditures, except those: (a) made primarily to reduce Operating Expenses, or to comply with any Laws or other governmental requirements, or (b) for replacements (as opposed to additions or new improvements) of non-structural items located in the common areas of the Property required to keep such areas in good condition; provided, all such permitted capital expenditures shall be amortized for purposes of this Lease over their useful lives, not to exceed three (3) years.

(J) "Person" shall mean an individual, trust, partnership, joint venture, association, corporation, and any other entity.

(K) "Property" shall mean the Building, and any common or public areas or facilities, easements, corridors, lobbies, sidewalks, loading areas, driveways, landscaped areas, skywalks, parking garages and lots, and any and all other structures or facilities operated or maintained in connection with or for the benefit of the Building, and all parcels or tracts of land on which all or any portion of the Building or any of the other foregoing items are located, and any fixtures, machinery, equipment, apparatus, Systems and Equipment, furniture and other personal property located thereon or therein and used in connection therewith, whether title is held by Landlord or its affiliates. Possession of areas necessary for utilities, services, safety and operation of the Property, including the Systems and Equipment (as defined in Article 25), fire stairways, perimeter walls, space between the finished ceiling of the Premises and the slab of the floor or roof of the Property thereabove, and the use thereof together with the right to install, maintain, operate, repair and replace the Systems and Equipment, including any of the same in, through, under or above the Premises in locations that will not materially interfere with Tenant's use of the Premises, are hereby excepted and reserved by Landlord, and not demised to Tenant. If the Building shall be part of a complex, development or group of buildings or structures collectively owned or managed by Landlord or its affiliates or collectively managed by Landlord's managing agent, the Property shall, at Landlord's option also be deemed to include such other of those buildings or structures as Landlord shall from time to time designate, and shall initially include such buildings and structures (and related facilities and parcels on which the same are located) as Landlord shall have incorporated by reference to the total square footage of the Property in Article 1.

(L) "Rent" shall have the meaning specified therefor in Article 3(G).

(M) "Systems and Equipment" shall mean any plant, machinery, transformers, duct work, cable, wires, and other equipment, facilities, and systems designed to supply heat, ventilation, air conditioning and humidity or any other services or utilities, or comprising or serving as any component or portion of the electrical, gas, steam, plumbing, sprinkler, communications, alarm, security, or fire/life/safety systems or equipment, or any other mechanical, electrical, electronic, computer or other systems or equipment for the Property.

(N) "Taxes" shall mean all federal, state, county, or local governmental or municipal taxes, fees, charges or other impositions of every kind and nature, whether general, special, ordinary or extraordinary (including without limitation, real estate taxes, general and special assessments, transit taxes, water and sewer rents; taxes based upon the receipt of rent including gross receipts or sales taxes applicable to the receipt of rent or service or value added taxes (unless required to be paid by Tenant under Article 17), personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, Systems and Equipment, appurtenances, furniture and other personal property used in connection with the Property) which Landlord shall pay during any calendar year, any portion of which occurs during the Term (without regard to any different fiscal year used by such government or municipal authority) because of or in connection with the ownership, leasing and operation of the Property. Notwithstanding the foregoing, there shall be excluded from Taxes all excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, federal and state income taxes, and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Property). If the method of taxation of real estate prevailing at the time of execution hereof shall be, or has been altered, so as to cause the whole or any part of the taxes now, hereafter or heretofor levied, assessed or imposed on real estate to be levied, assessed or imposed on Landlord, wholly or partially, as a capital levy or otherwise, or on or measured by the rents received therefrom, then such new or altered taxes attributable to the Property shall be included within the term "Taxes," except that the same shall not include any enhancement of said tax attributable to other income of Landlord. Any expenses incurred by Landlord in attempting to protest, reduce or minimize Taxes shall be included in Taxes in the calendar year such expenses are paid. Tax refunds shall be deducted from Taxes in the year they are received by Landlord, but if such refund shall relate to taxes paid in a prior year of the Term, and the Lease shall have expired, Landlord shall mail Tenant's Prorata Share of such net refund (after deducting expenses and attorneys' fees), up to the amount Tenant paid towards Taxes during such year, to Tenant's last known address. If Taxes for the Base Tax Year are reduced as the result of protest, or by means of agreement, or as the result of legal proceedings or otherwise, Landlord may adjust Tenant's obligations for Taxes in all years following the Tax Base Year, and Tenant shall pay Landlord within 30 days after notice any additional amount required by such adjustment for any such years or portions thereof that have theretofor occurred. If Taxes for any period during the Term or any extension thereof, shall be increased after payment thereof by Landlord, for any reason including without limitation error or reassessment by applicable governmental or municipal authorities, Tenant shall pay Landlord upon demand Tenant's Prorata Share of such increased Taxes. Tenant shall pay increased Taxes whether Taxes are increased as a result of increases in the valuation of the Property, increases in the tax rates, reduction or elimination of any rollbacks or other deductions available under current law, scheduled reductions

*except for Landlord's delinquency or failure to pay such taxes,

14



of any tax abatement, as a result of the elimination, invalidity or withdrawal of any tax abatement, or for any other cause whatsoever. Notwithstanding the foregoing, if any Taxes shall be paid based on assessments or bills by a governmental or municipal authority using a fiscal year other than a calendar year, Landlord may elect to average the assessments or bills for the subject calendar year, based on the number of months of such calendar year included in each such assessment or bill.

(O) "Tenant's Prorata Share" of Taxes and Operating Expenses shall be the rentable area of the Premises divided by the rentable area of the Property on the last day of the calendar year for which Taxes or Operating Expenses are being determined, excluding any parking facilities. Tenant acknowledges that the "rentable area of the Premises" under this Lease includes the usable area, without deduction for columns or projections, multiplied by a load or conversion factor, to reflect a share of certain areas, which may include lobbies, corridors, mechanical, utility, janitorial, boiler and service rooms and closets, restrooms, and other public, common and service areas. Except as provided expressly to the contrary herein, the "rentable area of the Property" shall include all rentable area of all space leased or available for lease at the Property, which Landlord may reasonably re-determine from time to time, to reflect re-configurations, additions or modifications to the Property. If the Property or any development of which it is a part, shall contain non-office uses, Landlord shall have the right to determine in accordance with sound accounting and management principles, Landlord shall have the Operating Expenses for only the office portion of the Property or of such development, in which event, Tenant's Prorata Share of Taxes and Share shall be based on the ratio of the rentable area of the Premises to the rentable area of such office portion. Similarly, if the Property shall contain tenants who do not participate in all or certain categories of Taxes or Operating Expenses on a prorata basis, Landlord may exclude the amount of such Taxes or Operating Expenses, or such categories of the same, as the case may be, attributable to such tenants, and exclude the rentable area of their premises, in computing Tenant's Prorata Share. If the Property shall be part of or shall include a complex, development or group of buildings or structures collectively owned or managed by Landlord or its affiliates or collectively managed by Landlord's managing agent, Landlord may allocate Taxes and Operating Expenses within such complex, development or group, and between such buildings and structures and the parcels on which they are located, in accordance with sound accounting and management principles. In the alternative, Landlord shall have the right to determine, in accordance with sound accounting and management principles, Tenant's Prorata Share of Taxes and Operating Expenses based upon the totals of each of the same for all such buildings and structures, the land constituting parcels on which the same are located, and all related facilities, including common areas and easements, corridors, lobbies, sidewalks, elevators, loading areas, parking facilities and driveways and other appurtenances and public areas, in which event Tenant's Prorata Share shall be based on the ratio of the rentable area of the Premises to the rentable area of all such buildings.

(P) "Tenant" shall mean Sklar Exploration Company L.L.C., a Louisiana limited liability company formed under the laws of the State of Louisiana.

## ARTICLE 26

### Conveyance by Landlord and Liability

In case Landlord or any successor owner of the Property or the Building shall convey or otherwise dispose of any portion thereof in which the Premises are located, to another Person (and nothing herein shall be construed to restrict or prevent such conveyance or disposition), such other Person shall thereupon be and become landlord hereunder and shall be deemed to have fully assumed and be liable for all obligations of this Lease to be performed by Landlord which first arise after the date of conveyance, including the return of any Security Deposit, and Tenant shall attorn to such other Person, and Landlord or such successor owner shall, from and after the date of conveyance, be free of all liabilities and obligations hereunder not then incurred. The liability of Landlord to Tenant for any default by Landlord under this Lease or arising in connection herewith or with Landlord's operation, management, leasing, repair, renovation, alteration, or any other matter relating to the Property or the Premises, shall be limited to the interest of Landlord in the Property (and the proceeds thereof). Tenant agrees to look solely to Landlord's interest in the Property (and the proceeds thereof) for the recovery of any judgment against Landlord, and Landlord shall not be personally, liable for any such judgment or deficiency after execution thereon. The limitations of liability contained in this Article shall apply equally and inure to the benefit of Landlord's present and future partners, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns. Under no circumstances shall any present or future general partner of Landlord (if Landlord is a partnership), or individual trustee or beneficiary (if Landlord or any partner of Landlord is a trust) have any liability for the performance of Landlord's obligations under this Lease. Notwithstanding the foregoing to the contrary, Landlord shall have personal liability for insured claims, beyond Landlord's interest in the Property (and proceeds thereof), to the extent of Landlord's liability insurance coverage available for such claims.

## ARTICLE 27

### Miscellaneous

(A) Each of the terms and provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, guardians, custodians, successors and assigns, subject to the provisions of Article 21 respecting Transfers.

(B) Neither this Lease ~~nor any memorandum of lease or~~ short form lease shall be recorded by Tenant.

(C) This Lease shall be construed in accordance with the Laws of the state in which the Property is located.



(D) Landlord agrees that, if Tenant timely pays the Rent and performs the terms and provisions hereunder, and subject to all other terms and provisions of this Lease, Tenant shall hold and enjoy the Premises during the Term, free of lawful claims by any Person acting by or through Landlord.

(E) This Lease does not grant any legal rights to "light and air" outside the Premises nor any particular view or cityscape visible from the Premises.

(F) If the Commencement Date is delayed in accordance with Article 4 for more than one year, Landlord may declare this Lease null and void, and if the Commencement Date is so delayed for more than seven years, this Lease shall thereupon become null and void without further action by either party.

## ARTICLE 28

### Offer

The submission and negotiation of this Lease shall not be deemed an offer to enter the same by Landlord, but the solicitation of such an offer by Tenant. Tenant agrees that its execution of this Lease constitutes a firm offer to enter the same which may not be withdrawn for a period of 30 days after delivery to Landlord (or such other period as may be expressly provided in any other agreement signed by the parties). During such period and in reliance on the foregoing, Landlord may, at Landlord's option (and shall, if required by applicable Law), deposit any security deposit and Rent, and proceed with any plans, specifications, alterations or improvements, and permit Tenant to enter the Premises, but such acts shall not be deemed an acceptance of Tenant's offer to enter this Lease, and such acceptance shall be evidenced only by Landlord signing and delivering this Lease to Tenant.

## ARTICLE 29

### Notices

Except as expressly provided to the contrary in this Lease, every notice or other communication to be given by either party to the other with respect hereto or to the Premises or Property, shall be in writing and shall not be effective for any purpose unless the same shall be served personally or by national air courier service, or United States certified mail, return receipt requested, postage prepaid, addressed, if to Tenant, at the address first set forth in the Lease, until the Commencement Date, and thereafter to the Tenant at the Premises, and if to Landlord, at the address at which the last payment of Rent was required to be made and to  SM Brell, L.P., 401 Edwards Street, Suite 930, Shreveport, Louisiana, 71101  or such other address or addresses as Tenant or Landlord may from time to time designate by notice given as above provided. Every notice or other communication hereunder shall be deemed to have been given as of the third business day following the date of such mailing or immediately if personally delivered. Notices not sent in accordance with the foregoing shall be of no force or effect until received by the foregoing parties at such addresses required herein.

## ARTICLE 30

### Real Estate Brokers

Tenant represents that Tenant has dealt only with ___Vintage Realty Company and CB Richard Ellis, Inc._____ (whose commission, if any, shall be paid by Landlord pursuant to separate agreement) as broker, agent or finder in connection with this Lease and agrees to indemnify and hold Landlord harmless from all damages, judgments, liabilities and expenses (including reasonable attorneys' fees) arising from any claims or demands of any other broker, agent or finder with whom Tenant has dealt for any commission or fee alleged to be due in connection with its participation in the procurement of Tenant or the negotiation with Tenant of this Lease.

## ARTICLE 31

### Security Deposit

Tenant shall deposit with Landlord the amount of $___zero (-0-)_____ ("Security Deposit"), upon Tenant's execution and submission of this Lease. The Security Deposit shall serve as security for the prompt, full and faithful performance by Tenant of the terms and provisions of this Lease. In the event that Tenant is in Default hereunder and fails to cure within any applicable time permitted under this Lease, Landlord may use or apply the whole or any part of the Security Deposit for the payment of Tenant's obligations hereunder. The use or application of the Security Deposit or any portion thereof shall not prevent Landlord from exercising any other right or remedy provided hereunder or under any Law and shall not be construed as liquidated damages. In the event the Security Deposit is reduced by such use or application, Tenant shall deposit with Landlord within ten (10) days after written notice, an amount sufficient to restore the full amount of the Security Deposit. Landlord shall not be required to keep the Security Deposit separate from Landlord's general funds or pay interest on the Security Deposit. Any remaining portion of the Security Deposit shall be returned to Tenant within sixty (60) days after Tenant has vacated the Premises in accordance with Article 13. If the Premises shall be expanded at any time, or if the Term shall be extended at an increased rate of Rent, the Security Deposit shall thereupon be proportionately increased.

16

## ARTICLE 32

### Entire Agreement

This Lease, together with Riders One through **3**, and Exhibits A through **N/A** and the documents captioned _____ Parking Agreement and Work Agreement

(WHICH COLLECTIVELY ARE HEREBY INCORPORATED WHERE REFERRED TO HEREIN AND MADE A PART HEREOF AS THOUGH FULLY SET FORTH), contains all the terms and provisions between Landlord and Tenant relating to the matters set forth herein and no prior or contemporaneous agreement or understanding pertaining to the same shall be of any force or effect, except any such contemporaneous agreement specifically referring to and modifying this Lease, signed by both parties. Without limitation as to the generality of the foregoing, Tenant hereby acknowledges and agrees that Landlord's leasing agents and field personnel are only authorized to show the Premises and negotiate terms and conditions for leases subject to Landlord's final approval, and are not authorized to make any agreements, representations, understandings or obligations, binding upon Landlord, respecting the condition of the Premises or Property, suitability of the same for Tenant's business, or any other matter, and no such agreements, representations, understandings or obligations not expressly contained herein or in such contemporaneous agreement shall be of any force or effect. Neither this Lease, nor any Riders or Exhibits referred to above may be modified, except in writing signed by both parties.

**WITNESSES; ATTESTATION**
(Two for each signatory
required if Property is
in Florida or Ohio):

Landlord:  SM Brell, L.P., a California limited partnership

By:  Koll-Bren Realty Advisors, Inc., its Agent

By: _____
David Mojica
Vice President

Tenant:  Sklar Exploration Company, L.L.C.

By: _____
Howard F. Sklar
Manager

## CERTIFICATE
### (If Tenant is a Corporation)

I, _____, Secretary of _____, Tenant, hereby certify that the officer(s) executing the foregoing Lease on behalf of Tenant was/were duly authorized to act in his/their capacities as _____ and _____, and his/their action(s) are the action of Tenant.

(Corporate Seal)

_____
Secretary

**IF TENANT PAYS FOR ALL ELECTRICITY IN PREMISES, E.G. BASED ON SUB-METERS, RATHER THAN THROUGH ESCALATIONS, USE JMB RIDER 112.**

17

## EXHIBIT A

**(Floor plan showing Premises cross-hatched)**



Case:20-12377-MER Doc#:1482-1 Filed:10/21/21 Entered:10/21/21 15:17:54 Page23 of 107

RIDER ONE

RULES

(1) On Saturdays, Sundays and Holidays, and on other days between the hours of 6:00 P.M. and 8:00 A.M. the following day, access to the Property and/or to the passageways, entrances, exits, shipping areas, halls, corridors, elevators or stairways and other areas in the Property may be restricted and access gained by use of a key to the outside doors of the Property, or pursuant to such security procedures Landlord may from time to time impose. All such areas, and all roofs, are not for use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord shall be prejudicial to the safety, character, reputation and interests of the Property and its tenants provided, however, that nothing herein contained shall be construed to prevent such access to persons with whom Tenant deals in the normal course of Tenant's business unless such persons are engaged in activities which are illegal or violate these Rules. No Tenant and no employee or invitee of Tenant shall enter into areas reserved for the exclusive use of Landlord, its employees or invitees. Tenant shall keep doors to corridors and lobbies closed except when persons are entering or leaving.

(2) Tenant shall not paint, display, inscribe, maintain or affix any sign, placard, picture, advertisement, name, notice, lettering or direction on any part of the outside or inside of the Property, or on any part of the inside of the Premises which can be seen from the outside of the Premises, without the prior consent of Landlord, and then only such name or names or matter and in such color, size, style, character and material as may be first approved by Landlord in writing. Landlord shall prescribe the suite number and identification sign for the Premises (which shall be prepared and installed by Landlord at Tenant's expense). Landlord reserves the right to remove at Tenant's expense all matter not so installed or approved without notice to Tenant.

(3) Tenant shall not in any manner use the name of the Property for any purpose other than that of the business address of the Tenant, or use any picture or likeness of the Property, in any letterheads, envelopes, circulars, notices, advertisements, containers or wrapping material without Landlord's express consent in writing.

(4) Tenant shall not place anything or allow anything to be placed in the Premises near the glass of any door, partition, wall or window which may be unsightly from outside the Premises, and Tenant shall not place or permit to be placed any article of any kind on any window ledge or on the exterior walls. Blinds, shades, awnings or other forms of inside or outside window ventilators or similar devices, shall not be placed in or about the outside windows in the Premises except to the extent, if any, that the character, shape, color, material and make thereof is first approved by the Landlord.

(5) Furniture, freight and other large or heavy articles, and all other deliveries may be brought into the Property only at times and in the manner designated by Landlord, and always at the Tenant's sole responsibility and risk. Landlord may impose reasonable charges for use of freight elevators after or before normal business hours. All damage done to the Property by moving or maintaining such furniture, freight or articles shall be repaired by Landlord at Tenant's expense. Landlord may inspect items brought into the Property or Premises with respect to weight or dangerous nature. Landlord may require that all furniture, equipment, cartons and similar articles removed from the Premises or the Property be listed and a removal permit therefor first be obtained from Landlord. Tenant shall not take or permit to be taken in or out of other entrances or elevators of the Property, any item normally taken, or which Landlord otherwise reasonably requires to be taken, in or out through service doors or on freight elevators. Tenant shall not allow anything to remain in or obstruct in any way, any lobby, corridor, sidewalk, passageway, entrance, exit, hall, stairway, shipping area, or other such area. Tenant shall move all supplies, furniture and equipment as soon as received directly to the Premises, and shall move all such items and waste (other than waste customarily removed by Property employees) that are at any time being taken from the Premises directly to the areas designated for disposal. Any hand-carts used at the Property shall have rubber wheels.

(6) Tenant shall not overload any floor or part thereof in the Premises, or Property, including any public corridors or elevators therein bringing in or removing any large or heavy articles, and Landlord may direct and control the location of safes and all other heavy articles and require supplementary supports at Tenant's expense o such material and dimensions as Landlord may deem necessary to properly distribute the weight.

(7) Tenant shall not attach or permit to be attached additional locks or similar devices to any door or window, change existing locks or the mechanism thereof, or make or permit to be made any keys for any door other than those provided by Landlord. If more than two keys for one lock are desired, Landlord will provide them upon payment therefor by Tenant. Tenant, upon termination of its tenancy, shall deliver to the Landlord all keys of offices, rooms and toilet rooms which have been furnished Tenant or which the Tenant shall have had made, and in the event of loss of any keys so furnished shall pay Landlord therefor.

(8) If Tenant desires signal, communication, alarm or other utility or similar service connections installed or changed, Tenant shall not install or change the same without the prior approval of Landlord, and then only under Landlord's direction at Tenant's expense. Tenant shall not install in the Premises any equipment which requires more electric current than Landlord is required to provide under this Lease, without Landlord's prior approval, and Tenant shall ascertain from Landlord the maximum amount of load or demand for or use of electrical current which can safely be permitted in the Premises, taking into account the capacity of electric wiring in the Property and the Premises and the needs of tenants of the Property, and shall not in any event connect a greater load than such safe capacity.

(9) Tenant shall not obtain for use upon the Premises ice, drinking water, towel, janitor and other similar services, except from Persons approved by the Landlord. Any Person engaged by Tenant to provide janitor or other services shall be subject to direction by the manager or security personnel of the Property.

(10) The toilet rooms, urinals, wash bowls and other such apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this Rule shall be borne by the Tenant who, or whose employees or invitees shall have caused it.

(11) The janitorial closets, utility closets, telephone closets, broom closets, electrical closets, storage closets, and other such closets, rooms and areas shall be used only for the purposes and in the manner designated by Landlord, and may not be used by tenants, or their contractors, agents, employees, or other parties without Landlord's prior written consent.

(12) Landlord reserves the right to exclude or expel from the Property any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules. Tenant shall not at any time manufacture, sell, use or give away, any spirituous, fermented, into:icating or alcoholic liquors on the Premises, nor permit any of the same to occur (except in connection with occasional social or business events conducted in the Premises which do not violate any Laws nor bother or annoy any other tenants). Tenant shall not at any time sell, purchase or give away, food in any form by or to any of Tenant's agents or employees or any other parties on the Premises, nor permit any of the same to occur (other than in lunch rooms or kitchens for employees as may be permitted or installed by Landlord, which does not violate any Laws or bother or annoy any other tenant).

. **(13)** Tenant shall not make any room-to-room canvass to solicit business or information or to distribute any article or material to or from other tenants or occupants of the Property and shall not exhibit, sell or offer to sell, use, rent or exchange any products or services in or from the Premises unless ordinarily embraced within the Tenant's use of the Premises specified in the Lease.

**(14)** Tenant shall not waste electricity, water, heat or air conditioning or other utilities or services, and agrees to cooperate fully with Landlord to assure the most effective and energy efficient operation of the Property and shall not allow the adjustment (except by Landlord's authorized Property personnel) of any controls. Tenant shall keep corridor doors closed and shall not open any windows, except that if the air circulation shall not be in operation, windows which are openable may be opened with Landlord's consent. As a condition to claiming any deficiency in the air-conditioning or ventilation services provided by Landlord, Tenant shall close any blinds or drapes in the Premises to prevent or minimize direct sunlight.

**(15)** Tenant shall conduct no auction, fire or "going out of business sale" or bankruptcy sale in or from the Premises, and such prohibition shall apply to Tenant's creditors.

**(16)** Tenant shall cooperate and comply with any reasonable safety or security programs, including fire drills and air raid drills, and the appointment of "fire wardens" developed by Landlord for the Property, or required by Law. Before leaving the Premises unattended, Tenant shall close and securely lock all doors or other means of entry to the Premises and shut off all lights and water faucets in the Premises (except heat to the extent necessary to prevent the freezing or bursting of pipes).

**(17)** Tenant will comply with all municipal, county, state, federal or other government laws, statutes, codes, regulations and other requirements, including without limitation, health, safety and police requirements and regulations respecting the Premises, now or hereinafter in force, at its sole cost, and will not use the Premises for any immoral purposes, and will not bring into the Premises any chemicals or other items that are included in any list or definition of hazardous chemicals, materials or waste published by any federal, state or local governing or regulatory body, or any such chemicals, materials or waste which would trigger any employee "right-to-know" provisions adopted by any such bodies.

