# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE:<br><br>SKLAR EXPLORATION COMPANY, LLC,<br>EIN:  72-1417930<br><br>    Debtor. | Case No. 20-12377-EEB<br><br>Chapter 11 |
| SKLARCO, LLC,<br>EIN:  72-1425432<br><br>    Debtor. | Case No. 20-12380-EEB<br><br>Chapter 11 |

### EAST WEST BANK'S OBJECTION TO THE APPLICATION OF RUDMAN PARTNERSHIP, CTM 2005, LTD. AND MER ENERGY, LTD FOR ALLOWANCE OF ADMINSITRATIVE EXPENSES UNDER 11 U.S.C. § 503(b)(3)(D) FOR SUBSTANTIAL CONTRIBUTION TO THESE CHAPTER 11 CASES

Secured creditor, East West Bank, a California state banking corporation ("EWB"), in its capacity as a lender and the administrative agent under the Credit Agreement dated June 15, 2018 with Sklar Exploration Company LLC ("SEC") and Sklarco LLC ("Sklarco") (collectively, the "Debtors"), through counsel, hereby objects to *The Application of the Rudman Partnership, CTM 2005, Ltd., and MER Energy, Ltd for Allowance of Administrative Expenses under 11 U.S.C. § 503(b)(b)(3)(D) for Substantial Xontribution to These Chapter 11 Cases*, filed by the Rudman Parties[1] on October 22, 2021 [ECF No. 1493] (the "Application"), and respectfully requests that the Application be denied in its entirety.

Contrary to the Rudman Parties' *ipse dixit* assertions, they have not "unquestionably made a substantial contribution" to these cases.  The exact opposite is true:  The Rudman

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application.

4875-6222-3875

Parties unjustifiably impeded the progress of these cases at every turn, drove up the expense for all parties, and ultimately garnered no material advantages for creditors or the estates beyond what the Plan already contemplated. The nominal settlement the Rudman Parties reached on the eve of plan confirmation served the parochial interests of the Rudman Parties, and only the Rudman Parties.

In short, the Rudman Parties' scorched-earth litigation tactics failed to provide creditors with anything but a higher administrative expense burden. To reward the Rudman Parties with a priority claim of more than $100,000[2] under these circumstances would compound the injury to creditors *and* add insult thereto.

In further support of this objection, EWB respectfully submits as follows:

## I. BACKGROUND

1. According to the allegations of the Application, the Rudman Parties purportedly made a substantial contribution to the cases by reviewing the Debtors' statements and schedules, filing and ultimately withdrawing a trustee/conversion motion, examining an agency services agreement, and "exposing" Howard Sklar's alleged dishonesty. The record makes clear, however, that the Rudman Parties' efforts were wholly unnecessary and wasteful for the estates. The hyperbolic allegations in the Rudman Parties' various court filings often muddied the waters and impeded constructive and timely resolution of these cases. To the extent their efforts focused on estate causes of action against Howard Sklar and similar matters, their efforts were redundant of the Committee's.

---

[2] The Rudman Parties did not include any time entries or billing detail with the Application. Certain belatedly provided invoices (filed late yesterday) appear to show an increased claim amount. The late filed support documents should be stricken as untimely. In addition to the procedural and substantive objections to such documents, EWB objects to any increase in the amount of the claim sought by the Rudman Parties as time barred under the terms of the confirmed plan.

2. Ultimately, the Rudman Parties and other creditors received the same treatment and the same rights under the plan that they would have otherwise received. The only difference the Rudman Parties made consisted of significant delay and additional expense for everyone. The Rudman Parties constantly creating their own perceived litigation leverage does not a substantial contribution make.

3. The only "concession" the Rudman Parties received for their zealotry related to their parochial interests in certain gas plant revenues. That concession benefitted the Rudman Parties exclusively and did not provide a substantial contribution to the cases and other creditors. EWB and other creditors should not be forced to foot the bill for the Rudman Parties' unreasonable legal fees and expenses.

4. Placing the Rudman Parties' allegations in the accurate factual and procedural context further reveals the absurdity of their arguments. The Court will recall that on May 12, 2020, at the conclusion of a lengthy evidentiary hearing on the contested use of cash collateral, the Court indicated that it would provide its oral ruling on the Debtor's motion to use cash collateral and objections thereto at a hearing on May 18, 2020. [ECF Nos. 291, 294] EWB, the Committee, and other parties supported the Debtors' proposed use of EWB's cash collateral, while the Rudman Parties and certain other working interest holders objected.

5. At the May 12 hearing, the Court had admonished Howard Sklar to provide a cash infusion to help fund the administration of the Debtors' cases. On May 14, 2020, the Debtors filed their *Report on Issues raised by Court on Cash Collateral Issues* [ECF No. 299]. The report indicated, among other things, that Mr. Sklar would provide more than $1 million, on a fully subordinated basis, to help fund the Debtors' chapter 11 cases.

