IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT COLORADO

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **SKLAR EXPLORATION COMPANY, LLC and SKLARCO, LLC** | ) | Case No. 20-12377-EEB |
| | ) | Chapter 11 |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| **SKLARCO, LLC** | ) | Case No. 20-12380-EEB |
| | ) | Chapter 11 |
| | ) | |
| **THE RUDMAN PARTNERSHIP,** | ) | |
| Plaintiff | ) | |
| | ) | |
| **vs.** | ) | Adversary No.__________________ |
| | ) | |
| **SKLAR EXPLORATION COMPANY, LLC, SKLARCO, LLC, EAST WEST BANK, AND THOMAS H. KIM, TRUSTEE OF THE SKLAR CREDITORS TRUST,** | ) | |
| | ) | |
| Defendants | ) | |

**ADVERSARY COMPLAINT**

The Rudman Partnership, Plaintiff ("**Rudman**"), hereby files this Complaint against Sklar Exploration Company, LLC ("**SEC**"), Sklarco, LLC ("**Sklarco**")[1], East West Bank ("**EWB**"), and Thomas H. Kim, Trustee of the Sklar Creditors Trust ("**Trustee**"), Defendants, and alleges as follows:

[1] SEC and Sklarco shall collectively be referred to as "**Debtors.**"

**INTRODUCTION**

1. By this Complaint Rudman seeks allowance and recovery of an administrative claim, pursuant to 11 U.S.C. § 503(b), arising from Debtors' use, during the pendency of this jointly administered case, of Rudman's oil and gas production revenues to pay Debtors' post-petition obligations, or otherwise arising from Debtors' appropriation or withholding of payment of such revenues rightfully owned by Rudman. Rudman also seeks declaratory relief as may be necessary to confirm its rights and interest in the revenues at issue and an accounting, if necessary to confirm such rights.

2. The funds in question were deposited into SEC's Revenue Account at EWB, which account was used by the Debtors to hold the proceeds from the sale of oil and gas production attributable to Rudman's and other working owners' interests in various SEC-operated units, prospects and leases, including those located in Escambia and Conecuh Counties, Alabama. SEC's Schedules list no oil and gas leases or interests whatsoever. At all times directly relevant to this suit, which, for purposes of clarity, would include periods from January 1, 2018 through the dates of SEC's departure as operator, SEC served only as a contract operating company and owned no interest in any oil, gas or other minerals or the sales proceeds or revenues thereof. The funds deposited in the Revenue Account were not the property of SEC's bankruptcy estate. Rather, those funds were owned by the working interest owners, one of which is Rudman. The governing unit operating agreements and joint operating agreements provide that upon their receipt by SEC the working interest owners' production proceeds remain

the property of the working interest owners. During the joint administration of these cases, SEC has admitted the factual allegations set forth in this Averment 2.

3. During both pre-petition and post-petition time periods, SEC kept detailed records of the production of oil and gas from the wells it operated and the amounts of production revenue each month attributable to each working interest owner and royalty owner from each well, prospect, or unit. Those records reflect gross production revenues derived from Rudman's working interest production totaling approximately $298,439.08, stemming primarily from February 2020 production, but including lesser amounts from January 2020 and December 2019 production, which were deposited into the SEC Revenue account in March and April 2020, or shortly thereafter, but never paid to Rudman. The purchasers of production of oil and gas from the Escambia Prospect, and the Southwest and Southeast Brooklyn Units and Fishpond Unit in Alabama, wire-transferred the revenues directly to the SEC Revenue account. The funds attributable to Rudman's interests that are the subject of this Complaint were either in the Revenue Account on the Petition Date or were so deposited in April 2020 or shortly thereafter. Rudman seeks the Court's approval of an administrative priority claim in the amount of $298,439.08, or such other amounts as may be shown by the evidence, arising from Debtors' use, during the pendency of this jointly administered case, of Rudman's funds to pay expenses of administration of the bankruptcy estate or arising from the Debtors' appropriation or withholding of payment of such revenues, rightfully owned by Rudman.

