# EXHIBIT E

Strausser - Cross/Skelton                    137

1  direct exam?

2         MR. SUZUKI:  Nothing from the bank at this time.

3         THE COURT:  Okay.  And let's start with Mr. Skelton

4  on behalf of Tauber.

5                  (No audible response heard)

6         THE COURT:  Mr. Skelton?

7         MR. SKELTON:  Yup, you'd think I'd get this right by

8  now.

9                       (Laughter)

10        MR. SKELTON:  Can you hear me okay?

11        THE COURT:  Yes, we can.

12        MR. SKELTON:  Okay.

13                  CROSS-EXAMINATION

14 BY MR. SKELTON:

15 Q    Mr. Strausser, earlier you looked at a bank statement,

16 which is marked as Debtors' Exhibit 8, which is the April 30,

17 2020 revenue account statement, do you have that there with

18 you?

19 A    Yes, sir, I do.

20 Q    Okay.  And what is the total balance on hand as of

21 April 1, and before the $800,000 was taken out of the account

22 on that date?

23 A    Two point -- $2,674,825.34.

24 Q    All right.  Now you testified before our lunch break that

25 that $800,000 represented Sklarco's interest in February

Strausser - Cross/Skelton                    138

1  revenues, is that correct?

2  A     No, sir; January revenues.

3  Q     January revenues, all right.  And why would there be

4  January revenues in the Sklarco account as of April 1st?

5  A     I'm not sure I understand the question.

6  Q     Well, are you saying that Sklarco did not receive its

7  January revenues when received in February or March?

8  A     No, sir, I'm saying that consistent with what I mentioned

9  earlier, we pay out revenues two months after the production

10 month.  And so at the end of -- at the end of March, we

11 calculate the amount of revenues -- or the amount owed to all

12 the interest holders in the revenue related to January

13 production.

14 Q     Okay.  Now earlier, there was testimony from the Chief

15 Operating Officer that the net revenue interest of Sklarco

16 ranged from ten to 30 percent, are you familiar with that?

17 A     Yes, sir.

18 Q     All right.  And I'm just really curious, how is it with a

19 range in net revenue interest of ten to 30 percent, that

20 exactly $800,000 and no cents just happened to be what you

21 calculated to be Sklarco's share of January production?

22 A     Well, that's actually an amount that is less than

23 Sklarco's share of the January revenue.  I believe the total

24 amount was somewhere closer to 870,000.

25 Q     Who made that calculation?

Strausser - Cross/Skelton                    139

1  A    The accounting system.

2  Q    And how does the accounting system do that?

3  A    The accounting system takes the production volumes that

4  are entered from all of the metering data that we have, it puts

5  them to the various wells to which they relate.  And it runs

6  the total volumes received over the decimals to calculate the

7  amount of revenue that is due to all of the revenue interest

8  holders.

9  Q    Correct.  So in other words, through this accounting

10 system, it's not just Sklarco's interest in revenues that you

11 can figure out, you can figure out anybody's interest,

12 correct?

13 A    That's right.

14 Q    All right, that's the way it's designed.  And that's the

15 job of an operator to be able to do that, or one of its jobs,

16 isn't it?

17 A    That's correct.

18 Q    To maintain the joint account.  Now you -- I guess you'd

19 say you rounded off 870,000 to 800,000.  But is it your

20 testimony here today under oath that the only money Sklarco was

21 owed or entitled to receive out of that revenue account as of

22 April 1st was about $870,000?

23         MS. RILEY:  Objection; mischaracterizes testimony.

24         THE COURT:  Overruled.  You may answer.

25         THE WITNESS:  Can you repeat the question?  I'm not

Strausser - Cross/Skelton                    140

1  sure I understand, Mr. Skelton?

2  BY MR. SKELTON:

3  Q    Well, as of April 1st -- and that -- that's a very

4  important date in the bankruptcy world, it's what we call the

5  petition date.  It's a line of cleavage between things that

6  happen before, and things that happen afterwards.  And so I

7  want to know whether you calculated, or the system calculated,

8  $870,000 or so to be the total amount that Sklarco had not yet

9  taken out of the revenue account.

10 A    That's correct, relative to the January production.

11 Q    All right.  Well, was there more than that?  What other

12 amounts were in that bank account on the petition date that

13 belonged to Sklarco?

14 A    That would be the reminder of the -- the difference

15 between the calculated amount and the amount that was

16 transferred to operating account.