**(18)** Tenant shall not (i) carry on any business, activity or service except those ordinarily embraced within the permitted use of the Premises specified in the Lease and more particularly, but without limiting the generality of the foregoing, shall not (ii) install or operate any internal combustion engine, boiler, machinery, refrigerating, heating or air conditioning equipment in or about the Premises, (iii) use the Premises for housing, lodging or sleeping purposes or for the washing of clothes, (iv) place any radio or television antennae other than inside of the Premises, (v) operate or permit to be operated any musical or sound producing instrument or device which may be heard outside the Premises, (vi) use any source of power other than electricity, (vii) operate any electrical or other device from which may emanate electrical or other waves which may interfere with or impair radio, television, microwave, or other broadcasting or reception from or in the Property or elsewhere, (viii) bring or permit any bicycle or other vehicle, or dog (except in the company of a blind person or except where specifically permitted) or other animal or bird in the Property, (ix) make or permit objectionable noise or odor to emanate from the Premises, (x) do anything in or about the Premises tending to create or maintain a nuisance or do any act tending to injure the reputation of the Property, (xi) throw or permit to be thrown or dropped any article from any window or other opening in the Property, (xii) use or permit upon the Premises anything that will invalidate or increase the rate of insurance on any policies of insurance now or hereafter carried on the Property or violate the certificates of occupancy issued for the premises or the Property, (xiii) use the Premises for any purpose, or permit upon the Premises anything, that may be dangerous to persons or property (including but not limited to flammable oils, fluids, paints, chemicals, firearms or any explosive articles or materials) nor (xiv) do or permit anything to be done upon the Premises in any way tending to disturb any other tenant at the Property or the occupants of neighboring property.

**(19)** If the Property shall now or hereafter contain a building garage, parking structure or other parking area or facility, the following Rules shall apply in such areas or facilities:

**(i)** Parking shall be available in areas designated generally for tenant parking, for such daily or monthly charges as Landlord may establish from time to time, or as may be provided in any Parking Agreement attached hereto (which, when signed by both parties as provided therein, shall thereupon become effective). In all cases, parking for Tenant and its employees and visitors shall be on a "first come, first served," unassigned basis, with Landlord and other tenants at the Property, and their employees and visitors, and other Persons (as defined in Article 25 of the Lease) to whom Landlord shall grant the right or who shall otherwise have the right to use the same, all subject to these Rules, as the same may be amended or supplemented, and applied on a non-discriminatory basis, all as further described in Article 6 of the Lease. Notwithstanding the foregoing to the contrary, Landlord reserves the right to assign specific spaces, and to reserve spaces for visitors, small cars, handicapped individuals, and other tenants, visitors of tenants or other Persons, and Tenant and its employees and visitors shall not park in any such assigned or reserved spaces. Landlord may restrict or prohibit full size vans and other large vehicles.

**(ii)** In case of any violation of these provisions, Landlord may refuse to permit the violator to park, and may remove the vehicle owned or driven by the violator from the Property without liability whatsoever, at such violator's risk and expense. Landlord reserves the right to close all or a portion of the parking areas or facilities in order to make repairs or perform maintenance services, or to alter, modify, re-stripe or renovate the same, or if required by casualty, strike, condemnation, act of God, Law or governmental requirement, or any other reason beyond Landlord's reasonable control. In the event access is denied for any reason, any monthly parking charges shall be abated to the extent access is denied, as Tenant's sole recourse. Tenant acknowledges that such parking areas or facilities may be operated by an independent contractor not affiliated with Landlord, and Tenant acknowledges that in such event, Landlord shall have no liability for claims arising through acts or omissions of such independent contractor, if such contractor is reputable.

**(iii)** Hours shall be 6 A.M. to 8 P.M., Monday through Friday, and 10:00 A.M. to 1:00 P.M. on Saturdays, or such other hours as may be reasonably established by Landlord or its parking operator from time to time; cars must be parked entirely within the stall lines, and only small cars may be parked in areas reserved for small cars; all directional signs and arrows must be observed; the speed limit shall be 5 miles per hour; spaces reserved for handicapped parking must be used only by vehicles properly designated; every parker is required to park and lock his own car; washing, waxing, cleaning or servicing of any vehicle is prohibited; parking spaces may be used only for parking automobiles; parking is prohibited in areas: (a) not striped or designated for parking, (b) aisles, (c) where "no parking" signs are posted, (d) on ramps, and (e) loading areas and other specially designated areas. Delivery trucks and vehicles shall use only those areas designated therefor.

**(iv)** Parking stickers, key cards or any other devices or forms of identification or entry supplied by Landlord shall remain the property of Landlord. Such devices must be displayed as requested and may not be mutilated in any manner. The serial number of the parking identification device may not be obliterated. Devices are not transferable and any device in the possession of an unauthorized holder will be void. Loss or theft of parking identification, key cards or other such devices must be reported to Landlord or any garage manager immediately. Any parking devices reported lost or stolen found on any unauthorized car will be confiscated and the illegal holder will be subject to prosecution. Lost or stolen devices found by Tenant or its employees must be reported to the office of the garage immediately. Landlord may require reasonable deposits for key cards and other devices, and may impose reasonable charges for replacements. Tenant shall comply with all applicable laws, and other governmental requirements, and shall ensure that all employees and visitors of Tenant who park in the garage, shall comply with the same, as well as the provisions hereof. Any parker who forgets his key card or other device must pay the daily rate. Garage managers or attendants are not authorized to make or allow any exceptions to these Rules.

**Office Rent Step-Ups**

RIDER ___2___

Notwithstanding anything to the contrary contained in the Lease, the parties agree as follows.  The term "Lease Year" herein means each twelve month period or portion thereof during the Term, commencing with the Commencement Date, without regard to calendar years.

A.  Commencing with the ___2nd___ Lease Year, monthly Base Rent shall be increased to $3,847.50    9.50

B.  Commencing with the ___3rd___ Lease Year, monthly Base Rent shall be increased to $4,252.50    10.50

C.  Commencing with the ___4th___ Lease Year, monthly Base Rent shall be increased to $4,657.50    11.50

D.  Commencing with the ___5th___ Lease Year, monthly Base Rent shall be increased to $5,062.50    12.50

E.  Commencing with the _____ Lease Year, monthly Base Rent shall be increased to $_____.

F.  Commencing with the _____ Lease Year, monthly Base Rent shall be increased to $_____.

G.  Commencing with the _____ Lease Year, monthly Base Rent shall be increased to $_____.

H.  Commencing with the _____ Lease Year, monthly Base Rent shall be increased to $_____.

I.  Commencing with the _____ Lease Year, monthly Base Rent shall be increased to $_____.

J.  Commencing with the _____ Lease Year, monthly Base Rent shall be increased to $_____.


Landlord:   SM Brell, L.P., a California limited partnership

By:   Koll Bren Realty Advisors, Inc., its Agent

By: _____
      David Mojica
      Vice President


Tenant:   Sklar Exploration Company, L.L.C.

By: _____
      Howard F. Sklar
      Manager

Right of First Opportunity
Prevailing Rate Adjustment
Vacant Expansion Space

## RIDER ___3___

During the initial Term of the Lease, Tenant shall have a right of first opportunity to lease the space shown on the floor plan attached hereto as Schedule 1, and known as Suite ___1625___, containing approximately ___1,850___ square feet of rentable area (the "Expansion Space") prior to the Expansion Space being leased to a third party, in an "as is" condition, on the same terms and provisions then in effect under the Lease, except that monthly Base Rent for the Expansion Space shall be increased to reflect the Prevailing Rental Rate. "Prevailing Rental Rate" means the average per rentable square foot rental rate per month for all leases for comparable space and approximately the same number of months, executed by tenants in the Building for office space expansions during the six (6) months immediately prior to the date upon which such Prevailing Rental Rate is to become effective and payable under the terms of this Lease, where the rates for such expansions were not set in such leases, subject to reasonable adjustments for comparable space on more desirable, or less desirable, floors or areas of the Property. If no such comparable space has been leased during such six (6) month period, the rental rates used for purposes of this provision shall be adjusted to the amounts Landlord would have used had leases for such comparable space been entered. In all cases, such rates shall be determined without regard to any free rent periods, improvement allowances, take-over lease obligations, or other economic incentives; however, any such economic incentives generally provided by Landlord in such comparable expansion leases shall also be provided to Tenant. In addition, if such comparable expansion leases include base years, stop levels or other provisions respecting taxes or operating expenses, or include any other economic provisions, such as but not limited to consumer price index provisions, utility reimbursements or fixed rent increases, the same shall be included in the expansion terms provided to Tenant.

Landlord shall notify Tenant when Landlord enters or intends to enter serious negotiations with a third party to lease the Expansion Space (and Landlord's good faith determination of whether serious negotiations have been entered or are about to be entered shall be conclusive and binding upon the parties). Tenant shall then have five (5) days in which to notify Landlord in writing exercising Tenant's right to lease the Expansion Space on the terms described above. If Tenant exercises the right to lease the Expansion Space, said lease shall commence the later of thirty (30) days after Tenant's notice exercising the right, or the date the Expansion Space is available for occupancy, and shall continue for the duration of the Term of the Lease. After Tenant validly exercises the expansion right provided herein, the parties shall execute an amendment to the Lease, adding the Expansion Space, or a new lease for the Expansion Space, or such other documentation as Landlord shall require, promptly after Landlord shall prepare the same, in order to confirm the leasing of such Expansion Space to Tenant, but an otherwise valid exercise of the expansion rights contained herein shall be fully effective, whether or not such confirmatory documentation is executed.

If the parties are unable to agree on the Prevailing Rental Rate within sixty (60) days after the commencement of the lease for the Expansion Space, either party may request that the Prevailing Rental Rate be determined by arbitration under the Commercial Arbitration Rules of the American Arbitration Association then in effect. In recognition that the Prevailing Rental Rate may not be determined until after the commencement of the lease for the Expansion Space, Tenant shall pay, as Rent for the Expansion Space, until the Prevailing Rental Rate is determined, the amount of Rent then in effect under the Lease on a per rentable square foot basis (including Base Rent and all other charges). Under no circumstances shall the Rent under the Lease ever be less than such amount of Rent then in effect under the Lease, on a per rentable square foot basis, regardless of the Prevailing Rental Rate, as determined in accordance with the foregoing provisions. If the Prevailing Rental Rate is determined to be greater than such amount, Tenant shall pay Landlord, within thirty (30) days after written request therefor, the difference between the amount required by such determination of the Prevailing Rental Rate, and the amount theretofor paid by Tenant for the Expansion Space.

The foregoing expansion right shall apply only with respect to the entire Expansion Space, and may not be exercised with respect to only a portion thereof, unless only a portion shall first become the subject of Landlord's notice concerning negotiations with another party as described above (in which case, the foregoing expansion right shall apply to such portions, as the same become subject to such notices). If Tenant shall fail to exercise such expansion right after notice by Landlord as provided herein, Landlord may freely lease the portion of the Expansion Space described in Landlord's notice to the party (or its affiliate) with whom Landlord has entered or intends to enter serious negotiations, on any terms in Landlord's sole discretion, and the foregoing expansion right shall be of no further force or effect with respect to such portion of the Expansion Space. If Landlord does not enter such lease with such party (or its affiliate), the expansion rights provided herein shall apply again to such space, and Landlord shall be required to notify Tenant when Landlord enters or intends to enter serious negotiations with another party to lease such space as provided above. If the Expansion Space or any portion thereof is the subject of serious lease negotiations which include other space at the Property, or if Landlord intends to enter such negotiations as further described above, the foregoing expansion rights shall, at Landlord's option, apply to the entire space which is subject to such negotiations, and at Landlord's option, Tenant shall be obligated to either accept or refuse the opportunity to lease such entire space on the terms provided herein. The foregoing expansion right shall be subject and subordinate to any other rights of any other parties to lease the Expansion Space, if such rights have already been granted prior to the date of this Lease.

If Tenant shall exercise the expansion right granted herein, Landlord does not guarantee that the Expansion Space will be available on the commencement date for the lease thereof for any reason beyond Landlord's reasonable control. In such event, Rent with respect to the Expansion Space shall be abated until Landlord legally delivers the same to Tenant, as Tenant's sole recourse. Tenant's exercise of such expansion right shall not operate to cure any default by

Tenant of any of the terms or provisions in the Lease, nor to extinguish or impair any rights or remedies of Landlord arising by virtue of such default.  The expansion right herein shall, at Landlord's election, be null and void, if Tenant is in default under the Lease on the date Tenant exercises its rights hereunder or at any time thereafter and prior to commencement of the Lease for the Expansion Space.  If the Lease or Tenant's right to possession of the Premises shall terminate in any manner whatsoever before Tenant shall exercise the right herein provided, or if Tenant shall have subleased or assigned all or any portion of the Premises, then immediately upon such termination, sublease or assignment, the right to lease the Expansion Space herein granted shall simultaneously terminate and become null and void.  Such right is personal to Tenant.  Under no circumstances whatsoever shall the assignee under a complete or partial assignment of the Lease, or a subtenant under a sublease of the Premises, have any right to exercise the expansion right granted herein.  Tenant agrees that time in giving notices hereunder is of the essence of this provision.

Landlord:   SM Brell, L.P., a California limited partnership

By:   Koll Bren Realty Advisors, Inc., its Agent

By:  _____

David Mojica
Vice President


Tenant:   Sklar Exploration Company, L.L.C.

By:  _____

Howard F. Sklar
Manager

2

**SCHEDULE 1**

**(Attach floor plan showing Expansion Space)**





3

Parking Agreement

## PARKING AGREEMENT

THIS AGREEMENT made as of the **8th** day of **FEBRUARY**, 19**99**, between _____ **SM Brell, L.P., a California limited partnership** ("Landlord") and **Sklar Exploration Company, L.L.C.** _____ ("Tenant").

1. The parties hereby acknowledge that they have heretofore entered, or are contemporaneously herewith entering, a certain lease dated _____, 19___ (the "Lease") for premises known as Suite(s) **1601** (the "Premises") located in the property known as **Louisiana Tower** (the "Property"). In the event of any conflict between the Lease and this Agreement, the latter shall control.

2. Landlord hereby grants to Tenant and persons designated by Tenant a license to use ___*___ parking spaces in the Property Garage, and ~~parking spaces in the~~ (collectively referred to herein as the "Garage"). The Term of such license shall commence on the Commencement Date under the Lease and shall continue until the earlier to occur of the Expiration Date under the Lease, or termination of the Lease or Tenant's abandonment of the Premises thereunder. During the Term of this license, Tenant shall pay Landlord the monthly charges established from time to time by Landord for parking in the Garage, payable in advance, with Tenant's payment of monthly Base Rent. The initial charge for such spaces is $___**___, per space, per month, or a total monthly charge of $_**690.00**_____, for all such spaces. No deductions from the monthly charge shall be made for days on which the Garage is not used by Tenant. However, Tenant may reduce the number of parking spaces hereunder, at any time, by providing at least thirty (30) days advance written notice to Landlord, accompanied by any key-card, sticker or other identification or entrance system provided by Landlord or its parking contractor; such cancellation shall be irrevocable. Tenant may, from time to time, request additional parking spaces, and if Landlord shall provide the same, such spaces shall be provided and used on a month-to-month basis, and otherwise on the foregoing terms and provisions, and such monthly parking charges as Landlord shall establish from time to time.

3. Tenant shall at all times comply with all applicable ordinances, rules, regulations, codes, laws, statutes and requirements of all federal, state, county and municipal governmental bodies or their subdivisions respecting the use of the Garage. Landlord reserves the right to adopt, modify and enforce reasonable Rules governing the use of the Garage from time to time, including any key-card, sticker or other identification or entrance system, and hours of operation. The Rules set forth hereinafter are currently in effect. Landlord may refuse to permit any person who violates such Rules to park in the Garage, and any violation of the Rules shall subject the car to removal from the Garage.

4. The parking spaces hereunder shall be provided on an unreserved "first-come, first-served" basis. Tenant acknowledges that Landlord has or may arrange for the Garage to be operated by an independent contractor, not affiliated with Landlord. In such event, Tenant acknowledges that Landlord shall have no liability for claims arising through acts or omissions of such independent contractor, if such contractor is reputable. Except for intentional acts or gross negligence, Landlord shall have no liability whatsoever for any damage to property or any other items located in the Garage, nor for any personal injuries or death arising out of any matter relating to the Garage, and in all events, Tenant agrees to look first to its insurance carrier and to require that Tenant's employees look first to their respective insurance carriers for payment of any losses sustained in connection with any use of the Garage. Tenant hereby waives on behalf of its insurance carriers all rights of subrogation against Landlord or Landlord's agents. Landlord reserves the right to assign specific spaces, and to reserve spaces for visitors, small cars, handicapped persons and for other tenants, guests of tenants or other parties, and Tenant and persons designated by Tenant hereunder shall not park in any such assigned or reserved spaces. Landlord also reserves the right to close all or any portion of the Garage in order to make repairs or perform maintenance services, or to alter, modify, re-stripe or renovate the Garage, or if required by casualty, strike, condemnation, act of God, governmental law or requirement or other reason beyond Landlord's reasonable control. In such event, Landlord shall refund any prepaid parking rent hereunder, prorated on a per diem basis. If, for any other reason, Tenant or persons properly designated by Tenant, shall be denied access to the Garage, and Tenant or such persons shall have complied with this Agreement and this Agreement shall be in effect, Landlord's liability shall be limited to such parking charges (excluding tickets for parking violations) incurred by Tenant or such persons in utilizing alternative parking, which amount Landlord shall pay upon presentation of documentation supporting Tenant's claims in connection therewith.

5. If Tenant shall default under this Agreement, Landlord shall have the right to remove from the Garage any vehicles hereunder which shall have been involved or shall have been owned or driven by parties involved in causing such default, without liability therefor whatsoever. In addition, if Tenant shall default under this Agreement, Landlord shall have the right to cancel this Agreement on ten days' written notice, unless within such ten day period, Tenant cures such default. If Tenant defaults with respect to the same term or condition under this Agreement more than three times during any twelve month period, and Landlord notifies Tenant thereof promptly after each such default, the next default of such term or condition during the succeeding twelve month period, shall, at Landlord's election, constitute an incurable default. Such cancellation right shall be cumulative and in addition to any other rights or remedies available to Landlord at law or equity, or provided under the Lease (all of which rights and remedies under the Lease are hereby incorporated herein, as though fully set forth). Any default by Tenant under the Lease shall be a default under this Agreement, and any default under this Agreement shall be a default under the Lease.

\*seven (7) unreserved covered and three (3) reserved covered
\*\*$60.00 unreserved covered and $90.00 reserved covered



LEASE AMENDMENT NO. 1                    **Expansion Agreement**

## TENANT EXPANSION AGREEMENT

THIS AGREEMENT made and entered into as of this __3RD__ day of __APRIL__ 19 2000 by and between __SM Brell, L.P.__, a California limited partnership ("Landlord"), and __Sklar Exploration Company, L.L.C.__ ("Tenant").

A. Landlord or its predecessor in interest, and Tenant or its predecessor in interest, have heretofore entered into that certain lease dated the __13th__ day of __February__, 19 __99__ for premises (the "Premises") described as Space, Store, Suite, or Unit No. __1601 (the "Original Premises")__ containing approximately __4,860__ square feet, in the property known as __Louisiana Tower__ __Shreveport, Louisiana  71101__ (the "Property") the address of which is __401 Edwards Street,__, which lease has heretofore been amended or assigned by instrument dated __N/A__ (collectively, the "Lease").

B. Tenant has requested that additional space in the Property consisting of approximately __707__ square feet of rentable space shown on Exhibit A, attached hereto and incorporated herein (the "Expansion Space") be added to the Premises, and that the Lease be appropriately amended, and Landlord is willing to do the same, all on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the parties do hereby agree as follows:

1. **Expansion.** Commencing on the __1st__ day of __May__, 19 2000 (the "Commencement Date"), the Expansion Space shall be added to and become a part of the Premises, subject to all of the terms and conditions of the Lease currently in effect, except as expressly modified herein. The Commencement Date shall be subject to adjustment as described in Paragraph 4, below.

2. **Rentals and Other Charges.** On the Commencement Date, the minimum or base monthly rent under the Lease for the Expansion Space shall be $ __4,407.21**__

In addition, on the Commencement Date, all increases in rentals, additional rent or other charges based or computed on the square footage of the Premises under the Lease, including without limitation, real estate taxes, insurance costs, common area maintenance expenses, operating expenses, merchants' association dues or promotional fees, shall be adjusted proportionately to reflect the Expansion Space square footage, but any "base year" or "stop" level respecting further increases in any of the foregoing items for the Expansion Space shall be __1999__.

The minimum or base rentals and all other charges respecting the Expansion Space are sometimes herein called the "Expansion Space Rent".⌐*

3. **Additional Security Deposit.** Upon Tenant's execution hereof, Tenant shall submit the amount of $ __N/A__ (the "Additional Security Deposit") in cash or certified check, which shall be added to and become part of the security deposit, if any, under the Lease, which shall be held by Landlord as security for payment of rentals and other charges, and the performance of other terms and conditions of the Lease by Tenant, without obligation to pay interest or segregate such amount from other funds, and otherwise as provided under the Lease. ⌐***

4. **Possession.** Tenant has inspected the Expansion Space and agrees to accept the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements except as expressly provided in any separate agreement that may be signed by the parties in connection herewith. Any construction, alterations or improvements made to the Expansion Space by Tenant shall be subject to Landlord's prior written approval including without limitation, approval of the plans, specifications, contractors and subcontractors therefor, and all applicable terms and conditions of the Lease relating to construction, alterations or improvements of the Premises, and such other reasonable requirements or conditions as Landlord may impose. During any period that Tenant shall be permitted to enter the Expansion Space prior to the Commencement Date other than to occupy the same (e.g., to perform alterations or improvements), Tenant shall comply with all terms and provisions of the Lease, except those provisions requiring payment of Expansion Space Rent. If Tenant shall be permitted to enter the Expansion Space prior to the Commencement Date for the purpose of occupying the same. Expansion Space Rent shall commence on such date; if Tenant shall commence occupying only a portion of the Expansion Space prior to the Commencement Date, such rent and charges shall be prorated based on the number of rentable square feet occupied by Tenant.

The Commencement Date shall be delayed and Expansion Space Rent shall be abated to the extent that Landlord fails: (i) to substantially complete any improvements to the Expansion Space required to be performed by Landlord under any separate agreement signed by both parties in connection herewith, or (ii) to deliver possession of the Expansion Space for any other reason, including but not limited to holding over by prior occupants, except to the extent that Tenant, its contractors, agents or employees in any way contribute to either such failures. If Landlord so fails for a ninety (90) day initial grace period, or such additional time as may be necessary due to strikes, acts of God, shortages of labor or materials, governmental requirements, acts or omissions of Tenant, its contractors, agents or employees, or other causes beyond Landlord's reasonable control.

*and the Original Premises

**See Rider No. 1 for applicable "Rent Step-Ups" attached hereto and made a part hereof

***See Rider No. 2 "Work Agreement" attached hereto and made a part hereof

Tenant shall have the right to terminate this Tenant Expansion Agreement by written notice to Landlord any time thereafter up until Landlord substantially completes any such improvements and delivers the Expansion Space to Tenant. Any such delay in the Commencement Date shall not subject Landlord to any liability for any loss or damage resulting therefrom, and Tenant's sole remedy with respect thereto shall be the abatement of Expansion Space Rent and right to terminate this Agreement described above. Upon any such termination, Landlord and Tenant shall be entirely relieved of their obligations hereunder, and any Additional Security Deposit and Expansion Space Rent payments shall be returned to Tenant. If the Commencement Date is delayed, the Expiration Date under the Lease shall not be similarly extended, unless the parties expressly agree in writing.

**5. Whole Agreement.** This Agreement sets forth the entire Agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. As amended herein, the Lease between the parties shall remain in full force and effect. In case of any inconsistency between the provisions of the Lease and this Agreement, the latter provisions shall govern and control. Under no circumstances shall this Agreement be deemed to grant any right to Tenant to further expand the Premises.