6. In addition, even prior to the May 12 evidentiary hearing on cash collateral, the Debtors, the Committee, and EWB had agreed that a chief restructuring officer ("CRO") needed to be appointed, and that Mr. Sklar needed to be removed from any management or control of the Debtors. Indeed, EWB insisted on a CRO as a condition of

Debtors' continued use of cash collateral and included a provision for the Debtors' consent to the appointment of a CRO in the proposed third interim cash collateral order. The proposed third interim order was of record by no later than May 8, 2020, and had been circulated to counsel for active creditors, ostensibly including the Rudman Parties, even prior to that time. [ECF No. 271]

7. On May 17, 2020, one day before the continued hearing and with full knowledge that the parties contemplated the appointment of a CRO, the Rudman Parties filed their *Motion to Appoint Trustee, or in the alternative Motion to Convert Case From Chapter 11 to Chapter 7*. [ECF No. 308] The motion made sweeping allegations regarding Howard Sklar's prepetition conduct and contended the only remedy was the appointment of a trustee or conversion to chapter 7.

8. Notably, the motion urged conversion to chapter 7 because alleged "past fraud and gross mismanagement of Debtors" purportedly made it "unlikely that reorganization attempts will be successful." Motion at 16, ¶ 54. At every step thereafter, the Rudman Parties attempted to make good on this false prognosis, objecting to nearly every motion, obstructing every attempt to confirm an abundantly reasonable plan, and inserting itself into every issue in the case through litigation, ultimately to no avail.

9. At the hearing on May 18, 2020, the Court overruled the objections to the Debtors' proposed use of cash collateral, concluding, among other things, that the objecting parties had failed to trace the Debtors' cash on hand with sufficient particularity. [ECF Nos. 315, 319] The Third Interim Cash Collateral Order, entered on that same day, included the provision acknowledging the Debtors consent to the appointment of a CRO and that a motion for such appointment was contemplated and forthcoming. [ECF No. 319]

10. Despite, and likely because of, the entry of the cash collateral order over their objections, the Rudman Parties continued to press their trustee/conversion motion and filed

objections to nearly every motion filed by the Debtors, seemingly for sport. [ECF Nos. 326, 327, 375, 379, 408, 414, 420]

11. On June 11, 2020, the Court held a hearing on the Rudman Parties' trustee/conversion motion and various other matters. Notably, the Office of the United States Trustee took the position that, in the event of trustee appointment or conversion, two separate case trustees would be appointed, thus undermining the Pruet Parties' suggestion that substantive consolidation of the bankruptcy estates was the intended purpose of the trustee/conversion motion.

12. In any event, at the conclusion of the hearing, the Court granted the Debtor's motion for appointment of a chief restructuring officer, and ordered the Rudman Parties' trustee/conversion motion in abeyance. [ECF No. 426] The Rudman Parties, however, seized the opportunity at the hearing to urge the addition of a number of "pet projects" for the CRO to accomplish upon appointment. None of those tasks, however, provided any clear benefit to the estate, and indeed, they appear only to have added to the professional fee burden overall.

13. After the June hearing, even though the cases were heading in a constructive direction, the Rudman Parties began to seek significant Rule 2004 discovery and the depositions of debtor personnel, even after shedding several members of their client group.[3] The Rudman Parties also purported to litigate various discovery disputes in start-and-stop

---

[3] As discussed below, the Rudman Parties did not provide any time entries or invoices with the Application. That fact alone should be fatal to the Application. Upon request, counsel for the Rudman Parties did circulate certain PDF "invoice" documents to counsel for the Creditor Trust, the Debtors, and EWB on October 29, 2021. The Rudman Parties also filed a set of invoices late yesterday. It is unclear whether the late-filed documents are identical to those circulated on October 29, and we have not had time to conduct a thorough review. Even a cursory review, however, raises more questions than answers. It is unclear whether the late-filed invoices are limited to the Rudman Parties currently represented, whether the fees and expenses being claimed have been paid at least partially by former clients who are not parties to the Application, or how the invoices were modified from the originals that counsel sent to the Rudman Parties and any former clients. EWB reserves all rights with respect to these and any other issues presented by the tardily provided documents.

5

fashion, only to abandon these "disputes" and vacate hearings thereon, wasting even more time and imposing even more unnecessary expense on the estates. [ECF Nos. 617, 632, 706, 712, 1223, 1233, 1237, 1238]

14. All the while, the Rudman Parties were benefitting directly from the Debtors' ongoing operations, as the estates were consistently losing money and the operational shortfalls were funded by EWB's cash collateral. EWB is informed that, as of April 2021, the Rudman Partnership alone had received approximately $839,597 in post-petition production revenues ($625,315 in cash net of JIB obligations). Rudman also collected ***more than $36 million*** in production revenues (more than $17 million in net cash) in the aggregate prior to the bankruptcy filing. In short, the Rudman Parties clearly benefitted from their relationship with the Debtors, particularly post-petition when the Rudman Parties received all of their production payments, even as the estates posted consistent losses, the risk of which was born by EWB.