**PARTIES**

4. Plaintiff, The Rudman Partnership, is a Texas limited partnership with its principal office in Dallas, Texas.

5. Defendants Sklar Exploration Company, LLC and Sklarco, LLC, the Debtors in the above captioned Chapter 11 case, are Louisiana limited liability companies. SEC and Sklarco have agreed to allow their attorney of record, Keri L. Riley, of Kutner Brinen Dickey Riley, P.C., 1660 Lincoln St., Suite 1720, Denver, CO 80264, to accept service of the summons and complaint on their behalf.

6. Defendant East West Bank is a California state-chartered banking corporation. EWB has agreed to allow its attorney of record, Bryce A. Suzuki, Bryan Cave Leighton Paisner, LLP, Two North Central Avenue, Suite 2100, Phoenix, AZ 85004-4406, to accept service of the summons and complaint on its behalf.

7. Defendant Thomas H. Kim, Trustee of the Sklar Creditors Trust, was appointed in such capacity under the terms of the Debtors' confirmed Plan of Reorganization. The Trustee has agreed to allow his attorney of record, Christopher D. Johnson, Diamond McCarthy LLP, 909 Fannin Street, Suite 3700 Houston, Texas 77010, to accept service of the summons and complaint on his behalf..

**JURISDICTION AND VENUE**

8. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and Federal Rules of Bankruptcy Procedure 7001(7) and 7065. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, Rudman consents to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND FACTS

**Procedural Background**

**A. *The Bankruptcy Cases***

10. SEC and Sklarco filed petitions under Chapter 11 of the United States Bankruptcy Code on April 1, 2020 ("Petition Date").

11. The cases are jointly administered but were not substantively consolidated.

12. At an early stage in these proceedings it became apparent to Rudman that Howard Sklar had grossly mismanaged the Debtors and had used the companies to bankroll a lavish lifestyle and costly divorce. On May 17, 2020, Rudman and other creditors filed a Motion to Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104, or in the Alternative, Convert the above-captioned bankruptcy cases to liquidation proceedings under Chapter 7 pursuant to 11 U.S.C. § 1112(b) (Docket No. 308) ("Trustee Motion").

13. The Debtors and Committee opposed the Trustee Motion, favoring appointment of a chief restructuring officer ("CRO"). Rudman objected (Docket No. 375), but ultimately acquiesced subject to inclusion of language in the order[2] appointing James Katchedurian as CRO requiring investigation and reporting to creditors regarding the use and disposition of some $7 million in proceeds of pre-petition cash calls misappropriated by Debtors and not used for their intended purposes.

14. Debtors' initial Plan of Reorganization (Docket No. 739) sought to continue SEC as operator of all extant prospects, units, and wells, but ultimately, in response to the opposition of many working interest owners, including Rudman, who sought and obtained the Court's authorization to hold removal elections, SEC relented and agreed to the appointment of successor operators.

---

[2] Entered June 15, 2020 at Docket No. 429.

15. As a result, SEC filed an amended plan on May 14, 2021 (Docket No. 1251), seeking to keep SEC on as operator only long enough to accomplish a "transition" to successor operators selected by the working interest owners. SEC also filed motions to reject all executory contracts to which it was a party, including the operating agreements and unit agreements to which Rudman is a party.

16. However, the Court's ultimate rejection of SEC's executory contracts,[3] including the Escambia Operating Agreement and the Southwest Brooklyn, Southeast Brooklyn, and Fishpond Unit Operating Agreements, did not extinguish Rudman's contract rights under those agreements.[4]

17. After several failed attempts by Debtors, and shortly after the withdrawal of the Trustee Motion (Docket No. 1409), a Plan of Reorganization was ultimately confirmed on August 24, 2021 (Docket No. 1433). The Confirmation Order appointed Bruce Walker as Manager of the Reorganized Debtors and Thomas H. Kim as Trustee of the Creditors' Trust.