17 Q    Okay, so $70,000, right?

18 A    Roughly.

19 Q    Okay.  So it follows, doesn't it, that the $2,600,000

20 figure -- let's see, I think I have it right here -- that that

21 opening balance of 2,674,825.34, Sklarco only had an interest

22 in $870,000 of it.  So the rest of it necessarily is owned by

23 the other interest owners, isn't it?

24 A    Yes, that would be right.

25 Q    Okay.  Now the March bank statement -- I'd like you to --

Strausser - Cross/Skelton                              141

1        MR. SKELTON:  And, Ms. Riley, I don't know whether he

2   has -- does he have with him the Tauber exhibit book?

3        MS. RILEY:  He should have the Tauber exhibits there,

4   as well.

5        MR. SKELTON:  Okay.

6   BY MR. SKELTON:

7   Q    And we're going to go to the last -- it will be in the

8   last of Mr. Shipps' many volumes, but we're going to look at

9   Exhibit N and Exhibit O.

10  A    Mr. Skelton, I do not have those in -- well --

11       THE COURT:  Neither does the Court, it ends with L.

12       MR. SKELTON:  This morning we delivered a

13  supplemental list of exhibits.

14       THE COURT:  Well, that's a problem, that's why we set

15  the deadlines head because the -- you know, the Court is

16  working remotely, so I don't have them.

17       MR. SKELTON:  Okay.  Well, Ms. Riley said she did not

18  have any objection.  I'm sorry, but I didn't realize that.  I

19  had understood that they had been delivered -- hand-delivered

20  this morning, but you're not there, okay.

21       THE COURT:  No, the WiFi band in the courthouse is

22  very unreliable.

23       MR. SKELTON:  Okay.

24       THE COURT:  So we would have a lot more trouble doing

25  this if I was at the courthouse.

Strausser - Cross/Skelton                    142

1          MR. SKELTON:  Okay.

2          UNIDENTIFIED ATTORNEY:  Your Honor, I don't think

3  that I have been provided with a copy of those exhibits, so if

4  -- maybe Mr. Skelton could provide those electronically, that

5  would be appreciated.

6          THE COURT:  And then maybe we could all see them.

7  That's a good idea.

8          MR. SKELTON:  Yeah, maybe Mr. Shipps can do that.

9  BY MR. SKELTON:

10 Q    But I can ask some questions that I think it would be fair

11 to say that you have general knowledge of.  One of them is that

12 in March, really, there wasn't much revenue deposited until

13 about March 20th, and that's usually the date that it happens,

14 right?

15 A    Yes, sir.

16 Q    Okay.  And so it quickly occurred that there were very

17 major deposits from Goodrich -- Goodway Refining of 3,973,144,

18 Plains Marketing, 589,750, and so forth.  So the money that was

19 in that bank account as of the petition date was money that

20 primarily had been received in the last few days of March,

21 isn't that correct?

22 A    That's correct.

23 Q    Okay.  Now I'd like you to go to your budget, which I

24 believe is Debtors' Exhibit 4.

25 A    Yes, sir, I have that in front of me.

Strausser - Cross/Skelton                              143

1  Q    Okay.  Okay, let me get to it.  And let's just go -- start

2  with the last page that you were talking with Ms. Riley about

3  where there was this inflow and outflow.  Well, actually the

4  beginning cash balance towards the top of the page where it

5  says, "Revenue Account Beginning Cash Balance," correct?  You

6  see it?

7  A    Yes, sir.

8  Q    And that's $1,827,904, but that is as of April 10th, isn't

9  it?

10  A    That was at the end of the day of April 1st.

11  Q    Well, that's true, but I mean if you go up the column, it

12  -- to the top of the page, it says original budget, April 10th

13  -- or -- April 10th.  But in any event, you're right.  In other

14  words, that 1,827,904 reflects the deduction of $800,000,

15  correct?

16  A    That's correct.

17  Q    And as you stated earlier, since there was only another

18  $70,000 or so that Sklarco was entitled to receive, the balance

19  of that -- 1,827,904 minus about $70,000 is revenue owing to

20  non-debtors, isn't that correct?

21  A    That would be correct.

22  Q    All right.  And if you take your revenue account ending

23  cash balance to the end of this cash collateral budget, am I

24  correct that approximately $1,200,000 of funds belonging to

25  non-debtors has been spent?  Because there's only 691,786 left.