**6. Guarantors.** This Agreement shall be of no force or effect unless and until accepted by any guarantors of the Lease, who by signing below shall agree that their guarantee shall apply to the Lease as amended herein, unless such requirement is waived by Landlord in writing.

**7. Not An Offer.** Submission of this Agreement by Landlord is not an offer to enter this Agreement, but a solicitation for such an offer by Tenant. Landlord shall not be bound by this Agreement until Landlord has executed and delivered the same to Tenant.

IN WITNESS WHEREOF, the Landlord and Tenant have duly executed this Agreement as of the day and year first above written.

WITNESSES; ATTESTATION

(Two for each signatory
mandatory if Property is in
Florida or Ohio):

LANDLORD: SM Brell, L.P., a California
limited partnership

By: Koll Bren Realty Advisors, Inc.,
its agent

By: _____
Sam DePoy
Its: _____
Vice President

TENANT: Sklar Exploration Company, L.L.C.

By: _____
Howard F. Sklar
Its: _____
Manager

GUARANTORS (and spouses):

N/A

N/A

2

## EXHIBIT A

**Floor Plan showing the Expansion Space
known as Suite 1615 containing approximately
707 rentable square feet cross-hatched**



## Rider No. 1

Notwithstanding anything to the contrary contained in the Lease, the parties agree as follows:

A. Commencing May 1, 2001, monthly Base Rent for the Original Premises and Expansion Space shall be increased to $4,871.13.

B. Commencing April 1, 2002, monthly Base Rent for the Original Premises and Expansion Space shall be increased to $5,335.04.

C. Commencing April 1, 2003, monthly Base Rent for the Original Premises and Expansion Space shall be increased to $5,798.96.

LANDLORD:  SM Brell, L.P., a California limited partnership

By:        Koll Bren Realty Advisors, Inc., its agent

By: _____

Sam DePoy
Vice President

TENANT:    Sklar Exploration Company, L.L.C.

By: _____

Howard F. Sklar
Manager

RIDER NO. 2

**WORK AGREEMENT**

THIS AGREEMENT made as of the **3RD** day of **APRIL**, ~~19~~ **2000**, between _____ SM BRELL L.P., a california limited partnership _____ ("Landlord") and Sklar Exploration Company, L.L.C. _____

("Tenant"). The parties hereby acknowledge that they have heretofor entered, or are contemporaneously herewith entering, a certain lease or tenant expansion agreement dated _____, 19____ (the "Lease") for premises ~~(the "Premises")~~ known as Suite(s) **1615** _____, located in the property known as Louisiana Tower (the "Property"). (the "Expansion Space")

**1. The Work.** Under the Lease, Tenant has agreed to accept the Premises "as is," without any obligations for the performance of improvements or other work by Landlord, and Tenant desires to perform certain improvements thereto (the "Work"). Such Work shall be in accordance with the provisions of this Work Agreement, and to the extent not expressly inconsistent herewith, in accordance with the provisions of the Lease, including without limitation, Article 8 thereof. Performance of the Work shall not serve to abate or extend the time for the commencement of Rent under the Lease, except to the extent Landlord delays approvals beyond the times permitted below.

**2. Cost of the Work.** Except as provided hereinafter, Tenant shall pay all costs (the "Costs of the Work") associated with the Work whatsoever, including without limitation, all permits, inspection fees, fees of space planners, architects, engineers, and contractors, utility connections, the cost of all labor and materials, bonds, insurance, and any structural or mechanical work, additional HVAC equipment or sprinkler heads, or modifications to any building mechanical, electrical, plumbing or other systems and equipment or relocation of any existing sprinkler heads, either within or outside the Premises required as a result of the layout, design, or construction of the Work.

Of the Costs of the Work, Landlord shall reimburse Tenant the amount of $ **9.00------** per square foot of rentable area of the Premises (the "Improvement Allowance"). (If such blank space is not filled in, then there is no Improvement Allowance.) The Improvement Allowance shall be funded by Landlord within thirty (30) days after the Work has been completed in accordance with the "Space Plan" and "Working Drawings" approved by Landlord in writing in accordance with the provisions hereof, and Tenant has submitted all invoices, lien waivers, affidavits of payment, and such other evidence as Landlord may reasonably require that the cost of the Work has been paid for and that no mechanic's, materialmen's or other such liens have been or may be filed against the Property or the Premises arising out of the design or performance of the Work. In the alternative, at Landlord's sole option, Landlord may elect to fund the Improvement Allowance in installments, not more frequently than monthly, based on applications for payment and releases of lien rights, submitted by Tenant on Landlord's standard form for use by contractors requesting progress payments, together with such lien releases and affidavits of payments by Tenant's general contractor and subcontractors contemplated therein, and such other documentation as Landlord may reasonably require. Landlord may issue checks to fund the Improvement Allowance jointly to Tenant, its general contractor, and, at Landlord's option, to any subcontractors or suppliers.

~~3. Space Plan and Specifications.~~

~~a. No later than ten (10) days after the date of this Work Agreement set forth above, Tenant shall submit two (2) sets of a "Space Plan" (as described in Section 16) to Landlord for approval.~~

~~b. Landlord shall, within ten (10) days after receipt thereof, either approve said Space Plan, or disapprove the same advising Tenant of the reasons for such disapproval. In the event Landlord disapproves said Space Plan, Tenant shall modify the same, taking into account the reasons given by Landlord for said disapproval, and shall submit two sets of the revised Space Plan to Landlord within five (5) days after receipt of Landlord's initial disapproval.~~

~~4. Working Drawings and Engineering Report.~~

~~a. No later than ten (10) days after receipt of Landlord's approval of the Space Plan, Tenant shall submit to Landlord for approval two (2) sets of "Working Drawings" (as defined in Section 16), and a report (the "Engineering Report") from Tenant's mechanical, structural and electrical engineers indicating any special heating, cooling, ventilation, electrical, heavy load or other special or unusual requirements of Tenant.~~

~~b. Landlord shall, within twenty (20) working days after receipt thereof, either approve the Working Drawings and Engineering Report, or disapprove the same advising Tenant of the reasons for disapproval. If Landlord disapproves of the Working Drawings or Engineering Report, Tenant shall modify and submit revised Working Drawings, and a revised Engineering Report, taking into account the reasons given by Landlord for disapproval, within five (5) days after receipt of Landlord's initial disapproval.~~

~~5. Landlord's Approval. Landlord shall not unreasonably withhold approval of any Space Plans, Working Drawings, or Engineering Report submitted hereunder if they provide for a customary office layout, with finishes and materials conforming to building standard finishes and materials currently being used by Landlord at the Property, are compatible with the Property's shell and core construction, and if no modifications will be required for the Property electrical, heating, air-conditioning, ventilation, plumbing, fire protection, life safety, or other systems or equipment, and will not require any structural modifications to the Property, whether required by heavy loads or otherwise.~~

~~6. Space Planners, Architects, Engineers, and Contractors. The Space Plan, Working Drawings, Engineering Report and the Work, shall be prepared and performed by such space planners, architects, engineers and contractors as Landlord~~

*The attached drawing showing the alterations to be made to the Expansion Space shall constitute the approved plan upon execution of this Tenant Expansion Agreement by both parties.

*PLEASE INITIAL*

customarily engages or recommends for use at the Property; provided, Tenant may substitute another licensed, bonded, reputable and qualified space planner, architect, engineer or contractor, who will work in harmony with each other and those of Landlord so as to ensure proper maintenance of good labor relationships, and in compliance with all applicable labor agreements existing between trade unions and the relevant chapter of the Association of General Contractors of America. Such substitutions may be made only with Landlord's prior written approval. Such approval shall be granted or denied within fifteen (15) days after Landlord receives from Tenant a written request for such substitution, containing a reasonable designation of the proposed party's background, references and qualifications. Any such substitution shall not serve to delay the times for submission of the Space Plan, Working Drawings and Engineering Report required herein, except to the extent that Landlord delays granting or denying approval beyond the aforementioned fifteen (15) day period.

**7. Change Orders.** No changes, modifications, alterations or additions to the approved Space Plan or Working Drawings may be made without the prior written consent of the Landlord after written request therefor by Tenant. In the event that the Premises are not constructed in a cordance with said approved Space Plan and Working Drawings, then Tenant shall not be permitted to occupy the Premises until the Premises reasonably comply in all respects with said approved Space Plan and Working Drawings; in such casa, the Rent shall nevertheless commence to accrue and be payable as otherwise provided in the Lease.

**8. Compliance.** Tenant's Work shall comply in all respects with the following: (a) the Building Code of the City and State in which the Building is located and State, County, City or other laws, codes, ordinances and regulations, as each may apply according to the rulings of the controlling public official, agent or other such person, (b) applicable standards of the National Board of Fire Underwriters and National Electrical Code, and (c) building material manufacturer's specifications.

**9. Guarantees.** Each contractor, subcontractor and supplier participating in Tenant's Work shall guarantee that the portion thereof for which he is responsible shall be free from any defects in workmanship and materials for a period of not less than one (1) year from the date of completion thereof. Every such contractor, subcontractor, and supplier shall be responsible for the replacement or repair, without additional charge, of all work done or furnished in accordance with its contract which shall become defective within one (1) year after completion thereof. The correction of such work shall include, without additional charge, all additional expenses and damages in connection with such removal or replacement of all or any part of Tenant's Work, and/or the Property and/or common areas, or work which may be damaged or disturbed thereby. All such warranties or guarantees as to materials or workmanship of or with respect to Tenant's Work shall be contained in the contract or subcontract which shall be written such that said warranties or guarantees shall inure to the benefit of both Landlord and Tenant, as their respective interests may appear, and can be directly enforced by either. Tenant covenants to give Landlord any assignment or other assurances necessary to effect such right of direct enforcement. Copies of all contracts and subcontracts shall be furnished to Landlord promptly after the same are entered.

**10. Performance.**

a. Tenant's Work shall be commenced within fifteen (15) days after Landlord approves the Working Drawings, and shall thereafter be diligently prosecuted to completion, subject to delays for reasons beyond Tenant's control (except financial matters). All Work shall conform with the Working Drawings approved by Landlord in writing, and Landlord may periodically inspect the Work for such compliance. Tenant's Work shall be coordinated under Landlord's direction with the work being done or to be performed for or by other tenants in the Property so that Tenant's Work will not interfere with or delay the completion of any other construction work in the Property.

b. Tenant's Work shall be performed in a thoroughly safe, first-class and workmanlike manner in conformity with the approved Space Plan and Working Drawings, and shall be in good and usable condition at the date of completion.

c. Tenant shall be required to obtain and pay for all necessary permits and/or fees with respect to Tenant's Work, and the same shall be shown to Landlord prior to commencement of the Work.

d. Each contractor and subcontractor shall be required to obtain prior written approval from Landlord for any space outside the Premises within the Property, which such contractor or subcontractor desires to use for storage, handling, and moving of his materials and equipment, as well as for the location of any facilities for his personnel.

e. The contractors and subcontractors shall be required to remove from the Premises and dispose of, at least once a week and more frequently as Landlord may direct, all debris and rubbish caused by or resulting from the construction. Upon completion of Tenant's Work, the contractors and subcontractors shall remove all surplus materials, debris and rubbish of whatever kind remaining within the Property which has been brought in or created by the contractors and subcontractors in the performance of Tenant's Work. If any contractor or subcontractor shall neglect, refuse or fail to remove any such debris, rubbish, surplus material or temporary structures within two (2) days after notice to Tenant from Landlord with respect thereto, Landlord may cause th s same to be removed by contract or otherwise as Landlord may determine expedient, and charge the cost thereof to Tenant as additional Rent under the Lease.

f. Tenant shall obtain and furnish Landlord all approvals with respect to electrical, water and telephone work as may be required by the respective company supplying the service. Tenant shall obtain utility service, including meter, from the utility company supplying service, unle s Landlord elects to supply service and/or meters.

g. Landlord shall have the right to require Tenant to furnish bonds or other security in form and amount reasonably satisfactory to Landlord for the prompt and faithful performance and payment for Tenant's Work.

h. Landlord's acceptance of Tenant's Work being complete in accordance with the approved Space Plan and Working Drawings shall be subject to Landlord's inspection and written approval. Tenant shall give Landlord 5 days prior written notification of the anticipated completion date of Tenant's Work.

i. If contemplated or permitted under the statutes of the State in which the Property is located, within ten (10) days after completion of construction of Tenant's Work, Tenant shall execute and file a Notice of Completion with respect thereto and furnish a copy thereof to Landlord upon recordation, failing which, Landlord may itself execute and file the same on behalf of Tenant as Tenant's agent for such purpose.

2

j. Tenant shall, at its cost and expense construct, purchase, install and perform any and all items of Tenant's Work, stock its merchandise, and employ its personnel so as to obtain any governmentally required certificate of occupancy and to occupy the Premises as soon as possible, and in all cases on or before the date required therefor hereunder or under the Lease.

k. If an expansion joint occurs within the Premises, Tenant shall install finish floor covering to or covering such joint in a workmanlike manner, and Landlord shall not accept responsibility for any finish floor covering applied to or installed over the expansion joint.

l. Copies of "as built" drawings shall be provided to Landlord no later than thirty (30) days after completion of the Work.

m. Landlord's approval of Tenant's plans and specifications, and Landlord's recommendations or approvals concerning contractors, subcontractors, space planners, engineers or architects, shall not be deemed a warranty as to the quality or adequacy of the Work, or the design thereof, or of its compliance with Laws, codes and other legal requirements.

n. Tenant shall conduct its labor relations and relations with employees so as to avoid strikes, picketing, and boycotts of, on or about the Premises or Property. If any employees strike, or if picket lines or boycotts or other visible activities objectionable to Landlord are established, conducted or carried out against Tenant, its employees, agents, contractors, subcontractors or suppliers, in or about the Premises or Property, Tenant shall immediately close the Premises and remove or cause to be removed all such employees, agents, contractors, subcontractors and suppliers until the dispute has been settled.

o. Landlord shall not be responsible for any disturbance or deficiency created in the air conditioning or other mechanical, electrical or structural facilities within the Property or Premises as a result of the Work. If such disturbances or deficiencies result, Tenant shall correct the same and restore the services to Landlord's reasonable satisfaction, within a reasonable time.

p. If performance of the Work shall require that additional services or facilities (including without limitation, extra or after-hours elevator usage or cleaning services) be provided, Tenant shall pay Landlord's reasonable charges therefor.

q. Tenant's contractors shall comply with the rules of the Property and Landlord's requirements respecting the hours of availability of elevators and manner of handling materials, equipment and debris. Demolition must be performed after 6:00 p.m. on weekends. Delivery of materials, equipment and removal of debris must be arranged to avoid any inconvenience or annoyance to other occupants. The Work and all cleaning in the Premises must be controlled to prevent dirt, dust or other matter from infiltrating into adjacent tenant or mechanical areas.

r. Landlord may impose reasonable additional requirements from time to time in order to ensure that the Work, and the construction thereof does not disturb or interfere with any other tenants of the Property, or their visitors, contractors or agents, nor interfere with the efficient, safe and secure operation of the Property.

11. **Insurance.** All contractors and sub-contractors shall carry Worker's Compensation Insurance covering all of their respective employees in the statutory amounts, Employer's Liability Insurance in the amount of at least $500,000 per occurrence, and comprehensive general liability insurance of at least $3,000,000 combined single limit for bodily injury, death, or property damage; and the policies therefor shall cover Landlord and Tenant, as additional insureds, as well as the contractor or subcontractor.  Tenant shall carry builder's risk insurance coverage respecting the construction and improvements to be made by Tenant, in the amount of the anticipated cost of construction of the Work (or any guaranteed maximum price). All insurance carriers hereunder shall be rated at least A and X in Best's Insurance Guide. Certificates for all such insurance shall be delivered to Landlord before the construction is commenced or contractor's equipment is moved onto the Property. All policies of insurance must require that the carrier give Landlord twenty (20) days' advance written notice of any cancellation or reduction in the amounts of insurance. In the event that during the course of Tenant's Work any damage shall occur to the construction and improvements being made by Tenant, then Tenant shall repair the same at Tenant's cost.

12. **Signage.** Notwithstanding anything contained herein to the contrary, Landlord shall cause signage of building standard material and design to be placed on or near the door of the Premises and Tenant shall pay the cost thereof to promptly advise Landlord what name or names Tenant wishes for said signage. The amount due from Tenant therefor shall be deemed "Rent" under the Lease. Tenant shall to Landlord's prior written approval. No other signage may be installed or placed outside the Premises by Tenant, except as provided in the Work Agreement entered February 8, 1999, by the parties. The content of all signage shall be subject

13. **Asbestos.** If the Property was constructed at a time when asbestos was commonly used in construction, Tenant acknowledges that asbestos-containing materials ("ACM") may be present at the Property, and that airborne asbestos fibers may involve a potential health hazard unless proper procedures are followed. In such case, before commencing the Work, Tenant and its contractor shall consult with Landlord and Landlord's asbestos consultant concerning appropriate procedures to be followed. Landlord shall, at Tenant's expense, undertake any necessary initial asbestos-related work, before Tenant commences the Work. During performance of the Work, Tenant shall require that its contractor comply with all laws, rules, regulations and other governmental requirements, as well as all directives of Landlord's asbestos consultant, respecting ACM. Tenant hereby irrevocably appoints Landlord and Landlord's asbestos consultant as Tenant's attorney-in-fact for purposes of supervising and directing any asbestos-related aspects of the Work (but such appointment shall not relieve Tenant from its obligations hereunder, nor impose any affirmative requirement on Landlord to provide such supervision or direction).

14. **Liens.** Tenant shall keep the Property and Premises free from any mechanic's, materialman's or similar liens or other such encumbrances in connection with the Work, and shall indemnify and hold Landlord harmless from and against any claims, liabilities, judgments, or costs (including attorneys' fees) arising in connection therewith. Tenant shall give Landlord notice at least twenty (20) days prior to the commencement of the Work (or such additional time as may be

3

necessary under applicable laws), to afford Landlord the opportunity of posting and recording appropriate notices of non-responsibility. Tenant shall remove any such lien or encumbrance by bond or otherwise within thirty (30) days after written notice by Landlord, and if Tenant shall fail to do so, Landlord may pay the amount necessary to remove such lien or encumbrance, without being responsible for investigating the validity thereof. The amount paid shall be deemed additional rent under the Lease payable upon demand, without limitation as to other remedies available to Landlord under the Lease. Nothing contained herein shall authorize Tenant to do any act which shall subject Landlord's title to the Property or Premises to any liens or encumbrances whether claimed by operation of law or express or implied contract. Any claim to a lien or encumbrance upon the Property or Premises arising in connection with the Work shall be null and void, or at Landlord's option shall attach only against Tenant's interest in the Premises and shall in all respects be subordinate to Landlord's title to the Property and Premises.

**15. Indemnity.** Tenant shall indemnify, defend and hold harmless Landlord (and Landlord's principals, partners, agents, trustees, beneficiaries, officers, employees and affiliates) from and against any claims, demands, losses, damages, injuries, liabilities, expenses, judgments liens, encumbrances, orders, and awards, together with attorneys' fees and litigation expenses arising out of or in connection with the Work, or Tenant's failure to comply with the provisions hereof, or any failure by Tenant's contractors, subcontractors or their employees to comply with the provisions hereof, except to the extent caused by Landlord's intentional or negligent acts.

**16. Certain Definitions.**

A. **"Space Plan"** herein means a floor plan, drawn to scale, showing: (1) demising walls, corridor doors, interior partition walls and interior doors, including any special walls, glass partitions or special corridor doors, (2) any restrooms, kitchens, computer rooms, file rooms and other special purpose rooms, and any sinks or other plumbing facilities, or other special facilities or equipment, (3) any communications system, indicating telephone and computer outlet locations, and (4) any other details or features required to reasonably delineate the Work to be performed.

B. **"Working Drawings"** herein means fully dimensioned architectural construction drawings and specifications, and any required engineering drawings (including mechanical, electrical, plumbing, air-conditioning, ventilation and heating), and shall include any applicable items described above for the Space Plan, and if applicable: (1) electrical outlet locations, circuits and anticipated usage therefor, (2) reflected ceiling plan, including lighting, switching, and any special ceiling specifications, (3) duct locations for heating, ventilating and air-conditioning equipment, (4) details of all millwork, (5) dimensions of all equipment and cabinets to be built in, (6) furniture plan showing details of space occupancy, (7) keying schedule, (8) lighting arrangement, (9) location of print machines, equipment in lunch rooms, concentrated file and library loadings and any other equipment or systems (with brand names wherever possible) which require special consideration relative to air-conditioning, ventilation, electrical, plumbing, structural, fire protection, life-fire-safety system, or mechanical systems, (10) special heating, ventilating and air conditioning equipment and requirements, (11) weight and location of heavy equipment, and anticipated loads for special usage rooms, (12) demolition plan, (13) partition construction plan, (14) type and color of floor and wall-coverings, wall paint and any other finishes, and any other details or features required to completely delineate the Work to be performed.

**17. Taxes.** Tenant shall pay prior to delinquency all taxes, charges or other governmental impostions (including without limitation, any real estate taxes or assessments, sales tax or value added tax) assessed against or levied upon Tenant's fixtures, furnishings, equipment and personal property located in the Premises and the Work to the Premises under this Agreement. Whenever possible, Tenant shall cause all such items to be assessed and billed separately from the property of Landlord. In the event any such items shall be assessed and billed with the property of Landlord, Tenant shall pay its share of such taxes, charges or other governmental impositions to Landlord within thirty (30) days after Landlord delivers a statement and a copy of the assessment or other documentation showing the amount of such impositions applicable to Tenant.

**18. INCORPORATED INTO LEASE; DEFAULT.** THE PARTIES AGREE THAT THE PROVISIONS OF THIS WORK AGREEMENT ARE HEREBY INCORPORATED BY THIS REFERENCE INTO THE LEASE FULLY AS THOUGH SET FORTH THEREIN. In the event of any express inconsistencies between the Lease and this Work Agreement, the latter shall govern and control. If Tenant shall default under this Work Agreement, Landlord may order that all Work being performed in the Premises be stopped immediately, and that no further deliveries to the Premises be made, until such default is cured, without limitation as to Landlord's other remedies. Any amounts payable by Tenant to Landlord hereunder shall be paid as additional rent under the Lease. Any default by the other party hereunder shall constitute a default under the Lease and shall be subject to the remedies and other provisions applicable thereto under the Lease. If Tenant shall default under the Lease or this Work Agreement and fail to cure the same within the time permitted for cure under the Lease, at Landlord's option, all amounts paid or incurred by Landlord towards the Improvement Allowance shall become immediately due and payable as additional Rent under the Lease.

LANDLORD: SM Brell, L.P., a California limited partnership

By: Koll Bren Realty Advisors, Inc., its agent

By: _____
Sam DePoy
Vice President

TENANT: Sklar Exploration Company, L.L.C.

By: _____
Howard F. Sklar
Manager

4

**Remodeling Notes - (#'s Key o Plan)**

1. Existing building standard entrance door to remain.
2. Extend existing ceiling high partition to deck.  Construct to building standards and applicable governmental codes.
3. Modify existing sprinkler system and fire alarm system as required to meet building standards and governmental codes.  New carpet, vinyl base and wallcovering throughout.  Colors to be selected by tenant.
4. New building standard wall and door unit.
5. Install building standard fire dampers.

**General Notes**

- Install two (2) dedicated duplex power outlets, ten (10) duplex outlets and four (4) telephone outlets at locations selected by tenant.
- Install sheet metal for magnetic walls where directed by tenant.
- Tenant's contractor to provide customary construction cleaning, and final cleaning. Tenant's contractor will obtain required permits and inspections.
- Tenant's contractor to provide certificate of insurance naming the following as additional insureds:  SM Erell, L.P., d/b/a Louisiana Tower and CB Richard Ellis, Inc., 401 Edwards Street, Suite 930, Shreveport, LA  71101.