15. At the end of the day, the Rudman Parties provided creditors nothing more than what the Plan already contemplated. *See In re Alert Holdings Inc.*, 157 B.R. 753 (Bankr. S.D.N.Y. 1993) (denying substantial contribution application when "even without the benefit of the [applicant's] objection, most of the changes to the disclosure statement would have been made anyway"). The avoidance claims were investigated by the Committee and were fully preserved for the Creditor Trust, which will pursue them under the Plan. Avoidance claims are rarely fully investigated, let alone pursued, until after confirmation in chapter 11 cases, and the Rudman Parties' obsessive pre-confirmation focus on them provided no clear benefit to the cases.

16. The Rudman Parties should not profit from their overly aggressive litigation tactics and constantly shifting positions taken to suit their parochial interests. As but one example, in February 2021, the Rudman Parties observed "the mounting post-petition losses reflected in the Debtors' operating reports" and cited them as a driving reason to proceed to plan confirmation as expeditiously as possible. [ECF No. 802 at 3, ¶ 3]

Thereafter, the Rudman Parties did all they could to delay plan confirmation, filing objections to virtually every confirmation-related filing of the Debtors, including a gratuitous objection to a status report. [ECF Nos. 1106, 1107, 1108, 1109, 1111, 1181, 1182, 1196, 1210, 1265, 1347]

17. The Rudman Parties' objection to assumption of the Agency Services Agreement, in particular, made sweeping allegations through innuendo and conjecture, even though the Rudman Parties had more than a year to pursue actual evidence but had failed to do so. [ECF No. 1196]

18. At hearing on May 28, 2021, the Court expressed significant concerns about the Agency Services Agreement, seemingly based on the broad, unsubstantiated, and ultimately incorrect allegations contained in the objection. Due to the Rudman Parties' unfounded but vociferous objections, the Court ordered confirmation and related matters held in abeyance, pending further disclosures and clarifications. [ECF No. 1276]

19. The additional delay caused by the Rudman Parties was, in short, unnecessary and detrimental to all creditors. Thereafter, the Committee took the deposition of Howard Sklar, Mr. Sklar provided a sworn statement as instructed by the Court, and the Debtors filed clarifying briefs joined by EWB and the Committee. By all indications, tens of thousands of dollars in additional professional fees were incurred. Undeterred, the Rudman Group continued to attempt to obstruct plan confirmation. As the Debtors summarized in one response:

> The Rudman [objection to Howard Sklar's verified statement] is the Rudman Group's latest attempt to delay confirmation of the Debtors' Second Amended and Restated Plan of Reorganization ("Plan") to the detriment of the Debtors, East West Bank, and the unsecured creditors in these cases—all of whom have overwhelmingly voted to accept the Plan. Rather than presenting actual, relevant facts or a cognizable legal argument that bear on confirmation, the Rudman Group has decided to create confusion through mere allegation, ignoring verified facts that have been put before this Court by parties with actual and direct knowledge of such facts and a serious interest in seeing the Debtors emerge from these chapter 11 cases and repay their creditors.

[ECF No. 1352]  Notably, the Rudman Parties suddenly became comfortable with all of their purported "grave concerns" and settled their plan-related disputes on the eve of the final evidentiary hearing on plan confirmation.

20. In short, the Application is, at best, a revisionist history that is wholly unsupported by the record.  Obstructionist litigious tactics should be discouraged rather rewarded in chapter 11 cases, and the Application should be denied.

## II. ARGUMENT

21. Section 503(b)(3) of the Bankruptcy Code includes as administrative expenses "the  actual, necessary expenses . . . incurred by . . . a creditor . . . in making a substantial contribution in a case under chapter 9 or 11 of this title." 11 U.S.C. § 503(b)(3)(D).  Section 503(b)(4) includes "reasonable compensation for professional services rendered by an attorney . . . of an entity whose expense is allowable" as a substantial contribution, "based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney."  *Id*. at § 503(b)(4).

22. The standard for recovering on an application for a substantial contribution administrative expense "is high because these expenses are paid on a priority basis and reduce the funds available for distribution under the debtor's plan of reorganization." *In re S & Y Enterprises, LLC*, 480 B.R. 452, 461 (Bankr. E.D.N.Y. 2012); *see also In re Best Prods. Co., Inc*., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994) ("The integrity of section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate."). Accordingly, a successful application "is the exception, not the rule." *Id*.