**B. *Rudman's Admin Claim***

18. On March 22, 2021, Rudman filed its *Application for Administrative Expense Priority Claim Pursuant to 11 U.S.C. § 503(b)* (Docket No. 1148) ("Rudman Admin Claim

---

[3] Order entered March 19, 2021 at Docket No. 1139.

[4] "A rejection does not terminate the contract. When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive." *Mission Prod. Holdings v. Tempnology*, LLC, __ U.S. ___, 139 S. Ct. 1652, 1662 (2019); *In re Thorp,* 624 B.R. 726, 737 (Bankr. N.M. 2020).

.

Motion") seeking an allowed administrative expense claim for the funds held in suspense for contested gas plant management fees ("Gas Plant Claim") and for its unpaid working interest revenue withheld from distribution by SEC ("Revenue Claim").

19. The Debtors and EWB timely filed objections to the Rudman Admin Claim Motion on April 5, 2021 (Docket Nos. 1173 and 1170, respectively), to which the Committee of Unsecured Creditors joined (Docket No. 1172).

20. The Stipulation Partially Resolving Administrative Claim filed August 11, 2021 (Docket No. 1408), between Rudman, Debtors, EWB and the Committee, was approved by the Court on August 12, 2021 (Docket No. 1413). Pursuant to the Stipulation, the Gas Plant Claim was resolved, but The Rudman Admin Claim Motion remained pending before the Court as to the Revenue Claim.

21. EWB opposes the Rudman Revenue Claim based on the assertion that, as a secured lender of the Debtors, its rights under the applicable credit agreement, security agreements, and mortgage documents are superior to Rudman's ownership of the proceeds of production of oil and gas attributable to Rudman's oil and gas working interests formerly operated by SEC.[5]

22. Rudman filed a Certificate of Contested Matter on January 7, 2022 (Docket No. 1579). The Court held a preliminary hearing on the Rudman Admin Claim on January 19, 2022, during which it was agreed by the parties, and so ordered by the Court, that on or before January

[5] *See* EWB Proof of Claim, Claim 1, Case No. 20-12380 (Sklarco) (May 1, 2020); EWB Proof of Claim, Claim 29, Case No. 20-12377 (SEC) (May 1, 2020). EWB's assertions of superior rights to Rudman's production revenues appear to conflict with the terms of the voluminous credit instruments attached as exhibits to its claims, which purport to exclude the interests of non-operating working interest owners from operation of the liens and lender rights granted by the Debtors to EWB under those documents.

26, 2022, Rudman would file a complaint setting forth the factual and legal basis for its alleged administrative priority claim referred to herein as the Revenue Claim.

**Factual Background**

**A. *Rudman's long business relationship with the Debtors and their predecessors.***

23. Rudman and its predecessors have been doing business with Debtors and their predecessor entities and principals for about 70 years. Duke Rudman and Howard Sklar's father, Albert Sklar, were involved in numerous East Texas oil ventures, including the Damascus Field. They were both members of the All American Wildcatters, and Duke Rudman, the founder and first President of that organization, sponsored Albert Sklar's membership.

24. Rudman had participated in numerous prospects with Debtors in Alabama and elsewhere before acquiring interests from Sklarco and investing funds in the primary prospects and units which generated the revenues for Rudman that are at issue in this Complaint.

25. Thus, prior to the events leading up to and following the filing of these Chapter 11 cases, Rudman had a relation of trust and confidence with the Sklar entities due to its long-standing business relationship with them and their owners for two generations.

**B. *Rudman's producing prospect and units operated by SEC in Alabama.***

i. Escambia Prospect

26. Rudman and other working interest participants, including Sklarco, entered into the Participation Agreement for the Escambia Prospect with SEC dated effective November 1, 2006.[6] SEC was designated as the Operator of the Escambia Prospect in an Operating Agreement attached as Exhibit F to the Participation Agreement.