1 A    I don't know that I would characterize it that way, Mr.

2 Skelton.

3 Q    Well, if it started out by your admission as being

4 1,827,904 minus 70,000 or so, how is it that that doesn't mean

5 that at the end of the cash collateral period, money that

6 you've admitted belongs to working interest owners has been

7 used?

8 A    The budget shows some four million or so during that

9 period of being paid out to outsiders.  So I don't understand

10 the question; I'm sorry.

11 Q    Well, the -- the -- are you saying that this budget

12 reflects an agreement of the debtors to pay out any remaining

13 revenues belonging to working interest owners -- to the working

14 interest owners even if it was from February?

15 A    This budget shows the payment of revenues to working

16 interest owners for the March production and going forward.

17 Any amounts payables related to January and February to the

18 working interest holders that weren't paid are not reflected in

19 the (indiscernible - muffled) of this accounting.

20 Q    Why not?

21 A    At this time, it's my understanding that we don't have

22 agreement between all parties to make such payments.

23 Q    Okay.  Well, and that does raise another question, but I

24 want to focus in on this.  I had understood that -- from your

25 testimony and the COO's testimony that Sklar was going to fund

Strausser - Cross/Skelton                    145

1  the operations -- or assist in funding the operations of the --

2  of SEC, is that correct?

3  A    That's correct.

4  Q    Well, why would there be outflows to Sklar then?  Why

5  would you be distributing 683,054 to Sklar, and then another

6  514,681 to Sklar?

7  A    Those are the amounts that would be paid into the

8  operating company to support the operating company's expenses.

9  Q    But that's not what it says.  The budget says "Outflows to

10  Sklar."

11           MS. RILEY:  Objection.

12  Q    It does not --

13           MS. RILEY:  Your Honor, this -- this does

14  mischaracterize his testimony.  He testified that the budget

15  shows those transfers.

16           THE COURT:  Overruled.  You should answer, Mr.

17  Strausser.

18           THE WITNESS:  Yeah, sure.

19  A    That represents the amounts payable out of the revenue

20  account which accrue to Sklarco although those -- although

21  those amounts would be moved from the SEC revenue account to

22  the Sklar Exploration operating account, not the accounts of

23  Sklarco.

24  Q    Okay.  But -- I mean does -- do these companies make any

25  semblance of keeping their affairs separate -- their financial

Strausser - Cross/Skelton                    146

1  affairs?

2  A    From a cash standpoint, all of the money is pooled and

3  commingled.

4  Q    Well, this is problematic.  Outflow to Sklar -- and that's

5  not a mistake.  You don't mean outflow to the operating

6  account.  That says outflow to Sklar, that means Sklarco,

7  doesn't it?

8         MS. RILEY:  Objection, Your Honor; at this point,

9  it's cumulative.

10         THE COURT:  Overruled.

11  A    No, sir.  And maybe the -- maybe the description in the

12  budget could be enhanced, but the 683,000 noted there was

13  transferred from the Sklar revenue account to the Sklar

14  Exploration operating account, and that would be the proposed

15  procedure moving forward, as I understand the agreement in --

16  that has been reached with the Court.

17  Q    Now are you familiar with the term "substantive

18  consolidation"?

19  A    No, I'm not.

20  Q    All right.  Well, let's just put it this way, while y'all

21  might have a joint administration in this case, the assets and

22  liabilities of these two debtors have not been consolidated,

23  meaning into one entity, have they?

24  A    No, sir, they have not.

25  Q    All right.  And so what is the nature of this transaction

Strausser - Cross/Skelton                    147

1  where money is described in a budget as being an outflow to

2  Sklar, and yet the money is just moved from one SEC account to

3  another?  So are these two amounts -- the two outflows to

4  Sklar, are those loans?  Are they capital contributions?  What

5  are they?

6  A    They are -- they are accounted for as intercompany

7  transfers on our books and records.  I think what you might be

8  referring to is that we could alternatively take that monies

9  and deposit it from the revenue account into Sklarco's

10 accounts, and then move it from Sklarco's accounts to SEC's

11 operating account, but that's not the -- the method of

12 transmission of cash that we've chosen.

13        To more fully answer your question, the -- Sklar

14 Exploration, on its own, without Sklarco subsidizing part of

15 the general administrative expenses of the combined entities

16 could not survive.  And so this reflects the fact that Sklarco,

17 in effect, pays, not only its share of the operating costs, but

18 it -- it provides money to Sklar Exploration to pay its general

19 and administrative expenses that can't be recouped

20 (indiscernible - muffled).