SUITE 1615

REMODEL PLAN

JMB 141 (2/89)
**Expansion Agreement**

*LEASE AMENDMENT No. 2*

## TENANT EXPANSION AGREEMENT

THIS AGREEMENT made and entered into as of this __17th__ day of __OCTOBER__, 2000__, by and between __SM BRELL, L.P., A CALIFORNIA LIMITED PARTNERSHIP__ ("Landlord"), and __SKLAR EXPLORATION COMPANY, L.L.C.__ ("Tenant").

A. Landlord or its predecessor in interest, and Tenant or its predecessor in interest, have heretofore entered into that certain lease dated the __8th__ day of __February__, 19__99__ for premises (the "Premises") described as Space, Store, Suite, or Unit No. __1601__, initially containing approximately _____ square feet, in the property known as __Louisiana Tower__ _____ (the "Property") the address of which is __401 Edwards Street,__ __Shreveport, LA, 71101__, which lease has heretofore been amended or assigned by instrument dated __April 3, 2000__ (collectively, the "Lease").

B. Tenant has requested that additional space in the Property consisting of approximately __855__ square feet of rentable space shown on Exhibit A, attached hereto and incorporated herein (the "Expansion Space") be added to the Premises, and that the Lease be appropriately amended, and Landlord is willing to do the same, all on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the parties do hereby agree as follows:

1. **Expansion.** Commencing on the __21st__ day of __August__, XXX2000 (the "Commencement Date"), the Expansion Space shall be added to and become a part of the Premises, subject to all of the terms and conditions of the Lease currently in effect, except as expressly modified herein. The Commencement Date shall be subject to adjustment as described in Paragraph 4, below. **

2. **Rentals and Other Charges.** On the Commencement Date, the minimum or base monthly rent under the Lease for the Expansion Space shall be $__570.00__.

In addition, on the Commencement Date, all increases in rentals, additional rent or other charges based or computed on the square footage of the Premises under the Lease, including without limitation, real estate taxes, insurance costs, common area maintenance expenses, operating expenses, merchants' association dues or promotional fees, shall be adjusted proportionately to reflect the Expansion Space square footage, but any "base year" or "stop" level respecting further increases in any of the foregoing items for the Expansion Space shall be __1999__.

The minimum or base rentals and all other charges respecting the Expansion Space are sometimes herein called the "Expansion Space Rent".

3. **Additional Security Deposit.** Upon Tenant's execution hereof, Tenant shall submit the amount of $__N/A__ (the "Additional Security Deposit") in cash or certified check, which shall be added to and become part of the security deposit, if any, under the Lease, which shall be held by Landlord as security for payment of rentals and other charges, and the performance of other terms and conditions of the Lease by Tenant, without obligation to pay interest or segregate such amount from other funds, and otherwise as provided under the Lease.

4. **Possession.** Tenant has inspected the Expansion Space and agrees to accept the same "as is" without any agreements, representations, understandings or obligations on the part of Landlord to perform any alterations, repairs or improvements except as expressly provided in any separate agreement that may be signed by the parties in connection herewith. Any construction, alterations or improvements made to the Expansion Space by Tenant shall be subject to Landlord's prior written approval including without limitation, approval of the plans, specifications, contractors and subcontractors therefor, and all applicable terms and conditions of the Lease relating to construction, alterations or improvements of the Premises, and such other reasonable requirements or conditions as Landlord may impose. During any period that Tenant shall be permitted to enter the Expansion Space prior to the Commencement Date other than to occupy the same (e.g., to perform alterations or improvements), Tenant shall comply with all terms and provisions of the Lease, except those provisions requiring payment of Expansion Space Rent. If Tenant shall be permitted to enter the Expansion Space prior to the Commencement Date for the purpose of occupying the same, Expansion Space Rent shall commence on such date; if Tenant shall commence occupying only a portion of the Expansion Space prior to the Commencement Date, such rent and charges shall be prorated based on the number of rentable square feet occupied by Tenant.

The Commencement Date shall be delayed and Expansion Space Rent shall be abated to the extent that Landlord fails: (i) to substantially complete any improvements to the Expansion Space required to be performed by Landlord under any separate agreement signed by both parties in connection herewith, or (ii) to deliver possession of the Expansion Space for any other reason, including but not limited to holding over by prior occupants, except to the extent that Tenant, its contractors, agents or employees in any way contribute to either such failures. If Landlord so fails for a ninety (90) day initial grace period, or such additional time as may be necessary due to strikes, acts of God, shortages of labor or materials, governmental requirements, acts or omissions of Tenant, its contractors, agents or employees, or other causes beyond Landlord's reasonable control,

**Either Landlord or Tenant shall have the right to cancel this expansion agreement, for this lease space ("expansion space" containing 853 square feet) by providing thirty (30) days' written notice of their intent to terminate.

thereafter up until Landlord substantially completes any such improvements and delivers the Expansion Space to Tenant. Any such delay in the Commencement Date shall not subject Landlord to any liability for any loss or damage resulting therefrom, and Tenant's sole remedy with respect thereto shall be the abatement of Expansion Space Rent and right to terminate this Agreement described above. Upon any such termination, Landlord and Tenant shall be entirely relieved of their obligations hereunder, and any Additional Security Deposit and Expansion Space Rent payments shall be returned to Tenant. If the Commencement Date is delayed, the Expiration Date under the Lease shall not be similarly extended, unless the parties expressly agree in writing.

**5. Whole Agreement.** This Agreement sets forth the entire Agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. As amended herein, the Lease between the parties shall remain in full force and effect. In case of any inconsistency between the provisions of the Lease and this Agreement, the latter provisions shall govern and control. Under no circumstances shall this Agreement be deemed to grant any right to Tenant to further expand the Premises.

**6. Guarantors.** This Agreement shall be of no force or effect unless and until accepted by any guarantors of the Lease, who by signing below shall agree that their guarantee shall apply to the Lease as amended herein, unless such requirement is waived by Landlord in writing.

**7. Not An Offer.** Submission of this Agreement by Landlord is not an offer to enter this Agreement, but a solicitation for such an offer by Tenant. Landlord shall not be bound by this Agreement until Landlord has executed and delivered the same to Tenant.

IN WITNESS WHEREOF, the Landlord and Tenant have duly executed this Agreement as of the day and year first above written.

WITNESSES; ATTESTATION

(Two for each signatory
mandatory if Property is in
Florida or Ohio):

LANDLORD: SM BRELL, L.P., a California
limited partnership

BY:  KOLL BREN SCHREIBER REALTY ADVISORS,
INC., ITS AGENT

By: _____
Samuel DePoy
Its: Vice President

TENANT: Sklar Exploration Company, L.L.C.

By: _____
William T. Gates

Its: _____
Vice President

GUARANTORS (and spouses):

# EXHIBIT A

### (Floor plan(s) showing Premises cross-hatched)



## THIRD AMENDMENT TO LEASE AGREEMENT

This Third Amendment to Lease Agreement (this "Third Amendment") is made and entered into effective as of MARCH 30TH , 2001 (the "Effective Date"), by and between **SM BRELL, L.P.**, a California limited partnership ("Landlord"), and **SKLAR EXPLORATION COMPANY, L.L.C.**, a Louisiana limited liability company ("Tenant").

## W I T N E S S E T H:

WHEREAS Landlord and Tenant have heretofore executed and entered into that certain Office Lease dated February 8, 1999, as amended by that certain Lease Amendment No. 1 dated April 3, 2000 (the "First Amendment") and that certain Lease Amendment No. 2 dated October 17, 2000 (the "Second Amendment") (as amended, the "Lease"), pursuant to which Tenant leased certain premises (the "Premises") in the Louisiana Tower (the "Building"), located at 401 Edwards Street, Shreveport, Louisiana 71101; and

WHEREAS, Landlord and Tenant desire to amend the terms of the Lease to expand the Premises, to extend the term of the Lease and to modify certain terms and provisions of the Lease, all as more particularly set forth herein below;

NOW, THEREFORE, for and in consideration of the premises contained herein, and other good and valuable consideration paid by each of Landlord and Tenant to the other, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree that the Lease is hereby ratified and amended as follows:

1. All capitalized terms used herein shall have the same meaning as defined in the Lease, unless otherwise defined in this Third Amendment.

2. Landlord and Tenant hereby acknowledge and agree that as of the Effective Date of this Third Amendment, the Premises contains 6,422 square feet of rentable area comprised of (i) Suite 1601 containing 4,860 square feet of rentable area as reflected on the floor plan attached hereto as Exhibit A-1 (the "Original Premises"), (ii) Suite 1615 containing 707 square feet of rentable area as reflected on the floor plan attached hereto as Exhibit A-2 (the "Suite 1615 Space"), and (iii) Suite 815 containing 855 square feet of rentable area as reflected on the floor plan attached hereto as Exhibit A-3 (the "Suite 815 Space")

3. Effective as of the Expansion Space Commencement Date (as defined below), the Premises shall be expanded to include that certain space in the Building consisting of 6,358 square feet of rentable area located on the sixteenth (16th) floor of the Building, adjacent to the Original Premises, and more particularly identified on the floor plan attached hereto as Exhibit B (the "Expansion Space"), for a term co-terminous with the term of the Lease (as extended pursuant to Paragraph 5 below). As used herein, the "Expansion Space

Commencement Date" shall mean the date which is the earlier to occur of (i) the date sixty (60) days following the date that Landlord tenders possession of the Expansion Space to Tenant, or (ii) the date that Tenant, or anyone occupying the Expansion Space with the permission of Tenant, commences the conduct of regular business operations in the Expansion Space.

4.   On and as of the Expansion Space Commencement Date, (i) Landlord and Tenant agree that the Lease, as amended hereby, shall terminate as to the Suite 1615 Space and the Suite 815 Space, and (ii) Tenant agrees to vacate and surrender the Suites 1615 Space and the Suite 815 Space to Landlord in the condition such space is required to be vacated and surrendered to Landlord at the expiration or earlier termination of the Term as provided in the Lease.

5.   The Term of the Lease is hereby extended for a period commencing on the Expansion Space Commencement Date and ending on the last day of the sixty-second (62nd) month thereafter (said sixty-two (62) month period being hereinafter referred to as the "Extension Term").

6.   Effective as of the Expansion Space Commencement Date, the Premises is stipulated to contain 11,218 square feet of rentable area comprised of the Original Premises and the Expansion Space.

7.   Effective as of the Expansion Space Commencement Date, "Tenant's Prorata Share" shall mean 3.20%.

8.   Commencing as of the Expansion Space Commencement Date, the monthly Base Rent for the Premises during the Extension Term shall be as follows:

| Months of the Extension Term | Monthly Base Rent |
|---|---|
| Months 1 – 2 | $4,799.25 |
| Months 3 – 14 | $11,077.78 |
| Months 15 – 26 | $12,012.61 |
| Months 27 – 38 | $12,947.44 |
| Months 39 – 50 | $13,742.05 |
| Months 51 – 62 | $14,162.73 |

9.   Effective as of the Expansion Space Commencement Date, the "Base Expense Year" shall mean the calendar year 2000.

10.  Effective as of the Expansion Space Commencement Date, the "Base Tax Year" shall mean the calendar year 2000.

11.  The Expansion Space shall be delivered to and accepted by Tenant in an "AS-IS", "WHERE-IS" condition; provided that Landlord shall provide Tenant an allowance of up to Ninety-Four Thousand Two Hundred Thirty-One and No/100 Dollars ($94,231.00)

24434488.3 33001 843C 01714899                     2

("Allowance"), for the purpose of completing certain tenant improvements to the Expansion Space (the "Tenant Improvements") as set forth in and in accordance with the Work Letter attached as Exhibit C hereto.

12.    Landlord hereby grants to Tenant and persons designated by Tenant a license to use an additional five (5) unreserved covered, and an additional three (3) unreserved uncovered, parking spaces in the Garage. The Term of such license shall commence on the Expansion Space Commencement Date and shall be co-terminus with the Term of the license granted to Tenant for the parking spaces described in the Parking Agreement attached to the Lease. Except as otherwise provided in this Paragraph 12, the license to use these additional spaces shall be subject to all of the terms and conditions applicable to the license granted to Tenant for the parking spaces described in the Parking Agreement attached to the Lease. The initial charge for such additional spaces is $60.00 per space per month for the covered spaces, and $45.00 per space per month for the uncovered spaces. Tenant shall have the right, at its option, to exchange two (2) of the five (5) additional unreserved covered spaces provided for in this Paragraph 12 for two (2) reserved covered spaces; however, the charge for such reserved covered spaces shall be $90.00 per space per month.

13.    Landlord hereby provides Tenant with the following option to renew the Term of the Lease:

        (a) Provided that as of the time of the giving of the Extension Notice and the Commencement Date of the Second Extension Term, (i) Tenant is the Tenant originally named herein, (ii) Tenant actually occupies a majority of the Premises then leased by Tenant under the Lease, (iii) no Default exists or would exist but for the passage of time or the giving of notice, or both; then Tenant shall have the right to extend the Term for an additional period of five (5) years (such additional period is hereinafter called the "Second Extension Term") commencing on the day following the expiration of the Extension Term (hereinafter referred to as the "Commencement Date of the Second Extension Term"). Tenant shall give Landlord notice (hereinafter called the "Extension Notice") of its election to extend the Term of the Lease at least nine (9) months, but not more than twelve (12) months, prior to the scheduled expiration date of the Extension Term.

        (b) The Base Rent payable by Tenant to Landlord during the Second Term shall be the greater of (i) the Base Rent applicable to the last year of the Extension Term, and (ii) the then prevailing market rate for comparable space in the Building and comparable buildings in the vicinity of the Building, taking into account the size of the lease, the length of the renewal term, market escalations and the credit of Tenant. The Base Rent shall not be reduced by reason of any costs or expenses saved by Landlord by reason of Landlord's not having to find a new tenant for such premises (including, without limitation, brokerage commissions, costs of improvements, rent concessions or lost rental income during any vacancy period). In the event Landlord and Tenant fail to reach an agreement on such rental rate and execute the Amendment (defined below) at least four (4) months prior to the expiration of the Extension Term, then Tenant's exercise of this renewal option shall be deemed withdrawn and the Lease shall terminate on the expiration of the Extension Term.

(c) The determination of Base Rent does not reduce the Tenant's obligation to pay or reimburse Landlord for Taxes and/or Operating Expenses and other reimbursable items as set forth in the Lease, and Tenant shall reimburse and pay Landlord as set forth in the Lease with respect to such Taxes and/or Operating Costs and other items with respect to the Premises during the Second Extension Term without regard to any cap on such expenses as may be set forth in the Lease.

(d) Except for the Base Rent as determined above, Tenant's occupancy of the Premises during the Second Extension Term shall be on the same terms and conditions as are in effect immediately prior to the expiration of the Extension Term; provided, however, Tenant shall have no further right to any allowances, credits or abatements or any options to expand, contract, renew or extend the Lease.

(e) If Tenant does not give the Extension Notice within the period set forth in subparagraph (a) above, Tenant's right to extend the Term shall automatically terminate. Time is of the essence as to the giving of the Extension Notice.

(f) [Intentionally Deleted]

(g) If the Lease is extended for the Second Extension Term, then Landlord shall prepare and Tenant shall execute an amendment to the Lease confirming the extension of the Term and the other provisions applicable thereto (the "Amendment").

(h) If Tenant exercises its right to extend the term of the Lease for the Second Extension Term pursuant to this Paragraph 13, the term "Term" as used in the Lease, shall be construed to include, when practicable, the Second Extension Term except as provided in subparagraph (d) above.

14. Notwithstanding anything to the contrary contained in the Lease, Rider 3 (Right of First Opportunity) of the Lease is hereby deleted in its entirety and of no further force or effect.

15. Landlord hereby agrees to provide Tenant with the following right of first opportunity to lease certain additional space in the Building as described hereinbelow:

(a) "Offered Space" shall mean approximately 1,234 square feet of rentable area on the sixteenth (16th) floor of the Building as more particularly identified on the floor plan attached as Exhibit D to this Third Amendment.

(b) Provided that as of the date of the giving of the First Offer Notice, (i) Tenant is the Tenant originally named herein, (ii) Tenant actually occupies all of the Premises then leased by Tenant under the Lease, and (iii) no Default exists or would exist but for the passage of time or the giving of notice, or both; if at any time during the Term any lease for any portion of the Offered Space shall expire, then Landlord, before offering such Offered Space to anyone, other than the tenant then occupying such space (or its affiliates), shall

24434488.3 33001 843C 01714899                                    4

offer to Tenant the right to include the Offered Space within the Premises on the same terms and conditions upon which Landlord intends to offer the Offered Space for lease.

(c) Such offer shall be made by Landlord to Tenant in a written notice (hereinafter called the "First Offer Notice") which offer shall designate the space being offered and shall specify the terms which Landlord intends to offer with respect to any such Offered Space. Tenant may accept the offer set forth in the First Offer Notice by delivering to Landlord an unconditional acceptance (hereinafter called "Tenant's Notice") of such offer within five (5) business days after delivery by Landlord of the Offer Notice to Tenant. Time shall be of the essence with respect to the giving of Tenant's Notice. If Tenant does not accept (or fails to timely accept) an offer made by Landlord pursuant to the provisions of this Paragraph 15 with respect to the Offered Space designated in the First Offer Notice, Landlord shall be under no further obligation with respect to such space by reason of this Paragraph 15.

(d) Tenant must accept all Offered Space offered by Landlord at any one time if it desires to accept any of such Offered Space and may not exercise its right with respect to only part of such space. In addition, if Landlord desires to lease more than just the Offered Space to one tenant, Landlord may offer to Tenant pursuant to the terms hereof all such space which Landlord desires to lease, and Tenant must exercise its rights hereunder with respect to all such space and may not insist on receiving an offer for just the Offered Space.

(e) If Tenant at any time declines any Offered Space offered by Landlord, Tenant shall be deemed to have irrevocably waived all further rights under this Paragraph 15, and Landlord shall be free to lease the Offered Space on terms which are not materially less favorable to Landlord than those set forth in the Offer Notice (it being understood and agreed that "materially less favorable" shall mean that the net present value of the material economic terms of the new transaction is more than ten percent (10%) less than the net present value of the material economic terms set forth in the Offer Notice); provided, however, in the event Landlord desires to enter into a lease on terms which are materially less favorable to Landlord than the terms set forth in the Offer Notice, then Landlord shall once again provide an Offer Notice to Tenant and give Tenant the right to lease such space on such new terms, all in accordance with the terms and procedures set forth hereinabove.

16. Notwithstanding anything to the contrary contained in the Lease, the following paragraph is added as a third paragraph to Article 11 of the Lease:

"Notwithstanding anything to the contrary in this Article 11 or in this Lease, Tenant hereby agrees to indemnify, protect, defend and hold harmless Landlord and its designated property management company, and their respective partners, members, affiliates and subsidiaries, and all of their respective officers, directors, shareholders, employees, servants, partners, representatives, insurers and agents (collectively, "Landlord Indemnities") for, from and against all liabilities, claims, fines, penalties, costs, damages or

injuries to persons, damages to property, losses, liens, causes of action, suits, judgments and expenses (including court costs, attorneys' fees and costs of investigation), of any nature, kind or description of any person or entity, directly or indirectly arising out of, caused by, or resulting from (in whole or part) (1) Tenant's construction of or use, occupancy or enjoyment of the Premises, (2) any activity, work or other things done, permitted or suffered by Tenant and its agents and employees in or about the Premises, (3) any breach or default in the performance of any of Tenant's obligations under this Lease, (4) any act, omission, negligence or willful misconduct of Tenant or any of its agents, contractors, employees, business invitees or licensees, or (5) any damage to Tenant's property, or the property of Tenant's agents, employees, contractors, business invitees or licensees, located in or about the Premises (collectively, "Liabilities"); BUT NOT TO THE EXTENT SUCH LIABILITIES ARE CAUSED BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY SUCH LANDLORD INDEMNITEE. This third paragraph of Article 11 shall survive the expiration or earlier termination of this Lease."

17. Notwithstanding anything to the contrary contained in the Lease, Landlord's address for notice shall be:

> SM Brell, L.P.
> c/o CB Richard Ellis, Inc.
> 401 Edwards, Suite 930
> Shreveport, Louisiana 71101
> Attention: Property Manager – Louisiana Tower

with a copy to:

> SM Brell, L.P.
> c/o Koll Bren Schreiber Realty Advisors, Inc.
> 4343 Von Karman Avenue
> Newport Beach, California 92660
> Attention: Samuel DePoy

18. Notwithstanding anything to the contrary contained herein to the contrary, it is understood and agreed that (i) the Expansion Space is currently occupied by an existing tenant under an existing lease, (ii) the delivery of the Expansion Space is subject to and conditioned upon the vacation and surrender of the Expansion Space by the existing tenant.

19. With the exception of those terms and conditions specifically modified and amended herein, the herein referenced Lease shall remain in full force and effect in accordance with all its terms and conditions. In the event of any conflict between the terms and provisions of this Third Amendment and the terms and provisions of the Lease, the terms and provisions of this Third Amendment shall supersede and control. Landlord and Tenant agree that

24434488.3 33001 1457C 01714899

6

notwithstanding anything herein to the contrary, in the event Landlord fails to tender possession of the Expansion Space to Tenant on or before December 31, 2001, Tenant shall thereafter have the right to terminate this Third Amendment at any time prior to the time that Landlord tenders possession of the Expansion Space to Tenant by providing Landlord with written notice of Tenant's election to so terminate this Third Amendment, and in the event of such termination, the terms of this Third Amendment shall automatically be deemed to be null and void and of no force or effect and the Lease shall continue in full force and effect without any of the modifications and amendments set forth in this Third Amendment.

20. This Third Amendment may be executed in any number of counterparts, each of which shall be deemed an original, and all of such counterparts shall constitute one agreement. To facilitate execution of this Third Amendment, the parties may execute and exchange facsimile counterparts of the signature pages and facsimile counterparts shall serve as originals.

[Signatures on following page]

SIGNATURE PAGE TO
THIRD AMENDMENT TO LEASE AGREEMENT
BY AND BETWEEN
SM BRELL, L.P., AS LANDLORD,
AND
SKLAR EXPLORATION COMPANY, L.L.C., AS TENANT

IN WITNESS WHEREOF, Landlord and Tenant, acting herein by duly authorized individuals, have caused these presents to be executed as of the Effective Date set forth herein.

**LANDLORD:**

**SM BRELL, L.P.,**
**a California limited partnership**

By:     Koll Bren Schreiber Realty Advisors, Inc.,
        a Delaware corporation, as agent

By: _____
        Samuel DePoy, Vice President

Date: _____3·30___, 2001

**TENANT**

**SKLAR EXPLORATION COMPANY, L.L.C.,**
**a Louisiana limited liability company**

By: _____
Name: _William T. Gates_____
Title: _Vice President_____

Date: _March 30th___, 2001

24434488.3 33001 843C 01714899                              8

# EXHIBIT A-1

## ORIGINAL PREMISES
### (cross-hatched)



# EXHIBIT A-2

## SUITE 1615 SPACE
### (cross-hatched)



LOUISIANA TOWER

ARCHITECTURAL PLAN
SHREVEPORT, LOUISIANA
12-14-89

# EXHIBIT A-3

## SUITE 815 SPACE
### (cross-hatched)



EXHIBIT B

## EXPANSION SPACE
### (cross-hatched)



FLOOR 16

SCALE

LOUISIANA TOWER

ARCHITECTURAL PLAN
SHREVEPORT, LOUISIANA
12-14-89

## EXHIBIT C

## WORK LETTER

**THIS WORK LETTER** is attached as <u>Exhibit C</u> to the Third Amendment to Lease Agreement between SM Brell, L.P., as Landlord, and Sklar Exploration Company, L.L.C., as Tenant, and constitutes the further agreement between Landlord and Tenant as follows:

(a)   <u>Tenant Improvements; Allowance</u>.   The leasehold improvements to be constructed by Tenant in the Expansion Space (the "<u>Tenant Improvements</u>"), at Tenant's sole cost and expense (except for the hereinbelow described Allowance), shall be constructed in accordance with the Final Plans to be submitted by Tenant and reviewed and approved by Landlord in accordance with the provisions of Paragraph (b) of this Exhibit C.