23. A creditor makes a substantial contribution only if its efforts provide an "actual and demonstrable benefit to the debtor's estate and the creditors," and were not

4875-6222-3875

undertaken primarily in the applicant's self-interest. *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988).

### The Application Lacks the Requisite Detail.

24. As a threshold matter, the Application fails to provide sufficient detail to assess the reasonableness of the fees and expenses sought or whether they even relate to a purported substantial contribution. The Application must be denied on this basis alone.

25. The law requires the Rudman Parties to prove by a preponderance of the evidence that they made a substantial contribution, *In re Buckhead America Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993), and that a "causal connection" exists between service provided and a demonstrable extraordinary contribution to the estate, *In re Worldwide Direct, Inc.*, 334 B.R. 112, 122 (Bankr. D. Del. 2005). The Application does not even attempt to carry this burden by including detailed time entries as customary and required.

26. The PDF "invoices" belatedly filed by counsel don't solve the issue either, as they contain block-billed time entries for multiple tasks, most of which are unrelated to the purported "substantial contribution" asserted by the Rudman Parties. Many hours appear to have been spent in discussions between lawyers, in preparing documents for delivery to the Court and other administrative tasks, and in reviewing court filings and other documents that have little or nothing to do with the asserted substantial contributions.

27. In addition, substantially all of the block-billed time entries are in whole- or half-hour increments rather than in tenths of an hour. Perhaps the Rudman Parties are happy to pay their counsel based on block-billed descriptions in 0.5 increments rather than detailed time entries in 0.1 increments, but EWB and other creditors surely are not.[4]

28. Because the Rudman Parties' have failed to provide sufficient to detail to carry their burden, the Application must be denied.

---

[4] The late-filed exhibits should be stricken altogether as untimely. To the extent the Rudman Parties attempt to further supplement their Application with time records or seeks to include them on reply, EWB objects based on untimeliness. EWB further reserves its right to object to any such time entries on any other basis and to supplement this objection as necessary.

**The Rudman Parties Obstructed Rather Than Contributed to These Cases.**

29. Perhaps more to the point, no conceivable time entries can overcome what the record makes painfully clear: The Rudman Parties consistently took aggressive action in their own perceived self-interest, to the detriment of the estates and other creditors.

30. To be compensable under section 503(b)(3)(D), the creditor's activity must have "benefit[ed] the estate as a whole." *Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 944 (3d Cir. 1994). Activities undertaken "primarily to serve [the applicant's] own interests" are not compensable, because they "would have been undertaken absent an expectation of reimbursement from the estate." *Id.*; *see also Lister*, 846 F.2d at 57 ("Efforts undertaken by a creditor solely to further his own self-interest … will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate.").

31. Creditors are presumed to act in their own interest "until they satisfy the court that their efforts have transcended self-protection." *Lebron*, 27 F.3d at 944. Accordingly, even if certain actions could be deemed "commendable" and provide some tangential benefit to the estate, they are not compensable if undertaken primarily to protect the creditor's parochial interests. *See*, *e.g.*, *In re Standard Metals Corp.*, 105 B.R. 625, 630 (Bankr. D. Colo. 1989) (denying substantial contribution application when "the Applicants acted primarily in their own interest and not for the benefit of the estate as a whole").

32. Here, Rudman has failed to establish the required causal link between their overly aggressive legal actions and an extraordinary, tangible benefit to the estates and creditors as a whole. As discussed above, the Rudman Parties consistently obstructed progress in these cases with needless objections and combative litigation tactics. The Application must be denied.

### III. JOINDER AND RESERVATION OF RIGHTS

33. EWB hereby joins in any other objections to the Application and reserves its rights to join in any additional legal or factual arguments raised by any other parties.

34. EWB reserves all applicable rights with respect to the Application, this objection, and any joinders to other objections, including without limitation EWB's rights to move to strike and/or respond to any new arguments raised by the Rudman Parties on reply, to supplement this objection as necessary or appropriate, to request a status conference on an expedited basis, and to issue subpoenas and seek discovery to the extent this matter proceeds to evidentiary hearing, all without prejudice to EWB's appellate and other rights.

### IV. CONCLUSION

35. Based on the foregoing, EWB respectfully requests that the Court deny the Application, and grant to EWB such other and further relief as it deems just and proper.

DATED this 12th day of November, 2021.

SNELL & WILMER L.L.P.

By: */s/ Bryce A. Suzuki*
Bryce A. Suzuki
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Phone: 602-382-6000
Email: bsuzuki@swlaw.com

4875-6222-3875

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on this 12th day of November 2021, a copy of the foregoing document was filed via ECF and was served by electronic transmission to all registered ECF users appearing in this case.

                                              */s/ Bryce A. Suzuki*