---

[6] Attached hereto as Exhibit 1.

27. Rudman tendered to SEC its share of the $750,000 "Prospect Fee" and acquired from Sklarco a 0.12500 working interest in the Escambia Prospect.

28. As of the Petition Date, there was a single producing well operated by SEC subject to the Escambia Operating Agreement: the CCL&T 2-15 #1. There are also four marginal wells operated by Fletcher Petroleum as of the Petition Date that were part of the Escambia Prospect. Rudman's proceeds from those wells are or should be remitted by Fletcher to SEC for payment to Rudman. Most of the remaining leases and wells within the Escambia Prospect had been included in four Brooklyn Units and were governed by the Brooklyn units agreements and unit operating agreements approved by the State of Alabama.

ii. <u>The Southwest and Southeast Brooklyn Units</u>

29. In January 2018, SEC proposed to Rudman and other affected working interest owners that a petition be filed with the State Oil and Gas Board of Alabama for the formation of four oil units in the Brooklyn Field: the Southwest Brooklyn Oil Unit and Southeast Brooklyn Oil Unit, to be operated by SEC, and the Northwest Brooklyn Oil Unit and Northeast Brooklyn Oil Unit, to be operated by Pruet Production Co. Most of the Southwest and Southeast Brooklyn Oil Units comprised leases and wells from the Escambia Prospect in Conecuh and Escambia Counties, Alabama.

30. The purpose of forming the units was to perform a coordinated secondary recovery and pressure maintenance operation by means of "waterflooding," where produced water is pumped into injection wells for the purpose of forcing oil to selected producing wells. This technique is designed to result in "enhanced recovery" of oil from mature oil fields whose pressure has declined over the years.

31. Copies of the Southwest Brooklyn Unit Agreement and Unit Operating Agreement are attached hereto as Exhibit 2. Exhibit E to the Southwest Brooklyn Unit Agreement reflects Rudman's ownership of a 0.04553798 Unit Net Revenue Interest.

32. Copies of the Southeast Brooklyn Unit Agreement and Unit Operating Agreement are attached hereto as Exhibit 3. Exhibit E to the Southeast Brooklyn Unit Agreement reflects Rudman's ownership of a 0.2390458 Unit Net Revenue Interest.

iii. The Fishpond Oil Unit

33. SEC proposed the Fishpond Unit in 2015, likewise, to accomplish enhanced recovery of oil from existing wells using waterflood technology. All of the Fishpond Unit leases and wells are located within the Escambia Prospect area.

34. Copies of the Fishpond Unit Agreement and Unit Operating Agreement are attached hereto as Exhibit 4. Exhibit E to the Fishpond Unit Agreement reflects Rudman's ownership of a 0.02969480 Unit Net Revenue Interest.

**C. *The salient provisions of the Escambia, Brooklyn and Fishpond agreements regarding (a) ownership and payment of oil and gas production and production proceeds and (b) the Operator's duty to keep true and accurate records.***

i. Ownership of production

35. The Escambia Operating Agreement and the Brooklyn and Fishpond Unit Operating Agreements have language confirming the working interest owners' ownership of oil and gas production.[7]

---

[7]Section III.B of the Escambia Operating Agreement, attached as part of Exhibit 1, governs "Interests of Parties in Costs and Production," and states: "[A]ll equipment and materials acquired in operations on the Contract Area shall be owned by the Parties as their interests are shown on Exhibit 'A.' In the same manner, the Parties shall also own all production of oil and gas from the Contract Area, subject to the payment of royalties to the extent of all jointly owned lease burdens."