21 Q    Okay.  Well, I guess I'm getting more confused.  Sklarco

22 has, just like all the other working interest owners, joint

23 interest billing obligations, right?

24 A    That's correct.

25 Q    It gets a bill just like anybody else.  So if its revenues

1  aren't going into its own accounts, how does it pay for

2  anything?

3  A    Through the commingled cash account.

4  Q    Okay, the commingled cash account.  So between the two

5  companies -- for -- for instance, if there is a billing by SEC

6  to Sklarco, is there a tally kept?  I mean do y'all keep track

7  of whether Sklarco has actually paid all of its joint interest

8  billings?

9  A    Through the use of intercompany accounting.

10 Q    Okay.  And is Sklarco a debtor to Sklar Exploration as of

11 the petition date?

12 A    Yes, it is.

13 Q    How much does Sklarco owe to Sklar Exploration?

14 A    I don't have that number.

15 Q    I would think you would have that number, that's a pretty

16 important number.

17      MS. RILEY:  Your Honor, I don't know that that's a

18 question.

19      MR. SKELTON:  It's a question.

20 Q    Don't you think that's a pertinent important number to

21 know?

22 A    When Sklar Exploration and Sklarco are managed on a

23 combined basis, that's not a -- a number that I pay particular

24 attention to.

25 Q    Okay.  Well, I want to ask you about a couple of other

MSTrust_006771

Strausser - Cross/Skelton                    149

1 exhibits that your own lawyer has marked.  And this has to --

2 I'm trying to understand the business -- the way that Sklarco

3 and SEC interact.  And among the debtors' exhibits are the

4 statement of financial affairs for each company.  And that --

5 and it should be Exhibits 1 and 2.  So if you could look --

6 A    Mr. Skelton, would you give me a moment to collect those?

7 Q    Sure.

8                         (Pause)

9           THE COURT:  Mr. Strausser, as you're repositioning

10 yourself, I want to make sure you are very close to the

11 microphone --

12           THE WITNESS:  Yes.

13           THE COURT:  -- because it's coming in weaker and

14 weaker.

15           THE WITNESS:  Certainly.

16           THE COURT:  Thank you.

17 BY MR. SKELTON:

18 Q    Okay.  The statement of financial affairs of both Sklarco

19 and Sklar Exploration contain --

20           THE COURT:  Well, let's get these document --

21 exhibits admitted and identified, etc.

22           MR. SKELTON:  Okay.  Your Honor, unusual as it is for

23 me to offer somebody else's exhibit, I would like to offer

24 Debtors' Exhibit 1, which is the Sklar Exploration statement of

25 financial affairs and schedules;

Strausser - Cross/Skelton                    150

1          And Debtors' Exhibit 2, which is Sklarco's statement

2  of financial affairs and -- Sklarco, LLC.  So 1 is Sklar

3  Exploration, 2 is Sklarco, LLC.

4          THE COURT:  Any objection to D-1 and D-2?

5          MS. RILEY:  No objection, Your Honor.

6          THE COURT:  Not hearing any, those are both received.

7      (Debtor's Exhibits D-1 and D-2 admitted into evidence)

8          THE COURT:  Thank you.

9          MR. SKELTON:  Okay.

10 BY MR. SKELTON:

11 Q    Did you assist in preparing the statement of financial

12 affairs?

13 A    I did.

14 Q    All right.  And do you recall that there is attached to

15 each one a list of payments to insiders before the filing?

16 A    Yes, sir, I'm aware.

17 Q    And did you prepare that schedule?

18 A    I assisted in its preparation.

19 Q    Okay.  Let's first look at Exhibit 1, and unfortunately I

20 don't know how to do this other than -- because these are not

21 Bates stamped, but just go past the printed form of the

22 statement of financial affairs and there's a list -- various

23 lists of payments.  And you'll ultimately get to the page where

24 you'll begin seeing payments to insiders.

25 A    Yes, sir.

Strausser - Cross/Skelton                    151

1   Q    And there is a page -- actually one easy one for you to

2   find that has your name on it, there are payments to John

3   Strausser for various kind of relocation expenses --

4   A    Yes, sir.

5   Q    -- do you see that?

6   A    Yes, sir.

7   Q    Are you on that page?

8   A    I'm on that page.

9   Q    All right.  Well, go down after they finish listing the

10  payments to you for relocating, I guess -- did you relocate

11  from -- to Boulder from -- where'd you -- where'd you come

12  from?