Landlord shall have no obligation to construct or to pay for the construction of the Tenant Improvements.  However, Landlord agrees to contribute toward the cost of construction of the Tenant Improvements the cash sum of up to Ninety-Four Thousand Two Hundred Thirty-One and No/100 Dollars (94,231.00) (the "Allowance").  The Allowance will be reduced by any consulting or architectural fees incurred by Landlord.  The construction costs that may be reimbursed from the Allowance shall include only the following:  costs of labor, equipment, supplies and materials furnished for construction of the Tenant Improvements; governmental fees and charges for required permits, plan checks, and inspections for the Tenant Improvements; charges of Tenant's design professionals; and charges of Landlord's design professionals for review of plans and monitoring of construction or installation of the Tenant Improvements.  No other costs, fees or expenses of the Tenant Improvements shall be reimbursable out of the Allowance.  Notwithstanding the foregoing to the contrary, Tenant shall be entitled to have reimbursed from the Allowance the out-of-pocket costs paid by Tenant to third party contractors (and not to any employees, or independent contractors, then under the employ of or then performing contract work for Tenant) to move Tenant's property to the Expansion Premises and to install phone and data wiring, cabling and associated equipment within the Expansion Space ("Eligible Reimbursement Costs"); provided, however, (i) any such reimbursement from the Allowance for such Eligible Reimbursement Costs shall in all events be limited Seventeen Thousand Five Hundred Seventy-Eight and No/100 Dollars ($17,578.00), (ii) with respect to any request by Tenant to be reimbursed from the Allowance for Eligible Reimbursement Costs, Landlord shall not be required to disburse any of the Allowance for any such Eligible Reimbursement Costs unless Tenant delivers to Landlord a written request for such reimbursement, together with copies of paid invoices reflecting the payment by Tenant of such Eligible Reimbursement Costs.

Landlord's payment of the Allowance, or such portion thereof as Tenant may be entitled to, shall be made within thirty (30) days after each and all of the following conditions shall have been satisfied: (i) the Tenant Improvements shall have been completed in accordance with the Final Plans; (ii) Tenant shall have delivered to Landlord satisfactory evidence that all mechanics' lien rights of all contractors, suppliers, subcontractors, or materialmen furnishing labor, supplies or materials in the construction or installation of the Tenant Improvements have been unconditionally waived, released, or extinguished; (iii) Tenant shall have delivered to Landlord paid receipts or other written evidence satisfactorily substantiating the actual amount of the construction costs of the Tenant Improvements; (iv) Tenant shall have delivered to Landlord a final certificate of occupancy for the Premises; (v) Tenant shall not then be in default of any of the

provisions of the Lease; and (vi) Tenant shall have occupied and opened for business at the Premises. Notwithstanding anything herein to the contrary, in no event shall Landlord have any obligation to disburse any portion of the Allowance that remains unpaid as of the date ninety (90) days following the Expansion Space Commencement Date (the "Outside Date") and for which Landlord has not, on or before the Outside Date, received a written request for payment of the any such remaining portion of the Allowance together with the required supporting deliveries applicable to any such written request.

(b)       Preparation and Review of Plans for Tenant Improvements.  Tenant, using licensed architectural and engineering firms selected by Tenant and approved by Landlord shall prepare or cause to be prepared and submitted, concurrently, and in each case by receipted courier or delivery service, to Landlord's construction representative, CB Richard Ellis, Inc., 401 Edwards, Suite 930, Shreveport, Louisiana 77701, Attn:  Mr. Mike Demler, and  to Landlord's offices at 4343 Von Karman Avenue, First Floor, Newport Beach, CA 92660, Attn:  Mr. Samuel DePoy, for Landlord's review, complete and final architectural and engineering drawings and specifications (hereinafter collectively referred to as the "Final Plans") setting forth the Tenant Improvements desired by Tenant.

Each set of proposed Final Plans furnished by Tenant shall include at least two (2) sets of prints.  The Final Plans shall be compatible with the design, construction, and equipment of the Building, and shall be capable of logical measurement and construction.  Unless Landlord shall otherwise agree in writing, the Final Plans shall be signed/stamped by Tenant's architect or engineer, as applicable, and shall include (to the extent relevant or applicable) such additional plans reasonably requested by Landlord related to the Tenant Improvements, including, without limitation, any and all additional plans related to Tenant's specific use of the Premises, or as may be required by local city ordinance or building code.

Tenant shall submit all Final Plans concurrently to Landlord's construction representative and offices, as designated above, for Landlord's review and approval.  Landlord shall have ten (10) business days after Landlord's receipt of the proposed Final Plans to review the same and notify Tenant in writing of any comments or required changes, or to otherwise give its approval or disapproval of such proposed Final Plans.  If Landlord fails to give written comments to or approve the Final Plans within such ten (10) business day period, then Landlord shall be deemed to have accepted the Final Plans as submitted.  Tenant shall have ten (10) business days following its receipt of Landlord's comments and objections to redraw the proposed Final Plans in compliance with Landlord's request and to resubmit the same for Landlord's final review and approval within ten (10) business days of Landlord's receipt of such revised plans.  Such process shall be repeated as necessary until final approval by Landlord of the proposed Final Plans has been obtained.  Landlord may at any time by written notice given in accordance with the notice provisions of the Lease change the name and/or address of the designated Landlord's construction representative to receive plans delivered by Tenant to Landlord.  In the event that Tenant disagrees with any of the changes to the proposed Final Plans required by Landlord, then Landlord and Tenant shall consult with respect thereto and each party shall use all reasonable efforts to promptly resolve any disputed elements of such proposed Final Plans.  If such Final Plans are not resolved by Landlord and Tenant, then Tenant shall accept Landlord's final changes to the proposed Final Plans.  For purposes hereof, "business days" shall be all calendar days except Saturdays and Sundays and holidays observed by national banks in the State in which the Premises are situated.

Notwithstanding the preceding provisions of this Paragraph (b), under no circumstances whatsoever shall (i) any combustible materials be utilized above finished ceiling or in any concealed space, (ii) any structural load, temporary or permanent, be placed or exerted on any part of the Building without the prior

24434488.3 33001 843C 01714899                              2

written approval of Landlord, or (iii) any holes be cut or drilled in any part of the roof or other portion of the Building shell without the prior written approval of Landlord.

In the event that Tenant proposes any changes to the Final Plans (or any portion thereof) after the same have been approved by Landlord, Landlord shall not unreasonably withhold its consent to any such changes, provided the changes do not, in Landlord's reasonable opinion, adversely affect the Building structure, systems, or equipment, or the external appearance of the Premises.

As soon as the Final Plans (or a portion thereof sufficient to permit commencement of construction or installation of the Tenant Improvements, if Tenant elects to proceed with a "fast track" construction) are mutually agreed upon, Tenant shall use diligent efforts to obtain all required permits, authorizations, and licenses from appropriate governmental authorities for construction of the Tenant Improvements (or such portion thereof, as applicable). Tenant shall be solely responsible for obtaining any business or other license or permit required for the conduct of its business at the Premises.

(c)      Construction of the Tenant Improvements. Construction or installation of the Tenant Improvements shall be performed by a licensed general contractor or contractors selected by Tenant and approved by Landlord, such approval not to be unreasonably withheld or delayed (the "Tenant's Contractor," whether one or more), pursuant to a written construction contract negotiated and entered into by and between the Tenant's Contractor and Tenant and approved by Landlord. Each such contract shall (i) obligate Tenant's Contractor to comply with all rules and regulations of Landlord relating to construction activities in the Building, (ii) name Landlord as an additional indemnitee under the provisions of the contract whereby the Tenant's Contractor holds Tenant harmless from and against any and all claims, damages, losses, liabilities and expenses arising out of or resulting from the performance of such work, (iii) name Landlord as a beneficiary of (and a party entitled to enforce) all of the warranties of the Tenant's Contractor with respect to the work performed thereunder and the obligation of the Tenant's Contractor to replace defective materials and correct defective workmanship for a period of not less than one (1) year following final completion of the work under such contract, (iv) evidence the agreement of the Tenant's Contractor that the provisions of the Lease shall control over the provisions of the contract with respect to distribution or use of insurance proceeds, in the event of a casualty during construction, and (v) evidence the waiver and release by the Tenant's Contractor of any lien or right to assert a lien on all or any portion of the fee estate of Landlord in and to the Building as a result of the work performed or to be performed thereunder (and obligating the Tenant's Contractor to include a substantially similar release and waiver provision in all subcontracts and purchase orders entered under or pursuant to the contract).

Tenant acknowledges and understands that all roof penetrations involved in the construction of the Tenant Improvements must be performed by the Landlord's Building roofing contractor. All costs, fees and expenses incurred with such contractor in performing such work shall be a cost of the Tenant Improvements, payable in accordance with the provisions of this Exhibit C. Tenant or Tenant's Contractor shall be responsible for all water, gas, electricity, sewer or other utilities used or consumed at the Premises during the construction of the Tenant Improvements.

Tenant specifically agrees to carry, or cause the Tenant's Contractor to carry, during all such times as the Tenant's work is being performed, (a) builder's risk completed value insurance on the Tenant Improvements, in an amount not less than the full replacement cost of the Tenant Improvements, (b) a policy of insurance covering commercial general liability, in an amount not less than One Million Dollars ($1,000,000.00), combined single limit for bodily injury and property damage per occurrence (and

24434488.3  33001 843C 01714899                                    3

combined single limit coverage of $2,000,000.00 in the aggregate), and automobile liability coverage (including owned, non-owned and hired vehicles) in an amount not less than One Million Dollars ($1,000,000.00) combined single limit (each person, each accident), and endorsed to show Landlord as an additional insured, and (c) workers' compensation insurance as required by law, endorsed to show a waiver of subrogation by the insurer to any claim the Tenant's Contractor may have against Landlord. Tenant shall not commence construction of the Tenant Improvements until Landlord has issued to Tenant a written authorization to proceed with construction after Tenant has delivered to Landlord's construction representative (i) certificates of the insurance policies described above, (ii) copies of all permits required for construction of the Tenant Improvements and a copy of the permitted Final Plans as approved by the appropriate governmental agency, and (iii) a copy of each signed construction contract for the Tenant Improvements (a copy of each subsequently signed contract shall be forwarded to Landlord's construction representative without request or demand, promptly after execution thereof and prior to the performance of any work thereunder). All of the construction work shall be the responsibility of and supervised by Tenant.

     (d)    <u>Requirements for Tenant's Work</u>. All of Tenant's construction with respect to the Premises shall be performed in substantial compliance with this Exhibit C and the Final Plans therefor previously approved in writing by Landlord (and any changes thereto approved by Landlord as herein provided), and in a good and workmanlike manner, utilizing only new materials. All such work shall be performed by Tenant in strict compliance with all applicable building codes, regulations and all other legal requirements. All materials utilized in the construction of Tenant's work must be confined to within the Premises. All trash and construction debris not located wholly within the Premises must be removed each day from the Project at the sole cost and expense of Tenant. Landlord shall have the right at all times to monitor the work for compliance with the requirements of this Exhibit C. If Landlord determines that any such requirements are not being strictly complied with, Landlord may immediately require the cessation of all work being performed in or around the Premises or the Building until such time as Landlord is satisfied that the applicable requirements will be observed. Any approval given by Landlord with respect to Tenant's construction or the Final Plans therefor, and/or any monitoring of Tenant's work by Landlord, shall not make Landlord liable or responsible in any way for the condition, quality or function of such matters or constitute any undertaking, warranty or representation by Landlord with respect to any of such matters. So long as Landlord reviews and responds to the plan submissions to Landlord as provided in this Exhibit C, no delays in plan approval, and no delays in construction of the Tenant Improvements, shall delay the Expansion Space Commencement Date of the Lease.

     (e)    <u>No Liens; Indemnification</u>. Tenant shall have no authority to place any lien upon the Premises, or the Building, or any portion thereof or interest therein, nor shall Tenant have any authority in any way to bind Landlord, and any attempt to do so shall be void and of no effect. If, because of any actual or alleged act or omission of Tenant, or Tenant's Contractor, or any subcontractors or materialmen, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Premises, the Building, or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its sole cost and expense, cause the same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in any event prior to the foreclosure thereof. With respect to the contract for labor or materials for construction of the Tenant Improvements, Tenant acts as principal and not as the agent of Landlord. Landlord expressly disclaims liability for the cost of labor performed for or supplies or materials furnished to Tenant. Landlord may post one or more "notices of non-responsibility" for Tenant's work on the Building. No contractor of Tenant is intended to be a third-party beneficiary with respect to the

Allowance, or the agreement of Landlord to make such Allowance available for payment of or reimbursement for the costs of construction of the Tenant Improvements. Tenant agrees to indemnify, defend and hold Landlord, the Premises and the Building, harmless from all claims (including all costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employees, contractor, subcontractors, suppliers, materialmen, architects, designers, surveyors, engineers, consultants, laborers, or invitees, or arising from any bodily injury or property damage occurring or alleged to have occurred incident to any of the work to be performed by Tenant or its contractors or subcontractors with respect to the Premises; provided, however, such indemnification, defense and hold harmless obligation of Tenant shall not extend to or cover any such claims to the extent such claims arise out of the negligence or willful misconduct of Landlord. Any default by Tenant under this Exhibit C shall constitute a Default by Tenant under the Lease for all purposes; provided, however, Tenant shall be entitled to the applicable notice and cure periods provided in the Lease prior to a default hereunder constituting a Default under the Lease. Additionally, any approval given by Landlord with respect to the Tenant Improvements or the Final Plans and/or any monitoring of the construction of the Tenant Improvements by Landlord shall not make Landlord liable or responsible in any way for the condition, quality or function of such matters or constitute any undertaking, warranty or representation by Landlord with respect to any such matters .

## EXHIBIT D

## RIGHT OF FIRST OFFER SPACE
### (cross-hatched)



LOUISIANA TOWER

ARCHITECTURAL PLAN
SHREVEPORT, LOUISIANA
12-14-99

FLOOR 16



## FOURTH AMENDMENT TO LEASE

THIS FOURTH AMENDMENT TO LEASE (the "Amendment") made and entered into as of this 19th day of July, 2004, by and between **LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, LIMITED PARTNERSHIP**, successor-in-interest to SM Brell, L.P., ("Landlord"), and **SKLAR EXPLORATION COMPANY, L.L.C.**, ("Tenant").

A.      Landlord or its predecessor in interest, and Tenant or its predecessor in interest, have heretofore entered into that certain lease dated the 8th day of February 1999, for the premises described as Suite No. 1601 initially containing approximately 4,860 rentable square feet (the "Premises"), in the building known as Louisiana Tower the address of which is 401 Edwards Street, Shreveport, Louisiana, 71101 which lease has been amendment by Lease Amendment No.1 dated, April 3, 2000; Lease Amendment No. 2 dated, October 17, 2000; and, Third Amendment to Lease Agreement dated March 30, 2001.

B.      Tenant has requested that additional space in the Property consisting of approximately 703 square feet of rentable space shown as Suite 1615 on Exhibit A, attached hereto and incorporated herein (the "Expansion Space") be added to the Premises, and that the lease be appropriately amended, and Landlord is willing to do the same, all on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.      **Expansion.**  Commencing on August 1, 2004 (the "Commencement Date"), the Expansion Space shall be added to and become part of the Premises, subject to all of the terms and conditions of the Lease currently in effect, except as expressly modified herein.

2.      **Term.**   Thirty-one (31) months, commencing August 1, 2004 and ending on February 28, 2007.

3.      **Termination.**  Landlord shall have the right to terminate this agreement for the Expansion Space by providing at least thirty (30) days prior written notice of such termination.

4.      **Rentals and Other Charges.**  On the Commencement Date, the minimum or base monthly rent under the Lease for the Expansion Space alone shall be $375.00 and the Tenant's minimum or base monthly rental for the entire Premises, including the Expansion Space, shall be $13,322.44.

5.      **Possession.**  Tenant has inspected the Expansion Space and agrees to accept the same "AS IS", "WHERE IS" condition without any agreements, representations, understandings or obligations on the part of the Landlord to perform any alterations, repairs or improvements.

6.      **Use.**  Tenant agrees to use the Expansion Space strictly for the storage of ordinary office materials and agrees not to house employees in the Expansion Space.  Stored items must be no closer than 18 inches (or current governing code) from ceiling.  Shelving may not be affixed to walls and Tenant will take reasonable care to protect the finishes in the Premises from damage.  Cleaning services will not be provided by the Landlord.

7. **Other.** Except as modified by this proposal, all other terms and conditions of the Tenant's current lease at Louisiana Tower will remain in full force and effect.

8. **Real Estate Brokers.** Tenant warrants that it has had no dealings with any broker or agent other than PM Realty Group, Inc., that would entitle any other broker to a commission (the "Broker") in connection with the negotiation or execution of this Amendment, and Tenant agrees to indemnify Landlord and hold Landlord harmless from and against any and all costs, expenses or liability for commissions or other compensations or charges claimed by any broker or agent, other than the Broker, with respect to this Amendment, as a result of dealing with Tenant.

9. **Entire Agreement.** This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. As extended and amended herein, the Lease between the parties shall remain in full force and effect. In case of inconsistency between the provisions of the Lease and this Amendment, the latter provisions shall govern and control.

10. **Not an Offer.** This Agreement shall not be binding until executed and delivered by both parties.

IN WITNESS WHEREOF, the Landlord and Tenant have duly executed this Amendment as of the day and year first above written.

**LANDLORD:**

LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, LIMITED PARTNERSHIP, a New Mexico limited partnership

By:   BGK LOUISIANA-EDWARDS TOWER LLC, a New Mexico limited liability company, its general partner

By:   BGK EQUITIES III LLC, a New Mexico limited liability company, its sole member

By:   _____
      Cheryl S. Willoughby
Its:  Executive Vice President an Chief Operating Officer

**TENANT:**

SKLAR EXPLORATION COMPANY, L.L.C., a Louisiana limited liability company

By:   _____
      William T. Gates
Its:  Vice President

## EXHIBIT A

**(Floor Plan showing the Expansion Space labeled as Suite 1615)**



Approved by V.P. _CLW_ 3/16/06
Database Entry _____ 3/16/06
Filed _____

## FIFTH AMENDMENT TO LEASE

THE FIFTH AMENDMENT TO LEASE (the "Fifth Amendment") is made and entered into as of March 2, 2006, by and between **LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P.,** a New Mexico limited partnership ("Landlord"), successor in interest to SM Brell, L.P., a California limited partnership, and **SKLAR EXPLORATION COMPANY** ("Tenant").

A.     Landlord or its predecessor in interest, and Tenant or its predecessor in interest, have heretofore entered into that certain lease dated the 8TH day of February 1999, for the premises described as Suite 1601 initially containing approximately 11,218 rentable square feet (the "Premises"), in the building known as Louisiana Tower, the address of which is 401 Edwards Street, Shreveport, Louisiana, 71101 which lease has been amended by the First Amendment to Lease dated April 3, 2000, the Second Amendment to Lease dated October 17, 2000, the Third Amendment to Lease dated March 30, 2001 and the Fourth Amendment to Lease dated July 19, 2004.

B.     Tenant has requested that additional space in the Property consisting of approximately 2190 square feet of rentable space shown as Suite 1620 on Exhibit A, attached hereto and incorporated herein (the "Expansion Space") be added to the Premises, and that the lease be appropriately amended, and Landlord is willing to do the same, all on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.     **Expansion.** Commencing on May 1, 2006 (the "Commencement Date"), the Expansion Space shall be added to and become part of the Premises, subject to all of the terms and conditions of the Lease currently in effect, except as expressly modified herein.

2.     **Extension of Term.** The Lease will continue in effect for an additional five years commencing on March 1, 2007, (the "Extension Date"), and ending on February 28, 2012, under the terms set out in the Lease, as amended in this Fifth Amendment.

3.     **Base Rental.** Effective as of May 1, 2006 and continuing throughout the Extended Term, the Base Rental for the Premises shall be as follows:

| Term | Ste 1601 | Ste 1620 | Total Monthly Base Rent |
|------|----------|----------|-------------------------|
| 05/01/06-02/28/07 | $14,162.73 | $2,098.75 | $16,261.48 |
| 03/01/07-02/28/08 | $13,408.00 | 0 | $13,408.00 |
| 03/01/08-02/28/09 | $13,687.33 | 0 | $13,687.33 |
| 3/01/09-02/28/10 | $13,966.67 | 0 | $13,966.67 |
| 3/01/10-02/28/11 | $14,246.00 | 0 | $14,246.00 |
| 3/01/11-02/28/12 | $14,525.33 | 0 | $14,525.33 |

4.   **Improvements to Premises.** Tenant shall accept the Leased Premises "as is" at the beginning of the Renewal Term, and Landlord shall not be obligated to make any improvements or alterations to the Premises. Tenant agrees not to place vinyl wall coverings on any perimeter walls.   If Tenant elects to improve the space, Tenant is required to obtain Landlord's approval in writing. Landlord shall have no other obligation to refurbish or otherwise improve such space.

5.   **Operating Expenses and Taxes.**   Commencing upon execution of this Amendment and thereafter for the remainder of the lease, Tenant shall pay Landlord Tenant's Prorata Share of the amount by which the Operating Expenses and Taxes for each calendar year and fractional calendar year during the term exceed the Operating Expenses and Taxes as set out in Section 6 of the Lease Agreement, except that (i) the Tenant's Prorata Share shall be increased to 3.904916% based on 13,408 square feet of Rentable Area in the Premises and (ii) the Tenant's Base Year will be changed to 2007 effective March 1, 2007.

6.   **No Disclosure.** Tenant agrees that it shall not disclose any matters set forth in this Agreement or disseminate or distribute any information concerning the terms, details or conditions hereof to any person, firm or entity without obtaining the express written consent of Landlord.

7.   **Parking.** With respect to the Additional Period, the Tenant currently leases 18 parking spaces per their current lease.   Tenant will continue to have the option to continue to lease the 18 parking spaces subject to the terms and conditions as set out in Parking Agreement to the Lease.

8.   **Real Estate Brokers.**   Tenant warrants that it has had no dealings with any broker or agent than Latter & Blum Property Management, Inc. (the "Broker"), that would entitle any other broker to a commission in connection with the negotiation or execution of this Amendment, and Tenant agrees to indemnify Landlord and hold Landlord harmless from and against any and all costs, expenses or liability for commissions or other compensations or charges claimed by any broker or agent, other than the Broker, with respect to this Amendment, as a result of dealing with Tenant. Landlord has agreed to pay the fees of the broker under the terms of a separate agreement.

9.   **Entire Agreement.**   This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements.   As amended herein, the Lease between the parties shall remain in full force and effect.   In case of inconsistency between the provisions of the Lease and this Amendment, the latter provisions shall govern and control.

10.   **Not an Offer.** This Agreement shall not be binding until executed and delivered by both parties.

*(SIGNATURE PAGE FOLLOWS)*

SIGNATURE PAGE TO FIFTH AMENDMENT TO LEASE AGREEMENT
BY AND BETWEEN LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P.,
AS LANDLORD AND SKLAR EXPLORATION COMPANY, L.L.C., AS TENANT

IN WITNESS WHEREOF, the parties hereto have executed this Fifth Amendment of the respective dates set forth below, to be effective, however, as of the day and year as first above written.

**LANDLORD:**

LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES LIMITED PARTNERSHIP, a New Mexico limited partnership

By: BGK LOUISIANA-EDWARDS TOWER LLC, a New Mexico limited liability company, its general partner

By: _____
    Cheryl S. Willoughby
Its:  Executive Vice President and Chief Operating Officer

Date: _____3/16/06_____

**TENANT:**

SKLAR EXPLORATION COMPANY, L.L.C., a Louisiana limited liability company

By: _____
    William T. Gates
It's: _____
    Vice President
Date: _____3/13/06_____



LOUISIANA TOWER

MARKETING PLAN
SHREVEPORT, LOUISIANA
9-18-04

OCCUPIED    VACANT    OPTION OR PREF.