ii. Ownership of production proceeds

36. The Escambia Operating Agreement and the Brooklyn and Fishpond Unit Agreements have substantially the same language concerning the ownership of oil and gas production proceeds paid to SEC as Operator; each provides that such funds remain the funds of the non-operator working interest owner.[8]

iii. Operator's duty to maintain true and accurate records of the Joint Account

---

The Southwest Brooklyn Unit Operating Agreement, the Southeast Brooklyn Unit Operating Agreement, and the Fishpond Unit Operating Agreement, attached as parts of Exhibits 2-4, use defined terms to accomplish the same result: "OIL AND GAS RIGHTS means the right to explore, develop and operate lands within the Unit Area for the production of Unitized Substances, or to share in the production so obtained or the proceeds thereof." " UNITIZED SUBSTANCES means all oil, gas, gaseous substances, sulfur contained therein, condensate, distillate, and all associated and constituent liquid or liquefiable substances, other than water and Outside Substances, within or produced from the Unitized Interval." "WORKING INTEREST means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title or otherwise." "WORKING INTEREST OWNER means a party hereto who owns a Working Interest in the Unit Area." In Section 3.1 of each Unit Agreement, these definitions are woven together to describe the effect of unitization on the Working Interest Owners' Oil and Gas Rights: "Subject to the provisions of this agreement, all Oil and Gas Rights of . . . Working Interest Owners in and to said lands, are hereby unitized . . . so that operations may be conducted as if the Unitized Interval had been included in a single lease executed by all Royalty Owners, as Lessors, in favor of all Working Interest Owners, as Lessees, and as if the lease had been subject to all of the provisions of this agreement."

[8] Section V.E of the Escambia Operating Agreement, attached as part of Exhibit 1, is a specially inserted provision that governs "Custody of Funds" and states: "Operator shall hold for the account of Non-Operators any funds of Non-Operators . . . paid to the Operator . . . as a result of the sale of production from the Contract Area, and such funds shall remain the funds of such Non-Operators on whose account they are . . . paid until used for their intended purpose or otherwise delivered to Non-Operators or applied towards the payment of debts. . . ."

Section 11.3 of the Southwest Brooklyn Unit Operating Agreement, the Southeast Brooklyn Unit Operating Agreement, and the Fishpond Unit Operating Agreement, attached as parts of Exhibits 2-4, governs "Commingling of Funds" and states: "Unit Operator shall hold for the account of the Working Interest Owners any funds of the Working Interest Owners . . . paid to the Unit Operator . . . as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Working Interest Owners on whose account they are . . . paid until used for their intended purpose or otherwise delivered to the Working Interest Owners or applied towards the payment of debts. . . ."

37. Article VII.C of the Escambia Operating Agreement requires the Operator to "keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received." Section 7.5 of the Brooklyn and Fishpond Unit Operating Agreements provides that "Unit Operator shall keep full, true and correct books, accounts, and records of the Unit Operations, which shall be made available for inspection by any Working Interest Owner at Unit Operator's principal place of business during normal business hours."

**D. *All proceeds of production were wired by the purchasers to SEC's Revenue Account at EWB***

38. Each month, as agent for the non-operating working interest owners ("Non-Operators") such as Rudman, SEC would receive payments for the sale of the oil and gas of all Non-Operators, which were paid to SEC via wire transfer from the purchasers to an account at EWB called the "Revenue Account."

39. Because revenues are typically received from 30 to 45 days after the month in which the oil and gas was sold, the February 2020 production revenues were or should have been received by SEC in April 2020. However, Rudman's experience is that sometimes payment can occur after 60 days from the month of production.

40. Approximately $1.2 million in revenues of pre-Petition production owned by Non-Operators, including Rudman, received in late March 2020, remained in the Revenue Account as of the Petition Date.[9]

---

[9] *See* testimony of John Strausser, Debtors' CFO, Transcript of Cash Collateral Hearing held April 27, 2020, pp.138-144.