13  A    New Orleans.

14  Q    Okay, all right.  Then there begins a list of payments to

15  Sklarco.  And all of them list -- they say transfer to pay

16  Sklar JIBs, transfer to pay Sklar JIBs, do you see those?

17  A    I do.

18  Q    Okay.  And let's just take an example.  On May 1st, 2019,

19  there is an entry for $225,000 paid to Sklarco, and the entry

20  is "Transfer to pay Sklar JIBs."  Do you see that?

21  A    I do.

22  Q    Now on what basis did you state that this was a transfer

23  to pay JIBs?

24          MS. RILEY:  Your Honor, I'm going to object to this

25  line of questioning.  We're getting pretty far afield from the

1  cash collateral issues here.

2          THE COURT:  Counsel, your response?

3          MR. SKELTON:  Judge, when you -- when we look at the

4  Sklarco SOFA, you will understand where I'm going.  I just

5  don't want to telegraph my punch, I'm sorry, but it does relate

6  because I think what this is showing is that the debtor cannot

7  be trusted to accurately depict what it says it is doing or has

8  done.

9          THE COURT:  So that goes to the adequate protection

10  issue.

11          MR. SKELTON:  Yes.

12          THE COURT:  Okay.

13          MR. SKELTON:  That's what I'm -- that's what I'm --

14  and I do believe that I should be given a little latitude to

15  explore this very unusual relationship between SEC and Sklarco.

16          THE COURT:  Okay.  So --

17          MR. SKELTON:  I want to -- go ahead.

18          THE COURT:  I just want to make sure that I'm on the

19  same page.  Exhibit 1 is SEC's SOFA.

20          MR. SKELTON:  Correct.

21          THE COURT:  And its SOFA is showing its transfers to

22  insiders.

23          MR. SKELTON:  Correct.

24          THE COURT:  So on this page of the attachment that

25  you've directed our attention to, this is SEC paying Sklarco.

Strausser - Cross/Skelton                    153

1          MR. SKELTON:  Correct.

2          THE COURT:  For Sklarco's share of joint billing

3   statements.

4          MR. SKELTON:  That's what it says.

5          THE COURT:  Okay.

6          MR. SKELTON:  So what I'd also like Mr. --

7          THE COURT:  So for the record, I'm overruling the

8   objection, and you may proceed.

9          MR. SKELTON:  Okay.

10  BY MR. SKELTON:

11  Q    If you would also look at Exhibit 2, sir -- and, Your

12  Honor -- and just go to the same schedule, and you'll then see

13  the transfers from Sklarco to various trusts.  And there is a

14  page which covers -- there are several different family members

15  that have these trusts, but there is a trust that is referred

16  to as the Howard Trust, and it shows quite a number of very

17  large distributions.  And if you can look at both of those at

18  the same time, I can --

19         THE COURT:  I'm having a hard time finding in Exhibit

20  2 where this is.

21         Ms. Riley, promise me you will never again submit

22  voluminous exhibits without page numbers.

23         MS. RILEY:  Yes, Your Honor.  And I do apologize for

24  that, Your Honor.

25         THE COURT:  So help me get to the page that he is

MSTrust_006776

Strausser - Cross/Skelton                    154

1  talking about.

2          MS. RILEY:  It's approximately Page 15.  I believe

3  the page starts, "Sklarco payments to insiders," it's a printed

4  PDF of a spreadsheet.

5          THE COURT:  Okay, I've got it now.

6  BY MR. SKELTON:

7  Q    So we were just talking about a transfer from SEC to

8  Sklarco on May 1st, 2019 of $225,000.  And on May 1st, 2019,

9  there is a distribution from Sklarco in the exact amount of

10 $225,000 to the Howard Trust.

11          Can you explain to me, sir, why the exact amount that

12 you characterized in the SEC SOFA -- the statement of financial

13 affairs to pay JIBs was, in fact, used to pay that exact amount

14 to Mr. Sklar's trust?

15 A    It must have been a mistake in classification, inadvertent

16 classification of that amount.

17 Q    Well, it's not the only one, sir.  If you'll look at July

18 11th, a $50,000 transfer to pay JIBs.

19          And then if you go over -- and it's not the exact

20 same date, but on July 9th, 2019, there's a $50,000 payment to

21 the Howard Sklar Trust.