SUITE 1620
DELTA-T
2,190 RSF

SUITE 1615
SKLAR
703 RSF

SUITE 1605
VACANT
1,250 RSF

SUITE 1601
SKLAR
11,221 RSF

FLOOR 16

SCALE

Approved by EVP _C.Lee 11/29/07_
Database Entry _TM 12/4/07_

# SIXTH AMENDMENT TO LEASE

THE SIXTH AMENDMENT TO LEASE (the "Sixth Amendment") is made and entered into as of November 21ˢᵗ, 2007, by and between **LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P.,** a New Mexico limited partnership ("Landlord"), successor in interest to SM Brell, L.P., a California limited partnership, and **SKLAR EXPLORATION COMPANY** ("Tenant").

A.     Landlord or its predecessor in interest, and Tenant or its predecessor in interest, have heretofore entered into that certain lease dated the 8ᵀᴴ day of February 1999, for the premises described as Suite 1601 initially containing approximately 11,218 rentable square feet and Suite 1620 containing approximately 2,190 rentable square feet for a total of 13,408 rentable square feet (the "Premises"), in the building known as Louisiana Tower, the address of which is 401 Edwards Street, Shreveport, Louisiana, 71101 which lease has been amended by the First Amendment to Lease dated April 3, 2000, the Second Amendment to Lease dated October 17, 2000, the Third Amendment to Lease dated March 30, 2001, the Fourth Amendment to Lease dated July 19, 2004 and the Fifth Amendment to Lease dated March 12, 2006.

B     Tenant desires to surrender to Landlord a portion of the Premises known as Suite 1620, consisting of a total of approximately 2,190 rentable square feet of space shown on Exhibit A, attached hereto and incorporated herein ("Suite 1620"). In addition, Tenant has requested that additional space in the Property consisting of approximately 4,775 square feet of rentable space shown as suite 1100 on Exhibit B, attached hereto and incorporated herein ("Suite 1100") be added to the Premises, and that the lease be appropriately amended, and the Landlord is willing to do the same, all on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.     **Surrender of Suite 1620.** Effective November 30, 2007 Tenant shall surrender Suite 1620 consisting of 2,190 rentable square feet by 11:59 p.m. Suite 1620 shall be left in clean condition and good repair except for normal wear and tear.

2.     **Expansion.** Commencing December 1, 2007 (the Commencement Date), Tenant shall lease Suite 1100 consisting of 4,775 rentable square feet. Suite 1100 shall be added to and become part of the Premises, subject to all of the terms and conditions of the Lease currently in effect, except as expressly modified herein.

3.     **Base Rental.** Effective as of December 1, 2007 and continuing throughout the Extended Term, the Base Rental for the Premises shall be as follows:

| Term | Ste 1601 | Ste 1100 | Total Monthly Base Rent |
|------|----------|----------|-------------------------|
| 12/01/07-02/28/08 | $11,218.00 | $4,973.96 | $16,191.96 |
| 03/01/08-02/28/09 | $11,451.71 | $5,172.92 | $16,624.62 |
| 03/01/09-02/28/10 | $11,685.42 | $5,371.88 | $17,057.30 |
| 03/01/10-02/28/11 | $11,919.13 | $5,570.83 | $17,489.95 |
| 03/01/11-02/28/12 | $12,152.83 | $5,769.79 | $17,922.62 |

4.     **Improvements to Premises.** Tenant shall accept Suite 1100 in its "as is" condition except Landlord has agreed to provide Tenant with a tenant improvement allowance pursuant to Exhibit C.

5.     **Operating Expenses and Taxes.**   Effective upon Commencement Date and thereafter for the remainder of the lease, Tenant shall pay Landlord Tenant's Prorata Share of the amount by which the Operating Expenses and Taxes for each calendar year and fractional calendar year during the term exceed the Operating Expenses and Taxes as set out in Section 6 of the Lease Agreement, except that (i) the Tenant's Prorata Share for Suite 1100 will be 1.39% based on 4,775 square feet of Rentable Area and (ii) the Tenant's Base Year will be 2007.  Suite 1601 square footage and prorata share, consisting of 11,218 rentable square feet and 3.267105% respectively, shall remain unchanged.

6.     **No Disclosure.**  Tenant agrees that it shall not disclose any matters set forth in this Agreement or disseminate or distribute any information concerning the terms, details or conditions hereof to any person, firm or entity without obtaining the express written consent of Landlord.

7.     **Real Estate Brokers.**   Tenant warrants that it has had no dealings with any broker or agent than Latter & Blum Property Management, Inc. (the "Broker"), that would entitle any other broker to a commission in connection with the negotiation or execution of this Amendment, and Tenant agrees to indemnify Landlord and hold Landlord harmless from and against any and all costs, expenses or liability for commissions or other compensations or charges claimed by any broker or agent, other than the Broker, with respect to this Amendment, as a result of dealing with Tenant. Landlord has agreed to pay the fees of the broker under the terms of a separate agreement.

8.     **Entire Agreement.**   This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements.  As amended herein, the Lease between the parties shall remain in full force and effect.  In case of inconsistency between the provisions of the Lease and this Amendment, the latter provisions shall govern and control.

9.   **Prohibited Persons and Transactions.**  Tenant represents to Landlord that (i) neither Tenant nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked persons List) or under Executive Order 13224 (the "Executive Order") signed on September 24, 2001, and entitled "Blocking Property and Prohibiting transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, (ii) that Tenant's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the term of this Lease, Tenant shall comply with the Executive Order and with the Money Laundering Act.

10.   **Tenant's Funds**.  (a) Tenant has taken, and shall continue to take at all time following the execution of the Lease, as required by law to ensure that the funds used to make payments under this Lease are derived (i) from transactions that do not violate U.S. law or, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under U.S. law or to the extent such funds originate outside the United Sates, under the laws of the jurisdiction in which they originated.

(a)      Tenant (i) is not under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of Anti-Money Laundering Laws; (ii) has not been assessed civil or criminal penalties under any Anti-Money Laundering Laws; (ii) has not been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has not had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(b)      "Anti-Money Laundering Laws" means those laws, rules, regulations, orders and sanctions, state and federal, criminal and civil, that (a) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (b) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotic dealers or otherwise engaged in activities contrary to the interest of the United States; (c) require identification and documentation of the parties with whom a financial institution conducts business; or (d) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the Executive Order Number 13224 on Terrorism Financing (September 23, 2001), the Patriot Act, the Bank Secrecy Act, Pub.L. No. 91-508, 84 Stet. 1305 (1970), the Trading with the Enemy Act 50 U.S.C. Appx. Section 1 et seq., the International Emergency Economics Powers Act, 50 U.S.C. Section 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957, as amended.

(c)    "Patriot Act" means the USA PATRIOT Act of 2001, Pub.L.No. 107-56, together
with all laws, rules, regulations and orders issued in connection therewith.

11.    **Not an Offer.**  This Agreement shall not be binding until executed and delivered
by both parties.

*(SIGNATURE PAGE FOLLOWS)*

SIGNATURE PAGE TO SIXTH AMENDMENT TO LEASE AGREEMENT
BY AND BETWEEN LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P.,
AS LANDLORD AND SKLAR EXPLORATION COMPANY, L.L.C., AS TENANT

IN WITNESS WHEREOF, the parties hereto have executed this Sixth
Amendment of the respective dates set forth below, to be effective, however, as of the
day and year as first above written.

**LANDLORD:**

LOUISIANA-EDWARDS TOWER OPERATING
ASSOCIATES LIMITED PARTNERSHIP, a
New Mexico limited partnership

By:  BGK LOUISIANA-EDWARDS TOWER LLC, a
New Mexico limited liability company, its general partner

By: _____

Cheryl S. Willoughby

Its:   Executive Vice President and Chief Operating Officer

Date: _____Nov. 29, 2007_____

**TENANT:**

SKLAR EXPLORATION COMPANY, L.L.C., a
Louisiana limited liability company

By: _____

William T. Gates

It's: _____

Vice President

Date: ____Nov. 21, 2007_____

Exhibit "1"



LOUISIANA TOWER

MARKETING PLAN
SHREVEPORT, LOUISIANA
9-18-04

OCCUPIED      VACANT      OPTION
                          OR PREF.

SUITE 1601
SKLAR
11,221 RSF

SUITE 1605
VACANT
1,250 RSF

SUITE 1615
SKLAR
703 RSF

SUITE 1620
DELTA-T
2,190 RSF

FLOOR 16

SCALE
0  5  10  20  30  40

Exhibit "B"



# LOUISIANA TOWER

MARKETING PLAN
SHREVEPORT, LOUISIANA
4-7-04

OCCUPIED

VACANT

OPTION
OR PREF.

FLOOR 11

PLAN
NORTH TRUE
NORTH

SCALE
0  5  10  20  30  40

SUITE 1120
PALMER STORAGE
962 RSF

SUITE 1130
TEEKELL
2,207 RSF

SUITE 1104
LINCOLN
416 RSF

SUITE 1100

SUITE 1107
VACANT
1,504 RSF

SUITE 1109
DEFENSE LOGIST.
948 RSF

SUITE 1113
VACANT
318 RSF

SUITE 1111
WASHINGTON
2,322 RSF

EXHIBIT "C"

<u>TENANT FINISH: ALLOWANCE</u>

1.  Except as set forth in this Exhibit, Tenant accepts the Premises in its "as is" condition on the date that this Lease is entered into.

2.  Within <u>thirty (30)</u> days after the effective date of this Lease, Tenant shall deliver to Landlord for its approval a space plan depicting improvements to be installed in the Premises ("Space Plans"), which plans were or are to be prepared by <u>Tenant's</u> architect.

3.  Within <u>thirty (30)</u> days after Landlord's approval of the Space Plans, Tenant shall provide to Landlord for its approval final drawings (as hereinafter defined) prepared by <u>Tenant's</u> architect in accordance with the Space Plans showing all improvements (as hereinafter defined) that Tenant proposes to install in the Premises; such drawings shall include the partition layout, ceiling plan, electrical outlets and switches, telephone outlets, drawings for any modifications to the mechanical and plumbing systems of the Building, and detailed plans and specifications for the construction of the improvements called for under this Exhibit in accordance with all applicable governmental laws, codes, rules, and regulations.  Further, if any of Tenant's proposed construction  will affect the Building's heating, ventilation and air conditioning, electrical, mechanical, or plumbing systems, then the drawings pertaining thereto shall be prepared by the Building's engineer of record at Tenant's sole cost and expense. Tenant shall, at Landlord's request, sign and date the Drawings prepared by the Building's engineer to evidence its review and approval thereof. It is further agreed, that under no circumstances will waterproofed and vinyl wall covering be installed on any exterior wall in the Leased Premises.

4.  As used herein, "Drawings" shall mean the final drawings approved by Landlord, as amended from time to time by any approved changes thereto, and "Improvements" shall mean all improvements to be constructed in accordance with and as indicated on the Drawings.

5.  Landlord's approval of the Drawings shall not be unreasonably withheld, provided that (a)  they comply with all applicable governmental laws, codes, rules, and regulations, (b) said Drawings are sufficiently detailed to allow construction of the Improvements in a good and workmanlike manner, and (c) the Improvements depicted thereon conform to the rules and regulations promulgated from time to time by the Landlord for the construction of tenant improvements.  Approval by Landlord of the Drawings shall not be a representation or warranty of Landlord that such Drawings are adequate for any use, purpose, or condition, or that such Drawings comply with any applicable law or code, but shall merely be the consent of Landlord to the Drawings.

6.   All changes in the Drawings must receive the prior written approval of Landlord, and in the event of any such approved change and upon completion of the Improvements, Tenant shall furnish Landlord with an accurate, reproducible "as-built" plan of the Improvements as constructed, which plan shall be incorporated into the Drawings and the Lease by this reference for all purposes.

7.   After the Drawings have been approved, Tenant shall cause the tenant finish work to be performed in accordance with the Drawings.   The work shall be performed only by contractors and subcontractors approved in writing by Landlord, which approval shall not be unreasonably withheld.   All contractors and subcontractors shall be required to procure and maintain (a) insurance against such risks, in such amounts, and with such companies as Landlord may reasonably require and (b) payment and performance bonds covering the cost of the Improvements and otherwise reasonably satisfactory to Landlord.   Original certificates of insurance evidencing such policies, with paid receipts therefore, and copies of such bonds must be received by Landlord before the work is commenced.   The work shall be performed in a good and workmanlike manner that is free of defects and is in strict conformance with the Drawings, and shall be performed in such a manner and at such times as to maintain harmonious labor relations and not to interfere with or delay Tenant's other contractors, the operation of the Building, and the occupancy thereof by other tenants. All contractors and subcontractors shall contact Landlord and schedule time periods during which they may use Building facilities in connection with the work (e.g., elevators, excess electricity, etc.).

8.   If a delay in the performance of the work occurs (a) because of any change by Tenant to the Drawings, (b) because of any specification by Tenant of materials or installations in addition to or other than Landlord's standard finish-out materials, or (c) if Tenant, any contractor or subcontractor, or Tenant's agents otherwise delays completion of the work, then, notwithstanding any provision to the contrary in this Lease, Tenant's obligation to pay Rent hereunder shall commence on the scheduled Commencement Date.   If the Premises are not ready for occupancy and the Improvements are not substantially completed (as reasonably determined by Landlord) on the scheduled Commencement Date for any reason other than the reasons specified in the immediately preceding sentence, then the obligations of Landlord and Tenant shall continue in full force and Rent shall be abated until the date the Improvements are substantially completed, which date shall be the Commencement Date.

9.   Tenant shall bear the entire cost of performing the work (including, without limitation, design of the Improvements and preparation of the Drawings, permit fees, demolition of existing improvements in the Premises required in connection with the construction of the Improvements, costs of construction labor and materials, all fire and life safety control systems such as fire walls, sprinklers, halon, including piping, wiring and accessories installed within the Premises, electrical usage during construction, additional janitorial services, general tenant signage, code compliance requirements,   related taxes and insurance costs, contractor's fees, including but not limited to any fees based on general conditions,   all of which costs are herein collectively called the "Total Construction Costs") in excess of the Construction Allowance (as hereinafter defined).   Upon approval of the

Drawings and selection of a contractor, Tenant shall promptly (a) execute a work order agreement acceptable to Landlord which identifies such Drawings, itemizes the Total Construction Costs and sets forth the Construction Allowance, and (b) pay to Landlord the amount by which the estimated Total Construction Costs exceed the Construction Allowance. Without limitation, upon substantial completion of the Improvements and before Tenant occupies the Premises to conduct business therein, Tenant shall pay to Landlord an amount equal to the Total Construction Costs (as adjusted for any approved changes to the Drawings), less (i) the amount of the payments already made by Tenant and (ii) the amount of the Construction Allowance.

10. Landlord shall provide to Tenant a construction allowance ("Construction Allowance") equal to the lesser of (a) _$ 16,713 ($ 3.50/rentable square foot)_ or (b) the Total Construction Costs, as adjusted for any approved changes to the Drawings; however, if Tenant or its agent is managing the performance of the work, then Tenant shall not become entitled to full credit for the Construction Allowance until Tenant has caused to be delivered to Landlord (i) all invoices from contractors, subcontractors, and suppliers evidencing the cost of performing the work, together with lien waivers from such parties, and a consent of the surety to the finished Improvements (if applicable) and (ii) a certificate of occupancy from the appropriate governmental authority, if applicable, and evidence of governmental inspection and approval of the Improvements, if applicable. Tenant has one (1) year from the Commencement Date of the Lease to use the Construction Allowance. Any unused Construction Allowance after one (1) year shall be forfeited by the Tenant. Tenant may utilize an amount not to exceed $5,500 of the aforementioned Construction Allowance for the purchase of personal property to be used within the Premises (e.g. non-affixed furniture, computer equipment, telecommunications equipment).

11. Notwithstanding anything herein to the contrary, it shall be an Event of Default under this Lease if Tenant has not completed the Improvements on or before the Scheduled Commencement Date.

12. Should the Construction Allowance be utilized for paint and/or carpet exclusively, the requirements for Drawings will not apply. If any portion of the Construction Allowance involve construction within the Premises, Drawings must be provided by Tenant and approved by Landlord. Landlord must approve carpet and/or paint selection(s), contractor(s), and work schedule(s) with all terms and conditions with regard to installation contained herein applying.

Approved by EVP _Chu_ 4-18-08
Database Entry _pa_ 4|18|08

## SEVENTH AMENDMENT TO LEASE

THE SEVENTH AMENDMENT TO LEASE (the "Seventh Amendment") is made and entered into as of _April 18_, 2008, by and between **LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P.,** a New Mexico limited partnership ("Landlord"), successor in interest to SM Brell, L.P., a California limited partnership, and **SKLAR EXPLORATION COMPANY** ("Tenant").

A.     Landlord or its predecessor in interest, and Tenant or its predecessor in interest, have heretofore entered into that certain lease dated the 8th day of February 1999, for the premises described as Suite 1601 initially containing approximately 4,860 rentable square feet (the "Premises"), in the building known as Louisiana Tower, the address of which is 401 Edwards Street, Shreveport, Louisiana, 71101 which lease has been amended by the First Amendment to Lease dated April 3, 2000, the Second Amendment to Lease dated October 17, 2000, the Third Amendment to Lease dated March 30, 2001, the Fourth Amendment to Lease dated July 19, 2004, the Fifth Amendment to Lease dated March 12, 2006 and the Sixth Amendment to Lease dated November 21, 2007.

B     Tenant has requested that additional space in the Property consisting of approximately 4,402 square feet of rentable space shown as Suite 1120, Suite 1605 and Suite 1620 on Exhibit A, attached hereto and incorporated herein (the "Expansion Space") be added to the Premises, and that the lease be appropriately amended, and Landlord is willing to do the same, all on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.     **Expansion Space.**   Commencing May 1, 2008 (the "Commencement Date Number One"), Tenant shall lease a portion of the Expansion Space, Suite 1120, consisting of 962 rentable square feet.   Commencing July 1, 2008 (the "Commencement Date Number Two"), Tenant shall lease the remainder of the Expansion Space, Suite 1605, consisting of 1,250 rentable square feet, and Suite 1620, consisting of 2,190 rentable square feet.   The Expansion Space shall be added to and become part of the Premises, subject to all of the terms and conditions of the Lease currently in effect, except as expressly modified herein.

2.     **Base Rental.** Effective as of May 1, 2008 and continuing throughout the term of
the lease, the Base Rental for the Premises shall be as follows:

| Term | Ste 1601 | Ste 1100 | Ste 1120 | Ste 1605 | Ste 1620 | Total Mthly Base Rent |
|------|----------|----------|----------|----------|----------|-----------------------|
| 05/01/08-06/30/08 | $11,451.71 | $5,172.92 | $982.04 | $0.00 | $0.00 | $17,606.67 |
| 07/01/08-02/28/09 | $11,451.71 | $5,172.92 | $982.04 | $1,276.04 | $2,235.63 | $21,118.34 |
| 03/01/09-02/28/10 | $11,685.42 | $5,371.88 | $1,002.08 | $1,302.08 | $2,281.25 | $21,642.71 |
| 03/01/10-02/28/11 | $11,919.13 | $5,570.83 | $1,022.13 | $1,328.13 | $2,326.88 | $22,167.10 |
| 03/01/11-02/28/12 | $12,152.83 | $5,769.79 | $1,042.17 | $1,354.17 | $2,372.50 | $22,691.46 |

3.     **Improvements to Premises.** Tenant shall accept Suite 1120, Suite 1605 and Suite
1620 in their "as is" condition except Landlord has agreed to provide Tenant with a
tenant improvement allowance pursuant to Exhibit C.

4.     **Operating Expenses and Taxes.** Effective upon Commencement Date Number
One and Commencement Date Number Two and thereafter for the remainder of the lease,
Tenant shall pay Landlord Tenant's Prorata Share of the amount by which the Operating
Expenses and Taxes for each calendar year and fractional calendar year during the term
exceed the Operating Expenses and Taxes as set out in Section 6 of the Lease Agreement,
except that (i) the Tenant's Prorata Share for Suite 1120, Suite 1605 and Suite 1620 will
be 1.28% based on 4,402 square feet of Rentable Area and (ii) the Tenant's Base Year
will be 2008.

5.     **No Disclosure.** Tenant agrees that it shall not disclose any matters set forth in
this Agreement or disseminate or distribute any information concerning the terms, details
or conditions hereof to any person, firm or entity without obtaining the express written
consent of Landlord.

6.     **Real Estate Brokers.** Tenant warrants that it has had no dealings with any
broker or agent than Latter & Blum Property Management, Inc. (the "Broker"), that
would entitle any other broker to a commission in connection with the negotiation or
execution of this Amendment, and Tenant agrees to indemnify Landlord and hold
Landlord harmless from and against any and all costs, expenses or liability for
commissions or other compensations or charges claimed by any broker or agent, other
than the Broker, with respect to this Amendment, as a result of dealing with Tenant.
Landlord has agreed to pay the fees of the broker under the terms of a separate
agreement.

7.     **Entire Agreement.** This Amendment sets forth the entire agreement between
the parties with respect to the matters set forth herein. There have been no additional oral
or written representations or agreements. As amended herein, the Lease between the
parties shall remain in full force and effect. In case of inconsistency between the
provisions of the Lease and this Amendment, the latter provisions shall govern and
control.

8.    **Prohibited Persons and Transactions.**  Tenant represents to Landlord that (i) neither Tenant nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked persons List) or under Executive Order 13224 (the "Executive Order") signed on September 24, 2001, and entitled "Blocking Property and Prohibiting transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, (ii) that Tenant's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the term of this Lease, Tenant shall comply with the Executive Order and with the Money Laundering Act.

9.    **Tenant's Funds**.  (a) Tenant has taken, and shall continue to take at all time following the execution of the Lease, as required by law to ensure that the funds used to make payments under this Lease are derived (i) from transactions that do not violate U.S. law or, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under U.S. law or to the extent such funds originate outside the United Sates, under the laws of the jurisdiction in which they originated.

(a)    Tenant (i) is not under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of Anti-Money Laundering Laws; (ii) has not been assessed civil or criminal penalties under any Anti-Money Laundering Laws; (ii) has not been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has not had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(b)    "Anti-Money Laundering Laws" means those laws, rules, regulations, orders and sanctions, state and federal, criminal and civil, that (a) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (b) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotic dealers or otherwise engaged in activities contrary to the interest of the United States; (c) require identification and documentation of the parties with whom a financial institution conducts business; or (d) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the Executive Order Number 13224 on Terrorism Financing (September 23, 2001), the Patriot Act, the Bank Secrecy Act, Pub.L. No. 91-508, 84 Stet. 1305 (1970), the Trading with the Enemy Act 50 U.S.C. Appx. Section 1 et seq., the International Emergency Economics Powers Act, 50 U.S.C. Section 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957, as amended.

(c)    "Patriot Act" means the USA PATRIOT Act of 2001, Pub.L.No. 107-56, together with all laws, rules, regulations and orders issued in connection therewith.

10.   **Not an Offer.**  This Agreement shall not be binding until executed and delivered
by both parties.

*(SIGNATURE PAGE FOLLOWS)*

SIGNATURE PAGE TO SEVENTH AMENDMENT TO LEASE AGREEMENT
BY AND BETWEEN LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P.,
AS LANDLORD AND SKLAR EXPLORATION COMPANY, L.L.C., AS TENANT

IN WITNESS WHEREOF, the parties hereto have executed this Seventh Amendment of the respective dates set forth below, to be effective, however, as of the day and year as first above written.