41. As part of its duty to maintain the Joint Account, SEC kept records that allowed it to know the amount of production of oil and gas attributable to each Non-Operator and to calculate to the penny the amount of revenue payable to each Non-Operator.[10]

42. The SEC "Distributions to Suspense Report" attached as Exhibit 5, is one of many examples of SEC's detailed recordkeeping showing the amount of production proceeds owed to Rudman, the dates production was measured, the value of the production, Rudman's decimal revenue interest, the amount of any deductions, the well or unit from which the production was derived, amount unpaid for each measured location, and the date the payment should have been made.

43. This report also shows that the production giving rise to the $298,439.08 amount owed and unpaid to Rudman[11] included small amounts from December 2019 but consisted primarily of amounts owed for January and February 2020 production that was scheduled to have been paid on March 22, 2020 and April 29, 2020, respectively.

44. SEC's records confirm that Rudman's January and February 2020 production proceeds, and small amounts of December 2019 production proceeds attributable to Rudman's interests, were deposited between March 20, 2020 and April 30, 2020 by the purchasers of production and, substantial portions of those production proceeds were included in the SEC

[10] *See* testimony of John Strausser, Debtors' CFO, Transcript of Cash Collateral Hearing held April 27, 2020, p. 139, lines 2-17.

[11] The Suspense Report also shows a "net" amount owed of $265,871.05. Presumably this reflects the deduction of amounts that should have been paid for severance taxes to the State of Alabama, but Rudman does not know that the taxes were in fact paid by SEC. Upon proof of payment, Rudman will reduce its administrative claim to the "net" amount reflected on the Suspense Report.

Revenue Account balance on the Petition Date.[12] By Court order, SEC was directed to pay to Non-Operators "all amounts owed to the holders of . . . working interests for revenues generated from the sale of produced oil and gas in the month of March 2020, which funds were received on a post-production basis in April 2020 . . . ." Third Interim Order Authorizing Use of Cash Collateral dated May 18, 2020 (Docket No. 319). However, the funds deposited into the Revenue Account attributable to Rudman's production revenues for December 2019 and January and February 2020 have not been paid to Rudman.

45. The largest deposits reflected on the Revenue Account statements in late March 2020 are from Goodway Refining, LLC, which purchased oil produced from the CCL&T 2-15 #1 well in the Escambia Prospect, and from the Brooklyn and Fishpond Units. Lesser amounts were wired from Plains Marketing and the Southeast Alabama Gas District, who purchased gas from the same well and Units.

46. The funds deposited from purchasers of production from Rudman's working interests into the Revenue Account were not commingled with SEC's operating, payroll, or other funds, all of which were kept in separate accounts. Since SEC owned no working interests and had no interest in any proceeds of production, since the governing agreements provided that the Non-Operators retained their ownership interest in production revenues received by SEC, and because the Revenue Account was not used for holding SEC's general operating funds, SEC had no interest in the funds in the Revenue Account.[13]

---

[12] An excerpt from March 2020 Revenue Account statement showing the deposits wired by purchasers of production is attached as Exhibit 6. An excerpt from April 2020 Revenue Account statement showing the deposits wired by purchasers of production is attached as Exhibit 7.

[13] Deposition of John Strausser taken on October 13, 2021, at pp. 15-16.

47. SEC has always known to whom the December 2019 and January and February 2020 revenues (and any other working interest owner production revenues deposited in the Revenue Account on or after the Petition Date) were payable, including the amounts owned by (and owed to) Rudman. Tracing is simply not required to establish Rudman's ownership of funds deposited in the Revenue Account attributed to its interest of production of oil and gas.

48. SEC either used Rudman's production revenue to pay general, administrative, and other operating expenses of the bankruptcy estate during the pendency of this case, spent the funds for other purposes, or has simply withheld payment of the funds and still holds them.

**CLAIMS FOR RELIEF**

**Count I: Administrative Claim Against Debtors Under 11 U.S.C. § 503(b)**

49. Rudman incorporates by reference and restates the allegations in paragraphs 1-48 in support of Count I.

50. The Bankruptcy Code defines administrative expenses non-exclusively, to include "actual and necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). The Supreme Court further explained that administrative expenses should also include "costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *Reading Co. v. Brown*, 391 U.S. 471, 483 (1968).