22          Then there are other transfers that appear to

23 coincide very closely with the ones that are received from SEC,

24 but instead of going to pay JIBs, you've got this, you know,

25 really tremendous amount of money going to the Howard Sklar

Strausser - Cross/Skelton                    155

1  Trust, can you -- can you explain that?

2          MS. RILEY:  Again, Your Honor, I'm going to object to

3  relevance at this point; I think we've established the point.

4  If we could maybe get back to some of the cash collateral

5  issues here.

6          THE COURT:  Overruled.

7  BY MR. SKELTON:

8  Q    Can you explain that, sir?

9  A    Can you repeat the question, please, Mr. Skelton?

10 Q    Can you explain why you listed every single transfer to

11 Sklarco as being to pay JIBs, and reconciled that with the fact

12 that on the same or very close dates in the Sklarco statement

13 of financial affairs there are payments out to the Howard Sklar

14 Trust in a very similar amount?

15 A    No, only that there could be mistakes that I made in the

16 characterization of those transfers.

17         THE COURT:  Which is the mistake, what's said in

18 Exhibit 1 or Exhibit 2?

19         THE WITNESS:  In the -- in the Sklar Exploration

20 statement of financial affairs, the transfers from Sklar

21 Exploration to Sklarco.

22         THE COURT:  So it wasn't to pay JIBs, it was, in

23 fact, to pay the Howard Trust.

24         THE WITNESS:  It -- it -- it certainly appears there

25 are -- there are certain of those transfers that were

Strausser - Cross/Skelton                    156

1   incorrectly identified.

2   BY MR. SKELTON:

3   Q    Now let's talk about the management -- or the relationship

4   of the Howard Sklar Trust to these two entities.  Am I correct

5   in understanding that the Howard Sklar Trust owns a hundred

6   percent of the equity of both companies?

7   A    That's right.  That's correct.

8   Q    Okay.  And did you have a hand in preparing -- it's not

9   marked as an exhibit, but there was a combined and consolidated

10  balance sheet that was attached to the original cash collateral

11  motion as Exhibit A, did you prepare that?

12  A    Yes, I would have assisted in that preparation.

13  Q    Okay.  And one thing I have never seen in any balance

14  sheet until this case is instead of showing stockholder's

15  equity or something like that, you have what are some entries

16  that do not sound like ordinary commercial or accounting

17  entries, which include trust principal and total liabilities in

18  trust principal.  Can you explain what the "trust principal"

19  is?

20  A    It equates to stockholder's equity.

21  Q    Okay.  But why is it referred to as trust principal?

22  A    These are the combined and consolidated financial

23  statements of Sklar Exploration, Sklarco, Sklar Transport, the

24  Howard Trust, and the trusts of his two sons, and so the equity

25  -- it's for the benefit of the trusts.

Strausser - Cross/Skelton                    157

1  Q    Okay.  Now have you got -- do you have any background in
2  forensic accounting?
3  A    I do not.
4  Q    Okay.  Have you done any -- made any effort to basically
5  determine what has been done with the money that was
6  transferred out to the various trusts?
7  A    I'm not sure I understand the question.
8  Q    Well, you came in -- what was the month in which you came
9  into Sklarco or Sklar Exploration?
10 A    November.
11 Q    Okay.
12 A    2019.
13 Q    And did these transfers that continued on into January, at
14 least, catch your attention?
15 A    I was aware of the transfers to the Howard Trust.
16 Q    Okay.  And when you came in in November, would you say
17 that as of that time, the company was already having trouble --
18 or keeping up with the payment of its indebtedness?
19 A    Cash management was -- was a focus.
20 Q    Wasn't focused?
21 A    Was a focus.
22 Q    Was a focus, okay.
23 A    Right.  Right, so outstanding payables.
24 Q    Right.
25 A    (Indiscernible - multiple speakers).

1  Q    Because, you know, our clients received and paid cash call

2  advances in November and December at the same time that -- that

3  they weren't spent for the proper purpose, at the same time all

4  this money is being transferred out, did you know that?

5  A    Yes, sir.

6  Q    Okay.  And do you have any explanation as CFO how it could

7  be that the company would spend $7 million that had been paid

8  in for specific projects on other purposes?

9  A    Those amounts were paid on outstanding bills of the

10 company.