**LANDLORD:**

LOUISIANA-EDWARDS TOWER OPERATING
ASSOCIATES LIMITED PARTNERSHIP, a
New Mexico limited partnership

By:  BGK LOUISIANA-EDWARDS TOWER LLC, a
New Mexico limited liability company, its general partner

By: _____
Cheryl S. Willoughby
Its:  Executive Vice President and Chief Operating Officer

Date: ___4|18|08_____

**TENANT:**

SKLAR EXPLORATION COMPANY, L.L.C., a
Louisiana limited liability company

By: _____
William T. Gates
It's: ___V.P.-_____
Vice President
Date: ___4/8/08_____

EXHIBIT A
EXPANSION SPACE
SUITE 1120, 1605, 1620



EXHIBIT "B"
Page 1

<u>TENANT IMPROVEMENTS: "AS IS"</u>

1.  Tenant hereby accepts the Expansion Space in it's "as-is" condition, and Landlord shall have no obligation to perform any improvements therein (including, without limitation, demolition of any improvements existing therein or construction of any tenant finish-or other improvements therein), and shall not be obligated to reimburse Tenant or provide an allowance for any costs related to the demolition or construction of improvements therein except Landlord will provide a Tenant Improvement Allowance not to exceed $50,000.00 to be used for the demolition, construction, and relocation costs associated with relocating the existing tenant from Suite 1605 to Suite 525.  These improvements are outlined below in Exhibit "B", Page 2.

2.  Landlord or its designee will contract with a contractor to perform the improvements described in Exhibit "B", Page 2 and to supervise the improvements, make disbursements required to be made, and act as a liaison between the contractor(s)/subcontractor(s) and coordinate the relationship between the Building, the Building's systems, and Suite 525.

EXHIBIT "B"
Page 2
RELOCATION PREMISES – SUITE 525



LOUISIANA TOWER
401 EDWARDS STREET
SHREVEPORT, LOUISIANA
7/18/03

## SCOPE OF WORK

1. Build out per plan on this page
2. Paint out complete with building standard paint
3. New carpet / base throughout suite with building standard carpet/base
4. 6 light fixtures
5. 14 duplex outlets
6. 6 telephone stub ups
7. New glass doors by elevator lobby
8. 4 foot wall with laminate top

Approved by EVP _Clw5/26/11_
Database Entry ___Dm 5|26|11

## EIGHTH AMENDMENT TO LEASE

THE EIGHTH AMENDMENT TO LEASE (the "Eighth Amendment") is made and entered into as of _May 26_, 20 _11_, by and between **LOUISIANA TOWER OPERATING LLC**, a Delaware limited liability company ("Landlord"), successor in interest to LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P., a New Mexico limited partnership, and **SKLAR EXPLORATION COMPANY, L.L.C.** ("Tenant").

A.    Landlord and Tenant entered into that certain lease dated February 8, 1999 ("Original Lease"), as amended by that certain Lease Amendment No. 1 dated April 3, 2000 ("First Amendment"), and that certain Lease Amendment No. 2 dated October 17, 2000 ("Second Amendment"), and that certain Third Amendment to Lease Agreement dated March 30, 2001 ("Third Amendment"), and that certain Fourth Amendment to Lease dated July 19, 2004 ("Fourth Amendment"), and that certain Fifth Amendment to Lease dated March 12, 2006 ("Fifth Amendment"), and that certain Sixth Amendment to Lease dated November 21, 2007 ("Sixth Amendment"), and that certain Seventh Amendment to Lease dated April 18, 2008 ("Seventh Amendment") (collectively the Original Lease, First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment and Seventh Amendment are referred to as the "Lease"), pursuant to which Landlord leased to Tenant certain premises in the building, Suite 1100, 1120, 1601, 1605, 1615 and 1620 (the "Premises"), known as the Louisiana Tower Office Building located at 401 Edwards Street, Shreveport, Louisiana 71101 (the "Building").

B    By this Eighth Amendment to Lease, Tenant desires to extend the term of the lease and surrender to Landlord a portion of the Premises, Suite 1100 and Suite 1120, consisting of a total of approximately 5,737 rentable square feet of space shown on Exhibit A, attached hereto and incorporated herein (the "Reduction Space") and that the Lease be appropriately amended, and the Landlord is willing to do the same, all on the terms and conditions hereinafter set forth. Upon execution of this Eighth Amendment, it with the Original Lease, First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment and Seventh Amendment to Lease thereafter are jointly the Lease;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.    **Surrender of Suite 1100 and Suite 1120.** Effective by 11:59 p.m., February 29, 2012, Tenant shall surrender the Reduction Space consisting of 5,737 rentable square feet. The Reduction Space shall be left in broom clean condition and good repair except for normal wear and tear.

2.    **Extended Term and Base Rent.** The Lease will continue in effect for an additional five (5) year period commencing March 1, 2012 and ending February 28, 2017. The base rent for the Premises shall be as follows:

| Term | Monthly Rent | Annual Rent |
|------|-----------|-----------|
| 03/01/12 – 02/28/13 | $18,253.99 | $219,047.88 |
| 03/01/13 – 02/28/14 | $18,574.01 | $222,888.12 |
| 03/01/14 – 02/28/15 | $18,894.03 | $226,728.36 |
| 03/01/15 – 02/29/16 | $19,214.05 | $230,568.60 |
| 03/01/16 – 02/28/17 | $19,534.07 | $234,408.84 |

3.    **Improvements to Premises.** Tenant shall accept the Premises in its "as is" condition except Landlord has agreed to provide Tenant with a tenant improvement allowance as outlined within "Exhibit B" herein. Landlord shall have no obligation to refurbish or otherwise improve any such space. Tenant agrees not to place vinyl wall coverings on any inside surfaces of all exterior walls.

4.      **Operating Expenses and Taxes.**  Effective March 1, 2012 and thereafter for the remainder of the lease, Tenant shall pay Landlord Tenant's Prorata Share of the amount by which the Operating Expenses and Taxes for each calendar year and fractional calendar year during the term for the Premises exceed the Operating Expenses and Taxes as set out in Section 6 of the Lease Agreement, except that (i) the Tenant's Prorata Share for the Premises will be .0447% based on 15,361 square feet of Rentable Area (ii) the Tenant's Base Year will be 2012 and (iii) there will be a cumulative cap on controllable operating expenses as outlined within Exhibit "D" herein.

5.      **Legal Description.**  The legal description for the Building is outlined within Exhibit "E" herein.

6.      **Parking.**  The parking agreement between Landlord and Tenant shall continue during the Eighth Amendment term as modified in accordance with the terms as set forth in the Parking Agreement dated February 8, 1999 and the Third Amendment to Lease Agreement dated March 30, 2001 except the Tenant will be allowed to have eight (8) additional parking spaces in the attached parking garage on a month-to-month basis. Therefore, Tenant will have 18 parking spaces guaranteed in the attached parking garage and 8 parking spaces on a month-to-month basis.  All 26 parking spaces will be charged market parking rates, plus applicable sales tax.

7.      **Brokerage.**  Landlord and Tenant each warrant to the other that it has not dealt with any broker or agent in connection with the negotiation or execution of this Lease except Landlord's Broker ( Latter & Blum Property Management, Inc. ).  Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, and other liability for commissions or other compensation claimed by any broker or agent claiming the same by, through, or under the indemnifying party.  Landlord shall be responsible for payment of all commissions to Landlord's Broker.

8.      **Entire Agreement.**  This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements.  As amended herein, the Lease between the parties shall remain in full force and effect.  In case of inconsistency between the provisions of the Lease and this Amendment, the latter provisions shall govern and control.

9.      **Not an Offer.**  This Agreement shall not be binding until executed and delivered by both parties.

*(SIGNATURE PAGE FOLLOWS)*

SIGNATURE PAGE TO EIGHTH AMENDMENT TO LEASE AGREEMENT
BY AND BETWEEN LOUISIANA TOWER OPERATING LLC,
AS LANDLORD AND SKLAR EXPLORATION COMPANY, L.L.C., AS TENANT

IN WITNESS WHEREOF, the parties hereto have executed this Eighth Amendment of the respective dates set forth below, to be effective, however, as of the day and year as first above written.

**LANDLORD:**

LOUISIANA TOWER OPERATING LLC,
A Delaware limited liability company

By:  Louisiana-Edwards Tower Operating Associates,
Limited Partnership, A New Mexico limited partnership, its
sole member

By:  BGK Louisiana-Edwards Tower LLC, A New Mexico
limited liability company, its general partner

By: _____
    Cheryl S. Willoughby
    Executive Vice President

Date: _____

**TENANT:**

SKLAR EXPLORATION COMPANY, L.L.C., a
Louisiana limited liability company

By: _____
    Christopher A. Farrell, CPA
    Vice President – Chief Financial Officer

Date: _____

## EXHIBIT "A"
## REDUCTION SPACE
### Suite 1100 and Suite 1120



Reduction Space

LOUISIANA TOWER

ARCHITECTURAL PLAN
SHREVEPORT, LOUISIANA
4-7-04

**EXHIBIT "B"**
TENANT FINISH ALLOWANCE
Page 1 of 2

1.     Except as set forth in this Exhibit, Tenant accepts the Premises in its "as is" condition on the date that this Lease is entered into.

2.     Landlord has approved the attached space plan per Exhibit "C".

3.     Tenant will make a reasonable effort to obtain final drawings in an expeditious manner. Tenant will submit to Landlord final drawings (as hereinafter defined) prepared by Tenant's architect in accordance with the Space Plans showing all improvements (as hereinafter defined) that Tenant proposes to install in the Premises; such drawings shall include the partition layout, ceiling plan, electrical outlets and switches, telephone outlets, drawings for any modifications to the mechanical and plumbing systems of the Building, and detailed plans and specifications for the construction of the improvements called for under this Exhibit in accordance with all applicable governmental laws, codes, rules, and regulations. Further, if any of Tenant's proposed construction will affect the Building's heating, ventilation and air conditioning, electrical, mechanical, or plumbing systems, then the drawings pertaining thereto shall be prepared by the Building's engineer of record at Tenant's sole cost and expense. Tenant shall, at Landlord's request, sign and date the Drawings prepared by the Building's engineer to evidence its review and approval thereof. It is further agreed, that under no circumstances will waterproofed and vinyl wall covering be installed on any exterior wall in the Leased Premises.

4.     As used herein, "Drawings" shall mean the final drawings approved by Landlord, as amended from time to time by any approved changes thereto, and "Improvements" shall mean all improvements to be constructed in accordance with and as indicated on the Drawings.

5.     Landlord's approval of the Drawings shall not be unreasonably withheld, provided that (a) they comply with all applicable governmental laws, codes, rules, and regulations, (b) said Drawings are sufficiently detailed to allow construction of the Improvements in a good and workmanlike manner, and (c) the Improvements depicted thereon conform to the rules and regulations promulgated from time to time by the Landlord for the construction of tenant improvements. Approval by Landlord of the Drawings shall not be a representation or warranty of Landlord that such Drawings are adequate for any use, purpose, or condition, or that such Drawings comply with any applicable law or code, but shall merely be the consent of Landlord to the Drawings.

6.     Tenant will advise landlord of desired non-cosmetic alterations of a mechanical, electrical, plumbing, or life safety system nature or of material cosmetic changes. These changes in the Drawings must receive the prior written approval of Landlord, and in the event of any such approved change and upon completion of the Improvements, Tenant shall furnish Landlord with an accurate, reproducible "as-built" plan of the Improvements as constructed, which plan shall be incorporated into the Drawings and the Lease by this reference for all purposes.

7.     After the Drawings have been approved, Tenant shall cause the tenant finish work to be performed in accordance with the Drawings. The work shall be performed only by contractors and subcontractors approved in writing by Landlord, which approval shall not be unreasonably withheld. All contractors and subcontractors shall be required to procure and maintain insurance against such risks, in such amounts, and with such companies as Landlord may reasonably require. Original certificates of insurance evidencing such policies, with paid receipts therefore, must be received by Landlord before the work is commenced. The work shall be performed in a good and workmanlike manner that is free of defects and is in strict conformance with the Drawings, and shall be performed in such a manner and at such times as to maintain harmonious labor relations and not to interfere with or delay Landlord's other contractors, the operation of the Building, and the occupancy thereof by other tenants. All contractors and subcontractors shall contact Landlord and schedule time periods during which they may use Building facilities in connection with the work (e.g., elevators, excess electricity, etc.).

**EXHIBIT "B"**
TENANT FINISH ALLOWANCE
Page 2 of 2

8.    Tenant shall bear the entire cost of performing the work (including, without limitation, design of the Improvements and preparation of the Drawings, permit fees, demolition of existing improvements in the Premises required in connection with the construction of the Improvements, costs of construction labor and materials, all fire and life safety control systems such as fire walls, sprinklers, halon, including piping, wiring and accessories installed within the Premises, all heating and air conditioning systems including duct work, piping, wiring and accessories, electrical usage during construction, additional janitorial services, general tenant signage, code compliance requirements,  related taxes and insurance costs, contractor's fees, including but not limited to any fees based on general conditions,  all of which costs are herein collectively called the "Total Construction Costs").

9.    Landlord shall provide to Tenant a construction allowance ("Construction Allowance") equal to $201,548.00.   Tenant shall not become entitled to full credit for the Construction Allowance until Tenant has caused to be delivered to Landlord (i) all paid invoices from contractors, subcontractors, and suppliers evidencing the cost of performing the work, together with lien waivers from such parties, and a consent of the surety to the finished Improvements (if applicable) and (ii) a certificate of occupancy from the appropriate governmental authority, if applicable, and evidence of governmental inspection and approval of the Improvements, if applicable.   Tenant has until June 30, 2012 to use the Construction Allowance.   Any unused Construction Allowance after June 30, 2012 shall be forfeited by the Tenant.

EXHIBIT "C"
SPACE PLAN



## EXHIBIT "D"
## CAP ON CERTAIN OPERATING EXPENSES

For the purpose of determining Additional Rent, Operating Expenses (exclusive of the Non-Capped Operating Expenses, as hereinafter defined) for any calendar year shall not be increased over the amount of Operating Expenses (exclusive of Non-Capped Operating Expenses) during the calendar year in which the term of this Lease commences by more than Five percent (5%) per year on a cumulative basis, compounded annually. For example, if Operating Expenses (exclusive of Non-Capped Operating Expenses) during the calendar year in which the term of this Lease commences were $100,000, the cap on Operating Expenses (exclusive of Non-Capped Operating Expenses) for the fourth full calendar year would be $121,550.63 ($100,000 times 1.05 times 1.05 times 1.05 times 1.05).  It is understood and agreed that there shall be no cap on "Non-Capped Operating Expenses", which are hereby defined to mean all utility expenses, snow removal costs, real estate taxes, Insurance Premiums and other Operating Expenses which are beyond the reasonable control of Landlord.

**EXHIBIT "E"**
**Page 1 of 3**

Legal Description

Tract 1: (Fee)

A tract of land in Block 40 of the City of Shreveport, Caddo Parish, Louisiana, as per plats recorded in Book 250, Pages 100 and 382 of the Conveyance Records of Caddo Parish, Louisiana and being more particularly described as follows:  Begin at the most Northerly corner of Block 40 at the intersection of the Southeasterly Right-of-Way line of Travis Street with the Southwesterly Right-of-Way line of Market Street, thence run Southeasterly along Market Street 155 feet to the Northwesterly line of an alley, thence run Southwesterly along the alley parallel to Travis Street 62 feet, thence run Northwesterly parallel to Market Street 155 feet to the Southeasterly Right-of-Way line of Travis Street thence run Northeasterly along Travis Street 62 feet to the Point of Beginning.

Tract 2: (Fee)

A tract of land in Block 40 of the City of Shreveport, Caddo Parish, Louisiana, as per plats recorded in Book 250, Pages 100 and 382 of the Conveyance Records of Caddo Parish, Louisiana and being more particularly described as follows:  Begin at the most Easterly corner of Block 40 at the intersection of the Southwesterly Right-of-way line of Market Street with the Northwesterly Right-of-Way line of Texas Street, thence run Southwesterly along Texas Street 62 feet, thence run Northwesterly parallel to Market Street 150 feet to the Southeasterly line of an alley, thence run Northeasterly along said alley parallel to Texas Street a distance of 62 feet to the Southwesterly Right-of-Way line of Market Street, thence run Southeasterly along Market street 150 feet to the Point of Beginning.

Tract 3: (Fee)

A tract of land in Block 40 of the City of Shreveport, Caddo Parish, Louisiana, as per plats recorded in Book 250, Pages 100 and 382 of the Conveyance Records of Caddo Parish, Louisiana, and being more particularly described as follows:  From the most westerly corner of Block 40 at the intersection of the Southeasterly Right-of-Way line of Travis Street and the Northeasterly Right-of-Way line of Edwards Street, thence run Northeasterly along Travis Street 160.2 feet to the center line of an abandoned alley and Point of Beginning of the tract herein described, thence run Southeasterly along the center line of the abandoned alley 155 feet, thence run Northeasterly parallel to Travis Street along the Northwesterly line of an alley 98.2 feet, thence run Northwesterly parallel to Market Street 155 feet to the Southeasterly Right-of-Way line of Travis Street thence run Southwesterly along Travis Street 98.2 feet to the Point of Beginning.

Tract 4: (Fee)

A tract of land in Block 40 of the City of Shreveport, Caddo Parish, Louisiana, as per plats recorded in Book 250, Pages 100 and 382 of the Conveyance Records of Caddo Parish, Louisiana, and being more particularly described as follows:  From the most Easterly corner of Block 40 at the intersection of the Southwesterly Right-of-Way line of Market Street with the Northwesterly Right-of-Way line of Texas Street, thence run Southwesterly along Texas Street 62 feet to the Point of Beginning of the tract herein described, thence continue along Texas Street 35.73 feet, thence run Northwesterly parallel to Market Street 150 feet to the Southeasterly Right-of-Way line of an alley, thence run Northeasterly along alley parallel to Texas Street 35.73 feet, thence run Southeasterly parallel to Market Street 150 feet to the Point of Beginning.

**EXHIBIT "E"**
**Page 2 of 3**

Tract 5: (Servitude)

The air space and air rights between the elevation of fourteen (14') feet and seventeen (17') feet above the grade level of the public alleyway connecting Market Street and Edwards Street between Texas Street and Travis Street and tract abutting the North side of Lots in 11 and 12 and the East 17.63 feet of Lot 10, all in Block 40, City of Shreveport as recorded in Conveyance Book 250, Page 100 of the Records of Caddo Parish, Louisiana.

AND

The air space and air rights between the elevations of fourteen (14') feet and three hundred (300') feet above the grade level of the public alleyway connecting Market Street and Edwards Street between Texas Street and Travis Street in Block 40, City of Shreveport as per Plat recorded in Book 250, Pages 100 and 382 of the Conveyance Records of Caddo Parish, Louisiana, and being more particularly described as follows: From the most Easterly corner of Block 40 at the intersection of the Southwesterly Right-of-Way line of Market Street with the Northwesterly Right-of-Way line of Texas Street run thence Northwesterly along Market Street 150 feet to the Southeasterly line of a 15 foot alley, thence run Southwesterly along the alley and parallel to Texas Street 97.73 feet to the Point of Beginning of the parcel herein described thence run Southwesterly along the alley and parallel to Texas Street 22.42 feet, thence run Northwesterly parallel to Market Street 15 feet to the Northwest line of said alley, thence run Northeasterly along said alley and parallel to Texas Street 22.42 feet, thence run Southeasterly parallel to Market Street 15 feet to the Point of Beginning as per instrument No. 923303 recorded in Book 1969, Page 63 of the Records of Caddo Parish, Louisiana and the Air Space and the Air Rights between the elevations of seventeen and three hundred feet above that part of the Public alley connecting Market Street and Edwards Street between Texas Street and Travis Street, abutting the North side of Lots 11 and 12, and East 17.67 feet of Lot 10, all in Block 40 City of Shreveport, as recorded in Conveyance Book 250, Page 100 of the Records of Caddo Parish, Louisiana, as per instrument No. 735718 recorded in Book 1630, Page 13 of said Parish.

Tract 6: (Leasehold)

(a) That certain leasehold interest and estate created under the Contract of Lease dated August 19, 1976, between Washington-Youree Hotel Company, Inc. as Lessor (the "Ground Lessor") and Louisiana Bank & Trust Company, as Lessee (the "Ground Lessee"), recorded in Conveyance Book 1559, Page 561 of the records of Caddo Parish, Louisiana, as assigned to Shreveport Plaza Limited Partnership by Assignment of Ground Lease dated February 9, 1982, between Ground Lessee and Shreveport Plaza Limited Partnership, as may be amended from time to time (collectively called Ground Lease), creating the leasehold Estate and covering a tract of land in Block 40, City of Shreveport, as per plats recorded in Book 250, Pages 100 and 382 of the Conveyance Records of Caddo Parish, Louisiana and being more particularly described as follows: Begin at the most Westerly corner of Block 40 at the intersection of the Southeasterly Right-of-way line of Travis Street with the Northeasterly Right-of-Way line of Edwards Street, thence run Northeasterly along Travis Street 160.2 feet to the centerline of the abandoned alley, thence run Southeasterly parallel to Edwards Street along the centerline of the abandoned alley 155 feet thence run Southwesterly parallel to Travis Street along the Northwesterly Right-of-Way line of an alley 160.2 feet to the Northeasterly Right-of-Way line of Edwards Street, thence run Northwesterly along Edwards Street 155 feet to the Point of Beginning (the "Ground Lease").

(b) the buildings, structures, improvements and other constructions located on the Ground Lease Parcel including without limitation that building known as Louisiana Tower, and all component parts of those buildings structures, improvements and other constructions.

**EXHIBIT "E"**
**Page 3 of 3**

Tract 7:  (Fee)

A tract of land in Block 40, City of Shreveport, as per plats recorded in Book 250, Pages 100 and 382 of the Conveyance Records of Caddo Parish, Louisiana, and being more particularly described as follows:   From the most Easterly corner of Bock 40 at intersection of Southwesterly Right-of-Way line of Market Street with the Northwesterly Right-of-Way line of Texas Street, run thence Southwesterly along Texas Street 97.73 feet to the Point of Beginning of the tract herein described, thence continue along Texas Street 22.42 feet, thence run Northwesterly parallel to Market Street 150 feet to the Southeasterly Right-of-Way line of an alley, thence run Northeasterly along alley parallel to Texas Street 22.42 feet thence run Southeasterly parallel to Market Street 150 feet to the Point of Beginning.

All being more particularly shown on a plat of survey dated June 20, 2008, revised July 16, 2008, July 21, 2008 and July 23, 2008 by Michael P. Bowman, R.P.L.S. of John R. Bowman & Assoc., Inc.

## NINTH AMENDMENT TO LEASE

THE NINTH AMENDMENT TO LEASE (the "Ninth Amendment") is made and entered into as of September 6, 2016 by and between **LOUISIANA TOWER OPERATING LLC**, a Delaware limited liability company ("Landlord"), successor in interest to LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P., a New Mexico limited partnership, and **SKLAR EXPLORATION, L.L.C.**, a Louisiana limited liability company ("Tenant").

A.        Landlord and Tenant entered into that certain lease dated February 8,1999 ("Original Lease"), as amended by that certain Lease Amendment No. 1 dated April 3, 2000 ("First Amendment"), and that certain Lease Amendment No. 2 dated October 17, 2000 ("Second Amendment"), and that certain Third Amendment to Lease Agreement dated March 30, 2001 ("Third Amendment"), and that certain Fourth Amendment to Lease dated July 19, 2004 ("Fourth Amendment"), and that certain Fifth Amendment to Lease dated March 12,2006 ("Fifth Amendment"), and that certain Sixth Amendment to Lease dated November 21, 2007 ("Sixth Amendment"), and that certain Seventh Amendment to Lease dated April 18, 2008 ("Seventh Amendment"), and that certain Eighth Amendment to Lease dated May 26, 2011 ("Eighth Amendment"), (collectively the Original Lease, First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, Seventh Amendment and Eighth Amendment are referred to as the "Lease"), pursuant to which Landlord leased to Tenant certain premises in the building, Suite 1601, 1605, 1615 and 1620 (the "Premises"), known as the Louisiana Tower Office Building located at 401 Edwards Street, Shreveport, Louisiana 71101 (the "Building").