51. Whether a claimant is entitled to an administrative claim is determined by a two-part test: (1) there must be a post-petition transaction between the creditor and the debtor; and (2) the estate must receive a benefit from the transaction. *See, e.g.*, *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001); *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 532–33 (3d Cir. 1999); *In re Mid-American Waste Sys.*, 228 B.R. 816 (Bankr. D. Del. 1999).

52. Administrative expense allowance is also awarded for damages due to a debtor's wrongful action or violation of law. *Al Copeland Enters., Inc. v. State of Texas (In re Al Copeland Enters., Inc.*), 991 F.2d 233, 240 (5th Cir.1993) (citing, among other cases, *Reading*, 391 U.S. at 485). *Reading* recognized that "damages resulting from the negligence of a receiver acting within the scope of his authority give rise to 'actual and necessary' costs of a Chapter XI arrangement." *Reading*, 391 U.S. at 485. The Fifth Circuit further recognized that "those injured during the trustee's administration of an estate are entitled to an administrative priority regardless of whether their injury was caused by a tort or other wrongdoing." *Al Copeland Enters., Inc.*, 991 F.2d at 239 (citing *New York v. N.L.R.B.*, 709 F.2d 1138, 1143 (7th Cir. 1983)).

53. Debtors post-Petition use of the production revenues of Rudman constituted a misappropriation of property that is not property of the Debtors' estates. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."). The practical consequence of this usage of Rudman's funds is that Rudman became an unwilling *de facto* DIP lender, without any of the benefits and protections accorded under Section 364 of the Bankruptcy Code.

54. The liability accruing from the Debtors' failure to remit such non-estate property to Rudman likewise constitutes an administrative claim. *See Reading Co. v. Brown*, 391 U.S. at 486; *In re Hildebrand*, 205 B.R. 278, 286 (Bankr. D. Colo. 1997) (relying on *Reading* in awarding an administrative claim); *see also In re Al Copeland Enters., Inc.*, 991 F.2d at 239-40 (citing *Reading* and concluding that because the debtor's "post-petition decision [not to carry out its obligations under applicable non-bankruptcy law to pay sales tax revenues] resulted in monetary harm to the State," an award of interest to the State "constitute[d] an administrative expense under 11 U.S.C. § 503(b).").

55. The *Reading* doctrine, as discussed and expanded upon in *Al Copeland*, is applicable to Rudman's administrative claim. Debtors have a duty under the Escambia Operating Agreement and the Brooklyn and Fishpond Unit Operating Agreements and Alabama law to account for and pay to Rudman the revenue attributable to its interests in production.

56. Because Debtors instead used Rudman's production revenue in the operation of their business and the administration of their estates, or alternatively, withheld the revenue or used the revenue for other unknown purposes, Rudman is entitled to judgment allowing and directing payment of an administrative expense claim for the entire amount of such unpaid revenue attributable in the amount of $298,439.00, or such other amount as may be supported by the evidence, plus interest at 6% per annum as provided under Code of Ala. § 8-8-1.

**Count II: Declaratory Judgment**

57. Rudman incorporates by reference and restates the allegations in paragraphs 1-56 in support of Count II.

58. To the extent the Court determines there is a genuine issue of material fact or law as to Rudman's ownership of the production and unpaid production revenues at issue in this proceeding, Rudman requests a declaratory judgment under 28 U.S.C § 2201, as to Rudman's ownership of such production revenues and the production from which it was derived.

59. Rudman is the owner of working interests in oil, gas and mineral leases more particularly described in the Escambia Participation Agreement and the Unit Agreements and Unit Operating Agreements for the Southwest Brooklyn Unit, the Southeast Brooklyn Unit, and the Fishpond Unit in Conecuh and Escambia Counties Alabama.