11 Q    But not the ones for which they were intended.

12 A    That's correct.

13 Q    Okay.  Going back to Exhibit 4, your budget, it does

14 appear that in order to -- for this budget to work, you've got

15 to use most of the money that was the cash on hand as of the

16 date the petition was filed, isn't that correct?

17 A    That's correct.

18 Q    Okay.  And how do you -- because you now propose to pay

19 all the revenue out, I guess, except Sklarco's, I'm still not

20 understanding how the numbers could work.

21 A    The -- as I mentioned before, the --

22        THE COURT:  You're coming in very softly, Mr.

23 Strausser.

24        THE WITNESS:  I'm sorry.  Is this better?

25        THE COURT:  Yes.

Strausser - Cross/Skelton                159

1         THE WITNESS:  Okay.

2  A    As I mentioned earlier, Mr. Skelton, the bottom portion of

3  the budget is intended to show under a hypothetical zero dollar

4  starting balance how the net cash flows attributable to

5  interest only related to Sklar entities that accumulate over

6  the forecast period.

7  Q    Okay, all right.  Just a couple more questions.  Your COO

8  testified earlier today that the filing was necessitated by

9  COVID-19, and just the Russians and the Saudis fighting each

10 other.  But isn't it true that what really happened was that

11 East-West Bank was insisting that you guys close out your

12 hedges?

13 A    No, that's not true.  We had approached East-West Bank

14 about the potential to close out our hedges, and we were

15 attempting to reach a forbearance type agreement, because as

16 mentioned, we were in default at that point in time, and we

17 ultimately decided to leave the hedges in place.

18 Q    All right.  But am I correct, though, that actions being

19 taken by East-West Bank were the primary precipitating cause of

20 the filing of this bankruptcy?

21 A    No, sir, I don't believe so.

22 Q    Okay.  Well, CFOs ordinarily would have to do with not

23 just accounting but also finance, and why is it that the debtor

24 has not reached out to see if any kind of a DIP financing was

25 available?

Strausser - Cross/Skelton                    160

1          MS. RILEY:  Objection to relevance, Your Honor.

2          THE COURT:  Overruled.

3   A    We have spoken to a number of finance type entities over

4   the past month or so about refinancing options that might be

5   available to us, primarily in conjunction with the formation of

6   a plan (indiscernible - muffled), but those are just -- those

7   are just discussions at this point.

8   Q    And what about the equity owners, has -- has the Howard

9   Sklar Trust -- have you explored any possible infusion of

10  capital from the trust that has been so richly paid over the

11  last year?

12  A    There is not much liquidity or available liquidity sitting

13  inside the Howard Trust for such an infusion.

14  Q    Well, why -- what happened to the liquidity?

15         MS. RILEY:  Objection to speculation, unless he

16  knows.

17         THE COURT:  You may answer to the best of your

18  knowledge.

19  A    Sure, those -- those amounts were distributed from the

20  Howard Trust -- or -- or much of that amount has been

21  distributed to the Howard Trust to pay Mr. Sklar's ongoing

22  needs.

23  Q    And those include -- isn't it about 40 grand a month to

24  pay his ex-wife?

25  A    It's 30, but, yes, sir.

1  Q    Okay.

2          MR. SKELTON:  I'll pass the witness.

3          THE COURT:  Okay.  How about Mr. Geno for --

4          MR. SHIPPS:  Your Honor --

5          MR. SKELTON:  Oh, I forgot I was supposed to hand off

6  Mr. Shipps.

7                    (Laughter)

8          THE COURT:  Ah, no.

9          MR. SKELTON:  I forgot.

10          MR. SHIPPS:  I hope wasn't too slow.

11          THE COURT:  You're supposed to get a text from him.

12                    (Laughter)

13          THE COURT:  All right, Mr. --

14          MR. SHIPPS:  Shipps.

15          THE COURT:  I'm sorry, Shipps.

16          MR. SHIPPS:  Your Honor, I apologize, and I will try

17  to be brief with my questioning, and it does cover a different

18  aspect of what Mr. Skelton has talked about and asked questions

19  about in Debtors' Exhibit 4.

20                    CROSS-EXAMINATION

21  BY MR. SHIPPS:

22  Q    So, Mr. Strausser, if I could direct your attention to

23  Page 1 of Debtors' Exhibit 4.  There is an entry about a third

24  of the way down talking about Alabama Gas Plant management fees

25  as being a source of revenue commencing on May 9th.  Do you