B.        By this Ninth Amendment to Lease, Tenant desires to surrender to Landlord all of the Premises (the "Surrendered Space") except for Suite 1601 which consists of approximately 4,917 square feet of rentable space in the Building, as highlighted in yellow on Exhibit "A", to extend the term of the Lease for Suite 1601, and to have the Lease appropriately amended, and the Landlord is willing to do the same, all on the terms and conditions hereinafter set forth. Upon execution of this Ninth Amendment, it with the Original Lease, First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, Seventh Amendment and Eighth Amendment to Lease thereafter are jointly the Lease.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.        **Extension of Term.** The Lease will continue in effect for an additional three (3) year period (the "Extended Term") commencing on March 1, 2017 (the "Extension Date") and ending February 28, 2020, under the terms set out in the Lease, as amended in this Ninth Amendment.

2.        **Premises.** As of the Extension Date, the Premises shall include only Suite 1601 consisting of 4,917 rentable square feet located on the 16 floor of the Building as highlighted in yellow on Exhibit "A", subject to all of the terms and conditions of the Lease currently in effect, except as expressly modified herein. The Surrendered Space shall be left in broom clean condition and good repair, except for normal wear and tear.

1896573-3

3.      **Base Rental.** Effective as of the Extension Date and continuing throughout the Extended Term, the Base Rental for the Premises during the Extended Term shall be as follows:

| Term | Monthly Rent |
|------|--------------|
| March 1, 2017 – February 28, 2018 | $5,531.63 |
| March 1, 2018 – February 28, 2019 | $5,736.50 |
| March 1, 2019 – February 28, 2020 | $5,941.38 |

4.      **Tenant Improvements.** Tenant hereby accepts the Premises in their "as-is" condition except Landlord has agreed to perform at its cost and expense the following: (a) the improvements and modifications to the Premises as indicated on Exhibit 'A', to match existing colors, floor coverings, paints and finishes of the Premises, and (b) appropriate modifications to the HVAC thermostatic control systems for the 16th Floor of the building so that the control of the HVAC for the Premises is controlled by control systems situated within the Premises, all to be performed in a workman-like fashion. Landlord shall have no other obligation to perform any other improvements therein (including, without limitation, demotion of any improvements existing therein or construction of any tenant finish-or other improvements therein).

5.      **Operating Expenses and Taxes.** Effective March 1, 2017 and thereafter for the remainder of the Lease, Tenant shall pay Landlord Tenant's Prorate Share of the amount by which the Operating Expenses and Taxes for each calendar year and fractional calendar year during the term for the Premises exceed the Operating Expenses and Taxes as set out in Section 6 of the Lease Agreement, except that (i) the Tenant's Prorate Share for the Premises will be 1.43% based on 4,917 square feet of rentable area (ii) the Tenant's Base Year will be 2017 and (iii) there will be a cumulative cap on controllable operating expenses as outlined within Exhibit "B" herein.

6.      **Parking.** During the Extended Term the Landlord will provide Tenant with up to nine (9) parking spaces in the attached parking garage at market parking rates, plus applicable sales tax.

7.      **Option to Renew.** During the Extended Term the Landlord hereby provides Tenant with the following option to renew the Term of the Lease:

(a) Provided that as of the time of the giving of the Extension Notice no Default exists or would exist but for the passage of time or the giving of notice, or both, Tenant shall have the right to extend the Term of the Lease for an additional period of three (3) years (the "Extension Term") commencing on the day following the expiration of the Extended Term. Tenant shall give Landlord notice (the "Extension Notice") of its election to extend the Term of the Lease at least six (6) months, but not more than twelve (12) months, prior to the scheduled expiration date of the Extended Term.

(b) The Base Rent payable by Tenant to Landlord during the Extension Term shall be the greater of (i) the Base Rent applicable to the last year of the Extended Term, and (ii) the then prevailing market rate for comparable space in the Building and comparable buildings in the vicinity of the Building, taking into account the size of the lease, the length of the renewal term, market escalations and the credit of Tenant. The Base Rent shall not be reduced by reason of any costs or expenses saved by Landlord by reason of Landlord's not having to find a new tenant for such premises (including, without

limitation, brokerage commissions, costs of improvements, rent concessions or lost rental income during any vacancy period). In the event Landlord and Tenant fail to reach an agreement on such rental rate and execute the Amendment (defined below) at least one (1) month prior to the expiration of the Extended Term, then Tenant's exercise of this renewal option shall be deemed withdrawn and the Lease shall terminate on the expiration of the Extended Term.

(c) The determination of Base Rent does not reduce the Tenant's obligation to pay or reimburse Landlord for Taxes and/or Operating Expenses and other reimbursable items as set forth in the Lease, and Tenant shall reimburse and pay Landlord as set forth in the Lease with respect to such Taxes and/or Operating Costs and other items with respect to the Premises during the Extension Term without regard to any cap on such expenses as may be set forth in the Lease.

(d) Except for the Base Rent as determined above, Tenant's occupancy of the Premises during the Extension Term shall be on the same terms and conditions of the Lease as are in effect immediately prior to the expiration of the Extended Term; provided, however, Tenant shall have no further right to any allowances, credits or abatements or any options to expand, contract, renew or extend the Lease.

(e) If Tenant does not give the Extension Notice within the period set forth in subparagraph (a) above, Tenant's right to extend the Term shall automatically terminate. Time is of the essence as to the giving of the Extension Notice.

(f) If the Lease is extended for the Extension Term, then Landlord shall prepare and Tenant shall execute an amendment to the Lease confirming the extension of the Term and the other provisions applicable thereto (the "Amendment'").

(g) If Tenant exercises its right to extend the term of the Lease for the Extension Term pursuant to this Paragraph 6, the term "Term" as used in the Lease, shall be construed to include, when practicable, the Extension Term except as provided in subparagraph (d) above.

8.    **Brokerage.** Landlord and Tenant each warrant to the other that it has not dealt with any broker or agent in connection with the negotiation or execution of this Lease except Landlord's Broker (Latter & Blum Property Management, Inc.) and Tenant's Broker Vintage Realty Company. Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, and other liability for commissions or other compensation claimed by any broker or agent claiming the same by, through, or under the indemnifying party. Landlord shall be responsible for payment of all commissions due to Landlord's Broker and Tenant shall be responsible for payment of all commissions due to Tenant's Broker.

9.    **Entire Agreement.** This Lease constitutes the entire agreement between Landlord and Tenant regarding the subject matter hereof and supersedes all oral statements and prior writings relating thereto. Except for those set forth in this Lease, no representations, warranties, or agreements have been made by Landlord or Tenant to the other with respect to this Lease or the obligations of Landlord or Tenant in connection therewith.

1896573-3

10.     **Not an Offer.** Submission of this Amendment by Landlord is not an offer to enter this Amendment, but a solicitation for such an offer by Tenant. Landlord shall not be bound by this Amendment until Landlord has executed and delivered the same to Tenant.

IN WITNESS WHEREOF, the parties hereto have executed this Ninth Amendment of the respective dates set forth below, to be effective, however, as of the day and year as first above written.

**LANDLORD:**

LOUISIANA TOWER OPERATING LLC,
A Delaware Limited Liability Company

By: Louisiana-Edwards Tower Operating Associates, Limited Partnership, A New Mexico limited partnership, its sole member

By:    BGK Louisiana-Edwards Tower LLC, A New Mexico limited liability company, its general partner

By: _____
        Michael Mahony
        President

Date: September 16, 2016

**TENANT:**

SKLAR EXPLORATION COMPANY, L.L.C.,
A Louisiana Limited Liability Company

By: _____
        Christopher A. Farrell
        Vice President – Chief Financial Officer

Date: 9-7-16

Page 4 of 6

1896573-3



SUITE 1601

"EXHIBIT A"
Premises Outline

ELEV #4

ELEV #5

ELEV #6

ELEV #7

DN   UP

BREAK

DON

SERVER

ENTRY
7'0" X 12'0"

DEBBIE

ENGINEER

Copier

FILES, COPIER, PLOTTERS

CONFERENCE

BOB

MARIE

JULIE

MILES

KIM

COREY

Page 5 of 6

1896573-3

SKLAR EXPLORATION COMPANY LLC    4917 RSF
AUGUST 4, 2016

## EXHIBIT "B"

For the purpose of determining Additional Rent, Operating Expenses (exclusive of the Non-Capped Operating Expenses, as hereinafter defined) for any calendar year shall not be increased over the amount of Operating Expenses (exclusive of Non-Capped Operating Expenses) during the calendar year in which the term of this Lease commences by more than Five percent (5%) per year on a cumulative basis, compounded annually. For example, if Operating Expenses (exclusive of Non-Capped Operating Expenses) during the calendar year in which the term of this Lease commences were $100,000, the cap on Operating Expenses (exclusive of Non-Capped Operating Expenses) for the second calendar year would be $110,250.00 ($100,000 times 1.05 times 1.05). It is understood and agreed that there shall be no cap on "Non-Capped Operating Expenses", which are hereby defined to mean all utility expenses, snow removal costs, real estate taxes, Insurance Premiums and other Operating Expenses which are beyond the reasonable control of Landlord.

1896573-3

## TENTH AMENDMENT TO LEASE

THE TENTH AMENDMENT TO LEASE (the "Tenth Amendment") is made and entered into as of January 30 , 20 19 by and between **LOUISIANA TOWER OPERATING LLC**, a Delaware limited liability company ("Landlord"), successor in interest to LOUISIANA-EDWARDS TOWER OPERATING ASSOCIATES, L.P., a New Mexico limited partnership and **SKLAR EXPLORATION, L.L.C.**, ("Tenant").

A.     Landlord and Tenant entered into that certain lease dated February 8, 1999 (the "Original Lease") for that certain space known as Suite 1601 (the "Premises"), located on the 16th floor of the building known as Louisiana Tower, the address of which is 401 Edwards Street, Shreveport, Louisiana, 71101 (the "Building"), which Original Lease has heretofore been amended by that certain Lease Amendment No. 1 dated April 3, 2000, that certain Lease Amendment No. 2 dated October 17, 2000, that certain Third Amendment to Lease dated March 30, 2001, that certain Fourth Amendment to Lease dated July 19, 2004, that certain Fifth Amendment to Lease dated March 12, 2006, that certain Sixth Amendment to Lease dated November 21, 2007, that certain Seventh Amendment to Lease dated April 18, 2008, that certain Eighth Amendment to Lease dated May 26, 2011 and that certain Ninth Amendment to Lease dated September 16, 2016. (collectively the "Lease").

B. By this Tenth Amendment to Lease, Tenant has requested to expand the size of the Premises by 810 square feet of rentable space as shown on Exhibit "A" attached hereto ( the "Expansion Area") and extend the Term of the Lease and that the Lease be appropriately amended. Landlord is willing to do the same, all on the terms and conditions hereinafter set forth. The parties also wish to extend further the Term of the Lease, and to modify or confirm certain other provisions of the Lease, all on terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.     **Expansion of Premises.** Commencing March 1, 2019, the Premises shall be expanded to include 810 rentable square feet subject to all of the terms and conditions of the Lease currently in effect, except as expressly modified herein. Upon the aforesaid expansion to the Premises, the Premises will consist of a total of 5,727 rentable square feet (the "Premises").

2.     **Extension of Term for Additional Period.** The Lease shall continue in effect for an additional two (2) year period commencing on March 1, 2020 and ending on February 28, 2022 (the "Tenth Amendment Renewal Term"), under the terms set out in the Lease, as amended in this Tenth Amendment. For clarity, the Term of the Lease for the Expansion Area shall be concurrent with the extension of the Term for the Lease, ending on February 28, 2022.

3.     **Base Rent.** Effective March 1, 2019 and continuing throughout the Term, the Base Rent for the Premises shall be as follows:

| Term | Expansion | Suite 1601 | Total Monthly Rent |
|---|---|---|---|
| 03/01/19 – 02/29/20 | $978.75 per month | $5,941.38 per month | $6,920.13 per month |
| 03/01/20 – 02/28/21 | $1,012.50 per month | $6,146.25 per month | $7,158.75 per month |
| 03/01/21 – 02/28/22 | $1,046.25 per month | $6,351.13 per month | $7,397.38 per month |

4.     **Operating Expenses and Taxes.** Effective March 1, 2019 and thereafter for the remainder of the lease, Tenant shall pay Landlord Tenant's Prorata Share of the amount by which the Operating Expenses and Taxes for each calendar year and fractional calendar year during the term for the Premises exceed the Operating Expenses and Taxes as set out in Section 7 of the Lease Agreement, except that (i) the Tenant's Prorata Share for the Premises will be .01667 (5,727 rsf/343,543 rsf); and (ii) the Tenant's Base Year will be 2019.

5.    **Improvements to Premises.** Tenant shall accept the Premises in its "as is" condition except Landlord has agreed to perform the work outlined in the proposal from Gene Nims Builders, Exhibit "B". Tenant agrees not to place vinyl wall coverings on any inside surfaces of all exterior walls.

6.    **Brokerage.** Landlord and Tenant each warrant to the other that it has not dealt with any broker or agent in connection with the negotiation or execution of this Lease except Landlord's Broker ( Latter & Blum Property Management, Inc. ). Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, and other liability for commissions or other compensation claimed by any broker or agent claiming the same by, through, or under the indemnifying party.

7.    **Entire Agreement.** This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. As amended herein, the Lease between the parties shall remain in full force and effect. In case of inconsistency between the provisions of the Lease and this Amendment, the latter provisions shall govern and control.

8.    **Not an Offer.** Landlord shall not be bound by this Amendment until Landlord has executed and delivered the same to Tenant.

9.    **Electronic Signatures.** Landlord and Tenant each (a) has agreed to permit the use from time to time, where appropriate, of telecopy, email or other electronic signatures (including .pdf files thereof) in order to expedite the transaction contemplated by this Agreement, (b) intends to be bound by its respective telecopy, email or other electronic signature, (c) is aware that the other will rely on the telecopied, emailed or other electronically transmitted signature, and (d) acknowledges such reliance and waives any defenses to the enforcement of this Agreement and the documents affecting the transaction contemplated by this Agreement based on the fact that a signature was sent by telecopy, email or electronic transmission only.

IN WITNESS WHEREOF, the parties hereto have executed this Tenth Amendment of the respective dates set forth below, to be effective, however, as of the day and year as first above written.

**LANDLORD:**
LOUISIANA TOWER OPERATING LLC,
a Delaware limited liability company

By: Louisiana-Edwards Tower Operating Associates,
Limited Partnership, a New Mexico limited partnership, its
sole member

By: BGK Louisiana-Edwards Tower LLC, A New Mexico
limited liability company, its general partner

By: _____
Helen Rivero
Authorized Signatory

Date: _____January 30, 2019_____

**TENANT:**
SKLAR EXPLORATION, L.L.C.

By: _____
Title: _VP/Exploration Manager_
Date: _Jan. 23, 2019_

**EXHIBIT "A"**
<u>EXPANSION SPACE</u>
<u>810 RENTABLE SQUARE FEET</u>



## EXHIBIT "B"
<u>LEASEHOLD IMPROVEMENTS</u>

1.     <u>Work by Landlord</u>.  Landlord shall cause to be constructed and/or installed in the Leased Premises the permanent leasehold improvements as shown on Exhibit "B1" attached hereto (the "Leasehold Improvements").  The leasehold construction will be performed by a general contractor of Landlord's choice.

2.     <u>Planning and Construction</u>.  Landlord and Tenant shall cooperate in good faith in the planning and construction of the Leasehold Improvements, and Tenant shall respond promptly to any request from Landlord or Landlord's architect or contractor for Tenant's approval of any particular aspect thereof, it being agreed and understood that it is the intent and desire of the parties that the Premises be ready for Tenant's occupancy on or before the Scheduled Commencement Date.  In the event Tenant fails to respond promptly to any request from Landlord or Landlord's architect and/or contractor in connection with the design and/or construction of the Leasehold Improvements, it shall be deemed a Tenant Delay as defined below.

3.     <u>Quality of Work</u>.  Landlord shall supervise the construction of the Leasehold Improvements and shall use its diligent good faith efforts to cause same to be constructed and installed in a good and workmanlike manner in accordance with good industry practice.

4.     <u>Completion of Construction</u>.  The "Leasehold Improvements Completion Date" shall mean the date upon which the Leasehold Improvements are substantially complete.  The phrase "substantially complete" shall mean that all construction debris has been removed from the Premises and the Premises are reasonably clean, the Premises may reasonably be used and occupied for the purposes intended by the Tenant and the progress of the construction of the Leasehold Improvements to date is such that final completion of the Leasehold Improvements can occur within a reasonable period of time and without undue interference to the Tenant's use of the Premises.  If the Premises are not ready for occupancy by the Scheduled Commencement Date for any reason, Landlord shall not be liable or responsible for any claims, damages or liabilities in connection therewith or by reason thereof.

5.     <u>Tenant Delay</u>.  As used herein, "Tenant Delay" shall mean the sum of (i) the number of days of delay in responding to Landlord's request for approval of any documentation in connection with the Leasehold Improvements, (ii) the number of days of delay in preparing any of such documentation caused by changes requested by Tenant to any aspect of the Leasehold Improvements which were reflected in the documentation theretofore approved by Tenant, and (iii) the positive difference, if any, between the increase and decrease in the number of days required to complete the Leasehold Improvements caused by changes requested by Tenant to the working drawings after Tenant's approval thereof.

6.     <u>Disclaimer of Warranty</u>.  **TENANT ACKNOWLEDGES THAT THE CONSTRUCTION AND INSTALLATION OF THE LEASEHOLD IMPROVEMENTS WILL BE PERFORMED BY AN UNAFFILIATED CONTRACTOR OR CONTRACTORS AND THAT ACCORDINGLY LANDLORD HAS MADE AND WILL MAKE NO WARRANTIES TO TENANT WITH RESPECT TO THE QUALITY OF CONSTRUCTION THEREOF OR AS TO THE CONDITION OF THE PREMISES, EITHER EXPRESS OR IMPLIED, AND THAT LANDLORD EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY THAT THE PREMISES ARE OR WILL BE SUITABLE FOR TENANT'S INTENDED COMMERCIAL PURPOSE.  TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE BUILDING OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND TENANT SHALL CONTINUE TO PAY THE RENT WITHOUT ABATEMENT, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.**  However, Landlord agrees that in the event that any defect in the construction of the Leasehold Improvements are discovered, Landlord will diligently pursue and seek

to enforce any warranties of the contractor(s) and/or the manufacturer of any defective materials incorporated therein.

7.    <u>Cost of Leasehold Improvements</u>.  Landlord shall pay all costs and expenses of the Leasehold Improvements (including labor, materials, architectural and engineering costs) up to the aggregate amount of **$31,155.16** (the "Improvement Allowance").  In the event that the cost and expense of constructing and installing any portion of the Leasehold Improvements exceeds the Improvement Allowance (the "Excess Cost"), Tenant shall pay said Excess Cost as provided below.  Prior to Landlord's awarding of the construction contract with respect to the Leasehold Improvements or, as applicable, Landlord performing any change order work, and in any event, within five (5) days following Landlord's demand, Tenant shall deposit with Landlord, one hundred percent (100%) of the amount of Landlord's good faith, reasonable estimate of any Excess Cost, with a final reconciliation being made between the Landlord and Tenant as to such actual Excess Costs as soon as reasonably possible after the Commencement Date.  To the extent all or any portion of the Improvement Allowance remains unused on or before the one hundred eightieth (180th) day following the Commencement Date, such remaining portion shall be deemed to be forfeited by Tenant and Landlord shall have no further obligations with respect thereto.  Tenant's right to use or receive the Improvement Allowance pursuant to this Exhibit "E" is personal to the Tenant specifically named herein and Tenant shall not have the right to assign to any sublessee of the Leased Premises or assignee of Tenant's interest in this Lease Agreement Tenant's right to use or receive the Improvement Allowance, nor may Tenant use such Improvement Allowance for the benefit of any such sublessee or assignee.

8.    <u>Construction Management Fee</u>.  Tenant acknowledges and agrees to pay Landlord a construction management fee equal to zero percent (0%) of the total costs and expenses of the Leasehold Improvements.  Such construction management fee may be paid for by Tenant out of the Improvement Allowance.

EXHIBIT "B1"

**Nims-Bilt**

Gene Nims Builders Inc.
8321 Line Avenue Suite 100
Shreveport, LA 71106

TO: LA TOWER

PROJECT:  16th FLOOR SKLAR EXPLORATION

| Scope of Work | Sub-Contractor | Amount | Notes |
|---|---|---|---|
| Carpentry/Drywall | Thompson | $ 6,285.00 | Demo walls |
| | | | Framing, gypsum board & patch ceilings |
| | | | Install doors, frames & hardware |
| | | | |
| Flooring | Andrews | $ 1,950.00 | Furnish/install carpet tile and use owners stock carpet tile |
| | | | Furnish/install rubber base |
| | | | Furnish/install carpet base |
| | | | |
| Painting | Martin | $ 3,797.00 | Tape float texture & install owner furnished wall covering for all new walls inside |
| | | | Sklar suite |
| | | | Tape float texture & paint all walls on uncarpeted side of suite |
| | | | Tape float texture & paint new walls in storage area where walls are painted |
| | | | |
| Electrical | HMR | $ 2,615.00 | Adjust existing lighting to accommodate new lay out |
| | | | Add up to (5) light switches and reconfigure switching to accommodate new layout |
| | | | Add up to (10) 110 volt outlets to accommodate new layout |
| | | | Add up to (5) conduit stub ups for data/phone excludes cabling and jacks |
| | | | |
| Fire Suppression | Fire Tech | $ 2,645.00 | Add/relocate sprinklers on existing system to provide proper coverage |
| | | | of new work.  Chrome Semi-Recessed type sprinklers w/ white escutcheons |
| | | | |
| Doors & Hardware | Tackett | $ 2,797.46 | (2) frames, (2) laminate doors, (6) hinges, (2) lock s, (2) stops & (2) closers |
| Material | RADG | $ 465.00 | Paco trim |
| | | | |
| | | | |
| City Permit | | $ 334.51 | Special Notes & Exclusions: |
| Genera Cleanup | | $ 600.00 | 1. We exclude any work not specifically noted |
| Supervision | | $ 3,000.00 | within this proposal |
| General Liability | | $ 514.54 | 2. Any changes made by state or local authorities |
| Debris removal | | $ 360.00 | will result in a change order |
| | | | 3. All work to be performed during normal business hours. |
| Sub Total | | $ 23,497.42 | |
| Overhead & Profit | | $ 2,349.74 | |
| Total | | $ 25,847.16 | |
| ALTERNATE 1 | Lighting | $ 6,308.00 | Retrofit up to (96) existing lay in light fixtures to LED |
| | | | Bypass existing ballast and rewire fixture sockets directly to line voltage |
| | | | Furnish & install (2) LED tubes per fixture - 4000 kelvin rated |
| ALTERNATE 2 | HVAC | $ 1,465.00 | Panasonic WhisperCeiling 110 CFM 115 Volt Ceiling Ventilation Fan |
| | | | Install Vent Duct in above ceiling return air plenum, Install ceiling vent |
| | | | fan in ceiling grid and tile, Install pass through wall sleeve with (2) |
| | | | return air grills in IT room wall |
| | | | Provide a 120 volt dedicated circuit to ventilation fan in expanded server |
| | | | room.  Connect to separate wall switch for control purposes. |
| | | | |
| | | | |

DATE _____  CONTRACTORS SIGNATURE _____

DATE _____  AUTHORIZED SIGNATURE _____

We appreciate the opportunity in submitting our quote  on your project.  Please advise us if we can answer any questions.