60. Under Alabama law an "oil and gas lease is real property." *Allied Prods. Corp. v. Trinidad Petroleum Corp.*, 570 F.Supp. 1353, 1354 (N.D. Ala. 1983), citing *Nelson v. Teal,* 293

Ala. 173, 301 So.2d 51, 52 (Ala. 1974). "Since early times, courts have held that ownership of property consists of a bundle of rights; every distinct portion of that bundle may be severed and conveyed away at the will of the owner. Thus, the owner of a parcel of land has rights to the resources contained on, within, and underneath, that parcel." *NCNB Texas Nat'l Bank, N.A. v. West,* 631 So.2d 212, 223 (Ala. 1993). Consequently, oil and "gas contained within a property is a distinct interest in land subject to separate ownership and severable from other interests." *Id.*

61. Upon being reduced to "capture" the oil and gas produced from the wells located on the oil and gas leases and units in which Rudman owns working interests, Rudman became the owner of its proportionate share of such proceeds. *Id.* at 224.[14] Furthermore, under the unambiguous provisions of the Escambia Operating Agreement and the Unit Operating Agreements for the Brooklyn and Fishpond Units, Rudman's ownership of the production proceeds continued upon deposit of such funds into the SEC Revenue Account.

62. Rudman, therefore, seeks a declaratory judgment as to its ownership of the production revenues deposited in the SEC Revenue Account as of the Petition Date and thereafter which have not been remitted to Rudman and which are the subject of its administrative claim as alleged herein.

---

[14] "Under the rule of capture, gas that migrates from one property to another is subject to recovery and possession by the holder of the gas estate on the property to which the gas migrates. The rule has been stated as follows:

> 'The owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though it may be proved that part of such oil and gas migrated from adjoining lands.'

Hardwicke, *The Rule of Capture and Its Implications as Applied to Oil and Gas*, 13 Tex. L. Rev. 391, 393 (1935)."

**Count III: Accounting and Audit**

63. To the extent necessary to establish its administrative claim, Rudman seeks an accounting from SEC and invokes its audit rights under the COPAS Accounting Procedures attached to the Escambia Operating Agreement and the Unit Operating Agreements for the Brooklyn and Fishpond Units. The granting of an accounting, if needed to confirm whether SEC has retained or disposed of the Rudman's production proceeds, is consistent with the statutory reporting and transparency obligations imposed on operators under Code of Ala. § 9-17-33(b).

**PRAYER FOR RELIEF**

64. The Rudman Partnership requests that the Court grant administrative priority to its claim for unpaid production revenues used by Debtors during the pendency of this case for payment of general, administrative and operating expenses, and that such claim be allowed and paid in the amount of $298,439.08, or such other amounts as may be shown by the evidence, arising from Debtors' use of its funds to pay expenses of administration of the bankruptcy estate or arising from the Debtors' appropriation or withholding of payment of such revenues, rightfully owned by Rudman, during the pendency of this jointly administered case. The Rudman Partnership further prays for a declaratory judgment as to its ownership of the production proceeds at issue herein and the oil and gas production from which the proceeds were derived, and an accounting and audit as alleged herein. The Rudman Partnership further prays for general relief.

Dated: January 26, 2022

Respectfully submitted,

**Maynes, Bradford, Shipps & Sheftel, LLP**

*/s/ Thomas H. Shipps*
Thomas H. Shipps
Maynes, Bradford, Shipps & Sheftel, LLP
835 E. Second Ave., Suite 123
Durango, CO  81301
Telephone: (970) 247-1755
Facsimile: (970) 247-8827
Email: tshipps@mbssllp.com;

*and*

*/s/ Barnet B. Skelton, Jr.*
Barnet B. Skelton, Jr.
815 Walker, Suite 1502
Houston, TX  77002
Telephone:: (713) 516-7450
Facsimile: (713)659-8764
Email: barnetbjr@msn.com

ATTORNEYS FOR THE RUDMAN
PARTNERSHIP